**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————

CLIMATE UNITED FUND,
*Plaintiffs-Appellees*,

v.

CITIBANK, N.A., et al.,
*Defendants-Appellants*.

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

**EMERGENCY MOTION FOR IMMEDIATE ADMINISTRATIVE STAY
AND FOR STAY PENDING APPEAL (RELIEF NEEDED BY APRIL17,
2PM)**

———————————

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

SHARON SWINGLE
SOPHIA SHAMS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7264*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, D.C. 20530*
  *(202) 514-2495*
  *sophia.shams@usdoj.gov*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

**A.      Parties and Amici**

Plaintiffs-appellees are Climate United Fund; Coalition for Green Capital; Power Forward Communities, Inc.; California Infrastructure and Economic Development Bank; Minnesota Climate Innovation Finance Authority; Efficiency Maine Trust; Illinois Finance Authority; Justice Climate Fund; and Inclusiv, Inc. Defendants-appellants are the Environmental Protection Agency; Lee Zeldin, in his official capacity as Administrator of the EPA; and Citibank, N.A.

**B.      Rulings Under Review**

The ruling under review (issued by Judge Tanya S. Chutkan) is an order filed April 15, 2025, granting plaintiffs' motion for a preliminary injunction.

 */s/ Sophia Shams*
SOPHIA SHAMS

# GLOSSARY

| | |
|---|---|
| Administrative Procedure Act | APA |
| Clean Communities Investment Accelerator | CCIA |
| Environmental Protection Agency | EPA |
| Greenhouse Gas Reduction Fund | GGRF |
| National Clean Investment Fund | NCIF |

# INTRODUCTION

Less than two weeks ago, the Supreme Court stayed a district court order that invoked the Administrative Procedure Act (APA) to enjoin an agency's termination of discretionary grants. *See Dep't of Educ. v. California*, 145 S. Ct. 966 (2025) (per curiam). The Court explained that the APA does not permit "orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered here." *Id.* at 968 (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). If a grantee contends that the government has breached contractual terms, it must pursue that claim in the Court of Federal Claims under the Tucker Act, where the remedy of specific performance is not available. *See id.*; *see also U.S. Conf. of Catholic Bishops v. U.S. Dep't of State,* No. 1:25-cv-00465, 2025 WL 763738, at *5 (D.D.C. Mar. 11, 2025) (McFadden, J.) (denying injunctive relief on this basis in similar suit against State Department), *injunction pending appeal denied*, No. 25-5066 (D.C. Cir. Mar. 28, 2025).

The district court here, however, refused to heed the Supreme Court's guidance, and instead ordered the Environmental Protection Agency (EPA) to reinstate *billions of dollars* in grant contracts that the agency terminated after concluding that they were deeply flawed and no longer served the public interest. The court's order, issued just before midnight last night (when a temporary restraining order was set to expire), lacks any accompanying opinion explaining the

court's reasoning. Yet it provides the government less than **48 hours** to secure a stay before having to release *hundreds of millions of dollars* that the plaintiffs have demanded be paid out immediately—and that EPA would have no feasible way to recover if the court's order is reversed on appeal. Given the short timeline, the government asks this Court to enter an administrative stay by **April 17, 2024, at 2 PM**, to allow this Court time to resolve the government's motion for a stay pending appeal. The government has informed plaintiffs of this motion, and they have indicated that they oppose this motion.

The Court should grant the government's motion. Indeed, the case for a stay here is even stronger than in *Department of Education*, along each of the stay factors. As to the merits, the plaintiffs' claim here is a quintessential breach-of-contract claim. No statute or regulation entitles plaintiffs to these grants. Rather, the foundation of their case is that the prior administration tied EPA's own hands by writing restrictive termination provisions into the grant agreements, and that EPA cannot terminate the contracts now because the requisite conditions have allegedly not been satisfied. As a remedy, plaintiffs sought (and obtained) an order that EPA must resume providing those billions of dollars. This is a contract claim through-and-through. Accordingly, it can only be brought in the Court of Federal Claims, 28 U.S.C. § 1491(a)(1), and the district court plainly erred in concluding otherwise.

The balance of equities overwhelmingly favors the government here too—again, even more so than in *Department of Education*.  Plaintiffs have made clear in demand letters and pending transaction requests that, absent a stay, they will transfer hundreds of millions of dollars in grant funds to external accounts *immediately*.  Once those funds are released, there is no reasonable likelihood the government will be able to recover them, even if it prevails on appeal.  Conversely, the only potential harm plaintiffs will experience from a temporary stay is financial harm that will be remedied if they prevail on appeal (or in an action for breach of contract in the Court of Federal Claims)—and that harm is itself minimal given that these grant programs have barely begun to get off the ground.  There is thus no question that a stay is the proper equitable course here.  On top of all that, EPA's interest in re-obligating the funds in a restructured, transparent, and accountable grant program, and the public's interest in safeguarding the public fisc, strongly favor an immediate stay.

For these reasons, this Court should issue an immediate administrative stay of the district court's injunction and, after an opportunity for briefing on the motion, also stay the preliminary injunction pending appeal.

## STATEMENT

1.a.  In August 2022, Congress enacted Section 134 of the Clean Air Act as part of a reconciliation bill that appropriated $27 billion to the EPA Administrator for the Greenhouse Gas Reduction Fund (GGRF).  Congress provided that those

funds would "remain available until September 30, 2024," and authorized EPA to make grants, on a competitive basis, to recipients that satisfied statutory eligibility criteria.  42 U.S.C. § 7434(a).

EPA then created three grant programs—the National Clean Investment Fund (NCIF), the Clean Communities Investment Accelerator (CCIA), and Solar For All—and, in July 2023, began accepting applications.  On April 1, 2024, EPA announced its selection of entities for NCIF: plaintiffs Climate United Fund, Coalition for Green Capital, and Power Forward Communities, which were awarded $6.97 billion, $5 billion, and $2 billion, respectively.  Climate United and Power Forward were formed specifically to apply for and receive funding from the NCIF program.  Doc. 33-2, at 3-4; Doc. 33-31, at 3.  These awards further allowed grantees to provide funds to subgrantees, with whom EPA is not in privity.  Doc. 49-2 at 89.  The EPA also selected plaintiffs Justice Climate Fund and Inclusiv, Inc., among others, to receive CCIA funding to the tune of billions of dollars.  Press Release, Environmental Protection Agency, *Biden-Harris Administration Announces $20 Billion in Grants* (April 4 2024), https://perma.cc/6N7R-J2QB.

In August 2024, plaintiffs and EPA entered into materially identical contracts memorializing the grant awards.  The initial grant agreements were subject to EPA's then-current General Terms and Conditions.  Doc. 49-2, at 8.  Those General Terms and Conditions provided EPA with the right to terminate the grants "[i]f the award

no longer effectuates the program goals or agency priorities." EPA, *General Terms and Conditions* 2-3 (effective Oct. 1, 2023), https://perma.cc/DE84-46AD. The agreements also contained a "Termination" provision that purported to establish the "only" bases for termination—but that language was preceded by a statement that this "clarification" to the General Terms and Conditions was meant to "expand on, rather than replace or modify, the EPA General Terms and Conditions." Doc. 49-2, at 41-42.

The grant agreements adopted an unusual mechanism for distributing grant funds. Rather than employ its ordinary practice of distributing grant funds through accounts at the Department of the Treasury, Treasury (at EPA's request) designated a private financial institution, Citibank, to serve as a financial agent to hold all $14 billion awarded to plaintiffs and to administer distribution of those funds to them. Doc. 49-3, at 13. To this end, on September 19, 2024, Treasury entered into a Financial Agency Agreement with Citibank. *Id.* According to EPA's Acting Chief Financial Officer, "EPA had never used a financial agent in connection with a grant program prior to 2024," and "EPA's use of a financial agent in connection with the GGRF program was the first use of a financial agent for a nonexchange grant program administered by the federal government." Doc. 49-5, at 3.

EPA and Citibank then entered into Account Control Agreements with each plaintiff regarding the administration of program distributions. As originally agreed,

the Account Control Agreements and related provisions in the grant agreements placed program funds in Citibank accounts in the name of each plaintiff and allowed plaintiffs to withdraw funds without prior EPA approval so long as the withdrawal "do[es] not exceed 10% of the total budget approved at [the] time of award" for a given category. Doc. 49-2, at 52, 113. Under the Account Control Agreements, EPA is a secured party in the funds and may assert exclusive control over the grant funds by filing a "Notice of Exclusive Control." *Id.* at 132.

The grant agreements and uncommon funding arrangement raised concerns from the start. The House Committee on Energy and Commerce expressed serious misgivings about EPA's "unusually accelerated timeline for disbursement" of the grant funds and "new and complex funding structure," Doc. 49-7, at 2, and subsequently investigated "recipient eligibility" issues, "the fairness and uniformity of the selection process," and the fact that "individuals with strong ties to Democratic politics hold significant leadership roles within some of the organizations the EPA selected to receive funding," *Id.* at 10. EPA's Inspector General later testified that it lacked sufficient resources to protect against fraud risks in the GGRF program and ensure efficient use of funds given EPA's "pace of spending." Doc. 49-3, at 6.

After the 2024 election, the prior administration revised the award agreements in a manner that further limited EPA's ability to oversee and control NCIF and CCIA grant funds. On December 20, 2024, EPA and plaintiffs amended the grant

agreements to restrict EPA's ability to terminate them. Doc. 49-3, at 12, 15. Specifically, they purported to require "credible evidence" of "a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18" or "a violation of the civil False Claims Act." Doc. 49-2, at 75. The December 2024 amendments also incorporated new, then-current EPA General Terms and Conditions, which omitted any reference to termination based on the agency's policy priorities. EPA, *General Terms and Conditions* 2-3 (effective Oct. 1, 2024).

Then, on January 13, 2025, just days before the current administration took office, EPA amended its Account Control Agreements with Citibank and the NCIF plaintiffs so that Citibank and EPA were required to "continue to disburse funds and financial assets associated with financial obligations 'properly incurred'" by plaintiffs, even after EPA files a Notice of Exclusive Control or otherwise takes control of the grant funds through termination. Doc. 49-2, at 148.

b. Under new leadership, EPA "reassessed and adopted agency policies and priorities that materially differ from the prior administration"—particularly with respect to oversight and transparency over grant funds. Doc. 49-3, at 14. These new policy aims led EPA to review and reevaluate the GGRF program's creation and implementation, which in turn has raised serious concerns. In particular, EPA has concluded that the prior administration's designation of a financial agent; plaintiffs'

roles as "pass-through for subrecipients," which themselves may act as pass-throughs; and last-minute modifications to the agreements have untenably reduced EPA's oversight and control over grant funding. Doc. 49-3, at 15-16. EPA further determined that potential "[c]onflicts of interest involving high-level" officials, as well as the failure of many awardees to properly meet statutory and regulatory eligibility requirements, "raise questions about EPA's selection process." *Id.* at 16. And EPA determined that its oversight and control over the use of grant funds had been so eroded as to risk violating the Constitution. *Id.* at 17.

EPA's Office of Inspector General is now investigating the "financial mismanagement, conflicts of interest, and oversight failures within the GGRF program." Doc. 49-3, at 15; *see also* Doc. 49-2, at 159. The Federal Bureau of Investigation and Department of Justice have also initiated investigations into the program for "potential fraud, waste, abuse, and impermissible conflicts of interest in connection with NCIF and CCIA grants." Doc. 49-3, at 16.

For all of these reasons, EPA on March 4, 2025, instructed Citibank "not to disburse funds from any of the GGRF accounts" for five days, Doc. 49-2 at 189, and Treasury subsequently instructed Citibank to comply with EPA's instruction "to impose certain account controls" related to the GGRF, Doc. 49-2 at 187.

Ultimately, on March 11, 2025, EPA issued official notices to the NCIF and CCIA grantees terminating the grant agreements. In the notices, EPA explained that

the terminations were "based on substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities, which collectively undermine the fundamental goals and statutory objectives of the award." Doc. 49-2, at 191. EPA also explained that the contractual scheme lacked sufficient controls to guard against constitutional concerns. *Id.* at 192. Finally, EPA explained that it would work to re-obligate the funds expeditiously under a reformed program. *Id.*

2. Plaintiffs Climate United, Coalition for Green Capital, and Power Forward brought suit challenging EPA's decision to terminate their grant agreements and seeking declaratory and injunctive relief under the APA that would require EPA (through Citibank) to resume disbursing grant funds to plaintiffs. The district court issued a temporary restraining order effectively freezing the grant funds pending its review of plaintiffs' motion for a preliminary injunction. Docs. 28, 29. Since then, some subgrantees that receive funds on a pass-through basis from the NCIF grantees filed suit raising similar claims, as have certain CCIA grantees. All five cases have been consolidated.

On April 15, 2025—the day on which the TRO was set to expire—EPA filed a contingent motion requesting a stay pending appeal in the event the district court granted a preliminary injunction. Shortly before midnight, the court issued an order granting plaintiff's motion for a preliminary injunction, stating that an opinion would

follow, and denying a stay pending appeal. Doc. 80. The order enjoins EPA from effectuating its termination of plaintiffs' grant agreements; and further enjoins EPA and Treasury, a non-party, from causing Citibank to "deny, obstruct, delay, or otherwise limit access to funds in accounts established in connection with Plaintiffs' grants, including funds in accounts established by Plaintiffs' subgrantees." *Id.* at 1-2.

Although the district court denied a stay, it ordered Citibank to refrain from releasing any funding disbursements until April 17, 2025, at 2 PM. *Id.* at 2. The district court offered that EPA could renew its stay motion following review of the forthcoming memorandum opinion, but that opinion has not yet been issued, and the April 17 deadline and impending irreparable harm makes it impossible for EPA to wait further before seeking relief from this Court. And, despite EPA's request, the court refused to order any security under Federal Rule of Civil Procedure 65(c).[1]

## ARGUMENT

This Court should grant a stay pending appeal to prevent the irreparable loss of potentially billions of dollars in grant funding, which the district court wrongly

---

[1] It is unclear whether the district court's order applies only to plaintiffs who are NCIF grantees and subgrantees, or whether it applies more broadly to plaintiffs with grant agreements under the CCIA program. To the extent the order applies to plaintiffs under the latter program, the same arguments presented in this motion apply, and the case for a stay is even more compelling given the larger amount of funds at issue.

ordered be released to plaintiffs but which the government will be unable to recover later absent relief from this Court. The government is likely to succeed on the merits because the district court lacked jurisdiction to transform this contract dispute into an APA case; the government faces irreparable injury absent a stay; and the balance of equities and public interest support a stay. *See Nken v. Holder*, 556 U.S. 418, 426 (2009). Finally, because plaintiffs have been clear that they intend to transfer over $600 million in grant funds to external accounts in the coming hours and days—and because the district court failed to impose any bond whatsoever to protect against that risk—an immediate administrative stay is also needed.

## I. The Equities Weigh Strongly in Favor of a Stay

At the outset, this is a classic case for a stay because the harms of allowing the district court's order to take effect are severe and irreparable, while the harms of a stay are limited and capable of full vindication later in the litigation.

To start, allowing the injunction to remain in effect threatens irreparable injuries to the government and the public, whose interests "merge" in this context. *Nken*, 556 U.S. at 435. The district court directed EPA to immediately make available billions of dollars under grant contracts that run counter to the government's priorities and policies and the public interest.

Above and beyond the obvious harms to the agency's ability to execute Executive Branch policy, the order barring EPA from withholding grant funds

irreparably and substantially harms the public fisc. Under the court's order, plaintiffs in less than 48 hours can draw down enormous sums of money. In the past few weeks, plaintiffs have submitted increasingly large disbursement requests to Citibank that now appear to exceed $600 million. Doc. 75-2, at 2. Just one such request asks Citibank to transfer more than $250 million to an external bank account controlled by Climate United. Doc. 75-3, at 35. Plaintiffs have also told Citibank to prepare to "immediately" process such pending requests to external accounts upon the entry of a preliminary injunction. Doc. 75-2, at 2.

If these massive sums are paid out to plaintiffs, EPA has limited ability to recover the funds—a point plaintiffs have not disputed. *See Dep't of Educ.*, 145 S. Ct. at 968-69 (finding irreparable harm where "respondents have not refuted the Government's representation that it is unlikely to recover the grant funds once they are disbursed"). And although EPA repeatedly requested an adequate bond under Federal Rule of Civil Procedure 65(c), Doc. 49 at 40, the district court instead waived the bond requirement—which is itself an abuse of discretion under these circumstances. Doc. 80. Only an immediate administrative stay, followed by a stay pending appeal, can halt this rush to place the funds outside of EPA's control forever.

In addition, the district court's order continues to bar EPA from effectuating its terminations and re-obligating the grant funding. That irreparably harms EPA

and the public by depriving the public fisc of significant interest earned on billions in outstanding funding and preventing EPA from effectuating agency priorities.

These serious and irreparable injuries far outweigh plaintiffs' asserted harms. Plaintiffs' claimed harms are almost exclusively monetary, and "it is 'well settled that economic loss does not, in and of itself, constitute irreparable harm.'" *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015). "Financial injury is only irreparable where no 'adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation.'" *Id.* If the district court's injunction is upheld on appeal, plaintiffs will receive the funds they claim entitlement to. Notably, despite initially claiming a risk of "grave economic harm" absent immediate distribution of funds during the week of March 11, 2025, Doc. 2, at 3, plaintiffs later supported multiple extensions of the TRO and have not identified any harm that actually manifested. The limited nature of the harm here is also underscored by the early stage of these grant programs.

In short, given the significant harm that the government and public fisc will experience in the absence of a stay and the modest and readily remedied fiscal harms plaintiffs may experience while a stay is in place, the balance of equities and public interest strongly favor a stay.

## II. The Government Is Likely to Prevail on the Merits.

The district court plainly lacked jurisdiction to address plaintiffs' claims. Congress vested the Court of Federal Claims with jurisdiction to address assertions that the government has not honored the terms of its contracts and owes money to private parties as a result of alleged breach. Plaintiffs' claims here allege that EPA improperly terminated their contracts under the terms of those contracts, and seek to compel EPA to resume contractual payments. Those are classic contractual claims covered by the Tucker Act, so the district court had no authority to entertain them or to award specific performance under the guise of the APA.

**A.** It is well established that "absent a clear and unequivocal waiver of sovereign immunity," the "United States and its agencies are generally immune from suit in federal court." *Crowley Gov't Servs., Inc. v. General Servs. Admin.*, 38 F.4th 1099, 1105 (D.C. Cir. 2022). Although the APA provides a limited waiver of the government's sovereign immunity for suits challenging final agency action and "seeking relief other than money damages," it does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S. § 702. That carve-out "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012).

One example of such an implicit limitation on APA relief involves suits against the United States that sound in contract. The Tucker Act provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a). This Court has long recognized that "the Tucker Act 'impliedly forbids'" the bringing of "contract actions" against "the government in a federal district court" under the APA. *Albrecht v. Committee on Emp. Benefits of the Fed. Reserve Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004). That jurisdictional barrier is mandatory, and for good reason. It ensures that contract claims against the government are channeled into the court with "unique expertise," *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985), and (importantly here) which Congress has generally not empowered to grant injunctive relief like specific performance, *see James v. Caldera*, 159 F.3d 573, 580 (Fed. Cir. 1998).

As this Court has instructed, courts consider two factors when assessing whether an action is in essence a contract claim governed by the Tucker Act. *First*, courts examine "the source of the rights upon which the plaintiff bases its claims." *Crowley*, 38 F.4th at 1106. In answering this question, courts consider whether "plaintiff's asserted rights and the government's purported authority arise from statute, whether the plaintiff's rights 'exist prior to and apart from rights created

under the contract,' and whether the plaintiff 'seeks to enforce any duty imposed upon' the government 'by the relevant contracts to which' the government 'is a party.'" *Id.* at 1107. *Second*, courts examine the "type of relief sought." *Id.* This inquiry asks "whether the plaintiff effectively seeks to attain monetary damages." *Id.* at 1107-08. When a plaintiff's claim is premised on a contract with the government, depends on the government's having breached that contract, and seeks to compel the government to pay sums due under the contract, it is a Tucker Act claim, not an APA claim. *See Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967-71 (D.C. Cir. 1982).

**B.** This is a contract case through and through. The grant agreements are plainly "the source of the rights upon which" plaintiffs base their claims. *Megapulse*, 672 F.2d at 968. The asserted right to billions of dollars in taxpayer funds arises solely from the grant agreements and "in no sense ... exist[s] independently of" those contracts. *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D. C. Cir. 1985). Plaintiffs would have no claim absent the government's alleged breach of those agreements. Indeed, the linchpin of their case is the restrictive termination provision, written into the grant agreements by the last administration, that purports to limit the circumstances in which EPA may terminate the grants. But even assuming that plaintiffs are right to treat that provision as both enforceable and not

satisfied here, the takeaway would merely be that EPA violated that contractual provision. That underscores that this is a breach-of-contract suit at its heart.

The relief that plaintiffs seek (and that the district court awarded) is likewise contractual in nature. Plaintiffs sought and the district court entered an order barring EPA from effectuating its termination of plaintiffs' contracts and requiring EPA to continue payments pursuant to those contracts. In other words, EPA was ordered to specifically perform contractual obligations, a classic contract remedy, and one that is generally unavailable against the government. *See Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 79-80 (D.C. Cir. 1985) (noting that an order "reinstating the original award of [a] contract …. amount[ed] to a request for specific performance"); *U.S. Conf. of Catholic Bishops*, 2025 WL 763738, at *5 (concluding that plaintiffs' request for an order requiring the government "to pay money due on a contract" amounts to specific performance."). The payment of money, far from being merely incidental to or "hint[ed] at" by plaintiffs' request for relief, is the entire object of their suit. *Crowley*, 38 F.4th at 1112. The appropriate vehicle for a claim seeking damages for terminations allegedly undertaken in breach of contract is a "Tucker Act [suit] in the Claims Court," not an APA action. *Bowen v. Massachusetts*, 487 U.S. 879, 890 n.13 (1988).

Indeed, applying the above principles, the Supreme Court recently granted a stay of a district court order that similarly required the government to resume making

payments on grants it had terminated. *Dep't of Educ.*, 145 S. Ct. 966. In so doing, the Court held that the government was "likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." *Id.* at 968. The Court emphasized that "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money,'" which the district court's order had, in effect, done. *Id.* Because the district court in this case committed the same error as the district court in *Department of Education*, the government is likely to prevail.

This Court's decision in *Spectrum Leasing Corp.,* 764 F.2d 891, likewise demonstrates the error in the district court's order. The plaintiff, Spectrum, entered into a contract with the General Services Administration, under which it agreed to provide hardware and software in exchange for lease payments. *Id.* at 892. Spectrum ran into difficulties providing the required software and, in response, the agency stopped making lease payments on the hardware. *Id.* Spectrum filed suit in district court, alleging that the agency violated the procedures required by the Debt Collection Act of 1982 when it withheld the lease payments. *Id.* Relying on the APA's waiver of sovereign immunity, Spectrum sought an injunction compelling the agency to resume making lease payments. *Id.*

This Court affirmed the dismissal of Spectrum's suit for lack of jurisdiction. 764 F.2d at 895. This Court rejected Spectrum's assertion that the source of its right

to relief was the Debt Collection Act, not the contract. *Id.* at 894. The Court noted that Spectrum sought an injunction "compelling the government to pay money owed in exchange for goods procured under an executory contract." *Id.* The "right to these payments is created in the first instance by the contract, not the Debt Collection Act." *Id.* Thus, although the Debt Collection Act "might impose procedural requirements on the government having some impact on the [parties'] contract," the Act "in no way create[d] the substantive right to the remedy" Spectrum sought. *Id.* And the relief Spectrum sought—the payment of money owed for goods provided— was the "classic contractual remedy of specific performance." *Id.*

The same is true here. Plaintiffs sought, and the district court entered, an order compelling the government to resume making grant payments to plaintiffs pursuant to the terms of their grant agreements. The source of that right to payment is the grant contracts, not any statutory or regulatory provisions. Like the Debt Collection Act, the statute and regulations may impose procedural requirements that have some impact on the parties' contractual relationship, but they do not create the substantive right that plaintiffs seek to vindicate—the right to payments under the grant contracts. And the district court's order requires the government to specifically perform the grant agreements, a classic contract remedy.

Plaintiffs contended below that this case is distinguishable from *Department of Education* and *Spectrum* because EPA used a financial agent (Citibank) to

19

administer distribution of the grant funds rather than relying on Treasury. But that is a distinction entirely without a difference. Plaintiffs' right to disbursement of funds held by Citibank—like the *Department of Education* plaintiffs' right to receive funds from Treasury—is defined by the grant agreements. In those agreements, each plaintiff agreed that their Citibank account could be used only "as Recipient's operating account for the award." Doc. 49-2, at 118. They also agreed to use funds only "under the conditions of the [Grant] Agreement." *Id.* at 117. Plaintiffs agreed that they could only use funds for specified allowable activities in specified regions. *Id.* at 58. To be allowable, the expense must be necessary "for the performance of the Federal award" and, significantly, "[c]onform to any limitations or exclusions set forth ... in the Federal award." 2 C.F.R. § 200.403(a)-(b). And financial obligations incurred after termination "are not allowable" unless expressly authorized by EPA. *Id.* § 200.343.

Simply put, plaintiffs have no cognizable interest in the Citibank accounts apart from whatever rights to payment they have under their grant agreements. And an order compelling EPA to resume distributing grants funds through Citibank under those agreements is an order to vindicate plaintiffs' contractual rights at the government's expense. The district court had no jurisdiction to issue that order.

**C.**   Although this Court need not and should not consider the merits of plaintiffs' misdirected APA claims, EPA's termination of the grant agreements was supported by both sufficient process and a reasonable basis.

EPA's decision to terminate was "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). In its termination notices, EPA explained that "termination [was] based on substantial concerns regarding program integrity, the award progress, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities, which collectively undermine the fundamental goals and statutory objectives of the award." Doc. 49-2, at 191. The notices further explained that the grant agreements lacked "adequate oversight," were deficient with respect to "the improper or speculative allocation of funds inconsistent with EPA's oversight and fiscal responsibilities," and involved "the circumvention and defeat of key oversight mechanisms," which was severe enough to raise constitutional concerns. Doc. 49-2, at 191-92. The notices further stated that the GGRF program "pose[d] an unacceptable risk to the efficient and lawful execution of [the GGRF] grant that cannot be remedied by imposing specific conditions." *Id.* at 191. EPA also reasonably terminated the grants based on concerns that the previous administration had significantly reduced federal oversight and control, as the contracts purported to prevent termination absent credible evidence of an enumerated list of crimes and violations. *Id.* at 191-92.

EPA's decision to terminate was thus based on reasonable concerns regarding the award process and lack of transparency and oversight over the resulting agreements. Given the billions of taxpayer dollars at stake, EPA acted well within its discretion—and certainly well within the bounds of the APA's requirements for reasoned decision-making—when it terminated plaintiffs' awards and opted to move forward to re-obligate the funds after addressing these concerns.

## CONCLUSION

For the foregoing reasons, the Court should grant an immediate administrative stay of the district court's order and a stay pending appeal.

Respectfully submitted,

YAAKOV M. ROTH
  *Acting Assistant Attorney General*
SHARON SWINGLE

 */s/ Sophia Shams*
SOPHIA SHAMS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7264*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, D.C. 20530*
  *(202) 514-2495*
  *sophia.shams@usdoj.gov*

APRIL 2025

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing motion complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because the motion contains 5,194 words.  The motion complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and (6) because it has been prepared using Microsoft Word 2016 in proportionally spaced 14-point Times New Roman typeface.

 */s/ Sophia Shams*
Sophia Shams

**CERTIFICATE OF SERVICE**

I hereby certify that on April 16, 2025, I electronically filed the foregoing

motion with the Clerk of the Court for the United States Court of Appeals for the

D.C. Circuit by using the appellate CM/ECF system. Participants in the case are

registered CM/ECF users, and service will be accomplished by the appellate

CM/ECF system.

*/s/ Sophia Shams*
SOPHIA SHAMS