**NOT YET SCHEDULED FOR ORAL ARGUMENT**

**Nos. 25-5122**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————

CLIMATE UNITED FUND,
            *Plaintiffs-Appellees*,
    v.

CITIBANK, N.A., et al.,
            *Defendants-Appellants.*

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

**AMENDED EMERGENCY MOTION FOR STAY PENDING APPEAL**

———————————

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

SHARON SWINGLE
SOPHIA SHAMS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7264*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, D.C. 20530*
  *(202) 514-2495*
  *sophia.shams@usdoj.gov*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.  Parties and Amici

Plaintiffs-appellees are Climate United Fund; Coalition for Green Capital; Power Forward Communities, Inc.; California Infrastructure and Economic Development Bank; Minnesota Climate Innovation Finance Authority; Efficiency Maine Trust; Illinois Finance Authority; Justice Climate Fund; and Inclusiv, Inc. Defendants-appellants are the Environmental Protection Agency; Lee Zeldin, in his official capacity as Administrator of the EPA; and Citibank, N.A.

### B.  Rulings Under Review

The ruling under review (issued by Judge Tanya S. Chutkan) is an order filed April 15, 2025, and an accompanying memorandum opinion filed April 16, 2025, granting plaintiffs' motion for a preliminary injunction.

*/s/ Sophia Shams*
SOPHIA SHAMS

# GLOSSARY

Administrative Procedure Act                      APA

Clean Communities Investment Accelerator      CCIA

Environmental Protection Agency                EPA

Greenhouse Gas Reduction Fund               GGRF

National Clean Investment Fund                 NCIF

## INTRODUCTION

Less than two weeks ago, the Supreme Court stayed a district court order that invoked the Administrative Procedure Act (APA) to enjoin an agency's termination of discretionary grants. *See Dep't of Educ. v. California*, 145 S. Ct. 966 (2025) (per curiam). The Court explained that the APA does not permit "orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered here." *Id.* at 968 (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). If a grantee contends that the government has breached contractual terms, it must pursue that claim in the Court of Federal Claims under the Tucker Act, where the remedy of specific performance is not available. *See id.*; *see also U.S. Conf. of Catholic Bishops v. U.S. Dep't of State,* No. 1:25-cv-00465, 2025 WL 763738, at *5 (D.D.C. Mar. 11, 2025) (McFadden, J.) (denying injunctive relief in a similar suit), *injunction pending appeal denied*, No. 25-5066 (D.C. Cir. Mar. 28, 2025).

The district court here, however, refused to heed the Supreme Court's guidance, and instead ordered the Environmental Protection Agency (EPA) to reinstate *billions of dollars* in grant contracts that the agency terminated after concluding that they were deeply flawed and no longer served the public interest. This Court has granted a partial administrative stay, and the government now renews its request for a stay pending appeal. Plaintiffs oppose this motion.

The Court should grant a stay pending appeal. Indeed, the case for a stay here is even stronger than in *Department of Education*, along each of the stay factors. As to the merits, the plaintiffs' claim here is a quintessential breach-of-contract claim. No statute or regulation entitles plaintiffs to these grants. Rather, the foundation of their case is that the prior administration tied EPA's own hands by writing restrictive termination provisions into the grant agreements, and that EPA cannot terminate the contracts now because the requisite conditions have allegedly not been satisfied. As a remedy, plaintiffs sought (and obtained) an order that EPA must resume providing those billions of dollars. This is a contract claim through-and-through. Accordingly, it can only be brought in the Court of Federal Claims, 28 U.S.C. § 1491(a)(1). The district court plainly erred in concluding otherwise: it said that plaintiffs' rights arose from statutes and regulations—but later in the opinion, in evaluating likelihood of success on the merits, hinged its analysis on contractual terms.

The balance of equities overwhelmingly favors the government here too. Plaintiffs have made clear in demand letters and pending transaction requests that, absent a stay, they will transfer hundreds of millions of dollars in grant funds to external accounts *immediately*. Once those funds are released, there is no reasonable likelihood the government will be able to recover them, even if it prevails on appeal. Conversely, the only potential harm plaintiffs will experience from a temporary stay is financial harm that will be remedied if they prevail on appeal (or in an action for

breach of contract in the Court of Federal Claims)—and that harm is itself minimal given that these grant programs have barely begun to get off the ground. On top of all that, EPA's interest in re-obligating the funds in a restructured, transparent, and accountable grant program, and the public's interest in safeguarding the public fisc, strongly favor stay pending appeal.

## STATEMENT

1.a. In August 2022, Congress enacted Section 134 of the Clean Air Act as part of a reconciliation bill that appropriated $27 billion to the EPA Administrator for the Greenhouse Gas Reduction Fund (GGRF). Congress provided that those funds would "remain available until September 30, 2024," and authorized EPA to make grants, on a competitive basis, to recipients that satisfied statutory eligibility criteria. 42 U.S.C. § 7434(a).

EPA then created three grant programs—the National Clean Investment Fund (NCIF), the Clean Communities Investment Accelerator (CCIA), and Solar For All—and, in July 2023, began accepting applications. On April 1, 2024, EPA announced its selection of entities for NCIF: plaintiffs Climate United Fund, Coalition for Green Capital, and Power Forward Communities, which were awarded $6.97 billion, $5 billion, and $2 billion, respectively. Climate United and Power Forward were formed specifically to apply for and receive funding from the NCIF program. Doc. 33-2, at 3-4; Doc. 33-31, at 3. These awards further allowed grantees

to provide funds to subgrantees, with whom EPA is not in privity. Doc. 49-2, at 89. The EPA also selected plaintiffs Justice Climate Fund and Inclusiv, Inc., among others, to receive CCIA funding to the tune of billions of dollars. Press Release, Environmental Protection Agency, *Biden-Harris Administration Announces $20 Billion in Grants* (April 4, 2024), https://perma.cc/6N7R-J2QB.

In August 2024, plaintiffs and EPA entered into materially identical contracts memorializing the grant awards. The initial grant agreements were subject to EPA's then-current General Terms and Conditions. Doc. 49-2, at 8. Those General Terms and Conditions provided EPA with the right to terminate the grants "[i]f the award no longer effectuates the program goals or agency priorities." EPA, *General Terms and Conditions* 2-3 (effective Oct. 1, 2023), https://perma.cc/DE84-46AD. The agreements also contained a "Termination" provision that purported to establish the "only" bases for termination—but that language was preceded by a statement that this "clarification" to the General Terms and Conditions was meant to "expand on, rather than replace or modify, the EPA General Terms and Conditions." Doc. 49-2, at 41-42.

The grant agreements adopted an unusual mechanism for distributing grant funds. Rather than employ its ordinary practice of distributing grant funds through accounts at the Department of the Treasury, Treasury (at EPA's request) designated a private financial institution, Citibank, to serve as a financial agent to hold all $16

billion awarded to plaintiffs and to administer distribution of those funds to them. Doc. 49-3, at 13. To this end, on September 19, 2024, Treasury entered into a Financial Agency Agreement with Citibank. *Id.* According to EPA's Acting Chief Financial Officer, "EPA had never used a financial agent in connection with a grant program prior to 2024," and "EPA's use of a financial agent in connection with the GGRF program was the first use of a financial agent for a nonexchange grant program administered by the federal government." Doc. 49-5, at 3.

EPA and Citibank then entered into Account Control Agreements with each plaintiff regarding the administration of program distributions. As originally agreed, the Account Control Agreements and related provisions in the grant agreements placed program funds in Citibank accounts in the name of each plaintiff and allowed plaintiffs to withdraw funds without prior EPA approval so long as the withdrawal "do[es] not exceed 10% of the total budget approved at [the] time of award" for a given category. Doc. 49-2, at 52, 113. Under the Account Control Agreements, EPA is a secured party in the funds and may assert exclusive control over the grant funds by filing a "Notice of Exclusive Control." *Id.* at 132.

The grant agreements and uncommon funding arrangement raised concerns from the start. The House Committee on Energy and Commerce expressed serious misgivings about EPA's "unusually accelerated timeline for disbursement" of the grant funds and "new and complex funding structure," Doc. 49-7, at 2, and

subsequently investigated "recipient eligibility" issues, "the fairness and uniformity of the selection process," and the fact that "individuals with strong ties to Democratic politics hold significant leadership roles within some of the organizations the EPA selected to receive funding," *Id.* at 10. EPA's Inspector General later testified that his office lacked sufficient resources to protect against fraud risks in GGRF programs and ensure efficient use of funds given EPA's "pace of spending." Doc. 49-3, at 6.

After the 2024 election, the prior administration revised the award agreements in a manner that further limited EPA's ability to oversee and control NCIF and CCIA grant funds. On December 20, 2024, EPA and plaintiffs amended the grant agreements to restrict EPA's ability to terminate them. Doc. 49-3, at 12, 15. Specifically, they purported to require "credible evidence" of "a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18" or "a violation of the civil False Claims Act." Doc. 49-2, at 75. The December 2024 amendments also incorporated new, then-current EPA General Terms and Conditions, which omitted any reference to termination based on the agency's policy priorities. EPA, *General Terms and Conditions* 2-3 (effective Oct. 1, 2024).

Then, on January 13, 2025, just days before the current administration took office, EPA amended its Account Control Agreements with Citibank and the NCIF

plaintiffs so that Citibank and EPA were required to "continue to disburse funds and financial assets associated with financial obligations 'properly incurred'" by plaintiffs, even after EPA files a Notice of Exclusive Control or otherwise takes control of the grant funds through termination. Doc. 49-2, at 148.

b. Under new leadership, EPA "reassessed and adopted agency policies and priorities that materially differ from the prior administration"—particularly with respect to oversight and transparency over grant funds. Doc. 49-3, at 14. These new policy aims led EPA to review and reevaluate the GGRF program's creation and implementation, which in turn has raised serious concerns. In particular, EPA has concluded that the prior administration's designation of a financial agent; plaintiffs' roles as "pass-through for subrecipients," which themselves may act as pass-throughs; and last-minute modifications to the agreements have untenably reduced EPA's oversight and control over grant funding. Doc. 49-3, at 15-16. EPA further determined that potential "[c]onflicts of interest involving high-level" officials, as well as the failure of many awardees to properly meet statutory and regulatory eligibility requirements, "raise questions about EPA's selection process." *Id.* at 16. And EPA determined that its oversight and control over the use of grant funds had been so eroded as to risk violating the Constitution. *Id.* at 17.

EPA's Office of Inspector General is now investigating the "financial mismanagement, conflicts of interest, and oversight failures within the GGRF

program." Doc. 49-3, at 15; *see also* Doc. 49-2, at 159. The Federal Bureau of Investigation and Department of Justice have also initiated investigations into the program for "potential fraud, waste, abuse, and impermissible conflicts of interest in connection with NCIF and CCIA grants." Doc. 49-3, at 16.

For all of these reasons, EPA on March 4, 2025, instructed Citibank "not to disburse funds from any of the GGRF accounts" for five days, Doc. 49-2 at 189, and Treasury subsequently instructed Citibank to comply with EPA's instruction "to impose certain account controls" related to the GGRF, Doc. 49-2, at 187.

Ultimately, on March 11, 2025, EPA issued official notices to the NCIF and CCIA grantees terminating the grant agreements. In the notices, EPA explained that the terminations were "based on substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities, which collectively undermine the fundamental goals and statutory objectives of the award." Doc. 49-2, at 191. EPA also explained that the contractual scheme lacked sufficient controls to guard against constitutional concerns. *Id.* at 192. Finally, EPA stated that it would work to re-obligate the funds expeditiously under a reformed program. *Id.*

2. Plaintiffs Climate United, Coalition for Green Capital, and Power Forward sued under the APA, challenging EPA's decision to terminate their grant agreements and seeking declaratory and injunctive relief that would require EPA (through

Citibank) to resume disbursing grant funds to plaintiffs. The district court issued a temporary restraining order effectively freezing the grant funds pending its review of plaintiffs' motion for a preliminary injunction. Docs. 28, 29. Since then, some NCIF subgrantees that receive funds on a pass-through basis filed suit raising similar claims, as have certain CCIA grantees. All six cases have been consolidated.

On April 15, 2025—the day on which the TRO was set to expire—EPA filed a contingent motion requesting a stay pending appeal in the event the district court granted a preliminary injunction. Shortly before midnight, the court issued an order granting a preliminary injunction, stating that an opinion would follow, and denying a stay pending appeal. Doc. 80. The order enjoins EPA from effectuating its termination of plaintiffs' grant agreements and further enjoins EPA and Treasury, a non-party, from causing Citibank to "deny, obstruct, delay, or otherwise limit access to funds in accounts established in connection with Plaintiffs' grants, including funds in accounts established by Plaintiffs' subgrantees." *Id.* at 1-2. Although the district court denied a stay, it ordered Citibank to refrain from releasing any disbursements until April 17, 2025, at 2 PM. *Id.* at 2. And, despite EPA's request, the court refused to order any security under Federal Rule of Civil Procedure 65(c).

The government immediately sought an administrative stay and stay pending appeal, which this Court granted in part on April 16. The district court issued its opinion later that day. Doc. 89. Relevant here, the court held that it had jurisdiction

over plaintiffs' claims because they "turn on examining the federal regulations and federal statute," and "seek equitable relief." *Id.* at 17-19. And the court found that plaintiffs were likely to succeed on their APA and constitutional claims because EPA failed to adequately explain its reasoning for terminating the grant agreements, and EPA supposedly sought to "dismantle" the GGRF program. *Id.* at 26-31.

## ARGUMENT

This Court should grant a stay pending appeal to prevent the irreparable loss of potentially billions of dollars, which the district court wrongly ordered be released to plaintiffs but which the government lacks a reasonable ability to recover even if it prevails on appeal. And the government is likely to so prevail, because the district court lacked jurisdiction to transform this contract dispute into an APA case. All of the relevant factors therefore support a stay here. *See Nken v. Holder*, 556 U.S. 418, 426 (2009).

### I. The Equities Weigh Strongly in Favor of a Stay

At the outset, this is a classic case for a stay because the harms of allowing the district court's order to take effect are severe and irreparable, while the harms of a stay are limited and capable of full vindication later in the litigation.

To start, letting the injunction remain in effect threatens irreparable injuries to the government and the public, whose interests "merge" in this context. *Nken*, 556 U.S. at 435. The district court directed EPA to immediately make available billions

of dollars under grant contracts that run counter to the government's priorities and policies and the public interest.

Above and beyond the obvious harms to the agency's ability to execute Executive Branch policy set by politically accountable agency leaders, the order barring EPA from withholding grant funds irreparably and substantially harms the public fisc. Under the court's order, plaintiffs can draw down enormous sums of money. In the past few weeks, plaintiffs have submitted increasingly large disbursement requests to Citibank that now appear to exceed $600 million. Doc. 75-2, at 2. One request asks Citibank to transfer more than $250 million to an external bank account controlled by Climate United. Doc. 75-3, at 35. Plaintiffs have also told Citibank to prepare to "immediately" process such pending requests to external accounts upon obtaining a preliminary injunction, noting that even a brief delay would be "unacceptable." Doc. 75-3, at 7.

If these massive sums are paid out to plaintiffs, EPA has limited ability to recover the funds—a point plaintiffs have not disputed. *See Dep't of Educ.*, 145 S. Ct. at 968-69 (finding irreparable harm where "respondents have not refuted the Government's representation that it is unlikely to recover the grant funds once they are disbursed"). And although EPA repeatedly requested an adequate bond under Federal Rule of Civil Procedure 65(c), Doc. 49, at 40, the district court instead

waived the bond requirement—which is itself a reversible abuse of discretion under these circumstances.  Doc. 80; Doc. 89, at 38-39.

The district court's order also continues to bar EPA from effectuating its terminations and re-obligating the grant funding.  That irreparably harms EPA and the public by depriving the public fisc of significant interest earned on billions in outstanding funding and by preventing EPA from effectuating agency priorities by reconstituting the program in a manner that ensures accountability and effective expenditure of taxpayer dollars.

These serious and irreparable injuries far outweigh plaintiffs' asserted harms, which are almost exclusively monetary.  It is "well settled that economic loss does not, in and of itself, constitute irreparable harm." *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015).  "Financial injury is only irreparable where no 'adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation.'" *Id.*  If the district court's injunction is upheld on appeal, plaintiffs will receive the funds they claim entitlement to. Notably, despite initially claiming a risk of "grave economic harm" absent immediate distribution of funds during the week of March 11, 2025, Doc. 2-1, at 12, plaintiffs later supported multiple extensions of the TRO and have not identified any harm that actually manifested.  The limited nature of the harm here is underscored

by the early stage of these grant programs, which have yet to engender any serious reliance interests. In short, the balance is clearly in the government's favor.

## II. The Government Is Likely to Prevail on the Merits.

The district court plainly lacked jurisdiction to address plaintiffs' claims. Congress vested the Court of Federal Claims with jurisdiction to address breach-of-contract claims against the government. Plaintiffs' claims here allege that EPA improperly terminated their contracts under the terms of those contracts, and seek to compel EPA to resume contractual payments. Those are classic contractual claims covered by the Tucker Act, so the district court had no authority to entertain them.

**A.** It is well established that "absent a clear and unequivocal waiver of sovereign immunity," the "United States and its agencies are generally immune from suit in federal court." *Crowley Gov't Servs., Inc. v. General Servs. Admin.*, 38 F.4th 1099, 1105 (D.C. Cir. 2022). Although the APA provides a limited waiver of the government's sovereign immunity for suits challenging final agency action and "seeking relief other than money damages," it does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. That carve-out "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012).

One example of such an implicit limitation on APA relief involves suits against the United States that sound in contract. The Tucker Act provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a). This Court has thus long recognized that "the Tucker Act 'impliedly forbids'" bringing "contract actions" against "the government in a federal district court" under the APA. *Albrecht v. Committee on Emp. Benefits of the Fed. Reserve Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004). That jurisdictional barrier is mandatory, and for good reason. It ensures that contract claims against the government are channeled into the court with "unique expertise," *Ingersoll-Rand*, 780 F.2d at 78, and (importantly here) which Congress has generally not empowered to grant injunctive relief like specific performance, *see James v. Caldera*, 159 F.3d 573, 580 (Fed. Cir. 1998).

As this Court has instructed, courts consider two factors in assessing whether an action is in essence a contract claim governed by the Tucker Act. *First*, courts examine "the source of the rights upon which the plaintiff bases its claims." *Crowley*, 38 F.4th at 1106. In answering this question, courts consider whether the "plaintiff's asserted rights and the government's purported authority arise from statute, whether the plaintiff's rights 'exist prior to and apart from rights created under the contract,' and whether the plaintiff 'seeks to enforce any duty imposed

upon' the government 'by the relevant contracts to which' the government 'is a party.'" *Id.* at 1107. *Second*, courts examine the "type of relief sought." *Id.* This inquiry asks "whether the plaintiff effectively seeks to attain monetary damages." *Id.* at 1107-08. When a claim is premised on a contract with the government, depends on the government's having breached that contract, and seeks to compel the government to pay sums due under the contract, it is a Tucker Act claim, not an APA claim. *See Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967-71 (D.C. Cir. 1982).

**B.** This is a contract case through and through. The grant agreements are plainly "the source of the rights upon which" plaintiffs base their claims. *Megapulse*, 672 F.2d at 968. The asserted right to billions of dollars in taxpayer funds arises solely from the grant agreements and "in no sense ... exist[s] independently of" those contracts. *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D. C. Cir. 1985). Plaintiffs would have no claim absent the government's alleged breach of those agreements. Indeed, the linchpin of their case is the restrictive termination provision, written into the grant agreements by the last administration, that purports to limit EPA's ability to terminate the grants. But even assuming that the provision is both enforceable and not satisfied here, that would only mean EPA violated that contractual provision—underscoring that this is a breach-of-contract suit.

The relief that plaintiffs seek (and that the district court awarded) is likewise contractual in nature. Plaintiffs sought and the district court entered an order barring

EPA from effectuating its termination of plaintiffs' contracts and requiring EPA to continue payments pursuant to those contracts. In other words, EPA was ordered to specifically perform contractual obligations, a classic contract remedy, and one that is generally unavailable against the government. *See Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 79-80 (D.C. Cir. 1985) (noting that an order "reinstating the original award of [a] contract …. amount[ed] to a request for specific performance"); *U.S. Conf. of Catholic Bishops*, 2025 WL 763738, at *5 (similar). The payment of money, far from being merely incidental to or "hint[ed] at" by plaintiffs' request for relief, is the entire object of their suit. *Crowley*, 38 F.4th at 1112. The appropriate vehicle for a claim seeking damages for terminations allegedly undertaken in breach of contract is a "Tucker Act [suit] in the Claims Court," not an APA action. *Bowen v. Massachusetts*, 487 U.S. 879, 890 n.13 (1988).

Applying the above principles, the Supreme Court recently granted a stay of a district court order that similarly required the government to resume making payments on grants it had terminated. *Dep't of Educ.*, 145 S. Ct. 966. In so doing, the Court held that the government was "likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." *Id.* at 968. The Court emphasized that "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money,'" which the district court's order had, in effect, done. *Id.* Because the district court in this case

committed the same error as the district court in *Department of Education*, the government is likely to prevail.

This Court's decision in *Spectrum Leasing,* 764 F.2d 891, likewise demonstrates the district court's error. Spectrum entered a contract with an agency, under which it agreed to provide hardware and software in exchange for lease payments. *Id.* at 892. But after Spectrum failed to provide the software, the agency stopped making lease payments. *Id.* Spectrum sued under the APA, alleging that the agency violated the Debt Collection Act and seeking an injunction compelling the agency to resume payments. *Id.* This Court affirmed the dismissal of Spectrum's suit. *Id.* at 895. The Court held that the "right to these payments is created in the first instance by the contract, not the Debt Collection Act." *Id.* Although that Act "might impose procedural requirements on the government having some impact on the [parties'] contract," it "in no way create[d] the substantive right to the remedy" Spectrum sought. *Id.* And that relief sought—payment of money owed for goods provided—was the "classic contractual remedy of specific performance." *Id.*

So too here. Plaintiffs sought an order compelling the government to resume grant payments under the terms of their grant agreements. The source of that alleged right to payment is the contracts, not any statutory or regulatory provisions. Like the Debt Collection Act, the background statute and regulations may inform the parties' contractual relationship, but do not create the substantive right that plaintiffs

seek to vindicate. And the district court's order requires EPA to specifically perform the grant agreements, a classic contract remedy.

In cursory fashion, the district court tried to distinguish *Department of Education* as inapplicable because "[p]laintiffs seek to regain access to their already disbursed funds at Citibank." Doc. 89, at 21. But that is a distinction entirely without a difference. Plaintiffs' right to disbursement of funds held by Citibank— like the *Department of Education* plaintiffs' right to receive funds from the Treasury—is defined solely by the grant agreements and related contracts. In those agreements, each plaintiff agreed that their Citibank account could be used only "as Recipient's operating account for the award." Doc. 49-2, at 118. They also agreed to use funds only "under the conditions of the [Grant] Agreement" and for specified allowable activities in specified regions. *Id.* at 58, 117. To be allowable, the expense must be necessary "for the performance of the Federal award" and, significantly, "[c]onform to any limitations or exclusions set forth ... in the Federal award." 2 C.F.R. § 200.403(a)-(b). And financial obligations incurred after termination "are not allowable" unless expressly authorized by EPA. *Id.* § 200.343.

Simply put, plaintiffs have no cognizable interest in the Citibank accounts apart from whatever rights to payment they have under their grant agreements. And an order compelling EPA to resume distributing grants funds through Citibank under

those agreements is an order to vindicate plaintiffs' contractual rights at the government's expense. The district court had no jurisdiction to issue that order.

**C.** In an opinion that followed this Court's administrative stay, the district court reached a contrary conclusion, but its reasoning does not withstand scrutiny.

To start, the court erroneously reasoned that the source of plaintiffs' rights lay in "federal regulations and federal statute" rather than the grant agreements. Doc. 89, at 16-17. As discussed above, however, no statute or regulation remotely confers on plaintiffs the right to billions of dollars in taxpayer funds. Congress appropriated funds for grant programs and authorized EPA to review and select, in its sole discretion, which entities would receive grant funds and the amounts awarded. Because plaintiffs would have no claim to the funds absent EPA's award, their claims arise solely from the agreements.

The district court's own opinion confirms this. Just twelve pages later, in evaluating plaintiffs' likelihood of success on the merits, the court rested on the fact that "the *Terms and Conditions governing the grant award* expressly limit" EPA's ability to terminate. Doc. 89, at 28 (emphasis added). The court's only reference to any "regulations" was to observe that 2 C.F.R. § 200.340(a)(4) permits termination "pursuant to the terms and conditions of the Federal award." *Id.* at 29. Of course, that only further underscores that the contractual terms are the crux of the dispute.

Perhaps to avoid that problem, the court also suggested plaintiffs would succeed on a constitutional claim, by construing EPA's termination as "effectively unilaterally dismantling a program that Congress has established." Doc. 89, at 31. But EPA has consistently maintained, including in the termination notices, that it will re-obligate funds in a manner that ensures proper oversight and control. The district court has not cited any reason to doubt that commitment. And, in any event, such a claim would not support the injunction, which does not merely require *EPA* to *re-obligate* the funds but instead confers on *plaintiffs* the right to *keep* the funds.

The district court's reliance (Doc. 89, at 18) on *Maryland Department of Human Resources v. Department of Health & Human Services*, 763 F.2d 1441 (D.C. Cir. 1985), is misplaced. That case involved Title XX of the Social Security Act and its implementing regulations, which conferred on participating states a specific right to reimbursement. *Id.* at 1443, 1449. By contrast, plaintiffs' asserted interest in the funds arises from the grant contracts rather than any statute or regulation.

The district court similarly erred in concluding that the APA applies because plaintiffs challenge the reasonableness of an agency action—here, EPA's decision to terminate the agreements. *See* Doc. 89, at 28. That proves too much. That logic would allow every contract dispute to be reframed as an APA claim. The Tucker Act cannot be so easily circumvented. *See Megapulse*, 672 F.2d at 967 n.34.

Finally, the district court wrongly concluded that plaintiffs "seek equitable relief" rather than damages. Doc. 89, at 19. As the Supreme Court recently reiterated, the "APA's limited waiver of immunity does not extend to orders to enforce a contractual obligation to pay money." *Dep't of Educ.*, 145 S. Ct. at 968. But that is exactly what plaintiffs have requested, and exactly what the district court granted. Doc. 80. The district court's concern (Doc. 89, at 20) that the Court of Federal Claims may not be able to order specific performance only further proves the government's point: the APA cannot be used to bypass limitations on relief under other, more specific statutes. *See Patchak*, 567 U.S. at 215.

**D.** Although this Court need not and should not consider the merits of plaintiffs' misdirected APA claims, EPA's termination of the grant agreements was supported by both sufficient process and a reasonable basis.

EPA's decision to terminate was "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). In its notices, EPA explained that "termination [was] based on substantial concerns regarding program integrity, the award progress, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities, which collectively undermine the fundamental goals and statutory objectives of the award." Doc. 49-2, at 191. The grant agreements lacked "adequate oversight," were deficient with respect to "the improper or speculative allocation of funds inconsistent with EPA's oversight and

fiscal responsibilities," and involved "the circumvention and defeat of key oversight mechanisms," severe enough to raise constitutional concerns. Doc. 49-2, at 191-92. And the notices stated that the GGRF program "pose[d] an unacceptable risk to the efficient and lawful execution of [the GGRF] grant." *Id.* at 191.

EPA's decision was thus based on reasonable concerns regarding the award process and lack of transparency and oversight over the resulting agreements. Given the billions of taxpayer dollars at stake, EPA acted well within its discretion—and certainly well within the bounds of the APA—when it chose to terminate plaintiffs' awards and re-obligate the funds after addressing these concerns.

## CONCLUSION

For the foregoing reasons, the Court should stay the district court's order pending appeal.

Respectfully submitted,

YAAKOV M. ROTH
*Acting Assistant Attorney General*

SHARON SWINGLE

*/s/ Sophia Shams*
SOPHIA SHAMS
*Attorneys, Appellate Staff*
*Civil Division, Room 7264*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, D.C. 20530*
*(202) 514-2495*
*sophia.shams@usdoj.gov*

APRIL 2025

# CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing motion complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because the motion contains 5,168 words. The motion complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and (6) because it has been prepared using Microsoft Word 2016 in proportionally spaced 14-point Times New Roman typeface.

*/s/ Sophia Shams*
Sophia Shams

## CERTIFICATE OF SERVICE

I hereby certify that on April 18, 2025, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Sophia Shams*
SOPHIA SHAMS