**NOT YET SCHEDULED FOR ORAL ARGUMENT**

**Nos. 25-5122, 25-5123**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

CLIMATE UNITED FUND, ET AL.,
*Plaintiffs-Appellees*,

v.

CITIBANK, N.A., ET AL.,
*Defendants-Appellants*.

---

On Appeal from the United States District Court
for the District of Columbia, No. 25-cv-698-TSC

---

**CCIA AWARDEES' OPPOSITION TO
AMENDED EMERGENCY MOTION FOR STAY PENDING APPEAL**

---

Jay C. Johnson
VENABLE LLP
600 Massachusetts Avenue, NW
Washington, DC 20001
Tel.: (202) 344-4000
jcjohnson@venable.com

*Counsel for Inclusiv, Inc.*

David J. Zimmer
ZIMMER, CITRON & CLARKE LLP
130 Bishop Allen Drive
Cambridge, MA 02139
Tel.: (617) 676-9421
dzimmer@zimmercitronclarke.com

Eric F. Citron
Kathleen Foley
ZIMMER, CITRON & CLARKE LLP
1629 K. St. NW
Suite 300
Washington, D.C. 20006
(202) 796-4540
ecitron@zimmercitronclarke.com
kfoley@zimmercitronclarke.com

*Counsel for Justice Climate Fund*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## A. Parties and Amici

All parties, intervenors, and amici appearing in this Court are listed in the Amended Emergency Motion for Stay Pending Appeal.

I certify under Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1 that neither Justice Climate Fund nor Inclusiv, Inc., has a parent company, and that no publicly held corporation holds 10% or more of the stock of either entity.

## B. Rulings under Review

References to the rulings at issue appear in the Amended Emergency Motion for Stay Pending Appeal.

## C. Related Cases

There are no related cases.

*/s/ David J. Zimmer*
David J. Zimmer

*Attorney for Plaintiff-Appellee Justice Climate Fund*

i

# TABLE OF CONTENTS

**Page**

INTRODUCTION ......................................................................................................1

BACKGROUND .....................................................................................................2

    I.     JCF and Inclusiv's Awards. ...................................................2

    II.    JCF and Inclusiv Begin Performing Under Their CCIA Awards. ........5

    III.   EPA Purports To Terminate The Awards But The District Court Enjoins That Termination......................................................................7

ARGUMENT ..........................................................................................................8

    I.     The Court Should Deny EPA's Motion Without Prejudice To Allow EPA To Comply With Rule 8(a). ................................................8

    II.    If The Court Reaches The Merits, It Should Deny The Motion. ........10

        A.     EPA is Unlikely to Succeed on the Merits. .............................10

        B.     EPA Will Suffer No Cognizable Harm Absent a Stay. ............14

        C.     Staying the Preliminary Injunction Would Grievously Injure JCF and Inclusiv.........................................................................16

        D.     The Public Interest Would Be Served by Allowing the District Court's Order to Take Effect. ..................................................20

    III.   If The Court Grants A Stay, It Should Limit Its Scope......................21

CONCLUSION .....................................................................................................23

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bennett v. Spear*,
    520 U.S. 154 (1997)..........................................................................10

*Bowen v. Massachusetts*,
    487 U.S. 879 (1988)..................................................................12, 13

*Citizens for Resp. & Ethics in Wash. v. FEC*,
    904 F.3d 1014 (D.C. Cir. 2018)................................................10, 15

*City of Houston v. HUD*,
    24 F.3d 1421 (D.C. Cir. 1994)..........................................................22

*Department of Education v. California*,
    145 S. Ct. 966 (2025).............................................................2, 13, 14

*Great-West Life & Annuity Ins. Co. v. Knudson*,
    534 U.S. 204 (2002).........................................................................13

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016)..............................................................21

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024).........................................................................11

*Maryland Department of Human Resources v. Department of Health
& Human Services*,
    763 F.2d 1441 (D.C. Cir. 1985).............................................11, 12, 13

*Merrill v. Milligan*,
    142 S. Ct. 879 (2022).......................................................................13

*Nken v. Holder*,
    556 U.S. 418 (2009).........................................................................10

*Washington v. Reno*,
    35 F.3d 1093 (6th Cir. 1994) ...........................................................20

*Whitman-Walker Clinic, Inc. v. HHS*,
   485 F. Supp. 3d 1 (D.D.C. 2020)........................................................................22

*Wis. Gas Co. v. FERC*,
   758 F.2d 669 (D.C. Cir. 1985)..............................................................15, 17, 18

**Statutes**

5 U.S.C. § 702................................................................................................10, 11

5 U.S.C. § 706(2)..................................................................................................10

42 U.S.C. § 7434(a)(3).......................................................................................3, 16

**Regulations**

2 C.F.R. § 200.206(b) ...........................................................................................20

31 C.F.R. § 202.6 ...................................................................................................15

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| CCIA | Clean Communities Investment Accelerator |
| Citibank | Defendant Citibank, N.A. |
| *Climate United* Dkt. | *Climate United Fund v. Citibank, N.A.*, D.D.C. No. 25-cv-698 |
| EPA | Defendants-Appellants U.S. Environmental Protection Agency and Lee M. Zeldin, in his official capacity as Administrator, Environmental Protection Agency |
| GGRF | Greenhouse Gas Reduction Fund |
| NCIF | National Clean Investment Fund |
| Inclusiv | Plaintiff-Appellee Inclusiv, Inc. |
| *Inclusiv* Dkt. | Inclusiv, Inc. v. United States Environmental Protection Agency, D.D.C. No. 25-cv-948 |
| JCF | Plaintiff-Appellee Justice Climate Fund |
| *JCF* Dkt. | *Justice Climate Fund v. United States Environmental Protection Agency*, D.D.C. No. 25-cv-938 |
| Mot. | EPA's Amended Emergency Motion for Stay Pending Appeal filed April 18, 2025 |
| Plaintiffs | Plaintiffs-Appellees Climate United Fund, Coalition for Green Capital, Power Forward Communities, Justice Climate Fund, and Inclusiv, Inc. |

v

# INTRODUCTION

Plaintiffs JCF and Inclusiv received grant awards from EPA to help low-income and disadvantaged communities access clean, affordable energy. EPA disbursed each Plaintiff's funds to a Citibank account in each Plaintiff's name. EPA retains only a security interest, allowing it to access those funds in the event of material non-compliance with the terms of the award. EPA does not dispute that JCF and Inclusiv have complied with and worked diligently to implement their awards. Yet EPA now seeks to unlawfully terminate their awards and reclaim the funds it already disbursed based on a new, vaguely articulated policy preference for more "oversight." Allowing EPA to claw back these funds or prevent JCF and Inclusiv from accessing them would be catastrophic for JCF and Inclusiv. So the district court, recognizing this irreparable harm and the weakness of Defendants' position, granted a preliminary injunction to maintain Plaintiffs' ordinary access to their accounts during the litigation.

EPA identifies no basis for this Court to stay that injunction. As an initial matter, its motion violates Federal Rule of Appellate Procedure 8(a). Regardless, EPA is likely to lose on the merits of its appeal. EPA hardly contests that its actions were unlawful; it just argues that Plaintiffs should have sued in the Court of Claims. That is wrong: Plaintiffs are not asking the government to pay money out of the Treasury pursuant to a contract; they are seeking to set aside EPA's interference with

Plaintiffs' access to money EPA already disbursed—in violation of governing regulations and the Constitution. Plaintiffs' only contract-based claim is against *Citibank*, which is unlawfully withholding the funds in Plaintiffs' Citibank accounts. But Plaintiffs cannot sue Citibank in the Court of Claims. This case is thus very different than *DOE v. California*, 145 S. Ct. 966 (2025), where plaintiffs asked for money to be paid out of the Treasury.

EPA also gets the harm analysis backwards. Given that EPA hardly defends its legal entitlement to Plaintiffs' funds, it cannot claim irreparable harm from being unable to access those funds. Moreover, EPA has not proven any meaningful harm from the absence of its preferred level of "oversight" during this appeal. But a stay would pose an existential threat to JCF and Inclusiv's mission—and, in JCF's case, to the organization itself. In that sense, too, this case is fundamentally different from *DOE v. California*, where plaintiffs had adequate interim funds to carry out their work.

## BACKGROUND

### I.  JCF and Inclusiv's Awards.

The Inflation Reduction Act ("IRA"), Pub. L. No. 117-169, 136 Stat. 1818, appropriated $19.97 billion to EPA to promote clean energy through the Greenhouse Gas Reduction Fund, including $8 billion "for the purposes of providing financial assistance and technical assistance in low-income and disadvantaged

2

communities[.]"  42 U.S.C. § 7434(a)(3).  EPA created the Clean Communities Investment Accelerator ("CCIA") program to provide grants to a few hub nonprofits that, in turn, provide training and small sub-grants (ordinarily capped at $10 million) for community lenders.  To apply for CCIA funding, JCF and Inclusiv "were required to submit information that encompassed 'organizational and governing documents; resumes of board members and senior management; legal and compliance risk management policies and procedures; financial statements; workplans for the first year of program implementations, and budget narratives.'" A4 (quoting *Review and Selection Process*, EPA, https://www.epa.gov/greenhouse-gas-reduction-fund/review-and-selection-process).[1]

JCF and Inclusiv each applied for a CCIA award.  JCF was formed in 2023 by a coalition of highly experienced community-development organizations for the express purpose of participating in CCIA program and, through it, obtaining grant money and providing technical assistance for small lenders in local communities.

Inclusiv's story starts in 1974, when it was known as the National Federation of Community Development Credit Unions.  It has long invested in credit unions— not-for-profit financial institutions that are owned by their members and exist to

---

[1] "A" cites refer to pages in the attached Appendix, which includes key documents filed at the district court.

serve specific communities—and sought a CCIA grant to support community lenders based on that experience and expertise.

EPA ultimately selected JCF for a $940 million award and Inclusiv for a $1.87 billion award. A4. The funds were transferred to JCF and Inclusiv's accounts at Citibank shortly thereafter. A95 (¶ 15); A67 (¶ 49).

JCF and Inclusiv have undertaken significant work to carry out their EPA-approved workplans. JCF has reviewed applications from 94 community lenders and selected 35 of those applicants, committing $248.5 million in capitalization funding and technical assistance. *See* A95-A96 (¶¶ 16-17). Inclusiv, after a thorough, independent review of 250 applications, chose 108 credit unions as subrecipients of its CCIA grant, committing $651 million.[2] A63-A65 (¶¶ 34-43).

Without access to their CCIA award funds, JCF and Inclusiv cannot honor their commitments and distribute funding, causing significant harm to community partners whose plans and operations depend on the funding JCF and Inclusiv committed. A114 (¶¶ 29-33).

JCF's and Inclusiv's awards are governed by two key documents. First, JCF and Inclusiv each agreed to a Notice of Award or "NOA," which contains the award's Terms and Conditions. The NOA was first signed in August 2024 and

---

[2] Inclusiv directed institutions that were not ready for this direct financing to enroll in its successful "Green Home Loan" training program.

amended in December 2024.  A61-A62 (¶¶ 28, 31); A95 (¶¶ 12-13).   As the district court explained, the governing regulations and these NOAs together allow EPA to terminate the awards for only three reasons, which do *not* include a change in EPA's policy priorities.  A4-A5.  That makes sense given the significant investment of time and capital undertaken by awardees and their subgrantees in reliance on the committed funds.

Second, JCF and Inclusiv each entered into an Account Control Agreement ("ACA") with EPA and Citibank.  Those ACAs require Citibank to comply with JCF's and Inclusiv's instructions "directing the disposition of funds and financial assets" in the accounts.  A6.  Citibank may refuse those instructions *only* if EPA takes "exclusive control" over the accounts by providing Citibank with a Notice of Exclusive Control.  A6-A7.  To take "exclusive control," EPA must "issue[] a written determination and finding" that one of the three exclusive grounds for termination has been triggered.  *E.g.*, *JCF* Dkt. 7-7 at 11.

EPA also entered into a separate Financial Agency Agreement ("FAA") with Citibank—an agreement to which JCF and Inclusiv were not parties.

## II.   JCF and Inclusiv Begin Performing Under Their CCIA Awards.

JCF and Inclusiv promptly began working to carry out their responsibilities under their awards.  JCF built its entire operation from the ground up.  It hired employees; undertook outreach with its community lenders; developed, solicited and

5

reviewed applications from 94 community lenders; and selected 35 lenders to receive funding. A95-A96 (¶¶ 16-17). The selected lenders sought CCIA funding to, among other things, "retrofit schools in Louisiana to save utility costs and improve air quality, convert an historic Maryland building into a workforce development center, finance community solar that will enable low-income families in North Carolina to save thousands of dollars annually, reduce the cost of mortgages for net-zero homes in Texas, and provide low-cost loans for small businesses in Virginia to purchase heat pumps, saving them hundreds of dollars annually on heating and cooling bills." *Id.* (¶ 17).

Inclusiv, having already built a field of hundreds of credit unions that were providing financing for clean and renewable energy, hired new personnel, nearly doubling its headcount. It invested in administrative support and compliance oversight to ensure appropriate and successful delivery of its CCIA program. It developed written guidance, and ran seminars, workshops, and trainings to help credit unions prepare for the grants. A58 (¶ 23). Over 250 credit unions from more than 40 states and territories filed pre-qualification forms; those that qualified were invited to apply for subrecipient awards. A63-A64 (¶¶ 34-35). Inclusiv ultimately chose 108 subrecipients whose applications demonstrated that their regulators deemed them financially sound; they had the necessary leadership, staff skillsets, and operational infrastructure to successfully manage federal funds; and they

understood how to develop new loan products that would help provide their members with affordable renewable-energy and energy-efficiency financing. A64-A66 (¶¶ 38, 45). That financing would lower energy costs, create good jobs, and increase financial security. A59 (¶ 25); A64-A65 (¶ 38); A66 (¶¶ 45-46).

## III. EPA Purports To Terminate The Awards But The District Court Enjoins That Termination.

In February 2025, EPA apparently decided to claw back the funds it had already disbursed. *See* A7. In mid-February, Citibank stopped disbursing any funds, and, on March 4, EPA instructed Citibank not to honor Inclusiv's and JCF's distribution withdrawal requests. *Id.* Then, on March 11, EPA sent every CCIA and NCIF awardee—including JCF and Inclusiv—an identical "Notice of Termination" purporting to terminate *every* award. A9. Those brief notices identified numerous purported bases for terminating the awards, including allegations of waste, fraud and abuse. A9. But they provided no evidence or explanation supporting those allegations. *Id.*

JCF and Inclusiv both filed Complaints challenging EPA's interference with and purported termination of their awards and sought preliminary injunctions. The district court ultimately consolidated those cases with the pending NCIF cases, but permitted the filing of joint status reports a week after any preliminary injunction stating whether any party requested additional briefing on JCF- or Inclusiv-specific issues. A121, A123.

7

On April 14, before the district court ruled on the preliminary-injunction motion, EPA filed a "contingent" motion seeking to stay any as-yet-unissued preliminary-injunction order.

On April 15, the district court granted a preliminary injunction maintaining the status quo prior to EPA's unlawful interference with and termination of Plaintiffs awards.    A40-A42.    The court denied EPA's "contingent" stay motion as procedurally improper but forbade Citibank from releasing any funds until April 17 at 2pm so EPA could file a procedurally proper motion.  A40 & n.1.  As Citibank informed the court, that actually meant that no funds could be released before April 21 at 2pm because of the Good Friday holiday.  A47-A48.  Notwithstanding that five-day window, EPA did not file a procedurally proper stay motion at the district court but instead filed the pending motion on April 16.

Later on April 16, the district court issued its opinion.  A1-A39.

## ARGUMENT

### I. The Court Should Deny EPA's Motion Without Prejudice To Allow EPA To Comply With Rule 8(a).

Federal Rule of Appellate Procedure 8(a) is clear:  A party seeking to stay a preliminary injunction pending appeal "must ordinarily move first in the district court" unless it can "show that moving first in the district court would be impracticable."  EPA did neither.

EPA did not "move first in the district court." In denying EPA's "contingent" stay motion as "premature[]," the district court explicitly invited EPA to file a procedurally proper motion after the court's opinion issued. EPA does not challenge the district court's procedural ruling or suggest that its motion to stay an unissued order satisfied Rule 8(a).

EPA also has not shown that properly moving in district court would have been "impracticable." Nor could it. Citibank represented that it could not release any funds until Monday, April 21. EPA thus had ample time to seek a stay from the district court before, if necessary, coming to this Court. And if EPA needed more time to seek a stay, it could have asked the district court to further delay the time at which Citibank could release funds. Given that the district court expressly invited EPA to seek a stay below, the court presumably would have given EPA a reasonable opportunity to do so. EPA cannot have complied with Rule 8(a) where the district court invited EPA to file a stay motion and yet EPA ignored that request and filed straight in this Court *five days* before Citibank was to release any funds.

EPA's rush to this Court was particularly improper given that district-court proceedings on JCF's and Inclusiv's preliminary-injunction motions had not even concluded. Both the CCIA Plaintiffs *and EPA* reserved the right to seek additional briefing on Plaintiff-specific irreparable harm and equitable-balancing arguments. A121; A123. Thus, the district court contemplated that the parties would submit

joint status reports a week after the court's preliminary-injunction decision.  A121; A123.

This Court should deny EPA's motion without prejudice to its renewing the motion after seeking a stay at the district court.

## II.    If The Court Reaches The Merits, It Should Deny The Motion.

A stay pending appeal is governed by a four-factor inquiry: (1) whether the moving party "has made a strong showing" on the merits; (2) whether that party "will be irreparably injured absent a stay"; (3) whether a stay "will substantially injure other parties"; and (4) "where the public interest lies."  *Nken v. Holder*, 556 U.S. 418, 434 (2009) (citation omitted).  The "most critical" factors are the applicant's likelihood of success and the possibility of irreparable harm.  *See Citizens for Resp. & Ethics in Wash. v. FEC*, 904 F.3d 1014, 1016 (D.C. Cir. 2018) ("*CREW*").  EPA is *not* likely to succeed and gets the harm factors backwards.

### A.    EPA is Unlikely to Succeed on the Merits.

This case challenges agency action under the Administrative Procedure Act and the U.S. Constitution.  *See* 5 U.S.C. § 702.  After freezing Plaintiffs' Citibank accounts, EPA sent letters on March 11 citing the relevant rules and purporting to terminate Plaintiffs' grants.  That course of conduct is quintessential agency action.  *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).  If agency action fails to comply with governing law, or is otherwise arbitrary, it must be "set aside."  5 U.S.C.

§ 706(2); *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024).  Because EPA's interference with and termination of these grants was arbitrary, capricious, and contrary to law, they cannot survive APA review.  A26-30.

EPA's motion barely even tries to defend the lawfulness of its actions.  Mot. at 21-22.  EPA sent the same generic termination letter to eight different grant recipients.  That letter acknowledged the rules governing grant termination, but EPA did not follow them.  As the district court recognized, this violated governing regulations and the Constitution.  A26-A31.

Unable to defend itself under the APA, EPA changes the subject.  The APA standard does not apply here, EPA says, because Plaintiffs' APA and Constitutional claims are just disguised claims for breach of contract that should have been filed in the Court of Federal Claims.  But, as the district court recognized, A18, Judge Bork's decision for this Court in *Maryland Department of Human Resources v. Department of Health & Human Services*, 763 F.2d 1441 (D.C. Cir. 1985), forecloses that jurisdictional argument.  The Court reasoned that "seeking funds" under a federal grant program is not a claim for "compensatory relief" that qualifies as "money damages," even though it would "require the payment of money by the federal government."[3]  *Id.* at 1446.  Further, the Court explained, such an action does not

---

[3] The APA's waiver of sovereign immunity does not apply to actions seeking "money damages."  5 U.S.C. § 702.

trigger the Tucker Act because it "turn[s] on the interpretation of statutes and regulations" governing "a federal grant program," not "on the interpretation of an agreement negotiated by the parties." *Id.* at 1449. The Supreme Court adopted this Court's holding—and large parts of Judge Bork's opinion—in *Bowen v. Massachusetts*, 487 U.S. 879, 894-96, 899-901 (1988).

EPA's response misconstrues Plaintiffs' claims. EPA asserts that *Maryland Department* does not apply here because "plaintiffs' asserted interest in the grant funds arises from the grant contract rather than any statute or regulation." Mot. at 20. Indeed, this is the centerpiece of EPA's jurisdictional argument: that Plaintiffs should go to the Claims Court because "[t]he asserted right to billions of dollars" stems "solely from the grant agreements." *Id.* at 15; *see id.* at 17, 18. But Plaintiffs are not claiming money damages or asserting a "right" to "funds" under a contract— they *already have* the funds in their Citibank accounts. Instead, they are seeking to set aside EPA's attempt to terminate their grants and claw back the already-disbursed funds in violation of the APA, the Constitution, and regulations governing grant terminations. The Court of Claims does not even have jurisdiction to hear Plaintiffs' constitutional claims, on which the district court held Plaintiffs are likely to succeed. The point of *Maryland Department* is that neither the existence of a grant agreement nor the fact that funding originally flowed from it can "transform the nature of the relief sought—specific relief, not relief in the form of damages." 763 F.2d at 1446.

The Supreme Court's recent order in *DOE v. California* does not change this analysis.  *See* 145 S. Ct. 966 (2025).  While there the Court found that the government was "likely to succeed in showing that the District Court lacked jurisdiction to order *the payment of money* under the APA," *id.* at 968 (emphasis added), that is not what Plaintiffs here seek.  In fact, the Supreme Court's order reiterates the distinction between claims "to enforce a contractual obligation to pay money," which belong in the Claims Court, and those seeking "an order setting aside an agency's action" that "may result in the disbursement of funds," which do not. *Id.* (citing *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002) and *Bowen*, 487 U.S. at 910).  At best for EPA, this case falls into the latter category.[4]

This case also differs from *DOE* since it cannot possibly involve any "disbursement" of funds from the U.S. Treasury.  As EPA admits, it asked Citibank "to serve as a financial agent" here, meaning that all the grant funds are now disbursed and deposited at Citibank "in the name of each plaintiff."  Mot. at 4, 5. Moreover, and again unlike *DOE*, this case involved a separate defendant (Citibank) with separate liability for separate actions not subject to the Claims Court's jurisdiction or to the Tucker Act.  Citibank, for its part, has not sought a stay of the

---

[4] In any case, *DOE* did not actually decide the Tucker Act question.  A "stay order is not a decision on the merits." *Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Kavanaugh, J., concurring).  And the potential for Tucker Act jurisdiction was just one factor justifying a stay.  *DOE*, 145 S. Ct. at 968.

district court's preliminary injunction.    An order setting aside EPA's unlawful termination of and interference with Plaintiffs' awards would thus require *no* payments from the government.  Instead, it would merely permit Plaintiffs access to their already-disbursed funds free from unlawful agency interference.

### B.    EPA Will Suffer No Cognizable Harm Absent a Stay.

EPA asserts that it will be irreparably injured absent a stay because, during the pendency of the appeal, the grant awardees will spend some of the money that EPA itself awarded and disbursed to them.  That argument fails.

First, EPA's failure to ultimately defend the lawfulness of its actions is fatal to its harm argument.  As the district court recognized, EPA "cannot suffer harm from an injunction that merely ends an unlawful practice."  A37-38.  And while EPA contests which court should hear Plaintiffs' claims, its Motion does not even dispute the district court's finding that EPA's change-in-policy-based terminations were unlawful.  A26-30.

Moreover, EPA's irreparable-harm argument is divorced from its purported objection to the awards.  EPA's justification for seeking to terminate Plaintiffs' awards has shifted dramatically over time.  The only justification EPA identifies in its Motion is that, based on a change of policy priorities, EPA would prefer to have a different level of "oversight."  *E.g.*, Mot. at 22.  But EPA identifies *no* oversight-

14

related harm that has resulted so far, nor any evidence that any such harm would likely result absent a stay.

That is unsurprising.  EPA already has significant oversight.  *See, e.g.*, *JCF* Dkt. 1 at 96-97 (permitting EPA to "[c]losely monitor[]" CCIA recipients and "ensure appropriate expenditure of grant funds").  Indeed, on March 4, 2025, EPA submitted 35 requests for information from JCF and Inclusiv, to which JCF and Inclusiv provided thorough and detailed responses.  *See*, *e.g.*, *Inclusiv* Dkt. 6-17.  EPA is also protected from misuse of the funds in other ways.  For instance, federal regulations require that Citibank pledge collateral security for the ACA funds; this collateralization gives the U.S. government what the Treasury already has determined by regulation is adequate protection in case the money were to be misused.  *See* 31 C.F.R. § 202.6.  Without identifying any harm from the absence of increased "oversight," EPA asserts at best a speculative harm that cannot support a stay.  *See, e.g.*, *CREW*, 904 F.3d at 1019; *Wis. Gas Co. v. FERC*, 758 F.2d 669, 672 (D.C. Cir. 1985).

Moreover, the fact that JCF and Inclusiv would, absent a stay, spend some of their awards to carry out their ongoing obligations is not, in and of itself, harm to EPA.  EPA agrees (*e.g.*, Mot. at 12) that, even if it could lawfully terminate the awards, the IRA would require re-obligating them to provide "financial assistance and technical assistance in low-income and disadvantaged communities." 42 U.S.C.

15

§ 7434(a)(3). That is precisely what JCF and Inclusiv are doing. JCF's projects include providing technical support and financing to allow rural hospitals, low-income families, small businesses, churches, schools, and nursing homes to implement energy solutions that will, among other things, reduce costs and provide more reliable energy access, including during and after severe storms. A96 (¶ 17); A115-A116 (¶¶ 34-37). Inclusiv has obligated $651 million to 108 credit unions. A59 (¶ 25). Those credit unions will leverage at least $2 of private capital for every $1 in CCIA funding, then use those funds to develop loan products aimed at improving their individual members' financial security. *See* A58 ¶ 24. EPA makes *no* argument that it would re-obligate the funds Congress appropriated in a meaningfully different way.

Without identifying either harm from a purported lack of "oversight" or a meaningful difference in how the funds would ultimately be spent, EPA's attempt to portray itself as a protector of the "public fisc" is a mirage. If anything, it is EPA's position that could damage the public fisc by forcing EPA to pay out the same funds *twice*: first under a re-obligated grant award and then again as damages to Plaintiffs in the Court of Claims.

## C. Staying the Preliminary Injunction Would Grievously Injure JCF and Inclusiv.

The undisputed evidence before the district court directly refutes EPA's suggestion (Mot. at 12-13) that a stay would impose only remediable financial harm

16

and that there are no reliance interests at stake. A stay would threaten JCF's very existence and undermine—perhaps permanently—both organizations' ability to carry out their mission.

JCF was created to apply for and disburse CCIA funding, and it has no funding beyond its CCIA award. A93-A94 (¶¶ 4, 6). So unless JCF can access the funds in its Citibank accounts, it simply cannot do its work. *See* A33. And because JCF relies on its CCIA award to fund its operations, the inability to draw from its bank accounts until the resolution of this appeal—which could take many months—may well require JCF to close its doors. A93 (¶ 5). This goes far beyond remediable financial harm. *See Wis. Gas Co.*, 758 F.2d at 674.

JCF is suffering reputational injury as well. JCF has built relationships with community lenders and other partners, often overcoming those lenders' hesitancy to participate in the GGRF program due to fears of "being labeled 'woke' or otherwise targeted." A101-A102 (¶ 41). Those relationships "are built on trust" and, once damaged, "cannot be easily repaired." A102 (¶ 42). JCF promised to provide funding to 35 community lenders, who have in turn committed funding to qualified projects, A96 (¶ 17)—but now cannot follow through. Every day JCF cannot "make good on its commitments to community lenders, and they to their qualified projects, is a day on which more irreparable damage is done." A102 (¶ 42).

The record also shows substantial reliance interests. Equipment purchased on the expectation of imminent funding may need to be sold "to reduce immediate burdens and losses, with the result that projects are essentially pushed back to an early stage of development and with additional imbedded debt." A115 (¶ 32). If delays are protracted, "underwriting will need to re-occur, both for prudential investment reasons and because projects costs would be expected to change." *Id.* That process "can be costly," further impeding these projects' progress and success. *Id.*

Inclusiv will also suffer if it loses access to the funding for a grant program that it has already started implementing. Inclusiv's organizational mission includes serving under-banked communities by creating access to affordable clean-energy financial products. When it received a CCIA grant, it invested heavily in a new program to use that grant in accordance with its mission. Inclusiv has hired and trained specialized staff, procured equipment and space for the program's implementation, and made commitments to subrecipients. *See Inclusiv* Dkt. 1 ¶ 111. Losing the grant now—even temporarily—would likely mean the end of the program and the permanent loss of the resources Inclusiv has committed. Equally significant, the loss of CCIA funds would permanently damage Inclusiv's business trust and goodwill with its members—particularly the 108 credit unions to which Inclusiv has committed $651 million in CCIA funding to date. A53 (¶ 10); A59

(¶ 25). For a membership organization like Inclusiv, with a 50-year history of supporting community-development credit unions nationwide, that erosion of confidence and trust would cause long-term harm to its mission, and jeopardize its ability do business. A70 (¶¶ 65-67).

It is also imperative to correct, as soon as possible, EPA's utterly unsubstantiated allegations causing Inclusiv additional reputational harm. EPA has made public statements describing grants under the GGRF program as "riddled with self-dealing and wasteful spending" for "unqualified recipients" that "[l]ack … [f]inancial [c]ompetency" due to "blatant conflicts of interest[.]" *Inclusiv* Dkt. 1 ¶ 83. EPA has also alluded to unspecified criminal conduct by the GGRF recipients. *See, e.g.*, *Inclusiv* Dkt. 1 ¶ 72. And EPA's termination letter—which falsely alleged that Inclusiv's use of its award perpetuated "programmatic fraud, waste, and abuse"—tarnished Inclusiv's trustworthiness and reputation. Inclusiv has carefully cultivated its reputation and goodwill over five decades of outreach and partnership building with the grant recipients, credit unions, and leaders in the communities it serves. *See Inclusiv* Dkt. 1 ¶ 31; A70 (¶¶ 65-68) ; *see also* A73-A75 (¶¶ 4-8); A80 (¶¶ 5-9); A83 (¶¶ 4-6); A87-A88 (¶¶ 3-8) (describing credit unions' relationship and service to their communities). The continued lack of fund access implies to Inclusiv's members and partners that these unsubstantiated and false allegations are true. The stigma from a continued inability to access CCIA grant funds would harm

Inclusiv's ability to retain its key relationships, and impair its opportunities to receive future government grants. *See* A70 (¶¶ 65-67); 2 C.F.R. § 200.206(b).

### D. The Public Interest Would Be Served by Allowing the District Court's Order to Take Effect.

Congress designed the CCIA program to benefit the public. JCF's and Inclusiv's work would provide such benefits through financing that would create jobs, lower energy bills, and facilitate the kind of energy independence that helps communities weather storms and blackouts without losing power to refrigerators, medical equipment, heat, or air conditioning. A100 (¶ 37); A109-A111 (¶¶ 11-16, 19); A52-A53 (¶¶ 6-9). Indeed, the 108 subrecipients selected by Inclusiv have demonstrated an ability to leverage $2 of private capital for every $1 of CCIA funding—deepening the impact of GGRF funds through community investments and individual and small-business loans. A58 (¶ 24).

Moreover, the "public interest [is] in having governmental agencies abide by the federal laws that govern their existence and operations." *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994). EPA's conduct violated the APA and the Constitution, and it has made virtually no effort to argue that its actions in fact comported with federal law. "There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

20

## III.    If The Court Grants A Stay, It Should Limit Its Scope.

If the Court stays the district court's injunction pending appeal, that stay should be limited in key ways.

*First*, the Court should ensure that Plaintiffs can access funds sufficient to cover operating expenses while this appeal is pending.  If the Court forbids Plaintiffs to draw on their funds *at all* for the duration of this appeal, at least some Plaintiffs, including JCF, may have to close their doors.  Others, such as Inclusiv, will need to shutter their CCIA programs.  And all Plaintiffs would lose the personnel they need to carry out their planned CCIA programs.  This outcome would effectively give EPA what it wants—an end to the CCIA program—even if Plaintiffs eventually prevail on the merits.  Moreover, Plaintiffs' inability to access operating expenses would place them at risk of noncompliance with their GGRF awards.  *See* A101 (¶ 40).  To avoid those results, any stay should allow Plaintiffs to draw the funds necessary to sustain their programs, including the retention of key staff and maintenance of program infrastructure.

*Second*, any stay should allow Plaintiffs to fulfill the program commitments they already made before EPA sent its termination letter.  Plaintiffs could not have known, when they committed their funds to subrecipients, that EPA would try to claw those funds back.  And Plaintiffs made these commitments following instructions provided by EPA's staff and grant managers before the March 11 letter.

21

*See, e.g.*, *Inclusiv* Dkt. 1 ¶¶ 62-68.  Even if the Court is inclined to believe EPA has the power, going forward, to terminate the CCIA grants based on a change in agency priorities, EPA should not be able to force Plaintiffs to default on valid commitments they made pursuant to a validly issued award.

*Third*, and at a bare minimum, any stay should prohibit EPA from removing the funds from Plaintiffs' Citibank accounts.  Otherwise, sovereign immunity will likely bar any recovery of the grant funds, *see Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1, 58 (D.D.C. 2020), especially if those funds are re-obligated, *see City of Houston v. HUD*, 24 F.3d 1421, 1426-27 (D.C. Cir. 1994).  If permitted, EPA could, again, accomplish what it set out to do with the March 11 termination letters even if its actions are held illegal.

*Fourth*, any stay should not apply to Citibank, which did not move to stay the injunction pending appeal.  Citibank explicitly declined to endorse EPA's motion; it merely asked that any stay be applied to it.  But Citibank cites no case in which a court of appeals stayed an injunction as to a nonmoving party.  And a stay as to Citibank would be particularly inappropriate given that EPA's primary merits argument—that Plaintiffs should have sued in the Court of Claims—*does not even apply to Citibank*.

In addition, JCF and Inclusiv support the NCIF plaintiffs' request for an expedited briefing-and-argument schedule in this case.

22

## CONCLUSION

The Court should deny a stay.


Date:  April 22, 2025

/s/ Jay C. Johnson

Jay C. Johnson
VENABLE LLP
600 Massachusetts Avenue, NW
Washington, DC 20001
Tel.: (202) 344-4000
jcjohnson@venable.com


*Counsel for Inclusiv, Inc.*

/s/ David J. Zimmer

David J. Zimmer
ZIMMER, CITRON & CLARKE LLP
130 Bishop Allen Drive
Cambridge, MA 02139
Tel.: (617) 676-9421
dzimmer@zimmercitronclarke.com

Eric F. Citron
Kathleen Foley
ZIMMER, CITRON & CLARKE LLP
1629 K. St. NW
Suite 300
Washington, D.C. 20006
(202) 796-4540
ecitron@zimmercitronclarke.com
kfoley@zimmercitronclarke.com

*Counsel for Justice Climate Fund*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing opposition complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because the opposition contains 5,136 words.  The opposition complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and (6) because it has been prepared using Microsoft Word for Microsoft 365 MSO in proportionally spaced, 14-point Times New Roman typeface.


*/s/ David J. Zimmer*
David J. Zimmer

*Attorney for Plaintiff-Appellee Justice Climate Fund*

## CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2025, I electronically filed the foregoing opposition with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ David J. Zimmer*
David J. Zimmer

*Attorney for Plaintiff-Appellee Justice Climate Fund*