**NOT YET SCHEDULED FOR ORAL ARGUMENT**

**No. 25-5122**

———————————————————————————————

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————————————————————————

CLIMATE UNITED FUND, ET AL.,
*Plaintiffs-Appellees*,

v.

CITIBANK, N.A., ET AL.,
*Defendants-Appellants*.

———————————————————————————————

On Appeal from the United States District Court
for the District of Columbia, No. 25-cv-698-TSC

———————————————————————————————

**APPENDIX TO CCIA AWARDEES' OPPOSITION TO
MOTION FOR STAY PENDING APPEAL**

———————————————————————————————

Jay C. Johnson
VENABLE LLP
600 Massachusetts Avenue, NW
Washington, DC 20001
Tel.: (202) 344-4000
jcjohnson@venable.com

*Counsel for Inclusiv, Inc.*

David J. Zimmer
ZIMMER, CITRON & CLARKE LLP
130 Bishop Allen Drive
Cambridge, MA 02139
Tel.: (617) 676-9421
dzimmer@zimmercitronclarke.com

Eric F. Citron
Kathleen Foley
ZIMMER, CITRON & CLARKE LLP
1629 K. St. NW
Suite 300
Washington, D.C. 20006
(202) 796-4540
ecitron@zimmercitronclarke.com
kfoley@zimmercitronclarke.com

*Counsel for Justice Climate Fund*

# TABLE OF CONTENTS

**Page**

Memorandum Opinion on Plaintiffs' Motion for Preliminary Injunction (*Climate United* Dkt. 89, Apr. 15, 2025) ........................................................A1

Order Granting Plaintiffs' Motion for Preliminary Injunction (*Climate United* Dkt. 80, Apr. 16, 2025) .................................................................A40

Order Modifying Order Granting Plaintiff's Motion for Preliminary Injunction (*Climate United* Dkt. 96, Apr. 19, 2025) ........................................................A43

Defendant Citibank, N.A.'s Status Report (*Climate United* Dkt. 88, Apr. 16, 2025) .........................................................................................A47

Declaration of Neda Arabshahi (*Inclusiv* Dkt. 6-2, Mar. 31, 2025) .....................A50

Declaration of Jared Freeman (*Inclusiv* Dkt. 6-4, Mar. 28, 2025).......................A72

Declaration of Greg Hanshaw (*Inclusiv* Dkt. 6-5, Mar. 31, 2025) .......................A78

Declaration of John Stott Lawson (*Inclusiv* Dkt. 6-3, Mar. 28, 2025) ................A82

Declaration of Ricardo Ledezma (*Inclusiv* Dkt. 6-6, Mar. 31, 2025)..................A86

Declaration of Amir Kirkwood (*JCF* Dkt. 7-2, Apr. 2, 2025) ..............................A92

Declaration of Reginald Parker (*Climate United* Dkt. 78-1, Apr. 15, 2025)......A105

Docket, *Inclusiv, Inc. v. United States Environmental Protection Agency*, No. 25-cv-948, D.D.C. (filed Mar. 31, 2025)...........................................A118

Docket, *Justice Climate Fund v. United States Environmental Protection Agency*, No. 25-cv-938, D.D.C. (filed Mar. 31, 2025)..............................A122

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

**CLIMATE UNITED FUND**

       Plaintiff,

v.

**CITIBANK, N.A.**, *et al.*

       Defendants.

</td><td>

Civil Action No. 25-cv-698 (TSC)
Civil Action No. 25-cv-735 (TSC)
Civil Action No. 25-cv-762 (TSC)
Civil Action No. 25-cv-820 (TSC)
Civil Action No. 25-cv-938 (TSC)
Civil Action No. 25-cv-948 (TSC)
(Consolidated Cases)

</td></tr>
</table>

## <u>MEMORANDUM OPINION</u>

Government agencies wield immense authority in areas central to public life. With that power comes the responsibility to act fairly, transparently, and in accordance with the law. When agencies fail to operate within the bounds of the law—whether through breaching agreements, arbitrary decision-making, or ignoring regulations—they erode public trust, materially affect the rights and interests of individuals and organizations, and undermine confidence in the very institutions meant to serve the people. The integrity of government actions depends not only on the decisions made but on the consistent and lawful execution of those decisions.

Plaintiffs Climate United Fund ("Climate United" or "CU"), Coalition for Green Capital ("CGC"), and Power Forward Communities, Inc. ("PFC") are nonprofit financial institutions who, in April 2024, were awarded grant funding by the U.S. Environmental Protection Agency ("EPA") to finance clean technology projects nationwide. Under the National Clean Investment Fund ("NCIF"), Climate United was awarded $6.97 billion, CGC was awarded $5 billion, and PFC was awarded $2 billion. Plaintiffs California Infrastructure and Economic Development Bank ("California IBank"), Efficiency Maine Trust ("Efficiency Maine"), Illinois Finance Authority

("Illinois Climate Bank"), and Minnesota Climate Innovation Finance Authority ("MnCIFA") (collectively, "Subgrantee Plaintiffs") are state green banks—public or quasi-public entities that provide crucial financial services to pollution-reducing projects in their states—who are subrecipients under CGC's NCIF grant. Plaintiffs Justice Climate Fund ("JCF") and Inclusiv, Inc. ("Inclusiv") are nonprofit financial institutions who were also awarded EPA grant funding in April 2024, but under the Clean Communities Investment Accelerator fund ("CCIA"). JCF was awarded $940 million and Inclusiv was awarded $1.87 billion.

These grants require Plaintiffs' funds be held at Citibank, N.A. ("Citibank") in their individual bank accounts, according to the parties' respective agreements. Since mid-February 2025, Plaintiffs have attempted to draw on funds from their respective accounts to no avail. For weeks, despite repeated inquiries to Citibank and EPA, Plaintiffs received little to no communication from EPA or Citibank regarding their inability to access their funds. Overnight, billions of dollars appropriated by Congress were frozen. As a result, nationwide projects were halted, workplans were disrupted, and millions of dollars in approved transactions with committed partners could not be disbursed.

After weeks of no communication, Plaintiffs filed this case against Defendants, and then finally received a response the day before a TRO hearing in this case—in near identical notices, EPA terminated their grants, effectively dismantling the entirety of the NCIF and CCIA grant programs. Plaintiffs allege that Defendants' actions violate several statutes and regulations, the U.S. Constitution, and the Administrative Procedure Act ("APA"), and they seek to extend this court's TRO order into a preliminary injunction pending a final decision on the merits. For the reasons discussed below, Plaintiffs' motion for a preliminary injunction will be **GRANTED**.

# I.    BACKGROUND

## A. Statutory Background: The Inflation Reduction Act and EPA's Greenhouse Gas Reduction Fund

The court discussed some of the background of this case in its Memorandum Opinion granting a TRO, which it incorporates here. *See Climate United Fund v. Citibank, N.A.*, ___ F. Supp. 3d ___, No. 25-cv-698, -735, -762, 2025 WL 842360 (D.D.C. Mar. 18, 2025).

In 2022, Congress enacted the Inflation Reduction Act of 2022 ("IRA"). Pub. L. No. 117-169, 136 Stat. 1818. The IRA amended the Clean Air Act to authorize EPA to make competitive grants under the Greenhouse Gas Reduction Fund ("GGRF"), which appropriated approximately $27 billion to the EPA Administrator to make grants available to eligible recipients for various clean energy climate projects. *See* 42 U.S.C. § 7434(a)(1)–(3).

Upon enactment of the IRA, EPA launched a stakeholder engagement strategy to help shape implementation of the GGRF. Cong. Rsch. Serv., IF12387, EPA's Greenhouse Gas Reduction Fund, https://www.congress.gov/crs-product/IF12387 (updated May 21, 2024). Among other things, EPA held multiple listening sessions for members of the public and stakeholder groups, "published a Request for Information seeking public comment on core design aspects of the GGRF," and sought advice from the agency's Environmental Financial Advisory Board. *Id.*

Finally, in June and July 2023, EPA launched three grant programs under the GGRF: the National Clean Investment Fund ("NCIF"), Clean Communities Investment Accelerator ("CCIA"), and Solar for All. *Id.* Together, NCIF and CCIA were built to work in tandem to "not only deploy clean energy and combat the climate crisis but also improve health outcomes, lower energy costs, and create high-quality jobs for Americans." Pls.' Consolidated Mot. for Prelim. Inj. Mot. ("PI Mot."), Ex. 1 at 4, ECF No. 33-3.

### B.  Plaintiffs Apply for and Win EPA Grants

In October 2023, Plaintiffs applied for grant funding for GGRF programs, which included a robust set of application requirements and evaluation criteria.  *Review and Selection Process*, EPA,  https://www.epa.gov/greenhouse-gas-reduction-fund/review-and-selection-process  (last updated Aug. 16, 2024).  Applicants were required to submit information that encompassed "organizational and governing documents; resumes of board members and senior management; legal and compliance risk management policies and procedures; financial statements; workplans for the first year of program implementations, and budget narratives." *Id.*  On April 4, 2024, EPA publicly announced that Plaintiffs had won grant funding.  EPA Prelim. Inj. Opp'n ("EPA PI Opp'n"), Ex. A at 3, ECF 49-2.  Under the NCIF, Climate United was awarded $6.97 billion, CGC was awarded $5 billion, and PFC was awarded $2 billion, and under the CCIA, JCF was awarded $940 million and Inclusiv was awarded $1.87 billion. *Id.*  Subgrantee Plaintiffs are subrecipients under CGC's NCIF grant. *California IBank v. Citibank, et al.*, No. 25-cv-820, Prelim. Inj. Mot. at 9, ECF No. 17.

### C.  Award Agreements and Relevant Regulations

Plaintiffs' awards were memorialized in grant agreements between Plaintiffs and EPA.[1]  PI Mot., Ex. 3, EPA Grant Agreement, Dec. Amend., ECF No. 33-5.  Under the grant agreements, EPA may only terminate an award under three circumstances:

> (1) If a grant recipient engages in "substantial" noncompliance such that "effective performance" is "Materially Impaired."  Performance is deemed "Materially

---

[1] "Given that the GGRF cases contain common questions of law and fact," including that EPA "issued the GGRF grants under 42 U.S.C. § 7434 at similar times utilizing similar grant agreements with common terms," Citibank is the designated financial agent for these awards, and "EPA sent termination notices regarding the GGRF grants agreements at similar times upon similar bases" to Plaintiffs, *see* Joint Mot. to Consolidate at 1, *Just. Climate Fund v. EPA*, No. 25-cv-938, ECF No. 13, for simplicity, the court refers to Climate United's exhibits when discussing common issues.

Impaired" if: (1) EPA issues a "written determination and finding . . . that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause;" and (2) EPA determines in its sole discretion that a "corrective action plan" would remedy the issue and EPA issues a "separate written determination and finding" that the Recipient "has not materially addressed its failure."

(2) If a Recipient engages in "material misrepresentation of eligibility status;" or

(3) For "Waste, Fraud, or Abuse," which is defined with reference to EPA General Terms and Conditions and 2 C.F.R. § 200.113. Termination on these grounds requires "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U.S.C. §§ 3729-3733."

*see* PI Mot. at 8–9, 12, 41, ECF No. 33-1.

The Uniform Grant Guidance, 2 C.F.R. § 200, applies to federal agencies that make federal awards to non-federal and other entities. These regulations lay out a host of requirements for federal grants, including the procedural steps an agency must take before it can suspend (*id.* § 200.339) or terminate a grant (*id.* § 200.340). *See also id.* §§ 200.341, 200.342, and 200.305.

For example, EPA must provide written notice of termination that includes "the reasons for termination, the effective date, and the portion of the Federal award to be terminated," and it must "clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award." *Id.* § 200.341(a)-(b). On April 22, 2024, the Office of Management and Budget ("OMB") finalized several revisions to these regulations, one of which included amending 2 C.F.R. § 200.340 to permit termination of federal grants when inconsistent with agency priorities *only* when that basis is stated in the grant's terms and conditions. Guidance for Federal Assistance, 89 Fed. Reg. 30,046, 30,089 (Apr. 22, 2024).

In July 2024, EPA decided to apply the revised version of 2 C.F.R. § 200.340, consistent with OMB guidance, to the grant agreements in this case. *See* 89 Fed. Reg. at 55,263. Under 2 C.F.R. § 200.340, EPA may terminate a federal award "if the recipient or subrecipient fails to

comply with the terms and conditions of the Federal award," or "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." *Id.* § 200.340(a)(1), (4).

Also relevant here, under *id.* § 200.305(b)(6)(i)(ii), "[p]ayments for allowable costs" pursuant to the grant agreements must not be withheld at any time during the period of performance, unless required by federal statute, regulations, or if (i) the recipient or subrecipient has failed to comply with the terms and conditions of the federal award, or (ii) the recipient or subrecipient is delinquent in a debt to the U.S. as defined in OMB Circular A-129. *Id.* (formatting modified).  Under these conditions, the federal agency "may, after providing reasonable notice, withhold payments to the recipient or subrecipient for financial obligations incurred after a specified date until the conditions are corrected or the debt is repaid to Federal Government." *Id.* (b)(6)(ii).

### D.  The Account Control Agreements and Financial Agency Agreements

Under the grant agreements, Plaintiffs' funds must be held at Citibank under the respective Financial Agency Agreements ("FAA") between Citibank and the U.S. Treasury Department ("Treasury"), and respective Account Control Agreements ("ACA") between Citibank, EPA, and Plaintiffs.  PI Mot. at 10–11.

Under the ACA, Citibank is "designated and authorized to act as a financial agent of the United States" under the authority of Treasury, and it administers and disburses the funds provided under the grant programs.  *See* PI Mot., Ex. 8 at 3, Account Control Agreement, ECF No. 33-10. Citibank must "comply with all instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and financial assets" and must release Plaintiffs' funds at their request, unless EPA—the "Secured Party" to the agreement—issues a "Notice of Exclusive

Control stating that it is exercising its right to exclusive control over an Account." *See* Citibank Opp'n to TRO Mot., FAA ("FAA") Ex. 1 at 25, ECF No. 14-1 (SEALED). Under the FAA, Citibank acts as a financial agent of the United States and provides banking and financial services related to these grant programs. *Id.* at 1.

Pursuant to the agreements discussed above, Plaintiffs would periodically request disbursement of their funds through Citibank. But beginning in mid-February 2025, Citibank stopped disbursing any funds after receiving a letter from the FBI "recommending" that Citibank freeze assets related to Plaintiffs' grants. Citibank Opp'n to TRO Mot., Ex. 5 at 2–6, ECF No. 14-5. Plaintiffs followed up with emails, letters, and voicemails to Citibank, with no response. And as discussed in the court's TRO opinion, EPA did not respond to Plaintiffs' inquiries. Plaintiffs were therefore left with no information as to why they could not access their funds. 2025 WL 842360, at *1.

Finally, on March 4, 2025, EPA sent Plaintiffs identical information requests. *See, e.g.*, EPA PI Opp'n, Ex. D, Compliance and Oversight Review of EPA Greenhouse Gas Reduction Fund Letter from EPA to CU, ECF No. 49-2. The letters expressed concerns over the oversight mechanisms of the grant award program and stated that EPA "will work with [Treasury] and [Citibank] to establish and implement additional account controls consistent with prudent operational standards pursuant to the [FAA]." *Id.* They instructed Plaintiffs to submit requested responses and documents to a list of 25 requests by March 28, 2025. *See id.*

That same day, Treasury instructed Citibank not to disburse any GGRF funds through March 9, 2025, stating it had been informed of EPA's "concerns regarding potential fraud and/or conflicts of interest related to the Greenhouse Gas Reduction Fund," and that "EPA anticipates developing additional account controls." Citibank Opp'n to TRO Mot., Ex. 7, ECF No. 14-7. And

on March 10, 2025, EPA and Treasury directed Citibank to continue to refrain from processing

payments. *Id.*, Ex. 2, ECF No. 14-2.

### E.  EPA Administrator and Funds Pause

On January 29, 2025, the Senate confirmed Lee Zeldin as EPA Administrator.  Decl. of

Eric Amidon ("Amidon Decl.") ¶ 3, ECF No. 49-3.  Almost immediately, and throughout February

and March 2025, Administrator Zeldin began to publicly express his desire to take control of the

funds disbursed under the IRA and to terminate the GGRF grants.  *See* PI Mot. at 1–3; 15–19.  On

February 12, 2025, he publicly announced EPA's intention to do so, stating that the FAA with

Citibank "needs to be instantly terminated," that Citibank "must immediately return the funding,"

and that EPA is "not going to rest" until it recovered the grant funds.  *Id.*, Ex. 7 at 4–5, ECF No.

33-9.

On February 13, 2025, Administrator Zeldin publicly announced that "roughly $20 billion"

of tax dollars were found "parked at a financial institution," and in a video, called for the immediate

cancellation of the FAA, stating that "the American public deserves a more transparent and

accountable government."  PI Mot. at 35; Administrator Zeldin Announces that Billions of Dollars

Worth of "Gold Bars" Have Been Located at Outside Financial Institution, EPA,

https://www.epa.gov/newsreleases/administrator-zeldin-announces-billions-dollars-worth-gold-

bars-have-been-located (Feb. 13, 2025).

On February 23, 2025, Administrator Zeldin discussed the GGRF funds on a television

program, stating that the agency was working to "re-establish accountability and oversight" over

the grant programs, and that the "entire scheme, in [his] opinion, is criminal."  PI Mot., Ex. 7 at

4–5;  @SundayMorningFutures,  *X*  (Feb.  23,  2025,  11:21  AM),

https://x.com/SundayFutures/status/1893697750937505807.  On March 2, 2025, EPA issued a

letter to its Office of the Inspector General requesting an investigation into GGRF.  EPA PI Opp'n, Ex. C, ECF No. 49-2.

### F.  Grant Termination Letters

On March 8, 2025, Climate United filed suit and moved for a TRO.  *Climate United Fund v. Citibank, et al.*, No. 1:25-cv-698, ECF Nos. 1 & 2.  The court informed the parties that it was inclined to set a hearing for March 11, 2025, with opposition briefs due that same day.  EPA Defendants "asked for an extension as a professional courtesy," and Climate United agreed.  TRO Mot. Hr'g Tr. 10:06–12 (Mar. 12, 2025), ECF No. 22.  The court scheduled a hearing on the motion for March 12, 2025.  *See* Mar. 10, 2025 Min. Order.

The day before the scheduled TRO hearing, March 11, EPA Defendants sent Plaintiffs identical letters (aside from differences in the addressees and grant award numbers), informing them that EPA was terminating their "grant effective immediately."  *See* PI Mot., Ex. 11 at 1, Termination Letter, ECF No. 33-13.  EPA Defendants stated that the terminations were "based on substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities, which collectively undermine the fundamental goals and statutory objectives of the award."  *Id.* at 1.  The letter instructed Plaintiffs to cease all further program expenditures immediately.

### G.  Procedural Posture

Plaintiffs individually filed suit on various dates throughout March 2025 against EPA Administrator Lee Zeldin, and EPA Acting Deputy Administrator William Charles McIntosh (collectively, "EPA Defendants"), seeking declaratory and injunctive relief.  *See Climate United Fund v. Citibank et al.*, No. 1:25-cv-698, *Coal. for Green Cap. v. Citibank et al.*, No. 1:25-cv-735, *Power Forward Communities, Inc. v. Citibank et al.*, No. 1:25-cv-762, *Cal. Infrastructure & Econ.*

*Dev. Bank, et al. v. Citibank, et al.*, No. 1:25-cv-820, *Justice Climate Fund v. EPA et al.*, No. 1:25-cv-938, and *Inclusiv, Inc. v. EPA et al.*, No. 1:25-cv-948.  Plaintiffs bring a variety of claims, including breach of contract, conversion, and replevin against Citibank, and claims under the U.S. Constitution and the APA, 5 U.S.C. § 706, against EPA Defendants, claiming its actions violated multiple regulations, statutes, and constitutional provisions.

The court heard argument on March 12 and March 15, 2025, and partially granted Plaintiffs' TRO on March 18, 2025.  On March 21, 2025, Plaintiffs Climate United, CGC, and PFC filed a consolidated motion for a preliminary injunction, which Subgrantee Plaintiffs joined with their own, separate briefing.  On March 31, 2025, the court granted Plaintiffs' motion to extend the TRO, given the preliminary injunction proceeding and for the reasons set forth in that Order.  *See* ECF No. 57.  On April 1, 2025, the court heard argument on the preliminary injunction motions, and on April 8, 2025, the court extended the TRO to April 15, 2025 to consider the parties' supplemental filings noticing the Supreme Court's Order staying the TRO in *U.S. Department of Education v. California*, No. 24A910 (Apr. 4, 2025).  *See* ECF Nos. 63–66; Order, ECF No. 70.  Finally, given the common questions of fact and law, these cases were consolidated. *See* Mar. 20, 2025, Mar. 25, 2025, and Apr. 15, 2025 Min. Orders.[2]

## II.    LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  A preliminary injunction is warranted where the moving party establishes that (1) it is likely to succeed on the merits, (2) irreparable harm is

---

[2] Prior to consolidation, Subgrantee Plaintiffs filed a separate Motion for Preliminary Injunction, *Cal. Infrastructure & Econ. Dev. Bank, et al. v. Citibank, et al.*, No. 1:25-cv-820, ECF No. 17, as did Inclusiv, *Inclusiv, Inc. v. EPA et al.*, No. 1:25-cv-948, ECF No. 6, and *Justice Climate Fund v. EPA et al.*, No. 1:25-cv-938, ECF No. 7.  Because this preliminary injunction covers all Plaintiffs, those motions were either dismissed as moot or granted.

likely in the absence of preliminary relief, (3) the balance of equities tips in the movant's favor, and (4) an injunction is in the public interest. *Id.* at 20; Fed. R. Civ. P. 65(b)(1). "The moving party bears the burden of persuasion and must demonstrate, 'by a clear showing,' that the requested relief is warranted." *Hosp. Staffing Solutions, LLC v. Reyes*, 736 F. Supp. 2d 192, 197 (D.D.C. 2010) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held," *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981), and "to balance the equities as the litigation moves forward," *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017) (per curiam). "The status quo is the last *uncontested* status which preceded the pending controversy." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733–34 (D.C. Cir. 2022) (quoting *District 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.*, 412 F.2d 165, 168 (D.C. Cir. 1969)).

## III.    ANALYSIS

The court begins its analysis with two threshold issues: subject-matter jurisdiction and standing.

### A. Standing

#### a.  *Plaintiffs Have Article III Standing*

It is an "essential and unchanging part of the case-or-controversy requirement" that a plaintiff must establish Article III standing to sue in federal court. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To establish Article III standing, a party must show that: (1) they have suffered an injury in fact, (2) the injury is fairly traceable to the challenged action of the defendant, and (3) it is likely that the injury will be redressed by a favorable decision. *Id.* at 560–61. A party seeking a preliminary injunction "must show a substantial likelihood of standing." *Green v. U.S.*

*Dep't of Just.*, 54 F.4th 738, 744 (D.C. Cir. 2022) (quoting *Food & Water Watch, Inc. v. Vilsack*,
808 F.3d 905, 913 (D.C. Cir. 2015)) (internal quotation marks omitted).

First, as to injury in fact, a plaintiff must have suffered "an invasion of a legally protected
interest," *Nat'l Fam. Plan. & Reprod. Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 828–29 (D.C.
Cir. 2006), that is "(1) concrete, (2) particularized, and (3) actual or imminent." *Vilsack*, 808 F.3d
at 914 (citation omitted). The injury in fact test "requires that the party seeking review be himself
among the injured." *Lujan*, 504 U.S. at 563 (citation omitted).

Plaintiffs are each themselves "among the injured." *Id.* There is no question that Plaintiffs
were awarded funds, which have been deposited in their individual accounts with Citibank. And
there is no question that each Plaintiff—including subgrantees of the grant awards—has its own,
individual account and a separate, individual agreement governing those accounts. *See* PI Hr'g
Tr. 86:12–86:25 (Apr. 2, 2025), ECF No. 62 ("[T]he subgrantees have their own separate
[Citibank] accounts . . . and there's a separate ACA that covers those accounts."). With no access
to the funds in their accounts, Plaintiffs have suffered a concrete injury that is "direct, real, and
palpable" and "personal, individual, distinct, and differentiated—not generalized." *Pub. Citizen,
Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1292 (D.C. Cir. 2007). Withdrawal
of funding qualifies as an injury in fact. *See, e.g.*, *Gonzales*, 468 F.3d at 829 (discussing how "[a]n
actual withdrawal of funding from the association's members would clearly qualify" as an injury
in fact but association did not "suggest that any such withdrawal has occurred.").

Plaintiffs have been unable to access their funds since mid-February. They have submitted
several declarations detailing the direct injuries they have suffered from this suspension. Without
access to their funds, Climate United has had to "defer compensation for certain employees,
terminate multiple vendors, cancel travel, and instruct non-essential lawyers, accountants, and

consultants to cease work." Decl. of Elizabeth Bafford ("Bafford Decl.") ¶ 62. PFC has been

unable to pay outstanding invoices from contractors for work completed on PFC's behalf and, as

a result, is incurring default risk with respect to these contracts. Decl. of Timothy J. Mayopoulos

("Mayopoulos Decl.") ¶ 19, ECF No. 33-31. And CGC has committed $135 million in funding to

fourteen emerging green banks and community lenders across fourteen states. Decl. of Stephen

Brown ("Brown Decl.") ¶¶ 4, 8, ECF No. 33-25. These are not "remote, speculative, conjectural,

or hypothetical" injuries. *Pub. Citizen*, 489 F.3d at 1293.

Defendants' arguments regarding Plaintiffs' position miss the mark. Plaintiffs are not, as

in *Hein v. Freedom,* mere taxpayers attempting to assert standing. *See Hein v. Freedom From

Religion Found., Inc.*, 551 U.S. 587, 593 (2007). ("It has long been established, [] that the payment

of taxes is generally not enough to establish standing to challenge an action taken by the Federal

Government."). They have articulated specific direct harm that they have suffered as a result of

Defendants' actions. Plaintiffs have therefore sufficiently demonstrated injury in fact.

Second, Plaintiffs' injuries are fairly traceable to the challenged action. EPA Defendants'

actions in ordering Citibank to freeze grant funds clearly prevent Plaintiffs from accessing the

funds in their accounts. These actions have resulted in halted projects, compromised

organizational missions, and caused injury to each Plaintiff individually. These injuries flow from

Defendants' actions and are not the "result [of] the independent action of some third party not

before the court." *Lujan*, 504 U.S. at 561 (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 462 U.S. 26,

41–2 (1976)). The causal connection between the injury and Defendants' conduct is clear.

Third, Plaintiffs must demonstrate redressability. It must be likely that a favorable decision

by the court would redress the plaintiff's injury. *Id.* Plaintiffs seek relief from what they claim is

the unlawful suspension and termination of their agreements and access to their funds. EPA

Defendants argue essentially that, since it is uncontested that EPA does have the authority to cancel grants, if EPA were to cancel Plaintiffs' grants lawfully, Plaintiffs would "cease to operate anyway." PI Hr'g Tr. 73:18–74:5.

But EPA's hypothetical possibility has no bearing on redressability, which does not "depend entirely on the occurrence of some other, future event, *Miami Bldg. & Constr. Trades Council, AFL/CIO v. Sec'y of Def.,* 493 F.3d 201, 206 (D.C. Cir. 2007), and a plaintiff need not "negate . . . speculative and hypothetical possibilities . . . in order to demonstrate the likely effectiveness of judicial relief." *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 78 (1978). Indeed, "a party seeking judicial relief need not show to a certainty that a favorable decision will redress [its] injury." *Nat'l Wildlife Fed'n v. Hodel,* 839 F.2d 694, 705 (D.C. Cir. 1988). Were the court to grant Plaintiffs' relief, they would have access to the funds in their accounts, dating back to, at a minimum, when their accounts were suspended in mid-February.

EPA Defendants also argue that any relief should not be extended to the subgrantees. But Plaintiffs have proffered evidence that their subgrantees' inability to access funds affects Plaintiffs' operations and ability to carry out their mission. *See, e.g.*, Decl. of Ari Matusiak ¶ 24, ECF No. 33-3 (If PFC loses its funding, [Subgrantee] Rewiring Community "will be forced to close its doors."); Decl. of John Moon ¶¶ 16-23; ECF No. 33-32; Decl. of Jessica Buendia ("Buendia Decl.") ¶ 12, ECF No. 33-26 (CGC's Subgrantee ICLEI "ultimately risks insolvency."); *see also* Decl. of Shaun Donovan ¶ 24, ECF No. 33-29.

The inability to access their grant funds affects both Plaintiffs *and* their subgrantees. *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 438 (2017) (standing requires plaintiffs to "alleg[e] such a personal stake in the outcome of the controversy as to . . . justify [the] exercise of the court's remedial powers on [their] behalf.") (quoting *Simon v. E. Ky. Welfare Rts. Org.,* 426 U.S. 26, 38

(1976)) (internal quotation marks omitted).  And on their own, Subgrantee Plaintiffs have shown

that they are at risk to suffer actual and imminent injury for the reasons already discussed.

     **b.**  ***Subgrantee Plaintiffs Have Prudential Standing***

     Finally, EPA argues that subgrantees lack prudential standing because they have no direct

legal relationship with EPA and are not parties to the terminated grants.  In addition to the

constitutional standing requirements, courts have recognized prudential limitations on standing not

specifically set forth by the Constitution's text.  *LaRoque v. Holder*, 650 F.3d 777, 781 (D.C. Cir.

2011).  These limitations are meant to avoid "the adjudication of rights which those not before the

Court may not wish to assert" and to ensure "that the most effective advocate of the rights at issue

is present to champion them."  *Duke Power Co.,* 438 U.S. at 80; *LaRoque*, 650 F.3d at 781–82.  A

party must show that "the interest it seeks to protect 'is arguably within the zone of interests to be

protected or regulated by the statute . . . in question.'"  *Cement Kiln Recycling Coal. v. EPA,* 255

F.3d 855, 870 (D.C. Cir. 2001) (quoting *Ass'n of Data Processing Serv. Orgs. V. Camp*, 397 U.S.

150, 153 (1970)).  This "test is not meant to be especially demanding."  *Clarke v. Secs. Indus.

Ass'n,* 479 U.S. 388, 399 (1987).

     For the reasons set forth above, the subgrantees' interests are not "so marginally related to

or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that

Congress intended to permit the suit."  *Motor & Equip. Mfrs. Ass'n v. Nichols,* 142 F.3d 449, 458

(D.C. Cir. 1998) (quoting *Clarke*, 479 U.S. at 399).  Subgrantee Plaintiffs assert their own legal

rights and interests, and they too bring claims challenging Defendants' actions, which have

upended their operations.[3]

---

[3] EPA Defendants claim that "the lack of prudential standing here is consistent with the Tucker
Act's denial of standing to a subrecipient, or any other party not in privity with the government."
EPA PI Opp'n to Subgrantee Pls.' PI Mot. at 8, ECF No. 56.  But EPA Defendants omit that there

**B. Subject-Matter Jurisdiction**

    **a.** ***This Court Has Jurisdiction Over These Claims***

      The court comes to the same conclusion it already reached on jurisdiction—it has jurisdiction over Plaintiffs' claims because these claims are not "in essence" contract claims, such that jurisdiction lies in the Court of Federal Claims. *See Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967–68 (D.C. Cir. 1982)).

      Federal district courts have jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Under the Tucker Act, 28 U.S.C. § 1491, and absent other grounds for district court jurisdiction, the Court of Federal Claims has exclusive jurisdiction over breach of contract claims against the federal government over $10,000. *Id.*; *see Megapulse*, 672 F.2d at 967–68.

      But the D.C. Circuit has "explicitly rejected the 'broad' notion 'that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act' because to do so would 'deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government.'" *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) (quoting *Megapulse*, 672 F.2d at 967–68). Thus, in determining whether a claim falls under the Tucker Act, the court

---

are exceptions to this rule. Even if this were a case properly before the Court of Federal Claims, subgrantees are not automatically barred from bringing their claims. While "[a]s a general rule, the Tucker Act does not provide the [Court of Federal Claims] with jurisdiction to hear a claim brought directly against the federal government by a subcontractor," (citing 28 U.S.C. § 1491(a)), "an exception exists however, which allows an intended third-party beneficiary of a government contract to enforce its rights directly against the federal government." *G4S Tech. LLC v. United States*, 114 Fed. Cl. 662, 669 (2014), *aff'd*, 779 F.3d 1337 (Fed. Cir. 2015); *see also First Hartford Corp. Pension Plan & Trust v. United States,* 194 F.3d 1279, 1289 (Fed. Cir. 1999) (one such exception allows suit against the government by an intended third-party beneficiary despite the lack of privity); *Flexfab, L.L.C. v. United States*, 424 F.3d 1254, 1263 (Fed. Cir. 2005).

must decide if the action "is *at its essence* a contract claim," which depends "both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)." *Id.*, 38 F.4th at 1106 (quoting *Megapulse*, 672 F.2d at 967–68).

EPA Defendants maintain that Plaintiffs' claims are not properly before this court—they contend that "this is just a run-of-the-mill [] contract dispute," and "at most, Plaintiffs are entitled to claim damages . . . [from] the Court of Federal Claims." EPA PI Opp'n at 10. The court cannot agree.

First, Plaintiffs' source of rights. Plaintiffs bring claims under the APA, the U.S. Constitution, and various statutes and regulations. They sued after Citibank refused to release their grant funds from their bank accounts—at what is now known to have been the direction of the FBI, EPA, and Treasury. Plaintiffs challenge EPA's action in suspending and then terminating their grants, which EPA concedes had nothing to do with Plaintiffs' performance under the grant. PI Hr'g Tr. 34:3–7, 53:13–16 (EPA conceding that Plaintiffs have not breached any terms of their agreements); EPA PI Opp'n at 20 (EPA explaining that it did not terminate Plaintiffs' grants for noncompliance). Indeed, nothing in the record suggests that Plaintiffs violated any term or condition of their agreements. *See id.* Yet, overnight, on the eve of a hearing challenging the freezing of the funds in their accounts, their grants were all terminated in identical letters using the same boilerplate language that referenced not only the terms of the contract to justify termination, but also federal regulations. *See* PI Mot., Ex. 11, Termination Letter.

In evaluating Plaintiffs' claims, the court does not look solely to any contract, nor could it when it must address clear regulatory and statutory questions. Plaintiffs were awarded this grant under a statute authorized by Congress. While it is true that the parties have entered into grant agreements that operate as contracts, the claims here turn on, at least in part, examining the federal

regulations and federal statute governing Plaintiffs' grant awards. EPA seems to agree but argues that the federal regulations are relevant to the grant agreements "because they're incorporated into the contract." PI Hr'g Tr. 41:25–42:3. It cannot be that the contract's authority trumps the agency's formal regulations and a federal statute.

EPA urges the court to treat the government as "any other contracting party" and argues that it should be free to breach contracts like any private party. *See* EPA PI Opp'n at 13. This ignores the fact that courts have long recognized that government actions, even those involving contractual relationships, are subject to review when they implicate statutory, constitutional, or procedural violations. The government is not just another contracting party. And as the Supreme Court has noted, "[u]nlike normal contractual undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy." *Bennett v. Ky. Dept. of Educ.,* 470 U.S. 656, 669 (1985). EPA's suspension and termination of Plaintiffs' grants interferes with Congress' mandate under the IRA concerning desirable public policy.

Ultimately, Plaintiffs' "claims arise under a federal grant program and turn on the interpretation of statutes and regulations rather than on the interpretation of an agreement negotiated by the parties." *Md. Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441, 1449 (D.C. Cir. 1985) (citation omitted). The record is clear: Plaintiffs do not challenge a mere contract between the parties—they challenge agency action governed by statutes and regulations.

Second, Plaintiffs' relief sought. "[E]xclusive jurisdiction in Claims Court under the Tucker Act does not lie 'merely because [a plaintiff] hints at some interest in a monetary reward from the federal government or because success on the merits may obligate the United States to

pay the complainant.'" *Crowley*, 38 F.4th at 1108 (quoting *Kidwell v. Dep't of Army*, 56 F.3d 279, 284 (D.C. Cir. 1995)). Indeed, "a claim is not for money merely because its success may lead to pecuniary costs for the government or benefits for the plaintiff." *Kidwell,* 56 F.3d at 284 (internal quotations omitted); *see Vietnam Veterans v. Sec'y of the Navy,* 843 F.2d 528, 534 (D.C. Cir. 1988).

Here, Plaintiffs seek equitable relief vindicating their rights to access their grant funds and to enjoin EPA's unlawful suspension and termination of their grants. Plaintiffs do not ask for specific performance, nor do they ask the court to interpret the terms of any contract. Any monetary benefit that might flow to Plaintiffs "would not come from [this] court's exercise of jurisdiction, but from the structure of statutory and regulatory requirements governing compensation" in this action. *Tootle v. Sec'y of Navy*, 446 F.3d 167, 175 (D.C. Cir. 2006) (citation omitted). The relief they seek "is not a claim for money damages, although it is a claim that would require the payment of money by the federal government." *Bowen v. Massachusetts*, 487 U.S. 879, 894 (1988).

Moreover, "[o]ur cases have long recognized the distinction between an action at law for damages—which are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation—and an equitable action for specific relief[.]" *Id.* at 893–96 ("The term 'money damages,' . . . normally refers to a sum of money used as compensatory relief. Damages are given to the plaintiff to *substitute* for a suffered loss, whereas specific remedies 'are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled.'"). Thus, "Courts frequently describe equitable actions for monetary relief under a contract" as specific relief, not money damages. *See id.* at 895.

Plaintiffs seek access to funds they are presently entitled to, "rather than money in compensation for the losses, whatever they may be, that [Plaintiffs] will suffer or ha[ve] suffered by virtue of the withholding of those funds." *Id.* They do not seek money damages for past harms or "compensation for the[ir] losses due to the failure to pay them, which, as in any contract case, could be far greater than the amount withheld pursuant to the agency policy[.]" *AIDS Vaccine Advoc. Coal. V. U.S. Dep't of State*, No. 25-cv-400, -402, 2025 WL 485324, at *6 (D.D.C. Feb. 13, 2025) (citation omitted). They seek "prospective, nonmonetary relief to clarify future obligations." *Me. Cmty. Health v. United States*, 590 U.S. 296, 327 (2020).

In addition, the Court of Federal Claims cannot provide the equitable relief Plaintiffs seek. Plaintiffs seek vacatur of the termination letters, an injunction compelling the government to meet its statutory obligations moving forward, and a determination of whether EPA acted in accordance with the law such that the grants were indeed lawfully terminated.[4] Were this court to find that EPA acted unlawfully, Plaintiffs could avail themselves "of statutory and regulatory provisions and procedures that may, or may not, entitle [them] to a monetary recovery." *Tootle*, 446 F.3d at 175 (collecting authorities).

Defendants rely heavily on the Supreme Court's recent order in *U.S. Department of Education v. California*, 604 U.S.____, 145 S.Ct. 966 (2025) in which it ordered a stay of the district court's TRO Order. *See California v. U.S. Dep't of Educ.*, No. CV 25-10548-MJJ, 2025

---

[4] For example, without a determination on the lawfulness of EPA's actions, EPA's termination of the grants on the current bases could affect the grantees and subgrantees' ability to apply for and receive federal grant funds, as these organizations would have to make disclosures when applying for future federal grant opportunities. *See* Decl. of Michael Stoddard ("Stoddard Decl.") ¶ 35, *Cal. Infrastructure & Econ. Dev. Bank, et al. v. Citibank, et al.*, No. 1:25-cv-820, ECF No. 17-2. Termination could also affect an organization's credit rating. *See* Decl. of Scott Wu ("Wu Decl.") ¶ 33, *Cal. Infrastructure & Econ. Dev. Bank, et al. v. Citibank, et al.*, No. 1:25-cv-820, ECF No. 17-5.

WL 760825, at *1 (D. Mass. Mar. 10, 2025); EPA Notice of Suppl. Authority, ECF No. 63; EPA Reply to Pls.' Resp.'s, ECF No. 71. The Supreme Court noted that the APA's waiver of sovereign immunity does not apply to claims seeking money damages or to orders "to enforce a contractual obligation to pay money." *Dep't. of Educ.*, 145 S.Ct. at 968. But the Court also noted that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." *Id.* (quoting *Bowen*, 487 U.S. at 910).

That is the situation here. Plaintiffs seek to regain access to their already disbursed funds at Citibank, rather than an order mandating the government to pay any type of money damages or money for past harms. In noting the distinction between money damages and relief other than damages, *Bowen* refused to characterize "expenses that [the government] should have paid all along" as money damages. 487 U.S. at 894. Indeed, *Bowen* characterized equitable actions for specific relief as orders providing for "reinstatement for an employee with backpay, or for the recovery of specific property or monies." *Id.* at 893–94 (citation and internal quotation marks omitted). This is part of the equitable relief Plaintiffs seek—reinstatement of their grants and the recovery of specific money. They also challenge EPA's thinly veiled attempts to dismantle the entirety of a congressionally created program and seek other declaratory relief that, as discussed, the Federal Court of Claims cannot grant. Finally, and importantly, the parties' relationship here—given the individual ACAs with Citibank and the lack of agreements between subgrantees and EPA—also differ from the ones implicated in *Department of Education v. California*. These factors materially alter the jurisdictional analysis.[5]

---

[5] Other district courts have recently addressed this question and "similarly held that *California* did not divest them of jurisdiction." *Woonasquatucket River Watershed Council, et al., v. U.S. Dep't of Agric.*, No. 25-cv-97-MSM-PAS, ECF No. 45 at 33–35 (D.R.I. Apr. 15, 2025); *Maine v. United States Dep't of Agric.*, No. 1:25-cv-131-JAW, 2025 WL 1088946, at *19 (D. Me. Apr. 11, 2025); *New York v. Trump*, No. 25-cv-39-JJM-PAS, ECF No. 182 at 5–9 (D.R.I. Apr. 14, 2025).

It also bears mentioning that the injury analysis in this case is different.  In *U.S. Dep't. of Educ.,* the Supreme Court noted that respondents in that case represented "that they have the financial wherewithal to keep their programs running."  *Dep't. of Educ.*, 145 S.Ct. at 969.  The coalitions in this case were created, under their current structure, to implement Congress's mandate.  Though they have decades of combined experience, they came together to implement Congress's specific call under the IRA.  Accordingly, the grantees do not have other committed sources of funding, meaning that the loss of access to their funds will have devastating effects. *See supra* § III(A) and *infra* § III(D).

It is undisputed that EPA can, and agencies do, terminate grants, but they must do so lawfully and in accordance with relevant regulations, the U.S. Constitution, and applicable law. The APA does not exist to review the actions of "other contracting parties"—it exists to review government action. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 371 (2024) ("Congress in 1946 enacted the APA 'as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices.') (quotation omitted).

EPA's position would impermissibly narrow the court's ability to review agency action. For example, the government might creatively contract their way out of judicial reviewability of its actions, shielding itself by virtue of its "contractual relationship" with a party.  That cannot be, and is not, what Congress envisioned for judicial review under the APA.  Nor is it the law.  As the *Megapulse* court said:

> It is one thing to rely on the generally recognized rule that a plaintiff cannot maintain a contract action in either the district court or the Court of Claims seeking specific performance of a contract. It is quite another to claim, as the Government does in this case, that an agency action may not be enjoined, even if in clear violation of a specific statute, simply because that same action might also amount to a breach of contract. Government's counsel admitted at oral argument that by the logical inference of its position the government could avoid injunctions against

activities violative of a statutory duty simply by contracting not to engage in those activities.

*Megapulse*, 672 F.2d at 971.

To be sure, the court understands the delicate balance here.  Of course, "it is important on the one hand to preserve the Tucker Act's limited and conditioned waiver of sovereign immunity in contract actions."  *Id.* at 968.  On the other hand, the court is also mindful that it "must not do so in terms so broad as to deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government."  *Id.*  As in *Bowen*, "[t]his restrictive—and unprecedented—interpretation of [the APA] should be rejected because the remedy available . . . in the Claims Court is plainly not the kind of 'special and adequate review procedure' that will oust a district court of its normal jurisdiction under the APA."  *See Bowen*, 487 U.S. at 904–05.  The "bar of sovereign immunity in property disputes arising from contractual relationships does not necessarily apply" where, as here, "government defendants are charged with having acted beyond the scope of their statutory authority."  *Megapulse*, 672 F.2d at 969.

### b.  *Committed to Agency Discretion*

EPA Defendants also argue that Plaintiffs improperly challenge funding decisions committed to agency discretion by law which are not subject to APA review.  EPA PI Opp'n at 16–17.  The court does not agree.

The APA establishes a cause of action for parties adversely affected by agency actions.  *Heckler v. Chaney,* 470 U.S. 821, 828 (1985), and generally, there is a "basic presumption of judicial review" in APA cases.  *Abbott Labs v. Gardner*, 387 U.S. 136, 140 (1967).  But that presumption falls away if the challenged agency decision is "committed to agency discretion by law."  *Sierra Club v. Jackson*, 648 F.3d 848, 855 (D.C. Cir. 2011); 5 U.S.C. § 701(a).  An action is committed to agency discretion where "a court would have no meaningful standard against

which to judge the agency's exercise of discretion." *Chaney*, 470 U.S. at 830.  To determine whether a matter has been committed to agency discretion, the court "consider[s] both the nature of the administrative action at issue and the language and structure of the statute that supplies the applicable legal standards for reviewing that action." *Sierra Club*, 648 F.3d at 855 (citation omitted).

Here, Plaintiffs challenge EPA's decision to suspend and then terminate their funding, and the court must look to the relevant statute to determine whether EPA's actions are committed to agency discretion.

EPA Defendants rely on *Lincoln v. Vigil*, 508 U.S. 182 (1993) to defend their position. There, the Supreme Court held that "allocation of funds from a lump-sum appropriation is [an] administrative decision traditionally regarded as committed to agency discretion." *Id.* at 192–93. But the Supreme Court also clarified that "of course, an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." *Id.*

In *Lincoln*, the relevant statute gave the agency discretion on how to allocate the "lump sum" appropriation.  The statute read, in part: "The Bureau of Indian Affairs, under the supervision of the Secretary of the Interior, shall direct, supervise, and expend such moneys as Congress may from time to time appropriate, for the benefit, care, and assistance of the Indians throughout the United States for the following purposes . . . ." 25 U.S.C. § 13.  The agency received a lump sum appropriation to use for general services such as "relief of distress and conservation of health" and "general support and civilization, including education." *Lincoln*, 508 U.S. at 185.  This reflected "a congressional recognition that an agency must be allowed "flexibility to shift funds within a

particular appropriation account so that the agency can make necessary adjustments for unforeseen developments and changing requirements." *Id.* at 192–93.

In this case, the relevant statute, 42 U.S.C. § 7434, is clear: Congress appropriated money for specific grant programs by a specific deadline and set specific, substantive priorities, thereby limiting how the appropriated funds could be allocated. *See, e.g.*, *Sierra Club*, 648 F.3d at 856 ("Congress can limit an agency's discretion "either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue.").

42 U.S.C. § 7434 provides, in part:

**(a) Appropriations**
  **(2) General assistance**
  In addition to amounts otherwise available, there is appropriated to the Administrator for fiscal year 2022, out of any money in the Treasury not otherwise appropriated, $11,970,000,000, to remain available until September 30, 2024, to make grants, on a competitive basis and beginning not later than 180 calendar days after August 16, 2022, to eligible recipients for the purposes of providing financial assistance and technical assistance in accordance with subsection (b).

  **(3) Low-income and disadvantaged communities**
  In addition to amounts otherwise available, there is appropriated to the Administrator for fiscal year 2022, out of any money in the Treasury not otherwise appropriated, $8,000,000,000, to remain available until September 30, 2024, to make grants, on a competitive basis and beginning not later than 180 calendar days after August 16, 2022, to eligible recipients for the purposes of providing financial assistance and technical assistance in low-income and disadvantaged communities in accordance with subsection (b).

42 U.S.C. § 7434(a)(2)–(3).

Not only have these appropriated funds already been disbursed, but a review of the statute, its specific deadlines, how it specifically defines "eligible recipients" and "qualified projects," reveals that "Congress limited the [Administrator's] authority to disburse funds." *Milk Train, Inc.*

*v. Veneman*, 310 F.3d 747, 752 (D.C. Cir. 2002).  "This limitation affords a 'statutory reference

point' by which the court is able to review" the Administrator's decision.  *Id.* (citation omitted).

EPA's statutory obligation to carry out the GGRF programs is mandatory.  For these reasons, the

court finds that Plaintiffs' challenge does present a cognizable APA claim.

### C. Plaintiffs Are Likely to Succeed on the Merits of Their Claims

#### a. *Plaintiffs Are Likely to Succeed on the Merits of Their APA Claims*

Plaintiffs are likely to succeed on the merits of their APA claims because EPA acted

arbitrarily and capriciously when it failed to explain its reasoning and acted contrary to its

regulations in suspending and terminating Plaintiffs' grants.[6]

The APA, 5 U.S.C. § 706, plays a crucial role in maintaining accountability within federal

agencies.  Under the APA, a court will set aside an agency decision if it is "arbitrary, capricious,

an abuse of discretion, [] otherwise not in accordance with law," contrary to statute, or unsupported

by substantial evidence.  5 U.S.C. § 706(2).  In an arbitrary and capricious challenge, the central

question is whether the agency's decision was "the product of reasoned decisionmaking."  *Motor*

*Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 52 (1983); *see also Nat'l*

*Tel. Coop. Ass'n v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009) ("The APA's arbitrary-and-

capricious standard requires that agency rules be reasonable and reasonably explained.").  Judicial

review of agency action is "highly deferential . . . the court presumes the validity of agency action

and must affirm unless the [agency] failed to consider relevant factors or made a clear error in

---

[6] Although the parties brief multiple issues, the court need only find that Plaintiffs are likely to
succeed on one of their claims for this factor to weigh in their favor, and therefore the court does
not address all their arguments.  *See Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1, 27
(D.D.C.), *appeal dismissed*, No. 24-7059, 2025 WL 492257 (D.C. Cir. Feb. 13, 2025).

judgment." *Nat'l Lifeline Ass'n v. FCC*, 983 F.3d 498, 507 (D.C. Cir. 2020) (cleaned up) (quoting *Cellco P'ship v. FCC*, 357 F.3d 88, 93–94 (D.C. Cir. 2004)).

A "fundamental" requirement of administrative law is that an agency "set forth [] reasons" for its decision; failure to do so constitutes arbitrary and capricious agency action. *Tourus Recs., Inc. v. Drug Enf't Admin.*, 259 F.3d 731, 737 (D.C. Cir. 2001). At a minimum, the agency must have considered relevant data and articulated an explanation establishing a "rational connection between the facts found and the choice made." *Bowen v. Am. Hosp. Ass'n,* 476 U.S. 610, 626 (1986) (internal quotations marks omitted) (collecting authorities).

An agency action is arbitrary or capricious if the agency relied on factors which Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before it, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43. In addition, "agency action may be set aside as arbitrary and capricious if the agency fails to 'comply with its own regulations.'" *Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (quoting *Envtl., LLC v. FCC*, 661 F.3d 80, 85 (D.C. Cir. 2011)).

Plaintiffs were in the process of implementing programs for which they had been awarded funds appropriated by Congress as part of the GGRF program when the government, without notice or justification, ordered Citibank to freeze Plaintiffs' funds. Plaintiffs could not access funds to which they were lawfully entitled and which had been deposited in their accounts, and they received no explanation from EPA, despite repeated inquiries. The court finds that EPA failed to set forth the reasons for its decision because it did not say *anything* about its decision, for weeks.

On March 4, 2025, EPA finally sent Plaintiffs identical information requests, giving them until March 28, 2025, to provide certain information so that EPA could evaluate the GGRF program's oversight controls. But, on March 11, 2025, before Plaintiffs could even respond, EPA terminated Plaintiffs' grants, on the eve of the TRO hearing in this case. It is unclear to the court what "relevant data" EPA considered within such a short period that called for the sudden termination of these grants, compelling the court to "guess at the theory underlying the agency's action." *SEC v. Chenery Corp.*, 332 U.S. 194, 196–197 (1947).

Though repeatedly pressed on the issue, EPA offers no rational explanation for why it suspended the grants and then immediately terminated the entire NCIF and CCIA grant programs overnight. Nor has EPA offered any rational explanation for why it needed to cancel the grants to safeguard taxpayer resources, especially when it had begun examining the grant programs to add oversight mechanisms, or why it needed to cancel *every single grant* to review *some* aspects of the GGRF program with which it was concerned.

In the letters terminating the grant programs, EPA provided no individualized reasoning as to anything Plaintiffs themselves did—instead referencing generalized and unsubstantiated reasons for termination—"substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities." PI Mot., Ex. 11, Termination Letter at 1.

But the Terms and Conditions governing the grant award expressly limit EPA to three possible grounds for termination, one of which is "adequate evidence of Waste, Fraud, or Abuse." PI Mot., Ex. 2, EPA Grant Agreement at 41. And as this court has already pointed out, EPA Defendants have never proffered this "adequate evidence." *See* 2025 WL 842360, at *8 ("Moreover, as to all Plaintiffs, EPA Defendants did not and have not identified a violation of any

applicable regulation or any of the grant's terms—only that there are concerns about potential conflicts of interest and their grant agreements.").[7] Now, in a shift in position, they contend that the termination was based on the agency's changed priorities.

EPA attempts—unsuccessfully—to take refuge in the regulations by turning to C.F.R. § 200.340(a)(4) as its basis for its termination. C.F.R. § 200.340(a)(4) states that a "[f]ederal award may be terminated in part or its entirety . . . by the Federal agency or pass-through entity ***pursuant to the terms and conditions of the Federal award***, including, ***to the extent authorized by law***, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4) (emphasis added). EPA Defendants' actions defy the plain language of the regulations that govern its decision-making in grant funding—it can only terminate a federal award on this basis pursuant to the terms and conditions of the federal award. The regulation establishes a boundary to ensure that when dealing with federal awards, no agency exceeds the legal authority granted to them.

As the court has already noted, agencies can decide to re-evaluate their programs, and they may decide to end agreements or federal awards. But those decisions must be made lawfully and in accordance with established procedures and relevant rules and regulations. The record does not

---

[7] EPA Defendants contend that the subsequent amendment modifications might not be binding as a matter of contract law by questioning the timing of the amendments, *see* EPA PI Opp'n at 12–13; PI Hearing Tr. 40:15–40:19 (EPA COUNSEL: "So there was indeed a change between the original grant agreement in August and the December grant agreement. In fact, there were multiple changes that restricted or limited EPA's ability to terminate the grant agreement. That was done of course after the election."). But they offer only conjecture, and nothing to support this in fact or law. Whereas the grant agreement expressly states that the "EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement," indicating the agency's agreement to the modifications. PI Mot., Ex. 2, EPA Grant Agreement at 55.

indicate that EPA's decisions were lawfully made, and therefore the court finds that Plaintiffs have shown a substantial likelihood of success on the merits on their APA claims.

### b. *Plaintiff Are Likely to Succeed on Their Constitutional Claims*

Plaintiffs also bring constitutional claims—among them, violation of the separation of powers. At this point, the record does indicate that EPA seeks to dismantle these grant programs in their entirety as a policy matter. But "Congress sets the policy, not the [Administrator]," and "policy disagreements" with Congress's decision to fund these clean energy projects "is not a lawful ground for the Administrator to decline to continue the congressionally mandated" GGRF program. *See In re Aiken Cnty.*, 725 F.3d 255, 260 (D.C. Cir. 2013). "Congress speaks through the laws it enacts" and here, EPA has terminated programs established through lawfully enacted congressional appropriations without any basis in statutory authority. *Id.* EPA cannot shut down these programs completely and it cannot "decline to spend previously appropriated funds." *Id.*

Indeed, agencies are "not free simply to disregard statutory responsibilities." *Lincoln*, 508 U.S. at 193. When Congress established the GGRF program, it laid out specific directives—not mere suggestions—as to what EPA could do with the money, and it provided specific deadlines and specific requirements for eligible recipients.

EPA contends that it conducted an individualized assessment of the grants and decided to terminate them on an individual basis, and it maintains that EPA intends to re-obligate the funds. But the record is clear: EPA suspended all eight grants comprising the entire NCIF and CCIA programs, and the agency's public statements contradict its representations here regarding the

future of the program.  EPA lacks the authority to effectively unilaterally dismantle a program that

Congress established, and Plaintiffs have shown a likelihood of success on these claims.[8]

### c. *Claims Against Citibank*

Under the FAA, Citibank is expected to perform its obligations and fiduciary duties "with

care, competence, and diligence" and to "construe the terms of th[e] FAA and any related

instructions from Treasury in a reasonable manner to serve the purposes and interests of the United

States."  FAA § 5B.(i).  The FAA permits Citibank to freeze assets only "in accordance with the

[ACAs]" Ex. A, § I.B.4, and only in response to "lawful instructions or directions" from Treasury,

*id.* § 5.A.

Citibank performed its obligations under the FAA in accordance with its responsibilities as

a financial agent of the United States, but the instructions it received were not lawful, as the record

shows there was no legal basis for the government to order that the funds be frozen.  Consequently,

the court will enjoin Citibank from transferring or otherwise moving funds out of accounts

established in connection with Plaintiffs' grants, including funds in accounts established by

---

[8] Although EPA claims it will re-obligate the funds, under its own grant agreements it must re-obligate the funds to specific eligible recipients—the very recipients from whom it seeks to pull funding:

> If EPA partially or fully terminates the Assistance Agreement, EPA must (1) ***de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.957 (NCIF)*** to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

*See, e.g.*, PI Mot., Ex. 3, EPA Grant Agreement, Dec. Amend. at 41.

Plaintiffs' subgrantees, except as permitted by the applicable ACA, the grant award, the relevant regulations, and applicable law. The court also orders Citibank to disburse any funds properly incurred under Plaintiffs' awards, in accordance with the relevant agreements.

### D. Irreparable Harm

As the court found at the TRO stage, Plaintiffs have made a sufficient showing of irreparable harm, which must be both "certain and great," "actual and not theoretical," and so "imminen[t] that there is a clear and present need for equitable relief." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (quotation omitted). The "possibility" of irreparable harm is not enough. *See Winter*, 555 U.S. at 22. The moving party must demonstrate "a clear and present need for extraordinary equitable relief to prevent irreparable harm." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (citation and internal quotation marks omitted). While ordinary economic injuries are usually insufficient to require injunctive relief, financial harm can "constitute irreparable harm . . . where the loss threatens the very existence of the movant's business." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

Plaintiffs have shown that without release of their grant funds, imminent harm is unavoidable. The very purpose of Plaintiffs' existence and their business operations, including the financing for their projects, depends on their grant money. The GGRF program was created, in part, to mobilize and leverage private financing. The NCIF is structured to "multiply the impact of public funds" by mobilizing private capital as grantees financed these projects, "ensuring that every dollar of public funds generates several times more private-sector investment into emissions- and air pollution-reducing projects." PI Mot., Ex. 1. And the purpose of CCIA is to "provide funding and technical assistance to specific industry networks of public, quasi-public, not-for-profit, and nonprofit community lenders, supporting the goal that every community in the country

has access to the capital they need to deploy clean technology projects in their homes, small businesses, schools, and community institutions." Inclusiv PI Mot., Decl. of Neda Arabshahi ("Arabshahi Decl.") ¶ 14, ECF No. 6-2.

Obviously, when an organization is created to fulfill the objectives of a grant and its existence relies on grant money, harm is certain once the grant funds are withdrawn. And in cases involving government expenditures, "once the relevant funds have been obligated, a court cannot reach them in order to award relief." *City of Houston v. Dep't of Hous. & Urb. Dev.*, 24 F.3d 1421, 1426–27 (D.C. Cir. 1994). Any transfer, re-allocation, or re-obligation of these funds would be an irreparable loss—one that threatens the very existence of Plaintiffs' businesses.

Plaintiffs have proffered some of the following examples of the harmful effects of the funding suspension:

**Climate United**

- To date, the Climate United coalition has committed $392 million to qualified projects. Bafford Decl. ¶¶ 24–26. It has:
  - Committed a $31.8 million pre-construction loan to finance 18 solar projects benefiting rural communities in Arkansas. This is the largest commercial solar deployment in Arkansas history and is projected to save over $120 million in energy costs and create hundreds of jobs.
  - Launched a program to establish affordable leasing options for battery electric heavy-duty trucks to small fleets and independent contractors, which will support an affordable leasing program at the ports of Long Beach and Los Angeles before expanding nationwide.
  - Committed $63 million in pre-construction financing for the design and development of solar power plants in partnership with Tribal governments and communities in Eastern Oregon and Idaho, bringing access to affordable energy to rural communities and Indigenous people, creating 1,200 jobs, and spurring local economic development.
- It cannot access funds to pay the 37 employees on its payroll, whose salaries and benefits are covered in part or whole by the NCIF Award. *Id.* ¶¶ 37, 39.
- It has had to defer compensation for certain employees, terminate multiple vendors, cancel travel, and instruct non-essential lawyers, accountants, and consultants to cease work. *Id.* ¶ 62.
- It is at imminent risk of being unable to pay critical third-party contractors who perform necessary services such as managing accounts payable, auditing

financial statements, maintaining IT security and infrastructure, advising on compliance, supporting communications, and providing legal services. *Id.* ¶ 67.

- It does not have funds to pay payroll or health, vision, and dental benefits, life insurance, and short- and long-term disability insurance for its employees. In order to preserve its available cash, Climate United has already had to defer compensation for certain employees, terminate multiple vendors, cancel travel, and instruct non-essential lawyers, accountants, and consultants to cease work.

- Without a stable source of funding, Climate United will no longer be able to pay its employees and will face having to cut hours and furlough staff.

- Furloughing or laying off staff will eliminate positions that perform critical functions for Climate United, including monitoring the loans that Climate United has already disbursed to funding recipients and the $392 million that it has committed to date. *Id.* ¶ 44.

- It imminently risks not being able to pay rent or insurance for certain offices *Id.* ¶ 45.

- Continued inability to access the funds would prevent Climate United from meeting its commitments under the loans and awards it has approved and plans to approve, potentially forcing it into breach of its existing agreements. *Id.* ¶¶ 46–48, 50.

**PFC**

- PFC has committed at least $539,000,000 to provide affordable housing support and has other projects that will be detrimentally impacted absent funding. TRO Mot. Hr'g Tr. 24:01–25:04.

- It has been unable to pay outstanding invoices from contractors for work completed on PFC's behalf and, as a result, is incurring default risk with respect to these contracts. Mayopoulos Decl. ¶ 19.

- Outstanding invoices include those for contracts for legal and management consultant services that are necessary for PFC to administer the grant in compliance with the terms of the Award Agreement and contracts for essential financial management and IT services. *Id.*

- If PFC is not able to make payment on these outstanding invoices, which it cannot do without access to its funds, PFC is at imminent risk of losing these services due to default. *Id.*

- PFC's key contractor has advised it that it has until March 17, 2025, to make payment or it may cease providing services. *Id.*

- PFC is unable to pay contractors to complete, or in some cases to begin, critical work for PFC, including the completion of a financial reporting audit and work improve PFC's website, which provides public information. *Id.* ¶ 19.

- PFC's inability to access its funds threatens its ability to pay staff members. PFC owes funds under the secondment and services agreements and is at risk of default under those agreements. *Id.* ¶ 20.

**CGC**

- As of January 2025, CGC has committed $135 million in funding to 14 emerging green banks and community lenders across 14 states. Brown Decl. ¶ 4.
- Loss of grant funding will harm a pipeline of 232 multifamily housing properties that would use loans from our subgrantees to increase energy efficiency and electrify core building systems to reduce building operating costs and keep rents affordable for low-income families. *Id.*

**Inclusiv**

- To date, Inclusiv has committed $651 million in subawards to 108 credit unions across the country to be part of just its first cohort of subrecipients. These credit unions are based in 27 states and Puerto Rico and provide direct banking services to more than 4.9 million Americans. They will leverage their CCIA subawards with their own institutional deposit capital to provide nearly $1.8 billion in new lending capital to homeowners and small businesses. These investments will make clean energy affordable, create jobs, and promote greater financial security within the communities the credit unions serve. The energy savings will allow Americans to reinvest their dollars elsewhere in the U.S. economy. Arabshahi Decl. ¶ 25.

**JCF**

- JCF will run out of money to fund its operations in less than 45 days—and possibly much sooner, depending on the expenses it incurs in this litigation. JCF PI Mot., Decl. of Amir Kirkwood ¶ 30, ECF No. 7.
- Without a committed source of funding, JCF will not be able to meet the subaward commitments it has already made to community lenders for projects that they have in turn already approved. *Id.* ¶ 37.

Plaintiffs also have demonstrated irreparable harm in damage to their business reputation.

*See Patriot, Inc. v. U.S. Dep't of Hous. & Urb. Dev.*, 963 F. Supp. 1, 5 (D.D.C. 1997) (finding

plaintiffs' business reputation would be damaged by HUD's characterization of them as "enticing"

senior citizens into meetings, and "pressuring" them to obtain reverse mortgages "under the guise

of sound estate planning."). EPA's termination of the grants will impact Plaintiffs' ability to apply

for and receive federal and/or state grant funds, *see supra* n.4, and damage their reputations.

Reputational harm, particularly in this case, cannot be overstated, especially given the

structure of the NCIF and CCIA programs and Plaintiffs' positions as lenders in the financial

markets. The reputation of these organizations as "reliable and trustworthy partner[s] and investor[s]" is critical to their operations, PI Mot. at 49, and without imminent restoration of their funds, it will be "more difficult, if not impossible," for these organizations to find partners willing to enter into financing arrangements and to find qualified employees willing to work" with them, Bafford Decl. ¶ 73.

A few examples illustrate this point:

- Subgrantee Plaintiffs face increasing risk of losing qualified projects, with the corresponding harms to their reputations as lenders in the financial markets. PI Mot. at 23.
- Plaintiff IFA will be limited in its ability to apply for or receive federal and state grant funds, as they would be obligated to make disclosures during the application process. Decl. of Christopher Meister ¶ 21, *Cal. Infrastructure & Econ. Dev. Bank, et al. v. Citibank, et al.*, No. 1:25-cv-820, ECF No. 17-1.
- Delay or loss of funding risks market confidence in Plaintiff MnCIFA, reducing partner willingness to contract. Decl. of Kari Growth Swan ¶ 36, *Cal. Infrastructure & Econ. Dev. Bank, et al. v. Citibank, et al.*, No. 1:25-cv-820, ECF No. 17-4.
- Public misperception about program termination has caused customer hesitancy, cancellations, layoffs. Stoddard Decl. ¶ 32.
- EPA's allegations and its baseless Notice of Termination will therefore have a significant but unquantifiable impact on CGC's reputation, goodwill, and business prospects in its field. Buendia Decl. ¶ 25.
- EPA and Citi's actions have damaged CGC's reputation (and its subgrantees reputation). "They have damaged its reputation, caused it to lose opportunities for funding and investment, and frustrated its operations and the achievement of its and Congress's objectives." Decl. of Eli Hopson ¶ 24, ECF No. 33-27.

Preserving the status quo here is particularly important, because, as explained above, removal of the funds from Plaintiffs' accounts would likely mean those funds would be beyond the reach of any court.

### E. Balance of Equities and Public Interest

The final two factors—balancing the equities and the public interest—support granting the preliminary injunction. The court's reasoning on this point is the same as in its TRO Memorandum and Order.

When assessing the equities and public interest factors, courts "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Ramirez v. U.S. Immigr. & Customs Enft.*, 310 F. Supp. 3d 7, 32 (D.D.C. 2018). If the movant seeks to enjoin the government, the final two factors merge "because the government's interest *is* the public interest." *Pursuing Am.'s Greatness v. Fed. Election Comm.*, 831 F.3d 500, 511–512 (D.C. Cir. 2016).

On Defendants' side of the balance, the court accords relevant weight to the government's protection of the public fisc. EPA PI Opp'n at 29–30. But the relief Plaintiffs seek allows them access to funds already in their accounts—funds that have been appropriated by Congress and obligated prior to this suit—and Plaintiffs can only use them for specific, approved purposes, under the already-discussed oversight mechanisms. *See* EPA Reply to Pls.' Resp.'s at 2, ECF No. 71 ("Plaintiffs then agreed that they could only use funds for specified allowable activities in specified regions.); *id.* ("To be allowable, the expense must be necessary "for the performance of the Federal award" and, significantly, '[c]onform to any limitations or exclusions set forth . . . in the Federal award") (citing 2 C.F.R. § 200.403(a), (b)); *id.* at 2–3 ("In requesting the disbursement, the grantee must comply with the Grant Agreement's requirement that it certify to the EPA that '[t]he amount of this expenditure is necessary to execute against the EPA-approved workplan.'") (citation omitted). There are sufficient protections in place to prevent the type of reckless spending EPA envisions once access to Plaintiffs' accounts is restored.

The court's order in no way limits EPA from making funding decisions in accordance with the law and, contrary to EPA's position, it does not "force EPA into a multiple year, $20 billon spending obligation." EPA PI Opp'n at 30. It merely restores the status quo to before the unlawful suspension and termination, and the government "cannot suffer harm from an injunction that

merely ends an unlawful practice." *TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 115 (D.D.C. 2020)

(quoting *R.I.L-R v. Johnson,* 80 F. Supp. 3d 164, 191 (D.D.C. 2015)).  Without a showing of actual

or imminent harm, EPA's interests remain adequately protected.  On the other side, however, as

discussed, Plaintiffs face immediate, irreparable harm.

  The public interest also favors an injunction.  "There is generally no public interest in the

perpetuation of unlawful agency action." *League of Women Voters*, 838 F.3d at 12 (citing *Pursuing*

*Am.'s Greatness*, 831 F.3d at 511–512).  In contrast, "there is a substantial public interest 'in having

governmental agencies abide by the federal laws that govern their existence and operations.'" *Id.*

(citation omitted).  Here, an injunction ensures that EPA abides by its own regulations and halts

any unlawful action in dismantling the NCIF and CCIA programs.  Preserving fairness and

accountability in governance serves the public interest.  Therefore, the final two factors warrant

injunctive relief.

### F.  The Court Will Not Require a Bond

  Under Federal Rule of Civil Procedure 65(c), the court may issue a TRO or preliminary

injunction "only if the movant gives security in an amount that the court considers proper to pay

the costs and damages sustained by any party found to have been wrongfully enjoined or

restrained." Fed. R. Civ. P. 65(c).  But Rule 65(c) gives this court broad discretion to determine

the appropriate amount of an injunction bond.  *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C.

Cir. 1999).  This includes "the discretion to require no bond at all." *P.J.E.S. ex rel. Escobar*

*Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020) (quoting *Simms v. District of Columbia*,

872 F. Supp. 2d 90, 107 (D.D.C. 2012)); *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,

No. 25-cv-239, 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025) ("A bond 'is not necessary where

requiring [one] would have the effect of denying the plaintiffs their right to judicial review of

administrative action.'") (citation omitted).   Plaintiffs' funding is currently frozen because of

Defendants' actions.  They cannot access the very thing that has kept them running.  Requiring a

bond in this context makes little sense.

## IV.     CONCLUSION

For these reasons, it is hereby ORDERED that Plaintiffs' Motion for a Preliminary

Injunction is GRANTED.  An Order will accompany this Memorandum Opinion.


Date: April 16, 2025

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **CLIMATE UNITED FUND** | Civil Action No. 25-cv-698 (TSC) |
| Plaintiff, | Civil Action No. 25-cv-735 (TSC) |
| | Civil Action No. 25-cv-762 (TSC) |
| v. | Civil Action No. 25-cv-820 (TSC) |
| | Civil Action No. 25-cv-938 (TSC) |
| **CITIBANK, N.A.**, *et al.* | Civil Action No. 25-cv-948 (TSC) |
| Defendants. | (Consolidated Cases) |

## <u>ORDER</u>

For the reasons set forth in the forthcoming Memorandum Opinion, Plaintiffs' Motion for Preliminary Injunction, ECF No. 33, is **GRANTED**. It is further **ORDERED** that EPA Defendants' Contingent Motion for Stay Pending Appeal, ECF No. 75, is **DENIED** without prejudice.[1] It is further

**ORDERED** that Defendants the U.S. Environmental Protection Agency ("EPA"), Administrator Lee Zeldin, in his official capacity as Administrator of EPA, Deputy Administrator W.C. McIntosh, in his official capacity as Acting Deputy Administrator of EPA, (collectively, "EPA Defendants"), and others in active concert or participation therewith, are **ENJOINED** from effectuating EPA's March 11, 2025 "Notice of Termination"; it is further

---

[1] EPA Defendants filed their motion prematurely, filing a "contingent" motion before the court ruled on the pending motions for preliminary injunction. ECF No. 75. If after reviewing the court's Order and forthcoming Memorandum Opinion, EPA Defendants believe that a stay pending appeal is warranted, they may make a request consistent with Federal Rule of Appellate Procedure 8. In consideration of EPA Defendants' position and Defendant Citibank's silence on the issue, Defendant Citibank is **ORDERED** to refrain from releasing any funding disbursements until **Thursday, April 17, 2025, at 2:00PM EST**.

**ORDERED** that EPA Defendants, and others in active concert or participation therewith, are **ENJOINED** from unlawfully suspending or terminating Plaintiffs' grant awards, including by issuing a Notice of Exclusive Control, effectuating a Notice of Termination, or limiting access to funds in accounts established in connection with Plaintiffs' grants, including funds in accounts established by Plaintiffs' subgrantees, except as permitted by the applicable Account Control Agreement ("ACA"), the grant award, the relevant regulations, and applicable law, including any administrative procedures mandated by the Administrative Procedure Act ("APA"); it is further

**ORDERED** that EPA Defendants, and others in active concert or participation therewith, including officials at the U.S. Department of the Treasury, are **ENJOINED** from directly or indirectly impeding Defendant Citibank or from causing Defendant Citibank to deny, obstruct, delay, or otherwise limit access to funds in accounts established in connection with Plaintiffs' grants, including funds in accounts established by Plaintiffs' subgrantees, except as permitted by the applicable ACA, the grant award, the relevant regulations, and applicable law, including any administrative procedures mandated by the APA; it is further

**ORDERED** that Defendant Citibank is **ENJOINED** from transferring or otherwise moving funds out of accounts established in connection with Plaintiffs' grants, including funds in accounts established by Plaintiffs' subgrantees, except as permitted by the applicable ACA, the grant award, the relevant regulations, and applicable law, including any administrative procedures mandated by the APA; it is further

**ORDERED** that Defendant Citibank must disburse any funds properly incurred before the mid-February suspension of Plaintiffs' funds;

**ORDERED** that the bond requirement of Federal Rule of Civil Procedure 65(c) is waived and that this preliminary injunction is effective upon service; it is further

**ORDERED** that Defendants shall file a status report with the court, within 24 hours of entry of this Order, confirming their compliance with the preliminary injunction; it is further

**ORDERED** that this preliminary injunction remains in effect pending further orders from this Court.

Memorandum Opinion to follow.


Date: April 15, 2025

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CLIMATE UNITED FUND**<br><br>Plaintiff,<br><br>v.<br><br>**CITIBANK, N.A.**, *et al.*<br><br>Defendants. | Civil Action No. 25-cv-698 (TSC)<br>Civil Action No. 25-cv-735 (TSC)<br>Civil Action No. 25-cv-762 (TSC)<br>Civil Action No. 25-cv-820 (TSC)<br>Civil Action No. 25-cv-938 (TSC)<br>Civil Action No. 25-cv-948 (TSC)<br>(Consolidated Cases) |

## **ORDER**

Plaintiffs Climate United Fund ("Climate United"), Coalition for Green Capital ("CGC"), and Power Forward Communities, Inc. ("PFC") moved the court to clarify its April 15, 2025 Order granting Plaintiffs' preliminary injunction ("Order"), ECF No. 80, with respect to the obligations imposed on Defendant Citibank, N.A. ("Citibank").[1] Mot. to Clarify Order ("Mot."), ECF No. 91. Specifically, Plaintiffs seek clarification with respect to this portion of the Order: "**ORDERED** that Defendant Citibank must disburse any funds properly incurred *before the mid-February suspension of Plaintiffs' funds*," Order at 2 (emphasis added), to ensure that it conforms to the remainder of the Order and the Court's Memorandum Opinion [] supporting that Order." Mot. at 2. Plaintiffs state that "[a]lthough this portion of the Court's Order is currently stayed pursuant to the D.C. Circuit's administrative stay order, the parties and the Court of Appeals would benefit from this clarity." *Id.*

---

[1] The court's Preliminary Injunction Order applies to Plaintiffs Climate United Fund, Power Forward Communities, Inc. ("PFC"), Coalition for Green Capital ("CGC"), Justice Climate Fund, Inclusiv, Inc. and Subgrantee Plaintiffs California Infrastructure and Economic Development Bank, Efficiency Maine Trust, Illinois Finance Authority, Minnesota Climate Innovation Finance Authority.

EPA Defendants object to the motion, arguing that "because the scope of injunctive relief is the very question before the Court of Appeals, this Court currently lacks authority to act upon Grantee's motion." Defs.' Obj. to Mot., ECF No. 94 at 1. As Defendants correctly point out, "[t]"he Court of Appeals granted an administrative stay, in part, and has set a briefing schedule to address the government's stay motion." *Id.* at 2. The Court of Appeals stayed this court's order "insofar as it (1) enables or requires Citibank to release, disburse, transfer, otherwise move, or allow access to funds," and ordered "that no party take any action, directly or indirectly, with regard to the disputed contracts, grants, awards or funds." *See Climate United Fund v. Citibank, N.A.*, No. 25-5122, 2025 WL 1123856, at *1 (D.C. Cir. Apr. 16, 2025).

The court construes Plaintiffs' motion more appropriately as a motion to amend judgment under Federal Rule of Civil Procedure 59(e), and **GRANTS** the motion.

Under Federal Rule of Civil Procedure 59(e), a party may move to "alter or amend a judgment no later than 28 days after the entry of the judgment." Fed. R. Civ. P. 59(e). "A Rule 59(e) motion is discretionary and need not be granted unless the district court finds that there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (quotation marks omitted); *see also Leidos, Inc. v. Hellenic Republic*, 881 F.3d 213, 217 (D.C. Cir. 2018). "The rule may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." *Shvartser v. Lekser*, 330 F. Supp. 3d 356, 360 (D.D.C. 2018) (citation and internal quotation marks omitted). The court grants the motion to correct an error in the court's Order with respect to the obligations imposed on Defendant Citibank.

To begin, the court reiterates its findings: the court found for Plaintiffs and granted their motion for a preliminary injunction because, among the other factors the court addressed, "[t]he record does not indicate that EPA's decisions were lawfully made" when EPA suspended and then terminated Plaintiffs' grant awards.  Mem. Op. at 29–30, ECF No. 89.  The court thus "order[ed] Citibank to disburse any funds properly incurred under Plaintiffs' awards, in accordance with the relevant agreements."  *Id.* at 32; *see also id.* at 14 ("[w]ere the court to grant Plaintiffs' relief," which it did, "[Plaintiffs] would have access to the funds in their accounts, dating back to, at a minimum, when their accounts were suspended in mid-February.").

As the court discussed in its Memorandum Opinion, sections I.B.4 and I.B.5 of the Financial Agency Agreement ("FAA") between Citibank and the U.S. Treasury Department permit Citibank "to freeze accounts at the direction of the relevant secured party, in accordance with the account control agreements" and only in response to "lawful instructions or directions received from Treasury."  *Id.* at 31.  The court found that "Citibank performed its obligations under the FAA in accordance with its responsibilities as a financial agent of the United States, but the instructions it received were not lawful, as the record shows there was no legal basis for the government to order that the funds be frozen."  *Id.*

Thus, the court "order[ed] Citibank to disburse any funds properly incurred under Plaintiffs' awards, in accordance with the relevant agreements."  *Id.* at 32.  The court also "enjoin[ed] Citibank from transferring or otherwise moving funds out of accounts established in connection with Plaintiffs' grants, including funds in accounts established by Plaintiffs' subgrantees, except as permitted by the applicable ACA, the grant award, the relevant regulations, and applicable law."  *Id.* at 31–32.  As the court explained, "[t]he very purpose of Plaintiffs' existence and their business operations, including the financing for their projects, depends on their

grant money" and "without release of their grant funds, imminent harm [to Plaintiffs] is unavoidable." *Id.* at 32. The court then enjoined Citibank, in part, "from violating its obligations under each Plaintiff's ACA, including by failing to process, disburse, and release funds in accounts established in connection with Plaintiffs' grants, including funds in accounts established by Plaintiffs' subgrantees, in accordance with the applicable ACA, both with respect to requests already submitted and future requests." Order at 3.

For those reasons, and to ensure that the court's Order conforms with its Memorandum Opinion, the court **GRANTS** Plaintiffs' motion to amend judgment, ECF No. 91, and amends its Order, ECF No. 80, in that the Order should read:

**ORDERED** that Defendant Citibank must disburse any funds properly incurred since the mid-February suspension of Plaintiffs' funds.[2]

Date: April 19, 2025

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge

---

[2] This replaces the following sentence in the court's order: [it is hereby] **ORDERED** that Defendant Citibank must disburse any funds properly incurred before the mid-February suspension of Plaintiffs' funds. The rest of the court's Order, ECF No. 80, remains unchanged.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **Climate United Fund**, | ) |
| | ) **Civil Action No. 25-cv-698 (TSC)** |
| Plaintiff, | ) **Civil Action No. 25-cv-735 (TSC)** |
| | ) **Civil Action No. 25-cv-762 (TSC)** |
| | ) **Civil Action No. 25-cv-820 (TSC)** |
| v. | ) **Civil Action No. 25-cv-938 (TSC)** |
| | ) **Civil Action No. 25-cv-948 (TSC)** |
| **Citibank, N.A., et al.**, | ) **(Consolidated Cases)** |
| | ) |
| Defendants. | ) |
| | ) |

## DEFENDANT CITIBANK, N.A.'S STATUS REPORT

Pursuant to the Court's April 15, 2025 Order granting Plaintiffs' Motion for Preliminary Injunction, ECF 80, Defendant Citibank, N.A. submits the following status report.

Citibank is complying with the Court's directives in its April 15 Order. Citibank understands those directives to require it to maintain the grant funds in Plaintiffs' respective accounts and to not transfer the funds to the Government. Citibank further understands that those directives require it to refrain from releasing any funding disbursements from those accounts until Thursday, April 17, 2025 at 2:00PM ET.

Citibank informs the Court that the Government Defendants have filed an Emergency Motion for Immediate Administrative Stay and Stay Pending Appeal with the D.C. Circuit Court of Appeals. *See* Case No. 25-5122, Doc. #2111408. Citibank also intends to make its own filing with the D.C. Circuit, joining the request for an administrative stay, while taking no position on the motion for stay pending appeal. If the D.C. Circuit grants a stay (administrative or otherwise), Citibank will comply with the terms of that order.

Whether or not the D.C. Circuit grants a stay, Citibank informs the Court that, as contemplated by the Account Control Agreements, *see, e.g.*, ECF 14-4 ¶ 4 and Addendum 1, the

grant funds in Plaintiffs' respective accounts are invested in money market funds.  Consistent with

Citibank's business-as-usual processes, and in light of the Court's disbursement pause until April

17, 2025 2:00PM ET and the money market fund holiday closures on Thursday, April 17, 2025,

and Friday, April 18, 2025, for the Good Friday holiday, Citibank is not able to begin processing

disbursement of grant funds until Monday, April 21, 2025.

Dated:  April 16, 2025                              Respectfully submitted,


                                         By:   /s/ K. Winn Allen
                                               K. Winn Allen, P.C.
                                               Saunders McElroy
                                               KIRKLAND & ELLIS LLP
                                               1301 Pennsylvania Ave., N.W.
                                               Washington, D.C. 20004
                                               Tel: 202.389.5000
                                               winn.allen@kirkland.com
                                               saunders.mcelroy@kirkland.com

                                               *Counsel for Defendant Citibank, N.A.*

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned certifies that on this 16th day of April 2025, I caused copies of the

foregoing to be served via the Court's CM/ECF system.

*/s/ K. Winn Allen*
K. Winn Allen, P.C.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| INCLUSIV, INC., | |
| Plaintiff, | |
| v. | Civil Action No. 1:25-cv-00948 |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.,* | |
| Defendants. | |

**DECLARATION OF NEDA ARABSHAHI**

I, Neda Arabshahi, pursuant to 28 U.S.C. § 1746, do hereby state and declare as follows:

**A. Background**

1.  I am Executive Vice President of the Inclusiv Center for Resiliency and Clean Energy for Inclusiv, Inc. ("Inclusiv"). My business address is 39 Broadway, Suite 2140, New York, NY 10006-3063.

2.  I am competent to testify concerning matters in this declaration. In my role at Inclusiv, where I have worked since 2020, I led the development and submission of Inclusiv's application to the U.S. Environment Protection Agency's ("EPA") Clean Communities Investment Accelerator ("CCIA") program under the Greenhouse Gas Reduction Fund ("GGRF"). Since EPA's award of the CCIA grant to Inclusiv in 2024, I have led the implementation of Inclusiv's CCIA program as we proudly work toward the critical goal of

bringing lower cost, clean, and efficient energy to at least 900,000 of the most energy cost burdened households and small businesses across the country.

3.  I have dedicated the past 21 years to making it easier for people to have affordable energy; clean air, water, and food; fair wages; and economic independence. I deeply understand how skyrocketing and unpredictable energy prices can mean having to turn the heat off during freezing cold winters and the air conditioning off during deadly hot summers. I have also seen firsthand how dirty, polluting energy sources lead to higher levels of air pollution, and dangerous and expensive medical problems, such as higher rates of childhood asthma, and increased allergies.

4.  I hold two degrees from Yale University, an MBA and a Master of Environmental Science degree, both focused on clean energy. My research at Yale focused on the economic development benefits of renewable energy projects in low-income communities.

5.  In my 21 years of experience in the clean energy and sustainability space, I've served as Chief Operating Officer at two different energy startups, where I helped to create financing and access to clean energy and energy efficiency retrofits for low- and moderate-income building owners. I also led the energy program at a large nonprofit organization, where I partnered with public and private sector members to build commitments to low carbon energy solutions, including developing resilient electricity grids and solar workforce development. I trained multinational corporations in how to build ethics and

sustainability into their practices, and I worked for a global wind turbine man-ufacturer that built wind power plants across the country.

## B. Inclusiv's History and Background

6.  Inclusiv is a nonprofit organization and a U.S. Department of the Treas-ury-certified Community Development Financial Institution ("CDFI").

7.  For fifty years, Inclusiv has supported a national network of credit un-ions, which are member-owned financial cooperatives that are operated by res-idents of the communities they serve.

8.  Inclusiv provides guidance, training, and investment capital to credit unions, so they are able to strengthen local economies, reach and serve under-banked individuals, promote affordable homeownership opportunities for low-income and first-time homebuyers, support small business enterprises to spur the creation of good jobs, and create access to affordable clean energy loans.

9.  Specifically, while at Inclusiv, I have led our Center for Resiliency and Clean Energy, working in partnership with the University of New Hampshire, to build and scale the nation's first Solar and Clean Energy Lending Training and Technical Assistance Program for community lenders. Since 2020, through our self-paced training courses and 22 instructor-led cohorts, we have trained over 900 individuals from over 400 community-based financial institutions that serve all 50 states, Washington DC, Puerto Rico, the US Virgin Islands and Guam.  This includes 220 credit unions and cooperatives trained.  These lenders have gone on to develop energy efficiency and renewable energy

3

lending programs designed to reduce energy costs, improve efficiency, and strengthen preparedness and resilience to extreme weather.

### C. Inclusiv's Partnerships with the Federal Government

10. As we stated in our CCIA application, Inclusiv has a strong track record of advancing federal government goals and objectives by leveraging its deep and long-standing relationships within the credit union movement.

11. Years before its CCIA award, Inclusiv developed extensive experience in pairing federal investments from the CDFI Fund with private impact capital. By leveraging CDFI funds to raise private capital, Inclusiv invested a total of $486 million directly into credit unions across the country. This work has allowed credit unions to extend loans to individuals who would otherwise be excluded from the financial mainstream, including first-time homebuyers and small business owners.

12. Inclusiv's work with the federal government in delivering financial products to communities includes several efforts during the first Trump administration, including:

> a. Inclusiv supported the U.S. Department of the Treasury's ("Treasury") Emergency Capital Investment Program ("ECIP"), which was implemented under the Coronavirus Aid, Relief, and Economic Security ("CARES") Act. In its ECIP work, Inclusiv assisted credit unions in leveraging federal investments to multiply their impact. Credit unions that participated in ECIP typically

4

raise $10 in deposits from their community members to fuel local lending for every $1 in federal investments.

b. Inclusiv assisted the U.S. Small Business Administration in enrolling and supporting community development credit unions in the Paycheck Protection Program ("PPP") to deliver capital to small businesses during the COVID-19 pandemic. Through these efforts, Inclusiv facilitated credit unions delivering almost $2 billion in PPP loans to small businesses, with an average loan size of $27,000.

c. Inclusiv teamed up with the University of New Hampshire's Carsey School of Public Policy, with support from the Trump U.S. Department of Energy, to design and deliver the nation's first solar lending training program for community lenders. The community lenders that completed this training program went on to finance thousands of solar projects, making affordable and clean solar power available to nearly 18,000 households.

**D. Inclusiv's CCIA Application**

13. On July 14, 2023, EPA published its Notice of Funding Opportunity ("NOFO") for the CCIA program.

14. The CCIA NOFO offered a $6 billion grant competition "to finance clean energy in low-income and disadvantaged communities while simultaneously building the capacity of community lenders that serve those communities. . . ." The CCIA competition would "provide grants to 2-7 hub nonprofits that will

5

provide funding and technical assistance to specific industry networks of public, quasi-public, not-for-profit, and nonprofit community lenders, supporting the goal that every community in the country has access to the capital they need to deploy clean technology projects in their homes, small businesses, schools, and community institutions." Such "community lenders could include community development financial institutions (including Certified Native CDFIs), credit unions, green banks, housing finance agencies, minority depository institutions, and other types of lenders."

15. Inclusiv meets the CCIA program "eligible recipient" requirements and was therefore to apply. An eligible recipient is defined as an organization that: (a) is a nonprofit; (b) is designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services; (c) does not take deposits other than deposits from repayments and other revenue received from financial assistance provided using grant funds under this program; (d) is funded by public or charitable contributions; and (e) invests in or finances projects alone or in conjunction with other investors.

16. In addition to meeting program eligibility requirements, given Inclusiv's background, including its unique status as a certified CDFI intermediary, decades of experience in providing technical and financial assistance to credit unions, years spent providing training and technical assistance to hundreds of community lenders in how to build clean energy financial products, and decades of experience working with the federal government to deliver tangible

6

economic benefits to  communities across the country, Inclusiv soon determined it would apply for a CCIA grant.

17. Inclusiv dedicated considerable staff time during the three months following the NOFO's posting to prepare its CCIA application, which was submitted to EPA in October 2023. Our application included a fifty-four-page Project Narrative, a Project Narrative Attachments section containing hundreds of pages of supporting materials, such as 220 Letters of Interest from different credit unions across the country, stating they would plan to seek a subaward from Inclusiv, if Inclusiv received a CCIA award. These 220 credit unions are based in 37 states, the District of Columbia, and Puerto Rico.

18. Inclusiv understands first-hand the ability of credit unions in the U.S. to directly serve individuals and small businesses in every corner of the country. According to the federal government's National Credit Union Administration, as of December 31, 2024, there are 4,455 federally insured credit unions that provide direct banking services to 142.3 million Americans.  These member-owned financial institutions collectively manage $2.31 trillion in community-owned assets.  And, as regulated depositories, credit unions can leverage federal resources to increase local investment and economic growth. All of these credit unions may apply to Inclusiv's CCIA program. And Inclusiv is operating as a pass-through entity, delivering 90% of our CCIA award directly to credit unions, to help them create direct pathways that empower consumers and small businesses across the country to make their own energy choices to help them lower their energy bills.

7

19. In addition, to support credit unions so they are positioned to succeed in the CCIA program, Inclusiv is "expanding and scaling existing partnerships, as well as launching new partnerships, with community organizations, such as credit union leagues, green lending financial technology companies, financial coaching platforms, and academic and research institutions." This approach was reinforced in our CCIA application by 67 Letters of Support from national and regional community organizations that indicated their interest in partnering with Inclusiv on its CCIA program.

### E. Inclusiv's CCIA Award and Program Implementation

20. On August 8, 2024, EPA awarded a CCIA prime grant to Inclusiv in the amount of $1.87 billion dollars. Importantly, 90% of these funds, or $1.683 billion will be directly passed through to credit unions across the country in the form of subawards. And these credit unions will use these grant funds to leverage their own institutional capital to make direct investments in communities across the country.

21. Leading up to the award, Inclusiv worked with EPA to finalize its Workplan and Budget to ensure the compliant deployment of the investment, ensure oversight and accountability, and maximize the impact of Inclusiv's CCIA program.

22. As memorialized in Inclusiv's EPA-approved Workplan and Budget, Inclusiv's CCIA program vision was based on hundreds of hours of specific and detailed engagements since 2020 with hundreds of community lenders that

demonstrated interest in creating affordable and equitable clean energy loan products for the communities they serve.

23. These credit unions applied to and completed Inclusiv's Solar and Green Lending Training and Technical Assistance Program that was developed in collaboration with the UNH Carsey School of Public Policy and with support from the DOE under the first Trump administration. After completing these courses, the credit unions had greater knowledge on clean capital financing, which was intended to facilitate efficient financial management practices. As a direct result of Inclusiv's technical support efforts, our network of credit unions reported investing $800 million in clean energy and energy efficiency loans—before Inclusiv was selected for its CCIA prime grant award.

24. Based on this work, these credit unions were well-positioned to leverage CCIA subawards with their own private institutional capital, to expand their existing lending programs and make clean energy financing available and accessible in their communities. The CCIA subawards would provide a significant capital infusion to support these efforts. Inclusiv expects that the up to 400 credit unions receiving Inclusiv's CCIA subawards will leverage $1.496 billion in CCIA Capitalization Funding, to deploy an additional $2.992 billion in private capital, resulting in $4.488 billion in total financial assistance to at least 900,000 CCIA-eligible energy projects—all of which will benefit households and small businesses nationwide. These subrecipients will also receive $187 million in Technical Assistance Subawards to enable them to build, manage, and report on their CCIA programs.

9

25. To date, Inclusiv has committed $651 million in subawards to 108 credit unions across the country to be part of just its first cohort of subrecipients. These credit unions are based in 27 states and Puerto Rico and provide direct banking services to more than 4.9 million Americans. They will leverage their CCIA subawards with their own institutional deposit capital to provide nearly $1.8 billion in new lending capital to homeowners and small businesses. These investments will make clean energy affordable, create jobs, and promote greater financial security within the communities the credit unions serve. The energy savings will allow Americans to reinvest their dollars elsewhere in the U.S. economy.

26. In addition to passing 90% of its CCIA award to credit unions in the form of subawards, Inclusiv will use the remaining 10% allocated to administrative costs and technical assistance services to invest in market-building activities that serve the nation. For example, Inclusiv will continue to expand its Solar and Green Lending Training and Technical Assistance program to train more than a thousand community lenders nationwide so they can leverage their own institutional deposit capital to grow their local clean energy markets. These training resources will be available to community lenders, whether or not they receive CCIA subawards.

27. Inclusiv is ensuring transparency and accountability in its use of CCIA funds in the following ways:

    a. A compliance plan to ensure that every single dollar that Inclusiv receives from CCIA, including the 90% of dollars that are passed

through to credit unions, follow the strictest code of federal regulations (CFR) requirements in terms of financial and administrative processes and controls.

b. An accountability plan for credit union subrecipients, which affirmed that all subrecipients would be "regulated, fully insured depositories, subject to rigorous examination by prudential regulators", reviewed to ensure "that [credit union] management and staff act with the highest standards of integrity, fairness and transparency", and monitored by the annual reports, presented by the credit unions to their members and to their regulators, including "reports on financials, products and pricing determinations, internal audits and accountability to member goals."

c. A reporting plan using Inclusiv's proprietary Financial Inclusion Data Analytics Platform (FIDAP) to ensure visibility into each and every loan transaction that a credit union originates using CCIA fund. FIDAP is a software platform designed to ensure that credit unions meet the compliance requirements of federal grant dollars and has, to date, processed millions of loan transactions from credit unions all across the country. All credit unions receiving CCIA subawards are required to use FIDAP to report on their CCIA loan transactions.

d. A plan to satisfy the requirements in 2 C.F.R. § 300.329 by providing quarterly and final reports to the government on

11

subrecipients' ongoing performance under the program, detailed accounting on all grant expenditures, organization financial statements and disclosures, and information on Inclusiv's past performance and reporting compliance in the 80 federal and non-federal financial assistance agreements that it has successfully completed and managed.

e.  A Financial Policies and Procedures Plan, which complied with the requirements set forth at 2 C.F.R. § 200.302, specifying "that all Inclusiv personnel comply with Generally Accepted Accounting Principles (GAAP), maintain effective systems of control to safeguard assets and monitor compliance with policies established by management and details the procedures by which the fiscal and accounting departments properly identify the sources and application of **all** funds (from federal awards or not), exhibiting effective control over and accountability for all assets, ensuring they are used only for authorized purposes, creating and monitoring budget-to-actual reporting, and the use of written procedures for Federal payments and the allowability of costs."

### F. Inclusiv's Grant Agreement and Modification

28. On August 8, 2024, EPA's CCIA award to Inclusiv was memorialized in Notice of Award No. 84094301 ("NOA"), which was executed by both EPA and Inclusiv. The NOA set a period of performance from April 1, 2024 to June 30, 2030. The total amount of the award was $1,870,000,000.

12

29. In the NOA's Project Description, Inclusiv was required to use the awarded funds to "provide funding and technical assistance to community lenders who will in turn finance clean technology deployment in low-income and disadvantaged communities while simultaneously building the capacity of the community lenders to draw on that capital to catalyze deployment of projects in communities across the country"—particularly in underserved communities.

30. The NOA acknowledged Inclusiv's extensive experience in this field: "Inclusiv is uniquely positioned as a hub nonprofit to enable this vast network of community lenders to finance clean technology projects in building retrofits, transportation, and distributed energy that support affordability and impact in low-income and disadvantaged communities, in perpetuity."

31. On December 19, 2024, EPA issued Modification No. 1 to the NOA (the "Modification." This Modification, which was issued unilaterally by EPA without incorporating any revisions proposed by Inclusiv, consisted of the following revisions to the initial award document:

    a. Section III(S)(3), which addresses EPA's termination rights under the Agreement, was modified to state that "EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.3339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the non-compliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is

adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination."

b. Section V(A) was revised due to the September 2024 designation of Citibank, N.A. ("Citibank") as a financial agent of the U.S. Specifically, this resulted in the inclusion of several terms related to the deposit accounts to be established by Inclusiv and its subrecipients at Citibank.

32. In follow up to the Modification, Inclusiv worked with EPA to make relevant updates to its Workplan and Budget to ensure the compliant deployment of the investment, ensure oversight and accountability, and maximize the impact of Inclusiv's CCIA program.

**G. Inclusiv's Implementation of its CCIA Program**

33. From the time of the award to this day, Inclusiv has worked with EPA to maintain open lines of communication and facilitate EPA's visibility into Inclusiv's activities under its CCIA program. In this effort, Inclusiv and EPA have attended scheduled calls each week so Inclusiv can apprise EPA of any updates to its implementation efforts.

34. On November 19, 2024, Inclusiv opened its pre-qualification form for credit unions. It received an overwhelming response of submissions from more than 250 credit union across the U.S. and in U.S. territories. Inclusiv informed its EPA grant managers during its weekly call on December 19, 2024 that it received 254 pre-qualification submissions from credit unions.

35. After a thoughtful review of all 254 applications, on December 26, 2024, Inclusiv sent out pre-qualification confirmation notices to selected credit unions.

36. On January 6, 2025, Inclusiv launched its full application period, with its first application round deadline of January 17, 2025. Inclusiv notified its EPA grants managers of this progress during the weekly calls on January 7 and January 16, 2025.

37. Once the application period had begun, Inclusiv continued to maintain open lines of communication with its EPA grants managers at all stages of the process during weekly calls, *e.g.*:

   a. On January 23, 2025, during a weekly call, Inclusiv alerted EPA that its independent application review process was underway.

   b. On January 30, 2025, during a weekly call, Inclusiv informed EPA that it was finalizing its application review and expected to finalize its scoring.

   c. On February 6, 2025, during a weekly call, Inclusiv told EPA that it was finalizing its preliminary list of subrecipients and that it would provide the full list of first cohort subrecipient credit unions.

38. Inclusiv undertook a diligent application and evaluation process to ultimately choose 108 subrecipient credit unions in 27 states and Puerto Rico to be part of its first cohort, which would use $651 million in CCIA funding to offer homeowners and small businesses affordable clean energy financing,

15

create jobs, and promote greater financial security within the communities served.

39. On February 12, 2025, Inclusiv chose its first group of 64 subrecipients and on the same date provided written notice to its EPA grants managers and EPA's Office of the Greenhouse Gas Reduction Fund ("OGGRF"). The written notices to EPA provided full breakdowns of all subrecipient credit unions' names, locations, and award amounts.

40. On February 12, 2025, Inclusiv also provided Subaward Notice Letters to the 64 individual subrecipient credit unions in the first group, These Subaward Notice Letters included each subrecipient's award amount and detailed instructions for the forthcoming Contracting Phase.

41. Inclusiv finalized the second group of 44 subrecipients on February 14, 2025, and, again, duly provided written notice to its EPA grants managers and the OGGRF.

42. On February 14, 2025, Inclusiv also provided the Subaward Notice Letters to the second group of 44 subrecipient credit unions.

43. All 108 subrecipient credit unions signed and returned their Subaward Notice Letters, thus committing to the funding and their individual CCIA subrecipient programs.

44. On February 19, 2025, and February 26, 2025, Inclusiv held two Welcome Webinars for all 108 subawardees, and initiated the Contracting Phase to eventually finalize their subaward agreements.

45. This initial cohort of 108 subrecipient credit unions provide direct banking services to more than 4.9 million Americans in 27 states and Puerto Rico, leveraging CCIA funds to invest additional private capital in communities burdened by high energy costs to generate a projected $1.8 billion in new lending capital and allow Americans to reinvest their energy savings elsewhere in the U.S. economy.

46. The CCIA funding will also allow credit unions to expand their affordable loan offerings so that Americans who seek out their loans have the autonomy to select the types of energy upgrades and vehicle upgrades they need most for their households and for their businesses. These may include heating and cooling systems, solar panels, back up battery storage, energy-efficient appliances, energy efficiency home improvements, electric vehicle charging stations, and electric vehicles, ultimately helping U.S. households and small businesses lower their energy costs. This new stream of financing will have a ripple effect in communities across the nation, as energy upgrades are performed and contractors, developers, and manufacturers are employed to carry out the projects.

## H. Account Control Agreement with EPA and Citibank

47. On September 19, 2024, the U.S. Treasury entered into a Financial Agent Agreement with Citibank, which tasked Citibank with responsibility to disburse $20 billion in GGRF funds under EPA's CCIA and National Clean Investment Fund ("NCIF") programs.

17

A66

48. On November 6, 2024, Inclusiv and EPA entered into an Account Control Agreement with Citibank.

49. As required by the December 19, 2024 Modification, Inclusiv was required to open a deposit account at Citibank, to be used as its operating account for the entire CCIA award. Once the deposit account was established, Inclusiv was required to draw down the entire available EPA award balance from Automated Standard Application for Payments ("ASAP") system and disburse it into the deposit account at Citibank, where it was required to be maintained until the Closeout Agreement went into effect.

50. The Modification also required that Subrecipients open and maintain their own deposit accounts with Citibank to use as their subaward operating accounts for the duration of their subawards.

## I.  EPA and Citibank's Freeze on Inclusiv's CCIA Funds

51. Beginning in early February 2025, while EPA was still conducting its regularly scheduled meetings with Inclusiv, the new EPA Administrator, Lee Zeldin, began making various public statements expressing concerns about the GGRF program and awards made by EPA under the Biden administration, which culminated in a February 12 announcement by Zeldin that EOA wanted to claw back all GGRF grants. EPA never expressed these concerns to Inclusiv.

52. Between February and March 2025, all GGRF funds held by Citibank were frozen, and Inclusiv, like recipients and subrecipients across all the GGRF programs, had its access to its awarded and obligated CCIA funds

18

suspended. When Inclusiv sought guidance from EPA on the freeze of its awarded and obligated grant funds, EPA provided no answer.

53. Critically, as part of the Contracting Phase that began on February 19, 2025, Inclusiv and Citibank were to provide co-guidance to Inclusiv's subrecipients on opening their own accounts with Citibank. Citibank has refused to allow any of Inclusiv's 108 subrecipients to open their accounts. Because of this, Inclusiv was forced to temporarily suspend its Contracting Phase on March 6, 2025, which we announced to our 108 subrecipients in writing that day.

54. As of today, none of the funds legally committed to Inclusiv's subrecipients have been disbursed.

**J.  EPA's Termination of Inclusiv's CCIA Award**

55. On March 11, 2025, Inclusiv received a letter from EPA purporting to terminate its CCIA award (the "Termination Letter") ("Exhibit 12").

56. The Termination Letter stated that pursuant to EPA's "authority under 2 C.F.R. §§ 200.339-40, the General Terms and Conditions of EPA assistance award agreements, the terms and conditions of the Grant Agreement, and the Agency's inherent authority to reconsider prior determinations in light of new information, the Agency is terminating Grant Agreement No. 84094301, awarded to Inclusiv, Inc. under the Greenhouse Gas Reduction Fund ("GGRF"), effective immediately."

57. However, this purported Termination Letter did not identify any proven "new information."

58. Further, the Termination Letter indicated that the decision to terminate was "based on substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities, which collectively undermine the fundamental goals and statutory objectives of the award."

59. The Termination Letter did not make any specific allegations of fraud, waste, or abuse by Inclusiv. Nor did it articulate any specific conduct by Inclusiv supporting the termination of its grant. Rather, the Termination Letter cited "material deficiencies" apparently uncovered by a "comprehensive review," as well as its concerns about "rigorous oversight and accountability," and a lack of "sufficient protections" against "potential violations of the Constitution."

60. EPA has not completed a comprehensive review of our CCIA program, nor has it identified specific material deficiencies.

61. In addition, EPA has not specified a single concern identifying specific issues with rigorous oversight and accountability.

62. And it certainly has not been made clear what the lack of sufficient protections against potential violation of the Constitution might be.

63. The Termination Letter stated that it was terminating the grant award "in accordance with" the grant agreement.

64. The Termination Letter did not provide Inclusiv with any procedural right to seek alternatives to or challenge its termination under the applicable

grant regulations. On multiple occasions, Inclusiv has invited the EPA Administrator's Office to discuss Inclusiv and its CCIA program, to no avail.

### K. Harms Suffered by Inclusiv

65. Inclusiv's business model is largely based not only on the membership dues paid by its member credit unions, but also on the goodwill and trust of the members. The widely publicized statements made by EPA and Zeldin disparaging the GGRF and the recipients of its programs as unscrupulous has seriously threatened Inclusiv's relationships with its member credit unions.

66. The termination would also disrupt Inclusiv's established relationships with its 108 subrecipient credit unions, each of which went through a rigorous and lengthy application and review process, along with diverting staff members to attend onboarding and technical trainings, in order to receive CCIA subawards. These wasted efforts have harmed Inclusiv's reputation with these subrecipients and their confidence in Inclusiv, and many are likely to sever their business relationships with Inclusiv as a result.

67. Inclusiv has also fostered decades-long relationships with leaders within low-income and disadvantaged communities, who because of the EPA's false allegations concerning Inclusiv's conduct, will be less likely to continue to work with Inclusiv. The severing of these long-standing relationships will harm Inclusiv's furtherance of its organizational mission of empowering and supporting low-income and disadvantaged communities.

21

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 31, 2025

_/s/ Neda Arabshahi_

Neda Arabshahi

New York, New York

22

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Inclusiv, Inc., <br><br> Plaintiff, <br><br> v. <br><br> U.S. Environmental Protection Agency, et al. <br><br> Defendants. | Civil Action No. 1:25-cv-00948 <br><br><br> Declaration of Jared Freeman |

I, Jared Freeman, pursuant to 28 U.S.C. § 1746, do hereby state and declare as follows:

### A. Background

1. I am the President/CEO for OnPath Federal Credit Union ("OnPath"). My business address is 3131 N. I-10 Service Road E., Metairie, Louisiana 70115.

2. I am competent to testify concerning matters in this declaration. In my role at OnPath, I lead a team of dedicated professionals who are committed to providing exceptional financial services and solutions to our members and communities. With over 15 years of experience in the credit union industry, I have developed a deep understanding of the challenges and opportunities facing our sector, and a passion for advancing our mission and values.

3. I attended the University of Mobile from 2006 to 2010, earning a Bachelor of Science in Finance, followed by an MBA in 2011. I first joined the credit

union movement in 2005 with Guardian Credit Union, where I served many roles ending in my position as Chief Operations Officer. From there, I went on to lead ASE Credit Union as President and Chief Executive Officer before making a move to Leaders Credit Union, where I held the role of Chief Experience Officer. In August 2020, I was named President/CEO of OnPath Federal Credit Union. My core competencies include strategic planning, financial management, problem solving, and innovation. I have successfully implemented multiple initiatives to enhance our growth, performance, and member satisfaction, such as launching new products, expanding our digital channels, and strengthening our partnerships.

**B. OnPath's History and Background**

4. OnPath FCU began as ASI Federal Credit Union in 1961, serving the hardworking employees of Avondale Shipyards. Over the decades, the credit union has grown to nearly 85,000 members across South Louisiana. In 2019, it rebranded as OnPath, symbolizing its commitment to guiding its members toward financial success. Building on the recent merger with Louisiana FCU in 2024, OnPath has set its sights on creating even greater opportunities for its members and the communities it serves - momentum that will continue with the upcoming core conversion in Summer 2025, laying the groundwork for deeper integration, enhanced services, and long-term growth.

OnPath has a long-standing commitment to improving the financial well-being of individuals and businesses through its mission to be financial

2

advocates for its members and the community it serves. Through its strategic vision and dedication to member financial advocacy, OnPath has made a significant impact by providing accessible financial solutions, financial education, and tailored products that empower individuals and businesses alike. The success of the recent merger has further solidified OnPath's ability to provide enhanced services, a broader geographic reach, and a more robust support system for its growing member base.

As OnPath continues its journey of transformational growth, the organization is expanding its reach and impact, strengthening its position as a trusted financial partner. While focusing on this growth, the credit union remains committed to deepening relationships with existing members, ensuring they receive the support and services needed to thrive.

5.  OnPath's mission is to be a financial advocate for our members and the communities we serve.

6.  OnPath is committed to providing accessible financial services to individuals and families who are often overlooked by traditional banking institutions.

7.  Serving 84,700 members across Louisiana, OnPath uses an inclusive approach that addresses historical economic disparities and systemic barriers that have caused some of Louisiana's most vulnerable individuals to receive limited access to affordable financial resources.

3

8. OnPath's focus also extends to immigrant communities navigating unfamiliar financial systems.

### C. OnPath's CCIA Grant Application Process

9. OnPath has been a longstanding member of Inclusiv's network of community development credit unions.

10. OnPath first learned about Inclusiv's Clean Communities Investment Accelerator (CCIA) grant in Fall 2024. Soon after, OnPath decided to apply for a CCIA grant from Inclusiv.

11. Following Inclusiv's written guidance, OnPath started its application process by submitting a prequalification form. Inclusiv informed OnPath that it was pre-qualified for a grant in February 2024.

12. Because OnPath pre-qualified for a CCIA grant from Inclusiv, it was automatically eligible to attend the University of New Hampshire's Solar and Green Lending Training and Technical Assistance Program. Over the months that followed, OnPath put together its formal grant application for Inclusiv. Members of the OnPath leadership team participated in the 2024 kickoff conference and discussion, followed by formal training that began in the third quarter and concluded at the start of the fourth quarter. Each session lasted approximately one to two hours. OnPath submitted its application on or about January 17, 2025.

13. On February 18, 2025 OnPath learned that Inclusiv had awarded it an $11 million CCIA grant.

4

**D. OnPath's Plans for CCIA Grant Funds**

14. OnPath will use these grant funds to relaunch and expand our clean energy lending program.

15. OnPath will use funds to revitalize our successful solar lending initiative with enhanced offerings. OnPath will use the funding primarily as loan loss reserves, allowing us to extend larger unsecured loans for solar installations, including systems with battery backup.

16. OnPath will also use funds to expand into energy efficiency home enhancements, appliance replacement loans, and financing for fully electric, zero-emission vehicles.

17. The CCIA funds will thus have a transformative impact on the communities OnPath serves. With access to affordable financing options for clean energy products, OnPath members will see reduced utility costs, increased energy independence, and improved living conditions.

18. The funds will also help OnPath ensure that clean energy solutions are accessible to those for whom such solutions would not be otherwise. This will contribute to the breaking of generational poverty cycles in these communities and the creation of pathways to financial stability for underserved populations.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 28, 2025

Jared Freeman

Metairie, Louisiana

6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

INCLUSIV, INC.,

          Plaintiff,

  v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, *et al.,*

          Defendants.

Civil Action No.
1:25-cv-00948

## <u>DECLARATION OF GREG HANSHAW</u>

I, Greg Hanshaw, pursuant to 28 U.S.C. § 1746, do hereby state and declare as follows:

### A. Background

1. I am President & CEO for Community 1st Credit Union (Community 1st). My business address is 1100 Hutchinson Ave, Ottumwa, Iowa 52501.

2. I am competent to testify concerning matters in this declaration. In my role at Community 1st, I am responsible for overseeing the day-to-day operations and ensuring the credit union's continued vitality and success, including the planning and implementation of all programs, policies, and procedures. I am also responsible to provide strategic and/or administrative direction and management in all credit union functions including: accounting, ALM, business development, compliance, facility management, finance, human resources, investments, lending, marketing, operations, retail services, risk management, and security.

A78

3.   Additionally, as President & CEO, I am responsible to develop, recommend, and implement financial policies and procedure, as well as for ensuring that the credit union follows the federal laws and regulations set forth by the National Credit Union Administration and other State and Federal regulatory agencies.

4.   I have been with the credit union for more than 13 years, and have served in the CEO role for more than 9 years.  Prior to coming to the credit union, I was a Human Resources professional serving as the Director of HR for a large manufacturer for 15 years.

### B. Community 1st's History and Background

1.   Community 1st is dedicated to improving the lives of our more than 70,000 members by serving as their trusted financial partner.

2.   Community 1st is deeply rooted in communities across Iowa and Missouri, serving a population in which 46% of households earn less than $35,000 annually, 19% live below the poverty line, and 20% receive public assistance.

3.   Community 1st is a certified Community Development Financial Institution (CDFI) that specializes in providing financial products that meet the needs of underserved, low-income, and unbanked households.

4.   Community 1st has a successful track record of creating specialized programs that make a real difference in the financial lives of our members, including those in the most vulnerable communities.  Examples include our Payday Alternative Loans and First-Time Home Buyers' Down Payment Assistance.

2

5.  Community 1st takes a comprehensive approach to serving our members, which includes financial coaching, education programs, and collaborations with local partners in clean energy. This approach ensures that members receive the support they need as they pursue clean energy options.

**C. Community 1st's CCIA Grant Application Process**

6.  Community 1st has been a member of Inclusiv's network of community development credit unions since 2016.

7.  Community 1st first learned about Inclusiv's Clean Communities Investment Accelerator (CCIA) grant in Fall 2024. Soon after, Community 1st decided to apply for a CCIA grant from Inclusiv.

8.  Following Inclusiv's written guidance, Community 1st started its application process by submitting a prequalification form. Inclusiv informed Community 1st that it was pre-qualified for a grant in December, 2024.

9.  Because Community 1st pre-qualified for a CCIA grant from Inclusiv, it was automatically eligible to attend the University of New Hampshire's Solar and Green Lending Training and Technical Assistance Program, which is currently being attended by our VP of Consumer Lending.

10. Over the months that followed, Community 1st put together its formal grant application for Inclusiv. The application process took approximately 4 weeks to complete, and Community 1st submitted its application on January 17, 2025.

11. On February 18, 2025 Community 1st learned that Inclusiv had awarded it an $5.5 million CCIA grant.

3

**D. Community 1st's Plans for CCIA Grant Funds**

12. Community 1st will use CCIA grant funds to design, launch, and support a comprehensive clean energy lending program. This program will be tailored specifically for low-income and disadvantaged communities.

13. The program will offer competitive loan rates, reasonable terms, minimal fees, and simplified qualification criteria for members investing in clean energy solutions.

14. With the funding, members will gain access to affordable financing for energy-efficient appliances, heat pumps, solar panels, electric vehicles, and other clean energy products that would otherwise be financially unattainable.

15. As a result, the grant funding will have a transformative impact on the communities that Community 1st serves by breaking down barriers to clean energy adoption, which will allow members to reduce energy costs while contributing to environmental sustainability.


I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 31, 2025


     */s/ Greg Hanshaw*

Greg Hanshaw

Ottumwa, Iowa


4

A81

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

INCLUSIV, INC.,

               Plaintiff,

    v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, *et al.,*

             Defendants.

Civil Action No.
1:25-cv-00948

<u>**DECLARATION OF JOHN STOTT LAWSON**</u>

I, John Stott Lawson, pursuant to 28 U.S.C. § 1746, do hereby state and declare as follows:

**A. Background**

1. I am President and Chief Executive Officer for Clearwater Federal Credit Union (Clearwater).  My business address is 3600 Brooks Street, Missoula, Montana, 59801.

2. I am competent to testify concerning matters in this declaration. In my role at Clearwater, I report to a Board of Directors to set strategy, risk tolerances, and annual budgets, manage an executive team to implement strategy, risk tolerances, and budgets, represent the organization publicly, and interface with community stakeholders, elected officials, and regulators.

3. I have broad-based experience working in the credit union industry having worked at senior management levels in both urban and rural environments spanning New York City, California, and Montana.

**B. Clearwater's History and Background**

4.   For nearly seven decades, Clearwater has worked to be a positive force in the lives of our members and in the communities we serve, with membership now totaling 63,878 people and small businesses.  We anchor our efforts in our four core values: inclusion, empowerment, ownership, and impact.

5.   Clearwater is Montana's largest Community Development Financial Institution (CDFI), providing tailored financial solutions to communities and members in 37 of Montana's 56 counties.

6.   Clearwater serves some of the state's most vulnerable populations.  The communities we serve face significant challenges, and include rural areas with limited banking options, low-income households with fewer resources for financial emergencies, and historically underserved populations such as Native American communities across multiple reservations.

**C. Clearwater's CCIA Grant Application Process**

7.   Clearwater has been a member of Inclusiv's network of community development credit unions since 2014.

8.   Clearwater first learned about Inclusiv's Clean Communities Investment Accelerator (CCIA) grant in Fall 2024. Soon after, Clearwater decided to apply for a CCIA grant from Inclusiv.

9.   Following Inclusiv's written guidance, Clearwater started its application process by submitting a prequalification form. Inclusiv informed Clearwater that it was pre-qualified for a grant in December 2024.

10. Because Clearwater pre-qualified for a CCIA grant from Inclusiv, it was automatically eligible to attend the University of New Hampshire's Solar and Green Lending Training and Technical Assistance Program. Our Clean Energy Lending Manager, Jess Dahlen, attended the training on behalf of Clearwater.

11. Over the months that followed, Clearwater put together its formal grant application for Inclusiv. From training to data collection through to drafting lending plans, proposal narratives, and budgets, Clearwater staff invested approximately 195 hours into the application. Clearwater submitted its application on January 17, 2025.

12. On February 18, 2025 Clearwater learned that Inclusiv had awarded it an $11 million CCIA grant.

**D. Clearwater's Plans for CCIA Grant Funds**

13. Clearwater will use CCIA grant funds to build upon our existing clean energy lending program—the only program of its kind offered by any credit union, bank, or loan fund in Montana.

14. Through this program, Clearwater originated more than $8.4 million in clean energy loans to low-income or disadvantaged communities in 2024 alone. Roughly half of these funds went directly to low-income borrowers, and the flexible loan terms are designed to be accessible for borrowers across all credit tiers. The program includes loans for home solar installations, energy efficiency improvements, and electric vehicles.

3

15. With CCIA grant funds, Clearwater will expand our clean energy lending to create lasting environmental and economic benefit for Montana's most vulnerable populations.

16. Clearwater plans to do so by reducing interest rates for qualified borrowers, developing new loan products for affordable housing retrofits and third-party solar ownership models, and strengthening partnerships with mission-aligned organizations throughout Montana.

17. These enhancements will directly help community members reduce greenhouse gas emissions, lower their energy costs, and improve health and safety conditions.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 28, 2025

*/s/ John Stott Lawson*

John Stott Lawson

Missoula, Montana

4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

INCLUSIV, INC.,

         Plaintiff,

  v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, *et al.,*

         Defendants.

Civil Action No.
1:25-cv-00948

### DECLARATION OF RICARDO LEDEZMA

I, Ricardo Ledezma, pursuant to 28 U.S.C. § 1746, do hereby state and declare as follows:

### A. Background

1.  I am President and Chief Executive Officer for Soarion Federal Credit Union (Soarion). My business address is 1560 Cable Ranch Road, Suite 200, San Antonio, Texas 78245.

I am competent to testify concerning matters in this declaration. In my role at Soarion, I oversee the strategic direction, operational management, and overall success of the organization. I serve as the highest-ranking executive, reporting directly to the Board of Directors, and take on the responsibility of ensuring that our credit union fulfills its mission. My focus is on empowering our members with simplified financial solutions while also strengthening the community we serve.

2.  Over the past 25 years in the industry, I have worked in every area of bank and credit union operations. In 2016, Director Richard Cordray nominated me to serve on the Consumer Financial Protection Bureau (CFPB) Advisory Council, and I was nominated again in 2017 by Mick Mulvaney. During my time there, I advocated for and helped design regulations to support Low-Income and Underserved Financial Services. As a values-conscious entrepreneur, I believe in creating products and services that make a positive impact on society and the environment while remaining financially sustainable—essentially, "doing well by doing good."

### B. Soarion's History and Background

3.  Founded by servicemen at Lackland Airforce Base in 1952, Soarion focuses on fostering stronger communities and illuminating paths to brighter futures for the individuals and families we serve. From our humble beginnings, Soarion has grown into a financial institution that empowers more than 55,000 members through simplified financial solutions.

4.  Soarion serves a diverse population, focusing on low-income and historically underserved communities in the San Antonio, Texas area.

5.  Many residents in these communities face significant economic challenges, to include lower-than-average median household incomes, limited access to affordable credit, and higher poverty rates compared to national averages.

2

6.  In these financial deserts, residents often face no other option than to rely on high-cost alternatives like payday lenders, which can perpetuate cycles of financial hardship.

7.  Soarion works to ensure households in these communities can build resiliency without facing prohibitive costs or high interest rates.

8.  For example, Soarion's home improvement financing program, HomeX, helps homeowners protect and enhance valuable assets while also supporting local contractors.

**C. Soarion CCIA Grant Application Process**

9.  Soarion has been a member of Inclusiv's network of community development credit unions since August 2024.

10. Soarion first learned about Inclusiv's Clean Communities Investment Accelerator (CCIA) grant in Fall 2024. Soon after, Soarion decided to apply for a CCIA grant from Inclusiv.

11. Following Inclusiv's written guidance, Soarion started its application process by submitting a prequalification form. Inclusiv informed Soarion that it was pre-qualified for a grant in December 2024.

12. Because Soarion pre-qualified for a CCIA grant from Inclusiv, it was automatically eligible to attend the University of New Hampshire's Solar and Green Lending Training and Technical Assistance Program.

13. Over the months that followed, Soarion put together its formal grant application for Inclusiv. Completing this application was a two-month effort, during which we gathered essential documentation and thoughtfully

3

A88

articulated our strategic vision for using the funds to create meaningful, lasting impact in our community. Soarion submitted its application on 01/17/2025.

14. On February 18, 2025, Soarion learned that Inclusiv had awarded it an $11 million CCIA grant.

### D. Soarion's Plans for CCIA Grant Funds

15. Soarion will use CCIA grant funds to build upon HomeX, our existing home improvement financing program. With the funds, Soarion will add a clean energy component to this program by offering loans to support clean energy and energy efficiency projects. Such projects include solar installations, energy-efficient HVAC systems, and electric vehicles.

16. The funds will allow Soarion to offer interest rates significantly more competitive than those provided by for-profit lenders.

17. This will ensure that financing remains accessible and affordable for low-income families. It will also reduce financial barriers that often prevent these households from being able to undertake energy-efficient upgrades.

18. The impact will reach beyond immediate financial benefits. Members will see reduced utility bills and enhanced home values. The environmental sustainability of their communities will be strengthened. Their quality of life will improve.

19. Without the CCIA grant, Soarion Credit Union will face significant limitations in our ability to scale clean energy financing solutions for the low-income and disadvantaged communities we serve. The absence of this funding would slow the development of accessible loan products aimed at reducing

4

household energy costs, improving home resilience, and lowering environmental impact. It would also limit our capacity to partner with local contractors and community organizations that are critical to delivering these solutions equitably.

More broadly, our community would miss a transformative opportunity to participate in the clean energy transition—an opportunity that not only supports environmental sustainability but also economic mobility. Without this grant, families already burdened by high energy bills and aging infrastructure may continue to fall behind, deepening existing inequities rather than closing the gap.

5

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 31, 2025

_/s/ Ricardo Ledezma_

RICARDO LEDEZMA

Soarion Federal Credit Union

San Antonio, Texas

6

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JUSTICE CLIMATE FUND** | |
| Plaintiff, | |
| v. | Civil Action No. 1:25-cv-938 |
| **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,** *et al.* | |
| Defendants. | |

**DECLARATION OF AMIR KIRKWOOD IN SUPPORT OF JUSTICE CLIMATE FUND'S MOTION FOR PRELIMINARY INJUNCTION**

I, Amir Kirkwood, declare as follows:

1.    I am the Chief Executive Officer of Justice Climate Fund ("JCF"). I have served in that role since July 1, 2024. In that role, I am responsible for managing all JCF operations, including staffing and administration, coordination with third-party vendors, and administering training programs operated by JCF. I am also responsible for overseeing the management and allocation of funds awarded by the Environmental Protection Agency ("EPA") through its Clean Communities Investment Accelerator ("CCIA") in accordance with our EPA-approved workplan.

2.    For these reasons, I have personal knowledge of the facts and information in this declaration.

3.    I respectfully provide this declaration to detail the ways in which JCF's mission, programs, and reputation will be immediately and irreparably harmed absent this Court's intervention to maintain the status quo. That includes: enjoining any effort by EPA to give effect to its purported March 11, 2025, termination of JCF's CCIA award; enjoining EPA from further attempting to unlawfully terminate JCF's CCIA award; enjoining Citibank, N.A. ("Citibank") from continuing to deny JCF access to the award funds in JCF's own accounts; and enjoining EPA and

1

others with whom it is acting in concert from further attempts to interfere with JCF's access to its award funds. Simply put, JCF will suffer immediate, harmful, and irreparable damage if access to its award funds continues to be unlawfully denied. Without access to those funds, JCF cannot disburse the already-obligated funds that community lenders have already planned to use to finance projects that would otherwise lack funding, and that may fail in the interim. JCF is also suffering daily reputational damage—a potentially fatal blow to our mission, which requires buy-in from community lenders and small businesses who were counting on the obligated funds and have acted in reliance on receiving them. Successful financing of new projects requires certainty from everyone in the financial chain that funds will flow in a predictable and timely manner. Our partners cannot wait months or years while EPA effectively freezes the funds it has no lawful authority to freeze.

4.    JCF does not have other committed sources of funding to replace the CCIA award funds. As a result of Defendants' actions, to preserve its available cash, JCF has already been compelled to terminate multiple vendors, limit business travel, and instruct non-essential lawyers, accountants, and consultants to cease work. Indeed, without access to its funds at Citibank, or a viable alternative funding source, JCF would not be able to litigate *this case* to a final judgment.

5.    Absent preliminary injunctive relief that restores the ordinary and orderly flow of funds from JCF's account, JCF will effectively fail as a going concern. JCF will be forced to lay off substantially all staff and close its office, and its existing projects will almost certainly fall apart. Accordingly, it is unlikely that JCF will ever be able to reopen for business again—even if the flow of funds is eventually restored—given the lost staff, community relationships, and reputational harm.

### JCF and Its Mission

6.      JCF is a purpose-built, non-profit organization that was founded to apply for CCIA funding on behalf of a consortium of community lender representatives. JCF's mission is to ensure that community lenders have the resources to provide affordable financing for clean-energy and affordable-housing-related qualified projects across the country, focusing on low-income and disadvantaged communities in unbanked areas. In its EPA-approved workplan, JCF estimated that its work would reduce and avoid 5.32 million metric tons of carbon dioxide emissions, directly and indirectly support 61,700 jobs, and mobilize $1.56 billion of private capital.

7.      JCF was formed in 2023, after the passage of the IRA, by a coalition of organizations with extensive experience advancing community-development finance for unbanked American families, businesses, and communities. JCF's founding organizations sought to utilize CCIA funding to fill a critical gap: Many community lenders were underrepresented in climate finance and lacked access to green lending resources. By forming JCF, coalition members aimed to centralize support and technical assistance, ensure that resources flow to community lenders not served by other GGRF awardees, and help lenders build capacity through experience with JCF's small-scale funding.

8.      Under its EPA-approved workplan, JCF is to use the funds it has been awarded in two primary ways: (1) to provide capitalization grants to community lenders, who then use those funds to finance qualified projects; and (2) to provide those community lenders with technical assistance grants, in order to build community lenders' capacity to deploy capital in low-income and disadvantaged communities.

9.      JCF's subgrants are inherently critical to the projects its community lenders fund, as one of the criteria for a qualified project is that it may not otherwise have been financed.

**JCF's CCIA Award**

10.    In July 2023, EPA posted a Notice of Funding Opportunity ("NOFO") for the CCIA program. A true and correct copy of the CCIA NOFO is attached hereto as **Exhibit 1**.

11.    Also in July 2023, EPA posted a NOFO for the National Clean Investment Fund ("NCIF") program. A true and correct copy of the NCIF NOFO is attached hereto as **Exhibit 2**.

12.    On August 8, 2024, following an extensive, competitive, and merit-based review process, JCF was awarded $940 million in CCIA funding. The award was memorialized in a final award agreement, known as a Notice of Award ("NOA"). The original NOA was dated August 8, 2024. A true and correct copy of the August NOA, with redactions for privacy, is attached hereto as **Exhibit 3.**

13.    The NOA was then updated on December 20, 2024. That December NOA sets forth the operative Terms and Conditions for JCF's award. A true and correct copy of the December NOA, with redactions for privacy, is attached hereto as **Exhibit 4**.

14.    The award agreement required JCF to enter into an Account Control Agreement. JCF entered into the ACA that governs its account with EPA and Citibank on November 1, 2024. The ACA sets forth the terms governing Citibank's custody of the award funds. A true and correct copy of the ACA, with redactions for privacy, is attached hereto as **Exhibit 5**.

15.    JCF's funds were fully obligated by EPA on August 8, 2024. After funding was disbursed to JCF's Citibank accounts, JCF drew money from its accounts approximately every two weeks, as permitted by the terms of the CCIA Award, including in accordance with its approved budget. Between December 23, 2024, and February 12, 2025, JCF conducted six successful draws on its award funds.

16.    JCF has used award funds for salaries and benefits for the 14 employees on its payroll. These staff members collectively operate all aspects of JCF's operations, including

4

building relationships with community lenders, evaluating the 94 applications for subgrants JCF received from community lenders, adhering to EPA's stringent data-collection and reporting requirements, meeting our grant leverage goals, and participating in frequent and regular meetings to discuss JCF's program plans, reporting, oversight, and application of the EPA Terms and Conditions. JCF intends to hire more staff and engage additional vendors to support its operations. We have been rapidly expanding our capacity to implement this program, fulfill the requirement that we identify projects and partners quickly, and get funds moving to benefit American communities most in need.

17.     JCF plans to use award funds to fund clean-energy lending projects to benefit under-resourced communities. Thus far, JCF has obligated funds to 35 community lenders to support numerous projects. Those projects include financing solar arrays for rural hospitals, improvements that would both mitigate the risks to patients that result from blackouts and brownouts and reduce hospitals' operating costs, thus enabling them to continue to serve small communities rather than shuttering. Other JCF-funded projects would retrofit schools in Louisiana to save utility costs and improve air quality, convert an historic Maryland building into a workforce development center, finance community solar that will enable low-income families in North Carolina to save thousands of dollars annually, reduce the cost of mortgages for net-zero homes in Texas, and provide low-cost loans for small businesses in Virginia to purchase heat pumps, saving them hundreds of dollars annually on heating and cooling bills.

**EPA's and Citibank's Recent Actions and Failure to Inform JCF**

18.     On February 25, 2026, JCF placed a request to Citibank to draw funds from JCF's account. In the normal course, Citibank would have distributed the funds to JCF. But JCF's accounts with Citibank do not reflect that the disbursement occurred, and JCF did not receive any funds from its account.

19.    On February 26, 2025, at 3:40 pm, JCF submitted an email message to Citibank noting that its funding request remained pending and had not been disbursed. The letter asked for an update on the status of the draw request.

20.    On February 26, 2025, at 6:41pm, Citibank responded, saying that Citibank "d[id] not have an updated status at this time" and was "continu[ing] to monitor the situation with EPA for status updates." Citibank stated that it would "advise once we have new information to share regarding the draw request." JCF received no further communications from Citibank.

21.    On March 11, 2025, EPA sent JCF a "Notice of Termination" ("Notice"), which purported to terminate JCF's award. A true and correct copy of that Notice, with a redaction for privacy, is attached hereto as **Exhibit 6**.

22.    The Notice baselessly accuses JCF of "programmatic fraud, waste, and abuse." Ex. 6 at 1. It does not purport to describe or detail any such fraud, waste, or abuse.

23.    JCF has been unable to access its award funds since its last successful draw on February 12, 2025.

24.    JCF is continuing to attempt to meet its obligations under the award agreement, including by preparing rigorous semi-annual and annual reports, detailing its transactions, activities, and progress against its workplan.

25.    EPA is continuing to exercise its oversight and supervisory authority, including by regularly meeting with JCF to discuss its program plans, reporting, oversight, and compliance with EPA's general terms and conditions.

26.    On March 4, 2025, EPA asked JCF for answers and documentation related to 35 questions addressing a wide range of topics, many of which ask for documentation or information previously provided to, or issued by, EPA, giving JCF just weeks to respond while its funds are

inaccessible. A true and correct copy of EPA's March 4 information request, with redactions for privacy, is attached hereto as **Exhibit 7**.

27.     On April 1, 2025, JCF learned that the Citibank accounts of other CCIA awardees had been completely drained. As of 2:35pm ET on April 1, 2025, JCF's Citibank accounts had full balances. A true and correct copy of JCF's Agency and Trust Account Statement as of 2:35pm ET on April 1, 2025, is attached hereto as **Exhibit 8**.

28.     As of 5:14pm ET on April 1, 2025, JCF's Citibank accounts had been completely drained by FedWire transfers moving money out of JCF's accounts. JCF did not originate or direct those transfers. A true and correct copy of JCF's Agency and Trust Account Statement as of 5:14pm ET on April 1, 2025, is attached hereto as **Exhibit 9**. As of 8:25am ET on April 2, 2025, JCF's money was back in its Citibank accounts.

**<u>Impact on JCF's Operations and Programs if JCF Does Not Promptly Regain Access to the Funding Provided by the CCIA Award</u>**

29.     JCF cannot currently access award funds to implement its EPA-approved program workplan.

30.     As noted above, JCF had been drawing money from its Citibank accounts approximately every two weeks to pay operating expenses. JCF will run out of money to fund its operations in less than 45 days—and possibly much sooner, depending on the expenses it incurs in this litigation.

31.     Without access to the award funds in its Citibank accounts, JCF does not have funds available to support its programs, nor does it have other committed sources of funding that could replace the CCIA award.

32.     Part of the reason it is difficult for JCF to find alternative funding is that JCF's primary goal, and indeed the goal of the CCIA program and policy enacted by Congress, is to

provide financing for projects that do not already have a steady source of funding. *See* 42 U.S.C. § 7434(b)(1)(B) (requiring funding recipients to "prioritize investment in qualified projects that would otherwise lack access to financing").

33.     Loss of access to its primary funding is severely damaging JCF's internal operations, the programs for which the CCIA funding was intended, and JCF's long-term reputation and ability to carry out its mission in the market. Continued loss of access will be devastating. If access to award funding is not restored imminently, millions of dollars in approved transactions with committed partners cannot move forward—to the detriment of the program, the mission of the organization, and the communities that stand to benefit.

*Impact on Internal Operations*

34.     With every day that passes without relief, JCF moves one day closer to the end of its operations.

35.     To execute on its EPA-approved program, JCF hired an excellent staff with extensive experience in finance and community development. In many cases, we hired them from other institutions where they enjoyed higher compensation. They came to JCF to do this work because of our mission and impact on the communities that benefit from our projects.

36.     When JCF runs out of money to pay staff salaries and benefits, they will almost certainly depart to seek employment elsewhere. And without a stable source of funding, we will not be able to replace our current staff with quality employees or attract additional talent to fill out our teams. That will leave JCF unable to fulfill its mission. Moreover, the experience of our existing staff from EPA's unlawful actions would likely discourage future potential hires from joining JCF and running the risk that their job or pay will evaporate based on arbitrary or capricious government action.

*Impact on JCF's Grant Programs*

37.    Without a committed source of funding, JCF will not be able to meet the subaward commitments it has already made to community lenders for projects that they have in turn already approved. JCF's present inability to issue these subawards on the publicly communicated timeline is already eroding trust in JCF as an institution and damaging its reputation. And it specifically harms the qualified projects of the 35 selected community lenders, which will provide otherwise-unavailable funding for climate solutions while creating jobs and local economic development for small businesses and contractors. Business plans cannot be maintained indefinitely while funding remains unavailable and uncertain.

38.    The effect of EPA's and Citibank's actions on JCF's network of community lenders can hardly be overstated. These community lenders are most frequently owned by shareholders embedded in the communities they serve—communities that would benefit from the qualified projects they would fund, and whose members would be employed to execute them. Many of these lenders were reluctant to participate in green lending for fear of being labeled "woke," and many stepped outside their usual business arenas to partner with JCF. Those community lenders, having committed to and spent time developing qualified projects, are now left holding the proverbial bag—their project partners fail or turn elsewhere, their reputations suffer, and their own invested resources come to naught. Accordingly, many community lenders have expressed to JCF the frustration and harm occasioned to them by JCF's inability to access and disburse its obligated award funds in the ordinary course.

39.    EPA's and Citibank's actions have also visited significant harm on the small businesses and communities that would have been benefitted by the qualified projects. Small-business owners like electricians and other contractors have made plans to expand into low-income

and disadvantaged communities in reliance on the qualified projects JCF's CCIA award would have funded. Rural hospitals that were counting on solar arrays to reduce patient risk from brownouts and blackouts, and to help them stay afloat by reducing costs, are now left wondering how long they can operate, whether they can do so safely, and whether installation and other partners will still be available and able to carry out the projects whenever funding eventually materializes.

40.    Furthermore, EPA's and Citibank's actions place JCF at risk of running afoul of the NOA, which would further hamper its mission. The NOA provides that "[t]he EPA Project Officer may assess whether the Recipient is making sufficient progress in implementing the workplan in effect under this Assistance Agreement within 90 calendar days of June 30, 2025." Ex. 4 at 42. "'Sufficient progress' shall be assessed based on a comparison of the Recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes." *Id.* If JCF is found not to have achieved "sufficient progress"—because EPA and Citibank have cut off its access to the funds essential to its mission—it may be subject to a "corrective action plan" under 2 C.F.R. § 200.208. *Id.* at 43.[1]

*Impact on JCF's Reputation*

41.    EPA's and Citibank's actions harm JCF's reputation and thus the ultimate success of JCF's endeavors. Many community lenders were already hesitant about participating in the GGRF program for fear of being labeled "woke" or otherwise targeted. Through careful relationship building and concerted efforts to educate potential partners on the benefits of clean

---

[1] To be sure, this particular risk of harm could be avoided by EPA committing not to use its own funding freeze against JCF in assessing JCF's progress in meeting the NOA. No such commitment has been made, however. And even if such a commitment were made, it would do nothing to alleviate the other imminent and irreparable harms detailed above.

lending—including the massive potential for job creation and the benefits to under-resourced communities—JCF was able to generate significant interest in its mission. EPA's baseless accusations of "waste, fraud, or abuse," Ex. 6 at 1, and its targeting of JCF, have damaged the relationships JCF forged. And Citibank's refusal to permit JCF to draw its grant funds has prevented JCF from making good on its commitments to its community lending partners.

42.    JCF's relationships with its community lenders and other partners are built on trust and cannot be easily repaired. Between JCF's inability to access its award funds and the baseless aspersions EPA has cast on JCF, that trust is already waning. Every passing day on which JCF is unable to make good on its commitments to community lenders, and they to their qualified projects, is a day on which more irreparable damage is done.

### **Impact on the Public**

43.    Absent immediate relief, the benefits from our community lenders' projects will not come to fruition, and they cannot be easily replaced. At the end of the day, this program is about delivering direct, tangible benefits to American communities in the form of energy savings, energy access and stability, job creation, and healthier communities through access to capital that the private markets alone have not and will not deliver.

44.    If JCF is unable to regain access to its award funds, it will be unable to deliver the long-term benefits derived from the execution of its EPA-approved workplan. That workplan predicts that JCF's work will avoid and reduce 5.32 million metric tons $CO_2$ emissions, directly and indirectly support 61,700 jobs, provide financing to over 155,000 households and 10,900 businesses, and mobilize $1.56 billion in private capital. JCF's deployment of its CCIA funds is projected to directly result in:

  a.   The financing of 180,000 qualified projects;

  b.   The installation of 281 megawatts of solar PV capacity;

11

A102

c.   The installation of 38 megawatts of new battery storage capacity;

d.   The financing of 93,600 heat pumps and heat pump water heaters;

e.   23,500 buildings weatherized, electrified, and made energy efficient;

f.   The construction of 143 new net-zero single family homes;

g.   The financing of 36,400 light-duty electric vehicles;

h.   The financing of 420 medium-and heavy-duty electric vehicles; and

i.   The installation of 8,890 electric-vehicle charging stations.

45.   Taken as a whole, the work JCF would perform through access to its awarded funds would yield improved indoor and outdoor air quality, an increase in affordable and sustainable housing, the creation of quality jobs, demand for clean technologies manufactured and distributed in America, savings for American households, small businesses, and nonprofits, green homeownership and wealth creation for American families, and the adoption of net-zero and net-zero-ready building standards in the commercial, multifamily and single-family markets.

46.   There is also the matter of lost time and opportunity cost. Numerous individuals have spent years preparing for the implementation of this program. We have conducted listening sessions, met hundreds of times with partners, and hosted events to inform our strategy and approach, in addition to drawing on our direct experience in finance and community development. If EPA's unlawful termination and Defendants' related conduct is permitted to continue, we will have lost that time that could have been spent more productively to generate financial and impact benefits for the communities we serve.

* * *

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28

U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.


Executed this 2nd day of April, 2025, in Washington, D.C.


_____

AMIR KIRKWOOD, CEO
Justice Climate Fund

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JUSTICE CLIMATE FUND** | |
| Plaintiff, | |
| v. | Civil Action No. 1:25-cv-938 |
| **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,** *et al.* | |
| Defendants. | |

**DECLARATION OF REGINALD PARKER IN SUPPORT OF JUSTICE CLIMATE FUND'S MOTION FOR PRELIMINARY INJUNCTION**

I, Reginald Parker, declare as follows:

1.     I am a trustee and chairman of the Board of Directors of Freedmen Green Bank & Trust ("Freedmen"). I have served in that role since January 2023. I have a B.S. in engineering from MIT, a Ph.D. in engineering from Georgia Tech, and a finance M.B.A. from Florida State University. At Freedmen, I am responsible for developing the transactional structure for the bank's community investments.

2.     Freedmen is a nonprofit and charitable trust headquartered in Atlanta, Georgia; it was founded in January 2023, partially in response to the passage of the Inflation Reduction Act. Freedmen is a community lender that relies on Greenhouse Gas Reduction Fund ("GGRF") funds both to fund qualified projects and to support its operations. Freedmen serves communities in Georgia, Mississippi, and Alabama, and receives no funds from the Georgia, Mississippi, or Alabama governments.

3.     The irreparable harm to Freedmen and the communities it serves that will result from the continued unavailability of GGRF funds is significant and actual, not theoretical. EPA's and Citibank's actions have already had irreversible, severe, and adverse effects on

1

Freedmen and its communities, both directly and distributionally.  Unless the Justice Climate
Fund ("JCF") is permitted to access its GGRF award and disburse committed funds to Freedmen,
those effects will continue and worsen.

4.    It is important to underscore that Freedmen is not impacted in isolation.  Freedmen
is part of the JCF network of roughly 270 community lenders operating throughout underserved
(i.e., unbanked or underbanked) areas across the United States.  JCF's community lenders rely
on JCF and on each other to develop lending strategies and achieve economies of scale in
providing our services, and we support each other in performing our services.  For these reasons,
while Freedmen is standing up for itself by providing this declaration, it is also necessarily
standing up for our network of peer community lenders, many of which have communicated the
fear of being targeted for standing up for their own missions and communities.  We at Freedmen
are also afraid, but we know that we must nevertheless speak up and speak out.  I therefore
provide this declaration to communicate the types of irreparable harm that we have suffered as
a result of the EPA's efforts to defund and undermine JCF, Freedmen, our peer network, and our
communities, and how that damage will only continue and be exacerbated unless a preliminary
injunction issues.

**The Need for Community Lenders Like Freedmen**

5.    There is no serious question that banking underpins U.S. household stability,
security, and prosperity.  The FDIC, the federal agency that both insures American depositors and
supervises financial institutions, is clear on these benefits: "Gaining access to credit and

establishing a credit history allow households to smooth consumption, build wealth, and weather financial shocks."[1]

6.      The concentration of banking driven by consolidation and the digitization of finance has impaired the historical relationship between banks and their communities.  FDIC data show that in 1994, the year the Community Development Financial Institutions Fund was created under the Riegle Act, there were 10,453 commercial banks spread across our country.[2]  In 2024, that number fell to 3,928.[3]  Bank closures tend to disproportionately affect rural areas that are less well-off economically, where residents are less educated and more likely to belong to racial and ethnic minorities.[4]  And lower-income, disabled, and of-color Americans are more likely to be unbanked.[5]

7.      Underserved people lack the safety net that banking affords and, because they are unbanked, are less likely to be able to weather customary financial shocks, particularly in a volatile economy where the costs of goods and services are in flux or rising.  The unbanked often do have incomes, but still struggle to afford expenses that ordinarily require credit (like buying a reliable car to get to work or school), and are forced to make tough choices that have long-term consequences for their families.

---

[1] Federal Deposit Insurance Corporation, *2023 FDIC National Survey of Unbanked and Underbanked Households: Executive Summary* 17 (Nov. 2024), https://www.fdic.gov/household-survey/2023-fdic-national-survey-unbanked-and-underbanked-households-executive-summary.
[2] Federal Deposit Insurance Corporation, BankFind Suite: Annual Historical Bank Data, https://banks.data.fdic.gov/explore/historical?displayFields=STNAME%2CBANKS%2CASSET%2CDEP%2CEQNM%2CNETINC&selectedEndDate=2024&selectedReport=CBF&selectedStartDate=1994&selectedStates=0&sortField=YEAR&sortOrder=desc (last visited Apr. 14, 2025).
[3] *Id.*
[4] *See, e.g.*, Press Release, Bd. of Governors of the Fed. Rsrv. Sys., Federal Reserve Board Publishes Report on Bank Branch Access in Rural Communities (Nov. 25, 2019), https://www.federalreserve.gov/newsevents/pressreleases/other20191125a.htm.
[5] *2023 FDIC National Survey of Unbanked and Underbanked Households: Executive Summary*, *supra* note 1, at 2.

3

8.      Community lenders like Freedmen are considered "the backbone of financial stewardship in underserved communities."[6]  The reason that we are considered the "backbone" of underserved communities is that Freedmen, like its peer community lenders, has taken the time to understand our communities, build relationships, provide financial-literacy education, and develop products that respond to the needs of underserved communities.  We work to solve real problems facing real people for whom our services are a lifeline.

9.      Community lenders are thus faced with the task of figuring out how to surmount the barriers that face underserved communities—barriers that can persist even when traditional banks exist or arrive in the community.

10.      Those barriers are both known and, we believe, surmountable.  In a survey administered biennially to approximately 30,000 U.S. families, the FDIC seeks to identify the reasons for respondents' unbanked status.[7]  The top two reasons given in 2023 by those in underserved communities are that they cannot afford the minimum account requirements (including to avoid fees that erode account values), and that they do not trust banks.[8]  A significant proportion of the unbanked persons surveyed also noted that they are not able to access the services they need, even where banks are available to them.[9]  These reasons resonate with Freedmen's own experiences and findings.

---

[6] Asia Salazar, Nicholas Bobst & Sabina Flandrick, *Four Things Community Lenders Realized about the Clean Energy Transition*, RMI (May 30, 2024), https://rmi.org/four-things-community-lenders-realized-about-the-clean-energy-transition/.
[7] *See generally supra* note 1.
[8] *Id.* at 3.
[9] *Id.*

### How GGRF Funding Helps Freedmen Serve the Unbanked and Underserved

11.    Freedmen was created to provide affordable capital access and technical assistance to low- and moderate-income communities in Georgia, Mississippi, and Alabama, with the mission to advance those communities' health, security, and prosperity.  Freedmen does that by providing affordable financing of residential, small-business, and community projects, including weatherization, building-upgrade, and clean-energy projects.  Freedmen focuses in particular on projects that underpin community resilience—for example, creating secure microgrids at churches that are havens for community members in regions facing extreme weather risks.  By doing this, we create a pathway for communities to advance local jobs and community economic viability.

12.    As a community lender, Freedmen operates as a direct lender to projects, using funds from public and private partners to provide lower-cost capital to finance qualified projects that, but for Freedmen, would not otherwise be able to obtain financing.

13.    GGRF funding focused on clean-energy systems and housing upgrades allows Freedmen to address the barriers to banking in effective ways that would not exist without GGRF funding or its focus on energy burdens.  The term "energy burden" refers to the percentage of a household's income spent on energy costs (electricity, heating and transportation fuel).  An energy-burdened household pays at least 6% of its income on energy costs, twice the proportion of family income that an average American spends.

14.    With GGRF funding, our affordable financing of clean energy technologies, such as solar on roofs and heat pumps that offset boilers and replace air conditioning, reduces that disproportionate burden, bringing savings to families' pockets—often, for the first time.   These savings become the safety net underserved families need and, like all safety nets, can transform

lives and livelihoods by allowing low-income families to weather financial events that would otherwise be destabilizing.

15.    Our financing of clean energy systems also reduces the adverse health effects of, for instance, older boilers ubiquitous in low-income communities, improving family health and reducing health care costs.

16.    At Freedman, we are able to use GGRF funds to: (1) lower the cost of entry to banking, eliminating minimums and needless fees and returning a higher interest rate on accounts than traditional banks; (2) take the time and effort to be an aligned partner, building trust via extensive community outreach, in which we communicate shared respect and the benefits of our reasonable underwriting of clean energy systems (with our outreach and staffing paid for, in large part, by GGRF technical assistance funds); (3) using technical assistance funds, provide financial literacy education to communities and to the contractors who serve them through our Freedom Academy; and (4) focus on streamlined, affordable, clean-energy loans that are structured to reduce monthly costs, creating savings that enable once energy-burdened families, businesses, and communities to thrive.

**Freedmen Will Be Irreparably Harmed If JCF Does Not Soon Regain The Ability To Disburse Its GGRF Funds**

17.    Freedmen is part of a consortium application that has been selected to receive grants from several primary recipients of GGRF awards, including JCF.  Freedmen was selected to receive capitalization funding (financial assistance) of approximately $9.9 million in concessionary loans from a GGRF recipient that is focused on advancing green banks, and was also selected—but has not yet entered into contracts— to receive technical-assistance funding of approximately $450,000 from JCF and other GGRF awardees.  The capitalization funding is to be

disbursed to finance qualified projects, and the technical-assistance funds are essentially working capital, critical to Freedmen's ability to function.

18.    Technical-assistance funds are startup capital essential to funding Freedmen's operations.  And because the technical-assistance funds JCF has obligated to Freedmen are in the form of a grant (rather than a loan), those funds will enable Freedmen to make its financing more affordable.  The technical-assistance funds JCF has committed to Freedmen grants are thus critical to Freedmen, which is unfunded by the states in which it is located.  Unless those funds are restored soon, Freedmen will be unable to continue in operation.

19.    In preparation for receiving and deploying the awarded funds, Freedmen developed an extensive qualified-project pipeline of energy-saving upgrades to, and clean-energy microgrids at, churches, community centers, and nursing homes.  These projects enable the facilities to save money on utilities and to be secure in the face of outages—for example, from major storm events common in these states.  Demand for these projects exceeds available funds, and every dollar of funding matters to Freedmen and its communities.

20.    In reliance on the promised receipt of funds from JCF that would sustain Freedmen's operations, Freedmen has taken numerous and substantial steps to engage with Freedmen's communities in Georgia, Mississippi, and Alabama to effectively advance projects, to stand up the institution to successfully underwrite affordable community loans, to obtain appropriate permitting, and to develop a high-quality, high-impact pipeline of qualified projects that meet the GGRF requirements.  For example, Freedmen designed its assessment, underwriting, and financing systems (including all policies and protocols), developed its ability to mobilize private capital (through hundreds of meetings with capital providers), and designed the models

under which Freedmen has solicited and analyzed applications for low-cost financing. These efforts represent tens of thousands of hours of work by Freedmen staff.

21.    EPA's and Citibank's actions in failing to disburse GGRF funds on the recipients' instructions have erected formidable barriers to Freedmen's success as a going concern. Those barriers are both operational and reputational, and unless the funding is restored soon, the damage will be irreparable.

22.    Operationally, the freeze of GGRF funds, and of JCF's funds in particular, has meant that Freedmen has not received its awarded technical-assistance funds to support its daily operations. As a new enterprise focused on community development, Freedmen has few alternative sources of traditional funding. Freedmen's GGRF awards represented a transformative infusion of capital that was and is essential to Freedmen's future—its reputation, its growth as a business, and its enduring legacy. Unless the JCF funds are restored and disbursed soon, Freedmen will have to drastically scale back its business model and may well have to close its doors.

23.    Prior to the freezing of JCF's funds, Freedmen approved the applications of numerous project sponsors for low-cost financing for their qualified projects. In so doing, Freedmen committed to the successful applicants that the financing for which they had been approved would in fact be provided. In order to make good on that promise, Freedmen must be able to continue in operation—something it cannot do without the committed technical-assistance funding from JCF.

24.    The reputational harm done to Freedmen by the funding freeze presents an independent existential threat. While Freedmen currently has sufficient funds to begin financing some approved projects, a key factor in the success of Freedmen's projects—and thus its own success—is the mobilization of private capital. As a result of the funding freeze, private investors

have expressed significant reservations about involvement in Freedmen's work, and that involvement has slowed. This chilling of private-capital investment compromises Freedmen's ability to make good on its commitments to project sponsors.

25.    Freedmen's inability to provide all the financing it promised to project sponsors is already doing significant harm to its reputation, and that harm will be magnified the longer it persists. As a green bank in a red state, Freedmen already faces skepticism. We have had to work hard to build relationships and to earn a reputation as a trustworthy, reliable lending institution. The funding freeze is damaging Freedmen's hard-won reputation for trustworthiness and reliability—qualities that all consumers consider essential in their lenders.

26.    Freedmen's reputation is even more important to its success than that of a mine-run lender. Every day that we are delayed in deploying GGRF funding adds to the weight of the objective setbacks we face within our communities as a result of the funding freeze. The community trust we have worked so hard to build—trust in our ability to deliver affordable financing—is damaged, in ways that feed directly into these communities' preexisting perceptions about banks. That dynamic makes our work much harder. And we are set back in our efforts to reduce costs and increase our capacity by featuring our successes—community members sharing with others their experiences with Freedmen and with the clean-energy installations Freedmen would finance. The loss of these symbols of success means that Freedmen appears less effective than we could be had EPA not undertaken to defund and delay our work. That reputational effect is direct, but its knock-on effects to communities will delay adoption and therefore achievement of GGRF's mission of making low-income communities more secure, healthier, and better able to gain access to the middle class.

27.    If Freedmen is unable to regain access to its technical-assistance award soon, it will likely fail—and its failure would, in turn, have reputational impacts across this community-lending sector.    Failures of institutions like Freedmen have an outsized effect:    Consistent with congressional intent, first movers like Freedmen are attempting to prove the feasibility of providing low-cost funding for energy- and cost-saving projects that benefit low- and moderate-income communities.    Undermining Freedmen casts a long shadow on community lending.

28.    Further, EPA's and Citibank's public positions have created uncertainty and fear among community lenders and project sponsors that they will be threatened with costly litigation in connection with their participation in the process.    The chilling effect of EPA's and Citibank's actions independently impede Freedmen's ability to fulfill its and Congress's joint mission.

29.    Even more important to Freedmen than its own irreparable harm is the profoundly adverse impact to its qualified project sponsors and communities of this funding freeze.

30.    The small businesses and community organizations whose projects Freedmen's capital would finance have, like Freedmen, acted in reliance on receipt of the funds, and those projects cannot survive long without them.

31.    It is the customary practice of the small-scale installation and construction businesses that support community solar to purchase materials, like solar panels, in tranched payments.    Some of our project sponsors have already purchased one or more tranches of materials, and have made commitments to purchase more, in reliance on their receipt of committed financing from Freedmen to make further payments.    Without access to their promised financing, these customers are currently either unable to make good on their own commitments to purchase further tranches or, where they can afford to continue making payments, are scrambling to find places to store the materials they have purchased but cannot afford to use.    If their inability to access

10

Freedmen's financing continues for too long, the relationships our customers have built with their suppliers and contractors will sour along with those we have built with our customers.

32.    The length of the delay is a critical consideration, because protracted delays have multiple spillover effects.

      a.    Restarting the projects will become difficult or impossible even if alternative sources of funding later materialize, because the trust in the project's momentum and therefore viability will have been squandered.

      b.    If delays are protracted, underwriting will need to re-occur, both for prudential investment reasons and because projects costs would be expected to change, which can be costly and compound the attrition burden that small projects face.

      c.    Equipment may need to be resold to reduce immediate burdens and losses, with the result that projects are essentially pushed back to an early stage of development and with additional imbedded debt.  These funds are funds our customers cannot afford to lose.  They certainly cannot afford to pay for any part of a project twice—once through a lost deposit, and again if and when financing becomes available many months down the road.

33.    In sum, because EPA and Citibank have frozen the promised funds and have yet to release them, our customers' projects are at risk of never being completed.

34.    The communities these projects were intended to benefit are also at risk of irreparable harm unless EPA and Citibank release GGRF funds, thus permitting primary GGRF recipients like JCF to enable Freedmen to spend its obligated funds.

35.    The cost to our communities is dangerously high.  In much of the underserved Deep South—where Freedmen operates—air conditioning is a luxury, utility outages are

common, and extreme weather events can leave communities without electricity for days and sometimes weeks. For example, according to the National Oceanic and Atmospheric Administration, the annual average number of disasters in Georgia with losses exceeding $1 billion was 9.8 events between 2020 and 2024, making such events effectively routine.[10] The frequency and magnitude of these events has increased in recent years.[11] But with our financing of clean-energy systems—which create micro-grids that allow community churches and schools to keep the lights, heat, and air conditioning on—these outages and interruptions have a lower impact on our communities, causing less economic turmoil and heartache.

36.    Our financing focuses on community energy security, including the installation of solar panels on churches and nursing homes, which would permit those places to be energy-independent safe havens for residents and community members in the aftermath of a storm. Unless our funding is restored soon, those projects cannot be completed in time for this year's storm season.

37.    The risks to communities outlined above are, ultimately, risks to individuals. Without the immediate restoration of JCF's funding support, projects that would improve, sustain, and save life cannot proceed as scheduled. Oxygen machines that would be powered by solar panels during a blackout will turn off. Essential medications that require refrigeration will warm and spoil. The jobs that would be created in low-income communities will not materialize, and low-income families' energy spending will remain disproportionately high. Further delay will irreparably harm the health and wellbeing of the most vulnerable individuals in our society.

---

[10] Billion-Dollar Weather and Climate Disasters: Georgia, National Oceanic and Atmospheric Administration, https://www.ncei.noaa.gov/access/billions/state-summary/GA (last visited April 10, 2025).

[11] *See id.*

***

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28

U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.


Executed this 15th day of April, 2025, in Atlanta, Georgia.


_____
Dr. Reginald Parker

13

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:25-cv-00948-TSC

INCLUSIV, INC. v. UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY et al
Assigned to: Judge Tanya S. Chutkan
Lead case: 1:25-cv-00698-TSC
Member case: (View Member Case)
Related Cases: 1:25-cv-00698-TSC
                1:25-cv-00735-TSC
                1:25-cv-00762-TSC
                1:25-cv-00820-TSC
                1:25-cv-00938-TSC

Date Filed: 03/31/2025
Jury Demand: None
Nature of Suit: 899 Administrative
Procedure Act/Review or Appeal of Agency
Decision
Jurisdiction: U.S. Government Defendant

Cause: 05:551 Administrative Procedure Act

| Date Filed | # | Docket Text |
|---|---|---|
| 03/31/2025 | 1 | COMPLAINT *for Declaratory and Injunctive Relief* against All Defendants ( Filing fee $ 405 receipt number ADCDC-11580047) filed by INCLUSIV, INC.. (Attachments: # 1 Civil Cover Sheet Civil Cover Sheet, # 2 Summons Summons - EPA, # 3 Summons Summons - Zeldin, # 4 Summons Summons - McIntosh, # 5 Summons Summons - Citibank, # 6 Summons Summons - Attorney General Pamela Bondi, # 7 Summons Summons - U.S. Attorney Edward R. Martin Jr.)(Keraga, Kyle) (Entered: 03/31/2025) |
| 03/31/2025 | 2 | ENTERED IN ERROR.....NOTICE OF RELATED CASE by INCLUSIV, INC. Case related to Case No. 25-cv-698. (Keraga, Kyle) (Entered: 03/31/2025) |
| 03/31/2025 | 3 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by INCLUSIV, INC. (Keraga, Kyle) (Entered: 03/31/2025) |
| 04/01/2025 | 4 | NOTICE of Appearance by Jay Christopher Johnson on behalf of INCLUSIV, INC. (Johnson, Jay) (Entered: 04/01/2025) |
| 04/01/2025 | | NOTICE OF NEW CASE ERROR regarding 2 Notice of Related Case, 1 Complaint,. The following error(s) need correction: Blank/Incomplete/Missing civil cover sheet. Please file the Civil Cover Sheet (JS44) form at www.dcd.uscourts.gov/new-case-forms using the event Civil Cover Sheet. Blank/Incomplete/Missing Related Case form. Please use the Notice of Designation of Related Cases (CO 932) form at www.dcd.uscourts.gov/new-case-forms and filing using the event Notice of Related Case. Forms filed as fillable PDF. Please file forms in a non-fillable PDF format. **COMPLIANCE DEADLINE is by close of business today. This case will not proceed any further until all errors are satisfied.** (zsl) (Entered: 04/01/2025) |
| 04/01/2025 | 5 | CIVIL COVER SHEET by INCLUSIV, INC. filed by INCLUSIV, INC..(Keraga, Kyle) (Entered: 04/01/2025) |
| 04/01/2025 | 6 | MOTION for Preliminary Injunction by INCLUSIV, INC.. (Attachments: # 1 Memorandum in Support, # 2 Exhibit Declaration of Neda Arabshahi, # 3 Exhibit Declaration of John S. Lawson, # 4 Exhibit Declaration of Jared Freeman, # 5 Exhibit Declaration of Greg Hanshaw, # 6 Exhibit Declaration of Ricardo Ledezma, # 7 Exhibit |

| | | |
|---|---|---|
| | | Inclusiv CCIA Grant Agreement (Aug. 8, 2024), # 8 Exhibit Inclusiv CCIA Modified Grant Agreement (Dec. 19, 2024), # 9 Exhibit Account Control Agreement (Nov. 6, 2024), # 10 Exhibit Financial Agency Agreement (Sept. 19, 2024), # 11 Exhibit EPA Letter to Inspector General (Mar. 2, 2025), # 12 Exhibit EPA Letter to Inclusiv (Mar. 4, 2025), # 13 Exhibit EPA Termination Letter to Inclusiv (Mar. 11, 2025), # 14 Exhibit Climate United TRO & Memorandum Opinion (Mar. 18, 2025), # 15 Exhibit Inclusiv Letter to Citibank (Mar. 21, 2025), # 16 Exhibit Inclusiv Response to EPA's March 4 Letter (Mar. 28, 2025), # 17 Text of Proposed Order)(Keraga, Kyle) (Entered: 04/01/2025) |
| 04/01/2025 | 7 | NOTICE OF RELATED CASE by INCLUSIV, INC.. Case related to Case No. 25-cv-698. (Keraga, Kyle) (Entered: 04/01/2025) |
| 04/01/2025 | 8 | WITHDRAWN PURSUANT TO NOTICE FILED 0402/2025.....Emergency MOTION for Temporary Restraining Order by INCLUSIV, INC.. (Attachments: # 1 Declaration of Jay Johnson and Exhibits, # 2 Declaration of Eben Sheaffer, # 3 Text of Proposed Order) (Keraga, Kyle) Modified on 4/4/2025 (zjm). (Entered: 04/01/2025) |
| 04/02/2025 | | Case Assigned to Judge Tanya S. Chutkan. (zjd) (Entered: 04/02/2025) |
| 04/02/2025 | 9 | SUMMONS (6) Issued Electronically as to CITIBANK, N.A., W.C. MCINTOSH, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN, U.S. Attorney, and U.S. Attorney General (Attachments: # 1 Notice and Consent)(zjd) (Entered: 04/02/2025) |
| 04/02/2025 | 10 | NOTICE of Appearance by Kenneth Winn Allen on behalf of CITIBANK, N.A. (Allen, Kenneth) (Entered: 04/02/2025) |
| 04/02/2025 | 11 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by CITIBANK, N.A. (Allen, Kenneth) (Entered: 04/02/2025) |
| 04/02/2025 | 12 | NOTICE of Appearance by Saunders Lee McElroy on behalf of CITIBANK, N.A. (McElroy, Saunders) (Entered: 04/02/2025) |
| 04/02/2025 | 13 | NOTICE of *Withdrawal of Request for Relief* by INCLUSIV, INC. re 8 Motion for TRO (Johnson, Jay) (Entered: 04/02/2025) |
| 04/03/2025 | 14 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Dismas N. Locaria, Filing fee $ 100. Fee Status: Fee Paid. by INCLUSIV, INC.. (Attachments: # 1 Declaration Declaration of D. Locaria, # 2 Good Standing Certificate, # 3 Text of Proposed Order Proposed Order)(Johnson, Jay) (Entered: 04/03/2025) |
| 04/03/2025 | 15 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Cogan R.S. Rooney, Filing fee $ 100. Fee Status: Fee Paid. by INCLUSIV, INC.. (Attachments: # 1 Declaration Declaration of C.Rooney, # 2 Good Standing Certificate, # 3 Text of Proposed Order Proposed Order)(Johnson, Jay) (Entered: 04/03/2025) |
| 04/03/2025 | 16 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Evan I. Suval, Filing fee $ 100. Fee Status: Fee Paid. by INCLUSIV, INC.. (Attachments: # 1 Declaration Declaration of E. Suval, # 2 Good Standing Certificate, # 3 Text of Proposed Order Proposed Order) (Johnson, Jay) (Entered: 04/03/2025) |
| 04/03/2025 | 17 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Lindsay M. Reed, Filing fee $ 100. Fee Status: Fee Paid. by INCLUSIV, INC.. (Attachments: # 1 Declaration Declaration of L. Reed, # 2 Good Standing Certificate, # 3 Text of Proposed Order Proposed Order)(Johnson, Jay) (Entered: 04/03/2025) |
| 04/07/2025 | 18 | NOTICE of Appearance by Marcus S Sacks on behalf of W.C. MCINTOSH, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN (Sacks, Marcus) (Entered: 04/07/2025) |

| | | |
|---|---|---|
| 04/07/2025 | 19 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Emily R. Marcy, Filing fee $ 100. Fee Status: Fee Paid. by INCLUSIV, INC.. (Attachments: # 1 Declaration Declaration of E. Marcy, # 2 Good Standing Certificate, # 3 Text of Proposed Order Proposed Order)(Johnson, Jay) (Entered: 04/07/2025) |
| 04/07/2025 | 20 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Taylor M. Sorrells, Filing fee $ 100. Fee Status: Fee Paid. by INCLUSIV, INC.. (Attachments: # 1 Declaration Declaration of T. Sorrells, # 2 Good Standing Certificate, # 3 Text of Proposed Order Proposed Order)(Johnson, Jay) (Entered: 04/07/2025) |
| 04/07/2025 | | MINUTE ORDER: GRANTING Motions for Leave to Appear Pro Hac Vice as to 14 Dismas N. Locaria, 15 Cogan R.S. Rooney, 16 Evan I. Suval, 17 Lindsay M. Reed, 19 Emily R. Marcy, and 20 Taylor M. Sorrells. Dismas N. Locaria, Cogan R.S. Rooney, Evan I. Suval, Lindsay M. Reed, Emily R. Marcy, and Taylor M. Sorrells are hereby admitted *pro hac vice* to represent Plaintiff Inclusiv, Inc. in this matter. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Tanya S. Chutkan on 4/7/2025. (lcer) (Entered: 04/07/2025) |
| 04/08/2025 | | Payment for 20 MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Taylor M. Sorrells, Filing fee $ 100. Fee Status: Fee Paid., 16 MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Evan I. Suval, Filing fee $ 100. Fee Status: Fee Paid., 15 MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Cogan R.S. Rooney, Filing fee $ 100. Fee Status: Fee Paid., 19 MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Emily R. Marcy, Filing fee $ 100. Fee Status: Fee Paid., 17 MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Lindsay M. Reed, Filing fee $ 100. Fee Status: Fee Paid., 14 MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Dismas N. Locaria, Filing fee $ 100. Fee Status: Fee Paid.. ($100). (Johnson, Jay) (Entered: 04/08/2025) |
| 04/08/2025 | | Payment for 14 MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Dismas N. Locaria, Filing fee $ 100. Fee Status: Fee Paid.. ($100; Receipt number ADCDC-11598472). (Johnson, Jay) (Entered: 04/08/2025) |
| 04/08/2025 | | Payment for 15 MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Cogan R.S. Rooney, Filing fee $ 100. Fee Status: Fee Paid.. ($100; Receipt number ADCDC-11598484). (Johnson, Jay) (Entered: 04/08/2025) |
| 04/08/2025 | | Payment for 16 MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Evan I. Suval, Filing fee $ 100. Fee Status: Fee Paid.. ($100; Receipt number ADCDC-11598506). (Johnson, Jay) (Entered: 04/08/2025) |
| 04/08/2025 | | Payment for 17 MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Lindsay M. Reed, Filing fee $ 100. Fee Status: Fee Paid.. ($100; Receipt number ADCDC-11598515). (Johnson, Jay) (Entered: 04/08/2025) |
| 04/08/2025 | | Payment for 19 MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Emily R. Marcy, Filing fee $ 100. Fee Status: Fee Paid.. ($100; Receipt number ADCDC-11598524). (Johnson, Jay) (Entered: 04/08/2025) |
| 04/08/2025 | | Payment for 20 MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Taylor M. Sorrells, Filing fee $ 100. Fee Status: Fee Paid.. ($100; Receipt number ADCDC-11598539). (Johnson, Jay) (Entered: 04/08/2025) |
| 04/08/2025 | 21 | Joint STATUS REPORT by W.C. MCINTOSH, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN. (Sacks, Marcus) (Entered: 04/08/2025) |
| 04/10/2025 | 22 | NOTICE of Appearance by Cogan Rooney on behalf of INCLUSIV, INC. (Rooney, Cogan) (Entered: 04/10/2025) |

| 04/10/2025 | | MINUTE ORDER: Upon consideration of the parties' 21 Joint Status Report, briefing on Plaintiffs' 6 Motion for Preliminary Injunction is stayed until further order of the Court. To the extent the parties would like to proceed with the briefing, the parties shall confer and file a joint status report with an updated briefing schedule. The status report shall be accompanied by a proposed order. Signed by Judge Tanya S. Chutkan on 4/10/2025. (lcer) (Entered: 04/10/2025) |
|---|---|---|
| 04/10/2025 | 23 | NOTICE of Appearance by Kevin Paul VanLandingham on behalf of W.C. MCINTOSH, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN (VanLandingham, Kevin) (Entered: 04/10/2025) |
| 04/15/2025 | | MINUTE ORDER: Pursuant to Federal Rule of Civil Procedure 42(a)(2), the court will consolidate this case with Case No. 25-cv-698, given the common questions of law and fact between both cases. The parties to this case may submit a Joint Status Report to the court within seven days of the courts decision on the preliminary injunction motions in Case No. 25-cv-698, setting forth whether there are any additional issues specific to Plaintiff Inclusiv, Inc. to address. All filings and papers related to the consolidated cases shall be filed in the lead case: 25-cv-698. Signed by Judge Tanya S. Chutkan on 4/15/2025. (lcer) (Entered: 04/15/2025) |
| 04/15/2025 | | Cases Consolidated. This case has been consolidated with case 25-cv-00698-TSC pursuant to Order. From this date forward, all pleadings shall be filed ONLY in the lead case, 25-cv-00698-TSC. Parties are advised NOT to elect the SPREAD TEXT option when filing in ECF, as this will result in repetitive docketing. (zjm) (Entered: 04/15/2025) |
| 04/16/2025 | | MINUTE ORDER: DENYING as MOOT Plaintiffs' 6 Motion for Preliminary Injunction. See Preliminary Injunction Order and forthcoming Memorandum Opinion in lead case No. 25-cv-698 for details. Signed by Judge Tanya S. Chutkan on 4/16/2025. (lcer) (Entered: 04/16/2025) |

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 04/21/2025 12:27:57 | | | |
| **PACER Login:** | kfoleyzcc | **Client Code:** | 00022 |
| **Description:** | Docket Report | **Search Criteria:** | 1:25-cv-00948-TSC |
| **Billable Pages:** | 4 | **Cost:** | 0.40 |

CONSOL,TYPE-E

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:25-cv-00938-TSC

JUSTICE CLIMATE FUND v. UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY et al
Assigned to: Judge Tanya S. Chutkan
Lead case: 1:25-cv-00698-TSC
Member case: (View Member Case)
Related Cases: 1:25-cv-00698-TSC
    1:25-cv-00735-TSC
    1:25-cv-00762-TSC
    1:25-cv-00820-TSC
    1:25-cv-00948-TSC
Cause: 05:0706 Judicial Review of Agency Actions

Date Filed: 03/31/2025
Jury Demand: None
Nature of Suit: 899 Administrative
Procedure Act/Review or Appeal of Agency
Decision
Jurisdiction: U.S. Government Defendant

| Date Filed | # | Docket Text |
|---|---|---|
| 03/31/2025 | 1 | COMPLAINT against All Defendants ( Filing fee $ 405 receipt number ADCDC-11578378) filed by Justice Climate Fund. (Attachments: # 1 Civil Cover Sheet Civil Cover Sheet, # 2 Summons Summons -- Bondi, # 3 Summons Summons -- Citibank, # 4 Summons Summons -- EPA, # 5 Summons Summons -- Martin, # 6 Summons Summons -- McIntosh, # 7 Summons Summons -- Zeldin)(Citron, Eric) (Entered: 03/31/2025) |
| 03/31/2025 | 2 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by Justice Climate Fund (Citron, Eric) (Entered: 03/31/2025) |
| 04/01/2025 | 3 | NOTICE OF RELATED CASE by Justice Climate Fund. Case related to Case No. 25-cv-698. (Citron, Eric) (Entered: 04/01/2025) |
| 04/01/2025 | | Case Assigned to Judge Tanya S. Chutkan. (zsl) (Entered: 04/01/2025) |
| 04/02/2025 | 4 | NOTICE of Appearance by Kenneth Winn Allen on behalf of CITIBANK, N.A. (Allen, Kenneth) (Entered: 04/02/2025) |
| 04/02/2025 | 5 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by CITIBANK, N.A. (Allen, Kenneth) (Entered: 04/02/2025) |
| 04/02/2025 | 6 | NOTICE of Appearance by Saunders Lee McElroy on behalf of CITIBANK, N.A. (McElroy, Saunders) (Entered: 04/02/2025) |
| 04/02/2025 | 7 | MOTION for Preliminary Injunction by JUSTICE CLIMATE FUND. (Attachments: # 1 Memorandum in Support, # 2 Declaration of Amir Kirkwood, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8, # 11 Exhibit 9, # 12 Declaration of David Zimmer, # 13 Exhibit A, # 14 Text of Proposed Order)(Citron, Eric) (Entered: 04/02/2025) |
| 04/02/2025 | 8 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- David J. Zimmer, Filing fee $ 100, receipt number ADCDC-11585363. Fee Status: Fee Paid. by JUSTICE CLIMATE FUND. (Citron, Eric) (Entered: 04/02/2025) |

| 04/04/2025 | | MINUTE ORDER: GRANTING Motion for Leave to Appear Pro Hac Vice as to 8 David J. Zimmer. David J. Zimmer is hereby admitted *pro hac vice* to represent Plaintiff Justice Climate Fund in this matter. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Tanya S. Chutkan on 4/4/2025. (lcer) (Entered: 04/04/2025) |
|---|---|---|
| 04/07/2025 | 9 | NOTICE of Appearance by Marcus S Sacks on behalf of WILLIAM CHARLES MCINTOSH, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN (Sacks, Marcus) (Entered: 04/07/2025) |
| 04/07/2025 | 10 | SUMMONS (7) Issued Electronically as to CITIBANK, N.A., WILLIAM CHARLES MCINTOSH, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN, U.S. Attorney, and U.S. Attorney General. (Attachments: # 1 Notice and Consent) (zjd) (Entered: 04/07/2025) |
| 04/09/2025 | 11 | RESPONSE re 7 MOTION for Preliminary Injunction filed by CITIBANK, N.A.. (Attachments: # 1 Text of Proposed Order)(Allen, Kenneth) (Entered: 04/09/2025) |
| 04/10/2025 | 12 | NOTICE of Appearance by Kevin Paul VanLandingham on behalf of WILLIAM CHARLES MCINTOSH, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN (VanLandingham, Kevin) (Entered: 04/10/2025) |
| 04/10/2025 | 13 | Joint MOTION to Consolidate Cases by WILLIAM CHARLES MCINTOSH, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN. (Attachments: # 1 Text of Proposed Order)(Sacks, Marcus) (Entered: 04/10/2025) |
| 04/11/2025 | 14 | NOTICE of Appearance by David Zimmer on behalf of JUSTICE CLIMATE FUND (Zimmer, David) (Entered: 04/11/2025) |
| 04/11/2025 | 15 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Kathleen Foley, Filing fee $ 100, receipt number ADCDC-11607603. Fee Status: Fee Paid. by JUSTICE CLIMATE FUND. (Citron, Eric) (Entered: 04/11/2025) |
| 04/15/2025 | | MINUTE ORDER: GRANTING Motion for Leave to Appear Pro Hac Vice as to 15 Kathleen Foley. Kathleen Foley is hereby admitted *pro hac vice* to represent Plaintiff Justice Climate Fund in this matter. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Tanya S. Chutkan on 4/15/2025. (lcer) (Entered: 04/15/2025) |
| 04/15/2025 | | MINUTE ORDER: GRANTING the parties' 13 Joint Motion to Consolidate Cases. Pursuant to Federal Rule of Civil Procedure 42(a)(2), the court will consolidate this case with Case No. 25-cv-698, given the common questions of law and fact between both cases, as set forth in the 13 Joint Motion. The parties to this case may submit a Joint Status Report to the court within seven days of the court's decision on the preliminary injunction motions in Case No. 25-cv-698, setting forth whether there are any additional issues specific to Plaintiff Justice Climate Fund to address. All filings and papers related to the consolidated cases shall be filed in the lead case: 25-cv-698. Signed by Judge Tanya S. Chutkan on 4/15/2025. (lcer) (Entered: 04/15/2025) |
| 04/15/2025 | | Cases Consolidated. This case has been consolidated with case 25-cv-00698-TSC pursuant to Order on Motion to Consolidate Cases. From this date forward, all pleadings shall be filed ONLY in the lead case, 25-cv-00698-TSC. Parties are advised NOT to elect the SPREAD TEXT option when filing in ECF, as this will result in repetitive docketing. (zjm) (Entered: 04/15/2025) |
| 04/15/2025 | | MINUTE ORDER: DENYING as MOOT Plaintiffs' 7 Motion for Preliminary Injunction. See Preliminary Injunction Order and forthcoming Memorandum Opinion in lead case No. |

25-cv-698 for details. Signed by Judge Tanya S. Chutkan on 4/16/2025. (lcer) (Entered: 04/16/2025)

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 04/21/2025 14:53:45 | | | |
| PACER Login: | kfoleyzcc | Client Code: | 00022 |
| Description: | Docket Report | Search Criteria: | 1:25-cv-00938-TSC |
| Billable Pages: | 3 | Cost: | 0.30 |

## CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2025, I electronically filed the foregoing Appendix with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ David J. Zimmer
David J. Zimmer