NOT YET SCHEDULED FOR ORAL ARGUMENT

Nos. 25-5122, 25-5123

# United States Court of Appeals
## for the
## District of Columbia Circuit

_____

CLIMATE UNITED FUND, et al.,
*Plaintiffs-Appellees*

v.

CITIBANK, N.A., et al.,
*Defendants-Appellants*

_____

From the United States District Court for the District of Columbia
Case No. 1:25-cv-00698-TSC (Hon. Tanya S. Chutkan)

_____

**NCIF GRANTEE APPELLEES' JOINT OPPOSITION TO
APPELLANTS' MOTION FOR A STAY PENDING APPEAL**

_____

Vincent Levy
  *Counsel of Record*
Kevin D. Benish
HOWELL SHUSTER & GOLDBERG LLP
425 Lexington Avenue, 14th Floor
New York, NY 10017
Tel.: (646) 837-5151
vlevy@hsgllp.com

*Attorneys for Plaintiff-Appellee Coalition for Green Capital*

Beth C. Neitzel
  *Counsel of Record*
Jack C. Smith
Kevin Y. Chen
FOLEY HOAG LLP
155 Seaport Boulevard, Suite 1600
Boston, MA 02210
Tel. (617) 832-1000
bneitzel@foleyhoag.com

Noah C. Shaw
James M. Gross
FOLEY HOAG LLP
1301 Ave. of the Americas, 25th Floor
New York, NY 10019
Tel.: (212) 812-0400
jgross@foleyhoag.com

*Attorneys for Plaintiff-Appellee Power Forward Communities*

Adam G. Unikowsky
  *Counsel of Record*
Kathryn L. Wynbrandt
David B. Robbins
Tanner J. Lockhead
JENNER & BLOCK LLP
1099 New York Avenue, Suite 900
Washington, D.C. 20001
Tel.: (202) 639-6000
Fax: (202) 639-6066
aunikowsky@jenner.com

Gabriel K. Gillett
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
Tel.: (312) 222-9350
ggillett@jenner.com

Allison N. Douglis
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
Tel.: (212) 891-1600
Fax: (212) 891-1699

*Attorneys for Plaintiff-Appellee Climate United Fund*

## <u>CERTIFICATES AS TO PARTIES, RULINGS, AND RELATED CASES</u>

### A.    Parties and Amici

All parties, intervenors, and amici appearing in this Court are listed in the Amended Emergency Motion for Stay Pending Appeal.

I certify under Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1 that Climate United Fund is a wholly-controlled subsidiary of Calvert Impact, Inc. No publicly held company owns 10% or more of Climate United Fund.

Coalition for Green Capital has no parent corporation, and no publicly held company owns 10% or more of Coalition for Green Capital.

Power Forward Communities, Inc. has no parent corporation, and no publicly held company owns 10% or more of Power Forward Communities, Inc.

### B.    Rulings Under Review

References to the rulings at issue appear in the Amended Emergency Motion for Stay Pending Appeal.

*/s/ Adam G. Unikowsky*

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............i

TABLE OF AUTHORITIES..........................................................................iii

GLOSSARY OF TERMS ...............................................................................v

INTRODUCTION ..........................................................................................1

BACKGROUND.............................................................................................2

    A.    EPA Awards Grants To The NCIF Plaintiffs....................................2

    B.    Plaintiffs Draw Funds To Their Citibank Accounts..........................4

    C.    The Administration Unlawfully Freezes IRA Funding And Seeks To Claw Back Plaintiffs' Award Funds..............................5

    D.    The District Court Orders Preliminary Injunctive Relief..................7

ARGUMENT...................................................................................................9

I.    The Motion Violates FRAP 8(a)(2). ......................................................9

II.    The Equities Weigh Strongly Against A Stay........................................10

    A.    EPA Will Not Be Irreparably Harmed Absent A Stay....................10

    B.    A Stay Would Irreparably Injure Plaintiffs. ...................................13

    C.    A Stay Is Contrary To The Public Interest. ....................................16

III.    EPA Failed To Make A Strong Showing On The Merits. .......................16

    A.    The District Court Had Jurisdiction. .............................................16

    B.    The Government Is Unlikely To Prevail On The Merits. ................20

IV.    The Injunction Against Citibank Should Stand.....................................21

V.    If This Court Enters A Stay, It Should Be Limited And Paired With Expediting The Appeal.........................................................22

CONCLUSION.............................................................................................24

# TABLE OF AUTHORITIES

**CASES**

*Armour & Co. v. Freeman*, 304 F.2d 404 (D.C. Cir. 1962) ............................... 14

*Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015) .................... 17

*Belbacha v. Bush*, 520 F.3d 452 (D.C. Cir. 2008) ............................................ 22

*Bowen v. Massachusetts*, 487 U.S. 879 (1988) ................................................ 18

*Crowley Government Services, Inc. v. GSA*, 38 F.4th 1099 (D.C. Cir. 2022) ...................................................................................... 18

*Dart v. United States*, 848 F.2d 217 (D.C. Cir. 1988) ....................................... 17

*KalshiEX LLC v. CFTC*, 119 F.4th 58 (D.C. Cir. 2024) .................................... 10

*League of Women Voters of United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ....................................................................................... 14, 16

*LeBlanc v. United States*, 50 F.3d 1025 (Fed. Cir. 1995) .................................. 17

*Maryland Department of Human Resource v. Department of Health & Human Services*, 763 F.2d 1441 (D.C. Cir. 1985) .................................... 18

*McQuiggin v. Perkins*, 569 U.S. 383 (2013) .................................................... 17

*Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982) ................................. 16

*Powder River Basin Resource Council v. United States Department of Interior*, 2025 WL 312649 (D.C. Cir. 2025) ......................................... 10

*Rust v. Sullivan*, 500 U.S. 173 (1991) ............................................................ 19

*Webster v. Doe*, 486 U.S. 592 (1988) .............................................................. 17

*Wisconsin Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985) ............................. 13

**STATUTES**

42 U.S.C. §7434(a) ............................................................................................ 2

42 U.S.C. §7434(a)(2) ....................................................................................... 5

42 U.S.C. §7434(b).................................................................... 4, 19

**OTHER AUTHORITIES**

2 C.F.R. §200.343 ........................................................................22

89 Fed. Reg. 55,262 (July 3, 2024)...............................................3

Federal Rule of Appellate Procedure 8(a)(2)............................. 9, 10

Hsu, <u>FBI takes up EPA Probe Amid Pushback from Judge, Prosecutors</u>,
    Wash. Post (Feb. 27, 2025) ....................................................6

<u>Read the Resignation Letter by Denise Cheung, a Veteran D.C. Federal
Prosecutor</u>, Wash. Post (Feb. 18, 2025)....................................6

# GLOSSARY OF TERMS

| Term or Abbreviation | Definition | Citation(s) |
|---|---|---|
| 4/2.Hr'g.Tr. | Transcript from April 2, 2025 Preliminary Injunction Hearing | Dkt.62 |
| ACA | Account Control Agreement with Citibank, related to Plaintiffs' grants. | Dkt.33-10 Dkt.33-15 Compl. Ex. D, *Power Forward Communities, Inc. v. Citibank, N.A.*, No. 25-cv-762 (D.D.C.), Dkt.1-4 |
| CCIA | Clean Communities Investment Accelerator | |
| CGC | Coalition for Green Capital | |
| CGC.Brown.Decl. | Declaration of Stephen Brown (CGC) | Dkt.33-25 |
| CGC.Buendia.Decl. | Declaration of Jessica Buendia (CGC) | Dkt.33-26 |
| CGC.Hopson.Decl. | Declaration of Eli Hopson (CGC) | Dkt.33-27 |
| CGC.Kauffman.Decl. | Declaration of Richard Kauffman (CGC) | Dkt.33-28 |
| CU | Climate United Fund | |
| CU.Bafford.Stay.Decl. | Declaration of Elizabeth Bafford (CU) | |
| Dkt. | Docket entry in *Climate United Fund v. Citibank, N.A., et al.*, 25-cv-698 | Dkt. |
| FAA | Financial Agency Agreement | Dkt.21 |
| GGRF | Greenhouse Gas Reduction Fund | |
| IRA | Inflation Reduction Act | |

| Mot. | Amended Emergency Motion for Stay Pending Appeal | Doc. No. 2111843 |
|---|---|---|
| NCIF | National Clean Investment Fund, a part of the Greenhouse Gas Reduction Fund (GGRF) | |
| Notice | Notice of Termination of grant issued by EPA to each Plaintiff, dated March 11, 2025 | Dkt.33-13 Dkt.33-23 Compl. Ex. J, *Power Forward Communities, Inc. v. Citibank, N.A.*, No. 25-cv-762 (D.D.C.), Dkt.1-10 |
| Op. | Memorandum Opinion Granting Plaintiffs' Motion for Preliminary Injunction | Dkt.89 |
| PFC | Power Forward Communities, Inc. | |
| PFC.Donovan.Decl. | Declaration of Shaun Donovan (PFC) | Dkt.33-29 |
| PFC.Matusiak.Decl. | Declaration of Ari Matusiak (PFC) | Dkt.33-30 |
| PFC.Mayopoulos.Decl. | Mar. 21, 2025 Declaration of Timothy J. Mayopoulos (PFC) | Dkt.33-31 |
| PFC.Mayopoulos.Supp.Decl. | Apr. 17, 2025 Declaration of Timothy J. Mayopoulos (PFC) | Dkt.92 |
| PFC.Moon.Decl. | Declaration of John Moon (PFC) | Dkt.33-32 |
| USAO-DC | Office of the U.S. Attorney for the District of Columbia | |

## **INTRODUCTION**

In 2022, Congress appropriated $27 billion for competitive grants, to be disbursed by September 2024, for clean-energy investments. Following Congress's mandate, EPA then awarded $14 billion in grants under the National Clean Investment Fund ("NCIF") to Plaintiffs, and disbursed the funds to accounts at Citibank held by Plaintiffs and their subgrantees. In the decision below, the District Court correctly held that EPA's recent effort to undo the NCIF and interfere with Plaintiffs' funds likely violated the Constitution and the APA, and that Citibank likely violated its contractual obligations to Plaintiffs. This Court should deny EPA's motion to stay the District Court's preliminary injunction.

EPA's stay motion does not contest the District Court's conclusion that EPA likely violated the separation of powers and Congress's mandate. Instead, EPA contends that the Tucker Act impliedly deprives the District Court of jurisdiction. But the Tucker Act cannot possibly oust the District Court's jurisdiction over constitutional claims that the Court of Federal Claims has no power to hear.

Even as to Plaintiffs' APA claims, the District Court had jurisdiction. Plaintiffs argue that statutes and regulations—not contracts—bar EPA from dismantling the grant program and interfering with money *already* disbursed to Plaintiffs and *already* on their balance sheets. That is nothing like a breach of contract action seeking money damages.

Nor can EPA show irreparable harm. Even with a stay, EPA would have no legal authority to retrieve the funds from Plaintiffs. Further, as the District Court found, ample safeguards ensure that Plaintiffs will use their funds only as Congress intended—just as they have always done. Even if EPA illegally directs Citibank to send Plaintiffs' money to the Treasury, and forces Plaintiffs into the Court of Federal Claims, it is essentially undisputed that Plaintiffs would win. All EPA would obtain is delay. But that delay would destroy two Plaintiffs completely, cause all Plaintiffs irreparable harm to their reputations and operations, and interfere with (if not eliminate) a program duly established by Congress.

## **BACKGROUND**

### **A.    EPA Awards Grants To The NCIF Plaintiffs.**

In the Inflation Reduction Act ("IRA"), Congress appropriated $27 billion for clean-energy investments through the Greenhouse Gas Reduction Fund ("GGRF"). 42 U.S.C. §7434(a). Part of the GGRF, the $14 billion NCIF was intended to capitalize non-profit institutions focused on financing clean-energy projects. Congress directed EPA "to make grants, on a competitive basis," and made funds "available until September 30, 2024." *Id.* The statute then specified how grantees would use those funds. *Id.*

In July 2023, EPA issued a Notice of Funding Opportunity for the NCIF. Dkt.33-3 at 3. It stated that EPA would "provide grants to 2-3 national nonprofit

financing entities to create national clean financing institutions capable of partnering with the private sector" to finance "tens of thousands of clean technology projects." *Id*. at 4. EPA awarded grants to Plaintiffs in August 2024, obligating the funds before the September 30 deadline: $6.97 billion to Climate United, a coalition of nonprofits with 120 years of combined experience managing $30+ billion; $5 billion to CGC, a not-for-profit established over a decade ago to support the development of national, state, and local green banks; and $2 billion to PFC, a coalition of nonprofits with nearly a century of combined experience financing and developing affordable housing.

Under EPA regulations, Plaintiffs' grants, like all "EPA financial assistance agreements awarded … on or after July 1, 2024," could be terminated because they "no longer effectuate[] … agency priorities"—but *only* if that ground was "clearly and unambiguously included in terms and conditions of the award." 89 Fed.Reg. 55,262, 55,263 (July 3, 2024) (applying revised 2 C.F.R. §200.340 to all EPA awards). That ground is not (and never was) included in the NCIF awards. *See* Op.4-5 (outlining termination grounds). Instead, EPA was authorized to terminate Plaintiffs' grants for only three reasons: contractual noncompliance, misrepresentation of eligibility, or commission of certain crimes. *Id.* Moreover, consistent with Congress's mandate (and the absence of statutory authorization for

3

a do-over), if part or all of any NCIF grant is terminated, the funds must be redistributed among Plaintiffs here. Op.31 n.8.

### B.  Plaintiffs Draw Funds To Their Citibank Accounts.

Congress directed that GGRF award recipients "ensure continued operability" by "retain[ing] [and] manag[ing]" all "revenue received from … using grant funds." 42 U.S.C. §7434(b). To effectuate that goal and ensure green-lending organizations were adequately capitalized, EPA structured the NCIF program to disburse all funds to Plaintiffs at once and to deposit the funds at Citibank in Plaintiffs' and their subgrantees' accounts. CU.Bafford.Stay.Decl. ¶¶34-39.[1] Citibank executed a Financial Agency Agreement ("FAA") with Treasury, Dkt.21, and separate Account Control Agreements ("ACAs") with each grantee and EPA, *e.g.*, Dkt.33-4 at 58.[2]

Plaintiffs agreed to a rigorous set of reporting requirements to facilitate EPA's oversight. *E.g.*, CU.Bafford.Stay.Decl. ¶42. For example, Plaintiffs must submit regular reports with "detailed narratives describing program performance … supported with qualitative discussions and quantitative metrics," Dkt.33-5 at 14, and quarterly transaction- and project-level reports and conflict-of-interest reports, *id.* at 15-16. Plaintiffs must also "obtain prior written approval" from EPA "for any

---

[1] "CU.Bafford.Stay.Decl.," which supplements declarations filed below, is being filed contemporaneously.

[2] Each subgrantee signed a separate ACA with Citibank and its respective grantee, but not EPA.

transfers that will not be disbursed … within 15 business days." *Id.* at 57-59. And EPA has full, real-time visibility into the Citibank accounts. CU.Bafford.Stay.Decl. ¶40; 4/2.Hr'g.Tr. 78:25-79:1.

Notwithstanding EPA's oversight, the funds disbursed to Plaintiffs and held at Citibank belong to Plaintiffs and their Subgrantees. The ACAs provide that Citibank "maintains the Accounts for [Plaintiffs]"; and that "all property (including, without limitation, all funds and financial assets) held by [Citibank] for the accounts of [Plaintiffs] are, and will continue to be, credited to the Accounts in accordance with instructions given by [Plaintiffs]." Dkt.33-10 at 1-2. The ACAs provide that EPA has only a perfected "security interest" in the funds, an interest "granted" to EPA by Plaintiffs. *Id.* at 1, 2. And because EPA is not a party to the ACAs signed by subgrantees, it has no security interest in those accounts.

Under the ACAs, Citibank must follow all instructions of the NCIF Plaintiffs as to the disposition of funds *unless* EPA issues a Notice of Exclusive Control stating that one of the three permissible grounds for termination occurred. Dkt.33-10 at 2 & Ex.A.

### C.     The Administration Unlawfully Freezes IRA Funding And Seeks To Claw Back Plaintiffs' Award Funds.

Congress appropriated the funds at issue here to be deployed by September 30, 2024, and the IRA provided no authority for undoing or re-doing that disbursement. 42 U.S.C. § 7434(a)(2). Yet, beginning on February 12, 2025, EPA's

Administrator announced EPA's goal to claw back all GGRF funds—including Plaintiffs' NCIF funds. Op.8.

Making good on this threat, EPA requested a formal review from EPA's Inspector General, Op.8-9, and DOJ began behind-the-scenes efforts to freeze Plaintiffs' funds. But the Chief of the Criminal Division at the D.C. U.S. Attorney's Office advised there was no basis to open a grand-jury investigation (and resigned);[3] a magistrate judge reportedly rejected a warrant application for lack of probable cause; and prosecutors in another office refused to seek a warrant.[4] Nonetheless, on February 17, the FBI sent a letter to Citibank "recommend[ing]" that Citibank freeze Plaintiffs' and their subgrantees' accounts. Dkt.14-5. Citibank did so without notifying Plaintiffs.

EPA next turned to Treasury to maintain the freeze. On March 4 and 10, Treasury, at EPA's behest, directed Citibank to freeze Plaintiffs' funds. Dkts.14-3, 14-7. Again, Citibank did so without notice to Plaintiffs.

---

[3] Read the Resignation Letter by Denise Cheung, a Veteran D.C. Federal Prosecutor, Wash. Post (Feb. 18, 2025).

[4] Hsu, FBI takes up EPA Probe Amid Pushback from Judge, Prosecutors, Wash. Post (Feb. 27, 2025).

Unable to access its funds, Climate United sued EPA and Citibank on March 8, 2025, and moved for a TRO two days later. Op.9-10.[5] After the District Court proposed a TRO hearing on March 11, Climate United consented to EPA's request, as a professional courtesy, to extend the hearing date by 24 hours. Op.9. But on the evening of March 11—after the originally scheduled TRO hearing would have occurred—EPA sent materially identical "Notices of Termination" to all NCIF and CCIA recipients. Op.9, 17.

The Notices were issued just days after EPA sent identical information requests to Plaintiffs but long before the deadline to respond. Op.7. The Notices contained no individualized findings or allegations of noncompliance, ineligibility, or impropriety by any grantee. Instead, they purported to terminate "based on substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities." Op.9.

### D.     The District Court Orders Preliminary Injunctive Relief.

Plaintiffs allege that EPA's suspension of Plaintiffs' accounts and dismantling of NCIF violated the Administrative Procedure Act, the IRA, and the Constitution. Plaintiffs further claimed Citibank breached the ACAs. The District Court entered a

---

[5] CGC and PFC initially sued Citibank in New York, and then sued EPA and Citibank in D.C. post-termination.

TRO enjoining EPA from implementing the purported terminations and barring Citibank from transferring funds to Treasury. Dkt.29 at 2.

Plaintiffs then moved for a preliminary injunction. In its opposition, EPA conceded—contrary to the agency's public statements, termination notices, and narrative in this Court, *see* Mot.7-8—that "EPA did not terminate for Plaintiffs' noncompliance" or for any other "conduct of Plaintiffs." Dkt.49 at 25-26. Rather, EPA acknowledged, it terminated the NCIF program based on "its assessment of the agency's priorities." *Id.* at 2; *see also id.* at 22-23.

On April 15, 2025, the District Court entered a preliminary injunction. The court held that the Tucker Act did not divest it of jurisdiction. Op.18-19. Unlike in EPA's principal authority, *Department of Education v. California*, Plaintiffs "seek to regain access to their already disbursed funds at Citibank," not, as in *DOE*, "an order mandating the government to pay any type of money damages or money for past harms." Op.21. Plus, the District Court noted, Plaintiffs "challenge EPA's thinly veiled attempts to dismantle the entirety of a congressionally created program"—a claim grounded in the IRA and the Constitution. Op.21.

The District Court next found that Plaintiffs are likely to succeed on the merits. EPA's failure to offer any "rational explanation for why it suspended the grants and then immediately terminated the entire NCIF and CCIA grant programs overnight" likely was arbitrary and capricious. Op.26-30. And EPA's attempt to

"unilaterally dismantle a program that Congress established" likely violated the IRA and the Constitution. Op.30-31. The court further ruled that Citibank breached its agreements with Plaintiffs. Op.31.

Finally, the District Court held, Plaintiffs demonstrated that irreparable harm is unavoidable "without release of their grant funds." Op.32. Any potential harm to EPA was negligible, by contrast, as there are "sufficient protections in place to prevent the type of reckless spending EPA envisions." Op.37.

## ARGUMENT

### I.    The Motion Violates FRAP 8(a)(2).

EPA and Citibank violated FRAP 8(a)(2)'s instruction to seek a stay in District Court first. They have no excuse for failing to do so.

EPA filed a "contingent" stay motion in District Court *before* the preliminary injunction issued. Dkt.75. The District Court denied that motion without prejudice as premature and invited EPA and Citibank to refile once its opinion issued. But EPA moved directly in this Court on April 16 and amended that motion on April 18.

Citibank made clear that no disbursements could occur until April 21. Dkt.88. So EPA could have moved in the District Court at any time between April 16 and April 21 without jeopardizing any funds. Yet EPA improperly bypassed the District Court, and Citibank never even sought relief there.

9

Because EPA and Citibank violated Rule 8(a)(2), the District Court was unable to make any factual findings on the sharply contested question whether EPA faces irreparable harm from the preliminary injunction, impeding this Court's review. The Court should deny the stay under FRAP 8(a)(2). *Powder River Basin Res. Council v. U.S. Dep't of Interior*, 2025 WL 312649 (D.C. Cir. 2025).

## II.    The Equities Weigh Strongly Against A Stay.

### A.    EPA Will Not Be Irreparably Harmed Absent A Stay.

A stay should be denied because EPA has not established irreparable harm. *See KalshiEX LLC v. CFTC*, 119 F.4th 58, 64 (D.C. Cir. 2024).

EPA contends the public fisc will be harmed if Plaintiffs draw their grant funds. Mot.10-12. EPA, apparently, intends to direct Citibank to send Plaintiffs' funds—to which Plaintiffs and subgrantees hold title—to Treasury, and wants to prevent Plaintiffs from spending them. Mot.12. This theory fails for many reasons.

*First*, EPA has no legal right to take Plaintiffs' money back. Exercising its power over the purse, Congress appropriated these funds and specified an obligation deadline (September 2024) without providing a do-over. The IRA does not permit EPA to unwind the NCIF program and create a different one. Moreover, EPA holds only a security interest in the funds in Plaintiffs' Citibank accounts and can exercise that interest only by issuing a "Notice of Exclusive Control." Op.6-7. EPA has never issued one and cannot *unless* specified conditions are met, Dkt.33-10 at 2 & Ex.A—

which EPA has never tried to show. A stay would therefore not protect the "public fisc." Mot. 12.

*Second*, even if EPA illegally clawed this money back, EPA would be legally obligated to send that money right back to Plaintiffs. As the District Court pointed out, under the grants, any de-obligated NCIF funds *must* be re-obligated to other NCIF grantees—Plaintiffs here—consistent with Congress's statutory deadline of September 2024 to obligate the funds. Op.31 n.8. There can also be no harm to the fisc as Plaintiffs will (collectively) get the money back.

*Third*, even if EPA illegally clawed the money back *and* illegally failed to re-obligate it to Plaintiffs, Plaintiffs would *still* be virtually guaranteed the funds. EPA conceded it "did not terminate for Plaintiffs' noncompliance." Dkt.49 at 25. That concession effectively guarantees Plaintiffs a win if forced into the Court of Federal Claims. EPA—which bears the burden of proof—offers no explanation for how it will avoid liability as to those funds. EPA cannot be irreparably harmed by being unable to illegally claw back funds it will have to pay Plaintiffs anyway.

More fundamentally, because EPA acknowledges that it "did not terminate for Plaintiffs' noncompliance," *id.*—and identifies no other lawful ground for termination—it cannot show irreparable harm as a matter of law. EPA "cannot suffer harm from an injunction that merely ends an unlawful practice." Op.37-38. Moreover, if EPA somehow prevails in showing it has authority to obligate new

grants using Plaintiffs' funds (despite not attempting to make that showing thus far), EPA can take those actions later.

Contrary to EPA's suggestion, denying a stay will not permit Plaintiffs to spend their grant money for improper purposes. Mot.11-12. EPA has never identified any evidence of harm from supposed insufficient "oversight." *E.g.* Mot.22. There is none. As EPA conceded below, although the termination letters use the terms "waste, fraud, [and] abuse," that reference is not "a statement that the grant is being terminated because [Plaintiffs] have committed waste, fraud" or abuse. *See, e.g.*, 4/2.Hr'g.Tr. 38:25-39:15. And every expense incurred by Plaintiffs has conformed with Congress's objectives. *E.g.*, CU.Bafford.Stay.Decl. ¶3 & Ex.A; Dkt.33-32 ("PFC.Moon.Decl.") ¶12; Dkt.33-27 ("CGC.Hopson.Decl.") ¶13; Dkt.33-26 ("CGC.Buendia.Decl.") ¶13. EPA highlights a request to "transfer more than $250 million to an external bank account." Mot.11. That transfer request is proper, too— it relates to a *pre*-termination commitment announced in October 2024 to purchase battery-electric heavy-duty trucks from U.S. auto manufacturers. *See* CU.Bafford.Stay.Decl. ¶47.

Nor is there risk that Plaintiffs will improperly spend funds prospectively. As the District Court found, "[t]here are sufficient protections in place to prevent the type of reckless spending EPA envisions once access to Plaintiffs' accounts is restored." Op.37. That includes safeguards on accounts at Citibank; detailed

reporting, policy formation, and budgeting requirements; real-time view access to each Citibank account; and systematic review of funds already spent. CU.Bafford.Stay.Decl. ¶42; CGC.Hopson.Decl. ¶13; Dkt.33-31 ("PFC.Mayopoulos.Decl.") ¶¶15-16, 27. Plaintiffs must also certify, under threat of criminal penalties, that each transaction-related draw request is proper under their grants. *E.g.*, CU.Bafford.Stay.Decl. ¶42(d); Dkt.33-20 at 57.

## B.    A Stay Would Irreparably Injure Plaintiffs.

Although EPA would not be harmed *absent* a stay, a stay would gravely harm Plaintiffs—including by depriving Plaintiffs of their funds and interfering with their congressionally specified activities. As the District Court found, "Plaintiffs have shown that without release of their grant funds, imminent harm is unavoidable." Op.32. Plaintiffs have already been without their funds for two months, and should not be forced to wait any longer.

EPA dismisses Plaintiffs' harm as "financial harm that will be remedied if they prevail on appeal." Mot.2. But financial harm can "constitute irreparable harm … where the loss threatens the very existence of the movant's business." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). That is the case for Climate United and PFC. Climate United will no longer be able to cover payroll, rent, or

insurance, and will be required to lay off staff. CU.Bafford.Stay.Decl. ¶¶6-17, 51.[6]
PFC likewise will "hav[e] to lay off its staff and close its doors for good." Dkt.92
("PFC.Mayopoulos.Supp.Decl.") ¶¶6, 13; Dkt.33-29 ("PFC.Donovan.Decl.") ¶24;
Dkt.33-30 ("PFC.Matusiak.Decl.") ¶24; PFC.Moon.Decl. ¶31.

In addition, all Plaintiffs have shown injury to reputation, goodwill, and
ability to operate that goes beyond financial harm and qualifies as irreparable. *See
Armour & Co. v. Freeman*, 304 F.2d 404, 406 (D.C. Cir. 1962) (reputation and
goodwill); *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016)
(harm to organization's ability to achieve primary mission).

The District Court correctly held that all Plaintiffs will experience irreparable
harm because "[t]he very purpose of Plaintiffs' existence and their business
operations, including the financing for their projects, depends on their grant money."
Op.32. Plaintiffs' declarations describe investment projects in jeopardy and
expenses incurred in reliance on their grants. CU.Bafford.Stay.Decl. ¶¶19-26;
Dkt.33-25 ("CGC.Brown.Decl.") ¶¶6-7, 10-11; CGC.Buendia.Decl. ¶¶7-14; Dkt.33-
28 ("CGC.Kauffman.Decl.") ¶¶8-9, 12-13; PFC.Donovan.Decl. ¶¶18-19, 22;
PFC.Moon.Decl. ¶¶16-23; PFC.Mayopoulos.Supp.Decl. ¶ 11-12.

---

[6] Despite diligent efforts, Plaintiffs have been unable to secure stopgap funding to
cover operations during the duration of this litigation. *See* CU.Bafford.Stay.Decl.
¶¶50-52; PFC.Mayopoulos.Supp.Decl. ¶3.

Likewise, the court correctly found that "[r]eputational harm, particularly in this case, cannot be overstated, especially given the structure of the NCIF and CCIA programs and Plaintiffs' positions as lenders in the financial markets." Op.35-36. Again, Plaintiffs' declarations explain how they depend on these funds to secure funding to attract investment partners and favorable deal terms necessary to further Congress's directives. *E.g.*, CU.Bafford.Stay.Decl. ¶¶27-32; CGC.Brown.Decl. ¶¶6-7, 11-13; CGC.Kauffman.Decl. ¶¶7-8, 18-24; CGC.Buendia.Decl. ¶¶16-17; PFC.Mayopoulos.Decl. ¶¶20, 26.

Finally, in balancing the equities, the Court should also consider EPA's litigation conduct. Pre-termination, Climate United sought a TRO to prevent EPA from impeding access to its funds and unlawfully terminating the grants. EPA sought and obtained consent, as a "professional courtesy," to delay the TRO hearing. Op.9. Taking advantage of the delay, EPA terminated the grants—*after* the originally scheduled hearing would have occurred. Then EPA argued that Plaintiffs' challenges to the *terminations* were breach-of-contract claims over which the court lacked jurisdiction—leading to a month of litigation on that issue in which Plaintiffs prevailed. The equities do not support allowing EPA to continue delaying access to Plaintiffs' funds.

## C.     A Stay Is Contrary To The Public Interest.

Finally, the District Court correctly found its injunction to be in the public interest, Op.38, while a stay would be against it. The injunction permits Plaintiffs to proceed with projects that Congress "declared to be [in] the public interest." *League of Women Voters*, 838 F.3d at 13. Moreover, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Id.* at 12.

## III.     EPA Failed To Make A Strong Showing On The Merits.

### A.     The District Court Had Jurisdiction.

Contrary to EPA's primary contention, the District Court correctly concluded that it had jurisdiction over Plaintiffs' claims against EPA. Op.16-23.

Begin with Plaintiffs' constitutional claims: the District Court explained that Congress appropriated billions of dollars toward specified projects, requiring EPA to conduct a competitive process and obligate the funds by September 2024, and that EPA violated the Constitution when it "terminated programs established through lawfully enacted congressional appropriations without any basis in statutory authority." Op.30. Congress never prescribed a do-over, and EPA never contests the District Court's holding that Plaintiffs are likely to succeed on this claim.

EPA nonetheless contends the District Court lacked jurisdiction under *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982). But *Megapulse* applies only when the Tucker Act impliedly limits jurisdiction *under the APA*, *id.* at 966-67, and here, Plaintiffs also invoked the court's inherent equitable jurisdiction to enjoin

unconstitutional action, *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). That jurisdiction cannot be displaced "absent the clearest command." *McQuiggin v. Perkins*, 569 U.S. 383, 397 (2013). Neither the APA, *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988), nor the Tucker Act includes any such statement.

In any event, even under *Megapulse*, Plaintiffs' constitutional claim may proceed in district court. The source of Plaintiffs' rights is the Constitution and a federal statute (the IRA), not a contract. Indeed, the Court of Federal Claims would not even be *capable* of deciding Plaintiffs' separation-of-powers claim. *LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995) (no jurisdiction over separation-of-powers claims). This Court should reject EPA's effort to altogether evade judicial review. *Webster v. Doe*, 486 U.S. 592, 603 (1988).

The District Court also had jurisdiction over Plaintiffs' non-constitutional APA claims. *First*, on the source of right, the District Court correctly explained that the question is whether federal regulations and the APA's reasoned-decision requirement permit EPA to freeze and then attempt to dismantle the NCIF program based on EPA's stated reasoning. Op.16-23. Plaintiffs' rights have "nothing to do with Plaintiffs' performance under the grant." Op.17.

*Second,* on the relief sought, the District Court properly held that Plaintiffs' requested relief would restrain EPA from interfering with Plaintiffs' performance of

the grant and use of money *already disbursed to them* for deployment consistent with Congress's policy directives. That is not "effectively" an effort "to attain monetary damages in the suit." *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1107 (D.C. Cir. 2022). In line with Judge Bork's reasoning later adopted in *Bowen v. Massachusetts*, 487 U.S. 879 (1988), jurisdiction is available because Plaintiffs are not seeking "a sum of money used as compensatory relief … to *substitute* for a suffered loss." *Md. Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441, 1446 (D.C. Cir. 1985); Op.21.

Thus, contrary to EPA's mischaracterization, Plaintiffs never sought—and the District Court never mandated—that EPA "continue payments pursuant to [its] contracts," Mot.16. EPA awarded the grants, obligated them by the statutory deadline, and *already* disbursed the money to Plaintiffs. Indeed, this litigation began with Plaintiffs seeking relief from EPA's and Citibank's unlawful *freeze* of funds at their Citibank accounts. That would have made no sense if the government had title and lawful control over those funds.

EPA's suggestion that the financial-agent structure is improper also makes no sense. EPA had sound justifications for this structure. As reflected in the NCIF notice of funding opportunity (Dkt.33-3 at 56), EPA disbursed the funds up front to allow NCIF recipients' balance sheets to reflect the full award amount, which made it possible for Plaintiffs to attract the private capital necessary to effectuate

Congress's directives. *See* CU.Bafford.Stay.Decl. ¶¶36-39; 42 U.S.C. §7434(b) (directing that grant recipients "shall" "retain, manage, recycle, and monetize" all "revenue received from … using grant funds" to "ensure continued operability"). If funds had been disbursed gradually based on benchmarks, Plaintiffs could not have leveraged the funds to attract private capital. *See* CU.Bafford.Stay.Decl. ¶¶19, 36 ($1 of grant funds is projected to mobilize $4 in private funds). And although EPA asserts this structure undermines its oversight, EPA has never substantiated that claim and the record contradicts it. *Id.* ¶37-42; 4/2.Hr'g.Tr. 78:25-79:1.

According to EPA, the fact that these funds belong to Plaintiffs is "a distinction entirely without a difference" because there are conditions on Plaintiffs' use of their funds. Mot.18. That is absurd. The government routinely attaches strings to the private use of funds received from the government, *e.g.*, *Rust v. Sullivan*, 500 U.S. 173 (1991), but those strings do not transform private funds into *government property* or force all litigation into the Court of Federal Claims. Plaintiffs are not aware of any federal court that has refused jurisdiction because funds came with conditions on use, and EPA cites none. In this case, moreover, the use restrictions cited by EPA are irrelevant because no claim hinges on them. *See supra* pp.11-12.

For these reasons, *Department of Education* and *Spectrum Leasing* are inapposite. *Cf.* Mot.16-18. In *DOE*, plaintiffs alleged that a government breach of contract was arbitrary and capricious, and sought a court order directing the Treasury

19

to continue paying money under the contract. The Supreme Court entered a stay, holding that the government was "likely to succeed in showing the District Court lacked jurisdiction *to order the payment of money* under the APA." Mot.16 (emphasis added). And in *Spectrum Leasing*, the plaintiff sought "an injunction compelling the agency to *resume payments*." Mot.17 (emphasis added). Those cases did not involve constitutional claims or allegations of ultra vires action. Nor did they involve allegations that the government was freezing money in private hands. As the District Court explained: "Plaintiffs seek to regain access to their already disbursed funds at Citibank, rather than an order mandating the government to pay any type of money damages or money for past harms." Op.21.

In sum, the District Court had jurisdiction over Plaintiffs' claims that EPA violated the Constitution and regulatory law in seeking to undo Congress's directive and EPA's prior disbursement of funds.

**B.    The Government Is Unlikely To Prevail On The Merits.**

On the merits, EPA does not dispute the District Court's ruling that there is no statutory authority to dismantle the NCIF program and that Congress did not prescribe a do-over (Op.30-31). That independently supports the injunction. As for the APA claim, the District Court correctly explained why Plaintiffs are likely to prevail. Op.26-30. Even today, EPA has nothing to say in response to the patently

irrational about-face between EPA's issuance of information requests and the sudden termination. Op.28. It is simply not enough to parrot the termination notices.

## IV.    The Injunction Against Citibank Should Stand.

There is also no basis to stay the portions of the preliminary injunction ordering Citibank to abide by its contractual obligations. Citibank, a defendant below and appellant here, has not sought to stay its own court-ordered obligations. If Citibank seeks a stay, it must meet the relevant standard, including by showing irreparable harm absent a stay. Citibank never attempts to do so.

Although Citibank filed a "statement" trying to piggy-back on EPA's motion, EPA's motion does not justify staying Citibank's obligations. Even if the Tucker Act ousts jurisdiction over Plaintiffs' claims against *EPA*, that has no effect on Plaintiffs' claims against *Citibank* because Plaintiffs cannot sue Citibank in the Court of Federal Claims. And, in exercising jurisdiction over contract claims against Citibank, the District Court surely can adjudicate Citibank's *defenses*—including that it followed supposedly lawful government instructions.[7]

On the merits, EPA has not shown any prospect of reversing the District Court's ruling that the FAA does not justify Citibank's actions. As the court found, "[t]he FAA permits Citibank to freeze assets only 'in accordance with the [ACAs],'"

_____

[7] Even if Plaintiffs never sued EPA, all Plaintiffs alleged—and Citibank does not contest—that there would be diversity jurisdiction over suits between Plaintiffs and Citibank.

and "only in response to 'lawful instructions or directions' from Treasury." Op. 31. Neither condition was met, so Citibank has no basis to stay the injunction against it.

## V.  If This Court Enters A Stay, It Should Be Limited And Paired With Expediting The Appeal.[8]

*First*, those parts of the injunction not subject to the administrative stay should remain in effect. They preserve the status quo and, as explained, EPA faces no irreparable harm from a short pause while this Court evaluates the constitutionality of EPA's efforts to dismantle the NCIF.

*Second*, at a minimum, any stay should order that the funds at Citibank must not be sent to government accounts. That also would drastically change the status quo. As the District Court recognized, "[i]f Citibank transfers money out of these accounts, the funds will not be recoverable," and "[a]ny transfer, re-allocation, or re-obligation of these funds would be an irreparable loss." Dkt.28 at 19.

*Third*, costs incurred before EPA's purported termination on March 11 should be excluded from any stay. Should this case eventually proceed in the Court of Federal Claims, and should EPA show its terminations were lawful, each Plaintiff would *still* have an ironclad case for those funds. Grant Agreement §V.A.3 permits Plaintiffs to "use the award to support … allowable activities." Dkt.33-5 at 55. And under 2 C.F.R. § 200.343, even "costs during suspension or after termination are

---

[8] The Court has jurisdiction to maintain the status quo even if it questions the district court's jurisdiction. *See Belbacha v. Bush*, 520 F.3d 452, 459 (D.C. Cir. 2008).

allowable if … (a) the costs result from financial obligations which were properly incurred" before "termination, a[nd] not in anticipation of it, and (b) the costs would be allowable" if the grant "expired normally at the end of the period of performance in which the termination takes effect." *Id.* at 40.

*Fourth*, any stay should not apply to operational expenses. Those constitute a tiny fraction of the total funds and are essential for basic operations and, for CU and PFC, their survival. To cover operational expenses for the next six months— including payroll, rent, insurance, payments to essential contractors, and other necessary expenses—Climate United needs approximately $25 million (or 0.36% of its grant award). CU.Bafford.Stay.Decl. ¶44. That would allow Climate United to survive until this case can be litigated to final judgment. *Id.* The same principles apply to PFC and its subgrantees, which would need access to approximately $8.6 million (or 0.4% of its grant award). *See* PFC.Mayopoulos.Supp.Decl. ¶13.[9]

*Finally*, if this Court stays the preliminary injunction in any respect, it should expedite the appeal, order argument in May, and decide the case as soon as possible. To facilitate that, Plaintiffs propose: Defendants' opening briefs due 5 days after this Court enters any stay; Plaintiffs' answering brief due 5 days later; and Defendants'

---

[9] The amount for operational expenses incurred as of March 11 would be smaller still. For Climate United, this amount is $6,347,304, and would keep the lights on for approximately 2 months. CU.Bafford.Stay.Decl. ¶45.

reply due 3 days later. [10]

## <u>CONCLUSION</u>

This Court should deny the Government's motion for a stay pending appeal.


Dated: April 22, 2025               Respectfully submitted:

/s/ *Vincent Levy*                      /s/ *Adam G. Unikowsky*
Vincent Levy                         Adam G. Unikowsky
   *Counsel of Record*                 *Counsel of Record*
Kevin D. Benish                     Kathryn L. Wynbrandt
HOWELL SHUSTER &             David B. Robbins
GOLDBERG LLP                   Tanner J. Lockhead
425 Lexington Avenue, 14th Floor   JENNER & BLOCK LLP
New York, NY 10017              1099 New York Avenue, Suite 900
Tel.: (646) 837-5151             Washington, D.C. 20001
vlevy@hsgllp.com                 Tel.: (202) 639-6000
                                   Fax: (202) 639-6066
*Attorneys for Plaintiff-Appellee*    aunikowsky@jenner.com
*Coalition for Green Capital*

/s/ *Beth C. Neitzel*                Gabriel K. Gillett
Beth C. Neitzel                    JENNER & BLOCK LLP
   *Counsel of Record*                353 N. Clark Street
Jack C. Smith                     Chicago, IL 60654
Kevin Y. Chen                    Tel.: (312) 222-9350
FOLEY HOAG LLP              ggillett@jenner.com
155 Seaport Boulevard, Suite 1600
Boston, MA 02210             Allison N. Douglis
Tel. (617) 832-1000            JENNER & BLOCK LLP
bneitzel@foleyhoag.com       1155 Avenue of the Americas
                                   New York, NY 10036
Noah C. Shaw                     Tel.: (212) 891-1600
James M. Gross                  Fax: (212) 891-1699

---

[10] The District Court did not abuse discretion in denying a bond, given that Plaintiffs "cannot access the very thing that has kept them running." Op.38-39.

FOLEY HOAG LLP
1301 Ave. of the Americas, 25th Floor
New York, NY 10019
Tel.: (212) 812-0400
jgross@foleyhoag.com

*Attorneys for Plaintiff-Appellee Climate*
*United Fund*

*Attorneys for Plaintiff-Appellee Power*
*Forward Communities*

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P 27(D)(2)(A)

Pursuant to Fed. R. App. P. 27(d)(2)(A), I hereby certify that the preceding motion complies with the type-volume limitation of the Rules, containing 5,163 words, excluding the parts of the document exempted by Federal Rules of Appellate Procedure 32(f). I further certify that the document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365, in 14-point Times New Roman font.

*/s/ Adam G. Unikowsky*

## CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2025, I caused this document to be filed through the ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Adam G. Unikowsky*