# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

**CLIMATE UNITED FUND, et al.,**

        Plaintiffs-Appellees,

    v.

**CITIBANK, N.A., et al.,**

        Defendants-Appellants.

Nos. 25-5122, 25-5123

## DECLARATION OF ELIZABETH BAFFORD IN SUPPORT OF CLIMATE UNITED FUND'S OPPOSITION TO EMERGENCY STAY MOTION

I, Elizabeth Bafford, declare as follows:

1.      I am the Chief Executive Officer of Climate United Fund ("Climate United"). I have managed Climate United since its inception in October 2022 and have worked for an affiliate of Climate United's parent entity, Calvert Impact, Inc., since January 2014. In my current role, I am responsible for managing all Climate United operations, including staffing and administration, coordination with third-party vendors, and administering financing programs operated by Climate United. I am also responsible for overseeing the management and allocation of funds awarded by the Environmental Protection Agency ("EPA") through its National Clean Investment Fund ("NCIF") in accordance with our EPA-approved workplan.

1

2.      For these reasons, I have personal knowledge of the facts and information in this declaration.

3.      I respectfully provide this declaration to detail the ways in which Climate United's reputation, mission and programs will continue to be imminently and irreparably harmed if the Court stays the District Court's order granting Plaintiffs a preliminary injunction and prevents the distribution of funds necessary to allow Climate United to continue to operate while this case proceeds. In addition, this declaration describes how Climate United will suffer particularly acute irreparable harm if this Court stays distribution of funds related to expenses incurred *prior to* EPA's purported termination on March 11, 2025—funds which I understand Climate United is entitled to receive regardless of the outcome of the merits of this case. These pre- and post-March 11 requests, and the reasons why these requests are permitted under Climate United's NCIF grant, are detailed in Exhibit A attached to this declaration.

4.      This declaration supplements my March 21, 2025 declaration submitted in the District Court in support of Climate United's motion for a preliminary injunction and my April 15, 2025 declaration submitted in the District Court in opposition to EPA's premature stay motion.

5.      In its preliminary injunction decision, the District Court explained why the record shows there was no legal basis for EPA to freeze Climate United's grant

funds or to terminate Climate United's grant, and ordered Citibank to disburse any funds properly incurred under Climate United's award. A stay of the District Court's preliminary injunction would continue the freeze on our accounts, which has been in place for nine weeks and counting, after the District Court concluded that the freeze and termination is likely unlawful. As a result, a stay of the District Court's preliminary injunction would further amplify the uncertainty around Climate United's access to grant funds and intensify the irreparable harms Climate United is suffering.

6.     If Climate United is forced to wait further to have access to its grant funding restored, Climate United would not survive as it exists today and would need to wind down much of its operations while it evaluates other potential paths. Climate United likely would be forced to lay off staff and may not be able to reopen for business again, given the lost staff, lost deals, and reputational harm. Without access to its funds or a viable alternative funding source, Climate United would not be able to litigate this case to judgment.

**Continued Irreparable Impact on Climate United's Operations**

7.     My March 21 Declaration detailed the impact on Climate United's operations if Climate United does not promptly regain access to the funding provided by the NCIF Award. Those harms will continue to persist if the Court stays the

preliminary injunction and continues to prevent Climate United from accessing its NCIF grant funds.

8.     Climate United relies on the NCIF award to pay payroll, health, vision, and dental benefits, life insurance, and short- and long-term disability insurance for its employees. To preserve its available cash, since March 1, 2025, Climate United has already deferred 40% of compensation for senior staff because the temporary stopgap funding Climate United received was not enough to cover its operations. This significantly harms Climate United's ability to retain essential staff, as reflected in my March 21 Declaration. *See* Dkt. 33-2 ¶¶ 62-66.

9.     Since March 21, one employee has left Climate United and others have notified Climate United that they are currently looking for other employment given the reduction in pay and uncertainty raised by our inability to access funds.

10.     If this Court stays the preliminary injunction and prevents Climate United from accessing its NCIF grant funds for an additional period of time, it will inject a significant level of additional uncertainty which we anticipate will accelerate staff departures. The work of Climate United is highly specialized. We structure financial transactions in hard-to-finance markets, which requires a deep understanding of various capital sources, including government programs (*e.g.*, low-income housing tax credits, solar investment tax credits, etc.) and private investors (*e.g.*, banks and insurance companies). Structuring and underwriting these

transactions requires experience in the private credit markets to assess expected and unexpected risks based on prior knowledge of similar transactions, market data, and industry dynamics.

11.     To execute on this program, we have hired a team of excellent investment professionals with expertise in credit underwriting, structuring, and asset management. These are talented individuals with relationships with portfolio partners and specialized skillsets that took many months to identify and onboard. In many cases, we hired them from other financial institutions where they had higher compensation. They came to Climate United to do this work because of our mission and impact on the communities that benefit from our projects.

12.     If we are unable to pay our staff, they are likely to leave and find other employment. Without a stable source of funding, we will not be able to replace our current staff with quality employees or attract additional talent to fill out our teams. That will leave Climate United unable to fulfill its mission. It will also have reverberating impacts that will harm the public. If we lose our current talented staff because we are no longer able to pay them, many of them may not continue working on investments that generate benefits for the public good.

13.     In addition, furloughing or laying off staff will eliminate positions that perform critical functions for Climate United, including: (1) monitoring the loans that Climate United has already disbursed to funding recipients and the $392 million

5

that the Climate United coalition has committed before March 11 (out of a total of $542 million to date); (2) timely fulfilling EPA's reporting requirements for grant recipients; and (3) deploying the NEXT grant program discussed in more detail below.

14.    Climate United also relies on the NCIF Award to pay rent for its offices, including monthly rent payments. If stopgap funds run out, we will be forced to terminate these rental agreements in advance of their maturity and may be forced to pay penalties that we may not have funds available to pay. We would also need to vacate these offices.

15.    Climate United also relies on the NCIF award to pay insurance. Climate United has received an invoice for its annual Directors and Officers and Errors and Omissions liability insurance renewal which is due on May 31, 2025. This insurance protects Climate United's directors and officers from legal defense costs and personal financial losses if they are sued for alleged wrongful acts or omissions in their official capacity, even if those allegations have no merit. If this Court stays the preliminary injunction and prevents Climate United from accessing its NCIF grant funds, Climate United will not be able to fund that insurance payment. If Climate United cannot pay for directors and officers' insurance, I believe it creates a serious risk that Climate United's officers and board members—who are uncompensated volunteers—will resign because they will not be willing to continue to serve as

officers and directors if it could open them up to potential legal defense costs and personal liability. This risk is heightened by the fact that the directors and officers that are protected by this insurance are aware that litigation is ongoing and that EPA has made multiple baseless and unfounded allegations about Climate United engaging in purported waste, fraud, and abuse related to its NCIF grant funds.

16. Climate United relies on the NCIF Award to pay critical third-party contractors who perform necessary services such as managing accounts payable, auditing financial statements, maintaining IT security and infrastructure, advising on compliance, supporting communications, and providing legal services. As I explained to the District Court in support of the motion for preliminary injunction, Climate United has already been required to terminate multiple vendors, cancel travel, and instruct non-essential contractors to cease work. Climate United also has outstanding vendor invoices that we cannot currently pay. This is causing significant disruption in our ability to carry out our responsibilities under the grant, including our compliance and community outreach work, and harming our partners who have done significant uncompensated work to prepare for implementation of this program. If this Court stays the preliminary injunction and prevents Climate United from accessing its NCIF grant funds, Climate United will be unable to pay existing contractors and restart these activities which are necessary to carry out the grant and Climate United's mission.

17.     Even with these drastic cost reductions, Climate United only has sufficient stopgap funding—secured primarily through a loan—to maintain our existing staff for approximately an additional one to two weeks. If this Court stays the preliminary injunction and prevents Climate United from accessing its NCIF grant funds, we face a real risk that we will be forced to furlough or terminate employees, further reduce staff salaries for those who remain, and shift staff to work on other projects or programs. Without access to its bank accounts for nine weeks and counting, there is no question that Climate United has already incurred grave economic harm and every day our funds are frozen accelerates that harm.

### Continued Irreparable Impact on Climate United Subgrantees

18.     Climate United's subgrantees—its coalition partners who are carrying out significant portions of the coalition workplan—are facing similar pressures, which will impair their future ability to partner with Climate United on its projects. For example, on April 10, 2025, one of Climate United's subgrantees executed a reduction in force impacting a majority of its staff, due to budget constraints caused by no longer having access to the funds it was relying on from Climate United's subgrant. This reduction involved laying off 8 people and reallocating 5 people to other business units that are not involved in implementing the NCIF grant or Climate United projects. If this Court stays the preliminary injunction and prevents Climate United's subgrantees from accessing NCIF grant funds, they will be unable to rehire,

onboard, and train employees to carry out their original workplan, causing delays in implementation for the overall program.

### Continued Irreparable Impact on Climate United's Programs and Mission

19.    Climate United helps fill gaps where private capital is missing by providing loans to finance projects that will bring the economic benefits of clean energy, electric mobility, and building efficiency projects to overlooked markets. Climate United's investments also mobilize private capital, stretching public dollars further: for every dollar invested in a program or project, Climate United estimates up to four dollars of private capital will flow into communities. My March 21 Declaration detailed the impact on Climate United's existing programs if Climate United does not promptly regain access to the funding provided by the NCIF Award. *See* Dkt. 33-2 ¶¶ 68-71. Those harms will also continue to persist if the Court stays the preliminary injunction and prevents Climate United from accessing its grant funds.

20.    Climate United has launched three financing programs to date. The first is a $31.8 million pre-construction loan to support solar power projects across rural communities in Arkansas, which was announced in October 2024. Through this project, Climate United is financing pre-construction costs for 18 solar projects comprising the largest commercial solar deployment in Arkansas history, which is

projected to save more than $120 million in energy costs over the project's life and create hundreds of jobs.

21.     The second is a $250 million program to offer affordable leasing options for battery electric heavy-duty trucks to small fleets and independent operators. Climate United issued a request for proposals in October 2024 from qualified U.S. auto manufacturers to deliver up to 500 electric drayage trucks, which Climate United intends to begin leasing at the ports of Long Beach and Los Angeles. When completed, these orders will represent some of the largest ever purchases of domestically manufactured battery electric trucks in U.S. history. The communities surrounding these ports have among the highest air pollution and worst health outcomes in the nation. Climate United intends to expand this program nationally. This program will not only reduce the cost per mile of operating drayage trucks for small businesses, but it will also reduce air pollution in port communities and create demand for U.S. manufacturing in factories across the country, including in states such as Mississippi, Oregon, and Virginia.

22.     The third is $63 million in committed pre-construction financing for projects designed and developed by a Native-owned and Native-led solar developer who develops solar power plants in partnership with Tribal governments and communities. These projects bring access to affordable energy to rural communities and Indigenous people in addition to creating more than 1,000 quality jobs and local

economic development. Initial projects will be located in Eastern Oregon and Idaho, with plans to use funds for future projects in the developer's pipeline.

23.     In addition, Climate United has used grant funds to design, develop and launch the Climate United NEXT program. This is a pre-development grant program intended to provide up to $30 million in technical assistance and planning support for community-led projects that increase energy independence and resiliency, reduce pollution, and save money for hardworking American families, small businesses, and communities. The first round of grants focused on projects serving Tribal communities. Climate United publicly committed to announcing the awardees of these pre-development grants through the NEXT program across the United States by the end of February 2025. After reviewing 104 applications for the program in the first round of submissions, Climate United currently has approved 22 awards across 18 states, and anticipates issuing $6.345 million in initial subawards.

24.     Climate United relies on the NCIF Award to be able to meet its commitments under loans that it has already approved and partially funded, as well as other existing lending programs—including all of the projects and programs mentioned above. Because it has not been able to access its NCIF funds, Climate United has been required to spend significant time and resources identifying alternative capital sources for partners in its immediate pipeline. To date, Climate United has not been able to find replacement capital for these existing lending

programs. If this Court stays the preliminary injunction and prevents Climate United from accessing its NCIF grant funds for an additional period of time, Climate United anticipates needing to expand these capital raising efforts as these projects enter their third month of funding freezes. And if Climate United is unable to identify additional sources to bridge its funds while a stay of the preliminary injunction is in effect, those projects could unwind altogether and some may never be reassembled. This includes financing for solar projects that, if not completed in the near term, could lose their ability to operate because of changes in state regulation that have since made solar development economically infeasible. These already committed (pre-March 11) and partially funded projects are projected to save significant energy costs for public schools, small businesses, and rural municipalities, create local jobs, and collectively drive over $100 million in local economic activity.

25.     In addition, we will be in default on our loan agreements with multiple borrowers with unfunded balances and we will not be able to make commitments to partners and borrowers who have spent weeks of uncompensated time responding to open and competitive requests for investment, representing over $1 billion of investable pipeline for projects that deliver significant economic and health benefits to local communities across the country in accordance with our EPA-approved workplan and budget.

26.     Any suggestion that this program is in its early stages and thus does not engender significant economic harm to families, small businesses, and communities—along with harm to Climate United itself—is entirely false. As required by EPA's application process, we began building our lending pipeline in July 2023—nearly two years ago. Since notification of our award in April 2024 we have been advancing that pipeline and made our first loan in September 2024. In total, we have committed $542 million to qualified projects—93 percent of our year one capital deployment goal (year ending June 30, 2025)—and have over $1 billion in near-term investable pipeline. There are hundreds of organizations and projects across the country that have spent significant time and expense preparing for the development of projects funded by this NCIF grant. Pulling the rug out at this time has economic ripple effects in local neighborhoods and communities from Arkansas to Alaska and everywhere in between.

**<u>Continued Irreparable Impact on Climate United's Reputation</u>**

27.     My March 21 Declaration detailed the impact on Climate United's reputation caused by the funding freeze and grant termination. Climate United is primarily a lender, which means that to do business, we have to find willing clients—*i.e.*, borrowers—to borrow money from us. In many cases, we make long-term loans to finance infrastructure projects. These are market transactions that require trust and certainty, similar to the trust and certainty a homeowner would want from their

mortgage lender or a small business would want from their banker. The freeze of our funds and the unlawful termination of our grant have caused significant uncertainty and unease about our ability to operate in the near-term and our ability to be a long-term partner to developers, small businesses, and American families.

28.     Our stability as a lending institution has always been our strength in the markets we serve, and the current legal limbo caused by actions from EPA and Citibank have dramatically impacted our ability to go to market as a stable source of funding. Climate United's reputation as a reliable and stable source of financing is essential to its ability to, among other things, attract high-quality co-investment to finance programs and to attract high-quality projects for its pipeline. If Climate United's funding is not restored imminently, Climate United's reputation would be irreparably damaged. That would make it more difficult, if not impossible, for Climate United to find partners willing to enter into financing arrangements and to find qualified employees willing to work at Climate United.

29.     In addition, a prolonged pause in funding would be likely to cause third parties to view Climate United as having a less stable source of funding going forward, meaning that it will receive increasingly unfavorable terms from essential vendors and prospective deal partners. In effect, if Climate United is seen as having a less stable source of funding, that has a reputational effect akin to a credit downgrade, causing counterparties to place higher premiums on long-term

partnerships and seek additional assurances to protect their economic interests—such as requiring Climate United to provide cash collateral for any guarantees or similar credit enhancement on transactions or prefunding commitments.

30.    If our funding is not restored, many partners will cease to engage with us. One existing partner responded to Climate United's latest Request for Proposals to support community lenders with asset purchases by saying it was "not allocating resources to this RFP at the present moment as [it] monitor[s] the NCIF situation and look[s] for resolution of some of the uncertainty." A manufacturer informed Climate United: "given the status of the current environment, we are going to pause any engagement with Climate United until the relationship between Climate United and the EPA is stable and we can be more confident that funds will not be clawed back." It is also less likely that organizations will work with us on pre-development activities, technical assistance activities, or financial transactions, given the freeze on the funds. In turn, this hinders our ability to generate demand and finance additional projects.

31.    These harms, too, will persist if the Court stays the preliminary injunction and prevents Climate United's access to its NCIF grant funds. As I explained to the District Court in my March 21 Declaration, Climate United had already begun receiving input from current and prospective partners indicating that they were no longer going to engage with Climate United while the status of its

15

funding was uncertain. Since March 21, Climate United has heard from additional current and prospective partners about similar concerns. Numerous partners have gone pencils-down on dealing with Climate United, impairing our ability to build trust in the market and execute on impactful projects and programs, particularly in communities that have often been left behind by traditional financial institutions.

32.     In my March 21 Declaration, I stated that Climate United would receive increasingly unfavorable terms from vendors and prospective portfolio partners if access to NCIF funding was not restored. With our funding frozen for more than two months, we have experienced the harm I feared. As Climate United has informed EPA, almost all professional services vendors including its accountants and all legal counsel have required that Climate United either fund retainers or fixed fee arrangements at the onset of an engagement. Climate United also has outstanding and overdue invoices owing to vendors and such vendors have ceased work pending payment of those outstanding amounts. Climate United's portfolio partners have required upfront funding of all commitment amounts into partner-owned accounts to ensure that funding will be available for the entirety of the project. No one wants a half-built project.

### EPA's Robust Oversight of Climate United's Grant and Accounts

33.     Climate United's funds were fully obligated by EPA on August 8, 2024. Climate United initially accessed funds through the Treasury Department's

16

Automated Standard Application for Payments ("ASAP") system while Treasury worked to implement the financial agency agreement ("FAA") that was described in the original Notice of Funding Opportunity in July 2023 and is discussed in more detail below.

34.    Climate United's undrawn funding was disbursed to accounts held at Citibank, after those accounts were established in November 2024, and subject to an Account Control Agreement entered into between Climate United, EPA, and Citibank (the "ACA"). *See* Dkt. 33-10. The process to establish the accounts began on September 26, 2024, once Citibank was selected by the U.S. Department of the Treasury as Financial Agent.

35.    Climate United, EPA, and Citibank executed an amendment to the ACA on January 13, 2025, to clarify the parties' intent regarding the treatment of certain obligations that were "properly incurred" if EPA issued a Notice of Exclusive Control. This was only a clarification and did not alter the substance of the ACA. *See* Dkt. 33-11.

36.    From the program's inception, EPA contemplated the need for a funding mechanism which would allow for balance-sheet capitalization enabling recipients to leverage private capital—a fundamental objective of the program. In the July 2023 Notice of Funding Opportunity, which outlined the parameters of the grant competition, EPA contemplated that "additional measures or other arrangements"

would be required if the program departed from typical drawdown requirements, and specifically highlighted that one such additional measure would be "financial agent arrangements with U.S. Department of Treasury … to ensure that EPA's interests are protected." *See* Dkt. 33-3 at 56.

37.    Details about this structure were then discussed with selectees in May 2024 and included in Climate United's original grant agreement, dated August 8, 2024. Specifically, the Terms and Conditions in the August NOA provided that "[t]he Recipient will open a Deposit Account at a depository institution that has been designated as a financial agent of the United States," that "[s]uch account will be used as Recipient's operating account for the award," and that "[t]he Recipient will take all such actions, enter into all such agreements, and execute and deliver all such documentation as may be necessary and/or directed by EPA from time to time to establish and maintain [a perfected security interest held by EPA], including but not necessarily limited to entering into a deposit account control agreement (DACA) with the Financial Agent and EPA." Dkt. 33-4 at 58. Climate United was not involved in EPA's decision to include the financial agent concept in the Notice of Funding Opportunity in July 2023. Climate United also had no role in the selection of the financial agent, which was coordinated by EPA and the Treasury Department as part of a competitive process.

38.    The alternative mechanism used to disburse funds under EPA grants is the ASAP system, which Climate United used to access funds while the ACA was being finalized between August 2024 (when the initial NOA was finalized) and November 2024. The ASAP system allows recipients to draw funds as needed—for example, to fund a project or pay administrative costs. Under the ASAP system, the entire award amount would be obligated to the recipient, but the recipient's balance sheet would only reflect those award funds already drawn down.

39.    One of the primary objectives of the NCIF program is to use government funds to spur private capital. The traditional ASAP mechanism would not allow for a recipient to raise private capital on the recipient's own balance sheet. My understanding, from reading the NOFO, is that EPA understood the need to solve for this technical accounting problem. EPA included a financial agent mechanism in its original program design from July 2023. *See* Ex. 1 at 56. The ability of the recipient to draw down award funds would remain unchanged, but the balance sheet of the recipients would reflect the entire award amount rather than only the funds already expended.

40.    My understanding is that the Treasury Department under the ASAP system does not conduct oversight—it simply reports to EPA the amounts which have been drawn by the recipient and what amounts remain. Under the FAA between Citibank and Treasury, Citibank agreed to assume this ministerial funding

responsibility. EPA's oversight functions remain identical under the FAA and under ASAP. I believe this is why the FAA is between Treasury and Citibank, not between EPA and Citibank—Citibank is taking over Treasury's ministerial functions, not EPA's oversight functions. However, Citibank's interface displays Climate United's expenditures broken down by budget category, and it provides EPA with full, real-time view access into all 21 accounts of Climate United and its subrecipients. This level of insight is not available under the ASAP system.

41.    After funding was disbursed to Climate United's Citibank accounts, Climate United has drawn money from its accounts approximately once every one to two weeks, as permitted by the terms of the NCIF Award, including in accordance with its approved budget. Absent EPA's prior approval, Climate United is only permitted to draw funds which will be disbursed in the following fourteen business days. *See* Dkt. 33-5 at 57-58.

42.    Throughout this period, EPA has overseen Climate United's activities. Climate United's actions have been transparent and visible to EPA, and EPA has at all times had the ability to view and audit any expenditures of Climate United. EPA has exercised its oversight and supervisory authority in the following ways, among others:

    a.  EPA has required Climate United to submit quarterly, semi-annual, and annual reports, detailing its transactions, activities, progress against its workplan, and expenditures by budget category, including mandatory quarterly conflict-of-interest reporting by Climate United and each of

Climate United's subgrantees. Climate United's inaugural semi-annual report covering the period from the start of the grant to December 31, 2024 is publicly available online;

b. EPA has held meetings at least weekly, and, at times, two to three times per week, to discuss Climate United's program plans, reporting, oversight, and compliance with the EPA Terms and Conditions;

c. EPA has view access to each of Climate United's seven Citibank accounts and each of the fourteen accounts of Climate United's subgrantees. EPA's view access allows EPA to see what funds Climate United is spending and what budget category that spending relates to. EPA's view access also allows EPA to see program income in the form of portfolio earnings or repayment of loans;

d. EPA receives a certification from Climate United each time Climate United submits a draw request to Citibank for a financial assistance transaction, certifying: "The amount of the transfer is necessary to execute against the EPA-approved workplan, and the financing agreements for identified qualified projects necessitating the transfer have been reviewed by Climate United's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions." Each of Climate United's subgrantees is required to make similar certifications;

e. EPA approved Climate United's detailed budget for the term of its award, and EPA must approve any material changes;

f. EPA has required Climate United to adopt and deliver to EPA detailed policies, including investment policies, risk policies, consumer protection policies, subaward oversight policies, and conflict of interest policies;

g. EPA requires Climate United to be subject to standard audit requirements by a third-party auditor, including both financial audits and a Single Audit for federal grant compliance;

h. In November, EPA conducted transaction testing, which is a systematic examination and verification of every dollar spent by Climate United

to ensure they comply with the grant's terms, conditions, and applicable regulations; and

i.  EPA has also issued additional oversight requests. For example, on March 4, 2025, EPA asked Climate United for answers and documents related to 35 questions addressing a wide range of topics, many of which ask for documentation or information previously provided to EPA, giving Climate United less than three weeks to respond while its funds are inaccessible. Climate United's response is posted on its website.

**Impact of Alternatives to Full Access to Funds**

43.     I understand that in deciding the motion for a stay pending appeal, this Court may consider temporarily modifying or limiting the scope of the preliminary injunction issued by the District Court. Only the relief entered by the District Court—ordering Citibank to disburse all funds properly incurred under Climate United's grant—will be sufficient to address all of the harms identified above. As my March 21 Declaration explained in detail, there are numerous restrictions in place to ensure proper use of funds. We can only disburse funds for projects that have been thoroughly vetted and approved as a part of our robust due diligence and investment policies and can only disburse funds for operating expenses due and payable over a fourteen-day period. However, at the very minimum, if this Court were to stay the District Court's preliminary injunction, Climate United could likely survive during the duration of this litigation if the stay did not apply to funds for Climate United's operations. And regardless, any stay from this Court should not apply to disbursement of funds for expenses and committed transactions Climate

United validly incurred prior to EPA's purported termination on March 11, 2025, because Climate United is entitled to those funds even if EPA's termination is ultimately found to be valid.

44.    In the preliminary injunction hearing, the District Court asked how much funding would be required to allow Climate United to solely "continue operations," but not necessarily to finance projects. To fully cover operational expenses for the next six months—including payroll for employees, rent, insurance, payments to essential contractors, and other necessary expenses—Climate United would need access to at least $25 million in funding for itself and its coalition partner subgrantees. To put that number in context, $25 million is a mere 0.36 percent of Climate United's award. This would save Climate United and its subgrantees from being forced to wind down operations before this case can be litigated to final judgment. Although this amount would not permit Climate United to continue any of its active projects and advance its mission—the very reason for Climate United's existence and for the NCIF funding—and thus would still force Climate United to suffer irreparable harm, it would at least allow Climate United to survive.

45.    Alternatively, if a stay from this Court did not apply to $6,347,304 in draw requests for expenses that were incurred as of March 11, 2025, *see* Exhibit A, then Climate United could keep the lights on for approximately 2 months. To be clear, that amount would not be sufficient to cover operating expenses for the

duration of this litigation, so it would not prevent Climate United from further suffering irreparable harm. But permitting disbursement of those funds would at least mitigate the irreparable harm Climate United would suffer by allowing Climate United to litigate this case through an appeal in this Court.

46.    As of March 11, 2025, there were an additional $292,250,000.00 in draw requests (4.2 percent of the award) related to requests for committed projects— each of which was legally obligated before March 11, 2025. *See* Exhibit A. Because these requests were made before EPA purported to terminate Climate United's grant on March 11, 2025, my understanding is that Climate United is entitled to these funds regardless of whether the termination is considered effective. In other words, my understanding is that even if this Court ultimately holds that the District Court lacked jurisdiction over Climate United's claims, and even if the Court of Federal Claims were to find EPA's termination is valid, and even if EPA were able to complete the closeout process, Climate United would *still* be entitled to this funding. Therefore, if this Court were to stay the District Court's preliminary injunction, the stay should not apply to these pre-termination requests related to legally committed funding.

47.    One such request sought to transfer $250 million to our reserve account in early February for a lending program that was announced in October 2024 and which has been in our pipeline since May 2024. This transfer request related to the battery electric heavy-duty truck project discussed above. Citibank never made this

transfer. In April, based on further development in the deal, we requested that the same $250 million be taken out of the reserve and transferred to an external account. That request related to the same pre-termination commitment related to the battery electric heavy-duty truck project.

48.    Finally, I note that the District Court initially granted a temporary restraining order that did not allow Climate United and its subgrantees immediate access to the funds in their Citibank accounts, while also enjoining Defendants from moving those funds away from those accounts. This Court's administrative stay similarly required that funds related to Climate United's grant remain in their current accounts at Citibank. Under no circumstances should this Court permit funds from Climate United's grant to leave Citibank while this litigation is pending. Keeping the funds at Citibank would allow Climate United to have immediate access to those funds upon a final resolution of this litigation in its favor. It would also prevent Defendants from transferring those funds to other potential recipients (which EPA has stated it intends to do). Keeping the funds at Citibank would also protect Climate United from being unable to recover the funds if they were transferred to another government entity, such as the Department of the Treasury.

**Status of Stopgap Charitable Funds**

49.    Funds available to cover operations from the NCIF grant were exhausted within 14 business days of the freeze because, under the Terms and

25

Conditions of our grant, absent EPA approval Climate United is only permitted to draw funds which will be disbursed in the following fourteen business days. *See* Dkt. 33-5 at 57-58.

50.    Since then, Climate United Fund has been operating on limited cash reserves and stopgap charitable grants and loans to cover costs. As outlined above, Climate United Fund has cut its monthly costs by more than 50% to only costs essential to maintaining its existence—primarily reduced salaries, limited legal expenses, rent and essential IT costs.

51.    Even with these drastic reductions, the stopgap funds received will not allow Climate United to survive much longer. As discussed above, if the Court stays the preliminary injunction and continues to prevent Climate United from accessing its NCIF grant funds, Climate United will be forced to furlough or terminate employees, terminate our rent agreements or risk eviction, lose our directors and officers insurance, and terminate other remaining monthly expenses like IT contracts.

52.    Part of the reason why it is difficult for Climate United to find alternative funding is that Climate United's primary goal, and indeed the goal of the NCIF program and policy enacted by Congress, is to provide financing for projects that do not already have a steady source of market-driven investments. *See* Dkt. 33-7 at 26; 42 U.S.C. § 7434(b)(1)(B) (requiring funding recipients to "prioritize investment in qualified projects that would otherwise lack access to financing"). If

the private markets financed these projects on their own, this program would not be

necessary. They do not.

* * *

I declare under penalty of perjury under the laws of the United States of America,

pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my

knowledge.


Executed this 22nd day of April, 2025, in Bethesda, Maryland.

*/s/ Elizabeth Bafford*
ELIZABETH BAFFORD, CEO
Climate United Fund