**[ORAL ARGUMENT SCHEDULED MAY 19, 2025]**

**No. 25-5122**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

CLIMATE UNITED FUND, et al.,

*Plaintiffs-Appellees,*

*v.*

CITIBANK, N.A., et al.,

*Defendants-Appellants.*

————————————

On Appeal from the United States District Court
for the District of Columbia

————————————

**JOINT APPENDIX**
**PUBLIC APPENDIX — SEALED MATERIAL IN SEPARATE SUPPLEMENT**
**VOLUME I**

————————————

YAAKOV M. ROTH
 *Acting Assistant Attorney General*

GERARD SINZDAK
SOPHIA SHAMS
 *Attorneys, Appellate Staff*
 *Civil Division, Room 7264*
 *U.S. Department of Justice*
 *950 Pennsylvania Avenue NW*
 *Washington, DC 20530*
 *(202) 514-2495*

# TABLE OF CONTENTS

# VOLUME I

**Excerpts from Climate United Fund v. Citibank, N.A.,
Case No. 1:25-cv-00698**

Docket Report ................................................................................................JA1

Memorandum in Support of Temporary Restraining Order (Doc. 2-1) ..................JA20

March 10, 2025 EPA Correspondance (Doc. 14-2)................................................JA64

March 10, 2025 Treasury Correspondence (Doc. 14-3) .........................................JA67

Account Control Agreement (Doc. 14-4) .............................................................JA69

February 2025 FBI Correspondence (Doc. 14-5) ..................................................JA98

March 2, 2025 EPA Office of Inspector General Correspondence (Doc. 14-6) ...JA104

March 4, 2025 Treasury Correspondence (Doc. 14-7) .........................................JA110

Amended Complaint (Doc. 24) ..........................................................................JA112

Hearing (March 8, 2025)...................................................................................JA174

Hearing (March 17, 2025)..................................................................................JA218

Memorandum Opinion on Temproary Restraining Order (Doc. 28) ...................JA263

Order Granting Motion for Temporary Restraining Order (Doc. 29)...................JA286

Motion for Preliminary Injunction (Doc. 33-1).................................................JA288

Bafford Decl. (Dkt. 33-2) .................................................................................JA360

Climate United Notice of Termination (Doc. 33-13) .........................................JA389

Representative Request from EPA (Doc. 33-22) .................................................JA392

Coalition for Green Capital Notice of Termination (Doc. 33-23).........................JA397

Brown Decl. (Doc. 33-25) .............................................................................JA401

Buendia Decl. (Doc. 33-26)..........................................................................JA406

Hopson Decl. (Doc. 33-27)...........................................................................JA415

Kauffman Decl. (Doc. 33-28) ........................................................................JA425

Donovan Decl. (Doc. 33-29) .........................................................................JA433

Matusiak Decl (Doc. 33-30) .........................................................................JA442

Mayopoulous Decl. (Doc. 33-31) ..................................................................JA451

Moon Decl. (Doc. 33-32) .............................................................................JA461

Opposition to Motion for Preliminary Injunction (Doc. 49) .................................JA470

## VOLUME II

**Excerpts from Climate United Fund v. Citibank, N.A.,
Case No. 1:25-cv-00698**

Exhibits to Coogan Decl. (Dkt. 49-2)..............................................................JA511

Amidon Decl. (Doc. 49-3).............................................................................JA703

Treml Decl. (Doc. 49-5) ...............................................................................JA721

Exhibits to Bailey Decl. (Doc. 49-7) ..............................................................JA724

Coalition for Green Capital Supplemental Record Evidence (Doc. 60) ...............JA736

Order Extending Temporary Restraining Order (Doc. 70) ..................................JA738

Emergency Contingent Motion to Stay Pending Appeal (Doc. 75)........................JA740

Supplemental Treml Decl. (Doc. 75-2)............................................................JA752

Exhibits to Treml Decl. (Doc. 75-3) ...............................................................JA758

Hearing (April 2, 2025) ................................................................................JA830

Parker Decl. (Doc. 78-1)..................................................................JA938

Supplemental Bafford Decl. (Doc. 79-1) .........................................JA952

Order Granting Preliminary Injunction (Doc. 80) ...........................JA961

Notice of Appeal (Doc. 81)...............................................................JA964

Memorandum Opinion (Doc. 89) .....................................................JA966

Supplemental Mayopoulos Decl. (Doc. 92) .....................................JA1005

Order Granting Motion to Clarify (Doc. 96) .....................................JA1011

**Excerpts from Power Forward Coalition v. Citibank, N.A.,
Case No. 1:25-cv-00762**

Docket Report ..................................................................................JA1015

Grant Agreement (Doc. 1-2)............................................................JA1020

Amended Grant Agreement (Doc. 1-3)..............................................JA1081

Account Control Agreement (Doc. 1-4) .............................................JA1142

Sub-Awardee Account Control Agreement (Doc. 1-5).........................JA1175

Notice of Termination Letter (Doc. 1-10) ..........................................JA1196

# VOLUME III

**Excerpts from California Infrastructure and Economic Development
Bank v. Citibank, N.A.,
Case No. 1:25-cv-00820**

Docket Report ..................................................................................JA1199

Complaint (Doc. 1) ..........................................................................JA1204

Motion for Preliminary Injunction (Doc. 17) ...................................JA1259

Meister Decl. (Doc.17-1) .................................................................JA1293

Stoddard Decl. (Doc. 17-2) .......................................................... JA1323

Strong Dec. (Doc. 17-3) ............................................................... JA1353

Swan Decl. (Doc. 17-4) ................................................................ JA1419

Wu Decl. (Doc. 17-5) ................................................................... JA1461

**Excerpts from Justice Climate Fund v. EPA**
**Case No. 1:25-cv-00938**

Docket Report ............................................................................. JA1507

Complaint (Doc. 1)....................................................................... JA1511

Kirkwood Decl. (Doc. 7-2) ........................................................... JA1644

CCIA Notice of Funding Opportunity (Doc. 7-3)......................... JA1657

NCIF Notice of Funding Opportunity (Doc. 7-4) ......................... JA1732

Grant Agreement (Doc. 7-5).......................................................... JA1805

# VOLUME IV

**Excerpts from Justice Climate Fund v. EPA**
**Case No. 1:25-cv-00938**

Amendments to Grant Agreement (Doc. 7-6) ................................. JA1867

Account Control Agreement (Doc. 7-7) ......................................... JA1930

Notice of Termination (Doc. 7-8)................................................... JA1948

Notice of Compliance and Oversight Review (Doc. 7-9) ............... JA1951

Agency and Trust Account Statement (Doc. 7-10)......................... JA1956

Agency and Trust Account Statement (Doc. 7-11)......................... JA1958

**Excerpts from Inclusiv, Inc. v. EPA,**
**Case No. 1:25-cv-00948**

Docket Report ............................................................................... JA1961

Arabshahi Decl (Doc. 6-2) ........................................................... JA1967

Lawson Dec. (Doc. 6-3) ............................................................... JA1990

Freeman Decl.(Doc. 6-4) .............................................................. JA1995

Hanshaw Dec. (Doc. 6-5).............................................................. JA2002

Ledezma Dec. Decl. (Doc. 6-6) ................................................... JA2007

Inclusiv Grant Agreement (Doc. 6-8)........................................... JA2014

Motion for Temporary Restraining Order (Doc. 8)..................... JA2076

Johnson Decl. (Doc. 8-1) ............................................................. JA2081

Sheaffer Decl. (Doc. 8-2)............................................................. JA2118

Notice of Withdrawal (Doc. 13) .................................................. JA2123

## VOLUME V

**Excerpts from Climate United Fund v. Citibank, N.A.,
Case No. 1:25-cv-00698**

Financial Agent Agreement (Under Seal) (Doc. 21) .................... JA2126

# 1:25cv698, Climate United Fund V. Citibank, N.A. Et Al

US District Court Docket

United States District Court, District of Columbia

(Washington, DC)

**This case was retrieved on 05/04/2025**

## Header

**Case Number:** 1:25cv698
**Date Filed:** 03/08/2025
**Assigned To:** Judge Tanya S. Chutkan
**Nature of Suit:** Other Statutes - Administrative Procedure Act/Review or Appeal of Agency Decision (899)
**Cause:** Judicial Review of Agency Actions
**Lead Docket:** None
**Other Docket:** 1:25cv00735, 1:25cv00762, 1:25cv00820, 1:25cv00938, 1:25cv00948, 1:25cv01208, USCA, 25-05122, USCA, 25-05123
**Jurisdiction:** U.S. Government Defendant

**Class Code:** Open
**Statute:** 05:0706
**Jury Demand:** None
**Demand Amount:** $0
**NOS Description:** Other Statutes - Administrative Procedure Act/Review or Appeal of Agency Decision

## Participants

| Litigants | Attorneys |
|---|---|
| CLIMATE UNITED FUND<br>**Plaintiff** | Allison N. Douglis<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Jenner & Block LLP<br>1155 Avenue Of The Americas<br>New York, NY  10036<br>USA<br>212-303-2505 Fax: 212-891-1699<br>Email:Adouglis@jenner.Com<br><br>David B. Robbins<br>ATTORNEY TO BE NOTICED<br>JENNER & BLOCK LLP<br>1099 New York Avenue, Nw Suite 900<br>Washington, DC  20001<br>USA<br>202-639-6040 Email:Drobbins@jenner.Com<br><br>Gabriel K. Gillett<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Jenner & Block LLP<br>353 North Clark Street<br>Chicago, IL  60654<br>USA<br>312-840-7220 Email:Ggillett@jenner.Com<br><br>Kathryn L. Wynbrandt<br>ATTORNEY TO BE NOTICED |

## Litigants

## Attorneys

JENNER & BLOCK LLP
1099 New York Ave., Nw Suite 900
Washington, DC  20001
USA
202-637-6389 Email:Kwynbrandt@jenner.Com

Simon De Carvalho
PRO HAC VICE;ATTORNEY TO BE NOTICED
JENNER & BLOCK
353 N. Clark Street
Chicago, IL  60654
USA
312-840-7204 Email:Sdecarvalho@jenner.Com

Tanner Lockhead
ATTORNEY TO BE NOTICED
JENNER & BLOCK LLP
1099 New York Ave., Nw Suite 900
Washington, DC  20001
USA
202-639-3898 Email:Tlockhead@jenner.Com

Adam Granich Unikowsky
ATTORNEY TO BE NOTICED
JENNER & BLOCK LLP
1099 New York Avenue, Nw Suite 900
Washington, DC  20001-4412
USA
(202) 639-6041 Email:Aunikowsky@jenner.Com

Power Forward Communities, Inc.
25-cv-00762-TSC |
**Plaintiff**

Beth C. Neitzel
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Foley Hoag LLP
155 Seaport Blvd Suite 1600
Boston, MA  02210
USA
(202) 663-6502 Email:Bneitzel@foleyhoag.Com

James Gross
LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE
NOTICED
FOLEY HOAG
1301 Avenue Of The Americas 25th Floor
New York, NY  10019
USA
212-812-0422 Email:Jgross@foleyhoag.Com

Jack C. Smith
ATTORNEY TO BE NOTICED
FOLEY HOAG, LLP
155 Seaport Boulevard
Boston, MA  02210
USA
617-832-1119 Email:Jcsmith@foleyhoag.Com

Kevin Chen
PRO HAC VICE;ATTORNEY TO BE NOTICED
FOLEY HOAG, LLP
155 Seaport Boulevard
Boston, MA  02210

## Litigants                                      ## Attorneys

|  |  |
|---|---|
|  | USA<br>617-832-1115 Email:Kchen@foleyhoag.Com |
|  | Noah C. Shaw<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>FOLEY HOAG LLP<br>1301 Avenue Of The Americas 25th Floor<br>New York, NY  10019<br>USA<br>518-226-9602 Email:Ncshaw@foleyhoag.Com |
| **Coalition for Green Capital**<br>1:25-cv-00735-TSC \|<br>**Plaintiff** | Vincent Levy<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>HOLWELL SHUSTER & GOLDBERG LLP<br>425 Lexington Avenue 14th Floor<br>New York, NY  10017<br>USA<br>646-837-5120 Email:Vlevy@hsgllp.Com |
|  | Kevin D. Benish<br>ATTORNEY TO BE NOTICED<br>Holwell Shuster & Goldberg LLP<br>425 Lexington Avenue 14th Floor<br>New York City, NY  10017<br>USA<br>646-837-8349 Email:Kbenish@hsgllp.Com |
| **AAG   ILLINOIS FINANCE AUTHORITY**<br>**Plaintiff** | Jason Elliott James<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>OFFICE OF THE ATTORNEY GENERAL/IL<br>69 W. Washington St 18th Floor<br>Chicago, IL  60602<br>USA<br>312-814-0660 Email:Jjames@atg.State.Il.Us |
|  | Megan Anne Schultz Richards<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>California Attorney General's Office<br>California Department Of Justice 1300 I Street Suite 125 P.O. Box 944255<br>Sacramento, CA  93721<br>USA<br>916-210-7739 Email:Megan.Richards@doj.Ca.Gov |
| **EFFICIENCY MAINE TRUST**<br>25-cv-820 \|<br>**Plaintiff** | Emma Akrawi<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>OFFICE OF THE ATTORNEY GENERAL/ME<br>6 State House Station<br>Augusta, ME  04333-0006<br>USA<br>207-626-8800 Email:Emma.Akrawi@maine.Gov |
|  | Megan Anne Schultz Richards<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>California Attorney General's Office<br>California Department Of Justice 1300 I Street Suite 125 P.O. Box 944255<br>Sacramento, CA  93721<br>USA<br>916-210-7739 Email:Megan.Richards@doj.Ca.Gov |

| Litigants | Attorneys |
|---|---|
| | Scott William Boak<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>OFFICE OF THE ATTORNEY GENERAL/ME<br>6 State House Station<br>Augusta, ME  04333-0006<br>USA<br>207-626-8566 Email:Scott.Boak@maine.Gov |
| MINNESOTA CLIMATE INNOVATION FINANCE<br>AUTHORITY<br>25-cv-820 \|<br>**Plaintiff** | Megan Anne Schultz Richards<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>California Attorney General's Office<br>California Department Of Justice 1300 I Street Suite 125 P.O.<br>Box 944255<br>Sacramento, CA  93721<br>USA<br>916-210-7739 Email:Megan.Richards@doj.Ca.Gov |
| | Oliver Larson<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>MINNESOTA ATTORNEY GENERAL'S OFFICE<br>445 Minnesota St. Suite 900<br>St. Paul, MN  55101<br>USA<br>651-757-1265 Email:Oliver.Larson@ag.State.Mn.Us |
| | Peter Nathaniel Surdo<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>OFFICE OF THE ATTORNEY GENERAL/MINNESOTA<br>445 Minnesota Street Suite 900<br>St. Paul, MN  55101<br>USA<br>(651) 757-1061 Email:Peter.Surdo@ag.State.Mn.Us |
| | Catherine Rios-Keating<br>ATTORNEY TO BE NOTICED<br>MINNESOTA ATTORNEY GENERAL'S OFFICE<br>445 Minnesota Street Suite 600<br>St. Paul, MN  55101<br>USA<br>651-300-7302 Email:Catherine.Rios-<br>Keating@ag.State.Mn.Us |
| California Infrastructure and Economic Development Bank<br>25-cv-00820-TSC \|<br>**Plaintiff** | Megan Anne Schultz Richards<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>CALIFORNIA ATTORNEY GENERAL'S OFFICE<br>1300 I Street Suite 125 P.O. Box 944255<br>Sacramento, CA  93721<br>USA<br>916-210-7739 Email:Megan.Richards@doj.Ca.Gov |
| | Meghan Strong<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DEPARTMENT OF JUSTICE- CA<br>455 Golden Gate Avenue Suite 11000<br>San Francisco, CA  94102<br>USA<br>415-510-3877 Fax: 415-703-5480<br>Email:Meghan.Strong@doj.Ca.Gov |
| | Robert William Setrakian<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED |

JA4

1:25cv698, Climate United Fund V. Citibank, N.A. Et Al

| Litigants | Attorneys |
|---|---|
| | CALIFORNIA ATTORNEY GENERAL'S OFFICE<br>300 S. Spring Street Ste 7750<br>Los Angeles, CA  90013<br>USA<br>213-269-6668 Email:William.Setrakian@doj.Ca.Gov<br><br>Theodore A.B. McCombs<br>ATTORNEY TO BE NOTICED<br>OFFICE OF THE ATTORNEY GENERAL<br>600 West Broadway Ste. 1800<br>San Diego, CA  92101<br>USA<br>619-738-9000 Email:Theodore.Mccombs@doj.Ca.Gov |
| Justice Climate Fund<br>**Plaintiff** | David Zimmer<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE<br>NOTICED<br>ZIMMER, CITRON & CLARKE LLP<br>130 Bishop Allen Dr.<br>Cambridge, MA  02139<br>USA<br>617-676-9421 Email:David@zimmercitronclarke.Com<br><br>Eric F. Citron<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>ZIMMER, CITRON & CLARKE LLP<br>130 Bishop Allen Drive<br>Cambridge, DC  02139<br>USA<br>617-821-6006 Email:Eric@zimmercitronclarke.Com<br><br>Kathleen Foley<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Zimmer, Citron & Clarke LLP<br>1629 K Street Nw Suite 300<br>Washington, DC  20006<br>USA<br>240-203-7746 Email:Kathleen@zimmercitronclarke.Com |
| INCLUSIV, INC.<br>**Plaintiff** | Jay Christopher Johnson<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>VENABLE LLP<br>600 Massachusetts Avenue, Nw<br>Washington, DC  20001<br>USA<br>(202) 344-4698 Fax: (202) 344-8300<br>Email:Jcjohnson@venable.Com |
| Citibank, N.A.<br>**Defendant** | Kenneth Winn Allen<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>KIRKLAND & ELLIS LLP<br>1301 Pennsylvania Avenue, N.W.<br>Washington, DC  20004<br>USA<br>(202) 389-5000 Fax: (202) 389-5200<br>Email:Winn.Allen@kirkland.Com<br><br>Saunders Lee McElroy<br>ATTORNEY TO BE NOTICED<br>KIRKLAND & ELLIS LLP<br>1301 Pennsylvania Ave, Nw<br>Washington, DC  20004 |

1:25cv698, Climate United Fund V. Citibank, N.A. Et Al

## Litigants | ## Attorneys

| Litigants | Attorneys |
|---|---|
| | USA<br>202-389-3081 Email:Saunders.Mcelroy@kirkland.Com |
| United States Environmental Protection Agency<br>**Defendant** | Kevin Paul VanLandingham<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>U.S. DEPARTMENT OF JUSTICE<br>P.O. Box 875, Ben Franklin Station<br>Washington, DC  20044-0875<br>USA<br>(202) 307-1134 Email:Kevin.P.Vanlandingham@usdoj.Gov |
| | Marcus S Sacks<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Poc Agostinho, Jean 1100 L St., N.W. 8142<br>Washington, DC  20530<br>USA<br>202-307-1104 Email:Marcus.S.Sacks@usdoj.Gov |
| Lee Zeldin<br>in his official capacity as ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY \|<br>**Defendant** | Kevin Paul VanLandingham<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>U.S. DEPARTMENT OF JUSTICE<br>P.O. Box 875, Ben Franklin Station<br>Washington, DC  20044-0875<br>USA<br>(202) 307-1134 Email:Kevin.P.Vanlandingham@usdoj.Gov |
| | Marcus S Sacks<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Poc Agostinho, Jean 1100 L St., N.W. 8142<br>Washington, DC  20530<br>USA<br>202-307-1104 Email:Marcus.S.Sacks@usdoj.Gov |
| Tarek Farag<br>[Terminated: 04/15/2025]<br>**Movant** | TAREK FARAG<br>PRO SE |
| | 411 N. Warwick Ave<br>Westmont, IL  60559<br>USA<br>(630)709-3965 |

## Proceedings

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| 1 | 03/08/2025 | COMPLAINT  against CITIBANK, N.A., UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN  ( Filing fee $ 405 receipt number ADCDC-11528517) filed by CLIMATE UNITED FUND. (Attachments: # 1 Civil Cover Sheet, # 2 Summons - CITIBANK, N.A., # 3 Summons - UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, # 4 Summons - LEE ZELDIN, # 5 Summons - ATTORNEY GENERAL PAMELA BONDI, # 6 Summons - US ATTORNEY GENERAL EDWARD R. MARTIN, JR.)(Unikowsky, Adam) (Entered: 03/08/2025) | |
| 2 | 03/10/2025 | MOTION for Temporary Restraining Order  by CLIMATE UNITED FUND. (Attachments: # 1 Memorandum in Support, # 2 Declaration of Elizabeth Bafford in Support, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8, # 11 Exhibit 9, # 12 Proposed | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Order)(Unikowsky, Adam) Modified docket text on 3/10/2025 (mg). (Entered: 03/10/2025) | |
| 3 | 03/10/2025 | ENTERED IN ERROR.....LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests  by CLIMATE UNITED FUND (Unikowsky, Adam) Modified on 3/10/2025 (zsl). (Entered: 03/10/2025) | |
| | 03/10/2025 | Case Assigned to Judge Tanya S. Chutkan. (zsl) (Entered: 03/10/2025) | |
| 4 | 03/10/2025 | SUMMONS (5) Issued Electronically as to All Defendants, U.S. Attorney and U.S. Attorney General (Attachment: # 1 Notice and Consent)(zsl) (Entered: 03/10/2025) | |
| | 03/10/2025 | NOTICE OF NEW CASE ERROR regarding 3 LCvR 26.1 Certificate of Disclosure - Corporate Affiliations/Financial Interests. The following error(s) need correction: Blank/Incomplete/Missing form. Form filed as fillable PDF. Please file form in a non-fillable PDF format. (zsl) (Entered: 03/10/2025) | |
| 5 | 03/10/2025 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests  by CLIMATE UNITED FUND (Unikowsky, Adam) (Entered: 03/10/2025) | |
| | 03/10/2025 | MINUTE ORDER: The parties are hereby ORDERED to appear for an in-person hearing on the 2 Motion for Temporary Restraining Order on March 12, 2025, at 4:00 PM in Courtroom 9 before Judge Tanya S. Chutkan. Upon consideration of the parties' proposed briefing schedule, it is further ORDERED that Defendants' Reply is due on March 12, 2025, at 12:00 PM. Plaintiff shall notify counsel for Defendants of the contents of this Minute Order. Signed by Judge Tanya S. Chutkan on 3/10/2025. (zcll) (Entered: 03/10/2025) | |
| | 03/10/2025 | MINUTE ORDER: The court will provide access for the public to telephonically attend the hearing scheduled for March 12, 2025, at 4:00 PM. The hearing can be accessed by dialing the Toll-Free Number: 833-990-9400 (Meeting ID: 493633106). It is hereby ORDERED that the attendees using the public access telephone line shall adhere to the following: persons remotely accessing court proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting any court proceedings (including those held by telephone or videoconference). Violation of these prohibitions may result in sanctions, including removal of court-issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the presiding Judge. Signed by Judge Tanya S. Chutkan on 3/10/2025. (zcll) (Entered: 03/10/2025) | |
| 6 | 03/10/2025 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Gabriel K. Gillett,  Filing fee $ 100, receipt number ADCDC-11531560. Fee Status: Fee Paid. by CLIMATE UNITED FUND. (Attachments: # 1 Declaration in Support, # 2 Certificate of Good Standing, # 3 Proposed Order)(Unikowsky, Adam) (Entered: 03/10/2025) | |
| 7 | 03/10/2025 | NOTICE of Appearance by Kenneth Winn Allen on behalf of CITIBANK, N.A. (Allen, Kenneth) (Entered: 03/10/2025) | |
| 8 | 03/10/2025 | NOTICE of Appearance by Saunders Lee McElroy on behalf of CITIBANK, N.A. (McElroy, Saunders) (Entered: 03/10/2025) | |
| | 03/10/2025 | RESOLVED.....NOTICE of Provisional/Government Not Certified Status re 7 NOTICE of Appearance by Kenneth Winn Allen on behalf of CITIBANK, N.A. (Allen, Kenneth).Your attorney renewal/government certification has not been received. As a result, your membership with the U.S. District & Bankruptcy Courts for the District of Columbia is not in good standing, and you | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | are not permitted to file. Pursuant to Local Civil Rule 83.9, you must immediately correct your membership status by following the appropriate instructions on this page of our website: https://www.dcd.uscourts.gov/attorney-renewal. Please be advised that the presiding judge in this case has been notified that you are currently not in good standing to file in this court. Renewal Due by 3/17/2025. (zhcn) Modified on 3/12/2025 (zhcn). (Entered: 03/11/2025) | |
| 9 | 03/11/2025 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Allison N. Douglis,  Filing fee $ 100, receipt number ADCDC-11534156. Fee Status: Fee Paid. by CLIMATE UNITED FUND. (Attachments: # 1 Declaration in Support, # 2 Certificate of Good Standing, # 3 Proposed Order)(Unikowsky, Adam) (Entered: 03/11/2025) | |
| 10 | 03/11/2025 | NOTICE of Appearance by Marcus S Sacks on behalf of UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN (Sacks, Marcus) (Entered: 03/11/2025) | |
| 11 | 03/11/2025 | NOTICE of Appearance by Kevin Paul VanLandingham on behalf of UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN (VanLandingham, Kevin) (Entered: 03/11/2025) | |
| 12 | 03/11/2025 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests  by CITIBANK, N.A. (McElroy, Saunders) (Entered: 03/11/2025) | |
| 13 | 03/11/2025 | NOTICE OF GRANT TERMINATION by UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN (Attachments: # 1 Exhibit 1)(Sacks, Marcus) (Entered: 03/11/2025) | |
| | 03/11/2025 | MINUTE ORDER: GRANTING Motions for Leave to Appear Pro Hac Vice as to 6 Gabriel K. Gillett and 9 Allison N. Douglis. Gabriel K. Gillett and Allison N. Douglis are hereby admitted pro hac vice to represent Plaintiff Climate United Fund in this matter. Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions. Signed by Judge Tanya S. Chutkan on 3/11/2025. (lcer) (Entered: 03/11/2025) | |
| 14 | 03/12/2025 | Memorandum in opposition to re 2 Motion for TRO,  filed by CITIBANK, N.A.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Text of Proposed Order)(Allen, Kenneth) (Entered: 03/12/2025) | |
| 15 | 03/12/2025 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by CITIBANK, N.A. (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit 1, # 2 Text of Proposed Order)(Allen, Kenneth) (Entered: 03/12/2025) | |
| 16 | 03/12/2025 | Memorandum in opposition to re 2 Motion for TRO,  filed by UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN. (Attachments: # 1 Declaration Schindel, # 2 Exhibit Exs. to Schindel Decl.)(VanLandingham, Kevin) (Entered: 03/12/2025) | |
| 17 | 03/12/2025 | RESPONSE re 13 Notice (Other)  filed by CLIMATE UNITED FUND. (Unikowsky, Adam) (Entered: 03/12/2025) | |
| 18 | 03/12/2025 | NOTICE of Appearance by Allison N. Douglis on behalf of CLIMATE UNITED FUND (Douglis, Allison) (Entered: 03/12/2025) | |
| 19 | 03/12/2025 | NOTICE of Appearance by David B. Robbins on behalf of CLIMATE UNITED FUND (Robbins, David) (Entered: 03/12/2025) | |
| 20 | 03/12/2025 | NOTICE of Appearance by Gabriel K. Gillett on behalf of CLIMATE UNITED FUND (Gillett, Gabriel) (Entered: 03/12/2025) | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
|  | 03/12/2025 | MINUTE ORDER: Upon consideration of Defendant Citibank's 15 Motion for Leave to File Under Seal, the court GRANTS the motion for the reasons asserted. Signed by Judge Tanya S. Chutkan on 3/12/2025. (lcer) (Entered: 03/12/2025) |  |
| 21 | 03/12/2025 | SEALED Exhibit re 14 Memorandum in opposition filed by CITIBANK, N.A.. (This document is SEALED and only available to authorized persons.)(zjm) Modified on 3/18/2025 to add docket link (zjm). (Entered: 03/13/2025) |  |
|  | 03/12/2025 | Minute Entry for proceedings held before Judge Tanya S. Chutkan: Motion Hearing held on 3/12/2025 re 2 MOTION for Temporary Restraining Order filed by CLIMATE UNITED FUND held and concluded. Minute Order forthcoming. Court Reporter Janice Dickman. (ztl) (Entered: 03/13/2025) |  |
| 22 | 03/14/2025 | TRANSCRIPT OF PROCEEDINGS before Judge Tanya S. Chutkan held on March 12, 2025; Page Numbers: 1-44. Date of Issuance: March 14, 2025. Court Reporter: Janice Dickman, Telephone number: 202-354-3267, Transcripts may be ordered by submitting the Transcript Order FormFor the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.NOTICE RE REDACTION OF TRANSCRIPTS: The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. Redaction Request due 4/4/2025. Redacted Transcript Deadline set for 4/14/2025. Release of Transcript Restriction set for 6/12/2025.(Dickman, Janice) (Entered: 03/14/2025) |  |
|  | 03/14/2025 | MINUTE ORDER: Following the Motion Hearing held on 3/12/2025, it is hereby ORDERED that Plaintiff's request for Leave to Amend its Complaint is due by Monday, March 17, 2025, by 5:00PM EST. It is further ORDERED that by Monday, March 17, 2025, by 5:00PM EST, Federal Defendants shall file a declaration addressing the basis for the grant termination, see ECF No. 13 , including the proffer of evidence discussed at the hearing. Signed by Judge Tanya S. Chutkan on 3/14/2025. (lcer) (Entered: 03/14/2025) |  |
|  | 03/16/2025 | MINUTE ORDER: The parties in No. 25-cv-698, No. 25-cv-735, and No. 25-cv-762, are hereby ORDERED to appear for an in-person motion hearing on the 2 Motion for Temporary Restraining Order on March 17, 2025, at 12:00 PM in Courtroom 9 before Judge Tanya S. Chutkan. The court will provide access for the public to telephonically attend the hearing. The hearing can be accessed by dialing the Toll-Free Number: 833-990-9400 (Meeting ID: 493633106). It is hereby ORDERED that the attendees using the public access telephone line shall adhere to the restrictions outlined in the March 10, 2025, Minute Order. Signed by Judge Tanya S. Chutkan on 3/16/2025. (lcer) (Entered: 03/16/2025) |  |
| 23 | 03/17/2025 | NOTICE of Proposed Order re 2 by CLIMATE UNITED FUND (Attachments: # 1 Proposed Order Granting Temporary Restraining Order)(Unikowsky, Adam) Modified on 3/19/2025 to add docket link (zjm). (Entered: 03/17/2025) |  |
| 24 | 03/17/2025 | AMENDED COMPLAINT against CITIBANK, N.A., UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, LEE |  |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | ZELDIN filed by CLIMATE UNITED FUND.(Unikowsky, Adam) (Entered: 03/17/2025) | |
| 25 | 03/17/2025 | NOTICE of Declaration by UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN (Attachments: # 1 Declaration of Eric Amidon)(VanLandingham, Kevin) (Entered: 03/17/2025) | |
| 26 | 03/17/2025 | NOTICE to the Court by CLIMATE UNITED FUND (Unikowsky, Adam) (Entered: 03/17/2025) | |
| | 03/17/2025 | Minute Entry for proceedings held before Judge Tanya S. Chutkan: Motion Hearing held on 3/17/2025 re 2 MOTION for Temporary Restraining Order  filed by CLIMATE UNITED FUND. Pursuant to Federal Rule of Civil Procedure 42(a), the Court will consolidate the Civil Cases 25-698, 25-735, 25-762. Minute Order Forthcoming. Court Reporter Jeff Hook. (ztl) (Entered: 03/18/2025) | |
| 27 | 03/18/2025 | TRANSCRIPT OF MOTION HEARING before Judge Tanya S. Chutkan held on March 17, 2025. Page Numbers: 1 - 45. Date of Issuance: March 18, 2025. Court Reporter: Jeff Hook. Telephone number: 202-354-3373. Transcripts may be ordered by submitting the Transcript Order FormFor the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.NOTICE RE REDACTION OF TRANSCRIPTS: The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. Redaction Request due 4/8/2025. Redacted Transcript Deadline set for 4/18/2025. Release of Transcript Restriction set for 6/16/2025.(Hook, Jeff) (Entered: 03/18/2025) | |
| 28 | 03/18/2025 | MEMORANDUM OPINION re: Plaintiff's 2 Motion for Temporary Restraining Order. Signed by Judge Tanya S. Chutkan on 3/18/2025. (lcer) (Main Document 28 replaced on 3/19/2025) (zsmc). (Entered: 03/18/2025) | |
| 29 | 03/18/2025 | ORDER GRANTING in part and DENYING in part Plaintiff's 2 Motion for Temporary Restraining Order. See Order for details. Signed by Judge Tanya S. Chutkan on 3/18/2025. (lcer) (Entered: 03/18/2025) | |
| 30 | 03/19/2025 | Joint STATUS REPORT  by CLIMATE UNITED FUND. (Unikowsky, Adam) (Entered: 03/19/2025) | |
| | 03/19/2025 | MINUTE ORDER: Upon consideration of the parties' 30 Joint Status Report, the court adopts and sets the following deadlines: Plaintiffs shall file their motions for a preliminary injunction by March 21, 2025. Defendants shall file an answer to the motions by March 26, 2025. Plaintiffs shall reply by March 28, 2025. For the reasons stated in the 30 Joint Status Report, Plaintiffs shall file a single consolidated opening brief with a 60-page limit and a single consolidated reply brief with a 30-page limit. The court will hold a hearing on Plaintiffs' motions on Wednesday, April 2, 2025, at 12:00 PM in Courtroom 9 before Judge Tanya S. Chutkan. The court will provide access for the public to telephonically attend the hearing. Signed by Judge Tanya S. Chutkan on 3/19/2025. (lcer) (Entered: 03/19/2025) | |
| | 03/20/2025 | MINUTE ORDER: The court will provide access for the public to | |

1:25cv698, Climate United Fund V. Citibank, N.A. Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | telephonically attend the hearing scheduled for April 2, 2025. The hearing can be accessed by dialing the Toll-Free Number: 833-990-9400 (Meeting ID: 493633106). It is hereby ORDERED that the attendees using the public access telephone line shall adhere to the following: persons remotely accessing court proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting any court proceedings (including those held by telephone or videoconference). Violation of these prohibitions may result in sanctions, including removal of court-issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the presiding Judge. Signed by Judge Tanya S. Chutkan on 3/20/2025. (smc) (Entered: 03/20/2025) | |
| | 03/20/2025 | MINUTE ORDER: As noticed in the March 17 hearing, see March 17, 2025 Min. Order, the court will consolidate cases 25-cv-698, 25-cv-735, and 25-cv-762 pursuant to Federal Rule of Civil Procedure 42(a). All filings and papers related to the consolidated cases shall be filed in the lead case: 25-cv-698. It is further ORDERED that the parties shall NOT "spread the text" when filing documents in the lead cases. Signed by Judge Tanya S. Chutkan on 3/20/2025. (lcer) Modified on 3/21/2025 (zsmc). (Entered: 03/20/2025) | |
| 31 | 03/20/2025 | STATUS REPORT  by CITIBANK, N.A.. (Allen, Kenneth) (Entered: 03/20/2025) | |
| | 03/20/2025 | Cases Consolidated: The following cases have been consolidated with this case: 25-cv-00762-TSC and 25-cv-00735-TSC pursuant to 03/10/20025 Minute Order. From this date forward, all pleadings shall be filed ONLY in this case. Parties are advised NOT to elect the SPREAD TEXT option when filing in ECF, as this will result in repetitive docketing. (zjm) (Entered: 03/20/2025) | |
| 32 | 03/21/2025 | NOTICE of Appearance by James Gross on behalf of POWER FORWARD COMMUNITIES, INC. (Gross, James) (Entered: 03/21/2025) | |
| 33 | 03/21/2025 | MOTION for Preliminary Injunction  by CLIMATE UNITED FUND. (Attachments: # 1 Memorandum in Support, # 2 Declaration of Elizabeth Bafford, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8, # 11 Exhibit 9, # 12 Exhibit 10, # 13 Exhibit 11, # 14 Declaration of Vincent Levy, # 15 Exhibit A, # 16 Exhibit B, # 17 Exhibit C, # 18 Exhibit D, # 19 Exhibit E, # 20 Exhibit F, # 21 Exhibit G, # 22 Exhibit H, # 23 Exhibit I, # 24 Exhibit J, # 25 Declaration of Stephen Brown, # 26 Declaration of Jessica Buendia, # 27 Declaration of Eli Hopson, # 28 Declaration of Richard Kauffman, # 29 Declaration of Shaun Donovan, # 30 Declaration of Ari Matusiak, # 31 Declaration of Timothy J. Mayopoulos, # 32 Declaration of John Moon, # 33 Text of Proposed Order)(Unikowsky, Adam) (Entered: 03/21/2025) | |
| 34 | 03/24/2025 | NOTICE of Appearance by Kevin Chen on behalf of POWER FORWARD COMMUNITIES, INC. (Chen, Kevin) (Entered: 03/24/2025) | |
| 35 | 03/24/2025 | NOTICE of Appearance by Beth C. Neitzel on behalf of POWER FORWARD COMMUNITIES, INC. (Neitzel, Beth) (Entered: 03/24/2025) | |
| 36 | 03/24/2025 | NOTICE of Appearance by Jack C. Smith on behalf of POWER FORWARD COMMUNITIES, INC. (Smith, Jack) (Entered: 03/24/2025) | |
| 37 | 03/24/2025 | NOTICE of Appearance by Vincent Levy on behalf of COALITION FOR GREEN CAPITAL (Levy, Vincent) (Entered: 03/24/2025) | |
| 38 | 03/25/2025 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Noah | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | C. Shaw,  Filing fee $ 100, receipt number ADCDC-11565216. Fee Status: Fee Paid. by POWER FORWARD COMMUNITIES, INC.. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Neitzel, Beth) (Entered: 03/25/2025) | |
| | 03/25/2025 | Cases Consolidated: The following cases have been consolidated with this case: 25-cv-00820-TSC. From this date forward, all pleadings shall be filed ONLY in this case. Parties are advised NOT to elect the SPREAD TEXT option when filing in ECF, as this will result in repetitive docketing. (zjm) (Entered: 03/25/2025) | |
| | 03/26/2025 | NOTICE OF ERROR regarding 38 MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Noah C. Shaw,  Filing fee $ 100, receipt number ADCDC-11565216. Fee Status: Fee Paid.. The following error(s) need correction: Pro Hac Vice motion must be accompanied by a Certificate of Good Standing issued within the last 30 days (LCvR 83.2(c)(2)). Please file certificate as an Errata (zjm) (Entered: 03/26/2025) | |
| 39 | 03/26/2025 | Errata Certificate of Good Standing by POWER FORWARD COMMUNITIES, INC. re 38 Motion for Leave to Appear Pro Hac Vice,. (Attachments: # 1 Errata Certificate of Good Standing)(Neitzel, Beth) (Entered: 03/26/2025) | |
| 40 | 03/26/2025 | NOTICE of Appearance by Jason Elliott James on behalf of ILLINOIS FINANCE AUTHORITY (James, Jason) (Entered: 03/26/2025) | |
| 41 | 03/26/2025 | NOTICE of Appearance by Emma Akrawi on behalf of EFFICIENCY MAINE TRUST (Akrawi, Emma) (Entered: 03/26/2025) | |
| 42 | 03/26/2025 | NOTICE of Appearance by Scott William Boak on behalf of EFFICIENCY MAINE TRUST (Boak, Scott) (Entered: 03/26/2025) | |
| 43 | 03/26/2025 | NOTICE of Appearance by Catherine Rios-Keating on behalf of MINNESOTA CLIMATE INNOVATION FINANCE AUTHORITY (Rios-Keating, Catherine) (Entered: 03/26/2025) | |
| 44 | 03/26/2025 | NOTICE of Appearance by Meghan Strong on behalf of CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK Associated Cases: 1:25-cv-00698-TSC, 1:25-cv-00820-TSC(Strong, Meghan) (Entered: 03/26/2025) | |
| 45 | 03/26/2025 | NOTICE of Appearance by Oliver Larson on behalf of MINNESOTA CLIMATE INNOVATION FINANCE AUTHORITY (Larson, Oliver) (Entered: 03/26/2025) | |
| 46 | 03/26/2025 | AFFIDAVIT of Mailing re 1 COMPLAINT by MINNESOTA CLIMATE INNOVATION FINANCE AUTHORITY RE SUMMONS AND COMPLAINT. (Attachments: # 1 Certificate of Service)(Rios-Keating, Catherine) Modified on 3/27/2025 to correct event/add docket link (zjm) (Entered: 03/26/2025) | |
| 47 | 03/26/2025 | NOTICE of Appearance by Megan Anne Schultz Richards on behalf of CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK (Richards, Megan) (Entered: 03/26/2025) | |
| 48 | 03/26/2025 | RESPONSE re 33 MOTION for Preliminary Injunction   filed by CITIBANK, N.A.. (Attachments: # 1 Text of Proposed Order)(Allen, Kenneth) (Entered: 03/26/2025) | |
| 49 | 03/26/2025 | Memorandum in opposition to re 33 Motion for Preliminary Injunction,,, filed by UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN. (Attachments: # 1 Declaration Declaration of Dan Coogan, # 2 Exhibit Exhibits to Coogan Declaration, # 3 Declaration Declaration of Eric Amidon, # 4 Exhibit Exhibits to Amidon Declaration, # 5 Declaration Declaration of Gregg Treml, # 6 Declaration Declaration of Kevin Bailey, # 7 Exhibit Exhibits to Bailey Declaration)(Sacks, Marcus) (Entered: 03/26/2025) | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 50 | 03/27/2025 | NOTICE of Appearance by Peter Nathaniel Surdo on behalf of MINNESOTA CLIMATE INNOVATION FINANCE AUTHORITY (Surdo, Peter) (Entered: 03/27/2025) | |
| 51 | 03/27/2025 | NOTICE of Appearance by Kevin D. Benish on behalf of COALITION FOR GREEN CAPITAL (Benish, Kevin) (Entered: 03/27/2025) | |
| 52 | 03/28/2025 | MOTION for Temporary Restraining Order  -- Extending Existing Temporary Restraining Order, by COALITION FOR GREEN CAPITAL. (Attachments: # 1 Text of Proposed Order)(Levy, Vincent) (Entered: 03/28/2025) | |
| 53 | 03/28/2025 | REPLY to opposition to motion re 33 Motion for Preliminary Injunction,,, in Support filed by CLIMATE UNITED FUND. (Unikowsky, Adam) (Entered: 03/28/2025) | |
| | 03/30/2025 | MINUTE ORDER: GRANTING Motion for Leave to Appear Pro Hac Vice as to 38 Noah C. Shaw. Noah C. Shaw is hereby admitted pro hac vice to represent Plaintiff Power Forward Communities, Inc. in this matter. Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a) Click for instructions. Signed by Judge Tanya S. Chutkan on 3/30/2025. (Icer) (Entered: 03/30/2025) | |
| 54 | 03/31/2025 | Unopposed MOTION for Extension of Time to File Answer  by CITIBANK, N.A.. (Allen, Kenneth) (Entered: 03/31/2025) | |
| 55 | 03/31/2025 | RESPONSE re 33 MOTION for Preliminary Injunction by CITIBANK, N.A.. (Attachments: # 1 Text of Proposed Order)(Allen, Kenneth) Modified on 4/2/2025 to correct event/docket text (zjm). (Entered: 03/31/2025) | |
| 56 | 03/31/2025 | Memorandum in opposition to re 33 Motion for Preliminary Injunction,,, (Opposition to Subgrantee Plaintiffs' Motion for Preliminary Injunction) filed by UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN. (VanLandingham, Kevin) (Entered: 03/31/2025) | |
| 57 | 03/31/2025 | ORDER granting Plaintiffs' 52 Motion to Extend Temporary Restraining Order. Signed by Judge Tanya S. Chutkan on 3/31/2025. (Icer) (Entered: 03/31/2025) | |
| 58 | 04/01/2025 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name-Simon A. de Carvalho,  Filing fee $ 100, receipt number ADCDC-11581763. Fee Status: Fee Paid. by CLIMATE UNITED FUND. (Attachments: # 1 Declaration, # 2 Certificate of Good Standing, # 3 Text of Proposed Order)(Unikowsky, Adam) (Entered: 04/01/2025) | |
| 59 | 04/01/2025 | NOTICE of Appearance by Noah C. Shaw on behalf of POWER FORWARD COMMUNITIES, INC. (Shaw, Noah) (Entered: 04/01/2025) | |
| | 04/02/2025 | MINUTE ORDER: GRANTING Motion for Leave to Appear Pro Hac Vice as to 58 Simon A. de Carvalho. Simon A. de Carvalho is hereby admitted pro hac vice to represent Plaintiff Climate United Fund in this matter. Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a) Click for instructions. Signed by Judge Tanya S. Chutkan on 4/2/2025. (Icer) (Entered: 04/02/2025) | |
| 60 | 04/02/2025 | NOTICE of Filing of Supplemental Record Evidence by COALITION FOR GREEN CAPITAL re 33 Motion for Preliminary Injunction,,, (Attachments: # 1 Exhibit A--Correspondence dated March 28, 2025, # 2 Exhibit B--Correspondence dated March 31, 2025, # 3 Exhibit C--Correspondence dated April 1, 2025)(Levy, Vincent) (Entered: 04/02/2025) | |
| 61 | 04/02/2025 | NOTICE of Appearance by Simon De Carvalho on behalf of CLIMATE UNITED FUND (De Carvalho, Simon) (Entered: 04/02/2025) | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | 04/02/2025 | MINUTE ORDER: GRANTING Defendants' 54 Joint Unopposed Motion to Extend Time. Defendants' responses to Plaintiffs' complaints are due by May 23, 2025. Signed by Judge Tanya S. Chutkan on 4/2/2025. (lcer) Modified on 4/2/2025 to edit language (zcll). (Entered: 04/02/2025) | |
| | 04/02/2025 | Minute Entry for proceedings held before Judge Tanya S. Chutkan: Motion Hearing held on 4/2/2025 re 33 MOTION for Preliminary Injunction filed by CLIMATE UNITED FUND. The Court takes the arguments under advisement. Ruling forthcoming. (Court Reporter Bryan Wayne.) (zcll) (Entered: 04/02/2025) | |
| 62 | 04/02/2025 | TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING before Judge Tanya S. Chutkan held on April 2, 2025; Page Numbers: 1-108. Date of Issuance: 4/2/2025. Court Reporter: Bryan A. Wayne. Transcripts may be ordered by submitting the Transcript Order FormFor the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.NOTICE RE REDACTION OF TRANSCRIPTS: The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. Redaction Request due 4/23/2025. Redacted Transcript Deadline set for 5/3/2025. Release of Transcript Restriction set for 7/1/2025.(Wayne, Bryan) (Entered: 04/02/2025) | |
| 63 | 04/04/2025 | NOTICE OF SUPPLEMENTAL AUTHORITY by UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN (Attachments: # 1 Exhibit Order, Dept. of Ed v. Cal. (Sup. Ct.))(VanLandingham, Kevin) (Entered: 04/04/2025) | |
| 64 | 04/05/2025 | RESPONSE re 63 NOTICE OF SUPPLEMENTAL AUTHORITY regarding Dept of Education v. California (U.S. Apr. 4, 2025) filed by COALITION FOR GREEN CAPITAL. (Levy, Vincent) (Entered: 04/05/2025) | |
| 65 | 04/07/2025 | RESPONSE re 64 Response to Document filed by CITIBANK, N.A.. (Allen, Kenneth) (Entered: 04/07/2025) | |
| | 04/07/2025 | MINUTE ORDER: Given EPA Defendants' 63 Notice of Supplemental Authority, Plaintiffs' 64 Response, and Defendant Citibank's 65 Response, as well as the recent developments discussed in the filings, it is hereby ORDERED that the parties shall confer and file a joint status report by 9:00PM EST tonight stating their positions on a brief extension of the temporary restraining order -- to April 15, 2025 -- for the court to consider the new filings. Signed by Tanya S. Chutkan on 4/7/2025. (lcer) (Entered: 04/07/2025) | |
| 66 | 04/07/2025 | RESPONSE re 63 NOTICE OF SUPPLEMENTAL AUTHORITY filed by CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK. (Strong, Meghan) (Entered: 04/07/2025) | |
| 67 | 04/07/2025 | Joint STATUS REPORT by COALITION FOR GREEN CAPITAL. (Levy, Vincent) (Entered: 04/07/2025) | |
| 68 | 04/08/2025 | NOTICE of Appearance by Tanner Lockhead on behalf of CLIMATE UNITED FUND (Lockhead, Tanner) (Entered: 04/08/2025) | |
| 69 | 04/08/2025 | NOTICE of Appearance by Kathryn L. Wynbrandt on behalf of CLIMATE UNITED FUND (Wynbrandt, Kathryn) (Entered: 04/08/2025) | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 70 | 04/08/2025 | ORDER extending 29 Temporary Restraining Order to April 15, 2025. See Order for details. Signed by Judge Tanya S. Chutkan on 4/8/2025. (lcer) (Entered: 04/08/2025) | |
| 71 | 04/09/2025 | REPLY re 63 NOTICE OF SUPPLEMENTAL AUTHORITY . (Reply to Plaintiffs' Responses to U.S. Notice of Supplemental Authority) filed by UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN. (Attachments: # 1 Exhibit A)(VanLandingham, Kevin) Modified on 4/11/2025 to correct docket link (zjm). (Entered: 04/09/2025) | |
| 72 | 04/09/2025 | MOTION to Intervene by TAREK FARAG. (zjm) (Main Document 72 replaced on 4/15/2025) (zjm). (Entered: 04/11/2025) | |
| 73 | 04/11/2025 | NOTICE of Appearance by Theodore A.B. McCombs on behalf of CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK (McCombs, Theodore) (Entered: 04/11/2025) | |
| 74 | 04/14/2025 | Memorandum in opposition to re 72 Motion to Intervene STATE GREEN BANK PLAINTIFFS' OPPOSITION TO TAREK FARAG'S MOTION TO INTERVENE filed by CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK, EFFICIENCY MAINE TRUST, ILLINOIS FINANCE AUTHORITY, MINNESOTA CLIMATE INNOVATION FINANCE AUTHORITY. (Richards, Megan) (Entered: 04/14/2025) | |
| 75 | 04/15/2025 | Emergency MOTION to Stay Pending Appeal (Contingent) by UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN. (Attachments: # 1 Text of Proposed Order, # 2 Declaration, # 3 Exhibit)(Sacks, Marcus) (Entered: 04/15/2025) | |
| | 04/15/2025 | MINUTE ORDER: Given Federal Defendant's 75 Contingent Emergency Motion for Stay Pending Appeal, Plaintiffs are hereby ORDERED to file a joint response or their respective responses to Defendant's Motion no later than today, April 15, 2025, at 7:00PM EST. FURTHER, the court is considering extending the 29 Temporary Restraining Order by one day, until April 16, 2025, to consider the 75 Contingent Emergency Motion. If any party objects to the one-day extension, the party shall submit a report (or a joint status report with any other objecting party, to the extent possible) stating its objection by today, April 15, 2025, at 6:00PM EST. (lcer) (Entered: 04/15/2025) | |
| | 04/15/2025 | Cases Consolidated. The following cases have been consolidated with this case: 25-cv-00938-TSC and 25-cv-00948-TSC. From this date forward, all pleadings shall be filed ONLY in this case. Parties are advised NOT to elect the SPREAD TEXT option when filing in ECF, as this will result in repetitive docketing. (zjm) (Entered: 04/15/2025) | |
| 76 | 04/15/2025 | STATUS REPORT by UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN. (Sacks, Marcus) (Entered: 04/15/2025) | |
| 77 | 04/15/2025 | RESPONSE re 75 Emergency MOTION to Stay Pending Appeal (Contingent) filed by CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK. (Strong, Meghan) (Entered: 04/15/2025) | |
| 78 | 04/15/2025 | Memorandum in opposition to re 75 Motion to Stay filed by JUSTICE CLIMATE FUND. (Attachments: # 1 Exhibit A)(Citron, Eric) (Entered: 04/15/2025) | |
| 79 | 04/15/2025 | RESPONSE re 75 Emergency MOTION to Stay Pending Appeal (Contingent) filed by COALITION FOR GREEN CAPITAL. (Attachments: # 1 Bafford Declaration, # 2 Exhibit A)(Levy, Vincent) (Entered: 04/15/2025) | |
| | 04/15/2025 | MINUTE ORDER: DENYING 72 Motion to Intervene as a Defendant. Movant has not made a showing that he satisfies the | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
|  |  | requirements to intervene as of right under Fed. R. Civ. P. 24(a) because he (1) is not given an unconditional right to intervene by any federal statute, and (2) does not claim an interest relating to any property of transaction that is the subject of the action and is not so situated that disposing of the action may as a practical matter impair or impede his ability to protect that interest. The Court will not exercise its discretion to grant permissive intervention under Rule 24(b)(1) because movant does not have a claim or defense that shares with the main action a common question of law or fact. The Clerk of the Court shall send a copy of this Minute Order to pro se Movant. Signed by Judge Tanya S. Chutkan on 4/15/2025. (lcer) (Entered: 04/15/2025) |  |
| 80 | 04/15/2025 | ORDER GRANTING Plaintiffs' 33 Motion for Preliminary Injunction and DENYING EPA Defendant's 75 Contingent Emergency Motion for Stay Pending Appeal. See Order for details. Memorandum Opinion forthcoming. Signed by Judge Tanya S. Chutkan on 4/15/2025. (lcer) (Entered: 04/15/2025) |  |
| 85 | 04/15/2025 | Amended MOTION to Intervene by TAREK FARAG. (znmw) (Entered: 04/16/2025) |  |
| 81 | 04/16/2025 | NOTICE OF APPEAL TO DC CIRCUIT COURT by UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN. Fee Status: No Fee Paid. Parties have been notified. (Sacks, Marcus) (Entered: 04/16/2025) |  |
| 82 | 04/16/2025 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 81 Notice of Appeal to DC Circuit Court. (znmw) (Entered: 04/16/2025) |  |
| 83 | 04/16/2025 | NOTICE of Appearance by Kathleen Foley on behalf of JUSTICE CLIMATE FUND (Foley, Kathleen) (Entered: 04/16/2025) |  |
|  | 04/16/2025 | USCA Case Number 25-5122 for 81 Notice of Appeal to DC Circuit Court filed by LEE ZELDIN, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY. (znmw) (Entered: 04/16/2025) |  |
| 84 | 04/16/2025 | NOTICE of Appearance by David Zimmer on behalf of JUSTICE CLIMATE FUND (Zimmer, David) (Entered: 04/16/2025) |  |
| 86 | 04/16/2025 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 80 Order on Motion for Preliminary Injunction,, Order on Motion to Stay,, Set/Reset Deadlines, by CITIBANK, N.A.. Filing fee $ 605, receipt number ADCDC-11621988. Fee Status: Fee Paid. Parties have been notified. (Allen, Kenneth) (Entered: 04/16/2025) |  |
| 87 | 04/16/2025 | STATUS REPORT EPA Defendants' Status Report by UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN. (Sacks, Marcus) (Entered: 04/16/2025) |  |
| 88 | 04/16/2025 | STATUS REPORT  by CITIBANK, N.A.. (Allen, Kenneth) (Entered: 04/16/2025) |  |
| 89 | 04/16/2025 | MEMORANDUM OPINION re: Plaintiff's 33 Motion for Preliminary Injunction. Signed by Judge Tanya S. Chutkan on 4/16/2025. (lcer) Modified on 4/17/2025 to change document type to opinion (zcll). (Entered: 04/16/2025) |  |
| 90 | 04/17/2025 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid re 86 Notice of Appeal to DC Circuit Court,. (znmw) (Entered: 04/17/2025) |  |
|  | 04/17/2025 | USCA Case Number 25-5123 for 86 Notice of Appeal to DC Circuit Court, filed by CITIBANK, N.A.. (zdp) (Entered: 04/17/2025) |  |
| 91 | 04/17/2025 | MOTION to Clarify re 80 Order on Motion for Preliminary |  |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Injunction,, Order on Motion to Stay,, Set/Reset Deadlines,, by POWER FORWARD COMMUNITIES, INC.. (Neitzel, Beth) (Entered: 04/17/2025) | |
| 92 | 04/17/2025 | DECLARATION of Timothy J. Mayopoulos by POWER FORWARD COMMUNITIES, INC. re 91 MOTION to Clarify re 80 Order on Motion for Preliminary Injunction,, Order on Motion to Stay,, Set/Reset Deadlines, . (Attachments: # 1 Exhibit A)(Neitzel, Beth) (Entered: 04/17/2025) | |
| 93 | 04/17/2025 | REQUEST FOR LEAVE TO FILE REVIEW. The attached document requires leave to file: TAREK FARAG - Notice of Appeal. Reason(s): Filer is not a party to the case. (znmw) (Entered: 04/18/2025) | |
| 94 | 04/18/2025 | RESPONSE re 91 MOTION to Clarify re 80 Order on Motion for Preliminary Injunction,, Order on Motion to Stay,, Set/Reset Deadlines,  filed by UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN. (Sacks, Marcus) (Entered: 04/18/2025) | |
| | 04/18/2025 | MINUTE ORDER: DENYING 85 Amended Motion to Intervene as a Defendant and 93 REQUEST FOR LEAVE TO FILE REVIEW. Movant seeks to intervene to "eliminat[e] his payments to enforce the Hoax that fossil fuel could cause harmful global warning" and "to stop the fraud." See Am. Mot. 85 at 14. Movant has not made a showing that he satisfies the requirements to intervene as of right under Fed. R. Civ. P. 24(a) because he (1) is not given an unconditional right to intervene by any federal statute, nor does he identify one, and (2) does not claim an interest relating to any property of transaction that is the subject of the action and is not so situated that disposing of the action may as a practical matter impair or impede his ability to protect that interest. The Court will not exercise its discretion to grant permissive intervention under Rule 24(b)(1) because movant does not have a claim or defense that shares with the main action a common question of law or fact. Permissive intervention is an inherently discretionary enterprise. EEOC v. Nat'l Children's Ctr., 146 F.3d 1042, 1046 (D.C. Cir. 1998). The Clerk shall accept no further submissions for filing in this case from Tarek Farag without further action or court order. The Clerk of the Court shall send a copy of this Minute Order to pro se Movant. Signed by Judge Tanya S. Chutkan on 4/18/2025. (lcer) (Entered: 04/18/2025) | |
| 95 | 04/18/2025 | REPLY to opposition to motion re 91 Motion to Clarify  filed by POWER FORWARD COMMUNITIES, INC.. (Neitzel, Beth) (Entered: 04/18/2025) | |
| 96 | 04/19/2025 | ORDER re: Plaintiffs' 91 Motion to Clarify. The court will construe Plaintiffs' 91 Motion to Clarify as a Motion to Alter Judgment under Federal Rule of Civil Procedure 59(e). The court GRANTS Plaintiffs' 91 Motion. See Order for details. Signed by Judge Tanya S. Chutkan on 4/19/2025. (lcer) (Entered: 04/19/2025) | |
| 97 | 04/21/2025 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. CITIBANK, N.A. served on 4/11/2025; UNITED STATES ENVIRONMENTAL PROTECTION AGENCY served on 4/14/2025, RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 4/15/2025. ( Answer due for ALL FEDERAL DEFENDANTS by 6/14/2025.), RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. CITIBANK, N.A. served on 4/11/2025; UNITED STATES ENVIRONMENTAL PROTECTION AGENCY served on 4/14/2025 (Attachments: # 1 Proof of Service)(Johnson, Jay) (Entered: 04/21/2025) | |

1:25cv698, Climate United Fund V. Citibank, N.A. Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 98 | 04/21/2025 | NOTICE of Appearance by Robert William Setrakian on behalf of CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK (Setrakian, Robert) (Entered: 04/21/2025) | |
| 99 | 04/22/2025 | Unopposed MOTION for Extension of Time to File Answer to Inclusiv, Inc.'s Complaint by CITIBANK, N.A.. (Allen, Kenneth) (Entered: 04/22/2025) | |
| | 04/23/2025 | MINUTE ORDER: GRANTING Defendant Citibank's 99 Unopposed Motion for Extension of Time to File Answer to Plaintiff Inclusiv, Inc.'s Complaint. Defendant Citibank's Response is due by June 16, 2025. Signed by Judge Tanya S. Chutkan on 4/23/2025. (Icer) (Entered: 04/23/2025) | |
| 100 | 04/24/2025 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. UNITED STATES ENVIRONMENTAL PROTECTION AGENCY served on 3/27/2025 (Neitzel, Beth) Modified on 4/28/2025 to correct docket text (zjm). (Entered: 04/24/2025) | |
| 101 | 04/24/2025 | ERRATA RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. UNITED STATES ENVIRONMENTAL PROTECTION AGENCY served on 3/27/2025 by POWER FORWARD COMMUNITIES, INC. re 100 Summons Returned Executed. (Neitzel, Beth) Modified on 4/28/2025 to correct docket text (zjm). (Entered: 04/24/2025) | |
| 102 | 04/24/2025 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. LEE ZELDIN served on 3/27/2025 (Neitzel, Beth) Modified on 4/28/2025 to correct docket text (zjm). (Entered: 04/24/2025) | |
| 103 | 04/24/2025 | AFFIDAVIT of Mailing on United States Attorney General. (Neitzel, Beth) Modified on 4/28/2025 to correct event (zjm). (Entered: 04/24/2025) | |
| 104 | 04/24/2025 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 3/28/2025. Answer due for ALL FEDERAL DEFENDANTS by 5/27/2025. (Neitzel, Beth) (Entered: 04/24/2025) | |
| 105 | 04/25/2025 | WAIVER OF SERVICE. CITIBANK, N.A. waiver sent on 4/25/2025, answer due 6/24/2025. (Citron, Eric) (Entered: 04/25/2025) | |
| 106 | 04/28/2025 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. UNITED STATES ENVIRONMENTAL PROTECTION AGENCY served on 4/11/2025; LEE ZELDIN served on 4/14/2025, RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 4/14/25., RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 4/9/2025. ( Answer due for ALL FEDERAL DEFENDANTS by 6/8/2025.) (Attachments: # 1 Proofs of Service)(Citron, Eric) (Entered: 04/28/2025) | |
| 107 | 04/29/2025 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 3/10/2025. ( Answer due for ALL FEDERAL DEFENDANTS by 5/9/2025.), RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. LEE ZELDIN served on 3/13/2025 (Attachments: # 1 Affidavit of Service)(Unikowsky, Adam) (Entered: 04/29/2025) | |
| 108 | 04/29/2025 | WAIVER OF SERVICE . CITIBANK, N.A. waiver sent on 3/10/2025, answer due 5/9/2025. (Unikowsky, Adam) Modified on 4/29/2025 to add date waiver served (zjm). (Entered: 04/29/2025) | |
| 109 | 04/30/2025 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. LEE ZELDIN served on 4/14/2025, RETURN OF | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
|   |      | SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 04/14/2025. (Attachments: # 1 Proof of Service)(Johnson, Jay) (Entered: 04/30/2025) |  |
| 110 | 04/30/2025 | NOTICE of Appearance by Jay Christopher Johnson on behalf of INCLUSIV, INC. (Johnson, Jay) (Entered: 04/30/2025) |  |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.

*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

**End of Document**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CLIMATE UNITED FUND**<br>7550 Wisconsin Avenue 8th Floor<br>Bethesda, Maryland 20814<br><br>                    Plaintiff,<br><br>    v.<br><br>**CITIBANK, N.A.,**<br>5800 South Corporate Place<br>Sioux Falls, South Dakota 57108,<br><br>        **and**<br><br>**UNITED STATES ENVIRONMENTAL<br>PROTECTION AGENCY**<br>1200 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20460,<br><br>        **and**<br><br>**LEE ZELDIN, in his official capacity as<br>ADMINISTRATOR, UNITED STATES<br>ENVIRONMENTAL PROTECTION<br>AGENCY**<br>1200 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20460<br><br>                    Defendants. | **ECF CASE**<br><br>No. 1:25-cv-00698 |

## MEMORANDUM OF LAW IN SUPPORT OF CLIMATE UNITED FUND'S MOTION FOR TEMPORARY RESTRAINING ORDER

Gabriel K. Gillett (*pro hac vice* forthcoming)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
Tel.: (312) 222-9350

Adam G. Unikowsky (989053)
JENNER & BLOCK LLP
1099 New York Avenue, Suite 900
Washington, DC 20001
Tel.: (202) 639-6000
Fax: (202) 639-6066
aunikowsky@jenner.com

Kathryn L. Wynbrandt* (1602446)
David B. Robbins (493976)
Tanner J. Lockhead* (90011928)
JENNER & BLOCK LLP
1099 New York Avenue, Suite 900
Washington, DC 20001
Tel.: (202) 639-6000

*Application for admission pending.

Allison N. Douglis (*pro hac vice*
forthcoming)
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
Tel.: (212) 891-1600
Fax: (212) 891-1699
adouglis@jenner.com

*Attorneys for Plaintiff Climate United Fund*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... iii

INTRODUCTION ............................................................................................... 1

STATEMENT OF FACTS ................................................................................... 4

    A.    The NCIF Was Established to Allocate Inflation Reduction Act Funding to Create National Clean Financing Institutions. .................................... 4

    B.    EPA Selected Climate United as the Largest Recipient of GGRF Funding. ......................................................................................................... 7

    C.    Climate United and EPA Entered Into a Grant Agreement Governing the Award, Including Terms and Conditions Regarding Suspension and Termination. ................................................................................................. 9

    D.    The Account Control Agreement Between Climate United, EPA, and Citibank. ....................................................................................................... 11

    E.    Climate United Has and Will Invest Its Awarded Funds to Further the Goals of the Inflation Reduction Act. ......................................................... 14

    F.    Following Statements and Actions by Administration Officials, Citibank Refused to Disburse Funds. ......................................................................... 16

        1.    EPA, DOJ, and OIG Actions .................................................... 16

        2.    Citibank's Failure to Disburse Funds ...................................... 18

    G.    Climate United Has Brought This Action to Vindicate Its Rights ......... 20

LEGAL STANDARD ........................................................................................ 21

ARGUMENT ..................................................................................................... 21

I.    The Court Should Issue a Temporary Restraining Order Barring Citibank from Failing to Disburse Climate United's Grant Funds Pursuant to the Contract. ................... 21

    A.    Climate United Is Likely to Succeed on the Merits of Its Claims Against Citibank. ....................................................................................................... 21

    B.    Climate United Will Suffer Irreparable Harm Absent Injunctive Relief Against Citibank. ......................................................................................... 23

    C.    The Balance of Equities Favors Climate United Over Citibank. ............ 27

    D.    Enjoining Citibank Is Firmly in the Public Interest. .............................. 27

II.    The Court Should Issue a Temporary Restraining Order Barring EPA from Impeding Citibank from Receiving Grant Funds Without Lawful Justification. ..............28

    A.    Climate United Is Likely to Succeed on The Merits of Its APA and Due Process Claims. ...................................................................................................28

    B.    Climate United Will Suffer Irreparable Harm Absent Injunctive Relief Against EPA.........................................................................................................32

    C.    The Balance of Equities Favors Climate United Over EPA .................................32

    D.    An Injunction Is Firmly in the Public Interest. ......................................................34

CONCLUSION.......................................................................................................................35

# TABLE OF AUTHORITIES[*]

CASES

*AIDS Vaccine Advocacy Coalition v. United States Department of State*, No. 25-cv-400, --- F. Supp. 3d ---, 2025 WL 485324 (D.D.C. Feb. 13, 2025)..............................27, 34

*Art-Metal-USA, Inc. v. Solomon*, 473 F. Supp. 1 (D.D.C. 1978)....................................33

*Atlas Air, Inc. v. International Brotherhood of Teamsters*, 280 F. Supp. 3d 59 (D.D.C. 2017) .......................................................................................26

*Bayer HealthCare, LLC v. United States Food & Drug Administration*, 942 F. Supp. 2d 17 (D.D.C. 2013) .................................................................21

*Chef Time 1520 LLC v. Small Business Administration*, 646 F. Supp. 3d 101 (D.D.C. 2022) ..........................................................................21

*Coastal Counties Workforce, Inc. v. LePage*, 284 F. Supp. 3d 32 (D. Me. 2018)........................27

*Deem v. Baron*, No. 15-cv-00755, 2018 WL 377286 (D. Utah Jan. 11, 2018) ...........................25

*Department of Commerce v. New York*, 588 U.S. 752 (2019).......................................29

*Destiny USA Holdings, LLC v. Citigroup Global Markets Realty Corp.*, 69 A.D.3d 212 (N.Y. App. Div., 4th Dep't 2009) ................................................25

*General Land Office v. Biden*, 722 F. Supp. 3d 710 (S.D. Tex. 2024)...............................34

*Kansas City v. Department of Housing & Urban Development*, 923 F.2d 188 (D.C. Cir. 1991) ........................................................................29

*\*League of Women Voters of United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ...................................................21, 25, 27, 28, 32, 33, 34

*Luokung Technology Corp. v. Department of Defense*, 538 F. Supp. 3d 174 (D.D.C. 2021) ........................................................................26

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Wertz*, 298 F. Supp. 2d 27 (D.D.C. 2002) ........................................................................28

*\*Motor Vehicle Manufacturers Ass'n of United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983)........................................29

*National Ass'n of Mortgage Brokers v. Board of Governors of Federal Reserve System*, 773 F. Supp. 2d 151 (D.D.C. 2011)..............................................23

[*] Authorities chiefly relied upon are marked with an asterisk.

*National Council of Nonprofits v. Office of Management & Budget*, No. 25-cv-239, --- F. Supp. 3d ---, 2025 WL 368852 (D.D.C. Feb. 3, 2025)......................................23, 27, 34

*National Council of Nonprofits v. Office of Management & Budget*, No. 25-cv-239, --- F. Supp. 3d ---, 2025 WL 597959 (D.D.C. Feb. 25, 2025)...................................23

*National Environmental Development Ass'n's Clean Air Project v. EPA*, 752 F.3d 999 (D.C. Cir. 2014) ........................................................................................30

*New York v. Trump*, No. 25-cv-00039, slip op. (D.R.I. Mar. 6, 2025), ECF No. 161 ........................................................................................................26, 27

*Northern Mariana Islands v. United States*, 686 F. Supp 2d 7 (D.D.C. 2009)..............................34

*Open Communities Alliance v. Carson*, 286 F. Supp. 3d 148 (D.D.C. 2017) ........................27, 33

*Pacito v. Trump*, No. 25-cv-255, --- F. Supp. 3d ---, 2025 WL 655075 (W.D. Wash. Feb. 28, 2025), *appeal docketed*, No. 25-1313 (9th Cir. Mar. 3, 2025) ..................................33

*Patriot, Inc. v. HUD*, 963 F. Supp. 1 (D.D.C. 1997) ......................................................34

*Train v. City of New York*, 420 U.S. 35 (1975)............................................................31

*United States v. E-Gold, Ltd.*, 521 F.3d 411 (D.C. Cir. 2008), *abrogated on other grounds by Kaley v. United States*, 571 U.S. 320 (2014) ......................................................32

*United States Lines, Inc. v. Federal Maritime Commission*, 584 F.2d 519 (D.C. Cir. 1978) ........................................................................................................30

*Verizon v. F.C.C.*, 740 F.3d 623 (D.C. Cir. 2014) .......................................................29

*Wagner v. Taylor*, 836 F.2d 566 (D.C. Cir. 1987) .......................................................23

STATUTES

2 U.S.C. § 683 .............................................................................................31

*5 U.S.C. § 706(2)(A)..................................................................................20, 29

42 U.S.C. § 7434.........................................................................................4, 31

42 U.S.C. § 7434(a) .........................................................................................1

42 U.S.C. § 7434(a)(1).......................................................................................7

*42 U.S.C. § 7434(a)(2)................................................................................5, 7, 33

42 U.S.C. § 7434(a)(3)..................................................................................5, 33

42 U.S.C. § 7434(b) ...............................................................................................5

42 U.S.C. § 7434(b)(1)(B) ...................................................................................24

42 U.S.C. § 7434(c)(1) .........................................................................................5

42 U.S.C. § 7434(c)(3) .........................................................................................5

Inflation Reduction Act 2022, Pub. L. No. 117-169, 136 Stat. 1818 ..................4

**OTHER AUTHORITIES**

2 C.F.R. § 200.113 ........................................................................................10, 31

2 C.F.R. § 200.208 .............................................................................................31

2 C.F.R. § 200.305(b)(6) ...............................................................................11, 31

*2 C.F.R. § 200.339 .......................................................................................11, 31

2 C.F.R. § 200.340(a)(1) ....................................................................................30

2 C.F.R. § 200.340(a)(4) ....................................................................................30

2 C.F.R. § 200.340(b) .........................................................................................30

*2 C.F.R. § 200.341 ...............................................................................10, 11, 29

85 Fed. Reg. 61,571 (Sept. 30, 2020) ................................................................11

*About the Greenhouse Gas Reduction Fund*, EPA, https://www.epa.gov/green
    house-gas-reduction-fund/about-greenhouse-gas-reduction-fund (last updated
    Feb. 13, 2025) ...............................................................................................4

Kyle Cheney, et al., *Senior Prosecutor in Washington Quits, Citing Pressure to
    Probe Biden-era Climate Funds*, Politico (Feb. 18, 2025), https://www.politico.
    com/news/2025/02/18/denise-cheung-us-attorneys-office-washington-020363 ...................18

Zack Colman, *Recipient Isn't Giving in as Trump's EPA Tries to Revoke Climate
    Grants*, Politico (Feb. 24, 2025), https://www.politico.com/news/2025/
    02/24/climate-grant-recipient-spending-trumps-epa-tries-claw-back-00205814 ...................17

Cong. Rsch. Serv., IN12090, *EPA's Greenhouse Gas Reduction Fund* (updated
    Feb. 14, 2023), https://crsreports.congress.gov/product/pdf/IN/IN12090 ..............................4

EPA, *General Terms and Conditions* (effective Oct. 1, 2024), https://www.epa.
    gov/system/files/documents/2024-10/fy_2025_epa_general_terms_and_
    conditions_effective_october_1_2024_or_later.pdf ..............................................................10

*Frequently Asked Questions about the National Clean Investment Fund (NCIF) and Climate United's Strategy*, Climate United (Aug. 16, 2024), https://wearecli mateunited.org/frequently-asked-questions-ncif-and-climate-united-strategy ........................7

*FAQ: What is Climate United?*, Climate United, https://weareclimateunited.org/faq (last visited Mar. 5, 2025) .....................................................................................................7

*Frequent Questions About the Fund*, EPA, https://www.epa.gov/greenhouse-gas-reduction-fund/frequent-questions-about-fund (last updated Oct. 17, 2024) ..........................6

*Green Banks*, EPA, https://www.epa.gov/statelocalenergy/green-banks (last updated Jan. 24, 2025) ...............................................................................................................4

Spencer Hsu, Maxine Joselow & Nicolas Rivero, *FBI takes up EPA Probe Amid Pushback from Judge, Prosecutors*, Wash. Post (Feb. 27, 2025), https://www. washingtonpost.com/dc-md-va/2025/02/27/trump-fbi-epa-grant-investigation/ ....................18

Press Release, EPA, *Biden-Harris Administration Announces $20 Billion in Grants to Mobilize Private Capital and Deliver Clean Energy and Climate Solutions to Communities Across America* (Apr. 4, 2024), https://www.epa.gov/ newsreleases/biden-harris-administration-announces-20-billion-grants-mobiliz e-private-capital-and .................................................................................................................8

Press Release, EPA, *EPA Formally Refers Financial Mismanagement of $20B "Gold Bars" to Inspector General* (Mar. 3, 2025), https://www.epa.gov/ newsreleases/epa-formally-refers-financial-mismanagement-20b-gold-bars-ins pector-general ...........................................................................................................................17

Rapid Response 47 (@RapidResponse47), X (Feb. 25, 2025, 10:16 AM), https://x. com/RapidResponse47/status/1894406216052289869 ..........................................................17

*Read the Resignation Letter by Denise Cheung, a Veteran D.C. Federal Prosecutor*, Wash. Post (Feb. 18, 2025), https://www.washingtonpost.com/dc-md-va/2025/02/18/read-resignation-letter-denise-cheung/ ......................................................18

*Review and Selection Process*, EPA, https://www.epa.gov/greenhouse-gas-reduc tion-fund/review-and-selection-process (last updated Aug. 16, 2024) ....................................6

SundayMorningFutures (@SundayMorningFutures), *X* (Feb. 23, 2025, 11:21 AM), https://x.com/SundayFutures/status/1893697750937505807 .................................................17

U.S. Gov't Accountability Off., GAO-17-176, *Revenue Collections And Payments: Treasury Has Used Financial Agents in Evolving Ways but Could Improve Transparency* (Jan. 2017), https://www.gao.gov/assets/gao-17-176.pdf ...............................12

Jeff Young, *Green Group Wants EPA to Explain Why $20 Billion Accounts Are Frozen*, Newsweek (Mar. 4, 2025), https://www.newsweek.com/climate-unit ed-fund-epa-letter-frozen-bank-accounts-2039608 ...............................................................20

Lee Zeldin (@EPALeeZeldin), *X* (Feb. 12, 2025, 7:52 PM), https://x.com/epalee
zeldin/status/1889840040622321778 ..............................................................16, 18

Lee Zeldin (@EPALeeZeldin), *X* (Feb. 19, 2025, 4:01 PM), https://x.com/epalee
zeldin/status/1892318587961930086 ......................................................................17

Lee Zeldin (@EPALeeZeldin), *X* (Feb. 22, 2025, 2:10 PM), https://x.com/epalee
zeldin/status/1893377875220332772 ......................................................................17

Lee Zeldin (@EPALeeZeldin), *X* (Feb. 28, 2025, 5:40 PM), https://x.com/epalee
zeldin/status/1895604975860125829 ......................................................................17

Lee Zeldin (@EPALeeZeldin), *X* (Mar. 4, 20255, 6:02 PM), https://x.com/epalee
zeldin/status/1897060177784004921 ......................................................................17

## INTRODUCTION

Plaintiff Climate United Fund ("Climate United") seeks a temporary restraining order that would halt Citibank, N.A.'s ("Citibank") illegal refusal to honor Climate United's requests for funds to which Climate United is legally entitled. Statements by both Citibank and EPA's Administrator strongly suggest that EPA has caused Citibank's illegal actions. As such, Climate United also seeks a temporary restraining order against EPA that would bar EPA from impeding Citibank from complying with its legal obligations. Because Climate United is undergoing immediate and irreparable harm as a result of Defendants' conduct, and because Defendants' conduct undermines an Act of Congress, Climate United requests a temporary restraining order as soon as possible.

In 2022, Congress passed and President Biden signed into law the Inflation Reduction Act. The Act authorized the Greenhouse Gas Reduction Fund, which appropriated $27 billion to invest in clean energy in communities across the country and directed EPA's Administrator to make grants to eligible recipients. *See* 42 U.S.C. § 7434(a). The Climate United coalition—which brings together three established nonprofits that have a combined 120 years of experience managing more than $30 billion of private and institutional capital—applied for grant funding from the Greenhouse Gas Reduction Fund, and was awarded $6.97 billion following EPA's rigorous grant competition process. Climate United's grant funds are held at Citibank, under a Financial Agent Agreement between Citibank and the U.S. Treasury Department and an Account Control Agreement ("ACA") between Citibank, Climate United, and EPA.

Section 2 of the ACA states: "The Bank shall comply with all instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and financial assets in the Accounts" originated by Climate United "until such time that the Bank receives" a "Notice of

Exclusive Control" from EPA stating EPA "is exercising its right to exclusive control over an Account." In other words, if Climate United requests a disbursement, the Bank "shall" honor that disbursement unless EPA sends a "Notice of Exclusive Control." EPA has never sent a "Notice of Exclusive Control." Thus, the ACA is clear: Citibank must honor Climate United's requests.

On February 18, 2025, however, Citibank stopped honoring Climate United's requests. Despite Climate United's many pleas for information, Citibank has refused to explain this blatant breach of contract. It ignored Climate United's pleas until March 3, 2025, when it made the vague statement that it had forwarded Climate United's communications to EPA and was "awaiting further guidance."

Meanwhile, EPA's Administrator has been making public statements that have apparently caused Citibank to stop disbursing funds to Climate United and other grantees. On February 12, 2025, the Administrator publicly stated, without basis, that "the financial agent agreement with the Bank needs to be instantly terminated," and stated that "the Bank must immediately return" grant funds. On February 23, 2025, the Administrator stated, again without basis, that "the entire scheme, in my opinion, is criminal." On March 4, 2025, the Administrator publicly announced: "The money is now FROZEN."

Climate United does not know why the Administrator is making these statements. After Climate United sought more information from EPA, EPA offered to meet with Climate United during the week of February 24, and Climate United agreed to meet. EPA then proceeded to reschedule the meeting three times and then cancel it altogether without explanation. Climate United requested a smaller meeting, in case scheduling for multiple people was the challenge, and did not receive any response. As of the date of this filing, there has been no substantive communication from EPA.

EPA has never identified any legal basis for freezing these funds. According to public reporting, the government's efforts to find such a legal basis have been rejected. Denise Cheung, the Chief of the Criminal Division at the D.C. U.S. Attorney's Office, was ordered to send a letter to Citibank directing that Citibank freeze grantees' assets. She viewed the order as unlawful and resigned—after 24 years in the office—rather than carry it out. According to a follow-up article, the U.S. Attorney submitted a seizure warrant application, but it was rejected. Prosecutors in a different U.S. Attorney's Office refused a request to seek a court-ordered bank freeze. There is no evidence that Climate United has done anything wrong. It has not.

And yet, despite the absence of any legal basis, Climate United's funds are frozen. On information and belief, other grantees are in the same position. The combined actions of Citibank and EPA effectively nullify a congressionally mandated and funded program.

Climate United is now facing irreparable harm. Under the terms of Climate United's grant, it generally can only seek 14 business days' worth of funds at a time. It has now been more than 14 business days since Citibank started withholding funds. As explained in the attached declaration, Climate United has already been compelled to defer compensation for certain staff to preserve its available cash, while also confronting increasingly unfavorable terms from essential vendors and prospective deal partners. If the freeze continues, Climate United will be forced to furlough staff, to renege on its loan obligations, and to encounter grave economic harm.

Climate United's access to its funds must be restored immediately.

First, Climate United requests that the Court enter a temporary restraining order directing Citibank to comply with the ACA. This is not a close issue. Citibank cannot decline to comply with its legal obligations based on vague statements that it is awaiting "guidance."

Second, by all appearances, EPA is the cause of Citibank's conduct. As explained below, Citibank represented that it was awaiting EPA's guidance; EPA's Administrator announced on March 4 that the funds were "frozen"; and EPA is the sole agency within the federal government with the authority to suspend or terminate the grant. But EPA cannot exercise that authority unless certain conditions are met, and they have not been met. Thus, the Court should restrain EPA from impeding Citibank from complying with the ACA.

The Court cannot permit EPA and Citibank to undermine an Act of Congress and irreparably harm Climate United's business without legal basis. Immediate relief is warranted.

## STATEMENT OF FACTS

### A.   The NCIF Was Established to Allocate Inflation Reduction Act Funding to Create National Clean Financing Institutions.

In 2022, Congress passed and President Biden signed into law the Inflation Reduction Act. Pub. L. No. 117-169, 136 Stat. 1818. The Act amended the Clean Air Act to authorize the Greenhouse Gas Reduction Fund ("GGRF"), which appropriated $27 billion to invest in clean energy in communities across the county. *See* 42 U.S.C. § 7434; *About the Greenhouse Gas Reduction Fund*, EPA, https://www.epa.gov/greenhouse-gas-reduction-fund/about-greenhouse-gas-reduction-fund (last updated Feb. 13, 2025).

The GGRF essentially establishes "green banks," which are "financial institutions aimed at overcoming market barriers and scaling up investment in low-carbon technologies and climate-resilient infrastructure." Cong. Rsch. Serv. IN12090, *EPA's Greenhouse Gas Reduction Fund*, (updated Feb. 14, 2023), https://crsreports.congress.gov/product/pdf/IN/IN12090. Green banks are generally used to "deliver projects that are not sufficiently met by other financial markets." *Green Banks*, EPA, https://www.epa.gov/statelocalenergy/green-banks%20 (last updated Jan. 24, 2025).

To establish these green financing institutions, Section 134(a)(2) of the Act appropriated to the Administrator $11.97 billion "to make grants, on a competitive basis …, to eligible recipients for the purposes of providing financial assistance and technical assistance in accordance with subsection (b)." 42 U.S.C. § 7434(a)(2). In addition, Section 134(a)(3) of the Act appropriated to the Administrator $8 billion to "make grants, on a competitive basis …, to eligible recipients for the purposes of providing financial assistance and technical assistance in low-income and disadvantaged communities in accordance with subsection (b)." *Id*. § 7434(a)(3). In turn, subsection (b) provides that an eligible recipient shall use the grant funds in accordance with the following: to facilitate "qualified projects at the national, regional, State, and local levels"; to prioritize "investment in qualified projects that would otherwise lack access to financing"; to "retain, manage, recycle, and monetize all repayments and other revenue received from fees, interest, repaid loans, and all other types of financial assistance provided using grant funds under this section to ensure continued operability"; and to provide "funding and technical assistance to establish new or support existing public, quasi-public, not-for-profit, or nonprofit entities that provide financial assistance to qualified projects." *Id*. § 7434(b).

Grant funding for qualified projects may be awarded to "public, quasi-public, not-for-profit, or nonprofit entities," *id*., that are "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services" and that meet other eligibility criteria. *Id*. § 7434(c)(1). Qualified projects eligible to receive funding include any "project, activity, or technology" that either "reduces or avoids greenhouse gas emissions and other forms of air pollution" or "assists communities in the efforts of those communities to reduce or avoid greenhouse gas emissions and other forms of air pollution." *Id*. § 7434(c)(3).

Consistent with the statute, in July 2023, EPA issued a Notice of Funding Opportunity ("NOFO") and launched a competition for the approximately $14 billion National Clean Investment Fund to award funding to "finance clean technology deployment nationally." Exhibit 1 at 3.[1] The NCIF program was "funded with $11.97 billion from Section 134(a)(2) and $2.00 billion from Section 134(a)(3)." *Frequent Questions About the Fund*, EPA, https://www.epa.gov/greenhouse-gas-reduction-fund/frequent-questions-about-fund (last updated Oct. 17, 2024). The purpose of the NCIF competition was to "provide grants to 2-3 national nonprofit financing entities to create national clean financing institutions capable of partnering with the private sector to provide accessible, affordable financing for tens of thousands of clean technology projects nationwide." Ex. 1 at 4.

The NOFO "included a robust set of application requirements and corresponding evaluation criteria that were used to assess materials submitted to meet those application requirements." *Review and Selection Process*, EPA, https://www.epa.gov/greenhouse-gas-reduction-fund/review-and-selection-process (last updated Aug. 16, 2024). "Application requirements covered a diverse set of topics and included not just a detailed project narrative but also a robust set of application attachments," such as "organizational and governing documents; resumes of board members and senior management; legal and compliance risk management policies and procedures; financial statements; workplans for the first year of program implementations, and budget narratives." *Id.* EPA established a rigorous process to review and select applications, including the establishment of review panels with broad and deep qualifications who would then present rankings and recommendations to a Selection Official

---

[1] All citations to exhibits refer to the exhibits to the Declaration of Elizabeth Bafford submitted contemporaneously with this Motion ("Decl.").

authorized to make the final selection for awards. Ex. 1 at 54. Under the statute, EPA's Administrator could award grants "on a competitive basis" until September 30, 2024. 42 U.S.C. § 7434(a)(1)-(2).

### B.    EPA Selected Climate United as the Largest Recipient of GGRF Funding.

Climate United is a nonprofit financial institution whose mission is to leverage public and private financing to remove financial barriers to deploying clean energy and "invest in solutions that tackle our nation's toughest economic and environmental challenges." *FAQ, What is Climate United?*, Climate United, https://weareclimateunited.org/faq (last visited Mar. 5, 2025); Decl. ¶ 4. The Climate United coalition brings together three established nonprofits—Calvert Impact, Community Preservation Corporation, and Center for Community Self-Help—that have a combined 120 years of experience (30 years, 50 years, and 40 years, respectively) managing more than $30 billion of private and institutional capital that has unlocked economic opportunity for communities in all 50 states and territories. Specifically, Climate United is focused on "[g]reening and electrifying businesses and commercial buildings, schools and community-supporting institutions; community and C&I solar; electric buses and trucks; [and] other non-residential qualified projects." *Frequently Asked Questions about the National Clean Investment Fund (NCIF) and Climate United's Strategy*, Climate United (Aug. 16, 2024), https://weareclimateunited.org/frequently-asked-questions-ncif-and-climate-united-strategy. Climate United accomplishes these objectives by "leverag[ing] public resources with private capital" to provide financing for qualified projects. *Id*. Because Climate United's investments mobilize private capital, they stretch public dollars further: for every dollar invested in a program or project, Climate United estimates up to four dollars of private capital will flow into communities. Decl. ¶ 6.

Climate United entered the NCIF grant competition with a $13.97 billion proposal to accelerate clean energy adoption across the U.S. economy, including by offering affordable financing for clean technology programs.[2] As part of that application process, Climate United was required to submit a detailed proposed budget to EPA. Decl. ¶ 9. In addition, the Notice of Award, discussed below, included a negotiated, thoroughly reviewed, and EPA-approved final budget. *Id.* ¶ 12.

At the conclusion of the agency's lengthy and rigorous review process, Climate United was awarded $6.97 billion. Decl. ¶ 11. The award was publicly announced by the White House in April 2024, in a press release touting Climate United's credentials and vision. Press Release, EPA, *Biden-Harris Administration Announces $20 Billion in Grants to Mobilize Private Capital and Deliver Clean Energy and Climate Solutions to Communities Across America* (Apr. 4, 2024), https://www.epa.gov/newsreleases/biden-harris-administration-announces-20-billion-grants-mobilize-private-capital-and.

Consistent with the purpose of the Inflation Reduction Act under which the NCIF funds were appropriated, Climate United developed and EPA approved a workplan that was finalized with the award and, like its original application, was posted publicly for full transparency. Decl. ¶ 12.

---

[2] While each of the coalition partners would have been eligible recipients, each formed subsidiaries to act as the grant recipients and subrecipients allowing them to adopt EPA-required policies, procedures, and governance specifically crafted to more efficiently deploy grant funds while mitigating deployment risk. The subsidiaries benefit from the organizational infrastructure and experience of their parent organizations while allowing them to comply fully with EPA oversight requirements, and leverage grant funds with private capital more effectively as stand-alone entities. Decl. ¶ 5.

**C.    Climate United and EPA Entered Into a Grant Agreement Governing the Award, Including Terms and Conditions Regarding Suspension and Termination.**

EPA and Climate United entered into an agreement to govern the grant called a "Notice of Award" or "NOA." NOAs contain the grant award's Terms and Conditions, which are binding on the agency and the recipient. Climate United's award was first memorialized in a NOA dated August 8, 2024. Decl. ¶ 11; Exhibit 2. EPA issued an amended notice of award on December 20, 2024, which was substantially similar to the August NOA but included changes to the Terms and Conditions that reflected the insights gained from the first six months of market and partner feedback as well as other clarifications. Decl. ¶ 11; Exhibit 3.

Importantly, the Terms and Conditions require Climate United to adhere to a rigorous set of reporting requirements to facilitate oversight and transparency. These requirements include Climate United to submit quarterly, semi-annual, annual, and final reports to EPA with "detailed narratives describing program performance … supported with qualitative discussions and quantitative metrics," Ex. 3 at 14**,** submit quarterly transaction-level and project-level data reports, *id*. at 15, and provide ongoing disclosures to EPA, *id*. at 16. In addition, the Terms and Conditions require Climate United to "obtain prior written approval from the EPA Project Officer (who will in turn notify the EPA Award Official) for any transfers that will not be disbursed for an Allowable Activity within 15 business days." *Id*. at 57-59.

The Terms and Conditions also enumerate the specific requirements with which EPA must comply to terminate or suspend Climate United's award. *Id.* at 41. At bottom, EPA may not terminate or suspend the award unilaterally.

Under the Terms and Conditions, EPA may terminate the award *only* in one of three circumstances:

(1) EPA may terminate the Agreement if Climate United engages in "substantial" noncompliance such that "effective performance" is "Materially Impaired." *Id.* Effective performance is "Materially Impaired" if (1) EPA issues a "written determination and finding … that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause" and, (2) if EPA determines in its sole discretion that a "corrective action plan" would remedy the issue, EPA issues a "separate written determination and finding" that the Recipient "has not materially addressed its failure." *Id.* at 8-9.

(2) EPA may terminate the Agreement if Climate United engages in "material misrepresentation of eligibility status." *Id.* at 41.

(3) EPA may terminate the Agreement for "Waste, Fraud, or Abuse," *id.*, which is defined with reference to the EPA General Terms and Conditions and 2 C.F.R. § 200.113, *id.* at 12. Those sources require "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act (31 U.S.C. §§ 3729-3733)." EPA, *General Terms and Conditions* 44 (effective Oct. 1, 2024), https://www.epa.gov/system/files/documents/2024-10/fy_2025_epa_general_terms_and_conditions_effective_october_1_2024_or_later.pdf; 2 C.F.R. § 200.113.

In addition, EPA must take certain procedural steps before it may terminate the grant award. Among other things, EPA must comply with 2 C.F.R. § 200.341, which requires EPA to provide written notice of termination to the recipient that includes "the reasons for termination, the

effective date, and the portion of the Federal award to be terminated, if applicable." 2 C.F.R. § 200.341; Ex. 3 at 41 (incorporating this regulatory requirement into the grant's Terms and Conditions).

As well, EPA may withhold payment for allowable costs during the period of performance only where required by Federal statute or regulations or where (i) the recipient "has failed to comply with the terms and conditions of the Federal award"; or (ii) the recipient is "delinquent in a debt to the United States." 2 C.F.R. § 200.305(b)(6).[3] Moreover, where funding is withheld on the grounds that a recipient failed to comply with the terms and conditions of the award, the agency may "[t]emporarily withhold payments" only where it "determines that noncompliance cannot be remedied by imposing specific conditions." 2 C.F.R. § 200.339.

The December NOA was further amended in January 2025,[4] but the January NOA did not change the operative Terms and Conditions from the December NOA. Exhibit 4 at 1, 4-5 (noting "All Administrative Conditions Remain the Same" and "All Programmatic Conditions Remain the Same"). The Terms and Conditions in the December NOA, described above, are thus the operative provisions that bind both Climate United and EPA.

**D.    The Account Control Agreement Between Climate United, EPA, and Citibank.**

The grant requires Climate United's grant funds to be held at Citibank, under a Financial Agent Agreement ("FAA") between Citibank and the U.S. Treasury Department and an Account

---

[3] EPA has adopted the Uniform Grant Guidance regulations codified at 2 C.F.R. 200 *et seq. See* 85 Fed. Reg. 61,571 (Sept. 30, 2020).

[4] The amended January NOA reflected relatively minor alterations in the allocation of particular grant funds within existing budget categories. *Compare* Ex. 3 at 3, *with* Ex. 4 at 3. The January NOA did not alter the overall grant award. Ex. 4 at 1.

Control Agreement between Citibank, Climate United, and EPA. Ex. 2 at 58; Ex. 3 at 52.[5] After a thorough review process run by the Treasury Department, Climate United and EPA entered into the ACA with Citibank on November 1, 2024, with an amendment on January 13, 2025. *See* Exhibit 8; Exhibit 9.

Under the ACA, Citibank is "designated and authorized to act as a financial agent of the United States" pursuant to the authority of the Treasury Department. Ex. 8 at 1. EPA, in turn, serves as the "Secured Party." *Id.* at 1.

Citibank's duties with respect to the funding are exclusively "administrative or ministerial." Ex. 8 at 3 (explaining these duties "shall not be construed as fiduciary"). Citibank exercises no responsibility for determining whether Climate United has complied with its obligations under the grant award: the ACA specifies that Citibank "shall not be responsible for any of the agreements referred to or described herein (including without limitation, the Grant Agreement …), or for determining or compelling compliance therewith, and shall not otherwise be bound thereby." *Id.* at 3.

Like the grant agreement, the ACA establishes a system that is transparent and provides for significant oversight by EPA. EPA has complete real-time visibility into both the accounts of

---

[5] The Financial Agent concept is an established mechanism for disbursing government funding that was first authorized in the 1860s and has been used for decades. U.S. Gov't Accountability Off., GAO-17-176, *Revenue Collections And Payments: Treasury Has Used Financial Agents in Evolving Ways but Could Improve Transparency* (Jan. 2017), https://www.gao.gov/assets/gao-17-176.pdf ("Treasury has a long history of using financial agents to support its core functions of disbursing payments and collecting revenue."). Relevant here, the use of a financial agent was referenced in EPA's Notice of Funding Opportunity released in July 2023, and the ACA was described in the Terms and Conditions of the August NOA. Ex. 2 at 58; Ex. 1 at 56. Climate United had no role in EPA's decision to include the financial agent concept in the Notice of Funding Opportunity in July 2023. Decl. ¶ 19. Climate United also had no role in the selection of the financial agent, which was coordinated by EPA and the Treasury Department as part of a competitive process. *Id.*

Climate United and those of its subrecipients. Decl. ¶ 20. The system displays expenditures broken down by budget category, and it provides EPA with full visibility of program income generated by Climate United or any subrecipient. Decl. ¶ 17.

Citibank's main role is to disburse funds to Climate United when Climate United asks for them. Section 2 of the ACA provides that Citibank "shall comply with all instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and financial assets in the Accounts including, without limitation, directions to distribute proceeds of any such transfer or redemption of interest or dividends on financial assets in the Accounts." Ex. 8 at 3.

The only circumstance in which Citibank is not required to disburse funds to Climate United is if EPA exercises its right of control over the funding under the ACA. *Id.* To do so, EPA must notify Citibank that it is exercising exclusive control over the account in a form substantially similar to a sample Notice of Exclusive Control contained in the ACA. *Id.*; *id.* at Ex. A; *see also id.* at 1 (stating that Climate United and EPA "have agreed that the terms and conditions entitled 'Deposit Account at Financial Agent' in the Grant Agreement indicate the conditions under which [EPA] may exercise its right of control").[6]

The ACA spells out when EPA may take exclusive control over the funds. Under the ACA, as amended, EPA may take exclusive control of the funds when, "[a]s required by the Grant Agreement, the Secured Party [*i.e.*, EPA] has issued a written determination and finding that Pledgor [*i.e.*, Climate United] has failed to comply with the terms and conditions of the Grant Agreement, and that noncompliance is substantial such that effective performance of the Grant

---

[6] The January 13, 2025 amendment clarifies the parties' intent regarding the treatment of certain obligations that were "properly incurred," if EPA issues a Notice of Exclusive Control. Ex. 9.

Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse (as defined in the Grant Agreement)." Ex. 9 at Ex. A**.** In short, EPA may take exclusive control only when termination is warranted under the Terms and Conditions of the grant award. *Compare id.* (incorporating the standard for termination in the Terms and Conditions), *with* Ex. 3 at 41 (discussing termination under "programmatic conditions"), *and* Ex. 4 at 5 ("All Programmatic Conditions Remain the Same"). Further, the ACA requires EPA to affirm that it, as "the Secured Party[,] has initiated action under 2 CFR 200.339 to wholly or partly suspend or terminate the Grant Agreement, as authorized in the terms of the Grant Agreement." Ex. 9 at Ex. A.

Climate United drew down grant funds through the Automated Standard Application for Payments ("ASAP") system from August 2024 until November 2024 when the accounts at Citibank were established. Decl. ¶¶ 16-17. EPA has since disbursed the balance of Climate United's grant funds into the designated Citibank accounts. *Id.* ¶ 17. Approximately every two weeks, Climate United began to draw money from those accounts to do its work and carry out its obligations under the grant. *Id.* ¶ 21.

### E.    Climate United Has and Will Invest Its Awarded Funds to Further the Goals of the Inflation Reduction Act.

Consistent with the purpose of the Inflation Reduction Act, Climate United developed and EPA approved a workplan that was finalized with the award and posted publicly. As enumerated in the workplan, the Climate United coalition plans to commit at least $580 million toward qualified projects in the first year of funding (*i.e.*, before July 2025), and to draw the full $6.97 billion award over the first five years of the program. *Id.* ¶ 13. The Climate United coalition has committed $392 million to qualified projects to date. *Id.* Approximately 45% of Climate United investments, or approximately $2.8 billion of the grant award, will focus on investing in energy-efficient buildings and homes. *Id.* ¶ 14. Approximately 20% of Climate United's investments, or

approximately $1.2 billion of the NCIF Award, will focus on electric transportation and charging infrastructure. *Id.* Another approximately 25% of Climate United's investments, or approximately $1.5 billion of the NCIF Award, will focus on producing affordable, clean electricity and heat through renewable energy generation and battery storage, including solar power, hydroelectric and geothermal. *Id.* The remaining 10% of investments will focus on other sectors that cut costs, reduce pollution, and provide direct benefits to American families, including in agriculture. *Id.* Pursuant to its workplan, Climate United will deploy 60% of its investments in low- and moderate-income communities, 20% of its loans in rural communities, and 10% of its investments in tribal communities. *Id.* ¶ 13.

Climate United has already launched three financing projects to date. First, it has committed $31.8 million to finance 18 solar projects benefiting rural communities in Arkansas, comprising the largest commercial solar deployment in the state's history. *Id.* ¶ 24. The project, announced in October 2024, is projected to save over $120 million in energy costs and create hundreds of jobs. *Id.*

Second, Climate United has launched a program to establish affordable leasing options for battery electric heavy-duty trucks to small fleets and independent contractors. *Id.* ¶ 25. In October 2024, Climate United issued a request for proposals from qualified U.S. auto manufacturers to deliver up to 500 electric drayage trucks, which Climate United will then use to support an affordable leasing program at the ports of Long Beach and Los Angeles before expanding the program across the country. *Id.* When completed, these orders will represent some of the largest ever purchases of domestically manufactured battery electric trucks in U.S. history. *Id.* This program will reduce the cost per mile to operate drayage trucks, reduce air pollution in port communities, and increase demand for U.S. manufacturing. *Id.*

Third, Climate United has committed $63 million to finance the design and development of solar power plants in partnership with Tribal governments and communities in Eastern Oregon and Idaho. *Id*. ¶ 26. The project will increase access to affordable energy for rural communities and Indigenous people, in addition to bringing high-quality jobs and accelerating local economic development. *Id.*

In addition to these three projects, Climate United has also recently closed a round of applications for its Climate United NEXT program, which will provide up to $30 million in technical assistance and planning support for clean energy projects to increase energy independence, reduce pollution, and help families and small businesses. *Id*. ¶ 27. Climate United has approved 22 awards across 18 states, and it anticipates issuing over $6.345 million in initial subawards. *Id.*

Consistent with the terms of the award, Climate United has also used grant funds for salaries and benefits of approximately 37 employees who empower Climate United to do its work: selecting partners, ensuring grant compliance, conducting oversight of subrecipients, analyzing financial transactions, engaging with communities, and servicing a portfolio of loans. *Id.* ¶ 23.

### F. Following Statements and Actions by Administration Officials, Citibank Refused to Disburse Funds.

#### 1. EPA, DOJ, and OIG Actions

On January 20, 2025, President Trump assumed office. His nominee for EPA Administrator, Lee Zeldin, was confirmed on January 30, 2025. Less than two weeks later, Administrator Zeldin publicly announced EPA's goal to take possession of grant funds disbursed pursuant to the Inflation Reduction Act, referring to Climate United by name.[7] In that same public

---

[7] Lee Zeldin (@EPALeeZeldin), *X* (Feb. 12, 2025, 7:52 PM), https://x.com/epaleezeldin/status/1889840040622321778.

statement, Administrator Zeldin stated: "the financial agent agreement with the Bank needs to be instantly terminated," "the Bank must immediately return" the funding, and until it has "recovered" the grant funds, the EPA is "not going to rest."[8] Administrator Zeldin did not identify any specific basis for adverse action under the terms of Climate United's grant award—or under the award of any other funding recipient.

On February 19, Administrator Zeldin stated that he had just read a GGRF grant agreement, and called it "wild."[9] He stated on multiple occasions that EPA has cancelled several grant agreements regarding climate and the environment, apparently unilaterally.[10] On February 23, Administrator Zeldin discussed the GGRF program on national television and stated, without basis, that "the entire scheme, in my opinion, is criminal."[11] One week later, EPA issued a letter to its Office of the Inspector General requesting a formal investigation into GGRF funding.[12] Then, on March 4, Administrator Zeldin stated: "The money is now FROZEN and DOJ/FBI is investigating."[13]

---

[8] Rapid Response 47 (@RapidResponse47), *X* (Feb. 25, 2025, 10:16 AM), https://x.com/Rapid Response47/status/1894406216052289869.

[9] Lee Zeldin (@EPALeeZeldin), *X* (Feb. 19, 2025, 4:01 PM), https://x.com/epaleezeldin/status/1892318587961930086.

[10] Lee Zeldin (@EPALeeZeldin), *X* (Feb. 22, 2025, 2:10 PM), https://x.com/epaleezeldin/status/1893377875220332772 (proclaiming EPA has "cancelled" various "DEI and environmental justice grants and contracts"); *see also* @EPALeeZeldin, *X* (Feb. 28, 2025, 5:40 PM), https://x.com/epaleezeldin/status/1895604975860125829.

[11] SundayMorningFutures (@SundayMorningFutures), *X* (Feb. 23, 2025, 11:21 AM), https://x.com/SundayFutures/status/1893697750937505807; *see also* Zack Colman, *Recipient Isn't Giving in as Trump's EPA Tries to Revoke Climate Grants*, Politico (Feb. 24, 2025), https://www.politico.com/news/2025/02/24/climate-grant-recipient-spending-trumps-epa-tries-claw-back-00205814 (collecting quotes).

[12] Press Release, EPA, *EPA Formally Refers Financial Mismanagement of $20B "Gold Bars" to Inspector General* (Mar. 3, 2025), https://www.epa.gov/newsreleases/epa-formally-refers-financial-mismanagement-20b-gold-bars-inspector-general.

[13] Lee Zeldin (@EPALeeZeldin), *X* (Mar. 4, 20255, 6:02 PM), https://x.com/epaleezeldin/status/1897060177784004921.

Administrator Zeldin stated that he would take action with "the Inspector General's Office and will work with the Justice Department" to ensure EPA "reassume[s] responsibility for all of these funds."[14] According to public reporting, the Office of the Deputy Attorney General at the Department of Justice ("ODAG") instructed the U.S. Attorneys' Office in Washington, D.C. ("USAO-DC") that it wished to open a criminal investigation into EPA's award.[15] At that point, the top criminal prosecutor in USAO-DC advised that there was not an adequate factual basis to do so.[16] ODAG instructed that a letter be sent directing Citibank to refuse to release grant funds pursuant to a criminal investigation. *Id*. Senior officials at USAO-DC asserted there was not sufficient evidence to justify issuing that letter, and, consistent with her oath of office, the Chief of the Criminal Division refused to send it. She was then forced to resign. *Id*. According to follow-up reporting, the Interim U.S. Attorney in the USAO-DC then submitted a seizure warrant application, apparently without signoff from any other prosecutor in that office.[17] A Magistrate Judge rejected it. *Id*.

## 2. Citibank's Failure to Disburse Funds

On February 18, 2025, Citibank began refusing to comply with Climate United's requests for disbursement. On that day, Climate United placed a request to draw funds from its account. In

---

[14] Lee Zeldin (@EPALeeZeldin), *X* (Feb. 12, 2025, 7:52 PM), https://x.com/epaleezeldin/status/1889840040622321778.

[15] *Read the Resignation Letter by Denise Cheung, a Veteran D.C. Federal Prosecutor*, Wash. Post (Feb. 18, 2025), https://www.washingtonpost.com/dc-md-va/2025/02/18/read-resignation-letter-denise-cheung/ [hereinafter *Resignation Letter*]; *see also* Kyle Cheney, et al., *Senior Prosecutor in Washington Quits, Citing Pressure to Probe Biden-era Climate Funds*, Politico (Feb. 18, 2025), https://www.politico.com/news/2025/02/18/denise-cheung-us-attorneys-office-washington-020363.

[16] *Resignation Letter* (noting assessment that no "predicate for opening such a grand jury investigation existed" on the face of the existing documents provided by ODAG).

[17] Spencer Hsu, Maxine Joselow & Nicolas Rivero, *FBI takes up EPA Probe Amid Pushback from Judge, Prosecutors*, Wash. Post (Feb. 27, 2025), https://www.washingtonpost.com/dc-md-va/2025/02/27/trump-fbi-epa-grant-investigation/.

the normal course, Citibank would have distributed funds to Climate United approximately that same day, but no transaction was reflected on Climate United's account. Decl. ¶ 28. After Citibank did not disburse any funds, Climate United emailed Citibank on February 19 requesting disbursement, an explanation, and an opportunity for Climate United to respond to any instruction or action impacting its accounts. *Id.* ¶ 29. Citibank did not respond. *Id.* On February 21, 2025, Climate United placed another request to Citibank to draw funds from Climate United's account. *Id.* ¶ 31. But again, no disbursement occurred. *Id.*

On February 25, counsel for Climate United emailed Citibank requesting disbursement within 24 hours or, alternatively, for Citibank to provide any legal bases for its decision to withhold funding. *Id.* ¶ 32. Citibank again did not respond. *Id.* The next day, counsel left voicemail messages for Citibank, but Citibank did not respond. *Id.* ¶ 33. On March 1, counsel submitted a letter to the Chief Executive and Chief Legal Officers of Citibank explaining that it is illegally withholding Climate United's funds in breach of the ACA. Citibank has ignored Climate United's repeated requests for information; and has failed to provide any legal basis for Citibank's actions. The letter requested a response by March 4. *Id.* ¶ 35. Again, Citibank failed to respond. *Id.*

Finally, Citibank responded to Climate United on a separate email chain on March 3. *Id.* ¶ 36. Citibank stated: "We have received your correspondence and have forwarded it to the United States Environmental Protection Agency and other federal officials for an appropriate response. … Once we have further information available regarding the program we can provide at that time." After Climate United replied requesting clarification, Citibank stated: "We are awaiting further guidance." Ex. 6. On March 4, 2025, counsel for Climate United submitted a letter to EPA by email, notifying EPA that Climate United has been unable to access its funding and to request information regarding the nature of and legal justification for EPA's actions. *Id.* ¶ 37. The letter

requested that EPA immediately reverse its actions and reinstate Climate United's access to its NCIF funding. EPA did not respond. But in an article reporting on the letter, Citibank's spokesman stated that Citibank is working to "address government officials' concerns" and "will of course comply with any binding instructions from the federal government."[18]

Over this period, EPA likewise failed to provide any reasoned explanation for its actions or any meaningful opportunity to object or be heard. When it became apparent that Citibank was not disbursing Climate United's funding, Climate United emailed EPA officials notifying them that they were being denied access to funds. EPA officials replied on February 21 with no additional information, but offered to speak the following week. Decl. ¶ 30. EPA then rescheduled three times. *Id.* ¶ 34. After Climate United informed EPA that outside counsel would be present, an EPA official cancelled the meeting without rescheduling. *Id.* After calling the official on February 27, the official's administrative assistant confirmed that the official was in possession of Climate United's emails and would reach out. *Id.* As of the date of this filing, Climate United is waiting for a response. *Id.*

### G. Climate United Has Brought This Action to Vindicate Its Rights.

This litigation followed. Climate United's Complaint, ECF No. 1, asserts claims for breach of contract, conversion, and replevin against Citibank, and claims under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), and the Due Process Clause against EPA. Climate United seeks to enjoin Citibank from breaching the ACA and continuing to refuse to disburse funds under the ACA, and to bar EPA from unlawfully suspending or terminating the grant.

---

[18] Jeff Young, *Green Group Wants EPA to Explain Why $20 Billion Accounts Are Frozen*, Newsweek (Mar. 4, 2025), https://www.newsweek.com/climate-united-fund-epa-letter-frozen-bank-accounts-2039608.

On March 1 and 4, 2025, Climate United asked Citibank to disburse funds, and EPA to stay the apparent suspension or termination of Climate United's grant, pending judicial review. Neither Citibank nor EPA have responded to these requests. This motion therefore seeks a temporary restraining order to restrain Citibank from violating the ACA and to restrain EPA from impeding Citibank's compliance with the ACA or unlawfully suspending or terminating the grant.

## LEGAL STANDARD

The same standard of proof applies for a movant to obtain either a temporary restraining order or a preliminary injunction under Federal Rule of Civil Procedure 65. *Bayer HealthCare, LLC v. U.S. FDA*, 942 F. Supp. 2d 17, 23 (D.D.C. 2013).[19] The moving party must "make a clear showing that four factors, taken together, warrant relief: [1] likely success on the merits, [2] likely irreparable harm in the absence of preliminary relief, [3] a balance of the equities in its favor, and [4] accord with the public interest." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (preliminary injunction); *see also, e.g.*, *Chef Time 1520 LLC v. Small Bus. Admin.*, 646 F. Supp. 3d 101, 109 (D.D.C. 2022) (temporary restraining order).

## ARGUMENT

I.    **The Court Should Issue a Temporary Restraining Order Barring Citibank from Failing to Disburse Climate United's Grant Funds Pursuant to the Contract.**

   A.    **Climate United Is Likely to Succeed on the Merits of Its Claims Against Citibank.**

Climate United is likely to succeed on the merits of its breach of contract claim because (1) the ACA is a valid enforceable contract; (2) Citibank has breached the contract by failing to perform without any legal or factual basis; and (3) Climate United has been harmed as a result.

---

[19] Case citations and quotations are "cleaned up," with extraneous quotation marks, alterations, and citations removed, unless specified.

Under the ACA, Citibank has a duty to disburse Climate United's grant funds to Climate United. The ACA specifies that Citibank "*shall* comply with *all* instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and financial assets in the Accounts." Ex. 8 at 2 (emphasis added). The ACA explains that Citibank's duties with respect to Climate United's grant funding are exclusively "administrative or ministerial (and shall not be construed to be fiduciary in nature)," and that Citibank "shall not be responsible" for determining whether Climate United's requests for the disbursement of grant funds comply with any applicable contracts or laws. *Id.* at 3.

Thus, the ACA does not provide Citibank with any discretion to decline to disburse funds in response to Climate United's requests. But since February 18, 2025, Citibank has repeatedly failed to disburse grant funds to Climate United at Climate United's requests. *See supra* pages 18-20.

Citibank has stated that it is waiting for direction from EPA before disbursing any grant funds. *See* Ex. 6. But the ACA does not allow Citibank to withhold Climate United's grant funds unless EPA has given notice that it intends to exercise exclusive control over the account. *See* Ex. 8. EPA has not provided such notice. Nor has EPA undertaken any of the steps to exercise exclusive control described in the ACA's form Notice of Exclusive Control. *See* Ex. 9 at Ex. A.

Citibank is therefore in breach of the ACA, and Climate United is likely to succeed on the merits of its breach of contract claim.[20]

---

[20] Although Climate United also brings claims for conversion and replevin, in this motion Climate United merely seeks to restrain Citibank from withholding grant funds and from refusing to follow the ACA.

**B.     Climate United Will Suffer Irreparable Harm Absent Injunctive Relief Against Citibank.**

Climate United has shown a likelihood of irreparable harm as well. "District Courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *Wagner v. Taylor*, 836 F.2d 566, 575-76 (D.C. Cir. 1987). Here, Climate United will suffer numerous irreparable harms, both monetary and non-monetary, that justify the grant of injunctive relief.

To begin, Citibank's actions will cause irreparable economic harm to Climate United. Economic harm is irreparable if it is "so severe as to cause extreme hardship to the business or threaten its very existence." *National Ass'n of Mortg. Brokers v. Board of Governors of Federal Reserve System*, 773 F. Supp. 2d 151, 179 (D.D.C. 2011). As a court in this district recently concluded in similar circumstances, a funding freeze results in irreparable harm when imposed on organizations that "rely on continued funding in order to keep their doors open." *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-cv-239, --- F. Supp. 3d ----, 2025 WL 597959, at *18 (D.D.C. Feb. 25, 2025) (granting preliminary injunction); *see also Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-cv-239, --- F. Supp. 3d ----, 2025 WL 368852, at *12 (D.D.C. Feb. 3, 2025) (granting temporary restraining order).

That is the case here. The grants funds in Climate United's Citibank accounts fund Climate United's operations and financing for projects that Climate United either has launched or is planning to launch. The Terms and Conditions of Climate United's grant require Climate United to "obtain prior written approval from the EPA Project Officer (who will in turn notify the EPA Award Official) for any transfers that will not be disbursed for an Allowable Activity within 15 business days." Ex. 3 at 57-59. In other words, under the terms of Climate United's grant, it generally can only seek 14 business days' worth of funds at a time.

It has now been more than 14 business days since Citibank started withholding funds. Climate United cannot currently access funds to pay its payroll and other expenses related to immediate implementation of its EPA-approved program workplan. Decl. ¶ 43. Climate United does not have other committed sources of funding to replace the grant funds in its Citibank accounts. *Id.* ¶ 40. Nor is private investment a viable replacement, because Climate United was specifically awarded NCIF funding to "prioritize investment in qualified projects that would otherwise lack access to financing." 42 U.S.C. § 7434(b)(1)(B); *see* Decl. ¶ 41.

Without access to the grant funds in its Citibank accounts, Climate United does not have excess cash or reserves available to pay operating expenses. Decl. ¶ 43. Climate United therefore imminently risks not being able to pay payroll or health, vision, and dental benefits, life insurance, and short- and long-term disability insurance for its employees. *Id.* As a result of Defendants' actions, Climate United has already been compelled to defer compensation for certain employees to preserve its limited cash available. *Id.* Without a stable substitute source of funding, Climate United will no longer be able to pay its employees. *Id.*

Climate United also imminently risks not being able to pay rent or insurance for select offices or to pay third-party contractors who perform necessary roles such as auditing its financial statements, maintaining its IT security and infrastructure, and providing legal services. Decl. ¶ 45. Continued failure to access the funds at Citibank would also prevent Climate United from meeting its commitments under the loans and awards it has already approved and plans to approve. This could force Climate United into breach of its existing agreements. *Id.* ¶¶ 46-48, 50. For example, Climate United has already awarded pre-construction financing to support a monumental solar power project in Arkansas and launched a project to purchase battery electric heavy-duty trucks for leasing to small fleets and independent operators. But neither project could go forward without

continued access to grant funds. *Id.* And future projects for which Climate United recently solicited and received applications would not be funded. *Id.* ¶ 46. This would immediately impact a pre-development grant program, Climate United NEXT, under which Climate United currently has approved 22 awards across 18 states and anticipates issuing $6.345 million in initial subawards. *Id.* ¶¶ 27, 46.

More fundamentally, Citibank's actions render Climate United incapable of fulfilling its core mission of providing financing for qualified projects. An organization has a likelihood of irreparable injury where "the actions taken by the defendant have perceptibly impaired the organization's programs" and "make it more difficult for [an organization] to accomplish [its] primary mission." *League of Women Voters*, 838 F.3d at 8-9. That is the case here: Climate United cannot engage in financing without funds available for financing.

Climate United's economic harm qualifies as irreparable for a second reason. Preliminary injunctions are awarded "where the subject of the action involves a specific fund." *Destiny USA Holdings, LLC v. Citigroup Glob. Mkts. Realty Corp.*, 69 A.D.3d 212, 217 (N.Y. App. Div., 4th Dep't 2009) (holding that borrower was entitled to preliminary injunction against Citigroup when Citigroup failed to honor draw requests from specific account); *see Deem v. Baron*, No. 15-cv-00755, 2018 WL 377286, at *2 (D. Utah Jan. 11, 2018) ("Many cases hold that a monetary damages claim directed at a specific fund is viable as an irreparable injury worthy of an injunction because the property, not the value of the property, is the true subject of the action."). Here, a preliminary injunction is warranted because Climate United is seeking to vindicate its interest in specific accounts containing withheld funds, and its right to draw from those specific accounts.

Climate United will also suffer nonquantifiable harms that independently qualify as irreparable harm warranting injunctive relief. First, if Climate United is unable to pay employees

or is forced to furlough employees, that would seriously impair its ability to retain and attract employees and to enter into beneficial arrangements with necessary contractors in the future. Decl. ¶¶ 43, 45. Courts routinely recognize that "loss of talent and the inability to recruit and retain employees to build—or even maintain—[a plaintiff's] business" constitutes irreparable harm. *Luokung Tech. Corp. v. Dep't of Def.*, 538 F. Supp. 3d 174, 194 (D.D.C. 2021) (alteration in original) (collecting cases).

Second, absent access to its grant funds, Climate United will suffer serious and irreversible reputational harm. Without secure funding, Climate United will be unable to attract high-quality applicants with a demonstrated ability to develop and carry out clean energy projects, as such applicants will not seek funding that is in significant doubt. Decl. ¶ 51. Likewise, Climate United will be significantly impaired in its ability to attract co-investors, who will require proof of stable government funding prior to investing. *Id.* Finally, Climate United will be seen as a greater financial risk by contractual counterparties, which impacts the favorability of terms Climate United can receive in contractual arrangements. *Id.* ¶ 52. This reputational damage reduces the quality and quantity of potential projects Climate United can pursue and the willingness of private capital to co-invest in those projects. That harm qualifies as irreparable. *Atlas Air, Inc. v. International Brotherhood of Teamsters*, 280 F. Supp. 3d 59, 103 (D.D.C. 2017) ("Injury to reputation or goodwill is not easily measurable in monetary terms, and so often is viewed as irreparable").

Third, the injury in this case is irreparable because Climate United is unable to access funds it was awarded pursuant to a program authorized by an Act of Congress. Where, as here, grant recipients "continue to experience interruptions to access and … draw[ing] down funds from grants funded by … [Inflation Reduction Act] appropriations," grant recipients "unquestionably" suffer irreparable harm. *See New York v. Trump*, No. 25-cv-00039, slip op. at 41-42 (D.R.I. Mar. 6, 2025),

ECF No. 161. "Congress enacted these statutes and appropriated these funds for legitimate reasons, and the Defendants' categorical freeze, untethered to any statute, regulation or grant term, frustrates those reasons, and causes significant and irreparable harms[.]" *Id*. at 39.

### C.    The Balance of Equities Favors Climate United Over Citibank.

Where an injunction "will not substantially injure other interested parties," the balance of equities tips in plaintiffs' favor. *League of Women Voters*, 838 F.3d at 12. In this case, Citibank "cannot suffer harm from an injunction that merely ends an unlawful practice." *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)). Nor can Citibank show it would suffer any harm—let alone substantial harm—as the result of an injunction. Citibank has no right to or interest in the funds it is holding, but rather is the intermediary by which federal funding is provided to Climate United. *Cf. Coastal Cntys. Workforce, Inc. v. LePage*, 284 F. Supp. 3d 32, 60 (D. Me. 2018) (holding that balance of equities favored injunction requiring release of funding by state where "there would be little, if any, burden on the state treasury, since the federal funds pass-through the state on their way to the local areas").

In contrast, Citibank's refusal to disburse Climate United's grant funds poses an "existential consequence" for Climate United's mission and risks forcing Climate United to "shut[ ] down programs, … furlough[ ] and lay[ ] off employees, [or] shutter[ ] altogether," all of which are significant consequences that tilt in its favor. *AIDS Vaccine Advocacy Coal. v. U.S. Dep't of State*, No. 25-cv-400, --- F. Supp. 3d ----, 2025 WL 485324, at *6 (D.D.C. Feb. 13, 2025); *see also Nat'l Council of Nonprofits*, --- F. Supp. 3d ----, 2025 WL 368852, at *13 (similar).

### D.    Enjoining Citibank Is Firmly in the Public Interest.

Finally, ensuring that Climate United can continue to access its awarded funds is strongly in the public interest. "[T]he public interest is served by … enforcing valid contractual provisions

[ ] to which parties have voluntarily entered." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Wertz*, 298 F. Supp. 2d 27, 34-35 (D.D.C. 2002). In the ACA, Citibank agreed to a specific procedure by which EPA could issue a Notice of Exclusive Control to prevent Citibank from disbursing funds to Climate United. *See supra* pages 13-14. But Citibank has ignored that procedure by cutting off Climate United's access to funds without having received any Notice of Exclusive Control.

In addition, the public interest in enjoining Citibank's unlawful refusal to disburse funds is particularly acute here. The American public has an interest in the billions of dollars of investment that Congress authorized through the Inflation Reduction Act in 2022. Climate United was awarded funding in line with that interest—for example, by advancing projects to develop solar power and electric vehicles—and intends to continue to do so. Decl. ¶¶ 14, 24-27. Injunctive relief is necessary to permit Climate United to carry out these critical projects, which "Congress, in enacting" the Inflation Reduction Act, "declared to be in the public interest." *League of Women Voters*, 838 F.3d at 13.

## II.    The Court Should Issue a Temporary Restraining Order Barring EPA from Impeding Citibank from Receiving Grant Funds Without Lawful Justification.

### A.    Climate United Is Likely to Succeed on the Merits of Its APA and Due Process Claims.

Although EPA has publicly stated that Citibank is acting "voluntarily," *see* Compl. ¶ 65(h), it appears that EPA has caused Citibank to refuse to honor Climate United's disbursement requests. EPA's Administrator has stated that "the financial agent agreement with the Bank needs to be instantly terminated," stated that "the Bank must immediately return" the grant funds, and stated that EPA is "not going to rest" until it has "recovered" the grant funds. *Supra* page 17. The EPA Administrator publicly stated that the grant funds were "FROZEN." *Id.* Citibank, for its part, represented that it had forwarded Climate United's requests to EPA and was awaiting "guidance." *Supra* page 19.

To the extent EPA has de facto suspended or terminated Climate United's grant, its actions are unlawful. Under the APA, this Court must hold unlawful and set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard is satisfied several times over. *First*, EPA has not offered an adequate explanation for its apparent decision to suspend or terminate the award. The APA requires an agency to give adequate reasons for its actions. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 48 (1983) ("[A]n agency must cogently explain why it has exercised its discretion in a given manner."). Yet EPA has not offered any reasoned explanation—despite regulations that require EPA to provide written notice of termination that includes "the reasons for termination, the effective date, and the portion of the Federal award to be terminated." 2 C.F.R. § 200.341; Ex. 3 at 41 (incorporating this regulatory requirement into the grant's Terms and Conditions).

Statements in the media by the EPA Administrator and EPA personnel do not provide the reasoned explanation the APA requires. *See Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (requiring the agency's reasoning to fit the evidentiary record); *Kansas City v. Dep't of Hous. & Urban Dev.*, 923 F.2d 188, 194 (D.C. Cir. 1991) (advising that if a grant is terminated for substantive deficiencies, "then that fact should have been made plain in the agency decisions"). Those statements are particularly insufficient to support EPA's decision to suspend or terminate Climate United's grant given that the grant was awarded following months of rigorous review as part of a competitive application process. *See Verizon v. F.C.C.*, 740 F.3d 623, 636 (D.C. Cir. 2014) ("The APA's requirement of reasoned decision-making ordinarily demands that an agency acknowledge and explain the reasons for a changed interpretation.") (citing *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

*Second*, EPA's suspension or termination violates federal regulations which limit the grounds upon which EPA may terminate the award. "It is axiomatic[ ] … that an agency is bound by its own regulations." *Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014). An agency may not "ignore or violate its regulations while they remain in effect." *U.S. Lines, Inc. v. Fed. Mar. Comm'n*, 584 F.2d 519, 526 n.20 (D.C. Cir. 1978); *see also Nat'l Envtl. Dev. Assocs. Clean Air Project*, 752 F.3d at 1009 (holding that "an agency action may be set aside as arbitrary and capricious if the agency fails to 'comply with its own regulations'").

EPA's grant regulations provide that any unilateral grant termination must be based on the grant award's terms and conditions, 2 C.F.R. § 200.340(a)(1), (4), which must "clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award," *id.* § 200.340(b). The Terms and Conditions governing Climate United's grant award expressly limit EPA *only* to three possible grounds for termination: "when [1] the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or [2] there is adequate evidence of Waste, Fraud, or Abuse or [3] material misrepresentation of eligibility status." Ex. 3 at 41.

None of these grounds is satisfied here. EPA has not put forward any evidence to find that Climate United has failed to comply with any Terms and Conditions of the grant, or that Climate United is "substantially noncompliant" such that "effective performance" of the Grant Agreement is "Materially Impaired," *id.*[21]

---

[21] Nor could EPA meet the two conditions necessary to show that Climate United's actions have "materially impaired" the grant agreement. *See* Ex. 3 at 9, 13-15, 22, 40; 2 C.F.R. § 200.339; 2 C.F.R. § 200.208 (requiring EPA to issue "a written determination and finding" that Climate United "has failed to achieve sufficient progress in accordance with the Sufficient Progress clause" in EPA's General Terms and Conditions, and issue a "separate written determination and finding" that "noncompliance cannot be remedied by imposing specific conditions" after giving Climate United an opportunity to remedy any noncompliance).

Nor has EPA offered any evidence of "Waste, Fraud, or Abuse,"[22] or that Climate United has made any material misrepresentations about its eligibility status. Indeed, there is absolutely *no* factual basis for *any* such findings.

As well, EPA may withhold payment for allowable costs during the period of performance only where required by Federal statute or regulations or where (i) the recipient "has failed to comply with the terms and conditions of the Federal award"; or (ii) the recipient is "delinquent in a debt to the United States." 2 C.F.R. § 200.305(b)(6). Moreover, where funding is withheld on the grounds that a recipient failed to comply with the terms and conditions of the award, the federal agency may "[t]emporarily withhold payments" only where it "determines that noncompliance cannot be remedied by imposing specific conditions." 2 C.F.R. § 200.339. Those conditions are not satisfied here.

*Third*, EPA's suspension or termination contravenes a duly enacted statute. In the Inflation Reduction Act, Congress appropriated $27 billion for distribution under the Greenhouse Gas Reduction Fund. 42 U.S.C. § 7434. EPA is legally required to spend those funds unless it satisfies the stringent requirements for rescinding an appropriation, which, as discussed above, EPA has not done. *See* 2 U.S.C. § 683. That is further reason to find EPA's actions are a violation of federal law. *See Train v. City of New York*, 420 U.S. 35 (1975) (holding that EPA violated federal law by implementing President's directive not to spend appropriated funds on grants as required by statute).

---

[22] To qualify as "adequate evidence of waste, fraud, or abuse," EPA must provide "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act[,] 31 U.S.C. [§§] 3729-3733." Ex. 3 at 12 (defining "Waste, Fraud, or Abuse" according to EPA's General Terms and Conditions and 2 C.F.R. § 200.113). EPA has not put forward facts that would satisfy this standard.

EPA's actions also violate the Due Process Clause. EPA's Administrator has stated that "[t]he money is now FROZEN." It is hornbook law that the government cannot freeze assets, even temporarily, unless it provides due process. *See United States v. E-Gold, Ltd.*, 521 F.3d 411, 416 (D.C. Cir. 2008) (even when an asset seizure is "potentially temporary, the deprivation of property is subject to the constraints of due process"), *abrogated on other grounds by Kaley v. United States*, 571 U.S. 320 (2014). Here Climate United has received no notice, no hearing, and no process of any kind. According to public reporting, a magistrate judge refused to issue a seizure warrant. No one has ever told Climate United what it did wrong. EPA has refused to meet with Climate United. And yet, apparently EPA's actions have caused Climate United's assets to be frozen. That is a due process violation.

For all of these reasons, EPA's suspension and termination is unlawful. Climate United has therefore exceeded the required showing of a likelihood of success on the merits to warrant a temporary restraining order. *See, e.g.*, *League of Women Voters*, 838 F.3d at 9.

## B.     Climate United Will Suffer Irreparable Harm Absent Injunctive Relief Against EPA.

For the reasons discussed above as to Citibank, Climate United has shown it will suffer irreparable harm if EPA's unlawful suspension or termination of its grant is not enjoined. Specifically, without its grant funds, Climate United will no longer be able to pay its employees, rent, contractors, subawardees, and contractual counterparties. Absent an immediate injunction, Climate United will suffer serious and irreversible reputational harm if its grant appears to be insecure or invalidated.

## C.     The Balance of Equities Favors Climate United Over EPA

Where an injunction "will not substantially injure other interested parties," the balance of equities tips in plaintiffs' favor. *League of Women Voters*, 838 F.3d at 12. In this case, EPA "cannot

suffer harm from an injunction that merely ends an unlawful practice." *Open Cmtys. All.*, 286 F. Supp. 3d at 179 (quoting *Rodriguez*, 715 F.3d at 1145). Nor can EPA show it would suffer any harm, or substantial harm, as the result of an injunction.

EPA's recent decision to select Climate United for NCIF funding and disburse the grant is evidence that EPA viewed the grant award as consistent with the interests of EPA and undermines any claim to hardship. Moreover, the Inflation Reduction Act prohibits EPA from allocating any funding it withdraws from Climate United for purposes other than those contemplated under the Act. *See* 42 U.S.C. § 7434(a)(2)-(3) (requiring that appropriated funds be used exclusively fund grant awards issued by EPA before September 2024). Injunctive relief would thus not "actually do much, if any, harm" to EPA's "interest[s]." *League of Women Voters*, 838 F.3d at 13.

The potential for waste, fraud, or abuse does not suffice to demonstrate harm to EPA. Where a program has "existing safeguards," the government must identify actual deficiencies in those safeguards for an interest in "preserving taxpayer resources" to weigh in the public interest. *Pacito v. Trump*, No. 25-cv-255, --- F. Supp. 3d ----, 2025 WL 655075, at *24 (W.D. Wash. Feb. 28, 2025); *see also Art-Metal-USA, Inc. v. Solomon*, 473 F. Supp. 1, 8 (D.D.C. 1978) (enjoining agency from blacklisting plaintiff based on vague and generalized allegations of corruption). EPA has not identified any such deficiencies here. EPA designed, structured, and negotiated the financial agent arrangement and the specific terms of the ACA to provide transparency, accountability, and a mechanism for EPA to assume exclusive control of the grant funds. The grant agreement provides EPA with significant oversight over Climate United's spending, which is limited under the Terms and Conditions of the agreement. The grant agreement's Terms and Conditions further require Climate United to provide extensive progress reports, transaction- and project-level reports, organizational disclosures, and ongoing disclosures to EPA. Ex. 3 at 13-17.

Those protections—which EPA imposed and deemed sufficient when it entered into the grant agreement—are therefore sufficient to protect EPA's interests.

In contrast, as discussed above, Defendants' conduct poses an "existential consequence" for Climate United's mission and risks forcing Climate United to "shut[ ] down programs, … furlough[ ] and lay[ ] off employees, [or] shutter[ ] altogether," all of which are significant consequences that tilt in its favor. *AIDS Vaccine Advocacy Coal.*, 2025 WL 485324, at *6; *see also Nat'l Council of Nonprofits*, 2025 WL 368852, at *13 (similar).

### D.     An Injunction Is Firmly in the Public Interest.

Finally, ensuring that Climate United can continue to access its awarded funds is strongly in the public interest. "There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters*, 838 F.3d at 12. Rather, "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id.*; *see also Northern Mariana Islands v. United States*, 686 F. Supp 2d 7, 21 (D.D.C. 2009) ("The public interest is served when administrative agencies comply with their obligations under the APA." (citing *New Jersey v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980))); *Patriot, Inc. v. U.S. HUD*, 963 F. Supp. 1, 6 (D.D.C. 1997) ("[T]he public interest is best served by having federal agencies comply with the requirements of federal law."). Moreover, "the public would be served if the Executive Branch is enjoined from" managing appropriated funds "in a manner that conflicts with the plain language of an appropriations bill." *General Land Office v. Biden*, 722 F. Supp. 3d 710, 745 (S.D. Tex. 2024) (citing *League of Women Voters*, 838 F.3d at 12).

## **CONCLUSION**

Climate United's motion for a temporary restraining order should be granted. Specifically, the Court should enter the following relief:

- Citibank should be restrained from refusing to comply with Climate United's disbursement requests under the ACA. This restraining order should apply both to already-submitted requests and to future requests while the restraining order is in force, so long as those requests comply with the ACA.

- EPA should be restrained from impeding Citibank from complying with its obligations under this TRO, and from unlawfully suspending or terminating Climate United's grant.

Dated: March 10, 2025

Respectfully submitted:

/s/  Adam G. Unikowsky

Gabriel K. Gillett (*pro hac vice* forthcoming)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
Tel.: (312) 222-9350

Adam G. Unikowsky (989053)
Kathryn L. Wynbrandt* (1602446)
David B. Robbins (493976)
Tanner J. Lockhead* (90011928)
JENNER & BLOCK LLP
1099 New York Avenue
Suite 900
Washington, D.C. 20001
Tel.: (202) 639-6000
Fax: (202) 639-6066
aunikowsky@jenner.com

* Application to Court pending.

Allison N. Douglis (*pro hac vice* forthcoming)
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, N.Y. 10036
Tel.: (212) 891-1600
Fax: (212) 891-1699
adouglis@jenner.com

*Attorneys for Plaintiff Climate United Fund*

# Exhibit 2

**From:** "Amidon, Eric" <█████████████████>
**Date:** March 10, 2025 at 12:28:29 AM EDT
**To:** "Byrnes, John Thomas" <john.byrnes@kirkland.com>, "Corlett, Thomas"
<█████████████████>, "Payne, James (Jim)" <█████████████>, "McIntosh, Chad"
<████████████████████████, █████████████████,
████████████████████, "Brown, Reg" <reginald.brown@kirkland.com>, "Dresner, Jeremy"
<jeremy.dresner@kirkland.com>
**Subject: RE: Confidential:  Account Control Agreements under Greenhouse Gas Reduction Fund**

---

**This message is from an EXTERNAL SENDER**

Be cautious, particularly with links and attachments.

---

Dear Mr. Brown,

As you know, and consistent with the Agency's letter of March 8, 2025, the U.S. Environmental Protection Agency (EPA) is working to review and develop additional account controls to address concerns regarding potential fraud and/or conflicts of interest related to the Greenhouse Gas Reduction Fund (GGRF), including based on incoming responses to oversight questions EPA issued to grant recipients on March 4, 2025. The GGRF is also the subject of an ongoing criminal investigation by the U.S. Department of Justice and an investigation by the EPA Office of Inspector General (OIG). Until those additional account controls are developed and implemented in collaboration with Citibank or any future financial agent (the Bank), and given the ongoing investigations into the GGRF, it is critical that the Bank not resume processing payment instructions for the GGRF accounts.

In its communication to the Bank this week, the U.S. Department of the Treasury (Treasury) directed the Bank to cooperate with EPA on account controls.  To prevent the misuse of funds in the interim, EPA instructs the Bank, pursuant to this Treasury directive, the grant agreements, and Section I.B of Exhibit A to the Financial Agency Agreement (FAA) between the Bank and Treasury dated September 19, 2024, to pause the processing of payment instructions for the GGRF accounts until further notice. This interim account control will be rescinded as soon as reasonably practicable once EPA completes its review and implements additional account controls through additional instructions as necessary.

EPA's instruction here does not supplant, conflict with, or supersede any instructions the Bank has or may receive from Treasury, and EPA will continue to work with the Bank to address the implementation of account controls.

Sincerely,

Eric Amidon
Chief of Staff
US EPA

cc:
• Citibank, N.A.
• Chad McIntosh, Acting Deputy Administrator, US EPA
• Jim Payne, Acting General Counsel, US EPA
• Chris Pilkerton, Acting General Counsel, US Department of the Treasury
• Eric Froman, Assistant General Counsel (Banking & Finance), US Department of the Treasury
• US Department of Justice


**Eric Amidon**
Chief of Staff
Environmental Protection Agency


**From:** Byrnes, John Thomas <john.byrnes@kirkland.com>
**Sent:** Sunday, March 9, 2025 8:06 PM
**To:** Zeldin, Lee <██████████████>; Corlett, Thomas <████████████████>; Payne, James (Jim)
<████████████>; Amidon, Eric <██████████████>; McIntosh, Chad
<█████████████████>; ███████████████████████;
███████████████



**Cc:** Brown, Reg <reginald.brown@kirkland.com>; Dresner, Jeremy <jeremy.dresner@kirkland.com>
**Subject:** Confidential: Account Control Agreements under Greenhouse Gas Reduction Fund

| **Caution:** This email originated from outside EPA, please exercise additional caution when deciding whether to open attachments or click on provided links. |

Please see attached on behalf of Citibank, N.A.


**John Byrnes**

**KIRKLAND & ELLIS LLP**
1301 Pennsylvania Avenue, N.W., Washington, D.C. 20004
**T** +1 202 389 3029 **M** +1 202 227 6678
**F** +1 202 389 5200

john.byrnes@kirkland.com


The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of the multi-national law firm Kirkland & Ellis LLP and/or its affiliated entities. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

# Exhibit 3

**From:** ▮▮▮▮▮▮▮▮▮▮▮

**Date:** March 10, 2025 at 1:13:39 AM EDT

**To:** "Brown, Reg" <reginald.brown@kirkland.com>, "Dresner, Jeremy" <jeremy.dresner@kirkland.com>, "Byrnes, John Thomas" <john.byrnes@kirkland.com>

**Cc:** ▮▮▮▮▮▮▮▮▮, ▮▮▮▮▮▮▮▮▮, ▮▮▮▮▮▮▮▮, ▮▮▮▮▮▮▮▮▮, ▮▮▮▮▮▮▮▮

**Subject:** GGRF

---

**This message is from an EXTERNAL SENDER**

Be cautious, particularly with links and attachments.

---

The U.S. Environmental Protection Agency (EPA) has informed the U.S. Department of the Treasury (Treasury) that they are instructing Citibank to impose certain account controls on accounts at Citibank related to the Greenhouse Gas Reduction Fund (GGRF), pursuant to Section I.B of Exhibit A to the Financial Agency Agreement (FAA), dated September 19, 2024, between Treasury and Citibank. In accordance with Treasury's authorities under the FAA, Treasury is instructing Citibank, in its capacity as fiduciary, to comply with EPA's instructions to Citibank pursuant to the FAA.

Thank you.

Eric Froman
Office of the General Counsel
U.S. Department of the Treasury

# Exhibit 4

JA69



**ACCOUNT CONTROL AGREEMENT**

**among**

Climate United Fund**, as PLEDGOR**

United States Environmental Protection Agency**, as SECURED PARTY**

**and**

**CITIBANK, N.A., as BANK**

**Dated as of November 1, 2024**

Docusign Envelope ID: 049E61F7-9927-48DF-BE07-AF62365B3063

**THIS ACCOUNT CONTROL AGREEMENT** (this "**Agreement**"), dated as of November 1, 2024, by and among Climate United Fund, a Delaware 501(c)(3) nonstock corporation (the "**Pledgor**"), the United States Environmental Protection Agency, an agency of the United States Government (the "**Secured Party**") and Citibank, N.A., a national banking association organized and existing under the laws of the United States of America ("Citibank") and acting through its Agency & Trust business solely in its capacity as bank under this Agreement, and any successors appointed pursuant to the terms hereof (Citibank in such capacity, the "**Bank**").

**WHEREAS,** the Pledgor and the Secured Party have entered into that certain federal financial assistance agreement, as identified in Addendum 1, (the "**Grant Agreement**") pursuant to which the Pledgor has granted the Secured Party a security interest in the accounts as identified in Addendum 1 established and maintained by the Bank for the Pledgor (the "**Accounts**").

**WHEREAS,** the Bank has been designated and authorized to act as a financial agent of the United States pursuant to the authority of the U.S. Department of the Treasury under 12 U.S.C. §§ 90 and 265.

**WHEREAS,** the parties wish that the Bank enter into this Agreement in order to provide for the "control" (as defined in Section 9-104(a) of the Uniform Commercial Code in effect in the State of New York ("**UCC**"), in the case of a deposit account, or Section 8-106 of the UCC, in the case of a security account) of the accounts as a means to perfect the security interest of the Secured Party.

**WHEREAS,** the Pledgor and the Secured Party have agreed that the terms and conditions entitled "Deposit Account at Financial Agent" in the Grant Agreement indicate the conditions under which the Secured Party may exercise its right of control herein, and such conditions will be defined as "default" for the purposes of this Agreement.

**WHEREAS,** capitalized terms used herein without definition and that are defined in Article 8 or Article 9 of the UCC as adopted in the State of New York shall have the respective meanings set forth therein.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and adequacy of which is hereby irrevocably acknowledged, the parties hereto agree as follows:

1.      **The Accounts.**  The Pledgor and the Bank represent and warrant to, and agree with the Secured Party that:

(a)     The Bank maintains the Accounts for the Pledgor, and all property (including, without limitation, all funds and financial assets) held by the Bank for the accounts of the Pledgor are, and will continue to be, credited to the Accounts in accordance with instructions given by the Pledgor (unless otherwise provided herein).

(b)     To the extent that cash is credited to the Accounts, the Accounts are a deposit account; and to the extent that financial assets (other than cash) are credited to the Accounts, the Accounts are a securities account.  The Bank is (i) the bank with which the Accounts are maintained and (ii) the securities intermediary with respect to financial assets held in the Accounts.  The Pledgor is (A) the Bank's customer with respect to the Accounts and (B) the entitlement holder with respect to all financial assets credited from time to time to the Accounts.

(c)     Notwithstanding any other agreement to the contrary, the Bank's jurisdiction with

**JA71**

Docusign Envelope ID: 049F61F7-9927-48DF-BE97-AF62365B3063

Case 1:25-cv-00698-TSC    Document 14-4    Filed 03/12/25    Page 4 of 29
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 78 of 516

respect to the Accounts for purposes of the UCC is, and will continue to be for so long as the Secured Party's security interest shall be in effect, the State of New York.

(d)     The Pledgor and the Bank do not know of any claim to or interest in the Accounts or any property (including, without limitation, funds and financial assets) credited to the Accounts, except for claims and interests of the parties referred to in this Agreement.

**2.**     **Control over Accounts.**

The Bank shall comply with all instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and financial assets in the Accounts including, without limitation, directions to distribute proceeds of any such transfer or redemption of interest or dividends on financial assets in the Accounts, substantially in the form attached hereto as Exhibit B ("**Account Direction**"), originated by the Pledgor, until the time that that Bank receives a notice, substantially in the form attached hereto as Exhibit A (a "**Notice of Exclusive Control**") from the Secured Party that the Secured Party is exercising its right to exclusive control over an Account, and after such time that the Bank receives a Notice of Exclusive Control, the Secured Party for such Account, without further consent by the Pledgor.

**3.**     **Priority of Secured Party's Security Interest.**  The Bank subordinates in favor of the Secured Party any interest, lien or right of setoff it may have, now or in the future, against the Accounts or assets in the Accounts; *provided; however*, that, subject to the foregoing, the Bank may set off all amounts due to it in respect of its fees and expenses (including, without limitation, the payment of any legal fees or expenses) or any amounts payable pursuant to Section 4 hereof.

**4.**     **Investment of Funds.**

(a)     The Bank shall deposit the assets in non-interest bearing Accounts and invest the assets in the Accounts consistent with the instructions provided by the Pledgor, in Addendum 1. The Pledgor's instructions will be in accordance with the Grant Agreement, provided that the Bank is not responsible for verifying whether the Pledgor's instructions are in compliance with the Grant Agreement. The Bank shall invest such assets in the Accounts on the date of deposit provided that such assets are received on or before 11:00 a.m. New York City time.  Any assets received after 11:00 a.m. New York City time shall be treated as if received on the following Business Day. For purposes of this Agreement, "**Business Day**" shall mean any day that the Bank is open for business.

(b)     The Bank is hereby authorized and directed to sell or redeem any such investments as it deems necessary to make any payments or distributions required under this Agreement. The Bank shall have no responsibility or liability for any loss in the value of any investment made pursuant to this Agreement, or for any loss, cost or penalty resulting from any sale or liquidation of the assets in the Account.  The Bank is hereby authorized to execute purchases and sales of investments through the facilities of its own trading or capital markets operations or those of any affiliated entity.  The Bank does not have a duty nor will it undertake any duty to provide investment advice.

(c)     The Bank shall transfer any earnings or proceeds received on or distributions of earnings or proceeds from the assets in the Accounts to the Program Income from Operations Account on a monthly basis.

**5.**     **Tax Matters.**

citi

-2-

**JA72**

Docusign Envelope ID: 019E61F7-9927-48DF-BF07-AF62365B3063

Case 1:25-cv-00698-TSC    Document 14-4    Filed 03/12/25    Page 5 of 29
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 79 of 516

(a)      The Pledgor and the Secured Party agree that, unless and until the Grant Agreement is terminated, any earnings or proceeds received on or distributions of earnings or proceeds from the assets in the Accounts shall be treated as the income of the Pledgor and shall be reported on an annual basis on United States Internal Revenue Service ("**IRS**") Form 1099-DIV, as required pursuant to the Internal Revenue Code of 1986, as amended (the "**Code**") and the regulations there under. Principal payments are not reportable to any payee hereunder.  No earnings or proceeds received on or distributions of earnings or proceeds from the assets in the Accounts, or principal payments from the Accounts, are reportable to the Secured Party. The Pledgor, the Secured Party and the Bank agree that the Bank will not be responsible for providing tax reporting and withholding for payments that are for compensation for services performed by an employee or independent contractor.

(b)      The Pledgor and the Secured Party shall upon the execution of this Agreement provide the Bank with a duly completed and properly executed IRS Form W-9 or applicable IRS Form W-8, in the case of a non-U.S. person, for each payee, together with any other documentation and information requested by the Bank in connection with the Bank's tax reporting obligations under the Code and the regulations thereunder.  With respect to the Bank's tax reporting obligations under the Code, the Foreign Account Tax Compliance Act and the Foreign Investment in Real Property Tax Act and any other applicable law or regulation, the Pledgor and the Secured Party understand that, in the event valid U.S. tax forms or other required supporting documentation are not provided to the Bank, the Bank may be required to withhold tax from the assets in the Accounts and report account information on any earnings, proceeds or distributions from the assets in the Accounts.

(c)      Should the Bank become liable for the payment of taxes, including withholding taxes relating to any funds, including interest and penalties thereon, held by it pursuant to this Agreement or any payment made hereunder, the Pledgor agrees to indemnify and hold the Bank harmless pursuant to Section 7(b) hereof from any liability or obligation on account of taxes, assessments, interest, penalties, expenses and other governmental charges that may be assessed or asserted against the Bank, provided that such liability shall not be satisfied by assets in the Accounts. If the Pledgor fails to indemnify the Bank for such taxes, the Bank will notify the Secured Party.

(d)      The Bank's rights under this Section 5 shall survive the termination of this Agreement or the resignation or removal of the Bank.

**6.      <u>Concerning the Bank.</u>**

(a)      <u>Bank Duties</u>. Each of the Pledgor and the Secured Party acknowledges and agrees that (i) the duties, responsibilities and obligations of the Bank shall be limited to those expressly set forth in this Agreement, each of which is administrative or ministerial (and shall not be construed to be fiduciary in nature), and no duties, responsibilities or obligations shall be inferred or implied, (ii) the Bank shall not be responsible for any of the agreements referred to or described herein (including, without limitation, the Grant Agreement and any defined term therein not otherwise defined in this Agreement), or for determining or compelling compliance therewith, and shall not otherwise be bound thereby, and (iii) the Bank shall not be required to expend or risk any of its own funds to satisfy payments from the Accounts hereunder.

(b)      <u>Liability of Bank</u>.  The Bank shall not be liable for any damage, loss or injury



Docusign Envelope ID: 049F61F7-9927-48DF-BE93-AF62365B3062

Case 1:25-cv-00698-TSC    Document 14-4    Filed 03/12/25    Page 6 of 29
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 80 of 516

resulting from any action taken or omitted in the absence of gross negligence or willful misconduct (as finally adjudicated by a court of competent jurisdiction).  In no event shall the Bank be liable for indirect, incidental, consequential, punitive or special losses or damages (including but not limited to lost profits), regardless of the form of action and whether or not any such losses or damages were foreseeable or contemplated.  The Bank shall be entitled to rely upon any instruction, notice, request or other instrument delivered to it without being required to determine the authenticity or validity thereof, or the truth or accuracy of any information stated therein.  The Bank may act in reliance upon any signature believed by it to be genuine (including any signature affixed by DocuSign) and may assume that any person purporting to make any statement, execute any document, or send any instruction in connection with the provisions hereof has been duly authorized to do so.  The Bank may consult with counsel satisfactory to it, and the opinion or advice of such counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it in good faith and in accordance with the opinion and advice of such counsel.  The Bank may perform any and all of its duties through its agents, representatives, attorneys, custodians and/or nominees.  The Bank shall not incur any liability for not performing any act or fulfilling any obligation hereunder by reason of any occurrence beyond its control (including, without limitation, any provision of any present or future law or regulation or any act of any governmental authority, any act of God or war or terrorism, or the unavailability of the Federal Reserve Bank wire services or any electronic communication facility).

(c)    _Reliance on Orders_.  The Bank is authorized to comply with final orders issued or process entered by any court with respect to the assets in the Accounts, without determination by the Bank of such court's jurisdiction in the matter.  If any portion of the assets in the Accounts are at any time attached, garnished or levied upon under any court order, or in case the payment, assignment, transfer, conveyance or delivery of any such property shall be stayed or enjoined by any court order, or in case any order, judgment or decree shall be made or entered by any court affecting such property or any part thereof, then and in any such event, the Bank is authorized to rely upon and comply with any such order, writ, judgment or decree which it is advised is binding upon it without the need for appeal or other action; and if the Bank complies with any such order, writ, judgment or decree, it shall not be liable to the Pledgor or the Secured Party or to any other person or entity by reason of such compliance even though such order, writ, judgment or decree may be subsequently reversed, modified, annulled, set aside or vacated.

(d)    _Erroneous Payments_.  If the Bank releases any funds (including but not limited to the assets in the Accounts or any portion of it) to the Pledgor or the Secured Party and subsequently determines (in its absolute discretion) that the payment (or any portion of it) was made in error, the Pledgor or the Secured Party, as applicable, shall upon notice promptly refund the erroneous payment, and none of the obligations of the Pledgor or the Secured Party, as applicable, or the remedies of the Bank will be affected by any act, omission, matter or thing (including, without limitation, any obligation pursuant to which an erroneous payment is made) which, but for this provision, would reduce, release, preclude or prejudice any such obligation or remedy (whether or not known by the Bank, the Pledgor or the Secured Party). Each of the Pledgor and the Secured Party agrees not to assert discharge for value, bona fide payee, or any similar doctrine as a defense to recovery of any erroneous payment by the Bank.

**7.    Compensation, Expense Reimbursement and Indemnification.**

(a)    _Compensation_. The Bank's compensation shall be as specified in _Schedule A_.

citi

JA74

Docusign Envelope ID: 019F61F7-9927-48DF-BE97-AF62365B3062

Case 1:25-cv-00698-TSC     Document 14-4     Filed 03/12/25     Page 7 of 29
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 81 of 516

(b)      Indemnification. The Pledgor covenants and agrees to indemnify the Bank and its employees, officers, directors, affiliates, and agents (each, an **Indemnified Party**") for, hold each Indemnified Party harmless from, and defend each Indemnified Party against, any and all claims, losses, actions, liabilities, costs, damages and expenses of any nature incurred by any Indemnified Party, arising out of or in connection with this Agreement or with the administration of its duties hereunder, including, but not limited to, attorney's fees, costs and expenses, except to the extent such loss, liability, damage, cost or expense shall have been finally adjudicated by a court of competent jurisdiction to have resulted solely from the Indemnified Party's own gross negligence or willful misconduct, provided that such liability shall not be satisfied by assets in the Accounts. The foregoing indemnification and agreement to hold harmless shall survive the termination of this Agreement and the resignation or removal of the Bank. If the Pledgor fails to indemnify the Bank pursuant to this Section 7(b), the Bank shall notify the Secured Party.

8.      **Statements, Confirmations and Notices of Adverse Claims.** The Bank will send copies of all statements and confirmations for the Accounts simultaneously to the Pledgor and the Secured Party. The Bank shall be deemed to have delivered statements and confirmations if such statements and confirmations are available on one or more of the Bank systems to deliver electronic media. The Bank will use reasonable efforts promptly to notify the Secured Party and the Pledgor if any other person claims that it has a property interest in the Accounts or any financial asset in the Accounts.

9.      **Entire Agreement; Exclusive Benefit.** This Agreement constitutes the entire agreement between the parties and sets forth in its entirety the obligations and duties of the Bank with respect to the assets in the Accounts. This Agreement is for the exclusive benefit of the parties to this Agreement and their respective permitted successors, and shall not be deemed to give, either expressly or implicitly, any legal or equitable right, remedy, or claim to any other entity or person whatsoever. No party may assign any of its rights or obligations under this Agreement without the prior written consent of the other parties.

10.      **Resignation and Removal.** The Bank may be removed only by the U.S. Department of the Treasury.

11.      **Governing Law.** This Agreement is governed by and shall be construed and interpreted in accordance with federal law of the United States, except where there is no applicable federal law, in accordance with the laws of the State of New York, without giving effect to the conflict of laws principles thereof.

12.      **Representations and Warranties.**

(a)      Each of the Pledgor and the Secured Party represents and warrants that it has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder; and this Agreement has been duly approved by all necessary action and constitutes its valid and binding agreement enforceable in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or other similar laws affecting the enforcement of creditors' rights and subject to general equity principles.

(b)      Each of the Pledgor and the Secured Party represents that neither it nor any of its parents or subsidiaries, or any of their respective directors, officers, or employees, or to the knowledge of the Pledgor and the Secured Party, the affiliates of the Pledgor, the Secured Party or any of its subsidiaries, will, directly or indirectly, use any part of any proceeds or lend, contribute,



JA75

Docusign Envelope ID: 019F61F7-9937-48DF-BF07-AF62365B3063

Case 1:25-cv-00698-TSC    Document 14-4    Filed 03/12/25    Page 8 of 29
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 82 of 516

or otherwise make available such assets in the Accounts in any manner that would result in a violation by any person of economic, trade, or financial sanctions, requirements, or embargoes imposed, administered, or enforced from time to time by the United States (including, without limitation, the Office of Foreign Assets Control of the U.S. Department of the Treasury and the U.S. Department of State), the United Kingdom (including, without limitation, His Majesty's Treasury), the European Union and any EU member state, the United Nations Security Council, and any other relevant sanctions authority.

### 13. **Notices; Instructions.**

(a)    Any notice or instruction hereunder shall be in writing in English, and may be sent by (i) secure file transfer or (ii) electronic mail with a scanned attachment thereto of an executed notice or instruction, and shall be effective upon actual receipt by the Bank in accordance with the terms hereof.  Any notice or instruction must be executed (which execution may be manual or affixed by DocuSign) by an authorized person of the Pledgor or the Secured Party, as applicable (the person(s) so designated from time to time, the "**Authorized Persons**").  Each of the applicable persons designated on <u>Schedule B</u> and <u>Schedule C</u> attached hereto have been duly appointed to act as Authorized Persons hereunder and individually have full power and authority to execute any notices or instructions, to amend, modify or waive any provisions of this Agreement, and to take any and all other actions permitted under this Agreement, all without further consent or direction from, or notice to, it or any other party.  Any notice or instruction must be originated from a corporate or government domain.  Any change in designation of Authorized Persons shall be provided by written notice, signed by an Authorized Person, and actually received and acknowledged by the Bank.  Any communication from the Bank that the Bank deems to contain confidential, proprietary, and/or sensitive information shall be encrypted in accordance with the Bank's internal procedures.

(b)    Each of the Pledgor and the Secured Party understands and agrees that the Bank cannot determine the identity of the actual sender of any notice or instruction and that the Bank shall be entitled to conclusively presume that notices or instructions that purport to have been sent by an Authorized Person have been sent by such Authorized Person.  Each of the Pledgor and the Secured Party agrees: (i) to assume all risks arising out of the use of electronic means (including electronic mail, secure file transfer or such other method or system specified by the Bank as available for use in connection with its services hereunder) to submit instructions to the Bank, including, without limitation, the risk of the Bank acting on unauthorized instructions, and the risk of interception or misuse by third parties; (ii) that it is fully informed of the protections and risks associated with the various methods of transmitting instructions to the Bank and that there may be more secure methods of transmitting instructions than the method(s) selected by the Pledgor and the Secured Party, as applicable; (iii) that the security procedures (if any) to be followed in connection with its transmission of instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances; and (iv) to notify the Bank immediately upon learning of any compromise or unauthorized use of the security procedures.  The Pledgor and the Secured Party agree that the security procedures set forth in Section 13(a) and this Section 13(b) are commercially reasonable.

If to the Pledgor:
As provided in Addendum 1

If to the Secured Party:
The Office of the Greenhouse Gas Reduction Fund,



JA76

Docusign Envelope ID: 049F61F7-9927-48DF-BE07-AF62365B3063

Case 1:25-cv-00698-TSC     Document 14-4     Filed 03/12/25     Page 9 of 29
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 83 of 516

United States Environmental Protection Agency
Attention: David Widawsky
Telephone: +1 ███████████
E-mail: ████████████ ; ████████████████

If to the Bank:
Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, NY 10013
Attn.: Nerlie Delly
Telephone: +1 █████████████
E-mail: ████████████████████

**14.** **Amendment; Waiver.** Any amendment of this Agreement shall be binding only if evidenced by a writing signed by each of the parties to this Agreement. No waiver of any provision hereof shall be effective unless expressed in writing and signed by the party to be charged.

**15.** **Severability.** The invalidity, illegality or unenforceability of any provision of this Agreement shall in no way affect the validity, legality or enforceability of any other provision. If any provision of this Agreement is held to be unenforceable as a matter of law, the other provisions shall not be affected thereby and shall remain in full force and effect.

**16.** **Mergers and Conversions.** Any corporation or entity into which the Bank may be merged or converted or with which it may be consolidated, or any corporation or entity resulting from any merger, conversion or consolidation to which the Bank will be a party, or any corporation or entity succeeding to the business of the Bank will be the successor of the Bank hereunder without the execution or filing of any paper with any party hereto or any further act on the part of any of the parties hereto except where an instrument of transfer or assignment is required by law to effect such succession, anything herein to the contrary notwithstanding.

**17.** **Termination.** This Agreement shall terminate upon receipt by the Bank of notice from the Secured Party that its security interest in such Accounts and all assets therein have terminated. Upon receipt of such notice, the Secured Party shall have no further right to originate instructions with respect to the assets in the Accounts. The Bank shall, upon payment of all outstanding fees and expenses hereunder, promptly forward any amounts held by the Bank in the Accounts to the Pledgor, and the Bank shall be relieved and discharged of any further responsibilities with respect to its duties hereunder.

**18.** **Counterparts.** This Agreement may be executed simultaneously in two or more counterparts, any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same agreement. Signatures on counterparts of this Agreement executed and delivered in electronic format (i.e. "pdf") or by other electronic means (including DocuSign) shall be deemed original signatures with all rights accruing thereto except in respect to any non-US entity, whereby originals may be required.

**[Remainder of Page Left Intentionally Blank]**

citi

**JA77**

Docusign Envelope ID: 019E61F7-9937-48DF-BE87-AF62365B3062

Case 1:25-cv-00698-TSC    Document 14-4    Filed 03/12/25    Page 10 of 29
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 84 of 516

**IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed by a duly authorized representative as of the day and year first written above.**

**CITIBANK, N.A.,**
as Bank

By: _Nerlie Delly_
    8BE0246B7B634D0...

    Name: Nerlie Delly
    Title: Senior Trust Officer

**Climate United Fund**,
as Pledgor

By: _Elizabeth Bafford_
    C41FE0C468DE46F...

    Name: Elizabeth Bafford
    Title: President & CEO

**United States Environmental Protection Agency**

By: _Phillip K Schindel_
    8474CD72C10743B...

    Name: Philip Schindel
    Title: EPA Award Official

JA78

Docusign Envelope ID: 019E6157-9937-48DF-BF87-AF62365B3062

Case 1:25-cv-00698-TSC    Document 14-4    Filed 03/12/25    Page 11 of 29
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 85 of 516

**EXHIBIT A**

**FORM OF NOTICE OF EXCLUSIVE CONTROL**

VIA EMAIL: ███████████ / ████████████████████

Nerlie Delly
Vice President
Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, New York 10013

Pursuant to the Account Control Agreement dated November 1, 2024, among Climate United Fund (the "**Pledgor**"), United States Environmental Protection Agency (the "**Secured Party**"), and Citibank, N.A. (the "**Bank**"), we hereby instruct you of the following:

The Pledgor and the Secured Party have agreed that the terms and conditions entitled "Deposit Account at Financial Agent" in the Grant Agreement indicate the conditions under which the Secured Party may exercise its right of control herein, and such conditions will be defined as "default" for the purposes of the Account Control Agreement.

As required by the Grant Agreement, the Secured Party has issued a written determination and finding that Pledgor has failed to comply with the terms and conditions of the Grant Agreement, and that noncompliance is substantial such that effective performance of the Grant Agreement is materially impaired or there is adequate evidence of waste, fraud, material misrepresentation of eligibility status, or abuse, and that the Secured Party has initiated action under 2 CFR 200.339 to wholly or partly suspend or terminate the Grant Agreement, as authorized in the terms of the Grant Agreement.

Therefore, the Secured Party hereby notifies you that (i) a default has occurred and is continuing under the Grant Agreement and (ii) from and after the receipt of this notice until you receive further instruction from Secured Party, you are hereby directed to retain and hold all funds in the Account and not to [invest or] disburse the same to any party whatsoever, other than as instructed by the Secured Party.

**United States Environmental Protection Agency**

as Secured Party

By: _____
     Name:
     Title:
     Date:

Exhibit A

Docusign Envelope ID: 019E6157-9937-48DF-BF87-AF62365B3062

Case 1:25-cv-00698-TSC    Document 14-4    Filed 03/12/25    Page 12 of 29
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 86 of 516

**EXHIBIT B**

**FORM OF ACCOUNT DIRECTION (NCIF)**
**Pledgor's UEI Number:** █████████

[Date]

Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, NY 10013
Attn: Nerlie Delly
E-mail: ███████████ / ████████████████

VIA: CitiSFT

RE: Account Control Agreement dated November 1, 2024, among Climate United Fund (the "**Pledgor**"), United States Environmental Protection Agency (the "**Secured Party**"), and Citibank, N.A. (the "**Bank**")

Pursuant to Section 2 of the above referenced Account Control Agreement, the Pledgor hereby instructs the Bank to disburse a total amount of $[●] funds as per below and as per the attached upload file named xxx:

**Check applicable boxes:**

( ) **Internal Transfer within the Bank (intra-entity).**

( ) **Internal Transfer within the Bank (inter-entity).**

( ) **External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities).**

( ) **External Transfer outside the Bank (for Financial Assistance Activities).**

**If an Internal Transfer within the Bank (intra-entity), check the following applicable boxes:**

( ) **Transfer of $[●] across Pledgor's 'Budget' sub-accounts, as defined in the Grant Agreement**.

( ) **Transfer of $[●] from Pledgor's 'Program Income from Operations' account to Pledgor's 'Budget' sub-account(s), as defined in the Grant Agreement**.

( ) **Transfer of $[●] from Pledgor's 'Reserve' account to Pledgor's 'Program Income from Operations' account, as defined in the Grant Agreement.**

( ) **Transfer of $[●] from Pledgor's 'Budget' sub-account(s) or 'Program Income from Operations' account to 'Reserve' account, as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

Docusign Envelope ID: 819E6157-9937-48DF-BF87-AF62365B3062

Case 1:25-cv-00698-TSC    Document 14-4    Filed 03/12/25    Page 13 of 29
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 87 of 516

*"The amount of this expenditure is necessary to execute against the EPA-approved workplan. Financing agreements for identified Qualified Projects necessitating the transfer have been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

**If an Internal Transfer within the Bank (inter-entity), check the following applicable boxes:**

( ) **Transfer of $[●] from Pledgor's 'Budget' sub-account(s) to 'Financial Assistance Subrecipient' as defined in the Grant Agreement.**

**If an External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities), check one of the following boxes:**

( ) **Disbursement of $[●] for Predevelopment Activities as defined in the Grant Agreement.**

( ) **Disbursement of $[●] for Market-Building Activities as defined in the Grant Agreement.**

( ) **Disbursement of $[●] for Program Administration Activities as defined in the Grant Agreement.**

**If an External Transfer outside the Bank (for Financial Assistance Activities), check the following applicable boxes:**

( ) **Disbursement of $[●] from Pledgor's 'Budget' sub-account to provide Financial Assistance to Qualified Projects as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the EPA-approved workplan. Financing agreements for identified Qualified Projects necessitating the transfer have been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

( ) **Disbursement of $[●] from Pledgor's 'Reserve' account to satisfy a legal obligation to a third party as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this transfer is necessary to execute against the EPA-approved workplan and pay a third party pursuant to a financing agreement that has been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

Capitalized terms in this instruction letter not otherwise defined shall have the same meaning given to them in the Account Control Agreement.

Signature on this Account Direction executed and delivered in electronic format (i.e. "pdf") or by other electronic means (including DocuSign) shall be deemed original signatures with all rights accruing thereto.

IN WITNESS WHEREOF, the Pledgor has caused this Account Direction to be duly executed and delivered as of the date first written above.

Pledgor:

_____

Authorized Person

Docusign Envelope ID: 019E6157-9937-48DF-BF87-AF62365B3062

Case 1:25-cv-00698-TSC    Document 14-4    Filed 03/12/25    Page 15 of 29
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 89 of 516

**ADDENDUM 1**
**Account Control Agreement**

| | |
|---|---|
| **Date of Account Control Agreement** | November 1, 2024 |
| **Grant Agreement** | Agreement Title: GGRF NCIF: Climate United (███████████) <br> Agreement Date: 8/8/2024 |
| **Pledgor Notice Details** | Attn: Beth Bafford <br> Address: 7550 Wisconsin Ave, 3rd Floor, Bethesda, MD 20814 <br> Email: ███████████ |
| **UEI Number** | ███████████ |
| **Tax Identification Number** | ███████ |
| **Citi Deposit Instructions** | Bank: CITIBANK, N.A. <br> ABA: ███████ <br> Account Name: <br> Account Number: <br> Ref: |

**Money Market Fund Investment Selection**

| Fund Name | Fund Number | CUSIP |
|---|---|---|
| Blackrock Treasury Trust Fund (10) Institutional Shares | ███████ | ███████ |

**Accounts to Be Established**

| Account Number | Account Name | Initial Deposit Amount |
|---|---|---|
| ███6100 | CUF Financial Assistance | ███████████ |
| ███6200 | CUF Predevelopment | ███████ |
| ███6300 | CUF Market-Building | ███████ |
| ███6400 | CUF Program Administration | ███████ |
| ███6500 | CUF Other Pass-Through Funding | ███████ |
| ███6600 | CUF Reserves | ███ |
| ███6700 | CUF Program Income from Operations | ███ |

**CitiVelocity Reporting Entitlements Request**:

The Pledgor hereby requests that the Bank entitle the following individuals to view-only access to the Bank's client reporting system for all accounts opened under this Account Control Agreement.

Docusign Envelope ID: 019E6157-9937-48DF-BE87-AF62365B3062

Case 1:25-cv-00698-TSC    Document 14-4    Filed 03/12/25    Page 16 of 29
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 90 of 516

Pledgor Client Profile Name: Climate United Fund

| Name | Phone Number | Email |
|------|-------------|-------|
| Beth Bafford | ███████ | ████████████ |
| Stephanie Seiberg | ███████ | ████████████ |
| Ann Dobbyn | ███████ | ████████████ |
| Emmeline Liu | ███████ | ████████████ |
| Comfort Siodlarz | ███████ | ████████████ |

The Pledgor hereby acknowledges that all accounts opened under this Account Control Agreement will be entitled to the Bank's client reporting system and made available for view-only access to the following Client Profiles and their associated users:

| Entity | Client Profile Name |
|--------|--------------------|
| Secured Party | U.S. Environmental Protection Agency |

**CitiSFT Entitlements Request:**

Citi makes available the Secure File Transfer (CitiSFT) platform for clients to securely upload Account Directions. The Pledgor hereby requests that the Bank entitle the below individuals with upload only access to CitiSFT:

| Name | Phone Number | Email | Maker, Checker, Maker and Checker |
|------|-------------|-------|-----------------------------------|
| Beth Bafford | ███████ | ███████████ | Checker |
| Stephanie Seiberg | ███████ | ███████████ | Checker |
| Ann Dobbyn | ███████ | ███████████ | Checker |
| Comfort Siodlarz | ██████ | ███████████ | Maker |
| Weijie Ma | ███████ | ██████████ | Maker |
| Emmeline Liu | ███████ | ██████████ | Maker |

Signed by:

*Elizabeth Bafford*

C11FE0C458DE46F...

Authorized Signature

Elizabeth Bafford

EAB

Docusign Envelope ID: 819E61F7-9937-48DF-BF87-AF62365B3062

# SCHEDULE A

## BANK COMPENSATION

### General compensation

For the services described in the Account Control Agreement, the Bank shall charge each Pledgor as follows:

| Agency & Trust Services | Fees |
|---|---|
| **Acceptance Fee** <br> This one-time fee covers the acceptance of the appointment, the review of the related Transaction documents submitted in connection with the execution and delivery thereof, setting up of internal controls, and communication with other members of the working group, as necessary. | Waived |
| **Annual Administration Fee** <br> To cover the administrative functions of Citi under the Agreement, including the establishment and maintenance of the account(s), safekeeping of assets, maintenance of the records, execution and administration of the Agreement provisions, and other duties required under the terms of the Agreement. | Waived |
| **Wire Fees** | Waived |
| **Legal Fees** <br> To cover the review of legal documents by Citibank Agency & Trust's outside counsel. | Waived |

The Transaction documents will be governed in accordance with federal law of the United States, except where there is no applicable federal law, in accordance with the laws of the State of New York, without giving effect to the conflict of laws principles thereof, as established in the Agreement and subject to internal approval and satisfactory review of all documentation. All outgoing payments processed by Citi will be made via wire. Account balances invested in an Institutional Money Market Fund will be chosen by the client from a list of providers that Citi will supply. If invested in a Money Market Fund, fund distributors may provide Citi with Shareholder Servicing fees. These fees are discussed in the fund's prospectus, which will be delivered to the client prior to investment. All of Citi's responsibilities will be non-discretionary and Citi will not be required to make any advances of its own funds. Therefore, all services provided by Citi must strictly follow the terms stated in the Agreements or in the written instructions of the authorized parties or third parties authorized to send instructions to Citi.

In accordance with US regulations regarding anti-money laundering and terrorist financing, Federal law requires Citi to obtain, verify and record information that identifies each business or entity that opens an account or establishes a relationship with Citi. What this means for our clients: when a client opens an account or establishes a relationship, we will ask for the client's business name, a street address and a tax identification number that Federal law requires us to obtain. In accordance with the Unlawful Internet Gambling Act (the "Act"), Citibank, N.A. accounts or other Citibank, N.A. facilities in the United States may not be used to process "restricted transactions" as such term is defined in U.S. 31 CFR Section 132.2(y).

JA85

Docusign Envelope ID: 819E61F7-9937-48DF-BF87-AF62365B3062

Case 1:25-cv-00698-TSC     Document 14-4     Filed 03/12/25     Page 18 of 29
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 92 of 516

**SCHEDULE B**

**PLEDGOR AUTHORIZED LIST OF SIGNERS**
**(to be provided separately)**

Each of the following person(s) is authorized to execute documents and to direct the Bank as to all matters on the Pledgor's behalf.  The Bank may confirm the instructions received by return call to any one of the telephone numbers listed below.

**PLEDGOR**

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name: Title: Phone: Email: | | |

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name: Title: Phone: Email: | | |

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name: Title: Phone: Email: | | |

Docusign Envelope ID: 019E61F7-9937-48DF-BE87-AF62365B3062

Case 1:25-cv-00698-TSC    Document 14-4    Filed 03/12/25    Page 19 of 29
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 93 of 516

**SCHEDULE C**

**SECURED PARTY AUTHORIZED LIST OF SIGNERS**
**(to be provided separately)**

Each of the following person(s) is authorized to execute documents and to direct the Bank as to all matters on the Secured Party's behalf.  The Bank may confirm the instructions received by return call to any one of the telephone numbers listed below.

**SECURED PARTY**

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: | | |

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: | | |

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: | | |

Docusign Envelope ID: 3AE10237-5B84-4059-A4E3-8AA2DCBB5197

Case 1:25-cv-00698-TSC    Document 14-4    Filed 03/12/25    Page 20 of 29
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 94 of 516

## AMENDMENT TO ACCOUNT CONTROL AGREEMENT

This Amendment to the Account Control Agreement (this "**Amendment**"), is entered into as of January 13, 2025 by and among CITIBANK, N.A. (in such capacity, the "**Bank**"), UNITED STATES ENVIRONMENTAL PROTECTION AGENCY (the "**Secured Party**"), and CLIMATE UNITED FUND (the "**Pledgor**" and together with Bank and Secured Party, collectively, the "**Parties**").

### R E C I T A L S :

A.      Reference is made to that certain Account Control Agreement, dated as of November 1, 2024 (as amended from time to time, the "**ACA**") by and among the Bank, the Secured Party and the Pledgor.  Capitalized terms used herein and not otherwise defined herein shall have the meaning given to such terms in the ACA.

B.      The Parties desire to amend the ACA as set forth herein.

NOW, THEREFORE, in consideration of the premises, the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1) <u>Amendments to ACA</u>.  The ACA is hereby amended as follows:

   a) Section 2 is amended by adding the following proviso to the end of such section:

   "; <u>provided</u> that notwithstanding the foregoing, after the delivery of a Notice of Exclusive Control, Bank shall continue to disburse funds and financial assets associated with financial obligations "properly incurred" by the Pledgor prior to the issuance of, but not in anticipation of, a delivery of a Notice of Exclusive Control, in Pledgor's "Reserve" Account pursuant to Account Directions originated by Pledgor except for any specific funds or financial assets, identified by Secured Party in the applicable Notice of Exclusive Control as not being "properly incurred" by the Pledgor in accordance with 2 CFR 200.343."

   b) Exhibit A (Notice of Exclusive Control) of the ACA is hereby amended and restated in the form attached to this Amendment as <u>Exhibit A</u>.

   c) Exhibit B (Form of Account Direction (NCIF) of the ACA is hereby amended and restated in the form attached to this Amendment as <u>Exhibit B</u>.

2) <u>Counterparts</u>.  This Amendment may be executed in several counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same document. Signatures transmitted by facsimile or e-mail shall be sufficient to bind the Parties to this Amendment.

3) <u>Ratification</u>.  The Parties acknowledge that in all other respects, the provisions of the ACA are hereby reaffirmed and ratified, and shall remain in full force and effect.

4) <u>Conflict</u>.  The Parties agree that in the event of a conflict between the terms and conditions of this Amendment and the ACA (as may have been amended by any prior amendment), the terms and conditions of this Amendment shall govern.

[Remainder of Page Intentionally Blank; Signature Pages to Follow]

Docusign Envelope ID: 3AE10237-5B84-4059-A4E3-8AA2DCBB5197

Case 1:25-cv-00698-TSC    Document 14-4    Filed 03/12/25    Page 22 of 29
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 96 of 516

IN WITNESS WHEREOF, the Parties hereto have executed this Amendment in their respective signatures, intending that this Amendment shall become effective as of the date first above written.

**CLIMATE UNITED FUND**

By: _Elizabeth Bafford_

Name: Elizabeth Bafford

Title: CEO

Docusign Envelope ID: 3AE10237-5B84-4059-A4E3-8AA2DCBB5107

**CITIBANK, N.A.**

By: _Nerlie Delly_ _____

Name: Nerlie Delly _____

Title: Senior Trust Officer _____

[*Signature Page to Amendment to Account Control Agreement*]

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

By: _____

Name: Phillip K Schindel

Title: Acting Dir, Grants Mgmt & Business Ops Division

Docusign Envelope ID: 3AE10237-5B84-4059-A4E3-8AA2DCBB5407

Case 1:25-cv-00698-TSC    Document 14-4    Filed 03/12/25    Page 25 of 29
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 99 of 516

EXHIBIT A

**FORM OF NOTICE OF EXCLUSIVE CONTROL**

VIA EMAIL: ███████████ / █████████████████████

Nerlie Delly
Vice President
Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, New York 10013
[Re. Account # [●]]

Pursuant to the Account Control Agreement dated November 1, 2024, among Climate United Fund (the "**Pledgor**"), United States Environmental Protection Agency (the "**Secured Party**"), and Citibank, N.A. (the "**Bank**"), we hereby instruct you of the following:

The Pledgor and the Secured Party have agreed that the terms and conditions entitled "Deposit Account at Financial Agent" in the Grant Agreement indicate the conditions under which the Secured Party may exercise its right of control herein, and such conditions will be defined as "default" for the purposes of the Account Control Agreement.

As required by the Grant Agreement, the Secured Party has issued a written determination and finding that Pledgor has failed to comply with the terms and conditions of the Grant Agreement, and that noncompliance is substantial such that effective performance of the Grant Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse (as defined in the Grant Agreement) or material misrepresentation of eligibility status, and that the Secured Party has initiated action under 2 CFR 200.339 to wholly or partly suspend or terminate the Grant Agreement, as authorized in the terms of the Grant Agreement.

Therefore, the Secured Party hereby notifies you that (i) a default has occurred and is continuing under the Grant Agreement and (ii) from and after the receipt of this notice until you receive further instruction from Secured Party, you are hereby directed to retain and hold all funds in the Account or Accounts named in this Notice and not to [invest or] disburse the same to any party whatsoever, other than as instructed by the Secured Party. Notwithstanding the foregoing, Bank shall continue to disburse funds in Pledgor's "Reserve" Account pursuant to Account Directions originated by Pledgor [except for $[    ] in Account No. [      ], identified by Secured Party in the written determination and finding, that Secured Party has determined was not "properly incurred" by the Pledgor in accordance with 2 CFR 200.343].

**United States Environmental Protection Agency**

Exhibit A

as Secured Party


By:_____
    Name:
    Title:
    Date:

Exhibit A

EXHIBIT B

FORM OF ACCOUNT DIRECTION (NCIF)

**Pledgor's UEI Number:** ███████████

[Date]

Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, NY 10013
Attn.:Nerlie Delly
E-mail: ████████████ / █████████████████

VIA: CitiSFT

RE: Account Control Agreement dated November 1, 2024, among Climate United Fund (the "**Pledgor**"), United States Environmental Protection Agency (the "**Secured Party**"), and Citibank, N.A. (the "**Bank**")

Pursuant to Section 2 of the above referenced Account Control Agreement, the Pledgor hereby instructs the Bank to disburse a total amount of $[●] funds as per below and as per the attached upload file named xxx:

**Check applicable boxes:**

( ) **Internal Transfer within the Bank (intra-entity).**

( ) **Internal Transfer within the Bank (inter-entity).**

( ) **External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities).**

( ) **External Transfer outside the Bank (for Financial Assistance Activities).**

**If an Internal Transfer within the Bank (intra-entity), check the following applicable boxes:**

( ) **Transfer of $[●] across Pledgor's 'Budget' sub-accounts, as defined in the Grant Agreement**.

( ) **Transfer of $[●] from Pledgor's 'Program Income from Operations' account to Pledgor's 'Budget' sub-account(s), as defined in the Grant Agreement**.

( ) **Transfer of $[●] from Pledgor's 'Reserve' account to Pledgor's 'Program Income from Operations' account, as defined in the Grant Agreement.**

( ) **Transfer of $[●] from Pledgor's 'Budget' sub-account(s) or 'Program Income from Operations' account to 'Reserve' account, as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the workplan in effect under the Grant Agreement. Financing agreements for identified Qualified Projects necessitating the transfer have been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

**If an Internal Transfer within the Bank (inter-entity), check the following applicable boxes:**

( ) **Transfer of $[●] from Pledgor's 'Budget' sub-account(s) to 'Financial Assistance Subrecipient' as defined in the Grant Agreement.**

**If an External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities), check one of the following boxes:**

( ) **Disbursement of $[●] for Predevelopment Activities as defined in the Grant Agreement.**

( ) **Disbursement of $[●] for Market-Building Activities as defined in the Grant Agreement.**

( ) **Disbursement of $[●] for Program Administration Activities as defined in the Grant Agreement.**

**If an External Transfer outside the Bank (for Financial Assistance Activities), check the following applicable boxes:**

( ) **Disbursement of $[●] from Pledgor's 'Budget' sub-account to provide Financial Assistance to Qualified Projects as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the workplan in effect under the Grant Agreement. Financing agreements for identified Qualified Projects necessitating the transfer have been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

( ) **Disbursement of $[●] from Pledgor's 'Reserve' account to satisfy a legal obligation to a third party as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

Docusign Envelope ID: 3AE10237-5B84-4059-A4E3-8AA2DCBB5407

*"The amount of this transfer is necessary to execute against the workplan in effect under the Grant Agreement and pay a third party pursuant to a financing agreement that has been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

Capitalized terms in this instruction letter not otherwise defined shall have the same meaning given to them in the Account Control Agreement.

Signature on this Account Direction executed and delivered in electronic format (i.e. "pdf") or by other electronic means (including DocuSign) shall be deemed original signatures with all rights accruing thereto.

IN WITNESS WHEREOF, the Pledgor has caused this Account Direction to be duly executed and delivered as of the date first written above.

Pledgor:

_____

Authorized Person

# Exhibit 5

JA98



**U. S. Department of Justice**

Federal Bureau of Investigation

9325 Discovery Blvd,
Manassas, Virginia 20109

**SUBMITTED VIA EMAIL**

February 17, 2025

Citibank, N.A.
Attention: Rachel Goldberg, Head, U.S. Government Affairs
        Andy Taylor, Managing Director, Head of Federal, State & Local Government Segment
        Frank Leung, Vice President, Securities Services Legal – Issuer Services
5800 S. Corporate Place, MC451
Sioux Falls, South Dakota 57108

Re: Account Control Agreements, all held at Citibank

To Whom It May Concern:

Please accept this letter as a recommendation to place an administrative freeze on the account(s) associated with the "Account Control Agreements" listed below for 30 days from the date of receipt of this letter:

Account Control Agreement
Native CDFI Network, Inc., as Pledgor
United States Environmental Protection Agency, as Secured Party
and
Citibank, N.A., as Bank
Dated as of November 1, 2024

Account Control Agreement
Appalachian Community Capital Corporation, as Pledgor
United States Environmental Protection Agency, as Secured Party
and
Citibank, N.A., as Bank
Dated as of November 1, 2024

Account Control Agreement
Coalition for Green Capital, as Pledgor
United States Environmental Protection Agency, as Secured Party
and

Citibank, N.A., as Bank
Dated as of November 1, 2024

Account Control Agreement
Climate United Fund, as Pledgor
United States Environmental Protection Agency, as Secured Party
and
Citibank, N.A., as Bank
Dated as of November 1, 2024

Account Control Agreement
Justice Climate Fund, as Pledgor
United States Environmental Protection Agency, as Secured Party
and
Citibank, N.A., as Bank
Dated as of November 1, 2024

Account Control Agreement
Opportunity Finance Network, as Pledgor
United States Environmental Protection Agency, as Secured Party
and
Citibank, N.A., as Bank
Dated as of November 1, 2024

Account Control Agreement
Power Forward Communities, Inc., as Pledgor
United States Environmental Protection Agency, as Secured Party
and
Citibank, N.A., as Bank
Dated as of November 1, 2024

Account Control Agreement
Inclusiv, Inc., as Pledgor
United States Environmental Protection Agency, as Secured Party
and
Citibank, N.A., as Bank
Dated as of November 1, 2024

This recommendation is being made following credible information received by the Federal Bureau of
Investigation that the above account(s) has been involved in possible criminal violations, including 18 §
U.S.C. 371 (Conspiracy to defraud the United States) and 18 § U.S.C. 1343 (Wire fraud).

If you have questions regarding this request, please contact the undersigned at ███████████.

Sincerely,

Sean Thomas Ryan
Special Agent in Charge

By *Steven T. Dunn*

Steven T. Dunn
Supervisory Special Agent



**U. S. Department of Justice**

Federal Bureau of Investigation

9325 Discovery Blvd,
Manassas, Virginia 20109

**SUBMITTED VIA EMAIL**

February 17, 2025

Citibank, N.A.
Attention: Rachel Goldberg, Head, U.S. Government Affairs
　　　　Andy Taylor, Managing Director, Head of Federal, State & Local Government Segment
　　　　Frank Leung, Vice President, Securities Services Legal – Issuer Services
5800 S. Corporate Place, MC451
Sioux Falls, South Dakota 57108

Re: Entities and Associated Accounts, all held at Citibank

To Whom It May Concern:

As an addendum to the letter previously provided on this same date, please accept this supplemental letter as an additional recommendation to place an administrative freeze on the account(s) associated with the below-listed entity names for 30 days from the date of receipt of this letter:

| Entity Name |
| --- |
| Appalachia, Coal and Energy Communities, and Underserved America LLC (d/b/a Green Bank for Rural America) |
| Mountain BizCapital |
| CPC Climate Capital |
| Colorado Clean Energy Fund |
| Michigan Saves, Inc. |
| Montgomery County Green Bank Corporation |
| Solar and Energy Loan Fund |
| California Infrastructure & Economic Development Bank |
| DC Green Bank |
| Efficiency Maine Trust |
| Illinois Finance Authority |
| Minnesota Climate Innovation Finance Authority |
| State Environmental Improvement and Energy Resources Authority – Missouri |
| State of New York Dept of Taxation and Finance |
| City First Enterprises, Inc. |
| New York City Energy Efficiency Corporation |
| Connecticut Green Bank |
| Community Development Venture Capital Alliance |
| Ohio Air Quality Development Authority |
| ICLEI Local Governments for Sustainability USA Inc. |

| Entity Name |
| --- |
| Elemental GG LLC |
| New Jersey Green Bank |
| Enterprise Green Accelerator, Inc./Enterprise Communities |
| Habitat Capital LLC |
| Habitat for Humanity International, Inc. |
| LISC Green LLC |
| Rewiring America Community Investment Fund |
| United Way Worldwide |

This recommendation is being made following credible information received by the Federal Bureau of Investigation that the above account(s) has been involved in possible criminal violations, including 18 § U.S.C. 371 (Conspiracy to defraud the United States) and 18 § U.S.C. 1343 (Wire fraud).

If you have questions regarding this request, please contact the undersigned at ███████████.

Sincerely,

Sean Thomas Ryan
Special Agent in Charge

By *Steven T. Dunn*

Steven T. Dunn
Supervisory Special Agent

# Exhibit 6

JA104

**From:** McIntosh, Chad <███████████████>
**Sent:** Sunday, March 2, 2025 3:24 PM
**To:** Brown, Reg <reginald.brown@kirkland.com>
**Cc:** Dresner, Jeremy <jeremy.dresner@kirkland.com>; Byrnes, John Thomas
<john.byrnes@kirkland.com>; Amidon, Eric <███████████>; Corlett, Thomas
<█████████████████>; Payne, James (Jim) <███████████████>;
<████████████████>;
**Subject:** Fw: Referral and Request for OIG Assistance

---

**This message is from an EXTERNAL SENDER**
Be cautious, particularly with links and attachments.

---

Attached, please find a copy of the correspondence I sent today to the EPA Office of Inspector General,
which highlights several of the egregious instances of misconduct regarding $20 billion GGRF
distributions that have been improperly funneled through your financial institution. If you were
previously unaware of attached letter's contents, this communication serves to help bring you up to
date. As the Department of Justice and the Federal Bureau of Investigation continue their ongoing
investigation, EPA will continue our efforts to re-establish accountability and oversight over the GGRF,
which is riddled with self-dealing, conflicts of interest, extraordinarily unqualified recipients, improperly
reduced government oversight, and much more.

Chad McIntosh, P.E.
Acting Deputy Administrator
U.S. Environmental Protection Agency

---

**From:** McIntosh, Chad <███████████████>
**Sent:** Sunday, March 2, 2025 3:09 PM
**To:** Murley, Nicole <████████████████>
**Cc:** Amidon, Eric <█████████████>; Zeldin, Lee <████████████████>; Payne, James (Jim)
<████████████████>
**Subject:** Referral and Request for OIG Assistance

Acting IG Murley,

Please find the attached Referral and Request.

Thank you for your immediate attention.

Chad McIntosh, P.E.
Acting Deputy Administrator
U.S. Environmental Protection Agency



**THE ADMINISTRATOR**

WASHINGTON, D.C. 20460

Acting Deputy Administrator W.C. McIntosh
U.S. Environmental Protection Agency
1200 Pennsylvania Ave, NW
Washington, DC 20460

March 2, 2025

Office of Inspector General
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

Dear Acting Inspector General Murley:

I am formally referring to your office urgent and deeply concerning matters of financial
mismanagement, conflicts of interest, and oversight failures within the Greenhouse Gas
Reduction Fund (GGRF).

To restore integrity and public trust, the Environmental Protection Agency (EPA) has launched
certain oversight and accountability measures that still exist despite the GGRF being designed to
limit oversight. We have placed staff on administrative leave, begun a full assessment of internal
controls, and are cooperating with the Department of Justice (DOJ) and Federal Bureau of
Investigation (FBI) in their ongoing investigation.

Given the severity of the alleged misconduct, waste, conflicts of interest, and potential fraud
within the GGRF program, the Administrator is conducting a comprehensive review. Concurrent
investigations by the Department of Justice (DOJ) and Federal Bureau of Investigation (FBI) are
underway. In response to these developments, the financial institution has voluntarily paused
further disbursements, aligning with the ongoing investigation by DOJ and FBI's publicly reported
recommendation to freeze the funds. These decisive actions aim to safeguard federal funds and
ensure adherence to congressional intent.

**JA106**

## Systemic Failures in Oversight of GGRF and Disturbing Public Information

Recent findings reveal a pattern of reckless financial management, blatant conflicts of interest, astonishing sums of tax dollars awarded to unqualified recipients, and severe deficiencies in regulatory oversight under the prior administration. The EPA Office of Inspector General (OIG) plays a critical role in eliminating waste and abuse, and we stand with your office in our shared mission to restore accountability and prevent further misuse of taxpayer dollars.

One of the most disturbing initial indicators of financial misconduct is a publicly circulated video of a former Biden Administration EPA political appointee boasting that officials were "tossing gold bars off the Titanic" — rushing to distribute billions in taxpayer dollars before the incoming administration could review or halt improper disbursements.[1] Even more troubling, the official implied that political favoritism influenced funding decisions, with expectations of securing employment at grant-recipient organizations.

## Documented Evidence of Potential Financial Misconduct

These are not hypothetical concerns; they are supported by troubling evidence that continues to emerge of improper conduct, including:

1. Lack of EPA Oversight in GGRF Distribution

- A large private-sector financial institution was used as an external financial agent, holding $20 billion in taxpayer dollars — an unprecedented arrangement for EPA.
- Only eight prime recipients controlled all $20 billion, acting as pass-through entities to subrecipients — many of which were also structured as pass-throughs, raising serious concerns about transparency and accountability.
- The design of this scheme removed $20 billion from governmental oversight in the days, weeks, and months before a new administration took office.
- The unusual and apparently improper structure of the agreements governing the administration of the GGRF altogether excluded EPA from being a party to Account Control Agreements (ACAs) with subrecipients.

2. Conflicts of Interest and Political Favoritism

- Jahi Wise, the former director of the GGRF, personally oversaw a $5 billion grant to his previous employer, the Coalition for Green Capital — without recusing himself.2

---

[1] https://www.youtube.com/watch?v=CblV6EwzKxg

- A \$2 billion grant was awarded to Power Forward Communities, a new nonprofit with ties to Stacey Abrams, despite reporting only \$100 in total revenue in 2023.[2]
- Young, Gifted & Green was awarded \$20 million, even though its CEO applied for funding while serving on the White House Environmental Justice Advisory Council.[3]

3. Prime Recipients' Lack of Financial Competency

- Recipients were required to begin drawing down funds within 21 days even though EPA, apparently recognizing the lack of qualifications, deemed it necessary that the recipients complete training on "How to Develop a Budget" within 90 days.[4]
- The EPA itself determined that recipients lacked basic financial competency — yet allowed them to manage and distribute billions of taxpayer dollars.
- If an entity requires 90 days to learn how to create a budget, it cannot be trusted to start responsible distribution of taxpayer funds within 21 days.

These examples are the tip of the iceberg and suggest a deeply entrenched pattern of political favoritism, lack of qualifications, and other possibly unlawful allocation of taxpayer funds. Disturbingly, these cases likely represent only a fraction of broader issues.

### Failure of Internal Controls & Structural Weaknesses in GGRF Management

Your predecessor testified before Congress last September, describing the GGRF's financial structure as "fantastically complex."[5] What we have uncovered since then raises even greater concerns:

- Financial Agent Agreements, Account Control Agreements (ACAs), and Amended Account Control Agreements, signed in the final months (and in some cases just days) of the Biden Administration, *reduced* rather than enhanced EPA oversight.

---

[2] Thomas Catenacci, "DOGE Finds \$2 Billion in Taxpayer Funds Earmarked for Stacey Abrams-Linked Group," *Washington Free Beacon*, last modified February 19, 2025, https://freebeacon.com/trump-administration/billions-doge-found-parked-at-bank-earmarked-for-stacey-abrams-backed-green-group/.
[3] Thomas Catenacci, "Biden Environmental Justice Adviser Received Millions in Taxpayer Funds After Personally Applying For EPA Grant," *Washington Free Beacon*, last modified February 24, 2025, https://freebeacon.com/energy/biden-environmental-justice-adviser-received-millions-after-personally-applying-for-epa-grant/.
[4] U.S. Environmental Protection Agency, "RAIN-2024-G01," *EPA Grants*, last modified March 4, 2024, https://www.epa.gov/grants/rain-2024-g01.
[5] U.S. House Committee on Energy and Commerce "Holding the Biden-Harris EPA Accountable for the Radical Rush-to-Green Spending," https://www.youtube.com/watch?v=dkgMgIo8g9g (34 minute mark), 19 September 2024.

**JA108**

- ACAs governing the GGRF appear to have been hastily amended, at the behest of GGRF recipients and without consideration, in the days leading up to Inauguration Day.
- EPA was not a party to the Account Control Agreements with subrecipients, allowing taxpayer dollars to be further distributed without proper agency oversight.
- The ironically named "Notice of Exclusive Control," the ostensible purpose of which is to allow EPA to take control of accounts at the financial agent, grants prime recipients and subrecipients the ability to transfer funds to private financial institutions of their choosing outside the scope of the financial agent agreement. It would have been more appropriately called a Notice of Less Control given the manner in which it granted recipients more power over the disposition of the money and the status of their accounts prior to the amendment.
- Contract provisions appear to have been intentionally structured to weaken EPA oversight.

**Immediate Action & Request for OIG Assistance**

Given the magnitude and significant risks to taxpayer funds, I am formally requesting your assistance with a comprehensive review of this arrangement and the issues involved. I value your recommendations.

If your office requires additional resources to conduct a full investigation, please let us know immediately. The EPA is committed to providing any necessary support to ensure a thorough and independent review of the program.

While these issues can be fully investigated, we will continue to aggressively pursue enhanced oversight, answers, and accountability. We stand firmly alongside the Office of the Inspector General in our shared mission to eliminate waste, fraud, and abuse with the EPA. I look forward to your recommendations.

Sincerely,

W.C. McIntosh
Acting Deputy Administrator
U.S. Environmental Protection Agency

cc:
Lee Zeldin, Administrator, U.S. EPA
James Payne, Acting General Counsel, U.S. EPA
Eric Amidon, Chief of Staff, U.S. EPA

# Exhibit 7

**From:** ▮▮▮▮▮▮▮▮
**Sent:** Tuesday, March 4, 2025 10:02 PM
**To:** Brown, Reg; Dresner, Jeremy; Byrnes, John Thomas
**Subject:** GGRF accounts

---

**This message is from an EXTERNAL SENDER**

Be cautious, particularly with links and attachments.

---

The U.S. Environmental Protection Agency (EPA) has informed the U.S. Department of the Treasury (Treasury) of their concerns regarding potential fraud and/or conflicts of interest related to the Greenhouse Gas Reduction Fund (GGRF). Treasury understands that the EPA anticipates developing additional account controls, including issuing a series of oversight questions to recipients, consistent with prudent operational standards and EPA's authority under grant agreement documents and Section I.B of Exhibit A to the Financial Agency Agreement (FAA), dated September 19, 2024, between Treasury and Citibank. Consequently, Treasury is instructing Citibank, in its capacity as fiduciary, to work directly with the EPA to establish and implement reasonable account controls to serve the purposes and interests of the United States, in accordance with Section 5 of the FAA. Further, in order to provide the EPA with the necessary time to develop reasonable account controls, we are further instructing Citibank not to disburse funds from any of the GGRF accounts prior to the end of the day Sunday, March 9, 2025.

Thank you.

Eric Froman
Office of the General Counsel
U.S. Department of the Treasury

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**CLIMATE UNITED FUND**
7550 Wisconsin Avenue 8th Floor
Bethesda, Maryland 20814

        Plaintiff,

  v.

**CITIBANK, N.A.,**                                    **ECF CASE**
5800 South Corporate Place
Sioux Falls, South Dakota 57108,        No. 1:25-cv-00698

    **and**

**UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY**
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460,

    **and**

**LEE ZELDIN, in his official capacity as
ADMINISTRATOR, UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY**
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

        Defendants.

## AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.    This case seeks to vindicate the right of Plaintiff Climate United Fund ("Climate

United") to access grant funds to which it is legally entitled and to enjoin EPA's illegal termination

of its grant.

2.    On October 12, 2023, Climate United applied for grant funding from EPA through the National Clean Investment Fund ("NCIF"), a program under the Greenhouse Gas Reduction Fund ("GGRF"). Climate United sought this grant funding to support Climate United's efforts to offer financing for critical clean energy projects that accelerate local economic development, save money for American families and small businesses, spur demand for domestic manufacturing, create jobs, and reduce air pollution.

3.    In April 2024, Climate United was awarded a grant after a rigorous and competitive application process. Climate United brought together three well-established nonprofits with a combined 120 years of experience managing more than $30 billion in private and institutional capital. Climate United did not have any relationship with anyone inside EPA or, to its knowledge, with any reviewers across the agencies during the application and selection process. Since being announced as a grantee, Climate United has funded projects across the United States that support domestic clean energy development, build healthy and affordable housing, accelerate American-made electric vehicle manufacturing, and save hard-working Americans money on their bills.

4.    The grant requires Climate United's award funds to be held at Citibank, N.A. ("Citibank") under a Financial Agency Agreement ("FAA") between Citibank and the U.S. Treasury Department, and an Account Control Agreement ("ACA") between Citibank, Climate United, and EPA. Arrangements like the FAA have been used by the Federal Government since the 1860s to allow the federal government to contract for financial services that the government cannot provide itself—in this case, to create accounts in the name of a recipient. EPA contemplated this arrangement from the program's inception, and described it in the original Notice of Funding Opportunity ("NOFO") in July 2023 as critical both to allow recipients to leverage private capital and to "ensure that EPA's interests are protected."

5.      EPA designed, structured, and negotiated the FAA and the ACA to provide transparency and accountability and to protect EPA's interests. The FAA requires that Citibank provide online access to EPA personnel "to allow full account visibility" into each account.[1] The ACA includes provisions that allow EPA to take "exclusive control" of the funds at Citibank under certain specified conditions: if Climate United engages in "substantial" noncompliance with the Terms and Conditions of the grant; if EPA finds "adequate evidence" of "Waste, Fraud, or Abuse," defined as "credible evidence" of a violation of federal criminal law or the False Claims Act; or if Climate United made a "material misrepresentation of eligibility status." The ACA also specifies the procedure that EPA must follow to take exclusive control of the funds—namely, delivering a "Notice of Exclusive Control," with a "written determination and finding" that Climate United has triggered one of the three grounds for terminating the grant. If EPA does not deliver a Notice of Exclusive Control with that written determination and finding, then Citibank must disburse funds at Climate United's request.

6.      Although no Notice of Exclusive Control had been delivered, Citibank began refusing to process Climate United's disbursement requests, despite Citibank's unambiguous contractual obligation to do so under the ACA. This left Climate United unable to access the grant funds to which it is entitled.

7.      Prior to Climate United's filing of this lawsuit on March 8, 2025, Citibank provided no explanation for its refusals. Nor did EPA. Although EPA's Administrator made numerous public statements expressing hostility to the GGRF program, he provided no legal justification for Citibank's withholding of funds, despite Climate United's many inquiries.

---

[1] Pursuant to the Court's March 12, 2025 sealing order, Climate United has quoted only portions of the FAA that were quoted in Citibank's TRO opposition, Dkt. 14.

8.    On March 8, 2025, Climate United filed this lawsuit. It moved for a temporary restraining order ("TRO") on March 10, 2025. When EPA and Citibank filed their response briefs on March 12, 2025, they revealed for the first time what was happening behind the scenes. Among other things:

a.    On February 17, FBI, at EPA's behest, sent a letter to Citibank "recommending" that Citibank freeze GGRF funds for 30 days. The letter did not cite any facts indicating Climate United had engaged in any misconduct. Still, Citibank construed that letter as imposing a legal obligation under the FAA to cooperate with FBI's request. EPA's actions were unconstitutional. The government lacked probable cause (indeed, had no evidence) that this freeze was justified; did not obtain a warrant after submitting a sworn affidavit to a neutral magistrate; gave Climate United no notice of the freeze; affirmatively misled Climate United by publicly declaring that Citibank was acting "voluntarily"; and afforded Climate United no process. Citibank's actions also were beyond Citibank's authority under the ACA and FAA, which do not permit Citibank to freeze funds based on an FBI "recommendation." And Citibank had no other legal basis for freezing Climate United's funds based on this illegal "recommendation" from FBI.

b.    On March 4 and March 10, the Department of the Treasury, at EPA's behest, directed Citibank not to disburse funds from Climate United's accounts for a specified period. Climate United received no notice of these actions, even though it had specifically asked Citibank if the funds had been frozen because of a governmental directive. These actions were unconstitutional and were beyond Citibank's authority under the FAA and ACA.

9.      Climate United's March 10, 2025 motion for TRO requested, among other things, that EPA be enjoined from unlawfully suspending or terminating the grant. This Court tentatively scheduled a hearing for the afternoon of March 11, 2025. After the parties received notice of the tentative hearing time, EPA's counsel requested a 24-hour extension of time, purportedly as a matter of "courtesy." Climate United consented to that extension.

10.     EPA took advantage of that courtesy. After business hours on March 11, 2025—*after* the originally scheduled time for the TRO hearing—EPA purported to accomplish precisely what Climate United was seeking to enjoin at the TRO hearing: the unlawful termination of the grant. Specifically, EPA served Climate United with a purported "Notice of Termination." The next day, EPA filed a brief stating that because it had served this "Notice" prior to the TRO hearing, the case was now moot. EPA has stated that it terminated not just Climate United's grant, but all eight grants under NCIF and a related program.

11.     The "Notice of Termination" claimed that EPA was terminating the grant based on EPA's "authority under 2 C.F.R. §§ 200.339-40, the General Terms and Conditions of EPA assistance award agreements, the terms and conditions of the Grant Agreement, and the Agency's inherent authority to reconsider prior determinations in light of new information." Dkt. 13-1 at 1. The "Notice" also mentioned EPA's interest in transparency and oversight. Tellingly, however, the "Notice" did not say *anything* about Climate United, and did not provide *any* legal or factual basis to believe that any of the ACA's or the grant's termination conditions had been satisfied.

12.     EPA's "Notice of Termination" was illegal for numerous reasons. It violated EPA's own regulations, which did not permit EPA to terminate the grant based on generic assertions regarding transparency and oversight. It violated the Inflation Reduction Act, the Appropriations Clause, and bedrock separation-of-powers principles by nullifying a duly enacted statute purely

because the Administrator disagreed with it. Finally, it was arbitrary and capricious. It made vague accusations of waste, fraud, and abuse, with nothing to back up those accusations. In point of fact, not one of EPA's documents, public statements, or investigations has identified *anything* Climate United has done improperly, much less something that would rise to the level that permits termination of the grant.

13.    Citibank's refusals to honor Climate United's requests are also illegal. Until Citibank receives a Notice of Exclusive Control, it must honor Climate United's requests. The purported "Notice of Termination" is no basis for Citibank to disregard Climate United's requests because that Notice is itself illegal and must be enjoined. Nor is the FAA, which allows Citibank to freeze assets only "in accordance with" the ACA, and only in response to "lawful instructions" from EPA. FAA § 5.B.iv; FAA Ex. A § I.B.4. But here, the freeze was not "in accordance with" the ACA and there were no "lawful instructions" from EPA or any other agency. The freeze was based on statements by EPA, the unlawful FBI "recommendation"—which provided no evidence, much less probable cause, of any criminal activity—and unsupported and unlawful statements by Treasury.

14.    EPA's unlawful actions are causing Climate United to suffer real and immediate harm. Aside from stopgap charitable grants covering solely essential operating expenses, which Climate United will need to pay back if its funding is restored, Climate United does not have other committed sources of funding to replace the NCIF grant funds. As a result of Defendants' actions, to preserve its available cash, Climate United has already been compelled to defer compensation for certain employees, slash staff salaries, terminate multiple vendors, cancel travel, and instruct non-essential lawyers, accountants, and consultants to cease work.

15.     Climate United's reliability as a source of capital is fundamental to its ability to carry out its mission and workplan. As a lender, and in particular as a lender to infrastructure and construction projects which are funded over a period of months or years, developers require confidence that Climate United is able to fulfill its all of its funding commitments for the life of their projects. But without a stable source of funding, Climate United's reputation will be irreparably and irreversibly harmed, and Climate United will be unable to attract the high-quality partners and co-investors, and secure the attractive deal terms, necessary to develop and carry out clean energy projects. Indeed, as a result of its funds being frozen, Climate United has confronted increasingly unfavorable terms from essential vendors and prospective transaction partners, many of whom have explicitly said they are unwilling to do deals with Climate United while its funding is uncertain.

16.     If Climate United does not obtain a preliminary injunction, and is forced to wait to have access to its grant funding restored, Climate United would not survive as it exists today and would need to wind-down as a going concern. Climate United likely would be forced to lay off substantially all staff and may not be able to reopen for business again, given the lost staff, deals, and reputational harm. Without additional funding, Climate United would not be able to litigate this case to judgment.

17.     Climate United's access to its grant funding should be restored and its rights should be vindicated. The Court should enjoin EPA's illegal "Notice of Termination" and enjoin EPA from taking actions premised on that illegal termination, including directing Citibank to withhold funds and sending Citibank a Notice of Exclusive Control. The Court should also enjoin Citibank from violating the unambiguous terms of the ACA.

## JURISDICTION AND VENUE

18.    This is an action for declaratory and injunctive relief based on EPA's violation of the Administrative Procedure Act, federal regulations and statutes, and the Constitution's Appropriations Clause and Due Process Clause. This action also seeks declaratory and injunctive relief and replevin based on Citibank's breach of contract and conversion.

19.    The Court has jurisdiction over Climate United's claims against Defendants EPA and Administrator Zeldin under 28 U.S.C. § 1331 and 5 U.S.C. § 702.

20.    The Court has jurisdiction over Climate United's claims against Citibank under 28 U.S.C. § 1367, because those claims are so related to Climate United's claims against EPA that they are part of the same case or controversy.[2]

21.    Venue is proper in this district because EPA is located in this district and a substantial part of the acts or omissions giving rise to the claim occurred in this district. 28 U.S.C. § 1391(e).

22.    This case presents a live controversy about whether EPA lawfully terminated Climate United's grant, or instead whether EPA's termination is unlawful because it is arbitrary and capricious and violates multiple regulations, statutes, and constitutional provisions. This case also presents a live controversy about whether Citibank breached and is continuing to breach the ACA.

## PARTIES

23.    Climate United, a Delaware corporation with its principal place of business in Maryland, is a nonprofit financial institution whose mission is to leverage public and private

---

[2] Even if EPA was not named as a defendant, the Court would have jurisdiction over Climate United's claims against Citibank under 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy exceeds $75,000.

financing to remove financial barriers to deploying clean energy. Climate United's work aims to unleash American clean energy and build a stronger, more efficient, and more resilient economy that lowers energy costs, creates jobs, improves public health, and benefits every American, while making the United States more competitive, secure, and energy independent.

24.     The Climate United coalition brings together three established nonprofits—Calvert Impact, Inc. and its affiliates ("Calvert Impact"), Community Preservation Corporation, and Center for Community Self-Help and its affiliates ("Self-Help")—that have a combined 120 years of experience managing more than $30 billion in private and institutional capital that has unlocked economic opportunity for communities in all 50 states and territories.

25.     Climate United helps fill market gaps where private capital is missing, bringing the economic benefits of clean energy, electric mobility, and building efficiency projects to overlooked markets. From Arkansas to Alaska, these projects will deliver direct benefits to hard-working Americans and communities in the form of lower energy bills, quality jobs, cleaner air and water, and more secure and reliable energy. Climate United focuses its loans and investments in rural, low-income, and Tribal communities across the country, building demand for clean energy and providing markets for domestic manufacturing. Climate United's investments also mobilize private capital, stretching public dollars to go further: for every dollar invested in a program or project, Climate United estimates up to four dollars of private capital flow into communities.

26.     Defendant Citibank, N.A. is a national banking association organized and existing under the laws of the United States of America, with headquarters in South Dakota. Citibank is the wholly owned subsidiary of Citigroup, Inc., headquartered in New York.

27.    Defendant EPA is the agency of the federal government of the United States responsible for administering the GGRF and its constituent NCIF program. EPA is an agency within the meaning of the APA.

28.    Defendant Lee Zeldin is the EPA Administrator and the agency's highest ranking official. Climate United sues Administrator Zeldin in his official capacity.

## BACKGROUND

### A.    Congress Establishes the NCIF Program.

29.    In 2022, Congress passed and President Biden signed into law the Inflation Reduction Act. Pub. L. No. 117-169, 136 Stat. 1818. The Act amended the Clean Air Act to authorize the GGRF, which appropriated $27 billion to invest in clean energy in communities across the county. *See* 42 U.S.C. § 7434; *About the Greenhouse Gas Reduction Fund*, EPA, https://www.epa.gov/greenhouse-gas-reduction-fund/about-greenhouse-gas-reduction-fund (last updated Feb. 13, 2025).

30.    The statute created this new program to leverage public funds with private capital and catalyze investment into places and projects that support local economic development, much like other government programs such as Small Business Administration loan guarantees, New Market Tax Credits, and Opportunity Zones.

31.    The GGRF essentially establishes "[g]reen banks," which are "financial institutions aimed at overcoming market barriers and scaling up investment in low-carbon technologies and climate-resilient infrastructure." Cong. Rsch. Serv. IN12090, *EPA's Greenhouse Gas Reduction Fund* (updated Feb. 14, 2023), https://crsreports.congress.gov/product/pdf/IN/IN12090. Green banks are generally used "to deliver projects that are not sufficiently met by other financial

markets." *Green Banks*, EPA, https://www.epa.gov/statelocalenergy/green-banks (last updated Jan. 24, 2025).

32.      Specifically, Section 134(a)(2) of the Inflation Reduction Act appropriated to the EPA Administrator $11.97 billion "to make grants, on a competitive basis … , to eligible recipients for the purposes of providing financial assistance and technical assistance in accordance with subsection (b)." 42 U.S.C. § 7434(a)(2).

33.      Section 134(a)(3) of the Act appropriated to the EPA Administrator $8 billion to "make grants, on a competitive basis … , to eligible recipients for the purposes of providing financial assistance and technical assistance in low-income and disadvantaged communities in accordance with subsection (b)." *Id*. § 7434(a)(3).

34.      In turn, Section 134(b) of the Act, entitled "Use of funds," provides that an eligible recipient shall use the grant as follows: (1) to "provide financial assistance to qualified projects at the national, regional, State, and local levels"; (2) to "prioritize investment in qualified projects that would otherwise lack access to financing"; (3) to "retain, manage, recycle, and monetize all repayments and other revenue received from fees, interest, repaid loans, and all other types of financial assistance provided using grant funds under this section to ensure continued operability"; and (4) to "provide funding and technical assistance to establish new or support existing public, quasi-public, not-for-profit, or nonprofit entities that provide financial assistance to qualified projects." *Id*. § 7434(b).

35.      An "eligible recipient" is defined to include a nonprofit organization that "is designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services," that "does not take deposits other than deposits from repayments and other revenue

received from financial assistance provided using grant funds under this section," that "is funded by public or charitable contributions," and that "invests in or finances projects alone or in conjunction with other investors." *Id.* § 7434(c)(1).

36.    Qualified projects are defined to include any "project, activity, or technology" that either "reduces or avoids greenhouse gas emissions and other forms of air pollution in partnership with, and by leveraging investment from, the private sector," or "assists communities in the efforts of those communities to reduce or avoid greenhouse gas emissions and other forms of air pollution." *Id.* § 7434(c)(3).

37.    Congress imposed a statutory deadline that required the EPA Administrator to use the appropriated funds "to make grants, on a competitive basis," between February 12, 2023 and September 30, 2024. 42 U.S.C. § 7434(a)(2), (3).

38.    In July 2023, EPA launched three grant competitions, including the approximately $14 billion National Clean Investment Fund competition geared at "financ[ing] clean technology deployment nationally." NOFO at 3. The NCIF program was "funded with $11.97 billion from Section 134(a)(2) and $2.00 billion from Section 134(a)(3)." *Frequent Questions About the Fund*, EPA,   https://www.epa.gov/greenhouse-gas-reduction-fund/frequent-questions-about-fund   (last updated Oct. 17, 2024).

39.    The purpose of the NCIF competition was to "provide grants to 2-3 national nonprofit financing entities to create national clean financing institutions capable of partnering with the private sector to provide accessible, affordable financing for tens of thousands of clean technology projects nationwide." NOFO at 4.

### B.    Climate United Is Awarded NCIF Grant Funding.

40.    Following passage of the Inflation Reduction Act, Calvert Impact, Community Preservation Corporation, and Self-Help joined together to form a coalition to apply for the GGRF competition.

41.    Calvert Impact has been in operation for 30 years in the private markets, investing in job creation, affordable housing, clean energy, and local economic development. The other Climate United coalition members have been in operation for 50 years and 40 years respectively, executing investment portfolios and strategies that directly relate to Climate United's workplan. Combined, the members of the Climate United coalition have more than 120 years' experience managing more than $30 billion in private and institutional capital.

42.    In 2022, Climate United was created as a separate legal entity, and structured as a subsidiary of Calvert Impact, Inc., to apply for GGRF funding. It is common practice for established organizations to set up subsidiaries for specific projects and programs.

43.    While each of the coalition partners would have been eligible recipients for GGRF funds, each deliberately formed bespoke subsidiaries to act as the grant recipients and subrecipients. As Climate United explained to EPA, this structure allowed them "to adopt custom policies, procedures, and governance specifically crafted to most efficiently deploy NCIF funds while mitigating deployment risk." *See CUF Narrative Proposal* at 4, EPA (Apr. 4, 2024), https://www.epa.gov/system/files/documents/2024-04/cuf_narrative_proposal1.pdf. The subsidiaries benefit from the organizational infrastructure and experience of their parent organizations while allowing them to leverage grant funds with private capital more effectively as stand-alone entities.

44.    On July 14, 2023, EPA issued a Notice of Funding Opportunity for the NCIF. The NOFO "included a robust set of application requirements and corresponding evaluation criteria

that were used to assess materials submitted to meet those application requirements.[3] "Application requirements covered a diverse set of topics and included not just a detailed project narrative but also a robust set of application attachments," such as "organizational and governing documents; resumes of board members and senior management; legal and compliance risk management policies and procedures; financial statements; workplans for the first year of program implementations, and budget narratives."[4]

45.    The NOFO provided that the NCIF competition was open for applications until October 12, 2023. NOFO at 1. The NOFO further provided that the "Anticipated Notification of Selections" would occur by March 2024, and that the "Anticipated Start of Period of Performance" would be July 2024. *Id.* The NOFO also mentioned that the "EPA General Terms and Conditions may be subject to measures or other arrangements," such as "financial agent arrangements with the U.S. Department of Treasury," to "ensure that EPA's interests are protected." *Id.* at 56.

46.    EPA established a rigorous process to review and select applications. That process included an evaluation of each applicant's program plan, organizational capacity, previous experience managing third-party capital, and experience managing financial, credit, compliance, and other risks. The review was conducted by expert panels with broad and deep qualifications who would then present rankings and recommendations to a Selection Official authorized to make the final selection for awards. *Id.* at 54.

47.    Climate United entered the NCIF grant competition with a $13.97 billion proposal to accelerate clean energy adoption across the U.S. economy, including by offering affordable financing for clean technology programs. As part of the application process, Climate United was

---

[3] *Greenhouse Gas Reduction Fund, Review and Selection Process*, EPA (last updated Aug. 16, 2024), https://www.epa.gov/greenhouse-gas-reduction-fund/review-and-selection-process.
[4] *Id.*

required to submit a detailed budget to EPA, along with proposed policies and organizational documents. Climate United's application also included letters of support from financial institutions, developers, labor organizations, affordable housing organizations, and state and local government—a testament to the coalition's deep and extensive experience backing up its proposed program plan. Additionally, prior to receiving the Notice of Award, Climate United was required to attach a negotiated, thoroughly reviewed, and approved budget to its grant agreement.

48.    Following the agency's lengthy and rigorous review process, Climate United was awarded $6.97 billion. The award was publicly announced by the White House in April 2024, in a press release touting Climate United's credentials and vision.[5]

49.    Consistent with the purpose of the Inflation Reduction Act under which the NCIF funds were appropriated, Climate United developed and EPA approved a workplan that was finalized with the award and posted publicly for full transparency. As enumerated in the workplan, the Climate United coalition plans to commit at least $580 million toward qualified projects in the first year of funding (*i.e.*, before July 2025), and to draw the full $6.97 billion over the first five years of the program. To date, the Climate United coalition has committed $392 million to qualified projects. Approximately 45% of Climate United investments (the portion of the funds provided through financial assistance), or approximately $2.8 billion of the NCIF Award, will focus on investing in energy-efficient buildings and homes. Approximately 20% of Climate United investments, or approximately $1.2 billion of the NCIF Award, will focus on electric transportation and charging infrastructure. Another approximately 25% of Climate United investments, or

---

[5] *Biden-Harris Administration Announces $20 Billion in Grants to Mobilize Private Capital and Deliver Clean Energy and Climate Solutions to Communities Across America*, EPA (last updated Aug. 16, 2024), https://www.epa.gov/newsreleases/biden-harris-administration-announces-20-billion-grants-mobilize-private-capital-and.

approximately $1.5 billion of the NCIF Award, will focus on producing affordable, clean electricity and heat through renewable energy generation and battery storage, including through solar, hydroelectric, and geothermal power. The remaining 10% of investments will focus on other sectors that cut costs, reduce pollution, and provide direct benefits to American families, including in agriculture. Further, consistent with the terms of the grant award, Climate United will deploy 60% of its investments in low- and moderate- income communities, 20% of its investments in rural communities and 10% of its investments in Tribal communities.

### C. The Terms and Conditions of the Grant, Including Suspending or Terminating the Grant.

50. On April 11, 2024, shortly after the award was publicly announced, EPA held a "terms and conditions briefing" for awardees. Among other things, EPA explained the process for agreeing upon the terms and conditions that would govern the grant. EPA explained that it expected to share draft terms in mid-to-late April, and that EPA expected the terms to change based on awardee feedback, to ensure they were clear and would be viable for awardee workplans. While noting the "dates are tentative," EPA expected a "final" set of terms to be included in a final grant agreement known as a Notice of Award ("NOA") in late June, modified terms to be agreed upon in September/October, additional modifications to occur in October/November, and further modifications "over the remainder of the performance period."

51. Climate United's award was memorialized in the NOA dated August 8, 2024 [hereinafter "August NOA"]. The August NOA appended Terms and Conditions governing the grant. The Terms and Conditions in the August NOA included several requirements regarding the use of GGRF funding, including labor and workforce requirements, *id*. at 34, "Buy America" requirements, *id*. at 28, consumer protection requirements, *id*. at 36, and training requirements, *id*. at 33-34.

52.    The Terms and Conditions in the August NOA required Climate United to adhere to a rigorous set of reporting requirements. These include requirements to produce quarterly, semi-annual, annual, and final reports to EPA with "detailed narratives describing program performance … supported with qualitative discussions and quantitative metrics," *id*. at 16, submit quarterly transaction-level and project-level data reports, *id*. at 17-18, and provide ongoing disclosures to EPA, *id*. at 18-19.

53.    The Terms and Conditions in the August NOA provided that Climate United "must obtain prior written approval from the EPA Project Officer (who will in turn notify the EPA Award Official) for any transfers that will not be disbursed for an Allowable Activity within 15 business days." *Id*. at 61.

54.    In addition, the Terms and Conditions required Climate United (as well as other GGRF recipients) to complete standard EPA grants training within 90 days of receipt of the grant, including the "*EPA Grants Management Training for Applicants and Recipients*" and "*How to Develop a Budget*." *Id*. at 8. Climate United complied with this requirement, even though Climate United had already submitted a detailed budget to EPA in connection with the grant competition selection process, and had already attached a negotiated, reviewed, and approved budget to its grant agreement before receiving the Notice of Award.

55.    As EPA had initially envisioned, the August NOA was amended on December 20, 2024 [hereinafter "December NOA"] to update the Terms and Conditions which apply to all NCIF recipients. The December NOA was substantially similar to the August NOA, and notably did not substantively change the overall grant award or provisions regarding EPA's oversight or underlying reporting and transparency requirements. The changes primarily reflected the insights gained from months of feedback from going to market with the program, in particular clarifying

the applicability of "Build America, Buy America" requirements and the applicability of Davis Bacon and Related Acts to projects. The December NOA also updated the Terms and Conditions to account for Citigroup being selected by the Treasury Department to serve as its financial agent under the Financial Agency Agreement entered into on September 19, 2024, *see infra* ¶¶ 60-70; clarified the definitions of "Waste, Fraud, and Abuse" and "Materially Impaired"; clarified which versions of the applicable regulations govern termination of the grant; and specified certain procedures involved in issuing notices about the grant funds to financial institutions. December NOA at 12, 41, 56. The changes in the December NOA were unrelated to any changes in Administration.

56.    The Terms and Conditions in the December NOA describe the three specific requirements with which EPA must comply to suspend or terminate Climate United's award. December NOA at 41. The Terms and Conditions do not allow EPA to unilaterally suspend the grant or remove Climate United's ability to access funding. The Terms and Conditions state that "EPA maintains the right to terminate the Assistance Agreement *only*" in the following situations. December NOA at 41 (emphasis added):

   a. *First*, EPA may terminate the Agreement if Climate United engages in "substantial" noncompliance such that "effective performance" is "Materially Impaired." *Id.* Effective performance is "Materially Impaired" if (1) EPA issues a "written determination and finding … that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause" and, (2) if EPA determines in its sole discretion that a "corrective action plan" would remedy the issue, EPA must issue a "separate written determination and finding" that the Recipient "has not materially addressed its failure." *Id.* at 8-9.

b. *Second*, EPA may terminate the Agreement if Climate United engages in "material misrepresentation of eligibility status." *Id.* at 41.

c. *Third*, EPA may terminate the Agreement if there is "adequate evidence" of "Waste, Fraud, or Abuse," *id.*, which is defined with reference to EPA's General Terms and Conditions and 2 C.F.R. § 200.113. Those sources require "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act (31 U.S.C. [§§] 3729-3733)." *See* EPA, *General Terms and Conditions* (effective Oct. 1, 2024), https://www.epa.gov/system/files/documents/2024-10/fy_2025_epa_general_terms_and_conditions_effective_october_1_2024_or_later.pdf; 2 C.F.R. § 200.113.

57.     In addition, EPA is obligated by regulation to take certain procedural steps if it wishes to terminate the grant agreement. Among other things, EPA must comply with 2 C.F.R. § 200.341, which requires EPA to provide written notice of termination to the recipient that includes "the reasons for termination, the effective date, and the portion of the Federal award to be terminated, if applicable." 2 C.F.R. § 200.341; December NOA at 41 (incorporating this regulatory requirement into the Terms and Conditions).

58.     The Terms and Conditions of the award set forth the EPA requirements, including all relevant oversight, reporting, termination and programmatic requirements, and apply to all NCIF recipients. The workplan and budget reflect Climate United's proposed investment and deployment strategy. There are two different workstreams within EPA, with different approval processes and different personnel, that address the grant's Terms and Conditions and the grant's budget and workplan. This led to separate NOA amendments in December and January.

59.     As EPA envisioned from the outset, there was a further amendment to the NOA on January 16, 2025. This amendment modified Climate United's workplan and budget—to tweak the allocation of grant funds within specified budget categories, to align with updates to the Code of Federal Regulations, and to update the workplan to reflect market feedback. *Compare* December NOA at 3, *with* January NOA at 3. The January NOA did not change the operative Terms and Conditions attached to the December NOA or alter the overall grant award. January NOA at 1, 4-5. The Terms and Conditions in the December NOA are thus the operative Terms and Conditions that remain binding on Climate United and EPA. The changes in the January NOA were unrelated to any changes in Administration.

**D.    The Financial Agency Agreement Between Citibank and the Treasury Department.**

60.     The July 2023 NOFO envisioned entering into "financial agent arrangements with the U.S. Department of Treasury" to "ensure that EPA's interests are protected." NOFO at 56. Climate United had no role in EPA's decision to include the financial agent concept in the July 2023 NOFO.

61.     The financial agent concept is an established mechanism for disbursing government funding that was first authorized in the 1860s and has been used for decades.[6]

62.     After a selection process run by the Treasury Department, Citibank was selected as the Financial Agent. Citibank and Treasury entered into the FAA on September 19, 2024.

63.      Climate United is not a party to the FAA. Citibank's selection as the Financial Agent was announced to Climate United on September 26, 2024. Climate United had no role in

---

[6] *Revenue Collections and Payments: Treasury Has Used Financial Agents in Evolving Ways but Could Improve Transparency*, GAO-17-176 (Jan. 2017), https://www.gao.gov/assets/gao-17-176.pdf ("Treasury has a long history of using financial agents to support its core functions of disbursing payments and collecting revenue.").

the selection of the financial agent, which was coordinated by EPA and the Treasury Department as part of a competitive process.

64.     The FAA provides that Citibank will provide "commercial banking and finance services" "related to programs under the Inflation Reduction Act … including grant programs" such as the NCIF. FAA at 1, A-1. The FAA is not specific to Climate United's grant and Climate United is not mentioned in the FAA.

65.     The FAA provides that Citibank "acknowledges and agrees that it owes a fiduciary duty of loyalty and fair dealing to the United States when acting as a financial agent of the United States." *Id.* § 5.A. The FAA further provides that as a financial agent, Citibank will "act at all times in the best interests of the United States when carrying out its responsibilities under this FAA and in all matters connected with this agency relationship." *Id.* The FAA further states that Citibank's fiduciary obligations include the duty to "construe the terms of this FAA and any related instructions from Treasury in a reasonable manner to serve the purposes and interests of the United States" and "to act only within the scope of its actual authority and to comply with all lawful instructions or directions received from Treasury." *Id.*

66.     The FAA authorizes Citibank to "freeze accounts, and transfer funds in frozen accounts, at the direction of the relevant secured party [*i.e.*, EPA], in accordance with the account control agreements." *Id.* at Ex. A § I.B.4.

67.     The FAA provides EPA with "full account visibility," *id.* at Ex. A § I.D.1. The FAA thus gives EPA full, real time view access into all accounts of Climate United and its subrecipients, and full transparency into how grant funds are being spent. Climate United and its subrecipients each have seven distinct accounts, for twenty-one accounts in total.

68.     EPA has traditionally used the Automated Standard Application for Payments ("ASAP") system to disburse award funds. The ASAP system allows recipients to draw funds as needed—for example, for funding a project or paying for administrative costs. While the entire award amount would be obligated to the recipient, the recipient's balance sheet would only reflect those award funds drawn down. One of the primary objectives of the NCIF program is to use government funds to spur private capital. The traditional ASAP mechanism would not allow for a recipient to raise private capital on its own balance sheet. EPA understood the need to solve for this technical accounting problem, and EPA's original design of the program, described in the July 2023 NOFO, proposed a financial agent mechanism. NOFO at 56. The ability of the recipient to draw down award funds would remain unchanged, but the balance sheet of the recipients would reflect the entire award amount rather than only the funds already expended.

69.     The oversight and accountability provisions of Climate United's award are contained within its agreement with EPA, specifically within the NCIF Terms and Conditions. The Treasury Department under the ASAP system does not conduct oversight—it simply reports to EPA the amounts which have been drawn by the recipient and what amounts remain. Under the FAA between Citibank and Treasury, Citibank agreed to assume this ministerial funding responsibility. *See* FAA at Ex. A § I. EPA's oversight functions remain identical under the FAA and under ASAP. This is why the FAA agreement is between Treasury and Citibank, not between EPA and Citibank—Citibank is taking over Treasury's functions, not EPA's.

70.     Climate United used the ASAP system to access funds between August 2024 (when the initial NOA was finalized) and November 2024, while the ACA was being finalized. But ASAP is far less transparent than the FAA by comparison. ASAP provides only a running total of grant funds disbursed to a grant recipient—it does not allow for visibility into the activities of

subrecipients. Therefore, the financial agent arrangement increases EPA's oversight of funds by requiring Climate United and its subrecipients to disclose expenditures by budget category in real time. The financial agent arrangement also provides EPA with full visibility into any program income generated by Climate United or any subrecipient, which is typically opaque to EPA under the ASAP system.

**E.    The Account Control Agreement Between Climate United, EPA, and Citibank.**

71.    The grant agreement required Climate United to enter into an Account Control Agreement. Climate United entered into the ACA with EPA and Citibank on November 1, 2024. Climate United, EPA, and Citibank executed an amendment on January 13, 2025, to clarify the parties' intent regarding the treatment of certain obligations that were "properly incurred," if EPA issued a Notice of Exclusive Control [hereinafter "Amended ACA"]. This was only a clarification and did not alter the substance of the ACA.

72.    Under the ACA, Citibank administers the funds provided under the NCIF, in its role "as a financial agent of the United States pursuant to the authority" of the Treasury Department, and EPA serves as the "Secured Party." ACA at 1.

73.    The ACA specifies that Citibank's duties with respect to the funding are exclusively "administrative or ministerial (and shall not be construed to be fiduciary in nature)." ACA at 3. The ACA further specifies that Citibank "shall not be responsible for any of the agreements referred to or described herein (including, without limitation, the Grant Agreement …), or for determining or compelling compliance therewith, and shall not otherwise be bound thereby." *Id*.

74.    Under the ACA, Citibank is required to disburse funds to Climate United upon Climate United's request. ACA § 2 provides that Citibank "shall comply with all instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and

financial assets in the Accounts including, without limitation, directions to distribute proceeds of any such transfer or redemption of interest or dividends on financial assets in the Accounts."

75. Citibank is not required to disburse funds to Climate United *if* EPA exercises its "right to exclusive control" under the ACA. ACA § 2; *see also* Amended ACA § 1 (amending ACA § 2 to clarify that "after the delivery of a Notice of Exclusive Control, Bank shall continue to disburse funds and financial assets associated with financial obligations 'properly incurred' by the Pledgor prior to the issuance of, but not in anticipation of, a delivery of a Notice of Exclusive Control … except for any specific funds or financial assets, identified by Secured Party in the applicable Notice of Exclusive Control as not being 'properly incurred' by the Pledgor in accordance with 2 [C.F.R. §] 200.343.").

76. To exercise its right of control, EPA must notify Citibank of its intention to exercise exclusive control over the accounts, in a form substantially similar to a sample Notice of Exclusive Control contained in the ACA. *Id*.; Amended ACA at 10 (Exhibit A: Sample NOEC); *see also* ACA at 1 (stating that Climate United and EPA "have agreed that the terms and conditions entitled 'Deposit Account at Financial Agent' in the Grant Agreement indicate the conditions under which the [EPA] may exercise its right of control").

77. The operative form Notice of Exclusive Control states: "As required by the Grant Agreement, the Secured Party [*i.e.*, EPA] has issued a written determination and finding that Pledgor [*i.e.*, Climate United] has failed to comply with the terms and conditions of the Grant Agreement, and that noncompliance is substantial such that effective performance of the Grant Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse (as defined in the Grant Agreement) or material misrepresentation of eligibility status, and that the Secured Party has initiated action under 2 [C.F.R. §] 200.339 to wholly or partly suspend or

terminate the Grant Agreement, as authorized in the terms of the Grant Agreement." Amended ACA at 10.

78.    The form NOEC thus incorporates the standard for termination of the award specified under the Terms and Conditions. *Compare id.*, *with* December NOA at 41 (discussing termination under programmatic conditions) *and* January NOA at 5 ("All Programmatic Conditions Remain the Same").

79.    The ACA does not refer to the FAA or purport to incorporate by reference any of the FAA's terms.

80.    The ACA does not provide that Citibank may decline to disburse funds to Climate United under the ACA if such disbursement is not in accordance with the FAA. To the contrary, the ACA states that "[e]ach of the Pledgor [*i.e.*, Climate United] and the Secured Party [*i.e.*, EPA] acknowledges and agrees that … the duties, responsibilities and obligations of the Bank shall be limited to those expressly set forth in this Agreement [*i.e.*, the ACA], each of which is administrative or ministerial (and shall not be construed to be fiduciary in nature)." ACA § 6(a). The ACA further states: "The Bank shall be entitled to rely upon any instruction, notice, request or other instrument delivered to it without being required to determine the authenticity or validity thereof, or the truth or accuracy of any information stated therein." ACA § 6(b). In addition, the ACA states that it "constitutes the entire agreement between the parties and sets forth in its entirety the obligations and duties of the Bank with respect to the assets in the Accounts." ACA § 9.

**F.    Climate United Uses Grant Funds Provided By Citibank In The Normal Course.**

81.    Climate United's funds were fully obligated by EPA on August 8, 2024. Climate United initially accessed funds through Treasury's ASAP system as Treasury worked to implement

the financial agent arrangement. The remainder of Climate United's undrawn funding was disbursed to accounts held at Citibank, after those accounts were established, subject to the ACA.

82.    Thereafter, Climate United drew money from its Citibank accounts approximately once every two weeks to pay operating expenses, as permitted by the governing Terms and Conditions, which requires prior approval for drawing of transfers that will not be disbursed in the following fourteen business days. *See* December NOA at 57-58.

83.    Climate United has used grant funds for salaries and benefits for 37 employees on its payroll. These staff members collectively operate all aspects of Climate United's operations, including establishing financing programs, underwriting potential financial transactions, ensuring compliance with the Terms and Conditions of the NCIF Award, soliciting and selecting partners, conducting community engagement, and structuring and servicing a portfolio of loans.

84.    Climate United has used grant funds to launch three financing programs to date. The first is a $31.8 million pre-construction loan to support solar power projects across rural communities in Arkansas, which was announced in October 2024. Through this project, Climate United is financing pre-construction costs for 18 solar projects comprising the largest commercial and industrial solar deployment in Arkansas history, which is projected to save more than $120 million in energy costs over the project's life and create hundreds of jobs.

85.    The second is a program to offer affordable leasing options for battery electric heavy-duty trucks to small fleets and independent operators. Climate United issued a request for proposals in October 2024 from qualified U.S. auto manufacturers to deliver up to 500 electric drayage trucks, which Climate United intends to begin leasing at the ports of Long Beach and Los Angeles. When completed, these orders will represent some of the largest-ever purchases of domestically manufactured battery electric trucks in U.S. history. Climate United intends to

expand this program nationally. This program will not only reduce the cost per mile of operating drayage trucks for small businesses, but it will also reduce air pollution in port communities and create demand for U.S. manufacturing in factories across the country.

86.    The third is $63 million in committed pre-construction financing for projects to design and develop solar power plants in partnership with Tribal governments and communities. These projects bring access to affordable energy to rural communities and Indigenous people in addition to quality jobs and local economic development. Initial projects will be located in Eastern Oregon and Idaho.

87.    In addition, Climate United has used grant funds to design, develop and launch the Climate United NEXT program. This is a pre-development grant program intended to provide up to $30 million in technical assistance and planning support for community-led projects that increase energy independence and resiliency, reduce pollution, and save money for families, small businesses, and communities. The first round of grants focused on projects serving Tribal communities. Climate United publicly committed to announcing pre-development grants through the NEXT program across the United States by the end of February 2025. After reviewing 104 applications for the program in the first round of submissions, Climate United approved 22 awards across 18 states, and anticipates issuing $6.345 million in initial subawards.

88.    Throughout this period, EPA has exercised its oversight and supervisory authority in the following ways:

      a.    The terms of the grant agreement require quarterly, semi-annual, and annual reports to be submitted to EPA, detailing Climate United's transactions, activities, progress against its workplan, and expenditures by budget category, including mandatory quarterly conflict-of-interest reporting by each of the Climate United coalition

partners and Climate United's subgrantees. Climate United's inaugural semi-annual report covering the period from the start of the grant to December 31, 2024 is publicly available;

b.  EPA has held meetings at least weekly, and frequently two to three times a week, to discuss Climate United's program plans, reporting, oversight, and application of the EPA Terms and Conditions;

c.  EPA has view access to each of Climate United's seven Citibank accounts and each of the fourteen accounts of Climate United's subrecipients, allowing EPA to see funds being spent and what budget category that spending relates to, as well as allowing EPA to see program income in the form of portfolio earnings or repayment of loans;

d.  Climate United is required to provide a certification each time it submits a draw request to Citibank for a financial assistance transaction establishing that the draw is necessary to execute against its EPA-approved workplan. The certification states: "The amount of the transfer is necessary to execute against the EPA-approved workplan, and the financing agreements for identified qualified projects necessitating the transfer have been reviewed by Climate United's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions.";

e.  Climate United was required to obtain EPA approval for a detailed budget for the term of its award, and EPA must approve any material changes;

f.  Climate United has adopted detailed policies as required by EPA, including investment policies and procedures to approve projects, many of which require further reporting from project borrowers;

g.  Climate United is subject to standard audit requirements by a third-party auditor, including both financial audits and a Single Audit for federal grant compliance; and

h.  In November, EPA conducted transaction testing, which is a systematic examination and verification of financial transactions to ensure they comply with the grant's terms, conditions, and applicable regulations. EPA recently issued additional oversight requests.

**G.   EPA Takes Actions to Attempt to Suspend or Terminate Climate United's Grant, and to Cause Citibank to Not Disburse Climate United's Funds, While Ignoring Climate United's Requests for Information.**

89.   On January 30, 2025, Administrator Zeldin was sworn in as the EPA Administrator.

90.   On February 12, 2025, Administrator Zeldin made a public statement announcing EPA's goal of taking possession of grant funds disbursed pursuant to the Inflation Reduction Act, referring to Climate United by name. [7] Without mentioning any specific basis for adverse action under the terms of Climate United's award—or that of any other recipient—Administrator Zeldin stated that "the financial agent agreement with the Bank needs to be instantly terminated," and stated that "the Bank must immediately return" the grant funds. [8] To ensure EPA "reassume[s] responsibility for all of these funds," Administrator Zeldin then stated that he would "refer[] this

---

[7] Lee Zeldin (@EPALeeZeldin), X, at 1:40 (Feb. 12, 2025, 7:52 PM), https://x.com/epaleezeldin/status/1889840040622321778.
[8] *Id*. at 2:15.

matter to the Inspector General's Office and will work with the Justice Department," and that EPA is "not going to rest" until it has "recover[ed]" the grant funds.[9]

91.    EPA, acting directly and through other government officials, thereafter took multiple actions designed to cause Citibank to withhold grant funds from Climate United. Those actions include, but are not limited to:

a.    On February 17, 2025, the Office of the Deputy Attorney General ("ODAG") at the Department of Justice communicated with the United States Attorney's Office in Washington, D.C. ("USAO-DC"), seeking to open a grand jury investigation into grants awarded by EPA under the GGRF, including to Climate United.[10] Denise Cheung, the Chief of the Criminal Division at USAO-DC, after reviewing the documentation provided by ODAG, advised that there was not an adequate factual basis to open that grand jury investigation.[11]

b.    On February 17, 2025, FBI "recommended" that Citibank freeze assets in the accounts of Climate United and every other prime recipient of a GGRF grant.[12] FBI did not refer to the FAA between Citibank and Treasury, or any obligations under the FAA. FBI did not produce a warrant issued by a judge who found probable cause based on a sworn affidavit. FBI did not articulate exigent circumstances

---

[9] Rapid Response 47 (@RapidResponse47), X (Feb. 25, 2025, 10:16 AM), https://x.com/Rapid Response47/status/1894406216052289869.

[10] *Read the Resignation Letter by Denise Cheung, a Veteran D.C. Federal Prosecutor*, Wash. Post (Feb. 18, 2025), https://www.washingtonpost.com/dc-md-va/2025/02/18/read-resignation-letter-denise-cheung/; *see also* Kyle Cheney, et al., *Senior Prosecutor in Washington Quits, Citing Pressure to Probe Biden-era Climate Funds*, Politico (Feb. 18, 2025), https://www.politico.com/news/2025/02/18/denise-cheung-us-attorneys-office-washington-020363.

[11] *Resignation Letter*, *supra* note 10 (noting assessment that no "predicate for opening such a grand jury investigation existed" on the face of the existing documents provided by ODAG).

[12] Dkt. 14-5 at 2-3 (listing Account Control Agreements between EPA and eight [NCIF/GGRF] grantees, including Climate United).

justifying an immediate seizure of Climate United's assets without notice to Climate United. FBI did not identify any substantive factual basis for this "recommendation." FBI took this action even though Ms. Cheung had advised that there was not "sufficient evidence to tell the bank that there is probable cause to seize the particular accounts identified."[13]

c.  That same day, the ODAG instructed that a second letter be sent to Citibank directing that Citibank implement an asset freeze and refrain from releasing funds in accounts of 28 other GGRF awardees and subawardees pursuant to a criminal investigation.[14] In response, senior officials at the DC-USAO again asserted there was not sufficient evidence to justify issuing that letter.[15] Consistent with her oath of office, Ms. Cheung refused to send the letter and was forced to resign on February 18, 2025.[16]

d.  Apparently without signoff from other prosecutors at the DC-USAO, Interim U.S. Attorney Ed Martin submitted a seizure warrant application with a magistrate judge, which was rejected.[17] After that, ODAG reportedly sought a different U.S. attorney's office to carry out the warrant request in order to launch a grand jury investigation and obtain a court-ordered bank freeze, but prosecutors in that office likewise refused to do so.[18]

---

[13] *Resignation Letter*, *supra* note 10.
[14] *Id*.; *see* Dkt. 14-5 at 5-6.
[15] *Resignation Letter*, *supra* note 10.
[16] *Id*.
[17] Spencer Hsu, Maxine Joselow & Nicolas Rivero, *FBI Takes Up EPA Probe Amid Pushback from Judge, Prosecutors*, Wash. Post (Feb. 27, 2025), https://www.washingtonpost.com/dc-md-va/2025/02/27/trump-fbi-epa-grant-investigation/.
[18] *Id*.

e.  On February 19, 2025, Administrator Zeldin stated on X that he had "just read" a "grant agreement" related to the GGRF, characterizing it as "wild."[19]

f.  On February 23, 2025, Administrator Zeldin discussed the GGRF program on national television and stated, without basis, that "the entire scheme, in my opinion, is criminal."[20]

g.  On March 2, 2025, EPA Deputy Administrator McIntosh sent a letter to EPA's Office of the Inspector General asking for an OIG investigation into GGRF funding.[21] That letter, which was public, states that Citibank was withholding the funds "voluntarily." The letter did not disclose FBI's "recommendation" to freeze the funds or EPA's role in procuring that "recommendation."

h.  EPA then sent a copy of that letter to Citibank by email, asserting that the letter "highlights several of the egregious instances of misconduct regarding $20 billion GGRF distributions that have been improperly funneled through your financial institution," and stating that "EPA will continue our efforts to re-establish accountability and oversight over the GGRF, which is riddled with self-dealing, conflicts of interest, extraordinarily unqualified recipients, improperly reduced government oversight, and much more."[22] Beyond these generalized statements,

---

[19] Lee Zeldin (@EPALeeZeldin), X (Feb. 19, 2025, 4:01 PM), https://x.com/epaleezeldin/status/1892318587961930086.

[20] Sunday Morning Futures (@SundayMorningFutures), X (Feb. 23, 2025, 11:21 AM), https://x.com/SundayFutures/status/1893697750937505807; *see also* Zack Colman, *Recipient Isn't Giving in as Trump's EPA Tries to Revoke Climate Grants*, Politico (Feb. 24, 2025), https://www.politico.com/news/2025/02/24/climate-grant-recipient-spending-trumps-epa-tries-claw-back-00205814 (collecting quotes).

[21] *EPA Formally Refers Financial Mismanagement of $20B "Gold Bars" to Inspector General*, EPA (last updated Mar. 3, 2025), https://www.epa.gov/newsreleases/epa-formally-refers-financial-mismanagement-20b-gold-bars-inspector-general.

[22] Dkt. 14-6.

the communication to Citibank offers no basis for its assertions of "conflicts of interest, extraordinarily unqualified recipients," or "improperly reduced government oversight" with respect to Climate United.

i.   On March 4, 2025, after EPA received a letter from Climate United outlining the legal and factual basis for why access to its funding must be restored, the Department of Treasury directed Citibank not to disburse funds from any of the GGRF accounts for a specified period." Dkt. 14 at 7. In an email to Citibank at 10:02 PM, Treasury stated that "Treasury is instructing Citibank, in its capacity as fiduciary, to work directly with the EPA to establish and implement reasonable account controls to serve the purposes and interests of the United States, in accordance with Section 5 of the FAA. Further, in order to provide the EPA with the necessary time to develop reasonable account controls, we are further instructing Citibank not to disburse funds from any of the GGRF accounts prior to the end of the day Sunday, March 9, 2025." Dkt. 14-7. Neither the ACA nor the FAA permit such a direction based on vague and unfounded suspicions. The FAA only permits Citibank to freeze funds "in accordance with the account control agreements," but the ACA did not permit this freeze. The FAA requires Citibank to comply with "all lawful instructions or directions received from Treasury," but the instructions on March 4 and 10 were not lawful. Citibank's role as a fiduciary of the United States does not extend to suborning unlawful conduct by EPA or Treasury.

j.   On March 8, 2025, EPA sent Citibank a letter regarding GGRF grant recipients. *See* Dkt. 14-2. On information and belief, that communication directed Citibank to

"not resume processing payment instructions for GGRF accounts," Dkt. 14-2, or language to that effect.

k. On March 10, 2025, in an email to Citibank with the timestamp of 12:28 AM eastern time, EPA directed Citibank to continue to refrain from processing payments. Dkt. 14 at 7. The message stated: "In its communication to the Bank this week, the U.S. Department of the Treasury (Treasury) directed the Bank to cooperate with EPA on account controls. To prevent the misuse of funds in the interim, EPA instructs the Bank, pursuant to this Treasury directive, the grant agreements, and Section I.B of Exhibit A to the [FAA], to pause the processing of payment instructions for the GGRF accounts until further notice." Dkt. 14-2. This direction was also illegal: Section I.B of Exhibit A to the FAA did not permit Treasury to take this step unless the grant was lawfully terminated. As of March 10, the grant had not been terminated and no termination would have been lawful.

92.    Amid these events, Citibank failed to comply with Climate United's normal-course requests for disbursements, as required by the ACA. When Climate United inquired, Citibank did not respond and did not provide Climate United with any legal or factual basis for its failure to act.

a. On February 14, 2025, Climate United requested an inter-account transfer, to move funds related to the purchase of electric trucks from Climate United's budget account to Climate United's reserve account. The transfer did not occur.

b. On February 18, 2025, Climate United placed a request to Citibank to draw funds from Climate United's account. In the normal course, Citibank would have sold shares in Climate United's money market account, and then distributed the resulting funds to Climate United later that same day. But Climate United's accounts with

Citibank do not reflect that the typical money market transaction or disbursement occurred, and Climate United did not receive any funds from its account.

c.  On the morning of February 19, 2025, Climate United submitted an email message to Citibank noting that its funding requests remained pending and had not been disbursed. That letter requested that Citibank provide the legal bases for those actions, advise whether those actions were taken pursuant to a directive by a government agency, and provide a reasonable opportunity to respond to any instruction or request that impacts Climate United's accounts before that instruction or request may be acted upon by Citibank. Citibank did not respond.

d.  On February 21, 2025, Climate United placed a request to Citibank to draw funds from Climate United's account. But Climate United's accounts with Citibank do not reflect that the typical money market transaction or disbursement occurred, and Climate United did not receive any funds from its account.

e.  On the evening of February 25, 2025, counsel for Climate United submitted another email message to Citibank requesting release of the funds within 24 hours or, in the alternative, to provide the legal bases for its actions. Citibank again did not respond.

f.  On February 26, 2025, counsel left voicemail messages for Citibank. Citibank again did not respond.

g.  On March 1, 2025, counsel submitted a letter in hard copy and by email to the Chief Executive and Chief Legal Officers of Citibank. The letter explained that Citibank is illegally withholding Climate United's funds in breach of the ACA; has ignored Climate United's repeated requests for information by phone, voicemail, and email; and has failed to provide any colorable legal basis for Citibank's actions. The letter

demanded a response by no later than close of business on Tuesday, March 4, 2025. Citibank did not respond.

93.    When Citibank finally responded to Climate United, Citibank stated that it was not disbursing funds because it was waiting for direction from EPA. Citibank did not disclose that it had frozen Climate United's funds based on FBI's "recommendation" or based on direction from EPA and Treasury.

   a.    On March 3, 2025, Climate United contacted Citibank by email requesting information about the status of Climate United's funds and the process for disbursing those funds. Citibank responded: "We have received your correspondence and have forwarded it to the United States Environmental Protection Agency and other federal officials for an appropriate response. … Once we have further information available regarding the program we can provide at that time." In response to a follow-up email from Climate United requesting clarification, Citibank stated: "We are awaiting further guidance."

   b.    On March 4, 2025, in "a statement emailed to *Newsweek* … , a spokesperson for Citibank said Citi has been working with federal officials to 'address government officials' concerns' regarding the GGRF. 'Our role as financial agent does not involve any discretion over which organizations receive grant funds,' the bank said in its statement. 'Citi will of course comply with any binding instructions from the federal government.'"[23]

---

[23] Jeff Young, *Green Group Wants EPA to Explain Why $20 Billion Accounts Are Frozen*, Newsweek (Mar. 4, 2025), https://www.newsweek.com/climate-united-fund-epa-letter-frozen-bank-accounts-2039608.

94.    Citibank's communications with Climate United and its public statements were misleading. Citibank did not assert that it was obligated under the FAA to freeze Climate United's funds. Citibank did not mention that EPA and Treasury had illegally caused Citibank to freeze Climate United's funds. Citibank did not state or suggest that it was withholding funds from Climate United based on a "recommendation" from FBI that cited no evidence and was not accompanied by a court order supported by probable cause and a sworn affidavit.

95.    Citibank also never described EPA's and Treasury's stated bases for withholding Climate United's funds. For example, Citibank never informed Climate United that the communications recommending or directing Citibank not to disburse funds to Climate United solely cited the FAA (to which Climate United is not a party), did not cite the ACA, did not assert that termination was warranted under the ACA, and did not suggest that a Notice of Exclusive Control had been issued or would be forthcoming. Citibank also never informed Climate United that the communications recommending or directing Citibank not to disburse Climate United's funds did not proffer adequate, let alone credible, evidence that any of the ACA's three bases for terminating Climate United's grant had been satisfied. And Citibank never gave Climate United an opportunity to respond. So Climate United never had an opportunity to explain that the FAA only permits accounts to be frozen "in accordance with the account control agreements," and that the ACA did not permit Climate United's assets to be frozen under these circumstances. Climate United also never had an opportunity to point out that the FAA requires Citibank to comply with "lawful instructions or directions" and act as a fiduciary, which did not require complying with the unlawful instructions and direction given by FBI, EPA, and Treasury. Instead, Citibank waited to reveal the truth until March 12—nearly a month after it began withholding Climate United's grant funds, and with Climate United on the brink of suffering irreparable harm.

96.    For its part, EPA never informed Climate United that EPA had been trying to freeze, suspend, or terminate Climate United's grant or its access to grant funds, or that EPA had directed Citibank to stop disbursing funds to Climate United. EPA never provided Climate United with a reasoned explanation, or any explanation, for its actions. EPA never even responded to Climate United's communications—even while EPA was simultaneously pressing Citibank to continue to prevent Climate United from accessing its funds, and directing Treasury to order Citibank to withhold Climate United's funds. Indeed, Climate United was not notified of these events until March 12, 2025, when it was served with briefs responding to its motion for a TRO.

a. On February 20, 2025, Climate United sent an email message to officials at EPA notifying EPA that it was being denied access to its funds and requesting additional information and guidance. The EPA team replied on February 21, providing no additional information but offering to discuss the following week. The following week, however, EPA rescheduled the meeting three times. After being informed that Climate United's outside counsel would be present at the meeting, an EPA official cancelled the meeting without rescheduling.

b. Climate United subsequently called the EPA official on February 27. The official's administrative assistant responded that the official was in possession of Climate United's e-mails and would reach out. As of the date of this filing, Climate United is still awaiting a response.

c. On March 4, 2025, Climate United submitted a letter to EPA by email, notifying EPA that Climate United has been unable to access its funding and requesting information regarding the nature of and legal justification for EPA's actions. The letter requested that EPA immediately reverse its actions and reinstate Climate

United's access to its NCIF funding. In the alternative, the letter requested that EPA

rescind or stay any suspension of termination of Climate United's grant pending

judicial review. EPA did not respond.

d.  On March 8, 2025, Climate United sued EPA after EPA had failed to respond to

earlier communications. Counsel for Climate United served Citibank and EPA by

email with a copy of the complaint and informed them that Climate United intended

to file a motion for a Temporary Restraining Order at the opening of business on

Monday, March 10, 2025. EPA did not respond.

**H.    EPA Files A Purported "Notice of Termination"**

97.    On March 10, 2025, Climate United moved for a TRO that would have, among

other things, enjoined EPA from "unlawfully suspending or terminated Climate United's grant

award except as is permitted in accordance with the Account Control Agreement, the grant award,

and applicable law." Dkt. 2 at 2. The Court tentatively scheduled a hearing for March 11, 2025, at

4:00 PM. The government's attorney requested a 24-hour extension as a purported "courtesy."

Climate United consented.

98.    On March 11, 2025, at approximately 6:22 PM—after the originally scheduled time

for the TRO hearing—EPA did precisely what Climate United was seeking to restrain EPA from

doing at the TRO hearing: it terminated Climate United's grant award in a manner that violated

the ACA, the grant award, and applicable law. At the TRO hearing, EPA then used the purported

termination as a basis for arguing that the case was moot.

99.    Specifically, after business hours on March 11, 2025, EPA served what it described

as a "Notice of Termination" ("Notice"). Dkt. 13-1. The "Notice" states that EPA is terminating

Climate United's grant "[p]ursuant to [EPA's] authority under 2 C.F.R. §[ ] 200.339." 2 C.F.R.

§ 200.339 applies only when "the recipient … fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award." EPA's "Notice" does not offer any evidence that Climate United violated any constitutional provision, statute, regulation, term, or condition of the grant.

100.    The "Notice" states that EPA is terminating Climate United's grant "[p]ursuant to [EPA's] authority under … 2 C.F.R. §§ 200.340." 2 C.F.R. § 200.340, which is the only termination authority mentioned in EPA's General Terms and Conditions for grants, permits termination "[b]y the Federal agency … if the recipient … fails to comply with the terms and conditions of the Federal award" or "[b]y the Federal agency … pursuant to the terms and conditions of the Federal award …." 2 C.F.R. § 200.340(a)(1) and (4). EPA's "Notice" does not offer any evidence that Climate United has failed to comply with any Terms and Conditions of its grant.

101.    The "Notice" states that EPA is terminating Climate United's grant "[p]ursuant to [EPA's] authority under … the General Terms and Conditions of EPA assistance award agreements." EPA's "Notice" does not offer any evidence that Climate United has failed to comply with any General Terms and Conditions of EPA assistance award agreements.

102.    The "Notice" states that EPA is terminating Climate United's grant "[p]ursuant to [EPA's] authority under … the terms and conditions of the Grant Agreement." The Grant Agreement specifies that termination may occur only in three situations: (1) noncompliance with the grant's Terms and Conditions; (2) "adequate evidence of Waste, Fraud, or Abuse," which in turn requires "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code

or a violation of the civil False Claims Act"; and (3) "material misrepresentation of eligibility status." EPA's "Notice" does not offer any evidence that any of these three situations has occurred.

103.    The "Notice" states that EPA is terminating Climate United's grant "[p]ursuant to … the Agency's inherent authority to reconsider prior determinations in light of new information." EPA's "Notice" does not identify the source of such inherent authority or any new information to support reconsidering the prior determination to award the grant to Climate United less than one year ago.

104.    The "Notice" states that the "termination is based on substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities, which collectively undermine the fundamental goals and statutory objectives of the award." EPA's "Notice" does not identify any legal or factual basis for terminating the grant on these grounds.

105.    The "Notice" states that EPA has identified certain deficiencies, such as "the absence of adequate oversight and account controls," "allocation of funds inconsistent with EPA's oversight and fiscal responsibilities," and the "circumvention and defeat of key oversight mechanisms." EPA's "Notice" does not substantiate these concerns or identify any legal or factual basis for terminating the grant on these grounds.

106.    The "Notice" asserts that EPA has "determined that its existing process for awarding and overseeing execution of the Grant Agreement" may violate the "Appointments Clause and private nondelegation doctrine." EPA's "Notice" does not explain any legal or factual basis for terminating the grant on these grounds. Indeed, neither the Appointments Clause nor the private nondelegation doctrine is implicated by this grant agreement.

107.    By press release dated March 11, 2025, EPA confirmed that it had "notified National Clean Investment Fund and Clean Communities Investment Accelerator recipients of the termination of their grant agreements."[24]

**I.    Citibank and EPA's Actions Have Harmed Climate United.**

108.    The NCIF award is currently the basis of funding for all of Climate United's operations and for all financing projects that Climate United either has launched or is planning to launch, aside from emergency charitable grants (which Climate United must pay back if funding is restored) to support operations while NCIF funds are unavailable. Even temporary inability to access its funding immediately threatens Climate United's operations, its ongoing and future projects, and its long-term reputation.

109.    Other than stopgap emergency charitable grants, which Climate United will need to repay if its access to funding is restored, Climate United does not have other committed sources of funding to replace the NCIF award. Nor is private investment a viable replacement. In fact, Climate United was specifically awarded NCIF funding to "prioritize investment in qualified projects that would otherwise lack access to financing." 42 U.S.C. § 7434(b)(1)(B).

110.    Without another source of funding aside from stopgap emergency charitable grants, Climate United does not have funds to pay operating expenses. Without that funding, Climate United also will not be able to pay its employees, pay rent, pay critical service providers and contractors, or meet its commitments under the loans and awards it has already approved. As a result of Defendants' actions, to preserve its available cash Climate United has already been compelled to defer compensation for certain employees, slash staff salaries, terminate multiple

---

[24] *See* Press Release, EPA, Administrator Zeldin Terminates Biden-Harris $20B 'Gold Bar' Grants (Mar. 11, 2025), https://www.epa.gov/newsreleases/administrator-zeldin-terminates-biden-harris-20b-gold-bar-grants.

vendors, cancel travel, and instruct non-essential lawyers, accountants, and consultants to cease work.

111. The work of Climate United is highly specialized. It structures financial transactions in hard-to-finance markets, which requires a deep understanding of various capital sources, including government programs (*e.g.*, low-income housing tax credits, solar investment tax credits, etc.) and private investors (*e.g.*, banks and insurance companies). Structuring and underwriting these transactions requires experience in the private credit markets to assess expected and unexpected risks based on prior knowledge of similar transactions, market data, and industry dynamics. To execute on this program, Climate United has hired a team of investment professionals with expertise in credit underwriting, structuring, and asset management—frequently from other financial institutions where they had higher compensation, on the promise of being able to serve Climate United's mission and the impact on the communities that benefit from Climate United's projects. If Climate United is unable to pay its staff, they are likely to leave and find other employment. Climate United has spent over two years cultivating relationships to develop its pipeline of bespoke transactions specifically tailored for this award; the departure of existing Climate United staff would irreparably harm Climate United's ability to fulfill its mission and workplan.

112. Continuing uncertainty around Climate United's funding has caused Climate United to confront increasingly unfavorable terms from essential vendors and prospective deal partners, some of whom have explicitly said they are unwilling to do deals with Climate United while its funds are frozen. Climate United also imminently risks not being able to pay rent and insurance for select offices or to pay critical third-party contractors who perform necessary services such as managing accounts payable, auditing financial statements, maintaining IT security

and infrastructure, advising on compliance, supporting communications, and providing legal services.

113. Continued uncertainty over Climate United's funding and inability to meet its existing commitments will have a devastating effect on Climate United's reputation. Climate United is primarily a lender, and borrowers who are uncertain about Climate United's sustained ability to deliver on funding commitments would not be willing to partner with Climate United to finance infrastructure projects. Climate United's loans typically disburse over a series of months or years and security of funding is paramount, in particular because many of the Climate United coalition's projects are construction projects.

114. Climate United has already heard from both borrowers and prospective financing partners about the impact Defendants' actions are having on their decision-making. One existing partner responded to Climate United's latest Request for Proposals to support community lenders with asset purchases by saying it was "not allocating resources to this RFP at the present moment as [it] monitor[s] the NCIF situation and look[s] for resolution of some of the uncertainty." A manufacturer informed Climate United: "given the status of the current environment, we are going to pause any engagement with Climate United until the relationship between Climate United and the EPA is stable and we can be more confident that funds will not be clawed back."

115. Further, without a source of funding, Climate United would not be able to meet its commitments under the loans and awards it has already approved. This could render Climate United in breach of its existing agreements and would cause profound harm to the local organizations who rely on these funds to develop critical energy projects that reduce costs and create jobs. As examples, Climate United will be unable to support the worthwhile projects described above—including the solar projects in Arkansas, the project to develop and lease electric

heavy-duty drayage trucks in the ports of Long Beach and Los Angeles, the projects to design and develop solar power plants in partnership with Tribal governments and communities in Eastern Oregon and Idaho, and the 22 Tribal projects across 18 states as part of the NEXT program.

116.    If Climate United is unable to carry out its projects, it will harm the communities across the country that it was awarded the NCIF grant to serve. The following are examples of some of the negative impacts on U.S. businesses and consumers, as estimated in Climate United's EPA-approved workplan:

a.    10,000 households would not get solar systems on their roofs, of which 60% are families living in low-to-moderate-income communities. This would result in a total annual loss to low-to-moderate-income consumers of $8.8 million annually. The total lifetime loss to consumers is estimated at nearly $100 million.

b.    11 solar power plants in Arkansas would not be built, which would be equivalent to $120 million in energy savings not realized for Arkansas taxpayers. In addition, 1,500 jobs, primarily in skilled trades, would not be created or preserved.

c.    Climate United would not be able to place an order of approximately 500 Class 8 heavy duty electric trucks that would generate demand for U.S. manufacturing facilities, allow truck drivers to realize a lower cost per mile by leasing the trucks, and reduce prices for consumers.

d.    Climate United's subgrantees would not be able to fund a pipeline of 232 multifamily housing properties to increase energy efficiency and electrify core

building systems to reduce building operating costs and keep rents affordable for low-income families.

117.    In addition, if Climate United's investment portfolio stalls, it will not be able to invest in programs and technologies that will reduce or avoid 11 million MT CO2e, bring economic benefits to millions of Americans, and mobilize at least $21 billion in private capital, benefiting consumers and businesses in the areas of housing, passenger and heavy-duty vehicles, and commercial and community buildings.

## CLAIMS FOR RELIEF

### COUNT ONE: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT— ARBITRARY AND CAPRICIOUS (CHALLENGE TO TERMINATION) (Defendants EPA, Administrator Zeldin)

118.    Climate United repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

119.    The APA authorizes this Court to hold unlawful and set aside final agency action that is "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A).

120.    On March 11, 2025, EPA purported to terminate Climate United's grant by delivering a "Notice of Termination."

121.    EPA's termination of Climate United's grant constitutes final agency action under the APA.

122.    EPA's termination of Climate United's grant is arbitrary and capricious because EPA had no legal or factual basis for the termination and EPA did not provide an adequate or reasoned basis for the termination.

a.    The "Notice" states that EPA is terminating Climate United's grant "[p]ursuant to [EPA's] authority under 2 C.F.R. §§ 200.339-40, the General Terms and Conditions

of EPA assistance award agreements, the terms and conditions of the Grant Agreement, and the Agency's inherent authority to reconsider prior determinations in light of new information." But EPA's "Notice" does not offer any evidence or explanation to support termination on those grounds. Indeed, there is no legal or factual basis for termination on any of those grounds. Climate United has not violated any constitutional provision, statute, or regulation; has not failed to comply with any Terms or Conditions of its grant; has not failed to comply with any General Terms and Conditions of EPA assistance award agreements; has not engaged in "Waste, Fraud, or Abuse," which is defined as "the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act"; and has not triggered any of the grounds for termination under the Terms and Conditions of its grant.

b. EPA's "Notice" does not identify the source of any inherent authority to terminate the grant; does not identify any new information to support reconsidering the prior determination to award the grant to Climate United less than one year ago; does not identify any basis to terminate the grant based on concerns about program integrity, the award process, programmatic fraud, waste, and abuse, misalignment with the Agency's priorities, or sufficiency of oversight mechanisms or account controls; and does not explain any legal or factual basis for terminating the grant based on the Appointments Clause or the private nondelegation doctrine.

c. EPA's termination reflects an arbitrary and capricious change in position. EPA has provided no reasoned explanation for its decision to terminate Climate United's

grant on March 11, 2025, when the grant was awarded in April 2024, following

months of rigorous review as part of a competitive application process.

d. EPA's "Notice" provides no explanation for its abrupt change of position that

accounts for upsetting the reliance interests of Climate United and its subgrantees.

123. Climate United is entitled to an injunction against EPA's wrongful action.

124. Pursuant to 28 U.S.C. § 2201, Climate United is entitled to a declaration that EPA's

termination of the grant is arbitrary and capricious, in violation of the APA.

## COUNT TWO: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT - NOT IN ACCORDANCE WITH FEDERAL REGULATIONS (CHALLENGE TO TERMINATION) (Defendants EPA, Administrator Zeldin)

125. Climate United repeats and incorporates herein by reference each and every

allegation contained in the preceding paragraphs as if fully set forth herein.

126. The APA authorizes this Court to hold unlawful and set aside final agency action

that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

127. On March 11, 2025, EPA purported to terminate Climate United's grant by

delivering a "Notice of Termination."

128. EPA's termination of Climate United's grant constitutes final agency action under

the APA.

129. EPA's termination of Climate United's grant is not in accordance with law because

it violates multiple federal regulations. For example:

a. EPA's termination of the grant violates EPA regulations and Uniform Grant

Guidance regulations codified at 2 C.F.R. § 200 *et seq.*, which do not allow EPA to

terminate Climate United's grant under these circumstances.

b. EPA's termination of the grant has not complied with EPA's regulatory obligation

to take certain procedural steps to terminate the grant agreement, such as providing written notice of termination that includes "the reasons for termination, the effective date, and the portion of the Federal award to be terminated, if applicable." 2 C.F.R. § 200.341(a). The Notice only provides vague references to "waste" and "accountability," among other things, with no supporting evidence or facts as to what Climate United is alleged to have done wrong.

c. EPA's termination of the grant has resulted in improperly withholding payment for allowable costs without establishing that Climate United has either "failed to comply with the terms and conditions of the Federal award" or is "delinquent in a debt to the United States." 2 C.F.R. § 200.305(b)(6).

d. EPA's termination of the grant has resulted in improperly withholding payment without first making a "determin[ation] that noncompliance cannot be remedied by imposing specific conditions." 2 C.F.R. § 200.339. Although the Notice includes a vague reference to "material deficiencies" and asserts that "these deficiencies … cannot be remedied by imposing specific conditions," EPA does not explain these statements or offer facts to support them.

e. EPA's termination of the grant does not comply with 2 C.F.R. § 200.340(b), which states: "The Federal agency or pass-through entity must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award." EPA's termination decision is not grounded in the "terms and conditions of the Federal award." Instead, the termination is based on EPA's disagreement with the GGRF program.

130.    Although EPA's "Notice" states that EPA is terminating Climate United's grant "[p]ursuant to [EPA's] authority under 2 C.F.R. §§ 200.339-40," those regulations do not provide EPA with grounds to terminate the grant.

a.    2 C.F.R. § 200.339 applies only when "the recipient … fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award." EPA has not provided any reasoned legal or factual basis to conclude that Climate United has violated any constitutional provision, statute, regulation, or term or condition of the grant. Indeed, Climate United has not violated any constitutional provision, statute, regulation, or term or condition of the grant.

b.    2 C.F.R. § 200.340 permits termination "[b]y the Federal agency … if the recipient … fails to comply with the terms and conditions of the Federal award" or "[b]y the Federal agency … pursuant to the terms and conditions of the Federal award …." 2 C.F.R. § 200.340(a)(1) and (4). EPA has not provided any reasoned legal or factual basis to conclude that Climate United has failed to comply with any Terms and Conditions of its grant.

131.    Climate United is entitled to an injunction against EPA's wrongful action.

132.    Pursuant to 28 U.S.C. § 2201, Climate United is entitled to a declaration that EPA's termination of the grant is not in accordance with federal regulations, in violation of the APA.

**COUNT THREE: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT—
NOT IN ACCORDANCE WITH INFLATION REDUCTION ACT
(CHALLENGE TO TERMINATION)
(Defendants EPA, Administrator Zeldin)**

133.    Climate United repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

134.    The APA authorizes this Court to hold unlawful and set aside final agency action that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

135.    On March 11, 2025, EPA purported to terminate Climate United's grant by delivering a "Notice of Termination."

136.    EPA's termination of Climate United's grant constitutes final agency action under the APA.

137.    EPA's termination of the grant violates the Inflation Reduction Act. The Act requires EPA to spend the funds appropriated for grants to be awarded under the Greenhouse Gas Reduction Fund, 42 U.S.C. § 7434. EPA violated the Act because it has not satisfied the stringent requirements for rescinding an appropriation under 2 U.S.C. § 683.

138.    Even if EPA "re-obligate[s] lawfully appropriated funds within the GGRF program," Dkt. 13-1, as EPA claims it will do, EPA's action would still be illegal. The Inflation Reduction Act sets a September 30, 2024 deadline for all grants to be awarded. 42 U.S.C. § 7434(a)(1), (2). Illegally terminating the entire program, and then re-awarding grants to unspecified new recipients, is inconsistent with that September 30, 2024 deadline.

139.    As a result of EPA's conduct, Climate United has suffered and will continue to suffer irreparable injury.

140.    Climate United is entitled to an injunction against EPA's wrongful action.

141.    Pursuant to 28 U.S.C. § 2201, Climate United is entitled to a declaration that EPA's termination of the grant is not in accordance with the Inflation Reduction Act, in violation of the APA.

## COUNT FOUR: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
### (CHALLENGE TO SUSPENSION)
### (Defendants EPA, Administrator Zeldin)

142.    Climate United repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

143.    The APA authorizes this Court to hold unlawful and set aside final agency action that is "arbitrary, capricious, … or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

144.    Prior to March 11, 2025, EPA effectuated a suspension of Climate United's grant by causing Citibank to withhold Climate United's grant funds.

145.    EPA's suspension of Climate United's grant constitutes final agency action under the APA.

146.    EPA's suspension of Climate United's grant is not in accordance with federal regulations, as described above. For example, EPA's actions resulted in improperly withholding payment for allowable costs without establishing that Climate United has either "failed to comply with the terms and conditions of the Federal award" or is "delinquent in a debt to the United States." 2 C.F.R. § 200.305(b)(6).

147.    EPA's suspension of Climate United's grant is arbitrary and capricious.

   a.    EPA had no legal or factual basis to open a grand jury investigation into Climate United's grant. Indeed, EPA's efforts to do so caused the Chief of the Criminal Division of the United States Attorneys' Office in Washington, D.C. to resign from that office after 24 years of service.

   b.    EPA had no legal or factual basis to cause a Freeze Letter to be issued to Citibank, or to cause Citibank or Treasury to freeze Climate United's grant funds, particularly when the freeze "recommendation" was not supported by an order issued by a judge

based on probable cause and cited no evidence in support of freezing Climate United's grant funds.

c.  EPA had no legal or factual basis to direct Treasury to demand that Citibank stop disbursing funds. Further, Treasury's action did not comply with the FAA, which states that any freeze of Climate United's accounts must occur in accordance with the ACA and must be lawful.

d.  EPA refused to meet with Climate United, and never responded to Climate United's communications about its inability to access its funds—even while EPA was simultaneously acting to prevent Climate United from accessing its grant funds.

148.    Climate United continues to experience ongoing injury from the suspension because during the suspension period it has not received funds to which it is lawfully entitled. Further, even if the termination is enjoined, any suspension that remains in effect would cause harm to Climate United.

149.    Climate United is entitled to an injunction against EPA's wrongful action.

150.    Pursuant to 28 U.S.C. § 2201, Climate United is entitled to a declaration that EPA's suspension of the grant is arbitrary, capricious, and not in accordance with law, in violation of the APA.

## COUNT FIVE: VIOLATION OF THE APPROPRIATIONS CLAUSE
### (Defendants EPA, Administrator Zeldin)

151.    Climate United repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

152.    The Appropriations Clause provides: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I,§ 9, cl. 7.

153.    The provision of the Inflation Reduction Act authorizing the GGRF is an "appropriation" because it authorizes EPA to expend $27 billion for purposes of carrying out the GGRF program.

154.    In the Inflation Reduction Act, Congress "appropriated to the [EPA] Administrator … $[19],970,000,000, to remain available until September 30, 2024, to make grants, on a competitive basis." 42 U.S.C. § 7434(a)(2), (3). The Appropriations Clause therefore forbids EPA from using appropriated funds to award grants after the statutory deadline.

155.    In the "Notice of Termination," EPA states: "EPA will work to re-obligate lawfully appropriated funds within the GGRF program …" Dkt. 13-1. In doing so, EPA seeks to spend money in a manner Congress has not permitted, in violation of the Appropriations Clause.

156.    If EPA re-obligates GGRF's grant funds to its preferred recipients, EPA would be violating Congress's intention for the funds to be obligated to clean-energy grants *that were completed prior to September 30, 2024*.

157.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr, lnc.*, 575 U.S. 320, 327 (2015).[25]

158.    Climate United is entitled to an injunction against EPA's wrongful action.

159.    Pursuant to 28 U.S.C. § 2201, Climate United is entitled to a declaration that EPA's suspension and termination of the grant violates the Appropriations Clause.

---

[25] The APA independently authorizes Climate United to bring this claim. 5 U.S.C. § 706(2).

**COUNT SIX: VIOLATION OF THE DUE PROCESS CLAUSE**
**(Defendants EPA, Administrator Zeldin)**

160.    Climate United repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

161.    Under the Fifth Amendment to the United States Constitution, the government may not deprive a person or entity of a protected property interest without due process of law.

162.    Climate United has a protected property interest in the grant funds it was awarded under the NCIF and in the accounts at Citibank to which those funds were disbursed.

163.    The government's actions preceding the termination, up to and including the termination, violated the Due Process Clause. For example:

    a.    EPA caused Citibank to freeze Climate United's assets without first obtaining a court order based on probable cause and supported by a sworn affidavit. Indeed, EPA initiated the freeze despite a judge having expressly rejected an application for a seizure warrant on the basis that no probable cause existed.

    b.    EPA never informed Climate United that EPA was trying to freeze, suspend, or terminate Climate United's grant or its access to grant funds, or that EPA was coordinating in secret with Treasury and FBI to direct Citibank to stop disbursing funds to Climate United. EPA thus deprived Climate United of its property in the grant funds without providing Climate United notice or an opportunity to be heard prior to the initiation of the freeze.

    c.    EPA also failed to provide Climate United notice or an opportunity to challenge the freeze once it had been implemented. After Climate United deduced that its funds had been frozen, EPA refused to respond to Climate United's multiple requests for information or to meet with Climate United, and never notified Climate United that

its funds had been frozen at EPA's direction. At the same time—and again without providing Climate United notice of its actions—EPA was continuing to pressure Citibank to keep Climate United from accessing funds in its accounts, and ultimately directed Treasury to order Citibank to withhold Climate United's funds.

    d.   In an attempt to extend the unlawful freeze of Climate United's assets in the wake of the filing of this litigation, EPA issued the "Notice of Termination" without any legal or factual basis. It offered no notice or process to Climate United before doing so; and the "Notice" provides no opportunity for Climate United to challenge the purported "termination" of its grant funds after the fact. EPA issued the "Notice" hours before a court hearing, which had been extended as a professional courtesy, despite being notified by Climate United days earlier that Climate United had filed a lawsuit and intended to seek temporary emergency relief.

164.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr, Inc.*, 575 U.S. 320, 327 (2015).[26]

165.    EPA's weekslong effort to deprive Climate United of its property in the grant funds violates the Due Process Clause. Climate United is entitled to an injunction preventing EPA from continuing to deprive Climate United of access to the funds in its accounts without due process.

## COUNT SEVEN: BREACH OF CONTRACT
### (Defendant Citibank)

166.    Climate United repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

---

[26] The APA independently authorizes Climate United to bring this claim. 5 U.S.C. § 706(2).

167.    Citibank has a duty under the ACA to disburse Climate United's grant funds to Climate United, as Climate United requests. Under the ACA, Citibank "shall comply with all instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and financial assets in the Accounts." ACA at 2.

168.    When Climate United requested that Citibank disburse grant funds held in Climate United's accounts, as required by the ACA, Citibank failed to disburse such funds.

169.    Citibank has no legal or factual basis for failing to disburse grant funds from Climate United's accounts, as required by the ACA.

170.    Under the ACA, Citibank's duties with respect to Climate United's grant funding are exclusively "administrative or ministerial (and shall not be construed as fiduciary in nature)," and Citibank "shall not be responsible" for determining whether Climate United's requests for the disbursement of grant funds comply with any applicable contracts or laws. ACA at 3.

171.    EPA (as the Secured Party under the ACA) has not delivered to Citibank a Notice of Exclusive Control and has stated that it has no intention of delivering such a notice to Citibank. Indeed, there is no factual basis to support such a notice.

172.    EPA has not "issued a written determination and finding that [Climate United] has failed to comply with the terms and conditions of the Grant Agreement, and that noncompliance is substantial such that effective performance of the Grant Agreement is materially impaired or there is adequate evidence of waste, fraud, material misrepresentation of eligibility status, or abuse." ACA Exhibit A. Indeed, there is no factual basis to support such a written determination or finding.

173.    EPA has not "initiated action under 2 CFR 200.339 to wholly or partly suspend or terminate the Grant Agreement, as authorized in the terms of the Grant Agreement." Indeed, there is no factual basis to support such an action.

174.    The FAA between Citibank and Treasury, to which Climate United is not a party, does not provide Citibank with a legal basis to fail to disburse Climate United's grant funds as required by the ACA. The FAA authorizes Citibank to "freeze accounts … in accordance with" the ACA, and in compliance with "lawful instructions or directions received from Treasury." But Citibank froze Climate United's funds without following the ACA's termination provisions and based on instructions that were not lawful. And Citibank was not obligated to withhold funds based on FBI's "recommendation," which did not provide any factual or legal basis for freezing the funds in Climate United's accounts. No such basis exists.

175.    By failing to disburse grant funds held in Climate United's accounts, Citibank has breached the ACA.

176.    Citibank's failure to disburse funds, as required under the ACA, has caused damage to Climate United. Such damage has resulted solely from Citibank's own gross negligence or willful misconduct.

177.    Pursuant to 28 U.S.C. § 2201, Climate United is entitled to a declaration that Citibank's failure to disburse funds from Climate United's accounts is a breach of the ACA.

178.    Climate United is entitled to an injunction against Citibank's wrongful refusal to honor Climate United's disbursement requests.

## COUNT EIGHT: REPLEVIN
### (Defendant Citibank)

179.    Climate United repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

180.    Climate United has an immediate legal right to possess the grant funds that Climate United lawfully requested that Citibank disburse from Climate United's accounts, pursuant to the ACA.

181.    Citibank has wrongfully detained the grant funds by unlawfully failing to disburse the grant funds that Climate United lawfully requested.

182.    Citibank's intentional actions have caused damage to Climate United.

## COUNT NINE: CONVERSION
### (Defendant Citibank)

183.    Climate United repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

184.    Climate United has a legal right to possess and control the grant funds held in its accounts at Citibank, pursuant to the ACA.

185.    Citibank has wrongfully and intentionally exercised dominion or control over the grant funds in Climate United's accounts, including by failing to disburse grant funds to Climate United from Climate United's accounts in response to Climate United's valid and proper requests.

186.    Citibank has intentionally permanently or substantially interfered with Climate United's property rights, including by failing to disburse grant funds to Climate United from Climate United's accounts in response to Climate United's valid and proper requests.

187.    Citibank has acted without Climate United's consent and has no legal basis or valid justification for its actions.

188.    Citibank's intentional actions have caused damage to Climate United.

189.    Climate United is entitled to an injunction against Citibank's wrongful retention of Citibank's funds.

190.    Pursuant to 28 U.S.C. § 2201, Climate United is entitled to a declaration that Citibank's failure to disburse funds from Climate United's accounts constitutes a conversion of Climate United's funds.

## PRAYER FOR RELIEF

WHEREFORE, Climate United respectfully asks this Court to:

1.    Declare that EPA's purported "Notice of Termination" is null, void, and of no legal effect;

2.    Declare that EPA and Administrator Zeldin's actions violate the Administrative Procedure Act because they are arbitrary and capricious, not in accordance with federal regulations, and not in accordance with federal statutes;

3.    Declare that EPA and Administrator Zeldin's actions violate the Appropriations Clause;

4.    Declare that EPA and Administrator Zeldin's actions violate the Due Process Clause;

5.    Enjoin EPA, Administrator Zeldin, and others in active concert or participation therewith, including officials at the U.S. Department of the Treasury, from impeding Citibank or from causing Citibank to deny, obstruct, delay, or otherwise prevent Climate United from accessing its funds as permitted under the terms of the ACA and the grant award;

6.    Enjoin EPA and Administrator Zeldin from unlawfully suspending or terminating

Climate United's grant award, including by effectuating the Notice of Termination or sending a Notice of Exclusive Control under the ACA, except as permitted in accordance with the ACA, the grant award, and applicable law;

7.    Declare that Citibank's failure to disburse grant funds from Climate United's accounts is a breach of the ACA;

8.    Order Citibank to process, disburse, and release all funds in accounts established in connection with Climate United's grant, at Climate United's request, in accordance with the ACA, both with respect to requests Climate United has already submitted and with respect to future requests;

9.    Order that Citibank may not transfer or otherwise move funds out of accounts established in connection with Climate United's grant, except at Climate United's direction as permitted under the ACA;

10.    Grant such other and further relief as may be just and proper.

Dated: March 17, 2025                    Respectfully submitted:

                                        /s/ Adam G. Unikowsky

Gabriel K. Gillett (admitted *pro hac vice*)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
Tel.: (312) 222-9350

Adam G. Unikowsky (989053)
Kathryn L. Wynbrandt* (1602446)
David B. Robbins (493976)
Tanner J. Lockhead* (90011928)
JENNER & BLOCK LLP
1099 New York Avenue
Suite 900
Washington, D.C. 20001
Tel.: (202) 639-6000
Fax: (202) 639-6066
aunikowsky@jenner.com

* Application to Court pending.

Allison N. Douglis (admitted *pro hac vice*)
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, N.Y. 10023
Tel.: (212) 891-1600
Fax: (212) 891-1699
adouglis@jenner.com

*Attorneys for Plaintiff Climate United Fund*

```
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
 2

 3      Climate United Fund,          ) Civil Action
                                      ) No. 25-cv-698
 4                    Plaintiff,      )
                                      ) MOTION HEARING
 5      vs.                           )
                                      ) Washington, DC
 6      Citibank, N.A., et al.,       ) March 12, 2025
                                      ) Time:  4:03 p.m.
 7                    Defendants.     )
        _____
 8
                   TRANSCRIPT OF MOTION HEARING
 9                       HELD BEFORE
           THE HONORABLE JUDGE TANYA S. CHUTKAN
10               UNITED STATES DISTRICT JUDGE

11      _____
                     A P P E A R A N C E S
12
        For Plaintiff:    Adam Unikowsky
13                        David B. Robbins
                          Jenner & Block LLP
14                        1099 New York Avenue, NW
                          Suite 900
15                        Washington, DC  20001
                          (202) 639-6041
16                        Email:  AUnikowsky@jenner.com
                          Email:  DRobbins@jenner.com
17
        For Defendant
18        Citibank:       Kenneth Winn Allen
                          Kirkland & Ellis LLP
19                        1301 Pennsylvania Avenue, NW
                          Washington, DC 20004
20                        (20) 238-9500
                          Email:  Winn.Allen@kirkland.com
21
          EPA:            Marcus S. Sacks
22                        Kevin P. VanLandingham
                          DOJ-CIV
23                        1100 L Street, NW
                          Room 8142
24                        Washington, DC  20530
                          (202) 307-1104
25                        Email:  Marcus.S.Sacks@usdoj.gov
                          Email:  Kevin.P.VanLandingham@usdoj.gov
```

2

```
 1    Court Reporter:           Janice E. Dickman, RMR, CRR, CRC
                                Official Court Reporter
 2                              United States Courthouse, Room 6523
                                333 Constitution Avenue, NW
 3                              Washington, DC  20001
                                202-354-3267
 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1        *  *  *  *  *  *  *P R O C E E D I N G S*  *  *  *  *  *  *

2              THE COURTROOM DEPUTY:  Good afternoon, Your Honor.

3    This is civil action 25-698, *Climate United Fund versus*

4    *Citibank, et al.*  And this matter is set for a motion hearing.

5              Parties please introduce yourselves for the record,

6    starting with the plaintiff.  Please come to the podium.

7              THE COURT:  We don't have a jury, you can either stay

8    at counsel table, but make sure the microphone is on and speak

9    into the microphone, or you can approach the podium, whatever

10   you prefer.

11             MR. UNIKOWSKY:  Sorry, Your Honor.  Can you hear now?

12             THE COURT:  Yes.  More importantly, she has to hear.

13             MR. UNIKOWSKY:  Thank you, Your Honor.  My name is

14   Adam Unikowsky.  I'm here on behalf of plaintiff, Climate

15   United Fund, and I'm here with my colleague, David Robbins.

16             THE COURT:  Good afternoon.

17             MR. SACKS:  Good afternoon, Your Honor.  Marc Sacks,

18   with the Department of Justice, on behalf of EPA.

19             THE COURT:  I don't see your name on here.  Can you

20   spell your name for me, please?

21             MR. SACKS:  Sure.  Marc, M-A-R-C.  And last name is

22   Sacks, S-A-C-K-S.

23             THE COURT:  On behalf of the EPA.  Okay.  Thank you.

24             MR. SACKS:  My colleague is Kevin VanLandingham.

25             THE COURT:  Kevin -- I'm sorry.
```

1          MR. SACKS:  VanLandingham.

2          THE COURT:  Okay.  And on behalf of Citibank?

3          MR. ALLEN:  Good afternoon, Your Honor.  Winn Allen,

4     on behalf of Citibank.

5          THE COURT:  All right.  I have a Kenneth Allen.  Is

6     that --

7          MR. ALLEN:  My mother calls me Kenneth, that's my

8     first name.

9          THE COURT:  If you're in big trouble?

10          MR. ALLEN:  I'm in big trouble.  I go by my middle

11     name.

12          THE COURT:  Okay.  Thank you, Mr. Allen.  All right.

13     Anybody else?

14          Okay.  We're here for a hearing on plaintiff's motion

15     for a temporary restraining order.  Since the time that

16     plaintiffs have filed this motion, there have been some

17     additional events.  Plaintiff is a nonprofit financial

18     institution, made up of three nonprofits which are focused on

19     deploying public and private financing to investments in clean

20     energy.

21          In 2023 plaintiffs applied for grant funding from the

22     EPA through the National Clean Investment Fund and in 2024 of

23     last year the EPA awarded plaintiffs $6.97 billion in grant

24     funding.  This past Saturday, Climate United sued Citibank, the

25     EPA, and EPA administrator Lee Zeldin, bringing claims for

1    breach of contract, conversion, and replevin against Citibank,

2    and APA claims and due process claims against the EPA.

3         On Monday, plaintiffs moved for a temporary

4    restraining order against all defendants.  In support of that

5    motion they filed several exhibits, including a declaration

6    from the CEO of Climate United.  They've also attached the

7    account control agreement between Climate United, Citibank, and

8    EPA, and the grant award agreement.

9         Defendant EPA has filed its opposition to the TRO and

10   accompanied that with nine exhibits, including some of the same

11   contracts, plus certain communications between EPA and

12   plaintiffs and EPA and Citibank.

13        Citibank also filed its opposition, along with seven

14   exhibits, also including various communications, as well as the

15   financial agent agreement between Citibank and Treasury.  And

16   last night, EPA filed a notice of grant termination, which has

17   been filed at ECF 13, which included as an exhibit a letter

18   from EPA to CEO of Climate United indicating that EPA was

19   terminating Climate United's grant effective immediately, for

20   reasons that I'll discuss in a moment.  And then finally, today

21   Climate United filed its response to the EPA's notice.

22        So I've reviewed all these documents and the filings.

23   Plaintiffs initially sought a TRO against Citibank for

24   preventing them from violating the ACA and continuing to refuse

25   to disburse Climate United's funds and against the EPA to bar

1    it from impeding Citibank from disbursing those funds, and to

2    bar the EPA from unlawfully suspending or terminating the

3    grant, except as permitted in the account control agreement.

4        Now, in light of the termination letter, there now

5    seem to be a few additional issues that I have to address.

6    First, I wanted to hear from the parties regarding the letter.

7    According to the letter, EPA has terminated the grant based on,

8    and I quote, concerns regarding program integrity, the award

9    process, programmatic fraud, waste and abuse, and misalignment

10   with the agency's priorities which collectively undermine the

11   goals and statutory objectives of the award.

12       EPA determined that its existing process for awarding

13   and overseeing execution of the grant agreement lacks

14   sufficient protections to guard against potential violations of

15   the Constitution, particularly the appointments clause and

16   private nondelegation doctrine.

17       As I see it, EPA has to take certain procedural steps

18   before it can terminate the award, including providing -- when

19   I say "as I see it," by virtue of the documents that have been

20   provided to me thus far.  It has to take certain procedural

21   steps, including providing written notice of termination that

22   includes the reasons for termination, the effective date, and

23   the portion of the federal award to be terminated, if

24   applicable.  And that's from 2 CFR § 200.341.  And it looks

25   like EPA does this in the letter.

1          But, under the contract, if terminating for waste,

2    fraud, or abuse, EPA is required to produce credible evidence

3    of the commission of a violation of federal criminal law

4    involving fraud, conflict of interest, bribery, or gratuity

5    violations found in Title 18 of the United States Code, or a

6    violation of the Civil False Claims Act.  EPA has not proffered

7    this information.

8          So, I guess I have some questions for counsel, for

9    plaintiff's counsel first.  I mean, I can go through the

10   various relevant provisions from the award agreement, but I

11   think you all are familiar enough with that.

12         How does the grant termination affect your request

13   for TRO at all?  I mean, you see the position that this puts

14   Citibank in, which has the money, but has been told by EPA

15   not -- that it would be impermissible to distribute the funds

16   and, as most banks are cautious institutions, they are between

17   a rock and a hard place here.

18         MR. UNIKOWSKY:  Yes, I understand, Your Honor.

19   Should I come to the podium or should I stay --

20         THE COURT:  You can come on up.  I mean, I take it by

21   your response that you're asking me to issue a TRO against

22   Citibank, ordering it to disburse the funds.  And you also ask

23   me to issue a TRO against EPA, to freeze the status quo ante

24   and to restrain them from giving effect to the notice of

25   termination.  But, can I do that with regard to Citibank, at

1    least?

2            MR. UNIKOWSKY:  Yes.  So let's begin with Citibank.

3            THE COURT:  What -- I'm sorry.  What would

4    maintaining the status quo ante look like here?

5            MR. UNIKOWSKY:  Okay.  So, first, with respect to

6    Citibank, what would maintain the status quo ante would be a

7    TRO directing Citibank to comply with the provisions of the

8    ACA, as it was doing until February the 18th.  The ACA is

9    fairly straightforward, it says that if Climate United Fund

10   asks for money or requests -- or instructs Citibank to issue a

11   disbursement, Citibank has to do it.  It has no discretion to

12   say no, unless there's a notice of exclusive control that's

13   issued by the EPA, which hasn't happened here.  And that's how

14   things were working until February 18th.

15           So I think a status quo order that would maintain the

16   status quo would be to issue a TRO directing Citibank to comply

17   with the provisions of the ACA.  And I do understand that it's

18   difficult for Citibank to say no to the FBI when the FBI

19   recommends to freeze someone's funds, even without a court

20   order.  But if there's a court order issued by this Court, then

21   I think Citibank would be in a better position in saying no.

22           THE COURT:  But then my question to you is:  How does

23   the notice of termination issued last night affect Citibank's

24   obligations?

25           MR. UNIKOWSKY:  So I think that we view that notice

1    as unlawful and I think the status quo order the Court should

2    enter would be one that temporarily freezes the status quo and

3    enjoins the notice of termination during the period of a TRO.

4         THE COURT:  I would have to find that that was an

5    unlawful termination.

6         MR. UNIKOWSKY:  Yes, Your Honor, I think it is

7    unlawful for several of the reasons we express in our filing

8    today.  It plainly does not comply with the requirements for a

9    termination.  There's no showing of waste, fraud, or abuse, as

10   Your Honor described it, by Climate United.

11        THE COURT:  Would granting the TRO require me to

12   reinstate a contract that's already been terminated?

13        MR. UNIKOWSKY:  I don't think that's the case because

14   we don't view this -- we view this termination as *ultra vires*,

15   Your Honor.  We think it's so plainly unlawful it shouldn't

16   have legal effect and the Court should --

17        THE COURT:  It does have a bit of a ready, fire,

18   aim --

19        MR. UNIKOWSKY:  I think the Court does have the

20   authority to issue that type of TRO, especially -- I mean, I

21   would point out that in the filing today, EPA contends that

22   this case is moot.  So, first of all, we don't think it's moot

23   because there's clearly a case of controversy between the

24   parties.  We've asked the Court to enjoin what we refer to in

25   our complaint as a *de facto* termination.  Now we got this

1    termination letter, there's even more adversity than there was

2    before.

3         Plainly, we still have standing to try to stop this

4    what we view as an unlawful termination.  The fact that EPA has

5    done the very thing that we contend is unlawful doesn't

6    eliminate case or controversy between the parties.  Also,

7    courts have been very reluctant to essentially reward

8    last-minute efforts by the government to moot a case, in this

9    case on the literal eve of the hearing.  It was actually after

10   the originally scheduled time for the hearing.  The government

11   asked for an extension as a professional courtesy, which I

12   granted.  So under the circumstances --

13        THE COURT:  Won't be doing that again, will you?

14        MR. UNIKOWSKY:  No, Your Honor, I will not.  But

15   under these unusual circumstances, I would ask the Court to

16   hesitate to the find the case moot and say there's still a live

17   controversy.

18        THE COURT:  Are you asking me to rule on the legality

19   of the contract?

20        MR. UNIKOWSKY:  I think that we have a likelihood of

21   success on the merits of establishing the termination was

22   unlawful, not as breach of contract.  We're not bringing a

23   breach of contract claim.

24        So what we're going to do is amend our complaint.  I

25   don't think we had a fair shot to do that, given that this came

11

 1    in after business hours last night.  If the Court issues a TRO

 2    and preserves the status quo, we will shortly amend our

 3    complaint and pursue not a breach of contract claim, a pure APA

 4    claim alleging violations of the Constitution, statutes, and

 5    applicable federal regulations and saying that the government's

 6    action is arbitrary and capricious and unlawful.

 7          And I think, absolutely, the Court has the authority

 8    to issue a TRO freezing the status quo, ensuring our case

 9    doesn't really become moot and the money leaves Citibank, to

10    allow us to file that complaint.

11          THE COURT:  Do you currently have a work plan in

12    place?  EPA argues that it does not, that you don't, and that

13    you can't certify that the amount of the payment is necessary

14    to execute the workplace plan in effect.

15          MR. UNIKOWSKY:  We have a work plan in place.  We

16    were working up until February.  We have several products in

17    process -- several projects, excuse me, in process that are

18    described in detail in Ms. Bafford's declaration.  So we do

19    face extreme irreparable harm if we don't get relief today or

20    this week.

21          THE COURT:  And that's really where I need to get to

22    because that is the show upon which many a motion for TRO

23    flounders.

24          Clearly there's harm if you can't pay your vendors

25    and you can't pay your staff and rent, other such things.  But

1    as you know, and I have said and other judges have said, a TRO

2    is not just a really, really meritorious PI.  It's saying that

3    something is going to happen immediately and that can't be

4    undone.  It's like a wrecking ball that's going to tear down

5    the building and it has to be stopped.

6            So, putting aside economic damages, which are

7    recoverable in due course, what's your imminent irreparable

8    harm that warrants -- in other words, what's going to happen in

9    the next four days that couldn't be remedied by a motion for

10   preliminary injunction?

11           MR. UNIKOWSKY:  Okay.  A few things will happen, Your

12   Honor.  So first of all, we anticipate that because of

13   yesterday's termination, EPA is going to ask Citibank to send

14   all of the money to the U.S. Treasury.  It's not clear that

15   could possibly be undone.  That's one thing, just based on the

16   late-breaking development last night.

17           THE COURT:  What do you mean?  Why?

18           MR. UNIKOWSKY:  The government would say that that's

19   a court order that the Court doesn't have jurisdiction to

20   enter.

21           THE COURT:  Can you slow down a little bit?

22           MR. UNIKOWSKY:  Excuse me.  I apologize.

23           THE COURT:  Thank you.

24           MR. UNIKOWSKY:  I suspect, and it's a question for, I

25   guess, counsel for the EPA.  But the EPA will say that once the

 1    money goes from Citibank back to the Treasury, the Court can't

 2    order it to be sent back to Citibank.  But that's -- I suspect

 3    we will hear that argument, but I guess that's an argument for

 4    government's counsel.

 5             But even setting that aside, we are out of money,

 6    Your Honor, and we will have permanent irreparable harm.  First

 7    of all, at the end of this week we're out of money.  We'll have

 8    to start furloughing our employees.  We'll never be able to get

 9    them back.  Okay?

10             THE COURT:  Wait a minute.  I'm not minimizing at all

11    that harm, but what do you mean, you'll never be able to get

12    them back?  They'll be hired by somebody else?

13             MR. UNIKOWSKY:  Probably.  We've think that once we

14    furlough these employees, we're unlikely to see a lot of them

15    again.  Once we can't pay rent, we might be evicted.  It's

16    going to be hard to get back to where we were.

17             THE COURT:  You see, every time you use the word

18    "might" --

19             MR. UNIKOWSKY:  It's not "might," Your Honor.  I can

20    tell you certainly, with 100 percent certainty that at the end

21    of this week we are out of money.  We cannot pay our employees

22    anymore.  We will -- not might -- furlough.  We cannot pay our

23    next rent payment.  That's it.  We are out of money.  It is

24    over because under the terms of the grant agreement, we only

25    get 14 days' worth of operating expenses.  We waited because we

1      didn't know what was happening.

2              There's a lot of information in Citibank's brief

3      about, you know, this FBI letter and these Treasury notices.

4      These aren't private, like -- this was put into a public

5      filing, it's not confidential, but we were never told any of

6      this.  So we were waiting this whole period, trying to

7      negotiate to get more information.  Finally, at the end of the

8      14 days, we had no choice but to sue.  Now we're completely out

9      of money.  So we certainly can no longer pay rent, we certainly

10     can no longer pay employees.  We also certainly --

11             THE COURT:  Slow down again.

12             MR. UNIKOWSKY:  Sorry, Your Honor.  We certainly

13     cannot comply with the terms of our agreements with our

14     subgrantees.  We are essentially a green bank.  We exist to

15     give money to these subgrantees.

16             THE COURT:  Right, and I understand that.  But I'm

17     trying to discern what's going to happen right away that can't

18     be undone.

19             MR. UNIKOWSKY:  I think we will have extreme

20     reputational harm if we suddenly default on all of our loan

21     agreements that we've already signed, suddenly have to furlough

22     our employees who are going to have to look for other

23     employment.  I don't think it is realistic to expect that if we

24     don't get money by the end of this week, we can just resurrect

25     ourselves as an organization, and that's why we had to wait

1    until now.

2         I'd also point out, Your Honor, again, the reason we

3    had to file a TRO is that we waited the 14 days.  And the

4    reason we did that is because we didn't know that Treasury and

5    FBI were doing all the things that have been disclosed for the

6    first time in Citibank's filing, which are public information.

7    If we had known what was happening, we would have filed

8    earlier.

9         It's not even just that we weren't told, we were

10   affirmatively mislead.  EPA made a public statement on March

11   3rd, in it's OIG investigation, saying Citibank is acting

12   voluntarily.  However, in Citibank's filing from earlier today,

13   it said it was legally obligated under the provisions of its

14   agreement with the Treasury to withhold these funds and that's

15   why it did that, which are completely inconsistent statements.

16   If we had known about this legal obligation, which we weren't

17   told about and isn't confidential, we would have sued earlier

18   and not had the need to ask for a TRO.  But we were kept in the

19   dark, based on these statements, and that's why we're in court

20   today, Your Honor.

21        THE COURT:  All right.  Just a minute.  Is the harm

22   that you've set out based entirely on existing contracts or is

23   it also on expectations of future funding?

24        MR. UNIKOWSKY:  I think it is both of those things.

25   So it is both existing grants -- so, we have existing loans in

1    which our grantees can ask us for money under the terms of the

2    agreement.  We're financing solar projects, we're financing

3    electric semi trucks, things like that, and we can't provide

4    that money, so those existing loans will just have to default

5    if we don't get this imminently.  As well, you know, it's a

6    large grant and so we're currently in the process of planning

7    additional projects, which Ms. Bafford's declaration discusses,

8    which we're going to have to abandon.  No one is ever going to

9    contract with us ever again if we run out of money.

10            THE COURT:  How much of the $7 billion has already

11    been committed to projects?

12            MR. UNIKOWSKY:  I will get that answer for you

13    shortly.  I don't want to say something incorrect.

14            THE COURT:  Okay.  All right.  I will hear from

15    counsel from EPA.

16            All right.  Mr. Sacks.

17            MR. SACKS:  Good afternoon.

18            THE COURT:  What procedural steps did EPA take prior

19    to canceling the grant?  Under the award agreement's general

20    terms and conditions, you have to put forth credible evidence

21    of the commission of a violation of federal criminal law

22    involving fraud, conflict of interest, bribery, or gratuity

23    violations.  Has there been a grand jury indictment?  Has a

24    grand jury issued an indictment in this case?

25            MR. SACKS:  Not that I'm aware of, Your Honor.

1          THE COURT:  Have there been any charges at all filed?

2          MR. SACKS:  Not that I'm aware of.

3          THE COURT:  So what is this based on?

4          MR. SACKS:  The termination is --

5          THE COURT:  In fact, let me ask you -- and I can take

6  judicial notice of reports -- is it correct that a grand jury

7  was presented with the evidence in this case and refused to

8  issue a bill?

9          MR. SACKS:  I'm sorry.  I don't know the answer to

10  that question, Your Honor.

11          THE COURT:  Can you find out?

12          MR. SACKS:  I certainly can find out.

13          THE COURT:  Because that would be extremely important

14  for me to know in assessing the legality of the termination.

15          MR. SACKS:  I understand, Your Honor.

16          THE COURT:  The notice also contains a vague

17  reference to waste, fraud, and abuse, but does not provide the

18  credible evidence that's required to find that Climate United

19  violated federal criminal law.  I mean, there's a lot of

20  statements floating out there about the EPA administrator's

21  opinion of this contract, but as far as I'm aware, the contract

22  can't be terminated just because the EPA administrator doesn't

23  like it.

24          There are certainly a lot of media reports about

25  attempts to freeze these funds, attempts to cancel these

1    contracts, none of which have to be sanctioned by law

2    enforcement as yet.  So can you tell me what this termination

3    is based on?

4         MR. SACKS:  The termination is based on the

5    information contained in the termination letter.

6         THE COURT:  That's pretty circular.

7         MR. SACKS:  Sure.  Can I speak a little bit more and

8    explained to Your Honor?

9         THE COURT:  Yes.  Yes.

10        MR. SACKS:  So the question you raised about the

11   right to terminate a contract and you asked this question:  Are

12   you being asked to rule upon the legality of the contract?  And

13   that's exactly what the plaintiff is asking you to rule upon.

14        THE COURT:  Well, no, I think the plaintiff is asking

15   me to rule on the legality of the termination of the contract.

16   If what you're saying is the contract was never legal -- that's

17   not what you're saying?

18        MR. SACKS:  No.

19        THE COURT:  You're saying that the contract has

20   been -- that there's evidence of some kind of skulduggery here?

21        MR. SACKS:  What I'm saying is the government has the

22   right to terminate a contract.  The question then becomes:  Is

23   that termination pursuant to the terms and conditions of the

24   contract such that it complies with the contract, or perhaps is

25   that termination not in line with what the contract says,

1    creating a breach claim and a potential suit for damages?

2         THE COURT:  I think it's pretty clear that the

3    plaintiffs are claiming that the contract's been terminated and

4    not in accordance with the terms of the contract.  In other

5    words, the agreements provide that the contract can be

6    terminated for certain reasons.  And you provide none of those.

7         MR. SACKS:  And that's exactly what a breach question

8    and a breach claim is.  And when you look at their analysis,

9    that analysis is:  What was our termination?  What information

10   did we have?  Why did we do what we did?  And was that in

11   compliance with --

12        THE COURT:  See, I know why EPA wants this to be a

13   breach of contract claim.  I understand that because, you know,

14   there's some jurisdictional issues.  But it's not a -- in other

15   words, if your term -- I'm not being asked to interpret one of

16   the terms the contract.  I'm being asked to find that EPA

17   unlawfully instructed Citibank not to disburse funds, as they

18   were obligated to do, and then unlawfully terminated the

19   contract.  Not unlawfully broke a contract term, but unlawfully

20   terminated the contract, as -- you know, because of fraud,

21   abuse, bribery, whatever.

22        I'm not sure that it is a breach of contract claim.

23   There may be a breach of contract claim in there somewhere, but

24   I don't think this motion is based on a breach of contract

25   claim, especially, frankly, now that you terminated it.

1          MR. SACKS:  Sure.  The complaint and the motion are

2     based on an allegation of a pause or a stay in the plaintiff's

3     ability to access funds.  That's the issue currently before the

4     Court.

5          THE COURT:  Well, this is sort of a moving target

6     because plaintiffs brought one claim based on Citibank's

7     refusal to disburse the funds as they were obligated to do

8     under their agreement.  Before they could get a hearing on

9     that -- and, you know, there's a question as to whether the

10    request for an additional day was made in good faith.  I'm not

11    even going to go into that because I do have some questions

12    there myself.  But before they could get a hearing on that, the

13    contract was, last night, on the eve of this hearing,

14    terminated, and facially, based on not very much that I'm able

15    to see.

16         So that then complicates things because then

17    Citibank, unsurprisingly, says we're not -- you know, before

18    they said we are uncertain as to whether we can legally

19    disburse these funds.  I may not be putting it the way you

20    would.  But after the termination, they're saying we definitely

21    can't disburse these funds.  Am I right?

22         MR. SACKS:  (No response.)

23         THE COURT:  More or less.  Okay.  For a lot less

24    money than you're charging.

25         But, what you've done is sort of -- you know,

1    plaintiffs now have an additional claim because it's gotten

2    even more difficult for them to make a claim to get their funds

3    from Citibank based on unilateral action that EPA took last

4    night that doesn't seem to be based on a whole lot.  And so

5    it's not just a breach of contract claim, as I see it.  And so

6    that's why I'm asking you:  What's this termination based on?

7           MR. SACKS:  And, again, the termination, to my

8    knowledge, is based on what's set forth in the --

9           THE COURT:  The termination letter.

10          MR. SACKS:  -- that letter.

11          THE COURT:  Tell me, can you proffer to me the

12   evidence of commission of a violation of federal criminal law

13   involving fraud, conflict of interest, bribery, or gratuity

14   violations?  Any one of those things?

15          MR. SACKS:  I cannot, Your Honor.  And I think the

16   reason I cannot is because this Court is not in a position to

17   rule upon whether or not this termination was consistent with

18   the contracts.

19          THE COURT:  That's why you can't provide it to me or

20   you don't have it?

21          MR. SACKS:  No, I don't have it.  Yeah, I don't have

22   it.

23          THE COURT:  So you're coming in here, defending a

24   notice of termination that was issued last night, but you don't

25   have any -- you don't have any evidence or a proffer for me as

1    to why that issuance of termination -- that termination was

2    issued?  You can't tell me what the fraud, conflict of

3    interest, bribery, or gratuity violation was?  All you know is

4    that it was issued?

5              MR. SACKS:  That's correct.  And, Your Honor, I don't

6    believe I'm here to defend the termination.

7              THE COURT:  Oh, I think you are.

8              MR. SACKS:  Okay.  Well, my ability do that is what

9    I'm telling you today.

10             THE COURT:  I understand the position you're in.

11             MR. SACKS:  I can explain to you the history of

12   what -- how these grants were created, issued, and the review

13   of the current administration into those grants, the pause on

14   the grant to allow time for that review and the ultimate

15   determination that the government no longer wanted to proceed

16   with this contract and party.

17             THE COURT:  Tell me, what procedural steps did the

18   EPA take prior to canceling the grant?

19             MR. SACKS:  Well, I think we know from the record

20   that EPA conducted -- began conducting an investigation into

21   the grant.  We know there are at least two independent

22   investigations into the grants.

23             THE COURT:  What are those?

24             MR. SACKS:  From reporting, I believe there is an EPA

25   OIG investigation and there is a federal criminal

23

 1    investigation.

 2              THE COURT:  When you say "from reporting," you mean

 3    what you've read in the media?

 4              MR. SACKS:  Yes, Your Honor.

 5              THE COURT:  All right.  So under the contract, EPA

 6    must follow several regulations when terminating for waste,

 7    fraud, or abuse, including under 2 CFR § 200.339, there has to

 8    be an allegation that they violated a constitutional provision,

 9    statute, regulation, term or condition of the grant.  Any

10    evidence of that?

11              MR. SACKS:  No, Your Honor.

12              THE COURT:  Under § 200.340, is there any contention

13    that they failed to comply with any terms or condition of the

14    grant?

15              MR. SACKS:  We don't know enough, Your Honor, but I

16    think the agency cited both of those regulations within their

17    termination letter.

18              THE COURT:  You can cite things, but if you don't --

19    I mean, I could cite cases all day long, but you have to some

20    kind of evidence or proffer to back it up.  What about 2 CFR

21    § 200.208?  Did EPA provide Climate United an opportunity to

22    remedy any violations?

23              MR. SACKS:  I don't believe that's required by the

24    contract.  But, if ultimately EPA's termination violated their

25    contractual rights, then that will be remedied through a breach

 1    of contract claim and a Court will fully consider all of these

 2    issues in the appropriate court.

 3              THE COURT:  Are there any costs or funds still owed

 4    to Climate United?  What about the projects it's already

 5    committed funding to?

 6              MR. SACKS:  Well, anytime there's a grant with the

 7    government or a contract that's terminated, there are closeout

 8    procedures set forth in 200.344, I think.  And so those

 9    closeout procedures have a way of determining -- and I'm not an

10    expert in those, but what are allowable costs?  What money a

11    grantee has that must be reimbursed to the government?  What,

12    perhaps, a grantee can ask the government to repay them?

13    There's a process for how that works once the period of

14    performance has ended, which has happened here.  So Climate

15    United may well be entitled to additional monies under the

16    closeout provisions.

17              THE COURT:  But that's a breach of contract claim, is

18    that what you're saying?

19              MR. SACKS:  Well, no, not perhaps.  I mean, if they

20    argue that we failed to follow those regulations in closing out

21    the grant and not pay them what they're entitled to, sure,

22    that's a claim under the contract.

23              THE COURT:  I think they're arguing that you just

24    unlawfully terminated the contract.

25              MR. SACKS:  And that's also a claim under our

1    contract.

2          THE COURT:  What's -- EPA alludes to its inherent

3    authority.  What inherent authority are you referring to?

4          MR. SACKS:  Well, again, this letter was written by

5    EPA.  I think I can explain to you what I think are some

6    inherent authorities that the agency has.  We're talking about

7    a $27 billion program that was -- grants were given in August.

8    I believe Citibank was installed as the financial agent in

9    November.  The grant agreements were changed seven days before

10   the inauguration to essentially give the grantees greater

11   ability to retain funds if there was a notice of exclusive

12   control issued by EPA.

13         THE COURT:  Do you have any -- can you proffer any

14   evidence that that was illegal or evidence of abuse or fraud or

15   bribery?  That any of that was improperly or unlawfully done,

16   other than the fact Mr. Zeldin doesn't like it?

17         MR. SACKS:  I certainly am not suggesting any of that

18   was illegal or improper, but I am suggesting that the

19   administration wanted to take a look at the account controls

20   that the agency had as a steward of federal funds to ensure

21   that it is satisfying congressional mandates for what this

22   money should do.

23         THE COURT:  Is it correct that at least one, or

24   perhaps two -- well, at least one assistant attorney, assistant

25   U.S. attorney was asked to do that, found no wrongdoing, and

```
 1    was fired for refusing to tell Citibank to freeze the funds?

 2              MR. SACKS:  I mean, you've read the papers, just like

 3    I have.

 4              THE COURT:  I have, too.

 5              MR. SACKS:  I do believe that there was an effort to,

 6    I believe, perhaps put a criminal freeze on the money.

 7              THE COURT:  Unsuccessful?

 8              MR. SACKS:  Obviously it wasn't successful because

 9    that didn't happen.  So I don't know any more than you do about

10    that.

11              THE COURT:  Okay.  And I'm sorry if I interrupted

12    you.  Do you plan on issuing a notice of exclusive control to

13    Citibank, or have you?

14              MR. SACKS:  We have not and will not because there is

15    no longer a need to do that because the grant has terminated.

16    And notice of exclusive control, as I see it, is essentially a

17    right of a secured party, right?  Under this setup EPA is a

18    secured party.  So to the extent the grant is ongoing and we

19    want to take control over the money in the Climate United's

20    account, we can issue a notice of exclusive control.  Once we

21    have terminated the grant, there is no longer a right to that

22    money or a right to perform.

23              THE COURT:  What if I find that the notice of

24    termination was unlawful?  Then are you going to issue a notice

25    of exclusive control?  Can you?
```

1   MR. SACKS:  I think we could, if we believed we'd met

2   the standard set forth in the contractual documents.  We could,

3   absolutely.  But again, I would question gently this Court's

4   right to declare a termination unlawful as a matter of contract

5   law.

6   THE COURT:  I'm not -- I'm not -- well, I don't think

7   plaintiff is asking me to declare the termination unlawful as a

8   matter of contract law.  But, I question a termination that's

9   issued on such conclusory language.  I mean, you can't even

10  tell me what the evidence of malfeasance is.  And I

11  recognize you're in a -- I know your position as counsel here,

12  but it's a very circular argument.  The contract was terminated

13  because of the reasons set forth in the termination, which

14  don't give me any evidence or any grounding.

15  MR. SACKS:  I think the most important point here is

16  there is no effort to prevent the plaintiff from vindicating

17  its rights in the appropriate forum, under the appropriate

18  jurisdiction, under the appropriate claims.  And this letter

19  may well, or may well not, give rise to those claims.  The

20  question for this Court to decide is whether it has the

21  jurisdiction to remedy this.

22  THE COURT:  The problem, Mr. Sacks, is if I -- if it

23  turns out that I do have the jurisdiction and we litigate that

24  issue, by the time that's resolved Climate United won't have

25  any employees, it won't have an office.  It's -- it will

1    basically have ceased to exist because of the -- it's run out

2    of money, which I guess may be the point.  But that's the

3    reason they're asking for this kind of emergency relief.

4            MR. SACKS:  But I think that the government has the

5    right to decide who it wants to contract with and when it no

6    longer wants to contract with someone.

7            THE COURT:  Absolutely.  Absolutely.  And that's not

8    at issue here.  What's at issue here is having the -- the

9    government did decide who it wanted to contract with.  A new

10   administration came in, didn't like the contract anymore.

11   That's what new administrations do, but there are procedures.

12   There are procedures that have to be followed, and doesn't

13   appear, at least on the record before me, that those procedures

14   have been followed.  And Citibank, obviously, is in the middle

15   of all of this.

16           But we have a plaintiff who is saying, you know,

17   they've terminated this contract without any kind of due

18   process, without complying with the APA, and it's going to

19   basically result in our collapse as an organization.

20           MR. SACKS:  So, Your Honor, I think when you said

21   there are procedures to be followed, those procedures are set

22   forth in the grant and they're grant terms and conditions.  And

23   so whether or not the government followed them is a question of

24   whether or not we've breached the contact.

25           THE COURT:  So you don't think they're also

1    conditions that are governed by the EPA or by constitutional

2    due process?

3            MR. SACKS:  No, Your Honor.  Not in this case, no,

4    not when there is a contract setting forth the parties' rights.

5    And that's the mechanism the government chose to interact with

6    the plaintiff in this case.

7            And I'll just note one final thing, that the flip

8    side of this coin, of issuing injunctive relief that forces the

9    government to continue to perform on this contact, is an order

10   of specific performance against the government.  Because the

11   government has decided it does not want to continue in this

12   contract, any ruling to the contrary is ordering it

13   specifically to perform.  I don't know if the Court has the

14   authority do that.

15           THE COURT:  The issue is not just that the government

16   has decided, the government still has to -- you know, there are

17   still rules that even the government has to follow, last I

18   checked.  And, you know, the government can't just void

19   contracts and void agreements and terminate agreements without

20   following the terms and following its own regulations, and

21   that's what I'm here to talk about.  And, I guess, what I would

22   ask is what would you interpret maintaining the status quo look

23   like in this case?

24           MR. SACKS:  Well, I think the status quo is that the

25   contract has been -- the grant has been terminated, so --

 1          THE COURT:  In other words, if I do what plaintiffs

 2   are asking me to do, issue a temporary restraining order,

 3   maintain the status quo ante, what would that mean?  That the

 4   contract at this point has not been terminated?  I would have

 5   to -- are you saying I would have to rule that the contact was

 6   unlawfully terminated, or at least provisionally that I'm going

 7   to stay termination of the contract?

 8          MR. SACKS:  I don't know how the Court does that, but

 9   I guess you could do that, yes.

10          THE COURT:  All right.  Go ahead.

11          MR. SACKS:  No, that's all.

12          THE COURT:  I'll hear from Citibank now.

13          MR. SACKS:  Thank you, Your Honor.

14          THE COURT:  Thank you.  And Mr. Sacks, I would -- I'm

15   going to ask that you -- the government, EPA file -- some sort

16   of a declaration setting forth the basis for the termination.

17   In other words, providing -- proffering to me the evidence of

18   the fraud, waste and abuse, or proffer the credible evidence

19   that Climate United violated criminal law, the False Claims

20   Act.  You know, the information that forms the basis for the

21   termination.  Thank you.

22          MR. ALLEN:  Good afternoon, Your Honor.  Winn Allen

23   on behalf of Citibank.

24          Your Honor, Citibank has been designated as a

25   financial agent of the United States by the Department of

1    Treasury and our relationship in that regard is governed by the

2    financial agency agreement that we have between Citi and

3    Treasury.

4            THE COURT:  Prior to the termination, when Citibank

5    began refusing to disburse the funds, was that -- did Citibank

6    receive any instruction or communication from EPA about those

7    funds?

8            MR. ALLEN:  I'll take the Court through the history.

9    On March 4th Citibank received a directive from the Treasury

10   Department to pause further distributions out of the GGRF

11   accounts.

12           THE COURT:  And what is the basis for that directive?

13           MR. ALLEN:  The directive was -- I'll pull it up for

14   the Court.  One second.

15           THE COURT:  Sure.

16           MR. ALLEN:  The basis for that directive, Your Honor,

17   was, according to the Department of Treasury, was that the U.S.

18   Environmental Protection Agency has informed the Treasury

19   Department of their concerns regarding potential fraud and/or

20   conflicts of interest related to the GGRF fund.

21           THE COURT:  Did the Treasury provide any documents or

22   any more information about those concerns?

23           MR. ALLEN:  Not to Citibank, Your Honor.  And then

24   they cited various provisions to us under the FAA which

25   requires Citibank to follow instructions --

1          THE COURT:  Is that from one of your exhibits?

2          MR. ALLEN:  Yes, Your Honor.  This is Exhibit 7 to

3     the motion we filed with the Court.

4          So we received that directive from the Treasury

5     Department on March 4th, and then late in the evening on March

6     9th -- or the morning March 10th, depending how you count.  It

7     was after midnight on March 9th -- we received a directive from

8     EPA.  It's a long email, I won't read the whole thing to the

9     Court, but it's Exhibit 2 to our brief, stating that EPA was

10    working to establish additional account controls, which it can

11    do under Exhibit A to the FAA.  And it instructed Citibank that

12    while it was doing that, EPA instructed Citibank to pause the

13    processing of payment instructions of the GGRF accounts until

14    further notice.

15         And we also received, that same evening, a direction

16    from Treasury, instructing Citibank, in its capacity as

17    fiduciary, to comply with EPA's instructions to Citibank

18    pursuant to the FAA.  So, Your Honor, we're a fiduciary of the

19    United States under the FAA.  We're bound to follow directives

20    that we receive from Treasury and EPA and we, at the moment,

21    have been instructed to pause processing of payment

22    instructions by EPA and we're obligated to comply with that

23    instruction, which we have been doing.

24         THE COURT:  All right.  I don't think I have too many

25    more questions for you.  You're sort of in the middle of all of

1    this.  All right.

2                    MR. ALLEN:  Thank you, Your Honor.

3                    THE COURT:  Mr. Unikowsky, do you want to respond?

4                    MR. UNIKOWSKY:  Yes.  Thank you, Your Honor.  Just a

5    couple things.

6                    First, I apologize for not knowing the answer to your

7    question about how much committed funds we have.  It's

8    $392 million right now, and if we're all terminated, all those

9    investments just, you know, go away, and that is irreparable

10    harm in the sense those investments will never be refunded

11    before terminating.

12                    THE COURT:  Wait.  Those are funds you've already

13    expended?

14                    MR. UNIKOWSKY:  We've committed them.  We've spent or

15    owe them, but they're already committed.

16                    I would just like to say a few other words.  With

17    respect to Citibank, so Citibank referred to this instruction

18    on March 4th from the Treasury.  So our funds have actually

19    been frozen since February the 17th, just based on this, like,

20    recommendation from the FBI.  We didn't get any notice of that,

21    there was no process.  We don't think it's based on anything.

22    That, we think, was plainly unlawful.  I understand Citibank

23    being concerned about the FBI, but there's just no legal basis

24    in anything.

25                    THE COURT:  But you understand Citibank's position

 1    now?

 2          MR. UNIKOWSKY:  Look, it's difficult for the FBI to

 3    send threatening letters, I get that, but there's certainly no

 4    legal basis in the ACA.  It's also another alarming due process

 5    violation here for us.  Right?  They tried and failed to get a

 6    seizure warrant, according to public reporting.  So then it's

 7    just the FBI just demanding that our accounts be frozen.  There

 8    was no notice to us, there was no probable cause, there was no

 9    sworn affidavit, there was no neutral third-party magistrate.

10    Nothing.  Just -- now we're going bankrupt and nobody knows

11    why.

12          THE COURT:  I think I did read also that an attempt

13    was rejected by a magistrate judge.

14          MR. UNIKOWSKY:  That's right.  It's public reporting

15    that they went to a magistrate judge, it was denied, and that

16    FBI just said we'll take matters in our own hands.

17          THE COURT:  Let me stop you, though.  I mean, I don't

18    dispute any of that, but with regard to Citibank's position, if

19    their position was difficult before the termination, but --

20    maybe erroneous, but understandable.  Their position now that

21    they can't release those funds I think is stronger because

22    they've received an order from the Treasury Department.

23          MR. UNIKOWSKY:  I think that's incorrect.  So, first

24    of all, there's a contract, the ACA, between us and Citibank.

25    Citibank says the contract says that until the notice of

1     exclusive control, they have to release and serve funds.

2     There's lots of requests we made before the notice of exclusive

3     control, so --

4          THE COURT:  Are you saying that Citibank is free --

5     no notice of control having being issued, Citibank could, if

6     they chose, to disburse the funds still, even though the --

7     even after termination?

8          MR. UNIKOWSKY:  No, I think they -- the notice of

9     exclusive control just follows termination.  Let me invite the

10    Court to look at what the notice of exclusive control is.  It's

11    a letter that's in the amendment to the ACA and it requires the

12    EPA to make the same findings that it would make in a

13    termination.  So it's Exhibit A to Exhibit 9 to Ms. Bafford's

14    declaration.  And it's the form of the notice of exclusive

15    control.  And you'll see, in the third paragraph -- I'll let

16    the Court go to that.

17         THE COURT:  Which exhibit did you say it was?

18         MR. UNIKOWSKY:  Exhibit 9 to Ms. Bafford's

19    declaration, which is the amendment to the ACA.  And then that

20    Exhibit 9 itself has an exhibit, it's the form of the notice of

21    exclusive control.

22         THE COURT:  Hang on.  Let me get there.  Page --

23         MR. UNIKOWSKY:  It's like the -- it's right after --

24    it's a pretty short document, Your Honor.

25         THE COURT:  Oh, I'm looking at the wrong one then.  I

1    have -- hold on.  Sorry.  I'm on Exhibit 7.  Hold on.  Hang on

2    a minute.  Nine.  All right.

3          MR. UNIKOWSKY:  So you can see Exhibit A to that

4    document, which is just a couple pages in, it says:  Form of

5    notice of exclusive control.

6          THE COURT:  Yes.

7          MR. UNIKOWSKY:  Okay.  So that's what -- that's what,

8    you know, EPA has to send.  You'll see it says, "As required by

9    the grant agreement, the secured party has issued a written

10   determination" --

11         THE COURT:  Now, when we read, we tend to speed up.

12   So slow down.

13         MR. UNIKOWSKY:  Okay.  I'm sorry Your Honor.

14         THE COURT:  No, I do it too.

15         MR. UNIKOWSKY:  "As required by the grant agreement,

16   the secured party has issued a written determination and

17   finding that pledgor" -- that's us -- "has failed to comply

18   with the terms and conditions of the grant agreement, and that

19   noncompliance is substantial such that effective performance of

20   the grant agreement is materially impaired or there's adequate

21   evidence of waste, fraud, or abuse, or material

22   misrepresentation of eligibility status."  Those are just

23   reiterating the termination conditions.

24         So that notice hasn't been sent because those

25   conditions are just plainly not satisfied.  And until the

1    notice is sent, the ACA just requires Citibank to comply with

2    our requests.

3              But can I just say one more thing?  I mean, I

4    understand the termination throws a wrench into things, that's

5    why we're asking the Court to issue a status quo order which

6    would essentially freeze that termination.  And if the

7    termination is frozen, then there's no problem directing

8    Citibank to --

9              THE COURT:  You're not asking me to freeze the

10   termination, you're asking me to void it.  You're asking me to

11   declare it unlawful.

12             MR. UNIKOWSKY:  To restrain it, yes.  TRO to restrain

13   it temporarily.  Just issue the status quo -- make sure the

14   status quo stays in place.  And then, what we will do if the

15   Court does that -- so if the Court does that, then there's no

16   problem with Citibank giving us this money.

17             THE COURT:  Oh, I think Citibank would disagree with

18   you there.

19             MR. UNIKOWSKY:  If there's a court order directing

20   you to do it, then Citibank has said in its filing that it will

21   comply with any court order.  Everyone complies with court

22   orders, and so -- well, most people do.

23             THE COURT:  You know, that seemed to be the

24   expectation in the before times.

25             MR. UNIKOWSKY:  If Citibank has represented that if

38

1    there is a TRO that's issued that directs it to comply with our

2    request going backwards and forwards, it's going to do it.  And

3    I understand, again, it's not pleasant to have the FBI send you

4    letters.  I'm sure Citibank would much rather if a Court told

5    it what to do.  And so that's why we've come to court today.

6           THE COURT:  Everybody wants the Court to tell them

7    what to do.

8           All right.  Can you respond to Mr. Sacks's argument

9    that this is really a breach of contract case?

10          MR. UNIKOWSKY:  It's emphatically not, Your Honor.

11   And we would appreciate at least the ability to amend our

12   complaint to explain why this is not a breach of contract.  The

13   termination has nothing to do with the termination provisions

14   in the contract.  It has nothing do to with our performance

15   under the contract.  You'll notice, Your Honor, in the letter

16   that we got, it's totally silent on our performance.  It has

17   nothing to do with anything we've done or the terms of the

18   contract.  Instead, it just simply asserts that EPA can

19   unilaterally, fundamentally alter this program because the

20   administrator doesn't like it.

21          We're not going to say that's a violation of any

22   contractual provision.  We are going to say that that violates

23   the Constitution, due process, and the appropriations clause.

24   We're going say it violates the applicable statute.  We're

25   going to say it violates the pertinent regulations in the FAR,

 1   and we're going to say it violates the APA.  You will not hear

 2   any mention of any breach of contract claim, nor will we seek

 3   money damages.

 4        THE COURT:  How much time do you need to amend your

 5   complaint?

 6        MR. UNIKOWSKY:  As soon as Your Honor wants.  We can

 7   do it by Monday, or sooner, if the Court prefers.

 8        THE COURT:  Mr. Sacks, how much time do you need to

 9   get me the declaration or the information I've asked you for?

10        MR. SACKS:  I don't know, Your Honor.  I would --

11        THE COURT:  How many courtrooms are you appearing in?

12   In this building are you appearing in, Mr. Sacks?

13        MR. SACKS:  Just this one today, Your Honor.

14        THE COURT:  Today.  All right.

15        MR. SACKS:  But we'll do our best, if the Court sets

16   a deadline.

17        THE COURT:  Okay.  All right.  Here's what I want:

18   I'm going to allow you leave to amend, address the breach of

19   contract claims and any of the other arguments of Mr. Sacks by

20   5 p.m. Monday.  Is that reasonable?  I mean, that totally

21   destroys your weekend, but mine is already destroyed, so --

22        Mr. Sacks, similarly, Monday, 5 p.m., for that

23   information?  And that can take the form of declaration,

24   affidavit.  But what I'm looking for is the evidence or a

25   proffer of the evidence of violation of federal criminal law

1   involving fraud, conflict of interest, bribery, or gratuity

2   violations or -- and/or, waste, fraud, and abuse.  Because I

3   don't have the credible evidence that's required.

4           MR. SACKS:  I understand, Your Honor.  If the Court

5   is going to enter a TRO, could we be heard on the scope of that

6   TRO?  Obviously we don't think that the Court should, but we

7   haven't spoken about that yet.  If the Court is inclined --

8           THE COURT:  Are you -- I'm sorry.  Mr. Unikowsky, are

9   you agreeing to hold off requesting issuance of a TRO until you

10  can amend your complaint?

11          MR. UNIKOWSKY:  No, Your Honor.  We need a TRO now

12  because we are going to have to furlough most of our workers on

13  Friday.  We've already deferred compensation for essential

14  workers.  We are going to have irreparable, immediate harm if

15  we don't get a TRO today from the Court.  And again, the reason

16  we're in this situation is because I feel we've been

17  intentionally left in the dark.  So I don't think that we

18  should encounter this sort of harm, with employees leaving,

19  possibly never to come back, and, you know, failing to pay our

20  grant --

21          THE COURT:  You say intentionally left in the dark,

22  and that implies a lack of information about what's going on.

23  That's not really irreparable harm.

24          MR. UNIKOWSKY:  I know, I'm just saying --

25          THE COURT:  Obviously, having to furlough employees

1    on Friday and perhaps losing those employees to other

2    employment opportunities -- have you been threatened with

3    eviction?

4         MR. UNIKOWSKY:  Yes, Your Honor.  I mean, absolutely.

5    We have already been made clear that we will not be able to pay

6    rent when it comes due.

7         THE COURT:  When is that?

8         MR. UNIKOWSKY:  I think it's at the end of the month.

9    We'll be evicted at that time.  But even before that, there's

10   also these funded projects which we are funding every day and

11   we can no longer pay the people we're funding.  They have to

12   stop work.

13        THE COURT:  But, again, those are economic losses

14   that may be recoverable, and that is not really the purpose of

15   a TRO.  A TRO is designed to allay imminent harm that is not

16   recoverable.

17        MR. UNIKOWSKY:  Well, let me just give an example.

18   So we've spent several months recruiting investment

19   professionals to our banking organization.

20        THE COURT:  I'm sorry.  Can you hear?

21        THE COURT REPORTER:  (Nods head.)

22        MR. UNIKOWSKY:  I'm sorry.  We've spent several

23   months recruiting investment professionals to work with us.

24   These are very experienced people who are managing large

25   amounts of funds.  If we tell them on Friday you're out, which

1   is where we're going to be, then we feel there's a very serious

2   risk that they'll never come back.  Right?  And so that is one

3   significant concern that we have.  I also, by the way, raised

4   at the beginning of the hearing, I'm concerned that if there's

5   no TRO, Citi is going to send the money, all of the money back

6   to Treasury and then there's going to be a huge fight as to

7   whether Treasury ever can or will send it back.

8           THE COURT:  What if the Court just says let -- keep

9   the money where it is?  In other words, if I order Citibank to

10  just hold onto that money.  Obviously that doesn't address your

11  financial constraints.

12          MR. UNIKOWSKY:  Severe reputational harm.  If someone

13  comes to us on Thursday and says, hey, you're a financier, you

14  know, we're asking for money on this loan because we're

15  building trucks, we have to pay a vendor, and we say no, I

16  think that is going to have permanent affects on our business.

17  We'll never be trustworthy ever again.

18          So, you know, like I'm -- I'm saying this seriously,

19  Your Honor, we are in a desperate situation because we are out

20  of money because our 14-day period has now elapsed.

21          THE COURT:  At least under the terms of the

22  agreement, how much -- what are the amount of the funds that

23  you're due at this juncture?

24          MR. UNIKOWSKY:  It's -- let me ask.

25          THE COURT:  You can go and consult with her, because

1        she can't yell it out.

2                    (Pause.)

3                    MR. UNIKOWSKY:  Sorry.

4                    THE COURT:  Just come on up to the podium.

5                    MR. UNIKOWSKY:  Sorry, Your Honor.  It's about

6        $3 million in pending disbursements, and there's also about

7        $300 million for the pending reserve, that's the money that

8        we're going to allocate to projects.  But current disbursements

9        is about $3 million.

10                   THE COURT:  To keep the lights on and the doors open,

11       you're talking about $3 million?

12                   MR. UNIKOWSKY:  Roughly, yes.

13                   THE COURT:  Okay.  Thank you all for coming in.

14       Obviously, I realize that time is of the essence so I will try

15       and issue some kind of ruling.  And I expect to have the

16       amended complaint and the information I've requested from the

17       government by close of business on Monday.

18                   Thank you all.

19                              *   *   *

20

21

22

23

24

25

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3

4          I, JANICE DICKMAN, do hereby certify that the above

5     and foregoing constitutes a true and accurate transcript of my

6     stenograph notes and is a full, true and complete transcript of

7     the proceedings to the best of my ability.

8                    Dated this 13th day of March, 2025

9

10

11                    /s/_____

12                    Janice E. Dickman, CRR, RMR
                      Official Court Reporter
13                    Room 6523
                      333 Constitution Avenue NW
14                    Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25

1                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
2

3   CLIMATE UNITED FUND,

4                  Plaintiff,

5        vs.                              Civil Action
                                          No. 1:25-cv-698
6   CITIBANK, N.A., et al.,

7                  Defendants.
    _____|
8
    COALITION FOR GREEN CAPITAL,
9
                   Plaintiff,
10
         vs.                              Civil Action
11                                        No. 1:25-cv-735
    CITIBANK, N.A., et al.,
12
                   Defendants.
13  _____|

14  POWER FORWARD COMMUNITIES, INC.,

15                                        Civil Action
                   Plaintiff,             No. 1:25-cv-762
16
         vs.
17
    CITIBANK, N.A., et al.,               Washington, D.C.
18                                        March 17, 2025
                   Defendants.            12:01 p.m.
19  _____/

20
                    TRANSCRIPT OF MOTION HEARING
21           BEFORE THE HONORABLE TANYA S. CHUTKAN
                  UNITED STATES DISTRICT JUDGE
22

23  Court Reporter:        JEFF HOOK
                           Official Court Reporter
24                         U.S. District & Bankruptcy Courts
                           333 Constitution Avenue, NW
25                         Washington, DC 20001

JA218

1  **APPEARANCES:**

2  **For Plaintiff CUF:**      **ADAM UNIKOWSKY**
3                              **DAVID ROBBINS**
                                Jenner & Block, LLP
4                               1099 New York Ave, NW, Suite 900
                                Washington, DC 20001

5

6  **For Plaintiff CFGC:**     **VINCENT LEVY**
                                **KEVIN BENISH**
7                               Holwell, Shuster & Goldberg, LLP
                                425 Lexington Avenue, 14th Floor
8                               New York City, NY 10017

9  **For Plaintiff PFC:**      **BETH NEITZEL**
10                              Foley Hoag, LLP
                                1717 K Street, NW
11                              Washington, DC 20006

12                             **JAMES GROSS**
                                **NOAH SHAW**
13                              Foley Hoag, LLP
                                1301 Avenue of the Americas
14                              New York, NY 10019

15 **For Federal Defendants:** **MARCUS SACKS**
                                DOJ-CIV
16                              1100 L Street, NW
                                Washington, DC 20530

17                             **KEVIN VanLANDINGHAM**
18                              U.S. Department of Justice
                                PO Box 875, Ben Franklin Station
19                              Washington, DC 20044

20

21 **For Defendant Citibank:** **WINN ALLEN**
                                **SAUNDERS McELROY**
22                              Kirkland & Ellis, LLP
                                1301 Pennsylvania Ave, NW
                                Washington, DC 20004
23

24

25

1                    **P R O C E E D I N G S**

2        **DEPUTY CLERK:**  We have civil case 25-698, Climate

3   United Fund vs. Citibank, et al.; civil case 25-735,

4   Coalition for Green Capital vs. Citibank, et al.; and civil

5   case 25-762, Power Forward Communities, Inc. vs. Citibank,

6   et al.  This matter is set for a motion hearing.

7            Parties, please introduce yourselves for the

8   record, starting with the plaintiff in civil case 25-698.

9        **MR. UNIKOWSKY:**  Good afternoon, Your Honor.  My

10  name is Adam Unikowsky for Plaintiff Climate United, and I'm

11  with my colleague David Robbins for Plaintiff Climate

12  United.

13       **THE COURT:**  Good afternoon.  That's fine, you can

14  stay at counsel table, just make sure you pull the mic to

15  you.  You can come on up and get your steps in, if you

16  prefer.

17       **MR. LEVY:**  Thank you, Your Honor.  Vincent Levy of

18  Holwell, Shuster & Goldberg on behalf of Coalition for Green

19  Capital, and I'm here with my colleague Kevin Benish.

20       **THE COURT:**  Good afternoon.

21       **MS. NEITZEL:**  Good afternoon, Your Honor.  Beth

22  Neitzel for Plaintiff Power Forward Communities.  I'm here

23  with my colleagues Jim Gross and Noah Shaw.

24       **THE COURT:**  Good afternoon.

25       **MR. SACKS:**  Good afternoon, Your Honor.  Mark

1   Sacks from the Department of Justice along with my colleague

2   Kevin VanLandingham on behalf of the federal defendants.

3          **THE COURT:**  Good afternoon.

4          **MR. ALLEN:**  Good afternoon, Your Honor.  Winn

5   Allen from Kirkland & Ellis.  I'm here with my colleague

6   Saunders McElroy, and we're here on behalf of Citibank.

7          **THE COURT:**  Good afternoon, everyone.  Since we

8   last met on Friday at 4:00, it seems as if you all have some

9   company now.  We had a hearing on a motion for a temporary

10  restraining order brought by Climate United Fund on Friday,

11  and on that same day Coalition for Green Capital filed a

12  complaint against the same defendants; that is, EPA, EPA

13  Administrator Zeldin and Citibank, and also against

14  Defendant William Charles McIntosh, EPA's acting deputy

15  administrator.  And then it also filed a motion for a

16  temporary restraining order on the 14th.  On that same day,

17  Power Forward Communities filed a complaint and motion for a

18  TRO against the same defendants, and filed notices of

19  related cases to Climate United.

20          So as brief background, in April of last year, EPA

21  awarded grant funding for clean energy projects to these

22  three entries, the three plaintiffs, under the NCIF program:

23  $6.97 billion to Climate United, $5 billion to CGC and $2

24  billion to PFC -- that's Power Forward Communities.  The

25  parties entered into several agreements with the EPA and

1    Citibank.  Citibank, acting as a financial agent of the

2    United States, manages the grant accounts, and pursuant to

3    the agreements, periodically disburses money to plaintiffs

4    upon request.  Sometime in mid February of this year,

5    Citibank froze those accounts at the direction of the EPA,

6    and plaintiffs have not received any of their grant funding

7    since.

8            On March 11th, the day before our hearing on the

9    12th, EPA sent a letter of termination to all three

10   plaintiffs indicating that they were -- EPA was terminating

11   their grants effective immediately.  And plaintiffs argue

12   here that Citibank has wrongfully suspended their accounts,

13   and EPA has unlawfully terminated their grants, funding for

14   which Congress approved and allocated in the NCIF program.

15   So plaintiffs ask for similar temporary injunctive relief to

16   enjoin Citibank from transferring any funds and giving

17   effect to the termination letter -- and I believe that's

18   transferring any funds to the Treasury, not to them.  And to

19   order Citibank to disburse funds upon their request, or at a

20   minimum to disburse funds submitted prior to the grant

21   termination on March 11th.

22            Finally, as of Saturday, in a welcomed decision to

23   defer a hearing yesterday morning -- thank you all -- the

24   parties conferred and agree that the government will neither

25   seek to nor move the funds at Citibank from any of these

1  accounts for a period of 72 hours beginning at 8:00 p.m. on

2  Saturday through to 5:00 p.m. -- excuse me, through to

3  8:00 p.m. tomorrow, March 18th.

4  So I want to say at the outset I understand all

5  these cases are important to the parties, and I want to make

6  a decision -- I intend to make a decision on the TRO as soon

7  as possible, like very soon.  But first things first, are we

8  expecting any other related cases?  Plaintiffs, do you know

9  of any others?  Okay.

10  The next thing I want to address is consolidation.

11  After reviewing the filings, I agree with the plaintiffs

12  that these cases grow out of the same series of events or

13  transactions, and they also involve common questions of law

14  or fact.

15  Any objection to my consolidating these cases,

16  plaintiffs?

17  Hearing no objection, Mr. Sacks?

18  **MR. SACKS:**  No objection, Your Honor.

19  **THE COURT:**  All right.  Then I will -- pursuant to

20  Federal Rule of Civil Procedure 42(a), I will consolidate

21  these cases.

22  So next I want to hear from the parties regarding

23  the ask and scope of the TROs.  The purpose of a restraining

24  order in a situation like this is to preserve the status quo

25  for a limited period of time until the Court has an

1    opportunity to pass on the merits of the demand for an

2    injunction.  I'm not going to go over all the factors

3    because you all know them.  At the last hearing on Friday, I

4    heard argument on a few things, including the scope of the

5    TRO; the circumstances of the EPA's termination of the

6    awards -- which remain murky as far as I'm concerned; and

7    what effect the termination had on a TRO, if any; whether

8    the EPA's termination was unlawful given that it appeared

9    not to have followed any of the procedural requirements to

10   terminate the grants in the first place; and whether Climate

11   United had proffered the evidence necessary -- excuse me,

12   whether the government had proffered the evidence necessary

13   for terminating the grant for findings of waste, fraud and

14   abuse.  I also heard arguments on mootness, and whether this

15   Court had jurisdiction as opposed to the Court of Federal

16   Claims in order and relief.

17          So Mr. Unikowsky, on behalf of Climate United, is

18   there anything else that you want to add -- and I always

19   hate saying that to lawyers because they rarely say nothing

20   else, but since our hearing on Friday?

21          **MR. UNIKOWSKY:**  I would just say one thing, Your

22   Honor.  At the hearing, I did orally request that the TRO

23   also freeze the funds, which is the request that the other

24   plaintiffs make.  So I just wanted to make sure that's clear

25   for the record.

1      **THE COURT:**  Okay.  Do you believe that there are

2  any agreements or issues unique to Climate United or are

3  basically the allegations -- as you can see, do your

4  client's allegations align with the other three -- the other

5  two?

6      **MR. UNIKOWSKY:**  Yes, Your Honor.  I mean, the

7  particular circumstances of irreparable harm are different

8  for every plaintiff, just because every organization is

9  slightly different.  But the legal arguments in terms of

10  challenges to the termination, I think, are -- at least from

11  my perspective right now, seem to be very similar.

12      **THE COURT:**  And we still have -- I still expect to

13  receive your amended complaint, if any, by 5:00 o'clock; is

14  that correct?

15      **MR. UNIKOWSKY:**  That's correct.  I didn't

16  interpret at the last hearing the Court to want anything

17  else from us on the TRO.  Obviously if there's something

18  else the Court wants, I'll submit it.

19      **THE COURT:**  Mr. Sacks, are you getting that

20  declaration for me -- or something?

21      **MR. SACKS:**  We're hard at work, Your Honor, but

22  not today.

23      **THE COURT:**  I know you are, all right.  In your --

24  maybe it makes sense for -- since all of you are -- again,

25  have your interests aligned, to submit a -- did I ask you to

 1  │ submit a proposed amended order for what you're asking for
 2  │ or are you going to stand on the order you propose in your
 3  │ original TRO?
 4  │       MR. UNIKOWSKY:  Well, the facts have changed
 5  │ between the original TRO.  I'm happy to submit a proposed
 6  │ amended order, if it's helpful to the Court.
 7  │       THE COURT:  I mean, if you all could confer on
 8  │ that, that would be helpful.
 9  │       MR. UNIKOWSKY:  Okay.
10  │       THE COURT:  Coalition for Green Capital, tell me
11  │ if you can briefly how you meet the four-prong standard for
12  │ a TRO, including imminent harm -- which I'm particularly
13  │ interested in; and also your response to the government's
14  │ argument that this is a contract claim and does not properly
15  │ belong before this Court.
16  │       MR. LEVY:  So just in terms of what we are
17  │ requesting, it's in fact narrower than my friends are in the
18  │ TRO itself.  We're seeking a limited TRO that would only
19  │ enjoin the money from leaving Citi's accounts back to the
20  │ government.
21  │       THE COURT:  I'm sorry, would only enjoin what?
22  │       MR. LEVY:  The money from leaving Citi's accounts
23  │ back to the government.  With respect to the other issues,
24  │ we intend to request it as part of a preliminary injunction,
25  │ and have not requested any sort of broader relief as part of

1   this TRO.

2       **THE COURT:**  So you're not actually asking for

3   disbursement of funds, you're just asking that the funds

4   stay where they are and not be returned to the Treasury?

5       **MR. LEVY:**  Correct.  And we intend to address the

6   broader issue of access to the funds, and whether the notice

7   should be temporarily set aside -- which in our view it

8   should as part of a preliminary injunction application.

9       **THE COURT:**  Okay.

10      **MR. LEVY:**  So the TRO that we're seeking is very

11   limited.  It is to make sure the funds stay in place so that

12   there's no issue later with respect to the Court addressing

13   the merits.  In terms of the merits, we think we amply

14   satisfy that issue, because there has been no explanation

15   that's individualized to our -- my client with respect to

16   this program.  Instead, the program was unilaterally

17   terminated based on boilerplate allegations that was issued

18   in notice letters sent to all three of our clients, and also

19   to some other grantees under --

20      **THE COURT:**  Did you all get the same -- the notice

21   letters at the same time on the 11th?

22      **MR. LEVY:**  My understanding is we received ours

23   one minute after Mr. Unikowsky's client, and I believe

24   Ms. Neitzel's received hers minutes apart.  And the language

25   of the notices are identical, and it is also identical to

1    what is in a press release issued by EPA that same day.  And

2    the point is the EPA's decided to shut down this program,

3    and has done so without explanation that is adequate in the

4    circumstances, and that violates the regulations.  That's

5    why we're here.

6         THE COURT:  What's your response to the

7    government's argument that this Court lacks jurisdiction?  I

8    mean, I assume you've seen Judge McFadden's opinion in

9    Catholic Bishops -- I think that's the name of the case.

10   But you know the one I'm talking about.

11        MR. LEVY:  Yes.  I think -- I have a couple of

12   points.  First, at this juncture, for a TRO, the Court does

13   not have to definitively resolve jurisdiction, it can just

14   maintain the status quo while it decides whether it has

15   jurisdiction.  And then with respect to whether there is

16   jurisdiction, number one, we are not seeking monetary

17   damages.  And the Court does have the authority to declare

18   administrative action unlawful.  And if as an incident to

19   that money disbursed remain available, that doesn't change

20   the nature of the remedy.

21             And the D.C. Circuit has made clear that if the

22   claims sound in violation of law, statutes or the

23   Constitution -- which is what our claims are, the fact that

24   reference may need to be had to the contracts -- to

25   contracts does not take the case out of the jurisdiction of

1  this Court.  And we have plenty -- and again, the way we see

2  it, this is not the termination of any individual contract,

3  it is the termination of an entire program that was designed

4  by Congress and that was -- as to which monies were

5  appropriated.  So the idea that this is a contract claim --

6  there may be contract claims in the future, but that doesn't

7  mean that we don't also have claims to ensure compliance

8  with the law, which is what this is about.

9         In terms of irreparable harm, given that our --

10  the relief we're seeking is very limited, and there's a real

11  possibility that if the funds are disbursed the jurisdiction

12  of this Court will be taken away, that is in itself

13  irreparable harm.

14         **THE COURT:**  When you say funds are disbursed, you

15  mean sent back to Treasury?

16         **MR. LEVY:**  Yeah, that's right.  So that's number

17  one.  Number two, there's case law we cite in our brief

18  recognizing that the deprivation of the ability to operate

19  in a program approved by the Congress is irreparable harm.

20  And then with respect to Citi, there is -- Citi has an

21  exculpation of liability clause which would be unenforceable

22  in the event -- for an intentional tort.  And I'm not saying

23  we're not there yet, but we can't obtain damages from Citi.

24  So as to Citi, there's --

25         **THE COURT:**  For which Citi's eternally grateful

13

1    I'm sure.  They're just sitting there waiting to be told

2    what to do.

3             **MR. LEVY:**  Well, I think they would welcome an

4    order saying don't send the money back -- or I think they

5    should.  The ACA is clear on its face that the obligations

6    of Citi with respect to the funds are exclusively set forth

7    in the ACA.  There's a broad merger and integration clause,

8    and it doesn't just say the obligations are set forth in the

9    agreement, but it says all the obligations with respect to

10   the funds are set forth in the agreement.  And so Citi can't

11   point to another document that we're not a party to to say

12   that it doesn't have obligations.  Citi is an agent for

13   purposes of being a custodian.

14            But these funds are my client's funds and the

15   respective funds of my friends.  So we think we meet all the

16   standards, and maintaining the status quo is in the public

17   interest as it would ensure that Congress' directives are

18   complied with.

19            **THE COURT:**  All right.  I'll hear from counsel for

20   Power Forward now.

21            **MR. LEVY:**  I had just a --

22            **THE COURT:**  Oh, I'm sorry.  Yes, I thought you

23   were done.

24            **MR. LEVY:**  No, no, I was done, I just had two -- a

25   procedural point.  I don't know if this is the right time.

1          **THE COURT:**  Go ahead.

2          **MR. LEVY:**  But the first is I assume my friends

3     will be filing -- well, I understand my friends will be

4     filing something at 5:00 o'clock today about Climate United.

5     To the extent there are issues specific to my client, at

6     some point we'd like to see that.  And then the second

7     point -- and we think it should be in short order, because

8     just to keep this moving.  And the second point is a related

9     point, which is that ordinarily there's a certain amount of

10    time to gather the administrative record.  I think we and

11    the Court would benefit from seeing it sooner rather than

12    later.

13         **THE COURT:**  All right, thank you.  Mr. Sacks, I

14    know we're going a little bit out of order, but do you have

15    any reason to believe that any declaration or affidavit or

16    any information you provide the Court about -- oh,

17    apparently our public line is not working.  I'm not going to

18    take -- we would have to take a break if I wanted to set it

19    up, but I'm not going to do that.  You have things to do by

20    5:00 o'clock.

21         Is there any reason to think that whatever

22    information you provide the Court today regarding the

23    circumstances of the termination against Climate United

24    wouldn't equally apply to the other two plaintiffs since

25    they all received the same -- what appears to be the same

1    letter almost simultaneously?

2          **MR. SACKS:**  I believe it would, Your Honor.  But

3    until we file the declaration, can we reserve the right, if

4    necessary and if the Court orders it, to file it in the

5    other cases as well in case there's different information?

6          **THE COURT:**  Sure.

7          **MR. SACKS:**  But at this time, it's not finalized.

8          **THE COURT:**  Okay, thank you.  Ms. Neitzel.

9          **MS. NEITZEL:**  So Your Honor, let me first begin by

10   reiterating what my friend, counsel for Coalition for Green

11   Capital, mentioned, and that's that the scope of our

12   requested TRO does diverge from theirs.  So let me cover

13   that a little bit.  Obviously we filed our complaint and our

14   motion for a TRO on Friday.  It seeks broader relief; in

15   other words, a temporary restraining order ordering Citibank

16   to resume its obligations under the ACA with respect to our

17   funds, and also of course to disburse any funds that are

18   currently pending.

19         **THE COURT:**  But why shouldn't -- I mean, obviously

20   a TRO, as I've said repeatedly, is an extraordinary remedy.

21   It's not to be -- you know, it's not something that's

22   supposed to be common or routine.  And it's supposed to be,

23   as far as I can tell, as narrowly drawn as possible given

24   that it is an extraordinary remedy.

25         So why wouldn't the more appropriate thing to do

1    here be to simply maintain the status quo until we can deal

2    with the merits, at least at a preliminary injunction phase?

3         Why wouldn't it simply be to just say -- because

4    the irreparable harm -- although Mr. Unikowsky, you know,

5    set forth his client's irreparable harm on Friday with

6    regard to the payment of rent and personnel and so on.  But

7    basically the irreparable harm that's universal to all of

8    these cases is if Citibank sends the money back to the

9    Treasury, that money is gone.

10         And so why isn't the appropriate remedy here most

11   narrowly drawn to simply maintain the status quo by telling

12   Citibank not to disburse this money -- not to move this

13   money, and then deal with the issue of irreparable -- of

14   whether a preliminary injunction is necessary regarding

15   disbursement of the funds?

16        **MS. NEITZEL:**  Let me respond with a few points,

17   Your Honor.  First of all, in our view, the relevant status

18   quo is the status quo ante that existed before unlawful

19   actions were taken by Citibank and the EPA defendants,

20   that's number one.  And so I can speak to the broader

21   relief, as I was starting to, that we would request under

22   those circumstances --

23        **THE COURT:**  But the irreparable harm is the funds

24   moving back to Treasury.  What's the irreparable harm for

25   your client other than that?

1          **MS. NEITZEL:** Yes, Your Honor, I will detail that

2 if you'll humor me for one more minute.

3          **THE COURT:** Yes, absolutely.

4          **MS. NEITZEL:** I do want to say -- as we did in our

5 brief, I think, in support of our TRO, both in the

6 introduction and in the conclusion, that to the extent Your

7 Honor is concerned about the scope of this TRO, we are in

8 agreement that the most urgent bits of this are, number one,

9 maintaining the funds at Citibank unquestionably. Number

10 two, we also do think that it is critically important for

11 the Court to order that Citibank comply with its

12 obligations, at least up to the point of EPA's purported

13 termination on March 11th, in order to allow us access to

14 some funds, right.

15          Because as you've undoubtedly seen in our brief

16 supporting our TRO, we have none. PFC has absolutely no

17 funds outside of those from the NCIF award. And that is

18 true for the affiliates of our subaward -- of our

19 subawardees as well. We are simply out of funds. So when

20 it comes to the additional irreparable harm required to

21 support more expansive relief beyond an order that would

22 simply maintain the funds at Citibank, we've listed a number

23 of harms of different types in our brief that we think

24 support broader relief, all of which have been recognized by

25 the D.C. Circuit.

1          So number one, when it comes to PFC, we are

2     looking at imminently it potentially having to close its

3     doors.  And even before that, we mention in our brief, for

4     example, that our key contractor -- which provides back

5     office services across the board -- and by that I mean

6     financial management services, compliance for this award,

7     accounting, contracting services.  They had advised us:  If

8     you don't access funds and pay your substantial invoice by

9     March 17th, by today, Your Honor, we may have to stop

10    providing services.  Well, we learned over the weekend that

11    that came early.  They are already pencils down, because

12    they sent us that notice before EPA purported to terminate

13    the entire program.

14          So I want to be clear here, there are a number of

15    what we think are imminent irreparable harms that we were

16    already facing because of Citibank's refusal to comply with

17    its legal obligations under the ACA.  Those have been

18    compounded by the unlawful purported termination of this

19    entire program last Tuesday evening.  And I want to step

20    back and mention that, Your Honor, because we agree with

21    Coalition for Green Capital that we need to proceed to the

22    merits as quickly as possible.

23          Because right now, that separate harm that is

24    being caused by that termination notice being out there --

25    you know, look, the prevailing narrative right now,

1    regardless of how lawless that purported termination is, is

2    that PFC's award has been terminated under the NCIF program;

3    that this whole program potentially has been terminated; and

4    that all of our important commitments under that program are

5    now dead letter.  And every day that remains out there, it

6    becomes more difficult for us to regain the trust of our

7    lending partners, our contractors, et cetera.

8         **THE COURT:**  But isn't that -- I mean, it's

9    negatively affected in any event because regardless of

10   whether this letter of termination was lawful, the EPA has

11   indicated that it wants to end this program.  I mean, and it

12   has to go about it lawfully.  But they have been

13   unequivocal -- Administrator Zeldin has been unequivocal in

14   his opinion of -- his desire to terminate these programs one

15   way or another.  So, I mean, it may be -- the narrative may

16   be incorrect in that maybe it hasn't been lawfully

17   terminated, maybe it has, but that the intent is there.  I

18   mean, you don't get a TRO for -- well, sometimes you get it

19   for reputational injury, but for what's out there in the

20   ether or the -- in terms of what the EPA intends to do one

21   way or the other with these programs.

22        **MS. NEITZEL:**  That's correct, Your Honor.  But

23   Mr. Zeldin's intent is not sufficient, right.  As Your Honor

24   of course knows, under the governing regulations -- which

25   incorporate by reference the terms and conditions of our

1    award, there are very limited bases on which the government

2    can unilaterally terminate these awards.  And that -- I

3    mean, coupled with that is the fact that these awards were

4    created pursuant to lawful appropriations by Congress.

5    Congress set a deadline of September 30th, 2024 by which

6    these funds were to be obligated.  They were, all of those

7    grounds were met.  And EPA has not been able to point to a

8    single basis for which they have any support whatsoever.

9         So the fact that they, quote, intend to terminate

10    this on one ground or another is simply not sufficient.  As

11    far as we can tell, there's absolutely no basis on which the

12    government can lawfully unilaterally terminate these awards.

13    And we are harmed every minute this remains in place.  So we

14    also think that this Court unquestionably has the authority

15    to, at least for the time being, order as part of the TRO

16    relief a temporary restraining order preventing the

17    government from taking additional steps to implement the

18    purported termination of last week.

19         **THE COURT:**  What additional steps do you have in

20    mind?  What are you thinking --

21         **MS. NEITZEL:**  Well, truly, Your Honor, I'm not

22    sure.

23         **THE COURT:**  -- other than moving the money back to

24    Treasury?

25         **MS. NEITZEL:**  I'm not sure.  That is a key one

 1  unquestionably, moving funds back. I don't know what else

 2  the government might seek to do on its end. But our ask is

 3  that they be prevented from doing anything else that could

 4  move the needle on this termination before we're able to

 5  reach a PI or merits stage.

 6      **THE COURT:** Well, I'm not sure I have the -- I

 7  mean, if I'm saying to Mr. Sacks: Look, you haven't pointed

 8  to any evidence of fraud, waste, abuse, bribery, corruption

 9  or anything in your termination, and they're -- I'm not

10  saying this would be -- it would suffice, but they are, they

11  are investigating, they have launched an investigation. You

12  know, I can't stop them from doing that, can I?

13      **MS. NEITZEL:** You cannot stop them -- I take Your

14  Honor's point, I understand.

15      **THE COURT:** I can't stop them from taking actions

16  to sort of fill in the blanks on their termination letter.

17      **MS. NEITZEL:** No, certainly they are within their

18  rights to continue to look into this program. But what I am

19  asking for, what Power Forward Communities is asking for is

20  an order preventing them from taking additional steps to

21  implement the purported notice of termination that was

22  issued last Tuesday evening on the 11th.

23          I mean, remember, Your Honor, as you may have

24  noticed, the government said -- EPA said in a letter one day

25  prior on March 10th to Citibank that it was acting based on

22

1    so called concerns about potential conflicts of interest, et

2    cetera.  That was one day before they terminated the

3    program.  And they said that they would evaluate those

4    concerns via response letters from all of the NCIF award

5    recipients that it was slated to receive on, I believe,

6    March 28th -- is that correct?  So that's 17 days after they

7    terminated the program -- or purported to, excuse me.

8    That's when they will receive the response letters that will

9    allow them to further evaluate their, quote, concerns about

10    potential conflicts of interest.

11    **THE COURT:**  Yeah, there's been a bit of -- as I

12    mentioned to Mr. Sacks, there does appear to be some ready,

13    fire, aim activity going on here.

14    **MS. NEITZEL:**  Indeed, Your Honor.  Now, if it's

15    helpful to the Court, I will turn to the other -- our other

16    arguments for irreparable harm that really stem not so much

17    from the purported notice of termination, but because of our

18    lack of access to the funds.  So number one, I already

19    touched on the fact that PFC, the prime recipient, my client

20    at issue here, has already lost the services of its

21    principal contractor that really supports every single

22    day-to-day operation at PFC.

23    **THE COURT:**  What do you mean lost, they've just --

24    **MS. NEITZEL:**  That contractor has gone pencils

25    down.  They will not provide any more compliance, financial

 1    management, accounting, contracting services for PFC, number

 2    one.  If we are not able to access funds soon, because all

 3    of our funds come from the NCIF grant, PFC is facing the

 4    possibility of having to close its doors.  And as I said,

 5    under D.C. Circuit precedent, that suffices for irreparable

 6    harm.  But there's more than that.  PFC is not able to hire

 7    folks.  As we detailed in our declarations, they were poised

 8    to hire a chief legal officer, a head of HR, and a new chief

 9    operating officer -- or I shouldn't say a new one, a chief

10    operating officer.  They had candidates in mind for each of

11    those positions and have had to freeze those processes.

12         One of our subawardees is in a similar position.

13    They had to implement a hiring freeze and withdraw an offer

14    of employment to an individual.  Again, these sorts of harm

15    the D.C. Circuit has recognized, and so have multiple other

16    courts in this district, constitute irreparable harm.  So

17    that's one piece of it.  That's sort of one category that I

18    would say, which is direct harm to our entities and to the

19    individuals who work for or contract with them.

20         Another piece, Your Honor, is -- really has to do

21    with our missions, right, and the harm under League of Women

22    Voters to PFC's ability, and our subawardees' ability, to

23    carry out their missions; and when it comes to the knock on

24    effects of those missions, all of the individuals and

25    families throughout this country who are slated to benefit

1    from our mission.  I mean, we have projects that will be

2    detrimentally impacted within the next few weeks.  I

3    understand, Your Honor, that's not one day from now.  But

4    we're not talking about a few months from now, right.

5          We have a huge rehabilitation project for

6    affordable housing in Virginia, 192 units.  If we don't --

7    if we are not able to move forward, then at the end of this

8    month that project will lose its nongovernmental source of

9    funding and could easily fall through.  And even if it looks

10    like we will be able to commit our funds, even a delay in

11    our ability to commit those funds of a few months is looking

12    like it will cost us, PFC, an increased $460,000 to proceed

13    with that project.  We're talking about affordable housing

14    and, as Your Honor knows, low emissions, clean affordable

15    housing, new construction, rehabilitation, renovation that

16    is urgently needed and that PFC has committed to provide.

17    Already PFC has committed to provide affordable housing

18    support in the amount of $539,000,000.  And we are working

19    to deploy those projects as quickly as possible.

20          Another project, Your Honor, in Vancouver,

21    Washington is at risk of being uninsurable and closing.

22    It's an affordable senior living facility.  It's at risk of

23    being uninsurable and simply too unsafe to be maintained

24    because it doesn't have fire sprinklers.  EGA, one of our

25    subawardees, is moving as quickly as possible to do that

1    rehabilitation job to provide a safe place for those seniors

2    to remain living.  All of this is at stake.  And as the D.C.

3    Circuit has recognized, that, too, constitutes irreparable

4    harm.

5         So those are the bases for our more expansive

6    request for a TRO here, Your Honor.

7         **THE COURT:**  All right, thank you.  Mr. -- well,

8    who's counsel for Citibank?  Did you have anything to say

9    other than you're waiting to be told what to do?  I mean, I

10   don't mean to make light of your position, it's a serious

11   one.

12        **MR. ALLEN:**  No, Your Honor.  As I said last week,

13   we're a financial agent of the United States, and we owe

14   fiduciary duties to the United States and must follow

15   instructions we receive from Treasury and EPA.  Unless the

16   Court has any questions for me, which I'm happy to answer, I

17   don't have anything to add to the proceedings today.

18        **THE COURT:**  All right, thank you.

19        **MR. ALLEN:**  Thank you.

20        **THE COURT:**  Mr. Sacks, are plaintiffs entitled to

21   funds that they didn't receive from mid February to before

22   the letter of termination?  They seem to have a pretty good

23   argument for that one.

24        **MR. SACKS:**  I think their entitlement to those

25   funds, Your Honor, is governed by the grant agreement and

1    the regulations that govern contract closeout and

2    termination.  When a contract is terminated --

3         **THE COURT:**  The contract wasn't terminated until

4    Tuesday the 11th, though.  So why aren't they entitled to

5    funds up until the time the contract was terminated?  That's

6    not an issue of contract law.

7         **MR. SACKS:**  I believe it is, Your Honor.  I

8    believe their right to that money and their ability to

9    access that is governed by the closeout procedures for the

10   grant.  When performance is over, there is a set of

11   procedures that govern how the remainder of the money is

12   allocated among the grantee and the government.  So I'm not

13   at all suggesting they are not entitled to that money in the

14   closeout process, I don't know the answer to that question.

15   But they're not entitled to it, I would argue, as an

16   injunctive order from this Court.  If the closeout

17   procedures are followed following the termination, then I

18   expect that the money will be allocated appropriately among

19   the grantee and the United States.

20        **THE COURT:**  Why shouldn't I just do the narrowest

21   possible thing right now which is to simply freeze the

22   money, to say Citibank can't give it out to anybody absent a

23   court order, further instruction of the Court, until I can

24   get through to the request on a preliminary injunction

25   basis?  What's the prejudice to the government there?

1          **MR. SACKS:**  Sure, I've got a couple of points on

2     that, Your Honor.  I think first to get there that you need

3     to find there's a likelihood of success on the merits on

4     behalf of the plaintiffs.

5          **THE COURT:**  I think -- well, yes, I think based on

6     at least what I have before me so far, there is a likelihood

7     of success on the merits based on the absence in the record

8     of any basis for the termination other than, as you said on

9     Friday, what's in the termination letter.  You know, I'm

10    seeing that's on the record before me they have a likelihood

11    of success, if I find that.  It appears that the government

12    hasn't come forward with any other -- hasn't been able to

13    point to any evidence or any justification for the

14    termination letter other than the termination letter.

15         **MR. SACKS:**  Sure, if I could be heard briefly on

16    that, Your Honor.  Obviously we argued that the other day,

17    and I want to raise a couple of points --

18         **THE COURT:**  Sure.

19         **MR. SACKS:**  -- that I didn't previously.  And I

20    understand why the Court keeps coming back to what it

21    believes to be the question of the lawfulness of the

22    termination.  That really isn't an issue that this Court

23    should be considering, and there's case law --

24         **THE COURT:**  Well, again, I know you're --

25    obviously the government wants this to be a case that should

1    fall under the Tucker Act and for it to go to the Court of

2    Federal Claims, but I have to satisfy myself of my own

3    jurisdiction.  And they're not just asserting contract

4    claims here.  The claims that they're asserting seem to

5    fall, unless you can convince me otherwise, squarely under

6    the APA -- at least, you know, to start.  Why not?

7           MR. SACKS:  Because, Your Honor, the question of

8    termination and lawfulness is a question purely of is the

9    contract terminated lawfully under the contract --

10          THE COURT:  But the APA has its own requirements

11   for how agencies have to act.  Agencies have to act -- they

12   can't act in a manner that's arbitrary, capricious or

13   contrary to law.  What the plaintiffs are saying is that the

14   agency has done just that without even getting to the merits

15   of the contract and whether these -- whether there's been

16   some kind of violation of contractual terms.  The APA

17   still -- are you saying once there's a contract, the APA

18   doesn't apply to agency action?

19          MR. SACKS:  Certainly, Your Honor, I'm not saying

20   that within the broader scope of potential APA claims or for

21   the APA claims here related to termination, it does.  I

22   think Judge McFadden's opinion tells us that.  I'll point

23   the Court to 2024 WL 3835353, a decision from this Court

24   last year, that cites some Seventh Circuit case law:  "When

25   a contract is terminated, even wrongfully, there is no

29

1    longer a contract.  There's no duty to perform, no right to

2    demand performance unless specific performance is sought."

3    And of course you can't seek that against the United States.

4         So in the world we're in, I think the question of

5    the termination is a question of whether the government

6    breached the contract or terminated in compliance with the

7    contract.  And that's a question, again, that, as we've

8    argued, of course this Court does not have jurisdiction

9    over.  So I don't want to go too far in making those points

10   again, but I think it's important to identify early on that

11   if there's no likelihood of success on the merits, no

12   jurisdictional argument, then I don't think the Court can

13   issue a TRO.

14        I'd like to make one additional point.  We've

15   heard -- Your Honor said this and plaintiffs' counsel said

16   this, that the government is terminating this program.  I

17   don't believe the record supports that conclusion, and I

18   think it's important to make that point.

19        **THE COURT:**  Wait, wait, wait.  What's left of the

20   program?  If these terminations go through, what's left?

21        **MR. SACKS:**  Well, the termination letters

22   themselves say EPA will work to reobligate lawfully

23   appropriated funds within the GGRF program with enhanced

24   controls to ensure adequate governance, transparency and

25   accountability.  You can believe that or not believe that,

 1   but that is what the agency is saying to the grantees as to

 2   what their intent is for the money.  They are not saying

 3   they intend to cancel the program.

 4        **THE COURT:**  I think your administrator has

 5   undermined that assertion in his public statements, has he

 6   not?

 7        **MR. SACKS:**  I don't know the answer to that, Your

 8   Honor, he may or may not have.  But those public statements,

 9   I would say, are not record evidence this Court can consider

10   in whether or not there's a violation of law here on behalf

11   of the agency.  I think the termination letter speaks for

12   itself in that regard.  So if we get past the question of

13   likelihood of success and you're going to harm, and your

14   question is why can't there be a freeze of the money at

15   Citibank, we understand Your Honor may do that.  We would

16   only ask if the Court did that, that the money in the

17   accounts currently of the plaintiffs at Citibank, we would

18   ask that be transferred into an escrow account where that

19   money could be kept at Citibank with no greater rights of

20   access on behalf of the government or the plaintiffs.

21        **THE COURT:**  Why?

22        **MR. SACKS:**  Because --

23        **THE COURT:**  Why isn't it -- why can't the money

24   just stay where it is, why the need for escrow?

25        **MR. SACKS:**  I think it would be an extra level of

1    protection that the government would appreciate from the

2    Court, if indeed it intends to freeze the money at Citibank.

3            **THE COURT:**  Does Citibank want to be heard on

4    that?  I'm going to let you finish, Mr. Sacks, sorry.

5            **MR. ALLEN:**  I don't think Citibank takes a

6    position on that question, Your Honor.  We certainly will

7    follow any direction or order that this Court enters.

8            **THE COURT:**  All right.  Okay, go ahead, Mr. Sacks.

9            **MR. SACKS:**  And then beyond that, Your Honor, I

10   think it would just be -- I think we're all in agreement

11   that perhaps a briefing schedule for a preliminary

12   injunction would allow the parties to present their

13   arguments a little more clearly, and then get the Court to a

14   ruling on that that might be useful going forward.

15           **THE COURT:**  All right, thank you.

16           **MR. SACKS:**  Thank you for your time.

17           **THE COURT:**  Any response to the government's

18   arguments?  I'll let you go first, Mr. Unikowsky, since you

19   were first.

20           **MR. UNIKOWSKY:**  No, Your Honor, this is not our

21   motions hearing.

22           **THE COURT:**  That's true.

23           **MR. UNIKOWSKY:**  No, this is not our motions

24   hearing.  Unless the Court wants to hear from me, I'll defer

25   to my colleagues.

1          **THE COURT:**  Yes, I appreciate that.  And if you

2     could respond to the government's request to have the funds

3     placed in escrow as well.

4          **MR. LEVY:**  Yeah, I can start there.  That changes

5     the status quo.

6          **THE COURT:**  It does.

7          **MR. LEVY:**  The status quo is the money is in these

8     accounts, subject to the contractual restrictions that are

9     there.  We have -- that's part of the bargain that was

10    struck with Citibank, and it's part of the program that was

11    designed.  I don't think it's appropriate on a TRO to just

12    move the money into escrow and change the status quo.

13    Perhaps they have ideas that can be briefed as part of a

14    preliminary injunction, but I don't think that's for today.

15         **THE COURT:**  Okay.

16         **MR. LEVY:**  With respect to the record, I did just

17    want to echo what my friend said about the record of how

18    quickly the agency acted, and some of the documents that

19    came out during -- in opposition to Climate United's TRO

20    application, including the correspondence between EPA and

21    Citi stating that they were lacking critical information,

22    that they were investigating.  This was just days before

23    termination of the entire program.  I just want to -- I

24    think it's telling, and there's a real need to know what

25    else the government is relying upon.  Thank you.

1          **THE COURT:**  All right, thank you.  Ms. Neitzel.

2          **MS. NEITZEL:**  Thank you, Your Honor.  Just a quick

3    note on the government's argument that this should be

4    channeled to the Court of Federal Claims under the Tucker

5    Act.  First of all, as Mr. Levy said previously, both the

6    U.S. Supreme Court and the D.C. Circuit have recognized that

7    a district court unquestionably has the power to issue a

8    restraining order for the purpose of preserving a status

9    quo, even if there is a question about its jurisdiction.

10   But we really think there is no question here.  This is not

11   a serious argument.  I mean, the D.C. Circuit's decision in

12   2022 in the Crowley case I think put this to bed.

13         **THE COURT:**  Well, let me ask you -- I mean, Judge

14   McFadden's opinion is certainly not binding on me, but I do

15   consider my colleagues' decisions in similar cases.  Why

16   isn't Judge McFadden's opinion persuasive?

17         **MS. NEITZEL:**  Well, first of all, Your Honor, I

18   would say that there are -- if I can count here, beyond the

19   one that you mentioned, in terms of decisions by your

20   colleagues, there are multiple recent cases by others of

21   your colleagues, the AIDs Vaccine Advocacy Coalition case.

22   And then of course -- and this was in the District of

23   Massachusetts, but Massachusetts vs. NIH.

24         But in terms of what is binding on this Court, in

25   the Crowley case, the court set up a two-part test that I

1   think is generally regarded as the rights and remedies test,

2   right.  The first question asks what is the source of the

3   rights upon which the plaintiff bases its claims; is it a

4   contract.  In this case, no, it is the APA and the U.S.

5   Constitution, right.  And again, I would remind Your Honor

6   that the terms and conditions of our award agreement are

7   incorporated by reference into the federal regulations that

8   govern termination of awards with the federal government,

9   not the other way around.

10          Number two, the rights and remedies question asks

11   what is the type of relief sought.  Again, is it contractual

12   remedy -- is it a contractual remedy, is it monetary

13   damages.  No, we are seeking exclusively injunctive and

14   declaratory relief.  So we think this is quite clearly

15   appropriate for this Court to proceed.

16          **THE COURT:**  All right.  Thank you, everyone.

17   We're all working very hard to comply with my own orders,

18   including -- and I'm working to try and get you all a ruling

19   as soon as possible.  Thank you for coming in.  I appreciate

20   your work over the weekend on this.  I will issue an order

21   forthwith.

22          (Proceedings adjourned at 12:43 p.m.)

23

24

25

1                          **C E R T I F I C A T E**

2

3                      I, **Jeff M. Hook, Official Court Reporter,**

4       certify that the foregoing is a true and correct transcript

5       of the record of proceedings in the above-entitled matter.

6

7

8

9         __March 18, 2025__                _____

10             **DATE**                          **Jeff M. Hook**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DEPUTY CLERK:
**[1]**   3/2
**MR. ALLEN: [4]**
4/4 25/12
25/19 31/5
**MR. LEVY: [15]**
3/17 9/16
9/22 10/5
10/10 10/22
11/11 12/16
13/3 13/21
13/24 14/2
32/4 32/7
32/16
**MR. SACKS:**
**[18]**   3/25
6/18 8/21 15/2
15/7 25/24
26/7 27/1
27/15 27/19
28/7 28/19
29/21 30/7
30/22 30/25
31/9 31/16
**MR. UNIKOWSKY:**
**[8]**   3/9 7/21
8/6 8/15 9/4
9/9 31/20
31/23
**MS. NEITZEL:**
**[14]**   3/21
15/9 16/16
17/1 17/4
19/22 20/21
20/25 21/13
21/17 22/14
22/24 33/2
33/17
**THE COURT:**
**[59]**

**$**

**$2 [1]**   4/23
**$460,000 [1]**
24/12
**$5 [1]**   4/23
**$5 billion [1]**
4/23
**$539,000,000**
**[1]**   24/18
**$6.97 [1]**   4/23
**$6.97 billion**
**[1]**   4/23

**1**

**10017 [1]**   2/7
**10019 [1]**   2/13

**1099 [1]**   2/3
**10th [1]**   21/25
**1100 [1]**   2/16
**11th [6]**   5/8
5/21 10/21
17/13 21/22
26/4
**12:01 [1]**   1/18
**12:43 p.m [1]**
34/22
**12th [1]**   5/9
**1301 [2]**   2/13
2/22
**14th [2]**   2/7
4/16
**17 [2]**   1/18
22/6
**1717 [1]**   2/10
**17th [1]**   18/9
**18th [1]**   6/3
**192 [1]**   24/6
**1:25-cv-698 [1]**
1/5
**1:25-cv-735 [1]**
1/11
**1:25-cv-762 [1]**
1/15

**2**

**20001 [2]**   1/25
2/4
**20004 [1]**   2/22
**20006 [1]**   2/10
**20044 [1]**   2/19
**2022 [1]**   33/12
**2024 [2]**   20/5
28/23
**2025 [1]**   1/18
**20530 [1]**   2/16
**25-698 [2]**   3/2
3/8
**25-735 [1]**   3/3
**25-762 [1]**   3/5
**28th [1]**   22/6

**3**

**30th [1]**   20/5
**333 [1]**   1/24
**3835353 [1]**
28/23

**4**

**42 [1]**   6/20
**425 [1]**   2/7
**4:00 [1]**   4/8

**5**

**5:00 [3]**   8/13

**14/4 14/20**
**5:00 p.m [1]**
6/2

**6**

**698 [3]**   1/5
3/2 3/8

**7**

**72 [1]**   6/1
**735 [2]**   1/11
3/3
**762 [2]**   1/15
3/5

**8**

**875 [1]**   2/18
**8:00 p.m [2]**
6/1 6/3

**9**

**900 [1]**   2/3

**A**

**ability [5]**
12/18 23/22
23/22 24/11
26/8
**able [7]**   20/7
21/4 23/2 23/6
24/7 24/10
27/12
**above [1]**   35/5
**above-entitled**
**[1]**   35/5
**absence [1]**
27/7
**absent [1]**
26/22
**absolutely [3]**
17/3 17/16
20/11
**abuse [2]**   7/14
21/8
**ACA [4]**   13/5
13/7 15/16
18/17
**access [7]**
10/6 17/13
18/8 22/18
23/2 26/9
30/20
**account [1]**
30/18
**accountability**
**[1]**   29/25
**accounting [2]**
18/7 23/1
**accounts [8]**

**5/2 5/5 5/12**
6/1 9/19 9/22
30/17 32/8
**across [1]**
18/5
**act [5]**   28/1
28/11 28/11
28/12 33/5
**acted [1]**
32/18
**acting [3]**
4/14 5/1 21/25
**action [5]**   1/5
1/10 1/15
11/18 28/18
**actions [2]**
16/19 21/15
**activity [1]**
22/13
**actually [1]**
10/2
**ADAM [2]**   2/2
3/10
**add [2]**   7/18
25/17
**additional [5]**
17/20 20/17
20/19 21/20
29/14
**address [2]**
6/10 10/5
**addressing [1]**
10/12
**adequate [2]**
11/3 29/24
**adjourned [1]**
34/22
**administrative**
**[2]**   11/18
14/10
**administrator**
**[4]**   4/13 4/15
19/13 30/4
**advised [1]**
18/7
**Advocacy [1]**
33/21
**affected [1]**
19/9
**affidavit [1]**
14/15
**affiliates [1]**
17/18
**affordable [5]**
24/6 24/13
24/14 24/17
24/22
**afternoon [9]**

**3/9 3/13 3/20**
3/21 3/24 3/25
4/3 4/4 4/7
**again [8]**   8/24
12/1 23/14
27/24 29/7
29/10 34/5
34/11
**against [5]**
4/12 4/13 4/18
14/23 29/3
**agencies [2]**
28/11 28/11
**agency [5]**
28/14 28/18
30/1 30/11
32/18
**agent [3]**   5/1
13/12 25/13
**agree [3]**   5/24
6/11 18/20
**agreement [6]**
13/9 13/10
17/8 25/25
31/10 34/6
**agreements [3]**
4/25 5/3 8/2
**ahead [2]**   14/1
31/8
**AIDs [1]**   33/21
**aim [1]**   22/13
**al [6]**   1/6
1/11 1/17 3/3
3/4 3/6
**align [1]**   8/4
**aligned [1]**
8/25
**allegations [3]**
8/3 8/4 10/17
**ALLEN [2]**   2/20
4/5
**allocated [3]**
5/14 26/12
26/18
**allow [3]**
17/13 22/9
31/12
**almost [1]**
15/1
**along [1]**   4/1
**although [1]**
16/4
**always [1]**
7/18
**amended [3]**
8/13 9/1 9/6
**Americas [1]**
2/13

**A**

**among [2]**
26/12 26/18
**amount [2]**
14/9 24/18
**amply [1]**
10/13
**ante [1]**   16/18
**APA [7]**   28/6
28/10 28/16
28/17 28/20
28/21 34/4
**apart [1]**
10/24
**apparently [1]**
14/17
**appear [1]**
22/12
**APPEARANCES [1]**
2/1
**appeared [1]**
7/8
**appears [2]**
14/25 27/11
**application [2]**
10/8 32/20
**apply [2]**
14/24 28/18
**appreciate [3]**
31/1 32/1
34/19
**appropriate [4]**
15/25 16/10
32/11 34/15
**appropriated [2]**   12/5
29/23
**appropriately [1]**   26/18
**appropriations [1]**   20/4
**approved [2]**
5/14 12/19
**April [1]**   4/20
**arbitrary [1]**
28/12
**argue [2]**   5/11
26/15
**argued [2]**
27/16 29/8
**argument [7]**
7/4 9/14 11/7
25/23 29/12
33/3 33/11
**arguments [5]**
7/14 8/9 22/16
31/13 31/18

**around [1]**
34/9
**aside [1]**   10/7
**asserting [2]**
28/3 28/4
**assertion [1]**
30/5
**assume [2]**
11/8 14/2
**authority [2]**
11/17 20/14
**available [1]**
11/19
**Ave [2]**   2/3
2/22
**Avenue [3]**
1/24 2/7 2/13
**award [6]**
17/17 18/6
19/2 20/1 22/4
34/6
**awarded [1]**
4/21
**awards [5]**   7/6
20/2 20/3
20/12 34/8
**away [1]**   12/12

**B**

**back [11]**   9/19
9/23 12/15
13/4 16/8
16/24 18/4
18/20 20/23
21/1 27/20
**background [1]**
4/20
**Bankruptcy [1]**
1/24
**bargain [1]**
32/9
**based [4]**
10/17 21/25
27/5 27/7
**bases [3]**   20/1
25/5 34/3
**basically [2]**
8/3 16/7
**basis [4]**   20/8
20/11 26/25
27/8
**becomes [1]**
19/6
**bed [1]**   33/12
**begin [1]**   15/9
**beginning [1]**
6/1
**behalf [7]**

3/18 4/2 4/6
7/17 27/4
30/10 30/20
**believes [1]**
27/21
**belong [1]**
9/15
**Ben [1]**   2/18
**benefit [2]**
14/11 23/25
**BENISH [2]**   2/6
3/19
**BETH [2]**   2/9
3/21
**beyond [3]**
17/21 31/9
33/18
**billion [3]**
4/23 4/23 4/24
**binding [2]**
33/14 33/24
**Bishops [1]**
11/9
**bit [3]**   14/14
15/13 22/11
**bits [1]**   17/8
**blanks [1]**
21/16
**Block [1]**   2/3
**board [1]**   18/5
**boilerplate [1]**
10/17
**both [2]**   17/5
33/5
**Box [1]**   2/18
**breached [1]**
29/6
**break [1]**
14/18
**bribery [1]**
21/8
**brief [6]**   4/20
12/17 17/5
17/15 17/23
18/3
**briefed [1]**
32/13
**briefing [1]**
31/11
**briefly [2]**
9/11 27/15
**broad [1]**   13/7
**broader [6]**
9/25 10/6
15/14 16/20
17/24 28/20
**brought [1]**
4/10

**C**

**called [1]**
22/1
**came [2]**   18/11
32/19
**can [21]**   3/13
3/15 8/3 9/11
11/13 15/3
15/23 16/1
16/20 20/2
20/11 20/12
21/12 26/23
28/5 29/12
29/25 30/9
32/4 32/13
33/18
**cancel [1]**
30/3
**candidates [1]**
23/10
**CAPITAL [7]**
1/8 3/4 3/19
4/11 9/10
15/11 18/21
**capricious [1]**
28/12
**carry [1]**
23/23
**case [15]**   3/2
3/3 3/5 3/8
11/9 11/25
12/17 15/5
27/23 27/25
28/24 33/12
33/21 33/25
34/4
**cases [10]**
4/19 6/5 6/8
6/12 6/15 6/21
15/5 16/8
33/15 33/20
**category [1]**
23/17
**Catholic [1]**
11/9
**caused [1]**
18/24
**certain [1]**
14/9
**certainly [4]**
21/17 28/19
31/6 33/14
**certify [1]**
35/4
**cetera [2]**
19/7 22/2
**CFGC [1]**   2/5

**CGC [1]**   4/23
**challenges [1]**
8/10
**change [2]**
11/19 32/12
**changed [1]**
9/4
**changes [1]**
32/4
**channeled [1]**
33/4
**Charles [1]**
4/14
**chief [3]**   23/8
23/8 23/9
**CHUTKAN [1]**
1/21
**Circuit [7]**
11/21 17/25
23/5 23/15
25/3 28/24
33/6
**Circuit's [1]**
33/11
**circumstances [5]**   7/5 8/7
11/4 14/23
16/22
**cite [1]**   12/17
**cites [1]**
28/24
**Citi [8]**   12/20
12/20 12/23
12/24 13/6
13/10 13/12
32/21
**Citi's [3]**
9/19 9/22
12/25
**CITIBANK [33]**
1/6 1/11 1/17
2/20 3/3 3/4
3/5 4/6 4/13
5/1 5/1 5/5
5/12 5/16 5/19
5/25 15/15
16/8 16/12
16/19 17/9
17/11 17/22
21/25 25/8
26/22 30/15
30/17 30/19
31/2 31/3 31/5
32/10
**Citibank's [1]**
18/16
**City [1]**   2/7
**CIV [1]**   2/15

**C**

**civil [8]**  1/5 1/10 1/15 1/15 3/2 3/3 3/4 3/8 6/20

**claim [2]**  9/14 12/5

**claims [12]** 7/16 11/22 11/23 12/6 12/7 28/2 28/4 28/4 28/20 28/21 33/14 34/3

**clause [2]** 12/21 13/7

**clean [2]**  4/21 24/14

**clear [4]**  7/24 11/21 13/5 18/14

**clearly [2]** 31/13 34/14

**client [5]** 10/15 10/23 14/5 16/25 22/19

**client's [3]** 8/4 13/14 16/5

**clients [1]** 10/18

**CLIMATE [13]** 1/3 3/2 3/10 3/11 4/10 4/19 4/23 7/10 7/17 8/2 14/4 14/23 32/19

**close [2]**  18/2 23/4

**closeout [4]** 26/1 26/9 26/14 26/16

**closing [1]** 24/21

**COALITION [8]** 1/8 3/4 3/18 4/11 9/10 15/10 18/21 33/21

**colleague [4]** 3/11 3/19 4/1 4/5

**colleagues [4]** 3/23 31/25 33/20 33/21

**colleagues' [1]** 33/15

**COLUMBIA [1]** 1/1

**coming [2]** 27/20 34/19

**commit [2]** 24/10 24/11

**commitments [1]** 19/4

**committed [2]** 24/16 24/17

**common [2]** 6/13 15/22

**COMMUNITIES [6]** 1/14 3/5 3/22 4/17 4/24 21/19

**company [1]** 4/9

**complaint [4]** 4/12 4/17 8/13 15/13

**compliance [4]** 12/7 18/6 22/25 29/6

**complied [1]** 13/18

**comply [3]** 17/11 18/16 34/17

**compounded [1]** 18/18

**concerned [2]** 7/6 17/7

**concerns [3]** 22/1 22/4 22/9

**conclusion [2]** 17/6 29/17

**conditions [2]** 19/25 34/6

**confer [1]**  9/7

**conferred [1]** 5/24

**conflicts [2]** 22/1 22/10

**Congress [5]** 5/14 12/4 12/19 20/4 20/5

**Congress' [1]** 13/17

**consider [2]** 30/9 33/15

**considering [1]** 27/23

**consolidate [1]** 6/20

**consolidating [1]**  6/15

**consolidation [1]**  6/10

**constitute [1]** 23/16

**constitutes [1]** 25/3

**Constitution [3]**  1/24 11/23 34/5

**construction [1]**  24/15

**continue [1]** 21/18

**contract [20]** 9/14 12/2 12/5 12/6 23/19 26/1 26/2 26/3 26/5 26/6 28/3 28/9 28/9 28/15 28/17 28/25 29/1 29/6 29/7 34/4

**contracting [2]** 18/7 23/1

**contractor [3]** 18/4 22/21 22/24

**contractors [1]** 19/7

**contracts [2]** 11/24 11/25

**contractual [4]** 28/16 32/8 34/11 34/12

**contrary [1]** 28/13

**controls [1]** 29/24

**convince [1]** 28/5

**correspondence [1]** 32/20

**corruption [1]** 21/8

**cost [1]**  24/12

**counsel [5]** 3/14 13/19 15/10 25/8 29/15

**count [1]** 33/18

**country [1]** 23/25

**couple [3]** 11/11 27/1 27/17

**coupled [1]** 20/3

**consolidation [1]**  6/10

**course [5]** 15/17 19/24 29/3 29/8 33/22

**court [47]**

**courts [2]** 1/24 23/16

**cover [1]** 15/12

**created [1]** 20/4

**critical [1]** 32/21

**critically [1]** 17/10

**Crowley [2]** 33/12 33/25

**CUF [1]**  2/2

**currently [2]** 15/18 30/17

**custodian [1]** 13/13

**cv [3]**  1/5 1/11 1/15

**D**

**D.C [8]**  1/17 11/21 17/25 23/5 23/15 25/2 33/6 33/11

**damages [3]** 11/17 12/23 34/13

**DATE [1]**  35/10

**DAVID [2]**  2/2 3/11

**day [11]**  4/11 4/16 5/8 11/1 19/5 21/24 22/2 22/22 22/22 24/3 27/16

**days [2]**  22/6 32/22

**DC [6]**  1/25 2/4 2/10 2/16 2/19 2/22

**dead [1]**  19/5

**deadline [1]** 20/5

**deal [2]**  16/1 16/13

**decided [1]** 11/2

**decides [1]** 11/14

**decision [5]**

**5/22 6/6 6/6 28/23 33/11**

**decisions [2]** 33/15 33/19

**declaration [3]** 8/20 14/15 15/3

**declarations [1]** 23/7

**declaratory [1]** 34/14

**declare [1]** 11/17

**Defendant [2]** 2/20 4/14

**defendants [8]** 1/7 1/12 1/18 2/15 4/2 4/12 4/18 16/19

**defer [2]**  5/23 31/24

**definitively [1]** 11/13

**delay [1]** 24/10

**demand [2]**  7/1 29/2

**Department [2]** 2/18 4/1

**deploy [1]** 24/19

**deprivation [1]** 12/18

**deputy [1]** 4/14

**designed [2]** 12/3 32/11

**desire [1]** 19/14

**detail [1]** 17/1

**detailed [1]** 23/7

**detrimentally [1]**  24/2

**different [4]** 8/7 8/9 15/5 17/23

**difficult [1]** 19/6

**direct [1]** 23/18

**direction [2]** 5/5 31/7

**directives [1]** 13/17

**disburse [4]** 5/19 5/20

**D**

disburse... [2]
15/17 16/12
disbursed [3]
11/19 12/11
12/14
disbursement
[2]   10/3
16/15
disburses [1]
5/3
district [7]
1/1 1/1 1/21
1/24 23/16
33/7 33/22
diverge [1]
15/12
document [1]
13/11
documents [1]
32/18
DOJ [1]   2/15
DOJ-CIV [1]
2/15
done [4]   11/3
13/23 13/24
28/14
doors [2]   18/3
23/4
down [3]   11/2
18/11 22/25
drawn [2]
15/23 16/11
during [1]
32/19
duties [1]
25/14
duty [1]   29/1

**E**

early [2]
18/11 29/10
easily [1]
24/9
echo [1]   32/17
effect [2]
5/17 7/7
effective [1]
5/11
effects [1]
23/24
EGA [1]   24/24
Ellis [2]   2/21
4/5
else [7]   7/18
7/20 8/17 8/18
21/1 21/3
32/25

emissions [1]
24/14
employment [1]
23/14
end [3]   19/11
21/2 24/7
energy [1]
4/21
enhanced [1]
29/23
enjoin [3]
5/16 9/19 9/21
ensure [3]
12/7 13/17
29/24
entered [1]
4/25
enters [1]
31/7
entire [4]
12/3 18/13
18/19 32/23
entities [1]
23/18
entitled [5]
25/20 26/4
26/13 26/15
35/5
entitlement [1]
25/24
entries [1]
4/22
EPA [18]   4/12
4/12 4/20 4/25
5/5 5/9 5/10
5/13 11/1
16/19 18/12
19/10 19/20
20/7 21/24
25/15 29/22
32/20
EPA's [5]   4/14
7/5 7/8 11/2
17/12
equally [1]
14/24
escrow [4]
30/18 30/24
32/3 32/12
et [8]   1/6
1/11 1/17 3/3
3/4 3/6 19/7
22/1
eternally [1]
12/25
ether [1]
19/20
evaluate [2]

22/3 22/9
even [6]   18/3
24/9 24/10
28/14 28/25
33/9
evening [2]
18/19 21/22
event [2]
12/22 19/9
events [1]
6/12
everyone [2]
4/7 34/16
evidence [5]
7/11 7/12 21/8
27/13 30/9
example [1]
18/4
exclusively [2]
13/6 34/13
exculpation [1]
12/21
excuse [3]   6/2
7/11 22/7
existed [1]
16/18
expansive [2]
17/21 25/5
expect [2]
8/12 26/18
expecting [1]
6/8
explanation [2]
10/14 11/3
extent [2]
14/5 17/6
extra [1]
30/25
extraordinary
[2]   15/20
15/24

**F**

face [1]   13/5
facility [1]
24/22
facing [2]
18/16 23/3
fact [6]   6/14
9/17 11/23
20/3 20/9
22/19
factors [1]
7/2
facts [1]   9/4
fall [3]   24/9
28/1 28/5
families [1]

23/25
far [5]   7/6
15/23 20/11
27/6 29/9
February [2]
5/4 25/21
federal [8]
2/15 4/2 6/20
7/15 28/2 33/4
34/7 34/8
few [5]   7/4
16/16 24/2
24/4 24/11
fiduciary [1]
25/14
file [2]   15/3
15/4
filed [5]   4/11
4/15 4/17 4/18
15/13
filing [2]
14/3 14/4
filings [1]
6/11
fill [1]   21/16
finalized [1]
15/7
Finally [1]
5/22
financial [4]
5/1 18/6 22/25
25/13
find [2]   27/3
27/11
findings [1]
7/13
fine [1]   3/13
finish [1]
31/4
fire [2]   22/13
24/24
first [13]   6/7
6/7 7/10 11/12
14/2 15/9
16/17 27/2
31/18 31/19
33/5 33/17
34/2
Floor [1]   2/7
Foley [2]   2/9
2/12
folks [1]   23/7
follow [2]
25/14 31/7
followed [2]
7/9 26/17
following [1]
26/17

23/25
foregoing [1]
35/4
forth [4]   13/6
13/8 13/10
16/5
forthwith [1]
34/21
forward [10]
1/14 3/5 3/22
4/17 4/24
13/20 21/19
24/7 27/12
31/14
four [1]   9/11
four-prong [1]
9/11
Franklin [1]
2/18
fraud [2]   7/13
21/8
freeze [6]
7/23 23/11
23/13 26/21
30/14 31/2
Friday [7]   4/8
4/10 7/3 7/20
15/14 16/5
27/9
friend [2]
15/10 32/17
friends [4]
9/17 13/15
14/2 14/3
froze [1]   5/5
FUND [3]   1/3
3/3 4/10
funding [4]
4/21 5/6 5/13
24/9
funds [39]
22/9 26/23
future [1]
12/6

**G**

gather [1]
14/10
generally [1]
34/1
GGRF [1]   29/23
given [3]   7/8
12/9 15/23
giving [1]
5/16
going to [1]
14/17
Goldberg [2]

JA256

**G**

**Goldberg... [2]**
2/6 3/18
**good [10]**   3/9
3/13 3/20 3/21
3/24 3/25 4/3
4/4 4/7 5/22
**govern [3]**
26/1 26/11
34/8
**governance [1]**
29/24
**governed [2]**
25/25 26/9
**governing [1]**
19/24
**government [19]**
5/24 7/12
9/20 9/23 20/1
20/12 20/17
21/2 21/24
26/12 26/25
27/11 27/25
29/5 29/16
30/20 31/1
32/25 34/8
**government's
[5]**   9/13 11/7
31/17 32/2
33/3
**grant [8]**   4/21
5/2 5/6 5/20
7/13 23/3
25/25 26/10
**grantee [2]**
26/12 26/19
**grantees [2]**
10/19 30/1
**grants [3]**
5/11 5/13 7/10
**grateful [1]**
12/25
**greater [1]**
30/19
**GREEN [7]**   1/8
3/4 3/18 4/11
9/10 15/10
18/21
**GROSS [2]**   2/11
3/23
**ground [1]**
20/10
**grounds [1]**
20/7
**grow [1]**   6/12

**H**

**happy [2]**   9/5

25/16
**hard [2]**   8/21
34/17
**harm [20]**   8/7
9/12 12/9
12/13 12/19
16/4 16/5 16/7
16/23 16/24
17/20 18/23
22/16 23/6
23/14 23/16
23/18 23/21
25/4 30/13
**harmed [1]**
20/13
**harms [2]**
17/23 18/15
**hate [1]**   7/19
**have the [1]**
21/6
**head [1]**   23/8
**hear [3]**   6/22
13/19 31/24
**heard [5]**   7/4
7/14 27/15
29/15 31/3
**hearing [12]**
1/20 3/6 4/9
5/8 5/23 6/17
7/3 7/20 7/22
8/16 31/21
31/24
**helpful [3]**
9/6 9/8 22/15
**hire [2]**   23/6
23/8
**hiring [1]**
23/13
**Hoag [2]**   2/9
2/12
**Holwell [2]**
2/6 3/18
**Honor [42]**
**Honor's [1]**
21/14
**HONORABLE [1]**
1/21
**HOOK [3]**   1/23
35/3 35/10
**hours [1]**   6/1
**housing [4]**
24/6 24/13
24/15 24/17
**HR [1]**   23/8
**huge [1]**   24/5
**humor [1]**   17/2

**I**

**idea [1]**   12/5
**ideas [1]**
32/13
**identical [2]**
10/25 10/25
**identify [1]**
29/10
**immediately [1]**
5/11
**imminent [2]**
9/12 18/15
**imminently [1]**
18/2
**impacted [1]**
24/2
**implement [3]**
20/17 21/21
23/13
**important [5]**
6/5 17/10 19/4
29/10 29/18
**INC [2]**   1/14
3/5
**incident [1]**
11/18
**including [4]**
7/4 9/12 32/20
34/18
**incorporate [1]**
19/25
**incorporated
[1]**   34/7
**incorrect [1]**
19/16
**increased [1]**
24/12
**indeed [2]**
22/14 31/2
**indicated [1]**
19/11
**indicating [1]**
5/10
**individual [2]**
12/2 23/14
**individualized
[1]**   10/15
**individuals [2]**
23/19 23/24
**information [4]**
14/16 14/22
15/5 32/21
**injunction [8]**
7/2 9/24 10/8
16/2 16/14
26/24 31/12
32/14

**injunctive [3]**
5/15 26/16
34/13
**injury [1]**
19/19
**Instead [1]**
10/16
**instruction [1]**
26/23
**instructions
[1]**   25/15
**integration [1]**
13/7
**intend [5]**   6/6
9/24 10/5 20/9
30/3
**intends [2]**
19/20 31/2
**intent [3]**
19/17 19/23
30/2
**intentional [1]**
12/22
**interest [3]**
13/17 22/1
22/10
**interested [1]**
9/13
**interests [1]**
8/25
**interpret [1]**
8/16
**into [5]**   4/25
21/18 30/18
32/12 34/7
**introduce [1]**
3/7
**introduction
[1]**   17/6
**investigating
[2]**   21/11
32/22
**investigation
[1]**   21/11
**invoice [1]**
18/8
**involve [1]**
6/13
**irreparable
[16]**   8/7 12/9
12/13 12/19
16/4 16/5 16/7
16/13 16/23
16/24 17/20
18/15 22/16
23/5 23/16
25/3
**issue [10]**

10/6 10/12
10/14 16/13
22/20 26/6
27/22 29/13
33/7 34/20
**issued [3]**
10/17 11/1
21/22
**issues [3]**   8/2
9/23 14/5

**J**

**JAMES [1]**   2/11
**JEFF [3]**   1/23
35/3 35/10
**Jenner [1]**   2/3
**Jim [1]**   3/23
**job [1]**   25/1
**JUDGE [5]**   1/21
11/8 28/22
33/13 33/16
**juncture [1]**
11/12
**jurisdiction
[10]**   7/15
11/7 11/13
11/15 11/16
11/25 12/11
28/3 29/8 33/9
**jurisdictional
[1]**   29/12
**Justice [2]**
2/18 4/1
**justification
[1]**   27/13

**K**

**keep [1]**   14/8
**keeps [1]**
27/20
**kept [1]**   30/19
**KEVIN [4]**   2/6
2/17 3/19 4/2
**key [2]**   18/4
20/25
**kind [1]**   28/16
**Kirkland [2]**
2/21 4/5
**knock [1]**
23/23
**knows [2]**
19/24 24/14

**L**

**lack [1]**   22/18
**lacking [1]**
32/21
**lacks [1]**   11/7

**L**

**language [1]**
10/24
**last [9]**   4/8
4/20 7/3 8/16
18/19 20/18
21/22 25/12
28/24
**later [2]**
10/12 14/12
**launched [1]**
21/11
**law [9]**   6/13
11/22 12/8
12/17 26/6
27/23 28/13
28/24 30/10
**lawful [2]**
19/10 20/4
**lawfully [5]**
19/12 19/16
20/12 28/9
29/22
**lawfulness [2]**
27/21 28/8
**lawless [1]**
19/1
**lawyers [1]**
7/19
**League [1]**
23/21
**learned [1]**
18/10
**least [6]**   8/10
16/2 17/12
20/15 27/6
28/6
**leaving [2]**
9/19 9/22
**left [2]**   29/19
29/20
**legal [3]**   8/9
18/17 23/8
**lending [1]**
19/7
**letter [12]**
5/9 5/17 15/1
19/5 19/10
21/16 21/24
25/22 27/9
27/14 27/14
30/11
**letters [5]**
10/18 10/21
22/4 22/8
29/21
**level [1]**

30/25
**LEVY [3]**   2/5
3/17 33/5
**Lexington [1]**
2/7
**liability [1]**
12/21
**light [1]**
25/10
**likelihood [5]**
27/3 27/6
27/10 29/11
30/13
**limited [5]**
6/25 9/18
10/11 12/10
20/1
**line [1]**   14/17
**listed [1]**
17/22
**little [3]**
14/14 15/13
31/13
**living [2]**
24/22 25/2
**LLP [5]**   2/3
2/6 2/9 2/12
2/21
**longer [1]**
29/1
**look [3]**   18/25
21/7 21/18
**looking [2]**
18/2 24/11
**looks [1]**   24/9
**lose [1]**   24/8
**lost [2]**   22/20
22/23
**low [1]**   24/14

**M**

**maintain [4]**
11/14 16/1
16/11 17/22
**maintained [1]**
24/23
**maintaining [2]**
13/16 17/9
**makes [1]**   8/24
**making [1]**
29/9
**management [2]**
18/6 23/1
**manages [1]**
5/2
**manner [1]**
28/12
**March [8]**   1/18

5/8 5/21 6/3
17/13 18/9
21/25 22/6
**March 10th [1]**
21/25
**March 11th [3]**
5/8 5/21 17/13
**March 17th [1]**
18/9
**March 18th [1]**
6/3
**March 28th [1]**
22/6
**MARCUS [1]**
2/15
**Mark [1]**   3/25
**Massachusetts
[2]**   33/23
33/23
**matter [2]**   3/6
35/5
**may [9]**   11/24
12/6 18/9
19/15 19/15
21/23 30/8
30/8 30/15
**maybe [3]**   8/24
19/16 19/17
**McELROY [2]**
2/21 4/6
**McFadden's [4]**
11/8 28/22
33/14 33/16
**McIntosh [1]**
4/14
**mean [20]**   8/6
9/7 11/8 12/7
12/15 15/19
18/5 19/8
19/11 19/15
19/18 20/3
21/7 21/23
22/23 24/1
25/9 25/10
33/11 33/13
**meet [2]**   9/11
13/15
**mention [2]**
18/3 18/20
**mentioned [3]**
15/11 22/12
33/19
**merger [1]**
13/7
**merits [10]**
7/1 10/13
10/13 16/2
18/22 21/5

27/3 27/7
28/14 29/11
**met [2]**   4/8
20/7
**mic [1]**   3/14
**mid [2]**   5/4
25/21
**might [2]**   21/2
31/14
**mind [2]**   20/20
23/10
**minimum [1]**
5/20
**minute [3]**
10/23 17/2
20/13
**minutes [1]**
10/24
**mission [1]**
24/1
**missions [3]**
23/21 23/23
23/24
**monetary [2]**
11/16 34/12
**money [23]**   5/3
9/19 9/22
11/19 13/4
16/8 16/9
16/12 16/13
20/23 26/8
26/11 26/13
26/18 26/22
30/2 30/14
30/16 30/19
30/23 31/2
32/7 32/12
**money back [1]**
20/23
**monies [1]**
12/4
**month [1]**   24/8
**months [2]**
24/4 24/11
**mootness [1]**
7/14
**more [8]**   15/25
17/2 17/21
19/6 22/25
23/6 25/5
31/13
**morning [1]**
5/23
**most [2]**   16/10
17/8
**motion [6]**
1/20 3/6 4/9
4/15 4/17

15/14
**motions [2]**
31/21 31/23
**move [5]**   5/25
16/12 21/4
24/7 32/12
**moving [5]**
14/8 16/24
20/23 21/1
24/25
**Mr. [13]**   6/17
7/17 8/19
10/23 14/13
16/4 19/23
21/7 22/12
25/20 31/4
31/18 33/5
**Mr. Levy [1]**
33/5
**Mr. Sacks [7]**
6/17 8/19
14/13 21/7
22/12 25/20
31/4
**Mr. Unikowsky
[3]**   7/17 16/4
31/18
**Mr. Unikowsky's
[1]**   10/23
**Mr. Zeldin's
[1]**   19/23
**Ms. [3]**   10/24
15/8 33/1
**Ms. Neitzel [2]**
15/8 33/1
**Ms. Neitzel's
[1]**   10/24
**much [1]**   22/16
**multiple [2]**
23/15 33/20
**murky [1]**   7/6
**must [1]**   25/14
**myself [1]**
28/2

**N**

**N.A [3]**   1/6
1/11 1/17
**name [2]**   3/10
11/9
**narrative [2]**
18/25 19/15
**narrower [1]**
9/17
**narrowest [1]**
26/20
**narrowly [2]**
15/23 16/11

**N**

**nature [1]** 11/20

**NCIF [6]** 4/22 5/14 17/17 19/2 22/4 23/3

**necessary [4]** 7/11 7/12 15/4 16/14

**need [5]** 11/24 18/21 27/2 30/24 32/24

**needed [1]** 24/16

**needle [1]** 21/4

**negatively [1]** 19/9

**neither [1]** 5/24

**NEITZEL [4]** 2/9 3/22 15/8 33/1

**Neitzel's [1]** 10/24

**new [6]** 2/3 2/7 2/13 23/8 23/9 24/15

**next [3]** 6/10 6/22 24/2

**NIH [1]** 33/23

**NOAH [2]** 2/12 3/23

**none [1]** 17/16

**nongovernmental [1]** 24/8

**nor [1]** 5/25

**note [1]** 33/3

**notice [7]** 10/6 10/18 10/20 18/12 18/24 21/21 22/17

**noticed [1]** 21/24

**notices [2]** 4/18 10/25

**number [12]** 11/16 12/16 12/17 16/20 17/8 17/9 17/22 18/1 18/14 22/18 23/1 34/10

**NW [5]** 1/24 2/3 2/10 2/16 2/22

**NY [2]** 2/7 2/13

**O**

**o'clock [3]** 8/13 14/4 14/20

**objection [3]** 6/15 6/17 6/18

**obligated [1]** 20/6

**obligations [7]** 13/5 13/8 13/9 13/12 15/16 17/12 18/17

**obtain [1]** 12/23

**obviously [5]** 8/17 15/13 15/19 27/16 27/25

**offer [1]** 23/13

**office [1]** 18/5

**officer [3]** 23/8 23/9 23/10

**Official [2]** 1/23 35/3

**once [1]** 28/17

**one [27]** 7/21 10/23 11/10 11/16 12/17 16/20 17/2 17/8 18/1 19/14 19/20 20/10 20/25 21/24 22/2 22/18 23/2 23/9 23/12 23/17 23/17 24/3 24/24 25/11 25/23 29/14 33/19

**only [3]** 9/18 9/21 30/16

**operate [1]** 12/18

**operating [2]** 23/9 23/10

**operation [1]** 22/22

**opinion [5]** 11/8 19/14 28/22 33/14 33/16

**opinion of [1]** 19/14

**opportunity [1]** 7/1

**opposed [1]** 7/15

**opposition [1]** 32/19

**orally [1]** 7/22

**order [23]** 4/10 4/16 5/19 6/24 7/16 9/1 9/2 9/6 13/4 14/7 14/14 15/15 17/11 17/13 17/21 20/15 20/16 21/20 26/16 26/23 31/7 33/8 34/20

**ordering [1]** 15/15

**orders [2]** 15/4 34/17

**ordinarily [1]** 14/9

**organization [1]** 8/8

**original [2]** 9/3 9/5

**others [2]** 6/9 33/20

**otherwise [1]** 28/5

**ours [1]** 10/22

**out [10]** 6/12 11/25 14/14 17/19 18/24 19/5 19/19 23/23 26/22 32/19

**outset [1]** 6/4

**outside [1]** 17/17

**over [5]** 7/2 18/10 26/10 29/9 34/20

**owe [1]** 25/13

**own [3]** 28/2 28/10 34/17

**P**

**p.m [5]** 1/18 6/1 6/2 6/3 34/22

**part [8]** 9/24 9/25 10/8

**opinion of [1]** 19/14

20/15 32/9 32/10 32/13 33/25

**particular [1]** 8/7

**particularly [1]** 9/12

**parties [6]** 3/7 4/25 5/24 6/5 6/22 31/12

**partners [1]** 19/7

**party [1]** 13/11

**pass [1]** 7/1

**past [1]** 30/12

**pay [1]** 18/8

**payment [1]** 16/6

**pencils [2]** 18/11 22/24

**pending [1]** 15/18

**Pennsylvania [1]** 2/22

**perform [1]** 29/1

**performance [3]** 26/10 29/2 29/2

**perhaps [2]** 31/11 32/13

**period [2]** 6/1 6/25

**periodically [1]** 5/3

**personnel [1]** 16/6

**perspective [1]** 8/11

**persuasive [1]** 33/16

**PFC [12]** 2/9 4/24 17/16 18/1 22/19 22/22 23/1 23/3 23/6 24/12 24/16 24/17

**PFC's [2]** 19/2 23/22

**phase [1]** 16/2

**PI [1]** 21/5

**piece [2]** 23/17 23/20

**place [4]** 7/10 10/11 20/13 25/1

**placed [1]** 32/3

**plaintiff [12]** 1/4 1/9 1/15 2/2 2/5 2/9 3/8 3/10 3/11 3/22 8/8 34/3

**plaintiffs [16]** 4/22 5/3 5/6 5/10 5/11 5/15 6/8 6/11 6/16 7/24 14/24 25/20 27/4 28/13 30/17 30/20

**plaintiffs' [1]** 29/15

**please [1]** 3/7

**plenty [1]** 12/1

**PO [1]** 2/18

**point [14]** 11/2 13/11 13/25 14/6 14/7 14/8 14/9 17/12 20/7 21/14 27/13 28/22 29/14 29/18

**pointed [1]** 21/7

**points [5]** 11/12 16/16 27/1 27/17 29/9

**poised [1]** 23/7

**position [3]** 23/12 25/10 31/6

**positions [1]** 23/11

**possibility [2]** 12/11 23/4

**possible [7]** 6/7 15/23 18/22 24/19 24/25 26/21 34/19

**potential [3]** 22/1 22/10 28/20

**potentially [2]** 18/2 19/3

**power [8]** 1/14 3/5 3/22 4/17 4/24 13/20 21/19 33/7

**P**

precedent [1]
23/5
prefer [1]
3/16
prejudice [1]
26/25
preliminary [7]
9/24 10/8
16/2 16/14
26/24 31/11
32/14
present [1]
31/12
preserve [1]
6/24
preserving [1]
33/8
press [1]    11/1
pretty [1]
25/22
prevailing [1]
18/25
prevented [1]
21/3
preventing [2]
20/16 21/20
previously [2]
27/19 33/5
prime [1]
22/19
principal [1]
22/21
prior [2]    5/20
21/25
procedural [2]
7/9 13/25
Procedure [1]
6/20
procedures [3]
26/9 26/11
26/17
proceed [3]
18/21 24/12
34/15
proceedings [3]
25/17 34/22
35/5
process [1]
26/14
processes [1]
23/11
proffered [2]
7/11 7/12
program [22]
4/22 5/14
10/16 10/16

11/2 12/3
12/19 18/13
18/19 19/2
19/3 19/4
19/11 21/18
22/3 22/7
29/16 29/20
29/23 30/3
32/10 32/23
programs [2]
19/14 19/21
project [4]
24/5 24/8
24/13 24/20
projects [3]
4/21 24/1
24/19
prong [1]    9/11
properly [1]
9/14
propose [1]
9/2
proposed [2]
9/1 9/5
protection [1]
31/1
provide [6]
14/16 14/22
22/25 24/16
24/17 25/1
provides [1]
18/4
providing [1]
18/10
public [4]
13/16 14/17
30/5 30/8
pull [1]    3/14
purely [1]
28/8
purported [8]
17/12 18/12
18/18 19/1
20/18 21/21
22/7 22/17
purpose [2]
6/23 33/8
purposes [1]
13/13
pursuant [3]
5/2 6/19 20/4
put [1]    33/12

**Q**

quick [1]    33/2
quickly [4]
18/22 24/19
24/25 32/18

quite [1]
34/14
quo [11]    6/24
11/14 13/16
16/1 16/11
16/18 16/18
32/5 32/7
32/12 33/9
quote [2]    20/9
22/9

**R**

raise [1]
27/17
rarely [1]
7/19
rather [1]
14/11
reach [1]    21/5
ready [1]
22/12
real [2]    12/10
32/24
really [5]
22/16 22/21
23/20 27/22
33/10
reason [2]
14/15 14/21
receive [5]
8/13 22/5 22/8
25/15 25/21
received [4]
5/6 10/22
10/24 14/25
recent [1]
33/20
recipient [1]
22/19
recipients [1]
22/5
recognized [4]
17/24 23/15
25/3 33/6
recognizing [1]
12/18
record [10]
3/8 7/25 14/10
27/7 27/10
29/17 30/9
32/16 32/17
35/5
reference [3]
11/24 19/25
34/7
refusal [1]
18/16
regain [1]

19/6
regard [2]
16/6 30/12
regarded [1]
34/1
regarding [3]
6/22 14/22
16/14
regardless [2]
19/1 19/9
regulations [4]
11/4 19/24
26/1 34/7
rehabilitation
[3]    24/5
24/15 25/1
reiterating [1]
15/10
related [4]
4/19 6/8 14/8
28/21
release [1]
11/1
relevant [1]
16/17
relief [11]
5/15 7/16 9/25
12/10 15/14
16/21 17/21
17/24 20/16
34/11 34/14
relying [1]
32/25
remain [3]    7/6
11/19 25/2
remainder [1]
26/11
remains [2]
19/5 20/13
remedies [2]
34/1 34/10
remedy [6]
11/20 15/20
15/24 16/10
34/12 34/12
remember [1]
21/23
remind [1]
34/5
renovation [1]
24/15
rent [1]    16/6
reobligate [1]
29/22
repeatedly [1]
15/20
Reporter [3]
1/23 1/23 35/3

reputational
[1]    19/19
request [9]
5/4 5/19 7/22
7/23 9/24
16/21 25/6
26/24 32/2
requested [2]
9/25 15/12
requesting [1]
9/17
required [1]
17/20
requirements
[2]    7/9 28/10
reserve [1]
15/3
resolve [1]
11/13
respect [9]
9/23 10/12
10/15 11/15
12/20 13/6
13/9 15/16
32/16
respective [1]
13/15
respond [2]
16/16 32/2
response [5]
9/13 11/6 22/4
22/8 31/17
restraining [6]
4/10 4/16
6/23 15/15
20/16 33/8
restrictions
[1]    32/8
resume [1]
15/16
returned [1]
10/4
reviewing [1]
6/11
right [25]
6/19 8/11 8/23
12/16 13/19
13/25 14/13
15/3 17/14
18/23 18/25
19/23 23/21
24/4 25/7
25/18 26/8
26/21 29/1
31/8 31/15
33/1 34/2 34/5
34/16
rights [5]

**R**

**rights... [5]**
21/18 30/19
34/1 34/3
34/10
**risk [2]**  24/21
24/22
**ROBBINS [2]**
2/2 3/11
**routine [1]**
15/22
**Rule [1]**  6/20
**ruling [2]**
31/14 34/18

**S**

**SACKS [10]**
2/15 4/1 6/17
8/19 14/13
21/7 22/12
25/20 31/4
31/8
**safe [1]**  25/1
**same [10]**  4/11
4/12 4/16 4/18
6/12 10/20
10/21 11/1
14/25 14/25
**satisfy [2]**
10/14 28/2
**Saturday [2]**
5/22 6/2
**SAUNDERS [2]**
2/21 4/6
**saying [10]**
7/19 12/22
13/4 21/7
21/10 28/13
28/17 28/19
30/1 30/2
**schedule [1]**
31/11
**scope [5]**  6/23
7/4 15/11 17/7
28/20
**second [2]**
14/6 14/8
**seeing [2]**
14/11 27/10
**seek [3]**  5/25
21/2 29/3
**seeking [5]**
9/18 10/10
11/16 12/10
34/13
**seeks [1]**
15/14
**seem [3]**  8/11

**seems [1]**  4/8
**send [1]**  13/4
**sends [1]**  16/8
**senior [1]**
24/22
**seniors [1]**
25/1
**sense [1]**  8/24
**sense for [1]**
8/24
**sent [4]**  5/9
10/18 12/15
18/12
**separate [1]**
18/23
**September [1]**
20/5
**September 30th
[1]**  20/5
**series [1]**
6/12
**serious [2]**
25/10 33/11
**services [6]**
18/5 18/6 18/7
18/10 22/20
23/1
**set [10]**  3/6
10/7 13/6 13/8
13/10 14/18
16/5 20/5
26/10 33/25
**Seventh [1]**
28/24
**several [1]**
4/25
**SHAW [2]**  2/12
3/23
**short [1]**  14/7
**Shuster [2]**
2/6 3/18
**shut [1]**  11/2
**similar [4]**
5/15 8/11
23/12 33/15
**simply [8]**
16/1 16/3
16/11 17/19
17/22 20/10
24/23 26/21
**simultaneously
[1]**  15/1
**single [2]**
20/8 22/21
**sitting [1]**
13/1
**situation [1]**

6/24
**slated [2]**
22/5 23/25
**slightly [1]**
8/9
**So as [1]**
12/24
**Sometime [1]**
5/4
**sometimes [1]**
19/18
**soon [4]**  6/6
6/7 23/2 34/19
**sooner [1]**
14/11
**sorry [3]**  9/21
13/22 31/4
**sort [3]**  9/25
21/16 23/17
**sorts [1]**
23/14
**sought [2]**
29/2 34/11
**sound [1]**
11/22
**source [2]**
24/8 34/2
**speak [1]**
16/20
**speaks [1]**
30/11
**specific [2]**
14/5 29/2
**sprinklers [1]**
24/24
**squarely [1]**
28/5
**stage [1]**  21/5
**stake [1]**  25/2
**stand [1]**  9/2
**standard [1]**
9/11
**standards [1]**
13/16
**start [2]**  28/6
32/4
**starting [2]**
3/8 16/21
**statements [2]**
30/5 30/8
**STATES [7]**  1/1
1/21 5/2 25/13
25/14 26/19
29/3
**stating [1]**
32/21
**Station [1]**
2/18

**status [11]**
6/24 11/14
13/16 16/1
16/11 16/17
16/18 32/5
32/7 32/12
33/8
**statutes [1]**
11/22
**stay [4]**  3/14
10/4 10/11
30/24
**stem [1]**  22/16
**step [1]**  18/19
**steps [4]**  3/15
20/17 20/19
21/20
**still [3]**  8/12
8/12 28/17
**stop [4]**  18/9
21/12 21/13
21/15
**Street [2]**
2/10 2/16
**struck [1]**
32/10
**subaward [1]**
17/18
**subawardees [3]**
17/19 23/12
24/25
**subawardees'
[1]**  23/22
**subject [1]**
32/8
**submit [4]**
8/18 8/25 9/1
9/5
**submit a [1]**
8/25
**submitted [1]**
5/20
**substantial [1]**
18/8
**success [5]**
27/3 27/7
27/11 29/11
30/13
**suffice [1]**
21/10
**suffices [1]**
23/5
**sufficient [2]**
19/23 20/10
**suggesting [1]**
26/13
**Suite [1]**  2/3
**support [5]**

17/5 17/21
17/24 20/8
24/18
**supporting [1]**
17/16
**supports [2]**
22/21 29/17
**supposed [2]**
15/22 15/22
**Supreme [1]**
33/6
**sure [11]**  3/14
7/24 10/11
13/1 15/6
20/22 20/25
21/6 27/1
27/15 27/18
**suspended [1]**
5/12

**T**

**table [1]**  3/14
**talking [3]**
11/10 24/4
24/13
**TANYA [1]**  1/21
**telling [2]**
16/11 32/24
**tells [1]**
28/22
**temporarily [1]**
10/7
**temporary [5]**
4/9 4/16 5/15
15/15 20/16
**terminate [6]**
7/10 18/12
19/14 20/2
20/9 20/12
**terminated [13]**
5/13 10/17
19/2 19/3
19/17 22/2
22/7 26/2 26/3
26/5 28/9
28/25 29/6
**terminating [3]**
5/10 7/13
29/16
**termination
[36]**
**terminations
[1]**  29/20
**terms [10]**  8/9
9/16 10/13
12/9 19/20
19/25 28/16
33/19 33/24

**T**

terms... [1] 34/6
test [2] 33/25 34/1
theirs [1] 15/12
thinking [1] 20/20
though [1] 26/4
thought [1] 13/22
three [5] 4/22 4/22 5/9 8/4 10/18
throughout [1] 23/25
today [6] 8/22 14/4 14/22 18/9 25/17 32/14
told [2] 13/1 25/9
tomorrow [1] 6/3
tort [1] 12/22
touched [1] 22/19
transactions [1] 6/13
transcript [2] 1/20 35/4
transferred [1] 30/18
transferring [2] 5/16 5/18
transparency [1] 29/24
Treasury [7] 5/18 10/4 12/15 16/9 16/24 20/24 25/15
TRO [26] 4/18 6/6 7/5 7/7 7/22 8/17 9/3 9/5 9/12 9/18 9/18 10/1 10/10 11/12 15/12 15/14 15/20 17/5 17/7 17/16 19/18 20/15 25/6 29/13 32/11 32/19
TROs [1] 6/23

true [3] 17/18 31/22 35/4
truly [1] 20/21
trust [1] 19/6
try [1] 34/18
Tucker [2] 28/1 33/4
Tuesday [3] 18/19 21/22 26/4
turn [1] 22/15
two [7] 8/5 12/17 13/24 14/24 17/10 33/25 34/10
two-part [1] 33/25
type [1] 34/11
types [1] 17/23

**U**

U.S [4] 1/24 2/18 33/6 34/4
under [14] 4/22 10/19 15/16 16/21 18/17 19/2 19/4 19/24 23/5 23/21 28/1 28/5 28/9 33/4
undermined [1] 30/5
undoubtedly [1] 17/15
unenforceable [1] 12/21
unequivocal [2] 19/13 19/13
UNIKOWSKY [5] 2/2 3/10 7/17 16/4 31/18
Unikowsky's [1] 10/23
unilaterally [3] 10/16 20/2 20/12
uninsurable [2] 24/21 24/23
unique [1] 8/2
UNITED [19] 1/1 1/3 1/21 3/3 3/10 3/12 4/10 4/19 4/23 5/2 7/11 7/17 8/2 14/4 14/23

25/13 25/14 26/19 29/3
United's [1] 32/19
units [1] 24/6
universal [1] 16/7
unlawful [4] 7/8 11/18 16/18 18/18
unlawfully [1] 5/13
unless [4] 25/15 28/5 29/2 31/24
unquestionably [4] 17/9 20/14 21/1 33/7
unsafe [1] 24/23
up [5] 3/15 14/19 17/12 26/5 33/25
upon [4] 5/4 5/19 32/25 34/3
urgent [1] 17/8
urgently [1] 24/16
useful [1] 31/14

**V**

Vaccine [1] 33/21
Vancouver [1] 24/20
VanLANDINGHAM [2] 2/17 4/2
via [1] 22/4
view [2] 10/7 16/17
VINCENT [2] 2/5 3/17
violates [1] 11/4
violation [3] 11/22 28/16 30/10
Virginia [1] 24/6
Voters [1] 23/22

**W**

wait [3] 29/19

29/19 29/19
waiting [2] 13/1 25/9
wants [4] 8/18 19/11 27/25 31/24
Washington [8] 1/17 1/25 2/4 2/10 2/16 2/19 2/22 24/21
waste [2] 7/13 21/8
way [4] 12/1 19/15 19/21 34/9
week [2] 20/18 25/12
weekend [2] 18/10 34/20
weeks [1] 24/2
welcome [1] 13/3
welcomed [1] 5/22
what's [7] 11/6 16/24 19/19 26/25 27/9 29/19 29/20
whatsoever [1] 20/8
who's [1] 25/8
whole [1] 19/3
William [1] 4/14
WINN [2] 2/20 4/4
withdraw [1] 23/13
within [4] 21/17 24/2 28/20 29/23
without [2] 11/3 28/14
WL [1] 28/23
Women [1] 23/21
words [1] 15/15
work [4] 8/21 23/19 29/22 34/20
working [4] 14/17 24/18 34/17 34/18
world [1] 29/4
wrongfully [2] 5/12 28/25

**Y**

year [3] 4/20 5/4 28/24
yesterday [1] 5/23
York [3] 2/3 2/7 2/13

**Z**

Zeldin [2] 4/13 19/13
Zeldin's [1] 19/23

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CLIMATE UNITED FUND** | |
| Plaintiff, | |
| v. | Civil Action No. 25-cv-698 |
| **CITIBANK, N.A.**, *et al.* | |
| Defendants. | |
| **COALITION FOR GREEN CAPITAL** | |
| Plaintiff, | |
| v. | Civil Action No. 25-cv-735 |
| **CITIBANK, N.A.**, *et al.* | |
| Defendants. | |
| **POWER FORWARD COMMUNITIES, INC.** | |
| Plaintiff, | |
| v. | Civil Action No. 25-cv-762 |
| **CITIBANK, N.A.**, *et al.* | |
| Defendants. | |

JA263

## MEMORANDUM OPINION

Plaintiffs Climate United Fund ("Climate United"), Coalition for Green Capital ("CGC"), and Power Forward Communities, Inc. ("PFC") are nonprofit financial institutions who, in April 2024, were awarded grant funding by the U.S. Environmental Protection Agency ("EPA") to finance clean technology projects nationwide.  Under the National Clean Investment Fund ("NCIF"), Climate United was awarded $6.97 billion, CGC was awarded $5 billion, and PFC was awarded $2 billion.  The grant requires that Plaintiffs' funds be held at Citibank, N.A. ("Citibank") under the parties' respective agreements.

On March 8, March 12, and March 14, 2025, Climate United, CGC, and PFC, respectively, sued Citibank, and EPA, EPA Administrator Lee Zeldin, and EPA Acting Deputy Administrator William Charles McIntosh (collectively, "EPA Defendants"), seeking declaratory and injunctive relief after EPA Defendants unilaterally terminated Plaintiffs' grant awards.[1]  Plaintiffs bring a variety of claims, including breach of contract, conversion, and replevin against Citibank, claims under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), and the Due Process Clause, against EPA Defendants, claiming its actions violated multiple regulations, statutes, and constitutional provisions.

In mid-February 2025, Plaintiffs attempted to draw on funds from their respective accounts, to no avail.  They received little to no communication from Citibank and EPA Defendants regarding their inability to access their funds.  On March 11, 2025, EPA Defendants transmitted nearly identical "Notice of Termination" letters to Plaintiffs, indicating that EPA was

---

[1] On March 17, 2025, Plaintiff Climate United filed an Amended Complaint.  *See Climate United*, ECF No. 24.  Plaintiff Climate United sues Citibank, EPA, and EPA Administrator Lee Zeldin only.  *Id.*  Plaintiff PFC sues on behalf of itself and certain of its award subrecipients.  *See Power Forward*, Compl. ECF No 1.

JA264

terminating their grants effectively immediately. *Climate United*, Notice of Grant Termination

Letter ("Termination Letter"), ECF No. 13-1; *Power Forward*, Notice of Grant Termination Letter,

ECF No. 1-10; *Coalition Green Capital*, Compl. ¶ 13.

That same week, Plaintiffs individually moved for a Temporary Restraining Order

("TRO"), seeking to enjoin Citibank from violating its legal and contractual obligations to disburse

grant money owed to Plaintiffs, to enjoin Citibank from transferring Plaintiffs' grant funds out of

their accounts, to enjoin Defendants from giving effect to EPA Defendants' Termination Letter,

and to enjoin EPA Defendants from taking action to, among other things, implement the

termination of Plaintiffs' grant awards.  On March 12, and March 17, 2025, the court held hearings

on the motions. *See* March 12, 2025 Min. Order; *see* March 16, 2025 Min. Order.

Based on the parties' briefing, oral argument, and the record, the court finds that Plaintiffs

have carried their burden of showing that they will suffer imminent, irreparable harm absent a

temporary restraining order.  It will therefore GRANT Plaintiffs' motions and enters a temporary

restraining order, though more limited in scope than Plaintiffs' proposed orders.

## I.    BACKGROUND

### A.  EPA Grant Funding – Statutory Background

In 2022, Congress passed, and President Biden signed into law, the Inflation Reduction

Act ("Act").  Pub. L. No. 117-169, 136 Stat. 1818.  The Act authorized the Greenhouse Gas

Reduction Fund ("GGFR"), which appropriated approximately $27 billion to the EPA

Administrator to make grants available to eligible recipients for various climate projects. *See* 42

U.S.C. § 7434(a)(1)–(3).

In 2023, EPA launched three grant competitions under the GGRF, including the $14 billion

National Clean Investment Fund ("NCIF") competition, geared at "financ[ing] clean technology

deployment nationally." *Climate United* Am. Compl. ¶ 80*; see Climate United*, TRO Mot. Ex. 1, ECF No. 2-3. The purpose of the NCIF was to "provide grants to 2-3 national nonprofit financing entities to create national clean financing institutions capable of partnering with the private sector to provide accessible, affordable financing for tens of thousands of clean technology projects nationwide." *Climate United*, ECF No. 2-3 at 4.

## B. Climate United, CGC, and PFC Apply for and Win EPA Grants

In October 2023, Plaintiffs applied for grant funding through the NCIF, and in April 2024, EPA awarded Climate United $6.97 billion, CGC $5 billion, and PFC $2 billion in grant funding. *Climate United*, Am. Compl. ¶¶ 48; *Power Forward*, Compl. ¶¶ 37–38; *Coalition Green Capital*, Compl. ¶ 2. Plaintiffs developed, and EPA approved, their respective workplans. Plaintiffs have begun implementing these workplans—some have committed funds to projects, *see Climate United*, Compl. ¶ 37 (noting that Climate United has committed $392 million to qualified projects), or entered into contracts with third parties, subrecipients, or subgrantees. *See Power Forward*, Compl. ¶¶ 18–23.

### a. Award Agreements and Relevant Regulations

Plaintiffs' grant awards were memorialized in grant agreements between Plaintiffs and EPA, which include 'Terms and Conditions' governing, among other things, EPA's termination of the award. *Climate United*, Am. Compl. ¶¶ 50–59. The Terms and Conditions specify that EPA may only terminate an award under three circumstances:

(1) If a grant recipient engages in "substantial" noncompliance such that "effective performance" is "Materially Impaired." Performance is deemed "Materially Impaired" if: (1) EPA issues a "written determination and finding . . . that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause;" and (2) if EPA determines in its sole discretion that a "corrective action plan" would remedy the issue and EPA issues a "separate

written determination and finding" that the Recipient "has not materially addressed its failure."

(2) If a Recipient engages in "material misrepresentation of eligibility status;" and

(3) For "Waste, Fraud, or Abuse," which is defined with reference to EPA General Terms and Conditions and 2 C.F.R. § 200.113. Termination on these grounds require "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act (31 U.S.C. §§ 3729-3733)."

*See, e.g.*, *Climate United*, TRO Mot. Ex. 2, ECF No. 2-4 at 42.

Grant award recipients also agree to comply with EPA's general terms and conditions, "in addition to the assurances and certifications made as part of the award" and which provide for situations where EPA may unliterally terminate an award, which shall be "consistent with 2 C.F.R. § 200.340." *Id.* at 8.

Under the relevant regulations, a federal award may be terminated by the agency "if the recipient or subrecipient fails to comply with the terms and conditions of the Federal award," or "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(1), (4).

EPA must also take certain procedural steps before it can terminate federal awards. For example, under 2 C.F.R. § 200.341, EPA must provide written notice of termination that includes "the reasons for termination, the effective date, and the portion of the Federal award to be terminated[.]" Under 2 C.F.R. § 200.342, titled, 'Opportunities to object, hearings, and appeals,' "[u]pon initiating a remedy for noncompliance"—such as termination—"the Federal agency must provide the recipient with an opportunity to object and provide information challenging the action." The agency must "comply with any requirements for hearings, appeals, or other

administrative proceedings to which the recipient or subrecipient is entitled under any statute or regulation applicable to the action involved." *Id.*

### C. Agreements Between Citibank, EPA, and Plaintiffs

Under the grant agreements, Plaintiffs' grant funds must be held at Citibank under their respective Financial Agency Agreement ("FAA") between Citibank and the U.S. Treasury Department, and respective Account Control Agreement ("ACA") between Citibank, EPA, and Plaintiffs. *See Climate United*, TRO Mot. at 11–12; *Coalition Green Capital*, Compl. ¶¶ 4–6.

Under the ACA, Citibank is "designated and authorized to act as a financial agent of the United States" under the authority of the Treasury Department, and it administers and disburses the funds provided under the NCIF. *Climate United*, TRO Mot. Ex. 8 at 3, ECF No. 2-10, Account Control Agreement. Citibank must "comply with all instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and financial assets" and must release Plaintiffs' funds at their request, unless EPA—considered a "Secured Party" to the agreement—issues a "Notice of Exclusive Control stating that it is exercising its right to exclusive control over an Account." *Id.* at 4; *see also* Citibank Opp'n in *Climate United*, Ex. 1 at 25, ECF No. 14-4. Similarly, under the FAA, Citibank acts as a financial agent of the United States and provides banking and financial services related to EPA's grant programs, including the one here. *Id.* Ex. 1, ECF No. 14-1, Financial Agency Agreement (SEALED).

### D. EPA Administrator and Funds Pause

On January 30, 2025, the Senate confirmed Lee Zeldin as EPA Administrator. *See Climate United*, Am. Compl. ¶ 89. On February 12, 2025, Administrator Zeldin publicly announced that EPA intended to take control of grant funds disbursed under the Inflation Reduction Act. *Id.* ¶ 90. In public statements, Administrator Zeldin declared that "the financial agent agreement with the

Bank needs to be instantly terminated," "the Bank must immediately return" the funding, and EPA is "not going to rest" until it has "recovered" the grant funds. *Id.*

On February 23, 2025, Administrator Zeldin discussed the GGRF program on a television program, stating that "the entire scheme, in my opinion, is criminal." *Id.* ¶ 91(f). One week later, on March 2, 2025, EPA issued a letter to its Office of the Inspector General requesting an investigation into GGRF. *Id.* ¶ 91(g).

Pursuant to the agreements discussed above, Plaintiffs would periodically request disbursement of their funds through Citibank. *See, e.g., Climate United*, TRO Mot. at 14 (requested funds every two weeks); Decl. of Elizabeth Brafford ("Brafford Decl.") ¶ 21, ECF No. 2-2. But in-mid February 2025, when Plaintiffs placed their usual request, Citibank did not release the funds. *Climate United*, TRO Mot. at 18–19**.** Though Plaintiffs requested access to their funds throughout February and March 2025, Citibank did not release the funds, and did not respond to Plaintiffs' inquiries. Around March 3, 2025, Citibank informed at least one Plaintiff, Climate United, that it had forwarded its communications to EPA and was "awaiting further guidance." *See Climate United*, TRO Mot. Ex. 6, ECF No. 2-8 (email correspondence between Citibank and Climate United).

During this time, EPA also did not respond to Plaintiffs' inquiries. *See* Brafford Decl. ¶ 10. It offered to meet with Climate United during the week of February 24, and Climate United agreed. *Climate United*, TRO Mot. Ex. 7 at 7, ECF No. 2-9. EPA rescheduled the meeting three times and then canceled it without explanation. Brafford Decl. ¶ 34. Climate United requested a smaller meeting, in case scheduling for multiple people was the challenge, and received no response. *Climate United*, TRO Mot. at 1. Climate United claims it did not receive any "substantive communication from the EPA" or notice as to why it could not access its funds. *Id.*

JA269

On March 4, 2025, the Treasury Department instructed Citibank not to disburse any GGRF funds through March 9, 2025, and on March 10, 2025, EPA directed Citibank to continue to refrain from processing payments.  Citibank Opp'n Ex. 7, ECF No. 14-7; *id.*, Ex. 2, ECF No. 14-2.

### E.  Grant Termination Letter

On March 8, 2025, Climate United filed suit and moved for a TRO.  *Climate United*, ECF No. 2.  In support of their motion, they attached several exhibits, including (1) a declaration from Elizabeth Bafford, Climate United's CEO; (2) the Account Control Agreement ("ACA") between Climate United, Citibank, and EPA; and (3) the grant award agreement.  *Id.*

The court informed the parties that it was inclined to set a hearing for March 11, 2025, and have opposition briefs due that same day.  EPA Defendants "asked for an extension as a professional courtesy," which Climate United agreed to.  TRO Mot. Hr'g Tr. 10:06–12 (March 12, 2025), ECF No. 22.  The court scheduled a hearing on the motion for March 12, 2025.  March 12, 2025 Min. Order.

A day before the scheduled hearing, on March 11, EPA Defendants sent Plaintiffs identical letters informing them that EPA was terminating Plaintiffs' "grant effective immediately."  *See* Termination Letter at 1–2.  EPA Defendants stated that they terminated the grants "based on substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities, which collectively undermine the fundamental goals and statutory objectives of the award."  *Id.* at 1.  The letters stated that "following a comprehensive review and consistent with multiple ongoing independent federal investigations into programmatic fraud, waste, abuse and conflicts of interest EPA has identified material deficiencies," including "absence of adequate oversight and account controls," "improper or speculative allocation of funds inconsistent with EPA's oversight and

JA270

fiscal responsibilities," and "circumvention and defeat of key oversight mechanisms in the disbursement of federal funds." *Id.* The letter instructed Plaintiffs to cease all further program expenditures immediately.

On March 12, 2025, EPA Defendants filed an opposition to Climate United's TRO, attaching nine exhibits, including communications between EPA Defendants and Plaintiff Climate United and between EPA Defendants and Citibank. Defs.' Opp'n to Mot. ("Defs.' Opp'n"), ECF No. 16. Citibank also filed its opposition, attaching seven exhibits, including various communications between Citibank and Treasury and Citibank and EPA Defendants, and the FAA between Citibank and Treasury. Citibank Opp'n, ECF No. 14.

On March 12, and March 14, 2025, CGC and PFC filed a similar suit against Citibank and EPA Defendants, and both subsequently moved for a TRO. *Coalition Green Capital*, Compl.; *Power Forward*, Compl.

## II.    LEGAL STANDARD

A temporary restraining order is "an extraordinary remedy that should be granted only when the party seeking relief, by a clear showing, carries the burden of persuasion." *Hulli v. Mayorkas*, 549 F. Supp. 3d 95, 99 (D.D.C. 2021) (quoting *Postal Police Off. Ass'n v. U.S. Postal Serv.*, 502 F. Supp. 3d 411, 418 (D.D.C. 2020)). As with a preliminary injunction, a party seeking a TRO must establish "(1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)).

A court also considers the "underlying purpose" of a TRO—"preserving the status quo and preventing irreparable harm" until it has an opportunity to rule on the merits. *See Granny Goose*

*Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S.

423, 439 (1974); *Shelley v. Am. Postal Workers Union*, 775 F. Supp. 2d 197, 202 (D.D.C. 2011)

("The court may issue a temporary restraining order ('TRO') when a movant is faced with the

possibility that irreparable injury will occur even before the hearing for a preliminary injunction

required by Federal Rule of Civil Procedure 65(a) can be held."); *Elec. Data Sys. Fed. Corp. v.*

*Gen. Servs. Admin.*, 629 F. Supp. 350, 352 (D.D.C. 1986) ("In the context of the limited purpose

of a temporary restraining order, the Court's analysis of these factors seeks principally to ensure

preservation of the status quo.").

### III.    ANALYSIS

The court finds that, on the record currently before it, Plaintiffs are entitled to a temporary

restraining order.

### A. Jurisdiction

First, EPA Defendants argue that the court lacks jurisdiction to hear this case because "the

relief Plaintiff seeks is entirely contractual in nature" and "really amounts to a breach-of-contract

claim." Defs.' Opp'n at 15.  According to EPA Defendants, jurisdiction therefore lies in the Court

of Federal Claims.  At the March 17 hearing, EPA Defendants re-iterated this position for all

Plaintiffs.  This argument is unavailing.

Under the Tucker Act, 28 U.S.C. § 1491, the Court of Federal Claims has exclusive

jurisdiction over certain contract and monetary claims against the government.  But the D.C.

Circuit has "explicitly rejected the 'broad' notion 'that any case requiring some reference to or

incorporation of a contract is necessarily on the contract and therefore directly within the Tucker

Act' because to do so would 'deny a court jurisdiction to consider a claim that is validly based on

grounds other than a contractual relationship with the government.'"  *Crowley Gov't Servs., Inc.*

*v. Gen. Servs. Admin.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967–68 (D.C. Cir. 1982)).

In determining whether a claim falls under the Tucker Act the court must decide if the action "is at its essence a contract claim." *Id.* at 1106 (quoting *Megapulse*, 672 F.2d at 967).  The D.C. Circuit has instructed that "whether a claim is 'at its essence' contractual" depends "both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)." *Id.* (quoting *Megapulse*, 672 F.2d at 968).

Plaintiffs' claims are not at their "essence contractual."  Plaintiffs sued Citibank and EPA Defendants after Citibank refused to release their grant funds and after EPA Defendants unilaterally terminated these grants, without giving Plaintiffs any meaningful opportunity to be heard.  They challenge the unlawful terminations and EPA's failure to take the necessary procedural steps before terminating the grant awards.  Plaintiffs do not challenge a contract between the parties—they challenge an action.  And "exclusive jurisdiction in Claims Court under the Tucker Act does not lie 'merely because [a plaintiff] hints at some interest in a monetary reward from the federal government or because success on the merits may obligate the United States to pay the complainant.'" *Id.* at 1108 (quoting *Kidwell v. Dep't of Army*, 56 F.3d 279, 284 (D.C. Cir. 1995)).  This court has jurisdiction over the alleged due process and "arbitrary and capricious" agency actions under the U.S. Constitution and the APA, 5 U.S.C. § 702.

Moreover, Plaintiffs were awarded this grant pursuant to a statute authorized by Congress.  As the Supreme Court has noted, "[u]nlike normal contractual undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy." *Bennett v. Kentucky Dept. of Educ.,* 470 U.S. 656, 669 (1985).  Plaintiffs' "claims arise under a federal grant program and turn on the interpretation

of statutes and regulations rather than on the interpretation of an agreement negotiated by the parties." *Maryland Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441, 1449 (D.C. Cir. 1985) (citation omitted).  EPA Defendants' termination of these grants appears to contravene a duly enacted statute and interferes with Plaintiffs' statutory rights to these funds.

At bottom, Plaintiffs do not bring simple breach of contract claims—they challenge adverse agency action.  Plaintiffs neither seek money damages nor ask the court to interpret the terms of any contract.  They instead ask the court to determine whether EPA Defendants' actions in terminating the grant were, as EPA Defendants contend, "reasonable and in compliance with EPA's rights under the Grant Agreement."  Defs.' Opp'n at 15.  A decision on that issue would enable Plaintiffs to avail themselves "of statutory and regulatory provisions and procedures that may, or may not, entitle [it] to a monetary recovery."  *Tootle v. Sec'y of Navy*, 446 F.3d 167, 175 (D.C. Cir. 2006) (collecting authorities).

Finally, cases "have long recognized" that "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'"  *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988).  Indeed, "a claim is not for money merely because its success may lead to pecuniary costs for the government or benefits for the plaintiff."  *Kidwell*, 56 F.3d at 285; *see Vietnam Veterans v. Sec'y of the Navy,* 843 F.2d 528, 534 (D.C. Cir. 1988).  And as is true here, any monetary benefit that might flow to Plaintiffs "would not come from this court's exercise of jurisdiction, but from the structure of statutory and regulatory requirements governing compensation" in this action.  *Tootle*, 446 F.3d 167 at 174 (citation omitted).

**B. Mootness**

Second, EPA Defendants argue that the request for a temporary restraining order is now moot because "EPA terminated the Grant, [] ending Plaintiff's performance and its right to request disbursement of funds." Defs.' Opp'n at 13. The court disagrees. [2]

Article III of the U.S. Constitution requires a case or controversy to remain live "at all stages of review." *Decker v. Nw. Env't Def. Ctr.*, 568 U.S. 597 (2013) (quoting *United States v. Juv. Male*, 564 U.S. 932, 963 (2011)). "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). A case is also moot "if the dispute 'is no longer embedded in any actual controversy about the plaintiffs' particular legal rights.'" *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quoting *Alvarez v. Smith*, 558 U.S. 87, 93 (2009)).

Based on the parties' arguments and the record, the court finds that there is a live controversy, and Plaintiffs' claims are not moot. The fact that EPA Defendants have done one of the things that Plaintiffs sought to enjoin—unilaterally terminated their grants—does not mean the controversy no longer exists. In fact, there is perhaps even more of a controversy over Plaintiffs' particular legal rights here. As discussed above, and at the very least, there are serious due process concerns and questions of whether EPA Defendants' actions were "arbitrary, capricious, an abuse of discretion, [] otherwise not in accordance with law," contrary to statute, or unsupported by substantial evidence in violation of the APA, 5 U.S.C. § 706(2).

---

[2] While EPA Defendants did not address mootness at the March 17 hearing, the court addresses the argument and addresses it as to all Plaintiffs.

## C. Temporary Restraining Order

### a. Likelihood of Success on the Merits

Plaintiffs challenge, among other things, EPA Defendants' actions as arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law under the APA, and violation of their due process rights. In its *Climate United* opposition, EPA Defendants counter that its termination of the grant was "eminently reasonable—not arbitrary and capricious," and "the only responsible course in the interim [] to suspend further grant disbursements that might otherwise be unrecoverable." Defs.' Opp'n at 21. But based on the record before the court, and under the relevant statutes and various agreements, it does not appear that EPA Defendants took the legally required steps necessary to terminate these grants, such that its actions were arbitrary and capricious. And when questioned at the March 12 hearing, and as discussed further below, EPA Defendants proffered no evidence to support their basis for the termination or that the sudden terminations, or that they followed the proper procedures.[3] Consequently, Plaintiffs have shown a substantial likelihood of success on the merits of its APA and due process claims.

The Terms and Conditions governing the grant award expressly limit EPA to three possible grounds for termination: "when [1] the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or [2] there is adequate evidence of Waste, Fraud, or Abuse or [3] material misrepresentation of eligibility

---

[3] TRO Mot. Hr'g Tr. 21:06–22 (March 12, 2025), ECF No. 22 (cleaned up): MR. SACKS: And, again, the termination, to my knowledge, is based on what's set forth in the [] letter. THE COURT: Tell me, can you proffer to me the evidence of commission of a violation of federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations? Any one of those things? MR. SACKS: I cannot, Your Honor. And I think the reason I cannot is because this Court is not in a position to rule upon whether or not this termination was consistent with the contracts. THE COURT: That's why you can't provide it to me or you don't have it? MR. SACKS: No, I don't have it. Yeah, I don't have it."

status[.]"  *Climate United*, TRO Mot. Ex. 3 at 41, ECF No. 2-5.  The termination letter states that the termination was pursuant to 2 C.F.R. § 200.339 and § 200.340 and "based on substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities, which collectively undermine the fundamental goals and statutory objectives of the award."  Termination Letter at 1.

EPA's General Terms and Conditions allow for unilateral termination of an award, which shall be "consistent with 2 C.F.R. § 200.340."  *See* Amidon Decl. ¶ 27.  Under 2 C.F.R. § 200.340, a grant may be terminated if a recipient fails to comply with the terms and conditions of the award, *id.* § 200.340(a)(1), or pursuant to the terms and conditions of the award, including *to the extent authorized by law*, if an award no longer effectuates the program goals or agency priorities, *id.* § 200.340(a)(4) (emphasis added).

But as explained, *see supra* Section I(B)(a), EPA must take certain procedural steps before it can terminate a federal award.  It must provide written notice of a grant termination, 2 C.F.R. § 200.341, and it must "provide the recipient with an opportunity to object and provide information challenging the action" and comply "with any requirements for hearings, appeals, or other administrative proceedings to which the recipient or subrecipient is entitled under any statute or regulation applicable to the action involved," 2 C.F.R. § 200.342.

Though EPA Defendants provided written notice, they did not comply with 2 C.F.R. § 200.342 and allow Plaintiffs "an opportunity to object and provide information challenging the action" when it unilaterally terminated their grants.  Moreover, as to all Plaintiffs, EPA Defendants did not and have not identified a violation of any applicable regulation or any of the grant's terms— only that there are concerns about potential conflicts of interest and their grant agreements.  If these concerns are valid, there are, again, procedures that must be followed.

In the termination letters, EPA Defendants vaguely reference "multiple ongoing investigations" into "programmatic waste, fraud, and abuse and conflicts of interest" but offer no specific information about such investigations, factual support for the decision, or an individualized explanation for each Plaintiff.  This is insufficient.  EPA may terminate the agreements for "waste, fraud, or abuse," but this requires "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act (31 U.S.C. §§ 3729-3733)."  At this stage, EPA Defendants have not provided the "credible evidence" required.

At the court's request, on March 17, 2025, EPA Defendants submitted a declaration from Eric Amidon, EPA's Chief of Staff.  Amidon Decl.; *see* March 14, 2025 Min. Order ("Federal Defendants shall file a declaration addressing the basis for the grant termination, [] including the proffer of evidence discussed at the hearing.").  In his declaration, Amidon details the agency's general concerns with management of the GGRF program, including concerns with lack of adequate oversight and transparency into use of grant funding and in the grant agreements, and potential conflicts of interest among the grant recipients.  *See* Amidon Decl. ¶¶ 31–39.

As to individual Plaintiffs, Amidon cites to potential conflicts of interest and concerns about the structure of their grant agreements.  *Id.* ¶¶ 34–37.  These concerns stemmed, in part, from public media reporting.  *Id.* ¶ 33–35.  Amidon also states that there are ongoing criminal and civil investigations and that the EPA Office of Inspector General has initiated an investigation into the GGRF program.  *Id.* ¶¶ 43.  At this juncture, EPA Defendants have not sufficiently explained

why unilaterally terminating Plaintiffs' grant awards was a rational precursor to reviewing the GGRF program.[4]

At the March 12 hearing, when asked why the grant was terminated, EPA Defendants stated that "the termination is based on the information contained in the termination letter." TRO Mot. Hr'g Tr. 18:04–5 (March 12). When pressed to, at a minimum, even proffer such evidence, counsel for EPA Defendants was unable to, stating that he was only aware of media reports discussing the termination. This circular argument and unhelpful response was of no assistance to the court in discerning whether EPA Defendants followed the necessary steps to terminate the grant, or whether EPA Defendants had offered a reasoned explanation for the termination.

To be sure, agencies can decide to re-evaluate their programs, or they may decide to end agreements or federal awards. But those decisions must be made lawfully and in accordance with established procedures and relevant rules and regulations, including the 'Remedies for

---

[4] EPA Defendants state that DOJ and FBI have initiated a criminal investigation into the GGRF program, though they offer not much else on the matter. *See* Amidon Decl. ¶¶ 42–43. Plaintiff Climate United proffers news reports of the government's thus far unsuccessful attempts to open a criminal investigation into Climate United's grant award. *Climate United*, Compl. ¶ 65. For example, according to public reporting, the Office of the Deputy Attorney General at the Department of Justice ("ODAG") instructed the D.C. U.S. Attorney's Office ("USAO-DC") to open a criminal investigation into the grant award. *Id.* Denise Cheung—Chief of the Criminal Division at USAO-DC at the time—advised that there was no adequate factual basis for a grand jury investigation. *Id.* When ODAG instructed that a letter be sent directing Citibank to refrain from releasing funds pursuant to a criminal investigation, senior officials at the USAO-DC again asserted there was insufficient evidence to justify issuing that letter. Denise Cheung refused to send the letter and resigned. *Id.* Other news reports indicate that the Interim D.C. U.S. Attorney submitted a seizure warrant application, which a magistrate judge rejected. There are also reports that ODAG sought a different U.S. attorney's office to carry out the warrant request for a grand jury investigation and to obtain a court-ordered bank freeze, but prosecutors in that office refused to do so. The court may take judicial notice of news articles for their existence, but not for the truth of the statements asserted therein. *See, e.g.*, *Hourani v. Psybersolutions*, 164 F. Supp. 3d 128, 132 n.1 (D.D.C. 2016); *cf. Banks v. Booth*, 459 F. Supp. 3d 143, 149, 154 (D.D.C. 2020) (refusing to consider counsel's assertions during preliminary injunction oral argument absent corroborating record evidence).

Noncompliance' under 2 C.F.R. §§ 200.339–200.343, and in accordance with the APA. The court cannot find that EPA complied with these procedures and regulations based on the current record. Consequently, the court finds that Plaintiffs have shown a substantial likelihood of success on the merits on their APA claims.[5]

### b. **Irreparable Injury**

Plaintiffs have also made a sufficient showing of irreparable harm. To show irreparable harm, the "injury alleged must be 'both certain and great, actual and not theoretical, beyond remediation, and of such *imminence* that there is a clear and present need for equitable relief.'" *Church v. Biden*, 573 F. Supp. 3d 118, 138 (D.D.C. 2021) (quoting *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015)). The "'possibility of irreparable harm' is not enough." *Id.* (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). A plaintiff must demonstrate "a clear and present need for extraordinary equitable relief to prevent harm." *Id.* (citation omitted). "If a party fails to make a sufficient showing of irreparable injury, a court may deny a motion for injunctive relief." *Beattie v. Barnhart*, 663 F. Supp. 2d 5, 8 (D.D.C. 2009) (citing *CityFed Fin. Corp. v. Off. Of Thrift Supervision*, 58 F.3d 738, 742 (D.C. Cir. 1995)); *Hulli v. Mayorkas*, 549 F. Supp. 3d 95, 99 (D.D.C. 2021) ("[M]ovants are barred from receiving such relief should they fail to establish irreparable injury.") (collecting authorities).

The Supreme Court has held that "[i]ssuing a preliminary injunction based only on a *possibility* of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled

---

[5] Although the parties brief multiple issues, the court need only find that Plaintiffs are likely to succeed on one of their claims for this factor to weigh in their favor, the court does not address these arguments. *See Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1, 27 (D.D.C.), *appeal dismissed*, No. 24-7059, 2025 WL 492257 (D.C. Cir. Feb. 13, 2025).

to such relief." *Winter*, 555 U.S. at 22 (emphasis added) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). Based on the current record, the court finds that Plaintiffs satisfy the "high standard for irreparable injury." *Church*, 573 F. Supp. 3d at 138 (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)).

Here, the harm is not a possibility—as Plaintiffs have shown, without release of the grant funds, imminent harm is unavoidable. Plaintiffs' financing for their operations and projects all derive from the grant money, which is used to pay employees, pay rent, and fund projects. Moreover, preserving the status quo here is particularly important. If Citibank transfers money out of these accounts, the funds will not be recoverable. In cases involving government expenditures, "once the relevant funds have been obligated, a court cannot reach them in order to award relief." *City of Houston v. Dep't of Hous. & Urb. Dev.*, 24 F.3d 1421, 1426–27 (D.C. Cir. 1994). Any transfer, re-allocation, or re-obligation of these funds would be an irreparable loss.

While ordinary economic injuries are usually insufficient to require injunctive relief, financial harm can "constitute irreparable harm . . . where the loss threatens the very existence of the movant's business." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). Without access to the grant funds, Plaintiffs have no cash or reserves available to pay their operating expenses, and they have no other committed sources of funding that could replace the grant award. *See* Brafford Decl. ¶¶ 40, 43; Timothy Mayopoulos Decl. ("Mayopoulos Decl.") ¶ 7. Plaintiffs will be unable to finance programs they have launched, and they will have to cease operations.

For example, to date, Plaintiff Climate United has committed $392 million to qualified projects and has launched three financing projects. Brafford Decl. ¶ 44. It has:

- Committed a $31.8 million pre-construction loan to finance 18 solar projects benefiting rural communities in Arkansas. This is the largest commercial solar deployment in Arkansas history and is projected to save over $120 million in energy costs over the project's life and create hundreds of jobs.

JA281

- Launched a program to establish affordable leasing options for battery electric heavy-duty trucks to small fleets and independent contractors, which will support an affordable leasing program at the ports of Long Beach and Los Angeles before expanding across the country.
- Committed $63 million in pre-construction financing for the design and development of solar power plants in partnership with Tribal governments and communities in Eastern Oregon and Idaho, bringing access to affordable energy to rural communities and Indigenous people, creating 1,200 jobs, and spurring local economic development.

*Id.* ¶¶ 24–26.

In her declaration, Bafford includes concrete examples of both monetary and non-monetary imminent harms. Specifically:

- Climate United cannot currently access funds to pay its payroll and other expenses related to immediate implementation of its grant workplan. *Id.* ¶ 39.
- Climate United has had to defer compensation for certain employees to preserve its limited cash. *Id.*
- Without a stable source of funding, Climate United will no longer be able to pay its employees and will face having to cut hours and furlough staff. *Id.*
- Climate United imminently risks not being able to pay payroll or health, vision, and dental benefits, life insurance, and disability insurance for its employees. *Id.* ¶ 43.
- Furloughing or laying off staff will eliminate positions that perform critical functions for Climate United, including monitoring the loans that Climate United has already disbursed to funding recipients and the $392 million that it has committed to date. *Id.* ¶ 44.
- Climate United imminently risks not being able to pay rent or insurance for certain offices or to pay third-party contractors who perform necessary tasks such as auditing its financial statements, maintaining its IT security and infrastructure, and providing legal services. *Id.* ¶ 45.
- Continued failure to access the funds would prevent Climate United from meeting its commitments under the loans and awards it has approved and plans to approve, potentially forcing it into breach of its existing agreements. *Id.* ¶¶ 46–48, 50.

As to PFC, the freeze has impacted the organization's ability to carry on day-to-day operations and fulfill its legal obligations. *Power Forward,* TRO Mot. at 28. For example, "the inability of PFC and its Subrecipients to access their NCIF funds impedes their ability to pay their

people." *Id.* at 29.  PFC's staff are either employees whose positions are funded by the NCIF

award or secondees on loan to PFC under secondment and services agreements.  *Id.*  PFC's

inability "to access funds has placed it at imminent risk of defaulting on contracts with critical

vendors—including for financial management, IT, legal, and management consultant services."

*Id.*  PFC has committed at least $539,000,000 to provide affordable housing support and has other

projects that will be detrimentally impacted absent funding.  TRO Mot. Hr'g Tr. (March 17) 24:01–

25:04.

> As PFC's President and CEO, Timothy Mayopoulos, details:

- PFC has been unable to pay outstanding invoices from contractors for work completed on PFC's behalf and, as a result, PFC is incurring default risk with respect to these contracts. Mayopoulos Decl. ¶ 18.
- These include contracts for legal and management consultant services that are necessary for PFC to administer the grant in compliance with the terms of the Award Agreement and contracts for essential financial management and IT services. *Id.*
- If PFC is not able to make payment on these outstanding invoices, which it cannot do without access to its funds, PFC is at imminent risk of losing these services due to default. *Id.*
- PFC's key contractor, for example, has advised that PFC has until March 17, 2025, to make payment or it may cease providing services. *Id.*
- PFC is also unable to pay contractors to complete, or in some cases to begin, critical work for PFC.  This includes the completion of a financial reporting audit and work improve PFC's website that is necessary to help make information available to the public. *Id.* ¶ 19.
- PFC's inability to access its funds threatens its ability to compensate these staff members.  PFC owes funds under the secondment and services agreements and is at risk of default under those agreements. *Id.* ¶ 20.

> Plaintiffs have made a sufficient preliminary showing that the loss of its grant funding

"threatens the very existence of [its] business." *Wis. Gas Co.*, 758 F.2d at 674.

### c.  <u>Balance of Equities and the Public Interest</u>

> The final two factors—balancing the equities and the public interest—further support

granting a TRO.  When assessing the equities and public interest, courts "balance the competing

claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Ramirez v. U.S. Immigr. & Customs Enft.*, 310 F. Supp. 3d 7, 32 (D.D.C. 2018). If the movant seeks to enjoin the government, the final two factors merge "because the government's interest *is* the public interest." *Pursuing Am.'s Greatness v. Fed. Election Comm.*, 831 F.3d 500, 511–512 (D.C. Cir. 2016). Although Plaintiffs seek to enjoin both Citibank and the government, the parties acknowledge that Citibank is caught in the middle of the dispute between Plaintiffs and EPA Defendants. Nonetheless, the court will address both factors.

Because neither Citibank nor EPA will suffer significant harm from a temporary injunction preserving the status quo, the balance of equities support granting a TRO. Citibank previously anticipated disbursing the funds to Plaintiffs. The court merely orders the parties to preserve the status quo—that is, for Citibank to maintain the grant funds in Plaintiffs' respective accounts. As to EPA Defendants, the government "cannot suffer harm from an injunction that merely ends an unlawful practice." *TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 115 (D.D.C. 2020) (quoting *R.I.L-R v. Johnson,* 80 F. Supp. 3d 164, 191 (D.D.C. 2015)).

When the court asked EPA to proffer evidence justifying its decision given the terms of the agreement, its only response was to refer to the termination letter, which gave no legal justification for the termination. TRO Mot. Hr'g Tr. (March 12) 18:04–5. While EPA Defendants voice concerns regarding "program integrity," "programmatic fraud, waste, and abuse," and "the absence of adequate oversight and account controls to prevent financial mismanagement, Termination Letter at 1–2, vague and unsubstantiated assertions of fraud are insufficient. *See Am. Foreign Serv. Assoc. v. Trump*, No. 2025 WL 434415, at *2 (D.D.C. Feb. 7, 2025) (finding "no difficulty concluding that the balance of the hardships favors the plaintiffs" when government "had no response—beyond asserting without any record support that USAID writ large was possibly

engaging in 'corruption and fraud'").  On the other side, Plaintiffs face irreparable harm absent a TRO.  By preserving the status quo, the court is not "forcing the government to undo its termination" or allowing "grantees to access billions of dollars in grant funds," as EPA Defendants argue.  Defs.' Opp'n at 25–26.  Preserving the status quo does not make these funds unrecoverable.

The public interest also favors a TRO.  "There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (citing *Pursuing Am.'s Greatness*, 831 F.3d at 511–512).  In contrast, "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Id.* (citation omitted).  Here, temporary relief ensures that the government abides by the statutes and regulations governing the NCIF, which serves the public interest.  Therefore, the final two factors warrant the narrow TRO issued here.

## IV.   CONCLUSION

For these reasons, it is hereby ORDERED that Plaintiffs' Motions for a Temporary Restraining Order are GRANTED in part and DENIED in part.  An Order will accompany this Memorandum Opinion.

Date: March 18, 2025

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge

JA285

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CLIMATE UNITED FUND**<br><br>Plaintiff,<br><br>v.<br><br>**CITIBANK, N.A.**, *et al.*<br><br>Defendants. | Civil Action No. 25-cv-698 |
| **COALITION FOR GREEN CAPITAL**<br><br>Plaintiff,<br><br>v.<br><br>**CITIBANK, N.A.**, *et al.*<br><br>Defendants. | Civil Action No. 25-cv-735 |
| **POWER FORWARD COMMUNITIES, INC.**<br><br>Plaintiff,<br><br>v.<br><br>**CITIBANK, N.A.**, *et al.*<br><br>Defendants. | Civil Action No. 25-cv-762 |

JA286

## **ORDER**

For the reasons set forth in the accompanying Memorandum Opinion, ECF No. 28, Plaintiff's Motion for Temporary Restraining Order is GRANTED in part and DENIED in part. It is further

**ORDERED** that EPA Defendants and Citibank are enjoined from giving effect to EPA Defendants' Termination Letter, pending a determination on the merits; it is further

**ORDERED** that EPA Defendants are enjoined from transmitting or taking action to implement the termination of Plaintiffs' grants, including taking action that results in the transfer, re-obligation, or re-allocation of the grant funds in Plaintiffs' Citibank accounts, or issuing a Notice of Exclusive Control under its agreements; it is further

**ORDERED** that Defendant Citibank is enjoined from moving or transferring Plaintiffs' grant funds to any party other than the accountholders, absent an Order from this court; it is further

**ORDERED** that Defendant Citibank shall file a status report by **Monday, March 24, 2025**, apprising the court of the status of its compliance with this Order; and it is further

**ORDERED** that the parties shall meet and confer regarding further proceedings, including any proposed briefing schedule, and file a joint status report with the parties' positions by **Wednesday, March 19, 2025, at 2 PM EST.**


Date: March 18, 2025

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge

JA287

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CLIMATE UNITED FUND** | |
| Plaintiff, | |
| v. | Civil Action No. 25-cv-698-TSC |
| **CITIBANK, N.A.**, *et al.* | |
| Defendants. | |
| **COALITION FOR GREEN CAPITAL** | |
| Plaintiff, | |
| v. | Civil Action No. 25-cv-735-TSC |
| **CITIBANK, N.A.**, *et al.* | |
| Defendants. | |
| **POWER FORWARD COMMUNITIES, INC.** | |
| Plaintiff, | |
| v. | Civil Action No. 25-cv-762-TSC |
| **CITIBANK, N.A.**, *et al.* | |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' CONSOLIDATED MOTION FOR PRELIMINARY INJUNCTION

Vincent Levy (NY 0487)
Kevin D. Benish (NY 0495)
Patrick J. Woods*
Daniel Fahrenthold (NY0603)
HOWELL SHUSTER & GOLDBERG LLP
425 Lexington Avenue, 14th Floor
New York, NY 10017
Tel.: (646) 837-5151
vlevy@hsgllp.com
*Application for admission pending.

*Attorneys for Plaintiff Coalition for Green Capital*

Beth C. Neitzel (103611)
Jack C. Smith (1725229)
Kevin Y. Chen (admitted *pro hac vice*)
FOLEY HOAG LLP
155 Seaport Boulevard, Suite 1600
Boston, MA 02210
Tel. (617) 832-1000
bneitzel@foleyhoag.com
jcsmith@foleyhoag.com
kchen@foleyhoag.com

Noah C. Shaw (*pro hac vice* forthcoming)
James M. Gross (admitted *pro hac vice*)
FOLEY HOAG LLP
1301 Ave. of the Americas, 25th Floor
New York, NY 10019
Tel.: (212) 812-0400
ncshaw@foleyhoag.com
jgross@foleyhoag.com

*Attorneys for Plaintiff Power Forward Communities*

Adam G. Unikowsky (989053)
Kathryn L. Wynbrandt* (1602446)
David B. Robbins (493976)
Tanner J. Lockhead* (90011928)
JENNER & BLOCK LLP
1099 New York Avenue, Suite 900
Washington, D.C. 20001
Tel.: (202) 639-6000
Fax: (202) 639-6066
aunikowsky@jenner.com
*Application for admission pending.

Gabriel K. Gillett (admitted *pro hac vice*)
Simon A. de Carvalho (*pro hac vice* forthcoming)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
Tel.: (312) 222-9350
ggillett@jenner.com
sdecarvalho@jenner.com

Allison N. Douglis (admitted *pro hac vice*)
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
Tel.: (212) 891-1600
Fax: (212) 891-1699
adouglis@jenner.com

*Attorneys for Plaintiff Climate United Fund*

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS ............................................................................................ 4

    A. Congress Funds the NCIF Competition Through the Inflation Reduction Act. ............... 4

    B. EPA Selects Climate United, CGC, and PFC as Recipients of NCIF Grants.................. 6

    C. The Grants Are Memorialized in Grant Agreements That Govern the Awards and
       Set Out the Exclusive Means for EPA to Suspend or Terminate the Awards.................. 8

    D. Plaintiffs Enter Into Account Control Agreements With EPA and Citibank. ................ 10

    E. Plaintiffs Invest Funds as Permitted by the Inflation Reduction Act............................ 13

    F. EPA Causes Citibank to Withhold Plaintiffs' Grant Funds, Without Notice, an
       Explanation, or an Opportunity to Object. .................................................................... 15

    G. EPA Serves a Purported "Notice of Termination" on Each Plaintiff. ........................... 19

    H. This Court Issues a Temporary Restraining Order......................................................... 21

LEGAL STANDARD ................................................................................................... 21

ARGUMENT ................................................................................................................ 22

I.  This Court Has Jurisdiction......................................................................................... 22

II.  The Court Should Issue a Preliminary Injunction Barring EPA From Terminating Plaintiffs'
    Grants or Impeding Citibank From Disbursing Grant Funds............................................. 27

    A. Plaintiffs Are Likely to Succeed on the Merits of Their APA Claims............................ 27

        1. EPA's Terminations Are Arbitrary and Capricious. .................................................. 27

        2. EPA's Notices of Termination Violate Federal Regulations. .................................... 32

        3. EPA's Notices of Termination Violate the Inflation Reduction Act. ........................ 34

        4. EPA's Suspension of the Grants Violates the APA. .................................................. 35

        5. EPA's Proffer Confirms Plaintiffs Will Prevail on Their APA Claims..................... 36

    B. Plaintiffs Are Likely to Succeed on Their Appropriations Clause Claims...................... 40

    C. Plaintiffs Are Likely to Succeed on Their Due Process Claims...................................... 41

D.  Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief Against EPA............. 44

    1.  Climate United Will Suffer Irreparable Harm. ..................................................... 44

    2.  CGC Will Suffer Irreparable Harm........................................................................ 47

    3.  PFC Will Suffer Irreparable Harm......................................................................... 51

    4.  Plaintiffs Will Be Irreparably Harmed if the Funds Are Diverted to Any Entity
        Other Than the Accountholders........................................................................... 54

E.  The Balance of Equities Favors Plaintiffs Over EPA...................................................... 54

F.  An Injunction Is Firmly in the Public Interest................................................................ 55

III. The Court Should Issue a Preliminary Injunction Barring Citibank From Failing to Disburse
    Plaintiffs' Grant Funds Pursuant to the ACAs................................................................... 56

A.  Plaintiffs Are Likely to Succeed on Their Claims Against Citibank.............................. 56

B.  The Other Preliminary Injunction Factors Favor Plaintiffs. .......................................... 59

C.  The Preliminary Injunction Should Cover Subgrantees................................................. 60

CONCLUSION........................................................................................................................... 60

# TABLE OF AUTHORITIES

CASES

*AIDS Vaccine Advocacy Coalition v. United States Department of State*, 2025 WL
752378 (D.D.C. Mar. 10, 2025)........................................................................ 24, 30, 35, 55

*In re Aiken County*, 725 F.3d 255 (D.C. Cir. 2013) ................................................. 34

*Alpine Securities Corp. v. FINRA*, 121 F.4th 1314 (D.C. Cir. 2024)......................... 31

*American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902)................. 26

*Amerijet, International, Inc. v. Pistole*, 753 F.3d 1343 (D.C. Cir. 2014)................... 27

*Apter v. Department of Health & Human Services*, 80 F.4th 579 (5th Cir. 2023)...... 25

*Armour & Co. v. Freeman*, 304 F.2d 404 (D.C. Cir. 1962)....................................... 52

*Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015)........................... 25

*Atlas Air, Inc. v. International Brotherhood of Teamsters*, 280 F. Supp. 3d 59
(D.D.C. 2017)..................................................................................................... 47

*Bartlett v. Bowen*, 816 F.2d 695 (D.C. Cir. 1987).................................................... 26

*Beacon Associates, Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277 (D.D.C. 2018)..................... 47, 49

*Clevinger v. Advocacy Holdings, Inc.*, 2023 WL 4560839, at *5 (D.D.C. July 15,
2023)................................................................................................................... 51

*CFPB v. Community Financial Services Ass'n*, 601 U.S. 416 (2024)....................... 40

*Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142 (2012).............................. 31

*Confederated Tribes of Chehalis Reservation v. Mnuchin*, 2020 WL 3791874
(D.D.C. July 7, 2020).......................................................................................... 54

*Crowley Services v. General Services Administration*, 38 F.4th 1099 (D.C. Cir.
2022)........................................................................................... 22, 24, 25-26

*Dart v. United States*, 848 F.2d 217 (D.C. Cir. 1988).............................................. 25

*Deem v. Baron*, 2018 WL 377286 (D. Utah Jan. 11, 2018)...................................... 46

*Dellinger v. Bessent*, 2025 WL 471022 (D.D.C. Feb. 12, 2025).............................. 54

*Department of Commerce v. New York*, 588 U.S. 752 (2019).................................... 30

JA292

*Department of Navy v. FLRA*, 665 F.3d 1339 (D.C. Cir. 2012)........................................... 40, 41

*Destiny USA Holdings, LLC v. Citigroup Global Markets Realty Corp.*, 69 A.D.3d
    212 (N.Y. App. Div., 4th Dep't 2009).................................................................... 46

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) ...................................... 31

*Endo Par Innovation Co., LLC v. Becerra*, 2024 WL 2988904 (D.D.C. 2024) ........................ 54

*General Land Office v. Biden*, 722 F. Supp. 3d 710 (S.D. Tex. 2024) ...................................... 55

*Guerrero-Lasprilla v. Barr*, 589 U.S. 221 (2020)....................................................... 26

*Henke v. United States Department of Commerce*, 83 F.3d 1445 (D.C. Cir. 1996).................... 40

*Kansas City v. Department of Housing & Urban Development*, 923 F.2d 188 (D.C.
    Cir. 1991)........................................................................................... 29

*League of Women Voters of United States v. Newby*, 838 F.3d 1 (D.C. Cir.
    2016).................................................................................. 21, 45, 53, 54, 56

*Lucia v. SEC*, 585 U.S. 237 (2018)....................................................................... 31

*Luokung Technology Corp. v. Department of Defense*, 538 F. Supp. 3d 174
    (D.D.C. 2021)............................................................................. 47, 49, 53

*Massachusetts v. NIH*, 2025 WL 702163 (D. Mass. Mar. 5, 2025)............................................ 24

*Mass. Law Reform Inst. v. Legal Servs. Corp.*, 581 F. Supp. 1179 (D.D.C. 1984).................... 49

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ............................................................. 41

*Mathis v. U.S. Parole Comm'n*, 749 F. Supp. 3d 8 (D.D.C. 2024)............................................ 25

*Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982) ...................................... 22

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Wertz*, 298 F. Supp. 2d 27 (D.D.C.
    2002)................................................................................................ 60

*Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 77 (D.D.C. 2001)............................... 51

*Motor Vehicle Manufacturers Ass'n of United States, Inc. v. State Farm Mutual
    Automobile Insurance Co.*, 463 U.S. 29 (1983)...................................... 27, 30, 37

*Nalco Co. v. EPA*, 786 F. Supp. 2d 177 (D.D.C. 2011)............................................... 48

*National Ass'n of Mortgage Brokers v. Board of Governors of Federal Reserve
    System*, 773 F. Supp. 2d 151 (D.D.C. 2011) .................................................. 44, 52

*National Council of Nonprofits v. Office of Management & Budget*, 2025 WL 597959 (D.D.C. Feb. 25, 2025) ............................................................. 44, 54

*National Environmental Development Ass'n's Clean Air Project v. EPA*, 752 F.3d 999 (D.C. Cir. 2014) ..................................................................... 32

*New Jersey Conservation Foundation v. FERC*, 111 F.4th 42 (D.C. Cir. 2024) ........................ 24

*\*New York v. Trump*, 2025 WL 715621 (D.R.I. Mar. 6, 2025) ........................................... 30, 46

*OPM v. Richmond*, 496 U.S. 414 (1990) .................................................................. 40

*Pacito v. Trump*, 2025 WL 655075 (W.D. Wash. Feb. 28, 2025) ......................................... 55

*Patriot, Inc. v. Department of Housing & Urban Development*, 963 F. Supp. 1 (D.D.C. 1997) ................................................................... 49

*Population Inst. v. McPherson*, 797 F.2d 1062 (D.C. Cir. 1986) ....................................... 54

*Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430 (2013) .............................................. 57, 58

*SEC v. Chenery Corp.*, 318 U.S. 80 (1943) ............................................................. 37

*Sierra Club v. Salazar*, 177 F. Supp. 3d 512 (D.D.C. 2016) ........................................... 31

*Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224 (D.D.C. 2014) ................................. 48

*Train v. City of New York*, 420 U.S. 35 (1975) ........................................................ 34

*United States v. E-Gold, Ltd.*, 521 F.3d 411 (D.C. Cir. 2008) ........................................ 42

*United States v. James Daniel Good Real Prop.*, 510 U.S. 43 (1993) ................................... 42

*United States Conference of Catholic Bishops v. Department of State*, 2025 WL 763738 (D.D.C. Mar. 11, 2025) ....................................................... 24, 25

*Verizon v. F.C.C.*, 740 F.3d 623 (D.C. Cir. 2014) ..................................................... 31

*Whitman-Walker Clinic, Inc. v. United States HHS*, 485 F. Supp. 3d 1 (D.D.C. 2020) ................................................................. 54

*Wiener v. AXA Equitable Life Insurance Co.*, 113 F.4th 201 (2d. Cir. 2024) .......................... 56

*Zampatori v. UPS*, 479 N.Y.S.2d 470 (N.Y. Sup. Ct. 1984) .............................................. 58

CONSTITUTIONAL PROVISIONS AND STATUTES

U.S. Const. amend. V ............................................................................................. 41

U.S. Const. art. I, § 9, cl. 7.................................................................................... 40

5 U.S.C. § 706(2) .................................................................................................. 24

5 U.S.C. § 706(2)(A) ............................................................................................ 27

28 U.S.C. § 1331 ................................................................................................... 22

28 U.S.C. § 1491(a)(1).......................................................................................... 22

42 U.S.C. § 7434 ............................................................................................. 4, 34

42 U.S.C. § 7434(a)......................................................................................... 1, 4, 5

42 U.S.C. § 7434(a)(1).......................................................................................... 35

42 U.S.C. § 7434(a)(2).......................................................................................... 35

42 U.S.C. § 7434(a)(3).......................................................................................... 35

42 U.S.C. § 7434(b)................................................................................................. 4

42 U.S.C. § 7434(c)(1)............................................................................................ 5

OTHER AUTHORITIES

2 C.F.R. § 200.206(b)(1)....................................................................................... 50

2 C.F.R. § 200.206(b)(2)(iii) ................................................................................ 50

2 C.F.R. § 200.208 ................................................................................................ 28

2 C.F.R. § 200.305 ................................................................................................ 23

2 C.F.R. § 200.305(b)(6)........................................................................... 10, 32, 36

*2 C.F.R. § 200.339.................................................................... 10, 23, 28, 32, 36

2 C.F.R. § 200.340 ...................................................................................... 23, 32, 40

2 C.F.R. § 200.340(a) ........................................................................................... 32

2 C.F.R. § 200.340(a)(1)........................................................................... 28, 30, 32, 33

2 C.F.R. § 200.340(a)(4)........................................................................... 28, 30, 33

JA295

*2 C.F.R. § 200.340(b)................................................................................ 28, 30, 33

*2 C.F.R. § 200.341.................................................................................... 10, 23, 32

2 C.F.R. § 200.341(a)....................................................................................... 33

*2 C.F.R. § 200.342.................................................................................... 23, 32, 34

85 Fed. Reg. 61,571 (Sept. 30, 2020)................................................................ 10

*About the Greenhouse Gas Reduction Fund*, EPA, .https://www.epa/gov
    greenhouse-gas-reduction-fund/about-greenhouse-gas-reduction-fund    (last
    updated Feb. 13, 2025)................................................................................. 4

Zack Colman, *Recipient Isn't Giving in as Trump's EPA Tries to Revoke Climate Grants*, Politico
    (Feb. 24, 2025) ......................................................................................... 15

Cong. Rsch. Serv. *IN12090*, *EPA's Greenhouse Gas Reduction Fund*, (updated Feb. 14, 2023),
    https://crsreports.congress.gov/product/pdf/IN/IN1209........................................ 4

*Frequently Asked Questions about the National Clean Investment Fund (NCIF) and Climate
    United's Strategy*, Climate United (Aug. 16, 2024), https://weareclimateunited.org/-frequently
    asked-questions-ncif-and-climate-united-strategy................................................ 7

Fed. R. Crim. P. 41(d)(1)................................................................................ 43

Fed. R. Crim. P. 41(g)................................................................................... 43

Spencer Hsu, Maxine Joselow & Nicolas Rivero, <u>FBI takes up EPA Probe Amid Pushback from
    Judge, Prosecutors</u>, Wash. Post (Feb. 27, 2025) ............................................. 16

Press Release, EPA, <u>Administrator Zeldin Terminates Biden-Harris $20B 'Gold Bar' Grants</u>
    (Mar. 11, 2025)........................................................................................ 19

Press Release, EPA, <u>Biden-Harris Administration Announces $20 Billion in Grants to Mobilize
    Private Capital and Deliver Clean Energy and Climate Solutions to Communities Across
    America</u> (Apr. 4, 2024)............................................................................. 6

Press Release, EPA, <u>EPA Administrator Lee Zeldin Announces EPA's "Powering the Great
    American Comeback" Initiative</u> (Feb. 4, 2025) ............................................... 39

Press Release, EPA, <u>ICYMI: Administrator Lee Zeldin Announces EPA Found Billions of Dollars
    Parked at an Outside Financial Institution by Biden Administration</u> (Feb. 15, 2025)........... 35

Press Release, EPA, <u>EPA Formally Refers Financial Mismanagement of $20B "Gold Bars" to
    Inspector General</u> (Mar. 3, 2025) .................................................................. 15

Press Release, Power Forward Communities, *Fact Sheet: Power Forward Communities Announces More Than Half a Billion Dollars in Investments to Lower Housing Costs and Utility Bills for Families Nationwide* (Feb. 24, 2025), /https://a-us.storyblok.com/f/1014573/x/0f93107325pfc-press-release-announcement_022425.pdf ................................................................................................... 8

Rapid Response 47 (@RapidResponse47), X (Feb. 25, 2025, 10:16 AM) ............................... 15

*Read the Resignation Letter by Denise Cheung, a Veteran D.C. Federal Prosecutor*, Wash. Post (Feb. 18, 2025) ................................................................................................ 16

Restatement (Third) Agency § 7.02 ............................................................................................. 58

Restatement (Third) Agency § 8.09 ............................................................................................. 59

*Review and Selection Process*, EPA, https://www.epa.gov/greenhouse-gas-reduction-fund/review-and-selection-process (last updated Aug. 16, 2024) .............................................................. 6

SundayMorningFutures (@SundayMorningFutures), X (Feb. 23, 2025, 11:21 AM) ................. 15

U.S. Gov't Accountability Off., GAO-17-176 (Jan. 2017) ........................................................ 10

Lee Zeldin (@EPALeeZeldin), X (Feb. 12, 2025, 7:52 PM) ............................................. 15, 42

Lee Zeldin (@EPALeeZeldin), X (Mar. 4, 2025, 6:02 PM) .................................................... 15

Lee Zeldin (@EPALeeZeldin), X (Mar. 18, 2025, 10:21 PM) ........................................... 30, 35

## GLOSSARY OF TERMS

| Term or Abbreviation | Definition | Citation(s) |
|---|---|---|
| ACA | Account Control Agreement with Citibank, related to Plaintiffs' grants. | CU Ex. 8 CGC Ex. A PFC Ex. D |
| Bafford Decl. | Declaration of Elizabeth Bafford (CU) | |
| Brown Decl. | Declaration of Stephen Brown (CGC) | |
| Buendia Decl. | Declaration of Jessica Buendia (CGC) | |
| CGC | Coalition for Green Capital | |
| CGC Ex. | Exhibits to the Declaration of Vincent Levy. | |
| CU | Climate United Fund | |
| CU Ex. | Exhibits to the Declaration of Elizabeth Bafford | CU Exs. 1-11 |
| Dkt. | Docket entry in *Climate United Fund v. Citibank, N.A., et al.*, 25-cv-698 | Dkt. |
| Donovan Decl. | Declaration of Shaun Donovan (PFC) | |
| FAA | Financial Agency Agreement between Citibank and U.S. Department of the Treasury | Dkt. 14-1 |
| GGRF | Greenhouse Gas Reduction Fund | |
| Hopson Decl. | Declaration of Eli Hopson (CGC) | |
| Kauffman Decl. | Declaration of Richard Kauffman (CGC) | |
| Matusiak Decl. | Declaration of Ari Matusiak (PFC) | |
| Mayopoulos Decl. | Declaration of Timothy J. Mayopoulos (PFC) | |
| Moon Decl. | Declaration of John Moon (PFC) | |
| NOA | Notice of Award | |
| NOFO | Notice of Funding Opportunity | |
| Notice | Notice of Termination of grant issued by EPA to each Plaintiff, dated March 11, 2025 | CU Ex. 11 CGC Ex. I PFC Ex. J |
| ODAG | Office of the Deputy Attorney General | |
| PFC | Power Forward Communities, Inc. | |
| PFC Ex. | Exhibits to the Complaint in *Power Forward Communities, Inc. v. Citibank, N.A., et al.*, 25-cv-762. | |
| USAO-DC | Office of the U.S. Attorney for the District of Columbia | |

JA298

## INTRODUCTION

Plaintiffs Climate United Fund ("Climate United"), Coalition for Green Capital ("CGC"), and Power Forward Communities ("PFC") seek an order preliminarily enjoining EPA from implementing its illegal termination of Plaintiffs' grants and from causing Plaintiffs' assets to be frozen. Plaintiffs also seek an order preliminarily enjoining Citibank, N.A. from violating its contractual obligations under Account Control Agreements ("ACA") related to Plaintiffs' grants and to restore access to the grant funds to which Plaintiffs and their subgrantees are legally entitled.

In the Inflation Reduction Act, Congress appropriated $27 billion for the EPA to make grants to invest in clean energy through the Greenhouse Gas Reduction Fund ("GGRF"). *See* 42 U.S.C. § 7434(a). The $13.97 billion National Clean Investment Fund ("NCIF") program is part of the GGRF. Following a lengthy process involving public comment and a rigorous competition, each Plaintiff was awarded an NCIF grant: $6.97 billion to Climate United, $5 billion to CGC, and $2 billion to PFC. The funds were then disbursed to accounts at Citibank, held under a Financial Agency Agreement ("FAA") between Citibank and the U.S. Treasury Department, and under an ACA between Citibank, EPA, each Plaintiff, and in some cases subgrantees.

Upon his confirmation on January 30, 2025, EPA Administrator Lee Zeldin began publicly expressing his desire to terminate GGRF grants. But EPA has no legal basis for doing so. Congress authorized the GGRF program and appropriated the funds, and EPA then obligated and disbursed the funds. EPA may not now override Congress's will. Instead, under the terms of the grant and applicable regulations, EPA can terminate a grant *only* if the grantee violates the grant's terms and conditions, engages in certain illegal activity, or misrepresents its eligibility status. None of these conditions is satisfied with respect to any Plaintiff—and EPA does not claim otherwise. EPA has no statutory or regulatory basis for dismantling the entire congressionally enacted program, either by freezing grant recipients' assets, issuing blanket termination letters, or any other means.

Yet that is what EPA has endeavored to do here. Without any legal justification, EPA began by illegally and clandestinely freezing access to Plaintiffs' grant funds. Apparently at the recommendation of EPA, the Justice Department directed the top criminal prosecutor in the U.S. Attorney's Office for the District of Columbia to send a letter to Citibank demanding that it freeze the assets of Plaintiffs and their subgrantees. She resigned rather than carry out that illegal order.

Undeterred, on February 17, 2025, the FBI—apparently at EPA's behest—sent Citibank a letter "recommending" that Citibank freeze assets related to Plaintiffs' grants. The letter stated that the FBI had "credible information" that the accounts "ha[d] been involved in possible criminal violations." Dkt. 14-5 at 1-4. It offered no facts to support those statements. Neither EPA nor Citibank gave Plaintiffs notice of this letter or an opportunity to contest it. Nevertheless, Citibank froze Plaintiffs' assets—without telling Plaintiffs the reason why.

EPA and Citibank ignored repeated requests for information about why the assets were frozen. Meanwhile, EPA secretly directed Treasury to order Citibank to freeze the grant funds—again, without telling Plaintiffs. EPA's directive to Treasury was illegal. Under the FAA, account freezes must occur "in accordance with the account control agreements." Dkt. 21 at Ex. A § I.B.4.[1] The ACAs, in turn, specify that Citibank must honor disbursement requests unless EPA sends a "notice of exclusive control," CU Ex. 8 at 2 & Ex. A, which it cannot do unless one of three requirements for grant termination is satisfied. EPA has never sent a notice of exclusive control nor even claimed that any of those requirements is satisfied, despite ample motive and opportunity.

Indeed, demonstrating EPA's lack of information to support lawful termination, EPA sent Plaintiffs identical information requests on March 4 with a deadline of March 28. As it later

---

[1] All FAA descriptions or quotes appear in Citibank's publicly filed response brief, Dkt. 14. Unless otherwise noted, docket citations refer to entries on the *Climate United* docket, No. 25-cv-698.

recounted to Citibank, EPA sent these requests because it was investigating "concerns" and "potential patterns of fraud, waste or abuse," as it then "lack[ed] critical information." Dkt. 16-2 at 184-85. On March 10, EPA reiterated that it was "working to … address concerns regarding potential fraud and/or conflicts of interest related to the [GGRF], including based on incoming responses to oversight questions" due March 28, 2025. Dkt. 14-2 at 2.

The next day, however, EPA announced that it was dismantling the grant program and had issued termination notices to all Plaintiffs, which were sent within minutes of each other. EPA's termination came on the eve of a hearing on Climate United's motion for a TRO in this lawsuit, and after Climate United consented to DOJ's request for a one-day extension as a professional courtesy.

The "Notices of Termination" were illegal. Among other things, they do not even attempt to show that any conditions for terminating Plaintiffs' grants were satisfied. EPA's actions violate EPA's own regulations prescribing when and how a grant can be terminated. They violate the Administrative Procedure Act's requirement that agencies engage in reasoned decision making that is consistent with the law. They violate the Inflation Reduction Act's express statutory deadline for grantmaking. And, as Citibank's filing in this Court revealed for the first time, the purported terminations are the fruit of EPA's clandestine, weekslong effort to freeze Plaintiffs' money without ever giving Plaintiffs notice of what was happening or an opportunity to contest it.

Effectively accepting the weakness of its case before this Court, EPA chiefly contends that Plaintiffs' sole remedy is through breach-of-contract actions in the Court of Federal Claims. But this is not a breach of contract action in disguise. By simultaneously serving similar "Notices" purporting to terminate all other NCIF grants, EPA made clear that it aims to wipe out this part of the GGRF program and nullify an act of Congress. As such, this challenge centers on federal

JA301

regulations, statutes, and the Constitution, as well as the APA's procedural standards—not the terms of any particular grant. And it seeks to enjoin the terminations—not obtain damages or specific performance. Accordingly, this Court has jurisdiction to consider Plaintiffs' claims.

On the merits, this is not a close case. EPA's hastily crafted "Notices of Termination" are facially unlawful and unsupported by the facts. Plaintiffs and their subgrantees face irreparable harm if they do not obtain injunctive relief to enjoin the effectiveness of the "Notices" and bar EPA from taking other steps to freeze or terminate their grants.

As for Citibank, each ACA unambiguously requires it to disburse grant funds unless Citibank receives a Notice of Exclusive Control or a court order, and it has received neither. Citibank claims it is obliged to do what the Government tells it to do. But the ACAs do not permit Citibank to withhold funds based on illegal government directives. The Court should therefore also enjoin Citibank from violating the ACAs.

## STATEMENT OF FACTS

### A.    Congress Funds the NCIF Competition Through the Inflation Reduction Act.

In 2022, the Inflation Reduction Act created the GGRF grant program. 42 U.S.C. § 7434.[2] The GGRF seeks to promote investments in clean energy projects and establishes "green banks," which are "financial institutions aimed at overcoming market barriers and scaling up investment in low-carbon technologies and climate-resilient infrastructure."[3]

The Act appropriated $19.97 billion to the Administrator to use "to make grants, on a competitive basis," for direct and indirect investment in green energy projects. 42 U.S.C. § 7434(a), (b). Congress required the Administrator to make those grants by September 30, 2024,

---

[2] *About the Greenhouse Gas Reduction Fund*, EPA, https://www.epa.gov/greenhouse-gas-reduction-fund/about-greenhouse-gas-reduction-fund (last updated Feb. 13, 2025).
[3] Cong. Rsch. Serv. IN12090, *EPA's Greenhouse Gas Reduction Fund*, (updated Feb. 14, 2023), https://crsreports.congress.gov/product/pdf/IN/IN12090.

JA302

*id.* § 7434(a), and to award the grants to entities "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services," *id.* § 7434(c)(1).

In July 2023, EPA issued a Notice of Funding Opportunity ("NOFO") for the NCIF competition, through which EPA would award $13.97 billion of GGRF funds. CU Ex. 1 at 3.[4] The NOFO stated that EPA would "provide grants to 2-3 national nonprofit financing entities to create national clean financing institutions capable of partnering with the private sector" to finance "tens of thousands of clean technology projects." *Id.* at 4. The NOFO anticipated that awardees would be selected in March 2024 and performance would begin in July 2024. *Id.* at 1. The NOFO also mentioned that the awards "may be subject to … financial agent arrangements with the U.S. Department of Treasury," to "ensure that EPA's interests are protected." *Id.* at 56.

Both individual and coalition applicants were eligible. *Id.* at 21. The NOFO described coalition applicants as "composed of one lead applicant, which partners with … non-lead coalition members that are named in the application and would receive subawards (in the form of subgrants) to carry out a portion of the grant's activities." *Id.* at 6. If a coalition is selected for an award, the NOFO explained, "the lead applicant will become the grantee, administer the grant as a pass-through entity for the purposes of 2 CFR Part 200 and the EPA Subaward Policy, and be accountable to EPA for effectively carrying out the full scope of work and the proper financial management of the grant (including subawards to non-lead coalition members)." *Id.* at 7.

The NOFO "included a robust set of application requirements and corresponding

---

[4] Exhibits indicated by "CU Ex. _" refer to Climate United's exhibits attached to the Declaration of Elizabeth Bafford, submitted along with this motion. References to "PFC Ex. _" indicate exhibits attached to PFC's complaint in case No. 25-cv-762, at *Power Forward Communities* Dkt. 1-1 through 1-10. References to "CGC Ex. _" indicate exhibits attached to the Declaration of Vincent Levy, submitted along with this motion.

evaluation criteria that were used to assess materials submitted to meet those application requirements."[5] Among other things, applicants were required to provide "a detailed project narrative"; "organizational and governing documents; resumes of board members and senior management; legal and compliance risk management policies and procedures; financial statements; workplans for the first year of program implementations, and budget narratives." *Id.* EPA established a rigorous process to review and select applications, including establishing review panels with broad and deep qualifications who would then present rankings and recommendations to a Selection Official authorized to make the final selection for awards. CU Ex. 1 at 54.

### B.    EPA Selects Climate United, CGC, and PFC as Recipients of NCIF Grants.

In April 2024, EPA awarded $13.97 billion in NCIF grants to three entities: Plaintiffs Climate United ($6.97 billion), CGC ($5 billion), and PFC ($2 billion).[6]

***Climate United.*** Plaintiff Climate United is a coalition of three established nonprofits with a combined 120 years of experience managing more than $30 billion. Decl. of Elizabeth Bafford ¶ 7 ("Bafford Decl."). Climate United was incorporated for the purpose of joining these three experienced entities together to apply for the NCIF grants, *id.*,[7] an arrangement the NOFO expressly contemplated when it made NCIF grants available to "coalition[s]" that would include

---

[5] *Review and Selection Process*, EPA, https://www.epa.gov/greenhouse-gas-reduction-fund/review-and-selection-process (last updated Aug. 16, 2024).

[6] Press Release, EPA, Biden-Harris Administration Announces $20 Billion in Grants to Mobilize Private Capital and Deliver Clean Energy and Climate Solutions to Communities Across America (Apr. 4, 2024).

[7] It is common for established organizations to set up subsidiaries for specific projects. While each coalition partner would have been an eligible recipient, each formed subsidiaries to act as the grant recipients and subgrantees. As Climate United explained in its NCIF grant application, this structure allowed them to adopt EPA-required policies, procedures, and governance specifically crafted to more efficiently deploy grant funds while mitigating deployment risk. The subsidiaries benefit from the organizational infrastructure and experience of their parent organizations while allowing them to comply fully with EPA oversight requirements, and leverage grant funds with private capital more effectively as stand-alone entities. Bafford Decl. ¶ 8.

"members [that] would each receive grant funds." CU Ex. 1 at 6-7. Climate United focuses on "leverag[ing] public resources with private capital" to provide financing for "[g]reening and electrifying businesses and commercial buildings, schools and community-supporting institutions; community and C&I solar; [and] electric buses and trucks," among other projects.[8]

Climate United entered the NCIF grant competition with a $13.97 billion proposal to accelerate clean energy adoption across the U.S. economy. Bafford Decl. ¶ 14. After EPA's lengthy and rigorous review process, Climate United was awarded $6.97 billion. *Id.* ¶ 17. Climate United developed, and EPA approved, a workplan that was posted publicly. *Id.* ¶ 22.

**CGC.** Plaintiff CGC was founded in 2010 to support the development of state and local green banks across the country; since its inception it has supported or created over forty green banks. Decl. of Eli Hopson ¶ 3 ("Hopson Decl."). CGC created the American Green Bank Consortium, whose members deployed over $25 billion across the country. *Id.* ¶ 5. With its NCIF grant, CGC has successfully established the country's first national green bank, advancing CGC's goal of leveraging private capital for deployment in state, local, and municipal projects. *Id.* ¶ 4.

CGC applied for grants totaling $11.9 billion across all three grant competitions EPA created under GGRF. *See id.* ¶ 7. EPA awarded CGC $5 billion from the NCIF, and CGC's EPA-approved NCIF workplan is accessible to the public on EPA's website. *See id.*

**PFC.** Plaintiff PFC is a coalition of leading nonprofit organizations with nearly a century of combined experience in financing, managing, and implementing affordable housing projects for Americans in need. Decl. of Timothy J. Mayopoulos ¶¶ 3-4 ("Mayopoulos Decl."). Those projects total more than $100 billion and have added approximately 1.5 million affordable homes and

---

[8] *Frequently Asked Questions about the National Clean Investment Fund (NCIF) and Climate United's Strategy*, Climate United (Aug. 16, 2024), https://weareclimateunited.org/frequently-asked-questions-ncif-and-climate-united-strategy.

apartments in communities across the United States. *Id*. ¶¶ 3-4. Through its coalition members, PFC invests in clean-energy housing nationwide to advance its mission of expanding and preserving affordable housing, improving community health and safety, and creating well-paying jobs. *Id*. ¶ 4. As contemplated by the NOFO for the NCIF program, PFC was established to serve as the coalition's lead award applicant and to administer the NCIF grant. *Id*. ¶ 5.

PFC was awarded a $2 billion NCIF award. *Id*. ¶ 6. Following its EPA-approved work plan, PFC has already committed $539 million to projects. *Id*.[9]

### C.     The Grants Are Memorialized in Grant Agreements That Govern the Awards and Set Out the Exclusive Means for EPA to Suspend or Terminate the Awards.

To govern the grants, EPA entered into separate agreements called a "Notice of Award," or "NOA," with each plaintiff. These NOAs contain each grant award's Terms and Conditions, which are binding on both the agency and the recipient. Each NOA was executed in August 2024. *See* Bafford Decl. ¶ 17; CU Ex. 2; Hopson Decl. ¶ 8; CGC Ex. E; Mayopoulos Decl. ¶ 6; PFC Ex. B.

From the beginning, EPA envisioned entering into initial NOAs with Plaintiffs in the summer, amending those NOAs in the fall and winter, and revising the Terms and Conditions as needed thereafter to more effectively carry out program objectives. *See, e.g.*, Bafford Decl. ¶¶ 18-19; CU Ex. 10. That is what happened. EPA issued amended NOAs in December 2024, which were very similar to the August NOAs but included changes to the Terms and Conditions reflecting insights gained from the first six months of market and partner feedback as well as other clarifications. *See* Bafford Decl. ¶¶ 17-20; Hopson Decl. ¶ 11; PFC Mayopoulos Decl. ¶ 6. These

---

[9] *See* Press Release, Power Forward Communities, Fact Sheet: Power Forward Communities Announces More Than Half a Billion Dollars in Investments to Lower Housing Costs and Utility Bills for Families Nationwide (Feb. 24, 2025), https://a-us.storyblok.com/f/1014573/x/0f93107325/pfc-press-release-announcement_022425.pdf.

JA306

NOAs, which contain the operative Terms and Conditions of the grants, are all dated December 20, 2024. *See* CU Ex. 3; CGC Ex. F; PFC Ex. C.[10]

The Terms and Conditions in each Plaintiff's NOA are materially identical. *Compare* CU Ex. 3, *with* CGC Ex. F, *and* PFC Ex. C. For simplicity, below we cite only Climate United's NOA.

As an initial matter, the NOAs require Plaintiffs to adhere to a rigorous set of reporting requirements to facilitate EPA's oversight. *See, e.g.*, Bafford Decl. ¶ 35 (describing EPA's many mechanisms for oversight). Among other things, Plaintiffs are required to submit quarterly, semi-annual, annual, and final reports to EPA with "detailed narratives describing program performance … supported with qualitative discussions and quantitative metrics," CU Ex. 3 at 14, and submit quarterly transaction-level and project-level data reports and conflict-of-interest reports, *id.* at 15. The Terms and Conditions also require Plaintiffs to "obtain prior written approval" from EPA "for any transfers that will not be disbursed … within 15 business days." *Id.* at 57-59.

The Terms and Conditions give EPA "the right to terminate the Assistance Agreement[s] *only* as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, *when*" one of three specific criteria are met. CU Ex. 3 at 41 (emphases added). Specifically, termination is permitted if and only if:

(1) A recipient engages in "substantial" noncompliance such that "effective performance" is "Materially Impaired." CU Ex. 3 at 41. Effective performance is "Materially Impaired" if (1) EPA issues a "written determination and finding … that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause" and, (2) if EPA determines in its sole discretion that a "corrective action plan" would remedy the issue, EPA issues a "separate written determination and finding" that the Recipient "has not materially addressed its failure." *Id.* at 8-9.

(2) A recipient makes a "material misrepresentation of eligibility status." *Id.* at 41.

---

[10] The December NOAs were further amended in January 2025, to update the budget and workplan, but not the operative Terms and Conditions. *Compare* CU Ex. 3 at 1, 3, *with* CU Ex. 4 at 1, 3-5 (noting that "All Administrative" and "All Programmatic Conditions Remain the Same").

JA307

(3) There is "adequate evidence" of "Waste, Fraud, or Abuse," *id.*, which is defined to require "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act (31 U.S.C. [§§] 3729-3733)." EPA, *General Terms and Conditions* 44 (effective Oct. 1, 2024; 2 C.F.R. § 200.113).

Critically, the Terms and Conditions do not give EPA the right to terminate the grants for convenience or based on a change in EPA's policy priorities. *See* CU Ex. 3.

Additionally, before terminating a grant, EPA must first take certain procedural steps. *See* 85 Fed. Reg. 61,571 (Sept. 30, 2020). Among other things, EPA must provide written notice of termination that includes "the reasons for termination." 2 C.F.R. § 200.341; CU Ex. 3 at 41 (incorporating this requirement into the grants' Terms and Conditions). EPA may withhold payment for allowable costs only if required by federal statute or regulations; if Plaintiffs "ha[ve] failed to comply with the terms and conditions" of the award; or if Plaintiffs are "delinquent in a debt to the United States." 2 C.F.R. § 200.305(b)(6). If Plaintiffs fail to comply with the Terms and Conditions, EPA may "[t]emporarily withhold payments," but only if EPA "determines that noncompliance cannot be remedied by imposing specific conditions." *Id.* § 200.339.

### D.    Plaintiffs Enter Into Account Control Agreements With EPA and Citibank.

To "ensure that EPA's interests are protected," CU Ex. 1 at 56, each grant requires the recipient's funds to be held at Citibank. Citibank's actions are governed by a Financial Agency Agreement ("FAA") between Citibank and Treasury covering all NCIF grants, Dkt. 21, as well as separate ACAs between Citibank, EPA, and each Plaintiff. CU Ex. 2 at 58; CU Ex. 3 at 52; CGC Ex. F at 56; PFC Ex. C at 56. This setup is consistent with Treasury's "long history of using financial agents," which since the 1860s have "support[ed] its core functions of disbursing payments and collecting revenue."[11]

---

[11] U.S. Gov't Accountability Off., GAO-17-176 (Jan. 2017).

Citibank and Treasury entered into the FAA on September 18, 2024. Dkt. 21 at 1. In the FAA, Citibank agreed "to comply with all lawful instructions or directions received from Treasury." Dkt. 21 at Ex. A § 5.A. The FAA authorizes Citibank to "freeze accounts, and transfer funds in frozen accounts, at the direction of the relevant secured party [*i.e.*, EPA]," but only "in accordance with the account control agreements." Dkt. 21 at Ex. A § I.B.4. The FAA also requires Citibank to provide EPA "full account visibility," *id.* at Ex. A § I.D.1, which includes real-time view access into every Citibank account held by Plaintiffs and their subgrantees.

With the FAA in place, Plaintiffs each entered into a materially identical ACA with Citibank and EPA in November 2024, *see* CU Ex. 8; CGC Ex. B; PFC Ex. D. These ACAs were amended on January 13, 2025, to clarify the treatment of certain "properly occurred" obligations if EPA issues a Notice of Exclusive Control, *e.g.*, CU Ex. 9; Bafford Decl. ¶¶ 27-28. Once again, for simplicity's sake, citations below are solely to Climate United's ACA.

Under the ACAs, Citibank is "designated and authorized to act as a financial agent of the United States," and EPA serves as the "Secured Party." CU Ex. 8 at 1. The ACAs do not refer to the FAA or incorporate by reference the FAA's terms. Instead, the ACAs state that each party "acknowledges and agrees" that Citibank's "duties, responsibilities and obligations … shall be limited to those expressly set forth in" the ACAs. CU Ex. 8 at 3. Like the grant agreements, the ACAs facilitate transparency and give EPA significant oversight tools, such as real-time visibility into Plaintiffs' accounts and those of their subgrantees. *See, e.g.*, Bafford Decl. ¶ 33.[12]

---

[12] Consistent with the structure designed by EPA under Congress's directive, subgrantees have their own Accounts and ACAs at Citibank where they maintain their own funds. These accounts also require Citibank to abide by subgrantees' instructions, subject only to the issuance of a Notice of Exclusive Control—which in that context can be issued only by a grantee, and *not EPA*. *See* CGC Ex. C at 2 & Ex. A (exemplar subgrantee ACA); *see also* PFC Exs. E-G at 2 & Ex. A (each subgrantee ACA). These subgrantee ACAs do not permit Citibank to disburse funds to the Government, whether on issuance of a Notice of Exclusive Control or grant termination.

The ACAs provide that Citibank "shall comply with all instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and financial assets in the Accounts … ." CU Ex. 8 at 3. Citibank may refuse to follow instructions under an ACA *only* if EPA exercises its option to take "exclusive control" over the accounts by providing Citibank with a Notice of Exclusive Control similar to a sample attached to each ACA. *Id*.; *id.* at Ex. A. To take "exclusive control," EPA must "issue[] a written determination and finding" that one of the three exclusive grounds for termination listed in the grant's Terms and Conditions has been triggered. CU Ex. 9 at Ex. A; *see also* CU Ex. 8 at 1 (parties "agree[] that the terms and conditions … in the Grant Agreement indicate the conditions under which [EPA] may exercise its right of control").

Beginning in August 2024 and prior to the opening of the Citibank accounts in November 2024, Plaintiffs drew down grant funds through Treasury's Automated Standard Application for Payments ("ASAP") system. *See* Bafford Decl. ¶¶ 26, 31; Hopson Decl. ¶ 9; Mayopoulos Decl. ¶¶ 7-11. EPA has since disbursed the balance of Plaintiffs' grant funds into their respective Citibank accounts. Bafford Decl. ¶ 27; Hopson Decl. ¶ 9; Mayopoulos Decl. ¶¶ 7-11. Plaintiffs have regularly drawn money from those accounts for operations and to carry out their obligations under their grants. Bafford Decl. ¶ 34; CFC Hopson Decl. ¶ 13; PFC Mayopoulos Decl. ¶¶ 11, 19, 21-23, 25. As they have done so, EPA has overseen Plaintiffs' activities, including by reviewing periodic financial and conflict-of-interest reports; regularly meeting with Plaintiffs; holding view access to all accounts affiliated with Plaintiffs' grants; requiring third-party audits; and transaction-testing payments to ensure they are proper under the grants. Bafford Decl. ¶ 35; Hopson Decl. ¶ 13; PFC Mayopoulos Decl. ¶¶ 15-16, 27. Plaintiffs also must certify, under threat of criminal penalties, that each draw request for a financial assistance transaction is proper under their grants. *E.g.*, Bafford Decl. ¶ 35(d); CGC Ex. F at 57; PFC Ex. C at 58.

E.    **Plaintiffs Invest Funds as Permitted by the Inflation Reduction Act.**

Plaintiffs have wasted no time getting to work on their EPA-approved, publicly posted workplans to carry out Congress's objectives in enacting the GGRF program.

*Climate United.* The Climate United coalition plans to commit at least $580 million toward qualified projects before July 2025, and to deploy the full $6.97 billion within five years. Bafford Decl. ¶ 23. To date, the Climate United coalition has committed $392 million to qualified projects, focusing on investments in energy-efficient buildings and homes; electric transportation and charging infrastructure; and producing affordable, clean electricity and heat through renewable energy generation and battery storage. *Id.* ¶¶ 23-24.

Climate United uses NCIF funds primarily to finance green energy projects, and has already launched and committed capital for three financing projects: $31.8 million for solar projects in Arkansas; up to $250 million for manufacturing and leasing battery electric heavy-duty trucks in California; and $63 million for solar power plants in Eastern Oregon and Idaho. *Id.* ¶¶ 38-40. Climate United also accepted applications for up to $30 million in technical assistance and planning support grants, and it has approved an initial 22 awards across 18 states. *Id.* ¶ 41.

Consistent with the grant, Climate United uses NCIF funds to pay approximately 37 employees, including highly specialized and sophisticated investment professionals who empower Climate United to do its congressionally mandated work: selecting partners, ensuring grant compliance, conducting oversight of subgrantees, analyzing financial transactions, engaging with communities, and servicing a portfolio of loans. *Id.* ¶ 37.

*CGC.* CGC has used its NCIF funding to establish the first national green bank in the country, creating a coalition of subrecipients (which are subgrantees) including 16 state and local green banks and two national nonprofits. Decl. of Richard Kauffman ¶¶ 5-7 ("Kauffman Decl."). In December 2024 and January 2025, CGC concluded definitive agreements with each subgrantee,

which paralleled the NCIF terms and conditions and included a robust internal investment policy to help address risks. *Id.* ¶ 5.

These agreements have allowed CGC to distribute approximately $1.8 billion among the subgrantees to support the creation of a self-sustaining nationwide network of state and local green banks and drive the deployment of clean energy projects. *Id.* ¶ 6. As of December 31, 2024, CGC's subgrantees closed six qualifying projects totaling $33.7 million in NCIF fund allocations, which are expected to mobilize an additional $192 million in private capital. *Id.* CGC helped develop and launch the Municipal Investment Fund, which seeks to partner CGC with two local entities in each State to support public-private partnerships oriented toward clean energy projects and award grants to local communities. Decl. of Jessica Buendia ¶ 3-6 ("Buendia Decl."). In November 2024, CGC launched "RFP1," an open and rolling solicitation for clean energy developers, commercial projects, community lenders, and financial investors (including private credit and equity firms) to submit proposals for green energy projects. Kauffman Decl. ¶ 8-9. By December 31, 2024, CGC received 82 investment proposals totaling $30.9 billion, and CGC scored these for further consideration, culminating in the identification of 24 projects totaling $5.3 billion and expected to create 240,700 clean energy jobs. *Id.* ¶ 4.

*PFC.* PFC uses its NCIF award to expand and preserve affordable housing, finance energy-efficient improvements in homes nationwide, and create well-paying jobs. As noted above, PFC has already committed $539 million of its $2 billion NCIF award. PFC Mayopoulos Decl. ¶ 6. That commitment includes nearly $100 million in NCIF funding for affordable housing construction and rehabilitation projects under term sheets executed by PFC subgrantee Enterprise Green Accelerator ("EGA") in Michigan, Texas, Virginia, New York, Washington, and Maryland. Decl. of Shaun Donovan ¶ 16 ("Donovan Decl."). It also includes approximately $86.5 million of

financial assistance that PFC subgrantee LISC Green committed to affordable home construction and rehabilitation, together with other projects, in Ohio, Texas, New Jersey, Massachusetts, Iowa, Florida, Michigan, Wisconsin, Illinois, Kentucky, and Georgia. Decl. of John Moon ¶ 16.

      **F.**    **EPA Causes Citibank to Withhold Plaintiffs' Grant Funds, Without Notice, an Explanation, or an Opportunity to Object.**

Beginning on February 12, 2025, EPA Administrator Zeldin announced EPA's goal to take possession of GGRF grant funds, including the NCIF grant funds awarded to Plaintiffs.[13] In that same public statement, Administrator Zeldin stated: "the [FAA] with the Bank needs to be instantly terminated" and "the Bank must immediately return" the funds.[14] Thereafter, Administrator Zeldin made multiple statements attacking the GGRF program. For example, he stated that the "the entire scheme" of the GGRF, "in my opinion, is criminal,"[15] and asserted that he would take action with "the Inspector General's Office and will work with the Justice Department" to ensure EPA "reassume[s] responsibility for all of these funds."[16] One week later, EPA issued a letter to its Office of the Inspector General requesting a formal investigation.[17] Then, on March 4, Administrator Zeldin stated: "The money is now FROZEN and DOJ/FBI is investigating."[18] Neither EPA nor Administrator Zeldin offered any specific basis for their allegations.

EPA and other federal agencies also engaged in behind-the-scenes efforts to freeze Plaintiffs' funds. On February 17, 2025, the Office of the Deputy Attorney General ("ODAG")

---

[13] Lee Zeldin (@EPALeeZeldin), X (Feb. 12, 2025, 7:52 PM).

[14] Rapid Response 47 (@RapidResponse47), *X* (Feb. 25, 2025, 10:16 AM).

[15] SundayMorningFutures (@SundayMorningFutures), X (Feb. 23, 2025, 11:21 AM); *see also* Zack Colman, Recipient Isn't Giving in as Trump's EPA Tries to Revoke Climate Grants, Politico (Feb. 24, 2025) (collecting quotes).

[16] Lee Zeldin (@EPALeeZeldin), X (Feb. 12, 2025, 7:52 PM).

[17] Press Release, EPA, EPA Formally Refers Financial Mismanagement of $20B "Gold Bars" to Inspector General (Mar. 3, 2025).

[18] Lee Zeldin (@EPALeeZeldin), X (Mar. 4, 2025, 6:02 PM).

asked the U.S. Attorney's Office in Washington, D.C. ("USAO-DC"), apparently at EPA's behest, to open a criminal investigation into grants awarded by EPA under the GGRF.[19] Denise Cheung, the Chief of the Criminal Division at USAO-DC, after reviewing the documentation provided by ODAG, advised that no "predicate for opening such a grand jury investigation existed."[20]

That same day, FBI sent a letter to Citibank "recommend[ing]" that Citibank freeze assets in all of Plaintiffs' accounts. Dkt. 14-5 at 1-4. The letter stated that FBI had "credible information" that Plaintiffs' accounts have "been involved in possible criminal violations," *id.*, but provided no supporting evidence for that assertion. Nonetheless, Citibank froze Plaintiffs' accounts without notifying Plaintiffs or giving them a chance to respond.

According to published reports, ODAG then instructed that a second letter be sent to Citibank, this time *directing* that Citibank freeze the accounts of 28 GGRF grantees and subgrantees pursuant to a criminal investigation. *See* Dkt. 14-5 at 5-6. In response, senior officials at the DC-USAO again asserted there was insufficient evidence to justify it.[21] Consistent with her oath of office, Cheung refused to send the letter. She was forced to resign on February 18, 2025.[22]

Published reports also state that, without signoff from other prosecutors, the Interim U.S. Attorney in Washington submitted a seizure warrant application to a magistrate judge, who rejected it.[23] After that, ODAG sought a different U.S. attorney's office to carry out the warrant request to obtain a court-ordered freeze, but prosecutors in that office likewise refused to do so.[24]

---

[19] Read the Resignation Letter by Denise Cheung, a Veteran D.C. Federal Prosecutor, Wash. Post (Feb. 18, 2025).

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] Spencer Hsu, Maxine Joselow & Nicolas Rivero, FBI takes up EPA Probe Amid Pushback from Judge, Prosecutors, Wash. Post (Feb. 27, 2025).

[24] *Id.*

JA314

In parallel, Citibank began failing to comply with disbursement and processing instructions related to Plaintiffs' grant funds. *See, e.g.*, Bafford Decl. ¶¶ 42-43, 46 (describing instructions on February 14, 18, and 21 that have not been processed); Mayopoulos Decl. ¶¶ 12-14 (describing disbursement instructions on February 14 and March 10 that have not been processed). And Citibank ignored multiple requests seeking information and answers about why instructions were not being followed. *See, e.g.*, Bafford Decl. ¶¶ 44, 46, 47, 48, 50 (describing communications to Citibank between February 19 and 25); Compl. ¶¶ 83-96 (describing communications to Citibank between February 14 and March 1); Dkt. 16-2 (Citibank letter referring to "approximately $450 million in pending transfer instructions" and "demands from prime recipients and subrecipients" on February 28, March 1, and March 6 "seeking disbursement of funds or an explanation").

On March 2, 2025, EPA Deputy Administrator McIntosh sent a letter asking for EPA's Office of the Inspector General to investigate GGRF funding. *See* Dkt. 14-6. That letter asserts that Citibank was withholding Plaintiffs' funds "voluntarily," notwithstanding EPA's efforts to procure the FBI's "recommendation" and freeze the funds. *Id.* The letter generally asserts, without supporting facts, that Plaintiffs were "extraordinarily unqualified recipients," that the grants were infected with "conflicts of interest," and that the grants "improperly reduced government oversight." *Id.* EPA then sent a copy of that letter to Citibank, stating that the letter "highlights several of the egregious instances of misconduct regarding $20 billion GGRF distributions that have been improperly funneled through your financial institution." *Id.* Mr. McIntosh cited a "publicly circulated video of a former Biden Administration EPA political appointee boasting that officials were 'tossing gold bars off the Titanic.'" *Id.* at 4. This video made no reference to the GGRF program and could not have been referring to it, as the Inflation Reduction Act required all grants to be made by September 30, 2024, and EPA complied with that deadline.

In an email to Citibank at 10:02 PM on March 4, Treasury sent a communication "instructing Citibank not to disburse funds from any of the GGRF accounts prior to the end of the day Sunday, March 9, 2025," citing unspecified "concerns regarding potential fraud and/or conflicts of interest related to the [GGRF]." Dkt. 14-7. That same day, March 4, Plaintiffs received letters from Mr. McIntosh containing 36 requests for documents and information. *See, e.g.*, Dkt. 16-2 at 164-67; CGC Ex. H; Mayopoulous Decl. ¶ 27. These letters each requested a response by March 28, 2025, and stated that "[f]ailure to fully respond to this request on time will be considered a violation of the Grant Agreement and may result in further compliance actions, which may include withholding payments, suspension of funding, or other enforcement measures." *Id.*

On March 6, Citibank's counsel wrote to EPA regarding the March 4 email it received from Treasury, explaining that, as of that time, Citibank had "approximately $450 million in pending transfer instructions from the prime recipients and subrecipients," and had "received additional demands from prime recipients and subrecipients seeking disbursement of funds or an explanation." Dkt. 16-2 at 169. The email urged that "EPA establish a direct line of communication with the recipients and subrecipients regarding its future decisions." *Id.*

On March 8, Mr. McIntosh responded to Citi's March 6 communication, explaining to Citi's counsel that the information requests issued to the NCIF grantees were "part of a compliance review of [the grant recipients'] organization, activities, and funds," and that "[t]he purpose of the compliance review is to inform EPA of any further oversight issues and noncompliance as well as alert us to *potential* patterns of waste, fraud or abuse." *Id.* at 184 (emphasis added). The letter reiterated that EPA's March 2 referral to the acting inspector general "detail[ed] numerous concerns" about supposed "self-dealing, conflicts of interest, recipient qualifications, and actions taken to deliberately undermine federal government oversight" and emphasized "ongoing

18

investigations" in light of a "current lack of critical information." *Id.* at 185.

On March 10, 2025, at 12:28 AM, EPA sent an email to Citibank, again alluding only to "*concerns* regarding *potential* fraud and/or conflicts of interest." Dkt. 14-2 at 2 (emphases added). In a follow-up email to Citibank at 1:13 AM, Treasury directed Citibank to continue to refrain from processing payments to Plaintiffs. Dkt. 14-3. Neither EPA nor Treasury notified Plaintiffs.

### G.    EPA Serves a Purported "Notice of Termination" on Each Plaintiff.

Faced with continued refusal by Citibank to disburse Plaintiffs' funds, continued silence from both Citibank and EPA, and with no information to go on other than public reporting and the EPA's March 4 document request, Plaintiffs sued.

Climate United filed its complaint on Saturday, March 8, 2025, and immediately informed the parties that it would file a motion for TRO on the morning of Monday, March 10, which it did. Climate United's motion for TRO sought to restrain Citibank from violating the ACA and to restrain EPA from impeding Citibank's compliance with the ACA or unlawfully suspending or terminating the grant. After the Court tentatively scheduled a hearing for March 11, 2025, EPA's counsel requested a 24-hour extension as a "courtesy" so he could "speak further and in detail with our clients regarding the issues here and the alleged harm." Climate United consented.

After business hours on March 11—after the TRO hearing would have occurred— Administrator Zeldin announced EPA's termination of all NCIF grants.[25] EPA sent Climate United, CFC, and PFC materially identical letters entitled "Notice of Termination" within minutes of each other. CU Ex. 11 at 1; CFC Ex. I at 1; PFC Ex. J at 1. Each Notice states that EPA is terminating the grant based on its "authority under 2 C.F.R. §§ 200.339-40, the General Terms and Conditions of EPA assistance award agreements, the terms and conditions of the Grant Agreement,

---

[25] Press Release, EPA, Administrator Zeldin Terminates Biden-Harris $20B 'Gold Bar' Grants (Mar. 11, 2025).

and the Agency's inherent authority to reconsider prior determinations in light of new information." *Id.* The Notices do not contain any individualized determinations, and do not make any findings of noncompliance with any Terms and Conditions by any Plaintiff. Instead, they state that termination "is based on substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities." *Id.*

"[W]hen questioned at the March 12 hearing" on Climate United's TRO motion, "EPA Defendants proffered no evidence to support their basis for the termination … or that they followed the proper procedures." Dkt. 28 at 14. "When pressed to, at a minimum, even proffer such evidence, counsel for EPA Defendants was unable to" do so, instead offering "circular" responses. *Id.* at 17. This Court then ordered EPA to "file a declaration addressing the basis for the grant termination" and "the proffer of evidence discussed at the hearing," which included information about the reported government investigations. *Id.* at 16; s*ee* Dkt. 22 at 22-23.

On March 17, per this Court's order, EPA submitted a declaration from EPA's Chief of Staff "setting forth the basis for the termination." Dkt. 25-1. That declaration contained no new relevant and material facts about any of the Plaintiffs. Instead, it traced the history of the amendments to the grant agreement, elaborating on EPA's general dislike for the structure of the award. *Id.* It concluded with "vague and unsubstantiated assertions of fraud," Dkt. 18 at 22, pointing, without evidence, to concerns with "program integrity," "programmatic fraud, waste, and abuse," and "the absence of adequate oversight and account controls." Dkt. 25-1.

On March 17, Climate United amended its complaint to challenge EPA's Notice of Termination and supplement the factual allegations with the documentary evidence of EPA's due process violations. On the same day, the Court held an additional hearing on CGC and PFC's TRO motions and consolidated the three cases. *See* Minute Entries (Mar. 17 & 20, 2025).

**H.     This Court Issues a Temporary Restraining Order.**

On March 18, 2025, the Court entered a TRO, holding that Plaintiffs established a "substantial likelihood of success on the merits of [their] APA and due process claims," and recognizing that "without release of the grant funds, imminent harm is unavoidable." Dkt. 28 at 14, 19. The Court enjoined EPA and Citibank "from giving effect to EPA Defendants' Termination Letter[s]" and enjoined EPA from "transmitting or taking action to implement the termination of Plaintiffs' grants, including taking action that results in the transfer, re-obligation, or re-allocation of the grant funds in Plaintiffs' Citibank accounts, or issuing a Notice of Exclusive Control under its agreements." Dkt. 29 at 2. The Court enjoined Citibank from "moving or transferring Plaintiffs' grant funds to any party other than the accountholders, absent an Order from this court." *Id*.

Plaintiffs now seek a preliminary injunction to enjoin EPA from enforcing any Notice of Termination as to Plaintiffs, unlawfully suspending or terminating Plaintiffs' grants, issuing a Notice of Exclusive Control, and impeding Citibank from complying with the ACAs and disbursing funds associated with Plaintiffs' grants. Plaintiffs also seek to enjoin Citibank from violating any ACA and failing to disburse funds as instructed to Plaintiffs and their subgrantees.

## LEGAL STANDARD

To obtain a preliminary injunction, the moving party must "make a clear showing that four factors, taken together, warrant relief: [1] likely success on the merits, [2] likely irreparable harm in the absence of preliminary relief, [3] a balance of the equities in its favor, and [4] accord with the public interest." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016).[26]

---

[26] Case citations and quotations are "cleaned up" unless otherwise specified.

## ARGUMENT

### I.    This Court Has Jurisdiction.

In granting a TRO, this Court found that it has jurisdiction over Plaintiffs' claims. Dkt. 28 at 10-12. This Court rejected EPA's argument that jurisdiction is lacking because Plaintiffs' suits are "in essence" breach of contract suits that belong in the Court of Federal Claims. *Id.* This Court reached the right conclusion. Plaintiffs' claims are not "in essence" for breach of contract, and EPA cannot unilaterally nullify an act of Congress without judicial review by an Article III court. Instead, Plaintiffs seek to enjoin agency action that violates federal regulations, a federal statute, and the Constitution—exactly the type of case that Article III courts hear every day.

Federal district courts have jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Plaintiffs' claims meet that description, and EPA does not claim otherwise. Instead, EPA invokes an implied exception to federal jurisdiction. The Tucker Act waives sovereign immunity for claims "founded … upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). Although the Tucker Act says nothing about jurisdiction under the APA, the D.C. Circuit has interpreted it to "impliedly forbid contract claims against the Government from being brought in district court under the waiver in the APA." *Crowley Servs. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022). EPA claims that Plaintiffs bring contract claims subject to that implied exception.

EPA is wrong. To determine whether the Tucker Act impliedly precludes jurisdiction over non-contract claims, courts consider "both … the source of the rights upon which the plaintiff bases its claims, and … the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). Both factors support this Court's exercise of jurisdiction.

*First*, Plaintiffs' claims against EPA are based in the Constitution, federal statutes, and federal regulations—not contract terms. As this Court recognized, "[u]nlike normal contractual

undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of desirable public policy." Dkt. 28 at 11. Plaintiffs are suing over EPA's arbitrary, capricious, and unlawful actions in directing a freeze of Plaintiffs' grant funds and purporting to terminate the grant program and Plaintiffs' grants in violation of law. *See infra* at 27-31. Plaintiffs are also suing over EPA's violation of a federal statute, and five federal regulations: 2 C.F.R. §§ 200.339, 200.340, 200.341, 200.342, and 200.305. *See infra* at 32-35. Independent of the APA, Plaintiffs bring a Due Process claim challenging the government's extraordinary pattern of *ultra vires* actions—which are disconnected from the parties' performance under the grant—and an Appropriations Clause claim challenging EPA's re-obligation of funds in violation of a clear statutory deadline.

Further, compliance with contractual requirements—the core issue in virtually every case litigated in the Court of Federal Claims—is not at issue here. The essentially identical Notices of Termination served on each Plaintiff does not suggest that any Plaintiff breached any term or condition of its agreements or engaged in other conduct warranting termination under the terms of the grants. Each Notice uses the same stock language, and describes the *programmatic* concerns EPA has about the way the GGRF program was established, structured, and implemented. *See, e.g.*, CU Ex. 11 at 1 (citing "the absence of adequate oversight and account controls to prevent financial mismanagement," "improper or speculative allocation of funds inconsistent with EPA's oversight and fiscal responsibilities," and "the circumvention and defeat of key oversight mechanisms in the disbursement of federal funds"). Those concerns are misplaced. *See infra* at 28-30. But they also have *nothing* to do with an alleged breach of the grant contracts themselves.

*Megapulse*'s second factor—"the type of relief sought (or appropriate)"—also favors this Court's jurisdiction. Plaintiffs do not seek a money judgment or specific performance of a contract.

Instead, Plaintiffs seek to "hold unlawful and set aside agency action," 5 U.S.C. § 706(2), for which "[v]acatur is the normal remedy." *N.J. Conservation Found. v. FERC*, 111 F.4th 42, 63 (D.C. Cir. 2024). And Plaintiffs seek declaratory and injunctive relief to restore the pre-existing status quo.

To be sure, if Plaintiffs prevail on this motion, their access to NCIF grant funds held at Citibank would be restored. But that is not a basis to decline jurisdiction. *Crowley*, 38 F.4th at 1108 ("[E]ven if the plaintiff filed the complaint with an eye to future monetary awards, a district court with otherwise appropriate jurisdiction may hear the claim and grant the proper equitable relief."). Indeed, courts have rejected the same argument in recent cases raising similar challenges. *See Massachusetts v. NIH*, 2025 WL 702163, at *7 (D. Mass. Mar. 5, 2025) (district court had jurisdiction because "Plaintiffs do not bring claims for past pecuniary harms," but instead seek to "preserve their ongoing and prospective agreements with [the government]"); *AIDS Vaccine Advocacy Coal. v. U.S. Dep't of State*, 2025 WL 752378, at *8-9 (D.D.C. Mar. 10, 2025) (similar).

*U.S. Conference of Catholic Bishops v. Department of State*, 2025 WL 763738 (D.D.C. Mar. 11, 2025), is not to the contrary. The Conference contracted with the State Department to provide refugee services. Following a public announcement, State sent a letter suspending payments because they "may no longer effectuate agency priorities." *Id.* at *2. State later sent termination notices articulating the same rationale. *Id.* at *3. The Conference sued to compel State to "stop withholding the money due" for past work under and "to keep paying up" for future work, arguing the termination violated statutes and the APA. *Id.* at *3-4. The court found it lacked jurisdiction for what it deemed a breach of contract claim.

This case differs from *Catholic Bishops* in many respects. First, Plaintiffs here seek an injunction, not an order for "the Government to pay money due on a contract." *Id.* at *5. Indeed, unlike the Conference, Plaintiffs are not asking the government to pay anything: the funds here

were already disbursed, and the money is at Citibank in accounts affiliated with Plaintiffs' grants, on their balance sheets. Of note, *Catholic Bishops* left open the possibility that the plaintiffs *could* seek the other relief in their complaint, which was "notably different than that sought in the present motion." *Id.* at *8. That relief—"Hold unlawful and set aside the Refugee Funding Suspension," No. 25-cv-00465-TNM, Dkt. 29 at 40—parallels what Plaintiffs seek here. Moreover, Plaintiffs here allege that EPA's purported termination had nothing to do with the termination grounds in the grants, an allegation with no analogue in *Catholic Bishops*. Plaintiffs also bring constitutional claims that are disconnected from any breach-of-contract allegation, unlike in *Catholic Bishops*.

Even if Plaintiffs' APA claims were impliedly preempted by the Tucker Act (they are not), the Tucker Act would not affect Plaintiffs' non-APA claims. It has been long been settled that private plaintiffs may bring claims for "injunctive relief" for "violations of federal law by federal officials" under this Court's equity jurisdiction wholly apart from any federal right of action under the APA. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015); *e.g.*, *Apter v. Dep't of Health & Hum. Servs.*, 80 F.4th 579, 589-92 (5th Cir. 2023) (plaintiffs had separate "nonstatutory" cause of action to challenge statements the FDA allegedly had "no authority" to make). Even where "Congress never created a cause of action for private individuals to enforce [provision of federal law]," a plaintiff can "still obtain the relief they seek because the Court has inherent equitable power to enjoin the Government from further violating [the statute]." *Mathis v. U.S. Parole Comm'n*, 749 F. Supp. 3d 8, 17 (D.D.C. 2024); *see also Dart v. United States*. 848 F.2d 217, 224 (D.C. Cir. 1988) ("Nothing in the subsequent enactment of the APA altered" doctrine permitting equitable jurisdiction). Here, each Plaintiff brings non-APA claims invoking that equitable authority. The D.C. Circuit has interpreted the Tucker Act to preclude contract claims "from being brought in district court *under the waiver in the APA*," *Crowley*, 38 F.4th at

1106 (emphasis added)—not to narrow this Court's inherent equitable jurisdiction. As a result, Plaintiffs' non-APA claims alleging violations of federal law may proceed.

The Court should be particularly reluctant to refuse jurisdiction because the practical effect of the government's position would be to authorize EPA's nullification of a federal statute with no judicial review. Where a federal official has acted in excess of statutory authority, courts "must have power in a proper proceeding to grant relief." *American Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902). "Otherwise, the individual is left to the absolutely uncontrolled and arbitrary action of a public and administrative officer, whose action is unauthorized by any law, and is in violation of rights of the individual." *Id.* Although EPA represents it will re-obligate the $20 billion in GGRF funds from grants it purports to terminate, nothing in EPA's position depends on that—according to EPA, even if it illegally pocketed all of that money, Plaintiffs' sole remedy would still be in the Court of Federal Claims because the money was awarded under contracts. And a breach of contract action, if successful, would not revive the NCIF program and the investments that Congress mandated; instead, contractors would merely receive a lump sum of money to compensate them for the government's breach of contract.

In sum, in view of the "well-settled" and "strong presumption" favoring "judicial review of administrative action," *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 229 (2020), the Court should not adopt an interpretation of the APA that would allow the government to avoid any meaningful review of its violation of a federal statute, and alternatively it should permit Plaintiffs to proceed under the Court's longstanding equitable jurisdiction to enjoin unlawful government conduct. The Court should be even more reluctant to foreclose jurisdiction here because Plaintiffs also bring constitutional claims, where "only the clearest evocation of congressional intent" can "overcome the presumption" of judicial review. *Bartlett v. Bowen*, 816 F.2d 695, 699 (D.C. Cir. 1987).

**II.    The Court Should Issue a Preliminary Injunction Barring EPA From Terminating Plaintiffs' Grants or Impeding Citibank From Disbursing Grant Funds.**

**A.    Plaintiffs Are Likely to Succeed on the Merits of Their APA Claims.**

EPA's termination of each Plaintiff's grant is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under the APA in several respects. 5 U.S.C. § 706(2)(A).

**1.    EPA's Terminations Are Arbitrary and Capricious.**

The APA requires an agency to give adequate reasons for its actions and to "cogently explain why it has exercised its discretion in a given manner." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983). EPA's Notices of Termination fails this standard. EPA's Notices offer no cogent explanation or supporting facts, and they do not mention any grounds for termination specific to Plaintiffs. They are unlawful.

First, it is settled that agency action that "merely parrot[s] the language of" a regulation "explains nothing about *why* the agency" did what it did and is therefore arbitrary and capricious for that reason. *Amerijet, Intern., Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (rejecting agency decision that "restated the rules from which [plaintiff] sought exceptions," which was "not a statement of reasoning, but of conclusion"). That is what happened here: the Notices of Termination simply incant the same formulaic language about waste, fraud, abuse, internal controls, and conflicts of interest contained in EPA's statements. But "the termination letters … offer no specific information about … investigations, factual support for the decision, or an individualized explanation for each Plaintiff. This is insufficient." Dkt. 16 at 16.

Second, EPA states that it is terminating Plaintiffs' grants "[p]ursuant to [EPA's] authority under 2 C.F.R. §§ 200.339-40, the General Terms and Conditions of EPA assistance award agreements," and "the terms and conditions of the Grant Agreement." *E.g.*, CU Ex. 11 at 1. But none of these sources support termination of Plaintiffs' grants.

Unlike prior versions of the federal regulations that permitted termination on the ground of changed priorities, the applicable regulations permit unilateral grant termination only when based on the grant award's terms and conditions, 2 C.F.R. § 200.340(a)(1), (4), and the agency must "clearly and unambiguously specify all termination provisions in the terms and conditions," *id.* § 200.340(b). The Terms and Conditions governing Plaintiffs' grants limit EPA *only* to three possible grounds for termination: (1) if Plaintiffs' "noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired;" (2) if "there is adequate evidence of Waste, Fraud, or Abuse," by Plaintiffs, which in turn requires "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations … or a violation of the civil False Claims Act"; or (3) if Plaintiffs made a "material misrepresentation of eligibility status." CU Ex. 3 at 12 (NOA); *id.* at 12 (defining "Waste, Fraud, or Abuse"). There is no right to terminate based on changed priorities.

But the Notices offer no basis to find that any of the termination conditions occurred. They say nothing at all about Plaintiffs' conduct or actions, and EPA has not identified any evidence to support criminal charges of fraud, conflicts of interest, or misconduct. The Notices offer *no* factual basis for *any* such allegation.[27] Although EPA's Notices contain generic references to "fraud, waste, and abuse," they contain no explanation of what EPA is referring to, and no indication that *Climate United*, *CGC*, or *PFC* engaged in any "Waste, Fraud, and Abuse" that warrants

---

[27] Nor could EPA meet the two conditions necessary to show that performance of any Plaintiff's grant agreement has been "materially impaired." *See* Ex. 3 at 9, 13-15, 22, 40; 2 C.F.R. § 200.339; 2 C.F.R. § 200.208 (requiring EPA to issue "a written determination and finding" that a recipient "has failed to achieve sufficient progress" as defined in EPA's General Terms and Conditions, and issue a "separate written determination and finding" that "noncompliance cannot be remedied by imposing specific conditions" after giving the recipient an opportunity to correct the issue).

JA326

termination under the Terms and Conditions. That makes each of EPA's terminations a classic example of arbitrary and capricious agency action. *See Kansas City v. Dep't of Hous. & Urban Dev.*, 923 F.2d 188, 194 (D.C. Cir. 1991) (advising that if a grant is terminated for substantive deficiencies, "then that fact should have been made plain in the agency decisions").

Indeed, it is clear that the vague references to lowercase "fraud, waste, and abuse" in the Notices are pretextual cover to shut down a program approved by Congress that the new Administration does not like. Again, the agency terminated every NCIF grant agreement at once on March 11, 2025, issuing identical Notices to every grant recipient within minutes of each other. And again, the record leading up to the termination highlights the pretextual nature of EPA's stated invocation of waste, fraud, and abuse. On March 8, Acting Deputy Administrator McIntosh wrote on EPA's behalf that on March 4, EPA had sent each NCIF grant recipient information requests, with a deadline of March 28, as part of what he said was "a compliance review of [the grant recipients'] organization, activities, and funds." Dkt. 16-2 at 184. He further told Citibank on March 8 that "[t]he purpose of the compliance review is to inform EPA of any further oversight issues or noncompliance as well as alert us to *potential* patterns of fraud, waste or abuse." *Id.* (emphasis added). The letter added that EPA had sent a letter to the Office of Inspector General regarding "concerns," and that there was then a "*lack* of *critical* information" as well as "*ongoing* investigations." *Id.* at 185 (emphasis added). Two days later, on March 10, EPA again alluded to "*concerns* regarding *potential* fraud and/or conflicts of interest." Dkt. 14-2 at 2.

There is no reasonable explanation for Acting Deputy Administrator McIntosh to have issued termination Notices the very next day—weeks before the March 28 deadline EPA had set for its "compliance review"—when EPA had just acknowledged a "lack of critical information." Dkt. 16-2 at 185. Administrator Zeldin underscored the point when, after this Court issued its TRO,

he reiterated that he "will not rest" until the grant funds "are returned to the U.S. Treasury."[28] The record thus demonstrates arbitrary and capricious agency action, and pretextual justifications. *See Dep't of Commerce v. New York*, 588 U.S. 752, 784 (2019) (affirming remand to agency where "the evidence tells a story that does not match the explanation the Secretary gave for his decision" because "[a]ccepting contrived reasons would defeat the purposes of … judicial review").

Third, EPA cites the generalized need for "rigorous oversight and accountability in the administration of public funds" and concerns about a lack of "oversight and account controls." CU Ex. 11 at 1. EPA does not cite any legal basis to terminate Plaintiffs' grants on these grounds. The applicable regulations do not permit termination on these bases, because they are not "clearly and unambiguously specif[ied]" in the grant agreement. 2 C.F.R. § 200.340(b); *see id.* § 200.340(a)(1), (4). Nor does EPA offer any factual basis to suggest that *Climate United*, *CGC*, or *PFC* has done anything to raise concerns about oversight and accountability. Vague and unsubstantiated assertions cannot justify termination of a grant, particularly where the termination upends well-founded reliance interests. *See AIDS Vaccine Advocacy Coal.*, 2025 WL 752378, at *10 (rejecting termination of grants due to oversight concerns when grantees were acting "pursuant to contractual terms"); *New York v. Trump*, 2025 WL 715621, at *12 (D.R.I. Mar. 6, 2025) (rejecting funding freeze based on "unsubstantiated 'wasteful or fraudulent expenditures'"). And EPA does not explain why the program's many oversight and accountability mechanisms are insufficient, particularly when they provide more real-time visibility than the Treasury ASAP system that is typically used. *See supra* at 12; Bafford Decl. ¶¶ 31, 33. EPA's concerns thus cannot justify termination. *State Farm*, 463 U.S. at 43 ("offer[ing] an explanation for its decision that runs counter to the evidence before" the agency is arbitrary and capricious).

---

[28] Lee Zeldin (@EPALeeZeldin), X (Mar. 18, 2025, 10:21 PM) (emphasis omitted).

Fourth, EPA cites its "inherent authority to reconsider prior determinations in light of new information." Dkt. 13-1. EPA cites no basis for such authority to reconsider prior grants, much less when doing so would violate applicable regulations and the grant's terms. And EPA identifies no "new information" about Plaintiffs that has come to light. To the contrary, EPA terminated all NCIF grants on the same day, using the same notice, based on supposed program-wide concerns— less than a year after awarding the grants following a rigorous review, when the program's structures and aims were fully disclosed and fully vetted along the way.[29]

Even if EPA had authority to terminate the grants based on the right to "chang[e] its course," it "is obligated to supply a reasoned analysis for the change." *Sierra Club v. Salazar*, 177 F. Supp. 3d 512, 537-58 (D.D.C. 2016); *see also Verizon v. F.C.C.*, 740 F.3d 623, 636 (D.C. Cir. 2014) ("[R]easoned decision-making ordinarily demands that an agency acknowledge and explain the reasons for a changed interpretation."). EPA does not offer any explanation, much less a reasoned one, for its stark about-face in just a year's time. More is required, especially given Plaintiffs' "good-faith reliance" on EPA's prior position. *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156-57 (2012); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016); Bafford Decl. ¶¶ 11, 72, 74; Buendia Decl. ¶ 6; Donovan Decl. ¶¶ 16-23; Decl. of Ari Matusiak ¶¶ 16-18 ("Matusiak Decl.").

---

[29] EPA refers in passing to a purported lack of "sufficient protections to guard against potential violations of the Constitution, particularly the Appointments Clause and private nondelegation doctrine." Ex. 11 at 1-2. Neither the Appointments Clause nor the private nondelegation doctrine is implicated by this grant agreement. No one at Citibank, Climate United, CGC, or PFC is an officer of the United States, which is a necessary prerequisite for the Appointments Clause to apply. *See Lucia v. SEC*, 585 U.S. 237, 241 (2018). And neither Citibank nor Climate United exercises the type of delegated regulatory authority that would trigger the private non-delegation doctrine. *See Alpine Securities Corp. v. FINRA*, 121 F.4th 1314, 1325 (D.C. Cir. 2024).

JA329

## 2.    EPA's Notices of Termination Violate Federal Regulations.

EPA's terminations are unlawful under the APA for the additional reason that they violate

federal regulations. "[A]n agency action may be set aside as arbitrary and capricious if the agency

fails to 'comply with its own regulations.'" *Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*,

752 F.3d 999, 1009 (D.C. Cir. 2014). Here, EPA's Notices represent that EPA is exercising its

authority under 2 C.F.R. §§ 200.339 and 340 and serving a notice of termination under 2 C.F.R.

§ 200.341. But the Notices violate all three regulations, as well as 2 C.F.R. § 200.342.

First, 2 C.F.R. § 200.339 recites:

> "The Federal agency … may implement specific conditions if the recipient or
> subrecipient fails to comply with the U.S. Constitution, Federal statutes,
> regulations, or terms and conditions of the Federal award. … When the Federal
> agency … determines that noncompliance cannot be remedied by imposing specific
> conditions, the Federal agency … may … terminate the Federal award."

Here, the Notices contain no finding that "the recipient or subrecipient fail[ed] to comply with the

U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award." *Id.*

Further, while the Notices include a vague reference to "material deficiencies" and assert that

"these deficiencies … cannot be remedied by imposing specific conditions," EPA provided no

explanation. CU Ex. 11 at 1. Plaintiffs have no idea what the "deficiencies" are or why they cannot

be remedied, and EPA does not link them to any legal obligations. Further, although EPA asserts

that there was "noncompliance [that] cannot be remedied by imposing specific conditions," it fails

to explain that assertion and simultaneously states EPA will "re-obligate lawfully appropriated

funds within the GGRF program with enhanced controls." CU Ex. 11 at 2. EPA fails to explain

why those "enhanced controls" could not be imposed here.

Second, 2 C.F.R. § 200.340(a) prescribes when a "Federal award may be terminated." As

relevant here, EPA may terminate a grant if a recipient "fails to comply with the terms and

conditions of the Federal Award." *Id.* § 200.340(a)(1). Plaintiffs have not failed to comply with the Terms and Conditions of their grants, and EPA does not argue otherwise.

EPA also may terminate a grant "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." *Id.* § 200.340(a)(4). The termination here does not comply with this provision either. The regulation clearly states that EPA may not terminate the grant because it does not "effectuate[] program goals or agency priorities" *unless* the termination is "*pursuant to the terms and conditions of the Federal award.*" *Id.* (emphasis added). The grant agreements here specify that the grants can be terminated for three reasons—none of which is a change in "program goals or agency priorities." *See supra* at 9-10 (describing three exclusive grounds for termination). Besides, even where (unlike here) the agency may terminate an award due to inconsistency with "program goals or agency priorities," that is permissible only when "clearly and unambiguously specif[ied]" in the grant's terms and conditions, 2 C.F.R. § 200.340(b), *and* "to the extent authorized by law." *Id.* Here, EPA's terminations do not satisfy either of these requirements.

Third, 2 C.F.R. § 200.340(b) provides: "The Federal agency … must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award." The Terms and Conditions of Plaintiffs' grants clearly and unambiguously describe "only" three grounds for termination. CU Ex. 3 at 41. But EPA's Notices do not rely on those three grounds, and instead describe many others—none of which is "clearly and unambiguously specified" in the relevant Terms and Conditions. So EPA's terminations violate this rule too.

Fourth, 2 C.F.R. § 200.341(a) states: "The written notice of termination should include the reasons for termination." As described above, EPA's Notices do not do so. Generic references to potential "waste" and "accountability," with no supporting evidence, do not suffice

Finally, 2 C.F.R. § 200.342 requires that upon "termination," an agency "must provide the recipient with an opportunity to object and provide information challenging the action." That did not happen here: EPA terminated the grants without warning and without hearing from Plaintiffs.

### 3.    EPA's Notices of Termination Violate the Inflation Reduction Act.

"[T]he President may not decline to follow a statutory mandate or prohibition simply because of policy objections." *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013). Here, Congress appropriated GGRF funds to EPA to be obligated by September 30, 2024. 42 U.S.C. § 7434. EPA ran the competitive process required by the statute, granted the awards, obligated the funds, and disbursed them. It would violate the statutory directive set forth in Congress's enactment to undo the program, and EPA has zero statutory authority to take the money back. *In re Aiken Cnty.*, 725 F.3d at 266 ("Prosecutorial discretion does not include the power to disregard other statutory obligations that apply to the Executive Branch, such as statutory requirements to issue rules, … or to pay benefits, or to implement or administer statutory projects or programs").

Indeed, even if the Administrator canceled the program *before* the grants were made, the Administrator's actions would be illegal because they would conflict with Congress's directive to obligate the appropriated funds. *See Train v. City of New York*, 420 U.S. 35, 42-43 (1975) (holding that EPA lacked authority to impound appropriated funds based on policy disagreement with Congress). Here, the funds in question were not just appropriated, as in *Train*, but disbursed to grantees. They are now the grantees' funds. Congress provided no authority to take them back.

EPA's termination letters represent that the agency will seek "to re-obligate lawfully appropriated funds within the GGRF program." CU Ex. 11 at 2; CGC Ex. I at 2; PFC Ex. J at 2. This is irrelevant for two reasons. *First*, the funds have not just been appropriated; they have been obligated and disbursed to grantees. Nothing in the Inflation Reduction Act authorizes EPA to claw back these funds and re-obligate them. *Second*, EPA's action violates the Inflation Reduction

34

Act's deadline. By terminating all NCIF grants and re-obligating all the funds, EPA would be effecting a new grant-awarding program in 2025—after the September 30, 2024 deadline for GGRF award. 42 U.S.C. § 7434(a)(1)-(3).

Moreover, there is reason to doubt whether these funds will be re-obligated. As in *AIDS Vaccine*, "the record here shows that Defendants are acting to rescind or defer the funds Congress has appropriated and have no intent to spend them." 2025 WL 752378, at *15. As in *AIDS Vaccine*, there are "multiple public statements in which the President and other senior officials have said Defendants' actions are being undertaken to end [GGRF] funding" altogether. *Id.* Administrator Zeldin consistently referred to the GGRF as the "Biden Harris Administration's $20 billion 'gold bar' scheme," falsely claiming that EPA "found $20 billion dollars [sic] parked at a financial institution by the Biden-Harris Administration to fund partisan pet projects."[30] President Trump referred to one of Plaintiffs' awards as an example of alleged "flagrant waste[s] of taxpayer dollars" during his March 4, 2025 speech to Congress. And again, the Court should consider what Administrator Zeldin stated after the TRO—that he would "not rest until these hard-earned taxpayer dollars are returned to the U.S. Treasury."[31]

### 4.    EPA's Suspension of the Grants Violates the APA.

Before EPA terminated the grants, EPA effectuated a suspension of the grants, including by inducing FBI to send its "recommendation" to Citibank and inducing Treasury to direct Citibank to freeze Plaintiffs' assets. That suspension also violated the APA and the Constitution. To the extent EPA contends that its illegal suspension remains in force even if its illegal termination is enjoined, that illegal suspension should be enjoined as well.

---

[30] Press Release, EPA, <u>ICYMI: Administrator Lee Zeldin Announces EPA Found Billions of Dollars Parked at an Outside Financial Institution by Biden Administration</u> (Feb. 15, 2025).
[31] <u>Lee Zeldin (@EPALeeZeldin)</u>, X (Mar. 18, 2025, 10:21 PM) (emphasis omitted).

The ACAs authorize only one way for EPA to direct Citibank to disregard disbursement requests from Plaintiffs' accounts: by delivering a Notice of Exclusive Control. CU Ex. 8 § 2. That, in turn, requires the conditions for terminating the grant be satisfied. CU Ex. 9 at Ex. A. EPA never sent any Notice of Exclusive Control; it could not, because the conditions are not satisfied.

No source of law authorized EPA to induce the FBI to send an intimidating "recommendation" to Citibank to freeze funds related to Plaintiffs' grants. Nor was EPA authorized to induce Treasury to direct Citibank to freeze those funds. The FAA permits Citibank to freeze assets only "in accordance with the [ACAs]," Dkt. 21 at Ex. A, § I.B.4, and only in response to "lawful instructions or directions" from Treasury, *id.* § 5.A. Here, the freeze was not undertaken "in accordance with" the ACAs. And Treasury's "instructions or directions" to freeze funds related to Plaintiffs' grants were not lawful because they had no legal or factual basis, *see supra* at 27-31, and violated Plaintiffs' due process rights, *see infra* at 41-44.

The suspension also violated federal regulations. Under 2 C.F.R. § 200.305(b)(6), EPA may not withhold payment for allowable costs during the period of performance unless it is: required by Federal statute or regulations; the recipient "has failed to comply with the terms and conditions" of the award; or the recipient is "delinquent in a debt to the United States." None of those conditions is satisfied. Where funding is withheld because a recipient failed to comply with terms and conditions of the award, the agency may "[t]emporarily withhold payments" only where it "determines that noncompliance cannot be remedied by imposing specific conditions." 2 C.F.R. § 200.339. That condition is also not satisfied as there was no violation of terms or conditions.

**5.    EPA's Proffer Confirms Plaintiffs Will Prevail on Their APA Claims.**

At the March 12 hearing, this Court ordered EPA to file a declaration "setting forth the basis for the termination," including "evidence of the fraud, waste, and abuse, or … credible evidence that Climate United violated criminal law [or] the False Claims Act." Dkt. 22 at 30.

EPA's response, a sworn declaration from Chief of Staff Eric Amidon (Dkt. 25-1), was not among the "grounds upon which the agency acted" when it purported to terminate Climate United's grant (or the grants for CGC or PFC), so it cannot be used to "sustain[]" the agency's decision. *See SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943); *State Farm*, 463 U.S. at 50 (noting court "may not accept" any "post hoc rationalizations" for agency action).

Even so, the Amidon Declaration confirms that EPA has still "proffered no evidence to support the basis for … the sudden terminations, or that they followed the proper procedures," Dkt. 28 at 14. It repeats many of the same generic and irrelevant grounds EPA offered in the Notice, and cites the same investigations into "potential" misconduct that have been publicly reported. Yet it offers no *evidence*, much less *credible evidence*, of any misconduct, and contains no basis to terminate any Plaintiff's grant. *See* Dkt. 25-1 ¶ 42-43. Indeed, EPA never explains why it makes sense to terminate grant programs *before* its review and other investigations are completed. *See* Dkt. 28 at 16-17. The mere existence of the reviews and investigations, which are tainted by dubious circumstances, do not support termination. *See supra* at 15-19.

The few statements specific to Plaintiffs do not support termination. As to PFC, the Amidon Declaration includes no individualized allegations at all.

In the only statement specific to Climate United, the declaration notes that an unspecified "media article" identified "potential conflicts of interest" because Climate United's CEO served as a community organizer on the Obama campaign and as an assistant in the Office of Management and Budget in the Obama Administration, and Climate United's Chief Strategy Officer worked as a contractor at the Department of Energy during the Biden Administration. Dkt. 25 ¶ 35; *see* Bafford Decl. ¶ 16 & n.1. These individuals' prior employment is not "credible evidence of the commission of a violation of Federal criminal law involving" a "conflict of interest." Ex. 3 at 13.

Indeed, it does not even qualify as a conflict of interest under applicable EPA regulations or under EPA's own policy referenced in the award's Terms and Conditions. Ex. 3 at 44. And these work histories did not impact Climate United's selection because "Climate United did not have any relationship with anyone inside EPA or, to its knowledge, with any reviewers across the agencies during the application and selection process." Bafford Decl. ¶ 16.

As to CGC, the Amidon Declaration references "concern that the GGRF program had been affected by conflicts of interest," referencing a June 27, 2024 ethics complaint "recently resubmitted" on March 7, 2025 regarding a Biden Administration climate advisor who had served on CGC's board prior to joining the administration and rejoined it "in 2023 while the organization was applying for GGRF funding." Dkt. 25-1 ¶ 34. But Mr. Hayes's employment in the administration similarly presented no "conflict of interest" with respect to CGC's selection as a GGRF grantee, as Mr. Hayes had no role in the Administration in any respect in working on the GGRF provisions that were ultimately included in the Inflation Reduction Act, and no role on the implementation of the program, and could not have had any role in selection of CGC has he departed prior to the NOFO being issued. Hopson Decl. ¶ 23.

The declaration also references the same unspecified "media article" identifying a "potential conflict[] of interest[]" because a former policy director at CGC left CGC in 2021 to "work at President Biden's Climate Policy Office on GGRF implementation." Dkt. 25-1 ¶ 35. This too is publicly available information, and omits that the referenced individual worked in the Climate Policy Office and then at EPA, so any credible evidence of a conflict of interest would be in EPA's hands. The Amidon Declaration cites no such evidence, however.

The Amidon Declaration cites GGRF's structure, including use of a financial agent and subgrantees. *See* Dkt. 25-1 ¶ 39. These are not grounds for terminating Plaintiffs' grants. As EPA

described from the outset, they are features designed to make the "green bank" concept function properly—not bugs. *See* Bafford Decl. ¶¶ 29-32. Moreover, Plaintiffs were "not involved in EPA's decision to include the financial agent concept" in the NOFO and "had no role in the selection of the financial agent, which was coordinated" by EPA and Treasury. *E.g.*, *id.* ¶ 30.

The Amidon Declaration describes the content and timing of the NOA and ACA amendments, suggesting they improperly limit EPA's ability to terminate and oversee the grant. Dkt. 25-1 ¶¶ 17-21, 26, 37, 39, 41. Yet again, EPA's statements contain no fact or law that would support terminating any Plaintiff's grant. And EPA ignores that the amendments' clarifications were expected, routine, transparent, and designed to ensure program success. EPA also ignores that the structure and grant terms here provide the agency with *more* transparency, and include many ways for EPA to both conduct oversight and prevent mismanagement. *See* Bafford Decl. ¶¶ 21, 33. Tellingly, EPA offers no legal or factual basis to terminate a grant simply because new leadership would prefer a do-over in designing and implementing the program.

Finally, EPA cites "misalignment" with certain of "leadership['s] … policies and priorities." Dkt. 25-1 ¶ 1, 40-41, 44; *see also id.* ¶¶ 37, 39.[32] EPA does not cite any regulation, statute, grant term, or legal authority that permits it to terminate grants based merely on a change in priorities. Instead, as EPA seems to acknowledge, *id.* ¶¶ 28-30, the regulations that apply to *Plaintiffs'* grants do not permit termination on policy grounds because those grounds are not stated in the terms of the awards. *See* 2 C.F.R. § 200.340. In response to the Court's explicit Order, EPA still has not provided any evidence to satisfy any of those grounds.

---

[32] EPA ignores that the NCIF program supports three of the Administrator's new stated priorities: "Clean Air, Land, and Water for Every American," "Restore American Energy Dominance," and "Protecting and Bringing Back American Auto Jobs." Press Release, EPA, <u>EPA Administrator Lee Zeldin Announces EPA's "Powering the Great American Comeback" Initiative</u> (Feb. 4, 2025).

**B.    Plaintiffs Are Likely to Succeed on Their Appropriations Clause Claims.**

EPA's terminations violate the Appropriations Clause, which states: "No Money shall be drawn from the Treasury, but in consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. "[A]n appropriation is simply a law that authorizes expenditures from a specified source of public money for designated purposes." *CFPB v. Cmty. Fin. Servs. Ass'n*, 601 U.S. 416, 424 (2024). The Inflation Reduction Act's provisions authorizing $27 billion to be spent under the GGRF program are "appropriations" under that definition.

Congress was explicit in the GGRF: EPA was required to obligate all GGRF grant funds through competitive processes, following the criteria Congress imposed, by September 30, 2024. And because "grants" are legally binding agreements, *see Henke v. U.S. Dep't of Com.*, 83 F.3d 1445, 1451 (D.C. Cir. 1996), and Congress presumably expected EPA to act lawfully, Congress anticipated that the grants that were in existence as of September 30, 2024 would remain in place so long as EPA did not have a legal basis for terminating them. But by cancelling all the grants unlawfully, based on new policy priorities, and re-obligating the funds according to those new priorities, EPA violates Congress's directive about how to spend public money—*i.e.*, on clean-energy grants that meet certain criteria and are awarded before September 30, 2024. EPA therefore violated the Appropriations Clause's core promise that "public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents." *OPM v. Richmond*, 496 U.S. 414, 427-28 (1990).

EPA's action also raises grave separation-of-powers concerns. "The Appropriations Clause is … a bulwark of the Constitution's separation of powers among the three branches of the National Government." *Dep't of Navy v. FLRA*, 665 F.3d 1339, 1347 (D.C. Cir. 2012). "It is particularly important as a restraint on Executive Branch officers: If not for the Appropriations Clause, 'the executive would possess an unbounded power over the public purse of the nation; and might apply

all its monied resources at his pleasure.'" *Id.* (quoting 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1342, at 213-14 (1833)). By terminating GGRF grants awarded based on EPA's policy priorities as of September 30, 2024, then using those funds for awards based on EPA's policy priorities after that date, EPA would be violating Congress's clear direction. This unilateral authority to re-obligate government funds, directly contrary to the intent of Congress, is precisely the outcome the Appropriations Clause was designed to prevent.

**C.    Plaintiffs Are Likely to Succeed on Their Due Process Claims.**

The Fifth Amendment provides that "[n]o person shall … be deprived of … property, without due process of law." U.S. Const. amend. V. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner" before being "finally deprived of a property interest." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). EPA repeatedly failed to provide Plaintiffs with any notice or any opportunity to be heard before depriving it of its vested property rights in NCIF grant funds. That violated due process.

Plaintiffs have a protected property interest in the grant funds EPA awarded under the NCIF because they are in Citibank accounts in Plaintiffs' names or affiliated with Plaintiffs' grants, and subject to their control. These are not funds in the Treasury that Plaintiffs have a future legal interest in obtaining; they are Plaintiffs' funds right now. NCIF grant "funds were fully obligated by EPA" under the notices of award. Bafford Decl. ¶ 26; *see* Ex. CU 3 at 1 (confirming obligation on August 8, 2024). They were deposited at Citibank, and, since then, the funds have belonged to Plaintiffs and their subgrantees. Bafford Decl. ¶ 27; *see* CU Ex. 8 ¶ 1(c) (describing grantees as the "entitlement holder[s] with respect to all financial assets"); CU Ex. 3 at 56 (authorizing grantees to "legally obligate[]" grant funds "for financial obligations" to third parties). Though EPA retains "a perfected security interest" in the grant funds—an interest "grant[ed] to EPA" by Plaintiffs, Ex. 3 at 56—EPA cannot exercise its security interest except in limited specific

41

circumstances and lacks discretion to revoke those funds unilaterally. *See supra* at 11-12.

EPA violated Plaintiffs' right to due process by freezing and then terminating Plaintiffs' grant funds without notice or an opportunity to be heard. EPA spurred the FBI to launch an investigation and "recommend" that Citibank freeze Plaintiffs' assets: Administrator Zeldin publicly announced that he would "work with the Justice Department" to ensure EPA "reassume[s] responsibility for all of these funds."[33] Similarly, EPA is responsible for Treasury's decision to direct Citibank to freeze Plaintiffs' funds, as Treasury itself has made clear. *See* Dkt. 14-7.

The asset freeze—for which EPA is responsible—violated the Due Process Clause. Assets cannot be frozen, even temporarily, without due process. *United States v. E-Gold, Ltd.*, 521 F.3d 411, 416 (D.C. Cir. 2008). "[T]he general rule" is that due process "requir[es] predeprivation notice and hearing." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53 (1993). That certainly did not happen here. EPA failed to provide Plaintiffs with notice of the freeze, then repeatedly ignored Plaintiffs' requests for information once their grant funds were inaccessible.

While post-deprivation notice and a hearing may suffice in "extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after" the deprivation of property, *id.*, EPA has never explained or suggested why this case presents such an "extraordinary situation"—and in any event, Plaintiffs did not receive post-deprivation process. EPA refused repeated requests for information *after* Plaintiffs' grant funds were secretly frozen as a result of the FBI "recommendation" on February 17. And Plaintiffs were kept in the dark on March 4, when EPA caused Treasury to order the freeze to continue until March 9, Dkt. 14-7, and on March 10, when EPA ordered the freeze to continue "until further notice." Dkt. 14-2. *Citibank*, not EPA, finally revealed the truth in its brief in this Court on March 12.

---

[33] Lee Zeldin (@EPALeeZeldin), X (Feb. 12, 2025, 7:52 PM).

Under the egregious circumstances of this case, the Court should find that EPA's actions violate the Due Process Clause. The facts are extraordinary, and bear repeating.

To obtain a seizure warrant, a government official must submit a sworn affidavit to a judge upon probable cause; once the warrant issues, the affected party receives notice of the seizure and an opportunity to contest it. *See* Fed. R. Crim. P. 41(d)(1), (g). Here, the government did not obtain a seizure warrant (and published reports indicate that the U.S. Attorney attempted to get a seizure warrant and failed). Instead, FBI sent a purported "recommendation" letter to Citibank to freeze Plaintiffs' funds for 30 days. This purported "recommendation" was not based on a sworn affidavit. FBI lacked probable cause that any crime was committed. No neutral magistrate approved the seizure (indeed, a neutral magistrate rejected it). Citibank, upon receiving this letter from FBI, predictably acquiesced, freezing Plaintiffs' accounts. But Plaintiffs received no notice or hearing. In the days that followed, EPA repeatedly ignored Plaintiffs' requests for information about what was happening and why, failed to engage when Plaintiffs attempted to initiate discussions, refused to meet, and stated publicly that Citibank was acting "voluntarily." *See* Bafford Decl. ¶¶ 45 (Feb. 20), 49 (Feb. 27), 52 (Mar. 4), 54 (Mar. 8), 55 (Mar. 10); Dkt. 14-6.

Meanwhile, EPA worked with Treasury to "direct" and "instruct" Citibank to maintain, and then to extend, the freeze on Plaintiffs' accounts. Yet EPA informed Plaintiffs about none of this, and Plaintiffs never received an opportunity to be heard.

EPA's subsequent attempt to terminate Plaintiffs' grants was a continuation of the illegal freeze, and part and parcel of the same due process violation. EPA issued its facially unlawful termination notices on the evening of March 11 in a blatant effort to moot the TRO hearing this Court had set for the next day. EPA was able to do so only because counsel for Climate United agreed, out of professional courtesy, to EPA's request for a 24-hour extension of time to respond

43

to Climate United's TRO motion. That context makes it particularly clear that EPA's illegal termination should be understood as an extension of the illegal freeze: EPA decided that it would unilaterally freeze Plaintiffs' assets without legal justification and without due process, and, on the eve of a court hearing to address that freeze, EPA served a facially illegal "termination" letter to attempt to insulate its unlawful asset freeze from judicial review. That effort must fail.

### D.    Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief Against EPA.

As the Court has recognized, Defendants' actions have caused and will continue to cause Plaintiffs irreparable harm that warrants the grant of injunctive relief.

#### 1.    Climate United Will Suffer Irreparable Harm.

Climate United faces numerous irreparable harms from EPA's action.

First, financial harm can "constitute irreparable harm … where the loss threatens the very existence of the movant's business." Dkt. 28 at 21 (citing *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). EPA's actions have resulted in "extreme hardship" to Climate United that threatens its "very existence." *Nat'l Ass'n of Mortg. Brokers v. Board of Governors of Fed. Res. Sys.*, 773 F. Supp. 2d 151, 179 (D.D.C. 2011); *see Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 2025 WL 597959, at *18 (D.D.C. Feb. 25, 2025) (granting preliminary injunction where funding freeze impacted organizations that "rely on continued funding in order to keep their doors open"). Climate United meets this standard. It will also suffer nonquantifiable harm to its reputation and mission that independently qualifies as irreparable harm.

Other than emergency charitable recoverable grants, Climate United has no funding beyond its NCIF grants. Bafford Decl. ¶¶ 4, 59. Thus, "if Climate United does not obtain a preliminary injunction, and is forced to wait to have access to its grant funding restored, Climate United would not survive as it exists today and would need to wind down its operations." *Id.* ¶ 5. "Climate United likely would be forced to lay off substantially all staff and may not be able to

reopen for business again, given the lost staff, deals, and reputational harm." *Id.* "Without access

to its funds or a viable alternative funding source," Climate United likely "would not be able to

litigate this case to judgment," even if its claims are meritorious. *Id.*

Climate United faces an imminent risk of not being able to pay payroll or health, vision,

and dental benefits, life insurance, and short- and long-term disability insurance for its employees.

*Id.* ¶ 62. It has already been forced to defer compensation for certain employees, terminate multiple

vendors, cancel travel, and instruct non-essential lawyers, accountants, and consultants to cease

work to preserve its available cash. *Id.* It also risks not being able to pay rent or insurance for select

offices or to pay contractors who perform necessary roles like auditing financial statements,

maintaining IT security and infrastructure, and providing legal services. *Id.* ¶ 67.

Moreover, Climate United will suffer irreparable economic harm because the withdrawal

of grant funding will "perceptibly impair[] the organization's programs" and "make it more

difficult" for Climate United "to accomplish [its] primary mission." *League of Women Voters*, 838

F.3d at 8-9. For example, Climate United has already awarded pre-construction financing for a

major solar power project in Arkansas and launched a project to purchase and lease battery electric

heavy-duty trucks in California. Neither project could go forward without continued access to

grant funds. Bafford Decl. ¶¶ 69-70. And future projects, such as the 22 awards across 18 states

that were recently approved as part of the Climate United NEXT program, would not be funded.

*Id.* ¶ 68. Importantly, there is no way Climate United could fund these projects unless it obtained

a *preliminary* injunction. *Id.* ¶¶ 68-70. Again, without preliminary relief, Climate United will have

no choice but to abandon its operations. *Id.* It would be unlikely to litigate this case to final

judgment. And its projects—those Congress sought to bring about—would never materialize.

As a consequence of the dire consequences of grant termination, Climate United has searched, and continues to search, for emergency financial assistance. *See* Dkt. 26 at 2 (discussing potential receipt of emergency recoverable charitable grant). It has done so because, as the Court has recognized, Climate United's "operations and projects all derive from the grant money, which is used to pay employees, pay rent, and fund projects." Dkt. 28 at 10. For that reason, absent an injunction "release[ing] the grant funds, imminent harm is unavoidable." Dkt. 28 at 19.

Climate United's harm also qualifies as irreparable for two additional reasons. First, courts find irreparable harm where "the subject of the action involves a specific fund"—and the issue here is Climate United's access to specific Citibank accounts containing specific funds. *Destiny USA Holdings, LLC v. Citigroup Glob. Mkts. Realty Corp.*, 69 A.D.3d 212, 217 (N.Y. App. Div., 4th Dep't 2009) (granting preliminary injunction against Citigroup when Citigroup failed to honor draw requests from specific account); *see Deem v. Baron*, 2018 WL 377286, at *2 (D. Utah Jan. 11, 2018) ("Many cases hold that a monetary damages claim directed at a specific fund is viable as an irreparable injury worthy of an injunction because the property … is the true subject of the action."). Second, courts find irreparable harm where a party is unable to access funds awarded pursuant to an act of Congress—which is precisely the situation here. *See New York v. Trump*, 2025 WL 715621, at *15 (finding plaintiffs "unquestionably" suffered "significant and irreparable harm" where they "continue to experience interruptions to access and … draw[] down funds from grants funded by" the Inflation Reduction Act).

Even if Climate United could somehow keep the lights on until this case reaches final judgment, it would still be irreparably harmed without a preliminary injunction. Climate United's work is highly specialized and requires sophisticated and skilled investment professionals "with expertise in credit underwriting, structuring, and asset management," and "experience in the

46

private credit markets to assess expected and unexpected risks based on prior knowledge of similar transactions, market data, and industry dynamics." Bafford Decl. ¶¶ 63-64. Without stable funding, these individuals are likely to leave and find other employment, and Climate United will not be able to attract quality replacements—even if its access to funds is later reinstated. *Id*. ¶¶ 64-65. This "loss of talent and the inability to recruit and retain employees to build—or even maintain—[a plaintiff's] business" constitutes irreparable harm. *Luokung Tech. Corp. v. Dep't of Def.*, 538 F. Supp. 3d 174, 194 (D.D.C. 2021) (collecting cases).

Climate United's reputation will also be irreparably and irreversibly harmed absent access to its grant funds. Without secure funding, Climate United will be unable to attract the high-quality partners and co-investors, and secure the attractive deal terms, necessary to develop and carry out clean energy projects. Bafford Decl. ¶¶ 72-75; *see, e.g., Beacon Assocs., Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277, 288 (D.D.C. 2018) ("termination for alleged default" would have clear reputational harms). Indeed, multiple current and potential partners have expressed unwillingness to work with Climate United while its funding is frozen—including a manufacturer who paused all engagement until it could be "more confident that funds will not be clawed back," and a partner who said it was "not allocating resources to [Climate United's] RFP" until there is "resolution of some of the uncertainty" around NCIF funds. Bafford Decl. ¶ 75. This reputational damage reduces the quality and quantity of potential projects Climate United can pursue and the willingness of private capital to co-invest in those projects. That harm qualifies as irreparable. *Atlas Air, Inc. v. Int'l Brotherhood of Teamsters*, 280 F. Supp. 3d 59, 103 (D.D.C. 2017).

### 2.   CGC Will Suffer Irreparable Harm.

For similar reasons, CGC and its subgrantees have suffered and will continue to suffer irreparable harm absent injunctive relief, including injury to reputation, loss of goodwill, an inability to implement ongoing programs, loss of business opportunities and clients, harm to their

organizational missions, and harm from loss of access to a congressionally authorized program.

**_Injury to CGC's programs and CGC's lost partnerships and investment opportunities._**

Defendants' conduct deprived CGC and its subgrantees of known and unknown opportunities and partnerships. _See Nalco Co. v. EPA_, 786 F. Supp. 2d 177, 188 (D.D.C. 2011). These sorts of losses when suffered by a non-profit organization—like CGC—are "different in kind from economic loss suffered by a for-profit entity" and deemed irreparable even if not franchise-terminating. _Tex. Children's Hosp. v. Burwell_, 76 F. Supp. 3d 224, 242-44 & n.7 (D.D.C. 2014) ("Plaintiffs may not be driven out of business, but the programs they provide may be.").

As CGC explains, the allegations have already harmed CGC's efforts to partner with investors, financial institutions, and vendors, preventing it from carrying out its mission:

- CGC's program to partner with nascent green banks across the country, the Network Loan Program, has been stopped in its tracks. Decl. of Stephen Brown ¶¶ 6-10 ("Brown Decl."). EPA's allegations and Administrator Zeldin's unlawful efforts to terminate the GGRF have already led at least one local partner, a green bank in the Midwest, to refuse funds from CGC. _Id._ ¶ 9. Other participants have delayed joining CGC's program or deploying _any_ funds under loans received from it, rather than carry out the investments as planned, stalling the growth of CGC's network. _Id._ ¶¶ 6-7, 11.

- Another major CGC initiative, the Municipal Investment Fund, has also been hamstrung by the Defendants. Buendia Decl. ¶¶ 7-14. The program launched in January, with applications closing on March 5. _Id._ ¶ 5. Following EPA's accusations against GGRF participants and Citi's freeze on CGC's funds, CGC staff began to face questions and concerns from potential applicants who feared that "the new EPA administration's attempts to freeze GGRF [would] impact the viability" of CGC's program, or expressed concern that the "likelihood of recapture" of CGC's funds meant that CGC's program did not have "a high likelihood of success." _Id._ ¶ 9. Ultimately, CGC received applications from less than 20% of the interested parties. _Id._ ¶ 8.

- And CGC's efforts to identify and direct funding to investment projects have suffered. For example, CGC launched its first grant and financing program, "Request for Proposals One" or "RFP1," in November 2024. Kauffman Decl. ¶¶ 8-9. At least one potential investment recipient has already suspended negotiations with CGC, stating that it feared that closing the deal with CGC would invite unnecessary and harmful scrutiny of the project. _Id._ ¶ 12. In addition, CGC has funded investment vehicles intended to bolster private-sector investment in clean energy projects and market these vehicles. _Id._ ¶ 13. Because of the EPA's actions, CGC's partners have halted any plans

48

to market the investment vehicles pending this litigation, threatening the viability of CGC's program.

These losses are certain to continue unless an injunction is issued. Brown Decl. ¶ 6; Buendia Decl. ¶ 10-11; Hopson Decl. ¶¶ 25-27. CGC's loss of these potential clients and vendors, and the reputational injury that will impede its efforts to recruit new ones (described below), are irreparable harm. And by freezing CGC's funding, Defendants have blocked access to the administration funds CGC and its partners need to vet project applications, blocking CGC's ability to move forward in implementing the program. Buendia Decl. ¶¶ 11-14, 18 (describing harms to CGC and its partner ICLEI). CGC has had to pause its technical assistance and knowledge sharing activities. Brown Decl. ¶¶ 5, 7, 12. And CGC cannot disburse funds that were already committed. This irreparable injury is not quantifiable. *See Luokung*, 538 F. Supp. 3d at 192-93 (loss of customers that would "accelerate" without injunction was irreparable harm); *Mass. Law Reform Inst. v. Legal Servs. Corp.*, 581 F. Supp. 1179, 1187-88 (D.D.C. 1984).

**Reputational and competitive harms**. That EPA purported to terminate CGC's grant agreement for cause is sufficient to find irreparable harm. *See Beacon Assocs.*, 308 F. Supp. 3d at 288 (irreparable harm from "termination for alleged default"). EPA, without any basis or evidence, charged CGC with "fraud, waste, and abuse," and "the improper and speculative allocation of funds," and EPA invoked its "duty to protect public funds and maintain the integrity of its grant programs." CGC Dkt. 6-1. EPA's unsubstantiated and dishonest accusations compound the reputational damage. *See Patriot, Inc. v. Dep't of Hous. & Urb. Dev.*, 963 F. Supp. 1, 3-4, 5 (D.D.C. 1997); *Luokung*, 538 F. Supp. 3d at 194 (similar).

As CGC's staff has explained, CGC's reputation as a reliable and trustworthy partner and investor is critical to CGC's operations, including in maintaining its nationwide network of member institutions, locating high-quality investments around the country, and bringing in private-

sector investments to clean energy projects that might otherwise fail to attract capital. Brown Decl. ¶¶ 11-13, Buendia Decl. ¶¶ 16-18; Kauffman Decl. ¶¶ 7-8, 13. EPA's and Citibank's actions have harmed this reputation. Brown Decl. ¶¶ 11-13; Kauffman Decl. ¶¶ 18-24.

The reputational injury to CGC will have far-reaching consequences for CGC and its partners and subgrantees. Under federal regulations, agencies must "conduct[] a risk assessment to evaluate the risks posed by applicants before issuing Federal awards." 2 C.F.R. § 200.206(b)(1). This requires consideration of an applicant's "[h]istory of performance" and its "compliance with reporting requirements and conformance to *the terms and conditions of Federal awards*." *Id.* § 200.206(b)(2)(iii). EPA's actions, if permitted to stand, would place a for-cause termination on CGC's performance record, endangering CGC's (and its subgrantees') future efforts to win grant funding from the federal government and any state or local governments with similar requirements. Buendia Decl. ¶¶ 20-23. These reputational harms may spread to private-sector investments as well. Buendia Decl. ¶ 24. Citibank's freezing of CGC's funds at EPA's direction has also harmed CGC's reputation as a lender and, if allowed to continue, will harm it further. Again, CGC must be perceived as a reliable investor and partner to succeed in its mission. Kauffman Decl. ¶ 18. A longstanding delay in CGC's ability to disburse funds and to execute on its programs will irreparably harm this reputation. *Id.* ¶¶ 16-17; Brown Decl. ¶¶ 11-13; Buendia Decl. ¶¶ 15-18.

A prolonged inability to deliver will also harm CGC's value proposition and consumer perception, Brown Decl. ¶ 12, especially where there are alternative organizations to which CGC's members could turn, *id.* ¶ 13. CGC's network is integral to its long-term strategy, because they help invest alongside CGC, identify and support suitable investment opportunities, and build partnerships in local communities. *Id.* ¶¶ 11-12; Hopson Decl. ¶¶ 3-5; Buendia Decl. ¶ 16-17; Kauffman Decl. ¶¶ 11-14. The knock-on effects of CGC's loss of such partnerships cannot be

JA348

calculated. *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 77 (D.D.C. 2001); *Clevinger v. Advocacy Holdings, Inc.*, 2023 WL 4560839, at *5 (D.D.C. July 15, 2023).

*CGC's organizational mission*. Defendants' actions irreparably impede CGC's efforts to accomplish Congress's objectives. Hopson Decl. ¶¶ 27-28. In authorizing and funding the GGRF, Congress directed the EPA to allocate funds to develop projects that will "reduce[] or avoid[] greenhouse gas emissions and other forms of air pollution in partnership with, and by leveraging investment from, the private sector." 42 U.S.C. § 7434(c)(3)(A). CGC has worked ceaselessly since 2012 to accomplish this objective. Hopson Decl. ¶¶ 3-5. So long as EPA's and Citibank's actions stand, CGC cannot do so. In the meantime, specific internal goals and objectives CGC has set, such as its intent to partner with local organizations in all fifty States, are jeopardized by EPA's and Citibank's harm to CGC's reputation, and are certain to fail so long as the freeze on CGC's funding remains in place. *Id.* ¶ 26; Buendia Decl. ¶¶ 7, 10, 15.

### 3.    PFC Will Suffer Irreparable Harm.

PFC, too, has suffered and—in the absence of a preliminary injunction—will continue to suffer irreparable harm in multiple respects. To begin, EPA's purported termination of PFC's award "for cause" has harmed PFC's reputation. According to EPA, after all, PFC's award was terminated because PFC engaged in "fraud, waste, and abuse" and/or its award was somehow tainted by "conflicts of interest." PFC Ex. J at 1. Despite the falsity of those accusations, the result has been a chilling effect on key vendors and investment partners who now view business with PFC and its subgrantees as financially and reputationally risky. Mayopoulos Decl. ¶¶ 20, 26; *see also* Matusiak Decl. ¶ 20 ("[T]he 'on again, off again' nature of the conversations with lenders on account of EPA's and Citibank's actions has lessened those lenders' confidence in the reliability of these dollars," leaving "RCIF [] at risk of losing these partnerships altogether."). Unless EPA defendants are enjoined from implementing their unlawful termination, PFC will continue to suffer

reputational harm that impedes its operations and mission. *See Armour & Co.*, 304 F.2d 404, 406 (D.C. Cir. 1962).

The impact of EPA's and Citibank's unlawful actions has been "so severe as to cause extreme hardship to [PFC's] business or threaten its very existence." *Nat'l Ass'n of Mortg. Brokers,* 773 F. Supp. 2d at 179. As a result of EPA's purported termination and the uncertainty surrounding PFC's award, PFC has lost essential services—including the compliance, accounting, and financial management services of its key contractor. PFC Mayopoulos Decl. ¶ 21. PFC is in discussions with this contractor to resume work on a limited set of projects, but even if that arrangement is finalized, it will leave PFC without critical services going forward. *Id.* And now that EPA has assertedly terminated PFC's award, PFC and its subgrantees face the prospect of having to cease operations altogether. *Id.* ¶ 28; Donovan Decl. ¶ 26; Matusiak Decl. ¶ 24; Moon Decl. ¶ 31. That is irreparable harm, as courts in this district have recognized.

Citibank's suspension of PFC's accounts, at EPA's direction, also impedes PFC's ability to pay its people and to recruit and hire essential new employees. All of PFC's staff are either employees whose positions are funded entirely by the NCIF award or secondees on loan to PFC under secondment and services agreements. Mayopoulos Decl. ¶ 23. The suspension of PFC's NCIF funds has threatened its ability to compensate these individuals—as well as to recruit and onboard badly needed new hires. *Id.* PFC's budget called for a team of 30 employees (24 more than it currently has), including a Chief Financial Officer, a Chief Legal Officer, and a Director of Human Resources. *Id.* ¶ 24. PFC had identified candidates for each of those executive positions, but, given its current funding status, cannot move forward with hiring the preferred candidates and may permanently lose the ability to do so. *Id.* Subgrantee EGA also has been forced to pause hiring, and was required to rescind an outstanding offer to a candidate in February due to its lack of access

to funds. Donovan Decl. ¶ 24. This inability to recruit and hire talented employees constitutes irreparable harm. *See Luokung*, 538 F. Supp. 3d at 194.

Beyond these impacts, Defendants' unlawful actions have made it "more difficult for [PFC and its subgrantees] to accomplish their primary mission[s]." *League of Women Voters*, 838 F.3d at 9. Without access to their funds, these organizations are not able to move forward with the projects they committed to undertake. For example, through its NCIF funding, EGA is expected to provide $11.5 million in financing to renovate an affordable senior-living housing apartment complex. Donovan Decl. ¶ 22. Rehabilitation is urgently needed because the property is at risk of being uninsurable due to the absence of fire sprinklers. *Id*. Yet, EGA cannot provide this financial assistance without access to its NCIF funds, leaving EGA unable to meet its commitment and the seniors residing in this apartment complex without safe or reliable housing. *Id*. Multiple affordable housing projects slated to be financed by subgrantee LISC Green are similarly poised to fall through—including one that will fail if LISC Green is unable to make a $90,000 deposit by March 31, 2025. Moon Decl. ¶¶ 16-23 (describing projects at risk due to Defendants' actions).

PFC's and its subgrantees' inability to carry out their organizational missions has a direct and devastating impact on their constituents. Among the projects in EGA's pipeline are affordable housing construction projects, including a 160-home rent-subsidized apartment community in Detroit, Michigan and a 192-unit project in Virgina—both of which will likely fail if access to funds is not restored imminently. Donovan Decl. ¶¶ 18-19. The same is true of LISC Green's NCIF-funded housing projects. Absent immediate access to funds, projects expected to provide affordable housing to 182 lower-income families in Iowa, Texas, and Michigan will likely fail. Subgrantee RCIF, too, is at risk of defaulting on obligations that will deprive American families of essential services like heating and cooling at affordable rates. Matusiak Decl. ¶¶ 19-20. Without

injunctive relief, families and communities will be "denied access to programs that … house [and

protect] them." *See Nat'l Council of Nonprofits*, 2025 WL 368852, at *13.

4.    **Plaintiffs Will Be Irreparably Harmed if the Funds Are Diverted to Any
        Entity Other Than the Accountholders.**

Plaintiffs will also suffer irreparable injury absent a preliminary injunction because, if EPA

is not enjoined from transferring funds back to Treasury, this Court will be unable to order

Defendants to redirect funds to Plaintiffs in the future. Dkt. 28 at 19; *see also Confed. Tribes of

Chehalis Rsrv. v. Mnuchin*, 2020 WL 3791874, at *2 (D.D.C. July 7, 2020); *Population Inst. v.

McPherson*, 797 F.2d 1062, 1081 (D.C. Cir. 1986). Here, EPA has publicly stated its intent to seize

the funds awarded under the GGRF and eventually "re-obligate lawfully appropriated funds" to

other recipients. If the funds are transferred to Treasury, Plaintiffs will need to contend with

sovereign immunity in any effort to recoup them. Absent a preliminary injunction, these outcomes

would greatly magnify the scale of Plaintiffs' injuries and may make full recovery impossible. *See

Whitman-Walker Clinic, Inc. v. United States HHS*, 485 F. Supp. 3d 1, 58 (D.D.C. 2020) ("[W]here

economic loss will be unrecoverable, such as in a case against a Government defendant where

sovereign immunity will bar recovery, economic loss can be irreparable.").

Moreover, should the funds be clawed back from Plaintiffs' accounts, Plaintiffs will be

deprived of a statutory entitlement. *See Endo Par Innovation Co., LLC v. Becerra*, 2024 WL

2988904, *7 (D.D.C. 2024); *cf. Dellinger v. Bessent*, 2025 WL 471022, at *9 (D.D.C. Feb. 12,

2025). The unlawful revocation of funds at this stage thus constitutes irreparable harm that

warrants the issuance of a preliminary injunction. *See, e.g.*, *Endo Par*, 2024 WL 2988904, at *7.

E.    **The Balance of Equities Favors Plaintiffs Over EPA.**

If an injunction "will not substantially injure other interested parties," the balance of

equities tips in plaintiffs' favor. *League of Women Voters*, 838 F.3d at 12. As this Court has

54

recognized, EPA "cannot suffer harm from an injunction that merely ends an unlawful practice." Dkt. 28 at 18 (citing *TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 115 (D.D.C. 2020)).

EPA's recent decisions to select Plaintiffs for NCIF funding and disburse the grants—after a rigorous application, review, selection, and post-selection negotiation process—undermine any claim to hardship. EPA, just like "Citibank[,] previously anticipated disbursing the funds to Plaintiffs." Dkt. 28 at 22. And EPA cannot claim hardship from potential waste, fraud, or abuse while a preliminary injunction is in place because EPA itself imposed a multitude of "existing safeguards," including through audits and the ability to disallow costs, that provide transparency and "preserv[e] taxpayer resources." *Pacito v. Trump*, 2025 WL 655075, at *24 (W.D. Wash. Feb. 28, 2025); *see supra* at 9, 12; Bafford Decl. ¶ 35 (describing EPA's oversight mechanisms).

In contrast, as detailed above, continued inability to access funding risks major harms "ranging from shutting down programs, to furloughing and laying off employees, to shuttering altogether." *AIDS Vaccine Advocacy Coal.*, 2025 WL 485324, at *6.

## F.    An Injunction Is Firmly in the Public Interest.

Finally, the public interest strongly favors an injunction. "There is generally no public interest in the perpetuation of unlawful agency action." Dkt. 28 at 23 (citing *League of Women Voters*, 838 F.3d at 12). Rather, "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id*. And "the public would be served if the Executive Branch is enjoined from" managing funds "in a manner that conflicts with the plain language of an appropriations bill." *General Land Office v. Biden*, 722 F. Supp. 3d 710, 745 (S.D. Tex. 2024) (citing *League of Women Voters*, 838 F.3d at 12).

The public has an acute interest in enjoining EPA's efforts to prevent disbursement of Plaintiffs' grant funds. The public has an interest in the billions of dollars of investments that Congress authorized in the Inflation Reduction Act. Plaintiffs were awarded funding in line with

that interest—for example, by advancing projects related to solar power, electric vehicles, energy-efficient affordable housing, and low-emissions heating and cooling systems for families across the country. Bafford Decl. ¶¶ 76-80; Donovan Decl. ¶¶ 18-22; Matusiak Decl. ¶¶ 19-20. Injunctive relief is necessary to permit Plaintiffs to carry out these critical projects, which "Congress, in enacting" the Inflation Reduction Act, "declared to be in the public interest." *League of Women Voters*, 838 F.3d at 13. "Here, [preliminary] relief ensures the government abides by the statues and regulations governing the NCIF, which serves the public interest." Dkt. 28 at 23.

## III. The Court Should Issue a Preliminary Injunction Barring Citibank From Failing to Disburse Plaintiffs' Grant Funds Pursuant to the ACAs.

### A. Plaintiffs Are Likely to Succeed on Their Claims Against Citibank.

Plaintiffs are likely to succeed on the merits of their breach of contract claims because (1) the ACAs are valid and enforceable contracts; (2) Citibank has breached them by failing to perform without legal or factual basis to do so; and (3) Plaintiffs have been harmed as a result. *Wiener v. AXA Equitable Life Ins. Co.*, 113 F.4th 201, 214 (2d. Cir. 2024).

Citibank has a duty to follow instructions regarding funds related to Plaintiffs' NCIF grant funds. The ACAs specify that Citibank "*shall* comply with *all* instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and financial assets in the Accounts." CU Ex. 8 at 2 (emphases added). The ACAs explain that Citibank's duties are exclusively "administrative or ministerial," and that Citibank "shall not be responsible" for determining whether" requests for grant funds comply with any contracts or laws. *Id.* at 3.

Thus, the ACAs do not provide Citibank with any discretion to decline to act in response to instructions unless EPA has given notice that it intends to exercise exclusive control over an account. *See* CU Ex. 8. EPA has not provided such notice. Nor has EPA undertaken any steps to exercise exclusive control described in the ACAs. *See* CU Ex. 9 at Ex. A. But since mid-February,

Citibank has repeatedly failed to follow instructions about what to do with Plaintiffs' grant funds in Plaintiffs' accounts and in the accounts of their subgrantees. *See supra* at 17.

Moreover, Citibank also breached the ACAs governing Plaintiffs' subgrantees' accounts. These ACAs are similar to Plaintiffs', except that EPA may not issue a Notice of Exclusive Control; EPA is not even a party to those ACAs. Thus, Citibank must comply with the subgrantee's instructions regarding assets in their accounts unless *Plaintiffs* issue a Notice of Exclusive Control.

Citibank has stated it was authorized to breach the ACAs because, under the FAA, it is a fiduciary of the United States, required to "act at all times in the best interests of the United States" and to "comply with all lawful instructions or directions received from Treasury." Dkt. 14 at 4. But if the Court grants Plaintiffs' preliminary injunction with respect to EPA, this defense would disappear; Citibank cannot claim it is obeying lawful government orders when a court finds those orders unlawful. Accordingly, if the Court enjoins EPA from terminating or suspending the grant, it should also direct Citibank to follow the ACAs—as it is legally required to do.

Regardless, Citibank's goal of complying with the FAA does not justify its breach of the ACAs. Plaintiffs are not a party to the FAA, and the ACAs do not allow Citibank to decline to disburse funds based on any supposed inconsistency with the FAA. Section 9 of the ACAs specifically states that each ACA "constitutes the entire agreement between the parties and sets forth in its entirety the obligations and duties of the Bank with respect to the assets in the Accounts." Because of this merger clause, "a court is obliged to require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing." *Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 433 (2013).

Section 6(a) of the ACAs is in accord. It instructs that each Plaintiff *and the EPA* "acknowledges and agrees that (i) the duties, responsibilities, and obligations of the Bank shall be

limited to those expressly set forth in this Agreement …, and no duties, responsibilities or obligations shall be inferred or implied." Had these "sophisticated … entities, represented by counsel" intended to condition Citibank's obligations under an ACA upon the FAA, "they easily could have included a provision to that effect." *Schron*, 20 N.Y.3d at 437.

Contrary to Citibank's claim, the FAA does not require, or even permit, Citibank to deny disbursement requests related to Plaintiffs' grant funds. The fact that Citibank acts as an agent of the Government is simply irrelevant. It does not mean that the funds from Plaintiffs' grants belong to the Government (they don't). It does not mean that Citibank has the right to withhold those funds, any more than Citibank has the right to take funds belonging to any other private party sitting in any other account at Citibank. And it certainly does not mean that Citibank can convert the funds and send them to the Government, simply because the Government so requested.

Indeed, it has long been a settled principle at common law that "a party may not escape liability simply because he was acting at the time at the behest of his principal." *Zampatori v. UPS*, 479 N.Y.S.2d 470, 473-474 (N.Y. Sup. Ct. 1984). As the Restatement instructs, "[a]n agent is subject to liability to a third party … when the agent's conduct breaches a duty that the agent owes the third party." Restatement (Third) Agency § 7.02. That duty, and the agent's own responsibility, "may be derived … from a contract between the third party and the principal when the agent is a party to the contract" as well as "from the agent's assumption of duties toward the third person that are independent of the duties the agent owes the principal." *Id.* That plainly occurred here: Citibank did not sign the ACAs on behalf of the Government, but on its own behalf, and it took on specific obligations to both the accountholders and EPA to comply with instructions within the scope of the ACAs. So, the Court may and should hold Citibank to the bargains it struck even if Citibank was acting at the direction of Treasury or EPA.

Nor are the FAA provisions that Citibank principally invokes relevant. The FAA authorizes Citibank to "freeze accounts, and transfer funds in frozen accounts" at EPA's direction "*in accordance with the account control agreements.*" Dkt. 21 at Ex. A § I.B.4 (emphasis added). Plaintiffs' ACAs only allow EPA to exercise control over Plaintiffs' funds if EPA delivers a Notice of Exclusive Control, which requires EPA to certify that it has "issued a written determination and finding" that the recipient has triggered one of the three termination conditions. CU Ex. 8 at Ex. A. But EPA never delivered any Notice of Exclusive Control or the required certification and written determination. *See* Dkt. 14; Mar. 12, 2025, Hrg Tr. at 26:11-22.

Second, the FAA provisions that Citibank invokes are irrelevant. These instruct Citibank "to act only within the scope of its actual authority and to comply with all *lawful* instructions or directions received from Treasury," *see* Dkt. 14-1 § 5.B.iv (emphasis added). The FAA merely adopts the same obligation that applies at common law. Restatement (Third) Agency § 8.09. But Citibank initially froze Plaintiffs' accounts not on the "instructions or directions" of Treasury, but based on a "recommendation" from the FBI. There was also no order issued by a neutral magistrate based on probable cause. *See supra* at 16. And Treasury's subsequent communications directing Citibank to maintain the freeze were no more lawful.

Again, Citibank ignores that it signed the ACA limiting its obligations with regard to the funds—and it would not be "lawful" to breach the ACA's control provision. Underscoring the point, the FAA specifies that Plaintiffs and their subgrantees would have control over funds related to the ACAs, subject only to the issuance of a Notice of Exclusive Control. Dkt. 21 at Ex. A.

## B.    The Other Preliminary Injunction Factors Favor Plaintiffs.

For the reasons discussed above as to EPA, Plaintiffs will suffer irreparable harm if Citibank is not enjoined from rejecting or ignoring instructions regarding the disposition of funds related to Plaintiffs' grants. *See supra* at 44-54. Further, as previously explained, the balance of

equities favors Plaintiffs. *See supra* at 54-55. Citibank will not be harmed by an injunction requiring it to honor the ACAs and disburse funds in which it has no right or interest. By contrast, without a preliminary injunction requiring Citibank to disburse funds under the ACAs, Plaintiffs' viability is threatened. Finally, ensuring access to NCIF grant funds is in the public interest. "[T]he public interest is served by … enforcing valid contractual provisions … to which parties have voluntarily entered." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Wertz*, 298 F. Supp. 2d 27, 34-35 (D.D.C. 2002).

### C.    The Preliminary Injunction Should Cover Subgrantees.

Finally, the injunction should expressly cover Plaintiffs' subgrantees' accounts. As noted above, the grant program expressly contemplated that grant recipients could "receive subawards (in the form of subgrants) to carry out a portion of the grant's activities" and if so "the lead applicant will … be accountable to EPA for effectively carrying out the full scope of work and the proper financial management of the grant (including subawards to non-lead coalition members)." CU Ex. 1 at 6-7. In line with this design, Plaintiffs have disbursed funds to accounts at Citibank subject to ACAs. *See supra* at 10-12. Citibank has no legal basis to deny the subgrantees access to their accounts, both because the termination is unlawful and because the ACAs provide EPA no right to control the accounts. But to avoid any confusion, the preliminary injunction should expressly cover Plaintiffs' subgrants and ensure Plaintiffs' subgrantees' access to accounts at Citibank.

**CONCLUSION**

Plaintiffs' motion for preliminary injunction should be granted.

Dated: March 21, 2025                      Respectfully submitted:

/s/ *Vincent Levy*                              /s/ *Adam G. Unikowsky*
Vincent Levy (NY 0487)                    Adam G. Unikowsky (989053)

JA358

Kevin D. Benish (NY0495)
Patrick J. Woods*
Daniel Fahrenthold (NY0603)
HOWELL SHUSTER & GOLDBERG LLP
425 Lexington Avenue, 14th Floor
New York, NY 10017
Tel.: (646) 837-5151
vlevy@hsgllp.com
*Application for admission pending.

*Attorneys for Plaintiff Coalition for Green Capital*

/s/ Beth C. Neitzel
Beth C. Neitzel (103611)
Jack C. Smith (1725229)
Kevin Y. Chen (admitted *pro hac vice*)
FOLEY HOAG LLP
155 Seaport Boulevard, Suite 1600
Boston, MA 02210
Tel. (617) 832-1000
bneitzel@foleyhoag.com
jcsmith@foleyhoag.com
kchen@foleyhoag.com

Noah C. Shaw (*pro hac vice* forthcoming)
James M. Gross (admitted *pro hac vice*)
FOLEY HOAG LLP
1301 Ave. of the Americas, 25th Floor
New York, NY 10019
Tel.: (212) 812-0400
ncshaw@foleyhoag.com
jgross@foleyhoag.com

*Attorneys for Plaintiff Power Forward Communities*

Kathryn L. Wynbrandt* (1602446)
David B. Robbins (493976)
Tanner J. Lockhead* (90011928)
JENNER & BLOCK LLP
1099 New York Avenue, Suite 900
Washington, D.C. 20001
Tel.: (202) 639-6000
Fax: (202) 639-6066
aunikowsky@jenner.com
*Application for admission pending.

Gabriel K. Gillett (admitted *pro hac vice*)
Simon A. de Carvalho (*pro hac vice* forthcoming)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
Tel.: (312) 222-9350
ggillett@jenner.com
sdecarvalho@jenner.com

Allison N. Douglis (admitted *pro hac vice*)
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
Tel.: (212) 891-1600
Fax: (212) 891-1699
adouglis@jenner.com

*Attorneys for Plaintiff Climate United Fund*

JA359

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CLIMATE UNITED FUND**<br><br>Plaintiff,<br><br>v.<br><br>**CITIBANK, N.A.**, *et al.*<br><br>Defendants. | Civil Action No. 25-cv-698-TSC |
| **COALITION FOR GREEN CAPITAL**<br><br>Plaintiff,<br><br>v.<br><br>**CITIBANK, N.A.**, *et al.*<br><br>Defendants. | Civil Action No. 25-cv-735-TSC |
| **POWER FORWARD COMMUNITIES, INC.**<br><br>Plaintiff,<br><br>v.<br><br>**CITIBANK, N.A.**, *et al.*<br><br>Defendants. | Civil Action No. 25-cv-762-TSC |

## DECLARATION OF ELIZABETH BAFFORD IN SUPPORT OF
## CLIMATE UNITED FUND'S MOTION FOR PRELIMINARY INJUNCTION

I, Elizabeth Bafford, declare as follows:

1.      I am the Chief Executive Officer of Climate United Fund ("Climate United"). I have managed Climate United since its inception in October 2022 and have worked at Climate United's parent entity since January 2014. In my current role, I am responsible for managing all Climate United operations, including staffing and administration, coordination with third-party vendors, and administering financing programs operated by Climate United. I am also responsible for overseeing the management and allocation of funds awarded by the Environmental Protection Agency ("EPA") through its National Clean Investment Fund ("NCIF") in accordance with our EPA-approved workplan.

2.      For these reasons, I have personal knowledge of the facts and information in this declaration.

3.      I respectfully provide this declaration to detail the ways in which Climate United's reputation, mission and programs will imminently be irreparably impacted if the Court does not invalidate EPA's purported termination of Climate United's NCIF grant on March 11, 2025, order Citibank, N.A. ("Citibank") to provide Climate United with access to its grant funds as required, and enjoin EPA and others it is acting in concert with from interfering with Climate United's access to its grant funds. Climate United's inability to access its grant funds has immediate, harmful, and irreparable impacts on our reputation, which is vital to effectively carrying out our mission, and our ability to pay and retain essential staff; effectuate and manage the program; pay invoices due from critical service providers like lawyers and auditors; disburse funds that are already legally obligated and committed under loan agreements; and provide approved predevelopment grants to expand energy access in Tribal communities. This termination and Defendants' other conduct also

impacts numerous other investors and organizations depending on Climate United's responsible fulfilment of its obligations and workplan.

4.      Aside from stopgap charitable grants covering solely essential operating expenses, which Climate United will need to pay back if its funding is restored, Climate United does not have other committed sources of funding to replace the NCIF grant funds. As a result of Defendants' actions, to preserve its available cash, Climate United has already been compelled to defer compensation for certain employees, terminate multiple vendors, cancel travel, and instruct non-essential lawyers, accountants, and consultants to cease work.

5.      If Climate United does not obtain a preliminary injunction and is forced to wait to have access to its grant funding restored, Climate United would not survive as it exists today and would need to wind down its operations. Climate United likely would be forced to lay off substantially all staff and may not be able to reopen for business again, given the lost staff, lost deals, and reputational harm. Without access to its funds or a viable alternative funding source, Climate United would not be able to litigate this case to judgment.

**Climate United and Its Mission**

6.      Climate United is a nonprofit financial institution whose mission is to leverage public and private financing to remove financial barriers to deploying clean energy. Our work aims to unleash American clean energy, build safe and affordable housing, and build a stronger economy that lowers energy costs, creates jobs, improves water and air quality, and benefits every American, while making the United States more competitive, secure, and energy independent.

7.      Following passage of the Inflation Reduction Act, Calvert Impact, Inc. and its affiliates ("Calvert Impact"), Community Preservation Corporation, and Center for Community Self-Help and its affiliates joined together to form a coalition to apply for the NCIF competition

under the Greenhouse Gas Reduction Fund ("GGRF"). In 2022, Climate United was created as a separate legal entity, and structured as a subsidiary of Calvert Impact, Inc., to apply for GGRF funding. Calvert Impact has been in operation for 30 years in the private markets investing in job creation, affordable housing, clean energy, and local economic development. The other Climate United coalition members have been in operation for 50 years and 40 years respectively, reflecting decades of experience executing investment portfolios and strategies that directly relate to Climate United's workplan. Combined, the members of the Climate United coalition have more than 120 years' experience managing more than $30 billion in private and institutional capital that has unlocked economic opportunity for communities in all 50 states and territories.

8.     It is common practice for established organizations to set up subsidiaries for specific projects and programs. While each of the coalition partners would have been eligible recipients for NCIF funds, each deliberately formed bespoke subsidiaries to act as the grant recipients and subrecipients. As Climate United explained to EPA in its proposal, this structure allowed them "to adopt custom policies, procedures, and governance specifically crafted to most efficiently deploy NCIF funds while mitigating deployment risk," *See CUF Narrative Proposal*, EPA (Apr. 4, 2024), https://www.epa.gov/system/files/documents/2024-04/cuf_narrative_proposal1.pdf. The subsidiaries benefit from the organizational infrastructure and experience of their parent organizations while allowing them to leverage grant funds with private capital more effectively as stand-alone entities.

9.     Climate United helps fill gaps where private capital is missing by providing loans to finance projects that will bring the economic benefits of clean energy, electric mobility, and building efficiency projects to overlooked markets. From Arkansas to Alaska, these projects will deliver direct benefits to hard-working Americans and communities in the form of lower energy

bills, quality jobs, cleaner air and water, and more secure and reliable energy. Climate United focuses its loans and investments in rural, low-income, and Tribal communities across the country, building demand for clean energy and providing markets for domestic manufacturing. Climate United's investments also mobilize private capital, stretching public dollars further: for every dollar invested in a program or project, Climate United estimates up to four dollars of private capital will flow into communities. These investments in American innovation are a down payment on a stronger, more resilient economy that works for all Americans.

10.    Climate United uses the grant funds it has been awarded primarily to make loans to finance green energy projects. Each coalition partner directly finances such projects, with Climate United responsible for oversight of its two coalition partners. Climate United's borrowers choose Climate United as their lender because, as a result of the grant funding, Climate United is able to offer loans that other private sector lenders could not offer due to risk, economic terms, and/or flexibility. Climate United's loans are typically funded over months or years, with the loan recipients drawing down committed funds as needed for their project's development or construction. This delayed drawdown mechanism ensures oversight by Climate United—allowing it to confirm that projects remain on track and funds are being used in accordance with loan and grant terms and conditions.

11.    A fundamental consideration for Climate United's lending partners is the reliability of Climate United's funding. Even if Climate United offers better terms, transaction partners will refuse to enter into projects with Climate United if they believe that Climate United will not serve as a stable source of capital. Many of Climate United's loans are long-term loans to finance infrastructure projects. It is vital to developers to ensure that funding is available to complete their entire project. As one example, one of the core strategies of one of our subgrantees is to support

the development and preservation of affordable and workforce housing across the country. Real estate transactions take time to incubate and to build a reliable capital structure, which is difficult because it requires bringing together multiple sources and forms of funding (*e.g.*, various layers of debt and equity). Current pipeline includes interest from developers to create more than 60,000 units of housing where funds from the award are a critical part of the financing. Losing these funds, even temporarily, will delay and kill deals, further straining the country's inadequate supply of affordable housing and perpetuating our housing crisis.

**Climate United's NCIF Award**

12.      On July 14, 2023, EPA posted a Notice of Funding Opportunity for the NCIF program. A copy of that notice is attached to my declaration as **Exhibit 1**.

13.      EPA established a rigorous process to review and select applicants. That process included an evaluation of each applicant's vision, investment strategy, reporting plan, detailed budget, organizational background and track record, governance and management structure, consumer protection plan, risk management, and financial history. The review was conducted by expert panels with broad and deep qualifications who would then present rankings and recommendations to a Selection Official authorized to make the final selection for awards. The panels reviewing all applicants included reviewers with a mix of qualifications, who were drawn both from EPA and from a variety of other federal agencies and national laboratories, and who received extensive training on how to conduct reviews and score applications.

14.      On October 12, 2023, Climate United entered the competition with a $13.97 billion proposal to accelerate clean energy adoption across the U.S. economy, including by offering affordable financing for clean technology programs. A detailed proposed budget was required to be submitted to EPA as part of Climate United's application, along with proposed policies and

organizational documents. Climate United's application also included letters of support from financial institutions, developers, labor organizations, affordable housing organizations, and state and local governments—a testament to the coalition's combined 120 years of deep and extensive experience backing up its proposed program plan.

15.    On March 31, 2024, Climate United and two other applicants were informed that they were selected for NCIF funding after a nine-month-long competitive process that stressed the importance of our ability to effectively manage risk and swiftly implement our strategy.

16.    Climate United won its grant based on merit and merit alone.[1] As Climate United explained in its application, its coalition brought together three well-established nonprofits with a combined 120 years of experience managing more than $30 billion in private and institutional capital. Climate United did not have any relationship with anyone inside EPA or, to its knowledge, with any reviewers across the agencies during the application and selection process.

17.    Climate United was ultimately awarded $6,970,000,000 (the "NCIF Award"), which was announced by the White House in a press release in April 2024. The award was memorialized in a final grant agreement, known formally as a Notice of Award (NOA), dated August 8, 2024. A copy of the August 8, 2024 NOA is attached to my declaration as **Exhibit 2**. That NOA was amended in an amended NOA dated December 20, 2024 to reflect an update to the

---

[1] Public reporting and the Declaration of Eric Amidon filed by EPA on March 17, 2025, referred to "potential conflicts" because, "Beth Bafford, CUF's CEO, served as a special assistant in the Office of Management and Budget during the Obama Administration," and "Phil Aroneanu, CUF's Chief Strategy Officer, served as a strategic advisor to the Department of Energy during the last two years of the Biden Administration." I worked for the Obama for America campaign from April to November 2008 as a community organizer and for the Obama Administration as an assistant from February 2009 to July 2010. I primarily performed administrative tasks for the President's economic advisors 15 years ago. Since 2010, I have worked exclusively in the private sector, primarily in private credit and structured finance. Phil Aroneanu was a contractor for the Department of Energy and was not a political appointee.

Terms and Conditions, and a further amended NOA dated January 16, 2024 to reflect an updated budget and workplan.

18.    My understanding is that there are two different workstreams within EPA, with different approval processes and different personnel. One workstream addresses the grant's Terms and Conditions and another addresses the grant's budget and workplan. The Terms and Conditions set forth the terms of Climate United's award, including EPA's program-specific reporting and oversight requirements. Climate United's workplan sets forth our projected projects and the specifics of our program which must be executed in accordance with the Terms and Conditions. My understanding is that these two different workstreams resulted in the separate December 2024 and January 2025 NOA amendments.

19.    The process for amending the Terms and Conditions began shortly after the award was announced, where all awardees were asked for input. EPA from the outset anticipated a series of amendments to the Terms and Conditions on approximately a quarterly basis, as communicated with awardees throughout the award process. On April 11, 2024, shortly after the award was publicly announced, EPA held a "terms and conditions briefing" for awardees. Among other things, EPA explained the process for agreeing upon the terms and conditions that would govern the grant. EPA explained that it expected to share draft terms in mid-to-late April, and that EPA expected the terms to change based on awardee feedback, to ensure they were clear and would be viable for awardee workplans. While noting the "dates are tentative," EPA expected a "final" set of terms to be included in a NOA in late June, modified terms to be agreed upon in September/October, additional modifications to occur in October/November, and further modifications "over the remainder of the performance period." Screenshots of this training are attached to my declaration as **Exhibit 10**.

20.     The amendment dated December 20, 2024 reflected changes along these lines to the Terms and Conditions, including updating disbursement procedures, clarifying reporting, and adjusting terms such as Davis-Bacon and Build America Buy America requirements to ensure more successful program execution for smaller scale projects. Climate United's first set of recommended changes to the NOA were contemplated in early October, after we had completed our first financial transaction and while we were in the process of shifting to the Financial Agent. The changes in the January NOA primarily reflect adjustments to our workplan and budget informed by market and partner feedback, implications of the shift to the Financial Agent (*e.g.*, accounting treatment based on feedback from auditors), as well as other clarifications. Copies of the December and January NOAs are attached to my declaration as **Exhibit 3** (December NOA) and **Exhibit 4** (January NOA).

21.     I do not believe that changes made in the December and January NOAs reduced EPA oversight of the Climate United award or altered the overall grant award. To my knowledge, the changes proposed were unrelated to any changes in Administration but were focused on the long-term viability of this financing program in a dynamic market. As noted earlier, from the beginning of the process we were told by EPA to expect that the NOA would be first issued in the summer and then amended in the fall, the winter, and as necessary.

22.     The NOA included a negotiated, thoroughly reviewed and EPA-approved budget. Climate United's plans for the NCIF Award were outlined in our publicly posted workplan, a revised version of the publicly posted program plan included in our application, that was agreed to by EPA on June 13, 2024 and codified in the NOA. Following several months of market feedback from partners, capital providers, and potential borrowers, EPA agreed to an amended

workplan in December 2024, which was codified in the January NOA. A copy of the amended workplan is attached to my declaration as **Exhibit 5** and is available on our website.

23.     As detailed in the workplan, the Climate United coalition plans to commit at least $580 million toward qualified projects in the first year of funding (*i.e.*, before July 2025), and to deploy the full $6.97 billion within the first five years of the program, with a further commitment to invest at least 60% in low-income and disadvantaged communities, 20% in rural areas, and 10% in Tribal communities. *Id.* at I, 14. To date, the Climate United coalition has committed $392 million to qualified projects in accordance with its workplan, with our first loan committed in September 2024.

24.     Approximately 45% of Climate United's investments (the portion of the funds provided through financial assistance), or approximately $2.8 billion of the NCIF Award, will focus on investing in energy-efficient buildings and homes. Approximately 20% of Climate United's investments, or approximately $1.2 billion of the NCIF Award, will focus on electric transportation and charging infrastructure. Another approximately 25% of Climate United's investments, or approximately $1.5 billion of the NCIF Award, will focus on producing affordable, clean electricity and heat through renewable energy generation and battery storage, including solar power, hydroelectric and geothermal. The remaining 10% of investments will focus on other sectors that cut costs, reduce pollution, and provide direct benefits to American families, including in agriculture. *See id.* at 10.

25.     Climate United estimates that its planned investments will result in private sector leverage of up to $21 billion—approximately four times the public funds invested in qualified projects. *Id.* at 16. In addition, Climate United's investments will help consumers and small businesses save money by purchasing more efficient clean energy technologies, and will help

support community infrastructure such as schools, municipal buildings, healthcare facilities, public housing, and other institutions, particularly those that serve rural, Tribal, and low-to-middle-income households and businesses.

### Procedures for Climate United's NCIF Funding

26.     Climate United's funds were fully obligated by EPA on August 8, 2024. Climate United initially accessed funds through the Treasury Department's Automated Standard Application for Payments ("ASAP") system while Treasury worked to implement the financial agency agreement ("FAA") that was described in the original Notice of Funding Opportunity in July 2023 and is discussed in more detail below.

27.     Climate United's undrawn funding was disbursed to accounts held at Citibank, after those accounts were established in November 2024, and subject to an Account Control Agreement entered into between Climate United, EPA, and Citibank (the "ACA"). The process to establish the accounts began on September 26, 2024, once Citibank was selected by the U.S. Department of the Treasury as Financial Agent. A copy of the ACA is attached to my declaration as **Exhibit 8**.

28.     Climate United, EPA, and Citibank executed an amendment to the ACA on January 13, 2025, to clarify the parties' intent regarding the treatment of certain obligations that were "properly incurred" if EPA issued a Notice of Exclusive Control. A copy of the January 13, 2025 Amendment to the ACA is attached to my declaration as **Exhibit 9**. This was only a clarification and did not alter the substance of the ACA.

29.     From the program's inception, EPA contemplated the need for a funding mechanism which would allow for balance-sheet capitalization enabling recipients to leverage private capital—a fundamental objective of the program. In the July 2023 Notice of Funding Opportunity, which outlined the parameters of the grant competition, EPA contemplated that "additional

measures or other arrangements" would be required if the program departed from typical drawdown requirements, and specifically highlighted that one such additional measure would be "financial agent arrangements with U.S. Department of Treasury … to ensure that EPA's interests are protected." *See* Ex. 1 at 56.

30.    Details about this structure were then discussed with selectees in May 2024 and included in Climate United's original grant agreement, dated August 8, 2024. Specifically, the Terms and Conditions in the August NOA provided that "[t]he Recipient will open a Deposit Account at a depository institution that has been designated as a financial agent of the United States," that "[s]uch account will be used as Recipient's operating account for the award," and that "[t]he Recipient will take all such actions, enter into all such agreements, and execute and deliver all such documentation as may be necessary and/or directed by EPA from time to time to establish and maintain [a perfected security interest held by EPA], including but not necessarily limited to entering into a deposit account control agreement (DACA) with the Financial Agent and EPA." Ex. 2 at 58. Climate United was not involved in EPA's decision to include the financial agent concept in the Notice of Funding Opportunity in July 2023. Climate United also had no role in the selection of the financial agent, which was coordinated by EPA and the Treasury Department as part of a competitive process.

31.    The alternative mechanism used to disburse funds under EPA grants is the ASAP system, which Climate United used to access funds while the ACA was being finalized between August 2024 (when the initial NOA was finalized) and November 2024. The ASAP system allows recipients to draw funds as needed—for example, to fund a project or pay administrative costs. Under the ASAP system, the entire award amount would be obligated to the recipient, but the recipient's balance sheet would only reflect those award funds already drawn down.

32.     One of the primary objectives of the NCIF program is to use government funds to spur private capital. The traditional ASAP mechanism would not allow for a recipient to raise private capital on the recipient's own balance sheet. My understanding, from reading the NOFO, is that EPA understood the need to solve for this technical accounting problem. EPA included a financial agent mechanism in its original program design from July 2023. *See* Ex. 1 at 56. The ability of the recipient to draw down award funds would remain unchanged, but the balance sheet of the recipients would reflect the entire award amount rather than only the funds already expended.

33.     My understanding is that the Treasury Department under the ASAP system does not conduct oversight—it simply reports to EPA the amounts which have been drawn by the recipient and what amounts remain. Under the FAA between Citibank and Treasury, Citibank agreed to assume this ministerial funding responsibility. EPA's oversight functions remain identical under the FAA and under ASAP. I believe this is why the FAA is between Treasury and Citibank, not between EPA and Citibank—Citibank is taking over Treasury's ministerial functions, not EPA's oversight functions. However, Citibank's interface displays Climate United's expenditures broken down by budget category, and it provides EPA with full, real-time view access into all 21 accounts of Climate United and its subrecipients.

34.     After funding was disbursed to Climate United's Citibank accounts, Climate United has drawn money from its accounts approximately once every one to two weeks, as permitted by the terms of the NCIF Award, including in accordance with its approved budget. Absent EPA's prior approval, Climate United is only permitted to draw funds which will be disbursed in the following fourteen business days. *See* Ex. 3 at 57-58.

35.     Throughout this period, EPA has overseen Climate United's activities. Climate United's actions have been transparent and visible to EPA, and EPA has at all times had the ability

to view and audit any expenditures of Climate United. EPA has exercised its oversight and

supervisory authority in the following ways, among others:

a.  EPA has required Climate United to submit quarterly, semi-annual, and annual reports, detailing its transactions, activities, progress against its workplan, and expenditures by budget category, including mandatory quarterly conflict-of-interest reporting by Climate United and each of Climate United's subgrantees. Climate United's inaugural semi-annual report covering the period from the start of the grant to December 31, 2024 is publicly available online;

b.  EPA has held meetings at least weekly, and, at times, two to three times per week, to discuss Climate United's program plans, reporting, oversight, and compliance with the EPA Terms and Conditions;

c.  EPA has view access to each of Climate United's seven Citibank accounts and each of the fourteen accounts of Climate United's subgrantees. EPA's view access allows EPA to see what funds Climate United is spending and what budget category that spending relates to. EPA's view access also allows EPA to see program income in the form of portfolio earnings or repayment of loans;

d.  EPA receives a certification from Climate United each time Climate United submits a draw request to Citibank for a financial assistance transaction, certifying: "The amount of the transfer is necessary to execute against the EPA-approved workplan, and the financing agreements for identified qualified projects necessitating the transfer have been reviewed by Climate United's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions." Each of Climate United's subgrantees is required to make similar certifications;

e.  EPA approved Climate United's detailed budget for the term of its award, and EPA must approve any material changes;

f.  EPA has required Climate United to adopt and deliver to EPA detailed policies, including investment policies, risk policies, consumer protection policies, subaward oversight policies, and conflict of interest policies;

g.  EPA requires Climate United to be subject to standard audit requirements by a third-party auditor, including both financial audits and a Single Audit for federal grant compliance;

h.  In November, EPA conducted transaction testing, which is a systematic examination and verification of every dollar spent by Climate United to ensure they comply with the grant's terms, conditions, and applicable regulations; and

     i.   EPA has also issued additional oversight requests. For example, on March 4, 2025, EPA asked Climate United for answers and documents related to 35 questions addressing a wide range of topics, many of which ask for documentation or information previously provided to EPA, giving Climate United less than three weeks to respond while its funds are inaccessible.

### Climate United's Operations and Projects Before EPA's Recent Actions

36.    Since the August NOA was issued, the NCIF Award has accounted for all of Climate United's funding, aside from emergency charitable grants and recoverable grants to support operations while funds are unavailable (and which Climate United must pay back if funding is restored).

37.    Climate United currently has 37 employees on its payroll, whose salaries and benefits are covered in part or whole by the NCIF Award. These staff members collectively operate all aspects of Climate United's operations, including establishing financing programs, underwriting potential financial transactions, ensuring compliance with the Terms and Conditions of the NCIF Award, managing oversight of subrecipients, soliciting and selecting partners, conducting community engagement, and structuring and servicing a portfolio of loans. That number represents approximately half of the total staff that Climate United intends to hire to support its programs. As noted above, we have been rapidly expanding our capacity since the award was announced in April 2024 to implement this program, fulfill the requirement that we identify projects and partners quickly, and get funds moving to benefit American communities.

38.    Climate United has launched three financing programs to date. The first is a $31.8 million pre-construction loan to support solar power projects across rural communities in Arkansas, which was announced in October 2024. Through this project, Climate United is financing pre-construction costs for 18 solar projects comprising the largest commercial solar deployment in Arkansas history, which is projected to save more than $120 million in energy costs over the project's life and create hundreds of jobs.

39.    The second is a program to offer affordable leasing options for battery electric heavy-duty trucks to small fleets and independent operators. Climate United issued a request for proposals in October 2024 from qualified U.S. auto manufacturers to deliver up to 500 electric drayage trucks, which Climate United intends to begin leasing at the ports of Long Beach and Los Angeles. When completed, these orders will represent some of the largest ever purchases of domestically manufactured battery electric trucks in U.S. history. The communities surrounding these ports have among the highest air pollution and worst health outcomes in the nation. Climate United intends to expand this program nationally. This program will not only reduce the cost per mile of operating drayage trucks for small businesses, but it will also reduce air pollution in port communities and create demand for U.S. manufacturing in factories across the country.

40.    The third is $63 million in committed pre-construction financing for projects designed and developed by a Native-owned and Native-led solar developer who develops solar power plants in partnership with Tribal governments and communities. These projects bring access to affordable energy to rural communities and Indigenous people in addition to creating more than 1,000 quality jobs and local economic development. Initial projects will be located in Eastern Oregon and Idaho, with plans to use funds for future projects in the developer's pipeline.

41.    In addition, Climate United has used grant funds to design, develop and launch the Climate United NEXT program. This is a pre-development grant program intended to provide up to $30 million in technical assistance and planning support for community-led projects that increase energy independence and resiliency, reduce pollution, and save money for hardworking American families, small businesses, and communities. The first round of grants focused on projects serving Tribal communities. Climate United publicly committed to announcing the awardees of these pre-development grants through the NEXT program across the United States by

the end of February 2025. After reviewing 104 applications for the program in the first round of submissions, Climate United currently has approved 22 awards across 18 states, and anticipates issuing $6.345 million in initial subawards.

### EPA's and Citibank's Recent Actions And Failure to Inform Climate United

42.    On February 14, 2025, Climate United requested an inter-account transfer within Citibank, to move funds related to the purchase of electric trucks from Climate United's budget account to Climate United's reserve account. The transfer did not occur.

43.    On February 18, 2025, Climate United placed a request to Citibank to draw funds. In the normal course, Citibank would have sold shares in Climate United's money market account and then distributed the resulting funds to Climate United later that same day. Climate United's accounts with Citibank do not reflect that either the typical money market transaction or disbursement occurred, and Climate United did not receive any funds.

44.    On the morning of February 19, 2025, Climate United submitted an email message to Citibank noting that its funding requests remained pending and had not been disbursed. That letter requested that Citibank provide the legal bases for those actions, advise whether those actions were taken pursuant to a directive by a government agency, and provide a reasonable opportunity to respond to any instruction or request that impacts Climate United's accounts before that instruction or request may be acted upon by Citibank. Citibank did not respond.

45.    On February 20, 2025, Climate United sent an email message to officials at EPA notifying EPA that it was being denied access to its funds and requesting additional information and guidance. A representative from EPA responded on February 21, offering to discuss the following week.

46.    On February 21, 2025, Climate United placed a request to Citibank to draw funds. But Climate United's accounts with Citibank do not reflect that the typical money market transaction or disbursement occurred, and Climate United did not receive any funds.

47.    On the evening of February 25, 2025, counsel for Climate United submitted another email message to Citibank requesting release of the funds within 24 hours or an explanation of the legal bases for Citibank's actions. Citibank again did not respond.

48.    On February 26, 2025, counsel for Climate United left voicemail messages for Citibank at Climate United's direction. Citibank did not respond.

49.    EPA rescheduled its meeting with Climate United three times. After being informed that Climate United's outside counsel would be present at the meeting, an EPA official cancelled the meeting without rescheduling. Climate United called the official on February 27 and was informed by the official's administrative assistant that the official would respond to Climate United's emails. Neither that official nor any other official at EPA has responded to Climate United's emails as of the date of this declaration.

50.    On March 1, 2025, counsel for Climate United submitted a letter in hard copy and by email to the Chief Executive and Chief Legal Officers of Citibank. The letter explained that Citibank is illegally withholding Climate United's funds in breach of the ACA; has ignored Climate United's repeated requests for information by phone, voicemail, and email; and has failed to provide any colorable legal basis for Citibank's actions. The letter demanded a response by no later than close of business on Tuesday, March 4, 2025. Citibank did not respond.

51.    On March 3, 2025, Climate United contacted Citibank by email requesting information about the status of Climate United's funds and the process for disbursing those funds. For the first time, Citibank responded, stating: "We have received your correspondence and have

forwarded it to the United States Environmental Protection Agency and other federal officials for
an appropriate response .… Once we have further information available regarding the program we
can provide at that time." In response to a follow-up email from Climate United requesting
clarification, Citibank stated: "We are awaiting further guidance." Citibank did not disclose that it
had frozen Climate United's funds based on FBI's "recommendation" or based on direction from
EPA and Treasury. A copy of that correspondence is attached to my declaration as **Exhibit 6**.

52.    On March 4, 2025, counsel for Climate United submitted a letter to EPA by email,
notifying EPA that Climate United has been unable to access its funding and requesting
information regarding the nature of and legal justification for EPA's actions. The letter requested
that EPA immediately reverse its actions and reinstate Climate United's access to its NCIF funding.
In the alternative, the letter requested that EPA rescind or stay any suspension of termination of
Climate United's grant pending judicial review. EPA did not respond. A copy of that letter is
attached to my declaration as **Exhibit 7**.

53.    Amid these events, Citibank has refused Climate United access to any of its grant
funds. Prior to this litigation, Citibank never revealed to Climate United that it was being asked by
EPA and other government officials to withhold Climate United's grant funds. For example,
Citibank did not state or suggest that it was withholding funds from Climate United based on a
"recommendation" from the FBI or based on a supposed obligation under the FAA, even when
Climate United inquired about why its accounts had been frozen. Nor did Citibank tell Climate
United that the communications recommending or directing Citibank not to disburse funds to
Climate United solely cited the FAA (to which Climate United is not a party), did not cite the ACA,
did not assert that termination was warranted under the ACA, and did not suggest that a Notice of
Exclusive Control had been issued or would be forthcoming. Citibank also never informed Climate

United that the communications recommending or directing Citibank not to disburse Climate United's funds did not proffer adequate, let alone credible, evidence that any of the ACA's three bases for terminating Climate United's grant had been satisfied. For its part, other than vague public statements, EPA never informed Climate United that EPA had been trying to freeze, suspend, or terminate Climate United's grant or its access to grant funds, or that EPA had directed Citibank to stop disbursing funds to Climate United. EPA also never provided Climate United with any explanation for its actions.

### Climate United Is Forced to Take Legal Action

54.    On March 8, 2025, Climate United filed this litigation, naming Citibank, EPA, and EPA's Administrator Lee Zeldin as defendants. Through counsel, Climate United served Citibank and EPA by email with a copy of the complaint and informed them that Climate United intended to file a motion for a Temporary Restraining Order at the opening of business on Monday, March 10, 2025. EPA did not respond.

55.    On March 10, 2025, Climate United filed a Motion for Temporary Restraining Order. Later that day, the Court proposed a briefing schedule whereby Defendants would be required to file responsive briefs on March 11, 2025, followed by a hearing. Counsel for EPA then emailed "ask[ing] for the courtesy of agreeing to ask the Court to push back these deadlines by 24 hours, proposing that our opp. would be due March 12 at noon, with argument at 4:00 p.m. that day." The government's attorney "recognize[d] from [Climate United's] papers that [Climate United] has been without access to the money for some time and that voluntarily agreeing to even a short extension from the proposed schedule is not what [Climate United] would prefer," but stated that "we'd appreciate the courtesy of an additional 24 hours." Climate United consented as

a professional courtesy. The Court then granted that extension, setting Defendants' deadline as noon on Wednesday, March 12, 2025, and setting a hearing for later that afternoon.

56.    At approximately 6:22 pm the evening of Tuesday, March 11, 2025, EPA's Acting Deputy Administrator, sent Climate United a letter entitled "Notice of Termination." A copy of that letter is attached to my declaration as **Exhibit 11**.

## Impact on Climate United's Operations and Programs if Climate United Does Not Promptly Regain Access to the Funding Provided by the NCIF Award

57.    Climate United cannot currently access grant funds to pay its payroll and other expenses related to immediate implementation of its program workplan.

58.    As noted above, Climate United had been drawing money from its Citibank accounts approximately every one to two weeks to pay operating expenses and had been drawing periodically to fund transactions. Without access to the grant funds in its Citibank accounts, Climate United does not have excess cash or reserves available to pay operating expenses or to support its programs.

59.    Climate United does not have other committed sources of funding that could replace the NCIF Award. Climate United has sought to obtain some amount of stopgap funding from other sources while Climate United litigated this dispute, but thus far has been able to only raise recoverable grant funds to cover its operations for a short period of time. Moreover, obtaining such funding has required, among other costs, substantial investments of time and energy diverted from Climate United's operations that could not be recouped. Even though Climate United has been able to obtain some additional funds as a further stopgap, given the size of the program, the funding secured is only a temporary fix and does not adequately replace the grant funds. Climate United does not anticipate being able to raise grant funds to cover its programmatic needs.

60.    Part of the reason why it is difficult for Climate United to find alternative funding is that Climate United's primary goal, and indeed the goal of the NCIF program and policy enacted by Congress, is to provide financing for projects that do not already have a steady source of market-driven investments. *See* Ex. 5 at 26; 42 U.S.C. § 7434(b)(1)(B) (requiring funding recipients to "prioritize investment in qualified projects that would otherwise lack access to financing").

61.    Loss of access to its primary funding will severely damage Climate United's internal operations, its financing programs for which the NCIF funding was intended, and its long-term reputation and ability to carry out its mission in the market. Continued loss of access will be devastating. If access to grant funding is not restored imminently, millions of dollars in approved transactions with committed partners cannot move forward—to the detriment of the program, the mission of the organization, and the communities that stand to benefit.

*Impact on Internal Operations*

62.    Without another source of funding, such as stopgap charitable grants, Climate United does not have funds to pay payroll or health, vision, and dental benefits, life insurance, and short- and long-term disability insurance for its employees. As a result of Defendants' actions, to preserve its available cash Climate United has already been compelled to defer compensation for certain employees, terminate multiple vendors, cancel travel, and instruct non-essential lawyers, accountants, and consultants to cease work.

63.    The work of Climate United is highly specialized. We structure financial transactions in hard-to-finance markets, which requires a deep understanding of various capital sources, including government programs (*e.g.*, low-income housing tax credits, solar investment tax credits, etc.) and private investors (*e.g.*, banks and insurance companies). Structuring and underwriting these transactions requires experience in the private credit markets to assess expected

and unexpected risks based on prior knowledge of similar transactions, market data, and industry dynamics.

64.     To execute on this program, we have hired a team of excellent investment professionals with expertise in credit underwriting, structuring, and asset management. In many cases, we hired them from other financial institutions where they had higher compensation. They came to Climate United to do this work because of our mission and impact on the communities that benefit from our projects.

65.     If we are unable to pay our staff, they are likely to leave and find other employment. Without a stable source of funding, we will not be able to replace our current staff with quality employees or attract additional talent to fill out our teams. That will leave Climate United unable to fulfill its mission. It will also have reverberating impacts that will harm the public. If we lose our current talented staff because we are no longer able to pay them, many of them may not continue working on investments that generate benefits for the public good.

66.     In addition, furloughing or laying off staff will eliminate positions that perform critical functions for Climate United, including: (1) monitoring the loans that Climate United has already disbursed to funding recipients and the $392 million that the Climate United coalition has committed to date; (2) timely fulfilling EPA's reporting requirements for grant recipients; and (3) deploying the NEXT grant program discussed in more detail above.

67.     Climate United also imminently risks not being able to pay rent and insurance for select offices or to pay critical third-party contractors who perform necessary services such as managing accounts payable, auditing financial statements, maintaining IT security and infrastructure, advising on compliance, supporting communications, and providing legal services. In addition, as Climate United has explained to EPA, continuing uncertainty around Climate

United's funding has caused Climate United to confront increasingly unfavorable terms from essential third-party contractors as well as prospective deal partners. This could place Climate United in default of its agreements and damage its ability to obtain services in the future.

*Impact on Climate United's Grant and Financing Programs*

68.    Without a committed source of funding, Climate United would not be able to meet its commitments as part of the awards it has already approved through the NEXT program, discussed above. To not issue these subawards on the publicly communicated timeline would erode trust in Climate United as an institution and damage its reputation, especially given the significant effort that the 104 groups referenced above spent putting together applications over the holidays. And it would specifically harm the 22 selected projects, which will provide affordable and reliable energy access to Tribal communities, creating jobs and local economic development for small businesses and contractors.

69.    Climate United would also not be able to finance programs it has already launched. For example, without a committed source of funding, Climate United cannot purchase electric heavy-duty trucks from the domestic manufacturers that responded to Climate United's request for proposals as part of the electric truck program mentioned above.

70.    For the solar projects discussed above, Climate United has approximately $20.8 million of commitments that remain outstanding, which Climate United is obligated to fund if requested by its existing borrowers. These funds may be drawn at any time, as is standard for loan agreements, and this draw timing is at the discretion of the borrowers. If a draw is requested while Climate United is unable to access funding, it could cause Climate United to be in legal breach of these agreements. Additionally, failure by Climate United to advance funds would harm the projects, which rely on this source of capital to leverage financing from local banks and other

private capital providers to get the solar projects built. Finally, inability to access additional funding would harm the projects because our partners entered into the partnership with the understanding that Climate United would be able to fund future stages of project development.

71.     In addition, Climate United is currently engaging in outreach and listening events to shape further rounds of NEXT funding and to design financial products across Climate United's market segments, which is a key program in Climate United's workplan. For example, Climate United representatives were scheduled to conduct a focus group with school districts from across America at the Green Schools Conference on March 3 and 4, 2025. Without access to money for travel to this and other critical events, Climate United has cancelled all travel and outreach events and is unable to continue its work of designing capital solutions for schools, hospitals, and other critical American institutions.

*Impact on Climate United's Reputation*

72.     Climate United is primarily a lender, which means that to do business, we have to find willing clients—*i.e.*, borrowers—to borrow money from us. In many cases, we make long-term loans to finance infrastructure projects. These are market transactions that require trust and certainty, similar to the trust and certainty a homeowner would want from their mortgage lender or a small business would want from their banker. The freeze of our funds and the unlawful cancellation of our grant agreement have all caused significant uncertainty and unease about our ability to operate in the near-term and our ability to be a long-term partner to developers, small businesses, and American families.

73.     Our stability as a lending institution has always been our strength in the markets we serve, and the current legal limbo caused by actions from EPA and Citibank have dramatically impacted our ability to go to market as a stable source of funding. Climate United's reputation as

a reliable and stable source of financing is essential to its ability to, among other things, attract high-quality co-investment to finance programs and to attract high-quality projects for its pipeline. If Climate United's funding is not restored imminently, Climate United's reputation would be irreparably damaged. That would make it more difficult, if not impossible, for Climate United to find partners willing to enter into financing arrangements and to find qualified employees willing to work at Climate United.

74.    In addition, a prolonged pause in funding would be likely to cause third parties to view Climate United as having a less stable source of funding going forward, meaning that it will receive increasingly unfavorable terms from essential vendors and prospective deal partners. In effect, if Climate United is seen as having a less stable source of funding, that has a reputational effect akin to a credit downgrade, causing counterparties to place higher premiums on long-term partnerships and seek additional assurances to protect their economic interests—such as requiring Climate United to provide cash collateral for any guarantees or similar credit enhancement on transactions or prefunding commitments.

75.    If our funding is not restored, many partners will cease to engage with us. One existing partner responded to Climate United's latest Request for Proposals to support community lenders with asset purchases by saying it was "not allocating resources to this RFP at the present moment as [it] monitor[s] the NCIF situation and look[s] for resolution of some of the uncertainty." A manufacturer informed Climate United: "given the status of the current environment, we are going to pause any engagement with Climate United until the relationship between Climate United and the EPA is stable and we can be more confident that funds will not be clawed back." It is also less likely that organizations will work with us on pre-development activities, technical assistance

activities, or financial transactions, given the freeze on the funds. In turn, this hinders our ability to generate demand and finance additional projects.

**Impact on the Public**

76.    The benefits from our existing and future investment pipeline will not come to fruition and cannot be easily replaced. At the end of the day, this program is about delivering direct, tangible benefits to American communities in the form of energy savings, energy access and stability, job creation, and healthier communities through access to capital that is not happening in the private markets alone.

77.    Examples of benefits from ***near-term*** transactions that will not happen if we are unable to finance our near-term pipeline include the following:

a.    Thousands of households would not get solar systems on their roofs, of which 60% are families living in low-to-moderate income communities. The average energy cost savings per household expected for these households is $74 per month, which would be a total annual loss to low-to-moderate-income consumers of millions of dollars annually. The total lifetime loss to consumers is estimated at tens of millions of dollars.

b.    11 solar power plants in Arkansas would not be built as part of the project I discuss above, which would be equivalent to $120 million in energy savings not realized for Arkansas taxpayers. In addition, 1,500 jobs, primarily in skilled trades, would not be created or preserved.

c.    We would not be able to place an order of approximately 500 Class 8 heavy duty electric trucks through the project I discuss above, which would represent approximately 15-30% of expected heavy-duty electric truck manufacturing capacity over the deal period. All trucks to be purchased by Climate United are compliant with Build America Buy America standards, which means lost demand for U.S. manufacturing facilities. The truck drivers hoping to lease these trucks will not realize the lower cost per mile from accessing these electric trucks. And the operators of these trucks will also have to continue paying the ports of Los Angeles and Long Beach $10 per twenty-foot equivalent unit for non-electric trucks, which is passed on to consumers.

78.    If Climate United's funding is not restored, it will harm our subgrantees as well. For example, loss of grant funding will harm a pipeline of 232 multifamily housing properties that

would use loans from our subgrantees to increase energy efficiency and electrify core building systems to reduce building operating costs and keep rents affordable for low-income families.

79.     In addition, Climate United will be unable to obtain the long-term benefits derived from Climate United's investment portfolio, the first five years of which (April 2024-June 2029) are detailed in our workplan. It predicts that in the first five years of the program, Climate United's investments will reduce or avoid 11 million metric tons of $CO_2e$, bring economic benefits to millions of Americans, and mobilize at least $21 billion in private capital. The investment strategy is projected to directly result in:

   a.     10,000-25,000 single-family homes with lower energy use and reduced emissions;

   b.     30,000-60,000 units of multifamily housing with lower energy use and reduced emissions;

   c.     100-300 small commercial and community facilities (including public school buildings and other municipal facilities) with lower energy use and reduced emissions;

   d.     10,000-35,000 passenger vehicles electrified, savings costs for consumers and reducing tailpipe emissions;

   e.     500-2,000 heavy-duty vehicles electrified, saving costs for truck drivers and school districts and reducing tailpipe emissions;

   f.     500-750 other vehicles electrified, saving costs and reducing tailpipe emissions;

   g.     10,000-35,000 residential solar installations and/or access to community solar and/or storage for single family homes, reducing energy bills for families;

   h.     250-300 small commercial and community facilities with access to solar and/or storage, reducing energy bills for small businesses and nonprofits; and

   i.     100-150 school and/or university buildings with access to solar and/or storage.

Ex. 5 at 11-12.

80.     Taken as a whole, our investment strategy will yield improved indoor and outdoor air quality, an increase in affordable and sustainable housing, the creation of quality jobs, demand

for clean technologies manufactured and distributed in America, savings for American households, small businesses, and nonprofits, green homeownership and wealth creation for American families, and the adoption of net-zero and net-zero ready building standards in the commercial, multifamily and single-family markets.

81.    There is also the matter of lost time and opportunity cost. Numerous individuals from Calvert Impact and our coalition partners, including myself, have spent two-and-a-half years (starting in August 2022) preparing for the implementation of this program. We have conducted listening sessions, hundreds of meetings with partners, and hosted events to inform our investment strategy and approach, in addition to drawing on our direct experience making loans and investments in these markets. If EPA's unlawful termination and Defendants' related conduct is permitted to continue, we will have lost that time that could have been spent more productively to generate financial and impact benefits for our organization and the communities we serve.

* * *

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.


Executed this 21st day of March, 2025, in Bethesda, Maryland.

/s/ Elizabeth Bafford
ELIZABETH BAFFORD, CEO
Climate United Fund

# EXHIBIT 11

JA389



U.S. Environmental Protection Agency
1200 Pennsylvania Ave, N.W.
Washington, DC 20460

March 11, 2025

By Email

Elizabeth Bafford
CEO
Climate United Fund
7550 Wisconsin Ave, 3rd floor
Bethesda, MD 20814

Re: Notice of Termination

Dear Elizabeth Bafford,

Pursuant to the U.S. Environmental Protection Agency's ("EPA" or "the Agency") authority under 2 C.F.R. §§ 200.339-40, the General Terms and Conditions of EPA assistance award agreements, the terms and conditions of the Grant Agreement, and the Agency's inherent authority to reconsider prior determinations in light of new information, the Agency is terminating Grant Agreement No. 84094001, awarded to Climate United Fund under the Greenhouse Gas Reduction Fund ("GGRF"), effective immediately. This termination is based on substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities, which collectively undermine the fundamental goals and statutory objectives of the award.

Following a comprehensive review and consistent with multiple ongoing independent federal investigations into programmatic fraud, waste, abuse and conflicts of interest, EPA has identified material deficiencies, including, but not limited to: 1) the absence of adequate oversight and account controls to prevent financial mismanagement; 2) the improper or speculative allocation of funds inconsistent with EPA's oversight and fiscal responsibilities; and 3) the circumvention and defeat of key oversight mechanisms in the disbursement of federal funds. EPA has determined that these deficiencies pose an unacceptable risk to the efficient and lawful execution of this grant that cannot be remedied by imposing specific conditions, necessitating immediate termination to safeguard taxpayer funds and ensure compliance with federal financial assistance regulations.

Additionally, the Agency has considered concerns raised by EPA Administrator Lee Zeldin regarding the need for rigorous oversight and accountability in the administration of public funds. The Administrator has emphasized the importance of eliminating fraud, waste, and abuse within EPA, particularly in high-

value awards such as those under GGRF. The structural and operational weaknesses identified in the execution of this grant are inconsistent with these priorities and materially impair the EPA's ability to ensure compliance with statutory and regulatory mandates governing the lawful expenditure of public money.

The Agency has also determined that its existing process for awarding and overseeing execution of the Grant Agreement lacks sufficient protections to guard against potential violations of the Constitution, particularly the Appointments Clause and private nondelegation doctrine. U.S. Const. art. II, § 2, cl. 2; *e.g.*, *Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1341 (D.C. Cir. 2024). Consistent with its independent duty to avoid exceeding constitutional constraints, EPA has reconsidered the prior administration's conclusion that the oversight mechanisms for the Grant Agreement are sufficient to ensure that the Recipient will not exercise significant authority independently of EPA's oversight and ultimate approval.

This termination is executed in accordance with Sections III.S and III.T.4 of the Grant Agreement and with EPA's General Terms and Conditions as incorporated in, and applicable in addition to, the terms of the Grant Agreement, and is consistent with EPA's obligations to safeguard public funds and inherent authority to reconsider prior decisions. This letter constitutes the notice of termination required by 2 C.F.R. § 200.341. Consistent with 2 C.F.R. §§ 200.344-45 and the Closeout Agreement, the recipient is required to cease all further program expenditures immediately, provide a comprehensive final financial and programmatic report, and comply with all applicable closeout procedures.

EPA is committed to ensuring that federal funding is administered in a manner that upholds transparency, accountability, and the highest standards of fiscal responsibility. This termination reflects the Agency's duty to protect public funds and maintain the integrity of its grant programs. In the coming months, EPA will work to re-obligate lawfully appropriated funds within the GGRF program with enhanced controls to ensure adequate governance, transparency, and accountability, consistent with applicable regulatory and statutory requirements.

Sincerely,

W.C. McIntosh

W.C. McIntosh
Acting Deputy Administrator
U.S. Environmental Protection Agency

cc:
- U.S. EPA, Office of the Greenhouse Gas Reduction Fund (OGGRF)
- U.S. EPA, Office of Mission Support (OMS)
- U.S. EPA, Office of General Counsel (OGC)
- U.S. Department of Justice
- U.S. Department of the Treasury
- U.S. House of Representatives
- U.S. Senate
- Citibank, N.A.

# EXHIBIT H



Acting Deputy Administrator W.C. McIntosh
U.S. Environmental Protection Agency
1200 Pennsylvania Ave, N.W.
Washington, DC 20460

March 4, 2025

Eli Hopson
Chief Administrative and Development Officer
Coalition for Green Capital
1255 Union St. NE, 7th floor
Washington, DC 20002
eli@coalitionforgreencapital.com

RE: Compliance and Oversight Review of EPA Greenhouse Gas Reduction Fund

Dear Eli Hopson,

Your organization was awarded funding under the Environmental Protection Agency's
(EPA) Greenhouse Gas Reduction Fund (GGRF). This funding—which was appropriated to
EPA under Section 134 of the Clean Air Act—was referenced by a Biden EPA political
appointee, in a widely circulated video, as "gold bars" that were "tossed off the Titanic".
Shockingly, their plan involved parking $20 billion at an outside financial institution to be
distributed to just 8 pass-through organizations, including your entity. This arrangement
was the first of its kind in EPA history and was purposely designed to obligate all the money
in a rush job with less, not more, oversight by the federal government.

This video is one of many recent developments that have raised questions and concerns
regarding the award process, potential self-dealing and conflicts of interest, qualifications
of recipients, the effectiveness and efficiency of the program, and the appropriate
management and oversight of these funds. As a result, a referral has been made to EPA
Office of Inspector General. The program is also subject to an ongoing investigation by
other federal agencies.

As part of EPA's oversight responsibilities within the Grant Agreement and Administrator Zeldin's pledge to Congress and the American public to be accountable for every penny EPA spends, please submit the requested responses and documents via email or secure file transfer to GGRFoversight@epa.gov **no later than 12:00 PM ET on March 28, 2025.** Responses, other than required forms, should be in Word format. Failure to fully respond to this request on time will be considered a violation of the Grant Agreement and may result in further compliance actions, which may include withholding payments, suspension of funding, or other enforcement measures. Your urgent cooperation in this timely matter is required pursuant to the terms of your Grant Agreement and federal regulations, including 2 CFR 200.337. Additionally, as part of EPA's due diligence process, the agency will work with the U.S. Department of the Treasury (Treasury) and the Financial Agent (FA) to establish and implement additional account controls consistent with prudent operational standards pursuant to the Financial Agency Agreement (FAA).

1. Provide a list of your current board of directors, including their roles, affiliations, and any financial compensation or stipends received from this grant.
2. Provide copies of your organization's most recent IRS Form 990 filings and any required financial disclosures under federal grant regulations.
3. Provide all written communications (hard copy, electronic, or otherwise), notices, or formal discussions your organization had with EPA officials regarding eligibility and program design prior to the grant award.
4. Provide a list of all EPA-sponsored training sessions, workshops, or technical assistance events attended by your organization related to this grant, including names of attendees and completion dates.
5. Submit proof of completion of EPA's "How to Develop a Budget" training, including date of completion and the names and roles of those who received it.
6. Provide copies of all EPA performance metrics and guidance documents you (or your representative) have in your possession defining program success and include an explanation of your understanding of how success was defined for these programs.
7. Provide an itemized breakdown of funds spent to date, including personnel, contractual, subawards, and program-related expenses.
8. What percentage of grant funds have been allocated to administrative costs versus direct financial assistance to subrecipients? Describe how your organization determines allowable administrative costs under this grant, including a justification for the percentages allocated to administrative expenses versus direct program funding. Provide supporting documentation.
9. Provide the total annual budget for your organization for fiscal years 2022, 2023, 2024, and 2025, including a breakdown of revenue sources prior to and after receiving this grant.
10. List all subrecipients of this grant, the funding amounts allocated to each, and the criteria used to determine eligibility. Include award dates and the purposes of each award. Provide a copy of your organization's subrecipient selection criteria and process, including due diligence measures and compliance verification.

**JA394**

11. Submit copies of all subaward agreements issued under this grant, including any contractual terms regarding fund disbursement and compliance monitoring and any required Account Control Agreements, in accordance with EPA reporting requirements.

12. What specific internal controls does your organization have in place to prevent, detect, and address fraud, waste, or abuse of funds? Provide any related policies or procedures, including any mechanisms for detecting improper payments, conflicts of interest, or misuse of funds. Please note which, if any, of these are part of your organization's formal financial policies.

13. Provide a list of all EPA and federal agency officials with whom your organization has had official grant-related communications since the award date.

14. What formal guidance, directives, or technical assistance has your organization received from EPA regarding how these grant funds should be used? Provide copies of any written guidance or relevant communications. Did your organization receive any guidance from EPA or other government entities on how the funds should be used? If so, specify.

15. Has your organization received any formal or informal direction from federal officials regarding how to allocate or distribute funds? If so, provide documentation or meeting records that detail this guidance.

16. List all projects funded to date, including project descriptions, status and locations, amounts awarded, success rate, and anticipated environmental impact.

17. For each funded project, submit documentation on how each project is measuring greenhouse gas reductions, specific emissions reduction targets, metrics used to measure progress, and specific methodologies and verification processes.

18. Has your organization been subject to any compliance reviews, audits, or corrective action plans related to this grant? If so, provide the results and any corrective measures taken. Provide copies of any independent audits, compliance reviews, or risk assessments conducted on your organization's use of EPA funds.

19. Submit an updated annual budget report showing what percentage of your organization's total revenue is now derived from this grant.

20. Has your organization used any grant funds for lobbying, political activity, or policy advocacy – directly or indirectly? If so, please provide details and justification for compliance with federal restrictions.

21. Provide a list of all current employees or contractors who previously worked at EPA or other federal agencies in the last three years. Include job descriptions and compensation details, if applicable.

22. Provide documentation demonstrating how this program has successfully mobilized private capital, including details on secured investments, investor agreements, leveraged investments or co-financing agreements.

23. Provide documentation of all external capital raised using grant funds, including private sector investments, loan guarantees, or matching funds secured.

24. What fundraising costs, if any, have been allocated to this grant? Provide a breakdown by category.

25. Provide details on any profits, interest earnings, or other income generated as a result of this grant, and how those funds are being reinvested.

26. Submit a list of all third-party vendors, consultants, funds, or contractors paid using grant funds, including compensation details and selection process documentation.

27. Provide records of any disclosed or potential conflicts of interest.

28. Provide a list of any state or local government entities receiving funds through your organization under this grant.

29. Provide a list of all quarterly transaction-level data submissions required under the grant's reporting conditions.

30. Have there been any discrepancies, delays, or issues in required reporting to EPA? If so, provide an explanation and corrective actions taken.

31. Provide documentation of all cybersecurity measures taken to safeguard sensitive data related to this grant.

32. Submit documentation on timekeeping and payroll allocation methods used to ensure that personnel costs charged to this grant are in compliance.

33. Provide documentation on how your organization ensures that all EPA-funded activities comply with Title IV of the Civil Rights Act, including nondiscrimination policies, public engagement efforts, and accessibility measures.

34. Provide documentation on how your organization ensures public access to information regarding funded programs, expenditures, and project outcomes as required under the grant agreement.

35. Submit documentation on the data collection methodologies used to evaluate program effectiveness, including any tracking systems, performance indicators, or external evaluations conducted.

Administrator Zeldin has made it clear that one of his top priorities at EPA is to be an excellent steward of the American public's hard-earned tax dollars. There will be zero tolerance of any waste, fraud, or abuse. Your cooperation and timely response to these inquiries will assist in ensuring transparency and accountability in the administration of these funds. I hope you share in EPA's concerns and have some of the same questions yourself.

Thank you for your prompt attention to this matter.

Sincerely,

W.C. McIntosh
Acting Deputy Administrator
U.S. Environmental Protection Agency

Cc:  Citibank, N.A.

# EXHIBIT I



U.S. Environmental Protection Agency
1200 Pennsylvania Ave, N.W.
Washington, DC 20460

March 11, 2025

By Email

Eli Hopson
Chief Administrative and Development Officer
Coalition for Green Capital
1255 Union St. NE, 7th floor
Washington, DC 20002
eli@coalitionforgreencapital.com

Re: Notice of Termination

Dear Eli Hopson,

Pursuant to the U.S. Environmental Protection Agency's ("EPA" or "the Agency") authority under 2 C.F.R. §§ 200.339-40, the General Terms and Conditions of EPA assistance award agreements, the terms and conditions of the Grant Agreement, and the Agency's inherent authority to reconsider prior determinations in light of new information, the Agency is terminating Grant Agreement No. 84094201, awarded to Coalition for Green Capital under the Greenhouse Gas Reduction Fund ("GGRF"), effective immediately. This termination is based on substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities, which collectively undermine the fundamental goals and statutory objectives of the award.

Following a comprehensive review and consistent with multiple ongoing independent federal investigations into programmatic fraud, waste, abuse and conflicts of interest, EPA has identified material deficiencies, including, but not limited to: 1) the absence of adequate oversight and account controls to prevent financial mismanagement; 2) the improper or speculative allocation of funds inconsistent with EPA's oversight and fiscal responsibilities; and 3) the circumvention and defeat of key oversight mechanisms in the disbursement of federal funds. EPA has determined that these deficiencies pose an unacceptable risk to the efficient and lawful execution of this grant that cannot be remedied by imposing specific conditions, necessitating immediate termination to safeguard taxpayer funds and ensure compliance with federal financial assistance regulations.

Additionally, the Agency has considered concerns raised by EPA Administrator Lee Zeldin regarding the need for rigorous oversight and accountability in the administration of public funds. The Administrator has emphasized the importance of eliminating fraud, waste, and abuse within EPA, particularly in high-

value awards such as those under GGRF. The structural and operational weaknesses identified in the execution of this grant are inconsistent with these priorities and materially impair the EPA's ability to ensure compliance with statutory and regulatory mandates governing the lawful expenditure of public money.

The Agency has also determined that its existing process for awarding and overseeing execution of the Grant Agreement lacks sufficient protections to guard against potential violations of the Constitution, particularly the Appointments Clause and private nondelegation doctrine. U.S. Const. art. II, § 2, cl. 2; *e.g.*, *Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1341 (D.C. Cir. 2024). Consistent with its independent duty to avoid exceeding constitutional constraints, EPA has reconsidered the prior administration's conclusion that the oversight mechanisms for the Grant Agreement are sufficient to ensure that the Recipient will not exercise significant authority independently of EPA's oversight and ultimate approval.

This termination is executed in accordance with Sections III.S and III.T.4 of the Grant Agreement and with EPA's General Terms and Conditions as incorporated in, and applicable in addition to, the terms of the Grant Agreement, and is consistent with EPA's obligations to safeguard public funds and inherent authority to reconsider prior decisions. This letter constitutes the notice of termination required by 2 C.F.R. § 200.341. Consistent with 2 C.F.R. §§ 200.344-45 and the Closeout Agreement, the recipient is required to cease all further program expenditures immediately, provide a comprehensive final financial and programmatic report, and comply with all applicable closeout procedures.

EPA is committed to ensuring that federal funding is administered in a manner that upholds transparency, accountability, and the highest standards of fiscal responsibility. This termination reflects the Agency's duty to protect public funds and maintain the integrity of its grant programs. In the coming months, EPA will work to re-obligate lawfully appropriated funds within the GGRF program with enhanced controls to ensure adequate governance, transparency, and accountability, consistent with applicable regulatory and statutory requirements.

Sincerely,

W.C. McIntosh
Acting Deputy Administrator
U.S. Environmental Protection Agency

cc:
- U.S. EPA, Office of the Greenhouse Gas Reduction Fund (OGGRF)
- U.S. EPA, Office of Mission Support (OMS)
- U.S. EPA, Office of General Counsel (OGC)
- U.S. Department of Justice
- U.S. Department of the Treasury
- U.S. House of Representatives
- U.S. Senate
- Citibank, N.A.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CLIMATE UNITED FUND,<br><br>　　　　　　　*Plaintiff*,<br><br>　　-against-<br><br>CITIBANK, N.A., *et al.*,<br><br>　　　　　　　*Defendants*. | Case No. 25-cv-00698-TSC |
| COALITION FOR GREEN CAPITAL,<br><br>　　　　　　　*Plaintiff*,<br><br>　　-against-<br><br>CITIBANK, N.A., *et al.*,<br><br>　　　　　　　*Defendants*. | Case No. 25-cv-00735-TSC |
| POWER FORWARD COMMUNITIES, INC.,<br><br>　　　　　　　*Plaintiff*,<br><br>　　-against-<br><br>CITIBANK, N.A., *et al.*,<br><br>　　　　　　　*Defendants*. | Case No. 25-cv-00762-TSC |

## DECLARATION OF STEPHEN BROWN IN SUPPORT OF COALITION FOR GREEN CAPITAL'S MOTION FOR A PRELIMINARY INJUNCTION

I, Stephen Brown, declare under penalty of perjury as follows:

1.　　I am an adult citizen of the United States and am competent to testify as to the matters set forth in this declaration.  I submit this declaration in support of the application for a preliminary injunction filed by the Coalition for Green Capital ("CGC") in the above-captioned suit.

**JA400**

2.      I am the Chief Network Officer at CGC.  I have over twenty years of experience in government relations, public affairs, and project finance.  In my current role, I am responsible for connecting CGC to members of the American Green Bank Consortium ("AGBC"), described below, developing new Consortium members, and establishing relationships with community groups.  The information set forth herein is true, to the best of my knowledge and belief.

## I.    The American Green Bank Consortium and the Network Loan Program

3.      I work along one of CGC's principal lines of business: the American Green Bank Consortium and the Network Loan Program.

4.      Using funds awarded by the EPA, CGC has developed the Network Loan Program as a catalytic loan program, in order to provide emerging green banks with up to $10 million each in initial capitalization to support capacity building, green power projects, job creation, and the mobilization of private capital in their respective regions.  As of January 2025, CGC had committed $135 million in funding to 14 emerging green banks and community lenders across 14 states.[1]

5.      The participants in the Network Loan Program are part of CGC's wider American Green Bank Consortium, a network of partners composed of green banks, community development financial institutions, capital providers, developers, community benefit organizations, and other clean energy supporters.  Through the AGBC program, CGC provides toolkits, expertise, and technical assistance to its dues-paying members, alongside the financial assistance given in the Network Loan Program.

---

[1] These states are Arizona, Georgia, Hawaii, Indiana, Iowa, Louisiana, Nebraska, Nevada, New Mexico, North Carolina, Pennsylvania, Texas, Utah, and Vermont.

## II.    CGC Is Suffering Irreparable Harm from Disruption to its Network Activities

### A.    CGC's Efforts to Build and Consolidate a Network of Green Banks Have Been Frustrated by the Defendants

6.    The EPA's and Citi's actions have already harmed CGC's efforts to partner with nascent green banks under the Network Loan Program. CGC's program goals will ultimately fail if the Defendants' actions continue, because Defendants have left CGC unable to disburse funds to new members or provide assistance and financial support to existing members. Additionally, the banks receiving funding under the Network Loan Program have elected to pause implementation of the Program with CGC given the funding freeze and legal uncertainty that the Defendants' actions are causing.

7.    Certain participating organizations in the Network Loan Program, which had already received funding from CGC, have delayed deploying *any* funds under the catalytic loans from CGC based on EPA's actions. Multiple of these organizations indicated that this decision was based on their board members' concerns with the EPA's funding freeze and the EPA's baseless allegations. CGC had also planned program support grants of up to $250,000 for organizations participating in the Network Loan Program, to fund staffing, due diligence, and other costs associated with their use of the seed funding CGC had provided them. Because the EPA's and Citi's conduct have made disbursement of these program support grants impossible, these organizations cannot effectively deploy their funds, which is frustrating an important mission of CGC: bringing the NCIF grant funds into circulation in the economy.

8.    Other CGC transactions are in jeopardy because of the Defendants' actions. For example, after eight weeks of negotiations with CGC, an Alaska-based community development financial institution agreed to a committed catalytic loan from CGC of up to $10 million. The organization intended to use these funds to facilitate local clean energy projects, such as

transitioning from high-emission diesel generators and oil heating to energy-efficient, zero-emission electric heat pumps in Tribal communities in Alaska. CGC had already committed its loan, and the organization intended to close the transaction this month, with only final board approval needed. Instead, following the Defendants' actions, it has been impossible for CGC to close on this transaction and follow through on its committed funding obligations.

9.      As another example, CGC had completed all negotiations to provide funding to a local green bank in the Midwest, including agreement on all negotiated documents and closing deliverables (*e.g.*, a legal opinion from the bank's counsel, a deposit account control agreement, and closing certificates), with only board approval remaining before closing. Following a board meeting which took place the day after Administrator Zeldin's video was posted to X,[2] a representative of this bank contacted CGC's counsel and informed CGC that the board had voted against accepting the loan, specifically citing Administrator Zeldin's threats and his commitment to ending the NCIF program.

10.      Similarly, CGC had been at various stages of negotiation with three additional financial institutions located across the United States. It was expected that these loans would make meaningful progress toward CGC's goal of supporting banks in all 50 States. Instead, given the uncertainty, these organizations have been forced to slow their negotiations with CGC, with the leadership of at least one of the organizations specifically stating to CGC that the EPA's attempts to end the NCIF program had complicated its political situation and made a future agreement uncertain. Based on conversations that I have had, I understand that this organization has no other clear source of funding and will be forced to discontinue or downsize its operations without the capital injection it anticipated receiving from CGC.

_____

[2] *See* https://x.com/epaleezeldin/status/1889840040622321778.

### B.    CGC Is Suffering Reputational Harm as a Result

11.    Left unable to disburse committed grants and loans to its network partners, the success of CGC's programs has been jeopardized.  Because CGC aims to build a network of self-sustaining operations, its effort to support and develop nascent green banks is critical to its future success, because CGC expects the institutions it has incubated through the Network Loan Program to become future partners and co-investors.  Making this a reality requires maintaining and bolstering CGC's excellent reputation, but the Defendants' actions deprive CGC of the reputational benefits that will accrue from success in the Network Loan Program and from a future generation of green banks that would partner with CGC on clean energy projects going forward.

12.    And as a result of the freeze and purported "termination" of its grant, CGC has been unable to carry out its activities providing members and coalition partners with technical and market-building assistance.  This is undermining CGC's value proposition, impacting its reputation among its existing and prospective members.  This harm will only get worse as CGC remains unable to carry out the work it envisioned doing under the NCIF program.

13.    Moreover, CGC's members and partners have other organizations they can turn to which offer similar services and have not been affected by similar action by the EPA.  If CGC's funds remain frozen, it will be unable to deliver the services and assistance its members expect, and risks losing to competitors the partners and network members that CGC relies on for funding and for sourcing and executing on investment opportunities.

*      *      *

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed this 21st day of March, 2025.


_/s/ Stephen Brown_
STEPHEN BROWN
Coalition for Green Capital

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CLIMATE UNITED FUND,<br><br>*Plaintiff*,<br><br>-against-<br><br>CITIBANK, N.A., *et al.*,<br><br>*Defendants*. | Case No. 25-cv-00698-TSC |
| COALITION FOR GREEN CAPITAL,<br><br>*Plaintiff*,<br><br>-against-<br><br>CITIBANK, N.A., *et al.*,<br><br>*Defendants*. | Case No. 25-cv-00735-TSC |
| POWER FORWARD COMMUNITIES, INC.,<br><br>*Plaintiff*,<br><br>-against-<br><br>CITIBANK, N.A., *et al.*,<br><br>*Defendants*. | Case No. 25-cv-00762-TSC |

## DECLARATION OF JESSICA BUENDIA IN SUPPORT OF COALITION FOR GREEN CAPITAL'S MOTION FOR A PRELIMINARY INJUNCTION

I, Jessica Buendia, declare under penalty of perjury as follows:

1.      I am an adult citizen of the United States and am competent to testify as to the matters set forth in this declaration.  I submit this declaration in support of Coalition for Green Capital's ("CGC") application for a preliminary injunction in the above-captioned suit.

2.      Since July 2024, I have been the full-time Chief Impact Officer at CGC.  In my role, I support the mission of CGC by shaping its impact strategy and spearheading the pre-

development, market building, and technical assistance strategies in communities across the United States, with a specific focus on low-income and disadvantaged communities. I have led the development and implementation of CGC's Municipal Investment Fund program, described below. Before joining CGC, I held positions within the public, philanthropic, and nonprofit sectors focusing on implementing environmental and social program objectives, including more than a decade in state and local government. The information set forth herein is true, to the best of my knowledge and belief.

## I.    **CGC's Municipal Investment Fund Program**

3.    Since joining CGC, I have been involved in developing and implementing the "Municipal Investment Fund" (or "MIF") program, one of CGC's principal initiatives.

4.    The plan has been for the MIF to operate in two Phases. Through Phase I, CGC aims to partner with up to 104 communities (two local entities per state, and up to four entities among Tribes, the District of Columbia, or local governments in federal territories) to offer $250,000 in market-building grants and technical assistance that will empower communities to develop public–private partnership plans to accelerate the development and financing of clean energy projects.[1] In Phase II, CGC will select up to ten communities to join the MIF cohort, receive up to $2 million in market-building and predevelopment support, and become the focus of concentrated investment. Through these planned phases—which took substantial time and effort to organize—CGC will expand its pipeline for investment and its network of local partners across the United States.

---

[1] *See* "Municipal Investment Fund – Call for Proposals," Coal. for Green Cap., *available at* https://coalitionforgreencapital.com/wp-content/uploads/CGC-Municipal-Investment-Fund-_one-sheet.pdf.

5.    After extensive listening sessions starting in October 2024, CGC issued the Municipal Investment Fund Request-for-Proposal on January 6, 2025 and began accepting applications through March 5, 2025.  CGC partnered on MIF with ICLEI–Local Governments for Sustainability USA ("ICLEI"), a non-profit national network that has worked with over 1,200 local governments and Tribal members, across all 50 states, that are active in clean energy and environmental sustainability.  To that end, CGC awarded ICLEI a subgrant under CGC's NCIF award to achieve the MIF program's objective to provide market-building and predevelopment grants and technical assistance for 104 communities across the United States.

6.    Through this subgrant, CGC and ICLEI will ultimately award $50 million in market-building grants and $10 million in pre-development grants and support services.  CGC plans to select up to 10 communities to receive such support every year for the next several years, assuming it is able to maintain access to its funding and continue fundraising activities.

## II.    CGC Is Suffering Irreparable Harm from Damage to the MIF Program

7.    Since the EPA's and Citi's actions, I have witnessed our prospective partners' confidence and interest in the MIF program wane as a result of the freeze on CGC's funds and the EPA's other actions against CGC.  Unless they are stopped, participation in the MIF program will continue to decline, and CGC's ability to achieve its objectives in the program will be permanently damaged.

### A.    Participation in the MIF Has Declined, and the Program Rollout Interrupted

8.    As of February 18, 2025, 667 interested parties (including 383 distinct municipalities and tribes) from across the country affirmatively indicated to CGC and ICLEI that they were interested in participating in the program, but by the application deadline—following Administrator Zeldin's criticisms of the GGRF and its recipients, and after Citi's freeze on GGRF

accounts became public knowledge,[2] but before the termination—only 112 applicants submitted proposals.

9.      CGC held eleven "office hour" information sessions for potential applicants between January 6 and March 5, 2025, and the tenor and nature of questions and comments from potential applicants during these sessions changed markedly following the Defendants' conduct against CGC in mid-February.  This was also reflected in communications CGC and ICLEI received from potential applicants in late February and early March.  For example:

- One individual working to secure participation in the MIF by Arlington County, VA wrote to MIF administrators on February 18, 2025 that the county had "expressed some concerns" about the program, including that "the new EPA administration's attempts to freeze GGRF funds [would] impact the viability of the MIF, generally."  Arlington County did not apply to the program.

- On the same day, a representative from an non-profit in Colorado wrote that given the "general administrative disruption of federal funds flowing down we have been cautious of finalizing our application for the MIF opportunity," because "[p]reparing a high quality grant application takes a significant amount of time" and the organization "ha[d] to prioritize opportunities with a high likelihood of success for bringing more resources to our region."  The representative therefore asked:  "Has ICLEI already secured the funds for Phase 1 of the MIF grant program *without the likelihood of recapture*?"

- On February 21, 2025, a representative from a non-profit that had been "doing a bunch of outreach on the Municipal Investment Fund, especially with tribes and tribal intermediaries and folks in more rural areas" wrote that he had seen "a ton of fear, confusion and extra

---

[2] *See, e.g.*, "EPA 'green bank' recipients lose access to Citibank accounts," E&E News (Feb .20, 2025),  https://www.eenews.net/articles/epa-green-bank-recipients-lose-access-to-citibank-accounts/.

workload out there" because of the "disturbing news breaking lately about illegal attempts to disrupt GGRF funding."

10.    These reactions (and others) are due to the EPA's actions toward CGC and Citi's freezing of CGC's funds, which have substantially harmed participation in the MIF.  I expect that many other applicants will choose to withdraw their applications given the uncertainty caused by EPA's conduct.

11.    The Defendants' actions will also hinder CGC's efforts to carry out the MIF (itself a part of CGC's implementation of the NCIF award) going forward.  As I noted above, under Phase I of the MIF, CGC has intended to work with up to 104 communities (including but not limited to participants in all 50 states), and expected to issue additional MIF requests for proposals that would be targeted at states that did not have Phase I applicants.  Doing so would help CGC meet its programmatic goal of having participants from all 50 states and beyond, but due to the EPA's and Citi's freezing of CGC's and the Subgrantees' accounts, CGC cannot complete the review of Phase I applications or issue the request for proposals for the 4 states that did not have submitted applications.  Even if it were able to issue a new request for proposal, without clarity about CGC's funding, I do not expect there to be many applicants (again, due to the EPA's actions).  In any event, the 104 recipients chosen for Phase I market building grants would not be able to apply for Phase II funding (up to $2 million in pre-development and market-building support) due to the funding freeze, nor could CGC and ICLEI distribute the funds.

12.    Separately, ICLEI's operations and financial situation have been profoundly disrupted as a result of the Defendants' conduct.  Because ICLEI cannot access its funds held by Citi, it is unable to continue implementation of MIF according to its contractual timelines with CGC, halting any progress on the program.  ICLEI ultimately risks insolvency.

13.     Prior to the March 11 "Notice of Termination," ICLEI incurred over $500,000 in costs for program administration that Citi has not processed draw requests for. It has less than half that amount as cash on hand. ICLEI hired two full-time staff members to administer the MIF grant program who are at risk of termination due to a lack of access to grant funds, and has halted hiring of two additional staff members who would have served critical roles in delivering on the MIF.

14.     ICLEI diverted significant resources and staff members to focus on implementing the MIF program, on the expectation that any decrease in its revenue from fee-for-service work would be offset by indirect cost recovery paid through ICLEI's grant agreement with CGC. At least 36 advisory calls with city governments and 144 hours of technical support that ICLEI would have carried out were cancelled or postponed in order for ICLEI to conduct MIF outreach activities.

**B.     CGC Is Suffering Reputational Harm as a Result**

15.     Citi's freeze on CGC's funds, EPA's public statements and purported termination of the NCIF program, and its utterly unsubstantiated allegations that CGC has committed Waste, Fraud, or Abuse have already caused significant reputational harm to CGC, and will cause more if they are allowed to stand.

**1.     Disruption to the MIF Program Undermines CGC's Reputation and Objectives**

16.     CGC undertook extensive efforts to encourage participation in its programs, conducting outreach with governments and not-for-profit across the United States and hosting information sessions for potential applicants and investors. CGC undertook these efforts assured that it had received grant funding lawfully and conclusively given under a competitive agency application process and congressional appropriation. If the freeze on funds leaves CGC unable to

carry out the programs it has recruited applicants for, CGC's reputation in the eyes of its partners and counterparties will suffer.

17.     Moreover, CGC will be unable to operate as the engine for local-level green energy investment as it intended, depriving it of investment opportunities, goodwill in the industry, and potential future partnerships.

18.     Similarly, ICLEI's ability to retain its existing local government members and recruit new ones is hampered by its inability to deliver on its joint program with CGC, the MIF. ICLEI vouched for the program, directing more information and outreach efforts to its members, and it encouraged stakeholders to apply to the MIF, knowing it was in compliance with its contract and had funding secured in a private bank account.  As the longest-running network of local governments serving an association dedicated to clean air and water, ICLEI is well known as a trusted resource to advise mayors, councils, and local government staff on which opportunities are worth pursuing.  Uncertainty and delayed timelines associated with MIF allocations hurts ICLEI's reputation in this important advisory role.  Ultimately, ICLEI may be seen as an unreliable source of information and responsible for time spent on a grant application that has no chance to be funded.

### 2.  CGC and Its Partners and Subgrantees May Be Set Back in Future Grant Applications

19.     In addition, the charge that CGC is responsible for Waste, Fraud, or Abuse in its implementation of the NCIF grant, and the supposed "termination" of its grant agreement for cause, will harm CGC and its partners' efforts to compete for federal, state, or local grants in the future.

20.     By federal regulation, agencies are required to "establish and maintain policies and procedures for conducting a risk assessment to evaluate the risks posed by applicants before

issuing Federal awards." 2 C.F.R. § 200.206(b)(1). This includes consideration of an applicant's "[h]istory of performance" and, in particular, its "compliance with reporting requirements *and conformance to the terms and conditions of Federal awards*." *Id.* § 200.206(b)(2)(iii). If EPA is allowed to terminate CGC's grant agreement, CGC will have a for-cause termination on its record, potentially fatally harming CGC's ability to compete for grant awards. Indeed, if it is allowed to stand, EPA's allegations in the Notice of Termination may be enough alone to endanger CGC's future federal grant applications—even if the EPA is not permitted to terminate CGC's grant agreement.

21.     In federal contracting, a termination for default essentially renders a grant recipient toxic. For example, I understand that a for-cause termination, if allowed to stand, would appear as a demerit on CGC's profile on SAM.gov, a U.S. government portal for contracting and federal assistance listings. A presence on SAM.gov is necessary to do business in CGC's industry, and simply registering on SAM.gov required months of effort. Removing a demerit from CGC's profile there—if it is possible at all—could be similarly arduous. And by way of illustration, CGC itself requires any grant recipients to be in good standing with the federal government as a condition to doing business. The EPA's notice of termination, therefore, would interfere with CGC's contractual relations with counterparties and potential investments.

22.     The damage would not be limited to federal programs and CGC. To the extent state or local grant programs incorporate or track these federal requirements, CGC's ability to compete for those funds would be similarly harmed. In addition, some of CGC's Subgrantees may too be blocked from accessing federal, state, or local grant funding as a result of the EPA's purported termination. One of CGC's Subgrantees (based in Illinois) has expressed concern that the Notice of Termination would bar the Subgrantee from applying to other programs.

23.    Similarly, ICLEI's ability to secure government funding would be jeopardized if it is no longer considered to be in good standing with the federal government.  ICLEI has a long track record of securing and managing federal grant funding successfully and transparently, which the Defendants' actions would put at risk.  For example, ICLEI has participated in multiple federal grant programs in the past, including the Department of State's Cities Forward program, the EPA's Climate Pollution Reduction Grant program, and the Department of Energy's Sun Shot award.  And ICLEI currently has a grant application pending with the Department of Energy.  This current application is endangered by the EPA's actions, and future applications will be similarly endangered if the EPA's actions are allowed to stand.

24.    Even beyond public grants, in any due diligence carried out by private investors or partners of CGC, CGC would be expected to disclose that a federal agency terminated its grant agreement for alleged fraud, endangering CGC's ability to raise funds or invest in the private market as well.

25.    EPA's allegations and its baseless Notice of Termination will therefore have a significant but unquantifiable impact on CGC's reputation, goodwill, and business prospects in its field.

*    *    *

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed this 21st day of March, 2025.

                                        _/s/ Jessica Buendia_____
                                        JESSICA BUENDIA
                                        Coalition for Green Capital

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CLIMATE UNITED FUND, <br><br> *Plaintiff*, <br><br> -against- <br> CITIBANK, N.A., *et al.*, <br><br> *Defendants*. | Case No. 25-cv-00698-TSC |
| COALITION FOR GREEN CAPITAL, <br><br> *Plaintiff*, <br><br> -against- <br> CITIBANK, N.A., *et al.*, <br><br> *Defendants*. | Case No. 25-cv-00735-TSC |
| POWER FORWARD COMMUNITIES, INC., <br><br> *Plaintiff*, <br><br> -against- <br> CITIBANK, N.A., *et al.*, <br><br> *Defendants*. | Case No. 25-cv-00762-TSC |

## DECLARATION OF ELI HOPSON IN SUPPORT OF
## COALITION FOR GREEN CAPITAL'S MOTION FOR A
## PRELIMINARY INJUNCTION

I, Eli Hopson, declare under penalty of perjury as follows:

1.      I am an adult citizen of the United States and am competent to testify as to the

matters set forth in this declaration.  I submit this declaration in support of Coalition for Green

Capital's ("CGC") application for a preliminary injunction in the above-captioned suit.

2.      I am the Chief Administrative and Development Officer at CGC.  I joined CGC in

October 2022, and previously held the title of Executive Director and Chief Operating Officer.  In

my role, I lead the legal, strategy, and people teams at CGC and am responsible for fundraising and partnerships with impact investors.  The information set forth herein is true, to the best of my knowledge and belief.

    **I.**    <u>**Background**</u>

    **A.**    **CGC's Founding and Purpose**

3.    Founded in 2012, CGC aims to support the development of state and local green banks across the country to facilitate private–public partnerships in driving clean and affordable energy development, and has supported or created over 40 green banks since its inception.

4.    Since its creation, CGC has aimed to create a national green bank to develop a new approach centered on public–private partnerships for affordable clean energy development, perceiving that existing municipal and commercial financial systems lacked the tools to accelerate the affordable clean energy transition independently, and that private sector investment was being hampered by hesitancy to invest in new geographies, newer management teams, small-scale projects, newer technologies, less well-understood revenue models, or transactions that were not perfectly suited to traditional bank and insurance project finance lenders.

5.    CGC has worked to coordinate and facilitate billions of dollars in clean-energy investment in the United States.  As part of its financing support efforts, CGC created the American Green Bank Consortium, a network of green banks, clean energy financing organizations, community development financial institutions, and other lending partners, to expand and accelerate innovative clean energy investments across the United States.  Consortium members have collectively deployed over $25 billion in clean energy investments since 2011.

6.    The Inflation Reduction Act authorized the EPA to create the Greenhouse Gas Reduction Fund ("GGRF") to "combat the climate crisis by mobilizing financing and private

capital for greenhouse gas- and air pollution-reducing projects in communities across the country."[1]  Congress allocated $27 billion in funding for the GGRF.  *See* 42 U.S.C. § 7434(a).

7.    In October 2023, CGC applied for grants totaling $11.9 billion under all three grant competitions created under the GGRF: the National Clean Investment Fund ("NCIF"), Solar for All ("SFA"), and the Clean Communities Investment Accelerator ("CCIA") programs.  CGC's application for the NCIF focused on swift deployment of capital to begin generating savings for consumers and mobilize private capital quickly.  CGC was awarded $5 billion from the NCIF and $125 million from SFA.  CGC's workplan for its NCIF grant from August 2024 with the EPA is available publicly on the EPA's website.  *See* "National Clean Investment Fund Program Work Plan of Coalition for Green Capital," Coal. for Green Cap., *available at* https://www.epa.gov/system/files/documents/2024-08/ncif-workplan-cgc.pdf.

**B.    CGC's Grant from the EPA**

8.    Following negotiations, the EPA finalized CGC's NCIF grant award on August 8, 2024 pursuant to the terms set forth in a grant agreement ("Grant Agreement").  The Grant Agreement required that, when a depository institution—ultimately, Citibank, N.A. ("Citi")—was designated as a financial agent of the United States ("the Financial Agent"), CGC was required to open a deposit account at the Financial Agent and such account was to be used as CGC's operating account.  CGC had no role in the EPA's selection of Citi as Financial Agent.

9.    On November 1, 2024, CGC entered into a three-party Account Control Agreement ("ACA") with the EPA and Citi, pursuant to which CGC's deposit account with Citi would be regulated, and the EPA's security interest in the account was perfected.  The ACA included a Form

---

[1] *See* "About the Greenhouse Gas Reduction Fund," Env't Prot. Agency (Feb. 13, 2025), https://www.epa.gov/greenhouse-gas-reduction-fund/about-greenhouse-gas-reduction-fund.

of Notice of Exclusive Control as Exhibit A that the EPA could utilize to exercise its security interest in accordance with the Grant Agreement.  After capitalization of CGC's deposit account at Citi with the balance of the funds awarded by the EPA, CGC began operating its EPA award through this account pursuant to the Grant Agreement (also known as an "NOA") and ACA.  Prior to the disbursement into CGC's deposit account at Citi, CGC had been using the federal Automated Standard Application Payments ("ASAP") system to draw down funds and execute on its commitments under the Grant Agreement.  The ACA granted EPA increased transactional visibility and a security interest in CGC's accounts not otherwise possible under the ASAP system.

10.    The deposit account established by the ACA consists of three sub-account types ('Budget,' 'Reserve', and 'Program Income from Operations'), each of which serves a distinct purpose.  The Budget Account holds funds that have yet to be used for any of the allowable activities.  The Reserve Account is intended to enable funds to be set-aside within the Financial Agent for use for any form of Financial Assistance (as that term is defined in the Grant Agreement) that requires CGC to pledge award funds for a future expenditure to a third party to meet a legal obligation, and from which properly incurred commitments could continue to be funded following a Notice of Exclusive Control.  The Program Income from Operations Account within the Deposit Account enables Program Income from Operations (as defined under the Grant Agreement) to be held, tracked, and segregated in accordance with the Grant Agreement.  Funds in the Program Income from Operations Account may be transferred to either the Budget Account or Reserve Account to be used for grant performance purposes.

11.    The Grant Agreement was amended on December 19, 2024 to update the terms and conditions and to approve CGC's amended workplan and budget.  On January 17, 2025, the EPA

further amended CGC's Grant Agreement to reflect an updated workplan and detailed budget modification, and limit CGCs amount of indirect costs that could be drawn.

12.     The January 17, 2025 revision of the Grant Agreement did not modify any of the underlying terms and conditions of the Grant Agreement and maintained the financial agent structure and the accompanying protections that were reflected in the original Grant Agreement, such as obligations to execute the workplan in accordance with EPA policies and procedures on legal, compliance, and financial risk, and to regularly report to the EPA on its performance and its Subgrantees' activities.

13.     Consistent with these obligations, the EPA has monitored CGC's performance under the Grant Agreement since the performance period began, and CGC has interfaced regularly with EPA staff and shared periodic reports as required under the Grant Agreement.

14.     Each of CGC's 19 Subgrantees hold its subaward funds at an account at Citi, and CGC and Citi have entered into an ACA with each Subgrantee, with a parallel structure to the ACA among CGC, Citi, and the EPA. CGC maintains a security interest in the subaward funds and the authority to issue a Notice of Exclusive Control directing Citi to cease compliance with the Subgrantees' instructions regarding the accounts.

## C.     Citi Freezes CGC's and the Subgrantees' Funds, and EPA Purports to Terminate the NCIF Program

15.     Since February 18, 2025, CGC and its Subgrantees have been unable to access funds and financial assets in accounts subject to the ACAs with Citi. This followed public comments from EPA Administrator Lee Zeldin, beginning on February 12, 2025, calling for the termination of GGRF programs and for the clawback of funds disbursed to GGRF grantees.

16.     With no first-hand information as to why Citi was declining to follow the instructions of CGC and its Subgrantees regarding the disposition of funds and assets in the ACA

accounts, CGC filed a complaint against Citi in the Southern District of New York seeking access to those funds.  CGC subsequently voluntarily dismissed this suit.

17.    On March 4, 2025, CGC received a "Compliance and Oversight Review of EPA Greenhouse Gas Reduction Fund" request from EPA Acting Deputy Administrator W.C. McIntosh that asked for responses by March 28, 2025.  I responded on March 5, 2025, to confirm receipt and that we would prepare a response by the date indicated.

18.    On March 11, 2025, CGC received a "Notice of Termination" (or "Notice") signed by EPA Acting Deputy Administrator W.C. McIntosh.  The Notice purported to terminate CGC's grant agreement with the EPA, and was previously provided to the Court.  ECF 6-1.

19.    Before or since issuing the Notice, the EPA has never provided any substantiation or evidence that it considered any of CGC's conduct to be a breach of the NCIF terms and conditions, the grant award, or applicable law, or that it constituted Waste, Fraud, or Abuse within the meaning of applicable law.  The EPA also provided no warning that it would seek to terminate CGC's grant agreement on March 11 and, to the contrary, the EPA requested on March 4 that CGC provide it additional information as part of a review, with a deadline of March 28.

### D.    EPA's Alleged "Conflicts of Interest"

20.    I am aware that, in response to the Court's request to counsel for the EPA Defendants at the March 12 hearing on Climate United's motion for a temporary restraining order, the EPA Defendants submitted a declaration from EPA Chief of Staff Eric Amidon ("Amidon Decl."). *See Climate United*, ECF 25-1.

21.    In his declaration, Mr. Amidon references an unspecified March 4, 2025 "media article identif[ying] a number of potential conflicts of interests regarding personnel at several grantees," which "noted that Jahi Wise, the policy director of grantee Coalition for Green

Capital until 2021, left Coalition for Green Capital to work at President Biden's Climate Policy Office on GGRF implementation."  Amidon Decl. ¶ 35.  But Mr. Wise's prior employment with CGC presented no such "conflict of interest" with respect to CGC's selection as a GGRF grantee.

22.    As a first order matter, it is inaccurate to say that Mr. Wise left CGC in 2021 to work "on GGRF implementation," as the GGRF was not established until the passage of the Inflation Reduction Act in 2022.  Mr. Wise was indeed appointed as a Senior Advisor to the Administrator at EPA, and also served as Acting Director for the Greenhouse Gas Reduction Fund at EPA.  When CGC was considering preparing an application for the expected funding opportunity, we consulted with counsel to insure that we were following all applicable rules regarding contact with former employees and potential conflicts of interest.  Counsel contacted EPA, who provided a copy of Mr. Wise's recusal statement (CGC Ex. J), which noted that the Biden Ethics Pledge expired on January 21, 2023, and that following that time period would be covered by EPA's competition policy. Consistent with our ethical obligations, EPA Order 5700.5A1, EPA's Policy for Competition of Assistance Agreements, and the rigorous ethics and conflict-of-interest review carried out by EPA during the review and selection process for GGRF funding, CGC did not contact Mr. Wise regarding the program and Mr. Wise was recused from reviewing, evaluating, selecting, or approving funding on any grant competition for GGRF funding for which CGC submitted an application.  In other words, Mr. Wise did not even review applications from CGC's competitors for GGRF funds.  It is not clear why EPA's Chief of Staff would cite an unspecified "media article" referencing an alleged conflict of interest with respect to Mr. Wise, or why in the EPA's referral letter from the Administrator that EPA's Chief of Staff relies on in paragraph 39 of his declaration would state that Mr. Wise did not recuse himself, when the documentation regarding his recusal is readily available to EPA.

23.    Mr. Amidon also references a June 27, 2024 ethics complaint, later resubmitted on March 7, 2025, regarding an alleged conflict of interest with respect to David Hayes, a CGC board member who has never received compensation from CGC.  Mr. Hayes served on CGC's board first from January 2017 until January 2021, when he resigned to join the Biden Administration as Special Assistant to the President for Climate Policy.  After departing the administration in October 2022, he rejoined CGC's board in August 2023.  But Mr. Hayes's employment in the administration similarly presented no "conflict of interest" with respect to CGC's selection as a GGRF grantee, as Mr. Hayes had no role in the Administration in any respect in working on the GGRF provisions that were ultimately included in the Inflation Reduction Act, and no role on the implementation of the program, and could not have had any role in selection of CGC has he departed prior to the NOFO being issued.

## II.    CGC's Ability to Carry Out Its Mission, and Congress's Purpose, Is Suffering

24.    As described in the declarations of my colleagues Stephen Brown, Jessica Buendia, and Richard Kauffman, the EPA's and Citi's actions have caused immediate and irreparable harm to CGC and its Subgrantees.  They have damaged its reputation, caused it to lose opportunities for funding and investment, and frustrated its operations and the achievement of its and Congress's objectives.

25.    Without an order from this Court staying the effect of the EPA's purported Notice of Termination and ordering the EPA and Citi to immediately release the assets and resume compliance with CGC's and the Subgrantees' lawful instructions concerning their use or disposition, CGC will continue to suffer permanent and irreparable harm.

26.    These actions have obstructed, and are continuing to obstruct, CGC's efforts to carry out its mission in ways that cannot be undone.  For instance, CGC and its Subgrantees have been unable to fully implement their investment programs, have had their day-to-day operations

impeded because of the reputational damage and the inability to access funds at Citi, and have lost known and unknown opportunities to work with companies and governmental organizations to direct funding toward affordable clean energy projects across the country.

27.    Unless CCG obtains relief from the EPA's actions and Citi's decision to freeze CGC's and the Subgrantees' accounts, specific milestones that CGC is obligated to meet in its EPA approved workplan—for example, its efforts to mobilize $14 for every NCIF dollar awarded— will not succeed.  Given my experience, I expect that these companies and governmental organizations will not be willing to partner with CGC unless its reputation is maintained and it can reliably access the resources around which CGC has spent significant time and effort planning.

28.    And the EPA's and Citi's actions frustrate CGC's efforts to accomplish the objectives that *Congress* set out when it authorized and funded the Greenhouse Gas Reduction Fund, including to provide financial assistance to "qualified projects" "in partnership with, and by leveraging investment from, the private sector."  42 U.S.C. § 7434(c)(3)(A).

*[continued on next page]*

29.    At the broadest level, the EPA and Citi are impeding CGC's efforts to mobilize private capital.  CGC was founded to find solutions to the market failures that impeded the development of cheap clean energy, and Congress and the EPA gave funding to CGC to help accomplish this mission.  Every delay and lost opportunity hurts CGC's efforts to accelerate the deployment of affordable clean energy nationwide.  Quite simply, CGC cannot implement the NCIF grant as intended by Congress and required by the contract.

*        *        *

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed this 21st day of March 2025.


_____/s/ Eli Hopson_____
ELI HOPSON
Coalition for Green Capital

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CLIMATE UNITED FUND,<br><br>            *Plaintiff,*<br><br>      -against-<br>CITIBANK, N.A., *et al.*,<br><br>            *Defendants.* | Case No. 25-cv-00698-TSC |
| COALITION FOR GREEN CAPITAL,<br><br>            *Plaintiff,*<br><br>      -against-<br>CITIBANK, N.A., *et al.*,<br><br>            *Defendants.* | Case No. 25-cv-00735-TSC |
| POWER FORWARD COMMUNITIES, INC.,<br><br>            *Plaintiff,*<br><br>      -against-<br>CITIBANK, N.A., *et al.*,<br><br>            *Defendants.* | Case No. 25-cv-00762-TSC |

## DECLARATION OF RICHARD KAUFFMAN IN SUPPORT OF COALITION FOR GREEN CAPITAL'S MOTION FOR A PRELIMINARY INJUNCTION

I, Richard Kauffman, declare under penalty of perjury as follows:

1.      I am an adult citizen of the United States and am competent to testify as to the matters set forth in this declaration.  I submit this declaration in support of Coalition for Green Capital's ("CGC") application for a preliminary injunction in the above-captioned suit.

2.      Since 2021, I have been a member of CGC's Board of Directors and became its Chief Executive Officer on January 6, 2025. In my current role, I am responsible for managing CGC's operations, including the administration of its financing and investment programs.

3.      Before joining CGC, I held positions in major private-sector financial institutions including Goldman Sachs, where I was a partner and chaired the Global Financing Group, and Morgan Stanley, where I served as Vice Chairman of the Institutional Securities business and co-Head of its Banking Department.  I am currently Chair of Generate Capital PBC, a leading financier, owner, and operator of sustainable infrastructure.  In the public sector, I served as Chair of Energy and Finance for the State of New York, and spearheaded the creation of the New York Green Bank, the nation's largest state green bank, which has mobilized more than $8 billion for clean energy projects.

4.      The information set forth herein is true, to the best of my knowledge and belief.

**I.      CGC's Structure and Activities**

5.      With funding from the NCIF, CGC has used its expertise—including proven past experience establishing self-sustaining green banks in Connecticut, New York, and elsewhere—to establish the first national green bank in the United States, creating a coalition of subrecipients (the "Subgrantees") that includes 16 well-established state and local green banks and two national nonprofit organizations.  In December 2024 and January 2025, CGC concluded definitive subgrant agreements with the 19 Subgrantees, which paralleled the terms and conditions of the NCIF grant to CGC itself, and required the Subgrantees to comply with oversight and reporting obligations to both CGC and the EPA.  CGC also developed and implemented an internal investment policy to help address risks and safeguard public funds, which Subgrantees were required to accept and apply to their own investments, except where CGC reviewed and approved an alternative investment policy.

6.    I have reviewed CGC's 2024 Semi-Annual Report and am familiar with its contents. As described therein, and with the agreements and oversight mechanisms in place, CGC distributed approximately $1.8 billion among the Subgrantees to support the creation of a self-sustaining nationwide network of state and local green banks and drive the deployment of qualifying clean energy projects.  As of December 31, 2024, the Subgrantees had already closed 6 qualifying projects totaling $33.7 million in NCIF fund allocations, which are expected to mobilize an additional $192 million in private capital and $2.2 million in non-NCIF public capital (for a public–private capital mobilization ratio of nearly 7:1).

7.    In addition to its partnership and grant activities, CGC operates to identify affordable clean energy investment opportunities throughout the United States, and to assist in funding those opportunities through its own assets and by mobilizing private-sector investment. CGC's investment activities are commercial, not concessional; they aim to generate positive returns on invested capital to drive a self-sustaining organization and facilitate continuous reinvestment in clean energy projects.

8.    CGC seeks to do business with direct participants in clean energy technology and infrastructure, including renewable energy developers, but also with a wide variety of investment firms and other financial institutions. CGC's 2024 Semi-Annual Report states that, in the latter part of 2024, CGC received 82 proposals through a program titled "Requests for Proposals One" ("RFP1") from clean energy developers, commercial partners, community lenders, and financial investors (including private credit and equity firms) to pursue qualified green energy projects in the United States.  As indicated in the report, RFP1 enables CGC to efficiently allocate capital across various strategies, assets, technologies, and locations, and to execute these investments in a

manner that will enhance mobilization of CGC capital and incorporate market-best underwriting practices, without sacrificing accountability or limiting oversight of how funds are invested.

9.      CGC's 2024 Semi-Annual details that between the launch of RFP1 and December 31, 2024, CGC received 82 investment proposals totaling $30.9 billion in requested funds.  Of these proposals, 24 projects totaling $5.3 billion were positively scored for further consideration for investment by CGC, with associated expected job creation of 240,700 and total project costs of $85.1 billion—a mobilization ratio of 16:1.  Proposals for qualified projects that scored high enough to demonstrate viability but that were not selected for CGC funding—generally, either because the projects were too small for CGC direct investments or because the type of transaction was better suited to a network partner with more applicable expertise—were considered for referral to the CGC Subgrantees and nascent green banks in the CGC Network Loan Program.  Among the total 82 proposals, CGC also received 37 proposals from various financial intermediaries totaling $22.6 billion in requested funds, of which 17 were positively scored and with whom CGC had extensive commercial discussions.

## II.      CGC Is Suffering Irreparable Harm to its Investment Activities

10.      If Defendants continue to freeze CGC's funds for the uncertain duration of litigation, I expect that CGC will lose out on vital investment opportunities necessary to carry out CGC's core mission, namely, to invest in clean energy projects in partnership with other public and private organizations. Indeed, the EPA's and Citi's actions have harmed CGC's direct investment activities by depriving CGC and its Subgrantees of known and unknown direct investment opportunities and partnerships.

11.      CGC has already faced concerns from its investment partners and co-investors about the status of the investment and grant commitments CGC has made.  Indeed, the quality and

number of investment proposals and applications appear to have been negatively impacted since EPA's funding freeze.

12.    Based on my knowledge and experience in the industry, I believe that the Defendants' actions have severely impacted CGC's pipeline of activities. CGC will never know how many opportunities it lost as a result of potential partners' concerns that CGC's funding will be delayed for months or years of litigation.

### A.    CGC's Direct Investment Efforts Have Been Impeded

13.    CGC's efforts to invest directly in clean energy projects and to attract private financing to invest alongside it have been disrupted by the Defendants' actions. To be an effective financing counterparty, CGC (or any organization) must have certainty of funding sources, be able to move efficiently and reliably in negotiations, and be viewed as credible by involved parties. CGC is made ineffective if potential partners cannot rely on when CGC's capital will become available. No credible counterparty will take this funding risk, or be willing to be associated financially with CGC.

14.    For example, CGC was in negotiations with a renewable energy company concerning CGC's potential investment in an interregional energy transmission project. Although CGC and the company were able to reach agreement in principle on a term sheet and a letter of intent, the company suspended negotiations on March 17, 2025 as a result of recent events.

15.    Consistent with CGC's workplan approved by EPA and the terms and conditions of CGC's grant agreement, one of CGC's strategies was to invest with large-scale institutional asset managers to magnify the impact of CGC's capital and community-investment expertise with private-sector operational capabilities and resources. In doing so, CGC intended to create investment funds to increase accessibility to private capital from institutional investors such as

pension funds, and lead to greater access to investment tools that maximize targeted impact. Unfortunately, as a result of the EPA's and Citi's actions, plans to market these investment vehicles have been put on hold, harming CGC's objectives and jeopardizing the viability of this program. Similarly, CGC had been in conversation with philanthropic entities that were interested in partnering with us on a fund-of-funds strategy, with at least one such entity indicating interest, on a preliminary basis, in investing up to $250 million in such a strategy with CGC. Following the Defendants' actions, discussions with these entities have been suspended.

16.     CGC's operations with respect to its Subgrantees have also been affected. For example, CGC intended to partner with a consulting firm that would assist CGC by helping to evaluate the investment policies of CGC's network partners and by periodically ensuring its Subgrantees were in compliance with CGC's investment policy. This consulting firm is widely accepted in commercial markets to evaluate lenders' operations and procedures, and its use would have provided an additional control to ensure that Subgrantee investments were being made in local markets in a sound and scalable manner. The use of such a service provider is embedded in CGC's investment policies with respect to Subgrantees. Following a public request for proposals and negotiations, this firm was prepared to deliver scope of services and an engagement letter, but following the EPA's allegations and the freezing of CGC's funds, the consulting firm broke off negotiations and declined to work with CGC.

17.     Because of this loss, CGC has been deprived of the ability to use a best-in-class provider, delaying the implementation of its investment programs.

**B.    CGC Is Suffering Reputational Harm**

18.     Financial institutions like CGC rely on their reputation and public trust. CGC's reputation as a reliable institution is therefore essential to its mission. It facilitates CGC's efforts

to locate qualifying investment projects across the country, and to partner with and pursue those opportunities. And because part of CGC's purpose is to bridge market failures and attract private co-investment to projects that might otherwise be deemed too risky, confidence in CGC's commitments as an investor is vital to achieving buy-in from private sector investors.

19.    The transactions CGC is involved in are highly significant for CGC's counterparties, and these counterparties rely on CGC's reputation as a credible organization that is capable of delivering on its investment commitments without risk of negative publicity or default.

20.    Citi's freeze on CGC's funds, EPA's public statements and purported termination of the NCIF program, have already caused significant reputational harm to CGC, and will cause more if the freeze is allowed to stand.

21.    Moreover, Citi's freezing of CGC's and its Subgrantees' funds at EPA's direction separately injured CGC's reputation and goodwill—even before the EPA's Notice of Termination. That conduct signaled to current and potential future partners of CGC and its Subgrantees that they could not be relied upon to deliver on investment proposals and commitments.

22.    I have been told that CGC officers and employees have heard from industry participants that potential partners and investment opportunities are reluctant to work with CGC following Citi's freeze of its accounts and the "Notice of Termination." As I understand it, the freeze has undermined the perception of CGC's ability to provide funds, raising concerns among our counterparties.

23.    The longer the freeze on CGC's funds continues, the more difficult it will be for CGC to originate deals and secure co-investors. CGC may be unable to attract applications from high-quality investments, and those investors that are willing to work with CGC may not be willing to risk CGC taking a large position in any investments CGC funds. In the medium to long term,

CGC's and its Subgrantees' programs may fail without access to the funding CGC has committed to them, permanently damaging CGC's reputation as a credible counterparty.

24.    It is impossible to know what other investment or partnership opportunities may have come available to CGC but for the freeze.  And these lost opportunities compound the reputational injury to CGC and its Subgrantees.

*        *        *

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed this 21st day of March 2025.

/s/  Richard Kauffman
RICHARD KAUFFMAN
Coalition for Green Capital

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CLIMATE UNITED FUND,** | |
| Plaintiff, | |
| v. | Civil Action No. 1:25-cv-00698-TSC |
| **CITIBANK, N.A.,** *et al.,* | |
| Defendants. | |
| **COALITION FOR GREEN CAPITAL,** | |
| Plaintiff, | |
| v. | Civil Action No. 1:25-cv-00735-TSC |
| **CITIBANK, N.A.,** *et al.,* | |
| Defendants. | |
| **POWER FORWARD COMMUNITIES, INC.,** | |
| Plaintiff, | |
| v. | Civil Action No. 1:25-cv-00762-TSC |
| **CITIBANK, N.A.,** *et al.,* | |
| Defendants. | |

## <u>DECLARATION OF SHAUN DONOVAN</u>

I, Shaun Donovan, declare as follows:

1.      I am the President of Enterprise Green Accelerator, Inc. ("EGA"). I submit this

declaration in support of Plaintiff Power Forward Communities, Inc.'s motion for a preliminary

injunction in this matter. The statements made in this declaration are based on my personal

knowledge, materials I have reviewed, and information made available to me pursuant to my

JA433

duties at EGA.

2.     Prior to my current role, I served as director of the U.S. Office of Management and Budget from 2014 to 2017, as secretary of the U.S. Department of Housing and Urban Development from 2009 to 2014, and as commissioner of the New York City Department of Housing Preservation and Development from 2004 to 2009. I was named a senior fellow by the Ford Foundation in 2022, and I have a bachelor's degree in engineering and master's degrees in public administration and architecture from Harvard University.

3.     EGA's mission is to catalyze investment in American housing and communities to decarbonize the U.S. economy. To achieve this goal, EGA provides capital, leverages private capital, and provides other forms of financial and technical assistance for the rapid deployment of low- and zero-emission products, technologies and services; partners with national and community organizations to aggregate demand in local communities, and promotes and facilitates the adoption of low- and zero-emission products, technologies and services; concentrates its resources and efforts to ensure that low-income and disadvantaged households and communities fully participate in and benefit from deployment and adoption of low- and zero-emission products, technologies and services; and supports workforce development and the creation of high-quality jobs in the United States in the deployment and adoption of low- and zero-emission products, technologies and services.

4.     EGA has been in operation since September 29, 2023, and is incorporated and domiciled in the State of Maryland. Enterprise Community Partners, Inc. is the sole corporate member of EGA.

5.     As a non-profit, EGA relies exclusively on federal funding and philanthropic donations to carry out its mission and operations.

JA434

6.     Enterprise Community Partners, Inc. is one of the coalition members comprising Power Forward Communities, Inc. ("PFC").  In April 2024, PFC received a $2 billion award from the Environmental Protection Agency ("EPA") under the National Clean Investment Fund ("NCIF").

7.     PFC's award is governed by the terms of an Award Agreement between EPA and PFC.  Among other terms, the Award Agreement authorizes PFC to issue subawards to designated subrecipients to carry out parts of its NCIF workplan.

8.     EGA is a designated subrecipient of approximately $600 million of the grant funds awarded to PFC.  EGA is expected to utilize this subaward over the next seven years (2024-2031) to fulfill its mission.  Approximately $480 million will be used for financial assistance, approximately $50 million for market building activities, roughly $30 million for predevelopment work, and approximately $40 million for program administration.

9.     The terms and conditions of EGA's subaward are set forth in a Subaward Agreement it executed with PFC on December 23, 2024.  Pursuant to its Subaward Agreement, EGA's funds are to be maintained in accounts held in EGA's name at Citibank, the designated Financial Agent for the NCIF award.  The Subaward Agreement requires that EGA comply with the applicable Financial Agent terms and conditions in PFC's NCIF award.

10.     EGA also entered into an Account Control Agreement ("ACA") with PFC and Citibank.  That Account Control Agreement obligates Citibank to "comply with all instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and financial assets in the Accounts."

11.     Prior to February 12, 2025, Citibank satisfied that contractual obligation by complying with disbursement instructions submitted by EGA within 24 hours.  If EGA submitted

JA435

a disbursement instruction prior to 11 a.m., Citibank would generally disburse the funds during

the same business day.  If EGA submitted a disbursement instruction after 11 a.m., Citibank

would generally disburse the funds the next business day.

12.    On March 11, 2025, at approximately 2:00 p.m., EGA sent a disbursement

instruction to Citibank for $180,070.39.

13.    As of the date of this declaration, Citibank has not disbursed funds in response to

this direction.  EGA understands that Citibank has not done so because Citibank has "frozen"

EGA's accounts.

14.    EGA understands that, on March 11, 2025, at 5:24 p.m., EPA informed PFC that it

had terminated the Award Agreement, effectively immediately.

15.    EGA has been and will continue to be harmed by Citibank's failure to disburse

funds in violation of its obligations under the ACA and EPA's unlawful termination of the Award

Agreement.

16.    EGA has a pipeline of projects that is vulnerable to collapse because EGA cannot

access its funds.  EGA has executed term sheets to provide financial assistance using almost

$100 million in NCIF funds for projects across the country, including in Michigan, Texas,

Virginia, New York, Washington, and Maryland.  Lack of NCIF funding puts many of these

projects at imminent threat of being forced to shutter, in numerous cases due to impending

financing deadlines.

17.    For example, several new construction projects in EGA's pipeline will not move

forward without the NCIF funding.  These projects have secured as much as they can in local and

state subsidies.  They require additional subsidy financing from EGA or risk collapse.  Without

the NCIF funding, the projects will not be built and their units will not be added to the affordable

JA436

housing stock.  These include a 302-unit multifamily affordable housing project in Texas and a

236-unit multifamily affordable housing project in Maryland.

18.    In Detroit, Michigan, EGA agreed to provide financial assistance for the

construction of a 160-home subsidized rental apartment community.  EGA is expected to provide

the project $24 million in financing via its NCIF grant.  That financing will contribute to a Rental

Assistance Demonstration (RAD) restructuring, preserving critically needed affordable housing

by replacing functionally obsolete public housing with new, highly efficient affordable

apartments.  The project consists of three multi-story buildings and townhomes and features a

mix of 1-, 2-, 3-, and 4-bedroom apartments.  All units will be restricted to households earning at

or below 80% of Area Median Income, and will be covered by a project-based voucher contract.

The project will use cost- and time-efficient modular construction, and will help provide a model

for the future of affordable housing construction.  Under the RAD program, the U.S. Department

of Housing and Urban Development's ("HUD"), which administers the program, may revoke its

Commitment to Enter into a Housing Assistance Payment (CHAP) if certain milestones are not

met, including the provision of a financing plan within 270 days of the CHAP award.  The

project received its CHAP award in December 2024.  Continued uncertainty regarding EGA's

financing jeopardizes the award.

19.    EGA's renovation projects are also at immediate risk.  One 192-unit renovation

project in Virginia faces losing its private activity bond cap allocation if EGA's financing is not

committed by the end of this month, March 2025.  If EGA cannot fulfill its obligations, the

project is also at risk of losing $4 million funds committed by the Department of Housing and

Community Development ("DHCD").  DHCD's commitment is contingent on the execution of

project documents by November 1, 2025.  By the terms of its commitment, DHCD also is

JA437

entitled to a 45-day review period to approve any changes with respect to third-party capital commitments to the project, and to modify their own commitment and relevant loan documents. Given the November 1, 2025 execution deadline, the result is that any uncertainty as to the status of EGA's funding commitment beyond September 15, 2025 will deprive DHCD of the requisite review period and will allow it to recapture its $4 million in committed funds. Were that to happen, the project would lack sufficient funding to proceed.

20.     Access to state funding aside, any further delay in funding from EGA will imperil the project because of the potential for costs increases stemming from that delay. At present, EGA estimates that, taking into account inflation and interest rate projections, a 3-month delay will add approximately $460,000 in additional costs to the project. Those costs stem from contingency agreements with contractors, payment of tax credit carry over fees, and other operating costs. But if inflation and/or interest rates were to vary significantly from projections, these costs could increase significantly and jeopardize the project's feasibility.

21.     EGA has another 106-unit renovation project in Virginia that must secure its bond cap allocation from the state in June 2025. To do so, the project must identify its full capital stack that will finance the project. This project relies on NCIF funding to meet these requirements, as there are no other soft funding sources from Virginia available to ensure the project's economic viability. Thus, if the NCIF funding committed by EGA is no longer available, the project will lack the resources to proceed.

22.     Another example relates to a project to renovate an apartment complex in Vancouver, Washington providing 170 affordable senior living housing units to people aged 62 and older. EGA is expected to provide the project $11.5 million in financing via its NCIF grant. The 15-story building was built in the 1960s, and the rehabilitation has become urgent as the

JA438

absence of fire sprinklers has put the property at risk of being uninsurable.  Energy and other

upgrades will be needed to significantly extend the building's lifespan.  The majority of the units

(108) are covered under a project-based rental assistance contract, ensuring affordability in a

high-cost neighborhood.

23.    Due to the unavailability of the NCIF funding, these projects and others are

delayed and at risk of falling through.

24.    Citibank's freeze also hinders EGA's ability to employ staff necessary to fulfill its

mission and obligations under the NCIF program.  Six of EGA's employees are funded entirely

through the NCIF award, and five employees are partially funded through the NCIF award.

Moreover, EGA has paused all hiring efforts and was forced to rescind an offer to a potential

employee in February due to Citibank's freezing of its accounts.

25.    Additionally, Citibank's freeze is impairing EGA's ability to enter necessary

contracts.  Prior to Citibank's freeze, EGA was negotiating a master contract with multiple

competitively pre-qualified vendors for technical assistance and predevelopment services

contracts related to EGA's obligations as a subrecipient under the grant.  These services are

necessary for EGA to achieve its goals under the workplan.  However, because of the

unavailability of NCIF funds, EGA has been forced to delay finalizing those agreements.

26.    EPA's purported termination of the Award Agreement exacerbates all the harms

detailed above.  Indeed, if the Award Agreement terminates and EGA loses access to the NCIF

award by virtue of its Subaward Agreement with PFC (EGA's sole source of funding), EGA will

be forced to close its doors.  More importantly, EGA would be unable to carry out the important

work for which its NCIF award was made—and for which Congress appropriated the funds

allotted to the NCIF program and obligated to EGA via PFC: to deploy "low- and zero-emission

1

products, technologies, and services," 42 U.S.C. § 7434(c)(1), to lower Americans' utility bills,

improve community health and safety, and help address the climate crisis.

JA440

I declare under penalty of perjury under the laws of the United States of America,

pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed this 21st day of March, 2025.

_____

Shaun Donovan

JA441

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CLIMATE UNITED FUND,** | |
| Plaintiff, | |
| v. | Civil Action No. 1:25-cv-00698-TSC |
| **CITIBANK, N.A.,** *et al.,* | |
| Defendants. | |
| **COALITION FOR GREEN CAPITAL,** | |
| Plaintiff, | |
| v. | Civil Action No. 1:25-cv-00735-TSC |
| **CITIBANK, N.A.,** *et al.,* | |
| Defendants. | |
| **POWER FORWARD COMMUNITIES, INC.,** | |
| Plaintiff, | |
| v. | Civil Action No. 1:25-cv-00762-TSC |
| **CITIBANK, N.A.,** *et al.,* | |
| Defendants. | |

## <u>DECLARATION OF ARI MATUSIAK</u>

I, Ari Matusiak, declare as follows:

1.       I am the President and Chief Executive Officer of Rewiring Community

Investment Fund, Inc. ("RCIF").  I submit this declaration in support of Plaintiff Power Forward

Communities, Inc.'s motion for a preliminary injunction in this matter.  The statements made in

JA442

this declaration are based on my personal knowledge, materials I have reviewed, and information made available to me pursuant to my duties at RCIF.

2.    As a founder of RCIF, I have been with the organization since it was established in 2023.  Prior to my current position, I held leadership positions at both for-profit and nonprofit organizations.  I have a bachelor's degree in political science from Brown University and a juris doctorate from Georgetown University Law Center.

3.    RCIF is a nonprofit organization dedicated to delivering lower household energy bills, local jobs that cannot be automated or offshored, and greater wealth for American communities via the low-cost installation of better and more efficient electric machines in American homes.  The RCIF entity was created for the sole purpose of applying to the Greenhouse Gas Reduction Fund ("GGRF").  As such, RCIF relies exclusively on federal funding to carry out its mission and operations.

4.    RCIF's sole corporate member is Rewiring America, Inc. ("Rewiring America"). Rewiring America was founded in the summer of 2020 with the aim of making electrification affordable, desirable and better for all American households.  The organization develops accessible, actionable data and tools, and works to build coalitions and partnerships to make going electric easier for households and communities.  Every opportunity to replace a car, water heater, furnace, dryer, cooktop, or to install rooftop solar and storage, is an opportunity for American families to get better, more efficient electric machines.  Rewiring America aims to lower energy bills and housing costs for American households, reducing emissions and improving air quality along the way.

5.    RCIF is a wholly controlled entity of Rewiring America that serves as a subrecipient of prime recipient Power Forward Communities, Inc. ("PFC") to implement the

JA443

NCIF program.  RCIF shares the same goals and objectives of Rewiring America.  No employees or employment structures are housed within RCIF.  All employees and employee structures related to the NCIF program are part of Rewiring America, and these resources are shared with RCIF to implement the goals of the NCIF award.

6.     Rewiring America is one of the coalition members comprising PFC.  In April 2024, after a robust and months-long competitive process, PFC received a $2 billion award from the Environmental Protection Agency ("EPA") under the National Clean Investment Fund ("NCIF").

7.     PFC's award is governed by the terms of an Award Agreement between EPA and PFC.  Among other terms, the Award Agreement authorizes PFC to issue subawards to designated subrecipients to carry out parts of its NCIF workplan.

8.     RCIF is a designated subrecipient of approximately $490 million of the grant funds awarded to PFC.  RCIF is expected to utilize this subaward over the next seven years (2024-2031) to advance single-family housing electrification.  Approximately $200 million will be used for financial assistance, structured to enable mainstream lenders to offer credit to low- and moderate-income homeowners at significantly reduced interest rates.  The assistance will thus lower the upfront cost to Americans of purchasing weatherization measures, heat pumps, rooftop solar and battery backup systems that will lower energy bills by hundreds to thousands of dollars per year.  Approximately $261 million will be used to: (1) directly negotiate upfront discounts entirely passed through to households on these upgrades from manufacturers; (2) build digital tools that make it easier for households to scope and price the project that is best for them; (3) connect households to available federal, state, local and utility incentives; (4) match households with trained, high quality, local contractors to do the job; and (5) establish local

JA444

partnerships that help households learn about these low cost upgrade opportunities from community officials mm, civic associations and other trusted messengers.  These activities are categorized as market building and predevelopment activities, as those terms are defined and described in PFC's Award Agreement with EPA and RCIF's Subaward Agreement with PFC. Together with the financial assistance dollars, these market building and predevelopment activities are projected to lower the cost of these upgrades by over 50 percent for households, significantly benefiting those households that elect to participate and efficiently deploying taxpayer dollars.  Lastly, approximately $29 million will be used for administrative costs.

9.    RCIF was identified as a Subrecipient in the proposal submitted by PFC in 2023 as well as in the August 2024 Award Agreement.  The terms and conditions of RCIF's subaward are set forth in a Subaward Agreement it executed with PFC on December 23, 2024.  Pursuant to its Subaward Agreement, RCIF's funds are to be maintained in accounts held in RCIF's name at Citibank, the Financial Agent selected by the U.S. Department of the Treasury for the NCIF award.  The Subaward Agreement requires that RCIF comply with the applicable Financial Agent terms and conditions in PFC's NCIF award.

10.    RCIF also entered into an Account Control Agreement ("ACA") with PFC and Citibank.  That Account Control Agreement obligates Citibank to "comply with all instructions, notifications, and entitlement orders the Bank receives from RCIF directing the disposition of funds and financial assets in the Accounts."

11.    Prior to February 12, 2025, Citibank satisfied that contractual obligation by complying with disbursement instructions submitted by RCIF within 24 hours.

12.     On March 9, 2025 at 9:17 p.m., RCIF directed Citibank to disburse a total of $1,327,632.26 as reimbursement for costs incurred in accordance with the Subrecipient Agreement as of that date.

13.     As of the date of this declaration, Citibank has not disbursed funds in accordance with those directions.  RCIF understands that Citibank has not done so because Citibank has "frozen" RCIF's accounts.

14.     RCIF understands that, on March 11, 2025, at 5:24 PM, EPA informed PFC that it had terminated the Award Agreement, effectively immediately.

15.     RCIF has been and will continue to be harmed by Citibank's failure to disburse funds in violation of its obligations under the ACA, and EPA's unlawful termination of the Award Agreement.

16.     RCIF's inability to access its NCIF grant award has left RCIF without expected funding and facing severe budget uncertainty.  Further, the costs of workplan compliance are largely fixed, comprised of personnel and systems infrastructure that must be built and maintained.

17.     If RCIF cannot access its funds, RCIF will be required to adjust or forfeit current contracts and other project operations.  RCIF also faces the prospect of losing critical contractors and project partners with hard-to-replace expertise, relationships, and skillsets necessary to its program operations.  That is true because of both RCIF's inability to pay these individuals and partners, and because of the severe reputational harm RCIF has endured due to its inability to comply with its commitments.

JA446

18.     The budget uncertainty has also affected RCIF's ability to execute on its project milestones.  RCIF cannot engage in contractual and other commitments necessary to advance its projects, because the lack of funding access renders RCIF unable to honor its commitments.

19.     For instance, Citibank's freeze of RCIF's accounts prevents RCIF from fulfilling its "loan loss reserve" obligations that are essential to providing households in low-income areas with access to affordable heating and cooling systems for their homes.  The EPA workplan contemplates that RCIF will establish a loan loss reserve to encourage lenders to provide loans with significantly discounted interest rates to households across the United States.  This arrangement allows RCIF to leverage private capital, making taxpayer dollars go further and allowing NCIF dollars to support more American households.  These low-interest loans, in turn, will enable recipients to afford the purchase of energy-efficient, clean heating and cooling systems.  Many of these households do not currently have adequate heating or cooling systems of any kind, despite living in areas susceptible to extreme temperatures.

20.     Due to the unavailability of NCIF funding, RCIF is unable to provide the promised loan loss reserve to private lenders.  As a result, the private lenders cannot offer the favorable-interest rate loans that are necessary to facilitate the purchase of energy-efficient heating and cooling systems.  Further, the "on again, off again" nature of the conversations with lenders on account of EPA's and Citibank's actions has lessened those lenders' confidence in the reliability of these dollars.  Because of this uncertainty, RCIF is at risk of losing these partnerships altogether, or having the underlying agreements transact on less favorable terms. The result will be that thousands of Americans will either pay a higher cost for or be outright deprived of access to those systems, meaning that some of the otherwise eligible individuals will be forced to endure another summer or winter without relief in their own home.

JA447

21.    As another example, the EPA workplan calls for RCIF to negotiate and finalize contracts with local community navigators in cities like Pittsburgh, Pennsylvania to conduct outreach and enrollment for homeowners in their community.  As the workplan details, "these local community navigators serve as an additional technical and programmatic resource, and inspire the confidence needed for households and property owners to move forward with qualified projects.  From retired engineers and building electrification experts to local educators and religious leaders, these navigators will have a range of experience and expertise."  Without access to its NCIF funding, RCIF has been unable to enter into the vast majority of the contractual arrangements contemplated by the work plan.  The result is an increased risk that eligible households will not be able to avail themselves of a low-cost option to improve their home and save money on their energy bills.  It also takes away an efficient mechanism for creating awareness, resulting in a higher cost to taxpayers in order to achieve the results anticipated by Congress.

22.    RCIF likewise cannot finalize the contractual agreements it has negotiated with original equipment manufacturers ("OEMs").  These contracts are intended to (1) secure lower standardized pricing for homeowners on electric household equipment and (2) develop career pathways that include on-the-job training and upskilling for OEM network contractors.  If RCIF cannot get these contracts in place before tariffs are imposed on parts and equipment for clean and efficient appliances, then households will lose the opportunity to lock in pre-tariff rates, thus further undermining the intent of the GGRF to lower costs for US households.

23.    Moreover, RCIF's inability to access its NCIF funds has prevented it from fulfilling its obligation to provide workforce development.  The EPA workplan tasks grantees to "develop new and untapped talent" to meet the imperatives of the EPA's Greenhouse Gas

JA448

Reduction Fund.  But because RCIF cannot access its funding, it is unable to provide any

assurances to its network of contractors that there will, in fact, be jobs in the pipeline for those

contractors to work on.

24.    The termination of the Award Agreement exacerbates all the harms detailed

above.  Indeed, if the Award Agreement terminates and RCIF loses access to the NCIF award by

virtue of its Subaward Agreement with PFC (RCIF's sole source of funding), RCIF will be

forced to close its doors.  More importantly, RCIF would be unable to carry out the important

work for which its NCIF award was made—and for which Congress appropriated the funds

allotted to the NCIF program and obligated to RCIF via PFC: to deploy "low- and zero-emission

products, technologies, and services,"  42 U.S.C. § 7434(c)(1), to lower Americans' utility bills,

improve community health and safety, and help address the climate crisis.

JA449

  I declare under penalty of perjury under the laws of the United States of America,

pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed this 21st day of March, 2025.


_____
Ari Matusiak

JA450

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CLIMATE UNITED FUND,** | |
| Plaintiff, | |
| v. | Civil Action No. 1:25-cv-00698-TSC |
| **CITIBANK, N.A.,** *et al.,* | |
| Defendants. | |
| **COALITION FOR GREEN CAPITAL,** | |
| Plaintiff, | |
| v. | Civil Action No. 1:25-cv-00735-TSC |
| **CITIBANK, N.A.,** *et al.,* | |
| Defendants. | |
| **POWER FORWARD COMMUNITIES, INC.,** | |
| Plaintiff, | |
| v. | Civil Action No. 1:25-cv-00762-TSC |
| **CITIBANK, N.A.,** *et al.,* | |
| Defendants. | |

## <u>DECLARATION OF TIMOTHY J. MAYOPOULOS</u>

I, Timothy J. Mayopoulos, declare as follows:

1.      I am the President and Chief Executive Officer of Power Forward Communities,

Inc. ("PFC").  I submit this declaration in support of Plaintiff PFC's motion for a preliminary

injunction in this matter.  The statements made in this declaration are based on my personal

JA451

knowledge, materials I have reviewed, and information made available to me pursuant to my

duties at PFC.

2.      I joined PFC as its Acting President and Chief Executive Officer in October 2023,

and have served as PFC's President and Chief Executive Officer since June 30, 2024.  Prior to

my current role, I held executive-level positions at multiple large-scale organizations, including

serving as the President and Chief Executive Officer of Silicon Valley Bridge Bank, N.A. in

2023; the President and Chief Executive Officer of Fannie Mae from 2012 to 2018; the

Executive Vice President, Chief Administrative Officer, General Counsel, and Corporate

Secretary of Fannie Mae from 2009 to 2012; and the Executive Vice President and General

Counsel of Bank of America from 2004 to 2008.  I have a bachelor's degree from Cornell

University and a juris doctorate degree from New York University School of Law.

3.      PFC is a nonprofit organization that comprises a coalition of some of the most

trusted nonprofit organizations in the country:  Enterprise Community Partners, Local Initiatives

Support Corporation (LISC), and Rewiring America.  PFC's coalition members have nearly a

century of combined experience in financing, managing, and implementing affordable housing

projects for Americans in need.  Those projects total more than $100 billion and have added

approximately 1.5 million affordable homes and apartments across the United States.

4.      PFC's mission is to help lower housing costs and utility bills for American

families and communities through clean-energy investments.  In partnership with its coalition

members, PFC aims to expand and preserve affordable housing, improve air quality, and create

well-paying jobs by ramping up simple energy-efficiency and other improvements in single-

family and multifamily homes nationwide.

JA452

5.      As contemplated by the Notice of Funding Opportunity for the U.S.

Environmental Protection Agency's National Clean Investment Fund ("NCIF") (a true and

correct copy of which is attached to the Complaint as Exhibit A), PFC was established to serve as

the lead applicant for coalition applicants and operates as a pass-through entity for purposes of

administering the NCIF grant.  As such, it is "accountable to EPA for effectively carrying out the

full scope of work and the proper financial management of the grant."  *See* Complaint Ex. A at 7.

6.      PFC received a $2 billion award from the U.S. Environmental Protection Agency

("EPA") under the NCIF program.  PFC's award is governed by the terms of an Award

Agreement between EPA and PFC entered into on August 8, 2024 (a true and correct copy of

which is attached to the Complaint as Exhibit B) and as amended on December 20, 2024 (a true

and correct copy of which is attached to the Complaint as Exhibit C).  Among other terms, the

Award Agreement authorizes PFC to issue subawards to designated subrecipients to carry out

parts of its NCIF workplan.  The coalition members and/or their affiliates are designated

subrecipients of the grant funds awarded to PFC, and in this role are obligated to implement

certain objectives of the grant (collectively, the "Subrecipients").  On February 24, 2025, PFC

announced that it had committed $539 million of its $2 billion award.

7.      The Award Agreement required that PFC drawdown the entire award amount into

an account at the designated Financial Agent, i.e., Citibank, N.A ("Citibank").  PFC would then

allocate NCIF grant funds to its designated subrecipients across various accounts at Citibank.

8.      PFC has no assets or funding other than from the NCIF award.

9.      PFC entered into an Account Control Agreement ("ACA") with EPA and Citibank

in connection with its own accounts (a true and correct copy of which is attached to the

complaint as Exhibit D), and Account Control Agreements with Citibank and each Subrecipient

with respect to each Subrecipient's accounts ("Subrecipient ACAs") (true and correct copies of which are attached to the Complaint as Exhibits E-G). In the ACA with PFC, Citibank agreed to "comply with all instructions, notifications, and entitlement orders it receives directing the disposition of funds and financial assets in the Accounts including, without limitation, directions to distribute proceeds of any such transfer or redemption of interest or dividends on financial assets in the Accounts    originated by PFC ." Complaint Ex. D, Section 2.1

10.    Citibank has identical obligations under the Subrecipient ACAs. Specifically, in the Subrecipient ACAs, Citibank agreed to "comply with all instructions, notifications, and entitlement orders it receives directing the disposition of funds and financial assets in the Accounts including, without limitation, directions to distribute proceeds of any such transfer or redemption of interest or dividends on financial assets in the Accounts    originated by Subrecipients ." Complaint Exs. E-G, Section 2.

11.    Prior to February 13, 2025, Citibank satisfied its contractual obligation to PFC by complying with disbursement instructions submitted by PFC within 24 hours. If PFC submitted a disbursement instruction prior to 11 a.m., Citibank would generally disburse the funds during the same business day. For example, PFC submitted a disbursement instruction at 10:41 a.m. on February 12, 2025, and Citibank processed the request the same day. If PFC submitted a disbursement instruction after 11 a.m., Citibank would generally disburse the funds the next business day.

12.    On February 14, 2025, at 4:14 p.m., PFC directed Citibank to disburse $1,085,683.50.

13.    On March 10, 2025, at 10:18 a.m., PFC directed Citibank to disburse $224,765.15.

JA454

14.     As of the date of this declaration, Citibank has not disbursed funds in response to those directions.

15.     In keeping with its monitoring and oversight responsibilities, PFC's current practice is to review all Subrecipients' directions to Citibank for disbursement prior to their issuance to Citibank.  PFC has view-only access to all Subrecipients' accounts at Citibank. Under the terms of the ACAs among PFC, the Subrecipients, and Citibank, Citibank must provide copies of statements and confirmations for the accounts simultaneously to the applicable Subrecipient and PFC.

16.     Because of these monitoring and oversight functions, PFC is aware that certain Subrecipients have also submitted disbursement instructions to Citibank since February 14, 2025 that Citibank has refused, as of the date of this filing.

17.     On March 11, 2025, at 5:24 p.m., EPA informed PFC that it was terminating the Award Agreement, effectively immediately.  A true and correct copy of EPA's purported termination notification is attached to the Complaint as Exhibit J.

18.     PFC has been and will continue to be harmed by Citibank's refusal to disburse funds and EPA's unlawful termination of the Award Agreement.  Since Defendants suspended PFC's accounts and purportedly terminated PFC's award, PFC has not secured a committed source of funding to replace the NCIF award.

19.     Without access to its funds, PFC has been unable to pay outstanding invoices from contractors for work completed on PFC's behalf and, as a result, PFC is incurring default risk with respect to these contracts.  These include contracts for legal and management consultant services that are necessary for PFC to administer the grant in compliance with the terms of the Award Agreement.  They also include contracts for essential financial management and IT

JA455

services.  If PFC is not able to make payment on these outstanding invoices, which it cannot do

without access to its NCIF funds, PFC is at imminent risk of losing these services due to default.

20.     Further, EPA's Notice of Termination and Citibank's freeze of PFC's accounts—

no matter how meritless—have caused PFC reputational harm by signaling the effective

cancellation of PFC's NCIF grant and, thus, uncertainty regarding PFC's ability to satisfy current

and future financial obligations.  EPA's purported termination of PFC's award "for cause," and

its unsupported accusations of "fraud, waste, and abuse," "conflicts of interest," and other

alleged misconduct, have compounded this reputational harm.  EPA's and Citibank's actions have

chilled the willingness of key vendors and investment partners to do business with PFC,

impeding PFC's ability to carry out its mission.

21.     As a result of EPA's purported termination and the uncertainty surrounding PFC's

grant award, PFC has lost essential services.  For example, on March 11, 2025, PFC's key

contractor advised that PFC had until March 17, 2025 to make payment or it may cease

providing services.  That contractor subsequently went "pencils down," stopping its work for

PFC.  As of March 19, PFC was in discussions with this contractor to resume work on a narrow

set of projects, and discussing what the compensation would be for such work.  The revised

scope of work will leave PFC without essential services going forward.

22.     PFC is also unable to pay contractors to complete, or in some cases to begin,

critical work for PFC.  This includes the completion of a financial reporting audit and work to

improve PFC's website that is necessary to help make information available to the public.  As of

the day of this filing, PFC has not secured alternative sources of funding to pay for such work.

As a result of Citibank's funding freeze, moreover, PFC has paused procurement processes to

engage additional contractors.

JA456

23.    Citibank's account freeze is also impairing PFC's ability to support its staff.  All PFC staff members are secondees on loan to PFC under secondment agreements that are to be paid for by grant funds.  PFC's inability to access its NCIF funds threatens PFC's ability to compensate these staff members.  PFC owes funds under the secondment and services agreements and is at risk of default under those agreements.

24.    Citibank's refusal to disburse PFC's funds has also hindered PFC's ability to recruit necessary and skilled employees to carry out its mission under the NCIF program.  PFC's budget contemplated a staff of more than thirty, but PFC remains staffed by only six employees.  Due to PFC's budget uncertainty, it is unable to hire the remaining employees needed to ensure regulatory compliance and to carry out PFC's obligations under the NCIF work plan.  Recently, for example, PFC conducted search and interview processes for a Chief Financial Officer, a Chief Legal and Risk Officer, and a Vice President of Human Resources.  PFC had candidates in mind for each of these positions but had to delay these hires due to its inability to access funding.  Because of Citibank's continued freeze of PFC's funds, moreover, PFC could permanently lose the opportunity to hire one or more of these accomplished candidates as they pursue other opportunities.

25.    Finally, Citibank's freeze prejudices PFC's ability to fulfill its obligations under the Award Agreement.  By the terms of its Award Agreement with EPA, PFC must demonstrate sufficient progress towards achieving the grant's objectives by certain dates.  In accordance with the Award Agreement, PFC relies on its Subrecipients to fulfill those objectives and timely achieve certain grant progress milestones.  Citibank's refusal to disburse funds from the Subrecipients' accounts negatively impacts the Subrecipients' ability to fulfill those obligations,

JA457

which, in turn, jeopardizes PFC's ability to fulfill its obligations under the Award Agreement as

the prime recipient of the NCIF grant funds.

26.    For example, certain of PFC's Subrecipients are in the process of negotiating

affordable housing financing projects involving hundreds of millions of grant dollars and over

$1 billion of total development costs (grant costs plus private capital).  These projects are at risk

of failing due to the unavailability of NCIF grant funds.  Because time is of the essence, the lack

of access to funds in the Citibank accounts jeopardizes these transactions and subjects PFC to

reputational harm.

27.    Under the Award Agreement, PFC is also required to report to EPA regarding its

progress in implementing the objectives of the grant.  For example, PFC recently received from

EPA a lengthy demand letter requesting information and seeking the production of various

categories of documents.  Among other things, the letter threatens the imposition of sanctions if

PFC fails to respond in a timely manner.  But PFC's ability to timely respond to these requests

has been and continues to be slowed by Citibank's refusal to disburse the NCIF funds, as PFC

cannot access the funding necessary to compensate the staff or third-party professionals

responsible for addressing EPA's requests.

28.    A termination of the Award Agreement would exacerbate all the harms detailed

above.  If EPA is indeed permitted to terminate the Award Agreement, PFC would lose access to

its award funds permanently.  In such a scenario, PFC, which has no source of funding other than

from the NCIF award, would be forced to lay off its employees and close its doors for good.

More importantly, PFC would be unable to carry out the important work for which its NCIF

award was made—and for which Congress appropriated the funds allotted to the NCIF program

and obligated to PFC: to deploy "low- and zero-emission products, technologies, and services,"

JA458

¹

42 U.S.C. § 7434(c)(1), to lower Americans' utility bills, improve community health and safety,

and help address the climate crisis.

1

I declare under penalty of perjury under the laws of the United States of America,

pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed this 21st day of March, 2025.

_____

Timothy J. Mayopoulos

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CLIMATE UNITED FUND,** | |
| Plaintiff, | |
| v. | Civil Action No. 1:25-cv-00698-TSC |
| **CITIBANK, N.A.,** *et al.,* | |
| Defendants. | |
| **COALITION FOR GREEN CAPITAL,** | |
| Plaintiff, | |
| v. | Civil Action No. 1:25-cv-00735-TSC |
| **CITIBANK, N.A.,** *et al.,* | |
| Defendants. | |
| **POWER FORWARD COMMUNITIES, INC.,** | |
| Plaintiff, | |
| v. | Civil Action No. 1:25-cv-00762-TSC |
| **CITIBANK, N.A.,** *et al.,* | |
| Defendants. | |

<u>**DECLARATION OF JOHN MOON**</u>

I, John Moon, declare as follows:

1.  I am the President of LISC Green LLC. ("LISC Green"). I submit this declaration in support of Plaintiffs' motion for a preliminary injunction in this matter. The statements made in this declaration are based on my personal knowledge, materials I have reviewed, and information made available to me pursuant to my duties at LISC Green.

JA461

2.     Prior to my current role, I served as Senior Vice President, Sustainability Philanthropy Leader at Wells Fargo Corporation from 2021 to 2024, Vice President and Community Affairs Officer at the Federal Reserve Bank of San Francisco from 2012 to 2019, and Community Development Team Leader at the Board of Governors of the Federal Reserve from 2006 to 2011. I have a bachelor's degree from the University of California Los Angeles and a master's degree in public policy from Harvard University.

3.     LISC Green has been in operation since September 26, 2023 and is formed as a limited liability company in the State of Delaware.  Local Initiatives Support Corporation ("LISC"), a New York not-for-profit organization and 501(c)(3) tax-exempt organization, is the sole member of LISC Green.  LISC Green is organized exclusively for charitable purposes under Section 501(c)(3) of the Internal Revenue Code and is operated exclusively to further the charitable purposes of LISC.  As a single-member limited liability company, LISC Green is a disregarded entity for federal income tax purposes and is not treated as a separate entity from LISC.

4.     LISC formed LISC Green to serve as a subrecipient pursuant to the U.S. Environmental Protection Agency ("EPA") National Clean Investment Fund ("NCIF").  LISC Green's purpose is to provide flexible and low-cost capital to leverage other sources of funding, including private capital, to support projects that lower emissions, improve affordability, and enable job creation.  By working with national and community-based organizations, LISC Green is working to aggregate demand and accelerate adoption of low-emissions and healthier solutions in communities across the country. LISC Green seeks to ensure that low-income communities are included in the transition to a clean energy economy, while also investing in workforce development to create quality jobs and supporting contractors and developers to realize the economic opportunities in the clean energy sector.

5.     LISC Green relies exclusively on federal funding to carry out its purpose and operations.

6.     LISC is one of the coalition members comprising Power Forward Communities, Inc. ("PFC").  In April 2024, PFC received a $2 billion award from the Environmental Protection Agency ("EPA") under the National Clean Investment Fund ("NCIF").

JA462

7.   PFC's award is governed by the terms of an Award Agreement between EPA and PFC.  Among other terms, the Award Agreement authorizes PFC to issue subawards to designated subrecipients as identified in PFC's application to carry out parts of its NCIF workplan.

8.   LISC Green is a designated subrecipient of approximately $589 million of the grant funds awarded to PFC.  LISC Green is expected to utilize this subaward over the next seven years (2024–2031) to fulfill its purpose.  LISC Green will use approximately $487 million for financial assistance, approximately $37 million for market building activities, approximately $28 million for predevelopment work, and approximately $37 million for program administration.

9.   The terms and conditions of LISC Green's subaward are set forth in a Subaward Agreement it executed with PFC on December 23, 2024.  Pursuant to its Subaward Agreement, LISC Green's funds are to be maintained in accounts held in LISC Green's name at Citibank, the designated Financial Agent for the NCIF award.  The Subaward Agreement requires that LISC Green comply with the applicable Financial Agent terms and conditions in PFC's NCIF award.

10. LISC Green also entered into an Account Control Agreement ("ACA") with PFC and Citibank. The ACA obligates Citibank to "comply with all instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and financial assets in the Accounts."

11. Prior to February 12, 2025, Citibank satisfied that contractual obligation by complying with disbursement instructions submitted by LISC Green within 24 hours.  If LISC Green submitted a disbursement instruction prior to 11:00 a.m., Citibank would generally disburse the funds during the same business day.  If LISC Green submitted a disbursement instruction after 11:00 a.m., Citibank would generally disburse the funds the next business day.

12. On February 14, 2025, at approximately 11:26 a.m. ET, LISC Green sent a disbursement instruction to Citibank for $187,592.63 in eligible costs incurred in furtherance of the NCIF workplan. LISC Green has since also incurred costs of $154,736.30 for the period of February 14, 2025 to February 28, 2025 and additional costs thereafter leading up to and following EPA's termination notice.

JA463

13. As of the date of this declaration, Citibank has not disbursed funds in response to the February 14 disbursement instruction. LISC Green understands that Citibank has not done so because Citibank has "frozen" LISC Green's accounts.

14. LISC Green understands that, on March 11, 2025, at 5:24 p.m., EPA informed PFC that it had terminated the Award Agreement, effectively immediately.

15. LISC Green has been and will continue to be harmed by Citibank's failure to disburse funds in violation of its obligations under the ACA and EPA's unlawful termination of the Award Agreement.

16. LISC Green has a pipeline of projects that is vulnerable to collapse because LISC Green cannot access its funds. LISC Green has letters of interest to provide financial assistance using approximately $86.5 million in NCIF funds for projects across the country, including in Ohio, Texas, New Jersey, Massachusetts, Iowa, Florida, Michigan, Wisconsin, Illinois, Kentucky, and Georgia. Lack of NCIF funding puts many of these projects at imminent threat of not being built, in numerous cases due to impending financing deadlines.

17. For example, several housing projects in LISC Green's pipeline will not move forward unless they receive the NCIF funding in the near future. These projects have secured as much as they can in local and state subsidies. They require additional subsidy financing from LISC Green or risk collapse. Without the NCIF funding, the projects will not be built and their units will not be added to the affordable housing stock. These include a 63-unit multifamily affordable housing project in Iowa, a 90-unit multifamily affordable housing project in Texas and a 46-unit multifamily affordable housing project in Michigan.

18. In Iowa, LISC Green has proposed to provide financial assistance for the complete rehabilitation of a historic hotel into a 63-home rental apartment community. The hotel is located in a rural community that has historically seen limited development activity. The apartment units would include geothermal and solar components to limit utility costs for the project owner and tenants. All units would be restricted to households earning at or below 60% of Area Median Income ("AMI"). With the NCIF grant, LISC Green anticipated providing the project $8.5 million in financing to support the construction of this

JA464

project. The LISC Green financing was instrumental in completing the final portion of the funding sources for this project. Including the proposed $8.5 million in NCIF financial assistance from LISC Green, the total amount for the project is $23.7 million

19. This Iowa project had proposed to utilize the 4% Low Income Housing Tax Credit ("LIHTC") program and has secured an allocation of bond capacity from Iowa Finance Authority ("IFA"). To continue to reserve the bond capacity allocation, the project team will need to make a significant deposit of $90,000 by March 31, 2025. The project team has previously requested extensions to this deadline from IFA to make this deposit multiple times. The project team has expressed wariness of making this deposit in light of the continued uncertainty related to the availability of funds under the NCIF grant. Without certainty on the availability of funds, we expect that the project team will be forced to not make the deposit, let the bond capacity allocation lapse, and not move forward with the project, leaving this rural community with a vacant hotel building and without 63 affordable rental homes.

20. In Texas, LISC Green has proposed to provide financial assistance for the complete rehabilitation of a historic parochial school into 53 housing units alongside the new construction of 37 housing units. The project will include a 90-home rental community with an integrated on-site preschool. This will be a mixed-income community with 20 units affordable to households at 30% AMI, 26 units affordable at 50% AMI, 28 units affordable at 60% AMI, and 16 market rate units. With the NCIF grant, LISC Green anticipated providing the project $3.6 million in financing to support the construction of this project, which is the last source the project needs to complete its capital sources. Including the proposed $3.6 million in NCIF financial assistance from LISC Green, the total amount for the project is $34 million.

21. This Texas project has secured an allocation of competitively awarded 9% LIHTC from the Texas Department of Housing and Community Affairs. This commitment requires the project to be "placed in service" by December 31, 2026. To meet this benchmark, the project needs to complete construction and lease at least one unit to a tenant. Based on the proposed construction and leasing timeline, the project needs to close on construction financing, including the proposed NCIF funded financial assistance, by June 30, 2025.

JA465

22.  In Michigan, LISC Green has proposed to provide financial assistance for the new construction of a 46-home rental community.  The project would propose to serve individuals and families in recovery from substance use disorders, many of whom face legal or financial barriers to stable housing.  The project will have on-site wrap around services including recovery services, life skills and financial literacy, and community life activities.  With the NCIF grant, LISC Green anticipated providing $4 million in financing to support the construction of this project, which is the last source the project needs to complete their capital sources.  Including the proposed $4 million in NCIF financial assistance from LISC Green, the total amount for the project is $21.3 million.

23.  This Michigan project has secured an allocation of competitively awarded 9% LIHTC from the Michigan State Housing Development Authority ("MSHDA") alongside a variety of commitment local subsidies.  This commitment from MSHDA requires the project to commence construction by July 31, 2025 or work with MSHDA to exchange the credits, which would result in significant, unbudgeted, additional costs to the project.  Without the continued availability of the NCIF grant, this project will be challenged to meet that deadline and absorb the additional costs.

24.  In addition to LISC Green's projected financial assistance to housing projects, there is a pipeline of community facility and solar projects that are at immediate risk of not being built.

25.  In New Jersey, LISC Green has proposed to provide financial assistance for the new construction of a community health facility to be primarily occupied by a Federally Qualified Health Center and a local YMCA.  These partners are projected to provide a variety of health services to 10,000 unique individuals annually.  With the NCIF grant, LISC Green anticipated providing the project $10 million in financing to support the construction of this project.  Including the proposed $10 million in NCIF financial assistance from LISC Green, the total amount for the project is $40.2 million.

26.  The project has been awarded an allocation of $21.79 million under New Jersey's ASPIRE tax credit program.  The ASPIRE tax credit allocation has a capital commitment deadline under which the project team must deliver evidence of commitments from all financing sources by July 17, 2025.  These

6

ASPIRE tax credits are a necessary source of subsidy for the project to be economically feasible and missing that deadline will almost certainly prevent this project from being built.

27. In Ohio, LISC Green has proposed to provide financial assistance for a solar development project that will provide electricity directly to an automobile manufacturing facility. The project team has secured long-term ground leases for two former landfill sites which will become solar arrays producing 18.6 megawatts of electricity. In addition, the project team has negotiated a Power Purchase Agreement with the global automaker that operates a nearby manufacturing facility and has agreed to purchase all of the electricity generated by this project. The negotiated Power Purchase Agreement outlines that the commercial operation of the project, including the flow of electricity to the manufacturing facility, is targeted for December 31, 2025 and that the project owner should use commercially reasonable efforts to cause that to occur. The project will take roughly 7 months to construct and get operational, so the construction capital sources need to close by May 31, 2025. Failure to meet this timeline may result in the nullification of the existing Power Purchase Agreement and cause the project to not get built.

28. Due to the unavailability of the NCIF funding, these projects and others are delayed and at risk of falling through.

29. The freeze and ongoing uncertainty around access to the Citibank account and EPA's position impairs LISC Green's ability to operate and meet the objectives of the PFC workplan. LISC Green had projected a total number of 20 full-time and 38 part-time employees, ranging from compliance, lending (multi-family and single-family), accounting, operations, IT, predevelopment, and market building (technical assistance, workforce development, and developer and contractor training) roles. Currently, LISC Green, through a service agreement with LISC, maintains 5 full-time employees who are fully funded through the NCIF award and 7 employees who are partially funded through the NCIF award. The gap between projected and current employees is reflective of the high uncertainty regarding ongoing funding for the program and the necessary steps LISC Green took to maintain a more financially conservative posture until there was definitive resolution. Given this gap in operational and program capacity, the ongoing uncertainty surrounding access to the Citibank account and the EPA's position is

JA467

creating obstacles that hinder our ability to execute the program at full scale. While LISC Green has the expertise, structure, and systems in place to effectively manage and implement the program, these delays are impeding our ability to fully staff critical roles and meet the ambitious targets outlined in the NCIF workplan.

30. Additionally, EPA's and Citibank's actions are impairing LISC Green's ability to enter into necessary contracts. Prior to Citibank's freeze and EPA's purported termination of PFC's award, LISC Green was negotiating a master contract with multiple competitively pre-qualified vendors for technical assistance and predevelopment services contracts related to LISC Green's obligations as a subrecipient under the grant. LISC Green was also in the process of identifying and contracting with eligible non-profit community-based organizations to expand access to workforce development training and upskilling opportunities in rural and urban communities. These services are necessary for LISC Green to achieve its goals under the workplan. However, because of the unavailability of NCIF funds, LISC Green has been forced to delay finalizing those agreements.

31. EPA's purported termination of the Award Agreement exacerbates all the harms detailed above. Indeed, if the Award Agreement terminates and LISC Green loses access to the NCIF award by virtue of its Subaward Agreement with PFC (LISC Green's sole source of funding), LISC Green will be forced to close its doors. More importantly, LISC Green would be unable to carry out the important work for which its NCIF award was made—and for which Congress appropriated the funds allotted to the NCIF program and obligated to LISC Green via PFC: to deploy "low- and zero-emission products, technologies, and services," 42 U.S.C. § 7434(c)(1), to lower Americans' utility bills, improve community health and safety, and help address the climate crisis.

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed this 21st day of March, 2025.

_John Moon_
_____
John Moon

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CLIMATE UNITED FUND,** | |
| Plaintiff, | |
| v. | Case No. 1:25-cv-00698 (TSC) |
| **CITIBANK, N.A.,** *et al.* | |
| Defendants. | |
| **COALITION FOR GREEN CAPITAL,** | |
| Plaintiff, | |
| v. | Case No. 1:25-cv-00735 (TSC) |
| **CITIBANK, N.A.,** *et al.* | |
| Defendants. | |
| **POWER FORWARD COMMUNITIES, INC.,** | |
| Plaintiff, | |
| v. | Case No. 1:25-cv-00762 (TSC) |
| **CITIBANK, N.A.,** *et al.* | |
| Defendants. | |

## FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFFS' CONSOLIDATED MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

**INTRODUCTION** ................................................................................................ 1

**FACTUAL AND REGULATORY BACKGROUND** ...................................... 3

**PROCEDURAL HISTORY** ............................................................................ 7

**LEGAL STANDARDS** .................................................................................. 8

**ARGUMENT** .................................................................................................. 8

    **I.**   **Plaintiffs Cannot Invoke the APA To Challenge Alleged Breaches of Contract** ......... **8**

        A.   Plaintiffs' Claims Are Contract Claims for Specific Performance. ................ 9

        B.   Plaintiffs Improperly Challenge Funding Decisions Committed to Agency Discretion... ............................................................................................................... 16

    **II.**   **Plaintiffs' Constitutional and Statutory Claims Do Not Support Relief.** ................... **17**

        A.   Termination Does Not Implicate the Appropriations Clause, and Plaintiffs Lack Standing Under the Clause. ................................................................................... 18

        B.   Termination Does Not Implicate the Appropriations Deadline in the Inflation Reduction Act. ......................................................................................................... 19

        C.   Termination Did Not Violate Due Process, Because the Tucker Act Provides All the Process Due. ...................................................................................................... 20

    **III.**  **Even If Jurisdiction Existed, Plaintiffs Are Not Likely to Succeed on the Merits.** ... **21**

        A.   EPA's Termination of Plaintiffs' Grant Agreements Was Not Arbitrary or Capricious  22

           i.   EPA's Termination of Plaintiffs' Grants was Reasonable and Reasonably Explained. ............................................................................................................... 22

           ii.   EPA Complied with its Regulations in Terminating the Grants. ............................. 25

           iii.  EPA's Suspension, Prior to Termination, Did Not Violate the APA ......................... 26

    **IV.**  **Plaintiffs' Alleged Harm Cannot Justify a Preliminary Injunction.** ......................... **26**

        A.   Plaintiffs' Alleged Harm is Not Irreparable. ........................................................ 26

        B.   Plaintiffs' Alleged Harm is Not Immediate ......................................................... 28

        C.   Plaintiffs' Alleged Reputational Harm Fails to Justify Entry of a Preliminary Injunction. ............................................................................................................... 29

    **V.**   **An Injunction Would Be Contrary to the Public Interest.** ......................................... **29**

    **VI.**  **Any Relief Should be Limited.** ................................................................................... **30**

    **VII. Bond is Required if the Court Issues a Preliminary Injunction.** ................................ **31**

**CONCLUSION** ............................................................................................... **31**

## TABLE OF AUTHORITIES

**Cases** .................................................................................................................... **Pages (s)**

*Ahuruonye v. U.S. Dep't of Interior*,
   312 F.Supp.3d 1 (D.D.C. 2018) ....................................................... 29

*Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*,
   357 F.3d 62 (D.C. Cir. 2004) .......................................................... 9

*Alexander v. Sandoval*,
   532 U.S. 275 (2001) ....................................................................... 21

*Armstrong v. Exceptional Child Ctr., Inc.*,
   575 U.S. 320 (2015) ....................................................................... 21

*Benderson Dev. Co., Inc. v. U.S. Postal Serv.*,
   998 F.2d 959 (Fed. Cir. 1992) ........................................................ 16

*Boaz Hous. Auth. v. United States*,
   994 F.3d 1359 (Fed. Cir. 2021) ...................................................... 16

*Bowen v. Massachusetts*,
   487 U.S. 879 (1988) ....................................................................... 14

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,
   419 U.S. 281 (1974) ....................................................................... 24

*Brock v. Pierce Cnty.*,
   476 U.S. 253 (1986) ....................................................................... 30

*C.G.B. v. Wolf*,
   464 F. Supp. 3d 174 (D.D.C. 2020) ............................................... 8

*Chaplaincy of Full Gospel Churches v. England*,
   454 F.3d 290 (D.C. Cir. 2006) ....................................................... 26

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*,
   370 F.3d 151 (1st Cir. 2004) .......................................................... 27

*City of New Haven, Conn. v. United States*,
   809 F.2d 900 (D.C Cir. 1987) ........................................................ 19

*Coggeshall Dev. Corp. v. Diamond*,
   884 F.2d 1 (1st Cir. 1989) .............................................................. 13

*Columbia Gulf Transmission v. FERC*,
    106 F.4th 1220 (D.C. Cir. 2024) ............................................... 22

*Crowley Gov't Services, Inc. v. GSA*,
    38 F.4th 1099 (D.C. Cir. 2022) ........................................... 14, 15

*Davis v. Pension Benefit Guar. Corp.*,
    571 F.3d 1288 (D.C. Cir. 2009).............................................. 27

*Dennis Melancon, Inc. v. City of New Orleans*,
    703 F.3d 262 (5th Cir. 2012)................................................. 28

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019)............................................................. 22

*DSE, Inc. v. United States*,
    169 F.3d 21 (D.C. Cir. 1999)................................................ 31

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016) ........................................................... 19

*Faculty Senate of Fla. Int'l Univ. v. Winn*,
    477 F. Supp. 2d 1198 (S.D. Fla. 2007)................................. 27

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009)............................................................. 24

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021).......................................................... 22, 24

*Hall v. McLaughlin*,
    864 F.2d 868 (D.C. Cir. 1989).............................................. 24

*Heckler v. Chaney*,
    470 U.S. 821 (1985)............................................................. 16

*Hein v. Freedom Religion Found., Inc.*,
    551 U.S. 587 (2007)............................................................. 18

*Horwitz-Matthews, Inc. v. City of Chicago*,
    78 F.3d 1248 (7th Cir. 1996)................................................ 16

*Hughes Commc'ns Galaxy, Inc. v. United States*,
    271 F.3d 1060 (Fed. Cir. 2001)............................................ 20

*Husky Mktg. & Supply Co. v. FERC*,
    105 F.4th 418 (D.C. Cir. 2024) ............................................. 22

*In re Aiken Cnty.*,
    725 F.3d 255 (D.C. Cir. 2013).............................................. 18

*In re Joliet-Will Cnty. Cmty. Action Agency*,
    847 F.2d 430 (7th Cir. 1988) .............................................. 20

*In re TelexFree Sec. Litig.*,
    No. 4:14-md-002566-TSH, 2021 WL 11604879 (D. Mass. Apr. 21, 2021) ............ 27

*Ingersoll-Rand Co. v. United States*,
    780 F.2d 74 (D.C. Cir. 1985)............................................. 9, 10

*John Doe Co. v. Consumer Fin. Prot. Bureau*,
    849 F.3d 1129 (D.C. Cir. 2017) ........................................... 29

*Larson v. Domestic & Foreign Com. Corp.*,
    337 U.S. 682 (1949) ..................................................... 13

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ..................................................... 17

*Madsen v. Women's Health Ctr., Inc.*,
    512 U.S. 753 (1994) ..................................................... 30

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012) ...................................................... 8

*McKay v. United States*,
    516 F.3d 848 (10th Cir. 2008) ........................................... 13

*Mead Johnson & Co. v. Abbott Labs.*,
    201 F.3d 883 (7th Cir. 2000) ............................................ 31

*Megapulse, Inc. v. Lewis*,
    672 F.2d 959 (D.C. Cir. 1982)....................................9, 11, 12, 15, 21

*Mexichem Spec. Resins, Inc. v. E.P.A.*,
    787 F.3d 544 (D.C. Cir. 2015)............................................ 27

*Mobil Oil Exp. and Producing Se. v. United States*,
    530 U.S. 604 (2000) ...................................................... 1

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ........................................................................................ 22

*Nat'l Ass'n of Chain Drug Stores v. U.S. Dep't of Health & Hum. Servs.*,
   631 F. Supp. 2d 17 (D.D.C. 2009) ............................................................... 30

*Neb. Dep't of Health & Hum. Servs. v. U.S. Dep't of Health & Hum. Servs.*,
   435 F.3d 326 (D.C. Cir. 2006) ...................................................................... 30

*Nken v. Holder*,
   556 U.S. 418 (2009) ...................................................................................... 21

*Off. of Pers. Mgmt. v. Richmond*,
   496 U.S 414 (1990) ....................................................................................... 18

*Olympic Fed. Sav. And Loan Ass'n v. Dir., Off. of Thrift Supervision.*,
   CIV. A. No. 90-0482, 1990 WL 134841 (D.D.C. Sept. 6, 1990) ................. 21

*Pacific Gas & Elec. Co. v. FPC*,
   506 F.2d 33 (D.C. Cir. 1974) ........................................................................ 26

*Palisades Gen. Hosp., Inc. v. Leavitt*,
   426 F.3d 400 (D.C. Cir. 2005) ...................................................................... 11

*Planned Parenthood Ass'n of Utah v. Schweiker*,
   700 F.2d 710 .................................................................................................. 29

*Preserve Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) ...................................................................................... 22

*Printing Packaging and Prod. Union of N. Am. v. Int'l Bhd. of Teamsters*,
   No. 23-1872 (TJK),  2024 WL 3835353 (D.D.C. Aug. 15, 2024) ............... 16

*Robbins v. U.S. Bureau of Land Mgmt.*,
   438 F.3d 1074 (10th Cir. 2006) .................................................................... 13

*Sackett v. E.P.A.*,
   566 U.S. 120 (2012) ...................................................................................... 26

*Sampson v. Murray*,
   415 U.S. 61 (1974) ........................................................................................ 27

*Sharp v. Weinberger*,
   798 F.2d 1521 (D.C. Cir. 1986) ............................................................. 3, 13

*Sissel v. Wormuth,*
   77 F.4th 941 (D.C. Cir. 2023) .................................................................. 22

*Spectrum Leasing Corp. v. United States,*
   764 F.2d. 891 (D.C. Cir. 1985) ........................................................... 10, 12

*Srour v. Barnes,*
   670 F. Supp. 18 (D.D.C. 1973) ................................................................ 21

*Steir v. Girl Scouts of the USA,*
   383 F.3d 7 (1st Cir. 2004) ....................................................................... 28

*Train v. City of New York,*
   420 U.S. 35 (1975) ................................................................................... 19

*Transohio Sav. Bank. v. Dir. Office of Thrift Supervision,*
   967 F.2d 598 (D.C. Cir. 1992) ................................................................. 15

*Trudeau v. Fed. Trade Com'n,*
   384 F.Supp.2d 281 (D.D.C. 2005) ........................................................... 30

*U.S. Conf. of Catholic Bishops* v. *United States Department of State,*
   No. 25-cv-465, 2025 WL 763738 (D.D.C. Mar. 11, 2025) ...................... 15

*United States v. McIntosh,*
   833 F.3d 1163 (9th Cir. 2016) ................................................................. 18

*United States v. Michigan,*
   230 F.R.D. 492 (E.D. Mich. 2005) .......................................................... 28

*United States v. Stone,*
   394 F. Supp. 3d 1 (D.D.C. 2019) ............................................................. 18

*United States v. Trump,*
   740 F. Supp. 3d 1245 (S.D. Fla 2024) ..................................................... 19

*United States v. Winstar Corp.,*
   518 U.S. 839 (1996) .............................................................................. 1, 16

*Wisc. Gas Co. v. FERC,*
   758 F.2d 669 (D.C. Cir. 1985) ................................................................. 27

**Statutes**
5 U.S.C. § 701 ................................................................................................. 16

5 U.S.C. § 702 ................................................................................................... 8

5 U.S.C. § 704 ............................................................................................................. 26

5 U.S.C. § 706 .......................................................................................................11, 21

28 U.S.C. § 1491 ........................................................................................................... 9

42 U.S.C. § 7434 .................................................................................. 3, 17, 18, 20

**Regulations**
2 C.F.R. § 200.339 ....................................................................................................... 4

2 C.F.R. § 200.340 ............................................................................................... passim

2 C.F.R. § 200.341 ....................................................................................................... 4

2 C.F.R. § 200.342 ..................................................................................................... 26

# GLOSSARY OF TERMS

| Term or Abbreviation | Definition | Citation(s) |
|---|---|---|
| ACA | Account Control Agreement with Citibank, related to Plaintiffs' grants. | Coogan Decl., Exhibit B |
| Amidon Decl. | March 26, 2025 Declaration of Eric Amidon | |
| APA | Administrative Procedure Act | |
| Bafford Decl. | Declaration of Elizabeth Bafford (CU) | |
| Bailey Decl. | Declaration of Kevin Bailey | |
| CCIA | Clean Communities Investment Accelerator | |
| CGC | Coalition for Green Capital | |
| CU | Climate United Fund | |
| DOJ | Department of Justice | |
| ECF No. | Docket entry in *Climate United Fund v. Citibank, N.A., et al.*, 25-cv-698 | |
| EPA | U.S. Environmental Protection Agency | |
| EPA TRO Opp. | Federal Defendants' Opposition to Climate United Fund's Motion For Temporary Restraining Order | ECF No. 16 |
| FAA | Financial Agency Agreement between Citibank and U.S. Department of the Treasury | |
| FBI | Federal Bureau of Investigations | |
| GGRF | Greenhouse Gas Reduction Fund | |
| Grant Agreement | Notice of Award (including grant terms and conditions) for each Plaintiff | Coogan Decl., Exhibit A |
| NCIF | National Clean Investment Fund | |
| NOFO | Notice of Funding Opportunity | |
| OIG | EPA's Office of Inspector General | |
| PFC | Power Forward Communities, Inc. | |
| PI Motion | Plaintiffs' Consolidated Motion for Preliminary Injunction | ECF No. 33 |
| SFA | Solar for All | |
| Termination Letter | Notice of Termination of grant issued by EPA to each Plaintiff, dated March 11, 2025 | Coogan Decl., Exhibit I |
| Treasury | U.S. Department of Treasury | |
| Treml Decl. | Declaration of Gregg Treml | |
| Coogan Decl. | Dan Coogan Declaration | |

## INTRODUCTION

Plaintiffs invoke the Constitution, statutes, and regulations as ostensible bases for a claimed right to continue to access billions of dollars in grants that were awarded by the Environmental Protection Agency (EPA), but that EPA has since terminated.  None of those authorities entitles Plaintiffs to these funds.  Plaintiffs' claims for relief are instead necessarily dependent on their assertion that the grant agreements themselves restrict the power that EPA would otherwise enjoy to terminate the grants.  The agreements do purport to restrict EPA, in language that appears to have been intentionally added in the waning days of the prior Administration in order to tie the new Administration's hands with respect to disbursement of grant funds (those new contract terms may be void or voidable as a matter of contract law).  But neither those contract defenses, nor Plaintiffs' affirmative claims, are properly before this Court.  At bottom, this is just a run-of-the-mill (albeit large) contract dispute.  And, at most, Plaintiffs are entitled to claim damages for this asserted breach of contract in the Court of Federal Claims.  After all, EPA has the same rights as every other party when it enters contracts. *See Mobil Oil Expl. and Producing Se. v. United States*, 530 U.S. 604, 607 (2000).  That includes the right to breach and face remedies. *See United States v. Winstar Corp.,* 518 U.S. 839, 919-20 (1996) (Scalia, J, concurring).

To distract from this reality, Plaintiffs try to dress up their claims in constitutional, statutory, and regulatory garb.  None of this works.  Nothing in the Constitution or any statute compels EPA to make *these* grants to *these* Plaintiffs; at most, those authorities direct EPA to re-obligate the funds for specified purposes, which EPA has stated it will do.  As for the lengthy list of regulations that Plaintiffs cite to manufacture Administrative Procedure Act (APA) review, none confers any right on Plaintiffs to perform their grants.  The regulations actually authorize sweeping termination authority; Plaintiffs' only response is that the contracts do not repeat that language.  Of course, that simply confirms that these claims rest, ultimately, on the contractual terms.

The real gist of Plaintiffs' complaints is their contention that EPA did not terminate the agreements properly because EPA relied on a reason—its assessment of the agency's priorities, which EPA supposedly did not adequately explain—that the agreements did not include as a stated ground to justify termination.[1]  To be clear, applicable regulations *allow* an agency to terminate for consideration of its priorities, which is a determination typically not subject to any APA review because it is committed to agency discretion.  Here, Plaintiffs' agreements originally incorporated that basis for termination—but subsequent post-election and post-award amendments stripped away the agency's right.  Even if the amendment modifications are binding (which is questionable under contract law), the change to the grant agreements would at most restrict EPA's right to terminate *for cause*—that is, without any consequences of breach.  It would not, and could not, remove EPA's right to cease performance and incur any applicable contract liability.

Put another way, the parties have a legitimate disagreement over whether, as a matter of contract law, EPA's terminations comported with the terms of their agreements.  If Plaintiffs are correct, they may be entitled to relief.  But it would be *contract* relief, which could be sought only in the Court of Federal Claims.  And that relief would *not* include specific performance—forcing EPA to proceed with billions of dollars in grants that it has decided no longer advance the interests of the United States.  Specific performance is not available against the government.  Plaintiffs'

---

[1]  EPA terminated Plaintiffs' grants based upon "substantial concerns regarding program integrity" and "misalignment with the Agency's priorities," which it further explained include

> 1) the absence of adequate oversight and account controls to prevent financial mismanagement; 2) the improper or speculative allocation of funds inconsistent with EPA's oversight and fiscal responsibilities; and 3) the circumvention and defeat of oversight mechanisms in the disbursement of federal funds.

Coogan Decl., Exhibit I (Termination Letter) at 1.  EPA also determined that the agreements insufficiently guarded against the constitutional proscription against the delegation of authority to non-federal actors.  *Id.* at 2.

APA claims are simply a vehicle to circumvent that black-letter limitation on contract remedies against the federal government.  The D.C. Circuit has long forbidden that maneuver.  *See Sharp v. Weinberger*, 798 F.2d 1521, 1523-24 (D.C. Cir. 1986) ("The waiver of sovereign immunity in the [APA] does not run to actions seeking . . . specific performance in contract cases, because . . . the Tucker Act and Little Tucker Act impliedly forbid such relief.").

In short, Plaintiffs are not entitled to the relief they seek because their non-contract claims are a mirage, and they offer no authority that would deny the government the same rights that every party enjoys when it chooses to conduct its affairs through contract.  For these reasons, and as explained further below, Plaintiffs' motion for a preliminary injunction should be denied and the complaints should instead be dismissed for lack of jurisdiction.

## FACTUAL AND REGULATORY BACKGROUND

**A. The Grant Programs and Awards.**  On August 16, 2022, Congress amended the Clean Air Act, through the Inflation Reduction Act, to create the Greenhouse Gas Reduction Fund (GGRF).  In doing so, Congress appropriated $27 billion towards funding groups to invest in certain climate projects aimed at reducing or avoiding greenhouse gas emissions.  42 U.S.C. § 7434(b), (c).  Congress tasked the EPA with determining, on a competitive basis, which particular groups should receive this funding.  *Id.* § 7434(a)(2).  The EPA accordingly announced three grant programs—the National Clean Investment Fund (NCIF), the Clean Communities Investment Accelerator (CCIA), and Solar for All (SFA).  In July 2023, EPA published Notices of Funding Opportunity (NOFO) and began accepting applications.

In August 2024, EPA awarded Climate United Fund (Climate United) a grant with an amount of $6.97 billion and grants to Coalition for Green Capital (CGC) and Power Forward Communities (PFC) in the amounts of $5 billion and $2 billion respectively.

The Grant Agreements included specific terms and conditions, incorporated various

provisions of the Uniform Grant Guidance, 2 C.F.R. §§ 200.339, 340 and 341, and were subject to EPA's then-current 2023-24 General Terms and Conditions.[2]  Declaration of Dan Coogan (Coogan Decl.) Declaration Exhibit A (Grant Agreement).[3]  The General Terms and Conditions provided EPA with the right to terminate the grants "if the award no longer effectuates the program goals or agency priorities."  EPA, General Terms and Conditions 2-3 (effective Oct. 1, 2023).  The Grant Agreement contains a "Termination" provision, which is preceded by a statement that EPA's following "clarifications to the EPA General Terms and Conditions. . . . expand on, rather than replace or modify, the EPA General Terms and Conditions."  Grant Agreement at 40 (§ T).  The Termination provision purports to establish the "only" bases for termination, but could not "replace or modify" the bases for termination set out in EPA's General Terms and Conditions.  Grant Agreement at 40 (§ T).

**B. The Late-Breaking Modifications.**  After the 2024 presidential election—but before the Inauguration—EPA and Plaintiffs amended their Grant Agreements.  The December 2024 amendments incorporated new, then-current 2024-25 EPA Terms and Conditions.[4]  The amendments also purported to limit EPA's contractual right to "terminate for noncompliance" by requiring "written determinations and opportunities to cure," March 26, 2025 Declaration of Eric

[2] EPA, General Terms and Conditions (effective Oct. 1, 2023), https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later.

[3] Each of the Plaintiffs' grant agreements, and any amendments there to, are materially the same. For purposes of this filing, Federal Defendants cite to Climate United's Grant Agreement, for the Court's convenience. Coogan Decl. Exhibit A contains Climate United's original August 2024 grant agreement (begins PDF page 2), followed by the December 2024 amendment (Modification Number: 1) (begins PDF page 64), and the January 2025 amendment (Modification Number: 2) (begins PDF page 124).  Citations to the Grant Agreement herein are by PDF page number.

[4] EPA, General Terms and Conditions (effective Oct. 1, 2024), https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2024-or-later.

Amidon, EPA, Chief of Staff, (Amidon Decl.) ¶ 28, and to limit EPA's right to "terminate for misconduct" by defining misconduct as limited "to 'credible evidence' that [the awardee] committed one or more serious federal crimes or actionable civil violations under the False Claims Act." Amidon Decl. ¶ 29; Grant Agreement at 75.

**C. The Unusual Structure of the Awards.** The Grant Agreements utilized an uncommon method for financial management of these enormous awards. Instead of operating through EPA (which would allow EPA real-time oversight of the use of the funds and control over disbursements), the Grant Agreements called for the use of a designated financial agent to hold the entire $20 billion allocated for the NCIF and CCIA grant programs and to administer program distributions. Grant Agreement at 58. Defendant Citibank was selected to that role under a Financial Agent Agreement (FAA) with the Department of Treasury. *See* Coogan Decl., Exhibit B (ACA) at 2. EPA was not a party to the FAA, but retained certain rights to issue account controls in addition to the rights retained by Treasury to issue instructions to Citibank. Amidon Decl. ¶ 31. According to EPA's Acting Chief Financial Officer, "EPA had never used a financial agent in connection with a grant program prior to 2024" and "EPA's use of a financial agent in connection with the GGRF program was the first use of a financial agent for a nonexchange grant program administered by the federal government." Declaration of Gregg Treml, EPA Acting Chief Financial Officer, (Treml Decl.) ¶¶ 6-7.

Next, Treasury, EPA, and each grantee entered an Account Control Agreement (ACA) on November 1, 2024. The ACAs provide, in relevant part, that EPA possesses a security interest in the Citibank accounts holding program funds. The ACAs also provide that EPA could exercise its rights as a secured party to take control over grant funds held at Citibank by filing a "Notice of Exclusive Control." Amidon Decl. ¶ 33; ACA at 2. Like the Grant Agreements, the ACA

agreements were also amended just days before the presidential transition. ACA 19. On January 13, 2025, EPA, Citibank, and the grantees amended the ACAs so that "EPA's filing of a Notice of Exclusive Control would no longer result in [awardees] needing to obtain EPA's consent before instructing Citibank to disburse funds for expenses [the awardees] consider[] 'properly incurred'." Amidon Decl. ¶ 34; ACA at 19. Another vestige of accountability was thus stripped away.

**D. The New Administration's Investigation and Terminations of the Grants.** Upon assuming office, EPA Administrator Lee Zeldin and other EPA officials began to learn more about this program and to express concerns with the GGRF program's creation and implementation.[5] *See* EPA TRO Opp. at 11 and Amidon Decl. ¶¶ 3-12.

Upon review of the Grant Agreements, the ACAs, and their amendments, "EPA determined that the Biden Administration's contractual scheme for administering the NCIF grants did not provide sufficient oversight and transparency to accomplish these stewardship obligations and objectives." Amidon Decl. ¶ 19. EPA also determined that "the amendments of December 20, 2024 and January 13, 2025—which limited EPA's contractual rights to terminate for misconduct short of a federal crime and limited EPA's contractual rights to assert exclusive control over funds in the Citibank accounts—left EPA with insufficient authority to retain control of funds short of

---

[5] These concerns were not new. The House Committee on Energy and Commerce expressed serious concerns about EPA's "unusually accelerated timeline for disbursement" and "new and complex funding structure" in October 2023, Declaration of Kevin Bailey (Bailey Decl.) Declaration Exhibit A, and subsequently investigated "recipient eligibility issues," "the fairness and uniformity of the selection process," and the fact that "individuals with strong ties to Democratic politics hold significant leadership roles within some of the organizations the EPA selected to receive funding" in December 2024, *id.* Ex. B. The Committee also held an oversight hearing on the subject in January 2024. Amidon Decl. ¶ 14. And EPA's Inspector General testified to the Committee in September 2024 that EPA's Office of Inspector General lacked sufficient resources to protect against fraud risks in the GGRF program and ensure efficient use of public funds given EPA's "pace of spending." *Id.* ¶ 15.

outright termination." *Id.* ¶ 37.

EPA referred to its Office of Inspector General its findings "on financial mismanagement, conflicts of interest, and oversight failures with the GGRF program" for further investigation. Amidon Decl. ¶¶ 35, 38; Coogan Decl., Exhibit C (OIG Letter) at 1. An investigation was initiated and remains ongoing. Amidon Decl. ¶ 40. The Department of Justice and the Federal Bureau of Investigation have also initiated criminal investigations into the GGRF program for "potential fraud, waste, abuse, and impermissible conflicts of interest in connection with NCIF and CCIA grants"; these too remain ongoing. *Id.* ¶ 39.

On March 11, EPA issued a notice terminating each Plaintiff's Grant Agreement under the GGRF program. Coogan Decl., Exhibit I (Termination Letter) at 1. In the notice, EPA explained that "termination is based on substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities, which collectively undermine the fundamental goals and statutory objectives of the award."[6] *Id.*

## PROCEDURAL HISTORY

Plaintiffs Climate United, CGC, and PFC filed complaints for declaratory and injunctive relief on March 8, March 12 and March 14, 2025, respectively. *See* No. 25-cv-698, ECF No.1 (Climate United Complaint)[7]; No. 25-cv-735, ECF No. 1 (CGC Complaint); No. 25-cv-762, ECF No. 1 (PFC Complaint). Plaintiffs followed those complaints with motions for temporary

---

[6] On March 17, 2025, pursuant to the Court's instructions at the March 12, 2025 hearing and in the March 14, 2025 minute order, EPA filed the declaration of Eric Amidon, EPA's Chief of Staff, setting forth the basis for its March 11, 2025 termination of the Plaintiffs' Grant Agreements. ECF No.. 25-1. With the benefit of additional time, EPA provides a second, supplemental declaration of Mr. Amidon that provides a more comprehensive discussion of the "decision to reconsider the EPA's approach to administering the [NCIF Program] and to terminate [Plaintiffs'] NCIF grant awards . . . on March 11, 2025." Amidon Decl. ¶ 2.

[7] Climate United amended its complaint on March 17, 2025. No. 25-cv-698, ECF No. 24 (CU Amended Compliant)

restraining orders.  *See* No. 25-cv-698, ECF No. 2 (Climate United) No. 25-cv-735, ECF No. 9

(CGC); No. 25-cv-762, ECF No. 4 (PFC).  On March 12 and March 17, the Court heard arguments

on Plaintiffs' motions.  No. 25-cv-698, ECF No. 21 (March 12 Hearing), ECF No. 26 (March 17

Hearing), ECF No. 30 (Consolidation Order).  On March 18, the Court granted Plaintiffs'

temporary relief, which effectively froze the grant funds in the Citibank accounts pending further

proceedings.  No. 25-cv-698, ECF Nos. 28, 29.  The instant motion for preliminary injunctive

relief followed.  EPA intends in due course to move to dismiss the actions for lack of jurisdiction.

## LEGAL STANDARDS

"The standard for issuance of the 'extraordinary and drastic remedy' of a temporary

restraining order or a preliminary injunction is very high, and by now very well established."

*C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 197 (D.D.C. 2020).  A movant seeking such an extraordinary

remedy "bears the burden of making a clear showing" that it is "entitled to such relief."  *Id.*  To

make such a showing, Plaintiff bears the burden of establishing (1) it is likely to "succeed on the

merits," (2) it is "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the

balance of the equities tips in [its] favor," and (4) "an injunction is in the public interest."  *Id.*

## ARGUMENT

### I.    Plaintiffs Cannot Invoke the APA To Challenge Alleged Breaches of Contract.

Plaintiffs principally rely on the APA to challenge the EPA's grant terminations.  But,

despite Plaintiffs' best efforts to recast them, these claims sound in contract—which means this

Court cannot exercise jurisdiction under the APA.  The APA provides a limited waiver of the

government's sovereign immunity for claims "seeking relief other than monetary damages."  5

U.S.C. § 702.  But the APA's waiver "comes with an important carve-out":  it does not apply "'if

any other statute that grants consent to suit expressly or impliedly forbids the relief which is

sought.'"  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians* v. *Patchak*, 567 U.S. 209,

215 (2012) (quoting 5 U.S.C. § 702). That carve-out "prevents plaintiffs from invoking the APA's waiver to evade limitations on suit contained in other statutes." *Id.*

That is what Plaintiffs are trying to do here. Their complaints and motions seek access to funds that they believe the government is obligated to pay them under the terms of their contracts (the Grant Agreements)—indeed, they effectively seek to compel specific performance of those alleged contractual commitments. But contract claims must be pursued under the Tucker Act, not the APA. The Tucker Act provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a). The D.C. Circuit has long recognized that "the Tucker Act impliedly forbids" the bringing of "contract actions" against "the government in a federal district court" under the APA. *Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004). That jurisdictional divide ensures that contract claims against the government are channeled to the court that has "unique expertise" in that area. *Ingersoll-Rand Co.* v. *United States*, 780 F.2d 74, 78 (D.C. Cir. 1985). Here, that principle precludes the relief that Plaintiffs seek from this Court.

**A. Plaintiffs' Claims Are Contract Claims for Specific Performance.**

Plaintiffs seek to enjoin EPA from terminating their Grant Agreements. But both the "source of the rights" they invoke, and "type of relief" they seek, demonstrate that these are contract claims beyond the jurisdiction of this Court to entertain. *See Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982).

As to the source of rights, everything hinges on the terms of the Grant Agreements. Plaintiffs assert that EPA violated the APA in terminating the Grant Agreements to further EPA's own program goals or agency priorities because "the Terms and Conditions do not give EPA the right to terminate the grants for convenience or based on a change in EPA's policy priorities." PI

Motion at 4.  The regulation that Plaintiffs rely upon is incorporated into the terms of the Grant Agreements. Grant Agreements at 41.  While the provisions incorporate regulations, that "does not transform the action into one based solely on those regulations." *Ingersoll-Rand Co. v. United States*, 78 F.2d 74, 78 (D.C. Cir. 1985).  In *Ingersoll*, the D.C. Circuit rejected a plaintiff's attempt to recharacterize breach of contract claims as APA claims by arguing that the agency's decision to terminate a contract also violated federal regulations. *Id.* at 77-78.  The same reasoning applies here.

Plaintiffs' own arguments demonstrate that their source of rights stem from their agreements. Plaintiffs argue that the "regulations that apply to Plaintiffs' grants do not permit termination on policy grounds because those grounds are not stated in the *terms of the awards*," *see* PI Motion at 39 (emphasis added); *see also id.* at 9 (asserting that the Grant Agreements Terms and Conditions applied the version of 2 C.F.R. § 200.340 effective as of October 1, 2024).  The only reason why "[t]here is no right to terminate based on changed priorities," as argued by Plaintiffs, is because the "Terms and Conditions governing Plaintiffs' grants limit EPA *only* to three possible grounds for termination."  *Id.* at 28 (emphasis in original); *see also id.* at 4 (stating that the Grant Agreements' Terms and Conditions limit EPA to only three grounds for termination); *id.* at 30 (stating that EPA may not terminate based on its need for oversight and concerns about lack of control under the regulations because they are not included in the Grant Agreements); *id.* at 33 (stating that the Grant Agreements do not allow termination for changes in agency priorities)

Thus, absent the Grant Agreements, Plaintiffs would have no claim to NCIF funds and axiomatically no right to perform under their Grant Agreements.  As discussed further below, the Constitution affords no right to receive or perform a grant.  Neither does the Inflation Reduction Act.  At most, those sources of law impose certain duties on EPA—but they plainly confer no

relevant rights on these Plaintiffs. *See Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985) (plaintiffs "right to . . . payments is created in the first instance by the contract, not by the Debt Collection Act. The DCA, even if it applied, confers no such right in the absence of the contract itself. Although the DCA might impose procedural requirements on the government having some impact on the contract, the Act in no way creates the substantive right to the remedy [plaintiff] seeks.).

Plaintiffs also cite a host of regulations. Certain regulations may define the parameters under which the grant may operate, but they too afford no individual rights to Plaintiffs that would exist independent of their contractual rights or separate from their status as parties to the Grant Agreements. To the contrary, the regulations repeatedly refer to the *terms of the grant agreements* to specify the agency's rights to terminate. *See, e.g.*, 2 C.F.R. § 200.340 (a)(1), (4) (award may be terminated if the "recipient . . . fails to comply with the terms and conditions of the Federal award" or "pursuant to the terms and conditions of the Federal award"). Ultimately, then, it is clear that Plaintiffs' source of rights lies in the fact that they are grant recipients, that is, contracting parties. And their only meaningful claim of injury is that their grants were terminated for reasons not authorized by their Grant Agreements. There is no source for Plaintiffs' asserted rights other than their claim of the contractual right to perform under the grants they were awarded.

As to the second *Megapulse* factor, the type of relief sought, Plaintiffs seek relief that is contractual—namely, specific performance. This is not a case in which the Court has been asked to simply "set aside" agency action. 5 U.S.C. § 706. Plaintiffs complain about the sufficiency of EPA's explanation of the reasons for its termination decisions, but they do not ask the Court to order EPA to provide a more fulsome explanation for why the grants no longer effectuate agency priorities. *Cf. Dep't of Homeland Sec. v. Regents of Univ. of Cal.,* 140 S. Ct 1891 (2020); *Palisades*

*Gen. Hosp., Inc. v. Leavitt,* 426 F.3d 400, 403 (D.C. Cir. 2005). Instead, Plaintiffs conflate APA

and contract concepts to pray for a remedy that would deny EPA any right to end the parties'

agreements even when EPA determines the agreements no longer effectuate the agency's goals and

priorities. That remedy is not relief available under the APA. Calling it "vacatur" of the

termination decisions is merely slapping an APA label on what, in function and practice, amounts

to the classic contractual remedy of specific performance. *See Spectrum*, 764 F.2d at 894

("Spectrum seeks an order compelling the government to pay money owed in exchange for goods

procured under an executory contract. In other words, Spectrum seeks the classic contractual

remedy of specific performance."). If that sufficed, nothing would be left of the *Megapulse* line

of precedent or the principle that it vindicates.

To be clear, this is not a case in which EPA has acted outside statutory or regulatory

authority separate and apart from contractual terms. Again, applicable regulations allow an agency

to terminate a grant when that grant "no longer effectuates the program goals or agency priorities."

2 C.F.R. § 200.340(a)(4). Plaintiffs' grants expressly recognized EPA's authority to terminate for

that very reason when they were first awarded in August 2024.[8] To be sure, Plaintiffs assert that

EPA voluntarily relinquished that contractual right in the December 2024 amendment to the Grant

---

[8] The Grant Agreements provide that specific clauses, including the Termination provision (§ T.4), do not "replace or modify[] the EPA General Terms and Conditions." § T. EPA's then-current 2023-24 General Terms and Conditions, incorporated into the original Grant Agreements, provided EPA with the right to terminate the grants "if the award no longer effectuates the program goals or agency priorities." EPA, General Terms and Conditions 2-3 (effective Oct. 1, 2023). Inexplicably, section T.4 begins with contradictory language: "Notwithstanding the General Term and Condition 'Termination' . . . "

The Grant Agreement was bilaterally negotiated and it provides explicitly that modifications can only be made through bilateral consent. § AI. As such, the parties share responsibility for the confusion caused by this drafting. However, the fact remains that EPA's General Terms and Conditions as originally adopted in the Grant Agreements preserved EPA's right to terminate the agreements to effectuate program goals and agency priorities.

Agreements. But even if that alteration were binding as a matter of contract, it is *a matter of contract*. It is not the *regulations* that bar EPA from terminating on this basis; at most, it is the *contract terms*. That leaves no doubt that Plaintiffs' claims, at bottom, are rooted in contract.

There is another problem that exposes the contractual nature of Plaintiffs' claims. In asking the Court to compel EPA to continue to act as their contractual counterparty, Plaintiffs seek to deny EPA its own inherent contractual right to breach. Like any other contracting party, the government is entitled to decide to breach a contract and incur the resulting liability (such as reliance damages). Recognizing that principle, "a distinct line of authority preserves the sovereign's immunity from being compelled to perform obligations it prefers to breach and compensate financially, holding that what are 'in essence' claims for breach of contract cannot circumvent the Tucker Act and its prohibition on equitable relief by being artfully pled as something else." *McKay v. United States*, 516 F.3d 848, 851 (10th Cir. 2008). The D.C. Circuit has long adopted that principle. *See Sharp*, 798 F.2d at 1523-24 ("The waiver of sovereign immunity in the [APA] does not run to actions seeking . . . specific performance in contract cases, because . . . the Tucker Act and Little Tucker Act impliedly forbid such relief."); *see also Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 704 (1949); *Robbins v. U.S. Bureau of Land Mgmt.*, 438 F.3d 1074, 1083 (10th Cir. 2006); *Coggeshall Dev. Corp. v. Diamond*, 884 F.2d 1, 3 (1st Cir. 1989) ("We are unaware of any waiver of sovereign immunity by the United States as to specific performance for breach of contract."). Treating claims like these as APA claims leading to the relief of "vacatur" would allow Plaintiffs to evade the prohibition on specific performance through artful pleading. Or, put another way, even if Plaintiffs were entirely correct about the terms and meaning of the Grant Agreements, and about the material facts, that would still entitle them at most to certain contract remedies—it would not subject EPA to compulsion to proceed with contracts it wants to terminate.

The prohibition against compelling the government's performance exists for good reason. As the Supreme Court explained, "it is one thing to provide a method by which a citizen may be compensated for a wrong done to him by the Government.  It is a far different matter to permit a court to exercise its compulsive power to restrain the Government from acting, or to compel it to act." *Larson*, 337 U.S. at 704.  This is exactly what Plaintiffs seek here: for the court to use its "compulsive power" to "restrain" the government from cancelling its agreements and "compel" the government to indefinitely maintain the contractual arrangement against its will.

Finally, the cases Plaintiffs rely upon do not support the exercise of jurisdiction here.  The best-reasoned recent decision on this issue actually confirms EPA's position and refutes Plaintiffs' theory.

To start, Plaintiffs cannot take refuge in *Bowen v. Massachusetts,* 487 U.S. 879 (1988).  In *Bowen,* the Supreme Court recognized that setting aside agency action could permit a party to receive money authorized by statute, and would therefore be in the nature of specific relief, not money damages.  That is surely correct, but this case is very different.  Here, the monetary relief is not merely some downstream consequence of vacating agency action like a regulation or order— the action that Plaintiffs directly challenge is itself *contractual* in nature (the termination of the grants).  Their request to the Court is to bind EPA to (their interpretation) of the contract terms, and thereby limit EPA to the specific bases for termination in the December 2024 Grant Agreements' amendments.  To provide that relief would be to compel specific performance of the amended termination clause in the agreement.  No fair or plausible reading of *Bowen* provides authority to specifically enforce a contractual promise.  This is a transparent end-run.

Plaintiffs also cite *Crowley Gov't Services, Inc. v. GSA*, 38 F.4th 1099 (D.C. Cir. 2022), which reviewed this Court's well-settled test for distinguishing APA claims from Tucker Act claims

but did so in circumstances that were completely different than this case. In *Crowley,* the plaintiffs'

complaint concerned administrative action undertaken by an agency that had no contractual

relationship with the plaintiff. *Id.* at 1109.

As for *Megapulse,* 672 F.2d 959, its test governs but its facts are even farther afield. The

case concerned the release of proprietary information and the plaintiff's claimed injury involved

that release—not the contract. Here, by contrast, Plaintiffs would have no basis to allege injury

(let alone any violation of rights) absent their Grant Agreements. The principle that applies here

is therefore straightforward: "Under [the D.C. Circuit's] decisions, if the case before us is a

'contract case,' the APA does not waive the sovereign's immunity from suit." *Transohio Sav. Bank.*

*v. Dir. Office of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992) (abrogated on other grounds

by *Perry Capital LLC v. Mnuchin,* 864 F.3d 591 (D.C. Cir. 2017)).

Another Judge of this Court recently adopted the government's view on this issue, and

rejected Plaintiffs' circumvention, in *U.S. Conference of Catholic Bishops* v. *U.S. Dep't of State*,

No. 25-cv-465, 2025 WL 763738, at *5 (D.D.C. Mar. 11, 2025). There, the Court held that the

Tucker Act precluded plaintiffs from asserting, in federal district court, putative APA claims

asserting that the agency violated the very same termination provision relied on here, 2 C.F.R. §

200.340.[9] EPA respectfully submits that Judge McFadden analyzed this issue correctly, and this

Court should follow that ruling here.

Ultimately, this Court should recognize that EPA retains the ability to end its agreements,

whether or not doing so complies with a (contested) for-cause termination provision. Contract law

recognizes every party's right to perform or face remedies for breach. *Winstar*, 518 U.S. at 919-

---

[9] The plaintiff in that case has filed an appeal and sought relief pending appeal, which remains
pending at this time. *See* No. 25-5066 (D.C. Cir.).

20 (Scalia, J. concurring); *Boaz Hous. Auth.* v. *United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021)

(to the extent that the government has implemented its grant programs by "employ[ing] contracts

to set the terms of and receive commitments from recipients," the proper recourse for any asserted

violation of those grant terms is a "suit in the Claims Court for damages"); *Horwitz-Matthews, Inc.*

*v City of Chicago,* 78 F.3d 1248, 1250-51 (7th Cir. 1996); *Benderson Dev. Co., Inc. v. U.S. Postal*

*Serv.,* 998 F.2d 959, 962 (Fed. Cir. 1992).  That principle applies equally to the government.  *See*

*Spectrum,* 764 F.2d. at 894 (rejecting "an injunction requiring the government to pay monies

owed" where "right to these payments is created in the first instance by the contract, not by the"

relevant statute, because the statute "confers no such right in the absence of the contract itself").

As another Judge of this Court recently put it: "When a contract is terminated, *even*

*wrongfully*, there is no longer a contract – no duty to perform and no right to demand performance,

. . . there is only a right to seek and a duty to pay damages caused by the termination. . . .Thus,

even a party that lacks the authority to terminate a contract may do so anyway."  *Printing*

*Packaging & Prod. Union of N. Am. v. Int'l Bhd. of Teamsters*, No. 23-1872 (TJK), 2024 WL

3835353, at *7 (D.D.C. Aug. 15, 2024).  That principle alone defeats Plaintiffs' APA claims here.

**B. Plaintiffs Improperly Challenge Funding Decisions Committed to Agency Discretion.**

Plaintiffs are also unlikely to succeed in this case because they challenge funding decisions

that are committed to agency discretion by law.  5 U.S.C. § 701(a)(2).  Review under the APA is

unavailable "if a statute is drawn so that a court would have no meaningful standard against which

to judge the agency's exercise of discretion."  *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).  There

is no waiver of sovereign immunity where agency action requires "complicated balancing of a

number of factors which are peculiarly within [agency's] expertise": whether its "resources are

best spent" on one program or another; whether it "is likely to succeed" in fulfilling its statutory

mandate; whether a particular program "best fits the agency's overall policies"; and, "indeed,

whether the agency has enough resources" to fund a program "at all" and the "agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) (quoting *Heckler*, 480 U.S. at 831-32).

EPA's determination that the current structure of the Grant Agreements does not afford the agency the oversight and account controls necessary for the agency to properly discharge the agency's responsibilities is a matter uniquely within EPA's expertise and a matter committed to its discretion. *See Lincoln,* 508 U.S. at 192. In *Lincoln*, the Supreme Court recognized that an agency decision to change prior funding decisions presented a matter committed to agency discretion by law. *Id.* at 185-88. Here, Congress entrusted EPA "to make grants, on a competitive basis" for distinct purposes, 42 U.S.C. § 7434(a), and left it to EPA to design its programs and provide appropriate oversight and control. *See id.* § 7434(a)(1) ("carry out other greenhouse gas emission reduction activities, *as determined appropriate by the Administrator*" (emphasis added)). As in *Lincoln,* Congress gave the agency "the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way," *id.* at 192, and Plaintiffs are unlikely to succeed on their effort to intrude upon the agency's exercise of discretion.

## II.    Plaintiffs' Constitutional and Statutory Claims Do Not Support Relief.

Although their APA claims are the main focus of the briefing, Plaintiffs also assert claims under the Appropriations Clause, Due Process Clause, and the authorizing and appropriating legislation of the Inflation Reduction Act itself. Plaintiffs are unlikely to succeed on any of those ill-fitting claims—and none of them could possibly support the preliminary injunctive relief that Plaintiffs seek here.

**A. Termination Does Not Implicate the Appropriations Clause, and Plaintiffs Lack Standing Under the Clause.**

There is no plausible Appropriations Clause claim here, and it is difficult to discern Plaintiffs' basis for maintaining such a claim. The Appropriations Clause provides "simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S 414, 424 (1990). EPA has not paid any money out of the Treasury absent appropriation by Congress and Plaintiffs make no argument to the contrary. Nor has EPA failed to use appropriations as directed by Congress. EPA timely awarded grants in accord with 42 U.S.C. § 7434 and now simply seeks to manage the program in a manner with which Plaintiffs disagree. Plaintiffs have no Appropriations Clause claim. *Cf. Hein v. Freedom Religion Found., Inc.*, 551 U.S. 587, 593 (2007) ("federal courts would cease to function as courts of law and would be cast in the role of general complaint bureaus" if "every federal taxpayer could sue to challenge any Government expenditure.").

The few decisions that have entertained private party claims under the Appropriations Clause have not sought to compel the government to disburse money, as Plaintiffs do here. Rather, they sought to *halt* the Executive from disbursing funding. *See United States v. McIntosh*, 833 F.3d 1163, 1173-75 (9th Cir. 2016) (plaintiffs had standing to pursue Appropriations Clause claim where the ostensibly unappropriated funding was used to prosecute them); *United States v. Trump*, 740 F. Supp. 3d 1245, 1304 n.65 (S.D. Fla 2024) (similar); *United States v. Stone*, 394 F. Supp. 3d 1, 19 n.13 (D.D.C. 2019) (similar). Plaintiffs cite no authority supporting their reliance upon the Appropriations Clause to force the government to fund their grants—which is quite backwards.

Finally, *In re Aiken Cnty.*, 725 F.3d 255 (D.C. Cir. 2013), and *Train v. City of New York*, 420 U.S. 35 (1975), have no relevance here. Those cases concerned policy disagreements with Congress. *In re Aiken Cnty.*, 725 F.3d at 259; *Train*, 420 U.S. at 42-43. Here, EPA terminated

Plaintiffs' Grant Agreements as part of its administration of the programs Congress authorized it to administer. There is no separation of powers concern with what EPA did (only with what Plaintiffs are asking this Court to do). The Executive Branch remains free to change positions upon changes in administration. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016). That is exactly what happened here; EPA, for the "normal and orderly operation of the government," *City of New Haven, Conn. v. United States*, 809 F.2d 900, 907 (D.C Cir. 1987) (quoting H.R. Rep. No. 658, 93d Cong., 1st Sess. 41, reprinted in 1974 U.S. Code Cong. & Admin. News 3462, 3486–87), terminated the grants and in so doing announced its intention to "work to re-obligate lawfully appropriated funds, within the GGRF program with enhanced controls to ensure adequate governance, transparency, and accountability, consistent with applicable regulatory and statutory requirements." Once more, if Plaintiffs claim injury based upon EPA's decision, their remedy lies only in contract. The Appropriations Clause has nothing to do with it.

## B. Termination Does Not Implicate the Appropriations Deadline in the Inflation Reduction Act.

Plaintiffs' Inflation Reduction Act claim has no foundation whatsoever. Although they raise a specter that deadlines have been violated, statutory mandates may not be followed, and funds may not be used appropriately, those contentions have no basis in fact.

Section 134 (42 U.S.C. § 7434) required that EPA "make grants" and stated that the appropriated funds would be available for that purpose until September 30, 2024. EPA fulfilled that statutory requirement timely. Plaintiffs' very existence demonstrates that EPA satisfied the requirements of the statute. No part of the statute constrains EPA's authority to reprogram funds as part of its GGRF program operation. In fact, Plaintiffs' contentions to the contrary contradict their own agreements. In the Grant Agreements, in two separate places, Plaintiffs expressly agreed and recognized conditions under which EPA was required to de-obligate and re-obligate funding.

Grant Agreement at 39 (T.4) and at 52 (AF). And Plaintiffs confirmed EPA's right to de-obligate and re-obligate funds in December 2024, well after the September 30, 2024 date they now, for litigation purposes, contend is somehow inviolate. Grant Agreement (amended December 2024) at 41 (T.4) and 51 (AF).

### C. Termination Did Not Violate Due Process, Because the Tucker Act Provides All the Process Due.

Plaintiffs' complaints about due process and assertions of property rights in NCIF grant funds have no purchase. Plaintiffs have only those rights granted under their contracts, and a party whose rights derive from a federal contract cannot maintain a separate claim based upon a property interest. *Hughes Commc'ns Galaxy, Inc. v. United States*, 271 F.3d 1060, 1070 (Fed. Cir. 2001).

Plaintiffs are incorrect in asserting that they own the grant funds obligated by their agreements. Under the Grant Agreements, Plaintiffs "must maintain" the grant funds at their Citibank accounts, which are subject to EPA's perfected security interest, "until the Closeout Agreement goes into effect." Grant Amendment at 118. Only if Plaintiffs had completed performance would Plaintiffs possess a contract basis "to transfer any remaining funds ... to an account ... of [Plaintiffs'] choosing." *Id*. Plaintiffs otherwise were required to spend the funds on allowed uses under the grants. *See id.* at 27 ("[Plaintiffs agree] to only use the award to support the following allowable activities: [listed allowed activities]"). The Notice of Award reflected EPA's agreement to a "cost-share of 100% of all approved budget period costs incurred" up to the award amount. Grant Agreement at 1. Stated simply, Plaintiffs had to perform the grants to become entitled to the funds outright. Until they incur a program cost on an approved budget, Plaintiffs have no claim to the money. *See In re Joliet-Will Cnty. Cmty. Action Agency*, 847 F.2d 430, 432 (7th Cir. 1988) (finding that federal grant funds did not constitute debtor's bankruptcy

estate because the debtor had no property interest in the grant money and property purchased with that money).

Because Plaintiffs only gained an interest in the NCIF grant funds by performing the contracts, their due process claims are nothing more than another set of contract claims. *See Olympic Fed. Sav. And Loan Ass'n v. Dir., Off. of Thrift Supervision.*, Civ. A. No. 90-0482, 1990 WL 134841, at *8-9 (D.D.C. Sept. 6, 1990) (quoting *Megapulse,* 672 F.2d at 967). Plaintiffs may not use their due process claim as "an alternative legal vehicle" through which to enforce their contract rights under the Grant Agreements.[10] *Id.* at *8.

### III.    Even If Jurisdiction Existed, Plaintiffs Are Not Likely to Succeed on the Merits.

Beyond their jurisdictional deficiencies, Plaintiffs are unlikely to succeed on the merits and therefore are not entitled to injunctive relief. *Nken v. Holder*, 556 U.S. 418, 426 (2009). Faced with grant agreements under which the agency had failed to ensure appropriate oversight, EPA made a lawful and reasoned decision to terminate Plaintiffs' grants and announced its intention to re-obligate GGRF funds under more responsible agreements. That decision was rational and supported by the terms of the grants. Indeed, it was compelled by basic principles of fiduciary duty, good government, and respect for taxpayers. As explained above, termination also did not violate the Constitution or the Inflation Reduction Act.

---

[10] The Court should disregard Plaintiffs' appeal to general equitable powers. *See* PI Motion 25-26. "It is axiomatic that federal courts are courts of limited jurisdiction." *Srour v. Barnes*, 670 F. Supp. 18, 20 (D.D.C. 1973). "The power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). And the "express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001). Plaintiffs' reliance on broad and generalized statements regarding equitable jurisdiction adds nothing to the merits of their claims.

**A. EPA's Termination of Plaintiffs' Grant Agreements Was Not Arbitrary or Capricious**

The APA's "arbitrary and capricious" standard, 5 U.S.C. § 706(2)(A), is "highly deferential and presumes the validity of agency action." *Sissel v. Wormuth,* 77 F.4th 941, 947 (D.C. Cir. 2023); *see also Husky Mktg. & Supply Co. v. FERC*, 105 F.4th 418, 421 (D.C. Cir. 2024) (judicial review under APA standard is "is deferential and narrow in scope."). A court reviewing agency action under the arbitrary-and-capricious standard should only set aside an agency decision if "there has been a clear error of judgement" "based on a consideration of the relevant factors." *Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). The court "may not substitute its own judgment for that of the agency." *Columbia Gulf Transmission v. FERC,* 106 F.4th 1220, 1230 (D.C. Cir. 2024). Instead, the court must "simply ensure[] that the agency has acted within a zone of reasonableness," and an agency decision must be upheld so long as it is "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

        i.    EPA's Termination of Plaintiffs' Grants was Reasonable and Reasonably Explained.

EPA's termination of Plaintiffs' Grant Agreements was reasonable. Under the new administration, new EPA officials prudently reviewed EPA's spending. Amidon Decl. ¶ 36. A change in administration "is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring in part, dissenting in part). "As long as the agency remains within the bounds established by Congress, it is entitled to assess administrative records and evaluate priorities in light of the philosophy of the administration." *Id.; see also Dep't of Com.* v. *New York*, 588 U.S. 752, 781 (2019). Within the bounds set by Congress, the agency discretion applies in the grants context as readily as it does in other spheres of activity.

Upon review, EPA determined that the level of oversight provided in Plaintiffs' Grant Agreements was exceedingly insufficient.[11]  Modifications to the agreements post-election, on December 20, 2024 and January 13, 2025, purportedly "limit[ing] EPA's contractual rights," "left EPA with insufficient authority to retain control of funds short of outright termination."  Amidon Decl. ¶ 37.

The Termination Letter explains that the Grant Agreements lacked "adequate oversight and account controls to prevent financial mismanagement," was deficient with respect to "the improper or speculative allocation of funds inconsistent with EPA's oversight and fiscal responsibilities," and involved "the circumvention and defeat of key oversight mechanisms in the disbursement of federal funds."  Termination Letter at 1.  The letter further explains that the GGRF program "pose[d] an unacceptable risk to the efficient and lawful execution of [the GGRF] grant that cannot be remedied by imposing specific conditions, necessitating immediate termination to safeguard taxpayer funds and ensure compliance with federal assistance regulations."  *Id.*  EPA also reasonably terminated the grants based on concerns that the previous Administration had significantly reduced federal oversight and control to Plaintiffs and a financial agent that the contractual scheme violated constitutional limitations on the delegation of Executive Branch authority to private parties.  Amidon Decl. ¶ 37.  The December 20, 2024 and January 13, 2025 amendments diminished EPA's control over the recipients, as the contracts purported to prevent termination absent credible evidence of an enumerated list of crimes and violations.  *Id.*

---

[11] To reiterate, EPA has not  abandoned the GGRF program.  The Termination Letter provides that "EPA will work to re-obligate lawfully appropriated funds within the GGRF program with enhanced controls to ensure adequate governance, transparency, and accountability, consistent with applicable regulatory and statutory requirements." Termination Letter at 2.

These explanations—as described in Mr. Amidon's declaration; the pending criminal investigations by the DOJ and FBI; and the EPA Office of Inspector General's ongoing investigation—confirm that EPA's decision to terminate Plaintiffs' grant agreements falls plainly well within "a zone of reasonableness," *Prometheus Radio Project*, 592 U.S. at 423, that merits this Court's deference under APA review. The APA merely requires an explanation clear enough for "the agency's path [to] reasonably be discerned" and to facilitate effective review. *Bowman Transp., Inc.* v. *Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974). The fact that the Plaintiffs' Grant Agreements were treated similarly and terminated in tandem does not undermine the reasonableness of EPA's decision making. To the contrary, treating similarly situated grants equally honors the APA, for "[r]easoned decisionmaking requires treating like cases alike." *Hall* v. *McLaughlin*, 864 F.2d 868, 872 (D.C. Cir. 1989).

Even if the terminations are deemed a change in agency policy (which they are not), EPA's priorities are matters of policy discretion and not a result of "factual findings"; accordingly, a shift in those priorities does not require any additional explanation under the APA. *FCC* v. *Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). EPA needed only to "display awareness that it *is* changing position," *id.*, which it plainly did.

In reality, Plaintiffs' problem with EPA's grant terminations is not that EPA failed to give sufficient explanation—their objection is that the reasonable explanation that EPA provided does not align with what are (in Plaintiffs' view) the exclusive grounds for termination that are set forth in the Grant Agreements. Once again, that returns to where we began: Even if that were all true, it proves these are contract claims at heart, not APA reasoned-decisionmaking claims.

ii.   <u>EPA Complied with its Regulations in Terminating the Grants.</u>

EPA's termination did not violate 2 C.F.R. § 200.340, which sets out four methods by which an agency "may" terminate a grant, including when "an award no longer effectuates the program goals or agency priorities."  § 200.340(a)(4).  The currently operative version of the regulation then provides that the agency "must clearly and unambiguously specify all termination provisions in the terms and conditions of the" grant.  § 200.340(b).  EPA satisfied this requirement at contract formation, by incorporating EPA's then-current General Terms and Conditions, which provided EPA with the right to terminate the grants "if the award no longer effectuates the program goals or agency priorities."  EPA, General Terms and Conditions 2-3 (effective Oct. 1, 2023).  At issue is whether EPA breached a subsequent contractual promise in the early phase of contract performance.

Although § 200.340 provides bases for termination and obligates an agency to include those bases in grant agreements, the regulation does not (a) mandate what grant termination provisions must or must not say, or (b) limit an agency's ability to terminate a grant to those bases agreed to in a grant agreement.  To the extent EPA's termination of Plaintiffs' Grant Agreements based upon program goals and agency priorities was contrary to the Grant Agreements' termination provision, that may be a breach of the agreements, but it is not a violation of the plain language of § 200.340.  In other words, if EPA did not specifically incorporate § 200.340(a)(4) into the Grant Agreements, that is a contract issue, not a regulatory one.

EPA's termination of the grants does not implicate 2 C.F.R. § 200.342 either, because EPA did not terminate for Plaintiffs' noncompliance.  Thus, the regulation's requirement that a grantee facing an agency's remedy for noncompliance be provided the opportunity to object is not applicable here and cannot form the basis of an APA claim.  Even if § 200.342 had applied, any

failure to provide an opportunity to object would be harmless error, because, as described above, EPA's bases for termination were the grants' structure and terms, including the changes to those terms made in the twilight of the prior administration, and not conduct of Plaintiffs for which they could use the opportunity to object to explain or justify.

### iii.    EPA's Suspension, Prior to Termination, Did Not Violate the APA.

Though mooted by the subsequent termination, EPA's direction to Citibank to freeze disbursements to the GGRF grantees did not violate the APA.  Only *final* agency action, as opposed to "preliminary, procedural, or intermediate" agency actions, is reviewable under the APA. 5 U.S.C. § 704.  The pause placed on Plaintiffs' Citibank accounts was a precautionary measure to ensure that funds were not transferred or disbursed as EPA continued its review of the $20 billion program.  *See* EPA TRO Opp. at 22, citing *Pacific Gas & Elec. Co. v. FPC*, 506 F.2d 33, 39 & n. 20, (D.C. Cir. 1974), *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997), and *Sackett v. E.P.A.*, 566 U.S. 120, 127 (2012) (A decision reflects the "consummation" of the agency decision making process when that decision is subject to no further agency review).  Because the temporary hold on the Citibank accounts was not final agency action, it is not reviewable under the APA.

Even it was, the suspension was reasonable for many of the same reasons that termination was reasonable:  the GGRF program's unusual features, post-election amendments, and ongoing DOJ, FBI and EPA OIG investigations.  *See* EPA TRO Opp. at 9 and 21.

## IV.    Plaintiffs' Alleged Harm Cannot Justify a Preliminary Injunction.

An injunction should be denied when Plaintiffs' alleged harms are monetary and may be remedied by damages.

### A.    Plaintiffs' Alleged Harm is Not Irreparable.

The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel*

*Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). "Where the injuries alleged are purely financial or economic, the barrier to proving irreparable injury is higher still, for it is 'well settled that economic loss does not, in and of itself, constitute irreparable harm.'" *Mexichem Spec. Resins, Inc. v. E.P.A.*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). "The Supreme Court has echoed this message, finding that 'the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury.'" *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009). (citing *Sampson v. Murray*, 415 U.S. 61, 90 (1974)).

In terminating Plaintiffs' grants, EPA has not prohibited or made it unlawful for Plaintiffs (or their subgrantees) to carry out their work. Nor has any other government action. The government is not preventing Plaintiffs from providing services; EPA has just terminated the contracts under which the government would provide reimbursement for those services. *See e.g.*, *Faculty Senate of Fla. Int'l Univ. v. Winn*, 477 F. Supp. 2d 1198, 1208 (S.D. Fla. 2007) ("There is no irreparable harm here because the plaintiffs can fund the desired travel themselves and then, if they prevail in this suit, obtain reimbursement. In other words, the harm is financial."). The only harm to Plaintiffs' mission here is not getting paid under the terms of the agreements. That is insufficient for injunctive relief.

Further, "Plaintiffs must show that irreparable harm is *likely*, not merely possible." *In re TelexFree Sec. Litig.*, No. 4:14-md-002566-TSH, 2021 WL 11604879, at *7 (D. Mass. Apr. 21, 2021) (citing *Steir v. Girl Scouts of the USA*, 383 F.3d 7, 16 (1st Cir. 2004)). That showing "must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004). Plaintiffs' brief and declarations are full of speculative language, pointing

the Court to harms that "may"—but have not and might not—occur.

**B. Plaintiffs' Alleged Harm is Not Immediate.**

Plaintiffs' claimed immediate injury—delayed disbursement of funds—would be remedied at the conclusion of this case (or a case brought in the Court of Federal Claims) if they are meritorious. And Plaintiffs' inability to collect money unless and until they prevail on the merits is a standard part of litigation that does not justify a preliminary injunction. "The rule that equitable remedies cannot issue when the damages are monetary in nature has been ingrained in law for 'half a millennium or so,' and no judge within the English common law tradition has the luxury of ignoring it." *United States v. Michigan*, 230 F.R.D. 492, 495 n.1 (E.D. Mich. 2005). This is true even where a plaintiff claims that it does not have ready reserves or charitable donors or that waiting for money is harmful because of a lack of other funds. *See id.* (movant failed to show irreparable harm beyond monetary damages even though "[movant] argue[d] that its ratepayers are low-income and do not have the luxury of saying, 'It's only money.'"); *see also., Dennis Melancon, Inc.* v. *City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (the "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, [weighs] heavily against a claim of irreparable harm") (citation omitted).

The risks Plaintiffs primarily expound upon are all financial—like the possibility of missed payments, inability to cover expenses, and paused disbursements to subgrantees. While Plaintiffs' attempt to emphasize the depth and breadth of the work they have begun under the GGRF program, the impact of terminating that work may be exaggerated. This litigation comes at the beginning of the GGRF's programmatic work. Plaintiffs' GGRF funding was obligated just a little over six months ago. Many of Plaintiffs' employees are recent hires or have not yet been hired at all. *See* PI Motion at 52; Bafford Decl. ¶7 (Climate United created as a separate legal entity in 2022). Plaintiffs' projects are not years in the making. And to the extent the work of Plaintiffs, their

various coalition partners, or their subgrantees predate the GGRF program, that longevity suggests that their work can survive a pause in funding as this litigation continues or the termination of Plaintiffs' grants should Plaintiffs' challenge prove unsuccessful.

**C. Plaintiffs' Alleged Reputational Harm Fails to Justify Entry of a Preliminary Injunction.**

Plaintiffs' alleged reputational harm boils down to anticipated difficulties in attracting investors and partners. Any anticipatory difficulties arising from the reduction of Plaintiffs' budget is "'strictly economic' and therefore not irreparable ... [and] the discontinuance of funds did not injure [Plaintiffs'] reputation because it reflected no more than a decision based on reasons of policy." *Planned Parenthood Ass'n of Utah v. Schweiker*, 700 F.2d 710, 718 n.16 (noting the discontinuance of Title X funding was not sufficient to justify preliminary injunction). The loss of potential investment stemming from EPA's efforts to impose oversight and control over the grant funds is an economic loss, which does not constitute irreparable harm. *Ahuruonye v. U.S. Dep't of Interior*, 312 F. Supp. 3d 1, 24 (D.D.C. 2018). The anticipated reputational injuries are also hypothetical and do not justify preliminary injunction "especially when [the alleged injuries are] nothing more than speculation about how third parties might respond." *John Doe Co. v. Consumer Fin. Prot. Bureau*, 849 F.3d 1129, 1134 (D.C. Cir. 2017). "As with all other forms of irreparable harm, the showing of reputational harm must be concrete and corroborated, not merely speculative." *Trudeau v. Fed. Trade Com'n*, 384 F.Supp.2d 281, 297 (D.D.C. 2005); *see also Ahuruonye*, 312 F. Supp. 3d at 24 (quoting *Trudeau*).

**V.    An Injunction Would Be Contrary to the Public Interest.**

As detailed in the EPA Defendants' Opposition to Plaintiffs' motion for a TRO, the balance of equities and public interest continue to weigh against the extraordinary remedy of a preliminary injunction. *See* EPA TRO Opp. at 24-26. "[T]he protection of the public fisc is a matter that is of

interest to every citizen," *Brock v. Pierce Cnty.*, 476 U.S. 253, 262 (1986). Granting Plaintiffs' requested relief here puts a significant portion of the public fisc out of the government's protection.

The public interest is also not served by "reinstating" a Grant Agreement that would force EPA into a multiple year, $20 billon spending obligation, which it has no ability to unilaterally terminate without allegedly violating the APA. Adopting Plaintiffs' reasoning would have grave consequences on procurement, healthcare, and any arena in which the federal government plays a role. Taken to its logical conclusion, Plaintiffs' theory would bind the Executive to perform contracts, even if the agreements no longer serve any public purpose, or instead run counter to the public interest. The need to protect against such circumstances demonstrates why Congress adopted a limited waiver of sovereign immunity under the Tucker Act. The public interest is served by furthering the Tucker Act's policy choice, not by evading it.

## VI.    Any Relief Should be Limited.

For the reasons explained above, Plaintiffs are not entitled to any preliminary injunctive relief.   But in the event the Court concludes otherwise, injunctive relief "must be narrowly tailored to remedy the specific harm shown," *Neb. Dep't of Health & Hum. Servs. v. U.S. Dep't of Health & Hum. Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006) (citation omitted), and "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). The scope of any relief granted here should not extend beyond the Court's Temporary Restraining Order, *see* ECF No. 28, especially considering the significant risk that any monies disbursed to Plaintiffs' may not be recoverable. Any granted relief should also be (1) limited to the specific agency action Plaintiffs' challenge—the Termination Letter—not any other conduct whose lawfulness is not before this Court, *see Nat'l Ass'n of Chain Drug Stores v. U.S. Dep't of Health & Hum.*

*Servs.*, 631 F. Supp. 2d 17, 21 (D.D.C. 2009); and (2) limited to the Plaintiffs' alone who have

shown imminent and irreparable harm.

### VII.    Bond is Required if the Court Issues a Preliminary Injunction.

If the Court decides to grant any preliminary injunctive relief, the Court should order

security with any preliminary injunction.  Under Federal Rule of Civil Procedure 65(c), the

Court may issue a preliminary injunction "only if the movant gives security" for "costs and

damages sustained" by Defendants if they are later found to "have been wrongfully enjoined."

Fed. R. Civ. P. 66(c).  Although this Rule provides "broad discretion in the district court to

determine the appropriate amount of an injunction bond," *DSE, Inc. v. United States*, 169 F.3d

21, 33 (D.C. Cir. 1999), when setting security, courts "should err on the high side" because

setting a bond amount too low might produce injury since "the damages for an erroneous

preliminary injunction cannot exceed the amount of the bond." *Mead Johnson & Co. v. Abbott

Labs.,* 201 F.3d 883, 888 (7th Cir. 2000).   Should the Court issue an injunction at this

preliminary stage that exceeds the scope of the temporary restraining order and allows Plaintiffs

to draw down on the Citibank accounts, the Courts must require Plaintiffs to post a bond.

### CONCLUSION

EPA respectfully requests that the Court deny Plaintiffs' motion for preliminary injunction.

Dated: March 26, 2025                    Respectfully Submitted,


                                        YAAKOV ROTH
                                        Acting Assistant Attorney General

                                        KIRK T. MANHARDT
                                        Director

                                        */s/ Marc S. Sacks*
                                        MARC S. SACKS (Ga. Bar No. 621931)
                                        *Deputy Director*
                                        KEVIN P. VANLANDINGHAM (NY Reg No. 4741799)
                                        *Assistant Director*
                                        U.S. Department of Justice
                                        Civil Division
                                        Corporate/Financial Section
                                        P.O. Box 875
                                        Ben Franklin Stations
                                        Washington D.C. 20044-0875
                                        Tel: (202) 307-1104
                                        Email: marcus.s.sacks@usdoj.gov


                                        *Attorneys for the United States*
                                        *Environmental Protection Agency*