**[ORAL ARGUMENT SCHEDULED MAY 19, 2025]**

**No. 25-5122**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————

CLIMATE UNITED FUND, et al.,

*Plaintiffs-Appellees,*

*v.*

CITIBANK, N.A., et al.,

*Defendants-Appellants.*

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

**JOINT APPENDIX
PUBLIC APPENDIX—SEALED MATERIAL IN SEPARATE SUPPLEMENT
VOLUME II**

———————————

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

GERARD SINZDAK
SOPHIA SHAMS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7264*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-2495*

# TABLE OF CONTENTS

## VOLUME I

**Excerpts from Climate United Fund v. Citibank, N.A.,
Case No. 1:25-cv-00698**

Docket Report ........................................................................................JA1

Memorandum in Support of Temporary Restraining Order (Doc. 2-1) ..................JA20

March 10, 2025 EPA Correspondance (Doc. 14-2)....................................JA64

March 10, 2025 Treasury Correspondence (Doc. 14-3) ............................JA67

Account Control Agreement (Doc. 14-4) ...................................................JA69

February 2025 FBI Correspondence (Doc. 14-5) ......................................JA98

March 2, 2025 EPA Office of Inspector General Correspondence (Doc. 14-6)...JA104

March 4, 2025 Treasury Correspondence (Doc. 14-7) ..............................JA110

Amended Complaint (Doc. 24) .................................................................JA112

Hearing (March 8, 2025).........................................................................JA174

Hearing (March 17, 2025).......................................................................JA218

Memorandum Opinion on Temproary Restraining Order (Doc. 28) ...................JA263

Order Granting Motion for Temporary Restraining Order (Doc. 29)...................JA286

Motion for Preliminary Injunction (Doc. 33-1)..........................................JA288

Bafford Decl. (Dkt. 33-2) ........................................................................JA360

Climate United Notice of Termination (Doc. 33-13) ................................JA389

Representative Request from EPA (Doc. 33-22) .......................................JA392

Coalition for Green Capital Notice of Termination (Doc. 33-23)..........................JA397

Brown Decl. (Doc. 33-25) ..............................................................................JA401

Buendia Decl. (Doc. 33-26)...........................................................................JA406

Hopson Decl. (Doc. 33-27)............................................................................JA415

Kauffman Decl. (Doc. 33-28) ........................................................................JA425

Donovan Decl. (Doc. 33-29) .........................................................................JA433

Matusiak Decl (Doc. 33-30) ..........................................................................JA442

Mayopoulous Decl. (Doc. 33-31) ..................................................................JA451

Moon Decl. (Doc. 33-32) ..............................................................................JA461

Opposition to Motion for Preliminary Injunction (Doc. 49) ...................JA470

## VOLUME II

**Excerpts from Climate United Fund v. Citibank, N.A.,
Case No. 1:25-cv-00698**

Exhibits to Coogan Decl. (Dkt. 49-2)...........................................................JA511

Amidon Decl. (Doc. 49-3)..............................................................................JA703

Treml Decl. (Doc. 49-5) .................................................................................JA721

Exhibits to Bailey Decl. (Doc. 49-7) ............................................................JA724

Coalition for Green Capital Supplemental Record Evidence (Doc. 60) ...............JA736

Order Extending Temporary Restraining Order (Doc. 70) .....................JA738

Emergency Contingent Motion to Stay Pending Appeal (Doc. 75).........................JA740

Supplemental Treml Decl. (Doc. 75-2)..........................................................JA752

Exhibits to Treml Decl. (Doc. 75-3) .............................................................JA758

Hearing (April 2, 2025) ..................................................................................JA830

Parker Decl. (Doc. 78-1).................................................................JA938

Supplemental Bafford Decl. (Doc. 79-1) ......................................JA952

Order Granting Preliminary Injunction (Doc. 80) ......................JA961

Notice of Appeal (Doc. 81)...........................................................JA964

Memorandum Opinion (Doc. 89) .................................................JA966

Supplemental Mayopoulos Decl. (Doc. 92) ...............................JA1005

Order Granting Motion to Clarify (Doc. 96).............................JA1011

**Excerpts from Power Forward Coalition v. Citibank, N.A.,**
**Case No. 1:25-cv-00762**

Docket Report ..............................................................................JA1015

Grant Agreement (Doc. 1-2)........................................................JA1020

Amended Grant Agreement (Doc. 1-3)........................................JA1081

Account Control Agreement (Doc. 1-4) ......................................JA1142

Sub-Awardee Account Control Agreement (Doc. 1-5).................JA1175

Notice of Termination Letter (Doc. 1-10) ..................................JA1196

## VOLUME III

**Excerpts from California Infrastructure and Economic Development**
**Bank v. Citibank, N.A.,**
**Case No. 1:25-cv-00820**

Docket Report ..............................................................................JA1199

Complaint (Doc. 1) .....................................................................JA1204

Motion for Preliminary Injunction (Doc. 17) ...........................JA1259

Meister Decl. (Doc.17-1) ............................................................JA1293

Stoddard Decl. (Doc. 17-2) .......................................................... JA1323

Strong Dec. (Doc. 17-3) ............................................................... JA1353

Swan Decl. (Doc. 17-4) ................................................................ JA1419

Wu Decl. (Doc. 17-5) ................................................................... JA1461

**Excerpts from Justice Climate Fund v. EPA
Case No. 1:25-cv-00938**

Docket Report ............................................................................. JA1507

Complaint (Doc. 1)...................................................................... JA1511

Kirkwood Decl. (Doc. 7-2) .......................................................... JA1644

CCIA Notice of Funding Opportunity (Doc. 7-3).......................... JA1657

NCIF Notice of Funding Opportunity (Doc. 7-4) ......................... JA1732

Grant Agreement (Doc. 7-5)......................................................... JA1805

## VOLUME IV

**Excerpts from Justice Climate Fund v. EPA
Case No. 1:25-cv-00938**

Amendments to Grant Agreement (Doc. 7-6) ....................................... JA1867

Account Control Agreement (Doc. 7-7) ............................................... JA1930

Notice of Termination (Doc. 7-8)........................................................ JA1948

Notice of Compliance and Oversight Review (Doc. 7-9) ..................... JA1951

Agency and Trust Account Statement (Doc. 7-10)................................ JA1956

Agency and Trust Account Statement (Doc. 7-11)................................ JA1958

**Excerpts from Inclusiv, Inc. v. EPA,
Case No. 1:25-cv-00948**

Docket Report ................................................................................... JA1961

Arabshahi Decl (Doc. 6-2) ............................................................... JA1967

Lawson Dec. (Doc. 6-3) .................................................................. JA1990

Freeman Decl.(Doc. 6-4) ................................................................ JA1995

Hanshaw Dec. (Doc. 6-5)................................................................ JA2002

Ledezma Dec. Decl. (Doc. 6-6) ..................................................... JA2007

Inclusiv Grant Agreement (Doc. 6-8)............................................. JA2014

Motion for Temporary Restraining Order (Doc. 8)........................ JA2076

Johnson Decl. (Doc. 8-1) ............................................................... JA2081

Sheaffer Decl. (Doc. 8-2)............................................................... JA2118

Notice of Withdrawal (Doc. 13) .................................................... JA2123

## VOLUME V

**Excerpts from Climate United Fund v. Citibank, N.A.,
Case No. 1:25-cv-00698**

Financial Agent Agreement (Under Seal) (Doc. 21) ...................... JA2126

# Exhibit A

5G - 84094001 - 0    Page 1

| U.S. ENVIRONMENTAL PROTECTION AGENCY  Grant Agreement | GRANT NUMBER (FAIN): 84094001  MODIFICATION NUMBER: 0  PROGRAM CODE: 5G | DATE OF AWARD 08/08/2024 |
|---|---|---|
| | TYPE OF ACTION  New | MAILING DATE 08/13/2024 |
| | PAYMENT METHOD:  ASAP | ACH# |

| RECIPIENT TYPE: | Send Payment Request to: |
|---|---|
| Not for Profit | Contact EPA RTPFC at ▮ |
| **RECIPIENT:** | **PAYEE:** |
| Climate United Fund  7550 WISCONSIN AVE  FI 8  BETHESDA, MD 20814-3559  EIN: ▮ | Climate United Fund  7550 WISCONSIN AVE  FI 8  BETHESDA, MD 20814-3559 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Elizabeth Bafford  7550 Wisconsin Ave  FI 8  Bethesda, MD 20814  Email: ▮  Phone: ▮ | Michelle Tucker  1200 Pennsylvania Ave, NW, 19-H16  Washington, DC 20460  Email: ▮  Phone: ▮ | Walker Oneil  OGD- GMBOD, 3093R  1200 Pennsylvania Ave, NW  Washington, DC 20460-0001  Email: ▮  Phone: ▮ |

**PROJECT TITLE AND DESCRIPTION**

GGRF NCIF: Climate United

See Attachment 1 for project description.

| BUDGET PERIOD  04/01/2024 - 06/30/2029 | PROJECT PERIOD  04/01/2024 - 06/30/2029 | TOTAL BUDGET PERIOD COST  $ 6,970,000,000.00 | TOTAL PROJECT PERIOD COST  $ 6,970,000,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 6,970,000,000.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 6,970,000,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| ORGANIZATION / ADDRESS | ORGANIZATION / ADDRESS |
| Environmental Protection Agency, Grants Management & Business Operations Division  1200 Pennsylvania Ave, NW Mail code 3903R  Washington, DC 20460 | Environmental Protection Agency, OGGRF  OA - Office of the Administrator  1200 Pennsylvania Ave, NW  Washington, DC 20460 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| Digital signature applied by EPA Award Official Katherine Tsing-Choy - Associate Award Official | DATE  08/08/2024 |

5G - 84094001 - 0    Page 2

## EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 6,970,000,000 | $ 6,970,000,000 |
| EPA In-Kind Amount | $ 0 | $ 0 | $ 0 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 6,970,000,000 | $ 6,970,000,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.957 - Greenhouse Gas Reduction Fund: National Clean Investment Fund | Clean Air Act: Sec. 134(a)(2) and (3) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

### Fiscal

| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
|---|---|---|---|---|---|---|---|---|---|
| - | 2411U41083 | 2224 | E1SF3 | QU | 000MGBXG3 | 4131 | - | - | $ 5,972,147,459 |
| - | 2411U41082 | 2224 | E1SF3 | QU | 000MGBXAC | 4131 | - | - | $ 997,852,541 |
| | | | | | | | | | $ 6,970,000,000 |

5G - 84094001 - 0     Page 3

Budget Summary Page

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. Personnel | $ 89,871,170 |
| 2. Fringe Benefits | $ 33,252,333 |
| 3. Travel | $ 4,697,854 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 1,080,080 |
| 6. Contractual | $ 861,952,518 |
| 7. Construction | $ 0 |
| 8. Other | $ 5,950,949,314 |
| 9. Total Direct Charges | $ 6,941,803,269 |
| 10. Indirect Costs: 10.00 % Base de minimis MTDC | $ 28,196,731 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 6,970,000,000 |
| 12. Total Approved Assistance Amount | $ 6,970,000,000 |
| 13. Program Income | $ 315,000,000 |
| 14. Total EPA Amount Awarded This Action | $ 6,970,000,000 |
| 15. Total EPA Amount Awarded To Date | $ 6,970,000,000 |

JA514

5G - 84094001 - 0    Page 4

## Attachment 1 - Project Description

This agreement provides funding under the Inflation Reduction Act (IRA) to Climate United (CU). The recipient will utilize the funding to reduce emissions of greenhouse gases and other air pollutants; deliver benefits of greenhouse gas- and air pollution-reducing projects to American communities, particularly low-income and disadvantaged communities; and mobilize financing and private capital to stimulate additional deployment of greenhouse gas- and air pollution-reducing projects.

Specifically, the recipient will endeavor to accomplish this by working with community groups, technical assistance providers, financial institutions, and workforce development entities to reduce the barriers and limit the inefficiencies that have prevented broad adoption and financing of clean technologies. To ensure clean energy acceleration and market transformation beyond the National Clean Investment Fund (NCIF), Climate United will integrate this capital resource into existing lending products and processes so that all lenders, (i.e., beyond just the community, green and nonprofit sectors) learn to address decarbonization in their routine lending practices. Greening existing lending with NCIF support will have the broadest transformative impact on the capital markets nationwide.

The activities include developing a sustainable fund that can be revolved while offering products that meet borrowers and markets where they are. Specifically, they intend to leverage EPA funds with private capital to provide adequate levels of subsidy to spur the adoption of green alternatives. As costs come down and markets mature, they plan to slowly decrease the amount of subsidy per transaction to ensure their products are additive and to maximize sustainability of the fund. Climate United's plan is to build a supportive ecosystem for the financing of Qualified Projects (QP) that leverage national networks of local implementation partners and coordination with labor and workforce organizations to ensure financed projects are (i) generating high-quality jobs with a diverse, skilled workforce trained in DBRA compliance and reporting where applicable, (ii) delivering high-performing buildings for owners and occupants or access to clean energy or transportation for American families, businesses, and organizations, and (iii) eliminating the barriers that have historically prevented the scaling of clean energy technologies across segments.

Their capital demand side market-building plan focuses on broad awareness building, targeted outreach and education, and straightforward conversion to address historic barriers. The foundation of their strategy will be potential partnerships with national networks of local organizations that will engage, educate, and equip local partners with the tools to facilitate QP development. Climate United will develop or partner to deliver ongoing training to lenders, contractors, owners, community organizations, building operators, and other priority segments, in conjunction with established, on the ground community organizations. They will work with CCIA partners creating training programs to provide the most up-to-date information on their products and processes to build the continuation of support for community lenders and build training for Community Based Organizations around how to access Climate United financial assistance.

Their capital supply side market-building plan focuses on asset and data standardization, financial product development, portfolio analysis, and market education. Through a cooperative design process with Transaction Partners, they will create and refine their standardized products so they can more quickly scale and support the development of viable secondary markets.Climate United (CU) is targeting the following outputs and outcomes resulting from the award and its investment strategy. Performance against these outputs is dependent on market conditions, market demand, and ultimate cost of Qualified Projects across various market segments. It is expected that some of these outputs may be hard to achieve over the five-year performance period. After three years, if they are not on track to meet the

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 6 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 12 of 694

5G - 84094001 - 0    Page 5

target outputs, they will shift strategy and adjust the information below to reflect the realities of the market once they are actively in it.

Climate United is striving for at least 60 percent of the beneficiaries to either be located in Low Income and Disadvantaged Communities (LIDAC) or serving LIDAC beneficiaries. The anticipated deliverables include:

– single family homes decarbonized

– units of multifamily housing decarbonized

– small commercial and community facilities decarbonized

– school buildings decarbonized

– passenger vehicles electrified

– school buses electrified

– heavy-duty trucks electrified

– other vehicles electrified

– residential solar installations and/or access to community solar and/or storage for single family homes

– small commercial and community facilities with access to solar and/or storage

– school buildings with access to solar and/or storage

The expected outcomes include CU leveraging this program to mobilize and engage the private sector to address the climate crisis. CU's strategy drives capital to demonstrate the benefits and the ability to finance a carbon free economy that will deliver significant, tangible benefits to American communities through lower energy bills, stable and reliable energy sources, and cleaner air; will reinvigorate American manufacturing and develop new supply chains that strengthen our national security; and will support the development of a workforce made of high-quality jobs that expand and deepen the American middle-class. This will be accomplished through reducing GHG emissions by increasing efficiency and electrifying systems in buildings, which improves indoor air quality and health of beneficiaries, reducing GHG emissions by electrifying vehicles, which improves outdoor air quality and the health of effected communities, and increasing renewable generation to expand clean generation of energy and reduce emissions, which reduces the carbon intensity of our electricity sector and lowers energy bills.

The intended beneficiaries include geographically diverse communities across all 50 States with a specific focus on rural communities, Tribal communities, and Low Income and Disadvantaged Communities.

A portion will be deployed to balance sheets investing in and with transaction partners to facilitate standardized and tailored loans into QPs that may stay on the balance sheets of the Community Lenders. Subaward loans include loans to the balance sheets of Community Lenders who use the funds combined with private funds to provide financial assistance to Qualified Projects.

5G - 84094001 - 0    Page 6

Based upon the Transaction Partner type and the relevant market segments, Climate United may conduct a Counterparty Assessment that reviews the operational and lending or investment history, current financial position, pipeline, community impact, and operational ability to execute QPs in accordance with CU's Investment and Fair & Responsible Lending Policies. Climate United and its Coalition Partners may provide subawards and/or procurement contracts, as appropriate, for the purpose of assisting with Counterparty Assessments.

In addition to subaward loans to financial intermediaries for the purpose of providing financial assistance to qualified projects as described in the workplan, CU will also provide subawards to it's two coalition partners who specialize in housing decarbonization and transportation.

5G - 84094001 - 0    Page 7

# Administrative Conditions

## A. General Terms and Conditions

The Recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later. These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): ██████████████ and EPA Grants Specialist listed on the award
- MBE/WBE reports (EPA Form 5700-52A): ████████████████████ and EPA Grants Specialist listed on the award
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to Recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Grants Specialist and EPA Project Officer listed on the award
- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer listed on the award

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a Recipient or Subrecipient intends to provide Financial Assistance to Qualified Project(s) that involves construction or land use planning. With the exception of Qualified Project(s) that will be carried out in the State of California, the Recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the Qualified Project(s) and provide comments to the EPA Project Officer. Qualified Project(s) that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

The Recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, Recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA

JA518

interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a Recipient incurs after EPA has notified the Recipient that its application has been selected for award consideration. The pre-award costs must be included in the workplan and budget to be eligible. As provided in 2 CFR 1500.9, Recipients incur pre-award costs at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information.

## E. New Recipient Training Requirement

The Recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The Recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the Recipient should refer to RAIN-2024-G01.

5G - 84094001 - 0    Page 9

# Programmatic Conditions

## I. DEFINITIONS

**Acquisition of Intangible Property:** 2 CFR 200.1 defines Intangible Property as "property having no physical existence, such as trademarks, copyrights, patents and patent applications and property, such as loans, notes and other debt instruments, lease agreements, stock and other instruments of property ownership (whether the property is tangible or intangible)." Acquisitions of Intangible Property involve the purchase of Intangible Property through procurement contracts.

**Air Pollutant:** Air Pollutant means any air pollutant that is listed pursuant to Section 108(a) of the Clean Air Act (or any precursor to such an air pollutant). This includes particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead (see 40 CFR Part 50) and their precursors (e.g., volatile organic compounds).

**Award Agreement:** Award Agreement means the set of legally binding documents between EPA and the Recipient under the federal award. Award Agreement is used interchangeably with Assistance Agreement and Notice of Award.

**Apprentice:** Apprentice means an individual working on a project receiving Financial Assistance who is participating in a Registered Apprenticeship program under the National Apprenticeship Act that meets the requirements of 29 CFR Parts 29 and 30.

**Environmental Information:** Environmental Information is defined in EPA's Environmental Information Quality Policy. Environmental Information includes "data and information that describe environmental processes or conditions which support EPA's mission of protecting human health and the environment. Examples include but are not limited to: direct measurements of environmental parameters or processes; analytical testing results of environmental conditions (e.g., geophysical or hydrological conditions); information on physical parameters or processes collected using environmental technologies; calculations or analyses of environmental information; information provided by models; information compiled or obtained from databases, software applications, decision support tools, websites, existing literature, and other sources; development of environmental software, tools, models, methods and applications; and design, construction, and operation or application of environmental technology."

**Environmental Information Operations:** Environmental Information Operations is defined in EPA's Environmental Information Quality Policy. Environmental Information Operations means "[a] collective term for work performed to collect, produce, evaluate, or use environmental information and the design, construction, operation or application of environmental technology."

**EPA Award Official**: EPA Award Official means the award official from the Office of Grants and Debarment that is authorized to execute the Award Agreement, as well as any subsequent amendments to the Award Agreement, and to make any other final determinations required by law or regulation on behalf of the EPA.

**EPA Project Officer**: EPA Project Officer means the project officer from the Office of the Greenhouse Gas Reduction Fund that is assigned, along with the EPA Grants Specialist, to monitor the Recipient on programmatic and technical aspects of the project and is typically authorized to make programmatic approvals on behalf of the EPA. Where required, the Recipient must notify or request approval from the EPA Project Officer through the EPA Project Officer's individual EPA email address as well ████████

⬛ such that the Office of the Greenhouse Gas Reduction Fund may delegate an alternative EPA Project Officer in the case of any absence.

**Financial Assistance:** Section 134(b)(1) of the Clean Air Act directs that the Recipient use funds for "Financial Assistance." Consistent with the definition of *Federal financial assistance* in 2 CFR 200.1, Financial Assistance means financial products, including debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, loan purchasing programs, and other debt instruments), equity investments (such as equity project finance investments, private equity investments, and other equity instruments), hybrids (such as mezzanine debt, preferred equity, and other hybrid instruments), and credit enhancements (such as loan guarantees, loan guarantee funds (whether full or partial), loan loss reserves, and other credit enhancement instruments). Expenditures for Financial Assistance are in the form of Subawards (other than subgrants), Participant Support Costs, or Acquisitions of Intangible Property, as defined in this Award Agreement. Subgrants are not eligible as Financial Assistance. The characterization of a Financial Assistance transaction as a Subaward, Participant Support Costs, or Acquisition of Intangible Property is limited to the transaction. For example, the same entity may be a Subrecipient for one transaction and a Program Beneficiary or a Contractor for another transaction.

**Freely Associated States:** Freely Associated States means the Republic of the Marshall Islands (the Marshalls), the Federated States of Micronesia (FSM), and the Republic of Palau (Palau).

**Greenhouse Gas:** Greenhouse Gas means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act. Greenhouse Gas Emissions mean emissions of Greenhouse Gases.

**Low-Income and Disadvantaged Communities**: Section 134(a)(3) of the Clean Air Act appropriates funds "for the purposes of providing financial assistance and technical assistance in low-income and disadvantaged communities." Low-Income and Disadvantaged Communities means CEJST-Identified Disadvantaged Communities, EJScreen-Identified Disadvantaged Communities, Geographically Dispersed Low-Income Households, Properties Providing Affordable Housing, and Federally Recognized Tribal Entities, as defined below.

- *CEJST-Identified Disadvantaged Communities:* All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.

- *EJScreen-Identified Disadvantaged Communities:* All communities within version 2.2 of EJScreen that fall within either (a) the limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.

- *Geographically Dispersed Low-Income Households:* Low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available

Case 1:25-cv-00698-TSC     Document 49-2     Filed 03/26/25     Page 12 of 192
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 18 of 694

5G - 84094001 - 0     Page 11

figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development (HUD). Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using HUD's Family Size Adjustment factor.

- _Properties Providing Affordable Housing:_ Properties providing affordable housing that fall within either of the following two categories: (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by HUD, including Public Housing, Section 8 Project-Based Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)); or (5) a housing assistance program administered by the Department of Hawaiian Homelands as defined in Title VIII of the Native American Housing Assistance and Self-Determination Act of 1996 (24 CFR 1006.10) or (b) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

- _Federally Recognized Tribal Entities:_ All Federally Recognized Tribal entities, which are considered disadvantaged regardless of whether a Federally Recognized Tribe has land, consistent with M-23-09 and CEJST.


**Market-Building Activities:** Market-Building Activities means activities that meet all three of the following criteria: (1) build the market for financeable Qualified Projects, (2) are not tied directly to Qualified Projects the Recipient intends to finance, and (3) are necessary and reasonable for the deployment of Financial Assistance to Qualified Projects.


**Named Subrecipient:** Named Subrecipient means an entity that is named on the EPA-approved workplan to receive a Subaward in the form of a Subgrant from the Recipient in order to carry out part of the award.


**Participant Support Costs**: 2 CFR 200.1 defines Participant Support Costs as "direct costs for items such as stipends or subsistence allowances, travel allowances, and registration fees paid to or on behalf of participants or trainees (but not employees) in connection with conferences, or training projects." EPA regulations at 2 CFR 1500.1(a)(1) expand the definition of Participant Support Costs to include "subsidies, rebates, and other payments to program beneficiaries to encourage participation in statutorily authorized environmental stewardship programs," which includes the Greenhouse Gas Reduction Fund. In this program, Participant Support Costs may include expenditures by the Recipient as Predevelopment Activities, Market-Building Activities, and Program Administration Activities (which may include subsidies, rebates, and other payments) as well as Financial Assistance to Qualified Projects.


**Period of Closeout**: Period of Closeout means the time interval between the beginning of the closeout

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 13 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 19 of 694

5G - 84094001 - 0    Page 12

period (the date that the award has been closed out, in accordance with 2 CFR 200.344) to the end of the closeout period (the date that the Closeout Agreement has been terminated). The Period of Closeout may also be referred to as the Closeout Period.

**Period of Performance**: 2 CFR 200.1 defines Period of Performance as "the total estimated time interval between the start of an initial Federal award and the planned end date, which may include one or more funded portions, or budget periods." For the purposes of this Award Agreement, the Period of Performance means the time interval between the start of the Federal award (either the first date that the Recipient has incurred allowable pre-award costs or the date on the Notice of Award, whichever is earlier) and the end of the Federal award (the date that the award has been closed out, in accordance with 2 CFR 200.344). The Period of Performance may also be referred to as the Performance Period.

**Post-Closeout Program Income**: Post-Closeout Program Income means Program Income retained at the end of the Period of Performance, which is subject to the terms and conditions of the Closeout Agreement, as well as Program Income earned by the non-Federal entity that is directly generated by a supported activity or earned as a result of the Federal award during the Period of Closeout, which is also subject to the terms and conditions of the Closeout Agreement. Under the Closeout Agreement, the Recipient is authorized to deduct the cost of generating Post-Closeout Program Income under 2 CFR 200.307(b) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Post-Closeout Program Income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Post Closeout Program Income. Costs of generating Post-Closeout Program Income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the Post-Closeout Program Income, provided the Recipient can account for the actual costs incurred.

**Predevelopment Activities:** Predevelopment Activities means activities that meet all three of the following criteria: (1) improve the likelihood of the Recipient financing Qualified Projects, (2) are tied directly to Qualified Projects the Recipient intends to finance, and (3) are necessary and reasonable for the Recipient to deploy Financial Assistance to Qualified Projects.

**Priority Project Categories:** Priority Project Categories means Distributed Energy Generation and Storage, Net-Zero Emissions Buildings, and Zero-Emissions Transportation, as defined below.

- *Distributed Energy Generation and Storage:* Projects, activities, and technologies that deploy small-scale power generation and/or storage technologies (typically from 1 kW to 10,000 kW), plus enabling infrastructure necessary for deployment of such generation and/or storage technologies. Projects, activities, and technologies within this category must support *carbon pollution-free electricity,* which is electrical energy produced from resources that generate no carbon emissions, consistent with the definition specified in Executive Order 14057 (Catalyzing Clean Energy Industries and Jobs Through Federal Sustainability).

- *Net-Zero Emissions Buildings:* Projects, activities, and technologies that either (1) retrofit an existing building, making a substantial contribution to that building being a net-zero emissions building and as part of a plan for that building achieving net-zero emissions over time, or (2) construct a new net-zero emissions building in a Low-Income and Disadvantaged Community. A n*et-zero emissions building* is a building that meets the requirements of Version 1 of the National Definition for a Zero Emissions Building (June 2024).

- *Zero-Emissions Transportation:* Projects, activities, and technologies that deploy zero-emissions

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 14 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 20 of 694

5G - 84094001 - 0    Page 13

transportation modes, plus enabling infrastructure necessary for zero-emissions transportation modes—especially in communities that are overburdened by existing diesel pollution, particulate matter concentration, and degraded air quality. Projects, activities, and technologies within this category must be consistent with the zero-emissions transportation decarbonization strategies in The U.S. National Blueprint for Transportation Decarbonization.

**Program Administration Activities:** Program Administration Activities means activities that support administration of the grant program, to the extent such activities meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. Program Administration Activities include but are not limited to establishing and convening advisory councils, as described in Item 2 of EPA's Guidance on Selected Items of Cost for Recipients, and fund raising, as described in Item 4 of EPA's Guidance on Selected Items of Cost for Recipients.

**Program Beneficiary:** Program Beneficiary means an entity (either an individual or an organization) that receives Financial Assistance as an end-user, except when such Financial Assistance is characterized as an Acquisition of Intangible Property (in which case the entity is a Contractor, as defined in 2 CFR 200.1). Expenditures for Financial Assistance to Program Beneficiaries are in the form of Participant Support Costs, as defined in 2 CFR 1500.1. A Program Beneficiary is distinct from a Subrecipient, as defined in 2 CFR 200.1.

**Program Income:** 2 CFR 200.1 defines Program Income as "gross income earned by the non-Federal entity that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(f)." 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, Program Income also includes but is not limited to income from origination fees, servicing fees, and asset management fees; dividends from equity investments; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). Program Income must be treated in accordance with the Program Income Programmatic Term and Condition. EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fund raising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Under this award agreement, the Recipient is authorized to deduct the cost of generating program income under 2 CFR 200.307(b) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of program income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Program Income. Costs of generating program income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the program income, provided the Recipient can account for the actual costs incurred. Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

**Qualified Project:** Section 134(c)(3) of the Clean Air Act provides that a Qualified Project is any project, activity, or technology that (A) reduces or avoids greenhouse gas emissions and other forms of air pollution in partnership with, and by leveraging investment from, the private sector; or (B) assists

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 15 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 21 of 694

5G - 84094001 - 0    Page 14

communities in the efforts of those communities to reduce or avoid greenhouse gas emissions and other forms of air pollution. For this Assistance Agreement, Qualified Project means any project, activity or technology meeting all six requirements listed below at the time that Financial Assistance is provided to the project, activity, or technology:

- The project, activity, or technology would reduce or avoid Greenhouse Gas Emissions, consistent with the climate goals of the United States to reduce Greenhouse Gas Emissions 50-52 percent below 2005 levels in 2030, reach 50 percent zero-emission vehicles share of all new passenger cars and light trucks sold in 2030, achieve a carbon pollution-free electricity sector by 2035, and achieve net-zero emissions by no later than 2050. The project, activity, or technology may reduce or avoid such emissions through its own performance or through assisting communities in their efforts to deploy projects, activities, or technologies that reduce or avoid such emissions.

- The project, activity, or technology would reduce or avoid emissions of other Air Pollutants. The project, activity, or technology may reduce or avoid such emissions through its own performance or through assisting communities in their efforts to deploy projects, activities, or technologies that reduce or avoid such emissions.

- The project, activity, or technology would deliver additional benefits (i.e., in addition to primarily reducing or avoiding emissions of greenhouse gases and other Air Pollutants) to communities within one or more of the following seven categories: climate change; clean energy and energy efficiency; clean transportation; affordable and sustainable housing; training and workforce development; remediation and reduction of legacy pollution; and development of critical clean water infrastructure.

- The project, activity, or technology may not have otherwise been financed.

- The project, activity, or technology would mobilize private capital.

- The project, activity, or technology would support only commercial technologies, defined as technologies that have been deployed for commercial purposes at least three times for a period of at least five years each in the United States for the same general purpose as the project, activity, or technology.

**Senior Management:** Senior Management means the chief executive officer, chief risk officer, general counsel, chief compliance officer, chief investment officer, chief reporting officer, and chief financial officer (or equivalent positions).

**Subaward:** 2 CFR 200.1 defines a Subaward as "an award provided by a pass-through entity to a Subrecipient for the Subrecipient to carry out part of a Federal award received by the pass-through entity." A Subgrant refers to a Subaward in the form of a grant.

**Subrecipient:** Consistent with 2 CFR 200.1, Subrecipient means "an entity that receives a Subaward from a pass-through entity to carry out part of a Federal award but does not include an entity that is a Program Beneficiary of such an award." A Subrecipient is distinct from a Program Beneficiary, which is referenced in 2 CFR 1500.1. In this program, there are three main types of Subrecipients: (1) a Subrecipient that receives a Subgrant that will be used, either in whole or in part, to provide Financial Assistance to Qualified Projects, or a "Financial Assistance Subrecipient"; (2) a Subrecipient that receives a Subgrant that will be used exclusively for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities, or a "Technical Assistance Subrecipient"; and (3) a Subrecipient that receives Financial Assistance in the form of a Subaward, with the Subrecipient then using the Subaward to provide Financial Assistance to Qualified Projects, or a "Financial Intermediary Subrecipient". In

5G - 84094001 - 0     Page 15

accordance with 2 CFR 200.332, each Subrecipient is accountable to the Recipient for proper use of EPA funding. Note that a financial transaction is a Subaward to a Financial Intermediary Subrecipient if the following two characteristics are true: (i) the financial transaction provides an award by a pass-through entity to a Subrecipient through a form of *Federal financial assistance*, other than a grant, and (ii) the proceeds of the award are used directly as Financial Assistance to Qualified Projects, carrying out part of a Federal award received by the pass-through entity.

The EPA Subaward Policy applies to Subgrants made to Financial Assistance Subrecipients and Technical Assistance Subrecipients, including but not limited to Named Subrecipients. However, the EPA Subaward Policy does not apply to Subawards made to Financial Intermediary Subrecipients.

## II. NATIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the Recipient agrees to the following four requirements of performance reporting: (1) reports, (2) transaction-level and project-level data, (3) organizational disclosures, and (4) ongoing disclosures. These performance reporting requirements "flow-down" as needed to enable the Recipient to comply with the requirements described in this term and condition. The Recipient must ensure that these reports cover its own grant-related activities, and where applicable to a certain performance report or element of a performance report, the grant-related activities of its Subrecipients, Contractors, and/or Program Beneficiaries. To comply with these performance reporting requirements, the Recipient agrees to use information collection instruments authorized by GGRF Accomplishment Reporting (███████████████████████████████████ ███████████ once such instruments are authorized; to the extent that information is not available for transactions that were closed prior to authorization of these instruments, the Recipient will not be out of compliance with the performance reporting requirements.

The Recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit performance reporting electronically to the EPA Project Officer. To the extent it is known, or should have been known, by the chief executive officer (or equivalent) and chief reporting officer (or equivalent) that the reporting is not compliant with the terms and conditions, or demonstrates material noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission. Should the chief executive officer (or equivalent) and chief reporting officer (or equivalent) signing the submission knowingly and willfully make any material false statement, they may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) prior to submission to EPA. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient.

5G - 84094001 - 0   Page 16

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344.

Where applicable, the intervals for reporting are authorized by 2 CFR 200.329(c)(1), as more frequent reporting is necessary for the effective monitoring of the Federal award and could significantly affect program outcomes.

## 1. Reports

### *Semi-Annual Report*

The Recipient agrees to submit semi-annual reports covering six months of the calendar year in accordance with information collection instruments approved through GGRF Accomplishment Reporting ███████████████████████████████████. A single semi-annual report must be submitted to cover grant-related activities of the Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the semi-annual report.

The Recipient agrees to submit semi-annual reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The first semi-annual reporting period ends on December 31 and covers all activities beginning on the first day of the Period of Performance.

### *Annual Report*

The Recipient agrees to submit annual reports that contain detailed narratives describing program performance over the Recipient's fiscal year, supported with qualitative discussions and quantitative metrics. A single annual report must be submitted to cover grant-related activities of the Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the annual report.

The Recipient must include the following broad, non-exhaustive elements in its annual reports:

- Progress towards objectives on key performance metrics over the reporting period,
- Summary of key activities completed in the reporting period, including case studies across different types of Financial Assistance to Qualified Projects,
- Geographic coverage of Financial Assistance to Qualified Projects made in the reporting period,
- Descriptions and examples of actions taken to meaningfully involve the communities the program serves in program design and operations,

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 18 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 24 of 694

5G - 84094001 - 0    Page 17

- Case studies of different types of Market-Building and/or Predevelopment Activities, and
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved in the next reporting period.

These reports must be submitted ready to be published on the EPA website for public consumption and must not include any material that the Recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI. Should EPA identify PII or claims of CBI in reports, the EPA Project Officer will require that the Recipient re-submit the report without the PII or claims of CBI so that it can be published without redaction.

The Recipient agrees to submit **annual reports** electronically to the EPA Project Officer within 90 calendar days after the Recipient's fiscal year end date. The first annual report is due 90 calendar days after the Recipient's fiscal year that ends in 2025.

*Final Report*

The Recipient agrees to submit a final report containing two documents. First, the recipient must submit a report containing all of the elements described above for the annual report, covering the entire Period of Performance and overall assessment of its program performance and implementation of its EPA-approved workplan. Second, the recipient must submit its investment strategy for the Closeout Period to detail its use of Post-Closeout Program Income over the Closeout Period. EPA intends to make the investment strategy, either in whole or in part, available to the public through disclosing copies of the investment strategy as submitted or using the content of the investment strategy. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient.

The two documents for the final report must be submitted to cover the grant-related activities of the Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the final report.

The Recipient agrees to submit the two documents for the final report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the Period of Performance.

## 2. Transaction-Level and Project-Level Data

The Recipient agrees to submit quarterly transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting . The data submission must cover the grant-related activities of the Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the data submission.

The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the quarterly reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request

5G - 84094001 - 0    Page 18

may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the quarterly reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The four quarterly reporting periods for data submission are as follows: July 1 to September 30; October 1 to December 31; January 1 to March 31; and April 1 to June 30. The data submissions must cover transactions originated in the preceding quarter. For the quarterly reporting period that ends September 30, the Recipient must provide information on transactions originated from April 1 to June 30 rather than from July 1 to September 30. For the quarterly reporting period that ends December 31, the Recipient must provide information on transactions originated from July 1 to September 30 rather than October 1 to December 31. For the quarterly reporting period that ends March 31, the Recipient must provide information on transactions originated from October 1 to December 31 rather than January 1 to March 31. For the quarterly reporting period that ends June 30, the Recipient must provide information on transactions originated from January 1 to March 31 rather than April 1 to June 30. The first transaction-level and project-level data submission is due 30 calendar days after December 31, 2024 and must cover all transactions originated from the beginning of the Performance Period through September 30, 2024.

### 3. Organizational Disclosures

The Recipient agrees to submit annual organizational disclosures electronically to the EPA Project Officer within 30 calendar days after submission of its Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. The organizational disclosures must cover the Recipient's fiscal year and be submitted in accordance with information collection instruments approved through GGRF Accomplishment Reporting ██████████████████████████ Additionally, the Recipient agrees to submit such organizational disclosures for each Financial Assistance Subrecipient that has received in excess of $10,000,000 in NCIF subgrants to provide Financial Assistance to Qualified Projects under the National Clean Investment Fund (to be delivered within 30 calendar days after submission of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System). The requirement for organizational disclosures is not applicable for any fiscal year in which the reporting entity did not meet the requirements of 2 CFR Subpart F—Audit Requirements. The first Organizational Disclosures are due in 2025.

### 4. Ongoing Disclosures

In addition to other ongoing disclosure obligations within the regulations and terms and conditions of this Award Agreement, the Recipient agrees to notify the EPA Project Officer of the following events in accordance with 2 CFR 200.329(e):

> 1. Changes to the Recipient's independent certified public accounting firm;

> 2. Non-reliance by the Recipient or its independent auditor on previously issued financial statements or a related audit report or completed interim audit review;

> 3. Changes in fiscal year end of the Recipient;

> 4. Material impairments to the Recipient's assets;

> 5. Intention to file bankruptcy petition or enter into receivership;

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 20 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 26 of 694

5G - 84094001 - 0    Page 19

6. Submission of annual Form 990 to the IRS, with provision of copy to EPA Project Officer upon request (only if submission of the Form 990 is otherwise required).

Additionally, the Recipient agrees to submit such ongoing disclosures for each Financial Assistance Subrecipient that has received in excess of $10,000,000 to provide Financial Assistance to Qualified Projects under the National Clean Investment Fund. The Recipient agrees to submit ongoing disclosures electronically to the EPA Project Officer within 15 calendar days of the event.

## B. Cybersecurity Condition

(a) The Recipient agrees that when collecting and managing environmental data under this Assistance Agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward Agreements and, during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(d), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process.  A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA

5G - 84094001 - 0    Page 20

Project Officer for this award.

## D. Signage Required

### 1. Signage Requirements

a. Investing in America Emblem: The Recipient will ensure that a sign is placed at construction sites supported in whole or in part by this award displaying the official Investing in America emblem and must identify the project as a "project funded by President Biden's Inflation Reduction Act," where the Financial Assistance used to fund the construction project exceeds $250,000. The Recipient will also make optional signage available for projects where the construction is less than $250,000. The sign must be placed at construction sites in an easily visible location that can be directly linked to the work taking place and must be maintained in good condition throughout the construction period. The Recipient will ensure compliance with the guidelines and design specifications provided by EPA for using the official Investing in America emblem available at: https://www.epa.gov/invest/investing-america-signage.

b. Procuring Signs: Consistent with section 6002 of RCRA, 42 USC 6962, and 2 CFR 200.323, the Recipient is encouraged to use recycled or recovered materials when procuring signs. Signage costs are considered an allowable cost under this Assistance Agreement provided that the costs associated with signage are reasonable. Additionally, to increase public awareness of projects serving communities where English is not the predominant language, the Recipient is encouraged to translate the language on signs (excluding the official Investing in America emblem or EPA logo or seal) into the appropriate non-English language(s). The costs of such translation are allowable, provided the costs are reasonable.

### 2. Public or Media Events

For public or media events that are planned more than 15 calendar days in advance, the Recipient agrees to notify the EPA Project Officer of public or media events it has organized publicizing the accomplishment of significant activities related to execution of the EPA-approved workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice.

## E. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards.  Information on these standards may be found at https://www.fgdc.gov/.

## F. Leveraging and Fund Raising

### 1. Leveraging

The Recipient agrees to make commercially reasonable efforts to provide the proposed leveraged funding that is described in its EPA-approved workplan. If the proposed leveraging does not substantially materialize during the Period of Performance, and the Recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future grant applications from the Recipient. In addition, if the proposed leveraging does not substantially materialize during the Period of Performance and the Recipient does not provide a satisfactory explanation, then EPA may reconsider the legitimacy of the award; if EPA determines that the Recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the EPA-approved workplan, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

JA531

5G - 84094001 - 0    Page 21

## 2. Fund Raising

2 CFR 200.442 provides coverage on allowable fund-raising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fund raising costs are an allowable cost and may include costs that are reasonable and necessary for raising capital from private investors to provide Financial Assistance to Qualified Projects.

Allowable fund-raising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private investors. Funds a Recipient raises for its own use with costs borne by an EPA Financial Assistance Agreement are considered Program Income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fund raising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fund-raising costs charged to the award will be treated as Program Income.

## G. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving Environmental Information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving Environmental Information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure sub-award recipients develop and implement Quality Assurance (QA) planning documents in accordance with this term and condition; and/or ensure sub-award recipients implement all applicable approved QA planning documents. EPA will not approve any QA planning documents developed by a Subrecipient; the Recipient is responsible for reviewing and approving its Subrecipient QA planning document(s), if required based on the Subrecipient's Environmental Information Operations.

## 1. Quality Management Plan (QMP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the recipient must: (i) develop a QMP, (ii) prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard and submit the document for EPA review, and (iii) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved and current QMP and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

The Recipient must submit the QMP within 90 calendar days after grant award, unless the Recipient requests a one-time extension that is granted by the QAM.

The Recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the Recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a

copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QAPP, (ii) prepare the QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard, (iii) submit the document for EPA review, and (iv) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s) and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer (PO) in writing if the previously EPA-approved QAPP is acceptable for this agreement.

The Recipient must submit the QAPP within 90 calendar days after grant award, unless the Recipient requests a one-time extension that is granted by the QAM.

The Recipient must notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

The recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted when changes occur.

### For Reference:

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

## H. Real Property

In accordance with 2 CFR 200.311, title to Real Property acquired or improved under this agreement will vest upon acquisition by the Recipient, including but not limited to title to Real Property acquired through exercise of a remedy for default of a Financial Assistance arrangement. This Real Property must be used for the originally authorized purpose as long as needed for that purpose, during which time the Recipient must not dispose of or encumber its title or other interests. The Real Property Programmatic Term and Condition flows down to Subrecipients but not to Program Beneficiaries or Contractors that receive Financial Assistance to Qualified Projects, which may acquire title to Real Property after receiving Financial Assistance to Qualified Projects.

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 24 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 30 of 694

5G - 84094001 - 0    Page 23

The Recipient must obtain prior approval from the EPA Award Official for the acquisition of Real Property. Note that the Recipient may meet this requirement by specifying the types of acquisitions of Real Property it plans to carry out (including in cases where the Recipient would acquire title to Real Property through exercise of a remedy for default) in its EPA-approved workplan.

<u>Disposition</u>

If the Recipient disposes of the Real Property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

Otherwise, when Real Property is no longer needed for the originally authorized purpose, the Recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where Recipient is disposing of Real Property acquired or improved with a Federal award and acquiring replacement Real Property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the Recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The Recipient is entitled to be paid an amount calculated by applying the Recipient's percentage of participation in the purchase of the Real Property (and cost of any improvements) to the current fair market value of the property.

<u>Recordation</u>

As authorized by 2 CFR 200.316, EPA requires that Recipients who use EPA funding to purchase and improve Real Property through an EPA funded construction project record a lien or similar notice in the Real Property records for the jurisdiction in which the Real Property is located, which indicates that the Real Property has been acquired and improved with federal funding and that use and disposition conditions apply to the Real Property.

## I. Program Income

In accordance with Clean Air Act Section 134(b)(1)(C) as well as 2 CFR 200.307(e)(2) and 2 CFR 1500.8 (b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

Case 1:25-cv-00698-TSC   Document 49-2   Filed 03/26/25   Page 25 of 192
USCA Case #25-5122   Document #2114423   Filed: 05/05/2025   Page 31 of 694

5G - 84094001 - 0    Page 24

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the EPA-approved workplan.

## J. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the Recipient or Subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the Recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## III. ADDITIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Eligible Recipient

**The Recipient agrees to maintain its status as an Eligible Recipient, which includes:**

a. Meeting the definition of *Nonprofit organization* set forth in 2 CFR 200.1;

b. Having an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"

c. Not receiving any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);

d. Being funded by public or charitable contributions; and

e. Having the legal authority to invest in or finance projects.

### B. Workplan and Budget

The Recipient agrees to execute the EPA-approved workplan. This document, once approved by the EPA, will reflect an agreement between the Parties and will be incorporated into and be a part of the agreement between the Recipient and the EPA.

5G - 84094001 - 0    Page 25

The Recipient agrees to conduct an annual review of the EPA-approved workplan within 90 calendar days of June 30 of each calendar year. If material changes are made during the annual review or in between annual reviews, the Recipient agrees to submit the updated workplan to the EPA Project Officer.

The Recipient also agrees to conduct an annual review of the EPA-approved detailed budget table within 90 calendar days of June 30 of each calendar year. If material changes are made during the annual review or in between annual reviews, the Recipient agrees to submit the updated detailed budget table to the EPA Project Officer. Such submissions are not subject to prior approval unless otherwise required by the regulations or the terms and conditions of the Award Agreement.

## C. Recipient Organizational Plan

The Recipient agrees to execute the workplan in accordance with the documents listed below, as submitted to EPA through Grants.gov for EPA-R-HQ-NCIF-23 or provided to EPA after the application submission deadline.

1. Organizational Plan, pursuant to *Section IV.C: Content of Application Submission* of the Notice of Funding Opportunity;

2. Legal Entity Structure Diagram, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity; and

3. Organizational and Governing Documents, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity.

The Recipient agrees to maintain its incorporation in the United States, as reflected in the above documents.

The Recipient agrees to conduct an annual review of the documents within 90 calendar days of June 30 of each calendar year. If material changes are made during the annual review or in between annual reviews, the Recipient agrees to submit the updated documents to the EPA Project Officer. Such submissions are not subject to prior approval unless otherwise required by the regulations or the terms and conditions of the Award Agreement.

## D. Recipient Policies and Procedures

The Recipient agrees to execute the workplan in accordance with the documents listed below (or other documents submitted in lieu of the documents listed below), as submitted to EPA through Grants.gov for EPA-R-HQ-NCIF-23 or provided to EPA after the application submission deadline.

1. Legal and Compliance Risk Management Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

2. Financial Risk Management Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

3. Board Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

JA536

5G - 84094001 - 0    Page 26

4. Management Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding
Opportunity;

5. Consumer Protection Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

6. Equity Policies and Practices, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity; and

7. Conflict of Interest Mitigation Plan, which include all documents submitted upon EPA's request regarding measures that will be taken to eliminate, neutralize, mitigate or otherwise resolve conflicts of interest.

8. Documentation of Personnel and Fringe Benefit Charges, which includes all documents submitted upon EPA's request to document how personnel and fringe benefits will be charged against the grant award in accordance with 2 CFR 200.430 *Compensation—personal services* and 2 CFR 200.431 *Compensation—fringe benefits*. Notwithstanding the content of the Recipient's EPA-approved budget, the Recipient is not authorized to charge the grant award for personnel and fringe benefits against employees without using the W-2 as the definitive definition of "employee" until the Documentation of Personnel and Fringe Benefit Charges has been reviewed and approved by the EPA, as communicated by the EPA Project Officer.

The Recipient agrees to conduct an annual review of the documents within 90 calendar days of June 30 of each calendar year. If material changes are made during the annual review or in between annual reviews, the Recipient agrees to submit the updated documents to the EPA Project Officer. With the exception of the Documentation of Personnel and Fringe Benefit Charges, where changes will be subject to prior approval, such submissions are not subject to prior approval unless otherwise required by the regulations or the terms and conditions of the Award Agreement.

## E. Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Financial Assistance to Qualified Projects; Predevelopment Activities; Market-Building Activities; and Program Administration Activities. The Recipient must use awards funds exclusively for allowable activities within the ten EPA regions, with the exception of the Freely Associated States. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

The Recipient agrees to not use the award for the following unallowable activities: (a) Financial Assistance to Qualified Projects in the form of Subgrants; (b) Subgrants for the purposes of providing Financial Assistance to Qualified Projects (other than Subgrants from the Recipient to first-tier Subrecipients); and (c) activities that support deployment of projects that do not meet the definition of Qualified Projects. The Recipient also agrees not to use the award for activities associated with defending against, settling, or satisfying a claim by a litigant, except when (1) the claim stems from the Recipient's implementation of its EPA-approved workplan in compliance with the terms and conditions of the Award Agreement and (2) the Recipient has obtained prior written approval from the EPA Award Official.

## F. Foreign Entity of Concern

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 28 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 34 of 694

5G - 84094001 - 0    Page 27

As part of carrying out this award, the Recipient agrees to ensure that entities the Recipient contracts with, the Recipient makes Subawards to, or that receive funds as Program Beneficiaries at any tier of funding under this grant agreement are not—

    (A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

    (B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

    (C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## G. LIDAC Expenditure Requirement

The Recipient agrees to ensure that a minimum of 40% of the award is used for the purposes of providing Financial Assistance in Low-Income and Disadvantaged Communities, with compliance maintained over each annual reporting period (i.e., from July 1 to June 30). Funds used for the purposes of providing Financial Assistance may include Financial Assistance to Qualified Projects; Predevelopment Activities; Market-Building Activities; and Program Administration Activities. This requirement applies to the entire award provided to the Recipient but does not "flow down" to each Subrecipient.

## H. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide Financial Assistance to Qualified Projects that may generate Program Income as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such Financial Assistance may include Subawards, Participant Support Costs, and/or Acquisitions of Intangible Property. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the Recipient's Subawards from the capitalization of a revolving loan fund.

EPA does not consider the remaining portion of the award as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). As such, all Subgrants made by the Recipient are subject to the EPA Subaward Policy.

## I. Subawards

### Subawards to Technical Assistance Subrecipients

The Establishing and Managing Subawards General Term and Conditions applies to Technical Assistance Subrecipients.

### Subawards to Financial Intermediary Subrecipients

The following requirements apply when the Recipient provides a Subaward to a Financial Intermediary Subrecipient. These requirements apply to the Recipient and Subrecipient <u>in lieu</u> of those specified in the

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 29 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 35 of 694

5G - 84094001 - 0    Page 28

Establishing and Managing Subawards General Term and Condition, as the EPA Subaward Policy does not apply to Financial Intermediary Subrecipients.

1. The Recipient must establish and follow a system that ensures all Subawards to Financial Intermediary Subrecipients are in writing and contain all of the elements required by 2 CFR 200.332(a), with the exception of the indirect cost provision of 2 CFR 200.332(a)(4) (which does not apply to loans). EPA has developed an optional template for Subaward Agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such Subaward Agreements with Financial Intermediary Subrecipients.

2. The Financial Intermediary Subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all Subawards that requires Financial Intermediary Subrecipients to comply with these requirements. No other provisions of the Uniform Grant Guidance, including the Procurement Standards, apply directly to the Subrecipient.

3. Prior to making the Subaward, the Recipient must ensure that the Financial Intermediary Subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(a)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

Subawards to Financial Assistance Subrecipients

The following requirements apply when the Recipient provides a Subaward to a Financial Assistance Subrecipient. These requirements apply to the Recipient and Subrecipient in addition to those specified in the Establishing and Managing Subawards General Term and Condition.

1. The Recipient must obtain written approval from the EPA Award Official prior to providing a Subgrant to a Financial Assistance Subrecipient that would exceed $10,000,000 cumulatively in Financial Assistance Subawards under the National Clean Investment Fund and Capitalization Funding under the Clean Communities Investment Accelerator.

2. Prior to providing a Subgrant not named on the application to a Financial Assistance Subrecipient, the Recipient must obtain disclosure from the potential Subgrantee regarding award funds that it has sought and/or received under the National Clean Investment and Clean Communities Investment Accelerator programs.

## J. Participant Support Costs

The Recipient may provide Financial Assistance to Qualified Projects in the form of Participant Support Costs. In addition, the Recipient may provide Participant Support Costs for other purposes, including Predevelopment Activities, Market-Building Activities, and Program Administration Activities, to the extent such purposes are authorized under the Award Agreement.

The Recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on Participant Support Costs, in addition to other requirements included in the terms and conditions of this Award Agreement:

Case 1:25-cv-00698-TSC   Document 49-2   Filed 03/26/25   Page 30 of 192
USCA Case #25-5122   Document #2114423   Filed: 05/05/2025   Page 36 of 694

5G - 84094001 - 0   Page 29

1. The Recipient and Program Beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as Participant Support Costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the Recipient and Program Beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates, and other participant support cost payments. However, EPA does not provide advice on tax issues relating to these payments.

2. Participant support cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The Recipient, therefore, may not make participant support cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that Subrecipients adhere to this requirement as well. The Recipient is responsible for checking that Program Beneficiaries (i.e., entities receiving Participant Support Costs) are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the Program Beneficiaries.

The Recipient agrees to provide written guidelines for Participant Support Costs that must be approved by the EPA prior to making payments to Program Beneficiaries, unless already described in the Recipient's EPA-approved workplan. These guidelines must: (a) describe the activities that will be supported by the Participant Support Costs; (b) specify the range of funding to be provided through the Participant Support Costs; (c) identify which types of entities will have title to equipment (if any) purchased with the funds; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the participant support cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

## K. Acquisitions of Intangible Property

## 2 CFR 200 Procurement Standards

The Recipient may provide Financial Assistance to Qualified Projects in the form of Acquisitions of Intangible Property. The Recipient agrees to acquire Intangible Property in compliance with the conflict of interest and competition requirements described in the 2 CFR Part 200 Procurement Standards. This includes but is not limited to the requirements at 2 CFR 200.318 to:

- Have and use documented procurement procedures to govern acquisitions of Intangible Property;
- Maintain oversight to ensure that contractors perform in accordance with the terms, conditions, and specifications of their contracts;
- Maintain written standards of conduct covering conflicts of interest and governing the actions of employees engaged in the selection, award, and administration of contracts as well as maintain written standards of conduct covering organizational conflicts of interest;
- Prioritize entering into inter-entity agreements where appropriate for procurement or use of common or shared goods and services as the Recipient seeks to mobilize financing and private capital;
- Award contracts only to responsible contractors possessing the ability to perform successfully under the terms and conditions of the proposed procurement; and
- Maintain records sufficient to detail the history of procurement.

5G - 84094001 - 0    Page 30

## Disposition

If the Recipient disposes of the Intangible Property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

## Recordation

The Recipient agrees to record liens or other appropriate notices of record to indicate that Intangible Property has been acquired with Federal funding and that use and disposition conditions apply to the Intangible Property, in cases where Financial Assistance to Qualified Projects is in the form of an Acquisition of Intangible Property. As provided in 2 CFR 200.1: "…loans, notes and other debt instruments, lease agreements, stock and other instruments of property ownership (whether the property is tangible or intangible)" are *Intangible Property* for the purposes of the restrictions described at 2 CFR 200.315(a). "Other appropriate notices of record" is not limited to filing Uniform Commercial Code instruments and may also include a notice of record in the legally-binding transaction documents.

Additional guidance is available at [Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements](#).

## L. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this Award Agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" and "Residential." The Secretary of Labor's wage determinations are available at [https://sam.gov/content/wage-determinations](https://sam.gov/content/wage-determinations).

Therefore, the Recipient must ensure that any construction work financed in whole or in part with such Financial Assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis-Bacon and Related Act requirements and the requirements of these Terms and Conditions. The Recipient must ensure that these requirements apply to all construction projects assisted by such Financial Assistance.

If the Recipient encounters a situation that presents uncertainties regarding DBRA applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with a Subrecipient, Program Beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this Term and Condition or the Davis-Bacon and

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 32 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 38 of 694

5G - 84094001 - 0    Page 31

Related Act, the Recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Note, the use of the term project in this term and condition is distinct from the use of the term project within the definition of Qualified Project under Clean Air Act Section 134(c)(3), which is broader and includes "any project, activity, or technology." Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed by a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

## B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

## C. Recipient Responsibilities When Entering Into and Managing Contracts:

### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

### b. After Award of Contract:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

## D. Recipient Responsibilities When Establishing and Managing Additional Subawards:

**a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all Subawards under this grant: "By accepting this award, the EPA Subrecipient acknowledges

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 33 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 39 of 694

5G - 84094001 - 0    Page 32

and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of Subrecipients and must ensure Subrecipients comply with the requirements in 29 CFR 5.6.

**c. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of Subrecipients and must ensure that Subrecipients comply with the requirements in subsection E, below.

## E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program Beneficiaries

Any Financial Assistance provided in the form of a participant support cost to a Program Beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

### a. Solicitation and Contract Requirements:

#### i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:

"[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

### b. After Award of Contract:

#### i. Approve and Submit Requests for Additional Wages Rates: Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

5G - 84094001 - 0    Page 33

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

## 2. Mega Construction Project Program

The Recipient must work with the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) to identify projects that are within the scope of OFCCP's Mega Construction Project Program, which includes federally-assisted projects with a total project value above $35,000,000. If those projects are selected from a wide range of federally-assisted projects over which OFCCP has jurisdiction, those projects will be required to participate and partner with OFCCP in the OFCCP Mega Construction Projects program.

## 3. Compliance with Federal Statutes and Regulations

The Recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with Subrecipients, contractors, and other partners (e.g., by including such provisions in contractual agreements). This includes but is not limited to applicable health and safety regulations as administered by the Occupational Safety and Health Administration.

## 4. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the Recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## 5. Labor and Equitable Workforce Development Implementation Plan

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), by December 31, 2024,the Recipient must submit a Labor and Equitable Workforce Development Implementation Plan to the EPA Project Officer. The Implementation Plan should articulate policies, practices, and procedures adopted by the Recipient to maximize high-quality jobs and workforce development outcomes on projects assisted with the award. Examples of how this can be demonstrated include, but are not limited to:

- Mechanisms for promoting job quality and evaluating labor standards on projects being considered for and/or receiving Financial Assistance;
- Plans to support workforce development as part of Market-Building Activities;

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 35 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 41 of 694

5G - 84094001 - 0    Page 34

- Current and planned partnerships with labor and workforce development organizations, including the purpose of those partnerships;

- Mechanisms for maximizing training and employment opportunities for participants in Registered Apprenticeship Programs on projects, including apprenticeship utilization targets, as applicable;

- Mechanisms for creating high-quality job training and employment opportunities available to residents of low-income and disadvantaged communities through projects and other program activities; and

- Processes for promoting Project Labor Agreements on construction projects above $25,000,000, as appropriate, in alignment with Executive Order 14063 (Use of Project Labor Agreements for Federal Construction Projects) and Executive Order 13502 (Use of Project Labor Agreements for Federal Construction Projects), as well as other types of binding agreements that promote strong workforce outcomes, such as Community Workforce Agreements and Community Benefits Agreements.

The Recipient may use or reference materials already submitted to EPA as part of its submission of the Implementation Plan, where relevant.

Note that EPA may make the information from this plan available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient.

## M. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that for any activity related to the construction, alteration, maintenance, or repair of infrastructure, "none of the funds made available for a Federal Financial Assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The Recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America requirements that all Recipients of EPA Financial Assistance awards must comply with.

If the Recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## N. Governance Requirements

The Recipient agrees to comply with the following governance requirements starting December 31, 2024. The governance requirements "flow-down" to Financial Assistance Subrecipients that have received in excess of $10,000,000 in NCIF subgrants but not to other subrecipients. The governance requirements

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 36 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 42 of 694

5G - 84094001 - 0    Page 35

are waived for (i) any entity that has been determined by the U.S. Treasury's CDFI Fund to meet the CDFI certification requirements set forth in 12 CFR 1805.201 and (ii) any entity whose specific governance structure is set forth in State, Tribal, or local law.

The Recipient (or Subrecipient) may meet all or some of the governance requirements through the parent entity, provided the Recipient (or Subrecipient) is subject to the governance of the parent entity and the Recipient (or Subrecipient) is wholly-controlled by the parent entity. Similarly, the governance requirements may be waived for the Recipient (or Subrecipient) through the parent entity meeting the CDFI certification requirements set forth in 12 CFR 1805.201, provided the Recipient (or Subrecipient) is wholly-controlled by the parent entity.

## 1. Board Size and Composition

The Recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the Recipient's EPA-approved workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The Recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from Low-Income and Disadvantaged Communities).

## 2. Board Independence

The Recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

## 3. Board Committees

The Recipient agrees to have the following board-level committees to oversee and monitor management, with each committee staffed by members qualified to execute the committee's objectives. While the Recipient need not adhere to the exact naming convention or structure in this term and condition, each of the responsibilities must be covered by board-level committees at all times during the Period of Performance; for the avoidance of doubt, one committee may perform the responsibilities of one or more of the committees specified below.

1. An investment or credit committee to oversee and approve investment or credit decisions;

2. A risk management committee to oversee the formulation and operationalization of the risk management framework;

3. An audit committee to oversee the integrity of reporting and internal controls and the performance of audit functions, with a majority independent members on such committee;

4. A nomination/governance committee to oversee nomination and succession of board and senior management, with a majority independent members on such committee; and

5. A compensation committee to oversee board as well as senior management and staff compensation,

5G - 84094001 - 0    Page 36

with a majority independent members on such committee.

Further, the Recipient agrees to act in good faith to ensure each committee obtains information from management, auditors, or other third-parties necessary to discharge their duties.

## 4. Board Policies and Procedures

The Recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The Recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of Subawards, participant support cost payments, Acquisitions of Intangible Property to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

## O. Consumer Protection Requirements

The Recipient agrees to carry out the following consumer protection requirements to the extent that the Recipient directly interacts, transacts, or contracts with consumers in the provision of Financial Assistance to Qualified Projects:

   1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

   2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

   3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

   4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

   5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The Recipient agrees to monitor and oversee Subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract

JA547

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 38 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 44 of 694

5G - 84094001 - 0    Page 37

with consumers, in accordance with 2 CFR 200.332(d) and 2 CFR 200.318.

## P. Financial Risk Management Requirements

### 1. Cash Management Requirements

The Recipient must deposit and maintain advance payments of Federal funds exclusively in insured accounts, in accordance with 2 CFR 200.305(b)(7)(ii). As provided in 2 CFR 200.1, an advance payment is "a payment that a Federal awarding agency or pass-through entity makes by any appropriate payment mechanism, including a predetermined payment schedule, before the non-Federal entity disburses the funds for program purposes;" a Recipient drawing down funds from ASAP prior to disbursement for actual and allowable project costs constitutes an advance payment. Interest income earned on the advance payment from EPA to the Recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The Recipient is authorized to maintain Program Income in two types of accounts:

1. Insured accounts, including in amounts in excess of the federal insurance limit of $250,000.

2. Accounts where such income is used to purchase (i) U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days and that such instruments are held-to-maturity if purchased directly, or (ii) short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions.

Interest income and other returns earned on funds that have already been disbursed is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9).

### 2. Financial Health Metrics

The Recipient agrees to report the following financial health metrics at the entity-level on an annual basis in accordance with its fiscal year as well as on behalf of each Financial Assistance Subrecipient that receives in excess of $10,000,000 in NCIF subgrants. The metrics are due to the EPA Project Officer within 30 calendar days after submission of the reporting entity's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System and may be submitted through the Organizational Disclosures form. The requirement for submission of financial health metrics is not applicable for any fiscal year in which the reporting entity did not meet the requirements of 2 CFR Subpart F—Audit Requirements. The first financial health metrics are due in 2025.

1. Net Asset Ratio: The net asset ratio is defined as net assets divided by total assets.

2. Current Ratio: The current ratio is defined as current assets divided by current liabilities, where current assets is equal to the value of all assets that are reasonably expected to be converted into cash within the coming 12-month period in the normal course of business and current liabilities is equal to the total value of all debts or obligations that must be paid in the coming 12-month period.

5G - 84094001 - 0    Page 38

3. Delinquency Rate: The delinquency rate is defined as the value of loans outstanding that are 90+ calendar days delinquent divided by the value of loans outstanding, where loans 90+ calendar days delinquent includes those with outstanding balances 90+ calendar days overdue and still accruing interest as well as those in nonaccrual status.

4. Net Charge-Off Rate: The net charge-off rate is defined as the value of loans charged-off over the past fiscal year, minus the value of loan recoveries over the past fiscal year, divided by the value of loans outstanding.

5. Concentration: The concentration of the portfolio, as demonstrated by calculating and reporting on recipient-level exposure, defined as on-balance sheet exposures to a single consolidated entity over all on-balance sheet exposures, for top ten highest exposures.

Note, the Delinquency Rate and Net Charge-Off Rate may exclude the value of loans which include an element of forgiveness, if and only if such forgiveness was established in the terms governing the financial product at origination.

The EPA Project Officer will consider Recipient and, where applicable, Subrecipient performance against these financial health metrics only to the extent by which they materially impair the Recipient's ability to execute the EPA-approved workplan when assessing whether the Recipient is making sufficient progress in implementing the EPA-approved workplan under this Assistance Agreement, as specified in the Sufficient Progress General Term and Condition.

### 3. Climate-Related Financial Risks

The Recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The Recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.

### 4. Additional Requirements

The Recipient agrees to not subordinate EPA's interest in grant funds that have not yet been used for program purposes in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law. Once a Recipient uses grant funds for program purposes and incurs a financial obligation, as defined under 2 CFR 200.339, EPA will only seek claims on those funds in the event that they were used for costs that do not comply with the terms and conditions of the Award Agreement or if there is adequate evidence of waste, fraud, or abuse, prompting adverse action by EPA per 2 CFR 200.339. This does not prohibit the use of subordinated debt as a form of Financial Assistance.

The Recipient agrees to provide Financial Assistance Subrecipients with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(e).

### Q. Historic Preservation

JA549

5G - 84094001 - 0    Page 39

## National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The Recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties can include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The Recipient should work with their Project Officer to ensure that Subrecipients are available to work with EPA on any required consultation process with the State Historic Preservation Office (SHPO) or Tribal Historic Preservation Office (THPO) prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

## Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The Recipient must ensure that Subrecipients performing construction projects are aware of this requirement, and the Recipient must notify EPA if the AHPA is triggered.

## R. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the Recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The Recipient must comply with, and ensure Subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the federal award" provision of 2 CFR 200.403(a). The Recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

5G - 84094001 - 0     Page 40

## S. Remedies for Non-Compliance

The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as provided in 2 CFR 200.343. As specified in 2 CFR 200.343, which will remain in effect throughout the term of this award, costs during suspension or after termination are allowable if (a) the costs result from financial obligations which were properly incurred by the non-Federal entity before the effective date of suspension or termination, are not in anticipation of it, and (b) the costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

The Recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the Recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of Subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the Recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action.

Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing an opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements.

## T. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The Recipient agrees to comply with these clarifications.

### 1. Access to Records

In accordance with 2 CFR 200.337, EPA and the EPA Office of Inspector General (OIG) have the right to access any documents, papers, or other records, including electronic records, of the Recipient and any Subrecipient which are pertinent to this award in order to make audits, examinations, excerpts, and transcripts. This right of access also includes timely and reasonable access to the Recipient and Subrecipient's personnel for the purpose of interview, discussion, and on-site review related to such documents. This right of access shall continue as long as the records are retained.

### 2. Indirect Cost Rate

The Recipient must exclude costs for acquisitions of Intangible Property from any calculations of modified total direct costs (MTDC), as defined in 2 CFR 200.1. Intangible Property is not a "service" and therefore is not included in MTDC. The Recipient should note that Subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive Participant Support Costs cannot charge an indirect cost rate against their participant support cost payments.

Case 1:25-cv-00698-TSC     Document 49-2     Filed 03/26/25     Page 42 of 192
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 48 of 694

5G - 84094001 - 0     Page 41

*MTDC* means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $25,000 of each Subaward (regardless of the Period of Performance of the Subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, Participant Support Costs and the portion of each Subaward in excess of $25,000.

In the event that the Recipient is compensating an affiliated entity for its direct and indirect costs related to use of employees, the Recipient must not charge its indirect cost rate against any of these costs.

## 3. Sufficient Progress

The EPA Project Officer may assess whether the Recipient is making sufficient progress in implementing the EPA-approved workplan under this Assistance Agreement within 90 calendar days of June 30, 2025 as well as within 90 calendar days of June 30 of each year thereafter during the Period of Performance. "Sufficient progress" shall be assessed based on a comparison of the Recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. As noted under the Financial Risk Management Programmatic Term and Condition, the Recipient's financial health, as measured by the required Financial Health Metrics, are also an input in this process. This term and condition "flows down" to Subrecipients, with the Recipient required to assess whether each Subrecipient is making sufficient progress in implementing the workplan under its Subaward Agreement; the Recipient may increase the frequency and scope of the review of sufficient progress of Subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the Recipient has not made sufficient progress in implementing its EPA-approved workplan, the Recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

EPA will not find that the Recipient has failed to make sufficient progress in implementing its EPA-approved workplan based on shifts between types of Financial Assistance and/or Qualified Projects over the Period of Performance (or other shifts in portfolio allocation, such as by region or market segment, over the Period of Performance). If EPA finds the Recipient has failed to achieve sufficient progress on deployment of Financial Assistance to Qualified Projects in general, the Recipient will have an opportunity to implement a corrective action plan pursuant to 2 CFR 200.208.

## 4. Termination

Notwithstanding the General Term and Condition "Termination," EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 applicable to EPA grants as of July 1, 2024, pursuant to 89 FR 55262 (July 3, 2024), when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is materially impaired or there is adequate evidence of waste, fraud, material misrepresentation of eligibility status, or abuse, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination.

5G - 84094001 - 0    Page 42

## U. Period of Performance

The Period of Performance under this Award Agreement will end on the date specified in the Notice of Award. However, the Period of Performance may end prior to the date specified in the Notice of Award if all required work of the Federal award has been completed, in accordance with 2 CFR 200.344. In accordance with 2 CFR 200.344(b), the Recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the Period of Performance. In this context, to "liquidate all financial obligations" means to pay outstanding bills, such as the payment of staff salaries accrued during the Period of Performance but for which the due date falls after the end date of the Period of Performance. To "liquidate all financial obligations" does not mean to liquidate, terminate, or accelerate outstanding obligations related to the provision of Financial Assistance to Qualified Projects at the end of the Period of Performance, which would continue to be subject to the Closeout Agreement.

The Recipient should note that the Recipient will not be considered to have met the requirements for closeout under its award under 2 CFR 200.344 so long as any Subrecipient has not met the requirements for closeout under its subaward under 2 CFR 200.344.

Notwithstanding the Extension of Project/Budget Period Expiration Date General Term and Condition, in accordance with 2 CFR 200.308(e)(2), the Recipient is authorized to initiate a one-time extension of the Period of Performance by up to 12 months without prior EPA approval, provided that the extension complies with the requirements 2 CFR 200.308(e)(2). In accordance with 2 CFR 200.308(e)(2), the Recipient must "notify the Federal awarding agency in writing with the supporting reasons and revised period of performance at least 10 calendar days before the end of the period of performance specified in the Federal award."

## V. Closeout Agreement

As provided at 2 CFR 200.307(f) and 2 CFR 1500.8(d), after the end of the Period of Performance of the Assistance Agreement, the Recipient may keep and use Program Income remaining at the end of the Assistance Agreement and use Post-Closeout Program Income in accordance with this term and condition. The Closeout Agreement goes into effect for this Assistance Agreement the day after the Assistance Agreement Period of Performance ends, unless the Recipient and the EPA Grants Management Officer or Award Official mutually agree on an alternative date.

In accordance with 2 CFR 200.344, EPA will proceed to closeout the Award Agreement and enter the Closeout Period even if the Recipient has not met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition). As provided in 2 CFR 200.344: "If the non-Federal entity fails to complete the requirements, the Federal awarding agency or pass-through entity will proceed to close out the Federal award with the information available." This Closeout Agreement is therefore self-executing.

This term and condition is the entire Closeout Agreement between the EPA and the Recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The Recipient shall comply with the requirements specified below as part of the Closeout Agreement. Definitions within 2 CFR 200.1, including as supplemented through *I. Definitions* of this award agreement, apply identically to how they do under the Period of Performance, unless otherwise noted.

As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to Subrecipients such that the Recipient must enter into a corresponding Closeout Agreement with any Subrecipient that has Program Income or anticipates generating Post-Closeout Program Income at the end of the Subrecipient's Period of Performance.

## 1. Allowable Activities

The Recipient shall use Post-Closeout Program Income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

The Recipient shall submit program performance reports to the EPA Project Officer in accordance with the Performance Reporting Programmatic Term and Condition through September 30, 2031, as applicable. After September 30, 2031, the Recipient shall disclose annual reports publicly, as described in the Performance Reporting Programmatic Term and Condition, rather than meeting the reporting requirements described in the Performance Reporting Programmatic Term and Condition.

## 3. LIDAC Expenditure Requirements

The Recipient shall expend 40% of Post-Closeout Program Income for the purposes of providing Financial Assistance in Low-Income and Disadvantaged Communities and comply with this requirement in accordance with the LIDAC Expenditure Requirement Programmatic Term and Condition, as applicable. Funds used for the purposes of providing Financial Assistance may include Financial Assistance to Qualified Projects; Predevelopment Activities; Market-Building Activities; and Program Administration Activities. This requirement applies to the entire award provided to the Recipient but does not "flow down" to each Subrecipient.

## 4. Cash Management Requirements

The Recipient must maintain Post-Closeout Program Income in accordance with the Cash Management Requirements in the Financial Risk Management Requirements Programmatic Term and Condition, as applicable. However, the Recipient may submit a Cash Management Policy for review and approval by the EPA Project Officer, which can authorize the Recipient to deviate from the aforementioned Cash Management Requirements.

## 5. Financial Health Metrics

The Recipient agrees to report financial health metrics to the EPA Project Officer in accordance with the Financial Health Metrics in the Financial Risk Management Requirements Programmatic Term and Condition (on behalf of the Recipient as well as any Financial Assistance Subrecipient that has received in excess of $10,000,000 in NCIF subgrants) through September 30, 2031, as applicable. The requirement for submission of financial health metrics is not applicable for any fiscal year in which the reporting entity did not meet the requirements of 2 CFR Subpart F—Audit Requirements. The Recipient agrees to add the following two financial health metrics as part of the financial health metrics for the Closeout Period.

1. Self-Sufficiency Ratio: The self-sufficiency ratio is defined as earned revenue divided by operating

Case 1:25-cv-00698-TSC     Document 49-2     Filed 03/26/25     Page 45 of 192
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 51 of 694

5G - 84094001 - 0     Page 44

expenses, where earned revenue is equal to the value of all income earned from normal business transactions and operating expenses is equal to the value of all expenses incurred as a part of normal business operations over the prior 12-month period, not including interest, financing, depreciation, amortization, and loan loss provision expense.

2. Operating Cash Ratio: The operating cash ratio is defined as cash and cash equivalents divided by operating expenses, where cash and cash equivalents is equal to the total value of all cash and cash equivalent items that can be converted into cash immediately and operating expenses is equal to the value of all expenses incurred as a part of normal business operations over the prior 12-month period, not including interest, financing, depreciation, amortization, and loan loss provision expense.

After September 30, 2031, the Recipient shall report on these financial health metrics publicly rather than disclosing the metrics to the EPA.

## 6. Conflicts of Interest

The Recipient agrees to comply with the conflict of interest requirements described in the Conflicts of Interest Programmatic Term and Condition through September 30, 2031.

## 7. Remedies for Non-Compliance

The Recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable. During the Closeout Period, the workplan and budget submitted for the Period of Performance are no longer applicable.

## 8. Suspension and Debarment

The Recipient agrees to ensure that Post-Closeout Program Income is not transferred to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The Recipient can maintain compliance with this requirement through either (1) checking the System for Award Management (for Subrecipients, Contractors, or Program Beneficiaries) or (2) obtaining eligibility certifications from counterparties (for Program Beneficiaries). The Recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity is presently excluded or disqualified.

## 9. Non-Discrimination

The Recipient must use Post-Closeout Program Income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

**Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975.** The Recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency" in 40 CFR Part 5 and 40 CFR Part 7, the Recipient agrees, and will require all Subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

Case 1:25-cv-00698-TSC     Document 49-2     Filed 03/26/25     Page 46 of 192
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 52 of 694

5G - 84094001 - 0     Page 45

**Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities.** As provided in section 301 of the Executive Order, the Recipient will ensure that Subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to Real Property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 10. Record-Keeping

In accordance with 2 CFR 200.334(e), the Recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of Post-Closeout Program Income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. Note that this requirement applies if and when the Closeout Agreement is terminated, in accordance *with Item 14. Termination of the Closeout Agreement*. EPA may obtain access to these records to verify that Post-Closeout Program Income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the Recipient must maintain adequate accounting records for how Post-Closeout Program Income is managed and spent as well as all other appropriate records and documents related to the activities conducted using Program Income.

The Recipient agrees to ensure that Subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. The Recipient may use the terms of its Subaward Agreements or other effective means to meet its responsibilities.

## 11. Other Federal Requirements

The following other federal requirements apply to the use of Post-Closeout Program Income under the Closeout Period to the same extent they do under the terms of the Performance Period:

- Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Development Requirements Programmatic Term and Condition;
- Build America, Buy America Act, as specified in the Build America, Buy America Act Programmatic Term and Condition and Build America, Buy America General Term and Condition; and
- National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition.

No other federal requirements apply to the use of Post-Closeout Program Income under the terms of this Closeout Agreement, other than those specified in this Closeout Agreement.

## 12. Audit Requirements

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Closeout Period, as activities related to the Federal award referenced in 2 CFR 200.502(a) include

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 47 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 53 of 694

5G - 84094001 - 0    Page 46

activities during the Closeout Period.

Through September 30, 2031, the Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## 13. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Closeout Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## 14. Termination of the Closeout Agreement

The Closeout Agreement terminates when either of the following situations occur: (1) the Recipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Recipient and the EPA Award Official or Grants Management Officer mutually agree to terminate the Closeout Agreement, with the Recipient remitting current and future Post-Closeout Program Income to the federal government.

The ability to terminate the Closeout Agreement flows down to Subrecipients, as a Closeout Agreement between the Recipient and Subrecipient terminates when either (1) the Subrecipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Subrecipient and the Recipient mutually agree to terminate the Closeout Agreement, with the Subrecipient remitting current and future Post-Closeout Program Income to the Recipient.

The de minimis amount must be agreed-upon in writing by the Recipient and the Director of the Office of the Greenhouse Gas Reduction Fund (or equivalent), prior to the Recipient using the "de minimis" criteria to terminate the Closeout Agreement.

## 15. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and the Authorized Representative on the EPA Key Contacts Form most recent submitted to the EPA Project Officer (for the Recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

## W. Legal Counsel

The Recipient agrees to appoint appropriate legal counsel if counsel is not already available.

## X. Accounting Principles

The Recipient must account for all award funds in accordance with Generally Accepted Accounting Principles (GAAP) as in effect in the United States.

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 48 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 54 of 694

5G - 84094001 - 0    Page 47

The Recipient must segregate and account for the award funds separately from all other program and business accounts. Additionally, the Recipient must segregate and account for Program Income separately from all other program and business accounts.

## Y. Internal Controls

The Recipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## Z. Audits

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Period of Performance, as described in the Audit Requirements General Term and Condition. Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(h), the Recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit Subrecipient that expends $750,000 or more of EPA funds from the Recipient's grant program in the Subrecipient's fiscal year. Any for-profit Subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier.

The Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## AA. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that specific conditions are necessary to ensure that the National Clean Investment Fund program is effectively carried out by Eligible Recipients that have not previously managed grants with the same scale and complexity of this agreement. These specific conditions will remain in effect throughout the Period of Performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer, will oversee and monitor the grant agreement through activities including:

1. Upon request, requiring the Recipient to participate in an annual workshop (i.e., one workshop per calendar year) with other Recipients under the National Clean Investment Fund and/or Clean Communities Investment Accelerator; the EPA Project Officer will contact the Recipient to finalize details for each annual workshop.

2. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on

5G - 84094001 - 0    Page 48

effective methods of carrying out the workplan, provided the Recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other Recipients under the Greenhouse Gas Reduction Fund and with other EPA programs; and coordination by EPA staff with other federal programs to avoid duplication of effort;

3. Closely monitoring the Recipient's management and oversight of Subrecipients and procedures for ensuring that Program Beneficiaries adhere to program participation guidelines;

4. Closely monitoring the Recipient's performance to verify compliance with the EPA-approved workplan and achievement of environmental results;

5. Participating in periodic telephone conference calls with Recipient personnel to discuss project successes and challenges as well as similar items impacting program performance;

6. Reviewing and commenting on performance reports prepared under the Award Agreement. Note that the final decision on the content of performance reports rests with the Recipient;

7. Verifying that the Recipient is expending the award on allowable activities, including but not limited to reviewing a sample of Financial Assistance transactions to verify compliance with regulatory requirements and the terms and conditions of the Award Agreement; and

8. Periodically reviewing costs incurred by the Recipient as well as its contractors and Subrecipients if needed to ensure appropriate expenditure of grant funds. Note that Recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds.

Subject to approval by the EPA Award Official, the EPA Project Officer and the Recipient may agree to additional areas of oversight and monitoring.

*Method for Reconsideration.* If the Recipient believes that one or more of these specific conditions are not warranted or requires modification, the Recipient must file a written objection naming the specific condition(s) within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist, and Project Officer identified in the Notice of Award.

## AB. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the Recipient's GGRF award. These materials may include links to Recipient and/or Subrecipients' websites. The Recipient agrees to work with the EPA Project Officer or another member of GGRF program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## AC. Conflicts of Interest

The Recipient must comply with requirements on transfers of funds that create actual and potential conflicts of interest, as specified in this term and condition. Transfers of funds include Subawards, Contracts (including but not limited to Acquisitions of Intangible Property), and Participant Support Costs. The definitions in the EPA's Financial Assistance Conflict of Interest Policy (COI Policy) apply to this term and condition.

Case 1:25-cv-00698-TSC     Document 49-2     Filed 03/26/25     Page 50 of 192
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 56 of 694

5G - 84094001 - 0     Page 49

There are three categories of transfers of funds, with the requirements differing by each category (as specified in this term and condition):

    1. <u>Transfers with Affiliated Entities:</u> Subawards, Contracts, and Participant Support Costs to Affiliated Entities or co-invested in projects with Affiliated Entities. An Affiliated Entity is any entity that is related to the Recipient in accordance with the indicia of control described in 2 CFR 180.905.

    2. <u>Financial Assistance to Qualified Projects:</u> Subawards, Contracts (in the form of Acquisitions of Intangible Property), and Participant Support Costs as forms of Financial Assistance to Qualified Projects, unless such transfers are with Affiliated Entities. These transfers are not within the scope of the COI Policy, which states that "subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by recipients of revolving loan fund capitalization grants or other EPA financial assistance agreements where Agency funds may be used for lending activities."

    3. <u>Subgrants and Contracts:</u> Subgrants and Contracts (other than Acquisitions of Intangible Property), unless such transfers are with Affiliated Entities.

    Note that all Contracts (including Acquisitions of Intangible Property) must also comply with the conflict of interest standards in 2 CFR 200.318(c).

## 1. Transfers with Affiliated Entities

### Prior Approval of COI Mitigation Plan

The Recipient must not transfer funds with Affiliated Entities unless those transfers have been included in an EPA-approved COI Mitigation Plan on Transfers of Funds with Affiliated Entities. The Recipient agrees to seek prior EPA approval for changes to the COI Mitigation Plan on Transfers of Funds with Affiliated Entities.

### Quarterly Disclosure Requirement

The Recipient agrees to disclose, on a quarterly basis, a list of newly originated transfers of funds with Affiliated Entities that are within the scope of its EPA-approved COI Mitigation Plan on Transfers of Funds with Affiliated Entities. Each quarterly disclosure must include (1) a list of such transfers of funds made over the quarter and (2) steps taken to taken to eliminate, neutralize or mitigate any conflicts of interest, in accordance with the EPA-approved COI Mitigation Plan on Transfers of Funds with Affiliated Entities. The Recipient must disclose its own transfers as well as transfers made by Subrecipients.

The quarterly periods for such disclosures are defined as follows: April 1 to June 30; July 1 to September 30; October 1 to December 31; and January 1 to March 31. The Recipient must make the disclosures to the EPA Project Officer within 30 calendar days of the end of the quarterly period.

### Project Officer Review

In accordance with 2 CFR 200.337, the EPA Project Officer may access records relating to a subset of transactions disclosed to review for compliance with the Recipient's EPA-approved COI Mitigation Plan on Transfers of Funds with Affiliated Entities as well as this term and condition. The EPA Project Officer

will not have approve transfers of funds in advance but rather will review transfers of funds that have already occurred for compliance.

## Waivers and Modifications

EPA agrees that, for transfers of funds with Affiliated Entities, the requirements of this term and condition apply in lieu of the requirements of the Disclosing Conflict of Interest General Term and Condition.

On a case-by-cases basis, the EPA Project Officer may extend the due date for disclosures on transfers of funds with Affiliated Entities. On a case-by-case basis, the EPA Project Officer may waive or modify the disclosure requirements on transfers of funds with Affiliated Entities.

## 2. Financial Assistance to Qualified Projects

### Quarterly Disclosure Requirement

The Recipient agrees to disclose, on a quarterly basis, a list of transfers of funds as Financial Assistance to Qualified Projects with actual and potential conflicts of interest. Each quarterly disclosure must include (1) a list of such transfers of funds made over the quarter and (2) steps taken to taken to eliminate, neutralize or mitigate any conflicts of interest, in accordance with any EPA-approved documents related to eliminating, neutralizing, and mitigating conflicts of interest. The Recipient must disclose its own transfers as well as transfers made by Subrecipients.

The quarterly periods for such disclosures are defined as follows:  April 1 to June 30; July 1 to September 30; October 1 to December 31; and January 1 to March 31. The Recipient must make the disclosures to the EPA Project Officer within 30 calendar days of the end of the quarterly period.

### Project Officer Review

In accordance with 2 CFR 200.337, the EPA Project Officer may access records relating to a subset of transactions disclosed to review for compliance with the Recipient's EPA-approved documents related to eliminating, neutralizing, and mitigating conflicts of interest as well as this term and condition. The EPA Project Officer will not have approve transfers of funds in advance but rather will review transfers of funds that have already occurred for compliance.

### Waivers and Modifications

On a case-by-cases basis, the EPA Project Officer may extend the due date for disclosures on transfers of funds as Financial Assistance to Qualified Projects. On a case-by-case basis, the EPA Project Officer may waive or modify the disclosure requirements on transfers of funds as Financial Assistance to Qualified Projects.

## 3. Subgrants and Contracts

The Recipient agrees to comply with the Disclosing Conflict of Interest General Term and Condition for Subgrants and Contracts (excluding Acquisitions of Intangible Property), unless such transfers are with Affiliated Entities. If such transfers are with Affiliated Entities, then the Recipient is required to include them in the process specified in *1. Transfers with Affiliated Entities*.

## AD. Prior Approvals

EPA will only have authority to review and approve revisions to the Recipient's EPA-approved workplan, budget, and other documents if authorized by 2 CFR 200.308 or 2 CFR 200.208. The Recipient must contact the EPA Project Officer when the EPA has prior approval authority specified below.

### Workplan

For the purposes of this Award Agreement, EPA interprets 2 CFR 200.308(c)(1) to enable the Recipient to revise the activities specified in its **EPA-approved workplan** without prior EPA approval, provided the activities still comply with the terms and conditions of the Award Agreement. The allowable and allocable grant costs are narrowly defined, pursuant to the terms and conditions of the Award Agreement; in accordance with 2 CFR 200.308(c)(1), any changes to the EPA-approved workplan that comply with the statute as well as the terms and conditions would not be a "change in the scope or objective of the project or program." Therefore, so long as the Recipient is updating its EPA-approved workplan with the revised activities in accordance with the terms and conditions of the Award Agreement, EPA will not require prior approval.

### Budget

For the purposes of this Award Agreement, EPA implements 2 CFR 200.308(f) in accordance with Item 1 of the Transfer of Funds General Term and Condition to enable the Recipient to revise the **EPA-approved budget** included in its Award Agreement without prior EPA approval, provided the cumulative funding transfers among Object Class Categories (Personnel, Fringe Benefits, Travel, Equipment, Supplies, Contractual, Construction, Other, Indirect) do not exceed 10% of the total budget approved at time of award. Therefore, so long as the Recipient is updating its EPA-approved budget by transferring funds by less than or equal to these amounts, EPA will not require prior approval.

However, notwithstanding the requirements of 2 CFR 200.308(f), if the Recipient seeks to increase the **amount of funds budgeted for Participant Support Costs,** then it must seek prior approval pursuant to 2 CFR 200.308(c)(5). Further, if the Recipient seeks to **transfer funds for any of the items listed in 2 CFR 200.407,** then it must seek prior approval pursuant to that regulation as well as Item 2 of the Transfer of Funds General Term and Condition.

### Transfers of Funds

2 CFR 200.308(c)(6) requires the Recipient to obtain prior agency approval for "Subawarding, transferring or contracting out of any work under a Federal award." If the **types of transfers are described in the EPA-approved workplan** (including types of transfers to be conducted through Subawards, Participant Support Costs, Acquisitions of Intangible Property, and other Contracts as defined in 2 CFR 200.1), then EPA has provided approval only for the purposes of 2 CFR 200.308(c)(6). Approval for the purposes of this regulation does not mean that such transfers of funds are compliant with the statutes, regulations, and terms and conditions.

### Changes in Key Personnel

2 CFR 200.308(c)(2) requires the Recipient to obtain prior agency approval for a "[c]hange in a key person specified in the application or the Federal award." If the Recipient is seeking to change a "key person," as defined by members of the board of directors and senior management whose roles are

Case 1:25-cv-00698-TSC     Document 49-2     Filed 03/26/25     Page 53 of 192
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 59 of 694

5G - 84094001 - 0     Page 52

specified in the most recently submitted Organizational Plan, then the Recipient must obtain prior EPA approval of the qualifications of the key person.

The Recipient must request prior agency approval for a change in "key person" via email through the EPA Project Officer, who will have 8 calendar days to communicate EPA's disapproval of their qualifications via email. If 8 calendar days have passed without notification of EPA disapproval of the key person's qualifications pursuant to 2 CFR 200.308(c)(2), the Recipient is authorized to change the "key person." Once the change is effective, the Recipient must submit an updated Organizational Plan to the EPA Project Officer.

## AE. Flow-Down Requirements

As described in 2 CFR 200.101, the terms and conditions of Federal awards flow down to Subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(a)(2) and in accordance with the Establishing and Managing Subawards General Term and Condition, the Recipient agrees to ensure that Subrecipients are subject to the same requirements as those that apply to the pass-through entity's EPA award.

For the purposes of this Award Agreement, all terms and conditions must flow down to Subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to Subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## AF. Resolution of Disputes Termination Provision

The Recipient is precluded from drawing down more than 78.46% of the Total Approved Assistance Amount until this condition is removed, which will occur when: a) the EPA Award Official, at the direction of the Grants Competition Disputes Decision Official (GCDDO), provides written confirmation that all administrative disputes under the National Clean Investment Fund and the Clean Communities Investment Accelerator are resolved in accordance with the dispute resolution procedures in Appendix A of the EPA Order 5700: Policy for Competition of Assistance Agreements; or b) the administrative disputes are withdrawn, abandoned or dismissed; or c) December 31, 2024, whichever is sooner.

If EPA does need to alter the Selection Official's selection and partial funding decisions for this agreement based on a GCDDO determination the EPA Award Official will partially terminate this assistance agreement, de-obligate a portion of the funds that have been obligated and use the de-obligated funds to satisfy the terms of a GCDDO remedy benefiting another entity. The Recipient will then provide an updated workplan and budget information, as needed, to amend the agreement.

For the purposes of this term and condition, EPA's partial termination may apply not just to obligated funds that have not been drawn down from ASAP but also to Program Income that has been generated and retained by the Recipient under 2 CFR 1500.8(d) and the Program Income Programmatic Term and Condition of this agreement. In accordance with 2 CFR 200.307(e)(1), EPA may require that the amount of funds committed by EPA to the Recipient be reduced by all or some of the Program Income that has been generated by the Recipient.

## AG. Deposit Account at Financial Agent

5G - 84094001 - 0    Page 53

When a depository institution is designated as a financial agent of the United States (the Financial Agent) for the Greenhouse Gas Reduction Fund, then the Recipient will be required to set up and utilize an Account or Accounts at the Financial Agent in accordance with the terms of the Account or Accounts that EPA will set forth in the Award Agreement, including but not limited to through amendments to the Award Agreement.

## AH. Interim SF-425 Requirement

The Recipient must submit an SF-425 within 30 calendar days of receiving access to an Account or Accounts at the Financial Agent, with the SF-425 covering all activities supported by funds drawn from ASAP and disbursed for actual and allowable costs, other than funds disbursed into the Account or Accounts at the Financial Agent.

## AI. Interim Drawdown Procedures

### Authority

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that specific conditions are necessary to ensure that the National Clean Investment Fund and Clean Communities Investment Accelerator programs are effectively carried out by Eligible Recipients that have not previously managed grants with the same scale and complexity of this agreement. These specific conditions will remain in effect throughout the Period of Performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

### General Term and Condition

During the interim period between the start of the Federal award and the date on which the Deposit Account at the Financial Agent is first made available and accessible to the Recipient, the Recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

This requirement "flows down" to Subrecipients; if a Subrecipient has an actual and immediate cash requirement, then the Recipient is required to draw funds from ASAP on behalf of the subrecipient and disburse the funds to the Subrecipient and the Subrecipient is required to disburse the funds for the actual and immediate cash requirement. Alternatively, as authorized by 2 CFR 200.332(c), the Recipient may impose the reimbursement method as opposed to the advance payment method with Subrecipients as part of "specific subaward conditions" if appropriate as described in 2 CFR 200.208.

### Interim ASAP Cap

During the interim period between the start of the Federal award and the date on which the Deposit Account at the Financial Agent is first made available and accessible to the Recipient, the Recipient is subject to a cap on the cumulative amount of its drawdowns. This cap starts at 8.33% (or one-twelfth) of the Recipient's EPA-approved first-year budget, plus allowable pre-award costs, and increases by 8.33% (or one-twelfth) of the Recipient's EPA-approved first-year budget on the first calendar day of each month after the date on the Notice of Award until the Deposit Account at the Financial Agent is available and accessible to the Recipient. The cap shall not exceed 25% (or one-fourth) of the Recipient's EPA-

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 55 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 61 of 694

5G - 84094001 - 0    Page 54

approved first-year budget, plus allowable pre-award costs. The cap shall cease to apply once the Deposit Account at the Financial Agent is available and accessible to the Recipient.

Note that this cap is in addition to, rather than in lieu of, the cap described in the Resolution of Disputes Termination Provision.

## Interim ASAP Payment Request

During the interim period between the start of the Federal award and the date on which the Deposit Account at the Financial Agent is first made available and accessible to the Recipient, the Recipient must abide by the following process for ASAP payment requests.

1. The Recipient must only initiate payment requests from ASAP each Thursday (for next business day payments) or Friday (for same business day payments).

2. The Recipient must submit payment requests to ASAP falling into the following four categories, with no more than one payment request in each category per week: (1) Recipient Financial Assistance Activities; (2) Recipient Other Allowable Activities; (3) First-Tier Subrecipient Financial Assistance Activities; or (4) First-Tier Subrecipient Other Allowable Activities. The first category is not applicable under the CCIA.

3. Prior to receiving the payment, the Recipient must provide the EPA Project Officer with the following information: (a) amount of payment requested, (b) category of payment, (c) type(s) of Financial Assistance anticipated, (d) descriptions of Qualified Project(s) anticipated, and (e) a certification from the Recipient's chief executive officer (or equivalent), chief financial officer (or equivalent), chief reporting officer (or equivalent), or chief compliance officer (or equivalent) that the amount of the payment is necessary to execute against the EPA-approved workplan and that financing agreements for identified Qualified Project(s) necessitating the payment have been reviewed by the Recipient's counsel for legal sufficiency. The certification must include the following language: "This certification is a material representation for the purposes of an EPA Financial Assistance Agreement, and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions." Requirements (c), (d), and (e) are applicable to payment requests for Recipient Financial Assistance Activities and "flow-down" as part of payment requests for First-Tier Subrecipient Financial Assistance Activities, as described below.

The EPA Project Officer is authorized to provide case-by-case modifications or exceptions to these requirements, provided those modifications or exceptions remain compliant with the ASAP and Proper Payment Draw Down General Term and Condition.

These requirements "flow down" to Subrecipients; if a Subrecipient has an actual and immediate cash requirement, then it must submit payment requests to the Recipient pursuant to these requirements. As authorized at 2 CFR 200.337, EPA may request records of payment requests to the Recipient and would expect documentation to show that, for each payment to a Subrecipient, the Subrecipient has provided the Recipient with the information described above.

## Disbursement of Payment

During the interim period between the start of the Federal award and the date on which the Deposit Account at the Financial Agent is first made available and accessible to the Recipient, for each payment, if the Recipient has not disbursed the entire payment amount within 5 business days of drawdown, the

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 56 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 62 of 694

5G - 84094001 - 0    Page 55

Recipient must provide the EPA Project Officer with the amount of payment not yet disbursed. The Recipient must then follow the procedures described in the ASAP and Proper Payment Drawdown General Term and Condition for the amount of payment not yet disbursed within 5 business days of drawdown.

<u>Method for Reconsideration</u>

If the Recipient believes that one or more of these specific conditions are not warranted or requires modification, the Recipient must file a written objection naming the specific condition(s) within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist, and Project Officer identified in the Notice of Award.

**AJ. Amendments to Award Agreement**

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.


**IV. ADMINISTRATIVE TERMS AND CONDITIONS (SEE ABOVE ADMINISTRATIVE CONDITIONS)**

**V. FINANCIAL AGENT TERMS AND CONDITIONS**

**A. Revisions to Award Agreement to Account for Financial Agent Arrangement**

When a depository institution is designated as a financial agent of the United States (the Financial Agent) for the Greenhouse Gas Reduction Fund, the following revisions to the Award Agreement will become effective without further action or notice required by the Recipient or EPA.

<u>1. Revisions to Section I. Definitions</u>

*The following **new definition** will be added to the Award Agreement:*

**Capitalization by Nonexchange Capital Contribution:** Capitalization by Nonexchange Capital Contribution means award funds that (1) the Recipient draws down from the Automated Standard Application Payments (ASAP) system and (2) disburses into the 'Budget Account' as defined under the Deposit Account at Financial Agent Programmatic Term and Condition to capitalize itself for subsequent use for any of the following Allowable Activities: Financial Assistance to Qualified Projects; Predevelopment Activities; Market-Building Activities; and Program Administration Activities.  Under this two-step transaction, which involves both a drawdown and disbursement, the Recipient's drawdown from ASAP is deemed (a) an advance payment of Federal funds in accordance with 2 CFR 200.305(b)(1); while the disbursement into the Deposit Account at Financial Agent is deemed (b) an allowable cost to be charged to the EPA award, and (c) a "nonexchange transaction", consistent with the definition of this term in the <u>Statement of Federal Financial Accounting Standards No. 5</u>. The full amount of the Capitalization by Nonexchange Capital Contribution must be recognized, reported, and accounted for as Program Income in accordance with the Program Income Programmatic Term and Condition once clauses (a) and (b) are fulfilled. Any Subrecipient with a Deposit Account at Financial Agent will be entitled to receive its

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 57 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 63 of 694

5G - 84094001 - 0    Page 56

payments from Recipient as a Capitalization by Nonexchange Capital Contribution.

*The definition of **Program Income** under the Award Agreement will be amended and replaced with:*

**Program Income:** 2 CFR 200.1 defines Program Income as "gross income earned by the non-Federal entity that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(f)." 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, there are two types of Program Income: (1) "Program Income from Operations" and (2) "Program Income from Capitalization by Nonexchange Capital Contribution".

Program Income from Operations includes but is not limited to income from origination fees, servicing fees, and asset management fees; dividends from equity investments; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). Under this award agreement, the Recipient is authorized to deduct the cost of generating Program Income from Operations under 2 CFR 200.307(b) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Program Income from Operations include origination, servicing, and management costs that are not charged as direct costs to the Federal award. Program Income from Operations can be earned prior to the availability of the 'Program Income from Operations' account as defined under the Deposit Account at Financial Agent Programmatic Term and Condition.

Program Income from Capitalization by Nonexchange Capital Contribution means award funds from the ASAP system that the Recipient draws down and immediately deposits into the 'Budget Account' at the Financial Agent in accordance with (a) the definition of Capitalization by Nonexchange Capital Contribution and (b) the Deposit Account at Financial Agent Programmatic Term and Condition. Program Income from Capitalization by Nonexchange Capital Contribution cannot be earned prior to the availability of the 'Budget Account' as defined under the Deposit Account at Financial Agent Programmatic Term and Condition.

Both forms of Program Income under this program must be treated in accordance with the Program Income Programmatic Term and Condition. EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fund raising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

## 2. Revisions to Section II. National Programmatic Terms and Conditions

*The **Program Income Programmatic Term and Condition** will be amended and replaced with:*

**Program Income**

In accordance with Clean Air Act Section 134(b)(1)(C) as well as 2 CFR 200.307(e)(2) and 2 CFR 1500.8

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 58 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 64 of 694

5G - 84094001 - 0    Page 57

(b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income from Operations once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income from Operations may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the EPA-approved workplan.

### 3. Revisions to Section III. Additional Programmatic Terms and Conditions

*The Allowable and Unallowable Activities Programmatic Term and Condition will be amended and replaced with:*

### Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Capitalization by Nonexchange Capital Contribution; Financial Assistance to Qualified Projects; Predevelopment Activities; Market-Building Activities; and Program Administration Activities. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

Capitalization by Nonexchange Capital Contribution generates Program Income for the Recipient in an amount equal to the available EPA award balance drawn down from ASAP into the 'Budget Account' as defined under the Deposit Account at Financial Agent Programmatic Term and Condition. Program Income from Capitalization by Nonexchange Capital Contribution must be expended on Financial Assistance to Qualified Projects, Predevelopment Activities, Market-Building Activities, and Program Administration activities in accordance with the EPA-approved workplan.

The Recipient agrees to not use the award for the following unallowable activities: (a) Financial Assistance to Qualified Projects in the form of Subgrants; (b) Subgrants for the purposes of providing Financial Assistance to Qualified Projects (other than Subgrants from the Recipient to first-tier Subrecipients); (c) activities that support deployment of projects that do not meet the definition of Qualified Projects; and (d) activities that support deployment of projects outside the boundaries of the ten EPA regions. The Recipient also agrees not to use the award for activities associated with defending against, settling, or satisfying a claim by a litigant, except when (a) the claim stems from the Recipient's implementation of its EPA-approved workplan in compliance with the terms and conditions of the Award Agreement and (b) the Recipient has obtained prior written approval from the EPA Award Official.

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 59 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 65 of 694

5G - 84094001 - 0    Page 58

*The Deposit Account at Financial Agent Programmatic Term and Condition will be amended and replaced with:*

## Deposit Account at Financial Agent

The Recipient will open a Deposit Account at a depository institution that has been designated as a financial agent of the United States (the Financial Agent). Such account will be used as Recipient's operating account for the award. Upon establishment of the Deposit Account, the Recipient will drawdown the entire available EPA award balance from ASAP and disburse it into the Deposit Account, where it must be maintained until the Closeout Agreement goes into effect in accordance with the Closeout Agreement Programmatic Term and Condition. Note, this requirement applies to any and all drawdowns from ASAP by the Recipient while the Deposit Account is available and accessible. Once the Closeout Agreement goes into effect, the Recipient will be entitled to transfer any remaining funds in the Deposit Account to an account at a financial institution of its choosing, provided such account is insured.

The Recipient will grant EPA a perfected security interest in all funds held in the Deposit Account. The Recipient will take all such actions, enter into all such agreements, and execute and deliver all such documentation as may be necessary and/or as directed by EPA from time to time to establish and maintain such security interest, including but not necessarily limited to entering into a deposit account control agreement (DACA) with the Financial Agent and EPA.

Notwithstanding any other provision of this Award Agreement, EPA will only furnish the Financial Agent with a Notice of Exclusive Control under a DACA when EPA issues a written determination and finding that the Recipient has failed to comply with the terms and conditions of this Award Agreement, and that noncompliance is substantial such that effective performance of the Assistance Agreement is materially impaired or there is adequate evidence of waste, fraud, material misrepresentation of eligibility status, or abuse, and that EPA has initiated action under 2 CFR 200.339 to wholly or partly suspend or terminate the Federal award, as authorized in the terms of the Award Agreement. Note, funds in the Deposit Account that were legally committed to 3rd parties under valid financing agreements prior to the issuance of, but not in anticipation of, a Notice of Exclusive Control constitute "financial obligations which were properly incurred" by the Recipient in accordance with 2 CFR 200.343 and are to remain allowable costs during suspension or after termination.

Funds held in the Recipient's account at the Financial Agent may be invested in accordance with the Cash Management Requirements in the Financial Risk Management Programmatic Term and Condition. The Financial Agent will be compensated in accordance with the terms of a valid Financial Agency Agreement (FAA).

The Deposit Account will consist of three distinct account types ('Budget,' 'Reserve', and 'Program Income from Operations'), each of which serves a distinct purpose (while the exact naming convention and structure of these accounts may differ from the below, the accounts must perform a substantively similar function). The Recipient is required to utilize the accounts at the Financial Agent for their intended purpose during any period in which the accounts are available and accessible, with exceptions to this requirement permitted by the EPA Project Officer only on a case-by-case basis, to the extent such exceptions are necessary to execute against the EPA-approved workplan.

## 1. Budget Account

This account within the Deposit Account will hold funds that have yet to be used for any of the following

5G - 84094001 - 0    Page 59

allowable activities: Financial Assistance to Qualified Projects; Predevelopment Activities; Market-Building Activities; and Program Administration Activities. It will hold funds within a number of sub-accounts that correspond to more specific allowable expenditures under the particular type of award or subaward.

**Transferring Funds Into the Budget Account.** Upon establishment of the Deposit Account, the Recipient will drawdown the entire available EPA award balance from ASAP directly into the Budget Account. The Recipient will direct the Financial Agent to allocate funds across the various sub-accounts in the Budget Account in accordance with its EPA-approved workplan. Recipient need not submit a certification notice to transfer funds within the Budget Account, but remains subject to the Transfer of Funds EPA General Term and Condition and any associated pre-approval or notification requirements therein.

**Transferring Funds Out of the Budget Account.**  When transferring award funds out of the Budget Account to provide Financial Assistance to Qualified Projects, Recipient must provide the EPA Project Officer with a certification notice from the Recipient's chief executive officer (or equivalent), chief financial officer (or equivalent), chief reporting officer (or equivalent), or chief compliance officer (or equivalent) that the amount of the payment is necessary to execute against the EPA-approved workplan and that financing agreements for identified Qualified Projects necessitating the payment have been reviewed by the Recipient's counsel for legal sufficiency, with notice provided to the Financial Agent with the transfer request. The certification notice must include the following language: "This certification is a material representation for the purposes of an EPA Financial Assistance Agreement, and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions." The Recipient must "flow-down" this requirement to Subrecipients, with each Subrecipient required to provide a substantively similar certification notice to Recipient when transferring subaward funds out of the Budget Account to provide Financial Assistance to Qualified Projects, with notice provided to the Financial Agent with the transfer request. In accordance with 2 CFR 200.337, the Recipient must make those certifications available to the EPA, upon request.

While transfers out of the Budget Account are not formally subject to any of the requirements established in either the EPA General Term and Condition on Automated Standard Application Payments (ASAP) and Proper Payment Draw Down or the Interim Drawdown Procedures Programmatic Term and Condition, Recipient agrees to the following requirements:

a) When the need for a longer disbursement window is known in advance of the transfer, Recipient must notify the EPA Project Officer prior to executing the transfer and follow-up to inform the EPA Project Officer of the amount of the transfer that has been disbursed for an Allowable Activity in 5, 10, and 14 business days. Recipient must return any undisbursed amounts to the Deposit Account at the Financial Agent on the 15th business day, or

b) When the need for a longer disbursement window is not known in advance of the transfer, Recipient must notify the EPA Project Officer of the delay no later than 5 business days after the transfer and follow-up to inform the EPA Project Officer of the amount of the transfer that has been disbursed for an Allowable Activity in 10 and 14 business days. Recipient must return any undisbursed amounts to the Deposit Account at the Financial Agent on the 15th business day.

Recipients must obtain prior written approval from the EPA Project Officer (who will in turn notify the EPA Award Official) for any transfers that will not be disbursed for an Allowable Activity within 15 business days.

5G - 84094001 - 0    Page 60

These requirements "flow down" to Subrecipients, who agree to provide the same notifications to and seek prior approval from Recipients where applicable.

## 2. Reserve Account

This account within the Deposit Account is intended to enable funds to be set-aside within the Financial Agent for use for any form of Financial Assistance that requires the Recipient to pledge award funds for a future expenditure to a third party to meet a legal obligation.

**Transferring Funds Into the Reserve Account.** The Recipient may only transfer award funds into the Reserve Account for grant performance purposes if the Recipient's chief executive officer (or equivalent), chief financial officer (or equivalent), chief reporting officer (or equivalent), or chief compliance officer (or equivalent) certify to the EPA Project Officer, with notice provided to the Financial Agent with the transfer request, that the amount of the expenditure is necessary to execute against the EPA-approved workplan, and that financing agreements for identified qualified projects necessitating the expenditure have been reviewed by Recipient's counsel for legal sufficiency. The certification notice must include the following language: "This certification is a material representation for the purposes of an EPA financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions." The Recipient must "flow-down" this requirement to Subrecipients, with each Subrecipient required to provide a substantively similar certification notice to Recipient when transferring subaward funds into the Reserve Account to provide Financial Assistance to Qualified Projects, with notice provided to the Financial Agent with the transfer request. In accordance with 2 CFR 200.337, the Recipient must make those certifications available to the EPA, upon request.

**Transferring Funds Out of the Reserve Account.**

## a. To Third Parties to Meet Legal Obligations

Funds in the Reserve Account may not be disbursed to Program Beneficiaries, Subrecipients, Contractors, or any other third parties, unless the funds are necessary for the Recipient to satisfy a legal obligation. The Recipient may only transfer award funds out of the Reserve Account to meet legal obligations to such parties if the recipient's chief executive officer (or equivalent), chief financial officer (or equivalent), chief reporting officer (or equivalent), or chief compliance officer (or equivalent) certify to the EPA Project Officer, with notice provided to the Financial Agent with the transfer request, that the amount of the expenditure is necessary to pay a third party pursuant to a financing agreement that has been reviewed by recipient's counsel for legal sufficiency. The certification notice must include the following language: "This certification is a material representation for the purposes of an EPA financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions." The Recipient must "flow-down" this requirement to Subrecipients, with each Subrecipient required to provide a substantively similar certification notice to Recipient when transferring subaward funds out of the Reserve Account to provide Financial Assistance to Qualified Projects, with notice provided to the Financial Agent with the transfer request. In accordance with 2 CFR 200.337, the Recipient must make those certifications available to the EPA, upon request.

While transfers out of the Reserve Account are not formally subject to any of the requirements established in either the EPA General Term and Condition on Automated Standard Application Payments (ASAP) and Proper Payment Draw Down or the Interim Drawdown Procedures Programmatic Term and

5G - 84094001 - 0    Page 61

Condition, Recipient agrees to the following requirements:

a) When the need for a longer disbursement window is known in advance of the transfer, Recipient must notify the EPA Project Officer prior to executing the transfer and follow-up to inform the EPA Project Officer of the amount of the transfer that has been disbursed for an Allowable Activity in 5, 10, and 14 business days. Recipient must return any undisbursed amounts to the Deposit Account at the Financial Agent on the 15th business day, or

b) When the need for a longer disbursement window is not known in advance of the transfer, Recipient must notify the EPA Project Officer of the delay no later than 5 business days after the transfer and follow-up to inform the EPA Project Officer of the amount of the transfer that has been disbursed for an Allowable Activity in 10 and 14 business days. Recipient must return any undisbursed amounts to the Deposit Account at the Financial Agent on the 15th business day.

Recipients must obtain prior written approval from the EPA Project Officer (who will in turn notify the EPA Award Official) for any transfers that will not be disbursed for an Allowable Activity within 15 business days.

These requirements "flow down" to Subrecipients, who agree to provide the same notifications to and seek prior approval from Recipients where applicable.

## b. To Program Income from Operations Account

When funds in the Reserve Account are no longer necessary to meet prudent capital management practices consistent with the Recipient's overall risk portfolio and a potential legal obligation to a third party pursuant to a financing agreement, the Recipient may transfer such funds to the Program Income from Operations Account. Recipient need not submit a certification notice to effectuate such a transfer.

## <u>3. Program Income from Operations Account</u>

This account within the Deposit Account will enable Program Income from Operations (as defined under the definition of Program Income) to be held, tracked, and segregated in accordance with the Accounting Principles Programmatic Term and Condition.

**Transferring Funds Into the Program Income from Operations Account.** When Recipient earns Program Income from Operations, it must deposit such funds into the Program Income from Operations Account. Recipient need not submit a certification notice to effectuate such a transfer. When Financial Agent generates interest income on behalf of Recipient by investing Recipient liquidity in accordance with the Cash Management Requirements under the Financial Risk Management Requirements Programmatic Term and Condition, it must deposit such income into the Program Income from Operations Account in accordance with the terms of the FAA. Such interest income is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9).

**Transferring Funds Out of the Program Income from Operations Account.** Funds in this account may be transferred to either the Budget Account or Reserve Account to be used for grant performance purposes in accordance with the Program Income Programmatic Term and Condition. Recipient need not submit a certification notice to effectuate such a transfer.

5G - 84094001 - 0    Page 62

**Flow-Down Requirements of Deposit Account at Financial Agent**. EPA may elect to extend the requirements under this term and condition to any and all Subrecipients of the Recipient at EPA's sole discretion, including but not limited to establishing and maintaining a security interest on all award funds held by the Subrecipient at the Financial Agent.

5G - 84094001 - 1    Page 1

| | **U.S. ENVIRONMENTAL PROTECTION AGENCY** <br><br> **Assistance Amendment** | **GRANT NUMBER (FAIN):** 84094001 <br> **MODIFICATION NUMBER:** 1 <br> **PROGRAM CODE:** 5G | **DATE OF AWARD** <br> 12/20/2024 |
|---|---|---|---|
| | | **TYPE OF ACTION** <br> No Cost Amendment | **MAILING DATE** <br> 12/20/2024 |
| | | **PAYMENT METHOD:** <br> ASAP | **ACH#** |

| **RECIPIENT TYPE:** | **Send Payment Request to:** |
|---|---|
| Not for Profit | Contact EPA RTPFC at: █████████ |
| **RECIPIENT:** | **PAYEE:** |
| Climate United Fund <br> 7550 WISCONSIN AVE <br> FI 8 <br> BETHESDA, MD 20814-3559 <br> EIN: ██████ | Climate United Fund <br> 7550 WISCONSIN AVE <br> FI 8 <br> BETHESDA, MD 20814-3559 |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Elizabeth Bafford <br> 7550 Wisconsin Ave <br> FI 8 <br> Bethesda, MD 20814 <br> Email: ████████ <br> Phone: ████████ | Michelle Tucker <br> 1200 Pennsylvania Ave, NW, 19-H16 <br> Washington, DC 20460 <br> Email: ████████ <br> Phone: ████████ | Walker Oneil <br> OGD- GMBOD, 3093R <br> 1200 Pennsylvania Ave, NW <br> Washington, DC 20460-0001 <br> Email: ████████ <br> Phone: ████████ |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

GGRF NCIF: Climate United

This amendment updates all terms and conditions.

| **BUDGET PERIOD** <br> 04/01/2024 - 06/30/2029 | **PROJECT PERIOD** <br> 04/01/2024 - 06/30/2029 | **TOTAL BUDGET PERIOD COST** <br> $ 6,970,000,000.00 | **TOTAL PROJECT PERIOD COST** <br> $ 6,970,000,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 6,970,000,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants Management & Business Operations Division <br> 1200 Pennsylvania Ave, NW Mail code 3903R <br> Washington, DC 20460 | Environmental Protection Agency, OGGRF <br> OA - Office of the Administrator <br> 1200 Pennsylvania Ave, NW <br> Washington, DC 20460 |

| **THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY** | |
|---|---|
| Digital signature applied by EPA Award Official Katherine Tsing-Choy - Associate Award Official | **DATE** <br> 12/20/2024 |

5G - 84094001 - 1     Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 6,970,000,000 | $ 0 | $ 6,970,000,000 |
| EPA In-Kind Amount | $ 0 | $ 0 | $ 0 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 6,970,000,000 | $ 0 | $ 6,970,000,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.957 - Greenhouse Gas Reduction Fund: National Clean Investment Fund | Clean Air Act: Sec. 134(a)(2) and (3) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

JA575

5G - 84094001 - 1    Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| **1. Personnel** | $ 89,871,170 |
| **2. Fringe Benefits** | $ 33,252,333 |
| **3. Travel** | $ 4,697,854 |
| **4. Equipment** | $ 0 |
| **5. Supplies** | $ 1,080,080 |
| **6. Contractual** | $ 861,952,518 |
| **7. Construction** | $ 0 |
| **8. Other** | $ 5,950,949,314 |
| **9. Total Direct Charges** | $ 6,941,803,269 |
| **10. Indirect Costs: 10.00 % Base de minimis MTDC** | $ 28,196,731 |
| **11. Total (Share: Recipient ___0.00_ % Federal _100.00_ %)** | $ 6,970,000,000 |
| **12. Total Approved Assistance Amount** | $ 6,970,000,000 |
| **13. Program Income** | $ 315,000,000 |
| **14. Total EPA Amount Awarded This Action** | $ 0 |
| **15. Total EPA Amount Awarded To Date** | $ 6,970,000,000 |

5G - 84094001 - 1    Page 4

# Administrative Conditions

## A. General Terms and Conditions

The Recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2024-or-later. These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): ████████████████ and EPA Grants Specialist listed on the award
- MBE/WBE reports (EPA Form 5700-52A):  Debora Bradford ████████████████, ████████████████, and the EPA Grants Specialist listed on the award
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to Recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Grants Specialist listed on the award and EPA Project Officer listed on the award
- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer listed on the award

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a Recipient or Subrecipient intends to provide Financial Assistance to Qualified Project(s) that involves construction or land use planning. With the exception of Qualified Project(s) that will be carried out in the State of California, the Recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the Qualified Project(s) and provide comments to the EPA Project Officer. Qualified Project(s) that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

EPA has allowed for an intergovernmental review comment period on behalf of the Recipient. This comment period closed on Tuesday October 22, 2024. The Recipient need not take any additional action with respect to intergovernmental review.

The Recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

JA577

5G - 84094001 - 1    Page 5

## D. Pre-Award Costs

As provided in 2 CFR 200.458, Recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a Recipient incurs after EPA has notified the Recipient that its application has been selected for award consideration. The pre-award costs must be included in the workplan and budget to be eligible. As provided in 2 CFR 1500.9, Recipients incur pre-award costs at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information.

## E. New Recipient Training Requirement

The Recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The Recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the Recipient should refer to RAIN-2024-G01.

5G - 84094001 - 1     Page 6

# Programmatic Conditions

## National Clean Investment Fund (NCIF) Terms and Conditions (December 12, 2024)

### I. DEFINITIONS

**Acquisition of Intangible Property:** 2 CFR 200.1 defines Intangible Property as "property having no physical existence, such as trademarks, copyrights, data (including data licenses), websites, IP licenses, trade secrets, patents, patent applications, and property such as loans, notes and other debt instruments, lease agreements, stocks and other instruments of property ownership of either tangible or intangible property, such as intellectual property, software, or software subscriptions or licenses." Acquisitions of Intangible Property involve the purchase of Intangible Property through procurement contracts.

**Air Pollutant:** Air Pollutant means any air pollutant that is listed pursuant to Section 108(a) of the Clean Air Act (or any precursor to such an air pollutant). This includes particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead (see 40 CFR Part 50) and their precursors (e.g., volatile organic compounds).

**Award Agreement:** Award Agreement means the set of legally binding documents between EPA and the Recipient under the federal award. Award Agreement is used interchangeably with Assistance Agreement and Notice of Award.

**Apprentice:** Apprentice means an individual working on a project receiving Financial Assistance who is participating in a Registered Apprenticeship program under the National Apprenticeship Act that meets the requirements of 29 CFR Parts 29 and 30.

**Environmental Information:** Environmental Information is defined in EPA's Environmental Information Quality Policy. Environmental Information includes "data and information that describe environmental processes or conditions which support EPA's mission of protecting human health and the environment. Examples include but are not limited to: direct measurements of environmental parameters or processes; analytical testing results of environmental conditions (e.g., geophysical or hydrological conditions); information on physical parameters or processes collected using environmental technologies; calculations or analyses of environmental information; information provided by models; information compiled or obtained from databases, software applications, decision support tools, websites, existing literature, and other sources; development of environmental software, tools, models, methods and applications; and design, construction, and operation or application of environmental technology."

**Environmental Information Operations:** Environmental Information Operations is defined in EPA's Environmental Information Quality Policy. Environmental Information Operations means "[a] collective term for work performed to collect, produce, evaluate, or use environmental information and the design, construction, operation or application of environmental technology."

**EPA Award Official**: EPA Award Official means the award official from the Office of Grants and Debarment that is authorized to execute the Award Agreement, as well as any subsequent amendments to the Award Agreement, and to make any other final determinations required by law or regulation on behalf of the EPA.

**EPA Project Officer**: EPA Project Officer means the project officer from the Office of the Greenhouse

5G - 84094001 - 1    Page 7

Gas Reduction Fund that is assigned, along with the EPA Grants Specialist, to monitor the Recipient on programmatic and technical aspects of the project and is typically authorized to make programmatic approvals on behalf of the EPA. Where required, the Recipient must notify or request approval from the EPA Project Officer through the EPA Project Officer's individual EPA email address as well as ███████████ such that the Office of the Greenhouse Gas Reduction Fund may delegate an alternative EPA Project Officer in the case of any absence.

**Financial Assistance:** Section 134(b)(1) of the Clean Air Act directs that the Recipient use funds for "Financial Assistance." Consistent with the definition of *Federal financial assistance* in 2 CFR 200.1, Financial Assistance means financial products, including debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, loan purchasing programs, and other debt instruments), equity investments (such as equity project finance investments, private equity investments, and other equity instruments), hybrids (such as mezzanine debt, preferred equity, and other hybrid instruments), and credit enhancements (such as loan guarantees, loan guarantee funds (whether full or partial), loan loss reserves, and other credit enhancement instruments). Expenditures for Financial Assistance are in the form of Subawards (other than subgrants), Participant Support Costs, or Acquisitions of Intangible Property, as defined in this Award Agreement. Subgrants are not eligible as Financial Assistance.  The characterization of a Financial Assistance transaction as a Subaward, Participant Support Cost, or Acquisition of Intangible Property is limited to the transaction. For example, the same entity may be a Subrecipient for one transaction and a Program Beneficiary or a Contractor for another transaction.

*Freely Associated States: Freely Associated States means the Republic of the Marshall Islands (the Marshalls), the Federated States of Micronesia (FSM), and the Republic of Palau (Palau).*

*Greenhouse Gas: Greenhouse Gas means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act. Greenhouse Gas Emissions mean emissions of Greenhouse Gases.*

**Low-Income and Disadvantaged Communities**: Section 134(a)(3) of the Clean Air Act appropriates funds "for the purposes of providing financial assistance and technical assistance in low-income and disadvantaged communities." Low-Income and Disadvantaged Communities means CEJST-Identified Disadvantaged Communities, EJScreen-Identified Disadvantaged Communities, Geographically Dispersed Low-Income Households, Properties Providing Affordable Housing, and Federally Recognized Tribal Entities, as defined below.

- *CEJST-Identified Disadvantaged Communities:* All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.

- *EJScreen-Identified Disadvantaged Communities:* All communities within version 2.3 of EJScreen that fall within either (a) the limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.

- *Geographically Dispersed Low-Income Households:* Low-income individuals and households

5G - 84094001 - 1    Page 8

living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development (HUD). Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using HUD's Family Size Adjustment factor.

- *Properties Providing Affordable Housing:* Properties providing affordable housing that fall within either of the following two categories: (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by HUD, including Public Housing, Section 8 Project-Based Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)); or (5) a housing assistance program administered by the Department of Hawaiian Homelands as defined in Title VIII of the Native American Housing Assistance and Self-Determination Act of 1996 (24 CFR 1006.10) or (b) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

- *Federally Recognized Tribal Entities:* All Federally Recognized Tribal entities, which are considered disadvantaged regardless of whether a Federally Recognized Tribe has land, consistent with M-23-09 (memorandum dated as of January 27, 2023) and CEJST. A "Federally Recognized Tribal Entity" means (i) any individual member of a Federally Recognized Tribe; (ii) any for-profit business that has at least 51 percent of its equity ownership (or the equivalent in limited liability companies) by members of Federally Recognized Tribes; (iii) any non-profit entity with at least 51 percent of its Board of Directors (i.e., Governing Board) comprised of members of Federally Recognized Tribes; or (iv) any Federally Recognized Tribal government entity.  Under this definition, any Federally Recognized Tribal Entity is included within the definition of Low-Income and Disadvantaged Communities, regardless of where that entity is located (i.e., the entity may be located in areas outside of the CEJST land area dataset, including but not limited to tribal service areas or counties).


**Market-Building Activities:** Market-Building Activities means activities that meet all three of the following criteria: (1) build the market for financeable Qualified Projects, (2) are not tied directly to Qualified Projects the Recipient intends to finance, and (3) are necessary and reasonable for the deployment of Financial Assistance to Qualified Projects.


**Materially Impaired:** For the definition and application of these terms under this Assistance Agreement (e.g. the Clarifications to EPA General Terms and Conditions) and any associated legal documentation

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 72 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 78 of 694

5G - 84094001 - 1    Page 9

related to the Assistance Agreement, note that EPA defines "Materially Impaired" in the context of effective performance of the Assistance Agreement as 1) the issuance of a written determination and finding from EPA that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause under the Clarifications to EPA General Terms and Conditions Programmatic Term and Condition and 2) if EPA in its sole discretion determines that a corrective action plan is an appropriate means of remedying the lack of sufficient progress, the subsequent issuance of a separate written determination and finding from EPA that the Recipient has not materially addressed its failure to achieve sufficient progress after implementing a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

**Named Subrecipient:** Named Subrecipient means an entity that is named on the workplan in effect under this Assistance Agreement to receive a Subaward in the form of a Subgrant from the Recipient in order to carry out part of the award.

**Participant Support Costs:** 2 CFR 200.1 defines Participant Support Costs as "direct costs that support participants (see definition for Participant in § 200.1) and their involvement in a Federal award, such as stipends, subsistence allowances, travel allowances, registration fees, temporary dependent care, and per diem paid directly to or on behalf of participants." EPA regulations at 2 CFR 1500.1(a)(1) expand the definition of Participant Support Costs to include "subsidies, rebates, and other payments to program beneficiaries to encourage participation in statutorily authorized environmental stewardship programs," which includes the Greenhouse Gas Reduction Fund. In this program, Participant Support Costs may include expenditures by the Recipient as Predevelopment Activities, Market-Building Activities, and Program Administration Activities (which may include subsidies, rebates, and other payments) as well as Financial Assistance to Qualified Projects.

**Period of Closeout:** Period of Closeout means the time interval between the beginning of the closeout period (the date that the award has been closed out, in accordance with 2 CFR 200.344) to the end of the closeout period (the date that the Closeout Agreement has been terminated). The Period of Closeout may also be referred to as the Closeout Period.

**Period of Performance:** 2 CFR 200.1 defines Period of Performance as "the total estimated time interval between the start of an initial Federal award and the planned end date, which may include one or more funded portions, or budget periods." For the purposes of this Award Agreement, the Period of Performance means the time interval between the start of the Federal award (either the first date that the Recipient has incurred allowable pre-award costs or the date on the Notice of Award, whichever is earlier) and the end of the Federal award (the date that the award has been closed out, in accordance with 2 CFR 200.344). The Period of Performance may also be referred to as the Performance Period.

**Post-Closeout Program Income:** Post-Closeout Program Income means Program Income retained at the end of the Period of Performance, which is subject to the terms and conditions of the Closeout Agreement, as well as Program Income earned by the Recipient during the Period of Closeout that is directly generated by a supported activity or earned as a result of the Federal award, which is also subject to the terms and conditions of the Closeout Agreement. Under the Closeout Agreement, the Recipient is authorized to deduct the cost of generating Post-Closeout Program Income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Post-Closeout Program Income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Post Closeout Program Income. Costs of generating Post-Closeout Program Income can be incurred in advance of receiving the gross income,

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 73 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 79 of 694

5G - 84094001 - 1    Page 10

with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the Post-Closeout Program Income, provided the Recipient can account for the actual costs incurred.

**Predevelopment Activities:** Predevelopment Activities means activities that meet all three of the following criteria: (1) improve the likelihood of the Recipient financing Qualified Projects, (2) are tied directly to Qualified Projects the Recipient intends to finance, and (3) are necessary and reasonable for the Recipient to deploy Financial Assistance to Qualified Projects.

**Priority Project Categories:** Priority Project Categories means Distributed Energy Generation and Storage, Net-Zero Emissions Buildings, and Zero-Emissions Transportation, as defined below.

- *Distributed Energy Generation and Storage:* Projects, activities, and technologies that deploy small-scale power generation and/or storage technologies (typically from 1 kW to 10,000 kW), plus enabling infrastructure necessary for deployment of such generation and/or storage technologies. Projects, activities, and technologies within this category must support *carbon pollution-free electricity,* which is electrical energy produced from resources that generate no carbon emissions, consistent with the definition specified in Executive Order 14057 (Catalyzing Clean Energy Industries and Jobs Through Federal Sustainability).
- *Net-Zero Emissions Buildings:* Projects, activities, and technologies that either (1) retrofit an existing building, making a substantial contribution to that building being a net-zero emissions building and as part of a plan for that building achieving net-zero emissions over time, or (2) construct a new net-zero emissions building in a Low-Income and Disadvantaged Community. A *net-zero emissions building* is a building that meets the requirements of Version 1 of the National Definition for a Zero Emissions Building (June 2024).
- *Zero-Emissions Transportation:* Projects, activities, and technologies that deploy zero-emissions transportation modes, plus enabling infrastructure necessary for zero-emissions transportation modes—especially in communities that are overburdened by existing diesel pollution, particulate matter concentration, and degraded air quality. Projects, activities, and technologies within this category must be consistent with the zero-emissions transportation decarbonization strategies in The U.S. National Blueprint for Transportation Decarbonization.

**Program Administration Activities:** Program Administration Activities means activities that support administration of the grant program, to the extent such activities meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. Program Administration Activities include but are not limited to establishing and convening advisory councils, as described in Item 2 of EPA's Guidance on Selected Items of Cost for Recipients, and fund raising, as described in Item 4 of EPA's Guidance on Selected Items of Cost for Recipients.

**Program Beneficiary:** Program Beneficiary means an entity (either an individual or an organization) that receives Financial Assistance or technical assistance as an end-user, except when such Financial Assistance is characterized as an Acquisition of Intangible Property (in which case the entity is a Contractor, as defined in 2 CFR 200.1). Expenditures to Program Beneficiaries are in the form of Participant Support Costs, as defined in 2 CFR 1500.1. A Program Beneficiary is distinct from a Subrecipient, as defined in 2 CFR 200.1.

5G - 84094001 - 1    Page 11

**Program Income:** 2 CFR 200.1 defines Program Income as "gross income earned by the recipient or subrecipient that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(c)". 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, Program Income also includes but is not limited to income from origination fees, servicing fees, and asset management fees; dividends from equity investments; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). Program Income must be treated in accordance with the Program Income Programmatic Term and Condition. EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fund raising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Under this award agreement, the Recipient is authorized to deduct the cost of generating program income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of program income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Program Income. Costs of generating program income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the program income, provided the Recipient can account for the actual costs incurred. Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

**Qualified Project:** Section 134(c)(3) of the Clean Air Act provides that a Qualified Project is any project, activity, or technology that (A) reduces or avoids greenhouse gas emissions and other forms of air pollution in partnership with, and by leveraging investment from, the private sector; or (B) assists communities in the efforts of those communities to reduce or avoid greenhouse gas emissions and other forms of air pollution. For this Assistance Agreement, Qualified Project means any project, activity or technology meeting all six requirements listed below at the time that Financial Assistance is provided to the project, activity, or technology:

- The project, activity, or technology would reduce or avoid Greenhouse Gas Emissions, consistent with the climate goals of the United States to reduce Greenhouse Gas Emissions 50-52 percent below 2005 levels in 2030, reach 50 percent zero-emission vehicles share of all new passenger cars and light trucks sold in 2030, achieve a carbon pollution-free electricity sector by 2035, and achieve net-zero emissions by no later than 2050. The project, activity, or technology may reduce or avoid such emissions through its own performance or through assisting communities in their efforts to deploy projects, activities, or technologies that reduce or avoid such emissions.

- The project, activity, or technology would reduce or avoid emissions of other Air Pollutants. The project, activity, or technology may reduce or avoid such emissions through its own performance or through assisting communities in their efforts to deploy projects, activities, or technologies that reduce or avoid such emissions.

- The project, activity, or technology would deliver additional benefits (i.e., in addition to primarily reducing or avoiding emissions of greenhouse gases and other Air Pollutants) to communities within one or more of the following seven categories: climate change; clean energy and energy efficiency; clean transportation; affordable and sustainable housing; training and workforce

Case 1:25-cv-00698-TSC     Document 49-2     Filed 03/26/25     Page 75 of 192
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 81 of 694

5G - 84094001 - 1     Page 12

development; remediation and reduction of legacy pollution; and development of critical clean water infrastructure.
- The project, activity, or technology may not have otherwise been financed.
- The project, activity, or technology would mobilize private capital.
- The project, activity, or technology would support only commercial technologies, defined as technologies that have been deployed for commercial purposes at least three times for a period of at least five years each in the United States for the same general purpose as the project, activity, or technology.

**Senior Management:** Senior Management means the chief executive officer, chief risk officer, general counsel, chief compliance officer, chief investment officer, chief reporting officer, and chief financial officer (or equivalent positions).

**Subaward:** 2 CFR 200.1 defines a Subaward as "an award provided by a pass-through entity to a subrecipient for the subrecipient to contribute to the goals and objectives of the project by carrying out part of a Federal award received by the pass-through entity. It does not include payments to a contractor, beneficiary, or participant". A Subgrant refers to a Subaward in the form of a grant.

**Subrecipient:** Consistent with 2 CFR 200.1, Subrecipient means an entity that receives a Subaward from a pass-through entity to carry out part of a Federal award but does not include an entity that is a Program Beneficiary of such an award. A Subrecipient is distinct from a Program Beneficiary, which is referenced in 2 CFR 1500.1. In this program, there are three main types of Subrecipients: (1) a Subrecipient that receives a Subgrant that will be used, either in whole or in part, to provide Financial Assistance to Qualified Projects, or a "Financial Assistance Subrecipient"; (2) a Subrecipient that receives a Subgrant that will be used exclusively for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities, or a "Technical Assistance Subrecipient"; and (3) a Subrecipient that receives Financial Assistance in the form of a Subaward, with the Subrecipient then using the Subaward to provide Financial Assistance to Qualified Projects, or a "Financial Intermediary Subrecipient". In accordance with 2 CFR 200.332, each Subrecipient is accountable to the Recipient for proper use of EPA funding. Note that a financial transaction is a Subaward to a Financial Intermediary Subrecipient if the following two characteristics are true: (i) the financial transaction provides an award by a pass-through entity to a Subrecipient through a form of *Federal financial assistance*, other than a grant, and (ii) the proceeds of the award are used directly as Financial Assistance to Qualified Projects, carrying out part of a Federal award received by the pass-through entity.

The EPA Subaward Policy applies to Subgrants made to Financial Assistance Subrecipients and Technical Assistance Subrecipients, including but not limited to Named Subrecipients. However, the EPA Subaward Policy does not apply to Subawards made to Financial Intermediary Subrecipients.

**Waste, Fraud, or Abuse:** For the definition and application of these terms under this Assistance Agreement (e.g. the Financial Risk Management Requirements, Clarifications to EPA General Terms and Conditions, and Financial Agent Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, refer to their use in the *Reporting Waste, Fraud, and Abuse* clause in the EPA General Terms and Conditions effective October 1, 2024 and 2 CFR 200.113: "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U.S.C. 3729-3733."

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 76 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 82 of 694

5G - 84094001 - 1    Page 13

## II. NATIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the Recipient agrees to the following four requirements of performance reporting: (1) progress reports, (2) transaction and-project level report , (3) organizational disclosures, and (4) ongoing disclosures. These performance reporting requirements "flow-down" as needed to enable the Recipient to comply with the requirements described in this term and condition. The Recipient must ensure that these reports cover its own grant-related activities, and where applicable to a certain performance report or element of a performance report, the grant-related activities of its Subrecipients, Contractors, and/or Program Beneficiaries. To comply with these performance reporting requirements, the Recipient agrees to use information collection instruments authorized by GGRF Accomplishment Reporting ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇, once such instruments are authorized; to the extent that information is not available for transactions that were closed prior to authorization of these instruments, the Recipient will not be out of compliance with the performance reporting requirements.

The Recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit performance reporting electronically to the EPA Project Officer. To the extent it is known, or should have been known, by the chief executive officer (or equivalent) and chief reporting officer (or equivalent) that the reporting is not materially compliant with the terms and conditions, or demonstrates material noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission. Should the chief executive officer (or equivalent) and chief reporting officer (or equivalent) signing the submission knowingly and willfully make any material false statement, they may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) prior to submission to EPA. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient. Recipient agrees that submitted information that does not include PII or CBI may be shared for program evaluation purposes, including with third parties.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. Notwithstanding any other provision of this Assistance Agreement, if Recipient's inability to submit the required performance reporting is due to issues with EPA systems, the Recipient shall be granted a reasonable extension to submit the reports after the technical issue has been corrected.

Where applicable, the intervals for reporting are authorized by 2 CFR 200.329(c)(1), as more frequent reporting is necessary for the effective monitoring of the Federal award and could significantly affect

5G - 84094001 - 1    Page 14

program outcomes.

## 1. Progress Reports

### *Semi-Annual Report*

The Recipient agrees to submit semi-annual reports covering six months of the calendar year in accordance with information collection instruments approved through GGRF Accomplishment Reporting ███████████████████████████████████████. A single semi-annual report must be submitted to cover grant-related activities of the Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the semi-annual report.

The Recipient agrees to submit semi-annual reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The first semi-annual reporting period ends on December 31 and covers all activities beginning on the first day of the Period of Performance.

### *Annual Report*

The Recipient agrees to submit annual reports that contain detailed narratives describing program performance over the Recipient's fiscal year, supported with qualitative discussions and quantitative metrics. A single annual report must be submitted to cover grant-related activities of the Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the annual report.

The Recipient must include the following broad, non-exhaustive elements in its annual reports:

- Progress towards objectives on key performance metrics over the reporting period,
- Summary of key activities completed in the reporting period, including case studies across different types of Financial Assistance to Qualified Projects,
- Geographic coverage of Financial Assistance to Qualified Projects made in the reporting period,
- Descriptions and examples of actions taken to meaningfully involve the communities the program serves in program design and operations,
- Case studies of different types of Market-Building and/or Predevelopment Activities, and
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved in the next reporting period.

These reports must be submitted ready to be published on the EPA website for public consumption and must not include any material that the Recipient considers to be Confidential Business Information (CBI)

5G - 84094001 - 1    Page 15

or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI. Should EPA identify PII or claims of CBI in reports, the EPA Project Officer will require that the Recipient re-submit the report without the PII or claims of CBI so that it can be published without redaction.

The Recipient agrees to submit **annual reports** electronically to the EPA Project Officer within 90 calendar days after the Recipient's fiscal year end date. The first annual report is due 90 calendar days after the Recipient's fiscal year that ends in 2025.

_Final Report_

The Recipient agrees to submit a final report containing two documents. First, the recipient must submit a report containing all of the elements described above for the annual report, covering the entire Period of Performance and overall assessment of its program performance and implementation of its workplan in effect under this Assistance Agreement. Second, the recipient must submit its investment strategy for the Closeout Period to detail its use of Post-Closeout Program Income over the Closeout Period. EPA intends to make the investment strategy, either in whole or in part, available to the public through disclosing copies of the investment strategy as submitted or using the content of the investment strategy. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient.

The two documents for the final report must be submitted to cover the grant-related activities of the Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the final report.

The Recipient agrees to submit the two documents for the final report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the Period of Performance.

## 2. Transaction and Project-Level Report

The Recipient agrees to submit quarterly transaction and project-level reporting in accordance with information collection instruments approved through GGRF Accomplishment Reporting ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. The data submission must cover the grant-related activities of the Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the data submission.

The Recipient agrees to submit the transaction and project-level report electronically to the EPA Project Officer within 30 calendar days after the quarterly reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the quarterly reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The four quarterly reporting periods for data submission are as follows: July 1 to September 30; October 1 to December 31; January 1 to March 31; and April 1 to June 30. The data submissions must cover

5G - 84094001 - 1    Page 16

transactions originated in the preceding quarter. For the quarterly reporting period that ends September 30, the Recipient must provide information on transactions originated from April 1 to June 30 rather than from July 1 to September 30. For the quarterly reporting period that ends December 31, the Recipient must provide information on transactions originated from July 1 to September 30 rather than October 1 to December 31. For the quarterly reporting period that ends March 31, the Recipient must provide information on transactions originated from October 1 to December 31 rather than January 1 to March 31. For the quarterly reporting period that ends June 30, the Recipient must provide information on transactions originated from January 1 to March 31 rather than April 1 to June 30. The first transaction and project-level report is due 30 calendar days after December 31, 2024 and must cover all transactions originated from the beginning of the Performance Period through September 30, 2024.

## 3. Organizational Disclosures

The Recipient agrees to submit annual organizational disclosures electronically to the EPA Project Officer within 30 calendar days after submission of its Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. The organizational disclosures must cover the Recipient's fiscal year and be submitted in accordance with information collection instruments approved through GGRF Accomplishment Reporting ███████████████████. Additionally, the Recipient agrees to submit such organizational disclosures for each Financial Assistance Subrecipient that has received in excess of $10,000,000 in NCIF subgrants to provide Financial Assistance to Qualified Projects under the National Clean Investment Fund (to be delivered within 30 calendar days after submission of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System). The requirement for organizational disclosures is not applicable for any fiscal year in which the reporting entity did not meet the requirements of 2 CFR Subpart F—Audit Requirements. The first Organizational Disclosures are due in 2025.

## 4. Ongoing Disclosures

In addition to other ongoing disclosure obligations within the regulations and terms and conditions of this Award Agreement, the Recipient agrees to notify the EPA Project Officer of the following events in accordance with 2 CFR 200.329(e):

    1. Changes to the Recipient's independent certified public accounting firm;

    2. Non-reliance by the Recipient or its independent auditor on previously issued financial statements or a related audit report or completed interim audit review;

    3. Changes in fiscal year end of the Recipient;

    4. Material impairments to the Recipient's assets;

    5. Intention to file bankruptcy petition or enter into receivership;

    6. Submission of annual Form 990 to the IRS, with provision of copy to EPA Project Officer upon request (only if submission of the Form 990 is otherwise required).

Additionally, the Recipient agrees to submit such ongoing disclosures for each Financial Assistance Subrecipient that has received in excess of $10,000,000 to provide Financial Assistance to Qualified Projects under the National Clean Investment Fund. The Recipient agrees to submit ongoing disclosures

5G - 84094001 - 1    Page 17

electronically to the EPA Project Officer within 15 calendar days of the event.

## B. Cybersecurity Condition

(a) The Recipient agrees that when collecting and managing environmental data under this Assistance Agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward Agreements and, during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process.  A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

## D. Public or Media Events

For public or media events that are planned more than 15 calendar days in advance, the Recipient agrees to notify the EPA Project Officer of public or media events it has organized publicizing the

Case 1:25-cv-00698-TSC   Document 49-2   Filed 03/26/25   Page 81 of 192
USCA Case #25-5122   Document #2114423   Filed: 05/05/2025   Page 87 of 694

5G - 84094001 - 1   Page 18

accomplishment of significant activities related to execution of the workplan in effect under this Assistance Agreement and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice.

## E. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards.  Information on these standards may be found at https://www.fgdc.gov/.

## F. Leveraging and Fund Raising

### 1. Leveraging

The Recipient agrees to make commercially reasonable efforts to provide the proposed leveraged funding that is described in its workplan in effect under this Assistance Agreement. If the proposed leveraging does not substantially materialize during the Period of Performance, and the Recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future grant applications from the Recipient. In addition, if the proposed leveraging does not substantially materialize during the Period of Performance and the Recipient does not provide a satisfactory explanation, then EPA may reconsider the legitimacy of the award; if EPA determines that the Recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the workplan in effect under this Assistance Agreement, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

### 2. Fund Raising

2 CFR 200.442 provides coverage on allowable fund-raising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fund raising costs are an allowable cost and may include costs that are reasonable and necessary for raising capital from private investors to provide Financial Assistance to Qualified Projects.

Allowable fund-raising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private investors. Funds a Recipient raises for its own use with costs borne by an EPA Financial Assistance Agreement are considered Program Income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fund raising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fund-raising costs charged to the award will be treated as Program Income.

## G. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving Environmental Information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving Environmental Information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure sub-award recipients develop and implement Quality Assurance (QA) planning documents in accordance with this

term and condition; and/or ensure sub-award recipients implement all applicable approved QA planning documents. EPA will not approve any QA planning documents developed by a Subrecipient; the Recipient is responsible for reviewing and approving its Subrecipient QA planning document(s), if required based on the Subrecipient's Environmental Information Operations.

## 1. Quality Management Plan (QMP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the recipient must: (i) develop a QMP, (ii) prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard and submit the document for EPA review, and (iii) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved and current QMP and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

The Recipient must submit the QMP within 90 calendar days after grant award, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the Recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QAPP, (ii) prepare the QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard, (iii) submit the document for EPA review, and (iv) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s) and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer (PO) in writing if the previously EPA-approved QAPP is acceptable for this agreement.

The Recipient must submit the QAPP within 90 calendar days after grant award, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

The recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 83 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 89 of 694

5G - 84094001 - 1    Page 20

when changes occur.

**For Reference:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

## H. Real Property

In accordance with 2 CFR 200.311, title to Real Property acquired or improved under this agreement will vest upon acquisition by the Recipient, including but not limited to title to Real Property acquired through exercise of a remedy for default of a Financial Assistance arrangement. This Real Property must be used for the originally authorized purpose as long as needed for that purpose, during which time the Recipient must not dispose of or encumber its title or other interests. The Real Property Programmatic Term and Condition flows down to Subrecipients but not to Program Beneficiaries or Contractors that receive Financial Assistance to Qualified Projects, which may acquire title to Real Property after receiving Financial Assistance to Qualified Projects.

The Recipient must obtain prior approval from the EPA Award Official for the acquisition of Real Property. Note that the Recipient may meet this requirement by specifying the types of acquisitions of Real Property it plans to carry out (including in cases where the Recipient would acquire title to Real Property through exercise of a remedy for default) in its workplan in effect under this Assistance Agreement.

<u>Disposition</u>

If the Recipient disposes of the Real Property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

Otherwise, when Real Property is no longer needed for the originally authorized purpose, the Recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where Recipient is disposing of Real Property acquired or improved with a Federal award and acquiring replacement Real Property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any

Case 1:25-cv-00698-TSC     Document 49-2     Filed 03/26/25     Page 84 of 192
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 90 of 694

5G - 84094001 - 1     Page 21

improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the Recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The Recipient is entitled to be paid an amount calculated by applying the Recipient's percentage of participation in the purchase of the Real Property (and cost of any improvements) to the current fair market value of the property.

<u>Recordation</u>

As authorized by 2 CFR 200.316, EPA requires that Recipients who use EPA funding to purchase and improve Real Property through an EPA funded construction project record a lien or similar notice in the Real Property records for the jurisdiction in which the Real Property is located, which indicates that the Real Property has been acquired and improved with federal funding and that use and disposition conditions apply to the Real Property.

I. Program Income

In accordance with Clean Air Act Section 134(b)(1)(C) as well as 2 CFR 200.307(c) and 2 CFR 1500.8 (b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the workplan in effect under this Assistance Agreement.

J. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the Recipient or Subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the Recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 85 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 91 of 694

5G - 84094001 - 1    Page 22

## III. ADDITIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Eligible Recipient

**The Recipient agrees to maintain its status as an Eligible Recipient, which includes:**

a. Meeting the definition of *Nonprofit organization* set forth in 2 CFR 200.1;

b. Having an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"

c. Not receiving any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);

d. Being funded by public or charitable contributions; and

e. Having the legal authority to invest in or finance projects.

### B. Workplan and Budget

The Recipient agrees to execute the workplan in effect under this Assistance Agreement. This document, once approved by the EPA, will reflect an agreement between the Parties and will be incorporated into and be a part of the agreement between the Recipient and the EPA.

The Recipient agrees to conduct an annual review of the workplan in effect under this Assistance Agreement within 90 calendar days of June 30 of each calendar year. If material changes are made during the annual review or in between annual reviews, the Recipient agrees to submit the updated workplan to the EPA Project Officer.

The Recipient also agrees to conduct an annual review of the EPA-approved detailed budget table within 90 calendar days of June 30 of each calendar year. If material changes are made during the annual review or in between annual reviews, the Recipient agrees to submit the updated detailed budget table to the EPA Project Officer. Such submissions are not subject to prior approval unless otherwise required by the regulations or the terms and conditions of the Award Agreement.

### C. Recipient Organizational Plan

The Recipient agrees to execute the workplan in accordance with the documents listed below, as submitted to EPA through Grants.gov for EPA-R-HQ-NCIF-23 or provided to EPA after the application submission deadline.

1. Organizational Plan, pursuant to *Section IV.C: Content of Application Submission* of the Notice of Funding Opportunity;

2. Legal Entity Structure Diagram, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity; and

JA595

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 86 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 92 of 694

5G - 84094001 - 1    Page 23

3. Organizational and Governing Documents, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity.

The Recipient agrees to maintain its incorporation in the United States, as reflected in the above documents.

The Recipient agrees to conduct an annual review of the documents within 90 calendar days of June 30 of each calendar year. If material changes are made during the annual review or in between annual reviews, the Recipient agrees to submit the updated documents to the EPA Project Officer. Such submissions are not subject to prior approval unless otherwise required by the regulations or the terms and conditions of the Award Agreement.

## D. Recipient Policies and Procedures

The Recipient agrees to execute the workplan in accordance with the documents listed below (or other documents submitted in lieu of the documents listed below), as submitted to EPA through Grants.gov for EPA-R-HQ-NCIF-23 or provided to EPA after the application submission deadline.

1. Legal and Compliance Risk Management Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

2. Financial Risk Management Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

3. Board Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

4. Management Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

5. Consumer Protection Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

6. Equity Policies and Practices, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity; and

7. Conflict of Interest Mitigation Plan, which include all documents submitted upon EPA's request regarding measures that will be taken to eliminate, neutralize, mitigate or otherwise resolve conflicts of interest.

8. Documentation of Personnel and Fringe Benefit Charges, which includes all documents submitted upon EPA's request to document how personnel and fringe benefits will be charged against the grant award in accordance with 2 CFR 200.430 *Compensation—personal services* and 2 CFR 200.431 *Compensation—fringe benefits*. Notwithstanding the content of the Recipient's EPA-approved budget, the Recipient is not authorized to charge the grant award for personnel and fringe benefits against employees without using the W-2 as the definitive definition of "employee" until the Documentation of Personnel and Fringe Benefit Charges has been reviewed and approved by the EPA, as communicated by the EPA Project Officer.

5G - 84094001 - 1    Page 24

The Recipient agrees to conduct an annual review of the documents within 90 calendar days of June 30 of each calendar year. If material changes are made during the annual review or in between annual reviews, the Recipient agrees to submit the updated documents to the EPA Project Officer. With the exception of the Documentation of Personnel and Fringe Benefit Charges, where changes will be subject to prior approval, such submissions are not subject to prior approval unless otherwise required by the regulations or the terms and conditions of the Award Agreement.

## E. Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Financial Assistance to Qualified Projects; Predevelopment Activities; Market-Building Activities; and Program Administration Activities. The Recipient must use awards funds exclusively for allowable activities within the ten EPA regions, with the exception of the Freely Associated States. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

The Recipient agrees to not use the award for the following unallowable activities: (a) Financial Assistance to Qualified Projects in the form of Subgrants; (b) Subgrants for the purposes of providing Financial Assistance to Qualified Projects (other than Subgrants from the Recipient to first-tier Subrecipients); and (c) activities that support deployment of projects that do not meet the definition of Qualified Projects. The allowability of legal costs incurred in connection with the award shall be governed by applicable provisions of 2 CFR Part 200, Subpart E, including but not limited to 2 CFR 200.403, 2 CFR 200.435, 2 CFR 200.441 and 2 CFR 200.459.

## F. Foreign Entity of Concern

As part of carrying out this award, the Recipient agrees to ensure that entities the Recipient contracts with, the Recipient makes Subawards to, or that receive funds as Program Beneficiaries at any tier of funding under this grant agreement are not—

(A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

(B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

(C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## G. LIDAC Expenditure Requirement

The Recipient agrees to ensure that a minimum of 40% of the award is used for the purposes of providing Financial Assistance in Low-Income and Disadvantaged Communities, with compliance maintained over each annual reporting period (i.e., from July 1 to June 30). Funds used for the purposes of providing Financial Assistance may include Financial Assistance to Qualified Projects; Predevelopment Activities; Market-Building Activities; and Program Administration Activities. This requirement applies to the entire award provided to the Recipient but does not "flow down" to each

JA597

Subrecipient.

## H. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide Financial Assistance to Qualified Projects that may generate Program Income as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such Financial Assistance may include Subawards, Participant Support Costs, and/or Acquisitions of Intangible Property. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the Recipient's Subawards from the capitalization of a revolving loan fund.

EPA does not consider the remaining portion of the award as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). As such, all Subgrants made by the Recipient are subject to the EPA Subaward Policy.

## I. Subawards

Subawards to Technical Assistance Subrecipients

The Establishing and Managing Subawards General Term and Conditions applies to Technical Assistance Subrecipients.

Subawards to Financial Intermediary Subrecipients

The following requirements apply when the Recipient provides a Subaward to a Financial Intermediary Subrecipient. These requirements apply to the Recipient and Subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition, as the EPA Subaward Policy does not apply to Financial Intermediary Subrecipients.

    1. The Recipient must establish and follow a system that ensures all Subawards to Financial Intermediary Subrecipients are in writing and contain all of the elements required by 2 CFR 200.332(b), with the exception of the indirect cost provision of 2 CFR 200.332(b)(4) (which does not apply to loans). EPA has developed an optional template for Subaward Agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such Subaward Agreements with Financial Intermediary Subrecipients.

    2. The Financial Intermediary Subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all Subawards that requires Financial Intermediary Subrecipients to comply with these requirements. No other provisions of the Uniform Grant Guidance, including the Procurement Standards, apply directly to the Subrecipient.

    3. Prior to making the Subaward, the Recipient must ensure that the Financial Intermediary Subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(b)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

5G - 84094001 - 1     Page 26

Subawards to Financial Assistance Subrecipients

The following requirements apply when the Recipient provides a Subaward to a Financial Assistance Subrecipient. These requirements apply to the Recipient and Subrecipient in addition to those specified in the Establishing and Managing Subawards General Term and Condition.

    1. The Recipient must obtain written approval from the EPA Award Official prior to providing a Subgrant to a Financial Assistance Subrecipient that would exceed $10,000,000 cumulatively in Financial Assistance Subawards under the National Clean Investment Fund and Capitalization Funding under the Clean Communities Investment Accelerator.

    2. Prior to providing a Subgrant not named on the application to a Financial Assistance Subrecipient, the Recipient must obtain disclosure from the potential Subgrantee regarding award funds that it has sought and/or received under the National Clean Investment and Clean Communities Investment Accelerator programs.

## J. Participant Support Costs

The Recipient may provide Financial Assistance to Qualified Projects in the form of Participant Support Costs. In addition, the Recipient may provide Participant Support Costs for other purposes, including Predevelopment Activities, Market-Building Activities, and Program Administration Activities, to the extent such purposes are authorized under the Award Agreement.

The Recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on Participant Support Costs, in addition to other requirements included in the terms and conditions of this Award Agreement:

    1. The Recipient and Program Beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as Participant Support Costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the Recipient and Program Beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates, and other participant support cost payments. However, EPA does not provide advice on tax issues relating to these payments.

    2. Participant Support Cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The Recipient, therefore, may not make Participant Support Cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that Subrecipients adhere to this requirement as well. The Recipient is responsible for checking that Program Beneficiaries (i.e., entities receiving Participant Support Costs) are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the Program Beneficiaries.

The Recipient agrees to provide written guidelines for Participant Support Costs to the EPA Project Officer prior to making payments to Program Beneficiaries, unless already described in the Recipient's workplan in effect under this Assistance Agreement. These guidelines must: (a) describe the activities that will be supported by the Participant Support Costs; (b) specify the range of funding to be provided through the Participant Support Costs; (c) identify which types of entities will have title to equipment (if

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 90 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 96 of 694

5G - 84094001 - 1    Page 27

any) purchased with the funds; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the Participant Support Cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

## K. Acquisitions of Intangible Property

### 2 CFR 200 Procurement Standards

The Recipient may provide Financial Assistance to Qualified Projects in the form of Acquisitions of Intangible Property. The Recipient agrees to acquire Intangible Property in compliance with the conflict of interest and competition requirements described in the 2 CFR Part 200 Procurement Standards. This includes but is not limited to the requirements at 2 CFR 200.318 to:

- Have and use documented procurement procedures to govern acquisitions of Intangible Property;
- Maintain oversight to ensure that contractors perform in accordance with the terms, conditions, and specifications of their contracts;
- Maintain written standards of conduct covering conflicts of interest and governing the actions of employees engaged in the selection, award, and administration of contracts as well as maintain written standards of conduct covering organizational conflicts of interest;
- Prioritize entering into inter-entity agreements where appropriate for procurement or use of common or shared goods and services as the Recipient seeks to mobilize financing and private capital;
- Award contracts only to responsible contractors possessing the ability to perform successfully under the terms and conditions of the proposed procurement; and
- Maintain records sufficient to detail the history of procurement.

### Disposition

If the Recipient disposes of the Intangible Property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

### Recordation

The Recipient agrees to record liens or other appropriate notices of record to indicate that Intangible Property has been acquired with Federal funding and that use and disposition conditions apply to the Intangible Property, in cases where Financial Assistance to Qualified Projects is in the form of an Acquisition of Intangible Property. As provided in 2 CFR 200.1: "…loans, notes and other debt instruments, lease agreements, stock and other instruments of property ownership (whether the property is tangible or intangible)" are *Intangible Property* for the purposes of the restrictions described at 2 CFR 200.315(a). "Other appropriate notices of record" is not limited to filing Uniform Commercial Code instruments and may also include a notice of record in the legally-binding transaction documents.

Additional guidance is available at Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements.

## L. Labor and Equitable Workforce Development Requirements

5G - 84094001 - 1     Page 28

## 1. Davis-Bacon and Related Acts (DBRA)

## A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this Award Agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" and "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific construction projects that were not completed prior to the execution of the final binding documentation governing the use of the Financial Assistance. The Recipient must ensure that any construction work financed in whole or in part with such Financial Assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis-Bacon and Related Act requirements and the requirements of these Terms and Conditions.

Note, however, that under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements do not apply to any form of Financial Assistance which meets any of the following criteria:

- Financial Assistance which exclusively funds pre-construction (e.g. permitting or design work) or post-construction activities (e.g. Acquiring Intangible Property related to a previously completed construction project or re-financing activity related to a previously completed construction project).
- Financial Assistance which serves end-users who are individual homeowners or tenants of single-family homes or multifamily buildings when these individual end-users ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves end-users who meet the definition of Federally Recognized Tribal Entities, as defined under this Assistance Agreement, when these Federally Recognized Tribal Entities ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves any end-user when such Financial Assistance is less than $250,000 for a project and the end-user ultimately selects the contractor(s) and executes the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.

If the Recipient encounters a situation that presents uncertainties regarding DBRA applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with a Subrecipient, Program Beneficiary, contractor, or subcontractor determines any instances of non-compliance or

Case 1:25-cv-00698-TSC     Document 49-2     Filed 03/26/25     Page 92 of 192
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 98 of 694

5G - 84094001 - 1     Page 29

potential non-compliance with the requirements of this Term and Condition or the Davis-Bacon and Related Act, the Recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Note, the use of the term project in this term and condition is distinct from the use of the term project within the definition of Qualified Project under Clean Air Act Section 134(c)(3), which is broader and includes "any project, activity, or technology." Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed by a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

## B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

## C. Recipient Responsibilities When Entering Into and Managing Contracts:

### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

### b. After Award of Contract:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

## D. Recipient Responsibilities When Establishing and Managing Additional Subawards:

### a. Include DBRA Requirements in All Subawards (including Loans): Include the following text on

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 93 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 99 of 694

5G - 84094001 - 1    Page 30

all Subawards under this grant: "By accepting this award, the EPA Subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of Subrecipients and must ensure Subrecipients comply with the requirements in 29 CFR 5.6.

**c. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of Subrecipients and must ensure that Subrecipients comply with the requirements in subsection E, below.

## E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program Beneficiaries

When DBRA is applicable, Financial Assistance provided in the form of a participant support cost to a Program Beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

**a. Solicitation and Contract Requirements:**

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

5G - 84094001 - 1     Page 31

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

## 2. Compliance with Federal Statutes and Regulations

The Recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with Subrecipients, contractors, and other partners (e.g., by including such provisions in contractual agreements). This includes but is not limited to applicable health and safety regulations as administered by the Occupational Safety and Health Administration.

## 3. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the Recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## 4. Labor and Equitable Workforce Development Implementation Plan

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), by December 31, 2024, the Recipient must submit a Labor and Equitable Workforce Development Implementation Plan to the EPA Project Officer. The Implementation Plan should articulate policies, practices, and procedures adopted by the Recipient to maximize high-quality jobs and workforce development outcomes on projects assisted with the award. Examples of how this can be demonstrated include, but are not limited to:

• Mechanisms for promoting job quality and evaluating labor standards on projects being considered for and/or receiving Financial Assistance;

• Plans to support workforce development as part of Market-Building Activities;

• Current and planned partnerships with labor and workforce development organizations, including the purpose of those partnerships;

• Mechanisms for maximizing training and employment opportunities for participants in Registered Apprenticeship Programs on projects, including apprenticeship utilization targets, as applicable;

• Mechanisms for creating high-quality job training and employment opportunities available to residents of low-income and disadvantaged communities through projects and other program activities; and

• Processes for promoting Project Labor Agreements on construction projects above $25,000,000, as appropriate, in alignment with Executive Order 14063 (Use of Project Labor Agreements for

Federal Construction Projects) and Executive Order 13502 (Use of Project Labor Agreements for Federal Construction Projects), as well as other types of binding agreements that promote strong workforce outcomes, such as Community Workforce Agreements and Community Benefits Agreements.

The Recipient may use or reference materials already submitted to EPA as part of its submission of the Implementation Plan, where relevant.

Note that EPA may make the information from this plan available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient.

## M. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that for any activity related to the construction, alteration, maintenance, or repair of infrastructure, "none of the funds made available for a Federal Financial Assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The Recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America (BABA) requirements that all Recipients of EPA Financial Assistance awards must comply with.

Under the Greenhouse Gas Reduction Fund, BABA requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific infrastructure projects that were not completed prior to the date the Recipient's award funds were obligated by the EPA.

EPA interprets the definition of infrastructure consistent with 2 CFR 184 and M-24-02 (memorandum dated as of October 23, 2023), including the "public function" test, when determining whether projects qualify as public infrastructure, based on the Civil Rights Act definition of public accommodation.

The following types of Greenhouse Gas Reduction Fund projects are deemed infrastructure for the purposes of BABA applicability:

1. The public infrastructure portion of any property (e.g., retail in a mixed-use multi-family property) where the principal purpose of the Financial Assistance is to directly benefit such portion of the property;

2. Privately-owned commercial buildings when they meet the "public function" test;

3. Residential-serving community solar projects, which EPA deems "structures, facilities, and equipment that generate, transport, and distribute energy" per 2 CFR 184.4(c);

5G - 84094001 - 1    Page 33

4. Publicly accessible EV charging stations;

5. Publicly owned energy generation and/or storage transportation facilities;

6. Publicly owned transportation facilities (e.g., bus depot);

7. Privately-owned transportation facilities that serve a public function.

The following types of Greenhouse Gas Reduction Fund projects are not deemed infrastructure for the purposes of BABA applicability:

1. Privately-owned vehicles for private use;

2. Certain publicly-owned or operated vehicles that EPA has determined do not constitute infrastructure (e.g. school buses);

3. Privately-owned manufacturing or industrial facilities;

4. Privately-owned offices;

5. Single family homes;

6. Privately-owned, non-mixed-use, multi-family housing properties;

7. Privately-owned residential portions of mixed-use properties;

8. EV charging stations that are not publicly accessible;

9. Any privately-owned, behind-the-meter energy generation and storage project that does not otherwise meet the definition of infrastructure.

The inclusion of the following types of funding, support, guarantee, or sponsorship in the funding stack of any Greenhouse Gas Reduction Fund project does not trigger BABA, in and of itself or in combination:

1. Low-Income Housing Tax Credit (LIHTC);

2. Fannie Mae and Freddie Mac Backed Multifamily Mortgages;

3. Federal Housing Administration Insured Multifamily Mortgages;

4. HUD Section 8 Funding;

5. Other Federal, State, Tribal, or Local Housing Assistance Funding Sources: in general, subsidies issued by federal, state, tribal, or local housing assistance funding sources that do not confer equity or ownership stakes for the governmental funding source do not trigger BABA applicability.

BABA applicability is assessed at the time of provision of Financial Assistance based on the terms, limitations, and requirements of the Financial Assistance. Applicability does not change retroactively

5G - 84094001 - 1    Page 34

based on a change of use (e.g., if a ground floor apartment is re-zoned for a restaurant). Recipients may not temporarily modify or mischaracterize usage to intentionally avoid BABA compliance.

If the Recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## N. Governance Requirements

The Recipient agrees to comply with the following governance requirements starting December 31, 2024. The governance requirements "flow-down" to Financial Assistance Subrecipients that have received in excess of $10,000,000 in NCIF subgrants but not to other subrecipients. The governance requirements are waived for (i) any entity that has been determined by the U.S. Treasury's CDFI Fund to meet the CDFI certification requirements set forth in 12 CFR 1805.201 and (ii) any entity whose specific governance structure is set forth in State, Tribal, or local law.

The Recipient (or Subrecipient) may meet all or some of the governance requirements through the parent entity, provided the Recipient (or Subrecipient) is subject to the governance of the parent entity and the Recipient (or Subrecipient) is wholly-controlled by the parent entity. Similarly, the governance requirements may be waived for the Recipient (or Subrecipient) through the parent entity meeting the CDFI certification requirements set forth in 12 CFR 1805.201, provided the Recipient (or Subrecipient) is wholly-controlled by the parent entity.

### 1. Board Size and Composition

The Recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the Recipient's workplan in effect under this Assistance Agreement as well as other business activities. The board must have a sufficient number of members to adequately staff each of its
committees.
The Recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from Low-Income and Disadvantaged Communities).

### 2. Board Independence

The Recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

### 3. Board Committees

The Recipient agrees to have the following board-level committees to oversee and monitor management, with each committee staffed by members qualified to execute the committee's objectives. While the Recipient need not adhere to the exact naming convention or structure in this term and condition, each of the responsibilities must be covered by board-level committees at all times during the Period of Performance; for the avoidance of doubt, one committee may perform the responsibilities of one or more of the committees specified below.

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 98 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 104 of 694

5G - 84094001 - 1    Page 35

1. An investment or credit committee to oversee and approve investment or credit decisions;

2. A risk management committee to oversee the formulation and operationalization of the risk management framework;

3. An audit committee to oversee the integrity of reporting and internal controls and the performance of audit functions, with a majority independent members on such committee;

4. A nomination/governance committee to oversee nomination and succession of board and senior management, with a majority independent members on such committee; and

5. A compensation committee to oversee board as well as senior management and staff compensation, with a majority independent members on such committee.

Further, the Recipient agrees to act in good faith to ensure each committee obtains information from management, auditors, or other third-parties necessary to discharge their duties.

## 4. Board Policies and Procedures

The Recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The Recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of Subawards, participant support cost payments, Acquisitions of Intangible Property to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

## O. Consumer Protection Requirements

The Recipient agrees to carry out the following consumer protection requirements to the extent that the Recipient directly interacts, transacts, or contracts with consumers in the provision of Financial Assistance to Qualified Projects:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 99 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 105 of 694

5G - 84094001 - 1    Page 36

procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The Recipient agrees to monitor and oversee Subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(e) and 2 CFR 200.318.

## P. Financial Risk Management Requirements

### 1a. Cash Management Requirements: Advance Payments

The Recipient must deposit and maintain advance payments of Federal funds exclusively in insured accounts, in accordance with 2 CFR 200.305(b)(10). As provided in 2 CFR 200.1, an advance payment is "a payment that a Federal agency or pass-through entity makes by any appropriate payment mechanism and payment method before the recipient or subrecipient disburses the funds for program purposes." A Recipient drawing down funds from ASAP prior to disbursement for actual and allowable project costs constitutes an advance payment. Interest income earned on the advance payment from EPA to the Recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

### 1b. Cash Management Requirements: Program Income

The Recipient is authorized to maintain Program Income in two types of accounts:

1. Insured accounts, including in amounts in excess of the federal insurance limit of $250,000.
2. Accounts where such income is used to purchase (i) U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days (if purchased directly) and that such instruments are held-to-maturity (if purchased directly), or (ii) short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. Note, the underlying instruments included in a short-term money market fund consisting solely of U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities and offering daily investor redemptions need not be of a particular duration or held-to-maturity.

Interest income and other returns earned on funds that have already been disbursed is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12).

### 2. Financial Health Metrics

5G - 84094001 - 1    Page 37

The Recipient agrees to report the following financial health metrics at the entity-level on an annual basis in accordance with its fiscal year as well as on behalf of each Financial Assistance Subrecipient that receives in excess of $10,000,000 in NCIF subgrants. The metrics are due to the EPA Project Officer within 30 calendar days after submission of the reporting entity's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System and may be submitted through the Organizational Disclosures form. The requirement for submission of financial health metrics is not applicable for any fiscal year in which the reporting entity did not meet the requirements of 2 CFR Subpart F—Audit Requirements. The first financial health metrics are due in 2025.

> 1. Net Asset Ratio: The net asset ratio is defined as net assets divided by total assets.
> 2. Current Ratio: **The current ratio is defined as current assets divided by current liabilities, where** current assets is equal to the value of all assets that are reasonably expected to be converted into cash within the coming 12-month period in the normal course of business and current liabilities is equal to the total value of all debts or obligations that must be paid in the coming 12-month period.
>
> 3. Delinquency Rate: The delinquency rate is defined as the value of loans outstanding that are 90+ calendar days delinquent divided by the value of loans outstanding, where loans 90+ calendar days delinquent includes those with outstanding balances 90+ calendar days overdue and still accruing interest as well as those in nonaccrual status.
>
> 4. Net Charge-Off Rate: The net charge-off rate is defined as the value of loans charged-off over the past fiscal year, minus the value of loan recoveries over the past fiscal year, divided by the value of loans outstanding.
>
> 5. Concentration: The concentration of the portfolio, as demonstrated by calculating and reporting on recipient-level exposure, defined as on-balance sheet exposures to a single consolidated entity over all on-balance sheet exposures, for top ten highest exposures.

Note, the Delinquency Rate and Net Charge-Off Rate may exclude the value of loans which include an element of forgiveness, if and only if such forgiveness was established in the terms governing the financial product at origination.

The EPA Project Officer will consider Recipient and, where applicable, Subrecipient performance against these financial health metrics only to the extent by which they Materially Impair the Recipient's ability to execute the workplan in effect under this Assistance Agreement when assessing whether the Recipient is making sufficient progress in implementing the workplan in effect under this Assistance Agreement, as specified in the Sufficient Progress clause under the Clarifications to EPA General Terms and Conditions Programmatic Term and Condition.

### 3. Climate-Related Financial Risks

The Recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The Recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.

5G - 84094001 - 1    Page 38

## 4. Additional Requirements

The Recipient agrees to not subordinate EPA's interest in grant funds that have not yet been used for program purposes in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law. Once a Recipient uses grant funds for program purposes and incurs a financial obligation, as defined under 2 CFR 200.1, EPA will only seek claims on those funds in the event that they were used for costs that do not comply with the terms and conditions of the Award Agreement or if there is adequate evidence of Waste, Fraud, or Abuse, prompting adverse action by EPA per 2 CFR 200.339. This does not prohibit the use of subordinated debt as a form of Financial Assistance.

The Recipient agrees to provide Financial Assistance Subrecipients with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(f).

## Q. Historic Preservation

### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The Recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties can include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The Recipient should work with their Project Officer to ensure that Subrecipients are available to work with EPA on any required consultation process with the State Historic Preservation Office (SHPO) or Tribal Historic Preservation Office (THPO) prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

### Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The Recipient must ensure that Subrecipients performing construction projects are aware of this requirement, and the Recipient must notify EPA if the AHPA is triggered.

5G - 84094001 - 1    Page 39

## R. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the Recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The Recipient must comply with, and ensure Subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the Federal award" provision of 2 CFR 200.403(a). The Recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## S. Remedies for Non-Compliance

The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as provided in 2 CFR 200.343. As specified in 2 CFR 200.343, which will remain in effect throughout the term of this award, costs during suspension or after termination are allowable if (a) the costs result from financial obligations which were properly incurred by the non-Federal entity before the effective date of suspension or termination, are not in anticipation of it, and (b) the costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

The Recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the Recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of Subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the Recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action.

Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing a reasonable opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Performance Reporting National Programmatic Term and Condition, Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements, requirements for Subrecipient oversight, or to obligate or expend funds for allowable activities.

## T. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The

5G - 84094001 - 1     Page 40

Recipient agrees to comply with these clarifications.

## 1. Indirect Cost Rate

The Recipient must exclude costs for acquisitions of Intangible Property from any calculations of modified total direct costs (MTDC), as defined in 2 CFR 200.1. Intangible Property is not a "service" and therefore is not included in MTDC. The Recipient should note that Subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive Participant Support Costs cannot charge an indirect cost rate against their participant support cost payments.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $50,000 of each Subaward (regardless of the period of performance of the Subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, Participant Support Costs and the portion of each Subaward in excess of $50,000.

In the event that the Recipient is compensating an affiliated entity for its direct and indirect costs related to use of employees, the Recipient must not charge its indirect cost rate against any of these costs.

Notwithstanding the General Term and Condition "Indirect Cost Rate Agreements," the Recipient may claim up to a 15% de minimis rate of modified total direct costs authorized by 2 CFR 200.414(f).

## 2. Sufficient Progress

The EPA Project Officer may assess whether the Recipient is making sufficient progress in implementing the workplan in effect under this Assistance Agreement under this Assistance Agreement within 90 calendar days of June 30, 2025 as well as within 90 calendar days of June 30 of each year thereafter during the Period of Performance. "Sufficient progress" shall be assessed based on a comparison of the Recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. As noted under the Financial Risk Management Programmatic Term and Condition, the Recipient's financial health, as measured by the required Financial Health Metrics, are also an input in this process. This term and condition "flows down" to Subrecipients, with the Recipient required to assess whether each Subrecipient is making sufficient progress in implementing the workplan under its Subaward Agreement; the Recipient may increase the frequency and scope of the review of sufficient progress of Subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the Recipient has not made sufficient progress in implementing its workplan in effect under this Assistance Agreement, the Recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

EPA will not find that the Recipient has failed to make sufficient progress in implementing its workplan in effect under this Assistance Agreement based on shifts between types of Financial Assistance and/or Qualified Projects over the Period of Performance (or other shifts in portfolio allocation, such as by region or market segment, over the Period of Performance). If EPA finds the Recipient has failed to achieve sufficient progress on deployment of Financial Assistance to Qualified Projects in general, or is achieving progress at a slower rate than projected under the workplan in effect under this Assistance Agreement, the Recipient will have an opportunity to implement a corrective action plan pursuant to 2 CFR 200.208.

5G - 84094001 - 1   Page 41

## 4. Termination

EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.957 (NCIF) to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

## U. Period of Performance

The Period of Performance under this Award Agreement will end on the date specified in the Notice of Award. However, the Period of Performance may end prior to the date specified in the Notice of Award if all required work of the Federal award has been completed, in accordance with 2 CFR 200.344. In accordance with 2 CFR 200.344(b), the Recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the Period of Performance. In this context, to "liquidate all financial obligations" means to pay outstanding bills, such as the payment of staff salaries accrued during the Period of Performance but for which the due date falls after the end date of the Period of Performance. To "liquidate all financial obligations" does not mean to liquidate, terminate, or accelerate outstanding obligations related to the provision of Financial Assistance to Qualified Projects at the end of the Period of Performance, which would continue to be subject to the Closeout Agreement.

The Recipient should note that the Recipient will not be considered to have met the requirements for closeout under its award under 2 CFR 200.344 so long as any Subrecipient has not met the requirements for closeout under its subaward under 2 CFR 200.344.

Notwithstanding the Extension of Project/Budget Period Expiration Date General Term and Condition, in accordance with 2 CFR 200.308(g)(2), the Recipient is authorized to initiate a one-time extension of the Period of Performance by up to 12 months without prior EPA approval, provided that the extension complies with the requirements 2 CFR 200.308(g)(2). In accordance with 2 CFR 200.308(g)(2), the Recipient must "notify the Federal agency in writing with the supporting justification and a revised period of performance at least 10 calendar days before the conclusion of the period of performance."

## V. Closeout Agreement

As provided at 2 CFR 200.307(c) and 2 CFR 1500.8(d), after the end of the Period of Performance of the Assistance Agreement, the Recipient may keep and use Program Income remaining at the end of the Assistance Agreement and use Post-Closeout Program Income in accordance with this term and condition. The Closeout Agreement goes into effect for this Assistance Agreement the earlier of 1) the day after the Assistance Agreement Period of Performance ends, 2) the first date when all required work of the Federal award has been completed in accordance with 2 CFR 200.344 and the Recipient has met

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 105 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 111 of 694

5G - 84094001 - 1    Page 42

the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition) or 3) an alternative date that is mutually agreed by the Recipient and the EPA Grants Management Officer or Award Official.

In accordance with 2 CFR 200.344, EPA will proceed to closeout the Award Agreement and enter the Closeout Period even if the Recipient has not met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition). As provided in 2 CFR 200.344: "When the recipient or subrecipient fails to complete the necessary administrative actions or the required work for an award, the Federal agency or pass-through entity must proceed with closeout based on the information available." This Closeout Agreement is therefore self-executing.

This term and condition is the entire Closeout Agreement between the EPA and the Recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The Recipient shall comply with the requirements specified below as part of the Closeout Agreement. Definitions within 2 CFR 200.1, including as supplemented through *I. Definitions* of this award agreement, apply identically to how they do under the Period of Performance, unless otherwise noted.

As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to Subrecipients such that the Recipient must enter into a corresponding Closeout Agreement with any Subrecipient that has Program Income or anticipates generating Post-Closeout Program Income at the end of the Subrecipient's Period of Performance.

## 1. Allowable Activities

The Recipient shall use Post-Closeout Program Income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

After the Closeout Agreement becomes effective, the Recipient shall disclose annual reports publicly, as described in the Performance Reporting Programmatic Term and Condition, rather than meeting the reporting requirements described in the Performance Reporting Programmatic Term and Condition.

## 3. LIDAC Expenditure Requirements

The Recipient shall expend 40% of Post-Closeout Program Income for the purposes of providing Financial Assistance in Low-Income and Disadvantaged Communities and comply with this requirement in accordance with the LIDAC Expenditure Requirement Programmatic Term and Condition, as applicable. Funds used for the purposes of providing Financial Assistance may include Financial Assistance to Qualified Projects; Predevelopment Activities; Market-Building Activities; and Program Administration Activities. This requirement applies to the entire award provided to the Recipient but does not "flow down" to each Subrecipient.

## 4. Cash Management Requirements

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 106 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 112 of 694

5G - 84094001 - 1    Page 43

The Recipient must maintain Post-Closeout Program Income in accordance with the Cash Management Requirements in the Financial Risk Management Requirements Programmatic Term and Condition, as applicable. However, the Recipient may submit a Cash Management Policy for review and approval by the EPA Project Officer, which can authorize the Recipient to deviate from the aforementioned Cash Management Requirements.

## 5. Financial Health Metrics

After the Closeout Agreement becomes effective, the Recipient agrees to report financial health metrics in accordance with the Financial Health Metrics in the Financial Risk Management Requirements Programmatic Term and Condition (on behalf of the Recipient as well as any Financial Assistance Subrecipient that has received in excess of $10,000,000 in NCIF subgrants) publicly, rather than disclosing the metrics to EPA, as applicable. The requirement for submission of financial health metrics is not applicable for any fiscal year in which the reporting entity did not meet the requirements of 2 CFR Subpart F—Audit Requirements. The Recipient agrees to add the following two financial health metrics as part of the financial health metrics for the Closeout Period:

1. Self-Sufficiency Ratio: The self-sufficiency ratio is defined as earned revenue divided by operating expenses, where earned revenue is equal to the value of all income earned from normal business transactions and operating expenses is equal to the value of all expenses incurred as a part of normal business operations over the prior 12-month period, not including interest, financing, depreciation, amortization, and loan loss provision expense.

2. Operating Cash Ratio: The operating cash ratio is defined as cash and cash equivalents divided by operating expenses, where cash and cash equivalents is equal to the total value of all cash and cash equivalent items that can be converted into cash immediately and operating expenses is equal to the value of all expenses incurred as a part of normal business operations over the prior 12-month period, not including interest, financing, depreciation, amortization, and loan loss provision expense.

## 6. Conflicts of Interest

The Recipient agrees to comply with the conflict of interest requirements described in the Conflicts of Interest Programmatic Term and Condition through September 30, 2031.

## 7. Remedies for Non-Compliance

The Recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable. During the Closeout Period, the workplan and budget submitted for the Period of Performance are no longer applicable.

## 8. Suspension and Debarment

The Recipient agrees to ensure that Post-Closeout Program Income is not transferred to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The Recipient can maintain compliance with this requirement through either (1) checking the System for Award Management (for Subrecipients, Contractors, or Program Beneficiaries) or (2) obtaining eligibility certifications from counterparties (for Program Beneficiaries). The Recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity is

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 107 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 113 of 694

5G - 84094001 - 1    Page 44

presently excluded or disqualified.

### 9. Non-Discrimination

The Recipient must use Post-Closeout Program Income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

**Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975.** The Recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency" in 40 CFR Part 5 and 40 CFR Part 7, the Recipient agrees, and will require all Subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

**Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities.** As provided in section 301 of the Executive Order, the Recipient will ensure that Subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to Real Property." Contracts less than $10,000 are exempt from the requirements of the Order.

### 10. Record-Keeping

In accordance with 2 CFR 200.334(e), the Recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of Post-Closeout Program Income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. Note that this requirement applies if and when the Closeout Agreement is terminated, in accordance *with Item 14. Termination of the Closeout Agreement*. EPA may obtain access to these records to verify that Post-Closeout Program Income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the Recipient must maintain adequate accounting records for how Post-Closeout Program Income is managed and spent as well as all other appropriate records and documents related to the activities conducted using Program Income.

The Recipient agrees to ensure that Subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. The Recipient may use the terms of its Subaward Agreements or other effective means to meet its responsibilities.

### 11. Other Federal Requirements

The following other federal requirements apply to the use of Post-Closeout Program Income under the Closeout Period to the same extent they do under the terms of the Performance Period:

5G - 84094001 - 1    Page 45

- Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Development Requirements Programmatic Term and Condition;
- Build America, Buy America Act, as specified in the Build America, Buy America Act Programmatic Term and Condition; and
- National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition.

No other federal requirements apply to the use of Post-Closeout Program Income under the terms of this Closeout Agreement, other than those specified in this Closeout Agreement.

## 12. Audit Requirements

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Closeout Period, as activities related to the Federal award referenced in 2 CFR 200.502(a) include activities during the Closeout Period.

Through September 30, 2031, the Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## 13. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Closeout Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## 14. Termination of the Closeout Agreement

The Closeout Agreement terminates when either of the following situations occur: (1) the Recipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Recipient and the EPA Award Official or Grants Management Officer mutually agree to terminate the Closeout Agreement, with the Recipient remitting current and future Post-Closeout Program Income to the federal government.

The ability to terminate the Closeout Agreement flows down to Subrecipients, as a Closeout Agreement between the Recipient and Subrecipient terminates when either (1) the Subrecipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Subrecipient and the Recipient mutually agree to terminate the Closeout Agreement, with the Subrecipient remitting current and future Post-Closeout Program Income to the Recipient.

The de minimis amount must be agreed-upon in writing by the Recipient and the Director of the Office of the Greenhouse Gas Reduction Fund (or equivalent), prior to the Recipient using the "de minimis" criteria to terminate the Closeout Agreement.

## 15. Points of Contact

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 109 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 115 of 694

5G - 84094001 - 1    Page 46

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and the Authorized Representative on the EPA Key Contacts Form most recently submitted to the EPA Project Officer (for the Recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

## W. Legal Counsel

The Recipient agrees to appoint appropriate legal counsel if counsel is not already available.

## X. Accounting Principles

The Recipient must account for all award funds in accordance with Generally Accepted Accounting Principles (GAAP) as in effect in the United States.

The Recipient must segregate and account for the award funds separately from all other program and business accounts. Additionally, the Recipient must segregate and account for Program Income separately from all other program and business accounts.

## Y. Internal Controls

The Recipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## Z. Audits

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Period of Performance, as described in the Audit Requirements General Term and Condition. Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(i), the Recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit Subrecipient that expends $1,000,000 or more of EPA funds from the Recipient's grant program in the Subrecipient's fiscal year. Any for-profit Subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier.

The Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## AA. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that specific conditions are necessary to ensure that the National Clean Investment Fund program is effectively carried out by Eligible Recipients that have not previously managed grants with the

Case 1:25-cv-00698-TSC     Document 49-2     Filed 03/26/25     Page 110 of 192
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 116 of 694

5G - 84094001 - 1     Page 47

same scale and complexity of this agreement. These specific conditions will remain in effect throughout the Period of Performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer or Division Director of the National Clean Investment fund, will oversee and monitor the grant agreement through activities, if determined necessary, including:

1. Upon request, requiring the Recipient to participate in an annual workshop (i.e., one workshop per calendar year) with other Recipients under the National Clean Investment Fund and/or Clean Communities Investment Accelerator; the EPA Project Officer will contact the Recipient to finalize details for each annual workshop.

2. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the workplan, provided the Recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other Recipients under the Greenhouse Gas Reduction Fund and with other EPA programs; and coordination by EPA staff with other federal programs to avoid duplication of effort;

3. Closely monitoring the Recipient's management and oversight of Subrecipients and procedures for ensuring that Program Beneficiaries adhere to program participation guidelines;

4. Closely monitoring the Recipient's performance to verify compliance with the workplan in effect under this Assistance Agreement and achievement of environmental results;

5. Participating in periodic telephone conference calls with Recipient personnel to discuss project successes and challenges as well as similar items impacting program performance;

6. Reviewing and commenting on performance reports prepared under the Award Agreement. Note that the final decision on the content of performance reports rests with the Recipient;

7. Verifying that the Recipient is expending the award on allowable activities, including but not limited to reviewing a sample of Financial Assistance transactions to verify compliance with regulatory requirements and the terms and conditions of the Award Agreement; and

8. Periodically reviewing costs incurred by the Recipient as well as its contractors and Subrecipients if needed to ensure appropriate expenditure of grant funds. Note that Recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds.

Subject to approval by the EPA Award Official, the EPA Project Officer and the Recipient may mutually agree to additional areas of oversight and monitoring.

*Method for Reconsideration.* If the Recipient believes that one or more of these specific conditions are not warranted or requires modification, the Recipient must file a written objection naming the specific condition(s) within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist, and Project Officer identified in the Notice of Award.

5G - 84094001 - 1    Page 48

## AB. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the Recipient's GGRF award. These materials may include links to Recipient and/or Subrecipients' websites. The Recipient agrees to work with the EPA Project Officer or another member of GGRF program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## AC. Conflicts of Interest

The Recipient must comply with requirements on transfers of funds that create actual and potential conflicts of interest, as specified in this term and condition. Transfers of funds include Subawards, Contracts (including but not limited to Acquisitions of Intangible Property), and Participant Support Costs. The definitions in the EPA's Financial Assistance Conflict of Interest Policy (COI Policy) apply to this term and condition.

There are three categories of transfers of funds, with the requirements differing by each category (as specified in this term and condition):

**1. Transfers with Affiliated Entities:** Subawards, Contracts, and Participant Support Costs to Affiliated Entities or co-invested in projects with Affiliated Entities. An Affiliated Entity is any entity that is related to the Recipient in accordance with the indicia of control described in 2 CFR 180.905.

**2. Financial Assistance to Qualified Projects:** Subawards, Contracts (in the form of Acquisitions of Intangible Property), and Participant Support Costs as forms of Financial Assistance to Qualified Projects, unless such transfers are with Affiliated Entities. These transfers are not within the scope of the COI Policy, which states that "subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by recipients of revolving loan fund capitalization grants or other EPA financial assistance agreements where Agency funds may be used for lending activities."

**3. Subgrants and Contracts:** Subgrants and Contracts (other than Acquisitions of Intangible Property), unless such transfers are with Affiliated Entities.

Note that all Contracts (including Acquisitions of Intangible Property) must also comply with the conflict of interest standards in 2 CFR 200.318(c).

## 1. Transfers with Affiliated Entities

### Prior Approval of COI Mitigation Plan

The Recipient must not transfer funds with Affiliated Entities unless those transfers have been included in an EPA-approved COI Mitigation Plan on Transfers of Funds with Affiliated Entities. The Recipient agrees to seek prior EPA approval for changes to the COI Mitigation Plan on Transfers of Funds with Affiliated Entities.

### Quarterly Disclosure Requirement

The Recipient agrees to disclose, on a quarterly basis, a list of newly originated transfers of funds with Affiliated Entities that are within the scope of its EPA-approved COI Mitigation Plan on Transfers of

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 112 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 118 of 694

5G - 84094001 - 1    Page 49

Funds with Affiliated Entities. Each quarterly disclosure must include (1) a list of such transfers of funds made over the quarter and (2) steps taken to taken to eliminate, neutralize or mitigate any conflicts of interest, in accordance with the EPA-approved COI Mitigation Plan on Transfers of Funds with Affiliated Entities. The Recipient must disclose its own transfers as well as transfers made by Subrecipients.

The quarterly periods for such disclosures are defined as follows: April 1 to June 30; July 1 to September 30; October 1 to December 31; and January 1 to March 31. The Recipient must make the disclosures to the EPA Project Officer within 30 calendar days of the end of the quarterly period.

### Project Officer Review

In accordance with 2 CFR 200.337, the EPA Project Officer may access records relating to a subset of transactions disclosed to review for compliance with the Recipient's EPA-approved COI Mitigation Plan on Transfers of Funds with Affiliated Entities as well as this term and condition. The EPA Project Officer will not approve transfers of funds in advance but rather will review transfers of funds that have already occurred for compliance.

### Waivers and Modifications

EPA agrees that, for transfers of funds with Affiliated Entities, the requirements of this term and condition apply in lieu of the requirements of the Disclosing Conflict of Interest General Term and Condition.

On a case-by-cases basis, the EPA Project Officer may extend the due date for disclosures on transfers of funds with Affiliated Entities. On a case-by-case basis, the EPA Project Officer may waive or modify the disclosure requirements on transfers of funds with Affiliated Entities.

### 2. Financial Assistance to Qualified Projects

### Quarterly Disclosure Requirement

The Recipient agrees to disclose, on a quarterly basis, a list of transfers of funds as Financial Assistance to Qualified Projects with actual and potential conflicts of interest. Each quarterly disclosure must include (1) a list of such transfers of funds made over the quarter and (2) steps taken to taken to eliminate, neutralize or mitigate any conflicts of interest, in accordance with any EPA-approved documents related to eliminating, neutralizing, and mitigating conflicts of interest. The Recipient must disclose its own transfers as well as transfers made by Subrecipients.

The quarterly periods for such disclosures are defined as follows:  April 1 to June 30; July 1 to September 30; October 1 to December 31; and January 1 to March 31. The Recipient must make the disclosures to the EPA Project Officer within 30 calendar days of the end of the quarterly period.

### Project Officer Review

In accordance with 2 CFR 200.337, the EPA Project Officer may access records relating to a subset of transactions disclosed to review for compliance with the Recipient's EPA-approved documents related to eliminating, neutralizing, and mitigating conflicts of interest as well as this term and condition. The EPA Project Officer will not approve transfers of funds in advance but rather will review transfers of funds that have already occurred for compliance.

5G - 84094001 - 1    Page 50

## Waivers and Modifications

On a case-by-cases basis, the EPA Project Officer may extend the due date for disclosures on transfers of funds as Financial Assistance to Qualified Projects. On a case-by-case basis, the EPA Project Officer may waive or modify the disclosure requirements on transfers of funds as Financial Assistance to Qualified Projects.

## 3. Subgrants and Contracts

The Recipient agrees to comply with the Disclosing Conflict of Interest General Term and Condition for Subgrants and Contracts (excluding Acquisitions of Intangible Property), unless such transfers are with Affiliated Entities. If such transfers are with Affiliated Entities, then the Recipient is required to include them in the process specified in *1. Transfers with Affiliated Entities*.

## AD. Prior Approvals

EPA will only have authority to review and approve revisions to the Recipient's workplan in effect under this Assistance Agreement, budget, and other documents if authorized by 2 CFR 200.308 or 2 CFR 200.208. The Recipient must contact the EPA Project Officer when the EPA has prior approval authority specified below. Approval will not be unreasonably withheld. Denial of a request for prior approval will be provided in writing, with an explanation of the rationale.

## Workplan

For the purposes of this Award Agreement, EPA interprets 2 CFR 200.308(c)(1) to enable the Recipient to revise the activities specified in its workplan in effect under this Assistance Agreement without prior EPA approval, provided the activities still comply with the terms and conditions of the Award Agreement. The allowable and allocable grant costs are narrowly defined, pursuant to the terms and conditions of the Award Agreement; in accordance with 2 CFR 200.308(c)(1), any changes to the workplan in effect under this Assistance Agreement that comply with the statute as well as the terms and conditions would not be a "change in the scope or objective of the project or program." Therefore, so long as the Recipient is updating its workplan in effect under this Assistance Agreement with the revised activities in accordance with the terms and conditions of the Award Agreement, EPA will not require prior approval.

## Budget

For the purposes of this Award Agreement, EPA implements 2 CFR 200.308(i)(2) in accordance with Item 1 of the Transfer of Funds General Term and Condition to enable the Recipient to revise the EPA-approved budget included in its Award Agreement without prior EPA approval, provided the cumulative funding transfers among Object Class Categories (Personnel, Fringe Benefits, Travel, Equipment, Supplies, Contractual, Construction, Other, Indirect) do not exceed 10% of the total budget approved at time of award. Therefore, so long as the Recipient is updating its EPA-approved budget by transferring funds by less than or equal to these amounts, EPA will not require prior approval.

However, notwithstanding the requirements of 2 CFR 200.308(i)(2), if the Recipient seeks to transfer any amount of funds budgeted for Participant Support Costs to other budget categories, then it must seek prior approval pursuant to 2 CFR 200.308(f)(5).

## Transfers of Funds

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 114 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 120 of 694

5G - 84094001 - 1    Page 51

2 CFR 200.308(f)(6) requires the Recipient to obtain prior agency approval for "Subaward activities not proposed in the application and approved in the Federal award." If the types of activities are described in the workplan in effect under this Assistance Agreement (including types of transfers to be conducted through Subawards, Participant Support Costs, Acquisitions of Intangible Property, and other Contracts as defined in 2 CFR 200.1), then EPA has provided the necessary prior agency approval for the purposes of 2 CFR 200.308(f)(6). Approval for the purposes of this regulation does not mean that such transfers of funds are compliant with the statutes, regulations, and terms and conditions.

### Changes in Key Personnel

2 CFR 200.308(f)(2) requires the Recipient to obtain prior agency approval for a "[c]hange in key personnel (including employees and contractors) that are identified by name or position in the Federal Award." If the Recipient is seeking to add or replace a "key person," as defined by members of the board of directors and Senior Management whose roles are specified in the most recently submitted Organizational Plan, then the Recipient must obtain prior EPA approval of the qualifications of the key person.

The Recipient must request prior agency approval for an addition or replacement of a "key person" via email through the EPA Project Officer, who will have 8 calendar days to communicate EPA's disapproval of their qualifications via email, along with an accompanying justification. If 8 calendar days have passed without notification of EPA disapproval of the key person's qualifications pursuant to 2 CFR 200.308(c)(2), the Recipient is authorized to change the "key person." Once the change is effective, the Recipient must submit an updated Organizational Plan to the EPA Project Officer.

### AE. Flow-Down Requirements

As described in 2 CFR 200.101(b)(1), the terms and conditions of Federal awards flow down to Subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(b), the Recipient agrees to ensure that Subrecipients are aware of the requirements that apply to the Subrecipient.

For the purposes of this Award Agreement, all terms and conditions must flow down to Subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to Subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

### AF. Resolution of Disputes Termination Provision

The Recipient is precluded from drawing down more than 78.46% of the Total Approved Assistance Amount until this condition is removed, which will occur when: a) the EPA Award Official, at the direction of the Grants Competition Disputes Decision Official (GCDDO), provides written confirmation that all administrative disputes under the National Clean Investment Fund and the Clean Communities Investment Accelerator are resolved in accordance with the dispute resolution procedures in Appendix A of the EPA Order 5700: Policy for Competition of Assistance Agreements; or b) the administrative disputes are withdrawn, abandoned or dismissed; or c) December 31, 2024, whichever is sooner.

If EPA does need to alter the Selection Official's selection and partial funding decisions for this agreement based on a GCDDO determination the EPA Award Official will partially terminate this assistance agreement, de-obligate a portion of the funds that have been obligated and use the de-

5G - 84094001 - 1    Page 52

obligated funds to satisfy the terms of a GCDDO remedy benefiting another entity. The Recipient will then provide an updated workplan and budget information, as needed, to amend the agreement.

For the purposes of this term and condition, EPA's partial termination may apply not just to obligated funds that have not been drawn down from ASAP but also to Program Income that has been generated and retained by the Recipient under 2 CFR 1500.8(d) and the Program Income Programmatic Term and Condition of this agreement. In accordance with 2 CFR 200.307(e)(1), EPA may require that the amount of funds committed by EPA to the Recipient be reduced by all or some of the Program Income that has been generated by the Recipient.

## AG. Deposit Account at Financial Agent

A depository institution has been designated as a financial agent of the United States (the Financial Agent) for the Greenhouse Gas Reduction Fund. The Recipient is required to set up and utilize an Account or Accounts at the Financial Agent in accordance with the Financial Agent Terms and Conditions (Section V) included in this Assistance Agreement.

## AH. Interim SF-425 Requirement

The Recipient must submit an SF-425 within 30 calendar days of receiving access to an Account or Accounts at the Financial Agent, with the SF-425 covering all activities supported by funds drawn from ASAP and disbursed for actual and allowable costs, other than funds disbursed into the Account or Accounts at the Financial Agent.

## AI. Amendments to Award Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## AJ. Preservation of Guidance and Data

Any statutes, regulations, agency documents, policies, and guidance (including FAQs and EPA's Implementation Framework for the Greenhouse Gas Reduction Fund), or executive orders referenced herein are incorporated by reference into the Award Agreement as of the effective date of this amended Award Agreement. These incorporated documents will be controlling on Recipient and Subrecipients in the event such documents are deleted, repealed, rescinded, or replaced unless a statute provides otherwise. This includes, but is not limited to, the Uniform Administrative Requirements, Cost Principles and Audit Requirements for Federal Awards; Title 2 CFR Part 200 effective October 1, 2024, and the EPA General Terms and Conditions effective October 1, 2024.

This provision cannot be changed without the consent of the Recipient.

## IV. ADMINISTRATIVE TERMS AND CONDITIONS

Please refer to Page 4, "Administrative Conditions."

Case 1:25-cv-00698-TSC     Document 49-2     Filed 03/26/25     Page 116 of 192
USCA Case #25-5122     Document #2114423          Filed: 05/05/2025     Page 122 of 694

5G - 84094001 - 1     Page 53

## V. FINANCIAL AGENT TERMS AND CONDITIONS

### A. Revisions to Award Agreement to Account for Financial Agent Arrangement

Because a depository institution has been designated as a financial agent of the United States (the Financial Agent) for the Greenhouse Gas Reduction Fund, the following revisions to the Award Agreement are effective without further action or notice required by the Recipient or EPA.

### 1. Revisions to Section I. Definitions

*The following new definition will be added to the Award Agreement:*

**Capitalization by Nonexchange Capital Contribution:** Capitalization by Nonexchange Capital Contribution means award funds that (1) the Recipient draws down from the Automated Standard Application Payments (ASAP) system and (2) disburses into the 'Budget Account' as defined under the Deposit Account at Financial Agent Programmatic Term and Condition to capitalize itself for subsequent use for any of the following Allowable Activities: Financial Assistance to Qualified Projects; Predevelopment Activities; Market-Building Activities; and Program Administration Activities.  Under this two-step transaction, which involves both a drawdown and disbursement, the Recipient's drawdown from ASAP is deemed (a) an advance payment of Federal funds in accordance with 2 CFR 200.305(b)(1); while the disbursement into the Deposit Account at Financial Agent is deemed (b) an allowable cost to be charged to the EPA award, and (c) a "nonexchange transaction", consistent with the definition of this term in the Statement of Federal Financial Accounting Standards No. 5. The full amount of the Capitalization by Nonexchange Capital Contribution must be recognized, reported, and accounted for as Program Income in accordance with the Program Income Programmatic Term and Condition once clauses (a) and (b) are fulfilled. Any Subrecipient with a Deposit Account at Financial Agent will be entitled to receive its payments from Recipient as a Capitalization by Nonexchange Capital Contribution.

*The definition of Program Income under the Award Agreement will be amended and replaced with:*

**Program Income:** 2 CFR 200.1 defines Program Income as "gross income earned by the non-Federal entity that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(f)." 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, there are two types of Program Income: (1) "Program Income from Operations" and (2) "Program Income from Capitalization by Nonexchange Capital Contribution".

Program Income from Operations includes but is not limited to income from origination fees, servicing fees, and asset management fees; dividends from equity investments; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). Under this award agreement, the Recipient is authorized to deduct the cost of generating Program Income from Operations under 2 CFR

**JA626**

5G - 84094001 - 1     Page 54

200.307(b) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Program Income from Operations include origination, servicing, and management costs that are not charged as direct costs to the Federal award. Costs of generating Program Income from Operations can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the Program Income from Operations, provided the Recipient can account for the actual costs incurred. Program Income from Operations requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries. Program Income from Operations can be earned prior to the availability of the 'Program Income from Operations' account as defined under the Deposit Account at Financial Agent Programmatic Term and Condition.

Program Income from Capitalization by Nonexchange Capital Contribution means award funds from the ASAP system that the Recipient draws down and immediately deposits into the 'Budget Account' at the Financial Agent in accordance with (a) the definition of Capitalization by Nonexchange Capital Contribution and (b) the Deposit Account at Financial Agent Programmatic Term and Condition. Program Income from Capitalization by Nonexchange Capital Contribution cannot be earned prior to the availability of the 'Budget Account' as defined under the Deposit Account at Financial Agent Programmatic Term and Condition.

Both forms of Program Income under this program must be treated in accordance with the Program Income Programmatic Term and Condition. EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fund raising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

## 2. Revisions to Section II. National Programmatic Terms and Conditions

The **Program Income Programmatic Term and Condition** will be amended and replaced with:

### Program Income

In accordance with Clean Air Act Section 134(b)(1)(C) as well as 2 CFR 200.307(e)(2) and 2 CFR 1500.8 (b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income from Operations once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income from Operations may be used by

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 118 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 124 of 694

5G - 84094001 - 1    Page 55

the Recipient in advance of the initial award funds (i.e. Program Income from Capitalization by Nonexchange Capital Contribution) being fully used where reasonable and necessary to execute the activities in the workplan in effect under this Assistance Agreement.

## 3. Revisions to Section III. Additional Programmatic Terms and Conditions

*The Allowable and Unallowable Activities Programmatic Term and Condition will be amended and replaced with:*

### Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Capitalization by Nonexchange Capital Contribution; Financial Assistance to Qualified Projects; Predevelopment Activities; Market-Building Activities; and Program Administration Activities. The Recipient must use awards funds exclusively for allowable activities within the ten EPA regions, with the exception of the Freely Associated States. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

Capitalization by Nonexchange Capital Contribution generates Program Income for the Recipient in an amount equal to the available EPA award balance drawn down from ASAP into the 'Budget Account' as defined under the Deposit Account at Financial Agent Programmatic Term and Condition. Program Income from Capitalization by Nonexchange Capital Contribution must be expended on Financial Assistance to Qualified Projects, Predevelopment Activities, Market-Building Activities, and Program Administration activities in accordance with the workplan in effect under this Assistance Agreement.

The Recipient agrees to not use the award for the following unallowable activities: (a) Financial Assistance to Qualified Projects in the form of Subgrants; (b) Subgrants for the purposes of providing Financial Assistance to Qualified Projects (other than Subgrants from the Recipient to first-tier Subrecipients); (c) activities that support deployment of projects that do not meet the definition of Qualified Projects; and (d) activities that support deployment of projects outside the boundaries of the ten EPA regions. The allowability of legal costs incurred in connection with the award shall be governed by applicable provisions of 2 CFR Part 200, Subpart E, including but not limited to 2 CFR 200.403, 2 CFR 200.435, 2 CFR 200.441 and 2 CFR 200.459.

*The Deposit Account at Financial Agent Programmatic Term and Condition will be amended and replaced with:*

### Deposit Account at Financial Agent

The Recipient will open a Deposit Account at a depository institution that has been designated as a financial agent of the United States (the Financial Agent). Such account will be used as Recipient's operating account for the award.  Upon establishment of the Deposit Account, the Recipient will drawdown the entire available EPA award balance from ASAP and disburse it into the Deposit Account, where it must be maintained until the Closeout Agreement goes into effect in accordance with the Closeout Agreement Programmatic Term and Condition. Note, this requirement applies to any and all drawdowns from ASAP by the Recipient while the Deposit Account is available and accessible. Once the Closeout Agreement goes into effect, the Recipient will be entitled to transfer any remaining funds in the Deposit Account to an account at a financial institution of its choosing, provided such account is insured in accordance with 2 CFR 200.305(b)(10)).

The Recipient will grant EPA a perfected security interest in all funds held in the Deposit Account. The Recipient will take all such actions, enter into all such agreements, and execute and deliver all such documentation as may be necessary and/or as directed by EPA from time to time to establish and maintain such security interest, including but not necessarily limited to entering into an account control agreement (ACA) with the Financial Agent and EPA.

Notwithstanding any other provision of this Assistance Agreement, EPA will only furnish the Financial Agent with a Notice of Exclusive Control under an ACA when EPA issues a written determination and finding that the Recipient has failed to comply with the terms and conditions of this Assistance Agreement, and that noncompliance is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse or material misrepresentation of eligibility status, and that EPA has initiated action under 2 CFR 200.339 to wholly or partly suspend or terminate the Federal award, as authorized in the terms of the Assistance Agreement. The written determination and finding and a copy of the Notice of Exclusive Control shall be sent to the Recipient when the Notice of Exclusive Control is furnished to the Financial Agent. EPA and Recipient have mutually agreed only to the specific process outlined in this term for furnishing a Notice of Exclusive Control instruction to the Financial Agent.

Note, funds in the Deposit Account that were legally obligated by the Recipient for financial obligations, as defined under 2 CFR 200.1, prior to the issuance of, but not in anticipation of, a Notice of Exclusive Control constitute "financial obligations which were properly incurred" by the Recipient in accordance with 2 CFR 200.343 and are to remain allowable costs during suspension or after termination of the Recipient's Assistance Agreement. Funds necessary to meet such financial obligations will be disbursed to Program Beneficiaries, Subrecipients, Contractors, or any other third parties which are due payment after a Notice of Exclusive Control is issued.

Note that a financial obligation to a third party for Financial Assistance is deemed "properly incurred" per 2 CFR 200.343 if it is a legally-binding, arms-length agreement where funds are transferred to the 'Reserve Account' in accordance with these terms and conditions. Any Notice of Exclusive Control shall not include any such funds. Funds necessary to meet such financial obligations for Financial Assistance will be disbursed to Program Beneficiaries, Subrecipients, Contractors, or any other third parties which are due payment after a Notice of Exclusive Control over other funds in the Deposit Account is issued.

Funds held in the Recipient's account at the Financial Agent may be invested in accordance with the Cash Management Requirements in the Financial Risk Management Programmatic Term and Condition. The Financial Agent will be compensated in accordance with the terms of a valid Financial Agency Agreement (FAA).

The Deposit Account will consist of three distinct account types ('Budget,' 'Reserve', and 'Program Income from Operations'), each of which serves a distinct purpose (while the exact naming convention and structure of these accounts may differ from the below, the accounts must perform a substantively similar function). The Recipient is required to utilize the accounts at the Financial Agent for their intended purpose during any period in which the accounts are available and accessible, with exceptions to this requirement permitted by the EPA Project Officer only on a case-by-case basis, to the extent such exceptions are necessary to execute against the workplan in effect under this Assistance Agreement.

## 1. Budget Account

This account within the Deposit Account will hold funds that have yet to be used for any of the following

5G - 84094001 - 1    Page 57

allowable activities: Financial Assistance to Qualified Projects; Predevelopment Activities; Market-Building Activities; and Program Administration Activities. It will hold funds within a number of sub-accounts that correspond to more specific allowable expenditures under the particular type of award or subaward.

**Transferring Funds Into the Budget Account.** Upon establishment of the Deposit Account, the Recipient will drawdown the entire available EPA award balance from ASAP directly into the Budget Account. The Recipient will direct the Financial Agent to allocate funds across the various sub-accounts in the Budget Account in accordance with its workplan in effect under this Assistance Agreement. Recipient need not submit a certification notice to transfer funds within the Budget Account, but remains subject to the Transfer of Funds EPA General Term and Condition and any associated pre-approval or notification requirements therein.

**Transferring Funds Out of the Budget Account.** When transferring award funds out of the Budget Account to provide Financial Assistance to Qualified Projects, Recipient must provide the EPA Project Officer with a certification notice from the Recipient's chief executive officer (or equivalent), chief financial officer (or equivalent), chief reporting officer (or equivalent), or chief compliance officer (or equivalent) that the amount of the payment is necessary to execute against the workplan in effect under this Assistance Agreement and that financing agreements for identified Qualified Projects necessitating the payment have been reviewed by the Recipient's counsel for legal sufficiency, with notice provided to the Financial Agent with the transfer request. The certification notice must include the following language: "This certification is a material representation for the purposes of an EPA Financial Assistance Agreement, and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions." The Recipient must "flow-down" this requirement to Subrecipients, with each Subrecipient required to provide a substantively similar certification notice to Recipient when transferring subaward funds out of the Budget Account to provide Financial Assistance to Qualified Projects, with notice provided to the Financial Agent with the transfer request. In accordance with 2 CFR 200.337, the Recipient must make those certifications available to the EPA, upon request.

While transfers out of the Budget Account are not formally subject to any of the requirements established in either the EPA General Term and Condition on Automated Standard Application Payments (ASAP) and Proper Payment Draw Down or the Interim Drawdown Procedures Programmatic Term and Condition, Recipient agrees to the following requirements:

a) When the need for a longer disbursement window is known in advance of the transfer, Recipient must notify the EPA Project Officer prior to executing the transfer and follow-up to inform the EPA Project Officer of the amount of the transfer that has been disbursed for an Allowable Activity in 5, 10, and 14 business days. Recipient must return any undisbursed amounts to the Deposit Account at the Financial Agent on the 15th business day, or

b) When the need for a longer disbursement window is not known in advance of the transfer, Recipient must notify the EPA Project Officer of the delay no later than 5 business days after the transfer and follow-up to inform the EPA Project Officer of the amount of the transfer that has been disbursed for an Allowable Activity in 10 and 14 business days. Recipient must return any undisbursed amounts to the Deposit Account at the Financial Agent on the 15th business day.

Recipients must obtain prior written approval from the EPA Project Officer (who will in turn notify the EPA Award Official) for any transfers that will not be disbursed for an Allowable Activity within 15 business

5G - 84094001 - 1     Page 58

days.

These requirements "flow down" to Subrecipients, who agree to provide the same notifications to and seek prior approval from Recipients where applicable.

## 2. Reserve Account

This account within the Deposit Account is intended to enable funds to be set-aside within the Financial Agent for use for any form of Financial Assistance that requires the Recipient to pledge or legally commit award funds for a future expenditure to a third party to meet a legal obligation.

**Transferring Funds Into the Reserve Account.** The Recipient may only transfer award funds into the Reserve Account for grant performance purposes if the Recipient's chief executive officer (or equivalent), chief financial officer (or equivalent), chief reporting officer (or equivalent), or chief compliance officer (or equivalent) certify to the EPA Project Officer, with notice provided to the Financial Agent with the transfer request, that the amount of the expenditure is necessary to execute against the workplan in effect under this Assistance Agreement, and that financing agreements for identified qualified projects necessitating the expenditure have been reviewed by Recipient's counsel for legal sufficiency. The certification notice must include the following language: "This certification is a material representation for the purposes of an EPA financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions." The Recipient must "flow-down" this requirement to Subrecipients, with each Subrecipient required to provide a substantively similar certification notice to Recipient when transferring subaward funds into the Reserve Account, with notice provided to the Financial Agent with the transfer request. In accordance with 2 CFR 200.337, the Recipient must make those certifications available to the EPA, upon request.

**Transferring Funds Out of the Reserve Account.**

### a. To Third Parties to Meet Legal Obligations

Funds in the Reserve Account may not be disbursed to Program Beneficiaries, Subrecipients, Contractors, or any other third parties, unless the funds are necessary for the Recipient to satisfy a legal obligation. The Recipient may only transfer award funds out of the Reserve Account to meet legal obligations to such parties if the recipient's chief executive officer (or equivalent), chief financial officer (or equivalent), chief reporting officer (or equivalent), or chief compliance officer (or equivalent) certify to the EPA Project Officer, with notice provided to the Financial Agent with the transfer request, that the amount of the expenditure is necessary to pay a third party pursuant to a financing agreement that has been reviewed by recipient's counsel for legal sufficiency. The certification notice must include the following language: "This certification is a material representation for the purposes of an EPA financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions." The Recipient must "flow-down" this requirement to Subrecipients, with each Subrecipient required to provide a substantively similar certification notice to Recipient when transferring subaward funds out of the Reserve Account to meet legal obligations to third parties, with notice provided to the Financial Agent with the transfer request. In accordance with 2 CFR 200.337, the Recipient must make those certifications available to the EPA, upon request.

While transfers out of the Reserve Account are not formally subject to any of the requirements established in either the EPA General Term and Condition on Automated Standard Application Payments

**JA631**

5G - 84094001 - 1    Page 59

(ASAP) and Proper Payment Draw Down or the Interim Drawdown Procedures Programmatic Term and Condition, Recipient agrees to the following requirements:

a) When the need for a longer disbursement window is known in advance of the transfer, Recipient must notify the EPA Project Officer prior to executing the transfer and follow-up to inform the EPA Project Officer of the amount of the transfer that has been disbursed for an Allowable Activity in 5, 10, and 14 business days. Recipient must return any undisbursed amounts to the Deposit Account at the Financial Agent on the 15th business day, or

b) When the need for a longer disbursement window is not known in advance of the transfer, Recipient must notify the EPA Project Officer of the delay no later than 5 business days after the transfer and follow-up to inform the EPA Project Officer of the amount of the transfer that has been disbursed for an Allowable Activity in 10 and 14 business days. Recipient must return any undisbursed amounts to the Deposit Account at the Financial Agent on the 15th business day.

Recipients must obtain prior written approval from the EPA Project Officer (who will in turn notify the EPA Award Official) for any transfers that will not be disbursed for an Allowable Activity within 15 business days.

These requirements "flow down" to Subrecipients, who agree to provide the same notifications to and seek prior approval from Recipients where applicable.

## b. To Program Income from Operations Account

When funds in the Reserve Account are no longer necessary to meet prudent capital management practices consistent with the Recipient's overall risk portfolio and a potential legal obligation to a third party pursuant to a financing agreement, the Recipient may transfer such funds to the Program Income from Operations Account. Recipient need not submit a certification notice to effectuate such a transfer.

## 3. Program Income from Operations Account

This account within the Deposit Account will enable Program Income from Operations (as defined under the definition of Program Income) to be held, tracked, and segregated in accordance with the Accounting Principles Programmatic Term and Condition.

**Transferring Funds Into the Program Income from Operations Account.** When Recipient earns Program Income from Operations, it must deposit such funds into the Program Income from Operations Account. Recipient need not submit a certification notice to effectuate such a transfer. When Financial Agent generates interest income on behalf of Recipient by investing Recipient liquidity in accordance with the Cash Management Requirements under the Financial Risk Management Requirements Programmatic Term and Condition, it must deposit such income into the Program Income from Operations Account in accordance with the terms of the FAA. Such interest income is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12).

**Transferring Funds Out of the Program Income from Operations Account.** Funds in this account may be transferred to either the Budget Account or Reserve Account to be used for grant performance purposes in accordance with the Program Income Programmatic Term and Condition. Recipient need not submit a certification notice to effectuate such a transfer.

5G - 84094001 - 1    Page 60

**Flow-Down Requirements of Deposit Account at Financial Agent**. EPA may elect to extend the requirements under this term and condition to any and all Financial Assistance Subrecipients of the Recipient at EPA's sole discretion, including but not limited to Recipient establishing and maintaining a security interest on all award funds held by its Financial Assistance Subrecipients at the Financial Agent.

5G - 84094001 - 2     Page 1

| | | | |
|---|---|---|---|
| **U.S. ENVIRONMENTAL PROTECTION AGENCY** **Assistance Amendment** | **GRANT NUMBER (FAIN):** 84094001 **MODIFICATION NUMBER:** 2 **PROGRAM CODE:** 5G | **DATE OF AWARD** 01/16/2025 | |
| | **TYPE OF ACTION** No Cost Amendment | **MAILING DATE** 01/16/2025 | |
| | **PAYMENT METHOD:** ASAP | **ACH#** | |

| **RECIPIENT TYPE:** Not for Profit | **Send Payment Request to:** Contact EPA RTPFC at: ▓▓▓▓▓▓ |
|---|---|
| **RECIPIENT:** | **PAYEE:** |
| Climate United Fund 7550 WISCONSIN AVE FI 8 BETHESDA, MD 20814-3559 EIN: ▓▓▓ | Stephanie Horner 7550 WISCONSIN AVE 3rd Floor BETHESDA, MD 20814-3559 |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Elizabeth Bafford 7550 Wisconsin Ave 3rd Floor Bethesda, MD 20814 Email: ▓▓▓▓ Phone: ▓▓▓▓ | Michelle Tucker 1200 Pennsylvania Ave, NW, 19-H16 Washington, DC 20460 Email: ▓▓▓▓ Phone: ▓▓▓▓ | Walker Oneil OGD- GMBOD, 3093R 1200 Pennsylvania Ave, NW Washington, DC 20460-0001 Email: ▓▓▓▓ Phone: ▓▓▓▓ |

### PROJECT TITLE AND EXPLANATION OF CHANGES

GGRF NCIF: Climate United

This agreement provides funding under the Inflation Reduction Act (IRA) to Climate United (CU). The recipient will utilize the funding to reduce emissions of greenhouse gases and other air pollutants; deliver benefits of greenhouse gas- and air pollution-reducing projects to American communities, particularly low-income and disadvantaged communities; and mobilize financing and private capital to stimulate additional deployment of greenhouse gas- and air pollution-reducing projects. Specifically, the recipient will endeavor to accomplish this by working with community groups, technical assistance providers, financial institutions, and workforce development entities to reduce the barriers and limit the inefficiencies that have prevented broad adoption and financing of clean technologies. To ensure clean energy acceleration and market transformation beyond the National Clean Investment Fund (NCIF), Climate United will integrate this capital resource into existing lending products and processes so that all lenders, (i.e., beyond just the community, green and nonprofit sectors) learn to address decarbonization in their routine lending practices. Greening existing lending with NCIF support will have the broadest transformative impact on the capital markets nationwide.

This amendment approves the sole-source procurement request, changes to the workplan and detailed budget, and updates to the key contacts.

| **BUDGET PERIOD** 04/01/2024 - 06/30/2029 | **PROJECT PERIOD** 04/01/2024 - 06/30/2029 | **TOTAL BUDGET PERIOD COST** $ 6,970,000,000.00 | **TOTAL PROJECT PERIOD COST** $ 6,970,000,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 6,970,000,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants Management & Business Operations Division 1200 Pennsylvania Ave, NW Mail code 3903R Washington, DC 20460 | Environmental Protection Agency, OGGRF OA - Office of the Administrator 1200 Pennsylvania Ave, NW Washington, DC 20460 |

| **THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY** | |
|---|---|
| Digital signature applied by EPA Award Official Katherine Tsing-Choy - Associate Award Official | **DATE** 01/16/2025 |

5G - 84094001 - 2    Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 6,970,000,000 | $ 0 | $ 6,970,000,000 |
| EPA In-Kind Amount | $ 0 | $ 0 | $ 0 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 6,970,000,000 | $ 0 | $ 6,970,000,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.957 - Greenhouse Gas Reduction Fund: National Clean Investment Fund | Clean Air Act: Sec. 134(a)(2) and (3) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

JA635

5G - 84094001 - 2    Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| **1. Personnel** | $ 84,722,869 |
| **2. Fringe Benefits** | $ 31,347,462 |
| **3. Travel** | $ 7,181,082 |
| **4. Equipment** | $ 0 |
| **5. Supplies** | $ 1,471,330 |
| **6. Contractual** | $ 768,783,830 |
| **7. Construction** | $ 0 |
| **8. Other** | $ 6,037,162,925 |
| **9. Total Direct Charges** | $ 6,930,669,498 |
| **10. Indirect Costs: 15.00 % Base de minimis MTDC** | $ 39,330,502 |
| **11. Total (Share: Recipient ___0.00__ % Federal __100.00_%)** | $ 6,970,000,000 |
| **12. Total Approved Assistance Amount** | $ 6,970,000,000 |
| **13. Program Income** | $ 315,000,000 |
| **14. Total EPA Amount Awarded This Action** | $ 0 |
| **15. Total EPA Amount Awarded To Date** | $ 6,970,000,000 |

**JA636**

5G - 84094001 - 2    Page 4

## Administrative Conditions

All Administrative Conditions Remain the Same.

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 128 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 134 of 694

5G - 84094001 - 2    Page 5

# Programmatic Conditions

All Programmatic Conditions Remain the Same.

# Exhibit B



**ACCOUNT CONTROL AGREEMENT**

**among**

Climate United Fund**, as PLEDGOR**

United States Environmental Protection Agency**, as SECURED PARTY**

**and**

**CITIBANK, N.A., as BANK**

**Dated as of November 1, 2024**

Docusign Envelope ID: 019E61F7-8937-48DF-B587-AE62365B3962

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 131 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 137 of 694

**THIS ACCOUNT CONTROL AGREEMENT** (this "**Agreement**"), dated as of November 1, 2024, by and among Climate United Fund, a Delaware 501(c)(3) nonstock corporation (the "**Pledgor**"), the United States Environmental Protection Agency, an agency of the United States Government (the "**Secured Party**") and Citibank, N.A., a national banking association organized and existing under the laws of the United States of America ("Citibank") and acting through its Agency & Trust business solely in its capacity as bank under this Agreement, and any successors appointed pursuant to the terms hereof (Citibank in such capacity, the "**Bank**").

**WHEREAS,** the Pledgor and the Secured Party have entered into that certain federal financial assistance agreement, as identified in Addendum 1, (the "**Grant Agreement**") pursuant to which the Pledgor has granted the Secured Party a security interest in the accounts as identified in Addendum 1 established and maintained by the Bank for the Pledgor (the "**Accounts**").

**WHEREAS,** the Bank has been designated and authorized to act as a financial agent of the United States pursuant to the authority of the U.S. Department of the Treasury under 12 U.S.C. §§ 90 and 265.

**WHEREAS,** the parties wish that the Bank enter into this Agreement in order to provide for the "control" (as defined in Section 9-104(a) of the Uniform Commercial Code in effect in the State of New York ("**UCC**"), in the case of a deposit account, or Section 8-106 of the UCC, in the case of a security account) of the accounts as a means to perfect the security interest of the Secured Party.

**WHEREAS,** the Pledgor and the Secured Party have agreed that the terms and conditions entitled "Deposit Account at Financial Agent" in the Grant Agreement indicate the conditions under which the Secured Party may exercise its right of control herein, and such conditions will be defined as "default" for the purposes of this Agreement.

**WHEREAS**, capitalized terms used herein without definition and that are defined in Article 8 or Article 9 of the UCC as adopted in the State of New York shall have the respective meanings set forth herein.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and adequacy of which is hereby irrevocably acknowledged, the parties hereto agree as follows:

1.    **The Accounts.** The Pledgor and the Bank represent and warrant to, and agree with the Secured Party that:

(a)    The Bank maintains the Accounts for the Pledgor, and all property (including, without limitation, all funds and financial assets) held by the Bank for the accounts of the Pledgor are, and will continue to be, credited to the Accounts in accordance with instructions given by the Pledgor (unless otherwise provided herein).

(b)    To the extent that cash is credited to the Accounts, the Accounts are a deposit account; and to the extent that financial assets (other than cash) are credited to the Accounts, the Accounts are a securities account. The Bank is (i) the bank with which the Accounts are maintained and (ii) the securities intermediary with respect to financial assets held in the Accounts. The Pledgor is (A) the Bank's customer with respect to the Accounts and (B) the entitlement holder with respect to all financial assets credited from time to time to the Accounts.

(c)    Notwithstanding any other agreement to the contrary, the Bank's jurisdiction with

respect to the Accounts for purposes of the UCC is, and will continue to be for so long as the Secured Party's security interest shall be in effect, the State of New York.

(d)    The Pledgor and the Bank do not know of any claim to or interest in the Accounts or any property (including, without limitation, funds and financial assets) credited to the Accounts, except for claims and interests of the parties referred to in this Agreement.

## 2.    <u>Control over Accounts</u>.

The Bank shall comply with all instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and financial assets in the Accounts including, without limitation, directions to distribute proceeds of any such transfer or redemption of interest or dividends on financial assets in the Accounts, substantially in the form attached hereto as <u>Exhibit B</u> ("**Account Direction**"), originated by the Pledgor, until the time that that Bank receives a notice, substantially in the form attached hereto as <u>Exhibit A</u> (a "**Notice of Exclusive Control**") from the Secured Party that the Secured Party is exercising its right to exclusive control over an Account, and after such time that the Bank receives a Notice of Exclusive Control, the Secured Party for such Account, without further consent by the Pledgor.

## 3.    <u>Priority of Secured Party's Security Interest</u>.  The Bank subordinates in favor of the Secured Party any interest, lien or right of setoff it may have, now or in the future, against the Accounts or assets in the Accounts; *provided; however*, that, subject to the foregoing, the Bank may set off all amounts due to it in respect of its fees and expenses (including, without limitation, the payment of any legal fees or expenses) or any amounts payable pursuant to Section 4 hereof.

## 4.    <u>Investment of Funds</u>.

(a)    The Bank shall deposit the assets in non-interest bearing Accounts and invest the assets in the Accounts consistent with the instructions provided by the Pledgor, in Addendum 1. The Pledgor's instructions will be in accordance with the Grant Agreement, provided that the Bank is not responsible for verifying whether the Pledgor's instructions are in compliance with the Grant Agreement. The Bank shall invest such assets in the Accounts on the date of deposit provided that such assets are received on or before 11:00 a.m. New York City time.  Any assets received after 11:00 a.m. New York City time shall be treated as if received on the following Business Day. For purposes of this Agreement, "**Business Day**" shall mean any day that the Bank is open for business.

(b)    The Bank is hereby authorized and directed to sell or redeem any such investments as it deems necessary to make any payments or distributions required under this Agreement. The Bank shall have no responsibility or liability for any loss in the value of any investment made pursuant to this Agreement, or for any loss, cost or penalty resulting from any sale or liquidation of the assets in the Account.  The Bank is hereby authorized to execute purchases and sales of investments through the facilities of its own trading or capital markets operations or those of any affiliated entity.  The Bank does not have a duty nor will it undertake any duty to provide investment advice.

(c)    The Bank shall transfer any earnings or proceeds received on or distributions of earnings or proceeds from the assets in the Accounts to the Program Income from Operations Account on a monthly basis.

## 5.    <u>Tax Matters</u>.



JA642

Docusign Envelope ID: 019E61F7-8937-48DF-B587-AE62365B3962

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 133 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 139 of 694

(a)      The Pledgor and the Secured Party agree that, unless and until the Grant Agreement is terminated, any earnings or proceeds received on or distributions of earnings or proceeds from the assets in the Accounts shall be treated as the income of the Pledgor and shall be reported on an annual basis on United States Internal Revenue Service ("**IRS**") Form 1099-DIV, as required pursuant to the Internal Revenue Code of 1986, as amended (the "**Code**") and the regulations there under. Principal payments are not reportable to any payee hereunder.  No earnings or proceeds received on or distributions of earnings or proceeds from the assets in the Accounts, or principal payments from the Accounts, are reportable to the Secured Party. The Pledgor, the Secured Party and the Bank agree that the Bank will not be responsible for providing tax reporting and withholding for payments that are for compensation for services performed by an employee or independent contractor.

(b)      The Pledgor and the Secured Party shall upon the execution of this Agreement provide the Bank with a duly completed and properly executed IRS Form W-9 or applicable IRS Form W-8, in the case of a non-U.S. person, for each payee, together with any other documentation and information requested by the Bank in connection with the Bank's tax reporting obligations under the Code and the regulations thereunder.  With respect to the Bank's tax reporting obligations under the Code, the Foreign Account Tax Compliance Act and the Foreign Investment in Real Property Tax Act and any other applicable law or regulation, the Pledgor and the Secured Party understand, that, in the event valid U.S. tax forms or other required supporting documentation are not provided to the Bank, the Bank may be required to withhold tax from the assets in the Accounts and report account information on any earnings, proceeds or distributions from the assets in the Accounts.

(c)      Should the Bank become liable for the payment of taxes, including withholding taxes relating to any funds, including interest and penalties thereon, held by it pursuant to this Agreement or any payment made hereunder, the Pledgor agrees to indemnify and hold the Bank harmless pursuant to Section 7(b) hereof from any liability or obligation on account of taxes, assessments, interest, penalties, expenses and other governmental charges that may be assessed or asserted against the Bank, provided that such liability shall not be satisfied by assets in the Accounts. If the Pledgor fails to indemnify the Bank for such taxes, the Bank will notify the Secured Party.

(d)      The Bank's rights under this Section 5 shall survive the termination of this Agreement or the resignation or removal of the Bank.

### 6.      <u>Concerning the Bank</u>.

(a)      <u>Bank Duties</u>. Each of the Pledgor and the Secured Party acknowledges and agrees that (i) the duties, responsibilities and obligations of the Bank shall be limited to those expressly set forth in this Agreement, each of which is administrative or ministerial (and shall not be construed to be fiduciary in nature), and no duties, responsibilities or obligations shall be inferred or implied, (ii) the Bank shall not be responsible for any of the agreements referred to or described herein (including, without limitation, the Grant Agreement and any defined term therein not otherwise defined in this Agreement), or for determining or compelling compliance therewith, and shall not otherwise be bound thereby, and (iii) the Bank shall not be required to expend or risk any of its own funds to satisfy payments from the Accounts hereunder.

(b)      <u>Liability of Bank</u>. The Bank shall not be liable for any damage, loss or injury



Docusign Envelope ID: 019E64F7-8937-48DF-B587-AE62365B3962

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 134 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 140 of 694

resulting from any action taken or omitted in the absence of gross negligence or willful misconduct (as finally adjudicated by a court of competent jurisdiction). In no event shall the Bank be liable for indirect, incidental, consequential, punitive or special losses or damages (including but not limited to lost profits), regardless of the form of action and whether or not any such losses or damages were foreseeable or contemplated. The Bank shall be entitled to rely upon any instruction, notice, request or other instrument delivered to it without being required to determine the authenticity or validity thereof, or the truth or accuracy of any information stated therein. The Bank may act in reliance upon any signature believed by it to be genuine (including any signature affixed by DocuSign) and may assume that any person purporting to make any statement, execute any document, or send any instruction in connection with the provisions hereof has been duly authorized to do so. The Bank may consult with counsel satisfactory to it, and the opinion or advice of such counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it in good faith and in accordance with the opinion and advice of such counsel. The Bank may perform any and all of its duties through its agents, representatives, attorneys, custodians and/or nominees. The Bank shall not incur any liability for not performing any act or fulfilling any obligation hereunder by reason of any occurrence beyond its control (including, without limitation, any provision of any present or future law or regulation or any act of any governmental authority, any act of God or war or terrorism, or the unavailability of the Federal Reserve Bank wire services or any electronic communication facility).

(c)    <u>Reliance on Orders</u>. The Bank is authorized to comply with final orders issued or process entered by any court with respect to the assets in the Accounts, without determination by the Bank of such court's jurisdiction in the matter. If any portion of the assets in the Accounts are at any time attached, garnished or levied upon under any court order, or in case the payment, assignment, transfer, conveyance or delivery of any such property shall be stayed or enjoined by any court order, or in case any order, judgment or decree shall be made or entered by any court affecting such property or any part thereof, then and in any such event, the Bank is authorized to rely upon and comply with any such order, writ, judgment or decree which it is advised is binding upon it without the need for appeal or other action; and if the Bank complies with any such order, writ, judgment or decree, it shall not be liable to the Pledgor or the Secured Party or to any other person or entity by reason of such compliance even though such order, writ, judgment or decree may be subsequently reversed, modified, annulled, set aside or vacated.

(d)    <u>Erroneous Payments</u>. If the Bank releases any funds (including but not limited to the assets in the Accounts or any portion of it) to the Pledgor or the Secured Party and subsequently determines (in its absolute discretion) that the payment (or any portion of it) was made in error, the Pledgor or the Secured Party, as applicable, shall upon notice promptly refund the erroneous payment, and none of the obligations of the Pledgor or the Secured Party, as applicable, or the remedies of the Bank will be affected by any act, omission, matter or thing (including, without limitation, any obligation pursuant to which an erroneous payment is made) which, but for this provision, would reduce, release, preclude or prejudice any such obligation or remedy (whether or not known by the Bank, the Pledgor or the Secured Party). Each of the Pledgor and the Secured Party agrees not to assert discharge for value, bona fide payee, or any similar doctrine as a defense to recovery of any erroneous payment by the Bank.

**7.    <u>Compensation, Expense Reimbursement and Indemnification</u>.**

(a)    <u>Compensation</u>. The Bank's compensation shall be as specified in <u>Schedule A</u>.



JA644

Docusign Envelope ID: 019F64F7-8937-48DF-B587-AF62365B3962

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 135 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 141 of 694

(b)    Indemnification. The Pledgor covenants and agrees to indemnify the Bank and its employees, officers, directors, affiliates, and agents (each, an "**Indemnified Party**") for, hold each Indemnified Party harmless from, and defend each Indemnified Party against, any and all claims, losses, actions, liabilities, costs, damages and expenses of any nature incurred by any Indemnified Party, arising out of or in connection with this Agreement or with the administration of its duties hereunder, including, but not limited to, attorney's fees, costs and expenses, except to the extent such loss, liability, damage, cost or expense shall have been finally adjudicated by a court of competent jurisdiction to have resulted solely from the Indemnified Party's own gross negligence or willful misconduct, provided that such liability shall not be satisfied by assets in the Accounts. The foregoing indemnification and agreement to hold harmless shall survive the termination of this Agreement and the resignation or removal of the Bank. If the Pledgor fails to indemnify the Bank pursuant to this Section 7(b), the Bank shall notify the Secured Party.

8.    **Statements, Confirmations and Notices of Adverse Claims.**  The Bank will send copies of all statements and confirmations for the Accounts simultaneously to the Pledgor and the Secured Party.  The Bank shall be deemed to have delivered statements and confirmations if such statements and confirmations are available on one or more of the Bank systems to deliver electronic media.  The Bank will use reasonable efforts promptly to notify the Secured Party and the Pledgor if any other person claims that it has a property interest in the Accounts or any financial asset in the Accounts.

9.    **Entire Agreement; Exclusive Benefit.**  This Agreement constitutes the entire agreement between the parties and sets forth in its entirety the obligations and duties of the Bank with respect to the assets in the Accounts.  This Agreement is for the exclusive benefit of the parties to this Agreement and their respective permitted successors, and shall not be deemed to give, either expressly or implicitly, any legal or equitable right, remedy, or claim to any other entity or person whatsoever.  No party may assign any of its rights or obligations under this Agreement without the prior written consent of the other parties.

10.    **Resignation and Removal.** The Bank may be removed only by the U.S. Department of the Treasury.

11.    **Governing Law.** This Agreement is governed by and shall be construed and interpreted in accordance with federal law of the United States, except where there is no applicable federal law, in accordance with the laws of the State of New York, without giving effect to the conflict of laws principles thereof.

12.    **Representations and Warranties.**

(a)    Each of the Pledgor and the Secured Party represents and warrants that it has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder; and this Agreement has been duly approved by all necessary action and constitutes its valid and binding agreement enforceable in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or other similar laws affecting the enforcement of creditors' rights and subject to general equity principles.

(b)    Each of the Pledgor and the Secured Party represents that neither it nor any of its parents or subsidiaries, or any of their respective directors, officers, or employees, or to the knowledge of the Pledgor and the Secured Party, the affiliates of the Pledgor, the Secured Party or any of its subsidiaries, will, directly or indirectly, use any part of any proceeds or lend, contribute,



Docusign Envelope ID: 019F561F7-8937-48DF-BF87-AE62365B3962

Case 1:25-cv-00698-TSC     Document 49-2     Filed 03/26/25     Page 136 of 192
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 142 of 694

or otherwise make available such assets in the Accounts in any manner that would result in a violation by any person of economic, trade, or financial sanctions, requirements, or embargoes imposed, administered, or enforced from time to time by the United States (including, without limitation, the Office of Foreign Assets Control of the U.S. Department of the Treasury and the U.S. Department of State), the United Kingdom (including, without limitation, His Majesty's Treasury), the European Union and any EU member state, the United Nations Security Council, and any other relevant sanctions authority.

### 13. <u>Notices; Instructions</u>.

(a)     Any notice or instruction hereunder shall be in writing in English, and may be sent by (i) secure file transfer or (ii) electronic mail with a scanned attachment thereto of an executed notice or instruction, and shall be effective upon actual receipt by the Bank in accordance with the terms hereof.  Any notice or instruction must be executed (which execution may be manual or affixed by DocuSign) by an authorized person of the Pledgor or the Secured Party, as applicable (the person(s) so designated from time to time, the "**Authorized Persons**").  Each of the applicable persons designated on <u>Schedule B</u> and <u>Schedule C</u> attached hereto have been duly appointed to act as Authorized Persons hereunder and individually have full power and authority to execute any notices or instructions, to amend, modify or waive any provisions of this Agreement, and to take any and all other actions permitted under this Agreement, all without further consent or direction from, or notice to, it or any other party.  Any notice or instruction must be originated from a corporate or government domain.  Any change in designation of Authorized Persons shall be provided by written notice, signed by an Authorized Person, and actually received and acknowledged by the Bank.  Any communication from the Bank that the Bank deems to contain confidential, proprietary, and/or sensitive information shall be encrypted in accordance with the Bank's internal procedures.

(b)     Each of the Pledgor and the Secured Party understands and agrees that the Bank cannot determine the identity of the actual sender of any notice or instruction and that the Bank shall be entitled to conclusively presume that notices or instructions that purport to have been sent by an Authorized Person have been sent by such Authorized Person.  Each of the Pledgor and the Secured Party agrees: (i) to assume all risks arising out of the use of electronic means (including electronic mail, secure file transfer or such other method or system specified by the Bank as available for use in connection with its services hereunder) to submit instructions to the Bank, including, without limitation, the risk of the Bank acting on unauthorized instructions, and the risk of interception or misuse by third parties; (ii) that it is fully informed of the protections and risks associated with the various methods of transmitting instructions to the Bank and that there may be more secure methods of transmitting instructions than the method(s) selected by the Pledgor and the Secured Party, as applicable; (iii) that the security procedures (if any) to be followed in connection with its transmission of instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances; and (iv) to notify the Bank immediately upon learning of any compromise or unauthorized use of the security procedures.  The Pledgor and the Secured Party agree that the security procedures set forth in Section 13(a) and this Section 13(b) are commercially reasonable.

If to the Pledgor:
As provided in Addendum 1

If to the Secured Party:
The Office of the Greenhouse Gas Reduction Fund,



JA646

United States Environmental Protection Agency
Attention: David Widawsky
Telephone: ███████████
E-mail: ████████████████████████

If to the Bank:
Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, NY 10013
Attn.: Nerlie Delly
Telephone: ███████████
E-mail: ██████████████████████

**14.    Amendment; Waiver.**  Any amendment of this Agreement shall be binding only if evidenced by a writing signed by each of the parties to this Agreement.  No waiver of any provision hereof shall be effective unless expressed in writing and signed by the party to be charged.

**15.    Severability.**  The invalidity, illegality or unenforceability of any provision of this Agreement shall in no way affect the validity, legality or enforceability of any other provision. If any provision of this Agreement is held to be unenforceable as a matter of law, the other provisions shall not be affected thereby and shall remain in full force and effect.

**16.    Mergers and Conversions.**  Any corporation or entity into which the Bank may be merged or converted or with which it may be consolidated, or any corporation or entity resulting from any merger, conversion or consolidation to which the Bank will be a party, or any corporation or entity succeeding to the business of the Bank will be the successor of the Bank hereunder without the execution or filing of any paper with any party hereto or any further act on the part of any of the parties hereto except where an instrument of transfer or assignment is required by law to effect such succession, anything herein to the contrary notwithstanding.

**17.    Termination.**  This Agreement shall terminate upon receipt by the Bank of notice from the Secured Party that its security interest in such Accounts and all assets therein have terminated.  Upon receipt of such notice, the Secured Party shall have no further right to originate instructions with respect to the assets in the Accounts.  The Bank shall, upon payment of all outstanding fees and expenses hereunder, promptly forward any amounts held by the Bank in the Accounts to the Pledgor, and the Bank shall be relieved and discharged of any further responsibilities with respect to its duties hereunder.

**18.    Counterparts.**  This Agreement may be executed simultaneously in two or more counterparts, any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same agreement. Signatures on counterparts of this Agreement executed and delivered in electronic format (i.e. "pdf") or by other electronic means (including DocuSign) shall be deemed original signatures with all rights accruing thereto except in respect to any non-US entity, whereby originals may be required.

**[Remainder of Page Left Intentionally Blank]**

citi

JA647

Docusign Envelope ID: 019F61F7-8937-48DF-BF87-AE62365B3962

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 138 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 144 of 694

**IN WITNESS WHEREOF**, each of the parties has caused this Agreement to be executed by a duly authorized representative as of the day and year first written above.

**CITIBANK, N.A.,**
as Bank

By: _____

    Name: Nerlie Delly
    Title: Senior Trust Officer

**Climate United Fund,**
as Pledgor

By: _____

    Name: Elizabeth Bafford
    Title: President & CEO

**United States Environmental Protection Agency**

By: _____

    Name: Philip Schindel
    Title: EPA Award Official

JA648

Docusign Envelope ID: 019F54F7-8937-48DF-BF87-AE62365B3962

Case 1.25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 139 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 145 of 694

**EXHIBIT A**

**FORM OF NOTICE OF EXCLUSIVE CONTROL**

VIA EMAIL: ███████████████████████

Nerlie Delly
Vice President
Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, New York 10013

Pursuant to the Account Control Agreement dated November 1, 2024, among Climate United Fund (the "**Pledgor**"), United States Environmental Protection Agency (the "**Secured Party**"), and Citibank, N.A. (the "**Bank**"), we hereby instruct you of the following:

The Pledgor and the Secured Party have agreed that the terms and conditions entitled "Deposit Account at Financial Agent" in the Grant Agreement indicate the conditions under which the Secured Party may exercise its right of control herein, and such conditions will be defined as "default" for the purposes of the Account Control Agreement.

As required by the Grant Agreement, the Secured Party has issued a written determination and finding that Pledgor has failed to comply with the terms and conditions of the Grant Agreement, and that noncompliance is substantial such that effective performance of the Grant Agreement is materially impaired or there is adequate evidence of waste, fraud, material misrepresentation of eligibility status, or abuse, and that the Secured Party has initiated action under 2 CFR 200.339 to wholly or partly suspend or terminate the Grant Agreement, as authorized in the terms of the Grant Agreement.

Therefore, the Secured Party hereby notifies you that (i) a default has occurred and is continuing under the Grant Agreement and (ii) from and after the receipt of this notice until you receive further instruction from Secured Party, you are hereby directed to retain and hold all funds in the Account and not to [invest or] disburse the same to any party whatsoever, other than as instructed by the Secured Party.

**United States Environmental Protection Agency**

as Secured Party

By: _____
    Name:
    Title:
    Date:

Exhibit A

JA649

**EXHIBIT B**

**FORM OF ACCOUNT DIRECTION (NCIF)**
**Pledgor's UEI Number:** ███████████

[Date]

Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, NY 10013
Attn: Nerlie Delly
E-mail: ████████████████████████████

VIA: CitiSFT

RE: Account Control Agreement dated November 1, 2024, among Climate United Fund (the "**Pledgor**"), United States Environmental Protection Agency (the "**Secured Party**"), and Citibank, N.A. (the "**Bank**")

Pursuant to Section 2 of the above referenced Account Control Agreement, the Pledgor hereby instructs the Bank to disburse a total amount of \$[●] funds as per below and as per the attached upload file named xxx:

<u>**Check applicable boxes:**</u>

( ) **Internal Transfer within the Bank (intra-entity).**

( ) **Internal Transfer within the Bank (inter-entity).**

( ) **External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities).**

( ) **External Transfer outside the Bank (for Financial Assistance Activities).**

<u>**If an Internal Transfer within the Bank (intra-entity), check the following applicable boxes:**</u>

( ) **Transfer of \$[●] across Pledgor's 'Budget' sub-accounts, as defined in the Grant Agreement**.

( ) **Transfer of \$[●] from Pledgor's 'Program Income from Operations' account to Pledgor's 'Budget' sub-account(s), as defined in the Grant Agreement**.

( ) **Transfer of \$[●] from Pledgor's 'Reserve' account to Pledgor's 'Program Income from Operations' account, as defined in the Grant Agreement.**

( ) **Transfer of \$[●] from Pledgor's 'Budget' sub-account(s) or 'Program Income from Operations' account to 'Reserve' account, as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

Docusign Envelope ID: 019F561F3 8937 48DF B5B7 AE62365B3962

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 141 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 147 of 694

*"The amount of this expenditure is necessary to execute against the EPA-approved workplan. Financing agreements for identified Qualified Projects necessitating the transfer have been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

**If an Internal Transfer within the Bank (inter-entity), check the following applicable boxes:**

( ) **Transfer of \$[●] from Pledgor's 'Budget' sub-account(s) to 'Financial Assistance Subrecipient' as defined in the Grant Agreement.**

**If an External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities), check one of the following boxes:**

( ) **Disbursement of \$[●] for Predevelopment Activities as defined in the Grant Agreement.**

( ) **Disbursement of \$[●] for Market-Building Activities as defined in the Grant Agreement.**

( ) **Disbursement of \$[●] for Program Administration Activities as defined in the Grant Agreement.**

**If an External Transfer outside the Bank (for Financial Assistance Activities), check the following applicable boxes:**

( ) **Disbursement of \$[●] from Pledgor's 'Budget' sub-account to provide Financial Assistance to Qualified Projects as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the EPA-approved workplan. Financing agreements for identified Qualified Projects necessitating the transfer have been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

( ) **Disbursement of \$[●] from Pledgor's 'Reserve' account to satisfy a legal obligation to a third party as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this transfer is necessary to execute against the EPA-approved workplan and pay a third party pursuant to a financing agreement that has been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

Capitalized terms in this instruction letter not otherwise defined shall have the same meaning given to them in the Account Control Agreement.

Docusign Envelope ID: 019F64F7-8937-48DF-B587-AE62365B3962

Signature on this Account Direction executed and delivered in electronic format (i.e. "pdf") or by other electronic means (including DocuSign) shall be deemed original signatures with all rights accruing thereto.

IN WITNESS WHEREOF, the Pledgor has caused this Account Direction to be duly executed and delivered as of the date first written above.

Pledgor:


_____

Authorized Person

**ADDENDUM 1**
**Account Control Agreement**

| | |
|---|---|
| **Date of Account Control Agreement** | November 1, 2024 |
| **Grant Agreement** | Agreement Title: GGRF NCIF: Climate United (5G — 84094001)<br>Agreement Date: 8/8/2024 |
| **Pledgor Notice Details** | Attn: Beth Bafford<br>Address: 7550 Wisconsin Ave, 3rd Floor, Bethesda, MD 20814<br>Email: ██████████ |
| **UEI Number** | ██████████ |
| **Tax Identification Number** | ██████████ |
| **Citi Deposit Instructions** | Bank: CITIBANK, N.A.<br>ABA: ██████<br>Account Name:<br>Account Number:<br>Ref: |

**Money Market Fund Investment Selection**

| Fund Name | Fund Number | CUSIP |
|---|---|---|
| Blackrock Treasury Trust Fund (10) Institutional Shares | TTTXX | ██████ |

**Accounts to Be Established**

| Account Number | Account Name | Initial Deposit Amount |
|---|---|---|
| ██████ | CUF Financial Assistance | $1,521,223,698.62 |
| ██████ | CUF Predevelopment | $23,618,778.17 |
| ██████ | CUF Market-Building | $68,560,774.30 |
| ██████ | CUF Program Administration | $171,303,020.35 |
| ██████ | CUF Other Pass-Through Funding | $3,668,418,776.25 |
| ██████ | CUF Reserves | $0.00 |
| ██████ | CUF Program Income from Operations | $0.00 |

**CitiVelocity Reporting Entitlements Request:**

The Pledgor hereby requests that the Bank entitle the following individuals to view-only access to the Bank's client reporting system for all accounts opened under this Account Control Agreement.

Addendum 1

Docusign Envelope ID: 019F64F3-8937-48DF-B5B7-AE62365B3662

Case 1:25-cv-00698-TSC   Document 49-2   Filed 03/26/25   Page 144 of 192
USCA Case #25-5122   Document #2114423   Filed: 05/05/2025   Page 150 of 694

Pledgor Client Profile Name: Climate United Fund

| Name | Phone Number | | Email | |
|------|--------------|--|-------|--|
| Beth Bafford | ███████ | | █████████ | |
| Stephanie Seiberg | ███████ | | █████████ | |
| Ann Dobbyn | ███████ | | █████████ | |
| Emmeline Liu | ███████ | | █████████ | |
| Comfort Siodlarz | ███████ | | █████████ | |

The Pledgor hereby acknowledges that all accounts opened under this Account Control Agreement will be entitled to the Bank's client reporting system and made available for view-only access to the following Client Profiles and their associated users:

| Entity | Client Profile Name |
|--------|---------------------|
| Secured Party | U.S. Environmental Protection Agency |

**CitiSFT Entitlements Request:**

Citi makes available the Secure File Transfer (CitiSFT) platform for clients to securely upload Account Directions. The Pledgor hereby requests that the Bank entitle the below individuals with upload only access to CitiSFT:

| Name | Phone Number | | Email | Maker, Checker, Maker and Checker |
|------|--------------|--|-------|-----------------------------------|
| Beth Bafford | ███████ | | █████████ | Checker |
| Stephanie Seiberg | ███████ | | █████████ | Checker |
| Ann Dobbyn | 3████ | | █████████ | Checker |
| Comfort Siodlarz | ███████ | | █████████ | Maker |
| Weijie Ma | ███████ | | █████████ | Maker |
| Emmeline Liu | ███████ | | █████████ | Maker |

Signed by:

*Elizabeth Bafford*

C11FE0C458DE46F...

Authorized Signature

Elizabeth Bafford

EAB

Addendum 1

JA654

Docusign Envelope ID: 019F64F7-8937-48DF-B5B7-AE62365B3962

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 145 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 151 of 694

# SCHEDULE A

## BANK COMPENSATION

### General compensation

For the services described in the Account Control Agreement, the Bank shall charge each Pledgor as follows:

| Agency & Trust Services | Fees |
|---|---|
| **Acceptance Fee**<br>This one-time fee covers the acceptance of the appointment, the review of the related Transaction documents submitted in connection with the execution and delivery thereof, setting up of internal controls, and communication with other members of the working group, as necessary. | Waived |
| **Annual Administration Fee**<br>To cover the administrative functions of Citi under the Agreement, including the establishment and maintenance of the account(s), safekeeping of assets, maintenance of the records, execution and administration of the Agreement provisions, and other duties required under the terms of the Agreement. | Waived |
| **Wire Fees** | Waived |
| **Legal Fees**<br>To cover the review of legal documents by Citibank Agency & Trust's outside counsel. | Waived |

The Transaction documents will be governed in accordance with federal law of the United States, except where there is no applicable federal law, in accordance with the laws of the State of New York, without giving effect to the conflict of laws principles thereof, as established in the Agreement and subject to internal approval and satisfactory review of all documentation. All outgoing payments processed by Citi will be made via wire. Account balances invested in an Institutional Money Market Fund will be chosen by the client from a list of providers that Citi will supply. If invested in a Money Market Fund, fund distributors may provide Citi with Shareholder Servicing fees. These fees are discussed in the fund's prospectus, which will be delivered to the client prior to investment. All of Citi's responsibilities will be non-discretionary and Citi will not be required to make any advances of its own funds. Therefore, all services provided by Citi must strictly follow the terms stated in the Agreements or in the written instructions of the authorized parties or third parties authorized to send instructions to Citi.

In accordance with US regulations regarding anti-money laundering and terrorist financing, Federal law requires Citi to obtain, verify and record information that identifies each business or entity that opens an account or establishes a relationship with Citi. What this means for our clients: when a client opens an account or establishes a relationship, we will ask for the client's business name, a street address and a tax identification number that Federal law requires us to obtain. In accordance with the Unlawful Internet Gambling Act (the "Act"), Citibank, N.A. accounts or other Citibank, N.A. facilities in the United States may not be used to process "restricted transactions" as such term is defined in U.S. 31 CFR Section 132.2(y).

JA655

**SCHEDULE B**

**PLEDGOR AUTHORIZED LIST OF SIGNERS**
**(to be provided separately)**

Each of the following person(s) is authorized to execute documents and to direct the Bank as to all matters on the Pledgor's behalf.  The Bank may confirm the instructions received by return call to any one of the telephone numbers listed below.

**PLEDGOR**

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: | | |

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: | | |

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: | | |

JA656

**SCHEDULE C**

**SECURED PARTY AUTHORIZED LIST OF SIGNERS**
**(to be provided separately)**

Each of the following person(s) is authorized to execute documents and to direct the Bank as to all matters on the Secured Party's behalf.  The Bank may confirm the instructions received by return call to any one of the telephone numbers listed below.

**SECURED PARTY**

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: |  |  |

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: |  |  |

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: |  |  |

Docusign Envelope ID: 3AE10237-5084-4859-A1E3-9AA2DCBB5197

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 148 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 154 of 694

## AMENDMENT TO ACCOUNT CONTROL AGREEMENT

This Amendment to the Account Control Agreement (this "**Amendment**"), is entered into as of January 13, 2025 by and among CITIBANK, N.A. (in such capacity, the "**Bank**"), UNITED STATES ENVIRONMENTAL PROTECTION AGENCY (the "**Secured Party**"), and CLIMATE UNITED FUND (the "**Pledgor**" and together with Bank and Secured Party, collectively, the "**Parties**").

### R E C I T A L S :

A.      Reference is made to that certain Account Control Agreement, dated as of November 1, 2024 (as amended from time to time, the "**ACA**") by and among the Bank, the Secured Party and the Pledgor.  Capitalized terms used herein and not otherwise defined herein shall have the meaning given to such terms in the ACA.

B.      The Parties desire to amend the ACA as set forth herein.

NOW, THEREFORE, in consideration of the premises, the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1)  Amendments to ACA.  The ACA is hereby amended as follows:

   a)  Section 2 is amended by adding the following proviso to the end of such section:

   "; provided that notwithstanding the foregoing, after the delivery of a Notice of Exclusive Control, Bank shall continue to disburse funds and financial assets associated with financial obligations "properly incurred" by the Pledgor prior to the issuance of, but not in anticipation of, a delivery of a Notice of Exclusive Control, in Pledgor's "Reserve" Account pursuant to Account Directions originated by Pledgor except for any specific funds or financial assets, identified by Secured Party in the applicable Notice of Exclusive Control as not being "properly incurred" by the Pledgor in accordance with 2 CFR 200.343."

   b)  Exhibit A (Notice of Exclusive Control) of the ACA is hereby amended and restated in the form attached to this Amendment as Exhibit A.

   c)  Exhibit B (Form of Account Direction (NCIF) of the ACA is hereby amended and restated in the form attached to this Amendment as Exhibit B.

2)  Counterparts.  This Amendment may be executed in several counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same document. Signatures transmitted by facsimile or e-mail shall be sufficient to bind the Parties to this Amendment.

3)  Ratification.  The Parties acknowledge that in all other respects, the provisions of the ACA are hereby reaffirmed and ratified, and shall remain in full force and effect.

Docusign Envelope ID: 3AE10237-5084-4859-A1E3-9AA2DCBB5197

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 149 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 155 of 694

4)  <u>Conflict</u>.  The Parties agree that in the event of a conflict between the terms and conditions of this Amendment and the ACA (as may have been amended by any prior amendment), the terms and conditions of this Amendment shall govern.


[Remainder of Page Intentionally Blank; Signature Pages to Follow]

Docusign Envelope ID: 3AE10237-5084-4859-A1E3-9AA2DCBB5197

IN WITNESS WHEREOF, the Parties hereto have executed this Amendment in their respective signatures, intending that this Amendment shall become effective as of the date first above written.

**CLIMATE UNITED FUND**

By: *Elizabeth Bafford*
       —Signed by:
       C11FE0C458DF48F
Name: Elizabeth Bafford
Title: CEO

[*Signature Page to Amendment to Account Control Agreement*]

**JA660**

**CITIBANK, N.A.**

By: _Nerlie Delly_ — DocuSigned by:

Name: Nerlie Delly

Title: Senior Trust Officer

[*Signature Page to Amendment to Account Control Agreement*]

**JA661**

Docusign Envelope ID: 3AE10237-5084-4859-A1E3-9AA2DCBB5197

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 152 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 158 of 694

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

By: _____

Name: Phillip K Schindel

Title: Acting Dir, Grants Mgmt & Business Ops Division

[*Signature Page to Amendment to Account Control Agreement*]

Docusign Envelope ID: 3AE10237-5084-4859-A1E3-9AA2DCBB5197

Case 1:25-cv-00698-TSC   Document 49-2   Filed 03/26/25   Page 153 of 192
USCA Case #25-5122   Document #2114423   Filed: 05/05/2025   Page 159 of 694

EXHIBIT A

**FORM OF NOTICE OF EXCLUSIVE CONTROL**

VIA EMAIL: ███████████████████████████████

Nerlie Delly
Vice President
Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, New York 10013
[Re. Account # [●]]

Pursuant to the Account Control Agreement dated November 1, 2024, among Climate United Fund (the "**Pledgor**"), United States Environmental Protection Agency (the "**Secured Party**"), and Citibank, N.A. (the "**Bank**"), we hereby instruct you of the following:

The Pledgor and the Secured Party have agreed that the terms and conditions entitled "Deposit Account at Financial Agent" in the Grant Agreement indicate the conditions under which the Secured Party may exercise its right of control herein, and such conditions will be defined as "default" for the purposes of the Account Control Agreement.

As required by the Grant Agreement, the Secured Party has issued a written determination and finding that Pledgor has failed to comply with the terms and conditions of the Grant Agreement, and that noncompliance is substantial such that effective performance of the Grant Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse (as defined in the Grant Agreement) or material misrepresentation of eligibility status, and that the Secured Party has initiated action under 2 CFR 200.339 to wholly or partly suspend or terminate the Grant Agreement, as authorized in the terms of the Grant Agreement.

Therefore, the Secured Party hereby notifies you that (i) a default has occurred and is continuing under the Grant Agreement and (ii) from and after the receipt of this notice until you receive further instruction from Secured Party, you are hereby directed to retain and hold all funds in the Account or Accounts named in this Notice and not to [invest or] disburse the same to any party whatsoever, other than as instructed by the Secured Party. Notwithstanding the foregoing, Bank shall continue to disburse funds in Pledgor's "Reserve" Account pursuant to Account Directions originated by Pledgor [except for $[    ] in Account No. [       ], identified by Secured Party in the written determination and finding, that Secured Party has determined was not "properly incurred" by the Pledgor in accordance with 2 CFR 200.343].

**United States Environmental Protection Agency**

Exhibit A

as Secured Party


By:_____
    Name:
    Title:
    Date:

Exhibit A

Docusign Envelope ID: 3AE10237-5084-4859-A1E3-9AA2DCBB5197

Case 1:25-cv-00698-TSC    Document 49-2    Filed 03/26/25    Page 155 of 192
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 161 of 694

EXHIBIT B

FORM OF ACCOUNT DIRECTION (NCIF)

**Pledgor's UEI Number:** ████████████

[Date]

Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, NY 10013
Attn.:Nerlie Delly
E-mail: ██████████████████

VIA: CitiSFT

RE: Account Control Agreement dated November 1, 2024, among Climate United Fund (the
"**Pledgor**"), United States Environmental Protection Agency (the "**Secured Party**"), and Citibank,
N.A. (the "**Bank**")

Pursuant to Section 2 of the above referenced Account Control Agreement, the Pledgor hereby
instructs the Bank to disburse a total amount of $[●] funds as per below and as per the attached
upload file named xxx:

**Check applicable boxes:**

( ) **Internal Transfer within the Bank (intra-entity).**

( ) **Internal Transfer within the Bank (inter-entity).**

( ) **External Transfer outside the Bank (for Predevelopment Activities, Market-Building
Activities, and/or Program Administration Activities).**

( ) **External Transfer outside the Bank (for Financial Assistance Activities).**

**If an Internal Transfer within the Bank (intra-entity), check the following applicable
boxes:**

( ) **Transfer of $[●] across Pledgor's 'Budget' sub-accounts, as defined in the Grant
Agreement**.

( ) **Transfer of $[●] from Pledgor's 'Program Income from Operations' account to
Pledgor's 'Budget' sub-account(s), as defined in the Grant Agreement**.

( ) **Transfer of $[●] from Pledgor's 'Reserve' account to Pledgor's 'Program Income from Operations' account, as defined in the Grant Agreement.**

( ) **Transfer of $[●] from Pledgor's 'Budget' sub-account(s) or 'Program Income from Operations' account to 'Reserve' account, as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the workplan in effect under the Grant Agreement. Financing agreements for identified Qualified Projects necessitating the transfer have been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

**If an Internal Transfer within the Bank (inter-entity), check the following applicable boxes:**

( ) **Transfer of $[●] from Pledgor's 'Budget' sub-account(s) to 'Financial Assistance Subrecipient' as defined in the Grant Agreement.**

**If an External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities), check one of the following boxes:**

( ) **Disbursement of $[●] for Predevelopment Activities as defined in the Grant Agreement.**

( ) **Disbursement of $[●] for Market-Building Activities as defined in the Grant Agreement.**

( ) **Disbursement of $[●] for Program Administration Activities as defined in the Grant Agreement.**

**If an External Transfer outside the Bank (for Financial Assistance Activities), check the following applicable boxes:**

( ) **Disbursement of $[●] from Pledgor's 'Budget' sub-account to provide Financial Assistance to Qualified Projects as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the workplan in effect under the Grant Agreement. Financing agreements for identified Qualified Projects necessitating the transfer have been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

( ) **Disbursement of $[●] from Pledgor's 'Reserve' account to satisfy a legal obligation to a third party as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this transfer is necessary to execute against the workplan in effect under the Grant Agreement and pay a third party pursuant to a financing agreement that has been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

Capitalized terms in this instruction letter not otherwise defined shall have the same meaning given to them in the Account Control Agreement.

Signature on this Account Direction executed and delivered in electronic format (i.e. "pdf") or by other electronic means (including DocuSign) shall be deemed original signatures with all rights accruing thereto.

IN WITNESS WHEREOF, the Pledgor has caused this Account Direction to be duly executed and delivered as of the date first written above.

Pledgor:

_____

Authorized Person

# Exhibit C

JA668



**THE ADMINISTRATOR**

WASHINGTON, D.C. 20460

Acting Deputy Administrator W.C. McIntosh
U.S. Environmental Protection Agency
1200 Pennsylvania Ave, NW
Washington, DC 20460

March 2, 2025

Office of Inspector General
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

Dear Acting Inspector General Murley:

I am formally referring to your office urgent and deeply concerning matters of financial
mismanagement, conflicts of interest, and oversight failures within the Greenhouse Gas
Reduction Fund (GGRF).

To restore integrity and public trust, the Environmental Protection Agency (EPA) has launched
certain oversight and accountability measures that still exist despite the GGRF being designed to
limit oversight. We have placed staff on administrative leave, begun a full assessment of internal
controls, and are cooperating with the Department of Justice (DOJ) and Federal Bureau of
Investigation (FBI) in their ongoing investigation.

Given the severity of the alleged misconduct, waste, conflicts of interest, and potential fraud
within the GGRF program, the Administrator is conducting a comprehensive review. Concurrent
investigations by the Department of Justice (DOJ) and Federal Bureau of Investigation (FBI) are
underway. In response to these developments, the financial institution has voluntarily paused
further disbursements, aligning with the ongoing investigation by DOJ and FBI's publicly reported
recommendation to freeze the funds. These decisive actions aim to safeguard federal funds and
ensure adherence to congressional intent.

**Systemic Failures in Oversight of GGRF and Disturbing Public Information**

Recent findings reveal a pattern of reckless financial management, blatant conflicts of interest, astonishing sums of tax dollars awarded to unqualified recipients, and severe deficiencies in regulatory oversight under the prior administration. The EPA Office of Inspector General (OIG) plays a critical role in eliminating waste and abuse, and we stand with your office in our shared mission to restore accountability and prevent further misuse of taxpayer dollars.

One of the most disturbing initial indicators of financial misconduct is a publicly circulated video of a former Biden Administration EPA political appointee boasting that officials were "tossing gold bars off the Titanic" — rushing to distribute billions in taxpayer dollars before the incoming administration could review or halt improper disbursements.[1] Even more troubling, the official implied that political favoritism influenced funding decisions, with expectations of securing employment at grant-recipient organizations.

**Documented Evidence of Potential Financial Misconduct**

These are not hypothetical concerns; they are supported by troubling evidence that continues to emerge of improper conduct, including:

1. Lack of EPA Oversight in GGRF Distribution

- A large private-sector financial institution was used as an external financial agent, holding $20 billion in taxpayer dollars — an unprecedented arrangement for EPA.
- Only eight prime recipients controlled all $20 billion, acting as pass-through entities to subrecipients — many of which were also structured as pass-throughs, raising serious concerns about transparency and accountability.
- The design of this scheme removed $20 billion from governmental oversight in the days, weeks, and months before a new administration took office.
- The unusual and apparently improper structure of the agreements governing the administration of the GGRF altogether excluded EPA from being a party to Account Control Agreements (ACAs) with subrecipients.

2. Conflicts of Interest and Political Favoritism

- Jahi Wise, the former director of the GGRF, personally oversaw a $5 billion grant to his previous employer, the Coalition for Green Capital — without recusing himself.2

---

[1] https://www.youtube.com/watch?v=CblV6EwzKxg

- A $2 billion grant was awarded to Power Forward Communities, a new nonprofit with ties to Stacey Abrams, despite reporting only $100 in total revenue in 2023.[2]
- Young, Gifted & Green was awarded $20 million, even though its CEO applied for funding while serving on the White House Environmental Justice Advisory Council.[3]

3. Prime Recipients' Lack of Financial Competency

- Recipients were required to begin drawing down funds within 21 days even though EPA, apparently recognizing the lack of qualifications, deemed it necessary that the recipients complete training on "How to Develop a Budget" within 90 days.[4]
- The EPA itself determined that recipients lacked basic financial competency — yet allowed them to manage and distribute billions of taxpayer dollars.
- If an entity requires 90 days to learn how to create a budget, it cannot be trusted to start responsible distribution of taxpayer funds within 21 days.

These examples are the tip of the iceberg and suggest a deeply entrenched pattern of political favoritism, lack of qualifications, and other possibly unlawful allocation of taxpayer funds. Disturbingly, these cases likely represent only a fraction of broader issues.

**Failure of Internal Controls & Structural Weaknesses in GGRF Management**

Your predecessor testified before Congress last September, describing the GGRF's financial structure as "fantastically complex."[5]  What we have uncovered since then raises even greater concerns:

- Financial Agent Agreements, Account Control Agreements (ACAs), and Amended Account Control Agreements, signed in the final months (and in some cases just days) of the Biden Administration, *reduced* rather than enhanced EPA oversight.

---

[2] Thomas Catenacci, "DOGE Finds $2 Billion in Taxpayer Funds Earmarked for Stacey Abrams-Linked Group," *Washington Free Beacon*, last modified February 19, 2025, https://freebeacon.com/trump-administration-billions-doge-found-parked-at-bank-earmarked-for-stacey-abrams-backed-green-group/.
[3] Thomas Catenacci, "Biden Environmental Justice Adviser Received Millions in Taxpayer Funds After Personally Applying For EPA Grant," *Washington Free Beacon*, last modified February 24, 2025, https://freebeacon.com/energy/biden-environmental-justice-adviser-received-millions-after-personally-applying-for-epa-grant/.
[4] U.S. Environmental Protection Agency, "RAIN-2024-G01," *EPA* Grants, last modified March 4, 2024, https://www.epa.gov/grants/rain-2024-g01.
[5] U.S. House Committee on Energy and Commerce "Holding the Biden-Harris EPA Accountable for the Radical Rush-to-Green Spending," https://www.youtube.com/watch?v=dkgMglo8g9g (34 minute mark), 19 September 2024.

- ACAs governing the GGRF appear to have been hastily amended, at the behest of GGRF recipients and without consideration, in the days leading up to Inauguration Day.
- EPA was not a party to the Account Control Agreements with subrecipients, allowing taxpayer dollars to be further distributed without proper agency oversight.
- The ironically named "Notice of Exclusive Control," the ostensible purpose of which is to allow EPA to take control of accounts at the financial agent, grants prime recipients and subrecipients the ability to transfer funds to private financial institutions of their choosing outside the scope of the financial agent agreement. It would have been more appropriately called a Notice of Less Control given the manner in which it granted recipients more power over the disposition of the money and the status of their accounts prior to the amendment.
- Contract provisions appear to have been intentionally structured to weaken EPA oversight.

**Immediate Action & Request for OIG Assistance**

Given the magnitude and significant risks to taxpayer funds, I am formally requesting your assistance with a comprehensive review of this arrangement and the issues involved. I value your recommendations.

If your office requires additional resources to conduct a full investigation, please let us know immediately. The EPA is committed to providing any necessary support to ensure a thorough and independent review of the program.

While these issues can be fully investigated, we will continue to aggressively pursue enhanced oversight, answers, and accountability. We stand firmly alongside the Office of the Inspector General in our shared mission to eliminate waste, fraud, and abuse with the EPA. I look forward to your recommendations.

Sincerely,

W.C. McIntosh
Acting Deputy Administrator
U.S. Environmental Protection Agency

cc:
      Lee Zeldin, Administrator, U.S. EPA
      James Payne, Acting General Counsel, U.S. EPA
      Eric Amidon, Chief of Staff, U.S. EPA

# Exhibit D



Acting Deputy Administrator W.C. McIntosh
U.S. Environmental Protection Agency
1200 Pennsylvania Ave, N.W.
Washington, DC 20460

March 4, 2025

Elizabeth Bafford
CEO
Climate United Fund
7550 Wisconsin Ave, 3rd floor
Bethesda, MD 20814

RE: Compliance and Oversight Review of EPA Greenhouse Gas Reduction Fund

Dear Elizabeth Bafford,

Your organization was awarded funding under the Environmental Protection Agency's
(EPA) Greenhouse Gas Reduction Fund (GGRF). This funding—which was appropriated to
EPA under Section 134 of the Clean Air Act—was referenced by a Biden EPA political
appointee, in a widely circulated video, as "gold bars" that were "tossed off the Titanic".
Shockingly, their plan involved parking $20 billion at an outside financial institution to be
distributed to just 8 pass-through organizations, including your entity. This arrangement
was the first of its kind in EPA history and was purposely designed to obligate all the money
in a rush job with less, not more, oversight by the federal government.

This video is one of many recent developments that have raised questions and concerns
regarding the award process, potential self-dealing and conflicts of interest, qualifications
of recipients, the effectiveness and efficiency of the program, and the appropriate
management and oversight of these funds. As a result, a referral has been made to EPA
Office of Inspector General. The program is also subject to an ongoing investigation by
other federal agencies.

As part of EPA's oversight responsibilities within the Grant Agreement and Administrator Zeldin's pledge to Congress and the American public to be accountable for every penny EPA spends, please submit the requested responses and documents via email or secure file transfer to GGRFoversight@epa.gov **no later than 12:00 PM ET on March 28, 2025.** Responses, other than required forms, should be in Word format. Failure to fully respond to this request on time will be considered a violation of the Grant Agreement and may result in further compliance actions, which may include withholding payments, suspension of funding, or other enforcement measures. Your urgent cooperation in this timely matter is required pursuant to the terms of your Grant Agreement and federal regulations, including 2 CFR 200.337. Additionally, as part of EPA's due diligence process, the agency will work with the U.S. Department of the Treasury (Treasury) and the Financial Agent (FA) to establish and implement additional account controls consistent with prudent operational standards pursuant to the Financial Agency Agreement (FAA).

1. Provide a list of your current board of directors, including their roles, affiliations, and any financial compensation or stipends received from this grant.
2. Provide copies of your organization's most recent IRS Form 990 filings and any required financial disclosures under federal grant regulations.
3. Provide all written communications (hard copy, electronic, or otherwise), notices, or formal discussions your organization had with EPA officials regarding eligibility and program design prior to the grant award.
4. Provide a list of all EPA-sponsored training sessions, workshops, or technical assistance events attended by your organization related to this grant, including names of attendees and completion dates.
5. Submit proof of completion of EPA's "How to Develop a Budget" training, including date of completion and the names and roles of those who received it.
6. Provide copies of all EPA performance metrics and guidance documents you (or your representative) have in your possession defining program success and include an explanation of your understanding of how success was defined for these programs.
7. Provide an itemized breakdown of funds spent to date, including personnel, contractual, subawards, and program-related expenses.
8. What percentage of grant funds have been allocated to administrative costs versus direct financial assistance to subrecipients? Describe how your organization determines allowable administrative costs under this grant, including a justification for the percentages allocated to administrative expenses versus direct program funding. Provide supporting documentation.
9. Provide the total annual budget for your organization for fiscal years 2022, 2023, 2024, and 2025, including a breakdown of revenue sources prior to and after receiving this grant.
10. List all subrecipients of this grant, the funding amounts allocated to each, and the criteria used to determine eligibility. Include award dates and the purposes of each award. Provide a copy of your organization's subrecipient selection criteria and process, including due diligence measures and compliance verification.

**JA675**

11. Submit copies of all subaward agreements issued under this grant, including any contractual terms regarding fund disbursement and compliance monitoring and any required Account Control Agreements, in accordance with EPA reporting requirements.

12. What specific internal controls does your organization have in place to prevent, detect, and address fraud, waste, or abuse of funds? Provide any related policies or procedures, including any mechanisms for detecting improper payments, conflicts of interest, or misuse of funds. Please note which, if any, of these are part of your organization's formal financial policies.

13. Provide a list of all EPA and federal agency officials with whom your organization has had official grant-related communications since the award date.

14. What formal guidance, directives, or technical assistance has your organization received from EPA regarding how these grant funds should be used? Provide copies of any written guidance or relevant communications. Did your organization receive any guidance from EPA or other government entities on how the funds should be used? If so, specify.

15. Has your organization received any formal or informal direction from federal officials regarding how to allocate or distribute funds? If so, provide documentation or meeting records that detail this guidance.

16. List all projects funded to date, including project descriptions, status and locations, amounts awarded, success rate, and anticipated environmental impact.

17. For each funded project, submit documentation on how each project is measuring greenhouse gas reductions, specific emissions reduction targets, metrics used to measure progress, and specific methodologies and verification processes.

18. Has your organization been subject to any compliance reviews, audits, or corrective action plans related to this grant? If so, provide the results and any corrective measures taken. Provide copies of any independent audits, compliance reviews, or risk assessments conducted on your organization's use of EPA funds.

19. Submit an updated annual budget report showing what percentage of your organization's total revenue is now derived from this grant.

20. Has your organization used any grant funds for lobbying, political activity, or policy advocacy – directly or indirectly? If so, please provide details and justification for compliance with federal restrictions.

21. Provide a list of all current employees or contractors who previously worked at EPA or other federal agencies in the last three years. Include job descriptions and compensation details, if applicable.

22. Provide documentation demonstrating how this program has successfully mobilized private capital, including details on secured investments, investor agreements, leveraged investments or co-financing agreements.

23. Provide documentation of all external capital raised using grant funds, including private sector investments, loan guarantees, or matching funds secured.

24. What fundraising costs, if any, have been allocated to this grant? Provide a breakdown by category.

25. Provide details on any profits, interest earnings, or other income generated as a result of this grant, and how those funds are being reinvested.

26. Submit a list of all third-party vendors, consultants, funds, or contractors paid using grant funds, including compensation details and selection process documentation.

27. Provide records of any disclosed or potential conflicts of interest.

28. Provide a list of any state or local government entities receiving funds through your organization under this grant.

29. Provide a list of all quarterly transaction-level data submissions required under the grant's reporting conditions.

30. Have there been any discrepancies, delays, or issues in required reporting to EPA? If so, provide an explanation and corrective actions taken.

31. Provide documentation of all cybersecurity measures taken to safeguard sensitive data related to this grant.

32. Submit documentation on timekeeping and payroll allocation methods used to ensure that personnel costs charged to this grant are in compliance.

33. Provide documentation on how your organization ensures that all EPA-funded activities comply with Title IV of the Civil Rights Act, including nondiscrimination policies, public engagement efforts, and accessibility measures.

34. Provide documentation on how your organization ensures public access to information regarding funded programs, expenditures, and project outcomes as required under the grant agreement.

35. Submit documentation on the data collection methodologies used to evaluate program effectiveness, including any tracking systems, performance indicators, or external evaluations conducted.

Administrator Zeldin has made it clear that one of his top priorities at EPA is to be an excellent steward of the American public's hard-earned tax dollars. There will be zero tolerance of any waste, fraud, or abuse. Your cooperation and timely response to these inquiries will assist in ensuring transparency and accountability in the administration of these funds. I hope you share in EPA's concerns and have some of the same questions yourself.

Thank you for your prompt attention to this matter.

Sincerely,

W.C. McIntosh
Acting Deputy Administrator
U.S. Environmental Protection Agency

Cc: Citibank, N.A.

# Exhibit E

JA678

# KIRKLAND & ELLIS LLP

1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
United States

Reg Brown, P.C.
To Call Writer Directly:
████████████████

Facsimile:
███████████

████████████

www.kirkland.com

March 6, 2025

**By E-mail**                                           **CONFIDENTIAL**

Lee Zeldin
Administrator
Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

Re:    Account Control Agreements under Greenhouse Gas Reduction Fund

Dear Administrator Zeldin:

On March 4, 2025, Citibank, N.A. (the "Bank") received a directive from the U.S. Department of the Treasury pursuant to the Financial Agency Agreement (FAA), instructing the Bank "to work directly with the EPA to establish and implement reasonable account controls to serve the purposes and interests of the United States." Treasury also instructed the Bank "not to disburse funds from any of the GGRF accounts prior to the end of the day Sunday, March 9, 2025," in order "to provide the EPA with the necessary time to develop reasonable account controls." In addition to this communication from Treasury, the Bank is in receipt of your March 4 letters to the eight prime recipients, seeking responses to various requests in furtherance of the EPA's oversight of the program. As those letters note, "as part of EPA's due diligence process, the agency will work with the U.S. Department of the Treasury (Treasury) and the Financial Agent (FA) to establish and implement additional account controls consistent with prudent operational standards pursuant to the Financial Agency Agreement (FAA)."

Currently, the Bank has approximately $450 million in pending transfer instructions from the prime recipients and subrecipients. We have also received additional demands from prime recipients and subrecipients seeking disbursement of funds or an explanation. *See* Exhibit A (email from NY Green Bank (February 28); letter from Foley Hoag on behalf of Power Forward Communities (March 1); letter from Holwell Shuster & Goldberg on behalf of Coalition for Green Capital (March 6)). Pursuant to Treasury's instruction, the Bank awaits further guidance from the EPA on the additional account controls and direction on the pending requests. To aid in the EPA's due diligence process, the Bank is sharing as Exhibit B information regarding the pending transfer instructions.

Austin   Bay Area   Beijing   Boston   Brussels   Chicago   Dallas   Frankfurt   Hong Kong   Houston   London   Los Angeles   Miami   Munich   New York   Paris   Riyadh   Salt Lake City   Shanghai

## KIRKLAND & ELLIS LLP

Administrator Lee Zeldin
March 6, 2025
Page 2

The Bank awaits the EPA's and Treasury's additional direction. We also ask that
EPA establish a direct line of communication with the recipients and subrecipients regarding
its future decisions.

Sincerely,

Reg Brown, P.C.
Jeremy Dresner, P.C.

cc:     U.S. Department of the Treasury
        U.S. Department of Justice

# EXHIBIT A

| | |
|---|---|
| **From:** | Rubin, Jesse [SVCS] ██████████████ |
| **Sent:** | Friday, February 28, 2025 9:29 AM |
| **To:** | [greenbank.ny.gov] Grenier, Ben (GREENBANK) |
| **Subject:** | RE: NYGB \| Transfer Instructions |

Hi Ben,

We will forward your correspondence to the EPA and other federal officials for an appropriate response.

Thanks,
Jesse

**From:** ███████████ Grenier, Ben (GREENBANK)
**Sent:** Friday, February 28, 2025 9:21 AM
**To:** Rubin, Jesse [SVCS]
**Subject:** RE: NYGB \| Transfer Instructions

Jesse – just so I get it. If we make a draw request it won't be honored at this time ?

**From:** Rubin, Jesse ██████████████
**Sent:** Friday, February 28, 2025 9:18 AM
**To:** Grenier, Ben (GREENBANK) ████████████████; O'Connor, Marion ████████████ *CITI
US A&T GGRF Financial Agent ██████████████ Delly, Nerlie ██████████████
**Cc:** Suich, Joseph S (GREENBANK) ██████████████ Reiter, Will D (GREENBANK)
████████████████
**Subject:** RE: NYGB \| Transfer Instructions

> ATTENTION: This email came from an external source. Do not open attachments or click on links from unknown senders or
> unexpected emails.

Hi Ben,

We do not have an updated status at this time and continue to monitor the situation with EPA for status updates once
they become available for the program. We will advise once we have new information to share regarding transfer
instructions.

Best Regards,
Jesse

**From:** ███████████ Grenier, Ben (GREENBANK)
**Sent:** Friday, February 28, 2025 9:04 AM
**To:** O'Connor, Marion [SVCS]; *CITI US A&T GGRF Financial Agent; Delly, Nerlie [SVCS]
**Cc:** Suich, Joseph S (GREENBANK); Reiter, Will D (GREENBANK)
**Subject:** NYGB \| Transfer Instructions

Hi Marion,

JA682

Are you presently processing transfer instructions for our NCIF subaward?

If not, will you advise us when and / or share the process by which we can begin to transfer funds?

Best regards,
Ben


**Ben Grenier**
Director

**NY Green Bank**
**A Division of NYSERDA**
1333 Broadway, 3rd Floor | New York, NY 10018-9998
O: ████████ | F: ████████ | E ██████████████████

www.greenbank.ny.gov

This email and any files transmitted with it may contain confidential and/or privileged material and are intended solely for the person or entity to whom they are addressed. Any review, retransmission, dissemination, or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you are not the intended recipient and have received this communication in error, please contact the sender and delete the material from any computer and/or device.

JA683

**FOLEY HOAG** LLP



1301 Avenue of the Americas
New York, NY 10019

main
fax

Noah C. Shaw



direct

March 1, 2025

**Via E-Mail & Overnight Mail**

Mr. Brent McIntosh
Chief Legal Officer
Citibank, N.A.
388 Greenwich Street
New York, NY 10013

Re:    <u>National Clean Investment Fund Accounts</u>

Dear Mr. McIntosh,

We represent Power Forward Communities, Inc. ("PFC" or "Pledgor"), which has beneficial ownership of Citibank accounts that collectively hold approximately $2 billion in funds awarded under the Environmental Protection Agency's National Clean Investment Fund ("NCIF"). PFC is a coalition led by some of the country's most trusted housing, climate, and community investment groups, which came together to transform the housing sector, save homeowners and renters money, invest in stronger communities, and help meet national climate goals. Led by Enterprise Community Partners, Rewiring America, Habitat for Humanity International, Local Initiatives Support Corporation (LISC), and United Way Worldwide, PFC aims to expand and preserve affordable housing, improve air quality, and create well-paying jobs by ramping up simple energy efficiency and other improvements in single-family and multifamily homes nationwide.

We write to request that Citibank comply with PFC's transfer instructions with respect to its accounts, as described herein, so that PFC can continue with its important mission. In addition, we request a meeting as soon as possible to discuss these urgent matters.

Since February 14, 2025, PFC and certain subgrantees have submitted multiple requests to Citibank to disburse funds in accordance with PFC's NCIF grant agreement and Account Control Agreement ("ACA"). Citibank has not fulfilled those requests. Nor has Citibank offered any reason for its failure to do so, despite PFC's February 19, 2025 request for such reason. Because of Citibank's failure to adhere to its obligations under the ACA, PFC and its subgrantees face financial shortfalls that imperil their ability to retain employees,

Mr. Brent McIntosh
Page 2

deliver the projects for which the funds are allocated and which they are legally obligated to perform, and meet their other legal obligations.

Pursuant to the ACA among Citibank, PFC, and EPA, Citibank "maintains the Accounts for [PFC (the Pledgor)], and all property (including, without limitation, all funds and financial assets) held by the Bank for the accounts of the Pledgor are, and will continue to be, credited to the Accounts in accordance with instructions given by the Pledgor."  ACA § 1(a).  The ACA contemplates only one scenario under which Citibank may be authorized to deviate from those obligations:  when it receives a "Notice of Exclusive Control" from EPA. ACA § 2.

To PFC's knowledge, EPA has not issued such a notice.  Nor could EPA do so, as that Notice can only be issued following (1) a "written determination and finding that Pledgor has failed to comply with the terms and conditions of the Grant Agreement, and that noncompliance is substantial such that effective performance of the Grant Agreement is materially impaired or there is adequate evidence of waste, fraud, material misrepresentation of eligibility status, or abuse," and (2) EPA "has initiated action under 2 CFR 200.339 to wholly or partly suspend or terminate the Grant Agreement, as authorized in the terms of the Grant Agreement."  To PFC's knowledge, EPA has made no such determination or even allegation, nor has it taken any action to terminate the Grant Agreement.

<u>PFC Was Awarded Funds Pursuant To A Congressionally Approved And Transparent Funding And Contracting Process</u>

Congress enacted the Inflation Reduction Act of 2022 ("IRA") in August 2022. Among other components, the IRA amended the Clean Air Act to authorize EPA to make competitive grants under the NCIF.  *See* 42 U.S.C. § 7434.  Specifically, Congress funded NCIF with a total of approximately $14 billion—$11,970,000,000.00 under 42 U.S.C. § 7434(a)(2) and another $2,000,000,000.00 under 42 U.S.C. § 7434(a)(3)—and instructed that the funds remain available to be awarded until September 30, 2024.

Pursuant to that legislative mandate, on July 14, 2023, EPA released Notice of Funding Opportunity ("NOFO") No. EPA-R-HQ-NCIF-23, which it further updated on August 11, 2023.  The purpose of this NOFO was to solicit applications for grants intended to "deploy clean energy and combat the climate crisis but also improve health outcomes, lower energy costs, and create high-quality jobs for Americans—all while strengthening our country's economic competitiveness and ensuring energy security."  Relevant here, the NOFO included "a $14 billion NCIF competition to finance clean technology deployment nationally."  The application requirements for this competition were complex, covering, as the EPA described on its website, "a diverse set of topics and include[ing] not just a detailed project narrative but also a robust set of application requirements."

PFC submitted its application in response to the NOFO in October 2023.  So too did other applicants.  From there, EPA engaged in a six-month review process to evaluate the applications and determine the winners.

Mr. Brent McIntosh
Page 3

To call this multi-staged review and scoring process "thorough" would be an understatement.  Nearly fifty federal employees participated in the process, with roles including:

- Serving on one of the review panels created by EPA to review and score the applications on issues relating to (1) consumer protection, (2) equity and environmental justice, (3) financial risk management, (4) financial transactions, (5) financial statement analysis, (6) governance, (7) labor and equitable workforce, and (8) legal and compliance risk management.  The federal employees who served on these panels hailed from all corners of the federal government, including in EPA, the U.S. Department of the Treasury, the U.S. Department of Energy, and other federal agencies;

- Interviewing and scoring the top-ranked applicants to ensure that those applicants and the leaders thereof were fully capable of executing the proposed program; and

- Serving on the Senior Review team that, following weeks of meetings, made unanimous recommendations to the Selection Officials as to which applicants should be awarded.  As with the review panels, the Senior Review team members consisted of employees from across multiple federal government agencies.

On April 4, 2024, the EPA publicly announced the winning applicants.  EPA awarded NCIF funds of $6.97 billion to Climate United Fund, $5 billion to Coalition for Green Capital, and $2 billion to PFC.

On August 8, 2024, the NCIF awards to each of the awardees were memorialized in grant agreements that are materially identical in their terms and conditions.  Of particular importance, the August 8, 2024 grant agreements expressly contemplate that the awards be administered by a "Financial Agent," defined to mean a "depository institution designated as a financial agent of the United States."  The awardees were required to "set up and utilize an Account or Accounts at the Financial Agent."

This Financial Agent, of course, is Citibank.  PFC understands that Citibank was not formally designated by the United States as the Financial Agent until December 20, 2024.  However, on November 1, 2024, the awardees, EPA, and Citibank entered into Account Control Agreements that provide the terms and conditions by which Citibank must manage the accounts and disburse payments therefrom.

<u>The Federal Government Seeks To Freeze PFC's Funds</u>

Despite this well-documented and public record, the current Administration has asserted allegations of wrongdoing with respect to the NCIF awards.  The Administration initially attempted to implement an across-the-board suspension of obligated but undisbursed funds appropriated through the IRA and the bipartisan Infrastructure Investment and Jobs Act (IIJA).  Those suspension efforts are currently on-hold following the issuance of a Temporary Restraining Order and a subsequent Order enforcing that TRO by a federal court.  *See* Temporary Restraining Order, *New York v. Trump*, Case No. 1:25-cv-00039-JJM-PAS

Mr. Brent McIntosh
Page 4

(D.R.I. Jan. 31, 2025), ECF No. 50; Order Enforcing Temporary Restraining Order, *id.* at ECF No. 96 (Feb. 10, 2025).

Thereafter, the Administration apparently shifted its focus to funds like PFC's that had been obligated and disbursed to third party fiscal agents. In early February, EPA issued an internal memorandum identifying programs that were to be "temporarily paused for new obligations or disbursements … pending a review for compliance with applicable administrative rules and policies." Included among such programs are those funded under the IRA and IIJA. Then, on February 12, 2025, new EPA Administrator Lee Zeldin posted a video on X.com in which he referenced the NCIF funds held by PFC's Citibank accounts, pledged to claw them back, and stated that EPA would work with the Department of Justice ("DOJ"). Mr. Zeldin repeated those pledges on February 20, 2025, during a media appearance on *Fox News*.

News reports have suggested that Citibank voluntarily froze PFC's accounts based on a request from DOJ officials. Of particular concern is a recent report dated February 27, 2025, in the *Washington Post*, which suggests that Citibank continues to disregard PFC's transfer requests without any legal basis for doing so. We presume you are aware of these reports. Yet, as of the writing of this letter, PFC's accounts at Citibank remain frozen.

*       *       *

As noted, Citibank continues to fail – without explanation – to comply with PFC's transfer instructions in violation of the ACA. At the same time, publicly reported information indicates more and more strongly that any standing request to Citibank by the federal government that Citibank not honor PFC's requests is inadequate and without legal basis.

We therefore request that Citibank immediately comply with PFC's transfer instructions so it can meet its contractual obligations and deliver the important benefits of the NCIF program to homeowners and residents throughout the country.

We further request a meeting as soon as possible to discuss these urgent matters. PFC reserves all rights.

Sincerely,

Noah C. Shaw
Beth Neitzel
James M. Gross

FOLEY HOAG LLP

*Counsel for Power Forward Communities, Inc.*

# HOLWELL SHUSTER & GOLDBERG LLP

*425 Lexington Avenue*
*New York, New York 10017*
*Tel:* █████████
*Fax:* █████████
*www.hsgllp.com*

*Vincent Levy*
*(646) 837-5120*
████████████

March 6, 2025

BY EMAIL

Brent McIntosh
Chief Legal Officer and Corporate Secretary
Citibank, N.A.
████████████

     Re:　　Coalition for Green Capital

Dear Mr. McIntosh:

My firm represents the Coalition for Green Capital ("CGC"). CGC has an account at Citi holding grant moneys awarded by the EPA (the "Account"). Since at least February 18, our client's Account has been frozen by Citi without any explanation from Citi.

Citi must promptly provide CGC with unrestricted access to its funds. The Account Control Agreement ("ACA") governing CGC's account (enclosed) gives CGC exclusive control over the account. Pursuant to the ACA, Citi is obligated to "comply with all instructions, notifications, and entitlement orders" issued by CGC. See Section 2. The only exception to this obligation is if the EPA has issued a Notice of Exclusive Control.

No such notice has been issued.

We add that CGC's 19 sub-recipients have accounts at Citi subject to the same control provisions, and that they also have been unable to access their funds.

**We request by 5pm Eastern, tomorrow, March 7**:

(i)　confirmation that Citi shall comply with Section 2 of the ACA, including that Citi "shall comply with all instructions, notifications, and entitlement orders" that Citi receives from CGC "directing the disposition of funds and financial assets" in the Account unless and until Citi receives a Notice of Control from EPA (in the form attached as Exhibit A to the ACA) that EPA is exercising its right to exclusive control over an Account,

(ii)　confirmation that Citi shall comply with the control provisions in the ACAs governing the accounts CGC's 19 sub-recipients, and

1

**JA688**

(iii)    an explanation as to why -- if Citi has not received a Notice of Exclusive Control from EPA -- Citi has failed to comply with all instructions, notifications, and entitlement orders provided by CGC (and sub-recipients) directing the disposition of funds and financial assets in the Account.

Absent confirmation that Citi shall comply with Section 2 of the ACA, our client may be compelled to seek appropriate legal and equitable relief. In connection with this matter, our client reserves all rights.

We look forward to your prompt response in this serious matter, as time is of the essence.

Sincerely yours,

Vincent Levy

Cc:    Nerlie Delly
Jesse Rubin

2

**JA689**

**Exhibit B**
**Pending Instructions**

| Pledgor (Instructing Party) | Date of transaction | Debit Account Name | Amount | Credit Account Name |
|---|---|---|---|---|
| CPC Climate Capital | 2/12/2025 | CPC Climate Program Admin | $301,400.00 | CPC Climate Capital LLC |
| CPC Climate Capital | 2/12/2025 | CPC Climate Program Admin | $243,532.85 | CPC Climate Capital LLC |
| CPC Climate Capital | 2/12/2025 | CPC Climate Program Admin | $703,680.84 | CPC Climate Capital LLC |
| CPC Climate Capital | 2/12/2025 | CPC Climate Reserves | $1,505,000.00 | The Community Preservation Corporation-Climate Capital Financial Assistance Disb. Acct |
| Self-Help Climate Capital LLC | 2/18/2025 | SHCC Climate Program Admin | $419,231.92 | Self-Help Climate Capital |
| Illinois Finance Authority | 2/14/2025 | ILLINOISFIN | $104,733,000.00 | IFA DEPOSITORY/MASTER FUNDING |
| Illinois Finance Authority | 2/13/2025 | ILLINOISFIN | $25,996.25 | IFA DEPOSITORY/MASTER FUNDING |
| Illinois Finance Authority | 2/18/2025 | ILLINOISFIN | $314,347.42 | IFA DEPOSITORY/MASTER FUNDING |
| California Infrastructure & Economic Development Bank | 2/13/2025 | FinAsst | $415,314.46 | State of CA GO-Biz IBank Fund 9334 |
| ICLEI Local Governments for Sustainability USA Inc. | 2/19/2025 | ICLEILocalGov Program Admin | $501,068.13 | ICLEI - LOCAL GOVERNMENTS FOR SUSTAINABILITY |
| Power Forward Communities, Inc. | 2/14/2024 | PFC Program Administration | $1,085,683.50 | Enterprise Community Partners, Inc. |
| Rewiring America Community Investment Fund | 2/14/2025 | Rewiring Prog Admin | $61,482.93 | Rewiring Community Investment Fund |
| Solar and Energy Loan Fund | 2/13/2025 | Program Administration | $173,571.00 | Solar Energy Lending Fund |
| Solar and Energy Loan Fund | 2/13/2025 | Market-building Activities | $18,159.00 | Solar Energy Lending Fund |
| Solar and Energy Loan Fund | 2/13/2025 | Financial Assistance | $2,553,518.00 | Program Administration |
| Solar and Energy Loan Fund | 2/13/2025 | Financial Assistance | $600,000.00 | Predevelopment |
| Solar and Energy Loan Fund | 2/13/2025 | Financial Assistance | $806,482.00 | Market Building Activities |
| Mountain BizCapital | 2/26/2025 | MTNBTASubAward | $500,000.00 | GBRATASu |

| Pledgor (Instructing Party) | Date of transaction | Debit Account Name | Amount | Credit Account Name |
|---|---|---|---|---|
| Climate United Fund | 2/12/2025 | CUF Financial Assistance | $250,000,000.00 | CUF Reserves |
| Climate United Fund | 2/18/2025 | CUF Program Administration | $898,342.31 | Climate United Fund |
| Climate United Fund | 2/21/2025 | CUF Program Administration | $711,525.13 | Climate United Fund |
| Climate United Fund | 3/5/2025 | CUF Financial Assistance | $42,250,000.00 | CUF Reserves |
| Coalition for Green Capital | 2/18/2025 | CGC Program Administration | 3,558,704.44 | Coalition for Green Capital |
| Coalition for Green Capital | 2/27/2025 | CGC RESERVES - USD | 10,000,000.00 | CGC PROGRAM INCOME FROM OPERATIONS - USD |
| United Way Worldwide | 2/14/2025 | United Way Reserves | $13,557,402.97 | United Way Market Bld |
| United Way Worldwide | 2/14/2025 | United Way Reserves | $2,551,379.23 | United Way Prog Admin |
| LISC Green LLC | 2/14/2025 | LISC Program Admin | $173,073.77 | LISC Green LLC |
| LISC Green LLC | 2/7/2025 | LISC Program Admin | $14,518.86 | LISC Green LLC |
| Inclusiv | 2/20/2025 | INC PROGRAM ADMINISTRATION - USD | $271,397.54 | Inclusiv Inc |
| Inclusiv | 3/3/2025 | INC PROGRAM ADMINISTRATION - USD | $296,177.44 | Inclusiv Inc |
| Efficiency Maine Trust | 2/20/2025 | EffMaineTst Financial Assistance | $225,000.00 | Efficiency Maine Trust |
| Efficiency Maine Trust | 2/21/2025 | EffMaineTst Financial Assistance | $17,807.83 | AmeriNat |
| Efficiency Maine Trust | 2/20/2025 | EffMaineTst Financial Assistance | $10,000,000.00 | Efficiency Maine Trust |
| Montgomery County Green Bank Corporation | 2/19/2025 | MontGreen Other Pass Through | $1,839,749.97 | MontGreen Predevelopment |
| Montgomery County Green Bank Corporation | 2/19/2025 | MontGreen Other Pass Through | $503,607.42 | MontGreen Market Building |
| Montgomery County Green Bank Corporation | 2/19/2025 | MontGreen Market Building | $229,686.25 | Montgomery County Green Bank Corporation |
| Montgomery County Green Bank Corporation | 2/19/2025 | MontGreen Program Admin | $10,250.46 | Montgomery County Green Bank Corp |

| Pledgor (Instructing Party) | Date of transaction | Debit Account Name | Amount | Credit Account Name |
|---|---|---|---|---|
| Justice Climate Fund | 2/25/2025 | JCF Program Administration | $28,750.00 | Justice Climate Fund, Inc |
| Opportunity Finance Network | 02/26/25 | OFN Technical Assistance Services | $94,651.75 | OFN Program Administration |
| Opportunity Finance Network | 03/3/25 | OFN Program Administration | $588,226.28 | OFN Operating Account |
| Opportunity Finance Network | 03/3/25 | OFN Technical Assistance Services | $144,530.00 | OFN Operating Account |
| Connecticut Green Bank | 3/4/2025 | CTGreenBank Financial Assistance | $45,308.06 | CTGreenBank Program Admin |
| Connecticut Green Bank | 3/4/2025 | CTGreenBank Program Admin | $45,308.06 | Connecticut Green Bank |
| Connecticut Green Bank | 2/14/2025 | CTGreenBank Financial Assistance | $70,724.25 | CTGreenBank Program Admin |
| Connecticut Green Bank | 2/14/2025 | CTGreenBank Program Admin | $70,724.25 | Connecticut Green Bank |

# Exhibit F



U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

March 8, 2025

By E-mail – CONFIDENTIAL

Reg Brown, P.C.
Kirkland & Ellis LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004

Re: Account Controls under Greenhouse Gas Reduction Fund

Dear Mr. Brown,

We acknowledge receipt of your March 6, 2025 letter and appreciate Citibank's (the "Bank")
engagement as we work to establish the necessary oversight and compliance guardrails on the
Greenhouse Gas Reduction Fund (GGRF).

As the Bank is aware, the U.S. Department of the Treasury (Treasury) has directed them to work with
EPA to establish new account controls to ensure that federal funds are disbursed in full compliance with
applicable laws, regulations, and agreements. However, under the current structure, EPA does not have
the necessary amount of account controls or level of oversight, which presents challenges and risks in
ensuring appropriate financial management. These concerns are further compounded by the
amendments made to the Account Control Agreements on January 13, 2025—just one week before
Inauguration Day—which further limited the government's ability to provide oversight and ensure
accountability over the funds.

The Bank, in its letter, also acknowledged EPA's communication to the eight prime recipients on March
4, 2025, which shared our concerns directly with them and initiated a compliance review of their
organization, activities, and funds. The purpose of the compliance review is to inform EPA of any further
oversight issues or noncompliance as well as alert us to potential patterns of fraud, waste or abuse.
Responses are due at noon ET on March 28, 2025, and those will guide EPA as we develop and
implement new account controls with the Bank. We anticipate the need to work through this process
with the Bank on a case-by-case basis, both for the prime and subrecipients and the individual accounts
themselves.

On March 2, 2025, EPA sent the attached letter to EPA's Office of Inspector General detailing numerous concerns that EPA has at this time regarding self-dealing, conflicts of interest, recipient qualifications, and actions taken to deliberately undermine federal government oversight that is required to ensure compliance with the law.

Given these structural challenges, the current lack of critical information, ongoing investigations by the U.S. Department of Justice and Federal Bureau of Investigation, and ongoing reviews by other federal oversight entities, it is time-critical and essential that we work together to develop and implement necessary safeguards. As Treasury said in its March 4th instruction to the Bank, this process to establish and implement account controls, and the Bank's direct coordination with EPA during this process, serve the purposes and interests of the United States of America.

If the Bank has proposals for how to accomplish the goals described above and in other correspondence, we welcome that information at this time.

One important question we have for the Bank at this time is whether they interpret the "Notice of Exclusive Control" as actually providing EPA with exclusive control over *all* the funds, or if EPA's issuance of a "Notice of Exclusive Control" could result in recipients successfully instructing the Bank to make an external transfer of funds to a third party. If the latter, the "Notice of Exclusive Control" has clearly been misnamed and should have more appropriately been called a "Notice of *Less* Control."

We appreciate the Bank's cooperation and look forward to working together to ensure responsible financial management and accountability of these funds.

Sincerely,

W.C. McIntosh
Acting Deputy Administrator
U.S. Environmental Protection Agency

cc:
- Citibank, N.A.
- Chris Pilkerton, Acting General Counsel, U.S. Department of the Treasury
- Eric Froman, Assistant General Counsel (Banking & Finance), U.S. Department of the Treasury
- U.S. Department of Justice
- Jim Payne, Acting General Counsel, U.S. Environmental Protection Agency

# Exhibit G



| **From:** | Froman, Eric |
| **To:** | |
| **Cc:** | |
| **Subject:** | GGRF |
| **Date:** | Monday, March 10, 2025 1:13:13 AM |

The U.S. Environmental Protection Agency (EPA) has informed the U.S. Department of the Treasury (Treasury) that they are instructing Citibank to impose certain account controls on accounts at Citibank related to the Greenhouse Gas Reduction Fund (GGRF), pursuant to Section I.B of Exhibit A to the Financial Agency Agreement (FAA), dated September 19, 2024, between Treasury and Citibank. In accordance with Treasury's authorities under the FAA, Treasury is instructing Citibank, in its capacity as fiduciary, to comply with EPA's instructions to Citibank pursuant to the FAA.

Thank you.

Eric Froman
Office of the General Counsel
U.S. Department of the Treasury

# Exhibit H

JA698



**From:**
**To:**
**Subject:** GGRF accounts

The U.S. Environmental Protection Agency (EPA) has informed the U.S. Department of the Treasury (Treasury) of their concerns regarding potential fraud and/or conflicts of interest related to the Greenhouse Gas Reduction Fund (GGRF). Treasury understands that the EPA anticipates developing additional account controls, including issuing a series of oversight questions to recipients, consistent with prudent operational standards and EPA's authority under grant agreement documents and Section I.B of Exhibit A to the Financial Agency Agreement (FAA), dated September 19, 2024, between Treasury and Citibank. Consequently, Treasury is instructing Citibank, in its capacity as fiduciary, to work directly with the EPA to establish and implement reasonable account controls to serve the purposes and interests of the United States, in accordance with Section 5 of the FAA. Further, in order to provide the EPA with the necessary time to develop reasonable account controls, we are further instructing Citibank not to disburse funds from any of the GGRF accounts prior to the end of the day Sunday, March 9, 2025.

Thank you.

Eric Froman
Office of the General Counsel
U.S. Department of the Treasury

# Exhibit I



U.S. Environmental Protection Agency
1200 Pennsylvania Ave, N.W.
Washington, DC 20460

March 11, 2025

By Email

Elizabeth Bafford
CEO
Climate United Fund
7550 Wisconsin Ave, 3rd floor
Bethesda, MD 20814

Re: Notice of Termination

Dear Elizabeth Bafford,

Pursuant to the U.S. Environmental Protection Agency's ("EPA" or "the Agency") authority under 2 C.F.R. §§ 200.339-40, the General Terms and Conditions of EPA assistance award agreements, the terms and conditions of the Grant Agreement, and the Agency's inherent authority to reconsider prior determinations in light of new information, the Agency is terminating Grant Agreement No. 84094001, awarded to Climate United Fund under the Greenhouse Gas Reduction Fund ("GGRF"), effective immediately. This termination is based on substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities, which collectively undermine the fundamental goals and statutory objectives of the award.

Following a comprehensive review and consistent with multiple ongoing independent federal investigations into programmatic fraud, waste, abuse and conflicts of interest, EPA has identified material deficiencies, including, but not limited to: 1) the absence of adequate oversight and account controls to prevent financial mismanagement; 2) the improper or speculative allocation of funds inconsistent with EPA's oversight and fiscal responsibilities; and 3) the circumvention and defeat of key oversight mechanisms in the disbursement of federal funds. EPA has determined that these deficiencies pose an unacceptable risk to the efficient and lawful execution of this grant that cannot be remedied by imposing specific conditions, necessitating immediate termination to safeguard taxpayer funds and ensure compliance with federal financial assistance regulations.

Additionally, the Agency has considered concerns raised by EPA Administrator Lee Zeldin regarding the need for rigorous oversight and accountability in the administration of public funds. The Administrator has emphasized the importance of eliminating fraud, waste, and abuse within EPA, particularly in high-

value awards such as those under GGRF. The structural and operational weaknesses identified in the execution of this grant are inconsistent with these priorities and materially impair the EPA's ability to ensure compliance with statutory and regulatory mandates governing the lawful expenditure of public money.

The Agency has also determined that its existing process for awarding and overseeing execution of the Grant Agreement lacks sufficient protections to guard against potential violations of the Constitution, particularly the Appointments Clause and private nondelegation doctrine. U.S. Const. art. II, § 2, cl. 2; *e.g.*, *Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1341 (D.C. Cir. 2024). Consistent with its independent duty to avoid exceeding constitutional constraints, EPA has reconsidered the prior administration's conclusion that the oversight mechanisms for the Grant Agreement are sufficient to ensure that the Recipient will not exercise significant authority independently of EPA's oversight and ultimate approval.

This termination is executed in accordance with Sections III.S and III.T.4 of the Grant Agreement and with EPA's General Terms and Conditions as incorporated in, and applicable in addition to, the terms of the Grant Agreement, and is consistent with EPA's obligations to safeguard public funds and inherent authority to reconsider prior decisions. This letter constitutes the notice of termination required by 2 C.F.R. § 200.341. Consistent with 2 C.F.R. §§ 200.344-45 and the Closeout Agreement, the recipient is required to cease all further program expenditures immediately, provide a comprehensive final financial and programmatic report, and comply with all applicable closeout procedures.

EPA is committed to ensuring that federal funding is administered in a manner that upholds transparency, accountability, and the highest standards of fiscal responsibility. This termination reflects the Agency's duty to protect public funds and maintain the integrity of its grant programs. In the coming months, EPA will work to re-obligate lawfully appropriated funds within the GGRF program with enhanced controls to ensure adequate governance, transparency, and accountability, consistent with applicable regulatory and statutory requirements.

Sincerely,

W.C. McIntosh
Acting Deputy Administrator
U.S. Environmental Protection Agency

cc:
- U.S. EPA, Office of the Greenhouse Gas Reduction Fund (OGGRF)
- U.S. EPA, Office of Mission Support (OMS)
- U.S. EPA, Office of General Counsel (OGC)
- U.S. Department of Justice
- U.S. Department of the Treasury
- U.S. House of Representatives
- U.S. Senate
- Citibank, N.A.

**JA702**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CLIMATE UNITED FUND, | |
| Plaintiff, | |
| v. | Case No. 1:25-cv-00698 (TSC) |
| CITIBANK, N.A., *et al.*, | |
| Defendants. | |
| COALITION FOR GREEN CAPITAL, | |
| Plaintiff, | |
| v. | Case No. 1:25-cv-00735 (TSC) |
| CITIBANK, N.A., *et al.*, | |
| Defendants. | |
| POWER FORWARD COMMUNITIES, INC., | |
| Plaintiff, | |
| v. | Case No. 1:25-cv-00762 (TSC) |
| CITIBANK, N.A., *et al.*, | |
| Defendants. | |

## <u>DECLARATION OF ERIC AMIDON</u>

I, Eric Amidon, hereby declare as follows:

1.    I am the Chief of Staff of the Environmental Protection Agency (EPA).

I have held this position since January 21, 2025. In this position, I am responsible for

overseeing EPA initiatives, managing EPA operations, and coordinating activities across EPA's various mission offices.

2.    This declaration incorporates information known to me and collected through reasonable diligence from those involved in the decision to reconsider the EPA's approach to administering the Greenhouse Gas Reduction Fund ("GGRF") National Climate Investment Accelerator (NCIF) program and to terminate the NCIF grant awards to Climate United Fund (CUF), Coalition for Green Capital (CGC), and Power Forward Communities, Inc. (PFC) on March 11, 2025.

## I.    EPA's Determination That The Grants Lacked Adequate Oversight

3.    On January 20, 2025, President Trump was inaugurated as the 47th President of United States.  Administrator Lee Zeldin was nominated to lead the EPA and confirmed by the Senate on January 29, 2025.  Incoming EPA officials became seriously concerned about potential waste, fraud, abuse, and conflicts of interest in the GGRF program based on public reporting, communications from Congress, and the initial results of investigations into the Biden EPA's contractual scheme for administering $13.97 billion in NCIF grants and processes for grantee selection and oversight.

### A.    Public Reporting, Ethics, and Competency Concerns

4.    Incoming EPA officials were alarmed by statements made by Brent Efron, a Biden Administration official tasked with implementing the GGRF at the EPA, in a publicly reported December 2024 video.  Mr. Efron stated that he worked "with Biden appointees" on GGRF "implementation" and expressed interest in "go[ing] [to] work for one of those places."  Mr. Efron stated that the EPA had sought "until recently" to ensure "processes are in place to … prevent fraud and prevent abuse," but had changed course

after the 2024 presidential election to "get the money out as fast as possible before they come in" to the tune of "billions" of dollars, "with a B." Mr. Efron predicted that "Congress will say, we're stopping this entirely [and] pass a law that says all this money doesn't exist anymore" and explained that the EPA "gave [grantees] the money" as "an insurance policy against Trump winning" because it would be harder to pull back the funding. According to Mr. Efron, "it truly feels we're on the Titanic and we're throwing gold bars off the edge."[1]

5.     In February 2025, a news article revealed serious potential conflicts of interest on the part of Jahi Wise, former Senior Advisor to the Administrator and inaugural Director of the GGRF program at the EPA. The article noted that Mr. Wise had worked for CGC until joining the Biden White House Climate Policy Office in January 2021 and then joining the EPA in December 2022. Under Mr. Wise's leadership, the Biden EPA's GGRF program awarded CGC billions of dollars in GGRF grant funding. According to the article, Mr. Wise left the EPA in September 2024—after the EPA's GGRF program awarded CGC $5 billion in grant funding—to join the Open Society Institute, a nonprofit funded by George Soros. A true and correct copy of the news article is attached as **Exhibit A**.

6.     Mr. Wise only recused himself from agency matters involving CGC until January 21, 2023, which was the expiration of the two-year period following employment covered by the prior administration's ethics bar. The recusal period ended before the EPA

---

[1] 'Gold Bars': EPA Advisor Admits 'Insurance Policy' Against Trump Funnels Billions to Climate Groups, Youtube (Dec. 3, 2024), https://youtu.be/CblV6EwzKxg.

issued a Notice of Funding Opportunity (NOFO) in July 2023, before the EPA selected CGC in early 2024, and before the EPA issued a $5 billion grant award to CGC in August 2024.

7.     In March 2024, a news article identified additional potential conflicts of interests involving Obama Administration and Biden Administration officials who held or currently hold leadership roles at the NCIF grantees.  A true and correct copy of the news article is attached as **Exhibit B**.

8.     Among other things, the article noted that:

   a.     Beth Bafford, CUF's CEO, served as a special assistant in the Obama Administration Office of Management and Budget;

   b.     Phil Aroneanu, CUF's Chief Strategy Officer, served as a strategic advisor to the Biden Administration Department of Energy for the last two years of the prior administration;

   c.     Richard Kauffman, CFC's CEO, served as a senior advisor to the Obama Administration Department of Energy and as New York Governor Andrew Cuomo's "energy czar";

   d.     Tim Mayopoulos, PFC's CEO, served as CEO of Fannie Mae during the Obama Administration;

   e.     and major subgrantees selected by the NFIC grantees had similar entanglements with the Obama and/or Biden Administrations.

9.     The article also noted that CUF, CFC, and PFC lacked a demonstrated history of successfully managing billions of dollars.  CUF is a coalition of three nonprofits that joined together in June 2023 for the purpose of applying for GGRF funds; CFC

expended only $2.42 million in 2023 before receiving a $5 billion award; and PFC became a registered nonprofit only in late 2023.

10.     More recently, a February 2025 article confirmed that PFC had received only $100 in 2023 and had not secured tax-exempt status from the Internal Revenue Service until 2024.  The article further confirmed that Democratic politician Stacey Abrams has held senior advisory, consultant, and counsel roles at Rewiring America, one of PFC's main coalition partners.  A true and correct copy of the news article is attached as **Exhibit C**.

11.     Incoming EPA officials also received an ethics complaint from a watchdog organization regarding conflicts of interest that was originally filed on June 27, 2024, and resubmitted on March 7, 2025, to Administrator Zeldin, the White House, and EPA's Office of Inspector General (OIG).  The complaint revealed that Mr. Hayes had served on CGC's Board of Directors before joining the Biden Administration in January 2021 as Special Assistant to the President for Climate Policy.  Mr. Hayes subsequently returned to CGC's Board of Directors before CGC formally submitted its application for billions of dollars in GGRF funding from EPA (which it ultimately received).  A true and correct copy of the refiled ethics complaint is attached as **Exhibit D**.

12.     Incoming EPA officials were further concerned by the Biden EPA's decision to require the NCIF grantees to complete basic budget trainings, which suggested an acknowledgement that the grantees lacked the necessary competency and established track record to manage billions of dollars in taxpayer funds.  The Grant Agreements required each NCIF grantee to complete a "How to Develop a Budget" training within 90 days.  The EPA does not generally require this training for applications received prior to

March 4, 2024, including CUF's, CGC's, and PFC's applications, but may determine that the training should be required on a case-by-case basis.

### B. Congressional Oversight

13.     Members of Congress and Committees with oversight responsibility over the EPA expressed significant concern regarding the Biden EPA's contractual scheme, award decisions, and selection process.

14.     The House Committee on Energy and Commerce's Subcommittee on Oversight and Investigations conducted a hearing on January 31, 2024, regarding potential waste, fraud, and abuse in the GGRF program as it was being formulated by EPA. Representative Cathy McMorris Rodgers, Chair of the House Committee on Energy and Commerce, noted that PFC was a newly formed coalition that included Rewiring America, an organization that counted Stacy Abrams and several other former Democratic appointees and political action committee members among its leadership.  Representative McMorris Rodgers and other participating Representatives expressed urgent concerns with EPA's implementation of the GGRF grant program.[2]

15.     Former EPA Inspector General Sean O'Donnell testified to the House Energy and Commerce Subcommittee on Environment, Manufacturing, and Critical Materials on September 19, 2024, that the EPA's "pace of spending" GGRF funds "escalates not only the risk for fraud but also the urgency for oversight."  Mr. O'Donnell

---

[2] Hearing: Fighting the Misuse of Biden's Green Bank Giveaway, House Comm. On Energy and Commerce Subcomm. on Oversight and Investigations (Jan. 30, 2024), https://energycommerce.house.gov/events/oversight-and-investigations-subcommittee-hearing-fighting-the-misuse-of-biden-s-green-bank-giveaway-1.

further testified that EPA's OIG "would need to hire oversight professional[s] with specialized expertise" to conduct sufficient oversight regarding the NCIF grants in particular, not only to "preven[t] waste, fraud, and abuse, but also [to] ensur[e] that IRA funds deliver the real environmental and human health benefits that the public is paying for."  Because EPA's OIG had not been allocated funds for this purpose, EPA OIG's "ability to expand" such oversight "is severely limited."[3]

16.    At Administrator Zeldin's confirmation hearing on January 16, 2025, Senator Pete Ricketts questioned the Administrator on EPA's expenditure of grant funding. Senator Ricketts noted that the Senate Committee on Environment and Public Works had serious concerns about "how some of these dollars were being distributed" and that he and Senator Shelley Moore Capito, the Committee's chair, had recently held a press conference to address the subject.  Senator Ricketts sought, and obtained, a commitment from the Administrator to "look into this to make sure those dollars were spent appropriately" and to "claw back those taxpayer dollars" that had not already been distributed.[4]

17.    EPA's Acting Inspector General Nicole Murley testified to the House Energy and Commerce Subcommittee on Oversight and Investigations on February 26, 2025, that EPA was "particularly concerned about" the GGRF program, including because

---

[3] Statement of Inspector General Sean O'Donnell, Hearing before the H. Comm. on Energy and Commerce Subcomm. on Environment, Manufacturing, and Critical Materials (Sept. 19, 2024), https://energycommerce.house.gov/events/subcommittee-on-environment-manufacturing-and-critical-materials-hearing-holding-the-biden-harris-epa-accountable-for-radical-rush-to-green-spending.
[4] Hearing on the Nomination of Lee Zeldin to be Administrator of the Environmental Protection Agency, S. Comm. on Environment and Public Works (Jan. 16, 2025), https://www.epw.senate.gov/public/index.cfm/2025/1/hearing-on-the-nomination-of-the-honorable-lee-m-zeldin-to-be-administrator-of-the-environmental-protection-agency.

the grant "structure makes providing effective oversight challenging," and that EPA is "concerned that there will be critical gaps in monitoring, accountability, and compliance in the GGRF."[5]

### C.    Last Minute Amendments to the Grant Agreements

18.    Incoming EPA officials initiated a review of the NCIF grants, including the December 20, 2024 and January 13, 2025 amendments to key provisions in the Grant Agreements and Account Control Agreements (ACAs), to assess the adequacy of the remaining oversight mechanisms for ensuring the $6.97 billion in public funds included within the award are spent effectively and lawfully to accomplish the objectives of CAA section 143.

19.    EPA determined that the Biden Administration's contractual scheme for administering the NCIF grants did not provide sufficient oversight and transparency to accomplish these stewardship obligations and objectives.  The EPA cannot, for example, assert control over grant funds in subgrantee accounts short of outright termination and does not have a contractual relationship with subgrantees.  The EPA also lacks sufficient visibility, oversight, and control into subgrantee activities, as the Biden EPA's contractual scheme significantly shifted oversight responsibility to the NCIF grantees.  As described below, the Biden EPA's last-minute amendments to the Grant Agreements and Account Control Agreements further deprived the EPA of contractual rights to insist on the NCIF

---

[5] Statement of Acting Inspector General Nicole N. Murley, Hearing before the H. Comm. on Energy and Commerce Subcomm. on Oversight and Investigations (Feb. 26, 2025), https://www.epaoig.gov/congressional-testimony/congressional-testimony-hearing-subcommittee-oversight-and-investigations-0.

grantees' adherence to these responsibilities by imposing inexplicable, unexplained, and unprecedented barriers to EPA's ability to find noncompliance and reduce the awards short of outright termination.

20.     On August 8, 2024, EPA issued Grant Agreements to CUF, CGC, and PFC that included virtually identical terms and conditions.

21.     Section III.S, titled "Remedies for Noncompliance," provided that EPA may impose remedies for noncompliance, including termination, with a limited set of circumstances where grantees would receive notice and opportunity to cure:

> The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as provided in 2 CFR 200.343. ...Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing an opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements.

22.     Section III.T.4, titled "Termination," purported to modify EPA's General Terms and Conditions and applicable regulations:

> Notwithstanding the General Term and Condition "Termination," EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 applicable to EPA grants as of July 1, 2024, pursuant to 89 FR 55262 (July 3, 2024), when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is materially impaired or there is adequate evidence of waste, fraud, material misrepresentation of eligibility status, or abuse, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect

the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination.

23.     The Grant Agreements issued on August 8, 2024, did not define the terms "Materially Impaired" or "Waste, Fraud, and Abuse," and used the terms in a manner that left EPA with significant discretion to administer the agreement.

24.     On November 5, 2024, then former President Donald Trump defeated then Vice President Kamala Harris in the presidential election.  State electors formally cast their votes in the Electoral College on December 17, 2024.

25.     On December 20, 2024, EPA issued amended Grant Agreements that revised the compliance and termination provisions and specifically defined the terms "Materially Impaired" and "Waste, Fraud, and Abuse."  The amendments did not define any other additional terms or materially alter the existing terms of other provisions of the Grant Agreements as relevant here.

26.     As amended, Section III.S, titled "Remedies for Noncompliance," added several critical oversight provisions to the list of conditions for which the grantees would receive notice and opportunity to cure before EPA could assert contractual authority to find noncompliance (changes bolded):

> The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as provided in 2 CFR 200.343. ...Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing a reasonable opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the **Performance Reporting National Programmatic Term and Condition**,

Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements, **requirements for Subrecipient oversight, or to obligate or expend funds for allowable activities**.

By adding these terms to the list of conditions, EPA removed its contractual authority to find the grantees in immediate noncompliance for failing to report the expenditure of grant funds, audit results, and project status (Performance Reporting), to oversee subrecipient compliance with statutory, regulatory, and contractual requirements (Subrecipient oversight), and to spend grant funds only on activities allowed by CAA section 134 (allowable activities).

27.    As amended, Section III.T.4, titled "Termination," incorporated new defined terms for "Materially Impaired" and "Waste, Fraud, or Abuse" (changes bolded):

EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 **effective as of October 1, 2024**, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is **Materially Impaired** or there is adequate evidence of **Waste, Fraud, or Abuse** or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient **selected under Funding Opportunity Number 66.957 (NCIF)** to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. **If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.**

As explained further below, this revision purported to restrict EPA's contractual authority to terminate absent evidence of severe criminal or civil violations.

28.    The new definition of "Materially Impaired" in the amended Grant

Agreements specified that:

> EPA defines 'Materially Impaired' in the context of effective performance of the
> Assistance Agreement as 1) the issuance of a written determination and finding
> from EPA that the Recipient has failed to achieve sufficient progress in accordance
> with the Sufficient Progress clause under the Clarifications to EPA General Terms
> and Conditions Programmatic Term and Condition and 2) if EPA in its sole
> discretion determines that a corrective action plan is an appropriate means of
> remedying the lack of sufficient progress, the subsequent issuance of a separate
> written determination and finding from EPA that the Recipient has not materially
> addressed its failure to achieve sufficient progress after implementing a corrective
> action plan concurred on by the EPA Project Officer and approved by the Award
> Official or Grants Management Officer pursuant to 2 CFR 200.208.

Read together with the amended termination provision, this language purported to revise

EPA's contractual right to terminate for noncompliance absent written determinations and

opportunities to cure for elements that were not required under the terms of the original

agreement of August 8, 2024.

29.    The new definition of "Waste, Fraud, and Abuse" in the amended Grant

Agreements specified that:

> For the definition and application of these terms under this Assistance Agreement
> … and any associated legal documentation related to the Assistance Agreement,
> refer to their use in the Reporting Waste, Fraud, and Abuse clause in the EPA
> General Terms and Conditions effective October 1, 2024 and 2 CFR 200.113:
> "credible evidence of the commission of a violation of Federal criminal law
> involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18
> of the United States Code or a violation of the civil False Claims Act 31 U.S.C.
> 3729-3733.

Read together with the amended termination provision, this language purported to revise

EPA's contractual right to terminate for misconduct to "credible evidence" that the

grantees committed one or more serious federal crimes or actionable civil violations under

the False Claims Act.  That heightened determination was not required under the terms of

the original agreements of August 8, 2024, to which the definition now applied.

30.     Incoming EPA officials determined that these amendments had no plausible purpose other than restricting EPA's ability to exercise oversight and control over the billions of taxpayer dollars held at Citibank for the grantees' purposes.

**D.     Last Minute Amendments to the Account Control Agreements**

31.     On September 19, 2024, the U.S. Department of the Treasury (Treasury) concluded a Financial Agency Agreement (FAA) with Citibank, NA that selected Citibank to serve as financial agency for the funds awarded to the NCIF and CCIA grantees.  EPA was not a party to the FAA but retained certain rights to issue account controls in addition to the rights retained by Treasury to issue instructions to the financial agent.

32.     On November 1, 2024, EPA, Citibank, and each NCIF grantee entered into an Account Control Agreement (ACA) governing the grant funds held at Citibank as the financial agent.  The ACAs provided that Citibank would process grantee payment instructions and transactions without prior approval from EPA, which held an interest in the funds as a secured party, provided that the grantees certified the amount of payment was necessary to execute against the workplan and copied EPA on the transaction notice. Related provisions in the Grant Agreements authorized the NCIF grantees to withdraw funds without prior EPA approval so long as the withdrawal "d[id] not exceed 10% of the total budget approved at time of award" for a given category.

33.     The ACAs further provided that EPA could exercise its right as a secured party to take control over grant funds held at Citibank by filing a "Notice of Exclusive Control."  As originally worded, Section 2 of the ACAs stated that:

> The Bank shall comply with all instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and financial assets in the Accounts including, without limitation, directions to distribute proceeds of any

such transfer or redemption of interest or dividends on financial assets in the Accounts, substantially in the form attached hereto as Exhibit B Account Direction the Pledgor, until the time that that Bank receives a notice, substantially in the form attached hereto as Exhibit A Notice of Exclusive Control from the Secured Party that the Secured Party is exercising its right to exclusive control over an Account, and after such time that the Bank receives a Notice of Exclusive Control, the Secured Party for such Account, without further consent by the Pledgor.

34.    On January 13, 2025, EPA, Citibank, and each NCIF grantee signed an amendment to the ACAs that revised Section 2 with respect to the effect of EPA's filing of a Notice of Exclusive Control.  New language at the end of Section 2 stated that:

> ; provided that notwithstanding the foregoing, after the delivery of a Notice of Exclusive Control, Bank shall continue to disburse funds and financial assets associated with financial obligations "properly incurred" by the Pledgor prior to the issuance of, but not in anticipation of, delivery of a Notice of Exclusive Control, in Pledgor's "Reserve" Account pursuant to Account Directions originated by Pledgor except for an specific funds or financial assets, identified by Secured Party in the applicable Notice of Exclusive Control as not being "properly incurred" by the Pledgor in accordance with 2 CFR 200.343.

Because of this amendment, EPA's filing of a Notice of Exclusive Control would no longer result in the grantees needing to obtain EPA's consent before instructing Citibank to disburse funds for expenses the grantees considered "properly incurred."

35.    Incoming EPA officials determined that these amendments had no plausible purpose other than restricting EPA's ability to reassert control over the grant funds held at Citibank through anything short of outright termination.

## III.    EPA's Further Determinations and Ongoing Investigations

36.    Under Administrator Zeldin's leadership, EPA has reassessed and adopted agency policies and priorities that materially differ from the prior administration.  For example, on March 3, 2025, the Administrator issued a public statement emphasizing that the "American people deserve accountability and responsible stewardship of their tax

dollars" and that "[i]t is my pledge to be accountable for every penny EPA spends." The Administrator noted that this policy "marks a stark turn from the waste and self-dealing of the Biden-Harris Administration intentionally tossing 'gold bars off the Titanic.'" EPA has also initiated a review of prior actions for consistency with the Constitution and the best reading of applicable statutes. *See* Exec. Order 14222, 90 Fed. Reg. 11,095 (Mar. 3, 2025).

37.     With respect to the NCIF grants, EPA determined that the Grant Agreements and related contracts raise serious constitutional concerns under the Appointments Clause and private nondelegation doctrine. Specifically, EPA determined that the financial structure of the grant effectively delegates EPA's authority to distribute grant funds under CAA section 134 to a private entity that is not properly appointed as an officer of the United States and over which EPA lacks sufficient oversight and control to retain ultimate authority over fund expenditure. Moreover, EPA determined that the amendments of December 20, 2024 and January 13, 2025—which limited EPA's contractual rights to terminate for misconduct short of a federal crime and limited EPA's contractual rights to assert exclusive control over funds in the Citibank accounts—left EPA with insufficient authority to retain control of funds short of outright termination.

38.     On March 2, 2025, EPA referred its findings on financial mismanagement, conflicts of interest, and oversight failures within the GGRF program to EPA's OIG for further investigation. The referral letter explained that:

> a.     The prior administration's unprecedented choice to use a financial agent for EPA grants deprives the Government of immediate control over money held in grantee accounts at Citibank, particularly under Section 2 of the ACAs as amended on January 13, 2025;

b.      EPA lacks sufficient oversight and transparency into the use of grant

funding because grantees act as a pass-through for subrecipients, many of

which are themselves pass-throughs, and EPA is not a party to agreements

between the grantees and the subrecipients;

c.      Conflicts of interest involving high-level EPA GGRF officials raise

questions about EPA's selection processes;

d.      Grants were awarded to entities that apparently failed to meet

statutory and regulatory requirements for eligibility, including because they

had insufficient experience managing substantial funding and may not have

been operative prior to 2023; and

e.      Last-minute modifications to the Grant Agreements and ACAs

appeared intentionally designed to reduce EPA's oversight and control over

grant funding.

39.      The Department of Justice and Federal Bureau of Investigation have

initiated a criminal investigation into the GGRF program, including potential fraud, waste,

abuse, and impermissible conflicts of interest in connection with NCIF and CCIA grants.

EPA is cooperating fully in that investigation, which remains ongoing, and is not at liberty

to disclose additional facts uncovered as part of the investigation.

40.      EPA OIG has initiated an investigation into the GGRF program, including

based on the March 2, 2025 referral letter.  EPA is cooperating fully in that investigation,

which remains ongoing, and is not at liberty to disclose additional facts uncovered as part

of the investigation.

**IV.    EPA's Termination Decisions**

41.    On March 11, 2025, EPA terminated the Grant Agreements with CUF, CGC, and PFC by sending Notices of Termination to the Agency's contact of record for each grant.  EPA specified that the termination was effective immediately, included the entirety of the grant, and was executed in accordance with Sections III.S and III.T.4 of each Grant Agreement, EPA's General Terms and Conditions, and EPA's inherent authority to reconsider prior decisions.

42.    EPA noted that the terminations were based on substantial concerns regarding program integrity, the award process, and programmatic fraud, waste, and abuse. EPA also noted that the grants no longer aligned with the Agency's priorities or effectuated the fundamental goals of the underlying statute.

43.    EPA explained that the grants lacked "adequate oversight and account controls to prevent financial mismanagement," were deficient with respect to "the improper or speculative allocation of funds inconsistent with EPA's oversight and fiscal responsibilities," and involved "the circumvention and defeat of key oversight mechanisms in the disbursement of federal funds."

44.    EPA further explained its determinations that the grants lacked sufficient protections to guard against violations of the Appointments Clause and private nondelegation doctrine.  Specifically, EPA reconsidered the previous administration's apparent position that the Grant Agreements contained sufficient controls to ensure that EPA retailed ultimate oversight and approval over use of the grant funds.

45.    Finally, EPA confirmed that the Agency and NCIF grantees would proceed to the closeout process as provided by 2 C.F.R. §§ 200.344-45 and the Closeout Agreement.

EPA further stated that consistent with CAA Section 134 and language in each Grant Agreement, the EPA would proceed in the coming months to reobligate the NCIF funding in a manner that ensures adequate oversight, accountability, and effective and efficient use of taxpayer dollars.

I HEREBY DECLARE TO THE BEST OF MY KNOWLEDGE AND BELIEF, UNDER PENALTY OF PERJURY under the laws of the United States of America, that the foregoing is true and correct.

EXECUTED this 26th day of March, 2025 at Washington, DC.

_____

Eric Amidon

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CLIMATE UNITED FUND, | |
| Plaintiff, | |
| v. | Case No. 1:25-cv-00698 (TSC) |
| CITIBANK, N.A., *et al.*, | |
| Defendants. | |
| COALITION FOR GREEN CAPITAL, | |
| Plaintiff, | |
| v. | Case No. 1:25-cv-00735 (TSC) |
| CITIBANK, N.A., *et al.*, | |
| Defendants. | |
| POWER FORWARD COMMUNITIES, INC., | |
| Plaintiff, | |
| v. | Case No. 1:25-cv-00762 (TSC) |
| CITIBANK, N.A., *et al.*, | |
| Defendants. | |

**<u>DECLARATION OF GREGG TREML</u>**

I, Gregg Treml, hereby declare as follows:

      1.      I am the Acting Chief Financial Officer of the United States Environmental

Protection Agency (EPA). I have held this position since January 20, 2025. In this

position, I am responsible for overseeing the EPA's annual budget, annual performance plans, financial operations, financial information systems, and directing strategic planning and financial policy development efforts. Prior to this role, my permanent role is Deputy Chief Financial Officer, which I held since June 2023. Before joining the EPA, I served as Assistant Inspector General and Deputy CFO of the Department of Health and Human Services Office of Inspector General and held a series of budget, financial, and human-resources leadership roles at the Federal Emergency Management Agency, General Services Administration, and Department of Homeland Security dating back to 2008.

2.      The responsibilities of my current and permanent role within the EPA's OCFO include advising the Agency with respect to financial and oversight risks with potential implications for the Agency's financial, budget, and performance. As part of this work, I am familiar with the EPA's typical financial arrangements and grants and assistance awards, including the oversight practices used to address financial, budget, and audit risk.

3.      In these roles as the EPA's CFO, as well as prior leadership and oversight roles at other government agencies, I have also encountered standard grant and assistance award practices at a number of other federal agencies and best practices that federal agencies are encouraged to use in grant and assistance programs.

4.      In the Inflation Reduction Act of 2022, Congress appropriated $27 billion to the EPA to make grants under the Greenhouse Gas Reduction Fund (GGRF) program. Congress appropriated $30 million to the EPA to administer the GGRF program through September 30, 2031, including the costs of establishing the program, selecting grantees, and conducting grant oversight for the life of the program.

5.     In 2024, the EPA chose to administer the GGRF's National Clean Investment Fund (NCIF) and Clean Communities Investment Accelerator (CCIA) grants by entering into a memorandum of understanding with the Department of the Treasury (Treasury).  Under the terms of the memorandum of understanding, EPA and Treasury agreed that Treasury would use its authority to select a financial agent to act as a fiduciary of the U.S. Government to receive the entire amount of the awarded grant funds and establish accounts for the grant recipients to withdraw funds.

6.     To my knowledge, the EPA had never used a financial agent in connection with a grant program prior to 2024.

7.     To my knowledge, the EPA's use of a financial agent in connection with the GGRF program was the first use of a financial agent for a nonexchange grant program administered by the federal government.


     I HEREBY DECLARE TO THE BEST OF MY KNOWLEDGE AND BELIEF, UNDER PENALTY OF PERJURY under the laws of the United States of America, that the foregoing is true and correct.

EXECUTED this 26th day of March, 2025 at Washington, DC.


_____

Gregg Treml

# Exhibit A

(to the Bailey Declaration)

JA724

CATHY McMORRIS RODGERS, WASHINGTON
CHAIR

FRANK PALLONE, JR., NEW JERSEY
RANKING MEMBER

ONE HUNDRED EIGHTEENTH CONGRESS

# Congress of the United States

## House of Representatives

### COMMITTEE ON ENERGY AND COMMERCE

2125 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515-6115

Majority (202) 225-3641
Minority (202) 225-2927

October 18, 2023

The Honorable Michael S. Regan
Administrator
U.S. Environmental Protection Agency
Mail Code 1101A
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

Dear Administrator Regan:

We write regarding the U.S. Environmental Protection Agency's (EPA) implementation of the Greenhouse Gas Reduction Fund (GGRF), established pursuant to the Inflation Reduction Act of 2022 (IRA). The IRA authorizes the EPA to disburse $27 billion, by September 30, 2024, in competitive grants to eligible non-profit organizations for clean energy investments, particularly those that impact low-income and disadvantaged communities.[1] With billions of dollars on the line, an unusually accelerated timeline for disbursement, and a new and complex funding structure, this program warrants close scrutiny and rigorous oversight.

Earlier this year, the EPA released its plan for implementing the GGRF.[2] In this announcement, the EPA announced three competitions through which it plans to administer $27 billion in grant funding. A $14 billion National Clean Investment Fund (NCIF) competition will fund two to three national non-profits that would partner with private capital providers to deliver financing to businesses, communities, community lenders, and others for clean energy projects.  A $6 billion Clean Communities Investment Accelerator (CCIA) competition will fund two to seven non-profits that will build financing capacity across specific networks of community lenders for clean technology projects.[4] Finally, a $7 billion Solar for All (SFA) competition aims to expand access to residential solar investment among low-income and disadvantaged communities.[5]

---

[1] Pub. L. No. 117-169 § 60103.
[2] Press Release, Envtl. Prot. Agency, EPA Releases Framework for the Implementation of the Greenhouse Gas Reduction Fund as Part of President Biden's Investing in America Agenda, Apr. 19, 2023, https://www.epa.gov/newsreleases/epa-releases-framework-implementation-greenhouse-gas-reduction-fund-part-president.
  *Id.*
[4] *Id.*
[5] *Id.*

This program is a completely new undertaking for the EPA.[6] The IRA's GGRF language includes provisions associated with entities often referred to as "green banks."  According to the EPA, the program will "leverage public investment with private capital" to finance clean energy projects.[8] The EPA has no experience administering such a funding vehicle, referring to it as "a first-of-its-kind" program.[9]

The GGRF implicates many oversight concerns. For example, the EPA's Inspector General recently testified before the Committee's Subcommittee on Oversight and Investigations that newly created programs providing funding to new recipients on short timelines possess an increased vulnerability to fraud and execution errors.[10]

On January 3, 2023, the U.S. Environmental Financial Advisory Board (EFAB) submitted its guidance and considerations pertaining to the GGRF, including risks associated with various program structures.[11] In evaluating an approach in which the EPA funds four or five "lender intermediaries," which seems to reflect the approach the EPA ultimately adopted, the EFAB noted that existing intermediaries have not operated at the scale the GGRF would require.[12]

Additionally, some have flagged that the EPA could use this program to subsidize favored special interest organizations.[1]  Others have alleged that current EPA appointees have ties to potential recipients of these sizeable awards, raising ethical concerns.[14]

As referenced above, we are also alarmed at the speed of implementation of the GGRF.[15] The SFA notice of funding opportunity (NOFO) was announced in June 2023, with an application deadline of October 12, 2023.[16] According to the NOFO, the EPA anticipates notifying selectees

---

[6] *See Follow the Money: Oversight of President Biden's Massive Spending Spree*: *Hearing Before the Subcomm. on Oversight and Investigations of the H. Comm. on Energy and Commerce*, 118th Cong. (2023) (statement of Sean O'Donnell, Inspector General, Environmental Protection Agency) (noting that this is a new funding vehicle).
   *See, e.g.*, RICHARD K. LATTANZIO, CONG. RESEARCH SERV., EPA'S GREENHOUSE GAS REDUCTION FUND (2023).
[8] *See* Press Release, Envtl. Prot. Agency, *supra* note 2.
[9] *See id.*
[10] *See Follow the Money: Oversight of President Biden's Massive Spending Spree*: *Hearing Before the Subcomm. on Oversight and Investigations of the H. Comm. on Energy and Commerce*, 118th Cong. (2023) (statement of Sean O'Donnell, Inspector General, Environmental Protection Agency)
[11] ENVTL. PROT. AGENCY, ENVTL. FIN. ADVISORY BD., *Environmental Financial Advisory Board Greenhouse Gas Reduction Fund Charge*, Jan. 3, 2023, *available at* https://www.epa.gov/system/files/documents/2023-01/efab-greenhouse-gas-reduction-fund.pdf.
[12] *Id.* at 57.
[1] *See* Benjamin Zycher, Response to Request for Information from the Environmental Protection Agency: Greenhouse Gas Reduction Fund 8, Am. Enterprise Inst., Dec. 5, 2022, *available at* https://www.aei.org/wp-content/uploads/2022/12/Zycher-EPA-GHG-Reduction-Fund-Info-Request-Dec-5-2022.pdf?x91208.
[14] *See* PROTECT THE PUBLIC'S TRUST, *Greendoggle? EPA Privately Discussed How to Spend $20B with a Few Favorite Environmental Groups*, Sept. 21, 2023, https://protectpublicstrust.org/press-releases/greendoggle-epa-privately-discussed-how-to-spend-20b-with-a-few-favorite-environmental-groups/.
[15] *See Follow the Money: Oversight of President Biden's Massive Spending Spree*: *Hearing Before the Subcomm. on Oversight and Investigations of the H. Comm. on Energy and Commerce*, 118th Cong. (2023) (statement of Sean O'Donnell, Inspector General, Environmental Protection Agency) (noting the rapid implementation timelines and narrow window of availability for the significant amount of funding).
[16] Envtl. Prot. Agency, Office of the Greenhouse Gas Reduction Fund, EPA-R-HQ-SFA-23-01, Request for Applications: Solar for All (Aug, 31, 2023) (revised) [hereinafter SFA NOFO]; ENVTL. PROT. AGENCY, *Solar for All*, https://www.epa.gov/greenhouse-gas-reduction-fund/solar-all (last visited Oct. 4, 2023).

in March 2024 and making awards in July 2024.[1]  The EPA released NOFOs for the $14 billion CCIA and the $6 billion NCIF on July 14, 2023, with applications closing on October 12, 2023.[18] For these competitions, the EPA anticipates notifying selectees in March 2024 and plans for them to start administering the funds by July 2024.[19] The EPA has a statutory deadline to obligate funds by September 2024.[20] Under this timeline, the EPA has just over a year to obligate $27 billion.[21]

Finally, we are also concerned about how this program will function, given the lack of domestic production for solar panels. The Department of Energy has noted that China's control of key materials in renewable energy extends "across the board."[22] Similarly, the *Wall Street Journal* reported on China's dominance of the U.S. solar market, noting that China controls almost half of the U.S. solar panel market share, making it incredibly difficult to supplant Chinese producers with domestic suppliers.[2]  The EPA has stated that certain projects under all three competitions are subject to the Buy America domestic sourcing requirements of the Build America, Buy America (BABA) provisions of the Infrastructure Investment and Jobs Act (IIJA).[24] The EPA also claims it will provide future guidance on which projects are subject to the BABA requirements.[25] If there will be domestic sourcing requirements through BABA on the various GGRF programs— and we know that China has a significant stranglehold on the availability of solar panels, among other green energy technologies—we are unsure how the EPA and program participants will ensure that the GGRF programs are *not* supporting Chinese products.

In order to assist with our oversight of the EPA's implementation of the GGRF and to ensure responsible stewardship of taxpayer dollars, we request that you provide answers to the following questions and requested documents no later than November 1, 2023:

1. In accordance with the IRA, all three NOFOs define an "eligible recipient" as a nonprofit organization that (a) is designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero- emission products, technologies, and services; (b) does not take deposits other than deposits from

---

[1] *Id.*

[18] Envtl. Prot. Agency, Office of the Greenhouse Gas Reduction Fund, EPA-R-HQ-CCIA-23, Request for Applications: Clean Communities Investment Accelerator, (Aug. 11, 2023) (revised) [hereinafter CCIA NOFO]; Envtl. Prot. Agency, *Clean Communities Investment Accelerator*, https://www.epa.gov/greenhouse-gas-reduction-fund/clean-communities-investment-accelerator#nfo (last visited Oct. 4, 2023); Envtl. Prot. Agency, Office of the Greenhouse Gas Reduction Fund, EPA-R-HQ-NCIF-23, Request for Applications: National Clean Investment Fund (Aug. 11, 2023) (revised) [hereinafter NCIF NOFO]; Envtl. Prot. Agency, *National Clean Investment Fund*, https://www.epa.gov/greenhouse-gas-reduction-fund/national-clean-investment-fund (last visited Oct. 4, 2023).

[19] CCIA NOFO, *supra* note 18; NCIF NOFO, *supra* note 18.

[20] *See, e.g.*, Envtl. Prot. Agency, Greenhouse Gas Reduction Fund: Implementation Framework Supporting Presentation (2023), *available at* https://www.epa.gov/system/files/documents/2023-05/Implementation%20Framework%20Presentation_508%20Compliant.pdf.

[21] *See id.*

[22] *See* Dep't of Energy, America's Strategy to Secure the Supply Chain for a Robust Clean Energy Transition 13 (2022), *available at* https://www.energy.gov/policy/articles/americas-strategy-secure-supply-chain-robust-clean-energy-transition.

[2] *See* Phred Dvorak, *China's Dominance Over U.S. Solar Market Grows Despite Efforts to Stem It*, Wall St. J., April 26, 2023, https://www.wsj.com/articles/china-dominates-u-s-solar-market-as-lawmakers-tussle-over-tariffs-7c2d749d.

[24] CCIA NOFO, *supra* note 18, at 58; NCIA NOFO, *supra* note 18, at 56; SFA NOFO, *supra* note 16, at 64.

[25] CCIA NOFO, *supra* note 18, at 58-59; NCIA NOFO, *supra* note 18, at 56; SFA NOFO, *supra* note 16, at 64-65.

Letter to Administrator Regan
Page 4

repayments and other revenue received from financial assistance using the grant funds; (c) is funded by public or charitable contributions, and (d) invests in or finances projects alone or in conjunction with other investors.[26]

    a. The NOFOs for the $14 billion CCIA and the $6 billion NCIF state that to be an eligible recipient, an applicant must be incorporated in the United States,[2] and all three NOFOs state the applicant cannot be controlled by one or several entities that are not eligible recipients.

        i. Was the "incorporated in the United States" language regarding nonprofits intentionally omitted from the SFA NOFO? If so, why?

        ii. How is the EPA ensuring and tracking that applicants meet these requirements? Is the EPA tracking who funds these U.S. entities or who has interests in these U.S. entities?

        iii. Will there be a tracking of the grantees and the subrecipients who have received other grants, loans, or tax credits under the IRA and/or the IIJA?

    b. As grantees will act as intermediaries distributing funding to subrecipients, please describe the EPA's plan for oversight once funds are released to recipients and subrecipients.

    c. How will EPA prepare these grantees to assist subrecipients who have little or no experience with federal agencies or federal awards?

2. What fiduciary duties will exist between the EPA, the grantees, and subrecipients? Do the grantees owe fiduciary duties to the EPA? Similarly, do the entities receiving loans from grantees owe fiduciary duties to the EPA?

3. Who will conduct the underwriting and risk analyses for any loans provided by grantees? What qualifications or experience will they have? What kind of reporting, if any, will they provide to the EPA?

4. Please describe and list all policies, procedures, and guidance documents that EPA will provide to grantees and subrecipients regarding conflicts of interest policies and provide a copy of each.

5. Which employees or contractors at EPA will be responsible for administering the GGRF? Please provide their names, job titles, and program office.

6. Outside of the EPA's Office of the Inspector General's oversight, who at the EPA will be auditing the GGRF program internally, including ensuring it is being administered without waste, fraud and abuse, maintaining all appropriate ethics protections, and protecting taxpayer dollars? Will these EPA employees auditing the program be separate from the GGRF program?

---

[26] Pub. L. No. 117-169 § 60103; *see also* CCIA NOFO, *supra* note 18, at 58-59; NCIF NOFO, *supra* note 18, at 20; SFA NOFO, *supra* note 16, at 30.
[2] CCIA NOFO, *supra* note 18, at 22; NCIF NOFO, *supra* note 18, at 20.

Letter to Administrator Regan
Page 5

7. Do any of the GGRF programs have a limit on the maximum amount that a specific grantee can provide to one subrecipient under that particular program? If so, please provide the maximum amount for each program. If not, did the EPA consider instituting a maximum amount, and why did it ultimately decide not to do so?

Additionally, we also request that you provide a staff-level briefing on the status of the program the week of October 30, 2023.

Thank you for your cooperation with this matter. If you have any questions regarding this request, please contact Christen Harsha with the Majority Committee staff at (202) 225-3641.

Sincerely,

Cathy McMorris Rodgers
Chair
House Committee on Energy and Commerce

H. Morgan Griffith
Chairman
Subcommittee om Oversight and Investigations

Bill Johnson
Chairman
Subcommittee on Environment,
Manufacturing, and Critical Materials

CC: The Honorable Frank Pallone, Ranking Member, Energy and Commerce Committee
The Honorable Kathy Castor, Ranking Member, Subcommittee on Oversight and Investigations
The Honorable Paul Tonko, Ranking Member, Subcommittee on Environment, Manufacturing, and Critical Materials

# Exhibit B

(to the Bailey Declaration)

JA730

CATHY McMORRIS RODGERS, WASHINGTON
CHAIR

FRANK PALLONE, JR., NEW JERSEY
RANKING MEMBER

ONE HUNDRED EIGHTEENTH CONGRESS

# Congress of the United States

## House of Representatives

### COMMITTEE ON ENERGY AND COMMERCE

2125 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515-6115

Majority (202) 225-3641
Minority (202) 225-2927

December   , 2024

The Honorable Michael S. Regan
Administrator
U.S. Environmental Protection Agency
Mail Code 1101A
1200 Pennsylvania Avenue, NW.
Washington, DC 204  0

Dear Administrator Regan:

We write to you regarding our investigation into the Environmental Protection Agency s (EPA) Greenhouse Gas Reduction Fund (GGRF) program.

On April 4, 2024, the EPA announced it selected three entities to receive a total of $14 billion to establish national clean finance institutions under the GGRF s National Climate Investment Fund (NCIF) program.[1] Similarly, under the Clean Communities Investment Accelerator (CCIA) program, the EPA selected five recipients to receive a total of $  billion to establish hubs to provide financial and technical assistance to community lenders in low-income and disadvantaged communities.[2] The EPA maintains that it employed a  robust, consistent, and ethical   scoring process to select recipients,[3] which included expert review panels and evaluation criteria.[4] According to the EPA, senior review teams then made final recommendations based on the final scores from each competition.[5]

---

[1] Press Release, Envtl. Prot. Agency, Biden-Harris Administration Announces $20 Billion in Grants to Mobilize Private Capital and Deliver Clean Energy and Climate Solutions Across America (Apr. 4, 2024), https://www.epa.gov/newsreleases/biden-harris-administration-announces-20-billion-grants-mobilize-private-capital-and.

[2] Id.

[3] ENVTL. PROT. AGENCY, Review and Selection Process, https://www.epa.gov/greenhouse-gas-reduction-fund/review-and-selection-process (last updated Aug. 1  , 2024).

[4] See Fighting the Misuse of Biden's Green Bank Giveaway: Hearing Before the Subcomm. on Oversight and Investigations of the H. Comm. on Energy and Commerce, 118th (2024)  (statement of   ealan Hoover, Senior Advisor to the Administrator, Environmental protection Agency); ENVTL. PROT. AGENCY, Review and Selection Process for NCIF and CCIA, https://www.epa.gov/greenhouse-gas-reduction-fund/review-and-selection-process-ncif-and-ccia (last visited April 22, 2024)

[5] ENVTL. PROT. AGENCY, supra note 4.

The Honorable Michael S. Regan
Page 2

Although the EPA has already obligated funding for these awards, the EPA has faced challenges to its application of statutory recipient eligibility criteria, as well as its process for selecting funding recipients. For example, the Committee is aware of at least one formal dispute regarding the selection process. One of the applicants for both the NCIF and CCIA filed a dispute with the EPA on April 9, 2024,[8] questioning the EPA s Office of the GGRF s application of eligibility requirements and administration of the process for evaluating and scoring applications.[9] Its scope includes questions of whether the EPA intentionally or inadvertently provided the successful applicants with unfair competitive advantages and unsuccessful applicants with unfair competitive disadvantages through assignments of reviewers, unwarranted differentials in the size of review panels, and failure to conduct a reconciliation process to address substantial variances in scores. [10]

We understand that federal agencies may occasionally receive disputes regarding their awards decisions. However, the EPA s response to this formal dispute indicates serious questions may exist regarding the agency s determination of applicant eligibility, as well as the evaluation and scoring process. As part of the dispute process, an EPA Grants Competition Dispute Decision Official (GCDDO) issued a Partial Delay Determination on June 5, 2024.[11] In this document, the EPA official noted that delays of the award process are an extraordinary action that GCDDO s are reluctant to take in disputes of non-selection decisions that take place after applications have been evaluated and scored. [12] The official concluded that the circumstances surrounding this dispute support delaying the awards process to ensure that a dispute with potential merit can run its course without unduly pre udicing the disputant, selected applicants, or the EPA program office. [13] As such, the official decided to partially delay awarding $4.3 billion of the total NCIF and CCIA funding in that decision[14]

---

ENVTL. PROT. AGENCY, *Greenhouse Gas Reduction Fund Award Obligation Update*, https://www.epa.gov/greenhouse-gas-reduction-fund/greenhouse-gas-reduction-fund-award-obligation-update (last updated Aug. 1 , 2024).

Letter from Kathleen Timmins, Grants Competition Dispute Decision Official, Envtl. Prot. Agency, to, Stephen Fotis, Esq., VanNess Feldman, *Re: Dispute of Competitive Assistance Award Denial for EPA-R-HQ-NCIF-23 (National Clean Investment Fund) and EPA-R-HQ-CCIA-23 (Clean Communities Investment Accelerator) by Ecority, Inc* 1 (Apr. 1 , 2024), *available at* https://foiapublicaccessportal.epa.gov/app/ReadingRoom.aspx.

[8] *Id.*

[9] Letter from Laurice Jones, Grants Competition Dispute Decision Official, Envtl. Prot. Agency, to Stephen Fotis, Esq., VanNess Feldman, *Re: Dispute of Competitive Assistance Award Denial for EPA-R-HQ-NCIF-23 (National Clean Investment Fund) and EPA-R-HQ-CCIA-23 (Clean Communities Investment Accelerator) by Ecority, Inc. – Delay of Award Process ("Partial Delay Determination")* 2 (June 5, 2024) [hereinafter Partial Delay Determination ], *available at* https://foiapublicaccessportal.epa.gov/app/ReadingRoom.aspx.; Letter from Laurice Jones, Grants Competition Dispute Decision Official, Envtl. Prot. Agency, to Stephen Fotis, Esq., VanNess Feldman, *Re: Dispute of Competitive Assistance Award Denial for EPA-R-HQ-NCIF-23 (National Clean Investment Fund) and EPA-R-HQ-CCIA-23 (Clean Communities Investment Accelerator) by Ecority, Inc. – Second Scheduling Order* 3-4 (May 29, 2024) [hereinafter Second Scheduling Order ], *available at* https://foiapublicaccessportal.epa.gov/app/ReadingRoom.aspx.

[10] Second Scheduling Order, *supra* note 9, at .

[11] Partial Delay Determination, *supra* note 9.

[12] *Id.* at 2.

[13] *Id.* at 2-3.

[14] *Id.* at 4.

The Honorable Michael S. Regan
Page 3

Additionally, the award agreements that the EPA executed with the NCIF and CCIA recipients include stipulations regarding the dispute. These award agreements prohibit recipients from drawing down more than a certain percentage of the total award amount until: (1) the dispute is resolved; (2) the dispute is withdrawn, abandoned, or dismissed; or (3) December 31, 2024, whichever is sooner.[15] This limitation also suggests serious concerns about the evaluation and scoring process persisted at the time the EPA and the awardees executed the award agreements.

Potential problems with determining recipient eligibility, as well as with the fairness and uniformity of the selection process are particularly alarming, given the pace with which recipients were chosen and awards were made. As the Committee has highlighted, the EPA has never operated anything remotely similar to this program,[1] and thus has no experience administering this type of funding competition. Notably, individuals with strong ties to Democratic politics hold significant leadership roles within some of the organizations the EPA selected to receive funding.[1] Moreover, as the Biden-Harris administration will depart in a few months, there is a great risk EPA officials may inappropriately rush decisions regarding federal funding to finalize awards before the new administration assumes office. As such, we seek additional clarity on the EPA s process for addressing this dispute and assessing the underlying allegations.

By no later than December 20, 2024, we request that the EPA provide a briefing on the dispute and status of the GGRF awards that includes, but is not limited to, the following questions:

1. What is the status of the dispute, *Dispute of Competitive Assistance Award Denial for EPA-R-HQ-NCIF-23 (National Clean Investment Fund) and EPA-R-HQ-CCIA-23 (Clean Communities Investment Accelerator) by Ecority, Inc*.

2. Were any additional formal disputes filed regarding any of the GGRF funding competitions

3. How much of the obligated funding has been disbursed or outlaid

Additionally, please provide the following documents and information by the same date:

---

[15] *See, e.g.*, Envtl. Prot. Agency, Grant No. 84094401, Grant Agreement with Appalachian Cmty. Capital Corp., Administrative Conditions 52 (Aug. 8, 2024) (on file with the Committee); Envtl. Prot. Agency, Grant No. 84094201, Coalition for Green Capital, Administrative Conditions 50 (Aug. 8, 2024) (on file with the Committee).

[1] *E.g.*, *Fighting the Misuse of Biden's Green Bank Giveaway*: *Hearing Before the Subcomm. on Oversight and Investigations of the H. Comm. on Energy and Commerce*, 118th Cong. (2024) (opening statement of Cathy McMorris Rodgers, Chair, H. Comm. on Energy and Commerce) (describing the GGRF as a new program); *Follow the Money: Oversight of President Biden's Massive Spending Spree: Hearing Before the Subcomm. on Oversight and Investigations of the H. Comm. on Energy and Commerce*, 118th Cong. (2024) [hereinafter E&C Spending Oversight Hearing] (statement of Sean O Donnell, Inspector Gen., Envtl. Prot. Agency) (describing the GGRF as a new funding vehicle.)

[1] Letter from Cathy McMorris Rodgers, Chair, H. Comm. on Energy and Commerce, et al., to Michael Regan, Adm r, Envtl. Prot. Agency (May 13, 2024).

The Honorable Michael S. Regan
Page 4

1. All documents, memoranda, and communications submitted to or received by the EPA from parties to *Dispute of Competitive Assistance Award Denial for EPA-R-HQ-NCIF-23 (National Clean Investment Fund) and EPA-R-HQ-CCIA-23 (Clean Communities Investment Accelerator) by Ecority, Inc*., as part of or pursuant to the dispute process, as well as all documents and communications submitted to parties to that same matter by the EPA, as part of or pursuant to the dispute process.

2. All policies and procedures governing the review, assessment, evaluation, and scoring of applications under the NCIF and CCIA funding competitions.

3. All policies, procedures, and criteria used to identify and select individuals to review or evaluation applications under the NCIF and CCIA funding competitions.

4. All instructions and training materials provided to individuals reviewing or evaluating applications under the NCIF and CCIA funding competitions.

5. A list of all individuals participating in the review or evaluation of applications, including documents sufficient to identify each individual reviewer if an anonymous reviewer system was used.

. All raw score sheets, memoranda, or notes each reviewer or review panel submitted as part of the review or evaluation process.

. All raw score sheets, memoranda, or notes submitted to score the interviews EPA held with applicants.[18]

8. All recommendations or memoranda provided by the NCIF and CCIA Senior Review Team to  advise and provide a final set of recommendations to the Selection Official. [19]

In light of the circumstances described above, the Committee requests that the EPA and any financial intermediaries, agencies, or escrow service providers involved with administering these programs, immediately stop all disbursements, outlays, or payments of funds to GGRF recipients to afford the Committee sufficient time to review and investigate these allegations.

Finally, this letter also serves as a formal request to preserve all existing and future records and materials in the EPA′s possession relating to the topics addressed in this letter. You should construe this preservation notice as an instruction to take all reasonable steps to prevent the destruction or alteration, whether intentionally or negligently, of all documents, communications, and other information, including electronic information and metadata, that are or may be related to the NCIF and CCIA programs and related funding competition. This instruction includes all electronic messages sent using official and personal accounts or devices,

---

[18] ENVTL. PROT. AGENCY, *supra* note 4.
[19] *Id.*

The Honorable Michael S. Regan
Page 5

including records created using text messages, phone-based message applications, or encryption software.

Should you have any questions about this request, please contact the Committee on Energy and Commerce Ma ority staff at (202) 225-3 41. Thank you in advance for your cooperation with this matter.

Sincerely,

Cathy McMorris Rodgers
Chair
Committee on Energy and Commerce

H. Morgan Griffith
Chair
Subcommittee on Oversight and Investigations

Earl L.  Buddy   Carter
Chair
Subcommittee on Environment, Manufacturing, and Critical Materials

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**CLIMATE UNITED FUND**

                        Plaintiff,

v.

**CITIBANK, N.A.**, *et al.*

                        Defendants.

Civil Action No. 25-cv-698-TSC

**COALITION FOR GREEN CAPITAL**

                        Plaintiff,

v.

**CITIBANK, N.A.**, *et al.*

                        Defendants.

Civil Action No. 25-cv-735-TSC

**POWER FORWARD COMMUNITIES, INC.**

                        Plaintiff,

v.

**CITIBANK, N.A.**, *et al.*

                        Defendants.

Civil Action No. 25-cv-762-TSC

## NOTICE OF FILING OF SUPPLEMENTAL RECORD EVIDENCE

Plaintiff Coalition for Green Capital ("CGC") writes to provide the Court with recent correspondence that CGC respectfully submits in connection with Plaintiffs' Consolidated Motion for Preliminary Injunction, Dkt. 33.

**JA736**

On March 26, 2025, EPA Defendants submitted the supplemental Declaration of Eric Amidon, Chief of Staff at EPA.  Dkt. 49-3.  Mr. Amidon made certain statements regarding Jahi Wise, a former employee of CGC.  *See* Dkt. 49-3 ¶¶ 5-6.  To the extent the Court relies upon paragraphs 5 and 6 of the supplemental Amidon declaration, CGC respectfully requests that the Court consider the attached correspondence between Ronald C. Machen, counsel to Mr. Wise, and Marc S. Sacks, counsel for EPA Defendants.  *See* **Exs. A, B, C**.

Dated: April 2, 2025

Respectfully submitted:

/s/ *Vincent Levy*

Vincent Levy (NY0487)
Kevin D. Benish (NY0495)
Patrick J. Woods*
Daniel Fahrenthold (NY0603)
HOLWELL SHUSTER & GOLDBERG LLP
425 Lexington Avenue, 14th Floor
New York, NY 10017
Tel.: (646) 837-5151
vlevy@hsgllp.com
*Application for admission pending

*Attorneys for Plaintiff Coalition for Green Capital*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **CLIMATE UNITED FUND**<br><br>Plaintiff,<br><br>v.<br><br>**CITIBANK, N.A.**, *et al.*<br><br>Defendants. | Civil Action No. 25-cv-698 (TSC)<br>Civil Action No. 25-cv-735 (TSC)<br>Civil Action No. 25-cv-762 (TSC)<br>Civil Action No. 25-cv-820 (TSC)<br>(Consolidated Cases) |

## <u>ORDER</u>

Given the recent developments discussed in the parties' filings, *see* Def.'s Notice of Suppl. Authority, ECF No. 63, Pls.' Resp., ECF Nos. 64 and 66, Def.'s Resp., ECF No. 65, the court ordered the parties to confer and submit a joint status report by April 7, 2025, 9:00PM EST, stating their positions on a brief extension of the temporary restraining order ("TRO") entered on March 18, 2025, Order, ECF No. 29, and extended on March 31, 2025, for the court to consider the new filings and developments.[1]  *See* Apr. 7, 2025 Min. Order.  The parties do not object to a brief, seven-day extension of the TRO, until April 15, 2025.[2]  *See* Apr. 7, 2025, Jt. Status Rep.

In consideration of the circumstances, and for the same reasons discussed in the court's March 31, 2025 Order, the court finds that there is good cause to briefly extend the TRO for seven

---

[1] On March 31, 2025, the court granted Plaintiffs' request to extend the TRO that was set to expire on April 1, 2025, and extended the TRO to April 7, 2025.  Although Plaintiffs requested an extension of fourteen days, the court extended the TRO by seven days.  Order, ECF No. 57.

[2] EPA Defendants maintain that the court lacks jurisdiction to award a TRO but do not object to the additional time to consider the issue.  Apr. 7, 2025, Jt. Status Rep. at 2.

JA738

days until **April 15, 2025**.  The TRO entered on March 18, 2025, ECF No. 29, remains in full force

and effect.

**SO ORDERED.**

Date: April 8, 2025

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge

JA739

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CLIMATE UNITED FUND,** | |
| Plaintiff, | |
| v. | Case No. 1:25-cv-00698 (TSC) |
| **CITIBANK, N.A.,** *et al.* | |
| Defendants. | |
| **COALITION FOR GREEN CAPITAL,** | |
| Plaintiff, | |
| v. | Case No. 1:25-cv-00735 (TSC) |
| **CITIBANK, N.A.,** *et al.* | |
| Defendants. | |
| **POWER FORWARD COMMUNITIES, INC.,** | |
| Plaintiff, | |
| v. | Case No. 1:25-cv-00762 (TSC) |
| **CITIBANK, N.A.,** *et al.* | |
| Defendants. | |
| **CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK,** *et al.* | |
| Plaintiffs, | |
| v. | Case No. 1:25-cv-00820 (TSC) |
| **CITIBANK, N.A.,** *et al.* | |
| Defendants. | |

**FEDERAL DEFENDANTS' CONTINGENT
EMERGENCY MOTION FOR STAY PENDING APPEAL**

# TABLE OF CONTENTS

BACKGROUND ................................................................................................ 3

LEGAL STANDARD ....................................................................................... 4

ARGUMENT .................................................................................................... 5

    A. EPA's Appeal Presents Serious Legal Question ..................................... 5

    B. Without A Stay The Government Faces Irreparable Injury ..................... 8

    C. Equities Favor a Stay Pending Appeal ................................................... 10

# TABLE OF AUTHORITIES

## Cases

*Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*,
    357 F.3d 62 (D.C. Cir. 2004) ................................................................. 6

*Bowen v. Massachusetts*,
    487 U. S. 879 (1988) ............................................................................... 7

*Brock v. Pierce Cnty.*,
    476 U.S. 253 (1986) ............................................................................... 10

*Citizens For Resp. And Ethics In Washington v. Off. of Admin.*,
    593 F. Supp. 2d 156 (D.D.C. 2009) ................................................... 5, 9

*Cuomo v. U.S. Nuclear Regulatory Comm'n*,
    772 F.2d 972 (D.C. Cir. 1985) ........................................................... 5, 9

*Great-West Life & Annuity Ins. Co. v. Knudson*,
    534 U. S. 204 (2002) ........................................................................... 4, 7

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ................................................................................ 7

*Heckler v. Turner*,
    468 U.S. 1305 (1984) .............................................................................. 9

*Judicial Watch v. Nat'l Energy Policy Dev. Group*,
    230 F.Supp.2d 12 (D.D.C.2002) ............................................................ 5

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ................................................................................ 6

*Mass. Fair Hous. Ctr et. al. v. Dept. of Hous. and Urban Dev., et. al.*,

3:25-cv-30041 (D. Mass.)……………………………………………..……4, 8

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
   567 U.S. 209 (2012) ......................................................................... 6

*Mathews v. Eldridge,*
   424 U.S. 319 (1976) ......................................................................... 10

*\*U.S. Dept. of Ed. v. California,*
   S. Ct. No. 24A910 (April 4, 2025) ......................................... 3, 4, 7, 8, 9

*Wash. Metro Area Tansit Comm'n v. Holiday Tours, Inc.,*
   559 F.2d 841 (D.C.Cir.1977) .......................................................... 5

**Statutes**

5 U.S.C. § 701 ...................................................................................... 7

5 U.S.C. § 702 ...................................................................................... 6

42 U.S.C. § 7434 .................................................................................. 8

**Regulations**

2 C.F.R. § 200.340 ............................................................................... 3,7

## FEDERAL DEFENDANTS' CONTINGENT
## EMERGENCY MOTION FOR STAY PENDING APPEAL

Because the government would face immediate irreparable injury through the disbursement of approximately $625 million,[1] and potentially up to $14 billion, in taxpayer funds to external accounts that would be unrecoverable if this Court grants the injunctive relief Plaintiffs have requested, Federal Defendants file this contingent motion for an emergency stay of any such order pending their appeal of such an order to the Court of Appeals for the District of Columbia Circuit.[2]  The Supreme Court has already recognized in these very circumstances that the government is likely to succeed on its appeal, yet Plaintiffs have represented their intent to thwart meaningful appellate review by immediately spending hundreds of millions in taxpayer funds that may not be recovered.  A stay pending appeal would be necessary to preserve the status quo in this case.

## BACKGROUND

Less than two weeks ago, the Supreme Court considered the very questions at issue in this case in *U.S. Department of Education v. California*, S. Ct. No. 24A910 (April 4, 2025).  Like this case, the respondents in *Dept. of Ed.* contend that the government's termination of their grant agreements did not comply with statutes and regulations, including the same termination regulation at issue here, 2 C.F.R. § 200.340.  The district court also entered the same basic relief requested here: an order enjoining the government from "terminating various education related

---

[1] This number reflects the amount of funding requested by grantees and subgrantees in both the NCIF and CCIA programs.  The NCIF program alone constitutes $447 million of that total.

[2] Grantees are Coalition for Green Capital (CGC), Power Forward Communities, Inc. (PFC), and Climate United Fund.  CGC subgrantees also filed suit, *California Infrastructure and Economic Development Bank, et al., v. Citibank, N.A., et al.*, Case No. 1:25-cv-00820 (TSC).

grants" and "to pay out past-due grant obligations and to continue paying obligations as they

accrue." *Dept. of Ed.*, Order at 1.

The Supreme Court stayed injunctive relief, concluding that "the Government is likely to

succeed in showing the District Court lacked jurisdiction to order payment of money under the

APA." *Id.* at 1–2.  The Supreme Court explained, "as we have recognized, the APA's limited

waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money'

along the lines of what the District Court ordered here.'" *Id.* at 2 (quoting *Great-West Life &*

*Annuity Ins. Co.* v. *Knudson*, 534 U. S. 204, 212 (2002)).  The Supreme Court also recognized

there, as here, that the government is unlikely to recover grant funds once they are disbursed.

Courts have begun applying the Supreme Court's direction in grant termination cases filed

improvidently in district court.  *See Mass. Fair Hous. Ctr et. al. v. Dept. of Hous. and Urban*

*Dev., et. al.*, 3:25-cv-30041 (D. Mass.) (April 14, 2025 Minute Order).

Although Plaintiffs attempted to distinguish their case from *Dept. of Ed.* based on the use

of a financial agent in the EPA grants, EPA has demonstrated that the use of a financial agent to

administer the funds in Treasury's shoes is not any distinction at all because Plaintiffs' rights to

federal funds, like the rights at issue in *Dept. of Ed.*, are defined by their grant agreements.

Any preliminary injunction that alters the status quo and directs disbursement of funds

from the accounts maintained by the federal financial agent, defendant Citibank, N.A. (Citibank),

would cause immediate irreparable injury to the United States, specifically, the potentially

permanent loss of up to $14 billion in taxpayer funds.

## LEGAL STANDARD

"The factors the Court considers in determining whether a stay pending appeal is

warranted are: (1) the likelihood that the party seeking the stay will prevail on the merits of the

appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the Court grants the stay; and (4) the public interest in granting the stay.  To justify the granting of a stay, a movant need not always establish a high probability of success on the merits." *Citizens For Resp. and Ethics in Washington v. Off. of Admin.*, 593 F. Supp. 2d 156, 159 (D.D.C. 2009) (quoting *Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985)).

The "court is not required to find that ultimate success by the movant is a mathematical probability, and indeed, [ ] may grant a stay even though its own approach may be contrary to the movant's view of the merits." *Citizens*, 593 F. Supp. 2d at 160.  "In particular, '[a]n order maintaining the status quo is appropriate when a serious legal question is presented, when little if any harm will befall other interested persons or the public, and when denial of the order would inflict irreparable injury on the movant." *Id.* (quoting *Wash. Metro Area Transit Comm'n v Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir.1977)).  In such a situation, "[t]here is substantial equity, and need for judicial protection, whether or not movant has shown a mathematical probability of success." *Id.* (quoting *Holiday Tours,* 559 F.2d at 844).

"Under this Circuit's precedent, the harms to each party are tested for 'substantiality, likelihood of occurrence, and adequacy of proof.'" *Id.* at 161 (quoting *Judicial Watch v. Nat'l Energy Policy Dev. Group*, 230 F. Supp. 2d 12, 15 (D.D.C. 2002)).  "The Court must consider the significance of the change from the *status quo* which would arise in the absence of a stay, as well as likelihood of occurrence of the claimed injury, when determining whether [parties] have truly met their burden of demonstrating irreparable harm justifying imposition of a stay." *Id.*  "A party moving for a stay is required to demonstrate that the injury claimed is 'both certain and great.'" *Id.* (quoting *Cuomo*, 772 F.2d at 976).

## ARGUMENT

As demonstrated in the briefing on Plaintiffs' Motion for Preliminary Injunction, EPA is likely to succeed on an appeal it may be obliged to take, and the government will incur irreparable harm absent a stay.  By contrast, extending a moderate delay in accessing grant funds will not substantially harm Grantees or Subgrantees.  And Plaintiffs' harm under a stay, if any, does not outweigh the government's interest in reobligating the funds under a reformed grant program or duty to act in the public interest to protect the public fisc.

### A.  EPA's Appeal Presents Serious Legal Questions

EPA has presented serious legal questions that warrant a stay pending appeal.  *First*, as has been briefed, this Court lacks jurisdiction to entertain Plaintiffs' claims. ECF No. 49 (EPA Opp. to PI) at 8–16.  The Court's exercise of jurisdiction pursuant to the APA's waiver of the federal government's sovereign immunity would be in error because that waiver does not apply "if any other any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians* v. *Patchak*, 567 U.S. 209, 215 (2012) (quoting 5 U.S.C. § 702).  And the waiver is limited to claims "seeking relief other than monetary damages." 5 U.S.C. § 702.

Here, both Grantees and Subgrantees seek one thing—the payment of money they claim is being denied to them under their grant agreements.  Such claims, though dressed as statutory and constitutional challenges, are "contract actions" that "the Tucker Act impliedly forbids" plaintiffs to bring against "the government in a federal district court." *Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004).  As a result, EPA is likely to prevail in an appeal challenging this Court's jurisdiction to grant Plaintiffs' injunctive relief.

To reiterate, the Supreme Court's recent order in *U.S. Departmen. of Education v. California*, No. 24A910 (Apr. 4, 2025) establishes the government's likelihood of success in this case. Like Plaintiffs here, the respondents in *Dept. of Ed.* contend that the government's termination of their grants, which relied upon the same termination regulation EPA relies on here (2 C.F.R. § 200.340), violated the APA. *See id.,* Opp. to App. at 22–23 (Mar. 28, 2025). The district court in *Dept. of Ed.* also entered the same basic relief provided in this Court's order: enjoining the government from "terminating various education related grants" and "to continue paying obligations as they accrue." *Id.* at 1.[3] The Supreme Court recognized in *Dept. of Ed.* that while "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds," *Dept. of Ed.* Order at 2 (quoting *Bowen* v. *Massachusetts*, 487 U. S. 879, 910 (1988)), the "APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered." *Id.* (quoting *Great-West Life & Annuity Ins. Co.* v. *Knudson*, 534 U. S. 204, 212 (2002)). Here, the result should be same. *See also* EPA Opp. to PI at 9-17.

*Second*, if this Court grants Plaintiffs their requested relief, the Court will have erroneously taken control of funding decisions that are committed to agency discretion by law. *See* 5 U.S.C. § 701(a)(2). Review under the APA is unavailable "if a statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). *See also*, EPA Opp. to PI at 16-17. In *Lincoln v. Vigil*, 508 U.S. 182 (1993), the Supreme Court recognized that an agency decision to change prior funding decisions presented a matter committed to agency discretion by law. *Id.* at

---

[3] The district court in *Dept. of Ed.* also compelled the government "to pay out past-due grant obligations." *Id.*

185-88.  Here, Congress entrusted EPA "to make grants, on a competitive basis" for distinct purposes, 42 U.S.C. § 7434(a), and left the program's design and implementation to EPA's discretion.  This Court would err if it intruded upon the agency's entitlement to the same prerogatives. *See id.* at 193 (APA "gives the court no leave to intrude" on agency decisions committed to agency discretion).

If an appeal is necessary, EPA is likely to succeed in showing that this Court lacks jurisdiction to order EPA to specifically perform any contractual obligation to provide funding to the Grantees or Subgrantees, for the same reasons recognized in *Dept. of Ed.* and because the agency's decisions, committed to agency discretion by law, are not subject to judicial review.  At a minimum, there is substantial equity, and need for judicial protection" here, "whether or not [the government] has shown a mathematical probability of success."  *Citizens*, 593 F. Supp. 2d at 160.  District courts have already reached the same conclusion on the jurisdictional issues the Supreme Court reached in *Dept. of Ed.  See U.S. Conf. of Catholic Bishops* v. *United States Department of State*, No. 25-cv-465, 2025 WL 763738 (D.D.C. Mar. 11, 2025); *see also Mass. Fair Hous. Ctr et. al. v. Dept. of Hous. and Urban Dev., et. al.*, 3:25-cv-30041 (D. Mass.) (April 14, 2015 Minute Order)[4] , A stay here would be warranted to allow for meaningful appellate review "even though [the Court's] own approach may be contrary to the movant's view of the merits."  *Citizens*, 593 F. Supp. 2d at 160.

---

[4]  Applying *Dept. of Ed.*, the district court dissolved a TRO for lack of jurisdiction because since plaintiffs, like the *Dept. of Ed* respondents, claim "the agency did not terminate the grant in accordance with statutory or regulatory authority—it follows that plaintiffs are likewise likely seeking to enforce a contractual obligation to pay money."

**B. Without A Stay The Government Faces Irreparable Injury**

The government will suffer irreparable injury absent a stay pending EPA's appeal.  If this Court allows disbursements from the Citibank accounts, Plaintiffs may immediately attempt to move approximately $625 million and all $14 billion could be equally subject to loss.  *See Heckler v. Turner*, 468 U.S. 1305, 1307-1308 (1984) (Rehnquist, J., in chambers) (prospect of the government being forced to make $1.3 million in improper payments per month supported a stay of injunction).  And that injury would be "both certain and great." *Citizens* 593 F. Supp. 2d at 161 (quoting *Cuomo*, 772 F.2d. at 976).  Plaintiffs have already requested approximately $625 million in external transfers from Citibank, *see* April 15, 2025 Declaration of Gregg Treml, EPA Acting Chief Financial Officer, (Treml Decl.) ¶¶ 6-23 and have sent letters purporting to instruct Citibank to "take whatever steps are necessary to ensure that, following the Court's decision, Citibank can *immediately* process all pending transactions. . ." *Id.* at Exhibit A (Climate United letter) and Exhibit B (CGC letter); *see also id.* at Exhibit C (PFC letter)("a single day's delay is unacceptable…").  Plaintiffs' grant awards total $14 billion, ECF No. 71 at 4, and there are few limits to what they can expend in short order under the injunction requested from this Court.  The government's harm would be particularly acute in the absence of a bond equal in amount to Plaintiffs' ongoing withdrawals, *see* Fed. R. Civ. Proc. 65(c), and no grantee promised "to return withdrawn funds should its grant termination be reinstated," *Dept. of Ed.* at 2.  Like the *Dept. of Ed.* respondents, Plaintiffs here "have not refuted the Government's representation that it is unlikely to recover the grant funds once they are disbursed." *Id.*

Moreover, EPA would be irreparably harmed by a continuation of the TRO's bar on effectuating grant termination.  Treml Decl. ¶¶ 4-5.  EPA cannot complete the closeout process, reform the program, and reobligate the funds as stated in its termination letters until this cloud on

the funding is removed. The government, and potential future grantees, cannot be made whole for this delay, unlike the Grantees and Subgrantees that may seek compensation in the Court of Federal Claims. And every day that goes by is another day EPA is deprived of substantial interest and income on the funds that could otherwise be rolled back into the reformed program.

### C. Equities Favor a Stay Pending Appeal

The balance of the final equitable factors for issuance of a stay, *i.e.*, "…the prospect that others will be harmed if the Court grants the stay; and [] the public interest in granting the stay," *Citizens*, 593 F. Supp. 2d at 159, tips decisively in government's favor, for one simple reason: This case is about money. If Plaintiffs are ultimately successful in their claims against EPA in the Court of Federal Claims, they may seek to recover loss resulting from EPA's alleged breach of the grant agreements. If Plaintiffs can be made whole by recovery on a claim for damages, they cannot be substantially harmed by a stay.

However, EPA, for the reasons explained above, cannot be made whole without a stay of these proceedings (or bond, which has not been issued) if later successful on appeal. The government also has a strong interest in safeguarding the public fisc. *See Mathews v. Eldridge*, 424 U.S. 319, 348 (1976). In fact, "the protection of the public fisc is a matter that is of interest to every citizen," *Brock v. Pierce Cnty.*, 476 U.S. 253, 262 (1986). Yet, a preliminary injunction order that bars the Executive Branch from exercising its authorities to ensure the GGRF is operated with the level of oversight and control it prefers threatens the agency's ability to ensure federal dollars remain protected. This separation of powers concern cannot be taken lightly, and caution is warranted before ordering immediate preliminary relief that impacts the ability of the Executive Branch to administer a program in a form no longer deems appropriate in the exercise of its constitutional functions.

\* \* \* \* \* \*

For these reasons, the Court should grant a stay of any order allowing disbursements

from the Citibank accounts pending resolution of the issues to be presented to the D.C. Circuit.

Dated: April 15, 2025                    Respectfully Submitted,

                                         YAAKOV M. ROTH
                                         Acting Assistant Attorney General

                                         KIRK T. MANHARDT
                                         Director

                                         */s/ Marc S. Sacks*
                                         MARC S. SACKS (Ga. Bar No. 621931)
                                         *Deputy Director*
                                         KEVIN P. VANLANDINGHAM (NY Reg No. 4741799)
                                         *Assistant Director*
                                         U.S. Department of Justice
                                         Civil Division
                                         Corporate/Financial Section
                                         P.O. Box 875
                                         Ben Franklin Stations
                                         Washington D.C. 20044-0875
                                         Tel: (202) 307-1134
                                         Email: kevin.p.vanlandingham@usdoj.gov

                                         *Attorneys for the United States*
                                         *Environmental Protection Agency*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CLIMATE UNITED FUND, | |
| Plaintiff, | |
| v. | Case No. 1:25-cv-00698 (TSC) |
| CITIBANK, N.A., *et al.*, | |
| Defendants. | |
| COALITION FOR GREEN CAPITAL, | |
| Plaintiff, | |
| v. | Case No. 1:25-cv-00735 (TSC) |
| CITIBANK, N.A., *et al.*, | |
| Defendants. | |
| POWER FORWARD COMMUNITIES, INC., | |
| Plaintiff, | |
| v. | Case No. 1:25-cv-00762 (TSC) |
| CITIBANK, N.A., *et al.*, | |
| Defendants. | |

## DECLARATION OF GREGG TREML

I, Gregg Treml, hereby declare as follows:

1.      I am the Acting Chief Financial Officer of the United States Environmental

Protection Agency (EPA).  I have held this position since January 20, 2025.  In this

position, I am responsible for overseeing the EPA's annual budget, annual performance

plans, financial operations, financial information systems, and directing strategic planning

and financial policy development efforts.  Prior to this role, my permanent role is Deputy

Chief Financial Officer, which I held since June 2023.  Before joining the EPA, I served

as Assistant Inspector General and Deputy CFO of the Department of Health and Human

Services Office of Inspector General and held a series of budget, financial, and human-

resources leadership roles at the Federal Emergency Management Agency, General

Services Administration, and Department of Homeland Security dating back to 2008.

2.     As evidenced by the attached documents, the three former grantees in the

EPA's National Clean Investment Fund (NCIF) program—Climate United Fund, Coalition

for Green Capital, and Power Forward Communities, Inc., have sent letters to Citibank

instructing the Bank to immediately process pending disbursement requests without delay

upon issuance of a preliminary injunction.

3.     As evidenced by the attached documents, the former NCIF grantees and

certain former grantees in the EPA's Clean Communities Investment Accelerator (CCIA)

have filed disbursement requests with Citibank for approximately $700,000,000 in

transfers, approximately $625,000,000 of which constitute transfers to external accounts,

based on the terminated NCIF and CCIA grant agreements.

4.     The EPA will be irreparably harmed by the transfer of at least $625,000,000

in funds from Citibank to external accounts controlled solely by the former grantees.  The

EPA cannot readily recoup the funds once transferred outside accounts administered by

Citibank as the designated financial agent.

5.     The EPA will be irreparably harmed by a continuation of the temporary restraining order's bar on implementing termination.  The EPA cannot proceed to complete the closeout process and reobligate the funds within a restructured Greenhouse Gas Reduction Fund (GGRF) program that reflects the agency's priorities and ensures greater accountability while this bar remains in effect.  The EPA and potential future grantees cannot be made whole for this delay after the fact.  Furthermore, the bar on implementing termination deprives the government of significant interest and income on the billions of dollars of unspent funds that could otherwise be used within the program.  The EPA cannot readily recoup these lost additional funds after the fact.

6.     Attached as **Exhibit A** is a true and correct copy of an April 3, 2025 letter from Climate United Fund's attorney instructing Citibank to prepare to disburse funds immediately to Climate United in anticipation of the dissolution of the temporary restraining order and entry of a preliminary injunction.

7.     Attached as **Exhibit B** is a true and correct copy of an April 4, 2025 letter from Coalition for Green Capital's attorney instructing Citibank to prepare to disburse funds immediately to Coalition for Green Capital in anticipation of the dissolution of the temporary restraining order and entry of a preliminary injunction.

8.     Attached as **Exhibit C** is a true and correct copy of an April 7, 2025 letter from Power Forward Communities, Inc.'s attorney instructing Citibank to prepare to disburse funds immediately to Power Forward in anticipation of the dissolution of the temporary restraining order and entry of a preliminary injunction.

9.      Attached as **Exhibit D** is a true and correct copy of a March 11, 2025 Form of Account Direction requesting the external transfer of $300,000.00 from Citibank to Climate United Fund.

10.     Attached as **Exhibit E** is a true and correct copy of a March 24, 2025 Form of Account Direction requesting the internal transfer of $75,000,000.00 in Climate United Fund accounts held at Citibank.

11.     Attached as **Exhibit F** is a true and correct copy of an April 2, 2025 Form of Account Direction requesting the external transfer of $604,455.69 from Citibank to Climate United Fund.

12.     Attached as **Exhibit G** is a true and correct copy of an April 2, 2025 Form of Account Direction requesting the external transfer of $75,000,000.00 from Citibank to Climate United Fund.

13.     Attached as **Exhibit H** is a true and correct copy of an April 2, 2025 Form of Account Direction requesting the external transfer of $42,250,000.00 from Citibank to Climate United Fund.

14.     Attached as **Exhibit I** is a true and correct copy of an April 3, 2025 Form of Account Direction requesting the external transfer of $250,000,000.00 from Citibank to Climate United Fund.

15.     Attached as **Exhibit J** is a true and correct copy of an April 7, 2025 Form of Account Direction requesting the external transfer of $175,436.25 from Citibank to Power Forward Communities.

16.    Attached as **Exhibit K** is a true and correct copy of an April 7, 2025 Form of Account Direction requesting the external transfer of $521,267.00 from Citibank to Inclusiv, Inc.

17.    Attached as **Exhibit L** is a true and correct copy of an April 7, 2025 Form of Account Direction requesting the external transfer of $185,237.08 from Citibank to Power Forward Communities.

18.    Attached as **Exhibit M** is a true and correct copy of an April 7, 2025 Form of Account Direction requesting the external transfer of $315,379.58 from Citibank to Appalachian Community Capital.

19.    Attached as **Exhibit N** is a true and correct copy of an April 8, 2025 Form of Account Direction requesting the external transfer of $1,574,811.00 from Citibank to Power Forward Communities, Inc.

20.    Attached as **Exhibit O** is a true and correct copy of an April 9, 2025 Form of Account Direction requesting the external transfer of $1,747,492.96 from Citibank to Climate United Fund.

21.    Attached as **Exhibit P** is a true and correct copy of an April 10, 2025 Form of Account Direction requesting the external transfer of $18,505.54 from Citibank to Climate United Fund.

22.    Attached as **Exhibit Q** is a true and correct copy of an April 14, 2025 Form of Account Direction requesting the external transfer of $428,390.76 from Citibank to Opportunity Finance Network.

23.     Attached as **Exhibit R** is a true and correct copy of an April 15, 2025 Form of Account Direction requesting the external transfer of $234,887.50 from Citibank to Climate United Fund.

I HEREBY DECLARE TO THE BEST OF MY KNOWLEDGE AND BELIEF, UNDER PENALTY OF PERJURY under the laws of the United States of America, that the foregoing is true and correct.

EXECUTED this 15th day of April, 2025 at Washington, DC.

Gregg Treml

# EXHIBIT A

1099 NEW YORK AVENUE, NW SUITE 900 WASHINGTON, DC 20001-4412                    **JENNER&BLOCK** LLP

Adam Unikowsky



APRIL 3, 2025

K. Winn Allen, P.C.
Kirkland & Ellis LLP
1301 Pennsylvania Ave., N.W.
Washington, D.C. 20004

Counsel:

As you know, yesterday the District Court held a hearing on Plaintiffs' motion for a preliminary injunction. With the Temporary Restraining Order scheduled to dissolve by Tuesday April 8, 2025, we anticipate the Court will issue a preliminary injunction decision in short order. In the meantime, as discussed extensively at the hearing and in our briefs, Climate United and its subgrantees continue to suffer serious irreparable harm because they cannot access their grant funds held at Citibank.

To remedy that ongoing harm as quickly as possible, Climate United requests that Citibank take all necessary steps *now* to prepare for the Court's likely issuance of a preliminary injunction. In particular, Citibank should take whatever steps are necessary to ensure that, following the Court's decision, Citibank can *immediately* process all pending transactions that have been submitted. For example, among other things, Citibank should:

- Liquidate money market funds, as needed, to facilitate disbursements and transfers;

- Prepare to process all pending requests for disbursements and transactions from Climate United and its subgrantees; and

- Secure any necessary approvals to allow Citibank to comply with the Court's order immediately upon issuance.

As the Court made clear at the hearing, Climate United's request is fully consistent with the TRO currently in place. That Order provides that Citibank "is enjoined from moving or transferring grant funds to any party *other than* the account holders." Dkt. 13 (emphasis added). Accordingly, Citibank is permitted to take steps to ensure that it can promptly process pending disbursement instructions related to Climate United's grant funds, to mitigate further irreparable injury stemming from the freeze of those funds.

As Citibank is in possession of all pending requests related to Climate United's grant funds, we assume Citibank requires no additional information to comply with this request. If however Citibank requires any additional information, please contact me immediately.

Sincerely,

/s/ Adam G. Unikowsky
Adam G. Unikowsky

CENTURY CITY    CHICAGO    LONDON    LOS ANGELES    NEW YORK    SAN FRANCISCO    WASHINGTON, DC



# EXHIBIT B

# HOLWELL SHUSTER & GOLDBERG LLP



*2  e  ington Avenue*
*New  ork, New  ork*



*incent  evy*

April 4, 2025

<u>VIA EMAIL</u>

K. Winn Allen, P.C.
Kirkland & Ellis LLP
1301 Pennsylvania Ave., N.W.
Washington, D.C. 20004

      Re:    *Coalition for Green Capital v. Citibank, N.A., et al.*, Case No. 25-cv- 35 (D.D.C.)

Dear Winn,

      As you know, on Wednesday, April 2, 2025, the District Court held a hearing on Plaintiffs preliminary-in unction motion.  With the Court s TRO scheduled to dissolve on Tuesday April 8, we anticipate the Court will issue its preliminary-in unction decision soon. In the meantime, as discussed at the hearing and in briefing, CGC and its subgrantees continue to suffer serious irreparable harm because they cannot access funds held in their Accounts at Citibank.

      To remedy that ongoing harm as quickly as possible, CGC requests that Citibank take all necessary steps *now* to prepare for the Court s likely issuance of a preliminary in unction.  In particular, Citibank should take whatever steps are necessary to ensure that, following the Court s decision, Citibank can *immediately* process all pending requests and timely process all requests made subsequent to the Court s decision that are authorized by the following accountholders (*i.e.*, CGC and its nineteen subgrantees):

1. Coalition for Green Capital
2. California Infrastructure and Economic Development Bank
3. Colorado Clean Energy Fund
4. The Community Development Venture Capital Alliance
5. City First Enterprises, Inc.
 . Connecticut Green Bank
 . Efficiency Maine Trust
8. Elemental GG LLC
9. Green Finance Authority
10. ICLEI-Local Governments for Sustainability USA
11. Illinois Finance Authority
12. Montgomery County Green Bank
13. Michigan Saves
14. Minnesota Climate Innovation Finance Authority

15. Missouri State Environmental Improvement and Energy Resources Authority
1 . New Jersey Green Bank
1 . New York City Energy Efficiency Corporation
18. NY Green Bank
19. Ohio Air   uality Development Authority
20. Solar and Energy Loan Fund of St. Lucie County, Inc.

As the Court made clear at the April 2 hearing, CGC s request is fully consistent with the TRO currently in place. That Order provides that Citibank  is en oined from moving or transferring grant funds to any party *other than* the account holders.  Dkt. 13 (emphasis added). Citibank should therefore ensure that it can promptly process disbursement instructions by CGC and its subgrantees to mitigate further irreparable in ury stemming from the freeze.

Sincerely,

_____s   incent   evy_____

JA762

# EXHIBIT C

JA763

 FOLEY HOAG LLP

155 Seaport Boulevard
Boston, MA 02210-2600



Beth C. Neitzel

April 7, 2025

**Via E-Mail**

K. Winn Allen, P.C.
Kirkland & Ellis LLP
1301 Pennsylvania Ave., N.W.
Washington, D.C. 20004

> Re:    *Power Forward Communities, Inc. v. Citibank, N.A. et al.*, No. 1:25-cv-762
> (D.D.C.)

Mr. Allen:

I write regarding the Court's expected order on Plaintiffs' motion for a preliminary injunction in *Climate United et al. v. Citibank et al.* As you are aware from Plaintiffs' briefs and declarations, Plaintiff Power Forward Communities (PFC) and its Subgrantees have already incurred irreparable injury and face dire financial straits due to Citibank's unlawful suspension of their accounts containing NCIF grant funds more than seven weeks ago. *See* Dkt. 33 (Declarations of Tim Mayopoulos, Shaun Donovan, John Moon, and Ari Matusiak).

With the Court's order expected by April 8, and to mitigate further harm to PFC and its Subgrantees, PFC asks that Citibank take all necessary steps to prepare for the Court's anticipated order restoring Plaintiffs' access to their accounts. Specifically, Citibank should ensure that it is prepared to process all disbursement and transfer instructions submitted by PFC and its Subgrantees—Enterprise Green Accelerator, Inc., LISC Green LLC, and Rewiring Community Investment Fund, Inc.—*immediately* upon the order's release. In PFC's current predicament, a single day's delay is unacceptable and will cause further harm.

As the Court confirmed at the hearing held on April 2, this request is entirely consistent with the TRO currently in place, and it is likely mandatory under the impending order. If Citibank requires any additional information to comply with this request, please contact me immediately.

K. Winn Allen, P.C.
Page 2

Sincerely,

/s/ *Beth Neitzel*
Beth C. Neitzel
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
███████████████

*Counsel for Power Forward Communities, Inc.*

# EXHIBIT D

Docusign Envelope ID: 43FCB6F4-786C-4B82-8217-50B607B6AFA9

Case 1:25-cv-00698-TSC   Document 75-3   Filed 04/15/25   Page 10 of 72
USCA Case #25-5122   Document #2114423   Filed: 05/05/2025   Page 263 of 694

## FORM OF ACCOUNT DIRECTION (NCIF)
### Pledgor's UEI Number: ███████████

3/11/2025

Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, NY 10013

Attn.: Nerlie Delly

Telephone: ████████████████████

VIA: CitiSFT
RE: Account Control Agreement dated November 1, 2024, among Climate United Fund (the "**Pledgor**"), United States Environmental Protection Agency (the "**Secured Party**"), and Citibank, N.A. (the "**Bank**")

Pursuant to Section 2 of the above referenced Account Control Agreement, the Pledgor hereby instructs the Bank to disburse a total amount of $ 300,000.00                funds as per below and as per the attached upload file named : 25.03.11_FA_Client Wire Instruction Template

**Check applicable boxes:**

( ) **Internal Transfer within the Bank (intra-entity).**

( ) **Internal Transfer within the Bank (inter-entity).**

(x) **External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities).**

( ) **External Transfer outside the Bank (for Financial Assistance Activities).**

**If an Internal Transfer within the Bank (intra-entity), check the following applicable boxes:**

( ) **Transfer of** $                      across Pledgor's 'Budget' sub-accounts, as defined in the **Grant Agreement**.

( ) **Transfer of** $                    from Pledgor's 'Program Income from Operations' account to Pledgor's 'Budget' sub-account(s), as defined in the Grant Agreement.

( ) **Transfer of** $                  from Pledgor's 'Reserve' account to Pledgor's 'Program Income from Operations' account, as defined in the Grant Agreement.

( ) **Transfer of** $                    from Pledgor's 'Budget' sub-account(s) or 'Program Income from Operations' account to 'Reserve' account, as defined in the Grant Agreement. **The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

Docusign Envelope ID: 43ECB6F4-786C-4B92-8217-59R697B6AFA9

Case 1:25-cv-00698-TSC    Document 75-3    Filed 04/15/25    Page 11 of 72
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 264 of 694

*"The amount of this expenditure is necessary to execute against the EPA-approved workplan. Financing agreements for identified Qualified Projects necessitating the transfer have been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

**If an Internal Transfer within the Bank (inter-entity), check the following applicable boxes:**

( ) **Transfer of** $ **                    from Pledgor's 'Budget' sub-account(s) to 'Financial Assistance Subrecipient' as defined in the Grant Agreement.**

**If an External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities), check one of the following boxes:**

( ) **Disbursement of** $ **                    or Predevelopment Activities as defined in the Grant Agreement.**

( ) **Disbursement of** $ **                    for Market-Building Activities as defined in the Grant Agreement.**

(x) **Disbursement of** $ 300,000.00 **    for Program Administration Activities as defined in the Grant Agreement.**

**If an External Transfer outside the Bank (for Financial Assistance Activities), check the following applicable boxes:**

( ) **Disbursement of** $ **                    from Pledgor's 'Budget' sub-account to provide Financial Assistance to Qualified Projects as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the EPA-approved workplan. Financing agreements for identified Qualified Projects necessitating the transfer have been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

( ) **Disbursement of** $ **                    from Pledgor's 'Reserve' account to satisfy a legal obligation to a third party as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this transfer is necessary to execute against the EPA-approved workplan and pay a third party pursuant to a financing agreement that has been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

Capitalized terms in this instruction letter not otherwise defined shall have the same meaning given to them in the Account Control Agreement.

Signature on this Account Direction executed and delivered in electronic format (i.e. "pdf") or by other electronic means (including DocuSign) shall be deemed original signatures with all rights accruing thereto.

IN WITNESS WHEREOF, the Pledgor has caused this Account Direction to be duly executed and delivered as of the date first written above.

Pledgor:

Signed by:

*Stephanie Seiberg*

DC56F181D6D2415...

Authorized Person

# EXHIBIT E

Docusign Envelope ID: 50DAD6D7-7B68-43BA-8DC2-93A38AADB363

Case 1:25-cv-00698-TSC    Document 75-3    Filed 04/15/25    Page 15 of 72
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 268 of 694

**FORM OF ACCOUNT DIRECTION (NCIF)**
**Pledgor's UEI Number:** ███████████

3/24/2025

Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, NY 10013

Attn.: Nerlie Delly

Telephone: ███████████████

VIA: CitiSFT
RE: Account Control Agreement dated November 1, 2024, among Climate United Fund (the
"**Pledgor**"), United States Environmental Protection Agency (the "**Secured Party**"), and Citibank,
N.A. (the "**Bank**")

Pursuant to Section 2 of the above referenced Account Control Agreement, the Pledgor hereby
instructs the Bank to disburse a total amount of $ 75,000,000.00         funds as per below
and as per the attached upload file named : 25_03_24_FA_Client Wire Instruction Template_ReserveXfer


**Check applicable boxes:**

(x) **Internal Transfer within the Bank (intra-entity).**

( ) **Internal Transfer within the Bank (inter-entity).**

( ) **External Transfer outside the Bank (for Predevelopment Activities, Market-Building
Activities, and/or Program Administration Activities).**

( ) **External Transfer outside the Bank (for Financial Assistance Activities).**

**If an Internal Transfer within the Bank (intra-entity), check the following applicable boxes:**

( ) **Transfer of** $                    **across Pledgor's 'Budget' sub-accounts, as defined in the
Grant Agreement**.

( ) **Transfer of** $                    **from Pledgor's 'Program Income from Operations'
account to Pledgor's 'Budget' sub-account(s), as defined in the Grant Agreement**.

( ) **Transfer of** $                    **from Pledgor's 'Reserve' account to Pledgor's 'Program
Income from Operations' account, as defined in the Grant Agreement**.

(x) **Transfer of** $ 75,000,000.00         **from Pledgor's 'Budget' sub-account(s) or 'Program
Income from Operations' account to 'Reserve' account, as defined in the Grant Agreement.
The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

Docusign Envelope ID: 50DAD697-7868-43BA-8DC2-93A38AADB363

Case 1:25-cv-00898-TSC    Document 75-3    Filed 04/15/25    Page 16 of 72
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 269 of 694

*"The amount of this expenditure is necessary to execute against the EPA-approved workplan. Financing agreements for identified Qualified Projects necessitating the transfer have been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

**If an Internal Transfer within the Bank (inter-entity), check the following applicable boxes:**

( ) **Transfer of** $                  **from Pledgor's 'Budget' sub-account(s) to 'Financial Assistance Subrecipient' as defined in the Grant Agreement.**

**If an External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities), check one of the following boxes:**

( ) **Disbursement of** $                  **or Predevelopment Activities as defined in the Grant Agreement.**

( ) **Disbursement of** $                  **for Market-Building Activities as defined in the Grant Agreement.**

( ) **Disbursement of** $                  **for Program Administration Activities as defined in the Grant Agreement.**

**If an External Transfer outside the Bank (for Financial Assistance Activities), check the following applicable boxes:**

( ) **Disbursement of** $                  **from Pledgor's 'Budget' sub-account to provide Financial Assistance to Qualified Projects as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the EPA-approved workplan. Financing agreements for identified Qualified Projects necessitating the transfer have been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

( ) **Disbursement of** $                  **from Pledgor's 'Reserve' account to satisfy a legal obligation to a third party as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this transfer is necessary to execute against the EPA-approved workplan and pay a third party pursuant to a financing agreement that has been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

Capitalized terms in this instruction letter not otherwise defined shall have the same meaning given to them in the Account Control Agreement.

Docusign Envelope ID: 50DAD6D7-7968-43BA-8DC2-93A38AADB363

Signature on this Account Direction executed and delivered in electronic format (i.e. "pdf") or by other electronic means (including DocuSign) shall be deemed original signatures with all rights accruing thereto.

IN WITNESS WHEREOF, the Pledgor has caused this Account Direction to be duly executed and delivered as of the date first written above.

Pledgor:

Signed by:

*Stephanie Seiberg*

DC56F181D6D2415...

Authorized Person

Docusign Envelope ID: 50DAD697-7068-43BA-8DC2-93A38AADB363

Case 1:25-cv-00698-TSC    Document 75-3    Filed 04/15/25    Page 18 of 72
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 271 of 694

JA775

# EXHIBIT F

JA776

**FORM OF ACCOUNT DIRECTION (NCIF)**
**Pledgor's UEI Number:** ███████████

4/2/2025

Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, NY 10013

Attn.: Nerlie Delly

Telephone: ████████████████████

VIA: CitiSFT

RE: Account Control Agreement dated November 1, 2024, among Climate United Fund (the "**Pledgor**"), United States Environmental Protection Agency (the "**Secured Party**"), and Citibank, N.A. (the "**Bank**")

Pursuant to Section 2 of the above referenced Account Control Agreement, the Pledgor hereby instructs the Bank to disburse a total amount of $ 604,455.69           funds as per below and as per the attached upload file named : 25.04.02_FA_Client Wire Instruction Template

**Check applicable boxes:**

( ) **Internal Transfer within the Bank (intra-entity).**

( ) **Internal Transfer within the Bank (inter-entity).**

(x) **External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities).**

( ) **External Transfer outside the Bank (for Financial Assistance Activities).**

**If an Internal Transfer within the Bank (intra-entity), check the following applicable boxes:**

( ) **Transfer of** $                        **across Pledgor's 'Budget' sub-accounts, as defined in the Grant Agreement**.

( ) **Transfer of** $                      **from Pledgor's 'Program Income from Operations' account to Pledgor's 'Budget' sub-account(s), as defined in the Grant Agreement**.

( ) **Transfer of** $                     **from Pledgor's 'Reserve' account to Pledgor's 'Program Income from Operations' account, as defined in the Grant Agreement.**

( ) **Transfer of** $                       **from Pledgor's 'Budget' sub-account(s) or 'Program Income from Operations' account to 'Reserve' account, as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

Docusign Envelope ID: 6488DDD8-B81F-4749-8F59-663C5CCE3738

Case 1:25-cv-00698-TSC    Document 75-3    Filed 04/15/25    Page 21 of 72
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 274 of 694

*"The amount of this expenditure is necessary to execute against the EPA-approved workplan. Financing agreements for identified Qualified Projects necessitating the transfer have been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

**If an Internal Transfer within the Bank (inter-entity), check the following applicable boxes:**

( ) **Transfer of** $                          **from Pledgor's 'Budget' sub-account(s) to 'Financial Assistance Subrecipient' as defined in the Grant Agreement.**

**If an External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities), check one of the following boxes:**

( ) **Disbursement of** $                    **or Predevelopment Activities as defined in the Grant Agreement.**

( ) **Disbursement of** $                     **for Market-Building Activities as defined in the Grant Agreement.**

(x) **Disbursement of** $ 604,455.69    **for Program Administration Activities as defined in the Grant Agreement.**

**If an External Transfer outside the Bank (for Financial Assistance Activities), check the following applicable boxes:**

( ) **Disbursement of** $                          **from Pledgor's 'Budget' sub-account to provide Financial Assistance to Qualified Projects as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the EPA-approved workplan. Financing agreements for identified Qualified Projects necessitating the transfer have been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

( ) **Disbursement of** $                     **from Pledgor's 'Reserve' account to satisfy a legal obligation to a third party as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this transfer is necessary to execute against the EPA-approved workplan and pay a third party pursuant to a financing agreement that has been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

Capitalized terms in this instruction letter not otherwise defined shall have the same meaning given to them in the Account Control Agreement.

Docusign Envelope ID: 6488DDD8-B81E-4749-8F59-663CECCE3738

Case 1:25-cv-00698-TSC    Document 75-3    Filed 04/15/25    Page 22 of 72
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 275 of 694

Signature on this Account Direction executed and delivered in electronic format (i.e. "pdf") or by other electronic means (including DocuSign) shall be deemed original signatures with all rights accruing thereto.

IN WITNESS WHEREOF, the Pledgor has caused this Account Direction to be duly executed and delivered as of the date first written above.

Pledgor:

Signed by:

Stephanie Seiberg

DC56F181D6D2415...

Authorized Person

# EXHIBIT G

JA781

# FORM OF ACCOUNT DIRECTION (NCIF)
## Pledgor's UEI Number: ▮▮▮▮▮▮▮▮

4/2/2025

Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, NY 10013

Attn.: Nerlie Delly

Telephone: ▮▮▮▮▮▮▮▮

VIA: CitiSFT

RE: Account Control Agreement dated November 1, 2024, among Climate United Fund (the "**Pledgor**"), United States Environmental Protection Agency (the "**Secured Party**"), and Citibank, N.A. (the "**Bank**")

Pursuant to Section 2 of the above referenced Account Control Agreement, the Pledgor hereby instructs the Bank to disburse a total amount of $ 75,000,000.00 funds as per below and as per the attached upload file named : 25_04_02_FA_Client Wire Instruction Template

**Check applicable boxes:**

( ) **Internal Transfer within the Bank (intra-entity).**

( ) **Internal Transfer within the Bank (inter-entity).**

( ) **External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities).**

(x) **External Transfer outside the Bank (for Financial Assistance Activities).**

**If an Internal Transfer within the Bank (intra-entity), check the following applicable boxes:**

( ) **Transfer of** $                       **across Pledgor's 'Budget' sub-accounts, as defined in the Grant Agreement**.

( ) **Transfer of** $                    **from Pledgor's 'Program Income from Operations' account to Pledgor's 'Budget' sub-account(s), as defined in the Grant Agreement**.

( ) **Transfer of** $                  **from Pledgor's 'Reserve' account to Pledgor's 'Program Income from Operations' account, as defined in the Grant Agreement.**

( ) **Transfer of** $                     **from Pledgor's 'Budget' sub-account(s) or 'Program Income from Operations' account to 'Reserve' account, as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

Docusign Envelope ID: 691C984E-9E13-4E7B-A131-60844334D864

Case 1:25-cv-00698-TSC    Document 75-3    Filed 04/15/25    Page 26 of 72
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 279 of 694

*"The amount of this expenditure is necessary to execute against the EPA-approved workplan. Financing agreements for identified Qualified Projects necessitating the transfer have been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

**If an Internal Transfer within the Bank (inter-entity), check the following applicable boxes:**

( ) **Transfer of** $                         **from Pledgor's 'Budget' sub-account(s) to 'Financial Assistance Subrecipient' as defined in the Grant Agreement.**

**If an External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities), check one of the following boxes:**

( ) **Disbursement of** $                         **or Predevelopment Activities as defined in the Grant Agreement.**

( ) **Disbursement of** $                         **for Market-Building Activities as defined in the Grant Agreement.**

( ) **Disbursement of** $                         **for Program Administration Activities as defined in the Grant Agreement.**

**If an External Transfer outside the Bank (for Financial Assistance Activities), check the following applicable boxes:**

( ) **Disbursement of** $                         **from Pledgor's 'Budget' sub-account to provide Financial Assistance to Qualified Projects as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the EPA-approved workplan. Financing agreements for identified Qualified Projects necessitating the transfer have been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

(x) **Disbursement of** $ 75,000,000.00          **from Pledgor's 'Reserve' account to satisfy a legal obligation to a third party as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this transfer is necessary to execute against the EPA-approved workplan and pay a third party pursuant to a financing agreement that has been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

Capitalized terms in this instruction letter not otherwise defined shall have the same meaning given to them in the Account Control Agreement.

Docusign Envelope ID: 691C984E-9E13-4E7B-A131-60844334D864

Case 1:25-cv-00698-TSC    Document 75-3    Filed 04/15/25    Page 27 of 72
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 280 of 694

Signature on this Account Direction executed and delivered in electronic format (i.e. "pdf") or by other electronic means (including DocuSign) shall be deemed original signatures with all rights accruing thereto.

IN WITNESS WHEREOF, the Pledgor has caused this Account Direction to be duly executed and delivered as of the date first written above.

Pledgor:

Signed by:

Stephanie Seiberg

DC56F181D6D2415...

Authorized Person

# EXHIBIT H

JA786

Docusign Envelope ID: 4B0BB1A2-CCE9-4334-B586-3A20CCFFDA16

Case 1:25-cv-00698-TSC    Document 75-3    Filed 04/15/25    Page 30 of 72
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 283 of 694

**FORM OF ACCOUNT DIRECTION (NCIF)**
**Pledgor's UEI Number:** ███████████

4/2/2025

Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, NY 10013

Attn.: Nerlie Delly

Telephone: ██████████████

VIA: CitiSFT
RE: Account Control Agreement dated November 1, 2024, among Climate United Fund (the "**Pledgor**"), United States Environmental Protection Agency (the "**Secured Party**"), and Citibank, N.A. (the "**Bank**")

Pursuant to Section 2 of the above referenced Account Control Agreement, the Pledgor hereby instructs the Bank to disburse a total amount of $ 42,250,000.00            funds as per below and as per the attached upload file named : 25_04_02_FA_Client Wire Instruction Template

<u>**Check applicable boxes:**</u>

( ) **Internal Transfer within the Bank (intra-entity).**

( ) **Internal Transfer within the Bank (inter-entity).**

( ) **External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities).**

(x) **External Transfer outside the Bank (for Financial Assistance Activities).**

<u>**If an Internal Transfer within the Bank (intra-entity), check the following applicable boxes:**</u>

( ) **Transfer of** $                    **across Pledgor's 'Budget' sub-accounts, as defined in the Grant Agreement**.

( ) **Transfer of** $                 **from Pledgor's 'Program Income from Operations' account to Pledgor's 'Budget' sub-account(s), as defined in the Grant Agreement**.

( ) **Transfer of** $                **from Pledgor's 'Reserve' account to Pledgor's 'Program Income from Operations' account, as defined in the Grant Agreement.**

( ) **Transfer of** $                    **from Pledgor's 'Budget' sub-account(s) or 'Program Income from Operations' account to 'Reserve' account, as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

**JA787**

Docusign Envelope ID: 4B0BB1A2-CCE9-4324-B586-2A20CCFFDA16

Case 1:25-cv-00698-TSC   Document 75-3   Filed 04/15/25   Page 31 of 72
USCA Case #25-5122   Document #2114423   Filed: 05/05/2025   Page 284 of 694

*"The amount of this expenditure is necessary to execute against the EPA-approved workplan. Financing agreements for identified Qualified Projects necessitating the transfer have been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

**If an Internal Transfer within the Bank (inter-entity), check the following applicable boxes:**

( ) **Transfer of** $                    **from Pledgor's 'Budget' sub-account(s) to 'Financial Assistance Subrecipient' as defined in the Grant Agreement.**

**If an External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities), check one of the following boxes:**

( ) **Disbursement of** $                    **or Predevelopment Activities as defined in the Grant Agreement.**

( ) **Disbursement of** $                    **for Market-Building Activities as defined in the Grant Agreement.**

( ) **Disbursement of** $                    **for Program Administration Activities as defined in the Grant Agreement.**

**If an External Transfer outside the Bank (for Financial Assistance Activities), check the following applicable boxes:**

( ) **Disbursement of** $                    **from Pledgor's 'Budget' sub-account to provide Financial Assistance to Qualified Projects as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the EPA-approved workplan. Financing agreements for identified Qualified Projects necessitating the transfer have been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

(x) **Disbursement of** $ 42,250,000.00                    **from Pledgor's 'Reserve' account to satisfy a legal obligation to a third party as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this transfer is necessary to execute against the EPA-approved workplan and pay a third party pursuant to a financing agreement that has been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

Capitalized terms in this instruction letter not otherwise defined shall have the same meaning given to them in the Account Control Agreement.

Docusign Envelope ID: 4B0BB1A2-CCE9-4234-B586-2A20CCFFDA16

Case 1:25-cv-00698-TSC    Document 75-3    Filed 04/15/25    Page 32 of 72
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 285 of 694

Signature on this Account Direction executed and delivered in electronic format (i.e. "pdf") or by other electronic means (including DocuSign) shall be deemed original signatures with all rights accruing thereto.

IN WITNESS WHEREOF, the Pledgor has caused this Account Direction to be duly executed and delivered as of the date first written above.

Pledgor:

Signed by:

*Stephanie Seiberg*

DC56F181D6D2415...

Authorized Person

# EXHIBIT I

# FORM OF ACCOUNT DIRECTION (NCIF)
## Pledgor's UEI Number: ███████████

4/3/2025

Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, NY 10013

Attn.: Nerlie Delly

Telephone: ████████████████

VIA: CitiSFT

RE: Account Control Agreement dated November 1, 2024, among Climate United Fund (the "**Pledgor**"), United States Environmental Protection Agency (the "**Secured Party**"), and Citibank, N.A. (the "**Bank**")

Pursuant to Section 2 of the above referenced Account Control Agreement, the Pledgor hereby instructs the Bank to disburse a total amount of $ 250,000,000.00 funds as per below and as per the attached upload file named : 25_04_03_FA_Client Wire Instruction Template

**Check applicable boxes:**

( ) **Internal Transfer within the Bank (intra-entity).**

( ) **Internal Transfer within the Bank (inter-entity).**

( ) **External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities).**

(x) **External Transfer outside the Bank (for Financial Assistance Activities).**

**If an Internal Transfer within the Bank (intra-entity), check the following applicable boxes:**

( ) **Transfer of $                    across Pledgor's 'Budget' sub-accounts, as defined in the Grant Agreement**.

( ) **Transfer of $                    from Pledgor's 'Program Income from Operations' account to Pledgor's 'Budget' sub-account(s), as defined in the Grant Agreement**.

( ) **Transfer of $                    from Pledgor's 'Reserve' account to Pledgor's 'Program Income from Operations' account, as defined in the Grant Agreement.**

( ) **Transfer of $                    from Pledgor's 'Budget' sub-account(s) or 'Program Income from Operations' account to 'Reserve' account, as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

Docusign Envelope ID: B367A79D-2E01-4B58-84D1-6EB456793949

Case 1:25-cv-00698-TSC    Document 75-3    Filed 04/15/25    Page 36 of 72
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 289 of 694

*"The amount of this expenditure is necessary to execute against the EPA-approved workplan. Financing agreements for identified Qualified Projects necessitating the transfer have been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

**If an Internal Transfer within the Bank (inter-entity), check the following applicable boxes:**

( ) **Transfer of** $                    **from Pledgor's 'Budget' sub-account(s) to 'Financial Assistance Subrecipient' as defined in the Grant Agreement.**

**If an External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities), check one of the following boxes:**

( ) **Disbursement of** $                    **or Predevelopment Activities as defined in the Grant Agreement.**

( ) **Disbursement of** $                    **for Market-Building Activities as defined in the Grant Agreement.**

( ) **Disbursement of** $                    **for Program Administration Activities as defined in the Grant Agreement.**

**If an External Transfer outside the Bank (for Financial Assistance Activities), check the following applicable boxes:**

( ) **Disbursement of** $                    **from Pledgor's 'Budget' sub-account to provide Financial Assistance to Qualified Projects as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the EPA-approved workplan. Financing agreements for identified Qualified Projects necessitating the transfer have been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

(x) **Disbursement of** $ 250,000,000.00          **from Pledgor's 'Reserve' account to satisfy a legal obligation to a third party as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this transfer is necessary to execute against the EPA-approved workplan and pay a third party pursuant to a financing agreement that has been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

Capitalized terms in this instruction letter not otherwise defined shall have the same meaning given to them in the Account Control Agreement.

Signature on this Account Direction executed and delivered in electronic format (i.e. "pdf") or by other electronic means (including DocuSign) shall be deemed original signatures with all rights accruing thereto.

IN WITNESS WHEREOF, the Pledgor has caused this Account Direction to be duly executed and delivered as of the date first written above.

Pledgor:

Signed by:

Stephanie Seiberg

DC56F181D6D2415...

Authorized Person

# EXHIBIT J

JA796

Docusign Envelope ID: DB469189-580A-4B39-B941-3775329DB793

Case 1:25-cv-00698-TSC    Document 75-3    Filed 04/15/25    Page 40 of 72
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 293 of 694

**EXHIBIT B**

**FORM OF ACCOUNT DIRECTION (NCIF)**
**Pledgor's UEI Number:** ███████████

04/07/2025
Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, NY 10013
Attn.: Nerlie Delly
E-mail: ████████████████████████████████

VIA: CitiSFT
RE: Account Control Agreement dated January 16, 2025, among Power Forward Communities, Inc. (the "**Pledgor**"), United States Environmental Protection Agency (the "**Secured Party**"), and Citibank, N.A. (the "**Bank**")

Pursuant to Section 2 of the above referenced Account Control Agreement, the Pledgor hereby instructs the Bank to disburse a total amount of $175,436.25 funds as per below and as per the attached upload file named 20250407 PFC Wire Instructions:

**Check applicable boxes:**

( ) **Internal Transfer within the Bank (intra-entity).**

( ) **Internal Transfer within the Bank (inter-entity).**

(X) **External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities).**

( ) **External Transfer outside the Bank (for Financial Assistance Activities).**

**If an Internal Transfer within the Bank (intra-entity), check the following applicable boxes:**

( ) **Transfer of $[●] across Pledgor's 'Budget' sub-accounts, as defined in the Grant Agreement**.

( ) **Transfer of $[●] from Pledgor's 'Program Income from Operations' account to Pledgor's 'Budget' sub-account(s), as defined in the Grant Agreement**.

( ) **Transfer of $[●] from Pledgor's 'Reserve' account to Pledgor's 'Program Income from Operations' account, as defined in the Grant Agreement.**

( ) **Transfer of $[●] from Pledgor's 'Budget' sub-account(s) or 'Program Income from Operations' account to 'Reserve' account, as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the EPA-approved workplan. Financing agreements for identified Qualified Projects necessitating the transfer have been reviewed by Recipient's counsel for legal sufficiency. This certification is a material*

Docusign Envelope ID: DB469189-580A-4B39-B941-3775329DB793

Case 1:25-cv-00698-TSC    Document 75-3    Filed 04/15/25    Page 41 of 72
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 294 of 694

*representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

**If an Internal Transfer within the Bank (inter-entity), check the following applicable boxes:**

( ) **Transfer of** $[●] **from Pledgor's 'Budget' sub-account(s) to 'Financial Assistance Subrecipient' as defined in the Grant Agreement.**

**If an External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities), check one of the following boxes:**

( ) **Disbursement of** $[●] **for Predevelopment Activities as defined in the Grant Agreement.**

( ) **Disbursement of** $[●] **for Market-Building Activities as defined in the Grant Agreement.**

(X) **Disbursement of** $175,436.25 **for Program Administration Activities as defined in the Grant Agreement.**

**If an External Transfer outside the Bank (for Financial Assistance Activities), check the following applicable boxes:**

( ) **Disbursement of** $[●] **from Pledgor's 'Budget' sub-account to provide Financial Assistance to Qualified Projects as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the EPA-approved workplan. Financing agreements for identified Qualified Projects necessitating the transfer have been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

( ) **Disbursement of** $[●] **from Pledgor's 'Reserve' account to satisfy a legal obligation to a third party as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this transfer is necessary to execute against the EPA-approved workplan and pay a third party pursuant to a financing agreement that has been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

Capitalized terms in this instruction letter not otherwise defined shall have the same meaning given to them in the Account Control Agreement.

Signature on this Account Direction executed and delivered in electronic format (i.e. "pdf") or by other electronic means (including DocuSign) shall be deemed original signatures with all rights accruing thereto.

Docusign Envelope ID: DB469189-580A-4B39-B941-3775329DB703

IN WITNESS WHEREOF, the Pledgor has caused this Account Direction to be duly executed and delivered as of the date first written above.

Pledgor:

*William N. Jenkins III*

Authorized Person

# EXHIBIT K

**EXHIBIT B**

**FORM OF ACCOUNT DIRECTION (CCIA)**
**Pledgor's UEI Number:** ███████████

April 7, 2025

Citibank,  N.A.
Agency & Trust
388 Greenwich Street
New York, NY 10013
Attn.: Nerlie Delly
E-mail: ████████████████████████

VIA: CitiSFT

RE: Account Control Agreement dated November 6, 2024, among Inclusiv, Inc. (the "**Pledgor**"), United States Environmental Protection Agency  (the "**Secured Party**"), and Citibank, N.A. (the "**Bank**")

Pursuant to Section 2 of the above referenced Account Control Agreement, the Pledgor hereby instructs the Bank to disburse a total amount of $521,267 funds as per below and as per the attachedupload file named GGRF AT_Wire Instruction_CCIA_Inclusiv_521,267_040725.xlsx:

**Check one boxes:**

( ) **Internal Transfer within the Bank (intra-entity).**

( ) **Internal Transfer within the Bank (inter-entity).**

( X ) **External Transfer outside the Bank (for Technical Assistance Services and/or Program Administration Activities).**

**If an Internal Transfer within the Bank (intra-entity), check the following applicable boxes:**

( ) **Transfer of $[●] across Pledgor's 'Budget' sub-accounts, as defined in the Grant Agreement**.

( ) **Transfer of $[●] from Pledgor's 'Program Income from Operations' account to Pledgor's 'Budget' sub-account(s), as defined in the Grant Agreement**.

**If an Internal Transfer within the Bank (inter-entity), check the following applicable boxes:**

( ) **Transfer of $[●] from Pledgor's 'Budget' sub-account(s) to 'Community Lender' for Capitalization Funding as defined in the Grant Agreement.**

( ) **Transfer of $[●] from Pledgor's 'Budget' sub-account(s) to 'Community Lender' for Technical Assistance Subaward as defined in the Grant Agreement.**

**If an External Transfer outside the Bank (for Technical Assistance Services and/or Program Administration Activities), check the following applicable boxes:**

**( ) Disbursement of $[●] for Technical Assistance Services as defined in the Grant Agreement.**
**( X ) Disbursement of $521,267.00 Program Administration Activities as defined in the Grant Agreement.**

Capitalized terms in this instruction letter not otherwise defined shall have the same meaning given to them in the Account Control Agreement.

Signature on this Account Direction executed and delivered in electronic format (i.e. "pdf") or by other electronic means (including DocuSign) shall be deemed original signatures with all rights accruing thereto.

IN WITNESS WHEREOF, the Pledgor has caused this Account Direction to be duly executed and delivered as of the date first written above.


Pledgor:


_____
Authorized Person

# EXHIBIT L

JA803

Docusign Envelope ID: 52903BF6-51B0-4E78-9B5E-8BAE2F2ECDAF

Case 1:25-cv-00698-TSC    Document 75-3    Filed 04/15/25    Page 47 of 72
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 300 of 694

**EXHIBIT B**

**FORM OF ACCOUNT DIRECTION (NCIF)**
**Pledgor's UEI Number:** ██████████

04/07/2025
Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, NY 10013
Attn.: Nerlie Delly
E-mail: ████████████████████████

VIA: CitiSFT
RE: Account Control Agreement dated January 16, 2025, among Power Forward Communities, Inc. (the "**Pledgor**"), United States Environmental Protection Agency (the "**Secured Party**"), and Citibank, N.A. (the "**Bank**")

Pursuant to Section 2 of the above referenced Account Control Agreement, the Pledgor hereby instructs the Bank to disburse a total amount of $185,237.08 funds as per below and as per the attached upload file named 20250407 PFC Wire Instructions-2:

**Check applicable boxes:**

( ) **Internal Transfer within the Bank (intra-entity).**

( ) **Internal Transfer within the Bank (inter-entity).**

(X) **External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities).**

( ) **External Transfer outside the Bank (for Financial Assistance Activities).**

**If an Internal Transfer within the Bank (intra-entity), check the following applicable boxes:**

( ) **Transfer of $[●] across Pledgor's 'Budget' sub-accounts, as defined in the Grant Agreement**.

( ) **Transfer of $[●] from Pledgor's 'Program Income from Operations' account to Pledgor's 'Budget' sub-account(s), as defined in the Grant Agreement**.

( ) **Transfer of $[●] from Pledgor's 'Reserve' account to Pledgor's 'Program Income from Operations' account, as defined in the Grant Agreement.**

( ) **Transfer of $[●] from Pledgor's 'Budget' sub-account(s) or 'Program Income from Operations' account to 'Reserve' account, as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the EPA-approved workplan. Financing agreements for identified Qualified Projects necessitating the transfer have been reviewed by Recipient's counsel for legal sufficiency. This certification is a material*

Docusign Envelope ID: 52903B56-51B0-4E78-9B5E-3BAE2F2ECBAE

Case 1:25-cv-00698-TSC    Document 75-3    Filed 04/15/25    Page 48 of 72
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 301 of 694

*representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

**If an Internal Transfer within the Bank (inter-entity), check the following applicable boxes:**

( ) **Transfer of** $[●] **from Pledgor's 'Budget' sub-account(s) to 'Financial Assistance Subrecipient' as defined in the Grant Agreement.**

**If an External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities), check one of the following boxes:**

( ) **Disbursement of** $[●] **for Predevelopment Activities as defined in the Grant Agreement.**

( ) **Disbursement of** $[●] **for Market-Building Activities as defined in the Grant Agreement.**

**(X) Disbursement of** $185,237.08 **for Program Administration Activities as defined in the Grant Agreement.**

**If an External Transfer outside the Bank (for Financial Assistance Activities), check the following applicable boxes:**

( ) **Disbursement of** $[●] **from Pledgor's 'Budget' sub-account to provide Financial Assistance to Qualified Projects as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the EPA-approved workplan. Financing agreements for identified Qualified Projects necessitating the transfer have been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

( ) **Disbursement of** $[●] **from Pledgor's 'Reserve' account to satisfy a legal obligation to a third party as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this transfer is necessary to execute against the EPA-approved workplan and pay a third party pursuant to a financing agreement that has been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

Capitalized terms in this instruction letter not otherwise defined shall have the same meaning given to them in the Account Control Agreement.

Signature on this Account Direction executed and delivered in electronic format (i.e. "pdf") or by other electronic means (including DocuSign) shall be deemed original signatures with all rights accruing thereto.

Docusign Envelope ID: 52903B56-51B0-4E78-9B5F-8BAE2F2ECBAF

Case 1:25-cv-00698-TSC    Document 75-3    Filed 04/15/25    Page 49 of 72
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 302 of 694

IN WITNESS WHEREOF, the Pledgor has caused this Account Direction to be duly executed and delivered as of the date first written above.

Pledgor:

*William N. Jenkins III*

Authorized Person

# EXHIBIT M

JA807

**EXHIBIT B**

**FORM OF ACCOUNT DIRECTION (CCIA)**
**Pledgor's UEI Number:** ███████████

4/07/2025

Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, NY 10013
E-mail: ███████████

VIA: CitiSFT

RE: Account Control Agreement dated November 1, 2024, among Appalachian Community Capital Corporation (the "**Pledgor**"), United States Environmental Protection Agency (the "**Secured Party**"), and Citibank, N.A. (the "**Bank**")

Pursuant to Section 2 of the above referenced Account Control Agreement, the Pledgor hereby instructs the Bank to disburse a total amount of $315,379.58 funds as per below and as per the attached upload file named ACC_to_ProgramAdmin_04.07.2025:

**Check applicable boxes:**

**( ) Internal Transfer within the Bank (intra-entity).**

**( ) Internal Transfer within the Bank (inter-entity).**

**X External Transfer outside the Bank (for Technical Assistance Services and/or Program Administration Activities).**

**If an Internal Transfer within the Bank (intra-entity), check the following applicable boxes:**

**( ) Transfer of $[●] across Pledgor's 'Budget' sub-accounts, as defined in the Grant Agreement**.

**( ) Transfer of $[●] from Pledgor's 'Program Income from Operations' account to Pledgor's 'Budget' sub-account(s), as defined in the Grant Agreement**.

**If an Internal Transfer within the Bank (inter-entity), check the following applicable boxes:**

**( ) Transfer of $[●] from Pledgor's 'Budget' sub-account(s) to 'Community Lender' for Capitalization Funding as defined in the Grant Agreement.**

**( ) Transfer of $[●] from Pledgor's 'Budget' sub-account(s) to 'Community Lender' for Technical Assistance Subaward as defined in the Grant Agreement.**

**( ) Transfer of $[●]from Pledgor's 'Budget' sub-account(s) to 'Pass-Through Subrecipient' as defined in the Grant Agreement.**

**If an External Transfer outside the Bank (for Technical Assistance Services and/or Program Administration Activities), check the following applicable boxes:**

**( ) Disbursement of $[●] for Technical Assistance Services as defined in the Grant Agreement.**

**X Disbursement of $315,379.58 for Program Administration Activities as defined in the Grant Agreement.**

Capitalized terms in this instruction letter not otherwise defined shall have the same meaning given to them in the Account Control Agreement.

Signature on this Account Direction executed and delivered in electronic format (i.e. "pdf") or by other electronic means (including DocuSign) shall be deemed original signatures with all rights accruing thereto.

IN WITNESS WHEREOF, the Pledgor has caused this Account Direction to be duly executed and delivered as of the date first written above.


Pledgor:


Authorized Person
Donna Gambrell
President and CEO
Appalachian Community Capital

# EXHIBIT N

Docusign Envelope ID: C6E44E70-0AAC-4A82-BB8C-F0FF4C735546

Case 1:25-cv-00698-TSC    Document 75-3    Filed 04/15/25    Page 54 of 72
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 307 of 694

**EXHIBIT B**

**FORM OF ACCOUNT DIRECTION (NCIF)**
**Pledgor's UEI Number:** ███████████

04/08/2025
Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, NY 10013
Attn.: Nerlie Delly
E-mail: ████████████████████████

VIA: CitiSFT
RE: Account Control Agreement dated January 16, 2025, among Power Forward Communities, Inc. (the "**Pledgor**"), United States Environmental Protection Agency (the "**Secured Party**"), and Citibank, N.A. (the "**Bank**")

Pursuant to Section 2 of the above referenced Account Control Agreement, the Pledgor hereby instructs the Bank to disburse a total amount of $1,574,811.00 funds as per below and as per the attached upload file named 20250408 PFC Wire Instructions:

**Check applicable boxes:**

( ) **Internal Transfer within the Bank (intra-entity).**

( ) **Internal Transfer within the Bank (inter-entity).**

(X) **External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities).**

( ) **External Transfer outside the Bank (for Financial Assistance Activities).**

**If an Internal Transfer within the Bank (intra-entity), check the following applicable boxes:**

( ) **Transfer of $[●] across Pledgor's 'Budget' sub-accounts, as defined in the Grant Agreement.**

( ) **Transfer of $[●] from Pledgor's 'Program Income from Operations' account to Pledgor's 'Budget' sub-account(s), as defined in the Grant Agreement.**

( ) **Transfer of $[●] from Pledgor's 'Reserve' account to Pledgor's 'Program Income from Operations' account, as defined in the Grant Agreement.**

( ) **Transfer of $[●] from Pledgor's 'Budget' sub-account(s) or 'Program Income from Operations' account to 'Reserve' account, as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the EPA-approved workplan. Financing agreements for identified Qualified Projects necessitating the transfer have been reviewed by Recipient's counsel for legal sufficiency. This certification is a material*

Docusign Envelope ID: C6E44E70-0AAC-4AB3-BB8C-F9FF1C735546

Case 1:25-cv-00698-TSC    Document 75-3    Filed 04/15/25    Page 55 of 72
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 308 of 694

*representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

**If an Internal Transfer within the Bank (inter-entity), check the following applicable boxes:**

( ) **Transfer of** $[●] **from Pledgor's 'Budget' sub-account(s) to 'Financial Assistance Subrecipient' as defined in the Grant Agreement.**

**If an External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities), check one of the following boxes:**

( ) **Disbursement of** $[●] **for Predevelopment Activities as defined in the Grant Agreement.**

( ) **Disbursement of** $[●] **for Market-Building Activities as defined in the Grant Agreement.**

(**X**) **Disbursement of** $1,574,811.00 **for Program Administration Activities as defined in the Grant Agreement.**

**If an External Transfer outside the Bank (for Financial Assistance Activities), check the following applicable boxes:**

( ) **Disbursement of** $[●] **from Pledgor's 'Budget' sub-account to provide Financial Assistance to Qualified Projects as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the EPA-approved workplan. Financing agreements for identified Qualified Projects necessitating the transfer have been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

( ) **Disbursement of** $[●] **from Pledgor's 'Reserve' account to satisfy a legal obligation to a third party as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this transfer is necessary to execute against the EPA-approved workplan and pay a third party pursuant to a financing agreement that has been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

Capitalized terms in this instruction letter not otherwise defined shall have the same meaning given to them in the Account Control Agreement.

Signature on this Account Direction executed and delivered in electronic format (i.e. "pdf") or by other electronic means (including DocuSign) shall be deemed original signatures with all rights accruing thereto.

Docusign Envelope ID: C6F44E70-9AAC-4A93-BD8C-F0FF1C73F546

Case 1:25-cv-00698-TSC     Document 75-3     Filed 04/15/25     Page 56 of 72
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 309 of 694

IN WITNESS WHEREOF, the Pledgor has caused this Account Direction to be duly executed and delivered as of the date first written above.

Pledgor:

Signed by:

*William N. Jenkins III*

8CBFCDA832AF4C4...

Authorized Person

# EXHIBIT O

Docusign Envelope ID: 6DB23327-7265-4A8B-8143-93BC7C05D041

Case 1:25-cv-00698-TSC    Document 75-3    Filed 04/15/25    Page 58 of 72
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 311 of 694

## FORM OF ACCOUNT DIRECTION (NCIF)
### Pledgor's UEI Number: ███████████

4/9/2025

Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, NY 10013

Attn.: Nerlie Delly

Telephone: ████████████████████

VIA: CitiSFT
RE: Account Control Agreement dated November 1, 2024, among Climate United Fund (the "**Pledgor**"), United States Environmental Protection Agency (the "**Secured Party**"), and Citibank, N.A. (the "**Bank**")

Pursuant to Section 2 of the above referenced Account Control Agreement, the Pledgor hereby instructs the Bank to disburse a total amount of $ 1,747,492.96          funds as per below and as per the attached upload file named : 25_04_09_FA_Client Wire Instruction


**Check applicable boxes:**

( ) **Internal Transfer within the Bank (intra-entity).**

( ) **Internal Transfer within the Bank (inter-entity).**

(x) **External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities).**

( ) **External Transfer outside the Bank (for Financial Assistance Activities).**

**If an Internal Transfer within the Bank (intra-entity), check the following applicable boxes:**

( ) **Transfer of** $                    **across Pledgor's 'Budget' sub-accounts, as defined in the Grant Agreement**.

( ) **Transfer of** $                    **from Pledgor's 'Program Income from Operations' account to Pledgor's 'Budget' sub-account(s), as defined in the Grant Agreement**.

( ) **Transfer of** $                    **from Pledgor's 'Reserve' account to Pledgor's 'Program Income from Operations' account, as defined in the Grant Agreement.**

( ) **Transfer of** $                    **from Pledgor's 'Budget' sub-account(s) or 'Program Income from Operations' account to 'Reserve' account, as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the EPA-approved workplan. Financing agreements for identified Qualified Projects necessitating the transfer have been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

**If an Internal Transfer within the Bank (inter-entity), check the following applicable boxes:**

( ) **Transfer of** $                  **from Pledgor's 'Budget' sub-account(s) to 'Financial Assistance Subrecipient' as defined in the Grant Agreement.**

**If an External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities), check one of the following boxes:**

( ) **Disbursement of** $                  **or Predevelopment Activities as defined in the Grant Agreement.**

( ) **Disbursement of** $                  **for Market-Building Activities as defined in the Grant Agreement.**

(x) **Disbursement of** $ 1,747,492.96 **for Program Administration Activities as defined in the Grant Agreement.**

**If an External Transfer outside the Bank (for Financial Assistance Activities), check the following applicable boxes:**

( ) **Disbursement of** $                  **from Pledgor's 'Budget' sub-account to provide Financial Assistance to Qualified Projects as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the EPA-approved workplan. Financing agreements for identified Qualified Projects necessitating the transfer have been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

( ) **Disbursement of** $                  **from Pledgor's 'Reserve' account to satisfy a legal obligation to a third party as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this transfer is necessary to execute against the EPA-approved workplan and pay a third party pursuant to a financing agreement that has been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

Capitalized terms in this instruction letter not otherwise defined shall have the same meaning given to them in the Account Control Agreement.

Docusign Envelope ID: 6DB23327-7265-4A8B-8142-93BC7C05D041

Signature on this Account Direction executed and delivered in electronic format (i.e. "pdf") or by other electronic means (including DocuSign) shall be deemed original signatures with all rights accruing thereto.

IN WITNESS WHEREOF, the Pledgor has caused this Account Direction to be duly executed and delivered as of the date first written above.

Pledgor:

Signed by:

*Stephanie Seiberg*

DC56F181D6D2415...

Authorized Person

USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 314 of 694

# EXHIBIT P

Docusign Envelope ID: 2EFDD179-8FC1-48CB-BC8D-6ACD58957B01

Case 1:25-cv-00698-TSC   Document 75-3   Filed 04/15/25   Page 63 of 72
USCA Case #25-5122   Document #2114423   Filed: 05/05/2025   Page 316 of 694

# FORM OF ACCOUNT DIRECTION (NCIF)
## Pledgor's UEI Number: ▆▆▆▆▆▆▆

4/10/2025

Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, NY 10013

Attn.: Nerlie Delly

Telephone: ▆▆▆▆▆▆▆

VIA: CitiSFT

RE: Account Control Agreement dated November 1, 2024, among Climate United Fund (the "**Pledgor**"), United States Environmental Protection Agency (the "**Secured Party**"), and Citibank, N.A. (the "**Bank**")

Pursuant to Section 2 of the above referenced Account Control Agreement, the Pledgor hereby instructs the Bank to disburse a total amount of $ 18,505.54           funds as per below and as per the attached upload file named : 25_04_10_FA_Client Wire Instruction

**Check applicable boxes:**

( ) **Internal Transfer within the Bank (intra-entity).**

( ) **Internal Transfer within the Bank (inter-entity).**

(x) **External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities).**

( ) **External Transfer outside the Bank (for Financial Assistance Activities).**

**If an Internal Transfer within the Bank (intra-entity), check the following applicable boxes:**

( ) **Transfer of** $                      **across Pledgor's 'Budget' sub-accounts, as defined in the Grant Agreement**.

( ) **Transfer of** $                   **from Pledgor's 'Program Income from Operations' account to Pledgor's 'Budget' sub-account(s), as defined in the Grant Agreement**.

( ) **Transfer of** $                 **from Pledgor's 'Reserve' account to Pledgor's 'Program Income from Operations' account, as defined in the Grant Agreement.**

( ) **Transfer of** $                   **from Pledgor's 'Budget' sub-account(s) or 'Program Income from Operations' account to 'Reserve' account, as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the EPA-approved workplan. Financing agreements for identified Qualified Projects necessitating the transfer have been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

**If an Internal Transfer within the Bank (inter-entity), check the following applicable boxes:**

( ) **Transfer of** $ _____ **from Pledgor's 'Budget' sub-account(s) to 'Financial Assistance Subrecipient' as defined in the Grant Agreement.**

**If an External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities), check one of the following boxes:**

( ) **Disbursement of** $ _____ **or Predevelopment Activities as defined in the Grant Agreement.**

( ) **Disbursement of** $ _____ **for Market-Building Activities as defined in the Grant Agreement.**

(x) **Disbursement of** $ 18,505.54 **for Program Administration Activities as defined in the Grant Agreement.**

**If an External Transfer outside the Bank (for Financial Assistance Activities), check the following applicable boxes:**

( ) **Disbursement of** $ _____ **from Pledgor's 'Budget' sub-account to provide Financial Assistance to Qualified Projects as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the EPA-approved workplan. Financing agreements for identified Qualified Projects necessitating the transfer have been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

( ) **Disbursement of** $ _____ **from Pledgor's 'Reserve' account to satisfy a legal obligation to a third party as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this transfer is necessary to execute against the EPA-approved workplan and pay a third party pursuant to a financing agreement that has been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

Capitalized terms in this instruction letter not otherwise defined shall have the same meaning given to them in the Account Control Agreement.

Signature on this Account Direction executed and delivered in electronic format (i.e. "pdf") or by other electronic means (including DocuSign) shall be deemed original signatures with all rights accruing thereto.

IN WITNESS WHEREOF, the Pledgor has caused this Account Direction to be duly executed and delivered as of the date first written above.

Pledgor:

Signed by:

DA428BC34F50450...

Authorized Person

# EXHIBIT Q

JA823

**EXHIBIT B**

**FORM OF ACCOUNT DIRECTION (CCIA)**
**Pledgor's UEI Number:** █████████████

April 14, 2025

Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, NY 10013
Attn.: Nerlie Delly
E-mail: ███████████████████████████

VIA: CitiSFT

RE: Account Control Agreement dated November 1, 2024, among Opportunity Finance Network (the "**Pledgor**"), United States Environmental Protection Agency (the "**Secured Party**"), and Citibank, N.A. (the "**Bank**")

Pursuant to Section 2 of the above referenced Account Control Agreement, the Pledgor hereby instructs the Bank to disburse a total amount of $428,390.76 funds as per below and as per the attached upload file named GGRF AT Client Wire Instruction Draw 7.xls:

<u>Check one boxes:</u>

( ) **Internal Transfer within the Bank (intra-entity).**

( ) **Internal Transfer within the Bank (inter-entity).**

(X) **External Transfer outside the Bank (for Technical Assistance Services and/or Program Administration Activities).**

<u>If an Internal Transfer within the Bank (intra-entity), check the following applicable boxes:</u>

( ) **Transfer of $[●]across Pledgor's 'Budget' sub-accounts, as defined in the Grant Agreement.**

( ) **Transfer of $[●] from Pledgor's 'Program Income from Operations' account to Pledgor's 'Budget' sub-account(s), as defined in the Grant Agreement**.

<u>If an Internal Transfer within the Bank (inter-entity), check the following applicable boxes:</u>

( ) **Transfer of $[●] from Pledgor's 'Budget' sub-account(s) to 'Community Lender' for Capitalization Funding as defined in the Grant Agreement.**

( ) **Transfer of $[●] from Pledgor's 'Budget' sub-account(s) to 'Community Lender' for Technical Assistance Subaward as defined in the Grant Agreement.**

<u>If an External Transfer outside the Bank (for Technical Assistance Services and/or Program Administration Activities), check the following applicable boxes:</u>

**(X) Disbursement of $181,615.88 for Technical Assistance Services as defined in the Grant Agreement.**
**(X) Disbursement of $246,774.88 for Program Administration Activities as defined in the Grant Agreement.**

Capitalized terms in this instruction letter not otherwise defined shall have the same meaning given to them in the Account Control Agreement.

Signature on this Account Direction executed and delivered in electronic format (i.e. "pdf") or by other electronic means (including DocuSign) shall be deemed original signatures with all rights accruing thereto.

IN WITNESS WHEREOF, the Pledgor has caused this Account Direction to be duly executed and delivered as of the date first written above.

Pledgor:

Authorized Person

# EXHIBIT R

USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 323 of 694

**FORM OF ACCOUNT DIRECTION (NCIF)**

4/15/2025        **Pledgor's UEI Number:** ▮▮▮▮▮▮▮▮

Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, NY 10013

Attn.: Nerlie Delly

Telephone: ▮▮▮▮▮▮▮▮

VIA: CitiSFT

RE: Account Control Agreement dated November 1, 2024, among Climate United Fund (the "**Pledgor**"), United States Environmental Protection Agency (the "**Secured Party**"), and Citibank, N.A. (the "**Bank**")

Pursuant to Section 2 of the above referenced Account Control Agreement, the Pledgor hereby instructs the Bank to disburse a total amount of $ 234,887.50        funds as per below and as per the attached upload file named : 25_04_14_FA_Client Wire Instruction

**Check applicable boxes:**

( ) **Internal Transfer within the Bank (intra-entity).**

( ) **Internal Transfer within the Bank (inter-entity).**

(x) **External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities).**

( ) **External Transfer outside the Bank (for Financial Assistance Activities).**

**If an Internal Transfer within the Bank (intra-entity), check the following applicable boxes:**

( ) **Transfer of $**        across Pledgor's 'Budget' sub-accounts, as defined in the **Grant Agreement**.

( ) **Transfer of $**        from Pledgor's 'Program Income from Operations' account to Pledgor's 'Budget' sub-account(s), as defined in the **Grant Agreement**.

( ) **Transfer of $**        from Pledgor's 'Reserve' account to Pledgor's 'Program Income from Operations' account, as defined in the **Grant Agreement**.

( ) **Transfer of $**        from Pledgor's 'Budget' sub-account(s) or 'Program Income from Operations' account to 'Reserve' account, as defined in the **Grant Agreement**. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:

USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 324 of 694

*"The amount of this expenditure is necessary to execute against the EPA-approved workplan. Financing agreements for identified Qualified Projects necessitating the transfer have been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

**If an Internal Transfer within the Bank (inter-entity), check the following applicable boxes:**

**( ) Transfer of $                          from Pledgor's 'Budget' sub-account(s) to 'Financial Assistance Subrecipient' as defined in the Grant Agreement.**

**If an External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities), check one of the following boxes:**

**( ) Disbursement of $                     or Predevelopment Activities as defined in the Grant Agreement.**

**( ) Disbursement of $                     for Market-Building Activities as defined in the Grant Agreement.**

**(x) Disbursement of $ 234,887.50          for Program Administration Activities as defined in the Grant Agreement.**

**If an External Transfer outside the Bank (for Financial Assistance Activities), check the following applicable boxes:**

**( ) Disbursement of $                         from Pledgor's 'Budget' sub-account to provide Financial Assistance to Qualified Projects as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the EPA-approved workplan. Financing agreements for identified Qualified Projects necessitating the transfer have been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

**( ) Disbursement of $                         from Pledgor's 'Reserve' account to satisfy a legal obligation to a third party as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this transfer is necessary to execute against the EPA-approved workplan and pay a third party pursuant to a financing agreement that has been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

Capitalized terms in this instruction letter not otherwise defined shall have the same meaning given to them in the Account Control Agreement.

**JA828**

Signature on this Account Direction executed and delivered in electronic format (i.e. "pdf") or by other electronic means (including DocuSign) shall be deemed original signatures with all rights accruing thereto.

IN WITNESS WHEREOF, the Pledgor has caused this Account Direction to be duly executed and delivered as of the date first written above.

Pledgor:

Signed by:

Beth Bafford

DA428BC34F50450

Authorized Person

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CLIMATE UNITED FUND, et al.,     .  No. 25-cv-0698 (TSC)
                              .  No. 25-cv-0735 (TSC)
         Plaintiffs,      .  No. 25-cv-0762 (TSC)
                              .  No. 25-cv-0820 (TSC)
    v.                      .
                              .
CITIBANK, N.A., et al.,       .  Washington, D.C.
                              .  Wednesday, April 2, 2025
         Defendants.      .  12:08 p.m.
. . . . . . . . . . . . . . . . . .

PRELIMINARY INJUNCTION HEARING
BEFORE THE HONORABLE TANYA S. CHUTKAN
UNITED STATES DISTRICT JUDGE

__APPEARANCES__:

For Plaintiff              ADAM G. UNIKOWSKY, ESQ.
Climate United Fund:      Jenner & Block LLC
                             1099 New York Avenue, NW
                             Suite 900
                             Washington, DC 20001

For Plaintiff Coalition     VINCENT LEVY, ESQ.
for Green Capital:        Holwell Shuster & Goldberg LLP
                             425 Lexington Avenue
                             14th Floor
                             New York, NY 10017

For Plaintiff Power         BETH C. NEITZEL, ESQ.
Forward Communities:      Foley Hoag LLP
                             155 Seaport Boulevard
                             Suite 1600
                             Boston, MA 02210

For Plaintiff              MEGHAN STRONG, ESQ.
California Infrastructure   California Department of Justice
and Economic Bank:        455 Golden Gate Avenue
                             Suite 1100
                             San Francisco, CA 94102

```
For Defendant Citibank:        KENNETH WINN ALLEN, ESQ.
                               Kirkland & Ellis LLP
                               1301 Pennsylvania Avenue NW
                               Washington, DC 20004

For Defendant EPA:             MARCUS S. SACKS, ESQ.
                               U.S. Department of Justice
                               P.O. Box 875
                               Ben Franklin Station
                               Washington, DC 20044

Court Reporter:                BRYAN A. WAYNE, RPR, CRR
                               U.S. Courthouse, Room 4704-A
                               333 Constitution Avenue NW
                               Washington, DC 20001
```

**Proceedings reported by stenotype shorthand.**
**Transcript produced by computer-aided transcription.**

```
 1                        P R O C E E D I N G S

 2          THE DEPUTY CLERK:  Good afternoon, Your Honor.  We're

 3     on record in civil case 25-698, Climate United Fund versus

 4     Citibank, N.A., et al.  Starting with plaintiffs' counsel,

 5     please approach the podium and state your appearance for the

 6     record.

 7          MR. UNIKOWSKY:  My name is Adam Unikowsky, and I

 8     represent plaintiff Climate United.

 9          THE COURT:  Good afternoon.

10          MR. LEVY:  Good afternoon, Your Honor.  Vincent Levy

11     on behalf of Coalition for Green Capital.

12          THE COURT:  All right.  Good afternoon.

13          MS. NEITZEL:  Good afternoon.  Beth Neitzel for Power

14     Forward Communities.

15          THE COURT:  Okay.

16          MS. STRONG:  Good afternoon, Your Honor.  Meghan Strong

17     on behalf of the California Infrastructure and Economic

18     Development Bank.  I'm also here on behalf of the other state

19     green bank plaintiffs in the 820 matter.

20          THE COURT:  All right.  Good afternoon.  Mr. Sacks.

21          MR. SACKS:  Good afternoon, Your Honor.  Mark Sacks,

22     Department of Justice on behalf of the federal defendants.

23     My colleague Kevin VanLandingham is here with me as well.

24          THE COURT:  Good afternoon.

25          MR. ALLEN:  Good afternoon, Your Honor.  Kenneth Winn
```

1    Allen on behalf of Citibank.

2         THE COURT:  Good afternoon.  It's Winn Allen.  Okay.

3    Mr. Sacks, I'm not seeing your name on here.  All right.

4    I know who you are.

5         Okay.  Just give me one minute, please.

6         Before we get started, my understanding is that the

7    plaintiffs in 25-CV-93, withdrew their motion for temporary

8    restraining order this morning.  So did you all get that

9    filing?  Okay.  I'm just letting you know.

10         All right.  So we're on the record here for a hearing on

11    a motion for preliminary injunction in the consolidated case

12    25-CV-698.  The parties in Climate United Fund versus

13    Citibank, Coalition For Green Capital versus Citibank, and

14    Power Forward Communities versus Citibank consented to

15    consolidation at the TRO hearing on March 17.

16         We'll also hear arguments from the parties in California

17    Infrastructure and Economic Development Bank versus Citibank,

18    who's also consolidated after the parties agreed or at least

19    did not object to consolidation on March 25.

20         I won't repeat the extensive background in this case.

21    As we all know by now, these cases involve the EPA's grant

22    funding for certain clean energy projects that were awarded to

23    plaintiffs and subgrantees in April 2024 under the National

24    Clean Investment Fund, NCIF, program.  Since mid-February of

25    this year plaintiffs have been unable to draw on their grant

1     award accounts which are held in Citibank accounts.

2         On March 11, a day before I held the first hearing in the TRO

3     in this matter, EPA sent a letter of termination to all

4     plaintiffs indicating that EPA was terminating their grants.

5         On March 12 and March 15, I held hearings on the motion for

6     TROs, and on March 18 I granted plaintiffs' request and entered

7     a TRO, though narrower than plaintiffs had requested, simply to

8     preserve the status quo ante by ordering that Citibank leave the

9     funds in the account and not transfer them to the Treasury or

10    anyplace else.

11        Now, as to plaintiffs' motion for preliminary injunction,

12    plaintiffs ask that I first enjoin EPA Administrator Lee Zeldin

13    and Deputy Administrator McIntosh and others from (1)

14    effectuating EPA's notice of termination as to each plaintiff;

15    (2) from unlawfully suspending, terminating or limiting access

16    to plaintiffs' grant awards, except as permitted in accordance

17    with the applicable Account Control Agreement -- that's the

18    ACA -- with Citibank, the grant awards, and applicable law; and

19    3, from directly or indirectly impeding Citibank from disbursing

20    the funds or causing Citibank to deny, obstruct, delay or

21    otherwise limit access to the funds in accounts established in

22    connection with plaintiffs' grants, including funds and accounts

23    established by plaintiffs, except as permitted under the terms

24    of the applicable ACA and applicable law.

25        Plaintiffs also ask the court to enjoin Citibank from (1)

1    violating its obligations under each plaintiff's ACA, including

2    by failing to process, disburse and release funds in accounts

3    established in connection with each plaintiff's grant, including

4    funds in accounts established by plaintiffs' subgrantees in

5    accordance with the applicable ACA, both with respect to

6    requests already submitted and future requests; and (2) from

7    transferring or otherwise moving funds out of accounts

8    established in connection with plaintiffs' grants, including

9    funds and accounts established by plaintiffs' subgrantees except

10   at the direction of plaintiffs or plaintiffs' subgrantees as

11   permitted in the applicable ACA.

12       They also ask that the preliminary injunction expressly cover

13   plaintiffs' subgrants.

14       EPA defendants argue that relief must be narrowly tailored

15   and the scope of relief should not extend beyond the Court's

16   TRO.  Specifically, any relief should be limited to the

17   plaintiffs who have shown imminent and irreparable harm based

18   on the termination letter, not any other conduct, and if a

19   preliminary injunction is issued that allows plaintiffs to

20   draw down on their accounts, EPA asks that the Court require

21   plaintiffs to post a bond.

22       As to the case originally filed as 25-CV-820, plaintiffs in

23   those cases -- in that case are state green banks, that is

24   public or quasi public entities that provide crucial financial

25   services to pollution-reducing projects in their states.  These

1    subgrantee plaintiffs, as I will refer to them, sued the same

2    defendants and have moved for the same preliminary injunction

3    based on the same events.  And these subgrantee plaintiffs ask

4    that I convert the relief extended in the TRO in CV-698 to a

5    preliminary injunction that lasts the duration of this action;

6    that I further enjoin Citibank from violating its obligations

7    to disburse funds in response to valid, ordinary course

8    disbursement instructions from plaintiffs; and 3, that I order

9    defendants to file a status report within 24 hours of the

10   issuance of any preliminary injunction confirming their

11   compliance with the order.

12      So I've read the briefing.  What I really wanted to do today

13   is sort of take each topic in turn, jurisdiction, irreparable

14   harm, likelihood of success, etc., because I do have some

15   specific questions as to each category.  Then we'll move on to

16   the subgrantee plaintiffs and hear from defendants.

17      Let me ask you before I begin, Mr. Sacks, I had some

18   questions for you regarding the letter of termination, and I

19   asked you at the last two hearings we had whether the government

20   had further information to proffer regarding the reasons for

21   termination.  Do you have any information to supplement the

22   record at this point?

23            MR. SACKS:  We do not, Your Honor.

24            THE COURT:  All right.  So we're still moving -- where

25   we are today is the record of -- reasons for termination that

1    we had at the previous two prior hearings.  Is that correct?

2    There's been no -- has there been an investigation opened?

3    Has there been a grand jury empaneled, anything like that?

4         MR. SACKS:  I'm not aware of any further information on

5    that subject.  We did file a second declaration of Mr. Amidon

6    with our opposition to the PI here.  That's subsequent to the

7    arguments we've had previously.  But that doesn't provide new

8    justifications --

9         THE COURT:  No, it doesn't.

10        MR. SACKS:  -- for the termination; it simply expands

11   upon I believe what the bases were.

12        THE COURT:  Okay.

13     All right.  We all know the standard for a preliminary

14   injunction.  There has to be a likelihood of success on the

15   merits, there has to be irreparable harm, the balance of

16   equities have to tip in favor of the movant, and the

17   injunction has to be in the public interest.

18     So let me start with jurisdiction because the government's

19   position is and has been that this case is a breach of

20   contract case and under the Tucker Act this court has no

21   jurisdiction to hear this case; it should be brought before

22   the Court of Federal Claims.

23     Under the Tucker Act, the Court of Federal Claims has

24   exclusive jurisdiction over certain monetary claims against

25   the government.  A court must decide if the action is at its

essence a contract claim, and whether that is the case depends both on the source of the rights upon which the plaintiff bases its claims, and on the type of relief sought.  These are known as the Megapulse factors from *Megapulse v. Lewis*, 672 F.2d 959, a D.C. Circuit case.

So the plaintiffs have argued that their claims are not in essence breach of contract claims.  The source of rights argument is that plaintiffs' claims are based in the Constitution, federal statutes and federal regulations, not contract terms, and they do not seek money judgment or specific performance of a contract.  They seek to hold unlawful and set aside agency action from which vacatur is the normal remedy.

The defendants argue that plaintiffs are improperly challenging funding decisions committed to agency discretion and that plaintiffs seek to deny EPA's inherent contractual rights to breach, like any contracting party.

And plaintiffs' own arguments demonstrate that their source of rights stem from their agreements, that the Constitution affords no right to receive or perform a grant, and absent agreements plaintiffs would have no right to claim NCIF funds.  Their source of rights lies in the fact that they're grant recipients and therefore contracting parties.

Defendants also argue that the regulations that they cite do not afford plaintiffs individual rights that would exist

1   independent of their contractual rights or separate them from

2   their status as parties to the grant agreements.

3       They also argue that the type of relief sought also

4   indicates that the court has no jurisdiction and that the

5   parties have disagreement over whether as a matter of contract

6   law, the terminations comported with the terms of the

7   agreement.

8       So at the outset, it's clear that there are agreements

9   and a contract involved.  I think we can all agree that just

10  because a contract is involved doesn't mean that these are

11  contractual claims that will automatically strip this court

12  of jurisdiction.

13      As the parties have identified, whether this is a true

14  contract claim that belongs in the Court of Federal Claims

15  hinges on the Megapulse factors, so I'm going to ask

16  plaintiffs and the EPA defendants to speak briefly on that.

17      So what does the Court need to look to when evaluating

18  your claims?  Do I need to look at the contract, to the grant

19  agreements, the notice of awards, the statutes, the

20  regulations, what?

21      MR. LEVY:  For that Megapulse factor, the primary

22  source of rights to which the Court must look are the

23  regulations that we cite, statutes that we cite in our brief,

24  including the APA and the IRA, and the Constitution of the

25  United States.  Those are the sources of our rights.  The D.C.

1    Circuit has made very clear that the fact that a court may

2    have reference to a contract as part of that adjudication --

3    I apologize.  The fact that a court may have to refer to a

4    contract does not turn the claim into --

5          THE COURT:  You're referring to *Crowley*.

6          MR. LEVY:  Correct, Your Honor.  And only one of our

7    arguments relies in any respect on the contract, and that's

8    one of the regs that we cite, which states that EPA may cancel

9    a grant for policy changes only if that is in the terms and

10    conditions of the contract.  That's the only claim that in any

11    way refers to a contract.

12       And then there's the second aspect of the test, of course,

13    which is the type of relief sought.  We are not seeking the

14    sort of relief that is in any way an order of money damages --

15          THE COURT:  Well, that's one of my questions.  Why is

16    this not an ask for money damages or specific performance from

17    a contract?

18          MR. LEVY:  The fact that money may become available as

19    a feature or as a function --

20          THE COURT:  It's all about the money.  I mean, this

21    case is all about the fact that Citibank has money that you

22    believe is due to you under a contract, and they're not giving

23    you the money.  And what you're asking me to do is order

24    Citibank to give you the money.  At its most basic terms.

25          MR. LEVY:  So we have a contract against Citi under the

1   ACA.  That is not subject to jurisdiction or the Tucker Act.

2   Citi is a private party.

3        THE COURT:  Right.  But Citi's position is we're not

4   doing anything until the government tells us it's okay, or a

5   court tells us it's okay.

6        MR. LEVY:  Right.  And my colleague will address the

7   Citi arguments more directly, but there is a private contract

8   between two private parties, Citi and the plaintiffs, and it

9   has a merger clause, integration clause that says all the

10  obligations are there.  It's a mine-run commercial contract.

11  There's no argument that the Tucker Act preempts that claim.

12  So I think the government's argument is that because the

13  court may have to refer to the terms and conditions of the

14  grant awards, that turns the claims into a contract claim.  It

15  does not.

16  And in terms of the relief being sought, I think the

17  direction of the D.C. Circuit and the Supreme Court, including

18  in *Bowen*, make very clear that an award of specific relief is

19  not a money damages award even if the effect of that is to

20  have money sent.  And that's not what's happening here because

21  the money is already in our accounts at Citi.  And that is in

22  fact a key distinguishing factor between our case and the

23  *Catholic Bishops* case, which is the principal authority that

24  my friends rely upon.

25  The court there said that the dispositive factor was the

1    second *Megapulse* criterion because the plaintiffs were seeking

2    an order requiring payment.  And that's not what's happening

3    here, because the money is in our accounts already, and the

4    relief we are seeking is an order preliminarily invalidating

5    the termination of this grant program and enjoining the

6    impairment with a private contract with Citi.  It's nothing to

7    do with -- it's not a contract claim that challenges

8    government contracts or requires the government to turn money

9    over to us.  The money was disbursed, it belongs to us.

10        There was another key distinguishing factor between our

11    case and *Catholic Bishops,* which is in *Catholic Bishops* and in

12    *Ingersoll-Rand* there were termination for convenience clauses

13    in the contract, and the circuit in *Ingersoll-Rand* said that

14    was a key issue because it was possible to conceive of the

15    entire case as a contract dispute.  That is not the case here.

16        And in fact, the government does not at all rely on the

17    terms of the contract to justify termination.  Although

18    initially in the notice of termination it relied upon waste,

19    fraud, abuse, very generically, in the PI opposition brief it

20    has said very clearly that it does not allege a violation by

21    the plaintiffs of terms and conditions, but that instead it is

22    relying on the right to change its mind as a matter of policy.

23        THE COURT:  Well, can EPA terminate the awards if they

24    no longer effectuate agency priorities?  That's a popular

25    phrase these days.

1           MR. LEVY:  Our awards cannot be terminated on that

2      ground under the applicable regulations because -- and my

3      friend Ms. Neitzel will address that more clearly.  But there

4      was a regulation that said very clearly that that sort of

5      termination can occur only if it's in the terms and condition,

6      and that's as a feature of regulatory law which was in place

7      at the time these grants were awarded.

8         And so we don't agree that that's a possibility in these

9      grants.  That is in fact the distinguishing factor with

10     *Catholic Bishops.*  We think given their heavy reliance on

11     that case and the fact that there is an order on that issue

12     on appeal, that it would be helpful to the parties and the

13     circuit for the Court to expressly distinguish that case.

14          THE COURT:  All right.  Mr. Sacks, do you want to --

15     did I let you finish, Mr. Levy?

16          MR. LEVY:  I'm --

17          THE COURT:  I'll let you respond to him, yes.

18        Mr. Sacks, let me just ask you as a matter of procedure,

19     we were originally scheduled to have this first TRO hearing on

20     March 11.  Government asked for another day.  Plaintiffs

21     agreed.  I agreed.  And in that day, that 24 hours, EPA

22     terminated the contracts.  If we had had the hearing on March

23     11, before the termination letter, would I have jurisdiction

24     over these claims?

25          MR. SACKS:  No, Your Honor, you would not.

```
 1              THE COURT:  Why?
 2              MR. SACKS:  For the same reasons that we've been
 3     discussing already.
 4              THE COURT:  So what legal effect does the termination
 5     letter have?
 6              MR. SACKS:  The legal effect of the termination letter
 7     is --
 8              THE COURT:  As far as this case is concerned.
 9              MR. SACKS:  Well, as far as jurisdiction, it has no
10     effect on this court's jurisdiction.
11              THE COURT:  Okay.
12              MR. SACKS:  So I want to start if I could with the
13     statement my friend finished with, I believe, which is
14     essentially a statement that EPA could not terminate these
15     awards if they didn't comply with the terms and conditions
16     within the contract.  They would be forever bound to continue
17     performing the contract unless they can meet those specific
18     terms within the contract.
19              THE COURT:  I mean, I think that agencies terminate
20     contracts all the time, but I think what the plaintiffs are
21     arguing is when they do that, they have to comply with the
22     rules for termination, and that EPA hasn't done that in this
23     case.  What you're saying is the termination doesn't make a
24     difference in my jurisdiction.
25              MR. SACKS:  It doesn't, Your Honor.  The difference
```

1    is whether that termination complied with the contract, which

2    gave EPA the right to do certain things, or it didn't, and

3    arguably becomes a breach of contract.

4        THE COURT:  So let's pretend for a moment that it's

5    March 11, not the 12th.  You haven't issued your letter of

6    termination.  Why don't I have jurisdiction?

7        MR. SACKS:  You don't have jurisdiction because the

8    claims brought by the plaintiffs at that point, which I

9    believe was that the alleged freeze of the money was violating

10   the terms and conditions of the contract or violating

11   regulations or violating the Constitution, all of those things

12   were sourced -- the source of the right was their -- the

13   contract and their desire to have access to funds under the

14   contract.

15       THE COURT:  Plaintiffs bring APA claims arguing that,

16   in part, there's a -- they're entitled to certain funds under

17   grants and agreements they've entered into with EPA, and EPA

18   can't unilaterally tell Citibank not to turn over the funds in

19   those entities' accounts just because they don't like the

20   program anymore.

21      And so it's not a contractual dispute, plaintiffs argue;

22   it's arbitrary and capricious and contrary to law dispute.

23   And that would be the case whether, as you say, if you're

24   saying that the existence of the termination letter doesn't

25   really affect my jurisdiction, why wouldn't that be an

1    argument that takes it out from under the Tucker Act?

2         MR. SACKS:  Because we still come back to the *Crowley*

3    and *Megapulse* tests, and we have to look at the source of the

4    right and the remedy sought.  And the source of the right, I

5    certainly understand they believe the APA and the regulations

6    that govern how EPA operates the grants are a separate source

7    of right, apart from contract, that gives them the right to

8    pursue an APA claim in this court and gives this court

9    jurisdiction over that --

10        THE COURT:  So you're saying on March 11 it was a

11   contract dispute.  March 12 it was a contract dispute.

12   The existence of the termination letter doesn't alter that.

13        MR. SACKS:  100 percent, Your Honor.

14        THE COURT:  Okay.  So plaintiffs filed suit and asked

15   for TRO because the government's withholding grant money.

16   You've already answered my question with regard to whether

17   the letter strips the court of its jurisdiction.  But does

18   the termination letter cabin my review under the APA?

19        MR. SACKS:  Well, again, Your Honor, I think there

20   is no APA review permitted here because of the source of the

21   right and the remedy sought.

22        THE COURT:  When is an action by the government over

23   grant awards reviewable by this court?  Does this court ever

24   have jurisdiction over the termination of -- over grant

25   awards?

1          MR. SACKS:  It again would depend on the source of the

2     right and the remedy sought.  When you look at *Crowley* and

3     *Megapulse* and you analyze the facts of those cases, those have

4     very different sources of rights from the contracts at issue.

5     When you look at this case, the legal principles of those

6     cases apply here a hundred percent.

7          THE COURT:  How do you respond to Mr. Levy's argument

8     with regard to the nature of the contract at issue in *Catholic*

9     *Bishops*?

10          MR. SACKS:  Sure.  So Mr. Levy brought up two

11     distinctions he believed make this case different from

12     *Catholic Bishops*.  So if I could address each of those in

13     turn --

14          THE COURT:  Yes.

15          MR. SACKS:  -- I would appreciate the opportunity to

16     do so.  The first I believe he said was that the difference

17     here is that the money is at Citibank in the accounts of the

18     plaintiffs and the money is not in the federal treasury, and

19     that's a difference.

20        I would argue that's a distinction without a difference.

21     The fact that the money is in Citibank as a financial agent

22     does not mean the plaintiffs own this money in a way that

23     other grantees who have to get reimbursed out of the federal

24     treasury don't own the money.

25          THE COURT:  And what authority did EPA have to instruct

1    Citibank not to release the funds?

2       MR. SACKS:  Their authority under the financial agent

3    agreements.  But again, the question that's important here I

4    think from the plaintiffs' perspective is whether the fact of

5    the money is with Citibank gives them more rights than another

6    grantee, the grantees in the *Catholic Bishops* case.  And it

7    does not.  That money is still government federal funds until

8    plaintiffs perform under the contract, under the grant, and

9    have the right to utilize that money.  With the grant

10   terminated, they don't have those rights anymore.

11      The contracts themselves say if the contract is terminated,

12   any remaining money will be deobligated from the plaintiff,

13   from the grantee, and reobligated again by the agency.  That's

14   an express understanding in the contract; this money can be

15   taken away at any point at which EPA terminates.

16      So the money --

17         THE COURT:  So if the government awards a grant and

18   enters into a contract with a party but midway through decides

19   to rescind the grant, do I have jurisdiction under the APA?

20         MR. SACKS:  No, Your Honor, you do not.

21         THE COURT:  And if the government awards a grant but

22   does not enter into a contract with a party and later decides

23   to rescind the grant, is that reviewable by this court?

24         MR. SACKS:  That's a question I'd want to consider

25   further, Your Honor.  If there's no existing contract there,

1     then the source of right analysis may be different.  I don't

2     know the answer to that.

3          THE COURT:  Thank you.  Continue.

4          MR. SACKS:  The second distinction that my friend

5     raised, I believe, is that in the Catholic Bishops contracts,

6     termination for convenience or for agency priorities is

7     specifically included in the grant documents, whereas here

8     of course it is not.  Again, that is a distinction without a

9     difference, because the question still is -- I mean, both

10    grants have a termination clause.  And both times the

11    government terminated the grants.

12         The question at issue is are those terminations consistent

13    with what the contract gave the parties rights to or

14    inconsistent, making it breach?  Whether in one case it's a

15    lawful termination under the contract, and in another, perhaps

16    here, it may not be -- again, we're not conceding that, but

17    let's say for a second that it's not -- that doesn't change

18    the source of the right.  The right is the grant agreements;

19    the termination clause is within those agreements.

20         And both of those agreements, as you know, incorporate the

21    regulation that I believe the plaintiffs place most of their

22    weight on, 200.340, as constraining the EPA's rights to

23    terminate here.

24         THE COURT:  But plaintiffs cite not just to the

25    contract -- in fact, the contract is the least of it.  They

1    cite to various regulations that they contend were violated,

2    including the Constitution.  Do these regulations -- I mean,

3    the Constitution always applies obviously, but do the

4    regulations apply to this dispute?

5         MR. SACKS:  The regulations apply to the dispute in the

6    sense that they're incorporated into the contract and

7    potentially give the plaintiffs contractual rights.

8         THE COURT:  So are you saying that the contract can

9    supersede the authority of, for example, the APA?  That the

10   APA doesn't apply if the contract sort of talks about rights

11   to terminate?

12        MR. SACKS:  Well, the APA doesn't apply if the relief

13   that the plaintiffs seek is impliedly forbidden by another

14   statutory provision, right?  And that's what the Tucker Act

15   does here.

16     So if -- again, we are not here today to say that all cases

17   involving grants or contracts can only go to the Court of

18   Federal Claims.  We're here today to talk about these specific

19   documents before us and the source of rights in this case.

20   And I understand the arguments about the appropriations

21   clause, I understand the arguments about due process.  I

22   understand the arguments about the Inflation Reduction Act and

23   7434, but there are no rights within the Constitution or the

24   Inflation Reduction Act that give these plaintiffs rights.

25        What gives them rights is they signed a grant agreement

1    with the United States that incorporated various regulations

2    and set the terms of the agreement between the parties.

3    THE COURT:  But doesn't the agency's decision, not just

4    in termination but in ordering -- because this claim was

5    brought before the agency terminated -- in ordering Citibank

6    not to release the plaintiffs' funds from their accounts, is

7    that decision not subject to APA review under arbitrary and

8    capricious or contrary to law?  It's all contractual?

9    MR. SACKS:  Again, because the source of their right,

10    their desire to have those funds and not have them stayed or

11    not have them terminated, their source of right for that is

12    their contractual agreement with the government to run their

13    program.

14    THE COURT:  Is there a difference here between money

15    damages and the relief that plaintiffs are seeking?

16    MR. SACKS:  I don't think the Court has to answer that

17    question because what the plaintiffs are asking for is --

18    THE COURT:  I'm actually asking you to answer that

19    question.

20    MR. SACKS:  Well, I don't think we need to go as far as

21    saying -- let's put it this way:  Yes, they're seeking money,

22    certainly.  Whether you classify that as monetary damages or

23    not is a separate question.  What they are seeking is specific

24    performance.  And with all due respect, I understand but they

25    are dressing up their claims for compliance with regulations,

1    compliance with the statute.  They want one thing here: they

2    want to perform their contracts and get the money they were

3    promised to do so.  That's clearly what they want.  That is

4    specific performance.

5         Even taking the regulation at issue, 200.340, what they say

6    I believe is that that regulation says -- the regulation

7    begins by saying there's various bases on which the government

8    may terminate agreements, one of them being agency priorities.

9    But then it says that the government needs to make sure that

10   it puts in a grant agreement the bases it's going to rely upon

11   for termination, right?  And that provision was part of the

12   initial contract and the amended contract here, right?  We're

13   not saying that it isn't.  We know that.

14        And so the question then becomes, if that's a regulatory

15   violation, our failure to do that, what does this court do to

16   correct that, right?  It's not going to issue a monetary award

17   because it can't.  What's it going to do to correct that?

18   It's going to go tell the agency, okay, under 340, go back now

19   and correct that.  If you want to terminate for that basis,

20   put it into the grant agreement.  But we can't do that because

21   it's a bilateral contract and we can't -- sorry.

22        So how is the court going to correct that error?  They're

23   going to ask us to, under 340, go back and include those

24   grounds for termination into an amended version of the

25   agreement that the plaintiffs will not agree to?  I use that

1    as an example to show why there is no real APA relief to offer

2    here.  The only relief this court can offer is to tell the

3    government you cannot terminate and you must perform the

4    contract.  And unfortunately, that's not relief this court has

5    the authority or jurisdiction to provide.

6         THE COURT:  According to EPA's acting CFO Gregg Treml,

7    who provided a declaration in this case, he said EPA had never

8    used a financial agent in connection with a grant program

9    prior to 2024, and EPA's use of a financial agent in

10   connection with the GGRF program was the first use of a

11   financial agent for a non-exchange grant program administered

12   by the federal government.  That's in his declaration which is

13   ECF 49-5.

14      Has the government or other agencies, if you know, used a

15   financial agent in connection with a grant program before?

16        MR. SACKS:  From conversations I've had with Treasury,

17   I think the answer to that is yes, we've used financial agents

18   before.  I don't believe in this exact context, but I can't

19   give the Court any more information than that.

20        THE COURT:  What mechanism, if not a contract, did EPA

21   previously use in awarding grants?

22        MR. SACKS:  I don't believe EPA has arguably made a

23   large number of grants.  I'm just not sure about that, Your

24   Honor.  But I would assume what they did -- I think the more

25   traditional means of grant-making is that the money remains in

1      the Treasury and then grantees submit requests for

2      reimbursement to obtain the funds that they've utilized.

3          THE COURT:  Last year in *Loper Bright Enterprises* the

4      Supreme Court held that federal courts must fulfill their

5      obligations under the APA to independently identify and

6      respect delegations of authority, police the outer statutory

7      boundaries of those delegations, and ensure that agencies

8      exercise their discretion consistent with the APA.

9          So how does *Loper Bright* affect your jurisdictional

10     argument?

11         MR. SACKS:  It doesn't, Your Honor.  To the best of my

12     knowledge, *Loper Bright* would apply here if this court

13     considered this to be an APA case and the question was about

14     whether the EPA interpreted and complied with 7434, the

15     Greenhouse Gas Reduction Fund statute.  *Loper Bright* what I

16     believe does is says that the agency no longer is permitted to

17     have deference given to it in its interpretation of the

18     statute; that a court makes its own independent determination.

19         But there is no issue before the court here about whether

20     EPA correctly interpreted and fulfilled the obligations of

21     7434.  It's a command to give grants, it gives discretion to

22     the administrator, and to do it by a certain date.  Those are

23     the only commands from Congress within that statute.  I don't

24     think there's any dispute EPA has done that.

25         There's a dispute now about what happens if the money is

1    deobligated, but that's not addressed by the statute.  EPA

2    complied with the statute, there's no issue with that.

3        I don't think *Loper Bright* applies or changes the analysis

4    under what we call -- what used to be the step two of *Chevron*,

5    I think, which is the arbitrary and capricious analysis.  I

6    don't believe it changes this court's legal analysis of those

7    claims in this case.  But again, we don't think the Court

8    should be conducting that analysis.

9        THE COURT:  All right.  I'll let you finish and then

10    I'll have Mr. Levy respond.

11        MR. SACKS:  We certainly understand the plaintiffs'

12    desire for relief, and we understand the Court's desire to

13    potentially provide them some relief, but the only way the

14    Court can do that is if it applies the tests from *Crowley* and

15    *Megapulse* and finds the source of right is something other

16    than --

17        THE COURT:  I don't have any desire to give anybody any

18    relief.  My desire is to make sure that the law is complied

19    with, and obviously to assure myself of my own jurisdiction to

20    do so.

21        MR. SACKS:  I'm sorry.  I just meant the desire to hear

22    the plaintiffs and if they're entitled to help --

23        THE COURT:  I'm here every day.  That's what I do.

24        MR. SACKS:  But what we must do and what the Court has

25    done is look at the tests from *Megapulse* and apply those

1    firmly to the facts before it.  And again, I think if you read

2    those cases and the facts of those cases and see how the court

3    applied the tests there and read the other cases we've cited

4    in our briefs like *Ingersoll-Rand*, for example, you'll see

5    very quickly that there's kind of a line of what is a contract

6    case and what is not, and we would submit that this case,

7    these facts, these documents, fall well on the side of the

8    contract line.  Thank you.

9        THE COURT:  Thank you, Mr. Sacks.

10    Mr. Levy.

11        MR. LEVY:  So I guess I'll begin by just remarking upon

12    the concession -- or the contention that the termination

13    letters --

14        THE COURT:  Doesn't change anything.

15        MR. LEVY:  That's pretty remarkable in terms of both

16    factors in the analysis.  And that is another distinguishing

17    factor, frankly, with *Catholic Bishops* case that is pretty

18    key.

19      You know, my friend declined to say whether -- he said it

20    didn't matter whether the award being sought is effectively a

21    money damages award.  That is in fact the key question in the

22    second factor and it is critical here.  It was in fact

23    critical in *Megapulse*.  And the circuit and the Supreme Court

24    have made clear that the fact that an order enjoining

25    government action may result in money becoming available as a

1    function of their regulatory or statutory scheme does not turn

2    the order into a prohibited order for damages.

3        So here, of course, the money is in our account, it belongs

4    to the plaintiffs, and it is program income.  So we just don't

5    agree --

6        THE COURT:  How do you respond to Mr. Sacks's argument

7    that the relief you're asking for means that EPA would be

8    forever bound in a contract like this?

9        MR. LEVY:  Well, there are terms and conditions in the

10   contract, so we're not saying that.  What we're saying is that

11   based on the record before the court for the APA claim, that

12   the agency has acted arbitrarily and capriciously and violated

13   its regulations.  We're saying that the process that EPA and

14   the government undertook here violated the Due Process Clause.

15   We're saying it violated the Appropriations Clause.  We're not

16   saying never in a million years could these contracts be

17   terminated.

18       THE COURT:  What about his argument that without this

19   contract you wouldn't have any claims at all?

20       MR. LEVY:  Well, I think that proves too much because

21   it -- there's several cases including by this circuit and the

22   Supreme Court that concerned grants, grant awards, and the

23   court made clear those could be considered, including in

24   *Bowen*.  There were grants there.  Clearly if the grants

25   weren't there, there wouldn't be a dispute.  The fact that

1    there are grants isn't the question.  The question is what

2    rights are being invoked, and the rights that are being

3    invoked here are again in statutes, regulations and the

4    Constitution.  And the remedy that's being sought is not

5    effectively a damages award.  Those are the questions.

6            THE COURT:  All right.  Thank you.

7            MR. LEVY:  Thank you, Your Honor.

8            THE COURT:  All right.  With regard to likelihood of

9    success, under the APA a court will set aside an agency

10   decision if it is arbitrary, capricious, an abuse of

11   discretion otherwise not in accordance with the law, contrary

12   to statute or unsupported by substantial evidence.

13     So I have a few questions here about the terminations to

14   help me evaluate the parties' arguments on the likelihood of

15   success.  And let me be clear, this is not about what I think

16   about the legality or validity of the terminations.

17     Ms. Neitzel, what is the agency action you're attempting to

18   set aside here?

19           MS. NEITZEL:  We are challenging both the unlawful

20   suspension of the accounts -- in other words, Citibank's

21   refusal to comply with our disbursement instructions at EPA's

22   urging.  And of course we are also seeking an order

23   preliminarily enjoining the agency from proceeding with the

24   notices of termination.

25           THE COURT:  Doesn't EPA have the right to manage its

1    own grants and programs?  I mean, why doesn't this include

2    terminating or freezing funds?

3         MS. NEITZEL:  It has a right to manage its own grant

4    programs, of course.  But they must do so within the metes and

5    bounds of the law.  And in this case and in any other case

6    governing a government grant, that involves the applicable

7    regulations, it involves any relevant statutes, and of course

8    the Constitution.

9       And so here our argument is, and the source of our rights

10   are, those authorities.  In other words, there are multiple

11   statutory provisions that are violated, meaning the APA and

12   the IRA, there are multiple governing regulations that were

13   violated by APA -- EPA's actions.

14        THE COURT:  But those violations all stem from the

15   existence of the contract, don't they?

16        MS. NEITZEL:  Well, not exactly.  They relate to the

17   existence of the contract unquestionably, but, for example,

18   we've talked a lot about a key regulation that is the central

19   termination provision in the federal government's uniform

20   grant guidance.  That's 2 CFR § 200.340.  That is the source

21   of one of our arguments, to be sure.  We have an argument that

22   is -- and it's clearly the case that in this case the

23   government violated that provision.

24      That is the only claim we have that requires that the court

25   also look specifically to the terms and conditions of the

1     grant.  And the reason for that is because, as we've talked

2     about already some this morning, and as you heard Mr. Sacks

3     discuss as well, that the revised version of that provision

4     says that the government may terminate a grant simply on the

5     basis of changed priorities or program goals, but it can do so

6     only if that basis is included in the terms and conditions of

7     the award.

8         So in evaluating the application of that particular

9     regulation, yes, the court must look to the regulation -- or

10     excuse me, the terms and conditions of the contract.  But that

11     does not mean that it is a contractual claim.  Nor of course

12     are any of our other claims here based in the contract.

13         THE COURT:  So are the terminations unreviewable

14     because they're committed to agency discretion by law?  It

15     does seem that funding decisions are traditionally regarded as

16     committed to agency discretion.

17         MS. NEITZEL:  The funding decision here, Your Honor,

18     has already been made.  Again, these awards were announced in

19     April of 2024, the awards were executed in August of 2024, the

20     funds were disbursed into our accounts, and we are not

21     challenging any of that, obviously.  What we are challenging

22     is the government's unlawful conduct that I described at the

23     outset here, in other words, the freezing of the funds and

24     then the unlawful terminations.

25         THE COURT:  So your argument is that *Lincoln v. Vigil*

1    doesn't apply because this is not -- because the disbursements

2    already occurred and the EPA isn't trying to claw them back as

3    it was in that case.

4    MS. NEITZEL:  I know one of my colleagues will discuss

5    this in greater detail.  In fact, Mr. Levy will when he

6    returns.

7    But, yes, we discussed *Lincoln* -- this is on page 10 of our

8    reply brief, where we talk about why *Lincoln v. Vigil* doesn't

9    apply here.  And it's specifically because it, as we

10   explained, concerned a challenge to the allocation of funds

11   from a lump sum appropriation that carried with it a

12   congressional recognition that the agency must be allowed

13   flexibility to shift funds within a particular appropriation

14   account so that the agency can make necessary adjustments for

15   unforeseen developments and changing requirements.  Obviously,

16   the circumstances here are different as we've set forth in our

17   papers.

18   Here the disbursement occurred and is not being challenged.

19   Plaintiffs' challenge, of course, as we've explained, is to

20   EPA's attempt to unwind the program and claw back those funds.

21   And I do want to talk a little bit more, Your Honor, about,

22   although --

23   THE COURT:  Go ahead.  I don't have any more questions

24   at this point.

25   MS. NEITZEL:  I do want to talk a little bit more about

1    the rationales that were the basis here for EPA's purported

2    terminations.

3           THE COURT:  I mean, does it matter?  Does motive matter

4    here?  Does it matter if this is a pretext?  There's a new

5    administration, they get to change their priorities, they get

6    to change their goals.  That's what they get to do.  Does it

7    matter if this is a pretext?  Does it matter what the motive

8    is here?

9           MS. NEITZEL:  I'm not sure that the motive matters,

10    Your Honor, but pretext absolutely does matter.  That is

11    quintessentially arbitrary and capricious behavior.  So what

12    we look to and what any court looks to under the APA when

13    assessing the lawfulness of an agency's action is its

14    contemporaneous explanation.

15      So let's talk a little about that, because as the Court

16    will recall, EPA stated in the notices that it was terminating

17    the awards based on, quote, substantial concerns regarding

18    program integrity and programmatic fraud, waste and abuse.

19    And the notices reiterate that point, saying they are

20    consistent with investigations based on fraud, waste, abuse

21    and conflicts of interest.

22      And at the first TRO hearing in this case Mr. Sacks, when

23    pressed by this court, reaffirmed that the awards were

24    terminated for the reasons stated in the notices of

25    termination.  To say nothing about the agency's many public

1    statements accusing our clients of waste, fraud, abuse and

2    conflicts of interest.

3      But that's not what the government says now.  In the

4    government's opposition it says, on page 25 of its brief, that

5    EPA did not terminate for plaintiffs' noncompliance.  On page

6    26 the government states it did not terminate the awards for

7    any, quote, conduct of plaintiffs --

8         THE COURT:  I noticed that.

9         MS. NEITZEL:  -- for which they could use the

10   opportunity to object or explain.

11     And then on page 29 of their brief, in arguing that the

12   freezing of plaintiffs' funds and the purported terminations

13   could not have hurt plaintiffs' reputations, they argue that

14   that is so because the actions here -- in other words, the

15   terminations and the discontinuance of the funds, was based

16   merely on, quote, reasons of policy.

17     Now, of course, EPA's new arguments, as well as

18   Mr. Amidon's multiple post hoc declarations, are just that,

19   they're post hoc rationales that cannot now be used to justify

20   the agency's actions.  But they do confirm -- and this is

21   where we began, Your Honor -- that the justification that was

22   provided in the notices of termination were pretextual.

23     But it is *Warth* pointing out that even if the Court could

24   consider the new justifications, they're inadequate.  EPA's

25   argument now appears to be they terminated the grants because

1    they lacked adequate oversight mechanisms.  But for one thing,

2    as we've said, that is not a lawful basis of termination here.

3    But number two, EPA has never even attempted to explain it.

4         EPA's only basis for that appears to be Treasury's use of a

5    financial agent, Citi, in this grant program.  But plaintiffs

6    have explained time and again that Citibank's role in this

7    arrangement in fact provides significantly increased oversight

8    and transparency by affording the agency complete, realtime

9    view access into every account at issue.  In other words, both

10   the prime grantee accounts and the subgrantee accounts.

11        Treasury's ASAP system can't do that.  And EPA has never

12   even sought to explain how having the funds at Treasury would

13   otherwise provide increased oversight and transparency.

14        And I'd like to turn as well briefly -- we've already

15   discussed this a little bit, but I'd like to talk a little bit

16   more about EPA's stated legal authorities for the termination,

17   because in addition to the agency's about-face on the

18   rationales, it has also changed its tune on the authorities it

19   says authorize the termination here.

20        In the notices, the Court will recall, EPA listed five

21   authorities that it said supported the notices of termination.

22   There were two regulations.  Those were 2 CFR § 200.339, and

23   the one we've talked about a lot today, § 200.340.  The third

24   basis was EPA's general terms and conditions.  Then the terms

25   and conditions of plaintiffs' grant agreements.  And lastly,

1    the agency's inherent authority.

2    Now, for the reasons we've explained in our papers, those

3    authorities do not support the terminations here.

4    But what we think is most striking here is that EPA now

5    seems to agree that those do not support the termination.  In

6    other words, with one exception, the agency appears to have

7    seemingly abandoned these authorities.

8    So according to EPA, the notices complied with and are

9    justified under one regulation -- this is what they said in

10    their opposition at least, which sounds somewhat different

11    from what Mr. Sacks said today.  And that regulation is the

12    one we've been discussing throughout this afternoon, 2 CFR

13    200.340.  EPA said in its opposition that it reads that

14    regulation to allow it to terminate a grant whenever an award

15    "no longer effectuates the program goals or agency

16    priorities."

17    But as we've covered somewhat today, and I think as

18    Mr. Sacks has now conceded, that is only half right.  Because

19    as we've explained in our briefs, the current iteration of

20    § 200.340 and the iteration that governs these awards, permits

21    an agency to terminate on that basis only if it is stated in

22    the award itself.  As the Court knows, that is not stated

23    here.

24    And although what Mr. Sacks said here today, if I'm

25    understanding correctly, seems to be somewhat at odds with

1    what the government wrote in its opposition, in the opposition

2    EPA contended that the original agreements with plaintiffs

3    included different terms that would have permitted termination

4    on the basis of changed priorities, had it not been for 11th

5    hour, in other words, December 2024 amendments to the terms

6    and conditions of the awards that were aimed at thwarting the

7    agenda of the incoming administration.

8        But that too is wrong, right?  Because this change to this

9    regulation was first announced in April of 2024, and then in

10   July of 2024 EPA announced that it would apply that regulation

11   consistent with OMB guidance to all awards going forward.  In

12   other words, to any awards made after July 1, 2024.  That is

13   exactly what happened here.

14       So this regulation does not support EPA's legal case or its

15   public narrative, and for the reasons we've explained in our

16   paper, none of the other authorities that EPA cited

17   contemporaneously support the terminations.  Thank you.

18           THE COURT:  Thank you.  Mr. Sacks?

19           MR. SACKS:  Your Honor, could I begin by making one

20   factual clarification I think is important, which I think the

21   parties don't quite get yet.  In the August 2024 original

22   grant agreement, at the beginning of that grant agreement, on

23   page 5, it says the recipient agrees to comply with the

24   current EPA general terms and conditions, and it gives a

25   website link to EPA's website where it lists those terms and

1    conditions in place as of 2023 to 2024.

2        Those EPA terms and conditions clearly state in a

3    termination provision that EPA may terminate for agency

4    priorities.  Those terms and conditions were incorporated into

5    the original grant agreement.

6        Now, the termination provision in the grant agreement

7    potentially is at odds with that right because it seems to

8    cabin EPA's termination rights under 200.340.

9            THE COURT:  Yes.

10            MR. SACKS:  But the grant agreement also, at page 18,

11    says that the clarifications in the termination provision

12    expand on rather than replace or modify the EPA general terms

13    and conditions.  So there is at least a dispute about whether

14    in that original grant agreement EPA's general terms and

15    conditions, incorporated into the agreement, gave EPA the

16    right at that point in time to terminate for agency

17    priorities.

18            THE COURT:  But you're saying now that that's not why

19    EPA terminated.

20            MR. SACKS:  I believe that is why --

21            THE COURT:  Right.  But before, in your termination

22    letter, that's not what you said.

23            MR. SACKS:  That is certainly something that we said in

24    our termination letter.

25            THE COURT:  You said there was waste, fraud, abuse, and

1    you were launching investigations and, you know, there was

2    malfeasance, right?  You seem to be abandoning that position

3    now.

4         MR. SACKS:  I don't believe that's correct, Your Honor.

5    I think that the termination letter -- and we can all read it

6    and see what it says, but it addresses in a number of ways the

7    idea of lack of account controls, a need for better regulation

8    and control over the money at issue here, and agency

9    priorities.  All of that is a part of the basis for

10   termination that's included within the citation in the

11   termination letter to 200.340.

12       And again, I don't believe the termination letter accuses

13   the plaintiffs of waste, fraud and abuse.  It uses that term.

14   I don't think it's a statement that the grant is being

15   terminated because they have committed waste, fraud.

16        THE COURT:  That's certainly been the statement of EPA

17   officials all over the public sphere.

18        MR. SACKS:  I understand that there's been a lot of

19   attention to what the EPA has said.

20        THE COURT:  Well, the administrator of the EPA speaks

21   for the agency.

22        MR. SACKS:  I certainly understand that, Your Honor.

23   At the same time, I think EPA tried to lay out in the

24   termination letter and in Mr. Amidon's declarations the bases

25   for termination.

1          But to go back to the issue of making sure we understand

2     the record here.  So again, in that original grant agreement,

3     those terms and conditions from EPA allow termination for

4     agency priorities.

5          THE COURT:  Okay.  Agency priority is in the notice,

6     but there were several other reasons given as well.  You'll

7     agree with me on that?

8          MR. SACKS:  I will, yes, but if I could just finish

9     this point, Your Honor, I want to be clear about this.  When

10    the grant was amended in December, EPA's terms and conditions

11    had changed at that point.  So when that grant agreement

12    incorporated the then-existing EPA terms and conditions, those

13    were different; they no longer allowed EPA to terminate for

14    agency priorities.

15    So there was indeed a change between the original grant

16    agreement in August and the December grant agreement.  In

17    fact, there were multiple changes that restricted or limited

18    EPA's ability to terminate the grant agreement.  That was done

19    of course after the election.

20    When the new administration came in, they looked at the

21    changes that had been made and the limitations on EPA's right

22    to terminate the grant agreement, and there was concern about

23    what that meant for EPA's oversight of the grant agreements

24    and the program.

25    So I think what the plaintiffs want you to -- I think what

1    the plaintiffs believe, and have submitted, is that there was

2    no difference between the original grant agreement and the

3    amendment in terms of EPA's rights, so there was no actual

4    change.  But the facts don't bear that out.  And a close

5    review of the two grant agreements show that there were

6    significant changes to EPA's rights and their ability to

7    terminate in that amendment, done after the election.  And

8    that was part of the bases on which EPA, when it evaluated

9    this program and these grant agreements, had concerns about

10    their oversight abilities, which led to the termination.

11        You also asked counsel -- kind of stepping aside for a

12    different issue -- about whether the funds here are committed

13    to agency discretion by law.  And you cited *Lincoln v. Vigil*,

14    which of course the government relies upon in our briefing.

15    And I do think that case applies here.  I believe there was a

16    program that was run and the agency decided to stop running it

17    and use the money a different way.  And that's essentially

18    what we have here.

19            THE COURT:  Well, not quite.  That's again, as

20    Ms. Neitzel pointed out, the agency deciding to use money for

21    another purpose.  That's not what -- this is money that was

22    granted to the plaintiffs and their subgrantees and was simply

23    to be disbursed to them through their Citibank accounts.

24    That's not the same factually as that case.

25        And let me ask you, are 2 CFR §§ 200.340 and 200.341

1    relevant to the grant agreements in the contracts here?

2         MR. SACKS:  They are absolutely relevant because

3    they're incorporated into the contract.

4         THE COURT:  And did EPA follow those regulations when

5    they terminated the grants?

6         MR. SACKS:  Well, no regulation says EPA can't

7    terminate a grant.

8         THE COURT:  I know.  But did they follow the

9    regulations when they terminated the grants?

10        MR. SACKS:  That's a complicated question, because

11   again, 340 says that one potential basis for termination is

12   agency priorities.  It goes on to say that if you want to

13   utilize that or any other basis, you have to put it in the

14   grant agreement.  So 340 directs you to the grant agreement

15   itself to determine whether or not EPA has met the terms of

16   the grant agreement in terminating the agreement and whether

17   or not that may or may not be a breach.

18     So 341, the notice provision, I think in the plaintiffs'

19   reply they agree that EPA complied with that notice provision.

20   I could be wrong about that, but I think when I read that this

21   morning, they essentially have abandoned arguing that we

22   didn't comply with 341.  They argued we didn't comply with

23   342, I believe, but 341, the notice provision, I think that

24   requires the agency to tell them we're terminating and give

25   them a basis for it.  They may disagree with that basis or

1    think that it's pretextual, but I think EPA did comply with

2    that regulation.

3         THE COURT:  They didn't do that before they ordered

4    Citibank to freeze the funds.  They terminated on the eve of

5    the TRO hearing.  You all terminated, I should say.

6         MR. SACKS:  I believe 341 is simply about giving notice

7    of termination, and I think the letter --

8         THE COURT:  But the letter was issued after EPA told

9    Citibank not to disburse the funds.  So sort of a post hoc

10   thing.  It didn't terminate and then tell Citibank we're

11   terminating so don't disburse the funds.  It said don't

12   disburse the funds, and when the plaintiffs filed the TRO, the

13   termination letter was apparently very hastily provided.

14        MR. SACKS:  Respectfully, Your Honor, I don't think the

15   freeze that was in place has anything to do with whether or

16   not EPA complied with 200.341.  That's a termination

17   provision, and if they provided the proper notice required by

18   the regulation, again, that would be something that they did.

19        THE COURT:  But I don't think plaintiffs concede that.

20   They didn't.  The record indicates that -- well, at least

21   according to plaintiffs, they inquired with Citibank over and

22   over, and with EPA, about why they weren't getting the funds

23   disbursed, and received no answer, no response, no kind of

24   notice, and then on the eve of the TRO hearing, get a

25   termination letter.  So I don't think the plaintiffs -- I

1    mean, they can stand up and speak for themselves, but that
2    appears to be one of the problems here.
3         MR. SACKS:  Well, if there is a concern about whether
4    or not EPA had the right to request Citibank to freeze the
5    money leading up to termination, that's a separate legal
6    issue.
7         THE COURT:  That's not what I was asking.  We were
8    talking about notice.  It doesn't appear that the parties --
9    that plaintiffs had any notice, that their only notice came
10   when they were told by Citibank we've been ordered not to
11   disburse the funds, and then they get a termination letter.
12   Isn't that the sequence of events here?
13        MR. SACKS:  I think that's right, but 341(a) says the
14   federal agency must provide written notice of termination to
15   the recipient.  The written notice should include the reasons
16   for termination, the effective date, and the portion of the
17   federal award to be terminated.
18        THE COURT:  Right.  And you did that on the 11th.
19        MR. SACKS:  Correct.
20        THE COURT:  Right.  But before you did that, you
21   instructed Citibank not to disburse the funds.  Right?
22        MR. SACKS:  But that's not a termination, Your Honor.
23        THE COURT:  I'm just asking, is that what you did?
24   That's the sequence of events.
25        MR. SACKS:  Yes.

1          THE COURT:  Okay.  And in fact, just to make this clear
2     and it's not just plaintiffs' allegations here, is it correct
3     that plaintiffs inquired with EPA about why they weren't --
4     the funds weren't being disbursed, and EPA didn't respond
5     until they filed a termination letter?  Is that correct?
6          MR. SACKS:  I believe there's record evidence that at
7     least one of the plaintiffs reached out to EPA and perhaps
8     there was not a meeting scheduled prior to termination.
9          THE COURT:  I think there was a -- plaintiffs allege
10    that there was a meeting scheduled and the meeting was
11    canceled.
12         MR. SACKS:  A meeting not held, I'm sorry, Your Honor.
13    I believe the record demonstrates that.
14      And finally, I'll just go back to the point Your Honor
15    began with in talking to my friend, which was does EPA have
16    the right to run its own programs and decide as a steward of
17    federal funds how best to utilize that money.  And I think we
18    cite the authorities for that in our brief, and I think that's
19    an important overarching principle of law --
20         THE COURT:  Of course, Mr. Sacks.  Of course.
21    Administrations change, they come with different priorities
22    and focuses, agency focuses and priorities change.
23    Absolutely.  I don't think anybody is disputing that.
24      I think what plaintiffs have challenged is the manner in
25    which -- not just the termination happened because the manner

1    in which EPA just instructed its financial agent not to

2    release the funds, without any notice, without any compliance

3    with federal law, not just contract principles, with federal

4    law and with due process.  And I think that's -- they can tell

5    me if I'm wrong, but I think that's the summit of their

6    argument.  Not that EPA can't change priorities.  I certainly

7    wouldn't agree with that.

8        MR. SACKS:  Sure.  So two responses to that, Your

9    Honor, and then I'll sit down.  The first is that again, those

10   complaints coming from the plaintiffs, which I understand, are

11   sourced out of their rights in the grant agreement and aren't

12   properly before this court.

13      And then finally, what we're kind of talking about in this

14   segment of the argument really comes down to the arbitrary and

15   capricious standard under the APA and whether the termination

16   meets that standard, if that's indeed where this Court is

17   going to go, I think the Court --

18        THE COURT:  I don't know where I'm going to go yet.

19        MR. SACKS:  If the Court may go there, I just want to

20   close by saying, obviously, we all know what that standard is

21   and the amount of kind of deference it gives an agency and the

22   need to present merely a rational basis of a termination.  I

23   would submit that, despite all of the reasons that plaintiffs

24   look at and the court has looked at as maybe don't feel are as

25   supported in the record, there are supported bases in the

1    letter, and in the declaration which was contemporaneous with

2    the letter, gives this contemporaneous basis for the

3    termination, that show a rational basis here regarding

4    oversight of the funds, the changes to the grant agreements

5    that restricted EPA's rights under those agreements, that

6    provide a rational basis for the termination --

7        THE COURT:  That's a bit of a shifting target,

8    Mr. Sacks, as I've asked you repeatedly, and you've been very

9    candid with me, in saying that you don't know what the

10   evidence is of waste, fraud and abuse and violation of the law

11   and corruption and all of that.  And I still don't.  I mean,

12   here we are weeks in, and as far as I -- you're still unable

13   to proffer me any information with regard to any kind of

14   investigation, malfeasance.

15     So it's -- you know, but then you're like, well, we don't

16   have to do that because it's terminated for this other reason,

17   no longer effectuating agency priorities.  So you've sort of

18   taken different positions here, and I'm trying to sort of pin

19   you down.

20       MR. SACKS:  Sure.  I think the position we're taking is

21   the one that's set forth in the --

22       THE COURT:  Termination letter.

23       MR. SACKS:  -- termination letter, and I think there's

24   a question of whether, if indeed that is a final agency action

25   this court can review, the question is whether that is

1    rationally based on the record at the time of the termination.

2    And again, putting aside the issues, the potential

3    allegations of waste, fraud and abuse, which may be aired at a

4    later date, the issues in the letter regarding EPA's

5    oversight, the changes to the grant agreements, there is

6    enough of a record that provides a clear rational basis for

7    the agency's decision to terminate.  And that's all the Court

8    needs, we would submit, if it goes down the APA route, to find

9    the termination did not violate the APA.

10    Thank you, Your Honor.

11    THE COURT:  All right.  Thank you.

12    MS. NEITZEL:  Your Honor, I'm going to start where

13    Mr. Sacks just left off and then I'll touch on a few other

14    points.  Mr. Sacks just said there's enough information in the

15    notices of termination issued on March 11 to be able to follow

16    the agency's basis for termination.

17    Even if there were multiple rationales that the agency has

18    since abandoned, even if it has changed course with respect to

19    a number of them, there was an indication in there that the

20    court can discern that the awards were being terminated for a

21    change in priorities and the concern about a lack of

22    sufficient oversight.

23    But as I said previously, and as the government still

24    hasn't responded to, the government has never, despite I don't

25    know how many opportunities at this point, explained why

1    having the money at Treasury would provide increased oversight

2    and satisfy the concerns that it has ostensibly articulated.

3    So we still don't have a basis for that, especially when, as

4    plaintiffs have articulated, the arrangement with Citibank

5    would appear to afford the agency increased transparency.

6        THE COURT:  Well, based on the public statements of the

7    EPA administrator that there were concerns with how these

8    contracts were arrived at and other theories of improper

9    activity.  So I mean, I'm not sure that simply being able to

10   keep an eye on the money is what the EPA has been stating is

11   the reason for not wanting these contracts to continue.

12       MS. NEITZEL:  Well, that is what EPA -- I will find

13   the page, Your Honor, but now in its argument, that was

14   essentially the only thing that the agency articulated in

15   its opposition.  This is on page -- this is on page 23 in

16   particular of their opposition, where they state three times

17   that the termination letter explains and was based on the

18   grant agreements' "lack of adequate oversight and account

19   controls."

20       However, even if it is the case, Your Honor, that they

21   also articulated concerns about the manner in which these

22   awards were issued, there has been no explanation for that.

23   And again, plaintiffs have explained, in their complaints,

24   in their TRO submissions, and in their PI filings, the

25   significant care and rigor with which these awards were -- in

1    which -- excuse me -- under which plaintiffs were selected and

2    the awards were executed.  And the ongoing substantial

3    oversight mechanisms in place, not just because of the manner

4    in which the arrangement with Citibank affords complete

5    real-time view into all the accounts, but all of the

6    third-party audits, all of EPA's oversight mechanisms that are

7    indeed in place.  Again, we have repeatedly said, why are

8    those not sufficient.  And there has never been an answer.

9        Now, I want to go back to section 200.340.  And I

10   apologize, we're going down a bit of a rabbit hole with that

11   regulation today.  But when Mr. Sacks stood up he said no, no,

12   what she just said is inaccurate.  That in the original

13   contracts there was a provision that permitted the government

14   to terminate based on changed priorities because that was

15   still -- because the prior iteration of that regulation was

16   the one that was still in place in EPA's general terms and

17   conditions for awards.

18       But if you look at our reply brief, Your Honor, this is on

19   page 14, we provided a redline showing the changes to the

20   termination provision in the award agreement.  In other words,

21   the changes from the manner that that termination agreement

22   appeared in August when the awards were originally executed,

23   and how it was updated in December.  And as you'll see with

24   the first -- very first clause said, in August,

25   notwithstanding the general term and condition termination,

1    EPA maintains the right to terminate, etc.

2        In other words, EPA stated in August, despite what our

3    general terms and conditions say, we now maintain the right to

4    terminate the assistance agreement only as specified in 2 CFR

5    200.339 and the version of 2 CFR 200.340 applicable to EPA

6    grants as of July 1, 2024, after the agency announced,

7    consistent with OMB guidance, that it would be applying the

8    new version of the regulation early.

9        But I also want to take a step back.  Again, we've gone

10   down this rabbit hole, but all of this is more or less

11   irrelevant.  The government has never asserted, because it

12   cannot, that EPA's update to this regulation was improper,

13   that OMB's update to the regulation, that EPA's announcement

14   that it would be applying that updated regulation was

15   improper, or the amendment to this agreement was somehow

16   unlawful or improper.

17       So we know, there's no dispute at this point about which

18   version of § 200.340 is in effect now and governs these

19   grants.  That is what matters.  But I do think it is important

20   for the public narrative, given what they have tried to do

21   with that public narrative, to understand that this was in

22   effect from the get-go.

23       Just very quickly, Your Honor, there were allusions to two

24   other regulations, §200.341 and 342.  We do maintain that

25   those were -- excuse me, on 341, which is the regulation

1    providing notice and the requirement that the reasons for the

2    termination be clearly articulated in that notice, we do

3    continue to maintain, as we stated in our briefs, that that

4    has been violated.  We did not raise it in our reply brief

5    again because there was nothing about it in the opposition

6    suggesting that they didn't violate it.

7    And we maintain that that was violated here for two

8    reasons.  The first, Your Honor, are the reasons that you

9    articulated.  In other words, even prior to the issuance of

10   the official notices of termination, there was a suspension

11   of the awards unquestionably.  There was arguably, as Climate

12   United initially articulated it, arguably a constructive

13   termination of these awards, and that was without any process

14   whatsoever, as we elucidate in our due process argument.

15   But the second reason is because, as we've said, this

16   regulation, Section 341, requires not only notice, which

17   arguably was provided by the termination notice, although it

18   was effective immediately -- but it also requires that the

19   agency state the reasons for the termination.  And EPA did not

20   do so, for all the reasons we've said.  In fact, they've since

21   confirmed that much of what was in there was pretextual, and

22   they no longer seek to defend it.  The little that they do

23   seek to defend, again, has not been explained.

24   THE COURT:  Well, they state the reasons -- when I

25   asked for -- you know, for the information to support the

1        reasons, in other words, where is the investigation, where is

2        the evidence of fraud, waste and abuse and so on, what I get

3        is our reasons are in the letter.  So it's a very circular

4        response.

5             MS. NEITZEL:  That's right, Your Honor.  There were no

6        specific facts articulated whatsoever to substantiate any of

7        the allegations in the letter.  There were no allegations or

8        facts identified with respect to any particular grantee at

9        all.  So in that respect, EPA violated Section 341 as well.

10         Now, with respect to Section 342, that is the provision

11       that permits a party to object or have an opportunity to

12       dispute the imposition of specific remedies when there is an

13       allegation of noncompliance.  In light of the government's new

14       concession that they did not terminate for noncompliance, and

15       that they did not terminate based on any of our conduct, that

16       would appear to be inapplicable.

17            THE COURT:  Since I have you up here, I'm going to get

18       to my last set -- I've sort of lumped in the due process and

19       appropriations clause, IRA claims -- what's your reading of

20       section 7434?  Is this for --

21            MS. NEITZEL:  I'm going to let Mr. Levy talk about

22       that.

23            THE COURT:  Okay.  And I'll have the same question for

24       you, Mr. Sacks, about 7434.  So you can start thinking about

25       that.

1           MS. NEITZEL:  Thank you.

2           THE COURT:  Thank you, Ms. Neitzel.

3      How do you read 7434?  Does it reflect that it was

4  Congress's intention to spend a certain amount of money by a

5  certain date, that is, September 30, 2024?

6           MR. LEVY:  Right.  So the statute says that $27 billion

7  was appropriated for certain purposes, that the funds had to

8  be obligated by September of 2024.  And in fact EPA abided by

9  the statute.  Back in the day, it ran a competitive process,

10  it awarded the funds to recipients that were eligible under

11  the statute, the sorts of not-for-profits identified by

12  Congress.  It made the selection in August of 2024.  It

13  obligated the funds in September of 2024.  And so that's what

14  the statute requires, that's what it says.

15      And the Supreme Court and the D.C. Circuit have made clear

16  that appropriation statutes of that nature are mandatory and

17  don't allow for discretion.  So the *Train* case by the Supreme

18  Court and *Aiken County* case have made clear that when there is

19  a statutory directive including an appropriation, that the

20  Executive Branch may not decline to abide by those

21  requirements for policy reasons.

22      And in *Train*, for example, there was the assertion that

23  prior to the obligation the Supreme Court should read in an

24  exercise of discretion by the executive, and the court said

25  no, the only place that one might imply discretion is at the

1    obligation phase.  That's at page 48 of the opinion.

2    And here what's remarkable is that EPA is saying the funds

3    have been obligated, they've been disbursed, they would have

4    been mandatory, but we can come back because we don't like the

5    policy that was effectuated during the obligation phase --

6    THE COURT:  Well, defendants argue that Congress didn't

7    appropriate the funds in favor of any specific recipient, and

8    that you all don't have a statutory right to this money.  Is

9    that correct?

10   MR. LEVY:  Well, I think what Congress established,

11   there was obviously discretion by EPA, and it was subject to

12   the exercise of abiding by the bounds of the statute to run a

13   competitive process, which EPA did, and then we, our clients

14   were awarded grants as a result of that.

15   But what -- so -- what EPA is now trying to do is to

16   dismantle the entire program.  It's not clear whether it

17   wishes to keep the money, which is what has been said in

18   public statements, or --

19   THE COURT:  Well, it says it wants to re-obligate and

20   reallocate the funds under GORF.  Does that affect your

21   appropriations clause claim?

22   MR. LEVY:  Well, I don't think it does in the sense

23   that there's no statutory authority to redo the program.  The

24   program was -- the funds had to be obligated by September

25   2024.  There's no statute saying that the EPA can claw it

1    back.  And if, as in *Train*, the court won't read an implied

2    authority to exercise discretion before obligation, then

3    surely Congress ought to have spoken directly to the question

4    if there were to be authority to claw it back.

5        And in fact, when Congress did enact the Impoundment Act,

6    the governing circumstances were the president can impound

7    funds, and the combination of these statutes collectively make

8    very clear that there is no statutory authority to dismantle

9    this program for policy reasons and either redo a program or

10   allocate the funds for other purposes or take the money back

11   to the Treasury.  That's not what Congress allowed.

12       And for those reasons, we think EPA violated the IRA, the

13   statute, violated the separation of powers, violated the

14   appropriations clause.  I note the EPA says the plaintiffs

15   lack standing --

16       THE COURT:  I was just going to get to that.  So go

17   ahead.

18       MR. LEVY:  So I think the only case they cite speaks to

19   taxpayer standing.  We are not taxpayers.  We have clearly a

20   vested interest here in the grants.  In fact, we allege a

21   vested property interest that triggers the Due Process Clause

22   as well.

23       THE COURT:  Well, that's an interesting point, because

24   I'm having a little trouble with the argument that the funds

25   are plaintiffs' property when there are legitimate ways for

1    EPA to halt the grants.  I mean, there are ways for them to do

2    it.  What you're saying is they haven't done it the right way.

3         MR. LEVY:  Well, there are terms and conditions to the

4    grants, but that doesn't mean that the plaintiffs don't have a

5    vested property interest that is protected by the Constitution

6    for purposes of due process.  It also -- and it also doesn't

7    mean we don't have standing to challenge action that is

8    contrary to the separation of powers.

9         THE COURT:  All right.  I'm going to let Mr. Sacks

10   respond, and then my only questions after that go to the

11   irreparable harm issue.

12        MR. LEVY:  On due process briefly --

13        THE COURT:  Yes.

14        MR. LEVY:  I think our arguments as to the substance of

15   the process do have some overlap with the notice arguments in

16   connection with the APA.  I don't want to repeat those

17   arguments, but we do have independent constitutional arguments

18   for violation of the due process.  There was zero

19   pre-deprivation notice or an opportunity to be heard, and so

20   it's a classic violation of the Due Process Clause.

21        THE COURT:  All right.

22        MR. LEVY:  Thank you.

23        THE COURT:  Mr. Sacks.  Let me start with section 7434.

24        MR. SACKS:  Thank you, Your Honor.  I think reading the

25   statute tells us that Congress commanded EPA to do some

1   things.  It commanded them to make grants on a competitive

2   basis.  It gave -- it said as determined appropriate by the

3   administrator in accordance with the section, set out the

4   appropriated funds, set out who were eligible recipients, and

5   then gave a deadline to appropriate the funds.

6       EPA complied with the statute; I don't think there's any

7   question about that.  There's nothing within the statute that

8   gives a grantee or an eligible recipient the basis to sue the

9   government for non- -- alleged noncompliance with the statute.

10       And again, let's remember what the record shows at this

11   point in time.  It was a grant agreement that was done

12   pursuant to statute.  Terminations of those grants for a basis

13   set forth by the agency pursuant to the grant agreements, and

14   a statement by the agency that they intend to re-obligate the

15   funds consistent with the statute.  That's the only record

16   before the court at this point in time.  There is no basis for

17   the plaintiffs or anyone else to argue any violation with

18   7434.

19       And my friend said that there was no statutory authority,

20   I think he said, no statutory authority for EPA to take back

21   the money and re-obligate it.  But I think an argument might

22   be different if one of the grantees went out of business and

23   couldn't utilize the grant funds and that was returned to the

24   agency.

25       Does that mean that the agency couldn't find a new grantee

1    to award the funds?  I don't think that would be the case.  I

2    think they had the authority, unless Congress prevented them

3    from doing so, of re-obligating that money.

4         THE COURT:  Well, your termination letter states that

5    EPA is going to re-obligate and reallocate the funds under the

6    GGRF.  Not "GORF," sorry, I said that before.

7       Can you point me to anything in the record that supports

8    this, that EPA is going to do this, other than them saying

9    that in the termination letter?

10        MR. SACKS:  No, Your Honor.  I think Mr. Amidon may say

11    the same thing in his declaration, but I think the agency has

12    been clear in that letter what they intend to do with the

13    money once it's returned to the United States.

14        THE COURT:  And was the decision to suspend the

15    funding, the disbursement of the funds, consistent with

16    Congress's intent under the IRA?

17        MR. SACKS:  It's certainly not inconsistent with its

18    intent.  I would say it's absolutely consistent in that it

19    asks EPA to administer and run the program.  So certainly if

20    EPA believes there are concerns about the administration of

21    the grants, it seems more than reasonable to pause money going

22    out the door while they assess whether indeed those concerns

23    are valid and merit termination or not.  So certainly nothing

24    would be inconsistent with --

25        THE COURT:  So you argue in part that EPA terminated

1  its grants as part of its administration of the programs that

2  Congress authorized it to administer, and that the Executive

3  Branch remains free to change positions upon administration.

4  So the grants were canceled, terminated because of a change of

5  policy and because the EPA wants to manage the grants?  Is

6  that true?

7       MR. SACKS:  No, Your Honor.  That's not true.  Nothing

8  that the agency has said -- my friend on the other side

9  suggests that it's the fact that the money is at Citibank is

10  the sole source of EPA's concerns about grant

11  administration --

12       THE COURT:  I don't think that's it.  I mean, I think

13  that EPA has made some statements about use of a financial

14  agent, but I don't think that's a sole -- that's not what I

15  hear the plaintiffs arguing, that that's EPA's sole focus.

16       MR. SACKS:  Well, their focus is oversight, their focus

17  is account controls, and their focus are the decrease in EPA's

18  rights that were a result of the amendment to the grant in

19  December.  Those are part of the driving factors that led EPA

20  to, when they reassessed the program, make a determination

21  that termination was the appropriate way to facilitate their

22  responsibilities as steward of the federal money and

23  administrator of the program.

24       THE COURT:  Plaintiffs contend that EPA ordered

25  Citibank to freeze the funds without first obtaining a court

1    order based on probable cause and supported by a sworn

2    affidavit.  There obviously are reports that EPA tried to get

3    those things unsuccessfully.  But isn't that a necessary step

4    before freezing the funds?

5        MR. SACKS:  I don't believe so, Your Honor.  Under the

6    account control agreement I believe that the -- under the

7    financial agent agreement EPA has the authority to request

8    that freeze as it believes is appropriate.  It did not do a

9    notice of account control, which is a different standard under

10    their agreements.  That's not what EPA did.

11        THE COURT:  All right.  Do you want to respond to any

12    of the other arguments that Ms. Neitzel made?

13        MR. SACKS:  I'll just note again that when it comes to

14    due process, there really is no separate process rights here

15    outside of the grant agreement.  You've heard us say that

16    before, but it's because it's true.  That's the basis of the

17    process that the plaintiffs are entitled to, because that's

18    what Congress said when it ordered EPA to run this program

19    through grant agreements.  Those grant agreements set out the

20    process.

21        And I'll note again that I understand why there are

22    allegations that EPA is dismantling a program.  We've heard

23    that over and over again, but I'd ask the Court to look at the

24    record.  There's no evidence in the record to support that.

25    The record shows termination of grant agreements --

1          THE COURT:  Isn't that the dismantling?  They're

2      terminating all the agreements with the plaintiffs here, who

3      are the grantees.  Doesn't that dismantle the program?

4      Reallocating the funds?

5          MR. SACKS:  Not at all, Your Honor.  It terminates

6      these grant agreements but has no impact on the program and

7      how EPA wants to run it.  It doesn't mean they'll run it

8      better or worse, but they have the right to run it the way

9      they want to run it after termination.

10          THE COURT:  What about your presentation of a change in

11      agency priorities?  Doesn't that indicate that EPA -- and I'm

12      not saying that's an illegitimate position to take, but isn't

13      that indicating that EPA wants to dismantle this program?

14          MR. SACKS:  No, Your Honor.  The change in agency

15      priorities here is within the constraints that Congress set

16      forth in 7434.  Now, if indeed it turns out the change in

17      agency priorities is outside the scope of this statute, then

18      there may be plaintiffs out there with a basis for claims

19      against EPA on that basis.  But we are nowhere near that and

20      that would be assuming things that are simply not in the

21      record.

22      Thank you, Your Honor.

23          THE COURT:  Thank you.  Did you want to respond,

24      Mr. Levy?

25          MR. LEVY:  Very briefly.  I heard my friend say that

1      there was authority under the IRA to administer the grants.  I

2      don't see that anywhere in the statute.  Section A speaks of

3      appropriations, and there's a deadline, there are requirements

4      to have a competitive process by September 30, 2024.  Then

5      there's a section governing the use of funds by eligible

6      recipients.  That's 7434(b), which speaks to what eligible

7      recipients chosen by that competitive process by September can

8      and should do.

9          And there's -- nowhere in this act is there any implied or

10     certainly no express term allowing the sort of revocation that

11     is being contemplated here.  I would also -- I know we cited

12     the AIDS vaccine case in our papers and I think it's very

13     relevant to it, to the situation.

14             THE COURT:  I have a couple of questions on irreparable

15     harm.

16             MR. UNIKOWSKY:  Thank you, Your Honor.  I'll speak

17     about irreparable harm, balance of equities, public interest,

18     and also address the issues against Citibank.

19             THE COURT:  So you're going to be up here for a little

20     bit.  You're rested.

21             MR. UNIKOWSKY:  I've been very patient, Your Honor.

22             THE COURT:  Unlike my court reporter.  But he's hanging

23     in there.

24         Are you able to obtain alternative sources of funding to

25     offset the loss of funds from the grant award?

1      MR. UNIKOWSKY:  So I'll speak for my client, Climate

2  United.  If the Court has specific questions for the other

3  grantees, they're probably in a better position to answer

4  those.

5      So Climate United has obtained very temporary stopgap

6  funding that's basically allowed us to keep the lights on

7  between the times of the TRO order and right now.  When I say

8  the lights are on, they're sort of dimmed in some sense

9  because we've had to defer compensation of our current

10  employees, we've had to terminate lots of contracts, we've had

11  to instruct lawyers other than me to stop work.  And so we've

12  had to significantly scale down our operations.

13      The answer is no.  So we've had this very temporary stopgap

14  funding, but that's not going to take us until a final

15  judgment.  So we cannot continue.

16      THE COURT:  All right.  And I'll allow each -- if each

17  Plaintiff wants to make the record on that issue, I'll let you

18  do that now.  You can actually just pull the microphone to you

19  without having to come up if you want.

20      MR. LEVY:  Thank you, Your Honor.  For Coalition for

21  Green Capital, there is record evidence that some of our

22  subgrantees are in the same position as Climate United.  But

23  CGC itself is not.  As to the broader question about whether

24  CGC could have access to the money without a remedy here, I

25  think the answer is no, not the same funds, not to that scope.

1      There's also evidence in the record from our clients that

2  termination itself would be disruptive to the ability to

3  obtain sources of private and public funding because of the

4  termination.  And this of course speaks nothing to

5  reputational harm, loss of goodwill and so on that is separate

6  and apart.

7          THE COURT:  All right.

8          MS. NEITZEL:  And for Power Forward Communities,

9  Your Honor, we have not yet been able to secure funding to

10 keep the lights on.  Now, the organization is in talks in

11 hopes of securing the sort of stopgap funding that CU has

12 acquired, and in hopes of being able to do the same.  But that

13 has not happened yet.  And the last time we were here we spoke

14 about some of the effects of that, including on our principal

15 contractor, who does all of our back-shop compliance,

16 financial management, etc.  The fact that they had gone

17 pencils down.

18     In our updated filings, in Mr. -- in our opposition brief

19 in the updated declarations we explained that we have secured

20 uncompensated a small amount of continuing services, in

21 particular to respond to EPA's questionnaire that was due on

22 the 28th, and some other minor services for subgrantees.  But

23 we have not been able to pay them yet, and that could stop at

24 any moment.

25          THE COURT:  All right.  Did you have any other points

1   you wanted to make on the irreparable harm?

2          MR. UNIKOWSKY:  Can I just make a very short record.

3          THE COURT:  Yes.

4          MR. UNIKOWSKY:  Just one or two other things.  So the

5   fact that we're going to go out of business is a pretty big

6   irreparable harm from our perspective.  There's a few others I

7   just wanted to raise to the Court's attention.  One is that we

8   view our inability to fund the projects that we'd like to fund

9   also as irreparable harm.  We already have a substantial

10  amount of committed funds.  Several projects are already

11  underway.  Those projects are consistent with Congress's

12  intent when it enacted the Inflation Reduction Act.  They're

13  not going to happen if this program is shut down, and we view

14  that harm as irreparable.  Those projects will go away;

15  they'll never come back.

16     There's also harms to our reputations.  Even from a short

17  delay, from here until final judgment, even if we could keep

18  the light on, which we can't, we depend on our reputation.  We

19  are a financial institution.  We need to be a reliable lender.

20  If we don't have funds, that is very damaging to our

21  reputation.

22     And finally, there's case law from the circuit court that

23  says that harms to an organization's institutional mission can

24  be considered irreparable.  And that's the case here.  Again,

25  we exist in order to be a financial institution, to finance

1    clean energy projects.  If we don't get those funds, our

2    purpose --

3         THE COURT:  Well, if EPA at some point, or if I find

4    that, but if EPA does have the option to terminate the

5    contracts, the agreements, if EPA lawfully terminates the

6    agreements, that's going to happen anyway.  Right?

7         MR. UNIKOWSKY:  Well, I mean, if it lawfully acted,

8    that would still cause us irreparable harm, it would just be

9    I guess lawful irreparable harm.

10        THE COURT:  Right.  And I don't mean to be flip.  But

11   that's what happens when an agency, there's an election,

12   there's a new administration, the agency has different

13   priorities, and as long as they comply with the law in

14   terminating the agreements, that happens.

15        MR. UNIKOWSKY:  That's right.  If an agency acts within

16   the law, it can inflict irreparable harm, but here we have to

17   show likelihood of success on the merits and irreparable harm.

18   And assuming we're correct that this action is unlawful, we do

19   have an independent obligation to show irreparable harm.  I

20   think we've shown that.

21        THE COURT:  With regard to the public interest, I mean,

22   are you asking to force the EPA into a contract or into

23   continuing to be bound by a contract it does not believe

24   serves the public interest?

25        MR. UNIKOWSKY:  I don't think so.  All we're asking EPA

1    to do is just follow the law with respect to these particular

2    terminations.  There's quite a bit of case law that says

3    there's no public interest in an agency not following the law.

4    In this case the Court posed the question to counsel, did you

5    abide by the regulations, and counsel said it was complicated.

6       We actually think it's not complicated; the regulations

7    were not complied with.  And so the Court doesn't need to make

8    broad statements about the public interest of the particular

9    work we're doing.  I think the Court can just say that the

10   public interest supports following a statute and the

11   regulations governing an agency.

12            THE COURT:  All right.

13            MR. UNIKOWSKY:  So I'll yield and then I'll discuss

14   Citibank afterwards.

15            THE COURT:  All right.  Thank you.

16            MR. SACKS:  Thank you, Your Honor.  When it comes to

17   harm, we'll stick with what we put in our briefing, which is

18   that the harm is not irreparable here, it's financial.  The

19   harm is also not immediate.

20            THE COURT:  What about reputational harm?

21            MR. SACKS:  Reputational harm also I think can be

22   viewed here as financial.  And even if it can't, then it's

23   not an immediate harm that is likely to be suffered by the

24   plaintiffs based on the declarations evidence in the record

25   to date.

1          And I do think the public interest weighs heavily here,

2     Your Honor.  As we noted in our briefing, that *Mathews v.*

3     *Eldridge* from the Supreme Court tells us that the United

4     States has an interest in safeguarding the public fisc.  If

5     this court were to allow the plaintiffs to access grant money

6     on a grant that EPA has terminated, then that money may not be

7     recovered.

8          THE COURT:  But Mr. Unikowsky pointed out that it's

9     black letter law that there's no public interest in having --

10     in allowing an agency to act unlawfully.  And so if I

11     determine that the agency acted unlawfully, there's a public

12     interest in making sure that stops.

13          The termination issue is -- yeah, sure, I mean, if there's

14     malfeasance going on, obviously the agency has an obligation

15     to ensure that that's not happening.  But what plaintiffs are

16     saying is that the agency has acted unlawfully in what it says

17     is addressing malfeasance, although I don't have any evidence

18     of that in the record.  But in terminating the contract.

19          MR. SACKS:  And again, I think we've made our position

20     on that clear, but if the Court goes in that direction, then I

21     think the question becomes what is the appropriate remedy for

22     that.  And it's a remedy to make the EPA comply with the law

23     perhaps, but it's not necessarily a financial remedy that

24     would allow the plaintiffs to access money that the government

25     may never recover.

1          THE COURT:  Well, I think what they're asking for is

2     for them to -- for the funds that are legally due to them to

3     be disbursed until such time as EPA complies with the law in

4     terminating the agreements, if that's what EPA seeks to do.

5        And I don't think plaintiffs are saying you can never

6     terminate.  What they're saying is you have to follow the law

7     in doing so, and until you do so, they're entitled to

8     disbursement of the funds that they were awarded under the

9     grants.

10         MR. SACKS:  That's asking EPA to specifically perform

11    a contract --

12         THE COURT:  It's actually asking Citibank to release

13    the funds as they're obligated to do.  Isn't that what they're

14    asking to do?

15         MR. SACKS:  That money is government funds on a grant

16    that the EPA has terminated.

17         THE COURT:  Again, you're putting the cart before the

18    horse.  The plaintiffs say you haven't terminated it, and they

19    filed this complaint before you even filed the letter of

20    termination.  They're saying it hasn't been terminated, that

21    EPA unlawfully directed Citibank to not disburse funds to

22    which they were legally owed, that they were awarded as

23    grantees.

24        If EPA has concerns about oversight and the funding of

25    these organizations, the way to do it is to either get a court

1    order, which you didn't do, or go through the procedures for

2    termination and follow the APA in terminating the contract.

3    And you haven't done that.  You certainly did that -- you

4    issued a termination letter, which is very thin on reasons,

5    the night before this hearing.  But you haven't done it.

6        I don't think anybody's going to argue -- I certainly

7    wouldn't find that EPA can't change direction and decide that

8    a particular program no longer suited the agency's goals.  But

9    you gotta comply with the law when you do that, and that's the

10   crux of the issue here.

11        MR. SACKS:  So if we go back into a pre termination

12   world, then EPA has asked Citibank to freeze the money and

13   not disburse it to the plaintiffs --

14        THE COURT:  Where's the notice?  Did you give

15   plaintiffs any notice?

16        MR. SACKS:  I don't believe there's any contractual

17   requirement or regulatory requirement for notice in that

18   circumstance.

19        THE COURT:  Due process?  Oh, but this is -- but your

20   position is there's no due process because it's a contractual

21   claim?

22        MR. SACKS:  Certainly, Your Honor.  There's no property

23   right here that would entitle the plaintiffs to notice on that

24   issue.

25        THE COURT:  But the plaintiffs have been awarded the

1    funds.  It's not like they're asking to be awarded funds and

2    somehow claiming that they have a property right in that.

3    They were awarded funds.  The funds had been disbursed

4    regularly, and EPA acts unilaterally in ordering Citibank not

5    to disburse any further funds without even letting plaintiffs

6    know, and not responding to their inquiries.  Is that lawful?

7         MR. SACKS:  It's certainly lawful, Your Honor.  I don't

8    know if it's the best course of action and one that in

9    retrospect we would all wish the agency had followed, but I

10   don't believe it was unlawful or violative of the

11   Constitution, statutes, regulations, or the contract in this

12   case.

13      And so if we go back into a pre termination world -- I

14   don't think we should but if we do go back into that world,

15   then maintaining the stay on the funds in the account would be

16   the most appropriate course of action here.  And if you want

17   EPA to remedy what the court determined to be violations of

18   regulation, then a freeze should remain in place and the

19   agency should have the opportunity if they can to remedy

20   those --

21        THE COURT:  But in the meantime there's -- plaintiffs

22   claim they are suffering irreparable harm by not receiving the

23   funds that they are legally -- they were legally and are

24   legally entitled to until such time as EPA lawfully terminates

25   the contracts.  And that would actually be the status quo.

1    The status quo is that plaintiffs were receiving their funds

2    at specific periods pursuant to the agreement it had with

3    Citibank.  And Citibank was doing that until EPA told them to

4    stop.  And then issued a termination letter.

5        And all plaintiffs I think are asking is that EPA follow

6    the law.  If it wants to get out of this contract, get out of

7    the agreement, follow the law in doing that.  And until it

8    does, plaintiffs should be entitled to access the funds.  I

9    believe that's what they're saying.

10        MR. SACKS:  Sure.  And so to have a right to do that,

11    obviously they have to demonstrate the irreparable harm

12    necessary --

13        THE COURT:  And if they have -- in other words, if my

14    freeze continues, if I continue this freeze until I reach a

15    resolution or rule on the merits, it'll be too late for them.

16    That's what they're saying.  It will be too late, they will no

17    longer be able to operate.

18        MR. SACKS:  So eventually, at least under the grant

19    agreements, if we all agree EPA can terminate them -- and if

20    they haven't done that lawfully yet, can do so lawfully --

21    then the plaintiffs are going to cease to operate anyway

22    perhaps, and they will have a potential claim for the monetary

23    loss they've incurred through the Court of Federal Claims --

24        THE COURT:  But if I allow you to do it unlawfully, I'm

25    allowing -- I mean, you can't be arguing that the end

1    justifies the means here.  I mean, what you're saying is well,

2    you know, if we have to do it lawfully, they're not going to

3    get the money anyways, so they might as well go out of

4    business now because they're going to go out of business

5    later.  That seems to be what you're saying.

6        MR. SACKS:  I'm not arguing that, Your Honor.  What I'm

7    arguing is, looking at the irreparable harm that they've put

8    forward and analyzing that based on the legal standards, then

9    considering the public interest and the fact that if money

10    goes out from these grant agreements through a court order,

11    that money may not be recovered by the United States should

12    the United States ultimately prevail in this case.

13        THE COURT:  But you could have prevented that by

14    following -- by what plaintiffs are saying, if you wanted to

15    stop that money from going out, you should have gone through

16    the procedures under the APA for terminating the contract.

17    And what you did was you just -- instead of doing that, you

18    just said don't give them the money anymore and then worked

19    your way back.

20        MR. SACKS:  I don't think that's the proper

21    characterization, Your Honor, but I understand that's the

22    Court's --

23        THE COURT:  Well, I mean, I think that's maybe what --

24    plaintiffs probably put it way more precisely and elegantly

25    than that.  But that's the argument, which is you want to get

1    out of this agreement, you want to get out of these contracts,

2    you gotta follow the law in doing that.  You can't just tell

3    the bank one day, stop giving them the money, and then go

4    through the procedures.

5        And again, since the time plaintiffs have filed this TRO,

6    there's been no development in the record with regard to

7    grounds for termination.  Nothing else has happened.  No court

8    order has been -- EPA could have gotten a court order.  They

9    haven't done that.

10        MR. SACKS:  Sure, and I'll close just by going back to

11    the Supreme Court precedent we've cited in our briefs, from

12    *Mobil Oil* and from *Winstar*, that talk about the government as

13    a contracting party and its right to terminate contracts, or

14    indeed a right to breach a contract.  The question then

15    becomes what are the rights of the counterparty after that.

16    And that really is the situation that we're in here.

17        Thank you very much, Your Honor.

18            THE COURT:  All right.

19        Citibank.  You've been waiting all this time, haven't you?

20    Well, let -- you're the plaintiff, so let me hear from you

21    first.

22            MR. UNIKOWSKY:  Thank you, Your Honor.  So we ask the

23    court to separately enter an injunction against Citibank,

24    directing Citibank to comply with the contract with all of the

25    Plaintiffs' disbursement requests.

1          THE COURT:  So I know that you are not parties to the

2     FAA, but why shouldn't I read both the ACA and the FAA in

3     harmony?  And doesn't the FAA specifically say that Citibank

4     is to comply with all directions received from Treasury?

5          MR. UNIKOWSKY:  So I think the simplest answer to that

6     question is that -- the sole argument Citibank has made, based

7     on the FAA, is that it was following lawful orders by the

8     government.  But we are here today to argue to the Court that

9     the government's actions are not lawful.

10         So if the Court were to agree with us and conclude that the

11    government's actions are not lawful, then there would be no

12    basis at all for Citibank to deny our requests.  And so there

13    would be no obstacle to the Court entering an injunction

14    telling Citibank to comply with the contract.

15         If I could just say one thing about that.  I don't think

16    Citibank will -- maybe that's a question for Citibank.  I

17    think it's going to take an injunction against Citibank

18    specifically for it to send us our funds.  So if the Court

19    doesn't specifically enter such relief, we'll probable be back

20    in court a few days later.  So we would ask the Court to enter

21    that relief.  And I think that's the most straightforward and

22    simplest way of resolving the dispute with Citibank.

23         But I want to answer Your Honor's questions head-on about

24    the FAA, because of course, as the Court knows, Plaintiffs'

25    position is, regardless of whether the Court finds that EPA

1      acted unlawfully, Citibank is still in breach of the contract.

2      I do understand that Citibank is in a tough spot, letters

3      coming from the FBI.  We're not impugning the motives of

4      Citibank at all, but we don't think they complied with the

5      plain text of this contract.

6           So first of all, our position is that the ACAs are not

7      limited by the FAA for the simple reason that plaintiffs never

8      signed the FAA.  So it's not part of the meeting of the minds

9      between plaintiffs and Citibank.

10          There are a number of cases that are cited by Citibank in

11     which courts consider multiple writings together and harmonize

12     them all.  But as far as I can tell -- and I've looked at all

13     of those cases -- every single one of them involved multiple

14     writings between the parties that are in front of the court.

15          So what the court said, look, to determine what the actual

16     meeting of the minds between the parties are, I have to look

17     at all of the writings together, and I can kind of synthesize

18     them and harmonize them to figure out exactly what the meeting

19     of the minds was.

20          But that's not the case here.  The plaintiffs signed the

21     ACAs, we did not sign the FAA, and so that is not pertinent to

22     the meeting of the minds between plaintiffs and Citibank.

23          But just one other thing, Your Honor.  Even if the Court

24     disagrees with that and incorporates the FAA into the ACAs, I

25     actually do think that even under the FAA, the actions of

1    Citibank weren't lawful because there's extremely specific

2    language in the FAA addressing when Citibank can freeze the

3    funds, and it specifically says it can only do that in

4    accordance with the account control agreements.

5         So that's in -- it's a sealed exhibit, but the relevant

6    language I think is quoted in the parties' briefs, so I'm

7    gonna just, you know, tell the Court, it's page A(4), and the

8    pertinent provision says the financial agent -- that's

9    Citibank -- shall freeze accounts and transfer funds in frozen

10   accounts at the direction of the relevant secured party in

11   accordance with the account control agreements.

12        So as we see it, there is harmony.  If the conditions for a

13   freeze under the ACAs are not satisfied, then the FAA does not

14   authorize Citibank to execute the freeze either.

15        And just one other thing, I mean, EPA has taken the

16   position that our claim against EPA has to go to the Court of

17   Federal Claims.  Of course we've disagreed with that.  But

18   even if that's correct, we can't sue Citibank in the Court of

19   Federal Claims.  This is the only court in which we're able to

20   seek relief.  There's a contract between the parties.  So we'd

21   urge the court to resolve those issues and enter an injunction

22   specifically against Citibank, directing it to comply with its

23   contractual obligations.

24             THE COURT:  All right.

25        So let me ask you, can the EPA monitor these accounts?

1            MR. ALLEN:  EPA can monitor these accounts, Your Honor.

2            THE COURT:  Okay.  And EPA contends that it terminated

3       these grants in part because of the lack of government

4       oversight, which is why I asked that question.  And what is

5       usually required for a secured party to exercise its right of

6       control?  There's a form attached to the amended January ACA

7       as Exhibit A.  Did EPA ever issue a form of notice of

8       exclusive control?

9            MR. ALLEN:  No, Your Honor, EPA has not issued a notice

10      of exclusive control.

11           THE COURT:  Section 4 of FAA governs compensation, says

12      Citibank shall be compensated for its services.  Are there any

13      incentives to Citibank in the various agreements providing for

14      compensation other than what it says here?

15           MR. ALLEN:  There is a provision of the FAA that

16      details how Citibank is compensated.  It's Exhibit B.

17           THE COURT:  And is Citibank still receiving payment for

18      its services?

19           MR. ALLEN:  It is.

20           THE COURT:  If I find that EPA acted unlawfully in

21      suspending and terminating the grant awards, does that allow

22      for Citibank to disburse the funds?

23           MR. ALLEN:  If the Court were to find that the

24      termination was unlawful and the directives to Citibank to

25      pause the processing of payment instructions was unlawful,

1   then at that point Citibank would be faced with disbursement

2   requests from the plaintiffs, it would have no lawful

3   instruction from its principal telling it to do -- to not

4   comply.  And so at that point Citibank would comply with the

5   requests it received from the plaintiffs, Your Honor.

6       THE COURT:  And that is regardless of whether I issued

7   an injunction against Citibank?  You would probably prefer

8   one.

9       MR. ALLEN:  I guess what I would say, Your Honor, is

10   it might make things more simple --

11       THE COURT:  I'm sure.

12       MR. ALLEN:  -- if we were included in the Court's

13   relief.  But certainly what I can say is we want to follow the

14   Court's orders, and we also want to, to the extent we can,

15   follow the directives from our principal, and we certainly

16   would follow the Court's instructions however they're

17   encapsulated in an order.

18       THE COURT:  All right.

19       MR. ALLEN:  Just to address briefly, Your Honor, there

20   are some arguments in the briefs that Citibank has breached

21   its contracts by not continuing to honor disbursement requests

22   over directives from the government that it not do so.  And we

23   just don't think that's correct.  Citibank has fully complied

24   with its contractual obligations.

25     As the Court knows, those are contained in two contracts,

1    the FAA and the ACAs, and those interrelated contracts must be

2    read together and in harmony.  Both contracts were signed

3    within weeks of each other, they are clearly interrelated and

4    they form part of the same general transaction, which is

5    setting up Citibank's role as a financial agent for the United

6    States government.

7        THE COURT:  But Mr. Unikowsky says that even if I read

8    them in harmony, you're still obligated to disburse the funds.

9        MR. ALLEN:  Well, Your Honor, for two reasons, at least

10    under the current record, we can't disburse the funds.

11        THE COURT:  I'm sorry, did you say you cannot?

12        MR. ALLEN:  Cannot on the current record.

13        THE COURT:  Why?

14        MR. ALLEN:  For two reasons.  First of all, on March 10

15    we received an instruction from the EPA to pause the

16    processing and payment instructions for the GGRF accounts.

17    Under Exhibit A, Section 1(b) of the FAA, EPA has the

18    authority to impose account controls that Citibank must

19    implement.  And EPA told us that one of the interim account

20    controls it was putting in place was a freeze on these

21    accounts.

22        THE COURT:  Did EPA give a time limit?

23        MR. ALLEN:  EPA did not give a time limit, Your Honor.

24        THE COURT:  So that's not a control, that's a halting.

25        MR. ALLEN:  All they told us at the time, Your Honor,

1    was that it was an interim, and they said this interim account

2    control will be rescinded as soon as reasonably practical once

3    EPA completes its review and implements additional account

4    controls.  That's what was told to us on March 10.

5        On March 11, Your Honor, the second reason we can't at

6    least on the current record release the funds, is on March 11

7    EPA terminated the grants, and under the FAA -- and again,

8    this is in Exhibit A -- Citibank must take direction from EPA

9    in the event of a termination in accordance with the account

10    control agreements.

11        So at least under the current directions that we're

12    receiving from EPA and from Treasury, Citibank can't comply

13    with the instructions it's receiving from plaintiffs.  And as

14    I also mentioned, or we note in our papers, Your Honor,

15    Citibank is required to comply with all lawful instructions or

16    directions received from Treasury and owes a fiduciary duty of

17    loyalty and fair dealing to the United States.

18        So because these contracts have to be construed in harmony

19    and together, and because under New York law, interrelated

20    agreements of this nature must be read together, Citibank

21    currently finds itself under instructions from its principal

22    not to release funds.  And therefore, when it did not honor

23    disbursement requests, it didn't breach the contract; it was

24    complying with both the FAA and the ACAs.

25        In addition, Your Honor, I would note that under section

1    6.B of the account control agreement -- and this is at ECF

2    33-10 at 4, it says Citibank cannot be held liable for failing

3    to -- for not performing any act or fulfilling any obligation

4    hereunder by reason of any occurrence beyond its control

5    including without limitation... any act of governmental

6    authority.

7         THE COURT:  I don't think plaintiffs are asking you to

8    be found liable.  I think they're asking for you to be ordered

9    to disburse the funds.

10        MR. ALLEN:  I understand, Your Honor.  I just wanted to

11   note that, and of course Citibank will comply with any order

12   that the Court might issue.  But I just wanted to briefly

13   respond to the suggestion from plaintiffs that Citibank should

14   have continued to honor these despite explicit directives from

15   its principal that it not do so.

16        THE COURT:  Think you chose rock over hard place?

17        (Laughter.)

18        MR. ALLEN:  Unless the Court has any other questions.

19        THE COURT:  To be fair to the parties, to be allowed to

20   make their arguments and to be fair to my court reporter,

21   we're going to take a short break.  Obviously, going longer

22   than I thought.  But these are tricky issues.  10 minutes.

23   And I realize everybody is very hungry, myself included.

24        (Recess from 2:05 p.m. to 2:27 p.m.)

25        THE COURT:  You were finished, right?

```
 1              MR. ALLEN:  Yes, Your Honor.

 2              THE COURT:  Okay.  Mr. Unikowsky?

 3              MR. UNIKOWSKY:  I promise I'll be quick, Your Honor.

 4         First of all, I think it's pretty clear from the remarks of my

 5         colleague that Citibank probably will not disburse funds

 6         without an order.  Just to raise one point to the Court's

 7         attention:  Even after the Court entered a TRO and found a

 8         likelihood of success on the merits, Citibank still didn't

 9         disburse our funds.  The court order the Court entered did not

10         bar Citibank from doing so.  They explicitly said that

11         defendant Citibank is enjoined from moving or transferring

12         plaintiffs' grant funds to any party other than the account

13         holders.

14              THE COURT:  I think Citibank sort of made clear at the

15         hearing on the TRO that they weren't going to move any money

16         anywhere absent a court order.  Am I characterizing your

17         position correctly?

18              MR. ALLEN:  For the plaintiffs here, Your Honor, I

19         think you're characterizing things correctly, and also we

20         certainly understood the court's TRO order to prevent us from

21         transferring plaintiffs' funds either to plaintiffs or to the

22         government.

23              THE COURT:  Well, my order didn't say that, but I have

24         to tell you, Mr. Unikowsky, I pretty much assumed they

25         wouldn't, because --
```

 1              MR. UNIKOWSKY:  I'm not blaming -- certainly the order

 2      didn't order them to do that.

 3              THE COURT:  And my TRO did not find that EPA's actions

 4      were unlawful.

 5              MR. UNIKOWSKY:  Right.

 6              THE COURT:  That would go to your argument that if they

 7      are unlawful then Citibank has no reason to not disburse the

 8      funds.

 9              MR. UNIKOWSKY:  I'm not suggesting Citibank did

10      anything wrong at all, after the TRO.  All I'm saying is that

11      I think clear language in the court order is needed.  We

12      proposed some language in our proposed order.  And I think it

13      would also be helpful for all parties if the court clarified

14      sort of what the ACA means in this situation, or else there

15      will be additional disputes with Citibank.

16         We've offered our interpretation of how the ACA and the FAA

17      fit together, so I think it would be helpful in terms of

18      future disputes for the Court resolve the parties' disputes

19      over the interpretation of the contracts.

20              THE COURT:  "Future disputes."  That really strikes

21      terror in my heart.

22              MR. UNIKOWSKY:  I hope there are none.

23              THE COURT:  All right.  Okay.  Subgrantees.  I want to

24      hear from you.  I want to hear from you.  Obviously, I don't

25      think we need to rehash everything we've discussed.  And I've

1    read the briefing.  But I think there's an argument with
2    regard to standing.  Did you want to address why you have
3    standing in this case?
4         MS. STRONG:  Yes, Your Honor.  I'd first just like to
5    say that I think everything my friends for the other
6    plaintiffs have already said applies equally to subgrantees,
7    which is why I think standing is the main issue that I need to
8    address for the subgrantees.
9         THE COURT:  I'm going to caution you to slow down.
10         MS. STRONG:  Yes, Your Honor.
11         THE COURT:  Thank you.
12         MS. STRONG:  So as to the standing argument, I think
13    that subgrantees' standing is in fact straightforward.
14    Subgrantees have accounts -- excuse me -- funds that are
15    theirs that are held in accounts for them at Citibank.
16         THE COURT:  But those are plaintiffs' accounts.
17         MS. STRONG:  So as to the subgrantees, Your Honor, the
18    subgrantees have their own separate accounts.  So there's --
19    for example, as to iBank, there's a designated account at
20    Citibank for iBank, with iBank's own funds, and there's a
21    separate ACA that covers those accounts.  The parties to that
22    ACA are iBank, Citibank, and CGC, who is our primary grantee.
23    EPA is not a party to that ACA.  So our standing runs from the
24    injury that we have suffered by the denial of our access to
25    our funds in our Citibank accounts.

1          And so the same jurisdictional and other arguments that

2     Mr. Levy brought up apply to us with equal force, and simply

3     put, the source of our rights here is the regulations,

4     statutes and constitutional provisions cited in our

5     complaints, and we are seeking to enjoin EPA from continuing

6     to interfere with and deny our access to our funds.

7          THE COURT:  But you all aren't parties to the

8     agreement, are you?

9          MS. STRONG:  So we're parties to our ACA, which

10    entitles us to have our funds disbursed to us consistent with

11    the ACA by Citibank.  EPA directed Citibank to freeze our

12    funds with we allege no lawful basis, and I want to respond

13    specifically to something I heard my friend for the EPA say

14    earlier, which was that the FAAs and the ACAs provided the

15    basis for EPA to freeze these funds.  But the FAA is not

16    something that iBank or any other state green bank has signed.

17    We're not party to that agreement.  And EPA isn't party to our

18    ACA.  So I don't see any basis that EPA would have to freeze

19    our accounts.  And I don't think EPA has provided one.

20         So our standing is, as I said, straightforward.  It's we

21    have these funds, we are entitled to these funds, we're

22    entitled to access them, and EPA has taken action to prevent

23    us from accessing those funds, first via its action directive

24    to Citibank to freeze those funds, and then by purporting to

25    terminate the grant and say that it was going to claw back and

1    then re-obligate all of the funds under the NCIF grant.

2    THE COURT:  If I grant a preliminary injunction for the

3    prime recipient plaintiffs, does that extend to the

4    subgrantees?

5    MS. STRONG:  I think, Your Honor, to be safe, your

6    order should make clear that it does --

7    THE COURT:  Oh, I'm sure you'd prefer that.

8    MS. STRONG:  I think the issue here is that because

9    there are separate accounts, because iBank and the other state

10   green banks' accounts are held in their own Citibank accounts,

11   the order should extend explicitly to those accounts that are

12   held for the subgrantees.

13   THE COURT:  What's your irreparable harm?

14   MS. STRONG:  So our irreparable harms are similar to

15   the primary grantee plaintiffs.  I think they're most closely

16   similar to CGC's harms, although these state green banks have

17   other sources and types of funding that extend to different

18   programs, and so the green banks themselves aren't at risk of

19   ceasing to exist.  They are unable to administer the programs

20   that -- and projects that they have set up specific for --

21   THE COURT:  But that's delay.  I mean, irreparable harm

22   is, you know, something's going to happen that we can't undo.

23   We're going to cease to exist, we can't pay our rent, we're

24   going to be evicted, something of that sort, or reputational

25   harm.  So I don't think yours is the same.

1          MS. STRONG:  Well, so that's what I want to get to,

2     Your Honor.  I think there are two points of irreparable harm

3     here that I think I have heard other plaintiffs mention, but

4     also, whether or not they have, are irreparable harms that we

5     suffer.  The first is, as Your Honor mentioned, reputational

6     harms.

7          The state green banks, as green banks, their reputation and

8     their ability to follow through on their financing commitments

9     is of the utmost importance.  And the inability to do so due

10    to their inaccess to their funds causes them reputational

11    harm.

12         Relatedly, they suffer reputational harm based on the

13    allegations that EPA has made both in public statements and

14    also in the termination letter.

15         THE COURT:  But that's going to happen regardless.  In

16    other words, EPA through its administrator has made no secret

17    of the fact that they don't support these agreements, that

18    they want to reallocate the funds, that they have opinions

19    about how these agreements were entered into and so on.

20         So I can't order them not to have opinions.  I can't order

21    them not to make statements.  He's doing that in his position

22    as an administrator.  So the reputational harm is going to

23    happen regardless, right?  I mean, even if the funding is

24    restored until such time as EPA terminates the contracts, the

25    reputational harm that has been caused by EPA's statements

1    about these programs is going to continue.  I can't stop that.

2         MS. STRONG:  Well, so, Your Honor, I think the specific

3    reputational harm that has been suffered here that is

4    irreparable and can be addressed by Your Honor issuing

5    injunctive relief is specific to the reputational harm that

6    state green banks have suffered as a result of the statements

7    in the termination letter.

8      So the termination letter evokes waste, fraud, and abuse

9    and substantial concerns about program integrity.  And I

10   understand EPA to now be focused on a change in agency

11   priorities.  So we've seen no basis or support for those other

12   statements --

13        THE COURT:  How can my injunction -- I mean, that's PR.

14   And I don't mean to be flip.  But my granting injunctive

15   relief and ordering Citibank to disburse the funds until such

16   time as, you know, EPA terminates these contracts is not going

17   to undo what's been said or what was stated in the letter.

18        MS. STRONG:  So I'd respond to that on two points, Your

19   Honor.  First, I think that continuing the relief Your Honor

20   issued in the TRO to preliminary injunctive relief, enjoining

21   EPA from effectuating its termination letter does begin to

22   address those harms.

23     But in addition, separate from the reputational harms,

24   there are specific harms that run to the state green banks

25   that would be remedied by the disbursement of funds due to

1    their inability to continue their due diligence in standing up

2    these projects that have applied to them and being able to

3    have these projects ready to fund if and when they do

4    ultimately prevail on the merits.

5        Absent disbursing funds now, projects that are currently in

6    the pipeline to be funded will not be funded.  We won't be

7    able to get those projects back.  And so that's the

8    irreparable harm that would be addressed by the interim relief

9    we're seeking here.

10        So, Your Honor, I just want to briefly address too the

11    primary relief we seek here, separate and apart from the

12    disbursements, is the need to convert the TRO to -- the TRO

13    relief to preliminary injunctive relief, and make sure that at

14    a minimum these funds don't leave Citibank and return to the

15    federal government.  And that's why -- going back to the

16    question that Your Honor asked earlier, that's why it's so

17    important that the subgrantees be specifically identified here

18    because their accounts are in a different place.

19        And I understand EPA to even be arguing that subgrantees

20    who aren't separately represented here should not be covered

21    by any injunctive relief.  And that's why it's so very

22    important and why indeed subgrantees, the subgrantees I'm here

23    on behalf of, filed their own complaint to protect those

24    interests and not have the subgrantee interests get lost amid

25    the plaintiffs' interests.

1    There's significant funds at stake that are separately held

2    in those separate subgrantee accounts, and it's important that

3    those not return to the federal government and that these

4    funds be -- the status quo be preserved as to the subgrantees

5    as well.

6    THE COURT:  All right.  Mr. Sacks, do the subgrantees'

7    grants fall under section 7434(a)(1)?  I didn't even let you

8    come up here first.  Sorry.

9    MS. STRONG:  Is that a question for me, Your Honor?

10    THE COURT:  No, it was a question for Mr. Sacks, but I

11    didn't even let him get a chance to get up here.  Sorry.  I

12    wanted you to have the statute with you when you came up.

13    MR. SACKS:  I'm sorry, Your Honor.  Your question was

14    whether the subgrants fall under 7434(a)(1)?

15    THE COURT:  Yes.

16    MR. SACKS:  I don't believe so, Your Honor, because the

17    statute sets out the basis to give grants, which is what the

18    agency has done here.  But I'd have to read a little bit

19    closer to --

20    THE COURT:  Well, did the EPA's order to Citibank to

21    freeze disbursement of the funds cover the subgrantee bank

22    accounts?

23    MR. SACKS:  I believe it covered all accounts under the

24    GGRF program, yes.  Or at least under the NCIF.

25    THE COURT:  So if I find the plaintiffs here have

1    standing, wouldn't the subgrantees also have standing?

2          MR. SACKS:  No, Your Honor, they would not.

3          THE COURT:  Why not?

4          MR. SACKS:  It's a completely different inquiry, Your

5    Honor.  And we set this out in our brief.  I think there's

6    three bases on which the Court can find that the subgrantee

7    plaintiffs do not lack standing.

8          THE COURT:  Do not have standing.  Not "do not lack."

9          MR. SACKS:  Sorry.  I misspoke.  I'm tired.  Do not

10    have standing.  The first is Article III constitutional basis

11    for standing, and we cite a case from District of Connecticut

12    a few years back that talks about whether or not a subgrantee

13    has a legally protected interest against the government in

14    this case --

15          THE COURT:  Normally -- I know that case.  Normally, I

16    would agree with that except, as counsel just points out, they

17    have bank accounts that have been frozen.  So they have a

18    legal -- I mean, they have skin in the game.  They're not just

19    saying we're due funds from the plaintiffs.  So yes, I think

20    that would be a much weaker argument.  But they actually have

21    accounts that have been frozen by order of the EPA.

22          MR. SACKS:  Well, they have skin in the game because of

23    their contractual relationship with the grantees.

24          THE COURT:  And also -- yes, and they're due funds

25    directly into their accounts.

1          MR. SACKS:  Based on their relationship with the

2     grantee and through their own contract.  And that contract has

3     not even been attached, I believe, to the complaint that

4     they've filed here.  We haven't looked at those contracts to

5     understand what the terms are and what their legal rights are

6     vis-à-vis the grantee.  They don't have legal rights --

7          THE COURT:  So EPA ordered that their accounts -- that

8     disbursement of the funds be frozen without even looking at

9     their contracts?  On what authority did you order that

10    disbursement of funds be frozen, if you don't even know what

11    the relationship they have with the plaintiffs are?

12         MR. SACKS:  Well, the freezing of the funds was based

13    on the financial agent agreement and EPA's rights under that

14    agreement, and concerns about the program as we've discussed.

15         THE COURT:  So do they have standing under that?

16         MR. SACKS:  They do not, Your Honor.

17         THE COURT:  So you can order that their funds not be

18    disbursed but they don't have standing to challenge you on

19    that.  Is that what you're saying?

20         MR. SACKS:  They have rights through their grantee

21    based on their contract with the grantee.  We're certainly not

22    contesting the grantee's rights for standing here.

23         THE COURT:  So then I guess I'm wondering under what --

24    you're claiming your authority to freeze the funds that are in

25    their accounts are under the ACA or the FAA.

```
 1              MR. SACKS:  FAA.

 2              THE COURT:  But they don't have any standing under

 3         those similar agreements to challenge your freezing.  That

 4         seems odd.

 5              MR. SACKS:  We're not saying they don't have any

 6         potential injury, Your Honor, but that's a separate question

 7         from whether they meet all the elements of Article III

 8         standing.  And I don't believe they have a legally protected

 9         interest on which they can proceed here.

10              THE COURT:  The money in the accounts isn't a legally

11         protected interest?

12              MR. SACKS:  I don't believe it is, Your Honor.  It's

13         federal funds, again, as we've discussed.  And then there's

14         also prudential standing based on the *Warth* case --

15              THE COURT:  I hate to keep going back to this.  But I

16         asked you if subgrantees' standing rises or falls with the

17         plaintiffs, and you said no.  But it seems your argument

18         undercuts that.  Because you're saying their right to the

19         funds is by virtue of them being a subgrantee.  I said, well,

20         they have their own accounts.  So you're saying they may have

21         a claim but not standing?  It seems as if you want to have it

22         both ways.

23              MR. SACKS:  I don't think we do, Your Honor.  I think

24         what their rights are are set forth in their contractual

25         agreement with their grantee, which we haven't seen here,
```

1    again.

2        THE COURT:  So then EPA could have said, you know,

3    Citibank, freeze the grantees' money, and then the grantee can

4    work out the subgrantees' funds between themselves since we

5    don't know what their contracts are.  But you didn't do that.

6    You said freeze the grantees' money and freeze the

7    subgrantees' money as well, even though you don't know what

8    the contracts say.

9        MR. SACKS:  Well, EPA's concerns are with the program

10    integrity as a whole, and so the decision was made to

11    temporarily freeze all program accounts.

12        THE COURT:  Let me ask you about this "temporarily"

13    thing.  What's the end date here?  If I don't intervene,

14    what's the end date for the freezing of the funds that is

15    provided for?  You heard Mr. Unikowsky talk about temporary.

16    And you just mentioned it as well.  So when's the end date?

17        MR. SACKS:  Well, the "temporary" language came from

18    the 310 direction to Citibank, and then of course the next day

19    there was the termination.

20        THE COURT:  That's right.  I'm sorry.  Not

21    Mr. Unikowsky, it was counsel for Citibank, that it was

22    temporary.  When is the contemplated end?

23        MR. SACKS:  I don't believe there was a contemplated

24    end at that point in time.  It was a temporary freeze to allow

25    the agency to determine whether or not their concerns about

1    the grants justified termination or whether they should end

2    the freeze because their concerns had been alleviated.

3        THE COURT:  Okay.  Standing here now, can you tell the

4    court when you anticipate this temporary freeze will end?

5        MR. SACKS:  So you're asking if the termination was

6    vacated by the court but the freeze was left in place, when

7    would EPA take action --

8        THE COURT:  Oh, I see.  So your position is that the

9    instruction to Citibank to freeze the accounts was temporary

10   but then your termination letter made that permanent.  Is that

11   right?

12       MR. SACKS:  No, Your Honor, it's completely --

13       THE COURT:  I'm trying to get at, if the freeze is --

14   is it still temporary?

15       MR. SACKS:  Well, I think at this point, the grants

16   have been terminated.  So the money would go back to EPA but

17   for the court's TRO.  So there's no freeze from EPA in place

18   at this time.  There's a freeze from the court.

19       THE COURT:  So what you were telling Citibank was don't

20   disburse the money for now until when?

21       MR. SACKS:  Until EPA had made a determination, again,

22   whether or not they wanted to continue to operate the grants

23   or they had determined they wanted to terminate them.

24       THE COURT:  I see.  Okay.

25       MR. SACKS:  So going back to the standing issue again,

1    the Supreme Court case from *Warth* talks about the standing of

2    a party to litigate a third party's rights here.  And again,

3    the rights vis-à-vis the government belong to the grantees

4    through the grant agreements, not the subgrantees.

5        And then finally, privity of contract, which comes from the

6    Court of Federal Claims of course, you can't come to the Court

7    of Federal Claims without privity, and I think that's

8    analogous to a standing argument that this court should adopt

9    if it's going to keep the case.  There is no privity of

10   contract here.  I mean, the subgrantees don't contest that

11   there is.  There isn't.  So again, to the extent they have

12   rights, they're in their documents.

13       I'll turn to harm if I could briefly, Your Honor.  So for

14   the subgrantees, I don't believe there's been a showing of

15   imminent harm that merits the release of funds to them if the

16   Court intends to go that route.  My friend just said things

17   they need to do are to continue their due diligence and be

18   ready to fund projects.  Those do not satisfy the definition I

19   think under any view of the case law of imminent irreparable

20   harm that this court can satisfy through a preliminary

21   injunction.

22       THE COURT:  But if I don't cover the funds in their

23   specific accounts, that money will be no longer accessible

24   regardless of what the ultimate outcome is in this case

25   because it will be returned to Treasury, won't it?  If I don't

1  order Citibank to disburse those funds or maintain those

2  funds, the funds are going to go back to the Treasury and the

3  subgrantees won't have any access to them regardless of what I

4  rule as to what plaintiffs' rights are.  Correct?

5          MR. SACKS:  No, I don't think so, Your Honor.  I think

6  we're talking about two kinds of relief here.  One is a

7  continuation of what the TRO -- or at least one interpretation

8  of what the TRO does.

9          THE COURT:  I see.

10          MR. SACKS:  Right?  And that is to keep the money

11  frozen where it is until we get a final judgment in this case

12  that resolves who has the right to that money.

13          THE COURT:  So what you're saying is even if I --

14  hypothetically -- ordered Citibank to disburse the funds to

15  plaintiffs, I could still find that subgrantees haven't shown

16  irreparable harm, requiring them to get their money and order

17  their funds continue to be frozen until I reach the merits.

18  Is that right?

19          MR. SACKS:  I think that's correct, Your Honor.  And I

20  think that same relief would also need to apply to CGC,

21  because I don't think that grantee plaintiff has demonstrated

22  the irreparable harm necessary to order funds disbursed out of

23  their account.  It may be a different story with the other two

24  grantee plaintiffs.

25          But one thing I think is important to think about if the

1    Court is going into what the scope of relief may be here, is

2    that the purpose of a preliminary injunction is not to put the

3    parties in what the Court believes is the status quo, right?

4    And so let's assume that status quo is no termination, no

5    freeze on the accounts --

6         THE COURT:  But it can be sometimes to maintain the

7    status quo because of a danger of irreparable harm until such

8    time as the court can rule on merits.

9         MR. SACKS:  Absolutely, Your Honor.  And I think the

10   scope of relief if the court went in that direction would be

11   to not go back to a status quo where all grantee and

12   subgrantees have the right to access as much of the funds as

13   they want --

14        THE COURT:  Well, no.  That's not even what they're

15   asking.  They're asking to access the funds that they are

16   entitled to under the terms of the agreement, not go on a, you

17   know, spending spree.  Right?

18        MR. SACKS:  Well, under the terms of the agreement, the

19   only restrictions on their ability to go on a spending spree

20   would be their certification requirement under the account

21   control agreement, I believe.  So I think if the Court is

22   going to order relief here on a preliminary injunction, that

23   it should do so narrowly tailored in terms of the

24   disbursements that any grantee or subgrantee needs to continue

25   operations until we've reached a final judgment in this case.

1    And I think particularly in light of what the D.C. Circuit

2    did in the *Catholic Bishops* case in denying the request for an

3    injunction pending appeal, I think we have some indication

4    here of the potential likelihood of success on the merits of

5    these plaintiffs.

6        And so considering that, I think it's important to

7    recognize that because money that goes out the door may not be

8    recovered by the EPA, that if the Court goes so far as to say,

9    yes, we're going to freeze the money, we're going to reverse

10   the termination, we're going to reverse the freeze, and we're

11   going to allow access to the money, that access should be

12   narrowly tailored to each individual plaintiff based on the

13   demonstrated need, truly need for money based on irreparable

14   harm and accompanied by a bond under Rule 65(c) for whatever

15   amounts of money those plaintiffs would be allowed to access.

16       THE COURT:  Based on the filings I've seen, am I

17   correct that all of the NCIF and CCIA funds were canceled, or

18   frozen, or suspended?

19       MR. SACKS:  I believe that's correct, Your Honor.

20       THE COURT:  And did all the grantees and subgrantees

21   receive the notice of termination on March 11, or just the

22   plaintiffs, just the grantees?

23       MR. SACKS:  All NCIF and CCIA grantees received the

24   notice.  There would be no basis for the United States to have

25   a right to terminate subgrantee agreements.  The terms for

1    that are set forth in the grant agreement.

2         THE COURT:  All right.  Did you want to respond?

3      Before you sit down, Mr. Sacks, did you want an opportunity

4    to respond to the TRO in 25-CV-948, that was filed on the more

5    recent one?  Or did they withdraw that?

6         MR. SACKS:  That's withdrawn.

7         THE COURT:  That's withdrawn, okay.

8         MR. SACKS:  And I'll just, for the Court's information,

9    we're talking to both of those CCIA grantee plaintiffs about

10   whether there's a way that essentially we can deem our

11   previous oppositions to the PI as applying to theirs or go

12   argument and potentially have the court --

13        THE COURT:  I would appreciate that.

14        MR. SACKS:  We're working on a way to resolve that,

15   Your Honor.

16        THE COURT:  All right.

17        MS. STRONG:  Just very briefly, Your Honor, if I can

18   respond.

19        THE COURT:  Yes.

20        MS. STRONG:  So my friend cited I think three separate

21   bases on which he thinks subgrantees lack standing.  I'll go

22   in reverse order because I think the third is the easiest to

23   dispense with here.

24      My friend said that the subgrantees don't have privy of

25   contract.  And we don't dispute that we are not party to any

1    contract with the EPA.  We don't need privity of contract here

2    because we're not bringing a contract claim.

3        As to the Article III standing, in the District of

4    Connecticut case, the basis for that decision was that the

5    individual, the pro se plaintiff who was seeking FEMA funds in

6    that action, didn't have a legally protected interest in the

7    funds, and the key difference here is that we have a legally

8    protected interest in the funds.  In fact, the funds have

9    already been disbursed to us, and so we are merely seeking to

10    regain access to the funds that are already ours.

11        And then finally, as to prudential standing, I think

12    similarly the *Warth* case and the statements that my friend

13    just made run to this idea that we can't pursue third-party

14    rights or third-party interests.  And again, that's not what

15    we're doing here; we're seeking to protect our own rights and

16    regain access to our own funds.

17        I want to also briefly address this question of making

18    differing disbursements to different plaintiffs.  And I don't

19    want to speak for the harm or the disbursements that should be

20    made to the primary grantee plaintiffs; I just want to

21    emphasize again that (1) I think it's important that the

22    subgrantees' funds at a minimum stay at Citi and not return to

23    federal government, and that the Court's order should

24    explicitly extend relief to the subgrantees because their

25    accounts are separate; but (2) I want to just reiterate that

1 there are projects that the state green banks had been working

2 on standing up and funding that will -- the time to fund those

3 will pass if they are not able to resume their activities and

4 gain access to at least some of these funds during the

5 pendency of this action.  So that's really the irreparable

6 harm here.

7   THE COURT:  All right.  Counsel for Citibank, can you

8 answer for me whether -- are the funds in the accounts?

9   MR. ALLEN:  The funds for the NCIF primary and

10 subrecipients are in their accounts at Citibank.

11   THE COURT:  All right.  Thank you.

12  Okay.  Thank you, everyone.  Oh, Mr. Unikowsky.

13   MR. UNIKOWSKY:  If I could say --

14   THE COURT:  Yes, you can.

15   MR. UNIKOWSKY:  I truly don't mean to prolong this,

16 Your Honor, but I haven't said anything about the subgrantee

17 issue, so just one thing.

18   THE COURT:  Sure.

19   MR. UNIKOWSKY:  So plaintiffs have asked for an

20 injunction to cover not only grantees themselves but also the

21 subgrantees.  Not all the subgrantees have filed lawsuits.

22 There are other ones that haven't, and we'd prefer that not

23 all the subgrantees came to court.  I think it actually makes

24 sense --

25   THE COURT:  I would too.

1          MR. UNIKOWSKY:  I think it makes sense --

2          THE COURT:  Just because I don't think we have room in

3  here.

4          MR. UNIKOWSKY:  Right.  There's already a lot of

5  plaintiffs here.  I think it would make sense for an

6  injunction in favor of the plaintiffs to also cover the

7  subgrantees.  We're not actually asserting injury to someone

8  else; we're asserting an injury to us.

9          THE COURT:  The issue is -- remember, this case comes

10  in as a lawsuit against Citibank as well as the EPA, and do

11  all these subgrantees have their own individual accounts with

12  Citibank?

13          MR. UNIKOWSKY:  They do.  We've also sued EPA and then

14  the termination covers the money in the subgrantees' accounts

15  because it's still our grant program.  We still are

16  responsible for ensuring that the actions of the subgrantee

17  ultimately comply with the terms and conditions of the primary

18  grant.  So if the EPA's termination decision is overturned,

19  then not only should we but also our subgrantee be able to

20  continue carrying out our activities.

21     So we view an injunction that would apply to the

22  subgrantees as remedying harm to us, not just the subgrantee.

23          THE COURT:  All right.  Mr. Sacks, I have one last

24  question for you.  Has EPA taken any steps to obtain a court

25  order freezing the funds?

1          MR. SACKS:  Not that I'm aware of, Your Honor.

2          THE COURT:  Okay.  And why is that?  If you know.

3          MR. SACKS:  I don't have an answer to that, Your Honor.

4     I'm sorry.

5          THE COURT:  Hold on one second.

6        Okay.  Thank you.  Did you want to come up?

7          MR. LEVY:  May I just say one thing?

8          THE COURT:  So Mr. Sacks asked narrowly -- if I was

9     going to issue a PI, to narrowly tailor it for what they need

10    to continue operations.  I don't have that sort of information

11    in front of me, Mr. Unikowsky.  I'll still let you speak,

12    Mr. Levy.  And that I assume would be very different for each

13    plaintiff and subgrantee.

14         MR. UNIKOWSKY:  So we'd urge the court to have the

15    injunction just put us to the status quo ante where we were on

16    February 16th before what we view as an unlawful freeze began.

17    Because I think we still have irreparable harm even if the

18    lights are on if we can't do anything.  We're a financial

19    institution, we give loans, we monitor loans, we invest in

20    projects.  And if we're not doing that and we're just sitting

21    in our office, we're still being harmed, we can't carry out

22    our mission.  We can't do what we're supposed to be doing.

23        And the reputational harms also continue.  The whole

24    reputational harm that we're asserting is that we can't be

25    trusted to dole out money.  That'll still happen if we're in

1    our office and the light is on but we can't dole out money.

2        So we'd urge the Court to simply grant an injunction that

3    restores the parties to the state of the world on February the

4    16th.

5            THE COURT:  All right.  Mr. Levy?

6        MR. LEVY:  I think I was going to say much of what

7    Mr. Unikowsky said and just to -- I understand Mr. Sacks --

8    our client is in a different position than the other grantees,

9    but we do have irreparable harm and I would just refer to the

10   briefs and the declaration.

11           THE COURT:  Thank you all.  Appreciate all the

12   preparation that's gone into this.  I will -- do we need a

13   briefing schedule?

14       (Court conferring.)

15       Okay.  Good.  I have quite enough.  All right.  Yes.

16           MR. ALLEN:  One ministerial issue.  Citibank's Rule 12

17   answer deadline is coming up on Friday for one of the cases.

18   We filed an unopposed motion, that everybody I think has

19   consented to, to put that deadline well off into the future

20   and to coincide with the government's.  So that's what we

21   intend to do unless the Court has a different preference.

22           THE COURT:  That's fine.  I'll take a look at that.

23       All right.  I will try and rule expeditiously.  Thank you.

24        (Proceedings adjourned at 3:00 p.m.)

25

*  *  *  *  *  *

CERTIFICATE

    I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Bryan A. Wayne*
Bryan A. Wayne

# EXHIBIT A

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JUSTICE CLIMATE FUND**<br><br>     Plaintiff,<br><br>  v.<br><br>**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,** *et al.*<br><br>     Defendants. | Civil Action No. 1:25-cv-938 |

**DECLARATION OF REGINALD PARKER IN SUPPORT OF JUSTICE CLIMATE FUND'S MOTION FOR PRELIMINARY INJUNCTION**

I, Reginald Parker, declare as follows:

  1.  I am a trustee and chairman of the Board of Directors of Freedmen Green Bank & Trust ("Freedmen"). I have served in that role since January 2023. I have a B.S. in engineering from MIT, a Ph.D. in engineering from Georgia Tech, and a finance M.B.A. from Florida State University. At Freedmen, I am responsible for developing the transactional structure for the bank's community investments.

  2.  Freedmen is a nonprofit and charitable trust headquartered in Atlanta, Georgia; it was founded in January 2023, partially in response to the passage of the Inflation Reduction Act. Freedmen is a community lender that relies on Greenhouse Gas Reduction Fund ("GGRF") funds both to fund qualified projects and to support its operations. Freedmen serves communities in Georgia, Mississippi, and Alabama, and receives no funds from the Georgia, Mississippi, or Alabama governments.

  3.  The irreparable harm to Freedmen and the communities it serves that will result from the continued unavailability of GGRF funds is significant and actual, not theoretical. EPA's and Citibank's actions have already had irreversible, severe, and adverse effects on

Freedmen and its communities, both directly and distributionally. Unless the Justice Climate Fund ("JCF") is permitted to access its GGRF award and disburse committed funds to Freedmen, those effects will continue and worsen.

4.      It is important to underscore that Freedmen is not impacted in isolation. Freedmen is part of the JCF network of roughly 270 community lenders operating throughout underserved (i.e., unbanked or underbanked) areas across the United States. JCF's community lenders rely on JCF and on each other to develop lending strategies and achieve economies of scale in providing our services, and we support each other in performing our services. For these reasons, while Freedmen is standing up for itself by providing this declaration, it is also necessarily standing up for our network of peer community lenders, many of which have communicated the fear of being targeted for standing up for their own missions and communities. We at Freedmen are also afraid, but we know that we must nevertheless speak up and speak out. I therefore provide this declaration to communicate the types of irreparable harm that we have suffered as a result of the EPA's efforts to defund and undermine JCF, Freedmen, our peer network, and our communities, and how that damage will only continue and be exacerbated unless a preliminary injunction issues.

## The Need for Community Lenders Like Freedmen

5.      There is no serious question that banking underpins U.S. household stability, security, and prosperity. The FDIC, the federal agency that both insures American depositors and supervises financial institutions, is clear on these benefits: "Gaining access to credit and

establishing a credit history allow households to smooth consumption, build wealth, and weather financial shocks."[1]

6.      The concentration of banking driven by consolidation and the digitization of finance has impaired the historical relationship between banks and their communities.  FDIC data show that in 1994, the year the Community Development Financial Institutions Fund was created under the Riegle Act, there were 10,453 commercial banks spread across our country.[2]  In 2024, that number fell to 3,928.[3]  Bank closures tend to disproportionately affect rural areas that are less well-off economically, where residents are less educated and more likely to belong to racial and ethnic minorities.[4]  And lower-income, disabled, and of-color Americans are more likely to be unbanked.[5]

7.      Underserved people lack the safety net that banking affords and, because they are unbanked, are less likely to be able to weather customary financial shocks, particularly in a volatile economy where the costs of goods and services are in flux or rising.  The unbanked often do have incomes, but still struggle to afford expenses that ordinarily require credit (like buying a reliable car to get to work or school), and are forced to make tough choices that have long-term consequences for their families.

---

[1] Federal Deposit Insurance Corporation, *2023 FDIC National Survey of Unbanked and Underbanked Households: Executive Summary* 17 (Nov. 2024), https://www.fdic.gov/household-survey/2023-fdic-national-survey-unbanked-and-underbanked-households-executive-summary.
[2] Federal Deposit Insurance Corporation, BankFind Suite: Annual Historical Bank Data, https://banks.data.fdic.gov/explore/historical?displayFields=STNAME%2CBANKS%2CASSET%2CDEP%2CEQNM%2CNETINC&selectedEndDate=2024&selectedReport=CBF&selectedStartDate=1994&selectedStates=0&sortField=YEAR&sortOrder=desc (last visited Apr. 14, 2025).
[3] *Id.*
[4] *See, e.g.*, Press Release, Bd. of Governors of the Fed. Rsrv. Sys., Federal Reserve Board Publishes Report on Bank Branch Access in Rural Communities (Nov. 25, 2019), https://www.federalreserve.gov/newsevents/pressreleases/other20191125a.htm.
[5] *2023 FDIC National Survey of Unbanked and Underbanked Households: Executive Summary*, *supra* note 1, at 2.

8.      Community lenders like Freedmen are considered "the backbone of financial stewardship in underserved communities."[6]  The reason that we are considered the "backbone" of underserved communities is that Freedmen, like its peer community lenders, has taken the time to understand our communities, build relationships, provide financial-literacy education, and develop products that respond to the needs of underserved communities.  We work to solve real problems facing real people for whom our services are a lifeline.

9.      Community lenders are thus faced with the task of figuring out how to surmount the barriers that face underserved communities—barriers that can persist even when traditional banks exist or arrive in the community.

10.     Those barriers are both known and, we believe, surmountable.  In a survey administered biennially to approximately 30,000 U.S. families, the FDIC seeks to identify the reasons for respondents' unbanked status.[7]  The top two reasons given in 2023 by those in underserved communities are that they cannot afford the minimum account requirements (including to avoid fees that erode account values), and that they do not trust banks.[8]  A significant proportion of the unbanked persons surveyed also noted that they are not able to access the services they need, even where banks are available to them.[9]  These reasons resonate with Freedmen's own experiences and findings.

---

[6] Asia Salazar, Nicholas Bobst & Sabina Flandrick, *Four Things Community Lenders Realized about the Clean Energy Transition*, RMI (May 30, 2024), https://rmi.org/four-things-community-lenders-realized-about-the-clean-energy-transition/.
[7] *See generally supra* note 1.
[8] *Id.* at 3.
[9] *Id.*

**How GGRF Funding Helps Freedmen Serve the Unbanked and Underserved**

11.    Freedmen was created to provide affordable capital access and technical assistance to low- and moderate-income communities in Georgia, Mississippi, and Alabama, with the mission to advance those communities' health, security, and prosperity.  Freedmen does that by providing affordable financing of residential, small-business, and community projects, including weatherization, building-upgrade, and clean-energy projects.  Freedmen focuses in particular on projects that underpin community resilience—for example, creating secure microgrids at churches that are havens for community members in regions facing extreme weather risks.  By doing this, we create a pathway for communities to advance local jobs and community economic viability.

12.    As a community lender, Freedmen operates as a direct lender to projects, using funds from public and private partners to provide lower-cost capital to finance qualified projects that, but for Freedmen, would not otherwise be able to obtain financing.

13.    GGRF funding focused on clean-energy systems and housing upgrades allows Freedmen to address the barriers to banking in effective ways that would not exist without GGRF funding or its focus on energy burdens.  The term "energy burden" refers to the percentage of a household's income spent on energy costs (electricity, heating and transportation fuel).  An energy-burdened household pays at least 6% of its income on energy costs, twice the proportion of family income that an average American spends.

14.    With GGRF funding, our affordable financing of clean energy technologies, such as solar on roofs and heat pumps that offset boilers and replace air conditioning, reduces that disproportionate burden, bringing savings to families' pockets—often, for the first time.   These savings become the safety net underserved families need and, like all safety nets, can transform

lives and livelihoods by allowing low-income families to weather financial events that would otherwise be destabilizing.

15.    Our financing of clean energy systems also reduces the adverse health effects of, for instance, older boilers ubiquitous in low-income communities, improving family health and reducing health care costs.

16.    At Freedman, we are able to use GGRF funds to: (1) lower the cost of entry to banking, eliminating minimums and needless fees and returning a higher interest rate on accounts than traditional banks; (2) take the time and effort to be an aligned partner, building trust via extensive community outreach, in which we communicate shared respect and the benefits of our reasonable underwriting of clean energy systems (with our outreach and staffing paid for, in large part, by GGRF technical assistance funds); (3) using technical assistance funds, provide financial literacy education to communities and to the contractors who serve them through our Freedom Academy; and (4) focus on streamlined, affordable, clean-energy loans that are structured to reduce monthly costs, creating savings that enable once energy-burdened families, businesses, and communities to thrive.

**Freedmen Will Be Irreparably Harmed If JCF Does Not Soon Regain The Ability To Disburse Its GGRF Funds**

17.    Freedmen is part of a consortium application that has been selected to receive grants from several primary recipients of GGRF awards, including JCF. Freedmen was selected to receive capitalization funding (financial assistance) of approximately $9.9 million in concessionary loans from a GGRF recipient that is focused on advancing green banks, and was also selected—but has not yet entered into contracts— to receive technical-assistance funding of approximately $450,000 from JCF and other GGRF awardees. The capitalization funding is to be

disbursed to finance qualified projects, and the technical-assistance funds are essentially working capital, critical to Freedmen's ability to function.

18.    Technical-assistance funds are startup capital essential to funding Freedmen's operations. And because the technical-assistance funds JCF has obligated to Freedmen are in the form of a grant (rather than a loan), those funds will enable Freedmen to make its financing more affordable. The technical-assistance funds JCF has committed to Freedmen grants are thus critical to Freedmen, which is unfunded by the states in which it is located. Unless those funds are restored soon, Freedmen will be unable to continue in operation.

19.    In preparation for receiving and deploying the awarded funds, Freedmen developed an extensive qualified-project pipeline of energy-saving upgrades to, and clean-energy microgrids at, churches, community centers, and nursing homes. These projects enable the facilities to save money on utilities and to be secure in the face of outages—for example, from major storm events common in these states. Demand for these projects exceeds available funds, and every dollar of funding matters to Freedmen and its communities.

20.    In reliance on the promised receipt of funds from JCF that would sustain Freedmen's operations, Freedmen has taken numerous and substantial steps to engage with Freedmen's communities in Georgia, Mississippi, and Alabama to effectively advance projects, to stand up the institution to successfully underwrite affordable community loans, to obtain appropriate permitting, and to develop a high-quality, high-impact pipeline of qualified projects that meet the GGRF requirements. For example, Freedmen designed its assessment, underwriting, and financing systems (including all policies and protocols), developed its ability to mobilize private capital (through hundreds of meetings with capital providers), and designed the models

under which Freedmen has solicited and analyzed applications for low-cost financing. These efforts represent tens of thousands of hours of work by Freedmen staff.

21.    EPA's and Citibank's actions in failing to disburse GGRF funds on the recipients' instructions have erected formidable barriers to Freedmen's success as a going concern. Those barriers are both operational and reputational, and unless the funding is restored soon, the damage will be irreparable.

22.    Operationally, the freeze of GGRF funds, and of JCF's funds in particular, has meant that Freedmen has not received its awarded technical-assistance funds to support its daily operations. As a new enterprise focused on community development, Freedmen has few alternative sources of traditional funding. Freedmen's GGRF awards represented a transformative infusion of capital that was and is essential to Freedmen's future—its reputation, its growth as a business, and its enduring legacy. Unless the JCF funds are restored and disbursed soon, Freedmen will have to drastically scale back its business model and may well have to close its doors.

23.    Prior to the freezing of JCF's funds, Freedmen approved the applications of numerous project sponsors for low-cost financing for their qualified projects. In so doing, Freedmen committed to the successful applicants that the financing for which they had been approved would in fact be provided. In order to make good on that promise, Freedmen must be able to continue in operation—something it cannot do without the committed technical-assistance funding from JCF.

24.    The reputational harm done to Freedmen by the funding freeze presents an independent existential threat. While Freedmen currently has sufficient funds to begin financing some approved projects, a key factor in the success of Freedmen's projects—and thus its own success—is the mobilization of private capital. As a result of the funding freeze, private investors

have expressed significant reservations about involvement in Freedmen's work, and that involvement has slowed. This chilling of private-capital investment compromises Freedmen's ability to make good on its commitments to project sponsors.

25.    Freedmen's inability to provide all the financing it promised to project sponsors is already doing significant harm to its reputation, and that harm will be magnified the longer it persists. As a green bank in a red state, Freedmen already faces skepticism. We have had to work hard to build relationships and to earn a reputation as a trustworthy, reliable lending institution. The funding freeze is damaging Freedmen's hard-won reputation for trustworthiness and reliability—qualities that all consumers consider essential in their lenders.

26.    Freedmen's reputation is even more important to its success than that of a mine-run lender. Every day that we are delayed in deploying GGRF funding adds to the weight of the objective setbacks we face within our communities as a result of the funding freeze. The community trust we have worked so hard to build—trust in our ability to deliver affordable financing—is damaged, in ways that feed directly into these communities' preexisting perceptions about banks. That dynamic makes our work much harder. And we are set back in our efforts to reduce costs and increase our capacity by featuring our successes—community members sharing with others their experiences with Freedmen and with the clean-energy installations Freedmen would finance. The loss of these symbols of success means that Freedmen appears less effective than we could be had EPA not undertaken to defund and delay our work. That reputational effect is direct, but its knock-on effects to communities will delay adoption and therefore achievement of GGRF's mission of making low-income communities more secure, healthier, and better able to gain access to the middle class.

27.    If Freedmen is unable to regain access to its technical-assistance award soon, it will likely fail—and its failure would, in turn, have reputational impacts across this community-lending sector.    Failures of institutions like Freedmen have an outsized effect:    Consistent with congressional intent, first movers like Freedmen are attempting to prove the feasibility of providing low-cost funding for energy- and cost-saving projects that benefit low- and moderate-income communities.    Undermining Freedmen casts a long shadow on community lending.

28.    Further, EPA's and Citibank's public positions have created uncertainty and fear among community lenders and project sponsors that they will be threatened with costly litigation in connection with their participation in the process.    The chilling effect of EPA's and Citibank's actions independently impede Freedmen's ability to fulfill its and Congress's joint mission.

29.    Even more important to Freedmen than its own irreparable harm is the profoundly adverse impact to its qualified project sponsors and communities of this funding freeze.

30.    The small businesses and community organizations whose projects Freedmen's capital would finance have, like Freedmen, acted in reliance on receipt of the funds, and those projects cannot survive long without them.

31.    It is the customary practice of the small-scale installation and construction businesses that support community solar to purchase materials, like solar panels, in tranched payments.    Some of our project sponsors have already purchased one or more tranches of materials, and have made commitments to purchase more, in reliance on their receipt of committed financing from Freedmen to make further payments.    Without access to their promised financing, these customers are currently either unable to make good on their own commitments to purchase further tranches or, where they can afford to continue making payments, are scrambling to find places to store the materials they have purchased but cannot afford to use.    If their inability to access

Freedmen's financing continues for too long, the relationships our customers have built with their suppliers and contractors will sour along with those we have built with our customers.

32.    The length of the delay is a critical consideration, because protracted delays have multiple spillover effects.

    a.  Restarting the projects will become difficult or impossible even if alternative sources of funding later materialize, because the trust in the project's momentum and therefore viability will have been squandered.

    b.  If delays are protracted, underwriting will need to re-occur, both for prudential investment reasons and because projects costs would be expected to change, which can be costly and compound the attrition burden that small projects face.

    c.  Equipment may need to be resold to reduce immediate burdens and losses, with the result that projects are essentially pushed back to an early stage of development and with additional imbedded debt.  These funds are funds our customers cannot afford to lose.  They certainly cannot afford to pay for any part of a project twice—once through a lost deposit, and again if and when financing becomes available many months down the road.

33.    In sum, because EPA and Citibank have frozen the promised funds and have yet to release them, our customers' projects are at risk of never being completed.

34.    The communities these projects were intended to benefit are also at risk of irreparable harm unless EPA and Citibank release GGRF funds, thus permitting primary GGRF recipients like JCF to enable Freedmen to spend its obligated funds.

35.    The cost to our communities is dangerously high.  In much of the underserved Deep South—where Freedmen operates—air conditioning is a luxury, utility outages are

common, and extreme weather events can leave communities without electricity for days and sometimes weeks. For example, according to the National Oceanic and Atmospheric Administration, the annual average number of disasters in Georgia with losses exceeding $1 billion was 9.8 events between 2020 and 2024, making such events effectively routine.[10] The frequency and magnitude of these events has increased in recent years.[11] But with our financing of clean-energy systems—which create micro-grids that allow community churches and schools to keep the lights, heat, and air conditioning on—these outages and interruptions have a lower impact on our communities, causing less economic turmoil and heartache.

36.    Our financing focuses on community energy security, including the installation of solar panels on churches and nursing homes, which would permit those places to be energy-independent safe havens for residents and community members in the aftermath of a storm. Unless our funding is restored soon, those projects cannot be completed in time for this year's storm season.

37.    The risks to communities outlined above are, ultimately, risks to individuals. Without the immediate restoration of JCF's funding support, projects that would improve, sustain, and save life cannot proceed as scheduled. Oxygen machines that would be powered by solar panels during a blackout will turn off. Essential medications that require refrigeration will warm and spoil. The jobs that would be created in low-income communities will not materialize, and low-income families' energy spending will remain disproportionately high. Further delay will irreparably harm the health and wellbeing of the most vulnerable individuals in our society.

---

[10] Billion-Dollar Weather and Climate Disasters: Georgia, National Oceanic and Atmospheric Administration, https://www.ncei.noaa.gov/access/billions/state-summary/GA (last visited April 10, 2025).

[11] *See id.*

***

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28

U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.


Executed this 15th day of April, 2025, in Atlanta, Georgia.


_____

Dr. Reginald Parker

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **CLIMATE UNITED FUND**<br>7550 Wisconsin Avenue 8th Floor<br>Bethesda, Maryland 20814<br><br>      Plaintiff,<br><br> v.<br><br>**CITIBANK, N.A.,**<br>5800 South Corporate Place<br>Sioux Falls, South Dakota 57108,<br><br>  **and**<br><br>**UNITED STATES ENVIRONMENTAL<br>PROTECTION AGENCY**<br>1200 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20460,<br><br>  **and**<br><br>**LEE ZELDIN, in his official capacity as<br>ADMINISTRATOR, UNITED STATES<br>ENVIRONMENTAL PROTECTION<br>AGENCY**<br>1200 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20460<br><br>      Defendants. | **ECF CASE**<br><br>No. 1:25-cv-00698 |

## DECLARATION OF ELIZABETH BAFFORD IN SUPPORT OF
## CLIMATE UNITED FUND'S OPPOSITION TO STAY MOTION

I, Elizabeth Bafford, declare as follows:

  1.  I am the Chief Executive Officer of Climate United Fund ("Climate United"). I

have managed Climate United since its inception in October 2022 and have worked at Climate

United's parent entity since January 2014. In my current role, I am responsible for managing all

Climate United operations, including staffing and administration, coordination with third-party vendors, and administering financing programs operated by Climate United. I am also responsible for overseeing the management and allocation of funds awarded by the Environmental Protection Agency ("EPA") through its National Clean Investment Fund ("NCIF") in accordance with our EPA-approved workplan.

2.      For these reasons, I have personal knowledge of the facts and information in this declaration.

3.      I respectfully provide this declaration to detail the ways in which Climate United's reputation, mission and programs will continue to be imminently and irreparably harmed if the Court stays its order deciding Plaintiffs' motion for preliminary injunction. In addition, this declaration describes how Climate United will suffer particularly acute irreparable harm if this Court stays distribution of funds necessary to allow Climate United to continue to operate while this case proceeds, and stays distribution of funds related to requests made *prior to* EPA's purported termination on March 11, 2025—funds which I understand Climate United is entitled to receive regardless of the outcome of the merits of this case. These pre-March 11 requests as well as post-March 11 requests, and the details of these requests are detailed in Exhibit A attached to this declaration.

4.      This declaration supplements my March 21, 2025 declaration submitted in support of Climate United's motion for a preliminary injunction, and is intended to provide detail on additional developments postdating that declaration.

**Continued Irreparable Impact on Climate United's Operations**

5.      My March 21 declaration detailed the impact on Climate United's operations if Climate United does not promptly regain access to the funding provided by the NCIF Award. Those harms will continue to persist if the Court stays any preliminary injunction.

6.      Climate United relies on the NCIF Award to pay payroll, health, vision, and dental benefits, life insurance, and short- and long-term disability insurance for its employees. As I explained in support of the motion for preliminary injunction, to preserve its available cash, since March 1, 2025, Climate United has already deferred 40% of compensation for senior staff because the temporary stopgap funding Climate United received was not enough to cover its operations. This significantly harms Climate United's ability to retain employees, as reflected in my March 21 Declaration.

7.      Since March 21, one employee has left Climate United and others have notified Climate United that they are currently looking for other employment given the reduction in pay and uncertainty raised by our inability to access funds.  A stay of any preliminary injunction with the potential for additional weeks or months without funding injects a consequential level of additional uncertainty which we anticipate will significantly accelerate staff departures. These are talented individuals with personal relationships with portfolio partners and specialized skillsets that took many months to identify and onboard. They cannot be replaced easily, if at all. If they leave Climate United, I believe that they will not return and that any others who might potentially serve as replacements will not be willing to consider joining Climate United.

8.      Climate United relies on the NCIF Award to pay rent for its offices, including monthly rent payments.  It also relies on the award to pay insurance.  Notably, Climate United has received an invoice for its annual Directors and Officers and Errors and Omissions liability

JA954

insurance renewal which is due on May 31, 2025. This insurance protects Climate United's directors and officers from legal defense costs and personal financial losses if they are sued for alleged wrongful acts or omissions in their official capacity, even if those allegations have no merit. If Climate United is not able to fund that insurance payment, I believe it creates a serious risk that Climate United's officers and board members – who are uncompensated volunteers – will resign because they will not be willing to continue to serve as officers and directors if it could open them up to potential legal defense costs and personal liability. This risk is heightened by the fact that litigation is ongoing and that EPA has made multiple baseless and unfounded allegations about Climate United engaging in purported waste, fraud, and abuse related to its NCIF grant funds.

9.      Climate United relies on the NCIF Award to pay third-party contractors who perform necessary services. As I explained in support of the motion for preliminary injunction, Climate United has already been required to terminate multiple vendors, cancel travel, and instruct non-essential contractors to cease work. The stopgap funding Climate United received was not enough to cover these expenses. This is causing significant disruption in our ability to carry out our responsibilities under the grant, including our compliance and community outreach work, and harming our partners who have done significant uncompensated work to prepare for implementation of this program.

**<u>Continued Irreparable Impact on Climate United Subgrantees</u>**

10.      In addition, Climate United's subgrantees are facing similar pressures, which will impair their future ability to partner with Climate United on its projects. For example, one of Climate United's subgrantees recently executed a reduction in force on April 10, 2025 impacting a majority of its staff, due to budget constraints caused by no longer having access to the funds it was relying on from Climate United's subgrant. This reduction involved laying off 8 people and

JA955

reallocating 5 people to other business units that are not involved in implementing Climate United projects. Even if Climate United ultimately obtains access to its NCIF funds, it will therefore have to invest additional resources to rehire, onboard, and train employees to carry out its original workplan, causing delays in implementation for the overall program.

**<u>Continued Irreparable Impact on Climate United's Programs and Mission</u>**

11.    My March 21 declaration detailed the impact on Climate United's existing programs if Climate United does not promptly regain access to the funding provided by the NCIF Award. Those harms will also continue to persist if the Court stays any preliminary injunction.

12.    Climate United relies on the NCIF Award to be able to meet its commitments under subawards that it has already approved, as well as existing lending programs. Because it has not been able to access its NCIF funds, Climate United has been required to spend significant time identifying alternative capital sources for partners in its immediate pipeline and anticipates needing to do that going forward if the Court stays a preliminary injunction. If Climate United is unable to identify additional sources to bridge its funds, those projects could unwind altogether, and some may never be reassembled. This includes financing for solar projects that, if not completed in the near term, could lose their ability to operate because of changes in state regulation that have since made solar development economically infeasible. These already committed projects are projected to save significant energy costs for public schools, small businesses, and rural municipalities, create local jobs, and collectively drive over $100 million in local economic activity.

13.    Climate United will be unable to finance programs it has already launched, including all of the projects and programs mentioned in my previous declarations. We will be in default of our loan agreements with multiple borrowers with unfunded balances and we will not

JA956

be able to make commitments to partners and borrowers who have spent weeks of uncompensated time responding to open and competitive requests.

**Continued Irreparable Impact on Climate United's Reputation**

14.     Finally, my March 21 declaration detailed the impact on Climate United's reputation caused by Climate United not having ready access to its NCIF funds. Climate United's ability to enter into lending and financing agreements, and to attract co-investment for those projects, relies on Climate United's reputation as a steady business partner. These harms, too, will persist if the Court stays a preliminary injunction.

15.     As I explained in my March 21 Declaration, Climate United had already begun receiving input from current and prospective partners indicating that they were no longer going to engage with Climate United while the status of its funding was uncertain. Since March 21, Climate United has heard from additional current and prospective partners about similar concerns. Numerous partners have gone pencils-down on dealing with Climate United, impairing our ability to build trust in the market and execute on impactful projects and programs, particularly in communities that have often been left behind by traditional financial institutions.

16.     In my March 21 Declaration, I stated that Climate United would receive increasingly unfavorable terms from vendors and prospective portfolio partners if access to NCIF funding was not restored.  With our funding frozen for two months, we have experienced the harm I feared. As Climate United has informed EPA, almost all professional services vendors including its accountants and all legal counsel have required that Climate United either fund retainers or fixed fee arrangements at the onset of an engagement.  Climate United also has outstanding and overdue invoices owing to vendors and such vendors have ceased work pending payment of those outstanding amounts.  Climate United's portfolio partners have required upfront funding of all

JA957

commitment amounts into partner-owned accounts to ensure that funding will be available for the entirety of the project. No one wants a half-built project.

**Impact of Alternatives to Full Access to Funds**

17.    I understand that in deciding the motion for preliminary injunction, this Court may consider modifying or limiting the scope of the Temporary Restraining Order it previously issued. Only full funding will be sufficient to address all of the harms identified above. However, at the very minimum, Climate United could likely survive the duration of this litigation if the Court restores Climate United's access to funding for its operations and does not correspondingly stay that order. And regardless, this Court should require disbursement of funds for expenses Climate United validly incurred prior to EPA's purported termination on March 11, 2025, because Climate United is entitled to those expenses even if EPA's termination is ultimately found to be valid.

18.    In the preliminary injunction hearing, the Court asked how much funding would be required to allow Climate United to solely "continue operations," but not necessarily to finance projects. To fully cover operational expenses for the next six months—including payroll for employees, rent, insurance, payments to essential contractors, and other necessary expenses—Climate United would need access to at least $25 million in funding for itself and its coalition partner subgrantees. This would save Climate United and its partners from being forced to wind down operations before this case can be litigated to final judgment. Although this amount would not permit Climate United to continue any of its active projects and advance its mission—the very reason for Climate United's existence and for the NCIF funding—and thus would still force Climate United to suffer irreparable harm, it would at least allow Climate United to survive.

19.    In addition, the irreparable harm Climate United and its partners are suffering could be mitigated at least somewhat if the Court were to order processing of $6,347,303.87 in draw

JA958

requests and disbursements related to Climate United's grant funds that included expenses incurred as of March 11, 2025. *See* Exhibit A. Although that amount would not be sufficient to cover operating expenses for the duration of this litigation, it would at least allow Climate United and its partners to keep the lights on for approximately 2 months.

20.    As of March 11, 2025, there were an additional $292,250,000.00 in draw requests pending to finance legally committed projects. *See* Exhibit A. Because these requests were made before EPA purported to terminate Climate United's grant on March 11, 2025, my understanding is that Climate United is entitled to these funds regardless of whether the termination is considered effective. In other words, my understanding is that even if this Court lacks jurisdiction over Climate United's claims, and even if the Court of Federal Claims were to find EPA's termination is valid, and even if EPA were able to complete the closeout process, Climate United would *still* be entitled to this funding.

21.    Finally, I note that the Court initially granted a temporary restraining order that did not allow Climate United or any of the other plaintiffs immediate access to the funds in their Citibank accounts, but enjoined Defendants from moving those funds away from those accounts. Under no circumstances should these funds be permitted to go back to Treasury while this litigation is pending. That would allow Climate United to have immediate access to those funds upon a final resolution of this litigation in its favor. It would also prevent Defendants from transferring those funds to other potential recipients. EPA has already stated its intent to re-obligate grant funds to other recipients. Preventing transfer of the funds from Climate United's accounts would also protect Climate United from being unable to recover the funds if they were transferred to another government entity, such as the Department of the Treasury.

JA959

**Status of Stopgap Charitable Grants**

22.    As previously stated, funds available to cover operations from the NCIF grant were exhausted within 14 business days of the freeze given the structure of our Terms and Conditions. Since then, Climate United Fund has been operating on limited cash reserves and stopgap charitable grants and loans to cover costs. As outlined above, Climate United Fund has cut its monthly costs to only costs essential to maintaining its existence – primarily salaries, limited legal expenses, rent and essential IT costs. Even with these drastic reductions, the stopgap grants received will only allow us to maintain our existing staff for approximately an additional one to two weeks. Failure to be able to access funds would force us to furlough or terminate employees, terminate our rent agreements, and terminate other remaining monthly expenses like IT contracts.

\* \* \*

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed this 15th day of April, 2025, in Bethesda, Maryland.

*/s/ Elizabeth Bafford*                            
ELIZABETH BAFFORD, CEO
Climate United Fund

JA960

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CLIMATE UNITED FUND** | Civil Action No. 25-cv-698 (TSC) |
| Plaintiff, | Civil Action No. 25-cv-735 (TSC) |
| | Civil Action No. 25-cv-762 (TSC) |
| v. | Civil Action No. 25-cv-820 (TSC) |
| | Civil Action No. 25-cv-938 (TSC) |
| **CITIBANK, N.A.**, *et al.* | Civil Action No. 25-cv-948 (TSC) |
| Defendants. | (Consolidated Cases) |

## ORDER

For the reasons set forth in the forthcoming Memorandum Opinion, Plaintiffs' Motion for Preliminary Injunction, ECF No. 33, is **GRANTED**. It is further **ORDERED** that EPA Defendants' Contingent Motion for Stay Pending Appeal, ECF No. 75, is **DENIED** without prejudice.[1] It is further

**ORDERED** that Defendants the U.S. Environmental Protection Agency ("EPA"), Administrator Lee Zeldin, in his official capacity as Administrator of EPA, Deputy Administrator W.C. McIntosh, in his official capacity as Acting Deputy Administrator of EPA, (collectively, "EPA Defendants"), and others in active concert or participation therewith, are **ENJOINED** from effectuating EPA's March 11, 2025 "Notice of Termination"; it is further

---

[1] EPA Defendants filed their motion prematurely, filing a "contingent" motion before the court ruled on the pending motions for preliminary injunction. ECF No. 75. If after reviewing the court's Order and forthcoming Memorandum Opinion, EPA Defendants believe that a stay pending appeal is warranted, they may make a request consistent with Federal Rule of Appellate Procedure 8. In consideration of EPA Defendants' position and Defendant Citibank's silence on the issue, Defendant Citibank is **ORDERED** to refrain from releasing any funding disbursements until **Thursday, April 17, 2025, at 2:00PM EST**.

1

**ORDERED** that EPA Defendants, and others in active concert or participation therewith, are **ENJOINED** from unlawfully suspending or terminating Plaintiffs' grant awards, including by issuing a Notice of Exclusive Control, effectuating a Notice of Termination, or limiting access to funds in accounts established in connection with Plaintiffs' grants, including funds in accounts established by Plaintiffs' subgrantees, except as permitted by the applicable Account Control Agreement ("ACA"), the grant award, the relevant regulations, and applicable law, including any administrative procedures mandated by the Administrative Procedure Act ("APA"); it is further

**ORDERED** that EPA Defendants, and others in active concert or participation therewith, including officials at the U.S. Department of the Treasury, are **ENJOINED** from directly or indirectly impeding Defendant Citibank or from causing Defendant Citibank to deny, obstruct, delay, or otherwise limit access to funds in accounts established in connection with Plaintiffs' grants, including funds in accounts established by Plaintiffs' subgrantees, except as permitted by the applicable ACA, the grant award, the relevant regulations, and applicable law, including any administrative procedures mandated by the APA; it is further

**ORDERED** that Defendant Citibank is **ENJOINED** from transferring or otherwise moving funds out of accounts established in connection with Plaintiffs' grants, including funds in accounts established by Plaintiffs' subgrantees, except as permitted by the applicable ACA, the grant award, the relevant regulations, and applicable law, including any administrative procedures mandated by the APA; it is further

**ORDERED** that Defendant Citibank must disburse any funds properly incurred before the mid-February suspension of Plaintiffs' funds;

**ORDERED** that the bond requirement of Federal Rule of Civil Procedure 65(c) is waived and that this preliminary injunction is effective upon service; it is further

JA962

**ORDERED** that Defendants shall file a status report with the court, within 24 hours of entry of this Order, confirming their compliance with the preliminary injunction; it is further

**ORDERED** that this preliminary injunction remains in effect pending further orders from this Court.

Memorandum Opinion to follow.

Date: April 15, 2025

*Tanya S. Chutkan*

TANYA S. CHUTKAN
United States District Judge

JA963

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CLIMATE UNITED FUND,**<br><br>　　　　　　Plaintiff,<br>　v.<br><br>**CITIBANK, N.A., *et al.***<br><br>　　　　Defendants. | Case No. 1:25-cv-00698 (TSC) |
| **COALITION FOR GREEN CAPITAL,**<br><br>　　　　　　Plaintiff,<br>　v.<br><br>**CITIBANK, N.A., *et al.***<br><br>　　　　Defendants. | Case No. 1:25-cv-00735 (TSC) |
| **POWER FORWARD COMMUNITIES, INC.,**<br><br>　　　　　　Plaintiff,<br>　v.<br><br>**CITIBANK, N.A., *et al.***<br><br>　　　　Defendants. | Case No. 1:25-cv-00762 (TSC) |
| **CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK, *et al.***<br><br>　　　　　　Plaintiffs,<br>v.<br><br>**CITIBANK, N.A., *et al.***<br><br>　　　　Defendants. | Case No. 1:25-cv-00820 (TSC) |

## <u>NOTICE OF APPEAL</u>

Pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure, Defendants, the

Environmental Protection Agency (EPA), Lee Zeldin, in his official capacity as EPA

Administrator, and W.C. McIntosh, in his official capacity as EPA Acting Deputy Administrator,

hereby appeal to the United States Court of Appeals for the District of Columbia Circuit from the

Preliminary Injunction (ECF No. 80) entered in these consolidated cases on April 15, 2025, as

well as from all other interlocutory orders merged into the preliminary injunction.


Respectfully Submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

KIRK T. MANHARDT
Director

*/s/ Marc. S. Sacks*
MARC S. SACKS (Ga. Bar No. 621931)
*Deputy Director*
KEVIN P. VANLANDINGHAM (NY Reg No. 4741799)
*Assistant Director*
U.S. Department of Justice
Civil Division
Corporate/Financial Section
P.O. Box 875
Ben Franklin Stations
Washington D.C. 20044-0875
Tel: (202) 307-1134
Email: kevin.p.vanlandingham@usdoj.gov

*Attorneys for the United States*
*Environmental Protection Agency*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>

**CLIMATE UNITED FUND**

      Plaintiff,

v.

**CITIBANK, N.A.**, *et al.*

      Defendants.

</td><td>

Civil Action No. 25-cv-698 (TSC)
Civil Action No. 25-cv-735 (TSC)
Civil Action No. 25-cv-762 (TSC)
Civil Action No. 25-cv-820 (TSC)
Civil Action No. 25-cv-938 (TSC)
Civil Action No. 25-cv-948 (TSC)
(Consolidated Cases)

</td></tr>
</table>

## <u>MEMORANDUM OPINION</u>

Government agencies wield immense authority in areas central to public life. With that power comes the responsibility to act fairly, transparently, and in accordance with the law. When agencies fail to operate within the bounds of the law—whether through breaching agreements, arbitrary decision-making, or ignoring regulations—they erode public trust, materially affect the rights and interests of individuals and organizations, and undermine confidence in the very institutions meant to serve the people. The integrity of government actions depends not only on the decisions made but on the consistent and lawful execution of those decisions.

Plaintiffs Climate United Fund ("Climate United" or "CU"), Coalition for Green Capital ("CGC"), and Power Forward Communities, Inc. ("PFC") are nonprofit financial institutions who, in April 2024, were awarded grant funding by the U.S. Environmental Protection Agency ("EPA") to finance clean technology projects nationwide. Under the National Clean Investment Fund ("NCIF"), Climate United was awarded $6.97 billion, CGC was awarded $5 billion, and PFC was awarded $2 billion. Plaintiffs California Infrastructure and Economic Development Bank ("California IBank"), Efficiency Maine Trust ("Efficiency Maine"), Illinois Finance Authority

JA966

("Illinois Climate Bank"), and Minnesota Climate Innovation Finance Authority ("MnCIFA") (collectively, "Subgrantee Plaintiffs") are state green banks—public or quasi-public entities that provide crucial financial services to pollution-reducing projects in their states—who are subrecipients under CGC's NCIF grant. Plaintiffs Justice Climate Fund ("JCF") and Inclusiv, Inc. ("Inclusiv") are nonprofit financial institutions who were also awarded EPA grant funding in April 2024, but under the Clean Communities Investment Accelerator fund ("CCIA"). JCF was awarded $940 million and Inclusiv was awarded $1.87 billion.

These grants require Plaintiffs' funds be held at Citibank, N.A. ("Citibank") in their individual bank accounts, according to the parties' respective agreements. Since mid-February 2025, Plaintiffs have attempted to draw on funds from their respective accounts to no avail. For weeks, despite repeated inquiries to Citibank and EPA, Plaintiffs received little to no communication from EPA or Citibank regarding their inability to access their funds. Overnight, billions of dollars appropriated by Congress were frozen. As a result, nationwide projects were halted, workplans were disrupted, and millions of dollars in approved transactions with committed partners could not be disbursed.

After weeks of no communication, Plaintiffs filed this case against Defendants, and then finally received a response the day before a TRO hearing in this case—in near identical notices, EPA terminated their grants, effectively dismantling the entirety of the NCIF and CCIA grant programs. Plaintiffs allege that Defendants' actions violate several statutes and regulations, the U.S. Constitution, and the Administrative Procedure Act ("APA"), and they seek to extend this court's TRO order into a preliminary injunction pending a final decision on the merits. For the reasons discussed below, Plaintiffs' motion for a preliminary injunction will be **GRANTED**.

JA967

# I.    BACKGROUND

## A. Statutory Background: The Inflation Reduction Act and EPA's Greenhouse Gas Reduction Fund

The court discussed some of the background of this case in its Memorandum Opinion granting a TRO, which it incorporates here.  *See Climate United Fund v. Citibank, N.A.*, ___ F. Supp. 3d ___, No. 25-cv-698, -735, -762, 2025 WL 842360 (D.D.C. Mar. 18, 2025).

In 2022, Congress enacted the Inflation Reduction Act of 2022 ("IRA").  Pub. L. No. 117-169, 136 Stat. 1818.  The IRA amended the Clean Air Act to authorize EPA to make competitive grants under the Greenhouse Gas Reduction Fund ("GGRF"), which appropriated approximately $27 billion to the EPA Administrator to make grants available to eligible recipients for various clean energy climate projects.  *See* 42 U.S.C. § 7434(a)(1)–(3).

Upon enactment of the IRA, EPA launched a stakeholder engagement strategy to help shape implementation of the GGRF.  Cong. Rsch. Serv., IF12387, EPA's Greenhouse Gas Reduction Fund, https://www.congress.gov/crs-product/IF12387 (updated May 21, 2024).  Among other things, EPA held multiple listening sessions for members of the public and stakeholder groups, "published a Request for Information seeking public comment on core design aspects of the GGRF," and sought advice from the agency's Environmental Financial Advisory Board.  *Id.*

Finally, in June and July 2023, EPA launched three grant programs under the GGRF: the National Clean Investment Fund ("NCIF"), Clean Communities Investment Accelerator ("CCIA"), and Solar for All.  *Id.*  Together, NCIF and CCIA were built to work in tandem to "not only deploy clean energy and combat the climate crisis but also improve health outcomes, lower energy costs, and create high-quality jobs for Americans."  Pls.' Consolidated Mot. for Prelim. Inj. Mot. ("PI Mot."), Ex. 1 at 4, ECF No. 33-3.

JA968

**B. Plaintiffs Apply for and Win EPA Grants**

In October 2023, Plaintiffs applied for grant funding for GGRF programs, which included a robust set of application requirements and evaluation criteria. *Review and Selection Process*, EPA, https://www.epa.gov/greenhouse-gas-reduction-fund/review-and-selection-process (last updated Aug. 16, 2024). Applicants were required to submit information that encompassed "organizational and governing documents; resumes of board members and senior management; legal and compliance risk management policies and procedures; financial statements; workplans for the first year of program implementations, and budget narratives." *Id.* On April 4, 2024, EPA publicly announced that Plaintiffs had won grant funding. EPA Prelim. Inj. Opp'n ("EPA PI Opp'n"), Ex. A at 3, ECF 49-2. Under the NCIF, Climate United was awarded $6.97 billion, CGC was awarded $5 billion, and PFC was awarded $2 billion, and under the CCIA, JCF was awarded $940 million and Inclusiv was awarded $1.87 billion. *Id.* Subgrantee Plaintiffs are subrecipients under CGC's NCIF grant. *California IBank v. Citibank, et al.*, No. 25-cv-820, Prelim. Inj. Mot. at 9, ECF No. 17.

**C. Award Agreements and Relevant Regulations**

Plaintiffs' awards were memorialized in grant agreements between Plaintiffs and EPA.[1] PI Mot., Ex. 3, EPA Grant Agreement, Dec. Amend., ECF No. 33-5. Under the grant agreements, EPA may only terminate an award under three circumstances:

    (1) If a grant recipient engages in "substantial" noncompliance such that "effective performance" is "Materially Impaired." Performance is deemed "Materially

---

[1] "Given that the GGRF cases contain common questions of law and fact," including that EPA "issued the GGRF grants under 42 U.S.C. § 7434 at similar times utilizing similar grant agreements with common terms," Citibank is the designated financial agent for these awards, and "EPA sent termination notices regarding the GGRF grants agreements at similar times upon similar bases" to Plaintiffs, *see* Joint Mot. to Consolidate at 1, *Just. Climate Fund v. EPA*, No. 25-cv-938, ECF No. 13, for simplicity, the court refers to Climate United's exhibits when discussing common issues.

JA969

Impaired" if: (1) EPA issues a "written determination and finding . . . that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause;" and (2) EPA determines in its sole discretion that a "corrective action plan" would remedy the issue and EPA issues a "separate written determination and finding" that the Recipient "has not materially addressed its failure."

(2) If a Recipient engages in "material misrepresentation of eligibility status;" or

(3) For "Waste, Fraud, or Abuse," which is defined with reference to EPA General Terms and Conditions and 2 C.F.R. § 200.113.  Termination on these grounds requires "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U.S.C. §§ 3729-3733."

*see* PI Mot. at 8–9, 12, 41, ECF No. 33-1.

The Uniform Grant Guidance, 2 C.F.R. § 200, applies to federal agencies that make federal awards to non-federal and other entities.  These regulations lay out a host of requirements for federal grants, including the procedural steps an agency must take before it can suspend (*id.* § 200.339) or terminate a grant (*id.* § 200.340).  *See also id.* §§ 200.341, 200.342, and 200.305.

For example, EPA must provide written notice of termination that includes "the reasons for termination, the effective date, and the portion of the Federal award to be terminated," and it must "clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award."  *Id.* § 200.341(a)-(b).  On April 22, 2024, the Office of Management and Budget ("OMB") finalized several revisions to these regulations, one of which included amending 2 C.F.R. § 200.340 to permit termination of federal grants when inconsistent with agency priorities *only* when that basis is stated in the grant's terms and conditions.  Guidance for Federal Assistance, 89 Fed. Reg. 30,046, 30,089 (Apr. 22, 2024).

In July 2024, EPA decided to apply the revised version of 2 C.F.R. § 200.340, consistent with OMB guidance, to the grant agreements in this case.  *See* 89 Fed. Reg. at 55,263.  Under 2 C.F.R. § 200.340, EPA may terminate a federal award "if the recipient or subrecipient fails to

JA970

comply with the terms and conditions of the Federal award," or "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities."  *Id.* § 200.340(a)(1), (4).

Also relevant here, under *id.* § 200.305(b)(6)(i)(ii), "[p]ayments for allowable costs" pursuant to the grant agreements must not be withheld at any time during the period of performance, unless required by federal statute, regulations, or if (i) the recipient or subrecipient has failed to comply with the terms and conditions of the federal award, or (ii) the recipient or subrecipient is delinquent in a debt to the U.S. as defined in OMB Circular A-129.  *Id.* (formatting modified).  Under these conditions, the federal agency "may, after providing reasonable notice, withhold payments to the recipient or subrecipient for financial obligations incurred after a specified date until the conditions are corrected or the debt is repaid to Federal Government."  *Id.* (b)(6)(ii).

### D.  The Account Control Agreements and Financial Agency Agreements

Under the grant agreements, Plaintiffs' funds must be held at Citibank under the respective Financial Agency Agreements ("FAA") between Citibank and the U.S. Treasury Department ("Treasury"), and respective Account Control Agreements ("ACA") between Citibank, EPA, and Plaintiffs.  PI Mot. at 10–11.

Under the ACA, Citibank is "designated and authorized to act as a financial agent of the United States" under the authority of Treasury, and it administers and disburses the funds provided under the grant programs.  *See* PI Mot., Ex. 8 at 3, Account Control Agreement, ECF No. 33-10. Citibank must "comply with all instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and financial assets" and must release Plaintiffs' funds at their request, unless EPA—the "Secured Party" to the agreement—issues a "Notice of Exclusive

Control stating that it is exercising its right to exclusive control over an Account." *See* Citibank Opp'n to TRO Mot., FAA ("FAA") Ex. 1 at 25, ECF No. 14-1 (SEALED). Under the FAA, Citibank acts as a financial agent of the United States and provides banking and financial services related to these grant programs. *Id.* at 1.

Pursuant to the agreements discussed above, Plaintiffs would periodically request disbursement of their funds through Citibank. But beginning in mid-February 2025, Citibank stopped disbursing any funds after receiving a letter from the FBI "recommending" that Citibank freeze assets related to Plaintiffs' grants. Citibank Opp'n to TRO Mot., Ex. 5 at 2–6, ECF No. 14-5. Plaintiffs followed up with emails, letters, and voicemails to Citibank, with no response. And as discussed in the court's TRO opinion, EPA did not respond to Plaintiffs' inquiries. Plaintiffs were therefore left with no information as to why they could not access their funds. 2025 WL 842360, at *1.

Finally, on March 4, 2025, EPA sent Plaintiffs identical information requests. *See, e.g.*, EPA PI Opp'n, Ex. D, Compliance and Oversight Review of EPA Greenhouse Gas Reduction Fund Letter from EPA to CU, ECF No. 49-2. The letters expressed concerns over the oversight mechanisms of the grant award program and stated that EPA "will work with [Treasury] and [Citibank] to establish and implement additional account controls consistent with prudent operational standards pursuant to the [FAA]." *Id.* They instructed Plaintiffs to submit requested responses and documents to a list of 25 requests by March 28, 2025. *See id.*

That same day, Treasury instructed Citibank not to disburse any GGRF funds through March 9, 2025, stating it had been informed of EPA's "concerns regarding potential fraud and/or conflicts of interest related to the Greenhouse Gas Reduction Fund," and that "EPA anticipates developing additional account controls." Citibank Opp'n to TRO Mot., Ex. 7, ECF No. 14-7. And

on March 10, 2025, EPA and Treasury directed Citibank to continue to refrain from processing payments. *Id.*, Ex. 2, ECF No. 14-2.

### E. EPA Administrator and Funds Pause

On January 29, 2025, the Senate confirmed Lee Zeldin as EPA Administrator. Decl. of Eric Amidon ("Amidon Decl.") ¶ 3, ECF No. 49-3. Almost immediately, and throughout February and March 2025, Administrator Zeldin began to publicly express his desire to take control of the funds disbursed under the IRA and to terminate the GGRF grants. *See* PI Mot. at 1–3; 15–19. On February 12, 2025, he publicly announced EPA's intention to do so, stating that the FAA with Citibank "needs to be instantly terminated," that Citibank "must immediately return the funding," and that EPA is "not going to rest" until it recovered the grant funds. *Id.*, Ex. 7 at 4–5, ECF No. 33-9.

On February 13, 2025, Administrator Zeldin publicly announced that "roughly $20 billion" of tax dollars were found "parked at a financial institution," and in a video, called for the immediate cancellation of the FAA, stating that "the American public deserves a more transparent and accountable government." PI Mot. at 35; Administrator Zeldin Announces that Billions of Dollars Worth of "Gold Bars" Have Been Located at Outside Financial Institution, EPA, https://www.epa.gov/newsreleases/administrator-zeldin-announces-billions-dollars-worth-gold-bars-have-been-located (Feb. 13, 2025).

On February 23, 2025, Administrator Zeldin discussed the GGRF funds on a television program, stating that the agency was working to "re-establish accountability and oversight" over the grant programs, and that the "entire scheme, in [his] opinion, is criminal." PI Mot., Ex. 7 at 4–5; @SundayMorningFutures, *X* (Feb. 23, 2025, 11:21 AM), https://x.com/SundayFutures/status/1893697750937505807. On March 2, 2025, EPA issued a

letter to its Office of the Inspector General requesting an investigation into GGRF.  EPA PI Opp'n, Ex. C, ECF No. 49-2.

### F.  Grant Termination Letters

On March 8, 2025, Climate United filed suit and moved for a TRO.  *Climate United Fund v. Citibank, et al.*, No. 1:25-cv-698, ECF Nos. 1 & 2.  The court informed the parties that it was inclined to set a hearing for March 11, 2025, with opposition briefs due that same day.  EPA Defendants "asked for an extension as a professional courtesy," and Climate United agreed.  TRO Mot. Hr'g Tr. 10:06–12 (Mar. 12, 2025), ECF No. 22.  The court scheduled a hearing on the motion for March 12, 2025.  *See* Mar. 10, 2025 Min. Order.

The day before the scheduled TRO hearing, March 11, EPA Defendants sent Plaintiffs identical letters (aside from differences in the addressees and grant award numbers), informing them that EPA was terminating their "grant effective immediately."  *See* PI Mot., Ex. 11 at 1, Termination Letter, ECF No. 33-13.  EPA Defendants stated that the terminations were "based on substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities, which collectively undermine the fundamental goals and statutory objectives of the award."  *Id.* at 1.  The letter instructed Plaintiffs to cease all further program expenditures immediately.

### G.  Procedural Posture

Plaintiffs individually filed suit on various dates throughout March 2025 against EPA Administrator Lee Zeldin, and EPA Acting Deputy Administrator William Charles McIntosh (collectively, "EPA Defendants"), seeking declaratory and injunctive relief.  *See Climate United Fund v. Citibank et al.*, No. 1:25-cv-698, *Coal. for Green Cap. v. Citibank et al.*, No. 1:25-cv-735, *Power Forward Communities, Inc. v. Citibank et al.*, No. 1:25-cv-762, *Cal. Infrastructure & Econ.*

JA974

*Dev. Bank, et al. v. Citibank, et al.*, No. 1:25-cv-820, *Justice Climate Fund v. EPA et al.*, No. 1:25-cv-938, and *Inclusiv, Inc. v. EPA et al.,* No. 1:25-cv-948.  Plaintiffs bring a variety of claims, including breach of contract, conversion, and replevin against Citibank, and claims under the U.S. Constitution and the APA, 5 U.S.C. § 706, against EPA Defendants, claiming its actions violated multiple regulations, statutes, and constitutional provisions.

The court heard argument on March 12 and March 15, 2025, and partially granted Plaintiffs' TRO on March 18, 2025.  On March 21, 2025, Plaintiffs Climate United, CGC, and PFC filed a consolidated motion for a preliminary injunction, which Subgrantee Plaintiffs joined with their own, separate briefing.  On March 31, 2025, the court granted Plaintiffs' motion to extend the TRO, given the preliminary injunction proceeding and for the reasons set forth in that Order.  *See* ECF No. 57.  On April 1, 2025, the court heard argument on the preliminary injunction motions, and on April 8, 2025, the court extended the TRO to April 15, 2025 to consider the parties' supplemental filings noticing the Supreme Court's Order staying the TRO in *U.S. Department of Education v. California*, No. 24A910 (Apr. 4, 2025).  *See* ECF Nos. 63–66; Order, ECF No. 70.  Finally, given the common questions of fact and law, these cases were consolidated.  *See* Mar. 20, 2025, Mar. 25, 2025, and Apr. 15, 2025 Min. Orders.[2]

## II.     LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  A preliminary injunction is warranted where the moving party establishes that (1) it is likely to succeed on the merits, (2) irreparable harm is

---

[2] Prior to consolidation, Subgrantee Plaintiffs filed a separate Motion for Preliminary Injunction, *Cal. Infrastructure & Econ. Dev. Bank, et al. v. Citibank, et al.*, No. 1:25-cv-820, ECF No. 17, as did Inclusiv, *Inclusiv, Inc. v. EPA et al.*, No. 1:25-cv-948, ECF No. 6, and *Justice Climate Fund v. EPA et al.*, No. 1:25-cv-938, ECF No. 7.  Because this preliminary injunction covers all Plaintiffs, those motions were either dismissed as moot or granted.

JA975

likely in the absence of preliminary relief, (3) the balance of equities tips in the movant's favor, and (4) an injunction is in the public interest. *Id.* at 20; Fed. R. Civ. P. 65(b)(1). "The moving party bears the burden of persuasion and must demonstrate, 'by a clear showing,' that the requested relief is warranted." *Hosp. Staffing Solutions, LLC v. Reyes*, 736 F. Supp. 2d 192, 197 (D.D.C. 2010) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held," *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981), and "to balance the equities as the litigation moves forward," *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017) (per curiam). "The status quo is the last *uncontested* status which preceded the pending controversy." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733–34 (D.C. Cir. 2022) (quoting *District 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.*, 412 F.2d 165, 168 (D.C. Cir. 1969)).

### III.    ANALYSIS

The court begins its analysis with two threshold issues: subject-matter jurisdiction and standing.

#### A. Standing

##### a.    *Plaintiffs Have Article III Standing*

It is an "essential and unchanging part of the case-or-controversy requirement" that a plaintiff must establish Article III standing to sue in federal court. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To establish Article III standing, a party must show that: (1) they have suffered an injury in fact, (2) the injury is fairly traceable to the challenged action of the defendant, and (3) it is likely that the injury will be redressed by a favorable decision. *Id.* at 560–61. A party seeking a preliminary injunction "must show a substantial likelihood of standing." *Green v. U.S.*

*Dep't of Just.*, 54 F.4th 738, 744 (D.C. Cir. 2022) (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015)) (internal quotation marks omitted).

First, as to injury in fact, a plaintiff must have suffered "an invasion of a legally protected interest," *Nat'l Fam. Plan. & Reprod. Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 828–29 (D.C. Cir. 2006), that is "(1) concrete, (2) particularized, and (3) actual or imminent." *Vilsack*, 808 F.3d at 914 (citation omitted). The injury in fact test "requires that the party seeking review be himself among the injured." *Lujan*, 504 U.S. at 563 (citation omitted).

Plaintiffs are each themselves "among the injured." *Id.* There is no question that Plaintiffs were awarded funds, which have been deposited in their individual accounts with Citibank. And there is no question that each Plaintiff—including subgrantees of the grant awards—has its own, individual account and a separate, individual agreement governing those accounts. *See* PI Hr'g Tr. 86:12–86:25 (Apr. 2, 2025), ECF No. 62 ("[T]he subgrantees have their own separate [Citibank] accounts . . . and there's a separate ACA that covers those accounts."). With no access to the funds in their accounts, Plaintiffs have suffered a concrete injury that is "direct, real, and palpable" and "personal, individual, distinct, and differentiated—not generalized." *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1292 (D.C. Cir. 2007). Withdrawal of funding qualifies as an injury in fact. *See, e.g.*, *Gonzales*, 468 F.3d at 829 (discussing how "[a]n actual withdrawal of funding from the association's members would clearly qualify" as an injury in fact but association did not "suggest that any such withdrawal has occurred.").

Plaintiffs have been unable to access their funds since mid-February. They have submitted several declarations detailing the direct injuries they have suffered from this suspension. Without access to their funds, Climate United has had to "defer compensation for certain employees, terminate multiple vendors, cancel travel, and instruct non-essential lawyers, accountants, and

JA977

consultants to cease work."  Decl. of Elizabeth Bafford ("Bafford Decl.") ¶ 62.  PFC has been unable to pay outstanding invoices from contractors for work completed on PFC's behalf and, as a result, is incurring default risk with respect to these contracts.  Decl. of Timothy J. Mayopoulos ("Mayopoulos Decl.") ¶ 19, ECF No. 33-31.  And CGC has committed $135 million in funding to fourteen emerging green banks and community lenders across fourteen states.  Decl. of Stephen Brown ("Brown Decl.") ¶¶ 4, 8, ECF No. 33-25.  These are not "remote, speculative, conjectural, or hypothetical" injuries.  *Pub. Citizen*, 489 F.3d at 1293.

Defendants' arguments regarding Plaintiffs' position miss the mark.  Plaintiffs are not, as in *Hein v. Freedom,* mere taxpayers attempting to assert standing.  *See Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 593 (2007).  ("It has long been established, [] that the payment of taxes is generally not enough to establish standing to challenge an action taken by the Federal Government.").  They have articulated specific direct harm that they have suffered as a result of Defendants' actions.  Plaintiffs have therefore sufficiently demonstrated injury in fact.

Second, Plaintiffs' injuries are fairly traceable to the challenged action.  EPA Defendants' actions in ordering Citibank to freeze grant funds clearly prevent Plaintiffs from accessing the funds in their accounts.  These actions have resulted in halted projects, compromised organizational missions, and caused injury to each Plaintiff individually.  These injuries flow from Defendants' actions and are not the "result [of] the independent action of some third party not before the court." *Lujan*, 504 U.S. at 561 (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 462 U.S. 26, 41–2 (1976)).  The causal connection between the injury and Defendants' conduct is clear.

Third, Plaintiffs must demonstrate redressability.  It must be likely that a favorable decision by the court would redress the plaintiff's injury.  *Id.*  Plaintiffs seek relief from what they claim is the unlawful suspension and termination of their agreements and access to their funds.  EPA

JA978

Defendants argue essentially that, since it is uncontested that EPA does have the authority to cancel grants, if EPA were to cancel Plaintiffs' grants lawfully, Plaintiffs would "cease to operate anyway." PI Hr'g Tr. 73:18–74:5.

But EPA's hypothetical possibility has no bearing on redressability, which does not "depend entirely on the occurrence of some other, future event, *Miami Bldg. & Constr. Trades Council, AFL/CIO v. Sec'y of Def.,* 493 F.3d 201, 206 (D.C. Cir. 2007), and a plaintiff need not "negate . . . speculative and hypothetical possibilities . . . in order to demonstrate the likely effectiveness of judicial relief." *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 78 (1978). Indeed, "a party seeking judicial relief need not show to a certainty that a favorable decision will redress [its] injury." *Nat'l Wildlife Fed'n v. Hodel,* 839 F.2d 694, 705 (D.C. Cir. 1988). Were the court to grant Plaintiffs' relief, they would have access to the funds in their accounts, dating back to, at a minimum, when their accounts were suspended in mid-February.

EPA Defendants also argue that any relief should not be extended to the subgrantees. But Plaintiffs have proffered evidence that their subgrantees' inability to access funds affects Plaintiffs' operations and ability to carry out their mission. *See, e.g.*, Decl. of Ari Matusiak ¶ 24, ECF No. 33-3 (If PFC loses its funding, [Subgrantee] Rewiring Community "will be forced to close its doors."); Decl. of John Moon ¶¶ 16-23; ECF No. 33-32; Decl. of Jessica Buendia ("Buendia Decl.") ¶ 12, ECF No. 33-26 (CGC's Subgrantee ICLEI "ultimately risks insolvency."); *see also* Decl. of Shaun Donovan ¶ 24, ECF No. 33-29.

The inability to access their grant funds affects both Plaintiffs *and* their subgrantees. *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 438 (2017) (standing requires plaintiffs to "alleg[e] such a personal stake in the outcome of the controversy as to . . . justify [the] exercise of the court's remedial powers on [their] behalf.") (quoting *Simon v. E. Ky. Welfare Rts. Org.,* 426 U.S. 26, 38

(1976)) (internal quotation marks omitted).  And on their own, Subgrantee Plaintiffs have shown that they are at risk to suffer actual and imminent injury for the reasons already discussed.

### b.  *Subgrantee Plaintiffs Have Prudential Standing*

Finally, EPA argues that subgrantees lack prudential standing because they have no direct legal relationship with EPA and are not parties to the terminated grants.  In addition to the constitutional standing requirements, courts have recognized prudential limitations on standing not specifically set forth by the Constitution's text.  *LaRoque v. Holder*, 650 F.3d 777, 781 (D.C. Cir. 2011).  These limitations are meant to avoid "the adjudication of rights which those not before the Court may not wish to assert" and to ensure "that the most effective advocate of the rights at issue is present to champion them."  *Duke Power Co.,* 438 U.S. at 80; *LaRoque*, 650 F.3d at 781–82.  A party must show that "the interest it seeks to protect 'is arguably within the zone of interests to be protected or regulated by the statute . . . in question.'"  *Cement Kiln Recycling Coal. v. EPA,* 255 F.3d 855, 870 (D.C. Cir. 2001) (quoting *Ass'n of Data Processing Serv. Orgs. V. Camp*, 397 U.S. 150, 153 (1970)).  This "test is not meant to be especially demanding."  *Clarke v. Secs. Indus. Ass'n,* 479 U.S. 388, 399 (1987).

For the reasons set forth above, the subgrantees' interests are not "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit."  *Motor & Equip. Mfrs. Ass'n v. Nichols,* 142 F.3d 449, 458 (D.C. Cir. 1998) (quoting *Clarke*, 479 U.S. at 399).  Subgrantee Plaintiffs assert their own legal rights and interests, and they too bring claims challenging Defendants' actions, which have upended their operations.[3]

---

[3] EPA Defendants claim that "the lack of prudential standing here is consistent with the Tucker Act's denial of standing to a subrecipient, or any other party not in privity with the government." EPA PI Opp'n to Subgrantee Pls.' PI Mot. at 8, ECF No. 56.  But EPA Defendants omit that there

## B. Subject-Matter Jurisdiction

### a. *This Court Has Jurisdiction Over These Claims*

The court comes to the same conclusion it already reached on jurisdiction—it has jurisdiction over Plaintiffs' claims because these claims are not "in essence" contract claims, such that jurisdiction lies in the Court of Federal Claims. *See Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967–68 (D.C. Cir. 1982)).

Federal district courts have jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Under the Tucker Act, 28 U.S.C. § 1491, and absent other grounds for district court jurisdiction, the Court of Federal Claims has exclusive jurisdiction over breach of contract claims against the federal government over $10,000. *Id.*; *see Megapulse*, 672 F.2d at 967–68.

But the D.C. Circuit has "explicitly rejected the 'broad' notion 'that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act' because to do so would 'deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government.'" *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) (quoting *Megapulse*, 672 F.2d at 967–68). Thus, in determining whether a claim falls under the Tucker Act, the court

---

are exceptions to this rule. Even if this were a case properly before the Court of Federal Claims, subgrantees are not automatically barred from bringing their claims. While "[a]s a general rule, the Tucker Act does not provide the [Court of Federal Claims] with jurisdiction to hear a claim brought directly against the federal government by a subcontractor," (citing 28 U.S.C. § 1491(a)), "an exception exists however, which allows an intended third-party beneficiary of a government contract to enforce its rights directly against the federal government." *G4S Tech. LLC v. United States*, 114 Fed. Cl. 662, 669 (2014), *aff'd*, 779 F.3d 1337 (Fed. Cir. 2015); *see also First Hartford Corp. Pension Plan & Trust v. United States,* 194 F.3d 1279, 1289 (Fed. Cir. 1999) (one such exception allows suit against the government by an intended third-party beneficiary despite the lack of privity); *Flexfab, L.L.C. v. United States*, 424 F.3d 1254, 1263 (Fed. Cir. 2005).

must decide if the action "is *at its essence* a contract claim," which depends "both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)." *Id.*, 38 F.4th at 1106 (quoting *Megapulse*, 672 F.2d at 967–68).

EPA Defendants maintain that Plaintiffs' claims are not properly before this court—they contend that "this is just a run-of-the-mill [] contract dispute," and "at most, Plaintiffs are entitled to claim damages . . . [from] the Court of Federal Claims." EPA PI Opp'n at 10.  The court cannot agree.

First, Plaintiffs' source of rights.  Plaintiffs bring claims under the APA, the U.S. Constitution, and various statutes and regulations.  They sued after Citibank refused to release their grant funds from their bank accounts—at what is now known to have been the direction of the FBI, EPA, and Treasury.  Plaintiffs challenge EPA's action in suspending and then terminating their grants, which EPA concedes had nothing to do with Plaintiffs' performance under the grant.  PI Hr'g Tr. 34:3–7, 53:13–16 (EPA conceding that Plaintiffs have not breached any terms of their agreements); EPA PI Opp'n at 20 (EPA explaining that it did not terminate Plaintiffs' grants for noncompliance).  Indeed, nothing in the record suggests that Plaintiffs violated any term or condition of their agreements.  *See id.*  Yet, overnight, on the eve of a hearing challenging the freezing of the funds in their accounts, their grants were all terminated in identical letters using the same boilerplate language that referenced not only the terms of the contract to justify termination, but also federal regulations.  *See* PI Mot., Ex. 11, Termination Letter.

In evaluating Plaintiffs' claims, the court does not look solely to any contract, nor could it when it must address clear regulatory and statutory questions.  Plaintiffs were awarded this grant under a statute authorized by Congress.  While it is true that the parties have entered into grant agreements that operate as contracts, the claims here turn on, at least in part, examining the federal

regulations and federal statute governing Plaintiffs' grant awards.  EPA seems to agree but argues that the federal regulations are relevant to the grant agreements "because they're incorporated into the contract."  PI Hr'g Tr. 41:25–42:3.  It cannot be that the contract's authority trumps the agency's formal regulations and a federal statute.

EPA urges the court to treat the government as "any other contracting party" and argues that it should be free to breach contracts like any private party.  *See* EPA PI Opp'n at 13.  This ignores the fact that courts have long recognized that government actions, even those involving contractual relationships, are subject to review when they implicate statutory, constitutional, or procedural violations.  The government is not just another contracting party.  And as the Supreme Court has noted, "[u]nlike normal contractual undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy."  *Bennett v. Ky. Dept. of Educ.,* 470 U.S. 656, 669 (1985).  EPA's suspension and termination of Plaintiffs' grants interferes with Congress' mandate under the IRA concerning desirable public policy.

Ultimately, Plaintiffs' "claims arise under a federal grant program and turn on the interpretation of statutes and regulations rather than on the interpretation of an agreement negotiated by the parties."  *Md. Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441, 1449 (D.C. Cir. 1985) (citation omitted).  The record is clear: Plaintiffs do not challenge a mere contract between the parties—they challenge agency action governed by statutes and regulations.

Second, Plaintiffs' relief sought.  "[E]xclusive jurisdiction in Claims Court under the Tucker Act does not lie 'merely because [a plaintiff] hints at some interest in a monetary reward from the federal government or because success on the merits may obligate the United States to

pay the complainant.'" *Crowley*, 38 F.4th at 1108 (quoting *Kidwell v. Dep't of Army*, 56 F.3d 279, 284 (D.C. Cir. 1995)). Indeed, "a claim is not for money merely because its success may lead to pecuniary costs for the government or benefits for the plaintiff." *Kidwell*, 56 F.3d at 284 (internal quotations omitted); *see Vietnam Veterans v. Sec'y of the Navy*, 843 F.2d 528, 534 (D.C. Cir. 1988).

Here, Plaintiffs seek equitable relief vindicating their rights to access their grant funds and to enjoin EPA's unlawful suspension and termination of their grants. Plaintiffs do not ask for specific performance, nor do they ask the court to interpret the terms of any contract. Any monetary benefit that might flow to Plaintiffs "would not come from [this] court's exercise of jurisdiction, but from the structure of statutory and regulatory requirements governing compensation" in this action. *Tootle v. Sec'y of Navy*, 446 F.3d 167, 175 (D.C. Cir. 2006) (citation omitted). The relief they seek "is not a claim for money damages, although it is a claim that would require the payment of money by the federal government." *Bowen v. Massachusetts*, 487 U.S. 879, 894 (1988).

Moreover, "[o]ur cases have long recognized the distinction between an action at law for damages—which are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation—and an equitable action for specific relief[.]" *Id.* at 893–96 ("The term 'money damages,' . . . normally refers to a sum of money used as compensatory relief. Damages are given to the plaintiff to *substitute* for a suffered loss, whereas specific remedies 'are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled.'"). Thus, "Courts frequently describe equitable actions for monetary relief under a contract" as specific relief, not money damages. *See id.* at 895.

JA984

Plaintiffs seek access to funds they are presently entitled to, "rather than money in compensation for the losses, whatever they may be, that [Plaintiffs] will suffer or ha[ve] suffered by virtue of the withholding of those funds." *Id.* They do not seek money damages for past harms or "compensation for the[ir] losses due to the failure to pay them, which, as in any contract case, could be far greater than the amount withheld pursuant to the agency policy[.]" *AIDS Vaccine Advoc. Coal. V. U.S. Dep't of State*, No. 25-cv-400, -402, 2025 WL 485324, at *6 (D.D.C. Feb. 13, 2025) (citation omitted). They seek "prospective, nonmonetary relief to clarify future obligations." *Me. Cmty. Health v. United States*, 590 U.S. 296, 327 (2020).

In addition, the Court of Federal Claims cannot provide the equitable relief Plaintiffs seek. Plaintiffs seek vacatur of the termination letters, an injunction compelling the government to meet its statutory obligations moving forward, and a determination of whether EPA acted in accordance with the law such that the grants were indeed lawfully terminated.[4] Were this court to find that EPA acted unlawfully, Plaintiffs could avail themselves "of statutory and regulatory provisions and procedures that may, or may not, entitle [them] to a monetary recovery." *Tootle*, 446 F.3d at 175 (collecting authorities).

Defendants rely heavily on the Supreme Court's recent order in *U.S. Department of Education v. California*, 604 U.S.____, 145 S.Ct. 966 (2025) in which it ordered a stay of the district court's TRO Order. *See California v. U.S. Dep't of Educ.*, No. CV 25-10548-MJJ, 2025

---

[4] For example, without a determination on the lawfulness of EPA's actions, EPA's termination of the grants on the current bases could affect the grantees and subgrantees' ability to apply for and receive federal grant funds, as these organizations would have to make disclosures when applying for future federal grant opportunities. *See* Decl. of Michael Stoddard ("Stoddard Decl.") ¶ 35, *Cal. Infrastructure & Econ. Dev. Bank, et al. v. Citibank, et al.*, No. 1:25-cv-820, ECF No. 17-2. Termination could also affect an organization's credit rating. *See* Decl. of Scott Wu ("Wu Decl.") ¶ 33, *Cal. Infrastructure & Econ. Dev. Bank, et al. v. Citibank, et al.*, No. 1:25-cv-820, ECF No. 17-5.

JA985

WL 760825, at *1 (D. Mass. Mar. 10, 2025); EPA Notice of Suppl. Authority, ECF No. 63; EPA Reply to Pls.' Resp.'s, ECF No. 71. The Supreme Court noted that the APA's waiver of sovereign immunity does not apply to claims seeking money damages or to orders "to enforce a contractual obligation to pay money." *Dep't. of Educ.*, 145 S.Ct. at 968. But the Court also noted that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." *Id.* (quoting *Bowen*, 487 U.S. at 910).

That is the situation here. Plaintiffs seek to regain access to their already disbursed funds at Citibank, rather than an order mandating the government to pay any type of money damages or money for past harms. In noting the distinction between money damages and relief other than damages, *Bowen* refused to characterize "expenses that [the government] should have paid all along" as money damages. 487 U.S. at 894. Indeed, *Bowen* characterized equitable actions for specific relief as orders providing for "reinstatement for an employee with backpay, or for the recovery of specific property or monies." *Id.* at 893–94 (citation and internal quotation marks omitted). This is part of the equitable relief Plaintiffs seek—reinstatement of their grants and the recovery of specific money. They also challenge EPA's thinly veiled attempts to dismantle the entirety of a congressionally created program and seek other declaratory relief that, as discussed, the Federal Court of Claims cannot grant. Finally, and importantly, the parties' relationship here— given the individual ACAs with Citibank and the lack of agreements between subgrantees and EPA—also differ from the ones implicated in *Department of Education v. California*. These factors materially alter the jurisdictional analysis.[5]

---

[5] Other district courts have recently addressed this question and "similarly held that *California* did not divest them of jurisdiction." *Woonasquatucket River Watershed Council, et al., v. U.S. Dep't of Agric.*, No. 25-cv-97-MSM-PAS, ECF No. 45 at 33–35 (D.R.I. Apr. 15, 2025); *Maine v. United States Dep't of Agric.*, No. 1:25-cv-131-JAW, 2025 WL 1088946, at *19 (D. Me. Apr. 11, 2025); *New York v. Trump*, No. 25-cv-39-JJM-PAS, ECF No. 182 at 5–9 (D.R.I. Apr. 14, 2025).

JA986

It also bears mentioning that the injury analysis in this case is different.  In *U.S. Dep't. of Educ.,* the Supreme Court noted that respondents in that case represented "that they have the financial wherewithal to keep their programs running."  *Dep't. of Educ.*, 145 S.Ct. at 969.  The coalitions in this case were created, under their current structure, to implement Congress's mandate.  Though they have decades of combined experience, they came together to implement Congress's specific call under the IRA.  Accordingly, the grantees do not have other committed sources of funding, meaning that the loss of access to their funds will have devastating effects.  *See supra* § III(A) and *infra* § III(D).

It is undisputed that EPA can, and agencies do, terminate grants, but they must do so lawfully and in accordance with relevant regulations, the U.S. Constitution, and applicable law. The APA does not exist to review the actions of "other contracting parties"—it exists to review government action.  *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 371 (2024) ("Congress in 1946 enacted the APA 'as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices.') (quotation omitted).

EPA's position would impermissibly narrow the court's ability to review agency action. For example, the government might creatively contract their way out of judicial reviewability of its actions, shielding itself by virtue of its "contractual relationship" with a party.  That cannot be, and is not, what Congress envisioned for judicial review under the APA.  Nor is it the law.  As the *Megapulse* court said:

> It is one thing to rely on the generally recognized rule that a plaintiff cannot maintain a contract action in either the district court or the Court of Claims seeking specific performance of a contract. It is quite another to claim, as the Government does in this case, that an agency action may not be enjoined, even if in clear violation of a specific statute, simply because that same action might also amount to a breach of contract. Government's counsel admitted at oral argument that by the logical inference of its position the government could avoid injunctions against

activities violative of a statutory duty simply by contracting not to engage in those activities.

*Megapulse*, 672 F.2d at 971.

To be sure, the court understands the delicate balance here.  Of course, "it is important on the one hand to preserve the Tucker Act's limited and conditioned waiver of sovereign immunity in contract actions."  *Id.* at 968.  On the other hand, the court is also mindful that it "must not do so in terms so broad as to deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government."  *Id.*  As in *Bowen*, "[t]his restrictive—and unprecedented—interpretation of [the APA] should be rejected because the remedy available . . . in the Claims Court is plainly not the kind of 'special and adequate review procedure' that will oust a district court of its normal jurisdiction under the APA."  *See Bowen*, 487 U.S. at 904–05.  The "bar of sovereign immunity in property disputes arising from contractual relationships does not necessarily apply" where, as here, "government defendants are charged with having acted beyond the scope of their statutory authority."  *Megapulse*, 672 F.2d at 969.

### b.  *Committed to Agency Discretion*

EPA Defendants also argue that Plaintiffs improperly challenge funding decisions committed to agency discretion by law which are not subject to APA review.  EPA PI Opp'n at 16–17.  The court does not agree.

The APA establishes a cause of action for parties adversely affected by agency actions. *Heckler v. Chaney,* 470 U.S. 821, 828 (1985), and generally, there is a "basic presumption of judicial review" in APA cases.  *Abbott Labs v. Gardner*, 387 U.S. 136, 140 (1967).  But that presumption falls away if the challenged agency decision is "committed to agency discretion by law."  *Sierra Club v. Jackson*, 648 F.3d 848, 855 (D.C. Cir. 2011); 5 U.S.C. § 701(a).  An action is committed to agency discretion where "a court would have no meaningful standard against

JA988

which to judge the agency's exercise of discretion." *Chaney*, 470 U.S. at 830.  To determine whether a matter has been committed to agency discretion, the court "consider[s] both the nature of the administrative action at issue and the language and structure of the statute that supplies the applicable legal standards for reviewing that action." *Sierra Club*, 648 F.3d at 855 (citation omitted).

Here, Plaintiffs challenge EPA's decision to suspend and then terminate their funding, and the court must look to the relevant statute to determine whether EPA's actions are committed to agency discretion.

EPA Defendants rely on *Lincoln v. Vigil*, 508 U.S. 182 (1993) to defend their position. There, the Supreme Court held that "allocation of funds from a lump-sum appropriation is [an] administrative decision traditionally regarded as committed to agency discretion." *Id.* at 192–93. But the Supreme Court also clarified that "of course, an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." *Id.*

In *Lincoln*, the relevant statute gave the agency discretion on how to allocate the "lump sum" appropriation.  The statute read, in part: "The Bureau of Indian Affairs, under the supervision of the Secretary of the Interior, shall direct, supervise, and expend such moneys as Congress may from time to time appropriate, for the benefit, care, and assistance of the Indians throughout the United States for the following purposes . . . ."  25 U.S.C. § 13.  The agency received a lump sum appropriation to use for general services such as "relief of distress and conservation of health" and "general support and civilization, including education." *Lincoln*, 508 U.S. at 185.  This reflected "a congressional recognition that an agency must be allowed "flexibility to shift funds within a

particular appropriation account so that the agency can make necessary adjustments for unforeseen developments and changing requirements." *Id.* at 192–93.

In this case, the relevant statute, 42 U.S.C. § 7434, is clear: Congress appropriated money for specific grant programs by a specific deadline and set specific, substantive priorities, thereby limiting how the appropriated funds could be allocated. *See, e.g.*, *Sierra Club*, 648 F.3d at 856 ("Congress can limit an agency's discretion "either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue.").

42 U.S.C. § 7434 provides, in part:

**(a) Appropriations**
  **(2) General assistance**
  In addition to amounts otherwise available, there is appropriated to the Administrator for fiscal year 2022, out of any money in the Treasury not otherwise appropriated, $11,970,000,000, to remain available until September 30, 2024, to make grants, on a competitive basis and beginning not later than 180 calendar days after August 16, 2022, to eligible recipients for the purposes of providing financial assistance and technical assistance in accordance with subsection (b).

  **(3) Low-income and disadvantaged communities**
  In addition to amounts otherwise available, there is appropriated to the Administrator for fiscal year 2022, out of any money in the Treasury not otherwise appropriated, $8,000,000,000, to remain available until September 30, 2024, to make grants, on a competitive basis and beginning not later than 180 calendar days after August 16, 2022, to eligible recipients for the purposes of providing financial assistance and technical assistance in low-income and disadvantaged communities in accordance with subsection (b).

42 U.S.C. § 7434(a)(2)–(3).

Not only have these appropriated funds already been disbursed, but a review of the statute, its specific deadlines, how it specifically defines "eligible recipients" and "qualified projects," reveals that "Congress limited the [Administrator's] authority to disburse funds." *Milk Train, Inc.*

*v. Veneman*, 310 F.3d 747, 752 (D.C. Cir. 2002). "This limitation affords a 'statutory reference

point' by which the court is able to review" the Administrator's decision. *Id.* (citation omitted).

EPA's statutory obligation to carry out the GGRF programs is mandatory. For these reasons, the

court finds that Plaintiffs' challenge does present a cognizable APA claim.

### C. Plaintiffs Are Likely to Succeed on the Merits of Their Claims

#### a. *Plaintiffs Are Likely to Succeed on the Merits of Their APA Claims*

Plaintiffs are likely to succeed on the merits of their APA claims because EPA acted

arbitrarily and capriciously when it failed to explain its reasoning and acted contrary to its

regulations in suspending and terminating Plaintiffs' grants.[6]

The APA, 5 U.S.C. § 706, plays a crucial role in maintaining accountability within federal

agencies. Under the APA, a court will set aside an agency decision if it is "arbitrary, capricious,

an abuse of discretion, [] otherwise not in accordance with law," contrary to statute, or unsupported

by substantial evidence. 5 U.S.C. § 706(2). In an arbitrary and capricious challenge, the central

question is whether the agency's decision was "the product of reasoned decisionmaking." *Motor

Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 52 (1983); *see also Nat'l

Tel. Coop. Ass'n v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009) ("The APA's arbitrary-and-

capricious standard requires that agency rules be reasonable and reasonably explained."). Judicial

review of agency action is "highly deferential . . . the court presumes the validity of agency action

and must affirm unless the [agency] failed to consider relevant factors or made a clear error in

---

[6] Although the parties brief multiple issues, the court need only find that Plaintiffs are likely to
succeed on one of their claims for this factor to weigh in their favor, and therefore the court does
not address all their arguments. *See Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1, 27
(D.D.C.), *appeal dismissed*, No. 24-7059, 2025 WL 492257 (D.C. Cir. Feb. 13, 2025).

judgment." *Nat'l Lifeline Ass'n v. FCC*, 983 F.3d 498, 507 (D.C. Cir. 2020) (cleaned up) (quoting *Cellco P'ship v. FCC*, 357 F.3d 88, 93–94 (D.C. Cir. 2004)).

A "fundamental" requirement of administrative law is that an agency "set forth [] reasons" for its decision; failure to do so constitutes arbitrary and capricious agency action. *Tourus Recs., Inc. v. Drug Enf't Admin.*, 259 F.3d 731, 737 (D.C. Cir. 2001). At a minimum, the agency must have considered relevant data and articulated an explanation establishing a "rational connection between the facts found and the choice made." *Bowen v. Am. Hosp. Ass'n,* 476 U.S. 610, 626 (1986) (internal quotations marks omitted) (collecting authorities).

An agency action is arbitrary or capricious if the agency relied on factors which Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before it, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43. In addition, "agency action may be set aside as arbitrary and capricious if the agency fails to 'comply with its own regulations.'" *Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (quoting *Envtl., LLC v. FCC*, 661 F.3d 80, 85 (D.C. Cir. 2011)).

Plaintiffs were in the process of implementing programs for which they had been awarded funds appropriated by Congress as part of the GGRF program when the government, without notice or justification, ordered Citibank to freeze Plaintiffs' funds. Plaintiffs could not access funds to which they were lawfully entitled and which had been deposited in their accounts, and they received no explanation from EPA, despite repeated inquiries. The court finds that EPA failed to set forth the reasons for its decision because it did not say *anything* about its decision, for weeks.

JA992

On March 4, 2025, EPA finally sent Plaintiffs identical information requests, giving them until March 28, 2025, to provide certain information so that EPA could evaluate the GGRF program's oversight controls. But, on March 11, 2025, before Plaintiffs could even respond, EPA terminated Plaintiffs' grants, on the eve of the TRO hearing in this case. It is unclear to the court what "relevant data" EPA considered within such a short period that called for the sudden termination of these grants, compelling the court to "guess at the theory underlying the agency's action." *SEC v. Chenery Corp.*, 332 U.S. 194, 196–197 (1947).

Though repeatedly pressed on the issue, EPA offers no rational explanation for why it suspended the grants and then immediately terminated the entire NCIF and CCIA grant programs overnight. Nor has EPA offered any rational explanation for why it needed to cancel the grants to safeguard taxpayer resources, especially when it had begun examining the grant programs to add oversight mechanisms, or why it needed to cancel *every single grant* to review *some* aspects of the GGRF program with which it was concerned.

In the letters terminating the grant programs, EPA provided no individualized reasoning as to anything Plaintiffs themselves did—instead referencing generalized and unsubstantiated reasons for termination—"substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities." PI Mot., Ex. 11, Termination Letter at 1.

But the Terms and Conditions governing the grant award expressly limit EPA to three possible grounds for termination, one of which is "adequate evidence of Waste, Fraud, or Abuse." PI Mot., Ex. 2, EPA Grant Agreement at 41. And as this court has already pointed out, EPA Defendants have never proffered this "adequate evidence." *See* 2025 WL 842360, at *8 ("Moreover, as to all Plaintiffs, EPA Defendants did not and have not identified a violation of any

JA993

applicable regulation or any of the grant's terms—only that there are concerns about potential

conflicts of interest and their grant agreements.").[7] Now, in a shift in position, they contend that

the termination was based on the agency's changed priorities.

EPA attempts—unsuccessfully—to take refuge in the regulations by turning to C.F.R.

§ 200.340(a)(4) as its basis for its termination.  C.F.R. § 200.340(a)(4) states that a "[f]ederal

award may be terminated in part or its entirety . . . by the Federal agency or pass-through entity

***pursuant to the terms and conditions of the Federal award***, including, ***to the extent authorized***

***by law***, if an award no longer effectuates the program goals or agency priorities."  2 C.F.R.

§ 200.340(a)(4) (emphasis added).  EPA Defendants' actions defy the plain language of the

regulations that govern its decision-making in grant funding—it can only terminate a federal award

on this basis pursuant to the terms and conditions of the federal award.  The regulation establishes

a boundary to ensure that when dealing with federal awards, no agency exceeds the legal authority

granted to them.

As the court has already noted, agencies can decide to re-evaluate their programs, and they

may decide to end agreements or federal awards.  But those decisions must be made lawfully and

in accordance with established procedures and relevant rules and regulations.  The record does not

---

[7] EPA Defendants contend that the subsequent amendment modifications might not be binding as a matter of contract law by questioning the timing of the amendments, *see* EPA PI Opp'n at 12–13; PI Hearing Tr. 40:15–40:19 (EPA COUNSEL: "So there was indeed a change between the original grant agreement in August and the December grant agreement. In fact, there were multiple changes that restricted or limited EPA's ability to terminate the grant agreement. That was done of course after the election.").  But they offer only conjecture, and nothing to support this in fact or law.  Whereas the grant agreement expressly states that the "EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement," indicating the agency's agreement to the modifications.  PI Mot., Ex. 2, EPA Grant Agreement at 55.

JA994

indicate that EPA's decisions were lawfully made, and therefore the court finds that Plaintiffs have shown a substantial likelihood of success on the merits on their APA claims.

### b. *Plaintiff Are Likely to Succeed on Their Constitutional Claims*

Plaintiffs also bring constitutional claims—among them, violation of the separation of powers. At this point, the record does indicate that EPA seeks to dismantle these grant programs in their entirety as a policy matter. But "Congress sets the policy, not the [Administrator]," and "policy disagreements" with Congress's decision to fund these clean energy projects "is not a lawful ground for the Administrator to decline to continue the congressionally mandated" GGRF program. *See In re Aiken Cnty.*, 725 F.3d 255, 260 (D.C. Cir. 2013). "Congress speaks through the laws it enacts" and here, EPA has terminated programs established through lawfully enacted congressional appropriations without any basis in statutory authority. *Id.* EPA cannot shut down these programs completely and it cannot "decline to spend previously appropriated funds." *Id.*

Indeed, agencies are "not free simply to disregard statutory responsibilities." *Lincoln*, 508 U.S. at 193. When Congress established the GGRF program, it laid out specific directives—not mere suggestions—as to what EPA could do with the money, and it provided specific deadlines and specific requirements for eligible recipients.

EPA contends that it conducted an individualized assessment of the grants and decided to terminate them on an individual basis, and it maintains that EPA intends to re-obligate the funds. But the record is clear: EPA suspended all eight grants comprising the entire NCIF and CCIA programs, and the agency's public statements contradict its representations here regarding the

JA995

future of the program.  EPA lacks the authority to effectively unilaterally dismantle a program that

Congress established, and Plaintiffs have shown a likelihood of success on these claims.[8]

### c.  *Claims Against Citibank*

Under the FAA, Citibank is expected to perform its obligations and fiduciary duties "with

care, competence, and diligence" and to "construe the terms of th[e] FAA and any related

instructions from Treasury in a reasonable manner to serve the purposes and interests of the United

States."  FAA § 5B.(i).  The FAA permits Citibank to freeze assets only "in accordance with the

[ACAs]" Ex. A, § I.B.4, and only in response to "lawful instructions or directions" from Treasury,

*id.* § 5.A.

Citibank performed its obligations under the FAA in accordance with its responsibilities as

a financial agent of the United States, but the instructions it received were not lawful, as the record

shows there was no legal basis for the government to order that the funds be frozen.  Consequently,

the court will enjoin Citibank from transferring or otherwise moving funds out of accounts

established in connection with Plaintiffs' grants, including funds in accounts established by

---

[8] Although EPA claims it will re-obligate the funds, under its own grant agreements it must re-obligate the funds to specific eligible recipients—the very recipients from whom it seeks to pull funding:

> If EPA partially or fully terminates the Assistance Agreement, EPA must (1) ***de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.957 (NCIF)*** to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

*See, e.g.*, PI Mot., Ex. 3, EPA Grant Agreement, Dec. Amend. at 41.

Plaintiffs' subgrantees, except as permitted by the applicable ACA, the grant award, the relevant

regulations, and applicable law. The court also orders Citibank to disburse any funds properly

incurred under Plaintiffs' awards, in accordance with the relevant agreements.

### D. Irreparable Harm

As the court found at the TRO stage, Plaintiffs have made a sufficient showing of

irreparable harm, which must be both "certain and great," "actual and not theoretical," and so

"imminen[t] that there is a clear and present need for equitable relief." *League of Women Voters

of U.S. v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (quotation omitted). The "possibility" of

irreparable harm is not enough. *See Winter*, 555 U.S. at 22. The moving party must demonstrate

"a clear and present need for extraordinary equitable relief to prevent irreparable harm."

*Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (citation and internal quotation marks

omitted). While ordinary economic injuries are usually insufficient to require injunctive relief,

financial harm can "constitute irreparable harm . . . where the loss threatens the very existence of

the movant's business." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

Plaintiffs have shown that without release of their grant funds, imminent harm is

unavoidable. The very purpose of Plaintiffs' existence and their business operations, including

the financing for their projects, depends on their grant money. The GGRF program was created,

in part, to mobilize and leverage private financing. The NCIF is structured to "multiply the impact

of public funds" by mobilizing private capital as grantees financed these projects, "ensuring that

every dollar of public funds generates several times more private-sector investment into emissions-

and air pollution-reducing projects." PI Mot., Ex. 1. And the purpose of CCIA is to "provide

funding and technical assistance to specific industry networks of public, quasi-public, not-for-

profit, and nonprofit community lenders, supporting the goal that every community in the country

JA997

has access to the capital they need to deploy clean technology projects in their homes, small businesses, schools, and community institutions."  Inclusiv PI Mot., Decl. of Neda Arabshahi ("Arabshahi Decl.") ¶ 14, ECF No. 6-2.

Obviously, when an organization is created to fulfill the objectives of a grant and its existence relies on grant money, harm is certain once the grant funds are withdrawn.  And in cases involving government expenditures, "once the relevant funds have been obligated, a court cannot reach them in order to award relief."  *City of Houston v. Dep't of Hous. & Urb. Dev.*, 24 F.3d 1421, 1426–27 (D.C. Cir. 1994).  Any transfer, re-allocation, or re-obligation of these funds would be an irreparable loss—one that threatens the very existence of Plaintiffs' businesses.

Plaintiffs have proffered some of the following examples of the harmful effects of the funding suspension:

**Climate United**

- To date, the Climate United coalition has committed $392 million to qualified projects.  Bafford Decl. ¶¶ 24–26. It has:
  o Committed a $31.8 million pre-construction loan to finance 18 solar projects benefiting rural communities in Arkansas.  This is the largest commercial solar deployment in Arkansas history and is projected to save over $120 million in energy costs and create hundreds of jobs.
  o Launched a program to establish affordable leasing options for battery electric heavy-duty trucks to small fleets and independent contractors, which will support an affordable leasing program at the ports of Long Beach and Los Angeles before expanding nationwide.
  o Committed $63 million in pre-construction financing for the design and development of solar power plants in partnership with Tribal governments and communities in Eastern Oregon and Idaho, bringing access to affordable energy to rural communities and Indigenous people, creating 1,200 jobs, and spurring local economic development.
- It cannot access funds to pay the 37 employees on its payroll, whose salaries and benefits are covered in part or whole by the NCIF Award. *Id.* ¶¶ 37, 39.
- It has had to defer compensation for certain employees, terminate multiple vendors, cancel travel, and instruct non-essential lawyers, accountants, and consultants to cease work. *Id.* ¶ 62.
- It is at imminent risk of being unable to pay critical third-party contractors who perform necessary services such as managing accounts payable, auditing

JA998

financial statements, maintaining IT security and infrastructure, advising on compliance, supporting communications, and providing legal services. *Id.* ¶ 67.

- It does not have funds to pay payroll or health, vision, and dental benefits, life insurance, and short- and long-term disability insurance for its employees. In order to preserve its available cash, Climate United has already had to defer compensation for certain employees, terminate multiple vendors, cancel travel, and instruct non-essential lawyers, accountants, and consultants to cease work.

- Without a stable source of funding, Climate United will no longer be able to pay its employees and will face having to cut hours and furlough staff.

- Furloughing or laying off staff will eliminate positions that perform critical functions for Climate United, including monitoring the loans that Climate United has already disbursed to funding recipients and the $392 million that it has committed to date. *Id.* ¶ 44.

- It imminently risks not being able to pay rent or insurance for certain offices *Id.* ¶ 45.

- Continued inability to access the funds would prevent Climate United from meeting its commitments under the loans and awards it has approved and plans to approve, potentially forcing it into breach of its existing agreements. *Id.* ¶¶ 46–48, 50.

**PFC**

- PFC has committed at least $539,000,000 to provide affordable housing support and has other projects that will be detrimentally impacted absent funding. TRO Mot. Hr'g Tr. 24:01–25:04.

- It has been unable to pay outstanding invoices from contractors for work completed on PFC's behalf and, as a result, is incurring default risk with respect to these contracts. Mayopoulos Decl. ¶ 19.

- Outstanding invoices include those for contracts for legal and management consultant services that are necessary for PFC to administer the grant in compliance with the terms of the Award Agreement and contracts for essential financial management and IT services. *Id.*

- If PFC is not able to make payment on these outstanding invoices, which it cannot do without access to its funds, PFC is at imminent risk of losing these services due to default. *Id.*

- PFC's key contractor has advised it that it has until March 17, 2025, to make payment or it may cease providing services. *Id.*

- PFC is unable to pay contractors to complete, or in some cases to begin, critical work for PFC, including the completion of a financial reporting audit and work improve PFC's website, which provides public information. *Id.* ¶ 19.

- PFC's inability to access its funds threatens its ability to pay staff members. PFC owes funds under the secondment and services agreements and is at risk of default under those agreements. *Id.* ¶ 20.

JA999

**CGC**

- As of January 2025, CGC has committed $135 million in funding to 14 emerging green banks and community lenders across 14 states. Brown Decl. ¶ 4.
- Loss of grant funding will harm a pipeline of 232 multifamily housing properties that would use loans from our subgrantees to increase energy efficiency and electrify core building systems to reduce building operating costs and keep rents affordable for low-income families. *Id.*

**Inclusiv**

- To date, Inclusiv has committed $651 million in subawards to 108 credit unions across the country to be part of just its first cohort of subrecipients. These credit unions are based in 27 states and Puerto Rico and provide direct banking services to more than 4.9 million Americans. They will leverage their CCIA subawards with their own institutional deposit capital to provide nearly $1.8 billion in new lending capital to homeowners and small businesses. These investments will make clean energy affordable, create jobs, and promote greater financial security within the communities the credit unions serve. The energy savings will allow Americans to reinvest their dollars elsewhere in the U.S. economy. Arabshahi Decl. ¶ 25.

**JCF**

- JCF will run out of money to fund its operations in less than 45 days—and possibly much sooner, depending on the expenses it incurs in this litigation. JCF PI Mot., Decl. of Amir Kirkwood ¶ 30, ECF No. 7.
- Without a committed source of funding, JCF will not be able to meet the subaward commitments it has already made to community lenders for projects that they have in turn already approved. *Id.* ¶ 37.

Plaintiffs also have demonstrated irreparable harm in damage to their business reputation.

*See Patriot, Inc. v. U.S. Dep't of Hous. & Urb. Dev.*, 963 F. Supp. 1, 5 (D.D.C. 1997) (finding

plaintiffs' business reputation would be damaged by HUD's characterization of them as "enticing"

senior citizens into meetings, and "pressuring" them to obtain reverse mortgages "under the guise

of sound estate planning."). EPA's termination of the grants will impact Plaintiffs' ability to apply

for and receive federal and/or state grant funds, *see supra* n.4, and damage their reputations.

Reputational harm, particularly in this case, cannot be overstated, especially given the

structure of the NCIF and CCIA programs and Plaintiffs' positions as lenders in the financial

markets. The reputation of these organizations as "reliable and trustworthy partner[s] and investor[s]" is critical to their operations, PI Mot. at 49, and without imminent restoration of their funds, it will be "more difficult, if not impossible," for these organizations to find partners willing to enter into financing arrangements and to find qualified employees willing to work" with them, Bafford Decl. ¶ 73.

A few examples illustrate this point:

- Subgrantee Plaintiffs face increasing risk of losing qualified projects, with the corresponding harms to their reputations as lenders in the financial markets. PI Mot. at 23.
- Plaintiff IFA will be limited in its ability to apply for or receive federal and state grant funds, as they would be obligated to make disclosures during the application process. Decl. of Christopher Meister ¶ 21, *Cal. Infrastructure & Econ. Dev. Bank, et al. v. Citibank, et al.*, No. 1:25-cv-820, ECF No. 17-1.
- Delay or loss of funding risks market confidence in Plaintiff MnCIFA, reducing partner willingness to contract. Decl. of Kari Growth Swan ¶ 36, *Cal. Infrastructure & Econ. Dev. Bank, et al. v. Citibank, et al.*, No. 1:25-cv-820, ECF No. 17-4.
- Public misperception about program termination has caused customer hesitancy, cancellations, layoffs. Stoddard Decl. ¶ 32.
- EPA's allegations and its baseless Notice of Termination will therefore have a significant but unquantifiable impact on CGC's reputation, goodwill, and business prospects in its field. Buendia Decl. ¶ 25.
- EPA and Citi's actions have damaged CGC's reputation (and its subgrantees reputation). "They have damaged its reputation, caused it to lose opportunities for funding and investment, and frustrated its operations and the achievement of its and Congress's objectives." Decl. of Eli Hopson ¶ 24, ECF No. 33-27.

Preserving the status quo here is particularly important, because, as explained above, removal of the funds from Plaintiffs' accounts would likely mean those funds would be beyond the reach of any court.

## E. Balance of Equities and Public Interest

The final two factors—balancing the equities and the public interest—support granting the preliminary injunction. The court's reasoning on this point is the same as in its TRO Memorandum and Order.

When assessing the equities and public interest factors, courts "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Ramirez v. U.S. Immigr. & Customs Enft.*, 310 F. Supp. 3d 7, 32 (D.D.C. 2018). If the movant seeks to enjoin the government, the final two factors merge "because the government's interest *is* the public interest." *Pursuing Am.'s Greatness v. Fed. Election Comm.*, 831 F.3d 500, 511–512 (D.C. Cir. 2016).

On Defendants' side of the balance, the court accords relevant weight to the government's protection of the public fisc. EPA PI Opp'n at 29–30. But the relief Plaintiffs seek allows them access to funds already in their accounts—funds that have been appropriated by Congress and obligated prior to this suit—and Plaintiffs can only use them for specific, approved purposes, under the already-discussed oversight mechanisms. *See* EPA Reply to Pls.' Resp.'s at 2, ECF No. 71 ("Plaintiffs then agreed that they could only use funds for specified allowable activities in specified regions.); *id.* ("To be allowable, the expense must be necessary "for the performance of the Federal award" and, significantly, '[c]onform to any limitations or exclusions set forth . . . in the Federal award") (citing 2 C.F.R. § 200.403(a), (b)); *id.* at 2–3 ("In requesting the disbursement, the grantee must comply with the Grant Agreement's requirement that it certify to the EPA that '[t]he amount of this expenditure is necessary to execute against the EPA-approved workplan.'") (citation omitted). There are sufficient protections in place to prevent the type of reckless spending EPA envisions once access to Plaintiffs' accounts is restored.

The court's order in no way limits EPA from making funding decisions in accordance with the law and, contrary to EPA's position, it does not "force EPA into a multiple year, $20 billon spending obligation." EPA PI Opp'n at 30. It merely restores the status quo to before the unlawful suspension and termination, and the government "cannot suffer harm from an injunction that

merely ends an unlawful practice." *TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 115 (D.D.C. 2020) (quoting *R.I.L-R v. Johnson,* 80 F. Supp. 3d 164, 191 (D.D.C. 2015)).  Without a showing of actual or imminent harm, EPA's interests remain adequately protected.  On the other side, however, as discussed, Plaintiffs face immediate, irreparable harm.

The public interest also favors an injunction.  "There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters*, 838 F.3d at 12 (citing *Pursuing Am.'s Greatness*, 831 F.3d at 511–512).  In contrast, "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Id.* (citation omitted).  Here, an injunction ensures that EPA abides by its own regulations and halts any unlawful action in dismantling the NCIF and CCIA programs.  Preserving fairness and accountability in governance serves the public interest.  Therefore, the final two factors warrant injunctive relief.

### F.  The Court Will Not Require a Bond

Under Federal Rule of Civil Procedure 65(c), the court may issue a TRO or preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  But Rule 65(c) gives this court broad discretion to determine the appropriate amount of an injunction bond.  *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999).  This includes "the discretion to require no bond at all."  *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020) (quoting *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012)); *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-cv-239, 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025) ("A bond 'is not necessary where requiring [one] would have the effect of denying the plaintiffs their right to judicial review of

JA1003

administrative action.'") (citation omitted).  Plaintiffs' funding is currently frozen because of

Defendants' actions.  They cannot access the very thing that has kept them running.  Requiring a

bond in this context makes little sense.

### IV.    CONCLUSION

For these reasons, it is hereby ORDERED that Plaintiffs' Motion for a Preliminary

Injunction is GRANTED.  An Order will accompany this Memorandum Opinion.


Date: April 16, 2025

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge

JA1004

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CLIMATE UNITED FUND**<br><br>                    Plaintiff,<br><br>        v.<br><br>**CITIBANK, N.A**., *et al.*<br><br>                    Defendants. | Civil Action No. 25-cv-698-TSC<br>Civil Action No. 25-cv-735-TSC<br>Civil Action No. 25-cv-762-TSC<br>Civil Action No. 25-cv-820-TSC<br>Civil Action No. 25-cv-938-TSC<br>Civil Action No. 25-cv-948-TSC<br>(Consolidated Cases) |

## DECLARATION OF TIMOTHY J. MAYOPOULOS

I, Timothy J. Mayopoulos, declare as follows:

1.       I am the President and Chief Executive Officer of Power Forward Communities, Inc. ("PFC").  The statements made in this declaration are based on my personal knowledge, materials I have reviewed, and information made available to me pursuant to my duties at PFC.

2.       This declaration supplements my March 21, 2025 declaration submitted in support of Plaintiffs' motion for a preliminary injunction and provides detail on additional developments postdating that declaration concerning the ways in which PFC will continue to be imminently and irreparably harmed if the Court's preliminary injunction order is stayed.  In addition, this declaration provides detail regarding amounts needed for PFC to keep its doors open and to continue to operate while this case proceeds, including the total amount of expenses that PFC and its subrecipients Enterprise Green Accelerator, Inc., LISC Green LLC, and Rewiring Community Investment Fund, Inc. (collectively, the "subrecipients") incurred prior to receiving EPA's Notice of Termination on March 11, 2025.  The disbursement instructions outlining expenses incurred by PFC and its subrecipients on or before March 11, 2025 are listed in Exhibit A attached to this declaration.

1

JA1005

**Continued Irreparable Impact on PFC's Operations**

3.      Since Defendants suspended PFC's accounts in mid-February 2025 and purportedly terminated PFC's award on March 11, 2025, PFC has searched for a source of funding to replace the NCIF award.  That search has not yet been successful, and PFC remains without a committed source of alternative funding.

4.      My March 21 declaration detailed the likely consequences for PFC's operations if PFC did not promptly regain access to its funds.  PFC continues to suffer the harms identified in my prior declaration, including but not limited to:  the reputational harm from the purported termination of the NCIF grant and uncertainty regarding PFC's ability to satisfy current and future financial obligations; the inability to pay contractors essential to PFC's operations; the pause in hiring necessary staff; the threat that PFC will be unable to pay its staff; and PFC's inability to fulfill its obligations under the NCIF program.

*5.*      Moreover, without access to its NCIF funding, PFC remains unable to carry out its mission, including the important projects PFC has committed to deliver to the American public.  Those projects are now in jeopardy because PFC cannot meet its commitments.  *See, e.g.*, R. French & J. Hinkley, *Michigan drug recovery, worker housing in limbo after Trump funding freeze* (Apr. 3, 2025), available at https://www.bridgemi.com/michigan-health-watch/michigan-drug-recovery-worker-housing-limbo-after-trump-funding-freeze.

6.      PFC is at imminent risk of having to lay off its staff and close its doors for good.

**Impact of Access to Operational Expenses**

7.      A return to the status quo ante, i.e., normal access to PFC's funds, is necessary to address the harms identified above and in my March 21 declaration.  However, PFC could likely at least keep its doors open during this litigation if (a) Citibank honored PFC's and its subrecipients' disbursement instructions for expenses incurred prior to the purported termination

JA1006

on March 11, 2025 and (b) PFC were permitted to access the funds necessary to maintain operations for the next six months.

8.      With respect to expenses incurred by PFC and its subrecipients before March 11, 2025, I understand that PFC and its subgrantees are entitled to reimbursement of allowable costs they incurred before EPA sent the Notices of Termination.  Under the Grant Agreement, Plaintiffs may spend and draw funds for allowable costs to support activities contemplated by their awards. *See* Grant Agreement § V.A.3 (providing that Recipient may "use the award to support [certain] allowable activities" and authorizing Recipient to transfer funds out of Deposit Account for those purposes).  Moreover, the applicable federal regulations and Grant Agreements entitle Plaintiffs to certain funds even *after* termination.  Although costs incurred post-termination are generally "not allowable," such post-termination costs "*are* allowable if: (a) [t]he costs result from financial obligations which were properly incurred . . . before the effective date of . . . termination, and not in anticipation of it; and (b) [t]he costs would be allowable if the Federal award . . . expired normally at the end of the period of performance in which the termination takes effect."  2 CFR 200.343 (emphasis added), *accord* Grant Agreement § III.S.  The effective date of termination for these purposes is March 11, 2025, the date of the Notices of Termination, which purported to terminate each Plaintiff's NCIF award "effective immediately."  Accordingly, even if EPA were to prevail in this action, I understand that PFC would nevertheless be entitled to funds to cover all allowable costs incurred *pre*-termination, as well as to funds corresponding to certain *post*-termination costs.

9.      PFC and its subrecipients incurred $4,598,722.89 in expenses prior to EPA's purported termination of the NCIF program on March 11, 2025, for which it has not been

JA1007

reimbursed. *See* Exhibit A. PFC and its subrecipients have submitted disbursement instructions for all these expenses. To date, Citibank has not fulfilled those disbursement requests.

10.    Of the $4,598,722.89 in expenses incurred before March 11, 2025, only $771,294.53 are expenses that PFC and its subrecipients can readily determine were wholly incurred before February 13, 2025, the date that Citibank first froze the accounts. *See id.*

11.    Consistent with their ordinary practice, PFC and its subgrantees frequently submitted disbursement instructions for total expenses incurred during a period of one month or two months. Some of these periods began before February 13, 2025 and ended after that date. *See id.* For instance, on April 8, 2025, PFC submitted a disbursement instruction for expenses incurred between December 1, 2024 and February 28, 2025. Thus, the vast majority of this request encompasses expenses incurred before Citibank implemented a freeze on PFC's funds on February 13—and *all* of this request corresponds to expenses incurred before the purported termination. Of the $4,598,722.89 in expenses incurred by PFC and its subrecipients before March 11, 2025, $3,847,137.44 are expenses that were incurred at least in part before Citibank froze the accounts of PFC and its subrecipients on February 13, 2025. *See* Exhibit A.

12.    Since March 11, 2025, PFC has incurred approximately $500,000 in additional operating expenses. PFC has not yet submitted disbursement instructions to Citibank for these expenses but intends to do so in accordance with its ordinary practice.

13.    In the preliminary injunction hearing, the Court asked how much funding would be required to allow Plaintiffs simply to "continue operations," even if they could not finance projects. To fully cover operational expenses for the next six months—including paying for outstanding expenses and for payroll for employees, insurance, payments to essential contractors, and other necessary expenses moving forward—PFC would need access to at least

JA1008

$8,548,722.89 in funding for itself and its coalition partner subgrantees. That amount represents a miniscule fraction of PFC's grant award, totaling only 0.4% of the full $2 billion award, and only 8.1% of the EPA-approved budget of $105 million for PFC program oversight and administration. Receipt of this amount would save PFC and its partners from being forced to wind down operations before this case can be litigated to final judgment. Although this amount would not permit PFC to continue its active projects or advance its mission, and thus would still cause PFC irreparable harm, it would at least allow PFC to survive.

JA1009

I declare under penalty of perjury under the laws of the United States of America,

pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed this 17th day of April, 2025.

<br>

_____

Timothy J. Mayopoulos

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **CLIMATE UNITED FUND**<br><br>Plaintiff,<br><br>v.<br><br>**CITIBANK, N.A.**, *et al.*<br><br>Defendants. | Civil Action No. 25-cv-698 (TSC)<br>Civil Action No. 25-cv-735 (TSC)<br>Civil Action No. 25-cv-762 (TSC)<br>Civil Action No. 25-cv-820 (TSC)<br>Civil Action No. 25-cv-938 (TSC)<br>Civil Action No. 25-cv-948 (TSC)<br>(Consolidated Cases) |

## <u>ORDER</u>

Plaintiffs Climate United Fund ("Climate United"), Coalition for Green Capital ("CGC"), and Power Forward Communities, Inc. ("PFC") moved the court to clarify its April 15, 2025 Order granting Plaintiffs' preliminary injunction ("Order"), ECF No. 80, with respect to the obligations imposed on Defendant Citibank, N.A. ("Citibank").[1]  Mot. to Clarify Order ("Mot."), ECF No. 91. Specifically, Plaintiffs seek clarification with respect to this portion of the Order: "**ORDERED** that Defendant Citibank must disburse any funds properly incurred *before the mid-February suspension of Plaintiffs' funds*," Order at 2 (emphasis added), to ensure that it conforms to the remainder of the Order and the Court's Memorandum Opinion [] supporting that Order."  Mot. at 2.  Plaintiffs state that "[a]lthough this portion of the Court's Order is currently stayed pursuant to the D.C. Circuit's administrative stay order, the parties and the Court of Appeals would benefit from this clarity."  *Id.*

---

[1] The court's Preliminary Injunction Order applies to Plaintiffs Climate United Fund, Power Forward Communities, Inc. ("PFC"), Coalition for Green Capital ("CGC"), Justice Climate Fund, Inclusiv, Inc. and Subgrantee Plaintiffs California Infrastructure and Economic Development Bank, Efficiency Maine Trust, Illinois Finance Authority, Minnesota Climate Innovation Finance Authority.

JA1011

EPA Defendants object to the motion, arguing that "because the scope of injunctive relief is the very question before the Court of Appeals, this Court currently lacks authority to act upon Grantee's motion." Defs.' Obj. to Mot., ECF No. 94 at 1. As Defendants correctly point out, "[t]"he Court of Appeals granted an administrative stay, in part, and has set a briefing schedule to address the government's stay motion." *Id.* at 2. The Court of Appeals stayed this court's order "insofar as it (1) enables or requires Citibank to release, disburse, transfer, otherwise move, or allow access to funds," and ordered "that no party take any action, directly or indirectly, with regard to the disputed contracts, grants, awards or funds." *See Climate United Fund v. Citibank, N.A.*, No. 25-5122, 2025 WL 1123856, at *1 (D.C. Cir. Apr. 16, 2025).

The court construes Plaintiffs' motion more appropriately as a motion to amend judgment under Federal Rule of Civil Procedure 59(e), and **GRANTS** the motion.

Under Federal Rule of Civil Procedure 59(e), a party may move to "alter or amend a judgment no later than 28 days after the entry of the judgment." Fed. R. Civ. P. 59(e). "A Rule 59(e) motion is discretionary and need not be granted unless the district court finds that there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (quotation marks omitted); *see also Leidos, Inc. v. Hellenic Republic*, 881 F.3d 213, 217 (D.C. Cir. 2018). "The rule may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." *Shvartser v. Lekser*, 330 F. Supp. 3d 356, 360 (D.D.C. 2018) (citation and internal quotation marks omitted). The court grants the motion to correct an error in the court's Order with respect to the obligations imposed on Defendant Citibank.

To begin, the court reiterates its findings: the court found for Plaintiffs and granted their motion for a preliminary injunction because, among the other factors the court addressed, "[t]he record does not indicate that EPA's decisions were lawfully made" when EPA suspended and then terminated Plaintiffs' grant awards. Mem. Op. at 29–30, ECF No. 89. The court thus "order[ed] Citibank to disburse any funds properly incurred under Plaintiffs' awards, in accordance with the relevant agreements." *Id.* at 32; *see also id.* at 14 ("[w]ere the court to grant Plaintiffs' relief," which it did, "[Plaintiffs] would have access to the funds in their accounts, dating back to, at a minimum, when their accounts were suspended in mid-February.").

As the court discussed in its Memorandum Opinion, sections I.B.4 and I.B.5 of the Financial Agency Agreement ("FAA") between Citibank and the U.S. Treasury Department permit Citibank "to freeze accounts at the direction of the relevant secured party, in accordance with the account control agreements" and only in response to "lawful instructions or directions received from Treasury." *Id.* at 31. The court found that "Citibank performed its obligations under the FAA in accordance with its responsibilities as a financial agent of the United States, but the instructions it received were not lawful, as the record shows there was no legal basis for the government to order that the funds be frozen." *Id.*

Thus, the court "order[ed] Citibank to disburse any funds properly incurred under Plaintiffs' awards, in accordance with the relevant agreements." *Id.* at 32. The court also "enjoin[ed] Citibank from transferring or otherwise moving funds out of accounts established in connection with Plaintiffs' grants, including funds in accounts established by Plaintiffs' subgrantees, except as permitted by the applicable ACA, the grant award, the relevant regulations, and applicable law." *Id.* at 31–32. As the court explained, "[t]he very purpose of Plaintiffs' existence and their business operations, including the financing for their projects, depends on their

JA1013

grant money" and "without release of their grant funds, imminent harm [to Plaintiffs] is unavoidable." *Id.* at 32.  The court then enjoined Citibank, in part, "from violating its obligations under each Plaintiff's ACA, including by failing to process, disburse, and release funds in accounts established in connection with Plaintiffs' grants, including funds in accounts established by Plaintiffs' subgrantees, in accordance with the applicable ACA, both with respect to requests already submitted and future requests."  Order at 3.

For those reasons, and to ensure that the court's Order conforms with its Memorandum Opinion, the court **GRANTS** Plaintiffs' motion to amend judgment, ECF No. 91, and amends its Order, ECF No. 80, in that the Order should read:

**ORDERED** that Defendant Citibank must disburse any funds properly incurred since the mid-February suspension of Plaintiffs' funds.[2]

Date: April 19, 2025

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge

---

[2] This replaces the following sentence in the court's order: [it is hereby] **ORDERED** that Defendant Citibank must disburse any funds properly incurred before the mid-February suspension of Plaintiffs' funds.  The rest of the court's Order, ECF No. 80, remains unchanged.

4

JA1014

# 1:25cv762, Power Forward Communities, Inc. V. Citibank, N.A. Et Al

US District Court Docket

United States District Court, District of Columbia

(Washington, DC)

**This case was retrieved on 05/04/2025**

## Header

**Case Number:** 1:25cv762
**Date Filed:** 03/14/2025
**Assigned To:** Judge Tanya S. Chutkan
**Nature of Suit:** Other Statutes - Administrative Procedure Act/Review or Appeal of Agency Decision (899)
**Cause:** Administrative Procedure Act
**Lead Docket:** 1:25cv00698
**Other Docket:** 1:25cv00698, 1:25cv00735, 1:25cv00820, 1:25cv00938, 1:25cv00948
**Jurisdiction:** U.S. Government Defendant

**Class Code:** Open
**Statute:** 05:702
**Jury Demand:** None
**Demand Amount:** $0
**NOS Description:** Other Statutes - Administrative Procedure Act/Review or Appeal of Agency Decision

## Participants

### Litigants

Power Forward Communities, Inc.
on behalf of itself and certain award subrecipients |
**Plaintiff**

Citibank, N.A.
**Defendant**

### Attorneys

Jack C. Smith
ATTORNEY TO BE NOTICED
FOLEY HOAG, LLP
155 Seaport Boulevard
Boston, MA  02210
USA
617-832-1119 Email:Jcsmith@foleyhoag.Com

Beth C. Neitzel
ATTORNEY TO BE NOTICED
Foley Hoag LLP
155 Seaport Blvd Suite 1600
Boston, MA  02210
USA
(202) 663-6502 Email:Bneitzel@foleyhoag.Com

Kenneth Winn Allen
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC  20004
USA
(202) 389-5000 Fax: (202) 389-5200
Email:Winn.Allen@kirkland.Com

Saunders Lee McElroy
ATTORNEY TO BE NOTICED
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave, Nw

JA1015

| Litigants | Attorneys |
|---|---|
| | Washington, DC  20004<br>USA<br>202-389-3081 Email:Saunders.Mcelroy@kirkland.Com |
| United States Environmental Protection Agency<br>**Defendant** | Kevin Paul VanLandingham<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>U.S. DEPARTMENT OF JUSTICE<br>P.O. Box 875, Ben Franklin Station<br>Washington, DC  20044-0875<br>USA<br>(202) 307-1134 Email:Kevin.P.Vanlandingham@usdoj.Gov<br><br>Marcus S Sacks<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Poc Agostinho, Jean 1100 L St., N.W. 8142<br>Washington, DC  20530<br>USA<br>202-307-1104 Email:Marcus.S.Sacks@usdoj.Gov |
| Lee Zeldin<br>in his official capacity as ADMINISTRATOR, UNITED<br>STATES ENVIRONMENTAL PROTECTION AGENCY |<br>**Defendant** | Kevin Paul VanLandingham<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>U.S. DEPARTMENT OF JUSTICE<br>P.O. Box 875, Ben Franklin Station<br>Washington, DC  20044-0875<br>USA<br>(202) 307-1134 Email:Kevin.P.Vanlandingham@usdoj.Gov<br><br>Marcus S Sacks<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Poc Agostinho, Jean 1100 L St., N.W. 8142<br>Washington, DC  20530<br>USA<br>202-307-1104 Email:Marcus.S.Sacks@usdoj.Gov |
| WILLIAM CHARLES MCINTOSH<br>in his official capacity as ACTING DEPUTY<br>ADMINISTRATOR, U.S. ENVIRONMENTAL PROTECTION<br>AGENCY |<br>**Defendant** | Kevin Paul VanLandingham<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>U.S. DEPARTMENT OF JUSTICE<br>P.O. Box 875, Ben Franklin Station<br>Washington, DC  20044-0875<br>USA<br>(202) 307-1134 Email:Kevin.P.Vanlandingham@usdoj.Gov<br><br>Marcus S Sacks<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Poc Agostinho, Jean 1100 L St., N.W. 8142<br>Washington, DC  20530<br>USA<br>202-307-1104 Email:Marcus.S.Sacks@usdoj.Gov |

## Proceedings

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| 1 | 03/14/2025 | COMPLAINT  against CITIBANK, N.A., LEE ZELDIN, in his official capacity as ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, WILLIAM CHARLES McINTOSH, in his official capacity as ACTING | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
|   |      | DEPUTY ADMINISTRATOR, U.S. ENVIRONMENTAL PROTECTION AGENCY ( Filing fee $ 405 receipt number ADCDC-11544208) filed by POWER FORWARD COMMUNITIES, INC., on behalf of itself and certain award subrecipients. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Civil Cover Sheet, # 12 Summons, # 13 Summons, # 14 Summons, # 15 Summons)(Neitzel, Beth) (Entered: 03/14/2025) | |
| 2 | 03/14/2025 | NOTICE OF RELATED CASE by POWER FORWARD COMMUNITIES, INC., on behalf of itself and certain award subrecipients. Case related to Case No. 1:25-cv-698; 1:25-cv-735. (Neitzel, Beth) (Entered: 03/14/2025) | |
| 3 | 03/14/2025 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests  by POWER FORWARD COMMUNITIES, INC., on behalf of itself and certain award subrecipients (Neitzel, Beth) (Entered: 03/14/2025) | |
| 4 | 03/14/2025 | MOTION for Temporary Restraining Order  by POWER FORWARD COMMUNITIES, INC., on behalf of itself and certain award subrecipients. (Attachments: # 1 Memorandum in Support, # 2 Declaration of Timothy J. Mayopoulos, # 3 Declaration of Shaun Donovan, # 4 Declaration of Ari Matusiak, # 5 Affidavit of Beth C. Neitzel)(Neitzel, Beth) (Entered: 03/14/2025) | |
|   | 03/15/2025 | Case Assigned to Judge Tanya S. Chutkan. (zjd) (Entered: 03/15/2025) | |
|   | 03/15/2025 | NOTICE OF NEW CASE ERROR regarding 1 Complaint. The following error needs correction: Missing summonses- U.S. government. When naming a U.S. government agent or agency as a defendant, you must supply a summons for each defendant & two additional summonses for the U.S. Attorney & U.S. Attorney General. Please submit using the event Request for Summons to Issue. (zjd) (Entered: 03/15/2025) | |
| 5 | 03/15/2025 | SUMMONS (4) Issued Electronically as to CITIBANK, N.A., WILLIAM CHARLES MCINTOSH, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, and LEE ZELDIN. (Attachment: # 1 Notice and Consent) (zjd) (Entered: 03/15/2025) | |
| 6 | 03/15/2025 | REQUEST FOR Summons TO ISSUE to Attorney General Bondi and US Attorney Martin filed by POWER FORWARD COMMUNITIES, INC.. Related document: Notice of Error- New Case,. (Attachments: # 1 Summons)(Neitzel, Beth) (Entered: 03/15/2025) | |
|   | 03/16/2025 | MINUTE ORDER: The parties in No. 25-cv-698, No. 25-cv-735, and No. 25-cv-762, are hereby ORDERED to appear for an in-person motion hearing on the 4 Motion for Temporary Restraining Order on March 17, 2025, at 12:00 PM in Courtroom 9 before Judge Tanya S. Chutkan. The court will provide access for the public to telephonically attend the hearing. The hearing can be accessed by dialing the Toll-Free Number: 833-990-9400 (Meeting ID: 493633106). It is hereby ORDERED that the attendees using the public access telephone line shall adhere to the restrictions outlined in the March 10, 2025, Minute Order. Signed by Judge Tanya S. Chutkan on 3/16/2025. (lcer) (Entered: 03/16/2025) | |
| 7 | 03/17/2025 | NOTICE of Appearance by Saunders Lee McElroy on behalf of CITIBANK, N.A. (McElroy, Saunders) (Entered: 03/17/2025) | |
| 8 | 03/17/2025 | NOTICE of Appearance by Kenneth Winn Allen on behalf of CITIBANK, N.A. (Allen, Kenneth) (Entered: 03/17/2025) | |
| 9 | 03/17/2025 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests  by CITIBANK, N.A. (Allen, | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Kenneth) (Entered: 03/17/2025) | |
| 10 | 03/17/2025 | SUMMONS (2) Issued Electronically as to U.S. Attorney and U.S. Attorney General (Attachment: # 1 Notice and Consent)(zjm) (Entered: 03/17/2025) | |
| 11 | 03/17/2025 | NOTICE of Appearance by Marcus S Sacks on behalf of UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN, WILLIAM CHARLES MCINTOSH (Sacks, Marcus) (Entered: 03/17/2025) | |
| 12 | 03/17/2025 | NOTICE of Appearance by Kevin Paul VanLandingham on behalf of UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN, WILLIAM CHARLES MCINTOSH (VanLandingham, Kevin) (Entered: 03/17/2025) | |
| | 03/17/2025 | Minute Entry for proceedings held before Judge Tanya S. Chutkan: Motion Hearing held on 3/17/2025 re 4 MOTION for Temporary Restraining Order  filed by POWER FORWARD COMMUNITIES, INC. Pursuant to Federal Rule of Civil Procedure 42(a), the Court will consolidate the Civil Cases 25-698, 25-735, 25-762. Minute Order Forthcoming. Court Reporter Jeff Hook. (ztl) (Entered: 03/18/2025) | |
| 13 | 03/18/2025 | TRANSCRIPT OF MOTION HEARING before Judge Tanya S. Chutkan held on March 17, 2025. Page Numbers: 1 - 45. Date of Issuance: March 18, 2025. Court Reporter: Jeff Hook. Telephone number: 202-354-3373. Transcripts may be ordered by submitting the Transcript Order FormFor the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.NOTICE RE REDACTION OF TRANSCRIPTS: The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. Redaction Request due 4/8/2025. Redacted Transcript Deadline set for 4/18/2025. Release of Transcript Restriction set for 6/16/2025.(Hook, Jeff) (Entered: 03/18/2025) | |
| 14 | 03/18/2025 | MEMORANDUM OPINION re: Plaintiff's 4 Motion for Temporary Restraining Order. Signed by Judge Tanya S. Chutkan on 3/18/2025. (lcer) (Main Document 14 replaced on 3/19/2025) (zsmc). (Entered: 03/18/2025) | |
| 15 | 03/18/2025 | ORDER GRANTING in part and DENYING in part Plaintiff's 4 Motion for Temporary Restraining Order. See Order for details. Signed by Judge Tanya S. Chutkan on 3/18/2025. (lcer) (Entered: 03/18/2025) | |
| 16 | 03/19/2025 | NOTICE of Appearance by Jack C. Smith on behalf of POWER FORWARD COMMUNITIES, INC. (Smith, Jack) (Entered: 03/19/2025) | |
| 17 | 03/19/2025 | Joint STATUS REPORT  by POWER FORWARD COMMUNITIES, INC.. (Neitzel, Beth) (Entered: 03/19/2025) | |
| | 03/19/2025 | MINUTE ORDER: Upon consideration of the parties' 17 Joint Status Report, the court adopts and sets the following deadlines: Plaintiffs shall file their motions for a preliminary injunction by March 21, 2025. Defendants shall file an answer to the motions by March 26, 2025. Plaintiffs shall reply by March 28, 2025. For the reasons stated in the 17 Joint Status Report, Plaintiffs shall file a single consolidated opening brief with a 60-page limit and a single | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
|  |  | consolidated reply brief with a 30-page limit. The court will hold a hearing on Plaintiffs' motions on Wednesday, April 2, 2025, at 12:00 PM in Courtroom 9 before Judge Tanya S. Chutkan. The court will provide access for the public to telephonically attend the hearing. Signed by Judge Tanya S. Chutkan on 3/19/2025. (lcer) (Entered: 03/19/2025) |  |
| 18 | 03/19/2025 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name-James M. Gross,  Filing fee $ 100, receipt number ADCDC-11554229. Fee Status: Fee Paid. by POWER FORWARD COMMUNITIES, INC.. (Attachments: # 1 Exhibit A - Declaration of James M. Gross with Certificate of Good Standing, # 2 Exhibit B - Proposed Order)(Neitzel, Beth) (Entered: 03/19/2025) |  |
| 19 | 03/19/2025 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name-Kevin Y. Chen,  Filing fee $ 100, receipt number ADCDC-11554255. Fee Status: Fee Paid. by POWER FORWARD COMMUNITIES, INC.. (Attachments: # 1 Exhibit A - Declaration of Kevin Y. Chen with Certificate of Good Standing, # 2 B - Proposed Order)(Neitzel, Beth) (Entered: 03/19/2025) |  |
|  | 03/20/2025 | MINUTE ORDER: The court will provide access for the public to telephonically attend the hearing scheduled for April 2, 2025. The hearing can be accessed by dialing the Toll-Free Number: 833-990-9400 (Meeting ID: 493633106). It is hereby ORDERED that the attendees using the public access telephone line shall adhere to the following: persons remotely accessing court proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting any court proceedings (including those held by telephone or videoconference). Violation of these prohibitions may result in sanctions, including removal of court-issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the presiding Judge. Signed by Judge Tanya S. Chutkan on 3/20/2025. (smc) (Entered: 03/20/2025) |  |
|  | 03/20/2025 | MINUTE ORDER: As noticed in the March 17 hearing, see March 17, 2025 Min. Order, the court will consolidate cases 25-cv-698, 25-cv-735, and 25-cv-762 pursuant to Federal Rule of Civil Procedure 42(a). All filings and papers related to the consolidated cases shall be filed in the lead case: 25-cv-698. It is further ORDERED that the parties shall NOT "spread the text" when filing documents in the lead cases. Signed by Judge Tanya S. Chutkan on 3/20/2025. (lcer) Modified on 3/21/2025 (zsmc). (Entered: 03/20/2025) |  |
|  | 03/20/2025 | MINUTE ORDER: GRANTING Motions for Leave to Appear Pro Hac Vice as to 18 James M. Gross and 19 Kevin Y. Chen. James M. Gross and Kevin Y. Chen are hereby admitted pro hac vice to represent Plaintiff Power Forward Communities, Inc. in this matter. Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a) Click for instructions. Signed by Judge Tanya S. Chutkan on 3/20/2025. (lcer) (Entered: 03/20/2025) |  |
|  | 03/20/2025 | Cases Consolidated. This case has been consolidated with case 25-cv-00698-TSC pursuant to 03/20/2025 Minute Order. From this date forward, all pleadings shall be filed ONLY in the lead case, 25-cv-00698-TSC. Parties are advised NOT to elect the SPREAD TEXT option when filing in ECF, as this will result in repetitive docketing. (zjm) (Entered: 03/20/2025) |  |
| 20 | 04/28/2025 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. WILLIAM CHARLES MCINTOSH served on 4/1/2025 (Neitzel, Beth) Modified on 4/28/2025 to correct docket text (zjm). (Entered: 04/28/2025) |  |

5G - 84096001 - 0    Page 1

| U.S. ENVIRONMENTAL PROTECTION AGENCY<br>Grant Agreement | GRANT NUMBER (FAIN): 84096001<br>MODIFICATION NUMBER: 0<br>PROGRAM CODE: 5G | DATE OF AWARD 08/08/2024 |
|---|---|---|
| | TYPE OF ACTION<br>New | MAILING DATE 08/13/2024 |
| | PAYMENT METHOD:<br>ASAP | ACH# |

| RECIPIENT TYPE:<br>Not for Profit | Send Payment Request to:<br>Contact EPA RTPFC at: ▮▮▮▮▮ |
|---|---|
| RECIPIENT:<br>POWER FORWARD COMMUNITIES, INC<br>▮▮▮▮▮<br>EIN: ▮▮▮▮▮ | PAYEE:<br>Power Forward Communities, Inc<br>▮▮▮▮▮ |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Shevani Patel<br>Power Forward Communities, Inc<br>▮▮▮▮▮<br>Email: ▮▮▮▮▮<br>Phone: | Zoe Davis<br>▮▮▮▮▮<br>Email: ▮▮▮▮▮<br>Phone: ▮▮▮▮▮ | ThuyT Nguyen<br>▮▮▮▮▮<br>Email: ▮▮▮▮▮<br>Phone: ▮▮▮▮▮ |

**PROJECT TITLE AND DESCRIPTION**

GGRF NCIF: Power Forward Communities' NCIF Application to Create Community Abundance by Decarbonizing America's Households

See Attachment 1 for project description.

| BUDGET PERIOD<br>04/01/2024 - 06/30/2031 | PROJECT PERIOD<br>04/01/2024 - 06/30/2031 | TOTAL BUDGET PERIOD COST<br>$ 2,000,000,000.00 | TOTAL PROJECT PERIOD COST<br>$ 2,000,000,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 2,000,000,000.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 2,000,000,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| ORGANIZATION / ADDRESS | ORGANIZATION / ADDRESS |
| Environmental Protection Agency, Grants and Interagency Agreement Management Division<br>▮▮▮▮▮ | Environmental Protection Agency, OGGRF<br>OA - Office of the Administrator<br>▮▮▮▮▮ |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| Digital signature applied by EPA Award Official Katherine Tsing-Choy - Associate Award Official | DATE<br>08/08/2024 |

JA1020

5G - 84096001 - 0    Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 2,000,000,000 | $ 2,000,000,000 |
| EPA In-Kind Amount | $ 0 | $ 0 | $ 0 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 2,000,000,000 | $ 2,000,000,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.957 - Greenhouse Gas Reduction Fund: National Clean Investment Fund | Clean Air Act: Sec. 134(a)(2) and (3) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 2411U41081 | 2224 | E1SF3 | QU | 000MGBXG3 | 4131 | - | - | $ 1,713,672,154 |
| - | 2411U41080 | 2224 | E1SF3 | QU | 000MGBXAC | 4131 | - | - | $ 286,327,846 |
| | | | | | | | | | $ 2,000,000,000 |

5G - 84096001 - 0    Page 3

Budget Summary Page

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| **1. Personnel** | $ 49,132,749 |
| **2. Fringe Benefits** | $ 10,771,621 |
| **3. Travel** | $ 1,536,707 |
| **4. Equipment** | $ 0 |
| **5. Supplies** | $ 356,304 |
| **6. Contractual** | $ 33,643,529 |
| **7. Construction** | $ 0 |
| **8. Other** | $ 1,895,000,000 |
| **9. Total Direct Charges** | $ 1,990,440,910 |
| **10. Indirect Costs: 10.00 % Base de minimis MTDC** | $ 9,559,090 |
| **11. Total (Share: Recipient ___0.00 % Federal __100.00 %)** | $ 2,000,000,000 |
| **12. Total Approved Assistance Amount** | $ 2,000,000,000 |
| **13. Program Income** | $ 0 |
| **14. Total EPA Amount Awarded This Action** | $ 2,000,000,000 |
| **15. Total EPA Amount Awarded To Date** | $ 2,000,000,000 |

5G - 84096001 - 0    Page 4

## Attachment 1 - Project Description

This agreement provides funding under the Inflation Reduction Act (IRA) to Power Forward Communities (PFC). The recipient will utilize the funding to reduce emissions of greenhouse gases and other air pollutants; deliver benefits of greenhouse gas- and air pollution-reducing projects to American communities, particularly low-income and disadvantaged communities (LIDACs); and mobilize financing and private capital to stimulate additional deployment of greenhouse gas- and air pollution-reducing projects.

Specifically, the recipient -- formed by five of the country's most trusted housing, climate, and community investment groups -- will build and lead a national financing program to provide customized and affordable capital solutions for single-family and multi-family housing owners and developers, driving down costs and creating stronger, more affordable, more resilient homes. The coalition will also dedicate time and funding towards collaborating with and educating community members to help prioritize the best solutions for an individual's specific needs in an effort to provide lasting and genuinely-impactful solutions.

The activities include a balance of local implementation with a national strategy to deliver focused, scaled, and LIDAC-first market transformation. Power Forward Communities (PFC) will enrich the local implementation, led by community-based organizations (CBOs), by putting all building owners in a position to act through awareness campaigns and expanding access to individualized, actionable information including planning tools, simplified choices, and trustworthy and reliable support services, in addition to supporting a vetted local contractor network. The national strategy will work to reduce the cost of participation and streamline project delivery and reduce friction, alongside customized and affordable financing solutions. Additionally, PFC will mobilize a variety of affordable capital solutions that cater to a variety of projects and needs.

The five national organizations joining forces to create Power Forward Communities (PFC) bring unique professional expertise in affordable housing finance; an extensive track record of investment in low-income communities; technical capacity and leadership on green resilience and sustainability; and unparalleled reach, with boots-on-the-ground across the country through access to hundreds of local staff and over 2,000 local chapters.

The anticipated deliverables include financing projects in many single-family and multifamily units. Further, PFC plans to support electrification benefits through the installation of EV chargers and rooftop solar in multifamily buildings. Rewiring America will complete their decarbonization cost-benefit and decision-analysis model and tool, The Cube, which will be accessible for others to utilize.

The expected outcomes include notable greenhouse gas (GHG) emissions reduced per year, among other air pollution reduction benefits. Customers will see reduced energy bills each year and additional health benefits as a result of the projects. PFC expects to help create many jobs over the course of the seven year project as well.

The intended beneficiaries include LIDAC communities across all EPA regions, rural communities, and tribal communities.

Power Forward Communities (PFC) is able to generate a pipeline from a number of sources: (1) Low-income Housing Tax Credit (LIHTC) properties with expiring compliance periods that are slated for green retrofits, as well as the origination of new net-zero emissions properties, through Enterprise and LISC's

5G - 84096001 - 0   Page 5

LIHTC business lines; (2) Enterprise Community Development's portfolio of units owned and operated across 115 properties in the mid-Atlantic region; (3) Enterprise Real Estate Equity's portfolio of affordable properties with green retrofit needs; (4) community facility projects through Enterprise and LISC's New Market Tax Credit (NMTC) units, the two largest allocatees in the country; (5) Habitat's 1,200 chapter network of single-family developers; and (6) Enterprise and LISC's existing initiatives for supporting MWBE developers and contractors.

Enterprise Green Accelerator, Inc. (EGA) will provide financial assistance through a few different mechanisms: 1) Low-income Housing Tax Credit (LIHTC) properties with expiring compliance periods that are slated for green retrofits, 2) their Real Estate Equity portfolio involving workforce and affordable properties with green retrofit needs as well as the origination of new net-zero emissions properties, 3) their Community Development portfolio which includes ownership and operation of affordable housing properties in the mid-Atlantic specifically, and 4) their New Market Tax Credit (NMTC) units which will include green retrofit or new construction of net-zero emission properties. They will be collaborating with LISC Green LLC to assist property owners with decarbonization plans. EGA will also be using some of their subaward for market building, predevelopment, and program administration activities.

LISC Green LLC will provide financial assistance through a few loan offerings that lean on LISC's current systems for impact including their on-balance sheet lending (loans or forgivable loans to qualified projects), LIHTC Properties (similar to EGA), and a fund to blend capital from other sources. They will be collaborating with EGA to assist property owners with decarbonization plans. LISC will also be using some of their subaward for market building, predevelopment, and program administration activities.

Habitat for Humanity International, Inc. will provide financial assistance for single-family homes and lean on their 1,200 chapters with local knowledge and expertise to develop, counsel, build, sell, and finance low-income housing in a variety of communities. Habitat Capital will provide financial assistance in accordance with their role as a community development financial institution (CDFI). Both offer predevelopment grants or forgivable loans for either new projects or rehab and repair projects (across a range of reduced emissions: net-zero emissions, to substantially low emissions, to limited emission homes, all are considered Qualified Projects if not Priority Projects). Both will also be using some of their subaward for market building, predevelopment, and program administration activities.

United Way Worldwide will support their already-standing 2-1-1 call centers (community action centers). These centers will hire Community Navigators who will help community members understand the benefits of the assistance and project themselves, in addition to helping community members find the product that is right for them. Therefore, most of their funding will go towards market building, and a small portion towards program administration.

Rewiring America Community Investment Fund (RA) will enhance and expand their market-building software, and prepare materials to support community outreach and education. The software platform, known as The Cube, will streamline consumer education, incentive and financial assistance eligibility verification and delivery, and project design and scheduling. The platform will also integrate with a vetted contractor network. Additionally, RA will develop content that community action centers can use for educating their specific community. Therefore, RA's funds will be split between market building and financial assistance, with some going towards program administration.

5G - 84096001 - 0     Page 6

# Administrative Conditions

## A. General Terms and Conditions

The Recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later. These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): ████████████ and EPA Grants Specialist listed on the award
- MBE/WBE reports (EPA Form 5700-52A): ████████████████ and EPA Grants Specialist listed on the award
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to Recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Grants Specialist and EPA Project Officer listed on the award
- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer listed on the award

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a Recipient or Subrecipient intends to provide Financial Assistance to Qualified Project(s) that involves construction or land use planning. With the exception of Qualified Project(s) that will be carried out in the State of California, the Recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the Qualified Project(s) and provide comments to the EPA Project Officer. Qualified Project(s) that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

The Recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, Recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA

5G - 84096001 - 0     Page 7

interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a Recipient incurs after EPA has notified the Recipient that its application has been selected for award consideration. The pre-award costs must be included in the workplan and budget to be eligible. As provided in 2 CFR 1500.9, Recipients incur pre-award costs at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information.

## E. New Recipient Training Requirement

The Recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The Recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the Recipient should refer to RAIN-2024-G01.

JA1026

Case 1:25-cv-00762    Document 1-2    Filed 03/14/25    Page 9 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 523 of 694

5G - 84096001 - 0    Page 8

## Programmatic Conditions

### I. DEFINITIONS

**Acquisition of Intangible Property:** 2 CFR 200.1 defines Intangible Property as "property having no physical existence, such as trademarks, copyrights, patents and patent applications and property, such as loans, notes and other debt instruments, lease agreements, stock and other instruments of property ownership (whether the property is tangible or intangible)." Acquisitions of Intangible Property involve the purchase of Intangible Property through procurement contracts.

**Air Pollutant:** Air Pollutant means any air pollutant that is listed pursuant to Section 108(a) of the Clean Air Act (or any precursor to such an air pollutant). This includes particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead (see 40 CFR Part 50) and their precursors (e.g., volatile organic compounds).

**Award Agreement:** Award Agreement means the set of legally binding documents between EPA and the Recipient under the federal award. Award Agreement is used interchangeably with Assistance Agreement and Notice of Award.

**Apprentice:** Apprentice means an individual working on a project receiving Financial Assistance who is participating in a Registered Apprenticeship program under the National Apprenticeship Act that meets the requirements of 29 CFR Parts 29 and 30.

**Environmental Information:** Environmental Information is defined in EPA's Environmental Information Quality Policy. Environmental Information includes "data and information that describe environmental processes or conditions which support EPA's mission of protecting human health and the environment. Examples include but are not limited to: direct measurements of environmental parameters or processes; analytical testing results of environmental conditions (e.g., geophysical or hydrological conditions); information on physical parameters or processes collected using environmental technologies; calculations or analyses of environmental information; information provided by models; information compiled or obtained from databases, software applications, decision support tools, websites, existing literature, and other sources; development of environmental software, tools, models, methods and applications; and design, construction, and operation or application of environmental technology."

**Environmental Information Operations:** Environmental Information Operations is defined in EPA's Environmental Information Quality Policy. Environmental Information Operations means "[a] collective term for work performed to collect, produce, evaluate, or use environmental information and the design, construction, operation or application of environmental technology."

**EPA Award Official**: EPA Award Official means the award official from the Office of Grants and Debarment that is authorized to execute the Award Agreement, as well as any subsequent amendments to the Award Agreement, and to make any other final determinations required by law or regulation on behalf of the EPA.

**EPA Project Officer**: EPA Project Officer means the project officer from the Office of the Greenhouse Gas Reduction Fund that is assigned, along with the EPA Grants Specialist, to monitor the Recipient on programmatic and technical aspects of the project and is typically authorized to make programmatic approvals on behalf of the EPA. Where required, the Recipient must notify or request approval from the EPA Project Officer through the EPA Project Officer's individual EPA email address as well ██████

Case 1:25-cv-00762     Document 1-2     Filed 03/14/25     Page 10 of 62
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 524 of 694

5G - 84096001 - 0     Page 9

▮ such that the Office of the Greenhouse Gas Reduction Fund may delegate an alternative EPA Project Officer in the case of any absence.

**Financial Assistance:** Section 134(b)(1) of the Clean Air Act directs that the Recipient use funds for "Financial Assistance." Consistent with the definition of *Federal financial assistance* in 2 CFR 200.1, Financial Assistance means financial products, including debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, loan purchasing programs, and other debt instruments), equity investments (such as equity project finance investments, private equity investments, and other equity instruments), hybrids (such as mezzanine debt, preferred equity, and other hybrid instruments), and credit enhancements (such as loan guarantees, loan guarantee funds (whether full or partial), loan loss reserves, and other credit enhancement instruments). Expenditures for Financial Assistance are in the form of Subawards (other than subgrants), Participant Support Costs, or Acquisitions of Intangible Property, as defined in this Award Agreement. Subgrants are not eligible as Financial Assistance.  The characterization of a Financial Assistance transaction as a Subaward, Participant Support Costs, or Acquisition of Intangible Property is limited to the transaction. For example, the same entity may be a Subrecipient for one transaction and a Program Beneficiary or a Contractor for another transaction.

**Freely Associated States:** Freely Associated States means the Republic of the Marshall Islands (the Marshalls), the Federated States of Micronesia (FSM), and the Republic of Palau (Palau).

**Greenhouse Gas:** Greenhouse Gas means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act. Greenhouse Gas Emissions mean emissions of Greenhouse Gases.

**Low-Income and Disadvantaged Communities**: Section 134(a)(3) of the Clean Air Act appropriates funds "for the purposes of providing financial assistance and technical assistance in low-income and disadvantaged communities." Low-Income and Disadvantaged Communities means CEJST-Identified Disadvantaged Communities, EJScreen-Identified Disadvantaged Communities, Geographically Dispersed Low-Income Households, Properties Providing Affordable Housing, and Federally Recognized Tribal Entities, as defined below.

- *CEJST-Identified Disadvantaged Communities:* All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.

- *EJScreen-Identified Disadvantaged Communities:* All communities within version 2.2 of EJScreen that fall within either (a) the limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.

- *Geographically Dispersed Low-Income Households:* Low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available

Case 1:25-cv-00762    Document 1-2    Filed 03/14/25    Page 11 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 525 of 694

5G - 84096001 - 0    Page 10

figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development (HUD). Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using HUD's Family Size Adjustment factor.

• *Properties Providing Affordable Housing:* Properties providing affordable housing that fall within either of the following two categories: (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by HUD, including Public Housing, Section 8 Project-Based Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)); or (5) a housing assistance program administered by the Department of Hawaiian Homelands as defined in Title VIII of the Native American Housing Assistance and Self-Determination Act of 1996 (24 CFR 1006.10) or (b) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

• *Federally Recognized Tribal Entities:* All Federally Recognized Tribal entities, which are considered disadvantaged regardless of whether a Federally Recognized Tribe has land, consistent with M-23-09 and CEJST.


**Market-Building Activities:** Market-Building Activities means activities that meet all three of the following criteria: (1) build the market for financeable Qualified Projects, (2) are not tied directly to Qualified Projects the Recipient intends to finance, and (3) are necessary and reasonable for the deployment of Financial Assistance to Qualified Projects.


**Named Subrecipient:** Named Subrecipient means an entity that is named on the EPA-approved workplan to receive a Subaward in the form of a Subgrant from the Recipient in order to carry out part of the award.


**Participant Support Costs**: 2 CFR 200.1 defines Participant Support Costs as "direct costs for items such as stipends or subsistence allowances, travel allowances, and registration fees paid to or on behalf of participants or trainees (but not employees) in connection with conferences, or training projects." EPA regulations at 2 CFR 1500.1(a)(1) expand the definition of Participant Support Costs to include "subsidies, rebates, and other payments to program beneficiaries to encourage participation in statutorily authorized environmental stewardship programs," which includes the Greenhouse Gas Reduction Fund. In this program, Participant Support Costs may include expenditures by the Recipient as Predevelopment Activities, Market-Building Activities, and Program Administration Activities (which may include subsidies, rebates, and other payments) as well as Financial Assistance to Qualified Projects.


**Period of Closeout**: Period of Closeout means the time interval between the beginning of the closeout

Case 1:25-cv-00762    Document 1-2    Filed 03/14/25    Page 12 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 526 of 694

5G - 84096001 - 0    Page 11

period (the date that the award has been closed out, in accordance with 2 CFR 200.344) to the end of the closeout period (the date that the Closeout Agreement has been terminated). The Period of Closeout may also be referred to as the Closeout Period.

**Period of Performance**: 2 CFR 200.1 defines Period of Performance as "the total estimated time interval between the start of an initial Federal award and the planned end date, which may include one or more funded portions, or budget periods." For the purposes of this Award Agreement, the Period of Performance means the time interval between the start of the Federal award (either the first date that the Recipient has incurred allowable pre-award costs or the date on the Notice of Award, whichever is earlier) and the end of the Federal award (the date that the award has been closed out, in accordance with 2 CFR 200.344). The Period of Performance may also be referred to as the Performance Period.

**Post-Closeout Program Income**: Post-Closeout Program Income means Program Income retained at the end of the Period of Performance, which is subject to the terms and conditions of the Closeout Agreement, as well as Program Income earned by the non-Federal entity that is directly generated by a supported activity or earned as a result of the Federal award during the Period of Closeout, which is also subject to the terms and conditions of the Closeout Agreement. Under the Closeout Agreement, the Recipient is authorized to deduct the cost of generating Post-Closeout Program Income under 2 CFR 200.307(b) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Post-Closeout Program Income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Post Closeout Program Income. Costs of generating Post-Closeout Program Income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the Post-Closeout Program Income, provided the Recipient can account for the actual costs incurred.

**Predevelopment Activities:** Predevelopment Activities means activities that meet all three of the following criteria: (1) improve the likelihood of the Recipient financing Qualified Projects, (2) are tied directly to Qualified Projects the Recipient intends to finance, and (3) are necessary and reasonable for the Recipient to deploy Financial Assistance to Qualified Projects.

**Priority Project Categories:** Priority Project Categories means Distributed Energy Generation and Storage, Net-Zero Emissions Buildings, and Zero-Emissions Transportation, as defined below.

- *Distributed Energy Generation and Storage:* Projects, activities, and technologies that deploy small-scale power generation and/or storage technologies (typically from 1 kW to 10,000 kW), plus enabling infrastructure necessary for deployment of such generation and/or storage technologies. Projects, activities, and technologies within this category must support *carbon pollution-free electricity,* which is electrical energy produced from resources that generate no carbon emissions, consistent with the definition specified in Executive Order 14057 (Catalyzing Clean Energy Industries and Jobs Through Federal Sustainability).

- *Net-Zero Emissions Buildings:* Projects, activities, and technologies that either (1) retrofit an existing building, making a substantial contribution to that building being a net-zero emissions building and as part of a plan for that building achieving net-zero emissions over time, or (2) construct a new net-zero emissions building in a Low-Income and Disadvantaged Community. A *net-zero emissions building* is a building that meets the requirements of Version 1 of the National Definition for a Zero Emissions Building (June 2024).

- *Zero-Emissions Transportation:* Projects, activities, and technologies that deploy zero-emissions

Case 1:25-cv-00762     Document 1-2     Filed 03/14/25     Page 13 of 62
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 527 of 694

5G - 84096001 - 0     Page 12

transportation modes, plus enabling infrastructure necessary for zero-emissions transportation modes—especially in communities that are overburdened by existing diesel pollution, particulate matter concentration, and degraded air quality. Projects, activities, and technologies within this category must be consistent with the zero-emissions transportation decarbonization strategies in The U.S. National Blueprint for Transportation Decarbonization.

**Program Administration Activities:** Program Administration Activities means activities that support administration of the grant program, to the extent such activities meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. Program Administration Activities include but are not limited to establishing and convening advisory councils, as described in Item 2 of EPA's Guidance on Selected Items of Cost for Recipients, and fund raising, as described in Item 4 of EPA's Guidance on Selected Items of Cost for Recipients.

**Program Beneficiary:** Program Beneficiary means an entity (either an individual or an organization) that receives Financial Assistance as an end-user, except when such Financial Assistance is characterized as an Acquisition of Intangible Property (in which case the entity is a Contractor, as defined in 2 CFR 200.1). Expenditures for Financial Assistance to Program Beneficiaries are in the form of Participant Support Costs, as defined in 2 CFR 1500.1. A Program Beneficiary is distinct from a Subrecipient, as defined in 2 CFR 200.1.

**Program Income:** 2 CFR 200.1 defines Program Income as "gross income earned by the non-Federal entity that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(f)." 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, Program Income also includes but is not limited to income from origination fees, servicing fees, and asset management fees; dividends from equity investments; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). Program Income must be treated in accordance with the Program Income Programmatic Term and Condition. EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fund raising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Under this award agreement, the Recipient is authorized to deduct the cost of generating program income under 2 CFR 200.307(b) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of program income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Program Income. Costs of generating program income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the program income, provided the Recipient can account for the actual costs incurred. Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

**Qualified Project:** Section 134(c)(3) of the Clean Air Act provides that a Qualified Project is any project, activity, or technology that (A) reduces or avoids greenhouse gas emissions and other forms of air pollution in partnership with, and by leveraging investment from, the private sector; or (B) assists

5G - 84096001 - 0    Page 13

communities in the efforts of those communities to reduce or avoid greenhouse gas emissions and other forms of air pollution. For this Assistance Agreement, Qualified Project means any project, activity or technology meeting all six requirements listed below at the time that Financial Assistance is provided to the project, activity, or technology:

• The project, activity, or technology would reduce or avoid Greenhouse Gas Emissions, consistent with the climate goals of the United States to reduce Greenhouse Gas Emissions 50-52 percent below 2005 levels in 2030, reach 50 percent zero-emission vehicles share of all new passenger cars and light trucks sold in 2030, achieve a carbon pollution-free electricity sector by 2035, and achieve net-zero emissions by no later than 2050. The project, activity, or technology may reduce or avoid such emissions through its own performance or through assisting communities in their efforts to deploy projects, activities, or technologies that reduce or avoid such emissions.

• The project, activity, or technology would reduce or avoid emissions of other Air Pollutants. The project, activity, or technology may reduce or avoid such emissions through its own performance or through assisting communities in their efforts to deploy projects, activities, or technologies that reduce or avoid such emissions.

• The project, activity, or technology would deliver additional benefits (i.e., in addition to primarily reducing or avoiding emissions of greenhouse gases and other Air Pollutants) to communities within one or more of the following seven categories: climate change; clean energy and energy efficiency; clean transportation; affordable and sustainable housing; training and workforce development; remediation and reduction of legacy pollution; and development of critical clean water infrastructure.

• The project, activity, or technology may not have otherwise been financed.

• The project, activity, or technology would mobilize private capital.

• The project, activity, or technology would support only commercial technologies, defined as technologies that have been deployed for commercial purposes at least three times for a period of at least five years each in the United States for the same general purpose as the project, activity, or technology.

**Senior Management:** Senior Management means the chief executive officer, chief risk officer, general counsel, chief compliance officer, chief investment officer, chief reporting officer, and chief financial officer (or equivalent positions).

**Subaward:** 2 CFR 200.1 defines a Subaward as "an award provided by a pass-through entity to a Subrecipient for the Subrecipient to carry out part of a Federal award received by the pass-through entity." A Subgrant refers to a Subaward in the form of a grant.

**Subrecipient:** Consistent with 2 CFR 200.1, Subrecipient means "an entity that receives a Subaward from a pass-through entity to carry out part of a Federal award but does not include an entity that is a Program Beneficiary of such an award." A Subrecipient is distinct from a Program Beneficiary, which is referenced in 2 CFR 1500.1. In this program, there are three main types of Subrecipients: (1) a Subrecipient that receives a Subgrant that will be used, either in whole or in part, to provide Financial Assistance to Qualified Projects, or a "Financial Assistance Subrecipient"; (2) a Subrecipient that receives a Subgrant that will be used exclusively for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities, or a "Technical Assistance Subrecipient"; and (3) a Subrecipient that receives Financial Assistance in the form of a Subaward, with the Subrecipient then using the Subaward to provide Financial Assistance to Qualified Projects, or a "Financial Intermediary Subrecipient". In

accordance with 2 CFR 200.332, each Subrecipient is accountable to the Recipient for proper use of EPA funding. Note that a financial transaction is a Subaward to a Financial Intermediary Subrecipient if the following two characteristics are true: (i) the financial transaction provides an award by a pass-through entity to a Subrecipient through a form of *Federal financial assistance*, other than a grant, and (ii) the proceeds of the award are used directly as Financial Assistance to Qualified Projects, carrying out part of a Federal award received by the pass-through entity.

The EPA Subaward Policy applies to Subgrants made to Financial Assistance Subrecipients and Technical Assistance Subrecipients, including but not limited to Named Subrecipients. However, the EPA Subaward Policy does not apply to Subawards made to Financial Intermediary Subrecipients.


## II. NATIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the Recipient agrees to the following four requirements of performance reporting: (1) reports, (2) transaction-level and project-level data, (3) organizational disclosures, and (4) ongoing disclosures. These performance reporting requirements "flow-down" as needed to enable the Recipient to comply with the requirements described in this term and condition. The Recipient must ensure that these reports cover its own grant-related activities, and where applicable to a certain performance report or element of a performance report, the grant-related activities of its Subrecipients, Contractors, and/or Program Beneficiaries. To comply with these performance reporting requirements, the Recipient agrees to use information collection instruments authorized by GGRF Accomplishment Reporting (███████████████████████████████████████ ██████████, once such instruments are authorized; to the extent that information is not available for transactions that were closed prior to authorization of these instruments, the Recipient will not be out of compliance with the performance reporting requirements.

The Recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit performance reporting electronically to the EPA Project Officer. To the extent it is known, or should have been known, by the chief executive officer (or equivalent) and chief reporting officer (or equivalent) that the reporting is not compliant with the terms and conditions, or demonstrates material noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission. Should the chief executive officer (or equivalent) and chief reporting officer (or equivalent) signing the submission knowingly and willfully make any material false statement, they may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) prior to submission to EPA. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient.

Case 1:25-cv-00762    Document 1-2    Filed 03/14/25    Page 16 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 530 of 694

5G - 84096001 - 0    Page 15

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344.

Where applicable, the intervals for reporting are authorized by 2 CFR 200.329(c)(1), as more frequent reporting is necessary for the effective monitoring of the Federal award and could significantly affect program outcomes.

## 1. Reports

### *Semi-Annual Report*

The Recipient agrees to submit semi-annual reports covering six months of the calendar year in accordance with information collection instruments approved through GGRF Accomplishment Reporting (█████████████████████████████████). A single semi-annual report must be submitted to cover grant-related activities of the Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the semi-annual report.

The Recipient agrees to submit semi-annual reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The first semi-annual reporting period ends on December 31 and covers all activities beginning on the first day of the Period of Performance.

### *Annual Report*

The Recipient agrees to submit annual reports that contain detailed narratives describing program performance over the Recipient's fiscal year, supported with qualitative discussions and quantitative metrics. A single annual report must be submitted to cover grant-related activities of the Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the annual report.

The Recipient must include the following broad, non-exhaustive elements in its annual reports:

- Progress towards objectives on key performance metrics over the reporting period,
- Summary of key activities completed in the reporting period, including case studies across different types of Financial Assistance to Qualified Projects,
- Geographic coverage of Financial Assistance to Qualified Projects made in the reporting period,
- Descriptions and examples of actions taken to meaningfully involve the communities the program serves in program design and operations,

5G - 84096001 - 0    Page 16

- Case studies of different types of Market-Building and/or Predevelopment Activities, and
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved in the next reporting period.


These reports must be submitted ready to be published on the EPA website for public consumption and must not include any material that the Recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI. Should EPA identify PII or claims of CBI in reports, the EPA Project Officer will require that the Recipient re-submit the report without the PII or claims of CBI so that it can be published without redaction.

The Recipient agrees to submit **annual reports** electronically to the EPA Project Officer within 90 calendar days after the Recipient's fiscal year end date. The first annual report is due 90 calendar days after the Recipient's fiscal year that ends in 2025.

*Final Report*

The Recipient agrees to submit a final report containing two documents. First, the recipient must submit a report containing all of the elements described above for the annual report, covering the entire Period of Performance and overall assessment of its program performance and implementation of its EPA-approved workplan. Second, the recipient must submit its investment strategy for the Closeout Period to detail its use of Post-Closeout Program Income over the Closeout Period. EPA intends to make the investment strategy, either in whole or in part, available to the public through disclosing copies of the investment strategy as submitted or using the content of the investment strategy. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient.

The two documents for the final report must be submitted to cover the grant-related activities of the Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the final report.

The Recipient agrees to submit the two documents for the final report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the Period of Performance.

## 2. Transaction-Level and Project-Level Data

The Recipient agrees to submit quarterly transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (). The data submission must cover the grant-related activities of the Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the data submission.

The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the quarterly reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request

Case 1:25-cv-00762    Document 1-2    Filed 03/14/25    Page 18 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 532 of 694

5G - 84096001 - 0    Page 17

may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the quarterly reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The four quarterly reporting periods for data submission are as follows: July 1 to September 30; October 1 to December 31; January 1 to March 31; and April 1 to June 30. The data submissions must cover transactions originated in the preceding quarter. For the quarterly reporting period that ends September 30, the Recipient must provide information on transactions originated from April 1 to June 30 rather than from July 1 to September 30. For the quarterly reporting period that ends December 31, the Recipient must provide information on transactions originated from July 1 to September 30 rather than October 1 to December 31. For the quarterly reporting period that ends March 31, the Recipient must provide information on transactions originated from October 1 to December 31 rather than January 1 to March 31. For the quarterly reporting period that ends June 30, the Recipient must provide information on transactions originated from January 1 to March 31 rather than April 1 to June 30. The first transaction-level and project-level data submission is due 30 calendar days after December 31, 2024 and must cover all transactions originated from the beginning of the Performance Period through September 30, 2024.

## 3. Organizational Disclosures

The Recipient agrees to submit annual organizational disclosures electronically to the EPA Project Officer within 30 calendar days after submission of its Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. The organizational disclosures must cover the Recipient's fiscal year and be submitted in accordance with information collection instruments approved through GGRF Accomplishment Reporting ███████████████████████████). Additionally, the Recipient agrees to submit such organizational disclosures for each Financial Assistance Subrecipient that has received in excess of $10,000,000 in NCIF subgrants to provide Financial Assistance to Qualified Projects under the National Clean Investment Fund (to be delivered within 30 calendar days after submission of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System). The requirement for organizational disclosures is not applicable for any fiscal year in which the reporting entity did not meet the requirements of 2 CFR Subpart F—Audit Requirements. The first Organizational Disclosures are due in 2025.

## 4. Ongoing Disclosures

In addition to other ongoing disclosure obligations within the regulations and terms and conditions of this Award Agreement, the Recipient agrees to notify the EPA Project Officer of the following events in accordance with 2 CFR 200.329(e):

1. Changes to the Recipient's independent certified public accounting firm;

2. Non-reliance by the Recipient or its independent auditor on previously issued financial statements or a related audit report or completed interim audit review;

3. Changes in fiscal year end of the Recipient;

4. Material impairments to the Recipient's assets;

5. Intention to file bankruptcy petition or enter into receivership;

6. Submission of annual Form 990 to the IRS, with provision of copy to EPA Project Officer upon request (only if submission of the Form 990 is otherwise required).

Additionally, the Recipient agrees to submit such ongoing disclosures for each Financial Assistance Subrecipient that has received in excess of $10,000,000 to provide Financial Assistance to Qualified Projects under the National Clean Investment Fund. The Recipient agrees to submit ongoing disclosures electronically to the EPA Project Officer within 15 calendar days of the event.

## B. Cybersecurity Condition

(a) The Recipient agrees that when collecting and managing environmental data under this Assistance Agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward Agreements and, during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(d), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process.  A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA

Case 1:25-cv-00762     Document 1-2     Filed 03/14/25     Page 20 of 62
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 534 of 694

5G - 84096001 - 0     Page 19

Project Officer for this award.

## D. Signage Required

### 1. Signage Requirements

a. Investing in America Emblem: The Recipient will ensure that a sign is placed at construction sites supported in whole or in part by this award displaying the official Investing in America emblem and must identify the project as a "project funded by President Biden's Inflation Reduction Act," where the Financial Assistance used to fund the construction project exceeds $250,000. The Recipient will also make optional signage available for projects where the construction is less than $250,000. The sign must be placed at construction sites in an easily visible location that can be directly linked to the work taking place and must be maintained in good condition throughout the construction period. The Recipient will ensure compliance with the guidelines and design specifications provided by EPA for using the official Investing in America emblem available at: https://www.epa.gov/invest/investing-america-signage.

b. Procuring Signs: Consistent with section 6002 of RCRA, 42 USC 6962, and 2 CFR 200.323, the Recipient is encouraged to use recycled or recovered materials when procuring signs. Signage costs are considered an allowable cost under this Assistance Agreement provided that the costs associated with signage are reasonable. Additionally, to increase public awareness of projects serving communities where English is not the predominant language, the Recipient is encouraged to translate the language on signs (excluding the official Investing in America emblem or EPA logo or seal) into the appropriate non-English language(s). The costs of such translation are allowable, provided the costs are reasonable.

### 2. Public or Media Events

For public or media events that are planned more than 15 calendar days in advance, the Recipient agrees to notify the EPA Project Officer of public or media events it has organized publicizing the accomplishment of significant activities related to execution of the EPA-approved workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice.

## E. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards.  Information on these standards may be found at https://www.fgdc.gov/.

## F. Leveraging and Fund Raising

### 1. Leveraging

The Recipient agrees to make commercially reasonable efforts to provide the proposed leveraged funding that is described in its EPA-approved workplan. If the proposed leveraging does not substantially materialize during the Period of Performance, and the Recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future grant applications from the Recipient. In addition, if the proposed leveraging does not substantially materialize during the Period of Performance and the Recipient does not provide a satisfactory explanation, then EPA may reconsider the legitimacy of the award; if EPA determines that the Recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the EPA-approved workplan, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

Case 1:25-cv-00762     Document 1-2     Filed 03/14/25     Page 21 of 62
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 535 of 694

5G - 84096001 - 0     Page 20

## 2. Fund Raising

2 CFR 200.442 provides coverage on allowable fund-raising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fund raising costs are an allowable cost and may include costs that are reasonable and necessary for raising capital from private investors to provide Financial Assistance to Qualified Projects.

Allowable fund-raising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private investors. Funds a Recipient raises for its own use with costs borne by an EPA Financial Assistance Agreement are considered Program Income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fund raising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fund-raising costs charged to the award will be treated as Program Income.

## G. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving Environmental Information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving Environmental Information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure sub-award recipients develop and implement Quality Assurance (QA) planning documents in accordance with this term and condition; and/or ensure sub-award recipients implement all applicable approved QA planning documents. EPA will not approve any QA planning documents developed by a Subrecipient; the Recipient is responsible for reviewing and approving its Subrecipient QA planning document(s), if required based on the Subrecipient's Environmental Information Operations.

## 1. Quality Management Plan (QMP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the recipient must: (i) develop a QMP, (ii) prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard and submit the document for EPA review, and (iii) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved and current QMP and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

The Recipient must submit the QMP within 90 calendar days after grant award, unless the Recipient requests a one-time extension that is granted by the QAM.

The Recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the Recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a

Case 1:25-cv-00762    Document 1-2    Filed 03/14/25    Page 22 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 536 of 694

5G - 84096001 - 0    Page 21

copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QAPP, (ii) prepare the QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard, (iii) submit the document for EPA review, and (iv) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s) and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer (PO) in writing if the previously EPA-approved QAPP is acceptable for this agreement.

The Recipient must submit the QAPP within 90 calendar days after grant award, unless the Recipient requests a one-time extension that is granted by the QAM.

The Recipient must notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

The recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted when changes occur.

## For Reference:

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

## H. Real Property

In accordance with 2 CFR 200.311, title to Real Property acquired or improved under this agreement will vest upon acquisition by the Recipient, including but not limited to title to Real Property acquired through exercise of a remedy for default of a Financial Assistance arrangement. This Real Property must be used for the originally authorized purpose as long as needed for that purpose, during which time the Recipient must not dispose of or encumber its title or other interests. The Real Property Programmatic Term and Condition flows down to Subrecipients but not to Program Beneficiaries or Contractors that receive Financial Assistance to Qualified Projects, which may acquire title to Real Property after receiving Financial Assistance to Qualified Projects.

5G - 84096001 - 0    Page 22

The Recipient must obtain prior approval from the EPA Award Official for the acquisition of Real Property. Note that the Recipient may meet this requirement by specifying the types of acquisitions of Real Property it plans to carry out (including in cases where the Recipient would acquire title to Real Property through exercise of a remedy for default) in its EPA-approved workplan.

<u>Disposition</u>

If the Recipient disposes of the Real Property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

Otherwise, when Real Property is no longer needed for the originally authorized purpose, the Recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where Recipient is disposing of Real Property acquired or improved with a Federal award and acquiring replacement Real Property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the Recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The Recipient is entitled to be paid an amount calculated by applying the Recipient's percentage of participation in the purchase of the Real Property (and cost of any improvements) to the current fair market value of the property.

<u>Recordation</u>

As authorized by 2 CFR 200.316, EPA requires that Recipients who use EPA funding to purchase and improve Real Property through an EPA funded construction project record a lien or similar notice in the Real Property records for the jurisdiction in which the Real Property is located, which indicates that the Real Property has been acquired and improved with federal funding and that use and disposition conditions apply to the Real Property.

I. Program Income

In accordance with Clean Air Act Section 134(b)(1)(C) as well as 2 CFR 200.307(e)(2) and 2 CFR 1500.8 (b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

5G - 84096001 - 0    Page 23

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the EPA-approved workplan.

## J. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the Recipient or Subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the Recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.


## III. ADDITIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Eligible Recipient

**The Recipient agrees to maintain its status as an Eligible Recipient, which includes:**

a. Meeting the definition of *Nonprofit organization* set forth in 2 CFR 200.1;

b. Having an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"

c. Not receiving any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);

d. Being funded by public or charitable contributions; and

e. Having the legal authority to invest in or finance projects.

### B. Workplan and Budget

The Recipient agrees to execute the EPA-approved workplan. This document, once approved by the EPA, will reflect an agreement between the Parties and will be incorporated into and be a part of the agreement between the Recipient and the EPA.

JA1042

5G - 84096001 - 0    Page 24

The Recipient agrees to conduct an annual review of the EPA-approved workplan within 90 calendar days of June 30 of each calendar year. If material changes are made during the annual review or in between annual reviews, the Recipient agrees to submit the updated workplan to the EPA Project Officer.

The Recipient also agrees to conduct an annual review of the EPA-approved detailed budget table within 90 calendar days of June 30 of each calendar year. If material changes are made during the annual review or in between annual reviews, the Recipient agrees to submit the updated detailed budget table to the EPA Project Officer. Such submissions are not subject to prior approval unless otherwise required by the regulations or the terms and conditions of the Award Agreement.

## C. Recipient Organizational Plan

The Recipient agrees to execute the workplan in accordance with the documents listed below, as submitted to EPA through Grants.gov for EPA-R-HQ-NCIF-23 or provided to EPA after the application submission deadline.

1. Organizational Plan, pursuant to *Section IV.C: Content of Application Submission* of the Notice of Funding Opportunity;

2. Legal Entity Structure Diagram, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity; and

3. Organizational and Governing Documents, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity.

The Recipient agrees to maintain its incorporation in the United States, as reflected in the above documents.

The Recipient agrees to conduct an annual review of the documents within 90 calendar days of June 30 of each calendar year. If material changes are made during the annual review or in between annual reviews, the Recipient agrees to submit the updated documents to the EPA Project Officer. Such submissions are not subject to prior approval unless otherwise required by the regulations or the terms and conditions of the Award Agreement.

## D. Recipient Policies and Procedures

The Recipient agrees to execute the workplan in accordance with the documents listed below (or other documents submitted in lieu of the documents listed below), as submitted to EPA through Grants.gov for EPA-R-HQ-NCIF-23 or provided to EPA after the application submission deadline.

1. Legal and Compliance Risk Management Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

2. Financial Risk Management Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

3. Board Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

5G - 84096001 - 0    Page 25

4. Management Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding
Opportunity;

5. Consumer Protection Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

6. Equity Policies and Practices, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity; and

7. Conflict of Interest Mitigation Plan, which include all documents submitted upon EPA's request regarding measures that will be taken to eliminate, neutralize, mitigate or otherwise resolve conflicts of interest.

8. Documentation of Personnel and Fringe Benefit Charges, which includes all documents submitted upon EPA's request to document how personnel and fringe benefits will be charged against the grant award in accordance with 2 CFR 200.430 *Compensation—personal services* and 2 CFR 200.431 *Compensation—fringe benefits*. Notwithstanding the content of the Recipient's EPA-approved budget, the Recipient is not authorized to charge the grant award for personnel and fringe benefits against employees without using the W-2 as the definitive definition of "employee" until the Documentation of Personnel and Fringe Benefit Charges has been reviewed and approved by the EPA, as communicated by the EPA Project Officer.

The Recipient agrees to conduct an annual review of the documents within 90 calendar days of June 30 of each calendar year. If material changes are made during the annual review or in between annual reviews, the Recipient agrees to submit the updated documents to the EPA Project Officer. With the exception of the Documentation of Personnel and Fringe Benefit Charges, where changes will be subject to prior approval, such submissions are not subject to prior approval unless otherwise required by the regulations or the terms and conditions of the Award Agreement.

## E. Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Financial Assistance to Qualified Projects; Predevelopment Activities; Market-Building Activities; and Program Administration Activities. The Recipient must use awards funds exclusively for allowable activities within the ten EPA regions, with the exception of the Freely Associated States. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

The Recipient agrees to not use the award for the following unallowable activities: (a) Financial Assistance to Qualified Projects in the form of Subgrants; (b) Subgrants for the purposes of providing Financial Assistance to Qualified Projects (other than Subgrants from the Recipient to first-tier Subrecipients); and (c) activities that support deployment of projects that do not meet the definition of Qualified Projects. The Recipient also agrees not to use the award for activities associated with defending against, settling, or satisfying a claim by a litigant, except when (1) the claim stems from the Recipient's implementation of its EPA-approved workplan in compliance with the terms and conditions of the Award Agreement and (2) the Recipient has obtained prior written approval from the EPA Award Official.

## F. Foreign Entity of Concern

JA1044

Case 1:25-cv-00762    Document 1-2    Filed 03/14/25    Page 27 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 541 of 694

5G - 84096001 - 0    Page 26

As part of carrying out this award, the Recipient agrees to ensure that entities the Recipient contracts with, the Recipient makes Subawards to, or that receive funds as Program Beneficiaries at any tier of funding under this grant agreement are not—

    (A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

    (B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

    (C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## G. LIDAC Expenditure Requirement

The Recipient agrees to ensure that a minimum of 40% of the award is used for the purposes of providing Financial Assistance in Low-Income and Disadvantaged Communities, with compliance maintained over each annual reporting period (i.e., from July 1 to June 30). Funds used for the purposes of providing Financial Assistance may include Financial Assistance to Qualified Projects; Predevelopment Activities; Market-Building Activities; and Program Administration Activities. This requirement applies to the entire award provided to the Recipient but does not "flow down" to each Subrecipient.

## H. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide Financial Assistance to Qualified Projects that may generate Program Income as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such Financial Assistance may include Subawards, Participant Support Costs, and/or Acquisitions of Intangible Property. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the Recipient's Subawards from the capitalization of a revolving loan fund.

EPA does not consider the remaining portion of the award as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). As such, all Subgrants made by the Recipient are subject to the EPA Subaward Policy.

## I. Subawards

### Subawards to Technical Assistance Subrecipients

The Establishing and Managing Subawards General Term and Conditions applies to Technical Assistance Subrecipients.

### Subawards to Financial Intermediary Subrecipients

The following requirements apply when the Recipient provides a Subaward to a Financial Intermediary Subrecipient. These requirements apply to the Recipient and Subrecipient in lieu of those specified in the

Establishing and Managing Subawards General Term and Condition, as the EPA Subaward Policy does not apply to Financial Intermediary Subrecipients.

1. The Recipient must establish and follow a system that ensures all Subawards to Financial Intermediary Subrecipients are in writing and contain all of the elements required by 2 CFR 200.332(a), with the exception of the indirect cost provision of 2 CFR 200.332(a)(4) (which does not apply to loans). EPA has developed an optional template for Subaward Agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such Subaward Agreements with Financial Intermediary Subrecipients.

2. The Financial Intermediary Subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all Subawards that requires Financial Intermediary Subrecipients to comply with these requirements. No other provisions of the Uniform Grant Guidance, including the Procurement Standards, apply directly to the Subrecipient.

3. Prior to making the Subaward, the Recipient must ensure that the Financial Intermediary Subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(a)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

Subawards to Financial Assistance Subrecipients

The following requirements apply when the Recipient provides a Subaward to a Financial Assistance Subrecipient. These requirements apply to the Recipient and Subrecipient in addition to those specified in the Establishing and Managing Subawards General Term and Condition.

1. The Recipient must obtain written approval from the EPA Award Official prior to providing a Subgrant to a Financial Assistance Subrecipient that would exceed $10,000,000 cumulatively in Financial Assistance Subawards under the National Clean Investment Fund and Capitalization Funding under the Clean Communities Investment Accelerator.

2. Prior to providing a Subgrant not named on the application to a Financial Assistance Subrecipient, the Recipient must obtain disclosure from the potential Subgrantee regarding award funds that it has sought and/or received under the National Clean Investment and Clean Communities Investment Accelerator programs.

## J. Participant Support Costs

The Recipient may provide Financial Assistance to Qualified Projects in the form of Participant Support Costs. In addition, the Recipient may provide Participant Support Costs for other purposes, including Predevelopment Activities, Market-Building Activities, and Program Administration Activities, to the extent such purposes are authorized under the Award Agreement.

The Recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on Participant Support Costs, in addition to other requirements included in the terms and conditions of this Award Agreement:

5G - 84096001 - 0     Page 28

1. The Recipient and Program Beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as Participant Support Costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the Recipient and Program Beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates, and other participant support cost payments. However, EPA does not provide advice on tax issues relating to these payments.

2. Participant support cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The Recipient, therefore, may not make participant support cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that Subrecipients adhere to this requirement as well. The Recipient is responsible for checking that Program Beneficiaries (i.e., entities receiving Participant Support Costs) are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the Program Beneficiaries.

The Recipient agrees to provide written guidelines for Participant Support Costs that must be approved by the EPA prior to making payments to Program Beneficiaries, unless already described in the Recipient's EPA-approved workplan. These guidelines must: (a) describe the activities that will be supported by the Participant Support Costs; (b) specify the range of funding to be provided through the Participant Support Costs; (c) identify which types of entities will have title to equipment (if any) purchased with the funds; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the participant support cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

## K. Acquisitions of Intangible Property

### 2 CFR 200 Procurement Standards

The Recipient may provide Financial Assistance to Qualified Projects in the form of Acquisitions of Intangible Property. The Recipient agrees to acquire Intangible Property in compliance with the conflict of interest and competition requirements described in the 2 CFR Part 200 Procurement Standards. This includes but is not limited to the requirements at 2 CFR 200.318 to:

- Have and use documented procurement procedures to govern acquisitions of Intangible Property;
- Maintain oversight to ensure that contractors perform in accordance with the terms, conditions, and specifications of their contracts;
- Maintain written standards of conduct covering conflicts of interest and governing the actions of employees engaged in the selection, award, and administration of contracts as well as maintain written standards of conduct covering organizational conflicts of interest;
- Prioritize entering into inter-entity agreements where appropriate for procurement or use of common or shared goods and services as the Recipient seeks to mobilize financing and private capital;
- Award contracts only to responsible contractors possessing the ability to perform successfully under the terms and conditions of the proposed procurement; and
- Maintain records sufficient to detail the history of procurement.

JA1047

Disposition

If the Recipient disposes of the Intangible Property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

Recordation

The Recipient agrees to record liens or other appropriate notices of record to indicate that Intangible Property has been acquired with Federal funding and that use and disposition conditions apply to the Intangible Property, in cases where Financial Assistance to Qualified Projects is in the form of an Acquisition of Intangible Property. As provided in 2 CFR 200.1: "…loans, notes and other debt instruments, lease agreements, stock and other instruments of property ownership (whether the property is tangible or intangible)" are *Intangible Property* for the purposes of the restrictions described at 2 CFR 200.315(a). "Other appropriate notices of record" is not limited to filing Uniform Commercial Code instruments and may also include a notice of record in the legally-binding transaction documents.

Additional guidance is available at Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements.

## L. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this Award Agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" and "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Therefore, the Recipient must ensure that any construction work financed in whole or in part with such Financial Assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis-Bacon and Related Act requirements and the requirements of these Terms and Conditions. The Recipient must ensure that these requirements apply to all construction projects assisted by such Financial Assistance.

If the Recipient encounters a situation that presents uncertainties regarding DBRA applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with a Subrecipient, Program Beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this Term and Condition or the Davis-Bacon and

5G - 84096001 - 0    Page 30

Related Act, the Recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Note, the use of the term project in this term and condition is distinct from the use of the term project within the definition of Qualified Project under Clean Air Act Section 134(c)(3), which is broader and includes "any project, activity, or technology."  Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed by a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

## B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

## C. Recipient Responsibilities When Entering Into and Managing Contracts:

### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

### b. After Award of Contract:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

## D. Recipient Responsibilities When Establishing and Managing Additional Subawards:

**a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all Subawards under this grant: "By accepting this award, the EPA Subrecipient acknowledges

Case 1:25-cv-00762    Document 1-2    Filed 03/14/25    Page 32 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 546 of 694

5G - 84096001 - 0    Page 31

and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of Subrecipients and must ensure Subrecipients comply with the requirements in 29 CFR 5.6.

**c. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of Subrecipients and must ensure that Subrecipients comply with the requirements in subsection E, below.

## E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program Beneficiaries

Any Financial Assistance provided in the form of a participant support cost to a Program Beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:**

"[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

### b. After Award of Contract:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

5G - 84096001 - 0     Page 32

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

## 2. Mega Construction Project Program

The Recipient must work with the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) to identify projects that are within the scope of OFCCP's Mega Construction Project Program, which includes federally-assisted projects with a total project value above $35,000,000. If those projects are selected from a wide range of federally-assisted projects over which OFCCP has jurisdiction, those projects will be required to participate and partner with OFCCP in the OFCCP Mega Construction Projects program.

## 3. Compliance with Federal Statutes and Regulations

The Recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with Subrecipients, contractors, and other partners (e.g., by including such provisions in contractual agreements). This includes but is not limited to applicable health and safety regulations as administered by the Occupational Safety and Health Administration.

## 4. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the Recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## 5. Labor and Equitable Workforce Development Implementation Plan

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), by December 31, 2024,the Recipient must submit a Labor and Equitable Workforce Development Implementation Plan to the EPA Project Officer. The Implementation Plan should articulate policies, practices, and procedures adopted by the Recipient to maximize high-quality jobs and workforce development outcomes on projects assisted with the award. Examples of how this can be demonstrated include, but are not limited to:

- Mechanisms for promoting job quality and evaluating labor standards on projects being considered for and/or receiving Financial Assistance;
- Plans to support workforce development as part of Market-Building Activities;

Case 1:25-cv-00762    Document 1-2    Filed 03/14/25    Page 34 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 548 of 694

5G - 84096001 - 0    Page 33

- Current and planned partnerships with labor and workforce development organizations, including the purpose of those partnerships;

- Mechanisms for maximizing training and employment opportunities for participants in Registered Apprenticeship Programs on projects, including apprenticeship utilization targets, as applicable;

- Mechanisms for creating high-quality job training and employment opportunities available to residents of low-income and disadvantaged communities through projects and other program activities; and

- Processes for promoting Project Labor Agreements on construction projects above $25,000,000, as appropriate, in alignment with Executive Order 14063 (Use of Project Labor Agreements for Federal Construction Projects) and Executive Order 13502 (Use of Project Labor Agreements for Federal Construction Projects), as well as other types of binding agreements that promote strong workforce outcomes, such as Community Workforce Agreements and Community Benefits Agreements.

The Recipient may use or reference materials already submitted to EPA as part of its submission of the Implementation Plan, where relevant.

Note that EPA may make the information from this plan available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient.

## M. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that for any activity related to the construction, alteration, maintenance, or repair of infrastructure, "none of the funds made available for a Federal Financial Assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The Recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America requirements that all Recipients of EPA Financial Assistance awards must comply with.

If the Recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## N. Governance Requirements

The Recipient agrees to comply with the following governance requirements starting December 31, 2024. The governance requirements "flow-down" to Financial Assistance Subrecipients that have received in excess of $10,000,000 in NCIF subgrants but not to other subrecipients. The governance requirements

5G - 84096001 - 0   Page 34

are waived for (i) any entity that has been determined by the U.S. Treasury's CDFI Fund to meet the CDFI certification requirements set forth in 12 CFR 1805.201 and (ii) any entity whose specific governance structure is set forth in State, Tribal, or local law.

The Recipient (or Subrecipient) may meet all or some of the governance requirements through the parent entity, provided the Recipient (or Subrecipient) is subject to the governance of the parent entity and the Recipient (or Subrecipient) is wholly-controlled by the parent entity. Similarly, the governance requirements may be waived for the Recipient (or Subrecipient) through the parent entity meeting the CDFI certification requirements set forth in 12 CFR 1805.201, provided the Recipient (or Subrecipient) is wholly-controlled by the parent entity.

## 1. Board Size and Composition

The Recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the Recipient's EPA-approved workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The Recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from Low-Income and Disadvantaged Communities).

## 2. Board Independence

The Recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

## 3. Board Committees

The Recipient agrees to have the following board-level committees to oversee and monitor management, with each committee staffed by members qualified to execute the committee's objectives. While the Recipient need not adhere to the exact naming convention or structure in this term and condition, each of the responsibilities must be covered by board-level committees at all times during the Period of Performance; for the avoidance of doubt, one committee may perform the responsibilities of one or more of the committees specified below.

1. An investment or credit committee to oversee and approve investment or credit decisions;

2. A risk management committee to oversee the formulation and operationalization of the risk management framework;

3. An audit committee to oversee the integrity of reporting and internal controls and the performance of audit functions, with a majority independent members on such committee;

4. A nomination/governance committee to oversee nomination and succession of board and senior management, with a majority independent members on such committee; and

5. A compensation committee to oversee board as well as senior management and staff compensation,

Case 1:25-cv-00762    Document 1-2    Filed 03/14/25    Page 36 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 550 of 694

5G - 84096001 - 0    Page 35

with a majority independent members on such committee.

Further, the Recipient agrees to act in good faith to ensure each committee obtains information from management, auditors, or other third-parties necessary to discharge their duties.

## 4. Board Policies and Procedures

The Recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The Recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of Subawards, participant support cost payments, Acquisitions of Intangible Property to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

## O. Consumer Protection Requirements

The Recipient agrees to carry out the following consumer protection requirements to the extent that the Recipient directly interacts, transacts, or contracts with consumers in the provision of Financial Assistance to Qualified Projects:

> 1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

> 2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

> 3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

> 4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

> 5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The Recipient agrees to monitor and oversee Subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract

5G - 84096001 - 0    Page 36

with consumers, in accordance with 2 CFR 200.332(d) and 2 CFR 200.318.

## P. Financial Risk Management Requirements

### 1. Cash Management Requirements

The Recipient must deposit and maintain advance payments of Federal funds exclusively in insured accounts, in accordance with 2 CFR 200.305(b)(7)(ii). As provided in 2 CFR 200.1, an advance payment is "a payment that a Federal awarding agency or pass-through entity makes by any appropriate payment mechanism, including a predetermined payment schedule, before the non-Federal entity disburses the funds for program purposes;" a Recipient drawing down funds from ASAP prior to disbursement for actual and allowable project costs constitutes an advance payment. Interest income earned on the advance payment from EPA to the Recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The Recipient is authorized to maintain Program Income in two types of accounts:

> 1. Insured accounts, including in amounts in excess of the federal insurance limit of $250,000.

> 2. Accounts where such income is used to purchase (i) U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days and that such instruments are held-to-maturity if purchased directly, or (ii) short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions.

Interest income and other returns earned on funds that have already been disbursed is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9).

### 2. Financial Health Metrics

The Recipient agrees to report the following financial health metrics at the entity-level on an annual basis in accordance with its fiscal year as well as on behalf of each Financial Assistance Subrecipient that receives in excess of $10,000,000 in NCIF subgrants. The metrics are due to the EPA Project Officer within 30 calendar days after submission of the reporting entity's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System and may be submitted through the Organizational Disclosures form. The requirement for submission of financial health metrics is not applicable for any fiscal year in which the reporting entity did not meet the requirements of 2 CFR Subpart F—Audit Requirements. The first financial health metrics are due in 2025.

1. Net Asset Ratio: The net asset ratio is defined as net assets divided by total assets.

2. Current Ratio: The current ratio is defined as current assets divided by current liabilities, where current assets is equal to the value of all assets that are reasonably expected to be converted into cash within the coming 12-month period in the normal course of business and current liabilities is equal to the total value of all debts or obligations that must be paid in the coming 12-month period.

3. Delinquency Rate: The delinquency rate is defined as the value of loans outstanding that are 90+ calendar days delinquent divided by the value of loans outstanding, where loans 90+ calendar days delinquent includes those with outstanding balances 90+ calendar days overdue and still accruing interest as well as those in nonaccrual status.

4. Net Charge-Off Rate: The net charge-off rate is defined as the value of loans charged-off over the past fiscal year, minus the value of loan recoveries over the past fiscal year, divided by the value of loans outstanding.

5. Concentration: The concentration of the portfolio, as demonstrated by calculating and reporting on recipient-level exposure, defined as on-balance sheet exposures to a single consolidated entity over all on-balance sheet exposures, for top ten highest exposures.

Note, the Delinquency Rate and Net Charge-Off Rate may exclude the value of loans which include an element of forgiveness, if and only if such forgiveness was established in the terms governing the financial product at origination.

The EPA Project Officer will consider Recipient and, where applicable, Subrecipient performance against these financial health metrics only to the extent by which they materially impair the Recipient's ability to execute the EPA-approved workplan when assessing whether the Recipient is making sufficient progress in implementing the EPA-approved workplan under this Assistance Agreement, as specified in the Sufficient Progress General Term and Condition.

### 3. Climate-Related Financial Risks

The Recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The Recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.

### 4. Additional Requirements

The Recipient agrees to not subordinate EPA's interest in grant funds that have not yet been used for program purposes in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law. Once a Recipient uses grant funds for program purposes and incurs a financial obligation, as defined under 2 CFR 200.339, EPA will only seek claims on those funds in the event that they were used for costs that do not comply with the terms and conditions of the Award Agreement or if there is adequate evidence of waste, fraud, or abuse, prompting adverse action by EPA per 2 CFR 200.339. This does not prohibit the use of subordinated debt as a form of Financial Assistance.

The Recipient agrees to provide Financial Assistance Subrecipients with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(e).

### Q. Historic Preservation

5G - 84096001 - 0    Page 38

## National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The Recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties can include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The Recipient should work with their Project Officer to ensure that Subrecipients are available to work with EPA on any required consultation process with the State Historic Preservation Office (SHPO) or Tribal Historic Preservation Office (THPO) prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

## Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The Recipient must ensure that Subrecipients performing construction projects are aware of this requirement, and the Recipient must notify EPA if the AHPA is triggered.

## R. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the Recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The Recipient must comply with, and ensure Subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the federal award" provision of 2 CFR 200.403(a). The Recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

JA1057

5G - 84096001 - 0    Page 39

## S. Remedies for Non-Compliance

The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as provided in 2 CFR 200.343. As specified in 2 CFR 200.343, which will remain in effect throughout the term of this award, costs during suspension or after termination are allowable if (a) the costs result from financial obligations which were properly incurred by the non-Federal entity before the effective date of suspension or termination, are not in anticipation of it, and (b) the costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

The Recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the Recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of Subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the Recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action.

Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing an opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements.

## T. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The Recipient agrees to comply with these clarifications.

### 1. Access to Records

In accordance with 2 CFR 200.337, EPA and the EPA Office of Inspector General (OIG) have the right to access any documents, papers, or other records, including electronic records, of the Recipient and any Subrecipient which are pertinent to this award in order to make audits, examinations, excerpts, and transcripts. This right of access also includes timely and reasonable access to the Recipient and Subrecipient's personnel for the purpose of interview, discussion, and on-site review related to such documents. This right of access shall continue as long as the records are retained.

### 2. Indirect Cost Rate

The Recipient must exclude costs for acquisitions of Intangible Property from any calculations of modified total direct costs (MTDC), as defined in 2 CFR 200.1. Intangible Property is not a "service" and therefore is not included in MTDC. The Recipient should note that Subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive Participant Support Costs cannot charge an indirect cost rate against their participant support cost payments.

Case 1:25-cv-00762    Document 1-2    Filed 03/14/25    Page 41 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 555 of 694

5G - 84096001 - 0    Page 40

*MTDC* means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $25,000 of each Subaward (regardless of the Period of Performance of the Subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, Participant Support Costs and the portion of each Subaward in excess of $25,000.

In the event that the Recipient is compensating an affiliated entity for its direct and indirect costs related to use of employees, the Recipient must not charge its indirect cost rate against any of these costs.

## 3. Sufficient Progress

The EPA Project Officer may assess whether the Recipient is making sufficient progress in implementing the EPA-approved workplan under this Assistance Agreement within 90 calendar days of June 30, 2025 as well as within 90 calendar days of June 30 of each year thereafter during the Period of Performance. "Sufficient progress" shall be assessed based on a comparison of the Recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. As noted under the Financial Risk Management Programmatic Term and Condition, the Recipient's financial health, as measured by the required Financial Health Metrics, are also an input in this process. This term and condition "flows down" to Subrecipients, with the Recipient required to assess whether each Subrecipient is making sufficient progress in implementing the workplan under its Subaward Agreement; the Recipient may increase the frequency and scope of the review of sufficient progress of Subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the Recipient has not made sufficient progress in implementing its EPA-approved workplan, the Recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

EPA will not find that the Recipient has failed to make sufficient progress in implementing its EPA-approved workplan based on shifts between types of Financial Assistance and/or Qualified Projects over the Period of Performance (or other shifts in portfolio allocation, such as by region or market segment, over the Period of Performance). If EPA finds the Recipient has failed to achieve sufficient progress on deployment of Financial Assistance to Qualified Projects in general, the Recipient will have an opportunity to implement a corrective action plan pursuant to 2 CFR 200.208.

## 4. Termination

Notwithstanding the General Term and Condition "Termination," EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 applicable to EPA grants as of July 1, 2024, pursuant to 89 FR 55262 (July 3, 2024), when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is materially impaired or there is adequate evidence of waste, fraud, material misrepresentation of eligibility status, or abuse, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination.

5G - 84096001 - 0    Page 41

## U. Period of Performance

The Period of Performance under this Award Agreement will end on the date specified in the Notice of Award. However, the Period of Performance may end prior to the date specified in the Notice of Award if all required work of the Federal award has been completed, in accordance with 2 CFR 200.344. In accordance with 2 CFR 200.344(b), the Recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the Period of Performance. In this context, to "liquidate all financial obligations" means to pay outstanding bills, such as the payment of staff salaries accrued during the Period of Performance but for which the due date falls after the end date of the Period of Performance. To "liquidate all financial obligations" does not mean to liquidate, terminate, or accelerate outstanding obligations related to the provision of Financial Assistance to Qualified Projects at the end of the Period of Performance, which would continue to be subject to the Closeout Agreement.

The Recipient should note that the Recipient will not be considered to have met the requirements for closeout under its award under 2 CFR 200.344 so long as any Subrecipient has not met the requirements for closeout under its subaward under 2 CFR 200.344.

Notwithstanding the Extension of Project/Budget Period Expiration Date General Term and Condition, in accordance with 2 CFR 200.308(e)(2), the Recipient is authorized to initiate a one-time extension of the Period of Performance by up to 12 months without prior EPA approval, provided that the extension complies with the requirements 2 CFR 200.308(e)(2). In accordance with 2 CFR 200.308(e)(2), the Recipient must "notify the Federal awarding agency in writing with the supporting reasons and revised period of performance at least 10 calendar days before the end of the period of performance specified in the Federal award."

## V. Closeout Agreement

As provided at 2 CFR 200.307(f) and 2 CFR 1500.8(d), after the end of the Period of Performance of the Assistance Agreement, the Recipient may keep and use Program Income remaining at the end of the Assistance Agreement and use Post-Closeout Program Income in accordance with this term and condition. The Closeout Agreement goes into effect for this Assistance Agreement the day after the Assistance Agreement Period of Performance ends, unless the Recipient and the EPA Grants Management Officer or Award Official mutually agree on an alternative date.

In accordance with 2 CFR 200.344, EPA will proceed to closeout the Award Agreement and enter the Closeout Period even if the Recipient has not met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition). As provided in 2 CFR 200.344: "If the non-Federal entity fails to complete the requirements, the Federal awarding agency or pass-through entity will proceed to close out the Federal award with the information available." This Closeout Agreement is therefore self-executing.

This term and condition is the entire Closeout Agreement between the EPA and the Recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The Recipient shall comply with the requirements specified below as part of the Closeout Agreement. Definitions within 2 CFR 200.1, including as supplemented through *I. Definitions* of this award agreement, apply identically to how they do under the Period of Performance, unless otherwise noted.

Case 1:25-cv-00762    Document 1-2    Filed 03/14/25    Page 43 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 557 of 694

5G - 84096001 - 0    Page 42

As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to Subrecipients such that the Recipient must enter into a corresponding Closeout Agreement with any Subrecipient that has Program Income or anticipates generating Post-Closeout Program Income at the end of the Subrecipient's Period of Performance.

## 1. Allowable Activities

The Recipient shall use Post-Closeout Program Income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

The Recipient shall submit program performance reports to the EPA Project Officer in accordance with the Performance Reporting Programmatic Term and Condition through September 30, 2031, as applicable. After September 30, 2031, the Recipient shall disclose annual reports publicly, as described in the Performance Reporting Programmatic Term and Condition, rather than meeting the reporting requirements described in the Performance Reporting Programmatic Term and Condition.

## 3. LIDAC Expenditure Requirements

The Recipient shall expend 40% of Post-Closeout Program Income for the purposes of providing Financial Assistance in Low-Income and Disadvantaged Communities and comply with this requirement in accordance with the LIDAC Expenditure Requirement Programmatic Term and Condition, as applicable. Funds used for the purposes of providing Financial Assistance may include Financial Assistance to Qualified Projects; Predevelopment Activities; Market-Building Activities; and Program Administration Activities. This requirement applies to the entire award provided to the Recipient but does not "flow down" to each Subrecipient.

## 4. Cash Management Requirements

The Recipient must maintain Post-Closeout Program Income in accordance with the Cash Management Requirements in the Financial Risk Management Requirements Programmatic Term and Condition, as applicable. However, the Recipient may submit a Cash Management Policy for review and approval by the EPA Project Officer, which can authorize the Recipient to deviate from the aforementioned Cash Management Requirements.

## 5. Financial Health Metrics

The Recipient agrees to report financial health metrics to the EPA Project Officer in accordance with the Financial Health Metrics in the Financial Risk Management Requirements Programmatic Term and Condition (on behalf of the Recipient as well as any Financial Assistance Subrecipient that has received in excess of $10,000,000 in NCIF subgrants) through September 30, 2031, as applicable. The requirement for submission of financial health metrics is not applicable for any fiscal year in which the reporting entity did not meet the requirements of 2 CFR Subpart F—Audit Requirements. The Recipient agrees to add the following two financial health metrics as part of the financial health metrics for the Closeout Period.

1. Self-Sufficiency Ratio: The self-sufficiency ratio is defined as earned revenue divided by operating

5G - 84096001 - 0     Page 43

expenses, where earned revenue is equal to the value of all income earned from normal business transactions and operating expenses is equal to the value of all expenses incurred as a part of normal business operations over the prior 12-month period, not including interest, financing, depreciation, amortization, and loan loss provision expense.

2. Operating Cash Ratio: The operating cash ratio is defined as cash and cash equivalents divided by operating expenses, where cash and cash equivalents is equal to the total value of all cash and cash equivalent items that can be converted into cash immediately and operating expenses is equal to the value of all expenses incurred as a part of normal business operations over the prior 12-month period, not including interest, financing, depreciation, amortization, and loan loss provision expense.

After September 30, 2031, the Recipient shall report on these financial health metrics publicly rather than disclosing the metrics to the EPA.

## 6. Conflicts of Interest

The Recipient agrees to comply with the conflict of interest requirements described in the Conflicts of Interest Programmatic Term and Condition through September 30, 2031.

## 7. Remedies for Non-Compliance

The Recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable. During the Closeout Period, the workplan and budget submitted for the Period of Performance are no longer applicable.

## 8. Suspension and Debarment

The Recipient agrees to ensure that Post-Closeout Program Income is not transferred to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The Recipient can maintain compliance with this requirement through either (1) checking the System for Award Management (for Subrecipients, Contractors, or Program Beneficiaries) or (2) obtaining eligibility certifications from counterparties (for Program Beneficiaries). The Recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity is presently excluded or disqualified.

## 9. Non-Discrimination

The Recipient must use Post-Closeout Program Income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

**Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975.** The Recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency" in 40 CFR Part 5 and 40 CFR Part 7, the Recipient agrees, and will require all Subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

**Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities.** As provided in section 301 of the Executive Order, the Recipient will ensure that Subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to Real Property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 10. Record-Keeping

In accordance with 2 CFR 200.334(e), the Recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of Post-Closeout Program Income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. Note that this requirement applies if and when the Closeout Agreement is terminated, in accordance *with Item 14. Termination of the Closeout Agreement*. EPA may obtain access to these records to verify that Post-Closeout Program Income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the Recipient must maintain adequate accounting records for how Post-Closeout Program Income is managed and spent as well as all other appropriate records and documents related to the activities conducted using Program Income.

The Recipient agrees to ensure that Subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. The Recipient may use the terms of its Subaward Agreements or other effective means to meet its responsibilities.

## 11. Other Federal Requirements

The following other federal requirements apply to the use of Post-Closeout Program Income under the Closeout Period to the same extent they do under the terms of the Performance Period:

- Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Development Requirements Programmatic Term and Condition;
- Build America, Buy America Act, as specified in the Build America, Buy America Act Programmatic Term and Condition and Build America, Buy America General Term and Condition; and
- National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition.

No other federal requirements apply to the use of Post-Closeout Program Income under the terms of this Closeout Agreement, other than those specified in this Closeout Agreement.

## 12. Audit Requirements

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Closeout Period, as activities related to the Federal award referenced in 2 CFR 200.502(a) include

Case 1:25-cv-00762    Document 1-2    Filed 03/14/25    Page 46 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 560 of 694

5G - 84096001 - 0    Page 45

activities during the Closeout Period.

Through September 30, 2031, the Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## 13. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Closeout Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## 14. Termination of the Closeout Agreement

The Closeout Agreement terminates when either of the following situations occur: (1) the Recipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Recipient and the EPA Award Official or Grants Management Officer mutually agree to terminate the Closeout Agreement, with the Recipient remitting current and future Post-Closeout Program Income to the federal government.

The ability to terminate the Closeout Agreement flows down to Subrecipients, as a Closeout Agreement between the Recipient and Subrecipient terminates when either (1) the Subrecipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Subrecipient and the Recipient mutually agree to terminate the Closeout Agreement, with the Subrecipient remitting current and future Post-Closeout Program Income to the Recipient.

The de minimis amount must be agreed-upon in writing by the Recipient and the Director of the Office of the Greenhouse Gas Reduction Fund (or equivalent), prior to the Recipient using the "de minimis" criteria to terminate the Closeout Agreement.

## 15. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and the Authorized Representative on the EPA Key Contacts Form most recent submitted to the EPA Project Officer (for the Recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

## W. Legal Counsel

The Recipient agrees to appoint appropriate legal counsel if counsel is not already available.

## X. Accounting Principles

The Recipient must account for all award funds in accordance with Generally Accepted Accounting Principles (GAAP) as in effect in the United States.

The Recipient must segregate and account for the award funds separately from all other program and business accounts. Additionally, the Recipient must segregate and account for Program Income separately from all other program and business accounts.

## Y. Internal Controls

The Recipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## Z. Audits

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Period of Performance, as described in the Audit Requirements General Term and Condition. Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(h), the Recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit Subrecipient that expends $750,000 or more of EPA funds from the Recipient's grant program in the Subrecipient's fiscal year. Any for-profit Subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier.

The Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## AA. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that specific conditions are necessary to ensure that the National Clean Investment Fund program is effectively carried out by Eligible Recipients that have not previously managed grants with the same scale and complexity of this agreement. These specific conditions will remain in effect throughout the Period of Performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer, will oversee and monitor the grant agreement through activities including:

1. Upon request, requiring the Recipient to participate in an annual workshop (i.e., one workshop per calendar year) with other Recipients under the National Clean Investment Fund and/or Clean Communities Investment Accelerator; the EPA Project Officer will contact the Recipient to finalize details for each annual workshop.

2. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on

Case 1:25-cv-00762    Document 1-2    Filed 03/14/25    Page 48 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 562 of 694

5G - 84096001 - 0    Page 47

effective methods of carrying out the workplan, provided the Recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other Recipients under the Greenhouse Gas Reduction Fund and with other EPA programs; and coordination by EPA staff with other federal programs to avoid duplication of effort;

3. Closely monitoring the Recipient's management and oversight of Subrecipients and procedures for ensuring that Program Beneficiaries adhere to program participation guidelines;

4. Closely monitoring the Recipient's performance to verify compliance with the EPA-approved workplan and achievement of environmental results;

5. Participating in periodic telephone conference calls with Recipient personnel to discuss project successes and challenges as well as similar items impacting program performance;

6. Reviewing and commenting on performance reports prepared under the Award Agreement. Note that the final decision on the content of performance reports rests with the Recipient;

7. Verifying that the Recipient is expending the award on allowable activities, including but not limited to reviewing a sample of Financial Assistance transactions to verify compliance with regulatory requirements and the terms and conditions of the Award Agreement; and

8. Periodically reviewing costs incurred by the Recipient as well as its contractors and Subrecipients if needed to ensure appropriate expenditure of grant funds. Note that Recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds.

Subject to approval by the EPA Award Official, the EPA Project Officer and the Recipient may agree to additional areas of oversight and monitoring.

*Method for Reconsideration.* If the Recipient believes that one or more of these specific conditions are not warranted or requires modification, the Recipient must file a written objection naming the specific condition(s) within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist, and Project Officer identified in the Notice of Award.

## AB. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the Recipient's GGRF award. These materials may include links to Recipient and/or Subrecipients' websites. The Recipient agrees to work with the EPA Project Officer or another member of GGRF program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## AC. Conflicts of Interest

The Recipient must comply with requirements on transfers of funds that create actual and potential conflicts of interest, as specified in this term and condition. Transfers of funds include Subawards, Contracts (including but not limited to Acquisitions of Intangible Property), and Participant Support Costs. The definitions in the EPA's Financial Assistance Conflict of Interest Policy (COI Policy) apply to this term and condition.

5G - 84096001 - 0    Page 48

There are three categories of transfers of funds, with the requirements differing by each category (as specified in this term and condition):

    1. Transfers with Affiliated Entities: Subawards, Contracts, and Participant Support Costs to Affiliated Entities or co-invested in projects with Affiliated Entities. An Affiliated Entity is any entity that is related to the Recipient in accordance with the indicia of control described in 2 CFR 180.905.

    2. Financial Assistance to Qualified Projects: Subawards, Contracts (in the form of Acquisitions of Intangible Property), and Participant Support Costs as forms of Financial Assistance to Qualified Projects, unless such transfers are with Affiliated Entities. These transfers are not within the scope of the COI Policy, which states that "subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by recipients of revolving loan fund capitalization grants or other EPA financial assistance agreements where Agency funds may be used for lending activities."

    3. Subgrants and Contracts: Subgrants and Contracts (other than Acquisitions of Intangible Property), unless such transfers are with Affiliated Entities.

    Note that all Contracts (including Acquisitions of Intangible Property) must also comply with the conflict of interest standards in 2 CFR 200.318(c).

## 1. Transfers with Affiliated Entities

### Prior Approval of COI Mitigation Plan

The Recipient must not transfer funds with Affiliated Entities unless those transfers have been included in an EPA-approved COI Mitigation Plan on Transfers of Funds with Affiliated Entities. The Recipient agrees to seek prior EPA approval for changes to the COI Mitigation Plan on Transfers of Funds with Affiliated Entities.

### Quarterly Disclosure Requirement

The Recipient agrees to disclose, on a quarterly basis, a list of newly originated transfers of funds with Affiliated Entities that are within the scope of its EPA-approved COI Mitigation Plan on Transfers of Funds with Affiliated Entities. Each quarterly disclosure must include (1) a list of such transfers of funds made over the quarter and (2) steps taken to taken to eliminate, neutralize or mitigate any conflicts of interest, in accordance with the EPA-approved COI Mitigation Plan on Transfers of Funds with Affiliated Entities. The Recipient must disclose its own transfers as well as transfers made by Subrecipients.

The quarterly periods for such disclosures are defined as follows: April 1 to June 30; July 1 to September 30; October 1 to December 31; and January 1 to March 31. The Recipient must make the disclosures to the EPA Project Officer within 30 calendar days of the end of the quarterly period.

### Project Officer Review

In accordance with 2 CFR 200.337, the EPA Project Officer may access records relating to a subset of transactions disclosed to review for compliance with the Recipient's EPA-approved COI Mitigation Plan on Transfers of Funds with Affiliated Entities as well as this term and condition. The EPA Project Officer

5G - 84096001 - 0    Page 49

will not have approve transfers of funds in advance but rather will review transfers of funds that have already occurred for compliance.

## Waivers and Modifications

EPA agrees that, for transfers of funds with Affiliated Entities, the requirements of this term and condition apply in lieu of the requirements of the Disclosing Conflict of Interest General Term and Condition.

On a case-by-cases basis, the EPA Project Officer may extend the due date for disclosures on transfers of funds with Affiliated Entities. On a case-by-case basis, the EPA Project Officer may waive or modify the disclosure requirements on transfers of funds with Affiliated Entities.

## 2. Financial Assistance to Qualified Projects

### Quarterly Disclosure Requirement

The Recipient agrees to disclose, on a quarterly basis, a list of transfers of funds as Financial Assistance to Qualified Projects with actual and potential conflicts of interest. Each quarterly disclosure must include (1) a list of such transfers of funds made over the quarter and (2) steps taken to taken to eliminate, neutralize or mitigate any conflicts of interest, in accordance with any EPA-approved documents related to eliminating, neutralizing, and mitigating conflicts of interest. The Recipient must disclose its own transfers as well as transfers made by Subrecipients.

The quarterly periods for such disclosures are defined as follows:  April 1 to June 30; July 1 to September 30; October 1 to December 31; and January 1 to March 31. The Recipient must make the disclosures to the EPA Project Officer within 30 calendar days of the end of the quarterly period.

### Project Officer Review

In accordance with 2 CFR 200.337, the EPA Project Officer may access records relating to a subset of transactions disclosed to review for compliance with the Recipient's EPA-approved documents related to eliminating, neutralizing, and mitigating conflicts of interest as well as this term and condition. The EPA Project Officer will not have approve transfers of funds in advance but rather will review transfers of funds that have already occurred for compliance.

### Waivers and Modifications

On a case-by-cases basis, the EPA Project Officer may extend the due date for disclosures on transfers of funds as Financial Assistance to Qualified Projects. On a case-by-case basis, the EPA Project Officer may waive or modify the disclosure requirements on transfers of funds as Financial Assistance to Qualified Projects.

## 3. Subgrants and Contracts

The Recipient agrees to comply with the Disclosing Conflict of Interest General Term and Condition for Subgrants and Contracts (excluding Acquisitions of Intangible Property), unless such transfers are with Affiliated Entities. If such transfers are with Affiliated Entities, then the Recipient is required to include them in the process specified in *1. Transfers with Affiliated Entities*.

5G - 84096001 - 0    Page 50

## AD. Prior Approvals

EPA will only have authority to review and approve revisions to the Recipient's EPA-approved workplan, budget, and other documents if authorized by 2 CFR 200.308 or 2 CFR 200.208. The Recipient must contact the EPA Project Officer when the EPA has prior approval authority specified below.

### Workplan

For the purposes of this Award Agreement, EPA interprets 2 CFR 200.308(c)(1) to enable the Recipient to revise the activities specified in its **EPA-approved workplan** without prior EPA approval, provided the activities still comply with the terms and conditions of the Award Agreement. The allowable and allocable grant costs are narrowly defined, pursuant to the terms and conditions of the Award Agreement; in accordance with 2 CFR 200.308(c)(1), any changes to the EPA-approved workplan that comply with the statute as well as the terms and conditions would not be a "change in the scope or objective of the project or program." Therefore, so long as the Recipient is updating its EPA-approved workplan with the revised activities in accordance with the terms and conditions of the Award Agreement, EPA will not require prior approval.

### Budget

For the purposes of this Award Agreement, EPA implements 2 CFR 200.308(f) in accordance with Item 1 of the Transfer of Funds General Term and Condition to enable the Recipient to revise the **EPA-approved budget** included in its Award Agreement without prior EPA approval, provided the cumulative funding transfers among Object Class Categories (Personnel, Fringe Benefits, Travel, Equipment, Supplies, Contractual, Construction, Other, Indirect) do not exceed 10% of the total budget approved at time of award. Therefore, so long as the Recipient is updating its EPA-approved budget by transferring funds by less than or equal to these amounts, EPA will not require prior approval.

However, notwithstanding the requirements of 2 CFR 200.308(f), if the Recipient seeks to increase the **amount of funds budgeted for Participant Support Costs,** then it must seek prior approval pursuant to 2 CFR 200.308(c)(5). Further, if the Recipient seeks to **transfer funds for any of the items listed in 2 CFR 200.407,** then it must seek prior approval pursuant to that regulation as well as Item 2 of the Transfer of Funds General Term and Condition.

### Transfers of Funds

2 CFR 200.308(c)(6) requires the Recipient to obtain prior agency approval for "Subawarding, transferring or contracting out of any work under a Federal award." If the **types of transfers are described in the EPA-approved workplan** (including types of transfers to be conducted through Subawards, Participant Support Costs, Acquisitions of Intangible Property, and other Contracts as defined in 2 CFR 200.1), then EPA has provided approval only for the purposes of 2 CFR 200.308(c)(6). Approval for the purposes of this regulation does not mean that such transfers of funds are compliant with the statutes, regulations, and terms and conditions.

### Changes in Key Personnel

2 CFR 200.308(c)(2) requires the Recipient to obtain prior agency approval for a "[c]hange in a key person specified in the application or the Federal award." If the Recipient is seeking to change a "key person," as defined by members of the board of directors and senior management whose roles are

JA1069

Case 1:25-cv-00762    Document 1-2    Filed 03/14/25    Page 52 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 566 of 694

5G - 84096001 - 0    Page 51

specified in the most recently submitted Organizational Plan, then the Recipient must obtain prior EPA approval of the qualifications of the key person.

The Recipient must request prior agency approval for a change in "key person" via email through the EPA Project Officer, who will have 8 calendar days to communicate EPA's disapproval of their qualifications via email. If 8 calendar days have passed without notification of EPA disapproval of the key person's qualifications pursuant to 2 CFR 200.308(c)(2), the Recipient is authorized to change the "key person." Once the change is effective, the Recipient must submit an updated Organizational Plan to the EPA Project Officer.

## AE. Flow-Down Requirements

As described in 2 CFR 200.101, the terms and conditions of Federal awards flow down to Subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(a)(2) and in accordance with the Establishing and Managing Subawards General Term and Condition, the Recipient agrees to ensure that Subrecipients are subject to the same requirements as those that apply to the pass-through entity's EPA award.

For the purposes of this Award Agreement, all terms and conditions must flow down to Subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to Subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## AF. Resolution of Disputes Termination Provision

The Recipient is precluded from drawing down more than 78.46% of the Total Approved Assistance Amount until this condition is removed, which will occur when: a) the EPA Award Official, at the direction of the Grants Competition Disputes Decision Official (GCDDO), provides written confirmation that all administrative disputes under the National Clean Investment Fund and the Clean Communities Investment Accelerator are resolved in accordance with the dispute resolution procedures in Appendix A of the EPA Order 5700: Policy for Competition of Assistance Agreements; or b) the administrative disputes are withdrawn, abandoned or dismissed; or c) December 31, 2024, whichever is sooner.

If EPA does need to alter the Selection Official's selection and partial funding decisions for this agreement based on a GCDDO determination the EPA Award Official will partially terminate this assistance agreement, de-obligate a portion of the funds that have been obligated and use the de-obligated funds to satisfy the terms of a GCDDO remedy benefiting another entity. The Recipient will then provide an updated workplan and budget information, as needed, to amend the agreement.

For the purposes of this term and condition, EPA's partial termination may apply not just to obligated funds that have not been drawn down from ASAP but also to Program Income that has been generated and retained by the Recipient under 2 CFR 1500.8(d) and the Program Income Programmatic Term and Condition of this agreement. In accordance with 2 CFR 200.307(e)(1), EPA may require that the amount of funds committed by EPA to the Recipient be reduced by all or some of the Program Income that has been generated by the Recipient.

## AG. Deposit Account at Financial Agent

Case 1:25-cv-00762    Document 1-2    Filed 03/14/25    Page 53 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 567 of 694

5G - 84096001 - 0    Page 52

When a depository institution is designated as a financial agent of the United States (the Financial Agent) for the Greenhouse Gas Reduction Fund, then the Recipient will be required to set up and utilize an Account or Accounts at the Financial Agent in accordance with the terms of the Account or Accounts that EPA will set forth in the Award Agreement, including but not limited to through amendments to the Award Agreement.

## AH. Interim SF-425 Requirement

The Recipient must submit an SF-425 within 30 calendar days of receiving access to an Account or Accounts at the Financial Agent, with the SF-425 covering all activities supported by funds drawn from ASAP and disbursed for actual and allowable costs, other than funds disbursed into the Account or Accounts at the Financial Agent.

## AI. Interim Drawdown Procedures

### Authority

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that specific conditions are necessary to ensure that the National Clean Investment Fund and Clean Communities Investment Accelerator programs are effectively carried out by Eligible Recipients that have not previously managed grants with the same scale and complexity of this agreement. These specific conditions will remain in effect throughout the Period of Performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

### General Term and Condition

During the interim period between the start of the Federal award and the date on which the Deposit Account at the Financial Agent is first made available and accessible to the Recipient, the Recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

This requirement "flows down" to Subrecipients; if a Subrecipient has an actual and immediate cash requirement, then the Recipient is required to draw funds from ASAP on behalf of the subrecipient and disburse the funds to the Subrecipient and the Subrecipient is required to disburse the funds for the actual and immediate cash requirement. Alternatively, as authorized by 2 CFR 200.332(c), the Recipient may impose the reimbursement method as opposed to the advance payment method with Subrecipients as part of "specific subaward conditions" if appropriate as described in 2 CFR 200.208.

### Interim ASAP Cap

During the interim period between the start of the Federal award and the date on which the Deposit Account at the Financial Agent is first made available and accessible to the Recipient, the Recipient is subject to a cap on the cumulative amount of its drawdowns. This cap starts at 8.33% (or one-twelfth) of the Recipient's EPA-approved first-year budget, plus allowable pre-award costs, and increases by 8.33% (or one-twelfth) of the Recipient's EPA-approved first-year budget on the first calendar day of each month after the date on the Notice of Award until the Deposit Account at the Financial Agent is available and accessible to the Recipient. The cap shall not exceed 25% (or one-fourth) of the Recipient's EPA-

Case 1:25-cv-00762    Document 1-2    Filed 03/14/25    Page 54 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 568 of 694

5G - 84096001 - 0    Page 53

approved first-year budget, plus allowable pre-award costs. The cap shall cease to apply once the Deposit Account at the Financial Agent is available and accessible to the Recipient.

Note that this cap is in addition to, rather than in lieu of, the cap described in the Resolution of Disputes Termination Provision.

## Interim ASAP Payment Request

During the interim period between the start of the Federal award and the date on which the Deposit Account at the Financial Agent is first made available and accessible to the Recipient, the Recipient must abide by the following process for ASAP payment requests.

1. The Recipient must only initiate payment requests from ASAP each Thursday (for next business day payments) or Friday (for same business day payments).

2. The Recipient must submit payment requests to ASAP falling into the following four categories, with no more than one payment request in each category per week: (1) Recipient Financial Assistance Activities; (2) Recipient Other Allowable Activities; (3) First-Tier Subrecipient Financial Assistance Activities; or (4) First-Tier Subrecipient Other Allowable Activities. The first category is not applicable under the CCIA.

3. Prior to receiving the payment, the Recipient must provide the EPA Project Officer with the following information: (a) amount of payment requested, (b) category of payment, (c) type(s) of Financial Assistance anticipated, (d) descriptions of Qualified Project(s) anticipated, and (e) a certification from the Recipient's chief executive officer (or equivalent), chief financial officer (or equivalent), chief reporting officer (or equivalent), or chief compliance officer (or equivalent) that the amount of the payment is necessary to execute against the EPA-approved workplan and that financing agreements for identified Qualified Project(s) necessitating the payment have been reviewed by the Recipient's counsel for legal sufficiency. The certification must include the following language: "This certification is a material representation for the purposes of an EPA Financial Assistance Agreement, and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions." Requirements (c), (d), and (e) are applicable to payment requests for Recipient Financial Assistance Activities and "flow-down" as part of payment requests for First-Tier Subrecipient Financial Assistance Activities, as described below.

The EPA Project Officer is authorized to provide case-by-case modifications or exceptions to these requirements, provided those modifications or exceptions remain compliant with the ASAP and Proper Payment Draw Down General Term and Condition.

These requirements "flow down" to Subrecipients; if a Subrecipient has an actual and immediate cash requirement, then it must submit payment requests to the Recipient pursuant to these requirements. As authorized at 2 CFR 200.337, EPA may request records of payment requests to the Recipient and would expect documentation to show that, for each payment to a Subrecipient, the Subrecipient has provided the Recipient with the information described above.

## Disbursement of Payment

During the interim period between the start of the Federal award and the date on which the Deposit Account at the Financial Agent is first made available and accessible to the Recipient, for each payment, if the Recipient has not disbursed the entire payment amount within 5 business days of drawdown, the

Case 1:25-cv-00762    Document 1-2    Filed 03/14/25    Page 55 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 569 of 694

5G - 84096001 - 0    Page 54

Recipient must provide the EPA Project Officer with the amount of payment not yet disbursed. The Recipient must then follow the procedures described in the ASAP and Proper Payment Drawdown General Term and Condition for the amount of payment not yet disbursed within 5 business days of drawdown.

<u>Method for Reconsideration</u>

If the Recipient believes that one or more of these specific conditions are not warranted or requires modification, the Recipient must file a written objection naming the specific condition(s) within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist, and Project Officer identified in the Notice of Award.

**AJ. Amendments to Award Agreement**

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.


**IV. ADMINISTRATIVE TERMS AND CONDITIONS (SEE ABOVE ADMINISTRATIVE CONDITIONS)**

**V. FINANCIAL AGENT TERMS AND CONDITIONS**

**A. Revisions to Award Agreement to Account for Financial Agent Arrangement**

When a depository institution is designated as a financial agent of the United States (the Financial Agent) for the Greenhouse Gas Reduction Fund, the following revisions to the Award Agreement will become effective without further action or notice required by the Recipient or EPA.

<u>1. Revisions to Section I. Definitions</u>

*The following **new definition** will be added to the Award Agreement:*

**Capitalization by Nonexchange Capital Contribution:** Capitalization by Nonexchange Capital Contribution means award funds that (1) the Recipient draws down from the Automated Standard Application Payments (ASAP) system and (2) disburses into the 'Budget Account' as defined under the Deposit Account at Financial Agent Programmatic Term and Condition to capitalize itself for subsequent use for any of the following Allowable Activities: Financial Assistance to Qualified Projects; Predevelopment Activities; Market-Building Activities; and Program Administration Activities.  Under this two-step transaction, which involves both a drawdown and disbursement, the Recipient's drawdown from ASAP is deemed (a) an advance payment of Federal funds in accordance with 2 CFR 200.305(b)(1); while the disbursement into the Deposit Account at Financial Agent is deemed (b) an allowable cost to be charged to the EPA award, and (c) a "nonexchange transaction", consistent with the definition of this term in the Statement of Federal Financial Accounting Standards No. 5. The full amount of the Capitalization by Nonexchange Capital Contribution must be recognized, reported, and accounted for as Program Income in accordance with the Program Income Programmatic Term and Condition once clauses (a) and (b) are fulfilled. Any Subrecipient with a Deposit Account at Financial Agent will be entitled to receive its

Case 1:25-cv-00762     Document 1-2     Filed 03/14/25     Page 56 of 62
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 570 of 694

5G - 84096001 - 0     Page 55

payments from Recipient as a Capitalization by Nonexchange Capital Contribution.

*The definition of **Program Income** under the Award Agreement will be amended and replaced with:*

**Program Income:** 2 CFR 200.1 defines Program Income as "gross income earned by the non-Federal entity that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(f)." 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, there are two types of Program Income: (1) "Program Income from Operations" and (2) "Program Income from Capitalization by Nonexchange Capital Contribution".

Program Income from Operations includes but is not limited to income from origination fees, servicing fees, and asset management fees; dividends from equity investments; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). Under this award agreement, the Recipient is authorized to deduct the cost of generating Program Income from Operations under 2 CFR 200.307(b) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Program Income from Operations include origination, servicing, and management costs that are not charged as direct costs to the Federal award. Program Income from Operations can be earned prior to the availability of the 'Program Income from Operations' account as defined under the Deposit Account at Financial Agent Programmatic Term and Condition.

Program Income from Capitalization by Nonexchange Capital Contribution means award funds from the ASAP system that the Recipient draws down and immediately deposits into the 'Budget Account' at the Financial Agent in accordance with (a) the definition of Capitalization by Nonexchange Capital Contribution and (b) the Deposit Account at Financial Agent Programmatic Term and Condition. Program Income from Capitalization by Nonexchange Capital Contribution cannot be earned prior to the availability of the 'Budget Account' as defined under the Deposit Account at Financial Agent Programmatic Term and Condition.

Both forms of Program Income under this program must be treated in accordance with the Program Income Programmatic Term and Condition. EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fund raising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

## 2. Revisions to Section II. National Programmatic Terms and Conditions

*The **Program Income Programmatic Term and Condition** will be amended and replaced with:*

**Program Income**

In accordance with Clean Air Act Section 134(b)(1)(C) as well as 2 CFR 200.307(e)(2) and 2 CFR 1500.8

Case 1:25-cv-00762     Document 1-2     Filed 03/14/25     Page 57 of 62
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 571 of 694

5G - 84096001 - 0     Page 56

(b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income from Operations once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income from Operations may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the EPA-approved workplan.

### 3. Revisions to Section III. Additional Programmatic Terms and Conditions

*The Allowable and Unallowable Activities Programmatic Term and Condition will be amended and replaced with:*

### Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Capitalization by Nonexchange Capital Contribution; Financial Assistance to Qualified Projects; Predevelopment Activities; Market-Building Activities; and Program Administration Activities. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

Capitalization by Nonexchange Capital Contribution generates Program Income for the Recipient in an amount equal to the available EPA award balance drawn down from ASAP into the 'Budget Account' as defined under the Deposit Account at Financial Agent Programmatic Term and Condition. Program Income from Capitalization by Nonexchange Capital Contribution must be expended on Financial Assistance to Qualified Projects, Predevelopment Activities, Market-Building Activities, and Program Administration activities in accordance with the EPA-approved workplan.

The Recipient agrees to not use the award for the following unallowable activities: (a) Financial Assistance to Qualified Projects in the form of Subgrants; (b) Subgrants for the purposes of providing Financial Assistance to Qualified Projects (other than Subgrants from the Recipient to first-tier Subrecipients); (c) activities that support deployment of projects that do not meet the definition of Qualified Projects; and (d) activities that support deployment of projects outside the boundaries of the ten EPA regions. The Recipient also agrees not to use the award for activities associated with defending against, settling, or satisfying a claim by a litigant, except when (a) the claim stems from the Recipient's implementation of its EPA-approved workplan in compliance with the terms and conditions of the Award Agreement and (b) the Recipient has obtained prior written approval from the EPA Award Official.

Case 1:25-cv-00762    Document 1-2    Filed 03/14/25    Page 58 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 572 of 694

5G - 84096001 - 0    Page 57

*The Deposit Account at Financial Agent Programmatic Term and Condition will be amended and replaced with:*

## Deposit Account at Financial Agent

The Recipient will open a Deposit Account at a depository institution that has been designated as a financial agent of the United States (the Financial Agent). Such account will be used as Recipient's operating account for the award.  Upon establishment of the Deposit Account, the Recipient will drawdown the entire available EPA award balance from ASAP and disburse it into the Deposit Account, where it must be maintained until the Closeout Agreement goes into effect in accordance with the Closeout Agreement Programmatic Term and Condition. Note, this requirement applies to any and all drawdowns from ASAP by the Recipient while the Deposit Account is available and accessible. Once the Closeout Agreement goes into effect, the Recipient will be entitled to transfer any remaining funds in the Deposit Account to an account at a financial institution of its choosing, provided such account is insured.

The Recipient will grant EPA a perfected security interest in all funds held in the Deposit Account. The Recipient will take all such actions, enter into all such agreements, and execute and deliver all such documentation as may be necessary and/or as directed by EPA from time to time to establish and maintain such security interest, including but not necessarily limited to entering into a deposit account control agreement (DACA) with the Financial Agent and EPA.

Notwithstanding any other provision of this Award Agreement, EPA will only furnish the Financial Agent with a Notice of Exclusive Control under a DACA when EPA issues a written determination and finding that the Recipient has failed to comply with the terms and conditions of this Award Agreement, and that noncompliance is substantial such that effective performance of the Assistance Agreement is materially impaired or there is adequate evidence of waste, fraud, material misrepresentation of eligibility status, or abuse, and that EPA has initiated action under 2 CFR 200.339 to wholly or partly suspend or terminate the Federal award, as authorized in the terms of the Award Agreement. Note, funds in the Deposit Account that were legally committed to 3rd parties under valid financing agreements prior to the issuance of, but not in anticipation of, a Notice of Exclusive Control constitute "financial obligations which were properly incurred" by the Recipient in accordance with 2 CFR 200.343 and are to remain allowable costs during suspension or after termination.

Funds held in the Recipient's account at the Financial Agent may be invested in accordance with the Cash Management Requirements in the Financial Risk Management Programmatic Term and Condition. The Financial Agent will be compensated in accordance with the terms of a valid Financial Agency Agreement (FAA).

The Deposit Account will consist of three distinct account types ('Budget,' 'Reserve', and 'Program Income from Operations'), each of which serves a distinct purpose (while the exact naming convention and structure of these accounts may differ from the below, the accounts must perform a substantively similar function). The Recipient is required to utilize the accounts at the Financial Agent for their intended purpose during any period in which the accounts are available and accessible, with exceptions to this requirement permitted by the EPA Project Officer only on a case-by-case basis, to the extent such exceptions are necessary to execute against the EPA-approved workplan.

## 1. Budget Account

This account within the Deposit Account will hold funds that have yet to be used for any of the following

5G - 84096001 - 0    Page 58

allowable activities: Financial Assistance to Qualified Projects; Predevelopment Activities; Market-Building Activities; and Program Administration Activities. It will hold funds within a number of sub-accounts that correspond to more specific allowable expenditures under the particular type of award or subaward.

**Transferring Funds Into the Budget Account.** Upon establishment of the Deposit Account, the Recipient will drawdown the entire available EPA award balance from ASAP directly into the Budget Account. The Recipient will direct the Financial Agent to allocate funds across the various sub-accounts in the Budget Account in accordance with its EPA-approved workplan. Recipient need not submit a certification notice to transfer funds within the Budget Account, but remains subject to the Transfer of Funds EPA General Term and Condition and any associated pre-approval or notification requirements therein.

**Transferring Funds Out of the Budget Account.**  When transferring award funds out of the Budget Account to provide Financial Assistance to Qualified Projects, Recipient must provide the EPA Project Officer with a certification notice from the Recipient's chief executive officer (or equivalent), chief financial officer (or equivalent), chief reporting officer (or equivalent), or chief compliance officer (or equivalent) that the amount of the payment is necessary to execute against the EPA-approved workplan and that financing agreements for identified Qualified Projects necessitating the payment have been reviewed by the Recipient's counsel for legal sufficiency, with notice provided to the Financial Agent with the transfer request. The certification notice must include the following language: "This certification is a material representation for the purposes of an EPA Financial Assistance Agreement, and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions." The Recipient must "flow-down" this requirement to Subrecipients, with each Subrecipient required to provide a substantively similar certification notice to Recipient when transferring subaward funds out of the Budget Account to provide Financial Assistance to Qualified Projects, with notice provided to the Financial Agent with the transfer request. In accordance with 2 CFR 200.337, the Recipient must make those certifications available to the EPA, upon request.

While transfers out of the Budget Account are not formally subject to any of the requirements established in either the EPA General Term and Condition on Automated Standard Application Payments (ASAP) and Proper Payment Draw Down or the Interim Drawdown Procedures Programmatic Term and Condition, Recipient agrees to the following requirements:

a) When the need for a longer disbursement window is known in advance of the transfer, Recipient must notify the EPA Project Officer prior to executing the transfer and follow-up to inform the EPA Project Officer of the amount of the transfer that has been disbursed for an Allowable Activity in 5, 10, and 14 business days. Recipient must return any undisbursed amounts to the Deposit Account at the Financial Agent on the 15th business day, or

b) When the need for a longer disbursement window is not known in advance of the transfer, Recipient must notify the EPA Project Officer of the delay no later than 5 business days after the transfer and follow-up to inform the EPA Project Officer of the amount of the transfer that has been disbursed for an Allowable Activity in 10 and 14 business days. Recipient must return any undisbursed amounts to the Deposit Account at the Financial Agent on the 15th business day.

Recipients must obtain prior written approval from the EPA Project Officer (who will in turn notify the EPA Award Official) for any transfers that will not be disbursed for an Allowable Activity within 15 business days.

5G - 84096001 - 0    Page 59

These requirements "flow down" to Subrecipients, who agree to provide the same notifications to and seek prior approval from Recipients where applicable.

## 2. Reserve Account

This account within the Deposit Account is intended to enable funds to be set-aside within the Financial Agent for use for any form of Financial Assistance that requires the Recipient to pledge award funds for a future expenditure to a third party to meet a legal obligation.

**Transferring Funds Into the Reserve Account.** The Recipient may only transfer award funds into the Reserve Account for grant performance purposes if the Recipient's chief executive officer (or equivalent), chief financial officer (or equivalent), chief reporting officer (or equivalent), or chief compliance officer (or equivalent) certify to the EPA Project Officer, with notice provided to the Financial Agent with the transfer request, that the amount of the expenditure is necessary to execute against the EPA-approved workplan, and that financing agreements for identified qualified projects necessitating the expenditure have been reviewed by Recipient's counsel for legal sufficiency. The certification notice must include the following language: "This certification is a material representation for the purposes of an EPA financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions." The Recipient must "flow-down" this requirement to Subrecipients, with each Subrecipient required to provide a substantively similar certification notice to Recipient when transferring subaward funds into the Reserve Account to provide Financial Assistance to Qualified Projects, with notice provided to the Financial Agent with the transfer request. In accordance with 2 CFR 200.337, the Recipient must make those certifications available to the EPA, upon request.

**Transferring Funds Out of the Reserve Account.**

## a. To Third Parties to Meet Legal Obligations

Funds in the Reserve Account may not be disbursed to Program Beneficiaries, Subrecipients, Contractors, or any other third parties, unless the funds are necessary for the Recipient to satisfy a legal obligation. The Recipient may only transfer award funds out of the Reserve Account to meet legal obligations to such parties if the recipient's chief executive officer (or equivalent), chief financial officer (or equivalent), chief reporting officer (or equivalent), or chief compliance officer (or equivalent) certify to the EPA Project Officer, with notice provided to the Financial Agent with the transfer request, that the amount of the expenditure is necessary to pay a third party pursuant to a financing agreement that has been reviewed by recipient's counsel for legal sufficiency. The certification notice must include the following language: "This certification is a material representation for the purposes of an EPA financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions." The Recipient must "flow-down" this requirement to Subrecipients, with each Subrecipient required to provide a substantively similar certification notice to Recipient when transferring subaward funds out of the Reserve Account to provide Financial Assistance to Qualified Projects, with notice provided to the Financial Agent with the transfer request. In accordance with 2 CFR 200.337, the Recipient must make those certifications available to the EPA, upon request.

While transfers out of the Reserve Account are not formally subject to any of the requirements established in either the EPA General Term and Condition on Automated Standard Application Payments (ASAP) and Proper Payment Draw Down or the Interim Drawdown Procedures Programmatic Term and

Case 1:25-cv-00762    Document 1-2    Filed 03/14/25    Page 61 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 575 of 694

5G - 84096001 - 0    Page 60

Condition, Recipient agrees to the following requirements:

a) When the need for a longer disbursement window is known in advance of the transfer, Recipient must notify the EPA Project Officer prior to executing the transfer and follow-up to inform the EPA Project Officer of the amount of the transfer that has been disbursed for an Allowable Activity in 5, 10, and 14 business days. Recipient must return any undisbursed amounts to the Deposit Account at the Financial Agent on the 15th business day, or

b) When the need for a longer disbursement window is not known in advance of the transfer, Recipient must notify the EPA Project Officer of the delay no later than 5 business days after the transfer and follow-up to inform the EPA Project Officer of the amount of the transfer that has been disbursed for an Allowable Activity in 10 and 14 business days. Recipient must return any undisbursed amounts to the Deposit Account at the Financial Agent on the 15th business day.

Recipients must obtain prior written approval from the EPA Project Officer (who will in turn notify the EPA Award Official) for any transfers that will not be disbursed for an Allowable Activity within 15 business days.

These requirements "flow down" to Subrecipients, who agree to provide the same notifications to and seek prior approval from Recipients where applicable.

## b. To Program Income from Operations Account

When funds in the Reserve Account are no longer necessary to meet prudent capital management practices consistent with the Recipient's overall risk portfolio and a potential legal obligation to a third party pursuant to a financing agreement, the Recipient may transfer such funds to the Program Income from Operations Account. Recipient need not submit a certification notice to effectuate such a transfer.

## 3. Program Income from Operations Account

This account within the Deposit Account will enable Program Income from Operations (as defined under the definition of Program Income) to be held, tracked, and segregated in accordance with the Accounting Principles Programmatic Term and Condition.

**Transferring Funds Into the Program Income from Operations Account.** When Recipient earns Program Income from Operations, it must deposit such funds into the Program Income from Operations Account. Recipient need not submit a certification notice to effectuate such a transfer. When Financial Agent generates interest income on behalf of Recipient by investing Recipient liquidity in accordance with the Cash Management Requirements under the Financial Risk Management Requirements Programmatic Term and Condition, it must deposit such income into the Program Income from Operations Account in accordance with the terms of the FAA. Such interest income is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9).

**Transferring Funds Out of the Program Income from Operations Account.** Funds in this account may be transferred to either the Budget Account or Reserve Account to be used for grant performance purposes in accordance with the Program Income Programmatic Term and Condition. Recipient need not submit a certification notice to effectuate such a transfer.

**Flow-Down Requirements of Deposit Account at Financial Agent**. EPA may elect to extend the requirements under this term and condition to any and all Subrecipients of the Recipient at EPA's sole discretion, including but not limited to establishing and maintaining a security interest on all award funds held by the Subrecipient at the Financial Agent.

# EXHIBIT C

5G - 84096001 - 1     Page 1

# U.S. ENVIRONMENTAL PROTECTION AGENCY

## Assistance Amendment

| | |
|---|---|
| **GRANT NUMBER (FAIN):** 84096001 | |
| **MODIFICATION NUMBER:** 1 | **DATE OF AWARD** |
| **PROGRAM CODE:** 5G | 12/20/2024 |
| **TYPE OF ACTION** No Cost Amendment | **MAILING DATE** 12/20/2024 |
| **PAYMENT METHOD:** ASAP | **ACH#** |

| **RECIPIENT TYPE:** Not for Profit | **Send Payment Request to:** Contact EPA RTPFC at: ███████████ |
|---|---|

| **RECIPIENT:** POWER FORWARD COMMUNITIES, INC ███████████ **EIN:** ███████ | **PAYEE:** Power Forward Communities, Inc ███████████ |
|---|---|

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Shevani Patel Power Forward Communities, Inc ███████████ **Email:** ███████ **Phone:** ███████ | Zoe Davis ███████████ **Email:** ███████ **Phone:** ███████ | ThuyT Nguyen ███████████ **Email:** ███████ **Phone:** ███████ |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

GGRF NCIF: Power Forward Communities' NCIF Application to Create Community Abundance by Decarbonizing America's Households

This amendment updates all terms and conditions.

| **BUDGET PERIOD** 04/01/2024 - 06/30/2031 | **PROJECT PERIOD** 04/01/2024 - 06/30/2031 | **TOTAL BUDGET PERIOD COST** $ 2,000,000,000.00 | **TOTAL PROJECT PERIOD COST** $ 2,000,000,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 2,000,000,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants Management & Business Operations Division ███████████ | Environmental Protection Agency, OGGRF OA - Office of the Administrator ███████████ |

| **THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY** | |
|---|---|
| **Digital signature applied by EPA Award Official** Katherine Tsing-Choy - Associate Award Official | **DATE** 12/20/2024 |

5G - 84096001 - 1    Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 2,000,000,000 | $ 0 | $ 2,000,000,000 |
| EPA In-Kind Amount | $ 0 | $ 0 | $ 0 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 2,000,000,000 | $ 0 | $ 2,000,000,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.957 - Greenhouse Gas Reduction Fund: National Clean Investment Fund | Clean Air Act: Sec. 134(a)(2) and (3) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

5G - 84096001 - 1     Page 3

Budget Summary Page

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. Personnel | $ 49,132,749 |
| 2. Fringe Benefits | $ 10,771,621 |
| 3. Travel | $ 1,536,707 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 356,304 |
| 6. Contractual | $ 33,643,529 |
| 7. Construction | $ 0 |
| 8. Other | $ 1,895,000,000 |
| 9. Total Direct Charges | $ 1,990,440,910 |
| 10. Indirect Costs: 10.00 % Base de minimis MTDC | $ 9,559,090 |
| 11. Total (Share: Recipient ___0.00 % Federal _100.00 %) | $ 2,000,000,000 |
| 12. Total Approved Assistance Amount | $ 2,000,000,000 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 2,000,000,000 |

5G - 84096001 - 1     Page 4

# Administrative Conditions

## A. General Terms and Conditions

The Recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2024-or-later. These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): ██████████████████ and EPA Grants Specialist listed on the award
- MBE/WBE reports (EPA Form 5700-52A):  Debora Bradford (████████████████████), ████████████████████████, and the EPA Grants Specialist listed on the award
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to Recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Grants Specialist listed on the award and EPA Project Officer listed on the award
- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer listed on the award

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a Recipient or Subrecipient intends to provide Financial Assistance to Qualified Project(s) that involves construction or land use planning. With the exception of Qualified Project(s) that will be carried out in the State of California, the Recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the Qualified Project(s) and provide comments to the EPA Project Officer. Qualified Project(s) that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

EPA has allowed for an intergovernmental review comment period on behalf of the Recipient. This comment period closed on Tuesday October 22, 2024. The Recipient need not take any additional action with respect to intergovernmental review.

The Recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

5G - 84096001 - 1    Page 5

## D. Pre-Award Costs

As provided in 2 CFR 200.458, Recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a Recipient incurs after EPA has notified the Recipient that its application has been selected for award consideration. The pre-award costs must be included in the workplan and budget to be eligible. As provided in 2 CFR 1500.9, Recipients incur pre-award costs at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information.

## E. New Recipient Training Requirement

The Recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The Recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the Recipient should refer to RAIN-2024-G01.

5G - 84096001 - 1     Page 6

## Programmatic Conditions

**National Clean Investment Fund (NCIF) Terms and Conditions (December 12, 2024)**

### I. DEFINITIONS

**Acquisition of Intangible Property:** 2 CFR 200.1 defines Intangible Property as "property having no physical existence, such as trademarks, copyrights, data (including data licenses), websites, IP licenses, trade secrets, patents, patent applications, and property such as loans, notes and other debt instruments, lease agreements, stocks and other instruments of property ownership of either tangible or intangible property, such as intellectual property, software, or software subscriptions or licenses." Acquisitions of Intangible Property involve the purchase of Intangible Property through procurement contracts.

**Air Pollutant:** Air Pollutant means any air pollutant that is listed pursuant to Section 108(a) of the Clean Air Act (or any precursor to such an air pollutant). This includes particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead (see 40 CFR Part 50) and their precursors (e.g., volatile organic compounds).

**Award Agreement:** Award Agreement means the set of legally binding documents between EPA and the Recipient under the federal award. Award Agreement is used interchangeably with Assistance Agreement and Notice of Award.

**Apprentice:** Apprentice means an individual working on a project receiving Financial Assistance who is participating in a Registered Apprenticeship program under the National Apprenticeship Act that meets the requirements of 29 CFR Parts 29 and 30.

**Environmental Information:** Environmental Information is defined in EPA's Environmental Information Quality Policy. Environmental Information includes "data and information that describe environmental processes or conditions which support EPA's mission of protecting human health and the environment. Examples include but are not limited to: direct measurements of environmental parameters or processes; analytical testing results of environmental conditions (e.g., geophysical or hydrological conditions); information on physical parameters or processes collected using environmental technologies; calculations or analyses of environmental information; information provided by models; information compiled or obtained from databases, software applications, decision support tools, websites, existing literature, and other sources; development of environmental software, tools, models, methods and applications; and design, construction, and operation or application of environmental technology."

**Environmental Information Operations:** Environmental Information Operations is defined in EPA's Environmental Information Quality Policy. Environmental Information Operations means "[a] collective term for work performed to collect, produce, evaluate, or use environmental information and the design, construction, operation or application of environmental technology."

**EPA Award Official**: EPA Award Official means the award official from the Office of Grants and Debarment that is authorized to execute the Award Agreement, as well as any subsequent amendments to the Award Agreement, and to make any other final determinations required by law or regulation on behalf of the EPA.

**EPA Project Officer**: EPA Project Officer means the project officer from the Office of the Greenhouse

5G - 84096001 - 1    Page 7

Gas Reduction Fund that is assigned, along with the EPA Grants Specialist, to monitor the Recipient on programmatic and technical aspects of the project and is typically authorized to make programmatic approvals on behalf of the EPA. Where required, the Recipient must notify or request approval from the EPA Project Officer through the EPA Project Officer's individual EPA email address as well as ▮▮▮▮▮▮▮▮ such that the Office of the Greenhouse Gas Reduction Fund may delegate an alternative EPA Project Officer in the case of any absence.

**Financial Assistance:** Section 134(b)(1) of the Clean Air Act directs that the Recipient use funds for "Financial Assistance." Consistent with the definition of *Federal financial assistance* in 2 CFR 200.1, Financial Assistance means financial products, including debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, loan purchasing programs, and other debt instruments), equity investments (such as equity project finance investments, private equity investments, and other equity instruments), hybrids (such as mezzanine debt, preferred equity, and other hybrid instruments), and credit enhancements (such as loan guarantees, loan guarantee funds (whether full or partial), loan loss reserves, and other credit enhancement instruments). Expenditures for Financial Assistance are in the form of Subawards (other than subgrants), Participant Support Costs, or Acquisitions of Intangible Property, as defined in this Award Agreement. Subgrants are not eligible as Financial Assistance.  The characterization of a Financial Assistance transaction as a Subaward, Participant Support Cost, or Acquisition of Intangible Property is limited to the transaction. For example, the same entity may be a Subrecipient for one transaction and a Program Beneficiary or a Contractor for another transaction.

*Freely Associated States:* *Freely Associated States means the Republic of the Marshall Islands (the Marshalls), the Federated States of Micronesia (FSM), and the Republic of Palau (Palau).*

*Greenhouse Gas:* *Greenhouse Gas means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act. Greenhouse Gas Emissions mean emissions of Greenhouse Gases.*

**Low-Income and Disadvantaged Communities**: Section 134(a)(3) of the Clean Air Act appropriates funds "for the purposes of providing financial assistance and technical assistance in low-income and disadvantaged communities." Low-Income and Disadvantaged Communities means CEJST-Identified Disadvantaged Communities, EJScreen-Identified Disadvantaged Communities, Geographically Dispersed Low-Income Households, Properties Providing Affordable Housing, and Federally Recognized Tribal Entities, as defined below.

- *CEJST-Identified Disadvantaged Communities:* All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.

- *EJScreen-Identified Disadvantaged Communities:* All communities within version 2.3 of EJScreen that fall within either (a) the limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.

- *Geographically Dispersed Low-Income Households:* Low-income individuals and households

5G - 84096001 - 1    Page 8

living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development (HUD). Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using HUD's Family Size Adjustment factor.

- *Properties Providing Affordable Housing:* Properties providing affordable housing that fall within either of the following two categories: (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by HUD, including Public Housing, Section 8 Project-Based Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)); or (5) a housing assistance program administered by the Department of Hawaiian Homelands as defined in Title VIII of the Native American Housing Assistance and Self-Determination Act of 1996 (24 CFR 1006.10) or (b) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

- *Federally Recognized Tribal Entities:* All Federally Recognized Tribal entities, which are considered disadvantaged regardless of whether a Federally Recognized Tribe has land, consistent with M-23-09 (memorandum dated as of January 27, 2023) and CEJST. A "Federally Recognized Tribal Entity" means (i) any individual member of a Federally Recognized Tribe; (ii) any for-profit business that has at least 51 percent of its equity ownership (or the equivalent in limited liability companies) by members of Federally Recognized Tribes; (iii) any non-profit entity with at least 51 percent of its Board of Directors (i.e., Governing Board) comprised of members of Federally Recognized Tribes; or (iv) any Federally Recognized Tribal government entity.  Under this definition, any Federally Recognized Tribal Entity is included within the definition of Low-Income and Disadvantaged Communities, regardless of where that entity is located (i.e., the entity may be located in areas outside of the CEJST land area dataset, including but not limited to tribal service areas or counties).


**Market-Building Activities:** Market-Building Activities means activities that meet all three of the following criteria: (1) build the market for financeable Qualified Projects, (2) are not tied directly to Qualified Projects the Recipient intends to finance, and (3) are necessary and reasonable for the deployment of Financial Assistance to Qualified Projects.


**Materially Impaired:** For the definition and application of these terms under this Assistance Agreement (e.g. the Clarifications to EPA General Terms and Conditions) and any associated legal documentation

related to the Assistance Agreement, note that EPA defines "Materially Impaired" in the context of effective performance of the Assistance Agreement as 1) the issuance of a written determination and finding from EPA that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause under the Clarifications to EPA General Terms and Conditions Programmatic Term and Condition and 2) if EPA in its sole discretion determines that a corrective action plan is an appropriate means of remedying the lack of sufficient progress, the subsequent issuance of a separate written determination and finding from EPA that the Recipient has not materially addressed its failure to achieve sufficient progress after implementing a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

**Named Subrecipient:** Named Subrecipient means an entity that is named on the workplan in effect under this Assistance Agreement to receive a Subaward in the form of a Subgrant from the Recipient in order to carry out part of the award.

**Participant Support Costs:** 2 CFR 200.1 defines Participant Support Costs as "direct costs that support participants (see definition for Participant in § 200.1) and their involvement in a Federal award, such as stipends, subsistence allowances, travel allowances, registration fees, temporary dependent care, and per diem paid directly to or on behalf of participants." EPA regulations at 2 CFR 1500.1(a)(1) expand the definition of Participant Support Costs to include "subsidies, rebates, and other payments to program beneficiaries to encourage participation in statutorily authorized environmental stewardship programs," which includes the Greenhouse Gas Reduction Fund. In this program, Participant Support Costs may include expenditures by the Recipient as Predevelopment Activities, Market-Building Activities, and Program Administration Activities (which may include subsidies, rebates, and other payments) as well as Financial Assistance to Qualified Projects.

**Period of Closeout**: Period of Closeout means the time interval between the beginning of the closeout period (the date that the award has been closed out, in accordance with 2 CFR 200.344) to the end of the closeout period (the date that the Closeout Agreement has been terminated). The Period of Closeout may also be referred to as the Closeout Period.

**Period of Performance**: 2 CFR 200.1 defines Period of Performance as "the total estimated time interval between the start of an initial Federal award and the planned end date, which may include one or more funded portions, or budget periods." For the purposes of this Award Agreement, the Period of Performance means the time interval between the start of the Federal award (either the first date that the Recipient has incurred allowable pre-award costs or the date on the Notice of Award, whichever is earlier) and the end of the Federal award (the date that the award has been closed out, in accordance with 2 CFR 200.344). The Period of Performance may also be referred to as the Performance Period.

**Post-Closeout Program Income**: Post-Closeout Program Income means Program Income retained at the end of the Period of Performance, which is subject to the terms and conditions of the Closeout Agreement, as well as Program Income earned by the Recipient during the Period of Closeout that is directly generated by a supported activity or earned as a result of the Federal award, which is also subject to the terms and conditions of the Closeout Agreement. Under the Closeout Agreement, the Recipient is authorized to deduct the cost of generating Post-Closeout Program Income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Post-Closeout Program Income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Post Closeout Program Income. Costs of generating Post-Closeout Program Income can be incurred in advance of receiving the gross income,

JA1090

Case 1:25-cv-00762    Document 1-3    Filed 03/14/25    Page 11 of 61
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 587 of 694

5G - 84096001 - 1    Page 10

with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the Post-Closeout Program Income, provided the Recipient can account for the actual costs incurred.

**Predevelopment Activities:** Predevelopment Activities means activities that meet all three of the following criteria: (1) improve the likelihood of the Recipient financing Qualified Projects, (2) are tied directly to Qualified Projects the Recipient intends to finance, and (3) are necessary and reasonable for the Recipient to deploy Financial Assistance to Qualified Projects.

**Priority Project Categories:** Priority Project Categories means Distributed Energy Generation and Storage, Net-Zero Emissions Buildings, and Zero-Emissions Transportation, as defined below.

- *Distributed Energy Generation and Storage:* Projects, activities, and technologies that deploy small-scale power generation and/or storage technologies (typically from 1 kW to 10,000 kW), plus enabling infrastructure necessary for deployment of such generation and/or storage technologies. Projects, activities, and technologies within this category must support *carbon pollution-free electricity,* which is electrical energy produced from resources that generate no carbon emissions, consistent with the definition specified in Executive Order 14057 (Catalyzing Clean Energy Industries and Jobs Through Federal Sustainability).
- *Net-Zero Emissions Buildings:* Projects, activities, and technologies that either (1) retrofit an existing building, making a substantial contribution to that building being a net-zero emissions building and as part of a plan for that building achieving net-zero emissions over time, or (2) construct a new net-zero emissions building in a Low-Income and Disadvantaged Community. A n*et-zero emissions building* is a building that meets the requirements of Version 1 of the National Definition for a Zero Emissions Building (June 2024).
- *Zero-Emissions Transportation:* Projects, activities, and technologies that deploy zero-emissions transportation modes, plus enabling infrastructure necessary for zero-emissions transportation modes—especially in communities that are overburdened by existing diesel pollution, particulate matter concentration, and degraded air quality. Projects, activities, and technologies within this category must be consistent with the zero-emissions transportation decarbonization strategies in The U.S. National Blueprint for Transportation Decarbonization.

**Program Administration Activities:** Program Administration Activities means activities that support administration of the grant program, to the extent such activities meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. Program Administration Activities include but are not limited to establishing and convening advisory councils, as described in Item 2 of EPA's Guidance on Selected Items of Cost for Recipients, and fund raising, as described in Item 4 of EPA's Guidance on Selected Items of Cost for Recipients.

**Program Beneficiary:** Program Beneficiary means an entity (either an individual or an organization) that receives Financial Assistance or technical assistance as an end-user, except when such Financial Assistance is characterized as an Acquisition of Intangible Property (in which case the entity is a Contractor, as defined in 2 CFR 200.1). Expenditures to Program Beneficiaries are in the form of Participant Support Costs, as defined in 2 CFR 1500.1. A Program Beneficiary is distinct from a Subrecipient, as defined in 2 CFR 200.1.

Case 1:25-cv-00762   Document 1-3   Filed 03/14/25   Page 12 of 61
USCA Case #25-5122   Document #2114423   Filed: 05/05/2025   Page 588 of 694

5G - 84096001 - 1   Page 11

**Program Income:** 2 CFR 200.1 defines Program Income as "gross income earned by the recipient or subrecipient that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(c)". 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, Program Income also includes but is not limited to income from origination fees, servicing fees, and asset management fees; dividends from equity investments; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). Program Income must be treated in accordance with the Program Income Programmatic Term and Condition. EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fund raising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Under this award agreement, the Recipient is authorized to deduct the cost of generating program income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of program income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Program Income. Costs of generating program income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the program income, provided the Recipient can account for the actual costs incurred. Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

**Qualified Project:** Section 134(c)(3) of the Clean Air Act provides that a Qualified Project is any project, activity, or technology that (A) reduces or avoids greenhouse gas emissions and other forms of air pollution in partnership with, and by leveraging investment from, the private sector; or (B) assists communities in the efforts of those communities to reduce or avoid greenhouse gas emissions and other forms of air pollution. For this Assistance Agreement, Qualified Project means any project, activity or technology meeting all six requirements listed below at the time that Financial Assistance is provided to the project, activity, or technology:

- The project, activity, or technology would reduce or avoid Greenhouse Gas Emissions, consistent with the climate goals of the United States to reduce Greenhouse Gas Emissions 50-52 percent below 2005 levels in 2030, reach 50 percent zero-emission vehicles share of all new passenger cars and light trucks sold in 2030, achieve a carbon pollution-free electricity sector by 2035, and achieve net-zero emissions by no later than 2050. The project, activity, or technology may reduce or avoid such emissions through its own performance or through assisting communities in their efforts to deploy projects, activities, or technologies that reduce or avoid such emissions.

- The project, activity, or technology would reduce or avoid emissions of other Air Pollutants. The project, activity, or technology may reduce or avoid such emissions through its own performance or through assisting communities in their efforts to deploy projects, activities, or technologies that reduce or avoid such emissions.

- The project, activity, or technology would deliver additional benefits (i.e., in addition to primarily reducing or avoiding emissions of greenhouse gases and other Air Pollutants) to communities within one or more of the following seven categories: climate change; clean energy and energy efficiency; clean transportation; affordable and sustainable housing; training and workforce

5G - 84096001 - 1    Page 12

development; remediation and reduction of legacy pollution; and development of critical clean water infrastructure.

• The project, activity, or technology may not have otherwise been financed.
• The project, activity, or technology would mobilize private capital.
• The project, activity, or technology would support only commercial technologies, defined as technologies that have been deployed for commercial purposes at least three times for a period of at least five years each in the United States for the same general purpose as the project, activity, or technology.

**Senior Management:** Senior Management means the chief executive officer, chief risk officer, general counsel, chief compliance officer, chief investment officer, chief reporting officer, and chief financial officer (or equivalent positions).

**Subaward:** 2 CFR 200.1 defines a Subaward as "an award provided by a pass-through entity to a subrecipient for the subrecipient to contribute to the goals and objectives of the project by carrying out part of a Federal award received by the pass-through entity. It does not include payments to a contractor, beneficiary, or participant". A Subgrant refers to a Subaward in the form of a grant.

**Subrecipient:** Consistent with 2 CFR 200.1, Subrecipient means an entity that receives a Subaward from a pass-through entity to carry out part of a Federal award but does not include an entity that is a Program Beneficiary of such an award. A Subrecipient is distinct from a Program Beneficiary, which is referenced in 2 CFR 1500.1. In this program, there are three main types of Subrecipients: (1) a Subrecipient that receives a Subgrant that will be used, either in whole or in part, to provide Financial Assistance to Qualified Projects, or a "Financial Assistance Subrecipient"; (2) a Subrecipient that receives a Subgrant that will be used exclusively for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities, or a "Technical Assistance Subrecipient"; and (3) a Subrecipient that receives Financial Assistance in the form of a Subaward, with the Subrecipient then using the Subaward to provide Financial Assistance to Qualified Projects, or a "Financial Intermediary Subrecipient". In accordance with 2 CFR 200.332, each Subrecipient is accountable to the Recipient for proper use of EPA funding. Note that a financial transaction is a Subaward to a Financial Intermediary Subrecipient if the following two characteristics are true: (i) the financial transaction provides an award by a pass-through entity to a Subrecipient through a form of *Federal financial assistance*, other than a grant, and (ii) the proceeds of the award are used directly as Financial Assistance to Qualified Projects, carrying out part of a Federal award received by the pass-through entity.

The EPA Subaward Policy applies to Subgrants made to Financial Assistance Subrecipients and Technical Assistance Subrecipients, including but not limited to Named Subrecipients. However, the EPA Subaward Policy does not apply to Subawards made to Financial Intermediary Subrecipients.

**Waste, Fraud, or Abuse:** For the definition and application of these terms under this Assistance Agreement (e.g. the Financial Risk Management Requirements, Clarifications to EPA General Terms and Conditions, and Financial Agent Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, refer to their use in the *Reporting Waste, Fraud, and Abuse* clause in the EPA General Terms and Conditions effective October 1, 2024 and 2 CFR 200.113: "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U.S.C. 3729-3733."

Case 1:25-cv-00762    Document 1-3    Filed 03/14/25    Page 14 of 61
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 590 of 694

5G - 84096001 - 1    Page 13

## II. NATIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the Recipient agrees to the following four requirements of performance reporting: (1) progress reports, (2) transaction and-project level report , (3) organizational disclosures, and (4) ongoing disclosures. These performance reporting requirements "flow-down" as needed to enable the Recipient to comply with the requirements described in this term and condition. The Recipient must ensure that these reports cover its own grant-related activities, and where applicable to a certain performance report or element of a performance report, the grant-related activities of its Subrecipients, Contractors, and/or Program Beneficiaries. To comply with these performance reporting requirements, the Recipient agrees to use information collection instruments authorized by GGRF Accomplishment Reporting (██████████████████████████████████ ████████), once such instruments are authorized; to the extent that information is not available for transactions that were closed prior to authorization of these instruments, the Recipient will not be out of compliance with the performance reporting requirements.

The Recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit performance reporting electronically to the EPA Project Officer. To the extent it is known, or should have been known, by the chief executive officer (or equivalent) and chief reporting officer (or equivalent) that the reporting is not materially compliant with the terms and conditions, or demonstrates material noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission. Should the chief executive officer (or equivalent) and chief reporting officer (or equivalent) signing the submission knowingly and willfully make any material false statement, they may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) prior to submission to EPA. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient. Recipient agrees that submitted information that does not include PII or CBI may be shared for program evaluation purposes, including with third parties.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. Notwithstanding any other provision of this Assistance Agreement, if Recipient's inability to submit the required performance reporting is due to issues with EPA systems, the Recipient shall be granted a reasonable extension to submit the reports after the technical issue has been corrected.

Where applicable, the intervals for reporting are authorized by 2 CFR 200.329(c)(1), as more frequent reporting is necessary for the effective monitoring of the Federal award and could significantly affect

Case 1:25-cv-00762     Document 1-3     Filed 03/14/25     Page 15 of 61
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 591 of 694

5G - 84096001 - 1     Page 14

program outcomes.

## 1. Progress Reports

### *Semi-Annual Report*

The Recipient agrees to submit semi-annual reports covering six months of the calendar year in accordance with information collection instruments approved through GGRF Accomplishment Reporting (███████████████████████). A single semi-annual report must be submitted to cover grant-related activities of the Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the semi-annual report.

The Recipient agrees to submit semi-annual reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The first semi-annual reporting period ends on December 31 and covers all activities beginning on the first day of the Period of Performance.

### *Annual Report*

The Recipient agrees to submit annual reports that contain detailed narratives describing program performance over the Recipient's fiscal year, supported with qualitative discussions and quantitative metrics. A single annual report must be submitted to cover grant-related activities of the Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the annual report.

The Recipient must include the following broad, non-exhaustive elements in its annual reports:

- Progress towards objectives on key performance metrics over the reporting period,
- Summary of key activities completed in the reporting period, including case studies across different types of Financial Assistance to Qualified Projects,
- Geographic coverage of Financial Assistance to Qualified Projects made in the reporting period,
- Descriptions and examples of actions taken to meaningfully involve the communities the program serves in program design and operations,
- Case studies of different types of Market-Building and/or Predevelopment Activities, and
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved in the next reporting period.

These reports must be submitted ready to be published on the EPA website for public consumption and must not include any material that the Recipient considers to be Confidential Business Information (CBI)

Case 1:25-cv-00762    Document 1-3    Filed 03/14/25    Page 16 of 61
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 592 of 694

5G - 84096001 - 1    Page 15

or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI. Should EPA identify PII or claims of CBI in reports, the EPA Project Officer will require that the Recipient re-submit the report without the PII or claims of CBI so that it can be published without redaction.

The Recipient agrees to submit **annual reports** electronically to the EPA Project Officer within 90 calendar days after the Recipient's fiscal year end date. The first annual report is due 90 calendar days after the Recipient's fiscal year that ends in 2025.

_Final Report_

The Recipient agrees to submit a final report containing two documents. First, the recipient must submit a report containing all of the elements described above for the annual report, covering the entire Period of Performance and overall assessment of its program performance and implementation of its workplan in effect under this Assistance Agreement. Second, the recipient must submit its investment strategy for the Closeout Period to detail its use of Post-Closeout Program Income over the Closeout Period. EPA intends to make the investment strategy, either in whole or in part, available to the public through disclosing copies of the investment strategy as submitted or using the content of the investment strategy. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient.

The two documents for the final report must be submitted to cover the grant-related activities of the Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the final report.

The Recipient agrees to submit the two documents for the final report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the Period of Performance.

## 2. Transaction and Project-Level Report

The Recipient agrees to submit quarterly transaction and project-level reporting in accordance with information collection instruments approved through GGRF Accomplishment Reporting (█████ ██████████████████████████████████████). The data submission must cover the grant-related activities of the Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the data submission.

The Recipient agrees to submit the transaction and project-level report electronically to the EPA Project Officer within 30 calendar days after the quarterly reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the quarterly reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The four quarterly reporting periods for data submission are as follows: July 1 to September 30; October 1 to December 31; January 1 to March 31; and April 1 to June 30. The data submissions must cover

Case 1:25-cv-00762    Document 1-3    Filed 03/14/25    Page 17 of 61
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 593 of 694

5G - 84096001 - 1    Page 16

transactions originated in the preceding quarter. For the quarterly reporting period that ends September 30, the Recipient must provide information on transactions originated from April 1 to June 30 rather than from July 1 to September 30. For the quarterly reporting period that ends December 31, the Recipient must provide information on transactions originated from July 1 to September 30 rather than October 1 to December 31. For the quarterly reporting period that ends March 31, the Recipient must provide information on transactions originated from October 1 to December 31 rather than January 1 to March 31. For the quarterly reporting period that ends June 30, the Recipient must provide information on transactions originated from January 1 to March 31 rather than April 1 to June 30. The first transaction and project-level report is due 30 calendar days after December 31, 2024 and must cover all transactions originated from the beginning of the Performance Period through September 30, 2024.

## 3. Organizational Disclosures

The Recipient agrees to submit annual organizational disclosures electronically to the EPA Project Officer within 30 calendar days after submission of its Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. The organizational disclosures must cover the Recipient's fiscal year and be submitted in accordance with information collection instruments approved through GGRF Accomplishment Reporting (███████████████████████████████████████). Additionally, the Recipient agrees to submit such organizational disclosures for each Financial Assistance Subrecipient that has received in excess of $10,000,000 in NCIF subgrants to provide Financial Assistance to Qualified Projects under the National Clean Investment Fund (to be delivered within 30 calendar days after submission of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System). The requirement for organizational disclosures is not applicable for any fiscal year in which the reporting entity did not meet the requirements of 2 CFR Subpart F—Audit Requirements. The first Organizational Disclosures are due in 2025.

## 4. Ongoing Disclosures

In addition to other ongoing disclosure obligations within the regulations and terms and conditions of this Award Agreement, the Recipient agrees to notify the EPA Project Officer of the following events in accordance with 2 CFR 200.329(e):

1. Changes to the Recipient's independent certified public accounting firm;

2. Non-reliance by the Recipient or its independent auditor on previously issued financial statements or a related audit report or completed interim audit review;

3. Changes in fiscal year end of the Recipient;

4. Material impairments to the Recipient's assets;

5. Intention to file bankruptcy petition or enter into receivership;

6. Submission of annual Form 990 to the IRS, with provision of copy to EPA Project Officer upon request (only if submission of the Form 990 is otherwise required).

Additionally, the Recipient agrees to submit such ongoing disclosures for each Financial Assistance Subrecipient that has received in excess of $10,000,000 to provide Financial Assistance to Qualified Projects under the National Clean Investment Fund. The Recipient agrees to submit ongoing disclosures

electronically to the EPA Project Officer within 15 calendar days of the event.

## B. Cybersecurity Condition

(a) The Recipient agrees that when collecting and managing environmental data under this Assistance Agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward Agreements and, during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process.  A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

## D. Public or Media Events

For public or media events that are planned more than 15 calendar days in advance, the Recipient agrees to notify the EPA Project Officer of public or media events it has organized publicizing the

Case 1:25-cv-00762    Document 1-3    Filed 03/14/25    Page 19 of 61
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 595 of 694

5G - 84096001 - 1    Page 18

accomplishment of significant activities related to execution of the workplan in effect under this Assistance Agreement and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice.

## E. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

## F. Leveraging and Fund Raising

### 1. Leveraging

The Recipient agrees to make commercially reasonable efforts to provide the proposed leveraged funding that is described in its workplan in effect under this Assistance Agreement. If the proposed leveraging does not substantially materialize during the Period of Performance, and the Recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future grant applications from the Recipient. In addition, if the proposed leveraging does not substantially materialize during the Period of Performance and the Recipient does not provide a satisfactory explanation, then EPA may reconsider the legitimacy of the award; if EPA determines that the Recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the workplan in effect under this Assistance Agreement, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

### 2. Fund Raising

2 CFR 200.442 provides coverage on allowable fund-raising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fund raising costs are an allowable cost and may include costs that are reasonable and necessary for raising capital from private investors to provide Financial Assistance to Qualified Projects.

Allowable fund-raising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private investors. Funds a Recipient raises for its own use with costs borne by an EPA Financial Assistance Agreement are considered Program Income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fund raising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fund-raising costs charged to the award will be treated as Program Income.

## G. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving Environmental Information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving Environmental Information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure sub-award recipients develop and implement Quality Assurance (QA) planning documents in accordance with this

Case 1:25-cv-00762    Document 1-3    Filed 03/14/25    Page 20 of 61
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 596 of 694

5G - 84096001 - 1    Page 19

term and condition; and/or ensure sub-award recipients implement all applicable approved QA planning documents. EPA will not approve any QA planning documents developed by a Subrecipient; the Recipient is responsible for reviewing and approving its Subrecipient QA planning document(s), if required based on the Subrecipient's Environmental Information Operations.

## 1. Quality Management Plan (QMP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the recipient must: (i) develop a QMP, (ii) prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard and submit the document for EPA review, and (iii) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved and current QMP and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

The Recipient must submit the QMP within 90 calendar days after grant award, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the Recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QAPP, (ii) prepare the QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard, (iii) submit the document for EPA review, and (iv) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s) and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer (PO) in writing if the previously EPA-approved QAPP is acceptable for this agreement.

The Recipient must submit the QAPP within 90 calendar days after grant award, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

The recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted

Case 1:25-cv-00762    Document 1-3    Filed 03/14/25    Page 21 of 61
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 597 of 694

5G - 84096001 - 1    Page 20

when changes occur.

**For Reference:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

## H. Real Property

In accordance with 2 CFR 200.311, title to Real Property acquired or improved under this agreement will vest upon acquisition by the Recipient, including but not limited to title to Real Property acquired through exercise of a remedy for default of a Financial Assistance arrangement. This Real Property must be used for the originally authorized purpose as long as needed for that purpose, during which time the Recipient must not dispose of or encumber its title or other interests. The Real Property Programmatic Term and Condition flows down to Subrecipients but not to Program Beneficiaries or Contractors that receive Financial Assistance to Qualified Projects, which may acquire title to Real Property after receiving Financial Assistance to Qualified Projects.

The Recipient must obtain prior approval from the EPA Award Official for the acquisition of Real Property. Note that the Recipient may meet this requirement by specifying the types of acquisitions of Real Property it plans to carry out (including in cases where the Recipient would acquire title to Real Property through exercise of a remedy for default) in its workplan in effect under this Assistance Agreement.

## Disposition

If the Recipient disposes of the Real Property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

Otherwise, when Real Property is no longer needed for the originally authorized purpose, the Recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where Recipient is disposing of Real Property acquired or improved with a Federal award and acquiring replacement Real Property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any

Case 1:25-cv-00762    Document 1-3    Filed 03/14/25    Page 22 of 61
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 598 of 694

5G - 84096001 - 1    Page 21

improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the Recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The Recipient is entitled to be paid an amount calculated by applying the Recipient's percentage of participation in the purchase of the Real Property (and cost of any improvements) to the current fair market value of the property.

<u>Recordation</u>

As authorized by 2 CFR 200.316, EPA requires that Recipients who use EPA funding to purchase and improve Real Property through an EPA funded construction project record a lien or similar notice in the Real Property records for the jurisdiction in which the Real Property is located, which indicates that the Real Property has been acquired and improved with federal funding and that use and disposition conditions apply to the Real Property.

## I. Program Income

In accordance with Clean Air Act Section 134(b)(1)(C) as well as 2 CFR 200.307(c) and 2 CFR 1500.8 (b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the workplan in effect under this Assistance Agreement.

## J. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the Recipient or Subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the Recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

Case 1:25-cv-00762    Document 1-3    Filed 03/14/25    Page 23 of 61
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 599 of 694

5G - 84096001 - 1    Page 22

## III. ADDITIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Eligible Recipient

**The Recipient agrees to maintain its status as an Eligible Recipient, which includes:**

a. Meeting the definition of *Nonprofit organization* set forth in 2 CFR 200.1;

b. Having an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"

c. Not receiving any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);

d. Being funded by public or charitable contributions; and

e. Having the legal authority to invest in or finance projects.

### B. Workplan and Budget

The Recipient agrees to execute the workplan in effect under this Assistance Agreement. This document, once approved by the EPA, will reflect an agreement between the Parties and will be incorporated into and be a part of the agreement between the Recipient and the EPA.

The Recipient agrees to conduct an annual review of the workplan in effect under this Assistance Agreement within 90 calendar days of June 30 of each calendar year. If material changes are made during the annual review or in between annual reviews, the Recipient agrees to submit the updated workplan to the EPA Project Officer.

The Recipient also agrees to conduct an annual review of the EPA-approved detailed budget table within 90 calendar days of June 30 of each calendar year. If material changes are made during the annual review or in between annual reviews, the Recipient agrees to submit the updated detailed budget table to the EPA Project Officer. Such submissions are not subject to prior approval unless otherwise required by the regulations or the terms and conditions of the Award Agreement.

### C. Recipient Organizational Plan

The Recipient agrees to execute the workplan in accordance with the documents listed below, as submitted to EPA through Grants.gov for EPA-R-HQ-NCIF-23 or provided to EPA after the application submission deadline.

1. Organizational Plan, pursuant to *Section IV.C: Content of Application Submission* of the Notice of Funding Opportunity;

2. Legal Entity Structure Diagram, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity; and

3. Organizational and Governing Documents, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity.

The Recipient agrees to maintain its incorporation in the United States, as reflected in the above documents.

The Recipient agrees to conduct an annual review of the documents within 90 calendar days of June 30 of each calendar year. If material changes are made during the annual review or in between annual reviews, the Recipient agrees to submit the updated documents to the EPA Project Officer. Such submissions are not subject to prior approval unless otherwise required by the regulations or the terms and conditions of the Award Agreement.

## D. Recipient Policies and Procedures

The Recipient agrees to execute the workplan in accordance with the documents listed below (or other documents submitted in lieu of the documents listed below), as submitted to EPA through Grants.gov for EPA-R-HQ-NCIF-23 or provided to EPA after the application submission deadline.

1. Legal and Compliance Risk Management Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

2. Financial Risk Management Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

3. Board Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

4. Management Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

5. Consumer Protection Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

6. Equity Policies and Practices, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity; and

7. Conflict of Interest Mitigation Plan, which include all documents submitted upon EPA's request regarding measures that will be taken to eliminate, neutralize, mitigate or otherwise resolve conflicts of interest.

8. Documentation of Personnel and Fringe Benefit Charges, which includes all documents submitted upon EPA's request to document how personnel and fringe benefits will be charged against the grant award in accordance with 2 CFR 200.430 *Compensation—personal services* and 2 CFR 200.431 *Compensation—fringe benefits*. Notwithstanding the content of the Recipient's EPA-approved budget, the Recipient is not authorized to charge the grant award for personnel and fringe benefits against employees without using the W-2 as the definitive definition of "employee" until the Documentation of Personnel and Fringe Benefit Charges has been reviewed and approved by the EPA, as communicated by the EPA Project Officer.

5G - 84096001 - 1    Page 24

The Recipient agrees to conduct an annual review of the documents within 90 calendar days of June 30 of each calendar year. If material changes are made during the annual review or in between annual reviews, the Recipient agrees to submit the updated documents to the EPA Project Officer. With the exception of the Documentation of Personnel and Fringe Benefit Charges, where changes will be subject to prior approval, such submissions are not subject to prior approval unless otherwise required by the regulations or the terms and conditions of the Award Agreement.

### E. Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Financial Assistance to Qualified Projects; Predevelopment Activities; Market-Building Activities; and Program Administration Activities. The Recipient must use awards funds exclusively for allowable activities within the ten EPA regions, with the exception of the Freely Associated States. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

The Recipient agrees to not use the award for the following unallowable activities: (a) Financial Assistance to Qualified Projects in the form of Subgrants; (b) Subgrants for the purposes of providing Financial Assistance to Qualified Projects (other than Subgrants from the Recipient to first-tier Subrecipients); and (c) activities that support deployment of projects that do not meet the definition of Qualified Projects. The allowability of legal costs incurred in connection with the award shall be governed by applicable provisions of 2 CFR Part 200, Subpart E, including but not limited to 2 CFR 200.403, 2 CFR 200.435, 2 CFR 200.441 and 2 CFR 200.459.

### F. Foreign Entity of Concern

As part of carrying out this award, the Recipient agrees to ensure that entities the Recipient contracts with, the Recipient makes Subawards to, or that receive funds as Program Beneficiaries at any tier of funding under this grant agreement are not—

(A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

(B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

(C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

### G. LIDAC Expenditure Requirement

The Recipient agrees to ensure that a minimum of 40% of the award is used for the purposes of providing Financial Assistance in Low-Income and Disadvantaged Communities, with compliance maintained over each annual reporting period (i.e., from July 1 to June 30). Funds used for the purposes of providing Financial Assistance may include Financial Assistance to Qualified Projects; Predevelopment Activities; Market-Building Activities; and Program Administration Activities. This requirement applies to the entire award provided to the Recipient but does not "flow down" to each

JA1105

Subrecipient.

## H. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide Financial Assistance to Qualified Projects that may generate Program Income as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such Financial Assistance may include Subawards, Participant Support Costs, and/or Acquisitions of Intangible Property. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the Recipient's Subawards from the capitalization of a revolving loan fund.

EPA does not consider the remaining portion of the award as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). As such, all Subgrants made by the Recipient are subject to the EPA Subaward Policy.

## I. Subawards

Subawards to Technical Assistance Subrecipients

The Establishing and Managing Subawards General Term and Conditions applies to Technical Assistance Subrecipients.

Subawards to Financial Intermediary Subrecipients

The following requirements apply when the Recipient provides a Subaward to a Financial Intermediary Subrecipient. These requirements apply to the Recipient and Subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition, as the EPA Subaward Policy does not apply to Financial Intermediary Subrecipients.

1. The Recipient must establish and follow a system that ensures all Subawards to Financial Intermediary Subrecipients are in writing and contain all of the elements required by 2 CFR 200.332(b), with the exception of the indirect cost provision of 2 CFR 200.332(b)(4) (which does not apply to loans). EPA has developed an optional template for Subaward Agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such Subaward Agreements with Financial Intermediary Subrecipients.

2. The Financial Intermediary Subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all Subawards that requires Financial Intermediary Subrecipients to comply with these requirements. No other provisions of the Uniform Grant Guidance, including the Procurement Standards, apply directly to the Subrecipient.

3. Prior to making the Subaward, the Recipient must ensure that the Financial Intermediary Subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(b)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

Subawards to Financial Assistance Subrecipients

The following requirements apply when the Recipient provides a Subaward to a Financial Assistance Subrecipient. These requirements apply to the Recipient and Subrecipient in addition to those specified in the Establishing and Managing Subawards General Term and Condition.

    1. The Recipient must obtain written approval from the EPA Award Official prior to providing a Subgrant to a Financial Assistance Subrecipient that would exceed $10,000,000 cumulatively in Financial Assistance Subawards under the National Clean Investment Fund and Capitalization Funding under the Clean Communities Investment Accelerator.

    2. Prior to providing a Subgrant not named on the application to a Financial Assistance Subrecipient, the Recipient must obtain disclosure from the potential Subgrantee regarding award funds that it has sought and/or received under the National Clean Investment and Clean Communities Investment Accelerator programs.

## J. Participant Support Costs

The Recipient may provide Financial Assistance to Qualified Projects in the form of Participant Support Costs. In addition, the Recipient may provide Participant Support Costs for other purposes, including Predevelopment Activities, Market-Building Activities, and Program Administration Activities, to the extent such purposes are authorized under the Award Agreement.

The Recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on Participant Support Costs, in addition to other requirements included in the terms and conditions of this Award Agreement:

    1. The Recipient and Program Beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as Participant Support Costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the Recipient and Program Beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates, and other participant support cost payments. However, EPA does not provide advice on tax issues relating to these payments.

    2. Participant Support Cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The Recipient, therefore, may not make Participant Support Cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that Subrecipients adhere to this requirement as well. The Recipient is responsible for checking that Program Beneficiaries (i.e., entities receiving Participant Support Costs) are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the Program Beneficiaries.

The Recipient agrees to provide written guidelines for Participant Support Costs to the EPA Project Officer prior to making payments to Program Beneficiaries, unless already described in the Recipient's workplan in effect under this Assistance Agreement. These guidelines must: (a) describe the activities that will be supported by the Participant Support Costs; (b) specify the range of funding to be provided through the Participant Support Costs; (c) identify which types of entities will have title to equipment (if

Case 1:25-cv-00762    Document 1-3    Filed 03/14/25    Page 28 of 61
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 604 of 694

5G - 84096001 - 1    Page 27

any) purchased with the funds; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the Participant Support Cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

## K. Acquisitions of Intangible Property

### 2 CFR 200 Procurement Standards

The Recipient may provide Financial Assistance to Qualified Projects in the form of Acquisitions of Intangible Property. The Recipient agrees to acquire Intangible Property in compliance with the conflict of interest and competition requirements described in the 2 CFR Part 200 Procurement Standards. This includes but is not limited to the requirements at 2 CFR 200.318 to:

- Have and use documented procurement procedures to govern acquisitions of Intangible Property;
- Maintain oversight to ensure that contractors perform in accordance with the terms, conditions, and specifications of their contracts;
- Maintain written standards of conduct covering conflicts of interest and governing the actions of employees engaged in the selection, award, and administration of contracts as well as maintain written standards of conduct covering organizational conflicts of interest;
- Prioritize entering into inter-entity agreements where appropriate for procurement or use of common or shared goods and services as the Recipient seeks to mobilize financing and private capital;
- Award contracts only to responsible contractors possessing the ability to perform successfully under the terms and conditions of the proposed procurement; and
- Maintain records sufficient to detail the history of procurement.

### Disposition

If the Recipient disposes of the Intangible Property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

### Recordation

The Recipient agrees to record liens or other appropriate notices of record to indicate that Intangible Property has been acquired with Federal funding and that use and disposition conditions apply to the Intangible Property, in cases where Financial Assistance to Qualified Projects is in the form of an Acquisition of Intangible Property. As provided in 2 CFR 200.1: "…loans, notes and other debt instruments, lease agreements, stock and other instruments of property ownership (whether the property is tangible or intangible)" are *Intangible Property* for the purposes of the restrictions described at 2 CFR 200.315(a). "Other appropriate notices of record" is not limited to filing Uniform Commercial Code instruments and may also include a notice of record in the legally-binding transaction documents.

Additional guidance is available at Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements.

## L. Labor and Equitable Workforce Development Requirements

5G - 84096001 - 1    Page 28

## 1. Davis-Bacon and Related Acts (DBRA)

### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this Award Agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" and "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific construction projects that were not completed prior to the execution of the final binding documentation governing the use of the Financial Assistance. The Recipient must ensure that any construction work financed in whole or in part with such Financial Assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis-Bacon and Related Act requirements and the requirements of these Terms and Conditions.

Note, however, that under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements do not apply to any form of Financial Assistance which meets any of the following criteria:

- Financial Assistance which exclusively funds pre-construction (e.g. permitting or design work) or post-construction activities (e.g. Acquiring Intangible Property related to a previously completed construction project or re-financing activity related to a previously completed construction project).
- Financial Assistance which serves end-users who are individual homeowners or tenants of single-family homes or multifamily buildings when these individual end-users ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves end-users who meet the definition of Federally Recognized Tribal Entities, as defined under this Assistance Agreement, when these Federally Recognized Tribal Entities ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves any end-user when such Financial Assistance is less than $250,000 for a project and the end-user ultimately selects the contractor(s) and executes the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.

If the Recipient encounters a situation that presents uncertainties regarding DBRA applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with a Subrecipient, Program Beneficiary, contractor, or subcontractor determines any instances of non-compliance or

Case 1:25-cv-00762     Document 1-3     Filed 03/14/25     Page 30 of 61
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 606 of 694

5G - 84096001 - 1     Page 29

potential non-compliance with the requirements of this Term and Condition or the Davis-Bacon and Related Act, the Recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Note, the use of the term project in this term and condition is distinct from the use of the term project within the definition of Qualified Project under Clean Air Act Section 134(c)(3), which is broader and includes "any project, activity, or technology." Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed by a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

## B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

## C. Recipient Responsibilities When Entering Into and Managing Contracts:

### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

### b. After Award of Contract:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

## D. Recipient Responsibilities When Establishing and Managing Additional Subawards:

### a. Include DBRA Requirements in All Subawards (including Loans): Include the following text on

5G - 84096001 - 1     Page 30

all Subawards under this grant: "By accepting this award, the EPA Subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of Subrecipients and must ensure Subrecipients comply with the requirements in 29 CFR 5.6.

**c. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of Subrecipients and must ensure that Subrecipients comply with the requirements in subsection E, below.

## E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program Beneficiaries

When DBRA is applicable, Financial Assistance provided in the form of a participant support cost to a Program Beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

**a. Solicitation and Contract Requirements:**

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

Case 1:25-cv-00762    Document 1-3    Filed 03/14/25    Page 32 of 61
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 608 of 694

5G - 84096001 - 1    Page 31

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

## 2. Compliance with Federal Statutes and Regulations

The Recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with Subrecipients, contractors, and other partners (e.g., by including such provisions in contractual agreements). This includes but is not limited to applicable health and safety regulations as administered by the Occupational Safety and Health Administration.

## 3. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the Recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## 4. Labor and Equitable Workforce Development Implementation Plan

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), by December 31, 2024, the Recipient must submit a Labor and Equitable Workforce Development Implementation Plan to the EPA Project Officer. The Implementation Plan should articulate policies, practices, and procedures adopted by the Recipient to maximize high-quality jobs and workforce development outcomes on projects assisted with the award. Examples of how this can be demonstrated include, but are not limited to:

- Mechanisms for promoting job quality and evaluating labor standards on projects being considered for and/or receiving Financial Assistance;
- Plans to support workforce development as part of Market-Building Activities;
- Current and planned partnerships with labor and workforce development organizations, including the purpose of those partnerships;
- Mechanisms for maximizing training and employment opportunities for participants in Registered Apprenticeship Programs on projects, including apprenticeship utilization targets, as applicable;
- Mechanisms for creating high-quality job training and employment opportunities available to residents of low-income and disadvantaged communities through projects and other program activities; and
- Processes for promoting Project Labor Agreements on construction projects above $25,000,000, as appropriate, in alignment with Executive Order 14063 (Use of Project Labor Agreements for

Case 1:25-cv-00762    Document 1-3    Filed 03/14/25    Page 33 of 61
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 609 of 694

5G - 84096001 - 1    Page 32

Federal Construction Projects) and Executive Order 13502 (Use of Project Labor Agreements for Federal Construction Projects), as well as other types of binding agreements that promote strong workforce outcomes, such as Community Workforce Agreements and Community Benefits Agreements.

The Recipient may use or reference materials already submitted to EPA as part of its submission of the Implementation Plan, where relevant.

Note that EPA may make the information from this plan available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient.

## M. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that for any activity related to the construction, alteration, maintenance, or repair of infrastructure, "none of the funds made available for a Federal Financial Assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The Recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America (BABA) requirements that all Recipients of EPA Financial Assistance awards must comply with.

Under the Greenhouse Gas Reduction Fund, BABA requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific infrastructure projects that were not completed prior to the date the Recipient's award funds were obligated by the EPA.

EPA interprets the definition of infrastructure consistent with 2 CFR 184 and M-24-02 (memorandum dated as of October 23, 2023), including the "public function" test, when determining whether projects qualify as public infrastructure, based on the Civil Rights Act definition of public accommodation.

The following types of Greenhouse Gas Reduction Fund projects are deemed infrastructure for the purposes of BABA applicability:

    1. The public infrastructure portion of any property (e.g., retail in a mixed-use multi-family property) where the principal purpose of the Financial Assistance is to directly benefit such portion of the property;

    2. Privately-owned commercial buildings when they meet the "public function" test;

    3. Residential-serving community solar projects, which EPA deems "structures, facilities, and equipment that generate, transport, and distribute energy" per 2 CFR 184.4(c);

Case 1:25-cv-00762    Document 1-3    Filed 03/14/25    Page 34 of 61
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 610 of 694

5G - 84096001 - 1    Page 33

4. Publicly accessible EV charging stations;

5. Publicly owned energy generation and/or storage transportation facilities;

6. Publicly owned transportation facilities (e.g., bus depot);

7. Privately-owned transportation facilities that serve a public function.

The following types of Greenhouse Gas Reduction Fund projects are not deemed infrastructure for the purposes of BABA applicability:

1. Privately-owned vehicles for private use;

2. Certain publicly-owned or operated vehicles that EPA has determined do not constitute infrastructure (e.g. school buses);

3. Privately-owned manufacturing or industrial facilities;

4. Privately-owned offices;

5. Single family homes;

6. Privately-owned, non-mixed-use, multi-family housing properties;

7. Privately-owned residential portions of mixed-use properties;

8. EV charging stations that are not publicly accessible;

9. Any privately-owned, behind-the-meter energy generation and storage project that does not otherwise meet the definition of infrastructure.

The inclusion of the following types of funding, support, guarantee, or sponsorship in the funding stack of any Greenhouse Gas Reduction Fund project does not trigger BABA, in and of itself or in combination:

1. Low-Income Housing Tax Credit (LIHTC);

2. Fannie Mae and Freddie Mac Backed Multifamily Mortgages;

3. Federal Housing Administration Insured Multifamily Mortgages;

4. HUD Section 8 Funding;

5. Other Federal, State, Tribal, or Local Housing Assistance Funding Sources: in general, subsidies issued by federal, state, tribal, or local housing assistance funding sources that do not confer equity or ownership stakes for the governmental funding source do not trigger BABA applicability.

BABA applicability is assessed at the time of provision of Financial Assistance based on the terms, limitations, and requirements of the Financial Assistance. Applicability does not change retroactively

based on a change of use (e.g., if a ground floor apartment is re-zoned for a restaurant). Recipients may not temporarily modify or mischaracterize usage to intentionally avoid BABA compliance.

If the Recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## N. Governance Requirements

The Recipient agrees to comply with the following governance requirements starting December 31, 2024. The governance requirements "flow-down" to Financial Assistance Subrecipients that have received in excess of $10,000,000 in NCIF subgrants but not to other subrecipients. The governance requirements are waived for (i) any entity that has been determined by the U.S. Treasury's CDFI Fund to meet the CDFI certification requirements set forth in 12 CFR 1805.201 and (ii) any entity whose specific governance structure is set forth in State, Tribal, or local law.

The Recipient (or Subrecipient) may meet all or some of the governance requirements through the parent entity, provided the Recipient (or Subrecipient) is subject to the governance of the parent entity and the Recipient (or Subrecipient) is wholly-controlled by the parent entity. Similarly, the governance requirements may be waived for the Recipient (or Subrecipient) through the parent entity meeting the CDFI certification requirements set forth in 12 CFR 1805.201, provided the Recipient (or Subrecipient) is wholly-controlled by the parent entity.

## 1. Board Size and Composition

The Recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the Recipient's workplan in effect under this Assistance Agreement as well as other business activities. The board must have a sufficient number of members to adequately staff each of its
committees.
The Recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from Low-Income and Disadvantaged Communities).

## 2. Board Independence

The Recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

## 3. Board Committees

The Recipient agrees to have the following board-level committees to oversee and monitor management, with each committee staffed by members qualified to execute the committee's objectives. While the Recipient need not adhere to the exact naming convention or structure in this term and condition, each of the responsibilities must be covered by board-level committees at all times during the Period of Performance; for the avoidance of doubt, one committee may perform the responsibilities of one or more of the committees specified below.

Case 1:25-cv-00762    Document 1-3    Filed 03/14/25    Page 36 of 61
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 612 of 694

5G - 84096001 - 1    Page 35

1. An investment or credit committee to oversee and approve investment or credit decisions;

2. A risk management committee to oversee the formulation and operationalization of the risk management framework;

3. An audit committee to oversee the integrity of reporting and internal controls and the performance of audit functions, with a majority independent members on such committee;

4. A nomination/governance committee to oversee nomination and succession of board and senior management, with a majority independent members on such committee; and

5. A compensation committee to oversee board as well as senior management and staff compensation, with a majority independent members on such committee.

Further, the Recipient agrees to act in good faith to ensure each committee obtains information from management, auditors, or other third-parties necessary to discharge their duties.

## 4. Board Policies and Procedures

The Recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The Recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of Subawards, participant support cost payments, Acquisitions of Intangible Property to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

## O. Consumer Protection Requirements

The Recipient agrees to carry out the following consumer protection requirements to the extent that the Recipient directly interacts, transacts, or contracts with consumers in the provision of Financial Assistance to Qualified Projects:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint

Case 1:25-cv-00762    Document 1-3    Filed 03/14/25    Page 37 of 61
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 613 of 694

5G - 84096001 - 1    Page 36

procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The Recipient agrees to monitor and oversee Subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(e) and 2 CFR 200.318.

## P. Financial Risk Management Requirements

### 1a. Cash Management Requirements: Advance Payments

The Recipient must deposit and maintain advance payments of Federal funds exclusively in insured accounts, in accordance with 2 CFR 200.305(b)(10). As provided in 2 CFR 200.1, an advance payment is "a payment that a Federal agency or pass-through entity makes by any appropriate payment mechanism and payment method before the recipient or subrecipient disburses the funds for program purposes." A Recipient drawing down funds from ASAP prior to disbursement for actual and allowable project costs constitutes an advance payment. Interest income earned on the advance payment from EPA to the Recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

### 1b. Cash Management Requirements: Program Income

The Recipient is authorized to maintain Program Income in two types of accounts:

1. Insured accounts, including in amounts in excess of the federal insurance limit of $250,000.
2. Accounts where such income is used to purchase (i) U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days (if purchased directly) and that such instruments are held-to-maturity (if purchased directly), or (ii) short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. Note, the underlying instruments included in a short-term money market fund consisting solely of U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities and offering daily investor redemptions need not be of a particular duration or held-to-maturity.

Interest income and other returns earned on funds that have already been disbursed is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12).

### 2. Financial Health Metrics

Case 1:25-cv-00762    Document 1-3    Filed 03/14/25    Page 38 of 61
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 614 of 694

5G - 84096001 - 1    Page 37

The Recipient agrees to report the following financial health metrics at the entity-level on an annual basis in accordance with its fiscal year as well as on behalf of each Financial Assistance Subrecipient that receives in excess of $10,000,000 in NCIF subgrants. The metrics are due to the EPA Project Officer within 30 calendar days after submission of the reporting entity's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System and may be submitted through the Organizational Disclosures form. The requirement for submission of financial health metrics is not applicable for any fiscal year in which the reporting entity did not meet the requirements of 2 CFR Subpart F—Audit Requirements. The first financial health metrics are due in 2025.

1. Net Asset Ratio: The net asset ratio is defined as net assets divided by total assets.

2. Current Ratio: **The current ratio is defined as current assets divided by current liabilities, where** current assets is equal to the value of all assets that are reasonably expected to be converted into cash within the coming 12-month period in the normal course of business and current liabilities is equal to the total value of all debts or obligations that must be paid in the coming 12-month period.

3. Delinquency Rate: The delinquency rate is defined as the value of loans outstanding that are 90+ calendar days delinquent divided by the value of loans outstanding, where loans 90+ calendar days delinquent includes those with outstanding balances 90+ calendar days overdue and still accruing interest as well as those in nonaccrual status.

4. Net Charge-Off Rate: The net charge-off rate is defined as the value of loans charged-off over the past fiscal year, minus the value of loan recoveries over the past fiscal year, divided by the value of loans outstanding.

5. Concentration: The concentration of the portfolio, as demonstrated by calculating and reporting on recipient-level exposure, defined as on-balance sheet exposures to a single consolidated entity over all on-balance sheet exposures, for top ten highest exposures.

Note, the Delinquency Rate and Net Charge-Off Rate may exclude the value of loans which include an element of forgiveness, if and only if such forgiveness was established in the terms governing the financial product at origination.

The EPA Project Officer will consider Recipient and, where applicable, Subrecipient performance against these financial health metrics only to the extent by which they Materially Impair the Recipient's ability to execute the workplan in effect under this Assistance Agreement when assessing whether the Recipient is making sufficient progress in implementing the workplan in effect under this Assistance Agreement, as specified in the Sufficient Progress clause under the Clarifications to EPA General Terms and Conditions Programmatic Term and Condition.

## 3. Climate-Related Financial Risks

The Recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The Recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.

5G - 84096001 - 1     Page 38

## 4. Additional Requirements

The Recipient agrees to not subordinate EPA's interest in grant funds that have not yet been used for program purposes in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law. Once a Recipient uses grant funds for program purposes and incurs a financial obligation, as defined under 2 CFR 200.1, EPA will only seek claims on those funds in the event that they were used for costs that do not comply with the terms and conditions of the Award Agreement or if there is adequate evidence of Waste, Fraud, or Abuse, prompting adverse action by EPA per 2 CFR 200.339. This does not prohibit the use of subordinated debt as a form of Financial Assistance.

The Recipient agrees to provide Financial Assistance Subrecipients with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(f).

## Q. Historic Preservation

### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The Recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties can include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The Recipient should work with their Project Officer to ensure that Subrecipients are available to work with EPA on any required consultation process with the State Historic Preservation Office (SHPO) or Tribal Historic Preservation Office (THPO) prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

### Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The Recipient must ensure that Subrecipients performing construction projects are aware of this requirement, and the Recipient must notify EPA if the AHPA is triggered.

5G - 84096001 - 1    Page 39

## R. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the Recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The Recipient must comply with, and ensure Subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the Federal award" provision of 2 CFR 200.403(a). The Recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## S. Remedies for Non-Compliance

The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as provided in 2 CFR 200.343. As specified in 2 CFR 200.343, which will remain in effect throughout the term of this award, costs during suspension or after termination are allowable if (a) the costs result from financial obligations which were properly incurred by the non-Federal entity before the effective date of suspension or termination, are not in anticipation of it, and (b) the costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

The Recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the Recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of Subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the Recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action.

Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing a reasonable opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Performance Reporting National Programmatic Term and Condition, Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements, requirements for Subrecipient oversight, or to obligate or expend funds for allowable activities.

## T. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The

5G - 84096001 - 1    Page 40

Recipient agrees to comply with these clarifications.

## 1. Indirect Cost Rate

The Recipient must exclude costs for acquisitions of Intangible Property from any calculations of modified total direct costs (MTDC), as defined in 2 CFR 200.1. Intangible Property is not a "service" and therefore is not included in MTDC. The Recipient should note that Subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive Participant Support Costs cannot charge an indirect cost rate against their participant support cost payments.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $50,000 of each Subaward (regardless of the period of performance of the Subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, Participant Support Costs and the portion of each Subaward in excess of $50,000.

In the event that the Recipient is compensating an affiliated entity for its direct and indirect costs related to use of employees, the Recipient must not charge its indirect cost rate against any of these costs.

Notwithstanding the General Term and Condition "Indirect Cost Rate Agreements," the Recipient may claim up to a 15% de minimis rate of modified total direct costs authorized by 2 CFR 200.414(f).

## 2. Sufficient Progress

The EPA Project Officer may assess whether the Recipient is making sufficient progress in implementing the workplan in effect under this Assistance Agreement under this Assistance Agreement within 90 calendar days of June 30, 2025 as well as within 90 calendar days of June 30 of each year thereafter during the Period of Performance. "Sufficient progress" shall be assessed based on a comparison of the Recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. As noted under the Financial Risk Management Programmatic Term and Condition, the Recipient's financial health, as measured by the required Financial Health Metrics, are also an input in this process. This term and condition "flows down" to Subrecipients, with the Recipient required to assess whether each Subrecipient is making sufficient progress in implementing the workplan under its Subaward Agreement; the Recipient may increase the frequency and scope of the review of sufficient progress of Subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the Recipient has not made sufficient progress in implementing its workplan in effect under this Assistance Agreement, the Recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

EPA will not find that the Recipient has failed to make sufficient progress in implementing its workplan in effect under this Assistance Agreement based on shifts between types of Financial Assistance and/or Qualified Projects over the Period of Performance (or other shifts in portfolio allocation, such as by region or market segment, over the Period of Performance). If EPA finds the Recipient has failed to achieve sufficient progress on deployment of Financial Assistance to Qualified Projects in general, or is achieving progress at a slower rate than projected under the workplan in effect under this Assistance Agreement, the Recipient will have an opportunity to implement a corrective action plan pursuant to 2 CFR 200.208.

Case 1:25-cv-00762     Document 1-3     Filed 03/14/25     Page 42 of 61
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 618 of 694

5G - 84096001 - 1     Page 41

## 4. Termination

EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.957 (NCIF) to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

## U. Period of Performance

The Period of Performance under this Award Agreement will end on the date specified in the Notice of Award. However, the Period of Performance may end prior to the date specified in the Notice of Award if all required work of the Federal award has been completed, in accordance with 2 CFR 200.344. In accordance with 2 CFR 200.344(b), the Recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the Period of Performance. In this context, to "liquidate all financial obligations" means to pay outstanding bills, such as the payment of staff salaries accrued during the Period of Performance but for which the due date falls after the end date of the Period of Performance. To "liquidate all financial obligations" does not mean to liquidate, terminate, or accelerate outstanding obligations related to the provision of Financial Assistance to Qualified Projects at the end of the Period of Performance, which would continue to be subject to the Closeout Agreement.

The Recipient should note that the Recipient will not be considered to have met the requirements for closeout under its award under 2 CFR 200.344 so long as any Subrecipient has not met the requirements for closeout under its subaward under 2 CFR 200.344.

Notwithstanding the Extension of Project/Budget Period Expiration Date General Term and Condition, in accordance with 2 CFR 200.308(g)(2), the Recipient is authorized to initiate a one-time extension of the Period of Performance by up to 12 months without prior EPA approval, provided that the extension complies with the requirements 2 CFR 200.308(g)(2). In accordance with 2 CFR 200.308(g)(2), the Recipient must "notify the Federal agency in writing with the supporting justification and a revised period of performance at least 10 calendar days before the conclusion of the period of performance."

## V. Closeout Agreement

As provided at 2 CFR 200.307(c) and 2 CFR 1500.8(d), after the end of the Period of Performance of the Assistance Agreement, the Recipient may keep and use Program Income remaining at the end of the Assistance Agreement and use Post-Closeout Program Income in accordance with this term and condition. The Closeout Agreement goes into effect for this Assistance Agreement the earlier of 1) the day after the Assistance Agreement Period of Performance ends, 2) the first date when all required work of the Federal award has been completed in accordance with 2 CFR 200.344 and the Recipient has met

Case 1:25-cv-00762    Document 1-3    Filed 03/14/25    Page 43 of 61
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 619 of 694

5G - 84096001 - 1    Page 42

the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition) or 3) an alternative date that is mutually agreed by the Recipient and the EPA Grants Management Officer or Award Official.

In accordance with 2 CFR 200.344, EPA will proceed to closeout the Award Agreement and enter the Closeout Period even if the Recipient has not met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition). As provided in 2 CFR 200.344: "When the recipient or subrecipient fails to complete the necessary administrative actions or the required work for an award, the Federal agency or pass-through entity must proceed with closeout based on the information available." This Closeout Agreement is therefore self-executing.

This term and condition is the entire Closeout Agreement between the EPA and the Recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The Recipient shall comply with the requirements specified below as part of the Closeout Agreement. Definitions within 2 CFR 200.1, including as supplemented through *I. Definitions* of this award agreement, apply identically to how they do under the Period of Performance, unless otherwise noted.

As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to Subrecipients such that the Recipient must enter into a corresponding Closeout Agreement with any Subrecipient that has Program Income or anticipates generating Post-Closeout Program Income at the end of the Subrecipient's Period of Performance.

## 1. Allowable Activities

The Recipient shall use Post-Closeout Program Income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

After the Closeout Agreement becomes effective, the Recipient shall disclose annual reports publicly, as described in the Performance Reporting Programmatic Term and Condition, rather than meeting the reporting requirements described in the Performance Reporting Programmatic Term and Condition.

## 3. LIDAC Expenditure Requirements

The Recipient shall expend 40% of Post-Closeout Program Income for the purposes of providing Financial Assistance in Low-Income and Disadvantaged Communities and comply with this requirement in accordance with the LIDAC Expenditure Requirement Programmatic Term and Condition, as applicable. Funds used for the purposes of providing Financial Assistance may include Financial Assistance to Qualified Projects; Predevelopment Activities; Market-Building Activities; and Program Administration Activities. This requirement applies to the entire award provided to the Recipient but does not "flow down" to each Subrecipient.

## 4. Cash Management Requirements

Case 1:25-cv-00762    Document 1-3    Filed 03/14/25    Page 44 of 61
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 620 of 694

5G - 84096001 - 1    Page 43

The Recipient must maintain Post-Closeout Program Income in accordance with the Cash Management Requirements in the Financial Risk Management Requirements Programmatic Term and Condition, as applicable. However, the Recipient may submit a Cash Management Policy for review and approval by the EPA Project Officer, which can authorize the Recipient to deviate from the aforementioned Cash Management Requirements.

<u>5. Financial Health Metrics</u>

After the Closeout Agreement becomes effective, the Recipient agrees to report financial health metrics in accordance with the Financial Health Metrics in the Financial Risk Management Requirements Programmatic Term and Condition (on behalf of the Recipient as well as any Financial Assistance Subrecipient that has received in excess of $10,000,000 in NCIF subgrants) publicly, rather than disclosing the metrics to EPA, as applicable. The requirement for submission of financial health metrics is not applicable for any fiscal year in which the reporting entity did not meet the requirements of 2 CFR Subpart F—Audit Requirements. The Recipient agrees to add the following two financial health metrics as part of the financial health metrics for the Closeout Period:

1. Self-Sufficiency Ratio: The self-sufficiency ratio is defined as earned revenue divided by operating expenses, where earned revenue is equal to the value of all income earned from normal business transactions and operating expenses is equal to the value of all expenses incurred as a part of normal business operations over the prior 12-month period, not including interest, financing, depreciation, amortization, and loan loss provision expense.

2. Operating Cash Ratio: The operating cash ratio is defined as cash and cash equivalents divided by operating expenses, where cash and cash equivalents is equal to the total value of all cash and cash equivalent items that can be converted into cash immediately and operating expenses is equal to the value of all expenses incurred as a part of normal business operations over the prior 12-month period, not including interest, financing, depreciation, amortization, and loan loss provision expense.

<u>6. Conflicts of Interest</u>

The Recipient agrees to comply with the conflict of interest requirements described in the Conflicts of Interest Programmatic Term and Condition through September 30, 2031.

<u>7. Remedies for Non-Compliance</u>

The Recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable. During the Closeout Period, the workplan and budget submitted for the Period of Performance are no longer applicable.

<u>8. Suspension and Debarment</u>

The Recipient agrees to ensure that Post-Closeout Program Income is not transferred to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The Recipient can maintain compliance with this requirement through either (1) checking the System for Award Management (for Subrecipients, Contractors, or Program Beneficiaries) or (2) obtaining eligibility certifications from counterparties (for Program Beneficiaries). The Recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity is

Case 1:25-cv-00762    Document 1-3    Filed 03/14/25    Page 45 of 61
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 621 of 694

5G - 84096001 - 1    Page 44

presently excluded or disqualified.

## 9. Non-Discrimination

The Recipient must use Post-Closeout Program Income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

**Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975.** The Recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency" in 40 CFR Part 5 and 40 CFR Part 7, the Recipient agrees, and will require all Subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

**Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities.** As provided in section 301 of the Executive Order, the Recipient will ensure that Subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to Real Property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 10. Record-Keeping

In accordance with 2 CFR 200.334(e), the Recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of Post-Closeout Program Income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. Note that this requirement applies if and when the Closeout Agreement is terminated, in accordance *with Item 14. Termination of the Closeout Agreement*. EPA may obtain access to these records to verify that Post-Closeout Program Income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the Recipient must maintain adequate accounting records for how Post-Closeout Program Income is managed and spent as well as all other appropriate records and documents related to the activities conducted using Program Income.

The Recipient agrees to ensure that Subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. The Recipient may use the terms of its Subaward Agreements or other effective means to meet its responsibilities.

## 11. Other Federal Requirements

The following other federal requirements apply to the use of Post-Closeout Program Income under the Closeout Period to the same extent they do under the terms of the Performance Period:

Case 1:25-cv-00762     Document 1-3     Filed 03/14/25     Page 46 of 61
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 622 of 694

5G - 84096001 - 1 · Page 45

- Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Development Requirements Programmatic Term and Condition;
- Build America, Buy America Act, as specified in the Build America, Buy America Act Programmatic Term and Condition; and
- National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition.

No other federal requirements apply to the use of Post-Closeout Program Income under the terms of this Closeout Agreement, other than those specified in this Closeout Agreement.

## 12. Audit Requirements

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Closeout Period, as activities related to the Federal award referenced in 2 CFR 200.502(a) include activities during the Closeout Period.

Through September 30, 2031, the Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## 13. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Closeout Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## 14. Termination of the Closeout Agreement

The Closeout Agreement terminates when either of the following situations occur: (1) the Recipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Recipient and the EPA Award Official or Grants Management Officer mutually agree to terminate the Closeout Agreement, with the Recipient remitting current and future Post-Closeout Program Income to the federal government.

The ability to terminate the Closeout Agreement flows down to Subrecipients, as a Closeout Agreement between the Recipient and Subrecipient terminates when either (1) the Subrecipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Subrecipient and the Recipient mutually agree to terminate the Closeout Agreement, with the Subrecipient remitting current and future Post-Closeout Program Income to the Recipient.

The de minimis amount must be agreed-upon in writing by the Recipient and the Director of the Office of the Greenhouse Gas Reduction Fund (or equivalent), prior to the Recipient using the "de minimis" criteria to terminate the Closeout Agreement.

## 15. Points of Contact

Case 1:25-cv-00762    Document 1-3    Filed 03/14/25    Page 47 of 61
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 623 of 694

5G - 84096001 - 1    Page 46

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and the Authorized Representative on the EPA Key Contacts Form most recently submitted to the EPA Project Officer (for the Recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

## W. Legal Counsel

The Recipient agrees to appoint appropriate legal counsel if counsel is not already available.

## X. Accounting Principles

The Recipient must account for all award funds in accordance with Generally Accepted Accounting Principles (GAAP) as in effect in the United States.

The Recipient must segregate and account for the award funds separately from all other program and business accounts. Additionally, the Recipient must segregate and account for Program Income separately from all other program and business accounts.

## Y. Internal Controls

The Recipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## Z. Audits

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Period of Performance, as described in the Audit Requirements General Term and Condition. Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(i), the Recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit Subrecipient that expends $1,000,000 or more of EPA funds from the Recipient's grant program in the Subrecipient's fiscal year. Any for-profit Subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier.

The Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## AA. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that specific conditions are necessary to ensure that the National Clean Investment Fund program is effectively carried out by Eligible Recipients that have not previously managed grants with the

Case 1:25-cv-00762     Document 1-3     Filed 03/14/25     Page 48 of 61
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 624 of 694

5G - 84096001 - 1     Page 47

same scale and complexity of this agreement. These specific conditions will remain in effect throughout the Period of Performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer or Division Director of the National Clean Investment fund, will oversee and monitor the grant agreement through activities, if determined necessary, including:

1. Upon request, requiring the Recipient to participate in an annual workshop (i.e., one workshop per calendar year) with other Recipients under the National Clean Investment Fund and/or Clean Communities Investment Accelerator; the EPA Project Officer will contact the Recipient to finalize details for each annual workshop.

2. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the workplan, provided the Recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other Recipients under the Greenhouse Gas Reduction Fund and with other EPA programs; and coordination by EPA staff with other federal programs to avoid duplication of effort;

3. Closely monitoring the Recipient's management and oversight of Subrecipients and procedures for ensuring that Program Beneficiaries adhere to program participation guidelines;

4. Closely monitoring the Recipient's performance to verify compliance with the workplan in effect under this Assistance Agreement and achievement of environmental results;

5. Participating in periodic telephone conference calls with Recipient personnel to discuss project successes and challenges as well as similar items impacting program performance;

6. Reviewing and commenting on performance reports prepared under the Award Agreement. Note that the final decision on the content of performance reports rests with the Recipient;

7. Verifying that the Recipient is expending the award on allowable activities, including but not limited to reviewing a sample of Financial Assistance transactions to verify compliance with regulatory requirements and the terms and conditions of the Award Agreement; and

8. Periodically reviewing costs incurred by the Recipient as well as its contractors and Subrecipients if needed to ensure appropriate expenditure of grant funds. Note that Recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds.

Subject to approval by the EPA Award Official, the EPA Project Officer and the Recipient may mutually agree to additional areas of oversight and monitoring.

*Method for Reconsideration.* If the Recipient believes that one or more of these specific conditions are not warranted or requires modification, the Recipient must file a written objection naming the specific condition(s) within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist, and Project Officer identified in the Notice of Award.

Case 1:25-cv-00762     Document 1-3     Filed 03/14/25     Page 49 of 61
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 625 of 694

5G - 84096001 - 1     Page 48

## AB. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the Recipient's GGRF award. These materials may include links to Recipient and/or Subrecipients' websites. The Recipient agrees to work with the EPA Project Officer or another member of GGRF program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## AC. Conflicts of Interest

The Recipient must comply with requirements on transfers of funds that create actual and potential conflicts of interest, as specified in this term and condition. Transfers of funds include Subawards, Contracts (including but not limited to Acquisitions of Intangible Property), and Participant Support Costs. The definitions in the EPA's Financial Assistance Conflict of Interest Policy (COI Policy) apply to this term and condition.

There are three categories of transfers of funds, with the requirements differing by each category (as specified in this term and condition):

**1. Transfers with Affiliated Entities:** Subawards, Contracts, and Participant Support Costs to Affiliated Entities or co-invested in projects with Affiliated Entities. An Affiliated Entity is any entity that is related to the Recipient in accordance with the indicia of control described in 2 CFR 180.905.

**2. Financial Assistance to Qualified Projects:** Subawards, Contracts (in the form of Acquisitions of Intangible Property), and Participant Support Costs as forms of Financial Assistance to Qualified Projects, unless such transfers are with Affiliated Entities. These transfers are not within the scope of the COI Policy, which states that "subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by recipients of revolving loan fund capitalization grants or other EPA financial assistance agreements where Agency funds may be used for lending activities."

**3. Subgrants and Contracts:** Subgrants and Contracts (other than Acquisitions of Intangible Property), unless such transfers are with Affiliated Entities.

Note that all Contracts (including Acquisitions of Intangible Property) must also comply with the conflict of interest standards in 2 CFR 200.318(c).

## 1. Transfers with Affiliated Entities

### Prior Approval of COI Mitigation Plan

The Recipient must not transfer funds with Affiliated Entities unless those transfers have been included in an EPA-approved COI Mitigation Plan on Transfers of Funds with Affiliated Entities. The Recipient agrees to seek prior EPA approval for changes to the COI Mitigation Plan on Transfers of Funds with Affiliated Entities.

### Quarterly Disclosure Requirement

The Recipient agrees to disclose, on a quarterly basis, a list of newly originated transfers of funds with Affiliated Entities that are within the scope of its EPA-approved COI Mitigation Plan on Transfers of

Case 1:25-cv-00762     Document 1-3     Filed 03/14/25     Page 50 of 61
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 626 of 694

5G - 84096001 - 1    Page 49

Funds with Affiliated Entities. Each quarterly disclosure must include (1) a list of such transfers of funds made over the quarter and (2) steps taken to taken to eliminate, neutralize or mitigate any conflicts of interest, in accordance with the EPA-approved COI Mitigation Plan on Transfers of Funds with Affiliated Entities. The Recipient must disclose its own transfers as well as transfers made by Subrecipients.

The quarterly periods for such disclosures are defined as follows: April 1 to June 30; July 1 to September 30; October 1 to December 31; and January 1 to March 31. The Recipient must make the disclosures to the EPA Project Officer within 30 calendar days of the end of the quarterly period.

### Project Officer Review

In accordance with 2 CFR 200.337, the EPA Project Officer may access records relating to a subset of transactions disclosed to review for compliance with the Recipient's EPA-approved COI Mitigation Plan on Transfers of Funds with Affiliated Entities as well as this term and condition. The EPA Project Officer will not approve transfers of funds in advance but rather will review transfers of funds that have already occurred for compliance.

### Waivers and Modifications

EPA agrees that, for transfers of funds with Affiliated Entities, the requirements of this term and condition apply in lieu of the requirements of the Disclosing Conflict of Interest General Term and Condition.

On a case-by-cases basis, the EPA Project Officer may extend the due date for disclosures on transfers of funds with Affiliated Entities. On a case-by-case basis, the EPA Project Officer may waive or modify the disclosure requirements on transfers of funds with Affiliated Entities.

### 2. Financial Assistance to Qualified Projects

### Quarterly Disclosure Requirement

The Recipient agrees to disclose, on a quarterly basis, a list of transfers of funds as Financial Assistance to Qualified Projects with actual and potential conflicts of interest. Each quarterly disclosure must include (1) a list of such transfers of funds made over the quarter and (2) steps taken to taken to eliminate, neutralize or mitigate any conflicts of interest, in accordance with any EPA-approved documents related to eliminating, neutralizing, and mitigating conflicts of interest. The Recipient must disclose its own transfers as well as transfers made by Subrecipients.

The quarterly periods for such disclosures are defined as follows:  April 1 to June 30; July 1 to September 30; October 1 to December 31; and January 1 to March 31. The Recipient must make the disclosures to the EPA Project Officer within 30 calendar days of the end of the quarterly period.

### Project Officer Review

In accordance with 2 CFR 200.337, the EPA Project Officer may access records relating to a subset of transactions disclosed to review for compliance with the Recipient's EPA-approved documents related to eliminating, neutralizing, and mitigating conflicts of interest as well as this term and condition. The EPA Project Officer will not approve transfers of funds in advance but rather will review transfers of funds that have already occurred for compliance.

5G - 84096001 - 1     Page 50

## Waivers and Modifications

On a case-by-cases basis, the EPA Project Officer may extend the due date for disclosures on transfers of funds as Financial Assistance to Qualified Projects. On a case-by-case basis, the EPA Project Officer may waive or modify the disclosure requirements on transfers of funds as Financial Assistance to Qualified Projects.

## 3. Subgrants and Contracts

The Recipient agrees to comply with the Disclosing Conflict of Interest General Term and Condition for Subgrants and Contracts (excluding Acquisitions of Intangible Property), unless such transfers are with Affiliated Entities. If such transfers are with Affiliated Entities, then the Recipient is required to include them in the process specified in *1. Transfers with Affiliated Entities*.

## AD. Prior Approvals

EPA will only have authority to review and approve revisions to the Recipient's workplan in effect under this Assistance Agreement, budget, and other documents if authorized by 2 CFR 200.308 or 2 CFR 200.208. The Recipient must contact the EPA Project Officer when the EPA has prior approval authority specified below. Approval will not be unreasonably withheld. Denial of a request for prior approval will be provided in writing, with an explanation of the rationale.

## Workplan

For the purposes of this Award Agreement, EPA interprets 2 CFR 200.308(c)(1) to enable the Recipient to revise the activities specified in its workplan in effect under this Assistance Agreement without prior EPA approval, provided the activities still comply with the terms and conditions of the Award Agreement. The allowable and allocable grant costs are narrowly defined, pursuant to the terms and conditions of the Award Agreement; in accordance with 2 CFR 200.308(c)(1), any changes to the workplan in effect under this Assistance Agreement that comply with the statute as well as the terms and conditions would not be a "change in the scope or objective of the project or program." Therefore, so long as the Recipient is updating its workplan in effect under this Assistance Agreement with the revised activities in accordance with the terms and conditions of the Award Agreement, EPA will not require prior approval.

## Budget

For the purposes of this Award Agreement, EPA implements 2 CFR 200.308(i)(2) in accordance with Item 1 of the Transfer of Funds General Term and Condition to enable the Recipient to revise the EPA-approved budget included in its Award Agreement without prior EPA approval, provided the cumulative funding transfers among Object Class Categories (Personnel, Fringe Benefits, Travel, Equipment, Supplies, Contractual, Construction, Other, Indirect) do not exceed 10% of the total budget approved at time of award. Therefore, so long as the Recipient is updating its EPA-approved budget by transferring funds by less than or equal to these amounts, EPA will not require prior approval.

However, notwithstanding the requirements of 2 CFR 200.308(i)(2), if the Recipient seeks to transfer any amount of funds budgeted for Participant Support Costs to other budget categories, then it must seek prior approval pursuant to 2 CFR 200.308(f)(5).

## Transfers of Funds

Case 1:25-cv-00762    Document 1-3    Filed 03/14/25    Page 52 of 61
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 628 of 694

5G - 84096001 - 1    Page 51

2 CFR 200.308(f)(6) requires the Recipient to obtain prior agency approval for "Subaward activities not proposed in the application and approved in the Federal award." If the types of activities are described in the workplan in effect under this Assistance Agreement (including types of transfers to be conducted through Subawards, Participant Support Costs, Acquisitions of Intangible Property, and other Contracts as defined in 2 CFR 200.1), then EPA has provided the necessary prior agency approval for the purposes of 2 CFR 200.308(f)(6). Approval for the purposes of this regulation does not mean that such transfers of funds are compliant with the statutes, regulations, and terms and conditions.

## Changes in Key Personnel

2 CFR 200.308(f)(2) requires the Recipient to obtain prior agency approval for a "[c]hange in key personnel (including employees and contractors) that are identified by name or position in the Federal Award." If the Recipient is seeking to add or replace a "key person," as defined by members of the board of directors and Senior Management whose roles are specified in the most recently submitted Organizational Plan, then the Recipient must obtain prior EPA approval of the qualifications of the key person.

The Recipient must request prior agency approval for an addition or replacement of a "key person" via email through the EPA Project Officer, who will have 8 calendar days to communicate EPA's disapproval of their qualifications via email, along with an accompanying justification. If 8 calendar days have passed without notification of EPA disapproval of the key person's qualifications pursuant to 2 CFR 200.308(c)(2), the Recipient is authorized to change the "key person." Once the change is effective, the Recipient must submit an updated Organizational Plan to the EPA Project Officer.

## AE. Flow-Down Requirements

As described in 2 CFR 200.101(b)(1), the terms and conditions of Federal awards flow down to Subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(b), the Recipient agrees to ensure that Subrecipients are aware of the requirements that apply to the Subrecipient.

For the purposes of this Award Agreement, all terms and conditions must flow down to Subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to Subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## AF. Resolution of Disputes Termination Provision

The Recipient is precluded from drawing down more than 78.46% of the Total Approved Assistance Amount until this condition is removed, which will occur when: a) the EPA Award Official, at the direction of the Grants Competition Disputes Decision Official (GCDDO), provides written confirmation that all administrative disputes under the National Clean Investment Fund and the Clean Communities Investment Accelerator are resolved in accordance with the dispute resolution procedures in Appendix A of the EPA Order 5700: Policy for Competition of Assistance Agreements; or b) the administrative disputes are withdrawn, abandoned or dismissed; or c) December 31, 2024, whichever is sooner.

If EPA does need to alter the Selection Official's selection and partial funding decisions for this agreement based on a GCDDO determination the EPA Award Official will partially terminate this assistance agreement, de-obligate a portion of the funds that have been obligated and use the de-

5G - 84096001 - 1    Page 52

obligated funds to satisfy the terms of a GCDDO remedy benefiting another entity. The Recipient will then provide an updated workplan and budget information, as needed, to amend the agreement.

For the purposes of this term and condition, EPA's partial termination may apply not just to obligated funds that have not been drawn down from ASAP but also to Program Income that has been generated and retained by the Recipient under 2 CFR 1500.8(d) and the Program Income Programmatic Term and Condition of this agreement. In accordance with 2 CFR 200.307(e)(1), EPA may require that the amount of funds committed by EPA to the Recipient be reduced by all or some of the Program Income that has been generated by the Recipient.

## AG. Deposit Account at Financial Agent

A depository institution has been designated as a financial agent of the United States (the Financial Agent) for the Greenhouse Gas Reduction Fund. The Recipient is required to set up and utilize an Account or Accounts at the Financial Agent in accordance with the Financial Agent Terms and Conditions (Section V) included in this Assistance Agreement.

## AH. Interim SF-425 Requirement

The Recipient must submit an SF-425 within 30 calendar days of receiving access to an Account or Accounts at the Financial Agent, with the SF-425 covering all activities supported by funds drawn from ASAP and disbursed for actual and allowable costs, other than funds disbursed into the Account or Accounts at the Financial Agent.

## AI. Amendments to Award Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## AJ. Preservation of Guidance and Data

Any statutes, regulations, agency documents, policies, and guidance (including FAQs and EPA's Implementation Framework for the Greenhouse Gas Reduction Fund), or executive orders referenced herein are incorporated by reference into the Award Agreement as of the effective date of this amended Award Agreement. These incorporated documents will be controlling on Recipient and Subrecipients in the event such documents are deleted, repealed, rescinded, or replaced unless a statute provides otherwise. This includes, but is not limited to, the Uniform Administrative Requirements, Cost Principles and Audit Requirements for Federal Awards; Title 2 CFR Part 200 effective October 1, 2024, and the EPA General Terms and Conditions effective October 1, 2024.

This provision cannot be changed without the consent of the Recipient.

## IV. ADMINISTRATIVE TERMS AND CONDITIONS

Please refer to Page 4, "Administrative Conditions."

Case 1:25-cv-00762    Document 1-3    Filed 03/14/25    Page 54 of 61
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 630 of 694

5G - 84096001 - 1    Page 53

## V. FINANCIAL AGENT TERMS AND CONDITIONS

### A. Revisions to Award Agreement to Account for Financial Agent Arrangement

Because a depository institution has been designated as a financial agent of the United States (the Financial Agent) for the Greenhouse Gas Reduction Fund, the following revisions to the Award Agreement are effective without further action or notice required by the Recipient or EPA.

### 1. Revisions to Section I. Definitions

*The following new definition will be added to the Award Agreement:*

**Capitalization by Nonexchange Capital Contribution:** Capitalization by Nonexchange Capital Contribution means award funds that (1) the Recipient draws down from the Automated Standard Application Payments (ASAP) system and (2) disburses into the 'Budget Account' as defined under the Deposit Account at Financial Agent Programmatic Term and Condition to capitalize itself for subsequent use for any of the following Allowable Activities: Financial Assistance to Qualified Projects; Predevelopment Activities; Market-Building Activities; and Program Administration Activities.  Under this two-step transaction, which involves both a drawdown and disbursement, the Recipient's drawdown from ASAP is deemed (a) an advance payment of Federal funds in accordance with 2 CFR 200.305(b)(1); while the disbursement into the Deposit Account at Financial Agent is deemed (b) an allowable cost to be charged to the EPA award, and (c) a "nonexchange transaction", consistent with the definition of this term in the Statement of Federal Financial Accounting Standards No. 5. The full amount of the Capitalization by Nonexchange Capital Contribution must be recognized, reported, and accounted for as Program Income in accordance with the Program Income Programmatic Term and Condition once clauses (a) and (b) are fulfilled. Any Subrecipient with a Deposit Account at Financial Agent will be entitled to receive its payments from Recipient as a Capitalization by Nonexchange Capital Contribution.

*The definition of Program Income under the Award Agreement will be amended and replaced with:*

**Program Income:** 2 CFR 200.1 defines Program Income as "gross income earned by the non-Federal entity that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(f)." 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, there are two types of Program Income: (1) "Program Income from Operations" and (2) "Program Income from Capitalization by Nonexchange Capital Contribution".

Program Income from Operations includes but is not limited to income from origination fees, servicing fees, and asset management fees; dividends from equity investments; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). Under this award agreement, the Recipient is authorized to deduct the cost of generating Program Income from Operations under 2 CFR

Case 1:25-cv-00762    Document 1-3    Filed 03/14/25    Page 55 of 61
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 631 of 694

5G - 84096001 - 1    Page 54

200.307(b) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Program Income from Operations include origination, servicing, and management costs that are not charged as direct costs to the Federal award. Costs of generating Program Income from Operations can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the Program Income from Operations, provided the Recipient can account for the actual costs incurred. Program Income from Operations requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries. Program Income from Operations can be earned prior to the availability of the 'Program Income from Operations' account as defined under the Deposit Account at Financial Agent Programmatic Term and Condition.

Program Income from Capitalization by Nonexchange Capital Contribution means award funds from the ASAP system that the Recipient draws down and immediately deposits into the 'Budget Account' at the Financial Agent in accordance with (a) the definition of Capitalization by Nonexchange Capital Contribution and (b) the Deposit Account at Financial Agent Programmatic Term and Condition. Program Income from Capitalization by Nonexchange Capital Contribution cannot be earned prior to the availability of the 'Budget Account' as defined under the Deposit Account at Financial Agent Programmatic Term and Condition.

Both forms of Program Income under this program must be treated in accordance with the Program Income Programmatic Term and Condition. EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fund raising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

## 2. Revisions to Section II. National Programmatic Terms and Conditions

*The **Program Income Programmatic Term and Condition** will be amended and replaced with:*

Program Income

In accordance with Clean Air Act Section 134(b)(1)(C) as well as 2 CFR 200.307(e)(2) and 2 CFR 1500.8 (b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income from Operations once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income from Operations may be used by

Case 1:25-cv-00762   Document 1-3   Filed 03/14/25   Page 56 of 61
USCA Case #25-5122   Document #2114423   Filed: 05/05/2025   Page 632 of 694

5G - 84096001 - 1   Page 55

the Recipient in advance of the initial award funds (i.e. Program Income from Capitalization by Nonexchange Capital Contribution) being fully used where reasonable and necessary to execute the activities in the workplan in effect under this Assistance Agreement.

### 3. Revisions to Section III. Additional Programmatic Terms and Conditions

*The Allowable and Unallowable Activities Programmatic Term and Condition will be amended and replaced with:*

### Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Capitalization by Nonexchange Capital Contribution; Financial Assistance to Qualified Projects; Predevelopment Activities; Market-Building Activities; and Program Administration Activities. The Recipient must use awards funds exclusively for allowable activities within the ten EPA regions, with the exception of the Freely Associated States. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

Capitalization by Nonexchange Capital Contribution generates Program Income for the Recipient in an amount equal to the available EPA award balance drawn down from ASAP into the 'Budget Account' as defined under the Deposit Account at Financial Agent Programmatic Term and Condition. Program Income from Capitalization by Nonexchange Capital Contribution must be expended on Financial Assistance to Qualified Projects, Predevelopment Activities, Market-Building Activities, and Program Administration activities in accordance with the workplan in effect under this Assistance Agreement.

The Recipient agrees to not use the award for the following unallowable activities: (a) Financial Assistance to Qualified Projects in the form of Subgrants; (b) Subgrants for the purposes of providing Financial Assistance to Qualified Projects (other than Subgrants from the Recipient to first-tier Subrecipients); (c) activities that support deployment of projects that do not meet the definition of Qualified Projects; and (d) activities that support deployment of projects outside the boundaries of the ten EPA regions. The allowability of legal costs incurred in connection with the award shall be governed by applicable provisions of 2 CFR Part 200, Subpart E, including but not limited to 2 CFR 200.403, 2 CFR 200.435, 2 CFR 200.441 and 2 CFR 200.459.

*The Deposit Account at Financial Agent Programmatic Term and Condition will be amended and replaced with:*

### Deposit Account at Financial Agent

The Recipient will open a Deposit Account at a depository institution that has been designated as a financial agent of the United States (the Financial Agent). Such account will be used as Recipient's operating account for the award.  Upon establishment of the Deposit Account, the Recipient will drawdown the entire available EPA award balance from ASAP and disburse it into the Deposit Account, where it must be maintained until the Closeout Agreement goes into effect in accordance with the Closeout Agreement Programmatic Term and Condition. Note, this requirement applies to any and all drawdowns from ASAP by the Recipient while the Deposit Account is available and accessible. Once the Closeout Agreement goes into effect, the Recipient will be entitled to transfer any remaining funds in the Deposit Account to an account at a financial institution of its choosing, provided such account is insured in accordance with 2 CFR 200.305(b)(10)).

Case 1:25-cv-00762     Document 1-3     Filed 03/14/25     Page 57 of 61
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 633 of 694

5G - 84096001 - 1     Page 56

The Recipient will grant EPA a perfected security interest in all funds held in the Deposit Account. The Recipient will take all such actions, enter into all such agreements, and execute and deliver all such documentation as may be necessary and/or as directed by EPA from time to time to establish and maintain such security interest, including but not necessarily limited to entering into an account control agreement (ACA) with the Financial Agent and EPA.

Notwithstanding any other provision of this Assistance Agreement, EPA will only furnish the Financial Agent with a Notice of Exclusive Control under an ACA when EPA issues a written determination and finding that the Recipient has failed to comply with the terms and conditions of this Assistance Agreement, and that noncompliance is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse or material misrepresentation of eligibility status, and that EPA has initiated action under 2 CFR 200.339 to wholly or partly suspend or terminate the Federal award, as authorized in the terms of the Assistance Agreement. The written determination and finding and a copy of the Notice of Exclusive Control shall be sent to the Recipient when the Notice of Exclusive Control is furnished to the Financial Agent. EPA and Recipient have mutually agreed only to the specific process outlined in this term for furnishing a Notice of Exclusive Control instruction to the Financial Agent.

Note, funds in the Deposit Account that were legally obligated by the Recipient for financial obligations, as defined under 2 CFR 200.1, prior to the issuance of, but not in anticipation of, a Notice of Exclusive Control constitute "financial obligations which were properly incurred" by the Recipient in accordance with 2 CFR 200.343 and are to remain allowable costs during suspension or after termination of the Recipient's Assistance Agreement. Funds necessary to meet such financial obligations will be disbursed to Program Beneficiaries, Subrecipients, Contractors, or any other third parties which are due payment after a Notice of Exclusive Control is issued.

Note that a financial obligation to a third party for Financial Assistance is deemed "properly incurred" per 2 CFR 200.343 if it is a legally-binding, arms-length agreement where funds are transferred to the 'Reserve Account' in accordance with these terms and conditions. Any Notice of Exclusive Control shall not include any such funds. Funds necessary to meet such financial obligations for Financial Assistance will be disbursed to Program Beneficiaries, Subrecipients, Contractors, or any other third parties which are due payment after a Notice of Exclusive Control over other funds in the Deposit Account is issued.

Funds held in the Recipient's account at the Financial Agent may be invested in accordance with the Cash Management Requirements in the Financial Risk Management Programmatic Term and Condition. The Financial Agent will be compensated in accordance with the terms of a valid Financial Agency Agreement (FAA).

The Deposit Account will consist of three distinct account types ('Budget,' 'Reserve', and 'Program Income from Operations'), each of which serves a distinct purpose (while the exact naming convention and structure of these accounts may differ from the below, the accounts must perform a substantively similar function). The Recipient is required to utilize the accounts at the Financial Agent for their intended purpose during any period in which the accounts are available and accessible, with exceptions to this requirement permitted by the EPA Project Officer only on a case-by-case basis, to the extent such exceptions are necessary to execute against the workplan in effect under this Assistance Agreement.

## 1. Budget Account

This account within the Deposit Account will hold funds that have yet to be used for any of the following

Case 1:25-cv-00762    Document 1-3    Filed 03/14/25    Page 58 of 61
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 634 of 694

5G - 84096001 - 1    Page 57

allowable activities: Financial Assistance to Qualified Projects; Predevelopment Activities; Market-Building Activities; and Program Administration Activities. It will hold funds within a number of sub-accounts that correspond to more specific allowable expenditures under the particular type of award or subaward.

**Transferring Funds Into the Budget Account.** Upon establishment of the Deposit Account, the Recipient will drawdown the entire available EPA award balance from ASAP directly into the Budget Account. The Recipient will direct the Financial Agent to allocate funds across the various sub-accounts in the Budget Account in accordance with its workplan in effect under this Assistance Agreement. Recipient need not submit a certification notice to transfer funds within the Budget Account, but remains subject to the Transfer of Funds EPA General Term and Condition and any associated pre-approval or notification requirements therein.

**Transferring Funds Out of the Budget Account.** When transferring award funds out of the Budget Account to provide Financial Assistance to Qualified Projects, Recipient must provide the EPA Project Officer with a certification notice from the Recipient's chief executive officer (or equivalent), chief financial officer (or equivalent), chief reporting officer (or equivalent), or chief compliance officer (or equivalent) that the amount of the payment is necessary to execute against the workplan in effect under this Assistance Agreement and that financing agreements for identified Qualified Projects necessitating the payment have been reviewed by the Recipient's counsel for legal sufficiency, with notice provided to the Financial Agent with the transfer request. The certification notice must include the following language: "This certification is a material representation for the purposes of an EPA Financial Assistance Agreement, and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions." The Recipient must "flow-down" this requirement to Subrecipients, with each Subrecipient required to provide a substantively similar certification notice to Recipient when transferring subaward funds out of the Budget Account to provide Financial Assistance to Qualified Projects, with notice provided to the Financial Agent with the transfer request. In accordance with 2 CFR 200.337, the Recipient must make those certifications available to the EPA, upon request.

While transfers out of the Budget Account are not formally subject to any of the requirements established in either the EPA General Term and Condition on Automated Standard Application Payments (ASAP) and Proper Payment Draw Down or the Interim Drawdown Procedures Programmatic Term and Condition, Recipient agrees to the following requirements:

a) When the need for a longer disbursement window is known in advance of the transfer, Recipient must notify the EPA Project Officer prior to executing the transfer and follow-up to inform the EPA Project Officer of the amount of the transfer that has been disbursed for an Allowable Activity in 5, 10, and 14 business days. Recipient must return any undisbursed amounts to the Deposit Account at the Financial Agent on the 15th business day, or

b) When the need for a longer disbursement window is not known in advance of the transfer, Recipient must notify the EPA Project Officer of the delay no later than 5 business days after the transfer and follow-up to inform the EPA Project Officer of the amount of the transfer that has been disbursed for an Allowable Activity in 10 and 14 business days. Recipient must return any undisbursed amounts to the Deposit Account at the Financial Agent on the 15th business day.

Recipients must obtain prior written approval from the EPA Project Officer (who will in turn notify the EPA Award Official) for any transfers that will not be disbursed for an Allowable Activity within 15 business

days.

These requirements "flow down" to Subrecipients, who agree to provide the same notifications to and seek prior approval from Recipients where applicable.

## 2. Reserve Account

This account within the Deposit Account is intended to enable funds to be set-aside within the Financial Agent for use for any form of Financial Assistance that requires the Recipient to pledge or legally commit award funds for a future expenditure to a third party to meet a legal obligation.

**Transferring Funds Into the Reserve Account.** The Recipient may only transfer award funds into the Reserve Account for grant performance purposes if the Recipient's chief executive officer (or equivalent), chief financial officer (or equivalent), chief reporting officer (or equivalent), or chief compliance officer (or equivalent) certify to the EPA Project Officer, with notice provided to the Financial Agent with the transfer request, that the amount of the expenditure is necessary to execute against the workplan in effect under this Assistance Agreement, and that financing agreements for identified qualified projects necessitating the expenditure have been reviewed by Recipient's counsel for legal sufficiency. The certification notice must include the following language: "This certification is a material representation for the purposes of an EPA financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions." The Recipient must "flow-down" this requirement to Subrecipients, with each Subrecipient required to provide a substantively similar certification notice to Recipient when transferring subaward funds into the Reserve Account, with notice provided to the Financial Agent with the transfer request. In accordance with 2 CFR 200.337, the Recipient must make those certifications available to the EPA, upon request.

**Transferring Funds Out of the Reserve Account.**

## a. To Third Parties to Meet Legal Obligations

Funds in the Reserve Account may not be disbursed to Program Beneficiaries, Subrecipients, Contractors, or any other third parties, unless the funds are necessary for the Recipient to satisfy a legal obligation. The Recipient may only transfer award funds out of the Reserve Account to meet legal obligations to such parties if the recipient's chief executive officer (or equivalent), chief financial officer (or equivalent), chief reporting officer (or equivalent), or chief compliance officer (or equivalent) certify to the EPA Project Officer, with notice provided to the Financial Agent with the transfer request, that the amount of the expenditure is necessary to pay a third party pursuant to a financing agreement that has been reviewed by recipient's counsel for legal sufficiency. The certification notice must include the following language: "This certification is a material representation for the purposes of an EPA financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions." The Recipient must "flow-down" this requirement to Subrecipients, with each Subrecipient required to provide a substantively similar certification notice to Recipient when transferring subaward funds out of the Reserve Account to meet legal obligations to third parties, with notice provided to the Financial Agent with the transfer request. In accordance with 2 CFR 200.337, the Recipient must make those certifications available to the EPA, upon request.

While transfers out of the Reserve Account are not formally subject to any of the requirements established in either the EPA General Term and Condition on Automated Standard Application Payments

Case 1:25-cv-00762     Document 1-3     Filed 03/14/25     Page 60 of 61
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 636 of 694

5G - 84096001 - 1     Page 59

(ASAP) and Proper Payment Draw Down or the Interim Drawdown Procedures Programmatic Term and Condition, Recipient agrees to the following requirements:

a) When the need for a longer disbursement window is known in advance of the transfer, Recipient must notify the EPA Project Officer prior to executing the transfer and follow-up to inform the EPA Project Officer of the amount of the transfer that has been disbursed for an Allowable Activity in 5, 10, and 14 business days. Recipient must return any undisbursed amounts to the Deposit Account at the Financial Agent on the 15th business day, or

b) When the need for a longer disbursement window is not known in advance of the transfer, Recipient must notify the EPA Project Officer of the delay no later than 5 business days after the transfer and follow-up to inform the EPA Project Officer of the amount of the transfer that has been disbursed for an Allowable Activity in 10 and 14 business days. Recipient must return any undisbursed amounts to the Deposit Account at the Financial Agent on the 15th business day.

Recipients must obtain prior written approval from the EPA Project Officer (who will in turn notify the EPA Award Official) for any transfers that will not be disbursed for an Allowable Activity within 15 business days.

These requirements "flow down" to Subrecipients, who agree to provide the same notifications to and seek prior approval from Recipients where applicable.

## b. To Program Income from Operations Account

When funds in the Reserve Account are no longer necessary to meet prudent capital management practices consistent with the Recipient's overall risk portfolio and a potential legal obligation to a third party pursuant to a financing agreement, the Recipient may transfer such funds to the Program Income from Operations Account. Recipient need not submit a certification notice to effectuate such a transfer.

## 3. Program Income from Operations Account

This account within the Deposit Account will enable Program Income from Operations (as defined under the definition of Program Income) to be held, tracked, and segregated in accordance with the Accounting Principles Programmatic Term and Condition.

**Transferring Funds Into the Program Income from Operations Account.** When Recipient earns Program Income from Operations, it must deposit such funds into the Program Income from Operations Account. Recipient need not submit a certification notice to effectuate such a transfer. When Financial Agent generates interest income on behalf of Recipient by investing Recipient liquidity in accordance with the Cash Management Requirements under the Financial Risk Management Requirements Programmatic Term and Condition, it must deposit such income into the Program Income from Operations Account in accordance with the terms of the FAA. Such interest income is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12).

**Transferring Funds Out of the Program Income from Operations Account.** Funds in this account may be transferred to either the Budget Account or Reserve Account to be used for grant performance purposes in accordance with the Program Income Programmatic Term and Condition. Recipient need not submit a certification notice to effectuate such a transfer.

5G - 84096001 - 1    Page 60

**Flow-Down Requirements of Deposit Account at Financial Agent**. EPA may elect to extend the requirements under this term and condition to any and all Financial Assistance Subrecipients of the Recipient at EPA's sole discretion, including but not limited to Recipient establishing and maintaining a security interest on all award funds held by its Financial Assistance Subrecipients at the Financial Agent.

# EXHIBIT D

JA1142



**ACCOUNT CONTROL AGREEMENT**

**among**

Power Forward Communities, Inc.**, as PLEDGOR**

United States Environmental Protection Agency**, as SECURED PARTY**

**and**

**CITIBANK, N.A., as BANK**

**Dated as of November 1, 2024**

**THIS ACCOUNT CONTROL AGREEMENT** (**Agreement**                    d
November 1, 2024, by and among Power Forward Communities, Inc, a Delaware Nonstock
Nonprofit  d  d  d      (**Pledgor**      the United States Environmental Protection Agency, an
agency of the United States Government      (**Secured Party**                    d
banking association organized and existing under the laws of the United States of America
  (                    through its Agency & Trust business solely in its capacity as bank under
this Agreement, and any successors appointed pursuant to the terms hereof (Citibank in such
      (**Bank**

**WHEREAS,** the Pledgor and the Secured Party have entered into that certain federal
financial assistance agreement, as identified in Addendum 1      (**Grant Agreement**      pursuant
to which the Pledgor has granted the Secured Party a security interest in the accounts as identified
in Addendum 1 established and maintained by t        d        d      (**Accounts"**).

**WHEREAS,** the Bank has been designated and authorized to act as a financial agent of
the United States pursuant to the authority of the U.S. Department of the Treasury under 12 U.S.C.
§§ 90 and 265.

**WHEREAS,** the parties wish that the Bank enter into this Agreement in order to provide
d    r  d    d              d    -104(a) of the Uniform Commercial Code in effect in the
      d    Rd    (**UCC**        d      d      d    , or Section 8-106 of the UCC, in the
case of a security account) of the accounts as a means to perfect the security interest of the Secured
Party.

**WHEREAS,** the Pledgor and the Secured Party have agreed that the terms and conditions
    (Deposit Account at Financial Agent      the Grant Agreement indicate the conditions under
which the Secured Party may exercise its right of control herein, and such conditions will be defined
as (    d      d      d    Agreement.

**WHEREAS**, capitalized terms used herein without definition and that are defined in Article
8 or Article 9 of the UCC as adopted in the State of New York shall have the respective meanings set
forth therein.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and adequacy of
which is hereby irrevocably acknowledged, the parties hereto agree as follows:

1.    **The Accounts.**  The Pledgor and the Bank represent and warrant to, and agree
with the Secured Party that:

(a)    The Bank maintains the Accounts for the Pledgor, and all property (including,
without limitation, all funds and financial assets) held by the Bank for the accounts of the Pledgor
are, and will continue to be, credited to the Accounts in accordance with instructions given by the
Pledgor (unless otherwise provided herein).

(b)    To the extent that cash is credited to the Accounts, the Accounts are a deposit
account; and to the extent that financial assets (other than cash) are credited to the Accounts, the
Accounts are a securities account.  The Bank is (i) the bank with which the Accounts are maintained
and (ii) the securities intermediary with respect to financial assets held in the Accounts.  The
        d            d            d    d    s and (B) the entitlement holder
with respect to all financial assets credited from time to time to the Accounts.

JA1144



Case 1:25-cv-00762   Document 1-4   Filed 03/14/25   Page 4 of 33
USCA Case #25-5122   Document #2114423   Filed: 05/05/2025   Page 641 of 694

(c) respect to the Accounts for purposes of the UCC is, and will continue to be for so long as the

(d)     The Pledgor and the Bank do not know of any claim to or interest in the Accounts or any property (including, without limitation, funds and financial assets) credited to the Accounts, except for claims and interests of the parties referred to in this Agreement.

**2.     Control over Accounts.**

The Bank shall comply with all instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and financial assets in the Accounts including, without limitation, directions to distribute proceeds of any such transfer or redemption of interest or dividends on financial assets in the Accounts, substantially in the form attached hereto as Exhibit B (**Account Direction**     the Pledgor, until the time that that Bank receives a notice, substantially in the form attached hereto as Exhibit A (**Notice of Exclusive Control**    from the Secured Party that the Secured Party is exercising its right to exclusive control over an Account, and after such time that the Bank receives a Notice of Exclusive Control, the Secured Party for such Account, without further consent by the Pledgor.

**3.     Priority of Secured Party's Security Interest.**  The Bank subordinates in favor of the Secured Party any interest, lien or right of setoff it may have, now or in the future, against the Accounts or assets in the Accounts; *provided; however*, that, subject to the foregoing, the Bank may set off all amounts due to it in respect of its fees and expenses (including, without limitation, the payment of any legal fees or expenses) or any amounts payable pursuant to Section 4 hereof.

**4.     Investment of Funds.**

(a)     The Bank shall deposit the assets in non-interest bearing Accounts and invest the assets in the Accounts consistent with the instructions provided by the Pledgor, in Addendum 1. The     be in accordance with the Grant Agreement, provided that the Bank is not responsible for verifying whether the     the Grant Agreement. The Bank shall invest such assets in the Accounts on the date of deposit provided that such assets are received on or before 11:00 a.m. New York City time. Any assets received after 11:00 a.m. New York City time shall be treated as if received on the following Business Day. For     (**Business Day**   shall mean any day that the Bank is open for business.

(b)     The Bank is hereby authorized and directed to sell or redeem any such investments as it deems necessary to make any payments or distributions required under this Agreement. The Bank shall have no responsibility or liability for any loss in the value of any investment made pursuant to this Agreement, or for any loss, cost or penalty resulting from any sale or liquidation of the assets in the Account.  The Bank is hereby authorized to execute purchases and sales of investments through the facilities of its own trading or capital markets operations or those of any affiliated entity.  The Bank does not have a duty nor will it undertake any duty to provide investment advice.

(c)     The Bank shall transfer any earnings or proceeds received on or distributions of earnings or proceeds from the assets in the Accounts to the Program Income from Operations Account on a monthly basis.



JA1145

5.    **Tax Matters.**

(a)    The Pledgor and the Secured Party agree that, unless and until the Grant Agreement is terminated, any earnings or proceeds received on or distributions of earnings or proceeds from the assets in the Accounts shall be treated as the income of the Pledgor and shall be



regulations thereunder. Principal payments are not reportable to any payee hereunder. No earnings or proceeds received on or distributions of earnings or proceeds from the assets in the Accounts, or principal payments from the Accounts, are reportable to the Secured Party. The Pledgor, the Secured Party and the Bank agree that the Bank will not be responsible for providing tax reporting and withholding for payments that are for compensation for services performed by an employee or independent contractor.

(b)    The Pledgor and the Secured Party shall upon the execution of this Agreement provide the Bank with a duly completed and properly executed IRS Form W-9 or applicable IRS Form W-8, in the case of a non-U.S. person, for each payee, together with any other documentation under the Code and the regulations thereunder.  With respect to under the Code, the Foreign Account Tax Compliance Act and the Foreign Investment in Real Property Tax Act and any other applicable law or regulation, the Pledgor and the Secured Party understand, that, in the event valid U.S. tax forms or other required supporting documentation are not provided to the Bank, the Bank may be required to withhold tax from the assets in the Accounts and report account information on any earnings, proceeds or distributions from the assets in the Accounts.

(c)    Should the Bank become liable for the payment of taxes, including withholding taxes relating to any funds, including interest and penalties thereon, held by it pursuant to this Agreement or any payment made hereunder, the Pledgor agrees to indemnify and hold the Bank harmless pursuant to Section 7(b) hereof from any liability or obligation on account of taxes, assessments, interest, penalties, expenses and other governmental charges that may be assessed or asserted against the Bank, provided that such liability shall not be satisfied by assets in the Accounts. If the Pledgor fails to indemnify the Bank for such taxes, the Bank will notify the Secured Party.

(d)    M                                    d 5 shall survive the termination of this Agreement or the resignation or removal of the Bank.

6.    **Concerning the Bank.**

(a)    Bank Duties. Each of the Pledgor and the Secured Party acknowledges and agrees that (i) the duties, responsibilities and obligations of the Bank shall be limited to those expressly set forth in this Agreement, each of which is administrative or ministerial (and shall not be construed to be fiduciary in nature), and no duties, responsibilities or obligations shall be inferred or implied, (ii) the Bank shall not be responsible for any of the agreements referred to or described herein (including, without limitation, the Grant Agreement and any defined term therein not otherwise defined in this Agreement), or for determining or compelling compliance therewith, and shall not otherwise be bound thereby, and (iii) the Bank shall not be required to expend or risk any of its own funds to satisfy payments from the Accounts hereunder.

citi

JA1146

(b)     <u>Liability of Bank</u>.  The Bank shall not be liable for any damage, loss or injury resulting from any action taken or omitted in the absence of gross negligence or willful misconduct (as finally adjudicated by a court of competent jurisdiction).  In no event shall the Bank be liable for indirect, incidental, consequential, punitive or special losses or damages (including but not limited to lost profits), regardless of the form of action and whether or not any such losses or damages were foreseeable or contemplated.  The Bank shall be entitled to rely upon any instruction, notice, request or other instrument delivered to it without being required to determine the authenticity or validity thereof, or the truth or accuracy of any information stated therein.  The Bank may act in reliance upon any signature believed by it to be genuine (including any signature affixed by DocuSign) and may assume that any person purporting to make any statement, execute any document, or send any instruction in connection with the provisions hereof has been duly authorized to do so.  The Bank may consult with counsel satisfactory to it, and the opinion or advice of such counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it in good faith and in accordance with the opinion and advice of such counsel.  The Bank may perform any and all of its duties through its agents, representatives, attorneys, custodians and/or nominees.  The Bank shall not incur any liability for not performing any act or fulfilling any obligation hereunder by reason of any occurrence beyond its control (including, without limitation, any provision of any present or future law or regulation or any act of any governmental authority, any act of God or war or terrorism, or the unavailability of the Federal Reserve Bank wire services or any electronic communication facility).

(c)     <u>Reliance on Orders</u>.  The Bank is authorized to comply with final orders issued or process entered by any court with respect to the assets in the Accounts, without determination by the Bank of such court's jurisdiction in the matter.  If any portion of the assets in the Accounts are at any time attached, garnished or levied upon under any court order, or in case the payment, assignment, transfer, conveyance or delivery of any such property shall be stayed or enjoined by any court order, or in case any order, judgment or decree shall be made or entered by any court affecting such property or any part thereof, then and in any such event, the Bank is authorized to rely upon and comply with any such order, writ, judgment or decree which it is advised is binding upon it without the need for appeal or other action; and if the Bank complies with any such order, writ, judgment or decree, it shall not be liable to the Pledgor or the Secured Party or to any other person or entity by reason of such compliance even though such order, writ, judgment or decree may be subsequently reversed, modified, annulled, set aside or vacated.

(d)     <u>Erroneous Payments</u>.  If the Bank releases any funds (including but not limited to the assets in the Accounts or any portion of it) to the Pledgor or the Secured Party and subsequently determines (in its absolute discretion) that the payment (or any portion of it) was made in error, the Pledgor or the Secured Party, as applicable, shall upon notice promptly refund the erroneous payment, and none of the obligations of the Pledgor or the Secured Party, as applicable, or the remedies of the Bank will be affected by any act, omission, matter or thing (including, without limitation, any obligation pursuant to which an erroneous payment is made) which, but for this provision, would reduce, release, preclude or prejudice any such obligation or remedy (whether or not known by the Bank, the Pledgor or the Secured Party). Each of the Pledgor and the Secured Party agrees not to assert discharge for value, bona fide payee, or any similar doctrine as a defense to recovery of any erroneous payment by the Bank.

**7.     <u>Compensation, Expense Reimbursement and Indemnification</u>.**

(a)     <u>Compensation</u>. The              compensation shall be as specified in <u>Schedule A</u>.



JA1147

(b)      Indemnification. The Pledgor covenants and agrees to indemnify the Bank and its **Indemnified Party** each Indemnified Party harmless from, and defend each Indemnified Party against, any and all claims, losses, actions, liabilities, costs, damages and expenses of any nature incurred by any Indemnified Party, arising out of or in connection with this Agreement or with the administration of its duties hereunder, including, but not limited to, costs and expenses, except to the extent such loss, liability, damage, cost or expense shall have been finally adjudicated by a court of competent jurisdiction to have resulted solely from the Indemnified Party's own gross negligence or willful misconduct, provided that such liability shall not be satisfied by assets in the Accounts. The foregoing indemnification and agreement to hold harmless shall survive the termination of this Agreement and the resignation or removal of the Bank. If the Pledgor fails to indemnify the Bank pursuant to this Section 7(b), the Bank shall notify the Secured Party.

**8.      Statements, Confirmations and Notices of Adverse Claims.**  The Bank will send copies of all statements and confirmations for the Accounts simultaneously to the Pledgor and the Secured Party.  The Bank shall be deemed to have delivered statements and confirmations if such statements and confirmations are available on one or more of the Bank systems to deliver electronic media.  The Bank will use reasonable efforts promptly to notify the Secured Party and the Pledgor if any other person claims that it has a property interest in the Accounts or any financial asset in the Accounts.

**9.      Entire Agreement; Exclusive Benefit.**  This Agreement constitutes the entire agreement between the parties and sets forth in its entirety the obligations and duties of the Bank with respect to the assets in the Accounts.  This Agreement is for the exclusive benefit of the parties to this Agreement and their respective permitted successors, and shall not be deemed to give, either expressly or implicitly, any legal or equitable right, remedy, or claim to any other entity or person whatsoever.  No party may assign any of its rights or obligations under this Agreement without the prior written consent of the other parties.

**10.      Resignation and Removal.** The Bank may be removed only by the U.S. Department of the Treasury.

**11.      Governing Law.** This Agreement is governed by and shall be construed and interpreted in accordance with federal law of the United States, except where there is no applicable federal law, in accordance with the laws of the State of New York, without giving effect to the conflict of laws principles thereof.

**12.      Representations and Warranties.**

(a)      Each of the Pledgor and the Secured Party represents and warrants that it has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder; and this Agreement has been duly approved by all necessary action and constitutes its valid and binding agreement enforceable in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or other similar laws affecting the enforcement.

(b)      Each of the Pledgor and the Secured Party represents that neither it nor any of its parents or subsidiaries, or any of their respective directors, officers, or employees, or to the knowledge of the Pledgor and the Secured Party, the affiliates of the Pledgor, the Secured Party or any of its subsidiaries, will, directly or indirectly, use any part of any proceeds or lend, contribute,



JA1148

or otherwise make available such assets in the Accounts in any manner that would result in a violation by any person of economic, trade, or financial sanctions, requirements, or embargoes imposed, administered, or enforced from time to time by the United States (including, without limitation, the Office of Foreign Assets Control of the U.S. Department of the Treasury and the U.S. Department of State), the United Kingdom (including, without limitation, His Treasury), the European Union and any EU member state, the United Nations Security Council, and any other relevant sanctions authority.

### 13. **Notices; Instructions.**

(a)      Any notice or instruction hereunder shall be in writing in English, and may be sent by (i) secure file transfer or (ii) electronic mail with a scanned attachment thereto of an executed notice or instruction, and shall be effective upon actual receipt by the Bank in accordance with the terms hereof. Any notice or instruction must be executed (which execution may be manual or affixed by DocuSign) by an authorized person of the Pledgor or the Secured Party, as applicable d        d        d        d        r **Authorized Persons**        d persons designated on Schedule B and Schedule C attached hereto have been duly appointed to act as Authorized Persons hereunder and individually have full power and authority to execute any notices or instructions, to amend, modify or waive any provisions of this Agreement, and to take any and all other actions permitted under this Agreement, all without further consent or direction from, or notice to, it or any other party. Any notice or instruction must be originated from a corporate or government domain. Any change in designation of Authorized Persons shall be provided by written notice, signed by an Authorized Person, and actually received and acknowledged by the Bank. Any communication from the Bank that the Bank deems to contain confidential, proprietary, and/or sensitive information shall be encrypted in accordance with the d

(b)      Each of the Pledgor and the Secured Party understands and agrees that the Bank cannot determine the identity of the actual sender of any notice or instruction and that the Bank shall be entitled to conclusively presume that notices or instructions that purport to have been sent by an Authorized Person have been sent by such Authorized Person. Each of the Pledgor and the Secured Party agrees: (i) to assume all risks arising out of the use of electronic means (including electronic mail, secure file transfer or such other method or system specified by the Bank as available for use in connection with its services hereunder) to submit instructions to the Bank, including, without limitation, the risk of the Bank acting on unauthorized instructions, and the risk of interception or misuse by third parties; (ii) that it is fully informed of the protections and risks associated with the various methods of transmitting instructions to the Bank and that there may be more secure methods of transmitting instructions than the method(s) selected by the Pledgor and the Secured Party, as applicable; (iii) that the security procedures (if any) to be followed in connection with its transmission of instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances; and (iv) to notify the Bank immediately upon learning of any compromise or unauthorized use of the security procedures. The Pledgor and the Secured Party agree that the security procedures set forth in Section 13(a) and this Section 13(b) are commercially reasonable.

If to the Pledgor:
As provided in Addendum 1

If to the Secured Party:
The Office of the Greenhouse Gas Reduction Fund,



United States Environmental Protection Agency
Attention: David Widawsky
Telephone: +1 202-566-2215
E-mail: GGRF@epa.gov; widawsky.david@epa.gov

If to the Bank:
Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, NY 10013
Attn.: Nerlie Delly
Telephone: +1 212-816-6846
E-mail: CitiGGRFFinancialAgent@citi.com

**14.** **Amendment; Waiver.** Any amendment of this Agreement shall be binding only if evidenced by a writing signed by each of the parties to this Agreement. No waiver of any provision hereof shall be effective unless expressed in writing and signed by the party to be charged.

**15.** **Severability.** The invalidity, illegality or unenforceability of any provision of this Agreement shall in no way affect the validity, legality or enforceability of any other provision. If any provision of this Agreement is held to be unenforceable as a matter of law, the other provisions shall not be affected thereby and shall remain in full force and effect.

**16.** **Mergers and Conversions.** Any corporation or entity into which the Bank may be merged or converted or with which it may be consolidated, or any corporation or entity resulting from any merger, conversion or consolidation to which the Bank will be a party, or any corporation or entity succeeding to the business of the Bank will be the successor of the Bank hereunder without the execution or filing of any paper with any party hereto or any further act on the part of any of the parties hereto except where an instrument of transfer or assignment is required by law to effect such succession, anything herein to the contrary notwithstanding.

**17.** **Termination.** This Agreement shall terminate upon receipt by the Bank of notice from the Secured Party that its security interest in such Accounts and all assets therein have terminated. Upon receipt of such notice, the Secured Party shall have no further right to originate instructions with respect to the assets in the Accounts. The Bank shall, upon payment of all outstanding fees and expenses hereunder, promptly forward any amounts held by the Bank in the Accounts to the Pledgor, and the Bank shall be relieved and discharged of any further responsibilities with respect to its duties hereunder.

**18.** **Counterparts.** This Agreement may be executed simultaneously in two or more counterparts, any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same agreement. Signatures on counterparts of this Agreement executed a          d      d      r      d      d          d means (including DocuSign) shall be deemed original signatures with all rights accruing thereto except in respect to any non-US entity, whereby originals may be required.

**[Remainder of Page Left Intentionally Blank]**



JA1150

**IN WITNESS WHEREOF,** each of the parties has caused this Agreement to be executed by a duly authorized representative as of the day and year first written above.

**CITIBANK, N.A.,**
as Bank

By: _Nerlie Delly_
8E0246B7B634D0...

    Name: Nerlie Delly
    Title: Senior Trust Officer

**Power Forward Communities, Inc.**

By: _William N. Jenkins III_
0CBFCDA032AF4C4...

    Name: William N. Jenkins III
    Title: Senior Vice President

**United States Environmental Protection Agency**

By: _Phillip K Schindel_
8474CD72C10743B...

    Name: Phillip Schindel
    Title: EPA Award Official

JA1151

**EXHIBIT A**

**FORM OF NOTICE OF EXCLUSIVE CONTROL**

VIA EMAIL: cts.spag@citi.com / CitiGGRFFinancialAgent@citi.com

Nerlie Delly
Vice President
Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, New York 10013

Inc. **Pledgor**                                        Power Forward Communities, Inc. **Pledgor**                    **Secured Party** **Bank**        , the Secured Party, hereby instruct the Bank of the following:

M        Secured Party may exercise its right of control herein, and such conditions will be defined as the Account Control Agreement.

As required by the Grant Agreement, the Secured Party has issued a written determination and finding that Pledgor has failed to comply with the terms and conditions of the Grant Agreement, and that noncompliance is substantial such that effective performance of the Grant Agreement is materially impaired or there is adequate evidence of waste, fraud, material misrepresentation of eligibility status, or abuse, and that the Secured Party has initiated action under 2 CFR 200.339 to wholly or partly suspend or terminate the Grant Agreement, as authorized in the terms of the Grant Agreement.

Therefore, the Secured Party hereby notifies you that (i) a default has occurred and is continuing under the Grant Agreement and (ii) from and after the receipt of this notice until you receive further instruction from Secured Party, you are hereby directed to retain and hold all funds in the Account and not to [invest or] disburse the same to any party whatsoever, other than as instructed by the Secured Party.

**United States Environmental Protection Agency**

as Secured Party

By: _____
        Name:
        Title:
        Date:

JA1152

**EXHIBIT B**

**FORM OF ACCOUNT DIRECTION (NCIF)**
**Pledgor's UEI Number: G1YAE6AFNDN4**

[Date]

Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, NY 10013
Attn.: Nerlie Delly
E-mail: cts.spag@citi.com/CitiGGRFFinancialAgent@citi.com

VIA: CitiSFT
RE: Account Control Agreement dated November 1, 2024, among Power Forward Communities, Inc. **⌐Pledgor** United States Environmental Protection Agency **⌐Secured Party** **⌐Bank**

Pursuant to Section 2 of the above referenced Account Control Agreement, the Pledgor hereby instructs the Bank to disburse a total amount of        funds as per below and as per the attached upload file named xxx:

**Check applicable boxes:**

( ) **Internal Transfer within the Bank (intra-entity).**

( ) **Internal Transfer within the Bank (inter-entity).**

( ) **External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities).**

( ) **External Transfer outside the Bank (for Financial Assistance Activities).**

**If an Internal Transfer within the Bank (intra-entity), check the following applicable boxes:**

( ) **Transfer of        across Pledgor's 'Budget' sub-accounts, as defined in the Grant Agreement**.

( ) **Transfer of        from Pledgor's 'Program Income from Operations' account to Pledgor's 'Budget' sub-account(s), as defined in the Grant Agreement**.

( ) **Transfer of        from Pledgor's 'Reserve' account to Pledgor's 'Program Income from Operations' account, as defined in the Grant Agreement.**

( ) **Transfer of        from Pledgor's 'Budget' sub-account(s) or 'Program Income from Operations' account to 'Reserve' account, as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the EPA-approved workplan. Financing agreements for identified Qualified Projects necessitating the transfer have been*

*reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

**If an Internal Transfer within the Bank (inter-entity), check the following applicable boxes:**

**( ) Transfer of      from Pledgor's 'Budget' sub-account(s) to 'Financial Assistance Subrecipient' as defined in the Grant Agreement.**

**If an External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities), check one of the following boxes:**

**( ) Disbursement of      for Predevelopment Activities as defined in the Grant Agreement.**

**( ) Disbursement of      for Market-Building Activities as defined in the Grant Agreement.**

**( ) Disbursement of      for Program Administration Activities as defined in the Grant Agreement.**

**If an External Transfer outside the Bank (for Financial Assistance Activities), check the following applicable boxes:**

**( ) Disbursement of      from Pledgor's 'Budget' sub-account to provide Financial Assistance to Qualified Projects as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the EPA-approved workplan. Financing agreements for identified Qualified Projects necessitating the transfer have been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

**( ) Disbursement of      from Pledgor's 'Reserve' account to satisfy a legal obligation to a third party as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this transfer is necessary to execute against the EPA-approved workplan and pay a third party pursuant to a financing agreement that has been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

Capitalized terms in this instruction letter not otherwise defined shall have the same meaning given to them in the Account Control Agreement.

Signature on this Account Direction executed and delivered in elect d    d    r    d other electronic means (including DocuSign) shall be deemed original signatures with all rights accruing thereto.

Exhibit B

IN WITNESS WHEREOF, the Pledgor has caused this Account Direction to be duly executed and delivered as of the date first written above.

Pledgor:

_____

Authorized Person

**ADDENDUM 1**
**Account Control Agreement**

| | |
|---|---|
| **Date of Account Control Agreement** | November 1, 2024 |
| **Grant Agreement** | Agreement Title: NCIF Application to Create Community Abundance by Decarbonizing d    d       84096001) Agreement Date: 8/8/2024 |
| **Pledgor Notice Details** | Attn: William N. enkins III Address: 11000 Broken Land Parkway, Columbia, MD 21044 Email: nate@powerforwardcommunities.org |
| **UEI Number** | **G1YAE6AFNDN4** |
| **Tax Identification Number** | 93-2705500 |
| **Citi Deposit Instructions** | Bank: CITIBANK, N.A. ABA: 0210-0008-9 Account Name: Account Number: Ref: |

**Money Market Fund Investment Selection**

| Fund Name | Fund Number | CUSIP |
|---|---|---|
| FS Treasury Instrument Fund Institutional Class (506) | FTIXX | 38142B500 |

**Accounts to Be Established**

| Account Number | Account Name | Initial Deposit Amount |
|---|---|---|
| 14129100 | PFC Market-Building | $0.00 |
| 14129300 | PFC Program Administration | $82,391,087.00 |
| 14129400 | PFC Other Pass-Through Funding | $1,486,962,944.00 |
| 14129600 | PFC Program Income from Operations | $0.00 |
| 14128900 | PFC Financial Assistance | $0.00 |
| 14129000 | PFC Predevelopment | $0.00 |
| 14129500 | PFC Reserves | $0.00 |

**CitiVelocity Reporting Entitlements Request**:

The Pledgor hereby requests that the Bank entitle the following individuals to view-only access to the                d                for all accounts opened under this Account Control Agreement.

Pledgor Client Profile Name: Power Forward Communities, Inc.

JA1156

| Name | Phone Number | Email |
|---|---|---|
| William N. enkins III | (202) 591-8067 | Nate@powerforwardcommunities.org |
| Timothy . Mayopoulos | (704) 909-9610 | Tim@powerforwardcommunities.org |

The Pledgor hereby acknowledges that all accounts opened under this Account Control Agreement will be entitled  d               d                         d  - only access to the following Client Profiles and their associated users:

| Entity | Client Profile Name |
|---|---|
| Secured Party | U.S. Environmental Protection Agency |

**CitiSFT Entitlements Request**:

Citi makes available the Secure File Transfer (CitiSFT) platform for clients to securely upload Account Directions. The Pledgor hereby requests that the Bank entitle the below individuals with upload only access to CitiSFT:

| Name | Phone Number | Email | Maker, Checker, Maker and Checker |
|---|---|---|---|
| William N. enkins III | (202) 591-8067 | Nate@powerforwardcommunities.org | Maker and Checker |
| Timothy . Mayopoulos | (704) 909-9610 | Tim@powerforwardcommunities.org | Maker and Checker |
| Matthew Foster | (443) 422-9380 | mattfoster@enterprisecommunity.com | Maker and Checker |
| Vidula oshi | (610) 291-4774 | vidula@powerforwardcommunities.org | Maker |
| Cory Delger | (253) 222-1153 | cdelger@guidehouse.com | Maker |
| Brandon Stebbins | (215) 832-4462 | bstebbins@guiesehouse.com | Maker |

Signed by:

*William N. Jenkins III*

8CBFCDA832AF4C4...

Authorized Signature
William N. Jenkins III

Senior Vice President and COO

## SCHEDULE A

## BANK COMPENSATION

### General compensation

For the services described in the Account Control Agreement, the Bank shall charge each Pledgor as follows:

| Agency & Trust Services | Fees |
|---|---|
| **Acceptance Fee**<br>This one-time fee covers the acceptance of the appointment, the review of the related Transaction documents submitted in connection with the execution and delivery thereof, setting up of internal controls, and communication with other members of the working group, as necessary. | Waived |
| **Annual Administration Fee**<br>To cover the administrative functions of Citi under the Agreement, including the establishment and maintenance of the account(s), safekeeping of assets, maintenance of the records, execution and administration of the Agreement provisions, and other duties required under the terms of the Agreement. | Waived |
| **Wire Fees** | Waived |
| **Legal Fees**<br>M   d      d        d                        M    d<br>counsel. | Waived |

The Transaction documents will be governed in accordance with federal law of the United States, except where there is no applicable federal law, in accordance with the laws of the State of New York, without giving effect to the conflict of laws principles thereof, as established in the Agreement and subject to internal approval and satisfactory review of all documentation. All outgoing payments processed by Citi will be made via wire. Account balances invested in an Institutional Money Market Fund will be chosen by the client from a list of providers that Citi will supply. If invested in a Money Market Fund, fund distributors may provide Citi with Shareholder Servicing fees. These fees are discussed      d                    d           d  d                     d              d non-discretionary and Citi will not be required to make any advances of its own funds. Therefore, all services provided by Citi must strictly follow the terms stated in the Agreements or in the written instructions of the authorized parties or third parties authorized to send instructions to Citi.

In accordance with US regulations regarding anti-money laundering and terrorist financing, Federal law requires Citi to obtain, verify and record information that identifies each business or entity that opens an account or establishes a relationship with Citi. What this means for our clients: when a client opens an account or establishes a relationship, we              d                           d                                  d obtain. In accordance with the Unlawful Internet Gambling Act (the "Act"), Citibank, N.A. accounts or other Citibank, N.A. facilities in the United States may not be used to process "restricted transactions" as such term is defined in U.S. 31 CFR Section 132.2(y).

**SCHEDULE B**

**PLEDGOR AUTHORIZED LIST OF SIGNERS**
**(to be provided separately)**

Each of the following person(s) is authorized to execute documents and to direct the Bank as to all matters on listed below.

**PLEDGOR**

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:   William N.  enkins III<br>Title:    Senior Vice President and COO<br>Phone:  (202) 591-8067<br>Email:   Nate@powerforwardcommunities.org |  |  |

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:    Timothy  . Mayopoulos<br>Title:     President and CEO<br>Phone:   (704) 909-9610<br>Email:    Tim@powerforwardcommunities.org |  |  |

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: |  |  |

Schedule B

**SCHEDULE C**

**SECURED PARTY AUTHORIZED LIST OF SIGNERS**
**(to be provided separately)**

Each of the following person(s) is authorized to execute documents and to direct the Bank as to all
        d                M          d                  d
call to any one of the telephone numbers listed below.

**SECURED PARTY**

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: | | |

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: | | |

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: | | |

**DocuSign**

## Certificate Of Completion

Envelope Id: 9D71F8DE43FA4A3A9FFFBDF7929A0994
Subject: Complete with Docusign: CITI - EPA - PFC - ACA - 11-1-2024 PFC Execution Version.docx
Source Envelope:

| | | |
|---|---|---|
| Document Pages: 18 | Signatures: 4 | Envelope Originator: |
| Certificate Pages: 4 | Initials: 0 | Marion O'Connor |
| AutoNav: Enabled | | 388 Greenwich Street |
| EnvelopeId Stamping: Enabled | | New York, NY  33610 |
| Time Zone: (UTC-05:00) Eastern Time (US & Canada) | | marion.oconnor@citi.com |
| | | IP Address: 199.67.131.156 |

Status: Completed

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Marion O'Connor | Location: DocuSign |
| 11/5/2024 2:05:05 PM | marion.oconnor@citi.com | |
| Security Appliance Status: Connected | Pool: Production Security Appliance | |

| Signer Events | Signature | Timestamp |
|---|---|---|
| William N. Jenkins III<br>Nate@powerforwardcommunities.org<br>Senior Vice President and COO<br>Security Level: Email, Account Authentication (None) | *William N. Jenkins III*<br>8CBFCDA832AF4C4...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 108.52.2.23 | Sent: 11/5/2024 2:08:00 PM<br>Viewed: 11/5/2024 3:05:14 PM<br>Signed: 11/5/2024 3:06:43 PM |

**Authentication Details**
Identity Verification Details:
    Claim Name: IP Validation
    Claim Timestamp: 11/5/2024 3:05:07 PM
    Provider Name: OFAC IP Validation
    Result: Passed
    Performed: 11/5/2024 3:05:08 PM
**Electronic Record and Signature Disclosure:**
    Accepted: 11/5/2024 3:05:14 PM
    ID: a47d64ce-88ac-4f7d-899c-7ed4dcc429ad

| | | |
|---|---|---|
| Phillip K Schindel<br>Schindel.Phillip@epa.gov<br>Security Level: Email, Account Authentication (None) | *Phillip K Schindel*<br>8474CD72C10743B...<br><br>Signature Adoption: Drawn on Device<br>Using IP Address: 161.80.29.68 | Sent: 11/5/2024 3:06:47 PM<br>Viewed: 11/5/2024 3:59:40 PM<br>Signed: 11/5/2024 4:03:09 PM |

**Authentication Details**
Identity Verification Details:
    Claim Name: IP Validation
    Claim Timestamp: 11/5/2024 3:59:31 PM
    Provider Name: OFAC IP Validation
    Result: Passed
    Performed: 11/5/2024 3:59:31 PM
**Electronic Record and Signature Disclosure:**
    Accepted: 11/5/2024 3:59:40 PM
    ID: 8da728ff-16fa-41d1-a61c-36f1a85e1232

| | | |
|---|---|---|
| Nerlie Delly<br>nerlie.delly@citi.com<br>Senior Trust Officer<br>Citi - SSO<br>Security Level: Email, Account Authentication (None) | DocuSigned by:<br>*Nerlie Delly*<br>8BE0246B7B634D0...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 199.67.140.42 | Sent: 11/5/2024 4:03:12 PM<br>Viewed: 11/5/2024 4:09:07 PM<br>Signed: 11/5/2024 4:09:13 PM |

**Authentication Details**

| Signer Events | Signature | Timestamp |
|---|---|---|

Identity Verification Details:
    Claim Name: IP Validation
    Claim Timestamp: 11/5/2024 4:08:58 PM
    Provider Name: OFAC IP Validation
    Result: Passed
    Performed: 11/5/2024 4:08:58 PM
**Electronic Record and Signature Disclosure:**
    Accepted: 9/8/2023 5:31:35 PM
    ID: e21e60c3-35f5-42bf-bb28-47d19bc69a79

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

Kathy Tsing-Choy
Tsing-Choy.Kathy@epa.gov
Security Level: Email, Account Authentication
(None)

**COPIED**

Sent: 11/5/2024 4:09:16 PM

**Electronic Record and Signature Disclosure:**
    Not Offered via DocuSign

Evan Hughes
Hughes.Evan@epa.gov
Security Level: Email, Account Authentication
(None)

**COPIED**

Sent: 11/5/2024 4:09:17 PM

**Electronic Record and Signature Disclosure:**
    Not Offered via DocuSign

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 11/5/2024 2:08:01 PM |
| Certified Delivered | Security Checked | 11/5/2024 4:09:07 PM |
| Signing Complete | Security Checked | 11/5/2024 4:09:13 PM |
| Completed | Security Checked | 11/5/2024 4:09:18 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

| Electronic Record and Signature Disclosure |
|---|

Electronic Record and Signature Disclosure created on 7/14/3020 11:23:20 AM
Parties agreed to: William N. Jenkins III , Phillip K Schindel, Nerlie Delly

Case 1:23-cv-00762    Document 1-4    Filed 03/14/25    Page 22 of 33
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 659 of 694

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Citibank, N.A. Agency Trust (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**To withdraw your consent with Citibank, N.A. Agency Trust**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to gregory.t.wheeler@citi.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Citibank, N.A. Agency Trust as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Citibank, N.A. Agency Trust during the course of your relationship with Citibank, N.A. Agency Trust.

Docusign Envelope ID: D3026779-1958-4CB1-B676-AE894B3219A5

## AMENDMENT TO ACCOUNT CONTROL AGREEMENT

This Amendment to the Account Control Agreement (this "**Amendment**"), is entered into as of January 13, 2025 by and among CITIBANK, N.A. (in such capacity, the "**Bank**"), UNITED STATES ENVIRONMENTAL PROTECTION AGENCY (the "**Secured Party**"), and POWER FORWARD COMMUNITIES, INC. (the "**Pledgor**" and together with Bank and Secured Party, collectively, the "**Parties**").

### R E C I T A L S :

A.    Reference is made to that certain Account Control Agreement, dated as of November 1, 2024 (as amended from time to time, the "**ACA**") by and among the Bank, the Secured Party and the Pledgor.  Capitalized terms used herein and not otherwise defined herein shall have the meaning given to such terms in the ACA.

B.    The Parties desire to amend the ACA as set forth herein.

NOW, THEREFORE, in consideration of the premises, the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1) <u>Amendments to ACA</u>.  The ACA is hereby amended as follows:

   a) Section 2 is amended by adding the following proviso to the end of such section:

   "; <u>provided</u> that notwithstanding the foregoing, after the delivery of a Notice of Exclusive Control, Bank shall continue to disburse funds and financial assets associated with financial obligations "properly incurred" by the Pledgor prior to the issuance of, but not in anticipation of, a delivery of a Notice of Exclusive Control, in Pledgor's "Reserve" Account pursuant to Account Directions originated by Pledgor except for any specific funds or financial assets, identified by Secured Party in the applicable Notice of Exclusive Control as not being "properly incurred" by the Pledgor in accordance with 2 CFR 200.343."

   b) Exhibit A (Notice of Exclusive Control) of the ACA is hereby amended and restated in the form attached to this Amendment as <u>Exhibit A</u>.

   c) Exhibit B (Form of Account Direction (NCIF) of the ACA is hereby amended and restated in the form attached to this Amendment as <u>Exhibit B</u>.

2) <u>Counterparts</u>.  This Amendment may be executed in several counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same document. Signatures transmitted by facsimile or e-mail shall be sufficient to bind the Parties to this Amendment.

3) <u>Ratification</u>.  The Parties acknowledge that in all other respects, the provisions of the ACA are hereby reaffirmed and ratified, and shall remain in full force and effect.

Docusign Envelope ID: D3006779-1958-4CB1-B676-AE894B3219A5

4) <u>Conflict</u>.  The Parties agree that in the event of a conflict between the terms and conditions of this Amendment and the ACA (as may have been amended by any prior amendment), the terms and conditions of this Amendment shall govern.


[Remainder of Page Intentionally Blank; Signature Pages to Follow]

IN WITNESS WHEREOF, the Parties hereto have executed this Amendment in their respective signatures, intending that this Amendment shall become effective as of the date first above written.

**POWER FORWARD COMMUNITIES, INC.**

By: _____

Name: Tim Mayopoulos

Title: President and CEO

Docusign Envelope ID: D3006779-1958-4CB1-B676-AE894B3219A5

**CITIBANK, N.A.**

By: _Nerlie Delly_

Name: Nerlie Delly

Title: Senior Trust Officer

*[Signature Page to Amendment to Account Control Agreement]*

Docusign Envelope ID: D3006779-1958-4CB1-B676-AE894B3219A5

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

By: _____

Signed by:

Name: Phillip K Schindel

Title: Acting Dir, Grants Mgmt & Business Ops Division

*[Signature Page to Amendment to Account Control Agreement]*

Docusign Envelope ID: D3006779-1958-4CB1-B676-AE894B3210A5

Case 1:25-cv-00762    Document 1-4    Filed 03/14/25    Page 29 of 33
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 666 of 694

EXHIBIT A

**FORM OF NOTICE OF EXCLUSIVE CONTROL**

VIA EMAIL: cts.spag@citi.com / CitiGGRFFinancialAgent@citi.com

Nerlie Delly
Vice President
Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, New York 10013
[Re. Account # [●]]

Pursuant to the Account Control Agreement dated November 1, 2024, among Power Forward Communities, Inc. (the "**Pledgor**"), United States Environmental Protection Agency (the "**Secured Party**"), and Citibank, N.A. (the "**Bank**"), we hereby instruct you of the following:

The Pledgor and the Secured Party have agreed that the terms and conditions entitled "Deposit Account at Financial Agent" in the Grant Agreement indicate the conditions under which the Secured Party may exercise its right of control herein, and such conditions will be defined as "default" for the purposes of the Account Control Agreement.

As required by the Grant Agreement, the Secured Party has issued a written determination and finding that Pledgor has failed to comply with the terms and conditions of the Grant Agreement, and that noncompliance is substantial such that effective performance of the Grant Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse (as defined in the Grant Agreement) or material misrepresentation of eligibility status, and that the Secured Party has initiated action under 2 CFR 200.339 to wholly or partly suspend or terminate the Grant Agreement, as authorized in the terms of the Grant Agreement.

Therefore, the Secured Party hereby notifies you that (i) a default has occurred and is continuing under the Grant Agreement and (ii) from and after the receipt of this notice until you receive further instruction from Secured Party, you are hereby directed to retain and hold all funds in the Account or Accounts named in this Notice and not to [invest or] disburse the same to any party whatsoever, other than as instructed by the Secured Party. Notwithstanding the foregoing, Bank shall continue to disburse funds in Pledgor's "Reserve" Account pursuant to Account Directions originated by Pledgor [except for $[    ] in Account No. [      ], identified by Secured Party in the written determination and finding, that Secured Party has determined was not "properly incurred" by the Pledgor in accordance with 2 CFR 200.343].

**United States Environmental Protection Agency**

Exhibit A

as Secured Party


By: _____
     Name:
     Title:
     Date:

Exhibit A

JA1171

EXHIBIT B

FORM OF ACCOUNT DIRECTION (NCIF)

**Pledgor's UEI Number: G1YAE6AFNDN4**

[Date]

Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, NY 10013
Attn.:Nerlie Delly
E-mail: cts.spag@citi.com/ CitiGGRFFinancialAgent@citi.com

VIA: CitiSFT

RE: Account Control Agreement dated November 1, 2024, among Power Forward Communities, Inc. (the "**Pledgor**"), United States Environmental Protection Agency (the "**Secured Party**"), and Citibank, N.A. (the "**Bank**")

Pursuant to Section 2 of the above referenced Account Control Agreement, the Pledgor hereby instructs the Bank to disburse a total amount of $[●] funds as per below and as per the attached upload file named xxx:

**Check applicable boxes:**

( ) **Internal Transfer within the Bank (intra-entity).**

( ) **Internal Transfer within the Bank (inter-entity).**

( ) **External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities).**

( ) **External Transfer outside the Bank (for Financial Assistance Activities).**

**If an Internal Transfer within the Bank (intra-entity), check the following applicable boxes:**

( ) **Transfer of $[●] across Pledgor's 'Budget' sub-accounts, as defined in the Grant Agreement**.

( ) **Transfer of $[●] from Pledgor's 'Program Income from Operations' account to Pledgor's 'Budget' sub-account(s), as defined in the Grant Agreement**.

Docusign Envelope ID: D3006779-1958-4CB1-B676-AE894B3219A5

( ) **Transfer of $[●] from Pledgor's 'Reserve' account to Pledgor's 'Program Income from Operations' account, as defined in the Grant Agreement.**

( ) **Transfer of $[●] from Pledgor's 'Budget' sub-account(s) or 'Program Income from Operations' account to 'Reserve' account, as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the workplan in effect under the Grant Agreement. Financing agreements for identified Qualified Projects necessitating the transfer have been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

**If an Internal Transfer within the Bank (inter-entity), check the following applicable boxes:**

( ) **Transfer of $[●] from Pledgor's 'Budget' sub-account(s) to 'Financial Assistance Subrecipient' as defined in the Grant Agreement.**

**If an External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities), check one of the following boxes:**

( ) **Disbursement of $[●] for Predevelopment Activities as defined in the Grant Agreement.**

( ) **Disbursement of $[●] for Market-Building Activities as defined in the Grant Agreement.**

( ) **Disbursement of $[●] for Program Administration Activities as defined in the Grant Agreement.**

**If an External Transfer outside the Bank (for Financial Assistance Activities), check the following applicable boxes:**

( ) **Disbursement of $[●] from Pledgor's 'Budget' sub-account to provide Financial Assistance to Qualified Projects as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the workplan in effect under the Grant Agreement. Financing agreements for identified Qualified Projects necessitating the transfer have been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

( ) **Disbursement of $[●] from Pledgor's 'Reserve' account to satisfy a legal obligation to a third party as defined in the Grant Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

Docusign Envelope ID: D3006779-1958-4CB1-B676-AE894B3219A5

*"The amount of this transfer is necessary to execute against the workplan in effect under the Grant Agreement and pay a third party pursuant to a financing agreement that has been reviewed by Recipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

Capitalized terms in this instruction letter not otherwise defined shall have the same meaning given to them in the Account Control Agreement.

Signature on this Account Direction executed and delivered in electronic format (i.e. "pdf") or by other electronic means (including DocuSign) shall be deemed original signatures with all rights accruing thereto.

IN WITNESS WHEREOF, the Pledgor has caused this Account Direction to be duly executed and delivered as of the date first written above.

Pledgor:


_____

Authorized Person

# EXHIBIT E

JA1175



**ACCOUNT CONTROL AGREEMENT**

**among**

**ENTERPRISE GREEN ACCELERATOR, INC., as PLEDGOR**

**POWER FORWARD COMMUNITIES, INC., as SECURED PARTY**

**and**

**CITIBANK, N.A., as BANK**

**Dated as of** _____January 10, 2025_____

170458438.1

**THIS ACCOUNT CONTROL AGREEMENT** (this "**Agreement**"), dated as of January 10, 2025, by and among Enterprise Green Accelerator, Inc., a Maryland nonstock, nonprofit corporation (the "**Pledgor**"), Power Forward Communities, Inc, a Delaware Nonstock Nonprofit corporation (the "**Secured Party**") and Citibank, N.A., a national banking association organized and existing under the laws of the United States of America ("**Citibank**") and acting through its Agency & Trust business solely in its capacity as bank under this Agreement, and any successors appointed pursuant to the terms hereof (Citibank in such capacity, the "**Bank**").

**WHEREAS,** the Secured Party has entered into a certain federal financial assistance agreement with the United States Environmental Protection Agency, an agency of the United States Government, as identified in Addendum 1, (the "**Grant Agreement**").

**WHEREAS,** under the Grant Agreement, Pledgor and Secured Party have entered into a Subaward as identified in Addendum 1, (the "**Subaward Agreement**"), pursuant to which the Pledgor has granted the Secured Party a security interest in the accounts as identified in Addendum 1 established and maintained by the Bank for the Pledgor (the "**Accounts**").

**WHEREAS,** the Bank has been designated and authorized to act as a financial agent of the United States pursuant to the authority of the U.S. Department of the Treasury under 12 U.S.C. §§ 90 and 265.

**WHEREAS,** the parties wish that the Bank enter into this Agreement in order to provide for the "control" (as defined in Section 9-104(a) of the Uniform Commercial Code in effect in the State of New York ("**UCC**"), in the case of a deposit account, or Section 8-106 of the UCC, in the case of a security account) of the accounts as a means to perfect the security interest of the Secured Party.

**WHEREAS,** the Pledgor and the Secured Party have agreed that the terms and conditions in the Subaward Agreement indicate the conditions under which the Secured Party may exercise its right of control herein, and such conditions will be defined as "default" for the purposes of this Agreement.

**WHEREAS**, capitalized terms used herein without definition and that are defined in Article 8 or Article 9 of the UCC as adopted in the State of New York shall have the respective meanings set forth therein.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and adequacy of which is hereby irrevocably acknowledged, the parties hereto agree as follows:

1.    **The Accounts.**  The Pledgor and the Bank represent and warrant to, and agree with the Secured Party that:

(a)    The Bank maintains the Accounts for the Pledgor, and all property (including, without limitation, all funds and financial assets) held by the Bank for the accounts of the Pledgor are, and will continue to be, credited to the Accounts in accordance with instructions given by the Pledgor (unless otherwise provided herein).

(b)    To the extent that cash is credited to the Accounts, the Accounts are a deposit account; and to the extent that financial assets (other than cash) are credited to the Accounts, the Accounts are a securities account.  The Bank is (i) the bank with which the Accounts are maintained

and (ii) the securities intermediary with respect to financial assets held in the Accounts.  The Pledgor is (A) the Bank's customer with respect to the Accounts and (B) the entitlement holder with respect to all financial assets credited from time to time to the Accounts.

(c)      Notwithstanding any other agreement to the contrary, the Bank's jurisdiction with respect to the Accounts for purposes of the UCC is, and will continue to be for so long as the Secured Party's security interest shall be in effect, the State of New York.

(d)      The Pledgor and the Bank do not know of any claim to or interest in the Accounts or any property (including, without limitation, funds and financial assets) credited to the Accounts, except for claims and interests of the parties referred to in this Agreement.

2.      **Control over Accounts.**

The Bank shall comply with all instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and financial assets in the Accounts including, without limitation, directions to distribute proceeds of any such transfer or redemption of interest or dividends on financial assets in the Accounts, substantially in the form attached hereto as Exhibit B ("**Account Direction**"), originated by the Pledgor, until the time that that Bank receives a notice, substantially in the form attached hereto as Exhibit A (a "**Notice of Exclusive Control**") from the Secured Party that the Secured Party is exercising its right to exclusive control over an Account, and after such time that the Bank receives a Notice of Exclusive Control, the Secured Party for such Account, without further consent by the Pledgor.

3.      **Priority of Secured Party's Security Interest.**  The Bank subordinates in favor of the Secured Party any interest, lien or right of setoff it may have, now or in the future, against the Accounts or assets in the Accounts; *provided; however*, that, subject to the foregoing, the Bank may set off all amounts due to it in respect of its fees and expenses (including, without limitation, the payment of any legal fees or expenses) or any amounts payable pursuant to Section 4 hereof.

4.      **Investment of Funds.**

(a)      The Bank shall deposit the assets in non-interest bearing Accounts and invest the assets in the Accounts consistent with the instructions provided by the Pledgor, in Addendum 1. The Pledgor's instructions will be in accordance with the Subaward Agreement, provided that the Bank is not responsible for verifying whether the Pledgor's instructions are in compliance with the Subaward Agreement. The Bank shall invest such assets in the Accounts on the date of deposit provided that such assets are received on or before 11:00 a.m. New York City time.  Any assets received after 11:00 a.m. New York City time shall be treated as if received on the following Business Day. For purposes of this Agreement, "**Business Day**" shall mean any day that the Bank is open for business.

(b)      The Bank is hereby authorized and directed to sell or redeem any such investments as it deems necessary to make any payments or distributions required under this Agreement. The Bank shall have no responsibility or liability for any loss in the value of any investment made pursuant to this Agreement, or for any loss, cost or penalty resulting from any sale or liquidation of the assets in the Account.  The Bank is hereby authorized to execute purchases and sales of investments through the facilities of its own trading or capital markets operations or those of any affiliated entity.  The Bank does not have a duty nor will it undertake any duty to provide investment advice.



170458438.1

(c)     The Bank shall transfer any earnings or proceeds received on or distributions of earnings or proceeds from the assets in the Accounts to the Pledgor's Program Income from Operations Account on a monthly basis.

**5.     <u>Tax Matters</u>.**

(a)     The Pledgor and the Secured Party agree that, unless and until the Subaward Agreement is terminated, any earnings or proceeds received on or distributions of earnings or proceeds from the assets in the Accounts shall be treated as the income of the Pledgor and shall be reported on an annual basis on United States Internal Revenue Service ("**IRS**") Form 1099-DIV, as required pursuant to the Internal Revenue Code of 1986, as amended (the "**Code**") and the regulations thereunder. Principal payments are not reportable to any payee hereunder. No earnings or proceeds received on or distributions of earnings or proceeds from the assets in the Accounts, or principal payments from the Accounts, are reportable to the Secured Party. The Pledgor, the Secured Party and the Bank agree that the Bank will not be responsible for providing tax reporting and withholding for payments that are for compensation for services performed by an employee or independent contractor.

(b)     The Pledgor and the Secured Party shall upon the execution of this Agreement provide the Bank with a duly completed and properly executed IRS Form W-9 or applicable IRS Form W-8, in the case of a non-U.S. person, for each payee, together with any other documentation and information requested by the Bank in connection with the Bank's tax reporting obligations under the Code and the regulations thereunder.  With respect to the Bank's tax reporting obligations under the Code, the Foreign Account Tax Compliance Act and the Foreign Investment in Real Property Tax Act and any other applicable law or regulation, the Pledgor and the Secured Party understand, that, in the event valid U.S. tax forms or other required supporting documentation are not provided to the Bank, the Bank may be required to withhold tax from the assets in the Accounts and report account information on any earnings, proceeds or distributions from the assets in the Accounts.

(c)     Should the Bank become liable for the payment of taxes, including withholding taxes relating to any funds, including interest and penalties thereon, held by it pursuant to this Agreement or any payment made hereunder, Secured Party and Pledgor agree, jointly and severally, to indemnify and hold the Bank harmless pursuant to Section 7(b) hereof from any liability or obligation on account of taxes, assessments, interest, penalties, expenses and other governmental charges that may be assessed or asserted against the Bank, provided that such liability shall not be satisfied by assets in the Accounts. If the Pledgor or Secured Party fail to indemnify the Bank for such taxes, the Bank will notify the United States Environmental Protection Agency.

(d)     The Bank's rights under this Section 5 shall survive the termination of this Agreement or the resignation or removal of the Bank.

**6.     <u>Concerning the Bank</u>.**

(a)     <u>Bank Duties</u>.  Each of the Pledgor and the Secured Party acknowledges and agrees that (i) the duties, responsibilities and obligations of the Bank shall be limited to those expressly set forth in this Agreement, each of which is administrative or ministerial (and shall not be construed to be fiduciary in nature), and no duties, responsibilities or obligations shall be inferred or implied, (ii) the Bank shall not be responsible for any of the agreements referred to or described

citi

-3-

JA1179

herein (including, without limitation, the Grant Agreement, the Subaward Agreement, and any defined term therein not otherwise defined in this Agreement), or for determining or compelling compliance therewith, and shall not otherwise be bound thereby, and (iii) the Bank shall not be required to expend or risk any of its own funds to satisfy payments from the Accounts hereunder.

(b)    Liability of Bank.  The Bank shall not be liable for any damage, loss or injury resulting from any action taken or omitted in the absence of gross negligence or willful misconduct (as finally adjudicated by a court of competent jurisdiction).   In no event shall the Bank be liable for indirect, incidental, consequential, punitive or special losses or damages (including but not limited to lost profits), regardless of the form of action and whether or not any such losses or damages were foreseeable or contemplated.  The Bank shall be entitled to rely upon any instruction, notice, request or other instrument delivered to it without being required to determine the authenticity or validity thereof, or the truth or accuracy of any information stated therein.  The Bank may act in reliance upon any signature believed by it to be genuine (including any signature affixed by DocuSign) and may assume that any person purporting to make any statement, execute any document, or send any instruction in connection with the provisions hereof has been duly authorized to do so.  The Bank may consult with counsel satisfactory to it, and the opinion or advice of such counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it in good faith and in accordance with the opinion and advice of such counsel.  The Bank may perform any and all of its duties through its agents, representatives, attorneys, custodians and/or nominees.  The Bank shall not incur any liability for not performing any act or fulfilling any obligation hereunder by reason of any occurrence beyond its control (including, without limitation, any provision of any present or future law or regulation or any act of any governmental authority, any act of God or war or terrorism, or the unavailability of the Federal Reserve Bank wire services or any electronic communication facility).

(c)    Reliance on Orders.  The Bank is authorized to comply with final orders issued or process entered by any court with respect to the assets in the Accounts, without determination by the Bank of such court's jurisdiction in the matter.  If any portion of the assets in the Accounts are at any time attached, garnished or levied upon under any court order, or in case the payment, assignment, transfer, conveyance or delivery of any such property shall be stayed or enjoined by any court order, or in case any order, judgment or decree shall be made or entered by any court affecting such property or any part thereof, then and in any such event, the Bank is authorized to rely upon and comply with any such order, writ, judgment or decree which it is advised is binding upon it without the need for appeal or other action; and if the Bank complies with any such order, writ, judgment or decree, it shall not be liable to the Pledgor or the Secured Party or to any other person or entity by reason of such compliance even though such order, writ, judgment or decree may be subsequently reversed, modified, annulled, set aside or vacated.

(d)    Erroneous Payments.  If the Bank releases any funds (including but not limited to the assets in the Accounts or any portion of it) to the Pledgor or the Secured Party and subsequently determines (in its absolute discretion) that the payment (or any portion of it) was made in error, the Pledgor or the Secured Party, as applicable, shall upon notice promptly refund the erroneous payment, and none of the obligations of the Pledgor or the Secured Party, as applicable, or the remedies of the Bank will be affected by any act, omission, matter or thing (including, without limitation, any obligation pursuant to which an erroneous payment is made) which, but for this provision, would reduce, release, preclude or prejudice any such obligation or remedy (whether or not known by the Bank, the Pledgor or the Secured Party). Each of the Pledgor and the Secured Party agrees not to assert discharge for value, bona fide payee, or any similar doctrine as a defense to recovery of any erroneous payment by the Bank.

citi

-4-

JA1180

7. **Compensation, Expense Reimbursement and Indemnification.**

(a) Compensation. The Bank's compensation shall be as specified in Schedule A.

(b) Indemnification. Each of the Pledgor and Secured Party covenants and agrees, jointly and severally, to indemnify the Bank and its employees, officers, directors, affiliates, and agents (each, an "**Indemnified Party**") for, hold each Indemnified Party harmless from, and defend each Indemnified Party against, any and all claims, losses, actions, liabilities, costs, damages and expenses of any nature incurred by any Indemnified Party, arising out of or in connection with this Agreement or with the administration of its duties hereunder, including, but not limited to, attorney's fees, costs and expenses, except to the extent such loss, liability, damage, cost or expense shall have been finally adjudicated by a court of competent jurisdiction to have resulted solely from the Indemnified Party's own gross negligence or willful misconduct, provided that such liability shall not be satisfied by assets in the Accounts. The foregoing indemnification and agreement to hold harmless shall survive the termination of this Agreement and the resignation or removal of the Bank. If the Pledgor or Secured Party fails to indemnify the Bank pursuant to this Section 7(b), the Bank shall notify the United States Environmental Protection Agency.

8. **Statements, Confirmations and Notices of Adverse Claims.**  The Bank will send copies of all statements and confirmations for the Accounts simultaneously to the Pledgor and the Secured Party.  The Bank shall be deemed to have delivered statements and confirmations if such statements and confirmations are available on one or more of the Bank systems to deliver electronic media.  The Bank will use reasonable efforts promptly to notify the Secured Party and the Pledgor if any other person claims that it has a property interest in the Accounts or any financial asset in the Accounts.

9. **Entire Agreement; Exclusive Benefit.**  This Agreement constitutes the entire agreement between the parties and sets forth in its entirety the obligations and duties of the Bank with respect to the assets in the Accounts.  This Agreement is for the exclusive benefit of the parties to this Agreement and their respective permitted successors, and shall not be deemed to give, either expressly or implicitly, any legal or equitable right, remedy, or claim to any other entity or person whatsoever.  No party may assign any of its rights or obligations under this Agreement without the prior written consent of the other parties.

10. **Resignation and Removal.** The Bank may be removed only by the U.S. Department of the Treasury.

11. **Governing Law.** This Agreement is governed by and shall be construed and interpreted in accordance with federal law of the United States, except where there is no applicable federal law, in accordance with the laws of the State of New York, without giving effect to the conflict of laws principles thereof.

12. **Representations and Warranties.**

(a) Each of the Pledgor and the Secured Party represents and warrants that it has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder; and this Agreement has been duly approved by all necessary action and constitutes its valid and binding agreement enforceable in accordance with its terms, except as may be limited by applicable

citi

170458438.1

JA1181

bankruptcy, insolvency, moratorium, reorganization or other similar laws affecting the enforcement of creditors' rights and subject to general equity principles.

(b)     Each of the Pledgor and the Secured Party represents that neither it nor any of its parents or subsidiaries, or any of their respective directors, officers, or employees, or to the knowledge of the Pledgor and the Secured Party, the affiliates of the Pledgor, the Secured Party or any of its subsidiaries, will, directly or indirectly, use any part of any proceeds or lend, contribute, or otherwise make available such assets in the Accounts in any manner that would result in a violation by any person of economic, trade, or financial sanctions, requirements, or embargoes imposed, administered, or enforced from time to time by the United States (including, without limitation, the Office of Foreign Assets Control of the U.S. Department of the Treasury and the U.S. Department of State), the United Kingdom (including, without limitation, His Majesty's Treasury), the European Union and any EU member state, the United Nations Security Council, and any other relevant sanctions authority.

### 13.     **Notices; Instructions.**

(a)     Any notice or instruction hereunder shall be in writing in English, and may be sent by (i) secure file transfer or (ii) electronic mail with a scanned attachment thereto of an executed notice or instruction, and shall be effective upon actual receipt by the Bank in accordance with the terms hereof.  Any notice or instruction must be executed (which execution may be manual or affixed by DocuSign) by an authorized person of the Pledgor or the Secured Party, as applicable (the person(s) so designated from time to time, the "**Authorized Persons**").  Each of the applicable persons designated on Schedule B and Schedule C attached hereto have been duly appointed to act as Authorized Persons hereunder and individually have full power and authority to execute any notices or instructions, to amend, modify or waive any provisions of this Agreement, and to take any and all other actions permitted under this Agreement, all without further consent or direction from, or notice to, it or any other party.  Any notice or instruction must be originated from a corporate or government domain.  Any change in designation of Authorized Persons shall be provided by written notice, signed by an Authorized Person, and actually received and acknowledged by the Bank.  Any communication from the Bank that the Bank deems to contain confidential, proprietary, and/or sensitive information shall be encrypted in accordance with the Bank's internal procedures.

(b)     Each of the Pledgor and the Secured Party understands and agrees that the Bank cannot determine the identity of the actual sender of any notice or instruction and that the Bank shall be entitled to conclusively presume that notices or instructions that purport to have been sent by an Authorized Person have been sent by such Authorized Person.  Each of the Pledgor and the Secured Party agrees: (i) to assume all risks arising out of the use of electronic means (including electronic mail, secure file transfer or such other method or system specified by the Bank as available for use in connection with its services hereunder) to submit instructions to the Bank, including, without limitation, the risk of the Bank acting on unauthorized instructions, and the risk of interception or misuse by third parties; (ii) that it is fully informed of the protections and risks associated with the various methods of transmitting instructions to the Bank and that there may be more secure methods of transmitting instructions than the method(s) selected by the Pledgor and the Secured Party, as applicable; (iii) that the security procedures (if any) to be followed in connection with its transmission of instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances; and (iv) to notify the Bank immediately upon learning of any compromise or unauthorized use of the security procedures.  The Pledgor and the Secured Party agree that the security procedures set forth in Section 13(a) and this Section 13(b)

170458438.1

citi

are commercially reasonable.

If to the Pledgor:
As provided in Addendum 1

If to the Secured Party:

Power Forward Communities, Inc.
Attn: William N. Jenkins III
Address: 11000 Broken Land Parkway,
Columbia, MD 21044
Email: nate@powerforwardcommunities.org

If to the Bank:

Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, NY 10013
Attn.: Nerlie Delly
Telephone: +1 212-816-6846
E-mail: CitiGGRFFinancialAgent@citi.com

If to the United States Environmental Protection Agency:

**The Office of the Greenhouse Gas Reduction Fund,
United States Environmental Protection Agency
Attention: David Widawsky
Telephone: +1 202-566-2215
E-mail: GGRF@epa.gov; widawsky.david@epa.gov**

14.    **Amendment; Waiver.**   Any amendment of this Agreement shall be binding only if evidenced by a writing signed by each of the parties to this Agreement.  No waiver of any provision hereof shall be effective unless expressed in writing and signed by the party to be charged.

15.    **Severability.**    The invalidity, illegality or unenforceability of any provision of this Agreement shall in no way affect the validity, legality or enforceability of any other provision. If any provision of this Agreement is held to be unenforceable as a matter of law, the other provisions shall not be affected thereby and shall remain in full force and effect.

16.    **Mergers and Conversions.**  Any corporation or entity into which the Bank may be merged or converted or with which it may be consolidated, or any corporation or entity resulting from any merger, conversion or consolidation to which the Bank will be a party, or any corporation or entity succeeding to the business of the Bank will be the successor of the Bank hereunder without the execution or filing of any paper with any party hereto or any further act on the part of any of the parties hereto except where an instrument of transfer or assignment is required by law to effect such succession, anything herein to the contrary notwithstanding.

citi

170458438.1

**JA1183**

17.    **Termination.**    This Agreement shall terminate upon receipt by the Bank of notice from the Secured Party that its security interest in such Accounts and all assets therein have terminated.  Upon receipt of such notice, the Secured Party shall have no further right to originate instructions with respect to the assets in the Accounts.  The Bank shall, upon payment of all outstanding fees and expenses hereunder, promptly forward any amounts held by the Bank in the Accounts to the Pledgor, and the Bank shall be relieved and discharged of any further responsibilities with respect to its duties hereunder.

18.    **Counterparts.**    This Agreement may be executed simultaneously in two or more counterparts, any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same agreement. Signatures on counterparts of this Agreement executed and delivered in electronic format (i.e. "pdf") or by other electronic means (including DocuSign) shall be deemed original signatures with all rights accruing thereto except in respect to any non-US entity, whereby originals may be required.

**[Remainder of Page Left Intentionally Blank]**

citi

170458438.1

**JA1184**

**IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed by a duly authorized representative as of the day and year first written above.**

**CITIBANK, N.A.,**
as Bank

By: _Nerlie Delly_____
Name: Nerlie Delly
Title: Senior Trust Officer

**ENTERPRISE GREEN ACCELERATOR, INC.,**
as Pledgor

By: _Shaun Donovan_____
Name: Shaun Donovan
Title: Chief Executive Officer

**POWER FORWARD COMMUNITIES, INC.,**
as Secured Party

By: _William N. Jenkins III_____
Name: William N. Jenkins III
Title: Senior Vice President and COO

170458438.1

**EXHIBIT A**

**FORM OF NOTICE OF EXCLUSIVE CONTROL**

VIA EMAIL: cts.spag@citi.com / CitiGGRFFinancialAgent@citi.com

Nerlie Delly
Vice President
Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, New York 10013
[Re. Account # [●]]

Pursuant to the Account Control Agreement dated ____January 10, 2025____, among
**Enterprise Green Accelerator, Inc.** (the "**Pledgor**"), **Power Forward Communities, Inc.** (the
"**Secured Party**"), and Citibank, N.A. (the "**Bank**"), we hereby instruct you of the following:

The Pledgor and the Secured Party have agreed that the terms and conditions in the Subaward
Agreement indicate the conditions under which the Secured Party may exercise its right of control
herein, and such conditions will be defined as "default" for the purposes of the Account Control
Agreement.

As required by the Subaward Agreement, the Secured Party has issued a written determination and
finding that:

1)  Pledgor has failed to comply with the terms and conditions of the Subaward Agreement,
    and that noncompliance is substantial such that effective performance of the Subaward
    Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse
    or material misrepresentation of eligibility status, and that the Secured Party has initiated
    action under 2 CFR 200.339, or 2 CFR 200.332(d) or (i), to wholly or partly suspend or
    terminate the Subaward Agreement as authorized in the terms of the Subaward Agreement
    or applicable provisions of 2 CFR Part 200,

    [or,

2)  Another condition constituting a default in the Subaward Agreement has occurred and is
    continuing].

Therefore, the Secured Party hereby notifies you that (i) a default has occurred and is continuing
under the Subaward Agreement and (ii) from and after the receipt of this notice until you receive
further instruction from Secured Party, you are hereby directed to retain and hold all funds in the
Account or Accounts named in this Notice and not to [invest or] disburse the same to any party
whatsoever, other than as instructed by the Secured Party.

170458438.1

**Power Forward Communities, Inc.,**
as Secured Party


By:_____
   Name:
   Title:
   Date:

170458438.1

**JA1187**

**EXHIBIT B**

**FORM OF ACCOUNT DIRECTION (NCIF Financial Assistance Subrecipient)**
**Pledgor's UEI Number:** _____ WXQEBMGBZG11 _____

[Date]

Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, NY 10013
E-mail: cts.spag@citi.com

VIA: CitiSFT

RE: Account Control Agreement dated January 10, 2025 , among Enterprise Green Accelerator, Inc. (the "**Pledgor**"), Power Forward Communities, Inc. (the "**Secured Party**"), and Citibank, N.A. (the "**Bank**")

Pursuant to Section 2 of the above referenced Account Control Agreement, the Pledgor hereby instructs the Bank to disburse a total amount of $[●] funds as per below and as per the attached upload file named xxx:

**Check applicable boxes:**

( ) **Internal Transfer within the Bank (intra-entity).**

( ) **Internal Transfer within the Bank (inter-entity).**

( ) **External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities).**

( ) **External Transfer outside the Bank (for Financial Assistance Activities).**

**If an Internal Transfer within the Bank (intra-entity), check the following applicable boxes:**

( ) **Transfer of $[●] across Pledgor's 'Budget' sub-accounts, as defined in the Subaward Agreement**.

( ) **Transfer of $[●] from Pledgor's 'Program Income from Operations' account to Pledgor's 'Budget' sub-account(s), as defined in the Subaward Agreement**.

( ) **Transfer of $[●] from Pledgor's 'Reserve' account to Pledgor's 'Program Income from Operations' account, as defined in the Subaward Agreement.**

( ) **Transfer of $[●] from Pledgor's 'Budget' sub-account(s) or 'Program Income from Operations' account to 'Reserve' account, as defined in the Subaward Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the workplan for the Subaward Agreement supported with EPA funding. Financing agreements for identified Qualified Projects*

170458438.1

*as defined in the Terms and Conditions of the Secured Party's Grant Agreement necessitating the transfer have been reviewed by Subrecipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

**If an Internal Transfer within the Bank (inter-entity), check the following applicable box:**

**( ) Transfer of $[●] from Pledgor's 'Budget' sub-account(s) to Secured Party's 'Budget' sub-account(s) as defined in the Subaward Agreement and compliant with the terms and conditions of the Grant Agreement, including the EPA Subaward Policy.**

**If an External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities), check one of the following boxes:**

**( ) Disbursement of $[●] for Predevelopment Activities as defined in the Subaward Agreement.**

**( ) Disbursement of $[●] for Market-Building Activities as defined in the Subaward Agreement.**

**( ) Disbursement of $[●] for Program Administration Activities as defined in the Subaward Agreement.**

**If an External Transfer outside the Bank (for Financial Assistance Activities), check the following applicable boxes:**

**( ) Disbursement of $[●] from Pledgor's 'Budget' sub-account to provide Financial Assistance to Qualified Projects as defined in the Subaward Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the workplan for the Subaward Agreement supported with EPA funding. Financing agreements for identified Qualified Projects as defined in the Terms and Conditions of the Secured Party's Grant Agreement necessitating the transfer have been reviewed by Subrecipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

**( ) Disbursement of $[●] from Pledgor's 'Reserve' account to satisfy a legal obligation to a third party as defined in the Subaward Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this transfer is necessary to execute against the workplan for the Subaward Agreement supported with EPA funding and pay a third party pursuant to a financing agreement that has been reviewed by Subrecipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

Exhibit B

Capitalized terms in this instruction letter not otherwise defined shall have the same meaning given to them in the Account Control Agreement.

Signature on this Account Direction executed and delivered in electronic format (i.e. "pdf") or by other electronic means (including DocuSign) shall be deemed original signatures with all rights accruing thereto.

IN WITNESS WHEREOF, the Pledgor has caused this Account Direction to be duly executed and delivered as of the date first written above.

Pledgor:

_____

Authorized Person

Exhibit B

**ADDENDUM 1**
**Account Control Agreement**

| | |
|---|---|
| **Date of Account Control Agreement** | January 10, 2025 |
| **Grant Agreement** | Agreement Title: NCIF Application to Create Community Abundance by Decarbonizing America's Households (5G – 84096001) Agreement Date: 8/8/2024 |
| **Subaward Agreement** | Agreement Title: GGRF NCIF Subaward Agreement Between PFC and EGA, Inc. Agreement Date: 12/26/2024 |
| **Pledgor Notice Details** | Attn: Shaun Donovan, 11000 Broken Land Address: Pkwy, Ste 800, Columbia MD 21044 Email: sdonovan@enterprisecommunity.org |
| **UEI Number** | WXQEBMGBZG11 |
| **Tax Identification Number** | 93-4026969 |
| **Citi Deposit Instructions** | Bank: CITIBANK, N.A. ABA: 0210-0008-9 Account Name: Account Number: Ref: |

**Money Market Fund Investment Selection**

| Fund Name | Fund Number | CUSIP |
|---|---|---|
| J.P. Morgan 100% US Treasury Securities Money Market Fund Capital Share Class (3163), 4812A0375 | | |

**Accounts to Be Established**

| Account Number | Account Name |
|---|---|
| 14201700 | EnterpGreen Reserves |
| 14201200 | EnterpGreen Program Admin |
| 14201400 | EnterpGreen Market Building |
| 14202000 | EnterpGreen Program Income from Ops |
| 14201900 | EnterpGreen Financial Assistance |
| 14201500 | EnterpGreen Other Pass Through |
| 14201600 | EnterpGreen Predevelopment |

**CitiVelocity Reporting Entitlements Request**:

The Pledgor hereby requests that the Bank entitle the following individuals to view-only access to the Bank's client reporting system for all accounts opened under this Account Control Agreement.

Pledgor Client Profile Name:

| Name | Phone Number | Email |
|---|---|---|
| David Rands | 410-230-3649 | drands@enterprisecommunity.com |

| | | |
|---|---|---|
| Matt Foster | 410-230-2297 | mattfoster@enterprisecommunity.com |
| Jeff Galentine | 410-772-2691 | jgalentine@enterprisecommunity.com |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

The Pledgor hereby acknowledges that all accounts opened under this Account Control Agreement will be entitled to the Bank's client reporting system and made available for view-only access to the following Client Profiles and their associated users:

| Entity | Client Profile Name |
|---|---|
| Secured Party | Citibank NA FBO Power Forward Communities, Inc. |
| United States Environmental Protection Agency | United States Environmental Protection Agency |

**CitiSFT Entitlements Request**:

Citi makes available the Secure File Transfer (CitiSFT) platform for clients to securely upload Account Directions. The Pledgor hereby requests that the Bank entitle the below individuals with upload only access to CitiSFT:

| Name | Phone Number | Email | Maker, Checker, Maker and Checker |
|---|---|---|---|
| David Rands | 410-230-3649 | drands@enterprisecommunity.com | Maker and Checker |
| Matt Foster | 410-230-2297 | mattfoster@enterprisecommunity.com | Maker and Checker |
| Jeff Galentine | 410-772-2691 | jgalentine@enterprisecommunity.com | Maker and Checker |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Pledgor:

Signed by:

*Shawn Donovan*

F4D0ED06CEF841F...

Authorized Signature

Addendum 1

170458438.1

## SCHEDULE A

## BANK COMPENSATION

### General compensation

For the services described in the Account Control Agreement, the Bank shall charge each Pledgor as follows:

| Agency & Trust Services | Fees |
|---|---|
| **Acceptance Fee**<br>This one-time fee covers the acceptance of the appointment, the review of the related Transaction documents submitted in connection with the execution and delivery thereof, setting up of internal controls, and communication with other members of the working group, as necessary. | Waived |
| **Annual Administration Fee**<br>To cover the administrative functions of Citi under the Agreement, including the establishment and maintenance of the account(s), safekeeping of assets, maintenance of the records, execution and administration of the Agreement provisions, and other duties required under the terms of the Agreement. | Waived |
| **Wire Fees** | Waived |
| **Legal Fees**<br>To cover the review of legal documents by Citibank Agency & Trust's outside counsel. | Waived |

The Transaction documents will be governed in accordance with federal law of the United States, except where there is no applicable federal law, in accordance with the laws of the State of New York, without giving effect to the conflict of laws principles thereof, as established in the Agreement and subject to internal approval and satisfactory review of all documentation. All outgoing payments processed by Citi will be made via wire. Account balances invested in an Institutional Money Market Fund will be chosen by the client from a list of providers that Citi will supply. If invested in a Money Market Fund, fund distributors may provide Citi with Shareholder Servicing fees. These fees are discussed in the fund's prospectus, which will be delivered to the client prior to investment. All of Citi's responsibilities will be non-discretionary and Citi will not be required to make any advances of its own funds. Therefore, all services provided by Citi must strictly follow the terms stated in the Agreements or in the written instructions of the authorized parties or third parties authorized to send instructions to Citi.

In accordance with US regulations regarding anti-money laundering and terrorist financing, Federal law requires Citi to obtain, verify and record information that identifies each business or entity that opens an account or establishes a relationship with Citi. What this means for our clients: when a client opens an account or establishes a relationship, we will ask for the client's business name, a street address and a tax identification number that Federal law requires us to obtain. In accordance with the Unlawful Internet Gambling Act (the "Act"), Citibank, N.A. accounts or other Citibank, N.A. facilities in the United States may not be used to process "restricted transactions" as such term is defined in U.S. 31 CFR Section 132.2(y).

170458438.1

**SCHEDULE B**

**PLEDGOR AUTHORIZED LIST OF SIGNERS**
**(to be provided separately)**

Each of the following person(s) is authorized to execute documents and to direct the Bank as to all matters on the Pledgor's behalf.  The Bank may confirm the instructions received by return call to any one of the telephone numbers listed below.

**PLEDGOR**

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: |  |  |

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: |  |  |

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: |  |  |

170458438.1

JA1194

**SCHEDULE C**

**SECURED PARTY AUTHORIZED LIST OF SIGNERS**
**(to be provided separately)**

Each of the following person(s) is authorized to execute documents and to direct the Bank as to all matters on the Secured Party's behalf.  The Bank may confirm the instructions received by return call to any one of the telephone numbers listed below.

**SECURED PARTY**

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: | | |

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: | | |

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: | | |

170458438.1

# EXHIBIT J



U.S. Environmental Protection Agency
1200 Pennsylvania Ave, N.W.
Washington, DC 20460

March 11, 2025

By Email

Tim Mayopoulos
CEO
Power Forward Communities, Inc.
11000 Broken Land Parkway, Ste 700
Columbia, MD 21044
tim@powerforwardcommunities.org

Re: Notice of Termination

Dear Tim Mayopoulos,

Pursuant to the U.S. Environmental Protection Agency's ("EPA" or "the Agency") authority under 2 C.F.R. §§ 200.339-40, the General Terms and Conditions of EPA assistance award agreements, the terms and conditions of the Grant Agreement, and the Agency's inherent authority to reconsider prior determinations in light of new information, the Agency is terminating Grant Agreement No. 84096001, awarded to Power Forward Communities, Inc. under the Greenhouse Gas Reduction Fund ("GGRF"), effective immediately. This termination is based on substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities, which collectively undermine the fundamental goals and statutory objectives of the award.

Following a comprehensive review and consistent with multiple ongoing independent federal investigations into programmatic fraud, waste, abuse and conflicts of interest, EPA has identified material deficiencies, including, but not limited to: 1) the absence of adequate oversight and account controls to prevent financial mismanagement; 2) the improper or speculative allocation of funds inconsistent with EPA's oversight and fiscal responsibilities; and 3) the circumvention and defeat of key oversight mechanisms in the disbursement of federal funds. EPA has determined that these deficiencies pose an unacceptable risk to the efficient and lawful execution of this grant that cannot be remedied by imposing specific conditions, necessitating immediate termination to safeguard taxpayer funds and ensure compliance with federal financial assistance regulations.

Additionally, the Agency has considered concerns raised by EPA Administrator Lee Zeldin regarding the need for rigorous oversight and accountability in the administration of public funds. The Administrator has emphasized the importance of eliminating fraud, waste, and abuse within EPA, particularly in high-

**JA1197**

value awards such as those under GGRF. The structural and operational weaknesses identified in the execution of this grant are inconsistent with these priorities and materially impair the EPA's ability to ensure compliance with statutory and regulatory mandates governing the lawful expenditure of public money.

The Agency has also determined that its existing process for awarding and overseeing execution of the Grant Agreement lacks sufficient protections to guard against potential violations of the Constitution, particularly the Appointments Clause and private nondelegation doctrine. U.S. Const. art. II, § 2, cl. 2; *e.g.*, *Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1341 (D.C. Cir. 2024). Consistent with its independent duty to avoid exceeding constitutional constraints, EPA has reconsidered the prior administration's conclusion that the oversight mechanisms for the Grant Agreement are sufficient to ensure that the Recipient will not exercise significant authority independently of EPA's oversight and ultimate approval.

This termination is executed in accordance with Sections III.S and III.T.4 of the Grant Agreement and with EPA's General Terms and Conditions as incorporated in, and applicable in addition to, the terms of the Grant Agreement, and is consistent with EPA's obligations to safeguard public funds and inherent authority to reconsider prior decisions. This letter constitutes the notice of termination required by 2 C.F.R. § 200.341. Consistent with 2 C.F.R. §§ 200.344-45 and the Closeout Agreement, the recipient is required to cease all further program expenditures immediately, provide a comprehensive final financial and programmatic report, and comply with all applicable closeout procedures.

EPA is committed to ensuring that federal funding is administered in a manner that upholds transparency, accountability, and the highest standards of fiscal responsibility. This termination reflects the Agency's duty to protect public funds and maintain the integrity of its grant programs. In the coming months, EPA will work to re-obligate lawfully appropriated funds within the GGRF program with enhanced controls to ensure adequate governance, transparency, and accountability, consistent with applicable regulatory and statutory requirements.

Sincerely,

W. C. McIntosh

W.C. McIntosh
Acting Deputy Administrator
U.S. Environmental Protection Agency

cc:
- U.S. EPA, Office of the Greenhouse Gas Reduction Fund (OGGRF)
- U.S. EPA, Office of Mission Support (OMS)
- U.S. EPA, Office of General Counsel (OGC)
- U.S. Department of Justice
- U.S. Department of the Treasury
- U.S. House of Representatives
- U.S. Senate
- Citibank, N.A.

JA1198