**[ORAL ARGUMENT SCHEDULED MAY 19, 2025]**

**No. 25-5122**

---

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

CLIMATE UNITED FUND, et al.,

*Plaintiffs-Appellees,*

*v.*

CITIBANK, N.A., et al.,

*Defendants-Appellants.*

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

**JOINT APPENDIX**
**PUBLIC APPENDIX — SEALED MATERIAL IN SEPARATE SUPPLEMENT**
**VOLUME III**

———————————

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

GERARD SINZDAK
SOPHIA SHAMS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7264*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-2495*

# TABLE OF CONTENTS

## VOLUME I

**Excerpts from Climate United Fund v. Citibank, N.A.,
Case No. 1:25-cv-00698**

Docket Report ................................................................................................. JA1

Memorandum in Support of Temporary Restraining Order (Doc. 2-1) ................. JA20

March 10, 2025 EPA Correspondance (Doc. 14-2) ................................................ JA64

March 10, 2025 Treasury Correspondence (Doc. 14-3) ......................................... JA67

Account Control Agreement (Doc. 14-4) ............................................................. JA69

February 2025 FBI Correspondence (Doc. 14-5) ................................................. JA98

March 2, 2025 EPA Office of Inspector General Correspondence (Doc. 14-6) ... JA104

March 4, 2025 Treasury Correspondence (Doc. 14-7) ......................................... JA110

Amended Complaint (Doc. 24) .......................................................................... JA112

Hearing (March 8, 2025) .................................................................................. JA174

Hearing (March 17, 2025) ................................................................................ JA218

Memorandum Opinion on Temproary Restraining Order (Doc. 28) ................... JA263

Order Granting Motion for Temporary Restraining Order (Doc. 29) ................... JA286

Motion for Preliminary Injunction (Doc. 33-1) ................................................. JA288

Bafford Decl. (Dkt. 33-2) ................................................................................. JA360

Climate United Notice of Termination (Doc. 33-13) ........................................ JA389

Representative Request from EPA (Doc. 33-22) ................................................ JA392

Coalition for Green Capital Notice of Termination (Doc. 33-23) ....................... JA397

Brown Decl. (Doc. 33-25) ...........................................................................JA401

Buendia Decl. (Doc. 33-26)........................................................................JA406

Hopson Decl. (Doc. 33-27)........................................................................JA415

Kauffman Decl. (Doc. 33-28) ....................................................................JA425

Donovan Decl. (Doc. 33-29) .....................................................................JA433

Matusiak Decl (Doc. 33-30) ......................................................................JA442

Mayopoulous Decl. (Doc. 33-31) ..............................................................JA451

Moon Decl. (Doc. 33-32) ..........................................................................JA461

Opposition to Motion for Preliminary Injunction (Doc. 49) ..................JA470

## VOLUME II

### Excerpts from Climate United Fund v. Citibank, N.A., Case No. 1:25-cv-00698

Exhibits to Coogan Decl. (Dkt. 49-2)........................................................JA511

Amidon Decl. (Doc. 49-3)..........................................................................JA703

Treml Decl. (Doc. 49-5) .............................................................................JA721

Exhibits to Bailey Decl. (Doc. 49-7) .........................................................JA724

Coalition for Green Capital Supplemental Record Evidence (Doc. 60) ...............JA736

Order Extending Temporary Restraining Order (Doc. 70) .....................JA738

Emergency Contingent Motion to Stay Pending Appeal (Doc. 75).........JA740

Supplemental Treml Decl. (Doc. 75-2).......................................................JA752

Exhibits to Treml Decl. (Doc. 75-3) ..........................................................JA758

Hearing (April 2, 2025) ..............................................................................JA830

Parker Decl. (Doc. 78-1)..............................................................................JA938

Supplemental Bafford Decl. (Doc. 79-1) ..................................................JA952

Order Granting Preliminary Injunction (Doc. 80) ...................................JA961

Notice of Appeal (Doc. 81)......................................................................JA964

Memorandum Opinion (Doc. 89) ............................................................JA966

Supplemental Mayopoulos Decl. (Doc. 92) .......................................... JA1005

Order Granting Motion to Clarify (Doc. 96).......................................... JA1011

**Excerpts from Power Forward Coalition v. Citibank, N.A.,
Case No. 1:25-cv-00762**

Docket Report ...................................................................................... JA1015

Grant Agreement (Doc. 1-2).................................................................. JA1020

Amended Grant Agreement (Doc. 1-3)................................................... JA1081

Account Control Agreement (Doc. 1-4) ................................................. JA1142

Sub-Awardee Account Control Agreement (Doc. 1-5)........................... JA1175

Notice of Termination Letter (Doc. 1-10) ............................................. JA1196

## VOLUME III

**Excerpts from California Infrastructure and Economic Development
Bank v. Citibank, N.A.,
Case No. 1:25-cv-00820**

Docket Report ...................................................................................... JA1199

Complaint (Doc. 1) .............................................................................. JA1204

Motion for Preliminary Injunction (Doc. 17) ....................................... JA1259

Meister Decl. (Doc.17-1) ...................................................................... JA1293

Stoddard Decl. (Doc. 17-2) ........................................................ JA1323

Strong Dec. (Doc. 17-3) ........................................................ JA1353

Swan Decl. (Doc. 17-4) ........................................................ JA1419

Wu Decl. (Doc. 17-5) ........................................................ JA1461

**Excerpts from Justice Climate Fund v. EPA**
**Case No. 1:25-cv-00938**

Docket Report ........................................................ JA1507

Complaint (Doc. 1) ........................................................ JA1511

Kirkwood Decl. (Doc. 7-2) ........................................................ JA1644

CCIA Notice of Funding Opportunity (Doc. 7-3) ........................ JA1657

NCIF Notice of Funding Opportunity (Doc. 7-4) ........................ JA1732

Grant Agreement (Doc. 7-5) ........................................................ JA1805

## VOLUME IV

**Excerpts from Justice Climate Fund v. EPA**
**Case No. 1:25-cv-00938**

Amendments to Grant Agreement (Doc. 7-6) ........................ JA1867

Account Control Agreement (Doc. 7-7) ........................ JA1930

Notice of Termination (Doc. 7-8) ........................ JA1948

Notice of Compliance and Oversight Review (Doc. 7-9) ........................ JA1951

Agency and Trust Account Statement (Doc. 7-10) ........................ JA1956

Agency and Trust Account Statement (Doc. 7-11) ........................ JA1958

**Excerpts from Inclusiv, Inc. v. EPA,**
**Case No. 1:25-cv-00948**

Docket Report ................................................................................................ JA1961

Arabshahi Decl (Doc. 6-2) .......................................................................... JA1967

Lawson Dec. (Doc. 6-3) ............................................................................... JA1990

Freeman Decl.(Doc. 6-4) .............................................................................. JA1995

Hanshaw Dec. (Doc. 6-5)............................................................................. JA2002

Ledezma Dec. Decl. (Doc. 6-6) .................................................................. JA2007

Inclusiv Grant Agreement (Doc. 6-8).......................................................... JA2014

Motion for Temporary Restraining Order (Doc. 8)................................. JA2076

Johnson Decl. (Doc. 8-1) ............................................................................. JA2081

Sheaffer Decl. (Doc. 8-2)............................................................................. JA2118

Notice of Withdrawal (Doc. 13) ................................................................ JA2123

## VOLUME V

**Excerpts from Climate United Fund v. Citibank, N.A.,
Case No. 1:25-cv-00698**

Financial Agent Agreement (Under Seal) (Doc. 21) ................................. JA2126

## *1:25cv820, California Infrastructure And Economic Development Bank Et Al V. Citibank, N.A. Et Al*

US District Court Docket

United States District Court, District of Columbia

(Washington, DC)

**This case was retrieved on 05/04/2025**

## Header

---

**Case Number:** 1:25cv820
**Date Filed:** 03/19/2025
**Assigned To:** Judge Tanya S. Chutkan
**Nature of Suit:** Other Statutes - Administrative Procedure Act/Review or Appeal of Agency Decision (899)
**Cause:** Judicial Review of Agency Actions
**Lead Docket:** *1:25cv00698*
**Other Docket:** *1:25cv00698*, *1:25cv00735*, *1:25cv00762*, *1:25cv00938*, *1:25cv00948*
**Jurisdiction:** U.S. Government Defendant

**Class Code:** Open
**Statute:** 05:0706
**Jury Demand:** None
**Demand Amount:** $0
**NOS Description:** Other Statutes - Administrative Procedure Act/Review or Appeal of Agency Decision

## Participants

---

### Litigants

California Infrastructure and Economic Development Bank
**Plaintiff**

### Attorneys

Meghan Strong
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
DEPARTMENT OF JUSTICE- CA
455 Golden Gate Avenue Suite 11000
San Francisco, CA  94102
USA
415-510-3877 Fax: 415-703-5480
Email:Meghan.Strong@doj.Ca.Gov

Megan Anne Schultz Richards
ATTORNEY TO BE NOTICED
CALIFORNIA ATTORNEY GENERAL'S OFFICE
1300 I Street Suite 125 P.O. Box 944255
Sacramento, CA  93721
USA
916-210-7739 Email:Megan.Richards@doj.Ca.Gov

Theodore A.B. McCombs
ATTORNEY TO BE NOTICED
OFFICE OF THE ATTORNEY GENERAL
600 West Broadway Ste. 1800
San Diego, CA  92101
USA
619-738-9000 Email:Theodore.Mccombs@doj.Ca.Gov

JA1199

1:25cv820, California Infrastructure And Economic Development Bank Et Al V. Citibank, N.A. Et Al

## Litigants | ## Attorneys

| Litigants | Attorneys |
|---|---|
| | Peter Nathaniel Surdo<br>ATTORNEY TO BE NOTICED<br>OFFICE OF THE ATTORNEY GENERAL/MINNESOTA<br>445 Minnesota Street Suite 900<br>St. Paul, MN  55101<br>USA<br>(651) 757-1061 Email:Peter.Surdo@ag.State.Mn.Us |
| EFFICIENCY MAINE TRUST<br>**Plaintiff** | Peter Nathaniel Surdo<br>ATTORNEY TO BE NOTICED<br>OFFICE OF THE ATTORNEY GENERAL/MINNESOTA<br>445 Minnesota Street Suite 900<br>St. Paul, MN  55101<br>USA<br>(651) 757-1061 Email:Peter.Surdo@ag.State.Mn.Us |
| ILLINOIS FINANCE AUTHORITY<br>**Plaintiff** | Peter Nathaniel Surdo<br>ATTORNEY TO BE NOTICED<br>OFFICE OF THE ATTORNEY GENERAL/MINNESOTA<br>445 Minnesota Street Suite 900<br>St. Paul, MN  55101<br>USA<br>(651) 757-1061 Email:Peter.Surdo@ag.State.Mn.Us |
| MINNESOTA CLIMATE INNOVATION FINANCE AUTHORITY<br>**Plaintiff** | Peter Nathaniel Surdo<br>ATTORNEY TO BE NOTICED<br>OFFICE OF THE ATTORNEY GENERAL/MINNESOTA<br>445 Minnesota Street Suite 900<br>St. Paul, MN  55101<br>USA<br>(651) 757-1061 Email:Peter.Surdo@ag.State.Mn.Us |
| Citibank, N.A.<br>**Defendant** | Kenneth Winn Allen<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>KIRKLAND & ELLIS LLP<br>1301 Pennsylvania Avenue, N.W.<br>Washington, DC  20004<br>USA<br>(202) 389-5000 Fax: (202) 389-5200<br>Email:Winn.Allen@kirkland.Com<br><br>Saunders Lee McElroy<br>ATTORNEY TO BE NOTICED<br>KIRKLAND & ELLIS LLP<br>1301 Pennsylvania Ave, Nw<br>Washington, DC  20004<br>USA<br>202-389-3081 Email:Saunders.Mcelroy@kirkland.Com |
| U.S. Environmental Protection Agency<br>**Defendant** | Kevin Paul VanLandingham<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>U.S. DEPARTMENT OF JUSTICE<br>P.O. Box 875, Ben Franklin Station<br>Washington, DC  20044-0875<br>USA<br>(202) 307-1134 Email:Kevin.P.Vanlandingham@usdoj.Gov<br><br>Marcus S Sacks<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Poc Agostinho, Jean 1100 L St., N.W. 8142<br>Washington, DC  20530<br>USA<br>202-307-1104 Email:Marcus.S.Sacks@usdoj.Gov |

1:25cv820, California Infrastructure And Economic Development Bank Et Al V. Citibank, N.A. Et Al

## Litigants / Attorneys

| Litigants | Attorneys |
|---|---|
| Lee Zeldin<br>in official capacity as Administrator of the U.S. Environmental Protection Agency \|<br>**Defendant** | Kevin Paul VanLandingham<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>U.S. DEPARTMENT OF JUSTICE<br>P.O. Box 875, Ben Franklin Station<br>Washington, DC  20044-0875<br>USA<br>(202) 307-1134 Email:Kevin.P.Vanlandingham@usdoj.Gov<br><br>Marcus S Sacks<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Poc Agostinho, Jean 1100 L St., N.W. 8142<br>Washington, DC  20530<br>USA<br>202-307-1104 Email:Marcus.S.Sacks@usdoj.Gov |
| W. C. MCINTOSH<br>in official capacities as Acting Deputy Administrator of the U.S. Environmental Protection Agency \|<br>**Defendant** | Kevin Paul VanLandingham<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>U.S. DEPARTMENT OF JUSTICE<br>P.O. Box 875, Ben Franklin Station<br>Washington, DC  20044-0875<br>USA<br>(202) 307-1134 Email:Kevin.P.Vanlandingham@usdoj.Gov<br><br>Marcus S Sacks<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Poc Agostinho, Jean 1100 L St., N.W. 8142<br>Washington, DC  20530<br>USA<br>202-307-1104 Email:Marcus.S.Sacks@usdoj.Gov |

## Proceedings

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| 1 | 03/19/2025 | COMPLAINT  against CITIBANK, N.A., WILLIAM CHARLES MCINTOSH, U.S. ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN  ( Filing fee $ 405 receipt number ADCDC-11554089) filed by ILLINOIS FINANCE AUTHORITY, EFFICIENCY MAINE TRUST, CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK, MINNESOTA CLIMATE INNOVATION FINANCE AUTHORITY. (Attachments: # 1 Civil Cover Sheet, # 2 Summons to Defendant Citibank, N.A., # 3 Summons to Defendant EPA, # 4 Summons to Defendant Zeldin, # 5 Summons to Defendant McIntosh)(Surdo, Peter) (Entered: 03/19/2025) | |
| 2 | 03/19/2025 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests  by CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK (Surdo, Peter) (Entered: 03/19/2025) | |
| 3 | 03/19/2025 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests  by EFFICIENCY MAINE TRUST (Surdo, Peter) (Entered: 03/19/2025) | |
| 4 | 03/19/2025 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests  by ILLINOIS FINANCE AUTHORITY (Surdo, Peter) (Entered: 03/19/2025) | |
| 5 | 03/19/2025 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests  by MINNESOTA CLIMATE | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | INNOVATION FINANCE AUTHORITY (Surdo, Peter) (Entered: 03/19/2025) | |
| 6 | 03/19/2025 | NOTICE OF RELATED CASE by CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK, EFFICIENCY MAINE TRUST, ILLINOIS FINANCE AUTHORITY, MINNESOTA CLIMATE INNOVATION FINANCE AUTHORITY. Case related to Case No. 25-cv-698, 25-cv-735, 25-cv-762. (Surdo, Peter) (Entered: 03/19/2025) | |
| | 03/20/2025 | NOTICE OF NEW CASE ERROR regarding 1 Complaint. The following error(s) need correction: Blank/Incomplete/Missing civil cover sheet. Please file the Civil Cover Sheet (JS44) form at www.dcd.uscourts.gov/new-case-forms using the event Civil Cover Sheet. Missing summonses- U.S. government. When naming a U.S. government agent or agency as a defendant, you must supply a summons for each defendant & two additional summonses for the U.S. Attorney & U.S. Attorney General. Please submit using the event Request for Summons to Issue. Form filed as fillable PDF. Please file form in a non-fillable PDF format. COMPLIANCE DEADLINE is by close of business today. This case will not proceed any further until all errors are satisfied. (zsl) (Entered: 03/20/2025) | |
| 7 | 03/20/2025 | REQUEST FOR SUMMONS TO ISSUE to EPA and other Defendants filed by ILLINOIS FINANCE AUTHORITY, EFFICIENCY MAINE TRUST, CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK, MINNESOTA CLIMATE INNOVATION FINANCE AUTHORITY. (Attachments: # 1 Summons Citibank, # 2 Summons McIntosh, # 3 Summons Martin, # 4 Summons Bondi, # 5 Summons Zeldin)(Surdo, Peter) (Entered: 03/20/2025) | |
| 8 | 03/20/2025 | CIVIL COVER SHEET  by ILLINOIS FINANCE AUTHORITY, EFFICIENCY MAINE TRUST, CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK, MINNESOTA CLIMATE INNOVATION FINANCE AUTHORITY filed by ILLINOIS FINANCE AUTHORITY, EFFICIENCY MAINE TRUST, CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK, MINNESOTA CLIMATE INNOVATION FINANCE AUTHORITY.(Surdo, Peter) (Entered: 03/20/2025) | |
| 9 | 03/21/2025 | NOTICE of Appearance by Kevin Paul VanLandingham on behalf of U.S. ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN, W. C. MCINTOSH (VanLandingham, Kevin) (Entered: 03/21/2025) | |
| 10 | 03/21/2025 | Joint STATUS REPORT  by CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK, EFFICIENCY MAINE TRUST, ILLINOIS FINANCE AUTHORITY, MINNESOTA CLIMATE INNOVATION FINANCE AUTHORITY, CITIBANK, N.A., U.S. ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN, W. C. MCINTOSH. (Strong, Meghan) (Entered: 03/21/2025) | |
| 11 | 03/24/2025 | NOTICE of Appearance by Kenneth Winn Allen on behalf of CITIBANK, N.A. (Allen, Kenneth) (Entered: 03/24/2025) | |
| 12 | 03/24/2025 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests  by CITIBANK, N.A. (Allen, Kenneth) (Entered: 03/24/2025) | |
| 13 | 03/24/2025 | NOTICE of Appearance by Saunders Lee McElroy on behalf of CITIBANK, N.A. (McElroy, Saunders) (Entered: 03/24/2025) | |
| | 03/24/2025 | Case Assigned to Judge Tanya S. Chutkan. (zsl) (Entered: 03/24/2025) | |
| 14 | 03/24/2025 | SUMMONS (6) Issued Electronically as to All Defendants, U.S. Attorney and U.S. Attorney General (Attachment: # 1 Notice and | |

1:25cv820, California Infrastructure And Economic Development Bank Et Al V. Citibank, N.A. Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Consent)(zsl) (Entered: 03/24/2025) | |
| 15 | 03/24/2025 | NOTICE of Appearance by Meghan Strong on behalf of CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK (Strong, Meghan) (Entered: 03/24/2025) | |
| 16 | 03/24/2025 | NOTICE of Appearance by Megan Anne Schultz Richards on behalf of CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK (Richards, Megan) (Entered: 03/24/2025) | |
| 17 | 03/24/2025 | MOTION for Preliminary Injunction  by CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK. (Attachments: # 1 Declaration of Christopher Meister with Exhibit A, # 2 Declaration of Michael Stoddard with Exhibit A, # 3 Declaration of Meghan Strong ISO with Exhibits A and B, # 4 Declaration of Kari Groth Swan with Exhibits 1 and 2, # 5 Declaration of Scott Wu with Exhibits 1 to 4, # 6 Text of Proposed Order)(Strong, Meghan) (Entered: 03/24/2025) | |
| 18 | 03/24/2025 | NOTICE of Appearance by Marcus S Sacks on behalf of U.S. ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN, W. C. MCINTOSH (Sacks, Marcus) (Entered: 03/24/2025) | |
| | 03/25/2025 | MINUTE ORDER: Upon consideration of the parties' 10 Joint Status Report, the court sets the following deadlines: Plaintiffs' preliminary injunction brief is due by March 24, 2025. Defendants' response is due by March 31, 2025. The court will hear argument on all matters on April 2, 2025. The court agrees with the parties' positions regarding the arguments in the briefs. See Jt. Status Rep.  (2). It is further ORDERED that, pursuant to Federal Rule of Civil Procedure 42(a), the court will consolidate case 25-cv-820 with 25-cv-698, but will not order the consolidation of briefs among the plaintiffs in 25-cv-820 and 25-cv-698 at this stage. All deadlines in 25-cv-698 remain the same. All filings and papers related to this case shall now be filed in the lead case: 25-cv-698. It is further ORDERED that the parties shall NOT "spread the text" when filing documents in the lead case. Signed by Judge Tanya S. Chutkan on 3/25/2025.(lcer) (Entered: 03/25/2025) | |
| | 03/25/2025 | Cases Consolidated. This case has been consolidated with case 25-cv-00698-TSC pursuant to 03/25/2025 Minute Order. From this date forward, all pleadings shall be filed ONLY in the lead case, 25-cv-00698-TSC. Parties are advised NOT to elect the SPREAD TEXT option when filing in ECF, as this will result in repetitive docketing. (zjm) (Entered: 03/25/2025) | |
| 19 | 03/25/2025 | NOTICE of Appearance by Theodore A.B. McCombs on behalf of CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK (McCombs, Theodore) (Entered: 03/25/2025) | |
| 20 | 03/26/2025 | NOTICE of Appearance by Meghan Strong on behalf of CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK Associated Cases: 1:25-cv-00698-TSC, 1:25-cv-00820-TSC(Strong, Meghan) (Entered: 03/26/2025) | |
| | 04/16/2025 | MINUTE ORDER: GRANTING Plaintiffs' 17 Motion for Preliminary Injunction. See Preliminary Injunction Order and forthcoming Memorandum Opinion in lead case No. 25-cv-698 for details. Signed by Judge Tanya S. Chutkan on 4/16/2025. (lcer) (Entered: 04/16/2025) | |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.

*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

**End of Document**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK,** 1325 J Street, Suite 1300, Sacramento, CA 95814 | <u>**Civil No. 25-cv-820**</u> |
| and | |
| **EFFICIENCY MAINE TRUST,** 168 Capitol Street, Suite 1 Augusta, ME 04330 | <u>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**</u> |
| and | |
| **ILLINOIS FINANCE AUTHORITY,** 160 N. LaSalle St., Suite S-1000 Chicago, IL 60601 | |
| and | |
| **MINNESOTA CLIMATE INNOVATION FINANCE AUTHORITY,** 85 7th Place East, Suite 280, Saint Paul, Minnesota 55101 | |
| Plaintiffs, | |
| v. | |
| **CITIBANK, N.A.,** 5800 South Corporate Place Sioux Falls, South Dakota 57108, | |
| and | |
| **U.S. ENVIRONMENTAL PROTECTION AGENCY** and **LEE ZELDIN** and **W.C. MCINTOSH**, in their official capacities as Administrator and Acting Deputy Administrator of the U.S. Environmental Protection Agency, | |
| Defendants. | |

Plaintiffs California Infrastructure and Economic Development Bank ("California IBank" or "IBank"), Efficiency Maine Trust ("Efficiency Maine"), Illinois Finance Authority ("Illinois Climate Bank"), and Minnesota Climate Innovation Finance Authority ("MnCIFA"), by and through their respective undersigned counsel, for their complaint against defendants Citibank, N.A. ("Citibank"), U.S. Environmental Protection Agency ("EPA"), Lee Zeldin, in his official capacity as EPA Administrator, and W.C. McIntosh, in his official capacity Acting EPA Deputy Administrator, allege as follows.[1]

## PRELIMINARY STATEMENT

1.    This action seeks declaratory and injunctive relief against EPA's unlawful efforts to impede the flow of billions of dollars in duly appropriated, awarded, and disbursed funds to the recipients that Congress expressly intended to support: "green banks," i.e., "organizations that provide capital, leverage private capital, and provide other forms of financial assistance to the rapid deployment of low- and zero-emission products, technologies, and services." 42 U.S.C. § 7434(c)(1). Plaintiffs are state green banks, public or quasi-public entities that provide crucial financial services to pollution-reducing projects in their States. Since February 12, 2025, EPA has pursued a highly irregular and illegal campaign to thwart the $20 billion appropriation that Congress made for Plaintiffs' "green lending" activities, consistent with the President's declared policy opposition to the law that created that appropriation. EPA's campaign violates fundamental constitutional guarantees of liberty in the separation of powers and flouts myriad statutory and regulatory controls on federal agencies' management of Congressional appropriations and finalized awards.

_____

[1] For the purpose of this Complaint, "federal Defendants" refers to EPA and the named officers, and "Defendants" refers to all named defendants.

2.      In an arrangement common for federal public-private partnerships, the grants that support these green lending activities placed awarded funds at Citibank as a financial agent for the federal government. *See* 12 U.S.C. §§ 90, 265. Accordingly, Citibank has been one of the primary targets of EPA's pressure campaign. Apparently bowing to those efforts, last month, Citibank stopped honoring Plaintiffs' and other grantees' instructions to draw down funds, in violation of the plain terms of the governing account control agreements. Accordingly, this action also seeks relief against Citibank for breach of contract.

3.      The division of powers between the federal branches is clear: "the legislature makes, the executive executes, and the judiciary construes the law." *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 46 (1825) (Marshall, C.J.). In 2022, both houses of Congress passed, and the President signed, the Inflation Reduction Act, Pub. L. No. 117-169, 136 Stat. 1818, which added Section 134 to the Clean Air Act, *see id.* § 60103, 136 Stat. 2065-67. Section 134 creates the Greenhouse Gas Reduction Fund and appropriates $20 billion to green lending activities, with $8 billion earmarked for green lending to low-income and disadvantaged communities. 42 U.S.C. § 7434(a)(2)-(3). Congress instructed EPA to "make grants" within 180 days to recipients—with an ultimate deadline of September 30, 2024—to support either direct lending to greenhouse gas-reducing projects, or indirect investment, i.e., providing funds and technical assistance to create new or support existing green banks at the state and local level. *Id.* § 7434(a)(2)-(3), (b).

4.      EPA faithfully executed Congress's vision for the Greenhouse Gas Reduction Fund—until about two months ago. EPA established two grant programs, the National Clean Investment Fund (NCIF) and Clean Communities Investment Accelerator (CCIA) to distribute the $20 billion appropriations to eligible green banks for direct and indirect investment. EPA established a third program, Solar For All, to fund the deployment of cheap, reliable, and zero-

emission distributed electricity generation in communities under a $7 billion appropriation also under the Greenhouse Gas Reduction Fund. 42 U.S.C. § 7434(a)(1). Most relevant here, on August 8, 2024, EPA finalized a $5 billion award to the Coalition for Green Capital (CGC) as prime grantee with the express goal of "foster[ing] an ecosystem of green banks, community lenders, and community partners by providing them with capital, co-investment opportunities, and other services." Plaintiffs in this action are all subawardees supported by CGC's $5 billion award from EPA.

5.      On his first day in office, January 20, 2025, President Trump announced his administration's policy of "[t]erminating the Green New Deal"—his nickname for the Inflation Reduction Act of 2022 and the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429 (2021) (sometimes called the Bipartisan Infrastructure Law). Exec. Order 14154, 90 Fed. Reg. 8353, 8357 (Jan. 29, 2025). Consistent with this directive and other agency pronouncements, EPA began "freezing" Inflation Reduction Act and Infrastructure Investment and Jobs Act funds in the final weeks of January 2025—i.e., it refused to disburse funds to grant recipients under awards funded by appropriations from either Act, including Solar For All awards under the Greenhouse Gas Reduction Fund. That unlawful and arbitrary action—part of a broader, government-wide freeze on federal financial assistance—was later enjoined by the U.S. District Court for the District of Rhode Island in *State of New York v. Trump*, No. 1:25-cv-0039-JJM-PAS.

6.      Due to the different structure of the NCIF and CCIA grant programs, however, EPA had to pursue a different tactic against these Inflation Reduction Act funds. Because Congress directed EPA to support recipients that could "provide capital" and "leverage private capital" for green lending, 42 U.S.C. § 7434(c)(1)(A), EPA originally opted to deposit NCIF and

CCIA funds at a private bank—Citibank—as the financial agent of the federal government. *See generally* 31 C.F.R. Part 202 (regulations for depositaries and financial agents of the federal government). But this meant that EPA under the new administration could not simply block awardee draw-downs in its payment portal, as EPA had done for other Inflation Reduction Act-funded awards. The money was at Citibank.

7.    What followed was an extraordinary campaign by EPA Administrator Lee Zeldin to undermine public confidence in his own agency's integrity. Riffing off a hidden-camera exposé by a partisan activist group, Administrator Zeldin posted a video on social media on February 12, 2025, claiming his team had "found" $20 billion in funds "parked" at Citibank by the previous administration and characterizing the financial agent arrangement as a "scheme" to "shovel[] boatloads of cash to far-left activist groups." On February 23, Administrator Zeldin declared the Greenhouse Gas Reduction Fund was a "criminal" scheme on national television. EPA and its officials knew these attacks on the NCIF awards were at bottom attacks on the structure and purposes of the Greenhouse Gas Reduction Fund as Congress had created it. But when the *Washington Post* fact-checked the administration's attacks on the NCIF awards as "overblown," EPA's press office on March 6 accused the paper of having "devolved into the radical left's own Pravda."

8.    EPA apparently then used the coercive power of federal law enforcement to cause Citibank to "freeze" the NCIF and CCIA funds it held for accountholders, in plain violation of the account control agreements governing these funds. As early as February 14, accountholders including Plaintiffs, CGC, and other prime grantees under the NCIF and CCIA awards instructed Citibank to disburse their funds, but Citibank has declined to honor those instructions. Based on public news reporting—including reporting on the high-profile resignation of a veteran federal

prosecutor—Plaintiffs believed that Citibank was acting in response to a letter sent by the

Federal Bureau of Investigation (FBI) advising Citibank to freeze these funds. However, in

recent communications and filings, Citibank has made clear it is taking direction *from EPA*, and

that the actions by FBI, the U.S. Department of Justice, and the U.S. Treasury Department, are

all traceable to EPA's campaign to baselessly characterize the NCIF and CCIA awards as

fraudulent schemes.

9.      Finally, on March 11, shortly after prime NCIF grantee Climate United Fund

sought a temporary restraining order to enjoin EPA's unlawful actions, EPA sent NCIF and

CCIA awardees a notice to terminate their awards effective immediately.

10.     EPA's actions are unconstitutional and violate the Administrative Procedure Act.

Instead of executing the law as Congress passed it, EPA and its officials have impeded the flow

of capital to green banks that Congress intended. Defendants' actions violate the separation of

powers by usurping the legislative prerogative to repeal or amend federal appropriations, violate

the clauses of the Constitution that govern the repeal or amendment of federal law, and violate

the Executive Branch's duty to execute Congress's laws "faithfully" even when the Executive

disfavors the policy behind them. EPA also acted *ultra vires*, contrary to statutory and regulatory

law, and arbitrarily and capriciously by pursuing unsupported claims of waste, fraud, and abuse

and unlawfully terminating the NCIF award, outside of the regular grant management procedures

for suspected waste, fraud and abuse or award termination, in order to carry out an executive

policy of "[t]erminating" the Inflation Reduction Act.

11.     Plaintiffs—and the Congressionally-mandated mission that they are charged with

fulfilling—have been and will continue to be harmed by EPA's unprecedented attacks on the

Greenhouse Gas Reduction Fund. While some of Plaintiffs' States have long undertaken green

lending activities, others formed green banks in response to and in reliance on Congress's express encouragement and financial support—i.e., "funding and technical assistance to establish *new* . . . public, quasi-public, not-for-profit, or nonprofit entities" for green lending, 42 U.S.C. § 7434(b)(2) (emphasis added)—such that the abrupt freeze and termination of their subawards threatens their ability to carry out their founding mission at all. For new and established green banks alike, confidence in the liquidity and availability of funds is vital to their core lending activities, and EPA's efforts to "poison the well" will cause lasting and irreparable reputational harm to the green banks. Plaintiffs are entitled to declaratory and injunctive relief against EPA and its officials to undo Defendants' unlawful freezes and arbitrary grant termination. Such relief is crucial to ensuring that state green banks can move forward with the critical work provided for in the Inflation Reduction Act—which remains good law to this day—and assuring markets that the funds Congress provided for environmentally sustainable projects will in fact be available.

12.     Citibank's actions breached its contracts with Plaintiffs. Citibank has refused to honor Plaintiffs' valid disbursement requests, despite its unambiguous contractual obligation to do so. The governing contracts provide one exclusive mechanism for Citibank to refuse to follow accountholders' instructions, and that mechanism has not been invoked. In disregarding Plaintiffs' instructions, Citibank has wrongfully withheld the award funds that Plaintiffs have an immediate right to possess. Its actions are willful or, at the very least, based on gross negligence.

13.     Plaintiffs' access to their funds should be restored. The Court should direct Citibank to specifically perform its contractual obligations to disburse funds upon instruction and award Plaintiffs any consequential damages for Citibank's breach.

## THE PARTIES

14.     Plaintiff California Infrastructure and Economic Development Bank is a public agency and instrumentality of the State of California within the California Governor's Office of Business and Economic Development, headquartered at 1325 J Street, Suite 1300, Sacramento, CA 95814. Created in 1994 to finance public infrastructure and private development in California, IBank offers a suite of financing and credit enhancement products that support public, private, and nonprofit sector entities investing in climate mitigation and resilience projects in California, including through its Climate Catalyst Revolving Loan Fund. IBank is an "eligible recipient" of Greenhouse Gas Reduction Fund monies under 42 U.S.C. § 7434(c)(1) and a subawardee of CGC's NCIF award.

15.     Plaintiff Efficiency Maine Trust is a quasi-state agency and instrumentality of the State of Maine, headquartered at 168 Capitol Street, Suite 1, Augusta, Maine 04330-6856, with authority to provide financing as set forth in state statute. *See* 35-A M.R.S. §§ 10103(2), 10104, 10105(8)(A), 10109(4), 10116, 10119(2), 10129, 10154, and 10203. Efficiency Maine was established by the Maine Legislature in 2009 to develop, plan, coordinate, and implement energy efficiency and alternative energy resources programs in Maine in order to achieve goals including but not limited to reducing energy costs to residents, maximizing adoption of cost-effective weatherization and energy efficiency measures, and reducing greenhouse gas emissions through the use of cost-effective energy and energy efficiency investments. *Id*. § 10103(1). Efficiency Maine is an "eligible recipient" of Greenhouse Gas Reduction Fund monies and a subawardee of CGC's NCIF award. Pursuant to a separate agreement between Efficiency Maine and CGC, Efficiency Maine is also the borrower of a $10,000,000 loan funded by CGC's NCIF award.

16.    Plaintiff Illinois Finance Authority is a body politic and corporate, headquartered at 160 N. LaSalle St., Suite S-1000, Chicago, Illinois 60601. Created in 2004, the Illinois Finance Authority provides access to low-cost capital to public and private institutions that are aligned with its mission of fostering economic development, creating and retaining jobs, and improving quality of life for Illinois residents. As the Illinois Climate Bank, it is an "eligible recipient" of Greenhouse Gas Reduction Fund monies and a subawardee of CGC's NCIF award.

17.    Plaintiff Minnesota Climate Innovation Finance Authority is a body politic and corporate of the State of Minnesota, headquartered at the Minnesota Department of Commerce, 85 7th Place East, Suite 280, Saint Paul, Minnesota 55101. The Minnesota legislature established MnCIFA in 2023 to stimulate the development of clean energy and greenhouse gas emissions reduction projects using innovative financing tools to leverage public and private capital to overcome market barriers that inhibit the financing of these projects. Minn. Stat. § 216C.411. MnCIFA is an "eligible recipient" of Greenhouse Gas Reduction Fund monies and a subawardee of CGC's NCIF award.

18.    Defendant EPA is a federal agency headquartered at 1200 Pennsylvania Avenue N.W., Washington, D.C. 20460. EPA was tasked by Congress with disbursing the grant funds appropriated in the Inflation Reduction Act's Greenhouse Gas Reduction Fund and administers the NCIF grant.

19.    Defendant Lee Zeldin is the Administrator of EPA and EPA's highest-ranking, Cabinet-level official. Administrator Zeldin oversees the EPA and is responsible for the actions and decisions challenged in this suit. Defendant Zeldin is sued in his official capacity.

20.     Defendant W.C. McIntosh is the Acting Deputy Administrator of EPA and the
EPA official who signed the "Notice of Termination" on March 11, 2025. Defendant McIntosh is
sued in his official capacity.

21.     Defendant Citibank is a national banking association organized under the laws of
the United States with its main office at 5800 South Corporate Place, Sioux Falls, South Dakota
57108.

## JURISDICTION AND VENUE

22.     The Court has federal question jurisdiction over Plaintiffs' claims against
Defendants EPA, Zeldin, and McIntosh under 28 U.S.C. § 1331 and 5 U.S.C. § 702.

23.     This Court has supplemental jurisdiction over the claims against Defendant
Citibank under 28 U.S.C. § 1367(a) because these claims are so related to the federal question
claims against Defendants EPA, Zeldin, and McIntosh that they form part of the same case or
controversy under Article III of the U.S. Constitution. The Court also has diversity jurisdiction
over these claims under 28 U.S.C. § 1332(a). All Plaintiffs are considered the citizens of their
respective States (California, Illinois, Maine, and Minnesota), while Citibank is considered a
citizen of South Dakota, where its main office is located, and the amount in controversy exceeds
$75,000.

24.     Venue is proper in this district because EPA is located in this district and a
substantial part of the acts or omissions giving rise to the claims occurred in this district. 28
U.S.C. § 1391(e). Three related cases, *Climate United Fund v. Citibank*, No. 1:25-cv-00698,
*Coalition for Green Capital v. Citibank*, No. 1:25-cv-00735, and *Power Forward Communities
v. Citibank*, No. 1:25-cv-00762, have also been filed in this district.

## FACTUAL ALLEGATIONS

### A. The Inflation Reduction Act established statutory grant programs.

25.    On August 16, 2022, the President signed the Inflation Reduction Act after passage in both houses of Congress. Pub. L. No. 117-169, 136 Stat. 1818. The Inflation Reduction Act provided for historic investments in projects to tackle the climate crisis, advance environmental justice, and secure America's position as a world leader in domestic clean energy manufacturing.[2] Key to the Inflation Reduction Act's success was its attention to ensuring that pollution-reducing energy, transportation, and infrastructure projects could secure the necessary financing.[3] The Act was also projected to reduce the federal deficit by $58 billion.[4]

26.    The Inflation Reduction Act includes, among other provisions, a $27 billion appropriation to spur pollution-reducing projects under the "Greenhouse Gas Reduction Fund" umbrella. According to EPA, the Greenhouse Gas Reduction Fund is designed "to mobilize financing and private capital to address the climate crisis, ensure our country's economic competitiveness, and promote energy independence while delivering lower energy costs and economic revitalization to communities that have historically been left behind."[5]

---

[2] *Inflation Reduction Act of 2022*, U.S. DEPT. OF ENERGY, https://www.energy.gov/lpo/inflation-reduction-act-2022, *archived at* https://perma.cc/KR8C-SAEL.

[3] *See, e.g.*, *Transforming Clean Energy Financing and Supply Chains in the United States: LPO One Year After the IRA*, U.S. DEPT. OF ENERGY, https://www.energy.gov/lpo/articles/transforming-clean-energy-financing-and-supply-chains-united-states-lpo-one-year-after, *archived at* https://perma.cc/D2ZE-XNAG.

[4] *Summary Estimated Budgetary Effects of Public Law 117-169*, CONGRESSIONAL BUDGET OFFICE COST ESTIMATE 1, 3 (Sept. 7, 2022), https://www.cbo.gov/system/files/2022-09/PL117-169_9-7-22.pdf, *archived at* https://perma.cc/JPX2-67RW.

[5] *Greenhouse Gas Reduction Fund*, U.S. EPA, https://www.epa.gov/greenhouse-gas-reduction-fund, *archived at* https://perma.cc/5JGY-6QAT.

27.    EPA created three grant programs under the Greenhouse Gas Reduction Fund appropriation. First, the National Clean Investment Fund directs $14 billion to establish national clean financing institutions to deliver accessible, affordable financing for clean technology projects nationwide. Second, the Clean Communities Investment Accelerator directs $6 billion to establishing hubs that provide funding and technical assistance to community lenders working in low-income and disadvantaged communities, providing an immediate pathway to deploy projects in those communities, while also building capacity of hundreds of community lenders to finance projects for years. Third, the Solar For All program directly supports the deployment of rooftop and community solar generation, enabling 900,000 households in low-income and disadvantaged communities to benefit from affordable and reliable distributed solar energy.

28.    EPA described how the two green lending programs, combined, would create a national clean financing network for clean energy and climate solutions across sectors, ensuring communities have access to the capital they need to participate in and benefit from a cleaner, more sustainable economy.

29.    It is critically important to address greenhouse gas emissions through projects supported by the NCIF and CCIA green lending programs. As the federal government's most recent National Climate Assessment concludes, without "rapid and deep reductions" in global greenhouse gas emissions, "the risks of accelerating sea level rise, intensifying extreme weather, and other harmful climate impacts will continue to grow. Each additional increment of warming is expected to lead to more damage and greater economic losses," while "the risk of catastrophic or unforeseen consequences also increases." Conversely, "each increment of warming that the world avoids . . .  reduces the risks and harmful impacts of climate change. . . . In addition to

reducing risks to future generations, rapid emissions cuts are expected to have immediate health and economic benefits."[6]

**B.      In implementing the Inflation Reduction Act, EPA selected grant recipients and set up Citibank as a Financial Agent.**

30.      After a public, competitive application process, in April 2024, EPA selected three entities to serve as prime grantees for the NCIF: Climate United Fund ($6.97 billion), Coalition for Green Capital ($5 billion), and Power Forward Communities ($2 billion). Along with the five CCIA grantees, these entities are the "recipients" or "prime grantees." As of filing, EPA's website continues to state that "throughout the multi-staged review and selection process for each program, EPA ensured that applications were reviewed and scored in accordance with a process that was robust, consistent, and ethical."[7]

31.      As directed by Congress, EPA obligated funds to these prime grantees in late summer 2024. 42 U.S.C. § 7434(a)(2)-(3), (b).

32.      While most prime grantees were tasked with deploying the NCIF and CCIA funds to directly support qualified projects, CGC's grant contemplated subgranting its awarded funds to various subrecipients. Plaintiffs California IBank, Efficiency Maine, Illinois Climate Bank, and MnCIFA are subrecipients under CGC's NCIF grant. The qualified projects they are to support using NCIF funds will provide jobs, improve the environment, build out critical infrastructure, and provide for resiliency and adaptation programs in their respective States.

---

[6] U.S. GLOBAL CHANGE RESEARCH PROGRAM, *Fifth National Climate Assessment: Overview* 1-5 (2023), https://nca2023.globalchange.gov/downloads/NCA5_Ch1_Overview.pdf, *archived at* https://perma.cc/M2MB-2RXP.

[7] *Greenhouse Gas Reduction Fund: Review and Selection Process*, U.S. EPA, https://www.epa.gov/greenhouse-gas-reduction-fund/review-and-selection-process, *archived at* https://perma.cc/6SP5-UTE5.

33.     The NCIF award requires Plaintiffs' subgrant funds to be held at Citibank under a financial agency agreement between Citibank and the U.S. Department of the Treasury (Treasury). Citibank and Treasury entered into a Financial Agency Agreement effective September 19, 2024 (FAA). Each of Plaintiffs' accounts at Citibank are governed by an Account Control Agreement (ACA) between Citibank, CGC, and the respective Plaintiff. Among other provisions, the ACAs set forth Citibank's obligations to follow disbursement instructions from the accountholder (or Pledgor) as well as an exclusive mechanism whereby the Secured Party may take control of the accounts. On or about January 22, 2025, Plaintiffs, as Pledgors, each executed an ACA with Citibank and CGC as the Secured Party. Each of the NCIF prime grantees (CGC, Climate United, and Power Forward) also executed ACAs, as Pledgors, with Citibank, and with EPA as the Secured Party.

34.     EPA contemplated this financial agent arrangement from the NCIF program's inception—and described it in the original July 2023 Notice of Funding Opportunity as critical both to allow recipients to leverage private capital and to "ensure that EPA's interests are protected." EPA designed, structured, and negotiated the FAA and the individual ACAs to provide transparency and accountability. For example, and as discussed further below, the prime grantees' ACAs include provisions that allow EPA, as Secured Party, to take exclusive control of the prime grantees' funds at Citibank under certain specified conditions.

35.     The below diagram depicts this arrangement between EPA, Citibank, the prime grantees, and the subrecipients including Plaintiffs:



36.    Section 1(a) of the ACAs provides that Citibank "maintains the Accounts for the
Pledgor"—here, each Plaintiff—"and all property (including, without limitation, all funds and
financial assets) held by [Citibank] for the accounts of the Pledgor are, and will continue to be,
credited to the Accounts in accordance with the instructions given by the Pledgor (unless
otherwise provided herein)."

37.    Section 2 requires Citibank to "comply with all instructions, notifications, and
entitlement orders the Bank receives directing the disposition of funds and financial assets in the
Accounts including, without limitation, directions to distribute proceeds of any such transfer or
redemption of interest or dividends on financial assets in the Accounts, substantially in the form

attached hereto . . . , originated by the Pledgor, until the time that that Bank receives a notice,

substantially in the form attached hereto as Exhibit A (a 'Notice of Exclusive Control') from the

Secured Party that the Secured Party is exercising its right to exclusive control over an Account."

In Plaintiffs' ACAs, the Secured Party is the prime NCIF grantee, CGC. After Citibank receives

such a notice, Citibank must "comply with all instructions, notifications, and entitlement orders"

it receives from CGC, "without further consent by the Pledgor."

    38.    This is the exclusive mechanism for Citibank to disregard the instructions of its

accountholder. Indeed, Section 6(a) takes pains to limit "the duties, responsibilities, and

obligations of the Bank" (i.e., Citibank) "to those expressly set forth in the Agreement," and

Section 9 confirms that the ACAs constitute "the entire agreement between the parties and sets

forth in its entirety the obligations and duties of the Bank with respect to the assets in the

Accounts." The ACAs further clarify the consequences of particular government actions:

    a.    Section 6(c) of the ACAs authorizes Citibank "to comply with final orders issued

or process entered by any court with respect to the assets in the Accounts, without

determination by the Bank of such court's jurisdiction in the matter."

    b.    Section 6(b) of the ACAs limits Citibank's liability "for any damage, loss, or

injury resulting from any action taken or omitted in the absence of gross

negligence or willful misconduct (as finally adjudicated by a court of competent

jurisdiction)." It also limits Citibank's liability "for not performing any act or

fulfilling any obligation hereunder by reason of any occurrence beyond its control

(including, without limitation, any provision of any present or future law or

regulation or any act of any governmental authority. . . .").

39.     In other words, under the ACAs, Citibank is authorized to restrict Plaintiffs'

access to their Accounts only if CGC issues a Notice of Exclusive Control to Citibank, or a court

issues a final order or process with respect to the assets in Plaintiffs' Citibank accounts. To date,

Plaintiffs have not received or been made aware of a Notice of Exclusive Control issued by

CGC. On information and belief, CGC has not issued a Notice of Exclusive Control regarding

Plaintiffs' Citibank accounts. And no court has issued any final order or process with respect to

the assets in the Plaintiffs' accounts.

**C.     Plaintiffs' Requests for Disbursements under the ACAs and Citibank's Refusal to Comply**

40.     Since February 14, 2025, Plaintiffs have submitted or attempted to submit

instructions to Citibank directing that funds and financial assets in their Citibank accounts be

disbursed, but Citibank has failed to comply with the Plaintiffs' valid instructions for

disbursement, or has failed to remedy the impediments to Plaintiffs' completing instructions for

disbursement.

41.     On February 14, 2025, Plaintiff IBank submitted instructions to Citibank directing

Citibank to disburse $415,314 from IBank's accounts to IBank. This request was valid and

proper; it complied with all applicable requirements of the ACA. For example, it used the proper

"Account Direction" form specified in the ACA.

42.     The previous day, on February 13, 2025, IBank had made contact with a Citibank

representative, who advised IBank that Citibank had frozen all of the NCIF grant funds based on

a social media posted issued by Administrator Zeldin (discussed *infra*) indicating an intent to

terminate Citibank's FAA. Citibank further advised IBank that it was awaiting further direction

from EPA.

43.    On February 14, 2025, Citibank informed IBank that it was unfreezing IBank's account and would honor IBank's disbursement instructions. Accordingly, IBank submitted its request to Citibank directing Citibank to disburse $415,314.

44.    On February 15, 2025, when the request had yet to be fulfilled, IBank emailed Citibank to ask about the status. Citibank did not respond.

45.    In the following days, IBank repeatedly requested information from Citibank about the status of its funds, but Citibank either did not respond or refused to provide IBank with any information justifying its inaction on IBank's instructions.

46.    To date, Citibank has not disbursed funds in response to IBank's February 14 request. Plaintiffs' Citibank accounts do not reflect that any such transaction has occurred.

47.    The other Plaintiffs have similarly submitted or attempted to submit requests for disbursements but encountered similar obstruction from Citibank.

48.    Plaintiff MnCIFA has attempted to submit instructions to Citibank directing that MnCIFA's funds and financial assets in its Citibank accounts be disbursed to MnCIFA using all the valid and proper requirements under the ACA, but Citibank's electronic systems have been inoperable, and Citibank has been unresponsive to requests that it cure the problem.

49.    On February 14, 2025, Illinois Climate Bank requested to draw funds from its Citibank account consistent with the ACA, but Citibank has not followed Illinois Climate Bank's instructions, and Illinois Climate Bank has been unable to draw funds since that date. Illinois Climate Bank received no information from Citibank about the reasons its draw requests have not been processed.

50.    On February 20, 2025, Efficiency Maine submitted a request to Citibank to transfer $10,000,000.00 (the amount of its loan from CGC) to its account at Camden National

Bank. That request was not processed, and as of March 17, 2025, Efficiency Maine has not received the requested funds.

51.    Later on February 20, 2025, Efficiency Maine submitted a second request to transfer funds totaling $242,807.83 for reimbursement of two qualified program administration expenses in the amounts of $225,000 and $17,807.83, respectively. The second request was not processed, and, as of March 17, 2025, Citibank has not disbursed Efficiency Maine's funds in response to either of its requests.

52.    On February 26, 2025, Plaintiff IBank emailed Citibank a letter stating that Citibank had failed to comply with its instructions as required by its ACA; requesting that Citibank identify the basis for its apparent refusal to comply with valid disbursement instructions; informing Citibank that its apparent refusal was threatening to cause significant harm to IBank, including by preventing IBank from fulfilling its contractual obligations to third parties and demanding that Citibank immediately disburse funds. Citibank never responded to this letter and did not disburse IBank's funds.

53.    On March 7, the Attorneys General for the States of Minnesota, Colorado, Maine, Maryland and New York, each of which have green banks that are subrecipients of CGC's NCIF award, similarly emailed Citibank a letter requesting that Citibank identify the basis for its apparent refusal to comply with valid disbursement instructions; informing Citibank that its apparent refusal was threatening to cause significant harm to Plaintiffs, including by preventing Plaintiffs from fulfilling their contractual obligations to third parties; and demanding that Citibank immediately disburse Plaintiffs' funds in accordance with their instructions. Citibank never responded to Plaintiffs' letter, and did not disburse Plaintiffs' funds.

54.     On information and belief, all three prime NCIF grantees similarly instructed Citibank to disburse funds and were similarly ignored. On information and belief, on March 3, after persistent attempts to extract an explanation from Citibank for the freeze on accounts and persistent silence from the bank, Citibank informed prime grantee Climate United that the bank was "awaiting further guidance" from EPA and other federal officials before it would disburse funds.

**D.    The Defendants' freeze and terminations are the result of the Executive's policy opposition to the Inflation Reduction Act, not evidence of grantee misconduct, fraud, waste, or abuse.**

55.     Since the Inflation Reduction Act's passage, Congress has considered but rejected dozens of bills intended to repeal all or part of it, several of which have proposed repealing the Greenhouse Gas Reduction Fund appropriation.[8] None of those bills have been successful. The Inflation Reduction Act's appropriation to the Greenhouse Gas Reduction Fund remains good law.

56.     On his first day in office, January 20, 2025, President Trump announced his administration's policy of "[t]erminating the Green New Deal." Exec. Order 14154, 90 Fed. Reg. 8353, 8357 (Jan. 29, 2025). Consistent with this directive and other agency pronouncements, EPA began "freezing" funding for programs under both the Inflation Reduction Act and the Infrastructure Investment Jobs Act.

57.     Under this unlawful freeze, the executive refused to disburse funds to grant recipients under Inflation Reduction Act and Infrastructure Investment and Jobs Act programs

---

[8] Riki Fujii-Rajani and Sanjay Patnaik, *What will happen to the Inflation Reduction Act under a Republican trifecta?*, BROOKINGS (Jan. 6, 2025), https://www.brookings.edu/articles/what-will-happen-to-the-inflation-reduction-act-under-a-republican-trifecta/, *archived at* https://perma.cc/FQG7-ZW34.

that were duly authorized, appropriated, awarded, and already underway. These included Solar

For All awards under the Inflation Reduction Act's Greenhouse Gas Reduction Fund. That

unlawful and arbitrary action—part of a broader, government-wide freeze on federal financial

assistance—was enjoined in a temporary restraining order and later, a preliminary injunction,

issued by the U.S. District Court for the District of Rhode Island in *State of New York v. Trump*,

ECF Nos. 50, 161, No. 1:25-cv-0039-JJM-PAS (Jan. 31 & Mar. 6, 2025).

58.    Due to the different structure of the NCIF and CCIA grant programs from the

other Inflation Reduction Act and Infrastructure Investment and Jobs Act programs, however, the

new EPA leadership could not simply lock up these funds with the stroke of a pen. Instead,

Defendants EPA, Zeldin, and McIntosh—and, on information and belief, other senior EPA

political appointees not yet identified—began making public, unsupported accusations of waste,

fraud, and abuse to justify future action to "claw back" the NCIF and CCIA funds that had

already been obligated to the grantees (as required by Congressional mandate, *see* 42 U.S.C.

§ 7434(a)(2)-(3), (b)) and disbursed to their accounts at Citibank.

59.    On February 12, 2025, Administrator Zeldin posted a video on social media

attacking the green investment programs, based on a hidden-camera "sting" video circulated

months prior.[9] That prior video was posted to X.com (formerly Twitter) by Project Veritas, an

organization that uses surreptitiously recorded and selectively edited camera footage to sway

public opinion against organizations, programs, or causes they oppose. In his own video,

Administrator Zeldin cites a metaphor used by the individual recorded by Project Veritas—

---

[9] *Administrator Zeldin Announces that Billions of Dollars Worth of "Gold Bars" Have Been Located at Outside Financial Institution*, U.S. EPA (Feb. 13, 2025), https://www.epa.gov/newsreleases/administrator-zeldin-announces-billions-dollars-worth-gold-bars-have-been-located, *archived at* https://perma.cc/5U9V-Y8T5.

identified as a former EPA staffer—of "[throwing] gold bars off the Titanic" and characterizes

the $20 billion deposited at Citibank under the NCIF and CCIA awards as "the gold bars" that

his team had just "found" or "located." Administrator Zeldin asserted, "This scheme was the first

of its kind in EPA history and it was purposefully designed to obligate all of the money in a rush

job with reduced oversight."

60.    Contrary to Administrator Zeldin's claims, the NCIF award and subawards are

subject to the same robust controls as any other EPA-administered grant. EPA staff scrutinize

EPA grants using well-defined monitoring activities, grant reporting obligations, and internal

financial controls.[10] All grantees who receive awards over a certain threshold, including CGC,

are subject to the single-audit requirements of 2 C.F.R. § 200.501. EPA's independent Office of

the Inspector General regularly audits agency programs for waste, fraud, and abuse. 5 U.S.C.

§ 401 *et seq*. In a report reviewing single audit findings reported to the Inspector General from

2019-2021, the Inspector General stressed that the single audit is one of the primary tools for

preventing waste, fraud, and abuse.[11]

---

[10] *See*, *e.g.*, *Office of Grants & Debarment, What To Expect When You're Expecting… A Grant*, U.S. EPA 26-35 (Mar. 29, 2023), https://www.epa.gov/system/files/documents/2023-03/What%20to%20Expect%20When%20You%27re%20Expecting...%20a%20Grant%20Presentation_3.29.2023.pdf, *archived at* https://perma.cc/LNV2-MSL4; *see also Agency Financial Report: Fiscal Year 2024*, U.S. EPA, 19-21 (Nov. 15, 2024), https://www.epa.gov/system/files/documents/2024-11/epa-fy-2024-agency-financial-report.pdf, *archived at* https://perma.cc/249X-SYH4 (analyzing and certifying internal financial controls, and identifying specific vulnerabilities and corresponding corrective actions).

[11] *Considerations From Single Audit Reports For The EPA's Administration of Infrastructure Investment And Jobs Act Funds*, U.S. EPA OFFICE OF INSPECTOR GENERAL (Sept. 14, 2022), https://www.epaoig.gov/sites/default/files/documents/2022-09/_epaoig_20220914-22-N-0057.pdf, *archived at* https://perma.cc/C5CA-T9YX.

61.     EPA's 2024 Financial Report states that EPA evaluated its internal controls in accordance with OMB Circular A-123 and that it operates a comprehensive internal control program, which ensures compliance with the requirements of Federal Managers Financial Integrity Act and other laws and regulations.[12]

62.     Such regulations include 2 C.F.R. § 200.303, which requires grant recipients to establish and maintain effective internal controls over federal awards, and 2 C.F.R. § 200.113, which requires grant recipients to disclose specific information related to integrity and compliance when receiving federal funds.

63.     EPA also requires the use of general grant terms and conditions, which all require grantees to report on fraud, waste, and abuse.[13] Those grant terms and conditions are reflected in the grant and subgrant agreements that govern CGC's and Plaintiffs' funds.

64.     Instead of invoking these well-defined mechanisms for policing grants, EPA pursued a pressure campaign—in public and in secret—to coerce Citibank to freeze the NCIF and CCIA award funds. Subsequent to Administrator Zeldin's February 12 announcement, on February 17, EPA apparently caused the FBI to send two separate letters to Citibank making a "recommendation" to place a 30-day administrative freeze of the $20 billion NCIF/CCIA funds.

---

[12] *Agency Financial Report*, *supra* note 10.

[13] *General Terms and Conditions*, U.S. EPA (Oct. 1, 2023) https://www.epa.gov/system/files/documents/2023-09/fy_2023_epa_general_terms_and_conditions_effective_october_1_2023_or_later.pdf, *archived at* https://perma.cc/6RPP-PNLX; General Terms and Conditions, U.S. EPA (Oct. 1, 2024) https://www.epa.gov/system/files/documents/2024-10/fy_2025_epa_general_terms_and_conditions_effective_october_1_2024_or_later.pdf, *archived at* perma.cc/YUK9-V2&T.

The funds have been inaccessible for draw-downs by the prime grantees and subgrantees since the FBI issued the February 17, 2025, letters.

65. Neither EPA nor Citibank have shared these letters with Plaintiffs. Until recently, much of Plaintiffs' understanding of the events behind Citibank's freeze of their funds came from public news reporting about the resignation of Denise Cheung, the former Chief of the Criminal Division in the United States Attorney's Office in Washington, D.C.[14]

66. Ms. Cheung's resignation letter is public.[15] In it, Ms. Cheung states that the Office of the Deputy Attorney General instructed her to open a criminal investigation and issue grand jury subpoenas based at least in part on the existence of the hidden-camera Project Veritas video. Ms. Cheung further assets that she consulted with the FBI but could not determine that any probable cause existed for securing a warrant that could freeze the accounts at Citibank. Her account indicates that the "recommendation" to Citibank to impose a 30-day administrative freeze in the two FBI letters was a compromise position short of probable cause—the Office of the Deputy Attorney General insisted that a freeze directive go out, but she could not find probable cause for sending one.

---

[14] Ryan Reilly, *Veteran Federal Prosecutor Resigns Over Bank Freeze Order From Trump Appointee*, NBC NEWS (Feb. 18, 2025 3:23 PM) https://www.nbcnews.com/politics/justice-department/veteran-federal-prosecutor-resigns-bank-freeze-order-trump-appointee-rcna192619, *archived at* https://perma.cc/WUE2-P6K5; Eileen Sullivan, Glenn Thrush, and Adam Goldman, *Prosecutor in U.S. Attorney's Office in Washington Abruptly Resigns*, The NEW YORK TIMES (Feb. 18, 2025), https://www.nytimes.com/2025/02/18/us/politics/denise-cheung-federal-prosecutor-quits.html; Spencer S. Hsu, Carol D. Leonnig and Nicolás Rivero, *High-ranking D.C. federal prosecutor resigns over order to freeze EPA funds*, THE WASHINGTON POST (Feb. 18, 2025), https://www.washingtonpost.com/investigations/2025/02/18/federal-prosecutor-dc-resigns/.

[15] *Read the Resignation Letter by Denise Cheung, a Veteran D.C. Federal Prosecutor*, THE WASHINGTON POST (Mar. 6, 2025),  https://www.washingtonpost.com/dc-md-va/2025/02/18/read-resignation-letter-denise-cheung/.

67.     After the recommendation letters were issued, Ms. Cheung asserts that the interim United States Attorney demanded she send a follow-up letter that *required* Citibank to institute a freeze. When she refused, the interim United States Attorney demanded her resignation.

68.     On information and belief, after Ms. Cheung's forced resignation, interim United States Attorney Ed Martin then attempted to obtain a seizure warrant. On information and belief, and based on credible news reports, a United States Magistrate Judge of the United States District Court for the District of Columbia found that Mr. Martin's request and accompanying FBI agent affidavit failed to establish a reasonable belief that a crime had occurred.[16]

69.     On March 2, 2025, Defendant McIntosh referred the Greenhouse Gas Reduction Fund to EPA's Office of the Inspector General, alleging "concerning matters." The March 2 referral letter failed, however, to identify any actual evidence of any financial mismanagement, conflicts of interest, or oversight failures.

70.     On information and belief, only on March 4, 2025, did Citibank receive an actual directive from any government agency not to disburse funds from Plaintiffs' Citibank accounts. On information and belief, the Treasury Department told Citibank that it had been informed of EPA's "concerns regarding potential fraud and/or conflicts of interest related to the Greenhouse Gas Reduction Fund," and that "EPA anticipates developing additional account controls," and "we are further instructing Citibank not to disburse funds from any of the [Greenhouse Gas Reduction Fund] accounts prior to the end of the day Sunday, March 9, 2025."

---

[16] FBI Takes Up EPA Probe Amid Pushback From Judge, Prosecutors, THE WASHINGTON POST (Feb. 27, 2025), https://www.washingtonpost.com/dc-md-va/2025/02/27/trump-fbi-epa-grant-investigation/.

71.    On March 5, 2025, however, EPA issued a statement to the media that the "freeze on funds is at the discretion of Citibank."[17] Citibank issued its own statement that it was awaiting—and would continue to follow—EPA's instructions not to disburse funds from any of the NCIF/CCIA accounts: "Our role as financial agent does not involve any discretion over which organizations receive grant funds. Citi will of course comply with any binding instructions from the federal government."

72.    On information and belief, on March 10, 2025, EPA directly ordered Citibank to "pause the processing of payment instruction of the [Greenhouse Gas Reduction Fund] accounts until further notice." The message included, "it is critical that the Bank not resume processing payment instructions for the [Greenhouse Gas Reduction Fund] accounts."

73.    On information and belief, the Treasury Department similarly instructed Citibank to comply with EPA's instructions.

74.    On March 8, prime NCIF grantee Climate United Fund sought a temporary restraining order to enjoin EPA's unlawful actions. *Climate United Fund v. Citibank*, No. 1:25-cv-00698, ECF No. 2 (D.D.C.). The hearing on Climate United's application was originally scheduled for March 11, 2025, but, on information and belief, the federal Defendants requested a 24-hour extension until March 12.

75.    During the 24-hour extension period, EPA sent all NCIF/CCIA grant awardees a notice purporting to terminate their awards effective immediately. Along with the termination,

---

[17] Leah Garden, *Citibank and EPA Spar Over Frozen Climate Action Funds*, TRELLIS (March 2, 2025), https://trellis.net/article/citibank-and-epa-spar-over-frozen-greenhouse-gas-reduction-fund/, *archived at* https://perma.cc/2CHX-UFVF.

Defendant Zeldin issued a statement that EPA was terminating the Financial Agent arrangement

with Citibank. EPA's Press Office posted a video in which Defendant Zeldin describes purported

"countless issues" attendant to the Greenhouse Gas Reduction Fund. None of the issues he

identifies, however, establishes any grantee noncompliance, mismanagement, or lack of

oversight, much less any fraud, wase, or abuse.

76.    The termination letters came under the signature of Defendant McIntosh. All of

these letters included similar content:

- An invocation of agency "authority under 2 C.F.R. §§ 200.399-40 (*sic*);"

- An allegation of "substantial concerns regarding program integrity, the award

  process, programmatic fraud, waste, and abuse, and misalignment with the Agency's

  priorities, which collectively undermine the fundamental goals and statutory

  objectives of the award;"

- Several allegations of alleged material deficiencies relating to oversight;

- The Agency's desire to guard against "potential" violations of the Appointments

  Clause and the private nondelegation doctrine.

77.    The March 11 termination letter did not identify what the "substantial concerns"

were. It did not identify whether any alleged programmatic fraud actually existed, or the basis on

which it had been identified. The letter did not identify what the Agency's priorities were, or

how the grantee's project was misaligned with them. The termination letter also did not identify

what material deficiencies existed with respect to oversight.

78.    The termination letter concludes with a statement that the federal Defendants

intend to redistribute the Greenhouse Gas Reduction Fund money to unspecified new recipients.

**E.    Plaintiffs are harmed by the Defendants' improperly instituted freezes and terminations.**

79.    Defendants' actions have deprived Plaintiffs of access to and use of funds to which they are legally entitled.

80.    As green banks, Plaintiffs provide financial products to deliver energy, transportation, and infrastructure projects that are insufficiently supported by other financial markets and to achieve desired economic development, public health, environmental, and other public benefit outcomes. As public or quasi-public agencies, Plaintiffs are also accountable to the public and their public-benefit missions in ways that private banks are generally not.

81.    Otherwise, the state green banks' business resembles those of a more familiar private bank: offering loans, credit enhancements, and other financing products that earn interest for the bank; investing or otherwise providing equity that earns a return; and offering similar financial services that earn money for the bank. The proceeds of such financial products and services in turn support further lending, investment, and revenue-generating activities for the state green bank.

82.    Plaintiffs have spent months identifying qualified projects to support with financing and investment under their NCIF subawards with CGC. The work of identifying and vetting pollution-reducing projects, negotiating agreements, and coordinating with CGC as the prime grantee has caused Plaintiffs to expend administrative costs. However, due to Citibank's ongoing freeze, none of the Plaintiffs can draw down funds to cover these incurred, valid costs to the extent their program seeks such coverage.

83.    Plaintiffs have identified and actively negotiated financing agreements with their customers (i.e., qualified projects) and contracted for services from third-party consultants and other vendors that depend on the availability of the funds held at Citibank. The ongoing freeze

and EPA's termination of the NCIF award threatens loss of those business opportunities and placing Plaintiffs in breach of executed agreements. A prolonged freeze or termination of the NCIF award will certainly result in the cancellation of financing for qualified projects, which will result in lost revenue for Plaintiffs, and likely result in the imminent cancellation of some qualified projects altogether. Even if Plaintiffs later prevail in this action, Defendants will have successfully "poisoned the well" by calling into question the legitimacy of these funds and delaying Plaintiffs' access to them for so long that all of Plaintiffs' prospective borrowers will have opted for alternative sources of funding—or chosen to cancel their projects altogether.

84.    Plaintiffs face substantial harms in lost business and reputational harm from Defendants' actions. Through their unlawful and arbitrary actions, EPA and its officials have cast a significant cloud of uncertainty over the funds that Plaintiffs expected and in certain cases have committed to use to support qualified projects. That cloud will likely render NCIF funds unusable for purposes of raising private capital (e.g., pledging receivables or securitizing NCIF loans for additional private capital, or purchasing interests in loans to qualified projects). Simply put, lenders and borrowers will not do business with a bank that cannot provide the promised funds. By rendering the availability of all NCIF award monies so uncertain, Defendants threaten immediate and lasting damage to Plaintiffs' credibility with their customers and vendors and their ability to retain and attract business.

85.    In addition, Plaintiffs have made expenditures of non-NCIF funds in expectation of projects receiving NCIF support from others.  The unfulfilled promise of NCIF fund causes Plaintiffs additional economic loss through those expenditures.

86.    Finally, the loss of qualified projects substantially harms the public mission of state green banks. EPA's aggressive campaign to impede the flow of Congressionally approved

funds to this public mission and paint the entire green lending industry as wasteful and fraudulent will wreak immediate and lasting harm on state green banks to pursue the mission for which they were created.

87.     Efficiency Maine Trust continues to be unable to access the more than $25 million in funds held in its Citibank account, which represents more than a doubling of the total capital that Efficiency Maine currently has under management through its loan program. Without the ability to access these grant and loan funds, Efficiency Maine cannot support the full scope of programs that it otherwise could, nor can it supply financing to as many energy improvement projects for Maine residents and small businesses as it otherwise would.

88.     Efficiency Maine forecasts that without the additional influx of capital being held at Citibank, it will exhaust its available capital in the next 12 months and be forced to discontinue financing on energy efficiency projects. This will disproportionately impact creditworthy small businesses and low- and moderate-income households who face steeper barriers to financing such projects than other customer classes.

89.     To illustrate the cost of these funds being frozen, a typical Maine home that switches from an old, conventional furnace or boiler to a modern, high-efficiency heat pump system will save more than $700 annually on their heating bills. For a typical low- or moderate-income home in Maine, the total project cost will be in the range of $10,000-$15,000. Of this total, customers seek to take advantage of Efficiency Maine low-interest loans by borrowing, on average, $6,700 per project. With the funds currently frozen at Citibank, Efficiency Maine would be able to finance 1,865 projects per year at the average borrowing level for each of the next three years. Without those funds, a significant fraction of these households will instead face more

than $700 in higher annual heating bills, and the more than four hundred firms that install heat pumps in Maine will forego the revenues that would have been associated with these projects.

90.     Moreover, these funds were formally awarded, publicly announced, and reported in the media, but subsequently were declared frozen due to assertions of improper conduct. As a consequence, the firms marketing heat pumps in Maine and their customers have questioned the integrity and reliability of these funds and Efficiency Maine's association with them.

91.     The harms to Plaintiffs' reputations run even beyond the NCIF context. For example, Plaintiff Illinois Climate Bank funds its operations primarily through fees from conduit finance transactions and income on its general funds, with additional smaller sources of support through grant programs and interest income on funded loans. The termination of Illinois Climate Bank's NCIF subaward on the bases suggested by the EPA's termination letter will limit Illinois Climate Bank's (and other Plaintiffs') ability to apply for or receive federal and state grants in the future. Even if EPA takes no direct action against Illinois Climate Bank, Illinois Climate Bank will be obligated to make disclosures when applying for federal and Illinois state grant opportunities. This may make Illinois Climate Bank ineligible or less competitive in future grant applications and may obligate state/federal agencies or pass-through entities to impose onerous and unwarranted administrative conditions on any grant funds provided to Illinois Climate Bank.

92.     Illinois Climate Bank also believes that third parties may be deterred from using certain of its services due to an increased risk of one or more federal audits resulting from the federal Defendants' allegations surrounding the NCIF grant. One of Illinois Climate Bank's (and other Plaintiffs') core purposes is to provide low-cost tax-exempt financing for eligible borrowers. Being identified as an alleged conspirator in a scheme to defraud the United States falsely suggests a serious lack of integrity and internal controls—which, if true, would warrant

more scrutiny of Illinois Climate Bank's bond issues and related transactions. This perception could negatively impact one or more ratings assigned to bonds issued or to be issued by the Illinois Climate Bank, and this perception could negatively impact terms and conditions of financial undertakings of borrowers, programs, and transactions supported by the Illinois Climate Bank, in each case which could make the Illinois Climate Bank an undesirable forum for tax-exempt financing and increase borrower costs, thus hindering one of the Illinois Climate Bank's core sources of revenue.

93.     While some of Plaintiffs' States have long undertaken green lending activities, others formed green banks in response to and in reliance on Congress's express encouragement and financial support—i.e., "funding and technical assistance to establish *new* . . . public, quasi-public, not-for-profit, or nonprofit entities" for green lending, 42 U.S.C. § 7434(b)(2) (emphasis added)—such that the abrupt freeze and termination of their subawards threatens their ability to carry out their founding mission at all. For new and established green banks alike, confidence in the liquidity and availability of funds is vital to their core lending activities, and EPA's efforts to "poison the well" will cause lasting and irreparable reputational harm to the green banks.

## COUNT 1

### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2): UNLAWFUL AS CONTRARY TO LAW, ULTRA VIRES (Federal Defendants)

94.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

95.     Defendants have taken official action purporting to terminate the Greenhouse Gas Reduction Fund grants to the prime recipients, which were intended to implement the NCIF.

96.     Federal Defendants have also taken final official action effectuating a freeze on the grantees' and subgrantees' Greenhouse Gas Reduction Fund accounts by either recommending or outright instructing Defendant Citibank not to disburse funds to which subrecipients are entitled. Defendant Citibank complied with the federal Defendants' recommendations and instructions.

97.     Defendants' final actions are not in accordance with, and are contrary to, the law.

98.     Defendants' actions unwind, and are thus contrary to, the specific requirements of the Inflation Reduction Act and its statutory mandate to establish and implement the Greenhouse Gas Reduction Fund. 42 U.S.C. § 7434.

99.     Defendants' actions to freeze or terminate Plaintiffs' access to federal funds that were duly appropriated by Congress in the Inflation Reduction Act violate the Impoundment Control Act. 2 U.S.C. § 683.

100.    No agency may take any action that exceeds the scope of its constitutional or statutory authority.

101.    No constitutional or statutory authority authorizes EPA to refrain from fulfilling its statutory duties, or to violate federal law.

102.    Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). For the same reasons that the Defendants' conduct violated the statutory mandates of the Inflation Reduction Act and protections of the Impoundment Control Act, such conduct exceeds the federal Defendants' jurisdiction, authority, and limitations.

103.     Plaintiffs are therefore entitled to a declaration that the Defendants' conduct is contrary to law under the Inflation Reduction Act and the Impoundment Control Act and *ultra vires*. Plaintiffs are further entitled to a corresponding preliminary and permanent injunction restoring the subrecipients' access to the Greenhouse Gas Reduction Fund accounts held in their name at Defendant Citibank.

## COUNT 2

### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2): UNLAWFUL AS CONTRARY TO UNIFORM GRANT GUIDANCE (Federal Defendants)

104.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

105.     Defendants have taken final official action purporting to terminate the Greenhouse Gas Reduction Fund grants to the prime recipients, which were intended to implement the NCIF.

106.     Federal Defendants have also taken final official action effectuating a freeze on the grantees' and subgrantees' Greenhouse Gas Reduction Fund accounts by either recommending or outright instructing Defendant Citibank not to disburse funds to which subrecipients are entitled. Defendant Citibank complied with the federal Defendants' recommendations and instructions.

107.     Defendants' final actions are not in accordance with, and are contrary to, the Uniform Grant Guidance regulations found in 2 C.F.R. Part 200.

108.     2 C.F.R. § 200.340(a) provides that EPA may only terminate the agreement in limited circumstances (1) failure to comply with the terms and conditions of the Federal award, (2) with consent, (3) upon notice by the recipient, or (4) pursuant to the terms and conditions of

the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities. Of these, subparts (2) and (3) do not apply because the recipients have neither sought to terminate their awards nor consented to termination.

109.    2 C.F.R. § 200.340(a)(1) does not apply because Defendants have not identified any instance of noncompliance, nor have defendants identified any evidence of waste, fraud, status, or abuse.

110.    And 2 C.F.R. § 200.340(a)(4) does not apply either. When 2 C.F.R. § 200.340 was amended in 2020, the Office of Management and Budget (OMB) confirmed that the termination language relating to agency priorities still constrained agencies from instituting arbitrary cancellations. *Guidance for Grants and Agreements* 85 Fed. Reg. 49,506, 49,509 (Aug. 13, 2020). In 2024, OMB completed another round of revisions to this provision. *Guidance for Federal Financial Assistance*, 89 Fed. Reg. 30,046 (Apr. 22, 2024).[18] After considering removal of the "agency priorities" provision of (a)(4) altogether, OMB determined to keep the provision as a permissive condition that *may* form a ground for termination, but *only if* "the language is included in the terms and condition of the award." *Id*. at 30,089. The agency must "clearly and unambiguously" include (a)(4) in the grant agreement for it to be an available basis for termination under 2 C.F.R. § 200.340(a)(4). *Id*; *accord* 2 C.F.R. § 200.340(b) (requiring the agency to "clearly and unambiguously" specify all termination provisions in the terms and conditions of the Federal award).

---

[18] The 2024 guidance applies in this matter. *See Applicability Date for the Office of Management and Budget's Regulatory Revisions*, 89 Fed. Reg. 55,262 (July 3, 2024) ("The revised version of 2 CFR 200.340 will apply to EPA financial assistance agreements awarded or amended to add funds on or after July 3, 2024.").

111.    Here, because the applicable grant agreements do not include at all the "agency priorities" provision of (a)(4) as a ground for termination—much less "clearly and unambiguously"—in their terms and conditions, 2 C.F.R. § 200.340(a)(4) provides no authority for EPA to terminate the awards.

112.    The federal Defendants' actions to terminate the NCIF awards based on an allegation that their purported concerns "collectively undermine the fundamental goals and statutory objectives of the award" thus does not constitute a valid basis for termination under 2 C.F.R. § 200.340(a)(1) or (a)(4). The federal Defendants acted contrary to the governing regulations. 2 C.F.R. § 200.340(b); *see* 89 Fed. Reg. at 30,089.

113.    2 C.F.R. § 200.342 further requires Defendants to provide grantees and subgrantees like Plaintiffs here with an opportunity to object and provide information challenging its determination prior to terminating the grant agreement.

114.    Defendants' actions purported to terminate the awards to the subrecipient-Plaintiffs without providing an opportunity to object and provide information challenging EPA's determination prior EPA's purported termination of the grant agreement.

115.    The federal Defendants' conduct surrounding the Citibank account freezes fare no better. 2 C.F.R. § 200.305(b)(6) provides that payments "must not be withheld at any time" unless the agency finds that the recipient or subrecipient failed to comply with the terms of the federal award, or that the recipient or subrecipient is delinquent in a debt to the United States. No such finding has been made.

116.    More specifically, Defendants took actions to cause Citibank to withhold payments to the subrecipient-Plaintiffs without making the required finding that any subrecipient

failed to comply with the terms of the federal award, or that the recipient was delinquent in a debt to the United States.

117.    To the contrary, 2 C.F.R. § 200.339 provides that once a grant program uses grant funds for a program purpose and incurs a financial obligation, EPA can only seek claims on those funds if they were used for costs that did not comply with the terms and conditions of the grant award agreement or if there is adequate evidence of waste, fraud, or abuse.

118.    Defendants have made no findings that the obligated funds the subgrantees are seeking to access were in any way inconsistent with the terms and conditions of the grant award; nor is there any adequate evidence of waste, fraud, or abuse.

119.    And for both freezes and termination, 2 C.F.R. § 200.208 requires federal agencies to ensure that specific Federal award conditions and performance expectations are consistent with the program design. To that end, Section 200.208 allows the agency to impose specific conditions based on considerations such as compliance (or noncompliance) with the terms and conditions of the award and other risk factors. 2 C.F.R. § 200.208(b). Subsection 208 further requires the agency to provide notice of any specific conditions it decides to impose as a result of those risk factors, and to provide an opportunity to satisfy them; when satisfied, the specific conditions must be promptly removed.  2 C.F.R. § 200.208(d)-(e).

120.    2 C.F.R. § 200.339 provides remedies that apply when such specific conditions have not been met. Relevant here, the remedies include (a) imposing a temporary hold on payments until the recipient takes corrective action, and (c) suspension or termination of the award in its entirety.

121.    Defendants' actions are contrary to these procedures. Defendants effectively imposed a hold on payments and unilaterally terminated the awards without identifying any risk

factors, without imposing any specific conditions, without giving the required notice to the awardees, and without providing an opportunity to cure. 2 C.F.R. § 200.208. Contrary to Section 200.208's notice-and-cure requirements, Defendants operated in secret to lock up Plaintiffs' access to their accounts. In imposing a hold, Defendants improperly resorted to the remedies available for noncompliance with the specific conditions under Section 200.208 without making the prerequisite finding of noncompliance in the first place. 2 C.F.R. § 200.339(a).

122.    Based on the foregoing, plaintiffs are entitled to a declaration that the Defendants' conduct is unlawful under the Uniform Grant Guidance and OMB guidance regarding the same. Plaintiffs are therefore further entitled to a corresponding preliminary and permanent injunction barring EPA from unlawfully impeding the subrecipients' access to the Greenhouse Gas Reduction Fund accounts held in their name at Defendant Citibank.

## COUNT 3

### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2): ARBITRARY AND CAPRICIOUS (Federal Defendants)

123.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

124.    Defendants have taken final official action purporting to terminate the Greenhouse Gas Reduction Fund grants to the prime recipients, which were intended to implement the NCIF.

125.    Federal Defendants have also taken final official action effectuating a freeze on the Greenhouse Gas Reduction Fund's programs through the NCIF by instructing Defendant Citibank not to disburse funds to which subrecipients are entitled.

126.    The federal Defendants have not articulated any rational explanation as to why EPA is taking action to terminate the grant funds, or to instruct defendant Citibank not to disburse grant funds. Although Defendants have suggested concerns over waste, fraud, and abuse motivated their actions against the NCIF grantees and subgrantees, these concerns refer to allegations of irresponsible or suspicious statements and behavior by Defendant EPA's previous employees, not misconduct by grantees or subgrantees.

127.    Most of Defendants' actions in the name of policing waste, fraud, and abuse were routed through—and in fact run contrary to—EPA's existing structures for detecting and preventing fraud, waste, and abuse.

128.    It is particularly troubling that EPA continued its pressure campaign to freeze the accounts even after career prosecutors determined that probable cause did not exist, and despite a United States Magistrate's denial of a seizure warrant.

129.    Without any evidence suggesting waste, fraud, or abuse by the recipients of funds, the federal Defendants cannot make any "rational connection" between the information they possessed had and the actions they took.

130.    Based on the foregoing, plaintiffs are entitled to a declaration that the Defendants' decision to terminate the grant agreements and otherwise instruct defendant Citibank not to disburse the subrecipients' funds is arbitrary and capricious. Plaintiffs are further entitled to a corresponding preliminary and permanent injunction restoring the subrecipients' access to the Greenhouse Gas Reduction Fund accounts held in their name at Defendant Citibank.

## COUNT 4

### EQUITABLE ULTRA VIRES—CONDUCT OUTSIDE THE SCOPE OF STATUTORY AUTHORITY CONFERRED ON THE EXECUTIVE (Federal Defendants)

131.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

132.     Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015). Indeed, the Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

133.     No agency may take any action that exceeds the scope of its constitutional or statutory authority.

134.     No constitutional or statutory authority authorizes EPA to refrain from fulfilling its statutory duties, or to violate federal law.

135.     As detailed *supra* in paragraphs 95-122 and *infra* in paragraphs 155-164, the federal Defendants' conduct in freezing the subrecipients' accounts and terminating the grant awards was contrary to the Inflation Reduction Act, the Impoundment Control Act, and the Uniform Grant Guidance regulations in 2 C.F.R. Part 200, and is contrary to the Executive's constitutional duty to faithfully execute the laws of the United States.

136.     Nothing in the Inflation Reduction Act, 2 C.F.R. Part 200, or the Executive's constitutionally prescribed powers gave EPA authority to pursue a freeze and termination of Greenhouse Gas Reduction Fund grants based on its policy opposition to Congress's legislative judgments.

137.    Defendants' conduct in freezing the subrecipients' accounts and terminating the grant awards without regard to the authorizing statutes, regulations, and terms that govern the awards is contrary to law and outside of Defendants' authority.

138.    Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that Defendants' actions to freeze the subrecipients' accounts and terminate the grant awards is contrary to law and outside of Defendants' authority.

139.    Plaintiffs are further entitled to a preliminary and permanent injunction preventing Agency Defendants from maintaining or reinstating the termination and freeze, and agency actions implementing them.

## COUNT 5

### VIOLATION OF THE SEPARATION OF POWERS—USURPING THE LEGISLATIVE FUNCTION; APPROPRIATIONS CLAUSE; SPENDING CLAUSE; LEGISLATIVE VESTING CLAUSE (Federal Defendants)

140.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

141.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015). Plaintiffs are "entitled to invoke the equitable jurisdiction to restrain enforcement" of unconstitutional acts by federal officials. *Panama Ref. Co. v. Ryan*, 293 U.S. 388, 414 (1935).

142.    The Constitution "grants the power of the purse to Congress," not the executive agencies. *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018); *see* U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); U.S. Const. art. I, § 8, cl. 1 (Spending Clause). The Appropriations Clause thus provides that "[n]o Money shall be drawn from the Treasury, but

in Consequence of Appropriations made by Law." U.S. Const. Art. I, § 9, cl. 7. The

Appropriations Clause is a "straightforward and explicit command" that "no money can be paid

out of the Treasury unless it has been appropriated by an act of Congress." *Office of Pers. Mgmt.*

*v. Richmond*, 496 U.S. 414, 424 (1990) (quoting *Cincinnati Soap Co. v. United States*, 301 U.S.

308, 321 (1937)).

143.    Consistent with these principles, the executive acts at the lowest ebb of his

constitutional authority and power when he acts contrary to the will of Congress by attempting to

unilaterally decline to spend appropriated funds. *See Youngstown Sheet & Tube Co. v. Sawyer*,

343 U.S. 579, 637–38 (1952) (Jackson, J., concurring).

144.    Congress also possesses exclusive power to legislate. Article I, Section 1 of the

Constitution enumerates that: "[a]ll legislative Powers herein granted shall be vested in a

Congress of the United States, which shall consist of a Senate and a House of Representatives."

U.S. Const. art. I, § 1; *see also Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is

no provision in the Constitution that authorizes the President to enact, to amend, or to repeal

statutes.").

145.    The Constitution strictly controls how legislation enacted by Congress and signed

by the President may be amended or repealed. Article I of the Constitution prescribes a "single,

finely wrought and exhaustively considered[] procedure" for enacting such an amendment or

repeal: passage of a new bill by both houses of Congress and presentment to the President for his

signature or veto. *Immigration & Naturalization Serv. v. Chadha*, 462 U.S. 919, 951 (1983); *see*

U.S. Const. art. I, § 7, cls. 2, 3. The Constitution identifies specific roles for the Executive in the

lawmaking process, via the Recommendation Clause and the Presentment Clause, which creates

the President's veto power; outside these roles, the Executive Branch has no authority to change

the law to suit the President's policy. U.S. Const. art. II, § 3; *id.* § 7, cl. 2; *cf. Perry v. Merit Sys. Prot. Bd.*, 582 U.S. 420, 441 (2017) (Gorsuch, J., dissenting) ("If a statute needs repair, there's a constitutionally prescribed way to do it. It's called legislation. To be sure, the demands of bicameralism and presentment are real and the process can be protracted. But the difficulty of making new laws isn't some bug in the constitutional design: it's the point of the design, the better to preserve liberty.").

146.    By passing the Inflation Reduction Act through both houses of Congress and with the President's signature, Congress exercised its appropriations and spending power to create the Greenhouse Gas Reduction Fund. With that appropriation, Congress directed $20 billion to support green lending. Specifically, Congress appropriated funds to support direct investment, i.e., providing financial assistance to "qualified projects" that avoid or reduce greenhouse gas emissions and other pollution "in partnership with, and by leveraging investment from, the private sector," and indirect investment, i.e., establishing new or supporting existing green banks that would lend to qualified projects. 42 U.S.C. § 7434(a)(2)-(3), (b), (c)(1). Congress expressly directed EPA to start making grants by February 2023 and finish by September 30, 2024.

147.    The current presidential administration opposes the Inflation Reduction Act as bad policy. On his first day in office, President Trump directed his administration to "terminate the Green New Deal," by which he means the Inflation Reduction Act as well as the Infrastructure Investment and Jobs Act. As directed, the next week, EPA began categorically suspending the disbursement of grant funds appropriated under both laws.

148.    The federal Defendants' successful campaign to pressure Citibank into freezing Plaintiff's accounts under the NCIF subawards is an extension of that unlawful effort to unwind the Inflation Reduction Act's policy.

149.    Far from identifying grounds to suspect waste, fraud, or abuse by Plaintiffs in the expenditure of their subawards, the federal Defendants have justified their actions to freeze funds and terminate the grants by citing features of Congress's appropriation that they oppose. Chief among these objections are the financial agency arrangement with Citibank, *but see* 42 U.S.C. § 7434(c)(3)(A); *supra* paras. 2, 6, 34 (financial agency arrangements characteristic of public-private partnerships); the speed with which EPA obligated funds to grantees during the summer and fall of 2024, *but see* 42 U.S.C. § 7434(a)(2)-(3) (September 30, 2024 deadline to obligate funds); the creation of new green banks to manage grant funds, *but see id.* § 7434(b)(2) (defining "indirect investment"); and the discretion of green lenders to select the projects to finance, *but see id.* § 7434(b), (c)(1), (c)(3) (charging *grantees* with investing in or financing qualified projects). And the federal Defendants repeatedly and negatively highlight the size of the funds at issue—$20 billion—which was, of course, Congress's choice as well.

150.    If carried to its end, EPA's campaign to "poison the well" threatens to effectively repeal the appropriation altogether. By casting a cloud of uncertainty over the availability and legitimacy of the $20 billion appropriation, EPA will render the entire funding stream toxic to risk-averse financial market participants. Unless the rights of grantees and subgrantees to these duly obligated and disbursed funds are swiftly clarified, the entire $20 billion will likely be unusable for the purposes Congress intended.

151.    The Defendants' unilateral executive action to freeze the Plaintiffs' accounts and terminate the grant awards violates the separation of powers. By thwarting the disbursement of funds appropriated by Congress to the recipients it intended, based on the Executive's own policy opposition to the appropriation, the Executive has overridden the careful judgments of Congress. The federal Defendants' actions threaten to effectively zero out that appropriation—

something only Congress may do, and only through the mechanisms of bicameralism and

presentment.

152.     Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that

Defendants actions to freeze the subrecipients' accounts and terminate the grant awards violates

the constitutional separation of powers doctrine, the Appropriations Clause, the Spending Clause,

Legislative Vesting Clause, and/or the Presentment Clause, and impermissibly arrogates to the

executive power that is reserved to Congress.

153.     Plaintiffs are further entitled to a preliminary and permanent injunction preventing

Agency Defendants from maintaining or reinstating the termination and freeze, and agency

actions implementing them.


### COUNT 6

### VIOLATION OF THE SEPARATION OF POWERS—TAKE CARE CLAUSE (Federal Defendants)

154.     Plaintiffs incorporate by reference the allegations contained in the preceding

paragraphs.

155.     Federal courts possess the power in equity to grant injunctive relief "with respect

to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575

U.S. 320, 326–27 (2015). Plaintiffs are "entitled to invoke the equitable jurisdiction to restrain

enforcement" of unconstitutional acts by federal officials. *Panama Ref. Co. v. Ryan*, 293 U.S.

388, 414 (1935).

156.     The Constitution prescribes exactly what the Executive must do, prior to any

amendment or repeal, when the President disagrees with the law that Congress has passed:

execute it. The Take Care Clause provides that the Executive "shall take Care that the Laws be

faithfully executed." U.S. Const. Art. II, § 3; *Utility Air Reg. Grp. v. Env't Prot. Agency*, 573

U.S. 302, 327 (2014) ("Under our system of government, Congress makes laws and the President

. . . 'faithfully execute[s]' them.").

157.    The Executive violates the Take Care Clause where it declines to execute or

otherwise undermines statutes enacted by Congress and signed into law or duly promulgated

regulations implementing such statutes. *See In re United Mine Workers of Am. Int'l Union*, 190

F.3d 545, 551 (D.C. Cir. 1999) ("the President is without authority to set aside congressional

legislation by executive order"); *Kendall v. United States*, 37 U.S. 524, 613 (1838) (rejecting

argument that by charging the President with faithful execution of the laws, the Take Care

Clause "implies a power to forbid their execution").

158.    The current presidential administration opposes the Inflation Reduction Act as

bad policy. On his first day in office, President Trump directed his administration to "terminate

the Green New Deal," by which he means the Inflation Reduction Act as well as the

Infrastructure Investment and Jobs Act. As directed, the next week, EPA began categorically

suspending the disbursement of grant funds appropriated under both laws.

159.    The federal Defendants' successful campaign to pressure Citibank into freezing

Plaintiff's accounts under the NCIF subawards is an extension of that unlawful effort to unwind

the Inflation Reduction Act's policy.

160.    Far from identifying grounds to suspect waste, fraud, or abuse by Plaintiffs in the

expenditure of their subawards, the federal Defendants have justified their actions to freeze funds

and terminate the grants by citing features of Congress's appropriation that they oppose. *See*

*supra* para. 149.

161.    If carried to its end, EPA's campaign to "poison the well" threatens to effectively repeal the appropriation altogether. By casting a cloud of uncertainty over the availability and legitimacy of the $20 billion appropriation, EPA will render the entire funding stream toxic to risk-averse financial market participants. Unless the rights of grantees and subgrantees to these duly obligated and disbursed funds are swiftly clarified, the entire $20 billion will likely be unusable for the purposes Congress intended.

162.    The Defendants' unilateral executive action to freeze the Plaintiffs' accounts and terminate the grant awards violates the separation of powers. Far from faithfully executing Congress's appropriation, the federal Defendants' actions threaten to effectively zero out that appropriation.

163.    Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that Defendants actions to freeze the subrecipients' accounts and terminate the grant awards violates the constitutional separation of powers doctrine and the Take Care Clause.

164.    Plaintiffs are further entitled to a preliminary and permanent injunction preventing Agency Defendants from maintaining or reinstating the termination and freeze, and agency actions implementing them.

## COUNT 7

## VIOLATION OF THE SPENDING CLAUSE AND TENTH AMENDMENT (Federal Defendants)

165.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

166.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575

U.S. 320, 326–27 (2015). "[T]he President's actions may . . . be reviewed for constitutionality." *Franklin v. Mass.*, 505 U.S. 788, 801 (1992). Plaintiffs are "entitled to invoke the equitable jurisdiction to restrain enforcement" of unconstitutional acts by federal officials, including "executive orders." *Panama Ref. Co. v. Ryan*, 293 U.S. 388, 414 (1935)

167.    The Spending Clause of the U.S. Constitution provides that Congress—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States . . . ." U.S. Const. art. I, § 8, cl. 1.

168.    The Tenth Amendment of the U.S. Constitution provides that "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

169.    When actions by the federal government come in the form of "threats to terminate . . . significant independent grants," the actions "are properly viewed as a means of pressuring the States to accept policy changes" and are barred by the Tenth Amendment. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 580 (2012).

170.    States must also have fair notice of the terms that apply to the disbursement of funds to them. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 25 (1981); *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 583–84 (2012).

171.    The Defendants' actions to freeze the subrecipients' accounts and terminate the grant awards altered the terms upon which grants were obligated and disbursed contrary to Congressional authority. These alterations are coercive, retroactive, ambiguous, and unrelated to the purpose of the grants affected.

172.    Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Defendants' actions to freeze the subrecipients' accounts and terminate the grant awards violates the Spending Clause.

173.    Plaintiffs are also entitled to a preliminary and permanent injunction barring the Agency Defendants from maintaining or reinstating the account freezes or grant terminations, and agency actions implementing them.

## COUNT 8

### BREACH OF CONTRACT (Citibank)

174.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

175.    Plaintiffs each entered into a valid contract with Citibank when they executed their respective ACAs.

176.    Plaintiffs have each performed in accordance with the contract. Pursuant to Section 2 of the ACAs, since February 14, 2025, Plaintiffs have each submitted or attempted to submit instructions to Citibank substantially in the form of Exhibit B to the ACAs, the Account Direction form, to disburse funds from their Accounts.

177.    The ACAs impose a duty on Citibank to comply with "all instructions, notifications and entitlement orders [Citibank] receives directing the disposition of funds and financial assets in the Accounts" from Plaintiffs, "until that time that [Citibank] receives a notice, substantially in the form attached hereto as Exhibit A (a "Notice of Exclusive Control") from [CGC]." On information and belief, Citibank has not received a Notice of Exclusive Control from CGC.

178.    Since February 14, Citibank has declined to comply with Plaintiffs' valid instructions to disburse funds. Citibank has also refused to confirm that it will comply with Plaintiffs' valid instructions moving forward. Plaintiffs' Citibank accounts are currently frozen.

179.    Citibank has therefore breached the ACAs by freezing Plaintiffs' accounts and failing to comply with Plaintiffs' valid instructions directing the disposition of funds and financial assets in Plaintiffs' Citibank Accounts.

180.    Plaintiffs have suffered, and will continue to suffer, damage as a direct result of Citibank's breach. Such damage has resulted solely from Citibank's own gross negligence and willful misconduct.

181.    Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that (1) Citibank's failure to disburse funds from Plaintiffs' Citibank Accounts is a breach of the ACAs, and (2) Citibank must abide by all instructions issued by Plaintiffs unless and until CGC issues a Notice of Exclusive Control.

182.    Plaintiffs are further entitled to an injunction and order mandating that Citibank specifically perform its obligations under the ACA, including its obligations under Section 2 of the ACA to disburse funds in accordance with valid Pledgor instructions.

### COUNT 9

### SPECIFIC PERFORMANCE (Citibank)

183.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

184.    Plaintiffs each entered into a valid contract with Citibank when they executed their respective ACAs.

185. Plaintiffs have substantially performed their contractual obligations, and are willing and able to perform their remaining obligations.

186. Citibank is able to fulfill its contractual obligations by complying with Plaintiffs' valid instructions directing the disposition of funds and financial assets in Plaintiffs' Citibank accounts.

187. Plaintiffs lack an adequate remedy at law. In particular, Plaintiffs face irreparable harms, including reputational harms and the imminent suspension of lending to mission-critical qualified projects, that a later damages award would come too late to remedy.

188. Therefore, Plaintiffs are entitled to an injunction and order mandating that Citibank specifically perform its obligations under the ACA, including its obligations under Section 2 of the ACA to disburse funds in accordance with valid Pledgor instructions.

## COUNT 10

## CONVERSION (Citibank)

189. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

190. In accordance with the ACAs, Plaintiffs have an immediate legal right to possess the funds and financial assets held in their Citibank accounts.

191. Citibank has wrongfully and intentionally exercised dominion and control over Plaintiffs' funds in Plaintiffs' accounts without Plaintiffs' consent, including by failing to comply with Plaintiffs' valid instructions directing the disposition of the funds and financial assets in Plaintiffs' accounts, without any lawful justification.

192.    Citibank has exercised an unauthorized dominion over the funds in Plaintiffs' accounts to the exclusion of Plaintiffs' right of possession, including by failing to comply with Plaintiffs' valid and lawful instructions.

193.    Citibank's actions have caused injury to Plaintiffs.

194.    Plaintiffs are entitled to damages in an amount to be determined at trial.

195.    Plaintiffs are entitled to an injunction and order mandating that Citibank cease its wrongful retention of the funds in Plaintiffs' accounts resulting from its failure to comply with Plaintiffs' lawful instructions.

196.    Under 28 U.S.C. § 2201, Plaintiffs are further entitled to a declaration that Citibank's failure to comply with the valid and lawful instructions of Plaintiffs directing the disposition of funds and financial assets in Plaintiffs' Accounts constitutes a conversion of Plaintiffs' accounts and the funds in the accounts.


## COUNT 11

### REPLEVIN (Citibank)

197.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

198.    Plaintiffs have an immediate and superior legal right to direct the disposition of funds and financial assets in their Citibank accounts, and to direct the disposition of any funds and financial assets as instructed to Citibank thereafter.

199.    Citibank has wrongfully and unlawfully withheld the funds and financial assets in Plaintiffs' accounts from Plaintiffs, including by failing to comply with Plaintiffs' valid and lawful instructions.

200.    Plaintiffs demanded that Citibank disburse the funds and financial assets in Plaintiffs' accounts, but Citibank refused to do so.

201.    Citibank's intentional actions have caused injury to Plaintiffs.

202.    Plaintiffs are entitled to an injunction and order mandating that Citibank cease its wrongful detention of Plaintiffs' Citibank Accounts, and the funds therein, as a result of its failure to comply with Plaintiffs' valid and lawful instructions directing the deposit of funds and financial assets in Plaintiffs' Accounts.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

1.    Issue a judicial declaration that Defendants EPA, Zeldin, and McIntosh's actions to direct Citibank to freeze Plaintiffs' funds and to terminate the NCIF award are unconstitutional and/or unlawful because they violate the APA and the U.S. Constitution;

2.    Pursuant to 5 U.S.C. § 706, vacate the purported termination of the NCIF award;

3.    Preliminarily and permanently enjoin the federal Defendants from issuing instructions to Citibank to freeze, withhold, or transfer NCIF funds except in strict accordance with the terms of the Financial Agency Agreement;

4.    Issue a judicial declaration that Citibank's failure to honor Plaintiffs' instructions to disburse funds in their accounts violates the Account Control Agreements and other applicable law and constitutes breach of contract and a conversion of Plaintiffs' accounts and the funds therein;

5.    Enjoin and order Citibank to cease wrongfully detaining Plaintiffs' funds by failing to comply with Plaintiffs' lawful and valid instructions directing the disposition of funds

and financial assets in Plaintiffs' accounts, and directing Citibank to specifically perform its

contractual obligations under the ACAs, including by complying with Plaintiffs' valid and lawful

instructions, both with respect to Plaintiffs' previously submitted instructions and any future

instructions;

6.      Award damages against Citibank, in an amount to be determined at trial;

7.      Award the Plaintiffs their reasonable fees, costs, and expenses, including

attorneys' fees, pursuant to 28 U.S.C. § 2412; and

8.      Grant other such relief as this Court may deem proper.

Respectfully submitted,

ROB BONTA
Attorney General of California

s/ Meghan Strong
**MEGHAN STRONG**
THEODORE A. MCCOMBS
JOHN D. ECHEVERRIA
DYLAN REDOR
MEGAN RICHARDS
Deputy Attorneys General
California Department of Justice
455 Golden Gate Avenue
San Francisco CA 94102
(415) 510-3877
meghan.strong@doj.ca.gov

*Attorneys for California Infrastructure and
Economic Development Bank*

KEITH ELLISON
Minnesota Attorney General

s/ Peter N. Surdo
**PETER N. SURDO**
Special Assistant Attorney General
OLIVER LARSON
Manager, Environment and Natural Resources
Division
CATHERINE RIOS-KEATING
Special Assistant Attorney General
Minnesota Attorney General's Office
445 Minnesota Street, Suite 600
651-757-1061
peter.surdo@ag.state.mn.us

*Attorneys for Minnesota Climate Innovation
Finance Authority*

KWAME RAOUL
Attorney General of Illinois

s/ Jason E. James
**JASON E. JAMES**
Assistant Attorney General
MATTHEW J. DUNN
Chief, Environmental
Enforcement/Asbestos Litigation Division
Office of the Attorney General of Illinois
201 W. Pointe Drive, Suite 7
Belleville, IL 62226
(217) 843-0322
jason.james@ilag.gov

*Attorneys for Illinois Finance Authority*

AARON M. FREY
Attorney General of Maine

s/ Emma Akrawi
**EMMA AKRAWI**
SCOTT W. BOAK
Assistant Attorneys General
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333
(207) 626-8800
Emma.Akrawi@maine.gov

*Attorneys for Efficiency Maine Trust*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK,** <br> 1325 J Street, Suite 1300, <br> Sacramento, CA 95814 <br><br> and <br><br> **EFFICIENCY MAINE TRUST,** <br> 168 Capitol Street, Suite 1 <br> Augusta, ME 04330 <br><br> and <br><br> **ILLINOIS FINANCE AUTHORITY,** <br> 160 N. LaSalle St., Suite S-1000 <br> Chicago, IL 60601 <br><br> and <br><br> **MINNESOTA CLIMATE INNOVATION FINANCE AUTHORITY,** <br> 85 7th Place East, Suite 280, <br> Saint Paul, Minnesota 55101 <br><br>       Plaintiffs, <br>   v. <br><br> **CITIBANK, N.A.,** <br> 5800 South Corporate Place <br> Sioux Falls, South Dakota 57108, <br><br> and <br><br> **U.S. ENVIRONMENTAL PROTECTION AGENCY** and **LEE ZELDIN** and **W.C. MCINTOSH**, in their official capacities as Administrator and Acting Deputy Administrator of the U.S. Environmental Protection Agency, <br><br>       Defendants. | Civil No. 25-cv-820 |

1

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Federal Rule of Civil Procedure 65 and Local Civil Rule 65.1(c), Plaintiffs California Infrastructure and Economic Development Bank, Efficiency Maine Trust, Illinois Finance Authority, and Minnesota Climate Innovation Finance Authority hereby move for a preliminary injunction that (1) converts the relief extended in the Court's temporary restraining order, issued in related case *Climate United Fund et al. v. Citibank, N.A. et al.*, Case No. 1:25-cv-698, ECF No. 28, to a preliminary injunction that lasts the duration of this action and (2) further enjoins Defendant Citibank, N.A. ("Citibank") from violating its obligations to disburse funds in response to valid, ordinary-course disbursement instructions from Plaintiffs. Plaintiffs further request that the Court order the Defendants to file a status report within twenty-four hours of the issuance of any preliminary injunction confirming their compliance with the order.

As set forth below, Defendants have unlawfully withheld funds from Plaintiffs in violation of the Administrative Procedure Act, the Constitution, and the parties' contractual obligations. Plaintiffs will suffer imminent and irreparable injury should Defendants continue to illegally withhold these funds or seek to transfer them to the federal government.

**Local Civil Rule 7(m) Statement**:  Counsel for Plaintiffs conferred with counsel for Defendants prior to filing this motion.  The parties reached agreement regarding the timing for filing, briefing, and hearing this motion, as reflected in their Joint Status Report, ECF No. 10. Defendants oppose Plaintiffs' motion.

JA1260

Date:  March 24, 2025                    Respectfully submitted,

ROB BONTA                                KEITH ELLISON
Attorney General of California           Minnesota Attorney General

s/ Meghan Strong_____                s/ Peter N. Surdo
**MEGHAN STRONG**                        **PETER N. SURDO**
THEODORE A. MCCOMBS                      Special Assistant Attorney General
JOHN D. ECHEVERRIA                       OLIVER LARSON
DYLAN REDOR                              Manager, Environment and Natural Resources
MEGAN RICHARDS                           Division
Deputy Attorneys General                 CATHERINE RIOS-KEATING
California Department of Justice          Special Assistant Attorney General
455 Golden Gate Avenue                   Minnesota Attorney General's Office
San Francisco CA 94102                   445 Minnesota Street, Suite 600
(415) 510-3877                           651-757-1061
meghan.strong@doj.ca.gov                 peter.surdo@ag.state.mn.us

*Attorneys for California Infrastructure and*    *Attorneys for Minnesota Climate Innovation*
*Economic Development Bank*                       *Finance Authority*


KWAME RAOUL                              AARON M. FREY
Attorney General of Illinois             Attorney General of Maine

s/ Jason E. James_____               s/ Emma Akrawi_____
**JASON E. JAMES**                       **EMMA AKRAWI**
Assistant Attorney General               SCOTT W. BOAK
MATTHEW J. DUNN                          Assistant Attorneys General
Chief, Environmental                     Office of the Maine Attorney General
Enforcement/Asbestos Litigation Division 6 State House Station
Office of the Attorney General of Illinois Augusta, ME 04333
201 W. Pointe Drive, Suite 7             (207) 626-8800
Belleville, IL 62226                     Emma.Akrawi@maine.gov
(217) 843-0322
jason.james@ilag.gov                     *Attorneys for Efficiency Maine Trust*

*Attorneys for Illinois Finance Authority*

3

JA1261

## TABLE OF CONTENTS

Page

Introduction ......................................................................................................8

Statement of Facts ............................................................................................9

    I.      Plaintiffs Are Subgrantees of Funds Appropriated under the Inflation Reduction Act ..............................................................................9

    II.     Plaintiffs Execute Account Control Agreements with Citibank...........10

    III.    Plaintiffs' Requests for Disbursements under the ACAs and Citibank's Refusal to Comply .................................................................................11

    IV.    Defendants' Funding Freezes and Ultimate Terminations Without Evidence or Support.............................................................................12

    V.     NCIF Grantees File Suit Against Citibank and EPA and Obtain a Temporary Restraining Order.............................................................15

Legal Standard ...............................................................................................16

Argument .......................................................................................................16

    I.      Plaintiffs Are Likely to Succeed on the Merits ...................................16

          A.     Plaintiffs Are Likely to Succeed on the Merits of Their Claims Against the EPA Defendants.........................................................18

              1.     The Termination Notice Is Contrary to Law and Unconstitutional..........................................................18

              2.     The Termination Notice Violates Federal Regulations................20

          B.     Plaintiffs Are Likely to Succeed on the Merits of Their Claims Against Citibank.......................................................................21

    II.     Plaintiffs Will Suffer Irreparable Injury............................................22

          A.     Plaintiffs Face Imminent Loss of Business and Reputational Harms from EPA's and Citibank's Freeze of NCIF Funds ...................23

          B.     Plaintiffs Face Imminent Reputational Harms from EPA Effectuating its Termination Notice.............................................26

          C.     Plaintiffs Face Irreparable Economic Harms from EPA Clawing Back Funds Based on the March 11 Termination Notice........................28

    III.    The Balance of Equities Weighs in Favor of Plaintiffs ......................30

    IV.    The Public Interest Favors a Preliminary Injunction ...........................30

Conclusion ....................................................................................................31

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Advance Am. v. FDIC*
2017 WL 2672741 (D.D.C. Feb. 23, 2017)........................................................16

*\*Atlas Air, Inc. v. Int'l Bhd. of Teamsters*
280 F. Supp. 3d 49 (D.D.C. 2017) ...................................................................26

*Beattie v. Barnhart*
663 F. Supp. 2d 5 (D.D.C. 2009) .....................................................................23

*Bowen v. Massachusetts*
487 U.S. 879 (1988) ........................................................................................17

*City & Cnty. of San Francisco v. Trump*
897 F.3d 1225 (9th Cir. 2018) ........................................................................19

*\*City of Houston v. Dep't of Hous. & Urban Dev.*
24 F.3d 1421 (D.C. Cir. 1994).........................................................................28

*Climate United Fund v. Citibank, N.A. et al.*
No. 1:25-cv-698 ......................................................................................*passim*

*Clinton v. City of New York*
524 U.S. 417 (1998) ........................................................................................19

*Cmtys. for a Better Env't v. Cenco Ref. Co.*
179 F. Supp. 2d 1128 (C.D. Cal. 2001)............................................................31

*Coalition for Green Capital v. Citibank, N.A. et al.*
No. 1:25-cv-735 ...............................................................................................15

*Confed. Tribes of Chehalis Rsrv. v. Mnuchin*
2020 WL 3791874 (D.D.C. July 7, 2020) ........................................................28

*\*Endo Par Innovation Co., LLC v. Becerra*
2024 WL 2988904 (D.D.C. 2024) ...................................................................29

*Kirwa v. U.S. Dept. of Defense*
285 F. Supp. 3d 21 (D.D.C. 2017) ...................................................................17

*\*League of Women Voters of U.S. v. Newby*
838 F.3d 1 (D.C. Cir. 2016)..............................................................................31

## TABLE OF AUTHORITIES

<u>**Page**</u>

*Open Cmtys. All. v. Carson*
   286 F. Supp. 3d 148 (D.D.C. 2017) ...................................................................30

*Pac. Merch. Shipping Ass'n v. Goldstene*
   639 F.3d 1154 (9th Cir. 2011) ..........................................................................30

*Patriot, Inc. v. U.S. Dept. of Hous. & Urban Dev.*
   963 F. Supp. 1 (D.D.C. 1997) ..........................................................................26

*Rodriguez v. Robbins*
   715 F.3d 1127 (9th Cir. 2013) ..........................................................................30

*Sherley v. Sebelius*
   644 F.3d 388 (D.C. Cir. 2011) .........................................................................16

*Winter v. Nat. Res. Def. Council, Inc.*
   555 U.S. 7 (2008) .............................................................................................16

STATUTES

United States Code, Title 5
   § 706(2)(C) ......................................................................................................18

United States Code, Title 42
   § 7434(a)(2)-(3).................................................................................... 9, 18, 19
   § 7434(c)(1) ......................................................................................................29

Clean Air Act
   § 134 ...................................................................................................................9

CONSTITUTIONAL PROVISIONS

United States Constitution, Article I
   § 1 ....................................................................................................................19

COURT RULES

Federal Rules of Civil Procedure
   Rule 65(b)(1)....................................................................................................16

JA1264

# TABLE OF AUTHORITIES

**Page**

OTHER AUTHORITIES

Code of Federal Regulations, Title 2
§ 200 .................................................................................................. 18, 20
§ 200.113 ................................................................................................. 13
§ 200.303 ................................................................................................. 13
§ 200.340 ................................................................................................. 20
§ 200.340(a)(4) ........................................................................................ 20
§ 200.340(b) ....................................................................................... 20, 21
§§ 200.345-346 ........................................................................................ 30
§§ 200.399-40 .......................................................................................... 14
§ 200.501 ................................................................................................. 13

Federal Register
Vol. 89 ............................................................................................... 20, 21
Vol. 90 ..................................................................................................... 19

*Read the Resignation Letter by Denise Cheung, a Veteran D.C. Federal
Prosecutor*, THE WASHINGTON POST (Mar. 6, 2025),
https://www.washingtonpost.com/dc-md-va/2025/02/18/read-resignation-
letter-denise-cheung/ ................................................................................ 14

JA1265

## STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

### INTRODUCTION

For over a month, Defendants have engaged in a series of unlawful actions that have deprived Plaintiffs of access to and use of funds to which they are legally entitled. Without any legal basis for doing so, EPA has purported to terminate National Clean Investment Fund (NCIF) grants, of which Plaintiffs are subgrantees, and Citibank has refused to disburse funds to Plaintiffs despite its clear contractual obligation to do so. EPA's actions are contrary to law, *ultra vires*, arbitrary and capricious, and constitute a fundamental violation of separation of powers. Citibank, in turn, has willfully breached its contracts with Plaintiffs. The Court already concluded in related litigation that the primary recipients of the grants are likely to succeed on the merits of their claims against Defendants. The same is true of Plaintiffs here, who are subgrantees of one of those primary grantees, Coalition for Green Capital (CGC).[1]

For their part, Plaintiffs have acted consistent with Congress's directives for these funds and Plaintiffs' contracts with Citibank. But Defendants actions now prevent them from effectuating their missions and congressional mandates. Without access to these funds, Plaintiffs are already suffering, and will continue to suffer, irreparable economic and reputation harms. And while the TRO relief the Court ordered in the related litigation extends to Plaintiffs' funds, Plaintiffs filed their own action to ensure their rights are protected and to provide evidence of their unique and direct harms as subgrantees. Plaintiffs further seek a preliminary injunction to ensure that injunctive relief extends for the full duration of any dispute among the parties. The Court should convert the temporary restraining order it already issued to a preliminary injunction

---

[1] As noted in the parties Joint Status Report, ECF No. 10, Plaintiffs agreed to make their best efforts to avoid duplicating the issues briefed in the prime grantee plaintiffs' Memorandum of Law in Support of Consolidated Motion for Preliminary Injunction, filed in the related, consolidated action. *Climate United Fund*, No. 1:25-cv-698, ECF No. 33-1. Plaintiffs hereby incorporate by reference the arguments made in the primary grantee plaintiffs' motion to the extent they are relevant to Plaintiffs' motion. *Id.* at 38-55, 65-67, 70-71 (citations to ECF-generated pagination throughout). Plaintiffs set out in this motion a short summary of certain of their positions on the merits for context but, consistent with their agreement with Defendants, focus mainly on their particular harms as state green banks.

JA1266

and issue further relief enjoining Citibank from violating its obligations to disburse funds in response to valid, ordinary-course disbursement instructions from Plaintiffs. Such injunctive relief is necessary to ensure that Plaintiffs' interests in the NCIF funds, to which they are lawfully entitled, are protected.

## STATEMENT OF FACTS

### I.   PLAINTIFFS ARE SUBGRANTEES OF FUNDS APPROPRIATED UNDER THE INFLATION REDUCTION ACT

In 2022, both houses of Congress passed, and the President signed, the Inflation Reduction Act, Pub. L. No. 117-169, 136 Stat. 1818. The Act added Section 134 to the Clean Air Act, *see id.* § 60103, 136 Stat. 2067-67, which created the Greenhouse Gas Reduction Fund. The Greenhouse Gas Reduction Fund appropriates $20 billion for financing zero-emission and other pollution-reducing projects, colloquially called "green" lending, with $8 billion earmarked for green lending to low-income and disadvantaged communities. 42 U.S.C. § 7434(a)(2)-(3). Congress instructed EPA to "make grants" within 180 days to recipients—with an ultimate deadline of September 30, 2024—to support both "direct" lending to greenhouse gas-reducing projects and "indirect investment," i.e., providing funds and technical assistance to create new or support existing green banks at the state and local level. *Id.* § 7434(a)(2)-(3), (b).

EPA created three grant programs under the Greenhouse Gas Reduction Fund. One of these programs, the National Clean Investment Fund (NCIF), directs $14 billion to establish national green lending institutions to deliver accessible and affordable financing for clean technology projects nationwide. One of the prime grantees of this fund, Coalition for Green Capital (CGC), was awarded a $5 billion grant that specifically contemplated subgranting its awarded funds to various recipients. Plaintiffs are subrecipients under CGC's NCIF grant. Plaintiffs will use their NCIF funds to support projects that will create jobs, improve the environment, build critical infrastructure, and provide for resiliency and adaptation programs in their respective States.

JA1267

## II.  PLAINTIFFS EXECUTE ACCOUNT CONTROL AGREEMENTS WITH CITIBANK

The NCIF award requires Plaintiffs' subgrant funds to be held at Citibank under a financial agency agreement between Citibank and the U.S. Department of Treasury.  Each Plaintiff's account at Citibank is governed by an Account Control Agreement (ACA) between Citibank (as Bank), CGC (as the Secured Party), and the Plaintiff (as Pledgor).  Each Plaintiff's ACA sets forth Citibank's obligations to follow disbursement instructions from the accountholder (i.e. Plaintiff, as Pledgor), as well as an exclusive mechanism whereby CGC (as the Secured Party) may take control of the accounts.  Unlike primary grantees like CGC, for whom the Secured Party on their ACA is EPA, EPA is not a party to Plaintiffs' ACAs, nor does EPA have any rights to assert control over Plaintiffs' accounts under the respective ACAs.

Plaintiffs' ACAs make clear that Citibank is not authorized to restrict Plaintiffs' access to their Accounts unless CGC first issues a Notice of Exclusive Control to Citibank, or a court issues a final order or process with respect to the assets in Plaintiffs' Citibank accounts.

Section 1(a) of each ACA provides that Citibank "maintains the Accounts for the Pledgor"—here, each Plaintiff—"and all property (including, without limitation, all funds and financial assets) held by [Citibank] for the accounts of the Pledgor are, and will continue to be, credited to the Accounts in accordance with the instructions given by the Pledgor (unless otherwise provided herein)." Wu Decl. Ex. 1 at 1.[2]

> Section 2 requires Citibank to:
> comply with all instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and financial assets in the Accounts including, without limitation, directions to distribute proceeds of any such transfer or redemption of interest or dividends on financial assets in the Accounts, substantially in the form attached hereto . . . , originated by the Pledgor, until the time that that Bank receives a notice, substantially in the form attached hereto as Exhibit A (a 'Notice of Exclusive Control') from the Secured Party that the Secured Party is exercising its right to exclusive control over an Account.

---

[2] Citations are to IBank's ACA, but each of Plaintiffs' ACAs are attached to their representative's respective declarations and are the same for purposes of the relevant provisions cited herein.

JA1268

*Id.* at 2.  In Plaintiffs' ACAs, the Secured Party is the prime NCIF grantee, CGC.  *See id.* at 1.

After Citibank receives such a notice, Citibank must "comply with all instructions, notifications, and entitlement orders" it receives from CGC, "without further consent by the Pledgor."  *Id.* at 2.

The Notice of Exclusive Control is the exclusive mechanism for Citibank to disregard the accountholder's instructions.  Indeed, Section 6(a) takes pains to limit "the duties, responsibilities, and obligations of the Bank" (i.e., Citibank) "to those expressly set forth in the Agreement," and Section 9 confirms that the ACA "constitutes the entire agreement between the parties and sets forth in its entirety the obligations and duties of the Bank with respect to the assets in the Accounts."  *Id.* at 3, 5.

Each ACA further clarifies the consequences of particular government actions.  Section 6(c) of the ACAs authorizes Citibank "to comply with final orders issued or process entered by any court with respect to the assets in the Accounts, without determination by the Bank of such court's jurisdiction in the matter."  *Id.* at 4.  Section 6(b) of the ACA limits Citibank's liability "for any damage, loss, or injury resulting from any action taken or omitted in the absence of gross negligence or willful misconduct (as finally adjudicated by a court of competent jurisdiction)."  *Id.*  It also limits Citibank's liability "for not performing any act or fulfilling any obligation hereunder by reason of any occurrence beyond its control (including, without limitation, any provision of any present or future law or regulation or any act of any governmental authority. . . .)."  *Id.*

## III.   PLAINTIFFS' REQUESTS FOR DISBURSEMENTS UNDER THE ACAS AND CITIBANK'S REFUSAL TO COMPLY

Despite Citibank's clear obligations under the ACAs, Citibank has refused to comply with the parties' agreements.  Since February 14, 2025, Plaintiffs have submitted instructions to Citibank directing that funds and financial assets in their Citibank accounts be disbursed using the proper "Account Direction" form specific in the ACA.  Wu Decl. ¶¶ 14-20; Meister Decl. ¶¶ 13-14; Stoddard Decl. ¶¶ 16-18; Swan Decl. ¶¶ 17-23.  Plaintiffs' submitted requests were

valid and proper; they complied with all applicable requirements of the ACA.  Wu Decl. ¶¶ 14-
20; Meister Decl. ¶¶ 13-14; Stoddard Decl. ¶¶ 16-18.

      Citibank has failed to comply with the Plaintiffs' valid instructions for disbursement.
Plaintiffs' Citibank accounts do not reflect that any transaction has occurred, and Plaintiffs to
date have not received any funds from their Citibank accounts.  Wu Decl. ¶¶ 20-25; Meister
Decl. ¶¶ 13-14; Stoddard Decl. ¶¶ 16-18.

      Plaintiffs have reached out to Citibank repeatedly requesting that Citibank identify the
basis for its apparent refusal to comply with valid disbursement instructions and demanding that
Citibank immediately disburse Plaintiffs' funds.  Citibank has ignored Plaintiffs' inquiries.  On
February 26, 2025, IBank contacted Citibank to request that they identify the basis for their
refusal to comply with disbursement instructions and to state that Citibank's refusal to comply
with disbursement instructions was causing significant harm.  Wu Decl. ¶ 26 & Ex. 4.   Citibank
did not respond.  On March 7, 2025, the Attorneys General for the States of Minnesota, Maine,
Maryland, and New York, all of which have state green banks that are subrecipients under
CGC's award, similarly emailed Citibank a letter requesting the basis for Citibank's failure to
comply with its obligations and demanding that Citibank immediately disburse Plaintiffs' funds
in accordance with their instructions.  Swan Decl. ¶ 24.  Still Citibank did not reply. Swan Decl.
¶ 25 & Ex. 2.

## IV.    DEFENDANTS' FUNDING FREEZES AND ULTIMATE TERMINATIONS WITHOUT EVIDENCE OR SUPPORT

      It quickly became clear that Citibank's refusal to comply with its obligations under the
ACAs was due to the new federal administration's hostility to the Inflation Reduction Act.  On
the first day of his second term, January 20, 2025, President Trump announced his
administration's policy of "[t]erminating the Green New Deal." Exec. Order 14154, 90 Fed. Reg.
8353, 8357 (Jan. 29, 2025).  The executive order makes clear that this "Green New Deal" refers
to the entirety of the Inflation Reduction Act and the Infrastructure Investment Jobs Act, two
duly enacted laws that the President views as unsound policy.  *Id.*  Consistent with this directive

and other agency pronouncements, EPA began "freezing" funding for programs under both the Inflation Reduction Act and the Infrastructure Investment Jobs Act.

Setting its sights on NCIF funds, EPA began a media campaign smearing the program, issued an unlawful directive to Citibank to freeze the funds in Plaintiffs' and other grantee and subgrantees' accounts, and ultimately proclaimed to terminate the grant program altogether.

Defendants EPA, Zeldin, and McIntosh—and, on information and belief, other senior EPA political appointees not yet identified—began making public, unsupported accusations of waste, fraud, and abuse to justify future action to "claw back" the NCIF funds disbursed to Citibank. As further detailed in Plaintiffs' complaint, Administrator Zeldin made a series of statements in the media, claiming that the Greenhouse Gas Reduction Fund was a "scheme" that was "purposefully designed to obligate all of the money in a rush job with reduced oversight." Compl. ¶ 59.

Contrary to Administrator Zeldin's claims, the NCIF award and subawards are subject to the same robust controls as any other EPA-administered grant. The recipients are the subject of audits, 2 C.F.R. § 200.501, must establish and maintain effective internal controls, 2 C.F.R. § 200.303, and must disclose specific information related to integrity and compliance, 2 C.F.R. § 200.113.

Instead of invoking these well-defined mechanisms for policing grants, without any lawful basis and before it had even purported to terminate the grants, EPA directed Citibank to freeze NCIF award funds entirely. On February 17, 2025—in a process that ultimately led veteran prosecutor Denise Cheung to resign—the FBI apparently sent two separate letters to Citibank making a "recommendation" to place a 30-day administrative freeze on the NCIF funds. Compl. ¶¶ 64-67. Though the letters suggested the freeze was a recommendation, it is clear they were intended to coerce Citibank into freezing the accounts. The interim United States' Attorney's demand that Ms. Cheung issue a letter to Citibank affirmatively ordering Citibank to freeze the

accounts confirms this.[3]  *Id.*  But whatever the language used, Citibank got the message. Apparently acting on this recommendation, Citibank froze Plaintiffs' accounts, and the funds have been inaccessible for draw-downs by Plaintiffs ever since.  Wu Decl. ¶ 25; Meister Decl. ¶ 14; Stoddard Decl. ¶¶ 17-18.

Directing Citibank to freeze the accounts was not enough for the EPA.  On March 11, 2025, less than 24 hours before the Court was to hear argument in a related case on a grant awardee's motion for temporary restraining order related to this freeze, EPA sent all NCIF grant awardees, including CGC, a notice purporting to terminate their awards effective immediately. Strong Decl. Ex. B.  The termination letters, signed by Defendant McIntosh, all included similar content:

- An invocation of agency "authority under 2 C.F.R. §§ 200.399-40 (*sic*)";
- An allegation of "substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities, which collectively undermine the fundamental goals and statutory objectives of the award";
- Several allegations of alleged material deficiencies relating to oversight; and
- The Agency's desire to guard against "potential" violations of the Appointments Clause and the private nondelegation doctrine.

The March 11 termination letter to CGC did not identify what the "substantial concerns" were.  It did not identify whether any alleged programmatic fraud actually existed, or the basis on which it had been identified.  It did not identify what the Agency's priorities were, or how the grantee's project was misaligned with them.  It also did not identify what material deficiencies existed with respect to oversight.  As far as EPA's or the Administrator's public statements shed any light on these "substantial concerns," they suggest concerns with EPA's past conduct, not

---

[3] *Read the Resignation Letter by Denise Cheung, a Veteran D.C. Federal Prosecutor*, THE WASHINGTON POST (Mar. 6, 2025),  https://www.washingtonpost.com/dc-md-va/2025/02/18/read-resignation-letter-denise-cheung/.

CGC's or its subgrantees' actions.  The termination letter concluded with a statement that the federal Defendants intend to redistribute the Greenhouse Gas Reduction Fund money to unspecified new recipients.

**V.    NCIF GRANTEES FILE SUIT AGAINST CITIBANK AND EPA AND OBTAIN A TEMPORARY RESTRAINING ORDER**

Already pending before the Court are three related and consolidated actions brought by the three primary recipients of NCIF funds from EPA: Climate United Fund, CGC, and Power Forward Communities.  *Climate United Fund v. Citibank, N.A. et al.*, No. 1:25-cv-698; *Coalition for Green Capital v. Citibank, N.A. et al.*, No. 1:25-cv-735; *Power Forward Communities, Inc.*, No. 1:25-cv-762.  The grantees bring similar claims against Citibank and the EPA Defendants, and Plaintiffs filed a Notice of Related Case regarding these cases together with their complaint. ECF No. 6.

On March 18, 2025, the Court issued a temporary restraining order enjoining Defendants from giving effect to the EPA Defendants' termination letters; enjoining the EPA Defendants from taking action to implement the termination of the grants, including taking action that results in the transfer, re-obligation, or re-allocation of the grant funds Citibank accounts or issuing a Notice of Exclusive Control under its agreements; and enjoining Citibank from moving or transferring grant funds to any party other than the accountholders, absent an order from the Court.  *Climate United Fund*, No. 1:25-cv-698, ECF No. 29.  While that TRO provides interim relief for both grantees and subgrantees like Plaintiffs, Plaintiffs filed suit and now bring this motion to ensure their interests as state green banks continue to be adequately protected and that any injunctive relief lasts for the duration of any litigation.  Plaintiffs also bring suit to offer the Court evidence of their direct harms as subgrantees and request additional relief that ensures Citibank resumes disbursing limited, ordinary-course funds, as it is obligated to do, to allow Plaintiffs to continue time-sensitive due diligence activities while this action is pending.  That limited relief is necessary to avoid the additional irreparable harms from irrecoverable delays and

lost business that would result if all processes associated with these funds were halted for this action's duration.

## LEGAL STANDARD

A preliminary injunction is warranted where the moving party establishes that (1) it is likely to succeed on the merits; (2) irreparable harm is likely in the absence of preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); Fed. R. Civ. P. 65(b)(1). When "balancing the competing claims of injury," the Court must "consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24.

## ARGUMENT

Plaintiffs are likely to succeed on the merits in this action. Neither the EPA nor Citibank have any basis for freezing Plaintiffs' funds, and EPA's purported termination of the NCIF Grant Agreement is unlawful and arbitrary and capricious. Given the immediate and irreparable harm Plaintiffs will face absent preliminary relief, a preliminary injunction is necessary to preserve the status quo and protect Plaintiffs' interests during the pendency of the litigation. Plaintiffs must be able to access their funds to avoid imminent economic and reputational harms. And absent preliminary relief, there is a significant risk that EPA may attempt to order Citibank to return the disputed funds to the federal government so that EPA may attempt to use Plaintiffs' funds for other purposes. Finally, the balance of equities and the public interest also support injunctive relief while Plaintiffs pursue this litigation.

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

"A movant may show a likelihood of success on the merits by demonstrating that it is 'more likely than not' that she will prevail." *Advance Am. v. FDIC*, 2017 WL 2672741, at *3 (D.D.C. Feb. 23, 2017) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 398 (D.C. Cir. 2011)). Under the alternative sliding scale approach, if the other factors "strongly favor the movant, the movant need only show the existence of a 'serious legal question' on the merits" to succeed. *Id.* Where, as here, "multiple causes of action are alleged, plaintiff need only show likelihood of success on

16

one claim to justify injunctive relief."[4] *Kirwa v. U.S. Dept. of Defense*, 285 F. Supp. 3d 21, 35 (D.D.C. 2017) (citation omitted).

First, as a preliminary matter, this Court has jurisdiction over Plaintiffs claims for the same reasons it has jurisdiction over the primary grantees' claims. *Climate United Fund*, No. 1:25-cv-698, ECF No. 33-1 at 33-37. Plaintiffs' claims against EPA are not "in essence" for breach of contract. Indeed, Plaintiffs as subgrantees are not even party to any contract to which EPA is also a party. As the Court recognized in issuing the TRO, "[a]t bottom Plaintiffs do not bring simple breach of contract claims—they challenge adverse agency action." *Climate United Fund*, No. 1:25-cv-698, ECF No. 28 at 12; *accord Bowen v. Massachusetts*, 487 U.S. 879, 904–07 (1988) (rejecting notion that cases relying on the APA and seeking equitable relief including restoration of payment belong in the Court of Claims). The Court has jurisdiction over this challenge to agency action.

Turning, then, to the merits, the Court has already held that grantees in the related actions are likely to succeed on the merits of their claims. *Climate United Fund*, No. 1:25-cv-698, ECF No. 28 at 14. Plaintiffs here, whose claims are substantially similar, are equally likely to succeed. The EPA's actions are in clear violation of the APA and separation of powers. The EPA had no statutory authority to issue the termination letter to CGC or to order Citibank to withhold funds from Plaintiffs, and its actions throughout this matter have been arbitrary and capricious and contrary to law. For its part, Citibank has no lawful basis for freezing Plaintiffs' funds. Citibank's refusal to follow Plaintiffs' instructions for disbursement of their funds constitutes a direct breach of the parties' Account Control Agreements.

---

[4] While this motion focuses mainly on Plaintiffs' APA claims against the EPA Defendants, Plaintiffs also assert additional claims against the EPA Defendants in their complaint, including violation of the separation of powers. ECF No. 1 at ¶¶ 140-173. Similarly, though this motion focuses mainly on EPA's unlawful termination of the NCIF grants, Plaintiffs also challenge EPA's unlawful direction to Citibank to freeze Plaintiffs' accounts prior to the freeze. *E.g.*, Compl.¶¶ 64-73, 96, 106, 125, 135. Plaintiffs are likely to succeed on the merits of these claims as well, including for the reasons asserted by primary grantee plaintiffs in *Climate United Fund*, No. 1:25-cv-698, ECF No. 33-1 at 46-47.

JA1275

A.    **Plaintiffs Are Likely to Succeed on the Merits of Their Claims Against the EPA Defendants**

Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). The EPA Defendants have taken official action purporting to terminate NCIF grants and directing Citibank to freeze these funds in the process, without any legal basis to support its actions. The EPA Defendants' actions are contrary to statute and the Uniform Grant Guidance regulations in 2 C.F.R. Part 200, as well as arbitrary and capricious.

The EPA's Notice of Termination provided no substantive explanation or justification for its purported termination. The notice identified "substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities," but it did not identify what the "substantial concerns" are, their source, or evidence supporting them. The letter did not identify whether any alleged programmatic fraud actually existed, or the basis on which it had been identified. The letter did not identify what the Agency's priorities were, or how the grantee's project was misaligned with them. The letter made it appear that the "concerns" were toward the actions and process taken by EPA officials in the prior federal administration, not any actions taken by grantees or subgrantees, but it did not identify what material deficiencies existed in that process or with respect to program oversight. *See Climate United Fund*, 1:25-cv-698, ECF No. 33-1 at 38-42.

1.    **The Termination Notice Is Contrary to Law and Unconstitutional**

EPA's actions are directly contrary to law. In passing the Inflation Reduction Act, Congress appropriated funds to the Greenhouse Gas Reduction Fund only until September 30, 2024, and directed EPA to "make grants, on a competitive basis and beginning not later than 180 calendar days after August 16, 2022, to eligible recipients." 42 U.S.C. § 7434(a)(2)-(3). Explicitly included in the definition of "eligible recipients" were entities "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services"—i.e., green banks

18

like Plaintiffs. *Id.* § 7434(c). And that is what EPA did under the previous administration, making grants consistent with Congress's directive. EPA Defendants' actions effectively undo the agency's prior implementation of Congress's instructions, unmaking the entire grant program that Congress created with the declared intent of "[t]erminating" the Inflation Reduction Act. Exec. Order 14154, 90 Fed. Reg. at 8357. *See also Climate United Fund*, No. 1:25-cv-698, ECF No. 33-1 at 45-46.

EPA's actions violate the separation of powers and usurp the legislative function for similar reasons. The Constitution "grants the power of the purse to Congress," not the executive agencies. *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018); *see* U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); U.S. Const. art. I, § 8, cl. 1 (Spending Clause). Congress also possesses exclusive power to legislate. Article I, Section 1 of the Constitution enumerates that: "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1; *see also Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes."). By passing the Inflation Reduction Act, Congress exercised its appropriations and spending power to create the Greenhouse Gas Reduction Fund. And by seeking to freeze lawfully-obligated funds and terminate grants made under that fund EPA seeks to usurp and undo that power. Indeed, EPA's chief justifications for its termination of the NCIF grant boil down to how *Congress* chose to structure the Greenhouse Gas Reduction Fund. Compl. ¶ 149; *see Climate United Fund*, No. 1:25-cv-698, ECF No. 33-1 at 49-50. The the Constitution does not allow executive agencies the power to amend or repeal appropriations they disfavor through freezes and grant terminations. EPA's unilateral action directing the freeze of Plaintiffs' accounts and the termination of the grant awards violates the separation of powers by overriding the careful judgments of Congress. Whatever EPA's disagreements with Congress' choice to appropriate funds to the Greenhouse Gas Reduction Fund, the Constitution does not authorize EPA to obstruct that appropriation. *See Climate United Fund*, No. 1:25-cv-698, ECF No. 33-1 at 51-52.

JA1277

**2.    The Termination Notice Violates Federal Regulations**

EPA's purported termination is also unlawful because it is contrary to the Uniform Grant

Guidance regulations found in 2 C.F.R. Part 200.  Section 200.340(a) provides that EPA may

only terminate the grant agreement in limited circumstances: (1) failure to comply with the terms

and conditions of the Federal award, (2) with consent, (3) upon notice by the recipient, or (4)

pursuant to the terms and conditions of the Federal award, including, to the extent authorized by

law, if an award no longer effectuates the program goals or agency priorities.  None of these

circumstances is present here.

Subparts (2) and (3) do not apply because the grant recipients have neither sought to

terminate their awards nor consented to termination.  Subpart (1) does not apply because the

EPA Defendants have not identified any instance of noncompliance.  Indeed, the termination

notice does not have any suggestion that the grantees have not complied with the grant.  Rather,

the notice is addressed to EPA's own actions under the previous administration.

Subpart (4) does not apply either.  Subpart (4) may permit EPA to terminate "an award that

no longer effectuates the program goals or agency priorities" but only if such termination is

"pursuant to the terms and conditions of the Federal award."  2 C.F.R. § 200.340(a)(4).  And

§ 200.340(b), in turn, requires that an agency "must clearly and unambiguously specify all

termination provisions in the terms and conditions of the Federal award."  When read together,

subparts (a)(4) and (b) reveal that an agency may only terminate an award based on agency

priorities *if* the award's terms and conditions "clearly and unambiguously" authorize a

termination on that basis.  *See Climate United Fund*, 1:25-cv-698, ECF No. 33-1 at 39, 43-44.

Further, the Office of Management and Budget's own guidance in issuing these regulations

confirms as much.  *Guidance for Federal Financial Assistance*, 89 Fed. Reg. 30,046, 30,089

(Apr. 22, 2024).[5]  That guidance makes clear that agencies may terminate an award on this basis

---

[5] The 2024 guidance applies in this matter.  *See Applicability Date for the Office of Management and Budget's Regulatory Revisions*, 89 Fed. Red. 55,262 (July 3, 2024) ("The revised version of 2 CFR 200.340 will apply to EPA financial assistance agreements awarded or amended to add funds on or after July 3, 2024.").

JA1278

but *only* "[p]rovided that the language is included in the terms and condition of the award." *Id.*
The guidance further "underscore[ed] the need for agencies and pass-through entities to clearly
and unambiguously communicate termination conditions in the terms and conditions of the
award." *Id.*

The terms and conditions for the NCIF award to CGC (the award for which Plaintiffs are
subawardees) contain no provision for termination based on agency priorities, much less the
"clear and unambiguous" authorization that § 200.340(b) requires. *See* Strong Decl. Ex. A.  It is
therefore not lawful for EPA to terminate the grant on any basis sounding in agency priorities.

EPA's post hoc attempts to justify its termination after the fact are no more successful than
the vague justifications in the termination letters.  Even when the Court ordered EPA to make a
proffer of evidence supporting its terminations in the *Climate United* action, EPA's submission
was sorely deficient for the reasons discussed in depth in the primary grantees' motion,
arguments Plaintiffs incorporate by reference here.  *Climate United Fund*, 1:25-cv-698, ECF No.
33-1 at 47-50.

Because EPA's purported termination is contrary to law, arbitrary and capricious, and in
excess of authority, Plaintiffs are likely to succeed on the merits of their claims challenging that
termination.

## B.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims Against Citibank

Plaintiffs are also likely to prevail in their breach of contract claim against Citibank.
Citibank's obligations under the ACAs are clear: it is required to disburse the funds of Plaintiff
Green Banks at Plaintiffs' request.  The sole exception to this obligation is when Citibank has
been issued a Notice of Exclusive Control by CGC.  In the absence of this triggering event,
Citibank's refusal to comply with Plaintiffs' valid requests for disbursement breaches the explicit
terms of the parties' agreements.

Plaintiff state green banks, as Pledgors, each executed an ACA with Citibank, as Bank, and CGC, as the Secured Party. Plaintiffs have each performed in accordance with the terms of their respective ACAs. Citibank has not.

As discussed *supra*, the ACA requires Citibank to comply with Plaintiffs' directions to distribute funds to them and only authorizes Citibank to restrict Plaintiffs' access to their Accounts if CGC issues a Notice of Exclusive Control to Citibank, or a court issues a final order or process with respect to the assets in Plaintiffs' Citibank Accounts. To date, Plaintiffs have not received or been made aware of a Notice of Exclusive Control issued by CGC. Wu Decl. ¶ 12; Swan Decl. ¶ 14. As Plaintiffs understand it, CGC never sent such a notice.

Despite the fact that the sole circumstance in which it could refuse Plaintiffs' instructions was not triggered, Citibank has, for over a month, failed or refused to comply with those instructions. Since February 14, 2025, Plaintiffs have submitted instructions to Citibank directing that funds and financial assets in their Citibank Accounts be disbursed. Wu Decl. ¶¶ 14-27; Meister Decl. ¶¶ 13-14; Stoddard Decl. ¶¶ 16-19. Each of these requests went unfulfilled and ignored. *Id.* Plaintiffs' requests for information about why their funds were frozen were similarly ignored. *Id.*

Plaintiffs have since learned, through pleadings filed in related litigation, that Citibank was apparently acting at the ultimate direction of EPA in freezing Plaintiffs' funds. *See Climate United Fund*, No. 1:25-cv-00698, ECF No. 14 at 8-10. But no provision found anywhere in the Account Control Agreements authorizes Citibank to follow such directives over the explicit instructions of the Pledgors, i.e., Plaintiffs.

Citibank is therefore in breach of the ACAs, and Plaintiffs are likely to succeed on the merits of their breach of contract claim.

## II.    PLAINTIFFS WILL SUFFER IRREPARABLE INJURY

If the EPA and Citibank are permitted to continue to withhold Plaintiffs' funds, Plaintiffs will be irreparably harmed. And these harms will only compound the longer Plaintiffs' cannot access their funds, necessitating the need for durable relief under a preliminary injunction.

Plaintiffs have already suffered immediate harms, both economic and reputational, due to Defendants' actions.  Their inability to access their funds has prevented them from conducting due diligence on and making financing commitments to eligible projects.  And the cloud of uncertainty surrounding these funds and unsupported accusations by EPA have already harmed Plaintiffs' reputations.  In order to mitigate these harms and prevent them from becoming irreparable, Plaintiffs require access to their funds during the pendency of this litigation.  At a minimum, Plaintiffs must be able to obtain funds to cover administrative costs and costs associated with due diligence, underwriting activities, and obtaining credit approval so that they can continue identifying eligible projects to fund and keep them on track for financing after a final judgment enters.  If Plaintiffs are unable to continue these activities, their harms will be irreparable even if they do later prevail on the merits.  Plaintiffs therefore request an injunction that prohibits Citibank from ignoring or declining ordinary-course disbursement requests.

"An irreparable harm is an imminent injury that is both great and certain to occur, and for which legal remedies are inadequate."  *Beattie v. Barnhart*, 663 F. Supp. 2d 5, 9 (D.D.C. 2009).  Defendants' actions have deprived Plaintiffs of access to and use of funds to which they are legally entitled.  Without access to the funds obligated to them, Plaintiffs are currently suffering and will continue to suffer irreparable economic and reputational harms.  Plaintiffs will also suffer additional and irreparable harms if the funds currently in their accounts are sent back to the federal government by Citibank at EPA's request.

### A.   Plaintiffs Face Imminent Loss of Business and Reputational Harms from EPA's and Citibank's Freeze of NCIF Funds

Plaintiffs face increasing risk of losing qualified projects, with the corresponding harms to their reputations as lenders in the financial markets, the longer Defendants' actions prevent them from accessing their funds.  Plaintiffs have spent months identifying qualified projects to support with financing and investment under their NCIF subawards with CGC.  Before Plaintiffs commit funds to finance these projects, they must complete important preparatory work—conducting due diligence and underwriting activities and obtaining credit approvals—that entail administrative

23

expenditures, including payment to third-party underwriting consultants and other vendors. Wu Decl. ¶ 29. Defendants' freeze has made it impossible to cover these administrative costs with NCIF funds, requiring Plaintiffs to suspend or curtail the work that would keep these projects on track for finalizing a loan or similar financing commitment. Without this continued work toward a financing commitment, many of Plaintiffs' identified qualified projects will be forced to cancel work with Plaintiffs and seek alternative financing instead. A prolonged freeze or outright termination of the NCIF award will certainly result in the cancellation of financing for qualified projects, and likely result in the imminent cancellation of some qualified projects altogether. More than lost business revenue, these cancellations of financing for projects and the projects themselves would work lasting and irreparable damage to Plaintiffs' reputations as financial partners and to public confidence in the green lending industry as a whole.

As just a few examples of the specific harms Plaintiffs have and will suffer as a result of Defendants' actions:

- Plaintiff IBank has been conducting due diligence on a loan of approximately $40 million to finance the construction of electric vehicle charging infrastructure in California. Wu Decl. ¶ 29. Due to the freeze on its funds, IBank has already had to curtail the work it was doing with an underwriting consultant and attempt to conduct due diligence through its own staff. *Id.* A continued freeze threatens to disrupt the project entirely, as the applicant was hoping for approval in March, but IBank is unable to issue a financing commitment without access to its NCIF subgrant funds. *Id.*

- Plaintiff MnCIFA has spent more than a year developing a pipeline of eligible projects and stands ready to deploy the NCIF funds in accordance with the terms of its subaward, which has an extremely expedited period of performance ending December 31, 2025. Swan Decl. ¶ 30. MnCIFA has dedicated substantial resources to properly and quickly deploying these funds, and the longer the delay on its ability to draw on the NCIF funds, the more MnCIFA is impaired in complying with its

subaward. *Id.* ¶ 32. MnCIFA's board of directors relied on its NCIF subaward in approving MnCIFA's commitment to funding several new loans. MnCIFA has approved seven loans for funding thus far, totaling $22.1 million. *Id.* ¶ 33. If NCIF funding is not available, MnCIFA will have to significantly slow its pace of lending, given its original state appropriation (of non-NCIF funds) must also cover its operating expenses. *Id.*

- Plaintiff Efficiency Maine Trust has been denied access to the more than $25 million, an amount that more than doubles the total capital that Efficiency Maine currently has under management through its loan program. Stoddard Decl. ¶¶ 11-12. Without the ability to access its funds, Efficiency Maine will exhaust its available capital for its revolving loan fund in the next 12 months and likely be forced to discontinue financing on energy efficiency projects. *Id.* ¶ 27. To illustrate the cost of these funds being frozen, a typical Maine home that switches from an old, conventional furnace or boiler to a modern, high-efficiency heat pump system will save more than $700 annually on their heating bills. *Id.* ¶ 28. For a typical low- or moderate-income home in Maine, the total project cost will be in the range of $10,000-$15,000. *Id.* Of this total, customers seek to take advantage of Efficiency Maine low-interest loans by borrowing, on average, $6,700 per project. *Id.* With the funds currently frozen at Citibank, Efficiency Maine would be able to finance 1,243 projects per year at the average borrowing level for each of the next three years. *Id.* Without those funds, a significant fraction of these households will instead face more than $700 in higher annual heating bills, and the more than four hundred firms that install heat pumps in Maine will forego the revenues that would have been associated with these projects. *Id.*

In addition to these specific examples, it is axiomatic that delay will hamper the Plaintiffs' ability to fund projects, and in many cases, such delay is fatal. For example, MnCIFA describes a significant geothermal project to support a 1,000-unit affordable housing development. Swan

Decl. ¶¶ 28(a), 35.  In large scale construction projects like this, there are numerous components that need to come together in sequence—geothermal systems are only one part of the overall construction plan, and need to be installed before other stages.  Such projects will need go ahead without the Plaintiffs' programs if the timing does not work out.  In this context, delaying funding is no mere delay; it operates to thwart the project entirely.  Plaintiffs are harmed when they cannot engage in projects that it is their mission to fund.

Reputational harms are also a problem here, and the reputational harms to Plaintiffs from cancelled financing and projects will be severe.  "Injury to reputation or goodwill is not easily measurable in monetary terms, and so often is viewed as irreparable."  *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 280 F. Supp. 3d 49, 103 (D.D.C. 2017).  Through their unlawful and arbitrary actions, EPA and its officials, as well as Citibank, have cast a significant cloud of uncertainty over the funds that Plaintiffs expected, and in certain cases have committed, to use to support qualified projects.  Simply put, borrowers will not do business with a bank that cannot provide promised funds.  By rendering the availability of all NCIF award monies so uncertain, Defendants threaten immediate and lasting damage to Plaintiffs' credibility with their customers and vendors and their ability to retain and attract business.  Even if Plaintiffs later prevail in this action, absent interim injunctive relief that extends beyond the existing TRO, EPA and Citibank will have successfully "poisoned the well" by delaying Plaintiffs' access to funds for so long that all of Plaintiffs' prospective borrowers will have opted for alternative sources of funding—or chosen to scrap their projects altogether.

**B.    Plaintiffs Face Imminent Reputational Harms from EPA Effectuating its Termination Notice**

EPA's March 11 termination letter threatens additional severe reputational harms to Plaintiffs if given effect.  In *Patriot, Inc. v. U.S. Dept. of Hous. & Urban Dev.*, 963 F. Supp. 1, 5 (D.D.C. 1997), the court concluded that HUD's characterization of the plaintiffs' as "'enticing' senior citizens into meetings and 'pressuring' them to obtain reverse mortgages 'under the guides of sound estate planning'" damaged the plaintiffs' reputation and supported the need for

26

injunctive relief.  Here too, EPA has recklessly insinuated without outright stating in its letter that CGC—and by extension Plaintiffs as subawardees—have committed fraud, waste, and abuse and otherwise acted in a deficient manner.  But EPA offers no evidence for these accusations. EPA thus impugns the reputation of Plaintiffs without support, causing them harm that cannot be remedied without immediate injunctive relief that publicly recognizes the lack of evidence for these insinuations and prevents the EPA from implementing its baseless termination notice.

As just a few examples of the specific reputational harms Plaintiffs will suffer:

- The termination of the NCIF grant will limit the ability of Illinois Finance Authority, operating as Illinois Climate Bank, to apply for or receive federal and state grant funds.  Even if EPA takes no direct action against Illinois Climate Bank, Illinois Climate Bank will be obligated to make disclosures when applying for federal and Illinois state grant opportunities.  Under current federal grant practice, this would automatically make Illinois Climate Bank ineligible or less competitive in future grant applications and would obligate state/federal agencies or pass-through entities to impose onerous and unwarranted administrative conditions on any grant funds provided to Illinois Climate Bank.  Meister Decl. ¶ 21.

- The termination of this grant would similarly cause collateral harm to IBank's other, non-NCIF-funded programs, many of which have been in place for several decades, including the Infrastructure State Revolving Fund, Small Business Finance Center, Expanding Venture Capital Access Program, and IBank's conduit bond program.  Wu Decl. ¶ 33.  For example, the Infrastructure State Revolving Fund program has long enjoyed a AAA rating on the bonds it issues to fund its loan pool.  *Id.*  Termination of this grant would likely be viewed adversely by credit rating agencies, placing this rating at risk, which would decrease the amount of bonds IBank can issue to grow its program, and increase the interest rates IBank charges the borrowers, most of which are small to medium municipalities.  *Id.*

JA1285

- The termination of Efficiency Maine's NCIF subaward on the bases suggested by EPA's March 11, 2025, letter will limit Efficiency Maine's ability to apply for or receive federal grant funds.  Even if EPA takes no direct action against Efficiency Maine, Efficiency Maine will be obligated to make disclosures when applying for federal grant opportunities.  Stoddard Decl. ¶ 35.

These reputational harms are particular to Plaintiffs, who as state green banks are uniquely positioned to support residents of their States by providing crucial financial services to pollution-reducing projects in their States.  In that role, Plaintiffs depend on their reputations and ability to obtain state and federal grants to provide such support, and as public or quasi-public entities, they suffer direct reputational harms as a result of Defendants' actions.

### C. Plaintiffs Face Irreparable Economic Harms from EPA Clawing Back Funds Based on the March 11 Termination Notice

Plaintiffs will suffer additional irreparable harms if the Court does not extend the existing TRO's relief for the pendency of this litigation, to ensure that EPA cannot claw back Plaintiffs' funds from Citibank.  First, there is an imminent risk that Defendants will take such an action once no court order is in place prohibiting it, despite the fact that no law or contract authorizes them to do so.  EPA has consistently expressed its desire to claw back the funds and has already announced its intent to "re-obligate" Plaintiffs' funds to other entities.  If EPA is successful in achieving this aim, it may be impossible to later return those same funds to Plaintiffs, even if they later prevail in this action.  In cases involving government expenditure, "once the relevant funds have been obligated, a court cannot reach them in order to award relief."  *City of Houston v. Dep't of Hous. & Urban Dev.*, 24 F.3d 1421, 1426-27 (D.C. Cir. 1994).  Indeed, in *City of Houston*, the court held that the plaintiff "must" seek injunctive relief "preventing the agency from disbursing those funds" at issue.  *Id.*; *see also Confed. Tribes of Chehalis Rsrv. v. Mnuchin*, 2020 WL 3791874, at *2 (D.D.C. July 7, 2020) ("Plaintiffs would suffer irreparable harm if the court denied injunctive relief and the Secretary then distributed the withheld [] funds . . . .  Such payments could result in this case becoming moot before receiving a full hearing").

Plaintiffs are also at risk of being deprived of a statutory entitlement, which is an irreparable harm. *Endo Par Innovation Co., LLC v. Becerra*, 2024 WL 2988904, at *7 (D.D.C. 2024) ("[A] clear statutory entitlement is not merely economic harm, and its loss may be sufficiently irreparable to justify emergency injunctive relief because once the statutory entitlement has been lost, it cannot be recaptured." (internal quotation marks and citation omitted)). Congress appropriated funds for the Greenhouse Gas Reduction Fund to accomplish its statutory objectives and explicitly directed that those funds should be granted to organizations that are "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services"—i.e., the exact purpose that Plaintiff green banks are designed for. 42 U.S.C. § 7434(c)(1). And CGC lawfully delegated subgrants to Plaintiffs consistent with its own grant agreement and the Inflation Reduction Act. Plaintiffs are thus lawful and intended subawardees of Greenhouse Gas Reduction Fund funds. If they are revoked now, the harm Plaintiffs will suffer is irreparable because the funds "cannot be recaptured later." *Id.*

*      *      *

The only thing currently stopping EPA from inflicting (or, at a minimum, seeking to inflict) these irreparable harms on Plaintiffs is the TRO in the *Climate United* action. That protection should be extended via a preliminary injunction in this action to ensure EPA does not take action that would irretrievably remove Plaintiffs' funds from their accounts while this action is pending. In addition, to ensure Plaintiffs can continue their due diligence, underwriting, and credit approval activities and ensure there are still qualified projects that can be financed with these funds, the Court should restore the status quo ante litem and enjoin Citibank from violating its obligation to disburse funds to Plaintiffs, which—like any depository institution holding the property of a customer—is an obligation Citibank has always been required to meet under the ACA.

29

JA1287

### III. THE BALANCE OF EQUITIES WEIGHS IN FAVOR OF PLAINTIFFS

As discussed *supra*, Plaintiffs will suffer imminent and irreparable economic and reputational harms if they are unable to access the funds in their accounts or EPA otherwise effectuates its termination.  On the other hand, Defendants would suffer no harm from a preliminary injunction.  A party "cannot suffer harm from an injunction that merely ends an unlawful practice."  *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)).  As the party merely holding these funds as a financial agent of the United States, Citibank will suffer no harm by being ordered to comply with the terms of the ACAs.  As for EPA, it cannot establish any harm that will result from the disbursement of funds it already agreed could be disbursed in the manner requested.  These valid, ordinary-course administrative costs will not represent the bulk of the NCIF subawards—the capital that would be committed only upon finalization of a qualified project's financing.  EPA would likewise possess the same post-award mechanisms to ensure program integrity specified in the Uniform Grant Guidance, including mechanisms to audit, disallow, or even recover improper expenses, subject to all the protections and dispute procedures for subrecipients.  *See* 2 C.F.R. §§ 200.345-346.  And certainly, EPA cannot show any harm from the funds, at a minimum, being maintained in their current location until the parties' dispute is resolved.

### IV. THE PUBLIC INTEREST FAVORS A PRELIMINARY INJUNCTION

Finally, the public interest favors a preliminary injunction because the public will be harmed by Plaintiffs' current and future inability to access their grant funds.  The qualified projects Plaintiffs seek to use these grant funds for will create jobs, improve the environment, build out critical infrastructure, and provide resilience and adaptation programs in the states in which each Plaintiff is located.  Without access to their grant funds, Plaintiffs will be unable to achieve this mission, and the public will suffer as a result.  If Plaintiffs are permitted to continue their work, the public will directly benefit from their activities.  *See Pac. Merch. Shipping Ass'n v. Goldstene*, 639 F.3d 1154, 1180-81 (9th Cir. 2011) (noting that state "clearly has an especially

JA1288

powerful interest in controlling the harmful effects of air pollution"); *see also Cmtys. for a Better Env't v. Cenco Ref. Co.*, 179 F. Supp. 2d 1128, 1148 (C.D. Cal. 2001), *aff'd*, 35 F. App'x 508 (9th Cir. 2002) ("[W]hen an environmental injury is sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment.").

Moreover, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (citation omitted). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id.* (internal quotation marks and citation omitted). Accordingly, the public interest strongly weights in favor of Plaintiffs' requested injunctive relief.

## CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court enter a preliminary injunctive that extends the relief provided by the temporary restraining order issued in the related actions for the pendency of this litigation, as described below, and provides the following additional relief:

- EPA Defendants and Citibank should continue to be enjoined from giving effect to EPA Defendants' termination letter, pending a final determination on the merits;

- EPA Defendants should continue to be enjoined from transmitting or taking action to implement the termination of grantees' grants or, by extension, Plaintiffs' grants, including taking action that results in the transfer, re-obligation, or re-allocation of Plaintiffs' subgrant funds in Plaintiffs' Citibank accounts, issuing a Notice of Exclusive Control under its agreements, or causing Plaintiffs' prime grantee (CGC) to issue a Notice of Exclusive Control under their agreements;

- Defendant Citibank should continue to be enjoined from moving or transferring Plaintiffs' subgrant funds to any party other than the accountholders, absent an order from this Court;

JA1289

- Defendant Citibank should be enjoined from violating its obligations to disburse funds in response to valid, ordinary-course disbursement instructions from Plaintiffs, including in response to both past and future requests from Plaintiffs; and

- EPA Defendants should be enjoined from directing, recommending, or otherwise causing or attempting to cause Citibank to freeze Plaintiffs' accounts or otherwise violate Citibank's obligations to disburse funds in response to valid, ordinary-course instructions from Plaintiffs.

Date:  March 24, 2025                    Respectfully submitted,

ROB BONTA                               KEITH ELLISON
Attorney General of California          Minnesota Attorney General

s/ Meghan Strong                        s/ Peter N. Surdo
**MEGHAN STRONG**                       **PETER N. SURDO**
THEODORE A. MCCOMBS                     Special Assistant Attorney General
JOHN D. ECHEVERRIA                      OLIVER LARSON
DYLAN REDOR                             Manager, Environment and Natural Resources
MEGAN RICHARDS                          Division
Deputy Attorneys General                CATHERINE RIOS-KEATING
California Department of Justice         Special Assistant Attorney General
455 Golden Gate Avenue                  Minnesota Attorney General's Office
San Francisco CA 94102                  445 Minnesota Street, Suite 600
(415) 510-3877                          651-757-1061
meghan.strong@doj.ca.gov                peter.surdo@ag.state.mn.us

*Attorneys for California Infrastructure and*    *Attorneys for Minnesota Climate Innovation*
*Economic Development Bank*                       *Finance Authority*

(Additional signatures on following page)

KWAME RAOUL
Attorney General of Illinois

s/ Jason E. James
**JASON E. JAMES**
Assistant Attorney General
MATTHEW J. DUNN
Chief, Environmental
Enforcement/Asbestos Litigation Division
Office of the Attorney General of Illinois
201 W. Pointe Drive, Suite 7
Belleville, IL 62226
(217) 843-0322
jason.james@ilag.gov

*Attorneys for Illinois Finance Authority*

SA2025301171/44561266.docx

AARON M. FREY
Attorney General of Maine

s/ Emma Akrawi
**EMMA AKRAWI**
SCOTT W. BOAK
Assistant Attorneys General
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333
(207) 626-8800
Emma.Akrawi@maine.gov

*Attorneys for Efficiency Maine Trust*

JA1291

## CERTIFICATE OF SERVICE

Case Name:     ***California Infrastructure and Economic Development Bank, et al. v.
Citibank, N.A., et al.***

Case No.     **1:25-cv-00820**

I hereby certify that on <u>March 24, 2025</u>, I electronically filed the following documents with the
Clerk of the Court by using the CM/ECF system:

- **PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

- **DECLARATION OF CHRISTOPHER MEISTER with Exhibit A**

- **DECLARATION OF MICHAEL STODDARD with Exhibit A**

- **DECLARATION OF MEGHAN STRONG IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION with Exhibits A and B**

- **DECLARATION OF KARI GROTH SWAN, EXECUTIVE DIRECTOR OF
MINNESOTA CLIMATE INNOVATION FINANCE AUTHORITY
with Exhibits 1 and 2**

- **DECLARATION OF SCOTT WU, EXECUTIVE DIRECTOR OF CALIFORNIA
INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK
with Exhibits 1 to 4**

- **[PROPOSED] ORDER**

I certify that **all** participants in the case are registered CM/ECF users and that service will be
accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States
of America the foregoing is true and correct and that this declaration was executed on <u>March 24,
2025</u>, at San Francisco, California.

|                          |                          |
|--------------------------|--------------------------|
| G. Pang                  |                          |
| Declarant                | Signature                |

SA2025301171/44561209.docx

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ILLINOIS FINANCE AUTHORITY, *et al.*, | |
| Plaintiffs, | |
| v. | |
| CITIBANK, N.A., | Civil No. 25-cv-820 |
| and | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, *et al.* | |
| Defendants. | |

<u>**DECLARATION OF CHRISTOPHER MEISTER**</u>

I, Christopher Meister, declare as follows:

1.     I am the Executive Director at the Illinois Finance Authority ("IFA"), a body politic and corporate created under the laws of the State of Illinois. I have held the position of Executive Director of IFA since December 2009.

2.     I make this declaration as a representative of IFA in part based on the business records of IFA and in part based on my personal knowledge and experience. In my official capacity and based on my personal knowledge and other sources of information which I have obtained and reviewed in that official capacity, I am familiar with, and if called upon to do so, would be competent to testify to the facts and circumstances set forth herein.

3.     I submit this declaration in support of the motion for preliminary injunction filed on March 24, 2025 by IFA, the California Infrastructure and

Economic Development Bank, Efficiency Maine Trust, and the Minnesota Climate Innovation Finance Authority.

**Illinois Finance Authority**

4.    IFA was established in 2004 pursuant to Illinois Public Act 93-205, and has the powers and duties set forth in the Illinois Finance Authority Act, 20 ILCS 3501/801, *et seq*.

5.    In 2021, pursuant to the Climate and Equitable Jobs Act (Illinois Public Act 102-0662), IFA was designated as the "Climate Bank" for the State of Illinois and was charged with "providing financial assistance, programs, and products to finance and otherwise develop and facilitate opportunities to develop clean energy and provide clean water, drinking water, and wastewater treatment in the State." 20 ILCS 3501/801-5(t).

6.    IFA was further authorized to utilize funding sources, including any federal funds, that can be used for clean energy purposes. 20 ILCS 3501/850-10(c)(2)(B).

**IFA Is a Subrecipient Under the NCIF Program**

7.    The Coalition for Green Capital ("CGC") applied as a lead applicant under the National Clean Investment Fund ("NCIF") program with a coalition of non-profit and governmental lending organizations.

8.    On or about April 4, 2024, the U.S. Environmental Protection Agency ("EPA") announced the award of grants under the NCIF program, including an

JA1294

award of $5 billion to CGC. IFA was part of the CGC-submitted work plan that was approved by EPA.

9.     IFA participated in a lengthy and involved due diligence and subaward negotiation process with CGC. IFA, along with other subrecipients, negotiated terms and conditions with CGC over a three-month period. IFA requested numerous changes to the form of the subaward agreement. Some of IFA's concerns were accommodated, but in many instances CGC elected not to modify or compromise its position.

10.     The Account Control Agreement ("ACA") with Citibank, N.A. ("Citi") was not negotiated between IFA and Citi except for a request related to indemnification (attached as Exhibit A).

11.     On January 3, 2025, IFA entered into a subaward agreement with CGC with a subaward amount of $108,900,000. IFA signed the ACA as required by EPA and CGC. IFA submitted all documents ancillary to the execution of the ACA, as directed by Citi, by January 13, 2025.

12.     On January 28, 2025, Citi countersigned the ACA. IFA promptly submitted a draw request to CGC to transfer the amount of IFA's subaward to its Citi account. IFA received the amount of its subaward in its Citi account on or about January 30, 2025.

**Citi's Failure to Follow Draw Instructions Has Harmed IFA**

13.     On February 14, 2025, IFA requested to draw funds from its Citi

account. IFA submitted additional draw requests to Citi on February 18, 2025.

However, IFA's draw instructions to Citi have not been followed and IFA has been

unable to draw funds.

14.     IFA has received no information from Citi about the reasons the draw

requests have not been processed. Only in the past week, through litigation

initiated by other participants in the NCIF program, has IFA begun to understand

why its funding has been restricted.

15.     On or about March 11, 2025, EPA sent CGC a letter purporting to

terminate its award effective immediately (the "Termination Letter"). This was

accompanied by a statement by EPA that the Financial Agency Agreement with Citi

was being terminated.

16.     The Termination Letter asserts "substantial concerns regarding

program integrity, the award process, programmatic waste, fraud, and abuse, and

misalignment with the Agency's priorities, which collectively undermine the

fundamental goals and statutory objectives of the [NCIF] award." Additionally, the

Termination Letter states that the authority to terminate stems from, among other

things, "2 C.F.R. §§ 200.339-40 [*sic*]" and that it constitutes notice of termination

required by 2 C.F.R. § 200.341.

17.     On March 12, 2025, exhibits filed by Citi in *Climate United Fund v.

Citibank*, No. 1:25-cv-00698 (D.D.C.) included a letter dated February 17, 2025,

from the Federal Bureau of Investigation to Citi (the "FBI Letter") recommending that Citi freeze the accounts of 28 Citi accountholders based on "credible information received by the Federal Bureau of Investigation" that the 28 accounts were "involved in possible criminal violations, including 18 § U.S.C. 371 (Conspiracy to defraud the United States) and 18 § U.S.C. 1343 (Wire fraud)."

**IFA Faces Severe Financial and Reputational Harm from EPA's Actions**

18.    Taking the Termination Letter together with the FBI Letter and public statements by EPA Administrator Lee Zeldin about the NCIF program, IFA faces severe reputational and financial harm without having been afforded specific information about supposed misconduct or any due process to contest EPA's allegations or actions.

19.    The grant termination and accusation of criminal activity endanger all IFA award funding and revenue sources. IFA funds its operations primarily through fees from conduit finance transactions and income on its general funds, with additional smaller sources of support through grant programs and interest income on funded loans.

20.    The Termination of IFA's NCIF Subaward on the bases suggested by the Termination Letter and FBI Letter will limit IFA's ability to apply for or receive federal and state grant funds. Even if EPA takes no direct action against IFA (*e.g.*, by commencing debarment proceedings or making an adverse entry on the U.S. government contracting portal called SAM.gov), IFA will be obligated to make disclosures when applying for federal and Illinois state grant opportunities. This

may make IFA ineligible or less competitive in future grant applications and may

obligate state/federal agencies or pass-through entities to impose onerous and

unwarranted administrative conditions on any grant funds provided to IFA.

21.    EPA's efforts to terminate the NCIF program and the allegations of

criminal activity have damaged IFA's ability to use NCIF funds for qualified

projects. It is likely that potential co-investors, developers, and beneficiaries have

been deterred from relying on NCIF funding (and other federal funds for similar

projects) due to uncertainty about whether the funding will be available when

needed and a desire not to be involved with funds that are alleged to have been

obtained by fraud. IFA intended to meet its obligation to mobilize private capital

through a financing model similar to EPA's drinking water and clean water state

revolving fund programs by using NCIF loans as security for bond issues, the

proceeds of which would finance additional qualified projects. Should access to

NCIF funds be restored, IFA could struggle to find a market for NCIF loans because

of perceived risk in using funds that are associated with the allegations in the FBI

Letter.

22.    EPA's efforts to terminate the NCIF program and the allegations of

criminal activity have adversely impacted IFA's non-NCIF loans. In early 2024, IFA

purchased a participating interest in a pre-construction loan for an estimated nine-

megawatt community-driven solar project to benefit low- and moderate-income

communities by reducing their energy costs and providing local clean energy. The

pre-construction loan facility matures in early August 2025 and was intended to be

repaid with the project's construction financing. IFA, as well as at least one other potential lender on the project, anticipated participating in the construction financing utilizing NCIF funds. The public and private construction financing would have allowed the borrower to complete its solar project, and the refinancing of IFA's pre-construction loan would have allowed IFA to re-deploy these funds for other economic development projects. With the EPA's attempt to terminate the NCIF program, this is no longer an option. This has negatively impacted the borrower and the community the project was meant to benefit, as the borrower has yet to find reasonable financing terms for the construction.

23.     IFA believes that third parties may be deterred from using certain of its services due to an increased risk of one or more federal audits resulting from the allegations surrounding the NCIF grant. One of IFA's core purposes is to provide low-cost tax-exempt financing for eligible borrowers. Being identified as an alleged conspirator in a scheme to defraud the United States falsely suggests a serious lack of integrity and internal controls—which, if true, would warrant more scrutiny of IFA bond issues and related transactions. This perception could negatively impact one or more ratings assigned or to be assigned to bonds issued or to be issued by IFA, and this perception could negatively impact terms and conditions of financial undertakings of borrowers, programs, and transactions supported by IFA, in each case which could make the IFA undesirable forum for tax-exempt financing and increase borrower costs, thus hindering one of IFA's core sources of revenue.

**Citi and EPA's Actions Will Harm the Health of Illinois Citizens**

24.    Citi's denial of access to NCIF funds and EPA's attempt to terminate the NCIF program will have severe impacts on the health and well-being of the people of Illinois. IFA intended to use NCIF funds to support critical environmental and energy security projects including school bus electrification, solar and charging infrastructure development, and clean energy development in public buildings. Without NCIF funding, these projects will not be implemented until alternate financing is identified. EPA's efforts to terminate the NCIF program will unnecessarily prolong children's exposure to harmful fuel emissions while buses idle at their schools, necessitate higher taxes by preventing local governments from undertaking cost-saving efficiency and renewable energy projects, and deny low-income communities the opportunity to reduce their energy costs.

I declare under penalty of perjury that the foregoing is true and correct. Executed in Chicago, Illinois on March 24, 2025.

By:    _Christopher Meister_

Christopher Meister
Executive Director
Illinois Finance Authority

JA1300

JA1301



**ACCOUNT CONTROL AGREEMENT**

**among**

**ILLINOIS FINANCE AUTHORITY , as PLEDGOR**

**COALITION FOR GREEN CAPITAL, as SECURED PARTY**

**and**

**CITIBANK, N.A., as BANK**

**Dated as of** _____January 28, 2025_____

170452352.2

**THIS ACCOUNT CONTROL AGREEMENT** (this "**Agreement**"), dated as of January 28, 2025 _____, by and among Illinois Finance Authority, a body politic and corporate created under the laws of the State of Illinois (the "**Pledgor**"), Coalition for Green Capital, a District of Columbia nonprofit corporation (the "**Secured Party**") and Citibank, N.A., a national banking association organized and existing under the laws of the United States of America ("**Citibank**") and acting through its Agency & Trust business solely in its capacity as bank under this Agreement, and any successors appointed pursuant to the terms hereof (Citibank in such capacity, the "**Bank**").

**WHEREAS,** the Secured Party has entered into a certain federal financial assistance agreement with the United States Environmental Protection Agency, an agency of the United States Government, as identified in Addendum 1, (the "**Grant Agreement**").

**WHEREAS,** under the Grant Agreement, Pledgor and Secured Party have entered into a Subaward as identified in Addendum 1, (the "**Subaward Agreement**"), pursuant to which the Pledgor has granted the Secured Party a security interest in the accounts as identified in Addendum 1 established and maintained by the Bank for the Pledgor (the "**Accounts**").

**WHEREAS,** the Bank has been designated and authorized to act as a financial agent of the United States pursuant to the authority of the U.S. Department of the Treasury under 12 U.S.C. §§ 90 and 265.

**WHEREAS,** the parties wish that the Bank enter into this Agreement in order to provide for the "control" (as defined in Section 9-104(a) of the Uniform Commercial Code in effect in the State of New York ("**UCC**"), in the case of a deposit account, or Section 8-106 of the UCC, in the case of a security account) of the accounts as a means to perfect the security interest of the Secured Party.

**WHEREAS,** the Pledgor and the Secured Party have agreed that the terms and conditions in the Subaward Agreement indicate the conditions under which the Secured Party may exercise its right of control herein, and such conditions will be defined as "default" for the purposes of this Agreement.

**WHEREAS**, capitalized terms used herein without definition and that are defined in Article 8 or Article 9 of the UCC as adopted in the State of New York shall have the respective meanings set forth therein.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and adequacy of which is hereby irrevocably acknowledged, the parties hereto agree as follows:

1.    **The Accounts.** The Pledgor and the Bank represent and warrant to, and agree with the Secured Party that:

(a)    The Bank maintains the Accounts for the Pledgor, and all property (including, without limitation, all funds and financial assets) held by the Bank for the accounts of the Pledgor are, and will continue to be, credited to the Accounts in accordance with instructions given by the Pledgor (unless otherwise provided herein).

(b)    To the extent that cash is credited to the Accounts, the Accounts are a deposit account; and to the extent that financial assets (other than cash) are credited to the Accounts, the Accounts are a securities account. The Bank is (i) the bank with which the Accounts are maintained

and (ii) the securities intermediary with respect to financial assets held in the Accounts. The Pledgor is (A) the Bank's customer with respect to the Accounts and (B) the entitlement holder with respect to all financial assets credited from time to time to the Accounts.

(c)     Notwithstanding any other agreement to the contrary, the Bank's jurisdiction with respect to the Accounts for purposes of the UCC is, and will continue to be for so long as the Secured Party's security interest shall be in effect, the State of New York.

(d)     The Pledgor and the Bank do not know of any claim to or interest in the Accounts or any property (including, without limitation, funds and financial assets) credited to the Accounts, except for claims and interests of the parties referred to in this Agreement.

2.     **Control over Accounts.**

The Bank shall comply with all instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and financial assets in the Accounts including, without limitation, directions to distribute proceeds of any such transfer or redemption of interest or dividends on financial assets in the Accounts, substantially in the form attached hereto as Exhibit B ("**Account Direction**"), originated by the Pledgor, until the time that that Bank receives a notice, substantially in the form attached hereto as Exhibit A (a "**Notice of Exclusive Control**") from the Secured Party that the Secured Party is exercising its right to exclusive control over an Account, and after such time that the Bank receives a Notice of Exclusive Control, the Secured Party for such Account, without further consent by the Pledgor.

3.     **Priority of Secured Party's Security Interest.**  The Bank subordinates in favor of the Secured Party any interest, lien or right of setoff it may have, now or in the future, against the Accounts or assets in the Accounts; *provided; however*, that, subject to the foregoing, the Bank may set off all amounts due to it in respect of its fees and expenses (including, without limitation, the payment of any legal fees or expenses) or any amounts payable pursuant to Section 4 hereof.

4.     **Investment of Funds.**

(a)     The Bank shall deposit the assets in non-interest bearing Accounts and invest the assets in the Accounts consistent with the instructions provided by the Pledgor, in Addendum 1. The Pledgor's instructions will be in accordance with the Subaward Agreement, provided that the Bank is not responsible for verifying whether the Pledgor's instructions are in compliance with the Subaward Agreement. The Bank shall invest such assets in the Accounts on the date of deposit provided that such assets are received on or before 11:00 a.m. New York City time. Any assets received after 11:00 a.m. New York City time shall be treated as if received on the following Business Day. For purposes of this Agreement, "**Business Day**" shall mean any day that the Bank is open for business.

(b)     The Bank is hereby authorized and directed to sell or redeem any such investments as it deems necessary to make any payments or distributions required under this Agreement. The Bank shall have no responsibility or liability for any loss in the value of any investment made pursuant to this Agreement, or for any loss, cost or penalty resulting from any sale or liquidation of the assets in the Account. The Bank is hereby authorized to execute purchases and sales of investments through the facilities of its own trading or capital markets operations or those of any affiliated entity. The Bank does not have a duty nor will it undertake any duty to provide investment advice.

citi

JA1304

(c)     The Bank shall transfer any earnings or proceeds received on or distributions of earnings or proceeds from the assets in the Accounts to the Pledgor's Program Income from Operations Account on a monthly basis.

5.     **Tax Matters.**

(a)     The Pledgor and the Secured Party agree that, unless and until the Subaward Agreement is terminated, any earnings or proceeds received on or distributions of earnings or proceeds from the assets in the Accounts shall be treated as the income of the Pledgor and shall be reported on an annual basis on United States Internal Revenue Service ("**IRS**") Form 1099-DIV, as required pursuant to the Internal Revenue Code of 1986, as amended (the "**Code**") and the regulations thereunder. Principal payments are not reportable to any payee hereunder. No earnings or proceeds received on or distributions of earnings or proceeds from the assets in the Accounts, or principal payments from the Accounts, are reportable to the Secured Party. The Pledgor, the Secured Party and the Bank agree that the Bank will not be responsible for providing tax reporting and withholding for payments that are for compensation for services performed by an employee or independent contractor.

(b)     The Pledgor and the Secured Party shall upon the execution of this Agreement provide the Bank with a duly completed and properly executed IRS Form W-9 or applicable IRS Form W-8, in the case of a non-U.S. person, for each payee, together with any other documentation and information requested by the Bank in connection with the Bank's tax reporting obligations under the Code and the regulations thereunder.  With respect to the Bank's tax reporting obligations under the Code, the Foreign Account Tax Compliance Act and the Foreign Investment in Real Property Tax Act and any other applicable law or regulation, the Pledgor and the Secured Party understand, that, in the event valid U.S. tax forms or other required supporting documentation are not provided to the Bank, the Bank may be required to withhold tax from the assets in the Accounts and report account information on any earnings, proceeds or distributions from the assets in the Accounts.

(c)     Should the Bank become liable for the payment of taxes, including withholding taxes relating to any funds, including interest and penalties thereon, held by it pursuant to this Agreement or any payment made hereunder, Secured Party agrees, to indemnify and hold the Bank harmless pursuant to Section 7(b) hereof from any liability or obligation on account of taxes, assessments, interest, penalties, expenses and other governmental charges that may be assessed or asserted against the Bank, provided that such liability shall not be satisfied by assets in the Accounts. If the Secured Party fails to indemnify the Bank for such taxes, the Bank will notify the United States Environmental Protection Agency.

(d)     The Bank's rights under this Section 5 shall survive the termination of this Agreement or the resignation or removal of the Bank.

6.     **Concerning the Bank.**

(a)     <u>Bank Duties</u>.  Each of the Pledgor and the Secured Party acknowledges and agrees that (i) the duties, responsibilities and obligations of the Bank shall be limited to those expressly set forth in this Agreement, each of which is administrative or ministerial (and shall not be construed to be fiduciary in nature), and no duties, responsibilities or obligations shall be inferred or implied, (ii) the Bank shall not be responsible for any of the agreements referred to or described

170452352.2

citi

JA1305

herein (including, without limitation, the Grant Agreement, the Subaward Agreement, and any defined term therein not otherwise defined in this Agreement), or for determining or compelling compliance therewith, and shall not otherwise be bound thereby, and (iii) the Bank shall not be required to expend or risk any of its own funds to satisfy payments from the Accounts hereunder.

(b)     Liability of Bank.  The Bank shall not be liable for any damage, loss or injury resulting from any action taken or omitted in the absence of gross negligence or willful misconduct (as finally adjudicated by a court of competent jurisdiction).   In no event shall the Bank be liable for indirect, incidental, consequential, punitive or special losses or damages (including but not limited to lost profits), regardless of the form of action and whether or not any such losses or damages were foreseeable or contemplated.  The Bank shall be entitled to rely upon any instruction, notice, request or other instrument delivered to it without being required to determine the authenticity or validity thereof, or the truth or accuracy of any information stated therein.  The Bank may act in reliance upon any signature believed by it to be genuine (including any signature affixed by DocuSign) and may assume that any person purporting to make any statement, execute any document, or send any instruction in connection with the provisions hereof has been duly authorized to do so.  The Bank may consult with counsel satisfactory to it, and the opinion or advice of such counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it in good faith and in accordance with the opinion and advice of such counsel.  The Bank may perform any and all of its duties through its agents, representatives, attorneys, custodians and/or nominees.  The Bank shall not incur any liability for not performing any act or fulfilling any obligation hereunder by reason of any occurrence beyond its control (including, without limitation, any provision of any present or future law or regulation or any act of any governmental authority, any act of God or war or terrorism, or the unavailability of the Federal Reserve Bank wire services or any electronic communication facility).

(c)     Reliance on Orders.  The Bank is authorized to comply with final orders issued or process entered by any court with respect to the assets in the Accounts, without determination by the Bank of such court's jurisdiction in the matter.  If any portion of the assets in the Accounts are at any time attached, garnished or levied upon under any court order, or in case the payment, assignment, transfer, conveyance or delivery of any such property shall be stayed or enjoined by any court order, or in case any order, judgment or decree shall be made or entered by any court affecting such property or any part thereof, then and in any such event, the Bank is authorized to rely upon and comply with any such order, writ, judgment or decree which it is advised is binding upon it without the need for appeal or other action; and if the Bank complies with any such order, writ, judgment or decree, it shall not be liable to the Pledgor or the Secured Party or to any other person or entity by reason of such compliance even though such order, writ, judgment or decree may be subsequently reversed, modified, annulled, set aside or vacated.

(d)     Erroneous Payments.  If the Bank releases any funds (including but not limited to the assets in the Accounts or any portion of it) to the Pledgor or the Secured Party and subsequently determines (in its absolute discretion) that the payment (or any portion of it) was made in error, the Pledgor or the Secured Party, as applicable, shall upon notice promptly refund the erroneous payment, and none of the obligations of the Pledgor or the Secured Party, as applicable, or the remedies of the Bank will be affected by any act, omission, matter or thing (including, without limitation, any obligation pursuant to which an erroneous payment is made) which, but for this provision, would reduce, release, preclude or prejudice any such obligation or remedy (whether or not known by the Bank, the Pledgor or the Secured Party). Each of the Pledgor and the Secured Party agrees not to assert discharge for value, bona fide payee, or any similar doctrine as a defense to recovery of any erroneous payment by the Bank.

citi

170452352.2

7.    **Compensation, Expense Reimbursement and Indemnification.**

(a)    Compensation. The Bank's compensation shall be as specified in Schedule A.

(b)    Indemnification. The Secured Party covenants and agrees, to indemnify the Bank and its employees, officers, directors, affiliates, and agents (each, an "**Indemnified Party**") for, hold each Indemnified Party harmless from, and defend each Indemnified Party against, any and all claims, losses, actions, liabilities, costs, damages and expenses of any nature incurred by any Indemnified Party, arising out of or in connection with this Agreement or with the administration of its duties hereunder, including, but not limited to, attorney's fees, costs and expenses, except to the extent such loss, liability, damage, cost or expense shall have been finally adjudicated by a court of competent jurisdiction to have resulted solely from the Indemnified Party's own gross negligence or willful misconduct, provided that such liability shall not be satisfied by assets in the Accounts. The foregoing indemnification and agreement to hold harmless shall survive the termination of this Agreement and the resignation or removal of the Bank. If the Secured Party fails to indemnify the Bank pursuant to this Section 7(b), the Bank shall notify the United States Environmental Protection Agency.

8.    **Statements, Confirmations and Notices of Adverse Claims.**  The Bank will send copies of all statements and confirmations for the Accounts simultaneously to the Pledgor and the Secured Party.  The Bank shall be deemed to have delivered statements and confirmations if such statements and confirmations are available on one or more of the Bank systems to deliver electronic media.  The Bank will use reasonable efforts promptly to notify the Secured Party and the Pledgor if any other person claims that it has a property interest in the Accounts or any financial asset in the Accounts.

9.    **Entire Agreement; Exclusive Benefit.**  This Agreement constitutes the entire agreement between the parties and sets forth in its entirety the obligations and duties of the Bank with respect to the assets in the Accounts.  This Agreement is for the exclusive benefit of the parties to this Agreement and their respective permitted successors, and shall not be deemed to give, either expressly or implicitly, any legal or equitable right, remedy, or claim to any other entity or person whatsoever.  No party may assign any of its rights or obligations under this Agreement without the prior written consent of the other parties.

10.    **Resignation and Removal.**  The Bank may be removed only by the U.S. Department of the Treasury.

11.    **Governing Law.**  This Agreement is governed by and shall be construed and interpreted in accordance with federal law of the United States, except where there is no applicable federal law, in accordance with the laws of the State of New York, without giving effect to the conflict of laws principles thereof.

12.    **Representations and Warranties.**

(a)    Each of the Pledgor and the Secured Party represents and warrants that it has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder; and this Agreement has been duly approved by all necessary action and constitutes its valid and binding agreement enforceable in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or other similar laws affecting the enforcement

citi

170452352.2

JA1307

of creditors' rights and subject to general equity principles.

(b)    Each of the Pledgor and the Secured Party represents that neither it nor any of its parents or subsidiaries, or any of their respective directors, officers, or employees, or to the knowledge of the Pledgor and the Secured Party, the affiliates of the Pledgor, the Secured Party or any of its subsidiaries, will, directly or indirectly, use any part of any proceeds or lend, contribute, or otherwise make available such assets in the Accounts in any manner that would result in a violation by any person of economic, trade, or financial sanctions, requirements, or embargoes imposed, administered, or enforced from time to time by the United States (including, without limitation, the Office of Foreign Assets Control of the U.S. Department of the Treasury and the U.S. Department of State), the United Kingdom (including, without limitation, His Majesty's Treasury), the European Union and any EU member state, the United Nations Security Council, and any other relevant sanctions authority.

### 13.    Notices; Instructions.

(a)    Any notice or instruction hereunder shall be in writing in English, and may be sent by (i) secure file transfer or (ii) electronic mail with a scanned attachment thereto of an executed notice or instruction, and shall be effective upon actual receipt by the Bank in accordance with the terms hereof.  Any notice or instruction must be executed (which execution may be manual or affixed by DocuSign) by an authorized person of the Pledgor or the Secured Party, as applicable (the person(s) so designated from time to time, the "**Authorized Persons**").  Each of the applicable persons designated on Schedule B and Schedule C attached hereto have been duly appointed to act as Authorized Persons hereunder and individually have full power and authority to execute any notices or instructions, to amend, modify or waive any provisions of this Agreement, and to take any and all other actions permitted under this Agreement, all without further consent or direction from, or notice to, it or any other party.  Any notice or instruction must be originated from a corporate or government domain.  Any change in designation of Authorized Persons shall be provided by written notice, signed by an Authorized Person, and actually received and acknowledged by the Bank.  Any communication from the Bank that the Bank deems to contain confidential, proprietary, and/or sensitive information shall be encrypted in accordance with the Bank's internal procedures.

(b)    Each of the Pledgor and the Secured Party understands and agrees that the Bank cannot determine the identity of the actual sender of any notice or instruction and that the Bank shall be entitled to conclusively presume that notices or instructions that purport to have been sent by an Authorized Person have been sent by such Authorized Person.  Each of the Pledgor and the Secured Party agrees: (i) to assume all risks arising out of the use of electronic means (including electronic mail, secure file transfer or such other method or system specified by the Bank as available for use in connection with its services hereunder) to submit instructions to the Bank, including, without limitation, the risk of the Bank acting on unauthorized instructions, and the risk of interception or misuse by third parties; (ii) that it is fully informed of the protections and risks associated with the various methods of transmitting instructions to the Bank and that there may be more secure methods of transmitting instructions than the method(s) selected by the Pledgor and the Secured Party, as applicable; (iii) that the security procedures (if any) to be followed in connection with its transmission of instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances; and (iv) to notify the Bank immediately upon learning of any compromise or unauthorized use of the security procedures.  The Pledgor and the Secured Party agree that the security procedures set forth in Section 13(a) and this Section 13(b) are commercially reasonable.

citi

170452352.2

If to the Pledgor:
As provided in Addendum 1

If to the Secured Party:

Coalition for Green Capital
Attn: David Pettit
Address: 1255 Union Street NE, 7th Floor,
Washington, D.C. 20002
Email: dpettit@coalitionforgreencapital.com

If to the Bank:

Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, NY  10013
Attn.: Nerlie Delly
Telephone: +1 212-816-6846
E-mail: CitiGGRFFinancialAgent@citi.com

If to the United States Environmental Protection Agency:

**The Office of the Greenhouse Gas Reduction Fund,
United States Environmental Protection Agency
Attention: David Widawsky
Telephone: +1 202-566-2215
E-mail: GGRF@epa.gov; widawsky.david@epa.gov**

14.     **Amendment; Waiver.**   Any amendment of this Agreement shall be binding only if evidenced by a writing signed by each of the parties to this Agreement.  No waiver of any provision hereof shall be effective unless expressed in writing and signed by the party to be charged.

15.     **Severability.**    The invalidity, illegality or unenforceability of any provision of this Agreement shall in no way affect the validity, legality or enforceability of any other provision. If any provision of this Agreement is held to be unenforceable as a matter of law, the other provisions shall not be affected thereby and shall remain in full force and effect.

16.     **Mergers and Conversions.**   Any corporation or entity into which the Bank may be merged or converted or with which it may be consolidated, or any corporation or entity resulting from any merger, conversion or consolidation to which the Bank will be a party, or any corporation or entity succeeding to the business of the Bank will be the successor of the Bank hereunder without the execution or filing of any paper with any party hereto or any further act on the part of any of the parties hereto except where an instrument of transfer or assignment is required by law to effect such succession, anything herein to the contrary notwithstanding.

17.     **Termination.**   This Agreement shall terminate upon receipt by the Bank of notice from the Secured Party that its security interest in such Accounts and all assets therein have



170452352.2

JA1309

terminated.  Upon receipt of such notice, the Secured Party shall have no further right to originate instructions with respect to the assets in the Accounts.  The Bank shall, upon payment of all outstanding fees and expenses hereunder, promptly forward any amounts held by the Bank in the Accounts to the Pledgor, and the Bank shall be relieved and discharged of any further responsibilities with respect to its duties hereunder.

     **18.**    **Counterparts.**  This Agreement may be executed simultaneously in two or more counterparts, any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same agreement. Signatures on counterparts of this Agreement executed and delivered in electronic format (i.e. "pdf") or by other electronic means (including DocuSign) shall be deemed original signatures with all rights accruing thereto except in respect to any non-US entity, whereby originals may be required.

**[Remainder of Page Left Intentionally Blank]**

170452352.2

citi

JA1310

**IN WITNESS WHEREOF,** each of the parties has caused this Agreement to be executed by a duly authorized representative as of the day and year first written above.

**CITIBANK, N.A.,**
as Bank

By: _____

Name: _____

Title: Senior Trust Officer

**ILLINOIS FINANCE AUTHORITY,**
as Pledgor

By: _____

Title: Executive Director

**COALITION FOR GREEN CAPITAL,**
as Secured Party

By: _____

Title: Chief Administrative and Development

S-1

170452352.2

**EXHIBIT A**

**FORM OF NOTICE OF EXCLUSIVE CONTROL**


VIA EMAIL: cts.spag@citi.com / CitiGGRFFinancialAgent@citi.com

Nerlie Delly
Vice President
Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, New York 10013
[Re. Account # [●]]

Pursuant to the Account Control Agreement dated _____January 28, 2025_____, among Illinois Finance Authority (the "**Pledgor**"), Coalition for Green Capital (the "**Secured Party**"), and Citibank, N.A. (the "**Bank**"), we hereby instruct you of the following:

The Pledgor and the Secured Party have agreed that the terms and conditions in the Subaward Agreement indicate the conditions under which the Secured Party may exercise its right of control herein, and such conditions will be defined as "default" for the purposes of the Account Control Agreement.

As required by the Subaward Agreement, the Secured Party has issued a written determination and finding that:

1)   Pledgor has failed to comply with the terms and conditions of the Subaward Agreement, and that noncompliance is substantial such that effective performance of the Subaward Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse or material misrepresentation of eligibility status, and that the Secured Party has initiated action under 2 CFR 200.339, or 2 CFR 200.332(d) or (i), to wholly or partly suspend or terminate the Subaward Agreement as authorized in the terms of the Subaward Agreement or applicable provisions of 2 CFR Part 200,

       [or,

2)   Another condition constituting a default in the Subaward Agreement has occurred and is continuing].

Therefore, the Secured Party hereby notifies you that (i) a default has occurred and is continuing under the Subaward Agreement and (ii) from and after the receipt of this notice until you receive further instruction from Secured Party, you are hereby directed to retain and hold all funds in the Account or Accounts named in this Notice and not to [invest or] disburse the same to any party whatsoever, other than as instructed by the Secured Party.

170452352.2

**Coalition for Green Capital,**
as Secured Party


By:_____
   Name:
   Title:
   Date:

Exhibit A

170452352.2

**EXHIBIT B**

**FORM OF ACCOUNT DIRECTION (NCIF Financial Assistance Subrecipient)**
**Pledgor's UEI Number:** _____ RBHJRALA6356 _____

[Date]

Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, NY 10013
E-mail: cts.spag@citi.com

VIA: CitiSFT

RE:     Account     Control     Agreement     dated     _____January 28, 2025_____,     among
Illinois Finance Authority (the "**Pledgor**"), Coalition for Green Capital (the "**Secured Party**"), and
Citibank, N.A. (the "**Bank**")

Pursuant to Section 2 of the above referenced Account Control Agreement, the Pledgor hereby
instructs the Bank to disburse a total amount of $[●] funds as per below and as per the attached
upload file named xxx:

**Check applicable boxes:**

**( ) Internal Transfer within the Bank (intra-entity).**

**( ) Internal Transfer within the Bank (inter-entity).**

**( ) External Transfer outside the Bank (for Predevelopment Activities, Market-Building
Activities, and/or Program Administration Activities).**

**( ) External Transfer outside the Bank (for Financial Assistance Activities).**

**If an Internal Transfer within the Bank (intra-entity), check the following applicable boxes:**

**( ) Transfer of $[●] across Pledgor's 'Budget' sub-accounts, as defined in the Subaward
Agreement**.

**( ) Transfer of $[●] from Pledgor's 'Program Income from Operations' account to Pledgor's
'Budget' sub-account(s), as defined in the Subaward Agreement**.

**( ) Transfer of $[●] from Pledgor's 'Reserve' account to Pledgor's 'Program Income from
Operations' account, as defined in the Subaward Agreement.**

**( ) Transfer of $[●] from Pledgor's 'Budget' sub-account(s) or 'Program Income from
Operations' account to 'Reserve' account, as defined in the Subaward Agreement. The
Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the workplan for the Subaward
Agreement supported with EPA funding. Financing agreements for identified Qualified Projects*

Exhibit B

*as defined in the Terms and Conditions of the Secured Party's Grant Agreement necessitating the transfer have been reviewed by Subrecipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

**If an Internal Transfer within the Bank (inter-entity), check the following applicable box:**

**( ) Transfer of $[●] from Pledgor's 'Budget' sub-account(s) to Secured Party's 'Budget' sub-account(s) as defined in the Subaward Agreement and compliant with the terms and conditions of the Grant Agreement, including the EPA Subaward Policy.**

**If an External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities), check one of the following boxes:**

**( ) Disbursement of $[●] for Predevelopment Activities as defined in the Subaward Agreement.**

**( ) Disbursement of $[●] for Market-Building Activities as defined in the Subaward Agreement.**

**( ) Disbursement of $[●] for Program Administration Activities as defined in the Subaward Agreement.**

**If an External Transfer outside the Bank (for Financial Assistance Activities), check the following applicable boxes:**

**( ) Disbursement of $[●] from Pledgor's 'Budget' sub-account to provide Financial Assistance to Qualified Projects as defined in the Subaward Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the workplan for the Subaward Agreement supported with EPA funding. Financing agreements for identified Qualified Projects as defined in the Terms and Conditions of the Secured Party's Grant Agreement necessitating the transfer have been reviewed by Subrecipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

**( ) Disbursement of $[●] from Pledgor's 'Reserve' account to satisfy a legal obligation to a third party as defined in the Subaward Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this transfer is necessary to execute against the workplan for the Subaward Agreement supported with EPA funding and pay a third party pursuant to a financing agreement that has been reviewed by Subrecipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

Capitalized terms in this instruction letter not otherwise defined shall have the same meaning given to them in the Account Control Agreement.

Signature on this Account Direction executed and delivered in electronic format (i.e. "pdf") or by other electronic means (including DocuSign) shall be deemed original signatures with all rights accruing thereto.

IN WITNESS WHEREOF, the Pledgor has caused this Account Direction to be duly executed and delivered as of the date first written above.

Pledgor:

_____

Authorized Person

Exhibit B

**ADDENDUM 1**
**Account Control Agreement**

**(to be provided separately)**

## SCHEDULE A

## BANK COMPENSATION

### General compensation

For the services described in the Account Control Agreement, the Bank shall charge each Pledgor as follows:

| Agency & Trust Services | Fees |
|---|---|
| **Acceptance Fee** <br> This one-time fee covers the acceptance of the appointment, the review of the related Transaction documents submitted in connection with the execution and delivery thereof, setting up of internal controls, and communication with other members of the working group, as necessary. | Waived |
| **Annual Administration Fee** <br> To cover the administrative functions of Citi under the Agreement, including the establishment and maintenance of the account(s), safekeeping of assets, maintenance of the records, execution and administration of the Agreement provisions, and other duties required under the terms of the Agreement. | Waived |
| **Wire Fees** | Waived |
| **Legal Fees** <br> To cover the review of legal documents by Citibank Agency & Trust's outside counsel. | Waived |

The Transaction documents will be governed in accordance with federal law of the United States, except where there is no applicable federal law, in accordance with the laws of the State of New York, without giving effect to the conflict of laws principles thereof, as established in the Agreement and subject to internal approval and satisfactory review of all documentation. All outgoing payments processed by Citi will be made via wire. Account balances invested in an Institutional Money Market Fund will be chosen by the client from a list of providers that Citi will supply. If invested in a Money Market Fund, fund distributors may provide Citi with Shareholder Servicing fees. These fees are discussed in the fund's prospectus, which will be delivered to the client prior to investment. All of Citi's responsibilities will be non-discretionary and Citi will not be required to make any advances of its own funds. Therefore, all services provided by Citi must strictly follow the terms stated in the Agreements or in the written instructions of the authorized parties or third parties authorized to send instructions to Citi.

In accordance with US regulations regarding anti-money laundering and terrorist financing, Federal law requires Citi to obtain, verify and record information that identifies each business or entity that opens an account or establishes a relationship with Citi. What this means for our clients: when a client opens an account or establishes a relationship, we will ask for the client's business name, a street address and a tax identification number that Federal law requires us to obtain. In accordance with the Unlawful Internet Gambling Act (the "Act"), Citibank, N.A. accounts or other Citibank, N.A. facilities in the United States may not be used to process "restricted transactions" as such term is defined in U.S. 31 CFR Section 132.2(y).

**SCHEDULE B**

**PLEDGOR AUTHORIZED LIST OF SIGNERS**
**(to be provided separately)**

Each of the following person(s) is authorized to execute documents and to direct the Bank as to all matters on the Pledgor's behalf.  The Bank may confirm the instructions received by return call to any one of the telephone numbers listed below.

**PLEDGOR**

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: |  |  |

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: |  |  |

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: | ` |  |

Schedule B

JA1319

**SCHEDULE C**

**SECURED PARTY AUTHORIZED LIST OF SIGNERS**
**(to be provided separately)**

Each of the following person(s) is authorized to execute documents and to direct the Bank as to all matters on the Secured Party's behalf.  The Bank may confirm the instructions received by return call to any one of the telephone numbers listed below.

**SECURED PARTY**

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: |  |  |

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: |  |  |

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: |  |  |

170452352.2

**ADDENDUM 1**
**Account Control Agreement**

| | |
|---|---|
| **Pledgor Name** | Illinois Finance Authority |
| **Grant Agreement** | Agreement Title: GGRF NCIF: The Coalition for Green Capital Fund (5G – 84094201) Agreement Date: 08/08/2024 |
| **Subaward Agreement** | Agreement Title: National Clean Investment Fund Subgrant Agreement Agreement Date: 01/03/2025 |
| **Pledgor Notice Details** | Attn: Chris Meister, Exec. Director Address: 160 N. LaSalle St., Ste. S-1000 Email: Chicago, IL 60601  cmeister@il-fa.com |
| **UEI Number** | RBHJRALA6356 |
| **Tax Identification Number** | 86-1091967 |
| **Citi Deposit Instructions** | Bank: CITIBANK, N.A. ABA: 0210-0008-9 Account Name: Account Number: Ref: |

**Money Market Fund Investment Selection**

**Fund Name (Fund Number), CUSIP**

Blackrock Treasury Trust Fund (10) Institutional Shares, 09248U551

**Accounts to Be Established**

| Account Number | Account Name |
|---|---|
| 14232000 | IllinoisFin Other Pass Through |
| 14231800 | IllinoisFin Program Admin |
| 14232500 | IllinoisFin Program Income from Ops |
| 14232100 | IllinoisFin Predevelopment |
| 14232200 | IllinoisFin Reserves |
| 14231900 | IllinoisFin Market Building |
| 14232400 | IllinoisFin Financial Assistance |

**CitiVelocity Reporting Entitlements Request**:

The Pledgor hereby requests that the Bank entitle the following individuals to view-only access to the Bank's client reporting system for all accounts opened under this Account Control Agreement.

Pledgor Client Profile Name:

| Name | Phone Number | Email |
|---|---|---|

| Ximena Granda | 312-651-1362 | xgranda@il-fa.com |
| John Paul | 312-651-1330 | jpaul@il-fa.com |
| Chris Meister | 312-590-1044 | cmeister@il-fa.com |
| Sanjay Patel | 847-338-2114 | spatel@il-fa.com |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

The Pledgor hereby acknowledges that all accounts opened under this Account Control Agreement will be entitled to the Bank's client reporting system and made available for view-only access to the following Client Profiles and their associated users:

| Entity | Client Profile Name |
|---|---|
| Secured Party | Citibank NA FBO Climate United Fund |
| United States Environmental Protection Agency | United States Environmental Protection Agency |

**CitiSFT Entitlements Request**:

Citi makes available the Secure File Transfer (CitiSFT) platform for clients to securely upload Account Directions. The Pledgor hereby requests that the Bank entitle the below individuals with upload only access to CitiSFT:

| Name | Phone Number | Email | Maker, Checker, Maker and Checker |
|---|---|---|---|
| Ximena Granda | 312-651-1362 | xgranda@il-fa.com | Maker and Checker |
| John Paul | 312-651-1330 | jpaul@il-fa.com | Maker and Checker |
| Sanjay Patel | 847-338-2114 | spatel@il-fa.com | Checker |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Pledgor Authorized Signor:

By: *Christopher Meister*
Signed by: 8485031EBA14404...
Name

Title: Executive Director

Date: January 8, 2025

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CALIFORNIA INFRASTRUCTURE AND ECONOMIC
DEVELOPMENT BANK, *et al.*,

                                            Plaintiffs,

                        v.

CITIBANK, N.A.,                                          Civil No. 1:25-cv-820

        and

U.S. ENVIRONMENTAL PROTECTION AGENCY, *et al.*

                                            Defendants.

## DECLARATION OF MICHAEL STODDARD

I, Michael Stoddard, declare as follows:

1.      I am the Executive Director at the Efficiency Maine Trust ("Efficiency Maine"), a

body corporate and politic and a public instrumentality of the State of Maine created under the

laws of the State of Maine. I have held the position of Executive Director of Efficiency Maine

since March 2010.

2.       I make this declaration as a representative of Efficiency Maine in part based on the business records of Efficiency Maine and in part based on my personal knowledge and experience. In my official capacity and based on my personal knowledge and other sources of information which I have obtained and reviewed in that official capacity, I am familiar with, and if called upon to do so, would be competent to testify to the facts and circumstances set forth herein.

3.       I submit this declaration in support of the Complaint filed on March 19, 2025, by Efficiency Maine, the California Infrastructure and Economic Development Bank, the Illinois Finance Authority, and the Minnesota Climate Innovation Finance Authority.

**Efficiency Maine Trust**

4.       Efficiency Maine Trust was established in 2009 pursuant to Maine Public Law 2009, Chapter 372 (emergency, effective June 11, 2009).

5.       Efficiency Maine Trust was established "for the purposes of developing, planning, coordinating and implementing energy efficiency and alternative energy resources programs in the State" of Maine in order to achieve goals including, but not limited to, reducing energy costs to residents, maximizing adoption of cost-effective weatherization and energy efficiency measures, stimulating jobs and businesses that deliver affordable energy and energy efficiency, enhancing cost-effective home heating improvements, and reducing greenhouse gas emissions through the use of cost-effective energy and energy efficiency investments. 35-A M.R.S. § 10103(1).

6.       Among other duties and powers, Efficiency Maine has the authority to provide financing as set forth in Maine statute. *See id.* §§ 10103, 10104, 10105(8)(A), 10109(4), 10116, 10119(2), 10129, 10154, 10203.

7.      Efficiency Maine is further authorized to receive funds from sources including federal funds. *See id.* §§ 10103(4), 10110, 10115, 10116(1), 10118(2), 10119(1), 10125(1), 10126(2), 10129(7).

8.      Efficiency Maine Trust is governed by the independent Efficiency Maine Trust Board and is administered by the Director, commonly referred to as the Executive Director, who is appointed by the Board. *See id.* M.R.S. § 10103.

**Efficiency Maine Is a Subrecipient and Borrower Under the NCIF Program**

9.      The Coalition for Green Capital ("CGC") applied as a lead applicant under the National Clean Investment Fund ("NCIF") program with a coalition of non-profit and governmental lending organizations.

10.      On or about April 4, 2024, the U.S. Environmental Protection Agency ("EPA") announced the award of grants under the NCIF program, including an award of $5 billion to CGC. Efficiency Maine was part of the CGC-submitted work plan that was approved by EPA.

11.      Efficiency Maine is an "eligible recipient" of Greenhouse Gas Reduction Fund monies and a subawardee of CGC's NCIF award. On January 5, 2025, after several months of negotiating terms with the CGC, Efficiency Maine entered into a subaward agreement with CGC with an amount of $15,422,500.

12.      Also on January 5, 2025, after several months of negotiating terms with CGC, Efficiency Maine entered a loan and security agreement with CGC, pursuant to which Efficiency Maine is the borrower of a $10,000,000 loan funded by CGC's NCIF award.

13.      Efficiency Maine entered into an Account Control Agreement ("ACA") as Pledgor with Citibank, N.A., ("Citibank") as Bank and CGC as Secured Party. A true and correct

copy of the ACA is attached as Exhibit A. Efficiency Maine and CGC signed the ACA on

January 14, 2025, and Citibank countersigned on January 27, 2025.

14.     On January 27, 2025, Efficiency Maine submitted a draw request to CGC to

transfer the amount of Efficiency Maine's loan to its Citibank account. Efficiency Maine

received the amount of its loan in its Citibank account on or about February 3, 2025.

15.     On January 28, 2025, Efficiency Maine submitted a draw request to CGC to

transfer the amount of Efficiency Maine's subaward to its Citibank account.  Efficiency Maine

received the amount of its subaward in its Citibank account on or about February 3, 2025.

**Citibank Failed to Follow Draw Instructions from Efficiency Maine**

16.     On February 20, 2025, Efficiency Maine submitted a request to Citibank to

transfer $10,000,000 (the amount of its loan from CGC) to Efficiency Maine's account at

Camden National Bank. That request was not processed, and as of March 19, 2025, Efficiency

Maine has not received the requested funds.

17.     Also on February 20, 2025, Efficiency Maine submitted a second request to

transfer funds totaling $242,807.83 for reimbursement of two qualified program administration

expenses in the amounts of $225,000 and $17,807.83, respectively. The second request was not

processed, and, as of March 19, 2025, Citibank has not disbursed Efficiency Maine's funds in

response to either of its requests.

18.     To date, Efficiency Maine has received no information from Citibank as to the

reasons its draw requests have not been processed. Efficiency Maine has learned through news

articles and through recent litigation brought by CGC and other NCIF why its funding had been

restricted.

19.     On March 7, 2025, the Maine Attorney General, along with Attorneys General from Minnesota, Colorado, Maryland, and New York, sent a letter to Citibank requesting that Citibank provide the basis for its refusal to disburse funds and demanding that Citibank comply with its obligations under the relevant agreements.

20.     On or about March 11, 2025, EPA sent CGC a letter purporting to terminate its award effective immediately. This was accompanied by a statement by EPA that the Financial Agency Agreement with Citibank was being terminated.

21.     EPA's letter to CGC dated March 11, 2025, alleged "substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities, which collectively undermine the fundamental goals and statutory objectives of the award." The letter referenced "multiple ongoing independent investigations" into alleged "programmatic fraud, waste, abuse and conflicts of interest."

**Efficiency Maine Faces Financial and Reputational Harms from EPA's and Citibank's Actions**

22.     Citibank's failure to disburse funds and EPA's efforts to terminate the NCIF program and allegations of criminal activity regarding Greenhouse Gas Reduction Fund funds is causing Efficiency Maine immediate and ongoing financial and reputational harms. Citibank's and EPA's actions will also harm Maine residents and businesses who would benefit from the frozen funds.

23.     Efficiency Maine Trust continues to be unable to access the more than $25 million in funds held in its Citibank account. This amount represents more than a doubling of the total capital that Efficiency Maine currently has under management through its loan program. Without the ability to access these grant and loan funds, Efficiency Maine cannot support the full

scope of programs that it otherwise could, nor can it supply financing to as many energy improvement projects for Maine residents and small businesses as it otherwise would.

24.    In terms of expansion of program offerings, with sufficient capitalization from the NCIF for its revolving loan fund, Efficiency Maine plans to use the NCIF capital to sustain larger maximum loan amounts per home, increasing the maximum from the prior level of $7,500 up to the new level of $25,000, for multiple years. The new higher maximum loan level is important because it is sufficient to accommodate the full of cost converting an entire home to a high-efficiency heat pump system, insulating a typical home's building envelope, or installing of an emergency backup battery system. The old, lower maximum loan amount cannot cover the full cost of any of these projects.

25.    Similarly, Efficiency Maine plans to use the NCIF capital to increase the maximum loan size for small businesses pursuing qualifying energy projects. Efficiency Maine's current maximum loan size for such projects is limited to $10,000 per business location, which is insufficient to support a full conversion to a high-efficiency heat pump system for most businesses.

26.    Finally, with sufficient capitalization, Efficiency Maine plans to pursue loans for larger projects, commonly in the range of $50,000 to $250,000, converting to modern, high-efficiency heating and cooling systems in public schools and municipal buildings.

27.    Efficiency Maine forecasts that without the additional influx of capital being held at Citibank, it will not be able to expand its loan offerings in scope, size, or quantity.  It forecasts exhausting the available capital for its revolving loan fund in the next 12 months at which point it will likely be forced to discontinue financing on energy efficiency projects. This loss of capital due to Citibank's freezing of and EPA's purported termination of these funds will

disproportionately impact creditworthy small businesses and low- and moderate-income households who face steeper barriers to financing such projects than other customer classes.

28.    To illustrate the cost of these funds being frozen, a typical Maine home that switches from an old, conventional furnace or boiler to a modern, high-efficiency heat pump system will save more than $700 annually on their heating bills and will deliver those annual savings for more than 15 years. For a typical low- or moderate-income home in Maine, the total project cost will be in the range of $10,000-$15,000. Of this total, customers seek to take advantage of Efficiency Maine low-interest loans by borrowing, on average, $6,700 per project. With the funds currently frozen at Citibank, Efficiency Maine would be able to finance 1,243 projects per year at the average borrowing level for each of the next three years. Without those funds, a significant fraction of these households will instead face more than $700 in higher annual heating bills, and the more than four hundred firms that install heat pumps in Maine will forego the revenues that would have been associated with these projects.

29.    More than half of Maine homes and businesses burn high-carbon, #2 distillate fuel, kerosene, or propane to heat their buildings through the winter. By contrast, heat pump systems will reduce carbon dioxide emissions by more than 60 percent when displacing an inefficient combustion system.  Maine's plans to use NCIF funds to expand adoption of high-efficiency heat pump systems, specially engineered to perform in cold climates, will generate millions of dollars of energy savings while also lowering emissions of carbon dioxide and other harmful air pollutants.

30.    Moreover, these funds were formally awarded, publicly announced, and reported in the media, but subsequently were declared frozen and/or terminated due to assertions of improper conduct.

31.    One consequence of the EPA and Citibank's freezing of funds is that it risks public and private confidence in the liquidity and availability of loans offered by Efficiency Maine. Without assurances that Efficiency Maine will be able to access funds, potential borrowers, co-investors, and other business partners will not enter into agreements with Efficiency Maine, seeing it and its NCIF subaward as too risky a source of financing. This will cause lasting and irreparable reputational harm to Efficiency Maine.

32.    Another consequence of the actions of EPA and Citibank is that some firms marketing heat pumps and weatherization in Maine, as well as a growing number of customers, have become confused, believing mistakenly that all funding for Efficiency Maine is implicated by the termination that has been announced. These contractors and customers conclude, erroneously, that all of Efficiency Maine's financial incentives (e.g., rebates) are no longer available. The hesitancy of a consumer to commit to a $10,000-25,000 home improvement project is understandable when they are expecting a rebate of up to $9,000 from Efficiency Maine's long-running, nationally recognized programs that would reduce the project cost but then receive information that programs related to the rebates are being terminated. Some consumers cancel their plans to proceed with the project. Others make the safe play to wait for more information. Under either scenario the result for the vendors and contractor community can be catastrophic. If a significant fraction of scheduled projects are canceled or even just postponed for a few months, some contractor firms cannot make payroll and have to lay off staff. This causes them to lose the economies of scale associated with operating to serve a high volume of customer transactions and getting volume discounts on orders of equipment from their supply houses. Their product costs and sales and marketing costs rise, causing their project prices to

rise. In these cases, Efficiency Maine is faced with the prospect of increasing rebate levels in order to maintain the same level of program activity.

33.    The grant termination threatens the ability of Efficiency Maine to cover the operational costs of its financing programs. Efficiency Maine has incurred qualified program administration expenses. Thus far, Efficiency has requested reimbursement for a total of $242,807.83 of these expenses but has been unable to obtain reimbursement due to Citibank's and EPA's actions.

34.    Efficiency Maine incurred significant costs to upgrade its online loan processing capacity and its loan servicing capacity in preparation for the expected increase in volume of loans to be funded through the NCIF. Other associated operating costs include staff and legal costs. Efficiency Maine had expected to be able to cover the increased costs of its loan operations first with the NCIF subaward funds and second, over time, using a portion of the interest collected on repayment of the loans that would be made with NCIF funds to homeowners and businesses. This strategy is premised on receiving the subaward and loan funds and, over time, having a minimum level of funds under management and successfully loaned out.

35.    The Termination of Efficiency Maine's NCIF subaward on the bases suggested by EPA's March 11, 2025, letter will limit Efficiency Maine's ability to apply for or receive federal grant funds. Even if EPA takes no direct action against Efficiency Maine, Efficiency Maine will be obligated to make disclosures when applying for federal grant opportunities. This may make Efficiency Maine ineligible or less competitive in future grant applications and may obligate federal agencies or pass-through entities to impose onerous and unwarranted administrative conditions on any grant funds provided to Efficiency Maine.

I declare under penalty of perjury that the foregoing is true and correct. Executed on

March 21, 2025.

By: _____

Michael Stoddard
Executive Director
Efficiency Maine Trust

# EXHIBIT A

**TO DECLARATION OF MICHAEL STODDARD**



**ACCOUNT CONTROL AGREEMENT**

**among**

**EFFICIENCY MAINE TRUST, as PLEDGOR**

**COALITION FOR GREEN CAPITAL, as SECURED PARTY**

**and**

**CITIBANK, N.A., as BANK**

**Dated as of** _____ January 27, 2025 _____

170452352.2

**THIS ACCOUNT CONTROL AGREEMENT** (this "**Agreement**"), dated as of January 27, 2025 _____, by and among Efficiency Maine Trust, a Maine _____ quasi-state agency and instrumentality of the State (the "**Pledgor**"), Coalition for Green Capital, a District of Columbia nonprofit corporation (the "**Secured Party**") and Citibank, N.A., a national banking association organized and existing under the laws of the United States of America ("**Citibank**") and acting through its Agency & Trust business solely in its capacity as bank under this Agreement, and any successors appointed pursuant to the terms hereof (Citibank in such capacity, the "**Bank**").

**WHEREAS,** the Secured Party has entered into a certain federal financial assistance agreement with the United States Environmental Protection Agency, an agency of the United States Government, as identified in Addendum 1, (the "**Grant Agreement**").

**WHEREAS,** under the Grant Agreement, Pledgor and Secured Party have entered into a Subaward as identified in Addendum 1, (the "**Subaward Agreement**"), pursuant to which the Pledgor has granted the Secured Party a security interest in the accounts as identified in Addendum 1 established and maintained by the Bank for the Pledgor (the "**Accounts**").

**WHEREAS,** the Bank has been designated and authorized to act as a financial agent of the United States pursuant to the authority of the U.S. Department of the Treasury under 12 U.S.C. §§ 90 and 265.

**WHEREAS,** the parties wish that the Bank enter into this Agreement in order to provide for the "control" (as defined in Section 9-104(a) of the Uniform Commercial Code in effect in the State of New York ("**UCC**"), in the case of a deposit account, or Section 8-106 of the UCC, in the case of a security account) of the accounts as a means to perfect the security interest of the Secured Party.

**WHEREAS,** the Pledgor and the Secured Party have agreed that the terms and conditions in the Subaward Agreement indicate the conditions under which the Secured Party may exercise its right of control herein, and such conditions will be defined as "default" for the purposes of this Agreement.

**WHEREAS**, capitalized terms used herein without definition and that are defined in Article 8 or Article 9 of the UCC as adopted in the State of New York shall have the respective meanings set forth therein.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and adequacy of which is hereby irrevocably acknowledged, the parties hereto agree as follows:

1.    **The Accounts.**  The Pledgor and the Bank represent and warrant to, and agree with the Secured Party that:

(a)    The Bank maintains the Accounts for the Pledgor, and all property (including, without limitation, all funds and financial assets) held by the Bank for the accounts of the Pledgor are, and will continue to be, credited to the Accounts in accordance with instructions given by the Pledgor (unless otherwise provided herein).

(b)    To the extent that cash is credited to the Accounts, the Accounts are a deposit account; and to the extent that financial assets (other than cash) are credited to the Accounts, the Accounts are a securities account.  The Bank is (i) the bank with which the Accounts are maintained

and (ii) the securities intermediary with respect to financial assets held in the Accounts. The Pledgor is (A) the Bank's customer with respect to the Accounts and (B) the entitlement holder with respect to all financial assets credited from time to time to the Accounts.

(c)    Notwithstanding any other agreement to the contrary, the Bank's jurisdiction with respect to the Accounts for purposes of the UCC is, and will continue to be for so long as the Secured Party's security interest shall be in effect, the State of New York.

(d)    The Pledgor and the Bank do not know of any claim to or interest in the Accounts or any property (including, without limitation, funds and financial assets) credited to the Accounts, except for claims and interests of the parties referred to in this Agreement.

**2.    Control over Accounts.**

The Bank shall comply with all instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and financial assets in the Accounts including, without limitation, directions to distribute proceeds of any such transfer or redemption of interest or dividends on financial assets in the Accounts, substantially in the form attached hereto as Exhibit B ("**Account Direction**"), originated by the Pledgor, until the time that that Bank receives a notice, substantially in the form attached hereto as Exhibit A (a "**Notice of Exclusive Control**") from the Secured Party that the Secured Party is exercising its right to exclusive control over an Account, and after such time that the Bank receives a Notice of Exclusive Control, the Secured Party for such Account, without further consent by the Pledgor.

**3.    Priority of Secured Party's Security Interest.**  The Bank subordinates in favor of the Secured Party any interest, lien or right of setoff it may have, now or in the future, against the Accounts or assets in the Accounts; *provided; however*, that, subject to the foregoing, the Bank may set off all amounts due to it in respect of its fees and expenses (including, without limitation, the payment of any legal fees or expenses) or any amounts payable pursuant to Section 4 hereof.

**4.    Investment of Funds.**

(a)    The Bank shall deposit the assets in non-interest bearing Accounts and invest the assets in the Accounts consistent with the instructions provided by the Pledgor, in Addendum 1. The Pledgor's instructions will be in accordance with the Subaward Agreement, provided that the Bank is not responsible for verifying whether the Pledgor's instructions are in compliance with the Subaward Agreement. The Bank shall invest such assets in the Accounts on the date of deposit provided that such assets are received on or before 11:00 a.m. New York City time. Any assets received after 11:00 a.m. New York City time shall be treated as if received on the following Business Day. For purposes of this Agreement, "**Business Day**" shall mean any day that the Bank is open for business.

(b)    The Bank is hereby authorized and directed to sell or redeem any such investments as it deems necessary to make any payments or distributions required under this Agreement. The Bank shall have no responsibility or liability for any loss in the value of any investment made pursuant to this Agreement, or for any loss, cost or penalty resulting from any sale or liquidation of the assets in the Account. The Bank is hereby authorized to execute purchases and sales of investments through the facilities of its own trading or capital markets operations or those of any affiliated entity. The Bank does not have a duty nor will it undertake any duty to provide investment advice.



170452352.2

JA1336

(c)    The Bank shall transfer any earnings or proceeds received on or distributions of earnings or proceeds from the assets in the Accounts to the Pledgor's Program Income from Operations Account on a monthly basis.

**5.    Tax Matters.**

(a)    The Pledgor and the Secured Party agree that, unless and until the Subaward Agreement is terminated, any earnings or proceeds received on or distributions of earnings or proceeds from the assets in the Accounts shall be treated as the income of the Pledgor and shall be reported on an annual basis on United States Internal Revenue Service ("**IRS**") Form 1099-DIV, as required pursuant to the Internal Revenue Code of 1986, as amended (the "**Code**") and the regulations thereunder. Principal payments are not reportable to any payee hereunder. No earnings or proceeds received on or distributions of earnings or proceeds from the assets in the Accounts, or principal payments from the Accounts, are reportable to the Secured Party. The Pledgor, the Secured Party and the Bank agree that the Bank will not be responsible for providing tax reporting and withholding for payments that are for compensation for services performed by an employee or independent contractor.

(b)    The Pledgor and the Secured Party shall upon the execution of this Agreement provide the Bank with a duly completed and properly executed IRS Form W-9 or applicable IRS Form W-8, in the case of a non-U.S. person, for each payee, together with any other documentation and information requested by the Bank in connection with the Bank's tax reporting obligations under the Code and the regulations thereunder. With respect to the Bank's tax reporting obligations under the Code, the Foreign Account Tax Compliance Act and the Foreign Investment in Real Property Tax Act and any other applicable law or regulation, the Pledgor and the Secured Party understand, that, in the event valid U.S. tax forms or other required supporting documentation are not provided to the Bank, the Bank may be required to withhold tax from the assets in the Accounts and report account information on any earnings, proceeds or distributions from the assets in the Accounts.

(c)    Should the Bank become liable for the payment of taxes, including withholding taxes relating to any funds, including interest and penalties thereon, held by it pursuant to this Agreement or any payment made hereunder, Secured Party agrees, to indemnify and hold the Bank harmless pursuant to Section 7(b) hereof from any liability or obligation on account of taxes, assessments, interest, penalties, expenses and other governmental charges that may be assessed or asserted against the Bank, provided that such liability shall not be satisfied by assets in the Accounts. If the Secured Party fails to indemnify the Bank for such taxes, the Bank will notify the United States Environmental Protection Agency.

(d)    The Bank's rights under this Section 5 shall survive the termination of this Agreement or the resignation or removal of the Bank.

**6.    Concerning the Bank.**

(a)    Bank Duties.  Each of the Pledgor and the Secured Party acknowledges and agrees that (i) the duties, responsibilities and obligations of the Bank shall be limited to those expressly set forth in this Agreement, each of which is administrative or ministerial (and shall not be construed to be fiduciary in nature), and no duties, responsibilities or obligations shall be inferred or implied, (ii) the Bank shall not be responsible for any of the agreements referred to or described

citi

170452352.2

JA1337

herein (including, without limitation, the Grant Agreement, the Subaward Agreement, and any defined term therein not otherwise defined in this Agreement), or for determining or compelling compliance therewith, and shall not otherwise be bound thereby, and (iii) the Bank shall not be required to expend or risk any of its own funds to satisfy payments from the Accounts hereunder.

(b)      Liability of Bank.  The Bank shall not be liable for any damage, loss or injury resulting from any action taken or omitted in the absence of gross negligence or willful misconduct (as finally adjudicated by a court of competent jurisdiction).   In no event shall the Bank be liable for indirect, incidental, consequential, punitive or special losses or damages (including but not limited to lost profits), regardless of the form of action and whether or not any such losses or damages were foreseeable or contemplated.  The Bank shall be entitled to rely upon any instruction, notice, request or other instrument delivered to it without being required to determine the authenticity or validity thereof, or the truth or accuracy of any information stated therein.  The Bank may act in reliance upon any signature believed by it to be genuine (including any signature affixed by DocuSign) and may assume that any person purporting to make any statement, execute any document, or send any instruction in connection with the provisions hereof has been duly authorized to do so.  The Bank may consult with counsel satisfactory to it, and the opinion or advice of such counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it in good faith and in accordance with the opinion and advice of such counsel.  The Bank may perform any and all of its duties through its agents, representatives, attorneys, custodians and/or nominees.  The Bank shall not incur any liability for not performing any act or fulfilling any obligation hereunder by reason of any occurrence beyond its control (including, without limitation, any provision of any present or future law or regulation or any act of any governmental authority, any act of God or war or terrorism, or the unavailability of the Federal Reserve Bank wire services or any electronic communication facility).

(c)      Reliance on Orders.  The Bank is authorized to comply with final orders issued or process entered by any court with respect to the assets in the Accounts, without determination by the Bank of such court's jurisdiction in the matter.  If any portion of the assets in the Accounts are at any time attached, garnished or levied upon under any court order, or in case the payment, assignment, transfer, conveyance or delivery of any such property shall be stayed or enjoined by any court order, or in case any order, judgment or decree shall be made or entered by any court affecting such property or any part thereof, then and in any such event, the Bank is authorized to rely upon and comply with any such order, writ, judgment or decree which it is advised is binding upon it without the need for appeal or other action; and if the Bank complies with any such order, writ, judgment or decree, it shall not be liable to the Pledgor or the Secured Party or to any other person or entity by reason of such compliance even though such order, writ, judgment or decree may be subsequently reversed, modified, annulled, set aside or vacated.

(d)      Erroneous Payments.  If the Bank releases any funds (including but not limited to the assets in the Accounts or any portion of it) to the Pledgor or the Secured Party and subsequently determines (in its absolute discretion) that the payment (or any portion of it) was made in error, the Pledgor or the Secured Party, as applicable, shall upon notice promptly refund the erroneous payment, and none of the obligations of the Pledgor or the Secured Party, as applicable, or the remedies of the Bank will be affected by any act, omission, matter or thing (including, without limitation, any obligation pursuant to which an erroneous payment is made) which, but for this provision, would reduce, release, preclude or prejudice any such obligation or remedy (whether or not known by the Bank, the Pledgor or the Secured Party). Each of the Pledgor and the Secured Party agrees not to assert discharge for value, bona fide payee, or any similar doctrine as a defense to recovery of any erroneous payment by the Bank.

citi

-4-

7.    **Compensation, Expense Reimbursement and Indemnification.**

(a)    <u>Compensation</u>. The Bank's compensation shall be as specified in <u>Schedule A</u>.

(b)    <u>Indemnification</u>. The Secured Party covenants and agrees, to indemnify the Bank and its employees, officers, directors, affiliates, and agents (each, an "**Indemnified Party**") for, hold each Indemnified Party harmless from, and defend each Indemnified Party against, any and all claims, losses, actions, liabilities, costs, damages and expenses of any nature incurred by any Indemnified Party, arising out of or in connection with this Agreement or with the administration of its duties hereunder, including, but not limited to, attorney's fees, costs and expenses, except to the extent such loss, liability, damage, cost or expense shall have been finally adjudicated by a court of competent jurisdiction to have resulted solely from the Indemnified Party's own gross negligence or willful misconduct, provided that such liability shall not be satisfied by assets in the Accounts. The foregoing indemnification and agreement to hold harmless shall survive the termination of this Agreement and the resignation or removal of the Bank. If the Secured Party fails to indemnify the Bank pursuant to this Section 7(b), the Bank shall notify the United States Environmental Protection Agency.

8.    **Statements, Confirmations and Notices of Adverse Claims.**  The Bank will send copies of all statements and confirmations for the Accounts simultaneously to the Pledgor and the Secured Party.  The Bank shall be deemed to have delivered statements and confirmations if such statements and confirmations are available on one or more of the Bank systems to deliver electronic media.  The Bank will use reasonable efforts promptly to notify the Secured Party and the Pledgor if any other person claims that it has a property interest in the Accounts or any financial asset in the Accounts.

9.    **Entire Agreement; Exclusive Benefit.**  This Agreement constitutes the entire agreement between the parties and sets forth in its entirety the obligations and duties of the Bank with respect to the assets in the Accounts.  This Agreement is for the exclusive benefit of the parties to this Agreement and their respective permitted successors, and shall not be deemed to give, either expressly or implicitly, any legal or equitable right, remedy, or claim to any other entity or person whatsoever.  No party may assign any of its rights or obligations under this Agreement without the prior written consent of the other parties.

10.    **Resignation and Removal.** The Bank may be removed only by the U.S. Department of the Treasury.

11.    **Governing Law.** This Agreement is governed by and shall be construed and interpreted in accordance with federal law of the United States, except where there is no applicable federal law, in accordance with the laws of the State of New York, without giving effect to the conflict of laws principles thereof.

12.    **Representations and Warranties.**

(a)    Each of the Pledgor and the Secured Party represents and warrants that it has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder; and this Agreement has been duly approved by all necessary action and constitutes its valid and binding agreement enforceable in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or other similar laws affecting the enforcement

citi

170452352.2

JA1339

of creditors' rights and subject to general equity principles.

(b)    Each of the Pledgor and the Secured Party represents that neither it nor any of its parents or subsidiaries, or any of their respective directors, officers, or employees, or to the knowledge of the Pledgor and the Secured Party, the affiliates of the Pledgor, the Secured Party or any of its subsidiaries, will, directly or indirectly, use any part of any proceeds or lend, contribute, or otherwise make available such assets in the Accounts in any manner that would result in a violation by any person of economic, trade, or financial sanctions, requirements, or embargoes imposed, administered, or enforced from time to time by the United States (including, without limitation, the Office of Foreign Assets Control of the U.S. Department of the Treasury and the U.S. Department of State), the United Kingdom (including, without limitation, His Majesty's Treasury), the European Union and any EU member state, the United Nations Security Council, and any other relevant sanctions authority.

### 13.    Notices; Instructions.

(a)    Any notice or instruction hereunder shall be in writing in English, and may be sent by (i) secure file transfer or (ii) electronic mail with a scanned attachment thereto of an executed notice or instruction, and shall be effective upon actual receipt by the Bank in accordance with the terms hereof.  Any notice or instruction must be executed (which execution may be manual or affixed by DocuSign) by an authorized person of the Pledgor or the Secured Party, as applicable (the person(s) so designated from time to time, the "**Authorized Persons**").  Each of the applicable persons designated on Schedule B and Schedule C attached hereto have been duly appointed to act as Authorized Persons hereunder and individually have full power and authority to execute any notices or instructions, to amend, modify or waive any provisions of this Agreement, and to take any and all other actions permitted under this Agreement, all without further consent or direction from, or notice to, it or any other party.  Any notice or instruction must be originated from a corporate or government domain.  Any change in designation of Authorized Persons shall be provided by written notice, signed by an Authorized Person, and actually received and acknowledged by the Bank.  Any communication from the Bank that the Bank deems to contain confidential, proprietary, and/or sensitive information shall be encrypted in accordance with the Bank's internal procedures.

(b)    Each of the Pledgor and the Secured Party understands and agrees that the Bank cannot determine the identity of the actual sender of any notice or instruction and that the Bank shall be entitled to conclusively presume that notices or instructions that purport to have been sent by an Authorized Person have been sent by such Authorized Person.  Each of the Pledgor and the Secured Party agrees: (i) to assume all risks arising out of the use of electronic means (including electronic mail, secure file transfer or such other method or system specified by the Bank as available for use in connection with its services hereunder) to submit instructions to the Bank, including, without limitation, the risk of the Bank acting on unauthorized instructions, and the risk of interception or misuse by third parties; (ii) that it is fully informed of the protections and risks associated with the various methods of transmitting instructions to the Bank and that there may be more secure methods of transmitting instructions than the method(s) selected by the Pledgor and the Secured Party, as applicable; (iii) that the security procedures (if any) to be followed in connection with its transmission of instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances; and (iv) to notify the Bank immediately upon learning of any compromise or unauthorized use of the security procedures.  The Pledgor and the Secured Party agree that the security procedures set forth in Section 13(a) and this Section 13(b) are commercially reasonable.

citi

170452352.2

JA1340

If to the Pledgor:
As provided in Addendum 1

If to the Secured Party:

Coalition for Green Capital
Attn: David Pettit
Address: 1255 Union Street NE, 7th Floor,
Washington, D.C. 20002
Email: dpettit@coalitionforgreencapital.com

If to the Bank:

Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, NY  10013
Attn.: Nerlie Delly
Telephone: +1 212-816-6846
E-mail: CitiGGRFFinancialAgent@citi.com

If to the United States Environmental Protection Agency:

**The Office of the Greenhouse Gas Reduction Fund,**
**United States Environmental Protection Agency**
**Attention: David Widawsky**
**Telephone: +1 202-566-2215**
**E-mail: GGRF@epa.gov; widawsky.david@epa.gov**

14.    **Amendment; Waiver.**   Any amendment of this Agreement shall be binding only if evidenced by a writing signed by each of the parties to this Agreement.  No waiver of any provision hereof shall be effective unless expressed in writing and signed by the party to be charged.

15.    **Severability.**    The invalidity, illegality or unenforceability of any provision of this Agreement shall in no way affect the validity, legality or enforceability of any other provision.  If any provision of this Agreement is held to be unenforceable as a matter of law, the other provisions shall not be affected thereby and shall remain in full force and effect.

16.    **Mergers and Conversions.**   Any corporation or entity into which the Bank may be merged or converted or with which it may be consolidated, or any corporation or entity resulting from any merger, conversion or consolidation to which the Bank will be a party, or any corporation or entity succeeding to the business of the Bank will be the successor of the Bank hereunder without the execution or filing of any paper with any party hereto or any further act on the part of any of the parties hereto except where an instrument of transfer or assignment is required by law to effect such succession, anything herein to the contrary notwithstanding.

17.    **Termination.**   This Agreement shall terminate upon receipt by the Bank of notice from the Secured Party that its security interest in such Accounts and all assets therein have



170452352.2

JA1341

terminated.  Upon receipt of such notice, the Secured Party shall have no further right to originate instructions with respect to the assets in the Accounts.  The Bank shall, upon payment of all outstanding fees and expenses hereunder, promptly forward any amounts held by the Bank in the Accounts to the Pledgor, and the Bank shall be relieved and discharged of any further responsibilities with respect to its duties hereunder.

   **18.**  **Counterparts.**  This Agreement may be executed simultaneously in two or more counterparts, any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same agreement. Signatures on counterparts of this Agreement executed and delivered in electronic format (i.e. "pdf") or by other electronic means (including DocuSign) shall be deemed original signatures with all rights accruing thereto except in respect to any non-US entity, whereby originals may be required.

**[Remainder of Page Left Intentionally Blank]**

170452352.2

citi

JA1342

**IN WITNESS WHEREOF**, each of the parties has caused this Agreement to be executed by a duly authorized representative as of the day and year first written above.

**CITIBANK, N.A.,**
as Bank

By: _Nerlie Delly_ _____

N........ly
Title: Senior Trust Officer

**EFFICIENCY MAINE TRUST,**
as Pledgor

By: _____

....ard
Title: Executive Director

**COALITION FOR GREEN CAPITAL**,
as Secured Party

By: _____

....n
Title: Chief Administrative and Development Officer

S-1

**EXHIBIT A**

**FORM OF NOTICE OF EXCLUSIVE CONTROL**

VIA EMAIL: cts.spag@citi.com / CitiGGRFFinancialAgent@citi.com

Nerlie Delly
Vice President
Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, New York 10013
[Re. Account # [●]]

Pursuant to the Account Control Agreement dated _____January 27, 2025_____, among Efficiency Maine Trust (the "**Pledgor**"), Coalition for Green Capital (the "**Secured Party**"), and Citibank, N.A. (the "**Bank**"), we hereby instruct you of the following:

The Pledgor and the Secured Party have agreed that the terms and conditions in the Subaward Agreement indicate the conditions under which the Secured Party may exercise its right of control herein, and such conditions will be defined as "default" for the purposes of the Account Control Agreement.

As required by the Subaward Agreement, the Secured Party has issued a written determination and finding that:

1)  Pledgor has failed to comply with the terms and conditions of the Subaward Agreement, and that noncompliance is substantial such that effective performance of the Subaward Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse or material misrepresentation of eligibility status, and that the Secured Party has initiated action under 2 CFR 200.339, or 2 CFR 200.332(d) or (i), to wholly or partly suspend or terminate the Subaward Agreement as authorized in the terms of the Subaward Agreement or applicable provisions of 2 CFR Part 200,

    [or,

2)  Another condition constituting a default in the Subaward Agreement has occurred and is continuing].

Therefore, the Secured Party hereby notifies you that (i) a default has occurred and is continuing under the Subaward Agreement and (ii) from and after the receipt of this notice until you receive further instruction from Secured Party, you are hereby directed to retain and hold all funds in the Account or Accounts named in this Notice and not to [invest or] disburse the same to any party whatsoever, other than as instructed by the Secured Party.

**Coalition for Green Capital,**
as Secured Party


By:_____
    Name:
    Title:
    Date:

Exhibit A

**EXHIBIT B**

**FORM OF ACCOUNT DIRECTION (NCIF Financial Assistance Subrecipient)**
**Pledgor's UEI Number:** _____LK5KQ9NBPRA6_____

[Date]

Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, NY 10013
E-mail: cts.spag@citi.com

VIA: CitiSFT

RE:     Account     Control     Agreement     dated     _____January 27, 2025_____,     among
Efficiency Maine Trust (the "**Pledgor**"), Coalition for Green Capital (the "**Secured Party**"), and
Citibank, N.A. (the "**Bank**")

Pursuant to Section 2 of the above referenced Account Control Agreement, the Pledgor hereby
instructs the Bank to disburse a total amount of $[●] funds as per below and as per the attached
upload file named xxx:

**Check applicable boxes:**

( ) **Internal Transfer within the Bank (intra-entity).**

( ) **Internal Transfer within the Bank (inter-entity).**

( ) **External Transfer outside the Bank (for Predevelopment Activities, Market-Building
Activities, and/or Program Administration Activities).**

( ) **External Transfer outside the Bank (for Financial Assistance Activities).**

**If an Internal Transfer within the Bank (intra-entity), check the following applicable boxes:**

( ) **Transfer of $[●] across Pledgor's 'Budget' sub-accounts, as defined in the Subaward
Agreement**.

( ) **Transfer of $[●] from Pledgor's 'Program Income from Operations' account to Pledgor's
'Budget' sub-account(s), as defined in the Subaward Agreement**.

( ) **Transfer of $[●] from Pledgor's 'Reserve' account to Pledgor's 'Program Income from
Operations' account, as defined in the Subaward Agreement.**

( ) **Transfer of $[●] from Pledgor's 'Budget' sub-account(s) or 'Program Income from
Operations' account to 'Reserve' account, as defined in the Subaward Agreement. The
Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the workplan for the Subaward
Agreement supported with EPA funding. Financing agreements for identified Qualified Projects*

170452352.2

*as defined in the Terms and Conditions of the Secured Party's Grant Agreement necessitating the transfer have been reviewed by Subrecipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

**If an Internal Transfer within the Bank (inter-entity), check the following applicable box:**

**( ) Transfer of $[●] from Pledgor's 'Budget' sub-account(s) to Secured Party's 'Budget' sub-account(s) as defined in the Subaward Agreement and compliant with the terms and conditions of the Grant Agreement, including the EPA Subaward Policy.**

**If an External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities), check one of the following boxes:**

**( ) Disbursement of $[●] for Predevelopment Activities as defined in the Subaward Agreement.**

**( ) Disbursement of $[●] for Market-Building Activities as defined in the Subaward Agreement.**

**( ) Disbursement of $[●] for Program Administration Activities as defined in the Subaward Agreement.**

**If an External Transfer outside the Bank (for Financial Assistance Activities), check the following applicable boxes:**

**( ) Disbursement of $[●] from Pledgor's 'Budget' sub-account to provide Financial Assistance to Qualified Projects as defined in the Subaward Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the workplan for the Subaward Agreement supported with EPA funding. Financing agreements for identified Qualified Projects as defined in the Terms and Conditions of the Secured Party's Grant Agreement necessitating the transfer have been reviewed by Subrecipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

**( ) Disbursement of $[●] from Pledgor's 'Reserve' account to satisfy a legal obligation to a third party as defined in the Subaward Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this transfer is necessary to execute against the workplan for the Subaward Agreement supported with EPA funding and pay a third party pursuant to a financing agreement that has been reviewed by Subrecipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

Exhibit B

Capitalized terms in this instruction letter not otherwise defined shall have the same meaning given to them in the Account Control Agreement.

Signature on this Account Direction executed and delivered in electronic format (i.e. "pdf") or by other electronic means (including DocuSign) shall be deemed original signatures with all rights accruing thereto.

IN WITNESS WHEREOF, the Pledgor has caused this Account Direction to be duly executed and delivered as of the date first written above.

Pledgor:

_____

Authorized Person

Exhibit B

170452352.2

JA1348

**ADDENDUM 1**
**Account Control Agreement**

**(to be provided separately)**

## SCHEDULE A

## BANK COMPENSATION

### General compensation

For the services described in the Account Control Agreement, the Bank shall charge each Pledgor as follows:

| Agency & Trust Services | Fees |
|---|---|
| **Acceptance Fee**<br>This one-time fee covers the acceptance of the appointment, the review of the related Transaction documents submitted in connection with the execution and delivery thereof, setting up of internal controls, and communication with other members of the working group, as necessary. | Waived |
| **Annual Administration Fee**<br>To cover the administrative functions of Citi under the Agreement, including the establishment and maintenance of the account(s), safekeeping of assets, maintenance of the records, execution and administration of the Agreement provisions, and other duties required under the terms of the Agreement. | Waived |
| **Wire Fees** | Waived |
| **Legal Fees**<br>To cover the review of legal documents by Citibank Agency & Trust's outside counsel. | Waived |

The Transaction documents will be governed in accordance with federal law of the United States, except where there is no applicable federal law, in accordance with the laws of the State of New York, without giving effect to the conflict of laws principles thereof, as established in the Agreement and subject to internal approval and satisfactory review of all documentation. All outgoing payments processed by Citi will be made via wire. Account balances invested in an Institutional Money Market Fund will be chosen by the client from a list of providers that Citi will supply. If invested in a Money Market Fund, fund distributors may provide Citi with Shareholder Servicing fees. These fees are discussed in the fund's prospectus, which will be delivered to the client prior to investment. All of Citi's responsibilities will be non-discretionary and Citi will not be required to make any advances of its own funds. Therefore, all services provided by Citi must strictly follow the terms stated in the Agreements or in the written instructions of the authorized parties or third parties authorized to send instructions to Citi.

In accordance with US regulations regarding anti-money laundering and terrorist financing, Federal law requires Citi to obtain, verify and record information that identifies each business or entity that opens an account or establishes a relationship with Citi. What this means for our clients: when a client opens an account or establishes a relationship, we will ask for the client's business name, a street address and a tax identification number that Federal law requires us to obtain. In accordance with the Unlawful Internet Gambling Act (the "Act"), Citibank, N.A. accounts or other Citibank, N.A. facilities in the United States may not be used to process "restricted transactions" as such term is defined in U.S. 31 CFR Section 132.2(y).

**SCHEDULE B**

**PLEDGOR AUTHORIZED LIST OF SIGNERS**
**(to be provided separately)**

Each of the following person(s) is authorized to execute documents and to direct the Bank as to all matters on the Pledgor's behalf.  The Bank may confirm the instructions received by return call to any one of the telephone numbers listed below.

**PLEDGOR**

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: | | |

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: | | |

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: | ` | |

Schedule B

**SCHEDULE C**

**SECURED PARTY AUTHORIZED LIST OF SIGNERS**
**(to be provided separately)**

Each of the following person(s) is authorized to execute documents and to direct the Bank as to all matters on the Secured Party's behalf.  The Bank may confirm the instructions received by return call to any one of the telephone numbers listed below.

**SECURED PARTY**

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: | | |

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: | | |

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: | | |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK,** 1325 J Street, Suite 1300, Sacramento, CA 95814 | Civil No. 25-cv-820 |

**CALIFORNIA INFRASTRUCTURE AND
ECONOMIC DEVELOPMENT BANK,**
1325 J Street, Suite 1300,
Sacramento, CA 95814

    and

**EFFICIENCY MAINE TRUST,**
168 Capitol Street, Suite 1
Augusta, ME 04330

    and

**ILLINOIS FINANCE AUTHORITY,**
160 N. LaSalle St., Suite S-1000
Chicago, IL 60601

    and

**MINNESOTA CLIMATE INNOVATION
FINANCE AUTHORITY,**
85 7th Place East, Suite 280,
Saint Paul, Minnesota 55101

                Plaintiffs,

    v.

**CITIBANK, N.A.,**
5800 South Corporate Place
Sioux Falls, South Dakota 57108,

    and

**U.S. ENVIRONMENTAL PROTECTION
AGENCY** and **LEE ZELDIN** and **W.C.
MCINTOSH**, in their official capacities as
Administrator and Acting Deputy
Administrator of the U.S. Environmental
Protection Agency,

                Defendants.

Civil No. 25-cv-820

1

**DECLARATION OF MEGHAN STRONG IN SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION**

I, Meghan Strong, declare as follows:

1.    I am an attorney authorized to practice law before this Court.  I am a Deputy
Attorney General in the Office of the California Attorney General and counsel for Plaintiff
California Infrastructure and Economic Development Bank in this action.  I submit this
declaration in support of Plaintiffs' Motion for Preliminary Injunction.

2.    Attached hereto as **Exhibit A** is a true and correct copy of the EPA's grant
agreement with Coalition for Green Capital (CGC) governing CGC's National Clean Investment
Fund grant.

3.    Attached hereto as **Exhibit B** is a true and correct copy of the "Notice of
Termination" issued to CGC by W.C. McIntosh, Acting Deputy Administrator of the EPA, on
March 11, 2025.

I declare under penalty of perjury of the laws of the United States of America that the
foregoing is true and correct.

Dated: March 24, 2025                    /s/ Meghan Strong
                                         Meghan Strong

SA2025301171/44560674.docx

2

JA1354

JA1355

5G - 84094201 - 0    Page 1

| | | GRANT NUMBER (FAIN): 84094201 MODIFICATION NUMBER: 0 PROGRAM CODE: 5G | DATE OF AWARD 08/08/2024 |
|---|---|---|---|
| ![EPA Seal] | **U.S. ENVIRONMENTAL PROTECTION AGENCY** Grant Agreement | TYPE OF ACTION New | MAILING DATE 08/13/2024 |
| | | PAYMENT METHOD: ASAP | ACH# PEND |

| RECIPIENT TYPE: | Send Payment Request to: |
|---|---|
| Not for Profit | Contact EPA RTPFC at: rtpfc-grants@epa.gov |
| **RECIPIENT:** | **PAYEE:** |
| COALITION FOR GREEN CAPITAL 1201 CONNECTICUT AVE NW WASHINGTON, DC 20036-2732 EIN: ▮▮▮▮▮ | COALITION FOR GREEN CAPITAL 1201 CONNECTICUT AVE NW STE 600 WASHINGTON, DC 20036-2732 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| ▮▮▮▮▮ | ▮▮▮▮▮ | ▮▮▮▮▮ |

**PROJECT TITLE AND DESCRIPTION**

GGRF NCIF: The Coalition for Green Capital Fund

See Attachment 1 for project description.

| BUDGET PERIOD 04/01/2024 - 06/30/2027 | PROJECT PERIOD 04/01/2024 - 06/30/2027 | TOTAL BUDGET PERIOD COST $ 5,000,000,000.00 | TOTAL PROJECT PERIOD COST $ 5,000,000,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 5,000,000,000.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 5,000,000,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants and Interagency Agreement Management Division 1200 Pennsylvania Ave, NW Mail code 3903R Washington, DC 20460 | Environmental Protection Agency, OGGRF OA - Office of the Administrator 1200 Pennsylvania Ave, NW Washington, DC 20460 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| Digital signature applied by EPA Award Official Katherine Tsing-Choy - Associate Award Official | DATE 08/08/2024 |

5G - 84094201 - 0    Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 5,000,000,000 | $ 5,000,000,000 |
| EPA In-Kind Amount | $ 0 | $ 0 | $ 0 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 5,000,000,000 | $ 5,000,000,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.957 - Greenhouse Gas Reduction Fund: National Clean Investment Fund | Clean Air Act: Sec. 134(a)(2) and (3) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 2411U41086 | 2224 | E1SF3 | QU | 000MGBXG3 | 4131 | - | - | $ 4,284,180,387 |
| - | 2411U41085 | 2224 | E1SF3 | QU | 000MGBXAC | 4131 | - | - | $ 715,819,613 |
| | | | | | | | | | $ 5,000,000,000 |

5G - 84094201 - 0     Page 3

Budget Summary Page

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. Personnel | $ 62,549,356 |
| 2. Fringe Benefits | $ 19,281,273 |
| 3. Travel | $ 4,497,916 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 705,168 |
| 6. Contractual | $ 188,809,587 |
| 7. Construction | $ 0 |
| 8. Other | $ 4,707,273,743 |
| 9. Total Direct Charges | $ 4,983,117,043 |
| 10. Indirect Costs: 10.00 % Base de minimus | $ 16,882,957 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 5,000,000,000 |
| 12. Total Approved Assistance Amount | $ 5,000,000,000 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 5,000,000,000 |
| 15. Total EPA Amount Awarded To Date | $ 5,000,000,000 |

5G - 84094201 - 0    Page 4

## Attachment 1 - Project Description

This agreement provides funding under the Inflation Reduction Act (IRA) to Coalition for Green Capital (CGC). The recipient will utilize the funding to reduce emissions of greenhouse gases and other air pollutants; deliver benefits of greenhouse gas- and air pollution-reducing projects to American communities, particularly low-income and disadvantaged communities; and mobilize financing and private capital to stimulate additional deployment of greenhouse gas- and air pollution-reducing projects. Specifically, the recipient will create the Coalition for Green Capital Fund, which will allow CGC to both invest directly in qualified projects and foster an ecosystem of green banks, community lenders, and community partners by providing them with capital, co-investment opportunities, and other services. CGC will invest in regional and national-level qualified projects that span across states and provide significant Greenhouse Gas Reduction Fund (GGRF) Program Objectives benefits.

The activities include investments in regional and national-level qualified projects that span across states and provide significant GGRF Program Objectives benefits. CGC will also provide financial and support services to facilitate the use of standardized financial products, accelerate recycling of capital sourced from GGRF grant funds, and expand private capital investment in qualified projects in low-income and disadvantaged communities and rural and tribal communities. Through these efforts, CGC will strive to support the creation of a self-sustaining nationwide network of state and local green banks to drive the deployment of qualified projects in or directly benefiting every low-income and disadvantaged communities (LIDACs) across the United States.

The anticipated deliverables include deployment of financial assistance to qualified projects, including financial assistance to LIDACs. Private capital mobilization and reductions in CO2e.

The expected outcomes include the creation of new jobs, cost savings and a reduction in instances of mortality, heart attacks, hospital admissions, asthma and lost work days.

The intended beneficiaries include geographically diverse communities across all ten EPA regions, including LIDACs, rural and Tribal communities.

CGC will make subawards to named Coalition Members, consistent with the definitions outlined in the NCIF Terms and Conditions. CGC may also make the following types of subawards during the period of performance: Additional subawards to Coalition Members to provide additional financial assistance, subawards to entities (e.g. state or local green banks and CDFIs) to enable financial assistance, subawards for predevelopment activities, subawards for market building activities and subawards for program administration activities.

Deliverables will include projects related to distributed energy generation & storage, zero-emissions transportation, net-zero emissions buildings, other qualified project categories, job creation, CO2e reductions and health benefits.

JA1359

5G - 84094201 - 0    Page 5

# Administrative Conditions

## A. General Terms and Conditions

The Recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later. These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): ▮▮▮▮▮▮▮▮ and EPA Grants Specialist listed on the award
- MBE/WBE reports (EPA Form 5700-52A): ▮▮▮▮▮▮▮▮▮ and EPA Grants Specialist listed on the award
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to Recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Grants Specialist and EPA Project Officer listed on the award
- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer listed on the award

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a Recipient or Subrecipient intends to provide Financial Assistance to Qualified Project(s) that involves construction or land use planning. With the exception of Qualified Project(s) that will be carried out in the State of California, the Recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the Qualified Project(s) and provide comments to the EPA Project Officer. Qualified Project(s) that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

The Recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, Recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA

JA1360

Case 1:25-cv-00820-TSC     Document 17-3     Filed 03/24/25     Page 9 of 66
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 169 of 674

5G - 84094201 - 0     Page 6

interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a Recipient incurs after EPA has notified the Recipient that its application has been selected for award consideration. The pre-award costs must be included in the workplan and budget to be eligible. As provided in 2 CFR 1500.9, Recipients incur pre-award costs at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information.

## E. New Recipient Training Requirement

The Recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The Recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the Recipient should refer to RAIN-2024-G01.

Case 1:25-cv-00820-TSC    Document 17-3    Filed 03/24/25    Page 10 of 66
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 170 of 674

5G - 84094201 - 0    Page 7

## Programmatic Conditions

### I. DEFINITIONS

**Acquisition of Intangible Property:** 2 CFR 200.1 defines Intangible Property as "property having no physical existence, such as trademarks, copyrights, patents and patent applications and property, such as loans, notes and other debt instruments, lease agreements, stock and other instruments of property ownership (whether the property is tangible or intangible)." Acquisitions of Intangible Property involve the purchase of Intangible Property through procurement contracts.

**Air Pollutant:** Air Pollutant means any air pollutant that is listed pursuant to Section 108(a) of the Clean Air Act (or any precursor to such an air pollutant). This includes particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead (see 40 CFR Part 50) and their precursors (e.g., volatile organic compounds).

**Award Agreement:** Award Agreement means the set of legally binding documents between EPA and the Recipient under the federal award. Award Agreement is used interchangeably with Assistance Agreement and Notice of Award.

**Apprentice:** Apprentice means an individual working on a project receiving Financial Assistance who is participating in a Registered Apprenticeship program under the National Apprenticeship Act that meets the requirements of 29 CFR Parts 29 and 30.

**Environmental Information:** Environmental Information is defined in EPA's Environmental Information Quality Policy. Environmental Information includes "data and information that describe environmental processes or conditions which support EPA's mission of protecting human health and the environment. Examples include but are not limited to: direct measurements of environmental parameters or processes; analytical testing results of environmental conditions (e.g., geophysical or hydrological conditions); information on physical parameters or processes collected using environmental technologies; calculations or analyses of environmental information; information provided by models; information compiled or obtained from databases, software applications, decision support tools, websites, existing literature, and other sources; development of environmental software, tools, models, methods and applications; and design, construction, and operation or application of environmental technology."

**Environmental Information Operations:** Environmental Information Operations is defined in EPA's Environmental Information Quality Policy. Environmental Information Operations means "[a] collective term for work performed to collect, produce, evaluate, or use environmental information and the design, construction, operation or application of environmental technology."

**EPA Award Official:** EPA Award Official means the award official from the Office of Grants and Debarment that is authorized to execute the Award Agreement, as well as any subsequent amendments to the Award Agreement, and to make any other final determinations required by law or regulation on behalf of the EPA.

**EPA Project Officer:** EPA Project Officer means the project officer from the Office of the Greenhouse Gas Reduction Fund that is assigned, along with the EPA Grants Specialist, to monitor the Recipient on programmatic and technical aspects of the project and is typically authorized to make programmatic approvals on behalf of the EPA. Where required, the Recipient must notify or request approval from the EPA Project Officer through the EPA Project Officer's individual EPA email address as well ███████

5G - 84004201 - 0    Page 8

such that the Office of the Greenhouse Gas Reduction Fund may delegate an alternative EPA Project Officer in the case of any absence.

**Financial Assistance:** Section 134(b)(1) of the Clean Air Act directs that the Recipient use funds for "Financial Assistance." Consistent with the definition of *Federal financial assistance* in 2 CFR 200.1, Financial Assistance means financial products, including debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, loan purchasing programs, and other debt instruments), equity investments (such as equity project finance investments, private equity investments, and other equity instruments), hybrids (such as mezzanine debt, preferred equity, and other hybrid instruments), and credit enhancements (such as loan guarantees, loan guarantee funds (whether full or partial), loan loss reserves, and other credit enhancement instruments). Expenditures for Financial Assistance are in the form of Subawards (other than subgrants), Participant Support Costs, or Acquisitions of Intangible Property, as defined in this Award Agreement. Subgrants are not eligible as Financial Assistance. The characterization of a Financial Assistance transaction as a Subaward, Participant Support Costs, or Acquisition of Intangible Property is limited to the transaction. For example, the same entity may be a Subrecipient for one transaction and a Program Beneficiary or a Contractor for another transaction.

**Freely Associated States:** Freely Associated States means the Republic of the Marshall Islands (the Marshalls), the Federated States of Micronesia (FSM), and the Republic of Palau (Palau).

**Greenhouse Gas:** Greenhouse Gas means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act. Greenhouse Gas Emissions mean emissions of Greenhouse Gases.

**Low-Income and Disadvantaged Communities**: Section 134(a)(3) of the Clean Air Act appropriates funds "for the purposes of providing financial assistance and technical assistance in low-income and disadvantaged communities." Low-Income and Disadvantaged Communities means CEJST-Identified Disadvantaged Communities, EJScreen-Identified Disadvantaged Communities, Geographically Dispersed Low-Income Households, Properties Providing Affordable Housing, and Federally Recognized Tribal Entities, as defined below.

- *CEJST-Identified Disadvantaged Communities:* All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.

- *EJScreen-Identified Disadvantaged Communities:* All communities within version 2.2 of EJScreen that fall within either (a) the limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.

- *Geographically Dispersed Low-Income Households:* Low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available

5G - 84094201 - 0    Page 9

figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development (HUD). Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using HUD's Family Size Adjustment factor.

- *Properties Providing Affordable Housing:* Properties providing affordable housing that fall within either of the following two categories: (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by HUD, including Public Housing, Section 8 Project-Based Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)); or (5) a housing assistance program administered by the Department of Hawaiian Homelands as defined in Title VIII of the Native American Housing Assistance and Self-Determination Act of 1996 (24 CFR 1006.10) or (b) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

- *Federally Recognized Tribal Entities:* All Federally Recognized Tribal entities, which are considered disadvantaged regardless of whether a Federally Recognized Tribe has land, consistent with M-23-09 and CEJST.

**Market-Building Activities:** Market-Building Activities means activities that meet all three of the following criteria: (1) build the market for financeable Qualified Projects, (2) are not tied directly to Qualified Projects the Recipient intends to finance, and (3) are necessary and reasonable for the deployment of Financial Assistance to Qualified Projects.

**Named Subrecipient:** Named Subrecipient means an entity that is named on the EPA-approved workplan to receive a Subaward in the form of a Subgrant from the Recipient in order to carry out part of the award.

**Participant Support Costs**: 2 CFR 200.1 defines Participant Support Costs as "direct costs for items such as stipends or subsistence allowances, travel allowances, and registration fees paid to or on behalf of participants or trainees (but not employees) in connection with conferences, or training projects." EPA regulations at 2 CFR 1500.1(a)(1) expand the definition of Participant Support Costs to include "subsidies, rebates, and other payments to program beneficiaries to encourage participation in statutorily authorized environmental stewardship programs," which includes the Greenhouse Gas Reduction Fund. In this program, Participant Support Costs may include expenditures by the Recipient as Predevelopment Activities, Market-Building Activities, and Program Administration Activities (which may include subsidies, rebates, and other payments) as well as Financial Assistance to Qualified Projects.

**Period of Closeout**: Period of Closeout means the time interval between the beginning of the closeout

Case 1:25-cv-00820-TSC    Document 17-3    Filed 03/24/25    Page 13 of 66
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 173 of 674

5G - 84094201 - 0    Page 10

period (the date that the award has been closed out, in accordance with 2 CFR 200.344) to the end of the closeout period (the date that the Closeout Agreement has been terminated). The Period of Closeout may also be referred to as the Closeout Period.

**Period of Performance**: 2 CFR 200.1 defines Period of Performance as "the total estimated time interval between the start of an initial Federal award and the planned end date, which may include one or more funded portions, or budget periods." For the purposes of this Award Agreement, the Period of Performance means the time interval between the start of the Federal award (either the first date that the Recipient has incurred allowable pre-award costs or the date on the Notice of Award, whichever is earlier) and the end of the Federal award (the date that the award has been closed out, in accordance with 2 CFR 200.344). The Period of Performance may also be referred to as the Performance Period.

**Post-Closeout Program Income**: Post-Closeout Program Income means Program Income retained at the end of the Period of Performance, which is subject to the terms and conditions of the Closeout Agreement, as well as Program Income earned by the non-Federal entity that is directly generated by a supported activity or earned as a result of the Federal award during the Period of Closeout, which is also subject to the terms and conditions of the Closeout Agreement. Under the Closeout Agreement, the Recipient is authorized to deduct the cost of generating Post-Closeout Program Income under 2 CFR 200.307(b) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Post-Closeout Program Income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Post Closeout Program Income. Costs of generating Post-Closeout Program Income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the Post-Closeout Program Income, provided the Recipient can account for the actual costs incurred.

**Predevelopment Activities:** Predevelopment Activities means activities that meet all three of the following criteria: (1) improve the likelihood of the Recipient financing Qualified Projects, (2) are tied directly to Qualified Projects the Recipient intends to finance, and (3) are necessary and reasonable for the Recipient to deploy Financial Assistance to Qualified Projects.

**Priority Project Categories:** Priority Project Categories means Distributed Energy Generation and Storage, Net-Zero Emissions Buildings, and Zero-Emissions Transportation, as defined below.

- *Distributed Energy Generation and Storage:* Projects, activities, and technologies that deploy small-scale power generation and/or storage technologies (typically from 1 kW to 10,000 kW), plus enabling infrastructure necessary for deployment of such generation and/or storage technologies. Projects, activities, and technologies within this category must support *carbon pollution-free electricity,* which is electrical energy produced from resources that generate no carbon emissions, consistent with the definition specified in <u>Executive Order 14057</u> (Catalyzing Clean Energy Industries and Jobs Through Federal Sustainability).

- *Net-Zero Emissions Buildings:* Projects, activities, and technologies that either (1) retrofit an existing building, making a substantial contribution to that building being a net-zero emissions building and as part of a plan for that building achieving net-zero emissions over time, or (2) construct a new net-zero emissions building in a Low-Income and Disadvantaged Community. A *net-zero emissions building* is a building that meets the requirements of Version 1 of the <u>National Definition for a Zero Emissions Building</u> (June 2024).

- *Zero-Emissions Transportation:* Projects, activities, and technologies that deploy zero-emissions

Case 1:25-cv-00820-TSC    Document 17-3    Filed 03/24/25    Page 14 of 66
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 174 of 674

5G - 84094201 - 0    Page 11

transportation modes, plus enabling infrastructure necessary for zero-emissions transportation modes—especially in communities that are overburdened by existing diesel pollution, particulate matter concentration, and degraded air quality. Projects, activities, and technologies within this category must be consistent with the zero-emissions transportation decarbonization strategies in The U.S. National Blueprint for Transportation Decarbonization.

**Program Administration Activities:** Program Administration Activities means activities that support administration of the grant program, to the extent such activities meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. Program Administration Activities include but are not limited to establishing and convening advisory councils, as described in Item 2 of EPA's Guidance on Selected Items of Cost for Recipients, and fund raising, as described in Item 4 of EPA's Guidance on Selected Items of Cost for Recipients.

**Program Beneficiary:** Program Beneficiary means an entity (either an individual or an organization) that receives Financial Assistance as an end-user, except when such Financial Assistance is characterized as an Acquisition of Intangible Property (in which case the entity is a Contractor, as defined in 2 CFR 200.1). Expenditures for Financial Assistance to Program Beneficiaries are in the form of Participant Support Costs, as defined in 2 CFR 1500.1. A Program Beneficiary is distinct from a Subrecipient, as defined in 2 CFR 200.1.

**Program Income:** 2 CFR 200.1 defines Program Income as "gross income earned by the non-Federal entity that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(f)." 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, Program Income also includes but is not limited to income from origination fees, servicing fees, and asset management fees; dividends from equity investments; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). Program Income must be treated in accordance with the Program Income Programmatic Term and Condition. EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fund raising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Under this award agreement, the Recipient is authorized to deduct the cost of generating program income under 2 CFR 200.307(b) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of program income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Program Income. Costs of generating program income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the program income, provided the Recipient can account for the actual costs incurred. Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

**Qualified Project:** Section 134(c)(3) of the Clean Air Act provides that a Qualified Project is any project, activity, or technology that (A) reduces or avoids greenhouse gas emissions and other forms of air pollution in partnership with, and by leveraging investment from, the private sector; or (B) assists

Case 1:25-cv-00820-TSC    Document 17-3    Filed 03/24/25    Page 15 of 66
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 175 of 674

5G - 84094201 - 0    Page 12

communities in the efforts of those communities to reduce or avoid greenhouse gas emissions and other forms of air pollution. For this Assistance Agreement, Qualified Project means any project, activity or technology meeting all six requirements listed below at the time that Financial Assistance is provided to the project, activity, or technology:

- The project, activity, or technology would reduce or avoid Greenhouse Gas Emissions, consistent with the climate goals of the United States to reduce Greenhouse Gas Emissions 50-52 percent below 2005 levels in 2030, reach 50 percent zero-emission vehicles share of all new passenger cars and light trucks sold in 2030, achieve a carbon pollution-free electricity sector by 2035, and achieve net-zero emissions by no later than 2050. The project, activity, or technology may reduce or avoid such emissions through its own performance or through assisting communities in their efforts to deploy projects, activities, or technologies that reduce or avoid such emissions.
- The project, activity, or technology would reduce or avoid emissions of other Air Pollutants. The project, activity, or technology may reduce or avoid such emissions through its own performance or through assisting communities in their efforts to deploy projects, activities, or technologies that reduce or avoid such emissions.
- The project, activity, or technology would deliver additional benefits (i.e., in addition to primarily reducing or avoiding emissions of greenhouse gases and other Air Pollutants) to communities within one or more of the following seven categories: climate change; clean energy and energy efficiency; clean transportation; affordable and sustainable housing; training and workforce development; remediation and reduction of legacy pollution; and development of critical clean water infrastructure.
- The project, activity, or technology may not have otherwise been financed.
- The project, activity, or technology would mobilize private capital.
- The project, activity, or technology would support only commercial technologies, defined as technologies that have been deployed for commercial purposes at least three times for a period of at least five years each in the United States for the same general purpose as the project, activity, or technology.

**Senior Management:** Senior Management means the chief executive officer, chief risk officer, general counsel, chief compliance officer, chief investment officer, chief reporting officer, and chief financial officer (or equivalent positions).

**Subaward:** 2 CFR 200.1 defines a Subaward as "an award provided by a pass-through entity to a Subrecipient for the Subrecipient to carry out part of a Federal award received by the pass-through entity." A Subgrant refers to a Subaward in the form of a grant.

**Subrecipient:** Consistent with 2 CFR 200.1, Subrecipient means "an entity that receives a Subaward from a pass-through entity to carry out part of a Federal award but does not include an entity that is a Program Beneficiary of such an award." A Subrecipient is distinct from a Program Beneficiary, which is referenced in 2 CFR 1500.1. In this program, there are three main types of Subrecipients: (1) a Subrecipient that receives a Subgrant that will be used, either in whole or in part, to provide Financial Assistance to Qualified Projects, or a "Financial Assistance Subrecipient"; (2) a Subrecipient that receives a Subgrant that will be used exclusively for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities, or a "Technical Assistance Subrecipient"; and (3) a Subrecipient that receives Financial Assistance in the form of a Subaward, with the Subrecipient then using the Subaward to provide Financial Assistance to Qualified Projects, or a "Financial Intermediary Subrecipient". In

Case 1:25-cv-00820-TSC    Document 17-3    Filed 03/24/25    Page 16 of 66
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 176 of 674

5G - 84094201 - 0    Page 13

accordance with 2 CFR 200.332, each Subrecipient is accountable to the Recipient for proper use of EPA funding. Note that a financial transaction is a Subaward to a Financial Intermediary Subrecipient if the following two characteristics are true: (i) the financial transaction provides an award by a pass-through entity to a Subrecipient through a form of *Federal financial assistance*, other than a grant, and (ii) the proceeds of the award are used directly as Financial Assistance to Qualified Projects, carrying out part of a Federal award received by the pass-through entity.

The EPA Subaward Policy applies to Subgrants made to Financial Assistance Subrecipients and Technical Assistance Subrecipients, including but not limited to Named Subrecipients. However, the EPA Subaward Policy does not apply to Subawards made to Financial Intermediary Subrecipients.

## II. NATIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the Recipient agrees to the following four requirements of performance reporting: (1) reports, (2) transaction-level and project-level data, (3) organizational disclosures, and (4) ongoing disclosures. These performance reporting requirements "flow-down" as needed to enable the Recipient to comply with the requirements described in this term and condition. The Recipient must ensure that these reports cover its own grant-related activities, and where applicable to a certain performance report or element of a performance report, the grant-related activities of its Subrecipients, Contractors, and/or Program Beneficiaries. To comply with these performance reporting requirements, the Recipient agrees to use information collection instruments authorized by GGRF Accomplishment Reporting (███████████████████████████████████ ████████), once such instruments are authorized; to the extent that information is not available for transactions that were closed prior to authorization of these instruments, the Recipient will not be out of compliance with the performance reporting requirements.

The Recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit performance reporting electronically to the EPA Project Officer. To the extent it is known, or should have been known, by the chief executive officer (or equivalent) and chief reporting officer (or equivalent) that the reporting is not compliant with the terms and conditions, or demonstrates material noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission. Should the chief executive officer (or equivalent) and chief reporting officer (or equivalent) signing the submission knowingly and willfully make any material false statement, they may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) prior to submission to EPA. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient.

5G - 84094201 - 0    Page 14

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344.

Where applicable, the intervals for reporting are authorized by 2 CFR 200.329(c)(1), as more frequent reporting is necessary for the effective monitoring of the Federal award and could significantly affect program outcomes.

## 1. Reports

### *Semi-Annual Report*

The Recipient agrees to submit semi-annual reports covering six months of the calendar year in accordance with information collection instruments approved through GGRF Accomplishment Reporting (█████████████████████████████████). A single semi-annual report must be submitted to cover grant-related activities of the Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the semi-annual report.

The Recipient agrees to submit semi-annual reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The first semi-annual reporting period ends on December 31 and covers all activities beginning on the first day of the Period of Performance.

### *Annual Report*

The Recipient agrees to submit annual reports that contain detailed narratives describing program performance over the Recipient's fiscal year, supported with qualitative discussions and quantitative metrics. A single annual report must be submitted to cover grant-related activities of the Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the annual report.

The Recipient must include the following broad, non-exhaustive elements in its annual reports:

- Progress towards objectives on key performance metrics over the reporting period,
- Summary of key activities completed in the reporting period, including case studies across different types of Financial Assistance to Qualified Projects,
- Geographic coverage of Financial Assistance to Qualified Projects made in the reporting period,
- Descriptions and examples of actions taken to meaningfully involve the communities the program serves in program design and operations,

Case 1:25-cv-00820-TSC    Document 17-3    Filed 03/24/25    Page 18 of 66
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 178 of 674

5G - 84094201 - 0    Page 15

- Case studies of different types of Market-Building and/or Predevelopment Activities, and
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved in the next reporting period.


These reports must be submitted ready to be published on the EPA website for public consumption and must not include any material that the Recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI. Should EPA identify PII or claims of CBI in reports, the EPA Project Officer will require that the Recipient re-submit the report without the PII or claims of CBI so that it can be published without redaction.

The Recipient agrees to submit **annual reports** electronically to the EPA Project Officer within 90 calendar days after the Recipient's fiscal year end date. The first annual report is due 90 calendar days after the Recipient's fiscal year that ends in 2025.

_Final Report_

The Recipient agrees to submit a final report containing two documents. First, the recipient must submit a report containing all of the elements described above for the annual report, covering the entire Period of Performance and overall assessment of its program performance and implementation of its EPA-approved workplan. Second, the recipient must submit its investment strategy for the Closeout Period to detail its use of Post-Closeout Program Income over the Closeout Period. EPA intends to make the investment strategy, either in whole or in part, available to the public through disclosing copies of the investment strategy as submitted or using the content of the investment strategy. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient.

The two documents for the final report must be submitted to cover the grant-related activities of the Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the final report.

The Recipient agrees to submit the two documents for the final report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the Period of Performance.

## 2. Transaction-Level and Project-Level Data

The Recipient agrees to submit quarterly transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (). The data submission must cover the grant-related activities of the Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the data submission.

The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the quarterly reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request

5G - 84094201 - 0    Page 16

may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the quarterly reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The four quarterly reporting periods for data submission are as follows: July 1 to September 30; October 1 to December 31; January 1 to March 31; and April 1 to June 30. The data submissions must cover transactions originated in the preceding quarter. For the quarterly reporting period that ends September 30, the Recipient must provide information on transactions originated from April 1 to June 30 rather than from July 1 to September 30. For the quarterly reporting period that ends December 31, the Recipient must provide information on transactions originated from July 1 to September 30 rather than October 1 to December 31. For the quarterly reporting period that ends March 31, the Recipient must provide information on transactions originated from October 1 to December 31 rather than January 1 to March 31. For the quarterly reporting period that ends June 30, the Recipient must provide information on transactions originated from January 1 to March 31 rather than April 1 to June 30. The first transaction-level and project-level data submission is due 30 calendar days after December 31, 2024 and must cover all transactions originated from the beginning of the Performance Period through September 30, 2024.

## 3. Organizational Disclosures

The Recipient agrees to submit annual organizational disclosures electronically to the EPA Project Officer within 30 calendar days after submission of its Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. The organizational disclosures must cover the Recipient's fiscal year and be submitted in accordance with information collection instruments approved through GGRF Accomplishment Reporting (███████████████████████████████). Additionally, the Recipient agrees to submit such organizational disclosures for each Financial Assistance Subrecipient that has received in excess of $10,000,000 in NCIF subgrants to provide Financial Assistance to Qualified Projects under the National Clean Investment Fund (to be delivered within 30 calendar days after submission of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System). The requirement for organizational disclosures is not applicable for any fiscal year in which the reporting entity did not meet the requirements of 2 CFR Subpart F—Audit Requirements. The first Organizational Disclosures are due in 2025.

## 4. Ongoing Disclosures

In addition to other ongoing disclosure obligations within the regulations and terms and conditions of this Award Agreement, the Recipient agrees to notify the EPA Project Officer of the following events in accordance with 2 CFR 200.329(e):

1. Changes to the Recipient's independent certified public accounting firm;

2. Non-reliance by the Recipient or its independent auditor on previously issued financial statements or a related audit report or completed interim audit review;

3. Changes in fiscal year end of the Recipient;

4. Material impairments to the Recipient's assets;

5. Intention to file bankruptcy petition or enter into receivership;

5G - 84094201 - 0    Page 17

6. Submission of annual Form 990 to the IRS, with provision of copy to EPA Project Officer upon request (only if submission of the Form 990 is otherwise required).

Additionally, the Recipient agrees to submit such ongoing disclosures for each Financial Assistance Subrecipient that has received in excess of $10,000,000 to provide Financial Assistance to Qualified Projects under the National Clean Investment Fund. The Recipient agrees to submit ongoing disclosures electronically to the EPA Project Officer within 15 calendar days of the event.

## B. Cybersecurity Condition

(a) The Recipient agrees that when collecting and managing environmental data under this Assistance Agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward Agreements and, during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(d), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process.  A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA

5G - 84094201 - 0    Page 18

Project Officer for this award.

## D. Signage Required

### 1. Signage Requirements

a. Investing in America Emblem: The Recipient will ensure that a sign is placed at construction sites supported in whole or in part by this award displaying the official Investing in America emblem and must identify the project as a "project funded by President Biden's Inflation Reduction Act," where the Financial Assistance used to fund the construction project exceeds $250,000. The Recipient will also make optional signage available for projects where the construction is less than $250,000. The sign must be placed at construction sites in an easily visible location that can be directly linked to the work taking place and must be maintained in good condition throughout the construction period. The Recipient will ensure compliance with the guidelines and design specifications provided by EPA for using the official Investing in America emblem available at: https://www.epa.gov/invest/investing-america-signage.

b. Procuring Signs: Consistent with section 6002 of RCRA, 42 USC 6962, and 2 CFR 200.323, the Recipient is encouraged to use recycled or recovered materials when procuring signs. Signage costs are considered an allowable cost under this Assistance Agreement provided that the costs associated with signage are reasonable. Additionally, to increase public awareness of projects serving communities where English is not the predominant language, the Recipient is encouraged to translate the language on signs (excluding the official Investing in America emblem or EPA logo or seal) into the appropriate non-English language(s). The costs of such translation are allowable, provided the costs are reasonable.

### 2. Public or Media Events

For public or media events that are planned more than 15 calendar days in advance, the Recipient agrees to notify the EPA Project Officer of public or media events it has organized publicizing the accomplishment of significant activities related to execution of the EPA-approved workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice.

## E. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards.  Information on these standards may be found at https://www.fgdc.gov/.

## F. Leveraging and Fund Raising

### 1. Leveraging

The Recipient agrees to make commercially reasonable efforts to provide the proposed leveraged funding that is described in its EPA-approved workplan. If the proposed leveraging does not substantially materialize during the Period of Performance, and the Recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future grant applications from the Recipient. In addition, if the proposed leveraging does not substantially materialize during the Period of Performance and the Recipient does not provide a satisfactory explanation, then EPA may reconsider the legitimacy of the award; if EPA determines that the Recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the EPA-approved workplan, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

5G - 84094201 - 0    Page 19

## 2. Fund Raising

2 CFR 200.442 provides coverage on allowable fund-raising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fund raising costs are an allowable cost and may include costs that are reasonable and necessary for raising capital from private investors to provide Financial Assistance to Qualified Projects.

Allowable fund-raising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private investors. Funds a Recipient raises for its own use with costs borne by an EPA Financial Assistance Agreement are considered Program Income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fund raising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fund-raising costs charged to the award will be treated as Program Income.

## G. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving Environmental Information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving Environmental Information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure sub-award recipients develop and implement Quality Assurance (QA) planning documents in accordance with this term and condition; and/or ensure sub-award recipients implement all applicable approved QA planning documents. EPA will not approve any QA planning documents developed by a Subrecipient; the Recipient is responsible for reviewing and approving its Subrecipient QA planning document(s), if required based on the Subrecipient's Environmental Information Operations.

## 1. Quality Management Plan (QMP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the recipient must: (i) develop a QMP, (ii) prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard and submit the document for EPA review, and (iii) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved and current QMP and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

The Recipient must submit the QMP within 90 calendar days after grant award, unless the Recipient requests a one-time extension that is granted by the QAM.

The Recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the Recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a

Case 1:25-cv-00820-TSC    Document 17-3    Filed 03/24/25    Page 23 of 66
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 183 of 674

5G - 84094201 - 0    Page 20

copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QAPP, (ii) prepare the QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard, (iii) submit the document for EPA review, and (iv) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s) and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer (PO) in writing if the previously EPA-approved QAPP is acceptable for this agreement.

The Recipient must submit the QAPP within 90 calendar days after grant award, unless the Recipient requests a one-time extension that is granted by the QAM.

The Recipient must notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

The recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted when changes occur.

### For Reference:

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

## H. Real Property

In accordance with 2 CFR 200.311, title to Real Property acquired or improved under this agreement will vest upon acquisition by the Recipient, including but not limited to title to Real Property acquired through exercise of a remedy for default of a Financial Assistance arrangement. This Real Property must be used for the originally authorized purpose as long as needed for that purpose, during which time the Recipient must not dispose of or encumber its title or other interests. The Real Property Programmatic Term and Condition flows down to Subrecipients but not to Program Beneficiaries or Contractors that receive Financial Assistance to Qualified Projects, which may acquire title to Real Property after receiving Financial Assistance to Qualified Projects.

Case 1:25-cv-00820-TSC    Document 17-3    Filed 03/24/25    Page 24 of 66
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 184 of 674

5G - 84094201 - 0    Page 21

The Recipient must obtain prior approval from the EPA Award Official for the acquisition of Real Property. Note that the Recipient may meet this requirement by specifying the types of acquisitions of Real Property it plans to carry out (including in cases where the Recipient would acquire title to Real Property through exercise of a remedy for default) in its EPA-approved workplan.

<u>Disposition</u>

If the Recipient disposes of the Real Property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

Otherwise, when Real Property is no longer needed for the originally authorized purpose, the Recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where Recipient is disposing of Real Property acquired or improved with a Federal award and acquiring replacement Real Property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the Recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The Recipient is entitled to be paid an amount calculated by applying the Recipient's percentage of participation in the purchase of the Real Property (and cost of any improvements) to the current fair market value of the property.

<u>Recordation</u>

As authorized by 2 CFR 200.316, EPA requires that Recipients who use EPA funding to purchase and improve Real Property through an EPA funded construction project record a lien or similar notice in the Real Property records for the jurisdiction in which the Real Property is located, which indicates that the Real Property has been acquired and improved with federal funding and that use and disposition conditions apply to the Real Property.

I. Program Income

In accordance with Clean Air Act Section 134(b)(1)(C) as well as 2 CFR 200.307(e)(2) and 2 CFR 1500.8 (b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

5G - 84094201 - 0     Page 22

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the EPA-approved workplan.

## J. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the Recipient or Subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the Recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## III. ADDITIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Eligible Recipient

**The Recipient agrees to maintain its status as an Eligible Recipient, which includes:**

a. Meeting the definition of *Nonprofit organization* set forth in 2 CFR 200.1;

b. Having an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"

c. Not receiving any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);

d. Being funded by public or charitable contributions; and

e. Having the legal authority to invest in or finance projects.

### B. Workplan and Budget

The Recipient agrees to execute the EPA-approved workplan. This document, once approved by the EPA, will reflect an agreement between the Parties and will be incorporated into and be a part of the agreement between the Recipient and the EPA.

The Recipient agrees to conduct an annual review of the EPA-approved workplan within 90 calendar days of June 30 of each calendar year. If material changes are made during the annual review or in between annual reviews, the Recipient agrees to submit the updated workplan to the EPA Project Officer.

The Recipient also agrees to conduct an annual review of the EPA-approved detailed budget table within 90 calendar days of June 30 of each calendar year. If material changes are made during the annual review or in between annual reviews, the Recipient agrees to submit the updated detailed budget table to the EPA Project Officer. Such submissions are not subject to prior approval unless otherwise required by the regulations or the terms and conditions of the Award Agreement.

## C. Recipient Organizational Plan

The Recipient agrees to execute the workplan in accordance with the documents listed below, as submitted to EPA through Grants.gov for EPA-R-HQ-NCIF-23 or provided to EPA after the application submission deadline.

1. Organizational Plan, pursuant to *Section IV.C: Content of Application Submission* of the Notice of Funding Opportunity;

2. Legal Entity Structure Diagram, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity; and

3. Organizational and Governing Documents, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity.

The Recipient agrees to maintain its incorporation in the United States, as reflected in the above documents.

The Recipient agrees to conduct an annual review of the documents within 90 calendar days of June 30 of each calendar year. If material changes are made during the annual review or in between annual reviews, the Recipient agrees to submit the updated documents to the EPA Project Officer. Such submissions are not subject to prior approval unless otherwise required by the regulations or the terms and conditions of the Award Agreement.

## D. Recipient Policies and Procedures

The Recipient agrees to execute the workplan in accordance with the documents listed below (or other documents submitted in lieu of the documents listed below), as submitted to EPA through Grants.gov for EPA-R-HQ-NCIF-23 or provided to EPA after the application submission deadline.

1. Legal and Compliance Risk Management Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

2. Financial Risk Management Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

3. Board Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

5G - 84094201 - 0    Page 24

4. Management Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding
Opportunity;

5. Consumer Protection Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

6. Equity Policies and Practices, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity; and

7. Conflict of Interest Mitigation Plan, which include all documents submitted upon EPA's request regarding measures that will be taken to eliminate, neutralize, mitigate or otherwise resolve conflicts of interest.

8. Documentation of Personnel and Fringe Benefit Charges, which includes all documents submitted upon EPA's request to document how personnel and fringe benefits will be charged against the grant award in accordance with 2 CFR 200.430 *Compensation—personal services* and 2 CFR 200.431 *Compensation—fringe benefits*. Notwithstanding the content of the Recipient's EPA-approved budget, the Recipient is not authorized to charge the grant award for personnel and fringe benefits against employees without using the W-2 as the definitive definition of "employee" until the Documentation of Personnel and Fringe Benefit Charges has been reviewed and approved by the EPA, as communicated by the EPA Project Officer.

The Recipient agrees to conduct an annual review of the documents within 90 calendar days of June 30 of each calendar year. If material changes are made during the annual review or in between annual reviews, the Recipient agrees to submit the updated documents to the EPA Project Officer. With the exception of the Documentation of Personnel and Fringe Benefit Charges, where changes will be subject to prior approval, such submissions are not subject to prior approval unless otherwise required by the regulations or the terms and conditions of the Award Agreement.

## E. Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Financial Assistance to Qualified Projects; Predevelopment Activities; Market-Building Activities; and Program Administration Activities. The Recipient must use awards funds exclusively for allowable activities within the ten EPA regions, with the exception of the Freely Associated States. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

The Recipient agrees to not use the award for the following unallowable activities: (a) Financial Assistance to Qualified Projects in the form of Subgrants; (b) Subgrants for the purposes of providing Financial Assistance to Qualified Projects (other than Subgrants from the Recipient to first-tier Subrecipients); and (c) activities that support deployment of projects that do not meet the definition of Qualified Projects. The Recipient also agrees not to use the award for activities associated with defending against, settling, or satisfying a claim by a litigant, except when (1) the claim stems from the Recipient's implementation of its EPA-approved workplan in compliance with the terms and conditions of the Award Agreement and (2) the Recipient has obtained prior written approval from the EPA Award Official.

## F. Foreign Entity of Concern

5G - 84094201 - 0     Page 25

As part of carrying out this award, the Recipient agrees to ensure that entities the Recipient contracts with, the Recipient makes Subawards to, or that receive funds as Program Beneficiaries at any tier of funding under this grant agreement are not—

> (A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);
>
> (B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or
>
> (C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## G. LIDAC Expenditure Requirement

The Recipient agrees to ensure that a minimum of 40% of the award is used for the purposes of providing Financial Assistance in Low-Income and Disadvantaged Communities, with compliance maintained over each annual reporting period (i.e., from July 1 to June 30). Funds used for the purposes of providing Financial Assistance may include Financial Assistance to Qualified Projects; Predevelopment Activities; Market-Building Activities; and Program Administration Activities. This requirement applies to the entire award provided to the Recipient but does not "flow down" to each Subrecipient.

## H. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide Financial Assistance to Qualified Projects that may generate Program Income as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such Financial Assistance may include Subawards, Participant Support Costs, and/or Acquisitions of Intangible Property. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the Recipient's Subawards from the capitalization of a revolving loan fund.

EPA does not consider the remaining portion of the award as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). As such, all Subgrants made by the Recipient are subject to the EPA Subaward Policy.

## I. Subawards

### Subawards to Technical Assistance Subrecipients

The Establishing and Managing Subawards General Term and Conditions applies to Technical Assistance Subrecipients.

### Subawards to Financial Intermediary Subrecipients

The following requirements apply when the Recipient provides a Subaward to a Financial Intermediary Subrecipient. These requirements apply to the Recipient and Subrecipient in lieu of those specified in the

Case 1:25-cv-00820-TSC    Document 17-3    Filed 03/24/25    Page 29 of 66
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 189 of 674

5G - 84094201 - 0    Page 26

Establishing and Managing Subawards General Term and Condition, as the EPA Subaward Policy does not apply to Financial Intermediary Subrecipients.

1. The Recipient must establish and follow a system that ensures all Subawards to Financial Intermediary Subrecipients are in writing and contain all of the elements required by 2 CFR 200.332(a), with the exception of the indirect cost provision of 2 CFR 200.332(a)(4) (which does not apply to loans). EPA has developed an optional template for Subaward Agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such Subaward Agreements with Financial Intermediary Subrecipients.

2. The Financial Intermediary Subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all Subawards that requires Financial Intermediary Subrecipients to comply with these requirements. No other provisions of the Uniform Grant Guidance, including the Procurement Standards, apply directly to the Subrecipient.

3. Prior to making the Subaward, the Recipient must ensure that the Financial Intermediary Subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(a)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

<u>Subawards to Financial Assistance Subrecipients</u>

The following requirements apply when the Recipient provides a Subaward to a Financial Assistance Subrecipient. These requirements apply to the Recipient and Subrecipient <u>in addition</u> to those specified in the Establishing and Managing Subawards General Term and Condition.

1. The Recipient must obtain written approval from the EPA Award Official prior to providing a Subgrant to a Financial Assistance Subrecipient that would exceed $10,000,000 cumulatively in Financial Assistance Subawards under the National Clean Investment Fund and Capitalization Funding under the Clean Communities Investment Accelerator.

2. Prior to providing a Subgrant not named on the application to a Financial Assistance Subrecipient, the Recipient must obtain disclosure from the potential Subgrantee regarding award funds that it has sought and/or received under the National Clean Investment and Clean Communities Investment Accelerator programs.

## J. Participant Support Costs

The Recipient may provide Financial Assistance to Qualified Projects in the form of Participant Support Costs. In addition, the Recipient may provide Participant Support Costs for other purposes, including Predevelopment Activities, Market-Building Activities, and Program Administration Activities, to the extent such purposes are authorized under the Award Agreement.

The Recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on Participant Support Costs, in addition to other requirements included in the terms and conditions of this Award Agreement:

Case 1:25-cv-00820-TSC    Document 17-3    Filed 03/24/25    Page 30 of 66
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 190 of 674

5G - 84094201 - 0    Page 27

1. The Recipient and Program Beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as Participant Support Costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the Recipient and Program Beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates, and other participant support cost payments. However, EPA does not provide advice on tax issues relating to these payments.

2. Participant support cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The Recipient, therefore, may not make participant support cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that Subrecipients adhere to this requirement as well. The Recipient is responsible for checking that Program Beneficiaries (i.e., entities receiving Participant Support Costs) are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the Program Beneficiaries.

The Recipient agrees to provide written guidelines for Participant Support Costs that must be approved by the EPA prior to making payments to Program Beneficiaries, unless already described in the Recipient's EPA-approved workplan. These guidelines must: (a) describe the activities that will be supported by the Participant Support Costs; (b) specify the range of funding to be provided through the Participant Support Costs; (c) identify which types of entities will have title to equipment (if any) purchased with the funds; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the participant support cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

## K. Acquisitions of Intangible Property

### 2 CFR 200 Procurement Standards

The Recipient may provide Financial Assistance to Qualified Projects in the form of Acquisitions of Intangible Property. The Recipient agrees to acquire Intangible Property in compliance with the conflict of interest and competition requirements described in the 2 CFR Part 200 Procurement Standards. This includes but is not limited to the requirements at 2 CFR 200.318 to:

- Have and use documented procurement procedures to govern acquisitions of Intangible Property;
- Maintain oversight to ensure that contractors perform in accordance with the terms, conditions, and specifications of their contracts;
- Maintain written standards of conduct covering conflicts of interest and governing the actions of employees engaged in the selection, award, and administration of contracts as well as maintain written standards of conduct covering organizational conflicts of interest;
- Prioritize entering into inter-entity agreements where appropriate for procurement or use of common or shared goods and services as the Recipient seeks to mobilize financing and private capital;
- Award contracts only to responsible contractors possessing the ability to perform successfully under the terms and conditions of the proposed procurement; and
- Maintain records sufficient to detail the history of procurement.

5G - 84094201 - 0    Page 28

## Disposition

If the Recipient disposes of the Intangible Property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

## Recordation

The Recipient agrees to record liens or other appropriate notices of record to indicate that Intangible Property has been acquired with Federal funding and that use and disposition conditions apply to the Intangible Property, in cases where Financial Assistance to Qualified Projects is in the form of an Acquisition of Intangible Property. As provided in 2 CFR 200.1: "…loans, notes and other debt instruments, lease agreements, stock and other instruments of property ownership (whether the property is tangible or intangible)" are *Intangible Property* for the purposes of the restrictions described at 2 CFR 200.315(a). "Other appropriate notices of record" is not limited to filing Uniform Commercial Code instruments and may also include a notice of record in the legally-binding transaction documents.

Additional guidance is available at Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements.

## L. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this Award Agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" and "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Therefore, the Recipient must ensure that any construction work financed in whole or in part with such Financial Assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis-Bacon and Related Act requirements and the requirements of these Terms and Conditions. The Recipient must ensure that these requirements apply to all construction projects assisted by such Financial Assistance.

If the Recipient encounters a situation that presents uncertainties regarding DBRA applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with a Subrecipient, Program Beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this Term and Condition or the Davis-Bacon and

5G - 84094201 - 0    Page 29

Related Act, the Recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Note, the use of the term project in this term and condition is distinct from the use of the term project within the definition of Qualified Project under Clean Air Act Section 134(c)(3), which is broader and includes "any project, activity, or technology." Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed by a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

## B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

## C. Recipient Responsibilities When Entering Into and Managing Contracts:

### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

### b. After Award of Contract:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

## D. Recipient Responsibilities When Establishing and Managing Additional Subawards:

**a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all Subawards under this grant: "By accepting this award, the EPA Subrecipient acknowledges

Case 1:25-cv-00820-TSC     Document 17-3     Filed 03/24/25     Page 33 of 66
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 193 of 674

5G - 84094201 - 0     Page 30

and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of Subrecipients and must ensure Subrecipients comply with the requirements in 29 CFR 5.6.

**c. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of Subrecipients and must ensure that Subrecipients comply with the requirements in subsection E, below.

### E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program Beneficiaries

Any Financial Assistance provided in the form of a participant support cost to a Program Beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

### a. Solicitation and Contract Requirements:

#### i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:

"[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

#### ii. Include DBRA Requirements in All Contracts: Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

### b. After Award of Contract:

#### i. Approve and Submit Requests for Additional Wages Rates: Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

#### ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions: Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

5G - 84094201 - 0     Page 31

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

## 2. Mega Construction Project Program

The Recipient must work with the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) to identify projects that are within the scope of OFCCP's Mega Construction Project Program, which includes federally-assisted projects with a total project value above $35,000,000. If those projects are selected from a wide range of federally-assisted projects over which OFCCP has jurisdiction, those projects will be required to participate and partner with OFCCP in the OFCCP Mega Construction Projects program.

## 3. Compliance with Federal Statutes and Regulations

The Recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with Subrecipients, contractors, and other partners (e.g., by including such provisions in contractual agreements). This includes but is not limited to applicable health and safety regulations as administered by the Occupational Safety and Health Administration.

## 4. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the Recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## 5. Labor and Equitable Workforce Development Implementation Plan

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), by December 31, 2024,the Recipient must submit a Labor and Equitable Workforce Development Implementation Plan to the EPA Project Officer. The Implementation Plan should articulate policies, practices, and procedures adopted by the Recipient to maximize high-quality jobs and workforce development outcomes on projects assisted with the award. Examples of how this can be demonstrated include, but are not limited to:

- Mechanisms for promoting job quality and evaluating labor standards on projects being considered for and/or receiving Financial Assistance;
- Plans to support workforce development as part of Market-Building Activities;

Case 1:25-cv-00820-TSC    Document 17-3    Filed 03/24/25    Page 35 of 66
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 195 of 674

5G - 84094201 - 0    Page 32

- Current and planned partnerships with labor and workforce development organizations, including the purpose of those partnerships;

- Mechanisms for maximizing training and employment opportunities for participants in Registered Apprenticeship Programs on projects, including apprenticeship utilization targets, as applicable;

- Mechanisms for creating high-quality job training and employment opportunities available to residents of low-income and disadvantaged communities through projects and other program activities; and

- Processes for promoting Project Labor Agreements on construction projects above $25,000,000, as appropriate, in alignment with Executive Order 14063 (Use of Project Labor Agreements for Federal Construction Projects) and Executive Order 13502 (Use of Project Labor Agreements for Federal Construction Projects), as well as other types of binding agreements that promote strong workforce outcomes, such as Community Workforce Agreements and Community Benefits Agreements.

The Recipient may use or reference materials already submitted to EPA as part of its submission of the Implementation Plan, where relevant.

Note that EPA may make the information from this plan available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient.

## M. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that for any activity related to the construction, alteration, maintenance, or repair of infrastructure, "none of the funds made available for a Federal Financial Assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The Recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America requirements that all Recipients of EPA Financial Assistance awards must comply with.

If the Recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## N. Governance Requirements

The Recipient agrees to comply with the following governance requirements starting December 31, 2024. The governance requirements "flow-down" to Financial Assistance Subrecipients that have received in excess of $10,000,000 in NCIF subgrants but not to other subrecipients. The governance requirements

Case 1:25-cv-00820-TSC    Document 17-3    Filed 03/24/25    Page 36 of 66
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 196 of 674

5G - 84094201 - 0    Page 33

are waived for (i) any entity that has been determined by the U.S. Treasury's CDFI Fund to meet the CDFI certification requirements set forth in 12 CFR 1805.201 and (ii) any entity whose specific governance structure is set forth in State, Tribal, or local law.

The Recipient (or Subrecipient) may meet all or some of the governance requirements through the parent entity, provided the Recipient (or Subrecipient) is subject to the governance of the parent entity and the Recipient (or Subrecipient) is wholly-controlled by the parent entity. Similarly, the governance requirements may be waived for the Recipient (or Subrecipient) through the parent entity meeting the CDFI certification requirements set forth in 12 CFR 1805.201, provided the Recipient (or Subrecipient) is wholly-controlled by the parent entity.

## 1. Board Size and Composition

The Recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the Recipient's EPA-approved workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The Recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from Low-Income and Disadvantaged Communities).

## 2. Board Independence

The Recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

## 3. Board Committees

The Recipient agrees to have the following board-level committees to oversee and monitor management, with each committee staffed by members qualified to execute the committee's objectives. While the Recipient need not adhere to the exact naming convention or structure in this term and condition, each of the responsibilities must be covered by board-level committees at all times during the Period of Performance; for the avoidance of doubt, one committee may perform the responsibilities of one or more of the committees specified below.

1. An investment or credit committee to oversee and approve investment or credit decisions;

2. A risk management committee to oversee the formulation and operationalization of the risk management framework;

3. An audit committee to oversee the integrity of reporting and internal controls and the performance of audit functions, with a majority independent members on such committee;

4. A nomination/governance committee to oversee nomination and succession of board and senior management, with a majority independent members on such committee; and

5. A compensation committee to oversee board as well as senior management and staff compensation,

Case 1:25-cv-00820-TSC     Document 17-3     Filed 03/24/25     Page 37 of 66
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 197 of 674

5G - 84094201 - 0     Page 34

with a majority independent members on such committee.

Further, the Recipient agrees to act in good faith to ensure each committee obtains information from management, auditors, or other third-parties necessary to discharge their duties.

### 4. Board Policies and Procedures

The Recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The Recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of Subawards, participant support cost payments, Acquisitions of Intangible Property to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

## O. Consumer Protection Requirements

The Recipient agrees to carry out the following consumer protection requirements to the extent that the Recipient directly interacts, transacts, or contracts with consumers in the provision of Financial Assistance to Qualified Projects:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The Recipient agrees to monitor and oversee Subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract

5G - 84094201 - 0    Page 35

with consumers, in accordance with 2 CFR 200.332(d) and 2 CFR 200.318.

## P. Financial Risk Management Requirements

### 1. Cash Management Requirements

The Recipient must deposit and maintain advance payments of Federal funds exclusively in insured accounts, in accordance with 2 CFR 200.305(b)(7)(ii). As provided in 2 CFR 200.1, an advance payment is "a payment that a Federal awarding agency or pass-through entity makes by any appropriate payment mechanism, including a predetermined payment schedule, before the non-Federal entity disburses the funds for program purposes;" a Recipient drawing down funds from ASAP prior to disbursement for actual and allowable project costs constitutes an advance payment. Interest income earned on the advance payment from EPA to the Recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The Recipient is authorized to maintain Program Income in two types of accounts:

> 1. Insured accounts, including in amounts in excess of the federal insurance limit of $250,000.

> 2. Accounts where such income is used to purchase (i) U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days and that such instruments are held-to-maturity if purchased directly, or (ii) short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions.

Interest income and other returns earned on funds that have already been disbursed is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9).

### 2. Financial Health Metrics

The Recipient agrees to report the following financial health metrics at the entity-level on an annual basis in accordance with its fiscal year as well as on behalf of each Financial Assistance Subrecipient that receives in excess of $10,000,000 in NCIF subgrants. The metrics are due to the EPA Project Officer within 30 calendar days after submission of the reporting entity's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System and may be submitted through the Organizational Disclosures form. The requirement for submission of financial health metrics is not applicable for any fiscal year in which the reporting entity did not meet the requirements of 2 CFR Subpart F—Audit Requirements. The first financial health metrics are due in 2025.

1. Net Asset Ratio: The net asset ratio is defined as net assets divided by total assets.

2. Current Ratio: The current ratio is defined as current assets divided by current liabilities, where current assets is equal to the value of all assets that are reasonably expected to be converted into cash within the coming 12-month period in the normal course of business and current liabilities is equal to the total value of all debts or obligations that must be paid in the coming 12-month period.

5G - 84094201 - 0    Page 36

3. Delinquency Rate: The delinquency rate is defined as the value of loans outstanding that are 90+ calendar days delinquent divided by the value of loans outstanding, where loans 90+ calendar days delinquent includes those with outstanding balances 90+ calendar days overdue and still accruing interest as well as those in nonaccrual status.

4. Net Charge-Off Rate: The net charge-off rate is defined as the value of loans charged-off over the past fiscal year, minus the value of loan recoveries over the past fiscal year, divided by the value of loans outstanding.

5. Concentration: The concentration of the portfolio, as demonstrated by calculating and reporting on recipient-level exposure, defined as on-balance sheet exposures to a single consolidated entity over all on-balance sheet exposures, for top ten highest exposures.

Note, the Delinquency Rate and Net Charge-Off Rate may exclude the value of loans which include an element of forgiveness, if and only if such forgiveness was established in the terms governing the financial product at origination.

The EPA Project Officer will consider Recipient and, where applicable, Subrecipient performance against these financial health metrics only to the extent by which they materially impair the Recipient's ability to execute the EPA-approved workplan when assessing whether the Recipient is making sufficient progress in implementing the EPA-approved workplan under this Assistance Agreement, as specified in the Sufficient Progress General Term and Condition.

## 3. Climate-Related Financial Risks

The Recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The Recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.

## 4. Additional Requirements

The Recipient agrees to not subordinate EPA's interest in grant funds that have not yet been used for program purposes in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law. Once a Recipient uses grant funds for program purposes and incurs a financial obligation, as defined under 2 CFR 200.339, EPA will only seek claims on those funds in the event that they were used for costs that do not comply with the terms and conditions of the Award Agreement or if there is adequate evidence of waste, fraud, or abuse, prompting adverse action by EPA per 2 CFR 200.339. This does not prohibit the use of subordinated debt as a form of Financial Assistance.

The Recipient agrees to provide Financial Assistance Subrecipients with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(e).

## Q. Historic Preservation

5G - 84094201 - 0    Page 37

National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The Recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties can include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The Recipient should work with their Project Officer to ensure that Subrecipients are available to work with EPA on any required consultation process with the State Historic Preservation Office (SHPO) or Tribal Historic Preservation Office (THPO) prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The Recipient must ensure that Subrecipients performing construction projects are aware of this requirement, and the Recipient must notify EPA if the AHPA is triggered.

R. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the Recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The Recipient must comply with, and ensure Subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the federal award" provision of 2 CFR 200.403(a). The Recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

Case 1:25-cv-00820-TSC    Document 17-3    Filed 03/24/25    Page 41 of 66
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 201 of 674

5G - 84094201 - 0    Page 38

## S. Remedies for Non-Compliance

The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as provided in 2 CFR 200.343. As specified in 2 CFR 200.343, which will remain in effect throughout the term of this award, costs during suspension or after termination are allowable if (a) the costs result from financial obligations which were properly incurred by the non-Federal entity before the effective date of suspension or termination, are not in anticipation of it, and (b) the costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

The Recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the Recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of Subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the Recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action.

Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing an opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements.

## T. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The Recipient agrees to comply with these clarifications.

### 1. Access to Records

In accordance with 2 CFR 200.337, EPA and the EPA Office of Inspector General (OIG) have the right to access any documents, papers, or other records, including electronic records, of the Recipient and any Subrecipient which are pertinent to this award in order to make audits, examinations, excerpts, and transcripts. This right of access also includes timely and reasonable access to the Recipient and Subrecipient's personnel for the purpose of interview, discussion, and on-site review related to such documents. This right of access shall continue as long as the records are retained.

### 2. Indirect Cost Rate

The Recipient must exclude costs for acquisitions of Intangible Property from any calculations of modified total direct costs (MTDC), as defined in 2 CFR 200.1. Intangible Property is not a "service" and therefore is not included in MTDC. The Recipient should note that Subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive Participant Support Costs cannot charge an indirect cost rate against their participant support cost payments.

5G - 84094201 - 0    Page 39

*MTDC* means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $25,000 of each Subaward (regardless of the Period of Performance of the Subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, Participant Support Costs and the portion of each Subaward in excess of $25,000.

In the event that the Recipient is compensating an affiliated entity for its direct and indirect costs related to use of employees, the Recipient must not charge its indirect cost rate against any of these costs.

## 3. Sufficient Progress

The EPA Project Officer may assess whether the Recipient is making sufficient progress in implementing the EPA-approved workplan under this Assistance Agreement within 90 calendar days of June 30, 2025 as well as within 90 calendar days of June 30 of each year thereafter during the Period of Performance. "Sufficient progress" shall be assessed based on a comparison of the Recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. As noted under the Financial Risk Management Programmatic Term and Condition, the Recipient's financial health, as measured by the required Financial Health Metrics, are also an input in this process. This term and condition "flows down" to Subrecipients, with the Recipient required to assess whether each Subrecipient is making sufficient progress in implementing the workplan under its Subaward Agreement; the Recipient may increase the frequency and scope of the review of sufficient progress of Subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the Recipient has not made sufficient progress in implementing its EPA-approved workplan, the Recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

EPA will not find that the Recipient has failed to make sufficient progress in implementing its EPA-approved workplan based on shifts between types of Financial Assistance and/or Qualified Projects over the Period of Performance (or other shifts in portfolio allocation, such as by region or market segment, over the Period of Performance). If EPA finds the Recipient has failed to achieve sufficient progress on deployment of Financial Assistance to Qualified Projects in general, the Recipient will have an opportunity to implement a corrective action plan pursuant to 2 CFR 200.208.

## 4. Termination

Notwithstanding the General Term and Condition "Termination," EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 applicable to EPA grants as of July 1, 2024, pursuant to 89 FR 55262 (July 3, 2024), when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is materially impaired or there is adequate evidence of waste, fraud, material misrepresentation of eligibility status, or abuse, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination.

5G - 84094201 - 0    Page 40

## U. Period of Performance

The Period of Performance under this Award Agreement will end on the date specified in the Notice of Award. However, the Period of Performance may end prior to the date specified in the Notice of Award if all required work of the Federal award has been completed, in accordance with 2 CFR 200.344. In accordance with 2 CFR 200.344(b), the Recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the Period of Performance. In this context, to "liquidate all financial obligations" means to pay outstanding bills, such as the payment of staff salaries accrued during the Period of Performance but for which the due date falls after the end date of the Period of Performance. To "liquidate all financial obligations" does not mean to liquidate, terminate, or accelerate outstanding obligations related to the provision of Financial Assistance to Qualified Projects at the end of the Period of Performance, which would continue to be subject to the Closeout Agreement.

The Recipient should note that the Recipient will not be considered to have met the requirements for closeout under its award under 2 CFR 200.344 so long as any Subrecipient has not met the requirements for closeout under its subaward under 2 CFR 200.344.

Notwithstanding the Extension of Project/Budget Period Expiration Date General Term and Condition, in accordance with 2 CFR 200.308(e)(2), the Recipient is authorized to initiate a one-time extension of the Period of Performance by up to 12 months without prior EPA approval, provided that the extension complies with the requirements 2 CFR 200.308(e)(2). In accordance with 2 CFR 200.308(e)(2), the Recipient must "notify the Federal awarding agency in writing with the supporting reasons and revised period of performance at least 10 calendar days before the end of the period of performance specified in the Federal award."

## V. Closeout Agreement

As provided at 2 CFR 200.307(f) and 2 CFR 1500.8(d), after the end of the Period of Performance of the Assistance Agreement, the Recipient may keep and use Program Income remaining at the end of the Assistance Agreement and use Post-Closeout Program Income in accordance with this term and condition. The Closeout Agreement goes into effect for this Assistance Agreement the day after the Assistance Agreement Period of Performance ends, unless the Recipient and the EPA Grants Management Officer or Award Official mutually agree on an alternative date.

In accordance with 2 CFR 200.344, EPA will proceed to closeout the Award Agreement and enter the Closeout Period even if the Recipient has not met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition). As provided in 2 CFR 200.344: "If the non-Federal entity fails to complete the requirements, the Federal awarding agency or pass-through entity will proceed to close out the Federal award with the information available." This Closeout Agreement is therefore self-executing.

This term and condition is the entire Closeout Agreement between the EPA and the Recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The Recipient shall comply with the requirements specified below as part of the Closeout Agreement. Definitions within 2 CFR 200.1, including as supplemented through *I. Definitions* of this award agreement, apply identically to how they do under the Period of Performance, unless otherwise noted.

Case 1:25-cv-00820-TSC    Document 17-3    Filed 03/24/25    Page 44 of 66
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 204 of 674

5G - 84094201 - 0    Page 41

As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to Subrecipients such that the Recipient must enter into a corresponding Closeout Agreement with any Subrecipient that has Program Income or anticipates generating Post-Closeout Program Income at the end of the Subrecipient's Period of Performance.

## 1. Allowable Activities

The Recipient shall use Post-Closeout Program Income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

The Recipient shall submit program performance reports to the EPA Project Officer in accordance with the Performance Reporting Programmatic Term and Condition through September 30, 2031, as applicable. After September 30, 2031, the Recipient shall disclose annual reports publicly, as described in the Performance Reporting Programmatic Term and Condition, rather than meeting the reporting requirements described in the Performance Reporting Programmatic Term and Condition.

## 3. LIDAC Expenditure Requirements

The Recipient shall expend 40% of Post-Closeout Program Income for the purposes of providing Financial Assistance in Low-Income and Disadvantaged Communities and comply with this requirement in accordance with the LIDAC Expenditure Requirement Programmatic Term and Condition, as applicable. Funds used for the purposes of providing Financial Assistance may include Financial Assistance to Qualified Projects; Predevelopment Activities; Market-Building Activities; and Program Administration Activities. This requirement applies to the entire award provided to the Recipient but does not "flow down" to each Subrecipient.

## 4. Cash Management Requirements

The Recipient must maintain Post-Closeout Program Income in accordance with the Cash Management Requirements in the Financial Risk Management Requirements Programmatic Term and Condition, as applicable. However, the Recipient may submit a Cash Management Policy for review and approval by the EPA Project Officer, which can authorize the Recipient to deviate from the aforementioned Cash Management Requirements.

## 5. Financial Health Metrics

The Recipient agrees to report financial health metrics to the EPA Project Officer in accordance with the Financial Health Metrics in the Financial Risk Management Requirements Programmatic Term and Condition (on behalf of the Recipient as well as any Financial Assistance Subrecipient that has received in excess of $10,000,000 in NCIF subgrants) through September 30, 2031, as applicable. The requirement for submission of financial health metrics is not applicable for any fiscal year in which the reporting entity did not meet the requirements of 2 CFR Subpart F—Audit Requirements. The Recipient agrees to add the following two financial health metrics as part of the financial health metrics for the Closeout Period.

1. Self-Sufficiency Ratio: The self-sufficiency ratio is defined as earned revenue divided by operating

5G - 84094201 - 0    Page 42

expenses, where earned revenue is equal to the value of all income earned from normal business transactions and operating expenses is equal to the value of all expenses incurred as a part of normal business operations over the prior 12-month period, not including interest, financing, depreciation, amortization, and loan loss provision expense.

2. Operating Cash Ratio: The operating cash ratio is defined as cash and cash equivalents divided by operating expenses, where cash and cash equivalents is equal to the total value of all cash and cash equivalent items that can be converted into cash immediately and operating expenses is equal to the value of all expenses incurred as a part of normal business operations over the prior 12-month period, not including interest, financing, depreciation, amortization, and loan loss provision expense.

After September 30, 2031, the Recipient shall report on these financial health metrics publicly rather than disclosing the metrics to the EPA.

## 6. Conflicts of Interest

The Recipient agrees to comply with the conflict of interest requirements described in the Conflicts of Interest Programmatic Term and Condition through September 30, 2031.

## 7. Remedies for Non-Compliance

The Recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable. During the Closeout Period, the workplan and budget submitted for the Period of Performance are no longer applicable.

## 8. Suspension and Debarment

The Recipient agrees to ensure that Post-Closeout Program Income is not transferred to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The Recipient can maintain compliance with this requirement through either (1) checking the System for Award Management (for Subrecipients, Contractors, or Program Beneficiaries) or (2) obtaining eligibility certifications from counterparties (for Program Beneficiaries). The Recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity is presently excluded or disqualified.

## 9. Non-Discrimination

The Recipient must use Post-Closeout Program Income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

**Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975.** The Recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency" in 40 CFR Part 5 and 40 CFR Part 7, the Recipient agrees, and will require all Subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

JA1397

5G - 84094201 - 0    Page 43

**Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities.** As provided in section 301 of the Executive Order, the Recipient will ensure that Subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to Real Property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 10. Record-Keeping

In accordance with 2 CFR 200.334(e), the Recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of Post-Closeout Program Income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. Note that this requirement applies if and when the Closeout Agreement is terminated, in accordance *with Item 14. Termination of the Closeout Agreement*. EPA may obtain access to these records to verify that Post-Closeout Program Income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the Recipient must maintain adequate accounting records for how Post-Closeout Program Income is managed and spent as well as all other appropriate records and documents related to the activities conducted using Program Income.

The Recipient agrees to ensure that Subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. The Recipient may use the terms of its Subaward Agreements or other effective means to meet its responsibilities.

## 11. Other Federal Requirements

The following other federal requirements apply to the use of Post-Closeout Program Income under the Closeout Period to the same extent they do under the terms of the Performance Period:

- Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Development Requirements Programmatic Term and Condition;
- Build America, Buy America Act, as specified in the Build America, Buy America Act Programmatic Term and Condition and Build America, Buy America General Term and Condition; and
- National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition.

No other federal requirements apply to the use of Post-Closeout Program Income under the terms of this Closeout Agreement, other than those specified in this Closeout Agreement.

## 12. Audit Requirements

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Closeout Period, as activities related to the Federal award referenced in 2 CFR 200.502(a) include

Case 1:25-cv-00820-TSC     Document 17-3     Filed 03/24/25     Page 47 of 66
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 207 of 674

5G - 84094201 - 0     Page 44

activities during the Closeout Period.

Through September 30, 2031, the Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## 13. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Closeout Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## 14. Termination of the Closeout Agreement

The Closeout Agreement terminates when either of the following situations occur: (1) the Recipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Recipient and the EPA Award Official or Grants Management Officer mutually agree to terminate the Closeout Agreement, with the Recipient remitting current and future Post-Closeout Program Income to the federal government.

The ability to terminate the Closeout Agreement flows down to Subrecipients, as a Closeout Agreement between the Recipient and Subrecipient terminates when either (1) the Subrecipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Subrecipient and the Recipient mutually agree to terminate the Closeout Agreement, with the Subrecipient remitting current and future Post-Closeout Program Income to the Recipient.

The de minimis amount must be agreed-upon in writing by the Recipient and the Director of the Office of the Greenhouse Gas Reduction Fund (or equivalent), prior to the Recipient using the "de minimis" criteria to terminate the Closeout Agreement.

## 15. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and the Authorized Representative on the EPA Key Contacts Form most recent submitted to the EPA Project Officer (for the Recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

## W. Legal Counsel

The Recipient agrees to appoint appropriate legal counsel if counsel is not already available.

## X. Accounting Principles

The Recipient must account for all award funds in accordance with Generally Accepted Accounting Principles (GAAP) as in effect in the United States.

Case 1:25-cv-00820-TSC    Document 17-3    Filed 03/24/25    Page 48 of 66
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 208 of 674

5G - 84094201 - 0    Page 45

The Recipient must segregate and account for the award funds separately from all other program and business accounts. Additionally, the Recipient must segregate and account for Program Income separately from all other program and business accounts.

## Y. Internal Controls

The Recipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## Z. Audits

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Period of Performance, as described in the Audit Requirements General Term and Condition. Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(h), the Recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit Subrecipient that expends $750,000 or more of EPA funds from the Recipient's grant program in the Subrecipient's fiscal year. Any for-profit Subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier.

The Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## AA. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that specific conditions are necessary to ensure that the National Clean Investment Fund program is effectively carried out by Eligible Recipients that have not previously managed grants with the same scale and complexity of this agreement. These specific conditions will remain in effect throughout the Period of Performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer, will oversee and monitor the grant agreement through activities including:

1. Upon request, requiring the Recipient to participate in an annual workshop (i.e., one workshop per calendar year) with other Recipients under the National Clean Investment Fund and/or Clean Communities Investment Accelerator; the EPA Project Officer will contact the Recipient to finalize details for each annual workshop.

2. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on

Case 1:25-cv-00820-TSC     Document 17-3     Filed 03/24/25     Page 49 of 66
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 209 of 674

5G - 84094201 - 0     Page 46

effective methods of carrying out the workplan, provided the Recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other Recipients under the Greenhouse Gas Reduction Fund and with other EPA programs; and coordination by EPA staff with other federal programs to avoid duplication of effort;

3. Closely monitoring the Recipient's management and oversight of Subrecipients and procedures for ensuring that Program Beneficiaries adhere to program participation guidelines;

4. Closely monitoring the Recipient's performance to verify compliance with the EPA-approved workplan and achievement of environmental results;

5. Participating in periodic telephone conference calls with Recipient personnel to discuss project successes and challenges as well as similar items impacting program performance;

6. Reviewing and commenting on performance reports prepared under the Award Agreement. Note that the final decision on the content of performance reports rests with the Recipient;

7. Verifying that the Recipient is expending the award on allowable activities, including but not limited to reviewing a sample of Financial Assistance transactions to verify compliance with regulatory requirements and the terms and conditions of the Award Agreement; and

8. Periodically reviewing costs incurred by the Recipient as well as its contractors and Subrecipients if needed to ensure appropriate expenditure of grant funds. Note that Recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds.

Subject to approval by the EPA Award Official, the EPA Project Officer and the Recipient may agree to additional areas of oversight and monitoring.

*Method for Reconsideration.* If the Recipient believes that one or more of these specific conditions are not warranted or requires modification, the Recipient must file a written objection naming the specific condition(s) within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist, and Project Officer identified in the Notice of Award.

## AB. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the Recipient's GGRF award. These materials may include links to Recipient and/or Subrecipients' websites. The Recipient agrees to work with the EPA Project Officer or another member of GGRF program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## AC. Conflicts of Interest

The Recipient must comply with requirements on transfers of funds that create actual and potential conflicts of interest, as specified in this term and condition. Transfers of funds include Subawards, Contracts (including but not limited to Acquisitions of Intangible Property), and Participant Support Costs. The definitions in the EPA's Financial Assistance Conflict of Interest Policy (COI Policy) apply to this term and condition.

Case 1:25-cv-00820-TSC    Document 17-3    Filed 03/24/25    Page 50 of 66
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 210 of 674

5G - 84094201 - 0    Page 47

There are three categories of transfers of funds, with the requirements differing by each category (as specified in this term and condition):

1. **Transfers with Affiliated Entities:** Subawards, Contracts, and Participant Support Costs to Affiliated Entities or co-invested in projects with Affiliated Entities. An Affiliated Entity is any entity that is related to the Recipient in accordance with the indicia of control described in 2 CFR 180.905.

2. **Financial Assistance to Qualified Projects:** Subawards, Contracts (in the form of Acquisitions of Intangible Property), and Participant Support Costs as forms of Financial Assistance to Qualified Projects, unless such transfers are with Affiliated Entities. These transfers are not within the scope of the COI Policy, which states that "subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by recipients of revolving loan fund capitalization grants or other EPA financial assistance agreements where Agency funds may be used for lending activities."

3. **Subgrants and Contracts:** Subgrants and Contracts (other than Acquisitions of Intangible Property), unless such transfers are with Affiliated Entities.

Note that all Contracts (including Acquisitions of Intangible Property) must also comply with the conflict of interest standards in 2 CFR 200.318(c).

## 1. Transfers with Affiliated Entities

### Prior Approval of COI Mitigation Plan

The Recipient must not transfer funds with Affiliated Entities unless those transfers have been included in an EPA-approved COI Mitigation Plan on Transfers of Funds with Affiliated Entities. The Recipient agrees to seek prior EPA approval for changes to the COI Mitigation Plan on Transfers of Funds with Affiliated Entities.

### Quarterly Disclosure Requirement

The Recipient agrees to disclose, on a quarterly basis, a list of newly originated transfers of funds with Affiliated Entities that are within the scope of its EPA-approved COI Mitigation Plan on Transfers of Funds with Affiliated Entities. Each quarterly disclosure must include (1) a list of such transfers of funds made over the quarter and (2) steps taken to taken to eliminate, neutralize or mitigate any conflicts of interest, in accordance with the EPA-approved COI Mitigation Plan on Transfers of Funds with Affiliated Entities. The Recipient must disclose its own transfers as well as transfers made by Subrecipients.

The quarterly periods for such disclosures are defined as follows: April 1 to June 30; July 1 to September 30; October 1 to December 31; and January 1 to March 31. The Recipient must make the disclosures to the EPA Project Officer within 30 calendar days of the end of the quarterly period.

### Project Officer Review

In accordance with 2 CFR 200.337, the EPA Project Officer may access records relating to a subset of transactions disclosed to review for compliance with the Recipient's EPA-approved COI Mitigation Plan on Transfers of Funds with Affiliated Entities as well as this term and condition. The EPA Project Officer

5G - 84094201 - 0    Page 48

will not have approve transfers of funds in advance but rather will review transfers of funds that have already occurred for compliance.

## Waivers and Modifications

EPA agrees that, for transfers of funds with Affiliated Entities, the requirements of this term and condition apply in lieu of the requirements of the Disclosing Conflict of Interest General Term and Condition.

On a case-by-cases basis, the EPA Project Officer may extend the due date for disclosures on transfers of funds with Affiliated Entities. On a case-by-case basis, the EPA Project Officer may waive or modify the disclosure requirements on transfers of funds with Affiliated Entities.

## 2. Financial Assistance to Qualified Projects

### Quarterly Disclosure Requirement

The Recipient agrees to disclose, on a quarterly basis, a list of transfers of funds as Financial Assistance to Qualified Projects with actual and potential conflicts of interest. Each quarterly disclosure must include (1) a list of such transfers of funds made over the quarter and (2) steps taken to taken to eliminate, neutralize or mitigate any conflicts of interest, in accordance with any EPA-approved documents related to eliminating, neutralizing, and mitigating conflicts of interest. The Recipient must disclose its own transfers as well as transfers made by Subrecipients.

The quarterly periods for such disclosures are defined as follows:  April 1 to June 30; July 1 to September 30; October 1 to December 31; and January 1 to March 31. The Recipient must make the disclosures to the EPA Project Officer within 30 calendar days of the end of the quarterly period.

### Project Officer Review

In accordance with 2 CFR 200.337, the EPA Project Officer may access records relating to a subset of transactions disclosed to review for compliance with the Recipient's EPA-approved documents related to eliminating, neutralizing, and mitigating conflicts of interest as well as this term and condition. The EPA Project Officer will not have approve transfers of funds in advance but rather will review transfers of funds that have already occurred for compliance.

### Waivers and Modifications

On a case-by-cases basis, the EPA Project Officer may extend the due date for disclosures on transfers of funds as Financial Assistance to Qualified Projects. On a case-by-case basis, the EPA Project Officer may waive or modify the disclosure requirements on transfers of funds as Financial Assistance to Qualified Projects.

## 3. Subgrants and Contracts

The Recipient agrees to comply with the Disclosing Conflict of Interest General Term and Condition for Subgrants and Contracts (excluding Acquisitions of Intangible Property), unless such transfers are with Affiliated Entities. If such transfers are with Affiliated Entities, then the Recipient is required to include them in the process specified in *1. Transfers with Affiliated Entities*.

## AD. Prior Approvals

EPA will only have authority to review and approve revisions to the Recipient's EPA-approved workplan, budget, and other documents if authorized by 2 CFR 200.308 or 2 CFR 200.208. The Recipient must contact the EPA Project Officer when the EPA has prior approval authority specified below.

### Workplan

For the purposes of this Award Agreement, EPA interprets 2 CFR 200.308(c)(1) to enable the Recipient to revise the activities specified in its **EPA-approved workplan** without prior EPA approval, provided the activities still comply with the terms and conditions of the Award Agreement. The allowable and allocable grant costs are narrowly defined, pursuant to the terms and conditions of the Award Agreement; in accordance with 2 CFR 200.308(c)(1), any changes to the EPA-approved workplan that comply with the statute as well as the terms and conditions would not be a "change in the scope or objective of the project or program." Therefore, so long as the Recipient is updating its EPA-approved workplan with the revised activities in accordance with the terms and conditions of the Award Agreement, EPA will not require prior approval.

### Budget

For the purposes of this Award Agreement, EPA implements 2 CFR 200.308(f) in accordance with Item 1 of the Transfer of Funds General Term and Condition to enable the Recipient to revise the **EPA-approved budget** included in its Award Agreement without prior EPA approval, provided the cumulative funding transfers among Object Class Categories (Personnel, Fringe Benefits, Travel, Equipment, Supplies, Contractual, Construction, Other, Indirect) do not exceed 10% of the total budget approved at time of award. Therefore, so long as the Recipient is updating its EPA-approved budget by transferring funds by less than or equal to these amounts, EPA will not require prior approval.

However, notwithstanding the requirements of 2 CFR 200.308(f), if the Recipient seeks to increase the **amount of funds budgeted for Participant Support Costs,** then it must seek prior approval pursuant to 2 CFR 200.308(c)(5). Further, if the Recipient seeks to **transfer funds for any of the items listed in 2 CFR 200.407,** then it must seek prior approval pursuant to that regulation as well as Item 2 of the Transfer of Funds General Term and Condition.

### Transfers of Funds

2 CFR 200.308(c)(6) requires the Recipient to obtain prior agency approval for "Subawarding, transferring or contracting out of any work under a Federal award." If the **types of transfers are described in the EPA-approved workplan** (including types of transfers to be conducted through Subawards, Participant Support Costs, Acquisitions of Intangible Property, and other Contracts as defined in 2 CFR 200.1), then EPA has provided approval only for the purposes of 2 CFR 200.308(c)(6). Approval for the purposes of this regulation does not mean that such transfers of funds are compliant with the statutes, regulations, and terms and conditions.

### Changes in Key Personnel

2 CFR 200.308(c)(2) requires the Recipient to obtain prior agency approval for a "[c]hange in a key person specified in the application or the Federal award." If the Recipient is seeking to change a "key person," as defined by members of the board of directors and senior management whose roles are

Case 1:25-cv-00820-TSC    Document 17-3    Filed 03/24/25    Page 53 of 66
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 213 of 674

5G - 84094201 - 0    Page 50

specified in the most recently submitted Organizational Plan, then the Recipient must obtain prior EPA approval of the qualifications of the key person.

The Recipient must request prior agency approval for a change in "key person" via email through the EPA Project Officer, who will have 8 calendar days to communicate EPA's disapproval of their qualifications via email. If 8 calendar days have passed without notification of EPA disapproval of the key person's qualifications pursuant to 2 CFR 200.308(c)(2), the Recipient is authorized to change the "key person." Once the change is effective, the Recipient must submit an updated Organizational Plan to the EPA Project Officer.

## AE. Flow-Down Requirements

As described in 2 CFR 200.101, the terms and conditions of Federal awards flow down to Subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(a)(2) and in accordance with the Establishing and Managing Subawards General Term and Condition, the Recipient agrees to ensure that Subrecipients are subject to the same requirements as those that apply to the pass-through entity's EPA award.

For the purposes of this Award Agreement, all terms and conditions must flow down to Subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to Subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## AF. Resolution of Disputes Termination Provision

The Recipient is precluded from drawing down more than 78.46% of the Total Approved Assistance Amount until this condition is removed, which will occur when: a) the EPA Award Official, at the direction of the Grants Competition Disputes Decision Official (GCDDO), provides written confirmation that all administrative disputes under the National Clean Investment Fund and the Clean Communities Investment Accelerator are resolved in accordance with the dispute resolution procedures in Appendix A of the EPA Order 5700: Policy for Competition of Assistance Agreements; or b) the administrative disputes are withdrawn, abandoned or dismissed; or c) December 31, 2024, whichever is sooner.

If EPA does need to alter the Selection Official's selection and partial funding decisions for this agreement based on a GCDDO determination the EPA Award Official will partially terminate this assistance agreement, de-obligate a portion of the funds that have been obligated and use the de-obligated funds to satisfy the terms of a GCDDO remedy benefiting another entity. The Recipient will then provide an updated workplan and budget information, as needed, to amend the agreement.

For the purposes of this term and condition, EPA's partial termination may apply not just to obligated funds that have not been drawn down from ASAP but also to Program Income that has been generated and retained by the Recipient under 2 CFR 1500.8(d) and the Program Income Programmatic Term and Condition of this agreement. In accordance with 2 CFR 200.307(e)(1), EPA may require that the amount of funds committed by EPA to the Recipient be reduced by all or some of the Program Income that has been generated by the Recipient.

## AG. Deposit Account at Financial Agent

When a depository institution is designated as a financial agent of the United States (the Financial Agent) for the Greenhouse Gas Reduction Fund, then the Recipient will be required to set up and utilize an Account or Accounts at the Financial Agent in accordance with the terms of the Account or Accounts that EPA will set forth in the Award Agreement, including but not limited to through amendments to the Award Agreement.

## AH. Interim SF-425 Requirement

The Recipient must submit an SF-425 within 30 calendar days of receiving access to an Account or Accounts at the Financial Agent, with the SF-425 covering all activities supported by funds drawn from ASAP and disbursed for actual and allowable costs, other than funds disbursed into the Account or Accounts at the Financial Agent.

## AI. Interim Drawdown Procedures

### Authority

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that specific conditions are necessary to ensure that the National Clean Investment Fund and Clean Communities Investment Accelerator programs are effectively carried out by Eligible Recipients that have not previously managed grants with the same scale and complexity of this agreement. These specific conditions will remain in effect throughout the Period of Performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

### General Term and Condition

During the interim period between the start of the Federal award and the date on which the Deposit Account at the Financial Agent is first made available and accessible to the Recipient, the Recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

This requirement "flows down" to Subrecipients; if a Subrecipient has an actual and immediate cash requirement, then the Recipient is required to draw funds from ASAP on behalf of the subrecipient and disburse the funds to the Subrecipient and the Subrecipient is required to disburse the funds for the actual and immediate cash requirement. Alternatively, as authorized by 2 CFR 200.332(c), the Recipient may impose the reimbursement method as opposed to the advance payment method with Subrecipients as part of "specific subaward conditions" if appropriate as described in 2 CFR 200.208.

### Interim ASAP Cap

During the interim period between the start of the Federal award and the date on which the Deposit Account at the Financial Agent is first made available and accessible to the Recipient, the Recipient is subject to a cap on the cumulative amount of its drawdowns. This cap starts at 8.33% (or one-twelfth) of the Recipient's EPA-approved first-year budget, plus allowable pre-award costs, and increases by 8.33% (or one-twelfth) of the Recipient's EPA-approved first-year budget on the first calendar day of each month after the date on the Notice of Award until the Deposit Account at the Financial Agent is available and accessible to the Recipient. The cap shall not exceed 25% (or one-fourth) of the Recipient's EPA-

Case 1:25-cv-00820-TSC    Document 17-3    Filed 03/24/25    Page 55 of 66
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 215 of 674

5G - 84094201 - 0    Page 52

approved first-year budget, plus allowable pre-award costs. The cap shall cease to apply once the Deposit Account at the Financial Agent is available and accessible to the Recipient.

Note that this cap is in addition to, rather than in lieu of, the cap described in the Resolution of Disputes Termination Provision.

<u>Interim ASAP Payment Request</u>

During the interim period between the start of the Federal award and the date on which the Deposit Account at the Financial Agent is first made available and accessible to the Recipient, the Recipient must abide by the following process for ASAP payment requests.

1. The Recipient must only initiate payment requests from ASAP each Thursday (for next business day payments) or Friday (for same business day payments).

2. The Recipient must submit payment requests to ASAP falling into the following four categories, with no more than one payment request in each category per week: (1) Recipient Financial Assistance Activities; (2) Recipient Other Allowable Activities; (3) First-Tier Subrecipient Financial Assistance Activities; or (4) First-Tier Subrecipient Other Allowable Activities. The first category is not applicable under the CCIA.

3. Prior to receiving the payment, the Recipient must provide the EPA Project Officer with the following information: (a) amount of payment requested, (b) category of payment, (c) type(s) of Financial Assistance anticipated, (d) descriptions of Qualified Project(s) anticipated, and (e) a certification from the Recipient's chief executive officer (or equivalent), chief financial officer (or equivalent), chief reporting officer (or equivalent), or chief compliance officer (or equivalent) that the amount of the payment is necessary to execute against the EPA-approved workplan and that financing agreements for identified Qualified Project(s) necessitating the payment have been reviewed by the Recipient's counsel for legal sufficiency. The certification must include the following language: "This certification is a material representation for the purposes of an EPA Financial Assistance Agreement, and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions." Requirements (c), (d), and (e) are applicable to payment requests for Recipient Financial Assistance Activities and "flow-down" as part of payment requests for First-Tier Subrecipient Financial Assistance Activities, as described below.

The EPA Project Officer is authorized to provide case-by-case modifications or exceptions to these requirements, provided those modifications or exceptions remain compliant with the ASAP and Proper Payment Draw Down General Term and Condition.

These requirements "flow down" to Subrecipients; if a Subrecipient has an actual and immediate cash requirement, then it must submit payment requests to the Recipient pursuant to these requirements. As authorized at 2 CFR 200.337, EPA may request records of payment requests to the Recipient and would expect documentation to show that, for each payment to a Subrecipient, the Subrecipient has provided the Recipient with the information described above.

<u>Disbursement of Payment</u>

During the interim period between the start of the Federal award and the date on which the Deposit Account at the Financial Agent is first made available and accessible to the Recipient, for each payment, if the Recipient has not disbursed the entire payment amount within 5 business days of drawdown, the

5G - 84094201 - 0     Page 53

Recipient must provide the EPA Project Officer with the amount of payment not yet disbursed. The Recipient must then follow the procedures described in the ASAP and Proper Payment Drawdown General Term and Condition for the amount of payment not yet disbursed within 5 business days of drawdown.

Method for Reconsideration

If the Recipient believes that one or more of these specific conditions are not warranted or requires modification, the Recipient must file a written objection naming the specific condition(s) within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist, and Project Officer identified in the Notice of Award.

AJ. Amendments to Award Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.


## IV. ADMINISTRATIVE TERMS AND CONDITIONS (SEE ABOVE ADMINISTRATIVE CONDITIONS)

## V. FINANCIAL AGENT TERMS AND CONDITIONS

### A. Revisions to Award Agreement to Account for Financial Agent Arrangement

When a depository institution is designated as a financial agent of the United States (the Financial Agent) for the Greenhouse Gas Reduction Fund, the following revisions to the Award Agreement will become effective without further action or notice required by the Recipient or EPA.

### 1. Revisions to Section I. Definitions

*The following **new definition** will be added to the Award Agreement:*

**Capitalization by Nonexchange Capital Contribution:** Capitalization by Nonexchange Capital Contribution means award funds that (1) the Recipient draws down from the Automated Standard Application Payments (ASAP) system and (2) disburses into the 'Budget Account' as defined under the Deposit Account at Financial Agent Programmatic Term and Condition to capitalize itself for subsequent use for any of the following Allowable Activities: Financial Assistance to Qualified Projects; Predevelopment Activities; Market-Building Activities; and Program Administration Activities.  Under this two-step transaction, which involves both a drawdown and disbursement, the Recipient's drawdown from ASAP is deemed (a) an advance payment of Federal funds in accordance with 2 CFR 200.305(b)(1); while the disbursement into the Deposit Account at Financial Agent is deemed (b) an allowable cost to be charged to the EPA award, and (c) a "nonexchange transaction", consistent with the definition of this term in the Statement of Federal Financial Accounting Standards No. 5. The full amount of the Capitalization by Nonexchange Capital Contribution must be recognized, reported, and accounted for as Program Income in accordance with the Program Income Programmatic Term and Condition once clauses (a) and (b) are fulfilled. Any Subrecipient with a Deposit Account at Financial Agent will be entitled to receive its

Case 1:25-cv-00820-TSC    Document 17-3    Filed 03/24/25    Page 57 of 66
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 217 of 674

5G - 84094201 - 0    Page 54

payments from Recipient as a Capitalization by Nonexchange Capital Contribution.

*The definition of **Program Income** under the Award Agreement will be amended and replaced with:*

**Program Income:** 2 CFR 200.1 defines Program Income as "gross income earned by the non-Federal entity that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(f)." 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, there are two types of Program Income: (1) "Program Income from Operations" and (2) "Program Income from Capitalization by Nonexchange Capital Contribution".

Program Income from Operations includes but is not limited to income from origination fees, servicing fees, and asset management fees; dividends from equity investments; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). Under this award agreement, the Recipient is authorized to deduct the cost of generating Program Income from Operations under 2 CFR 200.307(b) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Program Income from Operations include origination, servicing, and management costs that are not charged as direct costs to the Federal award. Program Income from Operations can be earned prior to the availability of the 'Program Income from Operations' account as defined under the Deposit Account at Financial Agent Programmatic Term and Condition.

Program Income from Capitalization by Nonexchange Capital Contribution means award funds from the ASAP system that the Recipient draws down and immediately deposits into the 'Budget Account' at the Financial Agent in accordance with (a) the definition of Capitalization by Nonexchange Capital Contribution and (b) the Deposit Account at Financial Agent Programmatic Term and Condition. Program Income from Capitalization by Nonexchange Capital Contribution cannot be earned prior to the availability of the 'Budget Account' as defined under the Deposit Account at Financial Agent Programmatic Term and Condition.

Both forms of Program Income under this program must be treated in accordance with the Program Income Programmatic Term and Condition. EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fund raising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

## 2. Revisions to Section II. National Programmatic Terms and Conditions

*The **Program Income Programmatic Term and Condition** will be amended and replaced with:*

## Program Income

In accordance with Clean Air Act Section 134(b)(1)(C) as well as 2 CFR 200.307(e)(2) and 2 CFR 1500.8

Case 1:25-cv-00820-TSC    Document 17-3    Filed 03/24/25    Page 58 of 66
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 218 of 674

5G - 84094201 - 0    Page 55

(b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income from Operations once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income from Operations may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the EPA-approved workplan.

## 3. Revisions to Section III. Additional Programmatic Terms and Conditions

*The Allowable and Unallowable Activities Programmatic Term and Condition will be amended and replaced with:*

### Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Capitalization by Nonexchange Capital Contribution; Financial Assistance to Qualified Projects; Predevelopment Activities; Market-Building Activities; and Program Administration Activities. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

Capitalization by Nonexchange Capital Contribution generates Program Income for the Recipient in an amount equal to the available EPA award balance drawn down from ASAP into the 'Budget Account' as defined under the Deposit Account at Financial Agent Programmatic Term and Condition. Program Income from Capitalization by Nonexchange Capital Contribution must be expended on Financial Assistance to Qualified Projects, Predevelopment Activities, Market-Building Activities, and Program Administration activities in accordance with the EPA-approved workplan.

The Recipient agrees to not use the award for the following unallowable activities: (a) Financial Assistance to Qualified Projects in the form of Subgrants; (b) Subgrants for the purposes of providing Financial Assistance to Qualified Projects (other than Subgrants from the Recipient to first-tier Subrecipients); (c) activities that support deployment of projects that do not meet the definition of Qualified Projects; and (d) activities that support deployment of projects outside the boundaries of the ten EPA regions. The Recipient also agrees not to use the award for activities associated with defending against, settling, or satisfying a claim by a litigant, except when (a) the claim stems from the Recipient's implementation of its EPA-approved workplan in compliance with the terms and conditions of the Award Agreement and (b) the Recipient has obtained prior written approval from the EPA Award Official.

Case 1:25-cv-00820-TSC   Document 17-3   Filed 03/24/25   Page 59 of 66
USCA Case #25-5122   Document #2114423   Filed: 05/05/2025   Page 219 of 674

5G - 84094201 - 0    Page 56

*The Deposit Account at Financial Agent Programmatic Term and Condition will be amended and replaced with:*

## Deposit Account at Financial Agent

The Recipient will open a Deposit Account at a depository institution that has been designated as a financial agent of the United States (the Financial Agent). Such account will be used as Recipient's operating account for the award.  Upon establishment of the Deposit Account, the Recipient will drawdown the entire available EPA award balance from ASAP and disburse it into the Deposit Account, where it must be maintained until the Closeout Agreement goes into effect in accordance with the Closeout Agreement Programmatic Term and Condition. Note, this requirement applies to any and all drawdowns from ASAP by the Recipient while the Deposit Account is available and accessible. Once the Closeout Agreement goes into effect, the Recipient will be entitled to transfer any remaining funds in the Deposit Account to an account at a financial institution of its choosing, provided such account is insured.

The Recipient will grant EPA a perfected security interest in all funds held in the Deposit Account. The Recipient will take all such actions, enter into all such agreements, and execute and deliver all such documentation as may be necessary and/or as directed by EPA from time to time to establish and maintain such security interest, including but not necessarily limited to entering into a deposit account control agreement (DACA) with the Financial Agent and EPA.

Notwithstanding any other provision of this Award Agreement, EPA will only furnish the Financial Agent with a Notice of Exclusive Control under a DACA when EPA issues a written determination and finding that the Recipient has failed to comply with the terms and conditions of this Award Agreement, and that noncompliance is substantial such that effective performance of the Assistance Agreement is materially impaired or there is adequate evidence of waste, fraud, material misrepresentation of eligibility status, or abuse, and that EPA has initiated action under 2 CFR 200.339 to wholly or partly suspend or terminate the Federal award, as authorized in the terms of the Award Agreement. Note, funds in the Deposit Account that were legally committed to 3rd parties under valid financing agreements prior to the issuance of, but not in anticipation of, a Notice of Exclusive Control constitute "financial obligations which were properly incurred" by the Recipient in accordance with 2 CFR 200.343 and are to remain allowable costs during suspension or after termination.

Funds held in the Recipient's account at the Financial Agent may be invested in accordance with the Cash Management Requirements in the Financial Risk Management Programmatic Term and Condition. The Financial Agent will be compensated in accordance with the terms of a valid Financial Agency Agreement (FAA).

The Deposit Account will consist of three distinct account types ('Budget,' 'Reserve', and 'Program Income from Operations'), each of which serves a distinct purpose (while the exact naming convention and structure of these accounts may differ from the below, the accounts must perform a substantively similar function). The Recipient is required to utilize the accounts at the Financial Agent for their intended purpose during any period in which the accounts are available and accessible, with exceptions to this requirement permitted by the EPA Project Officer only on a case-by-case basis, to the extent such exceptions are necessary to execute against the EPA-approved workplan.

## 1. Budget Account

This account within the Deposit Account will hold funds that have yet to be used for any of the following

5G - 84094201 - 0    Page 57

allowable activities: Financial Assistance to Qualified Projects; Predevelopment Activities; Market-Building Activities; and Program Administration Activities. It will hold funds within a number of sub-accounts that correspond to more specific allowable expenditures under the particular type of award or subaward.

**Transferring Funds Into the Budget Account.** Upon establishment of the Deposit Account, the Recipient will drawdown the entire available EPA award balance from ASAP directly into the Budget Account. The Recipient will direct the Financial Agent to allocate funds across the various sub-accounts in the Budget Account in accordance with its EPA-approved workplan. Recipient need not submit a certification notice to transfer funds within the Budget Account, but remains subject to the Transfer of Funds EPA General Term and Condition and any associated pre-approval or notification requirements therein.

**Transferring Funds Out of the Budget Account.** When transferring award funds out of the Budget Account to provide Financial Assistance to Qualified Projects, Recipient must provide the EPA Project Officer with a certification notice from the Recipient's chief executive officer (or equivalent), chief financial officer (or equivalent), chief reporting officer (or equivalent), or chief compliance officer (or equivalent) that the amount of the payment is necessary to execute against the EPA-approved workplan and that financing agreements for identified Qualified Projects necessitating the payment have been reviewed by the Recipient's counsel for legal sufficiency, with notice provided to the Financial Agent with the transfer request. The certification notice must include the following language: "This certification is a material representation for the purposes of an EPA Financial Assistance Agreement, and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions." The Recipient must "flow-down" this requirement to Subrecipients, with each Subrecipient required to provide a substantively similar certification notice to Recipient when transferring subaward funds out of the Budget Account to provide Financial Assistance to Qualified Projects, with notice provided to the Financial Agent with the transfer request. In accordance with 2 CFR 200.337, the Recipient must make those certifications available to the EPA, upon request.

While transfers out of the Budget Account are not formally subject to any of the requirements established in either the EPA General Term and Condition on Automated Standard Application Payments (ASAP) and Proper Payment Draw Down or the Interim Drawdown Procedures Programmatic Term and Condition, Recipient agrees to the following requirements:

a) When the need for a longer disbursement window is known in advance of the transfer, Recipient must notify the EPA Project Officer prior to executing the transfer and follow-up to inform the EPA Project Officer of the amount of the transfer that has been disbursed for an Allowable Activity in 5, 10, and 14 business days. Recipient must return any undisbursed amounts to the Deposit Account at the Financial Agent on the 15th business day, or

b) When the need for a longer disbursement window is not known in advance of the transfer, Recipient must notify the EPA Project Officer of the delay no later than 5 business days after the transfer and follow-up to inform the EPA Project Officer of the amount of the transfer that has been disbursed for an Allowable Activity in 10 and 14 business days. Recipient must return any undisbursed amounts to the Deposit Account at the Financial Agent on the 15th business day.

Recipients must obtain prior written approval from the EPA Project Officer (who will in turn notify the EPA Award Official) for any transfers that will not be disbursed for an Allowable Activity within 15 business days.

5G - 84094201 - 0     Page 58

These requirements "flow down" to Subrecipients, who agree to provide the same notifications to and seek prior approval from Recipients where applicable.

## 2. Reserve Account

This account within the Deposit Account is intended to enable funds to be set-aside within the Financial Agent for use for any form of Financial Assistance that requires the Recipient to pledge award funds for a future expenditure to a third party to meet a legal obligation.

**Transferring Funds Into the Reserve Account.** The Recipient may only transfer award funds into the Reserve Account for grant performance purposes if the Recipient's chief executive officer (or equivalent), chief financial officer (or equivalent), chief reporting officer (or equivalent), or chief compliance officer (or equivalent) certify to the EPA Project Officer, with notice provided to the Financial Agent with the transfer request, that the amount of the expenditure is necessary to execute against the EPA-approved workplan, and that financing agreements for identified qualified projects necessitating the expenditure have been reviewed by Recipient's counsel for legal sufficiency. The certification notice must include the following language: "This certification is a material representation for the purposes of an EPA financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions." The Recipient must "flow-down" this requirement to Subrecipients, with each Subrecipient required to provide a substantively similar certification notice to Recipient when transferring subaward funds into the Reserve Account to provide Financial Assistance to Qualified Projects, with notice provided to the Financial Agent with the transfer request. In accordance with 2 CFR 200.337, the Recipient must make those certifications available to the EPA, upon request.

**Transferring Funds Out of the Reserve Account.**

## a. To Third Parties to Meet Legal Obligations

Funds in the Reserve Account may not be disbursed to Program Beneficiaries, Subrecipients, Contractors, or any other third parties, unless the funds are necessary for the Recipient to satisfy a legal obligation. The Recipient may only transfer award funds out of the Reserve Account to meet legal obligations to such parties if the recipient's chief executive officer (or equivalent), chief financial officer (or equivalent), chief reporting officer (or equivalent), or chief compliance officer (or equivalent) certify to the EPA Project Officer, with notice provided to the Financial Agent with the transfer request, that the amount of the expenditure is necessary to pay a third party pursuant to a financing agreement that has been reviewed by recipient's counsel for legal sufficiency. The certification notice must include the following language: "This certification is a material representation for the purposes of an EPA financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions." The Recipient must "flow-down" this requirement to Subrecipients, with each Subrecipient required to provide a substantively similar certification notice to Recipient when transferring subaward funds out of the Reserve Account to provide Financial Assistance to Qualified Projects, with notice provided to the Financial Agent with the transfer request. In accordance with 2 CFR 200.337, the Recipient must make those certifications available to the EPA, upon request.

While transfers out of the Reserve Account are not formally subject to any of the requirements established in either the EPA General Term and Condition on Automated Standard Application Payments (ASAP) and Proper Payment Draw Down or the Interim Drawdown Procedures Programmatic Term and

Case 1:25-cv-00820-TSC   Document 17-3   Filed 03/24/25   Page 62 of 66
USCA Case #25-5122   Document #2114423   Filed: 05/05/2025   Page 222 of 674

5G - 84094201 - 0    Page 59

Condition, Recipient agrees to the following requirements:

a) When the need for a longer disbursement window is known in advance of the transfer, Recipient must notify the EPA Project Officer prior to executing the transfer and follow-up to inform the EPA Project Officer of the amount of the transfer that has been disbursed for an Allowable Activity in 5, 10, and 14 business days. Recipient must return any undisbursed amounts to the Deposit Account at the Financial Agent on the 15th business day, or

b) When the need for a longer disbursement window is not known in advance of the transfer, Recipient must notify the EPA Project Officer of the delay no later than 5 business days after the transfer and follow-up to inform the EPA Project Officer of the amount of the transfer that has been disbursed for an Allowable Activity in 10 and 14 business days. Recipient must return any undisbursed amounts to the Deposit Account at the Financial Agent on the 15th business day.

Recipients must obtain prior written approval from the EPA Project Officer (who will in turn notify the EPA Award Official) for any transfers that will not be disbursed for an Allowable Activity within 15 business days.

These requirements "flow down" to Subrecipients, who agree to provide the same notifications to and seek prior approval from Recipients where applicable.

**b. To Program Income from Operations Account**

When funds in the Reserve Account are no longer necessary to meet prudent capital management practices consistent with the Recipient's overall risk portfolio and a potential legal obligation to a third party pursuant to a financing agreement, the Recipient may transfer such funds to the Program Income from Operations Account. Recipient need not submit a certification notice to effectuate such a transfer.

### 3. Program Income from Operations Account

This account within the Deposit Account will enable Program Income from Operations (as defined under the definition of Program Income) to be held, tracked, and segregated in accordance with the Accounting Principles Programmatic Term and Condition.

**Transferring Funds Into the Program Income from Operations Account.** When Recipient earns Program Income from Operations, it must deposit such funds into the Program Income from Operations Account. Recipient need not submit a certification notice to effectuate such a transfer. When Financial Agent generates interest income on behalf of Recipient by investing Recipient liquidity in accordance with the Cash Management Requirements under the Financial Risk Management Requirements Programmatic Term and Condition, it must deposit such income into the Program Income from Operations Account in accordance with the terms of the FAA. Such interest income is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9).

**Transferring Funds Out of the Program Income from Operations Account.** Funds in this account may be transferred to either the Budget Account or Reserve Account to be used for grant performance purposes in accordance with the Program Income Programmatic Term and Condition. Recipient need not submit a certification notice to effectuate such a transfer.

5G - 84094201 - 0     Page 60

**Flow-Down Requirements of Deposit Account at Financial Agent**. EPA may elect to extend the requirements under this term and condition to any and all Subrecipients of the Recipient at EPA's sole discretion, including but not limited to establishing and maintaining a security interest on all award funds held by the Subrecipient at the Financial Agent.

JA1416



U.S. Environmental Protection Agency
1200 Pennsylvania Ave, N.W.
Washington, DC 20460

March 11, 2025

By Email

Eli Hopson
Chief Administrative and Development Officer
Coalition for Green Capital
1255 Union St. NE, 7th floor
Washington, DC 20002
eli@coalitionforgreencapital.com

Re: Notice of Termination

Dear Eli Hopson,

Pursuant to the U.S. Environmental Protection Agency's ("EPA" or "the Agency") authority under 2 C.F.R. §§ 200.339-40, the General Terms and Conditions of EPA assistance award agreements, the terms and conditions of the Grant Agreement, and the Agency's inherent authority to reconsider prior determinations in light of new information, the Agency is terminating Grant Agreement No. 84094201, awarded to Coalition for Green Capital under the Greenhouse Gas Reduction Fund ("GGRF"), effective immediately. This termination is based on substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities, which collectively undermine the fundamental goals and statutory objectives of the award.

Following a comprehensive review and consistent with multiple ongoing independent federal investigations into programmatic fraud, waste, abuse and conflicts of interest, EPA has identified material deficiencies, including, but not limited to: 1) the absence of adequate oversight and account controls to prevent financial mismanagement; 2) the improper or speculative allocation of funds inconsistent with EPA's oversight and fiscal responsibilities; and 3) the circumvention and defeat of key oversight mechanisms in the disbursement of federal funds. EPA has determined that these deficiencies pose an unacceptable risk to the efficient and lawful execution of this grant that cannot be remedied by imposing specific conditions, necessitating immediate termination to safeguard taxpayer funds and ensure compliance with federal financial assistance regulations.

Additionally, the Agency has considered concerns raised by EPA Administrator Lee Zeldin regarding the need for rigorous oversight and accountability in the administration of public funds. The Administrator has emphasized the importance of eliminating fraud, waste, and abuse within EPA, particularly in high-

value awards such as those under GGRF. The structural and operational weaknesses identified in the execution of this grant are inconsistent with these priorities and materially impair the EPA's ability to ensure compliance with statutory and regulatory mandates governing the lawful expenditure of public money.

The Agency has also determined that its existing process for awarding and overseeing execution of the Grant Agreement lacks sufficient protections to guard against potential violations of the Constitution, particularly the Appointments Clause and private nondelegation doctrine. U.S. Const. art. II, § 2, cl. 2; e.g., *Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1341 (D.C. Cir. 2024). Consistent with its independent duty to avoid exceeding constitutional constraints, EPA has reconsidered the prior administration's conclusion that the oversight mechanisms for the Grant Agreement are sufficient to ensure that the Recipient will not exercise significant authority independently of EPA's oversight and ultimate approval.

This termination is executed in accordance with Sections III.S and III.T.4 of the Grant Agreement and with EPA's General Terms and Conditions as incorporated in, and applicable in addition to, the terms of the Grant Agreement, and is consistent with EPA's obligations to safeguard public funds and inherent authority to reconsider prior decisions. This letter constitutes the notice of termination required by 2 C.F.R. § 200.341. Consistent with 2 C.F.R. §§ 200.344-45 and the Closeout Agreement, the recipient is required to cease all further program expenditures immediately, provide a comprehensive final financial and programmatic report, and comply with all applicable closeout procedures.

EPA is committed to ensuring that federal funding is administered in a manner that upholds transparency, accountability, and the highest standards of fiscal responsibility. This termination reflects the Agency's duty to protect public funds and maintain the integrity of its grant programs. In the coming months, EPA will work to re-obligate lawfully appropriated funds within the GGRF program with enhanced controls to ensure adequate governance, transparency, and accountability, consistent with applicable regulatory and statutory requirements.

Sincerely,

W.C. McIntosh
Acting Deputy Administrator
U.S. Environmental Protection Agency

cc:
- U.S. EPA, Office of the Greenhouse Gas Reduction Fund (OGGRF)
- U.S. EPA, Office of Mission Support (OMS)
- U.S. EPA, Office of General Counsel (OGC)
- U.S. Department of Justice
- U.S. Department of the Treasury
- U.S. House of Representatives
- U.S. Senate
- Citibank, N.A.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK, EFFICIENCY MAINE TRUST, ILLINOIS FINANCE AUTHORITY, & MINNESOTA CLIMATE INNOVATION FINANCE AUTHORITY,**<br><br>    Plaintiffs,<br><br>  v.<br><br>**CITIBANK, N.A., U.S. ENVIRONMENTAL PROTECTION AGENCY** and **LEE ZELDIN** and **W.C. MCINTOSH**, in their official capacities as Administrator and Acting Deputy Administrator of the U.S. Environmental Protection Agency,<br><br>    Defendants. | Civil No. 1:25-CV-00820<br><br><br>**DECLARATION OF KARI GROTH SWAN, EXECUTIVE DIRECTOR OF MINNESOTA CLIMATE INNOVATION FINANCE AUTHORITY** |

**DECLARATION OF KARI GROTH SWAN**

I, Kari Groth Swan, declare under penalty of perjury that the following is true and correct:

1.      I am a resident of the State of Minnesota. I am over the age of 18 and have

personal knowledge of all the facts stated herein, except to those matters stated upon information

and belief; as to those matters, I believe them to be true. If called as a witness, I could and would

testify competently to the matters set forth below.

2.      Since November 2024, I have been the Executive Director for the Minnesota

Climate Innovation Finance Authority (MnCIFA). Prior to that, Peter Klein acted as an interim

director until a permanent executive director could be hired.

3.      In the role of executive director, I have chief responsibility for all aspects of

MnCIFA's programs and activities, strategic goals, funding and daily operations. Throughout my career I have held several executive positions in the nonprofit and financial sectors. I am a graduate of St. Olaf College.

4.      MnCIFA is a recipient of the National Clean Investment Fund (NCIF) subaward that is the subject of this declaration. In my time as the executive director, I have overseen the negotiation and closing of the NCIF subaward with the Coalition for Green Capital (CGC), while Peter Klein oversaw the submissions related to being a named subrecipient in CGC's grant application and the early subaward.

5.      MnCIFA is a body politic and corporate of the State of Minnesota, headquartered at the Minnesota Department of Commerce, 85 7th Place East, Suite 280, Saint Paul, Minnesota 55101.

6.      The Minnesota legislature established MnCIFA in 2023 to stimulate the development of clean energy and greenhouse gas emissions reduction projects using innovative financing tools to leverage public and private capital to overcome market barriers that inhibit the financing of these projects.

7.      Because MnCIFA is a new state entity, it receives supportive services like human resources, accounting, and other services, from the Minnesota Department of Commerce, as detailed in Minn. Stat. § 216C.411. Our accounting contact is Amy Trumper.

**MnCIFA's Receipt of a National Clean Investment Fund Subgrant**

8.      MnCIFA is an "eligible recipient" of Greenhouse Gas Reduction Fund monies under 42 U.S.C. § 7434(c)(1).

9.      The Environmental Protection Agency (EPA) granted a $5 billion NCIF award to CGC. The award is to be used to establish national clean financing institutions that are able to

deliver accessible, affordable financing for clean technology projects.

10.    MnCIFA received a $25,000,000 NCIF subaward from CGC. MnCIFA also
provided an assurance letter that requires MnCIFA to reserve $750,000, leaving $24,250,000
available for funding projects at this time.

11.    On February 14, 2023, EPA announced its initial program design for the
Greenhouse Gas Reduction Fund, which includes NCIF. On July 14, 2023, EPA published its
Notice of Funding Opportunity number EPA-R-HQ-NCIF-23, later revised on August 11, 2023.
The deadline for application specified in the notice was October 12, 2023. MnCIFA joined
CGC's coalition as a subgrantee under CGC's grant application.

12.    On April 4, 2024, EPA announced the selected NCIF recipients, after which
negotiations commenced between EPA and awardees, and later between awardees and
subawardees, on the contract terms and EPA terms & conditions governing the program. CGC
completed its grant agreement with EPA in August of 2024. With approval for the subaward
granted in December 2024, MnCIFA concluded negotiations with CGC during the first week of
January 2025, executing the subgrant agreement and related documents on January 3, 2025.

### MnCIFA's Account Control Agreement and Citibank's Freeze on MnCIFA's Funds

13.    The subgrant required MnCIFA to establish an account at Citibank to hold the
grant funds and enter into an Account Control Agreement governing the account. Under the
terms of the Agreement, CGC was a secured party for the account. A true and correct copy of the
Account Control Agreement is attached as Exhibit 1.

14.    Under the Account Control Agreement with Citibank, MnCIFA has the right to
access and draw on its grant funds, unless CGC issues a Notice of Exclusive Control to Citibank.
MnCIFA has never received any copy of a Notice of Exclusive Control issued by CGC or any

related notice from CGC. On information and belief, to date, CGC has never issued a Notice of

Exclusive Control to Citibank to restrict MnCIFA's NCIF account.

15.    Under Addendum 1 to the Account Control Agreement, MnCIFA listed me as the

Maker and Checker, and Amy Trumper as a Checker. Under the form "Maker and Checker" was

an option. During negotiations, and confirmed by CGC later, I was told that I could act in both

roles within the same transaction.

16.    The $25,000,000 subaward was the only source of funds transferred to MnCIFA's

account by CGC or any other party. The funds were deposited in January and as of March 20,

2025, the account has also been credited interest of $124,502.89.

**Attempts to Request Disbursement**

17.    As early as January 31, 2025, we started having issues with access to the Citibank

accounts. I attempted to establish a password but the password reset functionality would not

work. On February 3, 2025, Citibank stated it manually sent a password reset to me, but I still

could not access the account. I was able to get in for the first time on February 5, 2025.

18.    On February 5, 2025, I logged in and attempted to make MnCIFA's first draw

request in accordance with the Account Control Agreement. I was able to complete the Maker

portion of the request. However, I was not, in fact, able to be the Maker and the Checker for the

same transaction, despite CGC's prior assurances that I could serve both roles.

19.    On February 18, 2025, from communication with other CGC subrecipients and

reports on the news and social media I became aware that EPA and/or the FBI had frozen the

funds in the account and that draw requests were not being honored. Despite this, we continued

to work with Citibank to get the account properly set up so that it would be ready for when the

funds became available and allow us to make the draw request.

20.    On March 11, 2025, I became aware of the termination letters sent related to the NCIF grant program, including the termination letter sent to CGC the same date.

21.    Despite this, MnCIFA remained in conversation with Citibank. We continued working through the administrative task of setting up MnCIFA's ability to draw funds through Citibank's system. Nonetheless, despite making numerous attempts to figure out why we could not fully complete a draw request, the issue continued to be unresolved. Then, on March 19, 2025, for the first time, Citibank told me that I cannot fulfill both roles in the same transaction. After making that adjustment, it appears the account is now set up properly.

22.    Amy Trumper, the Minnesota Department of Commerce contact for MnCIFA, is listed as "Checker" in MnCIFA's Account Control Agreement. It appears that MnCIFA's account could not be set up properly because Citibank failed to send Amy Trumper an invitation to create her own credentials in Citibank's system. Citibank did not send those credentials until March 20, 2025.

23.    MnCIFA submitted its first draw request at its earliest opportunity, which was today, March 24, 2025.

24.    Additionally, on March 7, 2025, the attorneys general of Minnesota, Maine, Colorado, Maryland, and New York transmitted a letter to Citibank, copying EPA, on behalf of MnCIFA and the other green banks within those states. The letter stated that Citibank had failed to comply with its Account Control Agreement, requested that Citibank identify the basis for its apparent refusal to comply with valid disbursement instructions, and informed Citibank that its apparent refusal was threatening to cause significant harm to MnCIFA and the other green banks. A true and correct copy of that letter is attached as Exhibit 2.

25.    Citibank never responded to this letter, nor has EPA.

26.    MnCIFA has yet to receive any funds from MnCIFA's account.

**MnCIFA's Plans for the Subgrant Funds**

27.    The MnCIFA CGC Pipeline will provide funding to energy projects that will save consumers money, maintain energy reliability, and increase resiliency for communities across Minnesota. CGC funding will provide tax credit bridge financing and direct loans to solar, efficiency, and geothermal projects. In addition to the high-impact project examples below, the MnCIFA CGC Pipeline includes solar for state colleges and ice arenas, resilient microgrids, and high-impact efficiency projects.

28.    The following are examples of projects that are already approved for funding by the MnCIFA board of directors and are either already funded by or flagged for funding from NCIF dollars:

**a.  The Heights:**

The MnCIFA board approved a $4.7M tax credit bridge loan for CGC financing for the Heights, a brownfield redevelopment that will include 1,000 units of affordable housing and one million square feet of lite industrial space. The loan was used to purchase and construct the infrastructure of a geothermal energy system, which is a renewable energy resource that circulates water to heat and cool buildings. The system will be coupled with renewable electricity sources, solar, that will produce the electricity needed for operations. The system will replace the need for natural gas, or any other fossil fuel, to heat and cool the buildings. The loan has a term of five years, with balloon payments beginning on the five-year anniversary. The project will create 500 full time employee (FTE) jobs.

**b. 3561 Minnehaha:**

The MnCIFA board has approved a $2M loan for CGC financing for 3561

Minnehaha LLC, a residential facility that will include at least 20% affordable

housing units. The loan funds will be used for the purchase and installation of solar

and energy efficiency measures including high efficiency HVAC components. The

project will be Passive House (Phius) Certified and DOE Net Zero Energy Ready

Certified. It will be 100% electric, and it will have a 71.7 kW rooftop solar array. The

loan will be a five-year term loan with interest accruing at the beginning of the term

and interest only payments beginning January 1, 2026. The project will create 86 FTE

construction jobs and 10 permanent FTE jobs.

**c. Avenues for Youth:**

The MnCIFA board has approved a $4.5M loan for CGC financing for Avenues of

Youth, which currently assists youth that are experiencing homelessness in

Minneapolis. The loan will fund a geothermal system and the associated HVAC

components of a 31-unit shelter and transitional housing complex. The loan will have

a five-year term with a 10-year amortization, with payments deferred for one year

with interest. The project will create 100 construction FTE jobs, and 8 new FTE jobs.

**d. Neighborhood Development Center:**

The MnCIFA board has approved a $3M loan for CGC financing for the

Neighborhood Development Center, which trains low-income residents to start their

own businesses, providing funding and incubator space. The loan will fund the

purchase and installation of solar and efficient HVAC equipment for a new

construction building. The loan will allow NDC to reduce the energy use of the

facility to less than half of a similarly configured structure. The loan will have a five-year term with a 20-year amortization, payments deferred for one year, or 30-days after closing, whichever is later. The project will create 40-70 FTE jobs.

**Immediate Harm to MnCIFA**

29.    EPA and Citibank's freeze of MnCIFA's account has caused immediate and continuing harm to MnCIFA.

30.    MnCIFA has spent more than a year developing a pipeline of eligible projects and stands ready to deploy the NCIF funds in accordance with the terms of its subaward, which has an extremely expedited period of performance ending December 31, 2025.

31.    MnCIFA is a small, but growing, green bank. The Minnesota legislature provided MnCIFA's initial start-up funds in 2023 in the amount of $45,000,000. The CGC/NCIF subaward more than doubled MnCIFA's lending capacity at the time of award.  In late January 2025, the Minnesota Department of Commerce transferred $60,000,000 from the State Competitiveness Fund to MnCIFA for the specific purpose of leveraging federal funding available for clean energy investments, like the CGC/NCIF subaward.

32.    MnCIFA has dedicated substantial resources to properly and quickly deploying the NCIF funds from its subaward. Any delay on its ability to draw on the NCIF funds will slow MnCIFA's ability to comply with the tight timeline in the period of performance.

33.    MnCIFA's board of directors relied on its CGC/NCIF subaward in approving MnCIFA's commitment to funding several new loans. MnCIFA has approved seven loans for funding thus far, totaling $22,100,000.  If NCIF funding is not available, MnCIFA will have to significantly slow its pace of lending.

34.    At our board meeting on March 19, 2025, the board had a serious conversation

about further prioritization of projects, including discussion about paring down the list of

projects that it anticipated it would be able to fund now that NCIF funds appear to be in question

because of EPA's conduct.

35.    Any further delay in MnCIFA's ability to access its NCIF subaward will have

lasting consequences on green energy projects in Minnesota. Many projects will not be able to

receive the supportive funding from MnCIFA to complete their loan stacking. Private capital will

not likely be available to fill the gaps in funding; the market will not always bear the additional

risks associated with these loans, which is why green banks exist. Without these funds, many

projects may opt for traditional energy sources, and such projects will be in existence for many

years to come, without the use of green energy.

36.    EPA's attacks on the Greenhouse Gas Reduction Fund are also causing

continuing and escalating harm to MnCIFA's business. Confidence in the liquidity and

availability of funds is vital to our core lending activities. EPA and Citibank's freezing of funds

risks public and private confidence in the liquidity and availability of funds offered by MnCIFA.

Without assurances that MnCIFA will be able to access funds, potential borrowers, co-investors,

and other business partners will not likely enter into agreements with MnCIFA, seeing it and its

NCIF subaward as too risky a source of financing. This will cause lasting and irreparable

reputational harm to MnCIFA.

37.    EPA's aggressive campaign to portray the "green lending" industry as inherently

wasteful and fraudulent—and even criminal--is causing and will cause lasting harm to

MnCIFA's business, despite being untrue. Prospective borrowers, co-investors, and other

business partners are naturally cautious about involvement in green bank programs targeted by

such allegations. And existing business relationships also need to be managed to address such

concerns.

38.     Minnesota and Minnesotans have and will continue to experience the devastating

harmful consequences of climate change. These harms include extreme heat that causes

dangerous living conditions in urban centers; increases in extreme conditions such as drought

and flooding; stress on aging transportation infrastructure; exacerbated negative health impacts

such as asthma, allergies, and vector-born disease; increased air pollution; devastating ecosystem

harm; and many other harms. Planning for and ameliorating these harms has cost Minnesota

billions of dollars and will cost the state billions more. MnCIFA's purpose to finance energy

projects that will save Minnesotans money, maintain energy reliability, and increase resiliency

for communities across Minnesota is integral to limiting the harmful consequences of climate

change in this state. Curtailing a significant portion of this activity could have negative

consequences for the State's economy and the well-being of its citizens.


I declare under penalty of perjury under the laws of the United States of America, pursuant

to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.


Executed on March 24, 2025, at Ramsey County, Minnesota.

Declaration of Kari Groth Swan
Executive Director of Minnesota Climate
Innovation Finance Authority

JA1429



**ACCOUNT CONTROL AGREEMENT**

among

**MINNESOTA CLIMATE INNOVATION FINANCE AUTHORITY, as PLEDGOR**

**COALITION FOR GREEN CAPITAL, as SECURED PARTY**

and

**CITIBANK, N.A., as BANK**

**Dated as of _____**

170625478.1

JA1430

**THIS ACCOUNT CONTROL AGREEMENT** (this "**Agreement**"), dated as of _____, by and among Minnesota Climate Innovation Finance Authority, a Minnesota body corporate and politic _____ (the "**Pledgor**"), Coalition for Green Capital, a District of Columbia nonprofit corporation (the "**Secured Party**") and Citibank, N.A., a national banking association organized and existing under the laws of the United States of America ("**Citibank**") and acting through its Agency & Trust business solely in its capacity as bank under this Agreement, and any successors appointed pursuant to the terms hereof (Citibank in such capacity, the "**Bank**").

**WHEREAS,** the Secured Party has entered into a certain federal financial assistance agreement with the United States Environmental Protection Agency, an agency of the United States Government, as identified in Addendum 1, (the "**Grant Agreement**").

**WHEREAS,** under the Grant Agreement, Pledgor and Secured Party have entered into a Subaward as identified in Addendum 1, (the "**Subaward Agreement**"), pursuant to which the Pledgor has granted the Secured Party a security interest in the accounts as identified in Addendum 1 established and maintained by the Bank for the Pledgor (the "**Accounts**").

**WHEREAS,** the Bank has been designated and authorized to act as a financial agent of the United States pursuant to the authority of the U.S. Department of the Treasury under 12 U.S.C. §§ 90 and 265.

**WHEREAS,** the parties wish that the Bank enter into this Agreement in order to provide for the "control" (as defined in Section 9-104(a) of the Uniform Commercial Code in effect in the State of New York ("**UCC**"), in the case of a deposit account, or Section 8-106 of the UCC, in the case of a security account) of the accounts as a means to perfect the security interest of the Secured Party.

**WHEREAS,** the Pledgor and the Secured Party have agreed that the terms and conditions in the Subaward Agreement indicate the conditions under which the Secured Party may exercise its right of control herein, and such conditions will be defined as "default" for the purposes of this Agreement.

**WHEREAS**, capitalized terms used herein without definition and that are defined in Article 8 or Article 9 of the UCC as adopted in the State of New York shall have the respective meanings set forth therein.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and adequacy of which is hereby irrevocably acknowledged, the parties hereto agree as follows:

1.    **The Accounts.**  The Pledgor and the Bank represent and warrant to, and agree with the Secured Party that:

(a)    The Bank maintains the Accounts for the Pledgor, and all property (including, without limitation, all funds and financial assets) held by the Bank for the accounts of the Pledgor are, and will continue to be, credited to the Accounts in accordance with instructions given by the Pledgor (unless otherwise provided herein).

(b)    To the extent that cash is credited to the Accounts, the Accounts are a deposit account; and to the extent that financial assets (other than cash) are credited to the Accounts, the Accounts are a securities account. The Bank is (i) the bank with which the Accounts are maintained

and (ii) the securities intermediary with respect to financial assets held in the Accounts. The Pledgor is (A) the Bank's customer with respect to the Accounts and (B) the entitlement holder with respect to all financial assets credited from time to time to the Accounts.

(c)     Notwithstanding any other agreement to the contrary, the Bank's jurisdiction with respect to the Accounts for purposes of the UCC is, and will continue to be for so long as the Secured Party's security interest shall be in effect, the State of New York.

(d)     The Pledgor and the Bank do not know of any claim to or interest in the Accounts or any property (including, without limitation, funds and financial assets) credited to the Accounts, except for claims and interests of the parties referred to in this Agreement.

**2.      Control over Accounts.**

The Bank shall comply with all instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and financial assets in the Accounts including, without limitation, directions to distribute proceeds of any such transfer or redemption of interest or dividends on financial assets in the Accounts, substantially in the form attached hereto as Exhibit B ("**Account Direction**"), originated by the Pledgor, until the time that that Bank receives a notice, substantially in the form attached hereto as Exhibit A (a "**Notice of Exclusive Control**") from the Secured Party that the Secured Party is exercising its right to exclusive control over an Account, and after such time that the Bank receives a Notice of Exclusive Control, the Secured Party for such Account, without further consent by the Pledgor.

**3.      Priority of Secured Party's Security Interest.**  The Bank subordinates in favor of the Secured Party any interest, lien or right of setoff it may have, now or in the future, against the Accounts or assets in the Accounts; *provided; however*, that, subject to the foregoing, the Bank may set off all amounts due to it in respect of its fees and expenses (including, without limitation, the payment of any legal fees or expenses) or any amounts payable pursuant to Section 4 hereof.

**4.      Investment of Funds.**

(a)     The Bank shall deposit the assets in non-interest bearing Accounts and invest the assets in the Accounts consistent with the instructions provided by the Pledgor, in Addendum 1. The Pledgor's instructions will be in accordance with the Subaward Agreement, provided that the Bank is not responsible for verifying whether the Pledgor's instructions are in compliance with the Subaward Agreement. The Bank shall invest such assets in the Accounts on the date of deposit provided that such assets are received on or before 11:00 a.m. New York City time.  Any assets received after 11:00 a.m. New York City time shall be treated as if received on the following Business Day. For purposes of this Agreement, "**Business Day**" shall mean any day that the Bank is open for business.

(b)     The Bank is hereby authorized and directed to sell or redeem any such investments as it deems necessary to make any payments or distributions required under this Agreement. The Bank shall have no responsibility or liability for any loss in the value of any investment made pursuant to this Agreement, or for any loss, cost or penalty resulting from any sale or liquidation of the assets in the Account.  The Bank is hereby authorized to execute purchases and sales of investments through the facilities of its own trading or capital markets operations or those of any affiliated entity.  The Bank does not have a duty nor will it undertake any duty to provide investment advice.

citi

170625478.1

JA1432

(c)     The Bank shall transfer any earnings or proceeds received on or distributions of earnings or proceeds from the assets in the Accounts to the Pledgor's Program Income from Operations Account on a monthly basis.

**5.     Tax Matters.**

(a)     The Pledgor and the Secured Party agree that, unless and until the Subaward Agreement is terminated, any earnings or proceeds received on or distributions of earnings or proceeds from the assets in the Accounts shall be treated as the income of the Pledgor and shall be reported on an annual basis on United States Internal Revenue Service ("**IRS**") Form 1099-DIV, as required pursuant to the Internal Revenue Code of 1986, as amended (the "**Code**") and the regulations thereunder. Principal payments are not reportable to any payee hereunder. No earnings or proceeds received on or distributions of earnings or proceeds from the assets in the Accounts, or principal payments from the Accounts, are reportable to the Secured Party. The Pledgor, the Secured Party and the Bank agree that the Bank will not be responsible for providing tax reporting and withholding for payments that are for compensation for services performed by an employee or independent contractor.

(b)     The Pledgor and the Secured Party shall upon the execution of this Agreement provide the Bank with a duly completed and properly executed IRS Form W-9 or applicable IRS Form W-8, in the case of a non-U.S. person, for each payee, together with any other documentation and information requested by the Bank in connection with the Bank's tax reporting obligations under the Code and the regulations thereunder.  With respect to the Bank's tax reporting obligations under the Code, the Foreign Account Tax Compliance Act and the Foreign Investment in Real Property Tax Act and any other applicable law or regulation, the Pledgor and the Secured Party understand, that, in the event valid U.S. tax forms or other required supporting documentation are not provided to the Bank, the Bank may be required to withhold tax from the assets in the Accounts and report account information on any earnings, proceeds or distributions from the assets in the Accounts.

(c)     Should the Bank become liable for the payment of taxes, including withholding taxes relating to any funds, including interest and penalties thereon, held by it pursuant to this Agreement or any payment made hereunder, Secured Party agrees to indemnify and hold the Bank harmless pursuant to Section 7(b) hereof from any liability or obligation on account of taxes, assessments, interest, penalties, expenses and other governmental charges that may be assessed or asserted against the Bank, provided that such liability shall not be satisfied by assets in the Accounts. If the Secured Party fails to indemnify the Bank for such taxes, the Bank will notify the United States Environmental Protection Agency.

(d)     The Bank's rights under this Section 5 shall survive the termination of this Agreement or the resignation or removal of the Bank.

**6.     Concerning the Bank.**

(a)     <u>Bank Duties</u>.  Each of the Pledgor and the Secured Party acknowledges and agrees that (i) the duties, responsibilities and obligations of the Bank shall be limited to those expressly set forth in this Agreement, each of which is administrative or ministerial (and shall not be construed to be fiduciary in nature), and no duties, responsibilities or obligations shall be inferred or implied, (ii) the Bank shall not be responsible for any of the agreements referred to or described

citi

JA1433

herein (including, without limitation, the Grant Agreement, the Subaward Agreement, and any defined term therein not otherwise defined in this Agreement), or for determining or compelling compliance therewith, and shall not otherwise be bound thereby, and (iii) the Bank shall not be required to expend or risk any of its own funds to satisfy payments from the Accounts hereunder.

(b)     Liability of Bank.  The Bank shall not be liable for any damage, loss or injury resulting from any action taken or omitted in the absence of gross negligence or willful misconduct (as finally adjudicated by a court of competent jurisdiction).   In no event shall the Bank be liable for indirect, incidental, consequential, punitive or special losses or damages (including but not limited to lost profits), regardless of the form of action and whether or not any such losses or damages were foreseeable or contemplated.  The Bank shall be entitled to rely upon any instruction, notice, request or other instrument delivered to it without being required to determine the authenticity or validity thereof, or the truth or accuracy of any information stated therein.  The Bank may act in reliance upon any signature believed by it to be genuine (including any signature affixed by DocuSign) and may assume that any person purporting to make any statement, execute any document, or send any instruction in connection with the provisions hereof has been duly authorized to do so.  The Bank may consult with counsel satisfactory to it, and the opinion or advice of such counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it in good faith and in accordance with the opinion and advice of such counsel.  The Bank may perform any and all of its duties through its agents, representatives, attorneys, custodians and/or nominees.  The Bank shall not incur any liability for not performing any act or fulfilling any obligation hereunder by reason of any occurrence beyond its control (including, without limitation, any provision of any present or future law or regulation or any act of any governmental authority, any act of God or war or terrorism, or the unavailability of the Federal Reserve Bank wire services or any electronic communication facility).

(c)     Reliance on Orders.  The Bank is authorized to comply with final orders issued or process entered by any court with respect to the assets in the Accounts, without determination by the Bank of such court's jurisdiction in the matter.  If any portion of the assets in the Accounts are at any time attached, garnished or levied upon under any court order, or in case the payment, assignment, transfer, conveyance or delivery of any such property shall be stayed or enjoined by any court order, or in case any order, judgment or decree shall be made or entered by any court affecting such property or any part thereof, then and in any such event, the Bank is authorized to rely upon and comply with any such order, writ, judgment or decree which it is advised is binding upon it without the need for appeal or other action; and if the Bank complies with any such order, writ, judgment or decree, it shall not be liable to the Pledgor or the Secured Party or to any other person or entity by reason of such compliance even though such order, writ, judgment or decree may be subsequently reversed, modified, annulled, set aside or vacated.

(d)     Erroneous Payments.  If the Bank releases any funds (including but not limited to the assets in the Accounts or any portion of it) to the Pledgor or the Secured Party and subsequently determines (in its absolute discretion) that the payment (or any portion of it) was made in error, the Pledgor or the Secured Party, as applicable, shall upon notice promptly refund the erroneous payment, and none of the obligations of the Pledgor or the Secured Party, as applicable, or the remedies of the Bank will be affected by any act, omission, matter or thing (including, without limitation, any obligation pursuant to which an erroneous payment is made) which, but for this provision, would reduce, release, preclude or prejudice any such obligation or remedy (whether or not known by the Bank, the Pledgor or the Secured Party). Each of the Pledgor and the Secured Party agrees not to assert discharge for value, bona fide payee, or any similar doctrine as a defense to recovery of any erroneous payment by the Bank.

citi

170625478.1

JA1434

7.    **Compensation, Expense Reimbursement and Indemnification.**

(a)    <u>Compensation</u>. The Bank's compensation shall be as specified in <u>Schedule A</u>.

(b)    <u>Indemnification</u>. The Secured Party covenants and agrees to indemnify the Bank and its employees, officers, directors, affiliates, and agents (each, an "**Indemnified Party**") for, hold each Indemnified Party harmless from, and defend each Indemnified Party against, any and all claims, losses, actions, liabilities, costs, damages and expenses of any nature incurred by any Indemnified Party, arising out of or in connection with this Agreement or with the administration of its duties hereunder, including, but not limited to, attorney's fees, costs and expenses, except to the extent such loss, liability, damage, cost or expense shall have been finally adjudicated by a court of competent jurisdiction to have resulted solely from the Indemnified Party's own gross negligence or willful misconduct, provided that such liability shall not be satisfied by assets in the Accounts. The foregoing indemnification and agreement to hold harmless shall survive the termination of this Agreement and the resignation or removal of the Bank. If the Secured Party fails to indemnify the Bank pursuant to this Section 7(b), the Bank shall notify the United States Environmental Protection Agency.

8.    **Statements, Confirmations and Notices of Adverse Claims.**  The Bank will send copies of all statements and confirmations for the Accounts simultaneously to the Pledgor and the Secured Party.  The Bank shall be deemed to have delivered statements and confirmations if such statements and confirmations are available on one or more of the Bank systems to deliver electronic media.  The Bank will use reasonable efforts promptly to notify the Secured Party and the Pledgor if any other person claims that it has a property interest in the Accounts or any financial asset in the Accounts.

9.    **Entire Agreement; Exclusive Benefit.**  This Agreement constitutes the entire agreement between the parties and sets forth in its entirety the obligations and duties of the Bank with respect to the assets in the Accounts.  This Agreement is for the exclusive benefit of the parties to this Agreement and their respective permitted successors, and shall not be deemed to give, either expressly or implicitly, any legal or equitable right, remedy, or claim to any other entity or person whatsoever.  No party may assign any of its rights or obligations under this Agreement without the prior written consent of the other parties.

10.    **Resignation and Removal.** The Bank may be removed only by the U.S. Department of the Treasury.

11.    **Governing Law.** This Agreement is governed by and shall be construed and interpreted in accordance with federal law of the United States, except where there is no applicable federal law, in accordance with the laws of the State of New York, without giving effect to the conflict of laws principles thereof.

12.    **Representations and Warranties.**

(a)    Each of the Pledgor and the Secured Party represents and warrants that it has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder; and this Agreement has been duly approved by all necessary action and constitutes its valid and binding agreement enforceable in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or other similar laws affecting the enforcement

citi

170625478.1

JA1435

of creditors' rights and subject to general equity principles.

(b)    Each of the Pledgor and the Secured Party represents that neither it nor any of its parents or subsidiaries, or any of their respective directors, officers, or employees, or to the knowledge of the Pledgor and the Secured Party, the affiliates of the Pledgor, the Secured Party or any of its subsidiaries, will, directly or indirectly, use any part of any proceeds or lend, contribute, or otherwise make available such assets in the Accounts in any manner that would result in a violation by any person of economic, trade, or financial sanctions, requirements, or embargoes imposed, administered, or enforced from time to time by the United States (including, without limitation, the Office of Foreign Assets Control of the U.S. Department of the Treasury and the U.S. Department of State), the United Kingdom (including, without limitation, His Majesty's Treasury), the European Union and any EU member state, the United Nations Security Council, and any other relevant sanctions authority.

### 13.    Notices; Instructions.

(a)    Any notice or instruction hereunder shall be in writing in English, and may be sent by (i) secure file transfer or (ii) electronic mail with a scanned attachment thereto of an executed notice or instruction, and shall be effective upon actual receipt by the Bank in accordance with the terms hereof.  Any notice or instruction must be executed (which execution may be manual or affixed by DocuSign) by an authorized person of the Pledgor or the Secured Party, as applicable (the person(s) so designated from time to time, the "**Authorized Persons**").  Each of the applicable persons designated on Schedule B and Schedule C attached hereto have been duly appointed to act as Authorized Persons hereunder and individually have full power and authority to execute any notices or instructions, to amend, modify or waive any provisions of this Agreement, and to take any and all other actions permitted under this Agreement, all without further consent or direction from, or notice to, it or any other party.  Any notice or instruction must be originated from a corporate or government domain.  Any change in designation of Authorized Persons shall be provided by written notice, signed by an Authorized Person, and actually received and acknowledged by the Bank.  Any communication from the Bank that the Bank deems to contain confidential, proprietary, and/or sensitive information shall be encrypted in accordance with the Bank's internal procedures.

(b)    Each of the Pledgor and the Secured Party understands and agrees that the Bank cannot determine the identity of the actual sender of any notice or instruction and that the Bank shall be entitled to conclusively presume that notices or instructions that purport to have been sent by an Authorized Person have been sent by such Authorized Person.  Each of the Pledgor and the Secured Party agrees: (i) to assume all risks arising out of the use of electronic means (including electronic mail, secure file transfer or such other method or system specified by the Bank as available for use in connection with its services hereunder) to submit instructions to the Bank, including, without limitation, the risk of the Bank acting on unauthorized instructions, and the risk of interception or misuse by third parties; (ii) that it is fully informed of the protections and risks associated with the various methods of transmitting instructions to the Bank and that there may be more secure methods of transmitting instructions than the method(s) selected by the Pledgor and the Secured Party, as applicable; (iii) that the security procedures (if any) to be followed in connection with its transmission of instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances; and (iv) to notify the Bank immediately upon learning of any compromise or unauthorized use of the security procedures.  The Pledgor and the Secured Party agree that the security procedures set forth in Section 13(a) and this Section 13(b) are commercially reasonable.

citi

If to the Pledgor:
As provided in Addendum 1

If to the Secured Party:

Coalition for Green Capital
Attn: David Pettit
Address: 1255 Union Street NE, 7th Floor,
Washington, D.C. 20002
Email: dpettit@coalitionforgreencapital.com

If to the Bank:

Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, NY 10013
Attn.: Nerlie Delly
Telephone: +1 212-816-6846
E-mail: CitiGGRFFinancialAgent@citi.com

If to the United States Environmental Protection Agency:

**The Office of the Greenhouse Gas Reduction Fund,**
**United States Environmental Protection Agency**
**Attention: David Widawsky**
**Telephone: +1 202-566-2215**
**E-mail: GGRF@epa.gov; widawsky.david@epa.gov**

14.    **Amendment; Waiver.**   Any amendment of this Agreement shall be binding only if evidenced by a writing signed by each of the parties to this Agreement.  No waiver of any provision hereof shall be effective unless expressed in writing and signed by the party to be charged.

15.    **Severability.**   The invalidity, illegality or unenforceability of any provision of this Agreement shall in no way affect the validity, legality or enforceability of any other provision. If any provision of this Agreement is held to be unenforceable as a matter of law, the other provisions shall not be affected thereby and shall remain in full force and effect.

16.    **Mergers and Conversions.**   Any corporation or entity into which the Bank may be merged or converted or with which it may be consolidated, or any corporation or entity resulting from any merger, conversion or consolidation to which the Bank will be a party, or any corporation or entity succeeding to the business of the Bank will be the successor of the Bank hereunder without the execution or filing of any paper with any party hereto or any further act on the part of any of the parties hereto except where an instrument of transfer or assignment is required by law to effect such succession, anything herein to the contrary notwithstanding.

17.    **Termination.**   This Agreement shall terminate upon receipt by the Bank of notice from the Secured Party that its security interest in such Accounts and all assets therein have



170625478.1

terminated.  Upon receipt of such notice, the Secured Party shall have no further right to originate instructions with respect to the assets in the Accounts.  The Bank shall, upon payment of all outstanding fees and expenses hereunder, promptly forward any amounts held by the Bank in the Accounts to the Pledgor, and the Bank shall be relieved and discharged of any further responsibilities with respect to its duties hereunder.

18.    **Counterparts.**  This Agreement may be executed simultaneously in two or more counterparts, any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same agreement. Signatures on counterparts of this Agreement executed and delivered in electronic format (i.e. "pdf") or by other electronic means (including DocuSign) shall be deemed original signatures with all rights accruing thereto except in respect to any non-US entity, whereby originals may be required.

**[Remainder of Page Left Intentionally Blank]**

citi

170625478.1

JA1438

**IN WITNESS WHEREOF**, each of the parties has caused this Agreement to be executed by a duly authorized representative as of the day and year first written above.

**CITIBANK, N.A.,**
as Bank

By: _____
    Name: Nerlie Delly
    Title: Senior Trust Officer

**MINNESOTA CLIMATE INNOVATION FINANCE AUTHORITY,**
as Pledgor

By: _____
    Name: Kari Groth Swan
    Title: Executive Director

**COALITION FOR GREEN CAPITAL**,
as Secured Party

By: _____
    Name: Eli Hopson
    Title: Chief Administrative and Development Officer

S-1

170625478.1

**EXHIBIT A**

**FORM OF NOTICE OF EXCLUSIVE CONTROL**

VIA EMAIL: cts.spag@citi.com / CitiGGRFFinancialAgent@citi.com

Nerlie Delly
Vice President
Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, New York 10013
[Re. Account # [●]]

Pursuant to the Account Control Agreement dated _____, among Minnesota Climate Innovation Finance Authority (the "**Pledgor**"), Coalition for Green Capital (the "**Secured Party**"), and Citibank, N.A. (the "**Bank**"), we hereby instruct you of the following:

The Pledgor and the Secured Party have agreed that the terms and conditions in the Subaward Agreement indicate the conditions under which the Secured Party may exercise its right of control herein, and such conditions will be defined as "default" for the purposes of the Account Control Agreement.

As required by the Subaward Agreement, the Secured Party has issued a written determination and finding that:

1)  Pledgor has failed to comply with the terms and conditions of the Subaward Agreement, and that noncompliance is substantial such that effective performance of the Subaward Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse or material misrepresentation of eligibility status, and that the Secured Party has initiated action under 2 CFR 200.339, or 2 CFR 200.332(d) or (i), to wholly or partly suspend or terminate the Subaward Agreement as authorized in the terms of the Subaward Agreement or applicable provisions of 2 CFR Part 200,

    [or,

2)  Another condition constituting a default in the Subaward Agreement has occurred and is continuing].

Therefore, the Secured Party hereby notifies you that (i) a default has occurred and is continuing under the Subaward Agreement and (ii) from and after the receipt of this notice until you receive further instruction from Secured Party, you are hereby directed to retain and hold all funds in the Account or Accounts named in this Notice and not to [invest or] disburse the same to any party whatsoever, other than as instructed by the Secured Party.

170625478.1

**Coalition for Green Capital,**
as Secured Party


By:_____
   Name:
   Title:
   Date:

In Process

170625478.1

**EXHIBIT B**

**FORM OF ACCOUNT DIRECTION (NCIF Financial Assistance Subrecipient)**
**Pledgor's UEI Number:** _____Q4K5CE7ZB2L5_____

[Date]

Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, NY 10013
E-mail: cts.spag@citi.com

VIA: CitiSFT

RE: Account Control Agreement dated _____, among Minnesota Climate Innovation Finance Authority (the "**Pledgor**"), Coalition for Green Capital (the "**Secured Party**"), and Citibank, N.A. (the "**Bank**")

Pursuant to Section 2 of the above referenced Account Control Agreement, the Pledgor hereby instructs the Bank to disburse a total amount of $[●] funds as per below and as per the attached upload file named xxx:

**Check applicable boxes:**

( ) **Internal Transfer within the Bank (intra-entity).**

( ) **Internal Transfer within the Bank (inter-entity).**

( ) **External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities).**

( ) **External Transfer outside the Bank (for Financial Assistance Activities).**

**If an Internal Transfer within the Bank (intra-entity), check the following applicable boxes:**

( ) **Transfer of $[●] across Pledgor's 'Budget' sub-accounts, as defined in the Subaward Agreement**.

( ) **Transfer of $[●] from Pledgor's 'Program Income from Operations' account to Pledgor's 'Budget' sub-account(s), as defined in the Subaward Agreement**.

( ) **Transfer of $[●] from Pledgor's 'Reserve' account to Pledgor's 'Program Income from Operations' account, as defined in the Subaward Agreement.**

( ) **Transfer of $[●] from Pledgor's 'Budget' sub-account(s) or 'Program Income from Operations' account to 'Reserve' account, as defined in the Subaward Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the workplan for the Subaward Agreement supported with EPA funding. Financing agreements for identified Qualified Projects*

170625478.1

*as defined in the Terms and Conditions of the Secured Party's Grant Agreement necessitating the transfer have been reviewed by Subrecipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

**If an Internal Transfer within the Bank (inter-entity), check the following applicable box:**

**( ) Transfer of $[●] from Pledgor's 'Budget' sub-account(s) to Secured Party's 'Budget' sub-account(s) as defined in the Subaward Agreement and compliant with the terms and conditions of the Grant Agreement, including the EPA Subaward Policy.**

**If an External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities), check one of the following boxes:**

**( ) Disbursement of $[●] for Predevelopment Activities as defined in the Subaward Agreement.**

**( ) Disbursement of $[●] for Market-Building Activities as defined in the Subaward Agreement.**

**( ) Disbursement of $[●] for Program Administration Activities as defined in the Subaward Agreement.**

**If an External Transfer outside the Bank (for Financial Assistance Activities), check the following applicable boxes:**

**( ) Disbursement of $[●] from Pledgor's 'Budget' sub-account to provide Financial Assistance to Qualified Projects as defined in the Subaward Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the workplan for the Subaward Agreement supported with EPA funding. Financing agreements for identified Qualified Projects as defined in the Terms and Conditions of the Secured Party's Grant Agreement necessitating the transfer have been reviewed by Subrecipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

**( ) Disbursement of $[●] from Pledgor's 'Reserve' account to satisfy a legal obligation to a third party as defined in the Subaward Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this transfer is necessary to execute against the workplan for the Subaward Agreement supported with EPA funding and pay a third party pursuant to a financing agreement that has been reviewed by Subrecipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

Exhibit B

Capitalized terms in this instruction letter not otherwise defined shall have the same meaning given to them in the Account Control Agreement.

Signature on this Account Direction executed and delivered in electronic format (i.e. "pdf") or by other electronic means (including DocuSign) shall be deemed original signatures with all rights accruing thereto.

IN WITNESS WHEREOF, the Pledgor has caused this Account Direction to be duly executed and delivered as of the date first written above.

Pledgor:

_____

Authorized Person

Exhibit B

**ADDENDUM 1**
**Account Control Agreement**

**(to be provided separately)**

In Process

170625478.1

## SCHEDULE A

## BANK COMPENSATION

### General compensation

For the services described in the Account Control Agreement, the Bank shall charge each Pledgor as follows:

| Agency & Trust Services | Fees |
|---|---|
| **Acceptance Fee** <br> This one-time fee covers the acceptance of the appointment, the review of the related Transaction documents submitted in connection with the execution and delivery thereof, setting up of internal controls, and communication with other members of the working group, as necessary. | Waived |
| **Annual Administration Fee** <br> To cover the administrative functions of Citi under the Agreement, including the establishment and maintenance of the account(s), safekeeping of assets, maintenance of the records, execution and administration of the Agreement provisions, and other duties required under the terms of the Agreement. | Waived |
| **Wire Fees** | Waived |
| **Legal Fees** <br> To cover the review of legal documents by Citibank Agency & Trust's outside counsel. | Waived |

The Transaction documents will be governed in accordance with federal law of the United States, except where there is no applicable federal law, in accordance with the laws of the State of New York, without giving effect to the conflict of laws principles thereof, as established in the Agreement and subject to internal approval and satisfactory review of all documentation. All outgoing payments processed by Citi will be made via wire. Account balances invested in an Institutional Money Market Fund will be chosen by the client from a list of providers that Citi will supply. If invested in a Money Market Fund, fund distributors may provide Citi with Shareholder Servicing fees. These fees are discussed in the fund's prospectus, which will be delivered to the client prior to investment. All of Citi's responsibilities will be non-discretionary and Citi will not be required to make any advances of its own funds. Therefore, all services provided by Citi must strictly follow the terms stated in the Agreements or in the written instructions of the authorized parties or third parties authorized to send instructions to Citi.

In accordance with US regulations regarding anti-money laundering and terrorist financing, Federal law requires Citi to obtain, verify and record information that identifies each business or entity that opens an account or establishes a relationship with Citi. What this means for our clients: when a client opens an account or establishes a relationship, we will ask for the client's business name, a street address and a tax identification number that Federal law requires us to obtain. In accordance with the Unlawful Internet Gambling Act (the "Act"), Citibank, N.A. accounts or other Citibank, N.A. facilities in the United States may not be used to process "restricted transactions" as such term is defined in U.S. 31 CFR Section 132.2(y).

170625478.1

**JA1446**

## SCHEDULE B

## PLEDGOR AUTHORIZED LIST OF SIGNERS
### (to be provided separately)

Each of the following person(s) is authorized to execute documents and to direct the Bank as to all matters on the Pledgor's behalf. The Bank may confirm the instructions received by return call to any one of the telephone numbers listed below.

**PLEDGOR**

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: |  |  |
| Name:<br>Title:<br>Phone:<br>Email: |  |  |
| Name:<br>Title:<br>Phone:<br>Email: |  |  |

Schedule B

## SCHEDULE C

## SECURED PARTY AUTHORIZED LIST OF SIGNERS
### (to be provided separately)

Each of the following person(s) is authorized to execute documents and to direct the Bank as to all matters on the Secured Party's behalf. The Bank may confirm the instructions received by return call to any one of the telephone numbers listed below.

### SECURED PARTY

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: | | |

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: | | |

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: | | |

**Docusign**

## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: 6ACAFCE6-3C3F-41B6-A50A-59F33E63A3DC | | Status: Sent |
| Subject: 2nd Tier ACA: MN Climate Innovation Finance Authority; Coalition for Green Capital NCIF | | |
| Source Envelope: | | |
| Document Pages: 19 | Signatures: 1 | Envelope Originator: |
| Certificate Pages: 6 | Initials: 0 | Stephanie Seigle |
| AutoNav: Enabled | | 1201 3rd Avenue |
| EnvelopeId Stamping: Disabled | | Suite 4900 |
| Time Zone: (UTC-08:00) Pacific Time (US & Canada) | | Seattle, WA 98101 |
| | | sseigle@perkinscoie.com |
| | | IP Address: 165.1.248.178 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Stephanie Seigle | Location: DocuSign |
| 1/7/2025 11:55:38 AM | sseigle@perkinscoie.com | |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Kari Groth Swan<br>Kari.Groth.Swan@state.mn.us<br>Security Level: Email, Account Authentication (None) | *Signed by:*<br>*kari Groth Swan*<br>CD0A64F33A7546E... | Sent: 1/7/2025 12:01:07 PM<br>Viewed: 1/7/2025 12:47:38 PM<br>Signed: 1/7/2025 1:26:35 PM |
| | Signature Adoption: Pre-selected Style<br>Using IP Address: 156.98.240.4 | |
| **Electronic Record and Signature Disclosure:**<br>    Accepted: 1/7/2025 12:47:38 PM<br>    ID: 3ea458ff-596f-4ae0-8037-6fe11da6e171 | | |
| Eli Hopson<br>eli@coalitionforgreencapital.com<br>CADO<br>Security Level: Email, Account Authentication (None) | | Sent: 1/7/2025 1:26:38 PM |
| **Electronic Record and Signature Disclosure:**<br>    Accepted: 1/7/2025 12:50:06 PM<br>    ID: 0acb1bb1-b2f2-4ee9-a1bd-bc048b9a75d6 | | |
| Nerlie Delly<br>nerlie.delly@citi.com<br>Security Level: Email, Account Authentication (None) | | |
| **Electronic Record and Signature Disclosure:**<br>    Accepted: 1/2/2025 12:06:40 PM<br>    ID: 97c42502-c936-4ce1-a8cf-b524bf176c26 | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

Nerlie Delly

nerlie.delly@citi.com

Security Level: Email, Account Authentication
(None)

**Electronic Record and Signature Disclosure:**
  Accepted: 1/2/2025 12:06:40 PM
  ID: 97c42502-c936-4ce1-a8cf-b524bf176c26

Susan Netrosio

susan.netrosio@citi.com

Security Level: Email, Account Authentication
(None)

**Electronic Record and Signature Disclosure:**
  Not Offered via DocuSign

Maria Zichichi

Maria.a.zichichi@citi.com

Security Level: Email, Account Authentication
(None)

**Electronic Record and Signature Disclosure:**
  Not Offered via DocuSign

Marion O'Connor

marion.oconnor@citi.com

Security Level: Email, Account Authentication
(None)

**Electronic Record and Signature Disclosure:**
  Accepted: 12/19/2024 5:39:55 AM
  ID: 9bdbd9df-6174-4a8d-b9a5-a85f5b17ee89

Alexis Shankman

AShankman@perkinscoie.com

Security Level: Email, Account Authentication
(None)

**Electronic Record and Signature Disclosure:**
  Not Offered via DocuSign

Cara Simpkins

CSimpkins@perkinscoie.com

Security Level: Email, Account Authentication
(None)

**Electronic Record and Signature Disclosure:**
  Not Offered via DocuSign

Stephanie Seigle

sseigle@perkinscoie.com

Security Level: Email, Account Authentication
(None)

**Electronic Record and Signature Disclosure:**
  Not Offered via DocuSign

Konstantin Petrov

KPetrov@perkinscoie.com

Security Level: Email, Account Authentication
(None)

**Electronic Record and Signature Disclosure:**
  Not Offered via DocuSign

Claire Boyer

CBoyer@perkinscoie.com

Security Level: Email, Account Authentication
(None)

**Electronic Record and Signature Disclosure:**

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| | Not Offered via DocuSign | |

David Pettit

dpettit@coalitionforgreencapital.com

Security Level: Email, Account Authentication
(None)

**Electronic Record and Signature Disclosure:**
Not Offered via DocuSign

Andy Jack

ajack@cov.com

Security Level: Email, Account Authentication
(None)

**Electronic Record and Signature Disclosure:**
Not Offered via DocuSign

Jen Uren

juren@cov.com

Security Level: Email, Account Authentication
(None)

**Electronic Record and Signature Disclosure:**
Not Offered via DocuSign

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 1/7/2025 12:01:07 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

| Electronic Record and Signature Disclosure |
|---|

Electronic Record and Signature Disclosure created on: 4/2/2018 10:40:15 AM
Parties agreed to: Kari Groth Swan, Eli Hopson, Nerlie Delly, Nerlie Delly, Marion O'Connor

Case 1:25-cv-00820-TSC    Document 17-4    Filed 03/24/25    Page 34 of 42
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 260 of 674

**ELECTRONIC RECORD AND SIGNATURE DISCLOSURE**

From time to time, Perkins Coie LLP (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Perkins Coie LLP:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: ESignaturesSupport@perkinscoie.com

**To advise Perkins Coie LLP of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at ESignaturesSupport@perkinscoie.com and in the body of such request you must state: your previous email address, your new email address. We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Perkins Coie LLP**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email at ESignaturesSupport@perkinscoie.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Perkins Coie LLP**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to ESignaturesSupport@perkinscoie.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent..  The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Perkins Coie LLP as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Perkins Coie LLP during the course of your relationship with Perkins Coie LLP.

**ADDENDUM 1**
**Account Control Agreement**

| | |
|---|---|
| **Pledgor Name** | Minnesota Climate Innovation Finance Authority |
| **Grant Agreement** | Agreement Title: GGRF NCIF: The Coalition for Green Capital Fund (5G – 84094201)<br>Agreement Date: 08/08/2024 |
| **Subaward Agreement** | Agreement Title: National Clean Investment Fund Subgrant Agreement<br>Agreement Date: 01/03/2025 |
| **Pledgor Notice Details** | Attn:   Kari Groth Swan<br>Address: 85 7th Pl E, Ste 280 St Paul MN 55101<br>Email:   Kari.groth.swan@state.mn.us |
| **UEI Number** | ▓▓▓▓▓▓ |
| **Tax Identification Number** | ▓▓▓▓▓ |
| **Citi Deposit Instructions** | Bank: CITIBANK, N.A.<br>ABA: ▓▓▓▓▓<br>Account Name:<br>Account Number:<br>Ref: |

**Money Market Fund Investment Selection**

**Fund Name (Fund Number), CUSIP**

J.P. Morgan 100% US Treasury Securities Money Market Fund Capital Share Class (3163), 4812A0375

**Accounts to Be Established**

| Account Number | Account Name |
|---|---|
| ▓▓▓ | MinnClimate Program Income from Ops |
| ▓▓▓ | MinnClimate Program Admin |
| ▓▓▓ | MinnClimate Financial Assistance |
| ▓▓▓ | MinnClimate Reserves |
| ▓▓▓ | MinnClimate Market Building |
| ▓▓▓ | MinnClimate Other Pass Through |
| ▓▓▓ | MinnClimate Predevelopment |

**CitiVelocity Reporting Entitlements Request**:

The Pledgor hereby requests that the Bank entitle the following individuals to view-only access to the Bank's client reporting system for all accounts opened under this Account Control Agreement.

Pledgor Client Profile Name:

| Name | Phone Number | Email |
|---|---|---|
| | | |

170625472.1

| | | |
|---|---|---|
| Parisa Rostamkhani | 651-418-0009 | Parisa.Rostamkhani@state.mn.us |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

The Pledgor hereby acknowledges that all accounts opened under this Account Control Agreement will be entitled to the Bank's client reporting system and made available for view-only access to the following Client Profiles and their associated users:

| Entity | Client Profile Name |
|---|---|
| Secured Party | Citibank NA FBO Climate United Fund |
| United States Environmental Protection Agency | United States Environmental Protection Agency |

**CitiSFT Entitlements Request**:

Citi makes available the Secure File Transfer (CitiSFT) platform for clients to securely upload Account Directions. The Pledgor hereby requests that the Bank entitle the below individuals with upload only access to CitiSFT:

| Name | Phone Number | Email | Maker, Checker, Maker and Checker |
|---|---|---|---|
| Kari Groth Swan | 651-539-2799 | kari.groth.swan@state.mn.us | Maker and Checker |
| Amy Trumper | 651-539-1517 | Amy.Trumper@state.mn.us | Checker |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Pledgor Authorized Signor:

By: _Kari Groth Swan_
Signed by:
CD0A64F33A7546E...
Name
Title: Executive Director

Date: January 7, 2025

- 2 -

170625472.1

**Attorneys General of Minnesota, Colorado, Maine, Maryland and New York**

March 7, 2025

**Via e-mail**

Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, New York 10013
Attention: Nerlie Delly
CitiGGRFFinancialAgent@citi.com

       Re: *Account Control Agreements relating to EPA Greenhouse Gas Reduction Fund Award*
       *to Coalition for Green Capital and its Subrecipients*

Dear Ms. Delly:

The Attorneys General of Minnesota, Colorado, Maine, Maryland, and New York (the "States") write on behalf of green banks located in the States ("Green Banks") because they received notice that their funds at your bank are frozen without notice or explanation. It is our understanding that you've taken this action despite any contractual basis or court order requiring you to freeze the funds.

These funds were awarded and/or loaned by the Coalition for Green Capital ("CGC") in connection with their U.S. Environmental Protection Agency ("EPA") grant out of Greenhouse Gas Reduction Fund ("GGRF") money, meant to finance clean energy projects in the States; many Green Banks are relying on these funds to be disbursed so they can be put into these projects imminently. We write to urge you to immediately unfreeze these funds and come into compliance with your contractual obligations to these Green Banks.

The obligations of Citibank, N.A. ("Citi") are related to the Second Tier Account Control Agreements entered among the Green Banks as the Pledgors, CGC as the Secured Party, and Citi for the administration of funding for the Grant and Loan Agreements entitled GGRF NCIF: The Coalition for Green Capital Fund (5G-84094201) (collectively, the "Agreements"). The undersigned Attorneys General have become aware that Citi has not complied with specific compulsory requirements under the Agreements.

Under the Agreements, the Green Banks are Citi's customers with respect to deposits in the accounts contemplated therein and the entitlement holders with respect to all other financial assets credited to the accounts. Agreements, §1(a). The Green Banks are subgrantees and/or borrowers of GGRF funding through CGC, and CGC is one of the prime award recipients under the United States Environmental Protection Agency's ("EPA") National Clean Investment Fund. Many Green Banks have submitted instructions to Citi to disburse funds in accordance with the terms of the Agreements. As of this writing, such funds have not been disbursed.

Pursuant to Section 2 of the Agreements, Citi must "comply with instructions, notifications, and entitlement orders received from Pledgor regarding disposition of funds and financial assets in the accounts." *Id*. §2. Citi "maintains the Accounts for the Pledgor, and all property (including, without limitation, all funds and financial assets) held by the Bank for the accounts of the Pledgor are, and will continue to be, credited to the Accounts in accordance with instructions given by the Pledgor (unless otherwise provided herein)." *Id.* §1(a). The Agreements provide for one sole, well-defined exception, a "Notice of Exclusive Control." *Id.* §2; *see id.* Ex. A. We have received direct confirmation from CGC that it did not transmit any Notice of Exclusive Control with respect to any accounts in the Agreements.  We are not aware of any court order prohibiting the disbursements either.  *See id*. §6(c).  Therefore, it appears Citi has no legal basis for rejecting the Green Banks' instructions to disburse any funds to any accounts in the Agreements.

Likewise, under the First Tier Account Control Agreement by and among CGC, as the pledgor, EPA, as the secured party, and Citi, similar terms exist with regard to Citi's obligation to CGC, to maintain the accounts for CGC, and that Citi must comply with all instructions, including directions to distribute proceeds in accordance with such instructions, as well as the bank's liability for failing to do so.  The States have been informed by CGC that it has not received any Notice of Exclusive Control related to its First Tier Account Control Agreement, nor has EPA indicated that one has been sent.

Please immediately identify the basis for Citi's refusal to comply with valid disbursement instructions given by the Green Banks and explain why Citi's refusal should not constitute a breach of its obligations under the Agreements, and indeed, willful misconduct under § 6(b) of the Agreements. Citi's refusal to abide by the Agreements and its fundamental obligations as a bank threatens to cause significant harm to the Green Banks, as the Green Banks will be unable to fulfill their contractual obligations to third parties. Citi's refusal to comply with the Green Banks' instructions sets a disturbing precedent for its treatment of depositors well beyond the immediate circumstances, and Citi's disregard for its contractual duties surely harms public confidence in Citi as a financial institution as well.

The undersigned therefore demand that Citi immediately comply with its obligations under the Agreements and disburse the Green Banks' funds in accordance with the instructions provided to date and continue to do so as instructed pursuant to the terms of the Agreements. If Citi refuses to do so, the States demand immediate notice and information in writing regarding the basis for such refusal to avoid further legal action.

The States, on behalf of all client Pledgors, hereby reserve all rights in law and equity, in the Agreements and otherwise.

Respectfully submitted,


KEITH ELLISON
Attorney General
State of Minnesota

ANTHONY G. BROWN
Attorney General
State of Maryland


PHILIP J. WEISER
Attorney General
State of Colorado

LETITIA JAMES
Attorney General
State of New York


AARON M. FREY
Attorney General
State of Maine


cc:    Brent McIntosh, Chief Legal Officer, Citibank, N.A. (brent.mcintosh@citi.com)
       EPA GGRF Administrator (GGRF@epa.gov)

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK, EFFICIENCY MAINE TRUST, ILLINOIS FINANCE AUTHORITY, & MINNESOTA CLIMATE INNOVATION FINANCE AUTHORITY,**<br><br>                    Plaintiffs,<br><br>        v.<br><br>**CITIBANK, N.A., U.S. ENVIRONMENTAL PROTECTION AGENCY** and **LEE ZELDIN** and **W.C. MCINTOSH**, in their official capacities as Administrator and Acting Deputy Administrator of the U.S. Environmental Protection Agency,<br><br>                    Defendants. | Civil No. 1:25-cv-820<br><br><br><br>**DECLARATION OF SCOTT WU, EXECUTIVE DIRECTOR OF CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK** |

**DECLARATION OF SCOTT WU**

I, Scott Wu, declare under penalty of perjury that the following is true and correct:

1.      I am a resident of the State of California. I am over the age of 18 and have

personal knowledge of all the facts stated herein, except to those matters stated upon information

and belief; as to those matters, I believe them to be true. If called as a witness, I could and would

testify competently to the matters set forth below.

2.      Since 2020, I have been the Executive Director for the California Infrastructure

and Economic Development Bank ("IBank").

3.      In this role I have chief responsibility for all aspects of IBank's programs and

activities, strategic goals, funding and daily operations. Throughout my career I have held

several executive positions in the financial sector. I am a graduate of Dartmouth College and

Harvard Business School. IBank's Climate Catalyst program, the recipient of the National Clean

Investment Fund (NCIF) funds that are the subject of this declaration, was established under my

tenure, in 2020. I have overseen all aspects of IBank's application, negotiation and closing of its

NCIF subaward with the Coalition for Green Capital (CGC).

4.     IBank is an instrumentality of the State of California that was created in 1994 by

the Bergeson-Peace Infrastructure and Economic Development Bank Act. IBank is a component

unit of the State of California located within the Governor's Office of Business and

Development, located at 1325 J Street, Suite 1300, Sacramento, California 95814.

5.     IBank's purpose is to finance public infrastructure and private development that

promote a healthy climate for jobs, contribute to a strong economy and improve the quality of

life in California communities. To this end, IBank offers a wide array of financial products,

including various forms of financing and credit enhancement products that support public,

private, and nonprofit sector entities investing in climate mitigation and resilience projects in

California.

**IBank's Receipt of a National Clean Investment Fund Subgrant**

6.     IBank is an "eligible recipient" of Greenhouse Gas Reduction Fund monies under

42 U.S.C. § 7434(c)(1).

7.     The Environmental Protection Agency (EPA) granted an NCIF award to CGC of

$5 billion. The award was to be used to establish national clean financing institutions that would

be able to deliver accessible, affordable financing for clean technology projects.

8.     IBank received an NCIF subaward from CGC in the amount of $446,257,500.

9.      On February 14, 2023, EPA announced its initial program design for the Greenhouse Gas Reduction Fund which includes NCIF. IBank began preparing for this program within days of that announcement. On July 14, 2023, EPA published its Notice of Funding Opportunity number EPA-R-HQ-NCIF-23, later revised on August 11, 2023. The deadline for application specified in the notice was October 12, 2023. IBank joined CGC's coalition as a subgrantee under CGC's grant application.

10.      On April 4, 2024, EPA announced the selected NCIF recipients, after which negotiations commenced between the EPA and awardees, and later between awardees and subawardees, on the contract terms and EPA terms & conditions governing the program. CGC completed its grant agreement with EPA in August of 2024. IBank concluded negotiations with CGC during the first week of January, 2025, executing the subgrant agreement and related documents on January 8, 2025, subject to final approval from IBank's Board of Directors. On January 22, 2025, the Board granted approval to accept the subaward, and on January 23, CGC transferred the entire amount of the subaward to IBank's Citibank account (as discussed further below).

### IBank's Account Control Agreement and Citibank's Freeze on IBank's Funds

11.      The subgrant required IBank to establish an account at Citibank to hold the grant funds and enter into an Account Control Agreement governing the account. Under the terms of the agreement, CGC was a secured party for the account. A true and correct copy of the Account Control Agreement is attached as Exhibit 1.

12.      Under the Account Control Agreement with Citibank, IBank has the right to access and draw on its grant funds, unless CGC issues a Notice of Exclusive Control to Citibank. IBank has never received notice or a copy of a Notice of Exclusive Control issued by CGC. On

information and belief, to date, CGC has never issued a Notice of Exclusive Control to Citibank

to restrict IBank's NCIF account.

13.    The $446,257,500 subaward was the only source of funds transferred to the

account by CGC or any other party. The funds were deposited in January and as of March 17,

2025, the account has also been credited interest of $1,915,655, which IBank also does not have

access to.

**Requests for Disbursements**

14.    According to account records, on February 11, 2025, there were approximately

$446,724,934 of funds (including $467,434 of interest at that time) in IBank's account at

Citibank.

15.    On February 11, 2025, I approved internally an administrative funds transfer

request to be issued to Citibank in the amount of approximately $415,314. The disbursement was

to pay for compensation, benefits and contracted support services relating to NCIF. IBank staff

began to prepare a disbursement request to Citibank.

16.    On February 12, 2025, I became aware of a tweet from EPA administrator Lee

Zeldin that appeared to show his intent to terminate the NCIF grant program.

17.    On February 13, 2025, at approximately 1 p.m. PT, I spoke with Daniel Figoni,

Director, Citi NAM Public Sector Banking. Mr. Figoni told me that all funds were paused based

on Mr. Zeldin's social media post, and that Citibank had asked EPA for direction. Mr. Figoni

acknowledged my contention that the process to exercise security control had not been followed.

18.    On February 14, 2025, at approximately 8 a.m. PT, Daniel Figoni called me to say

that Citibank was sending a letter to EPA to express that while they take the social media

announcement seriously, they have contractual obligations that they need to adhere to and until

they receive written direction from EPA otherwise, they will unfreeze the accounts and honor transfer requests.

19.    Later on February 14, at 1:32 p.m. PT, IBank submitted the request for $415,314 of administrative reimbursements to Citibank. A true and correct copy of the signed draw request and wire instructions are attached as Exhibit 2.

20.    IBank's draw request was valid and proper and complied with all applicable requirements of the Account Control Agreement. However, despite Citibank's claim that it was unfreezing the account, it never honored IBank's draw request.

21.    On February 15, 2025, which was the Saturday of President's Day weekend, IBank representatives emailed Citibank to request the status of the wire transfer but did not receive a response to that email correspondence.

22.    On February 18, 2025, at 10:43 a.m. PT, Daniel Figoni emailed in response to my request for the Citibank letter to EPA: "Hi Scott - apologies, we're not able to share that. We have not seen a response back from the EPA and are continuing to move forward with the payments."

23.    However, later that day, on information and belief, Citibank again froze the funds. While there was no express communication from Citibank or any other party about the freeze, as the day proceeded it became clear that IBank's draw request had not been processed. Press reports also began to circulate stating that on President's Day the FBI had issued a letter to Citibank recommending a thirty-day freeze on all NCIF accounts. Representatives of IBank repeatedly tried to contact Citibank to determine why Citibank had not disbursed IBank's funds and received no response.

24.    On February 19, 2025, at approximately 1 p.m., Daniel Figoni returned my call only to say that they were not in a position to say anything at this time. I asked him to confirm if Citibank had received a letter from the FBI as reported and if so, why Citibank would follow a request from the FBI unless the FBI had received a court order. Citibank stopped responding after this.

25.    While Citibank's online account upload platform generated an automatic email acknowledging receipt of the February 14 disbursement request, the request has never been reflected in IBank's account, nor has it been reflected in another Citibank online account viewing portal (Citi Velocity) as either having been received or processed. To date, IBank has not received funds in response to its February 14 request. True and correct copies of the Citibank acknowledgement emails are attached as Exhibit 3

26.    On February 26, 2025, the California Attorney General emailed Citibank a letter on behalf of IBank stating that Citibank had failed to comply with its instructions as required by its Account Control Agreement; requesting that Citibank identify the basis for its apparent refusal to comply with valid disbursement instructions; informing Citibank that its apparent refusal was threatening to cause significant harm to IBank, including by preventing IBank from fulfilling their contractual obligations to third parties and demanding that Citibank immediately disburse funds. A true and correct copy of that letter is attached as Exhibit 4. Citibank never responded to this letter, and did not disburse IBank's funds

27.    As of the date of this declaration, Citibank has not disbursed any of IBank's funds.

**IBank's Plans for the Subgrant Funds**

28.     IBank has been implementing its NCIF program to partner with private-sector investors, developers, community organizations, and others to deploy projects, and mobilize private capital at scale to meet the NCIF program objectives. These objectives include reduction of greenhouse gases and other air pollutants; delivering benefits of projects to American communities, including low-income and disadvantaged communities and mobilizing additional private capital to leverage NCIF funds to demonstrate the market-wide opportunity for financial markets and institutions to finance clean technology projects.

29.     IBank has been in the process of conducting due diligence, underwriting activities and obtaining credit approval for the following projects, in order to fund them with the NCIF subaward:

    a.   A loan of approximately $40 million to a private company to finance the construction of approximately 16 electric vehicle charging infrastructure sites mainly in the San Francisco Bay Area and Los Angeles. IBank had initiated due diligence including analyzing the company's financial models, reviewing historical financial statements, and validating the company's contracts, among other steps. IBank had been working with its underwriting consultant, Guidehouse, but had to curtail the work with the consultant when the NCIF funds were frozen. IBank staff is now attempting to proceed with due diligence independently. While the applicant had been hoping for IBank to approve the financing in March, the disruption has slowed our process, possibly by several months or longer. We are unable to issue a financing commitment without access

to the NCIF funds, which has raised doubts from the applicant of our ability to provide financing.

b.  A loan of approximately $10 million to a private company to finance the construction of a renewable hydrogen refueling station in the Fresno area. Anticipated customers would be local transit agencies looking to expand their hydrogen-powered fleets. IBank had initiated due diligence, including analyzing the company's financial model, investigating the local transit authorities' long term zero-emission transit plans, reviewing company and related entity financials, and scrutinizing existing and anticipated offtake and incentive contracts, among other steps. IBank had been working with Guidehouse but had to curtail the work with the consultant when the NCIF funds were frozen. IBank staff is now attempting to proceed with due diligence independently. While the applicant had been hoping for IBank to approve the financing in April, the disruption has slowed our process, possibly by several months or longer. We are unable to issue a financing commitment without access to the NCIF funds, which has raised doubts from the applicant of our ability to provide financing.

c.  A loan guarantee of approximately $16 million, in support of a loan of approximately $20 million, to be made by a community bank to a private company to finance the installation of solar and/or battery storage energy systems on single- and multi-family residential properties, primarily in the San Francisco Bay Area and Los Angeles. IBank staff has initiated a pre-screening of the financing request with the goal of referring the request to Guidehouse for further due diligence, but has had to put this process on hold. While the bank had been

hoping for IBank to approve the financing in April, the disruption has slowed our process, possibly by several months or longer. We are unable to issue a guarantee commitment without access to the NCIF funds, which has raised doubts from the applicant of our ability to provide the guarantee. In addition, the lead lender has indicated that, absent an IBank loan guarantee, the lender would not proceed with issuing the loan.

d.  A warehouse credit facility of up to $50 million to a private entity, to serve as credit enhancement to induce banks and CDFIs to expand their Commercial Property Assessed Clean Energy (C-PACE) lending activities to small commercial and multi-family residential properties throughout the state. IBank staff has initiated a pre-screening of the financing request with the goal of referring the request to Guidehouse for further due diligence, but has had to put this process on hold. While the applicant had been hoping for IBank to approve the financing in April, the disruption has slowed our process, possibly by several months or longer. We are unable to issue a financing commitment without access to the NCIF funds, which has raised doubts from the applicant of our ability to provide the loan. The absence of financing is likely to result in private capital sources refraining from entering the submarket for small- to medium-sized C-PACE borrowers.  This represents a market worth an estimated $350+ million that otherwise may not receive financing from private capital markets.

e.  Financing of approximately $80 million to sub-agencies within the California State Treasurer's Office (STO) to provide credit enhancement (loan loss reserves and debt service reserves) across various programs to induce participating lenders

to make loans for energy efficiency upgrades to single-family residences and small commercial properties, and loans for small businesses to acquire zero-emission heavy-duty vehicles. On March 6 IBank's internal credit committee provided preliminary approval (the step preceding final Board approval) of approximately $14 million for STO's residential lending program, and is working with STO staff to further refine the other proposals. IBank staff has been handling due diligence for these requests in house; however, the inability to rely on our underwriting consultant to process other pipeline opportunities has slowed down our timeline on the STO requests. STO staff has also de-prioritized these requests given the NCIF funding freeze. STO has requested a pause in underwriting activities until the freeze is resolved. Due to budgetary and regulatory constraints, STO is unlikely to be able to source significant funds to expand its programs as intended, absent the NCIF funding.

f.  In addition to the priority projects above, which could result in nearly $200 million in financing in the near term, approximately 19 other projects, for a total of nearly $550 million, currently remain at an earlier stage in our pipeline (at the 'Prospect' phase, by our internal terminology). Some of the larger opportunities include zero-emission rolling stock for a high-speed rail developer, and a portfolio of projects for a large commercial solar and storage developer. At this time, we are severely limited in our ability to proceed forward on these prospects, due to the freezing of the NCIF funds.

**Immediate Harm to IBank**

30.    EPA and Citibank's freeze of IBank's account and failure to honor IBank's

reimbursement requests has caused immediate and continuing harm to IBank.

31.    First, EPA and Citibank's action has harmed projects undertaken with prospective

NCIF funding:

    a.    Referring to the nearly $200 million of priority projects described above, each of

        these fall into one of the NCIF priority project categories of Distributed Energy

        Generation and Storage, Net-Zero Building Emissions, and Zero-Emissions

        Transportation, as do nearly all of the projects in our prospect pipeline. Those that

        do not fall into the three categories may still proceed (subject to CGC approval) if

        they meet the NCIF program's 'six-factor test' which addresses a project's ability

        to reduce GHG emissions, local benefits resulting from the technology, and

        mobilization of private capital, among other factors. Considering that most of the

        projects in our pipeline lack viable financing alternatives, the potential impacts

        from these projects, as further detailed below, would be foregone for California.

    b.    Based on IBank's information and industry knowledge, it is likely that the freeze

        on funds will have several specific effects. For example, for the projects listed

        above, foreseeable harms include: lender(s) that will not proceed with issuing

        loans; private capital sources refraining from entering the submarket for small- to

        medium-sized C-PACE borrowers; another state agency unwilling to proceed in

        underwriting until the freeze is resolved, resulting in a curtailment of planned

        expansions and new program launches; additional impacts that could include

        project delay (which typically increases financing costs and holding costs or

survivability), project curtailment or significant value engineering, higher cost of capital, or project failure.

c.  IBank has spent considerable time and effort cultivating the above and other investment opportunities, along with the private capital sources that accompany each deal. The delay in deal flow and completion caused by the freeze presents a real risk to IBank's reputation in the capital markets and among project developers. Furthermore, IBank's subaward agreement requires a period of performance that ends on December 31, 2025. IBank must disburse or obligate the entirety of its subaward by that date or risk the remaining balance being returned to CGC. The freeze has delayed implementation of IBank's workplan designed to meet this deployment timeframe, which raises the risk of private capital sources backing out of deals as the perception grows that we will be unable to obligate funds to qualified projects by that deadline.

d.  The NCIF has stated goals of reducing greenhouse gas emissions; delivering benefits to communities, with at least 40% of these benefits accruing to disadvantaged communities; and the mobilization of private capital in support of clean technologies. In our Board-approved subaward implementation plan submitted to CGC, we conservatively estimated that the full deployment of the subaward would result in annual greenhouse gas reductions in the state of approximately 180,000 tons, prior to any of the funds revolving. The STO programs described earlier are expected to result in approximately 15,500 tons of greenhouse gas reductions; the EV charging station project is forecast to result in over 6,700 tons of greenhouse gas reductions.

e.  We would expect to exceed the 40% NCIF disadvantaged target. In IBank's well-established Small Business Finance Center program, disadvantaged borrowers consistently comprise well over 50% of the program's beneficiaries. IBank staff have proactively sought out projects in and benefiting disadvantaged communities to ensure program compliance. For the $50 million C-PACE opportunity described earlier, while the applicant currently estimates that roughly half of its pipeline is located in disadvantaged communities, if it received an NCIF-funded loan it would pursue a proactive market-building strategy for boosting this representation further. Other borrowers, including one that provides no-cost solar and battery energy storage systems for low-income households, are at risk of losing access to capital entirely if they are unable to access IBank's Climate Loan Guarantee. The STO residential energy upgrade program is projected to support over 4,800 small loans (average size of about $18,500) in its first year of NCIF funding; many of these recipients would be disadvantaged customers.

f.  Each NCIF-funded transaction must mobilize private capital by at least a 1:1 ratio, meaning additional private investment of at least $446 million generated by IBank's NCIF award. IBank's forecasts showed leverage ratios of 1.9x in year one, rising to 6.3x over the seven-year performance period (these are consistent with CGC's own projections in its NCIF application to EPA), which would imply private leverage of up to $2.8 billion within California during that timeframe. For the C-PACE transaction, the NCIF funds would serve as a debt service reserve for lenders. The sponsor estimates that every $1 of reserves funded would support $5 to $10 in loans, before accounting for recycling over time.

32.    The EPA's attacks on the Greenhouse Gas Reduction Fund are also causing continuing and escalating harm to IBank's business. Confidence in the liquidity and availability of funds is vital to our core lending activities. The EPA and Citibank's freezing of funds risks public and private confidence in the liquidity and availability of funds offered by IBank. Without assurances that IBank will be able to access funds, potential borrowers, co-investors, and other business partners will not enter into agreements with IBank, seeing it and its NCIF subaward as too risky a source of financing. This will cause lasting and irreparable reputational harm to IBank.

33.    This harm will be especially focused on IBank's Climate Catalyst program. Besides reputational risk, the unit currently has three full-time employees and one additional hire on hold. If NCIF funding is permanently withdrawn, the stability of these staff positions could be in jeopardy. In addition, we may experience collateral harm to our other programs, many of which have been in place for several decades, including the Infrastructure State Revolving Fund, Small Business Finance Center, Expanding Venture Capital Access Program, and our conduit bond program. For example, the Infrastructure State Revolving Fund program has long enjoyed a AAA rating on the bonds it issues to fund its loan pool. Reputational harm could be viewed adversely by credit rating agencies, potentially placing this rating at risk, which would decrease the amount of bonds we can issue to grow the program, and increase the interest rates we charge the borrowers, most of which are small to medium municipalities.

34.    Lastly, the EPA's aggressive campaign to portray the "green lending" industry as inherently wasteful and fraudulent will cause lasting harm to IBank's business. Across all of IBank's programs, it has provided over $3.7 billion of climate-related financing, including a range of water and wastewater infrastructure, municipal solid waste projects, green building

construction, and forest resiliency projects. Recent events such as the wildfires in Los Angeles

further highlight the need for climate mitigation and adaptation projects in California. Curtailing

a significant portion of this activity could have negative consequences for the State's economy

and the well-being of its citizens.

I declare under penalty of perjury under the laws of the United States that the foregoing is

true and correct.

Executed on March 21, 2025, at San Francisco, California.

Declaration of Scott Wu
Executive Director of California
Infrastructure and Economic Development
Bank

JA1476



**ACCOUNT CONTROL AGREEMENT**

among

**CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK,
as PLEDGOR**

**COALITION FOR GREEN CAPITAL, as SECURED PARTY**

and

**CITIBANK, N.A., as BANK**

**Dated as of** _____January 22, 2025_____

170652298.1

JA1477

**THIS ACCOUNT CONTROL AGREEMENT** (this "**Agreement**"), dated as of _____, by and among California Infrastructure and Economic Development Bank, a an instrumentality   of the State of California   (the "**Pledgor**"), Coalition for Green Capital, a District of Columbia nonprofit corporation (the "**Secured Party**") and Citibank, N.A., a national banking association organized and existing under the laws of the United States of America ("**Citibank**") and acting through its Agency & Trust business solely in its capacity as bank under this Agreement, and any successors appointed pursuant to the terms hereof (Citibank in such capacity, the "**Bank**").

January 22, 2025

**WHEREAS,** the Secured Party has entered into a certain federal financial assistance agreement with the United States Environmental Protection Agency, an agency of the United States Government, as identified in Addendum 1, (the "**Grant Agreement**").

**WHEREAS,** under the Grant Agreement, Pledgor and Secured Party have entered into a Subaward as identified in Addendum 1, (the "**Subaward Agreement**"), pursuant to which the Pledgor has granted the Secured Party a security interest in the accounts as identified in Addendum 1 established and maintained by the Bank for the Pledgor (the "**Accounts**").

**WHEREAS,** the Bank has been designated and authorized to act as a financial agent of the United States pursuant to the authority of the U.S. Department of the Treasury under 12 U.S.C. §§ 90 and 265.

**WHEREAS,** the parties wish that the Bank enter into this Agreement in order to provide for the "control" (as defined in Section 9-104(a) of the Uniform Commercial Code in effect in the State of New York ("**UCC**"), in the case of a deposit account, or Section 8-106 of the UCC, in the case of a security account) of the accounts as a means to perfect the security interest of the Secured Party.

**WHEREAS,** the Pledgor and the Secured Party have agreed that the terms and conditions in the Subaward Agreement indicate the conditions under which the Secured Party may exercise its right of control herein, and such conditions will be defined as "default" for the purposes of this Agreement.

**WHEREAS,** capitalized terms used herein without definition and that are defined in Article 8 or Article 9 of the UCC as adopted in the State of New York shall have the respective meanings set forth therein.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and adequacy of which is hereby irrevocably acknowledged, the parties hereto agree as follows:

1. **The Accounts.** The Pledgor and the Bank represent and warrant to, and agree with the Secured Party that:

(a)   The Bank maintains the Accounts for the Pledgor, and all property (including, without limitation, all funds and financial assets) held by the Bank for the accounts of the Pledgor are, and will continue to be, credited to the Accounts in accordance with instructions given by the Pledgor (unless otherwise provided herein).

(b)   To the extent that cash is credited to the Accounts, the Accounts are a deposit account; and to the extent that financial assets (other than cash) are credited to the Accounts, the Accounts are a securities account. The Bank is (i) the bank with which the Accounts are maintained

and (ii) the securities intermediary with respect to financial assets held in the Accounts. The Pledgor is (A) the Bank's customer with respect to the Accounts and (B) the entitlement holder with respect to all financial assets credited from time to time to the Accounts.

(c)   Notwithstanding any other agreement to the contrary, the Bank's jurisdiction with respect to the Accounts for purposes of the UCC is, and will continue to be for so long as the Secured Party's security interest shall be in effect, the State of New York.

(d)   The Pledgor and the Bank do not know of any claim to or interest in the Accounts or any property (including, without limitation, funds and financial assets) credited to the Accounts, except for claims and interests of the parties referred to in this Agreement.

2.   **Control over Accounts.**

The Bank shall comply with all instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and financial assets in the Accounts including, without limitation, directions to distribute proceeds of any such transfer or redemption of interest or dividends on financial assets in the Accounts, substantially in the form attached hereto as Exhibit B ("**Account Direction**"), originated by the Pledgor, until the time that that Bank receives a notice, substantially in the form attached hereto as Exhibit A (a "**Notice of Exclusive Control**") from the Secured Party that the Secured Party is exercising its right to exclusive control over an Account, and after such time that the Bank receives a Notice of Exclusive Control, the Secured Party for such Account, without further consent by the Pledgor.

3.   **Priority of Secured Party's Security Interest.**  The Bank subordinates in favor of the Secured Party any interest, lien or right of setoff it may have, now or in the future, against the Accounts or assets in the Accounts; *provided; however*, that, subject to the foregoing, the Bank may set off all amounts due to it in respect of its fees and expenses (including, without limitation, the payment of any legal fees or expenses) or any amounts payable pursuant to Section 4 hereof.

4.   **Investment of Funds.**

(a)   The Bank shall deposit the assets in non-interest bearing Accounts and invest the assets in the Accounts consistent with the instructions provided by the Pledgor, in Addendum 1. The Pledgor's instructions will be in accordance with the Subaward Agreement, provided that the Bank is not responsible for verifying whether the Pledgor's instructions are in compliance with the Subaward Agreement. The Bank shall invest such assets in the Accounts on the date of deposit provided that such assets are received on or before 11:00 a.m. New York City time. Any assets received after 11:00 a.m. New York City time shall be treated as if received on the following Business Day. For purposes of this Agreement, "**Business Day**" shall mean any day that the Bank is open for business.

(b)   The Bank is hereby authorized and directed to sell or redeem any such investments as it deems necessary to make any payments or distributions required under this Agreement. The Bank shall have no responsibility or liability for any loss in the value of any investment made pursuant to this Agreement, or for any loss, cost or penalty resulting from any sale or liquidation of the assets in the Account. The Bank is hereby authorized to execute purchases and sales of investments through the facilities of its own trading or capital markets operations or those of any affiliated entity. The Bank does not have a duty nor will it undertake any duty to provide investment advice.

citi

(c)      The Bank shall transfer any earnings or proceeds received on or distributions of earnings or proceeds from the assets in the Accounts to the Pledgor's Program Income from Operations Account on a monthly basis.

5.    **Tax Matters.**

(a)      The Pledgor and the Secured Party agree that, unless and until the Subaward Agreement is terminated, any earnings or proceeds received on or distributions of earnings or proceeds from the assets in the Accounts shall be treated as the income of the Pledgor and shall be reported on an annual basis on United States Internal Revenue Service ("**IRS**") Form 1099-DIV, as required pursuant to the Internal Revenue Code of 1986, as amended (the "**Code**") and the regulations thereunder. Principal payments are not reportable to any payee hereunder. No earnings or proceeds received on or distributions of earnings or proceeds from the assets in the Accounts, or principal payments from the Accounts, are reportable to the Secured Party. The Pledgor, the Secured Party and the Bank agree that the Bank will not be responsible for providing tax reporting and withholding for payments that are for compensation for services performed by an employee or independent contractor.

(b)      The Pledgor and the Secured Party shall upon the execution of this Agreement provide the Bank with a duly completed and properly executed IRS Form W-9 or applicable IRS Form W-8, in the case of a non-U.S. person, for each payee, together with any other documentation and information requested by the Bank in connection with the Bank's tax reporting obligations under the Code and the regulations thereunder. With respect to the Bank's tax reporting obligations under the Code, the Foreign Account Tax Compliance Act and the Foreign Investment in Real Property Tax Act and any other applicable law or regulation, the Pledgor and the Secured Party understand, that, in the event valid U.S. tax forms or other required supporting documentation are not provided to the Bank, the Bank may be required to withhold tax from the assets in the Accounts and report account information on any earnings, proceeds or distributions from the assets in the Accounts.

(c)      Should the Bank become liable for the payment of taxes, including withholding taxes relating to any funds, including interest and penalties thereon, held by it pursuant to this Agreement or any payment made hereunder, Secured Party agrees to indemnify and hold the Bank harmless pursuant to Section 7(b) hereof from any liability or obligation on account of taxes, assessments, interest, penalties, expenses and other governmental charges that may be assessed or asserted against the Bank, provided that such liability shall not be satisfied by assets in the Accounts. If the Secured Party fails to indemnify the Bank for such taxes, the Bank will notify the United States Environmental Protection Agency.

(d)      The Bank's rights under this Section 5 shall survive the termination of this Agreement or the resignation or removal of the Bank.

6.    **Concerning the Bank.**

(a)      <u>Bank Duties</u>.  Each of the Pledgor and the Secured Party acknowledges and agrees that (i) the duties, responsibilities and obligations of the Bank shall be limited to those expressly set forth in this Agreement, each of which is administrative or ministerial (and shall not be construed to be fiduciary in nature), and no duties, responsibilities or obligations shall be inferred or implied, (ii) the Bank shall not be responsible for any of the agreements referred to or described

citi

JA1480

herein (including, without limitation, the Grant Agreement, the Subaward Agreement, and any defined term therein not otherwise defined in this Agreement), or for determining or compelling compliance therewith, and shall not otherwise be bound thereby, and (iii) the Bank shall not be required to expend or risk any of its own funds to satisfy payments from the Accounts hereunder.

(b)    <u>Liability of Bank</u>.  The Bank shall not be liable for any damage, loss or injury resulting from any action taken or omitted in the absence of gross negligence or willful misconduct (as finally adjudicated by a court of competent jurisdiction).   In no event shall the Bank be liable for indirect, incidental, consequential, punitive or special losses or damages (including but not limited to lost profits), regardless of the form of action and whether or not any such losses or damages were foreseeable or contemplated.  The Bank shall be entitled to rely upon any instruction, notice, request or other instrument delivered to it without being required to determine the authenticity or validity thereof, or the truth or accuracy of any information stated therein.  The Bank may act in reliance upon any signature believed by it to be genuine (including any signature affixed by DocuSign) and may assume that any person purporting to make any statement, execute any document, or send any instruction in connection with the provisions hereof has been duly authorized to do so.  The Bank may consult with counsel satisfactory to it, and the opinion or advice of such counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it in good faith and in accordance with the opinion and advice of such counsel.  The Bank may perform any and all of its duties through its agents, representatives, attorneys, custodians and/or nominees.  The Bank shall not incur any liability for not performing any act or fulfilling any obligation hereunder by reason of any occurrence beyond its control (including, without limitation, any provision of any present or future law or regulation or any act of any governmental authority, any act of God or war or terrorism, or the unavailability of the Federal Reserve Bank wire services or any electronic communication facility).

(c)    <u>Reliance on Orders</u>.  The Bank is authorized to comply with final orders issued or process entered by any court with respect to the assets in the Accounts, without determination by the Bank of such court's jurisdiction in the matter.  If any portion of the assets in the Accounts are at any time attached, garnished or levied upon under any court order, or in case the payment, assignment, transfer, conveyance or delivery of any such property shall be stayed or enjoined by any court order, or in case any order, judgment or decree shall be made or entered by any court affecting such property or any part thereof, then in any such event, the Bank is authorized to rely upon and comply with any such order, writ, judgment or decree which it is advised is binding upon it without the need for appeal or other action; and if the Bank complies with any such order, writ, judgment or decree, it shall not be liable to the Pledgor or the Secured Party or to any other person or entity by reason of such compliance even though such order, writ, judgment or decree may be subsequently reversed, modified, annulled, set aside or vacated.

(d)    <u>Erroneous Payments</u>.  If the Bank releases any funds (including but not limited to the assets in the Accounts or any portion of it) to the Pledgor or the Secured Party and subsequently determines (in its absolute discretion) that the payment (or any portion of it) was made in error, the Pledgor or the Secured Party, as applicable, shall upon notice promptly refund the erroneous payment, and none of the obligations of the Pledgor or the Secured Party, as applicable, or the remedies of the Bank will be affected by any act, omission, matter or thing (including, without limitation, any obligation pursuant to which an erroneous payment is made) which, but for this provision, would reduce, release, preclude or prejudice any such obligation or remedy (whether or not known by the Bank, the Pledgor or the Secured Party). Each of the Pledgor and the Secured Party agrees not to assert discharge for value, bona fide payee, or any similar doctrine as a defense to recovery of any erroneous payment by the Bank.

citi

7.    **Compensation, Expense Reimbursement and Indemnification.**

(a)    <u>Compensation</u>. The Bank's compensation shall be as specified in <u>Schedule A</u>.

(b)    <u>Indemnification</u>. The Secured Party covenants and agrees to indemnify the Bank and its employees, officers, directors, affiliates, and agents (each, an "**Indemnified Party**") for, hold each Indemnified Party harmless from, and defend each Indemnified Party against, any and all claims, losses, actions, liabilities, costs, damages and expenses of any nature incurred by any Indemnified Party, arising out of or in connection with this Agreement or with the administration of its duties hereunder, including, but not limited to, attorney's fees, costs and expenses, except to the extent such loss, liability, damage, cost or expense shall have been finally adjudicated by a court of competent jurisdiction to have resulted solely from the Indemnified Party's own gross negligence or willful misconduct, provided that such liability shall not be satisfied by assets in the Accounts. The foregoing indemnification and agreement to hold harmless shall survive the termination of this Agreement and the resignation or removal of the Bank. If the Secured Party fails to indemnify the Bank pursuant to this Section 7(b), the Bank shall notify the United States Environmental Protection Agency.

8.    **Statements, Confirmations and Notices of Adverse Claims.**  The Bank will send copies of all statements and confirmations for the Accounts simultaneously to the Pledgor and the Secured Party.  The Bank shall be deemed to have delivered statements and confirmations if such statements and confirmations are available on one or more of the Bank systems to deliver electronic media.  The Bank will use reasonable efforts promptly to notify the Secured Party and the Pledgor if any other person claims that it has a property interest in the Accounts or any financial asset in the Accounts.

9.    **Entire Agreement; Exclusive Benefit.**  This Agreement constitutes the entire agreement between the parties and sets forth in its entirety the obligations and duties of the Bank with respect to the assets in the Accounts.  This Agreement is for the exclusive benefit of the parties to this Agreement and their respective permitted successors, and shall not be deemed to give, either expressly or implicitly, any legal or equitable right, remedy, or claim to any other entity or person whatsoever.  No party may assign any of its rights or obligations under this Agreement without the prior written consent of the other parties.

10.    **Resignation and Removal.** The Bank may be removed only by the U.S. Department of the Treasury.

11.    **Governing Law.** This Agreement is governed by and shall be construed and interpreted in accordance with federal law of the United States, except where there is no applicable federal law, in accordance with the laws of the State of New York, without giving effect to the conflict of laws principles thereof.

12.    **Representations and Warranties.**

(a)    Each of the Pledgor and the Secured Party represents and warrants that it has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder; and this Agreement has been duly approved by all necessary action and constitutes its valid and binding agreement enforceable in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or other similar laws affecting the enforcement

**citi**

JA1482

of creditors' rights and subject to general equity principles.

(b)     Each of the Pledgor and the Secured Party represents that neither it nor any of its parents or subsidiaries, or any of their respective directors, officers, or employees, or to the knowledge of the Pledgor and the Secured Party, the affiliates of the Pledgor, the Secured Party or any of its subsidiaries, will, directly or indirectly, use any part of any proceeds or lend, contribute, or otherwise make available such assets in the Accounts in any manner that would result in a violation by any person of economic, trade, or financial sanctions, requirements, or embargoes imposed, administered, or enforced from time to time by the United States (including, without limitation, the Office of Foreign Assets Control of the U.S. Department of the Treasury and the U.S. Department of State), the United Kingdom (including, without limitation, His Majesty's Treasury), the European Union and any EU member state, the United Nations Security Council, and any other relevant sanctions authority.

### 13.     Notices; Instructions.

(a)     Any notice or instruction hereunder shall be in writing in English, and may be sent by (i) secure file transfer or (ii) electronic mail with a scanned attachment thereto of an executed notice or instruction, and shall be effective upon actual receipt by the Bank in accordance with the terms hereof.  Any notice or instruction must be executed (which execution may be manual or affixed by DocuSign) by an authorized person of the Pledgor or the Secured Party, as applicable (the person(s) so designated from time to time, the "**Authorized Persons**").  Each of the applicable persons designated on Schedule B and Schedule C attached hereto have been duly appointed to act as Authorized Persons hereunder and individually have full power and authority to execute any notices or instructions, to amend, modify or waive any provisions of this Agreement, and to take any and all other actions permitted under this Agreement, all without further consent or direction from, or notice to, it or any other party.  Any notice or instruction must be originated from a corporate or government domain.  Any change in designation of Authorized Persons shall be provided by written notice, signed by an Authorized Person, and actually received and acknowledged by the Bank.  Any communication from the Bank that the Bank deems to contain confidential, proprietary, and/or sensitive information shall be encrypted in accordance with the Bank's internal procedures.

(b)     Each of the Pledgor and the Secured Party understands and agrees that the Bank cannot determine the identity of the actual sender of any notice or instruction and that the Bank shall be entitled to conclusively presume that notices or instructions that purport to have been sent by an Authorized Person have been sent by such Authorized Person.  Each of the Pledgor and the Secured Party agrees: (i) to assume all risks arising out of the use of electronic means (including electronic mail, secure file transfer or such other method or system specified by the Bank as available for use in connection with its services hereunder) to submit instructions to the Bank, including, without limitation, the risk of the Bank acting on unauthorized instructions, and the risk of interception or misuse by third parties; (ii) that it is fully informed of the protections and risks associated with the various methods of transmitting instructions to the Bank and that there may be more secure methods of transmitting instructions than the method(s) selected by the Pledgor and the Secured Party, as applicable; (iii) that the security procedures (if any) to be followed in connection with its transmission of instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances; and (iv) to notify the Bank immediately upon learning of any compromise or unauthorized use of the security procedures.  The Pledgor and the Secured Party agree that the security procedures set forth in Section 13(a) and this Section 13(b) are commercially reasonable.

citi

If to the Pledgor:
As provided in Addendum 1

If to the Secured Party:

Coalition for Green Capital
Attn: David Pettit
Address: 1255 Union Street NE, 7th Floor,
Washington, D.C. 20002
Email: dpettit@coalitionforgreencapital.com

If to the Bank:

Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, NY  10013
Attn.: Nerlie Delly
Telephone: +1 212-816-6846
E-mail: CitiGGRFFinancialAgent@citi.com

If to the United States Environmental Protection Agency:

**The Office of the Greenhouse Gas Reduction Fund,
United States Environmental Protection Agency
Attention: David Widawsky
Telephone: +1 202-566-2215
E-mail: GGRF@epa.gov; widawsky.david@epa.gov**

14.    **Amendment; Waiver.**    Any amendment of this Agreement shall be binding only if evidenced by a writing signed by each of the parties to this Agreement.  No waiver of any provision hereof shall be effective unless expressed in writing and signed by the party to be charged.

15.    **Severability.**    The invalidity, illegality or unenforceability of any provision of this Agreement shall in no way affect the validity, legality or enforceability of any other provision. If any provision of this Agreement is held to be unenforceable as a matter of law, the other provisions shall not be affected thereby and shall remain in full force and effect.

16.    **Mergers and Conversions.**    Any corporation or entity into which the Bank may be merged or converted or with which it may be consolidated, or any corporation or entity resulting from any merger, conversion or consolidation to which the Bank will be a party, or any corporation or entity succeeding to the business of the Bank will be the successor of the Bank hereunder without the execution or filing of any paper with any party hereto or any further act on the part of any of the parties hereto except where an instrument of transfer or assignment is required by law to effect such succession, anything herein to the contrary notwithstanding.

17.    **Termination.**    This Agreement shall terminate upon receipt by the Bank of notice from the Secured Party that its security interest in such Accounts and all assets therein have

citi

terminated.  Upon receipt of such notice, the Secured Party shall have no further right to originate instructions with respect to the assets in the Accounts.  The Bank shall, upon payment of all outstanding fees and expenses hereunder, promptly forward any amounts held by the Bank in the Accounts to the Pledgor, and the Bank shall be relieved and discharged of any further responsibilities with respect to its duties hereunder.

18.    **Counterparts.**  This Agreement may be executed simultaneously in two or more counterparts, any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same agreement. Signatures on counterparts of this Agreement executed and delivered in electronic format (i.e. "pdf") or by other electronic means (including DocuSign) shall be deemed original signatures with all rights accruing thereto except in respect to any non-US entity, whereby originals may be required.

**[Remainder of Page Left Intentionally Blank]**

citi

170652298.1

**IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed by a duly authorized representative as of the day and year first written above.**

**CITIBANK, N.A.,**
as Bank

By: _Nerlie Delly_ _____
Name: Nerlie Delly
Title: Senior Trust Officer

**CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK,**
as Pledgor

By: _Ross Culverwell_ _____
Name: Ross Culverwell
Title: Chief Credit Officer

**COALITION FOR GREEN CAPITAL,**
as Secured Party

By: _____
Name: Eli Hopson
Title: Chief Administrative and Development Officer

S-1

170652298.1

**EXHIBIT A**

**FORM OF NOTICE OF EXCLUSIVE CONTROL**

VIA EMAIL: cts.spag@citi.com / CitiGGRFFinancialAgent@citi.com

Nerlie Delly
Vice President
Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, New York 10013
[Re. Account # [●]]

Pursuant to the Account Control Agreement dated <u>January 22, 2025</u>, among California Infrastructure and Economic Development Bank (the "**Pledgor**"), Coalition for Green Capital (the "**Secured Party**"), and Citibank, N.A. (the "**Bank**"), we hereby instruct you of the following:

The Pledgor and the Secured Party have agreed that the terms and conditions in the Subaward Agreement indicate the conditions under which the Secured Party may exercise its right of control herein, and such conditions will be defined as "default" for the purposes of the Account Control Agreement.

As required by the Subaward Agreement, the Secured Party has issued a written determination and finding that:

1)  Pledgor has failed to comply with the terms and conditions of the Subaward Agreement, and that noncompliance is substantial such that effective performance of the Subaward Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse or material misrepresentation of eligibility status, and that the Secured Party has initiated action under 2 CFR 200.339, or 2 CFR 200.332(d) or (i), to wholly or partly suspend or terminate the Subaward Agreement as authorized in the terms of the Subaward Agreement or applicable provisions of 2 CFR Part 200,

    [or,

2)  Another condition constituting a default in the Subaward Agreement has occurred and is continuing].

Therefore, the Secured Party hereby notifies you that (i) a default has occurred and is continuing under the Subaward Agreement and (ii) from and after the receipt of this notice until you receive further instruction from Secured Party, you are hereby directed to retain and hold all funds in the Account or Accounts named in this Notice and not to [invest or] disburse the same to any party whatsoever, other than as instructed by the Secured Party.

**Coalition for Green Capital,**
as Secured Party


By:_____
   Name:
   Title:
   Date:

Exhibit A

170652298.1

**EXHIBIT B**

**FORM OF ACCOUNT DIRECTION (NCIF Financial Assistance Subrecipient)**
**Pledgor's UEI Number:** _____LEKCJEPGPAE1_____

[Date]

Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, NY 10013
E-mail: cts.spag@citi.com

VIA: CitiSFT

RE: Account Control Agreement dated _____January 22, 2025_____, among
California Infrastructure and Economic Development Bank (the "**Pledgor**"), Coalition for Green
Capital (the "**Secured Party**"), and Citibank, N.A. (the "**Bank**")

Pursuant to Section 2 of the above referenced Account Control Agreement, the Pledgor hereby
instructs the Bank to disburse a total amount of $[●] funds as per below and as per the attached
upload file named xxx:

**Check applicable boxes:**

( ) **Internal Transfer within the Bank (intra-entity).**

( ) **Internal Transfer within the Bank (inter-entity).**

( ) **External Transfer outside the Bank (for Predevelopment Activities, Market-Building
Activities, and/or Program Administration Activities).**

( ) **External Transfer outside the Bank (for Financial Assistance Activities).**

**If an Internal Transfer within the Bank (intra-entity), check the following applicable boxes:**

( ) **Transfer of $[●] across Pledgor's 'Budget' sub-accounts, as defined in the Subaward
Agreement.**

( ) **Transfer of $[●] from Pledgor's 'Program Income from Operations' account to Pledgor's
'Budget' sub-account(s), as defined in the Subaward Agreement.**

( ) **Transfer of $[●] from Pledgor's 'Reserve' account to Pledgor's 'Program Income from
Operations' account, as defined in the Subaward Agreement.**

( ) **Transfer of $[●] from Pledgor's 'Budget' sub-account(s) or 'Program Income from
Operations' account to 'Reserve' account, as defined in the Subaward Agreement. The
Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the workplan for the Subaward
Agreement supported with EPA funding. Financing agreements for identified Qualified Projects*

Exhibit B

*as defined in the Terms and Conditions of the Secured Party's Grant Agreement necessitating the transfer have been reviewed by Subrecipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

**If an Internal Transfer within the Bank (inter-entity), check the following applicable box:**

**( ) Transfer of $[●] from Pledgor's 'Budget' sub-account(s) to Secured Party's 'Budget' sub-account(s) as defined in the Subaward Agreement and compliant with the terms and conditions of the Grant Agreement, including the EPA Subaward Policy.**

**If an External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities), check one of the following boxes:**

**( ) Disbursement of $[●] for Predevelopment Activities as defined in the Subaward Agreement.**

**( ) Disbursement of $[●] for Market-Building Activities as defined in the Subaward Agreement.**

**( ) Disbursement of $[●] for Program Administration Activities as defined in the Subaward Agreement.**

**If an External Transfer outside the Bank (for Financial Assistance Activities), check the following applicable boxes:**

**( ) Disbursement of $[●] from Pledgor's 'Budget' sub-account to provide Financial Assistance to Qualified Projects as defined in the Subaward Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the workplan for the Subaward Agreement supported with EPA funding. Financing agreements for identified Qualified Projects as defined in the Terms and Conditions of the Secured Party's Grant Agreement necessitating the transfer have been reviewed by Subrecipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

**( ) Disbursement of $[●] from Pledgor's 'Reserve' account to satisfy a legal obligation to a third party as defined in the Subaward Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this transfer is necessary to execute against the workplan for the Subaward Agreement supported with EPA funding and pay a third party pursuant to a financing agreement that has been reviewed by Subrecipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

Capitalized terms in this instruction letter not otherwise defined shall have the same meaning given to them in the Account Control Agreement.

Signature on this Account Direction executed and delivered in electronic format (i.e. "pdf") or by other electronic means (including DocuSign) shall be deemed original signatures with all rights accruing thereto.

IN WITNESS WHEREOF, the Pledgor has caused this Account Direction to be duly executed and delivered as of the date first written above.

Pledgor:

_____

Authorized Person

Exhibit B

**ADDENDUM 1**
**Account Control Agreement**

**(to be provided separately)**

170652298.1

## SCHEDULE A

## BANK COMPENSATION

### General compensation

For the services described in the Account Control Agreement, the Bank shall charge each Pledgor as follows:

| Agency & Trust Services | Fees |
|---|---|
| **Acceptance Fee**<br>This one-time fee covers the acceptance of the appointment, the review of the related Transaction documents submitted in connection with the execution and delivery thereof, setting up of internal controls, and communication with other members of the working group, as necessary. | Waived |
| **Annual Administration Fee**<br>To cover the administrative functions of Citi under the Agreement, including the establishment and maintenance of the account(s), safekeeping of assets, maintenance of the records, execution and administration of the Agreement provisions, and other duties required under the terms of the Agreement. | Waived |
| **Wire Fees** | Waived |
| **Legal Fees**<br>To cover the review of legal documents by Citibank Agency & Trust's outside counsel. | Waived |

The Transaction documents will be governed in accordance with federal law of the United States, except where there is no applicable federal law, in accordance with the laws of the State of New York, without giving effect to the conflict of laws principles thereof, as established in the Agreement and subject to internal approval and satisfactory review of all documentation. All outgoing payments processed by Citi will be made via wire. Account balances invested in an Institutional Money Market Fund will be chosen by the client from a list of providers that Citi will supply. If invested in a Money Market Fund, fund distributors may provide Citi with Shareholder Servicing fees. These fees are discussed in the fund's prospectus, which will be delivered to the client prior to investment. All of Citi's responsibilities will be non-discretionary and Citi will not be required to make any advances of its own funds. Therefore, all services provided by Citi must strictly follow the terms stated in the Agreements or in the written instructions of the authorized parties or third parties authorized to send instructions to Citi.

In accordance with US regulations regarding anti-money laundering and terrorist financing, Federal law requires Citi to obtain, verify and record information that identifies each business or entity that opens an account or establishes a relationship with Citi. What this means for our clients: when a client opens an account or establishes a relationship, we will ask for the client's business name, a street address and a tax identification number that Federal law requires us to obtain. In accordance with the Unlawful Internet Gambling Act (the "Act"), Citibank, N.A. accounts or other Citibank, N.A. facilities in the United States may not be used to process "restricted transactions" as such term is defined in U.S. 31 CFR Section 132.2(y).

**SCHEDULE B**

**PLEDGOR AUTHORIZED LIST OF SIGNERS**
**(to be provided separately)**

Each of the following person(s) is authorized to execute documents and to direct the Bank as to all matters on the Pledgor's behalf.  The Bank may confirm the instructions received by return call to any one of the telephone numbers listed below.

**PLEDGOR**

| | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: | | |

| | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: | | |

| | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: | | |

170652298.1

JA1494

**SCHEDULE C**

**SECURED PARTY AUTHORIZED LIST OF SIGNERS**
**(to be provided separately)**

Each of the following person(s) is authorized to execute documents and to direct the Bank as to all matters on the Secured Party's behalf.  The Bank may confirm the instructions received by return call to any one of the telephone numbers listed below.

**SECURED PARTY**

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: |  |  |

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: |  |  |

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: |  |  |

Docusign Envelope ID: 48FD7E1F-3A70-4B6E-8B45-E992F4780684

Case 1:25-cv-00820-TSC    Document 17-5    Filed 03/24/25    Page 37 of 46
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 305 of 674

**FORM OF ACCOUNT DIRECTION (NCIF Financial Assistance Subrecipient)**
**Pledgor's UEI Number: LEKCJEPGPAE1**

February 13, 2025

Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, NY 10013
E-mail: cts.spag@citi.com

VIA: CitiSFT

RE: Account Control Agreement dated January 22, 2025, among California Infrastructure and Economic Development Bank (the "**Pledgor**"), Coalition for Green Capital (the "**Secured Party**"), and Citibank, N.A. (the "**Bank**")

Pursuant to Section 2 of the above referenced Account Control Agreement, the Pledgor hereby instructs the Bank to disburse a total amount of $415,314.46 funds as per below.

**Check applicable boxes:**

( ) **Internal Transfer within the Bank (intra-entity).**

( ) **Internal Transfer within the Bank (inter-entity).**

(X) **External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities). Please see attached wire instructions.**

( ) **External Transfer outside the Bank (for Financial Assistance Activities).**

**If an Internal Transfer within the Bank (intra-entity), check the following applicable boxes:**

( ) **Transfer of $[●] across Pledgor's 'Budget' sub-accounts, as defined in the Subaward Agreement.**

( ) **Transfer of $[●] from Pledgor's 'Program Income from Operations' account to Pledgor's 'Budget' sub-account(s), as defined in the Subaward Agreement.**

( ) **Transfer of $[●] from Pledgor's 'Reserve' account to Pledgor's 'Program Income from Operations' account, as defined in the Subaward Agreement.**

( ) **Transfer of $[●] from Pledgor's 'Budget' sub-account(s) or 'Program Income from Operations' account to 'Reserve' account, as defined in the Subaward Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the workplan for the Subaward Agreement supported with EPA funding. Financing agreements for identified Qualified Projects as defined in the Terms and Conditions of the Secured Party's Grant Agreement necessitating the transfer have been reviewed by Subrecipient's counsel for legal sufficiency. This certification is a material*

*representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

**If an Internal Transfer within the Bank (inter-entity), check the following applicable box:**

**( ) Transfer of $[●] from Pledgor's 'Budget' sub-account(s) to Secured Party's 'Budget' sub-account(s) as defined in the Subaward Agreement and compliant with the terms and conditions of the Grant Agreement, including the EPA Subaward Policy.**

**If an External Transfer outside the Bank (for Predevelopment Activities, Market-Building Activities, and/or Program Administration Activities), check one of the following boxes:**

**( ) Disbursement of $[●] for Predevelopment Activities as defined in the Subaward Agreement.**

**( ) Disbursement of $[●] for Market-Building Activities as defined in the Subaward Agreement.**

**(X) Disbursement of $415,314.46 for Program Administration Activities as defined in the Subaward Agreement.**

**If an External Transfer outside the Bank (for Financial Assistance Activities), check the following applicable boxes:**

**( ) Disbursement of $[●] from Pledgor's 'Budget' sub-account to provide Financial Assistance to Qualified Projects as defined in the Subaward Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this expenditure is necessary to execute against the workplan for the Subaward Agreement supported with EPA funding. Financing agreements for identified Qualified Projects as defined in the Terms and Conditions of the Secured Party's Grant Agreement necessitating the transfer have been reviewed by Subrecipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

**( ) Disbursement of $[●] from Pledgor's 'Reserve' account to satisfy a legal obligation to a third party as defined in the Subaward Agreement. The Pledgor hereby certifies to Secured Party the following in respect of this transfer:**

*"The amount of this transfer is necessary to execute against the workplan for the Subaward Agreement supported with EPA funding and pay a third party pursuant to a financing agreement that has been reviewed by Subrecipient's counsel for legal sufficiency. This certification is a material representation for the purposes of an EPA Financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions"*

Capitalized terms in this instruction letter not otherwise defined shall have the same meaning given to them in the Account Control Agreement.

Signature on this Account Direction executed and delivered in electronic format (i.e. "pdf") or by other electronic means (including DocuSign) shall be deemed original signatures with all rights accruing thereto.

IN WITNESS WHEREOF, the Pledgor has caused this Account Direction to be duly executed and delivered as of the date first written above.

Pledgor:

Signed by:

*Ross Culverwell*

CB804FD424C74BD...

Ross Culverwell
Authorized Person

Docusign Envelope ID: 9E88F9F9-5E52-4C7C-8D49-5B5ACA7E38A8

Case 1:25-cv-00820-TSC     Document 17-5     Filed 03/24/25     Page 40 of 46
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 308 of 674



**California Infrastructure and
Economic Development Bank**

Mailing Address:
P.O. Box 2830
Sacramento, CA
95812-2830

Office Address:
1325 J Street, Suite 1300
Sacramento, CA 95814

(916) 341-6600 Phone
(916) 322-6314 Fax

February 13, 2025

**Citibank, N.A.**
Agency & Trust
388 Greenwich Street
New York, NY 10013
E-mail: cts.spag@citi.com

---

### REQUEST FOR WIRE / ACH — Transfer Funds to State Account

---

Trust Fund Account Name:  **CitiBank CalINFRA Financial Assistance**

Trust Fund Account Number:  **14223500**

Program: **National Clean Investment Fund (NCIF) Program**

On Behalf of **IBank**

Total Amount: **$415,314.46**

Beneficiary Account Name: **State of California - GO-Biz for I-Bank Fund 9334**

Beneficiary Address: **1325 J Street, Suite 1300, Sacramento, CA 95814**

Beneficiary Account Number: **0148280005**

Amount of Wire/ACH:  **$415,314.46 (Four Hundred Fifteen Thousand Three Hundred Fourteen
                Dollars and Forty-Six cents)**

               Bank:  **Bank of America (Main)**

                   **2000 Clayton Road Bldg. D, 5th Floor, Concord, CA 94520**

                   **ABA #026009593**

                   **CR: A/C #0148280005**

Please transfer $415,314.46 from the CitiBank CalINFRA Financial Assistance Account (14223500) to
the State Climate Catalyst Revolving Fund 9334 (SMIF) for administration costs. If any questions
arise, please contact Mei.Kwee@ibank.ca.gov. Thank you very much in advance.

Respectfully,
Signed by:

*Ross Culverwell*

**Ross Culverwell**
Chief Credit Officer



| From: | dl.gts.us.sfs.internal.solutions.prod.support@citi.com |
| To: | [REDACTED] @citi.com; [REDACTED] @citi.com; [REDACTED] @citi.com; [REDACTED] @citi.com; [REDACTED] @citi.com; [REDACTED] @citi.com; [REDACTED] @citi.com; [REDACTED] @citi.com; [REDACTED] @citi.com; [REDACTED] @citi.com; [REDACTED] @citi.com; [REDACTED] @citi.com; [REDACTED] @citi.com; [REDACTED] @citi.com; [REDACTED] @citi.com; [REDACTED] @citi.com; [REDACTED] @citi.com; [REDACTED] @citi.com; [REDACTED] @citi.com; [REDACTED] @citi.com; [REDACTED] @citi.com; [REDACTED] @citi.com; [REDACTED] @citi.com |
| Cc: | [REDACTED]; [REDACTED]; [REDACTED]; Scott Wu |
| Subject: | PRD - MIFT - files uploaded - California_Infrastru_CitiBank_Draw_Request_Signed_154641931.pdf |
| Date: | Friday, February 14, 2025 1:31:48 PM |

This email is sent to you on behalf of patrick.toppin@ibank.ca.gov.

| File Id | File Name | Custom File Name | File Memo |
|---|---|---|---|
| 1872045 | California_Infrastru_CitiBank_Draw_Request_Signed_154641931.pdf | | |

MIFT Application URL : *https://issuerservices.icg.citigroup.com*

| Source Company Name | California_Infrastru - California Infrastructure |
|---|---|
| Target Company Name | CITI_CSG - CITI CSG TEAM |
| Uploaded By | Toppin,Patrick |
| Uploaded Date | 02/14/2025 |
| Approved By | Culverwell,Ross |
| Approved Date | 02/14/2025 |

Regards,
ISW Application Support | *GTS US SFS Internal Solutions Prod Support |
dl.gts.us.sfs.internal.solutions.prod.support@citi.com



| From: | dl.gts.us.sfs.internal.solutions.prod.support@citi.com |
|---|---|
| To: | @citi.com; @citi.com; @citi.com; @citi.com; d@citi.com; o@citi.com; h@citi.com; @citi.com; @citi.com; @citi.com; @uk.com; @citi.com; @cit.com; @cit.com; @cit.com; @cit.com; @citi.com; @citi.com; @citi.com; citi.com; @citi.com; @citi.com; @citi.com; Scott Wu |
| Cc: | |
| Subject: | PRD - MIFT - Files uploaded - California_Infrastru_Copy_of_GGRF_ATT_Client_Wire_Instruction_Template_NCIF_v01242025_-_Copy_154641930.xlsx |
| Date: | Friday, February 14, 2025 1:32:18 PM |

This email is sent to you on behalf of patrick.toppin@ibank.ca.gov.

| File Id | File Name | Custom File Name | File Memo |
|---|---|---|---|
| 1872046 | California_Infrastru_Copy_of_GGRF_ATT_Client_Wire_Instruction_Template_NCIF_v01242025_-_Copy_154641930.xlsx | | |

**MIFT Application URL :** *https://issuerservices.icg.citigroup.com*

| Source Company Name | California_Infrastru – California Infrastructure |
|---|---|
| Target Company Name | CITI_CSG – CITI CSG TEAM |
| Uploaded By | Toppin,Patrick |
| Uploaded Date | 02/14/2025 |
| Approved By | Culverwell,Ross |
| Approved Date | 02/14/2025 |

Regards,
ISW Application Support | *GTS US SFS Internal Solutions Prod Support |
dl.gts.us.sfs.internal.solutions.prod.support@citi.com

600 WEST BROADWAY, SUITE 1800
SAN DIEGO, CA 92101
P.O. BOX 85266
SAN DIEGO, CA 92186-5266

Public:  (619) 738-9000
Telephone:  (619) 738-9003
Facsimile:  (619) 645-2271
E-Mail:  Theodore.McCombs@doj.ca.gov
Dylan.Redor@doj.ca.gov

February 26, 2025

VIA EMAIL

Attention: Nerlie Delly
Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, New York 10013
Email: CitiGGRFFinancialAgent@citi.com

RE:    Account Control Agreement relating to Account Numbers 14223000, 14223300, 14222900, 14223600, 14223500, 14223400, and 14223100

Dear Ms. Delly:

I am writing in connection with the Account Control Agreement relating to Account Numbers 14223000, 14223300, 14222900, and 14223100 ("the Accounts") dated as of January 22, 2025 (the "Agreement") among California Infrastructure and Economic Development Bank ("Pledgor"), the Coalition for Green Capital ("Secured Party"), and Citibank, N.A. ("Citi").

Under the Agreement, Pledgor is Citi's customer with respect to deposits in the Accounts and the entitlement holder with respect to all other financial assets credited to the Accounts. Agreement §1(a).  Pledgor is a subgrantee of Secured Party, and Secured Party is one of the prime award recipients under the EPA's National Clean Investment Fund.  On February 14, 2025, Pledgor submitted instructions to Citi to disburse funds in accordance with the terms of the Agreement.  As of this writing, such funds have not been disbursed.

Pursuant to Section 2 of the Agreement, Citi must "comply with instructions, notifications, and entitlement orders received from Pledgor regarding disposition of funds and financial assets in the accounts."  Agreement §2.  Citi "maintains the Accounts for the Pledgor, and all property (including, without limitation, all funds and financial assets) held by the Bank for the accounts of the Pledgor are, and will continue to be, credited to the Accounts in

accordance with instructions given by the Pledgor (unless otherwise provided herein)." *Id.* §1(a). The Agreement provides for one sole, well-defined exception, a "Notice of Exclusive Control." *Id.* §2; *see id.* Ex. A. To our knowledge, Citi has not received a notice of exclusive control under the Agreement and therefore has no basis for rejecting Pledgor's instructions as to the Accounts.

Please immediately identify the basis for Citi's refusal to comply with valid disbursement instructions and explain why Citi's refusal should not constitute a breach of its obligations under the Agreement, and indeed, willful misconduct under Section 6(b) of the Agreement. Citi's refusal to abide by the Agreement and its fundamental obligations as a bank threatens to cause significant harm to the Pledgor, as Pledgor will be unable to fulfill its contractual obligations to third parties. Citi's refusal to comply with Pledgor's instructions sets a disturbing precedent for its treatment of depositors well beyond the immediate circumstances, and Citi's disregard for its contractual duties surely harms public confidence in Citi as a financial institution as well.

Pledgor therefore demands that Citi immediately comply with its obligations under the Agreement and disburse Pledgor's funds in accordance with the instructions provided to date, and continue to do so as instructed pursuant to the terms of the Agreement. If Citi refuses to do so, Pledgor demands immediate notice and information in writing regarding the basis for such refusal.

Pledgor hereby reserves all rights in law and equity, under its Agreement, and otherwise.

Sincerely,

THEODORE A. MCCOMBS
DYLAN REDOR
Deputy Attorneys General

For     ROB BONTA
        Attorney General

Cc:     Brent McIntosh, Chief Legal Officer, Citibank, N.A. (brent.mcintosh@citi.com)

# 1:25cv938, Justice Climate Fund V. United States Environmental Protection Agency Et Al

US District Court Docket

United States District Court, District of Columbia

(Washington, DC)

**This case was retrieved on 05/04/2025**

## Header

**Case Number:** 1:25cv938
**Date Filed:** 03/31/2025
**Assigned To:** Judge Tanya S. Chutkan
**Nature of Suit:** Other Statutes - Administrative Procedure Act/Review or Appeal of Agency Decision (899)
**Cause:** Judicial Review of Agency Actions
**Lead Docket:** 1:25cv00698
**Other Docket:** 1:25cv00698, 1:25cv00735, 1:25cv00762, 1:25cv00820, 1:25cv00948
**Jurisdiction:** U.S. Government Defendant

**Class Code:** Open
**Statute:** 05:0706
**Jury Demand:** None
**Demand Amount:** $0
**NOS Description:** Other Statutes - Administrative Procedure Act/Review or Appeal of Agency Decision

## Participants

| Litigants | Attorneys |
|---|---|
| Justice Climate Fund<br>**Plaintiff** | David Zimmer<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>ZIMMER, CITRON & CLARKE LLP<br>130 Bishop Allen Dr.<br>Cambridge, MA  02139<br>USA<br>617-676-9421 Email:David@zimmercitronclarke.Com<br><br>Eric F. Citron<br>ATTORNEY TO BE NOTICED<br>ZIMMER, CITRON & CLARKE LLP<br>130 Bishop Allen Drive<br>Cambridge, DC  02139<br>USA<br>617-821-6006 Email:Eric@zimmercitronclarke.Com |
| United States Environmental Protection Agency<br>**Defendant** | Kevin Paul VanLandingham<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>U.S. DEPARTMENT OF JUSTICE<br>Civil Division, Commercial Litigation Branch P.O. Box 875, Ben Franklin Station<br>Washington, DC  20044-0875<br>USA<br>(202) 307-1134 Email:Kevin.P.Vanlandingham@usdoj.Gov<br><br>Marcus S Sacks |

JA1507

## Litigants

## Attorneys

| Litigants | Attorneys |
|---|---|
| Lee Zeldin<br>in his official capacity as ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY \|<br>**Defendant** | LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Poc Agostinho, Jean 1100 L St., N.W. 8142<br>Washington, DC 20530<br>USA<br>202-307-1104 Email:Marcus.S.Sacks@usdoj.Gov<br><br>Kevin Paul VanLandingham<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>U.S. DEPARTMENT OF JUSTICE<br>Civil Division, Commercial Litigation Branch P.O. Box 875, Ben Franklin Station<br>Washington, DC 20044-0875<br>USA<br>(202) 307-1134 Email:Kevin.P.Vanlandingham@usdoj.Gov<br><br>Marcus S Sacks<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Poc Agostinho, Jean 1100 L St., N.W. 8142<br>Washington, DC 20530<br>USA<br>202-307-1104 Email:Marcus.S.Sacks@usdoj.Gov |
| WILLIAM CHARLES MCINTOSH<br>in his official capacity as ACTING DEPUTY ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY \|<br>**Defendant** | Kevin Paul VanLandingham<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>U.S. DEPARTMENT OF JUSTICE<br>Civil Division, Commercial Litigation Branch P.O. Box 875, Ben Franklin Station<br>Washington, DC 20044-0875<br>USA<br>(202) 307-1134 Email:Kevin.P.Vanlandingham@usdoj.Gov<br><br>Marcus S Sacks<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Poc Agostinho, Jean 1100 L St., N.W. 8142<br>Washington, DC 20530<br>USA<br>202-307-1104 Email:Marcus.S.Sacks@usdoj.Gov |
| Citibank, N.A.<br>**Defendant** | Kenneth Winn Allen<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>KIRKLAND & ELLIS LLP<br>1301 Pennsylvania Avenue, N.W.<br>Washington, DC 20004<br>USA<br>(202) 389-5000 Fax: (202) 389-5200<br>Email:Winn.Allen@kirkland.Com<br><br>Saunders Lee McElroy<br>ATTORNEY TO BE NOTICED<br>KIRKLAND & ELLIS LLP<br>1301 Pennsylvania Ave, Nw<br>Washington, DC 20004<br>USA<br>202-389-3081 Email:Saunders.Mcelroy@kirkland.Com |

## Proceedings

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 1 | 03/31/2025 | COMPLAINT against All Defendants ( Filing fee $ 405 receipt number ADCDC-11578378) filed by Justice Climate Fund. (Attachments: # 1 Civil Cover Sheet Civil Cover Sheet, # 2 Summons Summons -- Bondi, # 3 Summons Summons -- Citibank, # 4 Summons Summons -- EPA, # 5 Summons Summons -- Martin, # 6 Summons Summons -- McIntosh, # 7 Summons Summons -- Zeldin)(Citron, Eric) (Entered: 03/31/2025) | |
| 2 | 03/31/2025 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by Justice Climate Fund (Citron, Eric) (Entered: 03/31/2025) | |
| 3 | 04/01/2025 | NOTICE OF RELATED CASE by Justice Climate Fund. Case related to Case No. 25-cv-698. (Citron, Eric) (Entered: 04/01/2025) | |
| | 04/01/2025 | Case Assigned to Judge Tanya S. Chutkan. (zsl) (Entered: 04/01/2025) | |
| 4 | 04/02/2025 | NOTICE of Appearance by Kenneth Winn Allen on behalf of CITIBANK, N.A. (Allen, Kenneth) (Entered: 04/02/2025) | |
| 5 | 04/02/2025 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by CITIBANK, N.A. (Allen, Kenneth) (Entered: 04/02/2025) | |
| 6 | 04/02/2025 | NOTICE of Appearance by Saunders Lee McElroy on behalf of CITIBANK, N.A. (McElroy, Saunders) (Entered: 04/02/2025) | |
| 7 | 04/02/2025 | MOTION for Preliminary Injunction by JUSTICE CLIMATE FUND. (Attachments: # 1 Memorandum in Support, # 2 Declaration of Amir Kirkwood, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8, # 11 Exhibit 9, # 12 Declaration of David Zimmer, # 13 Exhibit A, # 14 Text of Proposed Order)(Citron, Eric) (Entered: 04/02/2025) | |
| 8 | 04/02/2025 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- David J. Zimmer, Filing fee $ 100, receipt number ADCDC-11585363. Fee Status: Fee Paid. by JUSTICE CLIMATE FUND. (Citron, Eric) (Entered: 04/02/2025) | |
| | 04/04/2025 | MINUTE ORDER: GRANTING Motion for Leave to Appear Pro Hac Vice as to 8 David J. Zimmer. David J. Zimmer is hereby admitted pro hac vice to represent Plaintiff Justice Climate Fund in this matter. Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a) Click for instructions. Signed by Judge Tanya S. Chutkan on 4/4/2025. (lcer) (Entered: 04/04/2025) | |
| 9 | 04/07/2025 | NOTICE of Appearance by Marcus S Sacks on behalf of WILLIAM CHARLES MCINTOSH, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN (Sacks, Marcus) (Entered: 04/07/2025) | |
| 10 | 04/07/2025 | SUMMONS (7) Issued Electronically as to CITIBANK, N.A., WILLIAM CHARLES MCINTOSH, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN, U.S. Attorney, and U.S. Attorney General. (Attachments: # 1 Notice and Consent) (zjd) (Entered: 04/07/2025) | |
| 11 | 04/09/2025 | RESPONSE re 7 MOTION for Preliminary Injunction filed by CITIBANK, N.A.. (Attachments: # 1 Text of Proposed Order)(Allen, Kenneth) (Entered: 04/09/2025) | |
| 12 | 04/10/2025 | NOTICE of Appearance by Kevin Paul VanLandingham on behalf of WILLIAM CHARLES MCINTOSH, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN (VanLandingham, Kevin) (Entered: 04/10/2025) | |
| 13 | 04/10/2025 | Joint MOTION to Consolidate Cases by WILLIAM CHARLES MCINTOSH, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN. (Attachments: # 1 Text of | |

1:25cv938, Justice Climate Fund V. United States Environmental Protection Agency Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Proposed Order)(Sacks, Marcus) (Entered: 04/10/2025) | |
| 14 | 04/11/2025 | NOTICE of Appearance by David Zimmer on behalf of JUSTICE CLIMATE FUND (Zimmer, David) (Entered: 04/11/2025) | |
| 15 | 04/11/2025 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name-Kathleen Foley,  Filing fee $ 100, receipt number ADCDC-11607603. Fee Status: Fee Paid. by JUSTICE CLIMATE FUND. (Citron, Eric) (Entered: 04/11/2025) | |
| | 04/15/2025 | MINUTE ORDER: GRANTING Motion for Leave to Appear Pro Hac Vice as to 15 Kathleen Foley. Kathleen Foley is hereby admitted pro hac vice to represent Plaintiff Justice Climate Fund in this matter. Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a) Click for instructions. Signed by Judge Tanya S. Chutkan on 4/15/2025. (Icer) (Entered: 04/15/2025) | |
| | 04/15/2025 | MINUTE ORDER: GRANTING the parties' 13 Joint Motion to Consolidate Cases. Pursuant to Federal Rule of Civil Procedure 42(a)(2), the court will consolidate this case with Case No. 25-cv-698, given the common questions of law and fact between both cases, as set forth in the 13 Joint Motion. The parties to this case may submit a Joint Status Report to the court within seven days of the court's decision on the preliminary injunction motions in Case No. 25-cv-698, setting forth whether there are any additional issues specific to Plaintiff Justice Climate Fund to address. All filings and papers related to the consolidated cases shall be filed in the lead case: 25-cv-698. Signed by Judge Tanya S. Chutkan on 4/15/2025. (Icer) (Entered: 04/15/2025) | |
| | 04/15/2025 | Cases Consolidated. This case has been consolidated with case 25-cv-00698-TSC pursuant to Order on Motion to Consolidate Cases. From this date forward, all pleadings shall be filed ONLY in the lead case, 25-cv-00698-TSC. Parties are advised NOT to elect the SPREAD TEXT option when filing in ECF, as this will result in repetitive docketing. (zjm) (Entered: 04/15/2025) | |
| | 04/15/2025 | MINUTE ORDER: DENYING as MOOT Plaintiffs' 7 Motion for Preliminary Injunction. See Preliminary Injunction Order and forthcoming Memorandum Opinion in lead case No. 25-cv-698 for details. Signed by Judge Tanya S. Chutkan on 4/16/2025. (Icer) (Entered: 04/16/2025) | |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.

*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

**End of Document**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**JUSTICE CLIMATE FUND**
910 17th Street, NW, Suite 820
Washington, D.C. 20006,

       Plaintiff,

  v.

**UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,**
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460,

    and

**LEE ZELDIN, in his official capacity as
ADMINISTRATOR, UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY,**
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460,

    and

**WILLIAM CHARLES MCINTOSH, in his
official capacity as ACTING DEPUTY
ADMINISTRATOR, UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY,**
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460,

    and

**CITIBANK, N.A.,**
5800 South Corporate Place
Sioux Falls, South Dakota 57108,

      Defendants.

Civil Action No. _____

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

Plaintiff Justice Climate Fund ("JCF" or "Plaintiff"), by and through its undersigned

counsel, as and for its complaint against the United States Environmental Protection Agency (the

"EPA"), Lee Zeldin, in his official capacity as EPA Administrator, W.C. McIntosh, in his official

capacity as EPA Acting Deputy Administrator (together with EPA and Mr. Zeldin, "EPA

Defendants"), and Citibank, N.A. ("Citi"),  alleges as follows:

## INTRODUCTION

1.      This case seeks to vindicate the right of Plaintiff Justice Climate Fund ("JCF") to

access award funds to which it is legally entitled.  EPA, through its purported "Notice of

Termination," has unlawfully attempted to withhold those funds, and JCF seeks to enjoin that

ongoing, unlawful action. The facts alleged and claims asserted herein are materially identical to

those asserted in four consolidated cases already pending in this District: *Climate United Fund v.

Citibank, N.A.*, No. 25-cv-698-TSC (filed Mar. 8, 2025); *Coalition for Green Capital v. Citibank,

N.A.*, No. 25-cv-735-TSC (filed Mar. 12, 2025); *Power Forward Communities, Inc. v. Citibank,

N.A.*, No. 25-cv-762-TSC (filed Mar. 14, 2025); and *California Infrastructure and Economic

Development Bank v. Citibank, N.A.*, No. 25-cv-820 (filed March 19, 2025) (collectively, the

"*Climate United* Litigation").

2.      The Inflation Reduction Act of 2022 ("IRA"), Pub. L. No. 117-169, 136 Stat. 1818,

amended the Clean Air Act to authorize EPA to make competitive grants under the Greenhouse

Gas Reduction Fund ("GGRF") to provide financial assistance for "the rapid deployment of low-

and zero-emission products, technologies, and services." 42 U.S.C. § 7434(c)(1). EPA

implemented GGRF through three different programs:  The National Clean Investment Fund

("NCIF"), the Clean Communities Investment Accelerator ("CCIA"), and Solar for All. The

*Climate United* Litigation Plaintiffs were grantees under the NCIF program.

3.    While structured similarly to the NCIF program, the CCIA program differs in one key way: Rather than awarding money directly to large lenders, the CCIA program provides grants to nonprofit organizations that provide funding and technical assistance to much smaller, community lenders working in low-income and disadvantaged communities across the country. In other words, unlike the NCIF grant recipients, the CCIA grant recipients do not themselves invest the money but instead provide capitalization funding and technical assistance to community lenders to deploy in connection with proposed distributed energy, net-zero buildings, and zero-emissions transportation projects where they are needed most.

4.    JCF is a purpose-built, non-profit organization that was founded to apply for CCIA funding on behalf of a consortium of community lender representatives.  JCF's mission is to ensure that community lenders have the resources to provide affordable financing for clean-energy and affordable-housing-related qualified projects across the country, focusing on low-income and disadvantaged communities in unbanked areas.

5.    On October 12, 2023, JCF applied for a funding award from CCIA. In April 2024, JCF was awarded CCIA funding after a rigorous, competitive, and merit-based review of JCF's application. JCF did not have any relationship with anyone inside EPA or, to its knowledge, with any reviewers during the application and selection process. Since being announced as a selectee, JCF has negotiated with EPA a comprehensive program to train and provide grants to community lenders within its network.  For example, in its first solicitation, JCF received applications from 94 community lenders, selected 35 qualified projects, and committed $248.5 million of its $940 million award. The committed funds will provide capitalization funding and technical assistance grants to community lenders, whose qualified projects in unbanked, low-income, and disadvantaged communities will advance community health, security, and prosperity. A core

commitment of JCF is to mobilize private capital for these projects, bringing needed capital to communities that have not benefitted from the scaled, lower-cost support that more prosperous communities routinely enjoy.

6.    JCF's Award Agreement is governed by a twin set of detailed "Terms and Conditions," consisting of award-specific CCIA Terms and Conditions and general EPA Terms and Conditions issued by EPA on October 1, 2024. As most relevant here, the operative CCIA Terms and Conditions specify that EPA can only terminate JCF's award if one of three conditions is met: (1) if JCF engages in "substantial" noncompliance such that "effective performance" is "Materially Impaired"; (2) if JCF engages in "material misrepresentation of eligibility status"; and (3) for "Waste, Fraud, or Abuse," which is defined in the CCIA Terms and Conditions as requiring a violation of either Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations or the civil False Claims Act. The Terms and Conditions do not permit termination for any other reason.

7.    JCF's award requires that JCF's CCIA funds be held at Citibank, N.A. ("Citibank"), under a Financial Agent Agreement ("FAA") between Citibank and the U.S. Treasury Department, and an Account Control Agreement ("ACA") between and among Citibank (as custodian), JCF (as Pledgor and asset owner), and EPA (as the holder of a security interest in JCF's funds).

8.    EPA designed, structured, and negotiated the FAA and the ACA to provide transparency and accountability and to protect EPA's interests. The FAA requires that Citibank provide online access to EPA personnel "to allow full account visibility" into each account.[1] And

---

[1] Pursuant to the March 12, 2025, sealing order in *Climate United Fund v. Citibank, N.A.*, No. 25-cv-698-TSC, JCF quotes only those portions of the FAA quoted in Citibank's publicly filed opposition to Climate United's motion for a temporary restraining order in that case, *see id.*, Dkt. No. 14 (Mar. 12, 2025).

the federal regulations that provide for a bank's appointment as a "Financial Agent[] of the Federal Government," 31 C.F.R. § 202.1, require Citibank to "pledge collateral security in the amount required by the Secretary of the Treasury," *id.* § 202.6; *see id.* § 202.3. Citibank's collateral operates to protect EPA from any misuse of the award funds.

9.    The terms of the ACA are, as relevant to this case, straightforward. Section 2 of the ACA requires that Citibank honor JCF's withdrawal requests unless Citibank has received a written "Notice of Exclusive Control" from EPA, copied to JCF. Further, the ACA only allows EPA to issue a written Notice of Exclusive Control and assume that "exclusive control" over the funds under specified conditions: (a) if EPA finds that JCF has engaged in "substantial" noncompliance with the Terms and Conditions of the award; (b) if EPA finds "adequate evidence" of "Waste, Fraud, or Abuse," defined as "credible evidence" of a violation of federal criminal law or the False Claims Act; or (c) if EPA finds that JCF made a "material misrepresentation of eligibility status." The ACA also specifies the procedure that EPA must follow to take exclusive control of the funds—namely, delivering a written "Notice of Exclusive Control" with a "written determination and finding" that JCF has triggered one of the three grounds for terminating the award. To date, JCF has not received a written Notice of Exclusive Control.

10.    On or about February 25 and 26, 2025, JCF learned that Citibank had unexpectedly begun refusing to process JCF's disbursement requests, despite Citibank's unambiguous contractual obligation to do so under the ACA (given that no Notice of Exclusive Control had been delivered). This left JCF unable to access its award funds and thus to execute on its obligations under the Award Agreement. Given that JCF is a purpose-built non-profit created specifically to apply for, manage, and execute on its CCIA award, its lack of access to its funds at Citibank puts its operation—and its obligations to execute on the Award Agreement—at immediate risk.

11.     It has subsequently become clear that Citibank's failure to meet its ACA-related contractual obligations was not voluntary, but was rather the result of an extended and unlawful pressure campaign by EPA. As alleged in more detail below, EPA has in multiple ways sought to confiscate or take back JCF's award funds without even attempting to demonstrate that any of the conditions have been met for terminating the award or taking control of the funds in JCF's Citibank account. As a culmination of EPA's unlawful attempt to seize JCF's award funds, EPA served JCF, on March 11, 2025, with a purported "Notice of Termination"—one that JCF understands has been provided to all NCIF and CCIA recipients. The "Notice of Termination" claimed that EPA was terminating the award based on EPA's "authority under 2 C.F.R. §§ 200.339-40, the General Terms and Conditions of EPA assistance award agreements, the terms and conditions of the Grant Agreement, and the Agency's inherent authority to reconsider prior determinations in light of new information." The "Notice" also mentioned EPA's priorities and interest in transparency and oversight. Tellingly, however, the "Notice" did not say *anything* about JCF, and did not provide *any* legal or factual basis to believe that the Award Agreement termination conditions or the ACA Notice of Exclusive Control conditions had been satisfied.

12.     EPA's "Notice of Termination" was illegal for numerous reasons. It violated EPA's own regulations, which did not permit EPA to terminate JCF's award based on generic assertions of priorities, transparency, and oversight. It violated the Inflation Reduction Act, the Appropriations Clause, and bedrock separation-of-powers principles by nullifying a duly enacted statute purely because the Administrator disagreed with it. And it was arbitrary and capricious in that it made vague accusations of waste, fraud, and abuse, with nothing to back up those accusations. Not one of EPA's documents, public statements, or investigations has identified

*anything* JCF has done that is improper at all, much less something that meets the requirements for terminating the award.

13.    Citibank's refusals to honor JCF's withdrawal requests, while an understandable response to enormous government pressure, are also unlawful. Until Citibank receives a lawful Notice of Exclusive Control, the ACA requires that Citibank honor JCF's requests to draw money from its account. The purported "Notice of Termination" is no basis for Citibank to disregard JCF's requests because that Notice is itself illegal and must be enjoined. Nor is the FAA, which allows Citibank to fail to transfer JCF's assets to JCF only "in accordance with" the ACA, and only in response to "lawful instructions" from EPA. Here, Citi's decision not to respond to JCF's withdrawal requests was not "in accordance with" the ACA and there were no "lawful instructions" from EPA or any other agency.

14.    EPA's and Citibank's unlawful actions are causing JCF to suffer real and immediate harm. JCF is a purpose-built non-profit created to apply for and execute on its CCIA award. JCF and the network of community lenders that JCF supports with capitalization funding grants and technical assistance grants do not have, and could not reasonably be expected to obtain, other committed sources of non-dilutive funding to replace the CCIA award funds.  And JCF cannot replicate the reputational benefit of being selected for a major federal award after an extensive, merit-based selection process performed by EPA.

15.    JCF is also harmed by EPA's public campaign of misleading claims designed to demonize GGRF Recipients, including JCF. EPA's public statements suggest that JCF is an unqualified, undeserving, or unlawful recipient of these award funds, despite JCF's success in an extensive, EPA-led, merit-based review.

16.     JCF is further harmed by EPA's efforts to "starve" JCF by undermining JCF's access to capital, stymieing its ability to meet its obligations under the Award Agreement, and by the disruption of JCF's relationships with numerous partners whose cooperation with and confidence in JCF are essential to JCF's achievement of its mission. The small community lenders who would be JCF's subgrantees have no litigation budgets and cannot bring suit themselves. And all involved—private capital providers, JCF's vendors and consultants, and the community lenders themselves—have expressed understandable, rational concerns about losing other clients or being damaged by EPA's broad-brush targeting of GGRF Recipients, including JCF. JCF is concerned that, unless JCF receives immediate relief, JCF's ability to perform its crucial work will be irretrievably lost.

17.     EPA's and Citibank's actions have also compromised JCF's reliability, a crucial component of its work as a provider of capital. JCF is the source of capitalization funding and technical assistance grants for its network of community lenders. As an EPA-selected award recipient, JCF must be able to fulfill all of its funding commitments to these community lenders, including for the life of the qualified projects that these Community Lenders are advancing. Congress and JCF have a shared mission under JCF's EPA-approved Award Agreement, and JCF's EPA-approved workplan includes a private capital mobilization target of approximately $1.6 billion. Without the stable source of funding that the award represents, JCF's reputation will be irreparably and irreversibly harmed, and JCF will be compromised in its ability to attract the high-quality partners and mobilize private capital co-investors that is critical to JCF's compliance with the Award Agreement.

18.     JCF's Award Agreement should progress and JCF's access to its award funding should be restored. The Court should enjoin EPA's illegal "Notice of Termination" and enjoin EPA

from taking actions premised on that illegal termination. The Court should also enjoin Citibank from violating the unambiguous terms of the ACA.

## JURISDICTION AND VENUE

19.    This is an action for declaratory and injunctive relief based on EPA's violation of the Administrative Procedure Act, federal regulations and statutes, and the Constitution's Appropriations Clause and Due Process Clause. This action also seeks declaratory and injunctive relief against Citibank based on its breach of contract.

20.    The Court has jurisdiction over JCF's claims against EPA Defendants under 28 U.S.C. § 1331 and 5 U.S.C. § 702.

21.    This Court has jurisdiction over JCF's claims against Citibank under 28 U.S.C. § 1367, because those claims are so related to JCF's claims against EPA Defendants that they form part of the same case or controversy.[2]

22.    Venue in this District is proper pursuant to 28 U.S.C. § 1391(e) because EPA Defendants are located in this District and a substantial part of the acts or omissions giving rise to the claim occurred in this District.

23.    This case presents a live controversy about whether EPA lawfully terminated JCF's award, or instead whether EPA's termination is unlawful because it is arbitrary and capricious and violates multiple regulations, statutes, and constitutional provisions. This case also presents a live controversy about whether Citibank breached and is continuing to breach the ACA.

---

[2] Even if EPA were not named as a defendant, the Court would have jurisdiction over JCF's claims against Citibank under 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy exceeds $75,000.

## PARTIES

24.     JCF, a Delaware corporation with its principal place of business in Washington, D.C., is a nonprofit organization. JCF's work aims to mobilize capital and resources to strengthen under-resourced communities, funding projects that provide clean energy, support cleaner air and water, improve public health, and build economic resilience so all people across the nation can thrive. In its EPA-approved workplan, JCF estimated that its work would reduce and avoid 5.32 million metric tons of carbon dioxide emissions, directly and indirectly support 61,700 jobs, and mobilize $1.56 billion of private capital.

25.     Defendant Citibank, N.A. ("Citibank") is a national banking association organized and existing under the laws of the United States of America, with headquarters in South Dakota. Citibank is the wholly owned subsidiary of Citigroup, Inc., headquartered in New York.

26.     Defendant EPA is the agency of the federal government of the United States responsible for administering the GGRF and its constituent NCIF program. EPA is an agency within the meaning of the APA.

27.     Defendant Lee Zeldin is the Administrator of EPA and the agency's highest-ranking official. JCF sues Mr. Zeldin in his official capacity.

28.     Defendant William Charles McIntosh is the Acting Deputy Administrator of EPA and the agency's second highest-ranking official. JCF sues Mr. McIntosh in his official capacity.

## BACKGROUND

### I.     Congress Establishes the CCIA Program.

29.     In 2022, Congress passed, and President Biden signed into law, the Inflation Reduction Act ("IRA"). Pub. L. No. 117-169, 136 Stat. 1818. Among other components, the IRA amended the Clean Air Act to authorize EPA to make competitive grants under the Greenhouse

Gas Reduction Fund ("GGRF") to provide financial assistance for "the rapid deployment of low-and zero-emission products, technologies, and services." 42 U.S.C. § 7434(c)(1).

30.     The statute created this new program to leverage public funds with private capital and catalyze investment into places and projects that support local economic development, much like other government programs such as Small Business Administration loan guarantees, New Market Tax Credits, and Opportunity Zones.

31.     Specifically, Section 134(a)(3) of the IRA appropriated to the EPA Administrator $8 billion to "make grants, on a competitive basis …, to eligible recipients for the purposes of providing financial assistance and technical assistance in low-income and disadvantaged communities in accordance with subsection (b)." 42 U.S.C. § 7434(a)(3).

32.     In turn, subsection (b) provides that an eligible recipient shall use the grant in accordance with the following goals: (1) facilitating "financial assistance to qualified projects at the national, regional, State, and local levels"; (2) prioritizing "investment in qualified projects that would otherwise lack access to financing"; (3) "retain[ing], manag[ing], recycl[ing], and monetiz[ing] all repayments and other revenue received from fees, interest, repaid loans, and all other types of financial assistance provided using grant funds under this section to ensure continued operability"; and (4) providing "funding and technical assistance to establish new or support existing public, quasi-public, not-for-profit, or nonprofit entities that provide financial assistance to qualified projects." *Id.* § 7434(b).

33.     Eligible recipients are defined to include nonprofit organizations that are "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services," that do not "take deposits other than deposits from repayments and other revenue received from financial

assistance provided using grant funds under this section," that are "funded by public or charitable contributions," and that "invest[ ] in or finance[ ] projects alone or in conjunction with other investors." *Id.* § 7434(c)(1).

34.    Qualified projects are defined to include any "project, activity, or technology" that either "reduces or avoids greenhouse gas emissions and other forms of air pollution in partnership with, and by leveraging investment from, the private sector," or "assists communities in the efforts of those communities to reduce or avoid greenhouse gas emissions and other forms of air pollution." *Id.* § 7434(c)(3).

35.    In July 2023, EPA launched three grant competitions:  The National Clean Investment Fund ("NCIF"), the Clean Communities Investment Accelerator ("CCIA"), and Solar for All. The *Climate United* Litigation concerns grants under the NCIF program. That program allocated $14 billion directly to national institutions that themselves lend money, with 40% of capital being dedicated to low-income and disadvantaged communities.

36.    The $6 billion CCIA competition ("CCIA"), by contrast, focused entirely on "financ[ing] clean technology deployment in low-income and disadvantaged communities while simultaneously building the capacity of community lenders that serve those communities." NOFO at 3.

37.    The purpose of the CCIA competition was to provide grants to 2-7 hub nonprofits that will provide funding and technical assistance to specific industry networks of public, quasi-public, not-for-profit, and nonprofit community lenders, supporting the goal that every community in the country have access to the capital needed to deploy clean technology projects in their homes, small businesses, schools, and community institutions. NOFO at 4.

38.    Unlike the NCIF grant recipients, the CCIA recipients are not themselves lenders, but instead are nonprofit organizations that award grants to numerous community lenders across the country that operate in low-income and disadvantaged communities.

39.    Section 134(a)(3) provided that the EPA Administrator could award grants "on a competitive basis" until September 30, 2024. 42 U.S.C. § 7434(a)(3).

## II.    JCF Is Awarded CCIA Grant Funding.

40.    JCF was formed in 2023, after the passage of the IRA, by a coalition of organizations with extensive experience advancing community-development finance for unbanked American families, businesses, and communities. JCF's founding organizations sought to utilize CCIA funding to fill a critical gap: Many community lenders were underrepresented in climate finance and lacked access to green lending resources. By forming JCF, coalition members aimed to centralize support and technical assistance, ensure that resources flow to community lenders not served by other GGRF awardees, and help lenders build capacity through experience with JCF's small-scale funding.

41.    In July 2023, EPA issued a Notice of Funding Opportunity for the CCIA. The NOFO "included a robust set of application requirements and corresponding evaluation criteria that were used to assess materials submitted to meet those application requirements."[3] "Application requirements covered a diverse set of topics and included not just a detailed project narrative but also a robust set of application attachments," such as "organizational and governing documents; resumes of board members and senior management; legal and compliance risk

---

[3] Greenhouse Gas Reduction Fund, Review and Selection Process, EPA (last updated Aug. 16, 2024), https://www.epa.gov/greenhouse-gas-reduction-fund/review-and-selection-process.

management policies and procedures; financial statements; workplans for the first year of program implementations, and budget narratives."[4]

42.    EPA established a rigorous process to review and select applications. That process included an evaluation of each program's plan, budget, organizational capacity, risk management program, internal controls, financial statements, and previous experience managing third-party capital. The review was conducted by expert panels with broad and deep qualifications who would then present rankings and recommendations to a Selection Official authorized to make the final selection for awards. *Id.* at 55.

43.    JCF applied for CCIA funding on October 12, 2023, seeking $4.4 billion. As part of the application process, JCF was required to submit a detailed budget to EPA. Additionally, prior to receiving the Notice of Award, JCF was required to attach a negotiated, thoroughly reviewed, and approved budget to its award agreement.

44.    Following the agency's lengthy and rigorous review process, JCF was awarded $940 million. The award was publicly announced by the White House in April 2024, in a press release touting JCF's credentials and vision.[5]

45.    Consistent with the purpose of the Inflation Reduction Act under which the CCIA funds were appropriated, JCF developed and EPA approved a workplan that was finalized with the award and posted publicly for full transparency. As enumerated in the workplan, the JCF coalition plans to empower a national network of community lenders—especially those serving low-income and disadvantaged communities—to scale up green lending through a structured program of

---

[4] *Id.*
[5] Biden-Harris Administration Announces $20 Billion in Grants to Mobilize Private Capital and Deliver Clean Energy and Climate Solutions to Communities Across America, EPA (last updated Aug. 16, 2024), https://www.epa.gov/newsreleases/biden-harris-administration-announces-20-billion-grants-mobilize-private-capital-and.

assessment, training, certification, and support. Its goal is to build long-term capacity for financing climate solutions by prioritizing underserved communities and mobilizing private capital for projects that reduce emissions, create jobs, and improve community well-being. To date, the JCF coalition has received and reviewed 94 applications from community lenders and approved 35 of those applications, committing $248.5 in capitalization funding and technical assistance. Without access to its CCIA award funds, JCF cannot honor those commitments and distribute that funding.

### III.    The Terms and Conditions of the Award, Including Suspending or Terminating the Award.

46.    The award was memorialized in a final award agreement, known as a Notice of Award ("NOA"). The original NOA was dated August 8, 2024. The NOA was then updated on December 20, 2024. That December NOA sets forth the operative Terms and Conditions for JCF's award and is attached hereto as **Exhibit A**.

47.    The Terms and Conditions require JCF to adhere to a rigorous set of reporting requirements. These include requirements to produce semiannual, annual, and final reports to EPA with "detailed narratives describing program performance … supported with qualitative discussions and quantitative metrics," Ex. A at 15-16, submit semi-annual transaction-level and project-level data reports, *id*. at 17, and provide ongoing disclosures to EPA, *id*. at 17-18.

48.    The Terms and Conditions provide that JCF "must obtain prior written approval from the EPA Project Officer (who will in turn notify the EPA Award Official) for any transfers that will not be disbursed for an Allowable Activity within 15 business days." *Id*. at 60.

49.    In addition, the Terms and Conditions require JCF (as well as other GGRF recipients) to complete standard EPA grants training within 90 days of receipt of the award, including the "*EPA Grants Management Training for Applicants and Recipients*" and "*How to Develop a Budget*." *Id*. at 5. JCF complied with this requirement, even though JCF had already

submitted a detailed budget to EPA in connection with the grant competition selection process, and had already attached a negotiated, reviewed, and approved budget to its award agreement before receiving the Notice of Award.

50.    The Terms and Conditions constrain EPA's ability to unilaterally suspend the award or prevent JCF from accessing the awarded funds. Instead, the Terms and Conditions specify that EPA can suspend or terminate JCF's award in three (and only three) scenarios. Ex. A at 43.

a.    *First*, EPA may terminate the Agreement if JCF engages in "substantial" noncompliance such that "effective performance" is "Materially Impaired." *Id.* Effective performance is "Materially Impaired" if (1) EPA issues a "written determination and finding … that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause" and, (2) if EPA determines in its sole discretion that a "corrective action plan" would remedy the issue, EPA must issue a "separate written determination and finding" that the Recipient "has not materially addressed its failure." *Id.* at 9-10.

b.    *Second*, EPA may terminate the Agreement if JCF engages in "material misrepresentation of eligibility status." *Id.* at 43.

c.    *Third*, EPA may terminate the Agreement for "Waste, Fraud, or Abuse," *id.*, which is defined with reference to the EPA General Terms and Conditions and 2 C.F.R. § 200.113, *id.* at 14. Those sources require "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act (31 U.S.C. §§ 3729-3733)." *See* EPA, *General Terms and Conditions* (effective    Oct.    1,    2024),    https://www.epa.gov/system/files/documents/2024-

10/fy_2025_epa_general_terms_and_conditions_effective_october_1_2024_or_later.

pdf; 2 C.F.R. § 200.113.

51.    In addition, EPA is obligated by regulation to take certain procedural steps to terminate the award agreement. Among other things, EPA must comply with 2 C.F.R. § 200.341, which requires EPA to provide written notice of termination to the recipient that includes "the reasons for termination, the effective date, and the portion of the Federal award to be terminated, if applicable." 2 C.F.R. § 200.341; Ex. A at 43 (incorporating this regulatory requirement into the Terms and Conditions).

52.    The Terms and Conditions may not be unilaterally modified by either party. Rather, "[t]he EPA Award Official and Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding." Ex. A at 54.

**IV.    The Account Control Agreement Between JCF, EPA, and Citibank.**

53.    The award agreement required JCF to enter into an Account Control Agreement. JCF entered into the ACA with EPA and Citibank on November 1, 2024. The ACA is attached hereto as **Exhibit B**.

54.    Under the ACA, Citibank administers the funds provided under the CCIA, in its role "as a financial agent of the United States pursuant to the authority" of the Treasury Department, and EPA serves as the "Secured Party." Ex. B at 1.

55.    The ACA specifies that Citibank's duties with respect to the funding are exclusively "administrative or ministerial (and shall not be construed as fiduciary in nature)." Ex. B § 6(a). The ACA further specifies that Citibank "shall not be responsible for any of the agreements referred to or described herein (including, without limitation, the Grant Agreement …), or for

determining or compelling compliance therewith, and shall not otherwise be bound thereby." *Id*. at 3–4.

56.     Under the ACA, Citibank is required to disburse funds to JCF upon JCF's request. ACA § 2 provides that Citibank "shall comply with all instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and financial assets in the Accounts including, without limitation, directions to distribute proceeds of any such transfer or redemption of interest or dividends on financial assets in the Accounts."

57.     The only circumstances contemplated by the ACA under which Citibank could refuse to disburse funds as directed by JCF is if EPA exercises its "right of control" under the ACA. Ex. B § 2.

58.     To exercise its right of control, EPA must notify Citibank of its intention to exercise exclusive control over the accounts in a form substantially similar to a sample Notice of Exclusive Control contained in the ACA. *Id*.; *see also id.* at 1 (stating that JCF and EPA "have agreed that the terms and conditions entitled 'Deposit Account at Financial Agent' in the Grant Agreement indicate the conditions under which the [EPA] may exercise its right of control").

59.     The form Notice of Exclusive Control states: "As required by the Grant Agreement, the Secured Party [*i.e.*, EPA] has issued a written determination and finding that Pledgor [*i.e.*, JCF] has failed to comply with the terms and conditions of the Grant Agreement, and that noncompliance is substantial such that effective performance of the Grant Agreement is materially impaired or there is adequate evidence of waste, fraud, material misrepresentation of eligibility status, or abuse, and that the Secured Party has initiated action under 2 CFR 200.339 to wholly or partly suspend or terminate the Grant Agreement, as authorized in the terms of the Grant Agreement." Ex. B at 10.

60.    The form NOEC thus incorporates the standard for termination of the award specified under the Terms and Conditions. *Compare id.*, with Ex. A (December NOA) at 43 (discussing termination under "programmatic conditions").

## V.    The Financial Agency Agreement Between Citibank and the Treasury Department.

61.    The July 2023 NOFO envisioned entering into "financial agent arrangements with the U.S. Department of Treasury" to "ensure that EPA's interests are protected." NOFO at 58. JCF had no role in EPA's decision to include the financial agent concept in the July 2023 NOFO.

62.    The financial agent concept is an established mechanism for disbursing government funding that was first authorized in the 1860s and has been used for decades.[6]

63.    After a selection process run by the Treasury Department, Citibank was selected as the Financial Agent. Citibank and Treasury entered into the FAA on September 19, 2024.

64.    JCF is not a party to the FAA. Citibank's selection as the Financial Agent was announced to JCF on September 26, 2024. JCF had no role in the selection of the financial agent, which was coordinated by EPA and the Treasury Department as part of a competitive process.

65.    EPA has traditionally used the Automated Standard Application for Payments ("ASAP") system to disburse grant award funds. Under the ASAP system, the Treasury Department does not conduct oversight—it simply reports to EPA the amounts which have been drawn by the recipient and what amounts remain.[7] Under the FAA between Citibank and Treasury, Citibank agreed to assume this ministerial funding responsibility. EPA's oversight functions remain

---

[6] *Revenue Collections and Payments: Treasury Has Used Financial Agents in Evolving Ways but Could Improve Transparency*, GAO-17-176 (Jan. 2017), https://www.gao.gov/assets/gao-17-176.pdf ("Treasury has a long history of using financial agents to support its core functions of disbursing payments and collecting revenue.").

[7] JCF made no draws on its Award funds using the ASAP system.

identical under the FAA and under ASAP. This is why the FAA agreement is between Treasury and Citibank, not between EPA and Citibank—Citibank is taking over Treasury's functions, not EPA's.

66. The FAA provides that Citibank will provide "commercial banking and finance services" "related to programs under the Inflation Reduction Act ... including ... grant programs" such as the CCIA. The FAA is not specific to JCF's award and JCF is not mentioned in the FAA.

67. The FAA provides that Citibank "acknowledges and agrees that it owes a fiduciary duty of loyalty and fair dealing to the United States when acting as a financial agent of the United States." The FAA further provides that as a financial agent, Citibank will "act at all times in the best interests of the United States when carrying out its responsibilities under this FAA and in all matters connected with this agency relationship." The FAA further states that Citibank's fiduciary obligations include the duty to "construe the terms of this FAA and any related instructions from Treasury in a reasonable manner to serve the purposes and interests of the United States" and "to act only within the scope of its actual authority and to comply with all lawful instructions or directions received from Treasury."

68. The FAA authorizes Citibank to "freeze accounts, and transfer funds in frozen accounts, at the direction of the relevant secured party [*i.e.*, EPA]," but specifies that any such action must be "in accordance with the account control agreements." In other words, nothing in the FAA authorizes Citibank to freeze or transfer JCF's award money absent a valid "Notice of Exclusive Control" under the ACA.

69. The FAA provides EPA with "full account visibility." The FAA thus gives EPA full, real-time view access into all accounts of JCF and its subrecipients, and full transparency into how award funds are being disbursed.

## VI. JCF Uses Award Funds Provided by Citibank in the Normal Course.

70. JCF's funds were fully obligated by EPA on August 8, 2024.

71.     JCF drew money from its Citibank accounts approximately once every two weeks to pay operating expenses, as permitted by the governing Terms and Conditions, which requires prior approval for drawing of transfers that will not be disbursed in the following fourteen business days. *See* Ex. A (December NOA) at 60.

72.     JCF has used award funds for salaries and benefits for the 14 employees on its payroll.

73.     JCF plans to use award funds to fund green lending projects to benefit under-resourced communities. Thus far, JCF has selected 34 community lenders to receive funds.

74.     Throughout this period, EPA has exercised its oversight and supervisory authority, including through: receipt of quarterly, semi-annual, and annual reports; holding frequent and regular meetings to discuss JCF's program plans, reporting, oversight, and application of the EPA Terms and Conditions; view access to each of JCF's Citibank accounts, allowing EPA to see funds being spent and what budget category that spending relates to; the requirement that JCF provide a certification each time it submits a draw request to Citibank for a financial assistance transaction establishing that the draw is necessary to execute against its EPA-approved workplan; JCF's adoption of detailed policies as required by EPA, including investment policies and procedures to approve projects, many of which require further reporting from project borrowers; and JCF's being subject to standard audit requirements by a third-party auditor, including both financial audits and a Single Audit for federal grant compliance.

**VII.   EPA Takes Actions to Attempt to Suspend or Terminate JCF's Award, And to Cause Citibank to Withhold JCF's Funds.**

75.     On January 30, 2025, Administrator Zeldin was sworn in as the EPA Administrator.

76.     On February 12, 2025, Administrator Zeldin made a public statement announcing EPA's goal of taking possession of grant funds disbursed pursuant to the Inflation Reduction Act.[8] Without mentioning any specific basis for adverse action under the terms of JCF's award—or that of any other recipient—Administrator Zeldin stated that "the financial agent agreement with the Bank needs to be instantly terminated," and stated that "the Bank must immediately return" the grant funds.[9] To ensure EPA "reassume[s] responsibility for all of these funds," Administrator Zeldin then stated that he would "refer[] this matter to the Inspector General's Office and … work with the Justice Department," and that EPA was "not going to rest" until it had "recover[ed]" the grant funds.[10]

77.     According to public news reporting, EPA thereafter took multiple actions designed to suspend or terminate JCF's award and cause Citibank to withhold award funds from JCF. Those actions include, but are not limited to:

a.    On February 17, 2025, the Office of the Deputy Attorney General ("ODAG") at the Department of Justice communicated with the United States Attorney's Office in Washington, D.C. ("USAO-DC"), seeking to open a grand jury investigation into GGRF contracts awarded by EPA, including to JCF.[11] Denise Cheung, the Chief of the

---

[8]    Lee Zeldin (@EPALeeZeldin), X, at 1:40 (Feb. 12, 2025, 7:52 PM), https://x.com/epaleezeldin/status/1889840040622321778.
[9] *Id*. at 2:15.
[10]    Rapid Response 47 (@RapidResponse47), X (Feb. 25, 2025, 10:16 AM), https://x.com/RapidResponse47/status/1894406216052289869.
[11] *Read the Resignation Letter by Denise Cheung, a Veteran D.C. Federal Prosecutor*, Wash. Post (Feb. 18, 2025), https://www.washingtonpost.com/dc-md-va/2025/02/18/read-resignation-letterdenise-cheung/; *see also* Kyle Cheney, et al., *Senior Prosecutor in Washington Quits, Citing Pressure to Probe Biden-era Climate Funds*, Politico (Feb. 18, 2025), https://www.politico.com/news/2025/02/18/denise-cheung-us-attorneys-office-washington-020363.

Criminal Division at USAO-DC, advised that there was not an adequate factual basis to open that grand jury investigation.[12]

b.  On February 17, 2025, FBI "recommended" that Citibank freeze assets in the accounts of JCF and every other prime recipient of a GGRF grant.[13] FBI did not refer to the FAA between Citibank and Treasury, or any obligations under the FAA. FBI did not produce a warrant issued by a judge who found probable cause based on a sworn affidavit. FBI did not articulate exigent circumstances justifying an immediate seizure of JCF's assets without notice to JCF. FBI did not identify any substantive factual basis for this "recommendation." FBI took this action even though Ms. Cheung had advised that there was not "sufficient evidence to tell the bank that there is probable cause to seize the particular accounts identified."[14]

c.  That same day, the ODAG instructed that a second letter be sent to Citibank directing that Citibank implement an asset freeze and refrain from releasing funds in the accounts of 28 other GGRF awardees and subawardees pursuant to a criminal investigation.[15] In response, senior officials at the DC-USAO again asserted there was not sufficient evidence to justify issuing that letter.[16] Consistent with her oath of office, Ms. Cheung refused to send the letter and was forced to resign on February 18, 2025.[17]

---

[12] *Resignation Letter*, *supra* note 11 (noting assessment that no "predicate for opening such a grand jury investigation existed" on the face of the existing documents provided by ODAG).
[13] Exhibit 5 to Citibank's TRO Opposition, *Climate Fund United v. Citibank, N.A.*, No. 25-cv-698-TSC (D.D.C. Mar. 12, 2025), ECF No. 14-5.
[14] *Resignation Letter*, *supra* note 11.
[15] *Id.*; see Exhibit 5 to Citibank's TRO Opposition, supra note 13, at 5–6.
[16] *Resignation Letter*, *supra* note 11.
[17] *Id.*

    d.   Apparently without signoff from other prosecutors at the DC-USAO, Interim U.S.
Attorney Ed Martin submitted a seizure warrant application with a magistrate judge,
which was rejected.[18] After that, ODAG reportedly sought a different U.S. attorney's
office to carry out the warrant request in order to launch a grand jury investigation and
obtain a court-ordered bank freeze, but prosecutors in that office likewise refused to do
so.[19]

    e.   On February 19, 2025, Administrator Zeldin stated on X that he had "just read" a "grant
agreement" related to the GGRF, characterizing it as "wild."[20]

    f.   On February 23, 2025, Administrator Zeldin discussed the GGRF program on national
television and stated, without basis, that "the entire scheme, in my opinion, is
criminal."[21]

    g.   On March 2, 2025, EPA Deputy Administrator W.C. McIntosh sent a letter to EPA's
Office of the Inspector General asking for an OIG investigation into GGRF funding.[22]
That letter, which was public, stated that Citibank was withholding the funds

---

[18] Spencer Hsu, Maxine Joselow & Nicolas Rivero, *FBI Takes Up EPA Probe Amid Pushback from Judge, Prosecutors*, Wash. Post (Feb. 27, 2025), https://www.washingtonpost.com/dc-mdva/2025/02/27/trump-fbi-epa-grant-investigation/.

[19] *Id.*

[20] Lee Zeldin (@EPALeeZeldin), X (Feb. 19, 2025, 4:01 PM), https://x.com/epaleezeldin/status/1892318587961930086.

[21] Sunday Morning Futures (@SundayMorningFutures), X (Feb. 23, 2025, 11:21 AM), https://x.com/SundayFutures/status/1893697750937505807; *see also* Zack Colman, *Recipient Isn't Giving in as Trump's EPA Tries to Revoke Climate Grants*, Politico (Feb. 24, 2025), https://www.politico.com/news/2025/02/24/climate-grant-recipient-spending-trumps-epa-tries-claw-back-00205814 (collecting quotes).

[22] EPA Formally Refers Financial Mismanagement of $20B "Gold Bars" to Inspector General, EPA (last updated Mar. 3, 2025), https://www.epa.gov/newsreleases/epa-formally-refersfinancial-mismanagement-20b-gold-bars-inspector-general.

"voluntarily." The letter did not disclose FBI's "recommendation" to freeze the funds or EPA's role in procuring that "recommendation."

h.   EPA then sent a copy of that letter to Citibank by email, asserting that the letter "highlights several of the egregious instances of misconduct regarding $20 billion GGRF distributions that have been improperly funneled through your financial institution," and stating that "EPA will continue our efforts to re-establish accountability and oversight over the GGRF, which is riddled with self-dealing, conflicts of interest, extraordinarily unqualified recipients, improperly reduced government oversight, and much more."[23] Beyond these generalized statements, the communication to Citibank offers no basis for its assertions of "conflicts of interest, extraordinarily unqualified recipients," or "improperly reduced government oversight" with respect to JCF (or any other awardee).

i.   On March 4, 2025, the Department of Treasury directed Citibank not to disburse funds from any of the GGRF accounts for a specified period. In an email to Citibank at 10:02 PM, Treasury stated that "Treasury is instructing Citibank, in its capacity as fiduciary, to work directly with the EPA to establish and implement reasonable account controls to serve the purposes and interests of the United States, in accordance with Section 5 of the FAA. Further, in order to provide the EPA with the necessary time to develop reasonable account controls, we are further instructing Citibank not to disburse funds from any of the GGRF accounts prior to the end of the day Sunday, March 9, 2025."

---

[23] Exhibit 6 to Citibank's TRO Opposition, *Climate United Fund v. Citibank, N.A.*, No. 25-cv-698-TSC (Mar. 12, 2025), ECF No. 14-6.

j.  Neither the ACA nor the FAA permits such a direction based on vague and unfounded suspicions. The FAA only permits Citibank to freeze funds "in accordance with the account control agreements," but the ACA did not permit this freeze. The FAA requires Citibank to comply with "all lawful instructions or directions received from Treasury," but the instructions on March 4 and 10 were not lawful. Citibank's role as a fiduciary of the United States does not extend to suborning unlawful conduct by EPA or Treasury.

k.  On March 8, 2025, EPA sent Citibank a letter regarding GGRF grant recipients. On information and belief, that communication directed Citibank to "not resume processing payment instructions for GGRF accounts," or language to that effect.

l.  On March 10, 2025, in an email to Citibank with the timestamp of 12:28 AM eastern time, EPA directed Citibank to continue to refrain from processing payments. The message stated: "In its communication to the Bank this week, the U.S. Department of the Treasury (Treasury) directed the Bank to cooperate with EPA on account controls. To prevent the misuse of funds in the interim, EPA instructs the Bank, pursuant to this Treasury directive, the grant agreements, and Section I.B of Exhibit A to the [FAA], to pause the processing of payment instructions for the GGRF accounts until further notice."

m.  This direction was also illegal: Section I.B of Exhibit A to the FAA did not permit Treasury to take this step unless the award was lawfully terminated. As of March 10, the award had not been terminated and no termination would have been lawful.

78.  Presumably due to EPA's unlawful pressure campaign, Citibank has failed to comply with JCF's normal-course request for a disbursement, as required by the ACA, and has

failed to provide JCF with any legal basis for its failure to act other than a vague reference to awaiting EPA's guidance.

a. On February 25, 2025, JCF placed a request to Citibank to draw funds from JCF's account. In the normal course, Citibank would have distributed the funds to JCF. But JCF's accounts with Citibank do not reflect that the disbursement occurred, and JCF did not receive any funds from its account.

b. On February 26, 2025, at 3:40 pm, JCF submitted an email message to Citibank noting that its funding request remained pending and had not been disbursed. The letter asked for an update on the status of the draw request.

c. On February 26, 2025, at 6:41pm, Citibank responded, saying that Citibank "d[id] not have an updated status at this time" and were "continu[ing] to monitor the situation with EPA for status updates." Citibank stated that it would "advise once we have new information to share regarding the draw request." JCF received no further communications from Citibank.

d. On March 4, 2025, in "a statement emailed to *Newsweek*…, a spokesperson for Citibank said Citi has been working with federal officials to 'address government officials' concerns' regarding the GGRF. 'Our role as financial agent does not involve any discretion over which organizations receive grant funds,' the bank said in its statement. 'Citi will of course comply with any binding instructions from the federal government.'"[24]

---

[24] Jeff Young, *Green Group Wants EPA to Explain Why $20 Billion Accounts Are Frozen*, Newsweek (Mar. 4, 2025), https://www.newsweek.com/climate-united-fund-epa-letter-frozenbank-accounts-2039608.

79.     EPA has failed to provide JCF with a reasoned explanation for its actions or a meaningful opportunity to object or to be heard. EPA never informed JCF that EPA had been trying to freeze, suspend, or terminate JCF's award or its access to award funds, or that EPA had directed Citibank to stop disbursing funds to JCF. EPA never provided JCF with a reasoned explanation, or any explanation, for its actions.

## VIII.    EPA Sends a Purported "Notice of Termination"

80.     On March 11, 2025, EPA sent JCF a "Notice of Termination" ("Notice"). That Notice is materially identical to the notices that EPA sent to the three NCIF recipients that are at issue in *Climate United* Litigation and is attached hereto as **Exhibit C**.

81.     The "Notice" states that EPA is terminating JCF's award "[p]ursuant to [EPA's] authority under 2 C.F.R. §[ ] 200.339." Ex. C at 1. 2 C.F.R. § 200.339 applies only when "the recipient … fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award." EPA's "Notice" does not offer any explanation as to how JCF violated any constitutional provision, statute, regulation, term, or condition of the grant, let alone any evidence that might substantiate such an allegation.

82.     The "Notice" also states that EPA is terminating JCF's award "[p]ursuant to [EPA's] authority under … 2 C.F.R. §§ 200.340." Ex. C at 1. 2 C.F.R. § 200.340, which is the only termination authority mentioned in EPA's General Terms and Conditions for grants, permits termination "[b]y the Federal agency … if the recipient … fails to comply with the terms and conditions of the Federal award" or "[b]y the Federal agency … pursuant to the terms and conditions of the Federal award …." 2 C.F.R. § 200.340(a)(1) and (4). EPA's "Notice" does not offer any explanation as to how JCF has failed to comply with any Terms and Conditions of its grant, let alone any evidence that might substantiate such an allegation.

83.     The "Notice" also states that EPA is terminating JCF's award "[p]ursuant to [EPA's] authority under … the General Terms and Conditions of EPA assistance award agreements." Ex. C at 1. EPA's "Notice" does not offer any explanation as to how JCF has failed to comply with any General Terms and Conditions of EPA assistance award agreements, let alone any evidence that might substantiate such an allegation.

84.     The "Notice" also states that EPA is terminating JCF's award "[p]ursuant to [EPA's] authority under … the terms and conditions of the Grant Agreement." *Id.* The Grant Agreement specifies that termination may occur only if one of three conditions is met: (1) noncompliance with the grant's Terms and Conditions; (2) "adequate evidence of Waste, Fraud, or Abuse," which in turn requires "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act"; and (3) "material misrepresentation of eligibility status." Ex. A at 43. EPA's "Notice" does not say which of these conditions has been met, provide any explanation as to how JCF has violated the terms or conditions of the grant, or offer any evidence to substantiate any such allegation.

85.     The "Notice" also states that EPA is terminating JCF's award "[p]ursuant to … the Agency's inherent authority to reconsider prior determinations in light of new information." Ex. C at 1. EPA's "Notice" does not identify the source of such inherent authority or any new information to support reconsidering the prior determination to award the grant to JCF less than one year ago.

86.     The "Notice" also states that the "termination is based on substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities, which collectively undermine the fundamental goals

and statutory objectives of the award." *Id.* EPA's "Notice" does not identify any legal or factual basis for terminating the grant on these grounds.

87.    The "Notice" also states that EPA has identified certain deficiencies, such as "the absence of adequate oversight and account controls," "allocation of funds inconsistent with EPA's oversight and fiscal responsibilities," and the "circumvention and defeat of key oversight mechanisms." *Id.* EPA's "Notice" does not substantiate these concerns or identify any legal or factual basis for terminating the grant on these grounds.

88.    Finally, the "Notice" asserts that EPA has "determined that its existing process for awarding and overseeing execution of the Grant Agreement" may violate the "Appointments Clause and private nondelegation doctrine." *Id.* at 2. EPA's "Notice" does not explain any legal or factual basis for terminating the grant on these grounds. Indeed, neither the Appointments Clause nor the private nondelegation doctrine is implicated by this grant agreement.

89.    By press release dated March 11, 2025, EPA confirmed that it had "notified National Clean Investment Fund and Clean Communities Investment Accelerator recipients of the termination of their grant agreements."[25]

## IX.    EPA Modifies Its General Terms and Conditions to Add a New Ground for Termination, Then Rescinds Those Changes Days Later.

90.    On March 25, 2025, EPA updated its general terms and conditions to add "a new termination provision if the award no longer effectuates the program goals or agency priorities."

91.    The new termination provision purported to permit termination, with respect to "all new awards and funding amendments (incremental and supplemental) made on or after March 25,

---

[25] *See* Press Release, EPA, Administrator Zeldin Terminates Biden-Harris $20B 'Gold Bar' Grants (Mar. 11, 2025), https://www.epa.gov/newsreleases/administrator-zeldin-terminates-biden-harris-20b-gold-bar-grants.

2025," "[b]y the EPA or pass-through entity to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

92.     This new termination provision would not have been effective as against JCF's CCIA award, for at least three reasons: (1) the exclusive grounds for termination are set forth in the Terms and Conditions of the Grant Agreement, Ex. A (December NOA) at 43; (2) EPA may not unilaterally modify the Terms and Conditions of the Grant Agreement, *id.* at 54; and (3) the Grant Terms and Conditions formally incorporate EPA's General Terms and Conditions as they were on the effective date of the December NOA, which cannot be changed without JCF's consent, *see id.* at 54-55 (providing that "the EPA General Terms and Conditions effective October 1, 2024" "are incorporated by reference into the Award Agreement as of the effective date of this amended Award Agreement" and are "controlling … in the event [they] are … replaced"); *see also id.* at 55 ("This provision cannot be changed without the consent of the Recipient.").

93.     On Friday, March 28, 2025, EPA effectively rescinded its March 25, 2025, changes, replacing the EPA General Terms and Conditions with the version that was effective prior to March 25, 2025.

**X.     Citibank and EPA's Actions Have Harmed JCF.**

94.     JCF was created specifically to apply for and distribute money pursuant to the CCIA grant. The CCIA award is currently the basis of funding for all financing projects that JCF is planning to launch and for nearly all of JCF's operations. Even temporary inability to access its funding immediately threatens JCF's operations, its ongoing and future projects, and its long-term reputation.

95.     Without access to its award funds, JCF is unable to carry out the mission for which it was created and funded—deploying capital to vetted community lenders for use funding green projects that would not otherwise have been financed.

96.     EPA's and Citibank's actions harm both JCF's reputation and the ultimate success of JCF's endeavors. Many community lenders were already hesitant about participating in the GGRF program for fear of being labeled "woke" or otherwise targeted. Through careful relationship building and concerted efforts to educate potential partners on the benefits of clean lending—including the massive potential for job creation and the benefits to under-resourced communities—JCF was able to generate significant interest in its mission. EPA's baseless accusations of "waste, fraud, or abuse," and its targeting of JCF, have damaged the relationships JCF forged. And Citibank's refusal to permit JCF to draw its grant funds has prevented JCF from making good on its commitments to its community lending partners.

97.     EPA's and Citibank's actions place JCF at risk of running afoul of the NOA, which would further hamper its mission. The NOA provides that "[t]he EPA Project Officer may assess whether the Recipient is making sufficient progress in implementing the workplan in effect under this Assistance Agreement within 90 calendar days of June 30, 2025." Ex. A at 42. "'Sufficient progress' shall be assessed based on a comparison of the Recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes." *Id.* If JCF is found not to have achieved "sufficient progress"—because EPA and Citibank have cut off its access to the funds essential to its mission—it may be subject to a "corrective action plan" under 2 C.F.R. § 200.208. *Id.* at 43.

98.     2 C.F.R. § 200.208 permits EPA to, among other things, "withhold[] authority to proceed to the next phase until receipt of evidence of acceptable performance," "[r]equir[e] additional project monitoring," and "establish[] additional prior approvals." 2 C.F.R. § 200.208(c). Unless it is remedied quickly, EPA's concerted effort to stymie JCF's work could succeed even if its attempt to claw back the grant fails. Absent access to the funds it is charged with deploying,

JCF risks being found not to have made "sufficient progress," which would enable EPA to impose measures that would slow JCF's work to a halt even if it regains access to its grant funds.

**XI.    EPA Agrees Not to Move JCF's Grant Money out of or Exercise Control over JCF's Citibank Account While the Temporary Restraining Order for the NCIF Plaintiffs is In Effect.**

99.    On March 18, 2025, the court issued a temporary restraining order in the *Climate United* Litigation, which (among other things) enjoined EPA Defendants "from giving effect to EPA Defendants' Termination Letter, pending a determination on the merits" and "from transmitting or taking action to implement the termination of Plaintiffs' grants, including taking action that results in the transfer, re-obligation, or re-allocation of the grant funds in Plaintiffs' Citibank accounts, or issuing a Notice of Exclusive Control under its agreements[.]" *Climate United Fund v. Citibank, N.A.*, -- F. Supp. 3d ---, 2025 WL 842360, at *12 (D.D.C. Mar. 18, 2025).

100.    On March 28, 2025, as conveyed in an email to JCF's counsel—attached hereto as **Exhibit D**—"EPA … agreed not to take any steps to move the money out of or exercise control over JCF's Citi account while the TRO for the NICF [sic] plaintiffs is in effect." Ex. D at 1.

101.    In reliance on these representations, JCF does not intend at present to seek a temporary restraining order to enjoin the EPA Defendants from taking steps to move money out of or exercise control over JCF's Citibank account.

## CLAIMS FOR RELIEF

### COUNT ONE: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT— ARBITRARY AND CAPRICIOUS (CHALLENGE TO TERMINATION) (EPA Defendants)

102.    JCF repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

103.    The APA authorizes this Court to hold unlawful and set aside final agency action that is "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A).

104.    On March 11, 2025, EPA purported to terminate JCF's grant by delivering a "Notice of Termination."

105.    EPA's purported termination of JCF's grant constitutes final agency action under the APA.

106.    EPA's purported termination of JCF's grant is arbitrary and capricious because EPA had no legal or factual basis for the termination and EPA did not provide an adequate or reasoned basis for the termination.

    a.  The "Notice" states that EPA is terminating JCF's grant "[p]ursuant to [EPA's] authority under 2 C.F.R. §§ 200.339-40, the General Terms and Conditions of EPA assistance award agreements, the terms and conditions of the Grant Agreement, and the Agency's inherent authority to reconsider prior determinations in light of new information." Ex. C at 1. But EPA's "Notice" does not offer any evidence or explanation to support termination on those grounds. Indeed, there is no legal or factual basis for termination on any of those grounds. JCF has not violated any constitutional provision, statute, or regulation; has not failed to comply with any Terms or Conditions of its grant; has not failed to comply with any General Terms and Conditions of EPA assistance award agreements; has not engaged in "Waste, Fraud, or Abuse," which is defined as "the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act"; and has not triggered any of the grounds for termination under the Terms and Conditions of its grant.

    b.  EPA's "Notice" does not identify the source of any inherent authority to terminate the grant; does not identify any new information to support reconsidering the prior

determination to award the grant to JCF less than one year ago; does not identify any basis to terminate the grant based on concerns about program integrity, the award process, programmatic fraud, waste, and abuse, misalignment with the Agency's priorities, or sufficiency of oversight mechanisms or account controls; and does not explain any legal or factual basis for terminating the grant based on the Appointments Clause or the private nondelegation doctrine.

c.  EPA's termination reflects an arbitrary and capricious change in position. EPA has provided no reasoned explanation for its decision to terminate JCF's grant on March 11, 2025, when the grant was awarded in April 2024, following months of rigorous review as part of a competitive application process.

d.  EPA's "Notice" provides no explanation for its abrupt change of position that accounts for upsetting the reliance interests of JCF and its community lenders.

107.    JCF is entitled to an injunction against EPA's wrongful action.

108.    Pursuant to 28 U.S.C. § 2201, JCF is entitled to a declaration that EPA's termination of the grant is arbitrary and capricious, in violation of the APA.

**COUNT TWO: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT - NOT IN ACCORDANCE WITH FEDERAL REGULATIONS (CHALLENGE TO TERMINATION)**
**(EPA Defendants)**

109.    JCF repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

110.    The APA authorizes this Court to hold unlawful and set aside final agency action that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

111.    On March 11, 2025, EPA purported to terminate JCF's grant by delivering a "Notice of Termination."

112.    EPA's termination of JCF's award constitutes final agency action under the APA.

113.    EPA's termination of JCF's award is not in accordance with law because it violates multiple federal regulations. For example:

a.    EPA's termination of the award violates EPA regulations and Uniform Grant Guidance regulations codified at 2 C.F.R. § 200 *et seq.*, which do not allow EPA to terminate JCF's grant under these circumstances.

b.    EPA's termination of the award has not complied with EPA's regulatory obligation to take certain procedural steps to terminate the award agreement, such as providing written notice of termination that includes "the reasons for termination, the effective date, and the portion of the Federal award to be terminated, if applicable." 2 C.F.R. § 200.341(a). The Notice only provides vague references to "waste" and "accountability," among other things, with no supporting evidence or facts as to what JCF is alleged to have done wrong. *See generally* Ex. C.

c.    EPA's termination of the award has resulted in improperly withholding payment for allowable costs without establishing that JCF has either "failed to comply with the terms and conditions of the Federal award" or is "delinquent in a debt to the United States." 2 C.F.R. § 200.305(b)(6).

d.    EPA's termination of the award has resulted in improperly withholding payment without first making a "determin[ation] that noncompliance cannot be remedied by imposing specific conditions." 2 C.F.R. § 200.339. Although the Notice includes a vague reference to "material deficiencies" and asserts that "these deficiencies … cannot be remedied by imposing specific conditions," Ex. C at 1, EPA does not explain these statements or offer facts to support them.

e.  EPA's termination of the grant does not comply with 2 C.F.R. § 200.340(b), which states: "The Federal agency or pass-through entity must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award." EPA's termination decision is not grounded in the "terms and conditions of the Federal award." Instead, the termination is based on EPA's disagreement with the GGRF program.

114.    Although EPA's "Notice" states that EPA is terminating JCF's award "[p]ursuant to [EPA's] authority under 2 C.F.R. §§ 200.339-40," Ex. C at 1, those regulations do not provide EPA with grounds to terminate the award.

a.  2 C.F.R. § 200.339 applies only when "the recipient … fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award." EPA has not provided any reasoned legal or factual basis to conclude that JCF has violated any constitutional provision, statute, regulation, or term or condition of the grant. Indeed, JCF has not violated any constitutional provision, statute, regulation, or term or condition of the award.

b.  2 C.F.R. § 200.340 permits termination "[b]y the Federal agency … if the recipient … fails to comply with the terms and conditions of the Federal award" or "[b]y the Federal agency … pursuant to the terms and conditions of the Federal award …." 2 C.F.R. § 200.340(a)(1) and (4). EPA has not provided any reasoned legal or factual basis to conclude that JCF has failed to comply with any Terms and Conditions of its award.

115.    JCF is entitled to an injunction against EPA's wrongful action.

116.    Pursuant to 28 U.S.C. § 2201, JCF is entitled to a declaration that EPA's termination of the award is not in accordance with federal regulations, in violation of the APA.

**COUNT THREE: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT—NOT IN ACCORDANCE WITH INFLATION REDUCTION ACT (CHALLENGE TO TERMINATION)**
**(EPA Defendants)**

117.    JCF repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

118.    The APA authorizes this Court to hold unlawful and set aside final agency action that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

119.    On March 11, 2025, EPA purported to terminate JCF's award by delivering a "Notice of Termination."

120.    EPA's termination of JCF's award constitutes final agency action under the APA.

121.    EPA's termination of the award violates the Inflation Reduction Act. The Act requires EPA to spend the funds appropriated for grants to be awarded under the Greenhouse Gas Reduction Fund, 42 U.S.C. § 7434. EPA violated the Act because it has not satisfied the stringent requirements for rescinding an appropriation under 2 U.S.C. § 683.

122.    Even if EPA "re-obligate[s] lawfully appropriated funds within the GGRF program," as EPA claimed in its Notice of Grant Termination that it will do, Ex. C at 2, EPA's action would still be illegal. The Inflation Reduction Act sets a September 30, 2024, deadline for all grants to be awarded. 42 U.S.C. § 7434(a)(1)–(3). Illegally terminating the entire program, and then re-awarding grants to unspecified new recipients, is inconsistent with that September 30, 2024 deadline.

123.    As a result of EPA's conduct, JCF has suffered and will continue to suffer irreparable injury.

124.    JCF is entitled to an injunction against EPA's wrongful action.

125.     Pursuant to 28 U.S.C. § 2201, JCF is entitled to a declaration that EPA's termination of the award is not in accordance with the Inflation Reduction Act, in violation of the APA.

## COUNT FOUR: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT (CHALLENGE TO SUSPENSION) (EPA Defendants)

126.     JCF repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

127.     The APA authorizes this Court to hold unlawful and set aside final agency action that is "arbitrary, capricious, … or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

128.     Prior to March 11, 2025, EPA effectuated a suspension of JCF's award by causing Citibank to withhold JCF's grant funds.

129.     EPA's suspension of JCF's award constitutes final agency action under the APA.

130.     EPA's suspension of JCF's award is not in accordance with federal regulations, as described above. For example, EPA's actions resulted in improperly withholding payment for allowable costs without establishing that JCF has either "failed to comply with the terms and conditions of the Federal award" or is "delinquent in a debt to the United States." 2 C.F.R. § 200.305(b)(6).

131.     EPA's suspension of JCF's award is arbitrary and capricious.

a.     EPA had no legal or factual basis to open a grand jury investigation into JCF's award. Indeed, EPA's efforts to do so caused the Chief of the Criminal Division of the United States Attorneys' Office in Washington, D.C. to resign from that office after 24 years of service.

b.     EPA had no legal or factual basis to cause a Freeze Letter to be issued to Citibank, or to cause Citibank or Treasury to freeze JCF's award funds, particularly when the freeze

"recommendation" was not supported by an order issued by a judge based on probable cause and cited no evidence in support of freezing JCF's grant funds.

c. EPA had no legal or factual basis to direct Treasury to demand that Citibank stop disbursing funds. Further, Treasury's action did not comply with the FAA, which states that any freeze of JCF's accounts must occur in accordance with the ACA and must be lawful.

132.    JCF continues to experience ongoing injury from the suspension because during the suspension period it has not received funds to which it is lawfully entitled. Further, even if the termination is enjoined, any suspension that remains in effect would cause harm to JCF.

133.    JCF is entitled to an injunction against EPA's wrongful action.

134.    Pursuant to 28 U.S.C. § 2201, JCF is entitled to a declaration that EPA's suspension of the award is arbitrary, capricious, and not in accordance with law, in violation of the APA.

## COUNT FIVE: VIOLATION OF THE APPROPRIATIONS CLAUSE
### (EPA Defendants)

135.    JCF repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

136.    The Appropriations Clause provides: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I,§ 9, cl. 7.

137.    The provision of the Inflation Reduction Act authorizing the GGRF is an "appropriation" because it authorizes EPA to expend $27 billion for purposes of carrying out the GGRF program.

138.    In the Inflation Reduction Act, Congress "appropriated to the [EPA] Administrator … $8,000,000,000, to remain available until September 30, 2024, to make grants, on a competitive

basis." 42 U.S.C. § 7434(a)(3). The Appropriations Clause therefore forbids EPA from using appropriated funds to award grants after the statutory deadline.

139.    In the "Notice of Termination," EPA states: "EPA will work to re-obligate lawfully appropriated funds within the GGRF program …" Ex. C at 2. In doing so, EPA seeks to spend money in a manner Congress has not permitted, in violation of the Appropriations Clause.

140.    If EPA re-obligates GGRF's award funds to its preferred recipients, EPA would be violating Congress's intention for the funds to be obligated to clean-energy grants *that were completed prior to September 30, 2024*.

141.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr, Inc.*, 575 U.S. 320, 327 (2015).[26]

142.    JCF is entitled to an injunction against EPA's wrongful action.

143.    Pursuant to 28 U.S.C. § 2201, JCF is entitled to a declaration that EPA's suspension and termination of the grant violates the Appropriations Clause.

### COUNT SIX: VIOLATION OF THE DUE PROCESS CLAUSE
### (EPA Defendants)

144.    JCF repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

145.    Under the Fifth Amendment to the United States Constitution, the government may not deprive a person or entity of a protected property interest without due process of law.

146.    JCF has a protected property interest in its award funds under the CCIA and in the accounts at Citibank to which those funds were disbursed.

---

[26] The APA independently authorizes JCF to bring this claim. 5 U.S.C. § 706(2).

147.    The government's actions preceding the termination, up to and including the termination, violated the Due Process Clause. For example:

a.    EPA caused Citibank to freeze JCF's assets without first obtaining a court order based on probable cause and supported by a sworn affidavit. Indeed, EPA initiated the freeze despite a judge having expressly rejected an application for a seizure warrant on the basis that no probable cause existed.

b.    EPA never informed JCF that EPA was trying to freeze, suspend, or terminate JCF's award or its access to award funds, or that EPA was coordinating in secret with Treasury and FBI to direct Citibank to stop disbursing funds to JCF. EPA thus deprived JCF of its property in the award funds without providing JCF notice or an opportunity to be heard prior to the initiation of the freeze.

c.    EPA also failed to provide JCF notice or an opportunity to challenge the freeze once it had been implemented. After JCF deduced that its funds had been frozen, EPA refused to respond to JCF's requests to provide an explanation as to why its funding had been frozen and never notified JCF that its funds had been frozen at the EPA's discretion. At the same time—and again without providing JCF notice of its actions—EPA was continuing to pressure Citibank to keep JCF from accessing funds in its accounts and ultimately directed Treasury to order Citibank to withhold JCF's funds.

d.    In an attempt to extend the unlawful freeze of JCF's assets, EPA issued the "Notice of Termination" without any legal or factual basis. It offered no notice or process to JCF before doing so; and the "Notice" provides no opportunity for JCF to challenge the purported "termination" of its award funds after the fact.

148.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr, lnc.*, 575 U.S. 320, 327 (2015).[27]

149.    EPA's weekslong effort to deprive JCF of its property in the award funds violates the Due Process Clause. JCF is entitled to an injunction preventing EPA from continuing to deprive JCF of access to the funds in its accounts without due process.

## COUNT SEVEN: BREACH OF CONTRACT
### (Defendant Citibank)

150.    JCF repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

151.    Citibank has a duty under the ACA to disburse JCF's award funds to JCF, as JCF requests. Under the ACA, Citibank "shall comply with all instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and financial assets in the Accounts," including instructions from "the Pledgor"—*i.e.*, JCF. Ex. B § 2.

152.    When JCF requested that Citibank disburse award funds held in JCF's accounts in accordance with the ACA, Citibank failed to disburse such funds.

153.    Citibank has no legal or factual basis for failing to disburse award funds from JCF's accounts, as required by the ACA.

154.    Under the ACA, Citibank's duties with respect to JCF's award funding are exclusively "administrative or ministerial (and shall not be construed as fiduciary in nature)," and Citibank "shall not be responsible" for determining whether JCF's requests for the disbursement of award funds comply with any applicable contracts or laws. Ex. B at 3.

---

[27] The APA independently authorizes JCF to bring this claim. 5 U.S.C. § 706(2).

155.     The only condition under which Citibank is allowed to refuse JCF's request to disperse funds is if EPA has delivered a "Notice of Exclusive Control." EPA has not delivered such a Notice of Exclusive Control to Citibank.

156.     The FAA between Citibank and Treasury, to which JCF is not a party, does not provide Citibank with a legal basis to fail to disburse JCF's award funds as required by the ACA. The FAA authorizes Citibank to "freeze accounts" only "in accordance with" the ACA and in compliance with "lawful instructions or directions received from Treasury." But Citibank froze JCF's funds without following the ACA's termination provisions and based on instructions that were not lawful.

157.     By failing to disburse award funds held in JCF's accounts, Citibank has breached the ACA.

158.     Citibank's failure to disburse funds, as required under the ACA, has caused damage to JCF.

159.     JCF understands the predicament that EPA placed Citibank in by instructing Citibank not to disperse funds to which JCF was lawfully entitled under the ACA's plain terms. But allowing the U.S. government to unlawfully freeze bank customers' assets risks destabilizing the entire banking system. Even if its breach was understandable, Citibank plainly violated the clear terms of the ACA by refusing to honor JCF's request to disperse award funds to which it was lawfully entitled.

160.     Pursuant to 28 U.S.C. § 2201, JCF is entitled to a declaration that Citibank's failure to disburse funds from JCF's accounts is a breach of the ACA.

161.     JCF is entitled to an injunction against Citibank's wrongful refusal to honor JCF's disbursement requests.

**PRAYER FOR RELIEF**

WHEREFORE, JCF respectfully asks this Court to:

1. Declare that EPA's purported "Notice of Termination" is null, void, and of no legal effect;

2. Declare that EPA Defendants' actions violate the Administrative Procedure Act because they are arbitrary and capricious, not in accordance with federal regulations, and not in accordance with federal statutes;

3. Declare that EPA Defendants' actions violate the Appropriations Clause;

4. Declare that EPA Defendants' actions violate the Due Process Clause;

5. Enjoin EPA Defendants and others in active concert or participation therewith, including officials at the U.S. Department of the Treasury, from impeding Citibank or from causing Citibank to deny, obstruct, delay, or otherwise prevent JCF from accessing its funds as permitted under the terms of the ACA and the grant award;

6. Enjoin EPA Defendants from unlawfully suspending or terminating JCF's award, including by effectuating the Notice of Termination or sending a Notice of Exclusive Control under the ACA, except as permitted in accordance with the ACA, the grant award, and applicable law;

7. Declare that Citibank's failure to disburse award funds from JCF's accounts is a breach of the ACA;

8. Order Citibank to process, disburse, and release all funds in accounts established in connection with JCF's award, at JCF's request, in accordance with the ACA, both with respect to requests JCF has already submitted and with respect to future requests;

9. Order that Citibank may not transfer or otherwise move funds out of accounts established in connection with JCF's award, except at JCF's direction as permitted under the ACA;

10. Appoint a monitor to ensure that EPA and Citibank do not interfere with JCF's lawful

attempts to access its award funds; and

11. Grant such other and further relief as may be just and proper.

Dated: March 31, 2025                    Respectfully submitted

                                         /s/ Eric F. Citron
                                         Eric F. Citron (D.D.C. Bar ID 1001069)
                                         Kathleen Foley*
                                         ZIMMER, CITRON & CLARKE LLP
                                         1629 K Street NW
                                         Suite 300
                                         Washington, DC 20006
                                         Tel.: (202) 796-4540
                                         ecitron@zimmercitronclarke.com
                                         kfoley@zimmercitronclarke.com

                                         David J. Zimmer*
                                         ZIMMER, CITRON & CLARKE LLP
                                         130 Bishop Allen Drive
                                         Cambridge, MA 02139
                                         Tel.: (617) 676-9421
                                         dzimmer@zimmercitronclarke.com

                                         * *Pro hac vice* application forthcoming.

                                         *Attorneys for Plaintiff Justice Climate Fund*

# EXHIBIT A

5J - 84094101 - 1     Page 1

| **U.S. ENVIRONMENTAL PROTECTION AGENCY**<br><br>**Assistance Amendment** | **GRANT NUMBER (FAIN):** 84094101<br>**MODIFICATION NUMBER:** 1<br>**PROGRAM CODE:** 5J | **DATE OF AWARD**<br>12/20/2024 |
|---|---|---|
| | **TYPE OF ACTION**<br>No Cost Amendment | **MAILING DATE**<br>12/20/2024 |
| | **PAYMENT METHOD:**<br>ASAP | **ACH#** |

| **RECIPIENT TYPE:**<br>Not for Profit | **Send Payment Request to:**<br>Contact EPA RTPFC at: ▮ |
|---|---|
| **RECIPIENT:**<br>Justice Climate Fund, Inc.<br>910 17TH ST NW<br>STE 820<br>WASHINGTON, DC 20006-2606<br>EIN: | **PAYEE:**<br>Justice Climate Fund, Inc.<br>910 17TH ST NW<br>STE 820<br>WASHINGTON, DC 20006-2606 |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Amir Kirkwood<br>910 17th St. NW<br>Suite 820<br>Washington, DC 20006<br>**Email:** ▮<br>**Phone:** ▮ | Daniel OBrien<br>1200 Pennsylvania Ave, NW<br>Washington, DC 20460<br>**Email:** ▮<br>**Phone:** ▮ | Walker Oneil<br>OGD-GMBOD, 3903R<br>1200 Pennsylvania Ave, NW<br>Washington, DC 20460-0001<br>**Email:** ▮<br>**Phone:** ▮ |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

GGRF CCIA: Expanding Green Lending Capacity in Historically Underserved Communities for Enduring Change

This amendment updates all terms and conditions.

| **BUDGET PERIOD**<br>04/01/2024 - 06/30/2030 | **PROJECT PERIOD**<br>04/01/2024 - 06/30/2030 | **TOTAL BUDGET PERIOD COST**<br>$ 940,000,000.00 | **TOTAL PROJECT PERIOD COST**<br>$ 940,000,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 940,000,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants Management & Business Operations Division<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 | Environmental Protection Agency, OGGRF<br>OA - Office of the Administrator<br>1200 Pennsylvania Ave, NW<br>Washington, DC 20460 |

| **THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY** | |
|---|---|
| Digital signature applied by EPA Award Official for Phillip Schindel - Chief, Business Operations Branch<br>by Katherine Tsing-Choy - Award Official Delegate | **DATE**<br>12/20/2024 |

5J - 84094101 - 1    Page 2

## EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 940,000,000 | $ 0 | $ 940,000,000 |
| EPA In-Kind Amount | $ 0 | $ 0 | $ 0 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 940,000,000 | $ 0 | $ 940,000,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.960 - Greenhouse Gas Reduction Fund: Clean Communities Investment Accelerator | Clean Air Act: Sec. 134(a)(2) and (3) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

5J - 84094101 - 1    Page 3

Budget Summary Page

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. Personnel | $ 36,510,718 |
| 2. Fringe Benefits | $ 9,255,467 |
| 3. Travel | $ 509,628 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 361,500 |
| 6. Contractual | $ 17,637,969 |
| 7. Construction | $ 0 |
| 8. Other | $ 870,684,087 |
| 9. Total Direct Charges | $ 934,959,369 |
| 10. Indirect Costs: 10.00 % Base de minimis MTDC | $ 5,040,631 |
| 11. Total (Share: Recipient ___0.00_ % Federal __100.00_ %) | $ 940,000,000 |
| 12. Total Approved Assistance Amount | $ 940,000,000 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 940,000,000 |

5J - 84094101 - 1    Page 4

## Administrative Conditions

### A. General Terms and Conditions

The Recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2024-or-later. These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

### B. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA. Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): ▓▓▓▓▓▓▓▓▓▓▓ and EPA Grants Specialist listed on the award
- MBE/WBE reports (EPA Form 5700-52A):  Debora Bradford ▓▓▓▓▓▓▓▓▓▓▓▓▓, ▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓, and the EPA Grants Specialist listed on the award
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to Recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Grants Specialist listed on the award and EPA Project Officer listed on the award
- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer listed on the award

### C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a Recipient intends to provide Capitalization Funding to a Community Lender to support CCIA-Eligible Project(s) that involves construction or land use planning. With the exception of CCIA-Eligible Projects that will be carried out in the State of California, the Recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the CCIA-Eligible Project(s) contained in the application for funding for the project and provide comments to the EPA Project Officer. CCIA-Eligible Project(s) that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

EPA has allowed for an intergovernmental review comment period on behalf of the Recipient. This comment period closed on Tuesday October 22, 2024. The Recipient need not take any additional action with respect to intergovernmental review.

The Recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

JA1561

5J - 84094101 - 1    Page 5

## D. Pre-Award Costs

As provided in 2 CFR 200.458, Recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a Recipient incurs after EPA has notified the Recipient that its application has been selected for award consideration. The pre-award costs must be included in the workplan and budget to be eligible. As provided in 2 CFR 1500.9, Recipients incur pre-award cost at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information.

## E. Pre-Award Administrative Capability

EPA's policy for awarding Financial Assistance in excess of $200,000 to non-profit organizations requires an Administrative Capability Assessment review of the Recipient's administrative and financial management systems to be completed **prior** to the Recipient drawing down any EPA funds per EPA Order 5700.8. The Recipient is precluded from drawing down funds under this Assistance Agreement until EPA provides written confirmation of the completion of the assessment with satisfactory results. Please note, any costs incurred prior to EPA approval are the Recipient's own risk. If the Recipient fails to respond or is unable to satisfactorily address all identified deficiencies within 90 calendar days of the award date of this Assistance Agreement or within any extension of time granted by EPA, the agreement may be terminated. Noncompliance with this term and condition may result in adverse action by EPA per 2 CFR 200.339.

## F. New Recipient Training Requirement

The Recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The Recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the Recipient should refer to RAIN-2024-G01.

Case 1:25-cv-00938    Document 1    Filed 03/31/25    Page 53 of 133
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 371 of 674

5J - 84094101 - 1    Page 6

## Programmatic Conditions

**Clean Communities Investment Accelerator (CCIA) Terms and Conditions (December 12, 2024)**

## I. DEFINITIONS

**Acquisition of Intangible Property:** 2 CFR 200.1 defines Intangible Property as "property having no physical existence, such as trademarks, copyrights, data (including data licenses), websites, IP licenses, trade secrets, patents, patent applications, and property such as loans, notes and other debt instruments, lease agreements, stocks and other instruments of property ownership of either tangible or intangible property, such as intellectual property, software, or software subscriptions or licenses." Acquisitions of Intangible Property involve the purchase of Intangible Property through procurement contracts.

**Air Pollutant:** Air Pollutant means any air pollutant that is listed pursuant to Section 108(a) of the Clean Air Act (or any precursor to such an air pollutant). This includes particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead (see 40 CFR Part 50) and their precursors (e.g., volatile organic compounds).

**Apprentice:** Apprentice means an individual working on a project receiving Financial Assistance who is participating in a Registered Apprenticeship program under the National Apprenticeship Act that meets the requirements of 29 CFR Parts 29 and 30.

**Award Agreement**: Award Agreement means the set of legally binding documents between EPA and the Recipient under the federal award. Award Agreement is used interchangeably with Assistance Agreement and Notice of Award.

**Capitalization Funding**: Consistent with Section 134(b)(2) of the Clean Air Act of the Clean Air Act, the Recipient will provide Capitalization Funding to Community Lenders for the sole purpose of providing Financial Assistance to CCIA-Eligible Projects. The Recipient will provide these Subawards in the form of Subgrants, which are subject to the EPA Subaward Policy. Community Lenders will use these Subawards exclusively as capital to provide Financial Assistance to CCIA-Eligible Projects.

In general, a Community Lender may receive a maximum of $10,000,000 in total Capitalization Funding from all Recipients and Subrecipients under the Clean Communities Investment Accelerator; however, under limited exceptions, a Community Lender may receive total Capitalization Funding in excess of the $10,000,000 cap, provided that the exception has been approved by the EPA Award Official (either through the Recipient's workplan in effect under this Assistance Agreement or through separate post-award approval).

**CCIA-Eligible Project**: CCIA-Eligible Project means a project, activity, or technology that is eligible for support under this program. Section 134(b)(2) of the Clean Air Act directs that the Recipient use funds to support Community Lenders that provide Financial Assistance to Qualified Projects. For this program, a project, activity, or technology that is eligible for support through Capitalization Funding, Technical Assistance Subawards, and/or Technical Assistance Services must meet the following three requirements and is referred to as a "CCIA-Eligible Project:" (i) the project, activity, or technology must be a Qualified Project; (ii) the project, activity, or technology must be within a Priority Project Category; and (iii) the project, activity, or technology must be in a Low-Income and Disadvantaged Community.

Case 1:25-cv-00938    Document 1    Filed 03/31/25    Page 54 of 133
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 372 of 674

5J - 84094101 - 1    Page 7

**Community Lender:** Community Lender means an organization that, consistent with Section 134(b)(2) of the Clean Air Act, is eligible to receive Capitalization Funding and Technical Assistance Subawards. Section 134(b)(2) of the Clean Air Act directs that the Recipient provide funding and technical assistance to establish new or to support existing public, quasi-public, not-for-profit, or nonprofit entities that provide Financial Assistance to Qualified Projects at the state, local, territorial, or Tribal level or in the District of Columbia, including community- and low-income-focused lenders and capital providers. An organization must meet the following three requirements to be eligible as a Community Lender:

- Must be either a public, quasi-public, not-for-profit, or nonprofit entity.
  - A public entity must be a state, municipal, territorial, or Tribal government, including any department, agency, or instrumentality of one of those governments.
  - A quasi-public entity must either (1) have a close association with a public entity but not be a public entity, (2) be created by a public entity but be exempt from certain legal and administrative requirements, or (3) not have been created by a public entity but perform a public purpose and be significantly supported financially by a public entity. Any entity that has been determined by the U.S. Treasury's CDFI Fund to meet the CDFI certification requirements set forth in 12 CFR 1805.201 is a quasi-public entity that meets this requirement. In addition to being quasi-public, an entity meeting this requirement may also meet the requirements of being a not-for-profit or nonprofit entity, depending on the entity.
  - A not-for-profit entity must meet the definition of or be considered a "not-for-profit" under a federal, state, territorial, or Tribal law of a federally recognized tribe. Any Federal credit union or State credit union, as defined in Section 101 of the Federal Credit Union Act, is a not-for-profit entity that meets this requirement.
  - A nonprofit entity must meet the definition of *Nonprofit organization* set forth in 2 CFR § 200.1.
- Must have the legal authority to provide Financial Assistance to Qualified Projects at the state, local, territorial, or Tribal level or in the District of Columbia.
- Must be eligible to receive a Subaward under the EPA Subaward Policy.

**Environmental Information:** Environmental Information is defined in EPA's Environmental Information Quality Policy. Environmental Information includes "data and information that describe environmental processes or conditions which support EPA's mission of protecting human health and the environment. Examples include but are not limited to: direct measurements of environmental parameters or processes; analytical testing results of environmental conditions (e.g., geophysical or hydrological conditions); information on physical parameters or processes collected using environmental technologies; calculations or analyses of environmental information; information provided by models; information compiled or obtained from databases, software applications, decision support tools, websites, existing literature, and other sources; development of environmental software, tools, models, methods and applications; and design, construction, and operation or application of environmental technology."

**Environmental Information Operations:** Environmental Information Operations is defined in EPA's Environmental Information Quality Policy. Environmental Information Operations means "[a] collective term for work performed to collect, produce, evaluate, or use environmental information and the design, construction, operation or application of environmental technology."

**EPA Award Official:** EPA Award Official means the award official from the Office of Grants and

5J - 84094101 - 1   Page 8

Debarment that is authorized to execute the Award Agreement, as well as any subsequent amendments to the Award Agreement, and to make any other final determinations required by law or regulation on behalf of the EPA.

**EPA Project Officer:** EPA Project Officer means the project officer from the Office of the Greenhouse Gas Reduction Fund that is assigned, along with the EPA Grants Specialist, to monitor the Recipient on programmatic and technical aspects of the project and is typically authorized to make programmatic approvals on behalf of the EPA. Where required, the Recipient must notify or request approval from the EPA Project Officer through the EPA Project Officer's individual EPA email address as well as ███████████ such that the Office of the Greenhouse Gas Reduction Fund may delegate an alternative EPA Project Officer in the case of any absence.

**Financial Assistance:** Consistent with the definition of *Federal financial assistance* in 2 CFR 200.1, Financial Assistance means financial products, including debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, loan purchasing programs, and other debt instruments), equity investments (such as equity project finance investments, private equity investments, and other equity instruments), hybrids (such as mezzanine debt, preferred equity, and other hybrid instruments), and credit enhancements (such as loan guarantees, loan guarantee funds (whether full or partial), loan loss reserves, and other credit enhancement instruments). Expenditures for Financial Assistance are in the form of Subawards (other than subgrants), Participant Support Costs or Acquisitions of Intangible Property, as defined in this Award Agreement. Subgrants are not eligible as Financial Assistance. The characterization of a Financial Assistance transaction as a Subaward, Participant Support Cost, or Acquisition of Intangible Property is limited to the transaction. For example, the same entity may be a Subrecipient for one transaction and a Program Beneficiary or a Contractor for another transaction.

**Freely Associated States:** *Freely Associated States means the Republic of the Marshall Islands (the Marshalls), the Federated States of Micronesia (FSM), and the Republic of Palau (Palau).*

**Greenhouse Gas:** *"Greenhouse Gas" means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act. Greenhouse Gas Emissions mean emissions of Greenhouse Gases.*

**Low-Income and Disadvantaged Communities**: Section 134(a)(3) of the Clean Air Act appropriates funds "for the purposes of providing Financial Assistance and technical assistance in low-income and disadvantaged communities." This program is entirely funded by Section 134(a)(3) of the Clean Air Act. Low-Income and Disadvantaged Communities means CEJST-Identified Disadvantaged Communities, EJScreen-Identified Disadvantaged Communities, Geographically Dispersed Low-Income Households, Properties Providing Affordable Housing, and Federally Recognized Tribal Entities, as defined below.

- *CEJST-Identified Disadvantaged Communities:* All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.

- *EJScreen-Identified Disadvantaged Communities:* All communities within version 2.3 of EJScreen that fall within either (a) the limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the

Case 1:25-cv-00938    Document 1    Filed 03/31/25    Page 56 of 133
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 374 of 674

5J · 84094101 - 1    Page 9

following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.

- *Geographically Dispersed Low-Income Households:* Low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development (HUD). Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using HUD's Family Size Adjustment factor.

- *Properties Providing Affordable Housing:* Properties providing affordable housing that fall within either of the following two categories: (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units with an active affordability covenant from one of the following housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by HUD, including Public Housing, Section 8 Project-Based Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)); or (5) a housing assistance program administered by the Department of Hawaiian Homelands as defined in Title VIII of the Native American Housing Assistance and Self-Determination Act of 1996 (24 CFR 1006.10) or (b) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

- *Federally Recognized Tribal Entities:* All Federally Recognized Tribal entities, which are considered disadvantaged regardless of whether a Federally Recognized Tribe has land, consistent with M-23-09 (memorandum dated as of January 27, 2023) and CEJST. A "Federally Recognized Tribal Entity" means (i) any individual member of a Federally Recognized Tribe; (ii) any for-profit business that has at least 51 percent of its equity ownership (or the equivalent in limited liability companies) by members of Federally Recognized Tribes; (iii) any non-profit entity with at least 51 percent of its Board of Directors (i.e., Governing Board) comprised of members of Federally Recognized Tribes; or (iv) any Federally Recognized Tribal government entity.  Under this definition, any Federally Recognized Tribal Entity is included within the definition of Low-Income and Disadvantaged Communities, regardless of where that entity is located (i.e., the entity may be located in areas outside of the CEJST land area dataset, including but not limited to tribal service areas or counties).


**Materially Impaired:** For the definition and application of these terms under this Assistance Agreement (e. g. the Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, note that EPA defines "Materially Impaired" in the context of

Case 1:25-cv-00938    Document 1    Filed 03/31/25    Page 57 of 133
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 375 of 674

5J - 84094101 - 1    Page 10

effective performance of the Assistance Agreement as 1) the issuance of a written determination and finding from EPA that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause under the Clarifications to EPA General Terms and Conditions Programmatic Term and Condition and 2) if EPA in its sole discretion determines that a corrective action plan is an appropriate means of remedying the lack of sufficient progress, the subsequent issuance of a separate written determination and finding from EPA that the Recipient has not materially addressed its failure to achieve sufficient progress after implementing a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

**Named Subrecipient:** "Named Subrecipient" means an entity that is named on the workplan in effect under this Assistance Agreement to receive a Subaward in the form of a Subgrant from the Recipient in order to carry out part of the award.

**Participant Support Costs:** 2 CFR 200.1 defines Participant Support Costs as "direct costs that support participants (see definition for Participant in § 200.1) and their involvement in a Federal award, such as stipends, subsistence allowances, travel allowances, registration fees, temporary dependent care, and per diem paid directly to or on behalf of participants." EPA regulations at 2 CFR 1500.1(a)(1) expand the definition of Participant Support Costs to include "subsidies, rebates, and other payments to program beneficiaries to encourage participation in statutorily authorized environmental stewardship programs," which includes the Greenhouse Gas Reduction Fund. In this program, Participant Support Costs may include expenditures by the Recipient as Technical Assistance Services and/or Program Administration Activities and Community Lenders as Capitalization Funding and/or Technical Assistance Subawards (which may include subsidies, rebates, and other payments).

**Period of Closeout:** Period of Closeout means the time interval between the beginning of the closeout period (the date that the award has been closed out, in accordance with 2 CFR 200.344) to the end of the closeout period (the date that the Closeout Agreement has been terminated). The Period of Closeout may also be referred to as the Closeout Period.

**Period of Performance:** 2 CFR 200.1 defines Period of Performance as "the total estimated time interval between the start of an initial Federal award and the planned end date, which may include one or more funded portions, or budget periods." For the purposes of this Award Agreement, Period of Performance means the time interval between the start of the Federal award (either the first date that the Recipient has incurred allowable pre-award costs or the date on the Notice of Award, whichever is earlier) and the end of the Federal award (the date that the award has been closed out, in accordance with 2 CFR 200.344). The Period of Performance may also be referred to as the Performance Period.

**Post-Closeout Program Income:** Post-Closeout Program Income means Program Income retained at the end of the Period of Performance, which is subject to the terms and conditions of the Closeout Agreement, as well as Program Income earned by the Recipient during the Period of Closeout that is directly generated by a supported activity or earned as a result of the Federal award, which is also subject to the terms and conditions of the Closeout Agreement. Under the Closeout Agreement, the Recipient is authorized to deduct the cost of generating Post-Closeout Program Income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Post-Closeout Program Income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Post Closeout Program Income. Costs of generating Post-Closeout Program Income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than

Case 1:25-cv-00938    Document 1    Filed 03/31/25    Page 58 of 133
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 376 of 674

5J - 84094101 - 1    Page 11

the actual costs incurred to generate the Post-Closeout Program Income, provided the Recipient can account for the actual costs incurred.

**Priority Project Categories:** Priority Project Categories means Distributed Energy Generation and Storage, Net-Zero Emissions Buildings, and Zero-Emissions Transportation, as defined below.

- *Distributed Energy Generation and Storage:* Projects, activities, and technologies that deploy small-scale power generation and/or storage technologies (typically from 1 kW to 10,000 kW), plus enabling infrastructure necessary for deployment of such generation and/or storage technologies. Projects, activities, and technologies within this category must support *carbon pollution-free electricity,* which is electrical energy produced from resources that generate no carbon emissions, consistent with the definition specified in Executive Order 14057 (Catalyzing Clean Energy Industries and Jobs Through Federal Sustainability).
- *Net-Zero Emissions Buildings:* Projects, activities, and technologies that either (1) retrofit an existing building, making a substantial contribution to that building being a net-zero emissions building and as part of a plan for that building achieving net-zero emissions over time, or (2) construct a new net-zero emissions building in a Low-Income and Disadvantaged Community. A *net-zero emissions building* is a building that meets the requirements of Version 1 of the National Definition for a Zero Emissions Building (June 2024).
- *Zero-Emissions Transportation:* Projects, activities, and technologies that deploy zero-emissions transportation modes, plus enabling infrastructure necessary for zero-emissions transportation modes—especially in communities that are overburdened by existing diesel pollution, particulate matter concentration, and degraded air quality. Projects, activities, and technologies within this category must be consistent with the zero-emissions transportation decarbonization strategies in The U.S. National Blueprint for Transportation Decarbonization.

**Program Administration Activities:** Program Administration Activities means activities that support administration of the grant program, to the extent such activities meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. Program administration activities include but are not limited to establishing and convening advisory councils, as described in Item 2 of EPA's Guidance on Selected Items of Cost for Recipients, and fund raising, as described in Item 4 of EPA's Guidance on Selected Items of Cost for Recipients.

**Program Beneficiary:** Program Beneficiary means an entity (either an individual or an organization) that receives Financial Assistance or technical assistance as an end-user, except when such Financial Assistance is characterized as an Acquisition of Intangible Property (in which case the entity is a Contractor, as defined in 2 CFR 200.1). Expenditures to Program Beneficiaries are in the form of Participant Support Costs, as defined in 2 CFR 1500.1. A Program Beneficiary is distinct from a Subrecipient, as defined in 2 CFR 200.1.

**Program Income:** 2 CFR 200.1 defines Program Income as "gross income earned by the recipient or subrecipient that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(c)". 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, Program Income also includes but is not limited to income from origination fees, servicing fees, and asset management fees; dividends from equity

Case 1:25-cv-00938    Document 1    Filed 03/31/25    Page 59 of 133
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 377 of 674

5J - 84094101 - 1    Page 12

investments; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). Program Income must be treated in accordance with the Program Income Programmatic Term and Condition. EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fund raising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Under this award agreement, the Recipient is authorized to deduct the cost of generating program income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of program income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Program Income. Costs of generating program income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the program income, provided the Recipient can account for the actual costs incurred. Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

**Qualified Project:** Section 134(c)(3) of the Clean Air Act provides that a Qualified Project is any project, activity, or technology that (A) reduces or avoids Greenhouse Gas emissions and other forms of air pollution in partnership with, and by leveraging investment from, the private sector; or (B) assists communities in the efforts of those communities to reduce or avoid Greenhouse Gas emissions and other forms of air pollution. For this Assistance Agreement, Qualified Project means any project, activity or technology meeting all six requirements listed below at the time that Financial Assistance is provided to the project, activity, or technology:

- The project, activity, or technology would reduce or avoid Greenhouse Gas Emissions, consistent with the climate goals of the United States to reduce Greenhouse Gas Emissions 50-52 percent below 2005 levels in 2030, reach 50 percent zero-emission vehicles share of all new passenger cars and light trucks sold in 2030, achieve a carbon pollution-free electricity sector by 2035, and achieve net-zero emissions by no later than 2050. The project, activity, or technology may reduce or avoid such emissions through its own performance or through assisting communities in their efforts to deploy projects, activities, or technologies that reduce or avoid such emissions.

- The project, activity, or technology would reduce or avoid emissions of other Air Pollutants. The project, activity, or technology may reduce or avoid such emissions through its own performance or through assisting communities in their efforts to deploy projects, activities, or technologies that reduce or avoid such emissions.

- The project, activity, or technology would deliver additional benefits (i.e., in addition to primarily reducing or avoiding emissions of Greenhouse Gases and other Air Pollutants) to communities within one or more of the following seven categories: climate change; clean energy and energy efficiency; clean transportation; affordable and sustainable housing; training and workforce development; remediation and reduction of legacy pollution; and development of critical clean water infrastructure.

- The project, activity, or technology may not have otherwise been financed.

- The project, activity, or technology would mobilize private capital.

- The project, activity, or technology would support only commercial technologies, defined as technologies that have been deployed for commercial purposes at least three times for a period of at least five years each in the United States for the same general purpose as the project,

5J - 84094101 - 1    Page 13

activity, or technology.

**Senior Management:** Senior Management means the chief executive officer, chief risk officer, general counsel, chief compliance officer, chief investment officer, chief reporting officer, and chief financial officer (or equivalent positions).

**Subaward:** 2 CFR 200.1 defines a Subaward as "an award provided by a pass-through entity to a subrecipient for the subrecipient to contribute to the goals and objectives of the project by carrying out part of a Federal award received by the pass-through entity. It does not include payments to a contractor, beneficiary, or participant". A Subgrant refers to a Subaward in the form of a grant.

**Subrecipient:** Consistent with 2 CFR 200.1, Subrecipient means an entity that receives a Subaward from a pass-through entity to carry out part of a Federal award but does not include an entity that is a Program Beneficiary of such an award. A Subrecipient is distinct from a Program Beneficiary, which is referenced in 2 CFR 1500.1. In this program, there are four main types of Subrecipients: (1) a Subrecipient that receives a Subgrant that will be used, either in whole or in part, to provide Capitalization Funding and Technical Assistance Subawards to Community Lenders, or a "Pass-Through Subrecipient;" (2) a Subrecipient that receives a Subgrant that will be used exclusively to provide Technical Assistance Services and/or Program Administration Activities, or a "Technical Assistance Subrecipient"; (3) a Subrecipient that receives a Subgrant in the form of Capitalization Funding and/or Technical Assistance Subawards, or a "Community Lender Subrecipient;" and (4) a Subrecipient that receives Financial Assistance from a Community Lender in the form of a Subaward, with the Subrecipient then using the Subaward to provide Financial Assistance to CCIA-Eligible Projects, or a "Financial Intermediary Subrecipient." Note that a financial transaction is a Subaward to a Financial Intermediary Subrecipient if the following two characteristics are true: (i) the financial transaction provides an award by a pass-through entity to a Subrecipient through a form of *Federal financial assistance*, other than a grant, and (ii) the proceeds of the award are used directly as Financial Assistance to CCIA-Eligible Projects, carrying out part of a Federal award received by the pass-through entity. The EPA Subaward Policy applies to Subgrants made to Pass-Through Subrecipients, Technical Assistance Subrecipients, and Community Lender Subrecipients but not to Subawards made to Financial Intermediary Subrecipients.

**Technical Assistance Services:** Consistent with Section 134(b)(2) of the Clean Air Act, the Recipient will provide Technical Assistance Services to establish new and build the capacity of existing Community Lenders so that they can provide Financial Assistance to CCIA-Eligible Projects. Technical Assistance Services include targeted support activities for individual Community Lenders, such as providing training, market analysis, technical support, and structuring expertise as well as financial market-building activities for multiple Community Lenders, such as developing standardized project performance criteria, underwriting guidance, documentation, and product features. A Community Lender does not need to have been selected for Capitalization Funding under this program to be eligible for Technical Assistance Services.

**Technical Assistance Subawards:** Consistent with Section 134(b)(2) of the Clean Air Act, the Recipient will provide Technical Assistance Subawards to build the capacity of Community Lenders so that they can provide Financial Assistance to CCIA-Eligible Projects. The Recipient will provide these Subawards in the form of Subgrants, which are subject to the EPA Subaward Policy. Community Lenders will use Technical Assistance Subawards for activities including (but not limited to) procuring training, market analysis, and technical support; hiring staff; developing new financial products; supporting predevelopment activities, such as site and building assessments (e.g., energy audits), financial and technological feasibility studies (e.g., solar resource studies), design and engineering support, and

Case 1:25-cv-00938    Document 1    Filed 03/31/25    Page 61 of 133
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 379 of 674

5J - 84094101 - 1    Page 14

permitting support; and other activities. Community Lenders may use Technical Assistance Subawards to make additional Subawards to other organizations, consistent with the EPA Subaward Policy. A Community Lender may only receive a Technical Assistance Subaward if it has already been selected for Capitalization Funding under this program.

In general, a Community Lender may receive a maximum of $1,000,000 in total Technical Assistance Subawards from all Recipients and Subrecipients under the Clean Communities Investment Accelerator; however, under limited exceptions, a Community Lender may receive total Technical Assistance Subawards in excess of the $1,000,000 cap, provided that the exception has been approved by the EPA Award Official (either through the Recipient's workplan in effect under this Assistance Agreement or through separate post-award approval).

**Waste, Fraud, or Abuse:** For the definition and application of these terms under this Assistance Agreement (e.g. the Financial Risk Management Requirements, Clarifications to EPA General Terms and Conditions, and Financial Agent Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, refer to their use in the Reporting Waste, Fraud, and Abuse clause in the EPA General Terms and Conditions effective October 1, 2024 and 2 CFR 200.113: "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U.S.C. 3729-3733."


## II. NATIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the Recipient agrees to the following four requirements of performance reporting: (1) progress reports, (2) transaction and-project level report, (3) organizational disclosures, and (4) ongoing disclosures. These performance reporting requirements "flow-down" as needed to enable the Recipient to comply with the requirements described in this term and condition. The Recipient must ensure that these reports cover its own grant-related activities and, where applicable to a certain performance report or element of a performance report, the grant-related activities of its Subrecipients, Contractors, and/or Program Beneficiaries. To comply with these performance reporting requirements, the Recipient agrees to use information collection instruments authorized by GGRF Accomplishment Reporting (█████████████████████████████ █████████), once such instruments are authorized; to the extent that information is not available for transactions that were closed prior to authorization of these instruments, the Recipient will not be out of compliance with the performance reporting requirements.

The Recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit performance reporting electronically to the EPA Project Officer. To the extent it is known, or should have been known, by the chief executive officer (or equivalent) and chief reporting officer (or equivalent) that the reporting is not materially compliant with the terms and conditions, or demonstrates material noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission. Should the chief executive officer (or equivalent) and chief reporting officer (or equivalent) signing the submission knowingly and willfully make any material false statement, they may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and

Case 1:25-cv-00938     Document 1     Filed 03/31/25     Page 62 of 133
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 380 of 674

5J - 84094101 - 1     Page 15

administrative sanctions.

EPA intends to make performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) prior to submission to EPA. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient. Recipient agrees that submitted information that does not include PII or CBI may be shared for program evaluation purposes, including with third parties.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. Notwithstanding any other provision of this Assistance Agreement, if Recipient's inability to submit the required performance reporting is due to issues with EPA systems, the Recipient shall be granted a reasonable extension to submit the reports after the technical issue has been corrected.

Where applicable, the intervals for reporting are authorized by 2 CFR 200.329(c)(1), as more frequent reporting is necessary for the effective monitoring of the Federal award and could significantly affect program outcomes.

## 1. Progress Reports

### *Semi-Annual Report*

The Recipient agrees to submit semi-annual reports covering six months of the calendar year in accordance with information collection instruments approved through GGRF Accomplishment Reporting (███████████████████████████). A single semi-annual report must be submitted to cover grant-related activities of the Recipient as well as Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the semi-annual report.

The Recipient agrees to submit semi-annual reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The first semi-annual reporting period ends on December 31 and covers all activities beginning on the first day of the Period of Performance.

### *Annual Report*

The Recipient agrees to submit annual reports that contain detailed narratives describing program

Case 1:25-cv-00938    Document 1    Filed 03/31/25    Page 63 of 133
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 381 of 674

5J - 84094101 - 1    Page 16

performance over the Recipient's fiscal year, supported with qualitative discussions and quantitative metrics. A single annual report must be submitted to cover grant-related activities of the Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the annual report.

 The Recipient must include the following broad, non-exhaustive elements in its annual reports:

- Progress towards objectives on key performance metrics over the reporting period,
- Summary of key activities completed in the reporting period, including case studies of Community Lenders successfully launching or expanding clean financing programs,
- Geographic coverage of Capitalization Funding and Technical Assistance Subawards made in the reporting period,
- Descriptions and examples of actions taken to meaningfully involve the communities the program serves in program design and operations,
- Case studies of different types of Technical Assistance Services activities undertaken by the Recipient and uses of Technical Assistance Subawards by Community Lenders,
- Plans for key activities (including current pipeline of Community Lenders) to be supported as well as outputs and outcomes to be achieved in the next reporting period.


These reports must be submitted ready to be published on the EPA website for public consumption and must not include any material that the Recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI. Should EPA identify PII or claims of CBI in reports, the EPA Project Officer will require that the Recipient re-submit the report without the PII or claims of CBI so that it can be published without redaction.

The Recipient agrees to submit **the annual report** electronically to the EPA Project Officer within 90 calendar days after the Recipient's fiscal year end date. The first annual report is due 90 calendar days after the Recipient's fiscal year that ends in 2025.

_Final Report_

The Recipient agrees to submit a final report containing two documents. First, the recipient must submit a report containing all of the elements described above for the annual report, covering the entire Period of Performance and overall assessment of its program performance and implementation of its workplan in effect under this Assistance Agreement. Second, the recipient must submit its investment strategy for the Closeout Period to detail its use of Post-Closeout Program Income over the Closeout Period. EPA intends to make the investment strategy, either in whole or in part, available to the public through disclosing copies of the investment strategy as submitted or using the content of the investment strategy. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient.

The two documents for the final report must be submitted to cover the grant-related activities of the Recipient and Subrecipients as well as the grant-related activities of its Contractors and/or Program

5J - 84094101 - 1    Page 17

Beneficiaries where applicable to a certain element of the final report.

The Recipient agrees to submit the two documents for the final report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the Period of Performance.

## 2. Transaction and Project-Level Report

The Recipient agrees to submit semi-annual transaction and project-level reporting in accordance with information collection instruments approved through GGRF Accomplishment Reporting (███████ ██████████████████████████████). The data submission must cover the grant-related activities of the Recipient and Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the data submission.

The Recipient agrees to submit the transaction and project-level report electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods for data submission are as follows: October 1 to March 31; April 1 to September 30. The data submissions must cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends March 31, the Recipient must provide information on transactions originated from July 1 to December 31 rather than from October 1 to March 31. For the semi-annual reporting period that ends September 30, the Recipient must provide information on transactions originated from January 1 to June 30 rather than from April 1 to September 30. The first transaction and project-level report is due 30 calendar days after March 31, 2025, and must cover all transactions originated from the beginning of the Performance Period through December 31, 2024.

## 3. Organizational Disclosures

The Recipient agrees to submit annual organizational disclosures electronically to the EPA Project Officer within 30 calendar days after submission of its Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. The organizational disclosures must cover the Recipient's fiscal year and be submitted in accordance with information collection instruments approved through GGRF Accomplishment Reporting (██████████████████████████████). Additionally, the Recipient agrees to submit such organizational disclosures for each Pass-Through Subrecipient as well as each Community Lender Subrecipient that has received in excess of $10,000,000 in Capitalization Funding under the Clean Communities Investment Accelerator (to be delivered within 30 calendar days after submission of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System). The requirement for organizational disclosures is not applicable for any fiscal year in which the reporting entity did not meet the requirements of 2 CFR Subpart F—Audit Requirements. The first Organizational Disclosures are due in 2025.

## 4. Ongoing Disclosures

In addition to other ongoing disclosure obligations within the regulations and terms and conditions of this Award Agreement, the Recipient agrees to notify the EPA Project Officer of the following events in

accordance with 2 CFR 200.329(e):

    1. Changes to the Recipient's independent certified public accounting firm;

    2. Non-reliance by the Recipient or its independent auditor on previously issued financial statements or a related audit report or completed interim audit review;

    3. Changes in fiscal year end of the Recipient;

    4. Material impairments to the Recipient's assets;

    5. Intention to file bankruptcy petition or enter into receivership;

    6. Submission of annual Form 990 to the IRS, with provision of copy to EPA Project Officer upon request (only if submission of the Form 990 is otherwise required).

Additionally, the Recipient agrees to submit such ongoing disclosures for each Pass-Through Subrecipient as well as each Community Lender Subrecipient that has received in excess of $10,000,000 in Capitalization Funding under the Clean Communities Investment Accelerator. The Recipient agrees to submit ongoing disclosures electronically to the EPA Project Officer within 15 calendar days of the event.

## B. Cybersecurity Condition

(a) The Recipient agrees that when collecting and managing environmental data under this Assistance Agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward Agreements and, during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA

Case 1:25-cv-00938    Document 1    Filed 03/31/25    Page 66 of 133
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 384 of 674

5J - 84094101 - 1    Page 19

Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process.  A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

## D. Public or Media Events

For public or media events that are planned more than 15 calendar days in advance, the Recipient agrees to notify the EPA Project Officer of public or media events it has organized publicizing the accomplishment of significant activities related to execution of the workplan in effect under this Assistance Agreement and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice.

## E. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards.  Information on these standards may be found at https://www.fgdc.gov/.

## F. Leveraging and Fund Raising

### 1. Leveraging

The Recipient agrees to make commercially reasonable efforts to provide the proposed leveraged funding that is described in its workplan in effect under this Assistance Agreement. If the proposed leveraging does not substantially materialize during the Period of Performance, and the Recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future grant applications from the Recipient. In addition, if the proposed leveraging does not substantially materialize during the Period of Performance and the Recipient does not provide a satisfactory explanation, then EPA may reconsider the legitimacy of the award; if EPA determines that the Recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the workplan in effect under this Assistance Agreement, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

### 2. Fund Raising

2 CFR 200.442 provides coverage on allowable fund-raising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fund raising costs are an allowable cost and may include costs that are reasonable and necessary for raising capital from private

Case 1:25-cv-00938    Document 1    Filed 03/31/25    Page 67 of 133
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 385 of 674

5J - 84094101 - 1    Page 20

investors to provide Financial Assistance to CCIA-Eligible Projects.

Allowable fund-raising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private investors. Funds a Recipient raises for its own use with costs borne by an EPA Financial Assistance Agreement are considered Program Income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fund-raising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fund-raising costs charged to the award will be treated as Program Income.

## G. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving Environmental Information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The Recipient shall ensure that subawards involving Environmental Information issued under this agreement include appropriate quality requirements for the work. The Recipient shall ensure sub-award recipients develop and implement Quality Assurance (QA) planning documents in accordance with this term and condition; and/or ensure sub-award recipients implement all applicable approved QA planning documents. EPA will not approve any QA planning documents developed by a Subrecipient; the Recipient is responsible for reviewing and approving its Subrecipient QA planning document(s), if required based on the Subrecipient's Environmental Information Operations.

### 1. Quality Management Plan (QMP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QMP, (ii) prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard and submit the document for EPA review, and (iii) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved and current QMP and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

The Recipient must submit the QMP within 90 calendar days after grant award, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the Recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

### 2. Quality Assurance Project Plan (QAPP)

Case 1:25-cv-00938    Document 1    Filed 03/31/25    Page 68 of 133
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 386 of 674

5J - 84094101 - 1    Page 21

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QAPP, (ii) prepare the QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard, (iii) submit the document for EPA review, and (iv) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s) and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the previously EPA-approved QAPP is acceptable for this agreement.

The Recipient must submit the QAPP within 90 calendar days after grant award, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

The Recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted when changes occur.

**For Reference:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Specifications for EPA and Non-EPA Organizations.

• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

## H. Real Property

In accordance with 2 CFR 200.311, title to Real Property acquired or improved under this agreement will vest upon acquisition by the Recipient, including but not limited to title to Real Property acquired through exercise of a remedy for default of a Financial Assistance arrangement. This Real Property must be used for the originally authorized purpose as long as needed for that purpose, during which time the Recipient must not dispose of or encumber its title or other interests. The Real Property Programmatic Term and Condition flows down to Subrecipients but not to Program Beneficiaries or Contractors that receive Financial Assistance to CCIA-Eligible Projects, which may acquire title to Real Property after receiving Financial Assistance to CCIA-Eligible Projects.

The Recipient must obtain prior approval from the EPA Award Official for the acquisition of Real Property. Note that the Recipient may meet this requirement by specifying the types of acquisitions of Real Property it plans to carry out in its workplan in effect under this Assistance Agreement.

5J - 84094101 - 1    Page 22

Disposition

If the Recipient disposes of the Real Property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

Otherwise, when Real Property is no longer needed for the originally authorized purpose, the Recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where Recipient is disposing of Real Property acquired or improved with a Federal award and acquiring replacement Real Property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the Recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The Recipient is entitled to be paid an amount calculated by applying the Recipient's percentage of participation in the purchase of the Real Property (and cost of any improvements) to the current fair market value of the property.

Recordation

As authorized by 2 CFR 200.316, EPA requires that Recipients who use EPA funding to purchase and improve Real Property through an EPA funded construction project record a lien or similar notice in the Real Property records for the jurisdiction in which the Real Property is located, which indicates that the Real Property has been acquired and improved with federal funding and that use and disposition conditions apply to the Real Property.

I. Program Income

In accordance with Clean Air Act Section 134(b)(1)(C) as well as 2 CFR 200.307(c) and 2 CFR 1500.8 (b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the

Case 1:25-cv-00938    Document 1    Filed 03/31/25    Page 70 of 133
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 388 of 674

5J - 84094101 - 1    Page 23

Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the workplan in effect under this Assistance Agreement.

## J. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the Recipient or Subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the Recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## III. ADDITIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Eligible Recipient

**The Recipient agrees to maintain its status as an Eligible Recipient, which includes:**

> a. Meeting the definition of *Nonprofit organization* set forth in 2 CFR 200.1;

> b. Having an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"

> c. Not receiving any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);

> d. Being funded by public or charitable contributions; and

> e. Having the legal authority to invest in or finance projects.

### B. Workplan and Budget

The Recipient agrees to execute the workplan in effect under this Assistance Agreement. This document, once approved by the EPA, will reflect an agreement between the Parties and will be incorporated into and be a part of the agreement between the Recipient and the EPA.

The Recipient agrees to conduct an annual review of the workplan in effect under this Assistance Agreement within 90 calendar days of June 30 of each calendar year. If material changes are made

Case 1:25-cv-00938    Document 1    Filed 03/31/25    Page 71 of 133
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 389 of 674

5J - 84094101 - 1    Page 24

during the annual review or in between annual reviews, the Recipient agrees to submit the updated workplan to the EPA Project Officer.

The Recipient also agrees to conduct an annual review of the EPA-approved detailed budget table within 90 calendar days of June 30 of each calendar year. If material changes are made during the annual review or in between annual reviews, the Recipient agrees to submit the updated detailed budget table to the EPA Project Officer. Such submissions are not subject to prior approval unless otherwise required by the regulations or the terms and conditions of the Award Agreement.

## C. Recipient Organizational Plan

The Recipient agrees to execute the workplan in accordance with the documents listed below, as submitted to EPA through Grants.gov for EPA-R-HQ-CCIA-23 or provided to EPA after the application submission deadline.

1. Description of Programmatic Capabilities, pursuant to *Section IV.C: Content of Application Submission* of the Notice of Funding Opportunity;

2. Organizational and Governing Documents, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity.

The Recipient agrees to maintain its incorporation in the United States, as reflected in the above documents.

The Recipient agrees to conduct an annual review of the documents within 90 calendar days of June 30 of each calendar year. If material changes are made during the annual review or in between annual reviews, the Recipient agrees to submit the updated documents to the EPA Project Officer. Such submissions are not subject to prior approval unless otherwise required by the regulations or the terms and conditions of the Award Agreement.

## D. Recipient Policies and Procedures

The Recipient agrees to execute the workplan in accordance with the documents listed below (or other documents submitted in lieu of the documents listed below), as submitted to EPA through Grants.gov for EPA-R-HQ-CCIA-23 or provided to EPA after the application submission deadline.

1. Legal and Compliance Risk Management Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

2. Board Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

3. Management Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

4. Consumer Protection Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

5. Equity Policies and Practices    , pursuant to *Section IV.B: Application Materials* of the Notice

Case 1:25-cv-00938     Document 1     Filed 03/31/25     Page 72 of 133
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 390 of 674

5J - 84094101 - 1     Page 25

of Funding Opportunity; and

6. Conflict of Interest Mitigation Plan, which include all documents submitted upon EPA's request regarding measures that will be taken to eliminate, neutralize, mitigate or otherwise resolve conflicts of interest.

7. Documentation of Personnel and Fringe Benefit Charges, which includes all documents submitted upon EPA's request to document how personnel and fringe benefits will be charged against the grant award in accordance with 2 CFR 200.430 *Compensation—personal services* and 2 CFR 200.431 *Compensation—fringe benefits*. Notwithstanding the content of the Recipient's EPA-approved budget, the Recipient is not authorized to charge the grant award for personnel and fringe benefits against employees without using the W-2 as the definitive definition of "employee" until the Documentation of Personnel and Fringe Benefit Charges has been reviewed and approved by the EPA, as communicated by the EPA Project Officer.

The Recipient agrees to conduct an annual review of the documents within 90 calendar days of June 30 of each calendar year. If material changes are made during the annual review or in between annual reviews, the Recipient agrees to submit the updated documents to the EPA Project Officer. With the exception of the Documentation of Personnel and Fringe Benefit Charges, where changes will be subject to prior approval, such submissions are not subject to prior approval unless otherwise required by the regulations or the terms and conditions of the Award Agreement

## E. Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Capitalization Funding; Technical Assistance Subawards; Technical Assistance Services; and Program Administration Activities. The Recipient must use awards funds exclusively for allowable activities within the ten EPA regions, with the exception of the Freely Associated States. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

The Recipient agrees to not use the award for activities that support deployment of projects that do not meet the definition of CCIA-Eligible Projects. The allowability of legal costs incurred in connection with the award shall be governed by applicable provisions of 2 CFR Part 200, Subpart E, including but not limited to 2 CFR 200.403, 2 CFR 200.435, 2 CFR 200.441 and 2 CFR 200.459.

## F. Foreign Entity of Concern

As part of carrying out this award, the Recipient agrees to ensure that entities the Recipient contracts with, the Recipient makes Subawards to, or that receive funds as program beneficiaries at any tier of funding under this grant agreement are not—

    (A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

    (B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

    (C) a subsidiary of an entity described in (A) or (B).

5J - 84094101 - 1    Page 26

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## G. LIDAC Expenditure Requirement

The Recipient agrees to ensure that 100% of the award is used for the purposes of providing Financial Assistance in Low-Income and Disadvantaged Communities, with compliance maintained over each annual reporting period (i.e., from July 1 to June 30). Funds used for the purposes of providing Financial Assistance includes Capitalization Funding; Technical Assistance Subawards; Technical Assistance Services; and Program Administration Activities. This requirement applies to the entire award provided to the Recipient and "flows down" to each Subrecipient.

## H. Subgrants to For-Profit Entities

The Recipient is authorized to provide Subgrants to for-profit entities if and only if those Subgrants are provided to an entity that has been determined by the U.S. Treasury's CDFI Fund to meet the CDFI certification requirements set forth in 12 CFR 1805.201, the framework for awarding Subgrants to such for-profit entities is described in the Recipient's workplan in effect under this Assistance Agreement, and the for-profit entity meets the definition of a Community Lender. Community Development Banks, for example, may qualify under this definition, as they are for-profit entities and are U.S. Treasury-certified CDFIs.

The Recipient agrees to require that for-profit entities that receive such Subgrants:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the Subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition, by ensuring that the for-profit entity does not use Subgrant funds to accumulate and reserve funds for ongoing business expenses; unforeseen liabilities; or for other similar costs which are not allowable under this Assistance Agreement;

3. Account for and use Program Income under the rules for Program Income pursuant to 2 CFR 1500.8(b) and the terms and conditions of the Award Agreement and Closeout Agreement; and 4. Be subject to the same requirements as non-profit Subgrantees under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(a)(2).

## I. Capitalization Funding

As stated in the definition of Capitalization Funding, the Recipient will provide Capitalization Funding Subawards to Community Lenders in the form of Subgrants, which are subject to the EPA Subaward Policy. The following additional requirements apply when the Recipient provides Capitalization Funding to Community Lenders.

Case 1:25-cv-00938    Document 1    Filed 03/31/25    Page 74 of 133
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 392 of 674

5J - 84094101 - 1    Page 27

## 1. Disclosure and Approval Requirements

1. The Recipient must obtain written approval from the EPA Award Official prior to providing Capitalization Funding to a Community Lender Subrecipient that would exceed the cap of $10,000,000 in Capitalization Funding under the Clean Communities Investment Accelerator. If the exception has been approved by the EPA Award Official in the Recipient's workplan in effect under this Assistance Agreement, then no additional approval is required.

2. Prior to providing Capitalization Funding to a Community Lender Subrecipient, the Recipient must obtain disclosure from the Community Lender regarding award funds that it has sought and/or received under the National Clean Investment and Clean Communities Investment Accelerator programs.

## 2. Revolving Loan Fund Characterization

Capitalization Funding Subgrants are made for the sole purpose of providing Financial Assistance to CCIA-Eligible Projects. As stated in the definition of Financial Assistance, expenditures for Financial Assistance are in the form of Subawards, Participant Support Costs, and Acquisitions of Intangible Property, as defined in this Award Agreement. EPA considers all Capitalization Funding Subgrants to be capitalizations of revolving loan funds for the purposes of 2 CFR 1500.8(d).

## 3. Participant Support Costs

The Community Lender may provide Financial Assistance to CCIA-Eligible Projects in the form of Participant Support Costs. The Recipient agrees to impose the following eligibility, restrictions, timelines, and other programmatic requirements on Community Lenders payments of Participant Support Costs, in addition to other requirements included in the terms and conditions of this Award Agreement:

1. The Community Lender and Program Beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as Participant Support Costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the Community Lender and Program Beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates, and other Participant Support Cost payments. However, EPA does not provide advice on tax issues relating to these payments.

2. Participant Support Cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The Community Lender, therefore, may not make Participant Support Cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that Community Lenders adhere to this requirement as well. The Community Lender is responsible for checking that Program Beneficiaries (i.e., entities receiving Participant Support Costs) are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the Program Beneficiaries.

The Recipient agrees to provide written guidelines for Community Lenders' payments of Participant Support Costs to the EPA Project Officer prior to the Community Lenders' making payments to Program Beneficiaries, unless already described in the Recipient's workplan in effect under this Assistance

5J - 84094101 - 1    Page 28

Agreement. These guidelines must: (a) describe the activities that will be supported by the Participant Support Costs; (b) specify the range of funding to be provided through the Participant Support Costs; (c) identify which types of entities will have title to equipment (if any) purchased with the funds; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the Participant Support Cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

### 4. Acquisitions of Intangible Property

### 2 CFR 200 Procurement Standards

The Community Lender may use its Capitalization Funding to provide Financial Assistance to CCIA-Eligible Projects in the form of Acquisitions of Intangible Property. The Community Lender agrees to acquire Intangible Property in compliance with the conflict of interest and competition requirements described in the 2 CFR Part 200 Procurement Standards. This includes but is not limited to the requirements at 2 CFR 200.318 to:

- Have and use documented procurement procedures to govern Acquisitions of Intangible Property;
- Maintain oversight to ensure that contractors perform in accordance with the terms, conditions, and specifications of their contracts;
- Maintain written standards of conduct covering conflicts of interest and governing the actions of employees engaged in the selection, award, and administration of contracts as well as maintain written standards of conduct covering organizational conflicts of interest;
- Prioritize entering into inter-entity agreements where appropriate for procurement or use of common or shared goods and services as the Recipient seeks to mobilize financing and private capital;
- Award contracts only to responsible contractors possessing the ability to perform successfully under the terms and conditions of the proposed procurement; and
- Maintain records sufficient to detail the history of procurement.

### Disposition

If the Community Lender disposes of the Intangible Property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Subaward Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

### Recordation

The Community Lender agrees to record liens or other appropriate notices of record to indicate that Intangible Property has been acquired with Federal funding and that use and disposition conditions apply to the Intangible Property, in cases where Financial Assistance to CCIA-Eligible Projects is in the form of an Acquisition of Intangible Property. As provided in 2 CFR 200.1: "…loans, notes and other debt instruments, lease agreements, stock and other instruments of property ownership (whether the property is tangible or intangible)" are *Intangible Property* for the purposes of the restrictions described at 2 CFR 200.315(a). "Other appropriate notices of record" is not limited to filing Uniform Commercial Code instruments and may also include a notice of record in the legally-binding transaction documents.

Case 1:25-cv-00938    Document 1    Filed 03/31/25    Page 76 of 133
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 394 of 674

5J - 84094101 - 1    Page 29

## 5. Subawards to Financial Intermediary Subrecipients

The following requirements apply when a Community Lender provides a Subaward to a Financial Intermediary Subrecipient. These requirements apply to the Recipient and Subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition. As stated in the definition of Financial Assistance, Subgrants are not an eligible form of Financial Assistance:

    1. The Community Lender must establish and follow a system that ensures all Subawards to Financial Intermediary Subrecipients are in writing and contain all of the elements required by 2 CFR 200.332(b), with the exception of the indirect cost provision of 2 CFR 200.332(b)(4) (which does not apply to loans). EPA has developed an optional template for Subaward Agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such Subaward Agreements with Financial Intermediary Subrecipients.

    2. The Financial Intermediary Subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all Subawards that requires Financial Intermediary Subrecipients to comply with these requirements. No other provisions of the Uniform Grant Guidance, including the Procurement Standards, apply directly to the Subrecipient.

    3. Prior to making the Subaward, the Community Lender must ensure that the Financial Intermediary Subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(b)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

## J. Technical Assistance Subawards

As stated in the definition of Technical Assistance Subawards, the Recipient will provide Technical Assistance Subawards to Community Lenders in the form of Subgrants, which are subject to the EPA Subaward Policy. As such, the Establishing and Managing Subawards General Term and Conditions applies to Technical Assistance Subawards.

The following additional requirements apply when the Recipient provides Technical Assistance Subawards to Community Lenders:

    1. The Recipient must obtain prior written approval from the EPA Award Official for any Technical Assistance Subaward that exceeds $1,000,000 in EPA funds. If the exception has been approved by the EPA Award Official in the Recipient's workplan in effect under this Assistance Agreement, then no additional approval is required.

    2. Prior to providing a Technical Assistance Subaward to a Community Lender, the Recipient must obtain disclosure from the Community Lender regarding award funds that it has sought and/or received under the National Clean Investment and Clean Communities Investment Accelerator programs.

The above requirements apply specifically to Technical Assistance Subawards but do not apply to

Case 1:25-cv-00938    Document 1    Filed 03/31/25    Page 77 of 133
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 395 of 674

5J - 84094101 - 1    Page 30

Technical Assistance Services, which are allowable expenditures the Recipient may incur in accordance with the workplan in effect under this Assistance Agreement and the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

## K. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this Award Agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" and "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific construction projects that were not completed prior to the execution of the final binding documentation governing the use of the Financial Assistance. The Recipient must ensure that any construction work financed in whole or in part with such Financial Assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis-Bacon and Related Act requirements and the requirements of these Terms and Conditions.

Note, however, that under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements do not apply to any form of Financial Assistance which meets any of the following criteria:

- Financial Assistance which exclusively funds pre-construction (e.g. permitting or design work) or post-construction activities (e.g. Acquiring Intangible Property related to a previously completed construction project or re-financing activity related to a previously completed construction project).
- Financial Assistance which serves end-users who are individual homeowners or tenants of single-family homes or multifamily buildings when these individual end-users ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves end-users who meet the definition of Federally Recognized Tribal Entities, as defined under this Assistance Agreement, when these Federally Recognized Tribal Entities ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves any end-user when such Financial Assistance is less than $250,000 for a project and the end-user ultimately selects the contractor(s) and executes the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.

Case 1:25-cv-00938     Document 1     Filed 03/31/25     Page 78 of 133
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 396 of 674

5J - 84094101 - 1     Page 31

If the Recipient encounters a situation that presents uncertainties regarding DBRA applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with a Subrecipient, Program Beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this Term and Condition or the Davis-Bacon and Related Act, the Recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Note, the use of the term project in this term and condition is distinct from the use of the term project within the definition of Qualified Project under Clean Air Act Section 134(c)(3), which is broader and includes "any project, activity, or technology." Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed by a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

## B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

## C. Recipient Responsibilities When Entering Into and Managing Contracts:

### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

### b. After Award of Contract:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

Case 1:25-cv-00938     Document 1     Filed 03/31/25     Page 79 of 133
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 397 of 674

5J - 84094101 - 1     Page 32

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

## D. Recipient Responsibilities When Establishing and Managing Additional Subawards:

**a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all Subawards under this grant: "By accepting this award, the EPA Subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of Subrecipients and must ensure Subrecipients comply with the requirements in 29 CFR 5.6.

**c. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of Subrecipients and must ensure that Subrecipients comply with the requirements in subsection E, below.

## E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program Beneficiaries

When DBRA is applicable, Financial Assistance provided in the form of a participant support cost to a Program Beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

**a. Solicitation and Contract Requirements:**

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will

Case 1:25-cv-00938    Document 1    Filed 03/31/25    Page 80 of 133
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 398 of 674

5J - 84094101 - 1    Page 33

be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

## 2. Compliance with Federal Statutes and Regulations

The Recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with Subrecipients, contractors, and other partners (e.g., by including such provisions in contractual agreements). This includes but is not limited to applicable health and safety regulations as administered by the Occupational Safety and Health Administration.

## 3. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the Recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## 4. Labor and Equitable Workforce Development Implementation Plan

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), by December 31, 2024, the Recipient must submit a Labor and Equitable Workforce Development Implementation Plan to the EPA Project Officer. The Implementation Plan should articulate policies, practices, and procedures adopted by the Recipient to maximize high-quality jobs and workforce development outcomes on projects assisted with the award. Examples of how this can be demonstrated include, but are not limited to:

- Mechanisms for promoting job quality and evaluating labor standards on projects being considered for and/or receiving Financial Assistance;
- Plans to support workforce development as part of market-building activities;
- Current and planned partnerships with labor and workforce development organizations, including the purpose of those partnerships;

Case 1:25-cv-00938    Document 1    Filed 03/31/25    Page 81 of 133
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 399 of 674

5J - 84094101 - 1    Page 34

- Mechanisms for maximizing training and employment opportunities for participants in Registered Apprenticeship Programs on projects, including apprenticeship utilization targets, as applicable;
- Mechanisms for creating high-quality job training and employment opportunities available to residents of low-income and disadvantaged communities through projects and other program activities; and
- Processes for promoting Project Labor Agreements on construction projects above $25,000,000, as appropriate, in alignment with Executive Order 14063 (Use of Project Labor Agreements for Federal Construction Projects) and Executive Order 13502 (Use of Project Labor Agreements for Federal Construction Projects), as well as other types of binding agreements that promote strong workforce outcomes, such as Community Workforce Agreements and Community Benefits Agreements.

The Recipient may use or reference materials already submitted to EPA as part of its submission of the Implementation Plan, where relevant.

Note that EPA may make the information from this plan available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient.

## L. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that for any activity related to the construction, alteration, maintenance, or repair of infrastructure, "none of the funds made available for a Federal Financial Assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The Recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America (BABA) requirements that all Recipients of EPA Financial Assistance awards must comply with.

Under the Greenhouse Gas Reduction Fund, BABA requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific infrastructure projects that were not completed prior to the date the Recipient's award funds were obligated by the EPA.

EPA interprets the definition of infrastructure consistent with 2 CFR 184 and M-24-02 (memorandum dated as of October 23, 2023) including the "public function" test, when determining whether projects qualify as public infrastructure, based on the Civil Rights Act definition of public accommodation.

The following types of Greenhouse Gas Reduction projects are deemed infrastructure for the purposes of BABA applicability:

Case 1:25-cv-00938     Document 1     Filed 03/31/25     Page 82 of 133
USCA Case #25-5122     Document #2114423          Filed: 05/05/2025     Page 400 of 674

5J - 84094101 - 1     Page 35

1. The public infrastructure portion of any property (e.g., retail in a mixed-use multi-family property) where the principal purpose of the Financial Assistance is to directly benefit such portion of the property;

2. Privately-owned commercial buildings when they meet the "public function" test;

3. Residential-serving community solar projects, which EPA deems "structures, facilities, and equipment that generate, transport, and distribute energy" per 2 CFR 184.4(c);

4. Publicly accessible EV charging stations;

5. Publicly owned energy generation and/or storage transportation facilities;

6. Publicly owned transportation facilities (e.g., bus depot);

7. Privately-owned transportation facilities that serve a public function.

The following types of Greenhouse Gas Reduction projects are not deemed infrastructure for the purposes of BABA applicability:

1. Privately-owned vehicles for private use;

2. Certain publicly-owned or operated vehicles that EPA has determined do not constitute infrastructure (e.g. school buses);

3. Privately-owned manufacturing or industrial facilities;

4. Privately-owned offices;

5. Single family homes;

6. Privately-owned, non-mixed-use, multi-family housing properties;

7. Privately-owned residential portions of mixed-use properties;

8. EV charging stations that are not publicly accessible;

9. Any privately-owned, behind-the-meter energy generation and storage project that does not otherwise meet the definition of infrastructure.

The inclusion of the following types of funding, support, guarantee, or sponsorship in the funding stack of any Greenhouse Gas Reduction fund project does not trigger BABA, in and of itself or in combination:

1. Low-Income Housing Tax Credit (LIHTC);

2. Fannie Mae and Freddie Mac Backed Multifamily Mortgages;

3. Federal Housing Administration Insured Multifamily Mortgages;

Case 1:25-cv-00938    Document 1    Filed 03/31/25    Page 83 of 133
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 401 of 674

5J - 84094101 - 1    Page 36

4. HUD Section 8 Funding;

5. Other Federal, State, Tribal, or Local Housing Assistance Funding Sources: in general, subsidies issued by federal, state, tribal, or local housing assistance funding sources that do not confer equity or ownership stakes for the governmental funding source do not trigger BABA applicability.

BABA applicability is assessed at the time of provision of Financial Assistance based on the terms, limitations, and requirements of the Financial Assistance. Applicability does not change retroactively based on a change of use (e.g., if a ground floor apartment is re-zoned for a restaurant). Recipients may not temporarily modify or mischaracterize usage to intentionally avoid BABA compliance.

If the Recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## M. Governance Requirements

The Recipient agrees to comply with the following governance requirements starting December 31, 2024. The governance requirements "flow-down" to Pass-Through Subrecipients and Community Lender Subrecipients that have received in excess of $10,000,000 in Capitalization Funding but not to other subrecipients. The governance requirements are waived for (i) any entity that has been determined by the U.S. Treasury's CDFI Fund to meet the CDFI certification requirements set forth in 12 CFR 1805.201 and (ii) any entity whose specific governance structure is set forth in State, Tribal, or local law.

The Recipient (or Subrecipient) may meet all or some of the governance requirements through the parent entity, provided the Recipient (or Subrecipient) is subject to the governance of the parent entity and the Recipient (or Subrecipient) is wholly-controlled by the parent entity. Similarly, the governance requirements may be waived for the Recipient (or Subrecipient) through the parent entity meeting the CDFI certification requirements set forth in 12 CFR 1805.201, provided the Recipient (or Subrecipient) is wholly-controlled by the parent entity.

## 1. Board Size and Composition

The Recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the Recipient's workplan in effect under this Assistance Agreement as well as other business activities. The board must have a sufficient number of members to adequately staff each of its
committees.
The Recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from Low-Income and Disadvantaged Communities).

## 2. Board Independence

The Recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

Case 1:25-cv-00938    Document 1    Filed 03/31/25    Page 84 of 133
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 402 of 674

5J - 84094101 - 1    Page 37

### 3. Board Committees

The Recipient agrees to have the following board-level committees to oversee and monitor management, with each committee staffed by members qualified to execute the committee's objectives. While the Recipient need not adhere to the exact naming convention or structure in this term and condition, each of the responsibilities must be covered by board-level committees at all times during the Period of Performance; for the avoidance of doubt, one committee may perform the responsibilities of one or more of the committees specified below.

> 1. An investment or credit committee to oversee and approve investment or credit decisions;

> 2. A risk management committee to oversee the formulation and operationalization of the risk management framework;

> 3. An audit committee to oversee the integrity of reporting and internal controls and the performance of audit functions, with a majority independent members on such committee;

> 4. A nomination/governance committee to oversee nomination and succession of board and senior management, with a majority independent members on such committee; and

> 5. A compensation committee to oversee board as well as senior management and staff compensation, with a majority independent members on such committee.

Further, the Recipient agrees to act in good faith to ensure each committee obtains information from management, auditors, or other third-parties necessary to discharge their duties.

### 4. Board Policies and Procedures

The Recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The Recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of Capitalization Funding, Technical Assistance Subawards, and other Subawards to any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

## N. Consumer Protection Requirements

The Recipient agrees to carry out the following consumer protection requirements to the extent that the Recipient directly interacts, transacts, or contracts with consumers in the provision of Financial Assistance to CCIA-Eligible Projects:

> 1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer

Case 1:25-cv-00938    Document 1    Filed 03/31/25    Page 85 of 133
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 403 of 674

5J - 84094101 - 1    Page 38

Financial Protection Act, and other federal consumer protection laws that apply;

2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The Recipient agrees to monitor and oversee Subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(e) and 2 CFR 200.318.

## O. Financial Risk Management Requirements

### 1a. Cash Management Requirements: Advance Payments
The Recipient must deposit and maintain advance payments of Federal funds exclusively in insured accounts, in accordance with 2 CFR 200.305(b)(10). As provided in 2 CFR 200.1, an advance payment is "a payment that a Federal agency or pass-through entity makes by any appropriate payment mechanism and payment method before the recipient or subrecipient disburses the funds for program purposes." A Recipient drawing down funds from ASAP prior to disbursement for actual and allowable project costs constitutes an advance payment. Interest income earned on the advance payment from EPA to the Recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

### 1b. Cash Management Requirements: Program Income

The Recipient is authorized to maintain Program Income in two types of accounts:

1. Insured accounts, including in amounts in excess of the federal insurance limit of $250,000.

2. Accounts where such income is used to purchase (i) U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days (if purchased directly) and that such instruments are held-to-maturity (if purchased directly), or (ii) short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. Note, the underlying instruments included in a short-term money market fund consisting solely of U.S.

Case 1:25-cv-00938   Document 1   Filed 03/31/25   Page 86 of 133
USCA Case #25-5122   Document #2114423   Filed: 05/05/2025   Page 404 of 674

5J - 84094101 - 1   Page 39

Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities and offering daily investor redemptions need not be of a particular duration or held-to-maturity.

Interest income and other returns earned on funds that have already been disbursed is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12).

## 2. Financial Health Metrics

The Recipient agrees to report the following financial health metrics at the entity-level on an annual basis in accordance with its fiscal year as well as on behalf of each Pass-Through Subrecipient and Subrecipient Community Lender that has received in excess of $10,000,000 in Capitalization Funding. The metrics are due to the EPA Project Officer within 30 calendar days after submission of the reporting entity's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System and may be submitted through the Organizational Disclosures form. The requirement for submission of financial health metrics is not applicable for any fiscal year in which the reporting entity did not meet the requirements of 2 CFR Subpart F—Audit Requirements.  The first financial health metrics are due in 2025.

    1. Net Asset Ratio: The net asset ratio is defined as net assets divided by total assets.
    2. Current Ratio: **The current ratio is defined as current assets divided by current liabilities, where** current assets is equal to the value of all assets that are reasonably expected to be converted into cash within the coming 12-month period in the normal course of business and current liabilities is equal to the total value of all debts or obligations that must be paid in the coming 12-month period.

    3. Delinquency Rate: The delinquency rate is defined as the value of loans outstanding that are 90+ calendar days delinquent divided by the value of loans outstanding, where loans 90+ calendar days delinquent includes those with outstanding balances 90+ calendar days overdue and still accruing interest as well as those in nonaccrual status.

    4. Net Charge-Off Rate: The net charge-off rate is defined as the value of loans charged-off over the past fiscal year, minus the value of loan recoveries over the past fiscal year, divided by the value of loans outstanding.

    5. Concentration: The concentration of the portfolio, as demonstrated by calculating and reporting on recipient-level exposure, defined as on-balance sheet exposures to a single consolidated entity over all on-balance sheet exposures, for top ten highest exposures.

Note, the Delinquency Rate and Net Charge-Off Rate may exclude the value of loans which include an element of forgiveness, if and only if such forgiveness was established in the terms governing the financial product at origination.

The EPA Project Officer will consider Recipient and, where applicable, Subrecipient performance against these financial health metrics only to the extent by which they Materially Impair the Recipient's ability to execute the workplan in effect under this Assistance Agreement when assessing whether the Recipient is making sufficient progress in implementing the workplan in effect under this Assistance Agreement, as specified in the Sufficient Progress clause under the Clarifications to EPA General Terms and Conditions Programmatic Term and Condition.

Case 1:25-cv-00938    Document 1    Filed 03/31/25    Page 87 of 133
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 405 of 674

5J - 84094101 - 1    Page 40

## 3. Climate-Related Financial Risks

The Recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include working with Community Lender Subrecipients to account for and evaluate practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of their financial risk management policies and procedures.

The Recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include working with Community Lender Subrecipients to account for climate-related financial risks, including physical and transition risks, including through providing Technical Assistance Services that assist Community Lender Subrecipients with accounting for such climate-related financial risks in their own policies and procedures.

## 4. Additional Requirements

The Recipient agrees to not subordinate EPA's interest in grant funds that have not yet been used for program purposes in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law. Once a Recipient uses grant funds for program purposes and incurs a financial obligation, as defined under 2 CFR 200.1, EPA will only seek claims on those funds in the event that they were used for costs that do not comply with the terms and conditions of the Award Agreement or if there is adequate evidence of waste, fraud, or abuse, prompting adverse action by EPA per 2 CFR 200.339. This does not prohibit the use of subordinated debt as a form of Financial Assistance.

The Recipient agrees to provide Community Lender Subrecipients with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(f).

## P. Historic Preservation

### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The Recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties can include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The Recipient should work with their Project Officer to ensure that Subrecipients are available to work with EPA on any required consultation process with the State Historic Preservation Office (SHPO) or Tribal Historic Preservation Office (THPO) prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival

Case 1:25-cv-00938     Document 1     Filed 03/31/25     Page 88 of 133
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 406 of 674

5J - 84094101 - 1     Page 41

photographs, can be considered allowable and allocable grant costs.

### Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The Recipient must ensure that Subrecipients performing construction projects are aware of this requirement, and the Recipient must notify EPA if the AHPA is triggered.

### Q. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the Recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The Recipient must comply with, and ensure Subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the Federal award" provision of 2 CFR 200.403(a). The Recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

### R. Remedies for Non-Compliance

The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs provided in 2 CFR 200.343. As specified in 2 CFR 200.343, which will remain in effect throughout the term of this award, costs during suspension or after termination are allowable if (a) the costs result from financial obligations which were properly incurred by the non-Federal entity before the effective date of suspension or termination, are not in anticipation of it, and (b) the costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

The Recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the Recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of Subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the Recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or

criminal penalties through a DOJ criminal judicial enforcement action.

Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing a reasonable opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Performance Reporting National Programmatic Term and Condition, Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements, requirements for Subrecipient oversight, or to obligate or expend funds for allowable activities.

### S. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The Recipient agrees to comply with these clarifications.

### 1. Indirect Cost Rate

The Recipient must exclude costs for Acquisitions of Intangible Property from any calculations of modified total direct costs (MTDC), as defined in 2 CFR 200.1. Intangible Property is not a "service" and therefore is not included in MTDC. The Recipient should note that Subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive Participant Support Costs cannot charge an indirect cost rate against their Participant Support Cost payments.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $50,000 of each Subaward (regardless of the period of performance of the Subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, Participant Support Costs and the portion of each Subaward in excess of $50,000.

In the event that the Recipient is compensating an affiliated entity for its direct and indirect costs related to use of employees, the Recipient must not charge its indirect cost rate against any of these costs.

Notwithstanding the General Term and Condition "Indirect Cost Rate Agreements," the Recipient may claim up to a 15% de minimis rate of modified total direct costs authorized by 2 CFR 200.414(f).

### 2. Sufficient Progress

The EPA Project Officer may assess whether the Recipient is making sufficient progress in implementing the workplan in effect under this Assistance Agreement within 90 calendar days of June 30, 2025 as well as within 90 calendar days of June 30 of each year thereafter during the Period of Performance. "Sufficient progress" shall be assessed based on a comparison of the Recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. As noted under the Financial Risk Management Programmatic Term and Condition, the Recipient's financial health, as measured by the required Financial Health Metrics, are also an input in this process. This term and condition "flows down" to Subrecipients, with the Recipient required to assess whether each Subrecipient is making sufficient progress in implementing the workplan under its Subaward Agreement; the Recipient may increase the frequency and scope of the review of sufficient progress of Subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities*.

5J - 84094101 - 1    Page 43

If the EPA Project Officer determines that the Recipient has not made sufficient progress in implementing its workplan in effect under this Assistance Agreement, the Recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

EPA will not find that the Recipient has failed to make sufficient progress in implementing its workplan in effect under this Assistance Agreement based on shifts between types of Financial Assistance and/or CCIA-Eligible Projects over the Period of Performance (or other shifts in portfolio allocation, such as by region or market segment, over the Period of Performance). If EPA finds the Recipient has failed to achieve sufficient progress on deployment of Financial Assistance to CCIA-Eligible Projects in general, or is achieving progress at a slower rate than projected under the workplan in effect under this Assistance Agreement, the Recipient will have an opportunity to implement a corrective action plan pursuant to 2 CFR 200.208.

### 3. Termination

EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.960 (CCIA) to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

### T. Period of Performance

The Period of Performance under this Award Agreement will end on the date specified in the Notice of Award. However, the Period of Performance may end prior to the date specified in the Notice of Award if all required work of the Federal award has been completed, in accordance with 2 CFR 200.344. In accordance with 2 CFR 200.344(b), the Recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the Period of Performance. In this context, to "liquidate all financial obligations" means to pay outstanding bills, such as the payment of staff salaries accrued during the Period of Performance but for which the due date falls after the end date of the Period of Performance.

The Recipient should note that the Recipient will not be considered to have met the requirements for closeout under its award under 2 CFR 200.344 so long as any Subrecipient has not met the requirements for closeout under its subaward under 2 CFR 200.344.

Notwithstanding the Extension of Project/Budget Period Expiration Date General Term and Condition, in accordance with 2 CFR 200.308(g)(2), the Recipient is authorized to initiate a one-time extension of the Period of Performance by up to 12 months without prior EPA approval, provided that the extension

5J - 84094101 - 1    Page 44

complies with the requirements 2 CFR 200.308(g)(2). In accordance with 2 CFR 200.308(g)(2), the Recipient must "notify the Federal agency in writing with the supporting justification and a revised period of performance at least 10 calendar days before the conclusion of the period of performance."

## U. Closeout Agreement

As provided at 2 CFR 200.307(c) and 2 CFR 1500.8(d), after the end of the Period of Performance of the Assistance Agreement, the Recipient may keep and use Program Income remaining at the end of the Assistance Agreement and use Post-Closeout Program Income in accordance with this term and condition. The Closeout Agreement goes into effect for this Assistance Agreement the earlier of 1) the day after the Assistance Agreement Period of Performance ends, 2) the first date when all required work of the Federal award has been completed in accordance with 2 CFR 200.344 and the Recipient has met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition) or 3) an alternative date that is mutually agreed by the Recipient and the EPA Grants Management Officer or Award Official.

In accordance with 2 CFR 200.344, EPA will proceed to closeout the Award Agreement and enter the Closeout Period even if the Recipient has not met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition). As provided in 2 CFR 200.344: "When the recipient or subrecipient fails to complete the necessary administrative actions or the required work for an award, the Federal agency or pass-through entity must proceed with closeout based on the information available." This Closeout Agreement is therefore self-executing.

This term and condition is the entire Closeout Agreement between the EPA and the Recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The Recipient shall comply with the requirements specified below as part of the Closeout Agreement. Definitions within 2 CFR 200.1, including as supplemented through *I. Definitions* of this award agreement, apply identically to how they do under the Period of Performance, unless otherwise noted.

As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to Subrecipients such that the Recipient must enter into a corresponding Closeout Agreement with any Subrecipient that has Program Income or anticipates generating Post-Closeout Program Income at the end of the Subrecipient's Period of Performance.

## 1. Allowable Activities

The Recipient shall use Post-Closeout Program Income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

After the Closeout Agreement becomes effective, the Recipient shall disclose annual reports publicly, as described in the Performance Reporting Programmatic Term and Condition, rather than meeting the reporting requirements described in the Performance Reporting Programmatic Term and Condition.

Case 1:25-cv-00938    Document 1    Filed 03/31/25    Page 92 of 133
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 410 of 674

5J - 84094101 - 1    Page 45

### 3. LIDAC Expenditure Requirements

The Recipient shall expend 100% of Post-Closeout Program Income for the purposes of providing Financial Assistance in Low-Income and Disadvantaged Communities and comply with this requirement in accordance with the LIDAC Expenditure Requirement Programmatic Term and Condition, as applicable. Funds used for the purposes of providing Financial Assistance includes Capitalization Funding; Technical Assistance Subawards; Technical Assistance Services; and Program Administration Activities. This requirement applies to the entire award provided to the Recipient and "flows down" to each Subrecipient.

### 4. Cash Management Requirements

The Recipient must maintain Post-Closeout Program Income in accordance with the Cash Management Requirements in the Financial Risk Management Requirements Programmatic Term and Condition, as applicable. However, the Recipient may submit a Cash Management Policy for review and approval by the EPA Project Officer, which can authorize the Recipient to deviate from the aforementioned Cash Management Requirements.

### 5. Financial Health Metrics

After the Closeout Agreement becomes effective, the Recipient agrees to report financial health metrics in accordance with the Financial Health Metrics in the Financial Risk Management Requirements Programmatic Term and Condition (on behalf of the Recipient, Pass-Through Subrecipients, as well as Community Lender Subrecipients that have received in excess of $10,000,000 in Capitalization Funding) publicly, rather than disclosing the metrics to EPA, as applicable. The requirement for submission of financial health metrics is not applicable for any fiscal year in which the reporting entity did not meet the requirements of 2 CFR Subpart F—Audit Requirements. The Recipient agrees to add the following two financial health metrics as part of the financial health metrics for the Closeout Period:

1. Self-Sufficiency Ratio: The self-sufficiency ratio is defined as earned revenue divided by operating expenses, where earned revenue is equal to the value of all income earned from normal business transactions and operating expenses is equal to the value of all expenses incurred as a part of normal business operations over the prior 12-month period, not including interest, financing, depreciation, amortization, and loan loss provision expense.

2. Operating Cash Ratio: The operating cash ratio is defined as cash and cash equivalents divided by operating expenses, where cash and cash equivalents is equal to the total value of all cash and cash equivalent items that can be converted into cash immediately and operating expenses is equal to the value of all expenses incurred as a part of normal business operations over the prior 12-month period, not including interest, financing, depreciation, amortization, and loan loss provision expense.

### 6. Conflicts of Interest

The Recipient agrees to comply with the conflict of interest requirements described in the Conflicts of Interest Programmatic Term and Condition through September 30, 2031.

### 7. Remedies for Non-Compliance

The Recipient agrees to identical remedies for non-compliance that are specified in the Remedies for

5J - 84094101 - 1    Page 46

Non-Compliance Programmatic Term and Condition, as applicable. During the Closeout Period, the workplan and budget submitted for the Period of Performance are no longer applicable.

## 8. Suspension and Debarment

The Recipient agrees to ensure that Post-Closeout Program Income is not transferred to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The Recipient can maintain compliance with this requirement through either (1) checking the System for Award Management (for Subrecipients, Contractors, or Program Beneficiaries) or (2) obtaining eligibility certifications from counterparties (for Program Beneficiaries). The Recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity is presently excluded or disqualified.

## 9. Non-Discrimination

The Recipient must use Post-Closeout Program Income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

**Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975.** The Recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency" in 40 CFR Part 5 and 40 CFR Part 7, the Recipient agrees, and will require all Subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

**Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities.** As provided in section 301 of the Executive Order, the Recipient will ensure that Subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to Real Property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 10. Record-Keeping

In accordance with 2 CFR 200.334(e), the Recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of Post-Closeout Program Income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. Note that this requirement applies if and when the Closeout Agreement is terminated, in accordance with *Item 14. Termination of the Closeout Agreement*. EPA may obtain access to these records to verify that Post-Closeout Program Income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the Recipient must maintain adequate accounting records for how Post-Closeout Program

5J - 84094101 - 1    Page 47

Income is managed and spent as well as all other appropriate records and documents related to the activities conducted using Program Income.

The Recipient agrees to ensure that Subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. The Recipient may use the terms of its Subaward Agreements or other effective means to meet its responsibilities.

## 11. Other Federal Requirements

The following other federal requirements apply to the use of Post-Closeout Program Income under the Closeout Period to the same extent they do under the terms of the Performance Period:

- Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Development Requirements Programmatic Term and Condition;
- Build America, Buy America Act, as specified in the Build America, Buy America Act Programmatic Term and Condition; and
- National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition.

No other federal requirements apply to the use of Post-Closeout Program Income under the terms of this Closeout Agreement, other than those specified in this Closeout Agreement.

## 12. Audit Requirements

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Closeout Period, as activities related to the Federal award referenced in 2 CFR 200.502(a) include activities during the Closeout Period.

Through September 30, 2031, the Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## 13. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Closeout Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## 14. Termination of the Closeout Agreement

The Closeout Agreement terminates when either of the following situations occur: (1) the Recipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Recipient and the EPA Award Official or Grants Management Officer mutually agree to terminate the Closeout Agreement, with the Recipient remitting current and future Post-Closeout Program Income to the federal government.

JA1604

5J - 84094101 - 1    Page 48

The ability to terminate the Closeout Agreement flows down to Subrecipients, as a Closeout Agreement between the Recipient and Subrecipient terminates when either (1) the Subrecipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Subrecipient and the Recipient mutually agree to terminate the Closeout Agreement, with the Subrecipient remitting current and future Post-Closeout Program Income to the Recipient.

The de minimis amount must be agreed-upon in writing by the Recipient and the Director of the Office of the Greenhouse Gas Reduction Fund (or equivalent), prior to the Recipient using the "de minimis" criteria to terminate the Closeout Agreement.

<u>15. Points of Contact</u>

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and the Authorized Representative on the EPA Key Contacts Form most recently submitted to the EPA Project Officer (for the Recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

## V. Legal Counsel

The Recipient agrees to appoint appropriate legal counsel if counsel is not already available.

## W. Accounting Principles

The Recipient must account for award funds in accordance with Generally Accepted Accounting Principles (GAAP) as in effect in the United States.

The Recipient must segregate and account for the award funds separately from all other program and business accounts. Additionally, the Recipient must segregate and account for Program Income separately from all other program and business accounts.

## X. Internal Controls

The Recipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at: https://www.gao.gov/assets/gao-14-704g.pdf.

## Y. Audits

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Period of Performance, as described in the Audit Requirements General Term and Condition. Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(i), the Recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit Subrecipient that expends $1,000,000 or more of EPA funds from the Recipient's grant program in the Subrecipient's fiscal year. Any for-profit Subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's

Case 1:25-cv-00938   Document 1   Filed 03/31/25   Page 96 of 133
USCA Case #25-5122   Document #2114423   Filed: 05/05/2025   Page 414 of 674

5J - 84094101 - 1   Page 49

fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier.

The Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## Z. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that specific conditions are necessary to ensure that the Clean Communities Investment Accelerator Fund program is effectively carried out by Eligible Recipients that have not previously managed grants with the same scale and complexity of this agreement. These specific conditions will remain in effect throughout the Period of Performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer or the Division Director of the Clean Communities Investment Accelerator program, will oversee and monitor the grant agreement through activities, if determined necessary, including:

1. Upon request, requiring the Recipient to participate in an annual workshop (i.e., one workshop per calendar year) with other Recipients under the National Clean Investment Fund and/or Clean Communities Investment Accelerator; the EPA Project Officer will contact the Recipient to finalize details for each annual workshop.

2. Participation in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the workplan in effect under this Assistance Agreement, provided the Recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other Recipients under the Greenhouse Gas Reduction Fund with other EPA programs; and coordination by EPA staff with other federal programs to avoid duplication of effort;

3. Closely monitoring the Recipient's management and oversight of Subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

4. Closely monitoring the Recipient's performance to verify compliance with the workplan in effect under this Assistance Agreement and achievement of environmental results;

5. Participating in periodic telephone conference calls with Recipient personnel to discuss project successes and challenges as well as similar items impacting program performance;

6. Reviewing and commenting on performance reports prepared under the Award Agreement. Note that the final decision on the content of performance reports rests with the Recipient;

7. Verifying that the Recipient is expending the award on allowable activities, including but not limited to reviewing a sample of Capitalization Funding and Technical Assistance Subawards to verify compliance with regulatory requirements and the terms and conditions of the Award

5J - 84094101 - 1    Page 50

Agreement; and

8. Periodically reviewing costs incurred by the Recipient as well as its contractors and Subrecipients if needed to ensure appropriate expenditure of grant funds. Note that Recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds.

Subject to approval by the EPA Award Official, the EPA Project Officer and the Recipient may mutually agree to additional areas of oversight and monitoring.

*Method for Reconsideration.* If the Recipient believes that one or more of these specific conditions are not warranted or requires modification, the Recipient must file a written objection naming the specific condition(s) within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist, and Project Officer identified in the Notice of Award.

## AA. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the Recipient's GGRF award. These materials may include links to Recipient and/or Subrecipients' websites. The Recipient agrees to work with the EPA Project Officer or another member of GGRF program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## AB. Conflicts of Interest

The Recipient must comply with requirements on transfers of funds that create actual and potential conflicts of interest, as specified in this term and condition. Transfers of funds include Subawards, Contracts (including but not limited to Acquisitions of Intangible Property), and Participant Support Costs. The definitions in the EPA's Financial Assistance Conflict of Interest Policy (COI Policy) apply to this term and condition.

There are three categories of transfers of funds, with the requirements differing by each category (as specified in this term and condition):

1. Transfers with Affiliated Entities: Subawards, Contracts, and Participant Support Costs to Affiliated Entities or co-invested in projects with Affiliated Entities. An Affiliated Entity is any entity that is related to the Recipient in accordance with the indicia of control described in 2 CFR 180.905.

2. Financial Assistance to CCIA-Eligible Projects: Subawards, Contracts (in the form of Acquisitions of Intangible Property), and Participant Support Costs as forms of Financial Assistance to CCIA-Eligible Projects, unless such transfers are with Affiliated Entities. These transfers are not within the scope of the COI Policy, which states that "subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by recipients of revolving loan fund capitalization grants or other EPA financial assistance agreements where Agency funds may be used for lending activities."

3. Subgrants and Contracts: Subgrants and Contracts (other than Acquisitions of Intangible Property), unless such transfers are with Affiliated Entities.

Case 1:25-cv-00938    Document 1    Filed 03/31/25    Page 98 of 133
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 416 of 674

5J - 84094101 - 1    Page 51

Note that all Contracts (including Acquisitions of Intangible Property) must also comply with the conflict of interest standards in 2 CFR 200.318(c).

## 1. Transfers with Affiliated Entities

### Prior Approval of COI Mitigation Plan

The Recipient must not transfer funds with Affiliated Entities unless those transfers have been included in an EPA-approved COI Mitigation Plan on Transfers of Funds with Affiliated Entities. The Recipient agrees to seek prior EPA approval for changes to the COI Mitigation Plan on Transfers of Funds with Affiliated Entities.

### Quarterly Disclosure Requirement

The Recipient agrees to disclose, on a quarterly basis, a list of newly originated transfers of funds with Affiliated Entities that are within the scope of its EPA-approved COI Mitigation Plan on Transfers of Funds with Affiliated Entities. Each quarterly disclosure must include (1) a list of such transfers of funds made over the quarter and (2) steps taken to taken to eliminate, neutralize or mitigate any conflicts of interest, in accordance with the EPA-approved COI Mitigation Plan on Transfers of Funds with Affiliated Entities. The Recipient must disclose its own transfers as well as transfers made by Subrecipients.

The quarterly periods for such disclosures are defined as follows: April 1 to June 30; July 1 to September 30; October 1 to December 31; and January 1 to March 31. The Recipient must make the disclosures to the EPA Project Officer within 30 calendar days of the end of the quarterly period.

### Project Officer Review

In accordance with 2 CFR 200.337, the EPA Project Officer may access records relating to a subset of transactions disclosed to review for compliance with the Recipient's EPA-approved COI Mitigation Plan on Transfers of Funds with Affiliated Entities as well as this term and condition. The EPA Project Officer will not approve transfers of funds in advance but rather will review transfers of funds that have already occurred for compliance.

### Waivers and Modifications

EPA agrees that, for transfers of funds with Affiliated Entities, the requirements of this term and condition apply in lieu of the requirements of the Disclosing Conflict of Interest General Term and Condition.

On a case-by-cases basis, the EPA Project Officer may extend the due date for disclosures on transfers of funds with Affiliated Entities. On a case-by-case basis, the EPA Project Officer may waive or modify the disclosure requirements on transfers of funds with Affiliated Entities.

## 2. Financial Assistance to CCIA-Eligible Projects

### Semi-Annual Disclosure Requirement

The Recipient agrees to disclose, on a semi-annual basis, a list of transfers of funds as Financial Assistance to CCIA-Eligible Projects with actual and potential conflicts of interest. Each semi-annual disclosure must include (1) a list of such transfers of funds made over the semi-annual period and (2)

Case 1:25-cv-00938     Document 1     Filed 03/31/25     Page 99 of 133
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 417 of 674

5J - 84094101 - 1     Page 52

steps taken to taken to eliminate, neutralize or mitigate any conflicts of interest, in accordance with any EPA-approved documents related to eliminating, neutralizing, and mitigating conflicts of interest. The Recipient must disclose transfers made by Subrecipients.

The semi-annual periods for such disclosures are defined as follows: July 1 to December 31; January 1 to June 30. The Recipient must make the disclosures to the EPA Project Officer within 30 calendar days of the end of the semi-annual period.

## B. Project Officer Review

In accordance with 2 CFR 200.337, the EPA Project Officer may access records relating to a subset of transactions disclosed to review for compliance with the Recipient's EPA-approved documents related to eliminating, neutralizing, and mitigating conflicts of interest as well as this term and condition. The EPA Project Officer will not approve transfers of funds in advance but rather will review transfers of funds that have already occurred for compliance.

## C. Waivers and Modifications

On a case-by-cases basis, the EPA Project Officer may extend the due date for disclosures on transfers of funds as Financial Assistance to Qualified Projects. On a case-by-case basis, the EPA Project Officer may waive or modify the disclosure requirements on transfers of funds as Financial Assistance to Qualified Projects.

## 3. Subgrants and Contracts

The Recipient agrees to comply with the Disclosing Conflict of Interest General Term and Condition for Subgrants and Contracts (excluding Acquisitions of Intangible Property), unless such transfers are with Affiliated Entities. If such transfers are with Affiliated Entities, then the Recipient is required to include them in the process specified in *1. Transfers with Affiliated Entities*.

## AC. Prior Approvals

EPA will only have authority to review and approve revisions to the Recipient's workplan in effect under this Assistance Agreement, budget, and other documents if authorized by 2 CFR 200.308 or 2 CFR 200.208. The Recipient must contact the EPA Project Officer when the EPA has prior approval authority specified below. Denial of a request for prior approval will be provided in writing, with an explanation of the rationale.

## Workplan

For the purposes of this Award Agreement, EPA interprets 2 CFR 200.308(c)(1) to enable the Recipient to revise the activities specified in its workplan in effect under this Assistance Agreement without prior EPA approval, provided the activities still comply with the terms and conditions of the Award Agreement. The allowable and allocable grant costs are narrowly defined, pursuant to the terms and conditions of the Award Agreement; in accordance with 2 CFR 200.308(c)(1), any changes to the workplan in effect under this Assistance Agreement that comply with the statute as well as the terms and conditions would not be a "change in the scope or objective of the project or program." Therefore, so long as the Recipient is updating its workplan in effect under this Assistance Agreement with the revised activities in accordance with the terms and conditions of the Award Agreement, EPA will not require prior approval.

5J - 84094101 - 1     Page 53

## Budget

For the purposes of this Award Agreement, EPA implements 2 CFR 200.308(i)(2) in accordance with Item 1 of the Transfer of Funds General Term and Condition to enable the Recipient to revise the EPA-approved budget included in its Award Agreement without prior EPA approval, provided the cumulative funding transfers among Object Class Categories (Personnel, Fringe Benefits, Travel, Equipment, Supplies, Contractual, Construction, Other, Indirect) do not exceed 10% of the total budget approved at time of award. Therefore, so long as the Recipient is updating its EPA-approved budget by transferring funds by less than or equal to these amounts, EPA will not require prior approval.

However, notwithstanding the requirements of 2 CFR 200.308(i)(2), if the Recipient seeks to transfer any amount of funds budgeted for Participant Support Costs to other budget categories, then it must seek prior approval pursuant to 2 CFR 200.308(f)(5).

## Transfers of Funds

2 CFR 200.308(f)(6) requires the Recipient to obtain prior agency approval for "Subaward activities not proposed in the application and approved in the Federal award." If the types of activities are described in the workplan in effect under this Assistance Agreement (including types of transfers to be conducted through Subawards, Participant Support Costs, Acquisitions of Intangible Property, and other Contracts as defined in 2 CFR 200.1), then EPA has provided the necessary prior agency approval for the purposes of 2 CFR 200.308(f)(6). Approval for the purposes of this regulation does not mean that such transfers of funds are compliant with the statutes, regulations, and terms and conditions.

## Changes in Key Personnel

2 CFR 200.308(f)(2) requires the Recipient to obtain prior agency approval for a "[c]hange in key personnel (including employees and contractors) that are identified by name or position in the Federal Award." If the Recipient is seeking to add or replace a "key person," as defined by members of the board of directors and Senior Management whose roles are specified in the most recently submitted Organizational Plan, then the Recipient must obtain prior EPA approval of the qualifications of the key person.

The Recipient must request prior agency approval for an addition or replacement of a  "key person" via email through the EPA Project Officer, who will have 8 calendar days to communicate EPA's disapproval of their qualifications via email, along with an accompanying justification. If 8 calendar days have passed without notification of EPA disapproval of the key person's qualifications pursuant to 2 CFR 200.308(c)(2), the Recipient is authorized to change the "key person." Once the change is effective, the Recipient must submit an updated Organizational Plan to the EPA Project Officer.

## AD. Flow-Down Requirements

As described in 2 CFR 200.101(b)(1), the terms and conditions of Federal awards flow down to Subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(b), the Recipient agrees to ensure that Subrecipients are aware of the requirements that apply to the Subrecipient.

For the purposes of this Award Agreement, all terms and conditions must flow down to Subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of

Case 1:25-cv-00938    Document 1    Filed 03/31/25    Page 101 of 133
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 419 of 674

5J - 84094101 - 1    Page 54

programmatic terms and conditions to Subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## AE. Resolution of Disputes Termination Provision

The Recipient is precluded from drawing down more than 78.46% of the Total Approved Assistance Amount until this condition is removed, which will occur when: a) the EPA Award Official, at the direction of the Grants Competition Disputes Decision Official (GCDDO), provides written confirmation that all administrative disputes under the National Clean Investment Fund and the Clean Communities Investment Accelerator are resolved in accordance with the dispute resolution procedures in Appendix A of the EPA Order 5700: Policy for Competition of Assistance Agreements; or b) the administrative disputes are withdrawn, abandoned or dismissed; or c) December 31, 2024, whichever is sooner.

If EPA does need to alter the Selection Official's selection and partial funding decisions for this agreement based on a GCDDO determination the EPA Award Official will partially terminate this assistance agreement, de-obligate a portion of the funds that have been obligated and use the de-obligated funds to satisfy the terms of a GCDDO remedy benefiting another entity. The Recipient will then provide an updated workplan and budget information, as needed, to amend the agreement.

For the purposes of this term and condition, EPA's partial termination may apply not just to obligated funds that have not been drawn down from ASAP but also to Program Income that has been generated and retained by the Recipient under 2 CFR 1500.8(d) and the Program Income Programmatic Term and Condition of this agreement. In accordance with 2 CFR 200.307(e)(1), EPA may require that the amount of funds committed by EPA to the Recipient be reduced by all or some of the Program Income that has been generated by the Recipient.

## AF. Deposit Account at Financial Agent

A depository institution has been designated as a financial agent of the United States (the Financial Agent) for the Greenhouse Gas Reduction Fund. The Recipient is required to set up and utilize an Account or Accounts at the Financial Agent in accordance with the Financial Agent Terms and Conditions (Section V) included in this Assistance Agreement.

## AG. Interim SF-425 Requirement

The Recipient must submit an SF-425 within 30 calendar days of receiving access to an Account or Accounts at the Financial Agent, with the SF-425 covering all activities supported by funds drawn from ASAP and disbursed for actual and allowable costs, other than funds disbursed into the Account or Accounts at the Financial Agent.

## AH. Amendments to Terms and Conditions

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## AI. Preservation of Guidance and Data

Any statutes, regulations, agency documents, policies, and guidance (including FAQs and EPA's

Implementation Framework for the Greenhouse Gas Reduction Fund), or executive orders referenced herein are incorporated by reference into the Award Agreement as of the effective date of this amended Award Agreement. These incorporated documents will be controlling on Recipient and Subrecipients in the event such documents are deleted, repealed, rescinded, or replaced unless a statute provides otherwise. This includes, but is not limited to, the Uniform Administrative Requirements, Cost Principles and Audit Requirements for Federal Awards; Title 2 CFR Part 200 effective October 1, 2024, and the EPA General Terms and Conditions effective October 1, 2024.

This provision cannot be changed without the consent of the Recipient.

## IV. ADMINISTRATIVE TERMS AND CONDITIONS

Please refer to Page 4, "Administrative Conditions."

## V. FINANCIAL AGENT TERMS AND CONDITIONS

### A. Revisions to Award Agreement to Account for Financial Agent Arrangement

Because a depository institution has been designated as a financial agent of the United States (the Financial Agent) for the Greenhouse Gas Reduction Fund, the following revisions to the Award Agreement are effective without further action or notice required by the Recipient or EPA.

### 1. Revisions to Section I. Definitions

*The following **new definition** will be added to the Award Agreement:*

**Capitalization by Nonexchange Capital Contribution:** Capitalization by Nonexchange Capital Contribution means award funds that (1) the Recipient draws down from the Automated Standard Application Payments (ASAP) system and (2) disburses into the 'Budget Account' as defined under the Deposit Account at Financial Agent Programmatic Term and Condition to capitalize itself for subsequent use for any of the following Allowable Activities: Capitalization Funding; Technical Assistance Subawards; Technical Assistance Services; and Program Administration Activities. Under this two-step transaction, which involves both a drawdown and disbursement, the Recipient's drawdown from ASAP is deemed (a) an advance payment of Federal funds in accordance with 2 CFR 200.305(b)(1); while the disbursement into the Deposit Account at Financial Agent is deemed (b) an allowable cost to be charged to the EPA award, and (c) a "nonexchange transaction", consistent with the definition of this term in the Statement of Federal Financial Accounting Standards No. 5. The full amount of the Capitalization by Nonexchange Capital Contribution must be recognized, reported, and accounted for as Program Income in accordance with the Program Income Programmatic Term and Condition once clauses (a) and (b) are fulfilled. Any Subrecipient with a Deposit Account at Financial Agent will be entitled to receive its payments from Recipient as a Capitalization by Nonexchange Capital Contribution.

*The definition of **Program Income** under the Award Agreement will be amended and replaced with:*

**Program Income:** 2 CFR 200.1 defines Program Income as "gross income earned by the non-Federal entity that is directly generated by a supported activity or earned as a result of the Federal award during

Case 1:25-cv-00938    Document 1    Filed 03/31/25    Page 103 of 133
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 421 of 674

5J - 84094101 - 1    Page 56

the period of performance except as provided in § 200.307(f)." 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, there are two types of Program Income: (1) "Program Income from Operations" and (2) "Program Income from Capitalization by Nonexchange Capital Contribution".

Program Income from Operations includes but is not limited to income from origination fees, servicing fees, and asset management fees; dividends from equity investments; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). Under this award agreement, the Recipient is authorized to deduct the cost of generating Program Income from Operations under 2 CFR 200.307(b) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Program Income from Operations include origination, servicing, and management costs that are not charged as direct costs to the Federal award. Costs of generating Program Income from Operations can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the Program Income from Operations, provided the Recipient can account for the actual costs incurred. Program Income from Operations requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries. Program Income from Operations can be earned prior to the availability of the 'Program Income from Operations' account as defined under the Deposit Account at Financial Agent Programmatic Term and Condition.

Program Income from Capitalization by Nonexchange Capital Contribution means award funds from the ASAP system that the Recipient draws down and immediately deposits into the 'Budget Account' at the Financial Agent in accordance with (a) the definition of Capitalization by Nonexchange Capital Contribution and (b) the Deposit Account at Financial Agent Programmatic Term and Condition. Program Income from Capitalization by Nonexchange Capital Contribution cannot be earned prior to the availability of the 'Budget Account' as defined under the Deposit Account at Financial Agent Programmatic Term and Condition.

Both forms of Program Income under this program must be treated in accordance with the Program Income Programmatic Term and Condition. EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fund raising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

## 2. Revisions to Section II. National Programmatic Terms and Conditions

The **Program Income Programmatic Term and Condition** will be amended and replaced with:

Program Income

In accordance with Clean Air Act Section 134(b)(1)(C) as well as 2 CFR 200.307(e)(2) and 2 CFR 1500.8 (b), the Recipient must retain Program Income earned during the Period of Performance. Program

Case 1:25-cv-00938    Document 1    Filed 03/31/25    Page 104 of 133
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 422 of 674

5J - 84094101 - 1    Page 57

Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income from Operations once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income from Operations may be used by the Recipient in advance of the initial award funds (i.e. Program Income from Capitalization by Nonexchange Capital Contribution) being fully used where reasonable and necessary to execute the activities in the workplan in effect under this Assistance Agreement.

### 3. Revisions to Section III. Additional Programmatic Terms and Conditions

*The Allowable and Unallowable Activities Programmatic Term and Condition will be amended and replaced with:*

### Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Capitalization by Nonexchange Capital Contribution; Capitalization Funding; Technical Assistance Subawards; Technical Assistance Services; and Program Administration Activities. The Recipient must use awards funds exclusively for allowable activities within the ten EPA regions, with the exception of the Freely Associated States. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

Capitalization by Nonexchange Capital Contribution generates Program Income for the Recipient in an amount equal to the available EPA award balance drawn down from ASAP into the 'Budget Account' as defined under the Deposit Account at Financial Agent Programmatic Term and Condition. Program Income from Capitalization by Nonexchange Capital Contribution must be expended on Capitalization Funding, Technical Assistance Subawards, Technical Assistance Services, and Program Administration Activities in accordance with the workplan in effect under this Assistance Agreement. The allowability of legal costs incurred in connection with the award shall be governed by applicable provisions of 2 CFR Part 200, Subpart E, including but not limited to 2 CFR 200.403, 2 CFR 200.435, 2 CFR 200.441 and 2 CFR 200.459.

The Recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of CCIA-Eligible Projects; and (b) activities that support deployment of projects outside the boundaries of the ten EPA regions.

*The Deposit Account at Financial Agent Programmatic Term and Condition will be amended and replaced with:*

5J - 84094101 - 1    Page 58

## Deposit Account at Financial Agent

The Recipient will open a Deposit Account at a depository institution that has been designated as a financial agent of the United States (the Financial Agent). Such account will be used as Recipient's operating account for the award. Upon establishment of the Deposit Account, the Recipient will drawdown the entire available EPA award balance from ASAP and disburse it into the Deposit Account, where it must be maintained until the Closeout Agreement goes into effect in accordance with the Closeout Agreement Programmatic Term and Condition. Note, this requirement applies to any and all drawdowns from ASAP by the Recipient while the Deposit Account is available and accessible. Once the Closeout Agreement goes into effect, the Recipient will be entitled to transfer any remaining funds in the Deposit Account to an account at a financial institution of its choosing, provided such account is insured in accordance with 2 CFR 200.305(b)(10)).

The Recipient will grant EPA a perfected security interest in all funds held in the Deposit Account. The Recipient will take all such actions, enter into all such agreements, and execute and deliver all such documentation as may be necessary and/or as directed by EPA from time to time to establish and maintain such security interest, including but not necessarily limited to entering into an account control agreement (ACA) with the Financial Agent and EPA.

Notwithstanding any other provision of this Assistance Agreement, EPA will only furnish the Financial Agent with a Notice of Exclusive Control under an ACA when EPA issues a written determination and finding that the Recipient has failed to comply with the terms and conditions of this Assistance Agreement, and that noncompliance is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse or material misrepresentation of eligibility status, and that EPA has initiated action under 2 CFR 200.339 to wholly or partly suspend or terminate the Federal award, as authorized in the terms of the Assistance Agreement. The written determination and finding and a copy of the Notice of Exclusive Control shall be sent to the Recipient when the Notice of Exclusive Control is furnished to the Financial Agent. EPA and Recipient have mutually agreed only to the specific process outlined in this term for furnishing a Notice of Exclusive Control instruction to the Financial Agent.

Note, funds in the Deposit Account that were legally obligated by the Recipient for financial obligations, as defined under 2 CFR 200.1, prior to the issuance of, but not in anticipation of, a Notice of Exclusive Control constitute "financial obligations which were properly incurred" by the Recipient in accordance with 2 CFR 200.343 and are to remain allowable costs during suspension or after termination of the Recipient's Assistance Agreement. Funds necessary to meet such financial obligations will be disbursed to Program Beneficiaries, Subrecipients, Contractors, or any other third parties which are due payment after a Notice of Exclusive Control is issued.

Note further that a financial obligation to a third party for Financial Assistance is deemed "properly incurred" per 2 CFR 200.343 if it is a legally-binding, arms-length agreement where funds are transferred to the 'Reserve Account' in accordance with these terms and conditions. Any Notice of Exclusive Control shall not include any such funds. Funds necessary to meet such financial obligations for Financial Assistance will be disbursed to Program Beneficiaries, Subrecipients, Contractors, or any other third parties which are due payment after a Notice of Exclusive Control over other funds in the Deposit Account is issued.

Funds held in the Recipient's account at the Financial Agent may be invested in accordance with the Cash Management Requirements in the Financial Risk Management Programmatic Term and Condition.

Case 1:25-cv-00938    Document 1    Filed 03/31/25    Page 106 of 133
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 424 of 674

5J - 84094101 - 1    Page 59

The Financial Agent will be compensated in accordance with the terms of a valid Financial Agency Agreement (FAA).

The Deposit Account will consist of three distinct account types ('Budget,' 'Reserve', and 'Program Income from Operations'), each of which serves a distinct purpose (while the exact naming convention and structure of these accounts may differ from the below, the accounts must perform a substantively similar function). The Recipient is required to utilize the accounts at the Financial Agent for their intended purpose during any period in which the accounts are available and accessible, with exceptions to this requirement permitted by the EPA Project Officer only on a case-by-case basis, to the extent such exceptions are necessary to execute against the workplan in effect under this Assistance Agreement.

## 1. Budget Account

This account within the Deposit Account will hold funds that have yet to be used for any of the following allowable activities: Capitalization Funding; Technical Assistance Subawards; Technical Assistance Services; and Program Administration Activities. It will hold funds within a number of sub-accounts that correspond to more specific allowable expenditures under the particular type of award or subaward.

**Transferring Funds Into the Budget Account.** Upon establishment of the Deposit Account, the Recipient will drawdown the entire available EPA award balance from ASAP directly into the Budget Account. The Recipient will direct the Financial Agent to allocate funds across the various sub-accounts in the Budget Account in accordance with its workplan in effect under this Assistance Agreement. Recipient need not submit a certification notice to transfer funds within the Budget Account, but remains subject to the Transfer of Funds EPA General Term and Condition and any associated pre-approval or notification requirements therein.

**Transferring Funds Out of the Budget Account.** When Community Lenders transfer funds out of the Budget Account to provide Financial Assistance to CCIA-Eligible Projects, Recipient must obtain certification from the Community Lender's chief executive officer (or equivalent), chief financial officer (or equivalent), chief reporting officer (or equivalent), or chief compliance officer (or equivalent) that the amount of the payment is necessary to execute against the workplan in effect under this Assistance Agreement, and ensure that notice is provided to the Financial Agent with the transfer request. The certification must include the following language: "This certification is a material representation for the purposes of an EPA Financial Assistance Agreement, and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions". In accordance with 2 CFR 200.337, the Recipient must make those certifications available to the EPA, upon request.

While transfers out of the Budget Account are not formally subject to any of the requirements established in either the EPA General Term and Condition on Automated Standard Application Payments (ASAP) and Proper Payment Draw Down or the Interim Drawdown Procedures Programmatic Term and Condition, Recipient agrees to the following requirements:

a) When the need for a longer disbursement window is known in advance of the transfer, Recipient must notify the EPA Project Officer prior to executing the transfer and follow-up to inform the EPA Project Officer of the amount of the transfer that has been disbursed for an Allowable Activity in 5, 10, and 14 business days. Recipient must return any undisbursed amounts to the Deposit Account at the Financial Agent on the 15th business day, or

Case 1:25-cv-00938   Document 1   Filed 03/31/25   Page 107 of 133
USCA Case #25-5122   Document #2114423   Filed: 05/05/2025   Page 425 of 674

5J - 84094101 - 1   Page 60

b) When the need for a longer disbursement window is not known in advance of the transfer, Recipient must notify the EPA Project Officer of the delay no later than 5 business days after the transfer and follow-up to inform the EPA Project Officer of the amount of the transfer that has been disbursed for an Allowable Activity in 10 and 14 business days. Recipient must return any undisbursed amounts to the Deposit Account at the Financial Agent on the 15th business day.

Recipients must obtain prior written approval from the EPA Project Official (who will in turn notify the EPA Award Official) for any transfers that will not be disbursed for an Allowable Activity within 15 business days.

These requirements "flow down" to Subrecipients, who agree to provide the same notifications to and seek prior approval from Recipients where applicable.

## 2. Reserve Account

This account within the Deposit Account is intended to enable Community Lenders to set-aside funds within the Financial Agent for use for any form of Financial Assistance that requires the Community Lender to pledge or legally commit award funds for a future expenditure to a third party to meet a legal obligation.

**Transferring Funds Into the Reserve Account.** The Recipient must ensure that Community Lenders only transfer award funds into the Reserve Account for grant performance purposes if the Community Lender's chief executive officer (or equivalent), chief financial officer (or equivalent), chief reporting officer (or equivalent), or chief compliance officer (or equivalent) certify to Recipient, with notice provided to the Financial Agent with the transfer request, that the amount of the expenditure is necessary to execute against the workplan in effect under this Assistance Agreement, and that financing agreements for identified qualified projects necessitating the expenditure have been reviewed by Community Lender's counsel for legal sufficiency. The certification must include the following language: "This certification is a material representation for the purposes of an EPA financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions." In accordance with 2 CFR 200.337, the Recipient must make those certifications available to the EPA, upon request.

**Transferring Funds Out of the Reserve Account.**

## a. To Third Parties to Meet Legal Obligations

Funds in the Reserve Account may not be disbursed to Program Beneficiaries, Subrecipients, Contractors, or any other third parties, unless the funds are necessary for the Community Lender to satisfy a legal obligation. The Community Lender may only transfer award funds out of the Reserve Account to meet legal obligations to such parties if the Community Lender's chief executive officer (or equivalent), chief financial officer (or equivalent), chief reporting officer (or equivalent), or chief compliance officer (or equivalent) certify to the Recipient, with notice provided to the Financial Agent with the transfer request, that the amount of the expenditure is necessary to pay a third party pursuant to a financing agreement that has been reviewed by Community Lender. The certification must include the following language: "This certification is a material representation for the purposes of an EPA financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions." In accordance with 2 CFR 200.337, the Recipient must make those certifications available to the EPA, upon request.

While transfers out of the Reserve Account are not formally subject to any of the requirements established in either the EPA General Term and Condition on Automated Standard Application Payments (ASAP) and Proper Payment Draw Down or the Interim Drawdown Procedures Programmatic Term and Condition, Recipient agrees to hold Community Lenders to the following requirements:

> a) When the need for a longer disbursement window is known in advance of the transfer, Community Lender must notify the Recipient prior to executing the transfer and follow-up to inform the Recipient of the amount of the transfer that has been disbursed for an Allowable Activity in 5, 10, and 14 business days. Community Lender must return any undisbursed amounts to the Deposit Account at the Financial Agent on the 15th business day, or

> b) When the need for a longer disbursement window is not known in advance of the transfer, Community Lender must notify the Recipient of the delay no later than 5 business days after the transfer and follow-up to inform the Recipient of the amount of the transfer that has been disbursed for an Allowable Activity in 10 and 14 business days. Community Lender must return any undisbursed amounts to the Deposit Account at the Financial Agent on the 15th business day.

Community Lenders must obtain prior written approval from the Recipient (who will in turn notify the EPA Project Officer) for any transfers that will not be disbursed for an Allowable Activity within 15 business days.

## b. To Program Income from Operations Account

When funds in the Reserve Account are no longer necessary to meet prudent capital management practices consistent with the Community Lender's overall risk portfolio and a potential legal obligation to a third party pursuant to a financing agreement, the Community Lender may transfer such funds to the Program Income from Operations Account. Recipient need not submit a certification notice to effectuate such a transfer.

## 3. Program Income from Operations Account

This account within the Deposit Account will enable Program Income from Operations (as defined under the definition of Program Income) to be held, tracked, and segregated in accordance with the Accounting Principles Programmatic Term and Condition.

**Transferring Funds Into the Program Income from Operations Account.** When Recipient earns Program Income from Operations, it must deposit such funds into the Program Income from Operations Account. Recipient need not submit a certification notice to effectuate such a transfer. When Financial Agent generates interest income on behalf of Recipient by investing Recipient liquidity in accordance with the Cash Management Requirements under the Financial Risk Management Requirements Programmatic Term and Condition, it must deposit such income into the Program Income from Operations Account in accordance with the terms of the FAA. Such interest income is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12).

**Transferring Funds Out of the Program Income from Operations Account.** Funds in this account may be transferred to either the Budget Account or Reserve Account to be used for grant performance purposes in accordance with the Program Income Programmatic Term and Condition. Recipient need not submit a

5J - 84094101 - 1     Page 62

certification notice to effectuate such a transfer.

**Flow-Down Requirements of Deposit Account at Financial Agent**. EPA may elect to extend the requirements under this term and condition to any and all Pass-Through Subrecipients or Community Lender Subrecipients of the Recipient at EPA's sole discretion, including but not limited to Recipient establishing and maintaining a security interest on all award funds held by its Pass-Through Subrecipients or Community Lender Subrecipients at the Financial Agent.

# EXHIBIT B



**ACCOUNT CONTROL AGREEMENT**

**among**

Justice Climate Fund, Inc.**, as PLEDGOR**

United States Environmental Protection Agency**, as SECURED PARTY**

**and**

**CITIBANK, N.A., as BANK**

**Dated as of November 1, 2024**

**THIS ACCOUNT CONTROL AGREEMENT** (this "**Agreement**"), dated as of November 1, 2024, by and among Justice Climate Fund, Inc., a Delaware nonprofit nonstock corporation (the "**Pledgor**"), the United States Environmental Protection Agency, an agency of the United States Government (the "**Secured Party**") and Citibank, N.A., a national banking association organized and existing under the laws of the United States of America ("Citibank") and acting through its Agency & Trust business solely in its capacity as bank under this Agreement, and any successors appointed pursuant to the terms hereof (Citibank in such capacity, the "**Bank**").

**WHEREAS,** the Pledgor and the Secured Party have entered into that certain federal financial assistance agreement, as identified in Addendum 1, (the "**Grant Agreement**") pursuant to which the Pledgor has granted the Secured Party a security interest in the accounts as identified in Addendum 1 established and maintained by the Bank for the Pledgor (the "**Accounts**").

**WHEREAS,** the Bank has been designated and authorized to act as a financial agent of the United States pursuant to the authority of the U.S. Department of the Treasury under 12 U.S.C. §§ 90 and 265.

**WHEREAS,** the parties wish that the Bank enter into this Agreement in order to provide for the "control" (as defined in Section 9-104(a) of the Uniform Commercial Code in effect in the State of New York ("**UCC**"), in the case of a deposit account, or Section 8-106 of the UCC, in the case of a security account) of the accounts as a means to perfect the security interest of the Secured Party.

**WHEREAS,** the Pledgor and the Secured Party have agreed that the terms and conditions entitled "Deposit Account at Financial Agent" in the Grant Agreement indicate the conditions under which the Secured Party may exercise its right of control herein, and such conditions will be defined as "default" for the purposes of this Agreement.

**WHEREAS,** capitalized terms used herein without definition and that are defined in Article 8 or Article 9 of the UCC as adopted in the State of New York shall have the respective meanings set forth therein.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and adequacy of which is hereby irrevocably acknowledged, the parties hereto agree as follows:

1.     **The Accounts.** The Pledgor and the Bank represent and warrant to, and agree with the Secured Party that:

(a)     The Bank maintains the Accounts for the Pledgor, and all property (including, without limitation, all funds and financial assets) held by the Bank for the accounts of the Pledgor are, and will continue to be, credited to the Accounts in accordance with instructions given by the Pledgor (unless otherwise provided herein).

(b)     To the extent that cash is credited to the Accounts, the Accounts are a deposit account; and to the extent that financial assets (other than cash) are credited to the Accounts, the Accounts are a securities account. The Bank is (i) the bank with which the Accounts are maintained and (ii) the securities intermediary with respect to financial assets held in the Accounts. The Pledgor is (A) the Bank's customer with respect to the Accounts and (B) the entitlement holder with respect to all financial assets credited from time to time to the Accounts.

(c)     Notwithstanding any other agreement to the contrary, the Bank's jurisdiction with

Docusign Envelope ID: C1E58E4D-B258-40E5-B516-30DCBDAA941D

Case 1:25-cv-00938   Document 1   Filed 03/31/25   Page 113 of 133
USCA Case #25-5122   Document #2114423   Filed: 05/05/2025   Page 431 of 674

respect to the Accounts for purposes of the UCC is, and will continue to be for so long as the Secured Party's security interest shall be in effect, the State of New York.

(d)    The Pledgor and the Bank do not know of any claim to or interest in the Accounts or any property (including, without limitation, funds and financial assets) credited to the Accounts, except for claims and interests of the parties referred to in this Agreement.

**2.    Control over Accounts.**

The Bank shall comply with all instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and financial assets in the Accounts including, without limitation, directions to distribute proceeds of any such transfer or redemption of interest or dividends on financial assets in the Accounts, substantially in the form attached hereto as Exhibit B ("**Account Direction**"), originated by the Pledgor, until the time that that Bank receives a notice, substantially in the form attached hereto as Exhibit A (a "**Notice of Exclusive Control**") from the Secured Party that the Secured Party is exercising its right to exclusive control over an Account, and after such time that the Bank receives a Notice of Exclusive Control, the Secured Party for such Account, without further consent by the Pledgor.

**3.    Priority of Secured Party's Security Interest.** The Bank subordinates in favor of the Secured Party any interest, lien or right of setoff it may have, now or in the future, against the Accounts or assets in the Accounts; *provided; however*, that, subject to the foregoing, the Bank may set off all amounts due to it in respect of its fees and expenses (including, without limitation, the payment of any legal fees or expenses) or any amounts payable pursuant to Section 4 hereof.

**4.    Investment of Funds.**

(a)    The Bank shall deposit the assets in non-interest bearing Accounts and invest the assets in the Accounts consistent with the instructions provided by the Pledgor, in Addendum 1. The Pledgor's instructions will be in accordance with the Grant Agreement, provided that the Bank is not responsible for verifying whether the Pledgor's instructions are in compliance with the Grant Agreement. The Bank shall invest such assets in the Accounts on the date of deposit provided that such assets are received on or before 11:00 a.m. New York City time. Any assets received after 11:00 a.m. New York City time shall be treated as if received on the following Business Day. For purposes of this Agreement, "**Business Day**" shall mean any day that the Bank is open for business.

(b)    The Bank is hereby authorized and directed to sell or redeem any such investments as it deems necessary to make any payments or distributions required under this Agreement. The Bank shall have no responsibility or liability for any loss in the value of any investment made pursuant to this Agreement, or for any loss, cost or penalty resulting from any sale or liquidation of the assets in the Account. The Bank is hereby authorized to execute purchases and sales of investments through the facilities of its own trading or capital markets operations or those of any affiliated entity. The Bank does not have a duty nor will it undertake any duty to provide investment advice.

(c)    The Bank shall transfer any earnings or proceeds received on or distributions of earnings or proceeds from the assets in the Accounts to the Program Income from Operations Account on a monthly basis.

**5.    Tax Matters.**



(a)    The Pledgor and the Secured Party agree that, unless and until the Grant Agreement is terminated, any earnings or proceeds received on or distributions of earnings or proceeds from the assets in the Accounts shall be treated as the income of the Pledgor and shall be reported on an annual basis on United States Internal Revenue Service ("**IRS**") Form 1099-DIV, as required pursuant to the Internal Revenue Code of 1986, as amended (the "**Code**") and the regulations thereunder. Principal payments are not reportable hereunder. No earnings or proceeds received on or distributions of earnings or proceeds from the assets in the Accounts, or principal payments from the Accounts, are reportable to the Secured Party. The Pledgor, the Secured Party and the Bank agree that the Bank will not be responsible for providing tax reporting and withholding for payments that are for compensation for services performed by an employee or independent contractor.

(b)    The Pledgor and the Secured Party shall upon the execution of this Agreement provide the Bank with a duly completed and properly executed IRS Form W-9 or applicable IRS Form W-8, in the case of a non-U.S. person, for each payee, together with any other documentation and information requested by the Bank in connection with the Bank's tax reporting obligations under the Code and the regulations thereunder. With respect to the Bank's tax reporting obligations under the Code, the Foreign Account Tax Compliance Act and the Foreign Investment in Real Property Tax Act and any other applicable law or regulation, the Pledgor and the Secured Party understand that, in the event valid U.S. tax forms or other required supporting documentation are not provided to the Bank, the Bank may be required to withhold tax from the assets in the Accounts and report account information on any earnings, proceeds or distributions from the assets in the Accounts.

(c)    Should the Bank become liable for the payment of taxes, including withholding taxes relating to any funds, including interest and penalties thereon, held by it pursuant to this Agreement or any payment made hereunder, the Pledgor agrees to indemnify and hold the Bank harmless pursuant to Section 7(b) hereof from any liability or obligation on account of taxes, assessments, interest, penalties, expenses and other governmental charges that may be assessed or asserted against the Bank, provided that such liability shall not be satisfied by assets in the Accounts. If the Pledgor fails to indemnify the Bank for such taxes, the Bank will notify the Secured Party.

(d)    The Bank's rights under this Section 5 shall survive the termination of this Agreement or the resignation or removal of the Bank.

6.    **Concerning the Bank.**

(a)    <u>Bank Duties</u>. Each of the Pledgor and the Secured Party acknowledges and agrees that (i) the duties, responsibilities and obligations of the Bank shall be limited to those expressly set forth in this Agreement, each of which is administrative or ministerial (and shall not be construed to be fiduciary in nature), and no duties, responsibilities or obligations shall be inferred or implied, (ii) the Bank shall not be responsible for any of the agreements referred to or described herein (including, without limitation, the Grant Agreement and any defined term therein not otherwise defined in this Agreement), or for determining or compelling compliance therewith, and shall not otherwise be bound thereby, and (iii) the Bank shall not be required to expend or risk any of its own funds to satisfy payments from the Accounts hereunder.

(b)    <u>Liability of Bank</u>. The Bank shall not be liable for any damage, loss or injury



resulting from any action taken or omitted in the absence of gross negligence or willful misconduct (as finally adjudicated by a court of competent jurisdiction). In no event shall the Bank be liable for indirect, incidental, consequential, punitive or special losses or damages (including but not limited to lost profits), regardless of the form of action and whether or not any such losses or damages were foreseeable or contemplated. The Bank shall be entitled to rely upon any instruction, notice, request or other instrument delivered to it without being required to determine the authenticity or validity thereof, or the truth or accuracy of any information stated therein. The Bank may act in reliance upon any signature believed by it to be genuine (including any signature affixed by DocuSign) and may assume that any person purporting to make any statement, execute any document, or send any instruction in connection with the provisions hereof has been duly authorized to do so. The Bank may consult with counsel satisfactory to it, and the opinion or advice of such counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it in good faith and in accordance with the opinion and advice of such counsel. The Bank may perform any and all of its duties through its agents, representatives, attorneys, custodians and/or nominees. The Bank shall not incur any liability for not performing any act or fulfilling any obligation hereunder by reason of any occurrence beyond its control (including, without limitation, any provision of any present or future law or regulation or any act of any governmental authority, any act of God or war or terrorism, or the unavailability of the Federal Reserve Bank wire services or any electronic communication facility).

(c)    Reliance on Orders. The Bank is authorized to comply with final orders issued or process entered by any court with respect to the assets in the Accounts, without determination by the Bank of such court's jurisdiction in the matter. If any portion of the assets in the Accounts are at any time attached, garnished or levied upon under any court order, or in case the payment, assignment, transfer, conveyance or delivery of any such property shall be stayed or enjoined by any court order, or in case any order, judgment or decree shall be made or entered by any court affecting such property or any part thereof, then and in any such event, the Bank is authorized to rely upon and comply with any such order, writ, judgment or decree which it is advised is binding upon it without the need for appeal or other action; and if the Bank complies with any such order, writ, judgment or decree, it shall not be liable to the Pledgor or the Secured Party or to any other person or entity by reason of such compliance even though such order, writ, judgment or decree may be subsequently reversed, modified, annulled, set aside or vacated.

(d)    Erroneous Payments. If the Bank releases any funds (including but not limited to the assets in the Accounts or any portion of it) to the Pledgor or the Secured Party and subsequently determines (in its absolute discretion) that the payment (or any portion of it) was made in error, the Pledgor or the Secured Party, as applicable, shall upon notice promptly refund the erroneous payment, and none of the obligations of the Pledgor or the Secured Party, as applicable, or the remedies of the Bank will be affected by any act, omission, matter or thing (including, without limitation, any obligation pursuant to which an erroneous payment is made) which, but for this provision, would reduce, release, preclude or prejudice any such obligation or remedy (whether or not known by the Bank, the Pledgor or the Secured Party). Each of the Pledgor and the Secured Party agrees not to assert discharge for value, bona fide payee, or any similar doctrine as a defense to recovery of any erroneous payment by the Bank.

**7.    Compensation, Expense Reimbursement and Indemnification.**

(a)    Compensation. The Bank's compensation shall be as specified in Schedule A.



JA1625

Docusign Envelope ID: C1E58E4D-B258-40E5-B516-30DCBDAA941D

Case 1:25-cv-00938    Document 1    Filed 03/31/25    Page 116 of 133
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 434 of 674

(b)    <u>Indemnification</u>. The Pledgor covenants and agrees to indemnify the Bank and its employees, officers, directors, affiliates, and agents (each, an "**Indemnified Party**") for, hold each Indemnified Party harmless from, and defend each Indemnified Party against, any and all claims, losses, actions, liabilities, costs, damages and expenses of any nature incurred by any Indemnified Party, arising out of or in connection with this Agreement or with the administration of its duties hereunder, including, but not limited to, attorney's fees, costs and expenses, except to the extent such loss, liability, damage, cost or expense shall have been finally adjudicated by a court of competent jurisdiction to have resulted solely from the Indemnified Party's own gross negligence or willful misconduct, provided that such liability shall not be satisfied by assets in the Accounts. The foregoing indemnification and agreement to hold harmless shall survive the termination of this Agreement and the resignation or removal of the Bank. If the Pledgor fails to indemnify the Bank pursuant to this Section 7(b), the Bank shall notify the Secured Party.

8.    <u>**Statements, Confirmations and Notices of Adverse Claims**</u>. The Bank will send copies of all statements and confirmations for the Accounts simultaneously to the Pledgor and the Secured Party. The Bank shall be deemed to have delivered statements and confirmations if such statements and confirmations are available on one or more of the Bank systems to deliver electronic media. The Bank will use reasonable efforts promptly to notify the Secured Party and the Pledgor if any other person claims that it has a property interest in the Accounts or any financial asset in the Accounts.

9.    <u>**Entire Agreement; Exclusive Benefit**</u>. This Agreement constitutes the entire agreement between the parties and sets forth in its entirety the obligations and duties of the Bank with respect to the assets in the Accounts. This Agreement is for the exclusive benefit of the parties to this Agreement and their respective permitted successors, and shall not be deemed to give, either expressly or implicitly, any legal or equitable right, remedy, or claim to any other entity or person whatsoever. No party may assign any of its rights or obligations under this Agreement without the prior written consent of the other parties.

10.    <u>**Resignation and Removal**</u>. The Bank may be removed only by the U.S. Department of the Treasury.

11.    <u>**Governing Law**</u>. This Agreement is governed by and shall be construed and interpreted in accordance with federal law of the United States, except where there is no applicable federal law, in accordance with the laws of the State of New York, without giving effect to the conflict of laws principles thereof.

12.    <u>**Representations and Warranties**</u>.

(a)    Each of the Pledgor and the Secured Party represents and warrants that it has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder; and this Agreement has been duly approved by all necessary action and constitutes its valid and binding agreement enforceable in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or other similar laws affecting the enforcement of creditors' rights and subject to general equity principles.

(b)    Each of the Pledgor and the Secured Party represents that neither it nor any of its parents or subsidiaries, or any of their respective directors, officers, or employees, or to the knowledge of the Pledgor and the Secured Party, the affiliates of the Pledgor, the Secured Party or any of its subsidiaries, will, directly or indirectly, use any part of any proceeds or lend, contribute,



Docusign Envelope ID: C1E58E4D-B258-40F5-BF16-30DCBDAA941D

Case 1:25-cv-00938    Document 1    Filed 03/31/25    Page 117 of 133
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 435 of 674

or otherwise make available such assets in the Accounts in any manner that would result in a violation by any person of economic, trade, or financial sanctions, requirements, or embargoes imposed, administered, or enforced from time to time by the United States (including, without limitation, the Office of Foreign Assets Control of the U.S. Department of the Treasury and the U.S. Department of State), the United Kingdom (including, without limitation, His Majesty's Treasury), the European Union and any EU member state, the United Nations Security Council, and any other relevant sanctions authority.

**13.    Notices; Instructions.**

(a)    Any notice or instruction hereunder shall be in writing in English, and may be sent by (i) secure file transfer or (ii) electronic mail with a scanned attachment thereto of an executed notice or instruction, and shall be effective upon actual receipt by the Bank in accordance with the terms hereof. Any notice or instruction must be executed (which execution may be manual or affixed by DocuSign) by an authorized person of the Pledgor or the Secured Party, as applicable (the person(s) so designated from time to time, the "**Authorized Persons**"). Each of the applicable persons designated on <u>Schedule B</u> and <u>Schedule C</u> attached hereto have been duly appointed to act as Authorized Persons hereunder and individually have full power and authority to execute any notices or instructions, to amend, modify or waive any provisions of this Agreement, and to take any and all other actions permitted under this Agreement, all without further consent or direction from, or notice to, it or any other party. Any notice or instruction must be originated from a corporate or government domain. Any change in designation of Authorized Persons shall be provided by written notice, signed by an Authorized Person, and actually received and acknowledged by the Bank. Any communication from the Bank that the Bank deems to contain confidential, proprietary, and/or sensitive information shall be encrypted in accordance with the Bank's internal procedures.

(b)    Each of the Pledgor and the Secured Party understands and agrees that the Bank cannot determine the identity of the actual sender of any notice or instruction and that the Bank shall be entitled to conclusively presume that notices or instructions that purport to have been sent by an Authorized Person have been sent by such Authorized Person. Each of the Pledgor and the Secured Party agrees: (i) to assume all risks arising out of the use of electronic means (including electronic mail, secure file transfer or such other method or system specified by the Bank as available for use in connection with its services hereunder) to submit instructions to the Bank, including, without limitation, the risk of the Bank acting on unauthorized instructions, and the risk of interception or misuse by third parties; (ii) that it is fully informed of the protections and risks associated with the various methods of transmitting instructions to the Bank and that there may be more secure methods of transmitting instructions than the method(s) selected by the Pledgor and the Secured Party, as applicable; (iii) that the security procedures (if any) to be followed in connection with its transmission of instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances; and (iv) to notify the Bank immediately upon learning of any compromise or unauthorized use of the security procedures. The Pledgor and the Secured Party agree that the security procedures set forth in Section 13(a) and this Section 13(b) are commercially reasonable.

If to the Pledgor:
As provided in Addendum 1

If to the Secured Party:
The Office of the Greenhouse Gas Reduction Fund,



JA1627

Docusign Envelope ID: C1E58E4D-B259-40E5-B816-30DCBDAA941D

Case 1:25-cv-00938    Document 1    Filed 03/31/25    Page 118 of 133
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 436 of 674

United States Environmental Protection Agency
Attention: David Widawsky
Telephone: ████████
E-mail: ████████████████████████████████

If to the Bank:
Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, NY 10013
Attn.: Nerlie Delly
Telephone: ████████████████
E-mail: ██████████████████████████

**14.    Amendment; Waiver.**   Any amendment of this Agreement shall be binding only if evidenced by a writing signed by each of the parties to this Agreement. No waiver of any provision hereof shall be effective unless expressed in writing and signed by the party to be charged.

**15.    Severability.**   The invalidity, illegality or unenforceability of any provision of this Agreement shall in no way affect the validity, legality or enforceability of any other provision. If any provision of this Agreement is held to be unenforceable as a matter of law, the other provisions shall not be affected thereby and shall remain in full force and effect.

**16.    Mergers and Conversions.** Any corporation or entity into which the Bank may be merged or converted or with which it may be consolidated, or any corporation or entity resulting from any merger, conversion or consolidation to which the Bank will be a party, or any corporation or entity succeeding to the business of the Bank will be the successor of the Bank hereunder without the execution or filing of any paper with any party hereto or any further act on the part of any of the parties hereto except where an instrument of transfer or assignment is required by law to effect such succession, anything herein to the contrary notwithstanding.

**17.    Termination.**   This Agreement shall terminate upon receipt by the Bank of notice from the Secured Party that its security interest in such Accounts and all assets therein have terminated. Upon receipt of such notice, the Secured Party shall have no further right to originate instructions with respect to the assets in the Accounts. The Bank shall, upon payment of all outstanding fees and expenses hereunder, promptly forward any amounts held by the Bank in the Accounts to the Pledgor, and the Bank shall be relieved and discharged of any further responsibilities with respect to its duties hereunder.

**18.    Counterparts.** This Agreement may be executed simultaneously in two or more counterparts, any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same agreement. Signatures on counterparts of this Agreement executed and delivered in electronic format (i.e. "pdf") or by other electronic means (including DocuSign) shall be deemed original signatures with all rights accruing thereto except in respect to any non-US entity, whereby originals may be required.

**[Remainder of Page Left Intentionally Blank]**

citi

JA1628

**IN WITNESS WHEREOF,** each of the parties has caused this Agreement to be executed by a duly authorized representative as of the day and year first written above.

**CITIBANK, N.A.,**
as Bank

By: _____

   Name: Nerlie Delly
   Title: Senior Trust Officer

**Justice Climate**

By: _____

   Name: Amir Kirkwood
   Title:  Chief Executive Officer

**United States Environmental Protection Agency**

By: _____

   Name: Philip Schindel
   Title: EPA Award Official

**EXHIBIT A**

**FORM OF NOTICE OF EXCLUSIVE CONTROL**

VIA EMAIL: ███████████████████████

Nerlie Delly
Vice President
Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, New York 10013

Pursuant to the Account Control Agreement dated November 1, 2024, among Justice Climate Fund, Inc. (the "**Pledgor**"), United States Environmental Protection Agency (the "**Secured Party**"), and Citibank, N.A. (the "**Bank**"), we, the Secured Party, hereby instruct the Bank of the following:

The Pledgor and the Secured Party have agreed that the terms and conditions entitled "Deposit Account at Financial Agent" in the Grant Agreement indicate the conditions under which the Secured Party may exercise its right of control herein, and such conditions will be defined as "default" for the purposes of the Account Control Agreement.

As required by the Grant Agreement, the Secured Party has issued a written determination and finding that Pledgor has failed to comply with the terms and conditions of the Grant Agreement, and that noncompliance is substantial such that effective performance of the Grant Agreement is materially impaired or there is adequate evidence of waste, fraud, material misrepresentation of eligibility status, or abuse, and that the Secured Party has initiated action under 2 CFR 200.339 to wholly or partly suspend or terminate the Grant Agreement, as authorized in the terms of the Grant Agreement.

Therefore, the Secured Party hereby notifies you that (i) a default has occurred and is continuing under the Grant Agreement and (ii) from and after the receipt of this notice until you receive further instruction from Secured Party, you are hereby directed to retain and hold all funds in the Account and not to [invest or] disburse the same to any party whatsoever, other than as instructed by the Secured Party.

**United States Environmental Protection Agency**

as Secured Party

By:_____
    Name:
    Title:
    Date:

Exhibit A

JA1630

Docusign Envelope ID: C1E58E4D-B259-40E5-B516-30DCBDAA941D

**EXHIBIT B**

**FORM OF ACCOUNT DIRECTION (CCIA)**
**Pledgor's UEI Number:** ▮▮▮▮▮▮▮▮

[Date]

Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, NY 10013
Attn.: Nerlie Delly
E-mail: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

VIA: CitiSFT

RE: Account Control Agreement dated November 1, 2024, among Justice Climate Fund, Inc. (the "**Pledgor**"), United States Environmental Protection Agency (the "**Secured Party**"), and Citibank, N.A. (the "**Bank**")

Pursuant to Section 2 of the above referenced Account Control Agreement, the Pledgor hereby instructs the Bank to disburse a total amount of $[●] funds as per below and as per the attached upload file named xxx:

**Check one boxes:**

( ) **Internal Transfer within the Bank (intra-entity).**

( ) **Internal Transfer within the Bank (inter-entity).**

( ) **External Transfer outside the Bank (for Technical Assistance Services and/or Program Administration Activities).**

**If an Internal Transfer within the Bank (intra-entity), check the following applicable boxes:**

( ) **Transfer of $[●] across Pledgor's 'Budget' sub-accounts, as defined in the Grant Agreement**.

( ) **Transfer of $[●] from Pledgor's 'Program Income from Operations' account to Pledgor's 'Budget' sub-account(s), as defined in the Grant Agreement**.

**If an Internal Transfer within the Bank (inter-entity), check the following applicable boxes:**

( ) **Transfer of $[●] from Pledgor's 'Budget' sub-account(s) to 'Community Lender' for Capitalization Funding as defined in the Grant Agreement.**

( ) **Transfer of $[●] from Pledgor's 'Budget' sub-account(s) to 'Community Lender' for Technical Assistance Subaward as defined in the Grant Agreement.**

**If an External Transfer outside the Bank (for Technical Assistance Services and/or Program Administration Activities), check the following applicable boxes:**

**( ) Disbursement of $[●] for Technical Assistance Services as defined in the Grant Agreement.**

**( ) Disbursement of $[●] for Program Administration Activities as defined in the Grant Agreement.**

Capitalized terms in this instruction letter not otherwise defined shall have the same meaning given to them in the Account Control Agreement.

Signature on this Account Direction executed and delivered in electronic format (i.e. "pdf") or by other electronic means (including DocuSign) shall be deemed original signatures with all rights accruing thereto.

IN WITNESS WHEREOF, the Pledgor has caused this Account Direction to be duly executed and delivered as of the date first written above.


Pledgor:


_____

Authorized Person

Docusign Envelope ID: C1E58E4D-B258-40E5-B516-30DCBDAA941D

**ADDENDUM 1**
**Account Control Agreement**

| | |
|---|---|
| **Date of Account Control Agreement** | November 1, 2024 |
| **Grant Agreement** | Agreement Title: GGRF CCIA: Expanding Green Lending Capacity in Historically Underserved Communities for Enduring Change (5J-84094101)<br>Agreement Date: August 8, 2024 |
| **Pledgor Notice Details** | Attn: Amir Kirkwood, CEO<br>Justice Climate Fund, Inc.<br>Address: 910 17th Street, NW, Suite 820<br>Washington, DC 20006-2601<br>Email: |
| **UEI Number** | |
| **Tax Identification Number** | |
| **Citi Deposit Instructions** | Bank: CITIBANK, N.A.<br>ABA:<br>Account Name:<br>Account Number:<br>Ref: |

**Money Market Fund Investment Selection**

| Fund Name | Fund Number | CUSIP |
|---|---|---|
| Dreyfus Treasury Securities Cash Management Institutional Shares | 761 | |

**Accounts to Be Established**

| Account Number | Account Name | Initial Deposit Amount |
|---|---|---|
| | JCF Capitalization Funding | $ 604,829,044.00 |
| | JCF Technical Assistance Subawards | $59,007,711.00 |
| | JCF Technical Assistance Services | $17,639,545.00 |
| | JCF Program Administration | $56,120,095.00 |
| | JCF Program Income from Operations | $0.00 |
| | JCF Other Pass-Through Funding | $0.00 |

**CitiVelocity Reporting Entitlements Request**:

The Pledgor hereby requests that the Bank entitle the following individuals to view-only access to the Bank's client reporting system for all accounts opened under this Account Control Agreement.

Pledgor Client Profile Name: Justice Climate Fund

JA1633

| Name | Phone Number | | Email | | |
|------|-------------|--|-------|--|--|
| Susan Dearborn | ███████ | | ████████████ | ███ | |
| Renay Carver | | | | | |
| Amir Kirkwood | | | | | |

The Pledgor hereby acknowledges that all accounts opened under this Account Control Agreement will be entitled to the Bank's client reporting system and made available for view-only access to the following Client Profiles and their associated users:

| Entity | Client Profile Name |
|--------|---------------------|
| Secured Party | U.S. Environmental Protection Agency |

**CitiSFT Entitlements Request**:

Citi makes available the Secure File Transfer (CitiSFT) platform for clients to securely upload Account Directions. The Pledgor hereby requests that the Bank entitle the below individuals with upload only access to CitiSFT:

| Name | Phone Number | Email | | Maker, Checker, Maker and Checker |
|------|-------------|-------|--|-----------------------------------|
| Susan Dearborn | ███████ | ████████████ | | Maker and Checker |
| Renay Carver | | | █ | Maker and Checker |
| Amir Kirkwood | | | | Maker and Checker |

Signed by:



26E7B7DAAFCA434...

Authorized Signature
Amir Kirkwood

Chief Executive Officer

Docusign Envelope ID: C1E58E4D-B258-40E5-B516-30DCBDAA941D

## SCHEDULE A

## BANK COMPENSATION

### General compensation

For the services described in the Account Control Agreement, the Bank shall charge each Pledgor as follows:

| Agency & Trust Services | Fees |
| --- | --- |
| **Acceptance Fee** <br> This one-time fee covers the acceptance of the appointment, the review of the related Transaction documents submitted in connection with the execution and delivery thereof, setting up of internal controls, and communication with other members of the working group, as necessary. | Waived |
| **Annual Administration Fee** <br> To cover the administrative functions of Citi under the Agreement, including the establishment and maintenance of the account(s), safekeeping of assets, maintenance of the records, execution and administration of the Agreement provisions, and other duties required under the terms of the Agreement. | Waived |
| **Wire Fees** | Waived |
| **Legal Fees** <br> To cover the review of legal documents by Citibank Agency & Trust's outside counsel. | Waived |

The Transaction documents will be governed in accordance with federal law of the United States, except where there is no applicable federal law, in accordance with the laws of the State of New York, without giving effect to the conflict of laws principles thereof, as established in the Agreement and subject to internal approval and satisfactory review of all documentation. All outgoing payments processed by Citi will be made via wire. Account balances invested in an Institutional Money Market Fund will be chosen by the client from a list of providers that Citi will supply. If invested in a Money Market Fund, fund distributors may provide Citi with Shareholder Servicing fees. These fees are discussed in the fund's prospectus, which will be delivered to the client prior to investment. All of Citi's responsibilities will be non-discretionary and Citi will not be required to make any advances of its own funds. Therefore, all services provided by Citi must strictly follow the terms stated in the Agreements or in the written instructions of the authorized parties or third parties authorized to send instructions to Citi.

In accordance with US regulations regarding anti-money laundering and terrorist financing, Federal law requires Citi to obtain, verify and record information that identifies each business or entity that opens an account or establishes a relationship with Citi. What this means for our clients: when a client opens an account or establishes a relationship, we will ask for the client's business name, a street address and a tax identification number that Federal law requires us to obtain. In accordance with the Unlawful Internet Gambling Act (the "Act"), Citibank, N.A. accounts or other Citibank, N.A. facilities in the United States may not be used to process "restricted transactions" as such term is defined in U.S. 31 CFR Section 132.2(y).

JA1635

Docusign Envelope ID: C1E58F4D-B258-40F5-BB16-30DCBDAA941D

Case 1:25-cv-00938    Document 1    Filed 03/31/25    Page 126 of 133
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 444 of 674

## SCHEDULE B

### PLEDGOR AUTHORIZED LIST OF SIGNERS
**(to be provided separately)**

Each of the following person(s) is authorized to execute documents and to direct the Bank as to all matters on the Pledgor's behalf. The Bank may confirm the instructions received by return call to any one of the telephone numbers listed below.

### PLEDGOR

| | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name: Amir Kirkwood<br>Title: Chief Executive Officer<br>Phone:<br>Email: | | |

| | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name: Susan Dearborn<br>Title: Controller<br>Phone:<br>Email: | | |

| | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name: Renay Carver<br>Title: Chief Compliance & Reporting Officer<br>Phone:<br>Email: | | |

**SCHEDULE C**

**SECURED PARTY AUTHORIZED LIST OF SIGNERS**
**(to be provided separately)**

Each of the following person(s) is authorized to execute documents and to direct the Bank as to all matters on the Secured Party's behalf. The Bank may confirm the instructions received by return call to any one of the telephone numbers listed below.

**SECURED PARTY**

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: |  |  |

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: |  |  |

|  | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: |  |  |

# EXHIBIT C



U.S. Environmental Protection Agency
1200 Pennsylvania Ave, N.W.
Washington, DC 20460

March 11, 2025

By Email

Amir Kirkwood
CEO
Justice Climate Fund, Inc.
910 17th St NW Suite 820
Washington, D.C. 20006

Re: Notice of Termination

Dear Amir Kirkwood,

Pursuant to the U.S. Environmental Protection Agency's ("EPA" or "the Agency") authority under 2 C.F.R.
§§ 200.339-40, the General Terms and Conditions of EPA assistance award agreements, the terms and
conditions of the Grant Agreement, and the Agency's inherent authority to reconsider prior
determinations in light of new information, the Agency is terminating Grant Agreement No. 84094101,
awarded to Justice Climate Fund, Inc. under the Greenhouse Gas Reduction Fund ("GGRF"), effective
immediately. This termination is based on substantial concerns regarding program integrity, the award
process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities, which
collectively undermine the fundamental goals and statutory objectives of the award.

Following a comprehensive review and consistent with multiple ongoing independent federal
investigations into programmatic fraud, waste, abuse and conflicts of interest, EPA has identified
material deficiencies, including, but not limited to: 1) the absence of adequate oversight and account
controls to prevent financial mismanagement; 2) the improper or speculative allocation of funds
inconsistent with EPA's oversight and fiscal responsibilities; and 3) the circumvention and defeat of key
oversight mechanisms in the disbursement of federal funds. EPA has determined that these deficiencies
pose an unacceptable risk to the efficient and lawful execution of this grant that cannot be remedied by
imposing specific conditions, necessitating immediate termination to safeguard taxpayer funds and
ensure compliance with federal financial assistance regulations.

Additionally, the Agency has considered concerns raised by EPA Administrator Lee Zeldin regarding the
need for rigorous oversight and accountability in the administration of public funds. The Administrator
has emphasized the importance of eliminating fraud, waste, and abuse within EPA, particularly in high-

**JA1639**

value awards such as those under GGRF. The structural and operational weaknesses identified in the execution of this grant are inconsistent with these priorities and materially impair the EPA's ability to ensure compliance with statutory and regulatory mandates governing the lawful expenditure of public money.

The Agency has also determined that its existing process for awarding and overseeing execution of the Grant Agreement lacks sufficient protections to guard against potential violations of the Constitution, particularly the Appointments Clause and private nondelegation doctrine. U.S. Const. art. II, § 2, cl. 2; *e.g.*, *Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1341 (D.C. Cir. 2024). Consistent with its independent duty to avoid exceeding constitutional constraints, EPA has reconsidered the prior administration's conclusion that the oversight mechanisms for the Grant Agreement are sufficient to ensure that the Recipient will not exercise significant authority independently of EPA's oversight and ultimate approval.

This termination is executed in accordance with Sections III.R and III.S.3 of the Grant Agreement and with EPA's General Terms and Conditions as incorporated in, and applicable in addition to, the terms of the Grant Agreement, and is consistent with EPA's obligations to safeguard public funds and inherent authority to reconsider prior decisions. This letter constitutes the notice of termination required by 2 C.F.R. § 200.341. Consistent with 2 C.F.R. §§ 200.344-45 and the Closeout Agreement, the recipient is required to cease all further program expenditures immediately, provide a comprehensive final financial and programmatic report, and comply with all applicable closeout procedures.

EPA is committed to ensuring that federal funding is administered in a manner that upholds transparency, accountability, and the highest standards of fiscal responsibility. This termination reflects the Agency's duty to protect public funds and maintain the integrity of its grant programs. In the coming months, EPA will work to re-obligate lawfully appropriated funds within the GGRF program with enhanced controls to ensure adequate governance, transparency, and accountability, consistent with applicable regulatory and statutory requirements.

Sincerely,

W.C, McIntosh

W.C. McIntosh
Acting Deputy Administrator
U.S. Environmental Protection Agency

cc:
- U.S. EPA, Office of the Greenhouse Gas Reduction Fund (OGGRF)
- U.S. EPA, Office of Mission Support (OMS)
- U.S. EPA, Office of General Counsel (OGC)
- U.S. Department of Justice
- U.S. Department of the Treasury
- U.S. House of Representatives
- U.S. Senate
- Citibank, N.A.

# EXHIBIT D

3/28/25, 4:41 PM                    Mail - Kathleen Foley - Outlook

Case 1:25-cv-00938    Document 1    Filed 03/31/25    Page 132 of 133
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 450 of 674

 Outlook

---

## RE: Climate United Fund Litigation

---

**From** Sacks, Marcus S. (CIV) <Marcus.S.Sacks@usdoj.gov>

**Date** Fri 3/28/2025 9:31 AM

**To** David Zimmer <david@zimmercitronclarke.com>

**Cc** Eric Citron <eric@zimmercitronclarke.com>; Kathleen Foley <kathleen@zimmercitronclarke.com>; VanLandingham, Kevin P. (CIV) <Kevin.P.VanLandingham@usdoj.gov>

---

Hi, David.

Thanks again for the call yesterday.

We've communicated with EPA and, while EPA's position is that JCF's grant has been terminated, EPA has agreed not to take any steps to move the money out of or exercise control over JCF's Citi account while the TRO for the NICF plaintiffs is in effect.

Hopefully that should avoid JCF's having to seek TRO relief when you file.

Let me know if you have any questions.

Thanks.

Marc S. Sacks
Deputy Director
Corporate/Financial Litigation Section
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L St., NW
Washington, D.C. 20005
(202) 307-1104

This e-mail (including any attachments) is intended for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential or otherwise protected by applicable law. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering the e-mail to the intended recipient, the reader is hereby notified that any dissemination, distribution, copying or use of this e-mail or its contents is prohibited. If you have received this e-mail in error, please notify the sender immediately by replying to this message, and please destroy all copies of this e-mail.

**From:** David Zimmer <david@zimmercitronclarke.com>
**Sent:** Wednesday, March 26, 2025 1:45 PM
**To:** Sacks, Marcus S. (CIV) <Marcus.S.Sacks@usdoj.gov>
**Cc:** Eric Citron <eric@zimmercitronclarke.com>; Kathleen Foley <kathleen@zimmercitronclarke.com>
**Subject:** [EXTERNAL] Climate United Fund Litigation

Dear Mr. Sacks,

My colleagues and I were recently retained to represent the Justice Climate Fund, which was one of the CCIA recipients under the GGRF.  We were hoping to find a time to talk briefly with you about the ongoing litigation.  Do you have any time this afternoon or tomorrow morning?

Thank you,
David


**David Zimmer**

| Zimmer, Citron & Clarke

130 Bishop Allen Drive

Cambridge, MA 02139

o 617-676-9421

c 617-943-0586

david@zimmercitronclarke.com

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JUSTICE CLIMATE FUND** | |
| Plaintiff, | |
| v. | Civil Action No. 1:25-cv-938 |
| **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,** *et al.* | |
| Defendants. | |

**DECLARATION OF AMIR KIRKWOOD IN SUPPORT OF JUSTICE CLIMATE FUND'S MOTION FOR PRELIMINARY INJUNCTION**

I, Amir Kirkwood, declare as follows:

1.      I am the Chief Executive Officer of Justice Climate Fund ("JCF"). I have served in that role since July 1, 2024. In that role, I am responsible for managing all JCF operations, including staffing and administration, coordination with third-party vendors, and administering training programs operated by JCF. I am also responsible for overseeing the management and allocation of funds awarded by the Environmental Protection Agency ("EPA") through its Clean Communities Investment Accelerator ("CCIA") in accordance with our EPA-approved workplan.

2.      For these reasons, I have personal knowledge of the facts and information in this declaration.

3.      I respectfully provide this declaration to detail the ways in which JCF's mission, programs, and reputation will be immediately and irreparably harmed absent this Court's intervention to maintain the status quo. That includes: enjoining any effort by EPA to give effect to its purported March 11, 2025, termination of JCF's CCIA award; enjoining EPA from further attempting to unlawfully terminate JCF's CCIA award; enjoining Citibank, N.A. ("Citibank") from continuing to deny JCF access to the award funds in JCF's own accounts; and enjoining EPA and

others with whom it is acting in concert from further attempts to interfere with JCF's access to its award funds. Simply put, JCF will suffer immediate, harmful, and irreparable damage if access to its award funds continues to be unlawfully denied. Without access to those funds, JCF cannot disburse the already-obligated funds that community lenders have already planned to use to finance projects that would otherwise lack funding, and that may fail in the interim. JCF is also suffering daily reputational damage—a potentially fatal blow to our mission, which requires buy-in from community lenders and small businesses who were counting on the obligated funds and have acted in reliance on receiving them. Successful financing of new projects requires certainty from everyone in the financial chain that funds will flow in a predictable and timely manner. Our partners cannot wait months or years while EPA effectively freezes the funds it has no lawful authority to freeze.

4.    JCF does not have other committed sources of funding to replace the CCIA award funds. As a result of Defendants' actions, to preserve its available cash, JCF has already been compelled to terminate multiple vendors, limit business travel, and instruct non-essential lawyers, accountants, and consultants to cease work. Indeed, without access to its funds at Citibank, or a viable alternative funding source, JCF would not be able to litigate *this case* to a final judgment.

5.    Absent preliminary injunctive relief that restores the ordinary and orderly flow of funds from JCF's account, JCF will effectively fail as a going concern. JCF will be forced to lay off substantially all staff and close its office, and its existing projects will almost certainly fall apart. Accordingly, it is unlikely that JCF will ever be able to reopen for business again—even if the flow of funds is eventually restored—given the lost staff, community relationships, and reputational harm.

**JCF and Its Mission**

6.      JCF is a purpose-built, non-profit organization that was founded to apply for CCIA funding on behalf of a consortium of community lender representatives. JCF's mission is to ensure that community lenders have the resources to provide affordable financing for clean-energy and affordable-housing-related qualified projects across the country, focusing on low-income and disadvantaged communities in unbanked areas. In its EPA-approved workplan, JCF estimated that its work would reduce and avoid 5.32 million metric tons of carbon dioxide emissions, directly and indirectly support 61,700 jobs, and mobilize $1.56 billion of private capital.

7.      JCF was formed in 2023, after the passage of the IRA, by a coalition of organizations with extensive experience advancing community-development finance for unbanked American families, businesses, and communities. JCF's founding organizations sought to utilize CCIA funding to fill a critical gap: Many community lenders were underrepresented in climate finance and lacked access to green lending resources. By forming JCF, coalition members aimed to centralize support and technical assistance, ensure that resources flow to community lenders not served by other GGRF awardees, and help lenders build capacity through experience with JCF's small-scale funding.

8.      Under its EPA-approved workplan, JCF is to use the funds it has been awarded in two primary ways: (1) to provide capitalization grants to community lenders, who then use those funds to finance qualified projects; and (2) to provide those community lenders with technical assistance grants, in order to build community lenders' capacity to deploy capital in low-income and disadvantaged communities.

9.      JCF's subgrants are inherently critical to the projects its community lenders fund, as one of the criteria for a qualified project is that it may not otherwise have been financed.

**JCF's CCIA Award**

10.    In July 2023, EPA posted a Notice of Funding Opportunity ("NOFO") for the CCIA program. A true and correct copy of the CCIA NOFO is attached hereto as **Exhibit 1**.

11.    Also in July 2023, EPA posted a NOFO for the National Clean Investment Fund ("NCIF") program. A true and correct copy of the NCIF NOFO is attached hereto as **Exhibit 2**.

12.    On August 8, 2024, following an extensive, competitive, and merit-based review process, JCF was awarded $940 million in CCIA funding. The award was memorialized in a final award agreement, known as a Notice of Award ("NOA"). The original NOA was dated August 8, 2024. A true and correct copy of the August NOA, with redactions for privacy, is attached hereto as **Exhibit 3.**

13.    The NOA was then updated on December 20, 2024. That December NOA sets forth the operative Terms and Conditions for JCF's award. A true and correct copy of the December NOA, with redactions for privacy, is attached hereto as **Exhibit 4**.

14.    The award agreement required JCF to enter into an Account Control Agreement. JCF entered into the ACA that governs its account with EPA and Citibank on November 1, 2024. The ACA sets forth the terms governing Citibank's custody of the award funds. A true and correct copy of the ACA, with redactions for privacy, is attached hereto as **Exhibit 5**.

15.    JCF's funds were fully obligated by EPA on August 8, 2024. After funding was disbursed to JCF's Citibank accounts, JCF drew money from its accounts approximately every two weeks, as permitted by the terms of the CCIA Award, including in accordance with its approved budget. Between December 23, 2024, and February 12, 2025, JCF conducted six successful draws on its award funds.

16.    JCF has used award funds for salaries and benefits for the 14 employees on its payroll. These staff members collectively operate all aspects of JCF's operations, including

building relationships with community lenders, evaluating the 94 applications for subgrants JCF received from community lenders, adhering to EPA's stringent data-collection and reporting requirements, meeting our grant leverage goals, and participating in frequent and regular meetings to discuss JCF's program plans, reporting, oversight, and application of the EPA Terms and Conditions. JCF intends to hire more staff and engage additional vendors to support its operations. We have been rapidly expanding our capacity to implement this program, fulfill the requirement that we identify projects and partners quickly, and get funds moving to benefit American communities most in need.

17.     JCF plans to use award funds to fund clean-energy lending projects to benefit under-resourced communities. Thus far, JCF has obligated funds to 35 community lenders to support numerous projects. Those projects include financing solar arrays for rural hospitals, improvements that would both mitigate the risks to patients that result from blackouts and brownouts and reduce hospitals' operating costs, thus enabling them to continue to serve small communities rather than shuttering. Other JCF-funded projects would retrofit schools in Louisiana to save utility costs and improve air quality, convert an historic Maryland building into a workforce development center, finance community solar that will enable low-income families in North Carolina to save thousands of dollars annually, reduce the cost of mortgages for net-zero homes in Texas, and provide low-cost loans for small businesses in Virginia to purchase heat pumps, saving them hundreds of dollars annually on heating and cooling bills.

**EPA's and Citibank's Recent Actions and Failure to Inform JCF**

18.     On February 25, 2026, JCF placed a request to Citibank to draw funds from JCF's account. In the normal course, Citibank would have distributed the funds to JCF. But JCF's accounts with Citibank do not reflect that the disbursement occurred, and JCF did not receive any funds from its account.

19.    On February 26, 2025, at 3:40 pm, JCF submitted an email message to Citibank noting that its funding request remained pending and had not been disbursed. The letter asked for an update on the status of the draw request.

20.    On February 26, 2025, at 6:41pm, Citibank responded, saying that Citibank "d[id] not have an updated status at this time" and was "continu[ing] to monitor the situation with EPA for status updates." Citibank stated that it would "advise once we have new information to share regarding the draw request." JCF received no further communications from Citibank.

21.    On March 11, 2025, EPA sent JCF a "Notice of Termination" ("Notice"), which purported to terminate JCF's award. A true and correct copy of that Notice, with a redaction for privacy, is attached hereto as **Exhibit 6**.

22.    The Notice baselessly accuses JCF of "programmatic fraud, waste, and abuse." Ex. 6 at 1. It does not purport to describe or detail any such fraud, waste, or abuse.

23.    JCF has been unable to access its award funds since its last successful draw on February 12, 2025.

24.    JCF is continuing to attempt to meet its obligations under the award agreement, including by preparing rigorous semi-annual and annual reports, detailing its transactions, activities, and progress against its workplan.

25.    EPA is continuing to exercise its oversight and supervisory authority, including by regularly meeting with JCF to discuss its program plans, reporting, oversight, and compliance with EPA's general terms and conditions.

26.    On March 4, 2025, EPA asked JCF for answers and documentation related to 35 questions addressing a wide range of topics, many of which ask for documentation or information previously provided to, or issued by, EPA, giving JCF just weeks to respond while its funds are

inaccessible. A true and correct copy of EPA's March 4 information request, with redactions for privacy, is attached hereto as **Exhibit 7**.

27.     On April 1, 2025, JCF learned that the Citibank accounts of other CCIA awardees had been completely drained. As of 2:35pm ET on April 1, 2025, JCF's Citibank accounts had full balances. A true and correct copy of JCF's Agency and Trust Account Statement as of 2:35pm ET on April 1, 2025, is attached hereto as **Exhibit 8**.

28.     As of 5:14pm ET on April 1, 2025, JCF's Citibank accounts had been completely drained by FedWire transfers moving money out of JCF's accounts. JCF did not originate or direct those transfers. A true and correct copy of JCF's Agency and Trust Account Statement as of 5:14pm ET on April 1, 2025, is attached hereto as **Exhibit 9**. As of 8:25am ET on April 2, 2025, JCF's money was back in its Citibank accounts.

### Impact on JCF's Operations and Programs if JCF Does Not Promptly Regain Access to the Funding Provided by the CCIA Award

29.     JCF cannot currently access award funds to implement its EPA-approved program workplan.

30.     As noted above, JCF had been drawing money from its Citibank accounts approximately every two weeks to pay operating expenses. JCF will run out of money to fund its operations in less than 45 days—and possibly much sooner, depending on the expenses it incurs in this litigation.

31.     Without access to the award funds in its Citibank accounts, JCF does not have funds available to support its programs, nor does it have other committed sources of funding that could replace the CCIA award.

32.     Part of the reason it is difficult for JCF to find alternative funding is that JCF's primary goal, and indeed the goal of the CCIA program and policy enacted by Congress, is to

provide financing for projects that do not already have a steady source of funding. *See* 42 U.S.C. § 7434(b)(1)(B) (requiring funding recipients to "prioritize investment in qualified projects that would otherwise lack access to financing").

33.    Loss of access to its primary funding is severely damaging JCF's internal operations, the programs for which the CCIA funding was intended, and JCF's long-term reputation and ability to carry out its mission in the market. Continued loss of access will be devastating. If access to award funding is not restored imminently, millions of dollars in approved transactions with committed partners cannot move forward—to the detriment of the program, the mission of the organization, and the communities that stand to benefit.

*Impact on Internal Operations*

34.    With every day that passes without relief, JCF moves one day closer to the end of its operations.

35.    To execute on its EPA-approved program, JCF hired an excellent staff with extensive experience in finance and community development. In many cases, we hired them from other institutions where they enjoyed higher compensation. They came to JCF to do this work because of our mission and impact on the communities that benefit from our projects.

36.    When JCF runs out of money to pay staff salaries and benefits, they will almost certainly depart to seek employment elsewhere. And without a stable source of funding, we will not be able to replace our current staff with quality employees or attract additional talent to fill out our teams. That will leave JCF unable to fulfill its mission. Moreover, the experience of our existing staff from EPA's unlawful actions would likely discourage future potential hires from joining JCF and running the risk that their job or pay will evaporate based on arbitrary or capricious government action.

*Impact on JCF's Grant Programs*

37.    Without a committed source of funding, JCF will not be able to meet the subaward commitments it has already made to community lenders for projects that they have in turn already approved. JCF's present inability to issue these subawards on the publicly communicated timeline is already eroding trust in JCF as an institution and damaging its reputation. And it specifically harms the qualified projects of the 35 selected community lenders, which will provide otherwise-unavailable funding for climate solutions while creating jobs and local economic development for small businesses and contractors. Business plans cannot be maintained indefinitely while funding remains unavailable and uncertain.

38.    The effect of EPA's and Citibank's actions on JCF's network of community lenders can hardly be overstated. These community lenders are most frequently owned by shareholders embedded in the communities they serve—communities that would benefit from the qualified projects they would fund, and whose members would be employed to execute them. Many of these lenders were reluctant to participate in green lending for fear of being labeled "woke," and many stepped outside their usual business arenas to partner with JCF. Those community lenders, having committed to and spent time developing qualified projects, are now left holding the proverbial bag—their project partners fail or turn elsewhere, their reputations suffer, and their own invested resources come to naught. Accordingly, many community lenders have expressed to JCF the frustration and harm occasioned to them by JCF's inability to access and disburse its obligated award funds in the ordinary course.

39.    EPA's and Citibank's actions have also visited significant harm on the small businesses and communities that would have been benefitted by the qualified projects. Small-business owners like electricians and other contractors have made plans to expand into low-income

and disadvantaged communities in reliance on the qualified projects JCF's CCIA award would have funded. Rural hospitals that were counting on solar arrays to reduce patient risk from brownouts and blackouts, and to help them stay afloat by reducing costs, are now left wondering how long they can operate, whether they can do so safely, and whether installation and other partners will still be available and able to carry out the projects whenever funding eventually materializes.

40.      Furthermore, EPA's and Citibank's actions place JCF at risk of running afoul of the NOA, which would further hamper its mission. The NOA provides that "[t]he EPA Project Officer may assess whether the Recipient is making sufficient progress in implementing the workplan in effect under this Assistance Agreement within 90 calendar days of June 30, 2025." Ex. 4 at 42. "'Sufficient progress' shall be assessed based on a comparison of the Recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes." *Id.* If JCF is found not to have achieved "sufficient progress"—because EPA and Citibank have cut off its access to the funds essential to its mission—it may be subject to a "corrective action plan" under 2 C.F.R. § 200.208. *Id.* at 43.[1]

*Impact on JCF's Reputation*

41.      EPA's and Citibank's actions harm JCF's reputation and thus the ultimate success of JCF's endeavors. Many community lenders were already hesitant about participating in the GGRF program for fear of being labeled "woke" or otherwise targeted. Through careful relationship building and concerted efforts to educate potential partners on the benefits of clean

---

[1] To be sure, this particular risk of harm could be avoided by EPA committing not to use its own funding freeze against JCF in assessing JCF's progress in meeting the NOA. No such commitment has been made, however. And even if such a commitment were made, it would do nothing to alleviate the other imminent and irreparable harms detailed above.

lending—including the massive potential for job creation and the benefits to under-resourced communities—JCF was able to generate significant interest in its mission. EPA's baseless accusations of "waste, fraud, or abuse," Ex. 6 at 1, and its targeting of JCF, have damaged the relationships JCF forged. And Citibank's refusal to permit JCF to draw its grant funds has prevented JCF from making good on its commitments to its community lending partners.

42.    JCF's relationships with its community lenders and other partners are built on trust and cannot be easily repaired. Between JCF's inability to access its award funds and the baseless aspersions EPA has cast on JCF, that trust is already waning. Every passing day on which JCF is unable to make good on its commitments to community lenders, and they to their qualified projects, is a day on which more irreparable damage is done.

### Impact on the Public

43.    Absent immediate relief, the benefits from our community lenders' projects will not come to fruition, and they cannot be easily replaced. At the end of the day, this program is about delivering direct, tangible benefits to American communities in the form of energy savings, energy access and stability, job creation, and healthier communities through access to capital that the private markets alone have not and will not deliver.

44.    If JCF is unable to regain access to its award funds, it will be unable to deliver the long-term benefits derived from the execution of its EPA-approved workplan. That workplan predicts that JCF's work will avoid and reduce 5.32 million metric tons $CO_2$ emissions, directly and indirectly support 61,700 jobs, provide financing to over 155,000 households and 10,900 businesses, and mobilize $1.56 billion in private capital. JCF's deployment of its CCIA funds is projected to directly result in:

    a.    The financing of 180,000 qualified projects;

    b.    The installation of 281 megawatts of solar PV capacity;

    c.   The installation of 38 megawatts of new battery storage capacity;

    d.   The financing of 93,600 heat pumps and heat pump water heaters;

    e.   23,500 buildings weatherized, electrified, and made energy efficient;

    f.   The construction of 143 new net-zero single family homes;

    g.   The financing of 36,400 light-duty electric vehicles;

    h.   The financing of 420 medium-and heavy-duty electric vehicles; and

    i.   The installation of 8,890 electric-vehicle charging stations.

45.    Taken as a whole, the work JCF would perform through access to its awarded funds would yield improved indoor and outdoor air quality, an increase in affordable and sustainable housing, the creation of quality jobs, demand for clean technologies manufactured and distributed in America, savings for American households, small businesses, and nonprofits, green homeownership and wealth creation for American families, and the adoption of net-zero and net-zero-ready building standards in the commercial, multifamily and single-family markets.

46.    There is also the matter of lost time and opportunity cost. Numerous individuals have spent years preparing for the implementation of this program. We have conducted listening sessions, met hundreds of times with partners, and hosted events to inform our strategy and approach, in addition to drawing on our direct experience in finance and community development. If EPA's unlawful termination and Defendants' related conduct is permitted to continue, we will have lost that time that could have been spent more productively to generate financial and impact benefits for the communities we serve.

* * *

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28

U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.


Executed this 2nd day of April, 2025, in Washington, D.C.


_____

AMIR KIRKWOOD, CEO
Justice Climate Fund

# EXHIBIT 1

JA1657

| **FEDERAL AGENCY AND OFFICE:** | U.S. Environmental Protection Agency, Office of the Greenhouse Gas Reduction Fund |
|---|---|
| **FUNDING OPPORTUNITY TITLE:** | Clean Communities Investment Accelerator (CCIA) |
| **ANNOUNCEMENT TYPE:** | Request for Applications (RFA) |
| **FUNDING OPPORTUNITY NUMBER:** | EPA-R-HQ-CCIA-23 |
| **ASSISTANCE LISTING NUMBER:** | 66.957 |

**IMPORTANT DATES:**

| **October 12, 2023** | **Closing Date** |
|---|---|
| **By March 2024** | **Anticipated** Notification of Selections |
| **By July 2024** | **Anticipated** Start of Period of Performance |

**DEADLINE:** Application packages must be submitted on or before October 12, 2023 at 11:59 PM (Eastern Time) through Grants.gov. Applications received after the closing date and time will not be considered for funding. Please refer to *Section IV.A: Due Date and Submission Instructions* and *Appendix A: Grants.gov Application Submission Instructions* for further instructions.

**NOTE:** Transfers of EPA funds awarded through this competition must comply with the Procurement Standards in 2 CFR Parts 200 and 1500, EPA Subaward Policy, and EPA Guidance on Participant Support Costs, depending on the vehicle that the grantee uses to transfer funds, as well as the Participation by Disadvantaged Business Enterprises in EPA Programs requirements in 40 CFR Part 33. Prior to naming contractors (including consultants) or subrecipients in your application, please carefully review Section IV.d, "Contracts and Subawards," of EPA Solicitation Clauses as well as the guidance in *Section III.B: Named Contractors and Named Subrecipients*. EPA does not accept justifications for sole source contracts for services or products available in the commercial marketplace based on a contractor's role in preparing an application or existing relationships that an applicant may have established without complying with competitive procurement requirements. **For this competition, EPA requires applicants that name subrecipients to submit coalition applications and include the named subrecipients as coalition members; all named subrecipients must be coalition members.**

As discussed in *Section IV.A: Due Date and Submission Instructions*, in concert with EPA's commitment to conducting business in an open and transparent manner, copies of applications selected under this funding opportunity may be made publicly available on the GGRF website or another public website for a period of time after the selected applications are announced. Therefore, clearly indicate which portion(s) of the application, if any, you are claiming contains confidential, privileged, or sensitive information. As provided at 40 CFR § 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the applicant.

# Contents

**Section I. Funding Opportunity Description** ...................................................................... **3**
A. Background ............................................................................................................... 3
B. Statutory Authority .................................................................................................. 4
C. GGRF Program Objectives ..................................................................................... 5
D. Competition Terminology ....................................................................................... 6
E. Scope of Work ......................................................................................................... 15
F. Environmental Results and Strategic Plan Information ........................................... 16
G. Measuring Environmental Results: Example Outputs and Outcomes ..................... 16
H. Additional Provisions for Applicants Incorporated into the Funding Opportunity .... 19
**Section II. Federal Award Information** .......................................................................... **20**
A. Number and Amount of Awards .............................................................................. 20
B. Conditional Awards .................................................................................................. 20
C. Period of Performance ............................................................................................. 20
D. Partial Funding ........................................................................................................ 20
E. Additional Awards ................................................................................................... 20
F. Funding Type ........................................................................................................... 21
**Section III. Eligibility Information** ............................................................................... **22**
A. Eligible Applicants .................................................................................................. 22
B. Named Contractors and Named Subrecipients ......................................................... 23
C. Threshold Eligibility Criteria .................................................................................. 25
D. Allowable and Unallowable Costs ........................................................................... 27
E. Cost Sharing or Matching ........................................................................................ 28
**Section IV. Application and Submission Information** ..................................................... **29**
A. Due Date and Submission Instructions .................................................................... 29
B. Application Materials ............................................................................................... 30
C. Content of Application Submission .......................................................................... 31
D. Pre-Application Assistance ...................................................................................... 42
**Section V. Application Review Information** .................................................................... **43**
A. Evaluation Criteria .................................................................................................. 43
B. Review and Selection Process .................................................................................. 55
**Section VI. Award Administration Information** .............................................................. **57**
A. Award Notification and Disputes ............................................................................. 57
B. Grant Drawdown Schedule ...................................................................................... 57
C. Program Income and Other Income Requirements ................................................... 58
D. Administrative and National Policy Requirements ................................................... 58
E. Reporting Requirements ........................................................................................... 59
F. Audit Requirements .................................................................................................. 62
G. Remedies for Non-Compliance ................................................................................ 62
**Section VII. Contact Information** ................................................................................. **63**
**Appendix A. Grants.gov Application Submission Instructions** ........................................ **64**
A. Requirement to Submit through Grants.gov and Limited Exception Procedures ....... 64
B. Submission Instructions ........................................................................................... 64
C. Technical Issues with Submission ........................................................................... 65
**Appendix B. CCIA-Eligible Project Checklist** ............................................................... **67**
**Appendix C. Guidance for Low-Income and Disadvantaged Community Expenditures** ..... **69**
**Appendix D. Program Budget** ...................................................................................... **71**

# Section I. Funding Opportunity Description

## A. Background

In the United States and globally, we are already experiencing the impacts of climate change. As described in The Long-Term Strategy of the United States, the time is now for decisive action, and the United States is boldly tackling the climate crisis. The Biden Administration has set climate goals to reduce greenhouse gas emissions 50-52 percent below 2005 levels in 2030, reach 50 percent zero-emission vehicles share of all new passenger cars and light trucks sold in 2030, achieve a carbon pollution-free electricity sector by 2035, and achieve net-zero emissions by no later than 2050, as outlined in the U.S. Nationally Determined Contribution and in Executive Order 14037 *(Strengthening American Leadership in Clean Cars and Trucks)*. Further, the Biden Administration has been clear that achieving these and other climate goals must simultaneously deliver against other critical priorities, including promoting equity and environmental justice, strengthening our economic competitiveness, creating high-quality jobs, and growing our energy independence. President Biden has codified these priorities in Executive Order 14005 *(Ensuring the Future Is Made in All of America by All of America's Workers)*, Executive Order 14008 *(Tackling the Climate Crisis at Home and Abroad)*, Executive Order 14082 *(Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022)*, and Executive Order 14096 *(Revitalizing Our Nation's Commitment to Environmental Justice for All)*. President Biden is furthering these priorities through targeted initiatives, such as the Interagency Working Group on Coal and Power Plant Communities, which targets the economic revitalization of coal and power plant communities, and the Justice40 Initiative, which sets the goal that 40% of the overall benefits from certain federal investments flow to disadvantaged communities. Achieving these goals and priorities will require a tremendous amount of financing and private capital for greenhouse gas- and air pollution-reducing projects across the country, especially in and for the benefit of low-income and disadvantaged communities.

President Biden's Inflation Reduction Act authorized the U.S. Environmental Protection Agency (EPA) to implement the Greenhouse Gas Reduction Fund (GGRF) to help achieve these goals and priorities, creating a historic $27 billion investment in communities across the country—from states to territories to Tribal lands, from the largest urban cities to the most remote rural towns. This bold investment will not only deploy clean energy and combat the climate crisis but also improve health outcomes, lower energy costs, and create high-quality jobs for Americans—all while strengthening our country's economic competitiveness and ensuring energy security.

As part of this investment, EPA is launching three distinct but complementary grant competitions: a $14 billion National Clean Investment Fund competition to finance clean technology deployment nationally; a $6 billion Clean Communities Investment Accelerator competition to finance clean technology deployment in low-income and disadvantaged communities while simultaneously building the capacity of community lenders that serve those communities; and a $7 billion Solar for All competition to spur adoption of clean distributed solar energy that lowers energy bills for millions of Americans in low-income and disadvantaged communities. The National Clean Investment Fund and Clean Communities Investment Accelerator will work in tandem to deploy much-needed capital for clean technologies into communities across the country. The National Clean Investment Fund will create centralized, long-term financing institutions with the scale required to transform financial markets, while the Clean Communities Investment Accelerator will

build the capacity of community lenders to draw on that capital to catalyze deployment of projects in communities all across the country—especially in communities that have long faced barriers accessing capital and that most need the benefits of clean technology projects. All competitions are covered under the President's Justice40 Initiative, which sets the goal that 40% of the overall benefits from certain federal investments in climate, clean energy, and other areas flow to disadvantaged communities. This competition will require each grantee to expend 100% of funds for the purposes of providing financial and technical assistance in low-income and disadvantaged communities, as defined in this funding opportunity.

**This Notice of Funding Opportunity provides details on the $6 billion Clean Communities Investment Accelerator competition.** This competition will provide grants to 2–7 hub nonprofits that will provide funding and technical assistance to specific industry networks of public, quasi-public, not-for-profit, and nonprofit community lenders, supporting the goal that every community in the country has access to the capital they need to deploy clean technology projects in their homes, small businesses, schools, and community institutions. These community lenders could include community development financial institutions (including Certified Native CDFIs), credit unions, green banks, housing finance agencies, minority depository institutions, and other types of lenders. As a result of this competition, hundreds of these community lenders will launch new or expand existing programs to provide low-income and disadvantaged communities much-needed capital to deploy emissions- and air pollution-reducing projects that reduce energy costs, improve health outcomes, create good jobs, and more—and they will have the financial and technical resources to sustain these programs for years to come. To multiply the impact of public funds, these hub nonprofits will provide funding and technical assistance that not only mobilizes private-sector investment on projects directly supported by grant funds but also creates self-sustaining programs across hundreds of community lenders. To ensure that public funds are spent efficiently and for the maximum benefit of American communities, especially low-income and disadvantaged communities, these hub nonprofits will be subject to, among other measures, rigorous low-income and disadvantaged community engagement and accountability strategies; comprehensive equity policies and practices; robust labor and workforce plans; strong governance structures; stringent legal and compliance risk management and consumer protection plans; and cohesive programmatic, financial, and administrative reporting and transparency requirements—in addition to being subject to conducting significant diligence prior to providing funding and technical assistance to community lenders.

## B. Statutory Authority

The Inflation Reduction Act amends the Clean Air Act to include Section 134 (42 USC § 7434), which authorizes the EPA to make competitive grants under the Clean Communities Investment Accelerator. The Clean Communities Investment Accelerator is funded by $6 billion from Section 134(a)(3) (out of $8 billion provided in Section 134(a)(3)).

The Clean Communities Investment Accelerator implements the statute's use of funds for indirect investments under Section 134(b)(2). Section 134(b)(2) directs recipients of funds for indirect investments to provide funding and technical assistance to establish new or support existing public, quasi-public, not-for-profit, or nonprofit entities that provide financial assistance to qualified projects at the State, local, territorial, or Tribal level or in the District of Columbia, including community- and low-income-focused lenders and capital providers. Section 134(c)(3) provides

4

that a qualified project is any project, activity or technology that (A) reduces or avoids greenhouse gas emissions or other forms of air pollution in partnership with, and by leveraging investment from, the private sector; or (B) assists communities in the efforts of those communities to reduce or avoid greenhouse gas emissions and other forms of air pollution.

The statute limits the entities eligible to compete for funds under Section 134(a)(3) to "eligible recipients." Section 134(c)(1) defines an eligible recipient as a nonprofit organization that (A) is designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services; (B) does not take deposits other than deposits from repayments and other revenue received from financial assistance using the grant funds; (C) is funded by public or charitable contributions; and (D) invests in or finances projects alone or in conjunction with other investors.

## C. GGRF Program Objectives

The Clean Communities Investment Accelerator will advance the three GGRF program objectives of reducing emissions of greenhouse gases and other air pollutants; delivering benefits to American communities, particularly low-income and disadvantaged communities; and mobilizing financing and private capital.

- **Program Objective 1: Reduce emissions of greenhouse gases and other air pollutants.** Grantees will provide capital for community lenders to invest and re-invest in projects, activities, and technologies that reduce emissions of greenhouse gases and other air pollutants that harm communities and contribute to climate change. Grantees—and the community lenders they support—will accelerate progress toward the climate goals of the United States, including reducing greenhouse gas emissions 50-52 percent below 2005 levels in 2030, reaching 50 percent zero-emission vehicles share of all new passenger cars and light trucks sold in 2030, achieving a carbon pollution-free electricity sector by 2035, and achieving net-zero emissions by no later than 2050.
- **Program Objective 2: Deliver benefits of greenhouse gas- and air pollution-reducing projects to American communities, particularly low-income and disadvantaged communities.[1]** Grantees will ensure that the projects that community lenders invest in directly benefit Americans by improving health outcomes, lowering energy costs, creating high-quality jobs, and more. 100% of funds awarded under this competition must be used for the purposes of providing financial and technical assistance in low-income and disadvantaged communities.
- **Program Objective 3: Mobilize financing and private capital to stimulate additional deployment of greenhouse gas- and air pollution-reducing projects.** Grantees will work with community lenders to mobilize financing and private capital for underinvested projects and underinvested communities, which will build the long-term capacity of

---

[1] This funding solicitation uses the term "American communities" to refer to communities within the boundaries of the ten EPA regions and to "Americans" as individuals living within the boundaries of the ten EPA regions. The ten regions are: EPA Region 1 (CT, ME, MA, NH, RI, VT, and 10 Indian Tribes); EPA Region 2 (NJ, NY, PR, VI, and 8 Indian Nations); EPA Region 3 (DE, DC, MD, PA, VA, WV, and 7 Indian Tribes); EPA Region 4 (AL, FL, GA, KY, MS, NC, SC, TN, and 6 Indian Tribes); EPA Region 5 (IL, IN, MI, MN, OH, WI, and 35 Indian Tribes); EPA Region 6 (AR, LA, NM, OK, TX, and 66 Indian Tribes); EPA Region 7 (IA, KS, NE, MO, and 9 Indian Tribes); EPA Region 8 (CO, MT, ND, SD, UT, WY, and 28 Indian Tribes); EPA Region 9 (AZ, CA, HI, NV, American Samoa, Commonwealth of the Northern Mariana Islands, Federated States of Micronesia, Guam, Marshall Islands, Republic of Palau, and 148 Indian Tribes); and EPA Region 10 (AK, ID, OR, WA, and 271 Indian Tribes).

5

community lenders to finance clean technology projects in low-income and disadvantaged communities. As a result, grantees will spur market transformation, supporting market-wide accessibility of affordable financing for clean technology projects to multiply the impact of grant funds.

Grantees must align their programs with these three objectives, including setting goals and targets as described in *Section IV.C: Content of Application Submission*.

## D. Competition Terminology

This section defines competition terminology referenced throughout this funding opportunity. Some of this terminology includes important requirements of the grant award that should be carefully considered in preparing the application.

**Capital Mobilization:** For this competition, capital mobilization refers to capital contributions made toward CCIA-eligible projects as a result of the grant's activities, excluding capital contributions made with grant funds. Private capital mobilization is defined as a subset of capital mobilization, excluding additional capital contributions (such as tax credits and other financial incentives) from federal, Tribal, state, territorial, and local government entities. Applicants may define their own methodologies to set goals and targets for capital mobilization for the purposes of their applications. An example methodology is provided below; applicants that do not use this methodology will not be penalized.

*Capital mobilization is defined as additional capital contributions toward projects that are financed by community lenders through capitalization funding provided by the grantee (this figure excludes the capitalization funding itself). Additional capital contributions may include financing provided by community lenders with funds raised from private capital providers and philanthropic sources, additional sources of financing provided to project sponsors from private capital providers, and equity contributions from project sponsors. The capital mobilization ratio is defined as the grantee's capital mobilization, divided by the grantee's (indirect) capital commitments through capitalization funding. This ratio excludes the grantee's expenditures for technical assistance subawards, technical assistance services, and program administration activities.*

**Capitalization Funding:** Section 134(b)(2) of the Clean Air Act directs that grantees provide funding to community lenders. Consistent with Section 134(b)(2), grantees will provide "capitalization funding" to existing community lenders for the sole purpose of providing financial assistance to CCIA-eligible projects. In general, a community lender may receive a maximum of $10 million in total capitalization funding from all grantees under this competition; however, under limited exceptions, a community lender may receive total capitalization funding from a grantee(s) in excess of the $10 million cap, provided that the framework for those exceptions is specified by the grantee(s) in the application(s) or a post-award request for an exception is granted under procedures described by the terms and conditions of the grant(s). Grantees must pass-through a minimum of 80% of the grant award to community lenders through capitalization funding as well as a minimum of 90% of the grant award to community lenders through both capitalization funding and technical assistance subawards (defined as the direct costs of funds passed through as well as any associated indirect costs).

Grantees may deliver capitalization funding through either (a) subgrants and/or (b) subsidies. Grantees may propose programs that provide one or both of these forms of capitalization funding to community lenders.

a. *Subgrant:* When a grantee provides capitalization funding to a community lender in the form of a subgrant, the subgrant is characterized as a *Subaward* and the community lender is characterized as a *Subrecipient*, as defined in 2 CFR § 200.1. The community lender must use the subgrant exclusively as capital to provide financial assistance for CCIA-eligible projects. The financial assistance that the community lender provides with the subgrant will be characterized as either a *Subaward*, *Participant support costs*, or the acquisition of *Intangible property* for a financial assistance purpose, as defined in 2 CFR § 200.1, with the characterization dependent on the nature of the financial assistance.

b. *Subsidies:* When a grantee provides capitalization funding to a community lender in the form of transaction-level subsidies or other payments that meet the 2 CFR § 1500.1(b) definition of *Participant support costs*, the community lender is characterized as a *Program beneficiary*, for the purposes of that regulation and the EPA Guidance on Participant Support Costs. The grantee must provide the subsidies exclusively to subsidize a community lender's financial assistance for CCIA-eligible projects. For example, a grantee may make a one-time commitment to a community lender to contribute a certain percentage of capital for the community lender's transactions (such as loan originations) that meet the definition of financial assistance for CCIA-eligible projects (capped at $10 million in total subsidies). Participant support costs are subject to 2 CFR Part 200, Subpart E—Cost Principles, which requires that subsidies are "reasonable."

**CCIA-Eligible Projects:** Section 134(b)(2) of the Clean Air Act directs that grantees use funds to establish new or support existing community lenders that provide financial assistance to qualified projects. For this competition, projects that are ultimately supported by capitalization funding, technical assistance subawards, and technical assistance services must meet the requirements of all three criteria listed below and are referred to as "CCIA-eligible projects." *Appendix B: CCIA-Eligible Project Checklist* provides an illustrative checklist of the requirements.

a. The project, activity, or technology must be a *qualified project;*
b. The project, activity, or technology must be within a *priority project category;* and
c. The project, activity, or technology must be in a *low-income and disadvantaged community.*

**Coalition Application:** A coalition application is one of two types of eligible applications under this competition, with the other type being an individual application as described in *Section III.A: Eligible Applicants*. A coalition application is composed of one lead applicant, which partners with one or more non-lead coalition members that are named in the application and would receive subawards (in the form of subgrants) to carry out a portion of the grant's activities if the application is selected. The lead applicant must be an eligible recipient and submit the application on behalf of the coalition. The non-lead coalition member(s) may be eligible recipients or other types of organizations eligible for subawards under the EPA Subaward Policy. **A coalition application should describe the lead applicant's program plan and programmatic capabilities, incorporating the activities of coalition members as well as the lead applicant's management and oversight of those activities.** For example, the pass-through strategy should describe how funds will be passed through to community lenders through activities carried out by the lead

7

applicant and non-lead coalition members, and the legal and compliance risk management plan should describe how the lead applicant will manage legal and compliance risk across its own activities as well as the activities of non-lead coalition members.

If selected, the lead applicant will become the grantee, administer the grant as a pass-through entity for the purposes of 2 CFR Part 200 and the EPA Subaward Policy, and be accountable to EPA for effectively carrying out the full scope of work and the proper financial management of the grant (including subawards to non-lead coalition members). Additionally, if selected, as provided in 2 CFR § 200.332, non-lead coalition members will become subrecipients accountable to the lead applicant for proper use of EPA funding. **Note that pursuant to 2 CFR § 200.332(a)(2), as implemented in Items 2 and 4 of EPA's *Establishing and Managing Subawards* General Term and Condition, successful lead applicants of coalitions must ensure that the terms and conditions of the grant agreement "flow down" to any coalition members that are provided subawards. EPA has developed a template for subaward agreements, available in Appendix D of the EPA Subaward Policy.**

**Community Lender:** Section 134(b)(2) of the Clean Air Act directs that grantees provide funding and technical assistance to establish new or to support existing public, quasi-public, not-for-profit, or nonprofit entities that provide financial assistance to qualified projects at the state, local, territorial, or Tribal level or in the District of Columbia, including community- and low-income-focused lenders and capital providers. For this competition, an entity that meets these requirements is referred to as a "community lender."

Consistent with Section 134(b)(2), an organization must meet the following three requirements to be considered a community lender:
- Must be either a public, quasi-public, not-for-profit, or nonprofit entity.
    - A public entity must be a state, municipal, territorial, or Tribal government, including any department, agency, or instrumentality of one of those governments.
    - A quasi-public entity must either (1) have a close association with a public entity but not be a public entity, (2) be created by a public entity but be exempt from certain legal and administrative requirements, or (3) not have been created by a public entity but perform a public purpose and be significantly supported financially by a public entity.[2]
    - A not-for-profit entity must meet the definition of or be considered a "not-for-profit" under a federal, state, territorial, or Tribal law of a federally recognized tribe.[3]

---

[2] For the purposes of this funding opportunity, EPA has determined that any entity that has been determined by the U.S. Treasury's CDFI Fund to meet the CDFI certification requirements set forth in 12 CFR 1805.201, as listed on the CDFI Fund's website, is a quasi-public entity that meets this requirement. In addition to being quasi-public, an entity meeting this requirement may also meet the requirements of being a not-for-profit or nonprofit entity, depending on the entity.

[3] For the purposes of this funding opportunity, EPA has determined that any Federal credit union or State credit union, as defined in Section 101 of the Federal Credit Union Act, is a not-for-profit entity that meets this requirement.

8

- o  A nonprofit entity must meet the definition of *nonprofit organization* set forth in 2 CFR § 200.1.[4]
- • Must have the legal authority to provide financial assistance to qualified projects at the state, local, territorial, or Tribal level or in the District of Columbia.
- • Must be eligible to receive a subaward under the EPA Subaward Policy.

An individual(s) in the process of establishing a community lender, or an existing organization in the process of becoming a community lender, is not considered a community lender. However, while such individuals and organizations are not eligible for capitalization funding and technical assistance subawards provided by grantees, they are still eligible for technical assistance services provided by grantees.

**Financial Assistance:** Section 134(b)(1) of the Clean Air Act directs that grantees establish new or support existing community lenders that provide financial assistance to qualified projects. For this competition, consistent with the definition of "Federal financial assistance" in 2 CFR § 200.1, financial assistance constitutes financial products, including debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, loan purchasing programs, and other debt instruments), equity (such as equity project finance investments, private equity investments, and other equity instruments), hybrids (such as mezzanine debt, preferred equity, and other hybrid instruments), and credit enhancements (such as loan guarantees, loan guarantee funds, loan loss reserves, and other credit enhancement instruments).  For this competition, subgrants are not eligible as financial assistance.

*Note: The Clean Communities Investment Accelerator uses the term "financial assistance" in three ways: (1) capitalization funding must be used for financial assistance to CCIA-eligible projects; (2) technical assistance subawards must be used to build capacity for community lenders to provide financial assistance to CCIA-eligible projects; and (3) technical assistance services must be used to build capacity for community lenders to provide financial assistance to CCIA-eligible projects. If your application proposes to support community lenders in providing financial assistance in the form of equity investments,* ***it will be expected to account for the unique risks of equity investments as well as the capabilities required by community lenders to manage those risks.*** *This includes, but is not limited to, ensuring that community lenders have the investment policies, staffing plans, and financial risk management practices in place as well as have a plan to generate program income and other income from equity investments to support continued operability.*

**Low-Income and Disadvantaged Communities (LIDAC):** GGRF defines low-income and disadvantaged communities as encompassing the following four categories, as defined below: (a) communities identified as disadvantaged by the CEJST mapping tool; (b) a limited number of additional communities identified as disadvantaged by the EJScreen mapping tool; (c) geographically dispersed low-income households; and (d) properties providing affordable housing.

---

[4] 2 CFR § 200.1 states that a *nonprofit organization* "means any corporation, trust, association, cooperative, or other organization, not including Institutes of Higher Education, that: (1) is operated primarily for scientific, educational, service, charitable, or similar purposes in the public interest; (2) is not organized primarily for profit; and (3) uses net proceeds to maintain, improve, or expand the operations of the organization."

9

Section 134(a)(3) of the Clean Air Act appropriates funds "for the purposes of providing financial assistance and technical assistance in low-income and disadvantaged communities." For this competition, grantees will be required to use 100% of grant funds for the purposes of providing financial and technical assistance in the low-income and disadvantaged communities defined below. *Appendix C: Guidance for Low-Income and Disadvantaged Community Expenditures* provides guidance for assessing expenditures against this 100% requirement.

a. **CEJST-Identified Disadvantaged Communities:** The Climate and Economic Justice Screening Tool (CEJST) is a publicly-available mapping tool developed by the White House Council on Environmental Quality. GGRF's definition of "disadvantaged communities" includes all communities identified as disadvantaged through the CEJST.

b. **EJScreen-Identified Disadvantaged Communities:** EJScreen is a publicly-available, place-based environmental justice screening and mapping tool developed by the EPA. GGRF's definition of "disadvantaged communities" includes (1) the limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (2) geographic areas within Tribal lands as included in EJScreen.[5]

c. **Geographically Dispersed Low-Income Households:** GGRF's definition of "geographically dispersed low-income households" includes low-income individuals and households that fall within either of the two categories listed below.

   - Individuals and households with incomes at or below the greater of:
     - *For Metropolitan Areas:* (1) 80% Area Median Income (AMI) and (2) 200% of the Federal Poverty Level
     - *For Non-Metropolitan Areas:* (1) 80% AMI; (2) 80% Statewide Non-Metropolitan Area AMI; and (3) 200% of the Federal Poverty Level
   - Individuals and households currently approved for assistance from or participation in at least one of the following income-based or income-verified federal assistance programs, with an award letter within the last 12 months: (1) U.S. Department of Health and Human Services' (HHS) Low Income Home Energy Assistance Program; (2) U.S. Department of Agriculture's (USDA) Supplemental Nutrition Assistance Program; (3) U.S. Department of Energy's (DOE) Weatherization Assistance Program; (4) Federal Communications Commission's Lifeline Support for Affordable Communications; (5) USDA's National School Lunch Program; (6) U.S. Social Security Administration's Supplemental Security Income; or (7) any other verified government or non-profit program serving Asset Limited, Income Constrained, Employed (ALICE) individuals or households designated by the EPA Administrator

d. **Properties Providing Affordable Housing:** GGRF's definition of "properties providing affordable housing" includes properties serving low-income individuals and households that fall within either of the two categories listed below.

   - Multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following federal or state housing assistance programs: (1) Low-Income Housing Tax Credit;

---

[5] Within EJScreen, EJScreen-Identified Disadvantaged Communities can be found in the "Places" tab by clicking the "Justice40/IRA" category and then selecting "EPA IRA Disadvantaged Communities." This includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.

(2) a housing assistance program administered by the U.S. Department of Housing and Urban Development (HUD), including Public Housing, Section 8 Project-Based Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on the goal of ending homelessness funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)); or (5) any other housing assistance program designated by the EPA Administrator

- Naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units[6]

**Network:** For this competition, an industry "network" of community lenders is a class of community lenders that is defined by shared characteristics relevant to deploying financial assistance to CCIA-eligible projects, such as the entity's legal structure or business model. Applicants must propose serving a network of community lenders that have the capacity to exist across all ten EPA regions over the period of performance.

**Program Administration Activities:** Under 2 CFR § 200.403 and other applicable provisions of 2 CFR Part 200, Subpart E, costs are allowable under federal awards so long as they are necessary and reasonable for the performance of the grant award. For this competition, consistent with these regulations, program administration activities are allowable costs, with such activities supporting administration of the grant program. Program administration activities include (but are not limited to) managing processes to distribute capitalization funding and technical assistance subawards; establishing and convening advisory councils; conducting program performance and other reporting activities (e.g., expenditures for personnel and equipment to procure technology infrastructure and expertise for data analysis, performance, and evaluation); and supporting, monitoring, overseeing, and auditing subrecipients, contractors, and program beneficiaries.

**Priority Project Categories:** For this competition, priority project categories include: (a) distributed energy generation and storage; (b) net-zero emissions buildings; and (c) zero-emissions transportation. A project that falls within one or more of the priority project categories is likely to be a qualified project, but it is not guaranteed to be a qualified project. <u>**All projects ultimately supported through this competition by capitalization funding, technical assistance subawards, and technical assistance services must be both qualified projects and priority projects.**</u>

  a. <u>Distributed Energy Generation and Storage:</u> Projects, activities, and technologies that deploy small-scale power generation and/or storage technologies (typically from 1 kW to 10,000 kW), plus enabling infrastructure necessary for deployment of such generation and/or storage technologies. For this competition, the projects, activities, and technologies

---

[6] Applicants will be evaluated on their plan to integrate housing affordability protection into the program, including but not limited to maintaining affordability of existing housing stock, minimizing displacement, and preventing rapid cost increases.

must support *carbon pollution-free electricity,* which is electrical energy produced from resources that generate no carbon emissions, consistent with the definition specified in Executive Order 14057 *(Catalyzing Clean Energy Industries and Jobs Through Federal Sustainability)*. Examples of the types of projects in this category include (but are not limited to): residential rooftop solar; residential rooftop solar-plus-storage; community wind and solar; fuel cells; stand-alone energy storage, including replacement of backup diesel generators with battery storage; distributed generation and storage assets that support microgrids; and the previously listed projects paired with distribution system upgrades necessary for project interconnection. This priority project category is intended to make an outsized impact on delivering clean energy and energy efficiency benefits to low-income and disadvantaged communities.

b. <u>Net-Zero Emissions Buildings:</u> Projects, activities, and technologies that either (1) retrofit an existing building, making a substantial contribution to that building being a net-zero emissions building and as part of a plan for that building achieving zero-over-time, or (2) construct a new net-zero emissions building in a low-income and disadvantaged community. *Net-zero emissions buildings* are defined in Executive Order 14057 Implementing Instructions,[7] with the primary focus of reducing emissions but with occupant health, environmental stewardship, and climate resilience also as critical elements of a holistic building design, construction, and operations strategy. Net-zero emissions buildings include residential (e.g., 1- to 4-family homes, manufactured homes, multifamily housing), commercial, industrial, and other buildings—especially properties providing affordable housing. Examples of the types of projects in this category include (but are not limited to): decarbonization of affordable multifamily housing through energy and water efficiency, geothermal heating and cooling, and grid-interactive appliance electrification; school building space and water heating grid-interactive electrification; whole-home retrofits for 1- to 4-family homes and manufactured homes to improve energy efficiency; decarbonization retrofits as part of adaptive reuse of existing buildings to create housing, childcare centers, and other community facilities; and new construction of net-zero residential buildings in rural areas as well as in urban infill, transit-oriented locations that are in low-income and disadvantaged communities. This priority project category is intended to make an outsized impact on delivering affordable and sustainable housing benefits to low-income and disadvantaged communities.

c. <u>Zero-Emissions Transportation:</u> Projects, activities, and technologies that deploy zero-emissions transportation modes, plus enabling infrastructure necessary for zero-emissions transportation modes—especially in communities that are overburdened by existing diesel pollution, particulate matter concentration, and degraded air quality. *Zero-emissions transportation* should be consistent with the zero-emissions transportation decarbonization strategies in The U.S. National Blueprint for Transportation Decarbonization. Examples of the types of projects in this category include (but are not limited to): deployment of chargers (including prewiring for future charger installation) and other infrastructure to support zero-emissions micromobility options (e.g., electric bikes and scooters) as well as zero-emissions light-duty vehicles for individuals and families, particularly at and near

---

[7] As defined in Executive Order 14057, a net-zero emissions building is an efficient, all electric building that is designed and operated so scope 1 and scope 2 greenhouse gas emissions from all facility energy use equal zero on an annual basis, when connected to on-site renewable energy or a regional grid that provides 100 percent carbon-free electricity on a net annual basis.

multifamily housing; deployment of chargers and other infrastructure to support zero-emissions medium- and heavy-duty vehicles for small businesses and farms; charging and refueling depots for zero-emissions school buses, trucks, and public transportation vehicles; and small-scale infrastructure to improve walkability and bikeability. This priority project category is intended to make a particular impact on delivering clean transportation benefits to low-income and disadvantaged communities.

**Program Income:** Consistent with 2 CFR § 200.1, *Program income* means gross income earned by a grantee (or a subgrantee) that is directly generated by a supported activity or earned as a result of the grant award. This includes gross income earned by a community lender from capitalization funding provided in the form of a subgrant. For this competition, program income includes but is not limited to loan and other origination fees, interest payments, principal repayments, dividends from equity investments, interest from short-term securities (e.g., cash deposits), asset sales, and other sources of program income. EPA-specific rules on program income are provided at 2 CFR § 1500.8 and on the coverage of allowable fund raising costs are provided under 2 CFR § 200.442 (with additional details in Item 4 of the [EPA Guidance on Selected Items of Cost for Recipients](#)). These rules apply to grantees as well as subgrantees (such as non-lead coalition members) that are provided subgrants for the purposes of carrying out a portion of the grant's activities, in addition to community lenders that are provided capitalization funding in the form of subgrants. Additional guidance will be provided in the terms and conditions of the grant agreement.

**Qualified Project:** Section 134(c)(3) of the Clean Air Act provides that a qualified project is any project, activity, or technology that (A) reduces or avoids greenhouse gas emissions and other forms of air pollution in partnership with, and by leveraging investment from, the private sector; or (B) assists communities in the efforts of those communities to reduce or avoid greenhouse gas emissions and other forms of air pollution. For this competition, a project must meet all six requirements listed below at the time of financing to be eligible as a "qualified project."

a. The project, activity, or technology would reduce or avoid greenhouse gas emissions,[8] consistent with the climate goals of the United States to reduce greenhouse gas emissions 50-52 percent below 2005 levels in 2030, reach 50 percent zero-emission vehicles share of all new passenger cars and light trucks sold in 2030, achieve a carbon pollution-free electricity sector by 2035, and achieve net-zero emissions by no later than 2050. The project, activity, or technology may reduce or avoid such emissions through its own performance or through assisting communities in their efforts to deploy projects, activities, or technologies that reduce or avoid such emissions.

b. The project, activity, or technology would reduce or avoid emissions of other air pollutants. The project, activity, or technology may reduce or avoid such emissions through its own performance or through assisting communities in their efforts to deploy projects, activities, or technologies that reduce or avoid such emissions.

c. The project, activity, or technology would deliver additional benefits (i.e., in addition to primarily reducing or avoiding emissions of greenhouse gases and other air pollutants) to American communities within one or more of the following seven categories: climate change; clean energy and energy efficiency; clean transportation; affordable and

---

[8] For the purposes of this competition, greenhouse gas emissions are carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act.

sustainable housing; training and workforce development; remediation and reduction of legacy pollution; and development of critical clean water infrastructure.[9]

d.  The project, activity, or technology may not have otherwise been financed.
e.  The project, activity, or technology would mobilize private capital.
f.  The project, activity, or technology would support only commercial technologies, defined as technologies that have been deployed for commercial purposes at least three times for a period of at least five years each in the United States for the same general purpose as the project, activity, or technology.

**Technical Assistance Services:** Section 134(b)(2) of the Clean Air Act directs that grantees provide technical assistance to community lenders. Consistent with Section 134(b)(2), grantees will provide "technical assistance services" to establish new and build the capacity of existing community lenders so that they can provide financial assistance to CCIA-eligible projects. Technical assistance services include targeted support activities for individual community lenders, such as providing training, market analysis, technical support, and structuring expertise as well as financial market-building activities spanning multiple community lenders, such as developing standardized project performance criteria, underwriting guidance, documentation, and product features. A community lender does not need to have been selected by a grantee for capitalization funding under this competition to be eligible for technical assistance services.

**Technical Assistance Subawards:** Section 134(b)(2) of the Clean Air Act directs that grantees provide technical assistance to community lenders. Consistent with Section 134(b)(2), grantees will provide "technical assistance subawards" to build the capacity of existing community lenders so that they can provide financial assistance to CCIA-eligible projects (including but not limited to financial assistance provided with capitalization funding). Grantees will provide these subawards in the form of subgrants, which will be subject to the EPA Subaward Policy. Community lenders will use technical assistance subawards for activities including (but not limited to) procuring training, market analysis, and technical support; hiring staff; developing new financial products; supporting predevelopment activities, such as site and building assessments (e.g., energy audits), financial and technological feasibility studies (e.g., solar resource studies), design and engineering support, and permitting support; and other activities. Community lenders may use technical assistance subawards to make additional subawards to other organizations, consistent with the EPA Subaward Policy. A community lender may only receive a technical assistance subaward if it has already been selected by a grantee for capitalization funding under this competition. In general, a community lender may receive a maximum of $1 million in total technical assistance subawards from all grantees under this competition; however, under limited exceptions, a community lender may receive total technical assistance subawards from grantee(s) in excess of the $1 million cap, provided that the framework for those exceptions is specified by the grantee(s) in the application(s) or a post-award request for an exception is granted under procedures described by the terms and conditions of the grant(s). Grantees must pass-through a minimum of 90% of the grant award to community lenders through both capitalization funding and technical assistance subawards (defined as the direct costs of funds passed through as well as any associated indirect costs).

---

[9] The Interim Implementation Guidance for the Justice40 Initiative provides examples of benefits aligned to these categories for the purposes of this competition.

## E. Scope of Work

*Note: This section does not contain any threshold requirements for applicants but rather articulates EPA's vision for the work that grantees will accomplish during the period of performance, including the long-term impact of this work. Threshold requirements are included in* Section III.C: Threshold Eligibility Criteria.

In the Clean Communities Investment Accelerator competition, applicants should propose establishing programs that support specific industry networks of community lenders in financing CCIA-eligible projects while also building their enduring capacity to finance these projects for years to come. Given that CCIA-eligible projects must be in low-income and disadvantaged communities, as defined in *Section I.D: Competition Terminology*, programs supporting CCIA-eligible projects should inherently meet the requirement that 100% of funds are used for the purposes of providing financial and technical assistance in low-income and disadvantaged communities. Further, applicants should ensure that their programs support the GGRF program objectives, including through aligning with the United States' climate goals and with associated decarbonization pathways, such as The Long-Term Strategy of the United States; delivering critical benefits, such as improved health outcomes, lower energy costs, and high-quality jobs, to low-income and disadvantaged communities most in need of these benefits; and building clean community financing capacity to provide accessible, affordable financing for clean technology projects in low-income and disadvantaged communities, supporting the financial market transformation required to achieve the United States' climate goals.

Applicants should provide a vision and an accompanying plan for their program, focusing on a specific industry network of community lenders and offering details on how supporting that network will achieve the GGRF program objectives. Applicants should share their vision for a network of community lenders that provides accessible, affordable financing to deploy CCIA-eligible projects in low-income and disadvantaged communities across the country, including those that are also rural communities, Tribal communities, communities with environmental justice concerns, energy communities, and persistent poverty counties. Applicants should also provide a detailed plan for achieving that vision through offering capitalization funding, technical assistance subawards, and technical assistance to community lenders—including designing and executing a process to pass through a minimum of 90% of grant funds for capitalization funding and technical assistance subawards as well as providing technical assistance services to support individual community lenders and to build a more supportive financial market for community lenders seeking to finance CCIA-eligible projects.

Applicants should explain how they plan to work with a wide array of partners to shape the design and execution of the program as well as to strengthen the community financing ecosystem. These partners may include community stakeholders, including environmental justice advocates and community-based organizations; Tribal governments and Native-serving organizations; private capital providers; community lenders; philanthropic organizations; unions and other workers' rights groups; nonprofit technical assistance providers, utilities, rural electric cooperatives, and contractors; federal, state, and local government agencies; and others.

Applicants should explain how their activities would complement the grantees of the National Clean Investment Fund, taking into consideration the different but complementary functions of the

two competitions to support community lenders and to build the market for financeable projects. First, applicants should explain how their programs provide the capital and technical assistance necessary for community lenders to develop clean financing expertise and build project pipelines—and how their programs may (for example) enable community lenders to access larger sources of capital from National Clean Investment Fund grantees in the form of loans, loan guarantees, and other financial products. Second, applicants should explain how they will build enduring capacity within the community financing ecosystem, such as developing supporting financial market infrastructure for community lenders to leverage, considering that the National Clean Investment Fund will be focused on supporting the market's capacity to deliver financeable projects and demonstrating proofs of concept that enable the participation of established financial markets and institutions.

## F. Environmental Results and Strategic Plan Information

Pursuant to Section 6.a of EPA Order 5700.7A1, Environmental Results under Assistance Agreements, EPA must link proposed assistance agreements with the Agency's Strategic Plan. EPA must also require applicants and grantees to adequately describe environmental outputs and outcomes to be achieved under assistance agreements.

Awards made under this funding opportunity will support the following goals and objectives of the FY 2022-2026 EPA Strategic Plan:
- **Goal 1: Tackle the Climate Crisis**
  - Objective 1.1: Reduce Emissions that Cause Climate Change
  - Objective 1.3: Advance International and Subnational Climate Efforts
- **Goal 2: Take Decisive Action to Advance Environmental Justice and Civil Rights**
  - Objective 2.1: Promote Environmental Justice and Civil Rights at the Federal, Tribal, State, and Local Levels
  - Objective 2.2: Embed Environmental Justice and Civil Rights into EPA's Programs, Policies, and Activities
- **Goal 4: Ensure Clean and Healthy Air for All Communities**
  - Objective 4.1: Improve Air Quality and Reduce Localized Pollution and Health Impacts
  - Objective 4.2: Reduce Exposure to Radiation and Improve Indoor Air

## G. Measuring Environmental Results: Example Outputs and Outcomes

Pursuant to EPA Order 5700.7A1, Environmental Results under Assistance Agreements, EPA must require applicants and grantees to adequately describe environmental outputs and outcomes to be achieved under assistance agreements. Outputs and outcomes differ both in their nature and in how they are measured. The term "output" means an environmental activity, effort, and/or associated work product related to an environmental goal or objective that will be produced or provided over a period of time or by a specified date. Outputs may be quantitative or qualitative but must be measurable during the period of performance. The term "outcome" means the result, effect, or consequence that will occur from carrying out an environmental program or activity that relates to an environmental or programmatic goal or objective. Outcomes may be environmental, behavioral, health-related, or programmatic in nature; may be quantitative or qualitative; and may not necessarily be achievable within the period of performance.

Applicants must address environmental outputs and outcomes in the Project Narrative, as described in *Section IV.C: Content of Application Submission*. Those environmental outputs and outcomes should align with the GGRF program objectives. Example outputs and outcomes aligned to those program objectives are included in the table below.

| Category | Example Outputs | Example Outcomes |
|---|---|---|
| Climate and Air Pollution Benefits | • Projects financed *(total, by project category)*<br>• Projects deployed *(total, by project category)*<br><br>*Note: Additional detail will be expected on each project, which may vary by sector and technology. Distributed generation and storage projects may include nameplate generation/storage capacity (MW) as well as clean energy generated (MWh). Net zero-emissions buildings projects may include number of buildings and homes retrofitted (including type of retrofit e.g., full electrification) as well as number of newly constructed net zero-emissions buildings and homes (including building-level details e.g., square footage). Zero-emissions transportation projects may include number of light-, medium-, and heavy-duty vehicles financed, number of electric vehicle chargers financed, and miles of new bike lanes financed.* | • Reduction and avoidance of greenhouse gas emissions (e.g., carbon dioxide, methane)<br>• Reduction and avoidance of other air pollutants (e.g., particulate matter 2.5, sulfur dioxide, ammonia) |
| Equity and Community Benefits | • Projects financed *(by benefit type, by community type)*[10]<br>• Projects deployed *(by benefit type, by community type)*<br>• Number of households receiving financing for projects and total amount of financing received *(by community type)* | • Clean energy and energy efficiency (e.g., reduction of energy burden; deployment of clean energy; establishment of communitywide microgrids)<br>• Clean transportation (e.g., access to clean, high-frequency transportation; access to affordable electric |

---

[10] Benefit types may include clean energy and energy efficiency, clean transportation, affordable and sustainable housing, training and workforce development, and other types of benefits. Community types may include low-income and disadvantaged communities, subsets of low-income and disadvantaged communities, and other types of communities.

| | | |
|---|---|---|
| | <ul><li>Number of households benefitting from projects *(by community type)*</li><li>Number of businesses receiving financing for projects and total amount of financing received *(by business type: small business, low-income and disadvantaged community-led business, Native American-led business, community/locally-owned business, small business, women-owned business, other underrepresented business)*</li><li>Number of businesses benefitting from projects *(by business type)*</li><li>Total investment in low-income and disadvantaged communities *(by community type, including properties providing affordable housing)*</li></ul> | <ul><li>vehicles, charging stations, and purchase programs)</li><li>Affordable and sustainable housing (e.g., improved indoor air quality; reduced housing cost burden)</li><li>Training and workforce development (e.g., increased participation in clean energy good job training and subsequent good job placement/hiring, including providing the free and fair chance to join a union and collectively bargain)</li><li>Other types of benefits (e.g., community wealth/ownership, resilience benefits, entrepreneurship)</li></ul> |
| Market Transformation Benefits | <ul><li>Total grant funds committed to projects *(total, by community type, by geography, by project category)*</li><li>Total private capital mobilization for projects *(total, by community type, by project category)*</li><li>Total private capital mobilization ratio *(total, by community type, by project category)*</li><li>Number of community lenders supported *(total, by community type)*</li><li>Number of FTEs hired/trained at community lenders *(total, by community type)*</li><li>Volume of CCIA-supported transactions using</li></ul> | <ul><li>Increase in volume of clean capital deployment by community lenders *(all community lenders, CCIA-supported community lenders)*</li><li>Increase in share of community lenders with clean lending programs *(all community lenders, CCIA-supported community lenders)*</li><li>Increase in volume of transactions using standardized project performance criteria, underwriting guidance, documentation, and product features *(all community lenders, CCIA-supported community lenders)*</li></ul> |

| | | standardized project performance criteria, underwriting guidance, documentation, and product features *(total, by community type)* | |
|---|---|---|---|

## H. Additional Provisions for Applicants Incorporated into the Funding Opportunity

Additional provisions that apply to Sections III, IV, V, and VI of this opportunity and/or awards made under this opportunity can be found at EPA Solicitation Clauses. These provisions are important for applying to this opportunity, and applicants must review them when preparing applications for this opportunity. If you are unable to access these provisions electronically at the website above, please contact the EPA point of contact listed in *Section VII: Contact Information* to obtain the provisions.

# Section II. Federal Award Information

## A. Number and Amount of Awards
EPA anticipates awarding $6 billion in funding through this opportunity, drawn from the appropriation under Section 134(a)(3) of the Clean Air Act. EPA anticipates making 2–7 grant awards, depending on EPA funding levels, quality of applications received, EPA priorities, and other applicable considerations. EPA reserves the right to alter the amount of funding allocated to this competition from Sections 134(a)(2) and 134(a)(3) of the Clean Air Act as well as the number of awards, depending on EPA funding levels (including the availability of additional funding that may not be used to make awards under the NCIF competition), quality of applications received, EPA priorities, and other applicable considerations. There is no minimum or maximum award amount for this competition, subject to EPA's initial estimate that $6 billion will be available for funding under this competition.

## B. Conditional Awards
EPA may make conditional awards through this funding opportunity, which will be subject to terms and conditions.

## C. Period of Performance
EPA anticipates that programs funded under this opportunity will start by July 2024. All expenditures and disbursements with the grant award funds must be made within the negotiated period of performance of up to 6 years, subject to the provisions in 2 CFR § 200.344(b) on liquidating obligations incurred during the period of performance as part of the close-out process. In addition, community lenders will be required to retain and reuse program income (and similar income) for additional capital deployment through the terms of their close-out agreements, as described in Section *VI.C: Program Income and Other Income Requirements*.

## D. Partial Funding
EPA reserves the right to partially fund applications by funding discrete portions or phases of proposed programs. If EPA decides to partially fund an application, it will do so in a manner that does not prejudice any applicants or affect the basis upon which the application, or portion thereof, was evaluated and selected for award, and therefore maintains the integrity of the competition and selection process. **To facilitate consideration of an application for partial funding, EPA recommends that applicants separate costs for capitalization funding and technical assistance subawards in the program budget by industry network, to the extent practicable and if proposing to serve multiple networks.**

## E. Additional Awards
EPA reserves the right to make additional awards under this opportunity, consistent with EPA policy and guidance, if additional funding becomes available after the original selections are made. Any additional selections for awards will be made no later than 6 months after the original selection decisions.

## F. Funding Type

EPA anticipates awarding grants or cooperative agreements under this opportunity, depending on whether EPA determines that substantial Federal involvement is necessary for effective oversight of grantee performance or that EPA technical assistance will facilitate timely implementation of the EPA approved scope of work. A cooperative agreement provides for substantial involvement between the EPA Project Officer and a selected applicant in the performance of the work supported. Although EPA would negotiate precise terms and conditions relating to substantial federal involvement as part of the award process with each grantee awarded a cooperative agreement, the anticipated substantial federal involvement may include:

- Closely monitoring the grantee's performance to verify the results proposed by the applicant;
- Collaborating during performance of the scope of work;
- Reviewing proposed procurement, in accordance with 2 CFR § 200.317 and 2 CFR § 200.318;
- Reviewing evidence of completion of project phases (e.g., planning) before providing approval for the grantee to begin work on the next project phase (e.g., implementation);
- Reviewing the substantive terms of contracts, subawards, or other financial transactions (EPA will not select particular contractors, subrecipients, or program beneficiaries);
- Approving qualifications of key personnel (EPA will not select employees or contractors employed by the grantee); and
- Reviewing and commenting on reports prepared under the cooperative agreement (the final decision on the content of reports will rest with the grantee).

# Section III. Eligibility Information

Note: Additional provisions that apply to this section can be found at EPA Solicitation Clauses.

## A. Eligible Applicants

Consistent with Section 134(c)(1) of the Clean Air Act, an applicant that is eligible to receive a grant under the Clean Communities Investment Accelerator competition must be an "eligible recipient," which is an organization that: (a) is a nonprofit; (b) is designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services; (c) does not take deposits other than deposits from repayments and other revenue received from financial assistance provided using grant funds under this program; (d) is funded by public or charitable contributions; and (e) invests in or finances projects alone or in conjunction with other investors.

An applicant must meet this definition of eligible recipient at the time of application to be an eligible applicant. The Cover Page, described in *Section IV.C: Content of Application Submission*, must explain how an applicant meets the definition of eligible recipient and provide supporting evidence (including organizational documents, such as articles of incorporation or similar documents filed with a governmental authority as a condition of carrying out its activities; tax filings; financial statements; investment records; and/or any other information the applicant deems appropriate) for that explanation, showing that it:

   a. Meets the definition of *Nonprofit organization* set forth in 2 CFR § 200.1;[11]
   b. Has an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"
   c. Does not receive any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);
   d. Is funded by public or charitable contributions; and
   e. Has the legal authority to invest in or finance projects.

Further, to be an eligible recipient, an applicant must be incorporated in the United States and cannot be controlled by one or several entities that are not eligible recipients, such as for-profit commercial banks or asset managers. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions, as determined by the EPA.[12] A term and condition specifying compliance with this requirement—and the other requirements of being an eligible recipient— may be included in the grant agreement to ensure that grantees remain eligible recipients while they retain grant funds.

---

[11] 2 CFR § 200.1 states that a *Nonprofit organization* is "any corporation, trust, association, cooperative, or other organization, not including Institutes of Higher Education, that: (1) is operated primarily for scientific, educational, service, charitable, or similar purposes in the public interest; (2) is not organized primarily for profit; and (3) uses net proceeds to maintain, improve, or expand the operations of the organization."

[12] EPA may use the indicia of control described in the 2 CFR § 180.905 definition of "Affiliate" as a basis for making such determinations.

An eligible recipient, as described above, may apply to this competition as either an individual applicant or a "lead applicant" in a coalition.[13] An applicant that submits an application to this competition as an individual applicant or a lead applicant of a coalition may not submit an additional application to this competition as an individual applicant or a lead applicant of a coalition. However, an organization may participate in one or several coalition applications as a non-lead coalition member, even if the organization has submitted an application as an individual applicant or a lead applicant of a coalition. Note that EPA considers an organization and the entities that it controls as the same organization for these purposes, with control defined as above.

- **Individual Application:** An individual application is composed of an individual eligible recipient without any named subrecipients.
- **Coalition Application:** A coalition application is composed of one lead applicant, which partners with one or more non-lead coalition members that are named in the application and that would receive subawards to carry out a portion of the grant's activities if the application is selected. The lead applicant must be an eligible recipient and submit the application on its own behalf and on behalf of coalition members. The non-lead coalition member(s) may be eligible recipients or other types of organizations eligible for subawards under the EPA Subaward Policy. **Coalition applications must include a signed Memorandum of Agreement that confirms participation of each coalition member.** Once the lead applicant submits the application, the lead applicant as well as non-lead coalition members may not be substituted. If selected, the lead applicant must partner with the non-lead coalition members named in the application, unless approved by the EPA Award Official as explained in the EPA Subaward Policy Frequent Questions; additionally, if selected, as provided in 2 CFR § 200.332, the non-lead coalition members would become subrecipients that are accountable to the lead applicant for proper use of EPA funding. Refer to *Section I.D: Competition Terminology* for additional details on coalition applications.

## B. Named Contractors and Named Subrecipients

**Named Contractors.** EPA does not require or encourage applicants to name procurement contractors (including consultants) in applications for grant funding. However, if an applicant chooses to identify a procurement contractor(s) to conduct work proposed in this application, the applicant must comply with the following requirements, even if the entity is referred to as a "partner" in the application. **Contractors may not be coalition members.**

An applicant that identifies a procurement contractor(s) in its application where the amount of the contract will be more than the micro-purchase threshold in 2 CFR § 200.320(a)(1) ($10,000 for most applicants) must demonstrate in their application how the contractor (including consultants) was selected in compliance with the fair and open competition requirements in 2 CFR Parts 200 and 1500. EPA provides guidance on complying with the competition requirements in the Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance

---

[13] In either case, the grantee (either individual applicant or lead applicant) may make additional subawards to carry out a portion of the grant's activities, even if those subrecipients were not named in the application as a coalition member, provided that they are consistent with the grant's terms and conditions and with all applicable requirements, including the EPA Subaward Policy. EPA provides additional guidance in the EPA Subaward Policy Frequent Questions.

Agreements. For example, EPA will not accept sole source justifications for proposed procurement contracts for services that are available in the commercial marketplace, such as environmental or financial consulting and information technology services. Applicants must describe the procurement procedures that were followed to hire any contractor(s) named in the application and include information on where and when the Request for Proposals/Request for Qualifications were posted in the applicant's Cover Page, as described in *Section IV.C: Content of Application Submission*.

**Failure to demonstrate compliance with these requirements for named contractors in the application will result in rejection of the application.**

*Successful applicants that do not name procurement contractor(s) in their applications must also comply with these requirements, regardless of if the contractor(s) was procured before or after the EPA grant agreement is awarded. For example, firms or individual consultants that develop or draft specifications, requirements, statements of work, or invitations for bids or requests for proposals must be excluded from competing for such procurements as provided in 2 CFR § 200.319(b). EPA provides additional guidance on complying with this requirement in the Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements.*

**Named Subrecipients.** For this competition, **EPA requires applicants that name subrecipients in applications for grant funding to submit coalition applications and include the named subrecipients as coalition members.** If an applicant chooses to identify a subrecipient(s), the applicant must not only submit a coalition application but also demonstrate that the named subrecipient is eligible for a subaward in compliance with Appendix A of the EPA Subaward Policy. This policy provides, among other things, that transactions between recipients and for-profit firms and individual consultants are procurement contracts rather than subawards when the transaction involves the acquisition of services from the firm or individual, including services necessary to develop and manage the proposed program on behalf of the applicant (and/or on behalf of any non-lead coalition members). Note that grantees may make additional subawards to carry out a portion of the grant's activities, even if those subrecipients were not named in the application as a coalition member, provided that they are consistent with the grant's terms and conditions and with all applicable requirements, including the EPA Subaward Policy. EPA provides additional guidance in the EPA Subaward Policy Frequent Questions.

**Failure to demonstrate compliance with these requirements for named subrecipients in the application will result in rejection of the application.**

*Refer to Section IV.d, "Contracts and Subawards," of EPA Solicitation Clauses for additional guidance on these requirements, which must be met for all contractors (except for micro-purchases) and/or subrecipients specifically named in the application. EPA staff may contact the applicant to clarify issues or obtain additional information before making a final determination of non-compliance and rejection of the application.*

## C. Threshold Eligibility Criteria

All applications will be reviewed for eligibility and must meet the threshold eligibility criteria. **<u>Applications that do not meet all of the threshold eligibility criteria will be deemed ineligible for funding consideration and will not be considered further; as a result, applicants are strongly encouraged to ensure that their applications meet all of the threshold eligibility criteria prior to submitting their applications.</u>** If necessary, EPA may contact applicants to clarify threshold eligibility questions prior to making an eligibility determination. Applications deemed ineligible for funding consideration as a result of the threshold eligibility review will be notified within 15 calendar days of the ineligibility determination.

Applications must meet the following threshold criteria to be considered eligible:

1.  Applications must comply with the content and submission requirements, as listed below.
    a.  Applications must substantially comply with the application submission instructions and requirements set forth in *Section IV: Application and Submission Information* or else they will be rejected. However, where a page limit is expressed in *Section IV* with respect to the application, or parts thereof, pages in excess of the page limitation will not be reviewed. Applicants are advised that readability is of paramount importance and should take precedence in application format.
    b.  In addition, applications must be submitted through Grants.gov as stated in *Section IV: Application and Submission Information* (except in the limited circumstances where another mode of submission is specifically allowed for as explained in *Section IV*) on or before the application submission deadline published in *Section IV*. Applicants are responsible for following the submission instructions in *Section IV* of this funding opportunity to ensure that their application is timely submitted. Please note that applicants experiencing technical issues with submitting through Grants.gov should follow the instructions provided in *Section IV*, which include both the requirement to contact Grants.gov and email a full application to EPA prior to the deadline.
    c.  Applications submitted outside of Grants.gov will be deemed ineligible without further consideration unless the applicant can clearly demonstrate that it was due to EPA mishandling or technical problems associated with Grants.gov or SAM.gov. An applicant's failure to timely submit their application through Grants.gov because they did not timely or properly register in SAM.gov or Grants.gov will not be considered an acceptable reason to consider a submission outside of Grants.gov.
2.  Applications must explain and provide supporting evidence for how the applicant (either the individual applicant or the lead applicant in a coalition application) is an eligible recipient, as described in *Section III.A: Eligible Applicants*. This includes explaining and providing supporting evidence for being incorporated in the United States and not being controlled by one or several entities that are not eligible recipients.
3.  Applications must comply with the requirements for named contractors and named subrecipients, as described in *Section III.B: Named Contractors and Named Subrecipients*. EPA does not require or encourage applicants to name procurement contractors (including consultants) or subrecipients in applications for grant funding. However, if an applicant chooses to identify a procurement contractor(s) to conduct work proposed in this application or subrecipient(s) to be coalition members, the applicant must demonstrate compliance with the requirements. **For this competition, EPA requires applicants that**

**name subrecipients to submit coalition applications and include the named subrecipients as coalition members; all named subrecipients must be coalition members.**

4. Applications must demonstrate that they will expend the requested funding amount over a period of performance of up to 6 years. Note that community lenders will retain program income and other income to be used after the period of performance pursuant to the terms of a closeout agreement as provided in 2 CFR § 1500.8(d) and supplemented by the terms and conditions of the award, as discussed in *Section VI.C: Program Income and Other Income Requirements*.

5. Applications must include a program plan that provides funding and technical assistance to establish new or support existing public, quasi-public, not-for-profit, or nonprofit entities that provide financial assistance to qualified projects at the State, local, territorial, or Tribal level or in the District of Columbia, including community- and low-income-focused lenders and capital providers ("community lenders"). This program plan must support a network(s) of community lenders, as defined in *Section I.D: Competition Terminology*.

6. Applications must include a program plan that demonstrates the program's capacity (i.e., geographic coverage) to provide funding and technical assistance to community lenders that already exist (or that may be established over the period of performance) in each of the ten EPA regions.[14]

7. Applications must include a program plan that demonstrates the program's capacity to provide funding and technical assistance to community lenders across all three priority project categories, as described in *Section I.D: Competition Terminology*.

8. Applications must include a program budget that allocates 100% of grant funds for the purposes of providing financial and technical assistance in low-income and disadvantaged communities. Expenditures for these purposes include costs for capitalization funding, technical assistance subawards, and technical assistance services—all of which must support projects in low-income and disadvantaged communities—as well as other costs that are reasonable and necessary for the deployment of such financial and technical assistance, including costs for program administration activities. *Appendix C: Guidance for Low-Income and Disadvantaged Community Expenditures* provides guidance for assessing expenditures against this requirement.

9. Applications must include a program budget that meets the following three requirements:
   a. Passes through a minimum of 80% of grant funds to community lenders in the form of capitalization funding (defined as the direct costs of funds passed through as well as any associated indirect costs).
   b. Passes through a minimum of 90% of grant funds to community lenders in the form of both capitalization funding and technical assistance subawards (defined as the direct costs of funds passed through as well as any associated indirect costs).
   c. Allocates no more than 10% of grant funds to technical assistance services and program administration activities.

---

[14] The ten regions are: EPA Region 1 (CT, ME, MA, NH, RI, VT, and 10 Indian Tribes); EPA Region 2 (NJ, NY, PR, VI, and 8 Indian Nations); EPA Region 3 (DE, DC, MD, PA, VA, WV, and 7 Indian Tribes); EPA Region 4 (AL, FL, GA, KY, MS, NC, SC, TN, and 6 Indian Tribes); EPA Region 5 (IL, IN, MI, MN, OH, WI, and 35 Indian Tribes); EPA Region 6 (AR, LA, NM, OK, TX, and 66 Indian Tribes); EPA Region 7 (IA, KS, NE, MO, and 9 Indian Tribes); EPA Region 8 (CO, MT, ND, SD, UT, WY, and 28 Indian Tribes); EPA Region 9 (AZ, CA, HI, NV, American Samoa, Commonwealth of the Northern Mariana Islands, Federated States of Micronesia, Guam, Marshall Islands, Republic of Palau, and 148 Indian Tribes); and EPA Region 10 (AK, ID, OR, WA, and 271 Indian Tribes).

10. Applications must not include unallowable costs, as described in *Section III.D: Allowable and Unallowable Costs*. If an application is submitted that includes any unallowable costs, including but not limited to those described in *Section III.D*, that portion of the application will be ineligible for funding and may, depending on the extent to which it affects the application, render the entire application ineligible for funding.

11. Applications must be submitted by an individual applicant or a lead applicant of a coalition that has not already submitted an application to this competition as an individual applicant or a lead applicant of a coalition. Applicants submitting more than one application will be contacted to determine which application EPA will evaluate, with the remaining application(s) deemed ineligible. While eligible applicants are welcome to submit applications for each of the three GGRF competitions, they may submit only one application for each competition as either an individual applicant or a lead applicant of a coalition application.

12. *Coalitions:* Coalition applications must include a signed Memorandum of Agreement that confirms participation of each coalition member.

## D. Allowable and Unallowable Costs

**Allowable Costs:** The following are allowable costs for this competition:

- Costs for capitalization funding to community lenders, as defined in *Section I.D: Competition Terminology*[15]
- Costs for technical assistance subawards to community lenders, as defined in *Section I.D: Competition Terminology*
- Costs for technical assistance services to community lenders, as defined in *Section I.D: Competition Terminology*
- Costs for program administration activities, as defined in *Section I.D: Competition Terminology*, including costs for advisory councils (defined as groups of individuals who are not employees of a grantee but that provide strategic and policy advice to meet program objectives) and costs for fund raising (defined as costs for financial campaigns, endowment drives, solicitation of gifts and bequests, and similar expenses incurred to raise capital or obtain contributions)

All costs must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. EPA's Guidance on Selected Items of Cost for Recipients provides additional details on the allowability of costs for advisory councils and fund raising to meet program objectives for this competition.

*Note: Costs for capitalization funding and other activities for the purposes of acquiring or improving real property, including related equipment purchases, are allowable with the prior approval of the EPA Award Official. As provided in 2 CFR § 200.316, EPA will require that*

---

[15] If capitalization funding is provided in the form of a subgrant, some of the costs for financial assistance may be characterized as acquisitions of intangible property. For this financial assistance, pursuant to 2 CFR § 200.316, EPA will require that the subgrantee (i.e., the community lender) record liens or other appropriate notices of record to indicate that the intangible property has been acquired with Federal funding and that use and disposition conditions apply to the intangible property. As provided in 2 CFR § 200.1: "…loans, notes and other debt instruments, lease agreements, stock and other instruments of property ownership (whether the property is tangible or intangible)" are Intangible property for the purposes of the restrictions described at 2 CFR § 200.315(a).

grantees *"…record liens or other appropriate notices of record to indicate that personal or real property has been acquired or improved with a Federal award and that use and disposition conditions, described in 2 CFR § 200.311 and 2 CFR § 200.313, apply to the property."*

**Unallowable Costs:** The following are unallowable costs for this competition:

- Costs to support projects, activities, or technologies that fail to meet **any of the three criteria** for CCIA-eligible projects

  *Note: All projects, activities, or technologies supported by this competition must meet the requirements of all three criteria for CCIA-eligible projects—and those that fail any of those requirements are not eligible for support under this competition. For example, costs to support **projects, activities, or technologies that do not both reduce or avoid emissions of greenhouse gases as well as reduce or avoid emissions of other air pollutants are not "qualified projects"** and therefore are not CCIA-eligible projects.* Appendix B: CCIA-Eligible Project Checklist *provides an illustrative checklist of the requirements of the three criteria for CCIA-eligible projects.*

- Costs to support projects, activities, or technologies that constitute *Research and Development,* as defined in 2 CFR § 200.1
- Costs to support projects, activities, or technologies that will be deployed outside the boundaries of the ten EPA regions
- Costs for capitalization funding or technical assistance subawards from one coalition member to another coalition member (i.e., a lead applicant or non-lead coalition member cannot provide capitalization funding or technical assistance subawards to another coalition member)
- Costs for supporting or opposing union organizing, whether directly or as an offset for other funds
- Costs that are unallowable under 2 CFR Part 200, Subpart E and under applicable provisions of 2 CFR Part 1500

If an application is submitted that includes unallowable costs, that portion of the application will be ineligible for funding and may, depending on the extent to which it affects the application, render the entire application ineligible for funding.

## E. Cost Sharing or Matching

Cost sharing is not a requirement to be eligible to apply to this solicitation.

# Section IV. Application and Submission Information

## A. Due Date and Submission Instructions

An application package may be obtained by visiting this funding opportunity (EPA-R-HQ-CCIA-23) on Grants.gov. Applicants will be prompted to initiate the application process by generating a Workspace for this opportunity.

Your organization's Authorized Organization Representative (AOR) must submit your complete application package[16] electronically to EPA through Grants.gov. Application packages must be submitted on or before October 12, 2023 at 11:59 PM (Eastern Time) through Grants.gov. Applications received after the closing date and time will not be considered for funding. Applications submitted outside of Grants.gov will be deemed ineligible without further consideration unless the applicant can clearly demonstrate that it was due to EPA mishandling or technical problems associated with Grants.gov or SAM.gov. Please allow enough time to successfully submit your application package and allow for unexpected errors that may require you to resubmit. Occasionally, technical and other issues arise when using Grants.gov.

Refer to *Appendix A: Grants.gov Application Submission Instructions* for the requirements to apply through Grants.gov. In order to submit an application through Grants.gov, your organization must:

- Have an active System for Award Management (SAM) account in SAM.gov and a Unique Entity Identifier (UEI) assigned by SAM.gov;
- Be registered in Grants.gov; and
- Have the E-Business Point of Contact designate an AOR in Grants.gov.

**The registration process for all the above items may take a month or more to complete. Applicants should begin this process as soon as possible.**

In concert with EPA's commitment to conducting business in an open and transparent manner, copies of applications selected under this funding opportunity may be made publicly available on the GGRF website or another public website for a period of time after the selected applications are announced. EPA recommends that applications not include trade secrets or commercial or financial information that is confidential, privileged, or sensitive and that, if disclosed, would invade another individual's personal privacy (e.g., personal email addresses, etc.). However, if such information is included, it will be treated in accordance with 40 CFR § 2.203 (refer to *Section IV.a* of EPA Solicitation Clauses for additional information). However, if you do include such information, clearly indicate which portion(s) of the application you are claiming contains confidential, privileged, or sensitive information. As provided at 40 CFR § 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the applicant.

---

[16] For this competition, the "application package" includes the required federal forms available at Grants.gov as well as the Project Narrative, Project Narrative Attachments, and Other Attachments.

## B. Application Materials

The following forms and documents are included in the Workspace you generate on Grants.gov. Note that there are **two sets of attachments** included as part of these forms and documents. *Project Narrative Attachments* are required to meet the threshold eligibility criteria and/or to receive full points for the respective evaluation criteria. *Other Attachments* are optional (although encouraged) and may provide additional information that the application can reference in the 50-page Narrative Proposal and, as a result, may factor into the assessment against the evaluation criteria.

**Mandatory Documents:**

1. Application for Federal Assistance (SF-424)
2. Budget Information for Non-Construction Programs (SF-424A)
3. EPA Key Contacts Form 5700-54
4. EPA Form 4700-4 Preaward Compliance Review Report
5. Grants.gov Lobbying Form
6. Project Narrative: Use the "Project Narrative Attachment Form" in your Workspace on Grants.gov to submit your Project Narrative, prepared as described in *Section IV.C: Contents of Application Submission*. **Please submit one file (consisting of the Cover Page and Narrative Proposal) using a file name corresponding to the bullet below, replacing** *Applicant_Name* **with the name of your organization.**
   - Project Narrative - *Applicant_Name*
7. Project Narrative Attachments: Use the "Project Narrative Attachment Form" in your Workspace on Grants.gov to submit the attachments listed below, which are mandatory and do not count toward the page limits for the Project Narrative. **Please submit separate files using file names corresponding to the bullets below, replacing** *Applicant_Name* **with the name of your organization. Please submit the files in the order presented below.**
   - Supporting Documents for Applicant Eligibility - *Applicant_Name*
   - Supporting Documents for Coalition Member Subaward Eligibility - *Applicant_Name (Coalitions Only)*
   - Coalition Memorandum of Agreement - *Applicant_Name (Coalitions Only)*
   - 1.4.2 Budget Table - *Applicant_Name*
   - 2.1.1 Organizational and Governing Documents - *Applicant_Name*
   - 2.2.1 Resumes of Board Members - *Applicant_Name*
   - 2.2.2 Resumes of Senior Management - *Applicant_Name*
   - 2.3.1 Legal and Compliance Risk Management Policies and Procedures - *Applicant_Name*
   - 2.3.2 Financial Statements - *Applicant_Name*

**Optional Documents:**

8. Other Attachments: Use the "Other Attachments Form" in your Workspace on Grants.gov to submit the attachments listed below, which are optional (although encouraged) and do not count toward the page limits for the Project Narrative. **Please submit separate files using file names corresponding to the bullets below, replacing** *Applicant_Name* **with the name of your organization. Please submit the files in the order presented below.**
   - 1.1.3 Community Lender Letters of Interest - *Applicant_Name*

- 1.2.1 LIDAC Engagement and Accountability Letters of Support - *Applicant_Name*
- 1.2.5.2 Labor and Equitable Workforce Letters of Commitment - *Applicant_Name*
- 1.2.5.3 Consumer Protection Policies and Procedures - *Applicant_Name*
- 2.1.3 Equity Policies and Practices - *Applicant_Name*
- 2.2.1 Board Policies and Procedures - *Applicant_Name*
- 2.2.2 Management Policies and Procedures - *Applicant_Name*
9. Disclosure of Lobbying Activities (SF-LLL)[17]

## C. Content of Application Submission

The forms and documents required as part of the application submission are described in *Section IV.B: Application Materials*. Below are the instructions for the Project Narrative, which is composed of the Cover Page (a maximum of two pages) and the Narrative Proposal (a maximum of 50 pages). The Project Narrative must follow the requirements listed below.

- Must not exceed the above-mentioned page limits. **Applicants are encouraged to be concise and do not need to use all pages within the page limits.**
- Must only rely on the text in the above-mentioned page limits as well as the required attachments. **While optional attachments do not count toward the above-mentioned page limits, they may serve only as reference documents** for content described in the Project Narrative; optional attachments that provide new content, rather than serve as reference documents, will not be reviewed or considered. Links to external websites or content will not be reviewed or considered.
- Must be 8 1/2 x 11" typed, single-spaced pages in 12-point Times New Roman font with one column per page, without indenting paragraphs, and with one-inch page margins.

The Cover Page (maximum of two pages) must include:

1. **Program Title.** Provide a title for your proposed program.

2. **Applicant Name.** Identify the name of your organization.

3. **Applicant Eligibility.** Explain how your organization meets the definition of an eligible recipient, including being incorporated in the United States and not being controlled by a non-eligible recipient. Attach documents that provide supporting evidence for your explanation. As discussed in *Section III.A: Eligible Applicants*, supporting evidence may include organizational documents, such as articles of incorporation or similar documents filed with a governmental authority; tax filings; financial statements; investment records; certifications of independence; and/or other information.

4. **Program Summary.** Describe the proposed program in no more than ten sentences. Include the network(s) of community lenders that you propose supporting and why the network(s) has shared characteristics relevant to deploying financial assistance to CCIA-eligible projects.

5. **EPA Funding Requested.** Specify the amount you are requesting from the EPA.

---

[17] Applicants may be required to complete this form if instructed to do so through the Grants.gov Lobbying Form. See the Grants.gov Lobbying Form to determine applicability.

6.    **Period of Performance.** Provide estimated beginning and ending dates for your period of performance. Note that, if selected, community lenders you support with capitalization funding will be required to retain and reuse program income and other similar income for additional capital deployment, as described in *Section VI.C: Program Income and Other Income Requirements*.

7.    **Contact Information.** Include the name, title, email address, and phone number for a primary and/or an administrative contact.

8.    **Coalition Members.** Include the names and proposed subaward amounts of all non-lead coalition members that are part of this application, if applying as a coalition. For each organization, explain how that organization is eligible for a subaward under the EPA Subaward Policy and include the contact information listed above for each organization. Attach documents that provide supporting evidence for your explanation(s) as well as a signed Memorandum of Agreement for your coalition.

9.    **Named Contractors.** Include all named contractors that are part of this application. For each named contractor, describe the procurement procedures that were followed to hire the contractor(s) and include information on where and when the Request for Proposals/Request for Qualifications was posted. If there are no named contractors as part of this application, please write "not applicable."

The Narrative Proposal (a maximum of 50 pages) must include the components listed in this section, which should address the evaluation criteria in *Section V.A: Evaluation Criteria*. A table is included in *Section V.A: Evaluation Criteria* to show how the components relate to one another and to the evaluation criteria.

1.    **Program Plan:** Describe how you will use grant funds to advance the GGRF program objectives over the period of performance—and how that use of grant funds will build enduring capacity among community lenders that will last beyond the period of performance. The program plan consists of the program vision (1.1); investment strategy (1.2); program reporting (1.3); and program budget (1.4).

   *Note: The program plan must support community lenders in deploying CCIA-eligible projects (rather than other projects), which requires projects to meet the requirements of all three criteria for CCIA-eligible projects: (1) must be a qualified project (including but not limited to reducing/avoiding emissions of greenhouse gases **and** other air pollutants), (2) must be within a priority project category, and (3) must be in a low-income and disadvantaged community.* Appendix B: CCIA-Eligible Project Checklist *provides an illustrative checklist of the requirements for CCIA-eligible projects.*

1.1    **Program Vision:** Describe your vision to build a program that uses grant funds to achieve the GGRF program objectives during and after the period of performance, providing funding and technical assistance to community lenders serving low-income and disadvantaged communities in support of the climate goals in the U.S. Nationally Determined Contribution and Executive Order 14037 while also achieving the priorities embedded in Executive Order 14005, Executive Order 14008, Executive Order 14082, Executive Order 14096, the Interagency Working Group on Coal and Power Plant Communities, and the Justice40 Initiative.

**1.1.1** **Community Lender Network Strategy:** Describe the industry network(s) of community lenders that you have chosen to serve, including the business activities and current state of clean financing in the network(s); why the network(s) is well-suited to providing financial assistance to deploy CCIA-eligible projects in support of the aforementioned climate goals and priorities; the barriers to harnessing the full potential of the network(s); the role of your program, in coordination with and accounting for the other programs funded by the GGRF across all three competitions, in addressing those barriers; and the desired future state of clean financing in the network(s). In your vision, describe how your program will make a unique contribution toward this future state, including how your program will complement (rather than duplicate) and expand upon the successful efforts of federal, state, and local governments (including existing financing programs and financial incentives); Tribal governments; non-profit organizations; private capital providers; and others.

**1.1.2** **Geographic Coverage and Diversity:** Describe the geographic coverage and diversity that will be achieved by your community lender network strategy, including both existing community lenders you hope to strengthen as well as new community lenders that you hope to support establishing. In particular, describe your program's capacity to support community lenders that already exist (or that may be established over the period of performance) in each of the ten EPA regions, [18] as well as the diversity of coverage within those ten EPA regions (e.g., community lenders serving diverse low-income and disadvantaged communities, including those that are also rural communities, Tribal communities, communities with environmental justice concerns, energy communities, and persistent poverty counties).

**1.1.3** **Demonstrated Interest:** Describe the level of interest that already exists for your program vision within the network(s) of community lenders. You may attach any letters of interest from community lenders that would plan to seek support from your program, if provided a grant award.

**1.2** **Investment Strategy:** Describe your approach, in detail, to operationalizing the program vision over the entire period of performance, with additional granularity over the first three years. The investment strategy should result in enduring change in the community financing ecosystem that extends beyond the period of performance.

**1.2.1** **Low-Income and Disadvantaged Communities (LIDAC) Engagement and Accountability Strategy:** Describe your strategy for engaging low-income and disadvantaged communities in implementing the program and maintaining accountability to the priorities identified by those communities. Include low-income and disadvantaged communities that are also rural communities, Tribal communities (and their representatives from Tribal governments), communities with environmental justice concerns, energy

---

[18] The ten regions are: EPA Region 1 (CT, ME, MA, NH, RI, VT, and 10 Indian Tribes); EPA Region 2 (NJ, NY, PR, VI, and 8 Indian Nations); EPA Region 3 (DE, DC, MD, PA, VA, WV, and 7 Indian Tribes); EPA Region 4 (AL, FL, GA, KY, MS, NC, SC, TN, and 6 Indian Tribes); EPA Region 5 (IL, IN, MI, MN, OH, WI, and 35 Indian Tribes); EPA Region 6 (AR, LA, NM, OK, TX, and 66 Indian Tribes); EPA Region 7 (IA, KS, NE, MO, and 9 Indian Tribes); EPA Region 8 (CO, MT, ND, SD, UT, WY, and 28 Indian Tribes); EPA Region 9 (AZ, CA, HI, NV, American Samoa, Commonwealth of the Northern Mariana Islands, Federated States of Micronesia, Guam, Marshall Islands, Republic of Palau, and 148 Indian Tribes); and EPA Region 10 (AK, ID, OR, WA, and 271 Indian Tribes).

communities, and persistent poverty counties. You may attach any signed letters of support from applicable community representatives and organizations.

**1.2.1.1 LIDAC Engagement Plan:** Describe your plan to engage those and other low-income and disadvantaged communities in a manner that is comprehensive, frequent, accessible (e.g., to persons with limited English proficiency and persons with disabilities), and tailored to their priorities. Also describe any engagement activities that you have completed for the purposes of developing your application, as well as how those engagement activities have shaped your application.

**1.2.1.2 LIDAC Accountability Plan:** Describe your plan to maintain accountability to those and other low-income and disadvantaged communities in the program. Discuss transparency mechanisms as well as participatory governance structures and other tools/commitments, such as independent advisory committees and community benefits agreements, that you will implement in the program.

**1.2.2    Investment Objectives:** Identify the goals and targets of your investment strategy. Goals and targets should align with the GGRF program objectives and the corresponding environmental outputs and outcomes (as described in *Section I.G: Measuring Environmental Results*) and with EPA's strategic plan (as described in *Section I.F: Environmental Results and Strategic Plan Information*). If your goals and targets are evaluated and influence the selection decision, then you are expected to achieve them during the period of performance.

**1.2.2.1 Climate and Air Pollution Benefits:** Identify your program's goals and targets for delivering climate and air pollution benefits, including but not limited to accelerating progress toward the climate goals of the United States to reduce greenhouse gas emissions 50-52 percent below 2005 levels in 2030, reach 50 percent zero-emission vehicles share of all new passenger cars and light trucks sold in 2030, achieve a carbon pollution-free electricity sector by 2035, and achieve net-zero emissions by no later than 2050.

**1.2.2.2 Equity and Community Benefits:** Identify your program's goals and targets for delivering equity and community benefits to low-income and disadvantaged communities, including which types of benefits you will deliver and who will receive those benefits. Discuss in particular your goals and targets for benefits that will accrue to low-income and disadvantaged communities that are also rural communities, Tribal communities, communities with environmental justice concerns, energy communities, and persistent poverty counties.

**1.2.2.3 Market Transformation Benefits:** Identify your program's goals and targets for delivering market transformation benefits. In particular, describe your program's goals and targets for mobilizing private capital as well as creating enduring changes in the community lending ecosystem that leads to additional deployment of financial assistance to CCIA-eligible projects beyond the period of performance.

**1.2.3    Pass-Through Strategy:** Describe how you will pass through a minimum of 80% of funds through capitalization funding as well as a minimum of 90% of funds through both capitalization funding and technical assistance subawards to achieve the investment objectives.

**1.2.3.1 Capitalization Funding and TA Subaward Design:** Describe your proposed design for the parameters of capitalization funding and technical assistance subawards to achieve the investment objectives, with the design meeting the requirements defined in *Section I.D: Competition Terminology*. Provide details on parameters for capitalization funding (i.e., range of capitalization funding amounts, private leverage requirements for subgrants, subsidy levels for subsidies, eligibility for capital reserves and other uses of funds, time horizon to use funds) and for technical assistance subawards (i.e., range of subaward amounts, match requirements for subawards, eligible uses of funds, time horizon to use funds). **If you plan to exceed the $10 million cap on capitalization funding and/or the $1 million cap on technical assistance subawards, provide your framework for limited exceptions on these caps and explain why that framework is necessary to achieve the investment objectives.**

**1.2.3.2 Distribution Process Design:** Describe your proposed design of the process to distribute capitalization funding and technical assistance subawards to achieve the investment objectives. Include the overall structure with supporting details (e.g., a series of competitions with the number, timeline, and amount of funding for those competitions or another distribution process) and how technical assistance subawards will be complementary to capitalization funding.

**1.2.3.3 Eligibility Review Process:** Describe your proposed process to review eligibility of organizations for capitalization funding and technical assistance subawards, ensuring that they meet the requirements of being community lenders (as defined in *Section I.D: Competition Terminology*) in addition to meeting any other requirements set by the applicant (e.g., must be within the network(s) served by the applicant's program).

**1.2.3.4 Evaluation Process:** Describe your proposed process to evaluate community lenders for capitalization funding and technical assistance subawards to achieve the investment objectives. Include how you will assess a community lender's plan to use capitalization funding and technical assistance subawards to achieve the investment objectives (through its vision for a clean financing program, investment strategy, reporting plan, budget, etc.) as well as its capacity to carry out that plan (through its background and track record, governance and management, equity policies and practices, risk management and compliance plan, financials, etc.), in addition to any other details that you deem relevant to ensure that the evaluation process supports the investment objectives. Also include details on any evaluative bodies and/or other processes that will facilitate the evaluation process in support of the investment objectives.

**1.2.3.5 Amount Determination Approach:** Describe your approach to determining the amount of capitalization funding and technical assistance subaward to provide to a given community lender to achieve the investment objectives, including any criteria or rubrics used as well as allocation formulas. Where relevant, include both underlying characteristics of the community lender (e.g., deployment history, deployment potential) as well as the results of the evaluation process described above. Specify how the award determination approach is designed to achieve the market transformation goals and targets, such as catalyzing additional private capital and building enduring clean financing capacity among the network(s) of community lenders. Also include details on any decision-making bodies and/or other processes that will support the award determination process in support of the investment objectives.

**1.2.3.6 Management and Oversight Plan:** Describe how you will manage and oversee capitalization funding and technical assistance subawards after you make selections to achieve the investment objectives. In particular, describe how you will provide capitalization funding to community lenders (e.g., in tranches based on hitting milestones), how you will ensure community lenders use capitalization funding only for eligible purposes, and what remedies you will include for non-compliance. Also include any processes to reallocate funds that are not spent in a timely and efficient manner.

**1.2.4 Technical Assistance Services Strategy:** Describe your strategy to support the establishment of new and strengthen the capacity of existing community lenders through technical assistance services to achieve the investment objectives. If you intend to obtain external contractors (including consultants) for the provision of such services, you must comply with the competitive procurement requirements in 2 CFR Parts 200 and 1500 as well as EPA's 40 CFR Part 33 Disadvantaged Business Enterprise participation rule; additional guidance is available in the Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements.

**1.2.4.1 Targeted Community Lender Support Plan:** Describe your plan to provide community lenders with technical assistance services in the form of targeted support activities to achieve the investment objectives, such as providing training, market analysis, technical support, and structuring expertise (e.g., how to incentivize projects based on their climate and air pollution benefits and/or equity and community benefits using measures such as the Social Cost of Greenhouse Gases). As part of the plan, describe how such support helps community lenders effectively deploy their capitalization funding and technical assistance subawards as well as helps the broader network(s) of community lenders build their own clean financing capacity.

**1.2.4.2 Financial Market-Building Plan:** Describe your plan to build a more supportive financial market for community lenders to provide financial assistance to CCIA-eligible projects in order to achieve the investment objectives, such as through developing standardized project performance criteria, underwriting guidance, documentation, and product features for community lenders to adopt.

**1.2.5 Implementation Plan:** Provide details on your plan to implement the pass-through strategy and technical assistance services strategy.

**1.2.5.1 Community Lender Outreach and Accessibility Plan:** Describe your plan to conduct outreach to ensure that community lenders in your specific network(s)—especially those serving low-income and disadvantaged communities that are also rural communities, Tribal communities, communities with environmental justice concerns, energy communities, and persistent poverty counties—are aware of your program and how to take advantage of its resources. Also describe your plan to ensure your program is accessible to community lenders, including making sure that it is accessible to those led by persons with limited English proficiency and for persons with disabilities; integrating human-centered design; and providing support for community lenders seeking capitalization funding and technical assistance subawards while remaining consistent with principles of fair competition, as applicable.

**1.2.5.2 Labor and Equitable Workforce Development Plan:** Describe your plan to ensure that projects generated by the pass-through strategy and technical assistance services strategy

create high-quality jobs with a diverse, skilled workforce, in alignment with the U.S. Department of Labor and U.S. Department of Commerce's eight *Good Jobs Principles* and Executive Order 14082, including but not limited to ensuring all workers are paid a stable and predictable living wage, paying prevailing wages or above (where applicable), offering family-sustaining benefits, respecting workers' right to freely and fairly join a union and collectively bargain, and creating safe and healthy working conditions; ensuring projects benefit local workers and communities (including through tools such as community benefits agreements, community workforce agreements, project labor agreements, and provision of supportive services like childcare and transportation assistance for individuals with barriers to employment); promoting stable employment and evaluating and monitoring subcontractors, including temporary staffing agencies; recruiting diverse workers (especially from low-income and disadvantaged communities); incorporating high-quality and equitable workforce training (such as leveraging registered apprenticeship programs, as described in 29 CFR Parts 29 and 30, and pre-apprenticeship programs connected to registered apprenticeship programs as well as employing displaced energy workers); and developing formal partnerships with labor organizations, including unions and other workers' rights groups. Also describe your plan to comply with the requirements of the Build America, Buy America Act and Davis-Bacon and Related Acts. Refer to *Section VI.D: Administrative and National Policy Requirements* for additional details. You my attach any signed letters of commitment from applicable labor organizations that you plan to partner with.

*Note: EPA encourages project labor agreements (i.e., pre-hire collective bargaining agreements between unions and contractors that govern terms and conditions of employment for all workers on a construction project); the use of an appropriately trained workforce (i.e., through registered apprenticeships and other joint labor-management training programs that serve all workers, particularly those from underserved communities); the use of an appropriately credentialed workforce (i.e., requirements for appropriate and relevant professional training, certification, and licensure); the use of supportive services for those who need them, such as childcare and transportation, to recruit and retain workers on federally funded projects, as expressed in Executive Order 14095 (Increasing Access to High-Quality Care and Supporting Caregivers); and neutrality with respect to union organizing and operations (i.e., grant funds cannot support or oppose union organizing). Note that Executive Order 14063 (Use of Project Labor Agreements for Federal Construction Projects) mandates the use of project labor agreements on large-scale construction projects where the cost to the federal government is $35 million or more.*

**1.2.5.3 Consumer Protection Plan:** Describe your plan for ensuring consumer protection across any entity that interacts, transacts, or contracts with a consumer as part of your proposed program, such as through the sales and marketing of consumer products/services and financial products (including Property Assessed Clean Energy financing). Your plan should explain in detail how you will comply with applicable consumer protection laws, including the consumer protection laws in the jurisdictions your program (and community lenders it supports) will serve as well as federal consumer protection and consumer financial laws, such as those prohibiting unfair, deceptive, and abusive practices (e.g., the Federal Trade Commission Act (15 USC § 45), Consumer Financial Protection Act (12 USC § 5536), and Fair Debt Collection Practices Act (15 USC § 1692e)); the Truth in Lending Act (15 USC § 1601 *et seq.*) and Regulation Z (12 CFR §1026), which require the

disclosure of terms and cost of consumer credit and offer substantive protections to people who use consumer credit; and the Equal Credit Opportunity Act (15 USC § 1691 *et seq.*) and Regulation B (12 CFR § 1002), which prohibit creditors from discriminating against consumers who apply for or receive credit. Your plan should cover evaluation and selection of community lenders, requirements on capitalization funding provided to community lenders, and other aspects of your program as implemented through policies and procedures; training materials; processes for reviewing, tracking, and addressing consumer complaints regarding business practices and, if applicable, consumer complaints regarding the practices of any service provider used in the provision of a consumer financial product; periodic audits of consumer lending practices (including those of service providers); and more. You may attach evidence of established policies and procedures that reflect this plan.

**1.2.5.4 Housing Affordability Plan:** Describe your plan to ensure that the pass-through strategy and technical assistance services strategy integrate housing affordability protection into the program, including but not limited to maintaining affordability of existing housing stock, minimizing displacement, and preventing rapid cost increases.

**1.2.5.5 Coordination Plan:** Describe your plan to leverage existing resources from federal, Tribal, state, territorial, and local governments as well as non-governmental organizations, including financial assistance resources (such as tax credits and subsidies) and technical assistance resources (such as programs run by the EPA Regional Offices in the regions in which you intend to do business) to maximize effectiveness at achieving your investment objectives. Also describe your plan to coordinate with other GGRF grantees across the National Clean Investment Fund, Clean Communities Investment Accelerator, and Solar for All programs to maximize collective effectiveness at achieving the GGRF program objectives.

**1.3    Program Reporting:** Describe your plan for program reporting in alignment with the grant's reporting requirements, as described in *Section VI.E: Reporting Requirements*.

**1.3.1    Reporting Plan:** Describe the environmental outputs and outcomes you plan to track and report as well as the methodologies, inputs, and assumptions you plan to use for tracking and reporting those outputs and outcomes. Where relevant, include your plan to collect necessary data from community lenders. You may reference *Section I.G: Measuring Environmental Results* for example outputs and outcomes. You may reference the Tools and Technical Resources provided by the EPA in connection with the Climate Pollution Reduction Grants for example tools and technical resources.

*Note: After selection, EPA may update the terms and conditions to further define outputs and outcomes as well as provide guidance on methodologies, inputs, and assumptions for tracking and reporting outputs and outcomes, including but not limited to reduction and avoidance of greenhouse gas emissions and other air pollutants. For example, for climate and air pollution benefits-related outcomes on distributed generation and storage projects, such disclosure may include project-level data (e.g., MW capacity installed), key assumptions to translate project-level data into outcomes (e.g., capacity factors, emissions intensity of displaced power generation, global warming potential of greenhouse gases, asset useful life, etc.), and relevant sources (e.g., EPA, National Renewable Energy Laboratory, peer-reviewed studies) for estimates compared to a no-action baseline and to other reasonable alternatives. Grantees will be expected to disclose, on an ongoing basis,*

*the methodologies, inputs, and assumptions used to track and report outputs and outcomes as a component of quarterly performance reports. EPA may require outputs and outcomes reporting to be subject to third-party validation, verification, and/or assurance under the terms and conditions of the award.*

1.3.2    **Reporting Capacity:** Describe your plan to ensure the organizational capacity to execute against the grant's reporting requirements, including program performance as well as financial and administrative reporting requirements. Include the resources you plan to leverage (including personnel as well as data and technology); the policies and procedures you plan to establish to ensure reliable reporting; and third-party validation, verification, and assurance plans. If you intend to obtain external contractors (including consultants) for the provision of such services, you must comply with the competitive procurement requirements in 2 CFR Parts 200 and 1500 as well as EPA's 40 CFR Part 33 Disadvantaged Business Enterprise participation rule; additional guidance is available in the Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements.

*Note: Each applicant should integrate its capacity to conduct program evaluation activities into its description of reporting capacity, including but not limited to conducting evaluation to assess effectiveness and efficiency in achieving outputs and outcomes. Evaluations should be conducted in adherence with EPA Order 1000.33, U.S. EPA Policy for Evaluations and Other Evidence-Building Activities, including timely publication of findings. EPA Order 1000.33 provides a framework to comply with the Foundations for Evidence-Based Policymaking Act of 2018.*

1.3.3    **Past Performance and Reporting History:** Submit a list of federally and non-federally funded assistance agreements (assistance agreements include grants and cooperative agreements but not contracts) that your organization performed within the last five years. Describe your past performance in successfully completing and managing those assistance agreements. Also describe your history of meeting the reporting requirements under those assistance agreements, including your submitted acceptable final technical reports under those agreements and the extent to which you adequately and timely reported on your progress towards achieving the expected outputs and outcomes under those agreements and, if such progress was not being made, whether you adequately reported why not.

1.4    **Program Budget:** Provide details on the budget found in SF-424A, which includes the full EPA funding request to be expended over the period of performance. **Given that the period of performance is anticipated to begin by July 2024, the budget should reflect activities from July 2024 through the end of the period of performance, with annual figures provided for July through June of each year.**

1.4.1    **Expenditure and Disbursement of Awarded Funds:** Describe your approach, procedures, and controls for ensuring that the grant award will be expended and disbursed in a timely and efficient manner.

1.4.2    **Budget Description and Table:** Provide a description of the budget, and attach the detailed budget table. In the description, explain how the budget is reasonable to accomplish the program plan, including maximizing the share of funds passed through to community lenders in the form of capitalization funding and technical assistance subawards (both direct costs of funds passed through to community lenders as well as

associated indirect costs). In the description, also explain how the budget expends 100% of funds for the purposes of providing financial and technical assistance in low-income and disadvantaged communities, as described in *Section I.D: Competition Terminology*. In the budget table, break up funding type into the proper budget categories, and break out costs for capitalization funding and technical assistance subawards separately from other costs. Please see *Appendix D: Program Budget* for additional guidance on the budget table.

*Note: A template for the budget table is available for download under the related documents within this grant opportunity (EPA-R-HQ-CCIA-23) on Grants.gov. Applicants that do not use the template will not be penalized.*

2. **Description of Programmatic Capabilities:** Describe your programmatic capabilities necessary to carry out the program plan over the entire period of performance, with additional granularity over the first three years. **If applying as a coalition, describe the lead applicant's programmatic capabilities to carry out the program plan, which should include but not be limited to managing and overseeing subawards to coalition members.** The description of programmatic capabilities consists of organizational background, track record, and policies (2.1); governance and management (2.2); and risk management and financials (2.3).

2.1 **Organizational Background, Track Record, and Policies:** Provide information on your organization, including background information, track record, and policies for the purposes of demonstrating the programmatic capabilities necessary to carry out the program plan.

2.1.1 **Organizational and Governing Documents:** Describe your organizational and governing documents (include articles of incorporation, formation, or partnership; by-laws; and operating agreements) and the extent to which they align with the GGRF program objectives. Attach the relevant organizational and governing documents.

2.1.2 **Organizational Experience:** Describe your organizational experience to execute the activities discussed in the program plan. Include descriptions of any past instances designing and implementing programs to distribute funds as well as to provide technical assistance to community lenders, especially for clean technology projects in low-income and disadvantaged communities and to the network(s) of community lenders your program would serve.

2.1.3 **Equity Policies and Practices:** Describe your organization's policies and practices to advance equity, defined for the purposes of this grant program as "the consistent and systematic treatment of all individuals in a fair, just, and impartial manner, including individuals who belong to communities that often have been denied such treatment." Such communities may include persons from historically underserved communities of color; members of religious minorities; women and girls; LGBTQI+ persons; persons with disabilities; persons who live in rural areas; persons who live in United States Territories; persons otherwise adversely affected by persistent poverty or inequality; and individuals who belong to multiple such communities. Include policies and practices that integrate equity into your operational activities (e.g., a procurement policy providing outreach and access to disadvantaged business enterprises),[19] investment activities (e.g., policies and

---

[19] Note that grantees will have to comply with the Participation by Disadvantaged Business Enterprises in EPA Programs requirements in 40 CFR Part 33.

practices that commit to environmental and social risk management), and governance (e.g., policies and practices that incorporate community accountability). You may attach evidence of established equity policies and practices.

**2.2    Governance and Management:** Describe how your organization's governance structure and management team provide the capabilities necessary to carry out the program plan.

**2.2.1    Governance Structure:** Describe your organization's structure for ensuring strong board oversight and monitoring of management as well as stewardship of the organization's long-term success. Include information on board size and composition, board committee structures, board member independence, and other relevant board policies and procedures. Attach the resumes of board members. You may also attach evidence of established board policies and procedures (including by-laws) that reflect this structure.

**2.2.2    Senior Management and Staff Capabilities:** Describe your organization's senior management and staff capabilities to execute the program plan. Include a list of key management and staff (including roles, responsibilities, diversity, expertise, skills, and track record) as well as relevant management policies and procedures. Attach the resumes of senior management. You may also attach evidence of established management policies and procedures that are discussed in this component.

**2.3    Risk Management and Financials:** Describe your organization's risk management program (including but not limited to preventing fraud, waste, and abuse) and provide your historical financial statements.

**2.3.1    Legal and Compliance Risk Management Program:** Describe your organization's program to comply with the grant's terms and conditions and to manage broader legal and compliance risk. The legal and compliance risk management program may include: risk assessments and remediation steps based on those risk assessments; policies and procedures; systematic documentation; regular training and communications, including top-down management communications; an authorization and certification system; clear separation of duties, even among management; asset safeguarding; confidential reporting mechanisms, including whistleblower protection policies and procedures; an internal investigation framework; third-party management, including collection and retention of third-party identification, basic or enhanced due diligence, internal payment tracking, routine audits, and contract termination clauses for failure to execute; resource allocation and management commitment to legal and compliance risk management; legal and compliance risk management compensation incentives and disincentives; consequences for employees and third parties, up to and including termination, for violating the compliance program; audit and reconciliation mechanisms conducted by internal and external auditors; and subrecipient monitoring and management. Attach evidence of established policies and procedures that reflect this program.

**2.3.2    Financial Statements:** Attach audited financial statements (i.e., statement of financial position, statement of activities, statement of functional expenses, and statement of cash flows) for your organization's past three completed fiscal years and quarterly (unaudited) financial statements for the periods that ended during your organization's current fiscal year. If you do not have audited financial statements, attach copies of unaudited financial statements with third-party review and/or attestation. If no financial statements are available, explain the reasoning for the unavailability and provide a statement indicating

that you have no material liability or obligation, absolute or contingent (individually or in aggregate), no obligations under contracts made outside of the ordinary course of business, and no obligation that would be required to be reflected in financial statements under Generally Accepted Accounting Principles.

## D. Pre-Application Assistance

Applicants are invited to participate in a webinar with EPA for additional information about this funding opportunity. Interested parties may access information on the webinar (including date, time, and registration information) as well as other information (such as frequently asked questions) at the following website: www.epa.gov/GGRF. A recording of each webinar will be posted at that link along with presented materials. If necessary, EPA may schedule additional webinars.

In accordance with EPA Order 5700.5A1, EPA's Assistance Agreement Competition Policy, EPA staff will not meet with individual applicants to discuss draft applications, provide informal comments on draft applications, or provide advice to applicants on how to respond to evaluation criteria.

Applicants are responsible for the contents of their applications. However, consistent with the provisions in the announcement, EPA will respond to written questions from individual applicants regarding threshold eligibility criteria, administrative issues related to the submission of the application, and requests for clarification about this funding opportunity.

# Section V. Application Review Information

Note: Additional provisions that apply to this section can be found at EPA Solicitation Clauses.

## A. Evaluation Criteria

Each application that passes the threshold eligibility review described in *Section III.C: Threshold Eligibility Criteria* will be reviewed according to the evaluation criteria set forth in this section. Each application will be rated under a points system, with a total of 1,000 points possible—950 points possible for the specific application components of the Narrative Proposal, plus an additional 50 points possible for cross-component review of the Narrative Proposal's comprehensiveness and cohesiveness.

The evaluation criteria depicted in the table below directly correspond to specific application components in the Narrative Proposal described in *Section IV.C: Content of Application Submission*—and will be reviewed according to the evaluation criteria set forth in this section. **Applicants are encouraged to reference the index number and title of these components, especially those with specific point allocations, to ensure appropriate evaluation.**

| Evaluation Criteria for Application Components | | | | Points Possible |
|---|---|---|---|---|
| 1. Program Plan | 1.1 Program Vision | 1.1.1 Community Lender Network Strategy | | **55** |
| | | 1.1.2 Geographic Coverage and Diversity | | **15** |
| | | 1.1.3 Demonstrated Interest | | **20** |
| | 1.2 Investment Strategy | 1.2.1 LIDAC Engagement and Accountability Strategy | 1.2.1.1 LIDAC Engagement Plan | **30** |
| | | | 1.2.1.2 LIDAC Accountability Plan | **30** |
| | | 1.2.2 Investment Objectives | 1.2.2.1 Climate and Air Pollution Benefits | **25** |
| | | | 1.2.2.2 Equity and Community Benefits | **25** |
| | | | 1.2.2.3 Market Transformation Benefits | **25** |
| | | 1.2.3 Pass-Through Strategy | 1.2.3.1 Capitalization Funding and TA Subaward Design | **25** |
| | | | 1.2.3.2 Distribution Process Design | **20** |
| | | | 1.2.3.3 Eligibility Review Process | **10** |
| | | | 1.2.3.4 Evaluation Process | **65** |
| | | | 1.2.3.5 Amount Determination Approach | **15** |
| | | | 1.2.3.6 Management and Oversight Plan | **25** |
| | | 1.2.4 Technical Assistance Services Strategy | 1.2.4.1 Targeted Community Lender Support Plan | **30** |
| | | | 1.2.4.2 Financial Market-Building Plan | **20** |
| | | 1.2.5 Implementation Plan | 1.2.5.1 Community Lender Outreach and Accessibility Plan | **20** |

| | | | |
|---|---|---|---|
| | | 1.2.5.2 Labor and Equitable Workforce Development Plan | 20 |
| | | 1.2.5.3 Consumer Protection Plan | 20 |
| | | 1.2.5.4 Housing Affordability Protection Plan | 15 |
| | | 1.2.5.5 Coordination Plan | 20 |
| | 1.3 Program Reporting | 1.3.1 Reporting Plan | 20 |
| | | 1.3.2 Reporting Capacity | 10 |
| | | 1.3.3 Past Performance and Reporting History | 10 |
| | 1.4 Program Budget | 1.4.1 Expenditure and Disbursement of Awarded Funds | 10 |
| | | 1.4.2 Budget Description and Table | 40 |
| 2. Description of Programmatic Capabilities | 2.1 Organizational Background, Track Record, and Policies | 2.1.1 Organizational and Governing Documents | 10 |
| | | 2.1.2 Organizational Experience | 50 |
| | | 2.1.3 Equity Policies and Practices | 30 |
| | 2.2 Governance and Management | 2.2.1 Governance Structure | 75 |
| | | 2.2.2 Senior Management and Staff Capabilities | 75 |
| | 2.3 Risk Management and Financials | 2.3.1 Legal and Compliance Risk Management Program | 60 |
| | | 2.3.2 Financial Statements | 30 |
| | | | 950 |

The additional cross-component evaluation criteria depicted in the table below do not directly correspond to specific application components in the Narrative Proposal described in *Section IV.C: Content of Application Submission*—but will be reviewed according to the evaluation criteria set forth in this section. **Applicants do not need to reference the index number and title of these criteria in their applications.**

| Cross-Component Evaluation Criteria | | Points Possible |
|---|---|---|
| 3. Comprehensiveness and Cohesiveness | 3.1 Comprehensiveness | 25 |
| | 3.2 Cohesiveness | 25 |
| | | 50 |

1.    **Program Plan**

1.1    **Program Vision**

1.1.1    **Community Lender Network Strategy (55 points total):** Each application will be evaluated on the extent and quality to which the community lender network strategy supports the GGRF program objectives during and after the period of performance. Specifically, EPA will evaluate the extent and quality to which the application:

- Describes the industry network(s) of community lenders it has chosen to serve, including their business activities (e.g., customer segments, business lines) as well as their current state of clean financing (e.g., current share with clean financing programs, current percentage of capital allocated to clean financing). **(10 points)**

- Describes why the network(s) of community lenders it has chosen are well-suited to providing financial assistance to deploy CCIA-eligible projects, in support of the climate goals in the U.S. Nationally Determined Contribution and Executive Order 14037 while also achieving the priorities set forth in Executive Order 14005, Executive Order 14008, Executive Order 14082, Executive Order 14096, the Interagency

[Working Group on Coal and Power Plant Communities](#), and the [Justice40 Initiative](#). **(20 points)**

- Explains the barriers to harnessing the full potential of the network(s) of community lenders in providing such financial assistance as well as describes the solutions required to address those barriers, including identifying gaps in the current ecosystem of solutions being developed and/or implemented by governmental and non-governmental entities and explaining how the applicant's program makes a unique contribution to filling these gaps. **(15 points)**
- Describes the desired future state of clean financing in the network(s) of community lenders after implementation of the program—and the implications for the low-income and disadvantaged communities served by the network(s). **(10 points)**

**1.1.2 Geographic Coverage and Diversity (15 points total):** Each application will be evaluated on the extent and quality to which the geographic coverage and diversity that will be achieved by the applicant's community lender network strategy support the GGRF program objectives. Specifically, EPA will evaluate the extent and quality to which the application:

- Demonstrates the capacity to support community lenders that serve a broad geographic area and diverse low-income and disadvantaged communities in those geographic areas, including low-income and disadvantaged communities that are also rural communities, Tribal communities, communities with environmental justice concerns, energy communities, and persistent poverty counties. **(15 points)**

*Note: Applications must demonstrate the capacity to serve community lenders in each of the ten EPA regions for threshold eligibility, as described in* [Section III.C: Threshold Eligibility Criteria](#). *However, applications that demonstrate capacity for deeper coverage within those regions will score higher on this criterion.*

**1.1.3 Demonstrated Interest (20 points total):** Each application will be evaluated on the level of demonstrated interest that already exists for the applicant's program vision. Specifically, EPA will evaluate the extent and quality to which the application:

- Describes demonstrated interest from the network(s) of community lenders that is sizable, aligns with the program vision, and is likely to materialize (including as evidenced through signed letters of interest from community lenders). **(20 points)**

**1.2 Investment Strategy**

**1.2.1 Low-Income and Disadvantaged Communities (LIDAC) Engagement and Accountability Strategy**

**1.2.1.1 LIDAC Engagement Plan (30 points total):** Each application will be evaluated on the extent and quality of the applicant's plan to engage with low-income and disadvantaged communities, including as evidenced through signed letters of support from applicable community representatives and organizations. Specifically, EPA will evaluate the extent and quality to which the application:

- Describes mechanisms for engagement that are comprehensive, frequent, accessible, and tailored to community priorities. **(15 points)**
- Describes how the applicant will use those mechanisms (and has already used those mechanisms to prepare the application) for engagement across diverse low-income and disadvantaged communities, including low-income and disadvantaged communities

that are also rural communities, Tribal communities, communities with environmental justice concerns, energy communities, and persistent poverty counties. **(15 points)**

**1.2.1.2 LIDAC Accountability Plan (30 points total):** Each application will be evaluated on the extent and quality of the applicant's plan to maintain accountability to low-income and disadvantaged communities, including as evidenced through signed letters of support from applicable community representatives and organizations. Specifically, EPA will evaluate the extent and quality to which the application:

- Describes transparency mechanisms that will promote meaningful accountability to low-income and disadvantaged communities. **(10 points)**
- Describes participatory governance structures and other tools/commitments, such as independent advisory committees and community benefits agreements, that will ensure meaningful community input into organizational decisions (e.g., through providing decision-making authority) and community monitoring of the program's activities (e.g., through issuing regular public reports evaluating progress in achieving objectives, especially delivering equity and community benefits to low-income and disadvantaged communities). **(20 points)**

**1.2.2    Investment Objectives**

*Note: The magnitude of the goals and targets within the investment objectives will be evaluated on a per-dollar basis to for comparability across applications with different EPA funding requests.*

**1.2.2.1 Climate and Air Pollution Benefits (25 points total):** Each application will be evaluated on the extent and quality of the goals and targets related to Program Objective 1, including accelerating progress toward the climate goals of the United States to reduce greenhouse gas emissions 50-52 percent below 2005 levels in 2030, reach 50 percent zero-emission vehicles share of all new passenger cars and light trucks sold in 2030, achieve a carbon pollution-free electricity sector by 2035, and achieve net-zero emissions by no later than 2050. Specifically, EPA will evaluate the extent and quality to which the application:

- Articulates goals aligned to Program Objective 1 and describes impactful, measurable, and achievable targets to assess progress against the goals during and after the period of performance (e.g., reduction and avoidance of emissions of greenhouse gases and other air pollutants). **(25 points)**

**1.2.2.2 Equity and Community Benefits (25 points total):** Each application will be evaluated on the extent and quality of the goals and targets related to Program Objective 2, including delivering equity and community benefits to low-income and disadvantaged communities. Specifically, EPA will evaluate the extent and quality to which the application:

- Articulates goals aligned to Program Objective 2 and describes impactful, measurable, and achievable targets to assess progress against the goals during and after the period of performance. **(25 points)**

**1.2.2.3 Market Transformation Benefits (25 points total):** Each application will be evaluated on the extent and quality of the goals and targets related to Program Objective 3. Specifically, EPA will evaluate the extent and quality to which the application:

- Articulates goals aligned to Program Objective 3 and describes impactful, measurable, and achievable targets to assess progress against the goals during and after the period

of performance (e.g., private capital mobilization, community lender capacity-building). **(25 points)**

### 1.2.3    Pass-Through Strategy

**1.2.3.1 Capitalization Funding and TA Subaward Design (25 points <u>total</u>):** Each application will be evaluated on the extent and quality of the design of the parameters for capitalization funding and technical assistance subawards to achieve the investment objectives. Specifically, EPA will evaluate the extent and quality to which the application:

- Explains the design of the capitalization funding instruments and how that design supports the investment objectives. **(15 points)**
- Explains the design of the technical assistance subaward instruments and how that design supports the investment objectives. **(10 points)**

**1.2.3.2 Distribution Process Design (20 points <u>total</u>):** Each application will be evaluated on the extent and quality of the process by which it will distribute capitalization funding and technical assistance subawards to community lenders to achieve the investment objectives. Specifically, EPA will evaluate the extent and quality to which the application:

- Describes an effective process to distribute funds to community lenders that supports the investment objectives, including explaining how technical assistance subawards will complement capitalization funding to support community lenders in effectively deploying capitalization funding into projects. **(20 points)**

**1.2.3.3 Eligibility Review Process (10 points <u>total</u>):** Each application will be evaluated on the extent and quality of the eligibility review process to ensure entities receiving capitalization funding and technical assistance subawards meet the requirements of being community lenders as well as any other requirements set by the applicant to achieve the investment objectives. Specifically, EPA will evaluate the extent and quality to which the application:

- Describes a rigorous eligibility review process to ensure capitalization funding and technical assistance subawards only flow to entities that are community lenders through, for example, reviewing organizational documents, such as articles of incorporation or similar documents filed with a governmental authority; tax filings; financial statements; investment records; and/or any other information the applicant deems appropriate as well as describes any other eligibility requirements that are relevant guardrails to achieve the investment objectives. **(10 points)**

**1.2.3.4 Evaluation Process (65 points <u>total</u>):** Each application will be evaluated on the extent and quality of the approach to evaluate community lenders for capitalization funding and technical assistance subawards to achieve the investment objectives. Specifically, EPA will evaluate the extent and quality to which the application:

- Describes a rigorous, consistent, and equitable process for evaluating a community lender's planned use of capitalization funding and technical assistance subawards. **(35 points)**
- Describes a rigorous, consistent, and equitable process for evaluating a community lender's capacity to carry out its planned use of funds. **(20 points)**
- Describes evaluative bodies and/or other processes that will support an effective and fair evaluation process. **(10 points)**

**1.2.3.5 Amount Determination Approach (15 points <u>total</u>):** Each application will be evaluated on the extent and quality of the approach to determine the amount of capitalization funding and technical assistance subaward to provide to a given community lender to achieve the investment objectives. Specifically, EPA will evaluate the extent and quality to which the application:

- Describes the approach to determining the amount of funding and technical assistance subaward that achieves the investment objectives, including explaining how the design supports the investment objectives (especially those around market transformation) as well as providing details on any decision-making bodies and/or other processes that will support an effective and fair award determination process. **(15 points)**

**1.2.3.6 Management and Oversight Plan (25 points <u>total</u>):** Each application will be evaluated on the extent and quality of the plan to manage and oversee community lenders that are selected for capitalization funding and technical assistance subawards. Specifically, EPA will evaluate the extent and quality to which the application:

- Describes an effective management and oversight plan for capitalization funding, including the mechanics to distribute funds to community lenders, controls to ensure funding is only expended on eligible purposes, remedies for non-compliance, and processes to reallocate unused funds. **(15 points)**
- Describes an effective management and oversight plan for technical assistance subawards, including the mechanics to distribute funds to community lenders, controls to ensure funding is only expended on eligible purposes, remedies for non-compliance, and processes to reallocate unused funds. **(10 points)**

**1.2.4    Technical Assistance Services Strategy**

**1.2.4.1 Targeted Community Lender Support Plan (30 points <u>total</u>):** Each application will be evaluated on the extent and quality of the plan to provide targeted support to community lenders to achieve the investment objectives. Specifically, EPA will evaluate the extent and quality to which the application:

- Describes an effective plan to provide targeted support to community lenders *after they receive* capitalization funding and technical assistance subawards, helping them use these funds effectively and building long-term clean financing capacity in alignment with the investment objectives. **(15 points)**
- Describes an effective plan to provide targeted support to establish new and support existing community lenders *that have not received* capitalization funding and technical assistance subawards (at the time of the provision of the technical assistance services), helping them build long-term clean financing capacity in alignment with the investment objectives—particularly in low-income and disadvantaged communities not currently served by community lenders in the network(s). **(15 points)**

**1.2.4.2 Financial Market-Building Plan (20 points <u>total</u>):** Each application will be evaluated on the extent and quality of the applicant's plan to build a more supportive financial market for community lenders to provide financial assistance to CCIA-eligible projects in order to achieve the investment objectives. Specifically, EPA will evaluate the extent and quality to which the application:

- Describes an effective plan for financial market-building, explaining the types of financial market-building activities that will be carried out, the partners that will be

involved, and the rationale for why such financial market-building addresses existing market-wide barriers to community lender capacity to finance CCIA-eligible projects. **(20 points)**

**1.2.5    Implementation Plan**

**1.2.5.1 Community Lender Outreach and Accessibility Plan (20 points <u>total</u>):** Each application will be evaluated on the extent and quality of the applicant's plan to conduct outreach to community lenders and to ensure that the program is accessible to community lenders—especially community lenders serving low-income and disadvantaged communities that are also rural communities, Tribal communities, communities with environmental justice concerns, energy communities, and persistent poverty counties. Specifically, EPA will evaluate the extent and quality to which the application:

- Describes a robust outreach plan to ensure that community lenders in the network(s) are fully aware of the program, how to participate in it, and how it can be used to deliver benefits to low-income and disadvantaged communities that are served by the community lenders. **(10 points)**
- Describes a thorough accessibility plan to make the program accessible to all community lenders in the network(s). **(10 points)**

**1.2.5.2 Labor and Equitable Workforce Development Plan (20 points <u>total</u>):** Each application will be evaluated on the extent and quality of the applicant's plan to ensure that projects generated by the pass-through strategy and technical assistance services strategy create high-quality jobs with a diverse, skilled workforce as well as the applicant's plan to comply with the Build America, Buy America Act and Davis-Bacon and Related Acts. Specifically, EPA will evaluate the extent and quality to which the application:

- Describes an effective plan to ensure that projects generate high-quality jobs with a diverse, skilled workforce through setting policies and enforcing standards on community lenders (e.g., a framework to review capitalization funding and technical assistance subaward decisions with a labor and workforce lens); partnering with community lenders on best practices; and more. Applicants will be evaluated on the strength of the plan, which may include evidence through signed letters of commitment from applicable labor organizations, including unions and other workers' rights groups. **(10 points)**
- Describes an effective plan to comply with the requirements of the Build America, Buy America Act and Davis-Bacon and Related Acts, including through identifying the activities that will be involved and the resources that will be required to execute against those activities. **(10 points)**

**1.2.5.3 Consumer Protection Plan (20 points <u>total</u>):** Each application will be evaluated on the extent and quality of the plan for ensuring consumer protection across any entity that interacts, transacts, or contracts with a consumer as part of the applicant's program. Specifically, EPA will evaluate the extent and quality to which the application:

- Describes a plan to effectively comply with applicable consumer protection laws in the jurisdictions that will be served by the applicant's program (including community lenders supported by the program) and federal consumer protection and financial laws and regulations, including but not limited to those prohibiting unfair, deceptive, and

abusive practices; the Truth in Lending Act (15 USC § 1601 *et seq.*) and Regulation Z (12 CFR § 1026); and the Equal Credit Opportunity Act (15 USC § 1691 *et seq.*) and Regulation B (12 CFR § 1002)—including ensuring that any service provider utilized in the provision of a financial product (by the applicant or any of the community lenders it supports) does not present unwarranted risks to consumers, including service providers for financial products originated and sold, and creates a process for reviewing, tracking, and addressing consumer complaints against any service providers used in the provision of a financial product. **(20 points)**

**1.2.5.4 Housing Affordability Protection Plan (15 points <u>total</u>):** Each application will be evaluated on the extent and quality of the applicant's plan to integrate housing affordability protection into the program. Specifically, EPA will evaluate the extent and quality to which the application:

- Integrates housing affordability protection into the program, including but not limited to ensuring community lenders implement policies and strategies that maintain affordability of existing housing stock (e.g., affordability-related financing covenants), minimize displacement (e.g., displacement-related policies), and prevent rapid cost increases (e.g., prioritizing financing of properties providing affordable housing). **(15 points)**

**1.2.5.5 Coordination Plan (20 points <u>total</u>):** Each application will be evaluated on the extent and quality of the applicant's plan to leverage existing financial and technical assistance resources and to coordinate with other GGRF grantees. Specifically, EPA will evaluate the extent and quality to which the application:

- Describes a plan to leverage existing resources from federal, Tribal, state, territorial, and local governments as well as non-governmental organizations to maximize effectiveness at achieving the investment objectives. **(10 points)**
- Describes a plan to coordinate with grantees across the National Clean Investment Fund, Clean Communities Investment Accelerator, and Solar for All programs, minimizing duplication and maximizing complementarity across grantees in achieving the GGRF program objectives. **(10 points)**

**1.3    Program Reporting**

**1.3.1    Reporting Plan (20 points <u>total</u>):** Each application will be evaluated on the extent and quality of the applicant's plan for tracking and reporting environmental outputs and outcomes. Specifically, EPA will evaluate the extent and quality to which the application:

- Describes outputs and outcomes that align with the grant's reporting requirements, including measures to track and report against those outputs and outcomes. **(10 points)**
- Describes methodologies, inputs, and assumptions that will allow the applicant to execute tracking and reporting against those outputs and outcomes. **(10 points)**

**1.3.2    Reporting Capacity (10 points <u>total</u>):** Each application will be evaluated on the extent and quality of the applicant's capacity to meet the grant's reporting requirements. Specifically, EPA will evaluate the extent and quality to which the application:

- Details the resources that the applicant plans to leverage and why those resources are needed to execute against the grant's reporting requirements, especially tracking and reporting outputs and outcomes (i.e., climate and air pollution benefits, equity and community benefits, and market transformation benefits); establishing policies and

procedures to ensure reliable reporting; and developing plans for third-party validation, verification, and assurance of reporting. **(10 points)**

**1.3.3** **Past Performance and Reporting History (10 points <u>total</u>):** Each application will be evaluated on the extent and quality to which the applicant has successfully completed and managed past federally and non-federally funded assistance agreements. Specifically, EPA will evaluate the extent and quality of the applicant's:

- Past performance in successfully completing and managing assistance agreements as well as history of meeting the reporting requirements under those assistance agreements, including whether the applicant submitted acceptable final technical reports under those agreements and the extent to which the applicant adequately and timely reported on their progress toward achieving the expected outputs and outcomes under those agreements and, if such progress was not being made, whether the applicant adequately reported why not. **(10 points)**

*Note: In evaluating applicants under this factor, EPA will consider the information provided by the applicant and may also consider relevant information from other sources, including information from EPA files and from current/prior grantors (e.g., to verify and/or supplement the information provided by the applicant), pursuant to 2 CFR § 200.206. If the applicant does not have any relevant or available past performance or reporting history information, the applicant should indicate this in the application and will receive a neutral score (a neutral score is half of the total points available in a subset of possible points). If the applicant does not provide any response, the applicant may receive a score of 0.*

**1.4** **Program Budget**

**1.4.1** **Expenditure and Disbursement of Awarded Funds (10 points <u>total</u>):** Each application will be evaluated on the extent and quality of the applicant's planned expenditure and disbursement of awarded funds. Specifically, EPA will evaluate the extent and quality to which the application:

- Demonstrates the approach, procedures, and controls for ensuring that awarded grant funds will be expended and disbursed in a timely and efficient manner. **(10 points)**

**1.4.2** **Budget Description and Table (40 points <u>total</u>):** Each application will be evaluated on the extent and quality of the applicant's budget description and table. Specifically, EPA will evaluate the extent and quality to which the application:

- Describes costs that are reasonable to accomplish the program plan, including maximizing the amount of funds passed through to community lenders through capitalization funding and technical assistance subawards (both direct costs of funds passed through to community lenders as well as associated indirect costs). **(20 points)**
- Describes efficient, effective deployment of grant funds through the budget description and table. **(10 points)**
- Provides a detailed budget table that breaks up funding type into the proper budget categories, providing clarity, accuracy, and granularity on the applicant's planned use of funds. **(10 points)**

*Note: The budget table must show that the program would pass through a minimum of 80% of grant funds to community lenders in the form of capitalization funding as well as a*

*minimum of 90% of grant funds to community lenders in the form of <u>both</u> capitalization funding and technical assistance subawards, as described in* <u>Section III.C: Threshold Eligibility Criteria</u>*. Additionally, the budget description must describe how the applicant will meet the requirement that 100% of funds be used for the purposes of providing financial and technical assistance in low-income and disadvantaged communities, as described in* <u>Section III.C: Threshold Eligibility Criteria</u>*; applicants that describe using funds exclusively to support CCIA-eligible projects will meet this requirement, as CCIA-eligible projects have a low-income and disadvantaged community requirement.*

**2.      Description of Programmatic Capabilities**

**2.1      Organizational Background, Track Record, and Policies**

**2.1.1      Organizational and Governing Documents (10 points <u>total</u>):** Each application will be evaluated on the extent and quality to which the organizational and governing documents support the program plan. Specifically, EPA will evaluate the extent and quality to which the application:

- Provides organizational and governing documents that are relevant, high-quality, and aligned to the GGRF program objectives. **(10 points)**

**2.1.2      Organizational Experience (50 points <u>total</u>):** Each application will be evaluated on the extent and quality to which it describes organizational experience relevant to executing the activities discussed in the program plan. Specifically, EPA will evaluate the extent and quality to which the application:

- Describes past instances of successfully managing similar pass-through programs with community lenders, including the scope, activities, and results of those programs. **(40 points)**
- Describes past instances of successfully managing similar technical assistance services programs with community lenders, including the scope, activities, and results of those programs. **(10 points)**

*Note: The organizational experience of the individual applicant as well as any coalition members may be evaluated; the experience of contractors or specific individuals in governance and management will not be evaluated. If the applicant does not have any relevant or available organizational experience information, the applicant should indicate this in the application and will receive a neutral score (a neutral score is half of the total points available in a subset of possible points). If the applicant does not provide any response, the applicant may receive a score of 0.*

**2.1.3      Equity Policies and Practices (30 points <u>total</u>):** Each application will be evaluated on the extent and quality to which the equity policies and practices will ensure equity is integrated into the applicant's operations, investment activities, and governance. Specifically, EPA will evaluate the extent and quality to which the application:

- Includes policies and practices that integrate equity into the applicant's operational and investment activities and explains how such policies and practices advance "equity," as defined in *<u>Section IV.C: Content of Application Submission</u>*. **(15 points)**
- Includes policies and practices that integrate equity into the applicant's governance and explains how such policies and practices advance "equity," as defined in *<u>Section IV.C: Content of Application Submission</u>*. **(15 points)**

**2.2    Governance and Management**

**2.2.1    Governance Structure (75 points <u>total</u>):** Each application will be evaluated on the extent and quality of the board's oversight and monitoring of management as well as stewardship of the organization's long-term success as part of program plan execution. Specifically, EPA will evaluate the extent and quality to which the application:

- Describes an established board with appropriate size and composition, including a board of directors with relevant expertise, skills, and track record (such as in emissions and air pollution reduction; clean technology investment and low-income and disadvantaged community investment; and financial markets and institutions) as well as board diversity (especially with representation from low-income and disadvantaged communities, including those that are also rural communities, Tribal communities, communities with environmental justice concerns, energy communities, and persistent poverty counties). **(25 points)**

- Describes an established board with adequate committee structures to oversee and monitor management, such as an investment or credit committee (i.e., to oversee and approve investment or credit decisions), risk management committee (i.e., to oversee the formulation and operation of the risk management framework), audit committee (i.e., to oversee the integrity of reporting and internal controls and the performance of audit functions), nomination/governance committee (i.e., to oversee nomination and succession of board and senior management), and compensation committee (i.e., to oversee board as well as senior management and staff compensation). **(15 points)**

- Describes an established board that is independent, with an appropriate percentage of independent board members and a strong definition of "independent." **(10 points)**

- Describes effective and comprehensive board policies and procedures, including policies and procedures for board training; board meeting frequency (e.g., quarterly) and duration; board meeting documentation; board conflict of interest policies and procedures; whistleblower and ethics policies; board evaluation processes; and board nomination and succession plans. **(25 points)**

**2.2.2    Senior Management and Staff Capabilities (75 points <u>total</u>):** Each application will be evaluated on the extent and quality of the senior management and staff capabilities to execute the program plan. Specifically, EPA will evaluate the extent and quality to which the application:

- Describes senior management with the relevant expertise, skills, and track record to efficiently and effectively execute the program plan (such as in emissions and air pollution reduction; clean technology investment and low-income and disadvantaged community investment; and financial markets and institutions) as well as with diverse backgrounds (especially with representation from low-income and disadvantaged communities, including those that are also rural communities, Tribal communities, communities with environmental justice concerns, energy communities, and persistent poverty counties). **(35 points)**

- Describes staff with the relevant expertise, skills, and track record to efficiently and effectively execute the program plan (such as in data, technology, and cybersecurity and in planning, designing, developing, implementing, and evaluating programs). **(25 points)**

- Describes effective and comprehensive management policies and procedures, including those specifying management versus board duties; conflict of interest policies and procedures; and management succession plans. **(15 points)**

## 2.3 Risk Management and Financials

**2.3.1 Legal and Compliance Risk Management Program (60 points <u>total</u>):** Each application will be evaluated on the extent and quality of the legal and compliance risk management program to ensure compliance with the grant's terms and conditions and to manage broader legal and compliance risk. Specifically, EPA will evaluate the extent and quality to which the application:

- Describes an effective program to ensure compliance with 2 CFR § 200.302(b) *(financial management)*, 2 CFR § 200.303 *(internal controls)*, and 2 CFR § 200.332 *(requirements for pass-through entities)*. **(30 points)**
- Describes an effective program to assess legal and compliance risks associated with the applicant's program, as well as a robust plan to mitigate those risks. **(30 points)**

*Note: Applications with programs for stronger legal and compliance risk management across all EPA funds requested will score higher; applications with plans covering only a portion of the EPA funds requested (i.e., not covering how it will manage legal and compliance risk among coalition members, if submitting a coalition application) will score lower.*

**2.3.1 Financial Statements (30 points <u>total</u>):** Each application will be evaluated on the extent and quality of its financial statements. Specifically, EPA will evaluate the extent and quality to which the application:

- Provides audited financial statements for the past three fiscal years and quarterly (unaudited) financial statements for the current fiscal year; applicants without such financial statements will score lower, although they can still receive more than a neutral score by providing alternative information and explanations. **(15 points)**
- Demonstrates financial health and capacity through those financial statements, including based on performance against key financial ratios.[20] **(15 points)**

*Note: If the applicant does not have any financial statements (audited or unaudited) covering the past three fiscal years, the applicant should indicate this in the application and will receive a neutral score (a neutral score is half of the total points available in a subset of possible points) on the second criterion, since that criterion requires assessment of financial health against financial statements. If the applicant does not provide any response, the applicant may receive a score of 0.*

*Note: Applications will not receive full points unless they provide financial statements for each coalition member that would receive a subaward of greater than $10 million.*

## 3.    Comprehensiveness and Cohesiveness

---

[20] EPA may assess the following financial ratios, among others: Net Asset Ratio (Net Assets/Total Assets), Self-Sufficiency Ratio (Earned Revenue/Operating Expenses), Current Ratio (Current Assets/Current Liabilities), Change in Net Assets (Change in Net Assets), and Operating Liquidity Ratio (Unrestricted Cash & Cash Equivalents / 25% of Operating Expenses).

3.1    **Comprehensiveness (25 points total):** Each application will be evaluated on the extent and quality to which it is comprehensive, covering all components and sub-components described in *Section IV.C: Content of Application Submission*. Specifically, EPA will evaluate the extent and quality to which the application includes:
- A program plan that provides comprehensive coverage of all components and sub-components of the program plan, as described in *Section IV.C: Content of Application Submission*. **(15 points)**
- A description of programmatic capabilities that provides comprehensive coverage of all components and sub-components of the description of programmatic capabilities, as described in *Section IV.C: Content of Application Submission*. **(10 points)**

3.2    **Cohesiveness (25 points total):** Each application will be evaluated on the extent and quality to which it is cohesive, providing a clear program proposal that ties together the components and sub-components described in *Section IV.C: Content of Application Submission*. Specifically, EPA will evaluate the extent and quality to which the application includes:
- A program plan that is cohesive, providing a clear program proposal that ties together the components and sub-components describing how the applicant plans to effectively use grant funds to advance the GGRF program objectives, as described in *Section IV.C: Content of Application Submission*. **(15 points)**
- A description of programmatic capabilities that is cohesive, providing a clear program proposal that ties together the components and sub-components describing how the applicant has the programmatic capabilities necessary to carry out the program plan, as described in *Section IV.C: Content of Application Submission*. **(10 points)**

## B. Review and Selection Process

Applications will be reviewed and scored under the process listed below.

**1. Threshold Eligibility Review Process:** All applications will be evaluated for eligibility using the threshold eligibility criteria described in *Section III.C: Threshold Eligibility Criteria*.

**2. Review Panel and Evaluation Process:** Review panel(s) will review, score, and rank all eligible applications that pass the threshold eligibility review based on the merit evaluation criteria listed above. The review panel(s) will include EPA staff and may also include staff from other federal agencies and external subject matter experts who are free from any actual or apparent conflicts of interest.

**3. Interviews for Top-Ranked Applications:** The review panel(s) may conduct virtual or in-person interviews with top-ranked applicants. Applicants designated for such interviews would be provided information regarding the interview process upon designation.

**4. Final Selection Process and Other Factors:** The review panel(s) will present final rankings and selection recommendations to the Selection Official, who will then make the final selections for awards. EPA intends to make awards to ensure broad coverage of community lender networks and low-income and disadvantaged communities served. EPA particularly intends to ensure coverage of Tribal communities.

In addition to the information presented by the review panel(s), the Selection Official may also consider any of the following "other factors" in making final selection decisions from among the top-ranked applications: geographic diversity (e.g., to ensure sufficient coverage within all EPA regions); organizational capacity considerations due to organizations participating in multiple applications that are top-ranked (i.e., as individual applicants, lead applicants of coalition applications, or non-lead members of coalition applications); GGRF program objectives; EPA strategic goals and objectives; and availability of funds.

**5. Anticipated Announcement and Federal Award Date:** EPA anticipates it will announce selection decisions by March 2024.

56

# Section VI. Award Administration Information

Note: Additional provisions that apply to this section can be found at EPA Solicitation Clauses.

## A. Award Notification and Disputes

EPA anticipates notification of selected applicants will be made via electronic mail by March 2024. The notification will be sent to the original signer of the application or the contact listed in the application. This notification, which informs the applicant that its application has been selected, is not an authorization to begin work. The official notification of an award will be made by the EPA Award Official. Applicants are cautioned that only a grants officer is authorized to bind the Government to the expenditure of funds; selection does not guarantee an award will be made. For example, statutory authorization, funding, or other issues discovered during the award process may affect the ability of EPA to make an award to an applicant. The award notice, signed by a grants officer, is the authorizing document and will be provided through electronic mail. The successful applicant may be requested to prepare and submit additional documents and forms that must be approved by EPA before the grant can officially be awarded. The time between notification of selection and finalization of the award agreement can take up to 90 days or longer.[21]

Assistance agreement competition-related disputes will be resolved in accordance with the dispute resolution procedures published in 70 FR (Federal Register) 3629, 3630 (January 26, 2005), which can be found at Grant Competition Dispute Resolution Procedures. Copies of these procedures may also be requested by contacting the person listed in *Section VII* of the announcement. Note, the FR notice references regulations at 40 CFR Parts 30 and 31 that have been superseded by regulations in 2 CFR Parts 200 and 1500. Notwithstanding the regulatory changes, the procedures for competition-related disputes remain unchanged from the procedures described at 70 FR 3629, 3630, as indicated in 2 CFR Part 1500, Subpart E.

## B. Grant Drawdown Schedule

In accordance with the EPA General Terms and Conditions, grantees typically draws funds only for the minimum amounts needed for actual and immediate cash requirements; disbursements occurring within 5 business days of drawdown comply with this requirement. After an applicant is selected for an award, EPA staff (Project Officer, Grant Specialist, and Financial Specialist) will discuss departures from the EPA General Terms and Conditions with each selected awardee on a case-by-case basis, to the extent such departures are reasonable and necessary for performance under each selected application. These departures may include:

- A schedule of working capital advances to provide each grantee an initial advance as well as annual advances over the period of performance such that the grantee can provide timely capitalization funding and technical assistance subawards to community lenders, consistent with 2 CFR § 200.305(b)(4) as supplemented by 2 CFR § 1500.4(a), which allows for exceptions to 2 CFR § 200.305(b) as necessary;

---

[21] Non-profit applicants that are recommended for funding under this announcement are subject to pre-award administrative capability reviews consistent with Section 8b, 8c, and 9d of EPA Order 5700.8: EPA's Policy on Assessing Capabilities of Non-Profit Applicants for Managing Assistance Awards. In addition, non-profit applicants selected for awards over $200,000 may be required to fill out and submit to the grants management office EPA Form 6600.09, United States Environmental Protection Agency Administrative Capability Questionnaire with supporting documents as required in EPA Order 5700.8.

- A one-time or periodic balance-sheet capitalization(s), in accordance with 2 CFR Part 1500.4(a), which allows for exceptions to 2 CFR § 200.305(b); or
- Other departures as agreed upon by the EPA Award Official or through regulatory exceptions provided under 2 CFR § 1500.4(a).

Note that any departures from typical drawdown requirements in 2 CFR § 200.305(b) or the EPA General Terms and Conditions may be subject to measures or other arrangements (e.g., bonds, insurance requirements, financial agent arrangements with U.S. Department of Treasury) to ensure that EPA's interests are protected.[22]

## C. Program Income and Other Income Requirements

While grantees are not expected to generate program income, community lenders that receive capitalization funding in the form of subgrants will become subgrantees and are expected to generate program income, as defined in *Section I.D: Competition Terminology*. In accordance with 2 CFR § 200.307(e)(2) and 2 CFR § 1500.8(b), which "flow down" to subgrantees as provided in 2 CFR § 200.332 and EPA General Terms and Conditions, community lenders that are subgrantees will be required to retain program income earned during the period of performance; program income will be added to funds committed to the program by EPA and used by the subgrantees for the purposes and under the conditions of the assistance agreement and beyond the period of performance based on close-out agreements. Community lenders that receive capitalization funding in the form of subsidies will be subject to requirements under the grant's terms and conditions. In accordance with 2 CFR § 1500.8(d) as supplemented by the terms and conditions of the grant award, each subgrantee will only be authorized to use program income and other income once the subgrant award is fully drawn down. Note that EPA plans to establish programmatic requirements in a closeout agreement to implement requirements on program income and other income for community lenders, which will require community lenders to reuse such income to provide financial assistance for CCIA-eligible projects.

## D. Administrative and National Policy Requirements

Grantees will be subject to administrative and national policy requirements. Note that EPA plans to establish programmatic requirements in the terms and conditions of each grant agreement to implement these administrative and national policy requirements, which will include but not be limited to:

- **Build America, Buy America Act (BABA):** Certain projects under this competition are subject to the Buy America Sourcing requirements under the Build America, Buy America (BABA) provisions of the Infrastructure Investment and Jobs Act (IIJA) (P.L. 117-58, §§ 70911-70917) that apply when using Federal funds for the purchase of goods, products, and materials on any form of construction, alteration, maintenance, or repair of infrastructure in the United States. The Buy America preference requirement applies to all the iron and steel, manufactured products, and construction materials used for the infrastructure project under an award for identified EPA financial assistance funding programs. Please consider this information when preparing budget information. EPA will

---

[22] Costs for acquiring bonds or insurance required by the terms of the EPA grant award are allowable as provided in 2 CFR § 200.427 and 2 CFR § 200.447, respectively. EPA may require that grantees bear part of the cost of bonds or insurance as a cost-share.

provide further guidance on which projects are subject to BABA provisions and will work with grantees to support implementation as necessary, as applicants comply with applicable Buy America preference requirements or apply for a waiver for each infrastructure project.

- **Davis-Bacon and Related Acts (DBRA):** The Davis-Bacon Act (42 USC §§ 3141-3144) (DBA) sets out labor standards, including prevailing wages and fringe benefits, and applies to most federally funded contracts for construction of public works. The DBA labor standards and reporting requirements also apply to projects assisted with grants authorized by the Clean Air Act as provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA). A term and condition specifying DBRA compliance requirements will be included in the grant agreement.

- **Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA):** The URA applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require grantees to follow certain procedures for acquiring property for grant purposes, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. A term and condition specifying URA compliance requirements will be included in the grant agreement.

- **National Historic Preservation Act (NHPA)**: Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant agreement, on historic properties. If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs. A term and condition specifying NHPA compliance requirements will be included in the grant agreement.

- **Justice40 Initiative:** The Justice40 Initiative sets the goal that 40% of the overall benefits from certain federal investments in climate, clean energy, and other areas flow to disadvantaged communities. The Greenhouse Gas Reduction Fund is a covered program under the Justice40 Initiative, and EPA is tracking and measuring program benefits to advance this goal. A term and condition specifying reporting of metrics demonstrating the extent to which the grant's activities advance this 40% goal will be included in each grant agreement.

Note that Section 7(c) of the Energy Supply and Environmental Coordination Act of 1974 (15 USC § 793(c)(1)) exempts all actions under the Clean Air Act from the requirements of NEPA (National Environmental Policy Act). This Section states: "No action taken under the Clean Air Act shall be deemed a major Federal action significantly affecting the quality of the human environment within the meaning of the National Environmental Policy Act of 1969." Therefore, as a grant program authorized under the Clean Air Act, NEPA will not apply to projects funded under the Clean Communities Investment Accelerator.

## E. Reporting Requirements

Grantees will be subject to both program performance as well as financial and administrative reporting requirements, as described below. Note that EPA will only collect reporting information

from each grantee (rather than from any subrecipients), but each grantee may need to collect reporting information from subrecipients in order to meet these reporting requirements.

**Program Performance Reporting:** In accordance with 2 CFR § 200.329, each grantee will be subject to program performance reporting requirements. Reporting requirements effective during the period of performance will be established in the grant agreement's terms and conditions, and reporting requirements effective after the period of performance will be established in a closeout agreement.

During the period of performance, EPA will require each grantee to submit quarterly performance reports within 30 days after the end of each reporting period (and with additional requirements every fourth quarterly report i.e., annually) as well as a final performance report within 90 days after the end of the period of performance. EPA will require that each grantee's chief executive officer and chief reporting officer review and submit each of these reports. EPA will use information from these reports as part of program-wide public reporting, except to the extent such information includes confidential business information (CBI) or personally identifiable information (PII) pursuant to 2 CFR § 200.338.[23] Included below is information that EPA may require in these reports.

| Category | Sub-Category | Quarterly Reports | Annual Reports | Final Report |
|---|---|---|---|---|
| **Grant Expenditures** | Program expenditures | ✓ | ✓ | ✓ |
| | Capitalization funding commitments | ✓ | ✓ | ✓ |
| | Technical assistance subaward commitments | ✓ | ✓ | ✓ |
| | Closed transactions using capitalization funding[24] | ✓ | ✓ | ✓ |
| **Environmental Outputs and Outcomes[25]** | Climate and air pollution benefits | ✓ | ✓ | ✓ |
| | Equity and community benefits | ✓ | ✓ | ✓ |
| | Market transformation benefits | ✓ *(plus case studies)[26]* | ✓ *(plus case studies)* | ✓ *(plus case studies)* |

---

[23] Information claimed as CBI in accordance with this Notice will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B.

[24] Details may include origination date, origination fees, funding amount, financial product type, transaction characteristics (interest rate, tenor, structure, amortization, and prepayment terms), project type, basic counterparty information, and private capital mobilization; those details may be required at the transaction level and/or aggregated by geography, sector, technology, and/or portfolio.

[25] See *Section I.G: Measuring Environmental Results* for example outputs and outcomes.

[26] Case studies will facilitate market transformation by building community clean financing capacity, showcasing best practices that community lenders can adopt to start or expand clean financing programs.

| Program Evaluation and Other Evidence-Building | Program evaluation | ✕ | ✓ | ✓ |
|---|---|---|---|---|
| | Other evidence-building | ✕ | ✓ | ✓ |
| **Organizational Financial Statements and Disclosures** | Management's discussion and analysis of financial condition and results of operations | ✓ *(as needed)* | ✓ | ✕ |
| | Consolidated financial statements and notes | ✓[27] *(consolidated financial statements and notes prepared in accordance with GAAP)* | ✓ *(audited consolidated financial statements and notes complying with 2 CFR § 200)* | ✕ |
| | Scope 1 and 2 emissions; relevant categories of Scope 3 emissions[28] | ✕ | ✓ | ✕ |
| | Executive and board compensation disclosures | ✕ | ✓ | ✕ |
| | Additional board disclosures (e.g., board meeting records) | ✓ | ✓ | ✕ |

In addition, EPA may require each grantee to:
- Revise its investment strategy every three years, with EPA intending to publish this strategy, after redacting CBI and PII, unless the grantee voluntarily publishes the revised investment strategy;
- Provide timely disclosure of the grantee's events including, for example, completion of acquisition or disposition of assets; material impairments; changes in certifying accountants; non-reliance on previously issued financial statements; election, appointment, or departure of directors or management; and new contractor or subrecipient contracts substantially related to program execution; and
- Respond to reasonable requests from EPA, from time to time, pursuant to 2 CFR § 200.337(a), for information regarding the grantee's operations, business affairs, plans, financial condition and projections, and compliance with the terms of the award agreement to the extent that this information is pertinent to the EPA financial assistance award.

**Financial and Administrative Reporting Requirements:** Each grantee will be subject to financial and administrative reporting requirements, which will be included in the grant

---

[27] Grantees that provide unaudited financial statements, or that do not provide financial statements, in the application process may be required to provide audited consolidated financial statements and notes as part of the initial set of quarterly reports.
[28] Inventory guidance is available here for Scope 1 and 2 emissions and here for Scope 3 emissions.

agreement's terms and conditions (EPA's General Terms and Conditions are included here). These requirements will include, but not be limited to:

- **Federal Financial Report:** In accordance with 2 CFR § 200.328 and 2 CFR § 200.344, each grantee must submit the Federal Financial Report (SF-425) at least annually and no more frequently than quarterly. The frequency of reporting and report submission instructions will be specified in the terms and conditions.
- **Financial Records Retention:** In accordance with 2 CFR § 200.334, each grantee will be required to retain financial records, supporting documents, statistical records, and all other non-Federal entity records pertinent to the grant award for a period of three years from the date of submission of the final expenditure report. Additional record retention requirements on program income and other income used by community lenders after the end of the period of performance will be specified in close-out agreements.
- **MBE/WBE Utilization:** When required, each grantee must complete and submit a "MBE/WBE Utilization Under Federal Grants and Cooperative Agreements" report (EPA Form 5700-52A) on an annual basis.
- **Real Property Status Report:** In accordance with 2 CFR § 200.329, each grantee must submit a "Real Property Status Report" (SF-429) to report real property status or request agency instructions on real property that was/will be provided as Government Furnished Property (GFP) or acquired (i.e., purchased or constructed) in whole or in part under a Federal financial assistance award.

## F. Audit Requirements

In accordance with 2 CFR § 200.501(a), each grantee will be required to obtain a single audit from an independent auditor, if the grantee expends $750,000 or more in total Federal funds in the grantee's fiscal year. Audits will be made public in accordance with the process described in 2 CFR § 200.512. The grantee must submit the form SF-SAC and a Single Audit Report Package within 9 months of the end of the grantee's fiscal year or 30 days after receiving the report from an independent auditor. The SF-SAC and a Single Audit Report Package MUST be submitted using the Federal Audit Clearinghouse's Internet Data Entry System available at: https://facides.census.gov. In addition, each grantee may be subject to additional audit requirements, including but not limited to compliance requirements as part of any compliance supplement to the single audit.

## G. Remedies for Non-Compliance

In accordance with 2 CFR § 200.208, 2 CFR § 200.339, and 2 CFR § 200.340, EPA is provided authority for multiple potential responses if a grantee violates the terms of the grant agreement.

## Section VII. Contact Information

Further information, if needed, may be obtained by emailing ggrf@epa.gov. Information regarding this funding opportunity obtained from sources other than the EPA may not be accurate.

# Appendix A. Grants.gov Application Submission Instructions

## A. Requirement to Submit through Grants.gov and Limited Exception Procedures

Applicants must apply electronically through Grants.gov under this funding opportunity based on the Grants.gov instructions in this announcement. If your organization has no access to the internet or access is very limited, you may request an exception for the remainder of this calendar year by following the procedures outlined here. Please note that your request must be received at least 15 calendar days before the application due date to allow enough time to negotiate alternative submission methods. Issues with submissions with respect to this opportunity only are addressed in *Appendix A.C: Technical Issues with Submission* below.

## B. Submission Instructions

**1. SAM.gov (System for Award Management) Registration Instructions:** Organizations applying to this funding opportunity must have an active SAM.gov registration. If you have never done business with the Federal Government, you will need to register your organization in SAM.gov. If you do not have a SAM.gov account, then you will create an account using login.gov[29] to complete your SAM.gov registration. SAM.gov registration is FREE. The process for entity registration includes obtaining a Unique Entity ID (UEI), a 12-character alphanumeric ID assigned to an entity by SAM.gov that requires assertions, representations and certifications, and other information about your organization. Please review the Entity Registration Checklist for details on this process. If you have done business with the Federal Government previously, you can check your entity status using your government-issued UEI to determine if your registration is active. SAM.gov requires you to renew your registration every 365 days to keep it active.

Please note that SAM.gov registration is different than obtaining a UEI only. Obtaining a UEI only validates your organization's legal business name and address. Please review the Frequently Asked Question on the difference for additional details.

Organizations should ensure that their SAM.gov registration includes a current e-Business (EBiz) point of contact name and email address. The EBiz point of contact is critical for Grants.gov registration and system functionality.

Contact the Federal Service Desk for help with your SAM.gov account, to resolve technical issues, or to chat with a help desk agent: (866) 606-8220. The Federal Service desk hours of operation are Monday–Friday, 8 AM–8 PM (Eastern Time).

**2. Grants.gov Registration Instructions:** Once your SAM.gov account is active, you must register in Grants.gov. Grants.gov will electronically receive your organization's information, such as EBiz point of contact email address and UEI. Organizations applying to this funding opportunity must have an active Grants.gov registration. Grants.gov registration is FREE. If you have never applied for a federal grant before, please review the Grants.gov Applicant Registration instructions. As part of the Grants.gov registration process, the EBiz point of contact

---

[29] login.gov is a secure sign-in service used by the public to sign into Federal Agency systems, including SAM.gov and Grants.gov. For help with a login.gov account, visit login.gov/help.

is the only person that can affiliate and assign applicant roles to members of an organization. In addition, at least one person must be assigned as an Authorized Organization Representative (AOR). Only person(s) with the AOR role can submit applications in Grants.gov. Please review the Intro to Grants.gov – Understanding User Roles and Learning Workspace – User Roles and Workspace Actions for details on this important process.

Please note that this process can take a month or more for new registrants. Applicants must ensure that all registration requirements are met to apply for this opportunity through Grants.gov and should ensure that all such requirements have been met well in advance of the application submission deadline.

Contact Grants.gov for assistance at 1-800-518-4726 or support@grants.gov to resolve technical issues with Grants.gov. Applicants who are outside the U.S. at the time of submittal and are not able to access the toll-free number may reach a Grants.gov representative by calling 606-545-5035. The Grants.gov Support Center is available 24 hours a day, 7 days a week, excluding federal holidays.

**3. Application Submission Process:** To begin the application process under this funding opportunity, go to Grants.gov and click the red "Apply" button at the top of the view grant opportunity page associated with this opportunity.

The electronic submission of your application to this funding opportunity must be made by an official representative of your organization who is registered with Grants.gov and is authorized to sign applications for Federal financial assistance. If the submit button is grayed out, it may be because you do not have the appropriate role to submit in your organization. Contact your organization's EBiz point of contact or contact Grants.gov for assistance at 1-800-518-4726 or support@grants.gov.

Applicants need to ensure that the AOR who submits the application through Grants.gov and whose UEI is listed on the application is an AOR for the applicant listed on the application. Additionally, the UEI listed on the application must be registered to the applicant organization's SAM.gov account. If not, the application may be deemed ineligible.

**4. Application Submission Deadline:** Your organization's AOR must submit your complete application package electronically to EPA through Grants.gov **no later than October 12, 2023 at 11:59 PM (Eastern Time).** Please allow for enough time to successfully submit your application and allow for unexpected errors that may require you to resubmit.

Applications submitted through Grants.gov will be time- and date-stamped electronically. Please note that successful submission of your application through Grants.gov does not necessarily mean your application is eligible for an award. Any application submitted after the application deadline will be deemed ineligible and not be considered.

## C. Technical Issues with Submission

If you experience technical issues during the submission of an application that you are unable to resolve, follow these procedures **before** the application deadline:

1. Contact Grants.gov Support Center **before** the application deadline.
2. Document the Grants.gov ticket/case number.
3. Send an email with **EPA-R-HQ-CCIA-23** in the subject line to ggrf@epa.gov **before** the application deadline, which **must** include the following:
   a. Grants.gov ticket/case number(s)
   b. Description of the issue
   c. The entire application package in PDF format

Without this information, EPA may not be able to consider applications submitted outside of Grants.gov. Please note that successful submission of your application through Grants.gov or email does not necessarily mean your application is eligible for an award. Any application submitted after the application deadline will be deemed ineligible and not be considered.

EPA will make decisions concerning acceptance of each application submitted outside of Grants.gov on a case-by-case basis. EPA will only consider accepting applications that were unable to be submitted through Grants.gov due to Grants.gov or relevant SAM.gov system issues or for unforeseen exigent circumstances, such as extreme weather interfering with internet access. Failure of an applicant to submit prior to the application deadline because they did not properly or timely register in SAM.gov or Grants.gov is not an acceptable reason to justify acceptance of an application outside of Grants.gov.

# Appendix B. CCIA-Eligible Project Checklist

The table below provides an illustrative checklist of the requirements of all three criteria for CCIA-eligible projects, which applicants may use in their applications. Applicants that do not use this checklist will not be penalized.

| CCIA-Eligible Project Checklist | | |
|---|---|---|
| *Criteria* | *Requirement* | *Rationale* |
| **a. Qualified project** | ☐ Would the project, activity, or technology reduce or avoid **greenhouse gas emissions** (including carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride) consistent with the climate goals of the United States? | *[Determined by transaction, etc.]* |
| | ☐ Would the project, activity, or technology reduce or avoid **emissions of other air pollutants**? | *[Determined by transaction, etc.]* |
| | ☐ Would the project, activity, or technology deliver **additional benefits to American communities** within <u>one or more</u> of the following seven categories?<br>    ☐ Climate change<br>    ☐ Clean energy and energy efficiency<br>    ☐ Clean transportation<br>    ☐ Affordable and sustainable housing<br>    ☐ Training and workforce development<br>    ☐ Remediation and reduction of legacy pollution<br>    ☐ Development of critical clean water infrastructure | *[Determined by transaction, etc.]* |
| | ☐ May the project, activity, or technology **not otherwise have been financed**? | *[Determined by transaction, etc.]* |
| | ☐ Would the project, activity, or technology **mobilize private capital**? | *[Determined by transaction, etc.]* |
| | ☐ Would the project, activity, or technology **support only commercial technologies?** | *[Determined by transaction, etc.]* |
| **b. Priority project** | ☐ Would the project, activity, or technology fall within at least one of the three **priority project categories**?<br>    ☐ Distributed energy generation and storage<br>    ☐ Net-zero emissions buildings<br>    ☐ Zero-emissions transportation | *[Determined by transaction, etc.]* |
| **c. Low-income and** | ☐ Would the project, activity, or technology be in a **low-income and disadvantaged community**? | *[Determined by transaction, etc.]* |

| **disadvantaged community** | *(see* Appendix C: Guidance for Low-Income and Disadvantaged Community Expenditures *for details)* | |
|---|---|---|
| If the project, activity, or technology would fail to meet **any** of the three criteria, including any of the underlying requirements for those criteria, it would **not be a CCIA-eligible project.** | | |

# Appendix C. Guidance for Low-Income and Disadvantaged Community Expenditures

The table below provides guidance for assessing expenditures against the 100% requirement on use of funds for the purposes of providing financial and technical assistance in low-income and disadvantaged communities. Costs for these purposes include costs for capitalization funding, technical assistance subawards, and technical assistance services—all of which must ultimately support projects in low-income and disadvantaged communities—as well as other costs that are reasonable and necessary for the deployment of such financial and technical assistance, including costs for program administration activities. Applicants may consider this guidance in their applications.

| Guidance for Low-Income and Disadvantaged Community Expenditures | |
|---|---|
| *Category* | *Requirement* |
| **a. CEJST-Identified Disadvantaged Communities** | ☐ Would the expenditure be for the purposes of providing funding and/or technical assistance to a community lender(s), enabling financial assistance for a project (or set of projects) **in areas identified as disadvantaged** by the Climate and Economic Justice Screening Tool (CEJST)? |
| **b. EJScreen-Identified Disadvantaged Communities** | ☐ Would the expenditure be for the purposes of providing funding and/or technical assistance to a community lender(s), enabling financial assistance for a project (or set of projects) **in areas identified by EJScreen** within either of the following two categories? <br><br> ☐ Within census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state <br><br> ☐ Within Tribal lands as included in EJScreen |
| **c. Geographically Dispersed Low-Income Households** | ☐ Would the expenditure be for the purposes of providing funding and technical assistance to a community lender(s), enabling financial assistance **to low-income individuals/households** within either of the following two categories for them to deploy projects? <br><br> ☐ Is in a *Metropolitan Area* and has an income at or below the greater of (1) 80% AMI (Area Median Income) and (2) 200% of the Federal Poverty Level **or** is in a *Non-Metropolitan Area* and has an income at or below the greater of (1) 80% AMI, (2) 80% Statewide Non-Metropolitan Area AMI, and (3) 200% of the Federal Poverty Level <br><br> ☐ Is currently approved for assistance from or participation in at least one of the following programs, with an award letter within the last 12 months: <br><br> ☐ Low Income Home Energy Assistance Program |

| | |
|---|---|
| | ☐ Supplemental Nutrition Assistance Program |
| | ☐ Weatherization Assistance Program |
| | ☐ Lifeline Support for Affordable Communications |
| | ☐ National School Lunch Program |
| | ☐ Supplemental Security Income |
| | ☐ Any other verified government or non-profit program serving Asset Limited, Income Constrained, Employed (ALICE) individuals or households designated by the EPA Administrator |
| **d. Properties Providing Affordable Housing** | ☐ Would the expenditure be for the purposes of providing funding and technical assistance to a community lender(s), enabling financial assistance **to projects on properties providing affordable housing** that are within either of the following two categories?<br><br>☐ Multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following federal or state housing assistance programs:<br><br>☐ Low-Income Housing Tax Credit<br><br>☐ A housing assistance program administered by HUD<br><br>☐ A housing assistance program administered by USDA under Title V of the Housing Act of 1949<br><br>☐ A housing assistance program administered by a tribally designated housing entity<br><br>☐ Any other housing assistance program designated by the EPA Administrator<br><br>☐ Naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units |

If the expenditure would fall within **any** of the four categories above, then it would be an **eligible use of funds for the purposes of providing financial and technical assistance in low-income and disadvantaged communities.**

# Appendix D. Program Budget

The detailed budget table should be attached to the Project Narrative and does not count toward the Project Narrative's page limit. Applicants should include applicable rows of costs for each budget category in their budget table to accurately reflect the proposed program budget. EPA provides detailed guidance on budget development in the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance, but applicants may use other forms as long as total costs per category (and specific descriptions of costs) are included and will not be penalized for doing so in the evaluation process.

Applicants must show costs for capitalization funding and technical assistance subawards (i.e., direct costs for funds passed through as well as associated indirect costs) separately in the detailed budget table, with applicants required to submit a program budget that passes through a minimum of 80% of funds through capitalization funding as well as a minimum of 90% of funds through both capitalization funding and technical assistance subawards—with applicants also evaluated on the extent to which they surpass the 90% pass-through requirement. Applicants must categorize direct costs for capitalization funding as either subawards or participant support costs, depending on the form of capitalization funding (i.e., subgrants or subsidies). Applicants must place subawards and participant support costs in the "Other" category. **To facilitate consideration of an application for partial funding, EPA recommends that applicants separate costs for capitalization funding and technical assistance subawards in the program budget by industry network, to the extent practicable and if proposing to serve multiple networks.**

Applicants must itemize costs related to personnel, fringe benefits, travel, equipment, supplies, contractual costs, other direct costs (including subawards and participant support costs), indirect costs, and total costs. Applicants should be aware that if their proposals include using Federal funds for a project that includes the purchase of goods, products, and materials on any form of construction, alteration, maintenance, or repair of infrastructure in the United States, they must comply with the Build America, Buy America Term and Condition if they are selected for an award.

- **Personnel - List all staff positions by title. Give annual salary, percentage of time assigned to the project, and total cost for the budget period.** This category includes only direct costs for the salaries of those individuals who will perform work directly for the program (paid employees of the applicant organization as reflected in payroll tax records). Personnel costs do not include: (1) costs for services of contractors (including individual consultants), which are included in the "Contractual" category; (2) costs for employees of subrecipients under subawards or non-employee program participants (e.g., interns or volunteers), which are included in the "Other" category; or (3) effort that is not directly in support of the proposed program, which may be covered by the organization's negotiated indirect cost rate. The budget table must identify the personnel category type by Full Time Equivalent (FTE), including percentage of FTE for part-time employees, number of personnel proposed for each category, and the estimated funding amounts.

- **Fringe Benefits - Identify the percentage used, the basis for its computation, and the types of benefits included.** Fringe benefits are allowances and services provided by employers to their employees as compensation in addition to regular salaries and wages.

Fringe benefits may include, but are not limited to, the cost of leave, employee insurance, pensions, and unemployment benefit plans. If the applicant's fringe rate does not include the cost of leave, and the applicant intends to charge leave to the agreement, it must provide supplemental information describing its proposed method(s) for determining and equitably distributing these costs.

- **Travel - Specify the mileage, per diem, estimated number of trips in-state and out-of-state, number of travelers, and other costs for each type of travel.** Travel may be: integral to the purpose of the proposed program (e.g., site visits); related to proposed program activities (e.g., attendance at community engagement meetings); or for a technical training or workshop that supports effective implementation of the program activities (e.g., consumer awareness activities). Only include travel costs for employees in the travel category. Travel costs do not include: (1) costs for travel of contractors (including consultants), which are included in the "Contractual" category; or (2) travel costs for employees of subrecipients under subawards and non-employee program participants (e.g., trainees), which are included in the "Other" category. Further, travel does not include bus rentals for group trips, which would be covered under the "Contractual" category. Finally, if the applicant intends to use any funds for travel outside the United States, it must be specifically identified. All proposed foreign travel must be approved by EPA's Office of International and Tribal Affairs prior to being taken.

- **Equipment - Identify each item to be purchased that has an estimated acquisition cost of $5,000 or more per unit and a useful life of more than one year.** Equipment also includes accessories necessary to make the equipment operational. Equipment does not include: (1) equipment planned to be leased/rented, including lease/purchase agreement; or (2) equipment service or maintenance contracts that are not included in the purchase price for the equipment. These types of proposed costs must be included in the "Other" category. Items with a unit cost of less than $5,000 must be categorized as supplies, pursuant to 2 CFR § 200.1. The budget table must include an itemized listing of all equipment proposed under the program. If installation costs are included in the equipment costs, labor expenses shall be itemized with the detailed number of hours charged and the hourly wage. If the applicant has written procurement procedures that define a threshold for equipment costs that is lower than $5,000, then that threshold takes precedence.

- **Supplies - "Supplies" means all tangible personal property other than "equipment." The budget detail should identify categories of supplies to be procured (e.g., laboratory supplies or office supplies).** Non-tangible goods and services associated with supplies, such as printing services, photocopy services, and rental costs must be included in the "Other" category.

- **Contractual - Identify proposed contracts, specifying the purpose and estimated cost.** Contractual services (including consultant services) are those services to be carried out by an individual or organization, other than the applicant, in the form of a procurement relationship. The EPA Subaward Policy and supplemental frequently asked questions have detailed guidance available for differentiating between contractors and subrecipients. Leased or rented goods (equipment or supplies) must be included in the "Other" category.

EPA does not require applicants to identify specific contractors, but if an applicant does so they must demonstrate that the contractor was selected in compliance with competitive procurement requirements in 2 CFR Parts 200 and 1500.

In the budget description, the applicant should list the proposed contract activities along with a brief description of the anticipated scope of work or services to be provided, proposed duration, and proposed procurement method (competitive or non-competitive), if known. Any proposed non-competed/sole-source contracts in excess of the applicant's 2 CFR § 200.320(a) micro-purchase threshold (generally $10,000) must include a justification. Note that EPA rarely accepts proposed sole source contracts for goods and services (e.g., consulting) that are widely available in the commercial market absent a copyright, patent, or equipment warranty requirement or similar restriction that establishes that only one source can provide the necessary good or service; unique qualifications or long-standing relationships with a grantee do not provide an adequate basis for a sole source contract. Refer to the EPA Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements for EPA's policies on competitive procurements and encouraging the use of small and disadvantaged business enterprises.

- **Other - List each item in sufficient detail for EPA to determine the reasonableness and allowability of its cost.** This category should include only those types of direct costs that do not fit in any of the other budget categories, including subawards, participant support costs, and additional costs (e.g., insurance, costs for acquiring or improving real property, rental/lease of equipment or supplies, equipment service or maintenance contracts, and printing or photocopying). Subawards and participant support costs (e.g., subsidies) are distinct types of costs under this category. The term "subaward" means an award of financial assistance (money or property) by any legal agreement made by the grantee even if the agreement is referred to as a contract; this includes capitalization funding in the form of subgrants as well as technical assistance subawards. Rebates, subsidies, and similar one-time, lump-sum payments to program beneficiaries are considered participant support costs, as defined in 2 CFR § 1500.1(a); this includes capitalization funding in the form of subsidies. Subcontracts are not subawards and belong in the "Contractual category." Applicants must provide a budget that shows the aggregate amounts they propose to issue as subawards and as participant support costs as separate line items in the "Other" category. Additional guidance is available in the EPA Subaward Policy and EPA Guidance on Participant Support Costs.

- **Indirect Costs - If indirect costs are budgeted, indicate the approved rate and distribution base.** Indirect costs are those incurred by the grantee for a common or joint purpose that benefit more than one cost objective or project and are not readily assignable to specific cost objectives or projects as a direct cost. Indirect costs must be based on a rate approved by the applicant's cognizant Federal agency or the 10% de-minimus rate authorized by 2 CFR § 200.414(f). Additional indirect cost guidance is available in Indirect Cost Guidance for Recipients of EPA Assistance Agreements and in Section VI.u, "IDC Competition Clause," of the EPA Solicitation Clauses.

**Note on Management Fees:** When formulating budgets for applications, applicants must not include management fees or similar charges in excess of the direct costs and indirect costs at the rate approved by the applicant's cognizant federal audit agency, or at the rate provided for by the terms of the agreement negotiated with EPA. The term "management fees or similar charges" refers to expenses added to the direct costs in order to accumulate and reserve funds for ongoing business expenses, unforeseen liabilities, or other similar costs that are not allowable under EPA assistance agreements. Management fees or similar charges cannot be used to improve or expand the program funded under this agreement, except to the extent authorized as a direct cost of carrying out the work plan.

# EXHIBIT 2

JA1732

| | |
|---|---|
| **FEDERAL AGENCY AND OFFICE:** | U.S. Environmental Protection Agency, Office of the Greenhouse Gas Reduction Fund |
| **FUNDING OPPORTUNITY TITLE:** | National Clean Investment Fund (NCIF) |
| **ANNOUNCEMENT TYPE:** | Request for Applications (RFA) |
| **FUNDING OPPORTUNITY NUMBER:** | EPA-R-HQ-NCIF-23 |
| **ASSISTANCE LISTING NUMBER:** | 66.957 |

**IMPORTANT DATES:**

| | |
|---|---|
| **October 12, 2023** | **Closing Date** |
| **By March 2024** | <u>**Anticipated**</u> **Notification of Selections** |
| **By July 2024** | <u>**Anticipated**</u> **Start of Period of Performance** |

**DEADLINE:** Application packages must be submitted on or before October 12, 2023 at 11:59 PM (Eastern Time) through Grants.gov. Applications received after the closing date and time will not be considered for funding. Please refer to *Section IV.A: Due Date and Submission Instructions* and *Appendix A: Grants.gov Application Submission Instructions* for further instructions.

**NOTE:** Transfers of EPA funds awarded through this competition must comply with the Procurement Standards in 2 CFR Parts 200 and 1500, EPA Subaward Policy, and EPA Guidance on Participant Support Costs, depending on the vehicle that the grantee uses to transfer funds, as well as the Participation by Disadvantaged Business Enterprises in EPA Programs requirements in 40 CFR Part 33. Prior to naming contractors (including consultants) or subrecipients in your application, please carefully review Section IV.d, "Contracts and Subawards," of EPA Solicitation Clauses as well as the guidance in *Section III.B: Named Contractors and Named Subrecipients*. EPA does not accept justifications for sole source contracts for services or products available in the commercial marketplace based on a contractor's role in preparing an application or existing relationships that an applicant may have established without complying with competitive procurement requirements. <u>**For this competition, EPA requires applicants that name subrecipients to submit coalition applications and include the named subrecipients as coalition members; all named subrecipients must be coalition members.**</u>

As discussed in *Section IV.A: Due Date and Submission Instructions*, in concert with EPA's commitment to conducting business in an open and transparent manner, copies of applications selected under this funding opportunity may be made publicly available on the GGRF website or another public website for a period of time after the selected applications are announced. Therefore, clearly indicate which portion(s) of the application, if any, you are claiming contains confidential, privileged, or sensitive information. As provided at 40 CFR § 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the applicant.

1

# Contents

Section I. Funding Opportunity Description ................................................................. 3
  A. Background .............................................................................................................. 3
  B. Statutory Authority ................................................................................................. 4
  C. GGRF Program Objectives ..................................................................................... 5
  D. Competition Terminology ....................................................................................... 6
  E. Scope of Work ....................................................................................................... 13
  F. Environmental Results and Strategic Plan Information ......................................... 14
  G. Measuring Environmental Results: Example Outputs and Outcomes ................... 14
  H. Additional Provisions for Applicants Incorporated into the Funding Opportunity ........... 17
Section II. Federal Award Information ...................................................................... 18
  A. Number and Amount of Awards ........................................................................... 18
  B. Conditional Awards ............................................................................................... 18
  C. Period of Performance ........................................................................................... 18
  D. Partial Funding ..................................................................................................... 18
  E. Additional Awards ................................................................................................. 18
  F. Funding Type ........................................................................................................ 19
Section III. Eligibility Information ............................................................................ 20
  A. Eligible Applicants ............................................................................................... 20
  B. Named Contractors and Named Subrecipients ..................................................... 21
  C. Threshold Eligibility Criteria ................................................................................ 23
  D. Allowable and Unallowable Costs ........................................................................ 25
Section IV. Application and Submission Information ............................................... 27
  A. Due Date and Submission Instructions ................................................................. 27
  B. Application Materials ............................................................................................ 28
  C. Content of Application Submission ....................................................................... 29
  D. Pre-Application Assistance ................................................................................... 40
Section V. Application Review Information ............................................................... 41
  A. Evaluation Criteria ............................................................................................... 41
  B. Review and Selection Process ............................................................................... 53
Section VI. Award Administration Information ....................................................... 55
  A. Award Notification and Disputes .......................................................................... 55
  B. Grant Drawdown Schedule ................................................................................... 55
  C. Program Income Requirements ............................................................................. 56
  D. Administrative and National Policy Requirements ............................................... 56
  E. Reporting Requirements ........................................................................................ 57
  F. Audit Requirements ............................................................................................... 60
  G. Remedies for Non-Compliance ............................................................................. 60
Section VII. Contact Information ............................................................................... 61
Appendix A. Grants.gov Application Submission Instructions ............................... 62
  A. Requirement to Submit through Grants.gov and Limited Exception Procedures ........... 62
  B. Submission Instructions ........................................................................................ 62
  C. Technical Issues with Submission .......................................................................... 63
Appendix B. Qualified Project Checklist .................................................................. 65
Appendix C. Guidance for Low-Income and Disadvantaged Community Expenditures ........... 66
Appendix D. Program Budget ..................................................................................... 68
  A. Guidance for Detailed Budget Table ..................................................................... 68
  B. Guidance for Financial Assistance in the Detailed Budget Table .......................... 71

# Section I. Funding Opportunity Description

## A. Background

In the United States and globally, we are already experiencing the impacts of climate change. As described in The Long-Term Strategy of the United States, the time is now for decisive action, and the United States is boldly tackling the climate crisis. The Biden Administration has set climate goals to reduce greenhouse gas emissions 50-52 percent below 2005 levels in 2030, reach 50 percent zero-emission vehicles share of all new passenger cars and light trucks sold in 2030, achieve a carbon pollution-free electricity sector by 2035, and achieve net-zero emissions by no later than 2050, as outlined in the U.S. Nationally Determined Contribution and in Executive Order 14037 *(Strengthening American Leadership in Clean Cars and Trucks)*. Further, the Biden Administration has been clear that achieving these and other climate goals must simultaneously deliver against other critical priorities, including promoting equity and environmental justice, strengthening our economic competitiveness, creating high-quality jobs, and growing our energy independence. President Biden has codified these priorities in Executive Order 14005 *(Ensuring the Future Is Made in All of America by All of America's Workers)*, Executive Order 14008 *(Tackling the Climate Crisis at Home and Abroad)*, Executive Order 14082 *(Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022)*, and Executive Order 14096 *(Revitalizing Our Nation's Commitment to Environmental Justice for All)*. President Biden is furthering these priorities through targeted initiatives, such as the Interagency Working Group on Coal and Power Plant Communities, which targets the economic revitalization of coal and power plant communities, and the Justice40 Initiative, which sets the goal that 40% of the overall benefits from certain federal investments flow to disadvantaged communities. Achieving these goals and priorities will require a tremendous amount of financing and private capital for greenhouse gas- and air pollution-reducing projects across the country, especially in and for the benefit of low-income and disadvantaged communities.

President Biden's Inflation Reduction Act authorized the U.S. Environmental Protection Agency (EPA) to implement the Greenhouse Gas Reduction Fund (GGRF) to help achieve these goals and priorities, creating a historic $27 billion investment in communities across the country—from states to territories to Tribal lands, from the largest urban cities to the most remote rural towns. This bold investment will not only deploy clean energy and combat the climate crisis but also improve health outcomes, lower energy costs, and create high-quality jobs for Americans—all while strengthening our country's economic competitiveness and ensuring energy security.

As part of this investment, EPA is launching three distinct but complementary grant competitions: a $14 billion National Clean Investment Fund competition to finance clean technology deployment nationally; a $6 billion Clean Communities Investment Accelerator competition to finance clean technology deployment in low-income and disadvantaged communities while simultaneously building the capacity of community lenders that serve those communities; and a $7 billion Solar for All competition to spur adoption of clean distributed solar energy that lowers energy bills for millions of Americans in low-income and disadvantaged communities. The National Clean Investment Fund and Clean Communities Investment Accelerator will work in tandem to deploy much-needed capital for clean technologies into communities across the country. The National Clean Investment Fund will create centralized, long-term financing institutions with the scale required to transform financial markets, while the Clean Communities Investment Accelerator will

3

build the capacity of community lenders to draw on that capital to catalyze deployment of projects in communities all across the country—especially in communities that have long faced barriers accessing capital and that most need the benefits of clean technology projects. All competitions are covered under the President's Justice40 Initiative, which sets the goal that 40% of the overall benefits from certain federal investments in climate, clean energy, and other areas flow to disadvantaged communities. This competition will require each grantee to expend at least 40% of funds for the purposes of providing financial assistance in low-income and disadvantaged communities, as defined in this funding opportunity.

**This Notice of Funding Opportunity provides details on the $14 billion National Clean Investment Fund competition.** This competition will provide grants to 2–3 national nonprofit financing entities to create national clean financing institutions capable of partnering with the private sector to provide accessible, affordable financing for tens of thousands of clean technology projects nationwide. These national nonprofits will provide financing to individuals and families, nonprofit organizations, for-profit businesses (especially small businesses), units of government, and others deploying these projects, which will reduce pollution while creating jobs, accelerating progress toward energy security, and lowering energy costs. These national nonprofits will also provide capital to community lenders and other similar institutions so that they can, in turn, provide financing to the communities that they serve. To multiply the impact of public funds, these national nonprofit financing entities will mobilize private capital as they finance these projects, ensuring that every dollar of public funds generates several times more private-sector investment into emissions- and air pollution-reducing projects. To ensure that public funds are spent efficiently and for the maximum benefit of American communities, especially low-income and disadvantaged communities, these national nonprofit financing entities will be subject to, among other measures, rigorous community engagement and accountability strategies; comprehensive equity policies and practices; robust labor and workforce plans; strong governance structures; stringent legal and compliance risk management, financial risk management, and consumer protection plans; and cohesive programmatic, financial, and administrative reporting and transparency requirements.

## B. Statutory Authority

The Inflation Reduction Act amends the Clean Air Act to include Section 134 (42 USC § 7434), which authorizes the EPA to make competitive grants under the National Clean Investment Fund. The National Clean Investment Fund is funded by two separate appropriations to make competitive grants to eligible recipients: $11.97 billion from Section 134(a)(2) and $2 billion from Section 134(a)(3) (out of $8 billion provided in Section 134(a)(3)).

The National Clean Investment Fund implements the statute's use of funds for direct investments under Section 134(b)(1). Section 134(b)(1) directs recipients of funds for direct investments to (A) provide financial assistance to qualified projects at the national, regional, state, and local levels; (B) prioritize investment in qualified projects that would otherwise lack access to financing; and (C) retain, manage, recycle, and monetize all repayments and other revenue received from fees, interest, repaid loans, and any other financial assistance provided using the grant funds to ensure continued operability.

The statute limits the entities eligible to compete for funds under Section 134(a)(2) and 134(a)(3) to "eligible recipients." Section 134(c)(1) defines an eligible recipient as a nonprofit organization

4

that (A) is designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services; (B) does not take deposits other than deposits from repayments and other revenue received from financial assistance using the grant funds; (C) is funded by public or charitable contributions; and (D) invests in or finances projects alone or in conjunction with other investors.

The statute also limits the projects eligible for financial assistance under Section 134(b)(1) to "qualified projects." Section 134(c)(3) provides that a qualified project is any project, activity or technology that (A) reduces or avoids greenhouse gas emissions or other forms of air pollution in partnership with, and by leveraging investment from, the private sector; or (B) assists communities in the efforts of those communities to reduce or avoid greenhouse gas emissions and other forms of air pollution.

## C. GGRF Program Objectives

The National Clean Investment Fund will advance the three GGRF program objectives of reducing emissions of greenhouse gases and other air pollutants; delivering benefits to American communities, particularly low-income and disadvantaged communities; and mobilizing financing and private capital.

- **Program Objective 1: Reduce emissions of greenhouse gases and other air pollutants.** Grantees will invest in projects, activities, and technologies that reduce emissions of greenhouse gases and other air pollutants that harm communities and contribute to climate change. Grantees will accelerate progress toward the climate goals of the United States, including reducing greenhouse gas emissions 50-52 percent below 2005 levels in 2030, reaching 50 percent zero-emission vehicles share of all new passenger cars and light trucks sold in 2030, achieving a carbon pollution-free electricity sector by 2035, and achieving net-zero emissions by no later than 2050.
- **Program Objective 2: Deliver benefits of greenhouse gas- and air pollution-reducing projects to American communities, particularly low-income and disadvantaged communities.[1]** Grantees will ensure that the projects they invest in directly benefit Americans by improving health outcomes, lowering energy costs, creating high-quality jobs, and more. At least 40% of funds awarded under this competition must be used for the purposes of providing financial assistance in low-income and disadvantaged communities.
- **Program Objective 3: Mobilize financing and private capital to stimulate additional deployment of greenhouse gas- and air pollution-reducing projects.** Grantees will mobilize financing and private capital for underinvested projects and underinvested communities, which will demonstrate the market-wide opportunity for financial markets and institutions to finance clean technology projects. As a result, grantees will spur market

---

[1] This funding solicitation uses the term "American communities" to refer to communities within the boundaries of the ten EPA regions and to "Americans" as individuals living within the boundaries of the ten EPA regions. The ten regions are: EPA Region 1 (CT, ME, MA, NH, RI, VT, and 10 Indian Tribes); EPA Region 2 (NJ, NY, PR, VI, and 8 Indian Nations); EPA Region 3 (DE, DC, MD, PA, VA, WV, and 7 Indian Tribes); EPA Region 4 (AL, FL, GA, KY, MS, NC, SC, TN, and 6 Indian Tribes); EPA Region 5 (IL, IN, MI, MN, OH, WI, and 35 Indian Tribes); EPA Region 6 (AR, LA, NM, OK, TX, and 66 Indian Tribes); EPA Region 7 (IA, KS, NE, MO, and 9 Indian Tribes); EPA Region 8 (CO, MT, ND, SD, UT, WY, and 28 Indian Tribes); EPA Region 9 (AZ, CA, HI, NV, American Samoa, Commonwealth of the Northern Mariana Islands, Federated States of Micronesia, Guam, Marshall Islands, Republic of Palau, and 148 Indian Tribes); and EPA Region 10 (AK, ID, OR, WA, and 271 Indian Tribes).

5

transformation, supporting market-wide accessibility of affordable financing for clean technology projects to multiply the impact of grant funds.

Grantees must align their programs with these three objectives, including setting goals and targets as described in *Section IV.C: Content of Application Submission*.

## D. Competition Terminology

This section defines competition terminology referenced throughout this funding opportunity. Some of this terminology includes important requirements of the grant award that should be carefully considered in preparing the application.

**Capital Mobilization:** For this competition, capital mobilization refers to capital contributions made toward qualified projects as a result of the grant's activities, excluding capital contributions made with grant funds. Private capital mobilization is defined as a subset of capital mobilization, excluding additional capital contributions (such as tax credits and other financial incentives) from federal, Tribal, state, territorial, and local government entities. Applicants may define their own methodologies to set goals and targets for capital mobilization for the purposes of their applications. An example methodology is provided below; applicants that do not use this methodology will not be penalized.

*Capital mobilization is defined as additional capital contributions toward projects that are financed by the grantee (this figure excludes the grant funds themselves). Additional capital contributions may include financing provided by the grantee with funds raised from private capital providers and philanthropic sources (including through balance-sheet leverage and securitizations), additional sources of financing provided to project sponsors from private capital providers, and equity contributions from project sponsors. The capital mobilization ratio is defined as the grantee's capital mobilization, divided by the grantee's capital commitments through financial assistance. This ratio excludes the grantee's expenditures for predevelopment, market-building, and program administration activities.*

**Coalition Application:** A coalition application is one of two types of eligible applications under this competition, with the other type being an individual application as described in *Section III.A: Eligible Applicants*. A coalition application is composed of one lead applicant, which partners with one or more non-lead coalition members that are named in the application and would receive subawards (in the form of subgrants) to carry out a portion of the grant's activities if the application is selected. **Subgrantees may engage in any of the grant's eligible activities other than providing subgrants to other organizations for those organizations to provide financial assistance to qualified projects.** However, these and other first-tier subgrantees may still provide subgrants to second-tier subgrantees for predevelopment, market-building, and program administration activities to the extent permitted in Appendix A of the EPA Subaward Policy.

The lead applicant must be an eligible recipient and submit the application on behalf of the coalition. The non-lead coalition member(s) may be eligible recipients or other types of organizations eligible for subawards under the EPA Subaward Policy. **A coalition application should describe the lead applicant's program plan and organizational plan, incorporating the activities of coalition members as well as the lead applicant's management and oversight**

**of those activities.** For example, the portfolio allocation should describe the project categories that will be deployed through activities carried out by the lead applicant and non-lead coalition members, and the legal and compliance risk management plan should describe how the lead applicant will manage legal and compliance risk across its own activities as well as the activities of non-lead coalition members.

If selected, the lead applicant will become the grantee, administer the grant as a pass-through entity for the purposes of 2 CFR Part 200 and the EPA Subaward Policy, and be accountable to EPA for effectively carrying out the full scope of work and the proper financial management of the grant (including subawards to non-lead coalition members). Additionally, if selected, as provided in 2 CFR § 200.332, non-lead coalition members will become subrecipients accountable to the lead applicant for proper use of EPA funding. **Note that pursuant to 2 CFR § 200.332(a)(2), as implemented in Items 2 and 4 of EPA's *Establishing and Managing Subawards* General Term and Condition, successful lead applicants of coalitions must ensure that the terms and conditions of the grant agreement "flow down" to any coalition members that are provided subawards. EPA has developed a template for subaward agreements, available in Appendix D of the EPA Subaward Policy.**

**Community Lender:** Under the Clean Communities Investment Accelerator, grantees will provide funding and technical assistance to "community lenders," which are public, quasi-public, not-for-profit, or nonprofit entities that provide financial assistance to qualified projects at the state, local, territorial, or Tribal level or in the District of Columbia, including community- and low-income-focused lenders and capital providers. In addition to being eligible for funding and technical assistance from grantees of the Clean Communities Investment Accelerator, community lenders are eligible to transact with grantees of the National Clean Investment Fund through loans, loan guarantees, and other financial products.

**Financial Assistance:** Section 134(b)(1) of the Clean Air Act directs that grantees use funds for "financial assistance." For this competition, consistent with the definition of "Federal financial assistance" in 2 CFR § 200.1, financial assistance constitutes financial products, including debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, loan purchasing programs, and other debt instruments), equity (such as equity project finance investments, private equity investments, and other equity instruments), hybrids (such as mezzanine debt, preferred equity, and other hybrid instruments), and credit enhancements (such as loan guarantees, loan guarantee funds, loan loss reserves, and other credit enhancement instruments). For this competition, subgrants are not eligible as financial assistance. Grantees' expenditures for financial assistance will be in the form of *Subawards*, *Participant support costs*, and acquisitions of *Intangible property* for a financial assistance purpose, as defined in 2 CFR § 200.1, with the characterization dependent on the nature of the financial assistance. Additional information is provided in *Appendix D.B: Guidance for Financial Assistance in the Detailed Budget Table*.

Grantees may provide financial assistance to various types of counterparties, which include (as examples) project sponsors as well as community lenders and other similar institutions. Project sponsors—such as individuals and families, nonprofit organizations and for-profit businesses, and

others—may receive financial products such as consumer and business loans to deploy qualified projects in their homes, businesses, and communities. Community lenders and other similar institutions—including community development financial institutions, credit unions, green banks, housing finance agencies, minority depository institutions, farmer-owned cooperatives, community banks, and mission-driven investors—may receive financial products such as warehouse loans, preferred equity investments, and loan guarantees as well as participate in loan purchasing programs that directly enable them to provide financial products to deploy qualified projects in their communities.

*Note: If your application proposes financial assistance in the form of equity investments, **it will be expected to account for the unique risks of equity investments as well as the capabilities required to manage those risks.** This includes, but is not limited to, describing the types of equity investments planned and the allocation of funds across those types of equity investments, providing investment policies to manage the risks of those equity investments, explaining how those equity investments generate program income to support continued operability, describing the staffing plan capable of conducting diligence of such equity investments, sharing a financial risk management plan that accounts for the unique features of those equity investments, and more.*

**Low-Income and Disadvantaged Communities:** GGRF defines low-income and disadvantaged communities as encompassing the following four categories, as defined below: (a) communities identified as disadvantaged by the CEJST mapping tool; (b) a limited number of additional communities identified as disadvantaged by the EJScreen mapping tool; (c) geographically dispersed low-income households; and (d) properties providing affordable housing. Section 134(a)(3) of the Clean Air Act appropriates funds "for the purposes of providing financial assistance and technical assistance in low-income and disadvantaged communities." For this competition, grantees will be required to use at least 40% of grant funds for the purposes of providing financial assistance in the low-income and disadvantaged communities defined below. *Appendix C: Guidance for Low-Income and Disadvantaged Community Expenditures* provides guidance for assessing expenditures against this requirement.

    a. **CEJST-Identified Disadvantaged Communities:** The Climate and Economic Justice Screening Tool (CEJST) is a publicly-available mapping tool developed by the White House Council on Environmental Quality. GGRF's definition of "disadvantaged communities" includes all communities identified as disadvantaged through the CEJST.

    b. **EJScreen-Identified Disadvantaged Communities:** EJScreen is a publicly-available, place-based environmental justice screening and mapping tool developed by the EPA. GGRF's definition of "disadvantaged communities" includes (1) the limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (2) geographic areas within Tribal lands as included in EJScreen.[2]

    c. **Geographically Dispersed Low-Income Households:** GGRF's definition of "geographically dispersed low-income households" includes low-income individuals and households that fall within either of the two categories listed below.

---

[2] Within EJScreen, EJScreen-Identified Disadvantaged Communities can be found in the "Places" tab by clicking the "Justice40/IRA" category and then selecting "EPA IRA Disadvantaged Communities." This includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.

- Individuals and households with incomes at or below the greater of:
  - *For Metropolitan Areas:* (1) 80% Area Median Income (AMI) and (2) 200% of the Federal Poverty Level
  - *For Non-Metropolitan Areas:* (1) 80% AMI; (2) 80% Statewide Non-Metropolitan Area AMI; and (3) 200% of the Federal Poverty Level
- Individuals and households currently approved for assistance from or participation in at least one of the following income-based or income-verified federal assistance programs, with an award letter within the last 12 months: (1) U.S. Department of Health and Human Services' (HHS) Low Income Home Energy Assistance Program; (2) U.S. Department of Agriculture's (USDA) Supplemental Nutrition Assistance Program; (3) U.S. Department of Energy's (DOE) Weatherization Assistance Program; (4) Federal Communications Commission's Lifeline Support for Affordable Communications; (5) USDA's National School Lunch Program; (6) U.S. Social Security Administration's Supplemental Security Income; or (7) any other verified government or non-profit program serving Asset Limited, Income Constrained, Employed (ALICE) individuals or households designated by the EPA Administrator

d. **Properties Providing Affordable Housing:** GGRF's definition of "properties providing affordable housing" includes properties serving low-income individuals and households that fall within either of the two categories listed below.

- Multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following federal or state housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by the U.S. Department of Housing and Urban Development (HUD), including Public Housing, Section 8 Project-Based Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on the goal of ending homelessness funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)); or (5) any other housing assistance program designated by the EPA Administrator
- Naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units[3]

**Market-Building Activities:** Under 2 CFR § 200.403 and other applicable provisions of 2 CFR Part 200, Subpart E, costs are allowable under federal awards so long as they are necessary and reasonable for the performance of the grant award. For this competition, consistent with these regulations, market-building activities are allowable costs, with such activities (1) building the market for financeable qualified projects, (2) not tied directly to qualified projects grantees intend

---

[3] Applicants will be evaluated on their investment policies to integrate housing affordability protection, including but not limited to policies that maintain affordability of existing housing stock, minimize displacement, and prevent rapid cost increases.

to finance, and (3) being necessary and reasonable for the deployment of financial assistance to qualified projects. Market-building activities include activities to generate market-wide demand for qualified projects, including (but not limited to) marketing, customer education and engagement, community outreach, contractor engagement, workforce development, and other non-financial market-building activities. Market-building activities also include activities to build a more supportive financial market for financing qualified projects, including (but not limited to) standardization of documentation, development of new financial products, and other financial market-building activities.

**Predevelopment Activities:** Under 2 CFR § 200.403 and other applicable provisions of 2 CFR Part 200, Subpart E, costs are allowable under federal awards so long as they are necessary and reasonable for the performance of the grant award. For this competition, consistent with these regulations, predevelopment activities are allowable costs, with such activities (1) improving the likelihood of the grantee financing qualified projects, (2) tied directly to qualified projects grantees intend to finance, and (3) being necessary and reasonable for the deployment of financial assistance to qualified projects. Predevelopment activities include (but are not limited to) site and building assessments (e.g., energy audits); financial and technological feasibility studies (e.g., solar resource studies); design and engineering support; and permitting support.

**Program Administration Activities:** Under 2 CFR § 200.403 and other applicable provisions of 2 CFR Part 200, Subpart E, costs are allowable under federal awards so long as they are necessary and reasonable for the performance of the grant award. For this competition, consistent with these regulations, program administration activities are allowable costs, with such activities supporting administration of the grant program. Program administration activities include (but are not limited to) conducting due diligence and underwriting financial transactions; establishing and convening advisory councils; conducting program performance and other reporting activities (e.g., expenditures for personnel and equipment to procure technology infrastructure and expertise for data analysis, performance, and evaluation); and supporting, monitoring, overseeing, and auditing subrecipients, contractors, and program beneficiaries.

**Priority Project Categories:** For this competition, priority project categories include: (a) distributed energy generation and storage; (b) net-zero emissions buildings; and (c) zero-emissions transportation. A project that falls within one or more of the priority project categories is likely to be a qualified project, but it is not guaranteed to be a qualified project. Applications are expected to either cover each of the priority project categories in their investment strategies or provide a rationale for why any of the priority project categories are not covered; any application with such a rationale will not be penalized and will instead be awarded points based on the strength of the rationale. **Note that any project that meets the requirements of a qualified project is eligible for support under this competition.**

    a.   Distributed Energy Generation and Storage: Projects, activities, and technologies that deploy small-scale power generation and/or storage technologies (typically from 1 kW to 10,000 kW), plus enabling infrastructure necessary for deployment of such generation and/or storage technologies. For this competition, the projects, activities, and technologies must support *carbon pollution-free electricity,* which is electrical energy produced from resources that generate no carbon emissions, consistent with the definition specified in Executive Order 14057 *(Catalyzing Clean Energy Industries and Jobs Through Federal*

*Sustainability)*. Examples of the types of projects in this category include (but are not limited to): residential rooftop solar; residential rooftop solar-plus-storage; community wind and solar; fuel cells; stand-alone energy storage, including replacement of backup diesel generators with battery storage; distributed generation and storage assets that support microgrids; and the previously listed projects paired with distribution system upgrades necessary for project interconnection. This priority project category is intended to make an outsized impact on delivering clean energy and energy efficiency benefits—especially to low-income and disadvantaged communities.

b. Net-Zero Emissions Buildings: Projects, activities, and technologies that either (1) retrofit an existing building, making a substantial contribution to that building being a net-zero emissions building and as part of a plan for that building achieving zero-over-time, or (2) construct a new net-zero emissions building in a low-income and disadvantaged community. *Net-zero emissions buildings* are defined in Executive Order 14057 Implementing Instructions,[4] with the primary focus of reducing emissions but with occupant health, environmental stewardship, and climate resilience also as critical elements of a holistic building design, construction, and operations strategy. Net-zero emissions buildings include residential (e.g., 1- to 4-family homes, manufactured homes, multifamily housing), commercial, industrial, and other buildings—especially properties providing affordable housing. Examples of the types of projects in this category include (but are not limited to): decarbonization of affordable multifamily housing through energy and water efficiency, geothermal heating and cooling, and grid-interactive appliance electrification; school building space and water heating grid-interactive electrification; whole-home retrofits for 1- to 4-family homes and manufactured homes to improve energy efficiency; decarbonization retrofits as part of adaptive reuse of existing buildings to create housing, childcare centers, and other community facilities; and new construction of net-zero residential buildings in rural areas as well as in urban infill, transit-oriented locations that are in low-income and disadvantaged communities. This priority project category is intended to make an outsized impact on delivering affordable and sustainable housing benefits—especially to low-income and disadvantaged communities.

c. Zero-Emissions Transportation: Projects, activities, and technologies that deploy zero-emissions transportation modes, plus enabling infrastructure necessary for zero-emissions transportation modes—especially in communities that are overburdened by existing diesel pollution, particulate matter concentration, and degraded air quality. *Zero-emissions transportation* should be consistent with the zero-emissions transportation decarbonization strategies in The U.S. National Blueprint for Transportation Decarbonization. Examples of the types of projects in this category include (but are not limited to): deployment of chargers (including prewiring for future charger installation) and other infrastructure to support zero-emissions micromobility options (e.g., electric bikes and scooters) as well as zero-emissions light-duty vehicles for individuals and families, particularly at and near multifamily housing; deployment of chargers and other infrastructure to support zero-emissions medium- and heavy-duty vehicles for small businesses and farms; charging and refueling depots for zero-emissions school buses, trucks, and public transportation

---

[4] As defined in Executive Order 14057, a net-zero emissions building is an efficient, all electric building that is designed and operated so scope 1 and scope 2 greenhouse gas emissions from all facility energy use equal zero on an annual basis, when connected to on-site renewable energy or a regional grid that provides 100 percent carbon-free electricity on a net annual basis.

vehicles; and small-scale infrastructure to improve walkability and bikeability. This priority project category is intended to make a particular impact on delivering clean transportation benefits—especially to low-income and disadvantaged communities.

**Program Income:** Consistent with 2 CFR § 200.1, *Program income* means gross income earned by a grantee (or a subgrantee) that is directly generated by a supported activity or earned as a result of the grant award. For this competition, program income includes but is not limited to loan and other origination fees, interest payments, principal repayments, dividends from equity investments, interest from short-term securities (e.g., cash deposits), asset sales, and other sources of program income. EPA-specific rules on program income are provided at 2 CFR § 1500.8 and on the coverage of allowable fund raising costs are provided under 2 CFR § 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). These rules apply to grantees as well as subgrantees (such as non-lead coalition members) that are provided subgrants for the purposes of carrying out a portion of the grant's activities. Additional guidance will be provided in the terms and conditions of the grant agreement.

**Qualified Project:** Section 134(c)(3) of the Clean Air Act provides that a qualified project is any project, activity, or technology that (A) reduces or avoids greenhouse gas emissions and other forms of air pollution in partnership with, and by leveraging investment from, the private sector; or (B) assists communities in the efforts of those communities to reduce or avoid greenhouse gas emissions and other forms of air pollution. For this competition, a project must meet all six requirements listed below at the time of financing to be eligible as a "qualified project." **Note that any project that meets the requirements of a qualified project is eligible for support under this competition.** *Appendix B: Qualified Project Checklist* provides an illustrative checklist of these requirements.

    a.  The project, activity, or technology would reduce or avoid greenhouse gas emissions,[5] consistent with the climate goals of the United States to reduce greenhouse gas emissions 50-52 percent below 2005 levels in 2030, reach 50 percent zero-emission vehicles share of all new passenger cars and light trucks sold in 2030, achieve a carbon pollution-free electricity sector by 2035, and achieve net-zero emissions by no later than 2050. The project, activity, or technology may reduce or avoid such emissions through its own performance or through assisting communities in their efforts to deploy projects, activities, or technologies that reduce or avoid such emissions.

    b.  The project, activity, or technology would reduce or avoid emissions of other air pollutants. The project, activity, or technology may reduce or avoid such emissions through its own performance or through assisting communities in their efforts to deploy projects, activities, or technologies that reduce or avoid such emissions.

    c.  The project, activity, or technology would deliver additional benefits (i.e., in addition to reducing or avoiding emissions of greenhouse gases and other air pollutants) to American communities within one or more of the following four categories: clean energy and energy efficiency; clean transportation; affordable and sustainable housing; and training and workforce development.[6]

---

[5] For the purposes of this competition, greenhouse gas emissions are carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act.

[6] The Interim Implementation Guidance for the Justice40 Initiative provides examples of benefits aligned to these categories for the purposes of this competition.

d. The project, activity, or technology may not have otherwise been financed.
e. The project, activity, or technology would mobilize private capital.
f. The project, activity, or technology would support only commercial technologies, defined as technologies that have been deployed for commercial purposes at least three times for a period of at least five years each in the United States for the same general purpose as the project, activity, or technology.

## E. Scope of Work

*Note: This section does not contain any threshold requirements for applicants but rather articulates EPA's vision for the work that grantees will accomplish during and after the period of performance, including the long-term impact of this work. Threshold requirements are included in* Section III.C: Threshold Eligibility Criteria.

In the National Clean Investment Fund competition, applicants should propose establishing centralized, long-term financing institutions that provide affordable, accessible financial assistance to help communities deploy qualified projects—with at least 40% of funds used for the purposes of providing financial assistance in low-income and disadvantaged communities. Applicants should ensure that these centralized, long-term financing institutions support the GGRF program objectives, including through aligning with the United States' climate goals and with associated decarbonization pathways, such as The Long-Term Strategy of the United States; delivering critical benefits, such as improved health outcomes, lower energy costs, and high-quality jobs, to American communities, especially to low-income and disadvantaged communities most in need of these benefits; and mobilizing private capital to support the financial market transformation required to achieve the United States' climate goals.

Applicants should provide details on the types of projects they will seek to support, who will deploy those projects, and where they will be deployed. Applicants must propose portfolios that consist of qualified projects, as described in *Section I.D: Competition Terminology,* which exist in every sector of the economy—Electricity, Transportation, Buildings, Industry, and Agriculture and Lands. Applicants should justify why their project categories meet the eligibility requirements for qualified projects. Applicants should consider the three priority project categories, as described in *Section I.D: Competition Terminology*—distributed energy generation and storage; net zero-emissions buildings; and zero-emissions transportation. Across project types, applicants should describe which segments (e.g., consumers, small businesses) will deploy the projects—with particular consideration for underrepresented businesses that currently and historically have lacked access to capital, such as small businesses, low-income and disadvantaged community-led businesses, Native American-owned businesses, women-owned businesses, and community/locally-owned businesses. Across project types, applicants should also describe where they will be deployed, with particular consideration for geographically diverse communities, including rural communities; Tribal communities; and low-income and disadvantaged communities, including those that are also communities with environmental justice concerns, energy communities, and persistent poverty counties.

Applicants should explain how they plan to work with a wide array of partners to shape the design and execution of the program as well as to help build and execute on a robust, national transaction pipeline. These partners may include community stakeholders, including environmental justice

13

advocates and community-based organizations; Tribal governments and Native-serving organizations; private capital providers; community lenders and other similar institutions (e.g., farmer-owned cooperatives, community banks, and mission-driven investors); philanthropic organizations; unions and other workers' rights groups; nonprofit technical assistance providers, utilities, rural electric cooperatives, and contractors; federal, state, and local government agencies; and others.

Applicants should explain how their activities would complement the grantees of the Clean Communities Investment Accelerator, taking into consideration the different but complementary functions of the two competitions to support community lenders and to build the market for financeable projects. First, applicants should explain how they will provide larger sources of capital to community lenders in the form of loans, loan guarantees, and other financial products, which may occur (for example) after community lenders fully draw down their capital and develop clean financing expertise as a result of the Clean Communities Investment Accelerator. Second, applicants should explain how they will support the market's capacity to deliver financeable projects and demonstrate proofs of concept that enable the participation of established financial markets and institutions, considering that the Clean Communities Investment Accelerator will build the capacity of the community financing ecosystem.

## F. Environmental Results and Strategic Plan Information

Pursuant to Section 6.a of EPA Order 5700.7A1, Environmental Results under Assistance Agreements, EPA must link proposed assistance agreements with the Agency's Strategic Plan. EPA must also require applicants and grantees to adequately describe environmental outputs and outcomes to be achieved under assistance agreements.

Awards made under this funding opportunity will support the following goals and objectives of the FY 2022-2026 EPA Strategic Plan:
- **Goal 1: Tackle the Climate Crisis**
  - Objective 1.1: Reduce Emissions that Cause Climate Change
  - Objective 1.3: Advance International and Subnational Climate Efforts
- **Goal 2: Take Decisive Action to Advance Environmental Justice and Civil Rights**
  - Objective 2.1: Promote Environmental Justice and Civil Rights at the Federal, Tribal, State, and Local Levels
  - Objective 2.2: Embed Environmental Justice and Civil Rights into EPA's Programs, Policies, and Activities
- **Goal 4: Ensure Clean and Healthy Air for All Communities**
  - Objective 4.1: Improve Air Quality and Reduce Localized Pollution and Health Impacts
  - Objective 4.2: Reduce Exposure to Radiation and Improve Indoor Air

## G. Measuring Environmental Results: Example Outputs and Outcomes

Pursuant to EPA Order 5700.7A1, Environmental Results under Assistance Agreements, EPA must require applicants and grantees to adequately describe environmental outputs and outcomes to be achieved under assistance agreements. Outputs and outcomes differ both in their nature and in how they are measured. The term "output" means an environmental activity, effort, and/or associated work product related to an environmental goal or objective that will be produced or

provided over a period of time or by a specified date. Outputs may be quantitative or qualitative but must be measurable during the period of performance. The term "outcome" means the result, effect, or consequence that will occur from carrying out an environmental program or activity that relates to an environmental or programmatic goal or objective. Outcomes may be environmental, behavioral, health-related, or programmatic in nature; may be quantitative or qualitative; and may not necessarily be achievable within the period of performance.

Applicants must address environmental outputs and outcomes in the Project Narrative, as described in *Section IV.C: Content of Application Submission*. Those environmental outputs and outcomes should align with the GGRF program objectives. Example outputs and outcomes aligned to those program objectives are included in the table below.

| Category | Example Outputs | Example Outcomes |
|---|---|---|
| Climate and Air Pollution Benefits | • Projects financed *(total, by project category)*<br>• Projects deployed *(total, by project category)*<br><br>*Note: Additional detail will be expected on each project, which may vary by sector and technology. Distributed generation and storage projects may include nameplate generation/storage capacity (MW) as well as clean energy generated (MWh). Net zero-emissions buildings projects may include number of buildings and homes retrofitted (including type of retrofit e.g., full electrification) as well as number of newly constructed net zero-emissions buildings and homes (including building-level details e.g., square footage). Zero-emissions transportation projects may include number of light-, medium-, and heavy-duty vehicles financed, number of electric vehicle chargers financed, and miles of new bike lanes financed.* | • Reduction and avoidance of greenhouse gas emissions (e.g., carbon dioxide, methane)<br>• Reduction and avoidance of other air pollutants (e.g., particulate matter 2.5, sulfur dioxide, ammonia) |
| Equity and Community Benefits | • Projects financed *(by benefit type, by community type)*[7] | • Clean energy and energy efficiency (e.g., reduction of |

---

[7] Benefit types may include clean energy and energy efficiency, clean transportation, affordable and sustainable housing, training and workforce development, and other types of benefits. Community types may include low-income

| | | |
|---|---|---|
| | • Projects deployed *(by benefit type, by community type)*<br>• Number of households receiving financing for projects and total amount of financing received *(by community type)*<br>• Number of households benefitting from projects *(by community type)*<br>• Number of businesses receiving financing for projects and total amount of financing *(by business type: small business, low-income and disadvantaged community-led business, Native American-owned business, community/locally-owned business, women-owned business, other underrepresented business)*<br>• Number of businesses benefitting from projects *(by business type)*<br>• Total investment in low-income and disadvantaged communities *(by community type, including properties providing affordable housing)* | energy burden; deployment of clean energy; establishment of communitywide microgrids)<br>• Clean transportation (e.g., access to clean, high-frequency transportation; access to affordable electric vehicles, charging stations, and purchase programs)<br>• Affordable and sustainable housing (e.g., improved indoor air quality, reduced housing cost burden)<br>• Training and workforce development (e.g., increased participation in clean energy good job training and subsequent good job placement/hiring, including providing the free and fair chance to join a union and collectively bargain)<br>• Other types of benefits (e.g., community wealth/ownership, resilience benefits, entrepreneurship) |
| Market Transformation Benefits | • Total grant funds committed to projects *(total, by community type, by geography, by project category)*<br>• Total private capital mobilization for projects *(total, by community type, by project category)*<br>• Total private capital mobilization ratio *(total, by community type, by project category)* | • Significant market-wide capital deployment into emissions- and air pollution-reducing projects *(total, by community type, by project category)*<br>• Robust secondary markets participation in securitizations for emissions- and air pollution-reducing projects *(total, by community type, by project category)* |

and disadvantaged communities, subsets of low-income and disadvantaged communities, and other types of communities.

16

| | | • Affordable, accessible capital for individuals, families, small businesses, and nonprofits to finance clean projects *(total, by community type, by project category)* <br> • Accessible and tailored clean financial products for individuals, families, small businesses, and nonprofits *(total, by community type, by project category)* |
|---|---|---|

## H. Additional Provisions for Applicants Incorporated into the Funding Opportunity

Additional provisions that apply to Sections III, IV, V, and VI of this opportunity and/or awards made under this opportunity can be found at EPA Solicitation Clauses. These provisions are important for applying to this opportunity, and applicants must review them when preparing applications for this opportunity. If you are unable to access these provisions electronically at the website above, please contact the EPA point of contact listed in *Section VII: Contact Information* to obtain the provisions.

# Section II. Federal Award Information

## A. Number and Amount of Awards

EPA anticipates awarding $13.97 billion in funding through this opportunity, including $11.97 billion from the appropriation under Section 134(a)(2) of the Clean Air Act and $2.00 billion from the appropriation under Section 134(a)(3) of the Clean Air Act. EPA anticipates making 2–3 grant awards, depending on EPA funding levels, quality of applications received, EPA priorities, and other applicable considerations. EPA reserves the right to alter the amount of funding allocated to this competition from Sections 134(a)(2) and 134(a)(3) of the Clean Air Act as well as the number of awards, depending on EPA funding levels (including the availability of additional funding that may not be used to make awards under the CCIA competition), quality of applications received, EPA priorities, and other applicable considerations. There is no minimum or maximum award amount for this competition, subject to EPA's initial estimate that $13.97 will be available for funding under this competition.

## B. Conditional Awards

EPA may make conditional awards through this funding opportunity, which will be subject to terms and conditions.

## C. Period of Performance

EPA anticipates that programs funded under this opportunity will start by July 2024. All expenditures and disbursements with the grant award funds must be made within the negotiated period of performance of up to 7 years, subject to the provisions in 2 CFR § 200.344(b) on liquidating obligations incurred during the period of performance as part of the close-out process. There will be criteria in the grant's terms and conditions for ending the period of performance following deployment of the initial EPA funding. In addition, as provided in 2 CFR § 1500.8(d), grantees (and, if applicable, subrecipients) will be required to retain and reuse program income for additional capital deployment through the terms of the grantees' close-out agreements, as described in _Section VI.C: Program Income Requirements_.

## D. Partial Funding

EPA reserves the right to partially fund applications by funding discrete portions or phases of proposed programs. If EPA decides to partially fund an application, it will do so in a manner that does not prejudice any applicants or affect the basis upon which the application, or portion thereof, was evaluated and selected for award, and therefore maintains the integrity of the competition and selection process. **To facilitate consideration of an application for partial funding, EPA recommends that applications separate costs for financial assistance in the program budget by project category, to the extent practicable.**

## E. Additional Awards

EPA reserves the right to make additional awards under this opportunity, consistent with EPA policy and guidance, if additional funding becomes available after the original selections are made. Any additional selections for awards will be made no later than 6 months after the original selection decisions.

## F. Funding Type

EPA anticipates awarding grants or cooperative agreements under this opportunity, depending on whether EPA determines that substantial Federal involvement is necessary for effective oversight of grantee performance or that EPA technical assistance will facilitate timely implementation of the EPA approved scope of work. A cooperative agreement provides for substantial involvement between the EPA Project Officer and a selected applicant in the performance of the work supported. Although EPA would negotiate precise terms and conditions relating to substantial federal involvement as part of the award process with each grantee awarded a cooperative agreement, the anticipated substantial federal involvement may include:

- Closely monitoring the grantee's performance to verify the results proposed by the applicant;
- Collaborating during performance of the scope of work;
- Reviewing proposed procurement, in accordance with 2 CFR § 200.317 and 2 CFR § 200.318;
- Reviewing evidence of completion of project phases (e.g., planning) before providing approval for the grantee to begin work on the next project phase (e.g., implementation);
- Reviewing the substantive terms of contracts, subawards, or other financial transactions (EPA will not select particular contractors, subrecipients, or program beneficiaries);
- Approving qualifications of key personnel (EPA will not select employees or contractors employed by the grantee); and
- Reviewing and commenting on reports prepared under the cooperative agreement (the final decision on the content of reports will rest with the grantee).

Further, EPA anticipates considering all awards made under this competition as capitalizations of revolving loan funds for the purposes 2 CFR § 1500.8(d), regardless of the types of financial assistance that grantees and their coalition partners (if any) propose in their applications. With this characterization, the EPA Subaward Policy and its accompanying restrictions will not apply to financial assistance provided with grant funds (including financial assistance provided by coalition partners), although the EPA Subaward Policy will still apply to the subgrants provided by a grantee to coalition partners (if any).

19

# Section III. Eligibility Information

Note: Additional provisions that apply to this section can be found at EPA Solicitation Clauses.

## A. Eligible Applicants

Consistent with Section 134(c)(1) of the Clean Air Act, an applicant that is eligible to receive a grant under the National Clean Investment Fund competition must be an "eligible recipient," which is an organization that: (a) is a nonprofit; (b) is designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services; (c) does not take deposits other than deposits from repayments and other revenue received from financial assistance provided using grant funds under this program; (d) is funded by public or charitable contributions; and (e) invests in or finances projects alone or in conjunction with other investors.

An applicant must meet this definition of eligible recipient at the time of application to be an eligible applicant. The Cover Page, described in *Section IV.C: Content of Application Submission*, must explain how an applicant meets the definition of eligible recipient and provide supporting evidence (including organizational documents, such as articles of incorporation or similar documents filed with a governmental authority as a condition of carrying out its activities; tax filings; financial statements; investment records; and/or any other information the applicant deems appropriate) for that explanation, showing that it:

a. Meets the definition of *Nonprofit organization* set forth in 2 CFR § 200.1;[8]
b. Has an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"
c. Does not receive any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);
d. Is funded by public or charitable contributions; and
e. Has the legal authority to invest in or finance projects.

Further, to be an eligible recipient, an applicant must be incorporated in the United States and cannot be controlled by one or several entities that are not eligible recipients, such as for-profit commercial banks and asset managers. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions, as determined by the EPA.[9] A term and condition specifying compliance with this requirement—and the other requirements of being an eligible recipient—may be included in the grant agreement and in the closeout agreement to ensure that grantees remain eligible recipients while they retain grant funds.

---

[8] 2 CFR § 200.1 states that a *Nonprofit organization* is "any corporation, trust, association, cooperative, or other organization, not including Institutes of Higher Education, that: (1) is operated primarily for scientific, educational, service, charitable, or similar purposes in the public interest; (2) is not organized primarily for profit; and (3) uses net proceeds to maintain, improve, or expand the operations of the organization."

[9] EPA may use the indicia of control described in the 2 CFR § 180.905 definition of "Affiliate" as a basis for making such determinations.

An eligible recipient, as described above, may apply to this competition as either an individual applicant or a "lead applicant" in a coalition.[10] An applicant that submits an application to this competition as an individual applicant or a lead applicant of a coalition may not submit an additional application to this competition as an individual applicant or a lead applicant of a coalition. However, an organization may participate in one or several coalition applications as a non-lead coalition member, even if the organization has submitted an application as an individual applicant or a lead applicant of a coalition. Note that EPA considers an organization and the entities that it controls as the same organization for these purposes, with control defined as above.

- **Individual Application:** An individual application is composed of an individual eligible recipient without any named subrecipients.
- **Coalition Application:** A coalition application is composed of one lead applicant, which partners with one or more non-lead coalition members that are named in the application and that would receive subawards to carry out a portion of the grant's activities if the application is selected. The lead applicant must be an eligible recipient and submit the application on its own behalf and on behalf of coalition members. The non-lead coalition member(s) may be eligible recipients or other types of organizations eligible for subawards under the EPA Subaward Policy. **Coalition applications must include a signed Memorandum of Agreement that confirms participation of each coalition member.** Once the lead applicant submits the application, the lead applicant as well as non-lead coalition members may not be substituted. If selected, the lead applicant must partner with the non-lead coalition members named in the application, unless approved by the EPA Award Official as explained in the EPA Subaward Policy Frequent Questions; additionally, if selected, as provided in 2 CFR § 200.332, the non-lead coalition members would become subrecipients that are accountable to the lead applicant for proper use of EPA funding. Refer to *Section I.D: Competition Terminology* for additional details on coalition applications.

## B. Named Contractors and Named Subrecipients

**Named Contractors.** EPA does not require or encourage applicants to name procurement contractors (including consultants) in applications for grant funding. However, if an applicant chooses to identify a procurement contractor(s) to conduct work proposed in this application, the applicant must comply with the following requirements, even if the entity is referred to as a "partner" in the application. **Contractors may not be coalition members.**

An applicant that identifies a procurement contractor(s) in its application where the amount of the contract will be more than the micro-purchase threshold in 2 CFR § 200.320(a)(1) ($10,000 for most applicants) must demonstrate in their application how the contractor (including consultants) was selected in compliance with the fair and open competition requirements in 2 CFR Parts 200 and 1500. EPA provides guidance on complying with the competition requirements in the Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance

---

[10] In either case, the grantee (either individual applicant or lead applicant) may make additional subawards to carry out a portion of the grant's activities, even if those subrecipients were not named in the application as a coalition member, provided that they are consistent with the grant's terms and conditions and with all applicable requirements, including the EPA Subaward Policy. EPA provides additional guidance in the EPA Subaward Policy Frequent Questions.

Agreements. For example, EPA will not accept sole source justifications for proposed procurement contracts for services that are available in the commercial marketplace, such as environmental or financial consulting and information technology services. Applicants must describe the procurement procedures that were followed to hire any contractor(s) named in the application and include information on where and when the Request for Proposals/Request for Qualifications were posted in the applicant's Cover Page, as described in *Section IV.C: Content of Application Submission*

**Failure to demonstrate compliance with these requirements for named contractors in the application will result in rejection of the application.**

*Successful applicants that do not name procurement contractor(s) in their applications must also comply with these requirements, regardless of if the contractor(s) was procured before or after the EPA grant agreement is awarded. For example, firms or individual consultants that develop or draft specifications, requirements, statements of work, or invitations for bids or requests for proposals must be excluded from competing for such procurements as provided in 2 CFR § 200.319(b). EPA provides additional guidance on complying with this requirement in the Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements.*

**Named Subrecipients.** For this competition, **EPA requires applicants that name subrecipients in applications for grant funding to submit coalition applications and include the named subrecipients as coalition members.** If an applicant chooses to identify a subrecipient(s), the applicant must not only submit a coalition application but also demonstrate that the named subrecipient is eligible for a subaward in compliance with Appendix A of the EPA Subaward Policy. This policy provides, among other things, that transactions between recipients and for-profit firms and individual consultants are procurement contracts rather than subawards when the transaction involves the acquisition of services from the firm or individual, including services necessary to develop and manage the proposed program on behalf of the applicant (and/or on behalf of any non-lead coalition members). Note that grantees may make additional subawards to carry out a portion of the grant's activities, even if those subrecipients were not named in the application as a coalition member, provided that they are consistent with the grant's terms and conditions and with all applicable requirements, including the EPA Subaward Policy. EPA provides additional guidance in the EPA Subaward Policy Frequent Questions.

**Failure to demonstrate compliance with these requirements for named subrecipients in the application will result in rejection of the application.**

*Refer to Section IV.d, "Contracts and Subawards," of EPA Solicitation Clauses for additional guidance on these requirements, which must be met for all contractors (except for micro-purchases) and/or subrecipients specifically named in the application. EPA staff may contact the applicant to clarify issues or obtain additional information before making a final determination of non-compliance and rejection of the application.*

## C. Threshold Eligibility Criteria

All applications will be reviewed for eligibility and must meet the threshold eligibility criteria. **Applications that do not meet all of the threshold eligibility criteria will be deemed ineligible for funding consideration and will not be considered further; as a result, applicants are strongly encouraged to ensure that their applications meet all of the threshold eligibility criteria prior to submitting their applications.** If necessary, EPA may contact applicants to clarify threshold eligibility questions prior to making an eligibility determination. Applications deemed ineligible for funding consideration as a result of the threshold eligibility review will be notified within 15 calendar days of the ineligibility determination.

Applications must meet the following threshold criteria to be considered eligible:

1. Applications must comply with the content and submission requirements, as listed below.

   a. Applications must substantially comply with the application submission instructions and requirements set forth in *Section IV. Application and Submission Information* or else they will be rejected. However, where a page limit is expressed in *Section IV* with respect to the application, or parts thereof, pages in excess of the page limitation will not be reviewed. Applicants are advised that readability is of paramount importance and should take precedence in application format.

   b. In addition, applications must be submitted through Grants.gov as stated in *Section IV. Application and Submission Information* (except in the limited circumstances where another mode of submission is specifically allowed for as explained in *Section IV*) on or before the application submission deadline published in *Section IV*. Applicants are responsible for following the submission instructions in *Section IV* of this funding opportunity to ensure that their application is timely submitted. Please note that applicants experiencing technical issues with submitting through Grants.gov should follow the instructions provided in *Section IV*, which include both the requirement to contact Grants.gov and email a full application to EPA prior to the deadline.

   c. Applications submitted outside of Grants.gov will be deemed ineligible without further consideration unless the applicant can clearly demonstrate that it was due to EPA mishandling or technical problems associated with Grants.gov or SAM.gov. An applicant's failure to timely submit their application through Grants.gov because they did not timely or properly register in SAM.gov or Grants.gov will not be considered an acceptable reason to consider a submission outside of Grants.gov.

2. Applications must explain and provide supporting evidence for how the applicant (either the individual applicant or the lead applicant in a coalition application) is an eligible recipient, as described in *Section III.A: Eligible Applicants*. This includes explaining and providing supporting evidence for being incorporated in the United States and not being controlled by one or several entities that are not eligible recipients.

3. Applications must comply with the requirements for named contractors and named subrecipients, as described in *Section III.B: Named Contractors and Named Subrecipients*. EPA does not require or encourage applicants to name procurement contractors (including consultants) or subrecipients in applications for grant funding. However, if an applicant chooses to identify a procurement contractor(s) to conduct work proposed in this application or subrecipient(s) to be coalition members, the applicant must demonstrate compliance with the requirements. **For this competition, EPA requires applicants that**

**name subrecipients to submit coalition applications and include the named subrecipients as coalition members; all named subrecipients must be coalition members.**

4. Applications must demonstrate that they will expend the requested funding amount over a period of performance of up to 7 years. Note that grantees will retain program income to be used after the period of performance pursuant to the terms of a closeout agreement as provided in 2 CFR § 1500.8(d) and supplemented by the terms and conditions of the award, discussed in *Section VI.C: Program Income Requirements*. EPA intends to close out the grant and negotiate a closeout agreement prior to the end of the period of performance when the grantee has expended and disbursed all of the EPA funding.

5. Applications must include a program plan that provides financial assistance to qualified projects at the national, regional, State, and local levels; prioritizes investment in qualified projects that would otherwise lack access to financing; and retains, manages, recycles, and monetizes all repayments and other revenue received from fees, interest, repaid loans, and all other types of financial assistance provided using grant funds to ensure continued operability. Applications that do not propose providing financial assistance to qualified projects in each of the ten EPA regions will not be considered as "national" and therefore will not be considered as eligible.[11]

6. Applications must include a program budget that allocates at least 40% of grant funds for the purposes of providing financial assistance in low-income and disadvantaged communities. Expenditures for these purposes include costs for financial assistance as well as other costs that are reasonable and necessary for the deployment of such financial assistance, including costs for predevelopment activities, market-building activities, and program administration activities. *Appendix C: Guidance for Low-Income and Disadvantaged Community Expenditures* provides guidance for assessing expenditures against this requirement.

7. Applications must not include unallowable costs, as described in *Section III.D: Allowable and Unallowable Costs*. If an application is submitted that includes any unallowable costs, including but not limited to those described in *Section III.D*, that portion of the application will be ineligible for funding and may, depending on the extent to which it affects the application, render the entire application ineligible for funding.

8. Applications must be submitted by an individual applicant or a lead applicant of a coalition that has not already submitted an application to this competition as an individual applicant or a lead applicant of a coalition. Applicants submitting more than one application will be contacted to determine which application EPA will evaluate, with the remaining application(s) deemed ineligible. While eligible applicants are welcome to submit applications for each of the three GGRF competitions, they may submit only one application for each competition as either an individual applicant or a lead applicant of a coalition application.

---

[11] The ten regions are: EPA Region 1 (CT, ME, MA, NH, RI, VT, and 10 Indian Tribes); EPA Region 2 (NJ, NY, PR, VI, and 8 Indian Nations); EPA Region 3 (DE, DC, MD, PA, VA, WV, and 7 Indian Tribes); EPA Region 4 (AL, FL, GA, KY, MS, NC, SC, TN, and 6 Indian Tribes); EPA Region 5 (IL, IN, MI, MN, OH, WI, and 35 Indian Tribes); EPA Region 6 (AR, LA, NM, OK, TX, and 66 Indian Tribes); EPA Region 7 (IA, KS, NE, MO, and 9 Indian Tribes); EPA Region 8 (CO, MT, ND, SD, UT, WY, and 28 Indian Tribes); EPA Region 9 (AZ, CA, HI, NV, American Samoa, Commonwealth of the Northern Mariana Islands, Federated States of Micronesia, Guam, Marshall Islands, Republic of Palau, and 148 Indian Tribes); and EPA Region 10 (AK, ID, OR, WA, and 271 Indian Tribes).

9. _Coalitions:_ Coalition applications must include a signed Memorandum of Agreement that confirms participation of each coalition member.

## D. Allowable and Unallowable Costs

**Allowable Costs:** The following are allowable costs for this competition:

- Costs for financial assistance to qualified projects, as defined in _Section I.D: Competition Terminology_

  _Note: Some financial assistance will be characterized as acquisitions of intangible property. For this financial assistance, pursuant to 2 CFR § 200.316, EPA will require that grantees record liens or other appropriate notices of record to indicate that the intangible property has been acquired with Federal funding and that use and disposition conditions apply to the intangible property. As provided in 2 CFR § 200.1: "...loans, notes and other debt instruments, lease agreements, stock and other instruments of property ownership (whether the property is tangible or intangible)" are Intangible property for the purposes of the restrictions described at 2 CFR § 200.315(a)._

- Costs for predevelopment activities, as defined in _Section I.D: Competition Terminology_
- Costs for market-building activities, as defined in _Section I.D: Competition Terminology_
- Costs for program administration activities, as defined in _Section I.D: Competition Terminology_, including costs for advisory councils (defined as groups of individuals who are not employees of a grantee but that provide strategic and policy advice to meet program objectives) and costs for fund raising (defined as costs for financial campaigns, endowment drives, solicitation of gifts and bequests, and similar expenses incurred to raise capital or obtain contributions)

All costs must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. EPA's Guidance on Selected Items of Cost for Recipients provides additional details on the allowability of costs for advisory councils and fund raising to meet program objectives for this competition.

_Note: Costs for financial assistance and other activities for the purposes of acquiring or improving real property, including related equipment purchases, are allowable with the prior approval of the EPA Award Official. As provided in 2 CFR § 200.316, EPA will require that grantees "...record liens or other appropriate notices of record to indicate that personal or real property has been acquired or improved with a Federal award and that use and disposition conditions, described in 2 CFR § 200.311 and 2 CFR § 200.313, apply to the property."_

**Unallowable Costs:** The following are unallowable costs for this competition:

- Costs for subgrants to qualified projects
- Costs to support projects, activities, or technologies that fail to meet **any of the six eligibility requirements** for qualified projects

  _Note: All projects, activities, or technologies supported by this competition must meet all six eligibility requirements for qualified projects—and those that fail any of those six eligibility requirements are not eligible for support under this competition. For example,_

*costs to support **projects, activities, or technologies that do not both reduce or avoid emissions of greenhouse gases as well as reduce or avoid emissions of other air pollutants are not "qualified projects"** and therefore are not eligible for support under this competition.* Appendix B: Qualified Project Checklist *provides an illustrative checklist of the requirements for qualified projects.*

- Costs to support projects, activities, or technologies that constitute *Research and Development,* as defined in 2 CFR § 200.1
- Costs to support projects, activities, or technologies that will be deployed outside the boundaries of the ten EPA regions
- Costs for first-tier subgrantees to provide subgrants to second-tier subgrantees for those subgrantees to provide financial assistance to qualified projects (however, first-tier subgrantees may still provide subgrants to second-tier subgrantees for predevelopment, market-building, and program administration activities to the extent permitted in Appendix A of the EPA Subaward Policy)
- Costs for supporting or opposing union organizing, whether directly or as an offset for other funds
- Costs that are unallowable under 2 CFR Part 200, Subpart E and under applicable provisions of 2 CFR Part 1500

If an application is submitted that includes unallowable costs, that portion of the application will be ineligible for funding and may, depending on the extent to which it affects the application, render the entire application ineligible for funding.

# Section IV. Application and Submission Information

## A. Due Date and Submission Instructions

An application package may be obtained by visiting this funding opportunity (EPA-R-HQ-NCIF-23) on Grants.gov. Applicants will be prompted to initiate the application process by generating a Workspace for this opportunity.

Your organization's Authorized Organization Representative (AOR) must submit your complete application package[12] electronically to EPA through Grants.gov. Application packages must be submitted on or before October 12, 2023 at 11:59 PM (Eastern Time) through Grants.gov. Applications received after the closing date and time will not be considered for funding. Applications submitted outside of Grants.gov will be deemed ineligible without further consideration unless the applicant can clearly demonstrate that it was due to EPA mishandling or technical problems associated with Grants.gov or SAM.gov. Please allow enough time to successfully submit your application package and allow for unexpected errors that may require you to resubmit. Occasionally, technical and other issues arise when using Grants.gov.

Refer to *Appendix A: Grants.gov Application Submission Instructions* for the requirements to apply through Grants.gov. In order to submit an application through Grants.gov, your organization must:

- Have an active System for Award Management (SAM) account in SAM.gov and a Unique Entity Identifier (UEI) assigned by SAM.gov;
- Be registered in Grants.gov; and
- Have the E-Business Point of Contact designate an AOR in Grants.gov.

**The registration process for all the above items may take a month or more to complete. Applicants should begin this process as soon as possible.**

In concert with EPA's commitment to conducting business in an open and transparent manner, copies of applications selected under this funding opportunity may be made publicly available on the GGRF website or another public website for a period of time after the selected applications are announced. EPA recommends that applications not include trade secrets or commercial or financial information that is confidential, privileged, or sensitive and that, if disclosed, would invade another individual's personal privacy (e.g., personal email addresses, etc.). However, if such information is included, it will be treated in accordance with 40 CFR § 2.203 (refer to *Section IV.a* of EPA Solicitation Clauses for additional information). However, if you do include such information, clearly indicate which portion(s) of the application you are claiming contains confidential, privileged, or sensitive information. As provided at 40 CFR § 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the applicant.

---

[12] For this competition, the "application package" includes the required federal forms available at Grants.gov as well as the Project Narrative, Project Narrative Attachments, and Other Attachments.

## B. Application Materials

The following forms and documents are included in the Workspace you generate on Grants.gov. Note that there are **two sets of attachments** included as part of these forms and documents. *Project Narrative Attachments* are required to meet the threshold eligibility criteria and/or to receive full points for the respective evaluation criteria. *Other Attachments* are optional (although encouraged) and may provide additional information that the application can reference in the 70-page Narrative Proposal and, as a result, may factor into the assessment against the evaluation criteria.

**Mandatory Documents:**

1. Application for Federal Assistance (SF-424)
2. Budget Information for Non-Construction Programs (SF-424A)
3. EPA Key Contacts Form 5700-54
4. EPA Form 4700-4 Preaward Compliance Review Report
5. Grants.gov Lobbying Form
6. Project Narrative: Use the "Project Narrative Attachment Form" in your Workspace on Grants.gov to submit your Project Narrative, prepared as described in *Section IV.C: Contents of Application Submission*. **Please submit one file (consisting of the Cover Page and Narrative Proposal) using a file name corresponding to the bullet below, replacing *Applicant_Name* with the name of your organization.**
   - Project Narrative - *Applicant_Name*
7. Project Narrative Attachments: Use the "Project Narrative Attachment Form" in your Workspace on Grants.gov to submit the attachments listed below, which are mandatory and do not count toward the page limits for the Project Narrative. **Please submit separate files using file names corresponding to the bullets below, replacing *Applicant_Name* with the name of your organization. Please submit the files in the order presented below.**
   - Supporting Documents for Applicant Eligibility - *Applicant_Name*
   - Supporting Documents for Coalition Member Subaward Eligibility - Applicant_Name *(Coalitions Only)*
   - Coalition Memorandum of Agreement - Applicant_Name *(Coalitions Only)*
   - 1.4.2 Budget Table - *Applicant_Name*
   - 2.1.1 Legal Entity Structure Diagram - *Applicant_Name*
   - 2.1.2 Organizational and Governing Documents - *Applicant_Name*
   - 2.2.1 Resumes of Board Members - *Applicant_Name*
   - 2.2.2 Organizational Chart - *Applicant_Name*
   - 2.2.2 Resumes of Senior Management - *Applicant_Name*
   - 2.4.1 Legal and Compliance Risk Management Policies and Procedures - *Applicant_Name*
   - 2.4.2 Financial Risk Management Policies and Procedures - *Applicant_Name*
   - 2.5.1 Financial Statements - *Applicant_Name*
   - 2.5.2 Financial Projections - *Applicant_Name*

**Optional Documents:**

8. Other Attachments: Use the "Other Attachments Form" in your Workspace on Grants.gov to submit the attachments listed below, which are optional (although encouraged) and do not count toward the page limits for the Project Narrative. **Please submit separate files**

**using file names corresponding to the bullets below, replacing *Applicant_Name* with the name of your organization. Please submit the files in the order presented below.**

- 1.2.1 Community Engagement and Accountability Letters of Support - *Applicant_Name*
- 1.2.4.2 Current Transaction Pipeline Letters of Commitment - *Applicant_Name*
- 1.2.4.3 Transaction Partnerships Letters of Commitment - *Applicant_Name*
- 1.2.5.3 Labor and Equitable Workforce Letters of Commitment - *Applicant_Name*
- 2.2.1 Board Policies and Procedures - *Applicant_Name*
- 2.2.2 Management Policies and Procedures - *Applicant_Name*
- 2.3.1 Consumer Protection Policies and Procedures - *Applicant_Name*
- 2.3.2 Equity Policies and Practices - *Applicant_Name*

9. Disclosure of Lobbying Activities (SF-LLL)[13]

## C. Content of Application Submission

The forms and documents required as part of the application submission are described in *Section IV.B: Application Materials*. Below are the instructions for the Project Narrative, which is composed of the Cover Page (a maximum of two pages) and the Narrative Proposal (a maximum of 70 pages). The Project Narrative must follow the requirements listed below.

- Must not exceed the above-mentioned page limits. **Applicants are encouraged to be concise and do not need to use all pages within the page limits.**
- Must only rely on the text in the above-mentioned page limits as well as the required attachments. **While optional attachments do not count toward the above-mentioned page limits, they may serve only as reference documents** for content described in the Project Narrative; optional attachments that provide new content, rather than serve as reference documents, will not be reviewed or considered. Links to external websites or content will not be reviewed or considered.
- Must be 8 1/2 x 11" typed, single-spaced pages in 12-point Times New Roman font with one column per page, without indenting paragraphs, and with one-inch page margins.

The Cover Page (maximum of two pages) must include:

1. **Program Title.** Provide a title for your proposed program.

2. **Applicant Name.** Identify the name of your organization.

3. **Applicant Eligibility.** Explain how your organization meets the definition of an eligible recipient, **including being incorporated in the United States and not being controlled by a non-eligible recipient.** Attach documents that provide supporting evidence for your explanation. As discussed in *Section III.A: Eligible Applicants*, supporting evidence may include organizational documents, such as articles of incorporation or similar documents filed with a governmental authority; tax filings; financial statements; investment records; certifications of independence; and/or other information.

4. **Program Summary.** Describe the proposed program in no more than ten sentences.

---

[13] Applicants may be required to complete this form if instructed to do so through the Grants.gov Lobbying Form. See the Grants.gov Lobbying Form to determine applicability.

5.   **EPA Funding Requested.** Specify the amount you are requesting from the EPA.

6.   **Period of Performance.** Provide estimated beginning and ending dates for your period of performance. There will be criteria in the grant's terms and conditions for ending the period of performance following deployment of the initial EPA funding. Note that, if selected, you will be required to retain and reuse program income for additional capital deployment, as described in *Section VI.C: Program Income Requirements*.

7.   **Contact Information.** Include the name, title, email address, and phone number for a primary and/or an administrative contact.

8.   **Coalition Members.** Include the names and proposed subaward amounts of all non-lead coalition members that are part of this application, if applying as a coalition. For each organization, explain how that organization is eligible for a subaward under the EPA Subaward Policy and include the contact information listed above for each organization. Attach documents that provide supporting evidence for your explanation(s) as well as a signed Memorandum of Agreement for your coalition.

9.   **Named Contractors.** Include all named contractors that are part of this application. For each named contractor, describe the procurement procedures that were followed to hire the contractor(s) and include information on where and when the Request for Proposals/Request for Qualifications was posted. If there are no named contractors as part of this application, please write "not applicable."

The Narrative Proposal (a maximum of 70 pages) must include the components listed in this section, which should address the evaluation criteria in *Section V.A: Evaluation Criteria*. A table is included in *Section V.A: Evaluation Criteria* to show how the components relate to one another and to the evaluation criteria.

1.   **Program Plan:** Describe how you will use grant funds to advance the GGRF program objectives over the period of performance—and how that use of grant funds will lay the foundation for you to reuse grant funds to advance the GGRF program objectives beyond the period of performance. The program plan consists of the program vision (1.1); investment strategy (1.2); program reporting (1.3); and program budget (1.4).

*Note: The program plan must support deployment of qualified projects (rather than other projects), which requires projects to meet six distinct requirements (including but not limited to reducing/avoiding emissions of greenhouse gases **and** other air pollutants). Appendix B: Qualified Project Checklist provides an illustrative checklist of the requirements for qualified projects.*

1.1   **Program Vision:** Describe your vision to build a program that deploys grant funds to achieve the GGRF program objectives during and after the period of performance, aligning with the climate goals in the U.S. Nationally Determined Contribution and Executive Order 14037 while also achieving the priorities embedded in Executive Order 14005, Executive Order 14008, Executive Order 14082, Executive Order 14096, the Interagency Working Group on Coal and Power Plant Communities, and the Justice40 Initiative. In your program vision, describe the barriers to achieving these goals and priorities in the United States; the financing solutions required to address these barriers; and the role of your program, in coordination with and accounting for the other programs funded by the GGRF across all

three competitions, in addressing these barriers. In your vision, describe how your program will provide financing that makes a unique contribution to overcoming these barriers, including how your program will complement (rather than duplicate) and expand upon the successful efforts of federal, state, and local governments (including existing financing programs and financial incentives); Tribal governments; nonprofit organizations; private capital providers; community lenders and other similar institutions; and others.

**1.2    Investment Strategy:** Describe your approach, in detail, to operationalizing the program vision over the entire period of performance, with additional granularity over the first three years.

**1.2.1    Community Engagement and Accountability Strategy:** Describe your strategy for engaging communities in implementing the program and maintaining accountability to the priorities identified by those communities, including geographically diverse communities (including rural communities); Tribal communities (and their representatives from Tribal governments); and low-income and disadvantaged communities (including those that are communities with environmental justice concerns, energy communities, and persistent poverty counties). You may attach any signed letters of support from applicable community representatives and organizations.

**1.2.1.1 Community Engagement Plan:** Describe your plan to engage those communities, as well as other communities, in a manner that is comprehensive, frequent, accessible (e.g., to persons with limited English proficiency and persons with disabilities), and tailored to their priorities. Also describe any engagement activities that you have completed for the purposes of developing your application, as well as how those engagement activities have shaped your application.

**1.2.1.2 Community Accountability Plan:** Describe your plan to maintain accountability to those communities, as well as other communities, in the program. Discuss transparency mechanisms as well as participatory governance structures and other tools/commitments, such as independent advisory committees and community benefits agreements, that you will implement in the program.

**1.2.2    Investment Objectives:** Identify the goals and targets of your investment strategy. Goals and targets should align with the GGRF program objectives and the corresponding environmental outputs and outcomes (as described in *Section I.G: Measuring Environmental Results*) and with EPA's strategic plan (as described in *Section I.F: Environmental Results and Strategic Plan Information*). If your goals and targets are evaluated and influence the selection decision, then you are expected to achieve them during the period of performance.

**1.2.2.1 Climate and Air Pollution Benefits:** Identify your program's goals and targets for delivering climate and air pollution benefits, including but not limited to accelerating progress toward the climate goals of the United States to reduce greenhouse gas emissions 50-52 percent below 2005 levels in 2030, reach 50 percent zero-emission vehicles share of all new passenger cars and light trucks sold in 2030, achieve a carbon pollution-free electricity sector by 2035, and achieve net-zero emissions by no later than 2050.

**1.2.2.2 Equity and Community Benefits:** Identify your program's goals and targets for delivering equity and community benefits, including which types of benefits you will

deliver and who will receive those benefits. Discuss in particular your goals and targets for benefits that will accrue to geographically diverse communities (including rural communities); Tribal communities; and low-income and disadvantaged communities (including those that are communities with environmental justice concerns, energy communities, and persistent poverty counties).

**1.2.2.3 Market Transformation Benefits:** Identify your program's goals and targets for delivering market transformation benefits. In particular, describe your program's goals and targets for mobilizing private capital.

**1.2.3    Portfolio Allocation:** Describe the project categories you expect to be deployed as a result of your program, the market segments you expect to deploy those projects, and the geographies in which you expect those projects to be deployed to achieve the investment objectives. Include a projected portfolio allocation across project categories, market segments, and geographies.

**1.2.3.1 Project Categories:** Describe the project categories (e.g., sectors, technologies, etc.) you expect to be deployed, and explain how deploying those projects effectively supports your investment objectives. Include a projected portfolio allocation across project categories. **<u>Note that any project that meets the requirements of a qualified project is eligible for support under this competition.</u>**

**1.2.3.1 Market Segments:** Describe the market segments (e.g., consumer vs. commercial, small business, affordable housing developers) you expect to deploy those projects, and explain how serving those market segments effectively supports your investment objectives. Include market segments that currently lack and/or have historically lacked capital access, such as small businesses, low-income and disadvantaged community-led businesses, Native American-owned businesses, women-owned businesses, community/locally-owned businesses, and other underrepresented businesses. Include a projected portfolio allocation across market segments.

**1.2.3.3 Geographies:** Describe the geographies where you expect projects to be deployed, and explain how serving those geographies effectively supports your investment objectives as well as provides financial assistance at the national level. Include geographically diverse communities (including rural communities); Tribal lands; and low-income and disadvantaged communities (including those that are communities with environmental justice concerns, energy communities, and persistent poverty counties). Include a projected portfolio allocation across geographies (and use that allocation to demonstrate national coverage).

**1.2.4    Financial Products and Transactions:** Describe how you will operationalize the portfolio allocation through financial products and financial transactions.

**1.2.4.1 Financial Products:** Describe the financial products (e.g., small business loans, credit enhancements, green mortgages, etc.) that you plan to offer and how those financial products will help you achieve the portfolio allocation. Provide specific details on the financial products (e.g., interest rates, tenor, structure, amortization, and prepayment terms) and how those details are tailored to achieve the portfolio allocation, such as incentivizing projects based on their climate and air pollution benefits and/or equity and community benefits (e.g., using measures such as the <u>Social Cost of Greenhouse Gases</u>) as

well as improving affordability for certain types of counterparties (e.g., low-income and disadvantaged communities). Where relevant, include any financing vehicles and structures you will use to deliver these financial products. Include a projected allocation of grant funds across financial products.

**1.2.4.2 Current Transaction Pipeline:** Describe your current transaction pipeline, defined as transactions that you intend to originate over the first 6 months after receiving the grant award. Explain how this transaction pipeline aligns with your portfolio allocation. You may attach any signed letters from potential counterparties on these transactions, including details on the financial assistance that will be provided and descriptions of the underlying projects.

**1.2.4.3 Transaction Partnerships Plan:** Describe your plan to use partnerships to build and execute on a robust, national transaction pipeline. Include existing and/or planned partnerships to deploy financial assistance to qualified projects by working with intermediating institutions, including community lenders and other similar institutions; non-profit organizations; for-profit businesses; private capital providers; and others. If applying as a coalition, include partnerships as reflected in your coalition. You may attach any letters of commitment that reflect these partnerships.

**1.2.5 Market Development Plan:** Describe how you will support the development of a more supportive market for providing financial assistance to qualified projects.

**1.2.5.1 Predevelopment Plan:** Describe your plan to undertake and/or support predevelopment activities to build a pipeline of qualified projects you intend to finance, especially in low-income and disadvantaged communities.

**1.2.5.2 Market-Building Plan:** Describe your plan to generate market-wide demand for qualified projects, especially in low-income and disadvantaged communities, such as through customer education and engagement, community outreach, contractor engagement, workforce development, and other non-financial market-building activities that are not directly tied to projects you intend to finance. Also describe your plan to build a more supportive financial market for providing financial products to qualified projects, especially in low-income and disadvantaged communities, such as through standardization of documentation, development of financial products, and other financial market-building activities that are not directly tied to projects you finance.

**1.2.5.3 Labor and Equitable Workforce Development Plan:** Describe your plan to ensure that projects that are ultimately financed as a result of your program generate high-quality jobs with a diverse, skilled workforce, in alignment with the U.S. Department of Labor and U.S. Department of Commerce's eight *Good Jobs Principles* and Executive Order 14082, including but not limited to ensuring all workers are paid a stable and predictable living wage, paying prevailing wages or above (where applicable), offering family-sustaining benefits, respecting workers' right to freely and fairly join a union and collectively bargain, and creating safe and healthy working conditions; ensuring projects benefit local workers and communities (including through tools such as community benefits agreements, community workforce agreements, project labor agreements, and provision of supportive services like childcare and transportation assistance for individuals with barriers to employment); promoting stable employment and evaluating and monitoring subcontractors, including temporary staffing agencies; recruiting diverse workers

(especially from low-income and disadvantaged communities); incorporating high-quality and equitable workforce training (such as leveraging registered apprenticeship programs, as described in 29 CFR Parts 29 and 30, and pre-apprenticeship programs connected to registered apprenticeship programs as well as employing displaced energy workers); and developing formal partnerships with labor organizations, including unions and other workers' rights groups. Also describe your plan to comply with the requirements of the Build America, Buy America Act and Davis-Bacon and Related Acts. Refer to *Section VI.D: Administrative and National Policy Requirements* for additional details. You may attach any signed letters of commitment from applicable labor organizations that you plan to partner with.

*Note: EPA encourages project labor agreements (i.e., pre-hire collective bargaining agreements between unions and contractors that govern terms and conditions of employment for all workers on a construction project); the use of an appropriately trained workforce (i.e., through registered apprenticeships and other joint labor-management training programs that serve all workers, particularly those from underserved communities); the use of an appropriately credentialed workforce (i.e., requirements for appropriate and relevant professional training, certification, and licensure); the use of supportive services for those who need them, such as childcare and transportation, to recruit and retain workers on federally funded projects, as expressed in Executive Order 14095 (Increasing Access to High-Quality Care and Supporting Caregivers); and neutrality with respect to union organizing and operations (i.e., grant funds cannot support or oppose union organizing). Note that Executive Order 14063 (Use of Project Labor Agreements for Federal Construction Projects) mandates the use of project labor agreements on large-scale construction projects where the cost to the federal government is $35 million or more.*

**1.2.5.4 Coordination Plan:** Describe your plan to leverage existing resources from federal, Tribal, state, territorial, and local governments as well as non-governmental organizations, including financial assistance resources (such as tax credits and subsidies) and technical assistance resources (such as programs run by the EPA Regional Offices in the regions in which you intend to do business), to maximize effectiveness at achieving your investment objectives. Also describe your plan to coordinate with other GGRF grantees across the National Clean Investment Fund, Clean Communities Investment Accelerator, and Solar for All programs to maximize collective effectiveness at achieving the GGRF program objectives.

**1.2.6 Investment Policies:** Describe the investment policies that will govern your investments, such as transaction-level screening and decision-making policies as well as portfolio-level diversification and governance policies. In particular, include investment policies to align with the requirement that at least 40% of grant funds be used for the purposes of providing financial assistance in low-income and disadvantaged communities—and to ensure that this financial assistance also delivers benefits to low-income and disadvantaged communities.

**1.3    Program Reporting:** Describe your plan for program reporting in alignment with the grant's reporting requirements, as described in *Section VI.E: Reporting Requirements*.

**1.3.1    Reporting Plan:** Describe the environmental outputs and outcomes you plan to track and report as well as the methodologies, inputs, and assumptions you plan to use for tracking

and reporting those outputs and outcomes. You may reference *Section I.G: Measuring Environmental Results* for example outputs and outcomes. You may reference the Tools and Technical Resources provided by the EPA in connection with the Climate Pollution Reduction Grants for example tools and technical resources.

*Note: After selection, EPA may update the terms and conditions to further define outputs and outcomes as well as provide guidance on methodologies, inputs, and assumptions for tracking and reporting outputs and outcomes, including but not limited to reduction and avoidance of greenhouse gas emissions and other air pollutants. For example, for climate and air pollution benefits-related outcomes on distributed generation and storage projects, such disclosure may include project-level data (e.g., MW capacity installed), key assumptions to translate project-level data into outcomes (e.g., capacity factors, emissions intensity of displaced power generation, global warming potential of greenhouse gases, asset useful life, etc.), and relevant sources (e.g., EPA, National Renewable Energy Laboratory, peer-reviewed studies) for estimates compared to a no-action baseline and to other reasonable alternatives. Grantees will be expected to disclose, on an ongoing basis, the methodologies, inputs, and assumptions used to track and report outputs and outcomes as a component of quarterly performance reports. EPA may require outputs and outcomes reporting to be subject to third-party validation, verification, and/or assurance under the terms and conditions of the award.*

**1.3.2** **Reporting Capacity:** Describe your plan to ensure the organizational capacity to execute against the grant's reporting requirements, including program performance as well as financial and administrative reporting requirements. Include the resources you plan to leverage (including personnel as well as data and technology); the policies and procedures you plan to establish to ensure reliable reporting; and third-party validation, verification, and assurance plans. If you intend to obtain external contractors (including consultants) for the provision of such services, you must comply with the competitive procurement requirements in 2 CFR Parts 200 and 1500 as well as EPA's 40 CFR Part 33 Disadvantaged Business Enterprise participation rule; additional guidance is available in the Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements.

*Note: Each applicant should integrate its capacity to conduct program evaluation activities into its description of reporting capacity, including but not limited to conducting evaluation to assess effectiveness and efficiency in achieving outputs and outcomes. Evaluations should be conducted in adherence with EPA Order 1000.33, U.S. EPA Policy for Evaluations and Other Evidence-Building Activities, including timely publication of findings. EPA Order 1000.33 provides a framework to comply with the Foundations for Evidence-Based Policymaking Act of 2018.*

**1.3.3** **Past Performance and Reporting History:** Submit a list of federally and non-federally funded assistance agreements (assistance agreements include grants and cooperative agreements but not contracts) that your organization performed within the last five years. Describe your past performance in successfully completing and managing those assistance agreements. Also describe your history of meeting the reporting requirements under those assistance agreements, including your submitted acceptable final technical reports under those agreements and the extent to which you adequately and timely reported on your

progress towards achieving the expected outputs and outcomes under those agreements and, if such progress was not being made, whether you adequately reported why not.

**1.4**    **Program Budget:** Provide details on the budget found in SF-424A, which includes the full EPA funding request to be expended over the period of performance. **<u>Given that the period of performance is anticipated to begin by July 2024, the budget should reflect activities from July 2024 through the end of the period of performance, with annual figures provided for July through June of each year.</u>**

**1.4.1**    **Expenditure and Disbursement of Awarded Funds:** Describe your approach, procedures, and controls for ensuring that the grant award will be expended and disbursed in a timely and efficient manner.

**1.4.2**    **Budget Description and Table:** Provide a description of the budget, and attach the detailed budget table. In the description, explain how the budget is reasonable to accomplish the program plan, including maximizing the share of funds used for financial assistance (both the direct costs of funds passed through for financial assistance as well as associated indirect costs). In the description, also explain how the budget expends at least 40% of funds for the purposes of providing financial assistance in low-income and disadvantaged communities, as described in *Section I.D: Competition Terminology*. In the budget table, break up funding type into the proper budget categories, and break out costs for financial assistance separately from other costs. Please see *Appendix D: Program Budget* for additional guidance on the budget table.

*Note: A template for the budget table is available for download under the related documents within this grant opportunity (EPA-R-HQ-NCIF-23) on Grants.gov. Applicants that do not use the template will not be penalized.*

**2.**    **Organizational Plan:** Describe your plan to ensure the organizational capacity necessary to carry out the program plan over the entire period of performance, with additional granularity over the first three years. **<u>If applying as a coalition, describe the lead applicant's plan to ensure the organizational capacity to carry out the program plan, which should include but not be limited to managing and overseeing subawards to coalition members.</u>** The organizational plan consists of organizational background and track record (2.1); governance and management (2.2); equitable policies (2.3); risk management (2.4); and financials (2.5).

**2.1**    **Organizational Background and Track Record:** Provide information on your organization, including background information as well as relevant information about your organization's track record for the purposes of demonstrating the organizational capacity necessary to carry out the program plan alongside other business activities.

**2.1.1**    **Description of Business:** Describe your organization's planned business activities; the corporate or other structure of the legal entities that comprise the business; jurisdictions in which you and affiliated legal entities are qualified to do business, own or lease real property, or maintain an office; and activities carried out in each such jurisdiction. Explain how this business description will support the program plan alongside other business activities. Attach the legal entity diagram structure.

**2.1.2**    **Organizational and Governing Documents:** Describe your organizational and governing documents (include articles of incorporation, formation, or partnership; by-laws; and

operating agreements) and the extent to which they align with the GGRF program objectives. Attach the relevant organizational and governing documents.

**2.1.2** **Organizational Experience:** Describe your organizational experience to execute the activities discussed in the program plan. Include your organization's existing experience providing financial assistance to qualified projects, particularly as described in your portfolio allocation (e.g., prior organizational experience with the planned project categories, segments, and geographies) and financial products and transactions (e.g., prior organizational experience with the financial products and with the types of transaction partnerships listed).

**2.2** **Governance and Management:** Describe your organization's plans to ensure strong, capable governance and management to support the program plan alongside other business activities.

**2.2.1** **Governance Plan:** Describe your organization's plan for ensuring strong board oversight and monitoring of management as well as stewardship of the organization's long-term success. Include information on board size and composition, board committee structures, board member independence, and other relevant board policies and procedures. Attach the resumes of board members. You may also attach evidence of established board policies and procedures (including by-laws) that reflect this plan.

**2.2.2** **Management Plan:** Provide your organizational structure or planned organizational structure (including an organizational chart); a list of key existing or proposed senior management and staff (including roles, responsibilities, diversity, expertise, skills, and track record); the actual or projected number of employees and staffing plan; management conflict of interest policies and procedures; management succession plan; and other relevant management policies and procedures. Attach the organizational chart and resumes of senior management. You may also attach evidence of established management policies and procedures that reflect this plan.

**2.3** **Equitable Policies:** Describe your organization's policies to ensure equity and fairness in your program and in your organization's business activities.

**2.3.1** **Consumer Protection Plan:** Describe your organization's plan for ensuring consumer protection across any entity that interacts, transacts, or contracts with a consumer as part of your proposed program as well as your organization's other business activities, such as through the sales and marketing of consumer products/services and financial products (including Property Assessed Clean Energy financing). Your plan should explain in detail how you will comply with applicable consumer protection laws, including the consumer protection laws in the jurisdictions your program will serve, and federal consumer protection and consumer financial laws, such as those prohibiting unfair, deceptive, and abusive practices (e.g., the Federal Trade Commission Act (15 USC § 45), Consumer Financial Protection Act (12 USC § 5536), and Fair Debt Collection Practices Act (15 USC § 1692e)); the Truth in Lending Act (15 USC § 1601 *et seq.*) and Regulation Z (12 CFR § 1026), which require the disclosure of terms and cost of consumer credit and offer substantive protections to people who use consumer credit; and the Equal Credit Opportunity Act (15 USC § 1691 *et seq.*) and Regulation B (12 CFR § 1002), which prohibit creditors from discriminating against consumers who apply for or receive credit. These details may include policies and procedures; training materials; processes for

reviewing, tracking, and addressing consumer complaints regarding business practices and, if applicable, consumer complaints regarding the practices of any service provider used in the provision of a consumer financial product; periodic audits of consumer lending practices (including those of service providers); and more. You may attach evidence of established policies and procedures that reflect this plan.

2.3.2 **Equity Policies and Practices:** Describe your organization's policies and practices to advance equity, defined for the purposes of this grant program as "the consistent and systematic treatment of all individuals in a fair, just, and impartial manner, including individuals who belong to communities that often have been denied such treatment." Such communities may include persons from historically underserved communities of color; members of religious minorities; women and girls; LGBTQI+ persons; persons with disabilities; persons who live in rural areas; persons who live in United States Territories; persons otherwise adversely affected by persistent poverty or inequality; and individuals who belong to multiple such communities. Include policies and practices that integrate equity into your operational activities (e.g., a procurement policy providing outreach and access to disadvantaged business enterprises),[14] investment activities (e.g., policies and practices that commit to environmental and social risk management), and governance (e.g., policies and practices that incorporate community accountability). You may attach evidence of established equity policies and practices.

2.4 **Risk Management:** Describe your organization's plans for strong risk management across your operations and business activities, including but not limited to preventing fraud, waste, and abuse.

2.4.1 **Legal and Compliance Risk Management Plan:** Describe your organization's plan to comply with the grant's terms and conditions and to manage broader legal and compliance risk. The legal and compliance risk management plan may include: risk assessments and remediation steps based on those risk assessments; policies and procedures; systematic documentation; regular training and communications, including top-down management communications; an authorization and certification system; clear separation of duties, even among management; asset safeguarding; confidential reporting mechanisms, including whistleblower protection policies and procedures; an internal investigation framework; third-party management, including collection and retention of third-party identification, basic or enhanced due diligence, internal payment tracking, routine audits, and contract termination clauses for failure to execute; resource allocation and management commitment to legal and compliance risk management; legal and compliance risk management compensation incentives and disincentives; consequences for employees and third parties, up to and including termination, for violating the compliance plan; audit and reconciliation mechanisms conducted by internal and external auditors; and subrecipient monitoring and management. Attach evidence of established policies and procedures that reflect this plan.

2.4.2 **Financial Risk Management Plan:** Describe your organization's plan to identify, assess, measure, and manage critical financial risks, including climate-related financial risks. The

---

[14] Note that grantees will have to comply with the Participation by Disadvantaged Business Enterprises in EPA Programs requirements in 40 CFR Part 33.

financial risk management plan may include board and senior management oversight; policies, procedures, and limits (e.g., enterprise risk management framework, risk appetite statement, risk limits, etc.); risk monitoring and information systems (e.g., loan monitoring and management); and internal controls. Attach evidence of established policies and procedures that reflect this plan.

2.5    **Financials:** Provide your historical financial statements and future financial projections.

2.5.1    **Financial Statements:** Attach audited financial statements (i.e., statement of financial position, statement of activities, statement of functional expenses, and statement of cash flows) for your organization's past three completed fiscal years and quarterly (unaudited) financial statements for the periods that ended during your organization's current fiscal year. If you do not have audited financial statements, attach copies of unaudited financial statements with third-party review and/or attestation. If no financial statements are available, explain the reasoning for the unavailability and provide a statement indicating that you have no material liability or obligation, absolute or contingent (individually or in aggregate), no obligations under contracts made outside of the ordinary course of business, and no obligation that would be required to be reflected in financial statements under Generally Accepted Accounting Principles.

*Note: Applications will not receive full points unless they provide financial statements for each coalition member that would receive a subaward of greater than $10 million.*

2.5.2    **Financial Projections:** Attach pro forma annual financial statement projections for the entire period of performance that cover your statement of financial position (i.e., balance sheet) and statement of activities (i.e., income statement). **For the purposes of the financial projections, the statement of financial position should assume the full EPA funding request is recognized as an asset at the beginning of the period of performance.[15] Given that the period of performance is anticipated to begin by July 2024, the statement of financial position should reflect year-end figures as of June 30th of each year, starting with 2025, and the statement of activities should reflect activities from July through June of each year, starting with July 2024-June 2025.** Explain how those projections demonstrate efficient, effective deployment of grant funds; continued operability of grant funds (including generation of sufficient program income); and continued operability of your organization. Describe the key assumptions used for your financial projections, identify the potential risks or sensitivities to your assumptions, and explain your plan to mitigate those risks or sensitivities if they materialize.

*Note: A template for the financial projections is available for download under the related documents within this grant opportunity (EPA-R-HQ-NCIF-23) on Grants.gov. Applicants that do not use the template will not be penalized.*

*Note: Applications will not receive full points unless they provide financial projections for each coalition member that would receive a subaward of greater than $10 million.*

---

[15] This may not be the grant drawdown schedule included in the terms and conditions of the grant agreement. Please see *Section VI.B: Grant Drawdown Schedule* for additional details.

## D. Pre-Application Assistance

Applicants are invited to participate in a webinar with EPA for additional information about this funding opportunity. Interested parties may access information on the webinar (including date, time, and registration information) as well as other information (such as frequently asked questions) at the following website: www.epa.gov/GGRF. A recording of each webinar will be posted at that link along with presented materials. If necessary, EPA may schedule additional webinars.

In accordance with EPA Order 5700.5A1, EPA's Assistance Agreement Competition Policy, EPA staff will not meet with individual applicants to discuss draft applications, provide informal comments on draft applications, or provide advice to applicants on how to respond to evaluation criteria.

Applicants are responsible for the contents of their applications. However, consistent with the provisions in the announcement, EPA will respond to written questions from individual applicants regarding threshold eligibility criteria, administrative issues related to the submission of the application, and requests for clarification about this funding opportunity.

# Section V. Application Review Information

Note: Additional provisions that apply to this section can be found at EPA Solicitation Clauses.

## A. Evaluation Criteria

Each application that passes the threshold eligibility review described in *Section III.C: Threshold Eligibility Criteria* will be reviewed according to the evaluation criteria set forth in this section. Each application will be rated under a points system, with a total of 1,000 points possible—925 points possible for the specific application components of the Narrative Proposal, plus an additional 75 points possible for cross-component review of the Narrative Proposal's centralization, comprehensiveness, and cohesiveness.

The evaluation criteria depicted in the table below directly correspond to specific application components in the Narrative Proposal described in *Section IV.C: Content of Application Submission*—and will be reviewed according to the evaluation criteria set forth in this section. **Applicants are encouraged to reference the index number and title of these components, especially those with specific point allocations, to ensure appropriate evaluation.**

| Evaluation Criteria for Application Components | | | Points Possible |
|---|---|---|---|
| 1. Program Plan | 1.1 Program Vision | | 40 |
| | 1.2 Investment Strategy | 1.2.1 Community Engagement and Accountability Strategy | 1.2.1.1 Community Engagement Plan | 30 |
| | | | 1.2.1.2 Community Accountability Plan | 30 |
| | | 1.2.2 Investment Objectives | 1.2.2.1 Climate and Air Pollution Benefits | 20 |
| | | | 1.2.2.2 Equity and Community Benefits | 20 |
| | | | 1.2.2.3 Market Transformation Benefits | 20 |
| | | 1.2.3 Portfolio Allocation | 1.2.3.1 Project Categories | 25 |
| | | | 1.2.3.2 Market Segments | 20 |
| | | | 1.2.3.3 Geographies | 30 |
| | | 1.2.4 Financial Products and Transactions | 1.2.4.1 Financial Products | 40 |
| | | | 1.2.4.2 Current Transaction Pipeline | 15 |
| | | | 1.2.4.3 Transaction Partnerships Plan | 30 |
| | | 1.2.5 Market Development Plan | 1.2.5.1 Predevelopment Plan | 15 |
| | | | 1.2.5.2 Market-Building Plan | 20 |
| | | | 1.2.5.3 Labor and Equitable Workforce Development Plan | 20 |
| | | | 1.2.5.4 Coordination Plan | 20 |
| | | 1.2.6 Investment Policies | | 90 |
| | 1.3 Program Reporting | 1.3.1 Reporting Plan | 20 |
| | | 1.3.2 Reporting Capacity | 10 |
| | | 1.3.3 Past Performance and Reporting History | 10 |
| | 1.4 Program Budget | 1.4.1 Expenditure and Disbursement of Awarded Funds | 10 |
| | | 1.4.2 Budget Description and Table | 50 |
| 2. Organizational Plan | 2.1 Organizational Background and Track Record | 2.1.1 Description of Business | 10 |
| | | 2.1.2 Organizational and Governing Documents | 10 |
| | | 2.1.3 Organizational Experience | 20 |
| | | 2.2.1 Governance Plan | 45 |

| | 2.2 Governance and Management | 2.2.2 Management Plan | 45 |
|---|---|---|---|
| | 2.3 Equitable Policies | 2.3.1 Consumer Protection Plan | 30 |
| | | 2.3.2 Equity Policies and Practices | 30 |
| | 2.4 Risk Management | 2.4.1 Legal and Compliance Risk Management Plan | 40 |
| | | 2.4.2 Financial Risk Management Plan | 50 |
| | 2.5 Financials | 2.5.1 Financial Statements | 30 |
| | | 2.5.2 Financial Projections | 30 |
| | | | 925 |

The additional cross-component evaluation criteria depicted in the table below do not directly correspond to specific application components in the Narrative Proposal described in *Section IV.C: Content of Application Submission*—but will be reviewed according to the evaluation criteria set forth in this section. **Applicants do not need to reference the index number and title of these criteria in their applications.**

| Cross-Component Evaluation Criteria | | Points Possible |
|---|---|---|
| 3. Centralization, Comprehensiveness and Cohesiveness | 3.1 Centralization | 25 |
| | 3.2 Comprehensiveness | 25 |
| | 3.3 Cohesiveness | 25 |
| | | 75 |

1. **Program Plan**

1.1 **Program Vision (40 points <u>total</u>):** Each application will be evaluated on extent and quality to which the program vision supports the GGRF program objectives during and after the period of performance, supporting the United States' climate goals and priorities. Specifically, EPA will evaluate the extent to which the application:

- Identifies the barriers to achieving the climate goals in the U.S. Nationally Determined Contribution and Executive Order 14037 while also achieving the priorities set forth in Executive Order 14005, Executive Order 14008, Executive Order 14082, Executive Order 14096, the Interagency Working Group on Coal and Power Plant Communities, and the Justice40 Initiative. **(10 points)**
- Describes the financing solutions required to address those barriers and identifies gaps in the current ecosystem of financing solutions being developed and/or implemented by governmental and non-governmental entities. **(10 points)**
- Describes how the applicant's program makes a unique contribution to solving those barriers, particularly how it fills in gaps in the current financing ecosystem. **(20 points)**

1.2 **Investment Strategy**

1.2.1 **Community Engagement and Accountability Strategy**

1.2.1.1 **Community Engagement Plan (30 points <u>total</u>):** Each application will be evaluated on the extent and quality of the applicant's plan to engage with communities that the National Clean Investment Fund is intended to serve, including as evidenced through signed letters of support from applicable community representatives and organizations. Specifically, EPA will evaluate the extent and quality to which the application:

- Describes past, present, and future engagement with geographically diverse communities, including rural communities, that is comprehensive, frequent, accessible, and tailored to their priorities. **(10 points)**
- Describes past, present, and future engagement with Tribal communities (and their representatives from Tribal governments) that is comprehensive, frequent, accessible , and tailored to their priorities. **(10 points)**
- Describes past, present, and future engagement with low-income and disadvantaged communities—including those that are communities with environmental justice concerns, energy communities, and persistent poverty counties—that is comprehensive, frequent, accessible, and tailored to their priorities. **(10 points)**

**1.2.1.2 Community Accountability Plan (30 points <u>total</u>):** Each application will be evaluated on the extent and quality of the applicant's plan to maintain accountability to the communities that the National Clean Investment Fund is intended to serve, including as evidenced through signed letters of support from applicable community representatives and organizations. Specifically, EPA will evaluate the extent and quality to which the application:

- Describes transparency mechanisms that will promote meaningful accountability to communities, including but not limited to those described in the community engagement plan. **(10 points)**
- Describes participatory governance structures and other tools/commitments, such as independent advisory committees and community benefits agreements, that will ensure meaningful community input into organizational decisions (e.g., through providing decision-making authority) and community monitoring of the program's activities (e.g., through issuing regular public reports evaluating progress in achieving objectives, especially delivering equity and community benefits). **(20 points)**

**1.2.2  Investment Objectives**

*Note: The magnitude of the goals and targets within the investment objectives will be evaluated on a per-dollar basis to for comparability across applications with different EPA funding requests.*

**1.2.2.1 Climate and Air Pollution Benefits (20 points <u>total</u>):** Each application will be evaluated on the extent and quality of the goals and targets related to Program Objective 1, including accelerating progress toward the climate goals of the United States to reduce greenhouse gas emissions 50-52 percent below 2005 levels in 2030, reach 50 percent zero-emission vehicles share of all new passenger cars and light trucks sold in 2030, achieve a carbon pollution-free electricity sector by 2035, and achieve net-zero emissions by no later than 2050. Specifically, EPA will evaluate the extent and quality to which the application:

- Articulates goals aligned to Program Objective 1 and describes impactful, measurable, and achievable targets to assess progress against the goals during and after the period of performance (e.g., reduction and avoidance of emissions of greenhouse gases and other air pollutants). **(20 points)**

**1.2.2.2 Equity and Community Benefits (20 points <u>total</u>):** Each application will be evaluated on the extent and quality of the goals and targets related to Program Objective 2, including delivering equity and community benefits to low-income and disadvantaged communities. Specifically, EPA will evaluate the extent and quality to which the application:

- Articulates goals aligned to Program Objective 2 and describes impactful, measurable, and achievable targets to assess progress against the goals during and after the period of performance. **(20 points)**

**1.2.2.3 Market Transformation Benefits (20 points total):** Each application will be evaluated on the extent and quality of the goals and targets related to Program Objective 3. Specifically, EPA will evaluate the extent and quality to which the application:

- Articulates goals aligned to Program Objective 3 and describes impactful, measurable, and achievable targets to assess progress against the goals during and after the period of performance (e.g., private capital mobilization). **(20 points)**

**1.2.3    Portfolio Allocation**

**1.2.3.1 Project Categories (25 points total):** Each application will be evaluated on the extent and quality of the description of and rationale for the project categories that will be deployed. Specifically, EPA will evaluate the extent and quality to which the application:

- Explains how the project categories, and projected portfolio allocation across categories, support the investment objectives—especially around Program Objective 1—and describes how the project categories cover all three priority project categories or, alternatively, provides a rationale for why any of the priority project categories are not covered. Any application with such a rationale will not be penalized and will instead be awarded points based on the strength of the rationale. **(15 points)**
- Describes how each project category aligns with the requirements of qualified projects, where relevant, such as addressing the first requirement through referencing decarbonization pathways (applicants may refer to the template provided in *Appendix B: Qualified Project Checklist* for guidance). **(10 points)**

**1.2.3.2 Market Segments (20 points total):** Each application will be evaluated on the extent and quality of the description of and rationale for the market segments that will deploy projects. Specifically, EPA will evaluate the extent and quality to which the application:

- Explains how the market segments, and the projected portfolio allocation across them, support the investment objectives—especially around Program Objective 2. **(10 points)**
- Describes how each market segment aligns with the requirements of qualified projects, where relevant, such as addressing the fourth requirement through identifying market segments that currently lack and/or have historically lacked capital access (applicants may refer to the template provided in *Appendix B: Qualified Project Checklist* for guidance). **(10 points)**

**1.2.3.3 Geographies (30 points total):** Each application will be evaluated on the extent and quality of the description of and rationale for the geographies in which projects will be deployed. Specifically, EPA will evaluate the extent and quality to which the application:

- Explains how projects will be deployed in geographically diverse communities (such as rural communities), including through a projected portfolio allocation across geographically diverse communities. **(10 points)**
- Explains how projects will be deployed in Tribal lands, including through the projected portfolio allocation across Tribal lands. **(10 points)**
- Explains how projects will be deployed in low-income and disadvantaged communities (such as those that are communities with environmental justice concerns, energy

communities, and persistent poverty counties), including through the projected portfolio allocation across low-income and disadvantaged communities. **(10 points)**

### 1.2.4    Financial Products and Transactions

**1.2.4.1 Financial Products (40 points <u>total</u>):** Each application will be evaluated on the extent and quality of the financial products that the applicant plans to offer and how those financial products effectively support the portfolio allocation. Specifically, EPA will evaluate the extent and quality to which the application:

- Provides a detailed description of financial products that the applicant plans to offer, including any financing vehicles and structures that will be used to deliver those financial products. **(15 points)**
- Explains how the financial products, and the projected allocation of grant funds across them, effectively support the portfolio allocation (i.e., the project categories, market segments, and geographies). **(25 points)**

**1.2.4.2 Current Transaction Pipeline (15 points <u>total</u>):** Each application will be evaluated on the extent and quality of the applicant's current transaction pipeline of qualified projects aligned to its portfolio allocation. Specifically, EPA will evaluate the extent and quality to which the application:

- Provides an existing transaction pipeline of projects that is sizable, aligns with the portfolio allocation, and is likely to materialize (including as evidenced through signed letters of commitment from potential counterparties). **(15 points)**

**1.2.4.3 Transaction Partnerships Plan (30 points <u>total</u>):** Each application will be evaluated on the extent and quality of the applicant's plan to use partnerships to build and execute on a robust, national transaction pipeline. Specifically, EPA will evaluate the extent and quality to which the application:

- Proposes an effective operating model through which the applicant will partner with other organizations to build and execute on a robust, national transaction pipeline. **(15 points)**
- Provides clear evidence that this operating model will materialize, including as evidenced through signed letters of commitment from potential partners. **(15 points)**

*Note: Applications that do not propose partnerships will be evaluated based on how well they demonstrate that they can effectively and efficiently build and execute on a robust, national transaction pipeline on their own without any collaborating partners.*

### 1.2.5    Market Development Plan

**1.2.5.1 Predevelopment Plan (15 points <u>total</u>):** Each application will be evaluated on the extent and quality of the applicant's plan to undertake and/or support predevelopment activities, directly generating a pipeline of qualified projects that the applicant intends to finance (as articulated in the portfolio allocation), especially in low-income and disadvantaged communities. Specifically, EPA will evaluate the extent and quality to which the application:

- Describes an effective plan for predevelopment activities, explaining the types of predevelopment activities that will be carried out, the partners that will be involved, and the rationale for why the predevelopment activities will address existing barriers

and drive a pipeline of financeable projects, especially in low-income and disadvantaged communities. **(15 points)**

**1.2.5.2 Market-Building Plan (20 points <u>total</u>):** Each application will be evaluated on the extent and quality of the applicant's plan to generate market-wide demand for qualified projects and to build a more supportive financial market for providing financial products to qualified projects, especially in low-income and disadvantaged communities. Specifically, EPA will evaluate the extent and quality to which the application:

- Describes an effective plan for non-financial market-building, explaining the types of market-building activities that will be carried out, the partners that will be involved, and the rationale for why the non-financial market-building activities will address existing capital demand-side barriers to financing qualified projects, especially in low-income and disadvantaged communities. **(10 points)**
- Describes an effective plan for financial market-building, explaining the types of financial market-building activities that will be carried out, the partners that will be involved, and the rationale for why such financial market-building addresses existing capital supply-side barriers to financing qualified projects, especially in low-income and disadvantaged communities. **(10 points)**

**1.2.5.3 Labor and Equitable Workforce Development Plan (20 points <u>total</u>):** Each application will be evaluated on the extent and quality of the applicant's plan to ensure that projects that are ultimately financed as a result of the applicant's program generate high-quality jobs with a diverse, skilled workforce as well as the applicant's plan to comply with the Build-America, Buy-America Act and Davis-Bacon and Related Acts. Specifically, EPA will evaluate the extent and quality to which the application:

- Describes an effective plan to ensure that projects generate high-quality jobs with a diverse, skilled workforce through setting policies and enforcing standards on financial products (e.g., a framework to review investment decisions with a labor and workforce lens); supporting partners, such as private capital providers and community lenders as well as project sponsors, on best practices; and more. Applicants will be evaluated on the strength of the plan, which may include evidence through signed letters of commitment from applicable labor organizations, including unions and other workers' rights groups. **(10 points)**
- Describes an effective plan to comply with the requirements of the Build-America, Buy-America Act and Davis-Bacon and Related Acts, including through identifying the activities that will be involved and the resources that will be required to execute against those activities. **(10 points)**

**1.2.5.4 Coordination Plan (20 points <u>total</u>):** Each application will be evaluated on the extent and quality of the applicant's plan to leverage existing financial and technical assistance resources and to coordinate with other GGRF grantees. Specifically, EPA will evaluate the extent and quality to which the application:

- Describes a plan to leverage existing resources from federal, Tribal, state, territorial, and local governments and non-governmental organizations to maximize effectiveness at achieving the investment objectives. **(10 points)**
- Describes a plan to coordinate with grantees across the National Clean Investment Fund, Clean Communities Investment Accelerator, and Solar for All programs,

minimizing duplication and maximizing complementarity across grantees in achieving the GGRF program objectives. **(10 points)**

1.2.6    **Investment Policies (90 points total):** Each application will be evaluated on the extent and quality of the applicant's investment policies governing their investments. Specifically, EPA will evaluate the extent and quality to which the application:

- Integrates traditional financial factors into the transaction-level investment screening and selection process, consistent with prudent underwriting principles and covering the different types of financial products (e.g., asset classes) described in the program plan. **(15 points)**
- Integrates program-specific factors into the transaction-level investment screening and selection process, consistent with the definition of qualified projects. Applicants may refer to the template provided in *Appendix B: Qualified Project Checklist* for guidance. **(15 points)**
- Integrates housing affordability protection into the investment strategy, including but not limited to policies that maintain affordability of existing housing stock (e.g., affordability-related financing covenants), minimize displacement (e.g., displacement-related policies), and prevent rapid cost increases (e.g., policies to prioritize financing of properties providing affordable housing). **(10 points)**
- Provides well-documented, effective policies to ensure that at least 40% of grant funds are used for the purposes of providing financial assistance in low-income and disadvantaged communities (you may reference *Appendix C: Guidance for Low-Income and Disadvantaged Community Expenditures* for additional guidance) as well as that such financial assistance also delivers benefits to low-income and disadvantaged communities. **(20 points)**
- Provides well-documented, effective policies to support portfolio-level diversification and risk management, including those that limit concentration risks. **(20 points)**
- Explains well-documented, effective governance processes to make investment decisions as well as to update the investment strategy. **(10 points)**

## 1.3    Program Reporting

1.3.1    **Reporting Plan (20 points total):** Each application will be evaluated on the extent and quality of the applicant's plan for tracking and reporting environmental outputs and outcomes. Specifically, EPA will evaluate the extent and quality to which the application:

- Describes outputs and outcomes that align with the grant's reporting requirements, including measures to track and report against those outputs and outcomes. **(10 points)**
- Describes methodologies, inputs, and assumptions that will allow the applicant to execute tracking and reporting against those outputs and outcomes. **(10 points)**

1.3.2    **Reporting Capacity (10 points total):** Each application will be evaluated on the extent and quality of the applicant's capacity to meet the grant's reporting requirements. Specifically, EPA will evaluate the extent and quality to which the application:

- Details the resources that the applicant plans to leverage and why those resources are needed to execute against the grant's reporting requirements, especially tracking and reporting outputs and outcomes (i.e., climate and air pollution benefits, equity and community benefits, and market transformation benefits); establishing policies and

procedures to ensure reliable reporting; and developing plans for third-party validation, verification, and assurance of reporting. **(10 points)**

**1.3.3    Past Performance and Reporting History (10 points <u>total</u>):** Each application will be evaluated on the extent and quality to which the applicant has successfully completed and managed past federally and non-federally funded assistance agreements. Specifically, EPA will evaluate the extent and quality of the applicant's:

- Past performance in successfully completing and managing assistance agreements as well as history of meeting the reporting requirements under those assistance agreements, including whether the applicant submitted acceptable final technical reports under those agreements and the extent to which the applicant adequately and timely reported on their progress toward achieving the expected outputs and outcomes under those agreements and, if such progress was not being made, whether the applicant adequately reported why not. **(10 points)**

*Note: In evaluating applicants under this factor, EPA will consider the information provided by the applicant and may also consider relevant information from other sources, including information from EPA files and from current/prior grantors (e.g., to verify and/or supplement the information provided by the applicant), pursuant to 2 CFR § 200.206. If the applicant does not have any relevant or available past performance or reporting history information, the applicant should indicate this in the application and will receive a neutral score (a neutral score is half of the total points available in a subset of possible points). If the applicant does not provide any response, the applicant may receive a score of 0.*

**1.4    Program Budget**

**1.4.1    Expenditure and Disbursement of Awarded Funds (10 points <u>total</u>):** Each application will be evaluated on the extent and quality of the applicant's planned expenditure and disbursement of awarded funds. Specifically, EPA will evaluate the extent and quality to which the application:

- Demonstrates the approach, procedures, and controls for ensuring that awarded grant funds will be expended and disbursed in a timely and efficient manner. **(10 points)**

**1.4.2    Budget Description and Table (50 points <u>total</u>):** Each application will be evaluated on the extent and quality of the applicant's budget description and table. Specifically, EPA will evaluate the extent and quality to which the application:

- Describes costs that are reasonable to accomplish the program plan through the budget description and table, including maximizing the share of funds used for financial assistance (both the direct costs of funds passed through for financial assistance as well as associated indirect costs). **(30 points)**
- Describes efficient, effective deployment of grant funds through the budget description and table. **(10 points)**
- Provides a detailed budget table that breaks up funding type into the proper budget categories, providing clarity, accuracy, and granularity on the applicant's planned use of funds. **(10 points)**

*Note: The budget description must describe how the applicant will meet the requirement that at least 40% of funds be used for the purposes of providing financial assistance in low-*

*income and disadvantaged communities, as described in* Section III.C: Threshold Eligibility Criteria.

**2.    Organizational Plan**

**2.1    Organizational Background and Track Record**

**2.1.1    Description of Business (10 points <u>total</u>):** Each application will be evaluated on the extent and quality to which the business description supports the program plan alongside other business activities. Specifically, EPA will evaluate the extent and quality to which the application:

- Provides a description of business that aligns with the program plan and that enables the organization to execute the program plan alongside other business activities. **(10 points)**

**2.1.2    Organizational and Governing Documents (10 points <u>total</u>):** Each application will be evaluated on the extent and quality to which the organizational and governing documents support the program plan alongside other business activities. Specifically, EPA will evaluate the extent and quality to which the application:

- Provides organizational and governing documents that are relevant, high-quality, and aligned to the GGRF program objectives. **(10 points)**

**2.1.3    Organizational Experience (20 points <u>total</u>):** Each application will be evaluated on the extent and quality to which it describes organizational experience relevant to executing the activities discussed in the program plan. Specifically, EPA will evaluate the extent and quality to which the application:

- Describes past instances of successfully executing activities similar to those described in the applicant's program plan, including the scope, activities, and results of those activities. **(20 points)**

*Note: The organizational experience of the individual applicant as well as any non-lead coalition members may be evaluated; the experience of contractors or specific individuals in governance and management will not be evaluated. If the applicant does not have any relevant or available organizational experience information, the applicant should indicate this in the application and will receive a neutral score (a neutral score is half of the total points available in a subset of possible points). If the applicant does not provide any response, the applicant may receive a score of 0.*

**2.2    Governance and Management**

**2.2.1    Governance Plan (45 points <u>total</u>):** Each application will be evaluated on the extent and quality of the board's oversight and monitoring of management as well as stewardship of the organization's long-term success. Specifically, EPA will evaluate the extent and quality to which the application:

- Describes a board with appropriate size and composition, including a board of directors with relevant expertise, skills, and track record (such as in emissions and air pollution reduction; clean technology investment and low-income and disadvantaged community investment; and financial markets and institutions) as well as board diversity (such as from geographically diverse communities, including rural communities; Tribal communities; and low-income and disadvantaged communities, including those that

are communities with environmental justice concerns, energy communities, and persistent poverty counties). **(20 points)**

- Describes a board with adequate committee structures to oversee and monitor management, such as an investment or credit committee (i.e., to oversee and approve investment or credit decisions), risk management committee (i.e., to oversee the formulation and operation of the risk management framework), audit committee (i.e., to oversee the integrity of reporting and internal controls and the performance of audit functions), nomination/governance committee (i.e., to oversee nomination and succession of board and senior management), and compensation committee (i.e., to oversee board as well as senior management and staff compensation). **(10 points)**

- Describes a board that is independent, with an appropriate percentage of independent board members and a strong definition of "independent" as well as that has effective and comprehensive board policies and procedures, including policies and procedures for board training; board meeting frequency (e.g., quarterly) and duration; board meeting documentation; board conflict of interest policies and procedures; whistleblower and ethics policies; board evaluation processes; and board nomination and succession plans. **(15 points)**

2.2.2 **Management Plan (45 points total):** Each application will be evaluated on the extent and quality of the planned management team and accompanying organizational structure. Specifically, EPA will evaluate the extent and quality to which the application:

- Describes an organizational structure with the requisite number of employees and staffing (such as personnel with experience in data, technology, and cybersecurity and in planning, designing, developing, implementing, and evaluating programs) and with senior management covering the following roles or responsibilities: chief executive officer, chief risk officer, general counsel, chief compliance officer, chief investment officer, chief reporting/accounting officer, and chief financial officer. **(10 points)**

- Includes senior management with the expertise, skills, and track record to efficiently and effectively execute the program plan (such as in emissions and air pollution reduction; clean technology investment and low-income and disadvantaged community investment; and financial markets and institutions) as well as with diverse backgrounds (such as from geographically diverse communities, including rural communities; Tribal communities; and low-income and disadvantaged communities, including those that are communities with environmental justice concerns, energy communities, and persistent poverty counties). **(25 points)**

- Describes effective and comprehensive management policies and procedures, including those specifying management versus board duties; conflict of interest policies and procedures; and management succession plans. **(10 points)**

2.3 **Equitable Policies**

2.3.1 **Consumer Protection Plan (30 points total):** Each application will be evaluated on the extent and quality of the plan for ensuring consumer protection across any entity that interacts, transacts, or contracts with a consumer as part of the applicant's proposed program as well as other business activities. Specifically, EPA will evaluate the extent and quality to which the application:

- Describes a plan to effectively comply with applicable consumer protection laws that prohibit unfair, deceptive, and abusive practices. **(10 points)**

- Describes a plan to effectively comply with the Truth in Lending Act (15 USC § 1601 *et seq.*) and Regulation Z (12 CFR §1026) as well as the Equal Credit Opportunity Act (15 USC § 1691 *et seq.*) and Regulation B (12 CFR § 1002). **(10 points)**
- Describes a plan that ensures any service provider utilized in the provision of a financial product (by the applicant or any of its financing partners) does not present unwarranted risks to consumers, including service providers for financial products originated and sold, and creates a process for reviewing, tracking, and addressing consumer complaints against any service providers used in the provision of a financial product. **(10 points)**

**2.3.2   Equity Policies and Practices (30 points <u>total</u>):** Each application will be evaluated on the extent and quality to which the equity policies and practices will ensure equity is integrated into the applicant's operations, investment activities, and governance. Specifically, EPA will evaluate the extent and quality to which the application:

- Includes policies and practices that integrate equity into the applicant's operational and investment activities and explains how such policies and practices advance "equity," as defined in *Section IV.C: Content of Application Submission*. **(15 points)**
- Includes policies and practices that integrate equity into the applicant's governance and explains how such policies and practices advance "equity," as defined in *Section IV.C: Content of Application Submission*. **(15 points)**

**2.4     Risk Management**

*Note: Applications with plans for stronger risk management across all EPA funds requested will score higher; applications with plans for strong risk management for only a portion of the EPA funds requested (i.e., not covering how it will manage legal and compliance risk among coalition members, if submitting a coalition application) will score lower.*

**2.4.1   Legal and Compliance Risk Management Plan (40 points <u>total</u>):** Each application will be evaluated on the extent and quality of the plan to comply with the grant's terms and conditions and to manage broader legal and compliance risk. Specifically, EPA will evaluate the extent and quality to which the application:

- Describes a plan to comply with *2 CFR § 200.302(b) (financial management)*, *2 CFR § 200.303 (internal controls)*, and *2 CFR § 200.332 (requirements for pass-through entities)*. **(20 points)**
- Provides an assessment of legal and compliance risks associated with the applicant's program as well as other business activities, as well as a robust plan to mitigate those risks. **(20 points)**

**2.4.2   Financial Risk Management Plan (50 points <u>total</u>):** Each application will be evaluated on the extent and quality of the plan to identify, assess, measure, and manage critical financial risks. Specifically, EPA will evaluate the extent and quality to which the application:

- Provides a plan that effectively identifies, assesses, measures, and manages credit, liquidity, market, operational (e.g., cybersecurity), strategic, reputational, and other critical financial risks. **(35 points)**

- Provides a plan that effectively incorporates climate-related financial risks, both physical and transition risks, including integration into the aforementioned identification, assessment, measurement, and management of financial risks (especially within credit risk and underwriting processes). **(15 points)**

**2.5    Financials**

**2.5.1    Financial Statements (30 points <u>total</u>):** Each application will be evaluated on the extent and quality of its financial statements. Specifically, EPA will evaluate the extent and quality to which the application:

- Provides audited financial statements for the past three fiscal years and quarterly (unaudited) financial statements for the current fiscal year; applicants without such financial statements will score lower, although they can still receive more than a neutral score by providing alternative information and explanations. **(15 points)**
- Demonstrates financial health and capacity through those financial statements, including based on performance against key financial ratios.[16] **(15 points)**

*Note: If the applicant does not have any financial statements (audited or unaudited) covering the past three fiscal years, the applicant should indicate this in the application and will receive a neutral score (a neutral score is half of the total points available in a subset of possible points) on the second criterion, since that criterion requires assessment of financial health against financial statements. If the applicant does not provide any response, the applicant may receive a score of 0.*

*Note: Applications will not receive full points unless they provide financial statements for each coalition member that would receive a subaward of greater than $10 million.*

**2.5.2    Financial Projections (30 points <u>total</u>):** Each application will be evaluated on the extent and quality of the financial projections (for both the grant funds and the applicant as an organization considering all sources of funds) for the entire period of performance. Specifically, EPA will evaluate the extent and quality to which the application:

- Demonstrates continued operability of the program funded by the grant award, including generation of sufficient program income (consistent with 2 CFR § 200.307 and 2 CFR § 1500.8) as well as continued operability of the applicant, through the financial projections. **(15 points)**
- Explains the assumptions used in the financial projections, the level of risks associated with those assumptions, and the plans to mitigate those risks if they materialize— including how the macroeconomic environment (e.g., interest rates) may impact the financial projections. **(15 points)**

*Note: Applications will not receive full points unless they provide financial projections for each coalition member that would receive a subaward of greater than $10 million.*

---

[16] EPA may assess the following financial ratios, among others: Portfolio-at-Risk Ratio ([Loans 90+ Days Past Due + Troubled Debt Restructuring]/[Total On-Balance Sheet Loan and Lease Portfolio], Net Asset Ratio (Net Assets/Total Assets), Self-Sufficiency Ratio (Earned Revenue/Operating Expenses), Current Ratio (Current Assets/Current Liabilities), Change in Net Assets (Change in Net Assets), Deployment Ratio (Total On-Balance Sheet Loan and Lease Portfolio/Net Assets in Program Account), Operating Liquidity Ratio (Unrestricted Cash & Cash Equivalents / 25% of Operating Expenses), and Expense Ratio (Operating Expenses/Total Assets).

*Note: Applications may be able to receive full points even if they submit only selected line items for their financial projections; in this case, the individual line items may not sum together. All financial projections will be evaluated based on the evaluation criteria above, regardless of whether they include all line items or only selected line items.*

**3.        Centralization, Comprehensiveness, and Cohesiveness**

**3.1        Centralization (25 points <u>total</u>):** Each application will be evaluated on the extent and quality to which it proposed to create a centralized source of capital, wherein grant funds are centrally controlled and managed. Although applicants may submit either individual or coalition applications, individual applications will tend to score higher on this criterion, and coalition applications will tend to score lower on this criterion—unless the lead applicant can demonstrate that the coalition will operate in a coordinated fashion through standardized programmatic and financial practices as well as effective communication channels. Specifically, EPA will evaluate the extent and quality to which the application:

- Centralizes the control, management, and execution of the grant program. **(10 points)**
- Standardizes the control, management, and execution of the grant program such that grant activities are consistently controlled, managed, and executed across the entire program. **(15 points)**

**3.2        Comprehensiveness (25 points <u>total</u>):** Each application will be evaluated on the extent and quality to which it is comprehensive, covering all components and sub-components described in *Section IV.C: Content of Application Submission*. Specifically, EPA will evaluate the extent and quality to which the application includes:

- A program plan that provides comprehensive coverage of all components and sub-components of the program plan, as described in *Section IV.C: Content of Application Submission*. **(15 points)**
- An organizational plan that provides comprehensive coverage of all components and sub-components of the organizational plan, as described in *Section IV.C: Content of Application Submission*. **(10 points)**

**3.3        Cohesiveness (25 points <u>total</u>):** Each application will be evaluated on the extent and quality to which it is cohesive, providing a clear program proposal that ties together the components and sub-components described in *Section IV.C: Content of Application Submission*. Specifically, EPA will evaluate the extent and quality to which the application includes:

- A program plan that is cohesive, providing a clear program proposal that ties together the components and sub-components describing how the applicant plans to effectively use grant funds to advance the GGRF program objectives, as described in *Section IV.C: Content of Application Submission*. **(15 points)**
- An organizational plan that is cohesive, providing a clear program proposal that ties together the components and sub-components describing how the applicant will have the organizational capacity necessary to carry out the program plan, as described in *Section IV.C: Content of Application Submission*. **(10 points)**

## B. Review and Selection Process

Applications will be reviewed and scored under the process listed below.

**1. Threshold Eligibility Review Process:** All applications will be evaluated for eligibility using the threshold eligibility criteria described in *Section III.C: Threshold Eligibility Criteria*.

**2. Review Panel and Evaluation Process:** Review panel(s) will review, score, and rank all eligible applications that pass the threshold eligibility review based on the merit evaluation criteria listed above. The review panel(s) will include EPA staff and may also include staff from other federal agencies and external subject matter experts who are free from any actual or apparent conflicts of interest.

**3. Interviews for Top-Ranked Applications:** The review panel(s) may conduct virtual or in-person interviews with top-ranked applicants. Applicants designated for such interviews would be provided information regarding the interview process upon designation.

**4. Final Selection Process and Other Factors:** The review panel(s) will present final rankings and selection recommendations to the Selection Official, who will then make the final selections for awards.

In addition to the information presented by the review panel(s), the Selection Official may also consider any of the following "other factors" in making final selection decisions from among the top-ranked applications: project categories (e.g., to ensure sufficient coverage of priority project categories); geographic diversity (e.g., to ensure sufficient coverage within all EPA regions); organizational capacity considerations due to organizations participating in multiple applications that are top-ranked (i.e., as individual applicants, lead applicants of coalition applications, or non-lead members of coalition applications); GGRF program objectives; EPA strategic goals and objectives; and availability of funds.

**5. Anticipated Announcement and Federal Award Date:** EPA anticipates it will announce selection decisions in March 2024.

# Section VI. Award Administration Information

Note: Additional provisions that apply to this section can be found at <u>EPA Solicitation Clauses</u>.

## A. Award Notification and Disputes

EPA anticipates notification of selected applicants will be made via electronic mail in March 2024. The notification will be sent to the original signer of the application or the contact listed in the application. This notification, which informs the applicant that its application has been selected, is not an authorization to begin work. The official notification of an award will be made by the EPA Award Official. Applicants are cautioned that only a grants officer is authorized to bind the Government to the expenditure of funds; selection does not guarantee an award will be made. For example, statutory authorization, funding, or other issues discovered during the award process may affect the ability of EPA to make an award to an applicant. The award notice, signed by a grants officer, is the authorizing document and will be provided through electronic mail. The successful applicant may be requested to prepare and submit additional documents and forms that must be approved by EPA before the grant can officially be awarded. The time between notification of selection and finalization of the award agreement can take up to 90 days or longer.[17]

Assistance agreement competition-related disputes will be resolved in accordance with the dispute resolution procedures published in 70 FR (Federal Register) 3629, 3630 (January 26, 2005), which can be found at <u>Grant Competition Dispute Resolution Procedures</u>. Copies of these procedures may also be requested by contacting the person listed in *Section VII* of the announcement. Note, the FR notice references regulations at 40 CFR Parts 30 and 31 that have been superseded by regulations in 2 CFR Parts 200 and 1500. Notwithstanding the regulatory changes, the procedures for competition-related disputes remain unchanged from the procedures described at 70 FR 3629, 3630, as indicated in 2 CFR Part 1500, Subpart E.

## B. Grant Drawdown Schedule

In accordance with the <u>EPA General Terms and Conditions</u>, grantees typically draw funds only for the minimum amounts needed for actual and immediate cash requirements; disbursements occurring within 5 business days of drawdown comply with this requirement. After an applicant is selected for an award, EPA staff (Project Officer, Grant Specialist, and Financial Specialist) will discuss departures from the EPA General Terms and Conditions with each selected awardee on a case-by-case basis, to the extent such departures are reasonable and necessary for performance under each selected application. These departures may include:

- A schedule of working capital advances to provide each grantee an initial advance as well as annual advances over the period of performance such that the grantee can provide timely financial assistance to counterparties, consistent with 2 CFR § 200.305(b)(4) as supplemented by 2 CFR § 1500.4(a), which allows for exceptions to 2 CFR § 200.305(b) as necessary;

---

[17] Non-profit applicants that are recommended for funding under this announcement are subject to pre-award administrative capability reviews consistent with Section 8b, 8c, and 9d of <u>EPA Order 5700.8: EPA's Policy on Assessing Capabilities of Non-Profit Applicants for Managing Assistance Awards</u>. In addition, non-profit applicants selected for awards over $200,000 may be required to fill out and submit to the grants management office EPA Form 6600.09, United States Environmental Protection Agency Administrative Capability Questionnaire with supporting documents as required in EPA Order 5700.8.

- A one-time or periodic balance-sheet capitalization(s), in accordance with 2 CFR § 1500.4(a), which allows for exceptions to 2 CFR § 200.305(b); or
- Other departures as agreed upon by the EPA Award Official or through regulatory exceptions provided under 2 CFR § 1500.4(a).

Note that any departures from typical drawdown requirements in 2 CFR § 200.305(b) or the EPA General Terms and Conditions may be subject to measures or other arrangements (e.g., bonds, insurance requirements, financial agent arrangements with U.S. Department of Treasury) to ensure that EPA's interests are protected.[18]

## C. Program Income Requirements

In accordance with Clean Air Act Section 134(b)(1)(C) as well as 2 CFR § 200.307(e)(2) and 2 CFR § 1500.8(b), which "flow down" to subgrantees as provided in 2 CFR § 200.332 and EPA General Terms and Conditions, grantees will be required to retain program income earned during the period of performance. Program income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the assistance agreement and beyond the period of performance based on close-out agreements. Grantees will report on the amount of program income earned during the period of performance through the quarterly Federal Financial Report, Standard Form 425. In accordance with 2 CFR § 1500.8(d) as supplemented by the terms and conditions of the grant award, each grantee will only be authorized to use program income once the grant award is fully drawn down, at which point EPA will enter into a closeout agreement with the grantee. Note that EPA plans to establish programmatic requirements in a closeout agreement to implement program income requirements.

## D. Administrative and National Policy Requirements

Grantees will be subject to administrative and national policy requirements. Note that EPA plans to establish programmatic requirements in the terms and conditions of each grant agreement to implement these administrative and national policy requirements, which will include but not be limited to:

- **Build America, Buy America Act (BABA):** Certain projects under this competition are subject to the Buy America Sourcing requirements under the Build America, Buy America (BABA) provisions of the Infrastructure Investment and Jobs Act (IIJA) (P.L. 117-58, §§ 70911-70917) that apply when using Federal funds for the purchase of goods, products, and materials on any form of construction, alteration, maintenance, or repair of infrastructure in the United States. The Buy America preference requirement applies to all the iron and steel, manufactured products, and construction materials used for the infrastructure project under an award for identified EPA financial assistance funding programs. Please consider this information when preparing budget information. EPA will provide further guidance on which projects are subject to BABA provisions and will work with grantees to support implementation as necessary, as applicants comply with applicable Buy America preference requirements or apply for a waiver for each infrastructure project.

---

[18] Costs for acquiring bonds or insurance required by the terms of the EPA grant award are allowable as provided in 2 CFR § 200.427 and 2 CFR § 200.447, respectively. EPA may require that grantees bear part of the cost of bonds or insurance as a cost-share.

- **Davis-Bacon and Related Acts (DBRA):** The Davis-Bacon Act (42 USC §§ 3141-3144) (DBA) sets out labor standards, including prevailing wages and fringe benefits, and applies to most federally funded contracts for construction of public works. The DBA labor standards and reporting requirements also apply to projects assisted with grants authorized by the Clean Air Act as provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA). A term and condition specifying DBRA compliance requirements will be included in the grant agreement.

- **Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA):** The URA applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require grantees to follow certain procedures for acquiring property for grant purposes, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. A term and condition specifying URA compliance requirements will be included in the grant agreement.

- **National Historic Preservation Act (NHPA)**: Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant agreement, on historic properties. If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs. A term and condition specifying NHPA compliance requirements will be included in the grant agreement.

- **Justice40 Initiative:** The Justice40 Initiative sets the goal that 40% of the overall benefits from certain federal investments in climate, clean energy, and other areas flow to disadvantaged communities. The Greenhouse Gas Reduction Fund is a covered program under the Justice40 Initiative, and EPA is tracking and measuring program benefits to advance this goal. A term and condition specifying reporting of metrics demonstrating the extent to which the grant's activities advance this 40% goal will be included in each grant agreement.

Note that Section 7(c) of the Energy Supply and Environmental Coordination Act of 1974 (15 USC § 793(c)(1)) exempts all actions under the Clean Air Act from the requirements of NEPA (National Environmental Policy Act). This Section states: "No action taken under the Clean Air Act shall be deemed a major Federal action significantly affecting the quality of the human environment within the meaning of the National Environmental Policy Act of 1969." Therefore, as a grant program authorized under the Clean Air Act, NEPA will not apply to projects funded under the National Clean Investment Fund.

## E. Reporting Requirements

Grantees will be subject to both program performance as well as financial and administrative reporting requirements, as described below. Note that EPA will only collect reporting information from each grantee (rather than from any subrecipients), but each grantee may need to collect reporting information from subrecipients in order to meet these reporting requirements.

**Program Performance Reporting:** In accordance with 2 CFR § 200.329, each grantee will be subject to program performance reporting requirements. Reporting requirements effective during the period of performance will be established in the grant agreement's terms and conditions, and reporting requirements effective after the period of performance will be established in a closeout agreement.

During the period of performance, EPA will require each grantee to submit quarterly performance reports within 30 days after the end of each reporting period (and with additional requirements every fourth quarterly report i.e., annually) as well as a final performance report within 90 days after the end of the period of performance. EPA will require that each grantee's chief executive officer and chief reporting officer review and submit each of these reports. EPA will use information from these reports as part of program-wide public reporting, except to the extent such information includes confidential business information (CBI) or personally identifiable information (PII) pursuant to 2 CFR § 200.338.[19] Included below is information that EPA may require in these reports.

| Category | Sub-Category | Quarterly Reports | Annual Reports | Final Report |
|---|---|---|---|---|
| **Grant Expenditures** | Program expenditures | ✓ | ✓ | ✓ |
| | Closed transactions[20] | ✓ | ✓ | ✓ |
| | Current transaction pipeline | ✓ | ✓ | ✓ |
| **Environmental Outputs and Outcomes[21]** | Climate and air pollution benefits | ✓ | ✓ | ✓ |
| | Equity and community benefits | ✓ | ✓ | ✓ |
| | Market transformation benefits | ✓ *(plus case studies)[22]* | ✓ *(plus case studies)* | ✓ *(plus case studies)* |
| **Program Evaluation and Other Evidence-Building** | Program evaluation | ✕ | ✓ | ✓ |
| | Other evidence-building | ✕ | ✓ | ✓ |

---

[19] Information claimed as CBI in accordance with this Notice will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B.
[20] Details may include origination date, origination fees, funding amount, financial product type, transaction characteristics (interest rate, tenor, structure, amortization, and prepayment terms), project type, basic counterparty information, and private capital mobilization; those details may be required at the transaction level and/or aggregated by geography, sector, technology, and/or portfolio.
[21] See *Section I.G: Measuring Environmental Results* for example outputs and outcomes.
[22] Case studies will facilitate market transformation by demonstrating the market-wide opportunity for financial markets and institutions to finance clean technology projects through showcasing market-wide demand for capital, highlighting the financial performance of financial products (e.g., risk-return profile), sharing best practices on standardization of documentation, and more.

| **Organizational Financial Statements and Disclosures** | Management's discussion and analysis of financial condition and results of operations | ✓<br><br>*(as needed)* | ✓ | ✗ |
|---|---|---|---|---|
| | Consolidated financial statements and notes | ✓[23]<br><br>*(consolidated financial statements and notes prepared in accordance with GAAP)* | ✓<br><br>*(audited consolidated financial statements and notes complying with 2 CFR § 200)* | ✗ |
| | Performance against specified financial ratios/covenants[24] | ✓ | ✓ | ✗ |
| | Scope 1 and 2 emissions; relevant categories of Scope 3 emissions[25] | ✗ | ✓ | ✗ |
| | Executive and board compensation disclosures | ✗ | ✓ | ✗ |
| | Additional board disclosures (e.g., board meeting records) | ✓ | ✓ | ✗ |

In addition, EPA may require each grantee to:
- Revise its investment strategy every three years, with EPA intending to publish this strategy, after redacting CBI and PII, unless the grantee voluntarily publishes the revised investment strategy;
- Provide timely disclosure of the grantee's events including, for example, completion of acquisition or disposition of assets; material impairments; changes in certifying accountants; non-reliance on previously issued financial statements; election, appointment, or departure of directors or management; and new contractor or subrecipient contracts substantially related to program execution; and
- Respond to reasonable requests from EPA, from time to time, pursuant to 2 CFR § 200.337(a), for information regarding the grantee's operations, business affairs, plans, financial condition and projections, and compliance with the terms of the award agreement to the extent that this information is pertinent to the EPA financial assistance award.

---

[23] Grantees that provide unaudited financial statements, or that do not provide financial statements, in the application process may be required to provide audited consolidated financial statements and notes as part of the initial set of quarterly reports.

[24] EPA may assess the following financial ratios, among others: Portfolio-at-Risk Ratio, Net Asset Ratio, Self-Sufficiency Ratio, Current Ratio, Change in Net Assets, Deployment Ratio, Operating Liquidity Ratio, and Expense Ratio.

[25] Inventory guidance is available here for Scope 1 and 2 emissions and here for Scope 3 emissions.

**Financial and Administrative Reporting Requirements:** Each grantee will be subject to financial and administrative reporting requirements, which will be included in the grant agreement's terms and conditions (EPA's General Terms and Conditions are included here). These requirements will include, but not be limited to:

- **Federal Financial Report:** In accordance with 2 CFR § 200.328 and 2 CFR § 200.344, each grantee must submit the Federal Financial Report (SF-425) at least annually and no more frequently than quarterly. The frequency of reporting and report submission instructions will be specified in the terms and conditions.

- **Financial Records Retention:** In accordance with 2 CFR § 200.334, each grantee will be required to retain financial records, supporting documents, statistical records, and all other non-Federal entity records pertinent to the grant award for a period of three years from the date of submission of the final expenditure report. Additional record retention requirements on program income used after the end of the period of performance will be specified in close-out agreements.

- **MBE/WBE Utilization:** When required, each grantee must complete and submit a "MBE/WBE Utilization Under Federal Grants and Cooperative Agreements" report (EPA Form 5700-52A) on an annual basis.

- **Real Property Status Report:** In accordance with 2 CFR § 200.329, each grantee must submit a "Real Property Status Report" (SF-429) to report real property status or request agency instructions on real property that was/will be provided as Government Furnished Property (GFP) or acquired (i.e., purchased or constructed) in whole or in part under a Federal financial assistance award.

## F. Audit Requirements

In accordance with 2 CFR § 200.501(a), each grantee will be required to obtain a single audit from an independent auditor, if the grantee expends $750,000 or more in total Federal funds in the grantee's fiscal year. Audits will be made public in accordance with the process described in 2 CFR § 200.512. The grantee must submit the form SF-SAC and a Single Audit Report Package within 9 months of the end of the grantee's fiscal year or 30 days after receiving the report from an independent auditor. The SF-SAC and a Single Audit Report Package MUST be submitted using the Federal Audit Clearinghouse's Internet Data Entry System available at: https://facides.census.gov. In addition, each grantee may be subject to additional audit requirements, including but not limited to compliance requirements as part of any compliance supplement to the single audit.

## G. Remedies for Non-Compliance

In accordance with 2 CFR § 200.208, 2 CFR § 200.339, and 2 CFR § 200.340, EPA is provided authority for multiple potential responses if a grantee violates the terms of the grant agreement.

## Section VII. Contact Information

Further information, if needed, may be obtained by emailing ggrf@epa.gov. Information regarding this funding opportunity obtained from sources other than the EPA may not be accurate.

# Appendix A. Grants.gov Application Submission Instructions

## A. Requirement to Submit through Grants.gov and Limited Exception Procedures

Applicants must apply electronically through Grants.gov under this funding opportunity based on the Grants.gov instructions in this announcement. If your organization has no access to the internet or access is very limited, you may request an exception for the remainder of this calendar year by following the procedures outlined here. Please note that your request must be received at least 15 calendar days before the application due date to allow enough time to negotiate alternative submission methods. Issues with submissions with respect to this opportunity only are addressed in *Appendix A.C: Technical Issues with Submission* below.

## B. Submission Instructions

**1. SAM.gov (System for Award Management) Registration Instructions:** Organizations applying to this funding opportunity must have an active SAM.gov registration. If you have never done business with the Federal Government, you will need to register your organization in SAM.gov. If you do not have a SAM.gov account, then you will create an account using login.gov[26] to complete your SAM.gov registration. SAM.gov registration is FREE. The process for entity registration includes obtaining a Unique Entity ID (UEI), a 12-character alphanumeric ID assigned to an entity by SAM.gov that requires assertions, representations and certifications, and other information about your organization. Please review the Entity Registration Checklist for details on this process. If you have done business with the Federal Government previously, you can check your entity status using your government-issued UEI to determine if your registration is active. SAM.gov requires you to renew your registration every 365 days to keep it active.

Please note that SAM.gov registration is different than obtaining a UEI only. Obtaining a UEI only validates your organization's legal business name and address. Please review the Frequently Asked Question on the difference for additional details.

Organizations should ensure that their SAM.gov registration includes a current e-Business (EBiz) point of contact name and email address. The EBiz point of contact is critical for Grants.gov registration and system functionality.

Contact the Federal Service Desk for help with your SAM.gov account, to resolve technical issues, or to chat with a help desk agent: (866) 606-8220. The Federal Service desk hours of operation are Monday–Friday, 8 AM–8 PM (Eastern Time).

**2. Grants.gov Registration Instructions:** Once your SAM.gov account is active, you must register in Grants.gov. Grants.gov will electronically receive your organization's information, such as EBiz point of contact email address and UEI. Organizations applying to this funding opportunity must have an active Grants.gov registration. Grants.gov registration is FREE. If you have never applied for a federal grant before, please review the Grants.gov Applicant Registration instructions. As part of the Grants.gov registration process, the EBiz point of contact

---

[26] login.gov is a secure sign-in service used by the public to sign into Federal Agency systems, including SAM.gov and Grants.gov. For help with a login.gov account, visit login.gov/help.

is the only person that can affiliate and assign applicant roles to members of an organization. In addition, at least one person must be assigned as an Authorized Organization Representative (AOR). Only person(s) with the AOR role can submit applications in Grants.gov. Please review the Intro to Grants.gov – Understanding User Roles and Learning Workspace – User Roles and Workspace Actions for details on this important process.

Please note that this process can take a month or more for new registrants. Applicants must ensure that all registration requirements are met to apply for this opportunity through Grants.gov and should ensure that all such requirements have been met well in advance of the application submission deadline.

Contact Grants.gov for assistance at 1-800-518-4726 or support@grants.gov to resolve technical issues with Grants.gov. Applicants who are outside the U.S. at the time of submittal and are not able to access the toll-free number may reach a Grants.gov representative by calling 606-545-5035. The Grants.gov Support Center is available 24 hours a day, 7 days a week, excluding federal holidays.

**3. Application Submission Process:** To begin the application process under this funding opportunity, go to Grants.gov and click the red "Apply" button at the top of the view grant opportunity page associated with this opportunity.

The electronic submission of your application to this funding opportunity must be made by an official representative of your organization who is registered with Grants.gov and is authorized to sign applications for Federal financial assistance. If the submit button is grayed out, it may be because you do not have the appropriate role to submit in your organization. Contact your organization's EBiz point of contact or contact Grants.gov for assistance at 1-800-518-4726 or support@grants.gov.

Applicants need to ensure that the AOR who submits the application through Grants.gov and whose UEI is listed on the application is an AOR for the applicant listed on the application. Additionally, the UEI listed on the application must be registered to the applicant organization's SAM.gov account. If not, the application may be deemed ineligible.

**4. Application Submission Deadline:** Your organization's AOR must submit your complete application package electronically to EPA through Grants.gov **no later than October 12, 2023 at 11:59 PM (Eastern Time).** Please allow for enough time to successfully submit your application and allow for unexpected errors that may require you to resubmit.

Applications submitted through Grants.gov will be time- and date-stamped electronically. Please note that successful submission of your application through Grants.gov does not necessarily mean your application is eligible for an award. Any application submitted after the application deadline will be deemed ineligible and not be considered.

## C. Technical Issues with Submission

If you experience technical issues during the submission of an application that you are unable to resolve, follow these procedures **before** the application deadline:

1. Contact Grants.gov Support Center **before** the application deadline.
2. Document the Grants.gov ticket/case number.
3. Send an email with **EPA-R-HQ-NCIF-23** in the subject line to ggrf@epa.gov **before** the application deadline, which **must** include the following:
   a. Grants.gov ticket/case number(s)
   b. Description of the issue
   c. The entire application package in PDF format

Without this information, EPA may not be able to consider applications submitted outside of Grants.gov. Please note that successful submission of your application through Grants.gov or email does not necessarily mean your application is eligible for an award. Any application submitted after the application deadline will be deemed ineligible and not be considered.

EPA will make decisions concerning acceptance of each application submitted outside of Grants.gov on a case-by-case basis. EPA will only consider accepting applications that were unable to be submitted through Grants.gov due to Grants.gov or relevant SAM.gov system issues or for unforeseen exigent circumstances, such as extreme weather interfering with internet access. Failure of an applicant to submit prior to the application deadline because they did not properly or timely register in SAM.gov or Grants.gov is not an acceptable reason to justify acceptance of an application outside of Grants.gov.

# Appendix B. Qualified Project Checklist

The table below provides an illustrative checklist of the eligibility requirements for a qualified project, which applicants may use in their applications. Applicants that do not use this checklist will not be penalized.

| Qualified Project Checklist | |
| --- | --- |
| ***Requirement*** | ***Rationale*** |
| ☐ Would the project, activity, or technology reduce or avoid **greenhouse gas emissions** (including carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride) consistent with the climate goals of the United States? | *[Determined by project category, transaction, etc.]* |
| ☐ Would the project, activity, or technology reduce or avoid **emissions of other air pollutants**? | *[Determined by project category, transaction, etc.]* |
| ☐ Would the project, activity, or technology deliver **additional benefits to American communities** within <u>one or more</u> of the following four categories?<br>　　☐ Clean energy and energy efficiency<br>　　☐ Clean transportation<br>　　☐ Affordable and sustainable housing<br>　　☐ Training and workforce development | *[Determined by project category, transaction, etc.]* |
| ☐ May the project, activity, or technology **not otherwise have been financed?** | *[Determined by project category, transaction, etc.]* |
| ☐ Would the project, activity, or technology **mobilize private capital?** | *[Determined by project category, transaction, etc.]* |
| ☐ Would the project, activity, or technology **support only commercial technologies?** | *[Determined by project category, transaction, etc.]* |
| If the project, activity, or technology would fail to meet **<u>any</u>** of the six eligibility requirements above, then it would **<u>not be a qualified project.</u>** | |

# Appendix C. Guidance for Low-Income and Disadvantaged Community Expenditures

The table below provides guidance for assessing expenditures against the requirement to expend at least 40% of funds for the purposes of providing financial assistance in low-income and disadvantaged communities. Expenditures for these purposes include costs for financial assistance in low-income and disadvantaged communities as well as other costs that are reasonable and necessary for the deployment of such financial assistance, including costs for predevelopment activities, market-building activities, and program administration activities. Applicants may consider this guidance in their applications.

| Guidance for Low-Income and Disadvantaged Community Expenditures | |
|---|---|
| ***Category*** | ***Requirement*** |
| **a. CEJST-Identified Disadvantaged Communities** | ☐ Would the expenditure be for the purposes of providing financial assistance for a qualified project (or set of qualified projects) **in areas identified as disadvantaged** by the Climate and Economic Justice Screening Tool (CEJST)? |
| **b. EJScreen-Identified Disadvantaged Communities** | ☐ Would the expenditure be for the purposes of providing financial assistance for a qualified project (or set of qualified projects) **in areas identified by EJScreen** within either of the following two categories? <br> ☐ Within census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state <br> ☐ Within Tribal lands as included in EJScreen |
| **c. Geographically Dispersed Low-Income Households** | ☐ Would the expenditure be for the purposes of providing financial assistance **to low-income individuals/households** within either of the following two categories for them to deploy qualified projects? <br> ☐ Is in a *Metropolitan Area* and has an income at or below the greater of (1) 80% AMI (Area Median Income) and (2) 200% of the Federal Poverty Level **or** is in a *Non-Metropolitan Area* and has an income at or below the greater of (1) 80% AMI, (2) 80% Statewide Non-Metropolitan Area AMI, and (3) 200% of the Federal Poverty Level <br> ☐ Is currently approved for assistance from or participation in at least one of the following programs, with an award letter within the last 12 months: <br> ☐ Low Income Home Energy Assistance Program <br> ☐ Supplemental Nutrition Assistance Program <br> ☐ Weatherization Assistance Program <br> ☐ Lifeline Support for Affordable Communications |

| | |
|---|---|
| | ☐ National School Lunch Program |
| | ☐ Supplemental Security Income |
| | ☐ Any other verified government or non-profit program serving Asset Limited, Income Constrained, Employed (ALICE) individuals or households designated by the EPA Administrator |
| **d. Properties Providing Affordable Housing** | ☐ Would the expenditure be for the purposes of providing financial assistance **to qualified projects on properties providing affordable housing** that are within either of the following two categories?<br><br>☐ Multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following federal or state housing assistance programs:<br><br>☐ Low-Income Housing Tax Credit<br><br>☐ A housing assistance program administered by HUD<br><br>☐ A housing assistance program administered by USDA under Title V of the Housing Act of 1949<br><br>☐ A housing assistance program administered by a tribally designated housing entity<br><br>☐ Any other housing assistance program designated by the EPA Administrator<br><br>☐ Naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units |

If the expenditure would fall within **<u>any</u>** of the four categories above, then it would be an **<u>eligible use of funds for the purposes of providing financial assistance in low-income and disadvantaged communities.</u>**

# Appendix D. Program Budget

## A. Guidance for Detailed Budget Table

The detailed budget table should be attached to the Project Narrative and does not count toward the Project Narrative's page limit. Applicants should include applicable rows of costs for each budget category in their budget table to accurately reflect the proposed program budget. EPA provides detailed guidance on budget development in the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance, but applicants may use other forms as long as total costs per category (and specific descriptions of costs) are included and will not be penalized for doing so in the evaluation process.

Applicants must show costs for financial assistance (i.e., direct costs for funds passed through for financial assistance as well as associated indirect costs) separately in the detailed budget table, with applicants evaluated on the extent to which grant funds are used for financial assistance. Applicants must categorize direct costs for financial assistance as either subawards, participant support costs, or acquisitions of intangible property, depending on the nature of the financial assistance. Applicants must place subawards as well as participant support costs in the "Other" category and acquisitions of intangible property in the "Contractual" category. Additional guidance is included in *Appendix D.B: Guidance for Financial Assistance in the Detailed Budget Table*. **To facilitate consideration of an application for partial funding, EPA recommends that applicants separate costs for financial assistance in the program budget by project category, to the extent practicable.**

Applicants must itemize costs related to personnel, fringe benefits, travel, equipment, supplies, contractual costs (including acquisitions of intangible property), other direct costs (including subawards and participant support costs), indirect costs, and total costs. Applicants should be aware that if their proposals include using Federal funds for a project that includes the purchase of goods, products, and materials on any form of construction, alteration, maintenance, or repair of infrastructure in the United States, they must comply with the Build America, Buy America Term and Condition if they are selected for an award.

- **Personnel - List all staff positions by title. Give annual salary, percentage of time assigned to the project, and total cost for the budget period.** This category includes only direct costs for the salaries of those individuals who will perform work directly for the program (paid employees of the applicant organization as reflected in payroll tax records). Personnel costs do not include: (1) costs for services of contractors (including individual consultants), which are included in the "Contractual" category; (2) costs for employees of subrecipients under subawards or non-employee program participants (e.g., interns or volunteers), which are included in the "Other" category; or (3) effort that is not directly in support of the proposed program, which may be covered by the organization's negotiated indirect cost rate. The budget table must identify the personnel category type by Full Time Equivalent (FTE), including percentage of FTE for part-time employees, number of personnel proposed for each category, and the estimated funding amounts.

- **Fringe Benefits - Identify the percentage used, the basis for its computation, and the types of benefits included.** Fringe benefits are allowances and services provided by

employers to their employees as compensation in addition to regular salaries and wages. Fringe benefits may include, but are not limited to, the cost of leave, employee insurance, pensions, and unemployment benefit plans. If the applicant's fringe rate does not include the cost of leave, and the applicant intends to charge leave to the agreement, it must provide supplemental information describing its proposed method(s) for determining and equitably distributing these costs.

- **Travel - Specify the mileage, per diem, estimated number of trips in-state and out-of-state, number of travelers, and other costs for each type of travel.** Travel may be: integral to the purpose of the proposed program (e.g., site visits); related to proposed program activities (e.g., attendance at community engagement meetings); or for a technical training or workshop that supports effective implementation of the program activities (e.g., consumer awareness activities). Only include travel costs for employees in the travel category. Travel costs do not include: (1) costs for travel of contractors (including consultants), which are included in the "Contractual" category; or (2) travel costs for employees of subrecipients under subawards and non-employee program participants (e.g., trainees), which are included in the "Other" category. Further, travel does not include bus rentals for group trips, which would be covered under the "Contractual" category. Finally, if the applicant intends to use any funds for travel outside the United States, it must be specifically identified. All proposed foreign travel must be approved by EPA's Office of International and Tribal Affairs prior to being taken.

- **Equipment - Identify each item to be purchased that has an estimated acquisition cost of $5,000 or more per unit and a useful life of more than one year.** Equipment also includes accessories necessary to make the equipment operational. Equipment does not include: (1) equipment planned to be leased/rented, including lease/purchase agreement; or (2) equipment service or maintenance contracts that are not included in the purchase price for the equipment. These types of proposed costs must be included in the "Other" category. Items with a unit cost of less than $5,000 must be categorized as supplies, pursuant to 2 CFR § 200.1. The budget table must include an itemized listing of all equipment proposed under the program. If installation costs are included in the equipment costs, labor expenses shall be itemized with the detailed number of hours charged and the hourly wage. If the applicant has written procurement procedures that define a threshold for equipment costs that is lower than $5,000, then that threshold takes precedence.

- **Supplies - "Supplies" means all tangible personal property other than "equipment." The budget detail should identify categories of supplies to be procured (e.g., laboratory supplies or office supplies).** Non-tangible goods and services associated with supplies, such as printing services, photocopy services, and rental costs must be included in the "Other" category.

- **Contractual - Identify proposed contracts, specifying the purpose and estimated cost for typical contractual services and disaggregating any costs for acquisitions of intangible property.** Contractual services (including consultant services) are those services to be carried out by an individual or organization, other than the applicant, in the form of a procurement relationship; **this includes costs for acquisitions of intangible**

**property, such as equity investments as well as purchase of loans.** The EPA Subaward Policy and supplemental frequently asked questions have detailed guidance available for differentiating between contractors and subrecipients. Leased or rented goods (equipment or supplies) must be included in the "Other" category. EPA does not require applicants to identify specific contractors, but if an applicant does so they must demonstrate that the contractor was selected in compliance with competitive procurement requirements in 2 CFR Parts 200 and 1500.

In the budget description, the applicant should list the proposed contract activities along with a brief description of the anticipated scope of work or services to be provided, proposed duration, and proposed procurement method (competitive or non-competitive), if known. Any proposed non-competed/sole-source contracts in excess of the applicant's 2 CFR § 200.320(a) micro-purchase threshold (generally $10,000) must include a justification. Note that EPA rarely accepts proposed sole source contracts for goods and services (e.g., consulting) that are widely available in the commercial market absent a copyright, patent, or equipment warranty requirement or similar restriction that establishes that only one source can provide the necessary good or service; unique qualifications or long-standing relationships with a grantee do not provide an adequate basis for a sole source contract. Applicants must provide the aggregate amount they propose to issue as acquisitions of intangible property as a separate line item in the "Contractual" category. Refer to the EPA Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements for EPA's policies on competitive procurements and encouraging the use of small and disadvantaged business enterprises.

- **Other - List each item in sufficient detail for EPA to determine the reasonableness and allowability of its cost.** This category should include only those types of direct costs that do not fit in any of the other budget categories, including subawards, participant support costs, and additional costs (e.g., insurance, costs for acquiring or improving real property, rental/lease of equipment or supplies, equipment service or maintenance contracts, and printing or photocopying). Subawards and participant support costs (e.g., subsidies) are distinct types of costs under this category. Subcontracts are not subawards and belong in the "Contractual" category. Applicants must provide a budget that shows the aggregate amounts they propose to issue as subawards and as participant support costs as separate line items in the "Other" category. Additional guidance is available in the EPA Subaward Policy and EPA Guidance on Participant Support Costs.

- **Indirect Costs - If indirect costs are budgeted, indicate the approved rate and distribution base.** Indirect costs are those incurred by the grantee for a common or joint purpose that benefit more than one cost objective or project and are not readily assignable to specific cost objectives or projects as a direct cost. Indirect costs must be based on a rate approved by the applicant's cognizant Federal agency or the 10% de-minimus rate authorized by 2 CFR § 200.414(f). **Note that _Modified Total Direct Costs_, as defined in 2 CFR § 200.1, does not include acquisitions of intangible property, which are contractual expenses but are not "services;" instead, acquisitions of intangible property are "capital expenditures."** Additional indirect cost guidance is available in

Indirect Cost Guidance for Recipients of EPA Assistance Agreements and in Section VI.u, "IDC Competition Clause," of the EPA Solicitation Clauses.

**Note on Management Fees:** When formulating budgets for applications, applicants must not include management fees or similar charges in excess of the direct costs and indirect costs at the rate approved by the applicant's cognizant federal audit agency, or at the rate provided for by the terms of the agreement negotiated with EPA. The term "management fees or similar charges" refers to expenses added to the direct costs in order to accumulate and reserve funds for ongoing business expenses, unforeseen liabilities, or other similar costs that are not allowable under EPA assistance agreements. Management fees or similar charges cannot be used to improve or expand the program funded under this agreement, except to the extent authorized as a direct cost of carrying out the work plan.

## B. Guidance for Financial Assistance in the Detailed Budget Table

As described in *Section I.D: Competition Terminology*, grantees' expenditures for financial assistance will be in the form of subawards, participant support costs, and acquisitions of intangible property for a financial assistance purpose, as defined in 2 CFR § 200.1, with the characterization dependent on the nature of the financial assistance. For the detailed budget table, applicants must categorize costs for financial assistance within these three characterizations. Additional guidance is provided below on how to characterize financial assistance within these three characterizations.

**Subaward:** 2 CFR § 200.1 defines a subaward as "an award provided by a pass-through entity to a subrecipient for the subrecipient to carry out part of a Federal award received by the pass-through entity." 2 CFR § 200.1 defines a *Pass-through entity* as "a non-Federal entity that provides a subaward to a subrecipient to carry out part of a Federal program" and a *Subrecipient* as "an entity…that receives a subaward from a pass-through entity to carry out part of a Federal award; but does not include an individual that is a beneficiary of such award." EPA advises applicants to characterize loan originations and full loan guarantees as subawards. Subawards must be included in the "Other" category of the detailed budget table as well as aggregated and separated from all other costs such that they can be identified as a separate line item.

**Participant Support Costs:** 2 CFR § 200.1 defines participant support costs as "direct costs for items such as stipends or subsistence allowances, travel allowances, and registration fees paid to or on behalf of participants or trainees (but not employees) in connection with conferences, or training projects." EPA regulations at 2 CFR § 1500.1(a)(1) expands the definition of participant support costs to include "[S]ubsidies, rebates, and other payments to program beneficiaries to encourage participation in statutorily authorized environmental stewardship programs" such as the Greenhouse Gas Reduction Fund. EPA advises applicants to characterize credit enhancements that are "subsidies" (such as partial loan guarantees or loan loss reserves) as participant support costs. Participant support costs must be included in the "Other" category of the detailed budget table as well as aggregated and separated from all other costs such that they can be identified as a separate line item.

**Acquisition of Intangible Property:** 2 CFR § 200.1 defines intangible property as "property having no physical existence, such as trademarks, copyrights, patents and patent applications and property, such as loans, notes and other debt instruments, lease agreements, stock and other

instruments of property ownership (whether the property is tangible or intangible)." EPA advises applicants to characterize equity investments (including project finance equity investments, private equity investments, and other forms of equity) and loan purchases as acquisitions of intangible property through procurement contracts. Acquisitions of intangible property must be included in the "Contractual" category of the detailed budget table as well as aggregated and separated from all other estimated contractual costs (e.g., consulting services) such that they can be identified as a separate line item.

# EXHIBIT 3

5J - 84094101 - 0    Page 1

| U.S. ENVIRONMENTAL PROTECTION AGENCY<br>Grant Agreement | GRANT NUMBER (FAIN): 84094101<br>MODIFICATION NUMBER: 0<br>PROGRAM CODE: 5J | DATE OF AWARD<br>08/08/2024 |
|---|---|---|
| | TYPE OF ACTION<br>New | MAILING DATE<br>08/13/2024 |
| | PAYMENT METHOD:<br>ASAP | ACH# |

| RECIPIENT TYPE:<br>Not for Profit | Send Payment Request to:<br>Contact EPA RTPFC at: ▮ |
|---|---|
| RECIPIENT:<br>Justice Climate Fund, Inc.<br>910 17TH ST NW<br>WASHINGTON, DC 20006-2606<br>EIN: ▮ | PAYEE:<br>Justice Climate Fund, Inc.<br>910 17TH ST NW<br>STE 820<br>WASHINGTON, DC 20006-2606 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Amir Kirkwood<br>910 17th St. NW<br>Suite 820<br>Washington, DC 20006<br>Email: ▮<br>Phone: ▮ | Daniel OBrien<br>1200 Pennsylvania Ave, NW<br>Washington, DC 20460<br>Email: ▮<br>Phone: ▮ | Walker Oneil<br>OGD-GMBOD, 3903R<br>1200 Pennsylvania Ave, NW<br>Washington, DC 20460-0001<br>Email: ▮<br>Phone: ▮ |

**PROJECT TITLE AND DESCRIPTION**

GGRF CCIA: Expanding Green Lending Capacity in Historically Underserved Communities for Enduring Change

See Attachment 1 for project description.

| BUDGET PERIOD<br>04/01/2024 - 06/30/2030 | PROJECT PERIOD<br>04/01/2024 - 06/30/2030 | TOTAL BUDGET PERIOD COST<br>$ 940,000,000.00 | TOTAL PROJECT PERIOD COST<br>$ 940,000,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 940,000,000.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 940,000,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| ORGANIZATION / ADDRESS | ORGANIZATION / ADDRESS |
| Environmental Protection Agency, Grants and Interagency Agreement Management Division<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 | Environmental Protection Agency, OGGRF<br>OA - Office of the Administrator<br>1200 Pennsylvania Ave, NW<br>Washington, DC 20460 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| Digital signature applied by EPA Award Official Phillip Schindel - Chief, Business Operations Branch | DATE<br>08/08/2024 |

5J - 84094101 - 0     Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 940,000,000 | $ 940,000,000 |
| EPA In-Kind Amount | $ 0 | $ 0 | $ 0 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 940,000,000 | $ 940,000,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.960 - Greenhouse Gas Reduction Fund: Clean Communities Investment Accelerator | Clean Air Act: Sec. 134(a)(2) and (3) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 2411U41079 | 2224 | E1SF3 | QU | 000MGBXAC | 4131 | - | - | $ 940,000,000 |
| | | | | | | | | | $ 940,000,000 |

5J - 84094101 - 0    Page 3

Budget Summary Page

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. Personnel | $ 36,510,718 |
| 2. Fringe Benefits | $ 9,255,467 |
| 3. Travel | $ 509,628 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 361,500 |
| 6. Contractual | $ 17,637,969 |
| 7. Construction | $ 0 |
| 8. Other | $ 870,684,087 |
| 9. Total Direct Charges | $ 934,959,369 |
| 10. Indirect Costs: 10.00 % Base de minimis MTDC | $ 5,040,631 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 940,000,000 |
| 12. Total Approved Assistance Amount | $ 940,000,000 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 940,000,000 |
| 15. Total EPA Amount Awarded To Date | $ 940,000,000 |

5J - 84094101 - 0    Page 4

## Attachment 1 - Project Description

This agreement provides funding under the Inflation Reduction Act (IRA) to Justice Climate Fund, Inc. The recipient will provide funding and technical assistance to community lenders who will in turn finance clean technology deployment in low-income and disadvantaged communities while simultaneously building the capacity of the community lenders to draw on that capital to catalyze deployment of projects in communities across the country—especially in communities that have long faced barriers accessing capital and that most need the benefits of clean technology projects. Specifically, the recipient will enable community lenders in its nationwide, low-income and disadvantaged communities (LIDAC) focused community development bank and minority depository institutions (MDI) network and community lenders not covered by other applicants to gain the necessary skills, tools, and relationships to successfully deploy affordable, responsible green lending for LIDAC households, businesses and communities. The recipient will accelerate community lender capacity to finance priority qualified projects that meet community needs, based on the objective merits and spectrum of benefits to LIDACs of such projects, nationwide.

The recipient anticipates funding distributed energy generation and storage, net-zero emissions buildings, and zero-emissions transportation activities (Greenhouse Gas Reduction Fund priority project categories) in low-income and disadvantaged communities through its nationwide community lender network. Community lenders in this nationwide network selected to facilitate these activities will have access to capitalization funding, technical assistance funding, and technical assistance services.

The recipient's anticipated deliverables include capitalization funding and TA subawards to community lenders. Expected outcomes include climate and air pollution benefits (e.g., greenhouse gas emissions reductions, improved health outcomes due to improved indoor and outdoor air quality), equity and community benefits (e.g., direct and indirect job creation, household cost savings), and market transformation benefits (e.g., mobilization of private capital, de-risking strategies, new green lending). The beneficiaries of these deliverables are low-income and disadvantaged communities located nationwide, including persistent poverty, energy, tribal, and rural communities.

The recipient will enable community lenders in its nationwide, low-income and disadvantaged communities (LIDAC) focused community development bank and minority depository institutions (MDI) network and community lenders not covered by other applicants to gain the necessary skills, tools, and relationships to successfully deploy affordable, responsible green lending for LIDAC households, businesses and communities. Subawards will be provided to community lenders as capitalization funding intended to enable distributed energy generation and storage, net-zero emissions buildings, and zero-emissions transportation activities (Greenhouse Gas Reduction Fund priority project categories) in low-income and disadvantaged communities through its nationwide community lender network. Moreover, subawards will be provided to entities providing technical assistance and technical assistance services to community lenders for the development and deployment of these activities such as product platform development, training and content development, community engagement, market development, reporting assistance, and expert resources.

5J - 84094101 - 0     Page 5

## Administrative Conditions

### A. General Terms and Conditions

The Recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later. These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

### B. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA. Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): ████████████ and EPA Grants Specialist listed on the award
- MBE/WBE reports (EPA Form 5700-52A): ████████████████ and EPA Grants Specialist listed on the award
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to Recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Grants Specialist and EPA Project Officer listed on the award
- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer listed on the award

### C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a Recipient intends to provide Capitalization Funding to a Community Lender to support CCIA-Eligible Project(s) that involves construction or land use planning. With the exception of CCIA-Eligible Projects that will be carried out in the State of California, the Recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the CCIA-Eligible Project(s) contained in the application for funding for the project and provide comments to the EPA Project Officer.  CCIA-Eligible Project(s) that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

The Recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

### D. Pre-Award Costs

As provided in 2 CFR 200.458, Recipients are authorized to incur pre-award costs, which are costs that

5J - 84094101 - 0    Page 6

would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a Recipient incurs after EPA has notified the Recipient that its application has been selected for award consideration. The pre-award costs must be included in the workplan and budget to be eligible. As provided in 2 CFR 1500.9, Recipients incur pre-award cost at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the [Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance](#) for additional information.

## E. Pre-Award Administrative Capability

EPA's policy for awarding Financial Assistance in excess of $200,000 to non-profit organizations requires an Administrative Capability Assessment review of the Recipient's administrative and financial management systems to be completed **prior** to the Recipient drawing down any EPA funds per [EPA Order 5700.8](#). The Recipient is precluded from drawing down funds under this Assistance Agreement until EPA provides written confirmation of the completion of the assessment with satisfactory results. Please note, any costs incurred prior to EPA approval are the Recipient's own risk. If the Recipient fails to respond or is unable to satisfactorily address all identified deficiencies within 90 calendar days of the award date of this Assistance Agreement or within any extension of time granted by EPA, the agreement may be terminated. Noncompliance with this term and condition may result in adverse action by EPA per 2 CFR 200.339.

## F. New Recipient Training Requirement

The Recipient agrees to complete the [EPA Grants Management Training for Applicants and Recipients](#) and the [How to Develop a Budget training within 90 calendar days of the date of award of this agreement](#). The Recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the Recipient should refer to [RAIN-2024-G01](#).

Case 1:25-cv-00938-TSC     Document 7-5     Filed 04/02/25     Page 8 of 62
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 620 of 674

5J - 84094101 - 0     Page 7

# Programmatic Conditions

## I. DEFINITIONS

**Acquisition of Intangible Property:** 2 CFR 200.1 defines Intangible Property as "property having no physical existence, such as trademarks, copyrights, patents and patent applications and property, such as loans, notes and other debt instruments, lease agreements, stock and other instruments of property ownership (whether the property is tangible or intangible)." Acquisitions of Intangible Property involve the purchase of Intangible Property through procurement contracts.

**Air Pollutant:** Air Pollutant means any air pollutant that is listed pursuant to Section 108(a) of the Clean Air Act (or any precursor to such an air pollutant). This includes particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead (see 40 CFR Part 50) and their precursors (e.g., volatile organic compounds).

**Apprentice:** Apprentice means an individual working on a project receiving Financial Assistance who is participating in a Registered Apprenticeship program under the National Apprenticeship Act that meets the requirements of 29 CFR Parts 29 and 30.

**Award Agreement**: Award Agreement means the set of legally binding documents between EPA and the Recipient under the federal award. Award Agreement is used interchangeably with Assistance Agreement and Notice of Award.

**Capitalization Funding**: Consistent with Section 134(b)(2) of the Clean Air Act of the Clean Air Act, the Recipient will provide Capitalization Funding to Community Lenders for the sole purpose of providing Financial Assistance to CCIA-Eligible Projects. The Recipient will provide these Subawards in the form of Subgrants, which are subject to the EPA Subaward Policy. Community Lenders will use these Subawards exclusively as capital to provide Financial Assistance to CCIA-Eligible Projects.

In general, a Community Lender may receive a maximum of $10,000,000 in total Capitalization Funding from all Recipients and Subrecipients under the Clean Communities Investment Accelerator; however, under limited exceptions, a Community Lender may receive total Capitalization Funding in excess of the $10,000,000 cap, provided that the exception has been approved by the EPA Award Official (either through the Recipient's EPA-approved workplan or through separate post-award approval).

**CCIA-Eligible Project**: CCIA-Eligible Project means a project, activity, or technology that is eligible for support under this program. Section 134(b)(2) of the Clean Air Act directs that the Recipient use funds to support Community Lenders that provide Financial Assistance to Qualified Projects. For this program, a project, activity, or technology that is eligible for support through Capitalization Funding, Technical Assistance Subawards, and/or Technical Assistance Services must meet the following three requirements and is referred to as a "CCIA-Eligible Project:" (i) the project, activity, or technology must be a Qualified Project; (ii) the project, activity, or technology must be within a Priority Project Category*;* and (iii) the project, activity, or technology must be in a Low-Income and Disadvantaged Community.

**Community Lender:** Community Lender means an organization that, consistent with Section 134(b)(2) of the Clean Air Act, is eligible to receive Capitalization Funding and Technical Assistance Subawards. Section 134(b)(2) of the Clean Air Act directs that the Recipient provide funding and technical assistance to establish new or to support existing public, quasi-public, not-for-profit, or nonprofit entities that provide Financial Assistance to Qualified Projects at the state, local, territorial, or Tribal level or in the District of

5J - 84094101 - 0    Page 8

Columbia, including community- and low-income-focused lenders and capital providers. An organization must meet the following three requirements to be eligible as a Community Lender:

- Must be either a public, quasi-public, not-for-profit, or nonprofit entity.
  - A public entity must be a state, municipal, territorial, or Tribal government, including any department, agency, or instrumentality of one of those governments.
  - A quasi-public entity must either (1) have a close association with a public entity but not be a public entity, (2) be created by a public entity but be exempt from certain legal and administrative requirements, or (3) not have been created by a public entity but perform a public purpose and be significantly supported financially by a public entity. Any entity that has been determined by the U.S. Treasury's CDFI Fund to meet the CDFI certification requirements set forth in 12 CFR 1805.201 is a quasi-public entity that meets this requirement. In addition to being quasi-public, an entity meeting this requirement may also meet the requirements of being a not-for-profit or nonprofit entity, depending on the entity.
  - A not-for-profit entity must meet the definition of or be considered a "not-for-profit" under a federal, state, territorial, or Tribal law of a federally recognized tribe. Any Federal credit union or State credit union, as defined in Section 101 of the Federal Credit Union Act, is a not-for-profit entity that meets this requirement.
  - A nonprofit entity must meet the definition of *Nonprofit organization* set forth in 2 CFR § 200.1.
- Must have the legal authority to provide Financial Assistance to Qualified Projects at the state, local, territorial, or Tribal level or in the District of Columbia.
- Must be eligible to receive a Subaward under the EPA Subaward Policy.

**Environmental Information:** Environmental Information is defined in EPA's Environmental Information Quality Policy. Environmental Information includes "data and information that describe environmental processes or conditions which support EPA's mission of protecting human health and the environment. Examples include but are not limited to: direct measurements of environmental parameters or processes; analytical testing results of environmental conditions (e.g., geophysical or hydrological conditions); information on physical parameters or processes collected using environmental technologies; calculations or analyses of environmental information; information provided by models; information compiled or obtained from databases, software applications, decision support tools, websites, existing literature, and other sources; development of environmental software, tools, models, methods and applications; and design, construction, and operation or application of environmental technology."

**Environmental Information Operations:** Environmental Information Operations is defined in EPA's Environmental Information Quality Policy. Environmental Information Operations means "[a] collective term for work performed to collect, produce, evaluate, or use environmental information and the design, construction, operation or application of environmental technology."

**EPA Award Official:** EPA Award Official means the award official from the Office of Grants and Debarment that is authorized to execute the Award Agreement, as well as any subsequent amendments to the Award Agreement, and to make any other final determinations required by law or regulation on behalf of the EPA.

**EPA Project Officer:** EPA Project Officer means the project officer from the Office of the Greenhouse

Gas Reduction Fund that is assigned, along with the EPA Grants Specialist, to monitor the Recipient on programmatic and technical aspects of the project and is typically authorized to make programmatic approvals on behalf of the EPA. Where required, the Recipient must notify or request approval from the EPA Project Officer through the EPA Project Officer's individual EPA email address as well ███ ██ such that the Office of the Greenhouse Gas Reduction Fund may delegate an alternative EPA Project Officer in the case of any absence.

**Financial Assistance:** Consistent with the definition of *Federal financial assistance* in 2 CFR 200.1, Financial Assistance means financial products, including debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, loan purchasing programs, and other debt instruments), equity investments (such as equity project finance investments, private equity investments, and other equity instruments), hybrids (such as mezzanine debt, preferred equity, and other hybrid instruments), and credit enhancements (such as loan guarantees, loan guarantee funds (whether full or partial), loan loss reserves, and other credit enhancement instruments). Expenditures for Financial Assistance are in the form of Subawards (other than subgrants), Participant Support Costs or Acquisitions of Intangible Property, as defined in this Award Agreement. Subgrants are not eligible as Financial Assistance. The characterization of a Financial Assistance transaction as a Subaward, Participant Support Costs, or Acquisition of Intangible Property is limited to the transaction. For example, the same entity may be a Subrecipient for one transaction and a Program Beneficiary or a Contractor for another transaction.

**Freely Associated States:** Freely Associated States means the Republic of the Marshall Islands (the Marshalls), the Federated States of Micronesia (FSM), and the Republic of Palau (Palau).

**Greenhouse Gas:** "Greenhouse Gas" means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act. Greenhouse Gas Emissions mean emissions of Greenhouse Gases.

**Low-Income and Disadvantaged Communities:** Section 134(a)(3) of the Clean Air Act appropriates funds "for the purposes of providing Financial Assistance and technical assistance in low-income and disadvantaged communities." This program is entirely funded by Section 134(a)(3) of the Clean Air Act. Low-Income and Disadvantaged Communities means CEJST-Identified Disadvantaged Communities, EJScreen-Identified Disadvantaged Communities, Geographically Dispersed Low-Income Households, Properties Providing Affordable Housing, and Federally Recognized Tribal Entities, as defined below.

- *CEJST-Identified Disadvantaged Communities:* All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.

- *EJScreen-Identified Disadvantaged Communities:* All communities within version 2.2 of EJScreen that fall within either (a) the limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.

- *Geographically Dispersed Low-Income Households:* Low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is

Case 1:25-cv-00938-TSC    Document 7-5    Filed 04/02/25    Page 11 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 623 of 674

5J - 84094101 - 0    Page 10

higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development (HUD). Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using HUD's Family Size Adjustment factor.

- *Properties Providing Affordable Housing:* Properties providing affordable housing that fall within either of the following two categories: (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by HUD, including Public Housing, Section 8 Project-Based Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)); or (5) a housing assistance program administered by the Department of Hawaiian Homelands as defined in Title VIII of the Native American Housing Assistance and Self-Determination Act of 1996 (24 CFR 1006.10) or (b) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

- *Federally Recognized Tribal Entities:* All Federally Recognized Tribal entities, which are considered disadvantaged regardless of whether a Federally Recognized Tribe has land, consistent with M-23-09 and CEJST.

**Named Subrecipient:** "Named Subrecipient" means an entity that is named on the EPA-approved workplan to receive a Subaward in the form of a Subgrant from the Recipient in order to carry out part of the award.

**Participant Support Costs**: 2 CFR 200.1 defines Participant Support Costs as "direct costs for items such as stipends or subsistence allowances, travel allowances, and registration fees paid to or on behalf of participants or trainees (but not employees) in connection with conferences, or training projects." EPA regulations at 2 CFR 1500.1(a)(1) expand the definition of Participant Support Costs to include "subsidies, rebates, and other payments to program beneficiaries to encourage participation in statutorily authorized environmental stewardship programs," which includes the Greenhouse Gas Reduction Fund. In this program, Participant Support Costs may include expenditures by the Recipient as Technical Assistance Services and/or Program Administration Activities and Community Lenders as Capitalization Funding and/or Technical Assistance Subawards (which may include subsidies, rebates, and other payments).

**Period of Closeout**: Period of Closeout means the time interval between the beginning of the closeout period (the date that the award has been closed out, in accordance with 2 CFR 200.344) to the end of

Case 1:25-cv-00938-TSC    Document 7-5    Filed 04/02/25    Page 12 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 624 of 674

5J - 84094101 - 0    Page 11

the closeout period (the date that the Closeout Agreement has been terminated). The Period of Closeout may also be referred to as the Closeout Period.

**Period of Performance**: 2 CFR 200.1 defines Period of Performance as "the total estimated time interval between the start of an initial Federal award and the planned end date, which may include one or more funded portions, or budget periods." For the purposes of this Award Agreement, Period of Performance means the time interval between the start of the Federal award (either the first date that the Recipient has incurred allowable pre-award costs or the date on the Notice of Award, whichever is earlier) and the end of the Federal award (the date that the award has been closed out, in accordance with 2 CFR 200.344). The Period of Performance may also be referred to as the Performance Period.

**Post-Closeout Program Income**: Post-Closeout Program Income means Program Income retained at the end of the Period of Performance, which is subject to the terms and conditions of the Closeout Agreement, as well as Program Income earned by the non-Federal entity that is directly generated by a supported activity or earned as a result of the Federal award during the Period of Closeout, which is also subject to the terms and conditions of the Closeout Agreement. Under the Closeout Agreement, the Recipient is authorized to deduct the cost of generating Post-Closeout Program Income under 2 CFR 200.307(b) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Post-Closeout Program Income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Post-Closeout Program Income. Costs of generating Post-Closeout Program Income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the Post-Closeout Program Income, provided the Recipient can account for the actual costs incurred.

**Priority Project Categories:** Priority Project Categories means Distributed Energy Generation and Storage, Net-Zero Emissions Buildings, and Zero-Emissions Transportation, as defined below.

- *Distributed Energy Generation and Storage:* Projects, activities, and technologies that deploy small-scale power generation and/or storage technologies (typically from 1 kW to 10,000 kW), plus enabling infrastructure necessary for deployment of such generation and/or storage technologies. Projects, activities, and technologies within this category must support *carbon pollution-free electricity,* which is electrical energy produced from resources that generate no carbon emissions, consistent with the definition specified in Executive Order 14057 (Catalyzing Clean Energy Industries and Jobs Through Federal Sustainability).

- *Net-Zero Emissions Buildings:* Projects, activities, and technologies that either (1) retrofit an existing building, making a substantial contribution to that building being a net-zero emissions building and as part of a plan for that building achieving net-zero emissions over time, or (2) construct a new net-zero emissions building in a Low-Income and Disadvantaged Community. A *net-zero emissions building* is a building that meets the requirements of Version 1 of the National Definition for a Zero Emissions Building (June 2024).

- *Zero-Emissions Transportation:* Projects, activities, and technologies that deploy zero-emissions transportation modes, plus enabling infrastructure necessary for zero-emissions transportation modes—especially in communities that are overburdened by existing diesel pollution, particulate matter concentration, and degraded air quality. Projects, activities, and technologies within this category must be consistent with the zero-emissions transportation decarbonization strategies in The U.S. National Blueprint for Transportation Decarbonization.

Case 1:25-cv-00938-TSC    Document 7-5    Filed 04/02/25    Page 13 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 625 of 674

5J - 84094101 - 0    Page 12

**Program Administration Activities:** Program Administration Activities means activities that support administration of the grant program, to the extent such activities meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. Program administration activities include but are not limited to establishing and convening advisory councils, as described in Item 2 of EPA's Guidance on Selected Items of Cost for Recipients, and fund raising, as described in Item 4 of EPA's Guidance on Selected Items of Cost for Recipients.

**Program Beneficiary:** Program Beneficiary means an entity (either an individual or an organization) that receives Financial Assistance as an end-user, except when such Financial Assistance is characterized as an Acquisition of Intangible Property (in which case the entity is a Contractor, as defined in 2 CFR 200.1). Expenditures for Financial Assistance to Program Beneficiaries are in the form of Participant Support Costs, as defined in 2 CFR 1500.1. A Program Beneficiary is distinct from a Subrecipient, as defined in 2 CFR 200.1.

**Program Income:** 2 CFR 200.1 defines Program Income as "gross income earned by the non-Federal entity that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(f)." 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, Program Income also includes but is not limited to income from origination fees, servicing fees, and asset management fees; dividends from equity investments; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). Program Income must be treated in accordance with the Program Income Programmatic Term and Condition. EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fund raising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Under this award agreement, the Recipient is authorized to deduct the cost of generating program income under 2 CFR 200.307(b) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of program income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Program Income. Costs of generating program income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the program income, provided the Recipient can account for the actual costs incurred. Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

**Qualified Project:** Section 134(c)(3) of the Clean Air Act provides that a Qualified Project is any project, activity, or technology that (A) reduces or avoids Greenhouse Gas emissions and other forms of air pollution in partnership with, and by leveraging investment from, the private sector; or (B) assists communities in the efforts of those communities to reduce or avoid Greenhouse Gas emissions and other forms of air pollution. For this Assistance Agreement, Qualified Project means any project, activity or technology meeting all six requirements listed below at the time that  Financial Assistance is provided to the project, activity, or technology:

Case 1:25-cv-00938-TSC    Document 7-5    Filed 04/02/25    Page 14 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 626 of 674

5J - 84094101 - 0    Page 13

- The project, activity, or technology would reduce or avoid Greenhouse Gas Emissions, consistent with the climate goals of the United States to reduce Greenhouse Gas Emissions 50-52 percent below 2005 levels in 2030, reach 50 percent zero-emission vehicles share of all new passenger cars and light trucks sold in 2030, achieve a carbon pollution-free electricity sector by 2035, and achieve net-zero emissions by no later than 2050. The project, activity, or technology may reduce or avoid such emissions through its own performance or through assisting communities in their efforts to deploy projects, activities, or technologies that reduce or avoid such emissions.

- The project, activity, or technology would reduce or avoid emissions of other Air Pollutants. The project, activity, or technology may reduce or avoid such emissions through its own performance or through assisting communities in their efforts to deploy projects, activities, or technologies that reduce or avoid such emissions.

- The project, activity, or technology would deliver additional benefits (i.e., in addition to primarily reducing or avoiding emissions of Greenhouse Gases and other Air Pollutants) to communities within one or more of the following seven categories: climate change; clean energy and energy efficiency; clean transportation; affordable and sustainable housing; training and workforce development; remediation and reduction of legacy pollution; and development of critical clean water infrastructure.

- The project, activity, or technology may not have otherwise been financed.

- The project, activity, or technology would mobilize private capital.

- The project, activity, or technology would support only commercial technologies, defined as technologies that have been deployed for commercial purposes at least three times for a period of at least five years each in the United States for the same general purpose as the project, activity, or technology.


**Senior Management:** Senior Management means the chief executive officer, chief risk officer, general counsel, chief compliance officer, chief investment officer, chief reporting officer, and chief financial officer (or equivalent positions).


**Subaward:** 2 CFR 200.1 defines a Subaward as "an award provided by a pass-through entity to a Subrecipient for the Subrecipient to carry out part of a Federal award received by the pass-through entity." A Subgrant refers to a Subaward in the form of a grant.


**Subrecipient:** Consistent with 2 CFR 200.1, Subrecipient means "an entity that receives a Subaward from a pass-through entity to carry out part of a Federal award but does not include an entity that is a Program Beneficiary of such an award." A Subrecipient is distinct from a Program Beneficiary, which is referenced in 2 CFR 1500.1. In this program, there are four main types of Subrecipients: (1) a Subrecipient that receives a Subgrant that will be used, either in whole or in part, to provide Capitalization Funding and Technical Assistance Subawards to Community Lenders, or a "Pass-Through Subrecipient;" (2) a Subrecipient that receives a Subgrant that will be used exclusively to provide Technical Assistance Services and/or Program Administration Activities, or a "Technical Assistance Subrecipient"; (3) a Subrecipient that receives a Subgrant in the form of Capitalization Funding and/or Technical Assistance Subawards, or a "Community Lender Subrecipient;" and (4) a Subrecipient that receives Financial Assistance from a Community Lender in the form of a Subaward, with the Subrecipient then using the Subaward to provide Financial Assistance to CCIA-Eligible Projects, or a "Financial Intermediary Subrecipient." Note that a financial transaction is a Subaward to a Financial Intermediary Subrecipient if the following two characteristics are true: (i) the financial transaction provides an award by a pass-through entity to a Subrecipient through a form of *Federal financial assistance*, other than a grant, and (ii)

Case 1:25-cv-00938-TSC    Document 7-5    Filed 04/02/25    Page 15 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 627 of 674

5J - 84094101 - 0    Page 14

the proceeds of the award are used directly as Financial Assistance to CCIA-Eligible Projects, carrying out part of a Federal award received by the pass-through entity. The EPA Subaward Policy applies to Subgrants made to Pass-Through Subrecipients, Technical Assistance Subrecipients, and Community Lender Subrecipients but not to Subawards made to Financial Intermediary Subrecipients.

**Technical Assistance Services:** Consistent with Section 134(b)(2) of the Clean Air Act, the Recipient will provide Technical Assistance Services to establish new and build the capacity of existing Community Lenders so that they can provide Financial Assistance to CCIA-Eligible Projects. Technical Assistance Services include targeted support activities for individual Community Lenders, such as providing training, market analysis, technical support, and structuring expertise as well as financial market-building activities for multiple Community Lenders, such as developing standardized project performance criteria, underwriting guidance, documentation, and product features. A Community Lender does not need to have been selected for Capitalization Funding under this program to be eligible for Technical Assistance Services.

**Technical Assistance Subawards:** Consistent with Section 134(b)(2) of the Clean Air Act, the Recipient will provide Technical Assistance Subawards to build the capacity of Community Lenders so that they can provide Financial Assistance to CCIA-Eligible Projects. The Recipient will provide these Subawards in the form of Subgrants, which are subject to the EPA Subaward Policy. Community Lenders will use Technical Assistance Subawards for activities including (but not limited to) procuring training, market analysis, and technical support; hiring staff; developing new financial products; supporting predevelopment activities, such as site and building assessments (e.g., energy audits), financial and technological feasibility studies (e.g., solar resource studies), design and engineering support, and permitting support; and other activities. Community Lenders may use Technical Assistance Subawards to make additional Subawards to other organizations, consistent with the EPA Subaward Policy. A Community Lender may only receive a Technical Assistance Subaward if it has already been selected for Capitalization Funding under this program.

In general, a Community Lender may receive a maximum of $1,000,000 in total Technical Assistance Subawards from all Recipients and Subrecipients under the Clean Communities Investment Accelerator; however, under limited exceptions, a Community Lender may receive total Technical Assistance Subawards in excess of the $1,000,000 cap, provided that the exception has been approved by the EPA Award Official (either through the Recipient's EPA-approved workplan or through separate post-award approval).

## II. NATIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the Recipient agrees to the following four requirements of performance reporting: (1) reports, (2) transaction-level and project-level data, (3) organizational disclosures, and (4) ongoing disclosures. These performance reporting requirements "flow-down" as needed to enable the Recipient to comply with the requirements described in this term and condition. The Recipient must ensure that these reports cover its own grant-related activities and, where applicable to a certain performance report or element of a performance report, the grant-related activities of its Subrecipients, Contractors, and/or Program Beneficiaries. To comply with these performance reporting requirements, the Recipient agrees to use information collection instruments

Case 1:25-cv-00938-TSC    Document 7-5    Filed 04/02/25    Page 16 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 628 of 674

5J - 84094101 - 0    Page 15

authorized by GGRF Accomplishment Reporting (███████████████████████████
████████), once such instruments are authorized; to the extent that information is not available for
transactions that were closed prior to authorization of these instruments, the Recipient will not be out of
compliance with the performance reporting requirements.

The Recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or
equivalent) review, sign, and submit performance reporting electronically to the EPA Project Officer. To
the extent it is known, or should have been known, by the chief executive officer (or equivalent) and chief
reporting officer (or equivalent) that the reporting is not compliant with the terms and conditions, or
demonstrates material noncompliance with the terms and conditions, the chief executive officer (or
equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project
Officer alongside the submission. Should the chief executive officer (or equivalent) and chief reporting
officer (or equivalent) signing the submission knowingly and willfully make any material false statement,
they may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative
sanctions.

EPA intends to make performance reporting information available to the public, either in whole or in part,
through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA
reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable
information (PII) and mark confidential business information (CBI) prior to submission to EPA.
Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth
in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment
accompanies the information when it is received by EPA, it may be made available to the public by EPA
without further notice to the Recipient.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent
authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer
may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and
2 CFR 200.344.

Where applicable, the intervals for reporting are authorized by 2 CFR 200.329(c)(1), as more frequent
reporting is necessary for the effective monitoring of the Federal award and could significantly affect
program outcomes.

## 1. Reports

### Semi-Annual Report

The Recipient agrees to submit semi-annual reports covering six months of the calendar year in
accordance with information collection instruments approved through GGRF Accomplishment Reporting
(██████████████████████████████). A single semi-annual report must be
submitted to cover grant-related activities of the Recipient as well as Subrecipients as well as the grant-
related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of
the semi-annual report.

The Recipient agrees to submit semi-annual reports electronically to the EPA Project Officer within 30
calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the
Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must
include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii)

5J - 84094101 - 0    Page 16

the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The first semi-annual reporting period ends on December 31 and covers all activities beginning on the first day of the Period of Performance.

<u>Annual Report</u>

The Recipient agrees to submit annual reports that contain detailed narratives describing program performance over the Recipient's fiscal year, supported with qualitative discussions and quantitative metrics. A single annual report must be submitted to cover grant-related activities of the Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the annual report.

The Recipient must include the following broad, non-exhaustive elements in its annual reports:

- Progress towards objectives on key performance metrics over the reporting period,
- Summary of key activities completed in the reporting period, including case studies of Community Lenders successfully launching or expanding clean financing programs,
- Geographic coverage of Capitalization Funding and Technical Assistance Subawards made in the reporting period,
- Descriptions and examples of actions taken to meaningfully involve the communities the program serves in program design and operations,
- Case studies of different types of Technical Assistance Services activities undertaken by the Recipient and uses of Technical Assistance Subawards by Community Lenders,
- Plans for key activities (including current pipeline of Community Lenders) to be supported as well as outputs and outcomes to be achieved in the next reporting period.

These reports must be submitted ready to be published on the EPA website for public consumption and must not include any material that the Recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI. Should EPA identify PII or claims of CBI in reports, the EPA Project Officer will require that the Recipient re-submit the report without the PII or claims of CBI so that it can be published without redaction.

The Recipient agrees to submit **the annual report** electronically to the EPA Project Officer within 90 calendar days after the Recipient's fiscal year end date. The first annual report is due 90 calendar days after the Recipient's fiscal year that ends in 2025.

<u>Final Report</u>

The Recipient agrees to submit a final report containing two documents. First, the recipient must submit a report containing all of the elements described above for the annual report, covering the entire Period of Performance and overall assessment of its program performance and implementation of its EPA-approved workplan. Second, the recipient must submit its investment strategy for the Closeout Period to

5J - 84094101 - 0    Page 17

detail its use of Post-Closeout Program Income over the Closeout Period. EPA intends to make the investment strategy, either in whole or in part, available to the public through disclosing copies of the investment strategy as submitted or using the content of the investment strategy. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient.

The two documents for the final report must be submitted to cover the grant-related activities of the Recipient and Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the final report.

The Recipient agrees to submit the two documents for the final report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the Period of Performance.

## 2. Transaction-Level and Project-Level Data

The Recipient agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (████████ ████████████████████████████████). The data submission must cover the grant-related activities of the Recipient and Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the data submission.

The Recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods for data submission are as follows: October 1 to March 31; April 1 to September 30. The data submissions must cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends March 31, the Recipient must provide information on transactions originated from July 1 to December 31 rather than from October 1 to March 31. For the semi-annual reporting period that ends September 30, the Recipient must provide information on transactions originated from January 1 to June 30 rather than from April 1 to September 30. The first transaction-level and project-level data submission is due 30 calendar days after March 31, 2025, and must cover all transactions originated from the beginning of the Performance Period through December 31, 2024.

## 3. Organizational Disclosures

The Recipient agrees to submit annual organizational disclosures electronically to the EPA Project Officer within 30 calendar days after submission of its Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. The organizational disclosures must cover the Recipient's fiscal year and be submitted in accordance with information collection instruments approved through GGRF Accomplishment Reporting (████████████████████████████████████████). Additionally,

Case 1:25-cv-00938-TSC    Document 7-5    Filed 04/02/25    Page 19 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 631 of 674

5J - 84094101 - 0    Page 18

the Recipient agrees to submit such organizational disclosures for each Pass-Through Subrecipient as well as each Community Lender Subrecipient that has received in excess of $10,000,000 in Capitalization Funding under the Clean Communities Investment Accelerator (to be delivered within 30 calendar days after submission of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System). The requirement for organizational disclosures is not applicable for any fiscal year in which the reporting entity did not meet the requirements of 2 CFR Subpart F—Audit Requirements. The first Organizational Disclosures are due in 2025.

## 4. Ongoing Disclosures

In addition to other ongoing disclosure obligations within the regulations and terms and conditions of this Award Agreement, the Recipient agrees to notify the EPA Project Officer of the following events in accordance with 2 CFR 200.329(e):

1. Changes to the Recipient's independent certified public accounting firm;

2. Non-reliance by the Recipient or its independent auditor on previously issued financial statements or a related audit report or completed interim audit review;

3. Changes in fiscal year end of the Recipient;

4. Material impairments to the Recipient's assets;

5. Intention to file bankruptcy petition or enter into receivership;

6. Submission of annual Form 990 to the IRS, with provision of copy to EPA Project Officer upon request (only if submission of the Form 990 is otherwise required).

Additionally, the Recipient agrees to submit such ongoing disclosures for each Pass-Through Subrecipient as well as each Community Lender Subrecipient that has received in excess of $10,000,000 in Capitalization Funding under the Clean Communities Investment Accelerator. The Recipient agrees to submit ongoing disclosures electronically to the EPA Project Officer within 15 calendar days of the event.

## B. Cybersecurity Condition

(a) The Recipient agrees that when collecting and managing environmental data under this Assistance Agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated

Case 1:25-cv-00938-TSC    Document 7-5    Filed 04/02/25    Page 20 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 632 of 674

5J - 84094101 - 0    Page 19

Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward Agreements and, during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(d), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process.  A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

## D. Signage Required

### 1. Signage Requirements

a. Investing in America Emblem: The Recipient will ensure that a sign is placed at construction sites supported in whole or in part by this award displaying the official Investing in America emblem and must identify the project as a "project funded by President Biden's Inflation Reduction Act," where the Financial Assistance used to fund the construction project exceeds $250,000. The Recipient will also make optional signage available for projects where the construction is less than $250,000. The sign must be placed at construction sites in an easily visible location that can be directly linked to the work taking place and must be maintained in good condition throughout the construction period. The Recipient will ensure compliance with the guidelines and design specifications provided by EPA for using the official Investing in America emblem available at: https://www.epa.gov/invest/investing-america-signage.

b. Procuring Signs: Consistent with section 6002 of RCRA, 42 USC 6962, and 2 CFR 200.323, the Recipient is encouraged to use recycled or recovered materials when procuring signs. Signage costs are considered an allowable cost under this Assistance Agreement provided that the costs associated with signage are reasonable. Additionally, to increase public awareness of projects serving communities where English is not the predominant language, the Recipient is encouraged to translate the language on signs (excluding the official Investing in America emblem or EPA logo or seal) into the appropriate non-English language(s). The costs of such translation are allowable, provided the costs are reasonable.

5J - 84094101 - 0    Page 20

## 2. Public or Media Events

For public or media events that are planned more than 15 calendar days in advance, the Recipient agrees to notify the EPA Project Officer of public or media events it has organized publicizing the accomplishment of significant activities related to execution of the EPA-approved workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice.

## E. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards.  Information on these standards may be found at https://www.fgdc.gov/.

## F. Leveraging and Fund Raising

## 1. Leveraging

The Recipient agrees to make commercially reasonable efforts to provide the proposed leveraged funding that is described in its EPA-approved workplan. If the proposed leveraging does not substantially materialize during the Period of Performance, and the Recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future grant applications from the Recipient. In addition, if the proposed leveraging does not substantially materialize during the Period of Performance and the Recipient does not provide a satisfactory explanation, then EPA may reconsider the legitimacy of the award; if EPA determines that the Recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the EPA-approved workplan, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

## 2. Fund Raising

2 CFR 200.442 provides coverage on allowable fund-raising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fund raising costs are an allowable cost and may include costs that are reasonable and necessary for raising capital from private investors to provide Financial Assistance to CCIA-Eligible Projects.

Allowable fund-raising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private investors. Funds a Recipient raises for its own use with costs borne by an EPA Financial Assistance Agreement are considered Program Income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fund-raising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fund-raising costs charged to the award will be treated as Program Income.

## G. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving Environmental Information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

Case 1:25-cv-00938-TSC    Document 7-5    Filed 04/02/25    Page 22 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 634 of 674

5J - 84094101 - 0    Page 21

The Recipient shall ensure that subawards involving Environmental Information issued under this agreement include appropriate quality requirements for the work. The Recipient shall ensure sub-award recipients develop and implement Quality Assurance (QA) planning documents in accordance with this term and condition; and/or ensure sub-award recipients implement all applicable approved QA planning documents. EPA will not approve any QA planning documents developed by a Subrecipient; the Recipient is responsible for reviewing and approving its Subrecipient QA planning document(s), if required based on the Subrecipient's Environmental Information Operations.

## 1. Quality Management Plan (QMP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QMP, (ii) prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard and submit the document for EPA review, and (iii) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved and current QMP and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

The Recipient must submit the QMP within 90 calendar days after grant award, unless the Recipient requests a one-time extension that is granted by the QAM.

The Recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the Recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QAPP, (ii) prepare the QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard, (iii) submit the document for EPA review, and (iv) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s) and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the previously EPA-approved QAPP is acceptable for this agreement.

The Recipient must submit the QAPP within 90 calendar days after grant award, unless the Recipient requests a one-time extension that is granted by the QAM.

The Recipient must notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

Case 1:25-cv-00938-TSC     Document 7-5     Filed 04/02/25     Page 23 of 62
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 635 of 674

5J - 84094101 - 0     Page 22

The recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted when changes occur.

**For Reference:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Specifications for EPA and Non-EPA Organizations.

• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

## H. Real Property

In accordance with 2 CFR 200.311, title to Real Property acquired or improved under this agreement will vest upon acquisition by the Recipient, including but not limited to title to Real Property acquired through exercise of a remedy for default of a Financial Assistance arrangement. This Real Property must be used for the originally authorized purpose as long as needed for that purpose, during which time the Recipient must not dispose of or encumber its title or other interests. The Real Property Programmatic Term and Condition flows down to Subrecipients but not to Program Beneficiaries or Contractors that receive Financial Assistance to CCIA-Eligible Projects, which may acquire title to Real Property after receiving Financial Assistance to CCIA-Eligible Projects.

The Recipient must obtain prior approval from the EPA Award Official for the acquisition of Real Property. Note that the Recipient may meet this requirement by specifying the types of acquisitions of Real Property it plans to carry out in its EPA-approved workplan.

### Disposition

If the Recipient disposes of the Real Property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

Otherwise, when Real Property is no longer needed for the originally authorized purpose, the Recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where Recipient is disposing of Real Property acquired or improved with a Federal award and acquiring replacement Real Property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

Case 1:25-cv-00938-TSC    Document 7-5    Filed 04/02/25    Page 24 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 636 of 674

5J - 84094101 - 0    Page 23

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the Recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The Recipient is entitled to be paid an amount calculated by applying the Recipient's percentage of participation in the purchase of the Real Property (and cost of any improvements) to the current fair market value of the property.

Recordation

As authorized by 2 CFR 200.316, EPA requires that Recipients who use EPA funding to purchase and improve Real Property through an EPA funded construction project record a lien or similar notice in the Real Property records for the jurisdiction in which the Real Property is located, which indicates that the Real Property has been acquired and improved with federal funding and that use and disposition conditions apply to the Real Property.

I. Program Income

In accordance with Clean Air Act Section 134(b)(1)(C) as well as 2 CFR 200.307(e)(2) and 2 CFR 1500.8 (b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the EPA-approved workplan.

J. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the Recipient or Subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the Recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## III. ADDITIONAL PROGRAMMATIC TERMS AND CONDITIONS

## A. Eligible Recipient

The Recipient agrees to maintain its status as an Eligible Recipient, which includes:

    a. Meeting the definition of *Nonprofit organization* set forth in 2 CFR 200.1;

    b. Having an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"

    c. Not receiving any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);

    d. Being funded by public or charitable contributions; and

    e. Having the legal authority to invest in or finance projects.

## B. Workplan and Budget

The Recipient agrees to execute the EPA-approved workplan. This document, once approved by the EPA, will reflect an agreement between the Parties and will be incorporated into and be a part of the agreement between the Recipient and the EPA.

The Recipient agrees to conduct an annual review of the EPA-approved workplan within 90 calendar days of June 30 of each calendar year. If material changes are made during the annual review or in between annual reviews, the Recipient agrees to submit the updated workplan to the EPA Project Officer.

The Recipient also agrees to conduct an annual review of the EPA-approved detailed budget table within 90 calendar days of June 30 of each calendar year. If material changes are made during the annual review or in between annual reviews, the Recipient agrees to submit the updated detailed budget table to the EPA Project Officer. Such submissions are not subject to prior approval unless otherwise required by the regulations or the terms and conditions of the Award Agreement.

## C. Recipient Organizational Plan

The Recipient agrees to execute the workplan in accordance with the documents listed below, as submitted to EPA through Grants.gov for EPA-R-HQ-CCIA-23 or provided to EPA after the application submission deadline.

1. Description of Programmatic Capabilities, pursuant to *Section IV.C: Content of Application Submission* of the Notice of Funding Opportunity;

2. Organizational and Governing Documents, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity.

5J - 84094101 - 0   Page 25

The Recipient agrees to maintain its incorporation in the United States, as reflected in the above documents.

The Recipient agrees to conduct an annual review of the documents within 90 calendar days of June 30 of each calendar year. If material changes are made during the annual review or in between annual reviews, the Recipient agrees to submit the updated documents to the EPA Project Officer. Such submissions are not subject to prior approval unless otherwise required by the regulations or the terms and conditions of the Award Agreement.

### D. Recipient Policies and Procedures

The Recipient agrees to execute the workplan in accordance with the documents listed below (or other documents submitted in lieu of the documents listed below), as submitted to EPA through Grants.gov for EPA-R-HQ-CCIA-23 or provided to EPA after the application submission deadline.

1. Legal and Compliance Risk Management Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

2. Board Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

3. Management Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

4. Consumer Protection Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

5. Equity Policies and Practices    , pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity; and

6. Conflict of Interest Mitigation Plan, which include all documents submitted upon EPA's request regarding measures that will be taken to eliminate, neutralize, mitigate or otherwise resolve conflicts of interest.

7. Documentation of Personnel and Fringe Benefit Charges, which includes all documents submitted upon EPA's request to document how personnel and fringe benefits will be charged against the grant award in accordance with 2 CFR 200.430 *Compensation—personal services* and 2 CFR 200.431 *Compensation—fringe benefits*. Notwithstanding the content of the Recipient's EPA-approved budget, the Recipient is not authorized to charge the grant award for personnel and fringe benefits against employees without using the W-2 as the definitive definition of "employee" until the Documentation of Personnel and Fringe Benefit Charges has been reviewed and approved by the EPA, as communicated by the EPA Project Officer.

The Recipient agrees to conduct an annual review of the documents within 90 calendar days of June 30 of each calendar year. If material changes are made during the annual review or in between annual reviews, the Recipient agrees to submit the updated documents to the EPA Project Officer. With the exception of the Documentation of Personnel and Fringe Benefit Charges, where changes will be subject to prior approval, such submissions are not subject to prior approval unless otherwise required by the regulations or the terms and conditions of the Award Agreement.

## E. Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Capitalization Funding; Technical Assistance Subawards; Technical Assistance Services; and Program Administration Activities. The Recipient must use awards funds exclusively for allowable activities within the ten EPA regions, with the exception of the Freely Associated States. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

The Recipient agrees to not use the award for activities that support deployment of projects that do not meet the definition of CCIA-Eligible Projects. The Recipient also agrees not to use the award for activities associated with defending against, settling, or satisfying a claim by a litigant, except when (1) the claim stems from the Recipient's implementation of its EPA-approved workplan in compliance with the terms and conditions of the Award Agreement and (2) the Recipient has obtained prior written approval from the EPA Award Official.

## F. Foreign Entity of Concern

As part of carrying out this award, the Recipient agrees to ensure that entities the Recipient contracts with, the Recipient makes Subawards to, or that receive funds as program beneficiaries at any tier of funding under this grant agreement are not—

      (A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

      (B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

      (C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## G. LIDAC Expenditure Requirement

The Recipient agrees to ensure that 100% of the award is used for the purposes of providing Financial Assistance in Low-Income and Disadvantaged Communities, with compliance maintained over each annual reporting period (i.e., from July 1 to June 30). Funds used for the purposes of providing Financial Assistance includes Capitalization Funding; Technical Assistance Subawards; Technical Assistance Services; and Program Administration Activities. This requirement applies to the entire award provided to the Recipient and "flows down" to each Subrecipient.

## H. Subgrants to For-Profit Entities

The Recipient is authorized to provide Subgrants to for-profit entities if and only if those Subgrants are provided to an entity that has been determined by the U.S. Treasury's CDFI Fund to meet the CDFI certification requirements set forth in 12 CFR 1805.201, the framework for awarding Subgrants to such for-profit entities is described in the Recipient's EPA-approved workplan, and the for-profit entity meets the definition of a Community Lender. Community Development Banks, for example, may qualify under

Case 1:25-cv-00938-TSC    Document 7-5    Filed 04/02/25    Page 28 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 640 of 674

5J - 84094101 - 0    Page 27

this definition, as they are for-profit entities and are U.S. Treasury-certified CDFIs.

The Recipient agrees to require that for-profit entities that receive such Subgrants:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the Subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition, by ensuring that the for-profit entity does not use Subgrant funds to accumulate and reserve funds for ongoing business expenses; unforeseen liabilities; or for other similar costs which are not allowable under this Assistance Agreement;

3. Account for and use Program Income under the rules for Program Income pursuant to 2 CFR 1500.8 (b) and the terms and conditions of the Award Agreement and Closeout Agreement; and
4. Be subject to the same requirements as non-profit Subgrantees under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(b).

## I. Capitalization Funding

As stated in the definition of Capitalization Funding, the Recipient will provide Capitalization Funding Subawards to Community Lenders in the form of Subgrants, which are subject to the EPA Subaward Policy. The following additional requirements apply when the Recipient provides Capitalization Funding to Community Lenders.

### 1. Disclosure and Approval Requirements

1. The Recipient must obtain written approval from the EPA Award Official prior to providing Capitalization Funding to a Community Lender Subrecipient that would exceed the cap of $10,000,000 in Capitalization Funding under the Clean Communities Investment Accelerator. If the exception has been approved by the EPA Award Official in the Recipient's EPA-approved workplan, then no additional approval is required.

2. Prior to providing Capitalization Funding to a Community Lender Subrecipient, the Recipient must obtain disclosure from the Community Lender regarding award funds that it has sought and/or received under the National Clean Investment and Clean Communities Investment Accelerator programs.

### 2. Revolving Loan Fund Characterization

Capitalization Funding Subgrants are made for the sole purpose of providing Financial Assistance to CCIA-Eligible Projects. As stated in the definition of Financial Assistance, expenditures for Financial Assistance are in the form of Subawards, Participant Support Costs, and acquisitions of Intangible Property, as defined in this Award Agreement. EPA considers all Capitalization Funding Subgrants to be capitalizations of revolving loan funds for the purposes of 2 CFR 1500.8(d).

### 3. Participant Support Costs

Case 1:25-cv-00938-TSC    Document 7-5    Filed 04/02/25    Page 29 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 641 of 674

5J - 84094101 - 0    Page 28

The Community Lender may provide Financial Assistance to CCIA-Eligible Projects in the form of Participant Support Costs. The Recipient agrees to impose the following eligibility, restrictions, timelines, and other programmatic requirements on Community Lenders payments of Participant Support Costs, in addition to other requirements included in the terms and conditions of this Award Agreement:

    1. The Community Lender and program beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as Participant Support Costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the Community Lender and program beneficiaries to consult their tax advisers, the U. S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates, and other participant support cost payments. However, EPA does not provide advice on tax issues relating to these payments.

    2. Participant support cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The Community Lender, therefore, may not make participant support cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that Community Lenders adhere to this requirement as well. The Community Lender is responsible for checking that Program Beneficiaries (i.e., entities receiving Participant Support Costs) are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the Program Beneficiaries.

The Recipient agrees to provide written guidelines for Community Lenders' payments of Participant Support Costs that must be approved by the EPA prior to making payments to program beneficiaries, unless already described in the Recipient's EPA-approved workplan. These guidelines must: (a) describe the activities that will be supported by the Participant Support Costs; (b) specify the range of funding to be provided through the Participant Support Costs; (c) identify which types of entities will have title to equipment (if any) purchased with the funds; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the participant support cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

## 4. Acquisitions of Intangible Property

### 2 CFR 200 Procurement Standards

The Community Lender may use its Capitalization Funding to provide Financial Assistance to CCIA-Eligible Projects in the form of acquisitions of Intangible Property. The Community Lender agrees to acquire Intangible Property in compliance with the conflict of interest and competition requirements described in the 2 CFR Part 200 Procurement Standards. This includes but is not limited to the requirements at 2 CFR 200.318 to:

- Have and use documented procurement procedures to govern acquisitions of Intangible Property;
- Maintain oversight to ensure that contractors perform in accordance with the terms, conditions, and specifications of their contracts;
- Maintain written standards of conduct covering conflicts of interest and governing the actions of employees engaged in the selection, award, and administration of contracts as well as maintain written standards of conduct covering organizational conflicts of interest;

Case 1:25-cv-00938-TSC     Document 7-5     Filed 04/02/25     Page 30 of 62
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 642 of 674

5J - 84094101 - 0     Page 29

- Prioritize entering into inter-entity agreements where appropriate for procurement or use of common or shared goods and services as the Recipient seeks to mobilize financing and private capital;
- Award contracts only to responsible contractors possessing the ability to perform successfully under the terms and conditions of the proposed procurement; and
- Maintain records sufficient to detail the history of procurement.

## Disposition

If the Community Lender disposes of the Intangible Property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Subaward Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

## Recordation

The Community Lender agrees to record liens or other appropriate notices of record to indicate that Intangible Property has been acquired with Federal funding and that use and disposition conditions apply to the Intangible Property, in cases where Financial Assistance to CCIA-Eligible Projects is in the form of an Acquisition of Intangible Property. As provided in 2 CFR 200.1: "…loans, notes and other debt instruments, lease agreements, stock and other instruments of property ownership (whether the property is tangible or intangible)" are *Intangible Property* for the purposes of the restrictions described at 2 CFR 200.315(a). "Other appropriate notices of record" is not limited to filing Uniform Commercial Code instruments and may also include a notice of record in the legally-binding transaction documents.

## 5. Subawards to Financial Intermediary Subrecipients

The following requirements apply when a Community Lender provides a Subaward to a Financial Intermediary Subrecipient. These requirements apply to the Recipient and Subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition. As stated in the definition of Financial Assistance, Subgrants are not an eligible form of Financial Assistance:

1. The Community Lender must establish and follow a system that ensures all Subawards to Financial Intermediary Subrecipients are in writing and contain all of the elements required by 2 CFR 200.332(a), with the exception of the indirect cost provision of 2 CFR 200.332(a)(4) (which does not apply to loans). EPA has developed an optional template for Subaward Agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such Subaward Agreements with Financial Intermediary Subrecipients.

2. The Financial Intermediary Subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all Subawards that requires Financial Intermediary Subrecipients to comply with these requirements. No other provisions of the Uniform Grant Guidance, including the Procurement Standards, apply directly to the Subrecipient.

3. Prior to making the Subaward, the Community Lender must ensure that the Financial Intermediary Subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(a)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a

Case 1:25-cv-00938-TSC   Document 7-5   Filed 04/02/25   Page 31 of 62
USCA Case #25-5122   Document #2114423      Filed: 05/05/2025   Page 643 of 674

5J - 84094101 - 0    Page 30

UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

## J. Technical Assistance Subawards

As stated in the definition of Technical Assistance Subawards, the Recipient will provide Technical Assistance Subawards to Community Lenders in the form of Subgrants, which are subject to the EPA Subaward Policy. As such, the Establishing and Managing Subawards General Term and Conditions applies to Technical Assistance Subawards.

The following additional requirements apply when the Recipient provides Technical Assistance Subawards to Community Lenders.

1. The Recipient must obtain prior written approval from the EPA Award Official for any Technical Assistance Subaward that exceeds $1,000,000 in EPA funds. If the exception has been approved by the EPA Award Official in the Recipient's EPA-approved workplan, then no additional approval is required.

2. Prior to providing a Technical Assistance Subaward to a Community Lender, the Recipient must obtain disclosure from the Community Lender regarding award funds that it has sought and/or received under the National Clean Investment and Clean Communities Investment Accelerator programs.

The above requirements apply specifically to Technical Assistance Subawards but do not apply to Technical Assistance Services, which are allowable expenditures the Recipient may incur in accordance with the EPA-approved workplan and the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

## K. Labor and Equitable Workforce Development Requirements

## 1. Davis-Bacon and Related Acts (DBRA)

## A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this Award Agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" and "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Therefore, the Recipient must ensure that any construction work financed in whole or in part with such Financial Assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis-Bacon and Related Act requirements and the requirements of these Terms and Conditions. The Recipient must ensure that these requirements apply to all construction projects assisted by such Financial Assistance.

If the Recipient encounters a situation that presents uncertainties regarding DBRA applicability under this

Case 1:25-cv-00938-TSC    Document 7-5    Filed 04/02/25    Page 32 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 644 of 674

5J - 84094101 - 0    Page 31

Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with a Subrecipient, Program Beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this Term and Condition or the Davis-Bacon and Related Act, the Recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Note, the use of the term project in this term and condition is distinct from the use of the term project within the definition of Qualified Project under Clean Air Act Section 134(c)(3), which is broader and includes "any project, activity, or technology." Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed by a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

## B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

## C. Recipient Responsibilities When Entering Into and Managing Contracts:

### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

### b. After Award of Contract:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure

Case 1:25-cv-00938-TSC    Document 7-5    Filed 04/02/25    Page 33 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 645 of 674

5J - 84094101 - 0    Page 32

contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

## D. Recipient Responsibilities When Establishing and Managing Additional Subawards:

**a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all Subawards under this grant: "By accepting this award, the EPA Subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of Subrecipients and must ensure Subrecipients comply with the requirements in 29 CFR 5.6.

**c. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of Subrecipients and must ensure that Subrecipients comply with the requirements in subsection E, below.

## E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program Beneficiaries

Any Financial Assistance provided in the form of a participant support cost to a Program Beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

## a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

## b. After Award of Contract:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29

Case 1:25-cv-00938-TSC    Document 7-5    Filed 04/02/25    Page 34 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 646 of 674

5J - 84094101 - 0    Page 33

CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

## 2. Mega Construction Project Program

The Recipient must work with the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) to identify projects that are within the scope of OFCCP's Mega Construction Project Program, which includes federally-assisted projects with a total project value above $35,000,000. If those projects are selected from a wide range of federally-assisted projects over which OFCCP has jurisdiction, those projects will be required to participate and partner with OFCCP in the OFCCP Mega Construction Projects program.

## 3. Compliance with Federal Statutes and Regulations

The Recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with Subrecipients, contractors, and other partners (e.g., by including such provisions in contractual agreements). This includes but is not limited to applicable health and safety regulations as administered by the Occupational Safety and Health Administration.

## 4. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the Recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## 5. Labor and Equitable Workforce Development Implementation Plan

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), by December 31, 2024, the Recipient must submit a Labor and Equitable Workforce Development Implementation Plan to the EPA Project Officer. The Implementation Plan should articulate policies, practices, and procedures adopted by the Recipient to maximize high-quality jobs and workforce development outcomes on projects assisted with the award. Examples of how

5J - 84094101 - 0    Page 34

this can be demonstrated include, but are not limited to:

- Mechanisms for promoting job quality and evaluating labor standards on projects being considered for and/or receiving Financial Assistance;
- Plans to support workforce development as part of market-building activities;
- Current and planned partnerships with labor and workforce development organizations, including the purpose of those partnerships;
- Mechanisms for maximizing training and employment opportunities for participants in Registered Apprenticeship Programs on projects, including apprenticeship utilization targets, as applicable;
- Mechanisms for creating high-quality job training and employment opportunities available to residents of low-income and disadvantaged communities through projects and other program activities; and
- Processes for promoting Project Labor Agreements on construction projects above $25,000,000, as appropriate, in alignment with Executive Order 14063 (Use of Project Labor Agreements for Federal Construction Projects) and Executive Order 13502 (Use of Project Labor Agreements for Federal Construction Projects), as well as other types of binding agreements that promote strong workforce outcomes, such as Community Workforce Agreements and Community Benefits Agreements.

The Recipient may use or reference materials already submitted to EPA as part of its submission of the Implementation Plan, where relevant.

Note that EPA may make the information from this plan available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient.

## L. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that for any activity related to the construction, alteration, maintenance, or repair of infrastructure, "none of the funds made available for a Federal Financial Assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The Recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America requirements that all Recipients of EPA Financial Assistance awards must comply with.

If the Recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

JA1839

Case 1:25-cv-00938-TSC    Document 7-5    Filed 04/02/25    Page 36 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 648 of 674

5J - 84094101 - 0    Page 35

## M. Governance Requirements

The Recipient agrees to comply with the following governance requirements starting December 31, 2024. The governance requirements "flow-down" to Pass-Through Subrecipients and Community Lender Subrecipients that have received in excess of $10,000,000 in Capitalization Funding but not to other subrecipients. The governance requirements are waived for (i) any entity that has been determined by the U.S. Treasury's CDFI Fund to meet the CDFI certification requirements set forth in 12 CFR 1805.201 and (ii) any entity whose specific governance structure is set forth in State, Tribal, or local law.

The Recipient (or Subrecipient) may meet all or some of the governance requirements through the parent entity, provided the Recipient (or Subrecipient) is subject to the governance of the parent entity and the Recipient (or Subrecipient) is wholly-controlled by the parent entity. Similarly, the governance requirements may be waived for the Recipient (or Subrecipient) through the parent entity meeting the CDFI certification requirements set forth in 12 CFR 1805.201, provided the Recipient (or Subrecipient) is wholly-controlled by the parent entity.

### 1. Board Size and Composition

The Recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the Recipient's EPA-approved workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The Recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from Low-Income and Disadvantaged Communities).

### 2. Board Independence

The Recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

### 3. Board Committees

The Recipient agrees to have the following board-level committees to oversee and monitor management, with each committee staffed by members qualified to execute the committee's objectives. While the Recipient need not adhere to the exact naming convention or structure in this term and condition, each of the responsibilities must be covered by board-level committees at all times during the Period of Performance; for the avoidance of doubt, one committee may perform the responsibilities of one or more of the committees specified below.

1. An investment or credit committee to oversee and approve investment or credit decisions;

2. A risk management committee to oversee the formulation and operationalization of the risk management framework;

3. An audit committee to oversee the integrity of reporting and internal controls and the performance of audit functions, with a majority independent members on such committee;

5J - 84094101 - 0    Page 36

4. A nomination/governance committee to oversee nomination and succession of board and senior management, with a majority independent members on such committee; and

5. A compensation committee to oversee board as well as senior management and staff compensation, with a majority independent members on such committee.

Further, the Recipient agrees to act in good faith to ensure each committee obtains information from management, auditors, or other third-parties necessary to discharge their duties.

## 4. Board Policies and Procedures

The Recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The Recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of Capitalization Funding, Technical Assistance Subawards, and other Subawards to any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

## N. Consumer Protection Requirements

The Recipient agrees to carry out the following consumer protection requirements to the extent that the Recipient directly interacts, transacts, or contracts with consumers in the provision of Financial Assistance to CCIA-Eligible Projects:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the

Case 1:25-cv-00938-TSC    Document 7-5    Filed 04/02/25    Page 38 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 650 of 674

5J - 84094101 - 0    Page 37

appropriate government regulatory agency.

The Recipient agrees to monitor and oversee Subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(d) and 2 CFR 200.318.

## O. Financial Risk Management Requirements

### 1. Cash Management Requirements

The Recipient must deposit and maintain advance payments of Federal funds exclusively in insured accounts, in accordance with 2 CFR 200.305(b)(7)(ii). As provided in 2 CFR 200.1, an advance payment is "a payment that a Federal awarding agency or pass-through entity makes by any appropriate payment mechanism, including a predetermined payment schedule, before the non-Federal entity disburses the funds for program purposes;" a Recipient drawing down funds from ASAP prior to disbursement for actual and allowable project costs constitutes an advance payment. Interest income earned on the advance payment from EPA to the Recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The Recipient is authorized to maintain Program Income in two types of accounts:

   1. Insured accounts, including in amounts in excess of the federal insurance limit of $250,000.

   2. Accounts where such income is used to purchase (i) U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days and that such instruments are held-to-maturity if purchased directly, or (ii) short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions.

Interest income and other returns earned on funds that have already been disbursed is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9).

### 2. Financial Health Metrics

The Recipient agrees to report the following financial health metrics at the entity-level on an annual basis in accordance with its fiscal year as well as on behalf of each Pass-Through Subrecipient and Subrecipient Community Lender that has received in excess of $10,000,000 in Capitalization Funding. The metrics are due to the EPA Project Officer within 30 calendar days after submission of the reporting entity's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System and may be submitted through the Organizational Disclosures form. The requirement for submission of financial health metrics is not applicable for any fiscal year in which the reporting entity did not meet the requirements of 2 CFR Subpart F—Audit Requirements. The first financial health metrics are due in 2025.

1. Net Asset Ratio: The net asset ratio is defined as net assets divided by total assets.

5J - 84094101 - 0    Page 38

2. Current Ratio: The current ratio is defined as current assets divided by current liabilities, where current assets is equal to the value of all assets that are reasonably expected to be converted into cash within the coming 12-month period in the normal course of business and current liabilities is equal to the total value of all debts or obligations that must be paid in the coming 12-month period.

3. Delinquency Rate: The delinquency rate is defined as the value of loans outstanding that are 90+ calendar days delinquent divided by the value of loans outstanding, where loans 90+ calendar days delinquent includes those with outstanding balances 90+ calendar days overdue and still accruing interest as well as those in nonaccrual status.

4. Net Charge-Off Rate: The net charge-off rate is defined as the value of loans charged-off over the past fiscal year, minus the value of loan recoveries over the past fiscal year, divided by the value of loans outstanding.

5. Concentration: The concentration of the portfolio, as demonstrated by calculating and reporting on recipient-level exposure, defined as on-balance sheet exposures to a single consolidated entity over all on-balance sheet exposures, for top ten highest exposures.

Note, the Delinquency Rate and Net Charge-Off Rate may exclude the value of loans which include an element of forgiveness, if and only if such forgiveness was established in the terms governing the financial product at origination.

The EPA Project Officer will consider Recipient and, where applicable, Subrecipient performance against these financial health metrics only to the extent by which they materially impair the Recipient's ability to execute the EPA-approved workplan when assessing whether the Recipient is making sufficient progress in implementing the EPA-approved workplan under this Assistance Agreement, as specified in the Sufficient Progress General Term and Condition.

## 3. Climate-Related Financial Risks

The Recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include working with Community Lender Subrecipients to account for and evaluate practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of their financial risk management policies and procedures.

The Recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include working with Community Lender Subrecipients to account for climate-related financial risks, including physical and transition risks, including through providing Technical Assistance Services that assist Community Lender Subrecipients with accounting for such climate-related financial risks in their own policies and procedures.

## 4. Additional Requirements

The Recipient agrees to not subordinate EPA's interest in grant funds that have not yet been used for program purposes in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law. Once a Recipient uses grant funds for program purposes and incurs a financial obligation, as defined under 2 CFR 200.339, EPA will only seek claims on those funds in the event that they were used for costs that do not comply with the terms and conditions of the Award Agreement or if there is adequate evidence of waste, fraud, or abuse, prompting adverse action by EPA

Case 1:25-cv-00938-TSC    Document 7-5    Filed 04/02/25    Page 40 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 652 of 674

5J - 84094101 - 0    Page 39

per 2 CFR 200.339. This does not prohibit the use of subordinated debt as a form of Financial Assistance.

The Recipient agrees to provide Community Lender Subrecipients with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(e).

## P. Historic Preservation

### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The Recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties can include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The Recipient should work with their Project Officer to ensure that Subrecipients are available to work with EPA on any required consultation process with the State Historic Preservation Office (SHPO) or Tribal Historic Preservation Office (THPO) prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

### Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The Recipient must ensure that Subrecipients performing construction projects are aware of this requirement, and the Recipient must notify EPA if the AHPA is triggered.

## Q. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the Recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as

Case 1:25-cv-00938-TSC    Document 7-5    Filed 04/02/25    Page 41 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 653 of 674

5J - 84094101 - 0    Page 40

reimbursement requirements for moving expenses and standards for replacement housing. The Recipient must comply with, and ensure Subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the federal award" provision of 2 CFR 200.403(a). The Recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## R. Remedies for Non-Compliance

The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs provided in 2 CFR 200.343. As specified in 2 CFR 200.343, which will remain in effect throughout the term of this award, costs during suspension or after termination are allowable if (a) the costs result from financial obligations which were properly incurred by the non-Federal entity before the effective date of suspension or termination, are not in anticipation of it, and (b) the costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

The Recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the Recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of Subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the Recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action.

Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing an opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements.

## S. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The Recipient agrees to comply with these clarifications.

## 1. Access to Records

In accordance with 2 CFR 200.337, EPA and the EPA Office of Inspector General (OIG) have the right to access any documents, papers, or other records, including electronic records, of the Recipient and any Subrecipient which are pertinent to this award in order to make audits, examinations, excerpts, and transcripts. This right of access also includes timely and reasonable access to the Recipient and Subrecipient's personnel for the purpose of interview, discussion, and on-site review related to such

5J - 84094101 - 0    Page 41

documents. This right of access shall continue as long as the records are retained.

## 2. Indirect Cost Rate

The Recipient must exclude costs for acquisitions of Intangible Property from any calculations of modified total direct costs (MTDC), as defined in 2 CFR 200.1. Intangible Property is not a "service" and therefore is not included in MTDC. The Recipient should note that Subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive Participant Support Costs cannot charge an indirect cost rate against their participant support cost payments.

*MTDC* means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $25,000 of each Subaward (regardless of the Period of Performance of the Subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, Participant Support Costs and the portion of each Subaward in excess of $25,000.

In the event that the Recipient is compensating an affiliated entity for its direct and indirect costs related to use of employees, the Recipient must not charge its indirect cost rate against any of these costs.

## 3. Sufficient Progress

The EPA Project Officer may assess whether the Recipient is making sufficient progress in implementing the EPA-approved workplan under this Assistance Agreement within 90 calendar days of June 30, 2025 as well as within 90 calendar days of June 30 of each year thereafter during the Period of Performance. "Sufficient progress" shall be assessed based on a comparison of the Recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. As noted under the Financial Risk Management Programmatic Term and Condition, the Recipient's financial health, as measured by the required Financial Health Metrics, are also an input in this process. This term and condition "flows down" to Subrecipients, with the Recipient required to assess whether each Subrecipient is making sufficient progress in implementing the workplan under its Subaward Agreement; the Recipient may increase the frequency and scope of the review of sufficient progress of Subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the Recipient has not made sufficient progress in implementing its EPA-approved workplan, the Recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

EPA will not find that the Recipient has failed to make sufficient progress in implementing its EPA-approved workplan based on shifts between types of Financial Assistance and/or CCIA-Eligible Projects over the Period of Performance (or other shifts in portfolio allocation, such as by region or market segment, over the Period of Performance). If EPA finds the Recipient has failed to achieve sufficient progress on deployment of Financial Assistance to CCIA-Eligible Projects in general, the Recipient will have an opportunity to implement a corrective action plan pursuant to 2 CFR 200.208.

## 4. Termination

Notwithstanding the General Term and Condition "Termination," EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 applicable

Case 1:25-cv-00938-TSC    Document 7-5    Filed 04/02/25    Page 43 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 655 of 674

5J - 84094101 - 0    Page 42

to EPA grants as of July 1, 2024, pursuant to 89 FR 55262 (July 3, 2024), when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is materially impaired or there is adequate evidence of waste, fraud, material misrepresentation of eligibility status, or abuse, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination.

## T. Period of Performance

The Period of Performance under this Award Agreement will end on the date specified in the Notice of Award. However, the Period of Performance may end prior to the date specified in the Notice of Award if all required work of the Federal award has been completed, in accordance with 2 CFR 200.344. In accordance with 2 CFR 200.344(b), the Recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the Period of Performance. In this context, to "liquidate all financial obligations" means to pay outstanding bills, such as the payment of staff salaries accrued during the Period of Performance but for which the due date falls after the end date of the Period of Performance.

The Recipient should note that the Recipient will not be considered to have met the requirements for closeout under its award under 2 CFR 200.344 so long as any Subrecipient has not met the requirements for closeout under its subaward under 2 CFR 200.344.

Notwithstanding the Extension of Project/Budget Period Expiration Date General Term and Condition, in accordance with 2 CFR 200.308(e)(2), the Recipient is authorized to initiate a one-time extension of the Period of Performance by up to 12 months without prior EPA approval, provided that the extension complies with the requirements 2 CFR 200.308(e)(2). In accordance with 2 CFR 200.308(e)(2), the Recipient must "notify the Federal awarding agency in writing with the supporting reasons and revised period of performance at least 10 calendar days before the end of the period of performance specified in the Federal award."

## U. Closeout Agreement

As provided at 2 CFR 200.307(f) and 2 CFR 1500.8(d), after the end of the Period of Performance of the Assistance Agreement, the Recipient may keep and use Program Income remaining at the end of the Assistance Agreement and use Post-Closeout Program Income in accordance with this term and condition. The Closeout Agreement goes into effect for this Assistance Agreement the day after the Assistance Agreement Period of Performance ends, unless the Recipient and the EPA Grants Management Officer or Award Official mutually agree on an alternative date.

In accordance with 2 CFR 200.344, EPA will proceed to closeout the Award Agreement and enter the Closeout Period even if the Recipient has not met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition). As provided in 2 CFR 200.344: "If the non-Federal entity fails to complete the requirements, the Federal awarding agency or pass-through entity will proceed to close out the Federal award with the information available." This Closeout Agreement is therefore self-executing.

Case 1:25-cv-00938-TSC   Document 7-5   Filed 04/02/25   Page 44 of 62
USCA Case #25-5122   Document #2114423   Filed: 05/05/2025   Page 656 of 674

5J - 84094101 - 0   Page 43

This term and condition is the entire Closeout Agreement between the EPA and the Recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The Recipient shall comply with the requirements specified below as part of the Closeout Agreement. Definitions within 2 CFR 200.1, including as supplemented through *I. Definitions* of this award agreement, apply identically to how they do under the Period of Performance, unless otherwise noted.

As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to Subrecipients such that the Recipient must enter into a corresponding Closeout Agreement with any Subrecipient that has Program Income or anticipates generating Post-Closeout Program Income at the end of the Subrecipient's Period of Performance.

## 1. Allowable Activities

The Recipient shall use Post-Closeout Program Income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

The Recipient shall submit program performance reports to the EPA Project Officer in accordance with the Performance Reporting Programmatic Term and Condition through September 30, 2031, as applicable. After September 30, 2031, the Recipient shall disclose annual reports publicly, as described in the Performance Reporting Programmatic Term and Condition, rather than meeting the reporting requirements described in the Performance Reporting Programmatic Term and Condition.

## 3. LIDAC Expenditure Requirements

The Recipient shall expend 100% of Post-Closeout Program Income for the purposes of providing Financial Assistance in Low-Income and Disadvantaged Communities and comply with this requirement in accordance with the LIDAC Expenditure Requirement Programmatic Term and Condition, as applicable. Funds used for the purposes of providing Financial Assistance includes Capitalization Funding; Technical Assistance Subawards; Technical Assistance Services; and Program Administration Activities. This requirement applies to the entire award provided to the Recipient and "flows down" to each Subrecipient.

## 4. Cash Management Requirements

The Recipient must maintain Post-Closeout Program Income in accordance with the Cash Management Requirements in the Financial Risk Management Requirements Programmatic Term and Condition, as applicable. However, the Recipient may submit a Cash Management Policy for review and approval by the EPA Project Officer, which can authorize the Recipient to deviate from the aforementioned Cash Management Requirements.

## 5. Financial Health Metrics

The Recipient agrees to report financial health metrics to the EPA Project Officer in accordance with the Financial Health Metrics in the Financial Risk Management Requirements Programmatic Term and

5J - 84094101 - 0    Page 44

Condition (on behalf of the Recipient, Pass-Through Subrecipients, as well as Community Lender Subrecipients that have received in excess of $10,000,000 in Capitalization Funding) through September 30, 2031, as applicable. The requirement for submission of financial health metrics is not applicable for any fiscal year in which the reporting entity did not meet the requirements of 2 CFR Subpart F—Audit Requirements. The Recipient agrees to add the following two financial health metrics as part of the financial health metrics for the Closeout Period.

1. Self-Sufficiency Ratio: The self-sufficiency ratio is defined as earned revenue divided by operating expenses, where earned revenue is equal to the value of all income earned from normal business transactions and operating expenses is equal to the value of all expenses incurred as a part of normal business operations over the prior 12-month period, not including interest, financing, depreciation, amortization, and loan loss provision expense.

2. Operating Cash Ratio: The operating cash ratio is defined as cash and cash equivalents divided by operating expenses, where cash and cash equivalents is equal to the total value of all cash and cash equivalent items that can be converted into cash immediately and operating expenses is equal to the value of all expenses incurred as a part of normal business operations over the prior 12-month period, not including interest, financing, depreciation, amortization, and loan loss provision expense.

After September 30, 2031, the Recipient shall report on these financial health metrics publicly rather than disclosing the metrics to the EPA.

## 6. Conflicts of Interest

The Recipient agrees to comply with the conflict of interest requirements described in the Conflicts of Interest Programmatic Term and Condition through September 30, 2031.

## 7. Remedies for Non-Compliance

The Recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable. During the Closeout Period, the workplan and budget submitted for the Period of Performance are no longer applicable.

## 8. Suspension and Debarment

The Recipient agrees to ensure that Post-Closeout Program Income is not transferred to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The Recipient can maintain compliance with this requirement through either (1) checking the System for Award Management (for Subrecipients, Contractors, or Program Beneficiaries) or (2) obtaining eligibility certifications from counterparties (for Program Beneficiaries). The Recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity is presently excluded or disqualified.

## 9. Non-Discrimination

The Recipient must use Post-Closeout Program Income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

**Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age**

5J - 84094101 - 0    Page 45

**Discrimination Act of 1975.** The Recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency" in 40 CFR Part 5 and 40 CFR Part 7, the Recipient agrees, and will require all Subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

**Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities.** As provided in section 301 of the Executive Order, the Recipient will ensure that Subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to Real Property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 10. Record-Keeping

In accordance with 2 CFR 200.334(e), the Recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of Post-Closeout Program Income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. Note that this requirement applies if and when the Closeout Agreement is terminated, in accordance with *Item 14. Termination of the Closeout Agreement*. EPA may obtain access to these records to verify that Post-Closeout Program Income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the Recipient must maintain adequate accounting records for how Post-Closeout Program Income is managed and spent as well as all other appropriate records and documents related to the activities conducted using Program Income.

The Recipient agrees to ensure that Subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. The Recipient may use the terms of its Subaward Agreements or other effective means to meet its responsibilities.

## 11. Other Federal Requirements

The following other federal requirements apply to the use of Post-Closeout Program Income under the Closeout Period to the same extent they do under the terms of the Performance Period:

- Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Development Requirements Programmatic Term and Condition;
- Build America, Buy America Act, as specified in the Build America, Buy America Act Programmatic Term and Condition and Build America, Buy America General Term and Condition; and
- National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition.

Case 1:25-cv-00938-TSC    Document 7-5    Filed 04/02/25    Page 47 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 659 of 674

5J - 84094101 - 0    Page 46

No other federal requirements apply to the use of Post-Closeout Program Income under the terms of this Closeout Agreement, other than those specified in this Closeout Agreement.

## 12. Audit Requirements

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Closeout Period, as activities related to the Federal award referenced in 2 CFR 200.502(a) include activities during the Closeout Period.

Through September 30, 2031, the Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## 13. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Closeout Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## 14. Termination of the Closeout Agreement

The Closeout Agreement terminates when either of the following situations occur: (1) the Recipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Recipient and the EPA Award Official or Grants Management Officer mutually agree to terminate the Closeout Agreement, with the Recipient remitting current and future Post-Closeout Program Income to the federal government.

The ability to terminate the Closeout Agreement flows down to Subrecipients, as a Closeout Agreement between the Recipient and Subrecipient terminates when either (1) the Subrecipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Subrecipient and the Recipient mutually agree to terminate the Closeout Agreement, with the Subrecipient remitting current and future Post-Closeout Program Income to the Recipient.

The de minimis amount must be agreed-upon in writing by the Recipient and the Director of the Office of the Greenhouse Gas Reduction Fund (or equivalent), prior to the Recipient using the "de minimis" criteria to terminate the Closeout Agreement.

## 15. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and the Authorized Representative on the EPA Key Contacts Form most recent submitted to the EPA Project Officer (for the Recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

## V. Legal Counsel

Case 1:25-cv-00938-TSC    Document 7-5    Filed 04/02/25    Page 48 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 660 of 674

5J - 84094101 - 0    Page 47

The Recipient agrees to appoint appropriate legal counsel if counsel is not already available.

## W. Accounting Principles

The Recipient must account for award funds in accordance with Generally Accepted Accounting Principles (GAAP) as in effect in the United States.

The Recipient must segregate and account for the award funds separately from all other program and business accounts. Additionally, the Recipient must segregate and account for Program Income separately from all other program and business accounts.

## X. Internal Controls

The Recipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at: https://www.gao.gov/assets/gao-14-704g.pdf.

## Y. Audits

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Period of Performance, as described in the Audit Requirements General Term and Condition. Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(h), the Recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit Subrecipient that expends $750,000 or more of EPA funds from the Recipient's grant program in the Subrecipient's fiscal year. Any for-profit Subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier.

The Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## Z. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that specific conditions are necessary to ensure that the Clean Communities Investment Accelerator Fund program is effectively carried out by Eligible Recipients that have not previously managed grants with the same scale and complexity of this agreement. These specific conditions will remain in effect throughout the Period of Performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer, will oversee and monitor the grant agreement through activities including:

Case 1:25-cv-00938-TSC     Document 7-5     Filed 04/02/25     Page 49 of 62
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 661 of 674

5J - 84094101 - 0     Page 48

1. Upon request, requiring the Recipient to participate in an annual workshop (i.e., one workshop per calendar year) with other Recipients under the National Clean Investment Fund and/or Clean Communities Investment Accelerator; the EPA Project Officer will contact the Recipient to finalize details for each annual workshop.

2. Participation in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the workplan, provided the Recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other Recipients under the Greenhouse Gas Reduction Fund with other EPA programs; and coordination by EPA staff with other federal programs to avoid duplication of effort;

3. Closely monitoring the Recipient's management and oversight of Subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

4. Closely monitoring the Recipient's performance to verify compliance with the EPA-approved workplan and achievement of environmental results;

5. Participating in periodic telephone conference calls with Recipient personnel to discuss project successes and challenges as well as similar items impacting program performance;

6. Reviewing and commenting on performance reports prepared under the Award Agreement. Note that the final decision on the content of performance reports rests with the Recipient;

7. Verifying that the Recipient is expending the award on allowable activities, including but not limited to reviewing a sample of Capitalization Funding and Technical Assistance Subawards to verify compliance with regulatory requirements and the terms and conditions of the Award Agreement; and

8. Periodically reviewing costs incurred by the Recipient as well as its contractors and Subrecipients if needed to ensure appropriate expenditure of grant funds. Note that Recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds.

Subject to approval by the EPA Award Official, the EPA Project Officer and the Recipient may agree to additional areas of oversight and monitoring.

*Method for Reconsideration.* If the Recipient believes that one or more of these specific conditions are not warranted or requires modification, the Recipient must file a written objection naming the specific condition(s) within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist, and Project Officer identified in the Notice of Award.

## AA. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the Recipient's GGRF award. These materials may include links to Recipient and/or Subrecipients' websites. The Recipient agrees to work with the EPA Project Officer or another member of GGRF program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## AB. Conflicts of Interest

Case 1:25-cv-00938-TSC    Document 7-5    Filed 04/02/25    Page 50 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 662 of 674

5J - 84094101 - 0    Page 49

The Recipient must comply with requirements on transfers of funds that create actual and potential conflicts of interest, as specified in this term and condition. Transfers of funds include Subawards, Contracts (including but not limited to Acquisitions of Intangible Property), and Participant Support Costs. The definitions in the EPA's Financial Assistance Conflict of Interest Policy (COI Policy) apply to this term and condition.

There are three categories of transfers of funds, with the requirements differing by each category (as specified in this term and condition):

>    **1. Transfers with Affiliated Entities:** Subawards, Contracts, and Participant Support Costs to Affiliated Entities or co-invested in projects with Affiliated Entities. An Affiliated Entity is any entity that is related to the Recipient in accordance with the indicia of control described in 2 CFR 180.905.

>    **2. Financial Assistance to CCIA-Eligible Projects:** Subawards, Contracts (in the form of Acquisitions of Intangible Property), and Participant Support Costs as forms of Financial Assistance to CCIA-Eligible Projects, unless such transfers are with Affiliated Entities. These transfers are not within the scope of the COI Policy, which states that "subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by recipients of revolving loan fund capitalization grants or other EPA financial assistance agreements where Agency funds may be used for lending activities."

>    **3. Subgrants and Contracts:** Subgrants and Contracts (other than Acquisitions of Intangible Property), unless such transfers are with Affiliated Entities.

>    Note that all Contracts (including Acquisitions of Intangible Property) must also comply with the conflict of interest standards in 2 CFR 200.318(c).

## 1. Transfers with Affiliated Entities

### Prior Approval of COI Mitigation Plan

The Recipient must not transfer funds with Affiliated Entities unless those transfers have been included in an EPA-approved COI Mitigation Plan on Transfers of Funds with Affiliated Entities. The Recipient agrees to seek prior EPA approval for changes to the COI Mitigation Plan on Transfers of Funds with Affiliated Entities.

### Quarterly Disclosure Requirement

The Recipient agrees to disclose, on a quarterly basis, a list of newly originated transfers of funds with Affiliated Entities that are within the scope of its EPA-approved COI Mitigation Plan on Transfers of Funds with Affiliated Entities. Each quarterly disclosure must include (1) a list of such transfers of funds made over the quarter and (2) steps taken to taken to eliminate, neutralize or mitigate any conflicts of interest, in accordance with the EPA-approved COI Mitigation Plan on Transfers of Funds with Affiliated Entities. The Recipient must disclose its own transfers as well as transfers made by Subrecipients.

The quarterly periods for such disclosures are defined as follows: April 1 to June 30; July 1 to September 30; October 1 to December 31; and January 1 to March 31. The Recipient must make the disclosures to

Case 1:25-cv-00938-TSC    Document 7-5    Filed 04/02/25    Page 51 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 663 of 674

5J - 84094101 - 0    Page 50

the EPA Project Officer within 30 calendar days of the end of the quarterly period.

## Project Officer Review

In accordance with 2 CFR 200.337, the EPA Project Officer may access records relating to a subset of transactions disclosed to review for compliance with the Recipient's EPA-approved COI Mitigation Plan on Transfers of Funds with Affiliated Entities as well as this term and condition. The EPA Project Officer will not have approve transfers of funds in advance but rather will review transfers of funds that have already occurred for compliance.

## Waivers and Modifications

EPA agrees that, for transfers of funds with Affiliated Entities, the requirements of this term and condition apply in lieu of the requirements of the Disclosing Conflict of Interest General Term and Condition.

On a case-by-cases basis, the EPA Project Officer may extend the due date for disclosures on transfers of funds with Affiliated Entities. On a case-by-case basis, the EPA Project Officer may waive or modify the disclosure requirements on transfers of funds with Affiliated Entities.

## 2. Financial Assistance to CCIA-Eligible Projects

## Quarterly Disclosure Requirement

The Recipient agrees to disclose, on a quarterly basis, a list of transfers of funds as Financial Assistance to CCIA-Eligible Projects with actual and potential conflicts of interest. Each quarterly disclosure must include (1) a list of such transfers of funds made over the quarter and (2) steps taken to taken to eliminate, neutralize or mitigate any conflicts of interest, in accordance with any EPA-approved documents related to eliminating, neutralizing, and mitigating conflicts of interest. The Recipient must disclose transfers made by Subrecipients.

The quarterly periods for such disclosures are defined as follows:  April 1 to June 30; July 1 to September 30; October 1 to December 31; and January 1 to March 31. The Recipient must make the disclosures to the EPA Project Officer within 30 calendar days of the end of the quarterly period.

## B. Project Officer Review

In accordance with 2 CFR 200.337, the EPA Project Officer may access records relating to a subset of transactions disclosed to review for compliance with the Recipient's EPA-approved documents related to eliminating, neutralizing, and mitigating conflicts of interest as well as this term and condition. The EPA Project Officer will not have approve transfers of funds in advance but rather will review transfers of funds that have already occurred for compliance.

## C. Waivers and Modifications

On a case-by-cases basis, the EPA Project Officer may extend the due date for disclosures on transfers of funds as Financial Assistance to Qualified Projects. On a case-by-case basis, the EPA Project Officer may waive or modify the disclosure requirements on transfers of funds as Financial Assistance to Qualified Projects.

Case 1:25-cv-00938-TSC    Document 7-5    Filed 04/02/25    Page 52 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 664 of 674

5J - 84094101 - 0    Page 51

## 3. Subgrants and Contracts

The Recipient agrees to comply with the Disclosing Conflict of Interest General Term and Condition for Subgrants and Contracts (excluding Acquisitions of Intangible Property), unless such transfers are with Affiliated Entities. If such transfers are with Affiliated Entities, then the Recipient is required to include them in the process specified in *1. Transfers with Affiliated Entities*.

## AC. Prior Approvals

EPA will only have authority to review and approve revisions to the Recipient's EPA-approved workplan, budget, and other documents if authorized by 2 CFR 200.308 or 2 CFR 200.208. The Recipient must contact the EPA Project Officer when the EPA has prior approval authority specified below.

## Workplan

For the purposes of this Award Agreement, EPA interprets 2 CFR 200.308(c)(1) to enable the Recipient to revise the activities specified in its **EPA-approved workplan** without prior EPA approval, provided the activities still comply with the terms and conditions of the Award Agreement. The allowable and allocable grant costs are narrowly defined, pursuant to the terms and conditions of the Award Agreement; in accordance with 2 CFR 200.308(c)(1), any changes to the EPA-approved workplan that comply with the statute as well as the terms and conditions would not be a "change in the scope or objective of the project or program." Therefore, so long as the Recipient is updating its EPA-approved workplan with the revised activities in accordance with the terms and conditions of the Award Agreement, EPA will not require prior approval.

## Budget

For the purposes of this Award Agreement, EPA implements 2 CFR 200.308(f) in accordance with Item 1 of the Transfer of Funds General Term and Condition to enable the Recipient to revise the **EPA-approved budget** included in its Award Agreement without prior EPA approval, provided the cumulative funding transfers among Object Class Categories (Personnel, Fringe Benefits, Travel, Equipment, Supplies, Contractual, Construction, Other, Indirect) do not exceed 10% of the total budget approved at time of award. Therefore, so long as the Recipient is updating its EPA-approved budget by transferring funds by less than or equal to these amounts, EPA will not require prior approval.

However, notwithstanding the requirements of 2 CFR 200.308(f), if the Recipient seeks to increase the **amount of funds budgeted for Participant Support Costs,** then it must seek prior approval pursuant to 2 CFR 200.308(c)(5). Further, if the Recipient seeks to **transfer funds for any of the items listed in 2 CFR 200.407,** then it must seek prior approval pursuant to that regulation as well as Item 2 of the Transfer of Funds General Term and Condition.

## Transfers of Funds

2 CFR 200.308(c)(6) requires the Recipient to obtain prior agency approval for "Subawarding, transferring or contracting out of any work under a Federal award." If the **types of transfers are described in the EPA-approved workplan** (including types of transfers to be conducted through Subawards, Participant Support Costs, Acquisitions of Intangible Property, and other Contracts as defined in 2 CFR 200.1), then EPA has provided approval only for the purposes of 2 CFR 200.308(c)(6). Approval for the purposes of this regulation does not mean that such transfers of funds are compliant with the statutes,

Case 1:25-cv-00938-TSC    Document 7-5    Filed 04/02/25    Page 53 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 665 of 674

5J - 84094101 - 0    Page 52

regulations, and terms and conditions.

Changes in Key Personnel

2 CFR 200.308(c)(2) requires the Recipient to obtain prior agency approval for a "[c]hange in a key person specified in the application or the Federal award." If the Recipient is seeking to change a "key person," as defined by members of the board of directors and senior management whose roles are specified in the most recently submitted Description of Programmatic Capabilities, then the Recipient must obtain prior EPA approval of the qualifications of the key person.

The Recipient must request prior agency approval for a change in "key person" via email through the EPA Project Officer, who will have 8 calendar days to communicate EPA's disapproval of their qualifications via email. If 8 calendar days have passed without notification of EPA disapproval of the key person's qualifications pursuant to 2 CFR 200.308(c)(2), the Recipient is authorized to change the "key person." Once the change is effective, the Recipient must submit an updated Description of Programmatic Capabilities to the EPA Project Officer.

AD. Flow-Down Requirements

As described in 2 CFR 200.101, the terms and conditions of Federal awards flow down to Subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(a)(2) and in accordance with the Establishing and Managing Subawards General Term and Condition, the Recipient agrees to ensure that Subrecipients are subject to the same requirements as those that apply to the pass-through entity's EPA award.

For the purposes of this Award Agreement, all terms and conditions must flow down to Subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to Subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

AE. Resolution of Disputes Termination Provision

The Recipient is precluded from drawing down more than 78.46% of the Total Approved Assistance Amount until this condition is removed, which will occur when: a) the EPA Award Official, at the direction of the Grants Competition Disputes Decision Official (GCDDO), provides written confirmation that all administrative disputes under the National Clean Investment Fund and the Clean Communities Investment Accelerator are resolved in accordance with the dispute resolution procedures in Appendix A of the EPA Order 5700: Policy for Competition of Assistance Agreements; or b) the administrative disputes are withdrawn, abandoned or dismissed; or c) December 31, 2024, whichever is sooner.

If EPA does need to alter the Selection Official's selection and partial funding decisions for this agreement based on a GCDDO determination the EPA Award Official will partially terminate this assistance agreement, de-obligate a portion of the funds that have been obligated and use the de-obligated funds to satisfy the terms of a GCDDO remedy benefiting another entity. The Recipient will then provide an updated workplan and budget information, as needed, to amend the agreement.

For the purposes of this term and condition, EPA's partial termination may apply not just to obligated funds that have not been drawn down from ASAP but also to Program Income that has been generated

5J - 84094101 - 0    Page 53

and retained by the Recipient under 2 CFR 1500.8(d) and the Program Income Programmatic Term and Condition of this agreement. In accordance with 2 CFR 200.307(e)(1), EPA may require that the amount of funds committed by EPA to the Recipient be reduced by all or some of the Program Income that has been generated by the Recipient.

## AF. Deposit Account at Financial Agent

When a depository institution is designated as a financial agent of the United States (the Financial Agent) for the Greenhouse Gas Reduction Fund, then the Recipient will be required to set up and utilize an Account or Accounts at the Financial Agent in accordance with the terms of the Account or Accounts that EPA will set forth in the Award Agreement, including but not limited to through amendments to the Award Agreement.

## AG. Interim SF-425 Requirement

The Recipient must submit an SF-425 within 30 calendar days of receiving access to an Account or Accounts at the Financial Agent, with the SF-425 covering all activities supported by funds drawn from ASAP and disbursed for actual and allowable costs, other than funds disbursed into the Account or Accounts at the Financial Agent.

## AH. Interim Drawdown Procedures

### Authority

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that specific conditions are necessary to ensure that the National Clean Investment Fund and Clean Communities Investment Accelerator programs are effectively carried out by Eligible Recipients that have not previously managed grants with the same scale and complexity of this agreement. These specific conditions will remain in effect throughout the Period of Performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

### General Term and Condition

During the interim period between the start of the Federal award and the date on which the Deposit Account at the Financial Agent is first made available and accessible to the Recipient, the Recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

This requirement "flows down" to Subrecipients; if a Subrecipient has an actual and immediate cash requirement, then the Recipient is required to draw funds from ASAP on behalf of the subrecipient and disburse the funds to the Subrecipient and the Subrecipient is required to disburse the funds for the actual and immediate cash requirement. Alternatively, as authorized by 2 CFR 200.332(c), the Recipient may impose the reimbursement method as opposed to the advance payment method with Subrecipients as part of "specific subaward conditions" if appropriate as described in 2 CFR 200.208.

### Interim ASAP Cap

During the interim period between the start of the Federal award and the date on which the Deposit

5J - 84094101 - 0    Page 54

Account at the Financial Agent is first made available and accessible to the Recipient, the Recipient is subject to a cap on the cumulative amount of its drawdowns. This cap starts at 8.33% (or one-twelfth) of the Recipient's EPA-approved first-year budget, plus allowable pre-award costs, and increases by 8.33% (or one-twelfth) of the Recipient's EPA-approved first-year budget on the first calendar day of each month after the date on the Notice of Award until the Deposit Account at the Financial Agent is available and accessible to the Recipient. The cap shall not exceed 25% (or one-fourth) of the Recipient's EPA-approved first-year budget, plus allowable pre-award costs. The cap shall cease to apply once the Deposit Account at the Financial Agent is available and accessible to the Recipient.

Note that this cap is in addition to, rather than in lieu of, the cap described in the Resolution of Disputes Termination Provision.

### Interim ASAP Payment Request

During the interim period between the start of the Federal award and the date on which the Deposit Account at the Financial Agent is first made available and accessible to the Recipient, the Recipient must abide by the following process for ASAP payment requests.

1. The Recipient must only initiate payment requests from ASAP each Thursday (for next business day payments) or Friday (for same business day payments).

2. The Recipient must submit payment requests to ASAP falling into the following four categories, with no more than one payment request in each category per week: (1) Recipient Financial Assistance Activities; (2) Recipient Other Allowable Activities; (3) First-Tier Subrecipient Financial Assistance Activities; or (4) First-Tier Subrecipient Other Allowable Activities. The first category is not applicable under the CCIA.

3. Prior to receiving the payment, the Recipient must provide the EPA Project Officer with the following information: (a) amount of payment requested, (b) category of payment, (c) type(s) of Financial Assistance anticipated, (d) descriptions of Qualified Project(s) anticipated, and (e) a certification from the Recipient's chief executive officer (or equivalent), chief financial officer (or equivalent), chief reporting officer (or equivalent), or chief compliance officer (or equivalent) that the amount of the payment is necessary to execute against the EPA-approved workplan and that financing agreements for identified Qualified Project(s) necessitating the payment have been reviewed by the Recipient's counsel for legal sufficiency. The certification must include the following language: "This certification is a material representation for the purposes of an EPA Financial Assistance Agreement, and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions." Requirements (c), (d), and (e) are applicable to payment requests for Recipient Financial Assistance Activities and "flow-down" as part of payment requests for First-Tier Subrecipient Financial Assistance Activities, as described below.

The EPA Project Officer is authorized to provide case-by-case modifications or exceptions to these requirements, provided those modifications or exceptions remain compliant with the ASAP and Proper Payment Draw Down General Term and Condition.

These requirements "flow down" to Subrecipients; if a Subrecipient has an actual and immediate cash requirement, then it must submit payment requests to the Recipient pursuant to these requirements. As authorized at 2 CFR 200.337, EPA may request records of payment requests to the Recipient and would expect documentation to show that, for each payment to a Subrecipient, the Subrecipient has provided the Recipient with the information described above.

Case 1:25-cv-00938-TSC    Document 7-5    Filed 04/02/25    Page 56 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 668 of 674

5J - 84094101 - 0    Page 55

Disbursement of Payment

During the interim period between the start of the Federal award and the date on which the Deposit Account at the Financial Agent is first made available and accessible to the Recipient, for each payment, if the Recipient has not disbursed the entire payment amount within 5 business days of drawdown, the Recipient must provide the EPA Project Officer with the amount of payment not yet disbursed. The Recipient must then follow the procedures described in the ASAP and Proper Payment Drawdown General Term and Condition for the amount of payment not yet disbursed within 5 business days of drawdown.

Method for Reconsideration

If the Recipient believes that one or more of these specific conditions are not warranted or requires modification, the Recipient must file a written objection naming the specific condition(s) within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist, and Project Officer identified in the Notice of Award.

AI. Amendments to Terms and Conditions

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.


## IV. ADMINISTRATIVE TERMS AND CONDITIONS (SEE ABOVE ADMINISTRATIVE CONDITIONS)

## V. FINANCIAL AGENT TERMS AND CONDITIONS

### A. Revisions to Award Agreement to Account for Financial Agent Arrangement

When a depository institution is designated as a financial agent of the United States (the Financial Agent) for the Greenhouse Gas Reduction Fund, the following revisions to the Award Agreement will become effective without further action or notice required by the Recipient or EPA.

### 1. Revisions to Section I. Definitions

*The following **new definition** will be added to the Award Agreement:*

**Capitalization by Nonexchange Capital Contribution:** Capitalization by Nonexchange Capital Contribution means award funds that (1) the Recipient draws down from the Automated Standard Application Payments (ASAP) system and (2) disburses into the 'Budget Account' as defined under the Deposit Account at Financial Agent Programmatic Term and Condition to capitalize itself for subsequent use for any of the following Allowable Activities: Capitalization Funding; Technical Assistance Subawards; Technical Assistance Services; and Program Administration Activities. Under this two-step transaction, which involves both a drawdown and disbursement, the Recipient's drawdown from ASAP is deemed (a) an advance payment of Federal funds in accordance with 2 CFR 200.305(b)(1); while the disbursement into the Deposit Account at Financial Agent is deemed (b) an allowable cost to be charged to the EPA

Case 1:25-cv-00938-TSC    Document 7-5    Filed 04/02/25    Page 57 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 669 of 674

5J - 84094101 - 0    Page 56

award, and (c) a "nonexchange transaction", consistent with the definition of this term in the Statement of Federal Financial Accounting Standards No. 5. The full amount of the Capitalization by Nonexchange Capital Contribution must be recognized, reported, and accounted for as Program Income in accordance with the Program Income Programmatic Term and Condition once clauses (a) and (b) are fulfilled. Any Subrecipient with a Deposit Account at Financial Agent will be entitled to receive its payments from Recipient as a Capitalization by Nonexchange Capital Contribution.

*The definition of **Program Income** under the Award Agreement will be amended and replaced with:*

**Program Income:** 2 CFR 200.1 defines Program Income as "gross income earned by the non-Federal entity that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(f)." 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, there are two types of Program Income: (1) "Program Income from Operations" and (2) "Program Income from Capitalization by Nonexchange Capital Contribution".

Program Income from Operations includes but is not limited to income from origination fees, servicing fees, and asset management fees; dividends from equity investments; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). Under this award agreement, the Recipient is authorized to deduct the cost of generating Program Income from Operations under 2 CFR 200.307(b) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Program Income from Operations include origination, servicing, and management costs that are not charged as direct costs to the Federal award. Program Income from Operations can be earned prior to the availability of the 'Program Income from Operations' account as defined under the Deposit Account at Financial Agent Programmatic Term and Condition.

Program Income from Capitalization by Nonexchange Capital Contribution means award funds from the ASAP system that the Recipient draws down and immediately deposits into the 'Budget Account' at the Financial Agent in accordance with (a) the definition of Capitalization by Nonexchange Capital Contribution and (b) the Deposit Account at Financial Agent Programmatic Term and Condition. Program Income from Capitalization by Nonexchange Capital Contribution cannot be earned prior to the availability of the 'Budget Account' as defined under the Deposit Account at Financial Agent Programmatic Term and Condition.

Both forms of Program Income under this program must be treated in accordance with the Program Income Programmatic Term and Condition. EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fund raising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

## 2. Revisions to Section II. National Programmatic Terms and Conditions

Case 1:25-cv-00938-TSC    Document 7-5    Filed 04/02/25    Page 58 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 670 of 674

5J - 84094101 - 0    Page 57

*The **Program Income Programmatic Term and Condition** will be amended and replaced with:*

### Program Income

In accordance with Clean Air Act Section 134(b)(1)(C) as well as 2 CFR 200.307(e)(2) and 2 CFR 1500.8 (b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income from Operations once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income from Operations may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the EPA-approved workplan.

### 3. Revisions to Section III. Additional Programmatic Terms and Conditions

*The Allowable and Unallowable Activities Programmatic Term and Condition will be amended and replaced with:*

### Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Capitalization by Nonexchange Capital Contribution; Capitalization Funding; Technical Assistance Subawards; Technical Assistance Services; and Program Administration Activities. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

Capitalization by Nonexchange Capital Contribution generates Program Income for the Recipient in an amount equal to the available EPA award balance drawn down from ASAP into the 'Budget Account' as defined under the Deposit Account at Financial Agent Programmatic Term and Condition. Program Income from Capitalization by Nonexchange Capital Contribution must be expended on Capitalization Funding, Technical Assistance Subawards, Technical Assistance Services, and Program Administration Activities in accordance with the EPA-approved workplan.

The Recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of CCIA-Eligible Projects; and (b) activities that support deployment of projects outside the boundaries of the ten EPA regions. The Recipient also agrees not to use the award for activities associated with defending against, settling, or satisfying a claim by a litigant, except when (a) the claim stems from the Recipient's implementation of its EPA-approved

Case 1:25-cv-00938-TSC    Document 7-5    Filed 04/02/25    Page 59 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 671 of 674

5J - 84094101 - 0    Page 58

workplan in compliance with the terms and conditions of the Award Agreement and (b) the Recipient has obtained prior written approval from the EPA Award Official.

*The Deposit Account at Financial Agent Programmatic Term and Condition will be amended and replaced with:*

## Deposit Account at Financial Agent

The Recipient will open a Deposit Account at a depository institution that has been designated as a financial agent of the United States (the Financial Agent). Such account will be used as Recipient's operating account for the award. Upon establishment of the Deposit Account, the Recipient will drawdown the entire available EPA award balance from ASAP and disburse it into the Deposit Account, where it must be maintained until the Closeout Agreement goes into effect in accordance with the Closeout Agreement Programmatic Term and Condition. Note, this requirement applies to any and all drawdowns from ASAP by the Recipient while the Deposit Account is available and accessible. Once the Closeout Agreement goes into effect, the Recipient will be entitled to transfer any remaining funds in the Deposit Account to an account at a financial institution of its choosing, provided such account is insured in accordance with 2 CFR 200.305(b)(7)(ii).

The Recipient will grant EPA a perfected security interest in all funds held in the Deposit Account. The Recipient will take all such actions, enter into all such agreements, and execute and deliver all such documentation as may be necessary and/or as directed by EPA from time to time to establish and maintain such security interest, including but not necessarily limited to entering into a deposit account control agreement (DACA) with the Financial Agent and EPA.

Notwithstanding any other provision of this Award Agreement, EPA will only furnish the Financial Agent with a Notice of Exclusive Control under a DACA when EPA issues a written determination and finding that the Recipient has failed to comply with the terms and conditions of this Award Agreement, and that noncompliance is substantial such that effective performance of the Assistance Agreement is materially impaired or there is adequate evidence of waste, fraud, material misrepresentation of eligibility status, or abuse, and that EPA has initiated action under 2 CFR 200.339 to wholly or partly suspend or terminate the Federal award, as authorized in the terms of the Award Agreement. Note, funds in the Deposit Account that were legally committed to 3rd parties under valid financing agreements prior to the issuance of, but not in anticipation of, a Notice of Exclusive Control constitute "financial obligations which were properly incurred" by the Recipient in accordance with 2 CFR 200.343 and are to remain allowable costs during suspension or after termination.

Funds held in the Recipient's account at the Financial Agent may be invested in accordance with the Cash Management Requirements in the Financial Risk Management Programmatic Term and Condition. The Financial Agent will be compensated in accordance with the terms of a valid Financial Agency Agreement (FAA).

The Deposit Account will consist of three distinct account types ('Budget,' 'Reserve', and 'Program Income from Operations'), each of which serves a distinct purpose (while the exact naming convention and structure of these accounts may differ from the below, the accounts must perform a substantively similar function). The Recipient is required to utilize the accounts at the Financial Agent for their intended purpose during any period in which the accounts are available and accessible, with exceptions to this requirement permitted by the EPA Project Officer only on a case-by-case basis, to the extent such exceptions are necessary to execute against the EPA-approved workplan.

Case 1:25-cv-00938-TSC    Document 7-5    Filed 04/02/25    Page 60 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 672 of 674

5J - 84094101 - 0    Page 59

## 1. Budget Account

This account within the Deposit Account will hold funds that have yet to be used for any of the following allowable activities: Capitalization Funding; Technical Assistance Subawards; Technical Assistance Services; and Program Administration Activities. It will hold funds within a number of sub-accounts that correspond to more specific allowable expenditures under the particular type of award or subaward.

**Transferring Funds Into the Budget Account.** Upon establishment of the Deposit Account, the Recipient will drawdown the entire available EPA award balance from ASAP directly into the Budget Account. The Recipient will direct the Financial Agent to allocate funds across the various sub-accounts in the Budget Account in accordance with its EPA-approved workplan. Recipient need not submit a certification notice to transfer funds within the Budget Account, but remains subject to the Transfer of Funds EPA General Term and Condition and any associated pre-approval or notification requirements therein.

**Transferring Funds Out of the Budget Account.** When Community Lenders transfer funds out of the Budget Account to provide Financial Assistance to CCIA-Eligible Projects, Recipient must obtain certification from the Community Lender's chief executive officer (or equivalent), chief financial officer (or equivalent), chief reporting officer (or equivalent), or chief compliance officer (or equivalent) that the amount of the payment is necessary to execute against the EPA-approved workplan, and ensure that notice is provided to the Financial Agent with the transfer request. The certification must include the following language: "This certification is a material representation for the purposes of an EPA Financial Assistance Agreement, and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions". In accordance with 2 CFR 200.337, the Recipient must make those certifications available to the EPA, upon request.

While transfers out of the Budget Account are not formally subject to any of the requirements established in either the EPA General Term and Condition on Automated Standard Application Payments (ASAP) and Proper Payment Draw Down or the Interim Drawdown Procedures Programmatic Term and Condition, Recipient agrees to the following requirements:

a) When the need for a longer disbursement window is known in advance of the transfer, Recipient must notify the EPA Project Officer prior to executing the transfer and follow-up to inform the EPA Project Officer of the amount of the transfer that has been disbursed for an Allowable Activity in 5, 10, and 14 business days. Recipient must return any undisbursed amounts to the Deposit Account at the Financial Agent on the 15th business day, or

b) When the need for a longer disbursement window is not known in advance of the transfer, Recipient must notify the EPA Project Officer of the delay no later than 5 business days after the transfer and follow-up to inform the EPA Project Officer of the amount of the transfer that has been disbursed for an Allowable Activity in 10 and 14 business days. Recipient must return any undisbursed amounts to the Deposit Account at the Financial Agent on the 15th business day.

Recipients must obtain prior written approval from the EPA Project Official (who will in turn notify the EPA Award Official) for any transfers that will not be disbursed for an Allowable Activity within 15 business days.

These requirements "flow down" to Subrecipients, who agree to provide the same notifications to and seek prior approval from Recipients where applicable.

JA1864

5J - 84094101 - 0    Page 60

## 2. Reserve Account

This account within the Deposit Account is intended to enable Community Lenders to set-aside funds within the Financial Agent for use for any form of Financial Assistance that requires the Community Lender to pledge award funds for a future expenditure to a third party to meet a legal obligation.

**Transferring Funds Into the Reserve Account.** The Recipient must ensure that Community Lenders only transfer award funds into the Reserve Account for grant performance purposes if the Community Lender's chief executive officer (or equivalent), chief financial officer (or equivalent), chief reporting officer (or equivalent), or chief compliance officer (or equivalent) certify to Recipient, with notice provided to the Financial Agent with the transfer request, that the amount of the expenditure is necessary to execute against the EPA-approved workplan, and that financing agreements for identified qualified projects necessitating the expenditure have been reviewed by Community Lender's counsel for legal sufficiency. The certification must include the following language: "This certification is a material representation for the purposes of an EPA financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions." In accordance with 2 CFR 200.337, the Recipient must make those certifications available to the EPA, upon request.

**Transferring Funds Out of the Reserve Account.**

### a. To Third Parties to Meet Legal Obligations

Funds in the Reserve Account may not be disbursed to Program Beneficiaries, Subrecipients, Contractors, or any other third parties, unless the funds are necessary for the Community Lender to satisfy a legal obligation. The Community Lender may only transfer award funds out of the Reserve Account to meet legal obligations to such parties if the Community Lender's chief executive officer (or equivalent), chief financial officer (or equivalent), chief reporting officer (or equivalent), or chief compliance officer (or equivalent) certify to the Recipient, with notice provided to the Financial Agent with the transfer request, that the amount of the expenditure is necessary to pay a third party pursuant to a financing agreement that has been reviewed by Community Lender. The certification must include the following language: "This certification is a material representation for the purposes of an EPA financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions." In accordance with 2 CFR 200.337, the Recipient must make those certifications available to the EPA, upon request.

While transfers out of the Reserve Account are not formally subject to any of the requirements established in either the EPA General Term and Condition on Automated Standard Application Payments (ASAP) and Proper Payment Draw Down or the Interim Drawdown Procedures Programmatic Term and Condition, Recipient agrees to hold Community Lenders to the following requirements:

a) When the need for a longer disbursement window is known in advance of the transfer, Community Lender must notify the Recipient prior to executing the transfer and follow-up to inform the Recipient of the amount of the transfer that has been disbursed for an Allowable Activity in 5, 10, and 14 business days. Community Lender must return any undisbursed amounts to the Deposit Account at the Financial Agent on the 15th business day, or

b) When the need for a longer disbursement window is not known in advance of the transfer, Community Lender must notify the Recipient of the delay no later than 5 business days after the transfer and follow-

up to inform the Recipient of the amount of the transfer that has been disbursed for an Allowable Activity in 10 and 14 business days. Community Lender must return any undisbursed amounts to the Deposit Account at the Financial Agent on the 15th business day.

Community Lenders must obtain prior written approval from the Recipient (who will in turn notify the EPA Project Officer) for any transfers that will not be disbursed for an Allowable Activity within 15 business days.

## b. To Program Income from Operations Account

When funds in the Reserve Account are no longer necessary to meet prudent capital management practices consistent with the Community Lender's overall risk portfolio and a potential legal obligation to a third party pursuant to a financing agreement, the Community Lender may transfer such funds to the Program Income from Operations Account. Recipient need not submit a certification notice to effectuate such a transfer.

## 3. Program Income from Operations Account

This account within the Deposit Account will enable Program Income from Operations (as defined under the definition of Program Income) to be held, tracked, and segregated in accordance with the Accounting Principles Programmatic Term and Condition.

**Transferring Funds Into the Program Income from Operations Account.** When Recipient earns Program Income from Operations, it must deposit such funds into the Program Income from Operations Account. Recipient need not submit a certification notice to effectuate such a transfer. When Financial Agent generates interest income on behalf of Recipient by investing Recipient liquidity in accordance with the Cash Management Requirements under the Financial Risk Management Requirements Programmatic Term and Condition, it must deposit such income into the Program Income from Operations Account in accordance with the terms of the FAA. Such interest income is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9).

**Transferring Funds Out of the Program Income from Operations Account.** Funds in this account may be transferred to either the Budget Account or Reserve Account to be used for grant performance purposes in accordance with the Program Income Programmatic Term and Condition. Recipient need not submit a certification notice to effectuate such a transfer.

**Flow-Down Requirements of Deposit Account at Financial Agent**. EPA may elect to extend the requirements under this term and condition to any and all Subrecipients of the Recipient at EPA's sole discretion, including but not limited to establishing and maintaining a security interest on all award funds held by the Subrecipient at the Financial Agent.