**[ORAL ARGUMENT SCHEDULED MAY 19, 2025]**

**No. 25-5122**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

CLIMATE UNITED FUND, et al.,

*Plaintiffs-Appellees,*

*v.*

CITIBANK, N.A., et al.,

*Defendants-Appellants.*

_____

On Appeal from the United States District Court
for the District of Columbia

_____

**JOINT APPENDIX**
**PUBLIC APPENDIX—SEALED MATERIAL IN SEPARATE SUPPLEMENT**
**VOLUME IV**

_____

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

GERARD SINZDAK
SOPHIA SHAMS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7264*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-2495*

# TABLE OF CONTENTS

## VOLUME I

**Excerpts from Climate United Fund v. Citibank, N.A.,**
**Case No. 1:25-cv-00698**

Docket Report ...................................................................................................JA1

Memorandum in Support of Temporary Restraining Order (Doc. 2-1) ..................JA20

March 10, 2025 EPA Correspondance (Doc. 14-2)...................................................JA64

March 10, 2025 Treasury Correspondence (Doc. 14-3) ...........................................JA67

Account Control Agreement (Doc. 14-4) ..................................................................JA69

February 2025 FBI Correspondence (Doc. 14-5) ......................................................JA98

March 2, 2025 EPA Office of Inspector General Correspondence (Doc. 14-6) ...JA104

March 4, 2025 Treasury Correspondence (Doc. 14-7) ............................................JA110

Amended Complaint (Doc. 24) ................................................................................JA112

Hearing (March 8, 2025)..........................................................................................JA174

Hearing (March 17, 2025).........................................................................................JA218

Memorandum Opinion on Temproary Restraining Order (Doc. 28) ....................JA263

Order Granting Motion for Temporary Restraining Order (Doc. 29) ....................JA286

Motion for Preliminary Injunction (Doc. 33-1)........................................................JA288

Bafford Decl. (Dkt. 33-2) .........................................................................................JA360

Climate United Notice of Termination (Doc. 33-13) ..............................................JA389

Representative Request from EPA (Doc. 33-22) ......................................................JA392

Coalition for Green Capital Notice of Termination (Doc. 33-23)...........................JA397

Brown Decl. (Doc. 33-25) ..............................................................JA401

Buendia Decl. (Doc. 33-26)............................................................JA406

Hopson Decl. (Doc. 33-27).............................................................JA415

Kauffman Decl. (Doc. 33-28) .........................................................JA425

Donovan Decl. (Doc. 33-29) ..........................................................JA433

Matusiak Decl (Doc. 33-30) ...........................................................JA442

Mayopoulous Decl. (Doc. 33-31) ....................................................JA451

Moon Decl. (Doc. 33-32) ...............................................................JA461

Opposition to Motion for Preliminary Injunction (Doc. 49) ..................JA470

## VOLUME II

**Excerpts from Climate United Fund v. Citibank, N.A.,
Case No. 1:25-cv-00698**

Exhibits to Coogan Decl. (Dkt. 49-2).................................................JA511

Amidon Decl. (Doc. 49-3)...............................................................JA703

Treml Decl. (Doc. 49-5) .................................................................JA721

Exhibits to Bailey Decl. (Doc. 49-7) .................................................JA724

Coalition for Green Capital Supplemental Record Evidence (Doc. 60) ...............JA736

Order Extending Temporary Restraining Order (Doc. 70) .....................JA738

Emergency Contingent Motion to Stay Pending Appeal (Doc. 75).........................JA740

Supplemental Treml Decl. (Doc. 75-2)...............................................JA752

Exhibits to Treml Decl. (Doc. 75-3) .................................................JA758

Hearing (April 2, 2025) ..................................................................JA830

Parker Decl. (Doc. 78-1)..................................................................JA938

Supplemental Bafford Decl. (Doc. 79-1) ......................................JA952

Order Granting Preliminary Injunction (Doc. 80) ......................JA961

Notice of Appeal (Doc. 81)...........................................................JA964

Memorandum Opinion (Doc. 89) ................................................JA966

Supplemental Mayopoulos Decl. (Doc. 92) ...............................JA1005

Order Granting Motion to Clarify (Doc. 96)..............................JA1011

**Excerpts from Power Forward Coalition v. Citibank, N.A.,
Case No. 1:25-cv-00762**

Docket Report ...............................................................................JA1015

Grant Agreement (Doc. 1-2).........................................................JA1020

Amended Grant Agreement (Doc. 1-3)........................................JA1081

Account Control Agreement (Doc. 1-4) ......................................JA1142

Sub-Awardee Account Control Agreement (Doc. 1-5)................JA1175

Notice of Termination Letter (Doc. 1-10) ..................................JA1196

# VOLUME III

**Excerpts from California Infrastructure and Economic Development
Bank v. Citibank, N.A.,
Case No. 1:25-cv-00820**

Docket Report ...............................................................................JA1199

Complaint (Doc. 1) .......................................................................JA1204

Motion for Preliminary Injunction (Doc. 17) ............................JA1259

Meister Decl. (Doc.17-1) ..............................................................JA1293

Stoddard Decl. (Doc. 17-2) ................................................................ JA1323

Strong Dec. (Doc. 17-3) ................................................................... JA1353

Swan Decl. (Doc. 17-4) .................................................................... JA1419

Wu Decl. (Doc. 17-5) ...................................................................... JA1461

**Excerpts from Justice Climate Fund v. EPA**
**Case No. 1:25-cv-00938**

Docket Report ................................................................................ JA1507

Complaint (Doc. 1) ......................................................................... JA1511

Kirkwood Decl. (Doc. 7-2) .............................................................. JA1644

CCIA Notice of Funding Opportunity (Doc. 7-3) ........................... JA1657

NCIF Notice of Funding Opportunity (Doc. 7-4) ........................... JA1732

Grant Agreement (Doc. 7-5) ........................................................... JA1805

## VOLUME IV

**Excerpts from Justice Climate Fund v. EPA**
**Case No. 1:25-cv-00938**

Amendments to Grant Agreement (Doc. 7-6) ................................... JA1867

Account Control Agreement (Doc. 7-7) ........................................... JA1930

Notice of Termination (Doc. 7-8) ................................................... JA1948

Notice of Compliance and Oversight Review (Doc. 7-9) .................. JA1951

Agency and Trust Account Statement (Doc. 7-10) ........................... JA1956

Agency and Trust Account Statement (Doc. 7-11) ........................... JA1958

**Excerpts from Inclusiv, Inc. v. EPA,**
**Case No. 1:25-cv-00948**

Docket Report ......................................................................................... JA1961

Arabshahi Decl (Doc. 6-2) ..................................................................... JA1967

Lawson Dec. (Doc. 6-3) ......................................................................... JA1990

Freeman Decl.(Doc. 6-4) ........................................................................ JA1995

Hanshaw Dec. (Doc. 6-5)........................................................................ JA2002

Ledezma Dec. Decl. (Doc. 6-6) ............................................................. JA2007

Inclusiv Grant Agreement (Doc. 6-8)..................................................... JA2014

Motion for Temporary Restraining Order (Doc. 8)................................. JA2076

Johnson Decl. (Doc. 8-1) ........................................................................ JA2081

Sheaffer Decl. (Doc. 8-2)........................................................................ JA2118

Notice of Withdrawal (Doc. 13) ............................................................. JA2123

## VOLUME V

**Excerpts from Climate United Fund v. Citibank, N.A.,
Case No. 1:25-cv-00698**

Financial Agent Agreement (Under Seal) (Doc. 21) ............................... JA2126

# EXHIBIT 4

5J - 84094101 - 1     Page 1

| | | | |
|---|---|---|---|
| **U.S. ENVIRONMENTAL PROTECTION AGENCY**<br><br>**Assistance Amendment** | **GRANT NUMBER (FAIN):** 84094101<br>**MODIFICATION NUMBER:** 1<br>**PROGRAM CODE:** 5J | **DATE OF AWARD** 12/20/2024 |
| | **TYPE OF ACTION** No Cost Amendment | **MAILING DATE** 12/20/2024 |
| | **PAYMENT METHOD:** ASAP | **ACH#** |

| **RECIPIENT TYPE:** | **Send Payment Request to:** |
|---|---|
| Not for Profit | Contact EPA RTPFC at: |
| **RECIPIENT:** | **PAYEE:** |
| Justice Climate Fund, Inc.<br>910 17TH ST NW<br>STE 820<br>WASHINGTON, DC 20006-2606<br>EIN: | Justice Climate Fund, Inc.<br>910 17TH ST NW<br>STE 820<br>WASHINGTON, DC 20006-2606 |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Amir Kirkwood<br>910 17th St. NW<br>Suite 820<br>Washington, DC 20006<br>Email:<br>Phone: | Daniel OBrien<br>1200 Pennsylvania Ave, NW<br>Washington, DC 20460<br>Email:<br>Phone: | Walker Oneil<br>OGD-GMBOD, 3903R<br>1200 Pennsylvania Ave, NW<br>Washington, DC 20460-0001<br>Email:<br>Phone: |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

GGRF CCIA: Expanding Green Lending Capacity in Historically Underserved Communities for Enduring Change

This amendment updates all terms and conditions.

| **BUDGET PERIOD** | **PROJECT PERIOD** | **TOTAL BUDGET PERIOD COST** | **TOTAL PROJECT PERIOD COST** |
|---|---|---|---|
| 04/01/2024 - 06/30/2030 | 04/01/2024 - 06/30/2030 | $ 940,000,000.00 | $ 940,000,000.00 |

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 940,000,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants Management & Business Operations Division<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 | Environmental Protection Agency, OGGRF<br>OA - Office of the Administrator<br>1200 Pennsylvania Ave, NW<br>Washington, DC 20460 |

| **THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY** | |
|---|---|
| Digital signature applied by EPA Award Official for Phillip Schindel - Chief, Business Operations Branch<br>by Katherine Tsing-Choy - Award Official Delegate | **DATE**<br>12/20/2024 |

5J - 84094101 - 1    Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| **EPA Amount This Action** | $ 940,000,000 | $ 0 | $ 940,000,000 |
| **EPA In-Kind Amount** | $ 0 | $ 0 | $ 0 |
| **Unexpended Prior Year Balance** | $ 0 | $ 0 | $ 0 |
| **Other Federal Funds** | $ 0 | $ 0 | $ 0 |
| **Recipient Contribution** | $ 0 | $ 0 | $ 0 |
| **State Contribution** | $ 0 | $ 0 | $ 0 |
| **Local Contribution** | $ 0 | $ 0 | $ 0 |
| **Other Contribution** | $ 0 | $ 0 | $ 0 |
| **Allowable Project Cost** | $ 940,000,000 | $ 0 | $ 940,000,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.960 - Greenhouse Gas Reduction Fund: Clean Communities Investment Accelerator | Clean Air Act: Sec. 134(a)(2) and (3) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

JA1869

5J - 84094101 - 1     Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 36,510,718 |
| 2. Fringe Benefits | $ 9,255,467 |
| 3. Travel | $ 509,628 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 361,500 |
| 6. Contractual | $ 17,637,969 |
| 7. Construction | $ 0 |
| 8. Other | $ 870,684,087 |
| 9. Total Direct Charges | $ 934,959,369 |
| 10. Indirect Costs: 10.00 % Base de minimis MTDC | $ 5,040,631 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 940,000,000 |
| 12. Total Approved Assistance Amount | $ 940,000,000 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 940,000,000 |

JA1870

5J - 84094101 - 1    Page 4

# Administrative Conditions

## A. General Terms and Conditions

The Recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2024-or-later. These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA. Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): ▮▮▮▮▮▮▮▮▮ and EPA Grants Specialist listed on the award
- MBE/WBE reports (EPA Form 5700-52A):  Debora Bradford ▮▮▮▮▮▮▮▮▮▮▮, ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮, and the EPA Grants Specialist listed on the award
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to Recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Grants Specialist listed on the award and EPA Project Officer listed on the award
- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer listed on the award

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a Recipient intends to provide Capitalization Funding to a Community Lender to support CCIA-Eligible Project(s) that involves construction or land use planning. With the exception of CCIA-Eligible Projects that will be carried out in the State of California, the Recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the CCIA-Eligible Project(s) contained in the application for funding for the project and provide comments to the EPA Project Officer. CCIA-Eligible Project(s) that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

EPA has allowed for an intergovernmental review comment period on behalf of the Recipient. This comment period closed on Tuesday October 22, 2024. The Recipient need not take any additional action with respect to intergovernmental review.

The Recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

5J - 84094101 - 1    Page 5

## D. Pre-Award Costs

As provided in 2 CFR 200.458, Recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a Recipient incurs after EPA has notified the Recipient that its application has been selected for award consideration. The pre-award costs must be included in the workplan and budget to be eligible. As provided in 2 CFR 1500.9, Recipients incur pre-award cost at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information.

## E. Pre-Award Administrative Capability

EPA's policy for awarding Financial Assistance in excess of $200,000 to non-profit organizations requires an Administrative Capability Assessment review of the Recipient's administrative and financial management systems to be completed **prior** to the Recipient drawing down any EPA funds per EPA Order 5700.8. The Recipient is precluded from drawing down funds under this Assistance Agreement until EPA provides written confirmation of the completion of the assessment with satisfactory results. Please note, any costs incurred prior to EPA approval are the Recipient's own risk. If the Recipient fails to respond or is unable to satisfactorily address all identified deficiencies within 90 calendar days of the award date of this Assistance Agreement or within any extension of time granted by EPA, the agreement may be terminated. Noncompliance with this term and condition may result in adverse action by EPA per 2 CFR 200.339.

## F. New Recipient Training Requirement

The Recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The Recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the Recipient should refer to RAIN-2024-G01.

JA1872

Case 1:25-cv-00938-TSC    Document 7-6    Filed 04/02/25    Page 7 of 63
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 13 of 265

5J - 84094101 - 1    Page 6

# Programmatic Conditions

## Clean Communities Investment Accelerator (CCIA) Terms and Conditions (December 12, 2024)

### I. DEFINITIONS

**Acquisition of Intangible Property:** 2 CFR 200.1 defines Intangible Property as "property having no physical existence, such as trademarks, copyrights, data (including data licenses), websites, IP licenses, trade secrets, patents, patent applications, and property such as loans, notes and other debt instruments, lease agreements, stocks and other instruments of property ownership of either tangible or intangible property, such as intellectual property, software, or software subscriptions or licenses." Acquisitions of Intangible Property involve the purchase of Intangible Property through procurement contracts.

**Air Pollutant:** Air Pollutant means any air pollutant that is listed pursuant to Section 108(a) of the Clean Air Act (or any precursor to such an air pollutant). This includes particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead (see 40 CFR Part 50) and their precursors (e.g., volatile organic compounds).

**Apprentice:** Apprentice means an individual working on a project receiving Financial Assistance who is participating in a Registered Apprenticeship program under the National Apprenticeship Act that meets the requirements of 29 CFR Parts 29 and 30.

**Award Agreement**: Award Agreement means the set of legally binding documents between EPA and the Recipient under the federal award. Award Agreement is used interchangeably with Assistance Agreement and Notice of Award.

**Capitalization Funding**: Consistent with Section 134(b)(2) of the Clean Air Act of the Clean Air Act, the Recipient will provide Capitalization Funding to Community Lenders for the sole purpose of providing Financial Assistance to CCIA-Eligible Projects. The Recipient will provide these Subawards in the form of Subgrants, which are subject to the EPA Subaward Policy. Community Lenders will use these Subawards exclusively as capital to provide Financial Assistance to CCIA-Eligible Projects.

In general, a Community Lender may receive a maximum of $10,000,000 in total Capitalization Funding from all Recipients and Subrecipients under the Clean Communities Investment Accelerator; however, under limited exceptions, a Community Lender may receive total Capitalization Funding in excess of the $10,000,000 cap, provided that the exception has been approved by the EPA Award Official (either through the Recipient's workplan in effect under this Assistance Agreement or through separate post-award approval).

**CCIA-Eligible Project**: CCIA-Eligible Project means a project, activity, or technology that is eligible for support under this program. Section 134(b)(2) of the Clean Air Act directs that the Recipient use funds to support Community Lenders that provide Financial Assistance to Qualified Projects. For this program, a project, activity, or technology that is eligible for support through Capitalization Funding, Technical Assistance Subawards, and/or Technical Assistance Services must meet the following three requirements and is referred to as a "CCIA-Eligible Project:" (i) the project, activity, or technology must be a Qualified Project; (ii) the project, activity, or technology must be within a Priority Project Category; and (iii) the project, activity, or technology must be in a Low-Income and Disadvantaged Community.

Case 1:25-cv-00938-TSC    Document 7-6    Filed 04/02/25    Page 8 of 63
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 14 of 265

5J - 84094101 - 1    Page 7

**Community Lender:** Community Lender means an organization that, consistent with Section 134(b)(2) of the Clean Air Act, is eligible to receive Capitalization Funding and Technical Assistance Subawards. Section 134(b)(2) of the Clean Air Act directs that the Recipient provide funding and technical assistance to establish new or to support existing public, quasi-public, not-for-profit, or nonprofit entities that provide Financial Assistance to Qualified Projects at the state, local, territorial, or Tribal level or in the District of Columbia, including community- and low-income-focused lenders and capital providers. An organization must meet the following three requirements to be eligible as a Community Lender:

- Must be either a public, quasi-public, not-for-profit, or nonprofit entity.
  - A public entity must be a state, municipal, territorial, or Tribal government, including any department, agency, or instrumentality of one of those governments.
  - A quasi-public entity must either (1) have a close association with a public entity but not be a public entity, (2) be created by a public entity but be exempt from certain legal and administrative requirements, or (3) not have been created by a public entity but perform a public purpose and be significantly supported financially by a public entity. Any entity that has been determined by the U.S. Treasury's CDFI Fund to meet the CDFI certification requirements set forth in 12 CFR 1805.201 is a quasi-public entity that meets this requirement. In addition to being quasi-public, an entity meeting this requirement may also meet the requirements of being a not-for-profit or nonprofit entity, depending on the entity.
  - A not-for-profit entity must meet the definition of or be considered a "not-for-profit" under a federal, state, territorial, or Tribal law of a federally recognized tribe. Any Federal credit union or State credit union, as defined in Section 101 of the Federal Credit Union Act, is a not-for-profit entity that meets this requirement.
  - A nonprofit entity must meet the definition of *Nonprofit organization* set forth in 2 CFR § 200.1.
- Must have the legal authority to provide Financial Assistance to Qualified Projects at the state, local, territorial, or Tribal level or in the District of Columbia.
- Must be eligible to receive a Subaward under the EPA Subaward Policy.

**Environmental Information:** Environmental Information is defined in EPA's Environmental Information Quality Policy. Environmental Information includes "data and information that describe environmental processes or conditions which support EPA's mission of protecting human health and the environment. Examples include but are not limited to: direct measurements of environmental parameters or processes; analytical testing results of environmental conditions (e.g., geophysical or hydrological conditions); information on physical parameters or processes collected using environmental technologies; calculations or analyses of environmental information; information provided by models; information compiled or obtained from databases, software applications, decision support tools, websites, existing literature, and other sources; development of environmental software, tools, models, methods and applications; and design, construction, and operation or application of environmental technology."

**Environmental Information Operations:** Environmental Information Operations is defined in EPA's Environmental Information Quality Policy. Environmental Information Operations means "[a] collective term for work performed to collect, produce, evaluate, or use environmental information and the design, construction, operation or application of environmental technology."

**EPA Award Official:** EPA Award Official means the award official from the Office of Grants and

Case 1:25-cv-00938-TSC    Document 7-6    Filed 04/02/25    Page 9 of 63
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 15 of 265

5J - 84094101 - 1    Page 8

Debarment that is authorized to execute the Award Agreement, as well as any subsequent amendments to the Award Agreement, and to make any other final determinations required by law or regulation on behalf of the EPA.

**EPA Project Officer:** EPA Project Officer means the project officer from the Office of the Greenhouse Gas Reduction Fund that is assigned, along with the EPA Grants Specialist, to monitor the Recipient on programmatic and technical aspects of the project and is typically authorized to make programmatic approvals on behalf of the EPA. Where required, the Recipient must notify or request approval from the EPA Project Officer through the EPA Project Officer's individual EPA email address as well as ▮▮▮▮▮▮▮▮ such that the Office of the Greenhouse Gas Reduction Fund may delegate an alternative EPA Project Officer in the case of any absence.

**Financial Assistance:** Consistent with the definition of *Federal financial assistance* in 2 CFR 200.1, Financial Assistance means financial products, including debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, loan purchasing programs, and other debt instruments), equity investments (such as equity project finance investments, private equity investments, and other equity instruments), hybrids (such as mezzanine debt, preferred equity, and other hybrid instruments), and credit enhancements (such as loan guarantees, loan guarantee funds (whether full or partial), loan loss reserves, and other credit enhancement instruments). Expenditures for Financial Assistance are in the form of Subawards (other than subgrants), Participant Support Costs or Acquisitions of Intangible Property, as defined in this Award Agreement. Subgrants are not eligible as Financial Assistance. The characterization of a Financial Assistance transaction as a Subaward, Participant Support Cost, or Acquisition of Intangible Property is limited to the transaction. For example, the same entity may be a Subrecipient for one transaction and a Program Beneficiary or a Contractor for another transaction.

**Freely Associated States:** *Freely Associated States means the Republic of the Marshall Islands (the Marshalls), the Federated States of Micronesia (FSM), and the Republic of Palau (Palau).*

**Greenhouse Gas:** *"Greenhouse Gas" means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act. Greenhouse Gas Emissions mean emissions of Greenhouse Gases.*

**Low-Income and Disadvantaged Communities:** Section 134(a)(3) of the Clean Air Act appropriates funds "for the purposes of providing Financial Assistance and technical assistance in low-income and disadvantaged communities." This program is entirely funded by Section 134(a)(3) of the Clean Air Act. Low-Income and Disadvantaged Communities means CEJST-Identified Disadvantaged Communities, EJScreen-Identified Disadvantaged Communities, Geographically Dispersed Low-Income Households, Properties Providing Affordable Housing, and Federally Recognized Tribal Entities, as defined below.

- *CEJST-Identified Disadvantaged Communities:* All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.

- *EJScreen-Identified Disadvantaged Communities:* All communities within version 2.3 of EJScreen that fall within either (a) the limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the

5J - 84094101 - 1    Page 9

following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.

- *Geographically Dispersed Low-Income Households:* Low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development (HUD). Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using HUD's Family Size Adjustment factor.

- *Properties Providing Affordable Housing:* Properties providing affordable housing that fall within either of the following two categories: (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units with an active affordability covenant from one of the following housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by HUD, including Public Housing, Section 8 Project-Based Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)); or (5) a housing assistance program administered by the Department of Hawaiian Homelands as defined in Title VIII of the Native American Housing Assistance and Self-Determination Act of 1996 (24 CFR 1006.10) or (b) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

- *Federally Recognized Tribal Entities:* All Federally Recognized Tribal entities, which are considered disadvantaged regardless of whether a Federally Recognized Tribe has land, consistent with M-23-09 (memorandum dated as of January 27, 2023) and CEJST. A "Federally Recognized Tribal Entity" means (i) any individual member of a Federally Recognized Tribe; (ii) any for-profit business that has at least 51 percent of its equity ownership (or the equivalent in limited liability companies) by members of Federally Recognized Tribes; (iii) any non-profit entity with at least 51 percent of its Board of Directors (i.e., Governing Board) comprised of members of Federally Recognized Tribes; or (iv) any Federally Recognized Tribal government entity.  Under this definition, any Federally Recognized Tribal Entity is included within the definition of Low-Income and Disadvantaged Communities, regardless of where that entity is located (i.e., the entity may be located in areas outside of the CEJST land area dataset, including but not limited to tribal service areas or counties).

**Materially Impaired:** For the definition and application of these terms under this Assistance Agreement (e.g. the Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, note that EPA defines "Materially Impaired" in the context of

Case 1:25-cv-00938-TSC    Document 7-6    Filed 04/02/25    Page 11 of 63
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 17 of 265

5J - 84094101 - 1    Page 10

effective performance of the Assistance Agreement as 1) the issuance of a written determination and finding from EPA that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause under the Clarifications to EPA General Terms and Conditions Programmatic Term and Condition and 2) if EPA in its sole discretion determines that a corrective action plan is an appropriate means of remedying the lack of sufficient progress, the subsequent issuance of a separate written determination and finding from EPA that the Recipient has not materially addressed its failure to achieve sufficient progress after implementing a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

**Named Subrecipient:** "Named Subrecipient" means an entity that is named on the workplan in effect under this Assistance Agreement to receive a Subaward in the form of a Subgrant from the Recipient in order to carry out part of the award.

**Participant Support Costs:** 2 CFR 200.1 defines Participant Support Costs as "direct costs that support participants (see definition for Participant in § 200.1) and their involvement in a Federal award, such as stipends, subsistence allowances, travel allowances, registration fees, temporary dependent care, and per diem paid directly to or on behalf of participants." EPA regulations at 2 CFR 1500.1(a)(1) expand the definition of Participant Support Costs to include "subsidies, rebates, and other payments to program beneficiaries to encourage participation in statutorily authorized environmental stewardship programs," which includes the Greenhouse Gas Reduction Fund. In this program, Participant Support Costs may include expenditures by the Recipient as Technical Assistance Services and/or Program Administration Activities and Community Lenders as Capitalization Funding and/or Technical Assistance Subawards (which may include subsidies, rebates, and other payments)

**Period of Closeout**: Period of Closeout means the time interval between the beginning of the closeout period (the date that the award has been closed out, in accordance with 2 CFR 200.344) to the end of the closeout period (the date that the Closeout Agreement has been terminated). The Period of Closeout may also be referred to as the Closeout Period.

**Period of Performance**: 2 CFR 200.1 defines Period of Performance as "the total estimated time interval between the start of an initial Federal award and the planned end date, which may include one or more funded portions, or budget periods." For the purposes of this Award Agreement, Period of Performance means the time interval between the start of the Federal award (either the first date that the Recipient has incurred allowable pre-award costs or the date on the Notice of Award, whichever is earlier) and the end of the Federal award (the date that the award has been closed out, in accordance with 2 CFR 200.344). The Period of Performance may also be referred to as the Performance Period.

**Post-Closeout Program Income**: Post-Closeout Program Income means Program Income retained at the end of the Period of Performance, which is subject to the terms and conditions of the Closeout Agreement, as well as Program Income earned by the Recipient during the Period of Closeout that is directly generated by a supported activity or earned as a result of the Federal award, which is also subject to the terms and conditions of the Closeout Agreement. Under the Closeout Agreement, the Recipient is authorized to deduct the cost of generating Post-Closeout Program Income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Post-Closeout Program Income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Post Closeout Program Income. Costs of generating Post-Closeout Program Income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than

Case 1:25-cv-00938-TSC    Document 7-6    Filed 04/02/25    Page 12 of 63
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 18 of 265

5J - 84094101 - 1    Page 11

the actual costs incurred to generate the Post-Closeout Program Income, provided the Recipient can account for the actual costs incurred.

**Priority Project Categories:** Priority Project Categories means Distributed Energy Generation and Storage, Net-Zero Emissions Buildings, and Zero-Emissions Transportation, as defined below.

- *Distributed Energy Generation and Storage:* Projects, activities, and technologies that deploy small-scale power generation and/or storage technologies (typically from 1 kW to 10,000 kW), plus enabling infrastructure necessary for deployment of such generation and/or storage technologies. Projects, activities, and technologies within this category must support *carbon pollution-free electricity,* which is electrical energy produced from resources that generate no carbon emissions, consistent with the definition specified in Executive Order 14057 (Catalyzing Clean Energy Industries and Jobs Through Federal Sustainability).
- *Net-Zero Emissions Buildings:* Projects, activities, and technologies that either (1) retrofit an existing building, making a substantial contribution to that building being a net-zero emissions building and as part of a plan for that building achieving net-zero emissions over time, or (2) construct a new net-zero emissions building in a Low-Income and Disadvantaged Community. A *net-zero emissions building* is a building that meets the requirements of Version 1 of the National Definition for a Zero Emissions Building (June 2024).
- *Zero-Emissions Transportation:* Projects, activities, and technologies that deploy zero-emissions transportation modes, plus enabling infrastructure necessary for zero-emissions transportation modes—especially in communities that are overburdened by existing diesel pollution, particulate matter concentration, and degraded air quality. Projects, activities, and technologies within this category must be consistent with the zero-emissions transportation decarbonization strategies in The U.S. National Blueprint for Transportation Decarbonization.

**Program Administration Activities:** Program Administration Activities means activities that support administration of the grant program, to the extent such activities meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. Program administration activities include but are not limited to establishing and convening advisory councils, as described in Item 2 of EPA's Guidance on Selected Items of Cost for Recipients, and fund raising, as described in Item 4 of EPA's Guidance on Selected Items of Cost for Recipients.

**Program Beneficiary:** Program Beneficiary means an entity (either an individual or an organization) that receives Financial Assistance or technical assistance as an end-user, except when such Financial Assistance is characterized as an Acquisition of Intangible Property (in which case the entity is a Contractor, as defined in 2 CFR 200.1). Expenditures to Program Beneficiaries are in the form of Participant Support Costs, as defined in 2 CFR 1500.1. A Program Beneficiary is distinct from a Subrecipient, as defined in 2 CFR 200.1.

**Program Income:** 2 CFR 200.1 defines Program Income as "gross income earned by the recipient or subrecipient that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(c)". 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, Program Income also includes but is not limited to income from origination fees, servicing fees, and asset management fees; dividends from equity

Case 1:25-cv-00938-TSC    Document 7-6    Filed 04/02/25    Page 13 of 63
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 19 of 265

5J - 84094101 - 1    Page 12

investments; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). Program Income must be treated in accordance with the Program Income Programmatic Term and Condition. EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fund raising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Under this award agreement, the Recipient is authorized to deduct the cost of generating program income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of program income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Program Income. Costs of generating program income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the program income, provided the Recipient can account for the actual costs incurred. Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

**Qualified Project:** Section 134(c)(3) of the Clean Air Act provides that a Qualified Project is any project, activity, or technology that (A) reduces or avoids Greenhouse Gas emissions and other forms of air pollution in partnership with, and by leveraging investment from, the private sector; or (B) assists communities in the efforts of those communities to reduce or avoid Greenhouse Gas emissions and other forms of air pollution. For this Assistance Agreement, Qualified Project means any project, activity or technology meeting all six requirements listed below at the time that Financial Assistance is provided to the project, activity, or technology:

- The project, activity, or technology would reduce or avoid Greenhouse Gas Emissions, consistent with the climate goals of the United States to reduce Greenhouse Gas Emissions 50-52 percent below 2005 levels in 2030, reach 50 percent zero-emission vehicles share of all new passenger cars and light trucks sold in 2030, achieve a carbon pollution-free electricity sector by 2035, and achieve net-zero emissions by no later than 2050. The project, activity, or technology may reduce or avoid such emissions through its own performance or through assisting communities in their efforts to deploy projects, activities, or technologies that reduce or avoid such emissions.

- The project, activity, or technology would reduce or avoid emissions of other Air Pollutants. The project, activity, or technology may reduce or avoid such emissions through its own performance or through assisting communities in their efforts to deploy projects, activities, or technologies that reduce or avoid such emissions.

- The project, activity, or technology would deliver additional benefits (i.e., in addition to primarily reducing or avoiding emissions of Greenhouse Gases and other Air Pollutants) to communities within one or more of the following seven categories: climate change; clean energy and energy efficiency; clean transportation; affordable and sustainable housing; training and workforce development; remediation and reduction of legacy pollution; and development of critical clean water infrastructure.

- The project, activity, or technology may not have otherwise been financed.

- The project, activity, or technology would mobilize private capital.

- The project, activity, or technology would support only commercial technologies, defined as technologies that have been deployed for commercial purposes at least three times for a period of at least five years each in the United States for the same general purpose as the project,

activity, or technology.

**Senior Management:** Senior Management means the chief executive officer, chief risk officer, general counsel, chief compliance officer, chief investment officer, chief reporting officer, and chief financial officer (or equivalent positions).

**Subaward:** 2 CFR 200.1 defines a Subaward as "an award provided by a pass-through entity to a subrecipient for the subrecipient to contribute to the goals and objectives of the project by carrying out part of a Federal award received by the pass-through entity. It does not include payments to a contractor, beneficiary, or participant". A Subgrant refers to a Subaward in the form of a grant.

**Subrecipient:** Consistent with 2 CFR 200.1, Subrecipient means an entity that receives a Subaward from a pass-through entity to carry out part of a Federal award but does not include an entity that is a Program Beneficiary of such an award. A Subrecipient is distinct from a Program Beneficiary, which is referenced in 2 CFR 1500.1. In this program, there are four main types of Subrecipients: (1) a Subrecipient that receives a Subgrant that will be used, either in whole or in part, to provide Capitalization Funding and Technical Assistance Subawards to Community Lenders, or a "Pass-Through Subrecipient;" (2) a Subrecipient that receives a Subgrant that will be used exclusively to provide Technical Assistance Services and/or Program Administration Activities, or a "Technical Assistance Subrecipient"; (3) a Subrecipient that receives a Subgrant in the form of Capitalization Funding and/or Technical Assistance Subawards, or a "Community Lender Subrecipient;" and (4) a Subrecipient that receives Financial Assistance from a Community Lender in the form of a Subaward, with the Subrecipient then using the Subaward to provide Financial Assistance to CCIA-Eligible Projects, or a "Financial Intermediary Subrecipient." Note that a financial transaction is a Subaward to a Financial Intermediary Subrecipient if the following two characteristics are true: (i) the financial transaction provides an award by a pass-through entity to a Subrecipient through a form of *Federal financial assistance*, other than a grant, and (ii) the proceeds of the award are used directly as Financial Assistance to CCIA-Eligible Projects, carrying out part of a Federal award received by the pass-through entity. The EPA Subaward Policy applies to Subgrants made to Pass-Through Subrecipients, Technical Assistance Subrecipients, and Community Lender Subrecipients but not to Subawards made to Financial Intermediary Subrecipients.

**Technical Assistance Services:** Consistent with Section 134(b)(2) of the Clean Air Act, the Recipient will provide Technical Assistance Services to establish new and build the capacity of existing Community Lenders so that they can provide Financial Assistance to CCIA-Eligible Projects. Technical Assistance Services include targeted support activities for individual Community Lenders, such as providing training, market analysis, technical support, and structuring expertise as well as financial market-building activities for multiple Community Lenders, such as developing standardized project performance criteria, underwriting guidance, documentation, and product features. A Community Lender does not need to have been selected for Capitalization Funding under this program to be eligible for Technical Assistance Services.

**Technical Assistance Subawards:** Consistent with Section 134(b)(2) of the Clean Air Act, the Recipient will provide Technical Assistance Subawards to build the capacity of Community Lenders so that they can provide Financial Assistance to CCIA-Eligible Projects. The Recipient will provide these Subawards in the form of Subgrants, which are subject to the EPA Subaward Policy. Community Lenders will use Technical Assistance Subawards for activities including (but not limited to) procuring training, market analysis, and technical support; hiring staff; developing new financial products; supporting predevelopment activities, such as site and building assessments (e.g., energy audits), financial and technological feasibility studies (e.g., solar resource studies), design and engineering support, and

Case 1:25-cv-00938-TSC    Document 7-6    Filed 04/02/25    Page 15 of 63
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 21 of 265

5J - 84094101 - 1    Page 14

permitting support; and other activities. Community Lenders may use Technical Assistance Subawards to make additional Subawards to other organizations, consistent with the EPA Subaward Policy. A Community Lender may only receive a Technical Assistance Subaward if it has already been selected for Capitalization Funding under this program.

In general, a Community Lender may receive a maximum of $1,000,000 in total Technical Assistance Subawards from all Recipients and Subrecipients under the Clean Communities Investment Accelerator; however, under limited exceptions, a Community Lender may receive total Technical Assistance Subawards in excess of the $1,000,000 cap, provided that the exception has been approved by the EPA Award Official (either through the Recipient's workplan in effect under this Assistance Agreement or through separate post-award approval).

**Waste, Fraud, or Abuse:** For the definition and application of these terms under this Assistance Agreement (e.g. the Financial Risk Management Requirements, Clarifications to EPA General Terms and Conditions, and Financial Agent Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, refer to their use in the Reporting Waste, Fraud, and Abuse clause in the EPA General Terms and Conditions effective October 1, 2024 and 2 CFR 200.113: "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U.S.C. 3729-3733."

## II. NATIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the Recipient agrees to the following four requirements of performance reporting: (1) progress reports, (2) transaction and-project level report, (3) organizational disclosures, and (4) ongoing disclosures. These performance reporting requirements "flow-down" as needed to enable the Recipient to comply with the requirements described in this term and condition. The Recipient must ensure that these reports cover its own grant-related activities and, where applicable to a certain performance report or element of a performance report, the grant-related activities of its Subrecipients, Contractors, and/or Program Beneficiaries. To comply with these performance reporting requirements, the Recipient agrees to use information collection instruments authorized by GGRF Accomplishment Reporting (███████████████████████████████████████ █████████), once such instruments are authorized; to the extent that information is not available for transactions that were closed prior to authorization of these instruments, the Recipient will not be out of compliance with the performance reporting requirements.

The Recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit performance reporting electronically to the EPA Project Officer. To the extent it is known, or should have been known, by the chief executive officer (or equivalent) and chief reporting officer (or equivalent) that the reporting is not materially compliant with the terms and conditions, or demonstrates material noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission. Should the chief executive officer (or equivalent) and chief reporting officer (or equivalent) signing the submission knowingly and willfully make any material false statement, they may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and

5J - 84094101 - 1    Page 15

administrative sanctions.

EPA intends to make performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) prior to submission to EPA. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient. Recipient agrees that submitted information that does not include PII or CBI may be shared for program evaluation purposes, including with third parties.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. Notwithstanding any other provision of this Assistance Agreement, if Recipient's inability to submit the required performance reporting is due to issues with EPA systems, the Recipient shall be granted a reasonable extension to submit the reports after the technical issue has been corrected.

Where applicable, the intervals for reporting are authorized by 2 CFR 200.329(c)(1), as more frequent reporting is necessary for the effective monitoring of the Federal award and could significantly affect program outcomes.

## 1. Progress Reports

### *Semi-Annual Report*

The Recipient agrees to submit semi-annual reports covering six months of the calendar year in accordance with information collection instruments approved through GGRF Accomplishment Reporting (████████████████████████████████). A single semi-annual report must be submitted to cover grant-related activities of the Recipient as well as Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the semi-annual report.

The Recipient agrees to submit semi-annual reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The first semi-annual reporting period ends on December 31 and covers all activities beginning on the first day of the Period of Performance.

### *Annual Report*

The Recipient agrees to submit annual reports that contain detailed narratives describing program

Case 1:25-cv-00938-TSC    Document 7-6    Filed 04/02/25    Page 17 of 63
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 23 of 265

5J - 84094101 - 1    Page 16

performance over the Recipient's fiscal year, supported with qualitative discussions and quantitative metrics. A single annual report must be submitted to cover grant-related activities of the Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the annual report.

The Recipient must include the following broad, non-exhaustive elements in its annual reports:

- Progress towards objectives on key performance metrics over the reporting period,
- Summary of key activities completed in the reporting period, including case studies of Community Lenders successfully launching or expanding clean financing programs,
- Geographic coverage of Capitalization Funding and Technical Assistance Subawards made in the reporting period,
- Descriptions and examples of actions taken to meaningfully involve the communities the program serves in program design and operations,
- Case studies of different types of Technical Assistance Services activities undertaken by the Recipient and uses of Technical Assistance Subawards by Community Lenders,
- Plans for key activities (including current pipeline of Community Lenders) to be supported as well as outputs and outcomes to be achieved in the next reporting period.

These reports must be submitted ready to be published on the EPA website for public consumption and must not include any material that the Recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI. Should EPA identify PII or claims of CBI in reports, the EPA Project Officer will require that the Recipient re-submit the report without the PII or claims of CBI so that it can be published without redaction.

The Recipient agrees to submit **the annual report** electronically to the EPA Project Officer within 90 calendar days after the Recipient's fiscal year end date. The first annual report is due 90 calendar days after the Recipient's fiscal year that ends in 2025.

*Final Report*

The Recipient agrees to submit a final report containing two documents. First, the recipient must submit a report containing all of the elements described above for the annual report, covering the entire Period of Performance and overall assessment of its program performance and implementation of its workplan in effect under this Assistance Agreement. Second, the recipient must submit its investment strategy for the Closeout Period to detail its use of Post-Closeout Program Income over the Closeout Period. EPA intends to make the investment strategy, either in whole or in part, available to the public through disclosing copies of the investment strategy as submitted or using the content of the investment strategy. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient.

The two documents for the final report must be submitted to cover the grant-related activities of the Recipient and Subrecipients as well as the grant-related activities of its Contractors and/or Program

5J - 84094101 - 1    Page 17

Beneficiaries where applicable to a certain element of the final report.

The Recipient agrees to submit the two documents for the final report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the Period of Performance.

## 2. Transaction and Project-Level Report

The Recipient agrees to submit semi-annual transaction and project-level reporting in accordance with information collection instruments approved through GGRF Accomplishment Reporting (███████ ███████████████████████████████████████). The data submission must cover the grant-related activities of the Recipient and Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the data submission.

The Recipient agrees to submit the transaction and project-level report electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods for data submission are as follows: October 1 to March 31; April 1 to September 30. The data submissions must cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends March 31, the Recipient must provide information on transactions originated from July 1 to December 31 rather than from October 1 to March 31. For the semi-annual reporting period that ends September 30, the Recipient must provide information on transactions originated from January 1 to June 30 rather than from April 1 to September 30. The first transaction and project-level report is due 30 calendar days after March 31, 2025, and must cover all transactions originated from the beginning of the Performance Period through December 31, 2024.

## 3. Organizational Disclosures

The Recipient agrees to submit annual organizational disclosures electronically to the EPA Project Officer within 30 calendar days after submission of its Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. The organizational disclosures must cover the Recipient's fiscal year and be submitted in accordance with information collection instruments approved through GGRF Accomplishment Reporting (███████████████████████████████████). Additionally, the Recipient agrees to submit such organizational disclosures for each Pass-Through Subrecipient as well as each Community Lender Subrecipient that has received in excess of $10,000,000 in Capitalization Funding under the Clean Communities Investment Accelerator (to be delivered within 30 calendar days after submission of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System). The requirement for organizational disclosures is not applicable for any fiscal year in which the reporting entity did not meet the requirements of 2 CFR Subpart F—Audit Requirements. The first Organizational Disclosures are due in 2025.

## 4. Ongoing Disclosures

In addition to other ongoing disclosure obligations within the regulations and terms and conditions of this Award Agreement, the Recipient agrees to notify the EPA Project Officer of the following events in

Case 1:25-cv-00938-TSC     Document 7-6     Filed 04/02/25     Page 19 of 63
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 25 of 265

5J - 84094101 - 1     Page 18

accordance with 2 CFR 200.329(e):

    1. Changes to the Recipient's independent certified public accounting firm;

    2. Non-reliance by the Recipient or its independent auditor on previously issued financial statements or a related audit report or completed interim audit review;

    3. Changes in fiscal year end of the Recipient;

    4. Material impairments to the Recipient's assets;

    5. Intention to file bankruptcy petition or enter into receivership;

    6. Submission of annual Form 990 to the IRS, with provision of copy to EPA Project Officer upon request (only if submission of the Form 990 is otherwise required).

Additionally, the Recipient agrees to submit such ongoing disclosures for each Pass-Through Subrecipient as well as each Community Lender Subrecipient that has received in excess of $10,000,000 in Capitalization Funding under the Clean Communities Investment Accelerator. The Recipient agrees to submit ongoing disclosures electronically to the EPA Project Officer within 15 calendar days of the event.

## B. Cybersecurity Condition

(a) The Recipient agrees that when collecting and managing environmental data under this Assistance Agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward Agreements and, during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA

Case 1:25-cv-00938-TSC     Document 7-6     Filed 04/02/25     Page 20 of 63
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 26 of 265

5J - 84094101 - 1     Page 19

Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process.  A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

## D. Public or Media Events

For public or media events that are planned more than 15 calendar days in advance, the Recipient agrees to notify the EPA Project Officer of public or media events it has organized publicizing the accomplishment of significant activities related to execution of the workplan in effect under this Assistance Agreement and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice.

## E. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards.  Information on these standards may be found at https://www.fgdc.gov/.

## F. Leveraging and Fund Raising

### 1. Leveraging

The Recipient agrees to make commercially reasonable efforts to provide the proposed leveraged funding that is described in its workplan in effect under this Assistance Agreement. If the proposed leveraging does not substantially materialize during the Period of Performance, and the Recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future grant applications from the Recipient. In addition, if the proposed leveraging does not substantially materialize during the Period of Performance and the Recipient does not provide a satisfactory explanation, then EPA may reconsider the legitimacy of the award; if EPA determines that the Recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the workplan in effect under this Assistance Agreement, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

### 2. Fund Raising

2 CFR 200.442 provides coverage on allowable fund-raising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fund raising costs are an allowable cost and may include costs that are reasonable and necessary for raising capital from private

JA1886

Case 1:25-cv-00938-TSC    Document 7-6    Filed 04/02/25    Page 21 of 63
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 27 of 265

5J - 84094101 - 1    Page 20

investors to provide Financial Assistance to CCIA-Eligible Projects.

Allowable fund-raising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private investors. Funds a Recipient raises for its own use with costs borne by an EPA Financial Assistance Agreement are considered Program Income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fund-raising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fund-raising costs charged to the award will be treated as Program Income.

## G. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving Environmental Information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The Recipient shall ensure that subawards involving Environmental Information issued under this agreement include appropriate quality requirements for the work. The Recipient shall ensure sub-award recipients develop and implement Quality Assurance (QA) planning documents in accordance with this term and condition; and/or ensure sub-award recipients implement all applicable approved QA planning documents. EPA will not approve any QA planning documents developed by a Subrecipient; the Recipient is responsible for reviewing and approving its Subrecipient QA planning document(s), if required based on the Subrecipient's Environmental Information Operations.

## 1. Quality Management Plan (QMP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QMP, (ii) prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard and submit the document for EPA review, and (iii) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved and current QMP and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

The Recipient must submit the QMP within 90 calendar days after grant award, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the Recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

Case 1:25-cv-00938-TSC    Document 7-6    Filed 04/02/25    Page 22 of 63
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 28 of 265

5J - 84094101 - 1    Page 21

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QAPP, (ii) prepare the QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard, (iii) submit the document for EPA review, and (iv) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s) and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the previously EPA-approved QAPP is acceptable for this agreement.

The Recipient must submit the QAPP within 90 calendar days after grant award, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

The Recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted when changes occur.

### For Reference:

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Specifications for EPA and Non-EPA Organizations.

• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

### H. Real Property

In accordance with 2 CFR 200.311, title to Real Property acquired or improved under this agreement will vest upon acquisition by the Recipient, including but not limited to title to Real Property acquired through exercise of a remedy for default of a Financial Assistance arrangement. This Real Property must be used for the originally authorized purpose as long as needed for that purpose, during which time the Recipient must not dispose of or encumber its title or other interests. The Real Property Programmatic Term and Condition flows down to Subrecipients but not to Program Beneficiaries or Contractors that receive Financial Assistance to CCIA-Eligible Projects, which may acquire title to Real Property after receiving Financial Assistance to CCIA-Eligible Projects.

The Recipient must obtain prior approval from the EPA Award Official for the acquisition of Real Property. Note that the Recipient may meet this requirement by specifying the types of acquisitions of Real Property it plans to carry out in its workplan in effect under this Assistance Agreement.

5J - 84094101 - 1     Page 22

<u>Disposition</u>

If the Recipient disposes of the Real Property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

Otherwise, when Real Property is no longer needed for the originally authorized purpose, the Recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where Recipient is disposing of Real Property acquired or improved with a Federal award and acquiring replacement Real Property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the Recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The Recipient is entitled to be paid an amount calculated by applying the Recipient's percentage of participation in the purchase of the Real Property (and cost of any improvements) to the current fair market value of the property.

<u>Recordation</u>

As authorized by 2 CFR 200.316, EPA requires that Recipients who use EPA funding to purchase and improve Real Property through an EPA funded construction project record a lien or similar notice in the Real Property records for the jurisdiction in which the Real Property is located, which indicates that the Real Property has been acquired and improved with federal funding and that use and disposition conditions apply to the Real Property.

I. Program Income

In accordance with Clean Air Act Section 134(b)(1)(C) as well as 2 CFR 200.307(c) and 2 CFR 1500.8 (b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the

Case 1:25-cv-00938-TSC    Document 7-6    Filed 04/02/25    Page 24 of 63
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 30 of 265

5J - 84094101 - 1    Page 23

Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the workplan in effect under this Assistance Agreement.

## J. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the Recipient or Subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the Recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## III. ADDITIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Eligible Recipient

**The Recipient agrees to maintain its status as an Eligible Recipient, which includes:**

    a. Meeting the definition of *Nonprofit organization* set forth in 2 CFR 200.1;

    b. Having an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"

    c. Not receiving any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);

    d. Being funded by public or charitable contributions; and

    e. Having the legal authority to invest in or finance projects.

### B. Workplan and Budget

The Recipient agrees to execute the workplan in effect under this Assistance Agreement. This document, once approved by the EPA, will reflect an agreement between the Parties and will be incorporated into and be a part of the agreement between the Recipient and the EPA.

The Recipient agrees to conduct an annual review of the workplan in effect under this Assistance Agreement within 90 calendar days of June 30 of each calendar year. If material changes are made

Case 1:25-cv-00938-TSC   Document 7-6   Filed 04/02/25   Page 25 of 63
USCA Case #25-5122   Document #2114423   Filed: 05/05/2025   Page 31 of 265

5J - 84094101 - 1   Page 24

during the annual review or in between annual reviews, the Recipient agrees to submit the updated workplan to the EPA Project Officer.

The Recipient also agrees to conduct an annual review of the EPA-approved detailed budget table within 90 calendar days of June 30 of each calendar year. If material changes are made during the annual review or in between annual reviews, the Recipient agrees to submit the updated detailed budget table to the EPA Project Officer. Such submissions are not subject to prior approval unless otherwise required by the regulations or the terms and conditions of the Award Agreement.

## C. Recipient Organizational Plan

The Recipient agrees to execute the workplan in accordance with the documents listed below, as submitted to EPA through Grants.gov for EPA-R-HQ-CCIA-23 or provided to EPA after the application submission deadline.

1. Description of Programmatic Capabilities, pursuant to *Section IV.C: Content of Application Submission* of the Notice of Funding Opportunity;

2. Organizational and Governing Documents, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity.

The Recipient agrees to maintain its incorporation in the United States, as reflected in the above documents.

The Recipient agrees to conduct an annual review of the documents within 90 calendar days of June 30 of each calendar year. If material changes are made during the annual review or in between annual reviews, the Recipient agrees to submit the updated documents to the EPA Project Officer. Such submissions are not subject to prior approval unless otherwise required by the regulations or the terms and conditions of the Award Agreement.

## D. Recipient Policies and Procedures

The Recipient agrees to execute the workplan in accordance with the documents listed below (or other documents submitted in lieu of the documents listed below), as submitted to EPA through Grants.gov for EPA-R-HQ-CCIA-23 or provided to EPA after the application submission deadline.

1. Legal and Compliance Risk Management Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

2. Board Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

3. Management Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

4. Consumer Protection Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

5. Equity Policies and Practices     , pursuant to *Section IV.B: Application Materials* of the Notice

5J - 84094101 - 1    Page 25

of Funding Opportunity; and

6. Conflict of Interest Mitigation Plan, which include all documents submitted upon EPA's request regarding measures that will be taken to eliminate, neutralize, mitigate or otherwise resolve conflicts of interest.

7. Documentation of Personnel and Fringe Benefit Charges, which includes all documents submitted upon EPA's request to document how personnel and fringe benefits will be charged against the grant award in accordance with 2 CFR 200.430 *Compensation—personal services* and 2 CFR 200.431 *Compensation—fringe benefits*. Notwithstanding the content of the Recipient's EPA-approved budget, the Recipient is not authorized to charge the grant award for personnel and fringe benefits against employees without using the W-2 as the definitive definition of "employee" until the Documentation of Personnel and Fringe Benefit Charges has been reviewed and approved by the EPA, as communicated by the EPA Project Officer.

The Recipient agrees to conduct an annual review of the documents within 90 calendar days of June 30 of each calendar year. If material changes are made during the annual review or in between annual reviews, the Recipient agrees to submit the updated documents to the EPA Project Officer. With the exception of the Documentation of Personnel and Fringe Benefit Charges, where changes will be subject to prior approval, such submissions are not subject to prior approval unless otherwise required by the regulations or the terms and conditions of the Award Agreement

## E. Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Capitalization Funding; Technical Assistance Subawards; Technical Assistance Services; and Program Administration Activities. The Recipient must use awards funds exclusively for allowable activities within the ten EPA regions, with the exception of the Freely Associated States. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

The Recipient agrees to not use the award for activities that support deployment of projects that do not meet the definition of CCIA-Eligible Projects. The allowability of legal costs incurred in connection with the award shall be governed by applicable provisions of 2 CFR Part 200, Subpart E, including but not limited to 2 CFR 200.403, 2 CFR 200.435, 2 CFR 200.441 and 2 CFR 200.459.

## F. Foreign Entity of Concern

As part of carrying out this award, the Recipient agrees to ensure that entities the Recipient contracts with, the Recipient makes Subawards to, or that receive funds as program beneficiaries at any tier of funding under this grant agreement are not—

(A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

(B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

(C) a subsidiary of an entity described in (A) or (B).

5J - 84094101 - 1    Page 26

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## G. LIDAC Expenditure Requirement

The Recipient agrees to ensure that 100% of the award is used for the purposes of providing Financial Assistance in Low-Income and Disadvantaged Communities, with compliance maintained over each annual reporting period (i.e., from July 1 to June 30). Funds used for the purposes of providing Financial Assistance includes Capitalization Funding; Technical Assistance Subawards; Technical Assistance Services; and Program Administration Activities. This requirement applies to the entire award provided to the Recipient and "flows down" to each Subrecipient.

## H. Subgrants to For-Profit Entities

The Recipient is authorized to provide Subgrants to for-profit entities if and only if those Subgrants are provided to an entity that has been determined by the U.S. Treasury's CDFI Fund to meet the CDFI certification requirements set forth in 12 CFR 1805.201, the framework for awarding Subgrants to such for-profit entities is described in the Recipient's workplan in effect under this Assistance Agreement, and the for-profit entity meets the definition of a Community Lender. Community Development Banks, for example, may qualify under this definition, as they are for-profit entities and are U.S. Treasury-certified CDFIs.

The Recipient agrees to require that for-profit entities that receive such Subgrants:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the Subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition, by ensuring that the for-profit entity does not use Subgrant funds to accumulate and reserve funds for ongoing business expenses; unforeseen liabilities; or for other similar costs which are not allowable under this Assistance Agreement;

3. Account for and use Program Income under the rules for Program Income pursuant to 2 CFR 1500.8(b) and the terms and conditions of the Award Agreement and Closeout Agreement; and 4. Be subject to the same requirements as non-profit Subgrantees under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(a)(2).

## I. Capitalization Funding

As stated in the definition of Capitalization Funding, the Recipient will provide Capitalization Funding Subawards to Community Lenders in the form of Subgrants, which are subject to the EPA Subaward Policy. The following additional requirements apply when the Recipient provides Capitalization Funding to Community Lenders.

JA1893

Case 1:25-cv-00938-TSC   Document 7-6   Filed 04/02/25   Page 28 of 63
USCA Case #25-5122   Document #2114423   Filed: 05/05/2025   Page 34 of 265

5J - 84094101 - 1   Page 27

## 1. Disclosure and Approval Requirements

1. The Recipient must obtain written approval from the EPA Award Official prior to providing Capitalization Funding to a Community Lender Subrecipient that would exceed the cap of $10,000,000 in Capitalization Funding under the Clean Communities Investment Accelerator. If the exception has been approved by the EPA Award Official in the Recipient's workplan in effect under this Assistance Agreement, then no additional approval is required.

2. Prior to providing Capitalization Funding to a Community Lender Subrecipient, the Recipient must obtain disclosure from the Community Lender regarding award funds that it has sought and/or received under the National Clean Investment and Clean Communities Investment Accelerator programs.

## 2. Revolving Loan Fund Characterization

Capitalization Funding Subgrants are made for the sole purpose of providing Financial Assistance to CCIA-Eligible Projects. As stated in the definition of Financial Assistance, expenditures for Financial Assistance are in the form of Subawards, Participant Support Costs, and Acquisitions of Intangible Property, as defined in this Award Agreement. EPA considers all Capitalization Funding Subgrants to be capitalizations of revolving loan funds for the purposes of 2 CFR 1500.8(d).

## 3. Participant Support Costs

The Community Lender may provide Financial Assistance to CCIA-Eligible Projects in the form of Participant Support Costs. The Recipient agrees to impose the following eligibility, restrictions, timelines, and other programmatic requirements on Community Lenders payments of Participant Support Costs, in addition to other requirements included in the terms and conditions of this Award Agreement:

1. The Community Lender and Program Beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as Participant Support Costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the Community Lender and Program Beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates, and other Participant Support Cost payments. However, EPA does not provide advice on tax issues relating to these payments.

2. Participant Support Cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The Community Lender, therefore, may not make Participant Support Cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that Community Lenders adhere to this requirement as well. The Community Lender is responsible for checking that Program Beneficiaries (i.e., entities receiving Participant Support Costs) are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the Program Beneficiaries.

The Recipient agrees to provide written guidelines for Community Lenders' payments of Participant Support Costs to the EPA Project Officer prior to the Community Lenders' making payments to Program Beneficiaries, unless already described in the Recipient's workplan in effect under this Assistance

Case 1:25-cv-00938-TSC    Document 7-6    Filed 04/02/25    Page 29 of 63
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 35 of 265

5J - 84094101 - 1    Page 28

Agreement. These guidelines must: (a) describe the activities that will be supported by the Participant Support Costs; (b) specify the range of funding to be provided through the Participant Support Costs; (c) identify which types of entities will have title to equipment (if any) purchased with the funds; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the Participant Support Cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

## 4. Acquisitions of Intangible Property

## 2 CFR 200 Procurement Standards

The Community Lender may use its Capitalization Funding to provide Financial Assistance to CCIA-Eligible Projects in the form of Acquisitions of Intangible Property. The Community Lender agrees to acquire Intangible Property in compliance with the conflict of interest and competition requirements described in the 2 CFR Part 200 Procurement Standards. This includes but is not limited to the requirements at 2 CFR 200.318 to:

- Have and use documented procurement procedures to govern Acquisitions of Intangible Property;
- Maintain oversight to ensure that contractors perform in accordance with the terms, conditions, and specifications of their contracts;
- Maintain written standards of conduct covering conflicts of interest and governing the actions of employees engaged in the selection, award, and administration of contracts as well as maintain written standards of conduct covering organizational conflicts of interest;
- Prioritize entering into inter-entity agreements where appropriate for procurement or use of common or shared goods and services as the Recipient seeks to mobilize financing and private capital;
- Award contracts only to responsible contractors possessing the ability to perform successfully under the terms and conditions of the proposed procurement; and
- Maintain records sufficient to detail the history of procurement.

## Disposition

If the Community Lender disposes of the Intangible Property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Subaward Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

## Recordation

The Community Lender agrees to record liens or other appropriate notices of record to indicate that Intangible Property has been acquired with Federal funding and that use and disposition conditions apply to the Intangible Property, in cases where Financial Assistance to CCIA-Eligible Projects is in the form of an Acquisition of Intangible Property. As provided in 2 CFR 200.1: "…loans, notes and other debt instruments, lease agreements, stock and other instruments of property ownership (whether the property is tangible or intangible)" are *Intangible Property* for the purposes of the restrictions described at 2 CFR 200.315(a). "Other appropriate notices of record" is not limited to filing Uniform Commercial Code instruments and may also include a notice of record in the legally-binding transaction documents.

Case 1:25-cv-00938-TSC    Document 7-6    Filed 04/02/25    Page 30 of 63
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 36 of 265

5J - 84094101 - 1    Page 29

### 5. Subawards to Financial Intermediary Subrecipients

The following requirements apply when a Community Lender provides a Subaward to a Financial Intermediary Subrecipient. These requirements apply to the Recipient and Subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition. As stated in the definition of Financial Assistance, Subgrants are not an eligible form of Financial Assistance:

    1. The Community Lender must establish and follow a system that ensures all Subawards to Financial Intermediary Subrecipients are in writing and contain all of the elements required by 2 CFR 200.332(b), with the exception of the indirect cost provision of 2 CFR 200.332(b)(4) (which does not apply to loans). EPA has developed an optional template for Subaward Agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such Subaward Agreements with Financial Intermediary Subrecipients.

    2. The Financial Intermediary Subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all Subawards that requires Financial Intermediary Subrecipients to comply with these requirements. No other provisions of the Uniform Grant Guidance, including the Procurement Standards, apply directly to the Subrecipient.

    3. Prior to making the Subaward, the Community Lender must ensure that the Financial Intermediary Subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(b)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

## J. Technical Assistance Subawards

As stated in the definition of Technical Assistance Subawards, the Recipient will provide Technical Assistance Subawards to Community Lenders in the form of Subgrants, which are subject to the EPA Subaward Policy. As such, the Establishing and Managing Subawards General Term and Conditions applies to Technical Assistance Subawards.

The following additional requirements apply when the Recipient provides Technical Assistance Subawards to Community Lenders:

    1. The Recipient must obtain prior written approval from the EPA Award Official for any Technical Assistance Subaward that exceeds $1,000,000 in EPA funds. If the exception has been approved by the EPA Award Official in the Recipient's workplan in effect under this Assistance Agreement, then no additional approval is required.

    2. Prior to providing a Technical Assistance Subaward to a Community Lender, the Recipient must obtain disclosure from the Community Lender regarding award funds that it has sought and/or received under the National Clean Investment and Clean Communities Investment Accelerator programs.

The above requirements apply specifically to Technical Assistance Subawards but do not apply to

Technical Assistance Services, which are allowable expenditures the Recipient may incur in accordance with the workplan in effect under this Assistance Agreement and the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

## K. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this Award Agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" and "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific construction projects that were not completed prior to the execution of the final binding documentation governing the use of the Financial Assistance. The Recipient must ensure that any construction work financed in whole or in part with such Financial Assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis-Bacon and Related Act requirements and the requirements of these Terms and Conditions.

Note, however, that under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements do not apply to any form of Financial Assistance which meets any of the following criteria:

- Financial Assistance which exclusively funds pre-construction (e.g. permitting or design work) or post-construction activities (e.g. Acquiring Intangible Property related to a previously completed construction project or re-financing activity related to a previously completed construction project).
- Financial Assistance which serves end-users who are individual homeowners or tenants of single-family homes or multifamily buildings when these individual end-users ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves end-users who meet the definition of Federally Recognized Tribal Entities, as defined under this Assistance Agreement, when these Federally Recognized Tribal Entities ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves any end-user when such Financial Assistance is less than $250,000 for a project and the end-user ultimately selects the contractor(s) and executes the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.

Case 1:25-cv-00938-TSC    Document 7-6    Filed 04/02/25    Page 32 of 63
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 38 of 265

5J - 84094101 - 1    Page 31

If the Recipient encounters a situation that presents uncertainties regarding DBRA applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with a Subrecipient, Program Beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this Term and Condition or the Davis-Bacon and Related Act, the Recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Note, the use of the term project in this term and condition is distinct from the use of the term project within the definition of Qualified Project under Clean Air Act Section 134(c)(3), which is broader and includes "any project, activity, or technology." Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed by a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

## B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

## C. Recipient Responsibilities When Entering Into and Managing Contracts:

### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

### b. After Award of Contract:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

Case 1:25-cv-00938-TSC    Document 7-6    Filed 04/02/25    Page 33 of 63
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 39 of 265

5J - 84094101 - 1    Page 32

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

## D. Recipient Responsibilities When Establishing and Managing Additional Subawards:

**a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all Subawards under this grant: "By accepting this award, the EPA Subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of Subrecipients and must ensure Subrecipients comply with the requirements in 29 CFR 5.6.

**c. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of Subrecipients and must ensure that Subrecipients comply with the requirements in subsection E, below.

## E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program Beneficiaries

When DBRA is applicable, Financial Assistance provided in the form of a participant support cost to a Program Beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

**a. Solicitation and Contract Requirements:**

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will

Case 1:25-cv-00938-TSC    Document 7-6    Filed 04/02/25    Page 34 of 63
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 40 of 265

5J - 84094101 - 1    Page 33

be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

## 2. Compliance with Federal Statutes and Regulations

The Recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with Subrecipients, contractors, and other partners (e.g., by including such provisions in contractual agreements). This includes but is not limited to applicable health and safety regulations as administered by the Occupational Safety and Health Administration.

## 3. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the Recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## 4. Labor and Equitable Workforce Development Implementation Plan

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), by December 31, 2024, the Recipient must submit a Labor and Equitable Workforce Development Implementation Plan to the EPA Project Officer. The Implementation Plan should articulate policies, practices, and procedures adopted by the Recipient to maximize high-quality jobs and workforce development outcomes on projects assisted with the award. Examples of how this can be demonstrated include, but are not limited to:

- Mechanisms for promoting job quality and evaluating labor standards on projects being considered for and/or receiving Financial Assistance;
- Plans to support workforce development as part of market-building activities;
- Current and planned partnerships with labor and workforce development organizations, including the purpose of those partnerships;

Case 1:25-cv-00938-TSC    Document 7-6    Filed 04/02/25    Page 35 of 63
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 41 of 265

5J - 84094101 - 1    Page 34

- Mechanisms for maximizing training and employment opportunities for participants in Registered Apprenticeship Programs on projects, including apprenticeship utilization targets, as applicable;
- Mechanisms for creating high-quality job training and employment opportunities available to residents of low-income and disadvantaged communities through projects and other program activities; and
- Processes for promoting Project Labor Agreements on construction projects above $25,000,000, as appropriate, in alignment with Executive Order 14063 (Use of Project Labor Agreements for Federal Construction Projects) and Executive Order 13502 (Use of Project Labor Agreements for Federal Construction Projects), as well as other types of binding agreements that promote strong workforce outcomes, such as Community Workforce Agreements and Community Benefits Agreements.

The Recipient may use or reference materials already submitted to EPA as part of its submission of the Implementation Plan, where relevant.

Note that EPA may make the information from this plan available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient.

## L. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that for any activity related to the construction, alteration, maintenance, or repair of infrastructure, "none of the funds made available for a Federal Financial Assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The Recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America (BABA) requirements that all Recipients of EPA Financial Assistance awards must comply with.

Under the Greenhouse Gas Reduction Fund, BABA requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific infrastructure projects that were not completed prior to the date the Recipient's award funds were obligated by the EPA.

EPA interprets the definition of infrastructure consistent with 2 CFR 184 and M-24-02 (memorandum dated as of October 23, 2023) including the "public function" test, when determining whether projects qualify as public infrastructure, based on the Civil Rights Act definition of public accommodation.

The following types of Greenhouse Gas Reduction projects are deemed infrastructure for the purposes of BABA applicability:

Case 1:25-cv-00938-TSC     Document 7-6     Filed 04/02/25     Page 36 of 63
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 42 of 265

5J - 84094101 - 1     Page 35

1. The public infrastructure portion of any property (e.g., retail in a mixed-use multi-family property) where the principal purpose of the Financial Assistance is to directly benefit such portion of the property;

2. Privately-owned commercial buildings when they meet the "public function" test;

3. Residential-serving community solar projects, which EPA deems "structures, facilities, and equipment that generate, transport, and distribute energy" per 2 CFR 184.4(c);

4. Publicly accessible EV charging stations;

5. Publicly owned energy generation and/or storage transportation facilities;

6. Publicly owned transportation facilities (e.g., bus depot);

7. Privately-owned transportation facilities that serve a public function.

The following types of Greenhouse Gas Reduction projects are not deemed infrastructure for the purposes of BABA applicability:

1. Privately-owned vehicles for private use;

2. Certain publicly-owned or operated vehicles that EPA has determined do not constitute infrastructure (e.g. school buses);

3. Privately-owned manufacturing or industrial facilities;

4. Privately-owned offices;

5. Single family homes;

6. Privately-owned, non-mixed-use, multi-family housing properties;

7. Privately-owned residential portions of mixed-use properties;

8. EV charging stations that are not publicly accessible;

9. Any privately-owned, behind-the-meter energy generation and storage project that does not otherwise meet the definition of infrastructure.

The inclusion of the following types of funding, support, guarantee, or sponsorship in the funding stack of any Greenhouse Gas Reduction fund project does not trigger BABA, in and of itself or in combination:

1. Low-Income Housing Tax Credit (LIHTC);

2. Fannie Mae and Freddie Mac Backed Multifamily Mortgages;

3. Federal Housing Administration Insured Multifamily Mortgages;

Case 1:25-cv-00938-TSC    Document 7-6    Filed 04/02/25    Page 37 of 63
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 43 of 265

5J - 84094101 - 1    Page 36

4. HUD Section 8 Funding;

5. Other Federal, State, Tribal, or Local Housing Assistance Funding Sources: in general, subsidies issued by federal, state, tribal, or local housing assistance funding sources that do not confer equity or ownership stakes for the governmental funding source do not trigger BABA applicability.

BABA applicability is assessed at the time of provision of Financial Assistance based on the terms, limitations, and requirements of the Financial Assistance. Applicability does not change retroactively based on a change of use (e.g., if a ground floor apartment is re-zoned for a restaurant). Recipients may not temporarily modify or mischaracterize usage to intentionally avoid BABA compliance.

If the Recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## M. Governance Requirements

The Recipient agrees to comply with the following governance requirements starting December 31, 2024. The governance requirements "flow-down" to Pass-Through Subrecipients and Community Lender Subrecipients that have received in excess of $10,000,000 in Capitalization Funding but not to other subrecipients. The governance requirements are waived for (i) any entity that has been determined by the U.S. Treasury's CDFI Fund to meet the CDFI certification requirements set forth in 12 CFR 1805.201 and (ii) any entity whose specific governance structure is set forth in State, Tribal, or local law.

The Recipient (or Subrecipient) may meet all or some of the governance requirements through the parent entity, provided the Recipient (or Subrecipient) is subject to the governance of the parent entity and the Recipient (or Subrecipient) is wholly-controlled by the parent entity. Similarly, the governance requirements may be waived for the Recipient (or Subrecipient) through the parent entity meeting the CDFI certification requirements set forth in 12 CFR 1805.201, provided the Recipient (or Subrecipient) is wholly-controlled by the parent entity.

## 1. Board Size and Composition

The Recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the Recipient's workplan in effect under this Assistance Agreement as well as other business activities. The board must have a sufficient number of members to adequately staff each of its
committees.
The Recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from Low-Income and Disadvantaged Communities).

## 2. Board Independence

The Recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

## 3. Board Committees

The Recipient agrees to have the following board-level committees to oversee and monitor management, with each committee staffed by members qualified to execute the committee's objectives. While the Recipient need not adhere to the exact naming convention or structure in this term and condition, each of the responsibilities must be covered by board-level committees at all times during the Period of Performance; for the avoidance of doubt, one committee may perform the responsibilities of one or more of the committees specified below.

> 1. An investment or credit committee to oversee and approve investment or credit decisions;

> 2. A risk management committee to oversee the formulation and operationalization of the risk management framework;

> 3. An audit committee to oversee the integrity of reporting and internal controls and the performance of audit functions, with a majority independent members on such committee;

> 4. A nomination/governance committee to oversee nomination and succession of board and senior management, with a majority independent members on such committee; and

> 5. A compensation committee to oversee board as well as senior management and staff compensation, with a majority independent members on such committee.

Further, the Recipient agrees to act in good faith to ensure each committee obtains information from management, auditors, or other third-parties necessary to discharge their duties.

## 4. Board Policies and Procedures

The Recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The Recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of Capitalization Funding, Technical Assistance Subawards, and other Subawards to any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

## N. Consumer Protection Requirements

The Recipient agrees to carry out the following consumer protection requirements to the extent that the Recipient directly interacts, transacts, or contracts with consumers in the provision of Financial Assistance to CCIA-Eligible Projects:

> 1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer

Case 1:25-cv-00938-TSC     Document 7-6     Filed 04/02/25     Page 39 of 63
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 45 of 265

5J - 84094101 - 1     Page 38

Financial Protection Act, and other federal consumer protection laws that apply;

2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The Recipient agrees to monitor and oversee Subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(e) and 2 CFR 200.318.

## O. Financial Risk Management Requirements

### 1a. Cash Management Requirements: Advance Payments
The Recipient must deposit and maintain advance payments of Federal funds exclusively in insured accounts, in accordance with 2 CFR 200.305(b)(10). As provided in 2 CFR 200.1, an advance payment is "a payment that a Federal agency or pass-through entity makes by any appropriate payment mechanism and payment method before the recipient or subrecipient disburses the funds for program purposes." A Recipient drawing down funds from ASAP prior to disbursement for actual and allowable project costs constitutes an advance payment. Interest income earned on the advance payment from EPA to the Recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

### 1b. Cash Management Requirements: Program Income

The Recipient is authorized to maintain Program Income in two types of accounts:

1. Insured accounts, including in amounts in excess of the federal insurance limit of $250,000.

2. Accounts where such income is used to purchase (i) U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days (if purchased directly) and that such instruments are held-to-maturity (if purchased directly), or (ii) short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. Note, the underlying instruments included in a short-term money market fund consisting solely of U.S.

Case 1:25-cv-00938-TSC    Document 7-6    Filed 04/02/25    Page 40 of 63
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 46 of 265

5J - 84094101 - 1    Page 39

Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities and offering daily investor redemptions need not be of a particular duration or held-to-maturity.

Interest income and other returns earned on funds that have already been disbursed is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12).

<u>2. Financial Health Metrics</u>

The Recipient agrees to report the following financial health metrics at the entity-level on an annual basis in accordance with its fiscal year as well as on behalf of each Pass-Through Subrecipient and Subrecipient Community Lender that has received in excess of $10,000,000 in Capitalization Funding. The metrics are due to the EPA Project Officer within 30 calendar days after submission of the reporting entity's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System and may be submitted through the Organizational Disclosures form. The requirement for submission of financial health metrics is not applicable for any fiscal year in which the reporting entity did not meet the requirements of 2 CFR Subpart F—Audit Requirements.  The first financial health metrics are due in 2025.

 1. Net Asset Ratio: The net asset ratio is defined as net assets divided by total assets.
 2. Current Ratio: **The current ratio is defined as current assets divided by current liabilities, where** current assets is equal to the value of all assets that are reasonably expected to be converted into cash within the coming 12-month period in the normal course of business and current liabilities is equal to the total value of all debts or obligations that must be paid in the coming 12-month period.

 3. Delinquency Rate: The delinquency rate is defined as the value of loans outstanding that are 90+ calendar days delinquent divided by the value of loans outstanding, where loans 90+ calendar days delinquent includes those with outstanding balances 90+ calendar days overdue and still accruing interest as well as those in nonaccrual status.

 4. Net Charge-Off Rate: The net charge-off rate is defined as the value of loans charged-off over the past fiscal year, minus the value of loan recoveries over the past fiscal year, divided by the value of loans outstanding.

 5. Concentration: The concentration of the portfolio, as demonstrated by calculating and reporting on recipient-level exposure, defined as on-balance sheet exposures to a single consolidated entity over all on-balance sheet exposures, for top ten highest exposures.

Note, the Delinquency Rate and Net Charge-Off Rate may exclude the value of loans which include an element of forgiveness, if and only if such forgiveness was established in the terms governing the financial product at origination.

The EPA Project Officer will consider Recipient and, where applicable, Subrecipient performance against these financial health metrics only to the extent by which they Materially Impair the Recipient's ability to execute the workplan in effect under this Assistance Agreement when assessing whether the Recipient is making sufficient progress in implementing the workplan in effect under this Assistance Agreement, as specified in the Sufficient Progress clause under the Clarifications to EPA General Terms and Conditions Programmatic Term and Condition.

Case 1:25-cv-00938-TSC    Document 7-6    Filed 04/02/25    Page 41 of 63
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 47 of 265

5J - 84094101 - 1    Page 40

## 3. Climate-Related Financial Risks

The Recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include working with Community Lender Subrecipients to account for and evaluate practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of their financial risk management policies and procedures.

The Recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include working with Community Lender Subrecipients to account for climate-related financial risks, including physical and transition risks, including through providing Technical Assistance Services that assist Community Lender Subrecipients with accounting for such climate-related financial risks in their own policies and procedures.

## 4. Additional Requirements

The Recipient agrees to not subordinate EPA's interest in grant funds that have not yet been used for program purposes in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law. Once a Recipient uses grant funds for program purposes and incurs a financial obligation, as defined under 2 CFR 200.1, EPA will only seek claims on those funds in the event that they were used for costs that do not comply with the terms and conditions of the Award Agreement or if there is adequate evidence of waste, fraud, or abuse, prompting adverse action by EPA per 2 CFR 200.339. This does not prohibit the use of subordinated debt as a form of Financial Assistance.

The Recipient agrees to provide Community Lender Subrecipients with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(f).

## P. Historic Preservation

### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The Recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties can include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The Recipient should work with their Project Officer to ensure that Subrecipients are available to work with EPA on any required consultation process with the State Historic Preservation Office (SHPO) or Tribal Historic Preservation Office (THPO) prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival

Case 1:25-cv-00938-TSC    Document 7-6    Filed 04/02/25    Page 42 of 63
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 48 of 265

5J - 84094101 - 1    Page 41

photographs, can be considered allowable and allocable grant costs.

## Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The Recipient must ensure that Subrecipients performing construction projects are aware of this requirement, and the Recipient must notify EPA if the AHPA is triggered.

## Q. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the Recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The Recipient must comply with, and ensure Subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the Federal award" provision of 2 CFR 200.403(a). The Recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## R. Remedies for Non-Compliance

The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs provided in 2 CFR 200.343. As specified in 2 CFR 200.343, which will remain in effect throughout the term of this award, costs during suspension or after termination are allowable if (a) the costs result from financial obligations which were properly incurred by the non-Federal entity before the effective date of suspension or termination, are not in anticipation of it, and (b) the costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

The Recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the Recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of Subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the Recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or

5J - 84094101 - 1    Page 42

criminal penalties through a DOJ criminal judicial enforcement action.

Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing a reasonable opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Performance Reporting National Programmatic Term and Condition, Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements, requirements for Subrecipient oversight, or to obligate or expend funds for allowable activities.

## S. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The Recipient agrees to comply with these clarifications.

## 1. Indirect Cost Rate

The Recipient must exclude costs for Acquisitions of Intangible Property from any calculations of modified total direct costs (MTDC), as defined in 2 CFR 200.1. Intangible Property is not a "service" and therefore is not included in MTDC. The Recipient should note that Subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive Participant Support Costs cannot charge an indirect cost rate against their Participant Support Cost payments.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $50,000 of each Subaward (regardless of the period of performance of the Subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, Participant Support Costs and the portion of each Subaward in excess of $50,000.

In the event that the Recipient is compensating an affiliated entity for its direct and indirect costs related to use of employees, the Recipient must not charge its indirect cost rate against any of these costs.

Notwithstanding the General Term and Condition "Indirect Cost Rate Agreements," the Recipient may claim up to a 15% de minimis rate of modified total direct costs authorized by 2 CFR 200.414(f).

## 2. Sufficient Progress

The EPA Project Officer may assess whether the Recipient is making sufficient progress in implementing the workplan in effect under this Assistance Agreement within 90 calendar days of June 30, 2025 as well as within 90 calendar days of June 30 of each year thereafter during the Period of Performance. "Sufficient progress" shall be assessed based on a comparison of the Recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. As noted under the Financial Risk Management Programmatic Term and Condition, the Recipient's financial health, as measured by the required Financial Health Metrics, are also an input in this process. This term and condition "flows down" to Subrecipients, with the Recipient required to assess whether each Subrecipient is making sufficient progress in implementing the workplan under its Subaward Agreement; the Recipient may increase the frequency and scope of the review of sufficient progress of Subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

5J - 84094101 - 1    Page 43

If the EPA Project Officer determines that the Recipient has not made sufficient progress in implementing its workplan in effect under this Assistance Agreement, the Recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

EPA will not find that the Recipient has failed to make sufficient progress in implementing its workplan in effect under this Assistance Agreement based on shifts between types of Financial Assistance and/or CCIA-Eligible Projects over the Period of Performance (or other shifts in portfolio allocation, such as by region or market segment, over the Period of Performance). If EPA finds the Recipient has failed to achieve sufficient progress on deployment of Financial Assistance to CCIA-Eligible Projects in general, or is achieving progress at a slower rate than projected under the workplan in effect under this Assistance Agreement, the Recipient will have an opportunity to implement a corrective action plan pursuant to 2 CFR 200.208.

## 3. Termination

EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.960 (CCIA) to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

## T. Period of Performance

The Period of Performance under this Award Agreement will end on the date specified in the Notice of Award. However, the Period of Performance may end prior to the date specified in the Notice of Award if all required work of the Federal award has been completed, in accordance with 2 CFR 200.344. In accordance with 2 CFR 200.344(b), the Recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the Period of Performance. In this context, to "liquidate all financial obligations" means to pay outstanding bills, such as the payment of staff salaries accrued during the Period of Performance but for which the due date falls after the end date of the Period of Performance.

The Recipient should note that the Recipient will not be considered to have met the requirements for closeout under its award under 2 CFR 200.344 so long as any Subrecipient has not met the requirements for closeout under its subaward under 2 CFR 200.344.

Notwithstanding the Extension of Project/Budget Period Expiration Date General Term and Condition, in accordance with 2 CFR 200.308(g)(2), the Recipient is authorized to initiate a one-time extension of the Period of Performance by up to 12 months without prior EPA approval, provided that the extension

complies with the requirements 2 CFR 200.308(g)(2). In accordance with 2 CFR 200.308(g)(2), the Recipient must "notify the Federal agency in writing with the supporting justification and a revised period of performance at least 10 calendar days before the conclusion of the period of performance."

## U. Closeout Agreement

As provided at 2 CFR 200.307(c) and 2 CFR 1500.8(d), after the end of the Period of Performance of the Assistance Agreement, the Recipient may keep and use Program Income remaining at the end of the Assistance Agreement and use Post-Closeout Program Income in accordance with this term and condition. The Closeout Agreement goes into effect for this Assistance Agreement the earlier of 1) the day after the Assistance Agreement Period of Performance ends, 2) the first date when all required work of the Federal award has been completed in accordance with 2 CFR 200.344 and the Recipient has met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition) or 3) an alternative date that is mutually agreed by the Recipient and the EPA Grants Management Officer or Award Official.

In accordance with 2 CFR 200.344, EPA will proceed to closeout the Award Agreement and enter the Closeout Period even if the Recipient has not met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition). As provided in 2 CFR 200.344: "When the recipient or subrecipient fails to complete the necessary administrative actions or the required work for an award, the Federal agency or pass-through entity must proceed with closeout based on the information available." This Closeout Agreement is therefore self-executing.

This term and condition is the entire Closeout Agreement between the EPA and the Recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The Recipient shall comply with the requirements specified below as part of the Closeout Agreement. Definitions within 2 CFR 200.1, including as supplemented through *I. Definitions* of this award agreement, apply identically to how they do under the Period of Performance, unless otherwise noted.

As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to Subrecipients such that the Recipient must enter into a corresponding Closeout Agreement with any Subrecipient that has Program Income or anticipates generating Post-Closeout Program Income at the end of the Subrecipient's Period of Performance.

## 1. Allowable Activities

The Recipient shall use Post-Closeout Program Income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

After the Closeout Agreement becomes effective, the Recipient shall disclose annual reports publicly, as described in the Performance Reporting Programmatic Term and Condition, rather than meeting the reporting requirements described in the Performance Reporting Programmatic Term and Condition.

5J - 84094101 - 1    Page 45

## 3. LIDAC Expenditure Requirements

The Recipient shall expend 100% of Post-Closeout Program Income for the purposes of providing Financial Assistance in Low-Income and Disadvantaged Communities and comply with this requirement in accordance with the LIDAC Expenditure Requirement Programmatic Term and Condition, as applicable. Funds used for the purposes of providing Financial Assistance includes Capitalization Funding; Technical Assistance Subawards; Technical Assistance Services; and Program Administration Activities. This requirement applies to the entire award provided to the Recipient and "flows down" to each Subrecipient.

## 4. Cash Management Requirements

The Recipient must maintain Post-Closeout Program Income in accordance with the Cash Management Requirements in the Financial Risk Management Requirements Programmatic Term and Condition, as applicable. However, the Recipient may submit a Cash Management Policy for review and approval by the EPA Project Officer, which can authorize the Recipient to deviate from the aforementioned Cash Management Requirements.

## 5. Financial Health Metrics

After the Closeout Agreement becomes effective, the Recipient agrees to report financial health metrics in accordance with the Financial Health Metrics in the Financial Risk Management Requirements Programmatic Term and Condition (on behalf of the Recipient, Pass-Through Subrecipients, as well as Community Lender Subrecipients that have received in excess of $10,000,000 in Capitalization Funding) publicly, rather than disclosing the metrics to EPA, as applicable. The requirement for submission of financial health metrics is not applicable for any fiscal year in which the reporting entity did not meet the requirements of 2 CFR Subpart F—Audit Requirements. The Recipient agrees to add the following two financial health metrics as part of the financial health metrics for the Closeout Period:

1. Self-Sufficiency Ratio: The self-sufficiency ratio is defined as earned revenue divided by operating expenses, where earned revenue is equal to the value of all income earned from normal business transactions and operating expenses is equal to the value of all expenses incurred as a part of normal business operations over the prior 12-month period, not including interest, financing, depreciation, amortization, and loan loss provision expense.

2. Operating Cash Ratio: The operating cash ratio is defined as cash and cash equivalents divided by operating expenses, where cash and cash equivalents is equal to the total value of all cash and cash equivalent items that can be converted into cash immediately and operating expenses is equal to the value of all expenses incurred as a part of normal business operations over the prior 12-month period, not including interest, financing, depreciation, amortization, and loan loss provision expense.

## 6. Conflicts of Interest

The Recipient agrees to comply with the conflict of interest requirements described in the Conflicts of Interest Programmatic Term and Condition through September 30, 2031.

## 7. Remedies for Non-Compliance

The Recipient agrees to identical remedies for non-compliance that are specified in the Remedies for

Case 1:25-cv-00938-TSC    Document 7-6    Filed 04/02/25    Page 47 of 63
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 53 of 265

5J - 84094101 - 1    Page 46

Non-Compliance Programmatic Term and Condition, as applicable. During the Closeout Period, the workplan and budget submitted for the Period of Performance are no longer applicable.

## 8. Suspension and Debarment

The Recipient agrees to ensure that Post-Closeout Program Income is not transferred to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The Recipient can maintain compliance with this requirement through either (1) checking the System for Award Management (for Subrecipients, Contractors, or Program Beneficiaries) or (2) obtaining eligibility certifications from counterparties (for Program Beneficiaries). The Recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity is presently excluded or disqualified.

## 9. Non-Discrimination

The Recipient must use Post-Closeout Program Income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

**Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975.** The Recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency" in 40 CFR Part 5 and 40 CFR Part 7, the Recipient agrees, and will require all Subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

**Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities.** As provided in section 301 of the Executive Order, the Recipient will ensure that Subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to Real Property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 10. Record-Keeping

In accordance with 2 CFR 200.334(e), the Recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of Post-Closeout Program Income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. Note that this requirement applies if and when the Closeout Agreement is terminated, in accordance with *Item 14. Termination of the Closeout Agreement*. EPA may obtain access to these records to verify that Post-Closeout Program Income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the Recipient must maintain adequate accounting records for how Post-Closeout Program

JA1913

Case 1:25-cv-00938-TSC    Document 7-6    Filed 04/02/25    Page 48 of 63
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 54 of 265

5J - 84094101 - 1    Page 47

Income is managed and spent as well as all other appropriate records and documents related to the activities conducted using Program Income.

The Recipient agrees to ensure that Subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. The Recipient may use the terms of its Subaward Agreements or other effective means to meet its responsibilities.

## 11. Other Federal Requirements

The following other federal requirements apply to the use of Post-Closeout Program Income under the Closeout Period to the same extent they do under the terms of the Performance Period:

- Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Development Requirements Programmatic Term and Condition;
- Build America, Buy America Act, as specified in the Build America, Buy America Act Programmatic Term and Condition; and
- National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition.

No other federal requirements apply to the use of Post-Closeout Program Income under the terms of this Closeout Agreement, other than those specified in this Closeout Agreement.

## 12. Audit Requirements

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Closeout Period, as activities related to the Federal award referenced in 2 CFR 200.502(a) include activities during the Closeout Period.

Through September 30, 2031, the Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## 13. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Closeout Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## 14. Termination of the Closeout Agreement

The Closeout Agreement terminates when either of the following situations occur: (1) the Recipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Recipient and the EPA Award Official or Grants Management Officer mutually agree to terminate the Closeout Agreement, with the Recipient remitting current and future Post-Closeout Program Income to the federal government.

Case 1:25-cv-00938-TSC     Document 7-6     Filed 04/02/25     Page 49 of 63
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 55 of 265

5J - 84094101 - 1     Page 48

The ability to terminate the Closeout Agreement flows down to Subrecipients, as a Closeout Agreement between the Recipient and Subrecipient terminates when either (1) the Subrecipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Subrecipient and the Recipient mutually agree to terminate the Closeout Agreement, with the Subrecipient remitting current and future Post-Closeout Program Income to the Recipient.

The de minimis amount must be agreed-upon in writing by the Recipient and the Director of the Office of the Greenhouse Gas Reduction Fund (or equivalent), prior to the Recipient using the "de minimis" criteria to terminate the Closeout Agreement.

## 15. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and the Authorized Representative on the EPA Key Contacts Form most recently submitted to the EPA Project Officer (for the Recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

## V. Legal Counsel

The Recipient agrees to appoint appropriate legal counsel if counsel is not already available.

## W. Accounting Principles

The Recipient must account for award funds in accordance with Generally Accepted Accounting Principles (GAAP) as in effect in the United States.

The Recipient must segregate and account for the award funds separately from all other program and business accounts. Additionally, the Recipient must segregate and account for Program Income separately from all other program and business accounts.

## X. Internal Controls

The Recipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at: https://www.gao.gov/assets/gao-14-704g.pdf.

## Y. Audits

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Period of Performance, as described in the Audit Requirements General Term and Condition. Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(i), the Recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit Subrecipient that expends $1,000,000 or more of EPA funds from the Recipient's grant program in the Subrecipient's fiscal year. Any for-profit Subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's

Case 1:25-cv-00938-TSC    Document 7-6    Filed 04/02/25    Page 50 of 63
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 56 of 265

5J - 84094101 - 1    Page 49

fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier.

The Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## Z. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that specific conditions are necessary to ensure that the Clean Communities Investment Accelerator Fund program is effectively carried out by Eligible Recipients that have not previously managed grants with the same scale and complexity of this agreement. These specific conditions will remain in effect throughout the Period of Performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer or the Division Director of the Clean Communities Investment Accelerator program, will oversee and monitor the grant agreement through activities, if determined necessary, including:

1. Upon request, requiring the Recipient to participate in an annual workshop (i.e., one workshop per calendar year) with other Recipients under the National Clean Investment Fund and/or Clean Communities Investment Accelerator; the EPA Project Officer will contact the Recipient to finalize details for each annual workshop.

2. Participation in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the workplan in effect under this Assistance Agreement, provided the Recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other Recipients under the Greenhouse Gas Reduction Fund with other EPA programs; and coordination by EPA staff with other federal programs to avoid duplication of effort;

3. Closely monitoring the Recipient's management and oversight of Subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

4. Closely monitoring the Recipient's performance to verify compliance with the workplan in effect under this Assistance Agreement and achievement of environmental results;

5. Participating in periodic telephone conference calls with Recipient personnel to discuss project successes and challenges as well as similar items impacting program performance;

6. Reviewing and commenting on performance reports prepared under the Award Agreement. Note that the final decision on the content of performance reports rests with the Recipient;

7. Verifying that the Recipient is expending the award on allowable activities, including but not limited to reviewing a sample of Capitalization Funding and Technical Assistance Subawards to verify compliance with regulatory requirements and the terms and conditions of the Award

5J - 84094101 - 1    Page 50

Agreement; and

8. Periodically reviewing costs incurred by the Recipient as well as its contractors and Subrecipients if needed to ensure appropriate expenditure of grant funds. Note that Recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds.

Subject to approval by the EPA Award Official, the EPA Project Officer and the Recipient may mutually agree to additional areas of oversight and monitoring.

*Method for Reconsideration*. If the Recipient believes that one or more of these specific conditions are not warranted or requires modification, the Recipient must file a written objection naming the specific condition(s) within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist, and Project Officer identified in the Notice of Award.

## AA. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the Recipient's GGRF award. These materials may include links to Recipient and/or Subrecipients' websites. The Recipient agrees to work with the EPA Project Officer or another member of GGRF program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## AB. Conflicts of Interest

The Recipient must comply with requirements on transfers of funds that create actual and potential conflicts of interest, as specified in this term and condition. Transfers of funds include Subawards, Contracts (including but not limited to Acquisitions of Intangible Property), and Participant Support Costs. The definitions in the EPA's Financial Assistance Conflict of Interest Policy (COI Policy) apply to this term and condition.

There are three categories of transfers of funds, with the requirements differing by each category (as specified in this term and condition):

1. Transfers with Affiliated Entities: Subawards, Contracts, and Participant Support Costs to Affiliated Entities or co-invested in projects with Affiliated Entities. An Affiliated Entity is any entity that is related to the Recipient in accordance with the indicia of control described in 2 CFR 180.905.

2. Financial Assistance to CCIA-Eligible Projects: Subawards, Contracts (in the form of Acquisitions of Intangible Property), and Participant Support Costs as forms of Financial Assistance to CCIA-Eligible Projects, unless such transfers are with Affiliated Entities. These transfers are not within the scope of the COI Policy, which states that "subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by recipients of revolving loan fund capitalization grants or other EPA financial assistance agreements where Agency funds may be used for lending activities."

3. Subgrants and Contracts: Subgrants and Contracts (other than Acquisitions of Intangible Property), unless such transfers are with Affiliated Entities.

Note that all Contracts (including Acquisitions of Intangible Property) must also comply with the conflict of interest standards in 2 CFR 200.318(c).

## 1. Transfers with Affiliated Entities

### Prior Approval of COI Mitigation Plan

The Recipient must not transfer funds with Affiliated Entities unless those transfers have been included in an EPA-approved COI Mitigation Plan on Transfers of Funds with Affiliated Entities. The Recipient agrees to seek prior EPA approval for changes to the COI Mitigation Plan on Transfers of Funds with Affiliated Entities.

### Quarterly Disclosure Requirement

The Recipient agrees to disclose, on a quarterly basis, a list of newly originated transfers of funds with Affiliated Entities that are within the scope of its EPA-approved COI Mitigation Plan on Transfers of Funds with Affiliated Entities. Each quarterly disclosure must include (1) a list of such transfers of funds made over the quarter and (2) steps taken to taken to eliminate, neutralize or mitigate any conflicts of interest, in accordance with the EPA-approved COI Mitigation Plan on Transfers of Funds with Affiliated Entities. The Recipient must disclose its own transfers as well as transfers made by Subrecipients.

The quarterly periods for such disclosures are defined as follows: April 1 to June 30; July 1 to September 30; October 1 to December 31; and January 1 to March 31. The Recipient must make the disclosures to the EPA Project Officer within 30 calendar days of the end of the quarterly period.

### Project Officer Review

In accordance with 2 CFR 200.337, the EPA Project Officer may access records relating to a subset of transactions disclosed to review for compliance with the Recipient's EPA-approved COI Mitigation Plan on Transfers of Funds with Affiliated Entities as well as this term and condition. The EPA Project Officer will not approve transfers of funds in advance but rather will review transfers of funds that have already occurred for compliance.

### Waivers and Modifications

EPA agrees that, for transfers of funds with Affiliated Entities, the requirements of this term and condition apply in lieu of the requirements of the Disclosing Conflict of Interest General Term and Condition.

On a case-by-cases basis, the EPA Project Officer may extend the due date for disclosures on transfers of funds with Affiliated Entities. On a case-by-case basis, the EPA Project Officer may waive or modify the disclosure requirements on transfers of funds with Affiliated Entities.

## 2. Financial Assistance to CCIA-Eligible Projects

### Semi-Annual Disclosure Requirement

The Recipient agrees to disclose, on a semi-annual basis, a list of transfers of funds as Financial Assistance to CCIA-Eligible Projects with actual and potential conflicts of interest. Each semi-annual disclosure must include (1) a list of such transfers of funds made over the semi-annual period and (2)

5J - 84094101 - 1    Page 52

steps taken to taken to eliminate, neutralize or mitigate any conflicts of interest, in accordance with any EPA-approved documents related to eliminating, neutralizing, and mitigating conflicts of interest. The Recipient must disclose transfers made by Subrecipients.

The semi-annual periods for such disclosures are defined as follows: July 1 to December 31; January 1 to June 30. The Recipient must make the disclosures to the EPA Project Officer within 30 calendar days of the end of the semi-annual period.

### B. Project Officer Review

In accordance with 2 CFR 200.337, the EPA Project Officer may access records relating to a subset of transactions disclosed to review for compliance with the Recipient's EPA-approved documents related to eliminating, neutralizing, and mitigating conflicts of interest as well as this term and condition. The EPA Project Officer will not approve transfers of funds in advance but rather will review transfers of funds that have already occurred for compliance.

### C. Waivers and Modifications

On a case-by-cases basis, the EPA Project Officer may extend the due date for disclosures on transfers of funds as Financial Assistance to Qualified Projects. On a case-by-case basis, the EPA Project Officer may waive or modify the disclosure requirements on transfers of funds as Financial Assistance to Qualified Projects.

### 3. Subgrants and Contracts

The Recipient agrees to comply with the Disclosing Conflict of Interest General Term and Condition for Subgrants and Contracts (excluding Acquisitions of Intangible Property), unless such transfers are with Affiliated Entities. If such transfers are with Affiliated Entities, then the Recipient is required to include them in the process specified in *1. Transfers with Affiliated Entities*.

### AC. Prior Approvals

EPA will only have authority to review and approve revisions to the Recipient's workplan in effect under this Assistance Agreement, budget, and other documents if authorized by 2 CFR 200.308 or 2 CFR 200.208. The Recipient must contact the EPA Project Officer when the EPA has prior approval authority specified below. Denial of a request for prior approval will be provided in writing, with an explanation of the rationale.

### Workplan

For the purposes of this Award Agreement, EPA interprets 2 CFR 200.308(c)(1) to enable the Recipient to revise the activities specified in its workplan in effect under this Assistance Agreement without prior EPA approval, provided the activities still comply with the terms and conditions of the Award Agreement. The allowable and allocable costs are narrowly defined, pursuant to the terms and conditions of the Award Agreement; in accordance with 2 CFR 200.308(c)(1), any changes to the workplan in effect under this Assistance Agreement that comply with the statute as well as the terms and conditions would not be a "change in the scope or objective of the project or program." Therefore, so long as the Recipient is updating its workplan in effect under this Assistance Agreement with the revised activities in accordance with the terms and conditions of the Award Agreement, EPA will not require prior approval.

5J - 84094101 - 1     Page 53

## Budget

For the purposes of this Award Agreement, EPA implements 2 CFR 200.308(i)(2) in accordance with Item 1 of the Transfer of Funds General Term and Condition to enable the Recipient to revise the EPA-approved budget included in its Award Agreement without prior EPA approval, provided the cumulative funding transfers among Object Class Categories (Personnel, Fringe Benefits, Travel, Equipment, Supplies, Contractual, Construction, Other, Indirect) do not exceed 10% of the total budget approved at time of award. Therefore, so long as the Recipient is updating its EPA-approved budget by transferring funds by less than or equal to these amounts, EPA will not require prior approval.

However, notwithstanding the requirements of 2 CFR 200.308(i)(2), if the Recipient seeks to transfer any amount of funds budgeted for Participant Support Costs to other budget categories, then it must seek prior approval pursuant to 2 CFR 200.308(f)(5).

## Transfers of Funds

2 CFR 200.308(f)(6) requires the Recipient to obtain prior agency approval for "Subaward activities not proposed in the application and approved in the Federal award." If the types of activities are described in the workplan in effect under this Assistance Agreement (including types of transfers to be conducted through Subawards, Participant Support Costs, Acquisitions of Intangible Property, and other Contracts as defined in 2 CFR 200.1), then EPA has provided the necessary prior agency approval for the purposes of 2 CFR 200.308(f)(6). Approval for the purposes of this regulation does not mean that such transfers of funds are compliant with the statutes, regulations, and terms and conditions.

## Changes in Key Personnel

2 CFR 200.308(f)(2) requires the Recipient to obtain prior agency approval for a "[c]hange in key personnel (including employees and contractors) that are identified by name or position in the Federal Award." If the Recipient is seeking to add or replace a "key person," as defined by members of the board of directors and Senior Management whose roles are specified in the most recently submitted Organizational Plan, then the Recipient must obtain prior EPA approval of the qualifications of the key person.

The Recipient must request prior agency approval for an addition or replacement of a  "key person" via email through the EPA Project Officer, who will have 8 calendar days to communicate EPA's disapproval of their qualifications via email, along with an accompanying justification. If 8 calendar days have passed without notification of EPA disapproval of the key person's qualifications pursuant to 2 CFR 200.308(c)(2), the Recipient is authorized to change the "key person." Once the change is effective, the Recipient must submit an updated Organizational Plan to the EPA Project Officer.

## AD. Flow-Down Requirements

As described in 2 CFR 200.101(b)(1), the terms and conditions of Federal awards flow down to Subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(b), the Recipient agrees to ensure that Subrecipients are aware of the requirements that apply to the Subrecipient.

For the purposes of this Award Agreement, all terms and conditions must flow down to Subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of

5J - 84094101 - 1    Page 54

programmatic terms and conditions to Subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## AE. Resolution of Disputes Termination Provision

The Recipient is precluded from drawing down more than 78.46% of the Total Approved Assistance Amount until this condition is removed, which will occur when: a) the EPA Award Official, at the direction of the Grants Competition Disputes Decision Official (GCDDO), provides written confirmation that all administrative disputes under the National Clean Investment Fund and the Clean Communities Investment Accelerator are resolved in accordance with the dispute resolution procedures in Appendix A of the EPA Order 5700: Policy for Competition of Assistance Agreements; or b) the administrative disputes are withdrawn, abandoned or dismissed; or c) December 31, 2024, whichever is sooner.

If EPA does need to alter the Selection Official's selection and partial funding decisions for this agreement based on a GCDDO determination the EPA Award Official will partially terminate this assistance agreement, de-obligate a portion of the funds that have been obligated and use the de-obligated funds to satisfy the terms of a GCDDO remedy benefiting another entity. The Recipient will then provide an updated workplan and budget information, as needed, to amend the agreement.

For the purposes of this term and condition, EPA's partial termination may apply not just to obligated funds that have not been drawn down from ASAP but also to Program Income that has been generated and retained by the Recipient under 2 CFR 1500.8(d) and the Program Income Programmatic Term and Condition of this agreement. In accordance with 2 CFR 200.307(e)(1), EPA may require that the amount of funds committed by EPA to the Recipient be reduced by all or some of the Program Income that has been generated by the Recipient.

## AF. Deposit Account at Financial Agent

A depository institution has been designated as a financial agent of the United States (the Financial Agent) for the Greenhouse Gas Reduction Fund. The Recipient is required to set up and utilize an Account or Accounts at the Financial Agent in accordance with the Financial Agent Terms and Conditions (Section V) included in this Assistance Agreement.

## AG. Interim SF-425 Requirement

The Recipient must submit an SF-425 within 30 calendar days of receiving access to an Account or Accounts at the Financial Agent, with the SF-425 covering all activities supported by funds drawn from ASAP and disbursed for actual and allowable costs, other than funds disbursed into the Account or Accounts at the Financial Agent.

## AH. Amendments to Terms and Conditions

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## AI. Preservation of Guidance and Data

Any statutes, regulations, agency documents, policies, and guidance (including FAQs and EPA's

JA1921

Case 1:25-cv-00938-TSC    Document 7-6    Filed 04/02/25    Page 56 of 63
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 62 of 265

5J - 84094101 - 1    Page 55

Implementation Framework for the Greenhouse Gas Reduction Fund), or executive orders referenced herein are incorporated by reference into the Award Agreement as of the effective date of this amended Award Agreement. These incorporated documents will be controlling on Recipient and Subrecipients in the event such documents are deleted, repealed, rescinded, or replaced unless a statute provides otherwise. This includes, but is not limited to, the Uniform Administrative Requirements, Cost Principles and Audit Requirements for Federal Awards; Title 2 CFR Part 200 effective October 1, 2024, and the EPA General Terms and Conditions effective October 1, 2024.

This provision cannot be changed without the consent of the Recipient.


## IV. ADMINISTRATIVE TERMS AND CONDITIONS

Please refer to Page 4, "Administrative Conditions."


## V. FINANCIAL AGENT TERMS AND CONDITIONS

### A. Revisions to Award Agreement to Account for Financial Agent Arrangement

Because a depository institution has been designated as a financial agent of the United States (the Financial Agent) for the Greenhouse Gas Reduction Fund, the following revisions to the Award Agreement are effective without further action or notice required by the Recipient or EPA.

### 1. Revisions to Section I. Definitions

*The following **new definition** will be added to the Award Agreement:*

**Capitalization by Nonexchange Capital Contribution:** Capitalization by Nonexchange Capital Contribution means award funds that (1) the Recipient draws down from the Automated Standard Application Payments (ASAP) system and (2) disburses into the 'Budget Account' as defined under the Deposit Account at Financial Agent Programmatic Term and Condition to capitalize itself for subsequent use for any of the following Allowable Activities: Capitalization Funding; Technical Assistance Subawards; Technical Assistance Services; and Program Administration Activities. Under this two-step transaction, which involves both a drawdown and disbursement, the Recipient's drawdown from ASAP is deemed (a) an advance payment of Federal funds in accordance with 2 CFR 200.305(b)(1); while the disbursement into the Deposit Account at Financial Agent is deemed (b) an allowable cost to be charged to the EPA award, and (c) a "nonexchange transaction", consistent with the definition of this term in the Statement of Federal Financial Accounting Standards No. 5. The full amount of the Capitalization by Nonexchange Capital Contribution must be recognized, reported, and accounted for as Program Income in accordance with the Program Income Programmatic Term and Condition once clauses (a) and (b) are fulfilled. Any Subrecipient with a Deposit Account at Financial Agent will be entitled to receive its payments from Recipient as a Capitalization by Nonexchange Capital Contribution.

*The definition of **Program Income** under the Award Agreement will be amended and replaced with:*

**Program Income:** 2 CFR 200.1 defines Program Income as "gross income earned by the non-Federal entity that is directly generated by a supported activity or earned as a result of the Federal award during

JA1922

the period of performance except as provided in § 200.307(f)." 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, there are two types of Program Income: (1) "Program Income from Operations" and (2) "Program Income from Capitalization by Nonexchange Capital Contribution".

Program Income from Operations includes but is not limited to income from origination fees, servicing fees, and asset management fees; dividends from equity investments; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). Under this award agreement, the Recipient is authorized to deduct the cost of generating Program Income from Operations under 2 CFR 200.307(b) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Program Income from Operations include origination, servicing, and management costs that are not charged as direct costs to the Federal award. Costs of generating Program Income from Operations can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the Program Income from Operations, provided the Recipient can account for the actual costs incurred. Program Income from Operations requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries. Program Income from Operations can be earned prior to the availability of the 'Program Income from Operations' account as defined under the Deposit Account at Financial Agent Programmatic Term and Condition.

Program Income from Capitalization by Nonexchange Capital Contribution means award funds from the ASAP system that the Recipient draws down and immediately deposits into the 'Budget Account' at the Financial Agent in accordance with (a) the definition of Capitalization by Nonexchange Capital Contribution and (b) the Deposit Account at Financial Agent Programmatic Term and Condition. Program Income from Capitalization by Nonexchange Capital Contribution cannot be earned prior to the availability of the 'Budget Account' as defined under the Deposit Account at Financial Agent Programmatic Term and Condition.

Both forms of Program Income under this program must be treated in accordance with the Program Income Programmatic Term and Condition. EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fund raising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

## 2. Revisions to Section II. National Programmatic Terms and Conditions

*The **Program Income Programmatic Term and Condition** will be amended and replaced with:*

## Program Income

In accordance with Clean Air Act Section 134(b)(1)(C) as well as 2 CFR 200.307(e)(2) and 2 CFR 1500.8 (b), the Recipient must retain Program Income earned during the Period of Performance. Program

Case 1:25-cv-00938-TSC    Document 7-6    Filed 04/02/25    Page 58 of 63
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 64 of 265

5J - 84094101 - 1    Page 57

Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income from Operations once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income from Operations may be used by the Recipient in advance of the initial award funds (i.e. Program Income from Capitalization by Nonexchange Capital Contribution) being fully used where reasonable and necessary to execute the activities in the workplan in effect under this Assistance Agreement.

### 3. Revisions to Section III. Additional Programmatic Terms and Conditions

*The Allowable and Unallowable Activities Programmatic Term and Condition will be amended and replaced with:*

### Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Capitalization by Nonexchange Capital Contribution; Capitalization Funding; Technical Assistance Subawards; Technical Assistance Services; and Program Administration Activities. The Recipient must use awards funds exclusively for allowable activities within the ten EPA regions, with the exception of the Freely Associated States. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

Capitalization by Nonexchange Capital Contribution generates Program Income for the Recipient in an amount equal to the available EPA award balance drawn down from ASAP into the 'Budget Account' as defined under the Deposit Account at Financial Agent Programmatic Term and Condition. Program Income from Capitalization by Nonexchange Capital Contribution must be expended on Capitalization Funding, Technical Assistance Subawards, Technical Assistance Services, and Program Administration Activities in accordance with the workplan in effect under this Assistance Agreement. The allowability of legal costs incurred in connection with the award shall be governed by applicable provisions of 2 CFR Part 200, Subpart E, including but not limited to 2 CFR 200.403, 2 CFR 200.435, 2 CFR 200.441 and 2 CFR 200.459.

The Recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of CCIA-Eligible Projects; and (b) activities that support deployment of projects outside the boundaries of the ten EPA regions.

*The Deposit Account at Financial Agent Programmatic Term and Condition will be amended and replaced with:*

5J - 84094101 - 1    Page 58

## Deposit Account at Financial Agent

The Recipient will open a Deposit Account at a depository institution that has been designated as a financial agent of the United States (the Financial Agent). Such account will be used as Recipient's operating account for the award. Upon establishment of the Deposit Account, the Recipient will drawdown the entire available EPA award balance from ASAP and disburse it into the Deposit Account, where it must be maintained until the Closeout Agreement goes into effect in accordance with the Closeout Agreement Programmatic Term and Condition. Note, this requirement applies to any and all drawdowns from ASAP by the Recipient while the Deposit Account is available and accessible. Once the Closeout Agreement goes into effect, the Recipient will be entitled to transfer any remaining funds in the Deposit Account to an account at a financial institution of its choosing, provided such account is insured in accordance with 2 CFR 200.305(b)(10)).

The Recipient will grant EPA a perfected security interest in all funds held in the Deposit Account. The Recipient will take all such actions, enter into all such agreements, and execute and deliver all such documentation as may be necessary and/or as directed by EPA from time to time to establish and maintain such security interest, including but not necessarily limited to entering into an account control agreement (ACA) with the Financial Agent and EPA.

Notwithstanding any other provision of this Assistance Agreement, EPA will only furnish the Financial Agent with a Notice of Exclusive Control under an ACA when EPA issues a written determination and finding that the Recipient has failed to comply with the terms and conditions of this Assistance Agreement, and that noncompliance is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse or material misrepresentation of eligibility status, and that EPA has initiated action under 2 CFR 200.339 to wholly or partly suspend or terminate the Federal award, as authorized in the terms of the Assistance Agreement. The written determination and finding and a copy of the Notice of Exclusive Control shall be sent to the Recipient when the Notice of Exclusive Control is furnished to the Financial Agent. EPA and Recipient have mutually agreed only to the specific process outlined in this term for furnishing a Notice of Exclusive Control instruction to the Financial Agent.

Note, funds in the Deposit Account that were legally obligated by the Recipient for financial obligations, as defined under 2 CFR 200.1, prior to the issuance of, but not in anticipation of, a Notice of Exclusive Control constitute "financial obligations which were properly incurred" by the Recipient in accordance with 2 CFR 200.343 and are to remain allowable costs during suspension or after termination of the Recipient's Assistance Agreement. Funds necessary to meet such financial obligations will be disbursed to Program Beneficiaries, Subrecipients, Contractors, or any other third parties which are due payment after a Notice of Exclusive Control is issued.

Note further that a financial obligation to a third party for Financial Assistance is deemed "properly incurred" per 2 CFR 200.343 if it is a legally-binding, arms-length agreement where funds are transferred to the 'Reserve Account' in accordance with these terms and conditions. Any Notice of Exclusive Control shall not include any such funds. Funds necessary to meet such financial obligations for Financial Assistance will be disbursed to Program Beneficiaries, Subrecipients, Contractors, or any other third parties which are due payment after a Notice of Exclusive Control over other funds in the Deposit Account is issued.

Funds held in the Recipient's account at the Financial Agent may be invested in accordance with the Cash Management Requirements in the Financial Risk Management Programmatic Term and Condition.

Case 1:25-cv-00938-TSC   Document 7-6   Filed 04/02/25   Page 60 of 63
USCA Case #25-5122   Document #2114423   Filed: 05/05/2025   Page 66 of 265

5J - 84094101 - 1   Page 59

The Financial Agent will be compensated in accordance with the terms of a valid Financial Agency Agreement (FAA).

The Deposit Account will consist of three distinct account types ('Budget,' 'Reserve', and 'Program Income from Operations'), each of which serves a distinct purpose (while the exact naming convention and structure of these accounts may differ from the below, the accounts must perform a substantively similar function). The Recipient is required to utilize the accounts at the Financial Agent for their intended purpose during any period in which the accounts are available and accessible, with exceptions to this requirement permitted by the EPA Project Officer only on a case-by-case basis, to the extent such exceptions are necessary to execute against the workplan in effect under this Assistance Agreement.

## 1. Budget Account

This account within the Deposit Account will hold funds that have yet to be used for any of the following allowable activities: Capitalization Funding; Technical Assistance Subawards; Technical Assistance Services; and Program Administration Activities. It will hold funds within a number of sub-accounts that correspond to more specific allowable expenditures under the particular type of award or subaward.

**Transferring Funds Into the Budget Account.** Upon establishment of the Deposit Account, the Recipient will drawdown the entire available EPA award balance from ASAP directly into the Budget Account. The Recipient will direct the Financial Agent to allocate funds across the various sub-accounts in the Budget Account in accordance with its workplan in effect under this Assistance Agreement. Recipient need not submit a certification notice to transfer funds within the Budget Account, but remains subject to the Transfer of Funds EPA General Term and Condition and any associated pre-approval or notification requirements therein.

**Transferring Funds Out of the Budget Account.** When Community Lenders transfer funds out of the Budget Account to provide Financial Assistance to CCIA-Eligible Projects, Recipient must obtain certification from the Community Lender's chief executive officer (or equivalent), chief financial officer (or equivalent), chief reporting officer (or equivalent), or chief compliance officer (or equivalent) that the amount of the payment is necessary to execute against the workplan in effect under this Assistance Agreement, and ensure that notice is provided to the Financial Agent with the transfer request. The certification must include the following language: "This certification is a material representation for the purposes of an EPA Financial Assistance Agreement, and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions". In accordance with 2 CFR 200.337, the Recipient must make those certifications available to the EPA, upon request.

While transfers out of the Budget Account are not formally subject to any of the requirements established in either the EPA General Term and Condition on Automated Standard Application Payments (ASAP) and Proper Payment Draw Down or the Interim Drawdown Procedures Programmatic Term and Condition, Recipient agrees to the following requirements:

a) When the need for a longer disbursement window is known in advance of the transfer, Recipient must notify the EPA Project Officer prior to executing the transfer and follow-up to inform the EPA Project Officer of the amount of the transfer that has been disbursed for an Allowable Activity in 5, 10, and 14 business days. Recipient must return any undisbursed amounts to the Deposit Account at the Financial Agent on the 15th business day, or

5J - 84094101 - 1    Page 60

b) When the need for a longer disbursement window is not known in advance of the transfer, Recipient must notify the EPA Project Officer of the delay no later than 5 business days after the transfer and follow-up to inform the EPA Project Officer of the amount of the transfer that has been disbursed for an Allowable Activity in 10 and 14 business days. Recipient must return any undisbursed amounts to the Deposit Account at the Financial Agent on the 15th business day.

Recipients must obtain prior written approval from the EPA Project Official (who will in turn notify the EPA Award Official) for any transfers that will not be disbursed for an Allowable Activity within 15 business days.

These requirements "flow down" to Subrecipients, who agree to provide the same notifications to and seek prior approval from Recipients where applicable.

## 2. Reserve Account

This account within the Deposit Account is intended to enable Community Lenders to set-aside funds within the Financial Agent for use for any form of Financial Assistance that requires the Community Lender to pledge or legally commit award funds for a future expenditure to a third party to meet a legal obligation.

**Transferring Funds Into the Reserve Account.** The Recipient must ensure that Community Lenders only transfer award funds into the Reserve Account for grant performance purposes if the Community Lender's chief executive officer (or equivalent), chief financial officer (or equivalent), chief reporting officer (or equivalent), or chief compliance officer (or equivalent) certify to Recipient, with notice provided to the Financial Agent with the transfer request, that the amount of the expenditure is necessary to execute against the workplan in effect under this Assistance Agreement, and that financing agreements for identified qualified projects necessitating the expenditure have been reviewed by Community Lender's counsel for legal sufficiency. The certification must include the following language: "This certification is a material representation for the purposes of an EPA financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions." In accordance with 2 CFR 200.337, the Recipient must make those certifications available to the EPA, upon request.

**Transferring Funds Out of the Reserve Account.**

## a. To Third Parties to Meet Legal Obligations

Funds in the Reserve Account may not be disbursed to Program Beneficiaries, Subrecipients, Contractors, or any other third parties, unless the funds are necessary for the Community Lender to satisfy a legal obligation. The Community Lender may only transfer award funds out of the Reserve Account to meet legal obligations to such parties if the Community Lender's chief executive officer (or equivalent), chief financial officer (or equivalent), chief reporting officer (or equivalent), or chief compliance officer (or equivalent) certify to the Recipient, with notice provided to the Financial Agent with the transfer request, that the amount of the expenditure is necessary to pay a third party pursuant to a financing agreement that has been reviewed by Community Lender. The certification must include the following language: "This certification is a material representation for the purposes of an EPA financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions." In accordance with 2 CFR 200.337, the Recipient must make those certifications available to the EPA, upon request.

Case 1:25-cv-00938-TSC    Document 7-6    Filed 04/02/25    Page 62 of 63
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 68 of 265

5J - 84094101 - 1    Page 61

While transfers out of the Reserve Account are not formally subject to any of the requirements established in either the EPA General Term and Condition on Automated Standard Application Payments (ASAP) and Proper Payment Draw Down or the Interim Drawdown Procedures Programmatic Term and Condition, Recipient agrees to hold Community Lenders to the following requirements:

> a) When the need for a longer disbursement window is known in advance of the transfer, Community Lender must notify the Recipient prior to executing the transfer and follow-up to inform the Recipient of the amount of the transfer that has been disbursed for an Allowable Activity in 5, 10, and 14 business days. Community Lender must return any undisbursed amounts to the Deposit Account at the Financial Agent on the 15th business day, or

> b) When the need for a longer disbursement window is not known in advance of the transfer, Community Lender must notify the Recipient of the delay no later than 5 business days after the transfer and follow-up to inform the Recipient of the amount of the transfer that has been disbursed for an Allowable Activity in 10 and 14 business days. Community Lender must return any undisbursed amounts to the Deposit Account at the Financial Agent on the 15th business day.

Community Lenders must obtain prior written approval from the Recipient (who will in turn notify the EPA Project Officer) for any transfers that will not be disbursed for an Allowable Activity within 15 business days.

## b. To Program Income from Operations Account

When funds in the Reserve Account are no longer necessary to meet prudent capital management practices consistent with the Community Lender's overall risk portfolio and a potential legal obligation to a third party pursuant to a financing agreement, the Community Lender may transfer such funds to the Program Income from Operations Account. Recipient need not submit a certification notice to effectuate such a transfer.

## 3. Program Income from Operations Account

This account within the Deposit Account will enable Program Income from Operations (as defined under the definition of Program Income) to be held, tracked, and segregated in accordance with the Accounting Principles Programmatic Term and Condition.

**Transferring Funds Into the Program Income from Operations Account.** When Recipient earns Program Income from Operations, it must deposit such funds into the Program Income from Operations Account. Recipient need not submit a certification notice to effectuate such a transfer. When Financial Agent generates interest income on behalf of Recipient by investing Recipient liquidity in accordance with the Cash Management Requirements under the Financial Risk Management Requirements Programmatic Term and Condition, it must deposit such income into the Program Income from Operations Account in accordance with the terms of the FAA. Such interest income is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12).

**Transferring Funds Out of the Program Income from Operations Account.** Funds in this account may be transferred to either the Budget Account or Reserve Account to be used for grant performance purposes in accordance with the Program Income Programmatic Term and Condition. Recipient need not submit a

5J - 84094101 - 1    Page 62

certification notice to effectuate such a transfer.

**Flow-Down Requirements of Deposit Account at Financial Agent**. EPA may elect to extend the requirements under this term and condition to any and all Pass-Through Subrecipients or Community Lender Subrecipients of the Recipient at EPA's sole discretion, including but not limited to Recipient establishing and maintaining a security interest on all award funds held by its Pass-Through Subrecipients or Community Lender Subrecipients at the Financial Agent.

JA1929

# EXHIBIT 5

JA1930



**ACCOUNT CONTROL AGREEMENT**

**among**

Justice Climate Fund, Inc.**, as PLEDGOR**

United States Environmental Protection Agency**, as SECURED PARTY**

**and**

**CITIBANK, N.A., as BANK**

**Dated as of November 1, 2024**

Docusign Envelope ID: C1E58E4D-9258-40E5-BB18-30DCBDAA941D

**THIS ACCOUNT CONTROL AGREEMENT** (this "**Agreement**"), dated as of November 1, 2024, by and among Justice Climate Fund, Inc., a Delaware nonprofit nonstock corporation (the "**Pledgor**"), the United States Environmental Protection Agency, an agency of the United States Government (the "**Secured Party**") and Citibank, N.A., a national banking association organized and existing under the laws of the United States of America ("Citibank") and acting through its Agency & Trust business solely in its capacity as bank under this Agreement, and any successors appointed pursuant to the terms hereof (Citibank in such capacity, the "**Bank**").

**WHEREAS,** the Pledgor and the Secured Party have entered into that certain federal financial assistance agreement, as identified in Addendum 1, (the "**Grant Agreement**") pursuant to which the Pledgor has granted the Secured Party a security interest in the accounts as identified in Addendum 1 established and maintained by the Bank for the Pledgor (the "**Accounts"**).

**WHEREAS,** the Bank has been designated and authorized to act as a financial agent of the United States pursuant to the authority of the U.S. Department of the Treasury under 12 U.S.C. §§ 90 and 265.

**WHEREAS,** the parties wish that the Bank enter into this Agreement in order to provide for the "control" (as defined in Section 9-104(a) of the Uniform Commercial Code in effect in the State of New York ("**UCC**"), in the case of a deposit account, or Section 8-106 of the UCC, in the case of a security account) of the accounts as a means to perfect the security interest of the Secured Party.

**WHEREAS,** the Pledgor and the Secured Party have agreed that the terms and conditions entitled "Deposit Account at Financial Agent" in the Grant Agreement indicate the conditions under which the Secured Party may exercise its right of control herein, and such conditions will be defined as "default" for the purposes of this Agreement.

**WHEREAS,** capitalized terms used herein without definition and that are defined in Article 8 or Article 9 of the UCC as adopted in the State of New York shall have the respective meanings set forth herein.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and adequacy of which is hereby irrevocably acknowledged, the parties hereto agree as follows:

1.    **The Accounts.** The Pledgor and the Bank represent and warrant to, and agree with the Secured Party that:

(a)    The Bank maintains the Accounts for the Pledgor, and all property (including, without limitation, all funds and financial assets) held by the Bank for the accounts of the Pledgor are, and will continue to be, credited to the Accounts in accordance with instructions given by the Pledgor (unless otherwise provided herein).

(b)    To the extent that cash is credited to the Accounts, the Accounts are a deposit account; and to the extent that financial assets (other than cash) are credited to the Accounts, the Accounts are a securities account. The Bank is (i) the bank with which the Accounts are maintained and (ii) the securities intermediary with respect to financial assets held in the Accounts. The Pledgor is (A) the Bank's customer with respect to the Accounts and (B) the entitlement holder with respect to all financial assets credited from time to time to the Accounts.

(c)    Notwithstanding any other agreement to the contrary, the Bank's jurisdiction with

Docusign Envelope ID: C1E58E4D-B258-40F5-BB16-30DCBBAA941D

Case 1:25-cv-00938-TSC    Document 7-7    Filed 04/02/25    Page 4 of 18
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 73 of 265

respect to the Accounts for purposes of the UCC is, and will continue to be for so long as the Secured Party's security interest shall be in effect, the State of New York.

(d)    The Pledgor and the Bank do not know of any claim to or interest in the Accounts or any property (including, without limitation, funds and financial assets) credited to the Accounts, except for claims and interests of the parties referred to in this Agreement.

**2.    Control over Accounts.**

The Bank shall comply with all instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and financial assets in the Accounts including, without limitation, directions to distribute proceeds of any such transfer or redemption of interest or dividends on financial assets in the Accounts, substantially in the form attached hereto as Exhibit B ("**Account Direction**"), originated by the Pledgor, until the time that that Bank receives a notice, substantially in the form attached hereto as Exhibit A (a "**Notice of Exclusive Control**") from the Secured Party that the Secured Party is exercising its right to exclusive control over an Account, and after such time that the Bank receives a Notice of Exclusive Control, the Secured Party for such Account, without further consent by the Pledgor.

**3.    Priority of Secured Party's Security Interest.** The Bank subordinates in favor of the Secured Party any interest, lien or right of setoff it may have, now or in the future, against the Accounts or assets in the Accounts; *provided; however*, that, subject to the foregoing, the Bank may set off all amounts due to it in respect of its fees and expenses (including, without limitation, the payment of any legal fees or expenses) or any amounts payable pursuant to Section 4 hereof.

**4.    Investment of Funds.**

(a)    The Bank shall deposit the assets in non-interest bearing Accounts and invest the assets in the Accounts consistent with the instructions provided by the Pledgor, in Addendum 1. The Pledgor's instructions will be in accordance with the Grant Agreement, provided that the Bank is not responsible for verifying whether the Pledgor's instructions are in compliance with the Grant Agreement. The Bank shall invest such assets in the Accounts on the date of deposit provided that such assets are received on or before 11:00 a.m. New York City time. Any assets received after 11:00 a.m. New York City time shall be treated as if received on the following Business Day. For purposes of this Agreement, "**Business Day**" shall mean any day that the Bank is open for business.

(b)    The Bank is hereby authorized and directed to sell or redeem any such investments as it deems necessary to make any payments or distributions required under this Agreement. The Bank shall have no responsibility or liability for any loss in the value of any investment made pursuant to this Agreement, or for any loss, cost or penalty resulting from any sale or liquidation of the assets in the Account. The Bank is hereby authorized to execute purchases and sales of investments through the facilities of its own trading or capital markets operations or those of any affiliated entity. The Bank does not have a duty nor will it undertake any duty to provide investment advice.

(c)    The Bank shall transfer any earnings or proceeds received on or distributions of earnings or proceeds from the assets in the Accounts to the Program Income from Operations Account on a monthly basis.

**5.    Tax Matters.**



JA1933

Docusign Envelope ID: C1E58E4D-B258-40E5-BB18-30DCBBAA941D

Case 1:25-cv-00938-TSC    Document 7-7    Filed 04/02/25    Page 5 of 18
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 74 of 265

(a)    The Pledgor and the Secured Party agree that, unless and until the Grant Agreement is terminated, any earnings or proceeds received on or distributions of earnings or proceeds from the assets in the Accounts shall be treated as the income of the Pledgor and shall be reported on an annual basis on United States Internal Revenue Service ("**IRS**") Form 1099-DIV, as required pursuant to the Internal Revenue Code of 1986, as amended (the "**Code**") and the regulations thereunder. Principal payments are not reportable hereunder. No earnings or proceeds received on or distributions of earnings or proceeds from the assets in the Accounts, or principal payments from the Accounts, are reportable to the Secured Party. The Pledgor, the Secured Party and the Bank agree that the Bank will not be responsible for providing tax reporting and withholding for payments that are for compensation for services performed by an employee or independent contractor.

(b)    The Pledgor and the Secured Party shall upon the execution of this Agreement provide the Bank with a duly completed and properly executed IRS Form W-9 or applicable IRS Form W-8, in the case of a non-U.S. person, for each payee, together with any other documentation and information requested by the Bank in connection with the Bank's tax reporting obligations under the Code and the regulations thereunder. With respect to the Bank's tax reporting obligations under the Code, the Foreign Account Tax Compliance Act and the Foreign Investment in Real Property Tax Act and any other applicable law or regulation, the Pledgor and the Secured Party understand that, in the event valid U.S. tax forms or other required supporting documentation are not provided to the Bank, the Bank may be required to withhold tax from the assets in the Accounts and report account information on any earnings, proceeds or distributions from the assets in the Accounts.

(c)    Should the Bank become liable for the payment of taxes, including withholding taxes relating to any funds, including interest and penalties thereon, held by it pursuant to this Agreement or any payment made hereunder, the Pledgor agrees to indemnify and hold the Bank harmless pursuant to Section 7(b) hereof from any liability or obligation on account of taxes, assessments, interest, penalties, expenses and other governmental charges that may be assessed or asserted against the Bank, provided that such liability shall not be satisfied by assets in the Accounts. If the Pledgor fails to indemnify the Bank for such taxes, the Bank will notify the Secured Party.

(d)    The Bank's rights under this Section 5 shall survive the termination of this Agreement or the resignation or removal of the Bank.

**6.    Concerning the Bank.**

(a)    <u>Bank Duties</u>. Each of the Pledgor and the Secured Party acknowledges and agrees that (i) the duties, responsibilities and obligations of the Bank shall be limited to those expressly set forth in this Agreement, each of which is administrative or ministerial (and shall not be construed to be fiduciary in nature), and no duties, responsibilities or obligations shall be inferred or implied, (ii) the Bank shall not be responsible for any of the agreements referred to or described herein (including, without limitation, the Grant Agreement and any defined term therein not otherwise defined in this Agreement), or for determining or compelling compliance therewith, and shall not otherwise be bound thereby, and (iii) the Bank shall not be required to expend or risk any of its own funds to satisfy payments from the Accounts hereunder.

(b)    <u>Liability of Bank</u>. The Bank shall not be liable for any damage, loss or injury



Docusign Envelope ID: C1E58E4D-B258-40F5-BB15-30DCBDAA941D

Case 1:25-cv-00938-TSC    Document 7-7    Filed 04/02/25    Page 6 of 18
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 75 of 265

resulting from any action taken or omitted in the absence of gross negligence or willful misconduct (as finally adjudicated by a court of competent jurisdiction). In no event shall the Bank be liable for indirect, incidental, consequential, punitive or special losses or damages (including but not limited to lost profits), regardless of the form of action and whether or not any such losses or damages were foreseeable or contemplated. The Bank shall be entitled to rely upon any instruction, notice, request or other instrument delivered to it without being required to determine the authenticity or validity thereof, or the truth or accuracy of any information stated therein. The Bank may act in reliance upon any signature believed by it to be genuine (including any signature affixed by DocuSign) and may assume that any person purporting to make any statement, execute any document, or send any instruction in connection with the provisions hereof has been duly authorized to do so. The Bank may consult with counsel satisfactory to it, and the opinion or advice of such counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it in good faith and in accordance with the opinion and advice of such counsel. The Bank may perform any and all of its duties through its agents, representatives, attorneys, custodians and/or nominees. The Bank shall not incur any liability for not performing any act or fulfilling any obligation hereunder by reason of any occurrence beyond its control (including, without limitation, any provision of any present or future law or regulation or any act of any governmental authority, any act of God or war or terrorism, or the unavailability of the Federal Reserve Bank wire services or any electronic communication facility).

(c)    <u>Reliance on Orders</u>. The Bank is authorized to comply with final orders issued or process entered by any court with respect to the assets in the Accounts, without determination by the Bank of such court's jurisdiction in the matter. If any portion of the assets in the Accounts are at any time attached, garnished or levied upon under any court order, or in case the payment, assignment, transfer, conveyance or delivery of any such property shall be stayed or enjoined by any court order, or in case any order, judgment or decree shall be made or entered by any court affecting such property or any part thereof, then and in any such event, the Bank is authorized to rely upon and comply with any such order, writ, judgment or decree which it is advised is binding upon it without the need for appeal or other action; and if the Bank complies with any such order, writ, judgment or decree, it shall not be liable to the Pledgor or the Secured Party or to any other person or entity by reason of such compliance even though such order, writ, judgment or decree may be subsequently reversed, modified, annulled, set aside or vacated.

(d)    <u>Erroneous Payments</u>. If the Bank releases any funds (including but not limited to the assets in the Accounts or any portion of it) to the Pledgor or the Secured Party and subsequently determines (in its absolute discretion) that the payment (or any portion of it) was made in error, the Pledgor or the Secured Party, as applicable, shall upon notice promptly refund the erroneous payment, and none of the obligations of the Pledgor or the Secured Party, as applicable, or the remedies of the Bank will be affected by any act, omission, matter or thing (including, without limitation, any obligation pursuant to which an erroneous payment is made) which, but for this provision, would reduce, release, preclude or prejudice any such obligation or remedy (whether or not known by the Bank, the Pledgor or the Secured Party). Each of the Pledgor and the Secured Party agrees not to assert discharge for value, bona fide payee, or any similar doctrine as a defense to recovery of any erroneous payment by the Bank.

**7.    <u>Compensation, Expense Reimbursement and Indemnification</u>.**

(a)    <u>Compensation</u>. The Bank's compensation shall be as specified in <u>Schedule A</u>.



(b)    Indemnification. The Pledgor covenants and agrees to indemnify the Bank and its employees, officers, directors, affiliates, and agents (each, an "**Indemnified Party**") for, hold each Indemnified Party harmless from, and defend each Indemnified Party against, any and all claims, losses, actions, liabilities, costs, damages and expenses of any nature incurred by any Indemnified Party, arising out of or in connection with this Agreement or with the administration of its duties hereunder, including, but not limited to, attorney's fees, costs and expenses, except to the extent such loss, liability, damage, cost or expense shall have been finally adjudicated by a court of competent jurisdiction to have resulted solely from the Indemnified Party's own gross negligence or willful misconduct, provided that such liability shall not be satisfied by assets in the Accounts. The foregoing indemnification and agreement to hold harmless shall survive the termination of this Agreement and the resignation or removal of the Bank. If the Pledgor fails to indemnify the Bank pursuant to this Section 7(b), the Bank shall notify the Secured Party.

8.    **Statements, Confirmations and Notices of Adverse Claims.** The Bank will send copies of all statements and confirmations for the Accounts simultaneously to the Pledgor and the Secured Party. The Bank shall be deemed to have delivered statements and confirmations if such statements and confirmations are available on one or more of the Bank systems to deliver electronic media. The Bank will use reasonable efforts promptly to notify the Secured Party and the Pledgor if any other person claims that it has a property interest in the Accounts or any financial asset in the Accounts.

9.    **Entire Agreement; Exclusive Benefit.** This Agreement constitutes the entire agreement between the parties and sets forth in its entirety the obligations and duties of the Bank with respect to the assets in the Accounts. This Agreement is for the exclusive benefit of the parties to this Agreement and their respective permitted successors, and shall not be deemed to give, either expressly or implicitly, any legal or equitable right, remedy, or claim to any other entity or person whatsoever. No party may assign any of its rights or obligations under this Agreement without the prior written consent of the other parties.

10.    **Resignation and Removal.** The Bank may be removed only by the U.S. Department of the Treasury.

11.    **Governing Law.** This Agreement is governed by and shall be construed and interpreted in accordance with federal law of the United States, except where there is no applicable federal law, in accordance with the laws of the State of New York, without giving effect to the conflict of laws principles thereof.

12.    **Representations and Warranties.**

(a)    Each of the Pledgor and the Secured Party represents and warrants that it has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder; and this Agreement has been duly approved by all necessary action and constitutes its valid and binding agreement enforceable in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or other similar laws affecting the enforcement of creditors' rights and subject to general equity principles.

(b)    Each of the Pledgor and the Secured Party represents that neither it nor any of its parents or subsidiaries, or any of their respective directors, officers, or employees, or to the knowledge of the Pledgor and the Secured Party, the affiliates of the Pledgor, the Secured Party or any of its subsidiaries, will, directly or indirectly, use any part of any proceeds or lend, contribute,



Docusign Envelope ID: C1E58E4D-B258-40F5-BB19-30DCBDAA941D

Case 1:25-cv-00938-TSC    Document 7-7    Filed 04/02/25    Page 8 of 18
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 77 of 265

or otherwise make available such assets in the Accounts in any manner that would result in a violation by any person of economic, trade, or financial sanctions, requirements, or embargoes imposed, administered, or enforced from time to time by the United States (including, without limitation, the Office of Foreign Assets Control of the U.S. Department of the Treasury and the U.S. Department of State), the United Kingdom (including, without limitation, His Majesty's Treasury), the European Union and any EU member state, the United Nations Security Council, and any other relevant sanctions authority.

**13.** **Notices; Instructions.**

(a)    Any notice or instruction hereunder shall be in writing in English, and may be sent by (i) secure file transfer or (ii) electronic mail with a scanned attachment thereto of an executed notice or instruction, and shall be effective upon actual receipt by the Bank in accordance with the terms hereof. Any notice or instruction must be executed (which execution may be manual or affixed by DocuSign) by an authorized person of the Pledgor or the Secured Party, as applicable (the person(s) so designated from time to time, the "**Authorized Persons**"). Each of the applicable persons designated on Schedule B and Schedule C attached hereto have been duly appointed to act as Authorized Persons hereunder and individually have full power and authority to execute any notices or instructions, to amend, modify or waive any provisions of this Agreement, and to take any and all other actions permitted under this Agreement, all without further consent or direction from, or notice to, it or any other party. Any notice or instruction must be originated from a corporate or government domain. Any change in designation of Authorized Persons shall be provided by written notice, signed by an Authorized Person, and actually received and acknowledged by the Bank. Any communication from the Bank that the Bank deems to contain confidential, proprietary, and/or sensitive information shall be encrypted in accordance with the Bank's internal procedures.

(b)    Each of the Pledgor and the Secured Party understands and agrees that the Bank cannot determine the identity of the actual sender of any notice or instruction and that the Bank shall be entitled to conclusively presume that notices or instructions that purport to have been sent by an Authorized Person have been sent by such Authorized Person. Each of the Pledgor and the Secured Party agrees: (i) to assume all risks arising out of the use of electronic means (including electronic mail, secure file transfer or such other method or system specified by the Bank as available for use in connection with its services hereunder) to submit instructions to the Bank, including, without limitation, the risk of the Bank acting on unauthorized instructions, and the risk of interception or misuse by third parties; (ii) that it is fully informed of the protections and risks associated with the various methods of transmitting instructions to the Bank and that there may be more secure methods of transmitting instructions than the method(s) selected by the Pledgor and the Secured Party, as applicable; (iii) that the security procedures (if any) to be followed in connection with its transmission of instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances; and (iv) to notify the Bank immediately upon learning of any compromise or unauthorized use of the security procedures. The Pledgor and the Secured Party agree that the security procedures set forth in Section 13(a) and this Section 13(b) are commercially reasonable.

If to the Pledgor:
As provided in Addendum 1

If to the Secured Party:
The Office of the Greenhouse Gas Reduction Fund,



JA1937

Docusign Envelope ID: C4E58E4D-B258-40E5-BB18-30DCDDAA941D

Case 1:25-cv-00938-TSC   Document 7-7   Filed 04/02/25   Page 9 of 18
USCA Case #25-5122   Document #2114423   Filed: 05/05/2025   Page 78 of 265

United States Environmental Protection Agency
Attention: David Widawsky
Telephone: █████████
E-mail: ████████████████████████

If to the Bank:
Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, NY 10013
Attn.: Nerlie Delly
Telephone: ████████████
E-mail: ████████████████████

**14.** **Amendment; Waiver.** Any amendment of this Agreement shall be binding only if evidenced by a writing signed by each of the parties to this Agreement. No waiver of any provision hereof shall be effective unless expressed in writing and signed by the party to be charged.

**15.** **Severability.** The invalidity, illegality or unenforceability of any provision of this Agreement shall in no way affect the validity, legality or enforceability of any other provision. If any provision of this Agreement is held to be unenforceable as a matter of law, the other provisions shall not be affected thereby and shall remain in full force and effect.

**16.** **Mergers and Conversions.** Any corporation or entity into which the Bank may be merged or converted or with which it may be consolidated, or any corporation or entity resulting from any merger, conversion or consolidation to which the Bank will be a party, or any corporation or entity succeeding to the business of the Bank will be the successor of the Bank hereunder without the execution or filing of any paper with any party hereto or any further act on the part of any of the parties hereto except where an instrument of transfer or assignment is required by law to effect such succession, anything herein to the contrary notwithstanding.

**17.** **Termination.** This Agreement shall terminate upon receipt by the Bank of notice from the Secured Party that its security interest in such Accounts and all assets therein have terminated. Upon receipt of such notice, the Secured Party shall have no further right to originate instructions with respect to the assets in the Accounts. The Bank shall, upon payment of all outstanding fees and expenses hereunder, promptly forward any amounts held by the Bank in the Accounts to the Pledgor, and the Bank shall be relieved and discharged of any further responsibilities with respect to its duties hereunder.

**18.** **Counterparts.** This Agreement may be executed simultaneously in two or more counterparts, any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same agreement. Signatures on counterparts of this Agreement executed and delivered in electronic format (i.e. "pdf") or by other electronic means (including DocuSign) shall be deemed original signatures with all rights accruing thereto except in respect to any non-US entity, whereby originals may be required.

**[Remainder of Page Left Intentionally Blank]**

citi

JA1938

Docusign Envelope ID: 61E58E4D-9258-40FF-B516-39DSPDAA941D

Case 1:25-cv-00938-TSC    Document 7-7    Filed 04/02/25    Page 10 of 18
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 79 of 265

**IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed by a duly authorized representative as of the day and year first written above.**

**CITIBANK, N.A.,**
as Bank

By: _____

   Name: Nerlie Delly
   Title: Senior Trust Officer

**Justice Climate**

By: _____

   Name: Amir Kirkwood
   Title:  Chief Executive Officer

**United States Environmental Protection Agency**

By: _____

   Name: Philip Schindel
   Title: EPA Award Official

Docusign Envelope ID: 61E58E4D-9258-40FF-B546-39DSPDAA941D

Case 1:25-cv-00938-TSC   Document 7-7   Filed 04/02/25   Page 11 of 18
USCA Case #25-5122   Document #2114423   Filed: 05/05/2025   Page 80 of 265

**EXHIBIT A**

**FORM OF NOTICE OF EXCLUSIVE CONTROL**

VIA EMAIL: ████████████████████████

Nerlie Delly
Vice President
Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, New York 10013

Pursuant to the Account Control Agreement dated November 1, 2024, among Justice Climate Fund, Inc. (the "**Pledgor**"), United States Environmental Protection Agency (the "**Secured Party**"), and Citibank, N.A. (the "**Bank**"), we, the Secured Party, hereby instruct the Bank of the following:

The Pledgor and the Secured Party have agreed that the terms and conditions entitled "Deposit Account at Financial Agent" in the Grant Agreement indicate the conditions under which the Secured Party may exercise its right of control herein, and such conditions will be defined as "default" for the purposes of the Account Control Agreement.

As required by the Grant Agreement, the Secured Party has issued a written determination and finding that Pledgor has failed to comply with the terms and conditions of the Grant Agreement, and that noncompliance is substantial such that effective performance of the Grant Agreement is materially impaired or there is adequate evidence of waste, fraud, material misrepresentation of eligibility status, or abuse, and that the Secured Party has initiated action under 2 CFR 200.339 to wholly or partly suspend or terminate the Grant Agreement, as authorized in the terms of the Grant Agreement.

Therefore, the Secured Party hereby notifies you that (i) a default has occurred and is continuing under the Grant Agreement and (ii) from and after the receipt of this notice until you receive further instruction from Secured Party, you are hereby directed to retain and hold all funds in the Account and not to [invest or] disburse the same to any party whatsoever, other than as instructed by the Secured Party.

**United States Environmental Protection Agency**

as Secured Party

By: _____
    Name:
    Title:
    Date:

Exhibit A

**JA1940**

Docusign Envelope ID: C1E58E4D-B258-40FF-B516-39DCBDAA941D

**EXHIBIT B**

**FORM OF ACCOUNT DIRECTION (CCIA)**
**Pledgor's UEI Number:** ▮▮▮▮▮▮

[Date]

Citibank, N.A.
Agency & Trust
388 Greenwich Street
New York, NY 10013
Attn.: Nerlie Delly
E-mail: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

VIA: CitiSFT

RE: Account Control Agreement dated November 1, 2024, among Justice Climate Fund, Inc. (the "**Pledgor**"), United States Environmental Protection Agency (the "**Secured Party**"), and Citibank, N.A. (the "**Bank**")

Pursuant to Section 2 of the above referenced Account Control Agreement, the Pledgor hereby instructs the Bank to disburse a total amount of $[●] funds as per below and as per the attached upload file named xxx:

<u>**Check one boxes:**</u>

( ) **Internal Transfer within the Bank (intra-entity).**

( ) **Internal Transfer within the Bank (inter-entity).**

( ) **External Transfer outside the Bank (for Technical Assistance Services and/or Program Administration Activities).**

<u>**If an Internal Transfer within the Bank (intra-entity), check the following applicable boxes:**</u>

( ) **Transfer of** $[●] **across Pledgor's 'Budget' sub-accounts, as defined in the Grant Agreement**.

( ) **Transfer of** $[●] **from Pledgor's 'Program Income from Operations' account to Pledgor's 'Budget' sub-account(s), as defined in the Grant Agreement**.

<u>**If an Internal Transfer within the Bank (inter-entity), check the following applicable boxes:**</u>

( ) **Transfer of** $[●] **from Pledgor's 'Budget' sub-account(s) to 'Community Lender' for Capitalization Funding as defined in the Grant Agreement.**

( ) **Transfer of** $[●] **from Pledgor's 'Budget' sub-account(s) to 'Community Lender' for Technical Assistance Subaward as defined in the Grant Agreement.**

<u>**If an External Transfer outside the Bank (for Technical Assistance Services and/or Program Administration Activities), check the following applicable boxes:**</u>

Exhibit B

Docusign Envelope ID: 61E58E4D-9258-40FF-B516-39DCBDAA941D

Case 1:25-cv-00938-TSC    Document 7-7    Filed 04/02/25    Page 13 of 18
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 82 of 265

**( ) Disbursement of $[●] for Technical Assistance Services as defined in the Grant Agreement.**
**( ) Disbursement of $[●] for Program Administration Activities as defined in the Grant Agreement.**

Capitalized terms in this instruction letter not otherwise defined shall have the same meaning given to them in the Account Control Agreement.

Signature on this Account Direction executed and delivered in electronic format (i.e. "pdf") or by other electronic means (including DocuSign) shall be deemed original signatures with all rights accruing thereto.

IN WITNESS WHEREOF, the Pledgor has caused this Account Direction to be duly executed and delivered as of the date first written above.


Pledgor:


_____

Authorized Person

Docusign Envelope ID: 61E58E4D-9258-40FF-B546-39DCBDAA941D

Case 1:25-cv-00938-TSC    Document 7-7    Filed 04/02/25    Page 14 of 18
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 83 of 265

**ADDENDUM 1**
**Account Control Agreement**

| | |
|---|---|
| **Date of Account Control Agreement** | November 1, 2024 |
| **Grant Agreement** | Agreement Title: GGRF CCIA: Expanding Green Lending Capacity in Historically Underserved Communities for Enduring Change (5J-84094101) <br> Agreement Date: August 8, 2024 |
| **Pledgor Notice Details** | Attn: Amir Kirkwood, CEO <br> Justice Climate Fund, Inc. <br> Address: 910 17th Street, NW, Suite 820 <br> Washington, DC 20006-2601 <br> Email: ███████████████████████ |
| **UEI Number** | ███████████████████ |
| **Tax Identification Number** | ███████████████ |
| **Citi Deposit Instructions** | Bank: CITIBANK, N.A. <br> ABA: ████████████ <br> Account Name: <br> Account Number: <br> Ref: |

**Money Market Fund Investment Selection**

| Fund Name | Fund Number | CUSIP |
|---|---|---|
| Dreyfus Treasury Securities Cash Management Institutional Shares | 761 | ████████ |

**Accounts to Be Established**

| Account Number | Account Name | Initial Deposit Amount |
|---|---|---|
| ████████ | JCF Capitalization Funding | $ 604,829,044.00 |
| | JCF Technical Assistance Subawards | $59,007,711.00 |
| | JCF Technical Assistance Services | $17,639,545.00 |
| | JCF Program Administration | $56,120,095.00 |
| | JCF Program Income from Operations | $0.00 |
| | JCF Other Pass-Through Funding | $0.00 |

**CitiVelocity Reporting Entitlements Request**:

The Pledgor hereby requests that the Bank entitle the following individuals to view-only access to the Bank's client reporting system for all accounts opened under this Account Control Agreement.

Pledgor Client Profile Name: Justice Climate Fund

JA1943

Docusign Envelope ID: 61E58E4D-9258-40FF-B516-39DCBDAA941D

Case 1:25-cv-00938-TSC    Document 7-7    Filed 04/02/25    Page 15 of 18
USCA Case #25-5122    Document #2114423    Filed: 05/05/25    Page 84 of 265

| Name | Phone Number | | Email | |
|------|--------------|--|-------|--|
| Susan Dearborn | ███████ | | ███████████ | |
| Renay Carver | | | | |
| Amir Kirkwood | | | | |

The Pledgor hereby acknowledges that all accounts opened under this Account Control Agreement will be entitled to the Bank's client reporting system and made available for view-only access to the following Client Profiles and their associated users:

| Entity | Client Profile Name |
|--------|---------------------|
| Secured Party | U.S. Environmental Protection Agency |

**CitiSFT Entitlements Request**:

Citi makes available the Secure File Transfer (CitiSFT) platform for clients to securely upload Account Directions. The Pledgor hereby requests that the Bank entitle the below individuals with upload only access to CitiSFT:

| Name | Phone Number | | Email | | Maker, Checker, Maker and Checker |
|------|--------------|--|-------|--|-----------------------------------|
| Susan Dearborn | ██████ | | ████████ | | Maker and Checker |
| Renay Carver | | | | | Maker and Checker |
| Amir Kirkwood | | | | | Maker and Checker |



Signed by:

26E7B7DAAFCA434...

Authorized Signature
Amir Kirkwood

Chief Executive Officer

**SCHEDULE A**

**BANK COMPENSATION**

**General compensation**

For the services described in the Account Control Agreement, the Bank shall charge each Pledgor as follows:

| Agency & Trust Services | Fees |
|---|---|
| **Acceptance Fee**<br>This one-time fee covers the acceptance of the appointment, the review of the related Transaction documents submitted in connection with the execution and delivery thereof, setting up of internal controls, and communication with other members of the working group, as necessary. | Waived |
| **Annual Administration Fee**<br>To cover the administrative functions of Citi under the Agreement, including the establishment and maintenance of the account(s), safekeeping of assets, maintenance of the records, execution and administration of the Agreement provisions, and other duties required under the terms of the Agreement. | Waived |
| **Wire Fees** | Waived |
| **Legal Fees**<br>To cover the review of legal documents by Citibank Agency & Trust's outside counsel. | Waived |

The Transaction documents will be governed in accordance with federal law of the United States, except where there is no applicable federal law, in accordance with the laws of the State of New York, without giving effect to the conflict of laws principles thereof, as established in the Agreement and subject to internal approval and satisfactory review of all documentation. All outgoing payments processed by Citi will be made via wire. Account balances invested in an Institutional Money Market Fund will be chosen by the client from a list of providers that Citi will supply. If invested in a Money Market Fund, fund distributors may provide Citi with Shareholder Servicing fees. These fees are discussed in the fund's prospectus, which will be delivered to the client prior to investment. All of Citi's responsibilities will be non-discretionary and Citi will not be required to make any advances of its own funds. Therefore, all services provided by Citi must strictly follow the terms stated in the Agreements or in the written instructions of the authorized parties or third parties authorized to send instructions to Citi.

In accordance with US regulations regarding anti-money laundering and terrorist financing, Federal law requires Citi to obtain, verify and record information that identifies each business or entity that opens an account or establishes a relationship with Citi. What this means for our clients: when a client opens an account or establishes a relationship, we will ask for the client's business name, a street address and a tax identification number that Federal law requires us to obtain. In accordance with the Unlawful Internet Gambling Act (the "Act"), Citibank, N.A. accounts or other Citibank, N.A. facilities in the United States may not be used to process "restricted transactions" as such term is defined in U.S. 31 CFR Section 132.2(y).

Docusign Envelope ID: 61E58E4D-9258-40FE-B546-39DCBDAA941D

Case 1:25-cv-00938-TSC    Document 7-7    Filed 04/02/25    Page 17 of 18
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 86 of 265

## SCHEDULE B

## PLEDGOR AUTHORIZED LIST OF SIGNERS
### (to be provided separately)

Each of the following person(s) is authorized to execute documents and to direct the Bank as to all matters on the Pledgor's behalf. The Bank may confirm the instructions received by return call to any one of the telephone numbers listed below.

**PLEDGOR**

| | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name: Amir Kirkwood<br>Title: Chief Executive Officer<br>Phone:<br>Email: | | |

| | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name: Susan Dearborn<br>Title: Controller<br>Phone:<br>Email: | | |

| | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name: Renay Carver<br>Title: Chief Compliance & Reporting Officer<br>Phone:<br>Email: | | |

JA1946

Docusign Envelope ID: 61E58E4D-9258-40FF-B546-39DSPDAA941D

Case 1:25-cv-00938-TSC    Document 7-7    Filed 04/02/25    Page 18 of 18
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 87 of 265

**SCHEDULE C**

**SECURED PARTY AUTHORIZED LIST OF SIGNERS**
**(to be provided separately)**

Each of the following person(s) is authorized to execute documents and to direct the Bank as to all matters on the Secured Party's behalf. The Bank may confirm the instructions received by return call to any one of the telephone numbers listed below.

**SECURED PARTY**

| | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: | | |

| | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: | | |

| | Specimen Signature | DocuSign Specimen Signature |
|---|---|---|
| Name:<br>Title:<br>Phone:<br>Email: | | |

JA1947

# EXHIBIT 6

JA1948



U.S. Environmental Protection Agency
1200 Pennsylvania Ave, N.W.
Washington, DC 20460

March 11, 2025

By Email

Amir Kirkwood
CEO
Justice Climate Fund, Inc.
910 17th St NW Suite 820
Washington, D.C. 20006

██████████████████

Re: Notice of Termination

Dear Amir Kirkwood,

Pursuant to the U.S. Environmental Protection Agency's ("EPA" or "the Agency") authority under 2 C.F.R.
§§ 200.339-40, the General Terms and Conditions of EPA assistance award agreements, the terms and
conditions of the Grant Agreement, and the Agency's inherent authority to reconsider prior
determinations in light of new information, the Agency is terminating Grant Agreement No. 84094101,
awarded to Justice Climate Fund, Inc. under the Greenhouse Gas Reduction Fund ("GGRF"), effective
immediately. This termination is based on substantial concerns regarding program integrity, the award
process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities, which
collectively undermine the fundamental goals and statutory objectives of the award.

Following a comprehensive review and consistent with multiple ongoing independent federal
investigations into programmatic fraud, waste, abuse and conflicts of interest, EPA has identified
material deficiencies, including, but not limited to: 1) the absence of adequate oversight and account
controls to prevent financial mismanagement; 2) the improper or speculative allocation of funds
inconsistent with EPA's oversight and fiscal responsibilities; and 3) the circumvention and defeat of key
oversight mechanisms in the disbursement of federal funds. EPA has determined that these deficiencies
pose an unacceptable risk to the efficient and lawful execution of this grant that cannot be remedied by
imposing specific conditions, necessitating immediate termination to safeguard taxpayer funds and
ensure compliance with federal financial assistance regulations.

Additionally, the Agency has considered concerns raised by EPA Administrator Lee Zeldin regarding the
need for rigorous oversight and accountability in the administration of public funds. The Administrator
has emphasized the importance of eliminating fraud, waste, and abuse within EPA, particularly in high-

value awards such as those under GGRF. The structural and operational weaknesses identified in the execution of this grant are inconsistent with these priorities and materially impair the EPA's ability to ensure compliance with statutory and regulatory mandates governing the lawful expenditure of public money.

The Agency has also determined that its existing process for awarding and overseeing execution of the Grant Agreement lacks sufficient protections to guard against potential violations of the Constitution, particularly the Appointments Clause and private nondelegation doctrine. U.S. Const. art. II, § 2, cl. 2; *e.g.*, *Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1341 (D.C. Cir. 2024). Consistent with its independent duty to avoid exceeding constitutional constraints, EPA has reconsidered the prior administration's conclusion that the oversight mechanisms for the Grant Agreement are sufficient to ensure that the Recipient will not exercise significant authority independently of EPA's oversight and ultimate approval.

This termination is executed in accordance with Sections III.R and III.S.3 of the Grant Agreement and with EPA's General Terms and Conditions as incorporated in, and applicable in addition to, the terms of the Grant Agreement, and is consistent with EPA's obligations to safeguard public funds and inherent authority to reconsider prior decisions. This letter constitutes the notice of termination required by 2 C.F.R. § 200.341. Consistent with 2 C.F.R. §§ 200.344-45 and the Closeout Agreement, the recipient is required to cease all further program expenditures immediately, provide a comprehensive final financial and programmatic report, and comply with all applicable closeout procedures.

EPA is committed to ensuring that federal funding is administered in a manner that upholds transparency, accountability, and the highest standards of fiscal responsibility. This termination reflects the Agency's duty to protect public funds and maintain the integrity of its grant programs. In the coming months, EPA will work to re-obligate lawfully appropriated funds within the GGRF program with enhanced controls to ensure adequate governance, transparency, and accountability, consistent with applicable regulatory and statutory requirements.

Sincerely,

W.C. McIntosh

W.C. McIntosh
Acting Deputy Administrator
U.S. Environmental Protection Agency

cc:
- U.S. EPA, Office of the Greenhouse Gas Reduction Fund (OGGRF)
- U.S. EPA, Office of Mission Support (OMS)
- U.S. EPA, Office of General Counsel (OGC)
- U.S. Department of Justice
- U.S. Department of the Treasury
- U.S. House of Representatives
- U.S. Senate
- Citibank, N.A.

# EXHIBIT 7

JA1951



Acting Deputy Administrator W.C. McIntosh
U.S. Environmental Protection Agency
1200 Pennsylvania Ave, N.W.
Washington, DC 20460

March 4, 2025

Amir Kirkwood
CEO
Justice Climate Fund, Inc.
910 17th St NW Suite 820
Washington, D.C. 20006

RE: Compliance and Oversight Review of EPA Greenhouse Gas Reduction Fund

Dear Amir Kirkwood,

Your organization was awarded funding under the Environmental Protection Agency's
(EPA) Greenhouse Gas Reduction Fund (GGRF). This funding—which was appropriated to
EPA under Section 134 of the Clean Air Act—was referenced by a Biden EPA political
appointee, in a widely circulated video, as "gold bars" that were "tossed off the Titanic".
Shockingly, their plan involved parking $20 billion at an outside financial institution to be
distributed to just 8 pass-through organizations, including your entity. This arrangement
was the first of its kind in EPA history and was purposely designed to obligate all the money
in a rush job with less, not more, oversight by the federal government.

This video is one of many recent developments that have raised questions and concerns
regarding the award process, potential self-dealing and conflicts of interest, qualifications
of recipients, the effectiveness and efficiency of the program, and the appropriate
management and oversight of these funds. As a result, a referral has been made to EPA
Office of Inspector General. The program is also subject to an ongoing investigation by
other federal agencies.

As part of EPA's oversight responsibilities within the Grant Agreement and Administrator Zeldin's pledge to Congress and the American public to be accountable for every penny EPA spends, please submit the requested responses and documents via email or secure file transfer to ▮▮▮▮▮▮▮▮▮▮▮▮▮ **no later than 12:00 PM ET on March 28, 2025.** Responses, other than required forms, should be in Word format. Failure to fully respond to this request on time will be considered a violation of the Grant Agreement and may result in further compliance actions, which may include withholding payments, suspension of funding, or other enforcement measures. Your urgent cooperation in this timely matter is required pursuant to the terms of your Grant Agreement and federal regulations, including 2 CFR 200.337. Additionally, as part of EPA's due diligence process, the agency will work with the U.S. Department of the Treasury (Treasury) and the Financial Agent (FA) to establish and implement additional account controls consistent with prudent operational standards pursuant to the Financial Agency Agreement (FAA).

1. Provide a list of your current board of directors, including their roles, affiliations, and any financial compensation or stipends received from this grant.
2. Provide copies of your organization's most recent IRS Form 990 filings and any required financial disclosures under federal grant regulations.
3. Provide all written communications (hard copy, electronic, or otherwise), notices, or formal discussions your organization had with EPA officials regarding eligibility and program design prior to the grant award.
4. Provide a list of all EPA-sponsored training sessions, workshops, or technical assistance events attended by your organization related to this grant, including names of attendees and completion dates.
5. Submit proof of completion of EPA's "How to Develop a Budget" training, including date of completion and the names and roles of those who received it.
6. Provide copies of all EPA performance metrics and guidance documents you (or your representative) have in your possession defining program success and include an explanation of your understanding of how success was defined for these programs.
7. Provide an itemized breakdown of funds spent to date, including personnel, contractual, subawards, and program-related expenses.
8. What percentage of grant funds have been allocated to administrative costs versus direct financial assistance to subrecipients? Describe how your organization determines allowable administrative costs under this grant, including a justification for the percentages allocated to administrative expenses versus direct program funding. Provide supporting documentation.
9. Provide the total annual budget for your organization for fiscal years 2022, 2023, 2024, and 2025, including a breakdown of revenue sources prior to and after receiving this grant.
10. List all subrecipients of this grant, the funding amounts allocated to each, and the criteria used to determine eligibility. Include award dates and the purposes of each award. Provide a copy of your organization's subrecipient selection criteria and process, including due diligence measures and compliance verification.

11. Submit copies of all subaward agreements issued under this grant, including any contractual terms regarding fund disbursement and compliance monitoring and any required Account Control Agreements, in accordance with EPA reporting requirements.

12. What specific internal controls does your organization have in place to prevent, detect, and address fraud, waste, or abuse of funds? Provide any related policies or procedures, including any mechanisms for detecting improper payments, conflicts of interest, or misuse of funds. Please note which, if any, of these are part of your organization's formal financial policies.

13. Provide a list of all EPA and federal agency officials with whom your organization has had official grant-related communications since the award date.

14. What formal guidance, directives, or technical assistance has your organization received from EPA regarding how these grant funds should be used? Provide copies of any written guidance or relevant communications. Did your organization receive any guidance from EPA or other government entities on how the funds should be used? If so, specify.

15. Has your organization received any formal or informal direction from federal officials regarding how to allocate or distribute funds? If so, provide documentation or meeting records that detail this guidance.

16. List all projects funded to date, including project descriptions, status and locations, amounts awarded, success rate, and anticipated environmental impact.

17. For each funded project, submit documentation on how each project is measuring greenhouse gas reductions, specific emissions reduction targets, metrics used to measure progress, and specific methodologies and verification processes.

18. Has your organization been subject to any compliance reviews, audits, or corrective action plans related to this grant? If so, provide the results and any corrective measures taken. Provide copies of any independent audits, compliance reviews, or risk assessments conducted on your organization's use of EPA funds.

19. Submit an updated annual budget report showing what percentage of your organization's total revenue is now derived from this grant.

20. Has your organization used any grant funds for lobbying, political activity, or policy advocacy – directly or indirectly? If so, please provide details and justification for compliance with federal restrictions.

21. Provide a list of all current employees or contractors who previously worked at EPA or other federal agencies in the last three years. Include job descriptions and compensation details, if applicable.

22. Provide documentation demonstrating how this program has successfully mobilized private capital, including details on secured investments, investor agreements, leveraged investments or co-financing agreements.

23. Provide documentation of all external capital raised using grant funds, including private sector investments, loan guarantees, or matching funds secured.

24. What fundraising costs, if any, have been allocated to this grant? Provide a breakdown by category.

25. Provide details on any profits, interest earnings, or other income generated as a result of this grant, and how those funds are being reinvested.

26. Submit a list of all third-party vendors, consultants, funds, or contractors paid using grant funds, including compensation details and selection process documentation.

27. Provide records of any disclosed or potential conflicts of interest.

28. Provide a list of any state or local government entities receiving funds through your organization under this grant.

29. Provide a list of all quarterly transaction-level data submissions required under the grant's reporting conditions.

30. Have there been any discrepancies, delays, or issues in required reporting to EPA? If so, provide an explanation and corrective actions taken.

31. Provide documentation of all cybersecurity measures taken to safeguard sensitive data related to this grant.

32. Submit documentation on timekeeping and payroll allocation methods used to ensure that personnel costs charged to this grant are in compliance.

33. Provide documentation on how your organization ensures that all EPA-funded activities comply with Title IV of the Civil Rights Act, including nondiscrimination policies, public engagement efforts, and accessibility measures.

34. Provide documentation on how your organization ensures public access to information regarding funded programs, expenditures, and project outcomes as required under the grant agreement.

35. Submit documentation on the data collection methodologies used to evaluate program effectiveness, including any tracking systems, performance indicators, or external evaluations conducted.

Administrator Zeldin has made it clear that one of his top priorities at EPA is to be an excellent steward of the American public's hard-earned tax dollars. There will be zero tolerance of any waste, fraud, or abuse. Your cooperation and timely response to these inquiries will assist in ensuring transparency and accountability in the administration of these funds. I hope you share in EPA's concerns and have some of the same questions yourself.

Thank you for your prompt attention to this matter.

Sincerely,

W.C. McIntosh
Acting Deputy Administrator
U.S. Environmental Protection Agency

Cc: Citibank, N.A.

# EXHIBIT 8

**Agency and Trust Account Statement**

Multiple Accounts Selected
01-APR-2025 Thru 01-APR-2025
Posted Date

CREATED ON PAGE: 01-APR-2025 14:35:34 (EST)  1 of 1

| Account Name | Value Date | Posted Date | CCY Code | Description | Details | Quantity | Cash Principal | Cash Income | Cash Balance | MMF Balance | Cash plus MMF Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 04/01/25 | | Grand Total - Opening Balance Apr 01, 2025 | | | | | 938,303,302.91 | 0.00 | 938,303,302.91 |
| JCF CAPITALIZATION FUNDING - USD | | | | Opening Balance as of Apr 01, 2025 | | | 0.00 | 0.00 | 770,800,000.00 | 0.00 | 770,800,000.00 |
| | | | | Closing Balance as of Apr 01, 2025 | | | 0.00 | 0.00 | 770,800,000.00 | 0.00 | 770,800,000.00 |
| JCF TECHNICAL ASSISTANCE SUBAWARDS - USD | | | | Opening Balance as of Apr 01, 2025 | | | 0.00 | 0.00 | 75,200,000.00 | 0.00 | 75,200,000.00 |
| | | | | Closing Balance as of Apr 01, 2025 | | | 0.00 | 0.00 | 75,200,000.00 | 0.00 | 75,200,000.00 |
| JCF TECHNICAL ASSISTANCE SERVICES - USD | | | | Opening Balance as of Apr 01, 2025 | | | 0.00 | 0.00 | 14,480,007.00 | 0.00 | 14,480,007.00 |
| | | | | Closing Balance as of Apr 01, 2025 | | | 0.00 | 0.00 | 14,480,007.00 | 0.00 | 14,480,007.00 |
| JCF PROGRAM ADMINISTRATION - USD | | | | Opening Balance as of Apr 01, 2025 | | | 0.00 | 0.00 | 66,380,725.00 | 0.00 | 66,380,725.00 |
| | | | | Closing Balance as of Apr 01, 2025 | | | 0.00 | 0.00 | 66,380,725.00 | 0.00 | 66,380,725.00 |
| JCF OTHER PASS-THROUGH FUNDING - USD | | | | Opening Balance as of Apr 01, 2025 | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | | | Closing Balance as of Apr 01, 2025 | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| JCF PROGRAM INCOME FROM OPERATIONS - USD | | | | Opening Balance as of Apr 01, 2025 | | | 0.00 | 0.00 | 11,442,570.91 | 0.00 | 11,442,570.91 |
| | 04/01/25 | | USD | FEDWIRES | FOR ACCOUNT JCF PROGRAM INCOME FROM OPERATIONS CLIENT INITIATED MW REF NO: FTJ2504010031066 FED NO: 20250401B1B7TPIC000281 | | 2,035,176.39 | 0.00 | 13,477,747.30 | 0.00 | 13,477,747.30 |
| | | | USD | FEDWIRES | FOR ACCOUNT JCF PROGRAM INCOME FROM OPERATIONS CLIENT INITIATED MW REF NO: FTJ2504010024566 FED NO: 20250401B1B7TPIC000252 | | 198,553.77 | 0.00 | 13,676,301.07 | 0.00 | 13,676,301.07 |
| | | | USD | FEDWIRES | FOR ACCOUNT JCF PROGRAM INCOME FROM OPERATIONS CLIENT INITIATED MW REF NO: FTJ2504010019966 FED NO: 20250401B1B7TPIC000201 | | 38,232.15 | 0.00 | 13,714,533.22 | 0.00 | 13,714,533.22 |
| | | | USD | FEDWIRES | FOR ACCOUNT JCF PROGRAM INCOME FROM OPERATIONS CLIENT INITIATED MW REF NO: FTJ2504010011566 FED NO: 20250401B1B7TPIC000144 | | 175,267.90 | 0.00 | 13,889,801.12 | 0.00 | 13,889,801.12 |
| | | | | Closing Balance as of Apr 01, 2025 | | | 0.00 | 0.00 | 13,889,801.12 | 0.00 | 13,889,801.12 |
| | | | | Grand Total - Closing Balance Apr 01, 2025 | | | 0.00 | 0.00 | 940,750,533.12 | 0.00 | 940,750,533.12 |

**JA1957**

# EXHIBIT 9

JA1958

Multiple Accounts Selected
01-APR-2025 Thru 01-APR-2025
Posted Date

CREATED ON    01-APR-2025 17:14:18 (EST)

PAGE    1 of 2

| Account Name | Value Date | Posted Date | CCY Code | Description | Details | Quantity | Cash Principal | Cash Income | Cash Balance | MMF Balance | Cash plus MMF Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 04/01/25 | | Grand Total - Opening Balance Apr 01, 2025 | | | | | 938,303,302.91 | 0.00 | 938,303,302.91 |
| JCF CAPITALIZATION FUNDING - USD | | | | Opening Balance as of Apr 01, 2025 | | | 0.00 | 0.00 | 770,800,000.00 | 0.00 | 770,800,000.00 |
| | 04/01/25 | | USD | FEDWIRES | /CSDYNP/ | | -770,800,000.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | | | Closing Balance as of Apr 01, 2025 | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| JCF TECHNICAL ASSISTANCE SUBAWARDS - USD | | | | Opening Balance as of Apr 01, 2025 | | | 0.00 | 0.00 | 75,200,000.00 | 0.00 | 75,200,000.00 |
| | 04/01/25 | | USD | FEDWIRES | /CSDYNP/ | | -75,200,000.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | | | Closing Balance as of Apr 01, 2025 | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| JCF TECHNICAL ASSISTANCE SERVICES - USD | | | | Opening Balance as of Apr 01, 2025 | | | 0.00 | 0.00 | 14,480,007.00 | 0.00 | 14,480,007.00 |
| | 04/01/25 | | USD | FEDWIRES | /CSDYNP/ | | -14,480,007.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | | | Closing Balance as of Apr 01, 2025 | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| JCF PROGRAM ADMINISTRATION - USD | | | | Opening Balance as of Apr 01, 2025 | | | 0.00 | 0.00 | 66,380,725.00 | 0.00 | 66,380,725.00 |
| | 04/01/25 | | USD | FEDWIRES | /CSDYNP/ | | -66,380,725.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | | | Closing Balance as of Apr 01, 2025 | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| JCF OTHER PASS-THROUGH FUNDING - USD | | | | Opening Balance as of Apr 01, 2025 | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | | | Closing Balance as of Apr 01, 2025 | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| JCF PROGRAM INCOME FROM OPERATIONS - USD | | | | Opening Balance as of Apr 01, 2025 | | | 0.00 | 0.00 | 11,442,570.91 | 0.00 | 11,442,570.91 |
| | 04/01/25 | | USD | FEDWIRES | /CSDYNP/ | | -11,442,570.91 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | | USD | FEDWIRES | /CSDYNP/ | | -2,447,230.21 | 0.00 | -2,447,230.21 | 0.00 | -2,447,230.21 |
| | | | USD | FEDWIRES | FOR ACCOUNT JCF PROGRAM INCOME FROM OPERATIONS CLIENT INITIATED MW REF NO: FTJ250401003106 FED NO: 20250401B1B7TPIC000281 | | | 2,035,176.39 | 0.00 | -412,053.82 | 0.00 | -412,053.82 |

**JA1959**

## Agency and Trust Account Statement

Multiple Accounts Selected
01-APR-2025 Thru 01-APR-2025
Posted Date

CREATED ON     01-APR-2025 17:14:18 (EST)
PAGE           2 of 2

| Account Name | Value Date | Posted Date | CCY Code | Description | Details | Quantity | Cash Principal | Cash Income | Cash Balance | MMF Balance | Cash plus MMF Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|
| JCF PROGRAM INCOME FROM OPERATIONS - USD | 04/01/25 | 04/01/25 | USD | FEDWIRES | FOR ACCOUNT JCF PROGRAM INCOME FROM OPERATIONS CLIENT INITIATED MW REF NO: FTJ2504010024566 FED NO: 20250401B1B7TTP1C000252 | | 198,553.77 | 0.00 | -213,500.05 | 0.00 | -213,500.05 |
| | | | USD | FEDWIRES | FOR ACCOUNT JCF PROGRAM INCOME FROM OPERATIONS CLIENT INITIATED MW REF NO: FTJ2504010019966 FED NO: 20250401B1B7TTP1C000201 | | 38,232.15 | 0.00 | -175,267.90 | 0.00 | -175,267.90 |
| | | | USD | FEDWIRES | FOR ACCOUNT JCF PROGRAM INCOME FROM OPERATIONS CLIENT INITIATED MW REF NO: FTJ2504010011566 FED NO: 20250401B1B7TTP1C000144 | | 175,267.90 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | | | Closing Balance as of Apr 01, 2025 | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | | | Grand Total - Closing Balance Apr 01, 2025 | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

JA1960

# 1:25cv948, Inclusiv, Inc. V. United States Environmental Protection Agency Et Al

US District Court Docket

United States District Court, District of Columbia

(Washington, DC)

**This case was retrieved on 05/04/2025**

## Header

**Case Number:** 1:25cv948
**Date Filed:** 03/31/2025
**Assigned To:** Judge Tanya S. Chutkan
**Nature of Suit:** Other Statutes - Administrative Procedure Act/Review or Appeal of Agency Decision (899)
**Cause:** Administrative Procedure Act
**Lead Docket:** 1:25cv00698
**Other Docket:** 1:25cv00698, 1:25cv00735, 1:25cv00762, 1:25cv00820, 1:25cv00938
**Jurisdiction:** U.S. Government Defendant

**Class Code:** Open
**Statute:** 05:551
**Jury Demand:** None
**Demand Amount:** $0
**NOS Description:** Other Statutes - Administrative Procedure Act/Review or Appeal of Agency Decision

## Participants

### Litigants

INCLUSIV, INC.
**Plaintiff**

United States Environmental Protection Agency
**Defendant**

### Attorneys

Jay Christopher Johnson
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
VENABLE LLP
600 Massachusetts Avenue, Nw
Washington, DC  20001
USA
(202) 344-4698 Fax: (202) 344-8300
Email:Jcjohnson@venable.Com

Cogan Rooney
PRO HAC VICE;ATTORNEY TO BE NOTICED
VENABLE LLP
750 East Pratt Street Ste 900
Baltimore, MD  21202
USA
410-244-7660 Email:Crrooney@venable.Com

Kyle H. Keraga
ATTORNEY TO BE NOTICED
VENABLE LLP
750 East Pratt Street Ste 900
Baltimore, MD  21202
USA
410-244-7650 Email:Khkeraga@venable.Com

Kevin Paul VanLandingham
LEAD ATTORNEY;ATTORNEY TO BE NOTICED

1:25cv948, Inclusiv, Inc. V. United States Environmental Protection Agency Et Al

## Litigants

## Attorneys

|  |  |
|---|---|
|  | U.S. DEPARTMENT OF JUSTICE<br>Civil Division, Commercial Litigation Branch P.O. Box 875, Ben Franklin Station<br>Washington, DC  20044-0875<br>USA<br>(202) 307-1134 Email:Kevin.P.Vanlandingham@usdoj.Gov |
|  | Marcus S Sacks<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Poc Agostinho, Jean 1100 L St., N.W. 8142<br>Washington, DC  20530<br>USA<br>202-307-1104 Email:Marcus.S.Sacks@usdoj.Gov |
| Lee Zeldin<br>in his official capacity as ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY \|<br>**Defendant** | Kevin Paul VanLandingham<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>U.S. DEPARTMENT OF JUSTICE<br>Civil Division, Commercial Litigation Branch P.O. Box 875, Ben Franklin Station<br>Washington, DC  20044-0875<br>USA<br>(202) 307-1134 Email:Kevin.P.Vanlandingham@usdoj.Gov |
|  | Marcus S Sacks<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Poc Agostinho, Jean 1100 L St., N.W. 8142<br>Washington, DC  20530<br>USA<br>202-307-1104 Email:Marcus.S.Sacks@usdoj.Gov |
| W.C. MCINTOSH<br>in his official capacity as ACTING DEPUTY ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY \|<br>**Defendant** | Kevin Paul VanLandingham<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>U.S. DEPARTMENT OF JUSTICE<br>Civil Division, Commercial Litigation Branch P.O. Box 875, Ben Franklin Station<br>Washington, DC  20044-0875<br>USA<br>(202) 307-1134 Email:Kevin.P.Vanlandingham@usdoj.Gov |
|  | Marcus S Sacks<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Poc Agostinho, Jean 1100 L St., N.W. 8142<br>Washington, DC  20530<br>USA<br>202-307-1104 Email:Marcus.S.Sacks@usdoj.Gov |
| Citibank, N.A.<br>**Defendant** | Kenneth Winn Allen<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>KIRKLAND & ELLIS LLP<br>1301 Pennsylvania Avenue, N.W.<br>Washington, DC  20004<br>USA<br>(202) 389-5000 Fax: (202) 389-5200<br>Email:Winn.Allen@kirkland.Com |
|  | Saunders Lee McElroy<br>ATTORNEY TO BE NOTICED<br>KIRKLAND & ELLIS LLP<br>1301 Pennsylvania Ave, Nw |

1:25cv948, Inclusiv, Inc. V. United States Environmental Protection Agency Et Al

## Litigants

## Attorneys

Washington, DC  20004
USA
202-389-3081 Email:Saunders.Mcelroy@kirkland.Com

## Proceedings

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 1 | 03/31/2025 | COMPLAINT for Declaratory and Injunctive Relief against All Defendants  ( Filing fee $ 405 receipt number ADCDC-11580047) filed by INCLUSIV, INC.. (Attachments: # 1 Civil Cover Sheet Civil Cover Sheet, # 2 Summons Summons - EPA, # 3 Summons Summons - Zeldin, # 4 Summons Summons - McIntosh, # 5 Summons Summons - Citibank, # 6 Summons Summons - Attorney General Pamela Bondi, # 7 Summons Summons - U.S. Attorney Edward R. Martin Jr.)(Keraga, Kyle) (Entered: 03/31/2025) | |
| 2 | 03/31/2025 | ENTERED IN ERROR.....NOTICE OF RELATED CASE by INCLUSIV, INC. Case related to Case No. 25-cv-698. (Keraga, Kyle) (Entered: 03/31/2025) | |
| 3 | 03/31/2025 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests  by INCLUSIV, INC. (Keraga, Kyle) (Entered: 03/31/2025) | |
| 4 | 04/01/2025 | NOTICE of Appearance by Jay Christopher Johnson on behalf of INCLUSIV, INC. (Johnson, Jay) (Entered: 04/01/2025) | |
| | 04/01/2025 | NOTICE OF NEW CASE ERROR regarding 2 Notice of Related Case, 1 Complaint,. The following error(s) need correction: Blank/Incomplete/Missing civil cover sheet. Please file the Civil Cover Sheet (JS44) form at www.dcd.uscourts.gov/new-case-forms using the event Civil Cover Sheet. Blank/Incomplete/Missing Related Case form. Please use the Notice of Designation of Related Cases (CO 932) form at www.dcd.uscourts.gov/new-case-forms and filing using the event Notice of Related Case. Forms filed as fillable PDF. Please file forms in a non-fillable PDF format. COMPLIANCE DEADLINE is by close of business today. This case will not proceed any further until all errors are satisfied. (zsl) (Entered: 04/01/2025) | |
| 5 | 04/01/2025 | CIVIL COVER SHEET  by INCLUSIV, INC. filed by INCLUSIV, INC..(Keraga, Kyle) (Entered: 04/01/2025) | |
| 6 | 04/01/2025 | MOTION for Preliminary Injunction  by INCLUSIV, INC.. (Attachments: # 1 Memorandum in Support, # 2 Exhibit Declaration of Neda Arabshahi, # 3 Exhibit Declaration of John S. Lawson, # 4 Exhibit Declaration of Jared Freeman, # 5 Exhibit Declaration of Greg Hanshaw, # 6 Exhibit Declaration of Ricardo Ledezma, # 7 Exhibit Inclusiv CCIA Grant Agreement (Aug. 8, 2024), # 8 Exhibit Inclusiv CCIA Modified Grant Agreement (Dec. 19, 2024), # 9 Exhibit Account Control Agreement (Nov. 6, 2024), # 10 Exhibit Financial Agency Agreement (Sept. 19, 2024), # 11 Exhibit EPA Letter to Inspector General (Mar. 2, 2025), # 12 Exhibit EPA Letter to Inclusiv (Mar. 4, 2025), # 13 Exhibit EPA Termination Letter to Inclusiv (Mar. 11, 2025), # 14 Exhibit Climate United TRO &amp; Memorandum Opinion (Mar. 18, 2025), # 15 Exhibit Inclusiv Letter to Citibank (Mar. 21, 2025), # 16 Exhibit Inclusiv Response to EPA's March 4 Letter (Mar. 28, 2025), # 17 Text of Proposed Order)(Keraga, Kyle) (Entered: 04/01/2025) | |
| 7 | 04/01/2025 | NOTICE OF RELATED CASE by INCLUSIV, INC.. Case related to Case No. 25-cv-698. (Keraga, Kyle) (Entered: 04/01/2025) | |
| 8 | 04/01/2025 | WITHDRAWN PURSUANT TO NOTICE FILED | |

1:25cv948, Inclusiv, Inc. V. United States Environmental Protection Agency Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | 0402/2025.....Emergency MOTION for Temporary Restraining Order by INCLUSIV, INC.. (Attachments: # 1 Declaration of Jay Johnson and Exhibits, # 2 Declaration of Eben Sheaffer, # 3 Text of Proposed Order)(Keraga, Kyle) Modified on 4/4/2025 (zjm). (Entered: 04/01/2025) | |
| | 04/02/2025 | Case Assigned to Judge Tanya S. Chutkan. (zjd) (Entered: 04/02/2025) | |
| 9 | 04/02/2025 | SUMMONS (6) Issued Electronically as to CITIBANK, N.A., W.C. MCINTOSH, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN, U.S. Attorney, and U.S. Attorney General (Attachments: # 1 Notice and Consent)(zjd) (Entered: 04/02/2025) | |
| 10 | 04/02/2025 | NOTICE of Appearance by Kenneth Winn Allen on behalf of CITIBANK, N.A. (Allen, Kenneth) (Entered: 04/02/2025) | |
| 11 | 04/02/2025 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by CITIBANK, N.A. (Allen, Kenneth) (Entered: 04/02/2025) | |
| 12 | 04/02/2025 | NOTICE of Appearance by Saunders Lee McElroy on behalf of CITIBANK, N.A. (McElroy, Saunders) (Entered: 04/02/2025) | |
| 13 | 04/02/2025 | NOTICE of Withdrawal of Request for Relief by INCLUSIV, INC. re 8 Motion for TRO (Johnson, Jay) (Entered: 04/02/2025) | |
| 14 | 04/03/2025 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name-Dismas N. Locaria, Filing fee $ 100. Fee Status: Fee Paid. by INCLUSIV, INC.. (Attachments: # 1 Declaration Declaration of D. Locaria, # 2 Good Standing Certificate, # 3 Text of Proposed Order Proposed Order)(Johnson, Jay) (Entered: 04/03/2025) | |
| 15 | 04/03/2025 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name-Cogan R.S. Rooney, Filing fee $ 100. Fee Status: Fee Paid. by INCLUSIV, INC.. (Attachments: # 1 Declaration Declaration of C.Rooney, # 2 Good Standing Certificate, # 3 Text of Proposed Order Proposed Order)(Johnson, Jay) (Entered: 04/03/2025) | |
| 16 | 04/03/2025 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Evan I. Suval, Filing fee $ 100. Fee Status: Fee Paid. by INCLUSIV, INC.. (Attachments: # 1 Declaration Declaration of E. Suval, # 2 Good Standing Certificate, # 3 Text of Proposed Order Proposed Order)(Johnson, Jay) (Entered: 04/03/2025) | |
| 17 | 04/03/2025 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name-Lindsay M. Reed, Filing fee $ 100. Fee Status: Fee Paid. by INCLUSIV, INC.. (Attachments: # 1 Declaration Declaration of L. Reed, # 2 Good Standing Certificate, # 3 Text of Proposed Order Proposed Order)(Johnson, Jay) (Entered: 04/03/2025) | |
| 18 | 04/07/2025 | NOTICE of Appearance by Marcus S Sacks on behalf of W.C. MCINTOSH, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN (Sacks, Marcus) (Entered: 04/07/2025) | |
| 19 | 04/07/2025 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name-Emily R. Marcy, Filing fee $ 100. Fee Status: Fee Paid. by INCLUSIV, INC.. (Attachments: # 1 Declaration Declaration of E. Marcy, # 2 Good Standing Certificate, # 3 Text of Proposed Order Proposed Order)(Johnson, Jay) (Entered: 04/07/2025) | |
| 20 | 04/07/2025 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name-Taylor M. Sorrells, Filing fee $ 100. Fee Status: Fee Paid. by INCLUSIV, INC.. (Attachments: # 1 Declaration Declaration of T. Sorrells, # 2 Good Standing Certificate, # 3 Text of Proposed Order Proposed Order)(Johnson, Jay) (Entered: 04/07/2025) | |
| | 04/07/2025 | MINUTE ORDER: GRANTING Motions for Leave to Appear Pro Hac Vice as to 14 Dismas N. Locaria, 15 Cogan R.S. Rooney, 16 Evan I. Suval, 17 Lindsay M. Reed, 19 Emily R. Marcy, and 20 | |

| # | Date | Proceeding Text | Source |
|---|------|----------------|--------|
| | | Taylor M. Sorrells. Dismas N. Locaria, Cogan R.S. Rooney, Evan I. Suval, Lindsay M. Reed, Emily R. Marcy, and Taylor M. Sorrells are hereby admitted pro hac vice to represent Plaintiff Inclusiv, Inc. in this matter. Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a) Click for instructions. Signed by Judge Tanya S. Chutkan on 4/7/2025. (lcer) (Entered: 04/07/2025) | |
| | 04/08/2025 | Payment for 20 MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Taylor M. Sorrells,  Filing fee $ 100. Fee Status: Fee Paid., 16 MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Evan I. Suval,  Filing fee $ 100. Fee Status: Fee Paid., 15 MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Cogan R.S. Rooney,  Filing fee $ 100. Fee Status: Fee Paid., 19 MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Emily R. Marcy,  Filing fee $ 100. Fee Status: Fee Paid., 17 MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Lindsay M. Reed,  Filing fee $ 100. Fee Status: Fee Paid., 14 MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Dismas N. Locaria,  Filing fee $ 100. Fee Status: Fee Paid.. ($100). (Johnson, Jay) (Entered: 04/08/2025) | |
| | 04/08/2025 | Payment for 14 MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Dismas N. Locaria,  Filing fee $ 100. Fee Status: Fee Paid.. ($100; Receipt number ADCDC-11598472). (Johnson, Jay) (Entered: 04/08/2025) | |
| | 04/08/2025 | Payment for 15 MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Cogan R.S. Rooney,  Filing fee $ 100. Fee Status: Fee Paid.. ($100; Receipt number ADCDC-11598484). (Johnson, Jay) (Entered: 04/08/2025) | |
| | 04/08/2025 | Payment for 16 MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Evan I. Suval,  Filing fee $ 100. Fee Status: Fee Paid.. ($100; Receipt number ADCDC-11598506). (Johnson, Jay) (Entered: 04/08/2025) | |
| | 04/08/2025 | Payment for 17 MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Lindsay M. Reed,  Filing fee $ 100. Fee Status: Fee Paid.. ($100; Receipt number ADCDC-11598515). (Johnson, Jay) (Entered: 04/08/2025) | |
| | 04/08/2025 | Payment for 19 MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Emily R. Marcy,  Filing fee $ 100. Fee Status: Fee Paid.. ($100; Receipt number ADCDC-11598524). (Johnson, Jay) (Entered: 04/08/2025) | |
| | 04/08/2025 | Payment for 20 MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Taylor M. Sorrells,  Filing fee $ 100. Fee Status: Fee Paid.. ($100; Receipt number ADCDC-11598539). (Johnson, Jay) (Entered: 04/08/2025) | |
| 21 | 04/08/2025 | Joint STATUS REPORT  by W.C. MCINTOSH, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN. (Sacks, Marcus) (Entered: 04/08/2025) | |
| 22 | 04/10/2025 | NOTICE of Appearance by Cogan Rooney on behalf of INCLUSIV, INC. (Rooney, Cogan) (Entered: 04/10/2025) | |
| | 04/10/2025 | MINUTE ORDER: Upon consideration of the parties' 21 Joint Status Report, briefing on Plaintiffs' 6 Motion for Preliminary Injunction is stayed until further order of the Court. To the extent the parties would like to proceed with the briefing, the parties shall confer and file a joint status report with an updated briefing schedule. The status report shall be accompanied by a proposed order. Signed by Judge Tanya S. Chutkan on 4/10/2025. (lcer) (Entered: 04/10/2025) | |
| 23 | 04/10/2025 | NOTICE of Appearance by Kevin Paul VanLandingham on behalf of W.C. MCINTOSH, UNITED STATES ENVIRONMENTAL | |

1:25cv948, Inclusiv, Inc. V. United States Environmental Protection Agency Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | PROTECTION AGENCY, LEE ZELDIN (VanLandingham, Kevin) (Entered: 04/10/2025) | |
| | 04/15/2025 | MINUTE ORDER: Pursuant to Federal Rule of Civil Procedure 42(a)(2), the court will consolidate this case with Case No. 25-cv-698, given the common questions of law and fact between both cases. The parties to this case may submit a Joint Status Report to the court within seven days of the courts decision on the preliminary injunction motions in Case No. 25-cv-698, setting forth whether there are any additional issues specific to Plaintiff Inclusiv, Inc. to address. All filings and papers related to the consolidated cases shall be filed in the lead case: 25-cv-698. Signed by Judge Tanya S. Chutkan on 4/15/2025. (lcer) (Entered: 04/15/2025) | |
| | 04/15/2025 | Cases Consolidated. This case has been consolidated with case 25-cv-00698-TSC pursuant to Order. From this date forward, all pleadings shall be filed ONLY in the lead case, 25-cv-00698-TSC. Parties are advised NOT to elect the SPREAD TEXT option when filing in ECF, as this will result in repetitive docketing. (zjm) (Entered: 04/15/2025) | |
| | 04/16/2025 | MINUTE ORDER: DENYING as MOOT Plaintiffs' 6 Motion for Preliminary Injunction. See Preliminary Injunction Order and forthcoming Memorandum Opinion in lead case No. 25-cv-698 for details. Signed by Judge Tanya S. Chutkan on 4/16/2025. (lcer) (Entered: 04/16/2025) | |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.
*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

**End of Document**

# Exhibit 1

**Civil Action No. 1:25-cv-00498**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| INCLUSIV, INC., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.,* <br><br> Defendants. | Civil Action No. 1:25-cv-00948 |

## DECLARATION OF NEDA ARABSHAHI

I, Neda Arabshahi, pursuant to 28 U.S.C. § 1746, do hereby state and declare as follows:

**A. Background**

1.  I am Executive Vice President of the Inclusiv Center for Resiliency and Clean Energy for Inclusiv, Inc. ("Inclusiv"). My business address is 39 Broadway, Suite 2140, New York, NY 10006-3063.

2.  I am competent to testify concerning matters in this declaration. In my role at Inclusiv, where I have worked since 2020, I led the development and submission of Inclusiv's application to the U.S. Environment Protection Agency's ("EPA") Clean Communities Investment Accelerator ("CCIA") program under the Greenhouse Gas Reduction Fund ("GGRF"). Since EPA's award of the CCIA grant to Inclusiv in 2024, I have led the implementation of Inclusiv's CCIA program as we proudly work toward the critical goal of

bringing lower cost, clean, and efficient energy to at least 900,000 of the most energy cost burdened households and small businesses across the country.

3.  I have dedicated the past 21 years to making it easier for people to have affordable energy; clean air, water, and food; fair wages; and economic independence. I deeply understand how skyrocketing and unpredictable energy prices can mean having to turn the heat off during freezing cold winters and the air conditioning off during deadly hot summers. I have also seen firsthand how dirty, polluting energy sources lead to higher levels of air pollution, and dangerous and expensive medical problems, such as higher rates of childhood asthma, and increased allergies.

4.  I hold two degrees from Yale University, an MBA and a Master of Environmental Science degree, both focused on clean energy. My research at Yale focused on the economic development benefits of renewable energy projects in low-income communities.

5.  In my 21 years of experience in the clean energy and sustainability space, I've served as Chief Operating Officer at two different energy startups, where I helped to create financing and access to clean energy and energy efficiency retrofits for low- and moderate-income building owners. I also led the energy program at a large nonprofit organization, where I partnered with public and private sector members to build commitments to low carbon energy solutions, including developing resilient electricity grids and solar workforce development. I trained multinational corporations in how to build ethics and

sustainability into their practices, and I worked for a global wind turbine man-
ufacturer that built wind power plants across the country.

**B. Inclusiv's History and Background**

6.  Inclusiv is a nonprofit organization and a U.S. Department of the Treas-
ury-certified Community Development Financial Institution ("CDFI").

7.  For fifty years, Inclusiv has supported a national network of credit un-
ions, which are member-owned financial cooperatives that are operated by res-
idents of the communities they serve.

8.  Inclusiv provides guidance, training, and investment capital to credit
unions, so they are able to strengthen local economies, reach and serve under-
banked individuals, promote affordable homeownership opportunities for low-
income and first-time homebuyers, support small business enterprises to spur
the creation of good jobs, and create access to affordable clean energy loans.

9.  Specifically, while at Inclusiv, I have led our Center for Resiliency and
Clean Energy, working in partnership with the University of New Hampshire,
to build and scale the nation's first Solar and Clean Energy Lending Training
and Technical Assistance Program for community lenders. Since 2020, through
our self-paced training courses and 22 instructor-led cohorts, we have trained
over 900 individuals from over 400 community-based financial institutions
that serve all 50 states, Washington DC, Puerto Rico, the US Virgin Islands
and Guam.  This includes 220 credit unions and cooperatives trained.  These
lenders have gone on to develop energy efficiency and renewable energy

lending programs designed to reduce energy costs, improve efficiency, and strengthen preparedness and resilience to extreme weather.

### C. Inclusiv's Partnerships with the Federal Government

10. As we stated in our CCIA application, Inclusiv has a strong track record of advancing federal government goals and objectives by leveraging its deep and long-standing relationships within the credit union movement.

11. Years before its CCIA award, Inclusiv developed extensive experience in pairing federal investments from the CDFI Fund with private impact capital. By leveraging CDFI funds to raise private capital, Inclusiv invested a total of $486 million directly into credit unions across the country. This work has allowed credit unions to extend loans to individuals who would otherwise be excluded from the financial mainstream, including first-time homebuyers and small business owners.

12. Inclusiv's work with the federal government in delivering financial products to communities includes several efforts during the first Trump administration, including:

    a. Inclusiv supported the U.S. Department of the Treasury's ("Treasury") Emergency Capital Investment Program ("ECIP"), which was implemented under the Coronavirus Aid, Relief, and Economic Security ("CARES") Act. In its ECIP work, Inclusiv assisted credit unions in leveraging federal investments to multiply their impact. Credit unions that participated in ECIP typically

raise $10 in deposits from their community members to fuel local lending for every $1 in federal investments.

b. Inclusiv assisted the U.S. Small Business Administration in enrolling and supporting community development credit unions in the Paycheck Protection Program ("PPP") to deliver capital to small businesses during the COVID-19 pandemic. Through these efforts, Inclusiv facilitated credit unions delivering almost $2 billion in PPP loans to small businesses, with an average loan size of $27,000.

c. Inclusiv teamed up with the University of New Hampshire's Carsey School of Public Policy, with support from the Trump U.S. Department of Energy, to design and deliver the nation's first solar lending training program for community lenders. The community lenders that completed this training program went on to finance thousands of solar projects, making affordable and clean solar power available to nearly 18,000 households.

**D. Inclusiv's CCIA Application**

13. On July 14, 2023, EPA published its Notice of Funding Opportunity ("NOFO") for the CCIA program.

14. The CCIA NOFO offered a $6 billion grant competition "to finance clean energy in low-income and disadvantaged communities while simultaneously building the capacity of community lenders that serve those communities. . . ." The CCIA competition would "provide grants to 2-7 hub nonprofits that will

provide funding and technical assistance to specific industry networks of public, quasi-public, not-for-profit, and nonprofit community lenders, supporting the goal that every community in the country has access to the capital they need to deploy clean technology projects in their homes, small businesses, schools, and community institutions." Such "community lenders could include community development financial institutions (including Certified Native CDFIs), credit unions, green banks, housing finance agencies, minority depository institutions, and other types of lenders."

15. Inclusiv meets the CCIA program "eligible recipient" requirements and was therefore to apply. An eligible recipient is defined as an organization that: (a) is a nonprofit; (b) is designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services; (c) does not take deposits other than deposits from repayments and other revenue received from financial assistance provided using grant funds under this program; (d) is funded by public or charitable contributions; and (e) invests in or finances projects alone or in conjunction with other investors.

16. In addition to meeting program eligibility requirements, given Inclusiv's background, including its unique status as a certified CDFI intermediary, decades of experience in providing technical and financial assistance to credit unions, years spent providing training and technical assistance to hundreds of community lenders in how to build clean energy financial products, and decades of experience working with the federal government to deliver tangible

economic benefits to communities across the country, Inclusiv soon determined it would apply for a CCIA grant.

17. Inclusiv dedicated considerable staff time during the three months following the NOFO's posting to prepare its CCIA application, which was submitted to EPA in October 2023. Our application included a fifty-four-page Project Narrative, a Project Narrative Attachments section containing hundreds of pages of supporting materials, such as 220 Letters of Interest from different credit unions across the country, stating they would plan to seek a subaward from Inclusiv, if Inclusiv received a CCIA award. These 220 credit unions are based in 37 states, the District of Columbia, and Puerto Rico.

18. Inclusiv understands first-hand the ability of credit unions in the U.S. to directly serve individuals and small businesses in every corner of the country. According to the federal government's National Credit Union Administration, as of December 31, 2024, there are 4,455 federally insured credit unions that provide direct banking services to 142.3 million Americans. These member-owned financial institutions collectively manage $2.31 trillion in community-owned assets. And, as regulated depositories, credit unions can leverage federal resources to increase local investment and economic growth. All of these credit unions may apply to Inclusiv's CCIA program. And Inclusiv is operating as a pass-through entity, delivering 90% of our CCIA award directly to credit unions, to help them create direct pathways that empower consumers and small businesses across the country to make their own energy choices to help them lower their energy bills.

19. In addition, to support credit unions so they are positioned to succeed in the CCIA program, Inclusiv is "expanding and scaling existing partnerships, as well as launching new partnerships, with community organizations, such as credit union leagues, green lending financial technology companies, financial coaching platforms, and academic and research institutions." This approach was reinforced in our CCIA application by 67 Letters of Support from national and regional community organizations that indicated their interest in partnering with Inclusiv on its CCIA program.

**E. Inclusiv's CCIA Award and Program Implementation**

20. On August 8, 2024, EPA awarded a CCIA prime grant to Inclusiv in the amount of $1.87 billion dollars. Importantly, 90% of these funds, or $1.683 billion will be directly passed through to credit unions across the country in the form of subawards. And these credit unions will use these grant funds to leverage their own institutional capital to make direct investments in communities across the country.

21. Leading up to the award, Inclusiv worked with EPA to finalize its Workplan and Budget to ensure the compliant deployment of the investment, ensure oversight and accountability, and maximize the impact of Inclusiv's CCIA program.

22. As memorialized in Inclusiv's EPA-approved Workplan and Budget, Inclusiv's CCIA program vision was based on hundreds of hours of specific and detailed engagements since 2020 with hundreds of community lenders that

demonstrated interest in creating affordable and equitable clean energy loan products for the communities they serve.

23. These credit unions applied to and completed Inclusiv's Solar and Green Lending Training and Technical Assistance Program that was developed in collaboration with the UNH Carsey School of Public Policy and with support from the DOE under the first Trump administration. After completing these courses, the credit unions had greater knowledge on clean capital financing, which was intended to facilitate efficient financial management practices. As a direct result of Inclusiv's technical support efforts, our network of credit unions reported investing $800 million in clean energy and energy efficiency loans—before Inclusiv was selected for its CCIA prime grant award.

24. Based on this work, these credit unions were well-positioned to leverage CCIA subawards with their own private institutional capital, to expand their existing lending programs and make clean energy financing available and accessible in their communities. The CCIA subawards would provide a significant capital infusion to support these efforts. Inclusiv expects that the up to 400 credit unions receiving Inclusiv's CCIA subawards will leverage $1.496 billion in CCIA Capitalization Funding, to deploy an additional $2.992 billion in private capital, resulting in $4.488 billion in total financial assistance to at least 900,000 CCIA-eligible energy projects—all of which will benefit households and small businesses nationwide. These subrecipients will also receive $187 million in Technical Assistance Subawards to enable them to build, manage, and report on their CCIA programs.

25. To date, Inclusiv has committed $651 million in subawards to 108 credit unions across the country to be part of just its first cohort of subrecipients. These credit unions are based in 27 states and Puerto Rico and provide direct banking services to more than 4.9 million Americans. They will leverage their CCIA subawards with their own institutional deposit capital to provide nearly $1.8 billion in new lending capital to homeowners and small businesses. These investments will make clean energy affordable, create jobs, and promote greater financial security within the communities the credit unions serve. The energy savings will allow Americans to reinvest their dollars elsewhere in the U.S. economy.

26. In addition to passing 90% of its CCIA award to credit unions in the form of subawards, Inclusiv will use the remaining 10% allocated to administrative costs and technical assistance services to invest in market-building activities that serve the nation. For example, Inclusiv will continue to expand its Solar and Green Lending Training and Technical Assistance program to train more than a thousand community lenders nationwide so they can leverage their own institutional deposit capital to grow their local clean energy markets. These training resources will be available to community lenders, whether or not they receive CCIA subawards.

27. Inclusiv is ensuring transparency and accountability in its use of CCIA funds in the following ways:

    a.  A compliance plan to ensure that every single dollar that Inclusiv receives from CCIA, including the 90% of dollars that are passed

through to credit unions, follow the strictest code of federal regulations (CFR) requirements in terms of financial and administrative processes and controls.

b. An accountability plan for credit union subrecipients, which affirmed that all subrecipients would be "regulated, fully insured depositories, subject to rigorous examination by prudential regulators", reviewed to ensure "that [credit union] management and staff act with the highest standards of integrity, fairness and transparency", and monitored by the annual reports, presented by the credit unions to their members and to their regulators, including "reports on financials, products and pricing determinations, internal audits and accountability to member goals."

c. A reporting plan using Inclusiv's proprietary Financial Inclusion Data Analytics Platform (FIDAP) to ensure visibility into each and every loan transaction that a credit union originates using CCIA fund. FIDAP is a software platform designed to ensure that credit unions meet the compliance requirements of federal grant dollars and has, to date, processed millions of loan transactions from credit unions all across the country. All credit unions receiving CCIA subawards are required to use FIDAP to report on their CCIA loan transactions.

d. A plan to satisfy the requirements in 2 C.F.R. § 300.329 by providing quarterly and final reports to the government on

subrecipients' ongoing performance under the program, detailed accounting on all grant expenditures, organization financial statements and disclosures, and information on Inclusiv's past performance and reporting compliance in the 80 federal and non-federal financial assistance agreements that it has successfully completed and managed.

e. A Financial Policies and Procedures Plan, which complied with the requirements set forth at 2 C.F.R. § 200.302, specifying "that all Inclusiv personnel comply with Generally Accepted Accounting Principles (GAAP), maintain effective systems of control to safeguard assets and monitor compliance with policies established by management and details the procedures by which the fiscal and accounting departments properly identify the sources and application of **all** funds (from federal awards or not), exhibiting effective control over and accountability for all assets, ensuring they are used only for authorized purposes, creating and monitoring budget-to-actual reporting, and the use of written procedures for Federal payments and the allowability of costs."

## F. Inclusiv's Grant Agreement and Modification

28. On August 8, 2024, EPA's CCIA award to Inclusiv was memorialized in Notice of Award No. 84094301 ("NOA"), which was executed by both EPA and Inclusiv. The NOA set a period of performance from April 1, 2024 to June 30, 2030. The total amount of the award was $1,870,000,000.

29. In the NOA's Project Description, Inclusiv was required to use the awarded funds to "provide funding and technical assistance to community lenders who will in turn finance clean technology deployment in low-income and disadvantaged communities while simultaneously building the capacity of the community lenders to draw on that capital to catalyze deployment of projects in communities across the country"—particularly in underserved communities.

30. The NOA acknowledged Inclusiv's extensive experience in this field: "Inclusiv is uniquely positioned as a hub nonprofit to enable this vast network of community lenders to finance clean technology projects in building retrofits, transportation, and distributed energy that support affordability and impact in low-income and disadvantaged communities, in perpetuity."

31. On December 19, 2024, EPA issued Modification No. 1 to the NOA (the "Modification." This Modification, which was issued unilaterally by EPA without incorporating any revisions proposed by Inclusiv, consisted of the following revisions to the initial award document:

 a. Section III(S)(3), which addresses EPA's termination rights under the Agreement, was modified to state that "EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.3339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the non-compliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is

adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination."

b. Section V(A) was revised due to the September 2024 designation of Citibank, N.A. ("Citibank") as a financial agent of the U.S. Specifically, this resulted in the inclusion of several terms related to the deposit accounts to be established by Inclusiv and its subrecipients at Citibank.

32. In follow up to the Modification, Inclusiv worked with EPA to make relevant updates to its Workplan and Budget to ensure the compliant deployment of the investment, ensure oversight and accountability, and maximize the impact of Inclusiv's CCIA program.

**G. Inclusiv's Implementation of its CCIA Program**

33. From the time of the award to this day, Inclusiv has worked with EPA to maintain open lines of communication and facilitate EPA's visibility into Inclusiv's activities under its CCIA program. In this effort, Inclusiv and EPA have attended scheduled calls each week so Inclusiv can apprise EPA of any updates to its implementation efforts.

34. On November 19, 2024, Inclusiv opened its pre-qualification form for credit unions. It received an overwhelming response of submissions from more than 250 credit union across the U.S. and in U.S. territories. Inclusiv informed its EPA grant managers during its weekly call on December 19, 2024 that it received 254 pre-qualification submissions from credit unions.

35. After a thoughtful review of all 254 applications, on December 26, 2024, Inclusiv sent out pre-qualification confirmation notices to selected credit unions.

36. On January 6, 2025, Inclusiv launched its full application period, with its first application round deadline of January 17, 2025. Inclusiv notified its EPA grants managers of this progress during the weekly calls on January 7 and January 16, 2025.

37. Once the application period had begun, Inclusiv continued to maintain open lines of communication with its EPA grants managers at all stages of the process during weekly calls, *e.g.*:

    a. On January 23, 2025, during a weekly call, Inclusiv alerted EPA that its independent application review process was underway.

    b. On January 30, 2025, during a weekly call, Inclusiv informed EPA that it was finalizing its application review and expected to finalize its scoring.

    c. On February 6, 2025, during a weekly call, Inclusiv told EPA that it was finalizing its preliminary list of subrecipients and that it would provide the full list of first cohort subrecipient credit unions.

38. Inclusiv undertook a diligent application and evaluation process to ultimately choose 108 subrecipient credit unions in 27 states and Puerto Rico to be part of its first cohort, which would use $651 million in CCIA funding to offer homeowners and small businesses affordable clean energy financing,

create jobs, and promote greater financial security within the communities served.

39. On February 12, 2025, Inclusiv chose its first group of 64 subrecipients and on the same date provided written notice to its EPA grants managers and EPA's Office of the Greenhouse Gas Reduction Fund ("OGGRF"). The written notices to EPA provided full breakdowns of all subrecipient credit unions' names, locations, and award amounts.

40. On February 12, 2025, Inclusiv also provided Subaward Notice Letters to the 64 individual subrecipient credit unions in the first group, These Subaward Notice Letters included each subrecipient's award amount and detailed instructions for the forthcoming Contracting Phase.

41. Inclusiv finalized the second group of 44 subrecipients on February 14, 2025, and, again, duly provided written notice to its EPA grants managers and the OGGRF.

42. On February 14, 2025, Inclusiv also provided the Subaward Notice Letters to the second group of 44 subrecipient credit unions.

43. All 108 subrecipient credit unions signed and returned their Subaward Notice Letters, thus committing to the funding and their individual CCIA subrecipient programs.

44. On February 19, 2025, and February 26, 2025, Inclusiv held two Welcome Webinars for all 108 subawardees, and initiated the Contracting Phase to eventually finalize their subaward agreements.

45. This initial cohort of 108 subrecipient credit unions provide direct banking services to more than 4.9 million Americans in 27 states and Puerto Rico, leveraging CCIA funds to invest additional private capital in communities burdened by high energy costs to generate a projected $1.8 billion in new lending capital and allow Americans to reinvest their energy savings elsewhere in the U.S. economy.

46. The CCIA funding will also allow credit unions to expand their affordable loan offerings so that Americans who seek out their loans have the autonomy to select the types of energy upgrades and vehicle upgrades they need most for their households and for their businesses. These may include heating and cooling systems, solar panels, back up battery storage, energy-efficient appliances, energy efficiency home improvements, electric vehicle charging stations, and electric vehicles, ultimately helping U.S. households and small businesses lower their energy costs. This new stream of financing will have a ripple effect in communities across the nation, as energy upgrades are performed and contractors, developers, and manufacturers are employed to carry out the projects.

## H. Account Control Agreement with EPA and Citibank

47. On September 19, 2024, the U.S. Treasury entered into a Financial Agent Agreement with Citibank, which tasked Citibank with responsibility to disburse $20 billion in GGRF funds under EPA's CCIA and National Clean Investment Fund ("NCIF") programs.

48. On November 6, 2024, Inclusiv and EPA entered into an Account Control Agreement with Citibank.

49. As required by the December 19, 2024 Modification, Inclusiv was required to open a deposit account at Citibank, to be used as its operating account for the entire CCIA award. Once the deposit account was established, Inclusiv was required to draw down the entire available EPA award balance from Automated Standard Application for Payments ("ASAP") system and disburse it into the deposit account at Citibank, where it was required to be maintained until the Closeout Agreement went into effect.

50. The Modification also required that Subrecipients open and maintain their own deposit accounts with Citibank to use as their subaward operating accounts for the duration of their subawards.

### I. EPA and Citibank's Freeze on Inclusiv's CCIA Funds

51. Beginning in early February 2025, while EPA was still conducting its regularly scheduled meetings with Inclusiv, the new EPA Administrator, Lee Zeldin, began making various public statements expressing concerns about the GGRF program and awards made by EPA under the Biden administration, which culminated in a February 12 announcement by Zeldin that EOA wanted to claw back all GGRF grants. EPA never expressed these concerns to Inclusiv.

52. Between February and March 2025, all GGRF funds held by Citibank were frozen, and Inclusiv, like recipients and subrecipients across all the GGRF programs, had its access to its awarded and obligated CCIA funds

suspended. When Inclusiv sought guidance from EPA on the freeze of its awarded and obligated grant funds, EPA provided no answer.

53. Critically, as part of the Contracting Phase that began on February 19, 2025, Inclusiv and Citibank were to provide co-guidance to Inclusiv's subrecipients on opening their own accounts with Citibank. Citibank has refused to allow any of Inclusiv's 108 subrecipients to open their accounts. Because of this, Inclusiv was forced to temporarily suspend its Contracting Phase on March 6, 2025, which we announced to our 108 subrecipients in writing that day.

54. As of today, none of the funds legally committed to Inclusiv's subrecipients have been disbursed.

### J. EPA's Termination of Inclusiv's CCIA Award

55. On March 11, 2025, Inclusiv received a letter from EPA purporting to terminate its CCIA award (the "Termination Letter") ("Exhibit 12").

56. The Termination Letter stated that pursuant to EPA's "authority under 2 C.F.R. §§ 200.339-40, the General Terms and Conditions of EPA assistance award agreements, the terms and conditions of the Grant Agreement, and the Agency's inherent authority to reconsider prior determinations in light of new information, the Agency is terminating Grant Agreement No. 84094301, awarded to Inclusiv, Inc. under the Greenhouse Gas Reduction Fund ("GGRF"), effective immediately."

57. However, this purported Termination Letter did not identify any proven "new information."

58. Further, the Termination Letter indicated that the decision to terminate was "based on substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities, which collectively undermine the fundamental goals and statutory objectives of the award."

59. The Termination Letter did not make any specific allegations of fraud, waste, or abuse by Inclusiv. Nor did it articulate any specific conduct by Inclusiv supporting the termination of its grant. Rather, the Termination Letter cited "material deficiencies" apparently uncovered by a "comprehensive review," as well as its concerns about "rigorous oversight and accountability," and a lack of "sufficient protections" against "potential violations of the Constitution."

60. EPA has not completed a comprehensive review of our CCIA program, nor has it identified specific material deficiencies.

61. In addition, EPA has not specified a single concern identifying specific issues with rigorous oversight and accountability.

62. And it certainly has not been made clear what the lack of sufficient protections against potential violation of the Constitution might be.

63. The Termination Letter stated that it was terminating the grant award "in accordance with" the grant agreement.

64. The Termination Letter did not provide Inclusiv with any procedural right to seek alternatives to or challenge its termination under the applicable

grant regulations. On multiple occasions, Inclusiv has invited the EPA Administrator's Office to discuss Inclusiv and its CCIA program, to no avail.

### K. Harms Suffered by Inclusiv

65. Inclusiv's business model is largely based not only on the membership dues paid by its member credit unions, but also on the goodwill and trust of the members. The widely publicized statements made by EPA and Zeldin disparaging the GGRF and the recipients of its programs as unscrupulous has seriously threatened Inclusiv's relationships with its member credit unions.

66. The termination would also disrupt Inclusiv's established relationships with its 108 subrecipient credit unions, each of which went through a rigorous and lengthy application and review process, along with diverting staff members to attend onboarding and technical trainings, in order to receive CCIA subawards. These wasted efforts have harmed Inclusiv's reputation with these subrecipients and their confidence in Inclusiv, and many are likely to sever their business relationships with Inclusiv as a result.

67. Inclusiv has also fostered decades-long relationships with leaders within low-income and disadvantaged communities, who because of the EPA's false allegations concerning Inclusiv's conduct, will be less likely to continue to work with Inclusiv. The severing of these long-standing relationships will harm Inclusiv's furtherance of its organizational mission of empowering and supporting low-income and disadvantaged communities.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 31, 2025


_/s/ Neda Arabshahi_

Neda Arabshahi

New York, New York

# Exhibit 2

**Civil Action No. 1:25-cv-00498**

JA1990

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| INCLUSIV, INC., <br><br>         Plaintiff, <br><br>   v. <br><br> UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.,* <br><br>         Defendants. | Civil Action No. <br> 1:25-cv-00948 |

### DECLARATION OF JOHN STOTT LAWSON

I, John Stott Lawson, pursuant to 28 U.S.C. § 1746, do hereby state and declare as follows:

**A. Background**

1. I am President and Chief Executive Officer for Clearwater Federal Credit Union (Clearwater). My business address is 3600 Brooks Street, Missoula, Montana, 59801.

2. I am competent to testify concerning matters in this declaration. In my role at Clearwater, I report to a Board of Directors to set strategy, risk tolerances, and annual budgets, manage an executive team to implement strategy, risk tolerances, and budgets, represent the organization publicly, and interface with community stakeholders, elected officials, and regulators.

3. I have broad-based experience working in the credit union industry having worked at senior management levels in both urban and rural environments spanning New York City, California, and Montana.

**B. Clearwater's History and Background**

4.   For nearly seven decades, Clearwater has worked to be a positive force in the lives of our members and in the communities we serve, with membership now totaling 63,878 people and small businesses.  We anchor our efforts in our four core values: inclusion, empowerment, ownership, and impact.

5.   Clearwater is Montana's largest Community Development Financial Institution (CDFI), providing tailored financial solutions to communities and members in 37 of Montana's 56 counties.

6.   Clearwater serves some of the state's most vulnerable populations.  The communities we serve face significant challenges, and include rural areas with limited banking options, low-income households with fewer resources for financial emergencies, and historically underserved populations such as Native American communities across multiple reservations.

**C. Clearwater's CCIA Grant Application Process**

7.   Clearwater has been a member of Inclusiv's network of community development credit unions since 2014.

8.   Clearwater first learned about Inclusiv's Clean Communities Investment Accelerator (CCIA) grant in Fall 2024. Soon after, Clearwater decided to apply for a CCIA grant from Inclusiv.

9.  Following Inclusiv's written guidance, Clearwater started its application process by submitting a prequalification form. Inclusiv informed Clearwater that it was pre-qualified for a grant in December 2024.

JA1992

10. Because Clearwater pre-qualified for a CCIA grant from Inclusiv, it was automatically eligible to attend the University of New Hampshire's Solar and Green Lending Training and Technical Assistance Program. Our Clean Energy Lending Manager, Jess Dahlen, attended the training on behalf of Clearwater.

11. Over the months that followed, Clearwater put together its formal grant application for Inclusiv. From training to data collection through to drafting lending plans, proposal narratives, and budgets, Clearwater staff invested approximately 195 hours into the application. Clearwater submitted its application on January 17, 2025.

12. On February 18, 2025 Clearwater learned that Inclusiv had awarded it an $11 million CCIA grant.

**D. Clearwater's Plans for CCIA Grant Funds**

13. Clearwater will use CCIA grant funds to build upon our existing clean energy lending program—the only program of its kind offered by any credit union, bank, or loan fund in Montana.

14. Through this program, Clearwater originated more than $8.4 million in clean energy loans to low-income or disadvantaged communities in 2024 alone. Roughly half of these funds went directly to low-income borrowers, and the flexible loan terms are designed to be accessible for borrowers across all credit tiers. The program includes loans for home solar installations, energy efficiency improvements, and electric vehicles.

3

15. With CCIA grant funds, Clearwater will expand our clean energy lending to create lasting environmental and economic benefit for Montana's most vulnerable populations.

16. Clearwater plans to do so by reducing interest rates for qualified borrowers, developing new loan products for affordable housing retrofits and third-party solar ownership models, and strengthening partnerships with mission-aligned organizations throughout Montana.

17. These enhancements will directly help community members reduce greenhouse gas emissions, lower their energy costs, and improve health and safety conditions.


I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 28, 2025


*/s/ John Stott Lawson*

John Stott Lawson

Missoula, Montana

4

# Exhibit 3

**Civil Action No. 1:25-cv-00498**

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Inclusiv, Inc., <br><br> Plaintiff, <br><br> v. <br><br> U.S. Environmental Protection Agency, et al. <br><br> Defendants. | Civil Action No. 1:25-cv-00948 <br><br><br> Declaration of Jared Freeman |

I, Jared Freeman, pursuant to 28 U.S.C. § 1746, do hereby state and declare as follows:

**A. Background**

1. I am the President/CEO for OnPath Federal Credit Union ("OnPath"). My business address is 3131 N. I-10 Service Road E., Metairie, Louisiana 70115.

2. I am competent to testify concerning matters in this declaration. In my role at OnPath, I lead a team of dedicated professionals who are committed to providing exceptional financial services and solutions to our members and communities. With over 15 years of experience in the credit union industry, I have developed a deep understanding of the challenges and opportunities facing our sector, and a passion for advancing our mission and values.

3. I attended the University of Mobile from 2006 to 2010, earning a Bachelor of Science in Finance, followed by an MBA in 2011. I first joined the credit

union movement in 2005 with Guardian Credit Union, where I served many roles ending in my position as Chief Operations Officer. From there, I went on to lead ASE Credit Union as President and Chief Executive Officer before making a move to Leaders Credit Union, where I held the role of Chief Experience Officer. In August 2020, I was named President/CEO of OnPath Federal Credit Union. My core competencies include strategic planning, financial management, problem solving, and innovation. I have successfully implemented multiple initiatives to enhance our growth, performance, and member satisfaction, such as launching new products, expanding our digital channels, and strengthening our partnerships.

**B. OnPath's History and Background**

4. OnPath FCU began as ASI Federal Credit Union in 1961, serving the hardworking employees of Avondale Shipyards. Over the decades, the credit union has grown to nearly 85,000 members across South Louisiana. In 2019, it rebranded as OnPath, symbolizing its commitment to guiding its members toward financial success. Building on the recent merger with Louisiana FCU in 2024, OnPath has set its sights on creating even greater opportunities for its members and the communities it serves - momentum that will continue with the upcoming core conversion in Summer 2025, laying the groundwork for deeper integration, enhanced services, and long-term growth.

OnPath has a long-standing commitment to improving the financial well-being of individuals and businesses through its mission to be financial

advocates for its members and the community it serves. Through its strategic vision and dedication to member financial advocacy, OnPath has made a significant impact by providing accessible financial solutions, financial education, and tailored products that empower individuals and businesses alike. The success of the recent merger has further solidified OnPath's ability to provide enhanced services, a broader geographic reach, and a more robust support system for its growing member base.

As OnPath continues its journey of transformational growth, the organization is expanding its reach and impact, strengthening its position as a trusted financial partner. While focusing on this growth, the credit union remains committed to deepening relationships with existing members, ensuring they receive the support and services needed to thrive.

5. OnPath's mission is to be a financial advocate for our members and the communities we serve.

6. OnPath is committed to providing accessible financial services to individuals and families who are often overlooked by traditional banking institutions.

7. Serving 84,700 members across Louisiana, OnPath uses an inclusive approach that addresses historical economic disparities and systemic barriers that have caused some of Louisiana's most vulnerable individuals to receive limited access to affordable financial resources.

JA1998

8. OnPath's focus also extends to immigrant communities navigating unfamiliar financial systems.

### C. OnPath's CCIA Grant Application Process

9. OnPath has been a longstanding member of Inclusiv's network of community development credit unions.

10. OnPath first learned about Inclusiv's Clean Communities Investment Accelerator (CCIA) grant in Fall 2024. Soon after, OnPath decided to apply for a CCIA grant from Inclusiv.

11. Following Inclusiv's written guidance, OnPath started its application process by submitting a prequalification form. Inclusiv informed OnPath that it was pre-qualified for a grant in February 2024.

12. Because OnPath pre-qualified for a CCIA grant from Inclusiv, it was automatically eligible to attend the University of New Hampshire's Solar and Green Lending Training and Technical Assistance Program. Over the months that followed, OnPath put together its formal grant application for Inclusiv. Members of the OnPath leadership team participated in the 2024 kickoff conference and discussion, followed by formal training that began in the third quarter and concluded at the start of the fourth quarter. Each session lasted approximately one to two hours. OnPath submitted its application on or about January 17, 2025.

13. On February 18, 2025 OnPath learned that Inclusiv had awarded it an $11 million CCIA grant.

4

**D. OnPath's Plans for CCIA Grant Funds**

14. OnPath will use these grant funds to relaunch and expand our clean energy lending program.

15. OnPath will use funds to revitalize our successful solar lending initiative with enhanced offerings. OnPath will use the funding primarily as loan loss reserves, allowing us to extend larger unsecured loans for solar installations, including systems with battery backup.

16. OnPath will also use funds to expand into energy efficiency home enhancements, appliance replacement loans, and financing for fully electric, zero-emission vehicles.

17. The CCIA funds will thus have a transformative impact on the communities OnPath serves. With access to affordable financing options for clean energy products, OnPath members will see reduced utility costs, increased energy independence, and improved living conditions.

18. The funds will also help OnPath ensure that clean energy solutions are accessible to those for whom such solutions would not be otherwise. This will contribute to the breaking of generational poverty cycles in these communities and the creation of pathways to financial stability for underserved populations.

5

JA2000

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 28, 2025

Jared Freeman

Metairie, Louisiana

6

# Exhibit 4

**Civil Action No. 1:25-cv-00498**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

INCLUSIV, INC.,

               Plaintiff,

    v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, *et al.,*

            Defendants.

Civil Action No.
1:25-cv-00948

## DECLARATION OF GREG HANSHAW

I, Greg Hanshaw, pursuant to 28 U.S.C. § 1746, do hereby state and declare as follows:

**A. Background**

1. I am President & CEO for Community 1st Credit Union (Community 1st).  My business address is 1100 Hutchinson Ave, Ottumwa, Iowa  52501.

2. I am competent to testify concerning matters in this declaration.  In my role at Community 1st, I am responsible for overseeing the day-to-day operations and ensuring the credit union's continued vitality and success, including the planning and implementation of all programs, policies, and procedures.  I am also responsible to provide strategic and/or administrative direction and management in all credit union functions including: accounting, ALM, business development, compliance, facility management, finance, human resources, investments, lending, marketing, operations, retail services, risk management, and security.

3.  Additionally, as President & CEO, I am responsible to develop, recommend, and implement financial policies and procedure, as well as for ensuring that the credit union follows the federal laws and regulations set forth by the National Credit Union Administration and other State and Federal regulatory agencies.

4.  I have been with the credit union for more than 13 years, and have served in the CEO role for more than 9 years.  Prior to coming to the credit union, I was a Human Resources professional serving as the Director of HR for a large manufacturer for 15 years.

### B. Community 1st's History and Background

1.  Community 1st is dedicated to improving the lives of our more than 70,000 members by serving as their trusted financial partner.

2.  Community 1st is deeply rooted in communities across Iowa and Missouri, serving a population in which 46% of households earn less than $35,000 annually, 19% live below the poverty line, and 20% receive public assistance.

3.  Community 1st is a certified Community Development Financial Institution (CDFI) that specializes in providing financial products that meet the needs of underserved, low-income, and unbanked households.

4.  Community 1st has a successful track record of creating specialized programs that make a real difference in the financial lives of our members, including those in the most vulnerable communities.  Examples include our Payday Alternative Loans and First-Time Home Buyers' Down Payment Assistance.

2

JA2004

5.  Community 1st takes a comprehensive approach to serving our members, which includes financial coaching, education programs, and collaborations with local partners in clean energy.  This approach ensures that members receive the support they need as they pursue clean energy options.

### C. Community 1st's CCIA Grant Application Process

6.  Community 1st has been a member of Inclusiv's network of community development credit unions since 2016.

7.  Community 1st first learned about Inclusiv's Clean Communities Investment Accelerator (CCIA) grant in Fall 2024.  Soon after, Community 1st decided to apply for a CCIA grant from Inclusiv.

8.  Following Inclusiv's written guidance, Community 1st started its application process by submitting a prequalification form.  Inclusiv informed Community 1st that it was pre-qualified for a grant in December, 2024.

9.  Because Community 1st pre-qualified for a CCIA grant from Inclusiv, it was automatically eligible to attend the University of New Hampshire's Solar and Green Lending Training and Technical Assistance Program,  which is currently being attended by our VP of Consumer Lending.

10. Over the months that followed, Community 1st put together its formal grant application for Inclusiv.  The application process took approximately 4 weeks to complete, and Community 1st submitted its application on January 17, 2025.

11. On February 18, 2025 Community 1st learned that Inclusiv had awarded it an $5.5 million CCIA grant.

3

JA2005

**D. Community 1st's Plans for CCIA Grant Funds**

12. Community 1st will use CCIA grant funds to design, launch, and support a comprehensive clean energy lending program. This program will be tailored specifically for low-income and disadvantaged communities.

13. The program will offer competitive loan rates, reasonable terms, minimal fees, and simplified qualification criteria for members investing in clean energy solutions.

14. With the funding, members will gain access to affordable financing for energy-efficient appliances, heat pumps, solar panels, electric vehicles, and other clean energy products that would otherwise be financially unattainable.

15. As a result, the grant funding will have a transformative impact on the communities that Community 1st serves by breaking down barriers to clean energy adoption, which will allow members to reduce energy costs while contributing to environmental sustainability.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 31, 2025

   */s/ Greg Hanshaw*

Greg Hanshaw

Ottumwa, Iowa

4

JA2006

# Exhibit 5

**Civil Action No. 1:25-cv-00498**

JA2007

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

INCLUSIV, INC.,

                Plaintiff,

    v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, *et al.,*

           Defendants.

Civil Action No.
1:25-cv-00948

## DECLARATION OF RICARDO LEDEZMA

I, Ricardo Ledezma, pursuant to 28 U.S.C. § 1746, do hereby state and declare as follows:

### A. Background

1. I am President and Chief Executive Officer for Soarion Federal Credit Union (Soarion). My business address is 1560 Cable Ranch Road, Suite 200, San Antonio, Texas 78245.

I am competent to testify concerning matters in this declaration. In my role at Soarion, I oversee the strategic direction, operational management, and overall success of the organization. I serve as the highest-ranking executive, reporting directly to the Board of Directors, and take on the responsibility of ensuring that our credit union fulfills its mission. My focus is on empowering our members with simplified financial solutions while also strengthening the community we serve.

2.  Over the past 25 years in the industry, I have worked in every area of bank and credit union operations. In 2016, Director Richard Cordray nominated me to serve on the Consumer Financial Protection Bureau (CFPB) Advisory Council, and I was nominated again in 2017 by Mick Mulvaney. During my time there, I advocated for and helped design regulations to support Low-Income and Underserved Financial Services. As a values-conscious entrepreneur, I believe in creating products and services that make a positive impact on society and the environment while remaining financially sustainable—essentially, "doing well by doing good."

**B. Soarion's History and Background**

3.  Founded by servicemen at Lackland Airforce Base in 1952, Soarion focuses on fostering stronger communities and illuminating paths to brighter futures for the individuals and families we serve. From our humble beginnings, Soarion has grown into a financial institution that empowers more than 55,000 members through simplified financial solutions.

4.  Soarion serves a diverse population, focusing on low-income and historically underserved communities in the San Antonio, Texas area.

5.  Many residents in these communities face significant economic challenges, to include lower-than-average median household incomes, limited access to affordable credit, and higher poverty rates compared to national averages.

JA2009

6.  In these financial deserts, residents often face no other option than to rely on high-cost alternatives like payday lenders, which can perpetuate cycles of financial hardship.

7.  Soarion works to ensure households in these communities can build resiliency without facing prohibitive costs or high interest rates.

8.  For example, Soarion's home improvement financing program, HomeX, helps homeowners protect and enhance valuable assets while also supporting local contractors.

**C. Soarion CCIA Grant Application Process**

9.  Soarion has been a member of Inclusiv's network of community development credit unions since August 2024.

10. Soarion first learned about Inclusiv's Clean Communities Investment Accelerator (CCIA) grant in Fall 2024. Soon after, Soarion decided to apply for a CCIA grant from Inclusiv.

11. Following Inclusiv's written guidance, Soarion started its application process by submitting a prequalification form. Inclusiv informed Soarion that it was pre-qualified for a grant in December 2024.

12. Because Soarion pre-qualified for a CCIA grant from Inclusiv, it was automatically eligible to attend the University of New Hampshire's Solar and Green Lending Training and Technical Assistance Program.

13. Over the months that followed, Soarion put together its formal grant application for Inclusiv. Completing this application was a two-month effort, during which we gathered essential documentation and thoughtfully

3

articulated our strategic vision for using the funds to create meaningful, last-ing impact in our community. Soarion submitted its application on 01/17/2025.

14. On February 18, 2025, Soarion learned that Inclusiv had awarded it an $11 million CCIA grant.

**D. Soarion's Plans for CCIA Grant Funds**

15. Soarion will use CCIA grant funds to build upon HomeX, our existing home improvement financing program.  With the funds, Soarion will add a clean energy component to this program by offering loans to support clean en-ergy and energy efficiency projects.  Such projects include solar installations, energy-efficient HVAC systems, and electric vehicles.

16. The funds will allow Soarion to offer interest rates significantly more competitive than those provided by for-profit lenders.

17. This will ensure that financing remains accessible and affordable for low-income families.  It will also reduce financial barriers that often prevent these households from being able to undertake energy-efficient upgrades.

18. The impact will reach beyond immediate financial benefits.  Members will see reduced utility bills and enhanced home values.  The environmental sustainability of their communities will be strengthened.  Their quality of life will improve.

19. Without the CCIA grant, Soarion Credit Union will face significant lim-itations in our ability to scale clean energy financing solutions for the low-in-come and disadvantaged communities we serve. The absence of this funding would slow the development of accessible loan products aimed at reducing

household energy costs, improving home resilience, and lowering environmental impact. It would also limit our capacity to partner with local contractors and community organizations that are critical to delivering these solutions equitably.

More broadly, our community would miss a transformative opportunity to participate in the clean energy transition—an opportunity that not only supports environmental sustainability but also economic mobility. Without this grant, families already burdened by high energy bills and aging infrastructure may continue to fall behind, deepening existing inequities rather than closing the gap.

JA2012

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 31, 2025

  _/s/ Ricardo Ledezma_

RICARDO LEDEZMA

Soarion Federal Credit Union

San Antonio, Texas

# Exhibit 7

**Civil Action No. 1:25-cv-00498**

5J - 84094301 - 1    Page 1

| | | GRANT NUMBER (FAIN): 84094301 | |
|---|---|---|---|
| **U.S. ENVIRONMENTAL PROTECTION AGENCY**  Assistance Amendment | | MODIFICATION NUMBER: 1  PROGRAM CODE: 5J | **DATE OF AWARD**  12/19/2024 |
| | | **TYPE OF ACTION**  No Cost Amendment | **MAILING DATE**  12/19/2024 |
| | | **PAYMENT METHOD:**  ASAP | **ACH#** |

| **RECIPIENT TYPE:**  Not for Profit | **Send Payment Request to:**  Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| **RECIPIENT:**  INCLUSIV, INC  39 BROADWAY, SUITE 2140  NEW YORK, NY 10006-3051  EIN:  11-2421972 | **PAYEE:**  INCLUSIV, INC  39 BROADWAY, SUITE 2140  NEW YORK, NY 10006-3051 |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Neda Arabshahi  INCLUSIV, INC  39 BROADWAY SUITE 2140  NEW YORK, NY 10006-3051  **Email:** narabshahi@inclusiv.org  **Phone:** 212-809-1850 | Andrew Wynne  11201 Renner Blvd.  Lenexa, KS 66219  **Email:** wynne.andrew@epa.gov  **Phone:** 202-565-0069 | ThuyT Nguyen  1200 Pennsylvania Ave., NW 3903R  Washington, DC 20460-0001  **Email:** Nguyen.Thuyt@epa.gov  **Phone:** 202-564-5312 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

GGRF CCIA: Inclusiv Clean Communities Investment Accelerator

This amendment updates all terms and conditions.

| **BUDGET PERIOD**  04/01/2024 - 06/30/2030 | **PROJECT PERIOD**  04/01/2024 - 06/30/2030 | **TOTAL BUDGET PERIOD COST**  $ 1,870,000,000.00 | **TOTAL PROJECT PERIOD COST**  $ 1,870,000,000.00 |
|---|---|---|---|

### NOTICE OF AWARD

Based on your Application dated 10/11/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 1,870,000,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants Management & Business Operations Division  1200 Pennsylvania Ave, NW Mail code 3903R  Washington, DC 20460 | Environmental Protection Agency, OGGRF  OA - Office of the Administrator  1200 Pennsylvania Ave., NW  Washington, DC 20460 |

**THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY**

| Digital signature applied by EPA Award Official for Phillip Schindel - Chief, Business Operations Branch  by Katherine Tsing-Choy - Award Official Delegate | **DATE**  12/19/2024 |
|---|---|

5J - 84094301 - 1    Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| **EPA Amount This Action** | $ 1,870,000,000 | $ 0 | $ 1,870,000,000 |
| **EPA In-Kind Amount** | $ 0 | $ 0 | $ 0 |
| **Unexpended Prior Year Balance** | $ 0 | $ 0 | $ 0 |
| **Other Federal Funds** | $ 0 | $ 0 | $ 0 |
| **Recipient Contribution** | $ 0 | $ 0 | $ 0 |
| **State Contribution** | $ 0 | $ 0 | $ 0 |
| **Local Contribution** | $ 0 | $ 0 | $ 0 |
| **Other Contribution** | $ 0 | $ 0 | $ 0 |
| **Allowable Project Cost** | $ 1,870,000,000 | $ 0 | $ 1,870,000,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.960 - Greenhouse Gas Reduction Fund: Clean Communities Investment Accelerator | Clean Air Act: Sec. 134(a)(2) and (3) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

JA2016

5J - 84094301 - 1    Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 71,136,436 |
| 2. Fringe Benefits | $ 21,340,927 |
| 3. Travel | $ 1,569,109 |
| 4. Equipment | $ 50,000 |
| 5. Supplies | $ 1,330,638 |
| 6. Contractual | $ 62,518,056 |
| 7. Construction | $ 0 |
| 8. Other | $ 1,695,199,338 |
| 9. Total Direct Charges | $ 1,853,144,504 |
| 10. Indirect Costs: 10.00 % Base de minimis MTDC | $ 16,855,496 |
| 11. Total (Share: Recipient ___0.00 % Federal _100.00 %) | $ 1,870,000,000 |
| 12. Total Approved Assistance Amount | $ 1,870,000,000 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 1,870,000,000 |

JA2017

5J - 84094301 - 1    Page 4

## Administrative Conditions

### A. General Terms and Conditions

The Recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2024-or-later. These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

### B. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA. Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist listed on the award
- MBE/WBE reports (EPA Form 5700-52A):  Debora Bradford (Bradford.Debora@epa.gov), OMS-OGD-MBE_WBE@epa.gov, and the EPA Grants Specialist listed on the award
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to Recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Grants Specialist listed on the award and EPA Project Officer listed on the award
- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer listed on the award

### C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a Recipient intends to provide Capitalization Funding to a Community Lender to support CCIA-Eligible Project(s) that involves construction or land use planning. With the exception of CCIA-Eligible Projects that will be carried out in the State of California, the Recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the CCIA-Eligible Project(s) contained in the application for funding for the project and provide comments to the EPA Project Officer. CCIA-Eligible Project(s) that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

EPA has allowed for an intergovernmental review comment period on behalf of the Recipient. This comment period closed on Tuesday October 22, 2024. The Recipient need not take any additional action with respect to intergovernmental review.

The Recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

5J - 84094301 - 1    Page 5

## D. Pre-Award Costs

As provided in 2 CFR 200.458, Recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a Recipient incurs after EPA has notified the Recipient that its application has been selected for award consideration. The pre-award costs must be included in the workplan and budget to be eligible. As provided in 2 CFR 1500.9, Recipients incur pre-award cost at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information.

## E. Pre-Award Administrative Capability

EPA's policy for awarding Financial Assistance in excess of $200,000 to non-profit organizations requires an Administrative Capability Assessment review of the Recipient's administrative and financial management systems to be completed **prior** to the Recipient drawing down any EPA funds per EPA Order 5700.8. The Recipient is precluded from drawing down funds under this Assistance Agreement until EPA provides written confirmation of the completion of the assessment with satisfactory results. Please note, any costs incurred prior to EPA approval are the Recipient's own risk. If the Recipient fails to respond or is unable to satisfactorily address all identified deficiencies within 90 calendar days of the award date of this Assistance Agreement or within any extension of time granted by EPA, the agreement may be terminated. Noncompliance with this term and condition may result in adverse action by EPA per 2 CFR 200.339.

## F. New Recipient Training Requirement

The Recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The Recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the Recipient should refer to RAIN-2024-G01.

Case 1:25-cv-00948-TSC     Document 6-8     Filed 04/01/25     Page 7 of 62
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 160 of 265

5J - 84094301 - 1     Page 6

# Programmatic Conditions

## Clean Communities Investment Accelerator (CCIA) Terms and Conditions (December 12, 2024)

### I. DEFINITIONS

**Acquisition of Intangible Property:** 2 CFR 200.1 defines Intangible Property as "property having no physical existence, such as trademarks, copyrights, data (including data licenses), websites, IP licenses, trade secrets, patents, patent applications, and property such as loans, notes and other debt instruments, lease agreements, stocks and other instruments of property ownership of either tangible or intangible property, such as intellectual property, software, or software subscriptions or licenses." Acquisitions of Intangible Property involve the purchase of Intangible Property through procurement contracts.

**Air Pollutant:** Air Pollutant means any air pollutant that is listed pursuant to Section 108(a) of the Clean Air Act (or any precursor to such an air pollutant). This includes particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead (see 40 CFR Part 50) and their precursors (e.g., volatile organic compounds).

**Apprentice:** Apprentice means an individual working on a project receiving Financial Assistance who is participating in a Registered Apprenticeship program under the National Apprenticeship Act that meets the requirements of 29 CFR Parts 29 and 30.

**Award Agreement**: Award Agreement means the set of legally binding documents between EPA and the Recipient under the federal award. Award Agreement is used interchangeably with Assistance Agreement and Notice of Award.

**Capitalization Funding**: Consistent with Section 134(b)(2) of the Clean Air Act of the Clean Air Act, the Recipient will provide Capitalization Funding to Community Lenders for the sole purpose of providing Financial Assistance to CCIA-Eligible Projects. The Recipient will provide these Subawards in the form of Subgrants, which are subject to the EPA Subaward Policy. Community Lenders will use these Subawards exclusively as capital to provide Financial Assistance to CCIA-Eligible Projects.

In general, a Community Lender may receive a maximum of $10,000,000 in total Capitalization Funding from all Recipients and Subrecipients under the Clean Communities Investment Accelerator; however, under limited exceptions, a Community Lender may receive total Capitalization Funding in excess of the $10,000,000 cap, provided that the exception has been approved by the EPA Award Official (either through the Recipient's workplan in effect under this Assistance Agreement or through separate post-award approval).

**CCIA-Eligible Project**: CCIA-Eligible Project means a project, activity, or technology that is eligible for support under this program. Section 134(b)(2) of the Clean Air Act directs that the Recipient use funds to support Community Lenders that provide Financial Assistance to Qualified Projects. For this program, a project, activity, or technology that is eligible for support through Capitalization Funding, Technical Assistance Subawards, and/or Technical Assistance Services must meet the following three requirements and is referred to as a "CCIA-Eligible Project:" (i) the project, activity, or technology must be a Qualified Project; (ii) the project, activity, or technology must be within a Priority Project Category; and (iii) the project, activity, or technology must be in a Low-Income and Disadvantaged Community.

JA2020

**Community Lender:** Community Lender means an organization that, consistent with Section 134(b)(2) of the Clean Air Act, is eligible to receive Capitalization Funding and Technical Assistance Subawards. Section 134(b)(2) of the Clean Air Act directs that the Recipient provide funding and technical assistance to establish new or to support existing public, quasi-public, not-for-profit, or nonprofit entities that provide Financial Assistance to Qualified Projects at the state, local, territorial, or Tribal level or in the District of Columbia, including community- and low-income-focused lenders and capital providers. An organization must meet the following three requirements to be eligible as a Community Lender:

- Must be either a public, quasi-public, not-for-profit, or nonprofit entity.
    - A public entity must be a state, municipal, territorial, or Tribal government, including any department, agency, or instrumentality of one of those governments.
    - A quasi-public entity must either (1) have a close association with a public entity but not be a public entity, (2) be created by a public entity but be exempt from certain legal and administrative requirements, or (3) not have been created by a public entity but perform a public purpose and be significantly supported financially by a public entity. Any entity that has been determined by the U.S. Treasury's CDFI Fund to meet the CDFI certification requirements set forth in 12 CFR 1805.201 is a quasi-public entity that meets this requirement. In addition to being quasi-public, an entity meeting this requirement may also meet the requirements of being a not-for-profit or nonprofit entity, depending on the entity.
    - A not-for-profit entity must meet the definition of or be considered a "not-for-profit" under a federal, state, territorial, or Tribal law of a federally recognized tribe. Any Federal credit union or State credit union, as defined in Section 101 of the Federal Credit Union Act, is a not-for-profit entity that meets this requirement.
    - A nonprofit entity must meet the definition of *Nonprofit organization* set forth in 2 CFR § 200.1.
- Must have the legal authority to provide Financial Assistance to Qualified Projects at the state, local, territorial, or Tribal level or in the District of Columbia.
- Must be eligible to receive a Subaward under the EPA Subaward Policy.

**Environmental Information:** Environmental Information is defined in EPA's Environmental Information Quality Policy. Environmental Information includes "data and information that describe environmental processes or conditions which support EPA's mission of protecting human health and the environment. Examples include but are not limited to: direct measurements of environmental parameters or processes; analytical testing results of environmental conditions (e.g., geophysical or hydrological conditions); information on physical parameters or processes collected using environmental technologies; calculations or analyses of environmental information; information provided by models; information compiled or obtained from databases, software applications, decision support tools, websites, existing literature, and other sources; development of environmental software, tools, models, methods and applications; and design, construction, and operation or application of environmental technology."

**Environmental Information Operations:** Environmental Information Operations is defined in EPA's Environmental Information Quality Policy. Environmental Information Operations means "[a] collective term for work performed to collect, produce, evaluate, or use environmental information and the design, construction, operation or application of environmental technology."

**EPA Award Official:** EPA Award Official means the award official from the Office of Grants and

5J - 84094301 - 1    Page 8

Debarment that is authorized to execute the Award Agreement, as well as any subsequent amendments to the Award Agreement, and to make any other final determinations required by law or regulation on behalf of the EPA.

**EPA Project Officer:** EPA Project Officer means the project officer from the Office of the Greenhouse Gas Reduction Fund that is assigned, along with the EPA Grants Specialist, to monitor the Recipient on programmatic and technical aspects of the project and is typically authorized to make programmatic approvals on behalf of the EPA. Where required, the Recipient must notify or request approval from the EPA Project Officer through the EPA Project Officer's individual EPA email address as well as CCIA@epa.gov such that the Office of the Greenhouse Gas Reduction Fund may delegate an alternative EPA Project Officer in the case of any absence.

**Financial Assistance:** Consistent with the definition of *Federal financial assistance* in 2 CFR 200.1, Financial Assistance means financial products, including debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, loan purchasing programs, and other debt instruments), equity investments (such as equity project finance investments, private equity investments, and other equity instruments), hybrids (such as mezzanine debt, preferred equity, and other hybrid instruments), and credit enhancements (such as loan guarantees, loan guarantee funds (whether full or partial), loan loss reserves, and other credit enhancement instruments). Expenditures for Financial Assistance are in the form of Subawards (other than subgrants), Participant Support Costs or Acquisitions of Intangible Property, as defined in this Award Agreement. Subgrants are not eligible as Financial Assistance. The characterization of a Financial Assistance transaction as a Subaward, Participant Support Cost, or Acquisition of Intangible Property is limited to the transaction. For example, the same entity may be a Subrecipient for one transaction and a Program Beneficiary or a Contractor for another transaction.

*Freely Associated States:* Freely Associated States means the Republic of the Marshall Islands (the Marshalls), the Federated States of Micronesia (FSM), and the Republic of Palau (Palau).

*Greenhouse Gas:* "Greenhouse Gas" means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act. Greenhouse Gas Emissions mean emissions of Greenhouse Gases.

**Low-Income and Disadvantaged Communities**: Section 134(a)(3) of the Clean Air Act appropriates funds "for the purposes of providing Financial Assistance and technical assistance in low-income and disadvantaged communities." This program is entirely funded by Section 134(a)(3) of the Clean Air Act. Low-Income and Disadvantaged Communities means CEJST-Identified Disadvantaged Communities, EJScreen-Identified Disadvantaged Communities, Geographically Dispersed Low-Income Households, Properties Providing Affordable Housing, and Federally Recognized Tribal Entities, as defined below.

- *CEJST-Identified Disadvantaged Communities:* All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.

- *EJScreen-Identified Disadvantaged Communities:* All communities within version 2.3 of EJScreen that fall within either (a) the limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the

JA2022

5J - 84094301 - 1    Page 9

following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.

•  *Geographically Dispersed Low-Income Households:* Low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development (HUD). Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using HUD's Family Size Adjustment factor.

•  *Properties Providing Affordable Housing:* Properties providing affordable housing that fall within either of the following two categories: (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by HUD, including Public Housing, Section 8 Project-Based Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)); or (5) a housing assistance program administered by the Department of Hawaiian Homelands as defined in Title VIII of the Native American Housing Assistance and Self-Determination Act of 1996 (24 CFR 1006.10) or (b) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

•  *Federally Recognized Tribal Entities:* All Federally Recognized Tribal entities, which are considered disadvantaged regardless of whether a Federally Recognized Tribe has land, consistent with M-23-09 (memorandum dated as of January 27, 2023) and CEJST. A "Federally Recognized Tribal Entity" means (i) any individual member of a Federally Recognized Tribe; (ii) any for-profit business that has at least 51 percent of its equity ownership (or the equivalent in limited liability companies) by members of Federally Recognized Tribes; (iii) any non-profit entity with at least 51 percent of its Board of Directors (i.e., Governing Board) comprised of members of Federally Recognized Tribes; or (iv) any Federally Recognized Tribal government entity.  Under this definition, any Federally Recognized Tribal Entity is included within the definition of Low-Income and Disadvantaged Communities, regardless of where that entity is located (i.e., the entity may be located in areas outside of the CEJST land area dataset, including but not limited to tribal service areas or counties).

**Materially Impaired:** For the definition and application of these terms under this Assistance Agreement (e. g. the Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, note that EPA defines "Materially Impaired" in the context of

Case 1:25-cv-00948-TSC     Document 6-8     Filed 04/01/25     Page 11 of 62
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 164 of 265

5J - 84094301 - 1     Page 10

effective performance of the Assistance Agreement as 1) the issuance of a written determination and finding from EPA that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause under the Clarifications to EPA General Terms and Conditions Programmatic Term and Condition and 2) if EPA in its sole discretion determines that a corrective action plan is an appropriate means of remedying the lack of sufficient progress, the subsequent issuance of a separate written determination and finding from EPA that the Recipient has not materially addressed its failure to achieve sufficient progress after implementing a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

**Named Subrecipient:** "Named Subrecipient" means an entity that is named on the workplan in effect under this Assistance Agreement to receive a Subaward in the form of a Subgrant from the Recipient in order to carry out part of the award.

**Participant Support Costs:** 2 CFR 200.1 defines Participant Support Costs as "direct costs that support participants (see definition for Participant in § 200.1) and their involvement in a Federal award, such as stipends, subsistence allowances, travel allowances, registration fees, temporary dependent care, and per diem paid directly to or on behalf of participants." EPA regulations at 2 CFR 1500.1(a)(1) expand the definition of Participant Support Costs to include "subsidies, rebates, and other payments to program beneficiaries to encourage participation in statutorily authorized environmental stewardship programs," which includes the Greenhouse Gas Reduction Fund. In this program, Participant Support Costs may include expenditures by the Recipient as Technical Assistance Services and/or Program Administration Activities and Community Lenders as Capitalization Funding and/or Technical Assistance Subawards (which may include subsidies, rebates, and other payments).

**Period of Closeout:** Period of Closeout means the time interval between the beginning of the closeout period (the date that the award has been closed out, in accordance with 2 CFR 200.344) to the end of the closeout period (the date that the Closeout Agreement has been terminated). The Period of Closeout may also be referred to as the Closeout Period.

**Period of Performance:** 2 CFR 200.1 defines Period of Performance as "the total estimated time interval between the start of an initial Federal award and the planned end date, which may include one or more funded portions, or budget periods." For the purposes of this Award Agreement, Period of Performance means the time interval between the start of the Federal award (either the first date that the Recipient has incurred allowable pre-award costs or the date on the Notice of Award, whichever is earlier) and the end of the Federal award (the date that the award has been closed out, in accordance with 2 CFR 200.344). The Period of Performance may also be referred to as the Performance Period.

**Post-Closeout Program Income:** Post-Closeout Program Income means Program Income retained at the end of the Period of Performance, which is subject to the terms and conditions of the Closeout Agreement, as well as Program Income earned by the Recipient during the Period of Closeout that is directly generated by a supported activity or earned as a result of the Federal award, which is also subject to the terms and conditions of the Closeout Agreement. Under the Closeout Agreement, the Recipient is authorized to deduct the cost of generating Post-Closeout Program Income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Post-Closeout Program Income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Post Closeout Program Income. Costs of generating Post-Closeout Program Income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than

JA2024

the actual costs incurred to generate the Post-Closeout Program Income, provided the Recipient can account for the actual costs incurred.

**Priority Project Categories:** Priority Project Categories means Distributed Energy Generation and Storage, Net-Zero Emissions Buildings, and Zero-Emissions Transportation, as defined below.

- *Distributed Energy Generation and Storage:* Projects, activities, and technologies that deploy small-scale power generation and/or storage technologies (typically from 1 kW to 10,000 kW), plus enabling infrastructure necessary for deployment of such generation and/or storage technologies. Projects, activities, and technologies within this category must support *carbon pollution-free electricity,* which is electrical energy produced from resources that generate no carbon emissions, consistent with the definition specified in Executive Order 14057 (Catalyzing Clean Energy Industries and Jobs Through Federal Sustainability).
- *Net-Zero Emissions Buildings:* Projects, activities, and technologies that either (1) retrofit an existing building, making a substantial contribution to that building being a net-zero emissions building and as part of a plan for that building achieving net-zero emissions over time, or (2) construct a new net-zero emissions building in a Low-Income and Disadvantaged Community. A *net-zero emissions building* is a building that meets the requirements of Version 1 of the National Definition for a Zero Emissions Building (June 2024).
- *Zero-Emissions Transportation:* Projects, activities, and technologies that deploy zero-emissions transportation modes, plus enabling infrastructure necessary for zero-emissions transportation modes—especially in communities that are overburdened by existing diesel pollution, particulate matter concentration, and degraded air quality. Projects, activities, and technologies within this category must be consistent with the zero-emissions transportation decarbonization strategies in The U.S. National Blueprint for Transportation Decarbonization.

**Program Administration Activities:** Program Administration Activities means activities that support administration of the grant program, to the extent such activities meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. Program administration activities include but are not limited to establishing and convening advisory councils, as described in Item 2 of EPA's Guidance on Selected Items of Cost for Recipients, and fund raising, as described in Item 4 of EPA's Guidance on Selected Items of Cost for Recipients.

**Program Beneficiary:** Program Beneficiary means an entity (either an individual or an organization) that receives Financial Assistance or technical assistance as an end-user, except when such Financial Assistance is characterized as an Acquisition of Intangible Property (in which case the entity is a Contractor, as defined in 2 CFR 200.1). Expenditures to Program Beneficiaries are in the form of Participant Support Costs, as defined in 2 CFR 1500.1. A Program Beneficiary is distinct from a Subrecipient, as defined in 2 CFR 200.1.

**Program Income:** 2 CFR 200.1 defines Program Income as "gross income earned by the recipient or subrecipient that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(c)". 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, Program Income also includes but is not limited to income from origination fees, servicing fees, and asset management fees; dividends from equity

5J - 84094301 - 1    Page 12

investments; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). Program Income must be treated in accordance with the Program Income Programmatic Term and Condition. EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fund raising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Under this award agreement, the Recipient is authorized to deduct the cost of generating program income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of program income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Program Income. Costs of generating program income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the program income, provided the Recipient can account for the actual costs incurred. Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

**Qualified Project:** Section 134(c)(3) of the Clean Air Act provides that a Qualified Project is any project, activity, or technology that (A) reduces or avoids Greenhouse Gas emissions and other forms of air pollution in partnership with, and by leveraging investment from, the private sector; or (B) assists communities in the efforts of those communities to reduce or avoid Greenhouse Gas emissions and other forms of air pollution. For this Assistance Agreement, Qualified Project means any project, activity or technology meeting all six requirements listed below at the time that Financial Assistance is provided to the project, activity, or technology:

- The project, activity, or technology would reduce or avoid Greenhouse Gas Emissions, consistent with the climate goals of the United States to reduce Greenhouse Gas Emissions 50-52 percent below 2005 levels in 2030, reach 50 percent zero-emission vehicles share of all new passenger cars and light trucks sold in 2030, achieve a carbon pollution-free electricity sector by 2035, and achieve net-zero emissions by no later than 2050. The project, activity, or technology may reduce or avoid such emissions through its own performance or through assisting communities in their efforts to deploy projects, activities, or technologies that reduce or avoid such emissions.

- The project, activity, or technology would reduce or avoid emissions of other Air Pollutants. The project, activity, or technology may reduce or avoid such emissions through its own performance or through assisting communities in their efforts to deploy projects, activities, or technologies that reduce or avoid such emissions.

- The project, activity, or technology would deliver additional benefits (i.e., in addition to primarily reducing or avoiding emissions of Greenhouse Gases and other Air Pollutants) to communities within one or more of the following seven categories: climate change; clean energy and energy efficiency; clean transportation; affordable and sustainable housing; training and workforce development; remediation and reduction of legacy pollution; and development of critical clean water infrastructure.

- The project, activity, or technology may not have otherwise been financed.

- The project, activity, or technology would mobilize private capital.

- The project, activity, or technology would support only commercial technologies, defined as technologies that have been deployed for commercial purposes at least three times for a period of at least five years each in the United States for the same general purpose as the project,

5J - 84094301 - 1    Page 13

activity, or technology.

**Senior Management:** Senior Management means the chief executive officer, chief risk officer, general counsel, chief compliance officer, chief investment officer, chief reporting officer, and chief financial officer (or equivalent positions).

**Subaward:** 2 CFR 200.1 defines a Subaward as "an award provided by a pass-through entity to a subrecipient for the subrecipient to contribute to the goals and objectives of the project by carrying out part of a Federal award received by the pass-through entity. It does not include payments to a contractor, beneficiary, or participant". A Subgrant refers to a Subaward in the form of a grant.

**Subrecipient:** Consistent with 2 CFR 200.1, Subrecipient means an entity that receives a Subaward from a pass-through entity to carry out part of a Federal award but does not include an entity that is a Program Beneficiary of such an award. A Subrecipient is distinct from a Program Beneficiary, which is referenced in 2 CFR 1500.1. In this program, there are four main types of Subrecipients: (1) a Subrecipient that receives a Subgrant that will be used, either in whole or in part, to provide Capitalization Funding and Technical Assistance Subawards to Community Lenders, or a "Pass-Through Subrecipient;" (2) a Subrecipient that receives a Subgrant that will be used exclusively to provide Technical Assistance Services and/or Program Administration Activities, or a "Technical Assistance Subrecipient"; (3) a Subrecipient that receives a Subgrant in the form of Capitalization Funding and/or Technical Assistance Subawards, or a "Community Lender Subrecipient;" and (4) a Subrecipient that receives Financial Assistance from a Community Lender in the form of a Subaward, with the Subrecipient then using the Subaward to provide Financial Assistance to CCIA-Eligible Projects, or a "Financial Intermediary Subrecipient." Note that a financial transaction is a Subaward to a Financial Intermediary Subrecipient if the following two characteristics are true: (i) the financial transaction provides an award by a pass-through entity to a Subrecipient through a form of *Federal financial assistance*, other than a grant, and (ii) the proceeds of the award are used directly as Financial Assistance to CCIA-Eligible Projects, carrying out part of a Federal award received by the pass-through entity. The EPA Subaward Policy applies to Subgrants made to Pass-Through Subrecipients, Technical Assistance Subrecipients, and Community Lender Subrecipients but not to Subawards made to Financial Intermediary Subrecipients.

**Technical Assistance Services:** Consistent with Section 134(b)(2) of the Clean Air Act, the Recipient will provide Technical Assistance Services to establish new and build the capacity of existing Community Lenders so that they can provide Financial Assistance to CCIA-Eligible Projects. Technical Assistance Services include targeted support activities for individual Community Lenders, such as providing training, market analysis, technical support, and structuring expertise as well as financial market-building activities for multiple Community Lenders, such as developing standardized project performance criteria, underwriting guidance, documentation, and product features. A Community Lender does not need to have been selected for Capitalization Funding under this program to be eligible for Technical Assistance Services.

**Technical Assistance Subawards:** Consistent with Section 134(b)(2) of the Clean Air Act, the Recipient will provide Technical Assistance Subawards to build the capacity of Community Lenders so that they can provide Financial Assistance to CCIA-Eligible Projects. The Recipient will provide these Subawards in the form of Subgrants, which are subject to the EPA Subaward Policy. Community Lenders will use Technical Assistance Subawards for activities including (but not limited to) procuring training, market analysis, and technical support; hiring staff; developing new financial products; supporting predevelopment activities, such as site and building assessments (e.g., energy audits), financial and technological feasibility studies (e.g., solar resource studies), design and engineering support, and

JA2027

Case 1:25-cv-00948-TSC    Document 6-8    Filed 04/01/25    Page 15 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 168 of 265

5J - 84094301 - 1    Page 14

permitting support; and other activities. Community Lenders may use Technical Assistance Subawards to make additional Subawards to other organizations, consistent with the EPA Subaward Policy. A Community Lender may only receive a Technical Assistance Subaward if it has already been selected for Capitalization Funding under this program.

In general, a Community Lender may receive a maximum of $1,000,000 in total Technical Assistance Subawards from all Recipients and Subrecipients under the Clean Communities Investment Accelerator; however, under limited exceptions, a Community Lender may receive total Technical Assistance Subawards in excess of the $1,000,000 cap, provided that the exception has been approved by the EPA Award Official (either through the Recipient's workplan in effect under this Assistance Agreement or through separate post-award approval).

**Waste, Fraud, or Abuse:** For the definition and application of these terms under this Assistance Agreement (e.g. the Financial Risk Management Requirements, Clarifications to EPA General Terms and Conditions, and Financial Agent Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, refer to their use in the Reporting Waste, Fraud, and Abuse clause in the EPA General Terms and Conditions effective October 1, 2024 and 2 CFR 200.113: "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U.S.C. 3729-3733."

## II. NATIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the Recipient agrees to the following four requirements of performance reporting: (1) progress reports, (2) transaction and-project level report, (3) organizational disclosures, and (4) ongoing disclosures. These performance reporting requirements "flow-down" as needed to enable the Recipient to comply with the requirements described in this term and condition. The Recipient must ensure that these reports cover its own grant-related activities and, where applicable to a certain performance report or element of a performance report, the grant-related activities of its Subrecipients, Contractors, and/or Program Beneficiaries. To comply with these performance reporting requirements, the Recipient agrees to use information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized; to the extent that information is not available for transactions that were closed prior to authorization of these instruments, the Recipient will not be out of compliance with the performance reporting requirements.

The Recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit performance reporting electronically to the EPA Project Officer. To the extent it is known, or should have been known, by the chief executive officer (or equivalent) and chief reporting officer (or equivalent) that the reporting is not materially compliant with the terms and conditions, or demonstrates material noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission. Should the chief executive officer (or equivalent) and chief reporting officer (or equivalent) signing the submission knowingly and willfully make any material false statement, they may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

Case 1:25-cv-00948-TSC    Document 6-8    Filed 04/01/25    Page 16 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 169 of 265

5J - 84094301 - 1    Page 15

EPA intends to make performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) prior to submission to EPA. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient. Recipient agrees that submitted information that does not include PII or CBI may be shared for program evaluation purposes, including with third parties.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. Notwithstanding any other provision of this Assistance Agreement, if Recipient's inability to submit the required performance reporting is due to issues with EPA systems, the Recipient shall be granted a reasonable extension to submit the reports after the technical issue has been corrected.

Where applicable, the intervals for reporting are authorized by 2 CFR 200.329(c)(1), as more frequent reporting is necessary for the effective monitoring of the Federal award and could significantly affect program outcomes.

## 1. Progress Reports

### Semi-Annual Report

The Recipient agrees to submit semi-annual reports covering six months of the calendar year in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). A single semi-annual report must be submitted to cover grant-related activities of the Recipient as well as Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the semi-annual report.

The Recipient agrees to submit semi-annual reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The first semi-annual reporting period ends on December 31 and covers all activities beginning on the first day of the Period of Performance.

### Annual Report

The Recipient agrees to submit annual reports that contain detailed narratives describing program performance over the Recipient's fiscal year, supported with qualitative discussions and quantitative metrics. A single annual report must be submitted to cover grant-related activities of the Recipient and its

5J - 84094301 - 1     Page 16

Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the annual report.

 The Recipient must include the following broad, non-exhaustive elements in its annual reports:

- Progress towards objectives on key performance metrics over the reporting period,
- Summary of key activities completed in the reporting period, including case studies of Community Lenders successfully launching or expanding clean financing programs,
- Geographic coverage of Capitalization Funding and Technical Assistance Subawards made in the reporting period,
- Descriptions and examples of actions taken to meaningfully involve the communities the program serves in program design and operations,
- Case studies of different types of Technical Assistance Services activities undertaken by the Recipient and uses of Technical Assistance Subawards by Community Lenders,
- Plans for key activities (including current pipeline of Community Lenders) to be supported as well as outputs and outcomes to be achieved in the next reporting period.


These reports must be submitted ready to be published on the EPA website for public consumption and must not include any material that the Recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI. Should EPA identify PII or claims of CBI in reports, the EPA Project Officer will require that the Recipient re-submit the report without the PII or claims of CBI so that it can be published without redaction.

The Recipient agrees to submit **the annual report** electronically to the EPA Project Officer within 90 calendar days after the Recipient's fiscal year end date. The first annual report is due 90 calendar days after the Recipient's fiscal year that ends in 2025.

_Final Report_

The Recipient agrees to submit a final report containing two documents. First, the recipient must submit a report containing all of the elements described above for the annual report, covering the entire Period of Performance and overall assessment of its program performance and implementation of its workplan in effect under this Assistance Agreement. Second, the recipient must submit its investment strategy for the Closeout Period to detail its use of Post-Closeout Program Income over the Closeout Period. EPA intends to make the investment strategy, either in whole or in part, available to the public through disclosing copies of the investment strategy as submitted or using the content of the investment strategy. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient.

The two documents for the final report must be submitted to cover the grant-related activities of the Recipient and Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the final report.

Case 1:25-cv-00948-TSC    Document 6-8    Filed 04/01/25    Page 18 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 171 of 265

5J - 84094301 - 1    Page 17

The Recipient agrees to submit the two documents for the final report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the Period of Performance.

## 2. Transaction and Project-Level Report

The Recipient agrees to submit semi-annual transaction and project-level reporting in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The data submission must cover the grant-related activities of the Recipient and Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the data submission.

The Recipient agrees to submit the transaction and project-level report electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods for data submission are as follows: October 1 to March 31; April 1 to September 30. The data submissions must cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends March 31, the Recipient must provide information on transactions originated from July 1 to December 31 rather than from October 1 to March 31. For the semi-annual reporting period that ends September 30, the Recipient must provide information on transactions originated from January 1 to June 30 rather than from April 1 to September 30. The first transaction and project-level report is due 30 calendar days after March 31, 2025, and must cover all transactions originated from the beginning of the Performance Period through December 31, 2024.

## 3. Organizational Disclosures

The Recipient agrees to submit annual organizational disclosures electronically to the EPA Project Officer within 30 calendar days after submission of its Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. The organizational disclosures must cover the Recipient's fiscal year and be submitted in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). Additionally, the Recipient agrees to submit such organizational disclosures for each Pass-Through Subrecipient as well as each Community Lender Subrecipient that has received in excess of $10,000,000 in Capitalization Funding under the Clean Communities Investment Accelerator (to be delivered within 30 calendar days after submission of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System). The requirement for organizational disclosures is not applicable for any fiscal year in which the reporting entity did not meet the requirements of 2 CFR Subpart F—Audit Requirements. The first Organizational Disclosures are due in 2025.

## 4. Ongoing Disclosures

In addition to other ongoing disclosure obligations within the regulations and terms and conditions of this Award Agreement, the Recipient agrees to notify the EPA Project Officer of the following events in accordance with 2 CFR 200.329(e):

Case 1:25-cv-00948-TSC    Document 6-8    Filed 04/01/25    Page 19 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 172 of 265

5J - 84094301 - 1    Page 18

1. Changes to the Recipient's independent certified public accounting firm;

2. Non-reliance by the Recipient or its independent auditor on previously issued financial statements or a related audit report or completed interim audit review;

3. Changes in fiscal year end of the Recipient;

4. Material impairments to the Recipient's assets;

5. Intention to file bankruptcy petition or enter into receivership;

6. Submission of annual Form 990 to the IRS, with provision of copy to EPA Project Officer upon request (only if submission of the Form 990 is otherwise required).

Additionally, the Recipient agrees to submit such ongoing disclosures for each Pass-Through Subrecipient as well as each Community Lender Subrecipient that has received in excess of $10,000,000 in Capitalization Funding under the Clean Communities Investment Accelerator. The Recipient agrees to submit ongoing disclosures electronically to the EPA Project Officer within 15 calendar days of the event.

## B. Cybersecurity Condition

(a) The Recipient agrees that when collecting and managing environmental data under this Assistance Agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward Agreements and, during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

Case 1:25-cv-00948-TSC    Document 6-8    Filed 04/01/25    Page 20 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 173 of 265

5J - 84094301 - 1    Page 19

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process.  A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

## D. Public or Media Events

For public or media events that are planned more than 15 calendar days in advance, the Recipient agrees to notify the EPA Project Officer of public or media events it has organized publicizing the accomplishment of significant activities related to execution of the workplan in effect under this Assistance Agreement and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice.

## E. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards.  Information on these standards may be found at https://www.fgdc.gov/.

## F. Leveraging and Fund Raising

### 1. Leveraging

The Recipient agrees to make commercially reasonable efforts to provide the proposed leveraged funding that is described in its workplan in effect under this Assistance Agreement. If the proposed leveraging does not substantially materialize during the Period of Performance, and the Recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future grant applications from the Recipient. In addition, if the proposed leveraging does not substantially materialize during the Period of Performance and the Recipient does not provide a satisfactory explanation, then EPA may reconsider the legitimacy of the award; if EPA determines that the Recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the workplan in effect under this Assistance Agreement, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

### 2. Fund Raising

2 CFR 200.442 provides coverage on allowable fund-raising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fund raising costs are an allowable cost and may include costs that are reasonable and necessary for raising capital from private investors to provide Financial Assistance to CCIA-Eligible Projects.

Allowable fund-raising costs must meet the following two criteria, in addition to meeting the requirements

Case 1:25-cv-00948-TSC     Document 6-8     Filed 04/01/25     Page 21 of 62
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 174 of 265

5J - 84094301 - 1     Page 20

for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private investors. Funds a Recipient raises for its own use with costs borne by an EPA Financial Assistance Agreement are considered Program Income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fund-raising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fund-raising costs charged to the award will be treated as Program Income.

## G. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving Environmental Information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The Recipient shall ensure that subawards involving Environmental Information issued under this agreement include appropriate quality requirements for the work. The Recipient shall ensure sub-award recipients develop and implement Quality Assurance (QA) planning documents in accordance with this term and condition; and/or ensure sub-award recipients implement all applicable approved QA planning documents. EPA will not approve any QA planning documents developed by a Subrecipient; the Recipient is responsible for reviewing and approving its Subrecipient QA planning document(s), if required based on the Subrecipient's Environmental Information Operations.

### 1. Quality Management Plan (QMP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QMP, (ii) prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard and submit the document for EPA review, and (iii) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved and current QMP and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

The Recipient must submit the QMP within 90 calendar days after grant award, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the Recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

### 2. Quality Assurance Project Plan (QAPP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i)

Case 1:25-cv-00948-TSC    Document 6-8    Filed 04/01/25    Page 22 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 175 of 265

5J - 84094301 - 1    Page 21

develop a QAPP, (ii) prepare the QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard, (iii) submit the document for EPA review, and (iv) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s) and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the previously EPA-approved QAPP is acceptable for this agreement.

The Recipient must submit the QAPP within 90 calendar days after grant award, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

The Recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted when changes occur.

## For Reference:

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Specifications for EPA and Non-EPA Organizations.

• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

## H. Real Property

In accordance with 2 CFR 200.311, title to Real Property acquired or improved under this agreement will vest upon acquisition by the Recipient, including but not limited to title to Real Property acquired through exercise of a remedy for default of a Financial Assistance arrangement. This Real Property must be used for the originally authorized purpose as long as needed for that purpose, during which time the Recipient must not dispose of or encumber its title or other interests. The Real Property Programmatic Term and Condition flows down to Subrecipients but not to Program Beneficiaries or Contractors that receive Financial Assistance to CCIA-Eligible Projects, which may acquire title to Real Property after receiving Financial Assistance to CCIA-Eligible Projects.

The Recipient must obtain prior approval from the EPA Award Official for the acquisition of Real Property. Note that the Recipient may meet this requirement by specifying the types of acquisitions of Real Property it plans to carry out in its workplan in effect under this Assistance Agreement.

## Disposition

5J - 84094301 - 1    Page 22

If the Recipient disposes of the Real Property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

Otherwise, when Real Property is no longer needed for the originally authorized purpose, the Recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where Recipient is disposing of Real Property acquired or improved with a Federal award and acquiring replacement Real Property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the Recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The Recipient is entitled to be paid an amount calculated by applying the Recipient's percentage of participation in the purchase of the Real Property (and cost of any improvements) to the current fair market value of the property.

## Recordation

As authorized by 2 CFR 200.316, EPA requires that Recipients who use EPA funding to purchase and improve Real Property through an EPA funded construction project record a lien or similar notice in the Real Property records for the jurisdiction in which the Real Property is located, which indicates that the Real Property has been acquired and improved with federal funding and that use and disposition conditions apply to the Real Property.

## I. Program Income

In accordance with Clean Air Act Section 134(b)(1)(C) as well as 2 CFR 200.307(c) and 2 CFR 1500.8 (b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the

5J - 84094301 - 1     Page 23

Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the workplan in effect under this Assistance Agreement.

## J. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the Recipient or Subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the Recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## III. ADDITIONAL PROGRAMMATIC TERMS AND CONDITIONS

## A. Eligible Recipient

**The Recipient agrees to maintain its status as an Eligible Recipient, which includes:**

    a. Meeting the definition of *Nonprofit organization* set forth in 2 CFR 200.1;

    b. Having an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"

    c. Not receiving any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);

    d. Being funded by public or charitable contributions; and

    e. Having the legal authority to invest in or finance projects.

## B. Workplan and Budget

The Recipient agrees to execute the workplan in effect under this Assistance Agreement. This document, once approved by the EPA, will reflect an agreement between the Parties and will be incorporated into and be a part of the agreement between the Recipient and the EPA.

The Recipient agrees to conduct an annual review of the workplan in effect under this Assistance Agreement within 90 calendar days of June 30 of each calendar year. If material changes are made during the annual review or in between annual reviews, the Recipient agrees to submit the updated workplan to the EPA Project Officer.

The Recipient also agrees to conduct an annual review of the EPA-approved detailed budget table within

90 calendar days of June 30 of each calendar year. If material changes are made during the annual review or in between annual reviews, the Recipient agrees to submit the updated detailed budget table to the EPA Project Officer. Such submissions are not subject to prior approval unless otherwise required by the regulations or the terms and conditions of the Award Agreement.

## C. Recipient Organizational Plan

The Recipient agrees to execute the workplan in accordance with the documents listed below, as submitted to EPA through Grants.gov for EPA-R-HQ-CCIA-23 or provided to EPA after the application submission deadline.

1. Description of Programmatic Capabilities, pursuant to *Section IV.C: Content of Application Submission* of the Notice of Funding Opportunity;

2. Organizational and Governing Documents, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity.

The Recipient agrees to maintain its incorporation in the United States, as reflected in the above documents.

The Recipient agrees to conduct an annual review of the documents within 90 calendar days of June 30 of each calendar year. If material changes are made during the annual review or in between annual reviews, the Recipient agrees to submit the updated documents to the EPA Project Officer. Such submissions are not subject to prior approval unless otherwise required by the regulations or the terms and conditions of the Award Agreement.

## D. Recipient Policies and Procedures

The Recipient agrees to execute the workplan in accordance with the documents listed below (or other documents submitted in lieu of the documents listed below), as submitted to EPA through Grants.gov for EPA-R-HQ-CCIA-23 or provided to EPA after the application submission deadline.

1. Legal and Compliance Risk Management Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

2. Board Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

3. Management Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

4. Consumer Protection Policies and Procedures, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity;

5. Equity Policies and Practices, pursuant to *Section IV.B: Application Materials* of the Notice of Funding Opportunity; and

6. Conflict of Interest Mitigation Plan, which include all documents submitted upon EPA's request regarding measures that will be taken to eliminate, neutralize, mitigate or otherwise resolve

Case 1:25-cv-00948-TSC    Document 6-8    Filed 04/01/25    Page 26 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 179 of 265

5J - 84094301 - 1    Page 25

conflicts of interest.

7. Documentation of Personnel and Fringe Benefit Charges, which includes all documents submitted upon EPA's request to document how personnel and fringe benefits will be charged against the grant award in accordance with 2 CFR 200.430 *Compensation—personal services* and 2 CFR 200.431 *Compensation—fringe benefits*. Notwithstanding the content of the Recipient's EPA-approved budget, the Recipient is not authorized to charge the grant award for personnel and fringe benefits against employees without using the W-2 as the definitive definition of "employee" until the Documentation of Personnel and Fringe Benefit Charges has been reviewed and approved by the EPA, as communicated by the EPA Project Officer.

The Recipient agrees to conduct an annual review of the documents within 90 calendar days of June 30 of each calendar year. If material changes are made during the annual review or in between annual reviews, the Recipient agrees to submit the updated documents to the EPA Project Officer. With the exception of the Documentation of Personnel and Fringe Benefit Charges, where changes will be subject to prior approval, such submissions are not subject to prior approval unless otherwise required by the regulations or the terms and conditions of the Award Agreement

## E. Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Capitalization Funding; Technical Assistance Subawards; Technical Assistance Services; and Program Administration Activities. The Recipient must use awards funds exclusively for allowable activities within the ten EPA regions, with the exception of the Freely Associated States. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

The Recipient agrees to not use the award for activities that support deployment of projects that do not meet the definition of CCIA-Eligible Projects. The allowability of legal costs incurred in connection with the award shall be governed by applicable provisions of 2 CFR Part 200, Subpart E, including but not limited to 2 CFR 200.403, 2 CFR 200.435, 2 CFR 200.441 and 2 CFR 200.459.

## F. Foreign Entity of Concern

As part of carrying out this award, the Recipient agrees to ensure that entities the Recipient contracts with, the Recipient makes Subawards to, or that receive funds as program beneficiaries at any tier of funding under this grant agreement are not—

(A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

(B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

(C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

5J - 84094301 - 1    Page 26

## G. LIDAC Expenditure Requirement

The Recipient agrees to ensure that 100% of the award is used for the purposes of providing Financial Assistance in Low-Income and Disadvantaged Communities, with compliance maintained over each annual reporting period (i.e., from July 1 to June 30). Funds used for the purposes of providing Financial Assistance includes Capitalization Funding; Technical Assistance Subawards; Technical Assistance Services; and Program Administration Activities. This requirement applies to the entire award provided to the Recipient and "flows down" to each Subrecipient.

## H. Subgrants to For-Profit Entities

The Recipient is authorized to provide Subgrants to for-profit entities if and only if those Subgrants are provided to an entity that has been determined by the U.S. Treasury's CDFI Fund to meet the CDFI certification requirements set forth in 12 CFR 1805.201, the framework for awarding Subgrants to such for-profit entities is described in the Recipient's workplan in effect under this Assistance Agreement, and the for-profit entity meets the definition of a Community Lender. Community Development Banks, for example, may qualify under this definition, as they are for-profit entities and are U.S. Treasury-certified CDFIs.

The Recipient agrees to require that for-profit entities that receive such Subgrants:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the Subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition, by ensuring that the for-profit entity does not use Subgrant funds to accumulate and reserve funds for ongoing business expenses; unforeseen liabilities; or for other similar costs which are not allowable under this Assistance Agreement;

3. Account for and use Program Income under the rules for Program Income pursuant to 2 CFR 1500.8(b) and the terms and conditions of the Award Agreement and Closeout Agreement; and
4. Be subject to the same requirements as non-profit Subgrantees under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(a)(2).

## I. Capitalization Funding

As stated in the definition of Capitalization Funding, the Recipient will provide Capitalization Funding Subawards to Community Lenders in the form of Subgrants, which are subject to the EPA Subaward Policy. The following additional requirements apply when the Recipient provides Capitalization Funding to Community Lenders.

### 1. Disclosure and Approval Requirements

1. The Recipient must obtain written approval from the EPA Award Official prior to providing Capitalization Funding to a Community Lender Subrecipient that would exceed the cap of

Case 1:25-cv-00948-TSC    Document 6-8    Filed 04/01/25    Page 28 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 181 of 265

5J - 84094301 - 1    Page 27

$10,000,000 in Capitalization Funding under the Clean Communities Investment Accelerator. If the exception has been approved by the EPA Award Official in the Recipient's workplan in effect under this Assistance Agreement, then no additional approval is required.

2. Prior to providing Capitalization Funding to a Community Lender Subrecipient, the Recipient must obtain disclosure from the Community Lender regarding award funds that it has sought and/or received under the National Clean Investment and Clean Communities Investment Accelerator programs.

## 2. Revolving Loan Fund Characterization

Capitalization Funding Subgrants are made for the sole purpose of providing Financial Assistance to CCIA-Eligible Projects. As stated in the definition of Financial Assistance, expenditures for Financial Assistance are in the form of Subawards, Participant Support Costs, and Acquisitions of Intangible Property, as defined in this Award Agreement. EPA considers all Capitalization Funding Subgrants to be capitalizations of revolving loan funds for the purposes of 2 CFR 1500.8(d).

## 3. Participant Support Costs

The Community Lender may provide Financial Assistance to CCIA-Eligible Projects in the form of Participant Support Costs. The Recipient agrees to impose the following eligibility, restrictions, timelines, and other programmatic requirements on Community Lenders payments of Participant Support Costs, in addition to other requirements included in the terms and conditions of this Award Agreement:

1. The Community Lender and Program Beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as Participant Support Costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the Community Lender and Program Beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates, and other Participant Support Cost payments. However, EPA does not provide advice on tax issues relating to these payments.

2. Participant Support Cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The Community Lender, therefore, may not make Participant Support Cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that Community Lenders adhere to this requirement as well. The Community Lender is responsible for checking that Program Beneficiaries (i.e., entities receiving Participant Support Costs) are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the Program Beneficiaries.

The Recipient agrees to provide written guidelines for Community Lenders' payments of Participant Support Costs to the EPA Project Officer prior to the Community Lenders' making payments to Program Beneficiaries, unless already described in the Recipient's workplan in effect under this Assistance Agreement. These guidelines must: (a) describe the activities that will be supported by the Participant Support Costs; (b) specify the range of funding to be provided through the Participant Support Costs; (c) identify which types of entities will have title to equipment (if any) purchased with the funds; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing

Case 1:25-cv-00948-TSC     Document 6-8     Filed 04/01/25     Page 29 of 62
USCA Case #25-5122     Document #2114423     Filed: 05/05/2025     Page 182 of 265

5J - 84094301 - 1     Page 28

controls to ensure that the amount of the Participant Support Cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

## 4. Acquisitions of Intangible Property

### 2 CFR 200 Procurement Standards

The Community Lender may use its Capitalization Funding to provide Financial Assistance to CCIA-Eligible Projects in the form of Acquisitions of Intangible Property. The Community Lender agrees to acquire Intangible Property in compliance with the conflict of interest and competition requirements described in the 2 CFR Part 200 Procurement Standards. This includes but is not limited to the requirements at 2 CFR 200.318 to:

- Have and use documented procurement procedures to govern Acquisitions of Intangible Property;
- Maintain oversight to ensure that contractors perform in accordance with the terms, conditions, and specifications of their contracts;
- Maintain written standards of conduct covering conflicts of interest and governing the actions of employees engaged in the selection, award, and administration of contracts as well as maintain written standards of conduct covering organizational conflicts of interest;
- Prioritize entering into inter-entity agreements where appropriate for procurement or use of common or shared goods and services as the Recipient seeks to mobilize financing and private capital;
- Award contracts only to responsible contractors possessing the ability to perform successfully under the terms and conditions of the proposed procurement; and
- Maintain records sufficient to detail the history of procurement.

### Disposition

If the Community Lender disposes of the Intangible Property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Subaward Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

### Recordation

The Community Lender agrees to record liens or other appropriate notices of record to indicate that Intangible Property has been acquired with Federal funding and that use and disposition conditions apply to the Intangible Property, in cases where Financial Assistance to CCIA-Eligible Projects is in the form of an Acquisition of Intangible Property. As provided in 2 CFR 200.1: "…loans, notes and other debt instruments, lease agreements, stock and other instruments of property ownership (whether the property is tangible or intangible)" are *Intangible Property* for the purposes of the restrictions described at 2 CFR 200.315(a). "Other appropriate notices of record" is not limited to filing Uniform Commercial Code instruments and may also include a notice of record in the legally-binding transaction documents.

## 5. Subawards to Financial Intermediary Subrecipients

The following requirements apply when a Community Lender provides a Subaward to a Financial

Case 1:25-cv-00948-TSC    Document 6-8    Filed 04/01/25    Page 30 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 183 of 265

5J - 84094301 - 1    Page 29

Intermediary Subrecipient. These requirements apply to the Recipient and Subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition. As stated in the definition of Financial Assistance, Subgrants are not an eligible form of Financial Assistance:

1. The Community Lender must establish and follow a system that ensures all Subawards to Financial Intermediary Subrecipients are in writing and contain all of the elements required by 2 CFR 200.332(b), with the exception of the indirect cost provision of 2 CFR 200.332(b)(4) (which does not apply to loans). EPA has developed an optional template for Subaward Agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such Subaward Agreements with Financial Intermediary Subrecipients.

2. The Financial Intermediary Subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all Subawards that requires Financial Intermediary Subrecipients to comply with these requirements. No other provisions of the Uniform Grant Guidance, including the Procurement Standards, apply directly to the Subrecipient.

3. Prior to making the Subaward, the Community Lender must ensure that the Financial Intermediary Subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(b)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

## J. Technical Assistance Subawards

As stated in the definition of Technical Assistance Subawards, the Recipient will provide Technical Assistance Subawards to Community Lenders in the form of Subgrants, which are subject to the EPA Subaward Policy. As such, the Establishing and Managing Subawards General Term and Conditions applies to Technical Assistance Subawards.

The following additional requirements apply when the Recipient provides Technical Assistance Subawards to Community Lenders:

1. The Recipient must obtain prior written approval from the EPA Award Official for any Technical Assistance Subaward that exceeds $1,000,000 in EPA funds. If the exception has been approved by the EPA Award Official in the Recipient's workplan in effect under this Assistance Agreement, then no additional approval is required.

2. Prior to providing a Technical Assistance Subaward to a Community Lender, the Recipient must obtain disclosure from the Community Lender regarding award funds that it has sought and/or received under the National Clean Investment and Clean Communities Investment Accelerator programs.

The above requirements apply specifically to Technical Assistance Subawards but do not apply to Technical Assistance Services, which are allowable expenditures the Recipient may incur in accordance with the workplan in effect under this Assistance Agreement and the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

5J - 84094301 - 1    Page 30

## K. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

#### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this Award Agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" and "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific construction projects that were not completed prior to the execution of the final binding documentation governing the use of the Financial Assistance. The Recipient must ensure that any construction work financed in whole or in part with such Financial Assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis-Bacon and Related Act requirements and the requirements of these Terms and Conditions.

Note, however, that under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements do not apply to any form of Financial Assistance which meets any of the following criteria:

- Financial Assistance which exclusively funds pre-construction (e.g. permitting or design work) or post-construction activities (e.g. Acquiring Intangible Property related to a previously completed construction project or re-financing activity related to a previously completed construction project).
- Financial Assistance which serves end-users who are individual homeowners or tenants of single-family homes or multifamily buildings when these individual end-users ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves end-users who meet the definition of Federally Recognized Tribal Entities, as defined under this Assistance Agreement, when these Federally Recognized Tribal Entities ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves any end-user when such Financial Assistance is less than $250,000 for a project and the end-user ultimately selects the contractor(s) and executes the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.

If the Recipient encounters a situation that presents uncertainties regarding DBRA applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

JA2044

Case 1:25-cv-00948-TSC    Document 6-8    Filed 04/01/25    Page 32 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 185 of 265

5J - 84094301 - 1    Page 31

In the event that a periodic project site visit, audit, or routine communication with a Subrecipient, Program Beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this Term and Condition or the Davis-Bacon and Related Act, the Recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Note, the use of the term project in this term and condition is distinct from the use of the term project within the definition of Qualified Project under Clean Air Act Section 134(c)(3), which is broader and includes "any project, activity, or technology." Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed by a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

## B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

## C. Recipient Responsibilities When Entering Into and Managing Contracts:

### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

### b. After Award of Contract:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

## D. Recipient Responsibilities When Establishing and Managing Additional Subawards:

**a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all Subawards under this grant: "By accepting this award, the EPA Subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of Subrecipients and must ensure Subrecipients comply with the requirements in 29 CFR 5.6.

**c. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of Subrecipients and must ensure that Subrecipients comply with the requirements in subsection E, below.

## E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program Beneficiaries

When DBRA is applicable, Financial Assistance provided in the form of a participant support cost to a Program Beneficiary shall include the following text:

"[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:

**a. Solicitation and Contract Requirements:**

    **i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

    **ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

    **i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

    **ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance

5J - 84094301 - 1    Page 33

with applicable law.

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

## 2. Compliance with Federal Statutes and Regulations

The Recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with Subrecipients, contractors, and other partners (e.g., by including such provisions in contractual agreements). This includes but is not limited to applicable health and safety regulations as administered by the Occupational Safety and Health Administration.

## 3. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the Recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## 4. Labor and Equitable Workforce Development Implementation Plan

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), by December 31, 2024, the Recipient must submit a Labor and Equitable Workforce Development Implementation Plan to the EPA Project Officer. The Implementation Plan should articulate policies, practices, and procedures adopted by the Recipient to maximize high-quality jobs and workforce development outcomes on projects assisted with the award. Examples of how this can be demonstrated include, but are not limited to:

- Mechanisms for promoting job quality and evaluating labor standards on projects being considered for and/or receiving Financial Assistance;
- Plans to support workforce development as part of market-building activities;
- Current and planned partnerships with labor and workforce development organizations, including the purpose of those partnerships;
- Mechanisms for maximizing training and employment opportunities for participants in Registered Apprenticeship Programs on projects, including apprenticeship utilization targets, as applicable;
- Mechanisms for creating high-quality job training and employment opportunities available to residents of low-income and disadvantaged communities through projects and other program activities; and

Case 1:25-cv-00948-TSC    Document 6-8    Filed 04/01/25    Page 35 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 188 of 265

5J - 84094301 - 1    Page 34

- Processes for promoting Project Labor Agreements on construction projects above $25,000,000, as appropriate, in alignment with Executive Order 14063 (Use of Project Labor Agreements for Federal Construction Projects) and Executive Order 13502 (Use of Project Labor Agreements for Federal Construction Projects), as well as other types of binding agreements that promote strong workforce outcomes, such as Community Workforce Agreements and Community Benefits Agreements.

The Recipient may use or reference materials already submitted to EPA as part of its submission of the Implementation Plan, where relevant.

Note that EPA may make the information from this plan available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient.

## L. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that for any activity related to the construction, alteration, maintenance, or repair of infrastructure, "none of the funds made available for a Federal Financial Assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The Recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America (BABA) requirements that all Recipients of EPA Financial Assistance awards must comply with.

Under the Greenhouse Gas Reduction Fund, BABA requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific infrastructure projects that were not completed prior to the date the Recipient's award funds were obligated by the EPA.

EPA interprets the definition of infrastructure consistent with 2 CFR 184 and M-24-02 (memorandum dated as of October 23, 2023) including the "public function" test, when determining whether projects qualify as public infrastructure, based on the Civil Rights Act definition of public accommodation.

The following types of Greenhouse Gas Reduction projects are deemed infrastructure for the purposes of BABA applicability:

    1. The public infrastructure portion of any property (e.g., retail in a mixed-use multi-family property) where the principal purpose of the Financial Assistance is to directly benefit such portion of the property;

    2. Privately-owned commercial buildings when they meet the "public function" test;

3. Residential-serving community solar projects, which EPA deems "structures, facilities, and equipment that generate, transport, and distribute energy" per 2 CFR 184.4(c);

4. Publicly accessible EV charging stations;

5. Publicly owned energy generation and/or storage transportation facilities;

6. Publicly owned transportation facilities (e.g., bus depot);

7. Privately-owned transportation facilities that serve a public function.

The following types of Greenhouse Gas Reduction projects are not deemed infrastructure for the purposes of BABA applicability:

1. Privately-owned vehicles for private use;

2. Certain publicly-owned or operated vehicles that EPA has determined do not constitute infrastructure (e.g. school buses);

3. Privately-owned manufacturing or industrial facilities;

4. Privately-owned offices;

5. Single family homes;

6. Privately-owned, non-mixed-use, multi-family housing properties;

7. Privately-owned residential portions of mixed-use properties;

8. EV charging stations that are not publicly accessible;

9. Any privately-owned, behind-the-meter energy generation and storage project that does not otherwise meet the definition of infrastructure.

The inclusion of the following types of funding, support, guarantee, or sponsorship in the funding stack of any Greenhouse Gas Reduction fund project does not trigger BABA, in and of itself or in combination:

1. Low-Income Housing Tax Credit (LIHTC);

2. Fannie Mae and Freddie Mac Backed Multifamily Mortgages;

3. Federal Housing Administration Insured Multifamily Mortgages;

4. HUD Section 8 Funding;

5. Other Federal, State, Tribal, or Local Housing Assistance Funding Sources: in general, subsidies issued by federal, state, tribal, or local housing assistance funding sources that do not confer equity or ownership stakes for the governmental funding source do not trigger BABA applicability.

BABA applicability is assessed at the time of provision of Financial Assistance based on the terms, limitations, and requirements of the Financial Assistance. Applicability does not change retroactively based on a change of use (e.g., if a ground floor apartment is re-zoned for a restaurant). Recipients may not temporarily modify or mischaracterize usage to intentionally avoid BABA compliance.

If the Recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## M. Governance Requirements

The Recipient agrees to comply with the following governance requirements starting December 31, 2024. The governance requirements "flow-down" to Pass-Through Subrecipients and Community Lender Subrecipients that have received in excess of $10,000,000 in Capitalization Funding but not to other subrecipients. The governance requirements are waived for (i) any entity that has been determined by the U.S. Treasury's CDFI Fund to meet the CDFI certification requirements set forth in 12 CFR 1805.201 and (ii) any entity whose specific governance structure is set forth in State, Tribal, or local law.

The Recipient (or Subrecipient) may meet all or some of the governance requirements through the parent entity, provided the Recipient (or Subrecipient) is subject to the governance of the parent entity and the Recipient (or Subrecipient) is wholly-controlled by the parent entity. Similarly, the governance requirements may be waived for the Recipient (or Subrecipient) through the parent entity meeting the CDFI certification requirements set forth in 12 CFR 1805.201, provided the Recipient (or Subrecipient) is wholly-controlled by the parent entity.

## 1. Board Size and Composition

The Recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the Recipient's workplan in effect under this Assistance Agreement as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.
The Recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from Low-Income and Disadvantaged Communities).

## 2. Board Independence

The Recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

## 3. Board Committees

The Recipient agrees to have the following board-level committees to oversee and monitor management, with each committee staffed by members qualified to execute the committee's objectives. While the Recipient need not adhere to the exact naming convention or structure in this term and condition, each of the responsibilities must be covered by board-level committees at all times during the Period of Performance; for the avoidance of doubt, one committee may perform the responsibilities of one or more

of the committees specified below.

    1. An investment or credit committee to oversee and approve investment or credit decisions;

    2. A risk management committee to oversee the formulation and operationalization of the risk management framework;

    3. An audit committee to oversee the integrity of reporting and internal controls and the performance of audit functions, with a majority independent members on such committee;

    4. A nomination/governance committee to oversee nomination and succession of board and senior management, with a majority independent members on such committee; and

    5. A compensation committee to oversee board as well as senior management and staff compensation, with a majority independent members on such committee.

Further, the Recipient agrees to act in good faith to ensure each committee obtains information from management, auditors, or other third-parties necessary to discharge their duties.

### 4. Board Policies and Procedures

The Recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The Recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of Capitalization Funding, Technical Assistance Subawards, and other Subawards to any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

### N. Consumer Protection Requirements

The Recipient agrees to carry out the following consumer protection requirements to the extent that the Recipient directly interacts, transacts, or contracts with consumers in the provision of Financial Assistance to CCIA-Eligible Projects:

    1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

    2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

    3. With regard to solar products or services, provide written disclosures on the impact of the solar

5J - 84094301 - 1    Page 38

project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The Recipient agrees to monitor and oversee Subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(e) and 2 CFR 200.318.

## O. Financial Risk Management Requirements

### 1a. Cash Management Requirements: Advance Payments
The Recipient must deposit and maintain advance payments of Federal funds exclusively in insured accounts, in accordance with 2 CFR 200.305(b)(10). As provided in 2 CFR 200.1, an advance payment is "a payment that a Federal agency or pass-through entity makes by any appropriate payment mechanism and payment method before the recipient or subrecipient disburses the funds for program purposes." A Recipient drawing down funds from ASAP prior to disbursement for actual and allowable project costs constitutes an advance payment. Interest income earned on the advance payment from EPA to the Recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

### 1b. Cash Management Requirements: Program Income

The Recipient is authorized to maintain Program Income in two types of accounts:

1. Insured accounts, including in amounts in excess of the federal insurance limit of $250,000.

2. Accounts where such income is used to purchase (i) U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days (if purchased directly) and that such instruments are held-to-maturity (if purchased directly), or (ii) short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. Note, the underlying instruments included in a short-term money market fund consisting solely of U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities and offering daily investor redemptions need not be of a particular duration or held-to-maturity.

Interest income and other returns earned on funds that have already been disbursed is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12).

Case 1:25-cv-00948-TSC    Document 6-8    Filed 04/01/25    Page 40 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 193 of 265

5J - 84094301 - 1    Page 39

## 2. Financial Health Metrics

The Recipient agrees to report the following financial health metrics at the entity-level on an annual basis in accordance with its fiscal year as well as on behalf of each Pass-Through Subrecipient and Subrecipient Community Lender that has received in excess of $10,000,000 in Capitalization Funding. The metrics are due to the EPA Project Officer within 30 calendar days after submission of the reporting entity's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System and may be submitted through the Organizational Disclosures form. The requirement for submission of financial health metrics is not applicable for any fiscal year in which the reporting entity did not meet the requirements of 2 CFR Subpart F—Audit Requirements.  The first financial health metrics are due in 2025.

    1. Net Asset Ratio: The net asset ratio is defined as net assets divided by total assets.

    2. Current Ratio: **The current ratio is defined as current assets divided by current liabilities, where** current assets is equal to the value of all assets that are reasonably expected to be converted into cash within the coming 12-month period in the normal course of business and current liabilities is equal to the total value of all debts or obligations that must be paid in the coming 12-month period.

    3. Delinquency Rate: The delinquency rate is defined as the value of loans outstanding that are 90+ calendar days delinquent divided by the value of loans outstanding, where loans 90+ calendar days delinquent includes those with outstanding balances 90+ calendar days overdue and still accruing interest as well as those in nonaccrual status.

    4. Net Charge-Off Rate: The net charge-off rate is defined as the value of loans charged-off over the past fiscal year, minus the value of loan recoveries over the past fiscal year, divided by the value of loans outstanding.

    5. Concentration: The concentration of the portfolio, as demonstrated by calculating and reporting on recipient-level exposure, defined as on-balance sheet exposures to a single consolidated entity over all on-balance sheet exposures, for top ten highest exposures.

Note, the Delinquency Rate and Net Charge-Off Rate may exclude the value of loans which include an element of forgiveness, if and only if such forgiveness was established in the terms governing the financial product at origination.

The EPA Project Officer will consider Recipient and, where applicable, Subrecipient performance against these financial health metrics only to the extent by which they Materially Impair the Recipient's ability to execute the workplan in effect under this Assistance Agreement when assessing whether the Recipient is making sufficient progress in implementing the workplan in effect under this Assistance Agreement, as specified in the Sufficient Progress clause under the Clarifications to EPA General Terms and Conditions Programmatic Term and Condition.

## 3. Climate-Related Financial Risks

The Recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include working with Community Lender Subrecipients to account for and evaluate practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of their financial risk management policies and procedures.

5J - 84094301 - 1     Page 40

The Recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include working with Community Lender Subrecipients to account for climate-related financial risks, including physical and transition risks, including through providing Technical Assistance Services that assist Community Lender Subrecipients with accounting for such climate-related financial risks in their own policies and procedures.

## 4. Additional Requirements

The Recipient agrees to not subordinate EPA's interest in grant funds that have not yet been used for program purposes in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law. Once a Recipient uses grant funds for program purposes and incurs a financial obligation, as defined under 2 CFR 200.1, EPA will only seek claims on those funds in the event that they were used for costs that do not comply with the terms and conditions of the Award Agreement or if there is adequate evidence of waste, fraud, or abuse, prompting adverse action by EPA per 2 CFR 200.339. This does not prohibit the use of subordinated debt as a form of Financial Assistance.

The Recipient agrees to provide Community Lender Subrecipients with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(f).

## P. Historic Preservation

### National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The Recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties can include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The Recipient should work with their Project Officer to ensure that Subrecipients are available to work with EPA on any required consultation process with the State Historic Preservation Office (SHPO) or Tribal Historic Preservation Office (THPO) prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

### Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific,

Case 1:25-cv-00948-TSC    Document 6-8    Filed 04/01/25    Page 42 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 195 of 265

5J - 84094301 - 1    Page 41

prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The Recipient must ensure that Subrecipients performing construction projects are aware of this requirement, and the Recipient must notify EPA if the AHPA is triggered.

## Q. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the Recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The Recipient must comply with, and ensure Subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the Federal award" provision of 2 CFR 200.403(a). The Recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## R. Remedies for Non-Compliance

The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs provided in 2 CFR 200.343. As specified in 2 CFR 200.343, which will remain in effect throughout the term of this award, costs during suspension or after termination are allowable if (a) the costs result from financial obligations which were properly incurred by the non-Federal entity before the effective date of suspension or termination, are not in anticipation of it, and (b) the costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

The Recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the Recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of Subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the Recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action.

Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing a reasonable opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Performance Reporting National Programmatic Term and Condition, Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements,

Case 1:25-cv-00948-TSC    Document 6-8    Filed 04/01/25    Page 43 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 196 of 265

5J - 84094301 - 1    Page 42

requirements for Subrecipient oversight, or to obligate or expend funds for allowable activities.

## S. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The Recipient agrees to comply with these clarifications.

### 1. Indirect Cost Rate

The Recipient must exclude costs for Acquisitions of Intangible Property from any calculations of modified total direct costs (MTDC), as defined in 2 CFR 200.1. Intangible Property is not a "service" and therefore is not included in MTDC. The Recipient should note that Subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive Participant Support Costs cannot charge an indirect cost rate against their Participant Support Cost payments.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $50,000 of each Subaward (regardless of the period of performance of the Subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, Participant Support Costs and the portion of each Subaward in excess of $50,000.

In the event that the Recipient is compensating an affiliated entity for its direct and indirect costs related to use of employees, the Recipient must not charge its indirect cost rate against any of these costs.

Notwithstanding the General Term and Condition "Indirect Cost Rate Agreements," the Recipient may claim up to a 15% de minimis rate of modified total direct costs authorized by 2 CFR 200.414(f).

### 2. Sufficient Progress

The EPA Project Officer may assess whether the Recipient is making sufficient progress in implementing the workplan in effect under this Assistance Agreement within 90 calendar days of June 30, 2025 as well as within 90 calendar days of June 30 of each year thereafter during the Period of Performance. "Sufficient progress" shall be assessed based on a comparison of the Recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. As noted under the Financial Risk Management Programmatic Term and Condition, the Recipient's financial health, as measured by the required Financial Health Metrics, are also an input in this process. This term and condition "flows down" to Subrecipients, with the Recipient required to assess whether each Subrecipient is making sufficient progress in implementing the workplan under its Subaward Agreement; the Recipient may increase the frequency and scope of the review of sufficient progress of Subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the Recipient has not made sufficient progress in implementing its workplan in effect under this Assistance Agreement, the Recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

EPA will not find that the Recipient has failed to make sufficient progress in implementing its workplan in effect under this Assistance Agreement based on shifts between types of Financial Assistance and/or

Case 1:25-cv-00948-TSC    Document 6-8    Filed 04/01/25    Page 44 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 197 of 265

5J - 84094301 - 1    Page 43

CCIA-Eligible Projects over the Period of Performance (or other shifts in portfolio allocation, such as by region or market segment, over the Period of Performance). If EPA finds the Recipient has failed to achieve sufficient progress on deployment of Financial Assistance to CCIA-Eligible Projects in general, or is achieving progress at a slower rate than projected under the workplan in effect under this Assistance Agreement, the Recipient will have an opportunity to implement a corrective action plan pursuant to 2 CFR 200.208.

### 3. Termination

EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status,  prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.960 (CCIA) to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

### T. Period of Performance

The Period of Performance under this Award Agreement will end on the date specified in the Notice of Award. However, the Period of Performance may end prior to the date specified in the Notice of Award if all required work of the Federal award has been completed, in accordance with 2 CFR 200.344. In accordance with 2 CFR 200.344(b), the Recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the Period of Performance. In this context, to "liquidate all financial obligations" means to pay outstanding bills, such as the payment of staff salaries accrued during the Period of Performance but for which the due date falls after the end date of the Period of Performance.

The Recipient should note that the Recipient will not be considered to have met the requirements for closeout under its award under 2 CFR 200.344 so long as any Subrecipient has not met the requirements for closeout under its subaward under 2 CFR 200.344.

Notwithstanding the Extension of Project/Budget Period Expiration Date General Term and Condition, in accordance with 2 CFR 200.308(g)(2), the Recipient is authorized to initiate a one-time extension of the Period of Performance by up to 12 months without prior EPA approval, provided that the extension complies with the requirements 2 CFR 200.308(g)(2). In accordance with 2 CFR 200.308(g)(2), the Recipient must "notify the Federal agency in writing with the supporting justification and a revised period of performance at least 10 calendar days before the conclusion of the period of performance."

### U. Closeout Agreement

As provided at 2 CFR 200.307(c) and 2 CFR 1500.8(d), after the end of the Period of Performance of the

5J - 84094301 - 1    Page 44

Assistance Agreement, the Recipient may keep and use Program Income remaining at the end of the Assistance Agreement and use Post-Closeout Program Income in accordance with this term and condition. The Closeout Agreement goes into effect for this Assistance Agreement the earlier of 1) the day after the Assistance Agreement Period of Performance ends, 2) the first date when all required work of the Federal award has been completed in accordance with 2 CFR 200.344 and the Recipient has met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition) or 3) an alternative date that is mutually agreed by the Recipient and the EPA Grants Management Officer or Award Official.

In accordance with 2 CFR 200.344, EPA will proceed to closeout the Award Agreement and enter the Closeout Period even if the Recipient has not met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition). As provided in 2 CFR 200.344: "When the recipient or subrecipient fails to complete the necessary administrative actions or the required work for an award, the Federal agency or pass-through entity must proceed with closeout based on the information available." This Closeout Agreement is therefore self-executing.

This term and condition is the entire Closeout Agreement between the EPA and the Recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The Recipient shall comply with the requirements specified below as part of the Closeout Agreement. Definitions within 2 CFR 200.1, including as supplemented through *I. Definitions* of this award agreement, apply identically to how they do under the Period of Performance, unless otherwise noted.

As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to Subrecipients such that the Recipient must enter into a corresponding Closeout Agreement with any Subrecipient that has Program Income or anticipates generating Post-Closeout Program Income at the end of the Subrecipient's Period of Performance.

## 1. Allowable Activities

The Recipient shall use Post-Closeout Program Income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

After the Closeout Agreement becomes effective, the Recipient shall disclose annual reports publicly, as described in the Performance Reporting Programmatic Term and Condition, rather than meeting the reporting requirements described in the Performance Reporting Programmatic Term and Condition.

## 3. LIDAC Expenditure Requirements

The Recipient shall expend 100% of Post-Closeout Program Income for the purposes of providing Financial Assistance in Low-Income and Disadvantaged Communities and comply with this requirement in accordance with the LIDAC Expenditure Requirement Programmatic Term and Condition, as applicable. Funds used for the purposes of providing Financial Assistance includes Capitalization Funding; Technical Assistance Subawards; Technical Assistance Services; and Program Administration

Case 1:25-cv-00948-TSC    Document 6-8    Filed 04/01/25    Page 46 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 199 of 265

5J - 84094301 - 1    Page 45

Activities. This requirement applies to the entire award provided to the Recipient and "flows down" to each Subrecipient.

## 4. Cash Management Requirements

The Recipient must maintain Post-Closeout Program Income in accordance with the Cash Management Requirements in the Financial Risk Management Requirements Programmatic Term and Condition, as applicable. However, the Recipient may submit a Cash Management Policy for review and approval by the EPA Project Officer, which can authorize the Recipient to deviate from the aforementioned Cash Management Requirements.

## 5. Financial Health Metrics

After the Closeout Agreement becomes effective, the Recipient agrees to report financial health metrics in accordance with the Financial Health Metrics in the Financial Risk Management Requirements Programmatic Term and Condition (on behalf of the Recipient, Pass-Through Subrecipients, as well as Community Lender Subrecipients that have received in excess of $10,000,000 in Capitalization Funding) publicly, rather than disclosing the metrics to EPA, as applicable. The requirement for submission of financial health metrics is not applicable for any fiscal year in which the reporting entity did not meet the requirements of 2 CFR Subpart F—Audit Requirements. The Recipient agrees to add the following two financial health metrics as part of the financial health metrics for the Closeout Period:

1. Self-Sufficiency Ratio: The self-sufficiency ratio is defined as earned revenue divided by operating expenses, where earned revenue is equal to the value of all income earned from normal business transactions and operating expenses is equal to the value of all expenses incurred as a part of normal business operations over the prior 12-month period, not including interest, financing, depreciation, amortization, and loan loss provision expense.

2. Operating Cash Ratio: The operating cash ratio is defined as cash and cash equivalents divided by operating expenses, where cash and cash equivalents is equal to the total value of all cash and cash equivalent items that can be converted into cash immediately and operating expenses is equal to the value of all expenses incurred as a part of normal business operations over the prior 12-month period, not including interest, financing, depreciation, amortization, and loan loss provision expense.

## 6. Conflicts of Interest

The Recipient agrees to comply with the conflict of interest requirements described in the Conflicts of Interest Programmatic Term and Condition through September 30, 2031.

## 7. Remedies for Non-Compliance

The Recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable. During the Closeout Period, the workplan and budget submitted for the Period of Performance are no longer applicable.

## 8. Suspension and Debarment

The Recipient agrees to ensure that Post-Closeout Program Income is not transferred to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The Recipient

5J - 84094301 - 1    Page 46

can maintain compliance with this requirement through either (1) checking the System for Award Management (for Subrecipients, Contractors, or Program Beneficiaries) or (2) obtaining eligibility certifications from counterparts (for Program Beneficiaries). The Recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity is presently excluded or disqualified.

## 9. Non-Discrimination

The Recipient must use Post-Closeout Program Income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

**Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975.** The Recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency" in 40 CFR Part 5 and 40 CFR Part 7, the Recipient agrees, and will require all Subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

**Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities.** As provided in section 301 of the Executive Order, the Recipient will ensure that Subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to Real Property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 10. Record-Keeping

In accordance with 2 CFR 200.334(e), the Recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of Post-Closeout Program Income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. Note that this requirement applies if and when the Closeout Agreement is terminated, in accordance with *Item 14. Termination of the Closeout Agreement*. EPA may obtain access to these records to verify that Post-Closeout Program Income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the Recipient must maintain adequate accounting records for how Post-Closeout Program Income is managed and spent as well as all other appropriate records and documents related to the activities conducted using Program Income.

The Recipient agrees to ensure that Subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. The Recipient may use the terms of its Subaward Agreements or other effective means to meet its responsibilities.

5J - 84094301 - 1    Page 47

## 11. Other Federal Requirements

The following other federal requirements apply to the use of Post-Closeout Program Income under the Closeout Period to the same extent they do under the terms of the Performance Period:

- Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Development Requirements Programmatic Term and Condition;
- Build America, Buy America Act, as specified in the Build America, Buy America Act Programmatic Term and Condition; and
- National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition.

No other federal requirements apply to the use of Post-Closeout Program Income under the terms of this Closeout Agreement, other than those specified in this Closeout Agreement.

## 12. Audit Requirements

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Closeout Period, as activities related to the Federal award referenced in 2 CFR 200.502(a) include activities during the Closeout Period.

Through September 30, 2031, the Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## 13. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Closeout Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## 14. Termination of the Closeout Agreement

The Closeout Agreement terminates when either of the following situations occur: (1) the Recipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Recipient and the EPA Award Official or Grants Management Officer mutually agree to terminate the Closeout Agreement, with the Recipient remitting current and future Post-Closeout Program Income to the federal government.

The ability to terminate the Closeout Agreement flows down to Subrecipients, as a Closeout Agreement between the Recipient and Subrecipient terminates when either (1) the Subrecipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Subrecipient and the Recipient mutually agree to terminate the Closeout Agreement, with the Subrecipient remitting current and future Post-Closeout Program Income to the Recipient.

Case 1:25-cv-00948-TSC    Document 6-8    Filed 04/01/25    Page 49 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 202 of 265

5J - 84094301 - 1    Page 48

The de minimis amount must be agreed-upon in writing by the Recipient and the Director of the Office of the Greenhouse Gas Reduction Fund (or equivalent), prior to the Recipient using the "de minimis" criteria to terminate the Closeout Agreement.

## 15. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and the Authorized Representative on the EPA Key Contacts Form most recently submitted to the EPA Project Officer (for the Recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

## V. Legal Counsel

The Recipient agrees to appoint appropriate legal counsel if counsel is not already available.

## W. Accounting Principles

The Recipient must account for award funds in accordance with Generally Accepted Accounting Principles (GAAP) as in effect in the United States.

The Recipient must segregate and account for the award funds separately from all other program and business accounts. Additionally, the Recipient must segregate and account for Program Income separately from all other program and business accounts.

## X. Internal Controls

The Recipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at: https://www.gao.gov/assets/gao-14-704g.pdf.

## Y. Audits

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Period of Performance, as described in the Audit Requirements General Term and Condition. Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(i), the Recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit Subrecipient that expends $1,000,000 or more of EPA funds from the Recipient's grant program in the Subrecipient's fiscal year. Any for-profit Subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier.

The Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

5J - 84094301 - 1     Page 49

## Z. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that specific conditions are necessary to ensure that the Clean Communities Investment Accelerator Fund program is effectively carried out by Eligible Recipients that have not previously managed grants with the same scale and complexity of this agreement. These specific conditions will remain in effect throughout the Period of Performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer or the Division Director of the Clean Communities Investment Accelerator program, will oversee and monitor the grant agreement through activities, if determined necessary, including:

> 1. Upon request, requiring the Recipient to participate in an annual workshop (i.e., one workshop per calendar year) with other Recipients under the National Clean Investment Fund and/or Clean Communities Investment Accelerator; the EPA Project Officer will contact the Recipient to finalize details for each annual workshop.

> 2. Participation in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the workplan in effect under this Assistance Agreement, provided the Recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other Recipients under the Greenhouse Gas Reduction Fund with other EPA programs; and coordination by EPA staff with other federal programs to avoid duplication of effort;

> 3. Closely monitoring the Recipient's management and oversight of Subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

> 4. Closely monitoring the Recipient's performance to verify compliance with the workplan in effect under this Assistance Agreement and achievement of environmental results;

> 5. Participating in periodic telephone conference calls with Recipient personnel to discuss project successes and challenges as well as similar items impacting program performance;

> 6. Reviewing and commenting on performance reports prepared under the Award Agreement. Note that the final decision on the content of performance reports rests with the Recipient;

> 7. Verifying that the Recipient is expending the award on allowable activities, including but not limited to reviewing a sample of Capitalization Funding and Technical Assistance Subawards to verify compliance with regulatory requirements and the terms and conditions of the Award Agreement; and

> 8. Periodically reviewing costs incurred by the Recipient as well as its contractors and Subrecipients if needed to ensure appropriate expenditure of grant funds. Note that Recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds.

Subject to approval by the EPA Award Official, the EPA Project Officer and the Recipient may mutually

5J - 84094301 - 1    Page 50

agree to additional areas of oversight and monitoring.

*Method for Reconsideration.* If the Recipient believes that one or more of these specific conditions are not warranted or requires modification, the Recipient must file a written objection naming the specific condition(s) within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist, and Project Officer identified in the Notice of Award.

## AA. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the Recipient's GGRF award. These materials may include links to Recipient and/or Subrecipients' websites. The Recipient agrees to work with the EPA Project Officer or another member of GGRF program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## AB. Conflicts of Interest

The Recipient must comply with requirements on transfers of funds that create actual and potential conflicts of interest, as specified in this term and condition. Transfers of funds include Subawards, Contracts (including but not limited to Acquisitions of Intangible Property), and Participant Support Costs. The definitions in the [EPA's Financial Assistance Conflict of Interest Policy](#) (COI Policy) apply to this term and condition.

There are three categories of transfers of funds, with the requirements differing by each category (as specified in this term and condition):

1. **Transfers with Affiliated Entities:** Subawards, Contracts, and Participant Support Costs to Affiliated Entities or co-invested in projects with Affiliated Entities. An Affiliated Entity is any entity that is related to the Recipient in accordance with the indicia of control described in 2 CFR 180.905.

2. **Financial Assistance to CCIA-Eligible Projects:** Subawards, Contracts (in the form of Acquisitions of Intangible Property), and Participant Support Costs as forms of Financial Assistance to CCIA-Eligible Projects, unless such transfers are with Affiliated Entities. These transfers are not within the scope of the COI Policy, which states that "subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by recipients of revolving loan fund capitalization grants or other EPA financial assistance agreements where Agency funds may be used for lending activities."

3. **Subgrants and Contracts:** Subgrants and Contracts (other than Acquisitions of Intangible Property), unless such transfers are with Affiliated Entities.

Note that all Contracts (including Acquisitions of Intangible Property) must also comply with the conflict of interest standards in 2 CFR 200.318(c).

## 1. Transfers with Affiliated Entities

### Prior Approval of COI Mitigation Plan

The Recipient must not transfer funds with Affiliated Entities unless those transfers have been included in

Case 1:25-cv-00948-TSC    Document 6-8    Filed 04/01/25    Page 52 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 205 of 265

5J - 84094301 - 1    Page 51

an EPA-approved COI Mitigation Plan on Transfers of Funds with Affiliated Entities. The Recipient agrees to seek prior EPA approval for changes to the COI Mitigation Plan on Transfers of Funds with Affiliated Entities.

## Quarterly Disclosure Requirement

The Recipient agrees to disclose, on a quarterly basis, a list of newly originated transfers of funds with Affiliated Entities that are within the scope of its EPA-approved COI Mitigation Plan on Transfers of Funds with Affiliated Entities. Each quarterly disclosure must include (1) a list of such transfers of funds made over the quarter and (2) steps taken to taken to eliminate, neutralize or mitigate any conflicts of interest, in accordance with the EPA-approved COI Mitigation Plan on Transfers of Funds with Affiliated Entities. The Recipient must disclose its own transfers as well as transfers made by Subrecipients.

The quarterly periods for such disclosures are defined as follows: April 1 to June 30; July 1 to September 30; October 1 to December 31; and January 1 to March 31. The Recipient must make the disclosures to the EPA Project Officer within 30 calendar days of the end of the quarterly period.

## Project Officer Review

In accordance with 2 CFR 200.337, the EPA Project Officer may access records relating to a subset of transactions disclosed to review for compliance with the Recipient's EPA-approved COI Mitigation Plan on Transfers of Funds with Affiliated Entities as well as this term and condition. The EPA Project Officer will not approve transfers of funds in advance but rather will review transfers of funds that have already occurred for compliance.

## Waivers and Modifications

EPA agrees that, for transfers of funds with Affiliated Entities, the requirements of this term and condition apply in lieu of the requirements of the Disclosing Conflict of Interest General Term and Condition.

On a case-by-cases basis, the EPA Project Officer may extend the due date for disclosures on transfers of funds with Affiliated Entities. On a case-by-case basis, the EPA Project Officer may waive or modify the disclosure requirements on transfers of funds with Affiliated Entities.

## 2. Financial Assistance to CCIA-Eligible Projects

## Semi-Annual Disclosure Requirement

The Recipient agrees to disclose, on a semi-annual basis, a list of transfers of funds as Financial Assistance to CCIA-Eligible Projects with actual and potential conflicts of interest. Each semi-annual disclosure must include (1) a list of such transfers of funds made over the semi-annual period and (2) steps taken to taken to eliminate, neutralize or mitigate any conflicts of interest, in accordance with any EPA-approved documents related to eliminating, neutralizing, and mitigating conflicts of interest. The Recipient must disclose transfers made by Subrecipients.

The semi-annual periods for such disclosures are defined as follows: July 1 to December 31; January 1 to June 30. The Recipient must make the disclosures to the EPA Project Officer within 30 calendar days of the end of the semi-annual period.

5J - 84094301 - 1    Page 52

## B. Project Officer Review

In accordance with 2 CFR 200.337, the EPA Project Officer may access records relating to a subset of transactions disclosed to review for compliance with the Recipient's EPA-approved documents related to eliminating, neutralizing, and mitigating conflicts of interest as well as this term and condition. The EPA Project Officer will not approve transfers of funds in advance but rather will review transfers of funds that have already occurred for compliance.

## C. Waivers and Modifications

On a case-by-cases basis, the EPA Project Officer may extend the due date for disclosures on transfers of funds as Financial Assistance to Qualified Projects. On a case-by-case basis, the EPA Project Officer may waive or modify the disclosure requirements on transfers of funds as Financial Assistance to Qualified Projects.

## 3. Subgrants and Contracts

The Recipient agrees to comply with the Disclosing Conflict of Interest General Term and Condition for Subgrants and Contracts (excluding Acquisitions of Intangible Property), unless such transfers are with Affiliated Entities. If such transfers are with Affiliated Entities, then the Recipient is required to include them in the process specified in *1. Transfers with Affiliated Entities*.

## AC. Prior Approvals

EPA will only have authority to review and approve revisions to the Recipient's workplan in effect under this Assistance Agreement, budget, and other documents if authorized by 2 CFR 200.308 or 2 CFR 200.208. The Recipient must contact the EPA Project Officer when the EPA has prior approval authority specified below. Denial of a request for prior approval will be provided in writing, with an explanation of the rationale.

## Workplan

For the purposes of this Award Agreement, EPA interprets 2 CFR 200.308(c)(1) to enable the Recipient to revise the activities specified in its workplan in effect under this Assistance Agreement without prior EPA approval, provided the activities still comply with the terms and conditions of the Award Agreement. The allowable and allocable grant costs are narrowly defined, pursuant to the terms and conditions of the Award Agreement; in accordance with 2 CFR 200.308(c)(1), any changes to the workplan in effect under this Assistance Agreement that comply with the statute as well as the terms and conditions would not be a "change in the scope or objective of the project or program." Therefore, so long as the Recipient is updating its workplan in effect under this Assistance Agreement with the revised activities in accordance with the terms and conditions of the Award Agreement, EPA will not require prior approval.

## Budget

For the purposes of this Award Agreement, EPA implements 2 CFR 200.308(i)(2) in accordance with Item 1 of the Transfer of Funds General Term and Condition to enable the Recipient to revise the EPA-approved budget included in its Award Agreement without prior EPA approval, provided the cumulative funding transfers among Object Class Categories (Personnel, Fringe Benefits, Travel, Equipment, Supplies, Contractual, Construction, Other, Indirect) do not exceed 10% of the total budget approved at

Case 1:25-cv-00948-TSC    Document 6-8    Filed 04/01/25    Page 54 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 207 of 265

5J - 84094301 - 1    Page 53

time of award. Therefore, so long as the Recipient is updating its EPA-approved budget by transferring funds by less than or equal to these amounts, EPA will not require prior approval.

However, notwithstanding the requirements of 2 CFR 200.308(i)(2), if the Recipient seeks to transfer any amount of funds budgeted for Participant Support Costs to other budget categories, then it must seek prior approval pursuant to 2 CFR 200.308(f)(5).

## Transfers of Funds

2 CFR 200.308(f)(6) requires the Recipient to obtain prior agency approval for "Subaward activities not proposed in the application and approved in the Federal award." If the types of activities are described in the workplan in effect under this Assistance Agreement (including types of transfers to be conducted through Subawards, Participant Support Costs, Acquisitions of Intangible Property, and other Contracts as defined in 2 CFR 200.1), then EPA has provided the necessary prior agency approval for the purposes of 2 CFR 200.308(f)(6). Approval for the purposes of this regulation does not mean that such transfers of funds are compliant with the statutes, regulations, and terms and conditions.

## Changes in Key Personnel

2 CFR 200.308(f)(2) requires the Recipient to obtain prior agency approval for a "[c]hange in key personnel (including employees and contractors) that are identified by name or position in the Federal Award." If the Recipient is seeking to add or replace a "key person," as defined by members of the board of directors and Senior Management whose roles are specified in the most recently submitted Organizational Plan, then the Recipient must obtain prior EPA approval of the qualifications of the key person.

The Recipient must request prior agency approval for an addition or replacement of a "key person" via email through the EPA Project Officer, who will have 8 calendar days to communicate EPA's disapproval of their qualifications via email, along with an accompanying justification. If 8 calendar days have passed without notification of EPA disapproval of the key person's qualifications pursuant to 2 CFR 200.308(c)(2), the Recipient is authorized to change the "key person." Once the change is effective, the Recipient must submit an updated Organizational Plan to the EPA Project Officer.

## AD. Flow-Down Requirements

As described in 2 CFR 200.101(b)(1), the terms and conditions of Federal awards flow down to Subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(b), the Recipient agrees to ensure that Subrecipients are aware of the requirements that apply to the Subrecipient.

For the purposes of this Award Agreement, all terms and conditions must flow down to Subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to Subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## AE. Resolution of Disputes Termination Provision

The Recipient is precluded from drawing down more than 78.46% of the Total Approved Assistance Amount until this condition is removed, which will occur when: a) the EPA Award Official, at the direction

Case 1:25-cv-00948-TSC    Document 6-8    Filed 04/01/25    Page 55 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 208 of 265

5J - 84094301 - 1    Page 54

of the Grants Competition Disputes Decision Official (GCDDO), provides written confirmation that all administrative disputes under the National Clean Investment Fund and the Clean Communities Investment Accelerator are resolved in accordance with the dispute resolution procedures in Appendix A of the EPA Order 5700: Policy for Competition of Assistance Agreements; or b) the administrative disputes are withdrawn, abandoned or dismissed; or c) December 31, 2024, whichever is sooner.

If EPA does need to alter the Selection Official's selection and partial funding decisions for this agreement based on a GCDDO determination the EPA Award Official will partially terminate this assistance agreement, de-obligate a portion of the funds that have been obligated and use the de-obligated funds to satisfy the terms of a GCDDO remedy benefiting another entity. The Recipient will then provide an updated workplan and budget information, as needed, to amend the agreement.

For the purposes of this term and condition, EPA's partial termination may apply not just to obligated funds that have not been drawn down from ASAP but also to Program Income that has been generated and retained by the Recipient under 2 CFR 1500.8(d) and the Program Income Programmatic Term and Condition of this agreement. In accordance with 2 CFR 200.307(e)(1), EPA may require that the amount of funds committed by EPA to the Recipient be reduced by all or some of the Program Income that has been generated by the Recipient.

## AF. Deposit Account at Financial Agent

A depository institution has been designated as a financial agent of the United States (the Financial Agent) for the Greenhouse Gas Reduction Fund. The Recipient is required to set up and utilize an Account or Accounts at the Financial Agent in accordance with the Financial Agent Terms and Conditions (Section V) included in this Assistance Agreement.

## AG. Interim SF-425 Requirement

The Recipient must submit an SF-425 within 30 calendar days of receiving access to an Account or Accounts at the Financial Agent, with the SF-425 covering all activities supported by funds drawn from ASAP and disbursed for actual and allowable costs, other than funds disbursed into the Account or Accounts at the Financial Agent.

## AH. Amendments to Terms and Conditions

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## AI. Preservation of Guidance and Data

Any statutes, regulations, agency documents, policies, and guidance (including FAQs and EPA's Implementation Framework for the Greenhouse Gas Reduction Fund), or executive orders referenced herein are incorporated by reference into the Award Agreement as of the effective date of this amended Award Agreement. These incorporated documents will be controlling on Recipient and Subrecipients in the event such documents are deleted, repealed, rescinded, or replaced unless a statute provides otherwise. This includes, but is not limited to, the Uniform Administrative Requirements, Cost Principles and Audit Requirements for Federal Awards; Title 2 CFR Part 200 effective October 1, 2024, and the EPA General Terms and Conditions effective October 1, 2024.

Case 1:25-cv-00948-TSC    Document 6-8    Filed 04/01/25    Page 56 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 209 of 265

5J - 84094301 - 1    Page 55

This provision cannot be changed without the consent of the Recipient.

## IV. ADMINISTRATIVE TERMS AND CONDITIONS

Please refer to Page 4, "Administrative Conditions."

## V. FINANCIAL AGENT TERMS AND CONDITIONS

### A. Revisions to Award Agreement to Account for Financial Agent Arrangement

Because a depository institution has been designated as a financial agent of the United States (the Financial Agent) for the Greenhouse Gas Reduction Fund, the following revisions to the Award Agreement are effective without further action or notice required by the Recipient or EPA.

### 1. Revisions to Section I. Definitions

*The following **new definition** will be added to the Award Agreement:*

**Capitalization by Nonexchange Capital Contribution:** Capitalization by Nonexchange Capital Contribution means award funds that (1) the Recipient draws down from the Automated Standard Application Payments (ASAP) system and (2) disburses into the 'Budget Account' as defined under the Deposit Account at Financial Agent Programmatic Term and Condition to capitalize itself for subsequent use for any of the following Allowable Activities: Capitalization Funding; Technical Assistance Subawards; Technical Assistance Services; and Program Administration Activities. Under this two-step transaction, which involves both a drawdown and disbursement, the Recipient's drawdown from ASAP is deemed (a) an advance payment of Federal funds in accordance with 2 CFR 200.305(b)(1); while the disbursement into the Deposit Account at Financial Agent is deemed (b) an allowable cost to be charged to the EPA award, and (c) a "nonexchange transaction", consistent with the definition of this term in the Statement of Federal Financial Accounting Standards No. 5. The full amount of the Capitalization by Nonexchange Capital Contribution must be recognized, reported, and accounted for as Program Income in accordance with the Program Income Programmatic Term and Condition once clauses (a) and (b) are fulfilled. Any Subrecipient with a Deposit Account at Financial Agent will be entitled to receive its payments from Recipient as a Capitalization by Nonexchange Capital Contribution.

*The definition of **Program Income** under the Award Agreement will be amended and replaced with:*

**Program Income:** 2 CFR 200.1 defines Program Income as "gross income earned by the non-Federal entity that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(f)." 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, there are two types of Program Income: (1) "Program Income from Operations" and (2) "Program Income from Capitalization by Nonexchange Capital Contribution".

Program Income from Operations includes but is not limited to income from origination fees, servicing fees, and asset management fees; dividends from equity investments; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss

JA2069

Case 1:25-cv-00948-TSC    Document 6-8    Filed 04/01/25    Page 57 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 210 of 265

5J - 84094301 - 1    Page 56

reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). Under this award agreement, the Recipient is authorized to deduct the cost of generating Program Income from Operations under 2 CFR 200.307(b) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Program Income from Operations include origination, servicing, and management costs that are not charged as direct costs to the Federal award. Costs of generating Program Income from Operations can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the Program Income from Operations, provided the Recipient can account for the actual costs incurred. Program Income from Operations requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries. Program Income from Operations can be earned prior to the availability of the 'Program Income from Operations' account as defined under the Deposit Account at Financial Agent Programmatic Term and Condition.

Program Income from Capitalization by Nonexchange Capital Contribution means award funds from the ASAP system that the Recipient draws down and immediately deposits into the 'Budget Account' at the Financial Agent in accordance with (a) the definition of Capitalization by Nonexchange Capital Contribution and (b) the Deposit Account at Financial Agent Programmatic Term and Condition. Program Income from Capitalization by Nonexchange Capital Contribution cannot be earned prior to the availability of the 'Budget Account' as defined under the Deposit Account at Financial Agent Programmatic Term and Condition.

Both forms of Program Income under this program must be treated in accordance with the Program Income Programmatic Term and Condition. EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fund raising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

## 2. Revisions to Section II. National Programmatic Terms and Conditions

The **Program Income Programmatic Term and Condition** will be amended and replaced with:

## Program Income

In accordance with Clean Air Act Section 134(b)(1)(C) as well as 2 CFR 200.307(e)(2) and 2 CFR 1500.8 (b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

Case 1:25-cv-00948-TSC    Document 6-8    Filed 04/01/25    Page 58 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 211 of 265

5J - 84094301 - 1    Page 57

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income from Operations once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income from Operations may be used by the Recipient in advance of the initial award funds (i.e. Program Income from Capitalization by Nonexchange Capital Contribution) being fully used where reasonable and necessary to execute the activities in the workplan in effect under this Assistance Agreement.

### 3. Revisions to Section III. Additional Programmatic Terms and Conditions

*The Allowable and Unallowable Activities Programmatic Term and Condition will be amended and replaced with:*

### Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Capitalization by Nonexchange Capital Contribution; Capitalization Funding; Technical Assistance Subawards; Technical Assistance Services; and Program Administration Activities. The Recipient must use awards funds exclusively for allowable activities within the ten EPA regions, with the exception of the Freely Associated States. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

Capitalization by Nonexchange Capital Contribution generates Program Income for the Recipient in an amount equal to the available EPA award balance drawn down from ASAP into the 'Budget Account' as defined under the Deposit Account at Financial Agent Programmatic Term and Condition. Program Income from Capitalization by Nonexchange Capital Contribution must be expended on Capitalization Funding, Technical Assistance Subawards, Technical Assistance Services, and Program Administration Activities in accordance with the workplan in effect under this Assistance Agreement. The allowability of legal costs incurred in connection with the award shall be governed by applicable provisions of 2 CFR Part 200, Subpart E, including but not limited to 2 CFR 200.403, 2 CFR 200.435, 2 CFR 200.441 and 2 CFR 200.459.

The Recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of CCIA-Eligible Projects; and (b) activities that support deployment of projects outside the boundaries of the ten EPA regions.

*The Deposit Account at Financial Agent Programmatic Term and Condition will be amended and replaced with:*

### Deposit Account at Financial Agent

The Recipient will open a Deposit Account at a depository institution that has been designated as a financial agent of the United States (the Financial Agent). Such account will be used as Recipient's operating account for the award. Upon establishment of the Deposit Account, the Recipient will drawdown the entire available EPA award balance from ASAP and disburse it into the Deposit Account, where it must be maintained until the Closeout Agreement goes into effect in accordance with the Closeout Agreement Programmatic Term and Condition. Note, this requirement applies to any and all drawdowns from ASAP by the Recipient while the Deposit Account is available and accessible. Once the Closeout Agreement goes into effect, the Recipient will be entitled to transfer any remaining funds in the

Deposit Account to an account at a financial institution of its choosing, provided such account is insured in accordance with 2 CFR 200.305(b)(10)).

The Recipient will grant EPA a perfected security interest in all funds held in the Deposit Account. The Recipient will take all such actions, enter into all such agreements, and execute and deliver all such documentation as may be necessary and/or as directed by EPA from time to time to establish and maintain such security interest, including but not necessarily limited to entering into an account control agreement (ACA) with the Financial Agent and EPA.

Notwithstanding any other provision of this Assistance Agreement, EPA will only furnish the Financial Agent with a Notice of Exclusive Control under an ACA when EPA issues a written determination and finding that the Recipient has failed to comply with the terms and conditions of this Assistance Agreement, and that noncompliance is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse or material misrepresentation of eligibility status, and that EPA has initiated action under 2 CFR 200.339 to wholly or partly suspend or terminate the Federal award, as authorized in the terms of the Assistance Agreement. The written determination and finding and a copy of the Notice of Exclusive Control shall be sent to the Recipient when the Notice of Exclusive Control is furnished to the Financial Agent. EPA and Recipient have mutually agreed only to the specific process outlined in this term for furnishing a Notice of Exclusive Control instruction to the Financial Agent.

Note, funds in the Deposit Account that were legally obligated by the Recipient for financial obligations, as defined under 2 CFR 200.1, prior to the issuance of, but not in anticipation of, a Notice of Exclusive Control constitute "financial obligations which were properly incurred" by the Recipient in accordance with 2 CFR 200.343 and are to remain allowable costs during suspension or after termination of the Recipient's Assistance Agreement. Funds necessary to meet such financial obligations will be disbursed to Program Beneficiaries, Subrecipients, Contractors, or any other third parties which are due payment after a Notice of Exclusive Control is issued.

Note further that a financial obligation to a third party for Financial Assistance is deemed "properly incurred" per 2 CFR 200.343 if it is a legally-binding, arms-length agreement where funds are transferred to the 'Reserve Account' in accordance with these terms and conditions. Any Notice of Exclusive Control shall not include any such funds. Funds necessary to meet such financial obligations for Financial Assistance will be disbursed to Program Beneficiaries, Subrecipients, Contractors, or any other third parties which are due payment after a Notice of Exclusive Control over other funds in the Deposit Account is issued.

Funds held in the Recipient's account at the Financial Agent may be invested in accordance with the Cash Management Requirements in the Financial Risk Management Programmatic Term and Condition. The Financial Agent will be compensated in accordance with the terms of a valid Financial Agency Agreement (FAA).

The Deposit Account will consist of three distinct account types ('Budget,' 'Reserve', and 'Program Income from Operations'), each of which serves a distinct purpose (while the exact naming convention and structure of these accounts may differ from the below, the accounts must perform a substantively similar function). The Recipient is required to utilize the accounts at the Financial Agent for their intended purpose during any period in which the accounts are available and accessible, with exceptions to this requirement permitted by the EPA Project Officer only on a case-by-case basis, to the extent such exceptions are necessary to execute against the workplan in effect under this Assistance Agreement.

## 1. Budget Account

This account within the Deposit Account will hold funds that have yet to be used for any of the following allowable activities: Capitalization Funding; Technical Assistance Subawards; Technical Assistance Services; and Program Administration Activities. It will hold funds within a number of sub-accounts that correspond to more specific allowable expenditures under the particular type of award or subaward.

**Transferring Funds Into the Budget Account.** Upon establishment of the Deposit Account, the Recipient will drawdown the entire available EPA award balance from ASAP directly into the Budget Account. The Recipient will direct the Financial Agent to allocate funds across the various sub-accounts in the Budget Account in accordance with its workplan in effect under this Assistance Agreement. Recipient need not submit a certification notice to transfer funds within the Budget Account, but remains subject to the Transfer of Funds EPA General Term and Condition and any associated pre-approval or notification requirements therein.

**Transferring Funds Out of the Budget Account.** When Community Lenders transfer funds out of the Budget Account to provide Financial Assistance to CCIA-Eligible Projects, Recipient must obtain certification from the Community Lender's chief executive officer (or equivalent), chief financial officer (or equivalent), chief reporting officer (or equivalent), or chief compliance officer (or equivalent) that the amount of the payment is necessary to execute against the workplan in effect under this Assistance Agreement, and ensure that notice is provided to the Financial Agent with the transfer request. The certification must include the following language: "This certification is a material representation for the purposes of an EPA Financial Assistance Agreement, and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions". In accordance with 2 CFR 200.337, the Recipient must make those certifications available to the EPA, upon request.

While transfers out of the Budget Account are not formally subject to any of the requirements established in either the EPA General Term and Condition on Automated Standard Application Payments (ASAP) and Proper Payment Draw Down or the Interim Drawdown Procedures Programmatic Term and Condition, Recipient agrees to the following requirements:

    a) When the need for a longer disbursement window is known in advance of the transfer, Recipient must notify the EPA Project Officer prior to executing the transfer and follow-up to inform the EPA Project Officer of the amount of the transfer that has been disbursed for an Allowable Activity in 5, 10, and 14 business days. Recipient must return any undisbursed amounts to the Deposit Account at the Financial Agent on the 15th business day, or

    b) When the need for a longer disbursement window is not known in advance of the transfer, Recipient must notify the EPA Project Officer of the delay no later than 5 business days after the transfer and follow-up to inform the EPA Project Officer of the amount of the transfer that has been disbursed for an Allowable Activity in 10 and 14 business days. Recipient must return any undisbursed amounts to the Deposit Account at the Financial Agent on the 15th business day.

Recipients must obtain prior written approval from the EPA Project Official (who will in turn notify the EPA Award Official) for any transfers that will not be disbursed for an Allowable Activity within 15 business days.

These requirements "flow down" to Subrecipients, who agree to provide the same notifications to and

5J - 84094301 - 1    Page 60

seek prior approval from Recipients where applicable.

<u>2. Reserve Account</u>

This account within the Deposit Account is intended to enable Community Lenders to set-aside funds within the Financial Agent for use for any form of Financial Assistance that requires the Community Lender to pledge or legally commit award funds for a future expenditure to a third party to meet a legal obligation.

**Transferring Funds Into the Reserve Account.** The Recipient must ensure that Community Lenders only transfer award funds into the Reserve Account for grant performance purposes if the Community Lender's chief executive officer (or equivalent), chief financial officer (or equivalent), chief reporting officer (or equivalent), or chief compliance officer (or equivalent) certify to Recipient, with notice provided to the Financial Agent with the transfer request, that the amount of the expenditure is necessary to execute against the workplan in effect under this Assistance Agreement, and that financing agreements for identified qualified projects necessitating the expenditure have been reviewed by Community Lender's counsel for legal sufficiency. The certification must include the following language: "This certification is a material representation for the purposes of an EPA financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions." In accordance with 2 CFR 200.337, the Recipient must make those certifications available to the EPA, upon request.

**Transferring Funds Out of the Reserve Account.**

**a. To Third Parties to Meet Legal Obligations**

Funds in the Reserve Account may not be disbursed to Program Beneficiaries, Subrecipients, Contractors, or any other third parties, unless the funds are necessary for the Community Lender to satisfy a legal obligation. The Community Lender may only transfer award funds out of the Reserve Account to meet legal obligations to such parties if the Community Lender's chief executive officer (or equivalent), chief financial officer (or equivalent), chief reporting officer (or equivalent), or chief compliance officer (or equivalent) certify to the Recipient, with notice provided to the Financial Agent with the transfer request, that the amount of the expenditure is necessary to pay a third party pursuant to a financing agreement that has been reviewed by Community Lender. The certification must include the following language: "This certification is a material representation for the purposes of an EPA financial Assistance Agreement and knowing and willful false statements may be subject to prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions." In accordance with 2 CFR 200.337, the Recipient must make those certifications available to the EPA, upon request.

While transfers out of the Reserve Account are not formally subject to any of the requirements established in either the EPA General Term and Condition on Automated Standard Application Payments (ASAP) and Proper Payment Draw Down or the Interim Drawdown Procedures Programmatic Term and Condition, Recipient agrees to hold Community Lenders to the following requirements:

> a) When the need for a longer disbursement window is known in advance of the transfer, Community Lender must notify the Recipient prior to executing the transfer and follow-up to inform the Recipient of the amount of the transfer that has been disbursed for an Allowable Activity in 5, 10, and 14 business days. Community Lender must return any undisbursed amounts to the Deposit Account at the Financial Agent on the 15th business day, or

Case 1:25-cv-00948-TSC    Document 6-8    Filed 04/01/25    Page 62 of 62
USCA Case #25-5122    Document #2114423    Filed: 05/05/2025    Page 215 of 265

5J - 84094301 - 1    Page 61

b) When the need for a longer disbursement window is not known in advance of the transfer, Community Lender must notify the Recipient of the delay no later than 5 business days after the transfer and follow-up to inform the Recipient of the amount of the transfer that has been disbursed for an Allowable Activity in 10 and 14 business days. Community Lender must return any undisbursed amounts to the Deposit Account at the Financial Agent on the 15th business day.

Community Lenders must obtain prior written approval from the Recipient (who will in turn notify the EPA Project Officer) for any transfers that will not be disbursed for an Allowable Activity within 15 business days.

## b. To Program Income from Operations Account

When funds in the Reserve Account are no longer necessary to meet prudent capital management practices consistent with the Community Lender's overall risk portfolio and a potential legal obligation to a third party pursuant to a financing agreement, the Community Lender may transfer such funds to the Program Income from Operations Account. Recipient need not submit a certification notice to effectuate such a transfer.

## 3. Program Income from Operations Account

This account within the Deposit Account will enable Program Income from Operations (as defined under the definition of Program Income) to be held, tracked, and segregated in accordance with the Accounting Principles Programmatic Term and Condition.

**Transferring Funds Into the Program Income from Operations Account.** When Recipient earns Program Income from Operations, it must deposit such funds into the Program Income from Operations Account. Recipient need not submit a certification notice to effectuate such a transfer. When Financial Agent generates interest income on behalf of Recipient by investing Recipient liquidity in accordance with the Cash Management Requirements under the Financial Risk Management Requirements Programmatic Term and Condition, it must deposit such income into the Program Income from Operations Account in accordance with the terms of the FAA. Such interest income is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12).

**Transferring Funds Out of the Program Income from Operations Account.** Funds in this account may be transferred to either the Budget Account or Reserve Account to be used for grant performance purposes in accordance with the Program Income Programmatic Term and Condition. Recipient need not submit a certification notice to effectuate such a transfer.

**Flow-Down Requirements of Deposit Account at Financial Agent**. EPA may elect to extend the requirements under this term and condition to any and all Pass-Through Subrecipients or Community Lender Subrecipients of the Recipient at EPA's sole discretion, including but not limited to Recipient establishing and maintaining a security interest on all award funds held by its Pass-Through Subrecipients or Community Lender Subrecipients at the Financial Agent.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

INCLUSIV, INC.,

              Plaintiff,

    v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, *et al.,*

           Defendants.

Civil Action No.
1:25-cv-00948

## PLAINTIFF INCLUSIV, INC.'S EMERGENCY MOTION
## FOR TEMPORARY RESTRAINING ORDER

In addition to the relief requested in its preliminary injunction motion (ECF 6), Plaintiff Inclusiv, Inc., is moving for an emergency temporary restraining order under Rule 65(b) directing the restoration of its grant funds to its Citibank account. This request is necessary because counsel for EPA had agreed in writing "not to take any steps to move the money out of or exercise control over Inclusiv's Citi account while the TRO [in Case No. 25-cv-698] is in effect." Johnson Decl. ¶¶ 12–16 & Ex. D. Relying on that commitment, Inclusiv did not initially seek emergency relief in this case. But when Inclusiv's Chief Financial Officer checked the balance of its Citibank account around 12:30 on April 1, the money was gone. Sheaffer Decl. ¶¶ 18–19.

As Inclusiv's complaint and preliminary injunction papers explain, Inclusiv is the prime recipient of a $1.87 billion grant under EPA's Greenhouse Gas Reduction Fund (GGRF) program. Like other GGRF grant recipients, Inclusiv received a letter on March 11 purporting to terminate its grant. For all the

reasons discussed in Inclusiv's complaint and preliminary injunction papers, EPA's termination is arbitrary, capricious, and contrary to law, and should be set aside. Today's removal of funds from Inclusiv's account adds to Inclusiv's irreparable harm.

This Court has both inherent power and statutory authority to enjoin the reversion of Inclusiv's funds to the Treasury. Courts routinely use those powers to preserve the status quo if a statutory appropriation lapses while a lawsuit is pending. *E.g.*, *Burton v. Thornburgh*, 541 F. Supp. 168, 176 (E.D. Pa. 1982) (citing *Nat'l Ass'n of Reg. Councils v. Costle*, 564 F.2d 583, 588 (D.C. Cir. 1977)); 31 U.S.C. §§ 1502(b); *accord Westchester v. HUD*, 778 F.3d 412, 417 (2d Cir. 2015); *City of Houston v. HUD*, 24 F.3d 1421, 1426 (D.C. Cir. 1994) ("The equity powers of the courts allow them to take action to preserve the status quo of a dispute and protect their ability to decide a case properly before them." (quoting *Costle*, 564 F.2d at 588–89)). This Court should use those same powers now to restore the funds associated with Inclusiv's GGRF grant to Inclusiv's Citibank account.

The Court should act on an emergency basis because Inclusiv's grant funds could be beyond the Court's reach if EPA re-obligates them. *See W. Va. Ass'n of Cmty. Health Centers, Inc. v. Heckler*, 734 F.2d 1570, 1577 (D.C. Cir. 1984); *Population Inst. v. McPherson*, 797 F.2d 1062, 1081 (D.C. Cir. 1986) (App'x). Inclusiv therefore urges this Court to issue a temporary restraining order directing EPA to return Inclusiv's full $1.87 billion to its account. To guard against any reoccurrence, Inclusiv also asks this Court to impose monitoring, escrow, and any other relief it deems necessary, just, and proper to preserve the status quo.

Late this afternoon, EPA's counsel said that the money had not been withdrawn, but instead moved into a money market fund—something that happens monthly, according to EPA's counsel. Johnson Decl. ¶ 28. Inclusiv's Chief Financial Officer has not previously observed any such transfers that took Inclusiv's account to a zero balance. Sheaffer Decl. ¶ 22. Around 6:30, Inclusiv's counsel received an email from Citibank's outside counsel saying that "[i]n connection with requests from the government, last week funds relating to the CCIA grants were moved from Money Market Funds to the grantees' cash accounts on Citi's balance sheets," and that "Citi has now reinvested the funds in Money Market Funds with notice to the government, which should appear on your client's statements tomorrow." Johnson Decl. ¶ 29 & Ex. H.

Finally, shortly after 7:00, Mr. Sacks sent another email. Johnson Decl. Ex. I. That email says that "what happened appears to be a Citi month-end process to invest cash in money markets" and predicts that "the accounts will show full balances by morning." *Id.* It does not mention any "requests from the government," as the email from Citi's counsel did.

Inclusiv takes opposing counsel at their word, but it has too much at stake to stay silent. No matter how it happened, $1.87 billion was moved out of Inclusiv's account in spite of EPA's agreement "not to take any steps to move the money out of or exercise control over Inclusiv's Citi account." If the funds reappear in Inclusiv's account tomorrow, Inclusiv will withdraw its request for an emergency order requiring them to be put back. But it continues to think that more careful monitoring from the Court may be justified.

If the Court wants Inclusiv to speak to this issue during tomorrow's hearing in Case No. 25-cv-698, its counsel will be there.

Dated: April 1, 2025                    Respectfully submitted,


                                        /s/ Jay C. Johnson
                                        Jay C. Johnson (D.C. Bar No. 487768)
                                        Dismas Locaria (D.C. Bar No. 490096)*
                                        Christopher G. Griesedieck
                                          (D.C. Bar No. 1028847)*
                                        Lindsay M. Reed (D.C. Bar No. 1736766)*
                                        600 Massachusetts Avenue, N.W.
                                        Washington, DC 20001
                                        Phone: 202-344-4000
                                        Fax: 202-344-8300
                                        jcjohnson@venable.com

                                        Kyle H. Keraga (D.D.C. Bar. No. MD0216)
                                        Evan I. Suval*
                                        Cogan R. S. Rooney*
                                        750 E. Pratt Street, Suite 900
                                        Baltimore, MD 21202
                                        Phone: 410-244-7650
                                        Fax: 410-244-7742
                                        khkeraga@venable.com

                                        Emily R. Marcy*
                                        Taylor M. Sorrells*
                                        1850 Towers Crescent Plaza, Suite 400
                                        Tysons, VA 22182
                                        Phone: 703-760-1600
                                        Fax: 703-821-8949

                                        *Counsel for Plaintiff Inclusiv, Inc.*

                                        *\* Motions for pro hac vice admission
                                        forthcoming.
                                        \*\* Renewal certificate pending.*

## CERTIFICATE OF SERVICE

I hereby certify that on April 1, 2025, I caused a copy of the foregoing to be served on all counsel of record via the Court's CM/ECF system.

/s/ Jay C. Johnson
Jay C. Johnson

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

INCLUSIV, INC.,

             Plaintiff,

    v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, *et al.*

           Defendants.

Civil Action No.
1:25-cv-00948

## <u>DECLARATION OF JAY C. JOHNSON</u>

I, Jay C. Johnson, pursuant to 28 U.S.C. § 1746, do herby state and declare as follows:

1.    I am a partner at Venable LLP and lead counsel for Plaintiff Inclusiv, Inc. in this case. I make this declaration based on my personal knowledge.

2.    Inclusiv retained Venable to prepare a complaint and motion for injunctive relief in this case on March 20, 2025. At that time, there were three other cases involving Greenhouse Gas Reduction Fund grants pending before this Court.

3.    Like other GGRF grant recipients, Inclusiv's funds were held at Citibank in an account bearing Inclusiv's name.

4.    This Court had, on March 18, entered a Temporary Restraining Order in Case No. 25-cv-698 prohibiting EPA and Citibank from "giving effect to EPA Defendants' Termination Letter pending a determination on the merits."

5.    On March 21, I sent a letter on Inclusiv's behalf to Citibank's General Counsel. That letter, which is attached as Exhibit A, told Citibank that the reasoning in the Court's March 18 TRO applied equally to Inclusiv, which had received a substantively identical termination letter from EPA.

6.   My letter to Citibank explained that Inclusiv was "actively considering" litigation and asked Citibank to "maintain the status quo" in Inclusiv's account and to "alert me" of any efforts to alter that status quo.

7.   A team of lawyers at Venable worked diligently to prepare both a complaint and the materials needed to file a motion for a temporary restraining order or, in the alternative, a preliminary injunction.

8.   On Friday morning, March 28, I learned that EPA had agreed not to move or take control of the funds in the account another GGRF grant recipient, Justice Climate Fund, while the Court's TRO in Case No. 25-cv-698 remained in place.

9.   That same morning, I called the two Department of Justice attorneys who represent EPA in Case No. 25-cv-698, Marcus Sacks and Kevin Van Landingham. Neither answered, so I left messages with both.

10.   Marcus Sacks sent me an email at 12:55 Eastern Time confirming his receipt of my voicemail and saying that he would get back to me the same afternoon. A copy of this email is attached as Exhibit B.

11.   Mr. Sacks sent me another email at 3:01 Eastern indicating that he was ready to talk. I called him immediately.

12.   During our call, Mr. Sacks indicated that EPA was willing to make the same deal to Inclusiv that it had reached with Justice Climate Fund: EPA would not try to pull funds out of Inclusiv's Citibank account as long as the TRO in Case No. 25-cv-698 was still in place.

13.   I also told Mr. Sacks that we planned to seek our own TRO or preliminary injunction. He said that he thought a TRO was unnecessary in light of the deal we had reached, and I agreed. But I told him that we would likely still file a preliminary injunction motion.

14.   Mr. Sacks agreed to send me an email confirming our agreement.

15. After the call, I sent Mr. Sacks an email remining him of our plan to file a complaint and a preliminary injunction motion and my understanding that EPA would not try to remove funds from Inclusiv's account. That email is attached as Exhibit C.

16. Mr. Sacks responded to my email at 4:55 Eastern. He said:

> Yes, that is correct.
>
> While EPA's position is that Inclusiv's grant has been terminated, EPA agrees not to take any steps to move the money out of or exercise control over Inclusiv's Citi account while the TRO for the NICF plaintiffs [referencing the plaintiffs in Case No. 25-cv-698] is in effect.

That email is attached as Exhibit D.

17. Venable's team and Inclusiv's personnel kept working on the complaint and motion papers over the weekend. As discussed with Mr. Sacks, the motion was re-styled to seek a preliminary injunction instead of a TRO.

18. On Monday, March 31, we filed a complaint against EPA, its Administrator, its Acting Deputy Administrator, and Citibank in the United States District Court for the District of Columbia.

19. Justice Climate Fund also filed a complaint against the same parties on March 31.

20. I sent a copy of the complaint to Mr. Sacks via email. A copy of that email is attached as Exhibit E.

21. Mr. Sacks responded to my email Monday evening. He said that he was "exploring how we can make things efficient for all," which I understood as a reference to an efficient briefing process given the pending preliminary injunction motion in Case No. 25-cv-698. He also said that he had spoken with Justice Climate Fund's counsel earlier, and explained that DOJ was "discussing internally here what we can suggest as an approach," promising to "get back to" me "as soon as we can."

22. Also on March 31, the Court extended the TRO in Case No. 25-cv-698.

23. Despite EPA's agreement, I learned on April 1 around 12:30 that the money in Inclusiv's account had been removed.

24. When I learned that Inclusiv's account had been emptied, I called Mr. Sacks to ask what happened. He did not pick up, and I left a message.

25. Mr. Sacks called me back around 3:15 Eastern on April 1. He said that neither he nor the people he was working with at EPA knew why the money had been taken from Inclusiv's account. He acknowledged that this removal was in violation of his "very clear promise" and he apologized. He told me that he would continue trying to find out what happened.

26. Mr. Sacks sent me an email at 4:00 Eastern on April 1, attached as Exhibit F, saying that he was still "working to figure out what happened and how we fix it."

27. A few minutes later, Mr. Sacks followed up with another email saying that EPA "told Treasury and Citibank not to touch the money." According to Mr. Sacks, "EPA is telling [DOJ] clearly that it was not intended." This email is attached as Exhibit G.

28. Around 4:20, Mr. Sacks called me. During this call, he said that there had not been a "withdrawal" from Inclusiv's account, and that instead the cash balance was being moved into a money market fund. He said that this happens about once per month. According to Mr. Sacks, this was information from the Treasury Department.

29. Around 6:30, I received an email from Winn Allen, outside counsel to Citibank, with whom I had spoken earlier in the day. That email, attached as Exhibit H, says that Inclusiv's funds had "not been sent to the government." Rather, "[i]n connection with requests from the government," they had been "moved from Money Market Funds to the grantees' cash accounts." The email then said that "Citi has now

JA2084

reinvested the funds in Money Market Funds with notice to the government, which should appear on your client's statements tomorrow."

30.  A few minutes after 7:00 I received another email from Mr. Sacks. In that email (Exhibit I), he says that "what happened appears to be a Citi month-end process to invest cash in money markets." He also said that "the accounts will show full balances by morning." He did not mention the requests from the government that were described in the email from Citibank's counsel.

31. After talking with Inclusiv's Chief Financial Officer, I understand that, at the time of his declaration, the evening of April 1, the money has not been returned to Inclusiv's Citibank account.

I declare under penalty of perjury that the foregoing is true and correct.


/s Jay C. Johnson
Jay C. Johnson
Alexandria, VA

Dated: April 1, 2025

5

# Exhibit A

**VENABLE** LLP

600 MASSACHUSETTS AVE., NW   WASHINGTON, DC 20001
**T** 202.344.4000  **F** 202.344.8300  www.Venable.com

March 21, 2025

**t** 202.344.4698
JCJohnson@Venable.com

VIA EMAIL AND OVERNIGHT DELIVERY

Brent McIntosh
General Counsel
Citibank, N.A.
388 Greenwich Street
New York, NY 10013

Re:   Inclusiv, Inc., Greenhouse Gas Reduction Fund Grant Agreement No.
84094301

Dear Mr. McIntosh:

I am writing on behalf of our client, Inclusiv, Inc., because under the terms and
legal reasoning of the attached temporary restraining order, Citibank must not
move or transfer any money from the Greenhouse Gas Reduction Fund without
court approval. That order preserving the status quo logically applies to all such
grant funds at Citibank, including the grant funds deposited in Inclusiv's account.

Like the parties who sought the attached order, Inclusiv has received a GGRF
grant. The funds from that grant have been deposited at Citibank and available to
Inclusiv since November 2024. Indeed, Citibank was disbursing those funds to
Inclusiv under an Account Control Agreement (ACA) between Citibank, the U.S.
Environmental Protection Agency, and Inclusiv until mid-February 2025.

Inclusiv knows that Citibank has received instructions from the United States
government not to disburse funds from any GGRF accounts. And Inclusiv
understands that Citibank's Financial Agency Agreement with the government
requires it to "comply with all lawful instructions or directions" it receives. But the
direction to stop disbursing funds from GGRF accounts was unlawful. The same
would be true for any direction to transfer funds out of the GGRF accounts.

The attached order and memorandum of law from the United States District
Court for the District of Columbia explain this unlawfulness. In short, the Court
held that EPA did not take "the legally required steps necessary to terminate" the
GGRF grants, "such that its actions were arbitrary and capricious." Mem. At 14.
Because Inclusiv has also received a GGRF grant, and because the relevant law and

**VENABLE** LLP

March 21, 2025
Page 2

agreements involving Inclusiv, EPA, and Citibank are substantively the same as
the law and agreements addressed in the Court's order, Citibank should treat the
grant funds in Inclusiv's account the same way it must treat the GGRF accounts
directly at issue in the attached order. Thus, Citibank must not give any effect to
EPA's March 11 termination letter; it must not implement the termination of
Inclusiv's grant, including through any transfer, re-obligation, or re-allocation of
grant funds or by issuing a Notice of Exclusive Control; and it must not move or
transfer Inclusiv's grant funds to any party other than Inclusiv.

Inclusiv can see that "Citibank is caught in the middle of the dispute" between
Inclusiv and EPA. That is all the more reason for Citibank to maintain the status
quo while that dispute is resolved in court. Inclusiv is actively considering its own
suit against EPA, and it reasonably expects the same result should Inclusiv file and
seek similar relief: A judicial rejection of EPA's unlawful actions. In the meantime,
Citibank must treat Inclusiv's GGRF grant funds the same way that the Court has
ordered it to treat other GGRF grant funds.

Furthermore, in the event that EPA—or the United States Treasury or any
other government agency or actor—attempts to order Citibank to transfer Inclusiv's
GGRF grant funds out of Inclusiv's account at Citibank, we must insist that you
promptly make us aware of such a request prior to taking any further action. The
temporary restraining order's intent requires that intermediary step. The ACA also
requires Citibank to notify Inclusiv of any effort by the government to exercise
exclusive control over the account. Therefore, if the EPA seeks to violate the
temporary restraining order or the ACA, our client must be put on notice, and
Inclusiv will take appropriate, immediate action to protect its rights and its
property through all available legal remedies.

Please confirm that you will maintain the status quo for the GGRF grant funds
in Inclusiv's account and that you will alert me on behalf of my client of any efforts
to the contrary prior to taking any action in response to such a request. If you have
any questions about this letter or Inclusiv's GGRF grant funds, please contact me.

Sincerely,

Jay C. Johnson



March 21, 2025
Page 3


cc: Nerlie Delly, Citibank Agency & Trust
    Jesse Rubin, Citigroup
    Cathleen A. Mahon, Inclusiv, Inc.
    Eben Sheaffer, Inclusiv, Inc.
    Ian Forster, Inclusiv, Inc.

Encl.

# Exhibit B

| **From:** | Sacks, Marcus S. (CIV) |
|---|---|
| **To:** | Johnson, Jay C. |
| **Cc:** | VanLandingham, Kevin P. (CIV) |
| **Subject:** | Inclusiv |
| **Date:** | Friday, March 28, 2025 12:54:45 PM |

**Caution: External Email**

Hi, Jay.

Thanks for your voicemail.  Confirming receipt and I'll get back to you this afternoon.

Thanks.

Marc S. Sacks
Deputy Director
Corporate/Financial Litigation Section
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L St., NW
Washington, D.C. 20005
(202) 307-1104

This e-mail (including any attachments) is intended for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential or otherwise protected by applicable law. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering the e-mail to the intended recipient, the reader is hereby notified that any dissemination, distribution, copying or use of this e-mail or its contents is prohibited. If you have received this e-mail in error, please notify the sender immediately by replying to this message, and please destroy all copies of this e-mail.

# Exhibit C

| | |
|---|---|
| **From:** | Johnson, Jay C. |
| **To:** | Sacks, Marcus S. (CIV) |
| **Cc:** | VanLandingham, Kevin P. (CIV); Locaria, Dismas; Keraga, Kyle H. |
| **Subject:** | RE: Inclusiv |
| **Date:** | Friday, March 28, 2025 4:20:00 PM |

Marc,

Thanks for the call a short time ago. As I mentioned, Inclusiv plans to file a complaint and a preliminary injunction motion on Monday. Given that, I understand that EPA will not try to remove funds from Inclusiv's account.

Regards,

Jay

---

**From:** Sacks, Marcus S. (CIV) <Marcus.S.Sacks@usdoj.gov>
**Sent:** Friday, March 28, 2025 3:01 PM
**To:** Johnson, Jay C. <JCJohnson@Venable.com>
**Cc:** VanLandingham, Kevin P. (CIV) <Kevin.P.VanLandingham@usdoj.gov>; Locaria, Dismas <DLocaria@Venable.com>; Keraga, Kyle H. <KHKeraga@Venable.com>
**Subject:** RE: Inclusiv

**Caution: External Email**


Thanks, Jay.  Don't want to try you so close to your boarding.  If you have time, or Diz or Kyle, please give me a call at 202-598-7721, or the number in my sig. block.

Thanks.

Marc S. Sacks
Deputy Director
Corporate/Financial Litigation Section
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L St., NW
Washington, D.C. 20005
(202) 307-1104

This e-mail (including any attachments) is intended for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential or otherwise protected by applicable law. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering the e-mail to the intended recipient, the reader is hereby notified that any dissemination, distribution, copying or use of this e-mail or its contents is prohibited. If you have received this e-mail in error, please notify the sender immediately by replying to this message, and please destroy all copies of this e-mail.

---

**From:** Johnson, Jay C. <JCJohnson@Venable.com>

**Sent:** Friday, March 28, 2025 12:57 PM
**To:** Sacks, Marcus S. (CIV) <Marcus.S.Sacks@usdoj.gov>
**Cc:** VanLandingham, Kevin P. (CIV) <Kevin.P.VanLandingham@usdoj.gov>; Locaria, Dismas
<DLocaria@Venable.com>; Keraga, Kyle H. <KHKeraga@Venable.com>
**Subject:** [EXTERNAL] RE: Inclusiv

Thanks, Marc. I am traveling today and will be on a plane starting at 3:45 Eastern. If you
don't reach me before then, you can talk to Diz Locaria or Kyle Keraga, both of whom are
copied on this email.


Best regards,


Jay




**From:** Sacks, Marcus S. (CIV) <Marcus.S.Sacks@usdoj.gov>
**Date:** Friday, Mar 28, 2025 at 11:54 AM
**To:** Johnson, Jay C. <JCJohnson@Venable.com>
**Cc:** VanLandingham, Kevin P. (CIV) <Kevin.P.VanLandingham@usdoj.gov>
**Subject:** Inclusiv

**Caution: External Email**


Hi, Jay.

Thanks for your voicemail.  Confirming receipt and I'll get back to you this afternoon.

Thanks.

Marc S. Sacks
Deputy Director
Corporate/Financial Litigation Section
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L St., NW
Washington, D.C. 20005
(202) 307-1104

This e-mail (including any attachments) is intended for the use of the individual or entity to which it is
addressed. It may contain information that is privileged, confidential or otherwise protected by applicable
law. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for
delivering the e-mail to the intended recipient, the reader is hereby notified that any dissemination,
distribution, copying or use of this e-mail or its contents is prohibited. If you have received this e-mail in
error, please notify the sender immediately by replying to this message, and please destroy all copies of

this e-mail.


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
This electronic mail transmission may contain confidential or
privileged information. If
you believe you have received this message in error, please
notify the sender by reply
transmission and delete the message without copying or
disclosing it.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

JA2095

# Exhibit D

| | |
|---|---|
| **From:** | Sacks, Marcus S. (CIV) |
| **To:** | Johnson, Jay C. |
| **Cc:** | VanLandingham, Kevin P. (CIV); Locaria, Dismas; Keraga, Kyle H. |
| **Subject:** | RE: Inclusiv |
| **Date:** | Friday, March 28, 2025 4:54:42 PM |

**Caution: External Email**

Thanks, Jay.

Yes, that is correct.

While EPA's position is that Inclusiv's grant has been terminated, EPA agrees not to take any steps to move the money out of or exercise control over Inclusiv's Citi account while the TRO for the NICF plaintiffs is in effect.

Thanks.

Marc S. Sacks
Deputy Director
Corporate/Financial Litigation Section
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L St., NW
Washington, D.C. 20005
(202) 307-1104

This e-mail (including any attachments) is intended for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential or otherwise protected by applicable law. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering the e-mail to the intended recipient, the reader is hereby notified that any dissemination, distribution, copying or use of this e-mail or its contents is prohibited. If you have received this e-mail in error, please notify the sender immediately by replying to this message, and please destroy all copies of this e-mail.

**From:** Johnson, Jay C. <JCJohnson@Venable.com>
**Sent:** Friday, March 28, 2025 4:20 PM
**To:** Sacks, Marcus S. (CIV) <Marcus.S.Sacks@usdoj.gov>
**Cc:** VanLandingham, Kevin P. (CIV) <Kevin.P.VanLandingham@usdoj.gov>; Locaria, Dismas <DLocaria@Venable.com>; Keraga, Kyle H. <KHKeraga@Venable.com>
**Subject:** [EXTERNAL] RE: Inclusiv

Marc,

Thanks for the call a short time ago. As I mentioned, Inclusiv plans to file a complaint and a preliminary injunction motion on Monday. Given that, I understand that EPA will not try to remove funds from Inclusiv's account.

Regards,

Jay

---

**From:** Sacks, Marcus S. (CIV) <Marcus.S.Sacks@usdoj.gov>
**Sent:** Friday, March 28, 2025 3:01 PM
**To:** Johnson, Jay C. <JCJohnson@venable.com>
**Cc:** VanLandingham, Kevin P. (CIV) <Kevin.P.VanLandingham@usdoj.gov>; Locaria, Dismas <DLocaria@Venable.com>; Keraga, Kyle H. <KHKeraga@Venable.com>
**Subject:** RE: Inclusiv

**Caution: External Email**

Thanks, Jay.  Don't want to try you so close to your boarding.  If you have time, or Diz or Kyle, please give me a call at 202-598-7721, or the number in my sig. block.

Thanks.

Marc S. Sacks
Deputy Director
Corporate/Financial Litigation Section
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L St., NW
Washington, D.C. 20005
(202) 307-1104

This e-mail (including any attachments) is intended for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential or otherwise protected by applicable law. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering the e-mail to the intended recipient, the reader is hereby notified that any dissemination, distribution, copying or use of this e-mail or its contents is prohibited. If you have received this e-mail in error, please notify the sender immediately by replying to this message, and please destroy all copies of this e-mail.

---

**From:** Johnson, Jay C. <JCJohnson@Venable.com>
**Sent:** Friday, March 28, 2025 12:57 PM
**To:** Sacks, Marcus S. (CIV) <Marcus.S.Sacks@usdoj.gov>
**Cc:** VanLandingham, Kevin P. (CIV) <Kevin.P.VanLandingham@usdoj.gov>; Locaria, Dismas <DLocaria@Venable.com>; Keraga, Kyle H. <KHKeraga@Venable.com>
**Subject:** [EXTERNAL] RE: Inclusiv

Thanks, Marc. I am traveling today and will be on a plane starting at 3:45 Eastern. If you don't reach me before then, you can talk to Diz Locaria or Kyle Keraga, both of whom are copied on this email.

Best regards,

Jay

---

**From:** Sacks, Marcus S. (CIV) <Marcus.S.Sacks@usdoj.gov>
**Date:** Friday, Mar 28, 2025 at 11:54 AM
**To:** Johnson, Jay C. <JCJohnson@Venable.com>
**Cc:** VanLandingham, Kevin P. (CIV) <Kevin.P.VanLandingham@usdoj.gov>
**Subject:** Inclusiv

**Caution: External Email**

Hi, Jay.

Thanks for your voicemail.  Confirming receipt and I'll get back to you this afternoon.

Thanks.

Marc S. Sacks
Deputy Director
Corporate/Financial Litigation Section
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L St., NW
Washington, D.C. 20005
(202) 307-1104

This e-mail (including any attachments) is intended for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential or otherwise protected by applicable law. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering the e-mail to the intended recipient, the reader is hereby notified that any dissemination, distribution, copying or use of this e-mail or its contents is prohibited. If you have received this e-mail in error, please notify the sender immediately by replying to this message, and please destroy all copies of this e-mail.

```
**************************************************************
*************************
This electronic mail transmission may contain confidential or
privileged information. If
you believe you have received this message in error, please
notify the sender by reply
transmission and delete the message without copying or
disclosing it.
**************************************************************
*************************
```

# Exhibit E

| | |
|---|---|
| **From:** | Johnson, Jay C. |
| **To:** | Sacks, Marcus S. (CIV) |
| **Cc:** | VanLandingham, Kevin P. (CIV); Locaria, Dismas; Keraga, Kyle H. |
| **Subject:** | RE: Inclusiv |
| **Date:** | Monday, March 31, 2025 7:18:52 PM |
| **Attachments:** | Inclusiv, Inc. v. EPA, et al. (No. 25-948).pdf |

Marc,

You may already have seen this, but we filed our complaint today. A copy is attached. I'm happy to talk more about it tomorrow.

Regards,

Jay

---

**From:** Sacks, Marcus S. (CIV) <Marcus.S.Sacks@usdoj.gov>
**Sent:** Friday, March 28, 2025 4:55 PM
**To:** Johnson, Jay C. <JCJohnson@Venable.com>
**Cc:** VanLandingham, Kevin P. (CIV) <Kevin.P.VanLandingham@usdoj.gov>; Locaria, Dismas <DLocaria@Venable.com>; Keraga, Kyle H. <KHKeraga@Venable.com>
**Subject:** RE: Inclusiv

**Caution: External Email**

Thanks, Jay.

Yes, that is correct.

While EPA's position is that Inclusiv's grant has been terminated, EPA agrees not to take any steps to move the money out of or exercise control over Inclusiv's Citi account while the TRO for the NICF plaintiffs is in effect.

Thanks.

Marc S. Sacks
Deputy Director
Corporate/Financial Litigation Section
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L St., NW
Washington, D.C. 20005
(202) 307-1104

This e-mail (including any attachments) is intended for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential or otherwise protected by applicable law. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering the e-mail to the intended recipient, the reader is hereby notified that any dissemination, distribution, copying or use of this e-mail or its contents is prohibited. If you have received this e-mail in

error, please notify the sender immediately by replying to this message, and please destroy all copies of this e-mail.

**From:** Johnson, Jay C. <JCJohnson@Venable.com>
**Sent:** Friday, March 28, 2025 4:20 PM
**To:** Sacks, Marcus S. (CIV) <Marcus.S.Sacks@usdoj.gov>
**Cc:** VanLandingham, Kevin P. (CIV) <Kevin.P.VanLandingham@usdoj.gov>; Locaria, Dismas <DLocaria@Venable.com>; Keraga, Kyle H. <KHKeraga@Venable.com>
**Subject:** [EXTERNAL] RE: Inclusiv

Marc,

Thanks for the call a short time ago. As I mentioned, Inclusiv plans to file a complaint and a preliminary injunction motion on Monday. Given that, I understand that EPA will not try to remove funds from Inclusiv's account.

Regards,

Jay

**From:** Sacks, Marcus S. (CIV) <Marcus.S.Sacks@usdoj.gov>
**Sent:** Friday, March 28, 2025 3:01 PM
**To:** Johnson, Jay C. <JCJohnson@Venable.com>
**Cc:** VanLandingham, Kevin P. (CIV) <Kevin.P.VanLandingham@usdoj.gov>; Locaria, Dismas <DLocaria@Venable.com>; Keraga, Kyle H. <KHKeraga@Venable.com>
**Subject:** RE: Inclusiv

**Caution: External Email**

Thanks, Jay.  Don't want to try you so close to your boarding.  If you have time, or Diz or Kyle, please give me a call at 202-598-7721, or the number in my sig. block.

Thanks.

Marc S. Sacks
Deputy Director
Corporate/Financial Litigation Section
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L St., NW
Washington, D.C. 20005
(202) 307-1104

This e-mail (including any attachments) is intended for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential or otherwise protected by applicable law. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering the e-mail to the intended recipient, the reader is hereby notified that any dissemination,

distribution, copying or use of this e-mail or its contents is prohibited. If you have received this e-mail in error, please notify the sender immediately by replying to this message, and please destroy all copies of this e-mail.

---

**From:** Johnson, Jay C. <JCJohnson@Venable.com>
**Sent:** Friday, March 28, 2025 12:57 PM
**To:** Sacks, Marcus S. (CIV) <Marcus.S.Sacks@usdoj.gov>
**Cc:** VanLandingham, Kevin P. (CIV) <Kevin.P.VanLandingham@usdoj.gov>; Locaria, Dismas <DLocaria@Venable.com>; Keraga, Kyle H. <KHKeraga@Venable.com>
**Subject:** [EXTERNAL] RE: Inclusiv

Thanks, Marc. I am traveling today and will be on a plane starting at 3:45 Eastern. If you don't reach me before then, you can talk to Diz Locaria or Kyle Keraga, both of whom are copied on this email.

Best regards,

Jay

---

**From:** Sacks, Marcus S. (CIV) <Marcus.S.Sacks@usdoj.gov>
**Date:** Friday, Mar 28, 2025 at 11:54 AM
**To:** Johnson, Jay C. <JCJohnson@Venable.com>
**Cc:** VanLandingham, Kevin P. (CIV) <Kevin.P.VanLandingham@usdoj.gov>
**Subject:** Inclusiv

**Caution: External Email**

Hi, Jay.

Thanks for your voicemail.  Confirming receipt and I'll get back to you this afternoon.

Thanks.

Marc S. Sacks
Deputy Director
Corporate/Financial Litigation Section
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L St., NW
Washington, D.C. 20005
(202) 307-1104

This e-mail (including any attachments) is intended for the use of the individual or entity to which it is
addressed. It may contain information that is privileged, confidential or otherwise protected by applicable
law. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for
delivering the e-mail to the intended recipient, the reader is hereby notified that any dissemination,
distribution, copying or use of this e-mail or its contents is prohibited. If you have received this e-mail in
error, please notify the sender immediately by replying to this message, and please destroy all copies of
this e-mail.

```
****************************************************************
*************************
This electronic mail transmission may contain confidential or
privileged information. If
you believe you have received this message in error, please
notify the sender by reply
transmission and delete the message without copying or
disclosing it.
****************************************************************
*************************
```

JA2104

# Exhibit F

| | |
|---|---|
| **From:** | Sacks, Marcus S. (CIV) |
| **To:** | Johnson, Jay C. |
| **Cc:** | VanLandingham, Kevin P. (CIV); Locaria, Dismas; Keraga, Kyle H. |
| **Subject:** | RE: Inclusiv |
| **Date:** | Tuesday, April 1, 2025 4:02:41 PM |

**Caution: External Email**

Hi, Jay.

I promised you that I would update you at 4:00 p.m.  Unfortunately, I don't have any information to report yet.  I'm working to figure out what happened and how we fix it.

Understand that you may need to file of course.

We'll continue to seek answers and I will update you as soon as I know more.

Thanks.

Marc S. Sacks
Deputy Director
Corporate/Financial Litigation Section
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L St., NW
Washington, D.C. 20005
(202) 307-1104

This e-mail (including any attachments) is intended for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential or otherwise protected by applicable law. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering the e-mail to the intended recipient, the reader is hereby notified that any dissemination, distribution, copying or use of this e-mail or its contents is prohibited. If you have received this e-mail in error, please notify the sender immediately by replying to this message, and please destroy all copies of this e-mail.

**From:** Johnson, Jay C. <JCJohnson@Venable.com>
**Sent:** Friday, March 28, 2025 3:02 PM
**To:** Sacks, Marcus S. (CIV) <Marcus.S.Sacks@usdoj.gov>
**Cc:** VanLandingham, Kevin P. (CIV) <Kevin.P.VanLandingham@usdoj.gov>; Locaria, Dismas <DLocaria@Venable.com>; Keraga, Kyle H. <KHKeraga@Venable.com>
**Subject:** [EXTERNAL] RE: Inclusiv

I can call. Just waiting right now.

Jay

**From:** Sacks, Marcus S. (CIV) <Marcus.S.Sacks@usdoj.gov>
**Sent:** Friday, March 28, 2025 3:01 PM

**To:** Johnson, Jay C. <JCJohnson@Venable.com>
**Cc:** VanLandingham, Kevin P. (CIV) <Kevin.P.VanLandingham@usdoj.gov>; Locaria, Dismas
<DLocaria@Venable.com>; Keraga, Kyle H. <KHKeraga@Venable.com>
**Subject:** RE: Inclusiv

**Caution: External Email**


Thanks, Jay.  Don't want to try you so close to your boarding.  If you have time, or Diz or Kyle, please
give me a call at 202-598-7721, or the number in my sig. block.

Thanks.

Marc S. Sacks
Deputy Director
Corporate/Financial Litigation Section
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L St., NW
Washington, D.C. 20005
(202) 307-1104

This e-mail (including any attachments) is intended for the use of the individual or entity to which it is
addressed. It may contain information that is privileged, confidential or otherwise protected by applicable
law. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for
delivering the e-mail to the intended recipient, the reader is hereby notified that any dissemination,
distribution, copying or use of this e-mail or its contents is prohibited. If you have received this e-mail in
error, please notify the sender immediately by replying to this message, and please destroy all copies of
this e-mail.

**From:** Johnson, Jay C. <JCJohnson@Venable.com>
**Sent:** Friday, March 28, 2025 12:57 PM
**To:** Sacks, Marcus S. (CIV) <Marcus.S.Sacks@usdoj.gov>
**Cc:** VanLandingham, Kevin P. (CIV) <Kevin.P.VanLandingham@usdoj.gov>; Locaria, Dismas
<DLocaria@Venable.com>; Keraga, Kyle H. <KHKeraga@Venable.com>
**Subject:** [EXTERNAL] RE: Inclusiv


Thanks, Marc. I am traveling today and will be on a plane starting at 3:45 Eastern. If you
don't reach me before then, you can talk to Diz Locaria or Kyle Keraga, both of whom are
copied on this email.

Best regards,

Jay

**From:** Sacks, Marcus S. (CIV) <Marcus.S.Sacks@usdoj.gov>
**Date:** Friday, Mar 28, 2025 at 11:54 AM
**To:** Johnson, Jay C. <JCJohnson@Venable.com>
**Cc:** VanLandingham, Kevin P. (CIV) <Kevin.P.VanLandingham@usdoj.gov>
**Subject:** Inclusiv

**Caution: External Email**


Hi, Jay.

Thanks for your voicemail.  Confirming receipt and I'll get back to you this afternoon.

Thanks.

Marc S. Sacks
Deputy Director
Corporate/Financial Litigation Section
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L St., NW
Washington, D.C. 20005
(202) 307-1104

This e-mail (including any attachments) is intended for the use of the individual or entity to which it is
addressed. It may contain information that is privileged, confidential or otherwise protected by applicable
law. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for
delivering the e-mail to the intended recipient, the reader is hereby notified that any dissemination,
distribution, copying or use of this e-mail or its contents is prohibited. If you have received this e-mail in
error, please notify the sender immediately by replying to this message, and please destroy all copies of
this e-mail.



* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
* * * * * * * * * * * * * * * * * * * * * * * *
This electronic mail transmission may contain confidential or
privileged information. If
you believe you have received this message in error, please
notify the sender by reply
transmission and delete the message without copying or
disclosing it.
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
* * * * * * * * * * * * * * * * * * * * * * * *

# Exhibit G

| | |
|---|---|
| **From:** | Sacks, Marcus S. (CIV) |
| **To:** | Johnson, Jay C. |
| **Cc:** | VanLandingham, Kevin P. (CIV); Locaria, Dismas; Keraga, Kyle H. |
| **Subject:** | RE: Inclusiv |
| **Date:** | Tuesday, April 1, 2025 4:11:43 PM |

**Caution: External Email**

Jay – I'll add that EPA has told me that they told Treasury and Citibank not to touch the money.  So we think this is a mistake – and we're trying to get to the bottom of it.  So I don't have any more info on how it happened, but EPA is telling us clearly that it was not intended.  I'll update when I can.

Thanks.

Marc S. Sacks
Deputy Director
Corporate/Financial Litigation Section
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L St., NW
Washington, D.C. 20005
(202) 307-1104

This e-mail (including any attachments) is intended for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential or otherwise protected by applicable law. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering the e-mail to the intended recipient, the reader is hereby notified that any dissemination, distribution, copying or use of this e-mail or its contents is prohibited. If you have received this e-mail in error, please notify the sender immediately by replying to this message, and please destroy all copies of this e-mail.

**From:** Sacks, Marcus S. (CIV)
**Sent:** Tuesday, April 01, 2025 4:03 PM
**To:** Johnson, Jay C. <JCJohnson@Venable.com>
**Cc:** VanLandingham, Kevin P. (CIV) <Kevin.P.VanLandingham@usdoj.gov>; Locaria, Dismas <DLocaria@Venable.com>; Keraga, Kyle H. <KHKeraga@Venable.com>
**Subject:** RE: Inclusiv

Hi, Jay.

I promised you that I would update you at 4:00 p.m.  Unfortunately, I don't have any information to report yet.  I'm working to figure out what happened and how we fix it.

Understand that you may need to file of course.

We'll continue to seek answers and I will update you as soon as I know more.

Thanks.

Marc S. Sacks
Deputy Director
Corporate/Financial Litigation Section

Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L St., NW
Washington, D.C. 20005
(202) 307-1104

This e-mail (including any attachments) is intended for the use of the individual or entity to which it is
addressed. It may contain information that is privileged, confidential or otherwise protected by applicable
law. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for
delivering the e-mail to the intended recipient, the reader is hereby notified that any dissemination,
distribution, copying or use of this e-mail or its contents is prohibited. If you have received this e-mail in
error, please notify the sender immediately by replying to this message, and please destroy all copies of
this e-mail.

---

**From:** Johnson, Jay C. <JCJohnson@Venable.com>
**Sent:** Friday, March 28, 2025 3:02 PM
**To:** Sacks, Marcus S. (CIV) <Marcus.S.Sacks@usdoj.gov>
**Cc:** VanLandingham, Kevin P. (CIV) <Kevin.P.VanLandingham@usdoj.gov>; Locaria, Dismas
<DLocaria@Venable.com>; Keraga, Kyle H. <KHKeraga@Venable.com>
**Subject:** [EXTERNAL] RE: Inclusiv

I can call. Just waiting right now.

Jay

---

**From:** Sacks, Marcus S. (CIV) <Marcus.S.Sacks@usdoj.gov>
**Sent:** Friday, March 28, 2025 3:01 PM
**To:** Johnson, Jay C. <JCJohnson@Venable.com>
**Cc:** VanLandingham, Kevin P. (CIV) <Kevin.P.VanLandingham@usdoj.gov>; Locaria, Dismas
<DLocaria@Venable.com>; Keraga, Kyle H. <KHKeraga@Venable.com>
**Subject:** RE: Inclusiv

**Caution: External Email**


Thanks, Jay.  Don't want to try you so close to your boarding.  If you have time, or Diz or Kyle, please
give me a call at 202-598-7721, or the number in my sig. block.

Thanks.

Marc S. Sacks
Deputy Director
Corporate/Financial Litigation Section
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L St., NW
Washington, D.C. 20005
(202) 307-1104

This e-mail (including any attachments) is intended for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential or otherwise protected by applicable law. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering the e-mail to the intended recipient, the reader is hereby notified that any dissemination, distribution, copying or use of this e-mail or its contents is prohibited. If you have received this e-mail in error, please notify the sender immediately by replying to this message, and please destroy all copies of this e-mail.

**From:** Johnson, Jay C. <JCJohnson@Venable.com>
**Sent:** Friday, March 28, 2025 12:57 PM
**To:** Sacks, Marcus S. (CIV) <Marcus.S.Sacks@usdoj.gov>
**Cc:** VanLandingham, Kevin P. (CIV) <Kevin.P.VanLandingham@usdoj.gov>; Locaria, Dismas <DLocaria@Venable.com>; Keraga, Kyle H. <KHKeraga@Venable.com>
**Subject:** [EXTERNAL] RE: Inclusiv

Thanks, Marc. I am traveling today and will be on a plane starting at 3:45 Eastern. If you don't reach me before then, you can talk to Diz Locaria or Kyle Keraga, both of whom are copied on this email.

Best regards,

Jay

**From:** Sacks, Marcus S. (CIV) <Marcus.S.Sacks@usdoj.gov>
**Date:** Friday, Mar 28, 2025 at 11:54 AM
**To:** Johnson, Jay C. <JCJohnson@Venable.com>
**Cc:** VanLandingham, Kevin P. (CIV) <Kevin.P.VanLandingham@usdoj.gov>
**Subject:** Inclusiv

**Caution: External Email**

Hi, Jay.

Thanks for your voicemail.  Confirming receipt and I'll get back to you this afternoon.

Thanks.

Marc S. Sacks
Deputy Director
Corporate/Financial Litigation Section
Commercial Litigation Branch
Civil Division

U.S. Department of Justice
1100 L St., NW
Washington, D.C. 20005
(202) 307-1104

This e-mail (including any attachments) is intended for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential or otherwise protected by applicable law. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering the e-mail to the intended recipient, the reader is hereby notified that any dissemination, distribution, copying or use of this e-mail or its contents is prohibited. If you have received this e-mail in error, please notify the sender immediately by replying to this message, and please destroy all copies of this e-mail.

```
*******************************************************************
**************************
This electronic mail transmission may contain confidential or
privileged information. If
you believe you have received this message in error, please
notify the sender by reply
transmission and delete the message without copying or
disclosing it.
*******************************************************************
**************************
```

# Exhibit H

| | |
|---|---|
| **From:** | Allen, Winn |
| **To:** | Johnson, Jay C. |
| **Subject:** | Citi - Call From Earlier |
| **Date:** | Tuesday, April 1, 2025 6:26:32 PM |

**Caution: External Email**

Jay:

Circling back on our call from earlier, I conferred with Citibank, and here's what I can share:  The funds have not been sent to the government.  In connection with requests from the government, last week funds relating to the CCIA grants were moved from Money Market Funds to the grantees' cash accounts on Citi's balance sheet.  Citi has now reinvested the funds in Money Market Funds with notice to the government, which should appear on your client's statements tomorrow.

Best regards,

Winn

**K. Winn Allen, P.C.**

-------------------------------------------------

**KIRKLAND & ELLIS LLP**
1301 Pennsylvania Ave., N.W., Washington, D.C. 20004
**T** +1 202 389 5078  **M** +1 770 361 3348

-------------------------------------------------

winn.allen@kirkland.com

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of the multi-national law firm Kirkland & Ellis LLP and/or its affiliated entities. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

# Exhibit I

| From: | Sacks, Marcus S. (CIV) |
|---|---|
| To: | Locaria, Dismas; Keraga, Kyle H.; Johnson, Jay C.; Eric Citron; Kathleen Foley; David Zimmer |
| Cc: | VanLandingham, Kevin P. (CIV) |
| Subject: | CCIA grant funds - update |
| Date: | Tuesday, April 1, 2025 7:08:25 PM |

**Caution: External Email**

Writing to both JCF and Inclusiv counsel here for efficiency.

I'm getting more info that what happened appears to be a Citi month-end process to invest cash in money markets. Citi has indicated the accounts will show full balances by morning.

That explanation appears to be consistent with Citi's obligations under the FAA – which Inclusiv attached to its PI motion. Sec. I.C. of Ex. A to the FAA talks about Investment Management.

Not surprisingly, I don't have complete understanding about the process here – and I'm not sure why, from what Jay told me, there was a Fedwire notation associated with the "transfer."

But, at this point, I don't have a reason to doubt what I'm being told (and, from my perspective, my client's surprise when told that the money was allegedly withdrawn was genuine) – so would encourage your clients to hold off until the morning to see the status of the accounts then.

Thanks.

Marc S. Sacks
Deputy Director
Corporate/Financial Litigation Section
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L St., NW
Washington, D.C. 20005
(202) 307-1104

This e-mail (including any attachments) is intended for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential or otherwise protected by applicable law. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering the e-mail to the intended recipient, the reader is hereby notified that any dissemination, distribution, copying or use of this e-mail or its contents is prohibited. If you have received this e-mail in error, please notify the sender immediately by replying to this message, and please destroy all copies of this e-mail.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

INCLUSIV, INC.,

               Plaintiff,

     v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, *et al.*

            Defendants.

Civil Action No.
1:25-cv-00948

## DECLARATION OF EBEN SHEAFFER

I, Eben Sheaffer, pursuant to 28 U.S.C. § 1746, do hereby state and declare as follows:

### A. Background

1.  I am Chief Financial Officer for Inclusiv, Inc. ("Inclusiv"). My business address is 39 Broadway, Suite 2140, New York, NY 10006-3063.

2.  I am competent to testify concerning matters in this declaration. In my role at Inclusiv, where I have worked since 2013, I oversee the Fiscal and Lending departments, and I have full oversight of Inclusiv's balance sheet and all of Inclusiv's statements and accounts.

3.  I am also named as the account administrator for Inclusiv's Citibank account where all of Inclusiv's Greenhouse Gas Reduction Fund (GGRF) grant funds are held. I have the ability to check balances, and I approve withdrawal requests from Inclusiv's Citibank account into Inclusiv's operating banking

account using dual control of one other authorized Inclusiv employee, per Inclusiv's policies and procedures.

4.   Finally, I am in the regular practice of checking the Inclusiv GGRF operating banking account at Citibank twice a day, once in the morning and again in the evening.

**B. Inclusiv's Partnerships with the Federal Government and Citibank**

5.   On July 14, 2023, the U.S. Environmental Protection Agency (EPA) published its Notice of Funding Opportunity for the CCIA program.

6.   Inclusiv submitted its application for the Clean Communities Investment Accelatror (CCIA) program to EPA in October 2023.  As CFO, I was involved with Inclusiv's application.

7.   On August 8, 2024, EPA awarded a CCIA prime grant to Inclusiv in the amount of $1.87 billion dollars, which was memorialized in Notice of Award No. 84094301, was executed by both EPA and Inclusiv.

8.   As Inclusiv was later informed by EPA, on September 19, 2024, Citibank and the U.S. Treasury entered into a Financial Agency Agreement (FAA), designating Citibank as the financial agent for all GGRF grants, including the CCIA grant to Inclusiv.

9.   On November 6, 2024, Inclusiv, Citibank, and EPA entered an Account Control Agreement (ACA) governing Citibank's disbursement of Inclusiv's grant funds. Once that Agreement took effect, the U.S. Treasury deposited all of Inclusiv's GGRF grant funds into Inclusiv's Citibank account.

10. I was the signatory for Inclusiv on the ACA.

11. The ACA places Citibank in a ministerial role, responsible for following Inclusiv's instructions regarding the use of our CCIA grant funds. Specifically, the ACA obligates Citibank to fully comply with any "instructions, notifications, and entitlement orders" from Inclusiv "directing the disposition of funds and financial assets in the Accounts including, without limitation, directions to distribute proceeds of any such transfer or redemption of interest or dividends on financial assets in the Accounts."

12. Citibank is also obligated to comply with Inclusiv's instructions until such time as Citibank receives a Notice of Exclusive Control from EPA, which the EPA must in turn provide to Inclusiv under the terms of the ACA. To date, no such Notice has ever been issued.

**C. EPA and Citibank Freeze Inclusiv's Funds**

13. Since at least February 13, 2025, Citibank has refused all of Inclusiv's instructions to processes our disbursement requests, which cover Inclusiv's properly incurred program administration costs, per our prime award agreement with the EPA. That total of those unprocessed disbursements as of today, April 1, 2025, is $863,752.42.

14. Citibank has also refused Inclusiv's directions to open accounts for our 108 identified subrecipient credit unions, without sufficient explanation.

**D. Inclusiv Sues EPA and Citibank**

15. On March 31, 2025, Inclusiv filed a lawsuit in the U.S. District Court for the District of Columbia, seeking declaratory and injunctive relief against

EPA and Citibank.  Of immediate relevance, Inclusiv sought an injunction against any efforts by the EPA and Citibank attempting to return Inclusiv's CCIA funding held at Citibank to the U.S. government.

16. After the lawsuit was filed, in the evening on March 31, 2025, I checked Inclusiv's Citibank account and confirmed that our CCIA funds were still there.  The balance on March 31, 2025 was $1,887,341,322.06.

17. Today, April 1, 2025, I checked Inclusiv's Citibank account this morning at approximately 8:00 AM EST and confirmed that our CCIA funds were in the account in the same amount that had been present when I checked the night prior, $1,887,341,322.06.

18. Today, April 1, 2025, at approximately 12:30 PM EST, I again checked Inclusiv's Citibank account and discovered that our balance reflected a negative amount: -$4,045,004.39.  The funds were removed from the account using Federal Reserve wire transfers.

19. At approximately 1:40 PM EST, I again checked Inclusiv's Citibank account and discovered that our balance was now $0.

20. In my regular practice of checking Inclusiv's Citibank account, I have observed bank-initiated transfers between subaccounts, but I have not previously observed Federal Reserve wire transfers resulting in a zero end-of-day balance.

21. Inclusiv has not received any Notice of Exclusive Control.

22. Indeed, Inclusiv has not received any notice, written or otherwise from the EPA or Citibank related to this withdrawal.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 1, 2025

_____/s/ Eben Sheaffer____

Eben Sheaffer

New York, New York

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| INCLUSIV, INC.,<br><br>      Plaintiff,<br><br>  v.<br><br>UNITED STATES ENVIRONMENTAL<br>PROTECTION AGENCY, *et al.*,<br><br>      Defendants. | Civil Action No.<br>1:25-cv-00948 |

## NOTICE

Plaintiff Inclusiv, Inc., wishes to inform the Court that as of 9:30 am on April 2, the money that was yesterday moved out of Inclusiv's Citibank account is back. Inclusiv thus withdraws its request for an emergency order requiring that money to be returned. Inclusiv continues to seek the relief described in its preliminary injunction papers.

Dated: April 2, 2025           Respectfully submitted,

/s/ Jay C. Johnson
Jay C. Johnson (D.C. Bar No. 487768)
Dismas Locaria (D.C. Bar No. 490096)*
Christopher G. Griesedieck
  (D.C. Bar No. 1028847)*
Lindsay M. Reed (D.C. Bar No. 1736766)*
600 Massachusetts Avenue, N.W.
Washington, DC 20001
Phone: 202-344-4000
Fax: 202-344-8300
jcjohnson@venable.com

1

**JA2123**

Kyle H. Keraga (D.D.C. Bar. No. MD0216)
Evan I. Suval*
Cogan R. S. Rooney*
750 E. Pratt Street, Suite 900
Baltimore, MD 21202
Phone: 410-244-7650
Fax: 410-244-7742
khkeraga@venable.com

Emily R. Marcy*
Taylor M. Sorrells*
1850 Towers Crescent Plaza, Suite 400
Tysons, VA 22182
Phone: 703-760-1600
Fax: 703-821-8949

*Counsel for Plaintiff Inclusiv, Inc.*

*\* Motions for pro hac vice admission forthcoming.*
*\*\* Renewal certificate pending.*

## CERTIFICATE OF SERVICE

I hereby certify that on April 2, 2025, I caused a copy of the foregoing to be served on all counsel of record via the Court's CM/ECF system.

/s/ Jay C. Johnson
Jay C. Johnson

3

JA2125