**[ORAL ARGUMENT SCHEDULED MAY 19, 2025]**

**No. 25-5122**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

CLIMATE UNITED FUND, *et al.*,

Plaintiffs-Appellees,

v.

CITIBANK, N.A., *et al.*,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

### BRIEF FOR APPELLANTS

———————————

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

GERARD SINZDAK
SOPHIA SHAMS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7264*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-2495*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## A. Parties and Amici

Plaintiffs-appellees are Climate United Fund; Coalition for Green Capital; Power Forward Communities, Inc.; California Infrastructure and Economic Development Bank; Minnesota Climate Innovation Finance Authority; Efficiency Maine Trust; Illinois Finance Authority; Justice Climate Fund; and Inclusiv, Inc. Defendants-appellants are the Environmental Protection Agency; Lee Zeldin, in his official capacity as Administrator of the Environmental Protection Agency; and Citibank, N.A.

## B. Rulings Under Review

The ruling under review (issued by Judge Tanya S. Chutkan) is an order filed April 15, 2025, JA961, and an accompanying memorandum opinion filed April 16, 2025, JA66, granting plaintiffs' motion for a preliminary injunction.

## C. Related Cases

This case was not previously before this Court or any court other than the district court. Counsel is aware of no related cases within the meaning of D.C. Cir. R. 28(a)(1)(C).

*Sophia Shams*
Sophia Shams

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................1

STATEMENT OF JURISDICTION.........................................................................3

STATEMENT OF THE ISSUES .............................................................................4

PERTINENT STATUTES AND REGULATIONS ..................................................4

STATEMENT OF THE CASE.................................................................................5

      A.     Statutory and Regulatory Background ..................................................5

      B.     Factual Background..............................................................................5

      C.     Procedural Background .......................................................................12

SUMMARY OF ARGUMENT ..............................................................................14

STANDARD OF REVIEW ....................................................................................17

ARGUMENT .........................................................................................................17

    I.     Plaintiffs Are Not Likely to Succeed on Their Claims ............................17

      A.     Plaintiffs' APA claims are in essence contract
            claims and thus must be brought in the Court of
            Federal Claims....................................................................................18

      B.     Even if jurisdiction were proper, plaintiffs' APA
            claims lack merit ...............................................................................32

      C.     Plaintiffs' constitutional claims cannot support
            the injunction .....................................................................................35

II.     The Remaining Injunction Factors Overwhelmingly
        Weigh Against an Injunction ..................................................................40

CONCLUSION ........................................................................................................42

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Aiken County, In re,*
    725 F.3d 255 (D.C. Cir. 2013) .................................................... 38, 39

*Albrecht v. Committee on Emp. Benefits of the Fed. Reserve Emp. Benefits Sys.,*
    357 F.3d 62 (D.C. Cir. 2004) ................................................................19

*Atlas Air, Inc. v. International Bhd. of Teamsters,*
    928 F.3d 1102 (D.C. Cir. 2019) ..........................................................17

*Bennett v. Kentucky Dep't of Educ.,*
    470 U.S. 656 (1985) ...............................................................................30

*Bowen v. Massachusetts,*
    487 U.S. 879 (1988) ...............................................................................24

*Crowley Gov't Servs., Inc. v. General Servs. Admin.,*
    38 F.4th 1099 (D.C. Cir. 2022) ............................................. 18, 20, 23

*Department of Commerce v. New York,*
    588 U.S. 752 (2019) ...............................................................................35

*Department of Educ. v. California,*
    145 S. Ct. 966 (2025) ....................................... 2, 3, 24, 25, 26, 31, 41

*FCC v. Prometheus Radio Project,*
    592 U.S. 414 (2021) ...............................................................................33

*Great-West Life & Annuity Ins. Co. v. Knudson,*
    534 U.S. 204 (2002) .................................................................................2

*Ingersoll-Rand Co. v. United States,*
    780 F.2d 74 (D.C. Cir. 1985) ....................... 19, 23, 26, 27, 28, 29, 30

*James v. Caldera,*
    159 F.3d 573 (Fed. Cir. 1998) ............................................................19

*Maryland Dep't of Human Res. v. Department of Health & Human Servs.,*
    763 F.2d 1441 (D.C. Cir. 1985) ..........................................................30

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012) ...................................................................... 19, 32

*Megapulse, Inc. v. Lewis*,
    672 F.2d 959 (D.C. Cir. 1982) ............................................. 20, 21, 31

*Mexichem Specialty Resins, Inc. v. EPA*,
    787 F.3d 544 (D.C. Cir. 2015) ........................................................40

*Nken v. Holder*,
    556 U.S. 418 (2009) .......................................................................17

*Office of Personnel Mgmt. v. Richmond*,
    496 U.S. 414 (1990) ................................................................ 36, 37

*Roedler v. Department of Energy*,
    255 F.3d 1347 (Fed. Cir. 2001) .....................................................24

*Spectrum Leasing Corp. v. United States*,
    764 F.2d 891 (D.C. Cir. 1985) ............................... 21, 22, 23, 26, 27

*Train v. City of New York*,
    420 U.S. 35 (1975) .........................................................................37

*U.S. Conference of Catholic Bishops v. U.S. Dep't of State*,
    No. 1:25-cv-00465 (TNM), 2025 WL 763738 (D.D.C. Mar. 11, 2025) ............23

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ...........................................................................17

**U.S. Constitution:**

Art. I, § 9, cl. 7 ...............................................................................36

Art. II, § 3 .......................................................................................36

**Statutes:**

Administrative Procedure Act,
  5 U.S.C. § 702 ...................................................................19

Clean Air Act:
  42 U.S.C. § 7434(a)-(b) .........................................................5
  42 U.S.C. § 7434(a)(1) ..........................................................5
  42 U.S.C. § 7434(c)(3) ..........................................................5

Nuclear Waste Policy Act,
  42 U.S.C. § 10134(d) ...........................................................38

Tucker Act:
  28 U.S.C. § 1491(a) ............................................................30
  28 U.S.C. § 1491(a)(1) .........................................................19

20 U.S.C. 1022a(a) ...............................................................24

28 U.S.C. § 1292(a)(1) .............................................................3

28 U.S.C. § 1331 ..................................................................3

**Regulations:**

2 C.F.R. §§ 200.339-200.341 .......................................................7

2 C.F.R. § 200.340(a)(4) ..................................................... 29, 32

2 C.F.R. § 200.341(a) ............................................................32

2 C.F.R. § 200.343 ...............................................................26

2 C.F.R. § 200.403(a)-(b) ........................................................26

**Rule:**

Fed. R. Civ. P. 65(c) ............................................................41

**Other Authorities:**

EPA:
    *General Terms and Conditions* (effective Oct. 1, 2023),
        https://perma.cc/DE84-46AD ...........................................................................7
    *General Terms and Conditions* (effective Oct. 1, 2024),
        https://perma.cc/PD9W-M2UP ...................................................................10

Stay Order, *Widakurswara v. Lake*, No. 25-5145
    (May 3, 2025) ............................................................ 2, 3, 20, 21, 22, 36, 40, 41

# GLOSSARY

| | |
|---|---|
| Administrative Procedure Act | APA |
| Clean Communities Investment Accelerator | CCIA |
| Environmental Protection Agency | EPA |
| Greenhouse Gas Reduction Fund | GGRF |
| National Clean Investment Fund | NCIF |

**INTRODUCTION**

Plaintiffs in these cases were awarded nearly $20 billion in grants last year by the Environmental Protection Agency (EPA). Following a review by its new leadership, EPA determined that the grant agreements—which employed a highly unusual structure that deprived EPA of meaningful oversight, and which were amended *after* the presidential election to further limit EPA's rights—did not serve the public interest or agency's priorities and should be terminated. Plaintiffs challenged the termination, principally on the ground that the prior administration had tied EPA's hands by inserting restrictive termination language into the grant terms and conditions. The district court agreed and enjoined EPA from terminating the grants, thereby giving plaintiffs access to billions of dollars in taxpayer funds.

This Court entered an administrative stay freezing the funds pending appeal, and expedited briefing. The Court should now vacate the preliminary injunction, because the district court plainly lacked jurisdiction, badly erred on the merits and issued an injunction that irreparably harms the government by directing disbursement of billions of dollars that cannot be recouped if the government later prevails.

As to the merits, plaintiffs invoked the APA, but they sought to challenge the termination of grant agreements as inconsistent with the terms and conditions

of those agreements and demanded relief amounting to specific performance of the agreements. Those are quintessential breach-of-contract claims over which the district court lacked jurisdiction. A grantee's breach-of-contract claims against the government must be brought in the Court of Federal Claims, where only certain remedies are available. Plaintiffs may not evade these limits by disguising breach-of-contract claims as APA claims. As the Supreme Court and this Court have both recently reiterated, the APA does not permit "orders 'to enforce a contractual obligation' to pay money along the lines of what the District Court ordered here." *Department of Educ. v. California*, 145 S. Ct. 966 (2025) (per curiam) (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)); *see also* Stay Order, *Widakurswara v. Lake*, No. 25-5145 (May 3, 2025) (*Widakurswara* Stay Order). This case is even easier than those because no statute or regulation confers on plaintiffs any entitlement to these enormous sums.

Nor does the Constitution. The district court concluded that plaintiffs were likely to prevail on their separation-of-powers claim on the theory that termination of these grants means that EPA plans to abandon the grant program entirely. Not at all. EPA terminated plaintiffs' agreements because of grave concerns regarding how those particular grants were allocated and structured—but EPA has been very clear, both in and out of court, that it intends to act expeditiously to re-obligate the grant funds under new agreements, and this litigation has frustrated, rather than

2

enforced, that process. Even if there were any doubt on that score, it would at most support an injunction to re-obligate the funds—not to force EPA to proceed with flawed billion-dollar agreements with plaintiffs in particular.

Turning to the equities, they also weigh decisively against a preliminary injunction. EPA has repeatedly stated that any funds disbursed are unlikely to be recouped should the agency later prevail—a point that neither plaintiffs nor the district court have disputed. The potential loss of billions of dollars alone is sufficient to preclude preliminary injunctive relief in this case. *See Department of Educ.*, 145 S. Ct. at 968-69; *Widakurswara* Stay Order at 13. Meanwhile, plaintiffs face only monetary harm, which is classically reparable at the end of litigation by a judgment entered by a court with jurisdiction.

For these reasons, the government respectfully requests that this Court vacate the district court's preliminary injunction.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331, but the government contests plaintiffs' basis for jurisdiction over their putative APA claims, *see infra* p. 18-32. The district court granted plaintiffs' motion for a preliminary injunction on April 15, 2025. JA961-63. The government filed a timely notice of appeal on April 16, 2025. JA964. This Court accordingly has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

This case arises from EPA's decision to terminate grant agreements it has determined are deeply flawed and no longer serve the public interest or agency priorities. The issues presented are:

1. Whether the district court had APA jurisdiction over plaintiffs' claims challenging EPA's termination of their grant agreements and seeking an injunction requiring EPA and its fiscal agent to resume disbursing funds under those agreements.

2. If jurisdiction was proper, whether EPA's termination based on the agency's concerns regarding the grant agreements was unreasonable under the APA.

3. Whether the injunction can alternatively be justified on the theory that EPA's decision to terminate the grant agreements and re-obligate the funds violates the Constitution.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Statutory and Regulatory Background

In August 2022, Congress enacted Section 134 of the Clean Air Act as part of a reconciliation bill that appropriated $27 billion for the Greenhouse Gas Reduction Fund (GGRF).  Congress provided that these funds would be available to "make grants" to "eligible recipients" for purposes of investing in "qualified projects," which it defined as "any project, activity, or technology" aimed at "reduc[ing] or avoid[ing] greenhouse gas emissions and other forms of air pollution."  42 U.S.C. § 7434(a)-(b), (c)(3).  Congress vested EPA with discretion in operating and executing these programs, including selecting grant recipients "on a competitive basis" and ensuring that program activities are carried out "as determined appropriate by the Administrator in accordance" with the statute.  *Id.* § 7434(a)(1).

### B.    Factual Background

**1.**  Pursuant to this statutory appropriation, EPA created three grant programs—the National Clean Investment Fund (NCIF), the Clean Communities Investment Accelerator (CCIA), and Solar for All—and, in July 2023, began accepting applications.

On April 4, 2024, EPA announced its selection for grant awards under the NCIF and CCIA programs.  EPA awarded plaintiffs Climate United Fund,

Coalition for Green Capital, and Power Forward Communities $6.97 billion, $5 billion, and $2 billion, respectively, under the NCIF program. JA969. And EPA selected plaintiffs Justice Climate Fund and Inclusiv, Inc., among others, to receive $940 million and $1.87 billion, respectively, in funding under the CCIA program. JA969.

Many of these organizations have strong ties to the prior administration. Various officials overseeing the award process previously worked in high-ranking positions for those awarded funding. JA706-07. And many leaders of the entities selected for funding were affiliated with the prior administration. JA706-07. Climate United, Power Forward, and Justice Climate Fund had no prior track record; instead, they were formed specifically to apply for and receive funding from these grant programs. JA362-63; JA453, JA1646.

**2.** In August 2024, EPA and the recipients entered into materially identical contracts memorializing the grant awards.

Under the grant agreements, recipients "agree[d] to only use the award to support [specific] allowable activities." JA537. The agreements further contemplated separate subaward agreements to pass-through funding to other entities, with whom EPA does not have a direct relationship. JA599.

The grant agreements also specified bases for termination. A "Termination" provision specified that EPA may terminate for substantial noncompliance or if

"there is adequate evidence of waste, fraud, material misrepresentation of eligibility status, or abuse."  JA552.  And the provision referenced several regulations that identify similar bases and procedures for termination.  *See* 2 C.F.R. §§ 200.339-200.341.  The Termination provisions of the agreements purported to establish the "only" bases for termination—but that language is preceded by a statement that these terms are meant to "expand on, rather than replace or modify, the EPA General Terms and Conditions."  JA551-52; *see also* JA518 (specifying that the General Terms and Conditions are "in addition to" those which are part of the award).  And, at the time the agreements were originally executed, the General Terms and Conditions provided EPA with the right to terminate the grants "[i]f the award no longer effectuates the program goals or agency priorities."  EPA, *General Terms and Conditions* 2-3 (effective Oct. 1, 2023), https://perma.cc/DE84-46AD. The agreements further provide that, upon termination, EPA must "de-obligate uncommitted funds and re-obligate" them to eligible recipients.  JA552.

The grant agreements adopted an unusual mechanism for distributing grant funds.  Rather than employ its ordinary practice of distributing grant funds through accounts at the Department of the Treasury, Treasury (at EPA's request) designated a private financial institution, Citibank, N.A., to serve as a financial agent to hold all awarded funds and administer their distribution.  JA715.  To this end, on September 19, 2024, Treasury entered into a Financial Agency Agreement with

Citibank, which makes clear that Citibank is effectively acting as an arm of Treasury. Under the agreements, Citibank "has been designate[d] and authorize[d] [by Treasury] to act as a financial agent of the United States," JA641, and Citibank must "act at all times in the best interests of the United States," Citibank Br. 3-4. Citibank must take directions from Treasury and EPA, *see id.* at 15, and Treasury may remove Citibank as a financial agent at any point if it so chooses, JA645. This arrangement, according to EPA's Acting Chief Financial Officer, was the first of its kind: "EPA had never used a financial agent in connection with a grant program prior to 2024," and "EPA's use of a financial agent in connection with the GGRF program was the first use of a financial agent for a nonexchange grant program administered by the federal government." JA723.

EPA and Citibank then entered into Account Control Agreements with each plaintiff regarding the administration of program distributions. As originally agreed, the Account Control Agreements and related provisions in the grant agreements placed program funds in Citibank accounts in the name of each grantee and allowed grantees to withdraw funds without prior EPA approval so long as the withdrawal "do[es] not exceed 10% of the total budget approved at [the] time of award" for a given category. JA562, 623. Under the Account Control Agreements, EPA is a secured party in the funds and may assert exclusive control over the grant funds by filing a "Notice of Exclusive Control." JA642.

The grant agreements and unusual funding arrangement raised concerns from the start.  The House Committee on Energy and Commerce expressed serious misgivings about EPA's "unusually accelerated timeline for disbursement" of the grant funds and "new and complex funding structure," JA725, and it later investigated "recipient eligibility" issues, "the fairness and uniformity of the selection process," and the fact that "individuals with strong ties to Democratic politics hold significant leadership roles within some of the organizations the EPA selected to receive funding," JA733.  EPA's Inspector General later testified that it lacked sufficient resources to protect against fraud in the GGRF program and ensure efficient use of hastily disbursed funds.  JA708.

**3.**  After the 2024 election, the prior administration revised the grant agreements in a manner that further limited EPA's ability to oversee and control NCIF and CCIA grant funds.  On December 20, 2024, EPA and plaintiffs amended the grant agreements to try to further restrict EPA's ability to terminate them.  JA714, 717.  Specifically, they purported to require "credible evidence" of "a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18" or "a violation of the civil False Claims Act." JA585.  The December 2024 amendments also incorporated new, then-current EPA General Terms and Conditions, which omitted any reference to termination based

on the agency's policy priorities.  EPA, *General Terms and Conditions* 2-3
(effective Oct. 1, 2024), https://perma.cc/PD9W-M2UP.

Then, on January 13, 2025, just days before the current administration took
office, EPA amended its Account Control Agreements with Citibank and the NCIF
plaintiffs so that Citibank and EPA were required to "continue to disburse funds
and financial assets associated with financial obligations 'properly incurred'" by
plaintiffs, even after EPA files a Notice of Exclusive Control or otherwise takes
control of the grant funds through termination.  JA658.

**4.**  Under new leadership, EPA "reassessed and adopted agency policies and
priorities that materially differ from the prior administration"—particularly with
respect to oversight and transparency over grant funds.  JA716.  This led EPA to
review and reevaluate the GGRF program's creation and implementation, which in
turn raised serious concerns.  In particular, EPA has concluded that the prior
administration's designation of a financial agent; plaintiffs' roles as "pass-through
for subrecipients," which themselves may act as pass-throughs; and last-minute
modifications to the grant agreements have untenably reduced EPA's oversight and
control over grant funding.  JA717-18.  These concerns have been exacerbated by
comments by former officials indicating that the prior administration removed key
protections aimed at preventing fraud and abuse.  JA705-06.  EPA further
determined that potential "[c]onflicts of interest involving high-level" officials, as

well as the failure of many awardees to properly meet statutory and regulatory eligibility requirements, "raise questions about EPA's selection process." JA718. And EPA determined that its oversight and control over the use of grant funds had been so eroded as to risk violating the Constitution. JA719.

EPA's Office of Inspector General is now investigating the "financial mismanagement, conflicts of interest, and oversight failures within the GGRF program." JA717; *see also* JA669. The Federal Bureau of Investigation and Department of Justice have also initiated investigations into the program for "potential fraud, waste, abuse, and impermissible conflicts of interest in connection with NCIF and CCIA grants." JA718.

For all of these reasons, EPA on March 4, 2025, instructed Citibank "not to disburse funds from any of the GGRF accounts" for five days, JA699; Treasury subsequently instructed Citibank to comply with EPA's instruction "to impose certain account controls" related to the GGRF, JA697.

Ultimately, on March 11, 2025, EPA issued official notices to the NCIF and CCIA grantees terminating the grant agreements. In the notices, EPA explained that the terminations were "based on substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities, which collectively undermine the fundamental goals and statutory objectives of the award." JA701. EPA also

explained that the contractual scheme lacked sufficient controls to guard against constitutional concerns.  JA702.  Finally, EPA stated that it would work to re-obligate the funds expeditiously under a reformed program.  JA702.

### C. Procedural Background

Plaintiffs in this case are grantees who were selected for the NCIF and CCIA grants, as well as subgrantees who have separately contracted with grantees. Climate United, Coalition for Green Capital, and Power Forward were collectively awarded approximately $14 billion under the NCIF program.  JA966.  California Infrastructure and Economic Development Bank, Minnesota Climate Innovation Finance Authority; Efficiency Maine Trust; and Illinois Finance Authority are subgrantees that receive pass-through funds under the NCIF program.  JA966-76. And Justice Climate Fund and Inclusiv, Inc. together receive over $2.8 billion under the CCIA program.[1]  JA967.

Plaintiffs brought suit under the APA and a constitutional separation-of-powers theory challenging EPA's decision to terminate their grant agreements and seeking declaratory and injunctive relief that would require EPA (through Citibank) to resume disbursing grant funds to them.  JA157-67.  They also brought breach-of-contract claims against Citibank for following EPA's and Treasury's directives to stop disbursing funds.  JA167-70.

_____

[1] Plaintiffs originally brought independent suits, which were consolidated.

On March 18, 2025, the district court issued a temporary restraining order effectively freezing the grant funds pending its review of plaintiffs' motion for a preliminary injunction. JA263-87. The district court extended the temporary restraining order four times for a total of 28 days. JA738-39.

On April 15, 2025—the day on which the temporary restraining order was set to expire—EPA filed a contingent motion requesting a stay pending appeal in the event the district court granted a preliminary injunction. JA740-51. Shortly before midnight, the court issued an order granting a preliminary injunction, stating that an opinion would follow, and denying a stay pending appeal. JA961-63. The order enjoins EPA from effectuating its termination of plaintiffs' grant agreements and further enjoins EPA and Treasury, a non-party, from causing Citibank to "deny, obstruct, delay, or otherwise limit access to funds in accounts established in connection with Plaintiffs' grants, including funds in accounts established by Plaintiffs' subgrantees." JA961-62. Although the district court denied a stay, it ordered Citibank to refrain from releasing any funding disbursements until April 17, 2025, at 2:00 PM EST. JA961 n.1. And, despite EPA's request, supported by evidence that plaintiffs had requested immediate transfer of hundreds of millions of dollars to external accounts, the court refused to order any security under Federal Rule of Civil Procedure 65(c). JA962.

The government immediately sought an administrative stay and stay pending appeal, which this Court granted in part on April 16. The district court issued its opinion later that same day. JA966-1004. Relevant here, the court held that it had jurisdiction over plaintiffs' claims because they were not in "essence" contract claims but instead "turn on … examining the federal regulations and federal statute governing Plaintiffs' grant awards" and "seek equitable relief." JA982-84. As to the merits, the district court found that plaintiffs were likely to succeed on their APA claim because EPA failed to adequately explain its reasoning for terminating the grant agreements, and it further concluded that plaintiffs were likely to prevail on their constitutional claim because EPA's termination sought to "dismantle" the GGRF program. JA991-96. And because the court considered EPA's termination of the grant agreements to be unlawful, it found that the equities and public interest supported an injunction. JA1001. The court extended the injunction to Citibank on the basis that EPA's and Treasury's instructions to Citibank to not disburse funds were unlawful. JA996-97.

## SUMMARY OF ARGUMENT

The district court's preliminary injunction, authorizing plaintiffs to access nearly $20 billion in taxpayer funds, is both legally and equitably indefensible and should accordingly be vacated.

I.  At the outset, the district court lacked jurisdiction over plaintiffs' putative APA claims.  Plaintiffs challenge EPA's termination of their grant agreements and seek disbursement of billions of dollars under those agreements.  Although they pursue their claims under the guise of the APA, this Court's precedent makes clear that plaintiffs' claims are, in fact, contract claims that must be adjudicated in the Court of Federal Claims.  The right to payment that plaintiffs seek to vindicate arises from their contracts with EPA, not any statute or regulation.  And the relief they seek—reversal of the termination decisions and the resumption of payments under the grant agreements—amounts to the classic contractual remedy of specific performance.  The Supreme Court's recent decision in *Department of Education*, and this Court's recent in *Widakuswara*, leave no doubt that claims like plaintiffs' belong in the Court of Federal Claims.  Indeed, this case is *a fortiori*.

In any event, even if viewed through the lens of the APA, plaintiffs' claims are meritless.  EPA acted reasonably and followed all relevant regulations when it terminated the agreements.  EPA adequately explained its reasonable concerns regarding the award process and lack of transparency and oversight over the resulting agreements.  That rationale, based on EPA's role in overseeing and ensuring proper execution of these grant programs, is certainly not arbitrary and capricious under the APA.

Nor does EPA's termination of the grant agreements raise any constitutional concern, let alone one that could justify the preliminary injunction issued below. Although the district court characterized EPA's termination as "dismantling" the GGRF, the court provides no basis for that conclusion. The statute merely requires EPA to use appropriated funds to fund programs serving particular purposes—it imposes no obligation on EPA to enter into grant agreements with specific entities. And EPA has not disavowed its statutory responsibilities; in fact, the agency has repeatedly asserted its intent to re-obligate appropriated funds in a manner consistent with the statute. Plaintiffs' constitutional claims therefore do not justify any injunction and certainly cannot support an injunction forcing EPA to proceed with particular contracts with particular grantees.

II. The equities cut the same way. Plaintiffs have not had access to grant funds for nearly two months, yet the parade of irreparable harms they allege has not come to pass. Moreover, any alleged financial harms would be remedied by a final judgment awarding them the monetary relief they claim entitlement to. In any event, plaintiffs' alleged operational injuries pale in comparison to the potential billions of taxpayer dollars the government is likely to lose forever should the injunction remain in place.

## STANDARD OF REVIEW

This Court reviews de novo whether a district court had jurisdiction to issue a preliminary injunction. *Atlas Air, Inc. v. International Bhd. of Teamsters*, 928 F.3d 1102, 1108 (D.C. Cir. 2019). Although this Court reviews a preliminary injunction for abuse of discretion, it reviews the underlying legal conclusions de novo and factual findings for clear error. *Id.* at 1112.

## ARGUMENT

A preliminary injunction is "an extraordinary remedy" that is only "awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Id.* at 20. The third and fourth factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, all of the factors call for vacatur of the preliminary injunction that the court issued below.

## I. Plaintiffs Are Not Likely to Succeed on Their Claims.

As an initial matter, the district court lacked jurisdiction over plaintiffs' ostensible APA claims. In any event, plaintiffs cannot show that EPA's determination was unreasonable or otherwise violated the APA. Nor can plaintiffs

establish that they are likely to succeed as to their constitutional claims, which rely largely on speculation and do not match the relief granted regardless.

A. **Plaintiffs' APA claims are in essence contract claims and thus must be brought in the Court of Federal Claims.**

The district court plainly lacked jurisdiction under the APA to enjoin EPA from terminating the grant agreements and Citibank from complying with EPA's and Treasury's orders to not disburse funds. Congress has assigned the Court of Federal Claims exclusive jurisdiction to address assertions that the government has not honored the terms of its contracts and owes money to private parties as a result. Plaintiffs' claims here alleging that EPA improperly terminated their contracts under the terms of those contracts and seeking to compel the government to resume contractual payments fall well within that jurisdictional scheme. Because plaintiffs' claims are contractual in nature, the district court's injunction violates Congress's clear jurisdictional boundaries and warrants reversal.

**1.** It is well established that "absent a clear and unequivocal waiver of sovereign immunity," the "United States and its agencies are generally immune from suit in federal court." *Crowley Gov't Servs., Inc. v. General Servs. Admin.*, 38 F.4th 1099, 1105 (D.C. Cir. 2022). Although the APA provides a limited waiver of the government's sovereign immunity for suits challenging final agency action and "seeking relief other than money damages," it does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief

which is sought." 5 U.S.C. § 702. That carve-out "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012).

One example of such an implicit limitation on APA relief involves suits against the United States that sound in contract. The Tucker Act provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). This Court has thus long recognized that "the Tucker Act 'impliedly forbids'" bringing "contract actions" against "the government in a federal district court" under the APA. *Albrecht v. Committee on Emp. Benefits of the Fed. Reserve Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004). That jurisdictional barrier is mandatory and for good reason. It ensures that contract claims against the government are channeled into the court with "unique expertise," *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985), and (importantly here) which Congress has generally not empowered to grant injunctive relief like specific performance, *see James v. Caldera*, 159 F.3d 573, 580 (Fed. Cir. 1998).

As this Court has instructed, courts consider two factors in assessing whether an action is in essence a contract claim governed by the Tucker Act. *First*,

courts examine "the source of the rights upon which the plaintiff bases its claims." *Crowley*, 38 F.4th at 1106 (quotation marks omitted). In answering this question, courts consider whether the "plaintiff's asserted rights and the government's purported authority arise from statute, whether the plaintiff's rights 'exist prior to and apart from rights created under the contract,' and whether the plaintiff 'seeks to enforce any duty imposed upon' the government 'by the relevant contracts to which' the government 'is a party.'" *Id.* at 1107 (cleaned up). *Second*, courts examine the "type of relief sought." *Id.* (quotation marks omitted). This inquiry asks "whether the plaintiff effectively seeks to attain monetary damages." *Id.* at 1107-08. When a claim is premised on a contract with the government, depends on the government's having breached that contract, and seeks to compel the government to pay sums due under the contract, it is a Tucker Act claim, not an APA claim. *See Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967-71 (D.C. Cir. 1982).

This Court recently applied this two-factor rule specifically in the context of "claims for breach of grant agreements executed through binding government contracts." *Widakuswara* Stay Order at 8. There, the United States Agency for Global Media terminated various grant agreements it had originally executed pursuant to its authority via an appropriations statute. *Id.* at 1. The grantees challenged that termination on APA and other grounds and sought restoration of their grant agreements. *Id.* at 1-2. The district court entered a preliminary

20

injunction requiring the agency to restore the grants and disburse grant funds to the grantees. *Id.* at 6.

This Court granted the government's stay of the preliminary injunction, concluding the district court likely lacked jurisdiction over the plaintiffs' claims. *Widakuswara* Stay Order at 4. Specifically, this Court held that the plaintiffs asserted right to payment arose under the grant contracts, not the statute appropriating funds for those contracts. *Id.* at 10-11. And it further recognized that an injunction seeking restoration of the agreements "in substance orders specific performance of the grant agreements—a quintessentially contractual remedy." *Id.* at 6. Accordingly, plaintiffs' claims challenging the termination of their grants could be pursued only in the Court of Federal Claims. *Id.* at 5-9.

**2.** Applying the above principles, plaintiffs' claims fall squarely within the Tucker Act, as this is a contract case through and through. The grant agreements are plainly "the source of the rights upon which" plaintiffs base their claims. *Megapulse*, 672 F.2d at 968. And plaintiffs ultimately "seek[] the classic contractual remedy of specific performance." *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985). The district court thus lacked jurisdiction to issue an injunction barring EPA from effectuating its termination of the grant agreements and ordering the disbursement of billions of dollars to plaintiffs.

To start, plaintiffs' asserted right to billions of dollars in taxpayer funds arises solely from the grant agreements and "in no sense ... exist[s] independently of" those contracts. *Spectrum*, 764 F.2d at 894. Plaintiffs would have no claim absent the government's alleged breach of those agreements. Nothing in the GGRF statute or EPA's regulations confers any right to payment on plaintiffs independently of the grant contracts. That fact makes this case even easier than *Widakuswara*, in which the relevant statutes both established plaintiffs and "required allocation of funds to those *specific, named entities*." *Widakuswara* Stay Order at 12 (Pillard. J., dissenting).

Plaintiffs' own framing of their claims underscores the point. The linchpin of plaintiffs' case is the restrictive termination provision, written into the grant agreements by the last administration, that purports to limit EPA's ability to terminate the grants. JA326. Indeed, the district court's merits analysis rested entirely on the fact that "the *Terms and Conditions governing the grant award* expressly limit" EPA's ability to terminate, and EPA purportedly failed to explain how its termination decision complied with those contractual limitations. JA993 (emphasis added). Even assuming that these termination provisions are both enforceable and not satisfied here, that would only mean EPA violated that contractual provision—underscoring that this is a breach-of-contract suit. Because "it is possible to conceive of this dispute as entirely contained within the terms of

22

the contract," plaintiffs' claims are essentially contractual.  *Ingersoll-Rand*, 780 F.2d at 78.

The relief that plaintiffs seek (and that the district court awarded) is likewise contractual in nature.  Plaintiffs sought (JA288-359) and the district court entered (JA961-63) an order barring EPA from effectuating its termination of plaintiffs' contracts and requiring Citibank, acting as a financial agent of Treasury, to continue payments pursuant to those contracts.  In other words, EPA was ordered to specifically perform contractual obligations, a "classic contractual remedy," and one that is generally unavailable against the government.  *Spectrum Leasing*, 764 F.2d at 895; *see also Ingersoll-Rand*, 780 F.2d at 79-80 (noting that an order "reinstating the original award of [a] contract …. amount[ed] to a request for specific performance" (citation omitted)); *U.S. Conference of Catholic Bishops v. U.S. Dep't of State*, No. 1:25-cv-00465 (TNM), 2025 WL 763738, at *5 (D.D.C. Mar. 11, 2025) (denying on similar grounds an injunction pending appeal).  The payment of money, far from being merely incidental to or "hint[ed] at" by plaintiffs' request for relief, is the entire object of their suit.  *Crowley*, 38 F.4th at 1112.  The appropriate vehicle for a claim seeking damages for terminations allegedly undertaken in breach of contract is a "Tucker Act [suit] in the Claims

Court," not an APA action.  *Bowen v. Massachusetts*, 487 U.S. 879, 890 n.13

(1988) (quotation marks omitted). [2]

    **3.**  The Supreme Court's recent order in *Department of Education* confirms

the contractual nature of this case.  That case involved a statute similar to the

GGRF that generally appropriated program funds and authorized the Department

of Education to "award grants, on a competitive basis, to eligible partnerships" to

carry out the program's purposes.  Application to Vacate at 5, *Department of Educ*

*v. California.*, 145 S. Ct. 966 (No. 24A910), 2025 WL 945313, at *5 (quoting 20

U.S.C. 1022a(a)).  And like here, plaintiffs in *Department of Education* challenged

the agency's decision to terminate their grant agreements as arbitrary and

capricious.  *Id.* at 7, 2025 WL 945313, at *7.  The district court there purported to

"enjoin[] the Government from terminating" these grants, effectively ordering the

payment of money under the contracts.  *Department of Educ.*, 145 S. Ct. at 968.

    The Supreme Court granted a stay of that order.  In so doing, the Court

found that the government was "likely to succeed in showing the District Court

---

[2] For the same reasons, the subgrantees' claims also belong in the Court of Federal Claims.  The grant agreements expressly contemplate that grantees will make subgrants and that subgrantees will be bound by the terms of the prime contract.  *See supra* p. 6.  The subgrantees' claims are accordingly founded on a contract with the government for Tucker Act purposes.  *See, e.g.*, *Roedler v. Department of Energy*, 255 F.3d 1347, 1351 (Fed. Cir. 2001).  Like the grantee plaintiffs, the subgrantees must pursue their breach-of contract challenges in the Court of Federal Claims, subject to applicable limitations that may exist.

lacked jurisdiction to order the payment of money under the APA." *Department of Educ.*, 145 S. Ct. at 968. The Court emphasized that "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money,'" which the district court's order had, in effect, done. *Id.*

The district court in this case committed the same error as the district court in *Department of Education*. Purporting to exercise jurisdiction under the APA, it entered an order enjoining EPA from terminating plaintiffs' grant agreements and compelling EPA and its fiscal agent to resume the disbursement of grant funds to plaintiffs under those agreements. As the Supreme Court concluded, the APA's waiver of sovereign immunity does not extend to such relief.

In cursory fashion, the district court tried to distinguish *Department of Education* because, here, plaintiffs "seek to regain access to their already disbursed funds at Citibank." JA986. But that is a distinction entirely without a difference. Plaintiffs' right to disbursement of funds held by Citibank—like the *Department of Education* plaintiffs' right to receive funds from Treasury—is defined solely by the grant agreements and related contracts. In those agreements, each plaintiff agreed that their Citibank account could be used only "as Recipient's operating account for the award." JA628. They also agreed to use funds only "under the conditions of the [Grant] Agreement" and for specified allowable activities in specified regions. JA568, 627. To be allowable, the expense must be necessary "for the

performance of the Federal award" and, significantly, "[c]onform to any limitations or exclusions set forth ... in the Federal award." 2 C.F.R. § 200.403(a)-(b). And financial obligations incurred after termination "are not allowable" unless expressly authorized by EPA. *Id.* § 200.343. Simply put, plaintiffs have no cognizable interest in the Citibank accounts apart from whatever rights to payment they have under their grant agreements. So, as in *Department of Education*, it all comes down to the grant contracts and their terms.

Furthermore, the financial agreements make clear that Citibank is effectively acting as an arm of Treasury. Under the agreements, Citibank "has been designated and authorized [by Treasury] to act as a financial agent of the United States," JA641, and Citibank must "act at all times in the best interests of the United States," Citibank Br. 3-4. Treasury may remove Citibank as a financial agent if it so chooses. JA645. And the agreements further require Citibank to comply with directions from both EPA and Treasury. Citibank Br. 15. That the funds in *Department of Education* were held *directly* by Treasury rather than by a financial agent *under the direction* of Treasury thus makes no difference. Here, as there, "the APA's limited waiver of immunity does not extend 'to orders to enforce a contractual obligation to pay money.'" *Department of Educ.*, 145 S. Ct. at 968.

This Court's decisions in *Spectrum Leasing,* 764 F.2d 891, and *Ingersoll-Rand*, 780 F.2d at 76, likewise demonstrate the district court's error. In *Spectrum*

*Leasing,* the plaintiff (Spectrum) entered a contract with an agency, under which it agreed to provide hardware and software in exchange for lease payments. 764 F.2d at 892. But after Spectrum failed to provide the software, the agency stopped making lease payments. *Id.* Spectrum sued under the APA, alleging that the agency violated the Debt Collection Act and seeking an injunction compelling the agency to resume payments. *Id.* This Court affirmed the dismissal of Spectrum's suit. *Id.* at 895. The Court held that the "right to these payments is created in the first instance by the contract, not the Debt Collection Act." *Id.* at 894. Although that Act "might impose procedural requirements on the government having some impact on the [parties'] contract," it "in no way create[d] the substantive right to the remedy" Spectrum sought. *Id.* And that relief sought—payment of money owed for goods provided—was the "classic contractual remedy of specific performance." *Id.*

This Court reached the same conclusion in *Ingersoll-Rand*. There, the Air Force terminated a contract with Ingersoll-Rand and solicited new bids for the contract. 780 F.2d at 76-77. Ingersoll-Rand sued, arguing that the termination violated two federal regulations and was arbitrary and capricious under the APA, and seeking an injunction requiring that their contract be reinstated. *Id.* This Court affirmed the dismissal of Ingersoll-Rand's suit, agreeing with the district court that Ingersoll-Rand's claims were in essence contract claims that belonged in

the Court of Federal Claims. *Id.* at 77-80. In so holding, this Court emphasized that Ingersoll-Rand's suit boiled down to whether the contract permitted termination under the circumstances and that the dispute was thus "entirely contained within the terms of the contract." *Id.* at 78. "That the termination also arguably violates certain other regulations d[id] not transform the action into one based solely on those regulations." *Id.* This Court further concluded that Ingersoll-Rand's request that the contract be reinstated "amount[ed] to a request for specific performance." *Id.* at 80.

So too here. Plaintiffs' claims sound entirely in contract. Plaintiffs argue that EPA's decision to terminate was unreasonable because it allegedly exceeded the termination provisions of the grant agreements, and plaintiffs accordingly seek an order preventing EPA from effectuating its termination so that they may continue to receive grant payments under their grant agreements. The source of that alleged right to payment is the contracts, not any statutory or regulatory provisions. Like the Debt Collection Act in *Spectrum* and the regulations at issue in *Ingersoll-Rand*, the background statute and regulations may inform the parties' contractual relationship, but do not create the substantive right that plaintiffs seek to vindicate. And the district court's order preventing EPA from effectuating its termination and requiring Citibank, a financial agent of Treasury, to disburse

payments to plaintiffs is exactly the kind of order this Court recognized district courts likely lack jurisdiction to issue.

**4.** The district court's contrary conclusion rests on several errors and does not withstand scrutiny. To start, the court erroneously reasoned that the source of plaintiffs' rights lay in "federal regulations and federal statute" rather than the grant agreements. JA979-80. As discussed above, however, no statute or regulation remotely confers on plaintiffs the right to billions of dollars in taxpayer funds. Congress appropriated funds for grant programs and authorized EPA to review and select, in its sole discretion, which entities would receive grant funds and the amounts awarded. Because plaintiffs would have no claim to the funds absent EPA's award, their claims arise solely from the agreements.

The district court's own opinion confirms this. The court's analysis of the merits of plaintiffs' APA claims does not reference or construe the GGRF statute at all. Instead, as noted above, in evaluating plaintiffs' likelihood of success on the merits, the court rested on the fact that "the *Terms and Conditions governing the grant award* expressly limit" EPA's ability to terminate. JA993 (emphasis added). And the court's only reference to any "regulations" was to observe that 2 C.F.R. § 200.340(a)(4) permits termination "pursuant to the terms and conditions of the federal award." JA994. But that regulation only confirms that plaintiffs' claims are "based solely on contract principles." *Ingersoll-Rand*, 780 F.2d at 78; *see also*

*id.* (characterizing a plaintiff's claims as for breach of contract where the "question presented by the complaint could be phrased as whether the contract forbids termination under these conditions"). That "the termination also arguably violates certain other regulations does not transform" a breach of contract claim into an APA action. *Id.*

The district court's reliance on *Bennett v. Kentucky Department of Education*, 470 U.S. 656 (1985), and *Maryland Department of Human Resources v. Department of Health & Human Services*, 763 F.2d 1441, 1449 (D.C. Cir. 1985), was misplaced. Those cases are inapposite. *Maryland Department of Human Resources* involved Title XX of the Social Security Act and its implementing regulations, which themselves conferred on participating states a specific right to reimbursement. *Id.* at 1443, 1449. And *Bennett* concerned a State's rights and obligations under Title I of the Elementary and Secondary Act of 1965. 470 U.S. at 669. In other words, those cases concerned *statutory and regulatory entitlements*, not *contractual rights*. The claims there were thus not "founded" on a contract, and so did not fall within the preclusive scope of the Tucker Act. 28 U.S.C. § 1491(a).

By contrast, plaintiffs' asserted interest in the funds arises from the grant contracts rather than any statute or regulation. Put simply, the district court plainly erred in concluding that "[a]ny monetary benefit that might flow to Plaintiffs"

would come "from the structure of statutory and regulatory requirements governing compensation in this action." JA984 (quotation marks omitted). It would not. Plaintiffs' asserted right to payment instead flows from the grant agreements, and claims seeking to vindicate that right must be pursued in the Court of Federal Claims.

The district court's contrary reasoning would have sweeping consequences for the Court of Federal Claims's jurisdiction. If the APA applied simply because plaintiffs challenge the reasonableness of an agency action—here, EPA's decision to terminate the agreements—then every contract dispute could be reframed as an APA claim. The Tucker Act cannot be so easily circumvented. *See Megapulse*, 672 F.2d at 967 n.34.

Finally, the district court wrongly concluded that plaintiffs "seek equitable relief" rather than damages. JA984. As the Supreme Court recently reiterated, the "APA's limited waiver of immunity does not extend 'to orders to enforce a contractual obligation to pay money.'" *Department of Educ.*, 145 S. Ct. at 968. But that is exactly what plaintiffs have requested (JA299), and exactly what the district court granted (JA961-63) by preventing EPA from effectuating its termination of the grant agreements, enjoining EPA and Treasury from directing Citibank to not disburse funds, and ordering Citibank directly to disburse funds. The district court's concern (JA985) that the Court of Federal Claims may not be

able to order specific performance only further proves the government's point: the

APA cannot be used to bypass limitations on relief under other, more specific

statutes. *See Patchak*, 567 U.S. at 215.[3]

## B. Even if jurisdiction were proper, plaintiffs' APA claims lack merit.

Even if plaintiffs' claims were properly viewed as APA claims, they would

lack merit. The district court erred again in finding otherwise.

EPA's termination of the grant agreements complied with the APA's

standards and was supported by both sufficient process and a reasonable basis.

EPA followed all relevant regulations and procedures before terminating plaintiffs'

awards. Under 2 C.F.R. § 200.340(a)(4), an agency may terminate a federal award

"pursuant to the terms and conditions of the Federal award, including, to the extent

authorized by law, if an award no longer effectuates the program goals or agency

priorities." And 2 C.F.R. § 200.341(a) requires an agency to "provide written

notice of termination to the recipient or subrecipient," and include in that notice

---

[3] For the same reasons the Tucker Act bars plaintiffs' APA claims, it bars their breach of contract claims against Citibank, which is acting as a financial agent of Treasury. Indeed, plaintiffs' claims against Citibank depend entirely on a finding that EPA's decision to terminate the agreements was unlawful. JA996-97. As the district court noted, Citibank itself did not breach any contractual duty it owes to plaintiffs. JA996-97. Plaintiffs cannot bypass the federal government's limited waiver of sovereign immunity by bringing breach of contract claims against a private party acting under the direction of the government.

"the reasons for termination, the effective date, and the portion of the Federal award to be terminated."

EPA's termination satisfied these regulatory provisions. On March 11, 2025, EPA sent a Notice of Termination to plaintiffs detailing its reasons for terminating plaintiffs' grant agreements. In those notices, EPA stated that it was terminating the agreements "[p]ursuant to [its] authority under 2 C.F.R. §§ 200.339-40, the General Terms and Conditions of EPA assistance award agreements, the terms and conditions of the Grant Agreement, and the Agency's inherent authority to reconsider prior determinations in light of new information." JA701. And the notices further stated that EPA was terminating the entirety of the award, "effective immediately." JA701.

EPA's decision to terminate was also "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). In its notices, EPA stated that "termination [was] based on substantial concerns regarding program integrity, the award progress, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities, which collectively undermine the fundamental goals and statutory objectives of the award." JA701. EPA explained that "[f]ollowing a comprehensive review and consistent with multiple ongoing independent federal investigations," the agency has identified various "material deficiencies" it has determined "pose an unacceptable risk to the

33

efficient and lawful execution" of the grant programs.  JA701.  Specifically, the

grant agreements lacked "adequate oversight," were deficient with respect to "the

improper or speculative allocation of funds inconsistent with EPA's oversight and

fiscal responsibilities," and involved "the circumvention and defeat of key

oversight mechanisms," severe enough to raise constitutional concerns.  JA701-02.

Ultimately, EPA concluded that termination was necessary "to protect public funds

and maintain the integrity of [the agency's] grant programs."  JA702.

The district court below failed to give due deference to EPA's reasonable

bases for termination.  According to the court, EPA provided "no rational

explanation" for its termination of the grant agreements.  JA993.  But that

characterization is belied by the record, as EPA provided substantial explanation

regarding its concerns over the grant agreements and related contracts.  The court's

objection (JA993) that EPA did not provide individualized reasoning for

terminating each plaintiff's grant agreement only further demonstrates its disregard

of EPA's policy judgment regarding the structural concerns underlying the grant

and related agreements, which were effectively identical and thus included

identical flaws.  And to the extent the district court considered EPA's termination

to exceed the terms and conditions of the agreements themselves, JA993-94, that

only reinforces that plaintiffs' claims sound in contract and thus are not subject to

APA review.  *Supra* pp. 18-32.  Ultimately, the court had no sound basis to

second-guess EPA's conclusions, and its decision to disregard the agency's reasonable rationale "represents a substantial intrusion into the workings of another branch of Government" that the Supreme Court has cautioned should normally be avoided. *Department of Commerce v. New York*, 588 U.S. 752, 781 (2019) (quotation marks omitted).

Because the district court wrongly construed EPA's termination as unlawful, its injunction against Citibank was likewise erroneous. As the district court opinion reflects (JA996), plaintiffs' breach of contract claim against Citibank is premised entirely on their claims against EPA. Indeed, the district court's brief explanation for enjoining Citibank from transferring or otherwise moving funds and ordering the immediate disbursement of funds was that "the instructions [Citibank] received" from EPA and Treasury "were not lawful." JA996. Because the district court's injunction against Citibank relies entirely on its injunction against EPA, a ruling in the government's favor should extend to Citibank as well.

### C. Plaintiffs' constitutional claims cannot support the injunction.

Perhaps recognizing the jurisdictional vulnerability of plaintiffs' APA claims, the district court alternatively supported its injunction by finding a likelihood of success on plaintiffs' constitutional claims. To the extent these claims seek reinstatement of the specific grant agreements on the ground that EPA exceeded its authority in terminating them, that is simply a repackaging of

plaintiffs' APA claims, and the district court lacked jurisdiction over them for the reasons explained above. *Widakuswara* Stay Order at 8-9 (recognizing that plaintiffs' separation-of-powers claims "simply flow from allegations that the Executive Branch has failed to abide by governing congressional statutes, which does not suffice to trigger the distinctively strong presumptions favoring judicial review of constitutional claims"). But even as to the merits, plaintiffs are not likely to prevail because their constitutional claims are meritless, and there is a mismatch between those claims and the relief awarded.

The Appropriations Clause provides that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. In other words, the Clause requires that "the payment of money from the Treasury must be authorized by a statute." *Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990). At the same time, it is the President's duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

EPA's actions comport with these constitutional principles. As discussed, *supra* p. 29, the GGRF merely appropriates funds to be used for certain policy aims; it leaves EPA discretion in overseeing and managing the grant programs. EPA's decision to terminate plaintiffs' grant agreements and re-obligate the funds in a manner consistent with the statute's directives aligns with its duty to execute the law as Congress intended.

Relying solely on EPA's decision to terminate plaintiffs' grant agreements, the district court mischaracterized EPA as "effectively unilaterally dismantling a program that Congress has established." JA996. In doing so, the court disregarded EPA's repeated representations that it will re-obligate funds in a manner that ensures proper oversight and control. Neither the district court nor plaintiffs have cited any reason to doubt that commitment. Thus, even assuming the GGRF statute requires EPA to obligate all appropriated funds and further requires any de-obligated funds to be re-obligated, EPA intends to do so. And given that EPA maintains discretion under the GGRF in its selection of awardees and overall effectuation of the statute's policy aims, *see supra* p. 29, the agency's decision to terminate materially identical contracts it determined were deeply flawed and re-obligate the appropriated funds in a manner consistent with the statute's requirements and purpose does not reveal an intent to "disregard statutory responsibilities," JA995; rather; it reflects the agency's sound policy judgment.

Given that the record is devoid of any evidence that EPA has abandoned its statutory obligations, plaintiffs' constitutional claims have no chance of success. The limited cases involving successful Appropriations Clause challenges have involved attempts to spend funds not appropriated by Congress, *see Office of Personnel Mgmt.*, 496 U.S. at 432, or a refusal to spend appropriated funds where the relevant statutes required that the funds be spent, *see Train v. City of New York*,

420 U.S. 35, 42-43 (1975).  Neither of those circumstances exist here.  EPA has not attempted to spend any funds not appropriated to it, and it has committed to re-obligating the funds appropriated under the GGRF in a manner consistent with the statute.

For these same reasons, the district court erroneously relied on *In re Aiken County*, 725 F.3d 255 (D.C. Cir. 2013) (Kavanaugh, J.).  *Aiken County* involved the Nuclear Waste Policy Act, which provided that the Nuclear Regulatory Commission "shall consider" and "issue a final decision approving or disapproving" the Department of Energy's license application for storing nuclear waste within three years of submission.  *Id.* at 257-58 (quoting 42 U.S.C. § 10134(d)).  Congress also appropriated funds for the Commission to carry out its duty to consider the Department's licensing application.  But rather than carry out its statutory obligations, the Commission, "by its own admission," refused to comply with the law and "simply shut down its review and consideration of the Department of Energy's license application."  *Id.* at 258.

This Court concluded that the Nuclear Regulatory Commission's actions violated the separation of powers.  *Aiken County*, 725 F.3d at 259-67.  The Court reasoned that, "[u]nder Article II of the Constitution and relevant Supreme Court precedents, the President must follow statutory *mandates* so long as there is

appropriated money available and the President has no constitutional objection to the statute." *Id.* at 259.

This case raises none of the concerns at issue in *Aiken County*. Unlike the Nuclear Regulatory Commission in *Aiken County*, EPA has not refused to carry out its duties under the GGRF. To the contrary, as noted above, EPA has stated publicly—and represented both before this Court and the district court below—that it intends to re-obligate the funds appropriated by Congress. *See supra* pp. 7, 12.

At minimum, plaintiffs' constitutional claims cannot support the injunction entered below. *Aiken County* itself illustrates that setting aside the termination decisions and requiring EPA to maintain its contractual relationship with these particular plaintiffs would not be the appropriate remedy for any constitutional claim. Rather, the only proper remedy would be an injunction requiring EPA to *re-obligate* the grant funds and thereby continue the grantmaking process, not to *re-institute* plaintiffs' grants. *Aiken County*, 725 F.3d at 267. Of course, such an injunction would be unnecessary because EPA has already expressly committed to do exactly that. Under no circumstances, however, could the Constitution justify the injunction that the district court actually ordered—one that forces EPA to proceed with *these particular grant agreements* with *these particular plaintiffs*, in the face of an agency determination that doing so would be contrary to the public interest.

## II.   The Remaining Injunction Factors Overwhelmingly Weigh Against an Injunction.

The district court also erred in concluding that plaintiffs established the remaining injunction factors.  Plaintiffs' asserted harms, which are almost exclusively monetary, are not irreparable.  Indeed, it is "well settled that economic loss does not, in and of itself, constitute irreparable harm." *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quotation marks omitted). "Financial injury is only irreparable where no 'adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation.'"  *Id.* (quoting marks omitted).  If plaintiffs ultimately prevail in this litigation (or in litigation before the Court of Federal Claims), they will receive the funds they claim entitlement to.  Notably, despite initially claiming a risk of "grave economic harm" absent immediate distribution of funds during the week of March 11, 2025, JA31, plaintiffs later supported multiple extensions of the TRO and have not identified any harm that actually manifested over the nearly two months that have since passed.  The limited nature of the harm here is underscored by the early stage of these grant programs, which have yet to engender any serious reliance interests.

Conversely, the balance of the equities and public interest weigh strongly in the government's favor.  In concluding otherwise, the court underappreciated both the clear injury to the agency's ability to effectuate Executive Branch policy, as

well as the substantial and irreparable harm to the public fisc. Under the court's order, plaintiffs can draw down enormous sums of money immediately. In the past few weeks, plaintiffs have submitted increasingly large disbursement requests to Citibank that now appear to exceed $600 million. JA753. One request asks Citibank to transfer more than $250 million to an external bank account controlled by Climate United. JA792. Plaintiffs have also told Citibank to prepare to "immediately" process such pending requests to external accounts if the preliminary injunction takes effect, noting that even a brief delay would be "unacceptable." JA764.

If these massive sums are paid out to plaintiffs, EPA has limited ability to recover the funds—a point neither plaintiffs nor the district court have disputed. *See Department of Educ.*, 145 S. Ct. at 968-69 (finding irreparable harm to the government where the "respondents have not refuted the Government's representation that it is unlikely to recover the grant funds once they are disbursed"). And although EPA repeatedly requested an adequate bond under Federal Rule of Civil Procedure 65(c) (JA509), the district court instead waived the bond requirement, JA962; JA1003-04,which is itself a reversible abuse of discretion under these circumstances. *See Widakuswara* Stay Order at 10 & n.7.

The district court's order also continues to bar EPA from effectuating its terminations and re-obligating the grant funding. That irreparably harms EPA and

the public by depriving the public fisc of significant interest earned on billions in outstanding funding, and by preventing EPA from effectuating agency priorities by reconstituting the program in a manner that ensures accountability and effective expenditure of taxpayer dollars.

In short, this is a case where the merits and the equities point firmly in the same direction—there is no basis for an injunction.  This Court should reverse.

## CONCLUSION

For the foregoing reasons, this Court should vacate the district court's preliminary injunction order.

Respectfully submitted,

YAAKOV M. ROTH
*Acting Assistant Attorney General*

GERARD SINZDAK

*/s/ Sophia Shams*
SOPHIA SHAMS
*Attorneys, Appellate Staff*
*Civil Division, Room 7264*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-2496*

May 2025

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9,459 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Times New Roman 14-point font, a proportionally spaced typeface.

*Sophia Shams*
Sophia Shams

**CERTIFICATE OF SERVICE**

I hereby certify that on May 5, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*Sophia Shams*

Sophia Shams

**ADDENDUM**

# TABLE OF CONTENTS

42 U.S.C. § 7434 ..................................................................A1

5 U.S.C. § 701 ......................................................................A4

5 U.S.C. § 704 ......................................................................A5

28 U.S.C. § 1491(a) .............................................................A6

**42 U.S.C. § 7343**

**(a) Appropriations**

**(1) Zero-emission technologies**

In addition to amounts otherwise available, there is appropriated to the Administrator for fiscal year 2022, out of any money in the Treasury not otherwise appropriated, $7,000,000,000, to remain available until September 30, 2024, to make grants, on a competitive basis and beginning not later than 180 calendar days after August 16, 2022, to States, municipalities, Tribal governments, and eligible recipients for the purposes of providing grants, loans, or other forms of financial assistance, as well as technical assistance, to enable low-income and disadvantaged communities to deploy or benefit from zero-emission technologies, including distributed technologies on residential rooftops, and to carry out other greenhouse gas emission reduction activities, as determined appropriate by the Administrator in accordance with this section.

**(2) General assistance**

In addition to amounts otherwise available, there is appropriated to the Administrator for fiscal year 2022, out of any money in the Treasury not otherwise appropriated, $11,970,000,000, to remain available until September 30, 2024, to make grants, on a competitive basis and beginning not later than 180 calendar days after August 16, 2022, to eligible recipients for the purposes of providing financial assistance and technical assistance in accordance with subsection (b).

**(3) Low-income and disadvantaged communities**

In addition to amounts otherwise available, there is appropriated to the Administrator for fiscal year 2022, out of any money in the Treasury not otherwise appropriated, $8,000,000,000, to remain available until September 30, 2024, to make grants, on a competitive basis and beginning not later than 180 calendar days after August 16, 2022, to eligible recipients for the purposes of providing financial assistance and technical assistance in low-income and disadvantaged communities in accordance with subsection (b).

**(4) Administrative costs**

In addition to amounts otherwise available, there is appropriated to the Administrator for fiscal year 2022, out of any money in the Treasury not otherwise appropriated, $30,000,000, to remain available until September 30, 2031, for the administrative costs necessary to carry out activities under this section.

**(b) Use of funds**

An eligible recipient that receives a grant pursuant to subsection (a) shall use the grant in accordance with the following:

**(1) Direct investment**

The eligible recipient shall-

(A) provide financial assistance to qualified projects at the national, regional, State, and local levels;

(B) prioritize investment in qualified projects that would otherwise lack access to financing; and

(C) retain, manage, recycle, and monetize all repayments and other revenue received from fees, interest, repaid loans, and all other types of financial assistance provided using grant funds under this section to ensure continued operability.

**(2) Indirect investment**

The eligible recipient shall provide funding and technical assistance to establish new or support existing public, quasi-public, not-for-profit, or nonprofit entities that provide financial assistance to qualified projects at the State, local, territorial, or Tribal level or in the District of Columbia, including community- and low-income-focused lenders and capital providers.

**(c) Definitions**

In this section:

**(1) Eligible recipient**

The term "eligible recipient" means a nonprofit organization that-

(A) is designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;

(B) does not take deposits other than deposits from repayments and other revenue received from financial assistance provided using grant funds under this section;

(C) is funded by public or charitable contributions; and

(D) invests in or finances projects alone or in conjunction with other investors.

## (2) Greenhouse gas

The term "greenhouse gas" means the air pollutants carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride.

## (3) Qualified project

The term "qualified project" includes any project, activity, or technology that-

(A) reduces or avoids greenhouse gas emissions and other forms of air pollution in partnership with, and by leveraging investment from, the private sector; or

(B) assists communities in the efforts of those communities to reduce or avoid greenhouse gas emissions and other forms of air pollution.

## (4) Zero-emission technology

The term "zero-emission technology" means any technology that produces zero emissions of-

(A) any air pollutant that is listed pursuant to section 7408(a) of this title (or any precursor to such an air pollutant); and

(B) any greenhouse gas.

## 5 U.S.C. § 701

(a) This chapter applies, according to the provisions thereof, except to the extent that—

  (1) statutes preclude judicial review; or

  (2) agency action is committed to agency discretion by law.

(b) For the purpose of this chapter—

  (1) "agency" means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include—

    (A) the Congress;

    (B) the courts of the United States;

    (C) the governments of the territories or possessions of the United States;

    (D) the government of the District of Columbia;

    (E) agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them;

    (F) courts martial and military commissions;

    (G) military authority exercised in the field in time of war or in occupied territory; or

    (H) functions conferred by sections 1738, 1739, 1743, and 1744 of title 12; subchapter II of chapter 471 of title 49; or sections 1884, 1891–1902, and former section 1641(b)(2), of title 50, appendix; and

  (2) "person", "rule", "order", "license", "sanction", "relief", and "agency action" have the meanings given them by section 551 of this title.

**5 U.S.C. § 704**

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

**5 U.S.C. § 704(a)**

(1)The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort. For the purpose of this paragraph, an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aeronautics and Space Administration shall be considered an express or implied contract with the United States.

(2)To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States. In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just. The Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41, including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 [1] of that Act.