ORAL ARGUMENT SCHEDULED FOR MAY 19, 2025

**Nos. 25-5122, 25-5123**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

CLIMATE UNITED FUND, *et al.*,

Plaintiffs-Appellees,

v.

CITIBANK, N.A., *et al.*,

Defendants-Appellants.

---

**BRIEF OF IMPACT FINANCE EXPERTS
AS *AMICI CURIAE* IN SUPPORT OF APPELLEES**

---

*On Appeal from the United States District Court for the District of Columbia*

---

WILLIAM J. COOPER
ALEX WERNER
**CONRAD | METLITZKY | KANE LLP**
217 Leidesdorff Street
San Francisco, CA 94111
(415) 343-7100
wcooper@conmetkane.com
awerner@conmetkane.com

*Attorneys for* Amici Curiae
 *Impact Finance Experts*

## CERTIFICATE AS TO PARTIES, RULINGS, RELATED CASES & STATUTES

Pursuant to D.C. Circuit Rules 26.1 and 28(a)(1) as well as Federal Rule of Appellate Procedure 26.1, the undersigned counsel certifies as follows:

### A.    Parties, Intervenors, and *Amici*

Except for the *amici* filing this brief and Samuel R. Bagenstos, who has moved for leave to participate as an *amicus curiae*, the parties, intervenors, and *amici* appearing before this Court are listed in Appellants' brief.

### B.    Rulings Under Review

Appellants seek review of the district court's April 15, 2025 order granting Appellees' motion for a preliminary injunction.

### C.    Related Cases

*Amici* are not aware of any other related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

Dated: May 13, 2025                    CONRAD | METLITZKY | KANE LLP


                                       */s/ William J. Cooper*
                                       WILLIAM J. COOPER
                                       Attorneys for *Amici Curiae*
                                        *Impact Finance Experts*

i

## DISCLOSURE STATEMENT

Pursuant to D.C. Circuit Rule 26.1 and Federal Rule of Appellate Procedure 26.1, *amici* certify that *amici* are natural persons and as such have no parent entities or stock.

Dated: May 13, 2025                    CONRAD | METLITZKY | KANE LLP


                                       */s/ William J. Cooper*
                                       WILLIAM J. COOPER
                                       Attorneys for *Amici Curiae*
                                        *Impact Finance Experts*

## STATEMENT REGARDING CONSENT TO FILE
## AND SEPARATE BRIEFING

Counsel for all parties have consented to the filing of this *amicus* brief.

Pursuant to D.C. Circuit Rule 29(d), *amici* certify that a separate brief is necessary to present the important issues covered by this brief. *Amici* are not aware of any other *amicus* brief addressing these issues—which do not duplicate the legal arguments presented by the parties—and certify pursuant to D.C. Circuit Rule 29(d) that joinder in a single brief with other *amici* would be impracticable.

Dated: May 13, 2025                    CONRAD | METLITZKY | KANE LLP

*/s/ William J. Cooper*
WILLIAM J. COOPER
Attorneys for *Amici Curiae*
 *Impact Finance Experts*

iii

## STATEMENT OF AUTHORSHIP
## AND FINANCIAL CONTRIBUTIONS

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* certify that (1) this brief was authored entirely by counsel for *amici* and not by counsel for any party, in whole or part; (2) no party or counsel for any party contributed money to fund preparing or submitting this brief; and (3) apart from *amici* and their counsel, no other person contributed money to fund preparing or submitting this brief.

Dated: May 13, 2025                          CONRAD | METLITZKY | KANE LLP


                                             */s/ William J. Cooper*
                                             WILLIAM J. COOPER
                                             Attorneys for *Amici Curiae*
                                              *Impact Finance Experts*

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS,
RELATED CASES & STATUTES ............................................................................ i

DISCLOSURE STATEMENT ................................................................................ ii

STATEMENT REGARDING CONSENT TO FILE AND
SEPARATE BRIEFING ........................................................................................ iii

STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS ....... iv

GLOSSARY OF ABBREVIATIONS .................................................................... ix

IDENTITY AND INTEREST OF *AMICI CURIAE* ..................................................1

INTRODUCTION ....................................................................................................3

ARGUMENT ............................................................................................................4

      I.     Congress Sought to Leverage Private Capital Through the
            Greenhouse Gas Reduction Fund. ........................................................4

      II.    The Grant Structure Here Was Designed to Accomplish
            Congress's Goal of Leveraging Private Investment. ...........................7

      III.   The Grant Programs Are Grounded in Well-Established
            Government Practice. ...........................................................................14

CONCLUSION .......................................................................................................17

CERTIFICATE OF COMPLIANCE ......................................................................18

CERTIFICATE OF SERVICE ...............................................................................19

# TABLE OF AUTHORITIES

**Cases**

*Central Va. Cmty. Coll. v. Katz*,
546 U.S. 356 (2006) (Thomas, J., dissenting) ......................................14

*In re Transp. Design & Tech., Inc.*,
48 B.R. 635 (Bankr. S.D. Cal. 1985) ...................................................14

*Transactive Corp. v. United States*,
91 F.3d 232 (D.C. Cir. 1996)................................................................16

*United States v. Citizens & S. Nat'l Bank*,
889 F.2d 1067 (Fed. Cir. 1989) ...........................................................17

*United States v. Whiting Pools, Inc.*,
408 U.S. 198 (1983).............................................................................14

**Statutes**

42 U.S.C. § 7434(a)(1)–(3) .........................................................................5

42 U.S.C.  § 7434(c)(1)(A) .........................................................................4

42 U.S.C.  § 7434(c)(3)(A) .........................................................................4

**Legislative & Regulatory Materials**

2 C.F.R. § 200.305(b)(1)............................................................................10

168 Cong. Rec. H7577, H7702 (daily ed. Aug. 12, 2022) .........................4

Environmental Financial Advisory Board (EFAB);
Request for Nominations, 89 Fed. Reg. 89,992 (Nov. 14, 2024).........11

H.R. Rep. No. 117-130 (2021).....................................................................4

U.S. EPA, Environmental Financial Advisory Board
Public Meeting Minutes (Nov. 17, 2022) ............................................10

U.S. EPA, Implementation Framework
for the Greenhouse Reduction Fund (2023) ........................................12

## Other Authorities

Ben Bernanke & Mark Gertler, *Agency Costs, Net Worth,
and Business Fluctuations*, 79 Am. Econ. Rev. (1989).........................8

Caroline Flammer et al., *Blended Finance*
(Nat'l Bureau of Econ. Research Working Paper No. 32287, 2024) ...............8, 9

Claudio Rizzi, et al., *Government-Funded Green Banks: Catalysts
for the Green Transition* (Mar. 28, 2025) (unpublished manuscript)...................6

Climate Pol'y Initiative, *Global Landscape of Climate Finance 2024:
Insights for COP29* (2024).......................................................6

Coalition for Green Capital, *Green Bank Techniques*
(last accessed May 11, 2025), https://tinyurl.com/4fujxtzj ................................8

CREO Advisory, *Understanding the Climate Finance Gap* (2024) ......................6

FASB ASC § 958-605-25-2 (2018) ..........................................................10

FASB ASC Master Glossary (2015)...........................................................10

Jennifer Weiss & Kate Konschnik, Duke Univ., Nicholas Inst.
for Envtl. Pol'y Sol., *Beyond Financing: A Guide to
Green Bank Design in the Southeast* (2018).........................................6

Joseph E. Stiglitz & Andrew Weiss, *Credit Rationing
in Markets with Imperfect Information*, 71 Am. Econ. Rev. (1981) ....................8

Ken Berlin, et al., Brookings-Rockefeller Project on State & Metro.
Innovation, *State Clean Energy Finance Banks* (2012) ........................................5

McKinsey, *Delivering Transformative Impact from
US Green Bank Financing* (Apr. 2023)..............................................5, 7

Michael Swack & Eric Hangen, Global Impact Investing Network,
*Scaling U.S. Community Investing: The Investor-Product Interface* (2015) ......16

Michael Swack et al., *CDFIs Stepping into the Breach:
An Impact Evaluation—Summary Report* (2014)..................................8

N.Y. State Energy Research & Dev. Auth., *How NY Green Bank
Is Advancing Green Energy* ........................................................5

Natalie Paris, Cong. Research Serv., IF12924, *Understanding Federal Agency Grant Disbursement, Payment Processes, and "Freezes"* (2025)...........9

OECD, *Green Investment Banks: Scaling Up Private Investment in Low-Carbon, Climate-Resilient Infrastructure* (2016)...........................5

Opportunity Fin. Network, *CDFI 101: History of the CDFI Industry* (2023) ........15

Press Release, U.S. EPA, Biden-Harris Administration Announces $20 Billion in Grants to Mobilize Private Capital and Deliver Clean Energy and Climate Solutions to Communities Across America (Apr. 4, 2024)..................................4

Press Release, U.S. EPA, EPA Announces Initial Program Design of Greenhouse Gas Reduction Fund (Feb. 14, 2023)..............................................11

Press Release, U.S. EPA, EPA Releases Framework for the Implementation of the Greenhouse Gas Reduction Fund as Part of President Biden's Investing in America Agenda (Apr. 19, 2023) ....................................................11

U.N. Env't Programme, *Demystifying Private Climate Finance* (2014)..................7

U.S. Dep't of Energy, *Energy Investment Partnerships* (Dec. 2015) ............ 6, 9, 15

U.S. Dep't of Treasury, Cmty. Dev. Fin. Inst. Fund, *About Us* (last accessed May 13, 2025), https://cdifund.gov/about ...................................15

U.S. Dep't of Treasury, Office of the Comptroller of the Currency, *Comptroller's Handbook: Accounts Receivable and Inventory Financing* (2000) ..............................................................10

U.S. Dep't of Treasury, Office of the Comptroller of the Currency, *Comptroller's Handbook: Rating Credit Risk* (2001) .........................................8

U.S. EPA, *Clean Energy Finance: Green Banking Strategies for Local Governments* (October 2018)................................................................9

U.S. Gov't Accountability Office, GAO 09-161, *Troubled Asset Relief Program: Additional Actions Needed to Ensure Integrity, Accountability, and Transparency* (2008) .........................................................16

U.S. Gov't Accountability Office, GAO 17-176, *Revenue Collections and Payments: Treasury Has Used Financial Agents in Evolving Ways but Could Improve Transparency* (2017) ...............................................................16

## GLOSSARY OF ABBREVIATIONS

| Abbreviation | Definition |
|---|---|
| CCIA | Clean Communities Investment Accelerator |
| EPA | Environmental Protection Agency |
| GGRF | Greenhouse Gas Reduction Fund |
| IRA | Inflation Reduction Act |
| NCIF | National Clean Investment Fund |

## IDENTITY AND INTEREST OF *AMICI CURIAE*

*Amici* are scholars and experts in impact finance, with extensive research and professional experience in community development, sustainability finance, and social impact investing. Their backgrounds and specialized knowledge give them an interest in explaining the financing structure used to implement the Greenhouse Gas Reduction Fund grants and the important economic motivations underpinning that structure.

**Michael Swack** is a Professor at the University of New Hampshire, with appointments at the Carsey School of Public Policy and Peter T. Paul College of Business. Professor Swack directs the annual Financial Innovations Roundtable hosted by the Federal Reserve Bank. He has previously served on the U.S. Department of the Treasury's Community Development Advisory Board, as founder and former dean of the School of Community Economic Development at Southern New Hampshire University, and as board member of the New Hampshire Community Development Finance Authority.

**Paul Yoo** is an Assistant Professor of Finance at American University's Kogod School of Business. Professor Yoo previously worked as a Research Assistant at the Board of Governors of the Federal Reserve System. His research and

1

publications address optimal monetary policy, green banking, and the intersection of financial technology and credit intermediation.

**Ellen Lurie Hoffman** is the Executive Director of the Center for Impact Finance at the University of New Hampshire's Carsey School of Public Policy. Ms. Lurie Hoffman previously served as the Acting Director of the Office of Community and Economic Development and advised the U.S. Department of the Treasury on housing policy and leveraging public funds to increase housing supply and affordable housing access. She previously led federal housing and sustainability policy analysis and advocacy at the National Housing Trust and worked on multifamily housing policy at the National Council of State Housing Agencies.

**Eric Hangen** is the Director of Strategic Initiatives for the Center for Impact Finance at the University of New Hampshire's Carsey School of Public Policy. Mr. Hangen has decades of experience in community development. He ran a national consulting practice focused on social impact finance and his projects have included training programs for the U.S. Department of Energy Community Power Accelerator and development of the CIF-Inclusiv Green and Solar Lending Professional Training Program.

The views expressed here are those of the individual *amici* and not of their affiliated organizations. *Amici* respectfully submit this brief to aid the Court's consideration of the critical programs at stake in this case.

## INTRODUCTION

Congress created the Greenhouse Gas Reduction Fund to catalyze private investment in clean technology through strategic use of federal grants. When the EPA implemented that mandate through the National Clean Investment Fund and Clean Communities Investment Accelerator programs, the agency used a different funding structure than most federal grant programs. The government typically reimburses costs as grantees incur them—but these grants were fully disbursed at the outset, to bank accounts controlled by the grantees.

Appellants suggest that this is a "highly unusual structure" intended to deprive the Administration of "meaningful oversight." Gov't Br. 1. To the contrary, the EPA retained its same oversight authority while tailoring the funding structure to Congress's goal of leveraging private investment. By providing assets that appear on recipients' balance sheets, instead of merely a promise of future reimbursement, the structure creates opportunities to mobilize private capital. Recipients can attract additional financing to fund qualified projects and offer credit enhancements that make projects less risky for private investors. That is just the type of public-private partnership that Congress intended.

The carefully chosen funding structure at issue sets these facts apart from cases involving other grant programs. It also reinforces the importance of the district court's preliminary injunction, which restores "access to funds already in

3

[Plaintiffs'] accounts" that were "appropriated by Congress." JA1002. This Court should affirm.

## ARGUMENT

I.  **Congress Sought to Leverage Private Capital Through the Greenhouse Gas Reduction Fund.**

"[I]ncentivizing private sector development and investment" in clean energy and efficiency was a key goal of the Inflation Reduction Act of 2022. H.R. Rep. No. 117-130, at 5 (2021). In service of that goal, the IRA included $27 billion to create a Greenhouse Gas Reduction Fund to finance projects that lower "greenhouse gas emissions and other forms of air pollution in partnership with, and by leveraging investment from, the private sector." 42 U.S.C. § 7434(c)(3)(A). Congress told the EPA to distribute those funds through nonprofit organizations "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment" of clean technology. *Id.* § 7434(c)(1)(A). The Act's proponents hoped to "leverage private investment in amounts several times greater than the initial public investment." 168 Cong. Rec. H7577, H7702 (daily ed. Aug. 12, 2022) (statement of Rep. Dingell).[1]

---

[1] The grant recipients that were ultimately selected committed to "[a]chieve a private capital mobilization ratio of nearly 7 times, with every dollar in grant funds leveraged for almost seven dollars in private funds over the next seven years." Press Release, U.S. EPA, Biden-Harris Administration Announces $20 Billion in Grants to Mobilize Private Capital and Deliver Clean Energy and Climate Solutions to Communities Across America (Apr. 4, 2024), https://tinyurl.com/mr298c2t. This is

4

Congress directed the EPA to implement the program quickly, making all grants by September 30, 2024. 42 U.S.C. § 7434(a)(1)–(3). It was important that EPA not only "award capitalization grants" but also "disburse the funds" promptly: as one legislator explained, "***swift disbursement of the maximum funding amount possible w[ould] allow the [recipients] to leverage more private financing***— thereby ensuring [that] public investment has a far-reaching impact." 168 Cong. Rec. H7702 (statement of Rep. Dingell) (emphasis added).

Congress focused on leveraging private financing for good reason. The clean energy space "is highly asset-based and capital-intensive," with "long technology and cost curves" that can "deter private capital from investing." Ken Berlin, et al., Brookings-Rockefeller Project on State & Metro. Innovation, *State Clean Energy Finance Banks* 4 (2012), https://tinyurl.com/2vtentwx; *see also* OECD, *Green Investment Banks: Scaling Up Private Investment in Low-Carbon, Climate-Resilient Infrastructure* 18 (2016), https://tinyurl.com/3vw9ye77 (discussing investment

---

on par with multiplier effects seen with state green banks. *See, e.g.*, N.Y. State Energy Research & Dev. Auth., *How NY Green Bank Is Advancing Green Energy*, https://tinyurl.com/bdzhjw9t (last accessed May 9, 2025) (explaining that the New York Green Bank "started in 2013 with $1 billion in public capital" and has since "enabled over $7 billion of clean energy infrastructure . . . to be built"). Private-sector analysts agreed that the GGRF had the potential to mobilize several dollars of private investment per dollar of public funds. *See, e.g.*, McKinsey, *Delivering Transformative Impact from US Green Bank Financing* 4 (Apr. 2023), https://tinyurl.com/2wdw4p2f.

barriers "specific to energy efficiency investment"). The resulting gap in financing for low-carbon projects is "persistent" and well-documented. *E.g.*, Climate Pol'y Initiative, *Global Landscape of Climate Finance 2024: Insights for COP29* at 9–10 (2024), https://tinyurl.com/2apmuvzb. Using "catalytic capital to de-risk new opportunity areas" is a widely proposed way of filling the gap. CREO Advisory, *Understanding the Climate Finance Gap* 18–19 (2024).

The catalytic model provides a path to transition clean energy "away from grants and incentives to a more sustainable, long-term financing model." Jennifer Weiss & Kate Konschnik, Duke Univ., Nicholas Inst. for Envtl. Pol'y Sol., *Beyond Financing: A Guide to Green Bank Design in the Southeast* 3–4 (2018). Private capital "lowers the need for . . . public investment, allowing the government to deploy funds elsewhere" as "private investors see consistent returns." U.S. Dep't of Energy, *Energy Investment Partnerships* 59 (Dec. 2015), https://tinyurl.com/bdde5ypk. Strategic investment can not only "leverage public capital to attract private investment in established technologies," but also "indirectly catalyze investment in new climate-related technology." Claudio Rizzi, et al., *Government-Funded Green Banks: Catalysts for the Green Transition* 2–3 (Mar. 28, 2025) (unpublished manuscript), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5174254 (finding that green bank investment in commercialized technology increased venture-capital funding of earlier-stage startups).

To lend at scale, however, "private-sector financiers need some degree of certainty" concerning repayment. U.N. Env't Programme, *Demystifying Private Climate Finance* 39–40 (2014), https://tinyurl.com/mrz5mukr. And investors who depend on future government payments face the risk "that policies and incentives underpinning incentives in renewable energy projects may be altered or reversed, rendering renewable energy projects suddenly unviable and leaving investors with stranded assets." *Id.* at 42–43. The GGRF and its implementing programs were intended to address these problems and make clean projects less risky for private capital.

## II.    The Grant Structure Here Was Designed to Accomplish Congress's Goal of Leveraging Private Investment.

### A.    Leveraging private investment requires owning assets.

Turning each dollar of public funding into several dollars of combined private-public investment requires financial capacity and flexibility. Green banks and other mission-driven institutions need assets—not just an expected income stream—to employ powerful tools for encouraging private investment.

First, nonprofits with assets can "[r]ais[e] additional capital on the back of [their] balance sheet or capital reserves." McKinsey, *supra*, at 21. Well-established economic literature supports the intuitive concept that a healthy balance sheet is essential for accessing affordable capital. *See, e.g.*, U.S. Dep't of Treasury, Office of the Comptroller of the Currency, *Comptroller's Handbook: Rating Credit Risk* 13

7

(2001), https://tinyurl.com/yv5xyu6p (noting the importance of a borrower's "historical and project balance sheet" to assessments of expected performance and credit risk); Ben Bernanke & Mark Gertler, *Agency Costs, Net Worth, and Business Fluctuations*, 79 Am. Econ. Rev. 1, 14 (1989) (explaining the importance of borrowers' balance sheets to affordable credit access); Joseph E. Stiglitz & Andrew Weiss, *Credit Rationing in Markets with Imperfect Information*, 71 Am. Econ. Rev. 393, 393–94, 406–07 (1981) (describing challenges faced by low-net-worth borrowers). As every mortgage applicant knows, lenders require borrowers to have sufficient assets to demonstrate financial stability, cover future payments, and align incentives through "skin in the game." In the same way, a green bank with liquid assets "signals to capital markets, through balance sheet indicators, the ability to take on debt capital." Michael Swack et al., *CDFIs Stepping into the Breach: An Impact Evaluation—Summary Report* 42–43 (2014), https://tinyurl.com/4va4d5bv.

Second, asset reserves give nonprofits "credit enhancement" tools to entice private investment by making clean energy projects less financially risky. *See* Coalition for Green Capital, *Green Bank Techniques* (last accessed May 11, 2025), https://tinyurl.com/4fujxtzj. The idea is "to improve the risk-return trade-off of private investors and hence help crowd in private capital." Caroline Flammer et al., *Blended Finance* 15 (Nat'l Bureau of Econ. Research Working Paper No. 32287, 2024), https://www.nber.org/papers/w32287. Green banks with cash on hand can,

8

for instance, guarantee third-party loans to "incentivize private lend[ers] or investors to require lower return rates." U.S. Dep't of Energy, *supra*, at 59. Investors are less likely to accept a guaranty backed by future receivables rather than current assets. Having significant assets also enables nonprofit firms to absorb loan risk by, for example, offering loss reserves or taking junior debt or equity positions relative to private investors. *See* U.S. EPA, *Clean Energy Finance: Green Banking Strategies for Local Governments* 2–3 (October 2018), https://tinyurl.com/58bxhajv (explaining how loan loss reserves can reduce financial risk for private investment); Flammer et al., *supra*, at 14–15 (describing additional tools). In these and other use cases, balance-sheet assets are worth more to creditors and co-investors than an equivalent future promise of repayment.

## B. Most federal grants employ a reimbursement structure that does not support private leverage.

The typical federal grant structure is not well-suited to leverage private capital. Most programs use a reimbursement model: "the grantee expends their own funds and then requests payment from the federal government for those expenditures." Natalie Paris, Cong. Research Serv., IF12924, *Understanding Federal Agency Grant Disbursement, Payment Processes, and "Freezes"* 2 (2025). Agencies process such "draw-down" requests using a payment system such as the Automated Standard Application for Payments. *Id.* Even in the less common case where costs are advanced, payments "must be limited to the minimum amounts

9

needed" and "timed with actual, immediate cash requirements" to "minimize the time elapsing between the transfer of funds and disbursement by the recipient." 2 C.F.R. § 200.305(b)(1). This earn-as-you-go structure does not give grantees upfront capital that can readily be leveraged, because grants are recognized as revenue for accounting purposes only when the funds are received (*i.e.*, as approved costs are incurred). *See* FASB ASC § 958-605-25-2 (2018); JA371 ¶ 31; *see also* FASB ASC Master Glossary (2015) (specially defining "Contributions Receivable" as "amounts due" from sources of funding including "federal grants"); *cf.* U.S. Dep't of Treasury, Office of the Comptroller of the Currency, *Comptroller's Handbook: Accounts Receivable and Inventory Financing* 17–20 (2000), https://tinyurl.com/bdd73euh (describing the credit risks involved in evaluating receivables and noting that government receivables "are usually considered ineligible" as collateral).

### C. The grant structure here was structured to facilitate private leverage by fully disbursing funds to recipients' bank accounts.

The EPA heeded Congress's directive to facilitate private leverage. From the start, the EPA aimed to structure the GGRF to provide "[b]alance sheet equity," which had previously been a "barrier[] to private sector capital." *See* U.S. EPA, Environmental Financial Advisory Board Public Meeting Minutes 24 (Nov. 17,

2022), https://tinyurl.com/mu99n46y.[2] In February 2023, the agency published initial guidance on the GGRF program, through which it sought to "mobilize billions more in private capital to reduce pollution and improve public health, all while lowering energy costs, increasing energy security, creating good-paying jobs and boosting economic prosperity in communities across the country." Press Release, U.S. EPA, EPA Announces Initial Program Design of Greenhouse Gas Reduction Fund (Feb. 14, 2023), https://tinyurl.com/9dy23wat.

In April 2023, the EPA published a detailed implementation framework. *See* Press Release, U.S. EPA, EPA Releases Framework for the Implementation of the Greenhouse Gas Reduction Fund as Part of President Biden's Investing in America Agenda (Apr. 19, 2023), https://tinyurl.com/2xhc2j3r. That framework described three "program objectives," including: "Mobilize financing and private capital to stimulate additional deployment of greenhouse gas- and air pollution-reducing projects." U.S. EPA, Implementation Framework for the Greenhouse Reduction

---

[2] The Environmental Financial Advisory Board was established in 1991, pursuant to the Federal Advisory Committee Act, to enable a panel of outside experts to "provide advice and recommendations to EPA on innovative approaches to financing environmental programs, projects, and activities." Environmental Financial Advisory Board (EFAB); Request for Nominations, 89 Fed. Reg. 89,992 (Nov. 14, 2024). The Board advises on, among other things, "[c]reating incentives to increase private investment in the provision of environmental services," "[d]eveloping new and innovative environmental financing approaches," and "implementing public-private partnerships." *Id.*

11

Fund 4 (2023), https://tinyurl.com/3evmk6yw. In service of those objectives, the EPA would create three grant competitions, two of which are at issue here. *Id.* at 3. The $14 billion National Clean Investment Fund would fund a small number of national nonprofits to "partner with private capital lenders to deliver financing at scale to . . . clean technology projects." *Id.* The $6 billion Clean Communities Investment Accelerator would fund "hub nonprofits" to "build the clean financing capacity of specific networks of public, quasi-public and non-profit community lenders." *Id.*

After months of public input, *see* JA968, the agency published Notices of Funding Opportunity in July 2023 that emphasized the importance of private leverage and noted the atypical grant-funding structure that would likely require. The NCIF notice, for instance, told applicants to describe their "goals and targets for mobilizing private capital." JA1764, JA1773–76; *see also* JA1663 (similar language in CCIA notice). It also noted that federal grantees "typically draw funds only for the minimum amounts needed for actual and immediate cash requirements"—but that "departures" from that model might be needed here, such as a "one-time or periodic balance-sheet capitalization(s)." JA1787–88. Applicants were told to "assume the full EPA funding request is recognized as an asset at the beginning of the period of performance." JA1771.

12

In September 2024, Treasury entered into a Financial Agency Agreement with Citibank to administer the NCIF and CCIA programs by holding accounts for grant recipients. *See* Gov't Br. 7–8. Under this arrangement, the grant funds were fully disbursed to bank accounts in Plaintiffs' names. *See, e.g.*, JA986; JA990; JA1134; Citibank Br. 4. Citibank functions as Treasury's agent under a Financial Agency Agreement, and the EPA retains the ability to monitor the accounts, along with significant oversight rights. *See* JA907–08 (Defendants concede that "EPA can monitor these accounts"); JA1002 (district court findings on oversight mechanisms); JA372 (testimony that "EPA's oversight functions remain identical under the FAA and under ASAP"). The oversight regime includes regular reports to and meetings with EPA, third-party audit requirements, and a certification—subject to criminal prosecution and other sanctions—that each draw request is necessary to execute against an EPA-approved workplan. *See* JA373–74, JA1649.

By design, however, the grantees own the funds, not the government. Citibank "maintains the Accounts for each recipient," on whose behalf it holds all "funds and financial assets." *E.g.*, JA 71. The grantee is "the entitlement holder with respect to all financial assets credited" to the account, whereas the government has only a "security interest." JA71–72. Citibank must execute the accountholder's instructions unless the government gives notice that the recipient has failed to comply with the terms and conditions of the grant. JA79. And when the program concludes, grant

recipients are "entitled to transfer any remaining funds" to "account[s] at a financial institution of [their] choosing." JA1136.

To be sure, the EPA maintains a security interest along with significant oversight, including the ability to issue a notice of exclusive control. But the recipients own the assets—much as somebody with a mortgage owns their home, and can take out a line of credit on it, despite the bank's security interest and right to foreclose if the homeowner defaults. Put simply, "the grant of a security interest is not a conveyance of a present ownership right." *In re Transp. Design & Tech., Inc.*, 48 B.R. 635, 639 (Bankr. S.D. Cal. 1985). That is true even when a government agency holds the security interest. *See United States v. Whiting Pools, Inc.*, 408 U.S. 198, 209–10 (1983) (IRS provisions "grant to the Service powers to enforce its tax liens that are greater than those possessed by private secured creditors" but "do not transfer ownership of the property to the IRS"); *Central Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 392 n.8 (2006) (Thomas, J., dissenting) (noting the distinction between "the government possess[ing] merely a secured interest in the property" and "own[ing] the funds").

## III.    The Grant Programs Are Grounded in Well-Established Government Practice.

The full-disbursement structure here is distinctive and critical to the statutory goals of these grant programs, but Appellants are wrong to describe it as an "unusual funding arrangement rais[ing] concerns." Gov't Br. 9. The government has long used

14

public-private partnerships, private leverage, and financial agency agreements to ensure efficient delivery and use of public funds—just as the structure here was intended to do.

Structuring public funding to leverage private capital is nothing new. In particular, "[i]nfrastructure development, frequently including oil, gas, and coal energy facilities, has a long history of accessing both public and private capital." U.S. Dep't of Energy, *supra*, at 1. The federal government has previously used public funding to overcome barriers to private capital investment in specific domains. Since 1994, it has made grants through the Community Development Financial Institutions Fund to leverage private capital and increase lending to underserved communities. *See* U.S. Dep't of Treasury, Cmty. Dev. Fin. Inst. Fund, *About Us* (last accessed May 13, 2025), https://cdifund.gov/about. The CDFI Fund, as here, is structured to provide equity grants to recipients, which has allowed recipients to build their balance sheets and leverage additional capital. *See* Opportunity Fin. Network, *CDFI 101: History of the CDFI Industry* 14 (2023), https://tinyurl.com/ynwkvjvv (noting the "critical role" that equity grants and resulting leverage of outside capital played in scaling the overall industry); Michael Swack & Eric Hangen, Global Impact Investing Network, *Scaling U.S. Community Investing: The Investor-Product Interface* 69–71 (2015),

15

https://tinyurl.com/ybdjnm3z (noting the importance of direct equity grants to such organizations because of balance sheet limitations).[3]

Financial agency agreements with private institutions are also a longstanding practice, dating back at least as far as the National Banking Acts of 1863 and 1864. U.S. Gov't Accountability Office, GAO 17-176, *Revenue Collections and Payments: Treasury Has Used Financial Agents in Evolving Ways but Could Improve Transparency* 4 (2017). "Treasury historically has used financial agents to physically hold and disburse public money," and agents provide "custodial and asset management services" under, for instance, separate programs established under President Bush and President Obama in response to the 2008 financial crisis. *Id.* at 6, 11; *see also, e.g.*, U.S. Gov't Accountability Office, GAO 09-161, *Troubled Asset Relief Program: Additional Actions Needed to Ensure Integrity, Accountability, and Transparency* (2008), at 35–37 (noting key role of financial agents in the Troubled Asset Relief Program). The government has issued detailed regulations for financial agency agreements, 31 C.F.R. pt. 202, and courts have recognized them as common, *see Transactive Corp. v. United States*, 91 F.3d 232, 236 (D.C. Cir. 1996) ("federal financial agents are routinely appointed"); *United States v. Citizens & S. Nat'l Bank*,

---

[3] At the state level, multiple states have capitalized green banks with public funds, starting with Connecticut in 2011. *See* Rizzi et al., *supra*, at 5–6 (discussing Connecticut and New York state banks).

889 F.2d 1067, 1068–70 (Fed. Cir. 1989) (noting federal use of financial agents for cash concentration and deposit reporting). Far from being unconventional or novel, the government's use of a financial agent to hold fully disbursed grant funds is grounded in longstanding practice and convention. Tasked with engaging private capital in building a cleaner future, the EPA used previously applied and proven mechanisms to build up grantees' balance sheets and encourage private investment.

## CONCLUSION

The grant programs at issue were carefully structured to fulfill Congress's goal of leveraging and catalyzing private investment. This Court should affirm the preliminary injunction.


Dated: May 13, 2025                          Respectfully submitted,

                                             CONRAD | METLITZKY | KANE LLP


                                             */s/ William J. Cooper*
                                             William J. Cooper
                                             Attorneys for *Amici Curiae*
                                               *Impact Finance Experts*

17

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), I hereby certify that this brief complies with the type-volume limitations of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B), and with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6). The brief was prepared in proportionally spaced, 14-point Times New Roman font using Microsoft Word. It contains 3,630 words, excluding the parts of the brief exempted by Rule 32(f), according to the word-processing program used to prepare this brief.

Dated: May 13, 2025                             CONRAD | METLITZKY | KANE LLP


                                                */s/ William J. Cooper*
                                                WILLIAM J. COOPER
                                                Attorneys for *Amici Curiae*
                                                 *Impact Finance Experts*

18

## CERTIFICATE OF SERVICE

I hereby certify that on May 13, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: May 13, 2025                    CONRAD | METLITZKY | KANE LLP

                                       */s/ William J. Cooper*
                                       WILLIAM J. COOPER
                                       Attorneys for *Amici Curiae*
                                        *Impact Finance Experts*

19