**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**
_____

CLIMATE UNITED FUND, *et al.*,

Plaintiffs-Appellees,

v.

CITIBANK, N.A., *et al.*,

Defendants-Appellants.
_____

On Appeal from the United States District Court
for the District of Columbia
_____

**FEDERAL DEFENDANTS' REPLY BRIEF**
_____

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

GERARD SINZDAK
SOPHIA SHAMS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7264*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-2495*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................1

ARGUMENT .......................................................................................................3

I.  Plaintiffs Cannot Prevail on the Merits ...........................................................3

    A. Plaintiffs' claims sound in contract ...........................................................4

    B. Plaintiffs cannot recharacterize their contract claims as arising from regulatory, statutory, or constitutional rights ...........................................9

        1.  Regulations ........................................................................................10

        2.  APA ...................................................................................................11

        3.  GGRF & Constitution .......................................................................13

    C. Plaintiffs' belated *ultra vires* claim is meritless too................................18

II.  The Other Injunction Factors Overwhelmingly Weigh Against an Injunction ....................................................................................................22

CONCLUSION ...................................................................................................23

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Aiken Cty. In re*,
   725 F.3d 255 (D.C. Cir. 2013) .......................................................... 16

*Armstrong v. Exceptional Child Ctr., Inc.*,
   575 U.S. 320 (2015) ........................................................................ 19

*Board of Governors of the Fed. Reserve Sys. v. MCorp Fin., Inc.*,
   502 U.S. 32 (1991) ..........................................................................20

*Buchanan v. Alexander*,
   45 U.S. (4 How.) 20 (1846) ...............................................................8

*Dalton v. Specter*,
   511 U.S. 462 (1994) ........................................................................13

*Department of Educ. v. California*,
   145 S. Ct. 966 (2025) ..........................................................14, 20, 22

*FDA v. Wages & White Lion Invs., LLC*,
   145 S. Ct. 898 (2025) ......................................................................18

*Federal Express Corp. v. U.S. Dep't of Commerce*,
   39 F.4th 756 (D.C. Cir. 2022) ..........................................................21

*Ickes v. Fox*,
   300 U.S. 82 (1937) ............................................................................9

*Ingersoll-Rand Co. v. United States*,
   780 F.2d 74 (D.C. Cir. 1985) ....................................5, 6, 11, 12, 15, 20

*International Eng'g Co. v. Richardson*,
   512 F.2d 573 (D.C. Cir. 1975) ..........................................................12

*Joliet-Will Cty. Cmty. Action Agency, In re*,
   847 F.2d 430 (7th Cir. 1988) ..............................................................8

*Land v. Dollar*,
   330 U.S. 731 (1947) ..........................................................................9

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
   567 U.S. 209 (2012) ........................................................................12

ii

*Megapulse, Inc. v. Lewis*,
   672 F.2d 959 (D.C. Cir. 1982) ....................................................................4, 12

*North Am. Butterfly Ass'n v. Wolf*,
   977 F.3d 1244 (D.C. Cir. 2020) ................................................................20, 21

*Nyunt v. Chairman, Broad. Bd. of Governors*,
   589 F.3d 445 (D.C. Cir. 2009) ..........................................................................21

*Ontario Power Generation Inc. v. United States*,
   369 F. 3d 1298 (Fed. Cir. 2004) .........................................................................7

*Sharp v. Weinberger*,
   798 F.2d 1521 (D.C. Cir. 1986) ........................................................................15

*Son Broad., Inc. v. United States*,
   42 Fed. Cl. 532 (1998) .........................................................................................7

*Spectrum Leasing Corp. v. United States*,
   764 F.2d 891 (D.C. Cir. 1985) .................................................................6, 7, 15

*Train v. City of New York*,
   420 U.S. 35 (1975) .............................................................................................16

*Transohio Sav. Bank v. Director, Office of Thrift Supervision*,
   967 F.2d 598 (D.C. Cir. 1992) ........................................................................15

*U.S. Dep't of Justice v. FLRA*,
   981 F.2d 1339 (D.C. Cir. 1993) .......................................................................21

*Widakuswara v. Lake*,
   No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025),
   *stayed* (May 7, 2025) ......................................................................................14

*Wye Oak Tech, Inc. v. Republic of Iraq*,
   24 F.4th 686 (D.C. Cir. 2022) .......................................................................... 19

**Statutes:**

Administrative Procedure Act (APA),
   5 U.S.C. § 702 ...............................................................................................6, 19

42 U.S.C. § 7434(a) ...............................................................................14, 15, 16

**Regulations:**

2 C.F.R. § 200.340(a)(4) ...........................................................................10

2 C.F.R. § 200.341(a) ...............................................................................11

**Other Authority:**

Government Accountability Office, B-322628, *Department of Labor Replacement Grants* (Aug. 3, 2012) ................................................................17

## GLOSSARY

| | |
|---|---|
| Administrative Procedure Act | APA |
| Environmental Protection Agency | EPA |
| Greenhouse Gas Reduction Fund | GGRF |
| Natural Resources Defense Council | NRDC |

**INTRODUCTION**

The thrust of plaintiffs' argument is that they and the prior administration successfully tied the government's hands to the tune of $20 billion. They arranged by contract to hold the funds in accounts at Citibank. They purported by contract (and by amendment on the eve of a presidential transition) to restrict EPA's power to terminate the grants. And they stipulated by contract that any re-obligation of the funds would be made only to the existing grantees. All very convenient.

The government maintains that plaintiffs are mistaken even as a matter of contract. But the more critical point is that this is all plainly *a matter of contract*. That means that if plaintiffs are correct—*i.e.*, that EPA breached the grant agreements by terminating them under these circumstances—the remedy available to plaintiffs is a breach-of-contract suit in the Court of Federal Claims, where they could recover appropriate *damages*. In no event are they entitled to an injunction that compels the government to perform under these multi-billion, multi-year grant agreements. The Tucker Act does not allow specific performance, and plaintiffs cannot avoid that remedial restriction by suing in district court instead.

Plaintiffs' response marks a significant shift from their arguments below. They now claim the grant funds already "belong" to them; that EPA's actions ran afoul of the appropriations statute and even the Constitution; and that they can evade the Tucker Act by recharacterizing their suit as an *ultra vires* action.

All of this is wrong. The grant funds do not belong to plaintiffs—they are held at Citibank (acting as a financial agent for Treasury) and remain subject to and governed by the grant agreements and related contracts. Plaintiffs concede the grants can be terminated at least in some circumstances. That suffices to prove that the dispute here is contractual in nature: Did the terminations comport with the terms of the relevant contracts? If so, plaintiffs have no claim. If not, plaintiffs have a breach-of-contract claim. That controls this case.

Plaintiffs' effort to recast the claims in statutory and constitutional language goes nowhere. Plaintiffs have no truly independent statutory or constitutional claims here—and certainly no *likely meritorious* claims. Congress appropriated funds for EPA to make grants, and EPA did so. Nothing in the statute remotely restricts the agency's usual power to terminate the grants or re-obligate the funds consistent with principles of federal appropriations law (which is what EPA has made clear it intends to do). A contrary conclusion would be truly remarkable.

Finally, an *ultra vires* action is no panacea for plaintiffs. Even if they had sufficiently preserved that argument (they did not), the Tucker Act impliedly precludes using a non-statutory injunctive claim to award specific performance of a contract, for the same reasons as it impliedly precludes using the APA to that end. Plus, the Administrator plainly did not violate any clear statutory command.

For all of these reasons, this Court should vacate the injunction.

**ARGUMENT**

## I.     Plaintiffs Cannot Prevail on the Merits.

This case presents a classic contractual dispute.  EPA terminated plaintiffs' grants; plaintiffs maintain that the terms and conditions of the grant agreements did not allow for termination in these circumstances.  Plaintiffs are free to pursue their breach claims—but only in the Court of Federal Claims, where they can recover contract damages if they prevail.  They cannot seek the equitable relief of specific performance in district court and thereby force the government to perpetuate these structurally flawed grants for years to come.

Plaintiffs know they cannot pursue contract claims in this forum, so they try to recharacterize their claims in every possible way: as regulatory, statutory, and constitutional in nature.  In a particularly desperate move, they also try to reframe their case on appeal as a non-statutory "*ultra vires*" action.  But all of this pivoting leaves them standing in the same place.  Plaintiffs cannot hide the true contractual nature of their claims.  Their alleged entitlement to the billions in taxpayer dollars arises solely from contractual agreements among plaintiffs, Citibank, and the government.  All of plaintiffs' claims—regardless of their garb—ultimately hinge on their assertion that those agreements forbade EPA from terminating absent a serious federal crime or civil violation.  That proves this is, at bottom, a routine contract dispute.  And that, in turn, requires vacatur.

## A. Plaintiffs' claims sound in contract.

When a claim against the government is "essentially contractual," it must be pursued in the Court of Federal Claims under the Tucker Act, not in district court under the APA's sovereign-immunity waiver. *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982). In evaluating whether a claim is in essence a contract claim, this Court looks to "the source of the rights upon which the plaintiff bases its claims and upon the type of relief sought." *Id.* at 968. Both factors expose that plaintiffs' claims are contractual. Plaintiffs assert a right to receive grant funds derived solely from grant awards and related agreements. They challenge EPA's decision to terminate those agreements as a violation of the agreements' terms and conditions. And the relief plaintiffs seek—an injunction against termination of the contracts, triggering immediate disbursement of hundreds of millions of taxpayer dollars—amounts to an order requiring EPA to specifically perform its obligations under the grant agreements, a classic contractual remedy.

**1.** To start, the right that plaintiffs seek to vindicate arises solely from the grant agreements and related contracts. EPA Br. 22-23. The grant agreements and account-control agreements together provided for disbursements of federal funds into and out of the Citibank accounts in accordance with the terms and conditions of the grants. Absent these agreements, plaintiffs would have no basis for their claims and no interest in the funds. Indeed, plaintiffs themselves acknowledge that

their interest in the grant funds arises from and is defined by the grant agreements and account-control agreements between themselves and EPA.  *See*, *e.g.*, Resp. Br. 8, 18.

Moreover, the crux of plaintiffs' claims on the merits is that EPA's decision to terminate violated the terms and conditions of the contracts, which (after a late-breaking modification entered with no apparent consideration) purported to restrict EPA's power to terminate.  Resp. Br. 45 (arguing that EPA was only authorized to terminate "pursuant to the terms and conditions of the federal award" (cleaned up)).  Plaintiffs thus both invoke rights under their contracts and object to an alleged violation of the contracts' terms and conditions.  That is a classic breach-of-contract claim.

Indeed, this case is controlled by *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985), which plaintiffs ignore.  There, a plaintiff challenged "the government's decision to terminate [its] contract to supply air compressors"; this Court said the claim was in essence contractual because the "question … could be phrased as whether the contract forbids termination under these conditions."  *Id.* at 74, 78.  That is exactly the same question here: Did the grant agreements permit EPA to terminate the contracts under these conditions?  Whether the answer is yes or no, the question itself is one of contract.  The question must therefore be posed to—and answered by—the Court of Federal Claims.

**2.** The relief plaintiffs seek is also contractual in nature. By seeking an injunction preventing EPA from effectuating its termination of the grants (JA325) and requiring Citibank to continue to disburse funds under those grant agreements (JA354), plaintiffs seek specific performance. And that is precisely what the district court ordered. JA961-63. But that is impermissible. The whole point of channeling contract claims into the Tucker Act paradigm is that the federal government has not waived immunity with respect to specific performance; the Court of Federal Claims may only award damages. *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 895 (D.C. Cir. 1985). "To prevent government contractors from avoiding this remedy restriction, … a complaint involving a request for specific performance must be resolved by the Claims Court." *Ingersoll-Rand*, 780 F.2d at 80. This case is a perfect example.

Plaintiffs argue that the relief they seek is equitable (*i.e.*, an "injunction") rather than "money damages." Resp. Br. 25-26. But that misses the point. Even if plaintiffs' requested relief can be characterized as "other than money damages," 5 U.S.C. § 702, they nonetheless fail the separate requirement of showing they do not seek relief that another statute "impliedly forbids." *Id.* As explained, the Tucker Act impliedly forbids the relief of specific performance—a "classic contractual remedy." *Spectrum Leasing*, 764 F.2d at 894.

Plaintiffs further object that the injunctive relief they seek may not be obtained from the Court of Federal Claims.  Resp. Br. 26-28.  But that is exactly the point: "Congress intended the jurisdiction *and remedies* of the Tucker Act to be exclusive in cases based on government contracts."  *Spectrum Leasing*, 764 F.2d at 895 (emphasis added); *see also id.* at 893 n.2 (recognizing that Congress "intended to foreclose specific performance of government contracts" (quotation marks omitted)).[1]

**3.** On appeal, plaintiffs lead with an argument they did not emphasize below: that the *Megapulse* test is not satisfied (or does not even apply) because the grant money already "belongs to Plaintiffs."  Resp. Br. 18.  In their view, the rights at issue are not *contract* rights but *property* rights.  And the relief they seek is merely an injunction stopping "interference" with their property.  Resp. Br. 33.

Their premise—which was not the basis of the ruling below—is manifestly wrong.  While the Citibank accounts are in the grantees' *names*, that does not mean their contents are the grantees' *funds*, free and clear.  Rather, as plaintiffs admit, the funds remain governed by, and can only be expended pursuant to, the contracts.

---

[1]  Because plaintiffs' claims sound in contract, their argument (Resp. Br. 29, 31, 33, 35) that there is no "money-mandating requirement" warranting Tucker Act jurisdiction is misdirected.  *Ontario Power Generation Inc. v. United States,* 369 F.3d 1298, 1301 (Fed. Cir. 2004)*; Son Broad., Inc. v. United States*, 42 Fed. Cl. 532 (1998) (recognizing that a contract can provide a "specific source of substantive law … mandating compensation by the Federal Government" (quotation marks omitted)).

Per the agreements, plaintiffs may "only use the award to support [certain] allowable activities." JA568; JA627. And any disbursement request must be for "Qualified Projects as defined in the Grant Agreement," and "necessary to execute against the EPA-approved workplan." JA651. Put simply, plaintiffs' obligations are ongoing, and continue to restrict use of the funds. That is why "grant moneys" are "property of the grantors until expended in accordance with the terms of the grants." *In re Joliet-Will Cnty. Cmty. Action Agency*, 847 F.2d 430, 433 (7th Cir. 1988); *see also Buchanan v. Alexander*, 45 U.S. (4 How.) 20, 20-21 (1846) ("So long as money remains in the hands of a disbursing officer, it is as much the money of the United States, as if it had not been drawn from the treasury.").

Even more importantly, plaintiffs acknowledge that, under the terms of the grant agreements, EPA may validly terminate the grants and recover the remaining funds—at least under some circumstances. Resp. Br. 30, 40 n.12. Even plaintiffs do not seriously contend that a termination based on, say, criminal embezzlement, would leave them holding the $20 billion. So long as the funds are subject to being rescinded by the government pursuant to the contract's terms, the money cannot in any meaningful sense be described as belonging to plaintiffs. Rather, plaintiffs, Citibank, and the federal government all retain certain interests in the funds under the terms of the relevant agreements. That is what makes the source of plaintiffs' rights, and the nature of their remedy, in essence contractual.

For the same reasons, plaintiffs' reliance (Resp. Br. 24-25) on *Land v. Dollar* and *Ickes v. Fox* is misguided. In those cases, all contractual obligations had been fulfilled, so the property at issue belonged to the plaintiffs. *Ickes*, 300 U.S. 82, 93 (1937); *Land*, 330 U.S. 731, 733-34, 738 (1947). The Court took care to point out that neither case involved relief amounting to specific performance. *Ickes*, 300 U.S. at 96; *Land*, 330 U.S. at 737. Here, by contrast, plaintiffs have not fulfilled all obligations required for disbursement of the funds under the grant agreements—which is why the grants remained subject to termination. And the relief plaintiffs seek amounts to specific performance of the grant agreements and account-control agreements. This is a contract case in every sense.

### B. Plaintiffs cannot recharacterize their contract claims as arising from regulatory, statutory, or constitutional rights.

Plaintiffs try to talk about everything *but* the contracts. To disguise their contract claims, they invoke a variety of regulatory, statutory, and constitutional provisions as the purported source of their rights. These efforts are futile. None of these provisions vests any right in plaintiffs to receive grant funds (and certainly not any right on which plaintiffs are likely to prevail). Indeed, the more plaintiffs point in other directions, the clearer it becomes that their claims arise solely from the grant awards and related agreements. Plaintiffs cannot plead or argue their way around the Tucker Act's jurisdictional limits.

**1. Regulations**.  Plaintiffs claim that EPA's terminations of their grants violated 2 C.F.R. § 200.340(a)(4), which states that an agency may terminate an award that "no longer effectuates the program goals or agency priorities" only "pursuant to the terms and conditions of the Federal award."  As plaintiffs see it, this means EPA was not permitted by regulation to terminate their grants, because their "awards" did not "clearly and unambiguously" include such language in their termination provisions.  Resp. Br. 45.[2]

That argument proves EPA's point.  The regulation expressly turns on the terms of the parties' contractual agreements: If the contract permits termination, it is also authorized by the regulation.  If the contract forbids termination, then the breach of contract is also a breach of regulation.  That merely underscores that plaintiffs' claims about the validity of the terminations are rooted in the terms and conditions of the agreements themselves and thus sound in contract.  It cannot be the case that a regulatory violation, itself derivative of a contract breach, transforms the contractual dispute into an APA dispute.  Indeed, if it did, 2 C.F.R. § 200.340(a)(4) would allow every plaintiff claiming a termination in breach of "the terms and conditions" of the award to circumvent the Tucker Act.

---

[2] In fact, the original awards *did* provide for termination on these grounds, by incorporating EPA's then-extant General Terms and Conditions.  JA551-52; *see also* EPA Br. 7.  Only a later amendment—without consideration—purported to strip that right from EPA.  But such disputes over contract formation and interpretation are for the Court of Federal Claims to address in the first instance.

This Court rejected that view in *Ingersoll-Rand*. The fact that a breach-of-contract claim may *also* constitute a breach of regulations "does not transform the action into one based solely on those regulations." 780 F.2d at 78. Otherwise, "Congress' intent to limit contract remedies against the government to damages in the Claims Court would be effectively circumvented." *Id.* (quotation marks omitted) The proper question is not whether a plaintiff alleges any violation of a regulation, but whether the claim is essentially contractual. The claims here plainly fit that bill.

For similar reasons, plaintiffs cannot avoid the Tucker Act by claiming that EPA failed to provide a "written notice of termination" that includes "the reasons for termination." Resp. Br. 44-45 (quoting 2 C.F.R. § 200.341(a)). That too confirms, rather than undermines, the essentially contractual nature of the dispute. *Ingersoll-Rand*, 780 F.2d at 78. In all events, EPA indisputably provided written notice of the terminations, which included an explanation of reasons—whether plaintiffs like the reasons or not. JA389-91. At minimum, this is not a claim on which plaintiffs have any hope of success on the merits.

**2. APA.** Plaintiffs further argue that EPA's termination was not sufficiently explained, thus violating the APA's reasoned-decision-making requirement. Resp. Br. 31-32. That does not advance the ball. Plaintiffs cannot avoid the Tucker Act by reframing a breach of contract as "arbitrary and capricious."

Again, this Court has already held as much. *See Ingersoll-Rand*, 780 F.2d at 77 (dismissing claims that a termination "contravened the [APA's] prohibitions against arbitrary and capricious decisions" because "the essential rights at stake here are contractual"). For good reason—allowing plaintiffs to obtain APA review by casting their breach-of-contract claims as arbitrary and capricious would create an end-run around the Tucker Act. *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012). After all, it is "hard to conceive of a claim falling no matter how squarely within the Tucker Act which could not be urged to involve as well agency error subject to review under the APA." *Megapulse*, 672 F.2d at 967 n.34 (quoting *International Eng'g Co. v. Richardson*, 512 F.2d 573, 580 (D.C. Cir. 1975)).

In any event, EPA's decision to terminate was reasonable and reasonably explained. The terminations were "based on substantial concerns" regarding, among other things, "program integrity" and "the award process." JA701-02. In particular, the unusual structure of the grants—with the money held at a third-party bank, leaving EPA with very limited visibility into spending and pass-throughs of *billions* of dollars—raised concerns both within and beyond EPA. EPA Br. 10-11. The eleventh-hour modifications, combined with recordings suggesting a motive to tie the new Administration's hands, left the agency's leadership highly skeptical of the process. JA704-05. All of that is eminently reasonable.

To be sure, plaintiffs disagree with EPA's reasoning—but that does not mean EPA failed to explain itself. And insofar as plaintiffs suggest that EPA is resisting the Greenhouse Gas Reduction Fund (GGRF) as a whole, and using these concerns as a pretext to shut down the program, that is amply refuted by the fact that EPA has *not* terminated any grant agreements under the Solar For All program, which makes up roughly one-third of the GGRF appropriations. Those grants, unlike plaintiffs' grants, do not present these troubling structural features.

**3. GGRF & Constitution.** Plaintiffs fare no better in asserting that their claims are based on alleged statutory and constitutional violations. Resp. Br. 29-31. They argue that the statute mandated obligating these funds by September 30, 2024, so EPA's terminations after that date violate its commands. Resp. Br. 35-38. They label that supposed statutory violation a constitutional one too (a violation of the separation of powers and Appropriations Clause), but those claims collapse into their statutory claims and are thus "constitutional" in name only. *See Dalton v. Specter*, 511 U.S. 462, 474 (1994) (recognizing as a statutory claim a separation-of-powers claim alleging that the President violated a statutory mandate). Viewed through either lens, these claims are groundless. Whether as a matter of jurisdiction or the merits, this argument cannot support the injunction. Nothing in the statute or the Constitution remotely entitles plaintiffs to $20 billion in federal funds or restricts EPA from terminating these grants.

13

Congress "appropriated" funds for EPA "to make grants" for certain policy purposes. 42 U.S.C. § 7434(a). The statute does not confer on any entity a right to funding—which is why plaintiffs fail to identify any statutory provision as the source of their asserted right to payment. Rather, the statute allows EPA to select which recipients may receive funding and enter grants obligating the appropriated amounts to those recipients. *Id.* EPA did so by executing grant agreements in the first instance. Once executed, any obligation to provide payments to grantees arose under the contracts themselves, not the statute. Plaintiffs' claims based on those contractual entitlements are thus contractual in nature.

This Court recently divided over whether the Tucker Act precludes an APA suit when a statute expressly provides an identified entity with a right to payment, which the agency then effectuates via a grant. *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *3 (D.C. Cir. May 3, 2025) (per curiam), *stayed* (May 7, 2025); *id.* at *12 (Pillard, J., dissenting). This case does not present that question, because plaintiffs can claim no *statutory* right to any grant funds. Rather, the facts here mirror those in *Department of Education v. California*, where the Supreme Court agreed that the district court likely "lacked jurisdiction" to enjoin the termination of grants that the statute empowered the Secretary of Education to award. 145 S. Ct. 966, 968 (2025) (per curiam); *see also* EPA Br. 24-26.

For this reason, cases like *Transohio Savings Bank v. Director, Office of Thrift Supervision*, 967 F.2d 598 (D.C. Cir. 1992), and *Sharp v. Weinberger*, 798 F.2d 1521 (D.C. Cir. 1986), do not help plaintiffs here. Those cases recognize that the Tucker Act does not impliedly forbid a constitutional or statutory claim where the asserted constitutional or statutory right exists *independently* of a contract right. *Transohio*, 967 F.2d at 610; *Sharp*, 798 F.2d at 1523. The problem for plaintiffs here, however, is that their statutory and constitutional claims are merely a repackaging of their contract claims; they have no statutory or constitutional right to the funds that pre-exists the execution of the grant agreements. In this sense, this case is like *Spectrum Leasing* and *Ingersoll-Rand*, where this Court held that plaintiffs could not avoid the Tucker Act's limitations by simply describing their contract claims in constitutional or statutory terms. *Ingersoll-Rand*, 780 F.2d at 77-79; *Spectrum Leasing*, 764 F.2d at 894; *see also* EPA Br. 26-29.

Even considering plaintiffs' statutory and constitutional claims as independent of their breach-of-contract claims, those claims are meritless and thus cannot support the injunction. There is no plausible claim of any statutory (or constitutional) violation. As explained, the statute simply appropriates certain funds "to remain available until September 30, 2024, to make grants" to eligible recipients for certain policy purposes. 42 U.S.C. § 7434(a). At the outset, it is far from clear that the statute *required* EPA to use the entire sum. Unlike in the cases

15

plaintiffs cite, the statute contained no mandating language, like "shall" or "must." *Cf. Train v. City of New York*, 420 U.S. 35, 39 (1975) (statute provided that funds "shall be allotted"); *In re Aiken Cty.*, 725 F.3d 255, 257 (D.C. Cir. 2013) (statute provided that agency "shall consider" application and "shall issue a final decision" on it). Regardless, EPA made grants in the full amounts appropriated, and it did so by the statutory deadline.

EPA's decision to subsequently terminate some (not all) of the GGRF grants upon developing serious concerns about the structure and integrity of those grants does not amount to a statutory violation. It would be absurd to conclude that, in authorizing EPA to "make grants," 42 U.S.C. § 7434(a), Congress somehow impliedly prohibited EPA from exercising the usual power to terminate those grants. And even plaintiffs do not really believe that; they admit EPA has *some* authority to terminate grants. *See supra* p. 8. Nothing in the *statute* limits that authority.

Plaintiffs respond that, because September 2024 has passed, terminating the grants would mean the appropriated funds cannot be spent as Congress directed, creating a statutory (and constitutional) problem. *See* Resp. Br. 31, 37-40. That does not follow, for the reasons just explained: The statute appropriated funds to be obligated by a certain date, but does not require EPA to keep funding the grantees no matter what.

In any event, the premise of plaintiffs' theory is mistaken: EPA is not barred from re-obligating grant funds now. As the Government Accountability Office has recognized, if an agency made a subsequently vacated grant award before the relevant deadline, it can re-obligate funds from that award after the deadline through "replacement grants" so long as "the need for the object of the grants continues to exists, the new grants are of the same nature and purpose as the original grants, and the new grants [are] awarded" expeditiously. B-322628, *Department of Labor Replacement Grants* 4 (Aug. 3, 2012). Such replacement grants, which are "considered a continuation of the original obligation, not a new obligation," are permissible even where the new grantees "differ[] from the original grantees" and where the original grant was vacated for reasons unrelated to the grantee's ability "to carry out the grant." *Id.* at 3-4. Accordingly, such grants do not violate the principle that an agency may not make "new obligations" after an appropriation expires. *See* NRDC Br. 11-12.

EPA maintains that the need for the original grants continues to exist and has made clear that it plans to issue replacement grants in furtherance of the program's purposes as soon as it can. Despite that commitment, plaintiffs (like the district court) point to various public statements by the President and EPA's Administrator as a basis for questioning EPA's sincerity. Resp. Br. 40; JA995-96. In doing so, plaintiffs invite this Court to look behind the facially reasonable bases for EPA's

termination and probe the subjective motives of Executive officials. This Court should reject any such invitation. *See FDA v. Wages & White Lion Invs., LLC*, 145 S. Ct. 898, 922-23 (2025) (declining to "peel back the curtain" on representations as it would invite "substantial intrusion into the Executive's functioning"). And the pretext claims are nonsense anyway. The statements simply reflect that, given the unusual grant structure and suspiciously timed modifications, the Administrator suspected wasteful spending and conflicts of interest were afoot, and ultimately concluded that the program lacked sufficient safeguards. That does not mean he was rejecting the GGRF program writ large—again, EPA has maintained the $7 billion of Solar For All grants that were not similarly structured.

In the end, plaintiffs' theory cannot possibly be right. The notion that "the statute requires sticking with existing grantees" (Resp. Br. 40-41) is astounding in its implications—even if a grantee engaged in fraud or bribery, the Constitution would forbid terminating these grants (or any others for which appropriations have lapsed). No authority supports that outlandish position. Plaintiffs therefore cannot justify the injunction on independent statutory or constitutional grounds.

**C. Plaintiffs' belated *ultra vires* claim is meritless too.**

Perhaps realizing that their breach-of-contract claims are doomed, plaintiffs now change tack and claim this is not actually an APA suit against EPA. Instead,

they say, this is a non-statutory, *ultra vires* action against the Administrator, and thus no waiver of sovereign immunity is needed.  Resp. Br. 20-25.

As an initial matter, plaintiffs have forfeited this theory by failing to present it adequately below.  Plaintiffs' complaints pleaded causes of action under the APA and the Constitution—most never even mentioned the phrase "*ultra vires*." *See* JA112-73.  And plaintiffs failed to develop any *ultra vires* argument separate from their APA claims in their briefing below.  *See* JA174-359; JA 830-937; JA1259-92.  The district court accordingly did not address this argument, let alone rely on it.  Any *ultra vires* claim has thus been forfeited.  *Wye Oak Tech., Inc. v. Republic of Iraq*, 24 F.4th 686, 696 (D.C. Cir. 2022) (recognizing that arguments in favor of subject matter jurisdiction can be forfeited).

In any event, plaintiffs' new *ultra vires* theory provides no better prospect for success—again, as a matter of either jurisdiction or the merits.  Starting with jurisdiction, it is true that a claim for injunctive relief against an official for acting *ultra vires* does not require a waiver of sovereign immunity, and thus the claim cannot be impliedly precluded by 5 U.S.C. § 702.  But it is equally true that "[t]he power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations."  *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).  Accordingly, a non-statutory *ultra vires* claim is not cognizable if some "meaningful and adequate means of vindicating" plaintiffs'

rights exists. *Board of Govs. of Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991). Here, for all the reasons that the Tucker Act impliedly precludes APA review of claims that are in essence contractual, it also impliedly precludes a non-statutory equitable *ultra vires* review of such claims. Plaintiffs can seek relief from the Court of Federal Claims, which can adequately vindicate their asserted rights by awarding damages. That leaves no room for an independent cause of action in equity against the Administrator.

That must be the law, or else the *Megapulse* test would be easily evaded. On plaintiffs' novel theory, every breach-of-contract claim could be reframed as an *ultra vires* action against the relevant executive official, and plaintiffs could then circumvent the Tucker Act's remedial limits. In *Department of Education*, for example, the plaintiffs could have simply argued that the Secretary of Education acted *ultra vires* in terminating their grants. *See* 145 S. Ct. 966. Or, in *Ingersoll-Rand*, the company could have just sued the Secretary of Defense for the *ultra vires* act of terminating its contract. *See* 780 F.2d 74. This is a transparent workaround, and this Court should not bless it.

Finally, all of that aside, plaintiffs have no hope of making out an *ultra vires* claim on the merits. *Ultra vires* review of agency action "is intended to be of extremely limited scope." *North Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1262 (D.C. Cir. 2020). To prevail, plaintiffs would have to show that the termination

decisions "violated a specific prohibition in the statute that is clear and mandatory, was obviously beyond the terms of the statute, or was far outside the scope of the task that Congress gave it." *Id.* at 1263 (quotation marks omitted). *Ultra vires* review is thus reserved for the most "extreme agency error where the agency has stepped so plainly beyond the bounds of its statutory authority, or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court." *Federal Express Corp. v. U.S. Dep't of Commerce*, 39 F.4th 756, 764 (D.C. Cir. 2022) (cleaned up). These are claims of last resort, and they "rarely succeed[]." *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009).

Plaintiffs' *ultra vires* argument falls far short of the "nearly insurmountable" showing necessary. *U.S. Dep't of Justice v. FLRA*, 981 F.2d 1339, 1343 (D.C. Cir. 1993). The "extreme agency error" they identify is EPA's decision to terminate the grants. But, as discussed above, nothing in the statute prohibited EPA from doing so, let alone in a "clear and mandatory" way. *North Am. Butterfly*, 977 F.3d at 1263. To the contrary, it would be absurd to read the appropriations statute as prohibiting EPA from terminating grants once they were awarded, and even the contracting parties did not believe that (which is why they included a *termination provision* in the grant agreements). And to the extent that plaintiffs' new *ultra vires* claim is predicated on the notion that the Administrator violated the

Constitution when EPA terminated plaintiffs' grants, that claim fails for all the reasons previously discussed.

Plaintiffs' attempts to reframe their breach-of-contract claims as an *ultra vires* action thus suffers the same fate as their APA and other claims. Regardless of label, the only real claims here sound in contract. And if anything else could slip past the Tucker Act, it would be hopeless on the merits.

## II. The Other Factors Overwhelmingly Weigh Against an Injunction.

Absent relief, hundreds of millions (if not billions) of taxpayer dollars will be quickly disbursed with no means for EPA to recoup them. Plaintiffs do not even try to argue otherwise. Instead, they claim that this is not legitimate harm because Congress intended the funds to be spent through grants. That argument did not work in *Department of Education*, 145 S. Ct. at 968-69, and it does not work here. As discussed, Congress never committed funding to these specific plaintiffs. Rather, Congress delegated to EPA the authority to administer the grant programs, and EPA has now determined that new arrangements are needed.

On the other side of the balance, while plaintiffs may incur monetary losses absent an injunction, those harms are remediable. Plaintiffs admit they can recoup already-committed funds during the close-out process, which EPA stands ready to undertake expeditiously. Resp. Br. 50 n.14. As for any additional damages—loss in funding due to EPA's alleged breach, reliance costs, and so forth—those can be

remedied through money damages, which plaintiffs may seek in the Court of Federal Claims if they establish a breach of the contract.

Given that the balance of equities weighs against an injunction, and that EPA is overwhelmingly likely to succeed on the merits, this Court should vacate the injunction. It should not force EPA to proceed with a multi-billion-dollar, multi-year grant arrangement that it has determined is fundamentally flawed, notwithstanding the prior Administration's efforts to tie the government's hands.

## CONCLUSION

For the foregoing reasons, this Court should vacate the district court's preliminary injunction.

Respectfully submitted,

YAAKOV M. ROTH
*Acting Assistant Attorney General*

GERARD SINZDAK

*/s/ Sophia Shams*

SOPHIA SHAMS
*Attorneys, Appellate Staff*
*Civil Division, Room 7264*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-2496*

May 2025

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 5,429 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Times New Roman 14-point font, a proportionally spaced typeface.


*/s/ Sophia Shams*
Sophia Shams

**CERTIFICATE OF SERVICE**

I hereby certify that on May 15, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*/s/ Sophia Shams*
Sophia Shams

**ADDENDUM**

# TABLE OF CONTENTS

42 U.S.C. § 7434 .................................................................................A1

5 U.S.C. § 702 ....................................................................................A4

28 U.S.C. § 1491(a) ...........................................................................A5

28 C.F.R. § 200.340(A) ......................................................................A6

28 C.F.R. § 200.341 ...........................................................................A7

**42 U.S.C. § 7343**

**(a) Appropriations**

**(1) Zero-emission technologies**

In addition to amounts otherwise available, there is appropriated to the Administrator for fiscal year 2022, out of any money in the Treasury not otherwise appropriated, $7,000,000,000, to remain available until September 30, 2024, to make grants, on a competitive basis and beginning not later than 180 calendar days after August 16, 2022, to States, municipalities, Tribal governments, and eligible recipients for the purposes of providing grants, loans, or other forms of financial assistance, as well as technical assistance, to enable low-income and disadvantaged communities to deploy or benefit from zero-emission technologies, including distributed technologies on residential rooftops, and to carry out other greenhouse gas emission reduction activities, as determined appropriate by the Administrator in accordance with this section.

**(2) General assistance**

In addition to amounts otherwise available, there is appropriated to the Administrator for fiscal year 2022, out of any money in the Treasury not otherwise appropriated, $11,970,000,000, to remain available until September 30, 2024, to make grants, on a competitive basis and beginning not later than 180 calendar days after August 16, 2022, to eligible recipients for the purposes of providing financial assistance and technical assistance in accordance with subsection (b).

**(3) Low-income and disadvantaged communities**

In addition to amounts otherwise available, there is appropriated to the Administrator for fiscal year 2022, out of any money in the Treasury not otherwise appropriated, $8,000,000,000, to remain available until September 30, 2024, to make grants, on a competitive basis and beginning not later than 180 calendar days after August 16, 2022, to eligible recipients for the purposes of providing financial assistance and technical assistance in low-income and disadvantaged communities in accordance with subsection (b).

**(4) Administrative costs**

In addition to amounts otherwise available, there is appropriated to the Administrator for fiscal year 2022, out of any money in the Treasury not otherwise appropriated, $30,000,000, to remain available until September 30, 2031, for the administrative costs necessary to carry out activities under this section.

**(b) Use of funds**

An eligible recipient that receives a grant pursuant to subsection (a) shall use the grant in accordance with the following:

### (1) Direct investment

The eligible recipient shall-

(A) provide financial assistance to qualified projects at the national, regional, State, and local levels;

(B) prioritize investment in qualified projects that would otherwise lack access to financing; and

(C) retain, manage, recycle, and monetize all repayments and other revenue received from fees, interest, repaid loans, and all other types of financial assistance provided using grant funds under this section to ensure continued operability.

### (2) Indirect investment

The eligible recipient shall provide funding and technical assistance to establish new or support existing public, quasi-public, not-for-profit, or nonprofit entities that provide financial assistance to qualified projects at the State, local, territorial, or Tribal level or in the District of Columbia, including community- and low-income-focused lenders and capital providers.

**(c) Definitions**

In this section:

### (1) Eligible recipient

The term "eligible recipient" means a nonprofit organization that-

(A) is designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;

(B) does not take deposits other than deposits from repayments and other revenue received from financial assistance provided using grant funds under this section;

(C) is funded by public or charitable contributions; and

(D) invests in or finances projects alone or in conjunction with other investors.

## (2) Greenhouse gas

The term "greenhouse gas" means the air pollutants carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride.

## (3) Qualified project

The term "qualified project" includes any project, activity, or technology that-

(A) reduces or avoids greenhouse gas emissions and other forms of air pollution in partnership with, and by leveraging investment from, the private sector; or

(B) assists communities in the efforts of those communities to reduce or avoid greenhouse gas emissions and other forms of air pollution.

## (4) Zero-emission technology

The term "zero-emission technology" means any technology that produces zero emissions of-

(A) any air pollutant that is listed pursuant to section 7408(a) of this title (or any precursor to such an air pollutant); and

(B) any greenhouse gas.

**5 U.S.C. § 702**

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: Provided, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

**28 U.S.C. § 1491(a)**

(1)The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort. For the purpose of this paragraph, an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aeronautics and Space Administration shall be considered an express or implied contract with the United States.

(2)To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States. In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just. The Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41, including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 [1] of that Act.

**2 C.F.R. § 200.340(a)**

The Federal award may be terminated in part or its entirety as follows:

(1) By the Federal agency or pass-through entity if the recipient or subrecipient fails to comply with the terms and conditions of the Federal award;

(2) By the Federal agency or pass-through entity with the consent of the recipient or subrecipient, in which case the two parties must agree upon the termination conditions. These conditions include the effective date and, in the case of partial termination, the portion to be terminated;

(3) By the recipient or subrecipient upon sending the Federal agency or pass-through entity a written notification of the reasons for such termination, the effective date, and, in the case of partial termination, the portion to be terminated. However, if the Federal agency or pass-through entity determines that the remaining portion of the Federal award will not accomplish the purposes for which the Federal award was made, the Federal agency or pass-through entity may terminate the Federal award in its entirety; or

(4) By the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities.

**2 C.F.R. § 200.341**

(a) The Federal agency or pass-through entity must provide written notice of termination to the recipient or subrecipient. The written notice of termination should include the reasons for termination, the effective date, and the portion of the Federal award to be terminated, if applicable.

(b) If the Federal award is terminated for the recipient's material failure to comply with a Federal award, the notification must state the following:

    (1) The termination decision will be reported in SAM.gov;

    (2) The information will be available in SAM.gov for five years from the date of the termination and then archived;

    (3) Federal agencies that consider making a Federal award to the recipient during the five year period must consider this information in judging whether the recipient is qualified to receive the Federal award when the Federal share of the Federal award is expected to exceed the simplified acquisition threshold over the period of performance;

    (4) The recipient may comment on any information in SAM.gov about the recipient for future consideration by Federal agencies. The recipient may submit comments in SAM.gov.

    (5) Federal agencies should consider the recipient's comments when determining whether the recipient is qualified for a Federal award.

(c) Upon termination of the Federal award, the Federal agency must provide the information required by the Federal Funding Accountability and Transparency Act (FFATA) to USAspending.gov. In addition, the Federal agency must update or notify any other relevant government-wide systems or entities of any indications of poor performance as required by 41 U.S.C. 2313 and 31 U.S.C. 3321.