| Zimmer, Citron & Clarke

David Zimmer
Zimmer, Citron & Clarke LLP
130 Bishop Allen Dr.
Cambridge, MA 02139

dzimmer@zimmercitronclarke.com
617.676.9421

May 21, 2025

Clifton Cislak
Clerk of Court
U.S. Court of Appeals for the D.C. Circuit
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Re: *Climate United Fund, et al. v. Citibank*, N.A., No. 25-5122

Dear Mr. Cislak:

I write on behalf of Plaintiff-Appellee Justice Climate Fund (JCF) in the above-captioned case.

At oral argument on Monday, May 19, 2025, the Court asked EPA's counsel why EPA did not opt to restructure the existing awards to implement EPA's stated goal of increased oversight, rather than attempting to terminate the awards entirely. *Climate United Fund v. Citibank*, N.A., Nos. 25-5122 & 25-5123, at 9:58–10:09, 36:40–37:04, 37:47–38:02 (Oral Arg. D.C. Cir. May 19, 2025), media.cadc.uscourts.gov/recordings/docs/2025/05/25-5122.mp3. Counsel for EPA represented that EPA's central concern was a purported lack of visibility into subgrantees' use of sub-granted funds, *id.* 9:28–9:47, 38:44–39:43, but stated that he did not know how the grants could have been restructured to address that concern, *id.* 38:02–38:11, 39:53–40:13.

JCF writes to inform the Court that, on March 24, 2025, JCF affirmatively proposed to EPA a restructuring specifically designed to address EPA's central concern and the Administration's priorities. The letter proposing that restructuring is attached.[1] Under JCF's proposal, JCF's capitalization funding ($770 million) would be held in a segregated trust or escrow account and utilized as pooled cash collateral for subgrantees, giving EPA "a direct line of access to JCF's management of the overwhelming majority of the CCIA funds." Letter at 2.

As the letter makes clear, JCF has undertaken to work with EPA to address any and all purported concerns about the structure of JCF's award in a manner that preserves the award while achieving EPA's stated goal. EPA has not even responded to JCF's letter—despite repeated follow-up from JCF. EPA's lack of engagement suggests that EPA's purported goal of increased oversight is a pretext for the termination, not the reason for it.

Sincerely,

*/s/ David Zimmer*

David Zimmer
*Counsel for Plaintiff-Appellee Justice Climate Fund*

---

[1] While JCF initially marked the letter as confidential, JCF is waiving any confidentiality designation given the Court's interest in this issue at oral argument.




Proprietary and Confidential; Restricted; Not Subject to Disclosure

March 24, 2025

Ms. Aileen Nowlin
Acting Deputy Director
Office of the Greenhouse Gas Reduction Fund
US Environmental Protection Agency 1200
Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Dear Aileen,

On behalf of JCF, my thanks to you and Julie for the opportunity to speak earlier today and provide an update on JCF. As we discussed, in its Wave 1 allocation process, JCF was substantially oversubscribed, with applications from 94 Community Lenders presenting approximately 800 qualified projects located mostly throughout the South, Southwest, Mid-Atlantic and Midwest (through Western New York). Based on our ongoing outreach to major private capital providers and our Wave 1 oversubscription, JCF had to spent significant time and effort working to meet our initial selection target of 35 Community Lenders. During that process, we continuously asked our Community Lenders and ourselves how we could meet the demand for JCF's Capitalization Funding, while optimizing private capital mobilization and transactional efficiencies, e.g., underwriting economies of scale. With the benefit of these discussions, we have developed a proposal that allows JCF to advance our shared goals with EPA, while maintaining and even amplifying JCF's accountability to EPA. We summarize this proposal below, welcome your thoughts and underscore our gratitude to you both for helping JCF to better serve our 275+ core Community Lenders and the approximately 117 million Americans they represent.

In its March 11, 2025, correspondence to JCF (Letter), EPA indicated its preference for Recipients that undertake Award obligations with enhanced accountability. While the District of Columbia District Court has issued a Temporary Restraining Order enjoining EPA from giving that Letter any effect, JCF nonetheless has undertaken in good faith to respond to EPA's preference in JCF's existing, EPAapproved Work Plan by amplifying JCF's already rigorous commitment to accountability vis-à-vis EPA. As we discussed, this proposal also meets the concerns of EPA's prioritized category of JCF grantreceiving Community Lenders – community development banks. See Work Plan, p. 1 (explaining prioritization). Finally, major financial institutions and other CCIA recipients have expressed their interest in supporting JCF's proposal, which may enable even greater cost-efficiencies.

**Proposal:** JCF proposes to retain its $770M in Capitalization Funding slated for Community Lenders within JCF's authority, deploying it in a consolidated or aggregated external credit enhancement vehicle available to qualifying Community Lenders, each advancing a JCF-approved qualified project underwritten to a sound, balanced and prudent non-loss standard. The Capitalization Funding will be held on JCF's behalf by a qualified financial institution in a segregated trust or escrow account that both complies with the Award Agreement and ensures that JCF is directly accountable to EPA for that corpus and its program income, including via EPA's security interest. Under this mechanism, Community Lenders would underwrite qualified projects with access to the credit enhancement vehicle to cover shortfalls in interest or principal. The proposed vehicle is effectively a form of pooled cash collateral and has the effect of making the loans issued by Community Lenders more attractive to investors (resulting in



1




lowering borrowing costs for the small businesses and communities accessing these funds) and more readily capable of being securitized.  Thus, each JCF dollar currently allocated on a one-to-one (1:1) basis via a grant (Capitalization Funding) is extended to support an average of three to five Community Lenders' qualified projects, without transferring a single dollar (unless properly claimed) from JCF's account.  Via this mechanism, EPA is assured a direct line of access to JCF's management of the overwhelming majority of the CCIA Funds.  Further, since JCF's principal remains in the account unless required to be paid out, the vehicle is functionally structured to be an evergreen fund available to generations of Community Lenders, but again invariably retained by JCF with its direct accountability to EPA. Finally, via consolidation, JCF can reduce the cost of access to this credit enhancement, using an insurance premium or surety bond formula, which avoids the traditional reserve formula and allows JCF to adjust premiums as credit quality is determined.  These economies of scale can be amplified via JCF's relationships with other CCIA Recipients who have expressed interest collaborating with JCF.

**Delivering on Accountability**.  To meet EPA's focus on accountability, as a part of its initial workplan, JCF advanced a rigorous oversight model that underscored JCF's commitment to accountability. As JCF stated in its Work Plan (at p. 33): "The [JCF] accounting team will track, monitor and tag transactions in the central accounting system, including impact metrics, and utilize the system's powerful and robust reporting capabilities to provide oversight and reporting on the JCF Coalition's aggregated portfolio." Elsewhere in its Work Plan (p. 33), JCF underscores it commitment to third-party validation:
"JCF will engage third-party organizations to conduct annual formative evaluations – identifying actionable insights to improve program performance and acting as a third-party validation for our work."
Via this proposal, JCF amplifies its existing structure in a manner that provides every assurance that EPA reasonably could expect without creating needless inefficiencies that JCF understands EPA is keen to avoid.

Accountability is further enhanced by the very Community Lenders who are JCF's direct subrecipients and beneficiaries. Of the approximately 275 Community Lenders that are JCF's core network of community lenders, 115 are depositories with prudential regulation by a combination of the Federal Reserve, Office of the Comptroller of the Currency, Federal Deposit Insurance Corporation and state regulators. These depositories meet the transparency expectations of their depositors and their shareholders.  The balance of JCF's Community Lenders include loan funds certified by the US Treasury under the Community Development Financial Institutions Fund. Each of these institutions have a deep history of meeting standards of accountability by regulators, knowing that not meeting those expectations may result in sanctions, penalties and most importantly, a loss of faith by their investors, partners and communities.

**Benefits Beyond Accountability**:  Credit enhancement is a risk-reduction technique that has been widely used in bond transactions underpinning real estate development for multiple decades.  Adapting this approach to JCF's Award enables JCF to better and more cost-effectively support the Community Lenders within JCF's Network.  This in turn helps U.S. communities across the South, Southwest, Midwest and the Appalachian Region (through Western New York) to better achieve safer, healthier, more resilient status at a time when those goals can seem elusive.  This is particularly true since JCF's Network represents communities serving more than 117 million Americans, many facing new hardships related to recent environmental shocks such as Hurricane Helene. These communities are increasingly impacted by the changes of a challenging economy. These Community Lenders fill the gap in banking services in those markets not covered by the branch networks of super regional and money center banks. For these reasons, JCF adjustment of its Work Plan to reflect the proposal has the effect of converting every GGRF dollar count to a value of approximately four dollars, even before capital mobilization.  Capital mobilization is also expected to improve via this proposal.  Multiple major institutions have voiced their committed support






for JCF's proposal, with a willingness to commit capital equivalent to that held in the trust or escrow account. This ability to rapidly advance, in a consolidated manner, the capital mobilization process that is a core EPA value and implements a central theme and goal in JCF's Work Plan. See, e.g., Work Plan, p. 8 ("JCF's centralized Program more readily facilitates more ready access to capital, effectively providing a nationwide portfolio opportunity for institutional investors for which" a working class community "is below target transaction sizes and risk profiles."); p. 16 ("Well-constructed portfolios, and other funding models, can be determinative as to whether Projects "pencil out," improving the prospects of private capital leverage and arrangements. (Scott Sowers, "*Making Affordable Pencil Ou*t," National Apartment Association, September 30, 2022, naahq.org.)"); p. 23 ("JCF will make a determination on how catalytic the CCIA capitalization grant will be in *transitioning the organization* into a bigger, better, self-sustaining and growing sustainable lender….") (emphasis added).

Following your review, I can provide a conceptual proposal for the restructuring of the CCIA grant, applied directly to JCF, which could, with negotiation, include additional CCIA awardees who serve banks and loan funds. I thank you for your attention to this request and look forward to the opportunity to discuss.

Best regards,

Amir Kirkwood
CEO, Justice Climate Fund, Inc.

