Nos. 25-5122, 25-5123

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

CLIMATE UNITED FUND, *et al*.,

*Plaintiffs-Appellees*,

v.

CITIBANK, N.A., *et al*.,

*Defendants-Appellants*.

_____

**On Appeal from the United States District Court
for the District of Columbia**
No. 1:25-cv-00698-TSC
Hon. Tanya S. Chutkan

_____

## PETITION FOR REHEARING EN BANC

_____

ROB BONTA
  *Attorney General of California*
HELEN H. HONG
  *Acting Solicitor General*
THOMAS S. PATTERSON
  *Senior Assistant Attorney General*
ANYA BINSACCA
  *Supervising Deputy Attorney
General*

*DIANA L. KIM
  *Deputy Solicitor General*
MEGHAN H. STRONG
WILLIAM SETRAKIAN
  *Deputy Attorneys General*

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 510-3369
Diana.Kim@doj.ca.gov
*Counsel of Record*
*Attorneys for California Infrastructure
and Economic Development Bank*
(Additional counsel listed on signature page)

September 10, 2025

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................1

Background ..................................................................................................3

    A. Legal and factual background ..........................................................3

    B. Procedural history ............................................................................5

Argument .....................................................................................................7

I.      The panel's Tucker Act analysis warrants en banc review ..............7

II.    The panel's separation of powers analysis warrants en banc review ............13

Conclusion ................................................................................................18

i

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Am. Ass'n of Colleges v. McMahon*
No. 25-1281 (4th Cir.) ...................................................................13

*Am. Bar Ass'n v. Dep't of Justice*
No. 25-cv-1263, 2025 WL 1388891 (D.D.C. May 14, 2025) ...........13

*Anderson v. Bessemer City*
470 U.S. 564 (1985).......................................................................16

*Bowen v. Massachusetts*
487 U.S. 879 (1988).......................................................................12

*Cmty. Legal Servs. in E. Palo Alto v. Dep't of Health & Hum. Servs.*
137 F.4th 932 (9th Cir. 2025) ........................................................13

*Crowley Gov't Servs. v. Gen. Servs. Admin.*
38 F.4th 1099 (D.C. Cir. 2022).................................................7, 10

*Dalton v. Specter*
511 U.S. 462 (1995)................................................................14, 15

*Dep't of Education v. California*
145 S. Ct. 966 (2025)...............................................................11, 12

*Glob. Health Council v. Trump*
No. 25-5097, 2025 WL 2480618 (D.C. Cir. Aug. 13, 2025) .......3, 15

*Glob. Health Council v. Trump*
No. 25-5097, En Banc Order (Aug. 28, 2025) ................................16

*Ickes v. Fox*
300 U.S. 82 (1937).....................................................................8, 11

*In re Aiken County*
725 F.3d 255 (D.C. Cir. 2013)........................................3, 14, 15, 17

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Kendall v. United States*
    37 U.S. 524 (1838) ...............................................................14

*Land v. Dollar*
    330 U.S. 731 (1947) .......................................................8, 9, 10

*Mass. Fair Hous. Ctr. v. Dep't of Hous. Urb. Dev.*
    No. 25-1368 (1st Cir.) .........................................................13

*Megapulse v. Lewis*
    672 F.2d 959 (D.C. Cir. 1982) .......................................8, 9, 10

*Murphy Co. v. Biden*
    65 F.4th 1122 (2023) .......................................................15, 16

*Nat'l Treasury Emps. Union v. Vought*
    2025 WL 2371608 (D.C. Cir. Aug. 15, 2025) ........................15

*Nat'l Inst. of Health v. Am. Pub. Health Ass'n*
    2025 WL 2415669 (U.S. Aug. 21, 2025) ...........................11, 12

*Rhode Island v. Trump*
    No. 25-1477 (1st Cir.) .........................................................13

*S. Educ. Found. v. Dep't of Educ.*
    No. 25-cv-1079, 2025 WL 1453047 (D.D.C. May 21, 2025),
    *appeal filed*, No. 25-5262 (D.C. Cir.) ..............................12, 13

*Sharp v. Weinberger*
    798 F.2d 1521 (D.C. Cir. 1986) ...........................................11

*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*
    967 F.2d 598 (D.C. Cir. 1992) .............................................10

*Widakuswara v. Lake*
    No. 25-5144, 2025 WL 1521355 (D.C. Cir. May 28, 2025) ...........2, 12

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Woonasquatucket River Watershed Council v. Dep't of Agric.*
No. 25-1428 (1st Cir.)............................................................13

STATUTES

42 U.S.C. § 7434(a) (2022)......................................................3

OTHER AUTHORITIES

168 Cong. Rec. H7577 (daily ed. Aug. 12, 2022) .....................................4

Exec. Order No. 14154, 90 Fed. Reg. 8353, 8357....................................5

## INTRODUCTION

In 2022, Congress established the Greenhouse Gas Reduction Fund (GGRF) to provide grants for investment in clean-energy projects. Under the GGRF's funding structure, plaintiff grantees and subgrantees received full disbursement of their grant funds in 2024, and that money is now in their bank accounts at Citibank. The day he took office, however, President Trump announced his plan to dismantle the "Green New Deal," and EPA subsequently purported to terminate all the grants awarded under two GGRF programs, "for no substantiated reason other than disagreements with Congress's policy determination." Dissenting Op. 1-2. Plaintiffs sued on constitutional and statutory grounds to enjoin EPA from interfering with access to their funds. The district court granted a preliminary injunction, but a divided panel vacated it. This case presents two distinct questions of exceptional importance—each of which independently warrants en banc review.

First, this case presents an important test for how far the Tucker Act extends. The panel holds that the district court lacked jurisdiction over plaintiffs' Administrative Procedure Act (APA) and regulatory challenges to EPA's actions because it concludes they are "essentially contractual" claims that the Tucker Act limits to the Court of Federal Claims. Op. 8-21. But as Judge Pillard explains, the panel adopts a "breathtakingly expansive conception of the Tucker Act" that defies "[b]inding precedent of this court." Dissenting Op. 52, 62. The panel's analysis

1

"precludes district court jurisdiction … for a wide swath of claims" that "are simply not contract claims." *Id.* at 61.  That "flies in the face of" this Court's precedents holding that "'the mere fact that a court may have to rule on a contract issue'" does not "'automatically transform an action … into one on the contract.'" *Id.*  Here, "[t]he nature of the relief that Plaintiffs seek—recovery of property that is lawfully theirs—[should] suffice[] to resolve the Tucker Act question against the government." *Id.* at 49.  But the panel's decision adds this case to a growing number of cases challenging funding withdrawals for which the Tucker Act has proven dispositive.  As this Court already recognized, the question's "recurrence in a number of recent cases" underscores its importance.  *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1521355, at *1 (D.C. Cir. May 28, 2025).

Second, en banc review is needed to address the panel's erroneous treatment of plaintiffs' constitutional claim that EPA's dismantling of a congressionally authorized program violates the separation of powers.  The panel held the district court had jurisdiction over this claim but concluded it failed on the merits.  Op. 22-27.  In doing so, the panel held that plaintiffs' separation-of-powers challenge could not be brought as a constitutional claim at all, but only as a statutory claim that EPA exceeded its authority.  Op. 22-23.  Its reasoning would categorically prohibit constitutional challenges when the Executive refuses to carry out congressional funding mandates.  That is the same erroneous approach adopted by

2

another panel in *Global Health Council v. Trump*, No. 25-5097, 2025 WL 2480618, at *6-9 (D.C. Cir. Aug. 13, 2025), and it "squarely conflicts" (Dissenting Op. 38) with this Court's precedent in *In re Aiken County*, 725 F.3d 255, 260, 267 (D.C. Cir. 2013). If left uncorrected, the panel's rule will allow the government to "evade judicial review" of constitutional violations simply by identifying a statute it disobeyed. *Global Health*, 2025 WL 2480618, at *15 (Pan, J., dissenting). As Judge Pillard recognized, "'[i]t is no overstatement to say that our constitutional system of separation of powers w[ill] be significantly altered' by 'allow[ing] executive … agencies to disregard federal law in the manner asserted in this case.'" Dissenting Op. 4. This Court should grant en banc review to prevent that result.

## BACKGROUND

### A. Legal and Factual Background

1. Congress passed the Inflation Reduction Act in 2022, establishing the GGRF and appropriating $27 billion for EPA to "make grants" to banks to finance clean-energy projects. JA990 (quoting 42 U.S.C. § 7434(a) (2022)). Congress made the funds available until September 30, 2024. *Id.* EPA created three grant programs and obligated funds to grantees in August 2024. JA968-969; JA370.

One program, the National Clean Investment Fund (NCIF), awarded $14 billion to three primary grantees: Climate United Fund, Coalition for Green

Capital, and Power Forward.  JA969.  The Coalition for Green Capital then provided funds to subgrantees, including the State Banks.  JA966-967; JA969.[1]

The GGRF provided grantees the full grant amount "as an asset at the beginning of the period of performance," so those funds were fully disbursed to plaintiffs by fall of 2024.  JA1771; JA370; JA417-418; JA453-454.  That upfront disbursement, and plaintiffs' legal title to the funds, were crucial for leveraging private investment because investors require capital ownership as proof of ability to repay debts.  Finance Experts' Amicus Br. 7-14; *see* 168 Cong. Rec. H7577, H7702 (daily ed. Aug. 12, 2022); Dissenting Op. 6-7, 30-31.

Plaintiffs' funds are held at Citibank, which has a financial agency agreement with the Treasury Department.  JA971-972.  The money is in accounts in plaintiffs' names and governed by account control agreements.  JA71-78; JA971.  The primary grantees' agreements are between Citibank, EPA, and the grantee.  JA71.  The State Bank subgrantees' agreements, in contrast, are between Citibank, the primary grantee, and the subgrantee—EPA is not a party.  JA1478-1486.

Each plaintiff is "the entitlement holder with respect to all financial assets" in their account, JA71, and entitled to "keep and use" those funds to accomplish

---

[1] The State Banks are the California Infrastructure and Economic Development Bank, Efficiency Maine Trust, Illinois Finance Authority, and Minnesota Climate Innovation Finance Authority.

GGRF's goals, JA1122.  Citibank must follow plaintiffs' instructions "directing the disposition of funds and financial assets in the Accounts."  JA72.  Citibank cannot restrict access to the accounts unless a "Notice of Exclusive Control" is issued by EPA (for primary grantees' accounts) or the primary grantee (for subgrantees' accounts).  JA72; JA1478-1479.  No notice was ever issued.  JA30.

2.  On January 20, 2025, President Trump announced his policy "[t]erminating the Green New Deal."  Exec. Order No. 14154, 90 Fed. Reg. 8353, 8357.  Administrator Zeldin then announced EPA's intent to claw back the GGRF funds, stating EPA was "not going to rest" until the funds are returned.  JA973.

In February, despite prosecutors' advice and a judge's ruling that no probable cause existed to believe that grantees had misused funds, Citibank froze all NCIF-related accounts on the government's "recommend[ation]."  JA972; Dissenting Op. 11-15.  In March, EPA sent primary grantees identical letters purporting to terminate all the NCIF grants.  *E.g.*, JA390.  The letters claimed "concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities."  *Id.*

**B. Procedural History**

1.  The primary grantees and State Bank subgrantees sued to enjoin EPA's unlawful interference with their access to their grant funds, alleging that EPA

violated the Constitution, APA, and federal regulations.  JA1235-1252.  Plaintiffs asserted contract claims against Citibank, but none against EPA.  JA1252-1256.

The district court granted a preliminary injunction prohibiting EPA from limiting plaintiffs' access to their funds or clawing back that money.  JA961-962. The court found that the terminations were based on EPA's blanket decision to "dismantle these grant programs in their entirety as a policy matter," which usurped Congress's legislative role and violated the separation of powers.  JA995. Although EPA claimed it would reobligate the funds, the court found that claim was refuted by the record, including Trump's and Zeldin's statements.  JA995-996.

The court also held that plaintiffs were likely to succeed on their APA and regulatory claims and that jurisdiction was not barred by the Tucker Act.  JA981-988; JA991-994.  It concluded that plaintiffs did not seek a contract remedy for payment under the grants; they merely sought to prevent EPA from interfering with access to funds they already owned.  JA983-986.

2.  A divided panel reversed the injunction.  The majority held the district court lacked jurisdiction over plaintiffs' APA and regulatory claims because they were "essentially contractual" under the Tucker Act.  Op. 8-21.  While the majority held there was jurisdiction over plaintiffs' constitutional claims, it rejected those claims on the merits.  Op. 22-27.  Judge Pillard dissented, explaining that the

6

majority defies "[b]inding precedent of this court" on both questions and reaches "the wrong conclusion at every step of its review."  Dissenting Op. 1, 52.

## ARGUMENT

### I.  THE PANEL'S TUCKER ACT ANALYSIS WARRANTS EN BANC REVIEW

The Tucker Act only directs a claim to the Court of Federal Claims if the claim is "'*at its essence* a contract claim,'" which "'depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate).'"  *Crowley Gov't Servs. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022).  As Judge Pillard explains, plaintiffs' APA and regulatory claims are not contractual under this test.  Dissenting Op. 47-62.  That conclusion should be more straightforward here than in other funding challenges because a critical fact separating this case drives the analysis under both prongs of the test:  the Treasury disbursed all grant funds in 2024, so plaintiffs already own the funds in their accounts.  The source of plaintiffs' rights is thus their property interest in the money they own, not enforcement of the grant agreements.  And the remedy they seek is not an order for payment of money or specific performance, but an injunction preventing EPA from interfering with their access to their own property.  As Judge Pillard puts it, "Plaintiffs do not seek money from the Treasury; they seek only to get the government's hands off their money."  *Id.* at 55.

1.  The panel's disregard for this critical fact led to the wrong conclusion on both prongs of the Tucker Act analysis, and its holding conflicts with longstanding precedents of this Court and the Supreme Court.  As this Court recognized when it established its two-pronged approach to the Tucker Act in *Megapulse v. Lewis*, "[t]he Supreme Court many years ago recognized a private party's cause of action outside the Tucker Act to challenge the statutory authority of federal officials to claim ownership rights in property allegedly transferred during the course of a contract."  672 F.2d 959, 968-969 (D.C. Cir. 1982).  *Megapulse* derived that from the Supreme Court's decision in *Land v. Dollar*, 330 U.S. 731, 738 (1947), which established that district courts have jurisdiction to enjoin government interference with plaintiffs' property rights, even if those rights once involved a contract.

Under *Land*, where property is "wrongfully withheld" by officials "act[ing] in excess of their authority," plaintiffs can seek injunctive relief in district court and are "not relegated to the Court of Claims to recover a money judgment."  330 U.S. at 738 (plaintiffs claimed officials refused to return collateral after loan was repaid).  That was true "even though the plaintiff's alleged right to the disputed property originated in a contract and depended on interpreting the contract in its favor."  Dissenting Op. 49 (discussing *Land*); *see Ickes v. Fox*, 300 U.S. 82, 96-97 (1937) (injunction preventing interference with plaintiffs' water rights acquired

8

through government contracts "d[id] not seek specific performance of any

contract" because "ownership [was] in [plaintiffs] and not in the United States").

Applying that precedent, *Megapulse* held that the Tucker Act did not preclude

a district court from enjoining the government's release of a plaintiff's proprietary

information.  672 F.2d at 961.  Although the government argued it was

contractually permitted to release the data, the Court held the plaintiff's claim was

"based, not on breach of contract, but on an alleged governmental infringement of

property rights and violation of the Trade Secrets Act."  *Id.* at 969.  Plaintiffs here

similarly seek to enjoin EPA's interference with funds they own, but the panel

failed to apply these controlling precedents.  The majority does not mention *Land

v. Dollar*, let alone explain how its decision can be reconciled with that precedent.

2.  The panel instead turns these precedents on their head by claiming that

plaintiffs' ownership argument "reinforces that this dispute is contractual" because

determining who owns the funds depends on the agreements' disputed terms.  Op.

14-15 n.6 & n.7.  But, as explained above, that was true in *Megapulse* and *Land*

too, and it made no difference to the jurisdictional question.  Dissenting Op. 49-50.

In *Megapulse*, the government "rel[ied] on the contract" to argue it "lawfully came

into possession of the property" and was "empowered by the contract" to release

the information, but the Court rejected "the Government's argument that the mere

existence of such contract-related issues must convert this action to one based on

9

the contract." 672 F.2d at 969; *see Land*, 330 U.S. at 734 (government disputed whether contract pledged property as collateral or transferred it outright).

The panel's reasoning would make even non-contractual claims fall under the Tucker Act if they merely involved a contract or raised a contract issue. But this Court "explicitly rejected the 'broad' notion 'that any case requiring some reference to or incorporation of a contract is necessarily on the contract.'" *Crowley*, 38 F.4th at 1107. "[T]he mere fact that a court may have to rule on a contract issue does not, by triggering some mystical metamorphosis, automatically transform an action based on trespass or conversion into one on the contract and deprive the court of jurisdiction it might otherwise have." *Megapulse*, 672 F.2d at 968. Even where a plaintiff's claim "presuppose[d] the existence of a contract," such that he "'would have no claims to assert'" without the contract, the Court held that that fact did not make it a contract claim. *Crowley*, 38 F.4th at 1110.

The panel's decision is thus at odds with this Court's many cases affirming jurisdiction where contracts were involved but were not the basis for the claims. *E.g.*, *Crowley*, 38 F.4th at 1107; *Megapulse*, 672 F.2d at 968; *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 610-611 (D.C. Cir. 1992),

10

*abrogated on other grounds by Perry Capital v. Mnuchin*, 864 F.3d 591 (D.C. Cir.

2017); *Sharp v. Weinberger*, 798 F.2d 1521, 1521-1523 (D.C. Cir. 1986).[2]

    3.  The panel's reliance on *Department of Education v. California*, 145 S. Ct.

966 (2025), and *National Institutes of Health v. American Public Health*

*Association*, 2025 WL 2415669 (U.S. Aug. 21, 2025), is inapposite.  Op. 18; *see*

Dissenting Op. 51-52.  Both cases involved orders requiring the government to

disburse funds.  In *Department of Education*, the Court held the order "require[d]

the Government to pay out past-due grant obligations and to continue paying

obligations as they accrue."  145 S. Ct. at 968.  It reached a similar conclusion in

*National Institutes of Health*.  2025 WL 2415669, at *1 (no jurisdiction to "enforce

any 'obligation to pay money' pursuant to th[e] grants").  Here, by contrast, there

is no order to "'enforce a contractual obligation to pay money'" because the money

---

[2] The panel downplays plaintiffs' ownership of the funds, but it does not actually deny this critical fact.  Op. 14-15.  Nor could it.  Given the overwhelming record evidence (*supra* pp. 4-5), the district court's factual finding that plaintiffs "seek to regain access to their already disbursed funds," J.A. 986, was not clear error.  That "the funds are held by Citibank" (Op. 14) makes no difference because Citibank holds them in plaintiffs' names and must follow plaintiffs' instructions.  JA71-72. Nor does it matter that the agreements give EPA an (unexercised) security interest in primary grantees' (but not State Banks') accounts.  That does not divest plaintiffs of ownership any more than a bank's mortgage interest deprives homeowners of ownership of their homes.  *Ickes*, 300 U.S. at 95 (government's lien meant "water rights belong to another than the lienor," *i.e.*, plaintiffs).

11

was already paid and belongs to plaintiffs. *Dep't of Educ.*, 145 S. Ct. at 968; *see Bowen v. Massachusetts*, 487 U.S. 879, 908 (1988).

As Judge Pillard explains, one can "respect the reasoning of" the stay orders "where they apply," but they are "inapplicable" here. Dissenting Op. 51. Indeed, "[t]o the extent *National Institutes of Health* applies here, it *supports* the district court's jurisdiction over the policy-based interference with Plaintiffs' funds." *Id.* at 52. The Supreme Court did not deny the district court jurisdiction over claims challenging the agency's guidance governing grant policy. *Nat'l Inst. of Health*, 2025 WL 2415669, at *2 (Barrett, J., concurring) (mere fact that claim was "related to grants" does not transform it into "claim 'founded … upon' contract").

4. Correcting the panel's error is exceptionally important. In this case alone, plaintiffs stand to lose billions of dollars, which "has already caused Plaintiffs to default on promised loans and scuttled affordable housing and energy projects implementing Congress's vision." Dissenting Op. 2; *id.* at 19-21. And the panel's decision has far-reaching implications for other cases.

In granting rehearing en banc of the stay order in *Widakuswara v. Lake*, this Court recognized that the Tucker Act "raises an important issue, as indicated by its recurrence in a number of recent cases," and that the government was not likely to succeed. 2025 WL 1521355, at *1 (D.C. Cir. May 28, 2025). The panel's decision here is even more important, as the first appellate decision addressing that issue on

the merits rather than in a stay posture.  The panel's erroneous holding will bind

courts in this circuit, leading to wrong decisions in other funding cases.[3]

Numerous cases are also pending before other courts of appeals.[4]  The panel's

decision already creates a conflict with the Ninth Circuit, which will only deepen

as more courts weigh in.  *See Cmty. Legal Servs. in E. Palo Alto v. Dep't of Health*

*& Hum. Servs.*, 137 F.4th 932, 937-939 (9th Cir. 2025).  The panel's error will

cause confusion and mislead sister circuits, which often follow this Court's lead on

Tucker Act issues, *e.g.*, as many did with *Megapulse*.  Because this case—which

involves no order for the government to pay any money—should be a

straightforward case for district court jurisdiction, the panel's error in what should

have been an easy case is likely to skew the analysis in other cases.

## II.  THE PANEL'S SEPARATION OF POWERS ANALYSIS WARRANTS EN BANC REVIEW

The panel's analysis of plaintiffs' constitutional claims is doubly flawed.

1.  First, the panel erroneously prohibited plaintiffs from raising a

constitutional claim at all.  It treated plaintiffs' separation-of-powers claim as

---

[3] *E.g.*, *Am. Bar Ass'n v. Dep't of Justice*, No. 25-cv-1263, 2025 WL 1388891
(D.D.C. May 14, 2025); *S. Educ. Found. v. Dep't of Educ.*, No. 25-cv-1079, 2025
WL 1453047 (D.D.C. May 21, 2025), *appeal filed*, No. 25-5262 (D.C. Cir.).

[4] *E.g.*, *Mass. Fair Hous. Ctr. v. Dep't of Hous. Urb. Dev.*, No. 25-1368 (1st Cir.);
*Woonasquatucket River Watershed Council v. Dep't of Agric.*, No. 25-1428 (1st
Cir.); *Rhode Island v. Trump*, No. 25-1477 (1st Cir.); *Am. Ass'n of Colleges v.
McMahon*, No. 25-1281 (4th Cir.); *Cmty. Legal Servs.*, No. 25-2808 (9th Cir.).

merely a statutory claim that EPA violated the Inflation Reduction Act.  Op. 22-23.
Its reasoning creates a categorical bar to constitutional review of Executive actions
whenever those actions also violate a statute.  That contradicts this Court's holding
in *Aiken County* and undermines the judiciary's ability to protect "settled, bedrock
principles of constitutional law."  725 F.3d 255, 259 (D.C. Cir. 2013).

 *Aiken County* held that "agencies violate the constitutional separation of
powers when they refuse to spend money appropriated by Congress because they
disagree with Congress's policy choice."  Dissenting Op. 43 (citing 725 F.3d at
260).  Congress had appropriated funds for licensing nuclear waste storage, but the
agency refused to process the licenses.  *Aiken Cnty.*, 725 F.3d at 257-258.  This
Court ordered it to do so, holding that agencies "may not ignore statutory mandates
or prohibitions merely because of policy disagreement with Congress."  *Id.* at 260.
That holding rested on the need to protect "our constitutional system of separation
of powers."  *Id.* at 267; *see also Kendall v. United States*, 37 U.S. 524, 613 (1838).

 The panel here relied on a distorted reading of *Dalton v. Specter*, 511 U.S.
462 (1995), to conclude that applying *Aiken County* "would convert every statutory
challenge to agency action into a constitutional claim."  Op. 22-23.  *Dalton* held
that not every Executive action exceeding statutory authority "is *ipso facto* in
violation of the Constitution."  511 U.S. at 472.  But *Dalton* nowhere suggested
that plaintiffs can never assert a constitutional claim if a statute has been violated.

14

*See Murphy Co. v. Biden*, 65 F.4th 1122, 1130 (2023) ("While 'an action taken by the President in excess of his statutory authority does not necessarily violate the Constitution,' specific allegations regarding separation of powers may suffice.") (alterations and citation omitted).

*Dalton* addressed a claim that the President violated a statute governing closure of military bases "by accepting procedurally flawed recommendations" from a committee that, *e.g.*, "held closed meetings." 511 U.S. at 466, 474. EPA's actions here are far afield from mere failure to follow procedures or other statutory criteria; EPA sought to dismantle the very program Congress created. "Wherever the line between constitutional and statutory claims lies, *Aiken County* squarely holds that EPA's actions violated the Constitution." Dissenting Op. 43.

En banc review is important because the panel's distortion of *Dalton* "makes it all too easy for the Executive to evade constitutional scrutiny" by "simply invoking statutory authority." *Glob. Health Council v. Trump*, No. 25-5097, En Banc Order (Aug. 28, 2025) (Pan, J., dissenting), at 2-3. Eliminating judicial review of those constitutional violations expands Executive power and undermines the Legislature and Judiciary. The reach of such a rule is evident from other recent decisions rejecting constitutional claims on this basis. Op. 23 (citing *Glob. Health*, 2025 WL 2326021, at *6-9 (D.C. Cir. Aug. 13, 2025); *Nat'l Treasury Emps. Union v. Vought*, 2025 WL 2371608, at *19-20 (D.C. Cir. Aug. 15, 2025)). The issue is

an "important" one that "will likely recur," *Glob. Health* En Banc Order (statement of Garcia, J.), at 1; *id.* (Pan, J., dissenting), at 5, and this circuit's categorical rule creates a conflict with the Ninth Circuit. *See Murphy*, 65 F.4th at 1130.

2.  Second, treating plaintiffs' separation-of-powers challenge as statutory, the panel erroneously rejected that claim based on EPA's unsupported assertion that it would reobligate the funds. Op. 25-27. That holding contravenes appropriations law, which bars EPA from reobligating. Dissenting Op. 41-42. It also overturns the district court's factual finding (JA995-996) that the record refutes EPA's claimed intent. But clear error review is highly deferential: appellate courts must affirm if a district court's finding is "plausible," even if "it would have weighed the evidence differently." *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985).

Here, there was no evidence supporting EPA's purported intent to reobligate, beyond a bald statement in the termination letter and counsel's unsupported, post-hoc representations during litigation. As the district court found (JA995-996), that assertion was refuted by "EPA's remarkable conduct in this case." Dissenting Op. 39. President Trump's and Zeldin's statements made clear their intent to "[t]erminat[e] the Green New Deal." Exec. Order No. 14154, § 7; JA140-143; JA973. "[T]he district court had ample basis not to credit EPA's representations" about reobligating, given "EPA's track record throughout this case of making slanderous and insupportable public statements and disavowing them in court in

16

favor of self-serving contradictory representations."  Dissenting Op. 40.  If the Executive can insulate unlawful actions from constitutional review simply by disavowing them in court—with no evidence substantiating its disavowal and overwhelming evidence refuting it—the Executive could unilaterally undo congressional statutes.  That would "represent a major and unwarranted expansion of the Executive's power at the expense of Congress."  *Aiken Cnty.*, 725 F.3d at 260.

## CONCLUSION

The Court should grant rehearing en banc.

Dated:  September 10, 2025

Respectfully submitted,

_/s/_ Diana L. Kim

| | |
|---|---|
| KEITH ELLISON<br>  *Attorney General of Minnesota*<br>PETER N. SURDO<br>  *Special Assistant Attorney General*<br>OLIVER LARSON<br>  *Manager, Environment and Natural Resources Division*<br>CATHERINE RIOS-KEATING<br>  *Special Assistant Attorney General*<br>Minnesota Attorney General's Office<br>445 Minnesota Street, Suite 600<br>(651) 757-1061<br>peter.surdo@ag.state.mn.us<br>*Counsel for Minnesota Climate Innovation Finance Authority* | ROB BONTA<br>  *Attorney General of California*<br>HELEN H. HONG<br>  *Acting Solicitor General*<br>THOMAS S. PATTERSON<br>  *Senior Assistant Attorney General*<br>DIANA L. KIM<br>  *Deputy Solicitor General*<br>ANYA BINSACCA<br>  *Supervising Deputy Attorney General*<br>MEGHAN H. STRONG<br>WILLIAM SETRAKIAN<br>  *Deputy Attorneys General*<br>California Department of Justice<br>455 Golden Gate Avenue, Suite 11000<br>San Francisco, CA  94102-7004<br>(415) 510-3369<br>Diana.Kim@doj.ca.gov<br>*Counsel for California Infrastructure and Economic Development Bank* |
| KWAME RAOUL<br>  *Attorney General of Illinois*<br>JANE ELINOR NOTZ<br>  *Solicitor General*<br>ALEX HEMMER<br>  *Deputy Solicitor General*<br>Office of the Illinois Attorney General<br>115 S. LaSalle St.<br>Chicago, IL 60603<br>(312) 814-5526<br>alex.hemmer@ilag.gov<br>*Counsel for Illinois Finance Authority* | AARON M. FREY<br>  *Attorney General of Maine*<br>EMMA AKRAWI<br>SCOTT W. BOAK<br>  *Assistant Attorneys General*<br>Office of the Maine Attorney General<br>6 State House Station<br>Augusta, ME 04333<br>(207) 626-8800<br>emma.akrawi@maine.gov<br>*Counsel for Efficiency Maine Trust* |

18

**CERTIFICATE OF COMPLIANCE**

The foregoing brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 40(d)(3)(A).  The brief contains 3,899 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1).  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared using a proportionally spaced typeface (Times New Roman) in 14-point font in Microsoft Word.

Dated:  September 10, 2025                    */s/* Diana L. Kim

## CERTIFICATE AS TO PARTIES AND AMICI

Plaintiffs-appellees are Climate United Fund; Coalition for Green Capital; Power Forward Communities, Inc.; California Infrastructure and Economic Development Bank; Minnesota Climate Innovation Finance Authority; Efficiency Maine Trust; Illinois Finance Authority; Justice Climate Fund; and Inclusive, Inc. Defendants-appellants are the Environmental Protection Agency; Lee Zeldin, in his official capacity as Administrator of the EPA; W.C. McIntosh, in his official capacity as Acting Deputy Administrator of the EPA; and Citibank, N.A.

Amici before the D.C. Circuit panel include Samuel R. Bagenstos, Michael Swack, Paul Yoo, Ellen Lurie Hoffman, Eric Hangen, Tobias Barrington Wolff, and the Natural Resources Defense Council.

None of California Infrastructure and Economic Development Bank, Minnesota Climate Innovation Finance Authority, Efficiency Maine Trust, or Illinois Finance Authority has a parent corporation or any publicly held company that owns 10% or more of stock in the banks.

Dated:  September 10, 2025          */s/* Diana L. Kim

**ADDENDUM**

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 19, 2025         Decided September 2, 2025

No. 25-5122

CLIMATE UNITED FUND, ET AL.,
APPELLEES

v.

CITIBANK, N.A.,
APPELLANT

ENVIRONMENTAL PROTECTION AGENCY AND LEE M. ZELDIN,
IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR, UNITED
STATES ENVIRONMENTAL PROTECTION AGENCY,
APPELLANTS

———

Consolidated with 25-5123

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:25-cv-00698)

———

*Yaakov M. Roth*, Acting Assistant Attorney General, U.S.
Department of Justice, argued the cause for appellant
Environmental Protection Agency. With him on the briefs

2

were *Gerard Sinzdak* and *Sophia Shams*, Attorneys. *Sharon Swingle*, Attorney, entered an appearance.

*K. Winn Allen* argued the cause and filed the briefs for appellant Citibank, N.A.

*Adam G. Unikowsky* argued the cause for Private plaintiffs-appellees. With him on the brief were *Vincent Levy*, *Kevin D. Benish*, *Daniel Fahrenthold*, *Beth C. Neitzel*, *Jack C. Smith*, *Kevin Y. Chen*, *James M. Gross*, *Kathryn L. Wynbrandt*, *David B. Robbins*, *Tanner J. Lockhead*, *Gabriel K. Gillett*, *Jay C. Johnson*, *David J. Zimmer*, *Eric F. Citron*, and *Kathleen Foley*.

*Teresa A. Reed Dippo* argued the cause for State Bank appellees. With her on the brief were *Rob Bonta*, Attorney General, Office of the Attorney General for the State of California, *John D. Echeverria*, Supervising Deputy Attorney General, *Diana L. Kim*, Deputy Solicitor General, *Theodore A. McCombs* and *Meghan H. Strong*, Deputy Attorneys General, *Keith Ellison*, Attorney General, Office of the Attorney General for the State of Minnesota*, Peter N. Surdo*, Special Assistant Attorney General, *Catherine Rios-Keating*, Special Assistant Attorney General, *Kwame Raoul*, Attorney General, Office of the Attorney General for the State of Illinois, *Jane Elinor Notz*, Solicitor General, *Alex Hemmer*, Deputy Solicitor General, *Aaron Frey*, Attorney General, Office of the Attorney General for the State of Maine, and *Emma Akrawi*, Assistant Attorney General,

*Samuel R. Bagenstos* was on the brief for *amicus curiae* Samuel R. Bagenstos in support of appellees.

*William J. Cooper* was on the brief for *amici curiae* Impact Finance Experts in support of appellees.

3

Paul DeCamp was on the brief for *amicus curiae* Professor Tobias Barrington Wolff in support of appellees.

*Thomas Zimpleman*, *Nanding Chen*, and *Daniel F. Jacobson* were on the brief for *amicus curiae* Natural Resources Defense Council in support of appellees.

Before: PILLARD, KATSAS and RAO, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* RAO.

Dissenting opinion filed by *Circuit Judge* PILLARD.

RAO, *Circuit Judge*: The Environmental Protection Agency awarded grants worth $16 billion to five nonprofits to promote the reduction of greenhouse gas emissions. Citing concerns about conflicts of interest and lack of oversight, EPA terminated the grants in March 2025. The grantees sued, and the district court entered a preliminary injunction ordering EPA and Citibank to continue funding the grants.

We conclude the district court abused its discretion in issuing the injunction. The grantees are not likely to succeed on the merits because their claims are essentially contractual, and therefore jurisdiction lies exclusively in the Court of Federal Claims. And while the district court had jurisdiction over the grantees' constitutional claim, that claim is meritless. Moreover, the equities strongly favor the government, which on behalf of the public must ensure the proper oversight and management of this multi-billion-dollar fund. Accordingly, we vacate the injunction.

4

I.

This case involves EPA grants awarded under the Greenhouse Gas Reduction Fund, for which Congress appropriated $27 billion. Inflation Reduction Act of 2022, Pub. L. No. 117-169, § 60103, 136 Stat. 1818, 2065–67 (formerly codified at 42 U.S.C. § 7434 (2024)). In August 2024, EPA awarded $20 billion to eight nonprofits pursuant to two of the grant programs it created: the National Clean Investment Fund and the Clean Communities Investment Accelerator. Five of those grantees are plaintiffs in this case: Climate United Fund ($6.97 billion), Coalition for Green Capital ($5 billion), Power Forward Communities, Inc. ($2 billion), Inclusiv, Inc. ($1.87 billion), and Justice Climate Fund, Inc. ($940 million).

Each grant was memorialized in an agreement between the nonprofit and EPA. The grant agreements have an unusual structure. Typically, grant funds are held by the U.S. Treasury and disbursed incrementally as grantees use the funds for program purposes. EPA structured these grants with a middleman that would hold the funds as a "financial agent" of the United States. According to EPA, this was the first time the federal government used a financial agent, as opposed to Treasury, to carry out this kind of grant program. Treasury entered a Financial Agency Agreement ("FAA") with Citibank. As set forth in the grant agreements, the funds were to be transferred from Treasury to Citibank in a "two-step transaction" involving a "drawdown" by the grantee and a subsequent "disbursement" to the appropriate Citibank account. J.A. 566. The disbursement by the grantee is deemed "an allowable cost" under "the EPA award." *Id*.

Although the funds are held at Citibank, the grantees' use of the funds remains highly restricted. The money may be used only "for the purposes and under the conditions of the [grant

5

agreement]," and "must be maintained" at Citibank until the end of the grant's period of performance. J.A. 568. The grantees' use of the funds is further restricted by Account Control Agreements ("ACAs") between EPA, Citibank, and each of the grantees. The ACAs give the government a "right to exclusive control" over the Citibank accounts. J.A. 72. If the government exercises that right, Citibank must follow the government's transfer instructions "without further consent by the [grantee]." *Id.* The ACAs expressly acknowledge that Citibank "act[s] as a financial agent of the United States pursuant to the authority of the U.S. Department of the Treasury." J.A. 71.

The sheer scale of the grant program and the method of allocating billions of dollars drew public attention and criticism. The record includes a widely publicized video in which an EPA employee was recorded describing how "until recently" his role was to make sure proper "processes are in place to … prevent fraud and to prevent abuse," but after the election of President Donald Trump, EPA was "just trying to get the money out as fast as possible before they come in and … stop it all." J.A. 705 n.1. The employee compared the situation to "throwing gold bars off the Titanic."

The month before President Trump's inauguration, EPA modified the grant agreements—with no apparent consideration from the grantees—to make it more difficult for the government to terminate the grants.[1] The week before the

---

[1] In December 2024, the government unilaterally modified the grant agreements, including by (1) eliminating any reference to termination for agency priorities; (2) requiring "credible evidence … of a violation of Federal criminal law" before the government could exercise its contractual right to terminate for waste, fraud, or abuse; and (3) giving the grantees an expanded right

6

inauguration, EPA amended the ACAs to require Citibank to "continue to disburse funds" to the grantees, even if the government exercised its right of exclusive control, if the funds are "associated with financial obligations 'properly incurred'" before the government exercised its right. J.A. 658.

After the change in administration, EPA reviewed the grants and raised concerns about conflicts of interest during the award process, the political connections of the chosen grantees, lack of government oversight and control over tens of billions of dollars, and last-minute amendments to the grant agreements and ACAs.[2] In February 2025, the FBI recommended to Citibank that it "place an administrative freeze on the account(s) associated with" the grantees' ACAs. As the government's financial agent, Citibank complied and stopped disbursing funds to the grantees. EPA also referred the matter to the Office of Inspector General for investigation. Shortly thereafter, EPA terminated the grant agreements.

The grantees sued, seeking to enjoin the terminations as unconstitutional, unlawful, and arbitrary and capricious. They sought a preliminary injunction barring EPA from terminating the grants "except as permitted in accordance with the ACA, the grant award, and applicable law," and ordering Citibank to

---

to cure any nonperformance. There is no serious dispute that these modifications increased the likelihood that a termination by the incoming administration would constitute a breach of contract.

[2] For example, the Acting Deputy Administrator averred in a letter to the EPA Inspector General that "the former director of the [Greenhouse Gas Reduction Fund], personally oversaw a $5 billion grant to his previous employer, the Coalition for Green Capital – without recusing himself." J.A. 670.

7

resume disbursements "in accordance with the ACA." J.A. 171–72.

The district court entered the injunction. It first held that it had jurisdiction because the grantees' claims were not essentially contractual and therefore did not need to be brought in the Court of Federal Claims. *Climate United Fund v. Citibank, N.A.*, 778 F. Supp. 3d 90, 107–11 (D.D.C. 2025). On the merits, the court concluded the grantees were likely to succeed on their constitutional, regulatory, and arbitrary and capricious claims. The district court found the balance of harms supported an injunction because the nonprofits exist "to fulfill the objectives of a grant" and "sufficient protections [are] in place" to prevent "reckless spending." *Id.* at 117, 120. The district court further concluded that an injunction "halt[ing] any unlawful action" serves the public interest. *Id.* at 121. The court enjoined Citibank as well, requiring it to disburse funds according to the relevant agreements.

We administratively stayed the injunction and ordered the parties to take no action "directly or indirectly" with respect to the disputed funds, thereby prohibiting the grantees from making further commitments in reliance on the disputed funds. We then accelerated consideration of the merits of the appeal.

II.

While this litigation was pending, Congress enacted legislation repealing the Greenhouse Gas Reduction Fund. *See* Pub. L. No. 119-21, § 60002, 139 Stat. 72, 154 (2025) (repealing 42 U.S.C. § 7434 and rescinding "unobligated balances of amounts made available to carry out that section"). Our partial administrative stay did not lift the portion of the district court's order enjoining the grant terminations, so the funds at issue in this case remain at Citibank and remain

8

obligated. Congress's repeal of the Greenhouse Gas Reduction Fund therefore did not render this appeal moot.

We review the district court's preliminary injunction for abuse of discretion, its underlying legal conclusions de novo, and its findings of fact for clear error. *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 726 (D.C. Cir. 2022). We consider the same *Winter* factors the district court applied, which require a plaintiff seeking a preliminary injunction to establish that it "is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Id.* at 727 (quoting *Winter v. NRDC*, 555 U.S. 7, 20 (2008)).

## III.

The district court erred in concluding the grantees are likely to succeed on their regulatory, arbitrary and capricious, and constitutional claims. *See Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (describing likelihood of success on the merits as the "most important factor" when considering a preliminary injunction). The grantees' regulatory and arbitrary and capricious claims can be heard only in the Court of Federal Claims, and their constitutional claim is meritless.

## A.

The grantees first allege the termination of their grants violated Office of Management and Budget ("OMB") regulations and was arbitrary and capricious under the Administrative Procedure Act ("APA"). As a remedy, they sought and received an injunction barring the termination of their grants and restoring access to the funds held by Citibank. We conclude the district court lacked jurisdiction over these

9

claims, which are essentially contractual and therefore must be heard in the Court of Federal Claims.[3]

### 1.

The federal government enjoys sovereign immunity and may be subject to suit only when it has explicitly waived that immunity. *United States v. Testan*, 424 U.S. 392, 399 (1976). Waivers of sovereign immunity must be strictly construed to protect the prerogatives of the government and to ensure the courts stay within the jurisdiction provided by Congress. *See Lane v. Pena*, 518 U.S. 187, 192 (1996); *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 703–05 (1949). The grantees brought their claims in district court, invoking the APA's waiver of sovereign immunity, which applies to claims "seeking relief other than money damages." 5 U.S.C. § 702. But this waiver applies only if no "other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *Id*. For contract claims against the government, the Tucker Act establishes review in the Court of Federal Claims, which may award only damages and cannot provide

---

[3] Although the dissent considers this threshold jurisdictional question a "diver[sion]," Dissenting Op. 47, our authority to assess the lawfulness of EPA's actions of course depends on having jurisdiction. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). Concluding that jurisdiction over most of these claims lies with the Court of Federal Claims, we do not reach their merits. The dissent inverts this fundamental limitation on Article III courts by recounting at great length the integrity and virtue of the previous administration's efforts to implement the Inflation Reduction Act and the alleged misdeeds of the current administration in terminating the grants. Our jurisdiction, however, rests on law, not on the severity of the alleged wrongdoing claimed by the grantees and reported by *The Washington Post*, *The New York Times*, and *Politico*. *See* Dissenting Op. 11, 12, 14, 36.

declaratory or injunctive relief except in narrow circumstances. *See* 28 U.S.C. § 1491; *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 963 n.13 (D.C. Cir. 1982); *Walters v. Sec'y of Defense*, 725 F.2d 107, 112 n.10 (D.C. Cir. 1983).

When it applies, Tucker Act jurisdiction is exclusive and precludes jurisdiction in district court under the APA's waiver of sovereign immunity.[4] *See Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992). The Court of Federal Claims is the "single, uniquely qualified forum for the resolution of contractual disputes." *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985). Because Congress has limited the forum and the remedies for contract claims against the government, a litigant whose claim is essentially contractual cannot "avoid the jurisdictional (and hence remedial) restrictions of the Tucker Act" by simply asking for injunctive relief in district court. *Megapulse*, 672 F.2d at 967; *Transohio*, 967 F.2d at 613 ("[T]he APA does *not* waive sovereign immunity for contract claims seeking specific relief.").

This jurisdictional inquiry cannot turn on a plaintiff's preferred characterization of its claim, lest we "upset the carefully modulated waiver of sovereign immunity and grant of remedies for breach of contract embodied in the Tucker Act." *Int'l Eng'g Co., Div. of A-T-O v. Richardson*, 512 F.2d 573, 580 (D.C. Cir. 1975); *see also McKay v. United States*,

---

[4] The Tucker Act contains one exception to this rule, not relevant in this suit involving billions of dollars. Damages claims not exceeding $10,000 may be brought in district court, although the Tucker Act's remedial restrictions still apply. *See* 28 U.S.C. § 1346(a)(2); *Int'l Eng'g Co., Div. of A-T-O v. Richardson*, 512 F.2d 573, 577 n.4 (D.C. Cir. 1975); *see also* Contract Disputes Act of 1978, Pub. L. No. 95-563, §§ 3(a), 10(a), 14(a), 92 Stat. 2383, 2383–84, 2388–89 (limiting exception to non-procurement claims).

11

516 F.3d 848, 851 (10th Cir. 2008) ("[I]n the contract context, a distinct line of authority preserves the sovereign's immunity from being compelled to perform obligations it prefers to breach and compensate financially, holding that what are 'in essence' claims for breach of contract cannot circumvent the Tucker Act and its prohibition on equitable relief by being artfully pled as something else.").

To determine whether jurisdiction was proper in the district court, we must therefore assess whether the grantees' claims are essentially contractual. *Megapulse*, 672 F.2d at 967–68. The fact that the grantees' "complaint nowhere mentions breach of contract … cannot alone suffice to establish jurisdiction in the District Court." *Ingersoll-Rand*, 780 F.2d at 77. Instead, for each claim we consider (1) whether "the source of the rights" asserted is contractual or is "based on truly independent legal grounds" and (2) whether "the type of relief sought" is a typical contract remedy. *Megapulse*, 672 F.2d at 968–71; *see Transohio*, 967 F.2d at 609.

2.

The grantees first allege EPA's termination of their agreements violated OMB regulations. By terminating for "agency priorities," EPA allegedly relied on a basis for termination not set forth in the grant agreements, in violation of 2 C.F.R. § 200.340(a)(4). Furthermore, EPA allegedly failed to provide written notice of termination as required by 2 C.F.R. § 200.341(a). Despite the grantees' characterization, their claims are essentially contractual and therefore the district court lacked jurisdiction to hear them.

First, the source of the grantees' right to the relief they seek is their agreements, which are contracts for Tucker Act purposes. *See Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (per curiam); *Columbus Reg'l Hosp. v. United States*,

12

990 F.3d 1330, 1338–41 (Fed. Cir. 2021); *see also Medina v. Planned Parenthood S. Atl.*, 145 S. Ct. 2219, 2231 (2025) (explaining that courts have historically described federal grants as contracts). Each grantee's right to the funds arises "only upon creation and satisfaction of its contract with the government; in no sense d[oes] it exist independently of that contract." *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985). While the grantees attempt to ground their claims in OMB guidance, the substance of these claims may be understood "as entirely contained within the terms of the contract" or in principles of contract law. *Ingersoll-Rand*, 780 F.2d at 78.

The claim that EPA violated 2 C.F.R. § 200.340(a)(4) expressly refers to and incorporates the grant agreements. The grantees interpret this OMB guidance as prohibiting the government from terminating based on agency priorities unless the grant agreements reserve the right to terminate on those grounds. Even assuming this is what the guidance requires, the grantees' claim turns on the government's rights under the agreements—a question of contract interpretation that the parties fiercely dispute. Because this claim perforce incorporates the grant agreements, it is not based "solely" on the regulation or on "truly independent legal grounds." *Ingersoll-Rand*, 780 F.2d at 78; *Megapulse*, 672 F.2d at 969–70.

The claim that EPA failed to give proper notice of termination in violation of 2 C.F.R. § 200.341(a) is not an independent legal ground for a slightly different reason. This allegation "could be phrased" as a claim that the government stopped performing on the contract without sufficient warning. *Ingersoll-Rand*, 780 F.2d at 78. Federal contract law addresses

when defective notice by the government is actionable,[5] and therefore the substance of the grantees' claim can be analyzed "solely on contract principles." *Ingersoll-Rand*, 780 F.2d at 78. As we have explained, the fact that the government's termination of a contract "also arguably violates certain other regulations does not transform the action into one based solely on those regulations." *Id.* Indeed, "[i]f the mere allegation" of violations of the regulations governing federal contracting and grantmaking "were to bring claims of this type within the jurisdiction of the district court, Congress' intent to limit contract remedies against the government to damages in the [Court of Federal Claims] would be effectively circumvented." *Id.* (cleaned up). Because the substance of the grantees' notice claim sounds in federal contract law, the claim is essentially contractual and can be heard only in the Court of Federal Claims. The grantees cannot avoid the Tucker Act's jurisdictional channeling by disguising a breach of contract claim as a claim that the government violated the regulations governing grantmaking.

Furthermore, the guidance documents on which the grantees rely likely do not create enforceable private rights because they merely set out principles for agencies to follow when making grants. *See* Guidance for Federal Financial Assistance, 89 Fed. Reg. 30046, 30089–90 (Apr. 22, 2024). These guidance provisions fall within subtitle A of Title 2, which sets forth OMB's "guidance to Federal agencies on

---

[5] *See, e.g.*, *Decker & Co. v. West*, 76 F.3d 1573, 1579 (Fed. Cir. 1996) ("[H]arm should accompany a defect in an otherwise proper termination notice in order for the contractor to seek relief based on that defect."); *Philadelphia Regent Builders v. United States*, 634 F.2d 569, 572–73 (Ct. Cl. 1980) (declining to treat government's termination as defective because government's regulatory violations were "harmless technical defects").

government-wide policies for the award and administration of Federal financial assistance." 2 C.F.R. § 1.100(a). "Publication of the OMB guidance in the [Code of Federal Regulations] does not change its nature—it is guidance, not regulation." *Id.* § 1.105(b). But in any event, as the dissent concedes, Dissenting Op. 58, these regulatory claims are essentially contractual, and we have no jurisdiction to consider them.

Second, the Court of Federal Claims has exclusive jurisdiction because the remedy the grantees seek is contractual in nature. The grantees requested an injunction barring EPA from terminating the grants, "except as permitted in accordance with the ACA, the grant award, and applicable law," and ordering Citibank to resume disbursements "in accordance with the ACA." The grantees maintain they own the funds and seek an injunction barring unlawful interference, rather than an order for specific performance. But the grantees' "ownership" of the funds goes only as far as the grant agreements and the ACAs permit. And the funds are held by Citibank, which acts as a fiduciary of the government. Despite their characterization, in substance, the grantees are seeking specific performance of their agreements with the government.[6] As then-Judge Scalia

---

[6] The dissent's only legal argument that we have jurisdiction turns on the claim that the grantees have "title" to the billions of dollars in government funding. To demonstrate the grantees' ownership, however, the dissent relies on the grant agreements and the ACAs—that is, on the disputed and ongoing contracts that govern the parties' relationship. Dissenting Op. 48. The dissent's argument merely reinforces that this dispute is contractual and belongs in the Court of Federal Claims. And even assuming the grantees had somehow secured title, that would simply mean the grantees might have a Takings Clause claim for damages, a claim they have not made and which in any event would also have to be brought in the Court of Federal Claims. *See Knick v. Township of Scott*, 139 S. Ct. 2162,

15

explained, "[t]he waiver of sovereign immunity in the [APA] does not run to actions seeking declaratory relief or specific performance in contract cases."[7] *Sharp v. Weinberger*, 798 F.2d 1521, 1523 (D.C. Cir. 1986). "[A] complaint involving a request for specific performance must be resolved by the [Court of Federal] Claims." *Ingersoll-Rand*, 780 F.2d at 80.

In sum, the grantees cannot manufacture district court jurisdiction through artful pleading. Because the grantees' regulatory claims are essentially contractual, they must be heard in the Court of Federal Claims.

3.

Nor can the grantees repackage their contract claims by invoking the APA's bar on arbitrary and capricious action. The grantees' arbitrary and capricious claims are also essentially

---

2170, 2173 (2019) (explaining the Tucker Act "provides the standard procedure for bringing [takings] claims" against the federal government and that "[e]quitable relief [is] not available" if "monetary relief … under the Tucker Act" is).

[7] The dissent's reliance on *Sharp* is entirely misplaced. In *Sharp*, there was no dispute that the plaintiff was a military officer, that he had an interest in his employment, and that the deprivation of that interest without due process could be litigated in district court under *Sampson v. Murray*, 415 U.S. 61, 71 (1974). *See Sharp*, 798 F.2d at 1523. Here, by contrast, the rights and interests of the grantees are disputed. The grantees assert they "performed" on their contracts when Treasury deposited federal funds at Citibank, the government's financial agent. Even overlooking the oddity of this argument, whether the grantees have performed depends entirely on the terms of the disputed contracts—a question that must be adjudicated in the Court of Federal Claims.

16

contractual, considering both the source of the legal right asserted and the remedy sought.

The grantees assert the government acted arbitrarily because it "offered no facts or individualized reasoning to justify" the grant terminations. And the grantees insist they can challenge the sufficiency of the government's reasons for terminating the grants separately from the issue of whether the terminations were allowed under the agreements. But this court has expressly and repeatedly rejected attempts to manufacture district court jurisdiction by framing contract claims as violations of the APA's bar on arbitrary and capricious action. *See Ingersoll-Rand*, 780 F.2d at 77–78; *Richardson*, 512 F.2d at 580. Despite the grantees' characterizations, the remedy they seek is specific performance of their contracts, and they have identified no right to that relief that is "truly independent" of the grant agreements. *Megapulse*, 672 F.2d at 970.

As already discussed in reference to the grantees' regulatory claims, the grantees seek to set aside their grant terminations, which means they seek specific performance. *Ingersoll-Rand*, 780 F.2d at 79–80. This is a "typical contract remedy" that indicates a claim is "founded upon a contract for purposes of the Tucker Act." *Spectrum Leasing*, 764 F.2d at 894–95; *see also Transohio*, 967 F.2d at 613.

The APA's substantive bar on arbitrary and capricious action does not give the grantees an independent right to specific performance of their grant agreements. To the extent the grantees argue the government acted arbitrarily by failing to follow the terms of the grant agreements, that argument can be evaluated only by "reference to and incorporation of" the agreements. *Richardson*, 512 F.2d at 578. The source of the right asserted is therefore not "truly independent" of the contracts. *Megapulse*, 672 F.2d at 970.

17

To the extent the grantees argue the terminations were arbitrary regardless of whether they were permitted under the agreements, that challenge turns, in substance, on principles of federal contract law. That law prohibits the government from "dishonor[ing], with impunity, its contractual obligations" even when a contract allows the government to terminate for convenience. *Maxima Corp. v. United States*, 847 F.2d 1549, 1553 (Fed. Cir. 1988) (cleaned up). The grantees' argument that the termination was arbitrary and capricious is simply a claim that EPA breached the grant agreements by terminating with "impunity." That claim must be brought in the Court of Federal Claims.

The grantees insist the APA gives them an independent right to be free of arbitrary agency action, including contract terminations. But we have long rejected the idea that the APA's general bar on arbitrary and capricious action subjects contract terminations to a parallel review scheme in district court.[8] *See Ingersoll-Rand*, 780 F.2d at 77–78; *Richardson*, 512 F.2d at 580 ("[D]ecisions made by contracting officers pursuant to contract clauses fall outside the contemplation of the [APA]."). The APA's bar on arbitrary and capricious action did not "destroy the Court of [Federal] Claims by implication." *Richardson*, 512 F.2d at 580 (cleaned up).

---

[8] The dissent's analysis focuses on the grantees' "theory of relief" and concludes that because the grantees have "legitimate" APA claims and request injunctive relief, the district court has jurisdiction. Dissenting Op. 56–57. But Supreme Court and circuit precedent require that we look beyond plaintiffs' characterization of their claims and determine whether the claims are "based on truly independent legal grounds," not simply whether plaintiffs have made good faith legal arguments. *See Megapulse*, 672 F.2d at 969–70. On this central question, the dissent has nothing to offer.

18

In sum, district courts have no jurisdiction to hear claims that the federal government terminated a grant agreement arbitrarily or with impunity. Claims of arbitrary grant termination are essentially contractual and fall outside the APA's waiver of sovereign immunity.

This conclusion is reinforced by the Supreme Court's recent decision in a stay posture that a very similar arbitrary and capricious challenge to federal grant terminations likely could not be brought in district court. *See Dep't of Educ.*, 145 S. Ct. at 968. In that case, state plaintiffs sued in district court and claimed the Department of Education's decision to terminate several grants was arbitrary and capricious under the APA. The district court enjoined the terminations. The Court stayed the injunction on the ground that the district court likely lacked jurisdiction over the APA claims because "the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (quoting 28 U.S.C. § 1491(a)(1)). The Supreme Court has doubled down on this conclusion in another case staying an injunction against discretionary grant terminations: "The [APA]'s 'limited waiver of [sovereign] immunity' does not provide the District Court with jurisdiction to adjudicate claims 'based on'" the plaintiffs' grants "or to order relief designed to enforce any 'obligation to pay money' pursuant to those grants." *Nat'l Institutes of Health v. Am. Pub. Health Ass'n*, No. 25A103, 2025 WL 2415669, at *1 (Aug. 21, 2025) (quoting *Dep't of Educ.*, 145 S. Ct. at 968).

The Court's reasoning requires respect and strongly supports our conclusion that the grantees' arbitrary and capricious challenge to the grant terminations is a disguised contract claim that cannot be heard in district court. *See Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025) ("Although our interim orders are not conclusive as to the merits, they inform how a

19

court should exercise its equitable discretion in like cases.");
*Priests for Life v. HHS,* 808 F.3d 1, 25 (D.C. Cir. 2015)
(Kavanaugh, J., dissenting from denial of rehearing en banc)
(explaining that Supreme Court stay orders are "extremely
strong signals"); *see generally* Trevor N. McFadden & Vetan
Kapoor, *The Precedential Effects of The Supreme Court's
Emergency Stays*, 44 Harv. J. L. & Pub. Pol'y 827, 831 (2021)
(arguing some emergency orders are "authoritative with
respect to future cases considering the same legal questions").

In the face of this overwhelming authority, the grantees
nonetheless maintain that jurisdiction over their arbitrary and
capricious claims is proper. But the two cases on which they
rely cannot support that conclusion.

The grantees point out that this court reviewed an agency's
grant termination under the APA's arbitrary and capricious
standard in *Kansas City v. Department of Housing and Urban
Development*, 923 F.2d 188, 193 (D.C. Cir. 1991). But the
court in that case made no mention of the Tucker Act, nor did
it engage with our decisions in *Richardson* and *Ingersoll-Rand*.
This drive-by jurisdictional holding does not bind us. *Steel Co.
v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998). Just one
year later, we extensively considered the jurisdictional
framework and "decline[d] to overrule this Court's very
specific holdings that the APA does *not* waive sovereign
immunity for contract claims seeking specific relief."
*Transohio*, 967 F.2d at 613. As the Supreme Court's stay order
in *Department of Education* confirms, *Kansas City* is an outlier
and does not support district court jurisdiction over the
grantees' arbitrary and capricious claims.

Second, the grantees point to *Maryland Department of
Human Resources v. Department of Health and Human
Services*, which held that a state agency could maintain an

20

arbitrary and capricious claim in district court to challenge the federal government's withholding of grant funds. 763 F.2d 1441, 1451, 1453 (D.C. Cir. 1985). In that case, the federal government was required by law to pay block grant funds to Maryland according to a statutory formula. *See* 42 U.S.C. §§ 1397a(a)–(b), 1397b(b) (1982). We explained that Maryland's claim was not contractual for purposes of the Tucker Act because it "turn[ed] on the interpretation of statutes and regulations rather than on the interpretation of an agreement negotiated by the parties." *Maryland*, 763 F.2d at 1449. There was no "contract within the meaning of the Tucker Act"—only statutes and regulations that dictated how much Maryland was entitled to receive, how the funds could be spent, and under what circumstances the federal government could withhold payment. *Id*.

By contrast, these grant agreements are "contracts" within the meaning of the Tucker Act because they include the traditional contract elements of offer, acceptance, and consideration. *See, e.g.*, *Dep't of Educ.*, 145 S. Ct. at 968; *Columbus Reg'l Hosp.*, 990 F.3d at 1338–41. The grantees do not suggest that any of these elements is lacking. Moreover, the Inflation Reduction Act did not specify who was to receive money from the Greenhouse Gas Reduction Fund or in what amount. Those determinations were to be made "on a competitive basis" at the discretion of the EPA Administrator. 42 U.S.C. § 7434(a) (2024). The grantees obtained federal funds only because they were awarded discretionary EPA grants, the terms of which are governed by the grant agreements. *See Nat'l Institutes of Health*, 2025 WL 2415669, at *4 (Gorsuch, J., concurring in part and dissenting in part) (explaining that *Department of Education* "controls" when a district court seeks to remedy "the government's denial of previously awarded discretionary grants"). The dispute over the termination of these agreements does not turn solely, or

21

really at all, on the statute, and the relief sought is continued performance of the agreements.

In short, the grantees cannot circumvent the Court of Federal Claims by arguing that EPA's termination of the grants was arbitrary and capricious in violation of the APA.

4.

Finally, the grantees cannot bring their regulatory or arbitrary and capricious claims in district court by arguing that the EPA Administrator acted *ultra vires*. The grantees invoke the *Larson-Dugan* doctrine, which, like the *Ex parte Young* exception to state sovereign immunity, holds that sovereign immunity does not bar suits against federal officers whose "powers are limited by statute" and whose actions go "beyond those limitations" or are "constitutionally void." *Larson*, 337 U.S. at 689, 701–02; *see also Dugan v. Rank*, 372 U.S. 609, 621–23 (1963). The grantees insist Administrator Zeldin exceeded his lawful authority by terminating the agreements in violation of the OMB guidance provisions and the APA's bar on arbitrary and capricious action. We disagree.

The Supreme Court in *Larson* recognized that the *ultra vires* exception to sovereign immunity does not apply to contract claims: "The Government, as representative of the community as a whole, cannot be stopped in its tracks by any plaintiff who presents a disputed question of property or contract right." 337 U.S. at 704. As already explained, the grantees' regulatory and arbitrary and capricious claims essentially allege the government (1) violated the terms of the grant agreements and (2) acted with impunity. If proven, these claims establish breach of contract. They do not establish that the government (or any official) acted in excess of statutory limits or in contravention of the Constitution, as is required to

22

invoke the *Larson-Dugan* exception.[9] *See Larson*, 337 U.S. at
695 (squarely rejecting the contention that "an officer given the
power to make decisions" only has sovereign immunity when
he "make[s] correct decisions").

The grantees cannot bootstrap district court jurisdiction
through the *ultra vires* exception to sovereign immunity
because their regulatory and arbitrary and capricious claims are
essentially contractual.

B.

The grantees also maintain that EPA violated the
"Separation of Powers" by not enforcing the Inflation
Reduction Act, citing *In re Aiken County*, 725 F.3d 255 (D.C.
Cir. 2013). The grantees contend that Congress directed how
and when the Greenhouse Gas Reduction Fund appropriations
were to be spent and that EPA violated those directives by
canceling the grant agreements. Although the district court had
jurisdiction over this claim, it is unlikely to succeed on the
merits.

As an initial matter, this is not a constitutional claim at all,
but rather a claim that EPA violated the Inflation Reduction
Act. Claims that agency officials acted in excess of their
statutory authority do not *ipso facto* allege violations of the
"Separation of Powers." *See Dalton v. Specter*, 511 U.S. 462,

---

[9] This is consistent with the general principle that "[i]t is not illegal
for a party to breach a contract." *United States v. Blankenship*, 382
F.3d 1110, 1133 (11th Cir. 2004). "The duty to keep a contract at
common law means a prediction that you must pay damages if you
do not keep it[]—and nothing else." *United States v. Winstar Corp.*,
518 U.S. 839, 919–20 (1996) (Scalia, J., concurring) (quoting
Holmes, The Path of the Law (1897), in 3 The Collected Works of
Justice Holmes 391, 394 (S. Novick ed. 1995)).

23

474 (1994) (distinguishing between "claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of the Constitution, on the other"); *cf.* 5 U.S.C. § 706(2) (distinguishing judicial review of agency action "contrary to constitutional right, power, privilege, or immunity" and action "in excess of statutory jurisdiction, authority, or limitations"). As we recently explained, when a "supposed separation-of-powers violation turns entirely on whether [executive] officials violated the governing statutes, … *Dalton* requires us to analyze the claim as an *ultra vires* one." *Nat'l Treasury Emps. Union v. Vought*, No. 25-5091, 2025 WL 2371608, at *19–20 (D.C. Cir. Aug. 15, 2025); *see also Glob. Health Council v. Trump*, No. 25-5097, 2025 WL 2326021, at *6–9 (D.C. Cir. Aug. 13, 2025). The grantees here allege violations of the statute, not the Constitution, and we decline to adopt a principle that would convert every statutory challenge to agency action into a constitutional claim.

We conclude EPA did not violate the Inflation Reduction Act when it terminated these grants. The grantees have identified no statutory provision that barred the cancellation of the grants. In relevant part, the Inflation Reduction Act "appropriated to the Administrator" $20 billion "to make grants[] on a competitive basis" and provided that the funds are "to remain available until September 30, 2024." 42 U.S.C. § 7434(a) (2024). The grantees interpret these provisions as a mandate that EPA spend the full $20 billion, a mandate that EPA allegedly violated when it cancelled grants after the September 2024 appropriation deadline. But even assuming the statute required EPA to obligate all $20 billion by the appropriation deadline, EPA did so. EPA later cancelled the grants, but the Act does not limit the Administrator's discretion to withhold or terminate grants. And EPA repeatedly represented that it planned to recommit the funds.

24

The grantees and the dissent insist EPA's promise to recommit the funds was hollow because the Inflation Reduction Act appropriation had lapsed by the time EPA terminated the grants, and therefore EPA had no ability to recommit the funds. But the grantees cite no authority for the proposition that when an agency cancels a grant after an appropriation has lapsed, any recommitment of those funds requires deobligation and a new appropriation by Congress. Indeed, such a categorical rule would be inconsistent with the longstanding position of the Government Accountability Office—a legislative agency—that the Executive Branch may issue replacement contracts even after an appropriation has lapsed. *See* Funding of Replacement Contracts, 68 Comp. Gen. 158, 158 (Dec. 19, 1988); *see also* 31 U.S.C. § 1552(a) (providing that appropriation account does not close until five years after an appropriation expires).

In fact, the Executive often issues replacement contracts after terminating for convenience, a practice the Comptroller General has approved for decades.[10] *See* U.S. General Accounting Office, *Principles of Federal Appropriations Law* 3d ed., vol. 1, 5-28–5-33 (Jan. 2004) (discussing history of replacement contracts and associated Comptroller General opinions). Moreover, the rule the grantees assert would be inconsistent with this court's recognition that the government gets "a second chance to obligate" even after an appropriation has lapsed if a court sets aside the original, timely obligation. *Population Inst. v. McPherson*, 797 F.2d 1062, 1071 (D.C. Cir. 1986). Considering the longstanding practice of the political branches, as well as our precedent, we are not persuaded that

---

[10] The Comptroller General opinion the dissent cites is inapposite because it involves new obligations, not replacement grants. *See* Dissenting Op. 41. Replacement grants do not require a new obligation of funds.

the government lacks authority to recommit the funds after termination.[11]

The district court's determination that the grantees were likely to succeed on their "constitutional" Inflation Reduction Act claim rests on both factual and legal error. The court found that "EPA seeks to dismantle these grant programs in their entirety as a policy matter." *Climate United Fund*, 778 F. Supp. 3d at 115. This factual determination was not supported by any evidence in the record and rested only on the district court's assertion that EPA "suspended all eight grants." *Id.* at 116. But the suspension of the grants standing alone cannot demonstrate EPA was shutting down the statutory programs without congressional approval. Indeed, EPA repeatedly stated that it planned to recommit the grant money with greater oversight and accountability, contradicting the district court's shutdown finding. Absent any clear evidence to the contrary, EPA's representations were entitled to a presumption of regularity. *See Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan*, 870 F.2d 723, 727 (D.C. Cir. 1989).

Rather than credit EPA's statements or explain why the presumption of regularity was overcome, the district court simply declared EPA was shutting down the programs. The court disregarded the government's interest in prudent management of the grant programs and the government's representations that it planned to properly supervise, rather

---

[11] We need not consider for purposes of this appeal whether the recent repeal of the Greenhouse Gas Reduction Fund, and the recission of "unobligated balances," affects EPA's ability to recommit the funds at issue here. If the repeal of the statute bars EPA from recommitting the funds, it stands to reason that the repeal also relieves EPA of any statutory obligation to do so.

26

than abandon, the grantmaking process.[12] The district court's conclusory factual finding of program dismantlement was clearly erroneous. *See United States v. Microsoft Corp.*, 253 F.3d 34, 118 (D.C. Cir. 2001) (explaining that even on clear error review the court is not required to "accept findings that are utterly deficient").

Because EPA issued the grants in accordance with the Inflation Reduction Act, and there is no evidence the agency sought to dismantle the programs without congressional approval, *In re Aiken County* cannot support the grantees' claims. In that case we issued a writ of mandamus because for years the Nuclear Regulatory Commission flagrantly disregarded statutory commands, failed to spend appropriated funds, and plainly stated it had no intention of complying with its statutory obligations. *In re Aiken County*, 725 F.3d at 257– 59. By contrast, EPA entered the grant agreements before the appropriation expired in September 2024, in compliance with any requirement in the Inflation Reduction Act to spend funds. EPA *subsequently* terminated the agreements because of its concerns about lack of oversight and potential conflicts of interest during the award process.

EPA's actions here are well within the Executive Branch's authority and responsibility to manage the expenditure of funds and to ensure that money appropriated by Congress is properly spent for its intended purposes. The grant terminations may be

---

[12] The district court also ignored the government's evidence of mismanagement of the grant funds, such as the damning "gold bars" video, which further supports EPA's good faith in deciding to terminate the grants and recommit the funds with proper supervision and accountability. *See* J.A. 107 n.1. Moreover, the dissent focuses primarily on EPA's actions against *these* grantees, but the repeated recounting of these actions tells us little about whether EPA will recommit the funds through a more robust process.

27

challenged on the merits as a breach of contract, but nothing in the Inflation Reduction Act prevented EPA from taking care that the grant programs be faithfully executed.

The grantees' false invocation of the separation of powers cannot justify this preliminary injunction, which bars EPA from carrying out basic executive functions to ensure the prudent and effective management of substantial public funds.[13]

## IV.

The district court also abused its discretion in applying the remaining *Winter* factors: irreparable harm to the plaintiff, the balance of the equities, and the public interest. While some grantees may be forced to shutter their operations during the litigation, their harms do not outweigh the interests of the government and the public in the proper stewardship of billions of taxpayer dollars.

## A.

The loss of grant funds during this litigation is not irreparable because the harm is compensable through money damages. The district court concluded the grantees would suffer irreparable harm because their "purpose" and "business operations … depend[] on their grant money." *Climate United Fund*, 778 F. Supp. 3d at 117. But it is well-established that "economic loss does not, in and of itself, constitute irreparable harm." *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (cleaned up). Pecuniary injuries can be

---

[13] The grantees also argue EPA will violate the Appropriations Clause if it reobligates the funds after terminating the grant agreements. The district court did not base its preliminary injunction on this argument, so we do not address it.

28

redressed through money damages if a plaintiff proves its case. We have recognized only one exception, for pecuniary loss that "threatens the very existence of the movant's business." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). This exception generally applies when government action threatens the existence of an independent private entity. *See, e.g.*, *Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1329 (D.C. Cir. 2024) (finding irreparable harm when a financial services firm would be forced to shutter if regulatory action took effect during litigation).

The grantees do not fall within this exception. The nonprofit entities that may need to suspend operations are entities that were created solely for the purpose of applying for and spending these federal grants. So while their "existence relies on grant money" as the district court held, that is because these entities were established to benefit from government largesse. Creating such an entity cannot establish an irrevocable claim to government funds or an entitlement to injunctive relief preventing the Executive Branch from supervising and managing those funds. In short, the existential threat alleged by the grantees does not amount to irreparable harm.

EPA terminated the grants because of concerns about the integrity of the grantmaking process. While litigation is pending, the grantees may have to scale down their operations or return to the operational status they had before they received federal funds. Although this causes some harm, the harm is readily compensable through damages and therefore is not irreparable.

## B.

The balance of the equities and the public interest factors similarly favor the government. The injunction harms the

29

government and the public interest by preventing the Executive Branch from properly and prudently managing billions of dollars in public funds. The grantees have an interest in continued access to government funding. But the government and the public have a stronger interest in protecting the public fisc and eliminating the appearance of impropriety around these grant programs.

Moreover, if the grant terminations are later determined to be a breach of contract, the government may be required to pay damages to the grantees, which would substantially, if not entirely, redress the grantees' interim injuries. By contrast, if the government's position is eventually vindicated, it will have no apparent means to recover funds spent down while the litigation has run its course. *See Nat'l Institutes of Health*, 2025 WL 2415669, at *1 (Order) (recognizing irreparable harm to the government because the grant "funds cannot be recouped and are thus irrevocably expended") (cleaned up). The government's (and the public's) harm from an erroneous injunction is thus irreparable in a way that the grantees' harm from an erroneous contract termination is not.

Finally, Congress has explicitly channeled breach of government contract claims to the Court of Federal Claims and limited remedies to damages. *See Megapulse*, 672 F.2d at 967 ("The Court of [Federal] Claims may neither grant declaratory nor injunctive relief.") (cleaned up). The district court has no jurisdiction over these claims, and even the Court of Federal Claims lacks authority to issue injunctive relief. The public interest favors limiting federal courts to the jurisdiction and remedies provided by Congress. *See Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2562 (2025) ("When a court concludes that the Executive Branch has acted unlawfully, the answer is not for the court to exceed its power, too.").

30

The same considerations support vacating the injunction as to Citibank. The district court did not find that the grantees were likely to succeed on any of their independent claims against Citibank, which involve breach of contract, conversion, and replevin. To the contrary, the court found that "Citibank performed its obligations under the FAA in accordance with its responsibilities as a financial agent of the United States." *Climate United Fund*, 778 F. Supp. 3d at 116. The injunction against Citibank merely serves to stop Citibank from following the government's instructions, which the district court considered unlawful. Because we conclude the injunction against the government should be vacated, the derivative injunction against Citibank must be vacated as well.

\* \* \*

For the foregoing reasons, we vacate the district court's injunction and remand the case to the district court for further proceedings consistent with this opinion.

*So ordered*.

PILLARD, *Circuit Judge*, dissenting:    On the majority's telling, Plaintiffs bring garden-variety contract claims against EPA's reasonable decisions to terminate their grant awards. That version of events fails to contend with the government's actual behavior and misapprehends Plaintiffs' claims, leading the majority to the wrong conclusion at every step of its review of the district court's preliminary injunction.

Three years ago, Congress passed the Inflation Reduction Act.  One of the law's signature provisions directs the Environmental Protection Agency to distribute $20 billion in grants for investment in projects to develop clean energy infrastructure and manufacturing capacity.  Congress structured the Greenhouse Gas Reduction Fund to provide jobs while reducing greenhouse gas emissions and improving air quality, especially in low-income and underinvested communities.  EPA distributed the grant money by the fall of 2024, as Congress required.

After the change in administration, in response to President Trump's directives to terminate the "Green New Deal," new leadership at EPA decided to take back the money already awarded to Plaintiffs.  Plaintiffs were holding and spending the money exclusively as Congress intended.  Yet EPA—in conjunction with counterparts at the Department of Justice, the FBI, and the U.S. Treasury—opened spurious criminal and civil investigations into the Greenhouse Gas Reduction Fund and pressured Citibank into "voluntarily" freezing Plaintiffs' accounts even though the government lacked probable cause to impose such a freeze.  EPA then attempted to take back Plaintiffs' money by "terminating" all eight grants, comprising the entire $20 billion congressionally mandated program, 24 hours before the government was due in district court for a hearing on Plaintiffs' application for a temporary restraining order.  Those unprecedented and unfounded actions were part of EPA's hunt for reasons to shut down the congressionally mandated program and claw back the

2

funding that had already been disbursed to Plaintiffs and committed to infrastructure projects. EPA's termination letter claims the agency conducted a "comprehensive review" but fails to identify any contract breach or violation of law by Plaintiffs.

So far, EPA has succeeded in depriving Plaintiffs of access to their funding for six months. The freeze has already caused Plaintiffs to default on promised loans and scuttled affordable housing and energy projects implementing Congress's vision. EPA has done all that without presenting to any court any credible evidence or coherent reason that could justify its interference with Plaintiffs' money and its sabotage of Congress's law.

Plaintiffs challenge EPA's action to gut the Greenhouse Gas Reduction Fund as contrary to the Constitution's separation of powers. Fundamental to our "constitutional system of separation of powers" is the "settled, bedrock principle[]" that neither the President nor his "subordinate executive agencies" may "decline to follow a statutory mandate or prohibition simply because of policy objections." *In re Aiken Cnty.*, 725 F.3d 255, 259, 267 (D.C. Cir. 2013); U.S. Const. art. I, §§ 1, 9, cl. 7; U.S. Const. art. II, § 3. Yet that is just what EPA decided to do and has begun to effectuate here. The record strongly supports the district court's determination that EPA has frozen and attempted to repossess billions of dollars' worth of lawfully spent money for no substantiated reason other than disagreements with Congress's policy determination—grounds that are entirely inapposite and inadequate, and that the government does not defend here. The agency has no lawful basis—nor even a nonfrivolous assertion of any basis—to interfere with funding that, pursuant to Congress's instructions, already belongs to Plaintiffs, who in turn have committed it to energy infrastructure development

and advanced manufacturing projects according to Congress's plan.

That constitutional violation alone justifies the district court's injunction. The injunction is independently warranted by the arbitrary and capricious character of EPA's actions. Plaintiffs challenge EPA's taking of their funds under an irrational process with only pretextual justifications. That is a quintessential APA claim that belongs in the district court, and on which Plaintiffs are likely to succeed.

Defendants insist that this is a government contract dispute that we must dismiss because, under the Tucker Act, only the Court of Federal Claims has authority to decide it. Our Tucker Act precedents do not support that contention. They direct us to analyze whether a claim is "at its essence" contractual and, if it is, to cede jurisdiction to the Court of Claims for its expert "knowledge of the government contracting process." *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 76, 78 (D.C. Cir. 1985). That analysis, turning on the source of the right Plaintiffs assert and the nature of the relief they seek—here, constitutional and statutory claims to retain already-disbursed funds to which they remain lawfully entitled—confirms the jurisdiction of the district court. *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968-69 (D.C. Cir. 1982). The majority acknowledges the district court's jurisdiction over Plaintiffs' constitutional claims. And nothing in the Tucker Act or binding precedent interpreting it supports the majority's view that Plaintiffs' APA claim is transformed into a contract claim and ousted from the district court's jurisdiction merely because it seeks to prevent EPA's capricious interference with funds that Plaintiffs obtained through and must spend consistently with a contract. Maj. Op. 16-18.

4

In characterizing this case as merely a contract dispute subject to the Tucker Act's jurisdictional bar, the majority baselessly strips the district court of authority to decide these important claims. The majority holds that a plaintiff cannot bring an arbitrary and capricious challenge to any government action that affects something of value that was originally obtained by contract. Maj. Op. 16-18. Doing so undercuts the Constitution's and the APA's checks on the Executive's illegitimate seizure of Plaintiffs' funds and subversion of Congress's will. The government's Tucker Act defense is especially pernicious here. Dismissal of this case presumably will enable the government to carry out its announced plan to immediately and irrevocably seize Plaintiffs' funds. At best, in the unlikely event the government refrains from immediately draining Plaintiffs' frozen accounts, the further delay involved in reinitiating litigation in the Court of Federal Claims will itself irreparably harm the infrastructure projects that cannot move forward and may fail without funding. In these circumstances, "[i]t is no overstatement to say that our constitutional system of separation of powers w[ill] be significantly altered" by "allow[ing] executive . . . agencies to disregard federal law in the manner asserted in this case." *Aiken Cnty.*, 725 F.3d at 267.

## BACKGROUND

### A. The Greenhouse Gas Reduction Fund

In 2022, Congress passed the Inflation Reduction Act. The Act establishes the $27 billion Greenhouse Gas Reduction Fund and directs the Environmental Protection Agency (EPA) to distribute that money for investment in projects to deploy solar and electric energy technology throughout the country, especially in low-income and disadvantaged communities. Pub. L. No. 117-169, 136 Stat. 1818, 2065-67 (2022) (codified

5

at 42 U.S.C. § 7434). The program was intended to reduce greenhouse gas emissions, improve air quality, and "improve health outcomes, lower energy costs, and create high-quality jobs for Americans—all while strengthening [the] country's economic competitiveness and ensuring energy security." Notice of Funding Opportunity (NOFO) 3 (J.A. 1735).

Achieving that vision would "require a tremendous amount of financing and private capital for greenhouse gas- and air pollution-reducing projects across the country." *Id*. Because the private sector has historically been hesitant to invest in clean energy projects, Congress designed the Greenhouse Gas Reduction Fund to finance clean energy projects "in partnership with, and by leveraging investment from, the private sector." 42 U.S.C. § 7434(c)(3)(A). Specifically, Congress directed EPA to spend $20 billion by September 2024 to fund nonprofit financial institutions, which in turn must use the funds either to recruit private investment for clean energy programs or to assist community projects to reduce air pollution. *Id*. § 7434(a)(2)-(3), (c)(3).

Pursuant to Congress's directive, in July 2023, EPA created two funding programs: the National Clean Investment Fund (NCIF) program, to identify and deploy nonprofit lenders to use public seed money to attract private investment for tens of thousands of energy-efficient affordable housing, transportation, and electricity projects throughout the country; and the Clean Communities Investment Accelerator (CCIA) program, to identify and deploy nonprofit organizations to use public seed money to enable community lenders to invest in clean energy projects in low-income and underinvested communities.

EPA conducted a rigorous, competitive selection process, which included review of applicants' detailed program plans

6

and budgets, organizational capacity, and experience managing third-party capital and financial risk. EPA selected eight nonprofits—lenders and community organizations—capable of carrying out those aims. The approved workplans and budgets of the applicants EPA selected describe how those organizations will use the federal funds they have since received to expand access to—and recruit private investment for—affordable construction and renovation of energy-efficient businesses, schools, municipal buildings, healthcare facilities, public housing, and transportation, particularly in rural, Tribal, and low-income areas.

In compliance with the September 2024 deadline Congress imposed, EPA obligated the grant funds for both programs by the summer of 2024. To enable the grantees to recruit private investment—as Congress required, 42 U.S.C. § 7434(c)(3)(A)—EPA deposited the grant funds in accounts opened in the grantees' names at Citibank. Unlike EPA's traditional disbursement system, that structure gave the grantees title to the full amount of the award funds up front, allowing those funds to serve as assets for the grantees to rely on to raise private capital by reducing financial risk for private investments. *See* Impact Finance Experts Amicus Br. 7-14.

The Plaintiff grantees' legal title to their award funds is spelled out in Account Control Agreements between EPA, Citibank, and each grantee. Those agreements specify that Citibank "maintains the Accounts for the [grantee]" and state that the grantee is "the Bank's customer with respect to the Accounts and [] the entitlement holder with respect to all financial assets credited . . . to the Accounts." Account Control Agreement § 1 (J.A. 1144). The Account Control Agreements accordingly direct that Citibank "shall comply with all instructions" it receives from the grantees. *Id*. § 2 (J.A. 1145). The grantees' title to the award funds is also reflected in

7

Citibank's Financial Agency Agreement with Treasury, which requires Citibank to act as the government's "financial agent" to achieve Congress's goal by, among other things, establishing "accounts in the names of the three NCIF and five CCIA grant recipients" and maintaining a "customer relationship" with each grantee. Financial Agency Agreement Ex. A § I.A.1 (J.A. 2145).

Under those agreements, EPA retained a security interest in the grantees' award funds that allows it to assert control over the money in certain circumstances if—and only if—it issues a Notice of Exclusive Control, which it undisputedly has not done. Form of Notice of Exclusive Control (J.A. 1152); Oral Arg. Tr. 28:6-22. EPA has only an unexercised security interest; it does not own the funds in the grantees' accounts. *See United States v. Whiting Pools, Inc.*, 462 U.S. 198, 209-10 (1983); *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 392 n.8 (2006) (Thomas, J., dissenting) (noting the distinction between "the government possess[ing] merely a secured interest in the property" and "own[ing] the funds").

In addition to serving as the mechanism for conveying to the grantees legal title to the award funds, the financial agent structure affords EPA greater oversight of the grantees' use of the funds than it would have had under the default disbursement system: While EPA's traditional disbursement system reports only the amounts withdrawn by the recipient and the remaining award funds, the financial agent structure allows EPA real-time "view access," enabling it to see the grantees' and their subrecipients' accounts to follow how much they are spending, with all amounts broken down by budget category, and to see income in the form of portfolio earnings and loan repayments. Bafford Decl. ¶ 33 (J.A. 372).

8

Other oversight mechanisms provide further, detailed confirmation of grantees' lawful use of their funds. Grantees provide extensive reporting to EPA on their spending. They make quarterly, semi-annual, and annual written reports regarding their transactions and progress against their EPA-approved workplans, plus quarterly conflict-of-interest reporting. They attend oversight, planning, and compliance meetings with EPA at least weekly. They submit to EPA withdrawal certifications attesting to the propriety of each draw request to Citibank and to its necessity for their workplan. And grantees are also subject to third-party financial audits and audits for federal grant compliance. *Id.* ¶ 35 (J.A. 372-73).

The plaintiffs in this suit are five of the eight NCIF and CCIA grantees, as well as several of their subgrantees. Since mid-2024, they have been putting the grant money to work, committing to loans for projects around the country that will, for example:

- develop and renovate hundreds of energy-efficient affordable housing units;

- fund low-cost loans to small business and homeowners to finance heating and cooling systems and backup battery storage;

- build a fleet of 500 American-made electric trucks to be conveniently and affordably available for lease by small businesses and independent contractors; and

- provide backup power sources to rural hospitals to reduce the risks of harm to patients due to power outages.

Those projects will help cut energy costs for consumers and small businesses, create jobs, ameliorate the affordable-

9

housing crisis, and improve air quality in low-income and less developed communities.

Plaintiffs' projects provide benefits to people and communities the value of which is many times greater than their cost to the public fisc. Congress structured these programs to enable each dollar of public funding spent to attract multiple dollars of private funding. One Plaintiff, for example, estimates that it will generate up to $4 of private investment for every $1 of federal funds invested in projects. Another Plaintiff's workplan obligates it to mobilize $14 of private investment for every $1 of federal funding awarded to the Plaintiff. As of December 2024, it had already achieved a private-public capital mobilization ratio of nearly 7:1. But those projects—as well as many of the Plaintiffs' ability even to remain in business—cannot continue without Plaintiffs' access to the funds EPA awarded them. Plaintiffs' vulnerability to the freeze of their federal grant money is particularly acute given that many of the Plaintiffs were formed specifically to participate in the grant programs and as such do not have other sources of funding.

## B.   EPA's Actions

EPA's campaign to seize the grant money already owned by Plaintiffs began shortly after the new administration took office, in response to its directives. On January 20, 2025, President Trump issued Executive Order 14154. Exec. Order 14154, 90 Fed. Reg. 8353, 8357 (Jan. 29, 2025). Section 7 of the Executive Order, entitled "Terminating the Green New Deal," directs "[a]ll agencies" to "immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022." *Id*. Reacting to the E.O., EPA froze "all disbursements for unliquidated obligations funded by . . . the Inflation Reduction Act"—*i.e.*, legally binding funding

10

commitments that had not yet been disbursed. Memorandum from EPA Acting Chief Fin. Officer Gregg Treml Regarding Inflation Reduction Act and Infrastructure Inv. & Jobs Act Funding Action Pause (Jan. 27, 2025), https://perma.cc/5R6X-LY4B; U.S. Gov't Accountability Off., GAO-05-734SP, A Glossary of Terms Used in the Federal Budget Process 45, 70 (2005), https://perma.cc/AC5H-C7K6.

Despite that funding freeze—which was later enjoined by several district courts, *see Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440, 479 (D.R.I. 2025); *New York v. Trump*, 769 F. Supp. 3d 119, 146-47 (D.R.I. 2025); *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 775 F. Supp. 3d 100, 130-31 (D.D.C. 2025)—EPA could not freeze the funds that Congress had appropriated for the NCIF and CCIA programs because those funds had already been given to Plaintiffs and were held in their Citibank accounts. Nonetheless, EPA Administrator Lee Zeldin made clear his intent to take back the funds disbursed through those programs.

On February 12, Zeldin released a public statement video in which he described the NCIF and CCIA grant programs as a "scheme" by the "Biden EPA" to "park[]" 20 billion dollars at an outside financial institution in order to "obligate all of the money in a rush job with reduced oversight." Lee Zeldin (@EPALeeZeldin), X (Feb. 12, 2025, 7:52 PM), https://perma.cc/PU5X-PUBP. Zeldin asserted that the bank "must immediately return" the money in Plaintiffs' Citibank accounts so that EPA could "reassume responsibility" over the funds. *Id.* He also vowed to refer the grant programs for investigation by EPA's Office of the Inspector General and the Justice Department to redress "[t]he days of irresponsibly shoveling boatloads of cash to far-left activist groups in the name of environmental justice and climate equity." *Id.* The

11

next day, EPA issued a press release repeating those statements and reiterating that "Administrator Zeldin is calling for termination of the financial agent agreement, and for the immediate return of the entire fund balance to the United States Treasury to ensure EPA oversight." Press Release, EPA, Administrator Zeldin Announces that Billions of Dollars Worth of "Gold Bars" Have Been Located at Outside Financial Institution (Feb. 13, 2025), https://perma.cc/48VN-PLYE.

Five days later, the Department of Justice took up Zeldin's cause, seeking to use its criminal prosecutorial powers to cut off Plaintiffs' access to their funds despite the lack of probable cause to do so. The Justice Department first asked the Chief of the Criminal Division of the Washington, D.C., U.S. Attorney's Office, Denise Cheung, to open a criminal investigation into whether the NCIF and CCIA grants had been "unlawfully" awarded, so that the government could prevent the "contract awardees [from] continu[ing] to draw down" their funds from their Citibank accounts. *Read the Resignation Letter by Denise Cheung, A Veteran D.C. Federal Prosecutor*, Wash. Post (Feb. 18, 2025), https://perma.cc/8NMY-DRWE. When Cheung informed the Justice Department that probable cause to open a grand jury investigation did not exist, the Justice Department asked her to instead issue a letter requesting that Citibank freeze Plaintiffs' funds.

While Cheung worked in coordination with the FBI to draft the freeze request letter to Citibank, she informed the Justice Department that the government lacked probable cause to believe that Plaintiffs' accounts were subject to government seizure. *Id*. The FBI, too, expressed "concern about the current lack of evidence of any apparent crime and the need to send out any such freeze letter." *Id*. Despite that advice, the FBI sent the freeze letter to Citibank that night, "recommend[ing]" that Citibank freeze each of the NCIF and CCIA grantees' and

12

subgrantees' accounts for 30 days.  FBI Freeze Ltr. (J.A. 99-103).

Shortly after the letter went out, then-U.S. Attorney for the District of Columbia, Ed Martin, directed Cheung to immediately send a second letter to Citibank ordering—rather than merely recommending—that it freeze the accounts pursuant to a criminal investigation by the Justice Department. When Cheung explained that the evidence was insufficient to support such a letter, she was asked to resign for refusing to send the letter.  She resigned the next day.

Undeterred, Martin personally submitted a seizure warrant application to a D.C. magistrate judge.  Spencer S. Hsu, Maxine Joselow & Nicolás Rivero, *FBI Takes Up EPA Probe amid Pushback from Judge, Prosecutors*, WASH. POST (Feb. 27, 2025), https://perma.cc/E2JR-G4GF.  The judge rejected the seizure warrant application as unsupported by probable cause.  *Id*.  Around the same time, the Deputy Attorney General asked at least one other U.S. Attorney's office to open a grand jury investigation into the NCIF and CCIA grant programs and seek a court-ordered bank freeze, but, like Cheung, those other prosecutors refused the requests as unsupported.  *Id*.  As the government eventually told the district court, the "effort to . . . put a criminal freeze on the money" was "obviously" unsuccessful "because that didn't happen."  Mar. 12 TRO Hr'g Tr. 26:5-9 (J.A. 199).

Despite having received multiple, independent assessments that there was no probable cause to believe that "any apparent crime" had been committed in connection with Plaintiffs' funds, EPA continued without basis to press for investigations of Plaintiffs, and then pointed to the very existence of those investigations as if they supported its efforts to indefinitely prevent Plaintiffs from accessing their funds.

13

EPA's Acting Deputy Administrator Chad McIntosh referred the "GGRF program" to the EPA Office of Inspector General for a "full investigation" into what he termed a "pattern of reckless financial management, blatant conflicts of interest, astonishing sums of tax dollars awarded to unqualified recipients, and severe deficiencies in regulatory oversight under the prior administration." Mar. 2 Ltr. to EPA OIG 2 (J.A. 107). Fifteen minutes after sending the referral letter, in an act of arrant bootstrapping, McIntosh forwarded the letter to Citibank with a baseless cover email characterizing the GGRF program as being "riddled with self-dealing, conflicts of interest, extraordinarily unqualified recipients, improperly reduced government oversight, and much more." Mar. 2 EPA Ltr. to Citibank (J.A. 105).

Meanwhile, Citibank continued to block disbursements of Plaintiffs' funds. But—given the government's lack of success in convincing any prosecutor or court that probable cause existed to support a criminal freeze—that was only a "voluntar[y] pause[]" pursuant to the FBI's "recommendation" from two weeks earlier. Mar. 2 EPA Ltr. to EPA OIG (J.A. 106). To ensure that Citibank continued the freeze, EPA asked Treasury to instruct Citibank "not to disburse funds from any of the GGRF accounts prior to the end of the day Sunday, March 9, 2025." Mar. 4 Treasury Ltr. to Citibank (J.A. 111); *see also* Opp'n to Mot. for TRO 7, *Climate United Fund v. Citibank*, No. 25-cv-698, Dkt. No. 16 (D.D.C. Mar. 12, 2025) (hereinafter Opp'n to Mot. for TRO).

That same day—March 4—Zeldin posted from his official EPA X account: "The money is now FROZEN and DOJ/FBI is investigating." Lee Zeldin (@EPALeeZeldin), X (Mar. 4, 2025, 6:02 PM), https://perma.cc/3KRB-FS77. EPA also sent detailed requests to Plaintiffs for information and documents it claimed to need to inform its "Compliance and Oversight

14

Review" of the Greenhouse Gas Reduction Fund.  Mar. 4 EPA Ltr. to Climate United (J.A. 674-77).  Plaintiffs' responses were due by March 28 at noon.  Mar. 4 EPA Ltr. to Climate United (J.A. 675).

By March 9, as Treasury's funding freeze directive was set to expire, Justice Department officials worked with EPA and Treasury to craft emails to Citibank that would achieve the government's "short-term objective [] to prevent disbursement of the grant funds" by "making reference to the ongoing criminal investigation and EPA's civil investigation" into the Greenhouse Gas Reduction Fund.  Mar. 9 Emails, https://perma.cc/84PV-RUQA (reported in Alex Guillén, *Quest to Retake $20B in Climate Money Puts Trump Agencies at 'Significant' Risk, Attorney Warned*, POLITICO (Apr. 23, 2025), https://perma.cc/BY4Q-J39A).  The Justice Department officials admitted that those investigations had not "uncover[ed] . . . criminal conduct or other improprieties" that could justify the government's interference with Plaintiffs' money but advised that, before the government would have to defend the freeze in court, it would "make . . . arguments about how those claims sound in contract and should be pursued in another forum."  *Id*.

The Justice Department recognized that, "[a]t some point, we will need to raise defenses, but the criminal and civil investigations may fill that out over the intervening period."  *Id*.  That is, in the Justice Department's candid estimation, the government had not turned up any wrongdoing that could justify its action to "prevent disbursement of the grant funds."  *Id*.  Rather, it pursued criminal and civil investigations in the hopes of uncovering "criminal conduct or other improprieties" that could justify freezing Plaintiffs' accounts.

15

In response to the Justice Department's instructions, EPA sent a letter to Citibank the next day instructing it to "pause the processing of payment instructions for the GGRF accounts until further notice." Mar. 10 EPA Ltr. to Citibank (J.A. 65). EPA stated that it was "working to review and develop additional account controls to address concerns regarding potential fraud and/or conflicts of interest related to the [GGRF], including based on incoming responses to oversight questions EPA issued to grant recipients on March 4, 2025," and asserted that "[t]he GGRF is also the subject of an ongoing criminal investigation by the U.S. Department of Justice and an investigation by the EPA Office of Inspector General (OIG)." *Id*. EPA advised Citibank that, until "additional account controls are developed and implemented . . . and given the ongoing investigations into the GGRF, it is critical that the Bank not resume processing payment instructions for the GGRF accounts." *Id*. EPA stated further that "[t]his interim account control will be rescinded as soon as reasonably practicable once EPA completes its review and implements additional account controls through additional instructions as necessary." *Id*.

Meanwhile, Plaintiffs had already been unable to access the money in their bank accounts for over two weeks—a period that has now stretched to more than six months. And because the terms of the grant awards generally prohibited Plaintiffs from withdrawing funds unless they would be spent in the following fourteen business days, Plaintiffs were starting to run out of money to make payroll, pay the rent on their offices, and pay third-party contractors for essential auditing, legal, and IT security services. On top of that, without access to their funding, they would soon be unable to meet their commitments under loans for projects they had already agreed to finance. Some of those loan payments could be requested by borrowers at any time; if borrowers requested a loan draw-down while

16

Plaintiffs could not access their funds, Plaintiffs would be forced to default on those loans, imperiling the projects.

Plaintiffs remained unable to access the money in their accounts. They repeatedly requested an explanation from EPA or Citibank as to why their funds were inaccessible. They received no substantive reply. Climate United, for example, sent three emails, left a voicemail, and mailed a hard-copy letter to Citibank between February 19 and March 3 before finally receiving a response stating only that Citibank had "received [Climate United's] correspondence" and was "awaiting further guidance" from EPA. Bafford Decl. ¶¶ 42-51 (J.A. 376-78). When Climate United contacted EPA on February 20, the agency at first offered Climate United a meeting the following week, only to reschedule the meeting three times before cancelling it and becoming entirely non-responsive to Climate United's efforts to get in touch.

At the same time that EPA was refusing to respond to Plaintiffs' requests for information, Zeldin made multiple public statements in which he claimed to have "seen [] a lot of self-dealing, a lot of conflicts of interest," described the Greenhouse Gas Reduction Fund as a "clear-cut case of waste and abuse" and a "criminal" scheme, and vowed that EPA was "not going to rest" until it had "recover[ed]" the grant awards.[1]

After three weeks of being kept in the dark without access to their funds, Plaintiffs "had no choice but to sue." Mar. 12 TRO Hr'g Tr. 14:8 (J.A. 187). Climate United sued first. It named Citibank, EPA, and Zeldin in its March 8 complaint and

---

[1] Sunday Morning Futures (@SundayMorningFutures), X (Feb. 23, 2025, 11:21 AM), https://perma.cc/6H9Y-L7H8; Rapid Response 47 (@RapidResponse47), X (Feb. 25, 2025, 10:16 AM), https://perma.cc/V37L-84WC.

17

informed them that it intended to move for a temporary restraining order on March 10.

Despite that advance notice, when the district court preliminarily scheduled a hearing for March 11, the government emailed Climate United's counsel asking for "the courtesy of agreeing to ask the Court to push back these deadlines by 24 hours." Bafford Decl. ¶ 55 (J.A. 379-80). When Climate United agreed to EPA's request "as a professional courtesy," EPA used the 24-hour delay to send each of the grantees identical letters stating that their grants were terminated, effective immediately. *Climate United Fund v. Citibank*, 775 F. Supp. 3d 335, 343 (D.D.C. 2025); J.A. 390-91 (termination letter). The government then argued that the case should be dismissed as moot because the relief Plaintiffs sought—an injunction preventing EPA from terminating the awards—was no longer available, as EPA had already purported to terminate the awards.

Rejecting EPA's attempt to moot the case, the district court granted a temporary restraining order. It found that EPA had failed to provide any logical explanation for terminating Plaintiffs' grant awards. *Climate United*, 775 F. Supp. 3d at 346-48. Instead, in declarations and two live hearings before the district court, EPA cited allegations of criminal activity and fraud that the court held were unsupported by any credible evidence. *Id*. at 347-48; *see also id*. at 346 ("EPA Defendants proffered no evidence to support their basis for the termination . . . ."). Rather than proffer any credible evidence, EPA merely pointed to the ongoing investigations by EPA's Office of the Inspector General, the Department of Justice, and the FBI—each of which EPA had instigated based on the same unsubstantiated allegations for which it could not provide any credible evidence to the district court. *Id.* at 348 n.4; *see also* Opp'n to Mot. for TRO 21.

18

By the time Plaintiffs moved for a preliminary injunction a week later, EPA was still unable to provide anything more than "unsubstantiated reasons" for freezing their money and revoking their awards. *Climate United Fund v. Citibank*, 778 F. Supp. 3d 90, 114 (D.D.C. 2025); *see also* Apr. 2 PI Hr'g Tr. 47:8-14 (J.A. 876) ("[Court to EPA:] I've asked you repeatedly, and you've been very candid with me, in saying that you don't know what the evidence is of waste, fraud and abuse and violation of the law and corruption and all of that. And I still don't. I mean, here we are weeks in, and as far as I—you're still unable to proffer me any information with regard to any kind of investigation, malfeasance.").

In fact, once it had to answer in court, EPA abandoned its previous arguments that the terminations were necessary due to "substantial concerns regarding program integrity" and "programmatic fraud, waste, and abuse." Opp'n to Mot. for TRO 21. Instead, EPA maintained that its "bases for termination were the grants' structure and terms" and that its termination decision "reflected no more than a decision based on reasons of policy," not anything to do with Plaintiffs' "noncompliance" or "conduct." Opp'n to PI 34-35, 38 (J.A. 503-04, 507) (internal quotation marks omitted); *see also Climate United*, 778 F. Supp. 3d at 115 ("Now, in a shift in position, [EPA Defendants] contend that the termination was based on the agency's changed priorities.").

The district court preliminarily found that EPA froze and terminated Plaintiffs' grant awards in violation of the APA as, despite being "repeatedly pressed on the issue," EPA "offer[ed] no rational explanation for why it suspended the grants and then immediately terminated the entire NCIF and CCIA grant programs overnight." *Climate United*, 778 F. Supp. 3d at 114. And the court held that EPA violated the constitutional separation of powers by seeking to "effectively unilaterally

19

dismantle a program that Congress established." *Id*. at 116. Specifically, it found that "suspend[ing] all eight grants comprising the entire NCIF and CCIA programs," coupled with "the agency's public statements . . . regarding the future of the program," showed that EPA "seeks to dismantle these grant programs in their entirety as a policy matter" notwithstanding the agency's hollow representations in court that it intended to re-obligate the funds following the terminations. *Id* at 115-16.

By the time the district court granted the preliminary injunction in mid-April, Plaintiffs' inability to access their funding threatened to permanently unravel projects that depended on funding commitments they had incurred before EPA's actions to undo the GGRF. A project to renovate 192 affordable housing units in Virginia could lose its $4 million in committed Department of Housing and Urban Development (HUD) funding if a subgrantee cannot fulfill its funding obligations by September. Donovan Decl. ¶ 19 (J.A. 437-38). Projects to construct a community health center in New Jersey and to renovate a historic hotel into 63 rental apartments in rural Iowa were slated to lose their state tax credits and collapse if they did not receive a subgrantee's planned funding by July. Moon Decl. ¶¶ 19, 25-26 (J.A. 465-67). And construction of 302 affordable housing units in Texas and 236 units in Maryland will not move forward, and will eventually collapse, without a subgrantee's committed funding. Donovan Decl. ¶ 17 (J.A. 436-37).

Those harms have only continued to mount as the funding freeze has persisted, and for some projects, it is likely already too late. Due to one subgrantee's inability to access its grant funds, a 106-unit affordable housing renovation lost its state tax credits in May, increasing the project's cost and placing the project in jeopardy. Mayopoulos Decl. ¶¶ 5-6, *Climate United*,

20

No. 25-cv-698, Dkt. No. 112-1 (D.D.C. May 12, 2025) (hereinafter Mayopoulos Supp. Decl.). Another project to construct a 160-home subsidized rental apartment community in Detroit most likely lost its critical HUD housing assistance commitment because of a subgrantee's inability to provide a promised $4 million bridge loan in June. *Id*. at ¶¶ 7-8; Brown Decl. ¶ 18 (J.A. 437). And a $34 million project to build 90 rental homes in Texas was projected to fall through due to a subgrantee's inability to provide its $3.6 million of committed funding by the end of June. Moon Decl. ¶¶ 20-21 (J.A. 465).

In addition to undermining existing projects, EPA's actions will soon put many of the Plaintiffs themselves out of business, preventing accomplishment of the projects Congress intended them to fund. Without access to their funding, Plaintiffs are unable to make payroll, pay their bills, or keep current on their rent. *Climate United*, 778 F. Supp. 3d at 117-20. Due to EPA's interference with Plaintiffs' ability to make payroll, many employees have started looking for other jobs, left voluntarily, or been laid off. For instance, one Plaintiff has laid off or lost approximately 50% of its staff, and one of its subgrantees was "forced to act financially as though the GGRF award does not exist" by laying off 36 of its employees. Mayopoulos Supp. Decl. ¶¶ 2-3. And because Plaintiffs cannot pay their bills, third-party contractors have started to withdraw essential services, including critical accounting, financial management, and award compliance services. Simply put, without access to their funds, Plaintiffs cannot keep their doors open, much less honor their loan commitments.

More harmful still, faced with EPA's threats to claw back Plaintiffs' funds, existing partners have begun to shun Plaintiffs' funding offers, pulling out of near-final deals and stopping working on Plaintiffs' projects. After eight weeks of negotiations, an Alaska-based community finance institution

21

had agreed to a $10 million loan from one of the Plaintiffs; all that was left to officially close the deal was the board's approval. Following EPA's actions, the board refused to approve the loan. That same plaintiff had completed negotiations with a local green bank in the Midwest to help finance a different project, with only board approval outstanding. The board met the day after Zeldin's February 12 comments on X and voted against the loan because of Zeldin's public threats and vow to end the NCIF program. A philanthropic entity interested in investing $250 million in a partnership with one of the Plaintiffs broke off discussions following EPA's actions. Co-investment and collaboration is critical to Plaintiffs' ability to carry out Congress's directive to efficiently finance projects to benefit the public by lowering "greenhouse gas emissions and other forms of air pollution in partnership with, and by leveraging investment from, the private sector." 42 U.S.C. § 7434(c)(3)(A).

## DISCUSSION

An accurate understanding of the program Congress enacted, together with the complete lack of evidence to support EPA's false assertions of improper use or deficient oversight of federal expenditures, confirms that the district court's decision to preliminarily enjoin EPA's unlawful actions is unassailable. Based on nothing more than the President's announced vendetta against the "Green New Deal," EPA determined to cut off access to money that was already disbursed to Plaintiffs and that they were using—pursuant to Congress's explicit directions as implemented by EPA—to expand access to solar- and electric-powered housing, cars, buildings, and power generation. The Constitution does not allow the President or his subordinate executive agencies to unilaterally decide to take back money that Congress has appropriated and the agency already lawfully spent merely

22

because the Executive Branch disagrees with Congress's policy choices. Neither do the laws governing federal agencies allow them to initiate specious criminal investigations in hopes of digging up pretextual justifications to cover up that unconstitutional action, let alone rely on the very existence of those investigations to interfere with Plaintiffs' lawful use of their money.

EPA's violations of law are so clear that the agency hardly contests them. And the imminent, irreversible harm to Plaintiffs is incontrovertible. These circumstances cry out for preliminary injunctive relief, as the district court rightly recognized. The majority's contrary conclusion accepts the government's gambit to strip district courts of jurisdiction over the government's blatant violations of basic principles of constitutional and administrative law.

Plaintiffs received the funds at issue here via federal grant awards. Absent EPA's unjustified interference, the money in Plaintiffs' accounts is theirs to spend in conformity with the terms of the funding agreement. The government has expressly and repeatedly disclaimed any allegation that Plaintiffs have violated those terms. Neither has EPA attempted to regain control of the money by asserting its security interest in Plaintiffs' funds.

EPA has instead frozen and purported to terminate the grant awards based on shifting, *post-hoc*, and unsupported allegations. Plaintiffs thus challenge EPA's actions as arbitrary and capricious, and based on pretextual justifications. In no way is that claim "in essence" a contract claim over which the district court lacks jurisdiction. The reality that Plaintiffs obtained the funds by government contract does not mean that claims they raise against the government's interference with their lawful use of those funds sound in contract. Our binding

23

precedent makes clear that just because Plaintiffs "would have no claims to assert" if they had never received the funds through a grant does not mean that they assert a "contract right." *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1110 (D.C. Cir. 2022).

The court's holding to the contrary is unsupportable. The court falls short today in its Article III duty to independently say what the law is and thereby hold the Executive Branch to account. Such "[a]bdication of responsibility is not part of the constitutional design." *Clinton v. City of New York*, 524 U.S. 417, 452 (1998) (Kennedy, J., concurring).

## A. Likelihood of Success

### 1. APA

EPA's conduct is arbitrary and capricious. Agencies may not offer "contrived reasons" for their decisions, *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019), nor can they make any decision that "runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). It is beyond dispute that an agency's own patently unfounded criminal investigations against private companies cannot be invoked to justify the factually baseless and legally unauthorized taking of the companies' funds. By all indications, that is exactly what EPA did here.

Following the President's instructions to cut off funding to clean energy projects, EPA vowed to "reassume responsibility" of the NCIF and CCIA grant funds. To that end, without probable cause to suspect any criminal wrongdoing related to the grant programs, EPA—in coordination with the Justice Department and the FBI—first pressured Citibank into

24

voluntarily freezing Plaintiffs' accounts by referring to "possible criminal violations," including "[c]onspiracy to defraud the United States" and "wire fraud." FBI Freeze Ltr. (J.A. 99-101). Not satisfied that Citibank's voluntary freeze would hold, the agencies attempted to open a criminal investigation into the grants and impose a freeze of Plaintiffs' funds based on suspected criminal conduct. When those efforts came to nothing, EPA instructed the agency's Office of Inspector General to open a civil investigation, immediately sent the referral—including its unfounded allegations of "self-dealing, conflicts of interest, [and] extraordinarily unqualified recipients," J.A. 105—to Citibank, and instructed Citibank to keep the accounts frozen until EPA was able to establish sufficient account controls.

When that account freeze expired, the agencies again referenced "potential fraud" and ongoing criminal and civil investigations to Citibank as support for an indefinite continuation of its account freeze, ostensibly to enable EPA to evaluate Plaintiffs' responses to its oversight questions. Mar. 10 EPA Ltr. to Citibank (J.A. 65). But the very next day—weeks before those responses were due, and mere hours before a hearing on Climate United's TRO motion—EPA used the 24-hour delay, which it had requested as a "professional courtesy," to abruptly announce its putative termination of all the NCIF and CCIA awards. EPA then argued that the court should dismiss Climate United's suit as moot on the ground that EPA had terminated its grant.

When EPA could not point the court to any evidence supporting its allegations of fraud, *Climate United*, 775 F. Supp. 3d at 346-47, it changed its tune. EPA argued to the district court and then to us that it terminated the grants not because any "particular plaintiff has engaged in a particular act that constitutes fraud," but only because of "EPA's lack of

25

oversight tools to ensure that the money wasn't abused."  Oral Arg. Tr. 103:9-15; *see also* Apr. 2 PI Hr'g Tr. 39:4-15 (J.A. 868).  EPA insisted that its oversight concern did not in any way depend on Plaintiffs' "noncompliance" or "conduct"— despite the termination letters' references to "fraud, waste, and abuse" as a basis for the termination.  PI Opp. 34-35, 38 (J.A. 503-04, 507); Termination Ltr. (J.A. 390).

Each of those actions is consistent with EPA's unlawful pursuit of a "short-term objective [] to prevent disbursement of the grant funds" that had nothing to do with any valid concerns about fraud or oversight, and everything to do with the agency's desire to carry out President Trump's directive to block implementation of Congress's environmental policy.  Mar. 9 Emails, https://perma.cc/84PV-RUQA.   That is demonstrated most clearly by EPA's pursuit of criminal and civil investigations that it hoped would "uncover . . . criminal conduct or other improprieties" to substantiate its asserted justifications for freezing Plaintiffs' funds. *Id.*  It pursued those baseless (and fruitless) investigations against the advice of at least two experienced federal prosecutors the EPA consulted and the ruling of a magistrate judge that there was no probable cause to believe any improper conduct had occurred.

Equally revealing is EPA's double-speak:  EPA claimed publicly and in communications to the parties that its actions were justified because the program is a "criminal" scheme and a "clear-cut case of waste and abuse" that is "riddled with self-dealing, conflicts of interest, extraordinarily unqualified recipients . . . and much more," even as EPA insisted to the district court, which rebuked it for utterly failing to substantiate those allegations, and to our court, that it was not "accusing" and has never "accuse[d] the plaintiffs of waste, fraud and abuse."  Apr. 2 PI Hr'g 39:12-13 (J.A. 868); Oral Arg. Tr. 27:15-18.   Such shifting and contradictory representations

26

further show that the oversight concerns EPA emphasizes as its sole basis for terminating the awards are *post-hoc* and pretextual. Oral Arg. Tr. 27:15-21.

The timing of the termination letters similarly undermines EPA's purported oversight concerns. Only the day before terminating the grants, EPA instructed Citibank to extend the "voluntary" funding freeze while it waited for Plaintiffs' responses to its oversight questions—answers it claimed to need in order to evaluate "concerns regarding potential fraud and/or conflicts of interest." Mar. 10 EPA Ltr. to Citibank (J.A. 65). Later that day, Climate United moved for a TRO to prevent EPA from terminating the awards, among other requested relief. Instead of waiting for Plaintiffs' responses to its oversight questions—which EPA had given Plaintiffs another several weeks to submit—EPA abruptly terminated the grants the next day, less than 24 hours before the district court's scheduled TRO hearing.

That sequence of events—terminate first, gather data later—is emblematic of EPA's approach throughout the events underlying this litigation. It is fundamentally at odds with the APA's requirement of reasoned decision making. An agency must, at a minimum, "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (internal quotation marks omitted). By EPA's own admission, it decided to terminate the awards before gathering the relevant oversight data, just as it decided to freeze Plaintiffs' money and launch criminal investigations without any reason to believe that Plaintiffs were engaged in "criminal conduct or other improprieties." Mar. 9 Emails. At every turn, EPA's actions demonstrate that its purported reasons for terminating the grant—its "substantial concerns regarding program integrity, the award progress, [and]

27

programmatic fraud, waste, and abuse," Gov. Br. 33—are entirely pretextual. Deciding the outcome before investigating the facts, unleashing the government's prosecutorial power on private citizens with no basis to think fraud or crime occurred and, having uncovered no evidence, giving contrived and contradictory reasons for predetermined and unsupported agency action is quintessentially arbitrary and capricious. *See Dep't of Com.*, 588 U.S. at 782-85.

EPA argues that it had legitimate concerns about its ability to ensure that the grant funds were being spent lawfully, making its decision to suddenly terminate the awards reasonable. Gov. Br. 33-34. But the oversight issues it cites are contradicted by the record. EPA's explanation not only "runs counter to the evidence before the agency" and "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," *State Farm*, 463 U.S. at 43, but is patently pretextual.

EPA points to the use of Citibank as a financial agent, the distribution of grant funding to subgrantee organizations, and modification of the agreement between the presidential election and inauguration as raising "serious concerns" about EPA's ability to oversee Plaintiffs' use of the funds. Gov. Br. 9-11. From EPA's telling, unqualified grantees were awarded enormous sums of federal grant funding with virtually no oversight. That narrative finds no support in the record.

Start with EPA's allegation that Plaintiffs are "extraordinarily unqualified recipients" who "had no prior track record." Mar. 2 EPA Ltr. to Citibank (J.A. 105); Gov. Br. 6. That is a grave mischaracterization. Recipients were coalitions of some of the country's most reputable nonprofits with decades of relevant experience. They formed coalitions, structured as newly formed subsidiaries, to accommodate the

28

demands of the role that Congress envisioned for the grantees. That organizational design enables the subsidiary to adopt policies and structures most conducive to leveraging private capital—one of Congress's key goals for the program—while benefitting from the experience and infrastructure of the parent organizations. Bafford Decl. ¶ 8 (J.A. 363). Climate United, for instance, is a coalition of three nonprofits with thirty to fifty years of experience each who have collectively managed nearly $30 billion of private and institutional capital to increase environmental sustainability. *Id*. ¶ 7 (J.A. 363). Power Forward Communities is a coalition of five nonprofits—including household names like United Way and Habitat for Humanity—with more than a century of combined experience financing, managing, and implementing affordable housing projects. Its coalition partners' past projects total more than $100 billion and have successfully added approximately 1.5 million affordable homes and apartments across the United States for Americans in need. Mayopoulos Decl. ¶ 3 (J.A. 452).

Those coalitions are led by people of proven experience and integrity. Power Forward Communities itself is led by a former President and CEO of Fannie Mae who was also General Counsel of Bank of America; one of its subgrantees is led by a former director of the U.S. Office of Management and Budget and HUD Secretary; and another of its subgrantees is led by a former Senior Vice President at Wells Fargo who also served as Vice President at the Federal Reserve Bank of San Francisco. Such impressive leadership and proven track records make the coalitions eminently suited to fulfill Congress's objectives. It is disingenuous of EPA to insinuate that the coalition structure implies Plaintiffs' lack of qualifications when it is "common practice for established organizations to set up subsidiaries for specific projects and programs"; coalition applicants were specifically invited to

29

apply for the grants by EPA; and the coalition partners and their leaders are extraordinarily qualified to administer the grant awards. Bafford Decl. ¶ 8 (J.A. 363); NOFO at 6 (J.A. 1738). Nothing in the record materially disputes any of that.

Nor do EPA's purported concerns about conflicts of interest hold water. Start with the example selected by the majority. Maj. Op. 6 & n.2. The majority highlights that, in urging its Office of Inspector General to open an investigation into the grant program, EPA's Acting Deputy Administrator alleged that "Jahi Wise, the former director of the GGRF, personally oversaw a $5 billion grant to his previous employer, the Coalition for Green Capital [(CGC)]—without recusing himself." Mar. 2 Ltr. to EPA OIG (J.A. 107). But the record squarely contradicts that allegation. Consistent with "EPA Order 5700.5A1, EPA's Policy for Competition of Assistance Agreements, and the rigorous ethics and conflict-of-interest review carried out by EPA during the review and selection process for GGRF funding . . . Mr. Wise was recused from reviewing, evaluating, selecting, or approving funding on any grant competition for GGRF funding for which CGC submitted an application." Hopson Decl. ¶ 22 (J.A. 421). That is, in addition to recusing himself from CGC's application for funding, "Mr. Wise did not even review applications from CGC's competitors for GGRF funds." *Id*. Even EPA recognizes that its speculation about conflicts of interest does not support its termination decision. Indeed, after failing to present the district court with any evidence of fraud, conflicts of interest, or anything even approaching "waste, fraud, and abuse," EPA pivoted to argue that its decision to terminate the grants was solely "based on reasons of policy" and did not have anything to do with Plaintiffs' "noncompliance" or "conduct." PI Opp. 34-35, 38 (J.A. 503-04, 507) (internal quotation marks omitted).

30

EPA's characterization of the grants' funding structure as an "unusual and apparently improper" "scheme [to] remove[] $20 billion from governmental oversight in the days, weeks, and months before a new administration took office" is similarly unfounded.  Mar. 2 Ltr. to EPA OIG (J.A. 107).  As explained above, Plaintiffs received their awards as lump-sum payments which they held in accounts at Citibank, subject to a security interest held by EPA.  That financial structure was specifically chosen to enable Plaintiffs to carry out Congress's directive to act "in partnership with, and by leveraging investment from, the private sector."  42 U.S.C. § 7434(c)(3).  If the grant funds are to help attract private financing for clean energy projects, either by recruiting private co-investors or offering credit enhancements that make projects less risky for private investors, the funds need to be Plaintiffs' own assets and reflected on their balance sheets as such.  *See* Impact Finance Experts Amicus Br. 3, 9-14; Bafford Decl. ¶¶ 29, 32 (J.A. 370-72).  Under EPA's standard grant disbursement system, in contrast, a recipient's balance sheet reflects only the portions of the award that have already been expended, rather than the full award amount.  Adherence to the agency's default payment system would have impeded Plaintiffs' ability to recruit private capital.  To effectuate Congress's direction, EPA instead deposited the full award amount in Citibank accounts opened in Plaintiffs' and their subgrantees' names.  That way, their balance sheets reflected Plaintiffs' ownership of the full amount of the award, even as they drew down funds from the account only as needed and in compliance with their obligations to fund projects and cover administrative costs.

That funding mechanism was contemplated by EPA as early as July 2023—long before any potential change in administration.  *See* NOFO 55-56 (J.A. 1787-88) (contemplating departures from standard EPA practice, including a "one-time or periodic balance-sheet

31

capitalization(s)"). And there is nothing improper about it. Rather, "federal financial agents" like Citibank are "routinely appointed" and are specifically authorized by statute. *Transactive Corp. v. United States*, 91 F.3d 232, 236 (D.C. Cir. 1996); 12 U.S.C. § 265. Most relevant to EPA's litigating position, the financial agent structure affords EPA *more* oversight than the agency's standard payment system. Citibank's interface displays these grantees' and subgrantees' expenditures broken down by budget category and provides EPA with full, real-time view access into each of the grantees' and subgrantees' accounts. Those oversight features are absent from EPA's standard disbursement system, which reports only the amount of money drawn down by the recipient. EPA's determination that the "prior administration's designation of a financial agent . . . untenably reduced EPA's oversight" has it backwards. Gov. Br. 10.

In the same vein, EPA asserts that, because some subgrantees may distribute award funds to other entities, EPA lacks the "visibility to see how [the subgrantees are] making those decisions or how that money is being used." Oral Arg. Tr. 34:2-4; *see also* Gov. Br. 10. That concern inexplicably disregards the many ways in which EPA can oversee the subgrantees' activities. EPA approved detailed budgets and workplans that specify how the subgrantees will use the grant money. Just like the grantees, every subgrantee must certify, under threat of "prosecution under 18 U.S.C. 1001 and other applicable criminal, civil and administrative sanctions," that each requested withdrawal of funds from its Citibank account is "necessary to execute against the workplan for the Subaward Agreement supported with EPA funding." Subgrantee Account Control Agreement, Ex. B (J.A. 1189). And subgrantees' progress against that workplan is tracked and reported in quarterly, semi-annual, and annual reports to EPA. For instance, Rewiring Community Investment Fund—a

32

Power Forward Communities subgrantee—describes how its inability to access its funding will prevent it from fulfilling its obligations under its EPA-approved workplan, which include "establish[ing] a loan loss reserve to encourage lenders to provide loans with significantly discounted interest rates" to households for energy-efficient, clean heating and cooling systems. Matusiak Decl. ¶ 19 (J.A. 447). Moreover, many of the subgrantees are financial institutions that are themselves subject to extensive regulation and oversight by the Federal Reserve, Office of the Comptroller of the Currency, Federal Deposit Insurance Corporation, and state regulators. JCF Ltr. at 3 (May 21, 2025).

To the extent EPA takes issue with the fact that grantees may provide "subgrants to others, who then pass it through to others," that is the structure that *Congress*, not the prior administration, chose to adopt. *See* 42 U.S.C. § 7434(b)(2) ("The eligible recipient shall provide funding" to "entities that provide financial assistance to qualified projects at the State, local, territorial, or Tribal level or in the District of Columbia, including community- and low-income-focused lenders and capital providers.").

Tellingly, when one of the Plaintiffs responded to EPA's asserted concerns about its ability to oversee subgrantees by proposing restructuring the $770 million of its grant funding that was slated for distribution to subgrantee community lenders, EPA ignored it. JCF Ltr. at 2-3. Under the proposal, the vast majority of the Plaintiff's money would remain unspent in a segregated trust or escrow account that EPA could monitor. Instead of being distributed to the community lenders to lend directly, the funds would be used to secure the loans made by those community lenders to small businesses and communities looking to finance clean energy projects. In that way, the grant funds could have advanced the programs' goals

33

while largely staying put in an account monitored by EPA. EPA did not respond to the letter, despite repeated follow-up from the Plaintiff. *Id*. at 1. That lack of engagement further suggests that EPA's purported oversight concerns are not the real reason it terminated Plaintiffs' grant awards.

At bottom, each of EPA's specific examples of oversight concerns is refuted by the record. And its broad-brush argument is simply untenable in light of the detailed oversight mechanisms available to EPA. EPA's assertions that it had such grave oversight concerns that it had to cancel the grant awards overnight run aground on a conceded lack of any indication that Plaintiffs were out of compliance with the award terms, let alone that they were engaging in any conflicts of interest, fraud, or criminal activity. In addition to the real-time visibility Citibank provides EPA into Plaintiffs' and their subgrantees' accounts, EPA receives quarterly, semi-annual, and annual reports detailing Plaintiffs' transactions, activities, progress against their workplans, and expenditures by budget category, as well as mandatory quarterly conflict-of-interest reporting by Plaintiffs and their subgrantees. Bafford Decl. ¶ 35(a) (J.A. 373). Before it purported to halt the program and itself disengaged from constructive communication, EPA had also held meetings with Plaintiffs "at least weekly, and, at times, two to three times per week," to discuss their "program plans, reporting, oversight, and compliance with the EPA Terms and Conditions." *Id*. ¶ 35(b) (J.A. 373); Arabshahi Decl. ¶ 34 (J.A. 1981). On top of those controls, Plaintiffs are subject to third-party audits and to "transaction testing" by EPA, in which EPA conducts a "systematic examination and verification of every dollar spent by [the grantee] to ensure they comply with the grant's terms, conditions, and applicable regulations." Bafford Decl. ¶ 35(g), (h) (J.A. 373).

34

EPA and the majority make much of the fact that the grant awards were amended in December 2024 and January 2025, claiming that these "last-minute" modifications in the waning days of the Biden administration were implemented to "make it more difficult for the government to terminate the agreements." Maj. Op. 5; *see* Gov. Br. 10, 34. EPA specifically contends that the original terms of the awards allowed it to terminate them "based on [a] change in policy priorities," per the version of EPA's General Terms and Conditions in place before October 2024—a contention the majority credits. Oral Arg. Tr. 102:17-25; *see* Maj. Op. 5 n. 1. That is incorrect.

The original grant agreements, signed in August 2024— months before the election—already incorporated the termination provision from EPA's now-operative General Terms and Conditions. Those General Terms and Conditions allow terminations of federal awards based on a change in policy priorities *only* when that basis for termination is "clearly and unambiguously" set forth *in the award agreement itself*. 2 C.F.R. § 200.340(a)(4), (b) (emphasis added). (Neither the EPA nor the majority contends that the award agreement itself, apart from the referenced regulation, allows the awards to be terminated based on a change in policy priorities.) The December 2024 amendment to the grant award thus did not alter the permissible bases for termination, which had never allowed termination for changed policy priorities.

Plaintiffs' original award agreements specifically stated that, "*[n]otwithstanding* the General Term and Condition 'Termination,' [otherwise in effect before October 1, 2024,] EPA maintains the right to terminate the Assistance Agreement only as specified in . . . the version of 2 CFR 200.340 applicable to EPA grants as of July 1, 2024, pursuant to 89 Fed. Reg. 55262 (July 3, 2024)." J.A. 552 (emphasis added). The

35

version of the regulation the awards incorporated from the outset was the one providing "that an agency may terminate a Federal award if it no longer effectuates the program goals or agency priorities (*e.g.* unilateral termination) but *only when such language is clearly and unambiguously included in the terms and conditions of the award*," 89 Fed. Reg. 55,262, 55,263 (July 3, 2024) (emphasis added).

EPA adopted that constraint pursuant to OMB's invitation to agencies to opt into the revised rule before its default October 1, 2024, effective date. As of July 2024, EPA announced in the Federal Register that it had "decided to apply the revised version of 2 CFR 200.340 to EPA financial assistance agreements awarded or amended to add funds on or after July 1, 2024." 89 Fed. Reg. at 55263. The December amendment thus imposed no new limit on EPA's "control over [the] grant funding." Gov. Br. 10.

The timing of the amendment also is entirely innocuous. EPA had explained shortly after the awards were announced in April 2024 that it would share draft award terms that month, and that it "expected the terms to change based on awardee feedback, to ensure they were clear and would be viable for awardee workplans." Bafford Decl. ¶ 19 (J.A. 367). EPA accordingly planned to communicate a "final" set of award terms in late June, followed by an iterative process during the fall and winter of 2024 in which EPA would receive grantees' suggested modifications based on their experience implementing the programs. *Id.* ¶¶ 17-20 (J.A. 366-68). Despite EPA's and the majority's insinuations to the contrary, nothing about the timing or content of those amendments supports Defendants' assertion that they were intended to reduce the agency's oversight or control in the next administration.

36

Neither does the "gold bars" video, which Zeldin repeatedly referenced in public comments smearing Plaintiffs, provide any plausible basis for sincere oversight concerns on the part of EPA's new leadership. In the November 2024 Project Veritas video, an EPA staffer is shown saying to a peer on a Tinder date (who was surreptitiously filming him) that EPA was "trying to get the money out as fast as possible" before Trump's inauguration. Lisa Friedman, *An Offhand Remark About Gold Bars, Secretly Recorded, Upended His Life*, N.Y. TIMES (July 1, 2025), https://perma.cc/FHM4-94R9. Whatever the staffer may have meant, those comments cannot have been referring to awards under the Greenhouse Gas Reduction Fund because those had been fully obligated as of August 2024 (in accordance with Congress's September 2024 deadline). "EPA Awards $27B in Greenhouse Gas Reduction Fund Grants to Accelerate Clean Energy Solutions, Combat the Climate Crisis, and Save Families Money," EPA (Aug. 16, 2024), https://perma.cc/Z7ER-RV7A. Anyone with a basic familiarity with the GGRF program would understand that a video of a staffer's bluster at a bar in November is irrelevant to the grants at issue here.

In sum, the record makes clear that EPA's abrupt termination of the grant awards on the eve of the TRO hearing cannot rationally be explained by reference to the agency leadership's professed oversight concerns. That alone shows that the agency violated the APA, as EPA's explanation for its decision to terminate the awards "runs counter to the evidence before" it. *State Farm*, 463 U.S. at 43. Far more troubling, EPA's dogged pursuit of criminal investigations unsupported by probable cause and its unsubstantiated public accusations of criminal activity strongly suggest that the agency's professed oversight concerns are pretextual. EPA's refusals to discuss its declared concerns with Plaintiffs themselves, engage with their responses, or even wait to consider how they would answer its

37

oversight questions give the lie to its widely trumpeted concerns. Contrived, baseless justifications for the grant terminations do not satisfy the "reasoned explanation requirement of administrative law," which "is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Com.*, 588 U.S. at 785. The Supreme Court has made clear that "[a]ccepting contrived reasons would defeat the purpose of the enterprise." *Id.* "If judicial review is to be more than an empty ritual, it must demand something better" by way of reasoned explanation than the false statements EPA broadcast to build a sensationalist public narrative in its favor. *Id.*

### 2. Separation of Powers

It is equally clear that EPA's actions violate the Constitution. Our constitutional system of separation of powers rests on the idea that national "policy is for Congress and the President to establish as they see fit in enacting statutes, and for the President and subordinate executive agencies . . . to implement within statutory boundaries." *Aiken Cnty.*, 725 F.3d at 257. "Money is the instrument of policy," *Clinton*, 524 U.S. at 451 (Kennedy, J., concurring), and it is Congress—not the executive branch acting unilaterally—that has "exclusive power over the federal purse," *Rochester Pure Waters Dist. v. E.P.A.*, 960 F.2d 180, 185 (D.C. Cir. 1992). Only Congress may authorize "money [to] be paid out of the Treasury." *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937). And when it does so, the executive "may not ignore" those funding directives "merely because of policy disagreement with Congress." *Aiken Cnty.,* 725 F.3d at 260.

To hold otherwise would allow "the executive [to] possess an unbounded power over the public purse of the nation," 2

38

JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE
UNITED STATES § 1348, at 215 (Thomas Cooley ed., 4th ed.
1873)—the very concentration of power the Appropriations
Clause was intended to prevent. *See Cincinnati Soap Co.,* 301
U.S. at 321. It is thus incontrovertible that, "[a]bsent
congressional authorization, the Administration may not
redistribute or withhold properly appropriated funds in order to
effectuate its own policy goals." *City & Cnty. of San Francisco
v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018). As then-Judge
Kavanaugh explained, it is a "settled, bedrock principle[] of
constitutional law" that neither the President nor his
"subordinate executive agencies" may "decline to follow a
statutory mandate or prohibition simply because of policy
objections." *Aiken Cnty.*, 725 F.3d at 259. Insofar as the
majority defends a prerogative of EPA to cancel the grants for
policy reasons, the majority's assertion that "the [Inflation
Reduction] Act does not limit the Administrator's discretion to
withhold or terminate grants," Maj. Op. 23, squarely conflicts
with *Aiken*.

Congress in the Inflation Reduction Act appropriated
federal funds for the Greenhouse Gas Reduction Fund and
instructed EPA "to make grants" by September 30, 2024, to
"nonprofit organization[s] that [are] designed to provide
capital, leverage private capital, and provide other forms of
financial assistance for the rapid deployment of low- and zero-
emission products, technologies, and services." 42 U.S.C.
§ 7434(a) (providing funds "to remain available until
September 30, 2024" and instructing EPA to make the
described grants), (c)(1)(A) (specifying that "eligible
recipients" must be able to leverage private capital). The
statute specifies that grantees, working in partnership with the
private sector and with local communities, must provide
funding and other assistance to housing and infrastructure
projects designed to reduce greenhouse gas emissions. *Id.*

39

§ 7434(b).   EPA is constitutionally obligated to administer those grants; it cannot unilaterally decide to get rid of the grant programs based on the Administration's policy preference to "[t]erminat[e] the Green New Deal."  90 Fed. Reg. at 8357.

The district court found that EPA sought to do just that.  It found that "EPA seeks to dismantle these grant programs in their entirety as a policy matter," as shown by EPA's public expressions of determination to shut down the grant program, and as confirmed by its action to terminate "all eight grants comprising the entire NCIF and CCIA programs." *Climate United*, 778 F. Supp. 3d at 116.  The district court's factfinding is amply supported by the record, and the majority's conclusion that it was clearly erroneous cannot be squared with EPA's remarkable conduct in this case.  Maj. Op. 25-26.

As already discussed, EPA's actions at every turn reveal its determination to permanently defund the Greenhouse Gas Reduction Fund programs for no more reason than that President Trump announced that goal.  *See* 90 Fed. Reg. at 8357 (directing agencies to "Terminat[e] the Green New Deal" by preventing the "disbursement of funds appropriated through the Inflation Reduction Act").  Without any further planning, consideration, or explanation, EPA acted to prevent Plaintiffs from accessing their funds.  Current agency leadership has demonized the recipients as if the President's policy preferences alone license them to slander as fraudulent or criminal any grantee whose activities do not align with those preferences.  No matter that all evidence confirms that Plaintiffs were spending their money precisely as Congress intended and authorized.

Indeed, EPA's hasty decisions to freeze and terminate the grant awards with no evidence of noncompliance and no communication with Plaintiffs cannot be explained as anything

40

other than a decision to do what the President said he wanted only because he said so. The decision to terminate the grants just hours before the district court had a scheduled occasion to rule on whether to restore or preserve Plaintiffs' access to their award funds is hard to explain as anything but a bald effort to rewrite the statute and undo what was done in compliance with it. Those are not legitimate means to advance the new President's policy agenda. Why terminate grant awards that had been made and were being carried out as Congress intended unless EPA's real disagreement was with Congress's legislated policy choice to fund "green energy" projects?

The majority chides the district court for discounting EPA's representations that it intended to reconstitute the grant programs with increased oversight. Maj. Op. 25-26. At oral argument, EPA disavowed any "frontal assault on the appropriation or Congress's objective," insisting that the agency "intends, as consistent with principles of appropriations law, to continue to make these funds available in a permissible way and in a way that comports with the oversight principles that it thinks are important here." Oral Arg. Tr. at 25. But, as discussed below, since the appropriation's deadline to obligate the funds has passed, EPA retains at most a narrow authority to make "replacement" grants and cannot obligate the funds anew.

In any event, the district court had ample basis not to credit EPA's representations that it will spend the funds as Congress intended. The court observed EPA's track record throughout this case of making slanderous and insupportable public statements and disavowing them in court in favor of self-serving contradictory representations. The court knew that EPA instigated unsupported criminal and civil investigations to hunt for justifications to claw back Plaintiffs' money and observed that the agency remained unable to provide any

41

evidence to support its very public assertions of mismanagement and insufficient oversight. Presented with EPA's actions and its patent inability to justify them on any other basis, the district court was on unassailably solid evidentiary footing in finding that EPA's actions had nothing to do with its professed oversight concerns. EPA simply sought to "dismantle these grant programs in their entirety as a policy matter." *Climate United*, 778 F. Supp. 3d at 115.

EPA's "repeated[] represent[ations] that it planned to re-commit the funds," Maj. Op. 23, ring entirely hollow in light of its patent inability to do so. *See* Bagenstos Amicus Br. 3-11. It is an "elementary principle" of federal appropriations law that "a federal agency's budget authority lapses on the last day of the period for which funds were obligated." *W. Va. Ass'n of Cmty. Health Ctrs, Inc. v. Heckler*, 734 F.2d 1570, 1576 (D.C. Cir. 1984). Here, Congress specified that the appropriation for the Greenhouse Gas Reduction Fund would "remain available until September 30, 2024." 42 U.S.C. § 7434(a)(1), (2), (3). The appropriation thus expired on that date, after which EPA could no longer use the funding to incur new obligations. *See Off. of Nat. Res. Revenue-Coop. Agreements*, B-321297, 2011 WL 3343023, at *3 (Comp. Gen., Aug. 2, 2011).

Federal appropriations law thus bars EPA from terminating the awards and then re-obligating the funds to reconstitute the Greenhouse Gas Reduction Fund programs. "If an agency deobligates funds after the expiration of the period of availability, the funds are not available for new obligations." *Continued Availability of Expired Appropriation for Additional Project Phases*, B-286929, 2001 WL 717355, at *3 (Comp. Gen., Apr. 25, 2001). In other words, once EPA terminates the grant awards, it will no longer have the authority to make new grant awards to fulfill its statutory obligations. The majority suggests that Congress's repeal last month of the

42

Greenhouse Gas Reduction Fund could affect EPA's asserted authority to recommit the funds and thereby relieve it of any obligation to do so. Maj. Op. 25 n. 11. It does neither. The statute rescinds only "unobligated" funds: Obligated funds, like those at issue here, are unaffected. One Big Beautiful Bill Act (OBBBA), Pub. L. No. 119-21, § 60002, 139 Stat. 72, 155 (2025). *See generally* July 7, 2025, Neitzel Ltr. to Clerk of Court Cislak (noting that Senator Capito described the proposition that OBBBA might "claw back money" as "ridiculous") (quoting Josh Siegel, *Q&A: Sen. Shelley Moore Capito, incoming EPW chair*, (Nov. 20, 2024), https://perma.cc/T4KC-8MQ9). It is the federal appropriations rule, not the repeal legislation, that prevents EPA from recommitting the funds.

EPA's assertions that it will nonetheless fulfill Congress's plan by labeling its re-obligations as "replacement grants," Reply Br. 17, are empty promises. The majority, too, cites replacement-grant authority as evidence of EPA's intent to continue the program with new grantees rather than terminate it. Maj. Op. 24 & n.10. To qualify as a replacement grant, the re-obligation would have to be "substantially identical in scope and purpose to the original grant." *The Honorable Lawton Chiles U.S. Senate*, B-164031, 1976 WL 10353, at \*4 (Comp. Gen. June 25, 1976). Those requirements cannot be met by new grants that materially alter the financial structure, number of grantees, or other oversight controls—meaning that EPA would have to retain the very features it claims prompted the agency to interfere with Plaintiffs' grants. *See* NRDC Amicus Br. 9-13.

The majority reasons that, because "there is no evidence the agency sought to dismantle the programs without congressional approval, *In re Aiken County* cannot support the grantees' claims." Maj. Op. 26. The majority's factual premise

43

is unsupported, and the validity of Plaintiffs' separation of powers claim follows from *Aiken County*. We held in *Aiken County* that executive agencies violate the constitutional separation of powers when they refuse to spend money appropriated by Congress because they disagree with Congress's policy choice. 725 F.3d at 260. There, as here, Congress appropriated funds for a particular effort (there, assessing applications to store nuclear waste; here, making competitive grants) and set a statutory deadline for the agency to act. *Id*. at 257-58. When the agency refused to adhere to the statute due to "policy disagreement[s] with Congress," we held that refusal violated the Constitution, posing a threat to undermine "our constitutional system of separation of powers" that supported judicial intervention. *Id*. at 260, 267.

EPA's attempts to dismantle the statutorily mandated NCIF and CCIA programs due to the current agency leadership's policy disagreements with Congress run afoul of the Constitution in the same way. In rejecting Plaintiffs' separation of powers claim, the majority says that it is "declin[ing] to adopt a principle that would convert every statutory challenge to agency action into a constitutional claim." Maj. Op. 23. That may well be advisable, but it does not describe the rule of *Aiken County* that properly applies here. The majority cannot choose to "decline" to apply our binding precedent. Wherever the line between constitutional and statutory claims lies, *Aiken County* squarely holds that EPA's actions violated the Constitution.

## B.  Irreparable Injury and Balance of Equities

Baseless allegations of fraudulent or criminal activity, coupled with EPA's unfounded interference with Plaintiffs' grant funds, threaten enormous harm to Plaintiffs and, more importantly, to the communities, businesses, and individuals

44

across the United States who stand to benefit from the uses of the money that Congress prescribed. Without access to their grant awards, Plaintiffs are already out of money to make payments for rent, third-party contractors, and insurance policies critical to continue operating, and many of the Plaintiffs will permanently shutter in the coming months. Plaintiffs have already been forced to defer compensation for, lay off, withdraw offers from, and lose employees with specialized expertise that "cannot be replaced easily, if at all." Supp. Bafford Decl. ¶ 7 (J.A. 954).

Absent funding from Plaintiffs, major projects already underway will fold—projects intended to create demand for and boost the global competitiveness of U.S. advanced electric manufacturing capability, provide critically necessary affordable housing and infrastructure, lower energy costs, improve air quality, and reduce climate risks across the United States. If the agency succeeds in taking back the funding provided under the Act, many of those projects will not be able to raise capital from other sources and will irrevocably fail. That is particularly likely because Congress directed grantees to invest in "qualified projects that would otherwise lack access to financing." 42 U.S.C. § 7434(b)(1). As just a single example, one subgrantee community lender has set up projects to install clean-energy microgrids at churches, community centers, and nursing homes in rural Georgia, Mississippi, and Alabama to provide sustained power during outages of existing power sources. Without the subgrantee's promised funds, those projects are at risk of being left undone. The projects were intended to provide vulnerable populations with "energy independent safe havens for residents and community members" during increasingly common extreme weather events; instead, when blackouts inevitably happen, "[o]xygen machines that would be powered by solar panels during a blackout will turn off" and "[e]ssential medications that require

45

refrigeration will warm and spoil."  Parker Decl. ¶¶ 35-37 (J.A. 950).

EPA's unlawful actions are not just an enormous loss to Plaintiffs and the American people.  They defy Congress's objectives for authorizing and funding the Greenhouse Gas Reduction Fund: to provide financial assistance to pollution-reducing projects "in partnership with, and by leveraging investment from, the private sector."  42 U.S.C. § 7434 (c)(3)(A).  By directing Citibank to freeze Plaintiffs' money, the government is making it impossible for Plaintiffs to serve as reliable funding partners, ruining their prospects for securing future partnerships, favorable loan terms, qualified staff, and federal grant funding.  As one Plaintiff explained:

> To be an effective financing counterparty, CGC (or any organization) must have certainty of funding sources, be able to move efficiently and reliably in negotiations, and be viewed as credible by involved parties.  CGC is made ineffective if potential partners cannot rely on when CGC's capital will become available.  No credible counterparty will take this funding risk, or be willing to be associated financially with CGC.

Kauffman Decl. ¶ 13 (J.A. 429).  That reputational harm is devastating to Plaintiffs.  Because "part of [Plaintiffs'] purpose is to bridge market failures and attract private co-investment to projects that might otherwise be deemed too risky, confidence in [Plaintiffs'] commitments as . . . investor[s] is vital to achieving buy-in from private sector investors. . . .  The longer the freeze on [Plaintiffs'] funds continues, the more difficult it will be for [them] to originate deals and secure co-investors."  *Id*. ¶¶ 18, 23 (J.A. 430-31).  Worse, the agency's action contrary to Congress' enactment sets off a cycle of skepticism.

46

When Plaintiffs' hard-won partnerships with private investors and community lenders initially hesitant to fund clean-energy projects evaporate, those partners will be all the more reluctant to invest in similar ventures in the future. Plaintiffs "have had to work hard to build relationships and to earn a reputation as [] trustworthy, reliable lending institution[s]," and the "knock-on effects" of the damage EPA has caused to their reputations "will delay adoption and therefore achievement of GGRF's mission." Parker Decl. ¶¶ 25-26 (J.A. 947).

These harms are the very definition of irreparable injury. Once a lender's reputation as a stable source of promised funding is compromised, it is difficult, if not impossible, to repair. Indeed, investors and loan applicants have already pulled out of near-final agreements due to the uncertainty over whether Plaintiffs will be able to access their funds. Projects underway that miss key deadlines due to Plaintiffs' inability to make good on their loan commitments will be shut down permanently.

More broadly, the distrust bred by EPA's actions will make it exceedingly difficult to revive the coordination and cooperation between nonprofit organizations, private investors, private businesses, and community lenders critical to carrying out Congress's objective of building important projects at low public cost by spending government grant money to leverage private investment. What is more, without a court-ordered injunction, the government's actions portend that EPA will drain the money from Plaintiffs' accounts with no apparent avenue for Plaintiffs to reclaim it. Once EPA successfully terminates the awards and moves the funds back to Treasury—as it intends to do as soon as the district court's injunction is lifted, *see* Oral Arg. Tr. 4:14-16—it is unlikely that a court would be able to order their return to Plaintiffs or take any other action to fulfill the agency's congressional mandate. *See City*

47

*of Houston, Tex. v. Dep't of Hous. & Urb. Dev.*, 24 F.3d 1421, 1426 (D.C. Cir. 1994) (explaining that "a court cannot reach" funds that have reverted to Treasury "in order to award relief" when the appropriation authorizing their expenditure has expired); 42 U.S.C. § 7434(a) (appropriations for GGRF grant programs expired on September 30, 2024); *see also generally* Bagenstos Amicus Br. (explaining that EPA cannot re-obligate the grant funds, nor can a court order it to do so, because the appropriation authorizing those funds expired in September 2024). Under such circumstances, any eventual judicial declaration that the terminations were unlawful would be a hollow victory.

On the other side of the ledger, the government claims that allowing Plaintiffs to access their funding will cause "substantial and irreparable harm to the public fisc." Gov. Br. 41. But as the government itself submits, its "bases for termination were the grants' structure and terms" which "reflected no more than a decision based on reasons of policy," not anything to do with Plaintiffs' "noncompliance" or "conduct." PI Opp. 34-35, 38 (J.A. 503-04, 507) (internal quotation marks omitted). The government insists that it is "not accusing anybody of fraud." Oral Arg. Tr. 27:16. That is, the government no longer disputes that Plaintiffs are using the award funds as initially instructed by EPA, and as mandated by Congress. It is hard to see how the public is harmed by Plaintiffs' use of money allotted by Congress to carry out its duly enacted policies.

## C. Tucker Act

The government attempts to divert this court's attention from its brazenly unlawful actions by arguing that the district court lacked jurisdiction over Plaintiffs' APA claims. But the district court at a minimum had jurisdiction over Plaintiffs'

48

meritorious separation of powers claim.  That alone provides jurisdiction for the preliminary injunction.

In any event, the majority's conclusion that the Tucker Act bars Plaintiffs' arbitrary and capricious claim under the APA is wrong.  Plaintiffs are not seeking reinstatement of their grant awards or any other form of specific performance of contracts. Nor are they seeking payment of funds from the Treasury. Their suit challenges the government's decision to illegally seize their property—money in bank accounts opened in their names, in which the government has only a security interest (which it has not exercised).  The grant awards define that money as "gross income earned by" Plaintiffs, meaning that title to the money passed to Plaintiffs when the award funds were deposited in their Citibank accounts.  Grant Award at 53 (J.A. 1134) (quoting 2 C.F.R. § 200.1).

Plaintiffs' title to the funds in their accounts is cemented by the Account Control Agreements between Citibank, EPA, and each grantee, which specify that Citibank "maintains the Accounts for [Plaintiffs]," and that Plaintiffs are "the entitlement holder[s] with respect to all financial assets credited from time to time to the Accounts."  J.A. 1144. Citibank's status as a "fiduciary of the government," Maj. Op. 14—in which capacity it promises to maintain accounts for Plaintiffs, allow them to "access and use funds" in their accounts, and provide view access to EPA, Financial Agency Agreement Ex. A §§ I.A.1, I.D.1 (J.A. 2145, 2149)—changes nothing about Plaintiffs' title to the money in their accounts. That Citibank has a contractual obligation to the government to serve as a custodian of Plaintiffs' funds does not mean that the government owns the funds.

Indeed, Plaintiffs' title to the award funds, which allows the award to serve as a liquid asset instead of an inherently

49

risky "expected income stream," is critical to Congress's decision to equip grantees to attract private investment and is one of the reasons EPA selected the financial agent structure. Impact Finance Experts Amicus Br. 3, 7-14. Plaintiffs thus seek an equitable remedy "for the recovery of *specific property or monies*," which stands in contradistinction to money damages, *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988) (internal quotation marks omitted) (emphasis added), the "prototypical contract remedy," *Crowley*, 38 F.4th at 1107.

The nature of the relief that Plaintiffs seek—recovery of property that is lawfully theirs—suffices to resolve the Tucker Act question against the government. *Land v. Dollar*, 330 U.S. 731 (1947), reflects that longstanding principle. There, the plaintiff sought an injunction preventing the U.S. Maritime Commission from selling shares of stock that the plaintiff alleged it owned under a contract with the Commission. *Id*. at 734. The Court held that the district court had jurisdiction over the case even though the plaintiff's alleged right to the disputed property originated in a contract and depended on interpreting the contract in its favor. The Court nonetheless recognized that the plaintiff's "claim rests on [its] right under general law to recover possession of specific property wrongfully withheld"—a claim sounding in tort, not contract. *Id*. at 735-36. That was so even though the government possessed and had "record title" to the property. *Id.* at 737. As the Court explained:

> [P]ublic officials may become tort-feasors by exceeding the limits of their authority. And where they unlawfully seize or hold a citizen's realty or chattels, recoverable by appropriate action at law or in equity, he is not relegated to the Court of Claims to recover a money judgment. The dominant interest of the sovereign is then on the side of the victim who

50

>may bring his possessory action to reclaim that which
>is wrongfully withheld.

*Id.* at 738.

We acknowledged in *Megapulse, Inc. v. Lewis* the line drawn in *Land v. Dollar* between claims to property acquired by contract—which may proceed in district court—and claims to enforce rights to contractual proceeds, which must proceed in the Court of Claims under the Tucker Act: "The Supreme Court many years ago recognized a private party's cause of action outside the Tucker Act to challenge the statutory authority of federal officials to claim ownership rights in property allegedly transferred during the course of a contract." 672 F.2d at 968-69. That principle confirms the district court's jurisdiction here. Moreover, these cases underscore that a claim to recover property need not be framed as an unconstitutional taking to proceed in district court.

Plaintiffs claim that EPA has unlawfully interfered with their previously disbursed funds in violation of, *inter alia*, the APA. Appellee Br. at 15. Plaintiffs assert that EPA has "unlawfully seize[d]" their property, and they seek an injunction to "reclaim that which is wrongfully withheld." *Dollar*, 330 U.S. at 738. This case is even clearer in that regard than *Land v. Dollar* itself, because the government has neither title to nor possession of the disputed funds. Plaintiffs' action is one to recover their property. It does not seek any money from the Treasury. It is not a contract action so is not "relegated to the Court of Claims." *Id*. As in *Megapulse*, Plaintiff's "position is ultimately based, not on breach of contract, but on an alleged governmental infringement of property rights and violation of [a statute]." 672 F.2d at 969.

The Supreme Court itself recently recognized that distinction in *Department of State v. AIDS Vaccine Advocacy*

51

*Coalition*, where it declined to stay a district court order requiring the government to issue payments owed to plaintiffs for foreign aid work they had already completed. 145 S. Ct. 753 (2025). The government argued there, as here, that the plaintiffs essentially sought to enforce a government contract so must proceed, if at all, in the Court of Claims. *See id.* at 756 (Alito, J., joined by Thomas, Gorsuch, and Kavanaugh, JJ., dissenting from the denial of the application to vacate the district court's order). The Court was unpersuaded that the government thus was likely to establish a sovereign immunity bar against the district court's jurisdiction. *Id.* at 753. Like the grantees here, the plaintiffs in *AIDS Vaccine Advocacy Coalition* brought APA and constitutional challenges to defendants' interference with their existing entitlement to grant funding. Their claims depended not on breach of their contracts, but on the unlawfulness of the government's actions. The district court's jurisdiction over Plaintiffs' APA and constitutional claims here is even clearer than it was in *AIDS Vaccine Advocacy Coalition*, because here, unlike there, payment was already made.

Those same facts—that Plaintiffs seek an injunction preventing the government from interfering with money the government has already properly disbursed to them—renders inapplicable the Supreme Court's emergency stay orders in *National Institutes of Health v. American Public Health Ass'n*, No. 25-A-103, 2025 WL 2415669 (Aug. 21, 2025), and *Department of Education v. California*, 145 S. Ct. 966 (2025). I respect the reasoning of those orders where they apply, but no part of the district court's injunction in this case "order[s] the payment of money" from the Treasury or requires the government to "pay out past-due grant obligations" or to "continue paying obligations as they accrue." *Dep't of Ed.*, 145 S. Ct. at 968. And, unlike plaintiffs in *National Institutes of Health*, Plaintiffs here need not seek to enforce the

52

government's "obligation to pay money," 2025 WL 2415669, at *1, because these Plaintiffs' money was already paid before Defendants interfered with it.

Rather, what Plaintiffs seek here is to unfreeze their funds and to enjoin EPA from unlawfully interfering with them based on the President's announced policy disagreement with Congress's objectives. In doing so, Plaintiffs challenge EPA's decision to replace Congress's legislated policy choice with one aligning with the President's directions. *See* Executive Order 14154 (ordering agencies to "Terminat[e] the Green New Deal" by stopping the "disbursement of funds"); J.A. 507 (Defendants opposition to motion for preliminary injunction describing contract terminations as "reflect[ing] no more than a decision based on reasons of policy") (internal quotation marks omitted); *Climate United*, 778 F. Supp. 3d at 115-16 (finding that EPA "seeks to dismantle these grant programs in their entirety as a policy matter"). To the extent *National Institutes of Health* applies here, it *supports* the district court's jurisdiction over the policy-based interference with Plaintiffs' funds. *See National Institutes of Health*, 2025 WL 2415669, at *2 (Barrett, J., concurring) (asserting that a district court likely has jurisdiction over challenges to an agency's policies).

Binding precedent of this court anchors the district court's jurisdiction. Our "longstanding test for determining whether a claim falls within the exclusive jurisdiction of the Claims Court pursuant to the Tucker Act" confirms that the Tucker Act does not displace the district court's jurisdiction over Plaintiffs' arbitrary and capricious claim. *Crowley*, 38 F.4th at 1106. We explained in *Megapulse* that, in order to preserve the Court of Claims' exclusive jurisdiction over "actions based on government contracts," a plaintiff whose "claims against the United States are essentially contractual" cannot be allowed to "avoid the jurisdictional (and hence remedial) restrictions of

53

the Tucker Act by casting its pleadings in terms that would enable a district court to exercise jurisdiction under a separate statute." 672 F.2d at 967. Whether a "particular action" is "'at its essence' a contract action depends both on [1] the source of the rights upon which the plaintiff bases its claims, and upon [2] the type of relief sought (or appropriate)." *Id*. at 968. That is a flexible, context-specific inquiry that directs us to "determine if the claim so clearly presents a disguised contract action that jurisdiction over the matter is properly limited to the Court of Claims." *Id*.

Starting with the first prong, to determine whether the "source of the rights" of a claim is contractual, we consider whether the plaintiff's arguments turn on the terms of the contract. In *Perry Capital LLC v. Mnuchin*, for instance, we concluded that the plaintiff's claims were not "a disguised contract action" because the plaintiff did not "seek to enforce any duty imposed upon [the government] by the [relevant contract]," nor did it "contend [the government] breached the terms" of the contract or "invoke" the contract in any other meaningful way. 864 F.3d 591, 619 (D.C. Cir. 2017) (internal quotation marks omitted). Similarly, in *Megapulse*, we were "convinced" that the plaintiff's claims were not "disguised" contract claims by the fact that the plaintiff did not "claim a breach of contract" and based its "request for relief" on non-contractual documents. 672 F.2d at 969.

Plaintiffs' APA challenge to Defendants' arbitrary and capricious action is clearly not a "disguised contract action." Their claim is not premised on EPA's violation of the grant agreements' termination provisions, nor on its failure to perform any duty "imposed" on EPA by the grant award. Rather, Plaintiffs assert that they are entitled to relief because EPA froze and seeks to seize their funds based on pretextual, internally inconsistent, and unfounded reasons. *See, e.g.*,

54

Plaintiffs' Mot. for Preliminary Injunction (PI Mot.) 29 (J.A. 327) (arguing that "the record leading up to the termination"— for example, the fact that EPA purported to terminate the grants several days after professing a "lack of critical information" about "*concerns* regarding *potential* fraud" that would be informed by an ongoing compliance review—"highlights the pretextual nature of EPA's stated invocation of waste, fraud, and abuse"). According to Plaintiffs, and as supported by the record, EPA acted entirely outside the bounds of acceptable agency action by first deciding to seize the money Plaintiffs had been awarded and then casting about for after-the-fact justifications—including pressuring Citibank into freezing Plaintiffs' funds without any basis, notice, or explanation, and directing DOJ and FBI to open criminal investigations into Plaintiffs' grant performance without probable cause, or any grounds whatsoever. *See* PI Mot. 1-4 (J.A. 299-302).

That is precisely the type of arbitrary and capricious action the APA is designed to address. As the Supreme Court explained in *Department of Commerce v. New York*, agency action is arbitrary and capricious when the agency's "stated rationale was pretextual," because "contrived reasons . . . defeat the purpose of" the "reasoned explanation requirement of administrative law." 588 U.S. at 773-74, 785. The non-contractual "essence" of Plaintiffs' APA claim has been clear since Plaintiffs filed their complaint and sought a preliminary injunction. They have from the outset sought to show that EPA's vague, unsupported, and irrational justifications are merely "pretextual cover to shut down a program approved by Congress that the new Administration does not like." PI Mot. 29 (J.A. 327). That was clear to the district court from the very first hearing. *See* Mar. 12 TRO Hr'g Tr. 9:17-18 (J.A. 182) (district court observing that the terminations have "a ready, fire, aim" feel). Plaintiffs seek relief based on a quintessential claim of arbitrary and capricious agency action. The APA, and

55

not the contractual terms of the grants EPA awarded them, is the "source of the rights upon which the plaintiff bases its claims." *Megapulse*, 672 F.2d at 968.

As for the second prong of the *Megapulse* analysis—the "type of relief sought"—we have described the "crux of this inquiry" as "boil[ing] down to whether the plaintiff effectively seeks to attain . . . monetary relief from the federal government." *Crowley,* 38 F.4th at 1107. As explained above, Plaintiffs do not seek money from the Treasury; they seek only to get the government's hands off their money. To the extent the injunction preventing the government from interfering with or seizing their funds "require[s] the same governmental restraint that specific []performance might require in a contract setting," that is an "insufficient basis to deny a district court the jurisdiction otherwise available and the remedial powers otherwise appropriate." *Megapulse*, 672 F.2d at 971.

Both prongs of the *Megapulse* analysis thus point to the same conclusion: Plaintiffs' claim of arbitrary and capricious agency action is not a "disguised" contract action that must be heard by the Court of Claims. That conclusion comports with our longstanding recognition that the Tucker Act was a response to "congressional intent to provide a single, uniquely qualified forum for the resolution of contractual disputes." *Ingersoll-Rand*, 780 F.2d at 78. The "unique expertise of the Court of Claims" lies in its "knowledge of the government contracting process," *id*.; it is a "specialized forum" for awarding "damages for the Government's past acts," *Bowen*, 487 U.S. at 905 n.42, 908 (internal quotation marks omitted).

It is far outside the specialized expertise of the Court of Claims to resolve these Plaintiffs' request for injunctive relief halting EPA's naked pursuit of its preferred policy outcome in disregard for the evidence before it and its statutory mandate.

56

Plaintiffs' claim that EPA violated the APA's ban on arbitrary and capricious agency action—a claim for which they seek injunctive relief, not payment from the Treasury—is well within the district court's remit.

That Plaintiffs would have no right to the money to begin with but for the grant awards, which are government contracts, does not alter that conclusion.  We have squarely held that the fact that a plaintiff "would have no claims to assert" absent a government contract does not mean that the plaintiff asserts a "contract right."  *Crowley*, 38 F.4th at 1110 (explaining that imposing such a "'but-for' test for identifying the source of the right . . . contravenes *Megapulse*'s express rejection of the argument that the mere existence of such contract-related issues converts the action to one based on the contract") (internal quotation marks omitted); *see also Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 610 (D.C. Cir. 1992) ("[L]itigants may bring statutory and constitutional claims in federal district court even when the claims depend on the existence and terms of a contract with the government."), *abrogated on other grounds as recognized in Perry Capital*, 864 F.3d at 620.

At bottom, the government suggests that Plaintiffs' real complaint is that EPA terminated their grant awards—not that it acted arbitrarily and capriciously in doing so—making its claim "in essence" a contract claim.  It is obviously true that Plaintiffs are injured by the terminations.  But it does not follow that Plaintiffs therefore assert contractual claims.  When EPA began its campaign to undo the GGRF, it had already performed on the contracts by disbursing the funds, which by then belonged to Plaintiffs.  The fact that those funds may only be used in accordance with grant terms does not mean Plaintiffs' only legal right to protect them arises from contract.  As explained above, Plaintiffs' theory of relief is that EPA

57

carried out the funding freeze and purported terminations to replace Congress's policy choice with its own preferred approach, without regard for whether its actions were supported by evidence or reason. That is a classic claim of arbitrary and capricious agency action in violation of the APA. That is what makes the APA, and not their grant awards, the "source of the rights upon which the plaintiff[s] base[] [their] claims." *Megapulse*, 672 F.2d at 968.

Because Plaintiffs bring legitimate APA and constitutional claims over which the district court has jurisdiction, I would not reach their *ultra vires* theory. But to the extent the majority concludes that Plaintiffs' *ultra vires* claim fails because Plaintiffs "essentially" allege only a breach of contract, the majority errs. Maj. Op. 21-22. For all the reasons discussed above, Plaintiffs' claims are not "essentially" contractual.

Citing *Ingersoll-Rand*, the majority posits that Plaintiffs' allegations of pretextual agency action are contract claims because "that challenge turns, in substance, on principles of federal contract law"—that is, Plaintiffs' pretext argument could be rephrased as a claim that EPA "dishonor[ed], with impunity, its contractual obligations." Maj. Op. 17. But Plaintiffs' APA claim is not "essentially" contractual just because EPA's arbitrary and capricious action included grant terminations. The majority appears to read *Ingersoll-Rand* as establishing a rule that any claim that could be reconceptualized as a contractual violation that overlaps even in part with the claim Plaintiffs actually bring is necessarily a disguised contract claim. *See* Maj. Op. 16. *Ingersoll-Rand* announces no such rule, and any effort to interpret it to do so squarely conflicts with our binding precedent.

In *Ingersoll-Rand*, the government terminated its contract with the plaintiff "for convenience," as allowed under the terms

58

of the contract. *Id*. at 75. The plaintiff sued, alleging that the termination violated several regulations constraining the government's ability to cancel and administer federal acquisition contracts, and that those regulatory violations meant that the termination was arbitrary and capricious. *Id*. at 77. We held that the "essential rights at stake" were contractual because the regulations themselves—the violation of which was allegedly arbitrary and capricious—concerned the conditions under which the government could terminate the contract. *Id*. at 77-78. In effect, the plaintiff had relied on regulations circumscribing the government's behavior during the solicitation and performance of contracts to challenge the validity of the contract's termination-for-convenience provision. The plaintiff's claim thus "call[ed] for knowledge of the government contracting process" and fell "within the unique expertise of the Court of Claims." *Id*. at 78. In that context, in which the plaintiff's claim centered on the intricacies of the government's contracting process and the interaction between contracting regulations and the terms of the plaintiff's contract, it made sense to hold that the plaintiff's ability to "challenge the termination based solely on contract principles" supported our determination that its claim "sound[ed] genuinely in contract." *Id*. (internal quotation marks omitted).

*Ingersoll-Rand* thus establishes that claims that invoke regulations governing federal contracting to challenge government action taken pursuant to a contract are "in essence" contractual and belong in the Court of Claims, where that court's expertise in government contracting is particularly relevant. And it supports the majority's conclusion that claims based on violations of regulations governing termination procedures are "in essence" contract claims, which is likely correct. *See* Maj. Op. 11-13. But that does not describe Plaintiffs' arbitrary and capricious claim. *Ingersoll-Rand*

59

decidedly does not stand for a general rule that any claim that could have been framed as a breach of "principles of federal contract law" must be brought in the Court of Federal Claims" Maj. Op. 17—a rule that could not be squared with our other relevant decisions.

That is illustrated most clearly by *Sharp v. Weinberger*, 798 F.2d 1521 (D.C. Cir. 1986), a decision authored by then-Judge Scalia and decided the year after *Ingersoll-Rand*. The plaintiff in *Sharp* challenged a Department of Defense policy removing him from the Ready Reserve where he served pursuant to a contract—the Ready Reserve Service Agreement. 798 F.2d at 1521-23. The plaintiff alleged that the policy breached his contract and violated a statute governing the Ready Reserve, and that the contract gave him a "vested property interest" in serving in the reserves that the government "sought to deny without due process." *Id*. at 1523. The plaintiff's requested relief included a declaration that the policy was "contrary to statute or in the alternative that it effects a material breach of the Ready Reserve Service Agreement," as well as a declaration that the government's "failure to honor the terms of that contract deprived [the plaintiff] of due process." *Id*. We held that, while the Tucker Act barred the district court's jurisdiction over the plaintiff's breach of contract claim, it did not displace the district court's jurisdiction over the plaintiff's claims that the policy was "contrary to regulations, statutes and the Constitution." *Id*.; *accord Transohio*, 967 F.2d at 610. That is, the plaintiff's statutory, regulatory, and constitutional claims that he had been unlawfully deprived of his contractual right to serve in the Ready Reserve were not "in essence" contractual even though his right to serve in the first place depended on contract, and he expressly brought one claim as a pure breach of contract.

60

The majority's view of *Ingersoll-Rand* cannot be reconciled with *Sharp*. Allen Sharp's statutory, regulatory, and constitutional claims not only could be based on contract principles, but in fact *were* also framed that way. If the majority's rule were right, the district court could not have exercised jurisdiction over his due process claim. The same analysis is confirmed in *Megapulse* itself. There, the plaintiff alleged that the government's plan to distribute his data violated the Trade Secrets Act and deprived him of his property without due process. 672 F.2d at 962-63. That claim, too, could have been based solely on contract principles, as the government had made a contractual promise not to disseminate the plaintiff's "limited rights" data. *Id*. at 962. But that counterfactual did not preclude us from holding—nor even factor into our conclusion—that the district court had jurisdiction over the plaintiff's claim. *See id*. at 966-71.

Indeed, in *Megapulse*, we expressly rejected the idea that the Tucker Act means that "an agency action may not be enjoined, even if in clear violation of a specific statute, simply because that same action might also amount to a breach of contract." *Id*. at 971. Rather, district courts have jurisdiction over and can enjoin agency action that violates the APA, even if that action also "amounts to" a breach of contract. *Id.* That is the situation here: Plaintiffs claim that EPA's termination was arbitrary and capricious because it relied on pretextual and unsupported justifications, not because it violated the grant award's termination provision. The fact that the government's arbitrary and capricious decision making could be reframed as a claim that "EPA acted with 'impunity' when terminating the grants" does not transform the claim into a contract action.

In relegating to the Court of Claims any statutory, regulatory, or constitutional claim merely because it arguably could to some extent be reframed as a contract action, the

61

majority's rule precludes district court jurisdiction and injunctive relief for a wide swath of claims that—like Plaintiffs' claim that EPA's actions to freeze their accounts and terminate their grants were arbitrary and capricious—are simply not contract claims. Such a rule effects an unprecedented expansion of the Tucker Act that is divorced from the "congressional intent to provide a single, uniquely qualified forum for the resolution of contractual disputes," *Ingersoll-Rand*, 780 F.2d at 78, and it strips district courts of jurisdiction over all manner of claims over which they have the relevant expertise. It also threatens to "preclude any review at all of constitutional claims seeking equitable relief, where the constitutional claims stem from contracts," thereby raising "serious constitutional question[s]." *Transohio*, 967 F.2d at 611 (internal quotation marks omitted). And it flies in the face of our cases' longstanding refrain that "the mere fact that a court may have to rule on a contract issue does not, by triggering some mystical metamorphosis, automatically transform an action . . . into one on the contract and deprive the court of jurisdiction it might otherwise have." *Crowley*, 38 F.4th at 1107 (quoting *Megapulse*, 672 F.2d at 968). Such a rule is unsupported by our precedent, prevents the court from making "rational distinctions between actions sounding genuinely in contract and those based on truly independent legal grounds," and runs directly counter to our acknowledgement that, "[a]lthough it is important on the one hand to preserve the Tucker Act's limited and conditioned waiver of sovereign immunity in contract actions, we must not do so in terms so broad as to deny a [district] court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government." *Megapulse*, 672 F.2d at 968-70.

As applied in this case, the majority's conclusion that Plaintiffs' claims are merely contract claims ignores what the

62

agency did and describes a claim that Plaintiffs did not bring.
This case is not an attempt to reframe EPA's termination or
violation of some grant awards as unlawful agency action.
Indeed, throughout this litigation, there has hardly been any
dispute that the government *did* breach the terms of the grant
awards. That is not what this case is about. Plaintiffs challenge
EPA's asserted power to take baseless and unjustifiable actions
to pursue its desired ends—here, the termination of the grant
awards—regardless of the means it must employ to get there.
It is beyond dispute that questions of such significance to the
way our government operates are not relegated to the exclusive
jurisdiction of the Court of Claims.

## CONCLUSION

Embracing a misguided and breathtakingly expansive
conception of the Tucker Act, the majority allows the
government to seize Plaintiffs' money based on spurious and
pretextual allegations and to permanently gut implementation
of major congressional legislation designed to improve the
infrastructure, health, and economic security of communities
throughout the country. The injunction the district court put in
place is eminently supported by Plaintiffs' likelihood of
success on both their APA and constitutional claims, the
irreparable harm that will befall them, and the unlawful
nullification of Congress's duly enacted policy—all of which
inure to the detriment of the American people. I respectfully
dissent.

**CERTIFICATE OF SERVICE**

I hereby certify that on September 10, 2025, I caused a copy of the foregoing petition for rehearing en banc to be electronically filed with the Clerk of the Court for the U.S. Court of Appeals for the District of Columbia Circuit by using the Court's CM/ECF system.  I further certify that all participants are registered CM/ECF users, and service will be accomplished electronically by the CM/ECF system.

Dated:  September 10, 2025                        */s/* Diana L. Kim