IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

CLIMATE UNITED FUND, *et al.*,

Plaintiffs-Appellees,

v.

CITIBANK, N.A., *et al.*,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

EN BANC BRIEF FOR THE UNITED STATES

———————————

BRETT A. SHUMATE
  *Assistant Attorney General*

YAAKOV M. ROTH
  *Principal Deputy Assistant*
  *Attorney General*

DANIEL TENNY
SOPHIA SHAMS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7213*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-2495*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

A.    Parties and Amici

Plaintiffs-appellees are Climate United Fund; Coalition for Green Capital; Power Forward Communities, Inc.; California Infrastructure and Economic Development Bank; Minnesota Climate Innovation Finance Authority; Efficiency Maine Trust; Illinois Finance Authority; Justice Climate Fund; and Inclusiv, Inc.  Defendants-appellants are the Environmental Protection Agency; Lee Zeldin, in his official capacity as Administrator of the Environmental Protection Agency; and Citibank, N.A.

B.    Rulings Under Review

Under review is an order issued by Judge Tanya S. Chutkan on April 15, 2025, JA961, and the accompanying memorandum opinion filed April 16, 2025, JA66, granting plaintiffs' motion for a preliminary injunction.

C.    Related Cases

This case was not previously before this Court or any court other than the district court.  Counsel is aware of no related cases within the meaning of D.C. Cir. R. 28(a)(1)(C).

*/s/ Sophia Shams*
Sophia Shams

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................. iii

GLOSSARY .................................................................................................. vii

INTRODUCTION ............................................................................................ 1

STATEMENT OF JURISDICTION ................................................................. 4

STATEMENT OF THE ISSUES .................................................................... 4

PERTINENT STATUTES AND REGULATIONS ........................................... 5

STATEMENT OF THE CASE ....................................................................... 5

    A.    Statutory and Factual Background ................................................. 5

    B.    Procedural Background ................................................................ 12

SUMMARY OF ARGUMENT ....................................................................... 18

STANDARD OF REVIEW ........................................................................... 22

ARGUMENT ............................................................................................... 22

    I.    Plaintiffs Are Not Likely To Succeed On Their Claims .................... 22

    A.    Plaintiffs' APA claims are in essence contract
        claims that must be brought in the Court of
        Federal Claims. ........................................................................... 23

    B.    Plaintiffs' constitutional claims and *ultra vires* claims mirror
        their APA claims and cannot support the injunction. .................... 44

II.     The Remaining Injunction Factors Overwhelmingly
        Weigh Against An Injunction ............................................................. 55

CONCLUSION ............................................................................................ 59

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Aiken County, In re,*
   725 F.3d 255 (D.C. Cir. 2013)..................................................49, 50

*Albrecht v. Committee on Emp. Benefits of the Fed.*
   *Reserve Emp. Benefits Sys.,*
   357 F.3d 62 (D.C. Cir. 2004)....................................................25, 38

*Atlas Air, Inc. v. Int'l Bhd. of Teamsters,*
   928 F.3d 1102 (D.C. Cir. 2019)......................................................22

*Bennett v. Kentucky Dep't of Educ.,*
   470 U.S. 656 (1985) ................................................................36, 37

*Boaz Housing Auth. v. United States,*
   994 F.3d 1359, 1368 (Fed. Cir. 2021).............................................28

*Buchanan v. Alexander,*
   45 U.S. (4 How.) 20 (1846) ..........................................................41

*California v. U.S. Dep't of Educ.,*
   132 F.4th 92 (1st Cir. 2025)...........................................................27

*City of Chicago v. U.S. Dep't of Homeland Sec.,*
   No. 25 C 5463, 2025 WL 3043528 (N.D. Ill. Oct. 31, 2025) ...........32

*Crowley Gov't Servs., Inc. v. General Servs. Admin.,*
   38 F.4th 1099 (D.C. Cir. 2022) ...........................................24, 25, 26

*Dalton v. Specter,*
   511 U.S. 462 (1994) ................................................................44, 45

*Dep't of Educ. v. California,*
   604 U.S. 650 (2025) ..........................................2, 3, 22, 26, 27, 54, 55, 57

*Federal Express Corp. v. U.S. Dep't of Com.,*
   39 F.4th 756 (D.C. Cir. 2022) ........................................................51

*Global Health Council v. Trump,*
   153 F.4th 1 (D.C. Cir. 2025) ..........................................................45

*Ingersoll-Rand Co. v. United States,*
      780 F.2d 74 (D.C. Cir. 1985)..........................................25, 29, 30, 33, 34, 36, 54

*James v. Caldera,*
      159 F.3d 573 (Fed. Cir. 1998)......................................................................25, 38

*Joliet-Will Cnty. Cmty. Action Agency, In re,*
      847 F.2d 430 (7th Cir. 1988) ...............................................................................41

*Land v. Dollar,*
      330 U.S. 731 (1947)................................................................................................43

*Larson v. Domestic & Foreign Com. Corp.,*
      337 U.S. 682 (1949) .........................................................21, 23, 44, 52, 53, 54

*Maryland Dep't of Hum. Res. v. Department of Health & Hum. Servs.,*
      763 F.2d 1441 (D.C. Cir. 1985) ...........................................................36, 36-37

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
      567 U.S. 209 (2012) ..........................................................................................24, 38

*Megapulse, Inc. v. Lewis,*
      672 F.2d 959 (D.C. Cir. 1982).....................................................25, 26, 28, 31

*Mexichem Specialty Resins, Inc. v. EPA,*
      787 F.3d 544 (D.C. Cir. 2015).....................................................................55, 56

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n,*
      145 S. Ct. 2658 (2025)................................2, 3, 22, 26, 27, 28, 30, 32, 42, 55, 57

*North Am. Butterfly Ass'n v. Wolf,*
      977 F.3d 1244 (D.C. Cir. 2020).................................................................51, 52

*Nuclear Regul. Comm'n v. Texas,*
      605 U.S. 665 (2025) ................................................................................................51

*Office of Pers. Mgmt. v. Richmond,*
      496 U.S. 414 (1990) ...............................................................................................44

*Roedler v. Department of Energy,*
      255 F.3d 1347 (Fed. Cir. 2001)........................................................................31

*Sharp v. Weinberger,*
      798 F.2d 1521 (D.C. Cir. 1986).................................................................34, 35

*Spectrum Leasing Corp. v. United States*,
  764 F.2d 891 (D.C. Cir. 1985)........................................................28, 29, 30, 33, 47

*Trump v. Boyle*,
  145 S. Ct. 2653 (2025)........................................................................................57

*U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*,
  770 F. Supp. 3d. 155 (D.D.C. 2025),
  *injunction pending appeal denied per curiam*,
  Order, No. 25-5066 (D.C. Cir. Mar. 28, 2025) ................................................30

*U.S. Dep't of Just. v. FLRA*,
  981 F.2d 1339 (D.C. Cir. 1993)........................................................................52

*United States v. Winstar Corp.*,
  518 U.S. 839 (1996) ..........................................................................................39

*Vera Inst. of Just. v. U.S. Dep't of Just.*,
  No. 25-cv-1643, 2025 WL 1865160 (D.D.C. July 7, 2025) ..............................32

**U.S. Constitution:**

Art. I, § 9, cl. 7 ......................................................................................................44

Art. II, § 3 ..............................................................................................................45

**Statutes:**

Administrative Procedure Act (APA),
  5 U.S.C. § 702 ..........................................................................................16, 24, 38

Tucker Act:
  28 U.S.C. § 1491(a) ..................................................................................16, 28, 37
  28 U.S.C. § 1491(a)(1) ......................................................................................25

Pub. L. No. 119-21, tit. VI, 139 Stat. 72 (2025) ............................................15, 49

28 U.S.C. § 1292(a)(1) ............................................................................................4

28 U.S.C. § 1331 ......................................................................................................4

42 U.S.C. § 7434(a)-(b) ........................................................5

42 U.S.C. § 7434(a)(1) ........................................................5

42 U.S.C. § 7434(c)(3) ........................................................5

42 U.S.C. § 10134(d) .........................................................49

**Regulations:**

2 C.F.R. § 200.340(a)(4) ....................................................36

2 C.F.R. § 200.343 ..........................................................41

2 C.F.R. § 200.403(a)-(b) ...................................................41

2 C.F.R. §§ 200.339-200.341 ..................................................6

**Rule:**

Fed. R. Civ. P. 65(c) ........................................................14

**Legislative Material:**

171 Cong. Rec. S4080 (daily ed. June 30, 2025) ..........................16, 49

**Other Authorities:**

B-322628, *Department of Labor—Replacement Grants* (Aug. 3, 2012) .........................................................48

EPA, *General Terms and Conditions* (eff. Oct. 1, 2023), https://perma.cc/DE84-46AD ................................................7

EPA, *General Terms and Conditions* (eff. Oct. 1, 2024), https://perma.cc/PD9W-M2UP ................................................10

## GLOSSARY

Administrative Procedure Act                                   APA

Clean Communities Investment Accelerator       CCIA

Environmental Protection Agency                          EPA

Greenhouse Gas Reduction Fund                     GGRF

Inflation Reduction Act                                        IRA

National Clean Investment Fund                       NCIF

National Institutes of Health                           NIH

**INTRODUCTION**

This case involves nearly $20 billion in grants that the Environmental Protection Agency (EPA) awarded in 2024, under a Clean Air Act provision enacted as part of the Inflation Reduction Act (IRA).  Following a review by its new leadership after the 2025 presidential transition, EPA determined that the grant agreements—which employed a highly unusual structure that deprived EPA of meaningful oversight, and which were hurriedly amended between the presidential election and the transition in a way that purported to further limit EPA's rights—should be terminated because they were inconsistent with the public interest and the agency's priorities.  But the district court below enjoined EPA from terminating the grants, thereby giving plaintiffs access to billions of dollars in taxpayer funds for years to come.  A panel of this Court administratively stayed that injunction and, following briefing and argument on the merits, vacated it.

The panel's decision was correct and should be reinstated en banc. Plaintiffs principally challenge the terminations as arbitrary and capricious under the Administrative Procedure Act (APA), yet the Supreme Court has twice explained in the past year that the APA "does not provide" federal district courts "with jurisdiction to adjudicate claims 'based on' … grants" or

to "order relief designed to enforce any 'obligation to pay money' pursuant to those grants." *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2658 (2025) (*NIH*) (quoting *Dep't of Educ. v. California*, 604 U.S. 650 (2025) (per curiam)). Breach-of-contract claims against the government must be brought in the Court of Federal Claims, which can award only monetary damages. Grantees may not evade these jurisdictional and remedial limits by recasting a breach-of-contract suit as a challenge to "arbitrary" agency action. That is precisely what plaintiffs here seek to do. They argue that EPA's termination of their grants was inconsistent with the terms and conditions of those agreements, and they demand (and obtained) relief amounting to specific performance. These are quintessential breach-of-contract claims over which the district court lacked jurisdiction.

Plaintiffs also claim to be vindicating other, non-contractual statutory or constitutional rights, but nothing in the Constitution or any statute bars EPA from terminating the grants. The district court perceived a separation-of-powers violation on the premise that EPA intended to abandon the IRA's program entirely. But EPA made clear that it was terminating plaintiffs' agreements because of grave concerns regarding how those particular grants were allocated and structured, and that it intended to re-obligate the funds in

a more responsible manner.  That plan has been upended only because Congress has since *repealed* the underlying IRA provision and rescinded all unobligated balances from the appropriated funds.  It would be a most perverse separation-of-powers ruling to compel EPA to proceed with billion-dollar agreements even after Congress has acted to end the entire program and claw back as much of this money as possible.  If anything, separation-of-powers concerns reaffirm that the injunction should be vacated.

The equities also weigh decisively against the injunction.  Plaintiffs are poised to withdraw hundreds of millions of dollars from the grant accounts, and any funds disbursed are highly unlikely to be recouped even if EPA later prevails—a point that neither plaintiffs nor the district court have disputed.  The potential irrecoverable loss of billions of dollars is alone sufficient to preclude preliminary injunctive relief.  *NIH*, 145 S. Ct. at 2658; *California*, 604 U.S. at 651-52.  Meanwhile, plaintiffs face only monetary harm of a kind that would be reparable at the end of litigation.  Tellingly, despite their warnings about imminent existential harm absent immediate access to the funds, no such harm appears to have materialized over the past ten months.

For these reasons, this Court should vacate the district court's preliminary injunction.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331, but the government contests jurisdiction as explained below, *see infra* pp. 23-43. The district court granted a preliminary injunction on April 15, 2025. JA961-63. The government filed a timely notice of appeal on April 16, 2025. JA964. This Court accordingly has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

This case arises from EPA's decision to terminate grant agreements it determined were deeply flawed and no longer served the public interest or agency priorities. The issues presented are:

1. Whether the district court had jurisdiction over plaintiffs' APA claims challenging EPA's termination of their grant agreements and seeking an injunction requiring EPA and its fiscal agent to resume disbursing funds under those agreements.

2. Whether the injunction can be justified on the theory that EPA's decision to terminate the grant agreements and re-obligate the funds violates the Constitution or constitutes *ultra vires* action.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum.

## STATEMENT OF THE CASE

### A.     Statutory and Factual Background

**1.**  In August 2022, Congress enacted Section 134 of the Clean Air Act, which appropriated $27 billion for the Greenhouse Gas Reduction Fund (GGRF).  Congress provided that these funds would be available to "make grants" to "eligible recipients" for purposes of investing in "qualified projects," which it defined as "any project, activity, or technology" aimed at "reduc[ing] or avoid[ing] greenhouse gas emissions and other forms of air pollution."  42 U.S.C. § 7434(a)-(b), (c)(3).  Congress vested EPA with broad discretion in operating and executing these programs, including selecting grant recipients "on a competitive basis" and ensuring that program activities are carried out "as determined appropriate by the Administrator in accordance" with the statute.  *Id.* § 7434(a)(1).

**2.**  Pursuant to this statutory appropriation, EPA developed three grant programs: the National Clean Investment Fund (NCIF), the Clean Communities Investment Accelerator (CCIA), and Solar for All.  It began accepting applications in July 2023.

On April 4, 2024, EPA announced its selection for NCIF and CCIA grant awards. Several of the grantees, including plaintiffs Climate United Fund, Power Forward Communities, and Justice Climate Fund, had no prior track record; instead, they were formed specifically to apply for and receive funding from these grant programs. JA362-63; JA453; JA1646.

**3.** In August 2024, EPA and the recipients entered into materially identical contracts memorializing the grant awards.

The recipients "agree[d] to only use the award to support [specific] allowable activities." JA537. The agreements further contemplated separate subaward agreements to pass through funding to other entities, with whom EPA does not have a direct relationship. JA599.

The grant agreements allowed for termination. A "Termination" provision specified that EPA may terminate for substantial noncompliance or if "there is adequate evidence of waste, fraud, material misrepresentation of eligibility status, or abuse." JA552. And the provision referenced several regulations that identify similar and additional bases and procedures for termination. *See* 2 C.F.R. §§ 200.339-200.341. The Termination provisions of the agreements purported to establish the "only" bases for termination—but that language was preceded by a statement that these terms were meant to

"expand on, rather than replace or modify, the EPA General Terms and Conditions."  JA551-52; *see also* JA518 (specifying that the General Terms and Conditions are "in addition to" those which are part of the award).  And, at the time the agreements were originally executed, the General Terms and Conditions provided EPA with the right to terminate the grants "[i]f the award no longer effectuates the program goals or agency priorities."  EPA, *General Terms and Conditions* 2-3 (eff. Oct. 1, 2023), https://perma.cc/DE84-46AD; *see* 2 C.F.R. § 200.340(a)(4).  The agreements further contemplated that, upon termination, EPA must "de-obligate uncommitted funds and re-obligate" them to others.  JA552.

The grant agreements adopted an unusual mechanism for distributing grant funds.  Rather than employ its ordinary practice of distributing funds through its own accounts, the Department of the Treasury (at EPA's request) designated a private financial institution, Citibank, N.A., to serve as a financial agent to hold all awarded funds and administer their distribution.  JA715.  To this end, on September 19, 2024, Treasury entered a Financial Agency Agreement with Citibank, which makes clear that Citibank is effectively acting as an arm of Treasury.  Under the agreements, Citibank "has been designate[d] and authorize[d] [by Treasury] to act as a financial

agent of the United States," JA641, and Citibank must "act at all times in the best interests of the United States," Citibank Br. 5 (quoting JA2129). Citibank must take directions from Treasury and EPA, Citibank Br. 5 (citing JA2147-48), and Treasury may remove Citibank as its agent at any point, JA645. This arrangement, according to EPA's Acting Chief Financial Officer, was the first of its kind: "EPA had never used a financial agent in connection with a grant program prior to 2024," and "EPA's use of a financial agent in connection with the GGRF program was the first use of a financial agent for a nonexchange grant program administered by the federal government." JA723.

EPA and Citibank then entered into Account Control Agreements with each plaintiff regarding the administration of program distributions. As originally agreed, the Account Control Agreements and related provisions in the grant agreements placed program funds in Citibank accounts in the name of each grantee and allowed grantees to withdraw funds without prior EPA approval if the grantees certified in writing that the funds requested were for projects pursuant to the grants and necessary to carry out a workplan previously approved by EPA, and so long as the withdrawal "do[es] not exceed 10% of the total budget approved at [the] time of award" for a

given category. JA562, JA623; JA650.  Under the Account Control
Agreements, EPA is a secured party in the funds and may assert exclusive
control over the funds by filing a "Notice of Exclusive Control."  JA642.

The grant agreements and unusual funding arrangement raised
concerns from the start.  The House Committee on Energy and Commerce
expressed misgivings about EPA's "new and complex funding structure,"
JA725, and it later investigated "recipient eligibility" issues, "the fairness
and uniformity of the selection process," and the fact that "individuals with
strong ties to Democratic politics hold significant leadership roles within
some of the organizations the EPA selected to receive funding," JA733.
EPA's Inspector General later testified that his office lacked sufficient
resources to protect against fraud in the program.  JA708-09.

**4.**  On December 20, 2024, after the 2024 election but before the
presidential transition, the parties revised the grant agreements to attempt
to further limit EPA's ability to oversee and control the funds.  Specifically,
the amendments purported to require "credible evidence" of "a violation of
Federal criminal law involving fraud, conflict of interest, bribery, or gratuity
violations found in Title 18" or "a violation of the civil False Claims Act"
before EPA could terminate.  JA585.  The amendments also incorporated

revised EPA General Terms and Conditions, which omitted any reference to termination based on the agency's policy priorities. EPA, *General Terms and Conditions* 2-3 (eff. Oct. 1, 2024), https://perma.cc/PD9W-M2UP.

Then, on January 13, 2025, just days before the transition, EPA amended its Account Control Agreements with Citibank and the NCIF plaintiffs so that Citibank and EPA were ostensibly required to "continue to disburse funds and financial assets associated with financial obligations 'properly incurred'" by plaintiffs, even after EPA files a Notice of Exclusive Control or otherwise takes control of the grant funds. JA658.

**5.** Under new leadership after the presidential transition, EPA "reassessed and adopted agency policies and priorities that materially differ from the prior administration"—particularly with respect to oversight and transparency over grant funds. JA716. EPA also reviewed and reevaluated the GGRF program's creation and implementation and concluded that several features of the program—the designation of a financial agent; recipients' roles as "pass-through[s] for subrecipients," which themselves may act as pass-throughs; and the last-minute modifications to the grant agreements—untenably reduced EPA's oversight and control over grant funding. JA717-18.

These concerns were exacerbated by comments by former officials regarding the removal of key protections aimed at preventing waste, fraud, and abuse. One former EPA official involved with implementing the GGRF program admitted there were efforts to "get the money out as soon as possible" to grantees before the new administration came into office, likening it to "throwing gold bars off the edge" of "the Titanic." JA704-05. Moreover, many of the organizations chosen for funding have strong ties to officials of the prior administration. JA705-06. EPA thus determined that potential "[c]onflicts of interest involving high-level" officials, as well as the failure of many awardees to meet statutory and regulatory eligibility requirements, "raise questions about EPA's selection process." JA718. And EPA feared that its oversight and control over the use of grant funds had been so eroded as to risk violating the Constitution. JA719.

EPA's Office of Inspector General is now investigating the "financial mismanagement, conflicts of interest, and oversight failures within the GGRF program." JA717; *see also* JA669. The Federal Bureau of Investigation and Department of Justice have also initiated investigations into "potential fraud, waste, abuse, and impermissible conflicts of interest in connection with NCIF and CCIA grants." JA718.

For all of these reasons, EPA on March 4, 2025, instructed Citibank "not to disburse funds from any of the GGRF accounts" for five days. JA699. Treasury subsequently instructed Citibank to comply with EPA's instruction "to impose certain account controls" related to the GGRF. JA697.

Ultimately, on March 11, 2025, EPA issued official notices to the NCIF and CCIA grantees terminating their grant agreements. In the notices, EPA explained that the terminations were "based on substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities, which collectively undermine the fundamental goals and statutory objectives of the award." JA701. EPA also explained that the contractual scheme lacked sufficient provisions to ensure that the government maintained adequate control over the program. JA702. Finally, EPA stated that it would work to re-obligate the funds expeditiously in a more responsible manner. JA702.

## B.   Procedural Background

**1.** Plaintiffs are NCIF and CCIA grantees, as well as subgrantees who have separately contracted with them. Climate United, Coalition for Green Capital, and Power Forward were collectively awarded approximately $14 billion under the NCIF program. JA966. California Infrastructure and

Economic Development Bank, Minnesota Climate Innovation Finance Authority; Efficiency Maine Trust; and Illinois Finance Authority are subgrantees that receive pass-through funds under the NCIF program. JA966-76. And Justice Climate Fund and Inclusiv, Inc. together receive over $2.8 billion under the CCIA program.[1] JA967.

Plaintiffs pursued APA claims and a constitutional separation-of-powers theory challenging EPA's decision to terminate their grants; they sought declaratory and injunctive relief that would require EPA (through Citibank) to resume disbursing grant funds to them. JA157-67. They also brought breach-of-contract claims against Citibank for following EPA's and Treasury's directives to stop disbursing funds. JA167-70. Plaintiffs have further argued in this Court that the terminations constituted *ultra vires* conduct. JA182; JA321; JA1235.

**2.** On March 18, 2025, the district court issued a temporary restraining order effectively freezing the grant funds pending its review of plaintiffs' motion for a preliminary injunction. JA263-87. With four extensions, the temporary restraining order ran for a total of 28 days. JA738-39.

---

[1] Plaintiffs originally brought independent suits, which were consolidated in district court.

Shortly before midnight on April 15, 2025—the day on which the extended temporary restraining order was set to expire—the district court issued an order granting a preliminary injunction, stating that an opinion would follow. JA961-63. The order enjoined EPA from effectuating its termination of plaintiffs' grant agreements and on that basis enjoined EPA and Treasury, a non-party, from causing Citibank to "deny, obstruct, delay, or otherwise limit access to funds in accounts established in connection with Plaintiffs' grants, including funds in accounts established by Plaintiffs' subgrantees." JA961-62. Despite evidence that plaintiffs had requested immediate transfer of hundreds of millions of dollars to external accounts, the court refused to order any security under Federal Rule of Civil Procedure 65(c). JA962. And the district court denied a stay pending appeal, but it ordered Citibank to refrain from releasing any funding disbursements until April 17, 2025, at 2:00 PM EST. JA961 n.1.

The government immediately sought an administrative stay and stay pending appeal in this Court. This Court administratively stayed the district court's order in part on April 16, 2025, effectively freezing the funds in the Citibank accounts. The district court issued its opinion later that same day. JA966-1004. Relevant here, the court held that it had jurisdiction over

plaintiffs' claims because they were not in "essence" contract claims but instead "turn on … examining the federal regulations and federal statute governing Plaintiffs' grant awards," and "seek equitable relief."  JA982-84. As to the merits, the district court held that plaintiffs were likely to succeed on their APA claim because EPA failed to adequately explain its reasoning for terminating the grant agreements, and it further concluded that plaintiffs were likely to prevail on their constitutional claim because EPA sought to "dismantle" the GGRF program by terminating the grants.  JA991-96.  The court believed that the equities and public interest supported an injunction. JA1001.  The court extended the injunction to Citibank on the basis that EPA's and Treasury's instructions to Citibank not to disburse funds were unlawful.  JA996-97.

**3.**  On July 4, 2025, while the government's appeal was pending in this Court, Congress enacted and the President signed into law a bill repealing "Section 134 of the Clean Air Act (42 U.S.C. 7434)" and rescinding "the unobligated balances of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act)."  Pub. L. No. 119-21, tit. VI, § 60002, 139 Stat. 72, 154 (2025).  Senator Capito, Chair of the Senate Environment and Public Works Committee, explained that "[t]his

action reflects not only Congress's deep concern with reducing the deficit, but EPA's administration of the GGRF under the Biden administration, the Agency's selection of grant recipients, and the absence of meaningful program oversight."  171 Cong. Rec. S4080 (daily ed. June 30, 2025).

**4.**  On September 2, following full merits briefing and oral argument, a panel of this Court vacated the district court's preliminary injunction.[2]

The majority held that plaintiffs' APA "claims are essentially contractual and therefore the district court lacked jurisdiction to hear them" because they were impliedly precluded by the Tucker Act.  Op.11; *see* 28 U.S.C. § 1491(a) (Tucker Act); 5 U.S.C. § 702 (APA claims can be impliedly precluded by another statute providing a right of action).  Plaintiffs' claims ultimately turned on whether "the grant agreements reserve the right to terminate on" the grounds identified by EPA, Op.12, and plaintiffs' requested remedy "is contractual in nature," Op.14.  This Court has "long rejected the idea that the APA's general bar on arbitrary and capricious action subjects contract terminations to a parallel review scheme in district court."  Op.17.  The panel also held that plaintiffs could not "bootstrap

---

[2] The panel consolidated its consideration of the government's motion for a stay with its consideration of the merits.  Order (May 5, 2025).

district court jurisdiction" by bringing an *ultra vires* claim against EPA Administrator Zeldin because "the *ultra vires* exception to sovereign immunity does not apply to contract claims." Op.21-22.

The panel further concluded that plaintiffs' separation-of-powers claim lacked merit. To start, this was "not a constitutional claim at all, but rather a claim that EPA violated the [IRA]"—yet plaintiffs "identified no statutory provision that barred the cancellation of the grants." Op.22-23. Nor was there any evidence that EPA had sought to dismantle the GGRF program. Op.26. The district court's contrary assertion lacked evidentiary support, ignored "the government's evidence of mismanagement," and was "clearly erroneous." Op.26 & n.12. "EPA's actions here," the panel concluded, "are well within the Executive Branch's authority and responsibility to manage the expenditure of funds and to ensure that money appropriated by Congress is properly spent for its intended purposes." Op.24-26.

Last, the panel held that the loss of billions of dollars of federal funds that the government is unlikely to recover and the sovereign interest in "eliminating the appearance of impropriety around these grant programs" outweighed any injuries to plaintiffs, which would likely be redressed "if the grant terminations are later determined to be a breach of contract." Op.29.

Judge Pillard dissented. In her view, plaintiffs' APA suit "challenges the government's decision to … seize their property" and thus was not barred by the Tucker Act. Dissent 48. And she concluded that plaintiffs were likely to succeed on the merits of their APA claims. Dissent 23-37. Judge Pillard further believed "EPA's actions violate the Constitution" because, in her view, EPA sought to "dismantle the statutorily mandated NCIF and CCIA programs due to the current agency leadership's policy disagreements with Congress." Dissent 37, 43.

Plaintiffs filed petitions for rehearing en banc. On December 17, 2025, this Court granted rehearing, vacated the panel opinion, and reinstated the administrative stay previously entered on April 16, 2025.

## SUMMARY OF ARGUMENT

The district court's preliminary injunction, prohibiting EPA from terminating grant agreements worth nearly $20 billion in taxpayer funds, is legally and equitably indefensible. The panel therefore correctly vacated the injunction, and the en banc Court should do the same.

**I.** The district court lacked jurisdiction over plaintiffs' APA claims. Plaintiffs challenge EPA's termination of their grant agreements and seek disbursement of billions of dollars under those agreements. Although they

pursue their claims under the guise of the APA by characterizing the terminations as arbitrary and capricious, precedent forecloses that reframing. The right to payment that plaintiffs seek to vindicate arises from their contracts with EPA, not any statute or regulation. And the relief they seek—reversal of the terminations and resumption of payments under the grant agreements—amounts to the classic contractual remedy of specific performance. That relief is unavailable against the federal government, and plaintiffs cannot plead their way around that important remedial limit. If plaintiffs are correct that EPA violated the grant agreements, they can seek monetary relief in the Court of Federal Claims.

The Supreme Court's recent decisions in *California* and *NIH* leave no doubt that claims like plaintiffs' belong in the Court of Federal Claims, and preexisting precedent from this Court points the same way. If anything, this case involves more clear-cut contractual claims than those the Supreme Court considered: Plaintiffs' argument is premised on the alleged violation of a term of their agreements that ostensibly restricted the circumstances in which EPA could terminate the agreements. If the terminations were unlawful as plaintiffs claim, that could only be because EPA breached the agreements, which is definitionally a contractual claim.

Even assuming the district court had jurisdiction over plaintiffs' so-called constitutional claims, EPA's termination of the grant agreements does not raise any constitutional concern. Although the court characterized EPA's terminations as "dismantling" the GGRF, the court provided no basis for that conclusion. The IRA merely required EPA to use appropriated funds to fund programs serving particular purposes—it imposed no obligation on EPA to enter into grant agreements with specific entities, and it certainly did not preclude EPA from exercising its contractual entitlement to terminate those agreements later. Nor did EPA disavow its statutory responsibilities; in fact, the agency repeatedly asserted its intent to re-obligate appropriated funds in a manner consistent with the statute.

As it turned out, Congress repealed the IRA provision underlying the program and rescinded all unobligated funds, including the funds designated for EPA to administer the programs. It is difficult to see how the separation of powers would compel EPA to preserve billions of dollars of grants under a program that Congress has repealed and stripped the agency of funding to oversee. Plaintiffs' constitutional claims therefore do not justify any injunction at this juncture, much less the district court's injunction forcing EPA to proceed with particular contracts with particular grantees.

For similar reasons, plaintiffs' *ultra vires* claims also fail. These claims are premised on a contract dispute—whether EPA breached the agreements by terminating them—rather than any contention that Administrator Zeldin exceeded his statutory authority. The Supreme Court has held that the *ultra vires* exception to sovereign immunity does not extend to claims like these. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 693-95 (1949). To hold otherwise would circumvent implied preclusion under the Tucker Act. And even if plaintiffs could bring their breach-of-contract claims under the guise of the *ultra vires* exception, they cannot surmount the high bar that the Supreme Court has recently reiterated is applicable to such claims.

**II.** The equities cut the same way—against an injunction. Plaintiffs have not had access to grant funds for nearly ten months, yet the parade of harms they warned about has not come to pass. Moreover, any financial harms could be remedied by a final judgment awarding them appropriate monetary relief in the Court of Federal Claims. In any event, plaintiffs' alleged operational injuries pale in comparison to the billions of taxpayer dollars the government is likely to lose forever should the injunction take full effect. The Supreme Court has granted stays in two similar cases in part on the basis that the government was unlikely to recover funds paid out under

terminated grant agreements.  *NIH*, 145 S. Ct. at 2658; *California*, 604 U.S.

at 651-52.  The same equitable calculus requires vacatur here.

## STANDARD OF REVIEW

This Court reviews de novo whether a district court had jurisdiction to

issue a preliminary injunction.  *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 928

F.3d 1102, 1108 (D.C. Cir. 2019).  Although this Court reviews a preliminary

injunction for abuse of discretion, it reviews the underlying legal conclusions

de novo and factual findings for clear error.  *Id.* at 1112.

## ARGUMENT

### I.     Plaintiffs Are Not Likely To Succeed On Their Claims.

Plaintiffs primarily assert APA claims, but the district court lacked

jurisdiction over those claims because they are in essence contractual:

Plaintiffs contend that the termination of their grant agreements did not

comport with the Termination provision of those agreements, and seek to

force EPA to continue to perform.  Plaintiffs must pursue that classic

breach-of-contract claim in the Court of Federal Claims, where they are

limited to money damages.  They cannot circumvent the Tucker Act's

remedial limits by recharacterizing a purported breach of contract as

arbitrary or unlawful agency action under the APA.

Nor can plaintiffs establish that they are likely to succeed on their separation-of-powers claims—both because an alleged statutory violation does not give rise to a constitutional claim and because they cannot show that the terminations violated the now-repealed statute establishing the GGRF. Plaintiffs' *ultra vires* claims fare no better; beyond all of the defects above, they fail under the Supreme Court's decision in *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949).

### A. Plaintiffs' APA claims are in essence contract claims that must be brought in the Court of Federal Claims.

Under the Tucker Act, Congress has assigned the Court of Federal Claims exclusive jurisdiction to adjudicate the sorts of claims at issue in this case: that the government has wrongfully terminated contracts. Plaintiffs' allegations that the agency terminated their grant agreements in breach of the applicable Termination provision, and their request for an injunction compelling the government to resume payments that would otherwise be due under the agreements, fall squarely within that jurisdictional scheme. And for good reason—this jurisdictional scheme ensures that the government, like every other contracting party, may breach a contract and be liable for any resulting damages, rather than be forced to continue with the contract. The Supreme Court has accordingly stayed twice in the last year district-

court orders preventing the government from terminating grants. Because plaintiffs' claims challenging EPA's termination of the grants are equally (if not more) contractual in nature, the injunction violates Congress's clear jurisdictional boundaries and warrants reversal.

**1.** It is well established that "absent a clear and unequivocal waiver of sovereign immunity," the "United States and its agencies are generally immune from suit in federal court." *Crowley Gov't Servs., Inc. v. General Servs. Admin.*, 38 F.4th 1099, 1105 (D.C. Cir. 2022). Although the APA provides a limited waiver of the government's sovereign immunity for suits challenging final agency action and "seeking relief other than money damages," it does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quoting 5 U.S.C. § 702). That carve-out "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Id.*

One example of such an implicit limitation on APA relief involves suits against the United States that sound in contract. The Tucker Act provides that the "United States Court of Federal Claims shall have jurisdiction to

render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). This Court has thus long recognized that "the Tucker Act 'impliedly forbids'" bringing "contract actions" against "the government in a federal district court" under the APA. *Albrecht v. Committee on Emp. Benefits of the Fed. Reserve Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004). That jurisdictional barrier is mandatory, and for good reason. It ensures that contract claims against the government are channeled into the court with "unique expertise," *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985), and (importantly here) which Congress has generally not empowered to grant injunctive relief like specific performance, *see James v. Caldera*, 159 F.3d 573, 580 (Fed. Cir. 1998).

As this Court has instructed, courts consider two factors in assessing whether an action—however styled—is in essence a contract claim governed by the Tucker Act. *See Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). *First*, courts examine "the source of the rights upon which the plaintiff bases its claims." *Crowley*, 38 F.4th at 1106 (quotation marks omitted). In answering this question, courts consider whether the "plaintiff's asserted rights and the government's purported authority arise from statute,

whether the plaintiff's rights 'exist prior to and apart from rights created under the contract,' and whether the plaintiff 'seeks to enforce any duty imposed upon' the government 'by the relevant contracts to which' the government 'is a party.'" *Id.* at 1107 (cleaned up). One way of analyzing this factor is asking whether the claim would persist if the contract's terms expressly authorized the government's actions; if the answer is no, the claim sounds in contract. *Second*, courts examine the "type of relief sought." *Id.* (quotation marks omitted). This inquiry asks "whether the plaintiff effectively seeks to attain monetary damages." *Id.* at 1107-08. When a claim is premised on a contract with the government, depends on the government's having breached that contract, and seeks to compel the government to pay sums due under the contract, it is a Tucker Act claim, not an APA claim. *See Megapulse*, 672 F.2d at 967-71.

Applying these principles, the Supreme Court has twice recently stayed district-court orders that purported to set aside the termination of grant agreements, concluding that the government was likely to succeed in showing that the Tucker Act impliedly ousted the district courts of APA jurisdiction over such suits. *See NIH*, 145 S. Ct. at 2658; *California*, 604 U.S. at 651.

In *California*, a number of states challenged the Department of Education's termination of various education-related grants, the district court temporarily enjoined the terminations, and the First Circuit denied a motion to stay that injunction. *See California v. U.S. Dep't of Educ.*, 132 F.4th 92 (1st Cir. 2025). The Supreme Court granted the government's request for emergency relief, reaffirming that "the APA's limited waiver of immunity does not extend to orders to enforce a contractual obligation to pay money along the lines of what the District Court ordered here." *California*, 604 U.S. at 651 (quotation omitted).

While this appeal was originally being considered by this Court, the Supreme Court issued a stay in *NIH* "as to the District Court's judgments vacating the Government's termination of various research-related grants." 145 S. Ct. at 2658. In doing so, the Court reiterated *California*'s reasoning that the APA "does not provide [federal district courts] with jurisdiction to adjudicate claims based on [federal] grants or to order relief designed to enforce any obligation to pay money pursuant to those grants." *Id.* (quotation omitted).

The Supreme Court has thus made doubly clear that challenges to agency "decisions terminating existing" contracts—even if they purport to be

brought "under the [APA]"—"belong in the Court of Federal Claims." *Id.* at

2661 (Barrett, J., concurring in the partial grant of the application for stay);

*see also id.* at 2663 (Gorsuch, J., joined by Kavanaugh, J., concurring in part

and dissenting in part) (similar).

    **2.** Under the longstanding *Megapulse* framework, plaintiffs' APA

claims challenging EPA's termination of the grants are readily recognizable

as contract claims and thus belong in the Court of Federal Claims.[3] This is a

contract case through and through. The grant agreements are plainly "the

source of the rights upon which" plaintiffs base their claims. *Megapulse*, 672

F.2d at 968. And plaintiffs "seek[] the classic contractual remedy of specific

performance." *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894

(D.C. Cir. 1985). The district court thus lacked jurisdiction to enjoin EPA

from effectuating its termination of the grant agreements and thereby to

enable plaintiffs to secure the disbursement of billions of dollars.

---

[3] Plaintiffs do not dispute that the grant agreements are contracts within the meaning of 28 U.S.C. § 1491(a). Nor could they, as the Supreme Court's recent stay orders are premised on the understanding that these kinds of grant agreements are contracts. *See supra* pp. 26-28; *see also Boaz Housing Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021) (holding that when the government "chooses to employ contracts to set the terms of and receive commitments from recipients," it "may find itself subject to suit in the Claims Court of damages relating to an alleged breach").

**i.** To start, plaintiffs' asserted right to billions of dollars in taxpayer funds arises solely from the grant agreements and "in no sense ... exist[s] independently of" those contracts. *Spectrum*, 764 F.2d at 894. Plaintiffs would have no claim absent EPA's alleged breach of those agreements.

Plaintiffs' own framing of their claims underscores the point. The linchpin of plaintiffs' case is the restrictive termination provision, written into the grant agreements, that purports to limit EPA's ability to terminate the grants. JA326. Indeed, the district court's merits analysis rested entirely on the fact that "the *Terms and Conditions governing the grant award* expressly limit" EPA's ability to terminate, and EPA purportedly failed to explain how its termination complied with those contractual limitations. JA993 (emphasis added). The crux of plaintiffs' claim is thus that the termination provision is enforceable and not satisfied here, which would mean EPA violated the contractual provision—underscoring that this is a breach-of-contract suit. Put another way, if the grant agreements had expressly said that they could be terminated for any reason or no reason at all, plaintiffs would clearly have no claim. Because "it is possible to conceive of this dispute as entirely contained within the terms of the contract," these claims are essentially contractual. *Ingersoll-Rand*, 780 F.2d at 78.

The relief that plaintiffs seek (JA288-359), and that the district court awarded (JA961-63)—an injunction barring EPA from effectuating its termination of plaintiffs' contracts and therefore requiring Citibank, acting as a financial agent of Treasury, to continue payments pursuant to those contracts—is also contractual in nature. Indeed, that relief "is in every meaningful sense an order requiring the government to pay those grants." *NIH*, 145 S. Ct. at 2664 (Gorsuch, J., concurring); *see also Spectrum*, 764 F.2d at 895; *Ingersoll-Rand*, 780 F.2d at 79-80 (noting that an order "reinstating the original award of [a] contract …. amount[ed] to a request for specific performance" (citation omitted)); *U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*, 770 F. Supp. 3d. 155, 163 (D.D.C. 2025) (denying on similar grounds a preliminary injunction), *injunction pending appeal denied per curiam*, Order, No. 25-5066 (D.C. Cir. Mar. 28, 2025).

In the panel dissent's view, plaintiffs' claims are "not premised on EPA's violation of the grant agreements' termination provisions, nor on its failure to perform any duty 'imposed' on EPA by the grant award," but rather on EPA's allegedly "pretextual, internally inconsistent, and unfounded reasons" for termination. Dissent 53-54. But, as this Court has recognized, any contract claim could be recharacterized as an assertion that

the government's termination of the contract was arbitrary in violation of the APA; the Tucker Act is not evaded so easily. *See Megapulse*, 672 F.2d at 967 n.34. And in any event, this characterization overlooks that plaintiffs' APA claims are entirely based on EPA's alleged failure to terminate the grants in a manner consistent with the grant termination provisions. Nor is the dissent correct in characterizing the remedy plaintiffs seek, Dissent 8; the entire object of their suit is to retain access to federal funds pursuant to their grant agreements. If any APA claim is a disguised contract claim, it is the sort of claim challenging a contract termination that plaintiffs assert here.[4]

**ii.** The Supreme Court's recent decisions in similar grant-termination cases make clear that plaintiffs' claims sound in contract, as do this Court's longstanding precedents applying the *Megapulse* framework.

---

[4] The subgrantees' claims are precluded for the same reasons. The grant agreements contemplate that grantees will make subgrants and that subgrantees will be bound by the terms of the prime contract. *See supra* p. 6. The subgrantees' claims, to the extent they have any against the United States, are accordingly founded on a contract with the government for Tucker Act purposes. *See, e.g.*, *Roedler v. Department of Energy*, 255 F.3d 1347, 1351 (Fed. Cir. 2001). Indeed, the subgrantees also challenge EPA's termination of the grants as contrary to the grant terms, making their claims indistinguishable from those of the grantees. Like the grantee plaintiffs, the subgrantees must pursue their breach-of-contract challenges in the Court of Federal Claims to the extent that they are entitled to proceed in that forum, or depend on the contractor to enforce its own rights.

Plaintiffs' claims are materially indistinguishable from those at issue in *NIH* and *California*. As in those cases, plaintiffs allege that the agency has unlawfully terminated their grants. *See* JA157-67. As in those cases, the grants were made pursuant to a generalized appropriation, which means the source of any right to payment can only be the grant agreements themselves, not any statute or regulation. And, as in those cases, plaintiffs sought and received an order vacating the grant terminations, which constitutes "relief designed to enforce an[] obligation to pay money pursuant to those grants." *NIH*, 145 S. Ct. at 2658 (quotation marks omitted). *NIH* and *California* thus make clear that the district court lacked jurisdiction over plaintiffs' APA claims. *Accord Vera Inst. of Just. v. U.S. Dep't of Just.*, No. 25-cv-1643, 2025 WL 1865160, at *10 (D.D.C. July 7, 2025) (relying on *California* to dismiss the plaintiffs' APA arbitrary-and-capricious claims challenging an agency's grant terminations); *City of Chicago v. U.S. Dep't of Homeland Sec.*, No. 25 C 5463, 2025 WL 3043528, at *11 (N.D. Ill. Oct. 31, 2025) (similar).

The same result flows from this Court's precedents. *Ingersoll-Rand*, in particular, is directly controlling. There, the plaintiff filed suit arguing that the agency's termination of its contract violated two federal regulations and was arbitrary and capricious under the APA, and sought an injunction

requiring that the contract be reinstated. 780 F.2d at 76-77. This Court

affirmed dismissal on the basis that the plaintiff's claims were in essence

contract claims that belonged in the Court of Federal Claims. *Id.* at 77-80.

In so holding, this Court emphasized that the plaintiff's suit boiled down to

whether the contract permitted termination under the circumstances; the

dispute was thus "entirely contained within the terms of the contract." *Id.* at

78. "That the termination also arguably violates certain other regulations

d[id] not transform the action into one based solely on those regulations." *Id.*

This Court further concluded that the plaintiff's that the contract be

reinstated "amount[ed] to a request for specific performance." *Id.* at 80; *see*

*also Spectrum*, 764 F.2d at 892, 894-95 (affirming dismissal where the

plaintiff alleged that agency's failure to make lease payments in accordance

with a contract violated the Debt Collection Act, because the "right to these

payments is created in the first instance by the contract" and relief sought

was the "classic contractual remedy of specific performance").

So too here. Plaintiffs argue that EPA's decision to terminate was

unreasonable and arbitrary because it allegedly exceeded the termination

provision of the grant agreements, and plaintiffs accordingly seek an order

preventing EPA from effectuating its termination so that they may continue

to receive grant payments under their grant agreements. The source of that alleged right to payment is the contracts, not any statutory or regulatory provisions. Like the regulations in *Ingersoll-Rand* and the Debt Collection Act in *Spectrum*, the background statute and regulations may inform the parties' contractual relationship but do not create the substantive right that plaintiffs seek to vindicate here—the payment of funds awarded pursuant to EPA's statutory discretion and memorialized through the grant agreements. The core dispute, moreover, is the same as in *Ingersoll-Rand*: whether the contractual conditions for termination have been satisfied. That is "entirely contained within the terms of the contract." 780 F.2d at 78. And the district court's order preventing EPA from effectuating its termination and thereby requiring Citibank, a financial agent of Treasury, to disburse federal funds to plaintiffs is exactly the kind of order this Court recognized in *Ingersoll-Rand* and *Spectrum* that district courts likely lack jurisdiction to issue.

This Court's decision in *Sharp v. Weinberger*, 798 F.2d 1521 (D.C. Cir. 1986) does not, as the dissent suggests (Dissent 59-60), negate the force of *Ingersoll-Rand* and its applicability to this case. *Sharp* recognized that the Tucker Act may not impliedly forbid a constitutional or statutory claim where the asserted constitutional or statutory right exists *independently* of a

contract right. 798 F.2d at 1523. The problem for plaintiffs, however, is that their asserted right to receive funding arises entirely from the grants; they have no preexisting statutory or constitutional right separate from the grant agreements. In this sense, *Ingersoll-Rand* and *Spectrum* squarely govern: plaintiffs cannot avoid the Tucker Act's limitations by simply describing their contract claims in constitutional or statutory terms.

**3.** The district court's contrary conclusion rests on several legal errors (some of which were later exposed by *NIH*) and does not withstand scrutiny.

**i.** To start, the court erroneously reasoned that the source of plaintiffs' rights lay in "federal regulations and federal statute" rather than the grant agreements. JA979-80. As discussed above, however, no statute or regulation remotely confers on plaintiffs the right to billions of dollars in taxpayer funds. Congress appropriated funds for grant programs and authorized EPA to review and select, in its sole discretion, which entities would receive grants. Because plaintiffs would have no claim to the funds absent EPA's award, their claims arise solely from the agreements.

The district court's own opinion confirms this. The court's analysis of the merits of plaintiffs' APA claims does not reference or construe the IRA provision that gave rise to the GGRF. Instead, as noted above, in evaluating

35

plaintiffs' likelihood of success on the merits, the court rested on the fact that "the *Terms and Conditions governing the grant award* expressly limit" EPA's ability to terminate.  JA993 (emphasis added).  And the court's only reference to any "regulations" was to observe that 2 C.F.R. § 200.340(a)(4) permits termination "pursuant to the terms and conditions of the federal award."  JA994.  But that regulation—which points back to the contractual terms—only confirms that plaintiffs' claims are "based solely on contract principles."  *Ingersoll-Rand*, 780 F.2d at 78; *see also id.* (reasoning that the "question presented … could be phrased as whether the contract forbids termination under these conditions").  That "the termination also arguably violates certain other regulations"—especially when those regulations both refer to and are cross-referenced by the contractual terms—"does not transform" a breach of contract claim into an APA action.  *Id.*

The district court's reliance on *Bennett v. Kentucky Department of Education*, 470 U.S. 656 (1985), and *Maryland Department of Human Resources v. Department of Health & Human Services*, 763 F.2d 1441, 1449 (D.C. Cir. 1985), was misplaced.  The latter case involved Title XX of the Social Security Act and its implementing regulations, which themselves conferred on participating states a specific right to reimbursement.  *Id.* at

1443, 1449. And *Bennett* concerned a state's rights and obligations under Title I of the Elementary and Secondary Education Act of 1965. 470 U.S. at 669. In other words, those cases concerned *statutory and regulatory entitlements*, not *contractual rights*. The claims there were thus not "founded" on a contract, and so did not fall within the preclusive scope of the Tucker Act. 28 U.S.C. § 1491(a).

By contrast, plaintiffs' asserted interest in the funds arises from the grant contracts rather than any statute or regulation. Put simply, the district court was plainly mistaken to conclude that "[a]ny monetary benefit that might flow to Plaintiffs" would come "from the structure of statutory and regulatory requirements governing compensation in this action." JA984 (quotation marks omitted). It would not. Plaintiffs' asserted right to payment instead flows from the grant agreements, and claims seeking to vindicate that right must be pursued in the Court of Federal Claims.

**ii.** The district court also stated that plaintiffs "seek equitable relief" rather than damages. JA984. But that was equally true in *NIH* and *California*, so it does not mean the district court had jurisdiction here any more than in those cases.

37

While the APA's waiver of sovereign immunity applies only to claims "seeking relief other than money damages," 5 U.S.C. § 702, that is not the limitation at issue here. Instead, this case turns on the separate limitation that nothing in the APA "confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *Id.* It has been established law for decades that the Tucker Act impliedly precludes all contract claims against the government, whether they seek specific performance or damages. *See Albrecht*, 357 F.3d at 67-68.

Indeed, a central purpose of the APA's implied preclusion carveout is to prevent circumvention of remedial restrictions in more specific statutes. *See Patchak*, 567 U.S. at 215. It is true that the Court of Federal Claims may not order specific performance in this context. *See James*, 159 F.3d at 580. But, contrary to the district court, that is not a reason to allow an action under the APA. JA985. Rather, it only proves the government's point: It would defy Congress's design to prohibit specific performance against the federal government in the forum that is given exclusive jurisdiction over contract claims, yet permit plaintiffs to circumvent that limitation by seeking that same equitable relief in district court under the APA for the same alleged wrong.

Put another way, the United States is at least equally entitled as any other contracting party to choose to breach a contract and pay damages. Yet the district court's approach would make the federal government amenable to specific performance by order of the district court, despite Congress's decision to take that remedy off the table. That is backwards. *Cf. United States v. Winstar Corp.*, 518 U.S. 839, 919 (1996) (Scalia, J., concurring in the judgment) ("Virtually *every* contract operates, not as a guarantee of particular future conduct, but as an assumption of liability in the event of nonperformance: The duty to keep a contract at common law means a prediction that you must pay damages if you do not keep it,—and nothing else." (quotation omitted)).

**iii.** The district court (and the dissent) asserted that *California* was distinguishable, and the Tucker Act inapplicable, because plaintiffs here "seek to regain access to their already disbursed funds at Citibank." JA986; *see also* Dissent 51-52, 56. In this Court, plaintiffs have likewise contended that the grant funds belong to them, and therefore that this is a property dispute rather than a contract dispute. That misunderstands the issues on appeal, and is built on a false premise in any event.

The preliminary injunction is not premised on plaintiffs having title to the grant funds or the government having interfered with that title; instead, the district court enjoined the government from terminating contractual agreements, and ordered it to comply with the terms of those agreements. Those claims mirror the claims in *NIH* and *California*; they are in essence contractual and therefore must be pursued in the Court of Federal Claims. Where the grant funds are held, and who owns them, are beside the point at this juncture—all that is at issue in the district courts' preliminary injunction order and this appeal is EPA's termination of the grant agreements. Any disputes over what happens to the funds *following* termination are simply not implicated here, as this case merely concerns EPA's determination to terminate the grants in the first place. The focus by plaintiffs and the panel dissent over questions of title is therefore a red herring here.

In any event, the grant funds in the Citibank accounts do not belong to plaintiffs free and clear. Rather, those funds have not been disbursed to plaintiffs, and plaintiffs' prospective right to disbursement of funds held in the Citibank accounts—like the *California* and *NIH* plaintiffs' right to receive funds from Treasury—is defined solely by the grant agreements and related contracts. In their agreements, each plaintiff agreed that it could

access the funds in the Citibank account only "under the conditions of the [Grant] Agreement" and for specified allowable activities in specified regions. JA568, 627. To be allowable, the expense must be "for the performance of the Federal award" and "[c]onform to any limitations or exclusions set forth ... in the Federal award." 2 C.F.R. § 200.403(a)-(b). Critically, the grant agreements themselves contemplate the possibility of termination during the term of the award. JA585. And financial obligations incurred after such termination "are not allowable" unless expressly authorized by EPA. 2 C.F.R. § 200.343.

Simply put, plaintiffs have no cognizable interest in the Citibank accounts apart from whatever rights to receive funds they have under their agreements. That is why "grant moneys" are "property of the grantors until expended in accordance with the terms of the grants." *In re Joliet-Will Cnty. Cmty. Action Agency*, 847 F.2d 430, 433 (7th Cir. 1988); *see also Buchanan v. Alexander*, 45 U.S. (4 How.) 20, 20-21 (1846) ("So long as money remains in the hands of a disbursing officer, it is as much the money of the United States, as if it had not been drawn from the treasury."). This case is thus no different than *California* and *NIH*: It all comes down to the grant contracts and their terms.

Furthermore, the financial agreements make clear that Citibank is effectively acting as an arm of Treasury. Under the agreements, Citibank "has been designated and authorized [by Treasury] to act as a financial agent of the United States," JA641, and Citibank must "act at all times in the best interests of the United States," Citibank Br. 5 (quoting JA2129). Treasury may remove Citibank as a financial agent if it chooses. JA645. And the agreements further require Citibank to comply with directions from both EPA and Treasury. Citibank Br. 5 (citing JA2147-48). That the funds in *California* and *NIH* were held directly by Treasury rather than by a financial agent under the direction of Treasury thus makes no difference. Here, as there, the APA's "limited waiver of sovereign immunity does not provide [district courts] with jurisdiction to adjudicate claims based on [federal] grants or to order relief designed to enforce any obligation to pay money pursuant to those grants." *NIH*, 145 S. Ct. at 2658 (cleaned up).[5]

---

[5] Because the government objects to the exercise of APA reasoned-decisionmaking review of its contractual actions, it is not advancing an independent argument based on that framework. To be clear, however, the government vigorously disputes the district court's conclusion that EPA acted unreasonably by terminating plaintiffs' grants in light of the agency's concerns surrounding the GGRF program, and maintains that EPA adequately articulated the reasons for termination in its letters to plaintiffs. *See supra* pp. 10-12.

For this reason, the dissent's reliance (Dissent 49) on cases like *Land v. Dollar*, 330 U.S. 731 (1947), is misguided. In *Land*, all contractual obligations had been fulfilled, so the property at issue belonged to the plaintiffs. 330 U.S. at 738. The Court took care to point out that the case did not involve relief amounting to specific performance. *Id.* at 737. Here, by contrast, plaintiffs have not fulfilled all obligations required for disbursement of the funds under the grant agreements—which is why the grants remained subject to termination. And the relief plaintiffs seek amounts to specific performance. This is a contract case in every sense.

\*      \*      \*

This is an easy case for Tucker Act preclusion. The sole question is whether EPA's terminations of the grants accorded with the contractual termination provision (in which case plaintiffs have no claim) or contravened that provision (in which case plaintiffs have a breach-of-contract claim). If the APA applied simply because plaintiffs challenge the reasonableness of a contractual action, then every contract dispute could be reframed as an APA claim. The Tucker Act cannot be so easily circumvented.[6]

---

[6] Plaintiffs' claims against Citibank are derivative of their claims against the government, JA996-97, and thus fail for the same reasons.

**B.      Plaintiffs' constitutional and *ultra vires* claims mirror their APA claims and cannot support the injunction.**

Plaintiffs have also raised constitutional claims, upon which the district court alternatively supported its injunction, and *ultra vires* claims, which did not serve as a basis for the injunction but which plaintiffs have pressed on appeal.  Neither theory changes the analysis.  To the extent these claims seek reinstatement of the specific grant agreements on the ground that EPA exceeded its authority in terminating them, that is simply a repackaging of plaintiffs' APA claims, and the district court lacked jurisdiction over them for the reasons explained above.  *Dalton v. Specter*, 511 U.S. 462, 474 (1994); *Larson*, 337 U.S. at 693-95.  In any event, plaintiffs are not likely to prevail because their constitutional claims not only began as meritless but also have since been overtaken by events, and their *ultra vires* claim cannot satisfy the high bar required for establishing such claims.

**1.**  The Appropriations Clause provides that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7.  In other words, the Clause requires that "the payment of money from the Treasury must be authorized by a statute." *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990).  At the same time, it is the President's duty to "take Care that the Laws be faithfully

executed." U.S. Const. art. II, § 3. This case does not implicate the Appropriations Clause, which operates to prohibit the expenditure of funds without an appropriation rather than as a mandate to expend certain funds.

Instead, plaintiffs have tried to construct a constitutional separation-of-powers claim around the premise that EPA has violated its obligations under the IRA. At the outset, that project is misguided because any statutory violation would not give rise to a constitutional separation-of-powers claim. Indeed, the Supreme Court has "often distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Dalton*, 511 U.S. at 472. The Court has accordingly construed a purported separation-of-powers claim alleging that the President violated a statutory mandate as a statutory claim. *Id.* at 474. Applying *Dalton*'s holding that "statutory claims cannot be transformed into constitutional ones" to a case like this one, this Court recently construed a constitutional separation-of-powers claim challenging an agency's decisions regarding the expenditure of federal funds as a statutory claim. *See Global Health Council v. Trump*, 153 F.4th 1, 13-17 (D.C. Cir. 2025). Plaintiffs' separation-of-powers claim should likewise be considered as a statutory claim.

However styled, plaintiffs' premise—that EPA has violated its statutory obligations—is mistaken. As discussed, *supra* pp. 5, 35, the IRA merely appropriated funds to be used for certain policy aims, leaving EPA discretion in developing, overseeing, and managing grant programs. EPA's decision to terminate plaintiffs' grant agreements and re-obligate the funds in a manner consistent with the statute's directives aligns with its duty to execute the law as Congress intended.

The district court nonetheless concluded that EPA had "effectively unilaterally dismantle[d] a program that Congress [has] established." JA996. Not so. Terminating particular grants is not the same as dismantling a program, as there can be no serious contention that the statute, which provides EPA discretion in awarding grants, prohibits EPA from also terminating those grant agreements and entering into new ones. Plaintiffs do not argue that the statute prohibits all grant terminations, and their grant agreements concede otherwise by specifically contemplating terminations under certain circumstances and re-obligation of the funds. A dispute about whether the contractual prerequisites to terminate were satisfied is a contractual dispute, not a statutory one (much less a constitutional one, *see Global Health Council*, 153 F.4th at 13-17).

Nor could plaintiffs claim that they were challenging a separate EPA decision to leave appropriated funds unobligated. Even if such a claim would otherwise be cognizable, it plainly was not supported on the facts here, as EPA repeatedly stated (prior to the statute's repeal) that it would re-obligate funds in a manner that ensures proper oversight and control. Neither the district court nor plaintiffs cited any reason to doubt that commitment, much less a final agency action reaching the opposite conclusion. Given EPA's statutory discretion in selecting awardees and overall effectuation of the statute's policy aims, *see supra* pp. 5, 35, its decision to terminate contracts it determined were deeply flawed and re-obligate the appropriated funds in a manner consistent with the statute's requirements and purpose does not reveal an intent to "disregard statutory responsibilities," JA995 (quotation omitted); rather; it reflects the agency's sound policy judgment.

Judge Pillard's concern (Dissent 41-43) that EPA would have been barred from re-obligating grant funds because the underlying appropriation had expired also does not suggest an attempt to ignore a statutory mandate. This Court's assessment of whether EPA would have been entitled to enter into new agreements cannot supersede EPA's own determination that it intended to do so. EPA did not declare any intention to leave appropriated

funds unobligated, and thus cannot be held to have dismantled the program regardless of whether this Court believes that the agency's contemplated re-obligation would have violated principles of appropriations law. And the entire dispute in any event collapses into the contractual claim that is not properly before this Court. If EPA was entitled to terminate the grants, it could do so whether or not it could then re-obligate the funds. At most, the appropriations-law backdrop provides context for resolution of that contract dispute. *Cf. Spectrum,* 764 F.2d at 894. And the relevant appropriations law is, at a minimum, unclear, as the Government Accountability Office has recognized that an agency may re-obligate funds originally awarded before an appropriations deadline in at least some circumstances. *See* B-322628, *Department of Labor—Replacement Grants* 4 (Aug. 3, 2012).

In any event, the separation-of-powers concerns asserted by plaintiffs and the dissent most certainly cannot support the district court's injunction given Congress's repeal of the portion of the IRA appropriating funds for the GGRF grants and the administration of the GGRF program. Section 60002 of the Reconciliation Act of 2025 provides that "Section 134 of the Clean Air Act (42 U.S.C. 7434) is repealed and the unobligated balances of amounts made available to carry out that section (as in effect on the day before the

date of enactment of this Act) are rescinded."  Pub. L. No. 119-21, § 60002,

139 Stat. at 154.  Among the reasons for this repeal was not only "Congress's

deep concern with reducing the deficit" but also concern with "EPA's

administration of the GGRF ..., the Agency's selection of grant recipients,

and the absence of meaningful program oversight."  171 Cong. Rec. S4080.

Thus, EPA's decision to terminate the grants clearly comports with and

furthers Congress's intent.  It would defy logic to require on separation-of-

powers grounds that EPA continue funding a program that Congress has

made clear it no longer wishes to fund.

For a number of reasons, *In re Aiken County*, 725 F.3d 255 (D.C. Cir.

2013), upon which the district court relied, is inapposite.  *Aiken County*

involved the Nuclear Waste Policy Act, which provided that the Nuclear

Regulatory Commission "shall consider" and "issue a final decision

approving or disapproving" the Department of Energy's license application

for storing nuclear waste within three years of submission.  *Id.* at 257-58

(quoting 42 U.S.C. § 10134(d)).  Congress also appropriated funds for the

Commission to carry out its duty to consider the Department's licensing

application.  But rather than carry out its statutory obligations, the

Commission, "by its own admission," refused to comply with the law and

"simply shut down its review and consideration of the Department of Energy's license application." *Id.* at 258. This Court reasoned that, "[u]nder Article II of the Constitution and relevant Supreme Court precedents, the President must follow statutory *mandates* so long as there is appropriated money available and the President has no constitutional objection to the statute." *Id.* at 259. Plaintiffs here identify no statutory mandate that EPA has violated. Again, EPA made grants using the appropriated funds, and it permissibly exercised its authority to terminate those grants at a later time, with the intent of re-obligating in a more responsible fashion.

At a minimum, plaintiffs' constitutional claims cannot support the injunction the district court entered. For one, *Aiken County* itself illustrates that setting aside the termination decisions and requiring EPA to maintain its contractual relationship with these particular plaintiffs would not be the appropriate remedy for any viable claim, since these particular grants were never statutorily mandated. *Cf.* 725 F.3d at 267 (ordering the agency to "promptly continue with the legally mandated licensing process"). What's more, the injunction is now wholly inappropriate given that the statutory provision upon which plaintiffs' separation-of-powers claim relies has been repealed, and Congress has rescinded all unobligated funds.

Under no circumstances could the Constitution justify an injunction that forces EPA to proceed with *these particular grant agreements* with *these particular plaintiffs*, in the face of the agency's determination that doing so would be contrary to the public interest, and pursuant to a statute and funding source that have since been repealed.

**3.** Although plaintiffs have asserted in this Court that they have a separate *ultra vires* action against the Administrator, this theory provides no better prospect for success. *Ultra vires* review of agency action "is intended to be of extremely limited scope," *North Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1262 (D.C. Cir. 2020) (quotation marks omitted), and is reserved for the most "extreme agency error where the agency has stepped so plainly beyond the bounds of its statutory authority, or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court." *Federal Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022) (cleaned up). To prevail, plaintiffs would have to show that the "agency has taken action entirely 'in excess of its delegated powers and contrary to a *specific prohibition*' in a statute." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025). *Ultra vires* claims are thus considered a "Hail Mary pass," and they "rarely succeed[]." *Id.* at 681-82 (quotation omitted).

Plaintiffs' *ultra vires* argument falls far short of the "nearly insurmountable" showing necessary. *U.S. Dep't of Just. v. FLRA*, 981 F.2d 1339, 1343 (D.C. Cir. 1993). The ostensible "extreme agency error" they identify is EPA's decision to terminate the grants. But, as discussed above, nothing in the statute prohibited EPA from doing so, let alone in a "clear and mandatory" way. *North Am. Butterfly*, 977 F.3d at 1263 (quotation omitted). To the contrary, it would be absurd to read the appropriations statute as categorically prohibiting EPA from terminating grants after they were awarded, and even the contracting parties did not believe that (which is why they included a termination provision in the grant agreements, the only real dispute being over whether its terms were satisfied).

The Supreme Court rejected an effort to obtain *ultra vires* review in the context of a contract in *Larson*; that analysis is controlling here. In *Larson*, the plaintiff brought suit against an agency administrator alleging that the plaintiff had entered a contract with the agency for the sale of coal, but that the administrator had failed to deliver the item pursuant to the contract's terms. 337 U.S. at 684. The Supreme Court held that sovereign immunity barred the plaintiff's claim. Specifically, the Court held that the *ultra vires* exception did not apply because, while the plaintiff alleged that

the administrator acted unlawfully, "these allegations were not based and did not purport to be based upon any lack of delegated power," as the official had general authority to "administer a general sales program encompassing the negotiation of contracts, the shipment of goods and the receipt of payment." *Id.* at 691-92. The Court thus concluded that "if the actions of an officer do not conflict with the terms of his valid statutory authority, then they are the actions of the sovereign, whether or not they are tortious under general law, if they would be regarded as the actions of a private principal under the normal rules of agency." *Id.* at 695.

For this reason, plaintiffs' *ultra vires* claim against Administrator Zeldin fails. Like in *Larson*, plaintiffs cannot establish that EPA violated any statutory mandate, as the IRA provided EPA discretion in overseeing and managing the grant programs. Plaintiffs' *ultra vires* claim is instead premised on a disagreement with EPA's decision to terminate in a manner that plaintiffs allege contravenes the terms of the contract. Such a claim, *Larson* held, is barred by sovereign immunity.

Plaintiffs' novel theory of *ultra vires* claims, if accepted, would allow plaintiffs to easily evade sovereign-immunity principles and the Tucker Act's remedial limits, as every breach-of-contract claim could be reframed as an

*ultra vires* action against the relevant executive official. In *California*, for example, the plaintiffs could have simply argued that the Secretary of Education acted *ultra vires* in terminating their grants. *See* 604 U.S. 650. Or, in *Ingersoll-Rand*, the company could have just sued the Secretary of Defense for the *ultra vires* act of terminating its contract. *See* 780 F.2d 74. This is a transparent workaround, and this Court should not bless it.

Plaintiffs' argument that the funds in the Citibank accounts belong to them makes no difference. Indeed, this same argument was made by the plaintiff in *Larson*, and the Supreme Court expressly rejected it. 337 U.S. at 692 (rejecting the plaintiff's "erroneous theory" that the *ultra vires* exception applies because the "complaint alleged that the respondent's contract with the United States was an immediate contract of sale under which title to the coal had passed," and thus the coal was "alleged to be the respondent's coal, not the United States' coal"). The "mere allegation that the officer, acting officially, wrongfully holds property to which the plaintiff has title does not" satisfy the requirements for an *ultra vires* claim because "it does not establish that the officer, in committing that wrong, is not exercising the powers delegated to him by the sovereign." *Id.* at 693.

In short, plaintiffs' attempts to reframe their breach-of-contract claims as an *ultra vires* claim should suffer the same fate as their APA and other claims. Regardless of label, the only real claims here sound in contract, and thus must be brought in the Court of Federal Claims. And if anything else could slip past the Tucker Act, it would be hopeless on the merits.

## II. The Remaining Injunction Factors Overwhelmingly Weigh Against An Injunction.

The remaining injunction factors cut against injunctive relief, too. Plaintiffs' asserted imminent harms are almost exclusively monetary and remediable should plaintiffs ultimately prevail. While plaintiffs claimed they would face collapse without immediate access to their grant funds, that harm does not appear to have materialized over the nearly ten months since those funds were frozen. In contrast, as the Supreme Court has twice reiterated, the government suffers irreparable harm when it is forced to disburse funds that it may be unable to recover. *NIH*, 145 S. Ct. at 2658; *California*, 604 U.S. at 651-52. Here, those funds amount to *billions*.

**A.** Plaintiffs' economic harms are remediable and thus fail to establish irreparable injury. It is "well settled that economic loss does not, in and of itself, constitute irreparable harm." *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quotation marks omitted). Only

"where no 'adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation,'" can financial injury be irreparable. *Id.* (quotation omitted). That narrow exception does not apply here. If plaintiffs ultimately prevailed in this litigation (or in litigation before the Court of Federal Claims), they would receive relief that would remedy their asserted harms.

Although plaintiffs claimed a risk of "grave economic harm" absent immediate distribution of funds during the week of March 11, 2025, JA31, none of these "grave" harms have actualized despite their continued lack of access to the grant funds. Indeed, plaintiffs supported multiple extensions of the temporary restraining order freezing the funds, and have not identified any harm that manifested in the nearly ten months that have since passed. The limited nature of the harm here is also underscored by the early stage of these grant programs, which have yet to engender serious reliance interests: The awards were only finalized in late 2024 and terminated in early 2025.

**B.** Conversely, the equities and public interest weigh strongly in the government's favor. On this issue, too, the Supreme Court has been clear: the government suffers irreparable monetary harm from an injunction requiring the payment of grant funds. "[W]hile the loss of money is not

typically considered irreparable harm, that changes if the funds cannot be recouped and are thus irrevocably expended." *NIH*, 145 S. Ct. at 2659 (quotation omitted). Accordingly, the Court in both *NIH* and *California* concluded that the government faced irreparable harm where the "plaintiffs d[id] not state that they w[ould] repay grant money if the Government ultimately prevails." *Id.* at 2659; *California*, 604 U.S. at 651-52 (finding irreparable harm to the government where the "respondents have not refuted the Government's representation that it is unlikely to recover the grant funds once they are disbursed"). Those stay decisions must "inform how a court should exercise its equitable discretion in like cases." *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025); *see also NIH*, 145 S. Ct. at 2664 (Gorsuch, J., concurring in part and dissenting in part) (explaining that the Supreme Court's emergency orders in cases like *California* "bind[] lower courts" as to application of the stay factors).

This is a like case. The district court's order vacating EPA's grant terminations and effectively requiring the disbursement of nearly $20 billion in federal funds would irreparably harm the public fisc. As in *NIH*, plaintiffs have not promised to return withdrawn funds, and the government has no ready means to recover them later. And here EPA's termination decision

was already made against the backdrop of "lack of oversight and potential conflicts," "evidence of mismanagement of the funds," and a strong interest in "eliminating the appearance of impropriety."  Op.26 & n.12.

In concluding otherwise, the district court underappreciated the clear, substantial, and irreparable harm to the public fisc.  The injunction, if allowed to go into effect, would permit plaintiffs to withdraw enormous sums of money immediately.  Indeed, plaintiffs have submitted increasingly large disbursement requests to Citibank that now appear to exceed $600 million.  JA753.  One request asks Citibank to transfer more than $250 million to an external bank account controlled by Climate United.  JA792.  Plaintiffs have told Citibank to prepare to "immediately" process such pending requests to external accounts if the injunction takes effect, noting that even a brief delay would be "unacceptable."  JA764.  In the meantime, the public fisc is being deprived of significant interest earned on billions in outstanding funds.  These harms are even further amplified now that Congress has made clear through its repeal of the relevant appropriations statute that it no longer wishes to fund these programs at all.

In short, this is a case in which the merits and the equities point firmly in the same direction.  This Court should vacate the preliminary injunction.

**CONCLUSION**

For the foregoing reasons, this Court should vacate the district court's preliminary injunction.

Respectfully submitted,

BRETT A. SHUMATE
   *Assistant Attorney General*

YAAKOV M. ROTH
   *Principal Deputy Assistant*
    *Attorney General*

DANIEL TENNY

 */s/ Sophia Shams*
SOPHIA SHAMS
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7264*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 514-2495*

January 2026

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,146 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in CenturyExpd BT 14-point font, a proportionally spaced typeface.

_/s/  Sophia Shams_
Sophia Shams

## CERTIFICATE OF SERVICE

I hereby certify that on January 9, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

/s/ *Sophia Shams*
Sophia Shams

**ADDENDUM**

# TABLE OF CONTENTS

42 U.S.C. § 7434 ...............................................................A1

5 U.S.C. § 701 .................................................................A4

5 U.S.C. § 704 .................................................................A5

28 U.S.C. § 1491(a)...........................................................A6

42 U.S.C. § 7343

## (a) Appropriations

### (1) Zero-emission technologies

In addition to amounts otherwise available, there is appropriated to the Administrator for fiscal year 2022, out of any money in the Treasury not otherwise appropriated, $7,000,000,000, to remain available until September 30, 2024, to make grants, on a competitive basis and beginning not later than 180 calendar days after August 16, 2022, to States, municipalities, Tribal governments, and eligible recipients for the purposes of providing grants, loans, or other forms of financial assistance, as well as technical assistance, to enable low-income and disadvantaged communities to deploy or benefit from zero-emission technologies, including distributed technologies on residential rooftops, and to carry out other greenhouse gas emission reduction activities, as determined appropriate by the Administrator in accordance with this section.

### (2) General assistance

In addition to amounts otherwise available, there is appropriated to the Administrator for fiscal year 2022, out of any money in the Treasury not otherwise appropriated, $11,970,000,000, to remain available until September 30, 2024, to make grants, on a competitive basis and beginning not later than 180 calendar days after August 16, 2022, to eligible recipients for the purposes of providing financial assistance and technical assistance in accordance with subsection (b).

### (3) Low-income and disadvantaged communities

In addition to amounts otherwise available, there is appropriated to the Administrator for fiscal year 2022, out of any money in the Treasury not otherwise appropriated, $8,000,000,000, to remain available until September 30, 2024, to make grants, on a competitive basis and beginning not later than 180 calendar days after August 16, 2022, to eligible recipients for the purposes of providing financial assistance and technical assistance in low-income and disadvantaged communities in accordance with subsection (b).

**(4) Administrative costs**

In addition to amounts otherwise available, there is appropriated to the Administrator for fiscal year 2022, out of any money in the Treasury not otherwise appropriated, $30,000,000, to remain available until September 30, 2031, for the administrative costs necessary to carry out activities under this section.

## (b) Use of funds

An eligible recipient that receives a grant pursuant to subsection (a) shall use the grant in accordance with the following:

**(1) Direct investment**

The eligible recipient shall-

(A) provide financial assistance to qualified projects at the national, regional, State, and local levels;

(B) prioritize investment in qualified projects that would otherwise lack access to financing; and

(C) retain, manage, recycle, and monetize all repayments and other revenue received from fees, interest, repaid loans, and all other types of financial assistance provided using grant funds under this section to ensure continued operability.

**(2) Indirect investment**

The eligible recipient shall provide funding and technical assistance to establish new or support existing public, quasi-public, not-for-profit, or nonprofit entities that provide financial assistance to qualified projects at the State, local, territorial, or Tribal level or in the District of Columbia, including community- and low-income-focused lenders and capital providers.

## (c) Definitions

In this section:

**(1) Eligible recipient**

The term "eligible recipient" means a nonprofit organization that-

(A) is designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;

(B) does not take deposits other than deposits from repayments and other revenue received from financial assistance provided using grant funds under this section;

(C) is funded by public or charitable contributions; and

(D) invests in or finances projects alone or in conjunction with other investors.

## (2) Greenhouse gas

The term "greenhouse gas" means the air pollutants carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride.

## (3) Qualified project

The term "qualified project" includes any project, activity, or technology that-

(A) reduces or avoids greenhouse gas emissions and other forms of air pollution in partnership with, and by leveraging investment from, the private sector; or

(B) assists communities in the efforts of those communities to reduce or avoid greenhouse gas emissions and other forms of air pollution.

## (4) Zero-emission technology

The term "zero-emission technology" means any technology that produces zero emissions of-

(A) any air pollutant that is listed pursuant to section 7408(a) of this title (or any precursor to such an air pollutant); and

(B) any greenhouse gas.

## 5 U.S.C. § 701

(a) This chapter applies, according to the provisions thereof, except to the extent that—

(1) statutes preclude judicial review; or

(2) agency action is committed to agency discretion by law.

(b) For the purpose of this chapter—

(1) "agency" means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include—

(A) the Congress;

(B) the courts of the United States;

(C) the governments of the territories or possessions of the United States;

(D) the government of the District of Columbia;

(E) agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them;

(F) courts martial and military commissions;

(G) military authority exercised in the field in time of war or in occupied territory; or

(H) functions conferred by sections 1738, 1739, 1743, and 1744 of title 12; subchapter II of chapter 471 of title 49; or sections 1884, 1891–1902, and former section 1641(b)(2), of title 50, appendix; and

(2) "person", "rule", "order", "license", "sanction", "relief", and "agency action" have the meanings given them by section 551 of this title.

5 U.S.C. § 704

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

28 U.S.C. § 1491(a)

(1)The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort. For the purpose of this paragraph, an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aeronautics and Space Administration shall be considered an express or implied contract with the United States.

(2)To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States. In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just. The Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41, including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 [1] of that Act.