No. 25-5122

# IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

CLIMATE UNITED FUND, et al.,

*Plaintiffs-Appellees,*

v.

CITIBANK, N.A., et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Columbia
No. 1:25-cv-00698-TSC
Hon. Tanya S. Chutkan

## BRIEF OF AMICI CURIAE STATE OF WEST VIRGINIA AND 23 OTHER STATES IN SUPPORT OF APPELLANTS

JOHN B. MCCUSKEY
  *Attorney General*

OFFICE OF THE WEST
VIRGINIA ATTORNEY GENERAL
1900 Kanawha Blvd., East
Building 1, Room E-26
Charleston, WV 25305
Phone: (304) 558-2021
caleb.a.seckman@wvago.gov

MICHAEL R. WILLIAMS
  *Solicitor General*

CALEB A. SECKMAN
  *Assistant Solicitor General*
  *Counsel of Record*

MATTIE F. SHULER
  *Assistant Solicitor General*

*Counsel for Amicus Curiae State of West Virginia*
[additional counsel listed after signature page]

# TABLE OF CONTENTS

Table of Authorities ............................................................................. ii

Interests of Amici Curiae .....................................................................1

Introduction ..........................................................................................2

Summary Of The Argument ..................................................................4

Argument ...............................................................................................5

I.      EPA Had A Duty To Rescind The Grants. ...............................5

        A.      The Inflation Reduction Act Required EPA To Rescind The
                Grants Or At Minimum, Gave The Agency Discretion To Do So..6

        B.      Constitutional Duties Likewise Command That EPA Must
                Rescind The Improper Grants. .......................................12

II.     The Grant Program Exhibited Waste, Mismanagement, And Favoritism
        That Harmed Amici States And Justified EPA's Corrective Action. ....16

        A.      The Prior Administration Warped The Program's Structure To
                Evade Oversight. ...........................................................17

        B.      The Grantees Were Poorly Vetted, Unqualified, And Presented
                Serious Conflicts Of Interest. ........................................20

        C.      The Program's Past Implementation Shows The Climate Agenda
                Overrode Sound Fiscal Policy. .......................................24

Conclusion ...........................................................................................30

Certificate Of Compliance ..................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aiken County*,
725 F.3d 255 (D.C. Cir. 2013)...................................................................6, 15

*Bond v. United States*,
564 U.S. 211 (2011)................................................................................1

*Cboe Global Markets, Inc. v. SEC*,
155 F.4th 704 (D.C. Cir 2025).................................................................29

*Cincinnati Soap Co. v. United States*,
301 U.S. 308 (1937)..............................................................................15

*City of Arlington v. FCC*,
569 U.S. 290 (2013)................................................................................8

*Climate United Fund v. Citibank, N.A.*,
Nos. 25-5122 & 25-5123 (D.C. Cir. Sept. 2, 2025)......................................20

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016)..............................................................................11

*English v. Trump*,
279 F.Supp.3d 307 (D.D.C. 2018) ............................................................6

*FCC v. Consumers' Rsch.*,
606 U.S. 656 (2025)..............................................................................29

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)...........................................................................7, 12

*Fed. Crop Ins. Corp. v. Merrill*,
332 U.S. 380 (1947)..............................................................................11

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010)............................................................................5, 30

# TABLE OF AUTHORITIES
## (*continued*)

**Page(s)**

*Freytag v. Comm'n of Internal Revenue,*
  501 U.S. 868 (1991)................................................................15

*Heckler v. Chaney,*
  470 U.S. 821 (1985)..............................................................8, 9

*Helvering v. Davis,*
  301 U.S. 619 (1937)................................................................13

*Int'l Union, United Auto., Aerospace & Agric. Implement*
  *Workers of Am. v. Donovan,*
  746 F.2d 855 (D.C. Cir. 1984)..............................................10

*Kendall v. U.S. ex rel. Stokes,*
  37 U.S. 524 (1838)....................................................................8

*Knote v. United States,*
  95 U.S. 149 (1877)..................................................................15

*La. Pub. Serv. Comm'n v. FCC,*
  476 U.S. 355 (1986)..................................................................7

*Lincoln v. Vigil,*
  508 U.S. 182 (1993)......................................................9, 10, 12

*Marbury v. Madison,*
  5 U.S. 137 (1803)....................................................................15

*Massachusetts v. EPA,*
  549 U.S. 497 (2007)..................................................................1

*Milk Train, Inc. v. Veneman,*
  310 F.3d 747 (D.C. Cir. 2002)................................................6

*Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.,*
  545 U.S. 967 (2005)................................................................12

# TABLE OF AUTHORITIES
## (*continued*)

**Page(s)**

*Off. of Pers. Mgmt. v. Richmond,*
  496 U.S. 414 (1990)..................................................................10

*Permian Basin Area Rate Cases,*
  390 U.S. 747 (1968)..................................................................11

*Sabri v. United States,*
  541 U.S. 600 (2004)..............................................................13, 26

*Salazar v. Rama Navajo Chapter,*
  567 U.S. 182 (2012)..................................................................12

*South Dakota v. Dole,*
  483 U.S. 203 (1987)..................................................................13

*Train v. N.Y.C.,*
  420 U.S. 35 (1975)..................................................................7, 8

*United States v. Butler,*
  297 U.S. 1 (1936)......................................................................14

*United States v. Wurts,*
  303 U.S. 414 (1938)..................................................................11

*Utah Power & Light Co. v. United States,*
  243 U.S. 389 (1917)..................................................................11

*Util. Air Reg. Grp. v. EPA,*
  573 U.S. 302 (2014)....................................................................8

*West Virginia v. EPA,*
  597 U.S. 697 (2022)..............................................................1, 27

## Constitutional Provisions

U.S. CONST. art. I, § 8..................................................................13

# TABLE OF AUTHORITIES
## (*continued*)

**Page(s)**

U.S. CONST. art. I, § 9 ............................................................................14

U.S. CONST. art. II, § 3 ....................................................................5, 12, 16

**Statutes**

5 U.S.C. § 402 ......................................................................................26

42 U.S.C. § 7434 (2024)................................................................1, 4, 6, 17

H.B. 1500, 88th Leg., Reg. Sess. (Tex. 2023) ............................................28

OHIO REV. CODE § 4928.64 (2019) ..........................................................27

S.B. 91, 86th Leg., Reg. Sess. (Kan. 2015) ...............................................27

**Other Authorities**

Decl. of Eric Amidon, *Climate United Fund v. Citibank, N.A.*,
   No. 1:25-cv-698 (D.D.C. Mar. 17, 2025) ............................................19

*EPA Advisor Admits 'Insurance Policy' Against Trump is
   Funneling Billions to Climate Organizations, "We're
   Throwing Gold Bars off the Titanic,"* PROJECT VERITAS (Dec.
   3, 2024) ........................................................................................18, 24

EPA GENERAL TERMS AND CONDITIONS (2023) ...................................19

EPA GENERAL TERMS AND CONDITIONS (2024) ...................................19

Examining the Biden Administration's Energy and Environment
   Spending Push: Hearing Before the Subcomm. on Oversight
   and Investigations of the H. Comm. on Energy and
   Commerce, 119th Cong. (2025) .....................................................23, 24

*Greenhouse Gas Reduction Fund*, EPA (Sept. 30, 2025)...14, 18, 19, 20, 21, 22

# TABLE OF AUTHORITIES
## (*continued*)

**Page(s)**

Lee Zeldin, *Message to EPA Employees from Administrator Zeldin: Fighting waste, fraud and abuse of taxpayer resources (February 7, 2025)*, EPA (Oct. 16, 2025) ...............................13, 16

Letter from Brett Guthrie, Chairman, Comm. on Energy and Com.; John Joyce, M.D., Chairman, Subcomm. on Oversight and Investigation; and Gary Palmer, Chairman, Subcomm. on Env't to Lee Zeldin, Adm'r, EPA (Nov. 5, 2025)...........................................21

MAJORITY STAFF OF H. COMM. ON OVERSIGHT & GOV'T REFORM, 119TH CONG., THE GREEN NEW DEAL SCAM: THE GREENHOUSE GAS REDUCTION FUND 3 (2025) .....................17, 20, 22, 23, 24

News Release, EPA, EPA Formally Refers Financial Mismanagement of $20B "Gold Bars" to Inspector General (Mar. 3, 2025)..........................................................................................21, 22

Olivia Guarna, *EPA's Attacks on Greenhouse Reduction Fund and the Fate of IRA's "Green Banks,"* COLUM.: CLIMATE L. BLOG (Apr. 2, 2025)..............................................................................19

Pet. for Review, *West Virginia v. EPA*, No. 24-1120 (D.C. Cir. May 9, 2024)..................................................................................................27

Press Release, H. Comm. on Oversight & Gov't Reform, Oversight Committee Releases Report Exposing Biden's Green New Deal Scam (Sept. 10, 2025).....................................................23, 28

Thomas Catenacci, '*Serious Conflicts of Interest': Biden EPA Official Oversaw $5B Grant to His Former Employer*, WASH. FREE BEACON (Feb. 20, 2025).........................................................................22

*West Virginia: An Energy and Economic Analysis*, INST. FOR ENERGY RSCH. (Dec. 11, 2013) ........................................................................25

# TABLE OF AUTHORITIES
## (*continued*)

**Page(s)**

*West Virginia State Energy Profile*, U.S. ENERGY INFO. ADMIN.
(Feb. 20, 2025) ..............................................................................25, 27

## INTERESTS OF AMICI CURIAE

The amici States have a substantial interest in the proper functioning of federal agencies. *Cf. Massachusetts v. EPA*, 549 U.S. 497, 518 (2007) ("It is of considerable relevance that the party seeking review [of agency action] is a sovereign State."). An agency threatens the separation of powers when it exceeds its statutory or constitutional limits, endangering our States' sovereignty and our citizens' liberty. *See Bond v. United States*, 564 U.S. 211, 222 (2011). These concerns only grow when tremendous sums are at stake, too. *Cf. West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (explaining the importance of close scrutiny toward agency action involving "economic … significance").

All these concerns come together here. Congress appropriated $27 billion for the Greenhouse Gas Reduction Fund. Inflation Reduction Act of 2022, Pub. L. No. 117-169, § 60103, 136 Stat. 1818, 2065-67 (formerly codified at 42 U.S.C. § 7434 (2024)). But EPA now has serious misgivings about whether grantees are spending nearly $20 billion from that appropriation appropriately. Those funds implicate a significant amount of taxpayer dollars from the States' citizens. And the States also have specific concerns about the grant program's documented waste, mismanagement, and conflicts of interest.

1

Among other things, the past administration awarded funds to grantees with minimal financial history, a program director who oversaw a $5 billion grant to his former employer without recusing himself, and a funding structure officials admitted was designed to be "safer from Republicans taking the money away." Meanwhile, the program's evaluation criteria prioritized "climate equity" over financial stability, effectively directing federal taxpayer dollars to advance an ideological agenda that disadvantages energy-producing States like West Virginia.

Amici States thus support EPA's decision to terminate these grants and ensure responsible stewardship of federal funds. The Court should not upset that decision.

## INTRODUCTION

The Greenhouse Gas Reduction Fund appropriated $20 billion and tasked EPA to issue grants to eligible recipients. Congress directed that EPA make the grants on a "competitive basis" but provided little further guidance. The previous administration exploited this flexibility by funding a slew of projects that had no hopes of achieving their goals—and, by extension, Congress's goals. Worse still, those projects were often run by recipients with dubious backgrounds, conflicts, and biases. Because of these issues, EPA

determined that it needed to rescind the grants and reconsider appropriate recipients to properly align the funding decisions with both the statutory text and the agency's constitutional duties. That determination was correct, and the Court should say so.

EPA didn't just follow the law here; it also did the pragmatic thing by rescinding grants tainted by waste, mismanagement, and self-dealing. The Biden administration funneled $20 billion to just eight nonprofits through a funding structure that EPA officials admitted was "an insurance policy against Trump winning." The administration then hastily amended grant agreements after the 2024 election to strip oversight authority. Nothing in either the relevant statutes or the Constitution compels this Court to play along with such a scheme.

Amici States laud EPA's current attempt to rein in the agency's past wrongdoings. The rescissions here are both demanded by law and justified by the record. This Court should vacate the district court's preliminary injunction order.

## SUMMARY OF THE ARGUMENT

**A.** The Constitution and the Inflation Reduction Act required, or at least authorized, EPA to rescind the improperly awarded Greenhouse Gas Reduction Fund grants.

The Inflation Reduction Act directed EPA to award grants "on a competitive basis" to "eligible recipients."   But instead, the Biden administration awarded billions to organizations on a "who-you-know" basis using a process replete with conflicts of interest and self-dealing.  That flippant approach to fiscal prudence violates the statute, and EPA was right to rescind the grants.

Likewise, the Take Care Clause obligates the Executive Branch to faithfully execute the laws.  The Clause requires the President to ensure that appropriated spending actually meets Congress's objectives; that outcome doesn't follow when the spending merely satisfies the whims of a waning administration at the end of its time in power.  And because those grants were void from their inception, the Appropriations and Spending Clauses also compelled action: federal expenditures must serve the general welfare Congress intended—not the narrow interests of politically connected nonprofits.

4

**B.** The factual record confirms EPA's concerns. The Biden administration gifted $20 billion to eight nonprofits through a structure officials admitted was "an insurance policy against Trump winning." It then hastily amended grant agreements after the 2024 election to strip oversight authority. Apart from their apparent political connections, the grantees were unqualified, unprepared, and unvetted. These inappropriate grants impose disproportionate harm on the amici States. Indeed, under the political machinations of the past administration, all energy-producing States witnessed their tax dollars pay for programs that undermined their economies and funded otherwise non-viable projects in direct opposition to those States' interests. All this self-selection of winners and losers was done with inadequate vetting or supervision. This Court should allow EPA to correct those mistakes.

## ARGUMENT

### I. EPA Had A Duty To Rescind The Grants.

The President has a duty to "take Care that the Laws be faithfully executed." U.S. CONST. art. II, § 3. This responsibility extends to all "actions of the Executive Branch," including those of agencies like EPA. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 496-97 (2010) (cleaned up);

*see also English v. Trump*, 279 F.Supp.3d 307, 327 (D.D.C. 2018). And the "Laws" encompasses both statutes and "the Constitution, which is superior to statutes." *In re Aiken County*, 725 F.3d 255, 261 (D.C. Cir. 2013) (Kavanaugh, J.). After EPA learned of the previously awarded grants' deficiencies, both the Inflation Reduction Act and the Constitution demanded—or at minimum authorized—EPA to rescind them. EPA faithfully executed those laws when it terminated the awards.

### A. The Inflation Reduction Act Required EPA To Rescind The Grants Or At Minimum, Gave The Agency Discretion To Do So.

The Inflation Reduction Act endorses what EPA did here. The Act "appropriated to the Administrator" $20 billion "to make grants[] on a competitive basis" to "eligible recipients" who in turn will invest in "qualified projects" aimed at "reduc[ing] or avoid[ing] greenhouse gas emissions and other forms of air pollution." 42 U.S.C. § 7434(a)-(c) (2024). Beyond these broad directives, this Greenhouse Gas Reduction Fund "provides no relevant statutory reference point" about specific recipients, projects, outcomes, and so on. *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002) (cleaned up). The statute also lacks any limitations on EPA's discretion to withdraw or rescind grants. In effect, all the statute says is that the $20 billion "must be

allotted" according to Congress's broadly stated purposes. *Train v. N.Y.C.*, 420 U.S. 35, 44 (1975).

Although general, these terms mandated EPA rescind the grants. The agency explained that its decision was based "on substantial concerns regarding program integrity, the award progress, programmatic fraud, waste, and abuse." JA701. These problems, EPA continued, meant the grants were "misalign[ed] with the Agency's priorities" and "collectively undermine[d] the fundamental goals and statutory objectives of the [Greenhouse Gas Reduction Fund]." JA701. After all, if program recipients misled EPA about their projects or were chosen for reasons apart from a "competitive basis," those recipients would be statutorily ineligible, and EPA never should've awarded them the funds in the first place. When Congress "lay[s] down by legislative act an intelligible principle," then "the agency must follow it." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 536 (2009) (Kennedy, J., concurring) (cleaned up). So EPA lacked the power to make the illegal grants in the first instance, as "an agency literally has no power to act … unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

The ultimate goal of any agency action is to "give effect to the unambiguously express intent of Congress." *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013) (cleaned up). By rescinding the grants in the face of the discovered problems, EPA returned to the "bounds of its statutory authority" and cancelled money that would've impermissibly gone to groups and projects outside Congress's plainly expressed intent. *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 315 (2014) (cleaned up). "[T]hat is the end of the matter." *City of Arlington*, 569 U.S. at 296.

Even if the statute didn't demand this outcome, it at least *allowed* the agency to take this action. By directing EPA to make the grants on a competitive basis without further guidance, the Inflation Reduction Act leaves the details of grant determinations to EPA's discretion. If an executive officer "is directed to do an act" but "has a discretion to perform [the act]," that officer may still "exercise his discretion" and "perform the duty in the mode which he selected." *Kendall v. U.S. ex rel. Stokes*, 37 U.S. 524, 568 (1838). In that way, the Greenhouse Gas Reduction Fund's plain text "committed the decisionmaking to the agency's judgment absolutely." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985) (cleaned up). If EPA funds eligible "projects in th[e] [appropriated] amount," then the agency satisfies its statutory duty. *Train*,

8

420 U.S. at 44. At that point, EPA is free to allot and adjust grants as it sees fit based on its statutorily assigned discretion.

Thus, even if EPA's decision here constituted a reassessment of priorities, courts cannot substitute their judgment for that of an agency's on discretionary calls like this. "The allocation of funds from a lump-sum appropriation is an[] administrative decision traditionally regarded as committed to agency discretion." *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993). This rule makes good sense. Take EPA's decisions here: the agency's allocation of grants from a lump-sum appropriation involves "a complicated balancing of a number of factors which are peculiarly within its expertise." *Heckler*, 470 U.S. at 831. For instance, whether its "resources are best spent" on one proposal or another; whether a particular project "is likely to succeed" in its objectives; whether a particular program "best fits the agency's overall policies;" and "whether the agency has enough resources" to fund all potentially deserving initiatives. *Id.* On these questions, EPA "is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* at 831-32.

"[A]s a matter of law," Congress empowered EPA "to distribute the funds among some or all of the permissible objects as [EPA] sees fit" (provided

they meet the statute's minimal criteria).  *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Donovan*, 746 F.2d 855, 861 (D.C. Cir. 1984) (Scalia, J.).  This discretion extends to decisions to terminate grants as well.  Indeed, "the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way."  *Lincoln*, 508 U.S. at 192.  So apart from the delineated "statutor[y] restrict[ions]," Congress "d[id] not intend to impose legally binding" requirements about "how the funds should or are expected to be spent"—i.e., on one project or another.  *Id.* (cleaned up).  This leeway "reflects a congressional recognition that an agency must be allowed flexibility to shift … funds within a particular … appropriation" to "make necessary adjustments for unforeseen developments," "changing requirements," and the like.  *Id.* at 193 (cleaned up).

EPA's previous—and now-rebuked—determinations regarding the merits of the grants here do not change the outcome.  The agency cannot be bound by those previous awards because—as EPA now realizes—it had "no statutory authority for the[ir] issuance" in the first place.  *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 420 (1990).  So EPA "is neither bound nor

estopped" by past "agreement[s] to do or cause to be done what the law does not sanction or permit." *Utah Power & Light Co. v. United States*, 243 U.S. 389, 409 (1917). And although EPA's explanations for termination make this case straightforward, "not even the temptations of a hard case" suffice to order disbursement of improper grants and thereby defy "the conditions defined by Congress for charging the public treasury." *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 385-86 (1947). Cancellation of grants isn't the full extent of EPA's corrective options, either. Even if the grants were already paid out, the agency would likely be able to initiate a suit to "recover funds" like these "which its agents have wrongfully, erroneously, or illegally paid." *United States v. Wurts*, 303 U.S. 414, 415 (1938).

In any event, the bottom line is straightforward: EPA previously made a decision it now realizes was improper, and the agency must be given latitude to "adapt [its] rules and policies to the demands of changing circumstances." *Permian Basin Area Rate Cases*, 390 U.S. 747, 784 (1968). Indeed, that's true regardless of whether the grants were unlawful, as "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). EPA "display[ed] awareness that it is changing [its] position" and "show[ed]

11

that there are good reasons for the new policy." *Fox Television Stations*, 556 U.S. at 515 (cleaned up); *see also* Section II, *infra*. Because that explanation aligns with the statute's text, EPA is "free … to change course" on that basis alone. *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 1001 (2005). That the grants were wrongly given only reinforces the agency's position.

All told, Congress directed EPA to make decisions about grant recipients and which projects to fund to achieve the Greenhouse Gas Reduction Fund's purpose. "Within those constraints, the ability to direct th[e] funds [i]s committed to agency discretion by law." *Salazar v. Rama Navajo Chapter*, 567 U.S. 182, 192 (2012) (cleaned up). So "as long as [EPA] allocates funds from [the Greenhouse Gas Reduction Fund] to meet permissible statutory objectives," courts have "no leave to intrude." *Lincoln*, 508 U.S. at 193.

### B. Constitutional Duties Likewise Command That EPA Must Rescind The Improper Grants.

The Constitution demands the same outcome. Part of EPA's duty to "take Care that the Laws be faithfully executed," U.S. CONST. art. II, § 3, is to ensure that any public expenditures the agency makes comply with the Spending Clause. The Spending Clause directs that "Congress shall have

Power To lay and collect Taxes, Duties, Imposts and Excises, to … provide for the … general Welfare of the United States." U.S. CONST. art. I, § 8, cl. 1. So to be valid, the Spending Clause requires that the Greenhouse Gas Reduction Fund must be for "the general welfare." *See Helvering v. Davis*, 301 U.S. 619, 640 (1937) (cleaned up). And while Congress deserves deference as to "whether a particular expenditure is intended to serve general public purposes," the spending power is "not unlimited." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987).

But the question here isn't whether the Greenhouse Gas Reduction Fund's stated purpose as envisioned and "shaped by Congress" is in the general welfare. *Helvering*, 301 U.S. at 645. If the funds were properly awarded, their distribution would be valid. But the funds *weren't* properly awarded due to a host of issues with the process and the funded projects. *See* Section II, *infra*. Wasteful, fraudulent, and abusive grant awards "fritter[] away" taxpayer dollars, thus failing to serve Congress's purpose and the general welfare. *Sabri v. United States*, 541 U.S. 600, 605 (2004)

EPA discovered this misfeasance as part of an administration-wide push to "fight[] waste, fraud, and abuse" through "further attention and oversight." Lee Zeldin, *Message to EPA Employees from Administrator Zeldin:*

13

*Fighting waste, fraud and abuse of taxpayer resources (February 7, 2025)*, EPA (Oct. 16, 2025), https://tinyurl.com/2y77pd53. As EPA said in its initial brief, this endeavor revealed problems that were so severe they "raise[d] constitutional concerns." ECF No. 2114428. Administrator Zeldin described the situation as "throwing gold bars off the Titanic" due to the "well documented instances of self-dealing and conflicts of interest, unqualified recipients, and intentionally reduced agency oversight." *Greenhouse Gas Reduction Fund*, EPA (Sept. 30, 2025), https://tinyurl.com/2yjshcyr.

Considering the issues EPA described, the funds as they were actually distributed lined interested parties' pockets and funded projects with no hopes of achieving what they claimed. Thus, they did not serve Congress's stated purpose and were not for the "general welfare" Congress intended. The grants therefore "fail … their purpose and thus lose their constitutional character." *United States v. Butler*, 297 U.S. 1, 83 (1936).

The grants' failure to heed congressional purpose also disregards the Appropriations Clause, which provides that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. CONST. art. I, § 9, cl. 7. That limit "means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress."

*Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937). Because the improper grants weren't "expressly authorized by act of Congress," the Appropriations Clause instructs that EPA "cannot touch moneys in the treasury" to pay them. *Knote v. United States*, 95 U.S. 149, 154 (1877).

So the as-distributed grants not only failed to comply with the statutory requirements, but they also ran afoul of the Spending and Appropriations Clauses. On top of being statutorily barred, then, as "an act … repugnant to the [C]onstitution," the grants are "void." *Marbury v. Madison*, 5 U.S. 137, 177 (1803).

Because EPA "conclude[d] that [the grants] [were] unconstitutional," the agency was comfortably within its authority to "decline" to hand over the improperly awarded funds. *Aiken County*, 725 F.3d at 261. Indeed, because EPA operates under presidential authority, "unless and until a final Court decision in a justiciable case" says otherwise, the agency could refuse to follow even a mandatory directive from Congress if the agency believed it to be unconstitutional. *Id.*; *see also*, *e.g.*, *Freytag v. Comm'n of Internal Revenue*, 501 U.S. 868, 912 (1991) (Scalia, J., concurring) (noting that the President has "the power to veto encroaching laws or even to disregard them when they are

unconstitutional" (cleaned up)).  So EPA was especially right to rescind here where the grant awards were given at the agency's discretion.

EPA's recent attempts to better serve as "good stewards of our earth" and "of the taxpayer resources with which [the agency] [is] entrusted" reflects a renewed effort to faithfully fulfill both statutory and constitutional mandates.  Zeldin, *supra*.  Here, that fidelity to sound fiscal management means EPA was doubly required to cancel these grants.  Mandating otherwise and forcing EPA to distribute the funds despite their statutory and constitutional shortcomings is tantamount to ordering the agency to disregard its duty to "take Care that the Laws be faithfully executed," U.S. CONST. art. II, § 3.  This Court should not take that extraordinary step.

## II. The Grant Program Exhibited Waste, Mismanagement, And Favoritism That Harmed Amici States And Justified EPA's Corrective Action.

The record reveals a federal grant program riddled with deficiencies from inception to implementation.  The Greenhouse Gas Reduction Fund's unprecedented scale and structure—$20 billion funneled through just eight nonprofit intermediaries via a novel financial agent scheme—created inherent risks of mismanagement.  Yet the prior administration not only failed to address those risks; it actively exploited them.  Following the November 2024

16

election, EPA officials hastily amended grant agreements to strip the agency's oversight authority, while candidly admitting their intent to rush taxpayer funds out the door before the transition. The grantees receiving these billions of dollars, meanwhile, included newly created organizations with woefully inadequate financial histories, troubling conflicts of interest, and such limited competency that they required training on how to develop a budget. These deficiencies demonstrate that EPA's termination of the grants was not only legally justified, but also fiscally necessary.

## A.     The Prior Administration Warped The Program's Structure To Evade Oversight.

The Greenhouse Gas Reduction Fund represented an unprecedented federal grant program that warranted careful oversight—and termination when such oversight revealed serious deficiencies. The Inflation Reduction Act appropriated $27 billion to the Greenhouse Gas Reduction Fund—more than double EPA's entire annual budget for Fiscal Year 2025. Pub. L. No. 117-169, § 60103, 136 Stat. 1818, 2065-67 (2022) (formerly codified at 42 U.S.C. § 7434 (2024)). Of this sum, $20 billion was awarded to just eight nonprofit organizations through the National Clean Investment Fund and Clean Communities Investment Accelerator programs. *See* MAJORITY STAFF OF H. COMM. ON OVERSIGHT & GOV'T REFORM, 119TH CONG., THE GREEN NEW DEAL

SCAM: THE GREENHOUSE GAS REDUCTION FUND 3 (2025), https://bit.ly/3LLxdjC.

EPA's pioneering choice to use Citibank as a "financial agent" to hold grant funds—the first such arrangement for a nonexchange grant program administered by the federal government—deliberately reduced the agency's ability to exercise immediate control over disbursements. *See Greenhouse Gas Reduction Fund, supra.* This pass-through structure wasn't simply a bad choice, either: agency officials intended to cede oversight. In a December 2024 undercover video released by Project Veritas, EPA Special Advisor Brent Efron described the funding structure as "an insurance policy against Trump winning." *EPA Advisor Admits 'Insurance Policy' Against Trump is Funneling Billions to Climate Organizations, "We're Throwing Gold Bars off the Titanic,"* PROJECT VERITAS (Dec. 3, 2024), https://tinyurl.com/3mrh2def. According to Efron, EPA "gave the[] [nonprofits] the money because … they aren't [a government agency]," so "they're safer from Republicans taking the money away." *Id.* He also revealed that officials viewed the structure as a mechanism to ensure that climate programs would stay afloat—no matter who's in charge. *Id.* And a promised opportunity that officials could later "go work for one of these places" that received federal funding. *Id.*

18

The manipulation intensified after the November 2024 presidential election. Within weeks, the outgoing administration amended the grant agreements in ways that further reduced EPA's oversight authority. These modifications revised compliance and termination provisions and redefined contractual terms—including "waste, fraud, and abuse." *See Greenhouse Gas Reduction Fund*, *supra*. The original grant agreements included language allowing EPA to terminate if the award "no longer effectuates the program goals or agency priorities." EPA GENERAL TERMS AND CONDITIONS 2-3 (2023), https://tinyurl.com/48vb2s5h. The December 2024 grant amendments removed this ground for termination entirely. *See* EPA GENERAL TERMS AND CONDITIONS (2024), https://tinyurl.com/mrjzzxs5 (removing Section 3(b) termination ground); *see also* Olivia Guarna, *EPA's Attacks on Greenhouse Reduction Fund and the Fate of IRA's "Green Banks,"* COLUM.: CLIMATE L. BLOG (Apr. 2, 2025), https://tinyurl.com/3ub5c3d9. As EPA Chief of Staff Eric Amidon explained, the December amendments made it harder for EPA to find grantees in immediate noncompliance, to oversee subrecipient compliance, and to exercise contractual termination authority. Decl. of Eric Amidon ¶¶ 8-12, *Climate United Fund v. Citibank, N.A.*, No. 1:25-cv-698 (D.D.C. Mar. 17, 2025).

19

The agency employed these eleventh-hour amendments as part of a concerted effort. As Efron explained: "Now it's how to get the money out as fast as possible before they [[the] Trump Administration] come in[.] … [I]t's like we're on the Titanic and we're throwing gold bars off the edge." *Greenhouse Gas Reduction Fund, supra.* Like the panel here said, these "damning" statements serve as evidence of the outgoing administration's intent to rush funds without proper safeguards. *Climate United Fund v. Citibank, N.A.*, Nos. 25-5122 & 25-5123, slip op. at 26 n.12 (D.C. Cir. Sept. 2, 2025). The Court should reach the same conclusion.

## B. The Grantees Were Poorly Vetted, Unqualified, And Presented Serious Conflicts Of Interest.

The Greenhouse Gas Reduction Fund grantees included organizations created specifically for receiving Greenhouse Gas Reduction Fund money— with otherwise minimal financial history. For example, Power Forward Communities reported only $100 in assets in its 2023 tax return, just one year before receiving a $2 billion award. *See* THE GREEN NEW DEAL SCAM, *supra*, at 14; *see also Greenhouse Gas Reduction Fund*, *supra*. This sudden influx of funds represented an increase of 20 *million* times the organization's reported revenue. As the House Energy and Commerce Committee observed, "some of the grantees' previous revenues were only a small fraction of the

[Greenhouse Gas Reduction Funds] funds they received, which raises questions about whether the grant recipients can adequately manage grant amounts that are significantly larger than their previously documented revenue." Letter from Brett Guthrie, Chairman, Comm. on Energy and Com.; John Joyce, M.D., Chairman, Subcomm. on Oversight and Investigation; and Gary Palmer, Chairman, Subcomm. on Env't to Lee Zeldin, Adm'r, EPA (Nov. 5, 2025), https://tinyurl.com/mr2bva43.

Similarly, the Coalition for Green Capital spent only $1.42 million in 2023 before receiving a $5 billion award from EPA. *See Greenhouse Gas Reduction Fund, supra.* Despite these glaring capacity concerns, EPA required grantees to begin drawing down funds within 21 days—even though recipients were given 90 days to complete a required training entitled "How to Develop a Budget." *Id.* So while EPA itself apparently recognized that recipients lacked basic financial competency, the agency allowed them to manage and distribute billions of taxpayer dollars anyway.

The program also exhibited troubling conflicts of interest. Jahi Wise, the Greenhouse Gas Reduction Fund's founding director, previously served as Director of Policy at the Coalition for Green Capital—an organization which later received a $5 billion award. *See* News Release, EPA, EPA Formally

21

Refers Financial Mismanagement of $20B "Gold Bars" to Inspector General (Mar. 3, 2025), https://tinyurl.com/453n2hfk.  EPA later learned that Wise "personally oversaw a $5 billion grant to his previous employer, the Coalition for Green Capital—without recusing himself." *Id.*  The watchdog group Protect the Public's Trust characterized this arrangement as exemplifying "the sort of self-dealing revolving door that has become a hallmark of green energy handouts."  Thomas Catenacci, *'Serious Conflicts of Interest': Biden EPA Official Oversaw $5B Grant to His Former Employer*, WASH. FREE BEACON (Feb. 20, 2025), https://tinyurl.com/3vdd7yvc.

The conflicts didn't end there.  Power Forward Communities' application included a nearly $500 million "subaward" to Rewiring America—an organization whose CEO publicly declared that "[t]he Inflation Reduction Act was something that we were really involved with in shaping." THE GREEN NEW DEAL SCAM, *supra*, at 14.  And federal reviewers scrutinizing Greenhouse Gas Reduction Fund applications also flagged concerns that "exec comp seems high" and that the large budgets could "add risk to a federal award."  *Greenhouse Gas Reduction Fund*, *supra*; *see also* THE GREEN NEW DEAL SCAM, *supra*, at 10.  Yet to meet their last-minute deadlines, EPA overrode these concerns and rushed funds out the door anyway.

The House Oversight Committee's later audit of these funds revealed "outright waste, fraud, and abuse within the [Greenhouse Gas Reduction Fund], including taxpayer-funded, exorbitant salaries with lavish travel benefits for C-suite executives."  Press Release, H. Comm. on Oversight & Gov't Reform, Oversight Committee Releases Report Exposing Biden's Green New Deal Scam (Sept. 10, 2025), https://tinyurl.com/38na5by2.  The previous administration also slated funds for questionable projects, including housing for artists, a bar and communal kitchen, and emissions-free equipment for a brewery.  *Id.*  Based on these misguided disbursements, the Committee determined that awards couldn't have been based on a competitive basis, lamenting that "[w]hat the awardees lacked in ability or direction they made up for with political connections."  THE GREEN NEW DEAL SCAM, *supra*, at 20.

These concerns weren't new.  During the program's design phase, EPA Acting Inspector General Nicole Murley testified that her office was "particularly concerned" about the Greenhouse Gas Reduction Fund and had "raised questions regarding due diligence reviews, monitoring of grantees and subgrantees, and screening for potential conflicts of interest."  *See* Examining the Biden Administration's Energy and Environment Spending Push: Hearing Before the Subcomm. on Oversight and Investigations of the H.

23

Comm. on Energy and Commerce, 119th Cong. (2025).  The structure of the Greenhouse Gas Reduction Fund, she explained, "ma[d]e[] providing effective oversight challenging."  And "[u]sing third-party entities to determine how to distribute billions of dollars to additional passthrough entities reduce[d] the Agency's control" over the funds.  *Id.*

### C. The Program's Past Implementation Shows The Climate Agenda Overrode Sound Fiscal Policy.

The Greenhouse Gas Reduction Fund program reflects a troubling pattern of prioritizing ideological climate objectives over responsible stewardship of taxpayer funds.  By structuring billions of dollars in grants to flow through pass-through entities with minimal oversight—and then amending agreements after an election to further reduce oversight—the prior administration prioritized speed and political objectives over accountability.  Worse still, Efron candidly admitted that some agency officials thought the grants would allow them to later "go work for one of the[] places" that received federal funding.  PROJECT VERITAS, *supra.*

The Greenhouse Gas Reduction Fund's structure as operated by the previous administration prioritized "climate equity" and "environmental justice" criteria as heavily as financial stability and compliance.  *See* THE GREEN NEW DEAL SCAM, *supra*, at 6-7 (noting EPA evaluation criteria

24

emphasized "climate equity" and DEI policies). This redirection of federal funds effectively directed federal taxpayer dollars to advance an ideological agenda that disadvantaged energy-producing States. Yet many States remain heavily dependent on coal for electricity generation. For instance, coal fueled 86% of West Virginia's total electricity generation in 2023, and eight of the State's ten largest power plants use coal. *See West Virginia State Energy Profile*, U.S. ENERGY INFO. ADMIN. (Feb. 20, 2025), https://tinyurl.com/ynmrstwu. West Virginia is the nation's second-largest coal producer after Wyoming, accounting for approximately 15% of the nation's total coal production. *Id.*

It's not just generation, either: these States' citizens rely on traditional fuel industries for their livelihoods, too. In West Virginia, coal mining jobs are among the highest paying jobs in the State—more than twice the average wage of all industries. *See West Virginia: An Energy and Economic Analysis*, INST. FOR ENERGY RSCH. (Dec. 11, 2013), https://tinyurl.com/ysxewtyt. Thus, in States like West Virginia, federal policies that favor renewable energy directly and negatively impact the State's economy and its workers. The agency was effectively picking winners and losers, with disfavored (that is, pro-coal) States consistently losing.

But the harm to amici States is not just economic. When federal agencies divert billions to politically connected nonprofits while bypassing traditional oversight mechanisms, *all* taxpayers suffer. Congress's spending power comes with a corresponding responsibility "to see to it that taxpayer dollars appropriated under that power are in fact spent for the general welfare, and not frittered away." *Sabri*, 541 U.S. at 605. And the entire Inspector General system exists on the premise that federal programs require independent oversight to protect taxpayers from fraud, waste, and abuse. *See* 5 U.S.C. §§ 402(b)(2)(B) (establishing IGs "to prevent and detect fraud and abuse" in federal programs). When program structures are deliberately designed to evade such oversight—as EPA officials openly acknowledged the Greenhouse Gas Reduction Fund was—taxpayer dollars cannot serve their intended public purpose. So energy-producing States bear a double burden: their tax dollars fund programs explicitly designed to undermine their economies, while the resulting projects compete against their traditional industries.

West Virginia has been particularly vocal (and successful) in opposing federal climate policies that disregard economic realities. In 2015, West Virginia became the first State in the nation to completely repeal its

Renewable Portfolio Standard in direct response to federal pressure to transition away from coal. *See West Virginia State Energy Profile*, *supra*.

But West Virginia is far from alone. Twenty-seven States joined West Virginia in challenging the Obama administration's Clean Power Plan—a coalition that prevailed when this Court held that EPA lacked authority to restructure the nation's energy grid through generation-shifting mandates. *West Virginia*, 597 U.S. at 723-24. That victory was no isolated incident. In May 2024, twenty-five States again joined West Virginia in challenging the Biden administration's successor power plant regulations, arguing that EPA was once more attempting to force the premature closure of fossil fuel plants through impossible-to-meet emissions standards. *See* Pet. for Review, *West Virginia v. EPA*, No. 24-1120 (D.C. Cir. May 9, 2024).

Other States, too, have taken decisive action to resist federal pressure on their own energy policies. In 2014, Ohio became the first State to freeze its renewable portfolio standard, later phasing it out through H.B. 6 in 2019. *See* OHIO REV. CODE § 4928.64 (2019). In 2015, Kansas converted its mandatory renewable energy standard to a voluntary goal after years of legislative effort. S.B. 91, 86th Leg., Reg. Sess. (Kan. 2015). And in 2023, Texas repealed its

27

renewable portfolio standard entirely.  H.B. 1500, 88th Leg., Reg. Sess. (Tex. 2023).

The Greenhouse Gas Reduction Fund represents precisely the type of end-run around democratic accountability that amici States have consistently challenged: massive federal expenditures structured to advance climate policies without meaningful congressional debate or oversight.

The Greenhouse Gas Reduction Fund grants are not abstract federal expenditures.  They fund projects that will be deployed in the States— affecting local energy markets, land use, and employment.  The program's structure as a series of pass-through entities with subrecipients operating in communities across the nation means that inadequately vetted and politically motivated funding decisions have direct consequences for State residents and economies.  As the House Oversight Committee determined, the Greenhouse Gas Reduction Fund was "designed to funnel tens of billions in taxpayer dollars to enrich Democratic allies and fund partisan, politically motivated projects."  Press Release, H. Comm. on Oversight & Gov't Reform, *supra*.

When federal grant programs operate without meaningful oversight— as the House Oversight Committee found the Greenhouse Gas Reduction Fund did—States bear the consequences of projects that may be poorly

28

conceived, executed, or managed. Taxpayers in amici States deserve to know that federal climate spending is subject to proper oversight and accountability, not rushed out the door as "gold bars off the Titanic."

Moreover, the Greenhouse Gas Reduction Fund's unprecedented structure—transferring billions of dollars through a private financial agent rather than maintaining direct federal control—sets a troubling precedent for future federal grant programs. If such arrangements are permitted to stand, future administrations could similarly insulate billions in taxpayer funds from democratic oversight and accountability, effectively binding future administrations for years to come. This practice clashes with the principle that agencies "may change their positions" if "there are good reasons for the new position and [] the agency believes the new position to be better." *Cboe Global Markets, Inc. v. SEC*, 155 F.4th 704, 716 (D.C. Cir 2025) (cleaned up); *see also* Section I.A., *supra*. But even more concerningly, it deprives future executives of any control over those funds thus creating a situation where "no democratically elected official is accountable" for them. *FCC v. Consumers' Rsch.*, 606 U.S. 656, 709 (2025) (Kavanaugh, J., concurring). Yet "[t]he Constitution requires that a President chosen by the entire Nation oversee the execution of the laws," not a private entity cloistered away by a past

administration. *Free Enter. Fund*, 561 U.S. at 499. This Court should not allow such deliberate attempts to circumvent oversight mechanisms and constitutionally demanded accountability.

## CONCLUSION

The Court should vacate the district court's preliminary injunction order.

Respectfully submitted,

JOHN B. MCCUSKEY
 ATTORNEY GENERAL

/s/ Caleb A. Seckman
Michael R. Williams
 *Solicitor General*

Caleb A. Seckman
 *Assistant Solicitor General*
 *Counsel of Record*

Mattie F. Shuler
 *Assistant Solicitor General*

OFFICE OF THE WEST VIRGINIA
ATTORNEY GENERAL
1900 Kanawha Blvd., East
Building 1, Room E-26
Charleston, WV 25305
Phone: (304) 558-2021

Dated: January 16, 2026

*Counsel for Amicus Curiae*
*State of West Virginia*

## ADDITIONAL COUNSEL

STEVE MARSHALL
Attorney General
State of Alabama

STEPHEN J. COX
Attorney General
State of Alaska

TIM GRIFFIN
Attorney General
State of Arkansas

JAMES UTHMEIER
Attorney General
State of Florida

CHRISTOPHER M. CARR
Attorney General
State of Georgia

RAÚL R. LABRADOR
Attorney General
State of Idaho

THEODORE E. ROKITA
Attorney General
State of Indiana

BRENNA BIRD
Attorney General
State of Iowa

KRIS W. KOBACH
Attorney General
State of Kansas

RUSSELL COLEMAN
Attorney General
Commonwealth of Kentucky

LIZ MURRILL
Attorney General
State of Louisiana

LYNN FITCH
Attorney General
State of Mississippi

CATHERINE HANAWAY
Attorney General
State of Missouri

AUSTIN KNUDSEN
Attorney General
State of Montana

MICHAEL T. HILGERS
Attorney General
State of Nebraska

DREW H. WRIGLEY
Attorney General
State of North Dakota

DAVE YOST
Attorney General
State of Ohio

GENTNER DRUMMOND
Attorney General
State of Oklahoma

31

ALAN WILSON
Attorney General
State of South Carolina

KEN PAXTON
Attorney General
State of Texas

KEITH KAUTZ
Attorney General
State of Wyoming

MARTY J. JACKLEY
Attorney General
State of South Dakota

DEREK BROWN
Attorney General
State of Utah

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure, this brief contains 5782 words, excluding the parts of the document exempted by Rule 32(f), and complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6), as required by Rule 27(d)(1)(E), because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point CenturyExpd BT font.

/s/ Caleb A. Seckman
Caleb A. Seckman