# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

CLIMATE UNITED FUND, *et al.*,
*Petitioners-Appellees,*

v.

CITIBANK, N.A., *et al.*,
*Respondents-Appellants.*

———————————

**On Appeal from the United States District Court
for the District of Columbia**
No. 1:25-cv-00698-TSC

———————————

## STATE BANKS' EN BANC ANSWERING BRIEF

———————————

ROB BONTA
  *Attorney General of California*
SAMUEL T. HARBOURT
  *Solicitor General*
HELEN HONG
  *Principal Deputy Solicitor General*
THOMAS S. PATTERSON
  *Senior Assistant Attorney General*
ANYA M. BINSACCA
  *Supervising Deputy
    Attorney General*

DIANA L. KIM*
  *Deputy Solicitor General*
MEGHAN H. STRONG
WILLIAM SETRAKIAN
  *Deputy Attorneys General*

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3369
Diana.Kim@doj.ca.gov
*\*Counsel of Record*

*Attorneys for California Infrastructure
and Economic Development Bank*
(Additional counsel listed on signature page)

February 2, 2026

**CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES**

**(A)  Parties and Amici**

All parties in this case are listed in EPA's En Banc Opening Brief. Additionally, Tarek Farag moved to intervene, but his motion was denied.

Amici include the State of West Virginia; the Natural Resources Defense Council; Professor Samuel R. Bagenstos; Professor Tobias Barrington Wolff; impact finance experts Michael Swack, Paul Yoo, Ellen Lurie Hoffman, and Eric Hangen; and Congressmembers Nanette Diaz Barragan, Richard Blumenthal, Suzanne Bonamici, Julia Brownley, Troy Carter, Sean Casten, Kathy Castor, Yvette D. Clarke, Bonnie Watson Coleman, Diana DeGette, Debbie Dingell, Lloyd Doggett, Sarah Elfreth, Mazie K. Hirono, Jared Huffman, Greg Landsman, George Latimer, Mike Levin, Edward Markey, Doris Matsui, Jennifer McClellan, Robert Menendez, Jeff Merkley, Kevin Mullin, Alexandria Ocasio-Cortez, Frank Pallone, Jr., Mike Quigley, Jamie Raskin, Bernard Sanders, Mary Gay Scanlon, Jan Schakowsky, Brian Schatz, Bobby Scott, Tina Smith, Darren Soto, Mark Takano, Shri Thanedar, Paul Tonko, Chris Van Hollen, and Sheldon Whitehouse.

None of California Infrastructure and Economic Development Bank, Minnesota Climate Innovation Finance Authority, Efficiency Maine Trust, or Illinois Finance Authority has a parent corporation or any publicly held company that owns 10% or more of stock in the banks.

**(B)  Rulings Under Review**

References to the rulings at issue appear in EPA's En Banc Opening Brief.

**(C)  Related Cases**

This case was not previously before this Court or any court other than the

district court, and counsel is not aware of any related cases.


Dated:  February 2, 2026                      _s/ Diana L. Kim_____

# TABLE OF CONTENTS

Glossary................................................................................................. xi

Introduction ............................................................................................ 1

Statement of issues ................................................................................ 4

Statutes and regulations ........................................................................ 4

Statement of case .................................................................................. 4

    A.    Legal and factual background .................................... 4

    B.    Procedural history...................................................... 9

Standard of review ............................................................................... 12

Summary of argument.......................................................................... 12

Argument............................................................................................... 14

I.    Plaintiffs are likely to succeed on their APA claim .......................... 14

    A.    The district court had jurisdiction over the APA claim .......... 15

        1.    Plaintiffs' APA claim is not contractual in essence...... 15

        2.    The Supreme Court's stay orders in *DOE* and *NIH* do not weigh against jurisdiction here ............................... 23

        3.    The panel's and EPA's remaining arguments fail ........ 26

    B.    The district court correctly concluded that plaintiffs' APA claim is likely to succeed on the merits .................................. 35

II.    Plaintiffs are likely to succeed on their separation-of-powers claim...................................................................................................... 38

    A.    The district court had jurisdiction over plaintiffs' constitutional claim .................................................................. 38

    B.    The district court correctly concluded that plaintiffs' constitutional claim is likely to succeed on the merits............ 40

        1.    EPA violated the separation of powers by attempting to dismantle the GGRF ...................................................... 40

        2.    Plaintiffs' claim is constitutional, not statutory............ 43

Page

3.   EPA's claimed intent to re-obligate is refuted by the
      record and barred by appropriations law ....................... 46

4.   The OBBBA does not affect plaintiffs' funds .............. 51

III.   Equitable considerations support injunctive relief ........................... 53

Conclusion ................................................................................................. 55

# TABLE OF AUTHORITIES

**Page**

CASES

*Anderson v. Bessemer City*
470 U.S. 564 (1988)...........................................................47

*Arizona v. EPA*
No. 2:25-cv-2015 (W.D. Wash.) .................................5

*Armstrong v. Exceptional Child Ctr.*
575 U.S. 320 (2015).........................................................38

*Bowen v. Massachusetts*
487 U.S. 879 (1988)............................................16, 19, 20

*Bronner v. Duggan*
962 F.3d 596 (D.C. Cir. 2020).......................................38

*Buchanan v. Alexander*
45 U.S. 20 (1846).............................................................34

*Chicago v. Barr*
961 F.3d 882 (7th Cir. 2020) .........................................44

*Clinton v. City of New York*
524 U.S. 417 (1998).........................................................41

*Cmty. Legal Servs. in E. Palo Alto v. Dep't of Health & Hum. Servs.*
137 F.4th 932 (9th Cir. 2025) .......................................22

*Cmty. Legal Servs. in E. Palo Alto v. Dep't of Health & Hum. Servs.*
155 F.4th 1099 (9th Cir. 2025) .............................22, 25

*Collins v. Yellen*
594 U.S. 220 (2021).........................................................43

*Crowley Gov't Servs. v. Gen. Servs. Admin.*
38 F.4th 1099 (D.C. Cir. 2022)..............16, 20, 22, 30, 31

**TABLE OF AUTHORITIES**
**(continued)**

Page

*CTS Corp. v. EPA*
 759 F.3d 52 (D.C. Cir. 2014)....................................................35

*Dalton v. Specter*
 511 U.S. 462 (1994)..................................................13, 44, 45

*Dep't of Com. v. New York*
 588 U.S. 752 (2019)............................................................49

*Dep't of Homeland Security v. Regents of Univ. of Calif.*
 591 U.S. 1 (2020)..............................................................37

*Dep't of Navy v. Fed. Lab. Rels. Auth.*
 665 F.3d 1339 (D.C. Cir. 2012)..............................................40

*Dep't of Educ. v. California*
 145 S. Ct. 966 (2025)......................................................12, 23, 24

*Fed. of Gov't Employees, AFL-CIO v. Reagan*
 870 F.2d 723 (D.C. Cir. 1989)................................................47

*Fischer v. United States*
 603 U.S. 480 (2024)..........................................................52

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*
 561 U.S. 477 (2010)..........................................................43

*FTC v. Phoebe Putney Health Sys.*
 568 U.S. 216 (2013)..........................................................35

*Global Health Council v. Trump*
 153 F.4th 1 (D.C. Cir. 2025)................................................43, 45, 46

*Huisha-Huisha v. Mayorkas*
 27 F.4th 718 (D.C. Cir. 2022)..............................................12, 47

*Ickes v. Fox*
 300 U.S. 82 (1937)......................................... 18, 20, 21, 31, 33, 34

vi

## TABLE OF AUTHORITIES
### (continued)

*In re Aiken Cnty.*
725 F.3d 255 (D.C. Cir. 2013) ............................................. 41, 42, 43, 44, 45, 46

*In re Cambridge Indus. USA*
2025 WL 3526129 (Fed. Cir. Dec. 9, 2025) ........................................................ 45

*In re Joliet-Will Cnty. Cmty. Action Agency*
847 F.2d 430 (7th Cir. 1988) .............................................................................. 32

*Ingersoll-Rand Co. v. United States*
780 F.2d 74 (1985) ................................................................................. 15, 27, 28

*Kendall v. United States ex rel. Stokes*
37 U.S. 524 (1838) ....................................................................................41, 42, 45

*Land v. Dollar*
330 U.S. 731 (1947) ...................................................... 17, 18, 19, 20, 29, 31, 33

*League of Women Voters v. Newby*
838 F.3d 1 (D.C. Cir. 2016) ............................................................................... 54

*Leblanc v. United States*
50 F.3d 1025 (Fed. Cir. 1995) ........................................................................... 39

*Massachusetts v. NIH*
__ F.4th __, 2026 WL 26059 (1st Cir. Jan. 5, 2026) .................................... 12, 25

*Megapulse v. Lewis*
672 F.2d 959, 968-969 (D.C. Cir. 1982) ........... 17, 18, 20, 22, 23, 29, 30, 31, 32

*Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft
Noise*
501 U.S. 252 (1991) ............................................................................................ 40

*Mistretta v. United States*
488 U.S. 361 (1989) ...................................................................................... 40, 43

# TABLE OF AUTHORITIES
## (continued)

Page

*Motor Veh. Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins.*
463 U.S. 29 (1983)..................................................................36

*Murphy Co. v. Biden*
65 F.4th 1122 (9th Cir. 2023) ....................................44, 46

*Nat'l Inst. of Health v. Am. Public Health Ass'n*
145 S. Ct. 2658 (2025)........................3, 12, 23, 24, 25, 26

*Off. of Personnel Mgmt. v. Richmond*
496 U.S. 414 (1990)..................................................................41

*Pollack v. Hogan*
703 F.3d 117 (D.C. Cir. 2012)..........................................39

*San Francisco v. Trump*
897 F.3d 1225 (9th Cir. 2018) ..........................................44

*Sharp v. Weinberger*
798 F.2d 1521 (D.C. Cir. 1986)..........................29, 30, 31

*Solutions in Hometown Connections v. Noem*
2026 WL 179590 (4th Cir. Jan. 23, 2026)..................24, 25

*Spectrum Leasing v. United States*
764 F.2d 891 (D.C. Cir. 1985)..........................................24

*Sustainability Inst. v. Trump*
2026 WL 157120 (4th Cir. Jan. 21, 2026)............24, 25, 45

*Tootle v. Sec'y of Navy*
446 F.3d 167 (D.C. Cir. 2006)..........................................39

*Transohio Serv. Bank v. Dir., Off. of Thrift Supervision*
967 F.2d 598 (D.C. Cir. 1992)..........................29, 30, 31

*United States v. Bormes*
568 U.S. 6 (2012)..................................................................15

# TABLE OF AUTHORITIES
## (continued)

Page

*Vartelas v. Holder*
566 U.S. 257 (2012)..........................................................................52

*W.V. Ass'n of Cmty. Health Ctrs. v. Heckler*
734 F.2d 1570 (D.C. Cir. 1984).........................................................49

*Washington v. Dep't of Educ.*
161 F.4th 1136 (9th Cir. 2025).........................................................23

*Youngstown Sheet & Tube v. Sawyer*
343 U.S. 579 (1952)..............................................................40, 45

**STATUTES**

28 U.S.C. § 1491(a)(1)..................................................................15

42 U.S.C. § 7434 (2022)................................................................10

42 U.S.C. § 7434(a) (2022)................................................5, 42, 49

42 U.S.C. § 7434(c)(3)(A) (2022) ......................................................5

Pub. L. No. 119-21, 139 Stat. 72 (2025)......................................10, 51

**CONSTITUTIONAL PROVISIONS**

U.S. Const. Article I, §§ 1, 8-9 ...................................................40

U.S. Const. Article II, § 3 ............................................................40

**OTHER AUTHORITIES**

168 Cong. Rec. H7577 (Aug. 12, 2022) .............................................6

171 Cong. Rec. S4281-S4283 (July 9, 2025) .....................................52

*Continued Availability of Expired Appropriation for Additional
Project Phases*
B-286929, 2001 WL 717355 (Comp. Gen. Apr. 25, 2001).................49

**TABLE OF AUTHORITIES**
**(continued)**

Page

Exec. Order No. 14154, 90 Fed. Reg. 8357 (Jan. 20, 2025)................................7, 47

GAO, Federal Appropriations Law (3d ed. 2004)....................................................49

H.R. Rep. No. 117-130 (2021)....................................................................................5

*Hon. Lawton Chiles U.S. Senate*
   B-164031, 1976 WL 10353 (Comp. Gen. June 25, 1976) ...........................50, 51

Hsu, *FBI Takes Up EPA Probe amid Pushback from Judge,*
   *Prosecutors*, Wash. Post (Feb. 27, 2025) ...............................................................8

Restatement (Second) of Contracts Chapter 16 Topic 3 Intro. (1981)....................21

# GLOSSARY

| Term or Abbreviation | Definition |
|---|---|
| APA | Administrative Procedure Act |
| CCIA | Clean Communities Investor Accelerator |
| DOE | Department of Education |
| EPA | Environmental Protection Agency |
| GAO | Government Accountability Office |
| GGRF | Greenhouse Gas Reduction Fund |
| NCIF | National Clean Investment Fund |
| NIH | National Institutes of Health |
| OBBBA | One Big Beautiful Bill Act |
| State Banks | California Infrastructure and Economic Development Bank, Efficiency Maine Trust, Illinois Finance Authority, and Minnesota Climate Innovation Finance Authority, collectively |

**INTRODUCTION**

Congress established the Greenhouse Gas Reduction Fund (GGRF) in 2022 to provide grants for investment in clean-energy projects. Under the GGRF's funding structure, plaintiff grantees and subgrantees received full disbursement of their grant funds in 2024, and that money is in their bank accounts at Citibank, where plaintiffs had been using it to faithfully carry out the GGRF's purposes. But President Trump announced that his Administration would terminate the "Green New Deal," and EPA followed by cancelling plaintiffs' grant programs in their entirety—first freezing plaintiffs' accounts and then terminating all the grants in the two programs. EPA gave plaintiffs no explanation for the freeze, and its shifting explanations for the blanket termination were contrary to the evidence.

Plaintiffs sued to enjoin EPA from interfering with their funds and dismantling the GGRF programs, and the district court granted a preliminary injunction. After a divided panel reversed, this Court granted rehearing en banc, and it should now affirm the injunction. Plaintiffs' APA and constitutional claims provide independent grounds for affirmance, and both are likely to succeed.

EPA violated the APA because its final agency actions—dismantling the grant programs by freezing and then terminating all the grants in the programs—interfered with plaintiffs' property interest in their funds, and that interference was arbitrary and capricious. EPA provided no supportable reason for its actions.

Before this Court, it does not even make any meaningful attempt to defend the reasons it gave. *See* EPA Br. 42 n.5. It instead argues that the Tucker Act deprived the district court of jurisdiction over this claim, which it tries to recast as a contract claim. But EPA misconstrues the claim in two critical ways.

First, EPA erroneously suggests that plaintiffs are alleging EPA violated the grant agreements' termination provision. EPA Br. 2. But that is not the basis of plaintiffs' arbitrary-and-capricious claim: EPA's actions were arbitrary and capricious because the reasons for its actions were "pretextual" and "'counter to the evidence.'" Dissent 27. While EPA claimed concern about fraud, it was repeatedly told by prosecutors and a judge that it lacked probable cause. And when EPA pivoted to claiming concern about inadequate oversight, it did not even wait to collect answers to its oversight questions before terminating. EPA's APA violation thus turns on the explanation it gave and the evidence (or lack thereof) supporting that explanation, not on any contract terms.

Second, EPA erroneously assumes plaintiffs seek to require EPA to make payments owed under the grant agreements. EPA Br. 18-19. But these grants are structured differently from ones that disburse money over time as reimbursements; grantees here needed to own the funds to leverage private investment. The grants thus disbursed the full award upfront, so the funds were already paid and belong to plaintiffs. Plaintiffs seek no payment from EPA; they seek only to stop EPA's

interference with their own property. Expanding the Tucker Act to reach such claims would deprive district courts of jurisdiction over many claims for which they—not the Court of Federal Claims—have the relevant expertise.

Even if the Court disregarded these critical facts separating this case from other grant cases (which it should not), jurisdiction would still be proper for an independent reason. Plaintiffs do not just challenge individual grant terminations. They challenge EPA's program-wide decision to dismantle entire grant programs, which EPA implemented by freezing and terminating *all* the grants in the programs. Although the dismantling was implemented in part through grant terminations, *National Institutes of Health v. American Public Health Association* confirms that plaintiffs' program-wide challenge belongs in district court. 145 S. Ct. 2658, 2661 (2025) (Barrett, J., concurring).

Plaintiffs are also likely to succeed on their constitutional claim that EPA's dismantling of the GGRF violated the separation of powers. EPA does not deny that it has no power to dismantle congressionally mandated programs merely because of policy disagreements with Congress. And for good reason—the Executive's power to execute the laws does not allow it to implicitly repeal them.

EPA instead tries to deny that it dismantled the programs, claiming it intended to re-obligate the funds to new grantees. But the district court found that EPA's claimed intent was not credible and that it was in fact dismantling the GGRF. EPA

comes nowhere close to establishing that this finding was clear error. The district court's finding is supported by the agency's public statements, the pretextual nature of its rationales, its blanket termination of all the grants, and its inability to re-obligate funds after the appropriations period expired. Against this ample evidence, EPA points only to its own self-serving statements. But if agencies could insulate unconstitutional actions from review simply by disavowing them—with no evidence substantiating the disavowal and overwhelming evidence refuting it—nothing would prevent the Executive from undoing Congress's laws.

## STATEMENT OF ISSUES

1. Whether the district court had jurisdiction over plaintiffs' APA claim that EPA arbitrarily and capriciously interfered with their property rights in the grant funds, which were already disbursed and belonged to plaintiffs.

2. Whether the district court correctly held plaintiffs were likely to succeed on their constitutional claim that EPA violated the separation of powers by dismantling the GGRF programs that Congress directed it to administer.

## STATUTES AND REGULATIONS

All applicable statutes are contained in EPA's opening brief.

## STATEMENT OF CASE

### A.  Legal and Factual Background

1. Congress passed the Inflation Reduction Act in 2022, establishing the GGRF and appropriating $27 billion for EPA to "make grants" to banks for

investing in clean-energy projects.  42 U.S.C. § 7434(a) (2022).  Congress made the funds available until September 30, 2024.  *Id.*

EPA created three grant programs, selected grantees, and obligated the funds by August 2024.  JA968-969; *e.g.*, JA370.  One program, the National Clean Investment Fund (NCIF), awarded $14 billion to three primary grantees:  Climate United Fund, Coalition for Green Capital, and Power Forward.  JA969.  The Coalition for Green Capital then provided funds to subgrantees, including State Banks, for them to use to fund clean-energy projects.  JA966-967; JA969.[1] Another program, the Clean Communities Investment Accelerator (CCIA), awarded $6 billion to other grantees.  JA1661.[2]

These programs were designed to disburse "the entire available EPA award balance" to grantees at the outset, rather than through reimbursements over time. JA1136; *see* JA1771.  That upfront disbursement, which gave plaintiffs title to the funds, was crucial to Congress's goal of "incentivizing private sector development and investment."  H.R. Rep. No. 117-130, at 5 (2021); *see* 42 U.S.C. § 7434(c)(3)(A) (expecting projects to "leverage investment . . . from the private

---

[1] State Banks are the California Infrastructure and Economic Development Bank, Efficiency Maine Trust, Illinois Finance Authority, and Minnesota Climate Innovation Finance Authority.

[2] The third program, Solar for All, is not at issue here.  Its termination is the subject of separate litigation.  *Arizona v. EPA*, No. 2:25-cv-2015 (W.D. Wash.).

sector"). Congress intended grantees to "leverage private investment in amounts several times greater than the initial public investment." 168 Cong. Rec. H7577, H7702 (Aug. 12, 2022) (Rep. Dingell); *e.g.*, JA364 (plaintiff estimating $4 of private investment per $1 of public funding). That is only possible if grantees own the grant funds because investors look to current assets, not future payments, when assessing risk and stability. Finance Experts' Merits Amicus Br. 4-14.

Plaintiffs thus received disbursements for their full grant amounts by fall 2024. JA370; JA417-418; JA453. Plaintiffs' funds are held at Citibank, which has a financial agency agreement with the Treasury to maintain plaintiffs' accounts. JA971-972. The money is held in accounts in plaintiffs' names and governed by account control agreements. JA70-78; JA971. Primary grantees' agreements are between Citibank, EPA, and the grantee. JA71. State Bank subgrantees' agreements, in contrast, are between Citibank, the primary grantee, and the subgrantee—EPA is not a party. JA1477-1486.

Plaintiffs own the funds in their Citibank accounts. Each plaintiff is "the entitlement holder with respect to all financial assets" in their account, JA71, and entitled to "access and use" the funds to accomplish the GGRF's goals, JA2145. JA1122; JA1134-1136. Citibank "maintains the Accounts for" plaintiffs in their names and must follow their instructions "directing the disposition of funds and financial assets in the Accounts." JA71-JA72. Citibank cannot restrict plaintiffs'

access to their accounts unless a "Notice of Exclusive Control" is issued by EPA (for primary grantees' accounts) or the primary grantee (for subgrantees' accounts). JA72; JA1478-1479. Because EPA is not a party to State Banks' agreements, it cannot control their accounts. *See* JA1478-1479. Similarly, EPA has a security interest in primary grantees' accounts, but not State Banks' accounts. *Id.*; JA2145. No Notice of Exclusive Control was issued for any account. JA30.

2. On January 20, 2025, President Trump issued an executive order announcing a new policy "[t]erminating the Green New Deal." Exec. Order No. 14154, 90 Fed. Reg. 8353, 8357. He directed "[a]ll agencies" to "immediately pause the disbursement of funds appropriated through the Inflation Reduction Act." *Id.* While that order froze other funding, it did not reach NCIF or CCIA funds because they were already disbursed to plaintiffs.

Administrator Zeldin then announced that EPA would claw back the disbursed GGRF funds. JA973-974. He stated that the agreement with Citibank should be "instantly terminated"; that Citibank must "immediately return the funding" so EPA could "reassume[] responsibility for all of these funds"; and that EPA was "not going to rest" until the funds were returned. JA973; JA140. He stated that the GGRF's "entire scheme . . . is criminal," and he threatened to open criminal and civil investigations. JA973-974; JA140-141.

After reviewing EPA's fraud accusations, however, the Chief of the Criminal Division of the U.S. Attorney's Office in Washington, D.C. concluded there was no probable cause for a grand jury investigation and chose to resign rather than be forced to pursue an unjust investigation. JA141-142. When another attorney in the office later applied for a warrant to seize the funds, the magistrate judge denied the application for lack of probable cause. JA142. EPA's attempts to pressure a separate U.S. Attorney's Office to open an investigation likewise failed because prosecutors in that office also refused. *Id.*[3]

Despite the lack of probable cause, Citibank stopped responding to plaintiffs' instructions respecting their accounts in mid-February 2025, pursuant to the federal government's "recommend[ation]." JA972. On March 4, EPA mobilized the Treasury to formally instruct Citibank to freeze plaintiffs' accounts. JA111; JA972. That same day, EPA asked plaintiffs for information about the GGRF's oversight controls. JA993. EPA gave plaintiffs until March 28 to respond, but when plaintiffs moved to enjoin the freeze, EPA abruptly terminated all the grants on March 11—without waiting for plaintiffs' answers to its oversight questions. JA993. EPA sent each primary grantee an identical letter stating that their grants were terminated due to "concerns regarding program integrity, the award process,

---

[3] *See* Hsu, *FBI Takes Up EPA Probe amid Pushback from Judge, Prosecutors*, Wash. Post (Feb. 27, 2025), https://perma.cc/E2JR-G4GF.

programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities." JA390. The letters contained no specific or individualized allegations, instead treating all grants the same and terminating every grant in the NCIF and CCIA programs. JA398; JA1197; JA1949.

## B. Procedural History

1. Primary grantees and State Banks sued to enjoin EPA's interference with their funds. They alleged that EPA's cancellation of the NCIF and CCIA programs, including by freezing and then terminating all the grants in the programs, violated the separation of powers; was arbitrary and capricious under the APA; and violated federal regulations. JA1235-1252. Plaintiffs asserted contract-based claims against Citibank, but not against EPA. JA1252-1256.

The district court granted a preliminary injunction enjoining EPA from freezing or clawing back plaintiffs' funds, and ordering Citibank to honor plaintiffs' requests to access their funds. JA961-962; JA1011-1014.

The court held that plaintiffs' arbitrary-and-capricious claim was likely to succeed because EPA provided no "rational explanation" for freezing or canceling "*every single grant*" in the programs. JA991-993. The court rejected EPA's argument that the Tucker Act deprived it of jurisdiction. JA981-988. Plaintiffs' APA claim was not contractual because they merely sought to stop EPA from interfering with their "access to their already disbursed funds." JA986.

The court also held that plaintiffs' separation-of-powers claim was likely to succeed. JA995-996. It held that the terminations were part of EPA's blanket decision to "dismantle these grant programs in their entirety as a policy matter," which usurped Congress's legislative power. JA995. Although EPA claimed it would re-obligate the funds, the court found that EPA's claim was refuted by the record, including the Administration's contrary public statements. JA995-996.

2. EPA appealed, and the panel entered a partial administrative stay requiring all parties to leave the money at Citibank pending appeal.

a. While the appeal was pending, President Trump signed the One Big Beautiful Bill Act (OBBBA) on July 4, 2025. Pub. L. No. 119-21, 139 Stat. 72. It repealed 42 U.S.C. § 7434, which established the GGRF, and it provided that "the unobligated balances of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act) are rescinded." *Id.* § 60002. The OBBBA did not affect obligated funds, like NCIF and CCIA grants.

b. A divided panel reversed the injunction. The court recognized that the OBBBA did not moot the appeal because the funds here were not unobligated. Panel Op. 7-8. The majority, however, held the Tucker Act deprived the district court of jurisdiction over plaintiffs' arbitrary-and-capricious claim, *id.* at 15-21, and it declined to reach the claim's merits, *id.* at 9 n.3. In contrast, it held there was jurisdiction over plaintiffs' separation-of-powers claim but rejected that claim

on the merits. *Id.* at 22-27. It held that this was "not a constitutional claim at all," but a statutory claim under the Inflation Reduction Act. *Id.* at 22-23. And it found no violation because EPA claimed it would re-obligate the funds. *Id.* at 23-26.

Judge Pillard dissented. She explained that the majority misapplied the Tucker Act by "ignor[ing] what the agency did and describ[ing] a claim that Plaintiffs did not bring": EPA did not just breach individual grant agreements; it cancelled the NCIF and CCIA programs. Dissent 61-62. And plaintiffs did not seek payment from EPA; they sought to protect property that was already theirs. *Id.* at 49-50. Judge Pillard warned that the majority's "unprecedented expansion of the Tucker Act" was "divorced from" the Act's purpose and would "strip[] district courts of jurisdiction" over many claims that belong there. *Id.* at 61.

Judge Pillard also would have held that EPA's cancellation of the NCIF and CCIA violated the separation of powers because the Executive cannot "'decline to follow a statutory mandate or prohibition simply because of policy objections.'" Dissent 38. She disagreed with the majority's reliance on EPA's purported intent to re-obligate because the district court had "ample basis not to credit" EPA's stated intent. *Id.* at 40-41. She also explained that, regardless of intent, appropriations law prohibited EPA from re-obligating anyway. *Id.* at 41-42.

This Court granted rehearing en banc and vacated the panel's decision.

## STANDARD OF REVIEW

This Court reviews a district court's grant of a preliminary injunction "for abuse of discretion, its legal conclusions de novo, and its findings of fact for clear error." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 726 (D.C. Cir. 2022).

## SUMMARY OF ARGUMENT

I.  The district court correctly held that plaintiffs' arbitrary-and-capricious claim was likely to succeed because EPA failed to provide an adequate explanation for dismantling the programs, freezing all the accounts, or terminating all the grants.  EPA challenges this holding solely on jurisdictional grounds, but the court was correct that the Tucker Act does not apply because the claim is not contractual.

The Tucker Act analysis here is simplified by plaintiffs' ownership of the funds.  The source of their rights is their property interest in the money, not any duty under the grant agreements.  And the relief sought is to prevent EPA from interfering with their property, not to obtain payment from EPA.  That separates this case from *Department of Education v. California* and *National Institutes of Health v. American Public Health Association* (*NIH*), where the Supreme Court stayed portions of injunctions ordering the government to make grant payments. Indeed, *NIH* reinforces jurisdiction here because it directs challenges to program-wide policies, like EPA's decision to dismantle the entire NCIF, to district court.

EPA's arguments misconstrue plaintiffs' claim. EPA treats the claim as a challenge to its violation of the grant agreement's termination provision, but that is not the basis of plaintiffs' arbitrary-and-capricious claim. Plaintiffs' claim alleges that EPA failed to provide a reasoned explanation for its actions; it turns on EPA's lack of evidence of fraud or oversight problems, not on any contract term.

II. The district court also correctly held plaintiffs' constitutional claim was likely to succeed because EPA's dismantling of the GGRF violated the separation of powers. EPA does not argue that it has authority to cancel a congressionally mandated program. And its efforts to circumvent that constitutional limit fail.

First, EPA tries to recast this constitutional claim as a statutory violation of the Inflation Reduction Act based on *Dalton v. Specter*. But it misreads *Dalton*. *Dalton* held that not every statutory violation is automatically a separation-of-powers violation too; it did not hold that separation-of-powers claims can never be brought if a statute was also violated. Failing to follow required procedures when exercising delegated authority, as in *Dalton*, may be a purely statutory violation, but dismantling a congressionally mandated program crosses a constitutional line and can also be challenged on separation-of-powers grounds.

Second, EPA claims it was not dismantling the GGRF because it intended to re-obligate the funds. The district court, however, found that EPA's claimed intent was not credible in light of its public statements and boilerplate termination of all

grants. Against that evidence, EPA points only to its own self-serving statements, unsupported by any evidence. That falls far short of establishing clear error.

Finally, EPA invokes the OBBBA, but the OBBBA has no effect on this case. It prospectively repealed the GGRF and rescinded unobligated funds, but it did not purport to touch funds that were already obligated, like plaintiffs' grants.

## ARGUMENT

This Court can affirm the preliminary injunction so long as plaintiffs are likely to succeed on one of their claims. State Banks here focus on their APA arbitrary-and-capricious claim and their separation-of-powers claim, each of which provides an independent ground for affirmance. State Banks also agree with, and incorporate, primary grantees' arguments that EPA acted contrary to law in violation of federal regulations and the Inflation Reduction Act and that Citibank breached the account control agreements.

## I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR APA CLAIM

The district court correctly held that it had jurisdiction over plaintiffs' APA claim and that plaintiffs were likely to succeed on the merits. EPA's decisions to dismantle the grant programs by freezing and terminating every grant in the programs were arbitrary and capricious final actions that interfered with plaintiffs' property rights in the funds they owned. That claim turns on the inadequacy of EPA's reasons for the interference, not its failure to satisfy the grant agreements'

termination conditions.  EPA makes no meaningful attempt to defend the reasons given and instead disputes only the court's jurisdiction.  *See* EPA Br. 42 n.5.

## A.    The District Court Had Jurisdiction Over the APA Claim

### 1.    Plaintiffs' APA claim is not contractual in essence

a.  The district court correctly concluded that the Tucker Act did not deprive it of jurisdiction over plaintiffs' APA claim.  JA981-988.  The Tucker Act vests the Court of Federal Claims with jurisdiction over claims based on an "express or implied contract with the United States."  28 U.S.C. § 1491(a)(1).  The Act's text and history reveal that its purpose is narrow and not applicable here.

"The Court of Claims was established, and the Tucker Act enacted, to open a judicial avenue for certain monetary claims against the United States."  *United States v. Bormes*, 568 U.S. 6, 11 (2012).  Before that court's creation in 1855, claimants seeking money from the government had to petition Congress for private bills, which became "increasingly burdensome."  *Id.*  The Court of Claims was created to " 'relieve the pressure on Congress' " by allowing lawsuits for monetary relief.  *Id.*  Given these origins, the successor Court of Federal Claims developed a "unique expertise" in "the government contracting process," often hearing claims for damages from bidding and performance of procurement contracts.  *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (1985).  But that specialized court lacks expertise in the broader spectrum of non-contractual disputes heard by district

courts and "does not have the general equitable powers of a district court to grant prospective relief." *Bowen v. Massachusetts*, 487 U.S. 879, 905 (1988).

Consistent with this expertise, the Tucker Act directs a claim to the Court of Federal Claims only if it is "'*at its essence* a contract claim.'" *Crowley Gov't Servs. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022). This Court considers two factors when applying that test: "the source of the rights upon which the plaintiff bases its claims," and "the type of relief sought (or appropriate)." *Id.*

b. Here, both factors turn on a critical fact, which makes clear that plaintiffs' claims are not contractual: EPA disbursed all grant funds in 2024, and plaintiffs own the money in their Citibank accounts. *See supra* pp. 5-7. Plaintiffs' claims are thus based on their property interest in the funds, not any duty owed under the contract. The relief plaintiffs seek is to enjoin EPA's interference with their access to their property, not to obtain payment from EPA under the grant agreements.

i. Under the first factor, the source of plaintiffs' rights is their property interest in the money they own, which includes the right to be free from unlawful government interference with that property. Plaintiffs' APA claim stems from that property right because the APA prohibits EPA from taking arbitrary and capricious agency actions that interfere with plaintiffs' property interest without a reasoned explanation—here, by dismantling the grant programs and attempting to freeze and claw back money that was already disbursed and belongs to plaintiffs.

16

This Court and the Supreme Court have long held that protection against interference with property rights is not a contractual claim, regardless of whether the property was acquired by contract. As this Court explained in *Megapulse v. Lewis*, "[t]he Supreme Court many years ago recognized a private party's cause of action outside the Tucker Act to challenge the statutory authority of federal officials to claim ownership rights in property allegedly transferred during the course of a contract." 672 F.2d 959, 968-969 (D.C. Cir. 1982).

*Megapulse* derived that well-settled rule from the Supreme Court's decision in *Land v. Dollar*, 330 U.S. 731, 738 (1947), which held that district courts have jurisdiction to enjoin governmental interference with property rights, even if those rights involve a contract. In *Land*, the plaintiffs alleged they owned stock shares that were wrongfully withheld by the government. *Id.* at 736. The plaintiffs had transferred the shares to the government under a loan contract, and the parties disputed whether the contract treated the shares as collateral to be returned when the loan was repaid (as the plaintiffs argued) or gave the government ownership of the shares (as the government argued). *Id.* at 733-734.

Although the plaintiffs' property interest in the shares depended on the contract's interpretation, the Court explained that their claim nonetheless "rest[ed] on their right under general law to recover possession of specific property wrongfully withheld." *Land*, 330 U.S. at 736. The Court held that, where property

17

is seized by officials "act[ing] in excess of their authority," plaintiffs can seek injunctive relief in district court and are "not relegated to the Court of Claims to recover a money judgment." *Id.* at 738; *see Ickes v. Fox*, 300 U.S. 82, 96-97 (1937) (district court can enjoin government from depriving plaintiffs of water rights "acquired under . . . government contracts").

Applying that precedent, *Megapulse* held the Tucker Act did not preclude a district court from enjoining the government's release of data containing a plaintiff's proprietary information. 672 F.2d at 961. The plaintiff claimed the release would violate federal statute and deprive it of a property interest in the information. *Id.* at 963. Although the government argued the release was contractually authorized, the Court held that the plaintiff's claim was "based, not on breach of contract, but on an alleged governmental infringement of property rights and violation of the Trade Secrets Act." *Id.* at 969.

Plaintiffs here similarly seek to enjoin EPA's interference with funds they own. Like the stock in *Land* and the information in *Megapulse*, the funds in plaintiffs' Citibank accounts are plaintiffs' property, not "property of the United States," and are "being wrongfully withheld by [defendants] who acted in excess of their authority." *Land*, 330 U.S. at 738. Plaintiffs' APA claim is thus based on their property rights, which EPA interfered with by dismantling the NCIF program.

Indeed, plaintiffs' case is easier than *Land* or *Megapulse* because this claim does not turn on any contract.  Contrary to EPA's characterization, *see infra* pp. 26-27, plaintiffs' claim is not that their individual grant terminations were arbitrary and capricious because EPA violated the termination provision's conditions.  Rather, EPA's blanket freeze and termination of all the grants in the program was arbitrary and capricious because EPA failed to explain and support its reasons for the program-wide actions.  To evaluate that claim, this Court looks to precedents interpreting the APA's reasoned decision-making requirements, EPA's purported explanations of fraud and oversight concerns, and the evidence (or lack thereof) supporting those concerns, *see infra* pp. 35-37.  In other words, the Court can resolve plaintiffs' APA claim without examining the grant agreements' terms.

Granting district courts jurisdiction over such property-based challenges to program-wide actions is consistent with the Tucker Act's circumscribed purpose.  As Judge Pillard explained, evaluating EPA's reasons for unwinding entire grant programs is "far outside" the Court of Federal Claims' "specialized expertise."  Dissent 55.  It is the kind of APA claim district courts routinely resolve.  "It would be nothing less than remarkable to conclude that Congress intended judicial review of these complex questions" to be confined to the Court of Federal Claims' limited and "specialized forum."  *Bowen*, 487 U.S. at 908.

ii. The second factor—the nature of the relief requested—likewise supports jurisdiction. Consistent with the Tucker Act's origins, this Court has held that "the crux" of this factor "boils down to whether the plaintiff effectively seeks to attain . . . 'monetary relief from the federal government.'" *Crowley*, 38 F.4th at 1107 (*e.g.*, damages and specific performance). Here, plaintiffs do not seek payment from EPA—neither as damages for past harms nor specific performance of the grant agreements. As explained above, EPA already disbursed to plaintiffs the funds owed under the grants, and that money is now plaintiffs' property. *See supra* pp. 5-7. All plaintiffs need is an order prohibiting EPA from interfering with their access to their own property; the injunction thus enjoins EPA from freezing or clawing back funds belonging to plaintiffs. JA961-962.

That non-interference with plaintiffs' property is not a remedy derived from contract. It is prospective equitable relief akin to ordering the government to return the plaintiffs' stock in *Land*, 330 U.S. at 734; to refrain from diverting the plaintiffs' water in *Ickes*, 400 U.S. at 93; to prevent release of the plaintiff's information in *Megapulse*, 672 F.2d at 971; or to refrain from interfering with the plaintiff's receipt of payments from a third party in *Crowley*, 38 F.4th at 1102—all of which were within district court jurisdiction. Such relief is not available in a contract action before the Court of Federal Claims, which "does not have the general equitable powers of a district court to grant prospective relief." *Bowen*,

487 U.S. at 905.  EPA suggests that deficiency is intentional (at 38), but that would leave no way to stop the government from continuing to violate the law.

EPA and the panel erroneously equate the injunction here with specific performance, but neither explains that conclusory characterization.  Panel Op. 14, 16; EPA Br. 19, 43.  As the Supreme Court recognized, enjoining interference with property rights acquired through a contract is not specific performance of that contract.  *Ickes*, 300 U.S. at 96-97 (enjoining government from depriving plaintiffs of water rights acquired by contract "do[es] not seek specific performance").  Specific performance is "by definition limited to the enforcement of contract duties."  Restatement (Second) of Contracts Ch. 16 Topic 3 Intro. Note (1981).  EPA identifies no duty in the grant agreements that plaintiffs seek to enforce.

True, the agreements require EPA to disburse grant funds to primary grantees, but it performed that duty in 2024 when it paid the money into plaintiffs' accounts, transferring title to them.  EPA's characterization of the relief as "disbursing funds" or "compelling the government to resume payments" (EPA Br. 4, 23) is thus incorrect.  EPA cites no support for that characterization, which is irreconcilable with plaintiffs' ownership.  When someone withdraws money they already own from their bank account, that is not "payment" from the government.

Indeed, as EPA concedes (at 6), it has no contract with State Banks.  State Banks were paid by primary grantees, not EPA, and there is no contractual duty

EPA owes to State Banks that they seek to enforce.  *See Cmty. Legal Servs. in E. Palo Alto v. Dep't of Health & Hum. Servs.*, 137 F.4th 932, 937 (9th Cir. 2025) (claims not contractual where "no contract exists" between subcontractors and government), *denying reh'g en banc*, 155 F.4th 1099, 1104 (9th Cir. 2025) (statement of Fletcher and Koh, JJ.) (same); *Crowley*, 38 F.4th at 1110.  That State Banks can nonetheless assert identical arbitrary-and-capricious claims as primary grantees demonstrates that none of plaintiffs' claims are contractual.

EPA hardly addresses State Banks' circumstances, except in a single footnote.  EPA Br. 31 n.4.  EPA cites no support for its claim that State Banks are bound by primary grantees' contracts with EPA.  EPA is trying to have it both ways:  It seeks to relegate State Banks to the Court of Federal Claims without conceding "they are entitled to proceed in that forum."  *Id.*  To the extent EPA is trying to preserve its ability to challenge State Banks' capacity to sue in that court if EPA prevails here, what EPA really seeks is to deny State Banks any remedy in any forum.

Moreover, even if the relief sought might, as a practical matter, "require the same governmental restraint that specific [ ]performance might require in a contract setting," such overlap is an "insufficient basis to deny a district court the jurisdiction otherwise available."  *Megapulse*, 672 F.2d at 971; *see Cmty. Legal Servs.*, 155 F.4th at 1105 (statement of Fletcher and Koh, JJ., respecting denial of rehearing en banc).  Otherwise, "the government could avoid injunctions against

activities violative of a statutory duty simply by contracting not to engage in those activities." *Megapulse*, 672 F.2d at 971. This Court prevented that loophole by refusing to treat an injunction as a form of specific performance just because it enjoins conduct that "might also amount to a breach of contract." *Id.*

### 2. The Supreme Court's stay orders in *DOE* and *NIH* do not weigh against jurisdiction here

The same critical fact—that plaintiffs own the funds and seek to prevent interference with their property—separates this case from the stay orders in *Department of Education v. California* (*DOE*), 145 S. Ct. 966 (2025), and *National Institutes of Health v. American Public Health Association* (*NIH*), 145 S. Ct. 2658 (2025). As Judge Pillard explained, those orders are "inapplicable" here because they involved injunctions requiring the government to pay money. Dissent 51.

In *DOE*, the injunction "require[d] the Government to pay out past-due grant obligations and to continue paying obligations as they accrue." 145 S. Ct. at 968. The Court recognized that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds," but held that district courts cannot "'enforce a contractual obligation to pay money.'" *Id.* It said the same in *NIH*. 145 S. Ct. at 2659 (no jurisdiction "to enforce any 'obligation to pay money'"). But here, there is no order to "'enforce a contractual obligation to pay money'" because the money was already paid and belongs to plaintiffs. *DOE*, 145 S. Ct. at 968; *see Washington v.*

*Dep't of Educ.*, 161 F.4th 1136, 1140 (9th Cir. 2025) (distinguishing *DOE* and *NIH* because injunction did not "order payment of any funds").[4]

In fact, *NIH* "*supports* the district court's jurisdiction over the policy-based interference with Plaintiffs' funds" here. Dissent 52. Even if the Court were to disregard the critical fact of plaintiffs' ownership (which it should not), *NIH* provides an alternative basis for affirming jurisdiction. The order differentiated challenges to individual grant terminations, which belong in the Court of Federal Claims, from challenges to the program-wide directive that led to the terminations, which belong in district court. *NIH*, 145 S. Ct. at 2659 (staying injunction on former but not latter); *id.* at 2661 (Barrett, J., concurring). This case is the latter.

In *NIH*, agency guidance set a policy against funding certain research. 145 S. Ct. at 2661 (Barrett, J., concurring). To implement that policy, the agency reviewed existing grants and terminated those relating to the covered areas. *Id.* Justice Barrett explained that the Tucker Act did not bar district court jurisdiction over the program-wide policy, even though it was implemented by grant

---

[4] *Spectrum Leasing* and the district court cases EPA cites (at 30, 32) are inapt for the same reason. *E.g.*, *Spectrum Leasing v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985) (plaintiff sought order "requiring the government to pay monies owed"). As are the recent Fourth Circuit cases where the plaintiffs sought "continued payments on th[e] grants." *Sustainability Inst. v. Trump*, 2026 WL 157120, at *6 (4th Cir. Jan. 21, 2026); *see Solutions in Hometown Connections v. Noem*, 2026 WL 179590, at *3 (4th Cir. Jan. 23, 2026) ("'reimbursement of expenses'").

terminations: "That the agency guidance discusses internal policies related to grants does not transform a challenge to that guidance into a claim 'founded . . . upon' contract that only the [Court of Federal Claims] can hear." *Id.* Following *NIH*, other courts of appeals have understood the Court's decision to mean that "challenges to agency-wide policies . . . belong in district court." *Massachusetts v. NIH*, __ F.4th __, 2026 WL 26059, at *5 (1st Cir. Jan. 5, 2026); *see Cmty. Legal Servs.*, 155 F.4th at 1106 (statement of Fletcher and Koh, JJ., respecting denial of rehearing en banc) (district court had jurisdiction under *NIH* where plaintiffs challenged "Government's broader policy of non-compliance").[5]

Plaintiffs here challenge EPA's program-wide decision to cancel the NCIF and CCIA, not just their individual grant terminations. As EPA admits (at 10), it "'reassessed and adopted agency policies and priorities that materially differ from the prior administration.'" The district court thus correctly concluded that EPA did not terminate the grants "on an individual basis," but sought "to dismantle these grant programs in their entirety as a policy matter." JA995. President Trump and Zeldin announced a blanket policy ending the GGRF, and EPA terminated every grant in the NCIF and CCIA programs using identical boilerplate letters. *See supra* pp. 7-9. The letters stated the decision was based on "concerns regarding

---

[5] The Fourth Circuit has not addressed this question. *See Sustainability Inst.*, 2026 WL 157120, at *8 n.8; *Solutions*, 2026 WL 179590, at *4.

*program* integrity, the award *process*, *programmatic* fraud, waste, and abuse, and misalignment with the Agency's priorities." JA390 (emphasis added). EPA even conceded the terminations "had nothing to do with Plaintiffs' performance under the grant." JA982. Under *NIH*, plaintiffs' challenge to EPA's program-wide decision dismantling the NCIF and CCIA belongs in district court.

### 3. The panel's and EPA's remaining arguments fail

a. The panel and EPA misconstrue plaintiffs' claim. As explained above, plaintiffs' arbitrary-and-capricious claim does not turn on the grant agreements, but on EPA's failure to provide an adequate explanation for its actions. *See supra* pp. 18-19. EPA and the panel, however, recast plaintiffs' claim (albeit in different ways) in an attempt to link it to the grant agreements. Their analysis has no resemblance to the claim plaintiffs actually brought.

EPA's entire Tucker Act argument is based on its characterization that plaintiffs contend "the termination provision is enforceable and not satisfied here." EPA Br. 29; *see* EPA Br. 2, 19, 22-23, 31, 33-34, 43. But, as explained above, that is not true of the arbitrary-and-capricious claim, which focuses on the inadequacy of EPA's fraud- and oversight-based rationales for justifying its dismantling of the programs and interference with plaintiffs' property rights. This claim does not turn on the contract's conditions for termination at all. *See supra* p. 19. EPA makes no attempt to explain how plaintiffs' claim can be reframed in the way it desires.

EPA's own argument highlights the conceptual difference between breach-of-contract claims and plaintiffs' arbitrary-and-capricious claim. EPA notes that contracts generally do not prohibit breach, but instead impose "'an assumption of liability in the event of nonperformance.'" EPA Br. 39. A party that breaches but pays compensation thus has broken no law. In contrast, agencies cannot pay to avoid providing a reasoned explanation for their actions because the APA makes arbitrary and capricious actions unlawful. The Court of Federal Claims' limited expertise and remedies are appropriate to the former but not the latter.

The panel, for its part, recognized that plaintiffs "argue the terminations were arbitrary regardless of whether they were permitted under the agreements." Panel Op. 17. But it contorted their arbitrary-and-capricious claim into a claim that plaintiffs never made: that EPA violated the rule that termination-for-convenience clauses in procurement contracts (not present here) prohibit "dishonor[ing]" the contract "with impunity." *Id.* (quoting *Maxima Corp. v. United States*, 847 F.2d 1549 (Fed. Cir. 1988)). The panel at least appeared to recognize it was rewriting plaintiffs' claim. *Id.* at 17 n.8. It attempted to justify that rewriting by citing *Ingersoll-Rand. Id.* at 12-13. As Judge Pillard explained, however, *Ingersoll-Rand* did not establish "a rule that any claim that could be reconceptualized as a contractual violation that overlaps even in part with the claim Plaintiffs actually bring is necessarily a disguised contract claim." Dissent 57. While courts must

look beyond a claim's label to its "essential character," *Ingersoll-Rand*, 780 F.2d at 78, that is not license to rewrite the substance of plaintiffs' claim.

In *Ingersoll-Rand*, the plaintiff claimed that termination of its procurement contract was arbitrary and capricious, but the claim's "essential character" turned on application of the contract's termination-for-convenience clause incorporating a provision of the Federal Acquisition Regulation—which governs the procurement process and is thus the main area of the Court of Claims' "unique expertise." 780 F.2d at 78. In that context, the Contract Disputes Act for procurement disputes applied, and the Court of Claims was the "single, uniquely qualified forum" because of its "knowledge of the government contracting process." *Id.* The opposite is true here, as the essential character of plaintiffs' claim is that EPA arbitrarily and capriciously interfered with their property by dismantling the grant programs without providing a reasoned explanation consistent with the evidence.

Reading *Ingersoll-Rand* to reach such claims would significantly expand the Tucker Act, changing the inquiry from whether a claim is essentially a contract claim to whether it could somehow be rewritten as one. Such expansion would not serve the Tucker Act's purpose of providing a single forum for contract disputes, but would instead "strip[] district courts of jurisdiction over all manner of claims over which they have the relevant expertise." Dissent 61.

For example, the panel's approach would relegate to the Court of Federal Claims many of the leading cases this Court has held belong in district court.  The claims in *Land* and *Megapulse* could have been rewritten as contract claims—*e.g.*, that withholding collateral breached the loan contract, or that releasing plaintiffs' information violated the contract's distribution of data rights.  *See Land*, 330 U.S. at 734; *Megapulse*, 672 F.2d at 962.  But this Court held that the district court had jurisdiction even if the "same action might also amount to a breach of contract." *Megapulse*, 672 F.2d at 971.  Even where plaintiffs themselves framed their claims as simultaneously a breach of contract and a violation of federal law, this Court did not subject all claims to the Tucker Act; it sent the contract claims to the Court of Federal Claims and left the non-contract claims in district court.  *Sharp v. Weinberger*, 798 F.2d 1521, 1523 (D.C. Cir. 1986); *Transohio Serv. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 611 (D.C. Cir. 1992), *abrogated on other grounds as recognized in Perry Cap. v. Mnuchin*, 864 F.3d 591, 620 (D.C. Cir. 2017).  The panel offered no reason to discard these longstanding precedents, nor did it grapple with the far-reaching consequences of rewriting plaintiffs' claim.

b.  The panel and EPA further err by applying the wrong inquiry to their rewritten claims.  As explained above, plaintiffs' claim does not depend on the grant agreements, but even if it did, that would not make it a contract claim.  The panel and EPA erroneously assume a claim is contractual if it merely "is premised

29

on a contract" or "depends on" a contract's interpretation or breach. EPA Br. 26;
*see* Panel Op. 12, 14 n.8. But this Court "explicitly rejected the 'broad' notion
'that any case requiring some reference to or incorporation of a contract is
necessarily on the contract' "—and rightly so. *Crowley*, 38 F.4th at 1107.

As this Court explained, "the mere fact that a court may have to rule on a
contract issue does not, by triggering some mystical metamorphosis, automatically
transform an action based on trespass or conversion into one on the contract and
deprive the court of jurisdiction it might otherwise have." *Megapulse*, 672 F.2d at
968. Otherwise, even non-contractual claims would be subject to the Tucker Act if
they merely involved a contract or raised a contract issue. That would create the
same unworkable expansion of the Tucker Act as allowing courts to rewrite
plaintiffs' claims. Both errors would effectively overturn the many cases discussed
above that affirmed jurisdiction where contracts were involved but were not the
basis for the claim. *E.g.*, *Crowley*, 38 F.4th at 1110; *Megapulse*, 672 F.2d at 969-
970; *Transohio*, 967 F.2d at 610-611; *Sharp*, 798 F.2d at 1523. Again, neither the
panel nor EPA offers any compelling reason to depart from this established rule.

Thus, it matters not whether plaintiffs' right to the funds was created by the
grant agreements or depends on their interpretation. *Contra* Panel Op. 12, 14; EPA
Br. 29, 35, 41. *Crowley* rejected a similar "but-for" argument because it would
lead to the very expansion of the Tucker Act discussed above. 38 F.4th at 1110.

Even though the plaintiff's claim there "presuppose[d] the existence of a contract," such that he "'would have no claims to assert'" without it, that fact did not make it a contract claim. *Id.* And the same argument could have been made not only in *Crowley*, but also in numerous other cases—none of which were confined to the Court of Federal Claims. *See Land*, 330 U.S. at 734 (plaintiffs' claim depended on contract identifying shares as collateral); *Ickes*, 300 U.S. at 96-97 (water rights acquired through contract); *Megapulse*, 672 F.2d at 962 (contract determined ownership of data in dispute); *Transohio*, 967 F.2d at 600 (statutory claim depended on plaintiff having forbearance agreement); *Sharp*, 798 F.2d at 1523.

EPA's attempt to distinguish *Sharp* (EPA Br. 34-35) fails. There, the plaintiff challenged his transfer from the Ready Reserve, and the Court held that his claim that the transfer violated statutory rights for reservists belonged in district court— even though the plaintiff's right to serve as a reservist was created by his service contract and he had in fact brought another claim for violation of the contract. 798 F.2d at 1523. As this Court put it, "*Sharp* tells us that litigants may bring statutory and constitutional claims in federal district court even when the claims depend on the existence and terms of a contract." *Transohio*, 967 F.2d at 610.

EPA's argument that the Tucker Act merely "ask[s] whether the claim would persist if the contract's terms expressly authorized the government's actions" is wrong for the same reasons. EPA Br. 26. Even if EPA argued that the agreement

permitted termination, that purported defense would not make plaintiffs' claim contractual. In *Megapulse*, the government argued it was "empowered by the contract" to release the data, but the Court rejected the contention that "the mere existence of such contract-related issues must convert this action to one based on the contract." 672 F.2d at 969. A defense invoking the grant's termination provision here would be exactly the kind of contract issue that *Megapulse* explained can arise even "where the action itself is not founded on a contract." *Id.* at 968 ("A license, for example, may be raised as a defense in an action for trespass, or a purchase contract may be raised to counter an action for conversion."). Otherwise, defendants could defeat jurisdiction over any kind of claim simply by raising a contract-based defense, however meritless.

c. Finally, the panel and EPA downplay plaintiffs' ownership of the funds, but none of their arguments negate plaintiffs' property interest. Panel Op. 14-15; EPA 40-43. Critically, EPA does not dispute that plaintiffs have title to the funds, that they are the rightsholders of the Citibank accounts in their names, or that this structure was essential to the GGRF. *See supra* pp. 5-7.[6] Those undisputed facts

---

[6] *In re Joliet-Will County Community Action Agency*, 847 F.2d 430 (7th Cir. 1988), is inapposite. That case does not suggest that grant funds always belong to the grantor, as EPA claims (at 41). The court stated that ownership "depends on the terms under which the grants were made." 847 F.2d at 432. The court's holding, in the bankruptcy context, was based on the specific terms before it—which are different from those here. *Id.* at 432-433.

are sufficient to support the district court's holding that plaintiffs "seek to regain access to their already disbursed funds." JA986.

EPA's primary argument is not that the funds do not belong to plaintiffs, but merely that the funds do not belong to them "free and clear." EPA Br. 40. But the fact that plaintiffs must use their property for the GGRF's purposes does not negate their title or ownership.[7] Although EPA has a security interest in primary grantees' accounts and can issue a Notice of Exclusive Control for those accounts if primary grantees misuse the funds, that makes no difference to the ownership question here. EPA has no security in, or right to control, State Banks' accounts. JA1478-1486. EPA fails to explain how it could freeze State Banks' accounts, let alone assert ownership over State Banks' property. *See* JA2145; JA2148 (only primary grantees, not EPA, can freeze subgrantees' accounts).

Even as to primary grantees, EPA has not exercised its security interest. An unexercised security does not divest primary grantees of ownership of their funds any more than a bank's unexercised mortgage deprives homeowners of their property interest in their homes. Finance Experts' Merits Amicus Br. 14. In *Ickes*,

_____

[7] Nor does it meaningfully distinguish *Land*. *Contra* EPA Br. 43. That case turned on ownership of the property. Completion of contractual obligations was only relevant because the shares were collateral, so the plaintiffs could only claim ownership when the loan was repaid. *Land*, 330 U.S. at 734. The grants here are structured differently to give grantees ownership at the outset.

the Court explained that the government's security lien on the plaintiff's water rights "itself imports that the water rights belong to another than the lienor"—that is, to the plaintiffs, not the government. 300 U.S. at 95.

EPA's reliance on Citibank's financial agency agreement (at 42) fares no better. Contrary to EPA's characterization, plaintiffs' argument turns not on who holds the funds, but on who owns them. The fact that Citibank is a financial agent of the government is irrelevant because its contracted-for role is to act as custodian of *plaintiffs*' funds. The financial agency agreement reinforces that Citibank manages the accounts "in the names of" plaintiffs, not EPA. JA2145. Plaintiffs are the "customer" of the accounts, so they "have the ability to access and use [the] funds" and are "responsible for directing [Citibank] as to what type of account to create; amounts to transfer into Subrecipient accounts; and how to allocate the amount of funding." *Id.* As a fiduciary, Citibank owes certain duties to EPA, such as to protect nonpublic information from disclosure, JA2130, and to provide visibility into plaintiffs' accounts, JA2149, but none of those duties affects plaintiffs' title in the funds or gives ownership to EPA.[8]

---

[8] EPA's citation to *Buchanan v. Alexander*, 45 U.S. 20 (1846), is inapt. That case involved a "purser" who held wages that he had not yet disbursed to the seamen. *Id.* at 20. Citibank's role maintaining plaintiffs' accounts is not comparable to a purser's paying wages. And the critical fact in *Buchanan*—that the money had not been disbursed, *id.* at 20-21—is the opposite here.

Lastly, EPA asks the Court to simply ignore plaintiffs' ownership. EPA Br. 40. But EPA cannot avoid this critical fact. Plaintiffs argued below that they were "seeking to enjoin EPA from continuing to interfere with and deny our access to our funds," JA916, and the court based its holding on the fact that "[p]laintiffs seek to regain access to their already disbursed funds at Citibank," JA986. *See* JA962 (enjoining EPA from "limiting access to funds" in plaintiffs' accounts). Far from "beside the point" (EPA Br. 40), plaintiffs' ownership drives the Tucker Act analysis on both prongs: the source of plaintiffs' rights is their property interest, and the relief they seek is to stop EPA from interfering with their property.

## B. The District Court Correctly Concluded That Plaintiffs' APA Claim Is Likely to Succeed on the Merits

The panel did not reach the merits of plaintiffs' APA claim because it wrongly concluded there was no jurisdiction. Panel Op. 9 n.3. EPA likewise disclaims any "independent argument" on the merits. EPA Br. 42 n.5.[9] Although it states it still "vigorously disputes" them (*id.*), one conclusory sentence does not avoid its waiver. *See CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014).

---

[9] West Virginia and other amici States attempt to advance an argument that neither EPA nor the panel made—that EPA was *required* to terminate the grants. West Virginia Amicus Br. 5-16. Courts do not consider arguments raised only by amici. *FTC v. Phoebe Putney Health Sys.*, 568 U.S. 216, 226 n.4 (2013). Regardless, West Virginia's argument is meritless.

Regardless, the district court was correct: EPA's decision to dismantle the NCIF and CCIA programs, including by freezing all the accounts and terminating all the grants in the programs, was an arbitrary and capricious attempt to claw back money that had already become plaintiffs' property. EPA failed to "cogently explain" its reason for freezing the funds, and the reasons it gave for cancelling every grant in the programs "run[] counter to the evidence." *Motor Veh. Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins.*, 463 U.S. 29, 43, 48 (1983).

As the district court concluded, EPA failed to explain its reasons for the freeze because "it did not say *anything* about its decision, for weeks." JA992. Plaintiffs sent inquiries to EPA but received no response. JA972. They were left to speculate based on Zeldin's statements on television that he thought the "entire" GGRF was "criminal." JA973. When EPA later terminated all the grants, its termination letters claimed concerns about "programmatic fraud, waste, and abuse," but contained no specific allegations of wrongdoing by any grantee. JA390. To the contrary, after multiple investigation requests from EPA, several prosecutors and a judge concluded there was no probable cause to believe plaintiffs had committed fraud. *See supra* p. 8. And even after EPA initiated investigations anyway (EPA Br. 11), it has produced no evidence of wrongdoing.

During litigation, EPA had repeated opportunities to substantiate its fraud allegations but could not do so, so it "changed its tune." Dissent 24; JA993. EPA

conceded its actions "had nothing to do with Plaintiffs' performance" or misuse of funds. JA982. EPA instead claimed it needed more oversight at a programmatic level. Dissent 24-25. But it ignored the ample oversight tools the GGRF already has: For example, in addition to having full visibility into plaintiffs accounts, JA2149, EPA approves plaintiffs' budgets, conducts audits, and receives reports including "detailed narratives describing program performance . . . supported with qualitative discussions and quantitative merits," JA1095. JA372-374. EPA also ignored the significant reliance interests of plaintiffs and loan recipients, who were already developing projects based on committed funds. *See* JA390-391; *Dep't of Homeland Security v. Regents of Univ. of Calif.*, 591 U.S. 1, 30 (2020).

The timing of EPA's actions is telling. After EPA asked plaintiffs for information about oversight, it terminated all the grants without waiting for their answers, JA993—answers EPA itself claimed it needed to evaluate its concerns, JA65. JA695 (admitting "lack of critical information" 3 days before terminations). This "terminate first, gather data later" approach "is fundamentally at odds with the APA's requirement of reasoned decision making." Dissent 26. And it reinforces that EPA's investigations were fishing expeditions, and its "shifting and contradictory" explanations "are *post-hoc* and pretextual." *Id.* at 25-26.

## II. PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR SEPARATION-OF-POWERS CLAIM

The Court can independently affirm because plaintiffs' constitutional claim is likely to succeed. The district court correctly held that EPA usurped the legislative power by dismantling the GGRF. JA995-996. The panel agreed that the district court had jurisdiction over this claim. Panel Op. 22. And neither it nor EPA contends that the agency had any authority to dismantle a congressionally mandated program. They instead recharacterize EPA's actions as terminating individual grants in order to re-obligate to new grantees, but that argument—and their other attempts to downplay the constitutional violation—fail.

### A. The District Court Had Jurisdiction Over Plaintiffs' Constitutional Claim

The district court and panel agreed that there was jurisdiction over plaintiffs' constitutional claim. JA981-988; Panel Op. 22. EPA disputes this holding only in two cursory sentences (at 44, 46) and thus "forfeit[s] [its] insufficiently developed argument." *Bronner v. Duggan*, 962 F.3d 596, 611 (D.C. Cir. 2020). Regardless, the courts were correct that there is jurisdiction here.

District courts' jurisdiction over constitutional claims is "the creation of courts of equity, and reflects a long history of judicial review of illegal executive action." *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 327 (2015). The Tucker Act question, which arises for APA claims via the APA's limited sovereign

immunity waiver, is not presented because "'suits for specific relief against officers of the sovereign' allegedly acting . . . 'unconstitutionally' are not barred by sovereign immunity." *Pollack v. Hogan*, 703 F.3d 117, 120 (D.C. Cir. 2012).

Even if the Tucker Act framework applied, plaintiffs' constitutional claim is plainly not contractual because the source of their rights is the constitutional guarantee of the separation of powers. Their claim that EPA usurped the legislative power by undoing the congressionally created GGRF does not turn on the grant agreements' terms. EPA cannot dismantle a congressionally mandated program even if the agreements allowed individual grant terminations.

In fact, the Tucker Act could not grant exclusive jurisdiction over plaintiffs' constitutional claim to the Court of Federal Claims because that court has no jurisdiction over such claims in the first place. *See Leblanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995) (no jurisdiction over separation-of-powers claim). Otherwise, no court would have jurisdiction to address the Executive's unconstitutional action, even if it terminated grants based on race or religion. This Court has "categorically reject[ed] the suggestion that a federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims." *Tootle v. Sec'y of Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006).

### B. The District Court Correctly Concluded That Plaintiffs' Constitutional Claim Is Likely to Succeed on the Merits

#### 1. EPA violated the separation of powers by attempting to dismantle the GGRF

The Supreme Court has "[t]ime and again" reaffirmed both "'the importance in our constitutional scheme of the separation of governmental powers'" and the Court's "responsibility to enforce the principle." *Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise*, 501 U.S. 252, 272-273 (1991). That "system of checked and balanced power" is "the greatest security against tyranny." *Mistretta v. United States*, 488 U.S. 361, 381 (1989). To that end, Article I vests "[a]ll legislative Powers" in Congress, including the powers to make laws and direct spending. U.S. Const. art. I, §§ 1, 8-9. Congress's "'exclusive power over the federal purse'" is "one of the most important authorities allocated to Congress," particularly "as a restraint on Executive Branch officers." *Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346-1347 (D.C. Cir. 2012).

The Executive Branch is responsible for "tak[ing] Care that the laws be faithfully executed." U.S. Const. art. II, § 3. When it "takes measures incompatible with the expressed or implied will of Congress, [its] power is at its lowest ebb." *Youngstown Sheet & Tube v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring). The Supreme Court has long held that this authority to execute the laws does not include the power to refuse to execute a law (sometimes

called a "dispensing power"). *Kendall v. United States ex rel. Stokes*, 37 U.S. 524, 612-613 (1838); *Clinton v. City of New York*, 524 U.S. 417, 438 (1998); *Off. of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 435 (1990) (White, J., concurring).

In *Kendall*, the Court applied this principle to order an Executive official to spend appropriated funds: Congress had passed a law directing settlement and payment of certain claims involving the Postmaster General. 37 U.S. at 608-609. The Postmaster refused to pay some amounts, arguing he was "subject to the direction and control of the President," who had discretion whether to carry out the law. *Id.* at 609, 612-613. The Court rejected such a "dispensing power, which has no countenance for its support in any part of the constitution." *Id.* at 613. The Court warned that granting the President an implied power to refuse to execute the laws "would be clothing the President with a power entirely to control the legislation of congress, and paralyze the administration of justice." *Id.*

This Court did the same in *In re Aiken County*, 725 F.3d 255 (D.C. Cir. 2013). Congress had appropriated funds for licensing nuclear waste storage, but the agency refused to process the license. *Id.* at 257-258. The Court ordered the agency to use the funds to "continue with the legally mandated licensing process." *Id.* at 267. Writing for the Court, then-Judge Kavanaugh explained that agencies "may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress." *Id.* at 260. That would violate "settled, bedrock

principles of constitutional law" and "represent a major and unwarranted expansion of the Executive's power at the expense of Congress." *Id.* at 259-260.

EPA's actions here violate the same bedrock principles. Congress created the GGRF to invest in clean energy, appropriated money for grants, and directed EPA to administer the grant programs. 42 U.S.C. § 7434(a). EPA has no constitutional authority to cancel those programs and return the money to Treasury. Nor does EPA claim statutory authority to do so. EPA claims "discretion in developing, overseeing, and managing grant programs" (at 46), but even if that were true, it would still not include discretion to dismantle the program. *See Kendall*, 37 U.S. at 612-613. EPA can choose who receives grants and even terminate individual grants, but it cannot terminate *all* grants in order to eliminate the whole program.

Yet that is what EPA did: it was not just "[t]erminating particular grants," but "dismantling a program." *Contra* EPA 46; *also* Panel Op. 23. As the district court found, the record shows "EPA seeks to dismantle these grant programs in their entirety as a policy matter." JA995. EPA terminated all grants "comprising the entire NCIF and CCIA programs," JA995, without any "individualized reasoning as to anything Plaintiffs themselves did," JA993. Its reasons were "programmatic" (JA390), reflecting policy disagreements with the GGRF's goals and structure. *See supra* pp. 8-9. That fact is explicit in Zeldin's public statements criticizing the "entire scheme" as "criminal" and stating he was "not going to rest" until GGRF

funds were clawed back.  JA973.  Even EPA now admits its decision was due to changes in "agency policies and priorities."  EPA Br. 10.  But the Constitution does not allow EPA to "ignore" a statutory mandate "merely because of policy disagreement with Congress."  *Aiken Cnty.*, 725 F.3d at 260.

### 2.     Plaintiffs' claim is constitutional, not statutory

The panel erred by turning plaintiffs' separation-of-powers claim into a mere statutory claim under the Inflation Reduction Act.  Panel Op. 22-23; EPA Br. 45. Its approach erodes constitutional protections against Executive overreach, weakening our "greatest security against tyranny."  *Mistretta*, 488 U.S. at 381; *see Global Health Council v. Trump*, 153 F.4th 1, 46 (D.C. Cir. 2025) (Pan, J., dissenting) (discussing far-reaching consequences of narrowing ability to challenge Executive actions on separation-of-powers grounds).

The Supreme Court has settled that plaintiffs can bring constitutional claims challenging separation-of-powers violations.  *E.g.*, *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010); *Collins v. Yellen*, 594 U.S. 220, 245 (2021).  And this Court's *Aiken County* decision was constitutional.  Then-Judge Kavanaugh based his analysis on "settled, bedrock principles of constitutional law."  *Aiken Cnty.*, 725 F.3d at 259.  He explained:  "Our decision today rests on the constitutional authority of Congress, and the respect that the Executive and the Judiciary properly owe to Congress in the circumstances here."

*Id.* at 267. Recognizing the case's "serious implications for our constitutional structure," he explained that "our constitutional system of separation of powers would be significantly altered if we were to allow executive and independent agencies to disregard federal law." *Id.* at 266-267; *see Chicago v. Barr*, 961 F.3d 882, 892 (7th Cir. 2020) (separation of powers prohibits Executive from imposing conditions on grants that are not authorized by Congress); *San Francisco v. Trump*, 897 F.3d 1225, 1234-1235 (9th Cir. 2018) (separation of powers prohibits Executive from withholding funding without congressional authorization).

The panel concluded otherwise by misreading *Dalton v. Specter*, 511 U.S. 462 (1994). In *Dalton*, a statute gave the President discretion to close military bases but prescribed a specific procedure for doing so. 511 U.S. at 465. The plaintiffs claimed the President closed bases without following that procedure, for example, "by accepting procedurally flawed recommendations" from a committee that failed to place information in the record. *Id.* at 474; *see id.* at 466. *Dalton* held that this claim was purely statutory, not constitutional. *Id.* at 471-472.

In doing so, *Dalton* explained that not every Executive action exceeding statutory authority "is *ipso facto* in violation of the Constitution." *Id.* at 472. But *Dalton* nowhere suggested that a constitutional claim can never exist if a statute was also violated. *See id.* at 469 (recognizing presidential actions can be "'reviewed for constitutionality'"); *Murphy Co. v. Biden*, 65 F.4th 1122, 1130 (9th

Cir. 2023) ("While 'an action taken by the President in excess of his statutory authority does not necessarily violate the Constitution,' specific allegations regarding separation of powers may suffice.") (alterations, citation omitted). The panel's error was inverting *Dalton*'s logic: "just because the Court determined that not all [*ultra vires*] claims implicate the Constitution, that does not mean that none of them ever do." *Global Health*, 153 F.4th at 40 (Pan, J., dissenting). Otherwise, it would be impossible to explain cases like *Kendall* and *Aiken County*—each of which involved violations of the "express or implied will of Congress" that rose to constitutional dimensions. *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).

*Dalton* and this case are at opposite ends of the spectrum. Mere failure to follow procedures or statutory criteria, as in *Dalton*, or consideration of impermissible criteria when exercising congressionally delegated authority, as in *In re Cambridge Indus. USA*, 2025 WL 3526129, at *2 n.1 (Fed. Cir. Dec. 9, 2025), is far afield from refusing to execute a statutory mandate. Here, EPA did not fail to follow procedures in administering the grants. Nor did it merely fail to apply the right statutory standard when awarding grants. It *dismantled* the very programs that Congress required it to create.[10] If *Dalton* were stretched to prohibit even the kind of constitutional claim here, courts would be powerless to redress the

_____

[10] This case thus differs from *Sustainability Institute*, which did not involve the "cancel[lation of] entire grant programs wholesale." 2026 WL 157120, at *12.

most egregious Executive overreaches. Plaintiffs could never raise constitutional claims alongside statutory ones, and agencies could avoid constitutional review simply by raising a defense based on a statute, however baseless. This Court should not allow such "a major and unwarranted expansion of the Executive's power at the expense of Congress." *Aiken Cnty.*, 725 F.3d at 260.[11]

### 3. EPA's claimed intent to re-obligate is refuted by the record and barred by appropriations law

The panel erred on the merits by crediting EPA's representation that it would re-obligate the funds after clawing them back. Panel Op. 23-27; EPA Br. 47-48. That was factually and legally wrong. EPA's attempt to distinguish *Aiken County* because the government there refused to execute the law "'by its own admission'" (EPA Br. 49-50) is similarly problematic. That would allow the Executive to violate the Constitution with impunity simply by denying it was doing so.

a. As a factual matter, the panel failed to give appropriate deference to the district court's findings that EPA's claimed intent to re-obligate was not credible and that it instead "seeks to dismantle these grant programs in their entirety as a policy matter." JA995-996. The Court reviews those findings only for clear error.

---

[11] Even if plaintiffs' claim were treated purely as a statutory one, it would still be likely to succeed and justify an injunction, as primary grantees explain. But the panel's mischaracterization of the claim should be corrected because it has far-reaching consequences beyond this case, *see Global Health Council*, 153 F.4th at 46 (Pan, J., dissenting), and "creates a circuit split" with the Ninth Circuit, *id.* at 41 (discussing *Murphy*, 65 F.4th at 1130).

*Huisha-Huisha*, 27 F.4th at 726.  It must affirm so long as "the district court's account of the evidence is plausible in light of the record," even if the Court were "convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently."  *Anderson v. Bessemer City*, 470 U.S. 564, 573-574 (1988).

The district court's findings were more than plausible—they were thoroughly supported by the evidence.  As explained *supra* pp. 42-43, the district court relied not only on EPA's termination of "all eight grants comprising the entire NCIF and CCIA programs," but also on "the agency's public statements."  JA995.  *Contra* Panel Op. 25.  President Trump announced his goal to "[t]erminat[e] the Green New Deal."  90 Fed. Reg. 8357.  Following that directive, Zeldin attacked the GGRF, stating the "entire scheme . . . is criminal."  JA973.  He vowed to terminate the agreement with Citibank and "reassume[] responsibility for all of these funds."  JA140.  EPA was "not going to rest" until they were clawed back.  JA973.  These statements make clear EPA's decision to eliminate the programs; they suggest no intent to restart them with new grantees.

The panel and EPA ignore these statements.  They rely instead on EPA's own self-serving representations that it would re-obligate.  Panel Op. 25; EPA Br. 47.[12]

---

[12] The panel (but not EPA) invokes the presumption of regularity.  That presumption only applies "in the absence of clear evidence to the contrary."  *Fed. of Gov't Employees, AFL-CIO v. Reagan*, 870 F.2d 723, 727 (D.C. Cir. 1989).  Here, the presumption is rebutted by the clear evidence discussed above.

But EPA's statements are undermined by the lack of supporting evidence and refuted by abundant contrary evidence of EPA's bad faith. Neither the panel nor EPA point to any evidence substantiating EPA's bald statements. For example, they cite nothing suggesting EPA took steps to develop new oversight tools or prepare to resolicit applications. In fact, when one grantee proposed to address EPA's purported oversight concerns by restructuring its funding, EPA ignored it. JCR 28(j) Letter (May 21, 2025). EPA thus cannot meet clear error's high bar.

The evidence undermining EPA's claimed intent, in contrast, was substantial. As the district court found, EPA's representations were contradicted by the public statements described above. JA995-996. And EPA's credibility was tarnished by its shifting rationales for termination, which Judge Pillard aptly described as "pretextual." Dissent 26. As explained above, EPA first asserted concerns about fraud, despite the lack of evidence and contrary opinions of multiple prosecutors and a judge.[13] When that approach failed, EPA pivoted to an oversight rationale, but again had no evidence of oversight problems and did not even collect the relevant information. *See supra* pp. 8-9. This alarming "track record" discredited EPA's purported concerns, so there was no reason for the district court to believe

_____

[13] The panel suggested in a footnote that the "gold bars" video was evidence of EPA's good faith (Panel Op. 26), but it is nothing of the sort. As Judge Pillard explained, an EPA "staffer's bluster at a bar" is "irrelevant" because he was not even talking about the GGRF awards. Dissent 36.

EPA would re-obligate after developing more oversight tools.  Dissent 40.  EPA's claim that the court cited no "reason to doubt [EPA's] commitment" to re-obligate (at 47) is thus wrong; EPA simply ignored those reasons.  In evaluating EPA's self-serving statements, this Court is " 'not required to exhibit a naiveté from which ordinary citizens are free.' "  *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).  "Accepting contrived reasons would defeat the purpose of" judicial review.  *Id.*

b.  Regardless, appropriations law would bar EPA from re-obligating anyway.  An "agency's budget authority lapses on the last day of the period for which funds were obligated."  *W.V. Ass'n of Cmty. Health Ctrs. v. Heckler*, 734 F.2d 1570, 1576 (D.C. Cir. 1984).  After that, the funds "cease to be available for incurring and recording new obligations and are said to have 'expired.' "  1 GAO, Principles of Federal Appropriations Law 5-6, 5-67 (3d ed. 2004).  Congress made the GGRF appropriation "available until September 30, 2024."  42 U.S.C. § 7434(a).  EPA obligated the funds to plaintiffs before that date, and the appropriation has now expired and cannot be used to create new obligations to new grantees.

As explained by the former General Counsel to the Office of Management and Budget, that principle holds even if EPA de-obligated plaintiffs' funds.  Bagenstos Amicus Br. 6-11; *e.g.*, *Continued Availability of Expired Appropriation for Additional Project Phases*, B-286929, 2001 WL 717355, at *2-4 (Comp. Gen. Apr. 25, 2001).  When funds are de-obligated after an appropriation expires, they

are "not available to incur a new obligation," but can be used only to "to adjust and make payments to liquidate liabilities arising from obligations *made within the fiscal year for which the funds were appropriated*"—in this case, other grants obligated before September 30, 2024. 1 GAO, *supra*, 5-6, 5-80 (emphasis added). EPA's suggestion that the Constitution does not require it to proceed with "*these particular plaintiffs*" (EPA Br. 51) is thus beside the point. The Constitution requires EPA to execute the programs; it is appropriations law that limits EPA to doing so with plaintiffs because the appropriation has expired.

The panel attempted to avoid this rule by suggesting EPA could issue "replacement contracts." Panel Op. 24. But the scope of replacement contracts is narrow and does not cover EPA's claimed intent here. The general rule is that "the award to the alternative grantee must be treated as a new obligation and is not properly chargeable to the appropriation current at the time the original grant was made." 2 GAO, *supra*, 10-108-109. As a limited exception to that rule, replacement contracts must be "substantially identical in scope and purpose to the original grant." *Id.* at 109; *Hon. Lawton Chiles U.S. Senate*, B-164031, 1976 WL 10353, at *4 (Comp. Gen. June 25, 1976) (new grant was not "replacement" where funds would go to hospital 125 miles away from original grantee). EPA's purported goal is to fundamentally change the grant's terms. That cannot be done

by replacement contracts, which must be merely "a continuation of the original" grant. *Hon. Lawton Chiles*, B-164031, at *4.

EPA does not even contend that it could actually make replacement grants, suggesting only that the law is "unclear" and replacements are possible in "at least some circumstances." EPA Br. 48. EPA argues instead that its inability to re-obligate does not matter as long as it intended to do so. *Id.* at 47. That makes no sense. EPA's constitutional violation is determined by its actions, not its subjective intent. If it could not re-obligate, then terminating all the grants *is* the same as canceling the program. EPA cannot escape its constitutional violation by claiming it wanted to do what the law prohibits. At the very least, the fact that EPA claims to intend something unlawful reinforces that its claim is not credible.

### 4. The OBBBA does not affect plaintiffs' funds

EPA argues that plaintiffs' separation-of-powers claim is no longer valid after the OBBBA, but it is unclear whether their argument is one of mootness or merits. EPA Br. 48-49. The panel correctly rejected the mootness argument, Panel Op. 7-8, and found it unnecessary to consider the OBBBA on the merits, *id.* at 25 n.11. Either way, EPA's argument fails for the same reason: the OBBBA has no effect on plaintiffs' claim because the NCIF and CCIA funds were already obligated.

The OBBBA's plain text only rescinds "*unobligated* balances" appropriated under the GGRF. 139 Stat. 72, § 60002 (emphasis added). It does not rescind

plaintiffs' funds, which were obligated and disbursed.  Likewise, the OBBBA's repeal of the GGRF statute is prospective only.  *See Vartelas v. Holder*, 566 U.S. 257, 266 (2012) ("[C]ourts read laws as prospective in application unless Congress has unambiguously instructed retroactivity.").  That prospective repeal prevents Congress from appropriating new funds to the GGRF without enacting a new authorizing statute.  But it does not retroactively rescind existing grants.  *See* 171 Cong. Rec. S4283 (July 9, 2025) (Rep. Griffith) ("If the grant has already been granted and the money is obligated, . . . then our language does not affect that."); *id.* (Rep. Guthrie) (OBBBA "does not close the grants on any obligated funds").  In fact, if the repeal were read to rescind all appropriations, it would render superfluous the specific provision rescinding only unobligated funds.  *See Fischer v. United States*, 603 U.S. 480, 493 (2024) (rejecting "unbounded interpretation" of one provision that "render[s] superfluous the careful delineation" of another).

This reading is confirmed by the Congressional Budget Office's estimate that, of the GGRF's $27-billion appropriation, the rescission would return $19 million allocated to administrative costs.  171 Cong. Rec. S4281 (Sen. Whitehouse) (rescission "saved the $19 million EPA had remaining to oversee the program" and "the repeal of the program language did not create any additional savings").  If the OBBBA reached NCIF and CCIA grants, the number would have been billions.

EPA makes no attempt to reconcile its argument with the OBBBA's text, so it misunderstands what Congress intended. EPA Br. 48-49. Congress did not "claw back as much of this money as possible" (*id.* at 3); it differentiated obligated and unobligated funds. EPA's terminations of obligated funds thus do not "further[] Congress's intent" (*id.* at 49). There is nothing "perverse" (*id.* at 3) about enjoining EPA from clawing back money Congress left untouched.

## III.  EQUITABLE CONSIDERATIONS SUPPORT INJUNCTIVE RELIEF

The district court did not abuse its discretion in concluding that equitable considerations support injunctive relief. JA997-1003. As the district court found, plaintiffs' inability to access their funds will cause, and has caused, them to risk "losing qualified projects," limiting their ability to apply for other grants, reducing partners' willingness to work with them, and damaging their reputations. JA1001; *e.g.*, JA1297-1300; JA1327-1331; JA1426-1428; 1471-1475. For example, projects that depend on NCIF funding to pursue clean-energy options may be forced to construct traditional energy sources instead, and their opportunity to choose clean energy will be lost. JA1298-1299; JA1427; JA1471-1472. And as plaintiffs continue to lose partnerships and projects, "the distrust bred by EPA's actions will make it exceedingly difficult to revive the coordination and cooperation between nonprofit organizations, private investors, private businesses, and community lenders critical to" plaintiffs' missions. Dissent 46; *see* JA431.

Plaintiffs will suffer further irreparable harm if EPA claws back the funds. The district court found that, if EPA took the funds, there would be serious uncertainty about the court's ability to award complete relief after final judgment. JA998. EPA's arguments about the OBBBA heighten that concern, as EPA may attempt to return the funds to Treasury and argue they are beyond the court's reach.

In contrast, EPA's purported harms are illusory. "There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). The public fisc is not harmed because plaintiffs are using the funds for their congressionally dedicated purposes. And plaintiffs own the funds, so any interest belongs to them. JA524.

EPA also ignores the "enormous loss to . . . the American people" if plaintiffs must halt the projects they are funding, which are intended to "boost the global competitiveness of U.S. advanced electric manufacturing capability, provide critically necessary affordable housing and infrastructure, lower energy costs, improve air quality, and reduce climate risks." Dissent 44-45.

# CONCLUSION

The Court should affirm the preliminary injunction.

Dated: February 2, 2026

Respectfully submitted,
*s/ Diana L. Kim*

KEITH ELLISON
  *Attorney General of Minnesota*
PETER N. SURDO
  *Special Assistant Attorney General*
OLIVER LARSON
  *Manager, Environment and Natural*
    *Resources Division*
CATHERINE RIOS-KEATING
  *Special Assistant Attorney General*
Minnesota Attorney General's Office
445 Minnesota Street, Suite 600
(651) 757-1061
Peter.Surdo@ag.state.mn.us
*Counsel for Minnesota Climate*
*Innovation Finance Authority*

KWAME RAOUL
  *Attorney General of Illinois*
JANE ELINOR NOTZ
  *Solicitor General*
ALEX HEMMER
  *Deputy Solicitor General*
Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603
(312) 814-5526
Alex.Hemmer@ilag.gov
*Counsel for Illinois Finance Authority*

ROB BONTA
  *Attorney General of California*
SAMUEL HARBOURT
  *Solicitor General*
HELEN HONG
  *Principal Deputy Solicitor General*
THOMAS S. PATTERSON
  *Senior Assistant Attorney General*
DIANA L. KIM
  *Deputy Solicitor General*
ANYA M. BINSACCA
  *Supervising Deputy Attorney General*
MEGHAN H. STRONG
WILLIAM SETRAKIAN
  *Deputy Attorneys General*
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3369
Diana.Kim@doj.ca.gov
*Counsel for California Infrastructure and*
*Economic Development Bank*

AARON M. FREY
  *Attorney General of Maine*
EMMA AKRAWI
SCOTT W. BOAK
  *Assistant Attorneys General*
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333
(207) 626-8800
Emma.Akrawi@maine.gov
*Counsel for Efficiency Maine Trust*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume requirement of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because the brief contains 12,952 words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). The brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared using Microsoft Word in 14-point Times New Roman font, a proportionally spaced typeface.

Dated:  February 2, 2026              *s/ Diana L. Kim*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 2, 2026, I electronically filed the foregoing document with the Clerk of the Court for the U.S. Court of Appeals for the District of Columbia Circuit by using the CM/ECF system.  All participants are registered CM/ECF users and will be served by the CM/ECF system.

Dated:  February 2, 2026                    _s/ Diana L. Kim_____