**ORAL ARGUMENT SCHEDULED FOR FEBRUARY 24, 2026**

Nos. 25-5122, 25-5123

# United States Court of Appeals
## for the
## District of Columbia Circuit

_____

CLIMATE UNITED FUND,
COALITION FOR GREEN CAPITAL,
POWER FORWARD COMMUNITIES, INC.,
CALIFORNIA INFRASTRUCTURE AND
ECONOMIC DEVELOPMENT BANK, EFFICIENCY MAINE TRUST,
ILLINOIS FINANCE AUTHORITY, MINNESOTA CLIMATE INNOVATION
FINANCE AUTHORITY, JUSTICE CLIMATE FUND, and INCLUSIV, INC.
*Plaintiffs-Appellees*

v.

CITIBANK, N.A.,
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, and
LEE ZELDIN, in his official capacity as ADMINISTRATOR, UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY,
*Defendants-Appellants*

_____

From the United States District Court for the District of Columbia
Case Nos. 1:25-cv-00698-TSC (Hon. Tanya S. Chutkan)
1:25-cv-00735-TSC (Hon. Tanya S. Chutkan)
1:25-cv-00762-TSC (Hon. Tanya S. Chutkan)
1:25-cv-00820-TSC (Hon. Tanya S. Chutkan)
1:25-cv-00938-TSC (Hon. Tanya S. Chutkan)
1:25-cv-00948-TSC (Hon. Tanya S. Chutkan)

_____

**APPELLEES' ANSWERING BRIEF**

_____

Vincent Levy
  *Counsel of Record*
Kevin D. Benish
Daniel Fahrenthold
HOLWELL SHUSTER &
GOLDBERG LLP
425 Lexington Avenue, 14th Floor
New York, NY 10017
Tel.: (646) 837-5151
vlevy@hsgllp.com

*Attorneys for Plaintiff-Appellee*
*Coalition for Green Capital*

Beth C. Neitzel
  *Counsel of Record*
Matthew F. Casassa
FOLEY HOAG LLP
155 Seaport Boulevard, Suite 1600
Boston, MA 02210
Tel.: (617) 832-1000
bneitzel@foleyhoag.com
mcasassa@foleyhoag.com

Noah C. Shaw
James M. Gross
FOLEY HOAG LLP
1301 Ave. of the Americas, 25th
Floor
New York, NY 10019
Tel.: (212) 812-0400
ncshaw@foleyhoag.com
jgross@foleyhoag.com

*Attorneys for Plaintiff-Appellee*
*Power Forward Communities*

Adam G. Unikowsky
  *Counsel of Record*
Kathryn L. Wynbrandt
David B. Robbins
Tanner J. Lockhead
JENNER & BLOCK LLP
1099 New York Avenue, Suite 900
Washington, D.C. 20001
Tel.: (202) 639-6000
Fax: (202) 639-6066
aunikowsky@jenner.com

Gabriel K. Gillett
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
Tel.: (312) 222-9350
ggillett@jenner.com

Allison N. Douglis
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
Tel.: (212) 891-1600
Fax: (212) 891-1699
adouglis@jenner.com

*Attorneys for Plaintiff-Appellee*
*Climate United Fund*

Jay C. Johnson
  *Counsel of Record*
VENABLE LLP
600 Massachusetts Ave. NW
Washington, DC 20001
Tel: (202) 344-4000
jcjohnson@venable.com

*Attorney for Plaintiff-Appellee*
*Inclusiv, Inc.*

David J. Zimmer
  *Counsel of Record*
ZIMMER, CITRON & CLARKE
LLP
130 Bishop Allen Drive
Cambridge, MA 02139
Tel.: (617) 676-9421
dzimmer@zimmercitronclarke.com

Eric F. Citron
Kathleen Foley
ZIMMER, CITRON & CLARKE
LLP
1629 K. St. NW, Suite 300
Washington, D.C. 20006
Tel.: (202) 796-4540
ecitron@zimmercitronclarke.com
kfoley@zimmercitronclarke.com

*Attorneys for Plaintiff-Appellee*
*Justice Climate Fund*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.     Parties and Amici

The Plaintiffs-Appellees are Climate United Fund; Coalition for Green Capital; Power Forward Communities, Inc.; California Infrastructure and Economic Development Bank; Minnesota Climate Innovation Finance Authority; Efficiency Maine Trust; Illinois Finance Authority; Justice Climate Fund; and Inclusiv, Inc. The Defendants-Appellants are Citibank, N.A.; the U.S. Environmental Protection Agency; and Lee Zeldin, in his official capacity as Administrator of the U.S. Environmental Protection Agency.

I certify under Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1 that Climate United Fund is a wholly controlled subsidiary of Calvert Impact, Inc. No publicly held company owns 10% or more of Climate United Fund.

None of Coalition for Green Capital; Power Forward Communities, Inc.; Justice Climate Fund; or Inclusiv, Inc. has a parent corporation, and no publicly held company owns 10% or more of their stock.

Amici are Samuel R. Bagenstos; Michael Swack, Paul Yoo, Ellen Lurie Hoffman, and Eric Hangen; Tobias Barrington Wolff; the Natural Resources Defense Council; U.S. Senators Chris Van Hollen, Sheldon Whitehouse, Edward Markey, Mazie K. Hirono, Jeff Merkley, and Tina Smith and U.S. Representatives Debbie Dingell, Paul Tonko, Shri Thanedar, Greg Landsman, Nanette Barragan,

i

Lloyd Doggett, Julia Brownley, Bonnie Watson Coleman, Mike Quigley, Jared Huffman, Jan Schakowsky, Mary Gay Scanlon, Alexandria Ocasio-Cortez, Sarah Elfreth, Frank Pallone, Kevin Mullin, Jamie Raskin, Sean Casten, Suzanne Bonamici, Mike Levin, Troy Carter, Yvette Clarke, Jennifer McClellan, Darren Soto, Diana Degette, Robert Menendez, Kathy Castor, Mark Takano, Bobby Scott, George Latimer, and Doris Matsui; and the States of West Virginia, Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Texas, Utah, and Wyoming.

### B.    Rulings Under Review

References to the rulings at issue appear in Appellant's Opening Brief, Doc. 2114428.

### C.    Related Cases

There are no related cases.

/s/ *Vincent Levy*

ii

## TABLE OF CONTENTS

INTRODUCTION ................................................................................1

STATEMENT OF THE CASE...............................................................3

    A. The Inflation Reduction Act's Greenhouse Gas Reduction Fund.............3

    B. EPA Selects the NCIF and CCIA Plaintiffs to Receive
       Capitalization Grants. ...........................................................4

    C. EPA Structures the Grants to Meet Capital Market Needs by
       Capitalizing Grantees. ...........................................................5

    D. The NCIF and CCIA Plaintiffs Enter Into Account Control
       Agreements with EPA and Citibank. ..........................................8

    E. The Administration Freezes Plaintiffs' Funds. .......................................10

    F. The District Court Enters a Preliminary Injunction. ...............................13

    G. A Panel of This Court Reverses. .............................................15

SUMMARY OF THE ARGUMENT ......................................................15

ARGUMENT ....................................................................................17

  I. The Court Should Affirm The Preliminary Injunction Against EPA...........17

    A. The District Court Has Subject-Matter Jurisdiction...............................17

       1. The APA's Sovereign-Immunity Waiver Applies. ...........................18

       2. Sovereign Immunity Does Not Apply In The First Place.................32

    B. Plaintiffs Are Likely To Succeed On The Merits. ...................................34

       1. The Constitution and the IRA. ..............................................34

       2. Arbitrary-And-Capricious Action and Agency Regulations..............43

    C. Plaintiffs Demonstrated Irreparable Harm Absent An Injunction. ..........47

    D. The Balance of Equities and Public Interest Favor Plaintiffs. ................51

II. The Court Should Affirm The Preliminary Injunction Against Citibank. ....53

CONCLUSION ........................................................................................................57

# TABLE OF AUTHORITIES*

**Cases**                                                                    **Page(s)**

*Ariz. Grocery Co. v. Atchison, T.&S.F. Ry. Co.*,
   284 U.S. 370 (1932) ...............................................................................33

*Armour & Co. v. Freeman*,
   304 F.2d 404 (D.C. Cir. 1962)..............................................................48

*Atlas Air, Inc. v. International Bhd. of Teamsters*,
   928 F.3d 1102 (D.C. Cir. 2019)............................................................47

*Bowen v. Massachusetts*,
   487 U.S. 879 (1988) ............................................................. 18, 27, 29

*Chamber of Com. v. Reich*,
   74 F.3d 1322 (D.C. Cir. 1996)..............................................................32

*Cincinnati Soap Co. v. U.S.*,
   301 U.S. 308 (1937) .............................................................................35

*Clinton v. City of New York*,
   524 U.S. 417 (1998) ...................................................................... 36, 37

*Crowley Gov't Servs., Inc. v. GSA*,
   38 F.4th 1099 (D.C. Cir. 2022) ...........................................................30

*Dalton v. Specter*,
   511 U.S. 462 (1994) ...................................................................... 36, 37

**Department of Education** v. *California*,
   604 U.S. 650 (2025) ...................................................... 21, 23, 27

*Dugan v. Rank*,
   372 U.S. 609 (1963) .............................................................................34

*Envtl. Health Tr. v. FCC*,
   9 F.4th 893 (2021) ...............................................................................46

*Global Health Council v. Trump*,
   153 F.4th 1 (D.C. Cir. 2025) ...............................................................38

*Halverson v. Slater*,
   129 F.3d 180 (D.C. Cir. 1997)..............................................................42

---

* Authorities upon which we chiefly rely are marked with an asterisk.

*Ickes v. Fox*,
  300 U.S. 82 (1937) ..............................................................................33

*\*In re Aiken Cnty.*,
  725 F.3d 255 (D.C. Cir. 2013)........................................ 35, 36, 38, 39

*In re OPM Data Sec. Breach Litig.*,
  928 F.3d 42 (D.C. Cir. 2019)..............................................................53

*Ingersoll-Rand Co. v. United States*,
  780 F.2d 74 (D.C. Cir. 1985).......................................................26, 27

*Joint Anti-Fascist Refugee Comm. v. McGrath*,
  341 U.S. 123 (1951) ............................................................................33

*Kansas City v. HUD*,
  923 F.2d 188 (D.C. Cir. 1991)............................................................25

*Kendall v. U.S. ex rel. Stokes*,
  37 U.S. (12 Pet.) 524 (1838)...............................................................35

*\*Land v. Dollar*,
  330 U.S. 731 (1947) ...........................................................19, 24, 33

*Landgraf v. USI Film Prods.*,
  511 U.S. 244 (1994) ............................................................................43

*\*Larson v. Domestic & Foreign Com. Corp.*,
  337 U.S. 682 (1949) ............................................................................32

*League of Women Voters v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016)................................................................53

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024) ............................................................................25

*Md. Dep't of Hum. Res. v. HHS*,
  763 F.2d 1441 (D.C. Cir. 1985)......................................21, 22, 25, 32

*\*Megapulse, Inc. v. Lewis*,
  672 F.2d 959 (D.C. Cir. 1982)..............................19, 24, 28, 29, 31, 33

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ..............................................................................44

*N. Air Cargo v. USPS*,
  674 F.3d 852 (D.C. Cir. 2012)............................................................33

*Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*,
  752 F.3d 999 (D.C. Cir. 2014).............................................................46

*Nat'l Treas. Empls. Union v. Vought*,
   149 F.4th 762 (D.C. Cir. 2025) .................................................... 37, 38

*\*NIH v. Am. Pub. Health Ass'n*,
   145 S.Ct. 2658 (2025) .......................................... 2, 21, 22, 23, 25, 26

*NRC v. Texas*,
   605 U.S. 665 (2025) .........................................................................34

*OPM v. Richmond*,
   496 U.S. 414 (1990) .................................................................. 35, 36

*Phila. Co. v. Stimson*,
   223 U.S. 605 (1912) .........................................................................32

*Rochester Pure Waters Dist. v. EPA*,
   960 F.2d 180 (D.C. Cir. 1992)..........................................................35

*Schron v. Troutman Sanders LLP*,
   20 N.Y.3d 430 (2013)......................................................................55

*SEC v. Chenery Corp.*,
   318 U.S. 80 (1943) ...........................................................................33

*SEC v. Chenery Corp.*,
   332 U.S. 194 (1947) .........................................................................46

*\*Sharp v. Weinberger*,
   798 F.2d 1521 (D.C. Cir. 1986)...................................... 2, 20, 23, 24, 26

*Sherley v. Sebelius*,
   644 F.3d 388 (D.C. Cir. 2011)..........................................................43

*Spectrum Leasing Corporation v. U.S.*,
   764 F.2d 891 (D.C. Cir. 1985)..........................................................30

*Swan v. Clinton*,
   100 F.3d 973 (D.C. Cir. 1996)..........................................................33

*Tootle v. Sec'y of Navy*,
   446 F.3d 167 (D.C. Cir. 2006)..................................................... 21, 23

*\*Train v. City of New York*,
   420 U.S. 35 (1975) ...........................................................................39

*\*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*,
   967 F.2d 598 (D.C. Cir. 1992)....................................... 20, 23, 29, 30

*United Church of Christ v. FCC*,
   707 F.2d 1413 (D.C. Cir. 1983)........................................................45

*United States. v. Mitchell*,
    463 U.S. 206 (1983) ............................................................................22

*Vann v. Kempthorne*,
    534 F.3d 741 (D.C. Cir. 2008)...............................................................33

*Vartelas v. Holder*,
    566 U.S. 257 (2012) ............................................................................43

*Wis. Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985)...............................................................47

\*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ............................................................................37

**Statutes**

5 U.S.C. §702 ...................................................................................18

28 U.S.C. §1491 ...............................................................................29

41 U.S.C. §7103 ...............................................................................29

41 U.S.C. §7104 ...............................................................................29

42 U.S.C. §7434 ....................................................... 3, 4, 35, 36, 38, 40

NYUCC §8-503(b)...............................................................................9

NYUCC Article 4...............................................................................9

Pub. L. 118-42, 138 Stat. 25 (2024)...................................................43

Pub. L. 119-21, 139 Stat. 72 (2025)............................................. 41, 43

Pub. L. 119-4, 139 Stat. 9 (2025)......................................................42

Pub. L. 119-37, 139 Stat. 495 (2025)................................................43

**Regulations**

2 C.F.R. §200.305 ...............................................................................9

2 C.F.R. §200.340 ..................................................................... 7, 26, 46

2 C.F.R. §200.341 ..................................................................... 26, 46

2 C.F.R. §200.343 ...............................................................................9

89 Fed. Reg. 55262 ........................................................................7, 46

90 Fed. Reg. 8353 .............................................................................36

**Other Authorities**

168 Cong. Rec. H7577 (daily ed. Aug. 12, 2022) ....................................................3

Congressional Budget Office, *Estimated Budgetary Effects of an Amendment in the Nature of a Substitute to H.R. 1, the One Big Beautiful Bill Act, Relative to CBO's January 2025 Baseline,* Title 6, Rows 20-22 (June 29, 2025)................42

Restatement (Third) Agency §7.02.........................................................................56

## GLOSSARY OF TERMS

| Term or Abbreviation | Definition |
|---|---|
| ACA | Account Control Agreement with Citibank, related to Plaintiffs' grants. |
| APA | Administrative Procedure Act |
| CCIA | Clean Communities Investment Accelerator |
| CDIF | Community Development Investment Fund |
| Dkt. | Docket entry in *Climate United Fund v. Citibank, N.A., et al.*, 25-cv-698 (D.D.C.) |
| Doc. | Docket entry in *Climate United Fund, et al. v. Citibank, N.A., et al.*, 25-5122 (D.C. Cir.) |
| DOJ | Department of Justice |
| EPA | Environmental Protection Agency |
| FAA | Financial Agency Agreement |
| FBI | Federal Bureau of Investigation |
| GGRF | Greenhouse Gas Reduction Fund |
| IRA | Inflation Reduction Act |
| NCIF | National Clean Investment Fund |
| NOFO | Notice of Funding Opportunity |
| OBBBA | One Big Beautiful Bill Act |

## **INTRODUCTION**

This appeal concerns a preliminary injunction barring the Government from dismantling a congressionally created grant program, and clawing back $20 billion in grant funds that EPA previously disbursed to the Plaintiff grantees to capitalize and mobilize clean-energy investments. Entering that preliminary relief, the District Court held that EPA violated the Constitution, the Inflation Reduction Act (IRA), and its regulations; acted without statutory authority; and offered only arbitrary and pretextual justifications for its conduct.

There is ample support for that injunction. Just hours into President Trump's presidency, he issued an executive order to halt all IRA spending. But this had no effect on Plaintiffs because, just as Congress intended, EPA had already disbursed Plaintiffs' funds to their accounts at Citibank. So, without authority or probable cause, EPA worked with DOJ, FBI, and Treasury to pressure Citibank to breach Citibank's obligations to Plaintiffs and freeze their accounts. EPA then sought to shut down the program altogether and claw back all disbursed grant funds for good. This was done without statutory or constitutional authority based on pretextual and unfounded claims of waste, fraud, and abuse that EPA later abandoned.

On appeal, EPA hardly defends its conduct, but relies on the extraordinary notion that Article III courts are powerless to issue a prohibitory injunction to prevent the Government from illegally seizing property in private accounts or

dismantling a congressional program. But Plaintiffs' claims belong in the District Court, as this Court's precedents and recent Supreme Court orders confirm. *Sharp v. Weinberger*, 798 F.2d 1521 (D.C. Cir. 1986); *NIH v. Am. Pub. Health Ass'n*, 145 S.Ct. 2658 (2025). Plaintiffs assert a violation of the Appropriations Clause, the Separation of Powers, the IRA, the APA, and government regulations—not a violation of any contractual provision. And unlike in the cases EPA invokes, Plaintiffs do not seek an order compelling Treasury to pay them money under a contract, or mandating compliance with any contractual term. That is because, as Congress intended, Plaintiffs already own the funds. Plaintiffs thus seek only a prohibitory injunction preventing the federal government from seizing private funds and terminating an entire congressional grant program in violation of public law—a remedy that is the exclusive province of Article III courts.

On the merits, EPA does not dispute that EPA violated its own regulations and acted arbitrarily and pretextually when it sought to terminate this program. EPA contends there is neither a constitutional nor a statutory claim—because EPA supposedly satisfied its statutory obligations the moment it awarded grants. But that is wrong. The IRA (and, later, the One Big Beautiful Bill Act (OBBBA)) gave EPA no statutory authority to seize funds disbursed to Plaintiffs' accounts without cause, or to undo these grant programs, and EPA's claimed power to do so cannot be squared with the IRA, the Appropriations Clause or the Separation of Powers.

This Court should affirm the District Court's preliminary injunction against EPA. It should also affirm the preliminary injunction against Citibank, which simply requires Citibank, a private bank, to abide by its contracts with Plaintiffs.

## STATEMENT OF THE CASE

### A.    The Inflation Reduction Act's Greenhouse Gas Reduction Fund.

In 2022, Congress enacted the Inflation Reduction Act. Pub. L. 117-169. The IRA created the Greenhouse Gas Reduction Fund (GGRF) and appropriated $26.97 billion "until September 30, 2024" for EPA "to make grants, on a competitive basis," to "eligible recipients." 42 U.S.C. §7434(a).

Congress intended to provide capital for GGRF recipients to invest "in partnership with, and by leveraging investment from, the private sector." *Id.* §7434(c)(3)(A); *see* 168 Cong. Rec. H7577, H7702 (daily ed. Aug. 12, 2022) (recipients were expected to "use that capitalization funding to leverage private investment in amounts several times greater than the initial public investment").

Congress thus directed EPA to award grants to "nonprofit organization[s]" that were "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services," and "invest[] in or finance[] projects alone or in conjunction with other investors." §7434(c)(1). Congress intended for the GGRF grantees to become enduring financial institutions, directing them to "retain,

3

manage, recycle, and monetize all repayments and other revenue received from …
using grant funds." *Id.* §7434(b)(1)(C).

The GGRF mirrors successful state approaches to capitalizing green banks,
including in Connecticut and New York, where public funds have been successfully
deployed to capitalize clean-energy investment funds to mobilize shared public and
private investment in clean-energy projects.[1]

### B.    EPA Selects the NCIF and CCIA Plaintiffs to Receive Capitalization Grants.

EPA established three GGRF programs—the National Clean Investment Fund
("NCIF"), the Clean Communities Investment Accelerator ("CCIA"), and Solar for
All—and funded each program from IRA appropriations.

In line with Congress's directives, EPA designed the two programs at issue
here—NCIF and CCIA—to "work in tandem to deploy much-needed capital for
clean technologies into communities across the country." JA1735. In NCIF, EPA
aimed to "create centralized, long-term financing institutions with the scale required
to transform financial markets," while in CCIA, EPA sought to "build the capacity
of community lenders to draw on that capital to catalyze deployment of projects in
communities all across the country." JA1735-36.

---

[1] EPA, "Green Banks", *available at* https://perma.cc/G4VZ-HAH8 (describing pre-GGRF state green banks).

Consistent with Congress's September 30, 2024 deadline to obligate GGRF funds, EPA announced grants to NCIF and CCIA grantees in April 2024, obligated funds in August 2024, and disbursed the entirety of those funds to Plaintiffs' accounts by the end of 2024. Plaintiffs Climate United Fund, Coalition for Green Capital, and Power Forward Communities are NCIF grantees, while Plaintiffs Justice Climate Fund and Inclusiv are CCIA grantees. The NCIF grantees are nonprofit organizations or coalitions with more than two centuries of combined experience managing and investing hundreds of billions of dollars in affordable housing and clean-energy infrastructure. JA304-06. The CCIA grantees are similarly experienced nonprofit organizations or coalitions focused on deploying capital in underserved communities across the country.

Plaintiffs worked with subgrantees, including state green bank subgrantees of CGC, who are also plaintiffs and have filed a separate brief.

### C. EPA Structures the Grants to Meet Capital Market Needs by Capitalizing Grantees.

To accomplish Congress's goal of capitalizing clean-energy financial institutions, and to multiply the effect of the public funds invested in the GGRF, EPA did not structure the grants like ordinary grant programs. In typical grant programs, grantees incur costs and seek reimbursement from the Treasury on an ongoing basis until the maximum grant value is reached. Here, however, as Judge Pillard explained, EPA "gave the grantees title to the full amount of the award funds

5

up front." Dissent 6. This is because "the private sector has historically been hesitant to invest in clean energy projects," *id.* at 5, so "to help attract private financing for clean energy projects," the "funds need to be Plaintiffs' own assets and reflected on their balance sheets," *id.* at 30. This structure "allow[ed] those funds to serve as assets for the grantees to rely on to raise private capital by reducing financial risk for private investments." *Id.* at 6; JA1771 (NOFO stating that grantee "should assume the full EPA funding request" would be "recognized as an asset at the beginning of the period of performance"); *see supra* 3 (citing congressional record).

Each GGRF grantee executed an award agreement with EPA in August 2024 and an amended agreement in December 2024.[2] Those agreements memorialize that grant funds will serve as capitalization for the grantees—that is, the grantees will own the money up front. The agreements require the funds to be disbursed up-front in accounts titled to Plaintiffs at Citibank. JA1136-37. The grant agreements categorize these funds as "program income," recognizing that upon receipt they qualify as "Capitalization by Nonexchange Capital Contribution," to serve as unencumbered investment capital. JA1134-35. And because the grantees own the money up front, they are permitted to keep it when the five-year period of grant performance expires: "the Recipient may keep and use Program Income" for

---

[2] The Joint Appendix includes representative samples of these documents. JA1020 (Grant Agreement); JA1081 (Amended Grant Agreement); JA1142 (grantee ACA); JA1175 (sub-grantee ACA).

allowable activities and subject to public-reporting requirements, JA1122-23, and "transfer any remaining funds in the Deposit Account to an account at a financial institution of its choosing," JA1136.

Consistent with Congress's goal of ensuring that grantees could attract private capital and operate as enduring financial institutions, both EPA's regulations and the grants themselves bar EPA from terminating the grants unless narrow conditions are met. Under 2 C.F.R. §200.340 and Plaintiffs' grants, EPA can terminate Plaintiffs' awards for only three reasons: (1) substantial noncompliance with grant obligations; (2) material misrepresentation of eligibility status; or (3) "Waste, Fraud, or Abuse," meaning a violation of criminal-fraud, conflict-of-interest, bribery, or gratuity laws or of the civil False Claims Act. JA969-70. And under EPA regulations applicable to all "EPA financial assistance agreements awarded … on or after July 1, 2024," the grants could be terminated on the basis that they "no longer effectuate[] … agency priorities" *only* if that ground were "clearly and unambiguously included in the terms and conditions of the award." Applicability Date for the Office of Management and Budget's Regulatory Revisions, 89 Fed. Reg. 55262, 55263 (July 3, 2024). However, that ground is not (and never was) included in the NCIF or CCIA awards, so the regulations never allowed termination based on a post-award shift in agency priorities. *See* JA1059; JA1846-47 (original awards, invoking "*the version of 2 CFR 200.340 applicable to EPA grants as of July*

*1, 2024*, pursuant to 89 FR 55262"). EPA is thus incorrect that the grants were amended in December 2024 to prohibit "termination based on the agency's policy priorities." Br.10. EPA could *never* terminate these grants intended for use in capital markets based on changed agency priorities.[3]

This is not to say Plaintiffs had no ongoing obligations. They have rigorous reporting obligations to ensure compliance with Congress's goals, in addition to the real-time oversight made possible by the grants' structure. Dissent 7-8. But to assure private counterparties that funds would be available, it was essential that the grants not be subject to termination on a whim.

### D.    The NCIF and CCIA Plaintiffs Enter Into Account Control Agreements with EPA and Citibank.

The grant funds were duly deposited in Plaintiffs' names at Citibank, which operated as a private-sector financial agent—as the federal government has done in other programs. *See* Brief of *Amici* Impact Finance Experts, Doc.2135448 at 11-12. Citibank, EPA, and each NCIF and CCIA Plaintiff entered into Account Control Agreements ("ACAs").[4] *E.g.*, JA1143; JA1931.

---

[3] Thus, the claim by *Amici* States that EPA engaged in "manipulation" in December 2024 by removing agency priorities as a ground for termination, Doc.2154720 at 19-20, is just wrong. Dissent 34-35.

[4] Certain subgrantees, including the plaintiff subgrantees, also entered into ACAs with Citibank. *E.g.*, JA1176. EPA is not a party to those agreements.

The ACAs make clear that Plaintiffs hold legal title to their funds at Citibank. They provide that Citibank "maintains the Accounts for [Plaintiffs]," and that Plaintiffs are "the entitlement holder[s] with respect to all financial assets credited from time to time to the Accounts." JA1144. They also characterize EPA as holding a security interest—but not a property interest—in the funds, JA1145, while citing New York's Uniform Commercial Code, which characterizes accountholders as holding the relevant property interest. JA1144; NYUCC Article 4 (governing bank deposit); NYUCC §8-503(b) (property interest of entitlement holder).

Under the ACAs, Citibank must follow all instructions from accountholders—*i.e.*, Plaintiffs—"directing the disposition of funds and financial assets in the Accounts." JA1145. The only exception is if the "Secured Party" (*i.e.*, EPA) issues a Notice of Exclusive Control—"a written determination and finding" that one of the three grounds for termination was triggered. JA1145; JA1170. No such Notice has ever issued.[5]

Citibank and Treasury separately entered into the Financial Agency Agreement ("FAA") in September 2024. JA2126. Like the grant agreements, the FAA recognizes Plaintiffs', not EPA's, title to the funds: it requires Citibank to

---

[5] Contrary to EPA's claim (Br.10), the January 2025 amendments to the NCIF ACAs only clarified, consistent with 2 C.F.R. §§200.305(b)(6), 200.343, that grantees are entitled to reimbursement for costs "properly incurred" *before* (not after) any Notice of Exclusive Control. *See* JA1145; JA1165.

establish "accounts in the names of the three NCIF and five CCIA grant recipients," directs Citibank to maintain a "customer relationship with each Prime Recipient and Subrecipient Account holder," and provides that each grantee and subgrantee "account holder will have the ability to access and use funds in their respective accounts," JA2145, with EPA holding a security interest in the accounts of the grantees (but not the subgrantees), JA2147-48. The FAA also requires Citibank to provide EPA "full account visibility," including real-time view access "across all Prime Recipient and Subrecipient accounts." JA2149.

### E.    The Administration Freezes Plaintiffs' Funds.

On January 20, 2025, President Trump issued an Executive Order purporting to "Terminat[e] the Green New Deal" and directing "[a]ll agencies" to "immediately pause the disbursement of funds appropriated through the Inflation Reduction Act." Dissent 9-11. That same week, OMB issued implementing memoranda. Although these actions led to the freeze of other IRA climate-related funding, they could not affect Plaintiffs' funds because they were already disbursed.

Beginning on February 12, EPA Administrator Lee Zeldin announced EPA's intention to claw these funds back, stating that Citibank "must immediately return" the funding. *Id*. He further vowed to work with "the Inspector General's Office" and "the Justice Department" to recover the funds, and asserted that "the entire [GGRF] scheme," "in [his] opinion, is criminal." JA140-43.

Plaintiffs' funds at Citibank were frozen without explanation. JA972. Plaintiffs were left to read press reports that, on February 17, the DOJ asked the U.S. Attorney's Office in Washington, D.C., apparently at EPA's behest, to open a criminal investigation. Dissent 11. After reviewing the evidence, the Office's Chief of the Criminal Division advised that no probable cause existed. *Id.* She was ultimately forced to resign. *Id.* at 11-12. Published reports also state that, without signoff from other prosecutors, the Interim U.S. Attorney in Washington submitted a seizure warrant application to a magistrate judge, who rejected it for lack of probable cause. *Id.*

Lacking a warrant or other legal process, FBI sent Citibank a letter in February 2025 "recommend[ing]" that Citibank freeze the assets in Plaintiffs' accounts. JA99-103. Without factual support, the letter referenced "credible information" that Plaintiffs' accounts had "been involved in possible criminal violations." JA100. Starting in mid-February, Citibank chose to follow this "recommendation" and began disregarding Plaintiffs' instructions. JA972.

On March 2, EPA Deputy Administrator McIntosh asked EPA's Inspector General to investigate GGRF funding. JA105-09. Two days later, on March 4, Treasury—at EPA's bidding—"instruct[ed] Citibank not to disburse any GGRF funds through March 9," citing unspecified "concerns regarding potential fraud

and/or conflicts of interest related to the [GGRF]." JA972. (EPA later disavowed these "concerns." Dissent 47.)

That same day, March 4, Plaintiffs received letters from Mr. McIntosh expressing EPA's concern about oversight mechanisms in the program and instructing Plaintiffs to respond to numerous information requests by March 28. JA972.

On March 8, Mr. McIntosh told Citibank that, because of the "current lack of critical information," EPA requested information from grantees to assess "potential patterns of waste, fraud or abuse." JA694-95. On March 10, EPA emailed Citibank again, once more alluding to "concerns regarding potential fraud and/or conflicts of interest" in the GGRF and explaining that EPA would evaluate its concerns "based on incoming responses [from Plaintiffs] to oversight questions" due March 28. JA65-66.

After weeks without any explanation for the seizure of their funds, the NCIF Plaintiffs sued. Climate United sued EPA and Citibank on March 8, and sought a TRO two days later, while CGC and PFC sued Citibank in New York. JA974-75. After the District Court proposed a TRO hearing on March 11, Climate United consented to EPA's request, as a professional courtesy, to extend the hearing date by 24 hours. JA974.

But on the evening of March 11—after the originally scheduled TRO hearing—EPA sent materially identical "Notices of Termination" to all NCIF and CCIA grantees. JA390; JA398; JA1197; JA1949. The Notices contained no individualized findings or allegations, and instead generically cited "substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities." *Id.*[6]

## F.    The District Court Enters a Preliminary Injunction.

CGC, PFC, the Subgrantee Plaintiffs and the CCIA Plaintiffs then sued EPA and Citibank in D.D.C. The District Court entered a TRO enjoining EPA from implementing the purported terminations and barring Citibank from transferring funds to Treasury. JA287.

Plaintiffs then moved for a preliminary injunction. In its principal opposition, EPA conceded—contrary to the agency's public statements, Notices of Termination, and claims in this Court, *see* Br.11-12—that "EPA did not terminate for Plaintiffs' noncompliance" or any other "conduct of Plaintiffs." JA503-04; Dissent 47 (EPA's statement to the panel that it was "not accusing anybody of fraud"). Rather, EPA terminated the programs based on "its assessment of the agency's priorities." JA480.

---

[6] Plaintiffs timely responded to EPA's information requests, but EPA did not wait to act. Dissent 24.

On April 15, 2025, the District Court entered a preliminary injunction. The court applied this Court's *Megapulse* test and concluded it had subject-matter jurisdiction. It explained: "Plaintiffs do not challenge a mere contract between the parties—they challenge agency action governed by statutes[,] regulations," and the Constitution. JA983. And Plaintiffs permissibly "seek equitable relief vindicating their rights to access their grant funds." JA984.

Turning to the merits, the District Court concluded that Plaintiffs are likely to succeed. On the APA, the court held that EPA never explained its freeze of Plaintiffs' funds or why the programs' wholesale cancellation was necessary, JA991-93, and that EPA violated the "plain language of the regulations that govern its decision-making in grant funding," JA994. The court held that EPA also violated the IRA and the Constitution, as Congress set forth "what EPA could do with the money," and "provided specific deadlines and specific requirements." JA995. EPA's cancellation was "without any basis in statutory authority." *Id.*

The District Court also entered a preliminary injunction against Citibank. It concluded that Citibank could freeze Plaintiffs' accounts *only* "in accordance with the [ACAs]" and "*only* in response to 'lawful instructions or directions' from Treasury." JA996-97. Because neither condition was satisfied, the District Court required Citibank to comply with the ACAs.

14

On the equities, the District Court found that irreparable harm is unavoidable "without release of [Plaintiffs'] grant funds." JA997; *see also* JA998-1000 (detailing harms). By contrast, any potential harm to EPA is negligible, as there are more than "sufficient protections in place to prevent the type of reckless spending EPA envisions once access to Plaintiffs' accounts is restored." JA1002.

### G.    A Panel of This Court Reverses.

On September 2, 2025, a panel of this Court vacated the injunction over Judge Pillard's dissent. The panel concluded there was no jurisdiction over Plaintiffs' claims that EPA violated the APA and its own regulations because they "may be understood" or "could be phrased" as contract claims under the grant agreements. Op.9-22. Next, the panel concluded that Plaintiffs' constitutional claim was a statutory claim in disguise, and it rejected that claim on the theory that the IRA, by directing EPA to administer the GGRF program, did not require EPA to take any action other than to obligate funds. Op.22-27.

This Court vacated the panel's decision and granted rehearing *en banc*.

## SUMMARY OF THE ARGUMENT

This Court should affirm the preliminary injunction barring EPA's suspension of Plaintiffs' grants and wholesale termination of the NCIF and CCIA programs.

**I.A.** The District Court had jurisdiction over Plaintiffs' claims, which seek to put an end to EPA's unlawful interference with funds already disbursed to Plaintiffs'

accounts at a private bank—not to vindicate any right under a contract with the government. Under *Megapulse*, the APA's sovereign-immunity waiver applies because Plaintiffs do not invoke contractual rights—they invoke the Appropriations Clause, the Separation of Powers, the IRA, EPA regulations, and the APA. And there is perfect symmetry between Plaintiffs' claims and the relief they seek: if the District Court merely enforces the law Plaintiffs invoke, Plaintiffs will obtain all the relief they seek. Moreover, the District Court had jurisdiction because sovereign immunity does not apply to Defendants' *ultra vires* acts in the first place.

**I.B.** EPA's attempted termination violated the Constitution and the IRA. The IRA required EPA to obligate GGRF grant funds by September 30, 2024 to facilitate the capitalization of the awardee financial institutions. EPA claimed it would re-obligate the funds, but Congress never delegated authority to EPA to seize Plaintiffs' funds based on policy disagreement with the IRA or to redo the GGRF program after the September 2024 deadline. And the District Court did not clearly err in concluding that EPA had no intention to re-obligate funds. EPA's efforts violate the Appropriations Clause, Separation of Powers, and IRA. OBBBA changes none of this; it does not purport to disturb the already-established grant programs or already-obligated grant funds.

EPA also acted arbitrarily and capriciously, violating the APA. EPA failed to provide any legitimate and substantiated rationale to justify termination of the entire

16

GGRF program, and it violated its own regulations in doing so. EPA does not even bother to argue otherwise on this appeal.

**I.C.&D.** The District Court did not clearly err or abuse its discretion in concluding that dismantling the programs would inflict irreparable and indeed devastating harm on Plaintiffs. The balance of equities and public interest weigh in Plaintiffs' favor because a ruling that bars EPA's illegal acts aligns with Congress's directives.

**II.** The court had jurisdiction over Citibank, which cannot be sued in the Court of Federal Claims, and it correctly concluded that Citibank breached the ACAs. Even if Plaintiffs must sue EPA in the Court of Federal Claims, Citibank cannot invoke "derivative sovereign immunity" because Citibank improperly seeks a much broader immunity than EPA—immunity from suit in all forums.

## ARGUMENT

**I.     The Court Should Affirm The Preliminary Injunction Against EPA.**

**A.     The District Court Has Subject-Matter Jurisdiction.**

The District Court properly exercised jurisdiction. Plaintiffs do not seek an order requiring the Government to pay money under a contract, because Plaintiffs already hold and own the funds at issue. *Supra* 3-7. Invoking solely public-law sources (the Constitution, statutes, and regulations) and not the terms of grant agreements, Plaintiffs seek to enjoin the Government from interfering with their funds at Citibank and dismantling a government program. These public-law claims

cannot be brought in the Court of Federal Claims under the Tucker Act, and the Tucker Act does not impliedly preempt them.

### 1. The APA's Sovereign-Immunity Waiver Applies.

APA §702's broad waiver of sovereign immunity is subject only to limited exceptions—one is that the claimant not seek "money damages," and another is that a different "statute that grants consent to suit [does not] expressly or impliedly forbid[] the relief which is sought." 5 U.S.C. §702. Because neither exception applies here, the District Court correctly held it had jurisdiction.

#### a. Plaintiffs "seek relief other than money damages."

To begin, Plaintiffs "seek relief other than money damages." "[M]oney damages" here means payment of "money in compensation for … losses." *Bowen v. Massachusetts*, 487 U.S. 879, 895 (1988). Plaintiffs already own the funds, and seek only a prohibitory injunction to prevent the government from interfering with their funds. They do not seek damages, and EPA concedes as much. Br.38.

#### b. No other statute "impliedly forbids" the relief sought.

Contrary to the panel's holding, the Tucker Act does not impliedly forbid the relief sought here. As *NIH*, *California*, and this Court's decisions instruct, a district court undoubtedly has jurisdiction over claims based on the Constitution and federal statutes—including when those claims arise in the context of government contracting—where the plaintiff does not seek payment of a contract debt.

18

**1.** This Court first analyzed the question of implied Tucker Act preemption in *Megapulse, Inc. v. Lewis*, holding that an APA plaintiff cannot bring a claim that is "at its essence a contract claim." 672 F.2d 959, 967 (D.C. Cir. 1982). Citing *Land v. Dollar*, 330 U.S. 731 (1947), the Court stressed that sovereign immunity "does not necessarily apply where the government defendants are charged with having acted beyond the scope of their statutory authority," even where the plaintiff's right arises from a government contract, and that a plaintiff complaining about the government "unlawfully seiz[ing]" property "is not relegated to the Court of Claims to recover a money judgment." *Megapulse*, 672 F.2d at 969.

Thus, the Court held, whether the APA's sovereign immunity waiver applies turns on whether a case "is or is not 'at its essence' a contract action," which "depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)." *Id*. at 968. The Court also made clear that a contractual defense does not defeat jurisdiction: "[A]n action for trespass" does not become a contract case just because "[a] license … may be raised as a defense." *Id*. Applying these principles, *Megapulse* found jurisdiction over trade-secret claims despite the government citing a contract to argue it "lawfully came into possession of the property and [wa]s empowered by the contract to" use "the entrusted information" as plaintiff alleged. *Id.* at 969.

19

The Court elaborated on those principles in *Sharp*, 798 F.2d 1521. The plaintiff was both a federal judge and an Air Force officer. He sought to enjoin his transfer to the Standby Reserve, alleging transfer would violate *both* (1) the Constitution, statutes, and regulations *and* (2) a contract. *Id.* at 1521-23. This Court, in a decision by then-Judge Scalia, held that the district court lacked jurisdiction over the plaintiff's breach-of-contract claim, *id.* at 1524, but *could* enjoin the transfer based on the "complain[t] that his transfer would be contrary to regulations, statutes and the Constitution," *id.* at 1523. That is so even though the claims were seeking the same remedy. *Id.* ("clear" that APA §702 "constitutes a waiver of sovereign immunity from such nonmonetary suits, and that district courts have jurisdiction over them").

As this Court later explained, "[t]he lesson of *Sharp* ... is straightforward": "litigants may bring common-law contract claims only as actions for money damages in the Claims Court, but they may bring statutory and constitutional claims for specific relief in federal district court." *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 610 (D.C. Cir. 1992). "Crucially," the Court noted, "*Sharp* tells us that litigants may bring statutory and constitutional claims in federal district court even when the claims depend on the existence and terms of a contract with the government." *Id.*

20

Also significantly, this Court has clarified that the need to address Tucker Act preclusion under *Megapulse* "only arises when a plaintiff's substantive claim—apart from the type of relief the complaint seeks—is a claim over which Tucker Act jurisdiction could be invoked." *Md. Dep't of Hum. Res. v. HHS*, 763 F.2d 1441, 1449 (D.C. Cir. 1985) ("*Maryland*"). That makes sense: the APA's waiver does not apply if there is exclusive jurisdiction elsewhere, but "[t]here cannot be exclusive jurisdiction under the Tucker Act if there is no jurisdiction under the Tucker Act." *Tootle v. Sec'y of Navy*, 446 F.3d 167, 177 (D.C. Cir. 2006).

Two recent emergency-docket rulings by the Supreme Court also confirm that the Tucker Act only preempts contract disputes and not claims (like Plaintiffs') relying on public law and not seeking payment on a contract debt. In *California*, the Court held that APA §702 may not be invoked to obtain an "order[] 'to enforce a contractual obligation to pay money,'" nor to "requir[e] the Government to pay out past-due grant obligations and to continue paying obligations as they accrue." *Dep't of Educ. v. California*, 604 U.S. 650, 650-51 (2025). Similarly, in *NIH*, the Supreme Court held that a district court lacks jurisdiction "to adjudicate claims 'based on' the research-related grants or to order relief designed to enforce any 'obligation to pay money' pursuant to those grants." 145 S.Ct. at 2659 (quoting *California*, 604 U.S. at 650). But the Court held that a plaintiff *can* challenge the agency policy *underlying* grant-termination decisions, even though the plaintiff cannot challenge individual

21

contract terminations. *Id.* at 2661 (Barrett, J., concurring) ("Plaintiffs frequently seek vacatur" of unlawful agency policy, and the fact that such policy "relate[s] to grants does not transform a challenge to that [policy] into a claim 'founded … upon' contract that only the [Court of Federal Claims] can hear.").

**2.** Under these precedents, the District Court had jurisdiction. At the outset, as in *Maryland*, this Court can bypass the *Megapulse* inquiry altogether, because it "only arises when a plaintiff's substantive claim—apart from the type of relief the complaint seeks—is a claim over which Tucker Act jurisdiction could be invoked." 763 F.2d at 1449.

Here, Tucker Act jurisdiction could not be invoked. "Not every claim invoking the Constitution, a federal statute, or a regulation is cognizable under the Tucker Act." *United States v. Mitchell*, 463 U.S. 206, 216 (1983). "The claim must be one for money damages against the United States, and the claimant must demonstrate that the source of substantive law he relies upon 'can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained.'" *Id.* at 216-17. None of the sources of substantive law here—the Constitution, the IRA's appropriations directives, and applicable regulations—is money-mandating. If Plaintiffs brought claims in the Court of Federal Claims invoking these provisions, the claims would be dismissed for lack of jurisdiction. The Court should reject EPA's effort to avoid review in *any* forum. *Tootle*, 446 F.3d

at 176-77; *Transohio*, 967 F.2d at 611 (rejecting view that, "in enacting the APA and the Tucker Act, Congress intended to preclude any review at all of constitutional claims seeking equitable relief, where the constitutional claims stem from contracts").

**3.** Regardless, both *Megapulse* factors favor jurisdiction. The "source of rights" is the Constitution, statutes, and regulations, not government contracts. And the "type of relief sought" is a prohibitory injunction preventing unlawful interference with Plaintiffs' property and the grant programs, not an order mandating payment from Treasury. Plaintiffs analyze each claim "individually," because even if one claim is deemed contractual, jurisdiction over the balance would remain. *Sharp*, 798 F.2d at 1523-24; *NIH*, 145 S.Ct. at 2659 (severing claims).

***"Type of relief."*** Although second under *Megapulse*, we begin with the type of relief sought, because it sharply distinguishes this case from ordinary grant-termination cases seeking an order "designed to enforce any 'obligation to pay money' pursuant to th[e] grants." *NIH*, 145 S.Ct. at 2659 (quoting *California*, 604 U.S. at 651).

No obligation to pay money is at issue here because the money disbursed to Plaintiffs' Citibank accounts in 2024 already belongs to Plaintiffs. Indeed, as explained, the GGRF was specifically structured to capitalize the grantees in this way to attract private investment. *Supra* 3-8. Thus, Plaintiffs do not seek to compel

Treasury to pay money—or to specifically enforce any contract provision. Rather, they seek a remedy traditionally entered by Article III courts: an injunction prohibiting the Government from interfering with their property (including funds held at a private banking institution in their names) and halting the dismantling of a government program. "[W]here [officials] unlawfully seize or hold a citizen's realty or chattels, recoverable by appropriate action at law or in equity, the aggrieved party is not relegated to the Court of Claims to recover a money judgment." *Megapulse*, 672 F.2d at 969 (quoting *Land*, 330 U.S. at 738).

*"Source of Rights."* Next, the source of rights for Plaintiffs' claims is public law, not contracts.

Constitution and IRA. Plaintiffs claim that EPA violated the Constitution and the Inflation Reduction Act. Although these claims *relate* to grants, Plaintiffs do not seek to *enforce* the grants, but instead seek to enforce constitutional limits on executive authority and statutes that bind EPA. These claims belong in Article III court, as all judges on the panel agreed. Like in *Megapulse* and *Sharp*, Plaintiffs bring constitutional and statutory claims, even though they would not be in court without a government contract—and even if Plaintiffs could alternatively invoke contract rights. *See Sharp*, 798 F.2d at 1521-23. As Judge Bork put it in *Maryland*, "[u]nlike normal contractual undertakings, federal grant programs originate in and

24

remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy." 763 F.2d at 1449.

Arbitrary decisionmaking. Plaintiffs' claim that the Government failed to engage in reasoned decisionmaking when terminating *en masse* the NCIF and CCIA grants *also* finds its source in a statute—the APA—so the same analysis applies. Contrary to EPA's arguments, Plaintiffs are not bringing APA challenges to isolated grant-termination decisions. Plaintiffs claim that EPA arbitrarily and capriciously shuttered the NCIF and CCIA programs *in toto*, abusing regulatory authority based on policy disagreements with Congress while asserting baseless accusations of fraud it later abandoned; Plaintiffs seek a prohibitory injunction barring the wholesale dismantling of the program. Under the APA, the District Court was required to "fix[] the boundaries of [any claimed] delegated authority, and ensur[e] [EPA] engaged in reasoned decisionmaking within those boundaries." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024). This is a standard APA claim. *Kansas City v. HUD*, 923 F.2d 188, 193 (D.C. Cir. 1991).

*NIH* reinforces that the District Court has jurisdiction over this claim. Again, plaintiffs there had NIH grants, which the agency terminated for reasons set out in internal guidance documents. *NIH*, 145 S.Ct. at 2661 (Barrett, J., concurring). Plaintiffs sued, "challenging the guidance documents *and* their individual grant terminations under the Administrative Procedure Act." *Id.* The Supreme Court,

while holding that claims challenging the termination of individual agreements belonged in the Court of Federal Claims, held that claims "seek[ing] vacatur of internal agency guidance on arbitrary-and-capricious grounds" under the APA belonged in district court. *Id.* As Justice Barrett explained, "[t]hat the agency guidance" at issue was "related to grants does not transform a challenge to that guidance into a claim 'founded … upon' contract that only the CFC can hear." *Id.*

Regulations. A similar analysis applies to Plaintiffs' claim that EPA violated regulations prohibiting termination except as allowed in the contract, 2 C.F.R. §200.340(a)(4), and requiring pre-termination notice, *id.* §200.341(a). Again, the source of rights here consists of public law—duly implemented regulations following the APA's notice-and-comment procedures, and having the force of law—not contract terms. And the claim is just like in *Sharp*, where the district court could consider whether the transfer "would be contrary to regulations" and enter "an injunction of the transfer," although there was a separate claim (outside the district court's jurisdiction) that the same transfer violated a contract. 798 F.2d at 1523.

The panel held that Plaintiffs' regulation-based claims were essentially contractual, Op.11-13, in reliance on *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985). But in *Ingersoll-Rand*, the claim failed because the contract at issue incorporated a regulation allowing termination for convenience; the agency invoked that *contractual* provision; and the plaintiff sought to challenge the agency's

use of that contract right so that it could continue receiving payments on the contract—meaning that the plaintiff's claim *and* the remedy it sought overlapped entirely with the contract's rights and remedies. *Id.* ("[I]t is possible to conceive of this dispute as entirely contained within the terms of the contract."). Here, Plaintiffs' contracts never contained a termination-for-convenience clause; EPA does *not* seek to justify termination under the four corners of any contract; and Plaintiffs seek no money owing on a contract or any other remedy contained within the contract.[7]

**4.** EPA's arguments miss the mark. *First*, *California* and *NIH* do not support EPA's position. Br.31-32. Rather, the Supreme Court in those cases reaffirmed that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds," even though jurisdiction is absent over claims to enforce a contractual obligation to pay money. *E.g.*, *California*, 604 U.S. at 651 (quoting *Bowen*, 487 U.S. at 910). And this case does not concern a contractual obligation to pay money: EPA already disbursed the funds to Plaintiffs who hold title. Plaintiffs seek to enjoin interference with those funds and, as noted, *NIH* supports jurisdiction over Plaintiffs' claims challenging the agency policy to dismantle GGRF. *Supra* 21-22.

---

[7] EPA once claimed the terminations were motivated by waste, fraud, and abuse, but since abandoned that theory. Dissent 18.

*Second*, EPA contends that Plaintiffs are bringing contract challenges to the termination of their grants because "[t]he crux of plaintiffs' claim" is a dispute over the grants' "termination provision." Br.29. Again, EPA is wrong that it has a contractual right to terminate. *Supra* 7-8. More to the point, EPA's argument conflates Plaintiffs' claims with EPA's purported defense. Plaintiffs seek to enjoin the Government's improper interference with their property, and EPA's supposed contractual-right defense does not turn those claims into a contract case, because the *Megapulse* test focuses on the "source of the right" raised by *plaintiff*, not government defenses. Thus, *Megapulse* held that there was jurisdiction over a trade-secret claim even though the government raised a contractual defense. 672 F.2d at 968-69 (Tucker Act did not displace claim for "alleged governmental infringement of property rights" when it was "the Government, and not [plaintiff], which is relying on the contract" as a defense). And in *Sharp*, the Court found jurisdiction over public-law claims to enjoin a transfer that the government claimed was authorized by contract.

*Third*, EPA asserts Plaintiffs' claims challenge their grant terminations "because 'it is possible to conceive of this dispute as entirely contained within the terms of the contract.'" Br.29, 33-34. But as *Sharp* instructs, it is improper to ignore plaintiffs' sources of law, and a court is not deprived of jurisdiction merely because a plaintiff could *also* bring contract claims seeking the same relief based on

overlapping conduct. *Transohio*, 967 F.2d at 608 (rejecting view that just because a plaintiff "*could* reframe its claim as one for damages and bring it in the Claims Court," it must do so). Indeed, *Megapulse* rejects the notion "that an agency action may not be enjoined, even if in clear violation of a specific statute, simply because that same action might also amount to a breach of contract." 672 F.2d at 971.

Nor do *Ingersoll-Rand and Spectrum Leasing* assist EPA.[8] They stand for the uncontroversial proposition that a plaintiff seeking money due under an assertedly breached procurement contract must bring that claim in the Court of Federal Claims, a "'specialized forum' for awarding 'damages for the Government's past acts.'" Dissent 55 (quoting *Bowen*, 487 U.S. at 905 n.42, 908). Thus, in *Ingersoll-Rand*, although the plaintiff couched its claims as a breach of the agency's termination-related regulations, there was complete overlap between plaintiff's claim and the contract's termination-for-convenience clause, and plaintiff "ha[d] not established that the relief available in the Claims Court [wa]s inadequate" because damages would wholly satisfy plaintiff's claim "for wrongful termination of the contract." 780 F.2d at 80. And in *Spectrum Leasing*, plaintiff sought "an injunction compelling the GSA to cease withholding" payments invoiced under a contract, asserting it

---

[8] Both cases implicated the Contract Disputes Act, which routes to the Court of Federal Claims all "claim[s] *by a contractor* against the Federal Government *relating* to a contract." 41 U.S.C. §7103; *see also* §7104(b)(1); 28 U.S.C. §1491(b)(2) (COFC jurisdiction for "any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41").

violated the Debt Collection Act. 764 F.2d 891, 892 (D.C. Cir. 1985). The claim thus sought "an order compelling the government to pay money" owed "under an executory contract." *Id.* at 894. Only where the claimed rights and injuries *completely* overlap with contractual provisions—as in *Ingersoll-Rand* and *Spectrum Leasing*—is a plaintiff relegated to the Court of Federal Claims.

These cases are inapposite here. Plaintiffs are not challenging a termination for convenience—meaning their claim does not overlap with any contractual provision—and are not seeking monetary relief—meaning their injury cannot be remedied in the Court of Federal Claims. Instead, Plaintiffs seek prohibitory injunctive relief to enforce public law.

*Fourth*, EPA reads *Sharp* to stand for the rule that a district court lacks jurisdiction whenever the source of the rights on which the plaintiff sues is not "independent" of a contract. Br.34-35. But as this Court has made clear, "*Sharp* tells us that litigants may bring statutory and constitutional claims in federal district court even when the claims depend on the existence and terms of a contract." *Transohio*, 967 F.2d at 610. And *Megapulse* does not "impose a 'but-for' test for identifying the source of the right"; there is jurisdiction even if a plaintiff would "have no claims" absent a contract. *Crowley Gov't Servs. v. GSA*, 38 F.4th 1099, 1108-10 (D.C. Cir. 2022).

*Finally*, EPA contends Plaintiffs are seeking to enforce a contractual obligation to pay because Citibank is "acting as an arm of Treasury," and thus the fact that Plaintiffs' funds are held at a private bank "makes no difference." Br.42. EPA mischaracterizes the FAA. The FAA, like the ACAs, states that prime recipients' accounts are "in the names of the three NCIF and five CCIA grant recipients," with EPA only a "secured party." JA2145. The grantees are "responsible for directing" Citibank "as to what type of account to create; amounts to transfer into Subrecipient accounts; and how to allocate the amount of funding[.]" JA2145. And Citibank shall "invest[]" "liquidity" "at the direction of the Prime Recipients and Subrecipients." JA2148. Again, although EPA tries to portray Citibank's role as an aberration, EPA's choice to use Citibank was fundamental to the program's goals, and offered EPA *more*, not less, oversight. Dissent 27-32.

Similarly, EPA (Br.40-41) is incorrect in asserting that limitations on how Plaintiffs can use grant funds "reinforce[] that this dispute is contractual." Op.14 n.6. These provisions at most reflect state-law security interests; they do not defeat Plaintiff's title. And they do not defeat jurisdiction, as the Supreme Court has long recognized "a private party's cause of action outside the Tucker Act to challenge the statutory authority of federal officials to claim ownership rights in property allegedly transferred during the course of a [government] contract." *Megapulse,* 672 F.2d at 968-69.

31

### 2.    Sovereign Immunity Does Not Apply In The First Place.

Alternatively, the Court need not consider the question of Tucker-Act preclusion because the government lacks sovereign immunity, and thus no waiver is needed.

The law has long recognized that sovereign immunity is no barrier to a suit seeking equitable relief based on allegations that "a federal officer act[ed] in excess of his authority or under authority not validly conferred." *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 690-91 (1949); *see also Phila. Co. v. Stimson*, 223 U.S. 605, 620 (1912) ("[I]n case of an injury threatened by [an officer's] illegal action, the officer cannot claim immunity from injunction process"). Given that history, the APA initially did not include a sovereign-immunity waiver. In 1976, decades after the APA's enactment, Congress added that sovereign-immunity waiver, in part to allow plaintiffs to pursue "equitable suits for specific monetary relief," which could not be pursued merely by suing a federal officer. *See Maryland*, 763 F.2d at 1446-48. But if no sovereign immunity applies because the defendant officers acted in excess of authority, there is no need to satisfy the APA's waiver in the first place. *See id.* at 1448 n.2; *Chamber of Com. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996) (waiver unnecessary).

This case does not trigger a defense of sovereign immunity because "the government defendants are charged with having acted beyond the scope of their

statutory authority," and Plaintiffs seek to enjoin them from so acting. *Megapulse*, 672 U.S. at 969 & n.46 (collecting authority); *see, e.g.*, *Land*, 330 U.S. at 735-36, 738; *Ickes v. Fox*, 300 U.S. 82, 96-97 (1937). Plaintiffs indeed allege that EPA flagrantly violated the IRA, the Appropriations Clause, and the Separation of Powers by shuttering an entire statutory program, and there is no immunity from a suit to prohibit such a violation of public law. *See Swan v. Clinton*, 100 F.3d 973, 981 & n.4 (D.C. Cir. 1996) (no immunity for violating agency organic statute); *Vann v. Kempthorne*, 534 F.3d 741, 751 (D.C. Cir. 2008) (no immunity for violating Constitution). The Government also cannot claim immunity from a lawsuit to enjoin arbitrary agency action, which the Supreme Court did without impediment "[l]ong before the passage of the APA." *N. Air Cargo v. USPS*, 674 F.3d 852, 860 (D.C. Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80 (1943)). The same holds for claims asserting violations of agency regulations. *Ariz. Grocery Co. v. Atchison, T.&S.F. Ry. Co.*, 284 U.S. 370, 390 (1932) (pre-APA challenge alleging violation of regulation); *cf. Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 140 (1951) (no sovereign immunity for action alleged to be "beyond the officer's authority under [an] Executive Order").

EPA hardly challenges these principles but, seeking to confuse the issue, says there is a "nearly insurmountable" standard to bring an *ultra vires* claim. Br.51-52. The Government's argument relies on a different line of cases largely addressing

non-statutory review in the face of specific bars to suit. *Id.* (citing, *inter alia*, *NRC v. Texas*, 605 U.S. 665, 681 (2025)). But there is no such statutory prohibition here, and Plaintiffs can bring their claims under an explicit cause of action in the APA without needing to satisfy the sovereign-immunity waiver, as countless plaintiffs did before Congress enacted the waiver in 1976. Regardless, even under non-statutory *ultra vires* review, Plaintiffs may seek equitable remedies prohibiting executive non-compliance with public law. *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 109-11 (1902).

Nor is there merit to EPA's assertion that this approach would "allow plaintiffs to easily evade sovereign-immunity principles" and sidestep *California* and *Ingersoll-Rand*. Br.53-54. In those cases, plaintiffs sought payment of money from Treasury under contracts, a claim for which sovereign immunity undoubtedly applies (absent a waiver). *Dugan v. Rank*, 372 U.S. 609, 620 (1963). But here, because Plaintiffs already own the funds and are not seeking money from the Treasury, they do not need to rely on Section 702's waiver.

### B.    Plaintiffs Are Likely To Succeed On The Merits.

#### 1.    The Constitution and the IRA.

The District Court rightly concluded that Plaintiffs are likely to show that EPA violated the Constitution and, independently, the IRA. JA995-96. (Plaintiffs also alleged a violation of due process, though the District Court did not reach it.)

**a.** Our system of separated powers vests Congress with "exclusive power over the federal purse." *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992) (per curiam). As a result, only Congress can authorize "money [to] be paid out of the Treasury." *Cincinnati Soap Co. v. U.S.*, 301 U.S. 308, 321 (1937). And when Congress does so, the Executive "may not ignore" Congress's funding directives "merely because of policy disagreement[s]." *In re Aiken Cnty.*, 725 F.3d 255, 260 (D.C. Cir. 2013) (Kavanaugh, J.). This "settled, bedrock principle[] of constitutional law," *id.* at 259, inheres in the structure of the Constitution and follows from the Appropriations Clause, which takes as its "fundamental and comprehensive purpose" "assur[ing] that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good," *OPM v. Richmond,* 496 U.S. 414, 427-28 (1990); *see Kendall v. U.S. ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 612-13 (1838).

Congress exercised this authority in enacting the IRA. As relevant here, Congress appropriated funds "to remain available until September 30, 2024" for EPA to "make grants, on a competitive basis," 42 U.S.C. §7434(a), to capitalize "nonprofit organization[s] … designed to provide capital … for the rapid deployment of low- and zero-emission products, technologies, and services," *id.* §7434(c). Congress identified the "eligible recipients" and prescribed how they were to "use the grant[s]." *Id.* §7434(b). There was no authority to undo the capitalization

35

of these fund recipients, but instead the opposite directive that grantees "ensure" the programs' "continued operability." *Id.*

Because EPA cannot disregard Congress's spending directives for policy reasons, *see Aiken Cnty.*, 725 F.3d at 266-67; *Richmond*, 496 U.S. at 427-28, it may not "unilaterally decide to get rid of the [IRA's] grant programs" based on the Administration's stated desire "to '[t]erminat[e] the Green New Deal,'" Dissent 39 (quoting 90 Fed. Reg. 8353, 8357). EPA's efforts to do just that squarely implicate the Appropriations Clause and violate the Separation of Powers. *Aiken Cnty.*, 725 F.3d at 266-67; *see also Clinton v. City of New York*, 524 U.S. 417, 439-41 (1998) (line-item presidential veto of individual appropriation in omnibus bill violates Constitution).

**b.** EPA's first response is to deny that Plaintiffs can assert constitutional claims. Citing *Dalton v. Specter*, 511 U.S. 462 (1994), EPA argues that Plaintiffs' constitutional claims must be construed as alleging only statutory violations. Br.45. But *Dalton* does not reach nearly so far. *Dalton* concerned an elaborate statutory scheme that authorized the challenged conduct (closing a shipyard) under statutorily prescribed procedures. 511 U.S. at 464-65. It held that where the executive wields statutory authority to engage in conduct, but acts in excess of that authority, it is not "*ipso facto*" a constitutional violation. *Id.* at 472-74, 476-77; *see also Nat'l Treasury*

*Emps.' Union v. Vought*, 149 F.4th 762, 821-22 (D.C. Cir. 2025) (Pillard, J., dissenting).

Dalton did *not*, however, hold that any time the executive violates both the Constitution and a federal statute, a plaintiff challenging the executive's action may assert only statutory claims. *See Dalton*, 511 U.S. at 473. Nor could that be reconciled with *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952). *See Vought*, 149 F.4th at 822 (Pillard, J., dissenting). In *Youngstown*, the President's seizure of steel mills was both unauthorized by Congress and beyond his own constitutional powers, *Youngstown*, 343 U.S. at 585-89; in *Dalton*, on the other hand, the President "act[ed] pursuant to an express or implied authorization of Congress" when closing the shipyard, *Youngstown*, 343 U.S. at 635, and thus had at most erred in exercising statutory authority, *see* 511 U.S. at 471-74.

This case is like *Youngstown*, not *Dalton*. The Executive took an action "incompatible with the expressed or implied will of Congress," *Youngstown*, 343 U.S. at 637-38, because the IRA does not authorize the Executive to terminate GGRF programs, period. Necessarily, EPA can "only rely upon [the executive's] own *independent* powers." *Id*. *Dalton* has no application where the Executive lacks *any* statutory authority to undertake the challenged action. *See Clinton*, 524 U.S. at 442-44.

*Global Health Council v. Trump*, 153 F.4th 1 (D.C. Cir. 2025), is not to the contrary. There, a federal statute—just as in *Dalton*—"directly contemplated the presidential action under consideration," *Vought*, 149 F.4th at 821-22 (Pillard, J., dissenting). Nothing like that exists here. Rather, the most that can be said is that in unconstitutionally attempting to terminate the NCIF and CCIA programs (that is, in violating the Appropriations Clause and Separation of Powers), EPA also violated the IRA. *Global Health Council* does not support the audacious proposition that if an agency violates a federal statute while violating the Constitution, viable constitutional claims *ipso facto* become unavailable.

**c.** Nor can EPA distinguish *Aiken County*, *see* Br.49-50. In *Aiken County*, as here, Congress appropriated funds for a particular effort (here, making competitive grants; there, assessing an application to store nuclear waste) and set a statutory deadline for an agency to act. *See* 42 U.S.C. §7434; *Aiken Cnty.*, 725 F.3d at 257-58. In *Aiken County*, the agency refused to adhere to the statute due to "policy disagreement[s]" with Congress, 725 F.3d at 260, and this Court found a constitutional violation, *id.* at 267. The only difference is that, in *Aiken County*, the agency failed to comply from the outset. *Id.* at 258. Here, EPA timely *met* its statutory obligations—establishing the programs and obligating all funds by the deadline—and now seeks to *undo* the statutory directive and shut down the programs. *See* JA994-96; *supra* 4-5, 10-13. Both versions are unlawful. "Congress

sets the policy," and "policy disagreement with Congress's decision[s] … is not a lawful ground for [an agency] to decline to continue [a] congressionally mandated [program]." *Aiken Cnty.*, 725 F.3d at 260.

    **d.** EPA resists *Aiken County*—and the constitutional violation this Court recognized there—on the same grounds it insists that no statutory violation occurred: it intended to re-obligate the funds. Br.46-47. But that assurance is no help for three reasons. First, the IRA (even before OBBBA's enactment) would not permit EPA's proposed do-over, even if the agency genuinely intended to carry it out. In *Train v. City of New York*, 420 U.S. 35 (1975), an appropriation statute "ma[de] available federal financial assistance" to the States by "authoriz[ing] to be appropriated" sums "not to exceed" set limits, and "authorize[d] the [EPA] Administrator 'to make grants'" out of appropriated funds. *Id.* at 37-39. The Supreme Court rejected EPA's effort "to imply a power of some sort in the Executive to control outlays under the Act" at the allotment stage: at most, "the power to control [disbursements], such as it was, was to be exercised at the point where funds were obligated." *Id.* at 48. Similarly, here, there is no basis to "imply a power of some sort" on the part of EPA to tear down or re-do the program after the statutory deadline. *Id.*; *see also Aiken Cnty.*, 725 F.3d at 261 n.1.[9]

---

[9] Contrary to EPA, the IRA did not delegate "discretion" to determine "overall effectuation of the statute's policy aims," Br. 47. *See supra* 35-36. Rather, Congress

Second, contra EPA (at 46-50), the District Court had ample basis to refuse to "credit EPA's representations that it w[ould] spend the funds as Congress intended," Dissent 40-41; *see supra* 10-13, and find "that EPA s[ought] to dismantle" the NCIF and CCIA programs "in their entirety as a policy matter," JA995.

EPA cannot show that this factual determination was clearly erroneous. Although EPA describes the District Court's opinion as having not "cited any reason to doubt [EPA's] commitment" to re-obligate the funds, Br.47, EPA simply ignores the many facts supporting the District Court's finding, including the agency's abrupt termination of plaintiffs' grants the day before the TRO hearing, JA992-93; EPA's shifting explanations and persistent inability to substantiate its purported oversight concerns (even after DOJ's specious criminal investigations), *see id.*; Defendant Zeldin's public disparagement of the programs and vow to end them, JA973; and President Trump's similar statements and directives to halt IRA spending, *see* Dissent 9-10. The record "is clear: EPA suspended all eight grants comprising the entire NCIF and CCIA programs, and the agency's public statements contradict[ed] its representations … regarding the future of the program," JA995-96.

---

"laid out specific directives [in the IRA]—not mere suggestions—as to what EPA could do with the money." JA995. Congress afforded the agency discretion in only one, inapposite respect: It authorized EPA to identify "greenhouse gas emission reduction activities" for grants under 42 U.S.C. §7434(a)(1). But the programs at issue here, NCIF and CCIA, were funded under §7434(a)(2) and (3).

Third, EPA's re-obligation argument falters on basic principles of federal appropriations law. Because the IRA's appropriations period has lapsed, any new obligations must qualify as replacement grants, meaning grants "substantially identical in scope and purpose to the original grant"—foreclosing EPA's ability to "materially alter the financial structure, number of grantees, or other oversight controls." Dissent 42. In other words, "EPA would have to retain the very features it claims prompted the agency to interfere with Plaintiffs' grants" in the first place. *Id.*

EPA disputes almost none of this. Br.47-48. Instead, EPA contends that the Court must defer to its "determination that it intended" to re-obligate grant funds, Br.47, "regardless of whether th[e] Court believes that [EPA's] contemplated re-obligation would have violated principles of appropriations law," Br.48. But EPA's inability to lawfully re-obligate the appropriated funds in a way that would have addressed its purported oversight concerns, Dissent 41-43, together with its failure to explain, even now, why re-obligation was necessary, *see infra* p.44-46, serves only to confirm the soundness of the District Court's factual findings.

**e.** Finally, EPA argues, relying on the floor statement of a single senator, that OBBBA's July 2025 enactment confirms that its months-earlier "decision to terminate the grants" does not offend the Constitution. Br.48-49. EPA is wrong.

OBBBA §60002, Pub. L. 119-21, 139 Stat. 72, 154 (2025), provides:

> Section 134 of the Clean Air Act (42 U.S.C. 7434) is repealed and the *unobligated balances* of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act) are rescinded.

As the panel recognized (Op.7-8), OBBBA does not affect Plaintiffs' funds because Congress rescinded only "*unobligated* balances." OBBBA did not touch funds that were "obligated," let alone "disbursed," when it was enacted. *See Halverson v. Slater*, 129 F.3d 180, 185 (D.C. Cir. 1997) (where Congress has empowered an agency to do a specific thing, it "intended to exclude" the agency from acting otherwise). EPA obligated all GGRF funds by the September 2024 deadline, and Plaintiffs' funds have "remain[ed] obligated" ever since. Op.7-8. Thus, the only "unobligated balances" OBBBA rescinded were roughly $19 million (out of $30 million) that Congress originally appropriated for GGRF administrative costs under CAA § 134(a)(4). *See* Congressional Budget Office, *Estimated Budgetary Effects of an Amendment in the Nature of a Substitute to H.R. 1, the One Big Beautiful Bill Act, Relative to CBO's January 2025 Baseline,* Title 6, Rows 20-22 (June 29, 2025) (estimating savings of $19 million from OBBBA). And notwithstanding that rescission, EPA has ample resources to administer the program if the District Court's preliminary injunction is affirmed: Congress appropriated $3.195 billion that EPA can use for grant-administration purposes.[10]

---

[10] In March 2025, Congress appropriated $3.195 billion for "Environmental Programs and Management." Pub. L. 119-4, 139 Stat. 9, 30 (2025). That covered

EPA cites OBBBA's "repeal" of §7434, Br.48, but it is no help, as EPA completed its work in obligating grants under §7434 by the statutory deadline, and Congress did not purport to undo "events completed before [OBBBA's] enactment," *Landgraf v. USI Film Prods.,* 511 U.S. 244, 270 (1994); *see also id.* at 265 (explaining the "deeply rooted" presumption "against retroactive legislation"). Rather than "unambiguously instruct[] retroactivity," *Vartelas v. Holder*, 566 U.S. 257, 266 (2012), Congress did the opposite, declaring in the present tense that "Section 134 of the Clean Air Act … *is* repealed," OBBBA §60002. *See Sherley v. Sebelius*, 644 F.3d 388, 394 (D.C. Cir. 2011) ("The use of the present tense in a statute strongly suggests it does not extend to past actions.").

In short, Congress did not disturb the already-established grant programs or claw back already-obligated (and here, disbursed) funds. OBBBA does not assist EPA.

### 2.    Arbitrary-And-Capricious Action and Agency Regulations.

The District Court correctly concluded that EPA violated the APA's prohibition against arbitrary and capricious agency action by failing to (1) provide a reasoned explanation for its actions and (2) adhere to its own regulations. EPA does not attempt to refute these holdings, noting merely—and in a footnote, Br.42 n.5—

---

"necessary expenses not otherwise provided for," including "personnel and related costs" for grant administration. Pub. L. 118-42, 138 Stat. 25, 252 (2024). Congress continued this funding in November 2025. Pub. L. 119-37, 139 Stat. 495, 496 (2025).

that it "vigorously" disagrees. The Court should therefore affirm these holdings as unchallenged. Regardless, they were undoubtedly well supported.

**a**. EPA violated the APA's reasonable-explanation requirement multiple times. In February 2025, weeks before the Notices of Termination, EPA directed Citibank to freeze Plaintiffs' funds "without notice or justification." JA992. "[D]espite repeated inquiries" from Plaintiffs, EPA offered no explanation. *Id*. This conduct violated the APA, the District Court held, "because [EPA] did not say *anything* about its [seizure] decision, for weeks," *id*.—let alone "cogently explain" it, *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983); JA993 (EPA "offer[ed] no rational explanation for why it suspended the grants").

Nor did EPA reasonably explain its decision to undo—and purportedly *re*do—the grant programs. In the Notices, EPA justified program-wide termination due to "substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities," as well as "material deficiencies in oversight and account controls." JA701. But EPA offered *no facts*—then or later—to substantiate this, *see id.*; JA993, and then walked back its accusations, stating at oral argument that EPA was "not 'accusing' and has never 'accuse[d] the plaintiffs of waste, fraud and abuse," Dissent 25; Oral Arg. Tr. 103. And the arrangement with Citibank affords EPA extensive

oversight over the program—including the ability to track every dollar that leaves the grantees' and subgrantees' accounts. JA2149.[11] That capability is not available in ordinary grants when grantees withdraw funds directly from the Treasury—underscoring that this grant structure provides *more* transparency. Dissent 7-8.

The lead-up to the Notices underscores EPA's arbitrariness. EPA repeatedly represented that it needed additional information to evaluate potential program-integrity issues, *e.g.*, JA694-95, requesting documents from Plaintiffs on March 4, 2025, to be submitted by March 28. *E.g.,* JA393. EPA then twice (on March 8 and March 10) advised Citibank of the information requests, stressing there was "*potential*" fraud, and stating that it would evaluate those concerns "based on [Plaintiffs'] incoming responses," due March 28. JA65-66. Yet the very next day, March 11, weeks before the March 28 deadline for Plaintiffs' responses, EPA shut down the programs. Why? Because Plaintiffs sued, and the District Court scheduled an immediate TRO hearing. So EPA sent boilerplate terminations citing "generalized and unsubstantiated reasons" it supposedly sought to evaluate using Plaintiffs' submissions, JA993. *Compare* JA393 *with* JA701. That is textbook arbitrariness. *United Church of Christ v. FCC*, 707 F.2d 1413, 1440 (D.C. Cir. 1983).

---

[11] That extensive oversight refutes *Amici* States' argument that the program "sets a troubling precedent" by allegedly "insulat[ing] billions in taxpayer funds from democratic oversight and accountability." Doc.2154720 at 29-30.

On this record, "[i]t [wa]s unclear to the [District Court] what 'relevant data' EPA considered within such a short period that called for the sudden termination of these grants, compelling the court to 'guess at the theory underlying the agency's action.'" JA993 (quoting *SEC v. Chenery Corp.,* 332 U.S. 194, 196-197 (1947)). And, as the court found, EPA failed to provide any "rational explanation for why it needed to cancel the grants to safeguard taxpayer resources, especially when it had begun examining the grant programs to add oversight mechanisms, or why it needed to cancel *every single grant* to review *some* aspects of the GGRF program." JA993.

**b**. EPA's conduct should also be "set aside as arbitrary and capricious [because] the agency fail[ed] to 'comply with its own regulations.'" *Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014).

First, EPA violated 2 C.F.R. §200.341(a), which required "written notice of termination" of a federal award that "include[s] the reasons for termination." These requirements are not satisfied by EPA's "effective immediately" Notice that contained only "generalized and unsubstantiated reasons," JA992-93. *See Envtl. Health Tr. v. FCC*, 9 F.4th 893, 905 (2021).

Second, EPA violated 2 C.F.R. §200.340(a)(4), which permits termination based on changed agency priorities only if that ground is "clearly and unambiguously included in terms and conditions of the award." 89 Fed. Reg. 55263. "This regulation establishes a boundary to ensure that" agencies do not abuse their

authority "when dealing with federal awards." JA994. EPA crossed it here. Given EPA's total inability to substantiate its stated concerns about "waste, fraud, and abuse," it is obvious that EPA's terminations occurred because of a change in agency priorities—precisely what the regulations prohibit.

### C.    Plaintiffs Demonstrated Irreparable Harm Absent An Injunction.

Based on voluminous and unrebutted evidence, the District Court found that Plaintiffs would suffer irreparable harm absent a preliminary injunction. JA997. As Judge Pillard recounted, EPA's actions "threaten enormous harm to Plaintiffs and, more importantly, to the communities, businesses, and individuals across the United States who stand to benefit from the uses of the money that Congress prescribed." Dissent 43-44. The District Court's factual findings are not clearly erroneous and its irreparable-harm determination was not an abuse of discretion. *See Atlas Air, Inc. v. International Bhd. of Teamsters*, 928 F.3d 1102, 1112 (D.C. Cir. 2019).

*First*, EPA's actions are causing Plaintiffs irreparable financial injury. Financial injury can be "irreparable" if it "threatens the very existence of the movant's business." JA997 (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). The District Court correctly credited the unrebutted evidence that without an injunction, multiple Plaintiffs cannot cover payroll and will be forced to close their doors for good. JA998-1000. It further explained how Plaintiffs have

47

already had to defer compensation, terminate vendors, and issue stop-work orders. *See id.*; Dissent 44 (same).

*Second*, the District Court explained that Plaintiffs "demonstrated irreparable harm in damage to their business reputation." JA1000; *accord Armour & Co. v. Freeman*, 304 F.2d 404, 406 (D.C. Cir. 1962) (injury to party's "good name" that could cause "[w]ithdrawal" from market). Plaintiffs are financial entities that depend on their reputations to maintain the support of stakeholders; attract future grants, investment partners, favorable deal terms, and skilled employees, JA1001 (citing JA384-85);[12] and secure government and private funding, JA985 n.4 (citing JA1331, JA1474). Plaintiffs submitted abundant unrebutted evidence, which the District Court did not clearly err in crediting, that "in this case," the "[r]eputational harm … cannot be overstated, especially given the structure of the NCIF and CCIA programs and Plaintiffs' positions as lenders in the financial markets." JA1000-01 (citing sworn declarations).

As the dissent explained, Plaintiffs' reputational harms are "the very definition of irreparable injury," because "[o]nce a lender's reputation as a stable source of promised funding is compromised, it is difficult, if not impossible, to

---

[12] Doc.2112204 ¶¶27-32; JA402 ¶¶6-7; JA404 ¶¶11-13; JA427-28 ¶¶7-8; JA430-32 ¶¶18-24; JA411-12 ¶¶16-17; JA414 ¶25; JA456-58 ¶¶20, 26; JA1648 ¶17; JA1654 ¶42; JA1988-89 ¶¶65-67; JA2005 ¶¶5-9; JA1330-31 ¶¶32, 35; JA1474 ¶33; JA1298 ¶21; JA1427 ¶36.

repair." Dissent 46. Further, "the distrust bred by EPA's actions will make it exceedingly difficult to revive the coordination and cooperation between nonprofit organizations, private investors, private businesses, and community lenders critical to carrying out Congress's objective of building important projects at low public cost by spending government grant money to leverage private investment." *Id.*

*Third*, EPA's conduct will irreparably undermine Congress's purpose in enacting the GGRF. The NCIF was structured to "mobilize and leverage private financing" to "multiply the impact of public funds," and CCIA to provide "specific industry networks" with "access to the capital they need." JA997-98. Thus, the District Court explained, the "very purpose of Plaintiffs' existence and their business operations, including the financing for their projects, depends on their grant money." JA997. Without an injunction, the District Court found, it "will be more difficult, if not impossible" for Plaintiffs "to find partners willing to enter into financing arrangements and to find qualified employees willing to work with them" to accomplish Congress's mission. JA1001 (citing JA384-85). Projects cannot continue in limbo: without funds, these will fall apart and some already have, harming the members of the public who stand to benefit. JA998-1000 (cataloguing record evidence); Doc.2112204 ¶¶19-26; *see* Dissent 45 ("[B]y directing Citibank to freeze Plaintiffs' money, the government is making it impossible for Plaintiffs to serve as reliable funding partners, ruining their prospects for securing future

49

partnerships, favorable loan terms, qualified staff, and federal grant funding"). The same applies to several of Plaintiffs' subgrantees. *Id.* at 44-45 (citing JA950).

EPA asserts (Br.55-56) that Plaintiffs cannot show irreparable harm because they could obtain monetary relief in the Court of Federal Claims. But again, Plaintiffs do not seek any money damages. And the EPA ignores overwhelming evidence that, without the injunction, any future damages award (or post-judgment injunction) will be meaningless and cannot fully address their injuries. Multiple grant recipients and subrecipients will no longer be able to operate, and the injunction is needed to safeguard Plaintiffs' reputations and their ability to attract capital and partners. "Under such circumstances, any eventual judicial declaration that the terminations were unlawful would be a hollow victory." Dissent 47.

EPA further asserts that Plaintiffs "have not identified any harm that manifested in the nearly ten months that have since passed." Br.56. That is incorrect: prior to the district court's ruling, Plaintiffs submitted unrebutted evidence that they suffered irreparable harm. JA998-1000 (cataloguing evidence); Dissent 44 (explaining that "[a]bsent funding from Plaintiffs, major projects already underway will fold" and offering example of clean-energy projects in rural South). And Plaintiffs continue to experience devastating harm. Climate United is now in hibernation mode, having laid off or re-assigned virtually all staff and given up its New York office. PFC has likewise mothballed operations, laid off all but two

50

employees (one of whom will depart in June unless PFC can access funds before then), and seen multiple affordable-housing projects indefinitely stalled.

EPA also asserts (Br.56) that Plaintiffs' harm is "limited" because of "the early stage of these grant programs, which have yet to engender any serious reliance interests." But if a grantee ceases to exist or its projects cannot go forward, it suffers irreparable harm. Regardless, EPA ignores factual findings describing many projects, for hundreds of millions of dollars, that Plaintiffs and subgrantees spent substantial time developing and launching, while incurring substantial expenses, all in reliance on their grants. JA998-1000.

### D.    The Balance of Equities and Public Interest Favor Plaintiffs.

The District Court did not abuse its discretion in finding that the balance of equities and public interest favor Plaintiffs. The District Court stated that it "accord[ed] relevant weight to the government's protection of the public fisc," and that "EPA's interests remain adequately protected" by existing safeguards, while "Plaintiffs face immediate, irreparable harm" without an injunction. JA1002-03.

EPA relies primarily on *NIH* and *California*'s conclusions that the government experiences irreparable harm when its funds are irrevocably expended. (Br.56-58). Those cases do not assist EPA. First, unlike in *NIH* and *California*, the funds belong to Plaintiffs, not EPA. No case holds that the government is irreparably harmed when it is impeded from unlawfully seizing private property. Second, the

51

question is not whether EPA will experience harm (as in *NIH* and *California*), but whether, in view of Plaintiffs' irreparable harm, the balance of equities favors Plaintiffs. It does. Whereas Plaintiffs will experience devastating harm absent an injunction, the purported "irreparable harm" EPA faces simply consists of Plaintiffs carrying out Congress's directives. EPA's observation that the GGRF was repealed (Br.58) ignores that Congress left the GGRF programs intact and did not purport to rescind—or authorize EPA to rescind—obligated funds.

EPA gestures at concerns about "lack of oversight," "mismanagement," and "impropriety" (Br.57-58), but as explained, there is no evidence in the record supporting those assertions. *Supra* 45.[13] The District Court found (without any clear error identified) that there was no risk of improper expenditures because Plaintiffs "can only use" grant funds "for specific, approved purposes," and "[t]here are sufficient protections in place to prevent the type of reckless spending EPA envisions." JA1002-03; JA372-73. That includes a Notice of Exclusive Control, which EPA has not issued and has no grounds to issue. Indeed, as the dissent pointed out, the government conceded that it terminated the grants based on pure policy disagreements and was "not accusing anybody of fraud." Dissent 47.

---

[13] EPA singles out a $250 million transfer request from Climate United. Br.58. That relates to a commitment announced in October 2024 to purchase battery-electric heavy-duty trucks from U.S. manufacturers. Doc.2112204 ¶¶21, 47. Climate United would receive those funds as part of closeout even if its grant were terminated.

EPA is also wrong to suggest (Br.58) that the injunction "depriv[es] the public fisc of significant interest earned" on Plaintiffs' funds. EPA did not raise this argument below. Regardless, Plaintiffs are entitled to all interest on disbursed funds as "program income." JA523-24.

Finally, the public interest favors an injunction because "[t]here is generally no public interest in the perpetuation of unlawful agency action," while "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." JA1003 (quoting *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)). "It is hard to see how the public interest is harmed by Plaintiffs' use of money allotted by Congress to carry out its duly enacted policies." Dissent 47.

## II.    The Court Should Affirm The Preliminary Injunction Against Citibank.

The District Court found that Plaintiffs were likely to succeed on their contract claim against Citibank and ordered Citibank to comply with accountholder instructions. JA996-97. That should be affirmed.

At the outset, Citibank could not invoke derivative sovereign immunity, even if the Court lacked jurisdiction over EPA. Derivative immunity allows private defendants to share the United States' immunity, *In re OPM Data Sec. Breach Litig.,* 928 F.3d 42, 68-71 (D.C. Cir. 2019), but Citibank seeks *broader* immunity: EPA acknowledges it can be sued in the Court of Federal Claims, but Citibank seeks

immunity in *all* fora. So the defense fails. (If EPA were immune, the Court should remand for Plaintiffs to proceed independently against Citibank.)

Plaintiffs are likely to succeed on their claims against Citibank. By refusing to honor accountholder instructions, Citibank breached the ACAs. Under the ACAs, Citibank "shall comply with all instructions, notifications, and entitlement orders the Bank receives [from accountholders] directing the disposition of funds and financial assets in the Accounts." JA1145. Citibank may refuse *only* if the secured party under that ACA exercises its secured-party right to issue a Notice of Exclusive Control. *Id*. That requires "a written determination and finding" that one of the three exclusive grounds for terminating the grants was triggered. JA1152; *see also* JA1144 ("agree[ing] that the terms and conditions … in the Grant Agreement indicate the conditions under which [EPA] may exercise its right of control"). No such notice ever issued, nor could one have issued because the termination grounds were not satisfied. Hence, Citibank is required to comply with Plaintiffs' instructions. Because it refuses to do so, Citibank breached the ACAs.

Citibank points to contractual language stating Citibank will not "incur any liability" by reason of "any occurrence beyond its control" including "any act of any governmental authority." Br.23. But in moving for a preliminary injunction, Plaintiffs are not seeking to hold Citibank liable for backward-looking damages. They seek only forward-looking relief. Regardless, Citibank's decision to freeze the

funds, despite never receiving a Notice of Exclusive Control, was its own decision, not the government's. That clause cannot be read to allow Citibank to reject Plaintiffs' control over their funds at EPA's mere suggestion; to do so would nullify the ACA's careful provisions regarding the Notice of Exclusive Control. JA1152.

Finding no defense in the ACAs, Citibank cites a separate agreement to which Plaintiffs are not parties, the FAA, and contends that the ACAs contain an implied exception permitting it to refuse Plaintiffs' disbursement requests when necessary to comply with the FAA. Br.18-23. That is wrong. Section 9 of the ACA states that it "constitutes the entire agreement between the parties and sets forth in its entirety the obligations and duties of the Bank with respect to the assets in the Accounts." JA1148; *see also* JA1146 (each party "acknowledges and agrees" that Citibank's "duties, responsibilities and obligations … shall be limited to those expressly set forth in" the ACAs). That leaves no room for implied exceptions. Under New York law (which governs), "where a contract contains a merger clause, a court is obliged 'to require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing.'" *Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 436 (2013).

Citibank insists upon reading the ACAs "in conjunction with" the FAA, citing cases holding that interrelated agreements should be "read together." Br.18-19. But those cases concern multiple contemporaneous agreements signed by the *same*

*parties*. Here, Plaintiffs never signed the FAA. No case holds that an agreement the party did *not* sign can narrow another agreement the party *did* sign.

Regardless, the FAA does not require Citibank to breach the ACAs. The FAA authorizes Citibank to "freeze accounts, and transfer funds in frozen accounts" at EPA's direction *only* "in accordance with the account control agreements." JA2148. Similarly, in the event of "termination," the FAA instructs Citibank to take direction from EPA "in accordance with the account control agreements." *Id.* The natural reading of the FAA is thus to require Citibank's compliance with the ACAs.

Citibank nonetheless argues it was fulfilling its FAA obligation to "comply with all lawful instructions or directions received from Treasury." Br.20; *see* JA2129. But Citibank began freezing funds weeks *before* Treasury sent any "instruction," based only on FBI "recommendations." JA99-101. Treasury eventually did send instructions to Citibank—but as the District Court correctly concluded, "the instructions [Citibank] received were not lawful." JA996.

Citibank insists that, under the FAA, it could not second-guess the government. Br.21-23. But Citibank owed contractual obligations to Plaintiffs, too. Citibank's status as a fiduciary—rooted in an agreement Plaintiffs never signed— cannot justify a breach of the ACAs, which Citibank signed in its own name. Restatement (Third) Agency §7.02.

56

The factors favoring relief against EPA also favor relief against Citibank. *Supra* 47-53. Citibank insists private companies should not be disincentivized from serving as financial agents. Br.25. But a prospective injunction would not have that effect. Citibank's promises that "no injunction against Citibank is necessary," Br.26, ring hollow given Citibank's never-justified decision to freeze Plaintiffs' funds based on FBI "recommendations," without explanation to Plaintiffs. JA99-101, 145-148.

## CONCLUSION

The Court should affirm.

Dated: February 2, 2026

Respectfully submitted,

/s/ *Vincent Levy*
  Vincent Levy
    *Counsel of Record*
  Kevin D. Benish
  Daniel Fahrenthold
  HOLWELL SHUSTER &
  GOLDBERG LLP
  425 Lexington Avenue, 14th Floor
  New York, NY 10017
  Tel.: (646) 837-5151
  vlevy@hsgllp.com

  *Attorneys for Plaintiff-Appellee*
  *Coalition for Green Capital*

/s/ *Beth C. Neitzel*
  Beth C. Neitzel
    *Counsel of Record*
  Matthew F. Casassa
  FOLEY HOAG LLP

  /s/ *Adam G. Unikowsky*
  Adam G. Unikowsky
    *Counsel of Record*
  Kathryn L. Wynbrandt
  David B. Robbins
  Tanner J. Lockhead
  JENNER & BLOCK LLP
  1099 New York Avenue, Suite 900
  Washington, D.C. 20001
  Tel.: (202) 639-6000
  Fax: (202) 639-6066
  aunikowsky@jenner.com

  Gabriel K. Gillett
  JENNER & BLOCK LLP
  353 N. Clark Street
  Chicago, IL 60654
  Tel.: (312) 222-9350
  ggillett@jenner.com

155 Seaport Boulevard, Suite 1600
Boston, MA 02210
Tel. (617) 832-1000
bneitzel@foleyhoag.com
mcasassa@foleyhoag.com

Noah C. Shaw
James M. Gross
FOLEY HOAG LLP
1301 Ave. of the Americas, 25th Floor
New York, NY 10019
Tel.: (212) 812-0400
ncshaw@foleyhoag.com
jgross@foleyhoag.com

*Attorneys for Plaintiff-Appellee Power
Forward Communities*

/s/ *David J. Zimmer*
David J. Zimmer
  *Counsel of Record*
ZIMMER, CITRON & CLARKE LLP
130 Bishop Allen Drive
Cambridge, MA 02139
Tel.: (617) 676-9421
dzimmer@zimmercitronclarke.com

Eric F. Citron
Kathleen Foley
ZIMMER, CITRON & CLARKE LLP
1629 K. St. NW, Suite 300
Washington, D.C. 20006
Tel.: (202) 796-4540
ecitron@zimmercitronclarke.com
kfoley@zimmercitronclarke.com

*Attorneys for Plaintiff-Appellee Justice
Climate Fund*

Allison N. Douglis
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
Tel.: (212) 891-1600
Fax: (212) 891-1699
adouglis@jenner.com

*Attorneys for Plaintiff-Appellee
Climate United Fund*

/s/ *Jay C. Johnson*
Jay C. Johnson
  *Counsel of Record*
VENABLE LLP
600 Massachusetts Ave., NW
Washington, DC 20001
Tel.: (202) 344-4000
jcjohnson@venable.com

*Attorney for Plaintiff-Appellee Inclusiv,
Inc.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(B), I hereby certify that the preceding motion complies with the type-volume limitation of the rules, containing 12,995 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f). I further certify that the document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365, in 14-point Times New Roman font.

*/s/ Vincent Levy*

## CERTIFICATE OF SERVICE

I hereby certify that on February 2, 2026, I caused this document to be filed through the ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Vincent Levy*