EN BANC ORAL ARGUMENT SCHEDULED FOR FEBRUARY 24, 2026
No. 25-5122

---

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

CLIMATE UNITED FUND, *et al.*,

*Plaintiffs-Appellees*,

v.

CITIBANK, N.A., *et al.*,

*Defendants-Appellants*.

---

*On Appeal from the United States District Court
for the District of Columbia*

---

### BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER
### AS *AMICUS CURIAE* IN SUPPORT OF APPELLEES AND AFFIRMANCE

---

Elizabeth B. Wydra
Brianne J. Gorod
Brian R. Frazelle
Miriam Becker-Cohen
Nina Henry
CONSTITUTIONAL
  ACCOUNTABILITY CENTER
1730 Rhode Island Ave. NW
Suite 1200
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

## STATEMENT REGARDING CONSENT TO FILE
## AND SEPARATE BRIEFING

Pursuant to D.C. Circuit Rule 29(b), undersigned counsel for *amicus curiae* represents that counsel for all Plaintiffs-Appellees and the EPA have consented to the filing of this brief.  Counsel for Citibank takes no position, and a motion for leave to file therefore accompanies this brief.[1]

Pursuant to D.C. Circuit Rule 29(d), undersigned counsel for *amicus curiae* certifies that a separate brief is necessary.  *Amicus* is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history.  CAC works in our courts, through our government, and with legal scholars to improve understanding of the Constitution and to protect the rights, freedoms, and structural safeguards that our nation's charter guarantees.  CAC has filed *amicus* briefs in multiple cases about the Constitution's separation of powers, including on the issue of whether *Dalton v. Specter* requires treating certain separation-of-powers claims as purely statutory claims, and has accordingly developed expertise in the relevant constitutional text and history.

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amicus curiae* or its counsel made a monetary contribution to its preparation or submission.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

## CERTIFICATE AS TO PARTIES, RULINGS,
## AND RELATED CASES

I.     PARTIES AND *AMICUS*

Except for *amicus* Constitutional Accountability Center and any other *amici* who had not yet entered an appearance in this case as of the filing of Appellees' briefs, all parties, intervenors, and *amici* appearing in this Court are listed in Appellees' briefs.

II.    RULINGS UNDER REVIEW

Reference to the ruling under review appears in the EPA's En Banc Opening Brief.

III.   RELATED CASES

There are no related cases.

Dated:  February 9, 2026                              /s/ Brianne J. Gorod
                                                     Brianne J. Gorod

                                                     *Counsel for Amicus Curiae*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ v

GLOSSARY ...................................................................................... x

INTEREST OF *AMICUS CURIAE* ................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................. 1

ARGUMENT ..................................................................................... 8

I.    The Constitution's Separation of Powers Prohibits the President from Unilaterally Withholding Appropriated Funds Based on Disagreement with Congressional Policy ........................................... 8

    A. The Text, Structure, and History of the Appropriations and Spending Clauses Demonstrate Congress's Exclusive Power of the Purse ................................................................................ 9

    B. All Three Branches of Government Have Consistently Interpreted the Constitution as Barring the Executive Branch from Withholding Appropriated Funds Based on Disagreement with Congressional Policy ................................. 13

II.    Plaintiff's Separation-of-Powers Claim Is Reviewable Under *Dalton v. Specter* ......................................................................... 17

    A. The EPA Misinterprets *Dalton v. Specter* ............................... 17

    B. This Court Should Reject the Broad Reading of *Global Health Council* Advanced by the EPA or Overrule that Decision ...................................................................................... 21

    C. Plaintiffs' Separation-of-Powers Claim Is Premised on the EPA's Decision to Abolish a Mandatory Grant Program ........ 24

III.   A Proper Reading of *Dalton* Will Not Open the Floodgates to Statutory Claims Disguised as Constitutional Ones ........................... 26

CONCLUSION ................................................................................. 29

iv

# TABLE OF AUTHORITIES

**Page(s)**

<u>Cases</u>

*Am Forest Res. Council v. United States*,
    77 F.4th 787 (D.C. Cir. 2023) .................................................................... 27

*Campaign Clean Water, Inc. v. Ruckelshaus*,
    361 F. Supp. 689 (E.D. Va. 1973)............................................................. 15

*CFPB v. Cmty. Fin. Servs. Ass'n of Am.*,
    601 U.S. 416 (2024) .............................................................................. 2, 9

*Chamber of Com. of U.S. v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996) ................................................................ 27

*City & County of San Francisco v. Trump*,
    897 F.3d 1225 (9th Cir. 2018)................................................................. 12

*City of New Haven v. United States*,
    809 F.2d 900 (D.C. Cir. 1987) ................................................................ 14

*Climate United Fund v. Citibank, N.A.*,
    154 F.4th 809 (D.C. Cir. 2025)............................................................... 26

*Clinton v. City of New York*,
    524 U.S. 417 (1998)............................................................................ 3, 16

*Cmty. Action Programs Exec. Dirs. Ass'n of N.J. v. Ash*,
    365 F. Supp. 1355 (D.N.J. 1973) ............................................................ 15

*Dakota Cent. Tele. Co. v. South Dakota ex rel. Payne*,
    250 U.S. 163 (1919) ................................................................................. 5

*Dalton v. Specter*,
    511 U.S. 462 (1994)............................................ 1, 2, 4-7, 18, 19, 22, 23, 27

*Dames & Moore v. Regan*,
    453 U.S. 654 (1981) ............................................................................... 20

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Eagle County v. Surface Transp. Bd.*,
    82 F.4th 1152 (D.C. Cir. 2023) ............................................... 28

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ................................................................. 20, 21

*Global Health Council v. Trump*,
    153 F.4th 1 (D.C. Cir. 2025) ........................................... 2, 4, 7, 21-23

*Guadamuz v. Ash*,
    368 F. Supp. 1233 (D.D.C. 1973) ........................................... 15

*Harrington v. Bush*,
    553 F.2d 190 (D.C. Cir. 1977) ................................................ 8

*In re Aiken County*,
    725 F.3d 225 (D.C. Cir. 2013) ..................................... 3, 6, 12, 17, 23

*Kendall v. United States ex rel. Stokes*,
    37 U.S. 524 (1838) ................................................................. 3, 15

*Louisiana ex rel. Guste v. Brinegar*,
    388 F. Supp. 1319 (D.D.C. 1975) ........................................... 15

*Motions Systems Corp. v. Bush*,
    437 F.3d 1356 (Fed. Cir. 2006) ............................................... 27, 28

*Nat'l Treasury Emps. Union v. Vought*,
    149 F.4th 762 (D.C. Cir. 2025) ............................................... 22
    No. 25-5091, 2025 WL 3659406 (D.C. Cir. Dec. 17, 2025) ................ 22

*OPM v. Richmond*,
    496 U.S. 414 (1990) ............................................................... 13

*Pennsylvania v. Weinberger*,
    367 F. Supp. 1378 (D.D.C. 1973) ........................................... 15

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Seven Cnty. Infrastructure Coal. v. Eagle County*,
  605 U.S. 168 (2025) .................................................................. 28

*Sierra Club v. Trump*,
  929 F.3d 670 (9th Cir. 2019) ..................................................... 6

*Train v. City of New York*,
  420 U.S. 35 (1975) .................................................................. 16

*United States v. McIntosh*,
  833 F.3d 1163 (9th Cir. 2016) ............................................. 11, 24

*U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*,
  665 F.3d 1339 (D.C. Cir. 2012) .................................................. 8

*U.S. House of Representatives v. Mnuchin*,
  976 F.3d 1 (D.C. Cir. 2020) ..................................................... 11

*Widakuswara v. Lake*,
  No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025) ................... 12
  2025 WL 1521355 (D.C. Cir. May 28, 2025)........................................ 12

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ......................................................... 6, 19, 20


Constitutional Provisions

Articles of Confederation of 1781, art. IX, para. 6 .................................... 10

Del. Const. of 1776, art. VII ........................................................... 10

Mass. Const. of 1780, ch. 2, § 1, art. XI ............................................. 10

U.S. Const. art. I, §8, cl. 1 ......................................................... 2, 10

U.S. Const. art. I, §9, cl. 7 ..................................................... 2, 11, 23

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

Statutes and Legislative Materials

120 Cong. Rec. (1974) ................................................................. 14

Impoundment Control Act of 1974, Pub. L. No. 93-344, 88 Stat. 297 ...... 13

S. Rep. No. 93-688 (1974) ........................................................... 14

2 U.S.C. § 683 ............................................................................ 13, 14

2 U.S.C. § 684 ............................................................................ 13, 14

42 U.S.C. § 7434 ........................................................................ 24


Books, Articles, and Other Authorities

Josh Chafetz, *Congress's Constitution: Legislative Authority and the Separation of Powers* (2017) ................................................. 11

*The Debates in the Several State Conventions on the Adoption of the Federal Constitution* (Jonathan Elliot ed., 1836) ................................. 1, 11

Exec. Order No. 14,154, 90 Fed. Reg. 8353 (Jan. 29, 2025) ..................... 24

*The Federalist No. 30* (Clinton Rossiter ed., 1961) ................................... 2, 10

*The Federalist No. 78* (Clinton Rossiter ed., 1961) ................................... 10

Paul F. Figley & Jay Tidmarsh, *The Appropriations Power and Sovereign Immunity*, 107 Mich. L. Rev. 1207 (2009) ........................... 9

Alexander Hamilton, *Report on the Subject of Manufactures* (1791) ........ 10

F.W. Maitland, *The Constitutional History of England* (1908) .................. 9

*The President's Veto Power*, 12 Op. O.L.C. 128 (1988) .......................... 17

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

*The Records of the Federal Convention of 1787* (Max Farrand ed., 1911)............................................................... 10

John G. Roberts, Jr., *Memorandum for Fred F. Fielding Re: Impoundment Authority* (Aug. 15, 1985)................................ 17

Joseph Story, *Commentaries on the Constitution of the United States* (1833) ..................................................... 12

*Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools*, 1 Supp. Op. O.L.C. 303 (1969)................ 3, 16

# GLOSSARY

APA          Administrative Procedure Act

CAC         Constitutional Accountability Center

CFPB       Consumer Financial Protection Bureau

EPA         Environmental Protection Agency

ICA          Impoundment Control Act of 1974

IRA          Inflation Reduction Act

NEPA       National Environmental Policy Act

OLC         Office of Legal Counsel

x

## INTEREST OF *AMICUS CURIAE*

Constitutional Accountability Center (CAC) is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history. CAC works to improve understanding of the Constitution and preserve the rights, freedoms, and structural safeguards that it guarantees, and accordingly has an interest in this case.

## INTRODUCTION
## AND SUMMARY OF ARGUMENT

The EPA's argument in this case—that presidential usurpation of Congress's appropriations and spending powers raises no problem of constitutional dimension—would have astonished the founding generation. To the Framers of our Constitution, perhaps no tenet was more central to the preservation of liberty than the need to separate the powers of the sword and the purse. As Alexander Hamilton put it, "neither one nor the other shall have both, because this would destroy that division of powers on which political liberty is founded, and would furnish one body with all the means of tyranny." 2 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 348-49 (Jonathan Elliot ed., 1836).

The EPA asks this Court to reduce this constitutional pillar to an empty promise by endorsing a fundamental misunderstanding of the Supreme Court's decision in *Dalton v. Specter*, 511 U.S. 462 (1994). Although the Court in *Dalton* explained that "*all* executive actions in excess of statutory authority" are not "*ipso*

1

*facto* unconstitutional," *id.* at 472 (emphasis added), the Court never suggested that *no* presidential "violat[ion] [of] a statutory mandate" may *ever* give rise to an actionable "separation-of-powers claim," EPA Br. 45. To the extent the divided panel decision in *Global Health Council v. Trump*, 153 F.4th 1 (D.C. Cir. 2025), could be read to support that erroneous interpretation of *Dalton*, this Court should dispel that notion.

**I.** The choice to vest Congress with control over appropriations and spending was "uncontroversial" at the Founding, *CFPB v. Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. 416, 431 (2024), a consensus reflecting centuries of struggle in England for legislative supremacy over fiscal matters. When the Framers gathered to draft the new Constitution, there was no question that the authority to spend and appropriate funds would be given to Congress. Indeed, Congress's "Power … to pay the Debts and provide for the common Defence and general Welfare of the United States," U.S. Const. art. I, § 8, cl. 1, was deemed "indispensable" to the federal government's ability to do its job, *The Federalist No. 30*, at 188 (Alexander Hamilton) (Clinton Rossiter ed., 1961). At the same time, the Appropriations Clause evinced a clear limitation on executive authority: "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7.

Both the Supreme Court and this Court have recognized that these provisions, coupled with structural separation-of-powers principles, mean the executive has no

constitutional power to "spend less than the full amount appropriated by Congress for a particular project or program" for "policy reasons." *In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.).  The Supreme Court first made this clear in 1838, unanimously rejecting the authority of the Postmaster General to withhold appropriated funding for a contract he claimed was tainted by political favoritism. *Kendall v. United States ex rel. Stokes*, 37 U.S. 524 (1838).  The issue came to a head again during the 1970s when "President Nixon, the Mahatma Gandhi of all impounders, asserted … that his constitutional right to impound appropriated funds was absolutely clear." *Clinton v. City of New York*, 524 U.S. 417, 468 (1998) (Scalia, J., concurring in part and dissenting in part) (quotation marks omitted).  A slew of decisions "proved him wrong." *Id.*

Both Congress and the executive branch have expressed the same view— Congress through passage of the Impoundment Control Act of 1974 (ICA) and the executive branch through a series of authoritative memoranda.  As future Chief Justice Rehnquist put it while heading the Department of Justice's Office of Legal Counsel (OLC), it is "extremely difficult to formulate a constitutional theory to justify a refusal by the President to comply with a congressional directive to spend." *Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools*, 1 Supp. Op. O.L.C. 303, 310 (1969) ["Rehnquist Memo"].

**II.**  Rather than engage with these constitutional principles, the EPA asserts without justification that this Court should apply *Dalton* to conclude that any "claim challenging an agency's decisions regarding the expenditure of federal funds" should be considered a mere "statutory claim."  EPA Br. 45 (citing *Global Health Council*, 153 F.4th at 13-17).  That is wrong.

In *Dalton*, the Supreme Court grappled with a claim that the President had exceeded his statutorily delegated discretion in closing a naval shipyard.  In concluding that the statute granted unbridled discretion to the President and rejecting the plaintiffs' separation-of-powers claim, the Court clarified that "*all* executive actions in excess of statutory authority" are not "*ipso facto* unconstitutional." *Dalton*, 511 U.S. at 472 (emphasis added).

The EPA would read that language to mean that *no* executive action in excess of statutory authority is *ever* unconstitutional.  But that is not what *Dalton* says. Indeed, *Dalton* makes clear that certain executive actions in excess of statutory authority *do* give rise to actionable constitutional claims, including when the President "act[s] in violation of the Constitution," *id.* at 474, by exercising a power not delegated to him, or one expressly delegated to another branch, *id.* at 473.  In such instances, there is "a want of [Presidential] power," as opposed to "a mere excess or abuse of discretion in exerting a power given."  *Id.* at 474 (alteration in

original) (quoting *Dakota Cent. Tele. Co. v. South Dakota ex rel. Payne*, 250 U.S. 163, 184 (1919)).

To be sure, this understanding of *Dalton* is in substantial tension with the EPA's urged interpretation of the splintered panel decision in *Global Health Council*. The EPA reads *Global Health Council* to stand for the sweeping proposition that, under *Dalton*, whenever a President or his lawyers invoke a federal law to defend executive actions, the question of whether those actions also violate the Constitution falls away. If this Court agrees that the EPA's sweeping interpretation of *Global Health Council* is the proper reading of that decision, it should overrule it.

Otherwise, this Court should make clear that *Global Health Council* ultimately rested on the panel's perception that the plaintiffs' separation-of-powers claim there was fundamentally a claim that the President was exceeding some discretionary impoundment authority delegated by the ICA. Although that construction of the ICA was mistaken, it rendered the panel's analogy to *Dalton* more apt. And under this view, *Global Health Council* simply reaffirmed *Dalton*'s modest proposition: a claim that the President engaged in an "abuse of discretion in exerting a power given" to him by statute does not necessarily give rise to a separation-of-powers claim. *Dalton*, 511 U.S. at 474 (quotation marks omitted).

That narrower reading of *Global Health Council* not only brings this Court's case law into alignment with Supreme Court precedent, but it also renders the instant case readily distinguishable.    Here Plaintiffs do not "simply alleg[e] that the President has exceeded his statutory authority," *Dalton*, 511 U.S. at 473, by acting beyond the bounds of his delegated discretion.    After all, as the district court correctly found, the relevant statute here—the Inflation Reduction Act (IRA)—grants *no* discretion with respect to the grant programs at issue in this case: Congress "laid out specific directives—not mere suggestions—as to what EPA could do with the money, and it provided specific deadlines and specific requirements." JA995.

Thus, the thrust of Plaintiffs' separation-of-powers claim is that by unilaterally abolishing a mandatory grant program for which Congress appropriated funding, the President intentionally subverted congressional policy, not merely exceeded the scope of some delegated discretion.    In so doing, he arrogated a power that belongs exclusively to Congress—the power of the purse—without any statutory or constitutional authorization.    That makes this case like *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), the archetypal separation-of-powers case, and makes Plaintiffs' claim "fundamentally a constitutional one," *Sierra Club v. Trump*, 929 F.3d 670, 696-97 (9th Cir. 2019); *see Aiken County*, 725 F.3d at 260 (holding that "where … appropriated money is available for an agency

to perform a statutorily mandated activity," failure to fulfill "that statutory mandate" gives rise to an actionable separation-of-powers claim).

**III.** If endorsed by this Court, the EPA's reading of *Dalton* would have staggering implications. The President could escape liability for a constitutional claim simply by pointing to some statutory provision that dubiously authorized his conduct. Worse still, executive branch defendants could transform a plaintiff's allegation of statutory violations into a defense to any constitutional claim arising out of the same course of conduct. The resulting rule would be that a plaintiff may bring an actionable separation-of-powers claim only if he or she alleges that the President violated the Constitution without engaging in any arguable statutory violation. Perversely, engaging in statutory violations would give executive branch defendants a get-out-of-jail-free card on any separation-of-powers claim.

That scenario is what should give this Court pause—not *the Global Health Council* panel's concern that allowing constitutional claims to proceed will incentivize plaintiffs to "avoid statutory limits on review by reframing any alleged statutory violation by the President as a constitutional one." *Global Health Council*, 153 F.4th at 14. *Dalton* itself ensures that a claim that the President merely acted "in excess" of statutorily delegated discretion, 511 U.S. at 473—without also violating the Constitution—may not be recast as a constitutional claim. That restriction applies to a vast array of challenges to agency actions, from arbitrary-and-

7

capricious review under the Administrative Procedure Act (APA) to petitions for review of agency decisions under the National Environmental Policy Act (NEPA). But it does not allow executive branch officials to avoid answering to separation-of-powers allegations whenever their actions violate both the Constitution *and* a statute. This Court should affirm.

## ARGUMENT

I.    **The Constitution's Separation of Powers Prohibits the President from Unilaterally Withholding Appropriated Funds Based on Disagreement with Congressional Policy.**

Under the Constitution, the power of the purse is "exclusive" to Congress, *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (Kavanaugh, J.), which "has absolute control of the moneys of the United States," *Harrington v. Bush*, 553 F.2d 190, 194 n.7 (D.C. Cir. 1977).  Plaintiffs' separation-of-powers claim seeks to enforce that principle.  It challenges the executive branch's unilateral abolishment of a grant program implementing a mandatory appropriation, in contravention of constitutional text, structure, and history, as well as longstanding interpretations of that text, structure, and history by all three branches of government.

8

A.    **The Text, Structure, and History of the Appropriations and Spending Clauses Demonstrate Congress's Exclusive Power of the Purse.**

"By the time of the Constitutional Convention, the principle of legislative supremacy over fiscal matters engendered little debate and created no disagreement," as the Founders were intimately familiar with the struggles in England over the purse strings and sought to avoid a repeat of that saga. *CFPB*, 601 U.S. at 427-31. In the seventeenth century, British kings used their royal prerogatives to tax and spend without the approval of Parliament, *see id.*, antagonizing the legislature and blurring the distinction between the monarch's pocket money and the national treasury, F.W. Maitland, *The Constitutional History of England* 431-33 (1908). After the Glorious Revolution, royal attempts to seize the purse were finally squelched. *See, e.g.*, *id.* at 433 ("Since the Revolution the practice has [been,] … in granting money to the crown, parliament has appropriated the supply to particular purposes more or less narrowly defined."); Paul F. Figley & Jay Tidmarsh, *The Appropriations Power and Sovereign Immunity*, 107 Mich. L. Rev. 1207, 1229 (2009) (describing Parliament's elimination of the King's prerogative to determine how the "civil list"—the domestic budget—would be spent).

In "defining the Executive powers" of the new federal government, the American Founders firmly rejected the historic "Prerogatives of the British

Monarch."  1 *The Records of the Federal Convention of 1787*, at 65 (Max Farrand ed., 1911) (James Wilson).  Indeed, almost every state constitution vested spending and appropriations authority in a legislative body.  *See, e.g.*, Del. Const. of 1776, art. VII; Mass. Const. of 1780, ch. 2, § 1, art. XI.  Even the Articles of Confederation, despite leaving the federal government without the power to raise revenue through taxation, granted the appropriations power to the Confederation Congress.  Articles of Confederation of 1781, art. IX, para. 6.

Against that backdrop, when the Framers drafted the Constitution, there was no question that Congress would be granted the exclusive powers to raise, spend, and appropriate funds.  Congress's authority "to pay the Debts and provide for the common Defence and general Welfare of the United States," U.S. Const. art. I, § 8, cl. 1, was deemed "indispensable" to the federal government's ability to do its job, *The Federalist No. 30*, *supra*, at 188 (Alexander Hamilton).  The language of this clause was as "comprehensive as any that could have been used," Alexander Hamilton, *Report on the Subject of Manufactures* 54 (1791), and the Founders were resolute in their conviction that such sweeping power should be granted to the people's representatives in Congress—the branch that "not only commands the purse but prescribes the rules by which the duties and rights of every citizen are to be regulated," *The Federalist No. 78*, *supra*, at 465 (Alexander Hamilton).

10

At the same time that they empowered Congress, the Framers limited executive authority over finances: "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. Because the Appropriations Clause "is phrased as a limitation, it means that 'the expenditure [of] public funds is proper only when authorized by Congress, not that public funds may be expended unless prohibited by Congress.'" *U.S. House of Representatives v. Mnuchin*, 976 F.3d 1, 8 (D.C. Cir. 2020) (quotation marks omitted). In this manner, "[t]he Appropriations Clause plays a critical role in the Constitution's separation of powers among the three branches of government and the checks and balances between them." *United States v. McIntosh*, 833 F.3d 1163, 1175 (9th Cir. 2016).

Indeed, the Clause's simple command was repeatedly invoked during the ratification debates to assuage "Anti-Federalist fears of a tyrannical president." Josh Chafetz, *Congress's Constitution: Legislative Authority and the Separation of Powers* 57 (2017). As Charles Pinckney put it, "[w]ith this powerful influence of the purse, [Congress] will be always able to restrain the usurpations of the other departments." 4 *Debates in the Several State Conventions*, *supra*, at 330. Or in Edmund Randolph's words, the President "can handle no part of the public money except what is given him by law." 3 *id.* at 201; *see also, e.g.*, 2 *id.* at 349 (Alexander Hamilton); 3 *id.* at 17 (George Nicholas); 3 *id.* at 201 (James Madison). These

11

statements reflect the fundamental rule embodied in the Appropriations Clause: the President has no power over federal funds except that which is delegated by statute.

A critical corollary to this rule is that the President has no constitutional authority to, for "policy reasons," "spend less than the full amount appropriated by Congress for a particular project or program." *Aiken County*, 725 F.3d at 261 n.1. Such authority would give the President, not Congress, the ultimate "power to decide[] how and when any money should be applied for these purposes." 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1342, at 213 (1833). And the President's duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, further prohibits the executive branch from "redistribut[ing] or withhold[ing] properly appropriated funds in order to effectuate its own policy goals." *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018). Failure to execute appropriations laws in accordance with their terms thus amounts to the "effective[] repeal[]" of those laws in violation of "the separation of powers, the Presentment Clause, the Appropriations Clause, the Spending Clause, and the Take Care Clause." *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *12 (D.C. Cir. May 3, 2025) (Pillard, J., dissenting); *see Widakuswara v. Lake*, No. 25-5144, 2025 WL 1521355, at *1 (D.C. Cir. May 28, 2025) (en banc) (vacating panel decision "substantially for the reasons explained by Judge Pillard").

This constitutional text and history belies the EPA's assertion that "[t]his case does not implicate the Appropriations Clause" because that Clause merely "operates to prohibit the expenditure of funds without an appropriation rather than as a mandate to expend certain funds," EPA Br. 45.  Rather, "the Clause has a more fundamental and comprehensive purpose[:] … to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good."  *OPM v. Richmond*, 496 U.S. 414, 427-28 (1990).  Read in context and against the backdrop of its critical history, the Appropriations Clause, along with the Spending Clause and structural separation-of-powers principles, prohibits the executive branch from abolishing a mandatory grant program for which Congress appropriated funding.

> **B.    All Three Branches of Government Have Consistently Interpreted the Constitution as Barring the Executive Branch from Withholding Appropriated Funds Based on Disagreement with Congressional Policy.**

**1.**    Congress manifested its understanding that the President may not unilaterally withhold appropriated funds through enactment of the ICA in 1974, Pub. L. No. 93-344, tit. X, 88 Stat. 297, 332.  Passed in the wake of President Nixon's attempt to cut billions of dollars from federal programs he disfavored, the Act prohibited the President from deferring or rescinding appropriated funds without sending a "special message" to Congress justifying the decision.  2 U.S.C. §§ 683-

84.  Deferrals may not be made for policy reasons, *id.* § 684(b), and rescissions must be approved by Congress, *id.* § 683.

Notably, although the Act's procedures facilitating communication between the executive branch and Congress were new, its basic principles were merely a "reassert[ion]" of Congress's "control over the budgetary process" under longstanding separation-of-powers principles.  *City of New Haven v. United States*, 809 F.2d 900, 906 (D.C. Cir. 1987).  The ICA codified the constitutional rule that the President may not withhold appropriated funds without congressional approval. *See, e.g.*, S. Rep. No. 93-688, at 73-74 (1974) (cataloging pre-ICA cases rejecting impoundments as unconstitutional, and explaining that the ICA is "consistent" with them in its rejection of the idea that federal funds can be withheld "for fiscal policy purposes").  As one Representative put it, the ICA would "return to the Congress the basic powers of budgeting that were originally intended by the Founding Fathers in the Constitution."  120 Cong. Rec. 19668 (1974) (statement of Rep. Albert Ullman); *see also, e.g.*, *id.* at 20464 (statement of Sen. Samuel Ervin, Jr.).

**2.**    Federal courts have also consistently construed the Constitution's separation of powers as barring the executive branch from unilaterally withholding appropriated funds.  In *Kendall*, the Supreme Court unanimously rejected the Postmaster General's claim that he could withhold money that Congress had required him to spend.  The Justices balked at the Attorney General's defense that

14

the President possessed some inherent constitutional authority to rescind appropriated funds, which he had in turn delegated to the Postmaster General, remarking that "[t]o contend that the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the constitution, and entirely inadmissible." *Kendall*, 37 U.S. at 613. Sanctioning such a theory would be, according to the Court, "asserting a principle, which, if carried out in its results, to all cases falling within it, would be clothing the President with a power entirely to control the legislation of congress." *Id.*

Prior to the passage of the ICA, many of Nixon's impoundments were also tested in courts across the country, where the administration argued it had "'inherent power' to impound congressionally appropriated funds." *Guadamuz v. Ash*, 368 F. Supp. 1233, 1243 (D.D.C. 1973). This claim was rejected. Court after court held that the Appropriations Clause, Spending Clause, and structural separation-of-powers principles bar the executive from "refus[ing] to spend … appropriations." *Id.* at 1244; *see, e.g.*, *Louisiana ex rel. Guste v. Brinegar*, 388 F. Supp. 1319, 1324-25 (D.D.C. 1975); *Pennsylvania v. Weinberger*, 367 F. Supp. 1378, 1381 (D.D.C. 1973); *Campaign Clean Water, Inc. v. Ruckelshaus*, 361 F. Supp. 689, 696 (E.D. Va. 1973); *Cmty. Action Programs Exec. Dirs. Ass'n of N.J. v. Ash*, 365 F. Supp. 1355, 1360 (D.N.J. 1973).

15

By the time one of these cases made it to the Supreme Court, the Nixon administration had abandoned its constitutional argument. *See Train v. City of New York*, 420 U.S. 35, 42-49 (1975).  As Justice Scalia later summarized it, "our decision … in *Train* … proved [President Nixon] wrong" in his claim to a "constitutional right to impound appropriated funds."  *Clinton*, 524 U.S. at 468 (Scalia, J., concurring in part and dissenting in part) (quotation marks omitted).

**3.**  Even the executive branch has acknowledged that the Constitution does not permit it to withhold appropriated funds in furtherance of the President's policy preferences.  Future Chief Justice Rehnquist, writing in 1969 as the head of OLC, explained that "[w]ith respect to the suggestion that the President has a constitutional power to decline to spend appropriated funds, we must conclude that existence of such a broad power is supported by neither reason nor precedent."  Rehnquist Memo 309.  Rehnquist wrote that although "[i]t may be argued that the spending of money is inherently an executive function, … the execution of any law is, by definition, an executive function, and it seems an anomalous proposition that because the Executive branch is bound to execute the laws, it is free to decline to execute them." *Id.* at 310.

Fifteen years later, future Chief Justice Roberts reached a similar conclusion for the Reagan administration Office of White House Counsel.  He wrote a memo seeking to "dampen any hopes that inherent constitutional impoundment authority

16

may be invoked to achieve budget goals," warning that "[o]ur institutional vigilance with respect to the constitutional prerogatives of the presidency requires appropriate deference to the constitutional prerogatives of the other branches, and no area seems more clearly the province of Congress than the power of the purse." John G. Roberts, Jr., *Memorandum for Fred F. Fielding Re: Impoundment Authority* 1 (Aug. 15, 1985). The Reagan administration OLC later adopted Roberts's position in an advisory opinion. *See The President's Veto Power*, 12 Op. O.L.C. 128, 167 (1988).

## II. Plaintiffs' Separation-of-Powers Claim Is Reviewable Under *Dalton v. Specter*.

As the above discussion makes clear, the Constitution's text, structure, and history all demonstrate that the executive branch has no power to claw back appropriated funds in furtherance of the President's policy agenda. These are "settled, bedrock principles of constitutional law." *Aiken County*, 725 F.3d at 259. And they are the core of Plaintiffs' separation-of-powers claim. The EPA's assertion that Plaintiffs do not assert a proper constitutional claim simply because the executive branch's actions *also* violated the IRA misconstrues both *Dalton v. Specter* and the nature of Plaintiffs' constitutional claims.

### A. The EPA Misinterprets *Dalton v. Specter*.

In *Dalton v. Specter*, a group of plaintiffs challenged the President's decision to close a naval shipyard pursuant to a 1990 statute governing base closures, asserting that the President "violated the terms of the [governing statute] by

17

accepting procedurally flawed recommendations" from other executive branch officials regarding the shipyard's closure. 511 U.S. at 474. The Court rejected the plaintiffs' effort to convert this alleged statutory violation into a constitutional violation. It reasoned that the plaintiffs' constitutional claim was really just a challenge to the President's "exercise [of] discretion Congress ha[d] granted him" through the governing law. *Id.* at 476. And critically, that law did "not *at all* limit the President's discretion." *Id.* (emphasis added).

In rejecting the plaintiffs' separation-of-powers claim, the Supreme Court corrected a misperception by the court below: "[o]ur cases do not support the proposition that *every* action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id.* at 472 (emphasis added). The Court noted that its prior decisions would not have distinguished between statutory and constitutional claims "[i]f *all* executive actions in excess of statutory authority were *ipso facto* unconstitutional." *Id.* (emphasis added). But the Court never suggested that *no* action by the President in excess of his statutory authority may *ever* violate the Constitution. And the Court's repeated inclusion of "*ipso facto*" and "necessarily" in its formulations demonstrates that this was intentional.

Indeed, *Dalton* makes clear that some executive actions in excess of statutory authority *do* give rise to actionable constitutional claims, including whenever the

President "act[s] in violation of the Constitution," *id.* at 474, such as when he exercises a power not delegated to him, or one expressly delegated to another branch, *id.* at 473. In such instances, there is "a want of [Presidential] power," as opposed to "a mere excess or abuse of discretion in exerting a power given." *Id.* at 474 (quotation marks omitted).

Of course, a "want of [Presidential] power," *id.*, may exist when the President violates both the Constitution *and* a statute. The President's authority to act "must stem either from an act of Congress or from the Constitution itself," *Youngstown*, 343 U.S. at 585, so it is hardly surprising that separation-of-powers claims challenging executive actions often require inquiry into statutory provisions to ascertain whether they authorize or foreclose those actions.

To be sure, *Youngstown* was the rare case in which "no statutory authority was claimed" by the executive, as the Court noted in *Dalton*. *Dalton*, 511 U.S. at 473. Rather, the President claimed only constitutional authority to seize the country's steel mills in the face of a nationwide strike. *Youngstown*, 343 U.S. at 585-86. Given the conceded absence of any statutory authority in *Youngstown*, that decision of course does not stand for the proposition "that an action taken by the President in excess of his statutory authority *necessarily* violates the Constitution." *Dalton*, 511 U.S. at 473 (emphasis added).

At the same time, *Youngstown* explicitly contemplated courts' adjudication of separation-of-powers claims alongside analysis of statutory violations arising out of the same set of facts. Indeed, in his famous *Youngstown* concurrence, Justice Jackson analyzed the text of several federal condemnation statutes and concluded that their policies were inconsistent with President Truman's seizure of the steel mills, putting the President's power at its lowest ebb. *Youngstown*, 343 U.S. at 639-40 (Jackson, J., concurring).

Since *Youngstown*, the Supreme Court has confirmed that allegations of statutory violations do not foreclose review of separation-of-powers claims. For instance, in *Dames & Moore v. Regan*, 453 U.S. 654 (1981), the Court resolved the merits of a claim that the President and the Treasury Secretary went "beyond their statutory and constitutional powers." *Id.* at 667. Unlike in *Youngstown*, in *Dames & Moore* the President "purported to act under authority of" two federal statutes, *id.* at 675, which the Court had to interpret to resolve the separation-of-powers claim, *id.* at 670-74. The presence of the statutory dispute did not, however, nullify the plaintiffs' freestanding constitutional claim. *Id.* at 674.

Likewise, in *Franklin v. Massachusetts*, 505 U.S. 788 (1992), the plaintiffs challenged the executive branch's method of counting overseas federal employees for the census, bringing claims "under both the APA and the Constitution." *Id.* at 796. The Court held that the APA claims were not viable, *id.* at 796-801, but also

20

made explicit that this "d[id] not dispose of [the plaintiffs'] constitutional claims," *id.* at 801. Although the executive branch relied entirely on statutory authority, *id.* at 791-94, the Court resolved "[o]n the merits" the plaintiffs' claim "that the Secretary [of Commerce]'s allocation of overseas federal employees … violated the command of Article I, § 2, cl. 3." *Id.* at 803. *Dalton* did not silently overrule these cases.

**B.      This Court Should Reject the Broad Reading of *Global Health Council* Advanced by the EPA or Overrule that Decision.**

The panel's divided decision in *Global Health Council*—at least broadly interpreted—is in substantial tension with these Supreme Court precedents. That case involved a separation-of-powers claim alleging that the President had usurped Congress's spending and appropriations authority through the impoundment of foreign aid funds, and the panel majority held that *Dalton* barred that claim. *See Global Health Council*, 153 F.4th at 14-17.

The EPA reads *Global Health Council* to stand for the unprecedented proposition that *Dalton* forecloses private parties from bringing a constitutional claim whenever their constitutional argument overlaps with a claim that the President violated or exceeded his statutory authority. *See* EPA Br. 45. Yet despite the panel's sweeping rhetoric in *Global Health Council*, that decision ultimately rested upon the panel's perception that the ICA delegated some discretionary impoundment authority to the President that the plaintiffs, as part of their separation-

21

of-powers claim, were alleging he exceeded.  *See Global Health Council*, 153 F.4th at 16.  Put another way, the panel viewed the plaintiffs' constitutional claim in *Global Health Council* as predicated on the idea that the President was exceeding discretion delegated by the ICA, making the case akin to *Dalton*.  *See Nat'l Treasury Emps. Union v. Vought*, 149 F.4th 762, 821 (D.C. Cir. 2025) (Pillard, J., dissenting) (stating that in *Global Health Council*, the ICA "directly contemplated the presidential action under consideration"), *reh'g en banc granted, opinion vacated*, No. 25-5091, 2025 WL 3659406 (D.C. Cir. Dec. 17, 2025).  Though that interpretation of the ICA was wrong, it rendered the panel's analogy to *Dalton* more apt.  Under that view, *Global Health Council* simply reaffirmed *Dalton*'s modest proposition: that a claim alleging the President's "abuse of discretion in exerting a power given" to him by Congress does not necessarily give rise to a separation-of-powers claim.  *Dalton*, 511 U.S. at 474 (quotation marks omitted).

Here, however, the EPA relies on a much broader reading of *Global Health Council* to assert error by the district court.  The EPA does not appear to argue that Plaintiffs' separation-of-powers claim is foreclosed by a statutory delegation of discretion.  Rather, it asserts that whenever the President "violate[s] a statutory *mandate*," EPA Br. 45 (emphasis added), his actions cannot give rise to a separation-of-powers claim.  This boils down to a rule that a plaintiff may only bring a constitutional claim if the President violates the Constitution without engaging in

any arguable statutory violation. No court has ever endorsed such a proposition, and with good reason. As the discussion above makes clear, that interpretation of *Dalton* is wrong: *Dalton* stands for the much narrower rule that "every action by the President, or by another executive official, in excess of his statutory authority is [not] *ipso facto* in violation of the Constitution." *Dalton*, 511 U.S. at 472. *Dalton* did not hold that whenever a President or his lawyers invoke "the laws of the United States of America" to justify executive actions, *Global Health Council*, 153 F.4th at 15 (quotation marks and emphasis omitted), the question of whether those actions are constitutional falls away.

Indeed, if alleging violations of an appropriations statute automatically foreclosed a separation-of-powers claim, it is difficult to see how a plaintiff could ever bring a cause of action against the executive branch for arrogation of Congress's appropriations power. Because the Appropriations Clause requires that appropriations be "made by Law," U.S. Const. art. I, § 9, cl. 7, constitutional claims challenging the executive's refusal to spend funds will almost always depend in part on whether the executive is acting in accordance with appropriations statutes. That fact has not stopped this Court from recognizing freestanding separation-of-powers claims alongside those statutory disputes. *See, e.g.*, *Aiken County*, 725 F.3d at 259 (holding that an agency's refusal to comply with "statutory mandates" violated the separation of powers against the backdrop of Congress's appropriations power); *see*

23

*also McIntosh*, 833 F.3d at 1175 (holding that an alleged violation of an appropriations statute would also violate the Appropriations Clause and its "separation-of-powers limitation," which plaintiffs "can invoke to challenge [executive action]"). *Global Health Council* does not require that result, and if this Court concludes that it does, it should be overruled to bring this Court's case law into alignment with Supreme Court precedent.

### C.    Plaintiffs' Separation-of-Powers Claim Is Premised on the EPA's Decision to Abolish a Mandatory Grant Program.

Unlike in *Dalton*, Plaintiffs' separation-of-powers claim here is not premised on the President exceeding some delegated discretion. Rather, Plaintiffs have alleged and shown that the President acted without any authority—constitutional or statutory—to wipe out a congressionally mandated grant program, thus usurping Congress's power of the purse.

Specifically, Plaintiffs allege that under the IRA, Congress "appropriated [funds] to the Administrator" of the EPA, "to remain available until September 30, 2024, to make grants, on a competitive basis," to "eligible recipients," for specific purposes. 42 U.S.C. § 7434(a), (b). EPA awarded those grants in accordance with the statutory mandates, but then decided to claw them back based on a change in the agency's policy priorities. *See* Exec. Order No. 14,154, § 7, 90 Fed. Reg. 8353, 8357 (Jan. 29, 2025) (ordering the "[t]erminat[ion]" of grants created pursuant to the IRA and requiring all agencies to "immediately pause the disbursement of funds

24

appropriated through" the IRA pending agency review "for consistency with … the [President's] policy").

No statutory or constitutional provision authorizes the executive branch to substitute its own policy preferences for those enacted by Congress. As described above, the Constitution prohibits the President from rescinding appropriated funds unilaterally, and *Dalton*, *Franklin*, and *Dames & Moore* all make clear that a constitutional claim may lie when an officer violates the Constitution even if he also violates a statute along the way, or claims statutory authority for his actions. Moreover, a claim may be fundamentally a constitutional one where executive officials possess neither statutory nor constitutional authority for their challenged actions.

That is precisely what Plaintiffs allege here. Plaintiffs assert that the EPA seized Congress's power of the purse by unilaterally abolishing a mandatory grant program for which Congress appropriated funds based on disagreement with the policies the program furthers. Plaintiffs also claim that the EPA took these actions without *any* valid statutory or constitutional authority, making *Youngstown*, not *Dalton*, the closer comparison to this case.

At times in its opening brief, the EPA seems to concede this point as a legal matter—disputing only the factual premise of Plaintiffs' separation-of-powers claim. *See, e.g.*, EPA Br. 20 (acknowledging that "dismantling" the grant program would

25

"raise [a] constitutional concern," but disputing the district court's factual finding that such a dismantlement in fact occurred); *id.* at 2 (suggesting that "a separation-of-powers violation" would exist had the EPA in fact "intended to abandon the IRA's program entirely"). These concessions belie the EPA's assertion that *Dalton* forecloses Plaintiffs' separation-of-powers claim. In other words, even the EPA seems to acknowledge that a President's complete abolition of a mandatory program created by Congress would raise separation-of-powers concerns. This Court should, at a minimum, clarify that *Dalton* leaves that lane open.

## III.    A Proper Reading of *Dalton* Will Not Open the Floodgates to Statutory Claims Disguised as Constitutional Ones.

The EPA asserts in passing that Plaintiffs brought their separation-of-powers claim to circumvent the Tucker Act. *See* EPA Br. 44 (claiming that "[t]o the extent [Plaintiffs' constitutional claims] seek reinstatement of the specific grant agreements on the ground that EPA exceeded its authority in terminating them, … the district court lacked jurisdiction over [those claims]"). And the vacated panel opinion suggested that Plaintiffs' constitutional claims were an effort to circumvent the limits on *ultra vires* review. *See Climate United Fund v. Citibank, N.A.*, 154 F.4th 809, 827 (D.C. Cir. 2025) (citing the also-now-vacated panel opinion in *National Treasury Employees Union*). Both of these concerns are misguided. A proper reading of *Dalton* will not open the floodgates to the recharacterization of purely statutory violations as constitutional claims.

26

*Dalton* itself illustrates why.  In *Dalton*, there was no dispute that the ultimate executive action (closing a shipyard) was authorized by statute.  The only question was whether the President had exceeded his delegated discretion in executing that statute, including by failing to follow certain procedures and "accepting procedurally flawed recommendations" from other executive branch officials regarding the shipyard's closure.  *Dalton*, 511 U.S. at 474.  There was no allegation in *Dalton* that the President had taken an action unauthorized by Congress, such as dismantling a mandatory program.  And there was no allegation that the President violated the Constitution's text and structure by usurping a core congressional power.  Put simply, the Court in *Dalton* held that where the *only* question in a case is how expansively to read a grant of statutory discretion, the claim is best characterized as statutory and not constitutional in nature.  *Id.* at 475-77; *see Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1331 (D.C. Cir. 1996) ("*Dalton*'s holding merely stands for the proposition that when a statute entrusts a discrete specific decision to the President and contains no limitations on the President's exercise of that authority, judicial review … is not available."); *Am. Forest Res. Council v. United States*, 77 F.4th 787, 797 (D.C. Cir. 2023) (same).

As another example, take *Motions Systems Corp. v. Bush*, 437 F.3d 1356 (Fed. Cir. 2006) (per curiam).  There, the plaintiff challenged the President's determination not to grant import relief to a company under a trade statute.  As in *Dalton*, the court

27

held that the statute committed the determination to the President's discretion, and thus no separation-of-powers claim could be brought against him. *Id.* at 1360-61. The essence of the plaintiff's claim was, according to the court, that the President had exceeded his statutorily delegated discretion, not that he had violated the Constitution's structure. *Id.*

Or imagine a statute that granted discretion to an agency to consider certain environmental effects before greenlighting infrastructure projects—not unlike NEPA. *See Seven Cnty. Infrastructure Coal. v. Eagle County*, 605 U.S. 168, 182 (2025) (under NEPA, "agencies possess discretion and must have broad latitude" to make decisions about where to draw the line when considering environmental effects). A claim brought against the agency for failure to consider certain environmental factors would not amount to a constitutional violation—just an abuse of statutory discretion. *See Eagle County v. Surface Transp. Bd.*, 82 F.4th 1152, 1168-69 (D.C. Cir. 2023) (describing the petitioners' purely statutory and procedural claims). Indeed, the same could be said about the vast majority of challenges to agency actions alleged to be arbitrary and capricious under the APA.

Critically, Plaintiffs are not alleging that the executive's dismantlement of a mandatory grant program is an act in excess of discretionary authority conferred by statute. They are alleging that the President acted with *no authority*, statutory or constitutional, to abolish that program, and in the process usurped a power

28

committed exclusively to Congress under Article I.  That is a constitutional claim, and the courts should review it.

## CONCLUSION

For the foregoing reasons, this Court should affirm.

Respectfully submitted,

/s/ Brianne J. Gorod
Elizabeth B. Wydra
Brianne J. Gorod
Brian R. Frazelle
Miriam Becker-Cohen
Nina Henry
CONSTITUTIONAL ACCOUNTABILITY CENTER
1730 Rhode Island Ave. NW, Suite 1200
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

Dated: February 9, 2026

29

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6,492 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Times New Roman font.

Executed this 9th day of February, 2026.


/s/ Brianne J. Gorod
Brianne J. Gorod

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of February, 2026, I electronically filed the foregoing document using the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

Dated: February 9, 2026

/s/ Brianne J. Gorod
Brianne J. Gorod
