# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA

CLIMATE UNITED FUND, et al.

*Plaintiffs-Appellees,*

v.

CITIBANK, N.A., et al.

*Defendants-Appellants.*

*On Appeal from the United States District Court
for the District of Columbia*

**BRIEF OF *AMICI CURIAE* U.S. SENATORS SHELDON WHITEHOUSE, CHRIS VAN HOLLEN, EDWARD MARKEY, BERNIE SANDERS, JEFF MERKLEY, RICHARD BLUMENTHAL, BRIAN SCHATZ, MAZIE K. HIRONO, AND U.S. REPRESENTATIVES , DEBBIE DINGELL, FRANK PALLONE, JR., JAMES P. MCGOVERN, JAN SCHAKOWSKY, BETTY MCCOLLUM, KATHY CASTOR, STEVE COHEN, PAUL TONKO, MIKE QUIGLEY, JULIA BROWNLEY, JARED HUFFMAN, MARK TAKANO, DONALD BEYER JR., TED LIEU, BONNIE WATSON COLEMAN, NANETTE BARRAGAN, RAJA KRISHNAMOORTHI, DARREN SOTO, MARY GAY SCANLON, SEAN CASTEN, MADELEINE DEAN, LIZZIE FLETCHER, MIKE LEVIN, TROY CARTER, KEVIN MULLIN, BRITTANY PETTERSEN, SHRI THANEDAR, JENNIFER MCCLELLAN, MAXINE DEXTER, SARAH ELFRETH, EMILY RANDALL, AND ADELITA GRIJALVA**

Gary DiBianco
Kunyu Ching
LAWYERS FOR GOOD
GOVERNMENT
1319 F St NW Ste 301, PMB 181
Washington, DC 20004
Tel. (404) 913-5529
gary@lawyersforgoodgovernment.org
kunyu@lawyersforgoodgovernment.org

*Counsel for Amici Curiae*

**STATEMENT REGARDING CONSENT TO FILE AND SEPARATE BRIEFING**

Pursuant to D.C. Circuit Rule 29(b), undersigned counsel for *amici curiae* Lawyers for Good Government ("L4GG") represents that Plaintiffs-Appellees and the U.S. Government Defendants consent to the filing of this brief, and Defendant Citibank takes no position on the filing.

Pursuant to D.C. Circuit Rule 29(d), undersigned counsel for *amici curiae* certifies that a separate brief is necessary. This case is not a dispute about the terms of a grant agreement, but Executive contempt for grant programs created by Congress in Section 60103 of the Inflation Reduction Act ("IRA"). As the district court found, the Environmental Protection Agency ("EPA") sought to "dismantle these grant programs in their entirety as a policy matter." *Amici* Members of Congress have a particularized interest in preserving the separation of powers and ensuring that Congress's statutory mandates and plenary power over spending are protected. Vindication of this interest cannot occur in the Court of Federal Claims but can only come from review by an Article III court.

This brief analyzes the interplay between *Clinton v. New York*, 524 U.S. 417 (1998), *In re Aiken County*, 725 F.3d 255 (D.C. Cir. 2013), and *Dalton v. Specter*, 511 U.S. 462 (1994). This brief also describes Congressional intent as reflected in the text of Section 60103 of the IRA and budget reconciliation.

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## I.    PARTIES AND *AMICI*

Except for any *amici* who had not yet entered an appearance in this case as of the filing of the Plaintiffs-Appellees' Answering Brief, all parties, intervenors, and *amici* appearing in this Court are listed in the Plaintiffs-Appellees' Answering Brief.

## II.    RULINGS UNDER REVIEW

Reference to the ruling under review appears in the Plaintiffs-Appellees' Answering Brief.

## III.    RELATED CASES

Reference to any related cases pending before this Court appears in the Plaintiffs-Appellees' Answering Brief.

Dated: February 9, 2026                    /s/Gary DiBianco
                                           Gary DiBianco

                                           *Counsel for Amici Curiae*

# TABLE OF CONTENTS

STATEMENT REGARDING CONSENT TO FILE AND SEPARATE
BRIEFING..................................................................................... i

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............ ii

TABLE OF AUTHORITIES .................................................................v

GLOSSARY .....................................................................................1

INTEREST OF AMICI CURIAE AND RULE 29(a)(4)(E) STATEMENT ............2

INTRODUCTION AND SUMMARY OF ARGUMENT........................................5

ARGUMENT ...................................................................................7

I.   EPA Sought to Dismantle a Congressionally Mandated Program. .................7

    A. The District Court Correctly Concluded that EPA Sought to Dismantle the
       CCIA and NCIF Programs. .......................................................8

    B. EPA Provides No Reason to Overturn the District Court's Factual
       Findings .............................................................................9

II.  EPA's Repeated Refusal to Administer the Congressionally Mandated
     Program Violates the Appropriations and Presentment Clauses of the
     Constitution. ..............................................................................13

    C. EPA May Not Refuse to Spend Appropriated Funds Based on a Policy
       Disagreement with Congressional Mandates. ...........................................14

    D. EPA's Unlawful Actions Are Akin to an Impermissible Line-Item Veto
       Aimed at Retroactively Terminating a Congressionally Mandated
       Program ................................................................................16

III. EPA's Misreading and Misuse of the OBBBA Demonstrate Continued
     Disregard for Its Statutory Obligations. ........................................18

CONCLUSION ..................................................................................24

CERTIFICATE OF COMPLIANCE ......................................................................25

CERTIFICATE OF SERVICE................................................................................26

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Bessemer City*, 470 U.S. 564, 574–75 (1985) ....................................10

*Aptheker v. Secretary of State*, 378 U.S. 500, 515 (1964).....................................23

*Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 348 (1936)..................................23

*Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 928 F.3d 1102, 1112 (D.C. Cir. 2019) ....9

*Climate United v. Citibank, N.A.*, 154 F.4th 809, 835–41 (D.C. Cir. 2025) (Pillard,

J. dissenting), *vacated and reh'g granted*, 2025 WL 3663661 (D.C. Cir. Dec. 17,

2025)...............................................................................................6-9, 11-12, 14

Climate United v. Citibank, N.A., 778 F. Supp. 3d 90, 115 (D.D.C. 2025). 6-10, 13,

23-24

*Clinton v. City of New York*, 524 U.S. 417 (1998) .....................................16, 17, 18

*Dalton v. Specter*, 511 U.S. 462 (1994) .....................................................14, 15, 18

*Harris County, Texas v. U.S. E.P.A.*, No. 1:25-cv-3646 (D.D.C.) ...........................5

*In re Aiken Cnty.*, 725 F.3d 255, 260 (D.C. Cir. 2013))............................6, 7, 14, 18

*Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994) .......................................22

*Rhode Island AFL-CIO et al. v. U.S. E.P.A.*, No. 1:25-cv-00510 (D.R.I.)...............5

*South Dakota v. Dole,* 483 U.S. 203, 206–07 (1987)..............................................13

*United States v. Microsoft Corp.*, 253 F.3d 34, 117 (D.C. Cir. 2001)....................10

*Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014) .......................................22

*Vartelas v. Holder*, 566 U.S. 257, 266 (2012)........................................20

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 123 (1969) ..................9

**Statutes**

42 U.S.C. § 7434 ...............................................................................16

Inflation Reduction Act of 2022, Pub. L. 117-169, § 60103, 136 Stat. 1818, 2065–
67 (2022). ...........................................................................8, 13, 21

One Big Beautiful Bill Act, Pub. L. No. 119-21, § 60002, 139 Stat. ___ (2025) ...20

**Other Authorities**

Cong. Budget Off., *Estimated Budgetary Effects of an Amendment in the Nature of
a Substitute to H.R. 1, the One Big Beautiful Bill Act, Relative to CBO's January
2025 Baseline* (June 29, 2025) ...........................................................20

House Committee on Energy & Commerce, Full Committee Markup of Budget
Reconciliation Text (May 13, 2025) ...................................................21

**Rules**

Fed. R. Civ. P. 52(a)(6). ..................................................................7, 11

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 1 (Spending Clause)......................................15

U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause) ............................15

U.S. Const. art. II, § 3......................................................................17

## GLOSSARY

| | |
|---|---|
| CCIA | Clean Communities Investment Accelerator |
| EPA | United States Environmental Protection Agency |
| FAA | Financial Agency Agreement |
| GGRF | Greenhouse Gas Reduction Fund |
| IRA | Inflation Reduction Act |
| NCIF | National Clean Investment Fund |
| OBBBA | One Big Beautiful Bill Act |

## INTEREST OF *AMICI CURIAE* AND RULE 29(a)(4)(E) STATEMENT

*Amici curiae* include the original champions of Green Bank legislation, legislation which was later modified for inclusion in the Inflation Reduction Act ("IRA") and became known as the Greenhouse Gas Reduction Fund ("GGRF"); the Ranking Members of the Senate and House committees with jurisdiction over the GGRF (U.S. Senate Committee on Environment and Public Works, U.S. House Committee on Energy and Commerce); the Ranking Member of the Senate Appropriations Committee subcommittee with jurisdiction over GGRF funding; and other Members of Congress. *Amici* have a particularized interest in preserving the separation of powers and ensuring that Congress's statutory mandates and plenary power over spending are protected.

No party's counsel authored the brief in whole or in part, and no money has been contributed to L4GG by any party or other person to fund preparing or submitting the brief.

The following is the full list of amici:

Sen. Sheldon Whitehouse

Sen. Chris Van Hollen

Sen. Edward Markey

Sen. Bernie Sanders

Sen. Jeff Merkley

Sen. Richard Blumenthal

Sen. Brian Schatz

Sen. Mazie K. Hirono

Rep. Debbie Dingell

Rep. Frank Pallone, Jr.

Rep. James P. McGovern

Rep. Jan Schakowsky

Rep. Betty McCollum

Rep. Kathy Castor

Rep. Steve Cohen

Rep. Paul Tonko

Rep. Mike Quigley

Rep. Julia Brownley

Rep. Jared Huffman

Rep. Mark Takano

Rep. Donald Beyer Jr.

Rep. Ted Lieu

Rep. Bonnie Watson Coleman

Rep. Nanette Barragan

Rep. Raja Krishnamoorthi

Rep. Darren Soto

Rep. Mary Gay Scanlon

Rep. Sean Casten

Rep. Madeleine Dean

Rep. Lizzie Fletcher

Rep. Mike Levin

Rep. Troy Carter

Rep. Kevin Mullin

Rep. Brittany Pettersen

Rep. Shri Thanedar

Rep. Jennifer McClellan

Rep. Maxine Dexter

Rep. Sarah Elfreth

Rep. Emily Randall

Rep. Adelita Grijalva

## INTRODUCTION AND SUMMARY OF ARGUMENT

At every turn, EPA has sought to thwart Congressional intent concerning the GGRF.  From day one, the Trump Administration declared war on programs established and funded by the IRA, with a particular venom reserved for two of the GGRF's catalytic capitalization grant programs, the National Clean Investment Fund ("NCIF") and the Clean Communities Investment Accelerator ("CCIA").  In their efforts to eliminate Congressionally mandated grant programs,[1] Administration officials have harassed the award recipients with baseless threats of prosecution and sought to claw back disbursed grant money out of private hands.  At its heart, this is a case about whether the Executive Branch can freeze and confiscate lawfully made funding awards held in private bank accounts without due process because of an Administration's disagreements with policy decisions that Congress has already made and signed into law.  If so, then perhaps no one in the United States is safe from such unchecked arbitrary action.

The district court found in April 2025 that EPA's mass termination of Plaintiffs' grants was not to improve internal controls as it professed, but instead to

---

[1] EPA has also attempted to eliminate the GGRF's third and final program, Solar for All, despite those funds being fully obligated to state and local governments, Tribes, and other entities.  The agency's attempts to terminate Solar for All are being challenged in separate litigation.  *See Rhode Island AFL-CIO et al. v. U.S. E.P.A.*, No. 1:25-cv-00510 (D.R.I.); *Harris County, Texas v. U.S. E.P.A.*, No. 1:25-cv-3646 (D.D.C.).

freeze access to private bank accounts and "seek to dismantle these grant programs in their entirety as a policy matter." *Climate United v. Citibank, N.A.*, 778 F. Supp. 3d 90, 115 (D.D.C. 2025). A reviewing court may not set aside those factual findings unless it finds that they are "clearly erroneous." Fed. R. Civ. P. 52(a)(6). They are not, and the district court's legal conclusions that follow these findings of shocking conduct also must stand: "'Congress speaks through the laws it enacts' . . . EPA cannot shut down these programs completely and it cannot 'decline to spend previously appropriated funds.'" *Climate United*, 778 F. Supp. 3d at 115 (quoting *In re Aiken Cnty.*, 725 F.3d 255, 260 (D.C. Cir. 2013). Nor does the subsequent and prospective repeal of that program justify the Administration freezing privately held funds that were duly distributed in accordance with a lawfully enacted grant program.

EPA continues to re-litigate the facts in its latest brief, without any substantive discussion of the clear error standard. With the district court's correct findings intact, it is clear that EPA acted in excess of statutory limits and constitutional bounds to nullify a Congressional mandate. The record is overflowing with evidence of EPA's animosity toward the GGRF program and its dogged but unsuccessful attempts to gin up *any* evidence of impropriety that would justify clawing back GGRF grants. *See Climate United v. Citibank, N.A.*, 154 F.4th 809, 835–41 (D.C. Cir. 2025) (Pillard, J. dissenting), *vacated and reh'g*

*granted*, 2025 WL 3663661 (D.C. Cir. Dec. 17, 2025).  The Administration's position does injury to the Constitution's separation and limitation of powers, and the district court rightfully enjoined EPA's unconstitutional attempted usurpation of Congress's spending powers.  *See In re Aiken Cnty.*, 725 F.3d at 255.

EPA further disregards Congressional intent by pointing to rescission of the GGRF's *unobligated* funds in July 2025 as a retroactive source of authority to freeze *obligated* funds sitting in private bank accounts.  The Court should reject EPA's textual sleight of hand and adhere to the district court's factual findings.

## ARGUMENT

The district court correctly concluded, on the factual record before it, that EPA was "unilaterally dismant[ling]" entire grant programs created by Congress. *Climate United*, 778 F. Supp. 3d at 116.  Failing to give proper deference to the district court's well-supported factual findings, EPA's actions betray a contempt for a statutory program and an intent to thwart the Congressional prerogative to direct spending.

### I.    EPA Sought to Dismantle a Congressionally Mandated Program.

This case concerns EPA's repeated, ongoing attempts to subvert a statutory program and punish the entities that participated in it.  Congress created the GGRF to leverage private investment into projects that "reduce or avoid greenhouse gas emissions and other forms of air pollution."  Inflation Reduction Act of 2022, Pub.

L. 117-169, § 60103, 136 Stat. 1818, 2065–67 (2022).  In 2025, after the funds had

been fully obligated and distributed pursuant to binding agreements, EPA

unlawfully terminated the CCIA and NCIF programs wholesale and attempted to

freeze and confiscate the funds from private bank accounts.  When the grantees

challenged EPA's unlawful dismantling of the two programs, EPA sought to evade

federal district court jurisdiction by arguing that the case concerned mere contract

disputes and belonged in the Court of Federal Claims.

The district court rejected these arguments and correctly concluded that it

had jurisdiction because Plaintiffs' claims concerned statutory and constitutional

violations.  It based that conclusion on factual findings showing that EPA had

intended to eliminate the CCIA and NCIF programs, in contravention of

Congressional mandates.  Nothing in EPA's brief undermines that conclusion, and

EPA has provided no basis to set aside the district court's factual findings.

### A. The District Court Correctly Concluded that EPA Sought to Dismantle the CCIA and NCIF Programs.

The district court concluded as the finder of fact that "the record does

indicate that EPA seeks to dismantle these grant programs in their entirety as a

policy matter." *Climate United*, 778 F. Supp. 3d at 115.

As Judge Pillard detailed in her dissent from the panel decision, "[t]he

district court's factfinding is amply supported by the record."  *Climate United*, 154

F.4th at 850.  Among other support, the district court found that EPA: initially

claimed fraud and conflicts of interest in the grant process but later abandoned

those claims and admitted the terminations were "based on reasons of policy";

served Plaintiffs with identical information requests on the GGRF program's

oversight controls, then terminated *all* the grants prior to receiving responses; and

refused to provide any rationale for "why it needed to cancel every single grant to

review some aspects of the GGRF program . . . ." *Climate United,* 778 F. Supp. 3d

at 114–15.[2]

### B. EPA Provides No Reason to Overturn the District Court's Factual Findings.

EPA acknowledges, as it must, that this Court is bound by the district court's

factual findings unless they are "clearly erroneous." En Banc Br. of the United

States ("U.S. En Banc Br.") at 22 (citing *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*,

928 F.3d 1102, 1112 (D.C. Cir. 2019)); *see also* Fed. R. Civ. P. 52(a)(6). "In

applying the clearly erroneous standard to the findings of a district court sitting

without a jury, appellate courts must constantly have in mind that their function is

not to decide factual issues de novo." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,

395 U.S. 100, 123 (1969). "Ordinarily, there is no basis for doubting that the

District Court's factual findings are entitled to the substantial deference the clearly

---

[2] By continuing to rely on "shifting, post-hoc, and unsupported allegations," *Climate United*, 154 F.4th at 842–43 (Pillard, J. dissenting), EPA has forfeited any claim to the presumption of regularity.

erroneous standard entails." *United States v. Microsoft Corp.*, 253 F.3d 34, 117 (D.C. Cir. 2001). This standard promotes judicial economy and acknowledges the district court's authority as the court that heard the evidence and was able to weigh first-hand the credibility of the parties' arguments. *See, e.g.*, *Anderson v. Bessemer City*, 470 U.S. 564, 574–75 (1985) (discussing the "superiority of the trial judge's position to make determinations of credibility" and explaining that "[d]uplication of the trial judge's efforts in the court of appeals would very likely contribute only negligibly to the accuracy of fact determination at a huge cost in diversion of judicial resources").

While paying lip service to the clear error standard, EPA fails to seriously engage with it, let alone provide a basis for overturning the district court's findings. Instead, EPA doubles down on unsupported and vague assertions that the district court already has rejected, and which reek of pretext. First, for instance, citing its "repeated" statements to the district court that it "would re-obligate funds in a manner that ensures proper oversight and control," EPA claims that "[n]either the district court nor plaintiffs cited any reason to doubt that commitment . . . ." U.S. En Banc Br. at 47. That statement is false: the district court cited *many* reasons to doubt that EPA had any such commitment. *Climate United,* 778 F. Supp. 3d at 114–16. As Judge Pillard noted in her dissent, "EPA's actions at every turn reveal its determination to permanently defund the Greenhouse Gas Reduction

Fund programs for no more reason than that President Trump announced that goal." *Climate United*, 154 F.4th at 850 (Pillard, J. dissenting).

EPA's assertion that there was no reason to doubt the agency's commitment to re-obligate the funding is even more baffling in light of the well-publicized history of its war on the GGRF program. From day one of the Trump Administration, without a shred of evidence in support, Administration officials attacked the GGRF program. *Id.* at 835. These attacks included harassment of the award recipients with baseless threats of prosecution. A veteran Department of Justice ("DOJ") prosecutor resigned rather than send a letter to Citibank threatening a "criminal investigation" that was unsupported by probable cause; a D.C. magistrate judge rejected a seizure warrant submitted personally by then-Interim U.S. Attorney for the District of Columbia Ed Martin (presumably because no career attorney was willing to seek this warrant); and DOJ officials tried without success to persuade multiple U.S. Attorney Offices to open a grand jury investigation into the programs. *See Read the Resignation Letter by Denise Cheung, A Veteran D.C. Federal Prosecutor*, Wash. Post, Feb. 18, 2025, https://perma.cc/8NMY-DRWE; Spencer S. Hsu, Maxine Joselow & Nicolás Rivero, *FBI Takes Up EPA Probe amid Pushback from Judge, Prosecutors*, Wash. Post, Feb. 27, 2025, https://perma.cc/E2JR-G4GF. Even the reported FBI investigation fizzled out without producing any evidence to support the claims of

fraud.  As Judge Pillard explained, despite all its efforts, "[t]he agency has no lawful basis—nor even a nonfrivolous assertion of any basis—to interfere" with the GGRF programs.  *Climate United*, 154 F.4th at 831.

A second example of EPA re-litigating the record may be found in its continued raising of "concerns" about "how [the grant programs] were structured" and the "recipients' roles as 'pass-through[s] for subrecipients, which themselves may act as pass-throughs . . . .'"  U.S. En Banc Br. at 2, 10.  But the structure[3] and the roles of the recipients[4] were expressly written into the statute.  Congress intended that the CCIA and NCIF programs would capitalize large recipients "designed to provide capital [and] leverage private capital", who in turn would provide financing for projects in perpetuity.  § 60103(c)(1), 136 Stat. at 2067.  Even if the Court were to take at face value EPA's claims that it would reissue grants (which the district court did not), EPA would still not be free to do so under

_____

[3] § 60103(b), 136 Stat. at 2066 ("An eligible recipient that receives a grant pursuant to subsection (a), shall … (A) provide financial assistance to qualified projects at the national, regional, State, and local levels; (B) prioritize investment in qualified projects that would otherwise lack access to financing; and (C) retain, manage, recycle, and monetize all repayments and other revenue received from fees, interest, repaid loans, and all other types of financial assistance provided using grant funds under this section to ensure continued operability.").

[4] Section 60103(b) contemplates both a "direct investment" role for these large funding recipients, and an "indirect investment" role whereby the recipients would "establish new or support existing" community banks. § 60103(b), 136 Stat. at 2066–67.

terms that undermine the statutory text.  EPA's continued criticism of aspects of the GGRF programs that are fundamental to the statutory scheme further supports the district court's conclusion that EPA's goal was to dismantle the programs.

EPA asks this Court to accept its misleading and rejected version of the facts, but nowhere in its brief does it identify any clear error by the district court. Absent such a showing, this Court is bound by the district court's determination that EPA acted with the intent to "dismantle" the GGRF grant programs "in their entirety." *Climate United*, 778 F. Supp. 3d at 115.

## II. EPA's Repeated Refusal to Administer the Congressionally Mandated Program Violates the Appropriations and Presentment Clauses of the Constitution.

EPA's actions to dismantle a Congressionally mandated program are a brazen and impermissible attempt to usurp the Legislative Branch's power.  The Constitution granted the power of the purse to Congress, not the President or his agents.  U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); U.S. Const. art. I, § 8, cl. 1 (Spending Clause).  Congress may employ that power "to further broad policy objectives," *South Dakota v. Dole,* 483 U.S. 203, 206–07 (1987), and neither the President nor Executive agencies may decline to follow a statutory mandate or prohibit spending based on policy differences.

## C. EPA May Not Refuse to Spend Appropriated Funds Based on a Policy Disagreement with Congressional Mandates.

On the correct factual record, *Aiken County* is indistinguishable. *See Climate United*, 154 F.4th at 850 ("[A]bsent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." (internal quotation marks and citation omitted)) (Pillard, J., dissenting). Under *Aiken County*, an agency may not refuse to spend appropriated funds in violation of a statutory obligation. 725 F.3d at 257–69. As then-Judge Kavanaugh wrote: "[W]here previously appropriated money is available for an agency to perform a statutorily mandated activity, we see no basis for a court to excuse the agency from that statutory mandate." *Id.* at 260. EPA tries to avoid this precedent by discarding the district court's well-supported findings regarding EPA's inconsistent justifications for terminating the grants. As described above, the district court's factual conclusion that EPA had no intention of re-awarding the GGRF money was amply supported. Because *Aiken County* controls here, the district court correctly found that the Plaintiffs demonstrated a likelihood of success on this claim.

EPA's reliance on *Dalton v. Specter*, 511 U.S. 462 (1994) is a misplaced effort to reframe EPA's attack on the Constitution as a dispute over discretion. *Dalton* does not apply here. That case stands for the limited proposition that "[w]here a statute . . . commits decision-making to the discretion of the President,

judicial review of the President's decision is not available." *Id.* at 477. But the IRA did not give the President discretion over whether to fund the NCIF and CCIA programs at all. Congress could not have been clearer that the statutory purpose was to "enable low-income and disadvantaged communities to deploy or benefit from zero-emission technologies," that this purpose was to be accomplished by capitalizing pass-through financing entities, and that EPA was required to obligate all grant funding by September 30, 2024. 42 U.S.C. § 7434. It is the President's responsibility to "faithfully execute" that directive. U.S. Const. art. II, § 3.

EPA seeks to disguise its defiance of Congress as a discretion dispute by claiming that its "decision to terminate plaintiffs' grant agreements and re-obligate the funds in a manner consistent with the statute's directives aligns with its duty to execute the law as Congress intended." U.S. En Banc Br. at 46. But this again relies on unsupported storytelling that the district court rejected: EPA did not decide to re-obligate the funds in a manner consistent with the statute's directives; it acted—over and over—to dismantle the statutory program. Indeed, as discussed above, EPA now continues to complain about the program's statutorily required structure. At this point, EPA's continued effort to rewrite the record should be viewed as an admission: EPA could *only* prevail on the constitutional claims here if the Court discards the district court's factual findings. But, as described above,

the district court properly concluded that EPA's end goal is nothing other than elimination of the CCIA and NCIF programs.[5]

This Court should not sanction EPA's attempt to abrogate statutory directives by dismantling these programs.  No statute gives the President, let alone EPA, discretion to terminate all previously obligated and disbursed funds allocated by Congress.

### D. EPA's Unlawful Actions Are Akin to an Impermissible Line-Item Veto Aimed at Retroactively Terminating a Congressionally Mandated Program.

In seeking to dismantle the CCIA and NCIF programs and claw back funds in Citibank accounts, EPA also violated the Presentment Clause and the Supreme Court's ruling in *Clinton v. City of New York*, 524 U.S. 417 (1998), that the Executive Branch may not rewrite a statute (here, the IRA) to remove a program presented to and approved by the House of Representatives and the Senate.

EPA's efforts to muddy the record with reference to the One Big Beautiful Bill Act ("OBBBA") are a red herring because, as discussed below, the OBBBA had no lawful effect on the funds at issue in the district court's injunction.[6]  EPA's actions occurred, and the district court's injunction issued, prior to passage of H.R. 1, the OBBBA.  There can be no dispute that during this period (March 11 to July

---

[5] *See supra* Section I.
[6] *See infra* Section III.

3, 2025), the IRA was the sole legislative authority governing EPA's actions with respect to the GGRF.  The April 15, 2025 Order that EPA now appeals is governed by the statutory framework in place at the time: the IRA.

EPA's attempts to excise a provision of the IRA are analogous to the line-item veto of specific provisions in the Balanced Budget Act of 1997 that the Supreme Court ruled unconstitutional in *Clinton*.  There, pursuant to the Line Item Veto Act, the President "cancel[led] 'one item of new direct spending,' . . . . stating that he had determined that 'this cancellation will reduce the Federal budget deficit.'"  524 U.S. at 423 (citations omitted).  The Court's analysis is directly applicable here:

> The Balanced Budget Act of 1997 [here, the Inflation Reduction Act of 2022] is a 500–page document that became "Public Law 105–33" [here, Public Law 117-169] after three procedural steps were taken: (1) a bill containing its exact text was approved by a majority of the Members of the House of Representatives; (2) the Senate approved precisely the same text; and (3) that text was signed into law by the President. The Constitution explicitly requires that each of those three steps be taken before a bill may "become a law." Art. I, § 7.  If one paragraph of that text had been omitted at any one of those three stages, Public Law 105–33 [here, Public Law 117-169] would not have been validly enacted.  If the Line Item Veto Act [here, EPA's elimination of the grant programs authorized by 42 U.S.C. § 7438] were valid, it would authorize the President to create a different law—one whose text was not voted on by either House of Congress or presented to the President for signature.  Something that might be known as "Public Law 105–33 as modified by the President" [here, "Public Law 117-169 as modified by the EPA at the direction of the President"] may or may not be desirable, but it is surely not a document that may "become a law" pursuant to the procedures

designed by the Framers of Article I, § 7, of the Constitution.

*Id.* at 448–49 (bracketed information inserted to show parallels to this case).

Decided after *Dalton*, *Clinton* rejected the argument that the cancellation of Congressionally appropriated programs was "merely exercises of discretionary authority granted to the President." *Id.* at 442. Consistent with both *Dalton* and *Aiken County*, a claim that the Executive is refusing to spend funds appropriated by Congress is a constitutional Presentment Clause claim. Indeed, EPA's unlawful actions go even further: not only is EPA refusing to spend in contravention of Congress's direction, it seeks to void a Congressionally mandated program through extralegal termination after funds have not only been obligated but already disbursed to the rightful recipients. This is not a case where a bankrupted recipient or a criminally charged senior executive or a flooded-out physical location creates an occasion for executive "discretion" to withhold duly appropriated, obligated, and even disbursed funds. This is a blanket veto of a program outside the time and bounds of the constitutional veto rules.

### III. EPA's Misreading and Misuse of the OBBBA Demonstrate Continued Disregard for Its Statutory Obligations.

EPA points to the OBBBA, enacted after the district court made its findings, as another source of authority for it to terminate GGRF. U.S. En Banc Br. at 49, 51. This claim ignores the plain text of the OBBBA and demonstrates EPA's continued disregard of Congressional directives.

In July 2025, President Trump signed the OBBBA into law. The Act, among other things, rescinded *unobligated* funds from numerous IRA grant programs, including unobligated GGRF funds. In keeping with this pattern, the OBBBA section relating to the GGRF provided: "Section 134 of the Clean Air Act (42 U.S.C. 7434) is repealed and the *unobligated* balances of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act) are rescinded." Pub. L. No. 119-21, § 60002, 139 Stat. at 154 (emphasis added).[7] Although EPA suggests that the Court should read the OBBBA to support its prior termination of Plaintiffs' grants, the OBBBA could only have affected Plaintiffs' Citibank funds if the funds were "unobligated" at the time the statute was passed, or if the OBBBA was retroactive. Neither is the case.

First, the funds in the Citibank Financial Agency Agreement ("FAA") accounts were "obligated" and therefore not within the scope of the OBBBA rescission on July 3, 2025.[8] Second, Section 60002 has no retroactive effect.

---

[7] Of all the IRA's EPA-related programs, only the GGRF program was repealed. It was also the only EPA-related IRA grant program that had expired as of September 30, 2024, as EPA was required to obligate all GGRF grants before that date. Other EPA-related IRA grant programs had expiration dates in the future. *See, e.g.*, IRA § 60105 (Air Pollution Monitoring Grants) (authorizing a grant program until September 30, 2031); IRA § 60109 (Funding for HFCs Phaseout) (authorizing a grant program until September 30, 2026).

[8] Indeed, EPA could not have de-obligated the funds between the filing of Plaintiffs' suit and the passage of OBBBA, as it was initially enjoined from doing

"[C]ourts read laws as prospective in application unless Congress has unambiguously instructed retroactivity." *Vartelas v. Holder*, 566 U.S. 257, 266 (2012). Section 60002 contains no such unambiguous instruction.

Aside from the plain text of the OBBBA, confirmation that the OBBBA did not authorize rescission of already-obligated funds comes from the non-partisan Congressional Budget Office's ("CBO") budget "score" of the provision. Lawmakers relied on CBO's "score," or the estimated cost or savings of each provision, to ensure the reconciliation bill met each Committee's savings or spending instructions as set by the Budget Committees. When the proposed repeal and rescission of unobligated GGRF funds was initially proposed in the Senate Environment and Public Works Committee, CBO scored the provision as saving $19 million, which encompassed funding set aside from the grant programs for EPA administration and oversight. Cong. Budget Off., *Estimated Budgetary Effects of an Amendment in the Nature of a Substitute to H.R. 1, the One Big Beautiful Bill Act, Relative to CBO's January 2025 Baseline* (June 29, 2025), https://www.cbo.gov/publication/61534. Not a penny from the grant programs was counted, because those funds were already obligated and out the door. If the

---

so by the district court and then ordered by this Court not to "take any action, directly or indirectly, with regard to the disputed contracts, grants, awards or funds." Per Curiam Order (Apr. 16, 2025).

OBBBA had directed or authorized EPA to claw back GGRF money that the federal government had already obligated, the budget score would have added another $27 billion: $7 billion for Solar For All, $11.97 billion for the NCIF, and $8 billion for the CCIA.  CBO further confirmed that repeal of the program language did not create any additional savings. *See* Addendum at A1–A4 (emails from CBO confirming no budgetary impact from GGRF repeal, as reflected in chart showing "N" for budgetary impact of GGRF repeal in OBBBA).  The rescission and repeal together only amounted to $19 million.

Consistent with the statutory text and its budgetary score, Members of Congress confirmed that the OBBBA did not impact obligated GGRF funds. During the House Energy & Commerce Committee mark-up of the OBBBA on May 13, 2025, Congressman Morgan Griffith, then-Chair of the Environment Subcommittee, stated:

> I just want to point out that these provisions that we are talking about only apply as far, as this bill is concerned, to the unobligated balances. So if a grant was already given, as far as this bill is concerned, then that would still be going forward. . . . [W]e can't rescind expenditures that have already been obligated.

House Committee on Energy & Commerce, Full Committee Markup of Budget Reconciliation Text (May 13, 2025), https://energycommerce.house.gov/events/full-committee-markup-of-budget-reconciliation-text; *see also* Alex DeMarban, *EPA axes program that would have*

*injected $125 million in Alaska for small-scale solar projects*, Anchorage Daily News, August 24, 2025, https://perma.cc/PR54-JWYZ (statement by office of Senator Murkowski objecting to EPA's termination of obligated funding under GGRF's Solar for All program, as the reconciliation bill only rescinded unobligated balances).

"It is core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014). Yet, again, EPA seeks to persuade this Court that it may ignore clear statutory mandates in a transparent effort to dismantle the CCIA and NCIF programs. Allowing EPA to use the OBBBA to claw back funds already obligated and disbursed to Citibank would be a textbook example of what the rule against retroactivity is meant to prevent: impairing the rights of a private party with respect to a completed transaction. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994). If allowed here, there would be virtually no limits on any federal agency unilaterally re-opening completed federal funding, declaring its disagreement with the purposes of the funding, and removing the funds from private bank accounts.[9] Congress certainly did not intend to permit such action with the OBBBA—nor did it intend to.

---

[9] Such seizure of obligated and disbursed funds from privately held bank accounts could also implicate serious Fifth Amendment due process issues. Courts should

*     *     *

This Court should reaffirm the fundamentals of the Constitution, including the Article I authority of Congress and the Article III authority of the judiciary. For the GGRF's NCIF and CCIA programs, Congress directed EPA to award nearly $20 billion in capitalization grants to nonprofit financial organizations for the purpose of reducing pollution and energy costs for low-income and disadvantaged communities. Those grants were disbursed to private accounts more than a year ago, and many projects are already under contract. Thousands of citizens are still waiting for the pollution reduction benefits Congress intended for them to have.

As the district court eloquently stated:

> Government agencies wield immense authority in areas central to public life. With that power comes the responsibility to act fairly, transparently, and in accordance with the law. When agencies fail to operate within the bounds of the law—whether through breaching agreements, arbitrary decision-making, or ignoring regulations—they erode public trust, materially affect the rights and interests of individuals and organizations, and undermine confidence in the very institutions meant to serve the people. The integrity of government

---

avoid interpreting a statute or rules in a manner that creates constitutional problems. *See Aptheker v. Secretary of State*, 378 U.S. 500, 515 (1964) ("[T]his Court . . . must ask whether the statute that Congress did enact will permissibly bear a construction rendering it free from constitutional defects."); *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 348 (1936) ("[E]ven if a serious doubt of constitutionality is raised . . . [the court] will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.").

actions depends not only on the decisions made but on the consistent and lawful execution of those decisions.

*Climate United Fund*, 778 F. Supp. 3d at 98.

## CONCLUSION

The Court should affirm the district court's order and remand this matter to the district court with its preliminary injunction in place for further consideration of all events that have occurred since its original decision and determination of whether to issue a permanent injunction.

Dated: February 9, 2026

Respectfully submitted,

/s/Gary DiBianco
Gary DiBianco
Kunyu Ching
LAWYERS FOR GOOD
GOVERNMENT
1319 F St NW Ste 301, PMB 181
Washington, DC 20004
Tel. (404) 913-5529
gary@lawyersforgoodgovernment.org
kunyu@lawyersforgoodgovernment.org

*Counsel for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because it contains 5,115 words (without the Addendum, 6,425 with the Addendum) excluding the parts of the document exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Times New Roman font.

Executed this 9th day of February, 2026.

/s/Gary DiBianco
Gary DiBianco

*Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system on February 9, 2026.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Executed this 9th day of February, 2026.

/s/Gary DiBianco
Gary DiBianco

*Counsel for Amici Curiae*

# ADDENDUM



**From:** ▮▮▮▮▮▮ (EPW)
**To:** ▮▮▮▮▮ (Budget); ▮▮▮▮▮ (EPW); ▮▮▮▮▮ (Budget); ▮▮▮▮▮ (Budget); ▮▮▮▮▮ (Budget);
▮▮▮▮▮ (EPW); ▮▮▮▮▮ (EPW); ▮▮▮▮▮ (Budget)
**Subject:** FW: HR 1 E&C Questions - byrd
**Date:** Thursday, June 5, 2025 4:08:07 PM
**Attachments:** Repeal Rescind HR1 E&C Question for CBO_with byrd responses.xlsx

Thanks ▮▮▮▮. I believe that this e-mail and associated table definitively establishes that the repeals are nonbudgetary and the rescission do all the budgetary work. This is splendid news. Thanks again!

---

**From:** ▮▮▮▮▮▮▮▮▮ @cbo.gov>
**Sent:** Thursday, June 5, 2025 3:55 PM
**To:** ▮▮▮▮▮▮▮▮▮ @budget.senate.gov>
**Cc:** ▮▮▮▮▮▮▮▮ @budget.senate.gov>; ▮▮▮▮▮▮▮ @cbo.gov>;
▮▮▮▮▮▮▮ @epw.senate.gov>; ▮▮▮▮▮▮▮ @epw.senate.gov>
**Subject:** RE: HR 1 E&C Questions - byrd

▮▮▮▮,

This totally works. I attached our responses for your byrd requests. Let me know if you have any questions.

Thanks so much.

▮▮▮▮

---

**From:** ▮▮▮▮▮▮▮ @budget.senate.gov>
**Sent:** Thursday, June 5, 2025 2:57 PM
**To:** ▮▮▮▮▮▮▮ @cbo.gov>
**Cc:** ▮▮▮▮▮▮▮ @budget.senate.gov>; ▮▮▮▮▮▮▮ @cbo.gov>;
▮▮▮▮▮▮▮ @epw.senate.gov>; ▮▮▮▮▮▮▮ @epw.senate.gov>
**Subject:** RE: HR 1 E&C Questions

Thanks for clarifying! I've updated the spreadsheet and limited the ask to just the repeal subsections of the sections we are looking at. Please let me know if this is in line with what you are looking for.

Appreciate your assistance!
Best,
▮▮▮▮

---

**From:** ▮▮▮▮▮▮▮ @cbo.gov>
**Sent:** Thursday, June 5, 2025 1:58 PM
**To:** ▮▮▮▮▮▮▮ @budget.senate.gov>
**Cc:** ▮▮▮▮▮▮▮ @budget.senate.gov>; ▮▮▮▮▮▮▮ @cbo.gov>; ▮▮▮▮▮▮▮
▮▮▮▮▮▮▮ @epw.senate.gov>; ▮▮▮▮▮▮▮ @epw.senate.gov>
**Subject:** RE: HR 1 E&C Questions

▮▮▮▮,

I am sorry for the confusion. Can you include the entire provision? I know it seems tedious (and the example I sent didn't include it in the spreadsheet). But this is how we are approaching byrd requests so that there is no confusion about what language we are evaluating. Also, you probably already know this but it does seem like the senate is crafting their own language so an evaluation of the house language may be of limited use.

Thanks,

▮▮▮▮

**A-1**

**From:** <span style="background:black">    </span> @budget.senate.gov>
**Sent:** Thursday, June 5, 2025 10:45 AM
**To:** <span style="background:black">    </span> @cbo.gov>
**Cc:** <span style="background:black">    </span> @budget.senate.gov>; <span style="background:black">    </span> @cbo.gov>; <span style="background:black">    </span> @epw.senate.gov>; <span style="background:black">    </span> @epw.senate.gov>
**Subject:** RE: HR 1 E&C Questions

Thanks, <span style="background:black"> </span>! Attached is a spreadsheet of our question on several of the IRA repeal & rescind sections in HR1. Please let me know if additional information or changes are needed.

We have a clarifying question on your answer on the methane fee—are the effects after 2034 that you reference as not increasing the deficit for the title as a whole, or specifically for the methane fee provision (Sec 42113)?

I've also copied <span style="background:black"> </span> and <span style="background:black"> </span> from EPW here, so sorry for not looping you into my initial email!

Thanks,
<span style="background:black">  </span>

**From:** <span style="background:black">    </span> @cbo.gov>
**Sent:** Thursday, June 5, 2025 10:11 AM
**To:** <span style="background:black">    </span> @budget.senate.gov>
**Cc:** <span style="background:black">    </span> @budget.senate.gov>; <span style="background:black">    </span> @cbo.gov>
**Subject:** RE: HR 1 E&C Questions

Good morning <span style="background:black"> </span>,

It will take me some time to work through your questions. For byrd rule question we are requesting an excel spreadsheet with a precise breakout for what you want us to evaluate. I pasted an example below. Though note they were using current law they needed to go back to the drawing board but this gives you an idea for how to make your request. In this way, we are giving you exactly what you need. For your request, you would break out the sections in HR1 in the way you want me to evaluate them. Does that make sense?

For your questions regarding the methane fee score down.

| IRA Section | Codified | Subject | Line Items for Point Score | Budgetary Effect (Yes/No) (If Removed, would this change the score in any year?) |
|---|---|---|---|---|
| 60101 | CAA §132 | Clean Heavy-Duty Vehicles | | |
| | | | (a)(1) - In General | |
| | | | (a)(2) - Nonattainment Areas | |
| | | | (a)(3) - Administrative Costs | |
| | | | **(b) - Program** | |
| | | | **(c) - Applications** | |
| | | | **(d) - Definitions** | |
| 60103 | CAA §134 | Greenhouse Gas Reduction Fund | | |
| | | | (a)(1) - Zero-emission Technologies | |
| | | | (a)(2) General Assistance | |
| | | | (a)(3) - Low-income/Disadvantaged Communities | |
| | | | (a)(4) - Administrative Costs | |

| | | | (b) - Use of Funds | |
|---|---|---|---|---|
| | | | (c) - Definitions | |

**Your Questions:**

As my colleague ███ alluded to earlier, we are curious about the outyear effects of Sec. 42113. We notice that the methane fee is delayed until calendar year 2034, which means presumably it begins to be collected again in 2035.  Are the effects in 2035 and 2036 similar to those in 2034 (about $300 million a year)? Would this effect continue indefinitely into the future or would it grow or shrink?  If these particular questions are difficult to answer, we'd be happy to chat and come up with a different question about the outyears that's easier: we are just trying to understand the magnitude and duration of deficits after 2034.

**Response:**

The fees would resume in 2035.  We don't have a baseline outside the window but we have done enough analysis to determine that the effects after 2034 would not increase the deficit.  I hope this is helpful.

███

**From:** ███████████████████████ @budget.senate.gov>
**Sent:** Thursday, June 5, 2025 9:33 AM
**To:** ██████████████████ @cbo.gov>
**Cc:** ████████████████████ @budget.senate.gov>
**Subject:** HR 1 E&C Questions

Hi ████,

I hope you are doing well! We have a couple questions we are hoping you might be able to answer:

We are curious for a more detailed breakout of Sec. 42101 – 42112 and Sec. 42114 – 42117 in the Energy & Commerce title of H.R. 1. These sections all repeal and rescind unobligated balances for certain programs, and the text of the sections divides these two functions into subsection (a) (Repeal) and subsection (b) (Rescission).  If (a) was removed from the text, would the CBO scores of just (b) remain the same?  We have the same question for each of these rescissions if the answer is different for particular ones.

As my colleague ███ alluded to earlier, we are curious about the outyear effects of Sec. 42113. We notice that the methane fee is delayed until calendar year 2034, which means presumably it begins to be collected again in 2035.  Are the effects in 2035 and 2036 similar to those in 2034 (about $300 million a year)? Would this effect continue indefinitely into the future or would it grow or shrink?  If these particular questions are difficult to answer, we'd be happy to chat and come up with a different question about the outyears that's easier: we are just trying to understand the magnitude and duration of deficits after 2034.

We know things are quite busy, but it would be great if you could get back to us within the next few days. Let us know if we can clarify our questions in any way!

Best,

███

| H.R.1 Section | Subject | Line Items for Point Score | Budgetary Effect (Yes/No) (If Removed, would this change the score for that section in any year?) |
|---|---|---|---|
| 42101 | Clean Heavy Duty Vehicles | (a) Repeal.--Section 132 of the Clean Air Act (42 U.S.C. 7432) is repealed. | N |
| 42102 | Grants to Reduce Air Pollution at Ports | (a) Repeal.--Section 133 of the Clean Air Act (42 U.S.C. 7433) is repealed. | N |
| 42103 | Greenhouse Gas Reduction Fund | (a) Repeal.--Section 134 of the Clean Air Act (42 U.S.C. 7434) is repealed. | N |
| 42104 | Diesel Emissions Reductions | (a) Repeal.--Section 60104 of Public Law 117-169 is repealed. | N |
| 42105 | Funding to Address Air Pollution | (a) Repeal.--Section 60105 of Public Law 117-169 is repealed. | N |
| 42106 | Funding to Address Air Pollution at Schools | (a) Repeal.--Section 60106 of Public Law 117-169 is repealed. | N |
| 42107 | Low Emissions Electricity Program | (a) Repeal.--Section 135 of the Clean Air Act (42 U.S.C. 7435) is repealed. | N |
| 42108 | Funding for Section 211(o) of the Clean Air Act | (a) Repeal.--Section 60108 of Public Law 117-169 is repealed. | N |
| 42109 | Funding for Implementation of the American Innovation and Manufacturing Act | (a) Repeal.--Section 60109 of Public Law 117-169 is repealed. | N |
| 42110 | Funding for Enforcement Technology and Public Information | (a) Repeal.--Section 60110 of Public Law 117-169 is repealed. | N |
| 42111 | Greenhouse Gas Corporate Reporting | (a) Repeal.--Section 60111 of Public Law 117-169 is repealed. | N |
| 42112 | Environmental Product Declaration Assistance | (a) Repeal.--Section 60112 of Public Law 117-169 (42 U.S.C. 4321 note) is repealed. | N |
| 42114 | Greenhouse Gas Air Pollution Plans and Implementation Grants | (a) Repeal.--Section 137 of the Clean Air Act (42 U.S.C. 7437) is repealed. | N |
| 42115 | Environmental Protection Agency Efficient, Accurate, and Timely Reviews | (a) Repeal.--Section 60115 of Public Law 117-169 is repealed. | N |
| 42116 | Low-Embodied Carbon Labeling for Construction Materials | (a) Repeal.--Section 60116 of Public Law 117-169 (42 U.S.C. 4321 note) is repealed. | N |
| 42117 | Environmental and Climate Justice Block Grants | (a) Repeal.--Section 138 of the Clean Air Act (42 U.S.C. 7438) is repealed. | N |