# In the United States Court of Appeals for the District of Columbia Circuit

CLIMATE UNITED FUND, *et al.*,
*Plaintiffs-Appellees*,

*v.*

CITIBANK, N.A., *et al.*,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Columbia, No 1:25-cv-698,
Hon. Tanya S. Chutkan

**BRIEF FOR THE NATURAL RESOURCES DEFENSE COUNCIL
AS AMICI CURIAE IN SUPPORT OF APPELLEE AND AFFIRMANCE**

Thomas Zimpleman
NATURAL RESOURCES DEFENSE
  COUNCIL
1152 15th St. NW, Suite 300
Washington, DC 20005

Daniel F. Jacobson
Stephen K. Wirth
Kyla M. Snow
JACOBSON LAWYERS GROUP PLLC
5100 Wisconsin Ave., NW, Ste. 301
Washington, DC 20016
(301) 823-1148
dan@jacobsonlawyersgroup.com

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, amicus curiae Natural Resources Defense Council states that it has no parent corporation and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ..................................................i

TABLE OF AUTHORITIES .............................................................. iii

INTEREST OF AMICI CURIAE .....................................................1

SUMMARY OF ARGUMENT..........................................................2

ARGUMENT ...................................................................................6

I.  Defendants Are Unlawfully Impounding Appropriations......................6

    A.  Defendants Were Unlawfully Impounding the GGRF
        Appropriations upon Terminating the Awards ..............................6

    B.  Any Future Actions to Effectuate the Terminations Will
        Unlawfully Impound the Appropriations ......................................14

II.  EPA Has Appropriations to Operate the GGRF Programs ..................16

III.  The Court Should Make Clear that Jurisdiction Must Exist for
     Plaintiffs' Constitutional Claims................................................17

CONCLUSION....................................................................................20

# TABLE OF AUTHORITIES

**Cases**                                                                 Page(s)

*Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996)....................18

*Fisher v. United States*, 402 F.3d 1167 (Fed. Cir. 2005) ...................................19

*LeBlanc v. United States*, 50 F.3d 1025 (Fed. Cir. 1995)................................19

*Nat. Res. Def. Council, Inc. v. City of Los Angeles*,
    98 Cal. App. 5th 1176 (2023) .............................................................................1

*Population Inst. v. McPherson*, 797 F.2d 1062 (D.C. Cir. 1986) .....................12

*United States v. Chem. Found.*, 272 U.S. 1 (1926)...........................................13

*USPS v. Gregory*, 534 U.S. 1 (2001)...................................................................13

*W. Va. Ass'n of Community Health Centers v. Heckler*,
    734 F.2d 1570 (D.C. Cir. 1984) .......................................................................12

*Webster v. Doe*, 486 U.S. 592 (1988) .............................................................5, 18

**Statutes**

28 U.S.C. § 1491(a)(1) ..........................................................................................19

31 U.S.C.
    § 1341(a)(1) ......................................................................................................7
    § 1501(a)(1)(B) ................................................................................................7
    § 1502(a) ...........................................................................................................7

Consolidated Appropriations Act, 2026, Pub. L. 119–74, tit. II ......................17

Inflation Reduction Act, Pub. L. 117–169, title VI, § 60103, 136 Stat.
    2066 (2022)........................................................................................................7

Reconciliation Act of 2025, Pub. L. 119–21, 139 Stat. 72...................4, 14, 15, 16
    § 60002, 139 Stat. 154 .....................................................................................15

**Other Authorities**

*Continued Availability of Expired Appropriation for Additional
    Project Phases*, B-286929, 2001 WL 717355 (Apr. 25, 2001) .........................8

Exec. Order 14,154 (Jan. 20, 2025)........................................................................7

GAO, Principles of Federal Appropriations Law (3d ed. 2004) .................9, 11

*In the Matter of Substitute Grant Projects*, 57 Comp. Gen. 459, 461, B-190847, 1978 WL 13417 (May 12, 1978)..............................................................10

*In the Matter of the Cancer Research Institute, Los Angeles*, 57 Comp. Gen. 205, 209, B-189712, 1978 WL 13358 (Jan. 5, 1978)................................10

*Matter of Economic Development Administration*, B-211323, 1984 WL 43695 (Jan. 3, 1984)..........................................................................................8

*The Honorable Lawton Chiles United States Senate*, B-164031, 1976 WL 10353 (June 25, 1976)....................................................................................10

William Baude et al., *Hart & Wechsler's The Federal Courts and the Federal System* (8th ed. 2025) .........................................................................19

# INTEREST OF AMICI CURIAE

Amicus curiae Natural Resources Defense Council (NRDC) respectfully submits this amicus brief in support of appellees and affirmance.[1]

Since its founding in 1970, NRDC, a non-profit environmental organization, has litigated hundreds of cases that concern the legality of actions taken by the Executive Branch. The defendants in this case argue for interpretations of federal statutes that would prohibit the plaintiffs from pursuing statutory and constitutional claims in district court, and that could result in the permanent loss of funding that Congress appropriated to address environmental harms.[2] NRDC submits this brief as amicus curiae to discuss

---

[1] All parties consented to the filing of this brief. NRDC affirms that no counsel for a party authored this brief in whole or in part, no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief, and no person other than the NRDC or its counsel made such a monetary contribution.

[2] The loss of this funding would stymie efforts to remediate pollution. For example, Climate United announced a program to offer affordable leasing options for electric drayage vehicles serving the Port of Los Angles and Port of Long Beach. *See* Climate United, *Climate United Launches Historic $250 Electric Drayage Truck Program*, https://www.climateunited.org/news-and-press/electric-drayage-truck-program-announcement (Oct. 29, 2024). Reducing pollution from drayage operations has been a significant concern for communities near these ports. *See Nat. Res. Def. Council, Inc. v. City of Los Angeles*, 98 Cal. App. 5th 1176, 1221 (2023).

why the district court has jurisdiction over those claims and why it is essential for Plaintiffs to obtain relief on those claims now.

## SUMMARY OF ARGUMENT

Plaintiffs are likely to succeed on the merits of their constitutional and *ultra vires* claims for a straightforward reason: the March 2025 termination of Plaintiffs' grants—and any future steps by the Environmental Protection Agency (EPA) to effectuate the terminations—represent an unlawful impoundment of $20 billion that Congress appropriated for programs under the Greenhouse Gas Reduction Fund (GGRF).[3]

The grant terminations were unlawful the moment EPA sent the termination notices because the relevant appropriations could not be obligated after September 30, 2024, meaning the money would be impounded if not spent on Plaintiffs' awards. At the panel stage, EPA argued and the panel accepted that EPA could and would re-obligate the relevant funds after terminating

---

[3] Plaintiffs are also likely to succeed on their APA claims, including for arbitrary-and-capricious agency actions. Defendants do not contest the merits of the arbitrary-and-capricious claims, and as Plaintiffs explain, sovereign immunity is not an issue for the APA claims because Plaintiffs do not seek payments of funds held by the federal government. That must be correct because federal courts possess inherent equitable authority to prohibitively enjoin federal officials from violating the law, and sovereign immunity only becomes an issue when injunctive relief would require the affirmative expenditure of funds from the Treasury. However, Plaintiffs' APA claims are not the focus of this brief.

Plaintiffs' grants, to avoid impounding the money. But it is hornbook appropriations law, anchored in the Appropriations Clause and the Anti-Deficiency Act, that agencies may not obligate appropriations after the congressionally prescribed period of availability for the funds has passed.

The Government Accountability Office (GAO) has confirmed many times that this principle applies to agency efforts to terminate and re-issue grants after the grant funds have expired. GAO has recognized just one narrow exception—that an agency may issue a "replacement grant" with expired funds if the replacement grant would be a mere "continuation" of the original grant. That generally requires that the replacement grant be to a successor-in-interest of the original grantee, and it always requires that the replacement grant have the same "purpose," "scope," and "material features" as the original grant. There is no possibility that these conditions would be met here, given EPA's own assertions that it terminated the awards to pursue different policies and priorities. The panel overlooked these legal requirements for replacement grants in finding that EPA could issue them here.

Perhaps recognizing that it could not have legally issued new grants, EPA now changes tack in two ways. First, EPA argues that it does not matter whether issuing new awards would have been lawful; all that matters in EPA's

view is that it purportedly *intended* to issue new awards upon terminating Plaintiffs' grants. But the legal violation is the unlawful impoundment of money, which does not turn on Defendants' inchoate intent to take future action. Under the presumption of regularity, this Court should not assume that EPA would have obligated expired funds to new awards in violation of the Appropriations Clause and the Anti-Deficiency Act. That means the terminations would have resulted in the impoundment of all the money—$20 billion—that Congress appropriated for these GGRF programs.

EPA also contends that Congress' repeal of Section 134 of the Clean Air Act and rescission of unobligated GGRF funds in the Reconciliation Act of 2025 moots any impoundment issue. It is the opposite. To effectuate the grant terminations, EPA will need to take additional actions including "de-obligating" the money currently committed to Plaintiffs' awards. If, as EPA suggests, the repeal of Section 134 precludes EPA from issuing even replacement grants, then the de-obligation of funds from Plaintiffs' awards would unavoidably impound the funds. That is contrary not only to the Inflation Reduction Act, but also the Reconciliation Act of 2025. Congress specifically rescinded only the "unobligated balances" of the GGRF appropriations in 2025, and not the amounts obligated to Plaintiffs' awards.

Permitting the terminations to go forward would enable EPA to rescind $20 billion in appropriations that Congress did not rescind.

EPA also errs to the extent it implies that it could not administer Plaintiffs' awards if they are restored, because Congress rescinded a separate appropriation for EPA's administration of the GGRF. EPA has ample funds available to administer and oversee the GGRF program; just weeks ago, Congress appropriated several billion dollars to EPA that could be used for administering GGRF awards.

Finally, the Court should expressly hold that jurisdiction exists over Plaintiffs' constitutional claims, including because of the clear statement rule of *Webster v. Doe*, 486 U.S. 592 (1988). The panel correctly held that the district court had jurisdiction over Plaintiffs' constitutional claims, but the panel did not explain why. One critical reason that jurisdiction exists for the constitutional claims is that, if Plaintiffs could not bring these claims in district court, they would have *no judicial forum* to bring their constitutional claims, which they cannot bring in the Court of Federal Claims. *Webster* requires an express statement from Congress where it intends such a result, and the Tucker Act contains no such statement. Indeed, the Supreme Court has never found a federal statute to meet the *Webster* test. There is no basis to find the

Tucker Act meets the demanding standard needed to entirely preclude a party from challenging the constitutionality of federal government action.

Because the question of district court jurisdiction to hear constitutional challenges to grant terminations is a recurring one in this Circuit, the Court should make clear that jurisdiction does exist in this context for constitutional claims that a plaintiff could not bring in the Court of Federal Claims.

## ARGUMENT

I. **Defendants Are Unlawfully Impounding Appropriations**

A. **Defendants Were Unlawfully Impounding the GGRF Appropriations upon Terminating the Awards**

At the panel stage, EPA argued that it was not unlawfully impounding the relevant GGRF appropriations because it would "re-obligate" the funds to other grants, once it finalized the terminations and "de-obligate[d]" the funds from Plaintiffs' grants. EPA Panel Br. at 37-38. EPA insisted that "it ha[d] committed to re-obligating the funds appropriated under the [GGRF]," and there was no "reason to doubt that commitment." *Id.* In these en banc proceedings, EPA is similarly adamant that "it intended to" enter "new agreements" once it finalized the terminations of the existing awards. EPA En Banc Br. 47.

But regardless of whether EPA genuinely aspired at the time of the terminations to re-obligate the funds through new grant agreements, *see* Exec. Order 14,154, § 7 (Jan. 20, 2025) ("Terminating the Green New Deal"), EPA had no legal ability to actually award new grants with the GGRF appropriations.

Congress, in exercising its powers under the Appropriations Clause, may restrict the time period in which appropriations may be obligated. Congress prescribes that appropriations are "available until" a particular date, and the window in which agencies may then lawfully obligate funds is known as the "period of availability." 31 U.S.C. § 1502(a). The Appropriations Clause and myriad federal statutes prohibit agencies from obligating funds beyond their period of availability; any obligation of funds after the congressionally prescribed expiration date would be "[m]oney . . . drawn from the Treasury" that is not authorized "by Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7; *see* 31 U.S.C. §§ 1341(a)(1), 1501(a)(1)(B), 1502(a).

In the Inflation Reduction Act (IRA), Congress provided that the relevant appropriations for GGRF grants were "to remain available until September 30, 2024." Pub. L. 117–169, title VI, § 60103, 136 Stat. 2066 (2022). That means the period of availability of the appropriations ended on

September 30, 2024. The grants to Plaintiffs were properly obligated within the period of availability. But the period of availability had ended at the time of the March 2025 terminations, and there would be no lawful mechanism for EPA to de-obligate and then re-obligate the funds given the reasons provided for the terminations.

Government Accountability Office (GAO) precedents and basic principles of appropriations law make this clear. As GAO has explained, "[i]f an agency deobligates funds after the expiration of the period of availability, the funds are not available for new obligations." *Continued Availability of Expired Appropriation for Additional Project Phases*, B-286929, 2001 WL 717355, at *3 (Apr. 25, 2001). Rather, "[f]unds deobligated after the expiration of the period of availability revert to the Treasury." *Matter of Economic Development Administration*, B-211323, 1984 WL 43695, at *1 (Jan. 3, 1984).

These principles have been consistently applied to grants. "As a general rule, when a recipient of a grant is unable to implement the grant as originally contemplated, and an alternative grantee is designated subsequent to the expiration of the period of availability for obligation of the grant funds, the award to the alternative grantee must be treated as a new obligation and is not properly chargeable to the appropriation current at the time the original grant

was made." 2 GAO, Principles of Federal Appropriations Law 10-108 (3d ed. 2004).

GAO has recognized just one extremely narrow exception to this principle: where an agency terminates a grant after the appropriations obligated to the grants have expired, the agency may in certain circumstances use those appropriations to issue a "replacement grant." Replacement grants are permissible only when they are properly considered a *continuation* of the original grant, rather than a new or "substitute" grant. *Id.* at 10-108–10-110. For that reason, replacement grants must be "substantially identical in scope and purpose to the original grant." *Id.* at 10-109. If replacement grants are properly deemed a continuation of the original grant, the agency records the obligation of funds as if it were done at the time of the original award. *See id.* at 10-108–10-110.

Typically, to be a continuation of the original award, a replacement grant must go to "a successor of the original grantee" rather than "to an entirely different grantee," and must involve the same "community to be served" as the original grant. *Id.* For instance, GAO has permitted a replacement grant where a county and a university jointly submitted a grant application, the grant was made to only the county for accounting purposes, and the agency

subsequently sought to amend the grant to name the university as grantee to carry out the same purpose in "precisely the same area" as the original award. *In the Matter of the Cancer Research Institute, Los Angeles*, 57 Comp. Gen. 205, 209, B-189712, 1978 WL 13358 (Jan. 5, 1978). In contrast, an agency could not re-obligate expired funds where the new grant would go to a hospital "125 miles" away from the original grantee, because the new grant would not be "a continuation of the original [award]." *The Honorable Lawton Chiles United States Senate*, B-164031, 1976 WL 10353, at *4 (June 25, 1976); *see also In the Matter of Substitute Grant Projects*, 57 Comp. Gen. 459, 461, B-190847, 1978 WL 13417 (May 12, 1978).

Here, there is no plausible way that EPA could have issued "replacement grants" using the expired IRA appropriations tied to the terminated grants. In EPA's telling, the legal basis for terminating Plaintiffs" grants was that they "no longer effectuate[d] the program goals or agency priorities" of the new Administration. EPA Panel Br. at 32. There is no authority that permits an agency to de-obligate grant funds and then re-obligate them, post-expiration, to serve different goals and priorities. A grant intended to further different goals and policies cannot possibly be "a continuation of the original" grant. 1976 WL 10353, at *4. By definition, such

a grant does not have the same "purpose," "scope," and "material features" as the terminated grant, as is required to permissibly issue a replacement grant using expired funds. Principles of Federal Appropriations Law, *supra*, at 10-107. Moreover, EPA left no doubt that any new grants would be to "entirely different grantee[s]," making it that much more impossible that EPA could have lawfully re-obligated the funds. Principles of Federal Appropriations Law, *supra*, at 10-108,

In light of these principles of appropriations law, EPA is incorrect that, under the facts present here, "there can be no serious contention that the statute, which provides EPA discretion in awarding grants, prohibits EPA from also terminating those grant agreements and entering into new ones." EPA En Banc Br. 46. The statute—*i.e.*, the Inflation Reduction Act—set an expiration date to obligate these funds of September 30, 2024. Because the Appropriations Clause forbids EPA from re-obligating the funds to entirely new awards after that date, the statute and the separation of powers *did* prohibit EPA from "terminating [the] grant agreements and entering into new ones" in March 2025. *Id.*

The panel majority similarly erred in its assessment of whether EPA could have lawfully re-obligated the GGRF appropriations even though the

funds had expired. The panel reasoned that "the rule the grantees assert"—that funds may not be re-obligated after they have expired—"would be inconsistent with this court's recognition that the government gets 'a second chance to obligate' even after an appropriation has lapsed if a court sets aside the original, timely obligation." Panel Op. 24 (quoting *Population Inst. v. McPherson*, 797 F.2d 1062, 1071 (D.C. Cir. 1986)). But *Population Institute* concerned a court order setting aside an agency's obligation of funds, not an agency's voluntary de-obligation of funds. *Population Institute*'s holding that the agency could have a "second chance to obligate" when a court sets aside the original obligation was based on a line of cases where this Court has held that federal courts possess inherently equitable authority to extend an appropriation's period of availability. 797 F.2d at 1071 (citing *W. Va. Ass'n of Community Health Centers v. Heckler*, 734 F.2d 1570, 1576–77 (D.C. Cir. 1984)). Federal courts may possess the equitable power to extend an appropriation's deadline, but federal agencies do not.

Perhaps recognizing that it could not lawfully have re-obligated the funds post-termination, EPA now contends "[t]his Court's assessment of whether EPA would have been entitled to enter into new agreements cannot supersede EPA's own determination that it intended to do so." EPA En Banc

Br. 47. According to EPA, because it "did not declare any intention to leave appropriated funds unobligated," it "cannot be held to have dismantled the program." *Id.*

This makes no sense. Once EPA terminated Plaintiffs' grants and sought to de-obligate the funds, it was taking action to dismantle the program, because there would have been no lawful way to spend the billions in appropriations obligated to the terminated awards. Whether EPA openly "declare[d]" its intention to break the law is irrelevant. Any effort to re-obligate the funds would have been void and subject to successful legal challenges. And if EPA's alleged intent to commit a legally null act was relevant, this Court cannot assume, as EPA seemingly suggests it should, that EPA would have re-obligated the funds to new awards in violation of the law. This Court must assume the opposite under the "presumption of regularity" that attaches to agency actions—that EPA would have acted lawfully and not re-obligated the funds to new awards. *USPS v. Gregory*, 534 U.S. 1, 10 (2001); *see United States v. Chem. Found.*, 272 U.S. 1, 14–15 (1926) ("The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.").

EPA also has it backwards when it suggests that, so long as the grant agreements contemplated that EPA could terminate the awards at any date, "it could do so whether or not it could then re-obligate the funds." EPA En Banc Br. 48. The Constitution and federal statutes trump contractual terms, and they prohibited EPA from terminating the grants *en masse* for policy reasons after the funds' expiration date so as to permanently impound the appropriations. The contractual terms do not alter the constitutional and statutory prohibitions on doing so after September 2024.

The bottom line is that, when EPA terminated the grants at issue, the terminations would have resulted in the permanent impoundment of $20 billion in congressional appropriations, if not for the preliminary injunction entered below. The injunction should be affirmed on that basis alone.

## B. Any Future Actions to Effectuate the Terminations Will Unlawfully Impound the Appropriations

The terminations were not only unlawful at the time EPA issued the termination notices in March 2025, but any future actions that EPA now takes to effectuate its termination of the program—including de-obligating the funds committed to the awards—would be equally unlawful. The repeal of Section 134 of the Clean Air Act and rescission of unobligated GGRF funds in the Reconciliation Act of 2025 does not dictate otherwise. If anything, the

Reconciliation Act renders it more apparent that effectuating the March 2025 terminations at this point would unlawfully impound $20 billion in appropriations.

As described, if this Court vacates the district court's preliminary injunction and EPA is permitted to effectuate the terminations, EPA would then have to take subsequent actions to close-out the awards and finalize the terminations, including de-obligating the funds that had been committed to the awards. If the Reconciliation Act of 2025 had not repealed Section 134 of the Clean Air Act, then the only permissible way for EPA to avoid impounding the funds would have been to issue proper replacement grants, which, as previously explained, EPA could not have done.

However, if the repeal of Section 134 of the Clean Air Act prohibits EPA from issuing replacement grants, as EPA seems to suggest (*see* EPA En Banc Br. at 20), then it is a *certainty* that de-obligating the funds from Plaintiffs' grants would permanently impound the associated $20 billion in appropriations. That would be contrary to Congress' decision in the Reconciliation Act to rescind only the "unobligated balances" of the GGRF appropriations as of "the day before the date of enactment of [the Act]." Pub. L. 119–21, § 60002, 139 Stat. 154. Any de-obligation of funds from Plaintiffs'

awards at this point would rescind the *obligated* balances as of that date. Such action would be contrary to the Inflation Reduction Act and to Congress' actions in the Reconciliation Act as well.

The panel majority failed to grapple with this fact. The panel stated that "[i]f the repeal of the statute bars EPA from recommitting the funds, it stands to reason that the repeal also relieves EPA of any statutory obligation to do so." Panel Op. 25 n.11. The relevant legal question, however, is not whether EPA must re-obligate funds if they carry out the terminations, but rather whether EPA can lawfully *de-obligate* the funds via the terminations. De-obligating the funds is what the district court's injunction prevents EPA from doing. "If the repeal of the statute bars EPA from recommitting the funds," *id.*, that further cements that de-obligating the funds now would be unlawful.

## II. EPA Has Appropriations to Operate the GGRF Programs

EPA notes in its en banc brief that, in the Reconciliation Act of 2025, Congress rescinded the unobligated balances of money that Congress had appropriated in the Inflation Reduction Act to administer the GGRF programs. EPA En Banc Br. 20. To the extent that EPA is suggesting that the rescission of these funds renders EPA unable to "administer" and "oversee" the GGRF programs, *id.*, that is inaccurate.

Although Congress sometimes appropriates money for administration of a particular grant program, Congress separately appropriates money to each agency for its general operations, including for salaries and expenses in managing the agency's programs. EPA is no exception. In the most recent appropriations bill for Fiscal Year 2026, Congress appropriated $3,114,671,000 to EPA for "Environmental Programs and Management." Pub. L. 119–74, tit. II (Jan. 23, 2026). EPA would be free to use these funds to administer and operate the GGRF programs if the terminations remain enjoined. Indeed, Congress could have prohibited EPA in the recent appropriations act from using these funds to administer the GGRF programs, but Congress did not do so.

## III. The Court Should Make Clear that Jurisdiction Must Exist for Plaintiffs' Constitutional Claims.

Finally, because of the importance of the issue to present and future cases in this Circuit, the Court should make explicit that the panel was correct that the district court had jurisdiction over Plaintiffs' constitutional claims and the Court should explain why that is so.

As Plaintiffs explain in their briefs, sovereign immunity does not bar any of their claims because Plaintiffs do not seek payments of funds held by the federal government. Federal courts possess inherent equitable authority to

prohibitively enjoin federal officials from violating the law, and sovereign immunity is not an issue when judicial relief would not compel the federal government to affirmatively expend funds from the Treasury. Sovereign immunity independently is not an issue for Plaintiffs' constitutional challenges and *ultra vires* claims, because "if the federal officer, against whom injunctive relief is sought, allegedly acted in excess of his legal authority, sovereign immunity does not bar a suit." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996).

But there is an additional, unique reason why the district court has jurisdiction over Plaintiffs' constitutional claims: the clear statement rule of *Webster v. Doe*. In *Webster*, the Supreme Court held that where a plaintiff would lack any judicial forum to bring a constitutional challenge if a district court lacked jurisdiction, Congress' "intent" to produce this outcome "must be clear." 486 U.S. at 603. The Court "require[s] this heightened showing in part to avoid the serious constitutional question that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Id.* (quotations omitted). The Supreme Court has *never* read a federal statute to preclude a party from having any forum to challenge the constitutionality of government action, to "avoid squarely facing" the "serious constitutional

question" that would present. William Baude et al., *Hart & Wechsler's The Federal Courts and the Federal System* 462 (8th ed. 2025).

*Webster* controls here because if the district court lacks jurisdiction over Plaintiffs' constitutional claims, Plaintiffs would have *no judicial forum* to assert these claims. Plaintiffs could not bring their constitutional claims in the Court of Federal Claims, which the government suggests is the proper forum for challenging the terminations. Under 28 U.S.C. § 1491(a)(1), federal contractors may bring constitutional claims in the Court of Federal Claims only if the relevant constitutional provision is "money-mandating," meaning it entitles an individual to a particular sum of money. *Fisher v. United States*, 402 F.3d 1167, 1173 (Fed. Cir. 2005). The Federal Circuit has held the constitutional provisions underlying the separation of powers are not money-mandating, and therefore separation-of-powers claims may not be brought under § 1491(a)(1). *LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995). Thus, if the district court lacked jurisdiction over Plaintiffs' constitutional claims, no court would have jurisdiction to hear these claims.

The Tucker Act provides no clear statement that Congress intended to deny any judicial forum for bringing a constitutional challenge in the context of a grant termination. That is dispositive under *Webster*. There is simply no

basis to hold that the Tucker Act is the first ever federal statute to leave a private party with no forum to challenge the constitutionality of federal government action.

To eliminate all doubt in this case and other lawsuits in this Circuit challenging the constitutionality of grant terminations, this Court should make clear that, federal district courts have jurisdiction to hear constitutional challenges to grant terminations where the plaintiff could not assert that constitutional challenge in the Court of Federal Claims.

## CONCLUSION

For the foregoing reasons and those set forth in Plaintiffs' briefs, the Court should affirm the decision below.

Respectfully Submitted,

/s/ Daniel F. Jacobson

Thomas Zimpleman
NATURAL RESOURCES DEFENSE
  COUNCIL
1152 15th St. NW, Suite 300
Washington, DC 20005

Daniel F. Jacobson
Stephen K. Wirth
Kyla M. Snow
JACOBSON LAWYERS GROUP PLLC
5100 Wisconsin Ave., NW, Ste. 301
Washington, DC 20016
(301) 823-1148
dan@jacobsonlawyersgroup.com

*Counsel for Amicus Curiae*

February 9, 2026

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing brief complies with Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7) because it contains 4,209 words. I further certify that the brief complies with the typeface and typestyle requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared using Microsoft Word in proportionally spaced 14-point Century font.

Dated: February 9, 2026 */s/ Daniel F. Jacobson*
Daniel F. Jacobson

**CERTIFICATE OF SERVICE**

I certify that on February 9, 2026, I caused the foregoing document to be electronically filed using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: February 9, 2026        */s/ Daniel F. Jacobson*
                                             Daniel F. Jacobson