**ORAL ARGUMENT SCHEDULED FOR FEBRUARY 24, 2026**

No. 25-5122

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

CLIMATE UNITED FUND, *et al.*,

Plaintiffs-Appellees

v.

CITIBANK, N.A., *et al.*,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of Columbia

**BRIEF OF *AMICI CURIAE* THE NATIONAL LEAGUE OF CITIES AND THE U.S. CONFERENCE OF MAYORS IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE**

Michael Burger (*counsel of record*)
Romany Webb
Vincent M. Nolette
 SABIN CENTER FOR CLIMATE CHANGE
 LAW
 COLUMBIA LAW SCHOOL
435 W. 116th St.
New York, NY 10027
mburger@law.columbia.edu
(212) 854-2372

DATED: February 10, 2026      *Counsel for Amici Curiae*

## STATEMENT REGARDING SEPARATE BRIEFING, AUTHORSHIP, AND MONETARY CONTRIBUTIONS

*Amici* National League of Cities and U.S. Conference of Mayors file this separate *amicus* brief in compliance with the word limits set forth in Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i), excluding the parts excluded by Fed. R. App. P. 27(d)(2) and 32(f) and D.C. Circuit Rule 32(e)(1).

Pursuant to Fed. R. App. P. Rule 26.1, *amici curiae* state that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

Under Fed. R. App. P. 29(a)(4), *amici curiae* state that no party's counsel authored this brief in whole or in part, and no party or party's counsel contributed money intended to fund the preparation or submission of this brief. No person—other than the *amici curiae* or their counsel—contributed money intended to fund the preparation or submission of this brief.

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Cir. Rule 28(a)(1), *Amici Curiae* states as follows:

### A. Parties, Intervenors, and *Amici Curiae*

Except for the following, all Parties, Intervenors, and *Amici Curiae* appearing in this Court are listed in Plaintiffs-Appellees' Answering Brief: Amicus Public Citizen.

### B. Rulings Under Review

References to rulings at issue appear in Brief of Appellant Citibank, N.A., Doc. 95.

### C. Related Cases

References to rulings at issue appear in Brief of Appellant Citibank, N.A, Doc. 95.

Dated:      February 10, 2026          /s/ Michael Burger
                                        MICHAEL BURGER

# CONTENTS

TABLE OF AUTHORITIES.................................................................vi

GLOSSARY OF TERMS .................................................................x

IDENTITIES AND INTEREST OF AMICI CURIAE ............................................1

SUMMARY OF ARGUMENT.................................................................3

ARGUMENT .................................................................6

I.    Local Governments Were Slated to Receive Enormous Benefits from NCIF and CCIA Funding .................................................................7

    A.  NCIF Benefits .................................................................10

    B.  CCIA Benefits.................................................................16

II.    Amici's Members Have Suffered—and Remain at Risk of Suffering Further—Irreparable Harm if the Preliminary Injunction Is Not Upheld and the Administrative Stay Vacated.................................................................20

    A.  Harm Due to Budget Impacts, Projects Paused, and Services Interrupted ...22

    B.  Harm to Local Governments' Climate Efforts and Residents' Health, and Well-Being.................................................................27

CONCLUSION .................................................................31

CERTIFICATE OF COMPLIANCE.................................................................32

CERTIFICATE OF SERVICE.................................................................................33

# TABLE OF AUTHORITIES

## Cases

*New York v. Trump,* 769 F. Supp. 3d 119 (D.R.I. 2025), *appeal dismissed*,

No. 25-8010 (1st Cir. May 12, 2025).......................................................................6

*State of Washington et al., v. U.S. Dept. of Transportation et al*,

No. 2:25-CV-00848-TL, 2026 WL 183584 (W.D. Wash. Jan. 23, 2026) .............6

*Woonasquatucket River Watershed Council v. U.S. Dept. of Agric.*,

778 F. Supp. 3d 440 (D.R.I. 2025)...........................................................................6

## Statutes

Pub. L. No. 117-169, 136 Stat. 1818 (2022) ...........................................................7

## Regulations

42 U.S.C. § 7434 ...............................................................................................8, 9, 19

## Other Authorities

*Arkansas Profile Analysis*, U.S. ENERGY INFO. ADMIN. (updated Aug. 21, 2025),

https://www.eia.gov/state/analysis.php?sid=AR ...................................................12

City of Los Angeles, Cal., *L.A.'s Green New Deal*,

https://plan.mayor.lacity.gov ..................................................................................29

CLIMATE UNITED 2025 IMPACT REPORT, CLIMATE UNITED (Oct. 8, 2025),

https://www.climateunited.org/blog/climate-united-2025-impact-

report...........................................................................................................12, 13, 21

Climate United Fund, *NCIF Workplan* (Aug. 2024),

    https://www.epa.gov/system/files/documents/2024-08/ncif-workplan-

    cuf.pdf.................................................................................11, 13, 14, 28

Coalition for Green Capital, *NCIF Workplan* (2025), https://cgc.org//wp-

    content/uploads/CGC-NCIF-Work-Plan-2025.pdf................................11, 13, 28

*Greenhouse Gas Reduction Fund*, U.S. ENV'T. PROTECTION AGENCY (2023),

    https://www.epa.gov/system/files/documents/2023-

    02/Greenhouse%20Gas%20Reduction%20Fund%20Factsheet.pdf................8, 10

IPCC, AR6 SYNTHESIS REPORT: CLIMATE CHANGE 2023 (2023)...........................27

Justice Climate Fund, *CCIA Workplan* (Aug. 2024),

    https://www.epa.gov/system/files/documents/2024-08/ccia-workplan-

    jcf.pdf..............................................................................................18, 19

Kelly House, *Trump's 'green bank' freeze puts Michigan climate, housing efforts in

    limbo*, BRIDGE MICHIGAN (Mar. 26, 2025), https://bridgemi.com/michigan-

    environment-watch/trumps-green-bank-freeze-puts-michigan-climate-housing-

    efforts-limbo/ ...................................................................................21

Lachlan Carey & Jun Ukita Shepard, *Congress's Climate Triple Whammy:

    Innovation, Investment, and Industrial Policy*, ROCKY MOUNTAIN INST. (Aug. 22,

    2022), https://rmi.org/climate-innovation-investment-and-industrial-policy ........7

Megan Mahajan & Eric Hangen, *Clean Energy as Economic Development: An Analysis of the Greenhouse Gas Reduction Fund*, UNIV. OF NEW HAMPSHIRE, CTR. FOR IMPACT FINANCE (May 12, 2025), https://energyinnovation.org/wp-content/uploads/An-Analysis-of-the-Greenhouse-Gas-Reduction-Fund.pdf ...................................................................................................8, 28

Michelle Lee et al., *Harnessing the transformative potential of the Greenhouse Gas Reduction Fund*, CLIMATE POLICY INITIATIVE (June 2024) https://www.climatepolicyinitiative.org/wp-content/uploads/2024/01/CPI_GGRF-Assessment-Report.pdf ...........................23

*Municipal Investment Fund*, ICLEI – LOCAL GOVERNMENTS FOR SUSTAINABILITY USA, https://icleiusa.org/iclei-cgc/ ..................................................................23

Natural Resources Defense Council, *Stolen Futures Map of Communities Betrayed by Federal Funding Clawbacks* (2026), https://www.nrdc.org/resources/stolen-futures ..........................................................................................................25

Power Forward Communities, *Fact Sheet: Power Forward Communities Announces More Than Half a Billion Dollars in Investments to Lower Housing Costs and Utility Bills for Families Nationwide* (Feb. 24, 2025), https://a-us.storyblok.com/f/1014573/x/0f93107325/pfc-press-release-announcement_022425.pdf ..............................................................................24

Power Forward Communities, *NCIF Workplan* (Aug. 2024),

https://www.epa.gov/system/files/documents/2024-08/ncif-workplan-

pfc.pdf..................................................................................11, 13, 15, 16, 28

*Press Release*, Senator Edward Markey (Mar. 22, 2024),

https://www.markey.senate.gov/news/press-releases/senator-markey-blasts-

house-republican-push-to-defund-his-greenhouse-gas-reduction-fund-the-single-

largest-climate-investment-in-inflation-reduction-act .........................................19

Remarks of Rep. Blumenauer, 168 Cong. Rec. E856 (Daily Ed. Aug. 16, 2022) ....9

Remarks of Sen. Cardin, 168 Cong. Rec. S4210 (Daily Ed. Aug. 6, 2022)..............9

Zachary D. Liscow, *The Efficiency of Equity in Local Government Finance*, 92

N.Y.U. L. REV. 1828 (2017)...............................................................................9

Zack Colman, *Climate groups could beat Trump in fight for $20B. It may be too

late*, POLITICO (Mar. 23, 2025),

https://www.politico.com/news/2025/03/23/trump-court-loss-could-still-gut-

biden-green-agenda-00242974 ............................................................................22

**GLOSSARY OF TERMS**

| Term or Abbreviation | Definition | Citation |
|---|---|---|
| CCIA | Clean Communities Investment Accelerator | |
| CGC | Coalition for Green Capital | |
| CGC.Buendia.Decl. | Declaration of Jessica Buendia (CGC) | Dkt. 33-26 |
| CGC.Kauffman.Decl. | Declaration of Richard Kauffman (CGC) | Dkt. 33-28 |
| Climate United | Climate United Fund | |
| CU.Bafford.Decl. | Declaration of Elizabeth Bafford (CU) | Dkt. 33-2 |
| Dkt. | Docket entry in *Climate United Fund v. Citibank, N.A., et al.*, 25-cv-698 | Dkt. |
| Doc. | Docket entry in *Climate United Fund v. Citibank, N.A., et al.*, No. 25-05122 | Doc. |
| EPA | United States Environmental Protection Agency | |
| GGRF | Greenhouse Gas Reduction Fund | |
| ICLEI | ICLEI–Local Governments for Sustainability USA | |
| Inclusiv | Inclusiv, Inc. | |
| Inclusiv.Arabshahi.Decl. | Motion for Preliminary Injunction, *Inclusiv, Inc. v. EPA, et al.*, No. 1:25-cv-00948 | Dkt. 6 |
| IRA | Inflation Reduction Act | |
| JCF | Justice Climate Fund | |
| JCF.Kirkwood.Decl. | Motion for Preliminary Injunction, *Justice Climate Fund v. EPA, et al.*, No. 1:25-cv-01208 | Dkt. 7 |
| LIDAC | Low-Income and Disadvantaged Community | |
| NCIF | National Clean Investment Fund | |
| Op. | Memorandum Opinion Granting Plaintiffs' Motion for Preliminary Injunction | Dkt. 89 |
| PFC | Power Forward Communities, Inc. | |

x

| PFC.Donovan.Decl. | Declaration of Shaun Donovan (PFC) | Dkt. 33-29 |
|---|---|---|
| PFC.Matusiak.Decl. | Declaration of Ari Matusiak (PFC) | Dkt. 33-30 |
| PFC.Mayopoulos.Decl. | Declaration of Timothy J. Mayopoulos (PFC) | Dkt. 33-31 |
| PFC.Moon.Decl. | Declaration of John Moon (PFC) | Dkt. 33-32 |
| PI Motion | Motion for Preliminary Injunction | Dkt. 33 |
| TRO | Motion for Temporary Restraining Order | Dkt. 2 |

**IDENTITIES AND INTEREST OF *AMICI CURIAE***

The National League of Cities ("NLC"), founded in 1924, is the oldest and largest organization representing U.S. municipal governments. NLC works to strengthen local leadership, influence federal policy, and drive innovative solutions. In partnership with forty-nine state municipal leagues, NLC serves as a national advocate for more than 19,000 cities, towns, and villages representing more than 218 million Americans. NLC's sustainability and resilience program serves as a resource hub for climate change mitigation and adaptation for cities.[1]

The U.S. Conference of Mayors ("USCM"), founded in 1932, is the official nonpartisan organization of the more than 1,400 U.S. cities that have populations of 30,000 people or more. The Conference of Mayors established its Climate Protection Center and its Alliance for a Sustainable Future to assist local governments with implementation of both the 2005 Mayors Climate Protection Agreement and the goal to establish comprehensive decarbonization efforts to keep the global rise in temperature to the 1.5-degree Celsius level and to promote community resiliency efforts.

Federal financial assistance, including through the Inflation Reduction Act's ("IRA") Greenhouse Gas Reduction Fund ("GGRF"), is important for NLC and

---

[1] NLC holds a position on Plaintiff Power Forward Communities' Board of Directors.

USCM (together, "*Amici*") members in their efforts to protect the health and well-being of their residents, businesses, community organizations, and visitors and to mitigate and adapt to the impacts of climate change, address natural disasters, reduce pollution, and improve the resilience of transportation and other infrastructure.

Relying on a well-developed record, extensive briefing, and several hearings, the district court issued a preliminary injunction to halt the irreparably harmful effects of Defendants' actions. *See generally* Dkt. 80 & Op. This Court subsequently stayed the injunction' requirement that Citibank disburse funds. Doc. 12. Despite EPA's inability to "offer[] any rational explanation for why it needed to cancel the grants to safeguard taxpayer resources," the agency has successfully deprived Plaintiffs access to their funding for more than eight months. Op. at 28.

As the diversity of Plaintiffs reflects, GGRF is a highly interconnected program that depends on coordination among multiple entity types across sectors and levels of government, including local governments, to achieve the statutory mandates set by Congress. And as part of this network, *Amici's* members have experienced concrete and ongoing harm as a result of Defendants' actions. Since this Court's order pausing disbursement of grant funds, local governments have lost many of the expected benefits from Plaintiffs' planned administration of the National Clean Investment Fund ("NCIF") and the Clean Communities Investment Accelerator ("CCIA") funding. This has undermined local governments' ability to

protect their residents from increasingly severe climate and environmental harms and forced them to make capital allocation decisions in ways that risk short- and long-term harm to residents.

Accordingly, *Amici* respectfully urge this Court to uphold the district court's preliminary injunction in its entirety and vacate the partial administrative stay.

## SUMMARY OF ARGUMENT

This case "challenge[s] the unlawful terminations and EPA's failure to take the necessary procedural steps before terminating [NCIF and CCIA] grant awards," and the freezing of Plaintiffs' funds. Op. at 11. *Amici* file this brief in support of Plaintiffs to present the unique local government perspective on the benefits they stand to receive from the NCIF and CCIA and the serious and irreparable harms related to the environment, climate, public health, and fiscal policy that cities, towns, and counties will face if this Court permits Plaintiffs' funding to remain frozen. Although not direct grantees, local governments and their residents benefit from the NCIF and CCIA in at least three ways: (1) through direct investment in local projects; (2) through the creation of durable financing markets for low- and zero-emissions technologies; and (3) through broader climate, environmental, and public health benefits that flow from reductions in greenhouse gas ("GHG") emissions and other local air pollutants, and improvements in infrastructure.

3

The harms felt by Plaintiffs and *Amici* are the result of EPA's direction to Citibank to freeze Plaintiffs' funds. In 2024, eight NCIF and CCIA grantees were awarded a total of $19.97 billion in federal funding, with Citibank holding their funds in individual accounts. Op. at 2. By the start of 2025, Plaintiffs were "holding and spending the money exclusively as Congress intended." Doc. 78 at 31 (Pillard, J., dissenting). After the Senate confirmed Lee Zeldin as EPA Administrator, he began to "publicly express his desire to terminate GGRF grants." PI Motion at 1, 15 (cleaned up); Op. at 8. By mid-February 2025, and coinciding with Administrator Zeldin's public campaign against GGRF, Plaintiffs were unable to draw down funds from their Citibank accounts. *See* PI Motion at 16-19.

On April 15, 2025, the district court preliminarily enjoined EPA from "'causing Defendant Citibank to deny, obstruct, delay, or otherwise limit' Plaintiffs' access to their funds, and from terminating the grant program." Doc. 80 at 5. On September 2, 2025, a split panel of this Court vacated the preliminary injunction. Doc. 78. Thereafter, Plaintiffs filed a petition for, and were granted, a rehearing *en banc*. *See* Docs. 80, 81 & 91. In that order, this Court vacated its prior judgment and reinstated its earlier partial administrative stay, meaning that the funds are still frozen but EPA cannot effectuate termination of Plaintiffs' grant awards. *See* Doc. 91.

*Amici's* members and their residents are directly affected by Defendants' actions to freeze Plaintiffs' NCIF and CCIA funds and EPA's attempt to terminate their awards. Congress intended the NCIF and CCIA's $19.97 billion in funding to flow to beneficiaries nationwide, including to local governments, to support them in protecting the health and well-being of their residents through the achievement of their climate, clean energy, infrastructure, and equity goals. Billions of dollars in public capital and leveraged private capital were meant to enable projects to reduce GHG emissions, improve air quality, and increase community wealth and resilience.

The district court held that failure to immediately release the appropriated NCIF and CCIA funds would result in "imminent" and "unavoidable" harm to the Plaintiffs. Op. at 32-36. But the scope of the harm does not begin and end with the Plaintiffs. It has rippled outward to the local governments and communities that planned for, relied on, and would ultimately benefit from the timely administration of NCIF and CCIA funding.

Local governments have suffered, and remain at risk of further suffering, irreparable harm from their reasonable reliance on the NCIF and CCIA being fully implemented. They planned for projects, coordinated with Plaintiffs, and made budgetary decisions with the expectation that NCIF and CCIA funding would be used to catalyze projects that supplement their own work to advance climate, clean energy, infrastructure, and equity goals. As a result of Defendants' actions, local

governments cannot adequately protect the health and well-being of their residents and have already borne high administrative and opportunity costs as a result of Defendants' failure to oversee the programs lawfully. *See* Doc. 104 at 49-50 ("Projects cannot continue in limbo: without funds, these will fall apart and some already have, harming the members of the public who stand to benefit."). To limit the damage from Defendants' actions, this Court should uphold the district court's preliminary injunction in its entirety.

## ARGUMENT

Federal courts have granted broad injunctive relief in recognition of the irreparable harms from federal funding freezes. *See New York v. Trump,* 769 F. Supp. 3d 119, 142 (D.R.I. 2025), *appeal dismissed*, No. 25-8010 (1st Cir. May 12, 2025); *Woonasquatucket River Watershed Council v. U.S. Dept. of Agric.*, 778 F. Supp. 3d 440, 474-75 (D.R.I. 2025) (quoting *New York v. Trump*), *appeal filed*, No. 25-1428 (1st Cir. May 1, 2025); *State of Washington et al., v. U.S. Dept. of Transportation et al*, No. 2:25-CV-00848-TL, 2026 WL 183584 (W.D. Wash. Jan. 23, 2026) (granting permanent injunction enjoining the U.S. Department of Transportation from withholding formula grant funds for State electric vehicle infrastructure). This case is no different. The district court held that Plaintiffs faced "immediate, irreparable harm" if their funds remained frozen in Citibank accounts, including existential economic and reputational harm. Op. at 32-38. Indeed, it was obvious to the district

court that "when an organization is created to fulfill the objectives of a grant and its existence relies on grant money, harm is certain once the grant funds are withdrawn." *Id.* at 33. Where Congress structured a program to channel benefits through intermediaries to local communities, harm to the intermediaries necessarily translates into harm to the intended beneficiaries. In the case of the NCIF and CCIA, those intended beneficiaries include local governments and their residents. The next two sections detail those expected benefits and the harms that local governments and their residents have suffered and are at risk of suffering further should Plaintiffs' funds remain frozen.

## I.    Local Governments Were Slated to Receive Enormous Benefits from NCIF and CCIA Funding

In 2022, Congress enacted the IRA, which included the largest Congressional appropriation of clean energy spending in American history—allocating $362 billion toward environmental and energy investments.[2] Within the IRA, Congress appropriated $19.97 billion for the NCIF and CCIA, two GGRF programs designed to mobilize financing and leverage private capital for clean energy and climate

---

[2] *See* Inflation Reduction Act, Pub. L. No. 117-169, 136 Stat. 1818 (2022); Lachlan Carey & Jun Ukita Shepard, *Congress's Climate Triple Whammy: Innovation, Investment, and Industrial Policy*, ROCKY MOUNTAIN INST. (Aug. 22, 2022), https://rmi.org/climate-innovation-investment-and-industrial-policy (estimation based on authorizations and expenditures in the bill, excepting tax expenditure estimates).

projects that reduce GHG emissions and other air pollutants.[3] *See* 42 U.S.C. § 7434(a).

Congress intended the NCIF and CCIA funding to reach communities nationwide by providing public seed money to Plaintiffs, who then would catalyze energy-efficient housing, electricity, and transportation projects, especially in Low-Income/Disadvantaged Communities ("LIDACs"). Congress centered local communities in the programs' statutory design: NCIF and CCIA grantees, in addition to providing direct investment and recruiting private capital for local projects, were expected to provide technical and financial assistance at the local level for pollution-reducing projects. *See* 42 U.S.C. §§ 7434(a)(2)-(3), (b)(1)-(2).

Although Congress formally appropriated $19.97 billion to seed Plaintiffs' operations, the true value of the NCIF and CCIA was expected to be much larger because grantees were meant to "partner with," and "leverage investment from, the private sector." *Id.* § 7434(c)(3)(A) (cleaned up).[4] Further, because Plaintiffs were expected to "prioritize investment in qualified projects that would otherwise lack

---

[3] *See Greenhouse Gas Reduction Fund*, U.S. ENV'T. PROTECTION AGENCY (2023), https://www.epa.gov/system/files/documents/2023-02/Greenhouse%20Gas%20Reduction%20Fund%20Factsheet.pdf.

[4] *See* Megan Mahajan & Eric Hangen, *Clean Energy as Economic Development: An Analysis of the Greenhouse Gas Reduction Fund*, UNIV. OF NEW HAMPSHIRE, CTR. FOR IMPACT FINANCE (May 12, 2025), https://energyinnovation.org/wp-content/uploads/An-Analysis-of-the-Greenhouse-Gas-Reduction-Fund.pdf (estimating the economic impacts that the GGRF would generate if implemented as originally enacted).

access to financing," the NCIF and CCIA represented a significant opportunity for local governments, as the most resource-constrained level of government, and especially for the most under-resourced cities and communities among them.[5] *Id*. § 7434(b)(1)(B).

Though local governments and their residents are not the direct recipients of NCIF and CCIA funding, Congress intended that they would be key beneficiaries of it.[6] *See* 42 U.S.C. §§ 7434(a)(3), (b)(1)(A), (b)(2), (c)(3)(B). Local governments would benefit from much-needed supplemental assistance in achieving their climate and public health objectives, and their communities would benefit from cleaner air, lower emissions, and reduced financial burden through more resilient, energy-efficient housing and transportation. The specific NCIF and CCIA projects, programs, and supporting products discussed in subsections (A) and (B) illustrate how Plaintiffs' awards translate into concrete, statutorily protected benefits for *Amici's* members—benefits EPA seeks to eliminate in violation of the APA and the

---

[5] *See* Zachary D. Liscow, *The Efficiency of Equity in Local Government Finance*, 92 N.Y.U. L. REV. 1828, 1838 (2017) (describing how at the local level with "inequality in resources comes inequality in spending.").

[6] Remarks of Rep. Blumenauer, 168 Cong. Rec. E856 (Daily Ed. Aug. 16, 2022) (explaining that the passage of the IRA made "unprecedented progress on fulfilling" the mission "to make the federal government a better partner to local communities to make them more livable, healthy, and economically secure."); Remarks of Sen. Cardin, 168 Cong. Rec. S4210 (Daily Ed. Aug. 6, 2022) ("[T]he [IRA] delivers major Federal investments to make our communities healthier, safer, and more resilient in the face of increasing impacts of climate change.").

Constitution. *See, e.g.,* Op. at 26-31 (finding that the Plaintiffs showed a likelihood of success on their APA and constitutional claims).

## A. NCIF Benefits

This section describes how the NCIF awardees intended to "deliver the benefits of greenhouse gas- and air pollution-reducing projects to American communities" and the benefits local governments expected to see as a result of their investments.[7] The NCIF awardees planned to both invest award funds directly in specific projects and offer financial products to develop a national clean energy financing market that could enable broader deployment of low-carbon and energy efficient technologies. At the time of the freeze, awardees had committed capital to qualifying projects, but those commitments represent only a fraction of their total awarded funds. Local governments and their residents stand to benefit greatly from projects enabled by NCIF funding that improve air quality, reduce GHG emissions, and make buildings, transportation, and the electricity grid more energy-efficient and resilient.

As a preliminary matter, the aggregate projected benefits from the timely deployment of the NCIF funds are staggering. Climate United alone projected that the deployment of its award would avoid the emissions of 11 million metric tons of

---

[7] *Greenhouse Gas Reduction Fund*, U.S. ENV'T PROTECTION AGENCY (2023), https://www.epa.gov/system/files/documents/202302/Greenhouse%20Gas%20Reduction%20Fund%20Factsheet.pdf.

carbon dioxide over a five-year period.[8] The projects that would contribute to those avoided emissions include up to 25,000 decarbonized single-family homes, 80,000 decarbonized units of multi-family housing, 150 school buildings decarbonized, 35,000 vehicles and 1,000 school buses electrified, 35,000 residential solar installations, battery storage, and/or access to community solar, and 150 school buildings harnessing solar and battery storage.[9] At least 60% of the local beneficiaries of the capital deployment would be located in LIDACs, or serve such communities, representing a significant investment in historically underserved, under-resourced communities.[10] Both CGC and PFC projected similar benefits.[11]

When EPA caused Citibank to freeze the Plaintiffs' accounts, the NCIF prime grantees and their subgrantees had committed only about 7%, or $1 billion, of the NCIF's total $13.97 billion. *See* Dkt. 33-1 at 13-14; CU.Bafford.Decl. ¶¶ 23-24; CGC.Kauffman.Decl. ¶ 6; PFC.Mayopoulos.Decl. ¶ 6. Much of that committed

---

[8] Climate United Fund, *NCIF Workplan* (Aug. 2024), at 10-12, https://www.epa.gov/system/files/documents/2024-08/ncif-workplan-cuf.pdf (hereinafter "Climate United Workplan").

[9] *Id*.

[10] *Id*. at 11.

[11] *See* Power Forward Communities, *NCIF Workplan* (Aug. 2024), at 8-9, https://www.epa.gov/system/files/documents/2024-08/ncif-workplan-pfc.pdf (hereinafter "PFC Workplan"); Coalition for Green Capital, *NCIF Workplan* (2025), at 12-17 https://cgc.org//wp-content/uploads/CGC-NCIF-Work-Plan-2025.pdf (hereinafter "CGC Workplan").

funding was frozen before it could be disbursed.[12] Defendants' actions not only "deprived [Climate United, CGC, PFC, and their subgrantees] of known and unknown opportunities," Dkt. 33-1 at 48, but also the local communities that were intended to benefit from their investments. The capital that Climate United, CGC, PFC, and their subgrantees had committed to projects across the country at the time of the freeze demonstrates the local benefits the NCIF program would have delivered and, in turn, reveals the ongoing harm of the freeze.

Local governments and their communities are meant to receive NCIF benefits through direct investment. At the time of the freeze, Climate United had committed $362 million to three projects, and $30 million as technical assistance and planning support awards. CU.Bafford.Decl. ¶¶ 23, 38. For example, in Arkansas, Climate United committed to providing a $31.8 million pre-construction loan to support 18 solar projects across the state, the "largest solar deployment in Arkansas history." *Id*. ¶ 38. Arkansas currently relies overwhelmingly on fossil fuels for electricity generation,[13] meaning that, if the solar deployment were fully implemented, communities across the state would experience improvements in local air quality,

---

[12] *See, e.g.*, CLIMATE UNITED 2025 IMPACT REPORT, CLIMATE UNITED (Oct. 8, 2025), https://www.climateunited.org/blog/climate-united-2025-impact-report ("[T]he vast majority of committed transactions were not disbursed before funds were frozen[.]").

[13] *Arkansas Profile Analysis*, U.S. ENERGY INFO. ADMIN. (updated Aug. 21, 2025), https://www.eia.gov/state/analysis.php?sid=AR.

more stable utility bills and energy cost savings, and local economic development benefits.

Partnering with the City of Tarrytown, New York, one of Climate United coalition's members, CPC Climate Capital, financed a housing project for seniors to reduce emissions and retain affordability for 109 units.[14] And in Detroit, Michigan, PFC's subgrantee EGA had agreed to provide an expected $24 million in financing for the construction of a "highly efficient" 160-home apartment community. PFC.Donovan.Decl. ¶ 18. Without the NCIF's gap-filling funding, these clean energy projects would likely not be possible at all, much less on such an immense scale.

The NCIF grantees' work to establish durable financing markets also stands to benefit local governments through their provision of attractive financial products, many of which are exclusively offered by the NCIF grantees.[15] CGC planned to offer equity investments, loan loss reserves and credit enhancements, as well as junior and senior loans.[16] Climate United intended to advance similar products, as well as offer

---

[14] *See* Climate United 2025 Impact Report, *supra* note 12.

[15] PFC Workplan, at 9; CGC Workplan, at 12-14; Climate United Workplan, at 11-12.

[16] CGC Workplan, at 21-22.

bridge loans, leases, and bonds.[17] PFC also intended to provide a wide range of innovative and flexible financial products.[18]

The NCIF awardees' offerings were intended to, and absent the freeze would, catalyze private capital by making investments in clean energy projects more financially viable and appealing. For example, deploying pre-construction subsidies to fund feasibility studies, environmental assessments, and community engagement can help spur markets away from business-as-usual fossil fuel developments.[19] Further, loan loss reserves reduce risk for lenders by building in capital for anticipated loan defaults, encouraging them to offer loans with significantly reduced interest rates to households across the country. *See* PFC.Matusiak.Decl. ¶¶ 19-20 ("Due to the unavailability of NCIF funding, [subrecipient Rewiring Community Investment Fund] is unable to provide the promised loan loss reserve to private lenders . . . [who then] cannot offer the favorable-interest rate loans that are necessary to facilitate the purchase of energy-efficient heating and cooling systems."). Local governments would benefit from the NCIF grantees' market development because they are not, themselves, sophisticated financial institutions and often lack the resources and institutional capacity to create these financing structures.

---

[17] *See* Climate United Workplan, at 29-31.
[18] *See* PFC Workplan, at 23-29.
[19] *See* Climate United Workplan, at 33-34.

PFC's financing approach to decarbonizing single- and multi-family housing demonstrates how the NCIF funding would generate equitable climate, environmental, public health, and infrastructure benefits that local governments rely on to bolster their own actions. Focusing on retrofits of existing buildings, construction of all-electric buildings, and deployment of distributed energy resources in low-income and disadvantaged communities, PFC created a suite of tailored products to finance decarbonization of the affordable housing stock nationwide.[20]

For example, PFC planned to offer Energy Efficiency Rehab Permanent Loans—long-term, flexible loans with very low interest rates (1-3%), of which up to 15% could be forgivable—to target specific retrofits in multifamily housing that reduce emissions or energy usage, such as lighting upgrades and appliance electrification.[21] Some products were explicitly meant to dovetail with local initiatives. PFC's Incentive Bridge Loans, for example, were meant to help link local investment in decarbonization efforts, such as municipally owned solar projects or housing retrofits, with state and federal tax credits and rebates.[22]

On the single-family front, PFC's strategy included borrower friendly loans and construction of all-electric affordable housing, focusing on decarbonization

---

[20] *See* PFC Workplan, at 18-19.
[21] *Id.* at 25.
[22] *Id.* at 26.

projects that would also result in household savings.[23] PFC coalition member Habitat for Humanity had planned to support the construction and financing of low- to net-zero-emissions single-family homes with friendly loan terms, including flexible collateral, interest-only periods, below-market interest rates, and possibly a forgivable component.[24]

By deploying considerable public funding to leverage private capital, the NCIF grantees were set to supplement local governments' efforts to achieve ambitious climate goals, such as community-wide net-zero emissions. The communities those local governments serve would reap the welfare gains from lower emissions and energy bills, improved air quality and resilience, and increased wealth equity.

### B. CCIA Benefits

This section details the significant benefits *Amici's* members were expecting to receive via the CCIA. The funding EPA awarded to the CCIA grantees was to be used to provide funding and technical assistance to local financial institutions to advance clean energy development. CCIA grantees were meant to pass through almost all of their federally-awarded funds to "support[] the goal that every community in the country has access to the capital they need to deploy clean

---

[23] *Id*. at 27.
[24] *Id*.

16

technology projects in their homes, small businesses, schools, and community institutions." Inclusiv.Arabshahi.Decl. ¶ 14. Defendants' actions have caused planned investments to stall and delayed or eliminated community-level benefits.

CCIA awardees planned to increase access to, and the affordability of, clean energy capital through community lender capitalization and technical assistance. For example, 90% of CCIA Plaintiff Inclusiv's $1.87 billion award was meant to pass directly to credit unions across the country via subawards. Inclusiv.Arabshahi.Decl. ¶ 18. As a result of previous technical assistance provided by Inclusiv, many of the credit unions that applied for subawards already had specialized knowledge in developing affordable and clean energy loan products for the communities they serve. *Id*. ¶¶ 22-24. At the time of the freeze, Inclusiv had committed $651 million to its first cohort of subrecipients: 108 credit unions in 26 states and Puerto Rico that serve almost 5 million Americans. *Id*. ¶ 25. Using CCIA capitalization funding, along with their own institutional capital, these credit unions were set to provide more than $1.8 billion in new lending capital to grow decarbonization markets in their communities. *Id*. ¶ 45.  However, EPA caused Inclusiv to lose access to its funding before its committed funds could be disbursed. *Id*. ¶ 54.

JCF similarly intended to use its CCIA funds to transform the market for clean energy finance in LIDACs by providing small-scale capital and technical assistance

to community lenders.[25] The intention was that, after a training phase, recipient lenders of JCF's capitalization grants would leverage both public and private capital to finance qualified clean energy projects in LIDACs, including distributed energy resources, building decarbonization efforts, and net-zero transportation projects.[26]

Although EPA froze JCF's funding before it could fully implement its capitalization strategy, interest and opportunity were evident. JCF received 175 letters of interest from community lenders during its application process.[27] Finance New Orleans expressed a need for financial and technical assistance to support community solar and electrifying New Orleans' bus fleet.[28] The Chicago Community Loan Fund expressed interest in deploying $30 million a year for energy efficiency projects.[29] At the time of the freeze, JCF had obligated funds to 35 community lenders to finance clean energy projects, such as solar resources to serve rural hospitals, community solar in North Carolina, and heat pumps for small businesses in Virginia. *See* JCF.Kirkwood.Decl. ¶ 17. Without access to its Citibank account, JCF has not been able to meet its commitments to community lenders that had already approved projects at the time of the freeze. *Id*. ¶¶ 37-38.

---

[25] Justice Climate Fund, *CCIA Workplan* (Aug. 2024), https://www.epa.gov/system/files/documents/2024-08/ccia-workplan-jcf.pdf (hereinafter "JCF Workplan").

[26] *Id*. at 18-21.

[27] *Id*. at 7-8.

[28] *Id*. at 8.

[29] *Id*.

In total, JCF projected that its bank network would directly finance approximately 180,000 qualified clean technology projects during JCF's performance period, leading to over 5 million metric tons of carbon dioxide emissions avoided, over 300 megawatts of distributed solar energy resources and battery storage deployed, almost 9,000 electric vehicle charging stations installed, and $97.9 million in household cost savings, among other positive climate, infrastructure, economic, and public-health outcomes.[30] As indicated by both Inclusiv and JCF, CCIA implementation would not only reduce disparities in access to clean energy financing, but also increase community wealth through the household savings generated by capital deployment and project development. *See, e.g.*, Inclusiv.Arabshahi.Decl. ¶ 45; JCF.Kirkwood.Decl. ¶ 43. In other words, the CCIA program would provide a complementary, though distinct, set of hyper-local affordability, well-being, and health benefits.

Local governments and their residents stand to benefit from CCIA program implementation in three complementary ways, closely aligned with the benefits from the NCIF.[31] *See* 42 U.S.C. § 7434(b)(1)(A), (b)(2). First, subrecipient credit unions

---

[30] *Id*. at 13-14.

[31] *Press Release*, Senator Edward Markey (Mar. 22, 2024), https://www.markey.senate.gov/news/press-releases/senator-markey-blasts-house-republican-push-to-defund-his-greenhouse-gas-reduction-fund-the-single-largest-climate-investment-in-inflation-reduction-act ("[T]he [NCIF and CCIA] will supercharge new projects in communities across the country … while making people safer from climate change and cutting energy bills.").

would make capital for clean energy projects more accessible and affordable for local residents, an essential financing function that local governments are not structured to perform themselves. Second, as these projects are deployed, communities would realize the public-health and environmental benefits of decarbonization, enabling local governments to safeguard their residents' health and well-being. Third, the local clean energy market transformation would support the advancement of local governments' equitable climate goals, including reducing emissions, improving air quality, and lowering household energy burdens while increasing wealth-building opportunities in their most vulnerable communities.

## II. *Amici's* Members Have Suffered—and Remain at Risk of Suffering Further—Irreparable Harm if the Preliminary Injunction Is Not Upheld and the Administrative Stay Vacated

As the sites of projects financed through the NCIF and CCIA, and further, as the ultimate beneficiaries of the federal funding, local governments and their residents have suffered irreparable harm from Defendants' actions. Absent full reinstatement of the preliminary injunction, that harm will persist and worsen. Even the temporary disruption in the availability and reliability of these funds has caused non-compensable reliance, public health, and climate harm in *Amici's* members' communities. And, because of the NCIF and CCIA's particular focus on reducing emissions and mobilizing capital in LIDACs, the harm from a continued freeze of

funds will be disproportionately borne by our country's most vulnerable communities.

The harms from the funding freeze are not abstract or speculative. They have continued for almost a year. Projects that were merely at risk of languishing a year ago have since fallen through entirely, stalled, or had to be scaled back, and costs will likely rise as delays compound.[32] *See, e.g.*, Doc. 80 at 19-21 ("[H]arms have only continued to mount as the funding freeze has persisted, and for some projects, it is likely already too late."). Many of the harms from delayed decarbonization are irreversible: emissions and opportunity costs cannot be undone.

Today, program implementation is effectively immobilized, and local communities are already bearing, and will continue to bear, the burden of stalled or abandoned projects to the detriment of local taxpayers. In many cases, Plaintiffs were set to advance projects that local governments lack sufficient capital or institutional capacity to support, and that would not have been possible otherwise.[33]

---

[32] *See, e.g.*, CLIMATE UNITED 2025 IMPACT REPORT, *supra* note 12, at 21 (explaining that "[d]ue to the funding freeze, Climate United has been unable to move forward with the first round of [the NEXT program] and future rounds are on hold.").

[33] *See* Kelly House, *Trump's 'green bank' freeze puts Michigan climate, housing efforts in limbo*, BRIDGE MICHIGAN (Mar. 26, 2025), https://bridgemi.com/michigan-environment-watch/trumps-green-bank-freeze-puts-michigan-climate-housing-efforts-limbo/ (quoting Representative Debbie Dingell that "[t]hese funds are going to projects that otherwise would not be possible, are shovel ready, and will have real impacts in their communities . . .'");

### A. Harm Due to Budget Impacts, Projects Paused, and Services Interrupted

Local governments have structured their budgets, secured commitments, and coordinated with the NCIF and CCIA grantees in reliance on EPA's fulfillment of its statutory obligations and lawful administration of the GGRF programs. These benefits are not conceptual—Plaintiffs had pipelines of emissions-reducing projects and financing mechanisms in communities where local governments would otherwise be unable to pursue them. As Plaintiffs have extensively described, the administrative stay as to the district court's order that funding be disbursed has substantially disrupted these pipelines, resulting in delayed and cancelled projects, and putting others at risk of falling through. *See, e.g.*, PFC.Moon.Decl. ¶¶ 17-28; CGC.Buendia.Decl. ¶ 11; CU.Bafford.Decl. ¶¶ 68-69. Further, the funding freeze has impeded Plaintiffs' operational ability to identify, and commit, the bulk of their funding. *See, e.g.*, CGC.Buendia.Decl. ¶ 12; CU.Bafford.Decl. ¶¶ 58, 61, 71.

Programs and projects underway have had to be substantially scaled back. For example, CGC developed its two-phase Municipal Investment Fund ("MIF") to be one of its principal initiatives. *See* CGC.Buendia.Decl. ¶ 3. In the first phase, CGC would partner with 104 communities, offering $250,000 grants to "empower

---

Zack Colman, *Climate groups could beat Trump in fight for $20B. It may be too late*, POLITICO (Mar. 23, 2025), https://www.politico.com/news/2025/03/23/trump-court-loss-could-still-gut-biden-green-agenda-00242974.

communities to develop public–private partnership plans to accelerate the development and financing of clean energy projects." *Id.* ¶ 4. The second phase would see ten communities annually selected to join the "MIF cohort"; each selected community would receive up to $2 million in market-building and predevelopment support. *Id.* By linking $60 million in public capital with local communities, the MIF is intended to expand CGC's project pipeline and partner network. *Id.*

MIF thus represents an essential component of leveraging private capital for emissions-reducing projects in LIDACs, where awareness of, and access to, clean energy markets and financing have historically been limited.[34] However, due to the freeze on its funding, CGC's subgrantee ICLEI has been unable to fully implement the MIF program. *Id.* ¶¶ 8, 12. As of July 2025, it had only been able to provide $11.75 million in phase I grants, far less than the $26 million it had intended to supply, while phase II is stalled completely.[35]

Other local projects that were "vulnerable to collapse" when the Plaintiffs lost access to their accounts abound. PFC.Moon.Decl. ¶ 16. LISC Green, a subgrantee of PFC, had planned to use approximately $487 million of its $589 million subgrant

---

[34] *See* Michelle Lee et al., *Harnessing the transformative potential of the Greenhouse Gas Reduction Fund*, CLIMATE POLICY INITIATIVE (June 2024), at 3, https://www.climatepolicyinitiative.org/wp-content/uploads/2024/01/CPI_GGRF-Assessment-Report.pdf.

[35] *See Municipal Investment Fund*, ICLEI – LOCAL GOVERNMENTS FOR SUSTAINABILITY USA, https://icleiusa.org/iclei-cgc/.

to provide financial assistance for emission reducing projects. *Id.* ¶ 8. As of early 2025, due to Defendants' actions, $86.5 million in identified funding opportunities were at risk of falling through, including the rehabilitation of a historic hotel into a 63-home rental apartment community that would harness geothermal and solar energy, *id.* ¶ 18, and an 18.6-megawatt solar installation in Ohio, which would provide electricity to an automobile manufacturing facility. *Id.* ¶ 27.

Beyond those identified projects, in February 2025, PFC announced that LISC Green would invest $75 million specifically in rural communities, bringing affordable capital to areas typically excluded from it.[36] LISC Green also planned to invest $144 million in multifamily lending in California, Colorado, Illinois, Iowa, Florida, Kentucky, Massachusetts, Michigan, New Jersey, Ohio, Tennessee, Texas, and Wisconsin.[37] Due to Defendants' actions, these planned community investments are at risk of stalling, being scaled back, or fully falling through.

At the same time, Enterprise Green Accelerator, Inc. ("EGA"), another subrecipient of approximately $600 million of PFC's award, had a pipeline of low- and zero-emission affordable housing projects utilizing $100 million in NCIF funds

---

[36] Power Forward Communities, *Fact Sheet: Power Forward Communities Announces More Than Half a Billion Dollars in Investments to Lower Housing Costs and Utility Bills for Families Nationwide* (Feb. 24, 2025), https://a-us.storyblok.com/f/1014573/x/0f93107325/pfc-press-release-announcement_022425.pdf.

[37] *Id.*

that were at risk of collapse. PFC.Donovan.Decl. ¶ 16. In these cases, EGA subsidies are the projects' linchpin, as all state and local subsidies have been exhausted, meaning that without the NCIF funds, these projects likely cannot proceed. *Id.* ¶ 17.

Beyond the NCIF pipeline projects, CCIA grantees have also been unable to disburse seed funding to community lenders, meaning that the communities they are meant to serve must wait longer for accessible green financing to materialize, if it comes at all. Some of the lending partners that were supposed to receive CCIA funding, but whose funding is now frozen, include Clearwater Federal Credit Union in Montana, Forrit Credit Union in Oregon, MariSol Federal Credit Union in Arizona, Valley First Credit Union in California, and Community 1st Credit Union in Iowa.[38]

As these examples demonstrate, Defendants' actions have already jeopardized projects and halted many other grant activities, such as the capitalization of lenders and provision of technical assistance. Plaintiffs have explained that, in large part, they are entities created for the sole purpose of administering the NCIF and CCIA. *See, e.g.*, Dkt. 33-1 at 44, 52; Doc. 104 at 46. Without access to its Citibank account, for example, Climate United stated that it cannot "survive as it exists today and

---

[38] Natural Resources Defense Council, *Stolen Futures Map of Communities Betrayed by Federal Funding Clawbacks* (2026), https://www.nrdc.org/resources/stolen-futures (filtered to CCIA grant program).

would need to wind down its operations." CU.Bafford.Decl. ¶ 5. Plaintiffs' administration of financial and technical assistance for projects and community lenders are actions that local governments, especially those that represent our most vulnerable communities, do not have the funding or resources to fully pursue.

Besides losing out on the full slate of the NCIF's and CCIA's climate, resiliency, infrastructure, and economic benefits, local governments also face an institutional dilemma as a result of the Defendants' actions. Some could, possibly, revise their budgets to reallocate money to help limit the damage of the Defendants' actions—for instance, by offering subsidies for deployment of low-emissions technologies—or they could allow planned projects to fall apart and future projects to never materialize. Moving money from other programs could result in the loss of services essential to the daily lives of residents, while not re-allocating money to cover the loss of federal funding would decrease the health and well-being of local communities. And as a corollary, any budgetary trade-offs would risk layoffs to public employees and contractors, exacerbating the harm to local communities.

As Judge McConnell found in *New York v. Trump*, it is "so obvious" that even a temporary pause in funding causes harm because it creates unavoidable opportunity costs that cannot be undone after the fact. *New York,* 769 F. Supp. 3d at 142. Faced with the effective dissolution of the NCIF and CCIA, local governments

26

would have to give up something. Each option would leave *Amici's* members and their residents worse off.

### B. Harm to Local Governments' Climate Efforts and Residents' Health, and Well-Being

So long as Plaintiffs' funds are frozen in Citibank accounts, *Amici's* members' ability to fully respond to climate change will be delayed or foreclosed, causing further harm to the health and well-being of their residents. The Intergovernmental Panel on Climate Change ("IPCC"), a world-leading panel of scientific experts convened by the United Nations and the World Meteorological Organization, has clearly stated the world must reduce GHG emissions as rapidly as possible to avoid the potentially catastrophic consequences of anthropogenic global warming and climate change.[39] The IPCC has warned that, to limit future impacts threatening communities across America and around the world, GHG emissions must be rapidly and dramatically reduced over the next four years.[40] Local governments are at the forefront of efforts to reduce emissions and prepare for climate impacts and rely on federal funds to do that.

Congress appreciated the need to quickly lower GHG emissions and appropriated IRA funds accordingly. The creation and funding of GGRF programs, including the NCIF and CCIA, reflect Congressional policy judgments and priorities

---

[39] IPCC, AR6 SYNTHESIS REPORT: CLIMATE CHANGE 2023 (2023).
[40] *Id*. at 92.

that the Executive Branch must respect. Because Defendants' actions to freeze Plaintiffs' funds unlawfully violated and jeopardized that careful decision-making, the district court properly enjoined them.

A continued stay on disbursement of already obligated NCIF and CCIA funds would radically inhibit climate action at the local level. As explained above, the projects resulting from implementation of the NCIF and CCIA would bring climate, resiliency, and economic benefits to communities, rural and urban, in every region of the country. Based on the NCIF Plaintiffs' modeling, fully implementing the program would result in tens of millions of carbon dioxide emissions avoided, tens of thousands of decarbonized single-family homes and multi-family housing, tens of thousands electrified passenger vehicles, thousands of electrified school buses and heavy-duty vehicles, tens of thousands residential solar installations and/or access to community solar programs, and the mobilization of tens of billions of dollars in private capital.[41]

The projects at risk of collapsing and those unable to be initiated also include those that CCIA community lenders would finance. These are projects that would reduce GHG emissions and local air pollution, such as nitrogen oxides and particulate matter, and improve public health, through the deployment of distributed

---

[41] *See* PFC Workplan, at 9; CGC Workplan, at 12-14; Climate United Workplan, at 11-12; *see also* Mahajan & Hangen, *supra* note 2.

solar energy resources and battery storage, building decarbonization projects, and zero-emission transportation initiatives. Further, both the financing and technical assistance made possible by CCIA funds would be overwhelmingly distributed in LIDACs. CCIA community lenders would help bring clean energy to communities historically excluded from that market by offering financial products that reduce high upfront costs or otherwise make decarbonization more feasible, increasing public awareness of low-carbon technologies, and assisting with administrative and regulatory challenges associated with deploying those technologies.

The cascading effects of a continued freeze of Plaintiffs' funds would further threaten the long-term viability of local climate action. Even temporary delays in funding and program execution would result in long-lasting harm. For example, Climate United's stalled funding for an electric heavy-duty truck affordable leasing program at the ports of Los Angeles and Long Beach hinders achievement of local climate commitments, like Los Angeles' target of reaching net-zero emissions by 2025.[42] The timing of climate action matters a great deal. Even if Los Angeles could, in theory, reach its 2050 goal in the face of a temporary delay, achieving the necessary emissions reductions later will be more difficult and costly than doing it today. Local governments across the country that were planning for and relying on

---

[42] *See* City of Los Angeles, Cal., *L.A.'s Green New Deal*, https://plan.mayor.lacity.gov.

the availability of the NCIF and CCIA funds in their communities face similar risks, especially those representing LIDACs. Moreover, the reductions in GHG emissions and air pollution that could have been realized, but for Defendants' actions, are instead replaced by emissions that will now occur and cannot be retroactively cured. Further emissions and additional fossil fuel infrastructure will be locked in if this Court permits Plaintiffs' funding to languish in Citibank accounts.

A decision that does not reinstate the preliminary injunction in its entirety would thus immediately endanger projects critical to municipal climate action, and increase local climate-related, public health, and safety risks. The district court correctly recognized that Plaintiffs would experience similar harms and rightly granted injunctive relief. Op. at 57-62. Fully reinstating the preliminary injunction now would protect Plaintiffs and the day-to-day ability of local governments to serve their residents, meet statutory mandates, and deliver on federally funded climate and infrastructure goals, and bring no harm to the federal government.

## CONCLUSION

For the foregoing reasons, *Amici Curiae* NLC and USCM respectfully urge this Court to reinstate the district court's preliminary injunction, vacate the administrative stay, and allow briefing on the merits to proceed in that posture.

Respectfully Submitted,

/s/ Michael Burger

MICHAEL BURGER
   *Counsel of Record*
ROMANY WEBB
VINCENT M. NOLETTE
SABIN CENTER FOR CLIMATE
   CHANGE LAW
COLUMBIA LAW SCHOOL
435 West 116th Street
New York, NY 10027
mburger@law.columbia.edu
(212) 854-2372

*Counsel for Amici Curiae*

31

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief complies with the type-volume limitations set forth in Fed. R. App. P. 32(a)(7)(B)(i) and 29(a)(5) because this brief contains 6,491 words, excluding the parts of the brief exempted by Fed. R. App. P 32(f). The foregoing brief complies with the typeface requirements of Fed. R. App. P 32(a)(5) and the type style requirements of Fed. R. App. P 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point Times New Roman font.

/s/ Michael Burger
MICHAEL BURGER

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of February 2026, I caused a true and correct copy of the foregoing to be electronically filed with the Clerk of the Court of the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

/s/ Michael Burger
MICHAEL BURGER

33