**[EN BANC ORAL ARGUMENT SCHEDULED FEBRUARY 24, 2026]**

No. 25-5122

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

CLIMATE UNITED FUND, *et al.*,

Plaintiffs-Appellees,

v.

CITIBANK, N.A., *et al.*,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

EN BANC REPLY BRIEF FOR THE UNITED STATES

———————————

> BRETT A. SHUMATE
>    *Assistant Attorney General*
> YAAKOV M. ROTH
>    *Principal Deputy Assistant*
>    *Attorney General*
> DANIEL TENNY
> SOPHIA SHAMS
>    *Attorneys, Appellate Staff*
>    *Civil Division, Room 7213*
>    *U.S. Department of Justice*
>    *950 Pennsylvania Avenue NW*
>    *Washington, DC 20530*
>    *(202) 514-2495*

## TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT ................................1

ARGUMENT ........................................................................................5

I.    Plaintiffs Claims Fail, Regardless Of Their Label...................................5

    A. This is a contract case, not a property case. ........................................6

    B. Plaintiffs' regulatory claim is derivative of their contract
       claim and therefore also precluded. ...................................................12

    C. The APA does not impose reasoned-decisionmaking
       requirements on contractual actions..................................................16

    D. Plaintiffs have no viable separation-of-powers claim.......................19

    E. None of plaintiffs' other evasions succeed...........................................25

II.   The Equities Overwhelmingly Weigh Against An Injunction. ..............28

CONCLUSION.......................................................................................31

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                                    **Page(s)**

*Aiken Cty. In re,*
    725 F.3d 255 (D.C. Cir. 2013) .......................................................... 24

*Block v. Cmty. Nutrition Inst.,*
    467 U.S. 340 (1984) ........................................................................27

*Dalton v. Specter,*
    511 U.S. 462 (1994) .........................................................................20

*Department of Educ. v. California,*
    145 S. Ct. 966 (2025) ...................................................................5, 29

*FDA v. Wages & White Lion Invs., LLC,*
    145 S. Ct. 898 (2025) ..................................................................18, 23

*Glob. Health Council v. Trump,*
    153 F.4th 1 (D.C. Cir. 2025) .........................................................27

*Ingersoll-Rand Co. v. United States,*
    780 F.2d 74 (D.C. Cir. 1985) .......................................................9, 14

*Int'l Eng'g Co. v. Richardson,*
    512 F.2d 573 (D.C. Cir. 1975) ........................................................17

*Land v. Dollar,*
    330 U.S. 731 (1947) ........................................................................11

*Larson v. Domestic & Foreign Com. Corp.,*
    337 U.S. 682 (1949) ........................................................................12

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
    567 U.S. 209 (2012) ................................................................... 16-17

*Megapulse, Inc. v. Lewis,*
    672 F.2d 959 (D.C. Cir. 1982) ........................................................17

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n (NIH),*
    145 S. Ct. 2658 (2025) ...................................................5, 19, 28, 29

*Ontario Power Generation Inc. v. United States*,
    369 F. 3d 1298 (Fed. Cir. 2004) ...............................................................9

*Sharp v. Weinberger*,
    798 F.2d 1521 (D.C. Cir. 1986) ..................................................14, 15

*Son Broad., Inc. v. United States*,
    42 Fed. Cl. 532 (1998) ................................................................................9

*See Sustainability Inst. v. Trump*,
    No. 25-1575, 2026 WL 157120 (4th Cir. 2026) .....................................10, 20, 21

*Thakur v. Trump*,
    163 F.4th 1198 (9th Cir. 2025)..............................................................28

*Train v. City of New York*,
    420 U.S. 35 (1975) ....................................................................................24

**Statutes:**

Administrative Procedure Act (APA),
    5 U.S.C. § 702 ........................................................................................26

42 U.S.C. § 7434 (2024) .....................................................................20, 21

**Regulations:**

2 C.F.R. § 200.340(a)(4) ........................................................................13

2 C.F.R. § 200.341(a) ..........................................................................15, 16

**Other Authority:**

U.S. EPA, *Greenhouse Gas Reduction Fund*, https://perma.cc/RPD4-DAB2
    (last updated Sep. 30, 2025). ..............................................................17

## GLOSSARY

| | |
|---|---|
| Administrative Procedure Act | APA |
| Clean Communities Investment Accelerator | CCIA |
| Environmental Protection Agency | EPA |
| Inflation Reduction Act | IRA |
| National Clean Investment Fund | NCIF |
| Natural Resources Defense Council | NRDC |

## INTRODUCTION AND SUMMARY OF ARGUMENT

If the opening briefs appear to sail past each other in the night, that is because plaintiffs now seek to fundamentally alter what this case is about. But the dispute before the Court at this stage is straightforward. EPA entered grant agreements in 2024, and terminated them in 2025. The grantees and subgrantees maintain that the terms of the contracts only permitted termination in certain narrow circumstances, which they say were not satisfied. EPA disagrees.

That is a textbook *contractual* dispute. Plaintiffs can sue in the Court of Federal Claims, litigate over whether the terminations comported with the terms and conditions of the grants, and seek damages if they prevail. What they cannot do is circumvent the Tucker Act by pressing that same argument in district court under the APA and seeking an injunction to reinstate the grants. Yet that is exactly what they did, and what the district court ordered.

Plaintiffs cannot defend this; they know they cannot defend this; and they do not even try to defend this. Their entire response is an exercise in revisionism—they now pretend this case has nothing to do with contracts, termination of contracts, or judicial reinstatement of contracts. It is instead,

they now say, about property rights, agencies following their own regulations, or the separation of powers.  All of that is noise.

Plaintiffs' newest pivot is to say the contracts are irrelevant because the grant funds somehow belong to them regardless.  They recharacterize the injunction as "preventing the federal government from seizing private funds" and "clawing back $20 billion in grant funds."  Grantees' Br. 1, 2.  But the government did not seize or claw back anything.  EPA merely terminated the grants, which begins a close-out process to determine the parties' rights and obligations with respect to any remaining funds.  That process never got started because plaintiffs sued "to enjoin EPA's illegal termination of [their] grant[s]," JA112, and the district court enjoined EPA from "terminating Plaintiffs' grant awards," JA962.  This appeal is only about that antecedent step—the terminations—and whether a district court has the power to enjoin those terminations and thereby revive the contracts.  The answer is no.

Insofar as plaintiffs wish to argue that they already own the billions of dollars of grant funds and are entitled to keep them *even after termination of the grants*, that is not what they argued below, and it is not what the district court ordered.  Nor is it ripe at this juncture.  If this Court vacates the injunction so that the terminations can be effectuated, plaintiffs are free

2

to argue that they nonetheless maintain ownership of the grant funds in the Citibank accounts (as implausible as that may be). That is not, however, a basis to affirm an injunction reviving the terminated grants.

Nor can plaintiffs recast contractual challenges to the terminations as regulatory, statutory, or constitutional claims. Their alleged regulatory violation is subsumed by and depends entirely on the terms and conditions of the grant agreements—EPA violated the regulations only if it violated the contractual terms. That is not an independent regulatory claim, and this Court has long held that a regulatory violation that is derivative of a contractual breach does not escape the Tucker Act. Likewise for plaintiffs' arbitrary-and-capricious claim under the APA: Every contract breach could be reframed as arbitrary agency action, and this Court has always rejected that transfiguration. If the agency has breached the contract, the remedy lies in the Court of Federal Claims. If the agency has complied with the contract, the APA requires nothing more.

That leaves plaintiffs' invocation of the separation of powers to stop EPA from "terminating an entire congressional grant program." Grantees' Br. 2. Whether viewed as a constitutional claim or (more accurately) as a statutory claim, this theory fails to justify the injunction. Congress

3

appropriated funds for grants, and EPA made the grants.  Nothing in the
statute or Constitution remotely restricts the agency's power to terminate
the grants or re-obligate the funds consistent with federal appropriations
law.  And it cannot possibly be true that the separation of powers blocks an
agency from terminating a grant, no matter the circumstances, after expiry
of the original appropriation.  Nor can plaintiffs argue that EPA usurped
legislative power with these terminations.  EPA consistently justified them
based on concerns with how the prior administration had established and
executed the program, not with anything Congress had enacted.  EPA at
that time terminated only the awards that carried those features, not others
funded by the same statutory subsection.  EPA contemporaneously declared
its intention to reallocate the funds, not to return them to Treasury.  And
Congress has since *repealed* the underlying statutory provision.  The
"dismantling" claim thus fails on its own terms.  In all events, if the
government unlawfully fails to spend appropriated funds, the remedy would
be to require the funds to be expended consistent with the statute—not to
reinstate grants to these specific plaintiffs under these specific contractual
instruments, none of which was rooted in or required by statute.

Stripped of these distractions, this is just a contractual dispute over whether EPA's terminations were consistent with the grant terms. That is a question for the Court of Federal Claims, along with the measure of damages if the answer is no. Either way, the district court's injunction reinstating the grants cannot stand, and this Court should therefore vacate it.

## ARGUMENT

### I. Plaintiffs' Claims Fail, Regardless of Their Label.

This case presents a classic contractual dispute. EPA terminated plaintiffs' grants; plaintiffs challenged those terminations as unlawful under the grants' terms and conditions; and the district court enjoined EPA from terminating the grants by concluding that EPA lacked adequate evidence to invoke the grants' termination clause. As the Supreme Court recognized twice just last year, challenges to grant terminations are breach-of-contract claims that must be litigated in the Court of Federal Claims, where the only available remedy is damages. *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2659 (2025) (*NIH*); *Dep't of Educ. v. California*, 604 U.S. 650 (2025) (per curiam). Plaintiffs cannot invoke the APA to seek the equitable relief of specific performance in district court and thereby evade the remedial limits of the Tucker Act.

5

Appearing to recognize as much, plaintiffs barely bother to defend the district court's reasoning, which adopted the arguments they pressed below. Instead, plaintiffs urge that, despite appearances, this is not a contract case at all but an injunction protecting property rights, or enjoining statutory or regulatory violations, or vindicating the separation of powers. None of that pivots them into a viable claim.

### A.     This is a contract case, not a property case.

Plaintiffs' most significant reframing is to argue that this case is not about grant terminations at all, but rather about government interference with property in the Citibank accounts. They now say they "already own the funds" and the injunction thus merely prevents EPA "from seizing private funds," rather than "mandating compliance with any contractual term." Grantees' Br. 2. That is their lead effort to avoid the Tucker Act. Grantees' Br. 23-24, 28. But this argument mischaracterizes their own lawsuit and the injunction they secured, and it puts the cart before the horse.

Plaintiffs sued to challenge EPA's termination of their grants. Their amended complaint alleged that "EPA's 'Notice of Termination' was illegal," JA116, and asked the district court to "enjoin EPA from taking actions premised on that illegal termination," JA118. They asserted APA claims

6

captioned "Challenge to Termination" and seeking an injunction against termination of the grants and a declaration that the terminations were unlawful. JA159-62; JA1543-48. Plaintiffs then sought a preliminary injunction, arguing that, "under the terms of the grant and applicable regulations, EPA can terminate a grant *only*" under specified conditions, none of which was "satisfied." JA299; *see also* JA326 ("The Terms and Conditions governing Plaintiffs' grants limit EPA *only* to three possible grounds for termination … ."); JA1279 (similar). It is thus clear from the record that plaintiffs sought an injunction to stop EPA from terminating their grant awards—not to protect "property" that they purported to own regardless of whether the grants had been terminated.

The district court issued a preliminary injunction to that effect. The court understood plaintiffs to be seeking "vacatur of the termination letters" and "a determination of whether EPA acted in accordance with the law such that the grants were indeed lawfully terminated." JA985. And the court concluded that plaintiffs were likely to succeed on their APA claims because, in the court's view, EPA offered only "generalized and unsubstantiated reasons for termination," and never proffered "adequate evidence" sufficient to invoke the "three possible grounds for termination" set forth in "the

7

Terms and Conditions governing the grant award." JA993 (quotation marks omitted); *see also* JA994 (holding that, as a regulatory matter, EPA was only permitted to terminate "pursuant to the terms and conditions of the federal award"). The court accordingly enjoined the government "from effectuating EPA's March 11, 2025 'Notice of Termination'" and further from "unlawfully suspending or terminating Plaintiffs' grant awards … except as permitted by" "the grant award" and other "applicable law." JA961-62.[1]

In short, plaintiffs challenged—and the district court enjoined—EPA's termination of the grants. They did not argue—and the court did not hold—that the Citibank funds belonged to plaintiffs regardless of whether the grants were terminated. If anything, plaintiffs suggested just the opposite by asking the court to enjoin "actions premised on that illegal termination, including directing Citibank to withhold funds." JA118. Who would own the funds, they thus recognized, would depend on whether the terminations were effective. To the extent that the injunction had the effect of preserving plaintiffs' access to the grant funds, that was only a downstream consequence of enjoining the terminations.

---

[1] The district court also enjoined EPA from "unlawfully suspending" the grant awards, JA962, but the earlier suspension was mooted by EPA's subsequent termination of the grants.

8

Plaintiffs nonetheless now insist "the money disbursed to Plaintiffs' Citibank accounts in 2024 already belongs to Plaintiffs." Grantees' Br. 23. It is unclear what they mean by that. If plaintiffs mean that they are entitled to assume that the grant was not properly terminated, they have essentially assumed away the entire case. Again, if plaintiffs believe the government has unlawfully terminated their grant, they may bring a Tucker Act action in the Court of Federal Claims and seek to recover damages. But they cannot ask a district court to rule that EPA unlawfully terminated the contract and then grant specific performance on that basis. Congress did not contemplate actions against the government for specific performance of contracts, and a central purpose of channeling contract claims into the Tucker Act paradigm is to "prevent government contractors from avoiding this remedy restriction." *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 80 (D.C. Cir. 1985).[2] While plaintiffs suggest the injunction here did not order specific performance because, they claim, EPA had already "disbursed" the grant

---

[2] Because plaintiffs' claims sound in contract, their argument that there is no "money-mandating" requirement sufficient to ground Tucker Act jurisdiction (Grantees' Br. 22) is misdirected. *Ontario Power Generation, Inc. v. United States*, 369 F.3d 1298, 1301 (Fed. Cir. 2004)*; Son Broad., Inc. v. United States*, 42 Fed. Cl. 532, 535 (1998) (recognizing that a contract can provide a "specific source of substantive law … mandating compensation by the Federal Government" (quotation marks omitted)).

funds (State Banks' Br. 21), placing the awards into accounts at Citibank was not the end of EPA's obligations under the awards. EPA must also, among other things, approve grantees' requests for withdrawals from the Citibank accounts exceeding certain amounts. JA562. By enjoining the terminations, the order below compels EPA to perpetuate the contractual relationship and to undertake those contractual duties. That is specific performance. *See Sustainability Inst. v. Trump*, No. 25-1575, 2026 WL 157120, *7 (4th Cir. 2026) (concluding there is "no meaningful distinction" between declaring termination of grants unlawful and specific performance).

Alternatively, plaintiffs could mean that they are entitled to keep the billions of dollars in the Citibank accounts even if their grants remain terminated. That would be a surprising and highly implausible assertion: as plaintiffs admit, the funds remain governed by, and can only be expended pursuant to, the contracts. Grantees' Br. 8. Indeed, any disbursement must be "necessary to execute against the EPA-approved workplan." JA651 (cleaned up). And the contracts expressly contemplate that EPA "must" rescind the funds for any grants it terminates. JA552. It simply cannot be that a termination of the grants based on, say, criminal embezzlement, would still leave plaintiffs holding $20 billion in federal funds.

10

Regardless, as set forth above, plaintiffs challenged (and the district court enjoined) termination of the contracts, which is antecedent to any dispute over who retains the unspent award funds after a termination. The latter question is not even ripe: EPA has not purported to claw back any funds. Rather, the termination letters merely instructed plaintiffs to cease further program expenditures; to provide a comprehensive final financial and programmatic report; and to comply with applicable close-out procedures. JA1198. Any dispute over the Citibank funds would arise only in connection with those close-out reconciliations, which have not yet occurred because of the district court's injunction.

For that reason, *Land v. Dollar*, 330 U.S. 731 (1947), is inapposite. In that case, the plaintiffs asserted that government officials were holding their property without authority; the government, in response, claimed to have rightfully assumed title under a fully executed contract; the plaintiffs then challenged the legality of the contract and the government's interpretation of it. *See id.* at 739. That was a property dispute where the government was invoking a contract as justification for assuming title. Here, by contrast, plaintiffs alleged that EPA had wrongfully terminated their contracts, and the district court enjoined that contractual action. The Supreme Court

11

subsequently made clear that the reasoning of *Land* did not extend to circumstances like these, where plaintiffs are trying to enforce contractual rights. *See Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 696-703, 703 & n.27 (1949); EPA Br. 52-54.

If plaintiffs wish to make the implausible argument that they are entitled to retain the billions of unspent grant dollars despite the termination of their grants, they can do so in the appropriate forum, following vacatur of the injunction and effectuation of the terminations. For present purposes, the relevant point is that plaintiffs' attempts to recharacterize this case cannot support the injunction that the district court entered: again, one that operated against the grant terminations and was premised on the conclusion that EPA had unlawfully terminated the grants. That is a contract issue, and a contract remedy, that the district court had no power to resolve or award.

### B. Plaintiffs' regulatory claim is derivative of their contract claim and therefore also precluded.

Plaintiffs' second move is to frame their claims as regulatory ones, and so within the ordinary scope of the APA. The problem, however, is that these regulatory claims are not *independent* of the alleged breach of contract; they are *derivative* of it. The source of rights thus remains contractual, and the Tucker Act remains applicable, as this Court has long recognized.

12

Plaintiffs point to 2 C.F.R. § 200.340(a)(4), Grantees' Br. 7-8, 46-47, which states that an agency may terminate an award "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities."  As plaintiffs see it, this provision means EPA was not permitted by regulation to terminate their grants, because their awards supposedly did not "clearly and unambiguously" include such language in their termination provisions.  Grantees' Br. 46 (quotation marks omitted); *accord* JA994 (district court holding that EPA "can only terminate a federal award on this basis pursuant to the terms and conditions of the federal award").[3]

Plaintiffs' reliance on 2 C.F.R. § 200.340(a)(4) thus adds nothing to their argument that termination was not authorized under the terms of the contract itself.  If the termination was contractually permissible, then it was not a violation of the regulations; it was only a violation of the regulations if it

---

[3] In fact, the original awards *did* provide for termination on these grounds, by incorporating EPA's then-extant General Terms and Conditions. JA551-52; *see also* EPA Br. 6-7.  Only a later amendment—made without valid consideration, under highly dubious circumstances—purported to strip that right from EPA.  But such disputes over contract interpretation are for the Court of Federal Claims to address in the first instance.

13

exceeded the "terms and conditions" of the award.  In other words, the regulatory violation is wholly derivative of the contract claim.

This Court held long ago, in *Ingersoll-Rand*, that this sort of derivative regulatory claim is impliedly precluded by the Tucker Act.  *Ingersoll-Rand* involved a nearly identical allegation of a regulatory violation—namely, that the government's decision to terminate a contract violated a regulation allowing for termination to the same extent as allowed by the contract's termination clause.  780 F.2d at 77-78.  This Court held that the fact that a breach-of-contract claim may *also* constitute a breach of regulations "does not transform the action into one based solely on those regulations."  *Id.* at 78.  Otherwise, "Congress' intent to limit contract remedies against the government to damages in the Claims Court would be effectively circumvented."  *Id.* (quotation marks omitted).  The proper question is not whether a plaintiff alleges violation of a regulation, but whether that claim is essentially contractual.  The claims here plainly fit that bill.

Plaintiffs dismiss *Ingersoll-Rand*'s clear application to this case, but their attempted factual distinctions are irrelevant to the court's reasoning.  *See* Grantees' Br. 26-27.  Instead, they overread this Court's decision in *Sharp v. Weinberger*, 798 F.2d 1521 (D.C. Cir. 1986).  As we explained in our

14

opening brief (at 34-35), the claims that *Sharp* allowed to proceed were

independent of any contract claim.  For example, the plaintiff alleged "that

reassigning reservists because they are federal judges is prohibited by 5

U.S.C. § 5534 (1982), which permits reservists to accept civilian employment

from the federal government."  *Sharp*, 798 F.2d at 1523.  That claim would

exist even if no contract was ever formed, and so the court reasoned that

such a claim could proceed in district court.  *See id.*  The same is not true

here.  Instead, to the extent that any aspect of *Sharp* is relevant here, it is

this Court's holding that the district court lacked jurisdiction over the

plaintiff's claim "that appellees were contractually committed to retain

appellant in the Ready Reserve until August 31, 1986 under the terms of a

Ready Reserve Service Agreement."  *Id.*[4]

Plaintiffs fare no better in relying on 2 C.F.R. § 200.341(a).  Grantees'

Br. 26, 46.  Under that regulation, which was incorporated into the grant

agreements (JA552), EPA must provide "written notice of termination to the

recipient" that "include[s] the reasons for termination, the effective date, and

---

[4] As plaintiffs point out, *Sharp* also involved a due process claim in
which the protected property interest was alleged to be the contractual right;
that part of *Sharp* has no evident analog here, as the district court did not
rule on plaintiffs' due process claim and so it is not part of this appeal.

15

the portion of the Federal award to be terminated," 2 C.F.R. § 200.341(a). Here, EPA indisputably provided such written notice of the terminations, which explained that they were "based on substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse," as well as concerns that the contractual scheme lacked sufficient provisions to ensure that the government maintained adequate control over the program. JA1197-98. Plaintiffs may disagree with those conclusions (State Banks' Br. 26, 36-37), but that does not amount to a violation of this regulation, and plaintiffs cannot smuggle their substantive dispute about the termination of the contract into a procedural regulation that EPA plainly complied with.

### C. The APA does not impose reasoned-decisionmaking requirements on contractual actions.

Plaintiffs' argument that EPA's decision to terminate the grants was arbitrary and capricious under the APA (Grantees' Br. 43-46; State Banks' Br. 26-28) runs headlong into the Supreme Court's recent decisions in this area, as well as this Court's precedents. *See supra* p. 5; EPA Br. 26-34. And for good reason—allowing plaintiffs to obtain APA review by casting their breach-of-contract claims as arbitrary-and-capricious claims would create an end-run around the Tucker Act. *See Match-E-Be-Nash-She-Wish Band of*

16

*Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012).  After all, it is "hard to conceive of a claim falling no matter how squarely within the Tucker Act which could not be urged to involve as well agency error subject to review under the APA."  *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 n.34 (D.C. Cir. 1982) (quoting *Int'l Eng'g Co. v. Richardson*, 512 F.2d 573, 580 (D.C. Cir. 1975)).  APA claims asserting that a contract breach or termination was arbitrary or capricious are therefore precluded.

More generally, layering reasoned-decisionmaking requirements on top of contractual obligations makes no sense.  If a contract requires good cause to terminate, for example, then a party can bring a breach-of-contract claim in the Court of Federal Claims alleging absence of good cause; there is no utility in a separate, overlapping APA claim alleging failure to explain the good cause.  And if a contract is terminable for any reason or no reason at all, the APA should not impose an additional explanation obligation.  Simply put, the APA has nothing to say about government compliance with contractual obligations beyond what is already required by the contract's terms and conditions.

Plaintiffs seek to sidestep the Tucker Act by contending that they are "not bringing APA challenges to isolated grant-termination decisions," but

17

rather to EPA's alleged "dismantling" of the NCIF and CCIA programs. Grantees' Br. 25. As explained below, *see infra* Part I.D, the contract terminations at issue here did not effectuate a "dismantling," and so this argument fails on its own terms; until Congress itself repealed the statute, EPA had consistently stated that it would reassess and reobligate the funds. EPA merely terminated eight contracts, and there is no APA obligation to explain those terminations, either on an individual basis or collectively.

Moreover, plaintiffs are once again failing to come to grips with the preliminary injunction that the district court entered. The court did not prohibit the government from "dismantling" any federal program, or require EPA to reconstruct a program. Nor did the court remand to the agency to provide additional explanation for its actions, which would be the appropriate remedy for insufficient agency reasoning. *See FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 587 (2025) ("[T]he better course when an agency error is identified is for the reviewing court, except in rare circumstances, to remand to the agency for additional investigation or explanation[.]" (quotation marks omitted)). Instead, the court invalidated the grant terminations for these particular plaintiffs.

18

For this reason, plaintiffs are misguided in their reliance on Justice Barrett's concurrence in *NIH*. That concurrence merely acknowledged that a district court has jurisdiction to adjudicate claims seeking prospective relief against guidance documents outlining an agency's funding priorities. *NIH*, 145 S. Ct. at 2661 (Barrett, J., concurring). At the same time, Justice Barrett correctly recognized that "[v]acating the guidance does not reinstate terminated grants." *Id.* That is why the Supreme Court nonetheless stayed the portion of the district court's judgment that had set aside grant terminations: Even if plaintiffs had challenged an unlawful policy rather than an individual grant termination, the district court would still lack authority under the APA to invalidate individual grant terminations that flowed from the allegedly unlawful policy. *See id.* The preliminary injunction at issue here therefore cannot stand, even apart from the fact that, as discussed below, plaintiffs' assertion that EPA has impermissibly dismantled a federal program is entirely without merit.

### D.    Plaintiffs have no viable separation-of-powers claim.

In another effort to evade the Tucker Act, plaintiffs argue that because the IRA contemplated that EPA would obligate these funds by September 30, 2024, EPA's terminations after that date violate the statute's commands

and offend the separation of powers.  Grantees' Br. 35-36.[5]  That theory would not justify the contractual relief that plaintiffs sought and obtained, and in any event is both factually unsupported and legally flawed.

To start, the remedy for a constitutional claim (or an APA claim) that challenges an alleged dismantling of a statutory program would be an order to restore the program on the terms Congress enacted, subject to all of the discretion that Congress vested in the agency—not to reinstate particular grants under that program.  In the since-repealed statute here, Congress "appropriated" funds for EPA "to make grants" for certain purposes.  42 U.S.C. § 7434(a) (2024).  The statute defined the kinds of entities eligible for funding, but did not identify plaintiffs in particular as beneficiaries.  *Id.* § 7434(b)-(c) (2024).  EPA then exercised its discretion to select plaintiffs (among others) as recipients of the grants and execute grant agreements in the first instance, but none of that was required by the statute.  Accordingly, any order to restore the statutory program could not encompass an order to

---

[5] Plaintiffs devote considerable effort to arguing that these statutory claims should be properly treated as constitutional claims.  Grantees' Br. 36-39.  While that is mistaken, *see Dalton v. Specter*, 511 U.S. 462, 474 (1994); *Sustainability Inst.*, 2026 WL 157120 at *9, the distinction is immaterial here.  The only relevant question is whether plaintiffs bring contract claims or instead have claims premised on another independent source of law, whether statutory or constitutional.

restore particular grants. *See Sustainability Inst.*, 2026 WL 157120 at \*12 (vacating a district court injunction prohibiting termination of individual grants where the appropriations statutes do not require contracts with the plaintiffs specifically).

Putting all of that aside and taking the claim on its own terms, there is no merit to plaintiffs' dismantling theory. As explained, the statute simply appropriated certain funds "to remain available until September 30, 2024, to make grants" to eligible recipients for certain purposes. 42 U.S.C. § 7434(a) (2024). EPA made grants in the full amounts appropriated, and it did so by the statutory deadline.

Plaintiffs' argument is that EPA somehow contravened the statute by terminating some grants upon developing concerns about the structure and integrity of those contracts. But it would be absurd to conclude that, in authorizing EPA to "make grants," 42 U.S.C. § 7434(a) (2024), Congress impliedly forbade EPA from exercising its usual power to terminate grants. *Contra* Grantees' Br. 35-36 ("There was no authority to undo the capitalization of these fund recipients … ."). Otherwise, the termination provisions of the grant agreements would be meaningless. And even plaintiffs do not seriously advance that position; they acknowledge that EPA

21

has *some* authority to terminate grants consistent with the terms and conditions.  Grantees' Br. 7.  Plaintiffs' claims thus once again collapse into their argument that EPA was not entitled to terminate plaintiffs' grants under the particular circumstances here—in other words, that EPA breached its contractual obligations.

Plaintiffs appear to contend that, even if some terminations could be permissible, these were not, ostensibly because EPA was attempting to thwart the statutory scheme and reject Congress's judgment.  But there is no basis for that inference; the record contradicts it at every turn.

EPA consistently explained that its concerns with these grants arose from how the grantees were selected, how the grants were structured, and how the contracts limited EPA's oversight and thus created opportunity for waste, fraud, and abuse.  *See, e.g.*, JA65 (noting "potential fraud and/or conflicts of interest" as well as oversight concerns); JA106 (referring to Inspector General "concerning matters of financial mismanagement, conflicts of interest, and oversight failures within the Greenhouse Gas Reduction Fund"); JA1197-98 (citing similar concerns as basis for termination).  Those are objections to how the last administration implemented the program—not to the congressional judgment undergirding it.  Plaintiffs are of course free

22

to maintain that EPA lacked the contractual authority to terminate for those reasons, but this is not a separation-of-powers problem.

Confirming that EPA's objection was to these grants rather than the statute, EPA only terminated *some* of the grants that were funded by this IRA provision.  Congress appropriated $27 billion, of which $20 billion were attributable to the grants terminated here.  EPA maintained the $7 billion of Solar for All grants, precisely because those contracts did not raise the same concerns as the grants at issue here.[6]

Moreover, EPA contemporaneously committed to re-obligating the funds in a manner consistent with the statute's aims.  That too refutes the notion that EPA intended to dismantle the program.  Although the district court concluded EPA did not mean what it said, an agency's commitment to a federal court cannot be disregarded so easily.  *See Wages & White Lion*, 604 U.S. at 577 (holding that a court's "peel[ing] back the curtain on [an agency's] representation would have required … a strong showing of bad faith or improper behavior" (quotation marks omitted)).  Plaintiffs press a convoluted

---

[6] EPA later terminated the Solar For All grants in accordance with Congress's decision to repeal the statutory provision appropriating funds for these grants.  U.S. EPA, *Greenhouse Gas Reduction Fund*, https://perma.cc/RPD4-DAB2 (last updated Sep. 30, 2025).

response: that even though EPA expressed its intention to re-obligate the funds, it had no authority to do so after the appropriation expired and thus must be tagged with intentionally leaving the funds unexpended.  Once again, that would amount to the implausible contention that EPA cannot terminate grant awards under any circumstances.  Plaintiffs' only response once again returns to a contract claim, alleging that the agreements contemplate that EPA will re-obligate funds to other grantees within the program in the event of a termination.  JA552.  That only proves plaintiffs' error, by confirming that at least some degree of re-obligation would have been permitted, if only to the existing grantees through new contracts that better preserve EPA oversight.  Indeed, even plaintiffs and their *amici* concede that "replacement grants" of some sort would have been permissible.  *See* Grantees' Br. 41; Natural Resources Defense Council Br. 3.

For all of these reasons, plaintiffs are wrong to compare this case to *In re Aiken County*, 725 F.3d 255 (D.C. Cir. 2013), or *Train v. City of New York*, 420 U.S. 35 (1975).  Grantees' Br. 39.  Those cases concerned situations in which agencies failed to comply with a statute's appropriation requirements in the first instance, and indeed insisted they did not have to comply.  Here, by contrast, the agency issued grants by the statute's appropriation deadline,

24

later terminated some of those grants based on reasonable concerns about how those grants were executed, and expressed an intention to re-obligate the funds to respect Congress's will.

To be sure, the agency never re-obligated the funds, initially because of this injunction and ultimately because Congress repealed the statutory provision under which the program was established and rescinded associated unobligated funds.  Whatever effect that repeal may or may not have had on existing grants (*cf.* Grantees' Br. 42), EPA cannot now re-obligate the funds to support a program that no longer exists.  And that makes plaintiffs' separation-of-powers theory even more untenable.  *See* EPA Br. 15-16, 48-49. Indeed, Congress's decision to rescind these funds lends credence to EPA's serious concerns regarding how these grants were structured and executed by the prior administration.  It would defy rather than vindicate separation-of-powers principles to require EPA to reinstate grants for a program that Congress repealed and made clear it no longer wishes to fund.

### E.    None of plaintiffs' other evasions succeed.

Finally, plaintiffs advance a pair of other arguments to avoid the Tucker Act and defend the injunction, but neither succeeds.

*First*, plaintiffs make the surprising argument that they are suing agency officials for acting "beyond the scope of their statutory authority," and so can proceed without a waiver of sovereign immunity. Grantees' Br. 32-33 (quotation marks omitted). But plaintiffs admit they still must rely on the "explicit cause of action in the APA." Grantees' Br. 34. And the APA's implied-preclusion carveout (that "[n]othing herein … confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought") appears in the same provision in which Congress provided that persons aggrieved by agency action are "entitled to judicial review thereof." 5 U.S.C. § 702. There is thus no merit to plaintiffs' view that they can avail themselves of the APA's right of action without regard to that limitation. (And they do not even try to satisfy the demanding standard for nonstatutory review. *See* Grantees' Br. 33-34.)

*Second*, the subgrantee-plaintiffs argue that because they do not have any contract with EPA and may not be able to sue in the Court of Federal Claims, that somehow negates the contractual nature of their claims. State Banks' Br. 22. That argument misconstrues the relevant question here, which is whether the subgrantees' claims are in essence contractual. The answer is obviously yes: The subgrantee-plaintiffs' claims are entirely

26

derivative of the grantees' asserted right to receive grant funds pursuant to the agreements. Thus, the subgrantees-plaintiffs' claims sound in contract and are subject to the same limitations of the Tucker Act.

That remains true even if the subgrantees are ultimately unable to seek relief in the Court of Federal Claims. It is well established that APA review is impliedly precluded when Congress enacts an alternative remedial scheme, even if that scheme limits the parties who can seek relief. *See Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345-47, 349 (1984) (declining APA review over challenge to Agricultural Marketing Agreement Act of 1937 because, by limiting challenges to the Act to a particular class of plaintiffs, the Act "impliedly precluded" judicial review over similar challenges by those outside the class); *Glob. Health Council v. Trump*, 153 F.4th 1, 18-20 (D.C. Cir. 2025) (holding that the Impoundment Control Act, which contemplates claims by Comptroller General, impliedly precludes APA claims by private plaintiffs), *reh'g en banc denied*, Order (Aug. 28, 2025).

Here, Congress through the Tucker Act created a review scheme for contracting parties to bring contract claims. If the result of that scheme is that subrecipients like the State Banks here are impliedly precluded from seeking relief in the Court of Federal Claims, that merely reflects Congress's

27

common-sense decision to limit relief for contract claims to the parties to those contracts.  It would be anomalous if the parties to the contract were limited to a Tucker Act action for damages, but nonparties were entitled to injunctive relief under the APA.  *See Thakur v. Trump*, 163 F.4th 1198, 1204 (9th Cir. 2025) (holding that Tucker Act likely precluded claims challenging the government's grant terminations brought by plaintiffs who were indirect beneficiaries of those grants and thus not parties to any contract).

*    *    *

In sum, plaintiffs' attempts to recast contract claims as regulatory, statutory, constitutional, or vesting in some property interest all fail.  Labels aside, the only real claims here sound in contract; there is no way to describe an injunction against termination as anything other than contractual.

## II.    The Equities Overwhelmingly Weigh Against An Injunction.

Absent relief, the grant contracts will be revived against EPA's wishes and plaintiffs will demand that hundreds of millions (if not billions) of taxpayer dollars will be quickly disbursed with no means for EPA to recoup them.  Given that plaintiffs do not dispute that EPA is unlikely to ever recover funds disbursed from the Citibank accounts, the equities weigh sharply against an injunction.  *NIH*, 145 S. Ct. at 2659 (recognizing

28

irreparable harm where "plaintiffs d[id] not state that they w[ould] repay grant money if the Government ultimately prevails"); *California*, 604 U.S. at 651-52 (similar).

Plaintiffs do not even try to argue otherwise. Instead, they claim this is not a cognizable harm because, in their view, the funds already belong to them. For reasons discussed above, that either assumes that plaintiffs are correct on the merits (if they mean the grant terminations were unlawful and can be enjoined) or rests on an astounding assertion that no court has ever endorsed and that flies in the face of both the plain terms of the awards and common sense (if they mean they would be entitled to keep $20 billion in grant funds despite termination of the grants). *See supra* pp. 8-10.

Plaintiffs also attempt to undermine the government's irreparable harm as "simply … carrying out Congress's directives." Grantees' Br. 52. That argument did not work in *California*, 604 U.S. at 651-52; it did not work in *NIH*, 145 S. Ct. at 2659; and it does not work here. As discussed above, Congress never committed funding to these or any specific plaintiffs. Rather, Congress delegated to EPA the authority to administer the grant programs, and EPA determined that new arrangements were needed for two of the three programs funded by the IRA subsection. In any event, by

29

repealing the relevant statutory provisions, Congress has since made clear that it no longer is committed to this program, and that strongly reinforces the public interest in vacating this injunction.

On the other side of the balance, while plaintiffs may incur monetary losses absent an injunction, those harms are remediable.  Plaintiffs admit that they can recoup already-committed funds during the close-out process, Grantees' Br. 52 n.13, which EPA stands ready to undertake expeditiously. As for any additional damages—reliance costs, loss in funding due to EPA's alleged breach, and so forth—plaintiffs can seek to remedy those harms through money damages in the Court of Federal Claims, if they establish a breach of the contract.

## CONCLUSION

For the foregoing reasons, this Court should vacate the district court's preliminary injunction.

Respectfully submitted,

BRETT A. SHUMATE
   *Assistant Attorney General*

YAAKOV M. ROTH
   *Principal Deputy Assistant*
   *Attorney General*

DANIEL TENNY

 */s/ Sophia Shams*
SOPHIA SHAMS
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7213*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 514-2496*

February 2026

31

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,285 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in CenturyExpd BT 14-point font, a proportionally spaced typeface.

*/s/ Sophia Shams*
Sophia Shams

## CERTIFICATE OF SERVICE

I hereby certify that on February 17, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system.

*/s/ Sophia Shams*
Sophia Shams